Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

Paul B. Mello, State Bar No. 179755
Samantha D. Wolff, State Bar No. 240280
Laurel E. O'Connor, State Bar No. 305478
David C. Casarrubias, State Bar No. 321994
Hanson Bridgett LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
Attorneys for Defendants

Roman M. Silberfeld, State Bar No. 62783
Glenn A. Danas, State Bar No. 270317
Robins Kaplan LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
Special Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' SUBMISSION OF DOCUMENTS REFERENCED IN JULY 30, 2021 MINUTE ORDER (ECF NO. 7255)** |

On August 3, 2021, the Court granted Defendants' request to file the two communications referenced in the Court's July 30, 2021 minute order. (ECF No. 7260.)

//

//

1    Attached as Exhibit A is a copy of a July 23, 2021 e-mail to the Special Master concerning

2  staffing experts.  Attached as Exhibit B is a copy of a July 26, 2021 e-mail (with attachments) to

3  the Special Master concerning continuous-quality-improvement rounding by Defendants.

4   Dated: August 3, 2021                    Respectfully submitted,

5                                             ROB BONTA
                                             Attorney General of California
6                                             DAMON MCCLAIN
                                             Supervising Deputy Attorney General
7

8                                            /S/ ELISE OWENS THORN
                                             Elise Owens Thorn
9                                             Deputy Attorney General
                                             *Attorneys for Defendants*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# EXHIBIT A

| From: | Samantha Wolff |
|---|---|
| To: | Lopes Matthew; Walsh Kerry F.; Jones Mohamedu; Steven Fama; Lisa Ells; Michael W. Bien; Ernest Galvan; ColemanTeam-RBGOnly@rbgg.com |
| Cc: | Paul B. Mello; Damon McClain; Elise Thorn; Namrata Kotwani; v_Melissa.Bentz@cdcr.ca.gov; v_Nicholas.Weber@cdcr.ca.gov; Thind, Sundeep@CDCR; v_dillon.hockerson@cdcr.ca.gov; Laurel E. O"Connor; David C. Casarrubias |
| Subject: | Coleman - Staffing Expert Tours |
| Date: | Friday, July 23, 2021 3:56:24 PM |

Dear Special Master Lopes and Plaintiffs' Counsel:

As reported to the Court last fall, Defendants retained experts to "conduct a comprehensive study on the CDCR 2009 Mental Health Staffing Plan ("2009 Staffing Plan"), the relationship between the 2009 Staffing Plan to general requirements of the Coleman Program Guide, and whether changes in circumstances since development of the 2009 Staffing Plan, including but not limited to changes in population levels at various levels of care, technology, the use of telepsychiatry, the use of PNPs, etc., warrant modifications to the 2009 Staffing Plan," or alternatives for discharging CDCR's staffing obligations. (ECF No. 6855-1 at 1:23-2:2.) As Defendants noted in the Declaration of James Robertson, ECF No. 6855-1, Defendants' staffing experts anticipated conducting facility tours and expected such tours to last 4 weeks. (*Id.* at 4:16-25.)

As a courtesy, and in furtherance of their ongoing efforts to be transparent, Defendants write today to inform you that Defendants' staffing experts will shortly begin facility tours and a review of patient records. The facility tours will begin on August 17, 2021 (the full schedule of facility tours is below). Please note that the current schedule, while final, is of course subject to change. Defendants also write to invite one member each from Plaintiffs' counsel and the Office of the Special Master (OSM) to attend each facility tour, though Plaintiffs' counsel and the OSM may, of course, decline to attend all or some of the tours (Defendants will only be sending one attorney to attend each tour). Defendants' staffing experts will not be interviewing any class members during their scheduled tours.

Site Tour Week #1:
Aug. 17 – SAC
Aug. 18 – MCSP
Aug. 19 – CCWF

Site Tour Week #2:
Aug. 31 – SQ
Sept. 1 – CHCF
Sept. 2 – CMF

Site Tour Week #3:
Sept. 14 – CMC
Sept. 15 – SVSP
Sept. 16 – CTF

Site Tour Week #4:

Sept. 21 – NKSP
Sept. 22 – COR
Sept. 23 – SATF

Site Tour Week #5:
Sept. 28 – LAC
Sept. 29 – CIW
Sept. 30 - RJD

Regards,
Sam

---

**Samantha Wolff**
**Partner**
Hanson Bridgett LLP
(415) 995-5020 Direct
(415) 995-3547 Fax
swolff@hansonbridgett.com



---

This communication, including any attachments, is confidential and may be protected by privilege. If you are not the intended recipient, any use, dissemination, distr bution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or email, and permanently delete all copies, electronic or other, you may have.

The foregoing applies even if this notice is embedded in a message that is forwarded or attached.

# EXHIBIT B

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Matty Lopes (mlopes@pldolaw.com); Mohamedu Jones (mjones@pldolaw.com); Kerry Walsh (kwalsh@pldolaw.com); Coleman Team - RBG Only; "Steve Fama" |
| **Cc:** | Paul B. Mello; Samantha Wolff; Laurel E. O"Connor; David C. Casarrubias; Elise Thorn; Damon McClain; Namrata Kotwani; Neill, Jennifer@CDCR; Stafford, Carrie@CDCR; Hockerson, Dillon@CDCR; Weber, Nicholas@CDCR; Thind, Sundeep@CDCR |
| **Subject:** | Coleman: CQI Tours in 2022 and CQI Guidebook |
| **Date:** | Monday, July 26, 2021 4:31:23 PM |
| **Attachments:** | MCB-ML and Ps re CQI Tours in 2022- 7.26.21.pdf<br>CQI On Site Audit Guidebook 07.26.21.pdf |

Special Master Lopes and Plaintiffs' counsel:

Attached please find a letter regarding upcoming CQI tours and the revised CQI On-Site Audit Guidebook for your review.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 26, 2021


Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1201 Atwood Avenue
Johnston, RI 02919


*Coleman* Plaintiffs' Counsel
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105


*VIA EMAIL ONLY*


Dear Special Master Lopes and Plaintiffs' Counsel:

As the Court has emphasized in numerous orders, the Continuous Quality Improvement Tool (CQIT) is "a comprehensive tool that, once finalized, defendants will ultimately use as part of a process to 'self-monitor' the key components of the remedy in this action." *See* July 1, 2021 Order, ECF No. 7216 at 2 (citing ECF No. 6846 at 10 (citing ECF No. 5439 at 108)). By allowing CDCR to monitor, identify, and self-correct issues, continuous quality improvement (CQI) is a cornerstone of any successful healthcare delivery system and CDCR's continued efforts to improve patient care, as well as essential to any durable remedy. Given the critical importance of CQI, CDCR feels compelled to begin this important work without further delay.

The Court has also made clear for many years that CQIT is central to moving this case towards resolution. Most recently, in December 2020, the Court ordered Defendants, under the supervision of the Special Master, to update the key indicators in CQIT to reflect any changes required by the 2018 Update to the Program Guide and the Compendium and to file said list within three months. ECF No. 6996 at 11. Defendants timely filed the list of key indicators and Plaintiffs objected. *See* ECFs No. 7089, 7101. At the March 25, 2021 status conference, the Court referred the dispute to the Special Master and ordered that he file a report and recommendations on key CQIT indicators. The Special Master filed that report on May 6, 2021 (ECFs No. 7112, 7151), and both parties filed timely responses. The Court acted on the Special Master's report on July 1, 2021 and issued an order provisionally approving the Special Master's list of key indicators, certain indicators proposed by Plaintiffs' counsel, and struck one indicator that it deemed to be duplicative. ECF No. 7216. The Court also ordered the Special Master to "test and monitor the functionality and efficacy of the indicators on the provisionally approved list during his Twenty-Ninth Monitoring Round" and to "report his findings to the court in his Twenty-Ninth Monitoring Round Report." *Id.* at 14.

It is CDCR's understanding based upon prior conversations with the Special Master and members of his team that they do not intend to employ CDCR's methodology, audit questions, and data when they "test and monitor the functionality and efficacy of the indicators on the provisionally approved list during [the] Twenty-Ninth Monitoring Round." Rather, CDCR understands that the Special Master's team has indicated that it plans to use the provisionally-approved indicators as a list of categories to be monitored during the 29th Monitoring Round. If we are mistaken in this regard please let us know. If, however, we are not mistaken, we are concerned that using the provisional list of key indicators only as monitoring categories —instead of actually looking at the functionality and efficacy of the indicators themselves—would not provide the Special Master or the parties with the feedback needed to gauge the functionality and efficacy of the CQI indicators, identify issues with the tool (the CQIT), and expeditiously move CQI toward completion and ultimate implementation.

CQI was developed by CDCR to conduct self-monitoring and includes audit questions, methodologies, and current indicators that measure various items. The best way to appropriately test and evaluate the functionality and efficacy of the provisionally-approved indicators is for CDCR to use CQI, including CDCR's guidebook and methodology which were key to the development of CQI. Historically, CDCR has conducted test runs of CQIT, observed by Plaintiffs' counsel and the Special Master, in order to solicit feedback and improve the tool and CQI process.[1] While the Special Master's plan to use the key indicators as a list of monitoring categories during the 29th Monitoring Round might help define the scope of what CQI should ultimately monitor, it will miss an opportunity to test and evaluate methodology and on-site audit questions, leaving unresolved those issues as well as the timing of reports, and the review and assessment of the institutional and statewide roll-up report. For these reasons, CDCR believes that it is imperative that it begin to test CQI and the CQIT. As a result, and with an eye toward moving this important management tool forward and improving the mental health program, we are preparing to conduct CQI tours at eight institutions in the spring of 2022. It is CDCR's hope and expectation that the results of these initial tours will help CDCR further develop and refine CDCR's self-monitoring capability, including improving the thorough and comprehensive on-site monitoring, producing reports in a timely manner, and providing quick feedback to the institutions to help improve patient care. CDCR looks forward to identifying areas and practices that are working well in addition to any gaps, deficiencies, and opportunities for improvement. We invite Plaintiffs' counsel and the Special Master to observe CDCR's tours so there will be a common understanding of the methodology, audit questions, and tour practices employed by CDCR. We also appreciate the ability to have real-time discussions on-site regarding how to improve CQIT and patient care.

There are several steps that CDCR must complete before tours start in the spring. Initially, CDCR must update the CQI Guidebook that details the information that must be collected on-site for the CQI audits. The most recent version of the CQI Guidebook is attached for your review.[2] CDCR has worked with the Special Master and Plaintiffs' counsel on the CQI Guidebook since its inception. *See* ECF No. 7151 at 10. The track changes show all changes from the last version

---

[1] CDCR conducted test runs of CQI in 2013, 2014, and 2016. *See* ECF No. 7151 at 9-13. CDCR also conducted ten CQI tours in 2018; however, reports for those tours were never produced due to the release of the Golding Report.

[2] It is our understanding that the Special Master's team was awaiting the Court's action on the list of Key Indicators before providing comments or feedback on the CQI Guidebook. Now that the Court has provisionally approved a list of Key Indicators, we look forward to receiving the Special Master's feedback on the CQI Guidebook.

provided to Plaintiffs' counsel and the Special Master team in October 2018. The majority of the proposed revisions align the audit questions with current policy and update the ASU-EOP and PSU-Hub indicators to align with revisions suggested by the Special Master's team as part of the ASU-EOP Hub Certification workgroup. At this time, CDCR is not adding any additional or new indicators. However, CDCR anticipates having discussions with the Special Master and Plaintiffs' counsel regarding the placeholder indicators and new indicators that were provisionally approved by the Court as key indicators during the remainder of the 29th Round and the CQI tours.

A concern has been expressed about conducting CQI tours before full validation of all of the data used in CQIT. CDCR's goal in conducting the CQI tours in spring 2022 is to move CQIT forward and reach agreement on questions for the on-site audits, institutional reports, the statewide roll-up report, and other functional parts of CQI. Completion of data validation is not necessary to commence this important work. In fact, to delay any implementation of CQI until after all data has been fully validated would delay this important process, squander an opportunity to improve and move CQIT toward completion, and deny Defendants the ability to finalize other parts of the tool and process until a much later date.

We look forward to commencing CQI tours in the spring of 2022 and continuing discussions on the provisional list of key indicators and your feedback on the CQI tours. Please provide any comments on the proposed revisions in the CQI Guidebook by August 16, 2021, so that CDCR can finalize the CQI Guidebook and prepare for the upcoming tours. CDCR will provide a schedule for the anticipated CQI tours in the coming weeks.

Respectfully,

/s/ Melissa C. Bentz

Melissa C. Bentz
Attorney
Office of Legal Affairs
California Department of Corrections and Rehabilitation

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

# Continuous Quality Improvement

## On Site Audit Guidebook

**6/30/2021**

# Table of Contents

## Contents

Scheduling Your Visit ............................................................................................................5

   Coordinating Your Visit .....................................................................................................5

   Creating the Schedule .......................................................................................................5

Preparing for Your Visit .........................................................................................................8

   Data Review ......................................................................................................................8

   Computer/Tool Updating ..................................................................................................8

   Pre-Visit Call .....................................................................................................................8

What to Do Upon Arrival .......................................................................................................8

   Check In-Meeting ..............................................................................................................8

   Document Binders .............................................................................................................9

Mental Health Audit Instructions ........................................................................................10

   Preface ...........................................................................................................................10

   Treatment Space [RC, ML CCCMS, ML EOP, ASU,  PSU, LTRH, STRH, Condemned] .............10

   IDTT Observation [ML CCCMS, ML EOP, MHCB, ASU, PSU, LTRH, STRH, Condemned] ..........12

   Patient Interviews [RC, ML CCCMS, EOP, ASU, PSU,  LTRH, STRH, Desert Institutions, RC EOP] First Steps: Logistics .................................................................................................................16

   Group Treatment Observation [ML EOP, ASU, ASU EOP Hub,  PSU, LTRH, STRH, RC EOP, Condemned] .................................................................................................................................23

   Group Wait List [CCCMS] ................................................................................................24

   Morning Meeting Observation [ASU, ASU EOP HUB, PSU, LTRH, STRH] ............................24

   Primary Clinician/Psychiatric Technician (PT) Rounds .....................................................24

   ICC Observation [ASU, PSU, LTRH, STRH,  Condemned] ...................................................26

   High Refusers [ASU EOP and PSU] ..................................................................................27

   ASU Intake Screening [ASU Screen Questionnaire MH -7709] ..........................................28

   Cell Cleanliness [MHCB, Alternative Housing] .................................................................28

   Clinical Restraint [MHCB] ...............................................................................................28

   Limited Issue Observation [MHCB] ..................................................................................29

   Nursing Rounds [MHCB] .................................................................................................30

   Alternative Housing Location(s) and Watch Requirements ...............................................31

2

Mental Health Confidential Screening [RC] ............................................................... 31

R&R Screen ............................................................................................................ 32 31

Staff Interview ...................................................................................................... 32

Five Day Follow-Up Assessment ........................................................................... 32

Medication Management ...................................................................................... 33

Overall Area Rating .............................................................................................. 34

Annual IST Suicide Prevention Training ................................................................ 34

Cardiopulmonary Resuscitation (CPR) Training ................................................... 35

Suicide Risk Evaluation Training ........................................................................... 35

Custody Audit Instructions ........................................................................................ 36

Therapeutic Treatment Module Standards ........................................................... 36

Mechanical Restraint Documentation [MHCB] ..................................................... 36

Treatment Module Use Observation [MHCB] ....................................................... 37

Welfare Checks [ASU/STRH/STRH RC/LTRH/PSU/Condemned] ............................. 37

Out of Cell Time and Showers [ASU, ASU EOP Hub, PSU, Condemned] ................. 38 37

ICC Timelines [ASU/STRH/STRH RC] ..................................................................... 39 38

Intake Procedures [ASU/STRH/STRH RC] .............................................................. 39 38

Entertainment Appliances [ASU, ASU EOP Hub, STRH] ......................................... 39 38

Unclothed Body Search [ASU EOP HUB and PSU] ................................................. 40 39

Out of Cell Time and Showers [STRH RC, Female STRH/LTRH, Male LTRH] ............ 40 39

Out of Cell Time and Showers [STRH Male] .......................................................... 41 39

Entertainment Appliances [STRH/LTRH] ............................................................... 42 40

Entertainment Appliances [Condemned] .............................................................. 42 40

MHCB Activities ................................................................................................... 43 41

Custody MH Referral Process [All Housing Units] ................................................. 44 41

Peace Officer CPR Mouth Shield [All Housing Units] ............................................ 44 42

Cut Down Kit [All Housing Units] ......................................................................... 44 42

Heat Risk Thermometer Checks [All Housing Units] .............................................. 45 43

On Site Paperwork – Custody MHCB/Alternative Housing Discharge Follow-Ups .... 46 44

On Site Paperwork – RVRs .................................................................................... 47 45

Custody Training .................................................................................................. 49 47

Phone Calls, Issuance of Property Tracking, & Transfer Timelines for NDS [ASU, ASU EOP hub, STRH, STRH RC and Females] ..................................................................................................... 4947

Use of Force ................................................................................................................................ 5047

Post Visit Instructions .................................................................................................................... 5048

Check-Out Meeting ..................................................................................................................... 5048

Completing your Report ............................................................................................................. 5148

Checking your Data ..................................................................................................................... 5250

Attachments ...................................................................................................................................... 5351

Attachment A – CQI Site Visit Preparation Checklist ...................................................................... 5452

Attachment B – Pre-Scheduled Audit Areas .................................................................................... 5755

Attachment C – Custody Escort Officer Script ................................................................................. 5956

Attachment D – Restraint Checklist ................................................................................................. 6057

Attachment E – Regional Technical Instructions ............................................................................. 6360

Attachment F – Report Writing Outline ........................................................................................... 6461

Attachment G – How to Run the Non-Disciplinary Segregation Report (NDS) in SOMS ................ 6562

Attachment H – CQI Entrance Talking Points ................................................................................... 6865

Attachment I – Case Selection Review Guidelines ........................................................................... 6966

Case Review Selection Guidelines .............................................................................................. 6966

Case Review Writing Guidelines ................................................................................................. 7067

Attachment J – Exit Interview Talking Points ................................................................................... 7067

Mental Health Exit ...................................................................................................................... 7067

Custody Exit – To be presented by the MHCT Regional Lieutenants ........................................ 7168

Attachment K – Security Desks ........................................................................................................ 7370

Attachment L – Treatment Modules and Security Booths ............................................................... 7673

## Scheduling Your Visit

### Coordinating Your Visit

a) Prior to the audit quarter, the Mental Health Regional team will work together to schedule a range of audit date(s).
- Audit dates are not finalized until the Mental Health Regional team coordinates the dates with the institution staff.

b) A Mental Health team member contacts the Chief of Mental Health and CEO of the scheduled facility to determine final audit dates.
- Final dates are determined based upon IDTT, ICC, and group schedules. Ensure that these meetings, in the locations in which you need to observe them, are occurring on the days you are at the institution.

c) Team members will notify all the parties of the final dates.
- The mental health Regional Administrator or designee will notify the custody team member which of the dates they previously agreed upon will be the final visit dates (based upon scheduling of meetings).
- Custody team members will notify the institution's Warden of the visit dates along with expectations for the audit.
  - Expectations are noted in the pre-visit checklist (Attachment A).
  - Other expectations include:
    - The Warden's participation in a check in and checkout meeting.
    - Custody staff are available to escort audit team members upon request.
- The mental health Regional Administrator or designee will notify the CEO and CMH of the final visit dates and provide expectations for the audit.
  - Expectations are noted in the pre-visit checklist (Attachment A).
  - Other expectations include:
    - Staff conduct business as usual (do not change group leaders or IDTTs membership for the audit).
    - CEO and CMH participation in the check in and checkout meeting.
    - Adherence to schedules (ICC, IDTT, groups, patient survey).
    - Staff available to escort audit team members.

### Creating the Schedule

a) At least two weeks prior to your scheduled visit, the Mental Health Regional analyst will request the name of a local contact that has access to facility scheduling information.
- Ongoing communication with this liaison is critical to ensure your visit is well organized and the institution staff knows what is expected.
- Telephone calls are critical to finalizing a schedule that will help ensure your visit goes smoothly.

b) Coordinate with institution designee.
- This is done by the regional analyst.

- o Provide the pre-visit checklist (Attachment A) for the dates you will be visiting the institution, to request:
  - Interdisciplinary Treatment Team (IDTT for all MHSDS patients-ASU, ML EOP, ML CCCMS, MHCB, LTRH, STRH, PSU) schedules;
  - Institutional Classification Committee (ICC) schedules; and
  - ASU, ML EOP, and PSU group therapy schedules.
- o Coordinate the schedule with the institution designee using the IDTT, ICC, and group schedules, and the "prescheduled audit areas" sheet (Attachment B). Ensure all required pre-scheduled meetings/interviews are included in your schedule.
  - Custody team members do not have any pre-scheduled events so the defined schedule is primarily for the clinical team.
  - To avoid excessive walking from one end of the institution to another, ensure the pre-scheduled items are coordinated logistically with the lay-out of the institution.
  - Build in estimated time for non-scheduled audit items (example: Reserve about two hours in your schedule before or after the MHCB IDTT to complete all non-scheduled MHCB items).
  - Include in the schedule all areas where there are no pre-scheduled events. This will help ensure the team remembers to visit all required areas during the visit (example: alternative housing, OHU).
  - Teams can be divided to accommodate scheduling (example: one clinical team member can go to a CCCMS IDTT, while another goes to an EOP IDTT in another yard, and a custody team member is in the ASU).
- c) The Regional Analyst or designee provides the random patient list to the
  - Institution's designee to schedule the patient survey.
    - o Two weeks before the visit:
      - Go to Lifeline Internet site, Click on "Quality Management" (under Divisions), click "Quality Management Portal" (under External Links), click "Mental Health Reports" (under Management Reports), click "Mental Health Reports" (under Reports), select "Random Patient List" enter parameters (see below).
        - ***Example:*** *Mainline EOP (ML EOP) list*
          Enter:
          Sub program - uncheck ASU, LTRH, STRHSHU, and PSU
          Number to select (auto populated)
          Program *Mainline*
          Mental Health Identifier (MHI) *EOP, EOPMod*
          Cell bed (Null)
          Provider *Any*
          Click "View Report"
          ***Example:*** *ASU*
          Sub program *All*

6

Number to select (auto populated)
Program *ASU*
Mental Health Identifier (MHI) *EOP, EOPMod, CCCMS*

- ▪ Export each list to Excel and save.
- ▪ Run the report for ML CCCMS, ML EOP, RC, ASU, ~~LTRH, STRH~~SHU, and PSU programs.
- ▪ Ensure you only run the list for programs offered at the institution.

d) Email the saved excel random patient list(s) to the designee at the institution with the instructions for them to schedule:

- One group of 10 patients in each yard per program (ML CCCMS, ML EOP, RC, ASU, ASU EOP HUB, ~~LTRH, STRH~~SHU, and PSU) as applicable to their institution.
- One group of up to 10 patients at Desert institutions in the MHSDS program. If there are less than 10, then ducat all patients.
- Do not cancel the patient's treatment for them to participate in the patient survey.

e) Email the "escort officer script" (Attachment C) along with the Excel random patient list to the institution designee.

- Ask the designee to provide the script to the officers and request that they use it.
- Contact a custody audit team member and ask that the script is provided to the Warden. Also ask them to request that the Warden provide the script to the officers and use it to explain the purpose of the patient survey to the patients.

f) Remind the institution contact to email electronic copies of the ICF/ACUTE returns list (to both the MH regional contact and the regional LT), SRE mentor program training list, and staffing numbers for clinical staff.

- Call the institution designee one day before your visit to remind them about the custody script. Verify that patients are scheduled for the patient survey and ensure you know about any last minute schedule changes.
- The institution will provide the percentage of all PC and Psychiatrist appointments seen in a confidential setting.
  - ○ Two weeks prior to the visit:
    - ▪ Run the Appointments report in the "On Demand" folder, select institution, MHI, program, subprogram, start/end dates, modality(all), tx category PC or/and Psy, leave all other defaults.
    - ▪ Export each list to Excel. Create a pivot table. Pivot by Modality (Row) and (Values), Housing and LOC (filters).Add a column to the right of the table and label it "Percentage for Standard Confidential", compute the percentage. Create a table for each set of contacts.
- The Regional analyst or designee ensures all attendees and their equipment have been cleared for entrance.
- The Regional analyst or designee ensures a call in line, and invitations are provided to exit meetings. (Refer to attachment M for instructions and list of required attendees).

## Preparing for Your Visit

### Data Review

a) Within one week before your visit:
- Review all data on the performance report from "on demand". This will help inform your visit and prompt you to ask further questions and/or undertake additional investigations.

### Computer/Tool Updating

a) If you receive a notification email from the QM team indicating that there is a new release of the tool, click on the update link which appears as:
Click here to install/update CQIT (this will be emailed to you) to update the tool.
b) Test the update to ensure the tool is working properly.
c) Update patient lists in CQIT - The night or morning before you go – by clicking on "Refresh Files".
d) At the end of every quarter and once you no longer need the audit responses that are stored on your computer, select "clear data" on the home screen of CQIT. This will clear all of the data from your prior quarterly visits and reset your color coding of items (with the exception of patient flags).
- Note that all data must be uploaded to the server before you clear data.
- You can access prior audit data numbers through the following link:
CQIT Audits
- Previously submitted comments are found through this link:
CQIT Comments

### Pre-Visit Call

a) Mental Health and Custody audit team designee should coordinate a pre-visit call with the CEO, Warden, Health Care AW, and CMH the week prior to the visit.
b) All visit expectations will be expressed including:
- Patient Survey script
- Patient Survey ducating and escorts (timely)
- Binder preparation
- Confidentiality of patient survey
- Institution mental health staff not to attend patient survey
- CMH not to attend any observation meeting unless they typically attend

## What to Do Upon Arrival

### Check In-Meeting

a) The first thing that will occur at the start of each visit is a brief "check-in" meeting with, at a minimum, the CEO, CMH, Warden, custody audit team, and mental health audit team.

It is also recommended that facility Captains attend. ( See attachment H for entrance talking points)

b) Warden and CEO/CMH presentations
   - Custody audit team members may ask Wardens to provide any relevant updates regarding their program, mission, etc.
   - Mental Health audit team members may ask CEOs and CMHs to provide any relevant updates regarding their mental health census, populations, and program changes.

c) Custody and Mental Health presentations
   - Both audit teams should provide institution leadership with an overview of the areas in which they will be visiting.
   - At the inception of the visit, the audit teams should inform institutional leadership that the visit is a means to collect data to provide support tools for leadership and their staff.
     - Emphasize that the reports generated from the visit will allow them to use and make decisions about their quality improvement priority areas.
     - Emphasize that the reports generated from the visit will allow them to facilitate change through their own quality management system.
   - Data discussion – A designated mental health audit team member will provide an overview of the data that was reviewed in Step I of "Preparing for Your Visit" in this training guide on the performance report.

A designated custody staff member will review all relevant custody data from the Mental Health Performance report and the CDCR Office of Research site (for welfare check data).

## Document Binders

a) Before you leave the check-in meeting, ask institutional staff for the document binders (one for mental health and one for custody) outlined in the pre-visit checklist (Attachment A) provided by the team members ahead of the visit.
   - The details related to the items that go into these binders are in the pre-visit checklist (Attachment A).

## Mental Health Audit Instructions

### Preface

This guidebook is designed to provide specific audit instructions for every audit included in your Continuous Quality Improvement Tool (CQIT) to improve inter-rater reliability and validity of our audits. Although CQIT covers a great deal of items that shall be reviewed on site, it is also critical that each auditor pay special attention to qualitative items that may not be explicitly written in CQIT. It is critical that all information available (CQIT audit items, other performance report items) are utilized to paint a complete picture on institution performance using your written report.

For example: Performance report reflects high percentage of appointment cancellations (uses EHRS data), patients report they don't get to their appointments on time (CQIT pt survey item), and while on site you notice the MH staff is unorganized and there is a lack of escort officers (not in any formal audit but important to note and include in your report).

Also note that the patient and staff interview questions are predominantly conveyed through report writing. Although patient survey questions are measureable, questions related to unclothed body searches, custody response, timeliness of groups, and yard time offered in restricted units are not reported on the performance report from a patient report perspective; these items are intended to further inform your impression and other data regarding institution performance in these areas.

### Treatment Space [RC, ML CCCMS, ML EOP, ASU, ~~SHU~~, PSU, LTRH, STRH, Condemned]

a) General instructions
   - Respond one time for each treatment room observed.
   - If possible, ask staff about accessibility to each space; otherwise enter the overall response each time you enter data for the space.
   - In the audit sections relating to staff's report of access to space, respond one time for each staff person interviewed.
   - In auditing treatment space, it is not necessary to observe a room in use. Instead, staff may be asked about the size of the space.

10

- If possible, complete the IDTT and group treatment space audits while observing IDTT and group.

b) **Group Treatment Space**

1. Is the group treatment space confidential?
   - Confidential means other patients cannot see or hear the interaction and other staff cannot hear the interaction.

2. Is the space large enough to accommodate chairs for each participant?
   - If you do not respond to this question while observing a group, you may need to ask staff if they usually (more than half of the time) have enough chairs for everyone.

3. Does the space have adequate ventilation and temperature control (not too hot or cold)?
   - Noting that everyone prefers a different room temperature, respond if the room is judged by the auditor to be too "stuffy" or if participants report it is too hot or cold.

c) **Individual Treatment Space**

1. Is the treatment space observed confidential?
   - Confidential means other patients cannot see or hear the interaction and other staff cannot hear the interaction.

2. Is there space enough for two chairs?
   - If you do not respond to this question while observing an individual session, you will need to determine if the space has enough room for two chairs to fit in comfortably.

3. Is the space configured so the space is safe?
   - Examples of unsafe space include:
     - The space is set up so the patient sits by the door, blocking the door from custody being able to get in if there were an emergency (check for possible lay out change).
     - The space is used for storage of items (i.e. broom closet, storage for beds or other items).
     - The space is in a remote area with no custody supervision or proximity to respond in case of an emergency.
     - The space is in an area where an alarm will not work.

4. Is the space well ventilated and temperature controlled (not too hot or cold)?
   - This is more difficult to assess in an individual room with no people using the space. To assess you may:
     - Interview staff and ask about ventilation.
     - Noting that everyone prefers a different room temperature, respond if the room is judged to be too "stuffy".

5. Do staff report that they have access to confidential individual treatment space when needed?
   o Confidential means other patients cannot see or hear the interaction and other staff cannot hear the interaction.

d) **IDTT Treatment Space**
   o Complete this audit while observing the quality of the IDTT

1. Is there enough space for each participant to have a chair?
   o Do not count the audit team. Only determine this by judging if there is enough space for regular institution ~~team~~ IDTT members.

2. Is there a chair for each participant?
   o Do not count the audit team. Only determine this by judging if there is a chair for regular institution IDTT~~team~~ members.
   o This includes the patient having a chair, but the custody escort does not require a chair.

3. Is there a conference table?
   o Some rooms have a small side table in the middle used as a conference table. This is not adequate and does not count as a "yes".

4. Is the space free from unnecessary and distracting noise?
   o Some examples of unnecessary and distracting noise are:
     ▪ Loud fans that make it difficult to hear.
     ▪ A crowd of people and activity right outside the room that make it difficult to hear.

5. Is the space free from unnecessary interruptions (i.e. People walking through)?
   o Some examples of unnecessary interruptions include:
     ▪ Space in which people have to walk through the meeting to get to other locations in the facility.
     ▪ Space in a large area (such as the dining room) where many people are regularly entering and exiting the area during the meeting.

6. Is the space well ventilated and temperature controlled (not too hot or cold)?
   o Noting that everyone prefers a different room temperature, respond if the room is judged by the auditor to be too "stuffy" or if participants report it is too hot or cold.

**IDTT Observation** [ML CCCMS, ML EOP, MHCB, ASU, ~~SHU (if applicable)~~, PSU, LTRH, STRH, Condemned]

a) **General Guidelines**
   • You are _only_ required to observe five patient IDTTs in one unit of each program (e.g., if the prison has three separate EOP units, you only need to sit in on one of

their IDTTs for five patients) but you must rotate units each visit to ensure over time all programs are sampled.
- If there are less than five to observe in any given program, observe all.
- Before the first patient is brought in, introduce yourself to the team and tell them:
  - You must introduce yourself to each patient.
  - Other than your initial introduction, they should proceed with the ~~meeting~~ IDTT as they typically would. Do NOT present to you.
  - To the extent that any of the attendees are present at the IDTT due solely to the audit, politely request that they not attend so that the audit fairly represents the quality of the treating team members.
  - Ask for a list of patients scheduled to be seen by the IDTT. This will help you with entering the patient CDCR numbers as they are brought in.

b) IDTT observations
  1. Did the first IDTT start within ~~5~~15 minutes of scheduled time?
     o Judge this using the schedule you received in planning your visit. If the meeting is more than ~~5~~15 minutes late starting, note this as a "no" unless there was a legitimate reason (such as one of the team members attending to an emergency), that does not appear to the norm.
  2. Did the IDTT Leader state the purpose of the IDTT?
     o This will be apparent. The IDTT leader is expected to tell the patient the reason(s) they are having the meeting.
  3. Did the primary clinician (PC) complete or update the PC intake evaluation prior to the IDTT meeting?
     o The requirement for a new or updated intake evaluation will depend on the patient's program. If it is required, the PC must complete either a new intake evaluation or update the current intake evaluation on a progress note. ~~7386 or update the current 7386 on a progress note or 7389.~~
     o You may need to ask the PC after the patient leaves if you can see this paperwork; other times it may be obvious as they will be looking at it in the IDTT.
  4. Did the psychiatrist complete the ~~7230-G~~ intake evaluation prior to the IDTT meeting?
     o The psychiatrist must complete an initial evaluation (intake evaluation documented on a progress note) prior to the IDTT.
     o You may need to ask the psychiatrist after the patient leaves if you can see this paperwork; other times it may be obvious as they will be looking at it in the IDTT.
  5. If it appears that the patient's mental health status had an impact on his/her understanding of the proceedings, did ~~staff members in~~ IDTT members ensure effective communication?

- o This applies only to patients who you, as a clinician, observe to have difficulty paying attention to or understanding what the IDTT members are saying. ~~This is NOT required for all patients~~.
    - *Training discussion – what are some of the things you might observe with a patient who is having difficulty understanding?*
- o Note N/A if you judge the patient as being able to understand.
- o Note this as a "yes" if any member in the IDTT checked with the patient for understanding by asking him/her to restate what was said.

6. Did the PC provide succinct case formulation (Four P's) to inform relevant treatment information including, but not limited to:
    - o Functional impairments
    - o Diagnosis
    - o Areas of distress
    - o Strengths
    - o Weaknesses
    - o History of mental illness, hospitalizations, suicide attempts

7. Did the psychiatrist provide relevant information regarding diagnosis, medications to address the diagnosis, and discuss side effects?
    - o The psychiatrist should express what was prescribed and the rationale, or if no medication were prescribed the rationale.
    - o The psychiatrist should talk with the patient about side effects and benefits (risks and benefits) of the medication prescribed, if medication is prescribed.

8. Was the patient invited to participate in the IDTT and asked open ended questions that enhances his or her understanding of the treatment plan?
    - o Select N/A if the patient declined to attend or there is good clinical rationale for not inviting the patient.
    - o If the patient attends, one can assume he/she was invited to attend.
    - o Asking only whether the patient "has any questions" is insufficient.
    - o Some examples of questions you might look for to qualify as a "yes" response are:
        - ~~Can you tell me w~~What ~~did we talk about~~ we said we would be working on together when we met last (week, two days ago, etc.)?
        - ~~Can you t~~Tell me what we said is your diagnosis? What does that mean?
        - ~~Can you t~~Tell me what this meeting is about?

9. Was the Correctional Counselor engaged in the discussion, knowledgeable, and provided relevant information to the case?
    - o The Correctional Counselor does not have to give an entire case presentation but is expected to provide relevant custody information and engage in the team's discussion.

14

10. Did the IDTT leader facilitate a team discussion by attempting to engage all participants (including staff and the patient)?
    o If the IDTT leader asked other team members questions to prompt their input, this response is "yes" even if the team leader was unsuccessful in his/her attempt.
11. Did the overall IDTT include interactive discussion of all staff participants toward the treatment plan?
    o This is about the interaction of all team members; if team members present information in isolation, and then disengage, the response to this item is "no."
    o If one staff participant on the patient's treatment team does not interact, the response is "no".
    o You may exclude staff attendees who are NOT on the patient's treatment team but are in attendance (this should be clear from introductions at the beginning of the meeting).
12. Was the patient talked to rather than about in language that is at the patient's level?
    o This will be evident. It is the expectation that IDTT staff members discuss treatment options with the patient, rather than present their case to other team members or discuss treatment options with other team members and not engage the patient.
13. Were measurable treatment goals discussed?
    o All treatment goals must be measurable.
      ▪ For example: "Your short-term goal is to be free of auditory hallucinations for two weeks.  Your long-term goal is to come out of your cell for yard time at least two times per week for the next two months."
14. Were all considerations on the ~~7388B~~ HLOC form and appropriateness of level of care discussed with contributions from all members of the IDTT?
    o If the patient meets any criteria on HLOC from, and was not referred to HLOC, the team much verbally discuss treatment modifications and clinical justification for non-referral.
    o Statements such as "doesn't meet any indicators on ~~7388B~~HLOC form" are not acceptable – this will not be meaningful to the patient.
    o Look for statements such as "you are doing well at the EOP level of care so I am recommending we keep you at this level of care, you have not had any MHCB admissions, you are going to most of your treatment appointments, and we are making progress on your treatment goals."
15. For IDTT updates ONLY: Did the team leader discuss progress towards the treatment goals?
    o The PC is expected to discuss with the IDTT what progress, if any, has been made toward measurable treatment goals.

15

- For example: "Mr. Y has reported that he accomplished his goal of being free from auditory hallucinations for two weeks. He is working towards his long term goal of coming out for yard at least three times per week for two months and has done this for one week so far."

16. Can the clinician access the health record and are they using it as needed?
17. Can the correctional counselor access the ~~e-file~~ SOMS/ERMS and are they accessing it as needed?
18. For non-ASU: For Initial EOP IDTTs and IDTTs in which a patient does not have a work/education assignment, was eligibility (clinical appropriateness) for program assignment discussed?
19. For non-ASU: Did the treatment team discuss what, if any, reasonable accommodations may be needed for program assignment?
20. Is management of patients resistant to treatment addressed through an individualized treatment intervention and goals with custody input?
21. Did the treatment team discuss if there were any RVR write ups?
22. If appropriate to address in treatment plan, was the behavior accounted for in the treatment plan?
23. Suicidal patients only: Is the safety plan discussed?
24. MHCB only: are levels of observation discussed?
25. MHCB only: is level of observation justified?
26. MHCB only: Is the discharge plan discussed?

## Patient Interviews [RC, ML CCCMS, EOP, ASU, PSU, ~~SHU~~, LTRH, STRH, Desert Institutions, RC EOP] First Steps: Logistics

1. The regional analyst or regional administrator will run a random list from on demand at least two weeks prior to your visit and send the list to the institution's Chief of Mental Health and to your contact at the institution. The list MUST be run for two weeks prior to your visit to ensure that patients who are interviewed have been in the program for several weeks (not applicable to Desert Institutions).
2. Prior to and again upon arrival at the institution, confirm that the institution received the list and remind institution leadership when you plan on conducting the patient surveys.
3. Ensure that the institution staff followed the pre-visit checklist and they plan on ducating 10 patients to a group room for you. Advise the institution staff to skip patient names on the list for those who are no longer in the program (this is going to occur since we run a list two weeks prior).

16

    4. Remind your institution contact that the custody officers must use the script to explain to patients the reason for the ducat.

a) **Data Entry**
    1. All integer responses must be entered.
        o For any items that are N/A, enter 0 for all questions that are not applicable. The computer will score them as N/A.

b) **Conducting the Interviews**
    1. Introduction - Before you begin asking the standardized questions:
        o Introduce yourself
        o Explain that you are there to conduct a patient survey to see how they rate the treatment that is being provided to them.
        o Explain that ~~they~~ the survey is anonymous.
        o "This is anonymous. Although you were ducated for this, we do not know who you are and we are not keeping the ducats nor are we putting any names or CDCR numbers into our computer. We want you to be as honest as possible." Explain that you aren't writing their name and CDCR number down.
            ▪ "Although you were ducated for this, I am not keeping your name and I am not keeping the ducats nor am I putting any names or CDCR numbers into my computer or onto paper.  I want you to be as honest as possible."
        o Explain that you have to ask each question in positive and negative format because some people do not respond and we need both to calculate the response. Remind patients to respond only once.
        o Explain what is meant by usually or mostly.
            ▪ "When I say usually or mostly, I mean more than half of the time."
        o Remind patients to only answer about the program and institution in which you are conducting the survey.
            ▪ Answer about your experiences here at _____only
        o Explain to patients that you need to count responses, so you need them to raise their hand high in the air and hold it up while you count when they respond.
        o Explain to patients that you also want to hear more about their experiences but to please hold off unit the end, because many of the things they will like want to tell you about will likely be asked in the survey.
    2. Asking the standardized questions
        o Although it is critical that all assessors utilize the standardized questions as their template, to create an improved communication flow and ensure we obtain as many accurate responses as possible, questions may be amended as needed.
            ▪ *For Example:* Instead of asking "What keeps you from going to your MH appointments?"  You might ask, "There are times when you

may not be able to get to your MH appointments, when that happens, what are some of the reasons you aren't able to go?"
- o The most important thing here is to use your clinical skills to read the patients.
- o Another example is when you have a smaller group of patients you may not need to ask the positive and negative questions each time.
    - ▪ *For Example*: Let's say you are interviewing five patients and you ask, "Raise your hand if you feel that you are seen as often as you need to be?" Rather than asking the next question, "Raise your hand if you feel that you are NOT seen as often as you need to be?" you may just be able to turn to the patients that did not raise their hand on the first question and ask, "You didn't raise your hand, does that mean you do not think you are seen as often as you need to be?"

3. Getting qualitative details using dropdown boxes
    - o Once you have ascertained how many patients are satisfied and/or dissatisfied, you need to get information about where we can make improvements.
    - o Ask each patient who reported satisfaction to raise their hand then, one by one, ask what they like about the treatment. Use the dropdown boxes to record their responses, and when no dropdown is available for the response, mark "other" and type it in.
    - o Now ask each patient who reported dissatisfaction to raise their hand, one by one, and ask how we can make improvements. Again, use the dropdown boxes to record responses, and when no dropdown is available for the responses, mark "other" and type it in.
    - o If you frequently get a response that is not on the dropdown, notify the QM team so a dropdown for this response can be added.

4. Managing group leaders
    - o A limitation of conducting interviews in a group setting is that a strong group leader can take over the group and influence other's responses.
        - ▪ Use your clinical skills to minimize this.
        - ▪ Let every person in the group know their responses are kept among the group.
        - ▪ If anyone is uncomfortable responding within the group, they can see you after.
        - ▪ If any patient expresses disinterest in participating and wants to leave, let him or her leave.

5. Managing non responders

- o You may encounter a situation where a patient does not respond to your questions, or does so but not according to what you asked (i.e. Shrugs shoulders when you ask who likes/dislikes their group therapy).
  - ▪ Do not immediately make assumptions about their responses. Again use your clinical skills to engage the patient.  Ask for clarification if needed.
  - ▪ If it appears the patient is not stable and the responses are not likely to be meaningful, do not count this patient in your sample as they meet our exclusionary criteria.
  - ▪ If they are stable but simply withdrawn, offer to get responses afterwards or do what you can to draw them out.

c) Standardized Questions

1. Raise your hand if you go to most of your MH appointments?
2. Raise your hand if you do NOT go to most of your MH appointments?
3. What keeps you from going to your MH appointments?
   - o Did not get ducat
   - o Escort problems
   - o Modified program
   - o Discouraged by others
   - o Weather (too cold, too hot)
   - o Schedule conflicts (other appointments, work, visiting, canteen)
   - o Treatment is not helpful
   - o I don't like my clinician
   - o Symptoms of mental illness (e.g., "too depressed")
   - o Other
4. (Do not ask ASU/SHU/PSU) Raise your hand if you are usually able to get to your MH appointments on time?
5. (Do not ask ASU/SHU/PSU) Raise your hand if you are NOT usually able to get to your MH appointments on time?
6. (Don not ask ASU/SHU/PSU) When you don't get there on time, what types of things keep you from getting to your appointments on time?
   - o Did not get ducat
   - o Escort problems
   - o Modified program
   - o Discouraged by others
   - o Weather (too cold, too hot)
   - o Schedule conflicts (other appointments, work, visiting, canteen)
   - o Other: Describe
7. Raise your hand if you feel that you are seen as often as you need to be?
8. Raise your hand if you feel that you are NOT seen as often as you need to be?
9. Raise your hand if you are usually seen quickly (ex. emergency- same day, routine – within 5 days) when you need to be?

19

10. Raise your hand if you are NOT usually seen quickly when you need to be?
11. Raise your hand if you know your MH treatment plan?

   Item Tip: Describe treatment team and Tx plan to pts – this is the plan that is developed when your psychiatrist, PC, CCI, and you all meet and discuss your treatment. It is what you are working on for your mental health treatment. The issues that you and your clinicians have identified and that you want help with in your treatment sessions.

12. Raise your hand if you do NOT know your MH treatment plan?
13. Raise your hand if you agree with your MH treatment plan?
14. Raise your hand if you do NOT agree with your MH treatment plan?
15. Raise your hand if you are mostly satisfied with your MH treatment team meetings?
16. What do you like about your MH treatment team meetings (IDTT)?
   - The clinicians listen to me
   - They help me get the treatment I need
   - The IDTT asks what I think
   - The IDTT is helpful
   - I get to discuss treatment with all of my providers at once
   - Other:  Specify
17. Raise your hand if you are NOT mostly satisfied with your MH treatment team meetings (IDTT)?
18. How can your mental health treatment team meetings be improved?
   - Listen to my opinion more
   - Less people in the room
   - They ask what I think
   - Spend more time with me
19. Raise your hand if you know how to make an appointment with your PC or psychiatrist?
20. Raise your hand if you do NOT know how to make an appointment with your PC or psychiatrist?
21. Raise your hand if you are satisfied with the treatment from your PC?
22. What do you like about the treatment you receive from your PC?
   - He/she listens to me
   - He/she cares about me (or understands me)
   - He/she provides methods to help cope
23. Raise your hand if you are NOT satisfied with the treatment from you PC?
24. How can the treatment you receive from your PC be improved?
   - Be seen more often
   - Spend more time with me
   - More individualized treatment

       ○ We would make treatment progress rather a quick check in

25. Raise your hand if you satisfied with the treatment from your psychiatrist?
26. What do you like about the treatment you receive from your psychiatrist?
       ○ He/she listens to me
       ○ He/she explains the medications to me
       ○ He/she provides methods to cope
27. Raise your hand if you are NOT satisfied with the treatment from your psychiatrist?
28. How can the treatment you receive from your psychiatrist be improved?
       ○ Be seen more often
       ○ Spend more time with me
       ○ Better explain medications
29. Raise your hand if you are mostly satisfied with your group treatment?
30. What do you like about your group treatment?
       ○ The group leader encourages discussion
       ○ The group leader helps me with my MH issues
       ○ The clinician pays attention to my treatment needs
       ○ The clinician asks us all to contribute.
       ○ I learn new skills/techniques
       ○ I get support from others
       ○ I get out of cell
       ○ I get to interact with others
       ○ Other: Specify
31. Raise your hand if you are NOT mostly satisfied with your group treatment?
32. How can your group treatment be improved?
       ○ More groups offered
       ○ Groups more directed to my treatment issues
33. Raise your hand if you are usually seen by MH clinicians in a confidential setting?
    Item Tip: Explain confidential – a private setting where other patients cannot hear or see the interaction and other staff cannot hear the interaction.
34. Raise your hand if you are NOT usually seen by your MH clinician in a confidential setting?
35. For those of you who take psychiatric medication, raise your hand if you usually do NOT have to wait more than 24 hours to start getting a new medication that was prescribed to you?
36. Raise your hand if you usually have to wait more than 24 hours to start getting a new medication that was prescribed to you?

37. Raise your hand if you usually get your regular medications on time (ex. AM meds are received between 6:30-8:00 AM, afternoon meds between 1130-1300, PM meds between 1630-1830, and HS meds after 2000).
38. Raise your hand if you usually do NOT get your regular medications on time?
39. ML EOP ONLY: How many of you are offered at least 10 hours of treatment per week (for ML) or 5 hours per week (RC).
40. ML EOP ONLY: How many of you are NOT offered at least 10 hours (or 5 for RC) of treatment per week?
41. ASU ONLY: Raise your hand if you received the ASU orientation guide?
42. ASU ONLY: Raise your hand if you have NOT received the ASU orientation guide?
43. For those of you on heat medications, how many of you are offered alternatives for yard when you have to return from the yard when there is a heat alert? (Note: this is for your report only – will not be calculated).

**The following items are not measured on the performance report. Keep measurable data but also ensure sufficient comments are noted.**

44. Raise your hand if group treatment hours offered usually conflict with other activities (showers, yard, and law library).
45. Raise your hand if your treatment groups usually start on time and last for the full allotted time.
46. Raise your hand if your treatment groups usually do NOT start on time and last for the full allotted time.
47. Raise your hand if the C/Os respond to urgent MH requests.
48. Raise your hand if the C/Os do NOT respond to urgent MH requests.
49. ASU Only: Raise your hand if you are offered 10 hours of yard each week.
50. ASU Only: Raise your hand if you are NOT offered 10 hours of yard each week.
51. STRH Male only: Raise your hand if you are offered 18.5 hours of out of cell time each week.
52. STRH Male only: Raise your hand if you are NOT offered 18.5 hours of out of cell time each week.
53. STRH RC, female, LTRH: Raise your hand if you are offered 13.5 hours of out of cell time each week.
54. STRH RC, female, LTRH: Raise your hand if you are NOT offered 13.5 hours of out of cell time each week.
55. Segregated units: Raise your hand if you have a crank radio, television, or other entertainment device.

56. Segregated units: Raise your hand if you do NOT have a crank radio, television, or other entertainment device.
57. ASU EOP: Raise your hand if you are strip searched upon return to cell after remaining within a secure housing unit under the supervision of staff.
58. Is there anything else regarding the mental health program you would like to share?

## Group Treatment Observation [ML EOP, ASU, ASU EOP Hub, ~~SHU~~, PSU, LTRH, STRH, RC EOP, Condemned]

a) General Guidelines
- Obtain a list of planned groups for the week(s) of the audit and randomly select at least two groups (per program) with different facilitators to audit.
- Only observe "talking" groups. Not art or exercise groups.
- Before the first patient is brought in, introduce yourself to the group leader and tell him or her:
  o Introduce yourself to the group
  o Other than your initial introduction, proceed with the group as they typically would. Do NOT present the group content to you.
- If the CMH or chief psychiatrist is in attendance, ask them if they usually attend group; if they don't, tell them you want to see business as usual and politely ask them not to attend.
- If the group leader was changed as a result of your visit, you must audit another group. ~~ask if there is another group you can attend. If not, note that this change was made and advise the chief that a change in group leader should not be made during future visits.~~

b) Group Observations
1. Did the group leader start the group on time?
   o If the group starts more than 5 minutes after the scheduled time, mark "no" unless there is a legitimate reason (such as the leader attending to a patient emergency) that does not appear to be the norm.
2. Did the group leader attempt to engage each participant?
   o If the group leader asked each group participant a question in an attempt to engage them, this response is "yes" regardless if all the patients actually engaged.
3. If media or music is used, is it only used for short periods of time to illustrate?
   o If a movie or music is used consistently throughout the group, without any pause to apply the contents to treatment, the response to this item is "no."
4. Does the leader facilitate interaction between all group members on the clinical topic?

23

- o This is about the group leader attempting to get each participant to engage with others about the clinical topic.
5. For clinician led groups, is clinical process addressed during the group?
    - o Clinician led groups are those led by a social worker, psychologist, or psychiatrist.
    - o For example, if the clinician is using cognitive behavioral techniques to address treatment issues in a stress reduction group, he/she may help group members to dispel stressors that are not real and to focus on steps to address stressors that are real.

## Group Wait List [CCCMS]

a) General guidelines
- Use Attachment A, item # 9 to assist in answering the following questions.
b) Responding to questions.
    1. Is more than one type of group (different topics or focus) currently offered?
    2. Have any inmates on the list been longer than 90 days?
    3. If there is no wait list why?

## Morning Meeting Observation [ASU, ASU EOP HUB, PSU, LTRH, STRH]

a) General guidelines
- To respond to questions relating to the morning meeting, you ~~may either interview the ASU sergeant and ASU MH clinical staff about the morning meeting the day of the audit or~~ must observe the morning meeting.
- The morning meeting observation is only required in one ASU unit but you should ensure that for each visit you rotate the units observed.
b) Responding to questions.
    1. Did MH staff identify high risk patients?
        - o Mental health staff should explicitly state which patients are identified as high risk. On the rare occasion there are none identified, they should also state this or the response on this item is "no".
    2. Were the ASU Sgt and MH clinician in attendance?
        - o If either or both the ASU Sgt or designee and a MH clinician were not in attendance, the response on this item is "no."
    3. Were new arrivals discussed?
    4. ~~Method of measurement: (interview or observation)~~
        - o ~~Select the method you utilized to respond to the questions above.~~

## Primary Clinician/Psychiatric Technician (PT) Rounds

a) General guidelines

24

- These audits shall be conducted by designated and quali~~ti~~ed nursing staff (SRN/US/Sr. PT) on restricted housing units. Restricted housing units are: Ad Seg, Ad Seg EOP, PSU, STRH, LTRH.
- The regional mental health auditors will request the PT round audit results from the CNE while on site.
- ~~Walk with PT (or, in PSU PC), while conducting rounds~~
- ~~Respond to each question for each patient rounds observed.~~

b) Questions that are audited by the on site nursing staff (for regional info only)

   1. Did the PT complete all rounds as indicated by the policy?

      General Guidelines and Instructions:

      - Enter the Month/Year of audit, institution, and unit name. Select Month/Year from the drop-down menu.
      - The Roll-up % Compliance will auto-complete. The Roll-Up Compliance Percentage is only calculated on the "Present" and "Absent" responses on the "Initials on Isolation Log for Each Inmate/Patient."
      - Initials on Isolation Log for Each Inmate/Patient (Check One):
        a. Check Present if each inmate/patient in the restricted housing unit that required a psych rounds was initialed on that day.
        b. Check Absent if any inmate/patient in the restricted housing unit that required a psych rounds was not initialed on that day.
      - Sign In/Out (Check One): **This section is optional and may be used for institutional documentation requirements.**
        a. Check "Yes" if the licensed nursing staff conducting psych rounds signed in and out of the building for their shift and completed institution documentation requirements.
        b. Check "No" if the licensed nursing staff conducting psych rounds did not sign in and/or out of the building for their shift and completed institution documentation requirements.
      - Enter comments to explain any negative audit results.
        Restricted Housing Unit Weekly Summary:
        a. Check "Yes" if all the Mental Health Services Delivery System (MHSDS) inmates/patients had a weekly summary done for each full week they were in the Restricted Housing Unit.

25

2. Check "No" if any of the MHSDS patients did not have a weekly summary done for each full week they were in the Restricted Housing Unit. Explain "No" response on the allocated space.

1. ~~Did the PC/PT document real time?~~
2. ~~Were any medication side effects observed or verbalized by the patients?~~
    i. ~~If yes, did the PC/PT document the noted side effects?~~
3. ~~Was a MHPC/MHMH consult indicated?~~
    i. ~~If yes, was the consult order placed?~~

## ICC Observation [ASU, PSU, LTRH, STRH, ~~SHU,~~ Condemned]

a) General guidelines
   - Ask for a list of patients scheduled to attend the ICC before the meeting begins. This is often referred to as the "call sheet".
   - You may have to look up the patient in the EHRS to determine who is in the mental health program.
   - To save yourself time, and at the institution's discretion, you may request that staff bring in all mental health patients first.
   - Respond to questions for each MH patients ICC.
   - Before the first patient is brought in, introduce yourself to the ~~group~~ ICC members and tell them:
       o You should introduce yourself to each patient.
       o Other than your initial introduction, proceed with the ~~meeting~~ ICC as they typically would. You want to see business as usual.
b) Responding to questions.
   1. Is a MH clinician in attendance?
       o If this isn't apparent, after the patient leaves ask if a clinician was present.
   2. Did the MH clinician provide useful information regarding each patient's current mental health condition (e.g. need for medication, tendency for behavioral difficulties, suggested interventions, LOC, need for staff assistant)?
       o Some examples from the program guide (p. 12-7-2) are:
           ▪ Patient's current participation in treatment
           ▪ Medication compliance
           ▪ Suitability of single or double celling
           ▪ Risk assessment of self-injurious or assaultive behavior
           ▪ Status of ADLs
           ▪ Ability to understand Due Process proceedings
           ▪ Likelihood of decompensation if retained in ASU
           ▪ Recommendations for alternative placement
           ▪ Any other custodial and clinical issues that have an impact on patient's mental health treatment.

26

- o Not all of the items above must be included to qualify for a "yes" response on this question, but relevant information regarding a patient's current mental health condition is expected.

3. Did the ~~committee~~ ICC chair consider both the clinical and custody needs of the patient for program review?
   - o It is expected that this consideration will occur after the mental health clinician provides input but may also surface in terms of a discussion regarding the patient's level of care and/or questions the committee chair asks the MH clinician.

4. If it appears that the patient's mental health status had an impact on his/her understanding of the ICC, did staff members ensure effective communication?
   - o This applies only to the patient who you, as a clinician, observe ~~are~~ having difficulty paying attention to or understanding what ICC members are saying. This is NOT required for all patients.
   - o Note N/A if you judge the patient as being able to understand.
   - o Note this as a "yes" if any member in the ICC checked with the patient for understanding by asking him/her to restate what was said.

5. Did the ICC start on time?

## High Refusers [ASU EOP and PSU]

a) General Instructions
- Use the ~~list of high refusers provided~~ "Weekly Treatment Hours Summary, High Refusers" report in the ~~binder~~ MH on demand folder.
- In the ASU EOP Unit, ask for the 128B Chronos for high refusers. These should be kept in the 114A.
- Use the information on all 128Bs to respond to each question.
- Run high refuser report one month prior to the reporting period for two month increments up until the site visit date to capture patients that refused more than 50% for two consecutive months.

b) High Refuser questions.
1. How many high refusers were identified (on the list provided)?
2. Of those, how many 128Bs were available and indicated a discussion between mental health and custody staff to address reasons for high refusal?
3. How many high refusals were due to custody reasons?
4. Of those in which high refusal was due to custody reasons, how many 128Bs include a plan of action to address reasons for high refusal?
5. Of those in which high refusal was due to custody, how many was a documented discussion between MH and Custody conducted within 7 calendar days?

27

## ASU Intake Screening [ASU Screen Questionnaire MH -7709]

a) General Instructions
- Observe ASU screening process to see if they are conducted confidentially.
- If not, note reasons for this.

b) Question
1. Are screenings completed in confidential setting unless the patient refused?

## Cell Cleanliness [MHCB, Alternative Housing]

a) General Instructions
- For all units throughout the prison, observe all of the MHCB, and alternative housing cells used for mental health patients.

b) Cell Cleanliness questions
1. How many cells were observed?
   - In each unit, enter the total number of cells observed for cell cleanliness.
2. Of those, how many are clean (free of debris, old food, feces and urine, etc.)?
   - Enter the total number in each unit observed that you classify as "clean."
   - Clean cells may include but are not limited to:
     o Free of debris on the floor (use judgment, the patient's lunch tray from that day, for example, may not be enough to consider the cell unclean)
     o Clean floor (no grime on the floor. Floor has clearly been mopped within past few days.)
     o No grime on walls, vents, and ceiling
   - Another strategy you may use to determine cell cleanliness is to ask the patients.
3. Number of cells where there is a cleaning schedule that is up to date?
   - Although there is typically one cleaning schedule, ensure it includes all cells and, if so, enter the number of cells if there is one and it is up to date.

## Clinical Restraint [MHCB]

a) General Instructions
- Ask the MHCB RN for their restraint log and the Restraint Checklist (attachment D).  This was implemented in July 2013.
- Use the log to document the number of restraint occurrences for the last COMPLETE QUARTER.
- Do not change the default "audit start date" as it needs to reflect that the audit was completed on site during the current quarter.
- Use the checklist to respond to all other questions.

28

- Ensure any deficiencies are noted in your exit and qualitative summary as this is a high risk area.

b) Clinical restraint questions

1. How many restraint occurrences were there during the quarter?
   - Using the restraint checklists, count the number of restraint occurrences there were for the quarter prior to your visit (i.e. If you are visiting in Oct., use July-Sept. data to count the number of occurrences).
   - If the checklist was not done, ask for a restraint log to obtain this data.
   - If no checklist or log is available, note this in your comments and address it in your write-up and exit.

2. How many restraint incidents met all audit criteria?
   - Use the restraint checklist to respond to this question.
   - Respond for each restraint occurrence.
   - If there is one box on the restraint checklist marked with a "no", you can respond "no" to this question (this is an "all or nothing" audit).

3. For deficiencies, which items were not met? Did the institution address the deficiencies? How?
   - Use the comment box in CQIT to respond to this item. Only those items documenting how the deficiencies were addressed are considered.
   - You may ask staff if deficiencies were addressed and, if so, where to find the documentation.

## Limited Issue Observation [MHCB]

a) General Instructions
   - Do not change the default "audit start date" as it needs to reflect that the audit was completed on site during the current quarter.
   - ~~Refer to CDCR 7221 Physician's order~~
   - ~~Refer to CDCR 7230 Progress Note for justification~~
   - User issue orders in EHRS and progress notes to conduct this review.
   - Limited issue is anything less than:
     - Socks (1 pair)
     - Clothing
       - Male patients: 1 pair blue denim jeans and one blue chambray shirt, or one jumpsuit, or one reception center shirt and pants.
       - Female patients: 1 blouse or T-shirt, 1 pair slacks, or 1 dress, muumuu, robe, or duster, 1 nightgown.
     - Underclothes
       - Male patients: 1 pair white undershorts (to be exchanged as needed), 1 undershirt

29

- o Female patients: 1 bra, 1 pair panties (to be exchanged as needed)
- o Transgendered patients, upon request: 1 brassiere or 1 pair white boxer shorts.
  - ▪ Reading material (1 book or psycho educational articles)
  - ▪ Hygiene items (1 toothbrush, tooth powder, soap)
  - ▪ One blanket
  - ▪ A bed (cement bed with mattress on top acceptable)
  - ▪ Prescribed healthcare *appliance (pay special attention to this as it may not be apparent the patient has an appliance. Ask the patient, ask staff, don't make assumptions they don't have/need a healthcare appliance if they don't have one).*
    Examples:
    - o Glasses
    - o CPAP machine
    - o Cane
    - o Walker
- Randomly select 10 patients who are on limited issue and use their health record to respond to the following question.
- While reviewing orders, check for terms like "psych observation", "crisis evaluation" or other nonspecific orders that are inconsistent with policy.
- Check to see if decisions are justified.
b) Limited Issue Questions
  1. Does the progress note justify limited issue (required every 24 hours)?
     - ▪ Vague statements such as "suicide precaution" should not be considered adequate justification.
     - ▪ The justification should be written by the provider who writes and updates the physician's order every 24 hours.
  2. Are vague terms such as suicide obs, or/and suicide eval used?
  3. Are decisions about observation level justified?
  4. Are specific orders for suicide prevention documented?

## Nursing Rounds [MHCB]
a) General Instructions:
   - Walk through the unit and look to see if notification of round requirements (Q15, etc.) is posted on the doors.
   - Review for every patient on suicide watch and for randomly selected 5 patients on suicide observation.
   - Respond for each patient/rounds observed.

30

b) Questions:
1. Is the observation level identifier ~~check sheet/notice of checks~~ on the door?
2. Is the correct form (in EHRS) used for documentation of checks?
3. ~~Are checks staggered not to exceed 15 min?~~
4.3. _____ Are checks being conducted and documented at the cell front while observing the patient?

**Alternative Housing Location(s) and Watch Requirements**

a) General Instructions
- Ask staff to see all of their alternative housing cells.
- Respond once for EACH individual cell.

b) Policy Requirement for Cell Location.
- Correctional Treatment Center Licensed medical beds
- patient Housing Unit overflow cells
- Large holding cells with toilets
- Large holding cells without toilets
- Triage and Treatment Area or other clinic physical exam room
- Other unit-housing where complete and constant visibility can be maintained.
- Correctional Treatment Center holding cells.

c) Alternative Housing Questions
1. Is the cell in an area consistent with policy?
2. ~~Is the cell clean (free of debris, old food, feces and urine, etc.)? (see Cell Cleanliness audit for specific auditing instructions).~~
3. ~~Is there a cleaning log?~~
4.2. _____ How many patients in alt housing were observed?
5.3. _____ How many patients are on continuous direct visual observation?
6.4. _____ Number of patients observed with watch staff actively watching (not reading, talking with other staff, etc.) with an unobstructed view, and on 1:1 only?
7.5. _____ How many patients have a bed?

**~~Mental Health~~ Mental Health Confidential Screening [RC]**

a) General Instructions
- Observe RC screenings.
- Confidentiality means not within sight & sound of other inmates, patients and sound of staff members.

b) Questions

31

Commented [A1]: This item is being automated using EHRS.

1. How many RC screens were observed?
2. Of those observed how many were conducted in a confidential setting?

## R&R Screen

a) General Instructions
- Observe R&R process to see if they are conducted confidentially barring any safety and security concerns.
- Check to see if all of the questions are being asked.

b) Questions
1. How many R&R screenings were observed?
2. Of those, how many screenings were conducted in a confidential setting unless there is a safety risk that requires an officer in proximity, and the correct documentation used?
3. Of those observed, in how many of the screenings were all questions asked?

## Staff Interview

a) General Instructions
- Invite all staff to attend.
- Conduct an informal interaction with staff and enter information in comments section of CQIT (or take your own notes as this data will only be used for your report).

b) Suggested Questions (This portion is not scripted. These are suggested questions)
1. Bring up patient survey items to verify, gain more information.
2. How many of you have seen the performance report?
3. Are there any custodial concerns as it relates to access to care?
4. Are there things that prevent you from being able to do your job?
5. What would you like us to know?
6. Are there any barriers to program efficiency and completion of work?
7. If barriers to program efficiency exist, what are they?
8. Do you find staff works collaboratively to effectively accomplish required work?

## Five Day Follow-Up Assessment

a) General Instructions
- Using the document provided in your binder, randomly select 15 patients on five day follow up who were never admitted to MHCB to interview.
- Interview each patient to determine if MHCB referral is indicated.
- Assess if they were appropriately NOT admitted, or if they should have been admitted.

- If they should have been admitted, have them seen emergently by local MH staff for a SRE and MHCB referral review.
- Assessments should include an out of cell interview and be thorough enough for the reviewer to determine if the patient was appropriately NOT admitted to MHCB.
- An SRE is not required, but a progress note and referral to local staff should be completed if the patient requires a referral to MHCB.

b)  This item will not show on performance report – this is a report only item.

c)  If there were no patients to interview, randomly select at least 10 patients who were previously on five day follow-up using the appointments report in the "MH On Demand" to interview, ideally from different buildings, select N/A for questions 1 and 2 below, and respond to question 3 regarding confidentiality.

d)  This item is a qualitative report only item – no percentages associated.

~~b)~~e)        Questions
1. How many patients on 5-day follow ups were interviewed?
2. How many patients were on 5-day follow ups, but not clinically indicated for MHCB placement?
3. Did the patients indicate if they are usually seen confidentially for their five day follow-ups? If not, why?
    i.  Note if this is due to refusal.
    ii.  If refusal, what does clinician do? Do they encourage patient to vacate cell?
    iii.  If not due to refusal, why are they seen cell front?
        Compare to data in appointments report

## Medication Management
a)  General Instructions
- There are no standardized medication management audit questions in CQIT except in the patient survey; however, ensure you pay attention to medication management issues such as:
    o Patient reports of delays in receiving medications
    o Staff reports of patient safety issues related to medication prescribing or access to medication.
    o Review medication management items on the healthcare dashboard in advance of your visit and note any areas where you either validate or find discrepancies between your observations and the data.
    o Ensure you have the psychiatrist on the visit with you while addressing/questioning medication issues, where possible.

33

## Overall Area Rating

a) General Instructions
- Take into consideration all factors including, but not being limited to applicable controls, policies and procedures.
- If there are measures in place to address deficiencies and risk management, note this.

b) Question:
1. Select one appropriate rating from the list: (considerations are defined for each response)
   - Not applicable-an overall rating does not apply in this area
   - Proficient- controls are adequate and effective in addressing key risks to patient mental healthcare, documentation meets or exceeds standards, staff are effectively using tools available to them, local policies and procedures are current, etc.
   - Improvement is needed –controls are lacking in addressing key risks to patient mental healthcare and are sporadic, risks are not being effectively managed, documentation does not meet qualitative standards, staff are not aware of the most recent applicable requirements for the area, etc.
   - Significant improvement needed-Most findings were rated as critical and/or high and urgent corrective actions are required, documentation was nonexistent or incomplete in communicating intent or patient treatment, elevated actions must be taken, etc.

## Annual IST Suicide Prevention Training
*(Not part of the regular CQIT audit. Part of an annual onsite review of training quality)*

a) General Instructions
- Observe training in session.
- Watch trainer and trainee interaction to respond to the following questions.

b) Questions:
1. Was the Suicide Prevention training done by a mental health clinician?
2. Had the mental health clinician received T4T prior to giving the Suicide Prevention training?
3. Were all the main objectives of the training covered?
4. Was the duration of the class the full 120 minutes?
5. Did the instructor attempt to stimulate discussion?
6. Did the instructor use examples that illustrated his/her main points?

34

7.  Was the correct version of the training used?

## Cardiopulmonary Resuscitation (CPR) Training [nursing]
a)  General Instructions
- Obtain training completion status for the past 6 months from the CEO.

## Suicide Risk Evaluation Training
a)  General Instructions
- Obtain training completion status for the past 6 months from the CMH.



## Custody Audit Instructions

### Treatment Module/Security Desk Standards

a) General Instructions:
- View therapeutic treatment modules (TTM)/security desks in the ASU EOP Hub or PSU to respond to each question.
- ~~While visiting areas of the institution for other purposes, view treatment modules to respond to each question.~~
- ~~You may need to ask staff which modules are used for MH treatment to determine which are used as treatment modules.~~
- For institutions and program in which ADA TTMs are required, note in comments if an ADA TTM is not available and address in comments and provide to regional for reporting.

b) Treatment Module/Security Desk Questions:
1. For groups, are the ~~tx modules/security desks~~ TTMs in a semi-circle?
   - ~~This would primarily relate to segregated units where treatment modules are used for group.~~
2. Are the ~~tx modules/security desks~~ TTMs in an area where other patients and/or staff ~~are not able to~~cannot hear the interaction?
   - Locate all tx modules/security desks used for clinical interaction with patients and confirm that they are located in an area where other patients and/~~or~~ staff ~~are not able to~~cannot hear the interaction.
3. Do the tx modules/security desks meet PIA approval standards?
   - See attached PIA standards.
4. Do staff report sufficient number of ~~tx modules/security desk~~TTMs for providing treatment?
   - Ask several MH clinicians if they usually have a sufficient number of Tx modules available to provide treatment.
5. Are the tx modules/security desks clean? (free of debris, spider webs, clean walls, floor)
   - Look for garbage on the floors, grime on the walls and floor, spider webs. If any are present, mark "no."

### Mechanical Restraint Documentation [~~MHCB~~MHCB]

a) Questions
1. How many patients are in the MHCB?
   - Count how many patients in the MHCB who are not on ASU, STRH, ~~SHU~~, LTRH, PSU or Condemned.

36

2. How many 128-Bs determining the requirement for restraints for GP patients are present and readily available to MHCB custody staff?
   ▪ Required for all patients housed in the MHCB and identifies whether or not each requires the use of restraints.
   ▪ Confirm a hard copy 128-B is present is placed on the cell door for each identified patient.
   ▪ Enter the total number of 128-Bs present for patients.

### Treatment Module Use Observation [MHCBMHCB]

a) General Instructions.
   • While in the MHCB conducting other audits, observe patients being seen by mental health staff in the MHCB.
   • If none are observed, ask MHCB custody staff where the patients who do not require restraints are seen for mental health treatment. DO NOT ASK LEADING QUESTIONS such as: "You don't put the patients who do not have to be in restraints in a treatment module for mental health appointments, do you?"
   • Check to see if each patient you observe has documentation requiring restraints.
   • Respond to question for each patient observed or for each response you receive from staff interviews. **Respond *per patient– not per interview.***

b) Questions
   1. How many patients are GP custody status and/or do not requirenot max custody?
   1. Of those how many were placed in a TTM for treatment?How many patients were observed in a TTM?
   2. Of those, how many were max custody or had appropriate justification for placement in a TTM?

### Welfare Checks [ASU/STRH/STRH RC/SHU/LTRH/PSU/Condemned]

a) General Instructions:
   • Review the Guard One Rounds Tracker report summaries for the prior 30-day period.
   • Refer to the sign/print date to check to see if the custody supervisor signed off on the reports.

b) Questions:
   1. How many "Rounds Tracker Shift Summary" reports were reviewed? (Should be 90)
   2. How many "Rounds Tracker Shift Summary" reports reviewed were signed by the custody supervisor responsible at the end of each shift? (Should be 90)

37

## Out of Cell Time and Showers [ASU, ASU EOP Hub, ~~SHU,~~ PSU, Condemned]

a) General Instructions:

- Count "R" refused times as offered. ~~(Although not an auditable item, ensure 114-A's identifying "R" time identifies actual hours refused. e.g. Time Out: R 12:30, Time In: 15:30.~~
- ~~Ask housing unit for copy of their yard schedule to identify days and amount of time yard is offered each week.~~
- ~~Review 20 randomly selected 114-A's per segregated program (to qualify, the patient's length of stay must be over four weeks). If you select one and the patient's length of stay is less than four weeks, skip that file, select another, and move on.~~
- ~~Do not change the default "audit start date" as it needs to reflect that the audit was completed on site during the current quarter.~~
- Review all 114-A's per ASU EOP hub or PSU program to ensure all patients have been offered the minimally required yard and showers, noting any exceptions and deficiencies.
- The reviewer will only review the 114-A's of inmates who have been in the housing unit for a full seven day week period. For each week, identify how many were there for the entire week (Monday 12:01AM – Sunday 12:00AM).

b) Questions:

1. How many inmates were reviewed and met requirements for full 10 hours of yard (were in the housing unit for a full seven day week period and there was no documented safety or security issues that would have prevented the institution staff from offering out of cell/yard time)?
2. How many inmates were offered three showers within the week audited?
3. How many inmates were offered 10 hours of yard within the week audited?
1. ~~Out of the past four weeks, how many weeks were required (note: when safety and security issues preclude out of cell/yard time the week is not counted as required)?~~
   - ~~For each of the randomly selected patient files, enter the total number of weeks in which there were no documented safety or security issues that would have prevented the institution staff from offering out of cell/yard time.~~
2. ~~Of those, how many weeks were 10 hours of yard offered?~~
   - ~~For each of the randomly selected patient files, enter the number of weeks he/she was offered yard time.~~
3. ~~Out of the past four weeks, how many weeks were showers offered at least three times per week?~~

38

~~• For each of the randomly selected patient files, enter the number of weeks showers were offered at least three times per week.~~

## ICC Timelines [ASU/STRH/STRH RC]

a) General Instructions.
b) While reviewing 114As for shower and yard time, check to see if the initial ICC was completed within 10 calendar days. Questions.
   1. How many 114As were reviewed?
   2. Of those, ~~for~~ how many had initial ICC held within 10 calendar days of ASU or STRH placement?

## Intake Procedures [ASU/STRH/STRH RC]

a) General Instructions.
   • Utilize the CQIT ASU Intake Report located in the CQIT Reports folder in SOMS Reporting. Use the report to determine current 21-day IP roster. (Institutions completing a self-audit may reach out to regional lieutenants and request a copy of the report if needed.)
   • Identify ASU patients on 21-day Intake Status by reviewing the "Intake Markers" posted outside the cell door. Cross reference that information with the ASU placement information from COMPSTAT ASU tracking and SOMS.
b) Questions.
   1. How many patients are in ASU for 21 days or less on "intake" status?
   2. How many patients on intake status have "intake" identifying markers posted on the outside of their cell doors?
   3. How many patients are on intake status within the first 72 hours of placement?
   4. How many patients housed in ASU for the first 72 hours are either double celled with an appropriate cell partner or are celled alone in a retrofitted intake cell?
      ▪ Identify~~-~~ patients housed in ASU for the first 72 hours of confinement.
      ▪ Input the total number of those patients who are celled appropriately – either celled alone in a retrofitted cell or double celled.

## Entertainment Appliances [ASU, ASU EOP Hub, STRH]

a) General Instructions.
   • Enter the number of cells audited
   • Review institution's DOM or LOP regarding property.
   • Randomly select at least 10 cells and check presence of entertainment appliances in cells.

39

- ~~Ensure all inmates and patients (regardless of level of care) have been issued an entertainment appliance during the first 21 days of their segregation placement. This can include multi powered radios, tablets and personally owned radios or televisions.~~

b) Questions.
   1. How many cells were audited?
   2. Of those, in how many were entertainment appliances permitted and/or provided? (Approved appliances are a television or radio upon initial placement).
   1. ~~How many inmates and patients are within the first 21 days of segregation placement?~~
   2. ~~Of those, how many were in possession of an entertainment appliance?~~

## Unclothed Body Search [ASU EOP HUB and PSU]
a) General Instructions.
   - Respond once for each staff person interviewed.
   - Attempt to interview all staff in unit individually.
   - Ask the following question, then respond to the question in CQIT.
     - When you conduct an unclothed body search, where do you do it? (If out of cell have them show you where they are conducted).
b) Question
   1. Are unclothed body searches done in a private area?

## Out of Cell Time and Showers [STRH RC, Female STRH/LTRH, Male LTRH]
a) General Instructions:
   - Count "R" refused times as offered.
   - Review all 114-A's per ASU EOP hub or PSU program to ensure all patients have been offered the minimally required yard and showers, noting any exceptions or deficiencies.
   - The reviewer will only review the 114-A's of inmates who have been in the housing unit for a full seven day week period. For each week, identify how many were there for the entire week (Monday 12:01AM – Sunday 12:00AM).
   - ~~Review 20 randomly selected 114-A's per ASU program (to qualify, the patient's length of stay must be over four weeks). If you select one and the patient's length of stay is less than four weeks, skip that file, select another, and move on.~~
   - ~~Do not change the default "audit start date" as it needs to reflect that the audit was completed on site during the current quarter.~~
b) Questions:

40

1. How many inmates were reviewed and met requirements for full 13.5 hours of **out of cell time** (were in the housing unit for a full seven day week period and there was no documented safety or security issues that would have prevented the institution staff from offering out of cell/yard time)?

2. How many inmates were offered three showers within the week audited?
3. How many inmates were offered 13.5~~0~~ hours of **out of cell time** within the week audited?

1. ~~Out of the past four weeks, how many weeks were required (note: when safety and security issues preclude yard time the week is not counted as required)?~~
   - ~~For each of the randomly selected IP files, enter the total number of weeks there were no documented safety or security issues that would have prevented the institution staff from offering yard time.~~
2. ~~Of those, how many weeks were 10 hours of yard and 3.5 hours of additional out of cell activities offered?~~
   - ~~For each of the randomly selected IP files, enter the number of weeks he/she was offered yard time. STRH RC housing units may provide 13.5 hours of yard in lieu of providing 3.5 hours of out of cell activities.~~
3. ~~Out of the past four weeks, how many weeks were showers offered at least three times per week?~~
   - ~~For each of the randomly selected IP files, enter the number of weeks showers were offered at least three times per week.~~

## Out of Cell Time and Showers [STRH Male]

a) General Instructions:
   - Count "R" refused times as offered.
   - Review all 114-A's per ASU EOP hub or PSU program to ensure all patients have been offered the minimally required yard and showers, noting any exceptions or deficiencies.
   - The reviewer will only review the 114-A's of inmates who have been in the housing unit for a full seven day week period. For each week, identify how many were there for the entire week (Monday 12:01AM – Sunday 12:00AM).
   - ~~Review 20 randomly selected 114-A's per ASU program (to qualify, the patient's length of stay must be over four weeks). If you select one and the patient's length of stay is less than four weeks, skip that file, select another, and move on.~~
   - ~~Do not change the default "audit start date" as it needs to reflect that the audit was completed on site during the current quarter.~~

b) Questions:

41

1. How many inmates were reviewed and met requirements for full 18.5 hours of out of cell time (were in the housing unit for a full seven day week period and there was no documented safety or security issues that would have prevented the institution staff from offering out of cell/yard time)?

2. How many inmates were offered three showers within the week audited?
3. How many inmates were offered 18.5~~0~~ hours of out of cell time within the week audited?
1. ~~Out of the past four weeks, how many weeks were required (note: when safety and security issues preclude yard time the week is not counted as required)?~~
   * ~~For each of the randomly selected IP files, enter the total number of weeks there were no documented safety or security issues that would have prevented the institution staff from offering yard time.~~
2. ~~Of those, how many weeks were 18.5 hours of yard offered, with time allocated 7 days per week?~~
   * ~~For each of the randomly selected IP files, enter the number of weeks he/she was offered yard time.~~
3. ~~Out of the past four weeks, how many weeks were showers offered at least three times per week?~~
   * ~~For each of the randomly selected IP files, enter the number of weeks he/she was offered a shower at least three times per week.~~

## Entertainment Appliances [STRH/LTRH]
a) General Instructions.
   * Enter the number of cells audited
   * Review institution's DOM or LOP regarding property.
   * Randomly select at least 10 cells and check presence of entertainment appliances in cells.
b) Questions.
   1. How many cells were audited?
   2. Of those, in how many were entertainment appliances permitted and/or provided? (Approved appliances are a television or radio)

## Entertainment Appliances [Condemned]
a) General Instructions.
   * Enter the number of cells audited
   * Review institution's DOM or LOP regarding property.

- Randomly select at least 10 cells and check presence of entertainment appliances in cells.

b) Questions.
1. How many cells were audited?
2. Of those, in how many were entertainment appliances permitted and/or provided? (Approved appliances are a television or radio)

## MHCB Activities

a) General instructions for all parts of this audit.
1. If no activities are clinically approved for patients, or a low proportion are approved, notify the regional clinical team who will review clinical justification.

b) Questions.
1. How many IPs who have attended IDTT are NOT restricted yard time (due to clinical risk) as part of their treatment plan?
2. Of those, how many IPs have documentation in the 114-A identifying yard was offered or received?
3. How many IPs who have attended IDTT are NOT restricted dayroom (due to clinical risk) as part of their treatment plan?
4. Of those, how many IPs have documentation in the 114-A identifying dayroom was offered or received?
5. How many IPs who have attended IDTT receive Rec Therapy as part of their treatment plan?
6. Of those, how many IPs have documentation in the 114-A identifying Rec Therapy groups were offered or received?
7. How many IPs have attended IDTT are NOT restricted phone calls (due to clinical risk) as part of their treatment plan?
8. Of those, how many IPs have documentation in the 114-A identifying a phone call was offered or received?
9. How many IPs who have attended IDTT are NOT restricted from visits (due to clinical risk)?
10. Of those, how many had a visitor arrive at the institution during their time in the MHCB for a visit and received a visit?
   - Instruction for Q10: Pull SOMS visiting history for all IPs currently housed in MHCB to verify whether a visitor arrived for a visit. For those IPs who did have a visitor arrive at the institution for a visit, were any visits denied?
   - Note any denied visits in comments section and address this in your report.
   - If a visit was denied, identify the reason(s) in the notes and the report if appropriate/not appropriate.

43

## Custody MH Referral Process [All Housing Units]

a) Questions
   1. Is housing unit staff aware of their responsibility to complete a 128-MH5 Mental Health Referral Chrono when patients exhibit signs of mental illness?
      - Interview available staff in housing units regarding awareness of their responsibility to complete a 128-MH5, Mental Health Referral Chrono, when patients exhibit signs of mental illness.
      - ~~●~~ Respond to the question once for each individual housing unit staff person interviewed.
   2. Are CDCR Forms 128-MH5 (revised ~~5/14~~ 8/19), Mental Health Referral Chronos accessible and available to staff (both paper and electronic forms are acceptable)?
      - Physically check each housing unit for availability of 128MH-5.
      - Respond once for each housing unit observed.

## Peace Officer CPR Mouth Shield [All Housing Units]

a) General Instructions.
   - Go to all housing units on site and ask to see each officer's Cardiopulmonary Resuscitation (CPR) mouth shield.
   - The mouth shield MUST be carried by the staff member to qualify as a "yes" response.
b) Questions.
   1. How many peace officers were observed?
      - Enter the total number of peace officers queried about their mouth shield in each unit.
   2. Of those, how many peace officers were observed to carry a personal Cardiopulmonary Resuscitation (CPR) mouth shield on their person?
      - Total the number of officers you queried who were carrying their mouth shield and enter that number.

## Cut Down Kit [All Housing Units]

Title 15, Section 3365. Suicide Prevention and Response.

a) General Instructions:
   - ~~●~~ Go to all housing units on site, inspect the ~~and ask to see their~~ cut-down kit/tool ~~and~~ inventory log.
   - Staff must physically inspect the AMBU bag to ensure there are no cracks and that it is functional.

44

b) Questions.
1. Does the housing unit have an approved cut-down kit?
   ▪ Respond once per housing unit based upon if there is a cut-down kit present that includes all of the following:
   ▪ ~~Cut-down kit includes:~~
      o Durable Response Bag
      o ResQHook
      o ResQHook Sheath
      o AMBU Bag
2. ~~Is the cut down kit inventoried each shift on the standardized~~Is the AMBU bag functional? Staff much physically inspect the AMBU bag. Is the cut-down kit inventoried each shift on the standardized "Cut-Down Kit Inventory Sheet"?
   ▪ –Select ~~one~~ five random dates within the past thirty days that is prior to ~~visit the audit~~ and check the log in each applicable unit/area for compliance for that day.
   ▪ Institutions shall receive credit for inventorying cut-down kits whether it is on the standardized inventory sheet or not. However, it must be noted each time an improper inventory sheet is discovered, followed up with providing the institution with the proper inventory sheet to remedy the discrepancy.
3. ~~Is the ambu bag functional?~~

Heat Risk Thermometer Checks~~Heat Plan~~ [All Housing Units]
a) General Instructions:
   • Only required once per ~~year~~month between ~~the months of~~ May – October.
   • Physically check the thermometer in every housing unit in which MHSDS patients are housed.
   • Enter the building number (e.g. D-1) in the sub area drop down of CQIT.
   • Respond to audit questions for each thermometer and log checked. If the unit is air conditioned and the air conditioner functional, mark N/A for questions about the logs.
b) Questions:
1. Is a working thermometer present?
2. Is the thermometer mounted in a location that gives an accurate reading of the temperature (e.g., not in front of a fan)?
3. Is there a heat log that is current? (Logged within the past three hours)?
4. Is the staff documenting the highest reading (not averaging temperatures)?
5. Is there a current heat risk list available on the unit?
6. Does the Daily Activity Report (DAR) reflect alternative out of cell activities were offered during periods in which outside temperatures exceeded 90 degrees?
   ▪ For this question:

45

- o Check the DAR for a random period of 10 days when _outside_ temperatures exceeded 90 degrees.; i_if_ _outside_ temperatures were never 90 degrees or above, select n/a.
- o Report once for all days reviewed to assess overall if alternatives are offered.
- o The results of this question must be reflected in your write up. No percentage will be calculated using this information, you must write in your report if the institution is or is not providing alternatives during heat recall.

c) Staff knowledge of heat plan requirements – _this is a report only item and will not appear on the performance report._
   1. How many staff were interviewed regarding knowledge of heat plan procedures?
   2. Of those, how many were knowledgeable of the heat plan procedures (including provisions of alternative activities during heat recall, how to use heat list to recall inmates from the yard, etc.)?

## On Site Paperwork – Custody MHCB/Alternative Housing Discharge Follow-Ups

a) General Instructions.
   - Do not change the default "audit start date" as it needs to reflect the audit was completed on- site during the current quarter.
   - Use the list of all MHCB discharges and alt housing patients who were required to have custody discharge checks (item 13 on pre visit checklist) and randomly select 15 from the list.  Review 15 randomly selected custody follow-ups (or the total number of discharges if there were less than 15) The auditor is to select these NOT unit staff.
   - If you cannot locate the checks for an inmate on the list, ask custody leadership to research this. Do not assume it was an error on the report – it could be the checks were not done as required and therefore the folder/file missing.
   - Item 13 on the pre visit checklist requires the institution staff to tell you where the checks are kept.
   - The MHCB discharge custody checks are usually kept with the Litigation Coordinators or Associate Warden of Health Care.
   - Restricted housing units utilizing Guard One are no longer required to complete MHCB discharge custody checks.
   - Check if custody staff completed checks every 30 minutes for the first (24) hours following discharge from a MHCB for each patient (total responses will be 15, or the total number of discharges if there were less than 15).
   - Respond to questions one time per each individual check sheet audited.

46

b) Questions:

1. On day one, is the name of the clinician who completed the form, the date and time of evaluation, and status (continue, discontinue, refer to MHCB) all documented on the form?

2. On day two, is the name of the clinician who completed the form, the date and time of evaluation, and status (continue, discontinue, refer to MHCB) all documented on the form?

3. On day three is the name of the clinician who completed the form, the date and time of evaluation and status (discontinue or refer to MHCB) all documented on the form?

4. Were the checks continued for a minimum of 24 hours after the patient entered the housing unit?

5. At day three, were the check s either discontinued prior to 72 hours or was the patient referred to the MHCB?

6. Does the custody staff's documented arrival time on page two, section IV, match the date and time of arrival in section III and is the code "1-arrival to unit" entered?

7. Were all of the checks staggered and with no more than 30 minutes lapsing between checks with specific observation details noted?

8. Was there documentation of a custodial supervisor reviewing the form on each shift for the entirety of the time the custody discharge checks are conducted?

1. ~~Did the clinician fully complete Page 1 of the CDCR MH 7497 form by signing and dating the document? (In addition, note the patient's arrival time in housing unit – if NOT provide the MH regional administrator).~~

2. ~~Did the clinician order the discharge checks for a minimum of 24 hours and a maximum of 72 hours? (patients released from 30 minute checks prior to 24 hours would be a violation)~~

3. ~~Were the duration of the custody checks recorded on Page 2 consistent with time frame ordered by the clinician on Page 1?~~

4. ~~How many checks were completed within 30 minute intervals? (count EACH CHECK on time)?~~

   ▪ ~~Provide the number~~ for each file reviewed.

~~5.~~0.    ~~How many checks were required (there should be 48 unless the patient transferred out before 24 hour period)?~~

## On Site Paperwork – RVRs

a) General Instruction:

47

- Do not change the default "audit start date" as it needs to reflect that the audit was completed on site during the current quarter.
- Institutions completing a self-audit should reach out to regional lieutenants and request copies of all reports utilized for RVRs prior to completing any reviews.

b) Questions.

1. During the prior quarter, how many RVRs were issued?
   - Identify the number of RVRs by running the CQIT RVR Analytics report in SOMS Reporting (Shared Folders/Team Folders/Mental Health Compliance/CQIT Reports) for the audit period (Q1 Jan-March, Q2 April-June, Q3 July-Sept, Q4 Oct-Dec) Ex: for an audit in April, audit Jan-March RVRs.
2. Of those, how many were issued to non-MHSDS participants?
3. How many were issued to IPs at the CCCMS level of care?
4. How many were issued to IPs at the EOP level of care?
5. How many were issued to IPs at the MHCB level of care?
6. How many were issued to IPs at the ICF level of care?
7. How many were issued to IPs at the acute level of care?
8. How many assessed RVRs were reviewed?
   - Use sample size table – 10% precision level. Population size is total number of RVRs logged per Mental Health Level of Care per quarter.
   - Completed RVR's are defined as "Final/Concluded".
9. Of the RVRs reviewed, how many met the criteria for MH assessment?
   - This will be the total number of RVRs listed on the CQIT RVR Report.
10. Of those, how many were referred for MH assessment?

MH assessments are automatically requested now, your number will be the number of RVRs listed on the CQIT RVR Report.

11. Of the RVRs reviewed that met criteria for MH assessment, how many were recommended for the behavior to be documented in an alternate manner (RVR MH assessment q. 2)?
    - Using the CQIT MH RVRs Documented in an Alternative Manner Report, located in the CQIT Reports folder in SOMS Reporting, count the number of RVRs listed for the quarter.
12. Of those, how many did the Captain disagree with the clinician's recommendation and document their rationale in the Captain's Review?
13. Of the RVRs that met criteria for MH assessment, how many did the Captain agree with (reduced to a 128A, 128B or void)?
14. Of the assessed RVRs reviewed, how many did the MH clinician recommend mitigation (RVR MH assessment q. 4)?

48

15. Of the RVRs reviewed in which mitigation was recommended, how many did the Senior Hearing Officer (SHO) document consideration of mitigation based on MH clinician's recommendation and document in the findings section of RVR disposition?

16. Of the RVRs reviewed in which mitigation was recommended, how many did the Senior Hearing Officer (SHO) mitigate?

- Count how many RVRs were actually mitigated by the Senior Hearing Officer (SHO) by reviewing documentation in findings section of RVR disposition.

17. How many adjudicated RVRs requiring a CDCR 115 MH-A that could result in a SHU term were reviewed?

18. Of those, in how many did the ICC consider and document the input from the clinician?

- Randomly select 20 per institution and use the CQIT RVR Report to identify the RVRs that are SHU-able from the prior quarter. Use SOMS to locate finalized ICC chrono assessing the RVR to respond to Q2.

## Custody Training

a) General Instructions
- Use Staffing information provided by the institution prior to the visit (on the pre-visit checklist) to determine overall custody staffing numbers.
- Use the BIS program to determine who has received training.

b) Custody Training Questions
1. How many custody staff are there (less long term leave).
2. Of those, how many are current with biennial CPR training?
3. Of the total staff how many are current with annual suicide prevention training?
4. Of the total staff, how many are current with annual UOF Policy training?

## Phone Calls, Issuance of Property Tracking, & Transfer Timelines for NDS [ASU, ASU EOP hub, STRH, STRH RC and Females]

a) General Instructions
- Run NDS report in SOMS 72 hours (3 days prior to visit) see attachment G for instructions "How to Run NDS Report".
- Talk to staff to see if they can identify which patients are NDS, and if phone calls & issuance of property is being tracked.
- For transfer timelines, use the NDS report previously ran against SOMS to determine if the IP was transferred within 72 hours of NDS placement. (Note: NDS: 102 cases are eligible for property and privileges only-not accelerated transfer.

NDS: 204 cases meet criteria for accelerated transfer, but cannot transfer due to Medical Hold).Count the total number of NDS reviewed and the total number transferred within 72 hours.

b) Questions:

1. Does staff know which patients are NDS?
2. Is there tracking for provision on phone calls?
3. Is there tracking for issuance of property of NDS patients?
4. How many NDS patients were reviewed for transfer timeliness?
5. When applicable how many were transferred within 72 hours?

## Use of Force

a) Instructions:

- Contact the Captain of the Mental Health Compliance Team at DAI HQ two weeks prior to the visit and request a copy of the Use of Force incidents for the prior quarter.

b) Questions:

1. What is the total number of controlled use of force incidents?
2. What is the total number of controlled us of force incidents involving MH patients?
3. What is the total number of immediate use of force incidents?
4. What is the total number of immediate use of force incidents involving MH patients?

# Post Visit Instructions

## Check-Out Meeting

a) Before you leave the institution, you will have a check-out meeting. The Regional Administrator and Custody audit team lead will attempt to ensure that the Warden, CEO, and CMH are in attendance. The custody and mental health audit teams will attend the check-out meeting together. (See section f below for exit talking points)

b) Mental Health audit team members will discuss their impressions during the visit.

- The institution leadership has been notified that specific information related to opportunities for improvement within their programs may be discussed at these meetings.
- Provide specific information that will enable the institution leadership to take action on any high priority areas.

c) Remind institutional leadership that data will be updated on the performance report within several days.

d) Custody audit team members will also discuss their impressions during the custody specific audits.
e) Address any immediate health and safety issues with the institution leadership and ensure they have a course of action before leaving the institution.

## Completing your Report

a) Once you are certain all data are complete, press the "upload data to server" button on the home screen of CQIT.
- One day after you have uploaded the data (the day after the last day of your site visit), each team (custody and MH) will run the most recent (14-44 days) performance report of the institution for which you are writing the report.
- Click on the "disk" symbol at the top of the page and the select "word". This opens the report in Microsoft word format.

b) Within three working days of your visit, the custody team will complete the qualitative report for each audit category (access to care, quality of care, special populations, utilization and resource management, and safety) and submit to the mental health regional administrator and Trent Allen.

c) Within two days of receipt of custody reports, Trent Allen will provide edits, if applicable, and submit to the MH Regional Administrator and the regional custody auditor.

d) Within 10 working days of receipt of custody's report, the MH regional team will complete the written report following the process and template below.

e) Writing Process
- Once the Regional Administrator receives the custody portion of the report, start writing the report at the beginning of the data on the report previously exported to word. Note that if formatting changes occur with the data a page break may need to be entered before the text.
- Once the finished draft report is ready, including custody's portion of the report, submit a copy to the custody team for final review.
- The custody team will conduct an executive review and will submit the final report back to the Regional Administrator or designee within one week. Any edits will be in track changes.
- Once the final report is received, the Regional Administrator or designee will save the report and email to Laura Ceballos, John Rekart and Ric Castillo within 15 working days of the visit.
- Headquarters Mental Health Quality Management staff will upload reports onto SharePoint within 3 working days of receipt.

f) General Writing Guidelines
- Use Calibri (Body) 12 point font.
- Proof read. The Regional Administrator is accountable for report quality.
- If there were any immediate health or safety issues, if they are included in your report you must include that the issue was addressed, and what the institution staff have done to resolve the issue in your report.
- Provide brief introduction that includes demographic/census information.

51

- Provide brief sentences that state when the institution is performing well on items.
- Provide specific examples.
- Compare all sources of data available - note discrepancies and similarities between data and observations.
- *Example*: Regional staff attended the IDTT in CTC I. There was a full complement of staff for the IDTT that began twenty minutes late. This is consistent with staff attendance data on the performance report, which reflects 96% of all IDTTs measured included all required staff.
- The quarter you are writing your report for will be the quarter during the time of your visit (Q1 Jan 1-March 31, Q2 April 1-June 30, Q3 July 1 – Sept. 30, and Q4 Oct. 1-Dec. 31).
- Avoid opinions. State facts.
- *Example*: instead of – The lengths of stay in the MHCB are too long.
- Say: Lengths of stay in MHCB exceeded policy requirements. Data reveal that 95% of all MHCB admits within the past 6 months had lengths of stay beyond 10 days. Ten out of the 55 admits over the past 6 months had lengths of stay beyond 18 days.
- Use the report writing template (attachment F) to write your report.

## Checking your Data

a) At the conclusion of each visit, the regional analyst should open the performance report for the institution toured and check to ensure all data from the visit are showing. The "heat grid", which is accessed by clicking on the colored performance bar, is a user friendly way to easily check for missing data.
b) If data on any indicators are missing, then the analyst can open the CQIT Audit Report to check to see if the data were uploaded.
  - If data were NOT uploaded, work with your team and/or the custody team to ensure all data are entered and uploaded.
  - One reason for missing data may be missing responses. The computer will not calculate if responses are missing.
  - If data WERE uploaded and all responses complete, email Ric Castillo immediately.
c) Check percentages for CQIT indicators.
  - If a percentage is over 100%, check the raw data for data entry errors.
  - If a percentage is lower than expected given the impressions from the visit, check the raw data for data entry errors.



Attachments

## Attachment A – CQI Site Visit Preparation Checklist

| | |
|---|---|
| **Facility:** | **Reporting Period:** |
| Quarter : (1) Jan - March (2) April - June (3) July - Sept (4 ) October - December | |
| Site Visit Dates: | |
| Contact: | |
| Admin: | |
| *Instructions:   Please ensure that you complete each item on the list before your CQI Site Visit starts. Upon the audit team's arrival at your institution for the CQI Site Visit, provide the audit team (one for the mental health and one for the custody team) copies of those items requested on paper.  The copies should be organized and presented in a tabbed binder.  The mental health contact at each institution shall coordinate with custody staff to ensure that all custody items are ready for the audit team upon arrival.* | |
| **Audit Preparation and Document Request:** | **Completed ?** |
| 1. ***Three weeks prior*** *the planned audit week, email an IDTT Schedule to the HQ or Regional  staff person who emails you this checklist.  The IDTT schedule should include the times and locations for all the IDTTs scheduled for the entire planned audit week.* | |
| 2.  ***Three weeks prior*** *to the planned audit week, email a group schedule for all CCCMS,EOP, ASU, PSU, ~~SHU,~~LTRH, STRH, STRH RC programs to the HQ or Regional staff person who emails this checklist.  The group schedule should include the times, programs ( CCCMS, EOP, ASU, PSU, ~~SHU,~~LTRH,STRH, STRH RC, RC EOP) and locations for all the groups scheduled for the planned audit week.* | |
| 3. ***Three weeks prior*** *to the planned audit week, email an ICC Schedule to the HQ or Regional staff person who emailed you this checklist.  The ICC schedule should include the times and locations of all ICCs scheduled for the entire planned audit week.* | |
| 4. ***Three weeks prior*** *to the planned audit week, email a list of DSH and PIP returns for the reporting period (always the prior quarter from the quarter of the visit) to your regional contact and to Captain Eric.Hobbs@cdcr.ca.gov.* | |
| 5.  ***Three weeks prior*** *to the planned audit week, email copies of vacancy reports for all Mental Health staff. Note the staff on long term leave.* | |
| 6. ***Three weeks prior*** *to the planned audit week provide one copy of the past six months (two quarters)of Mental Health Subcommittee Minutes.* | |
| 7. ***Three weeks prior*** *to planned audit week (For ASU EOP HUB and PSU ONLY): Provide a list of inmate-patients who refused more than 50% of offered treatment in a two month period during the review period.* | |
| 8. ***Three weeks prior*** *to planned audit week provide a copy of the Alternative Housing Local Operating Procedure.* | |
| 9. ***Three weeks prior*** *to planned audit week provide a copy of the waitlist for all groups in all programs.* | |

54

| | |
|---|---|
| 10. **Three weeks prior** to planned audit week, provide the percentage of all appointments seen in a confidential setting, by program, for the review period. (Primary Care & Psychiatry contacts) | |
| 11. **Three weeks prior** to planned audit week, provide a copy of MH staff who have received Suicide Risk Evaluation training. | |
| 12. **Three weeks prior** to planned audit week provide copy of MHCB Operational Procedure and MHCB custody restraint policy. (Disregard if no MHCB at facility) | |
| 13. **Three weeks prior** to planned audit week provide a list of all patients that were discharged from MHCB or referred to MHCB due to suicidal reasons and required a Discharge Custody Check (CDCR MH-7497) per clinical indication/order for the previous quarter. Ensure the institution has identified where the previous quarter of MHCB Discharge Custody Checks (CDCR MH-7497) are archived. | |
| 14. **Three weeks prior** to planned audit week provide the total number of custody staff employed at the institution. Note the number of staff on long term leave. | |
| 15. **Three weeks prior** to planned audit week provide an IST printout of total number of custody staff who completed biennial CPR training and annual suicide prevention training. | |
| 16. **Three weeks prior** to planned audit week provide the number of controlled and immediate use of force incidents, and the number for each type on ICF, ACUTE, MHCB, EOP, and CCCMS patients. | |
| 17. **Three weeks prior** to planned audit week provide the number of heat related illnesses reported at your facility during the audit period. | |
| 18. **72 hours prior to visit:** Using each "Random Patient List" you received from the regional administrator or analyst prior to the visit, either ducat or coordinate with custody staff to ensure groups of 10 inmate-patients are scheduled to be seen for a patient group satisfaction survey on a day during the tour.  Use the appointment type "MH CQIT Group Survey"in EHRS. <br> • The goal is to have groups of 10. Please account for refusals, ducat more than 10 as many will refuse.  Remind custody staff that only **ten** inmate patients are needed. <br> • <u>One group per each yard</u> for each program (ML CCCMS, ML EOP, MHSDS in Reception Centers, STRHin Reception Centers, ASU, LTRH, and STRH, RC EOP) must be ducated. Ex. Yards A, B,C MLCCMS.  **No other programs will require this group interview.** <br> • All MHSDS patients must be ducated at Desert Institutions. <br> • Ensure adequate, confidential treatment space is available for the group surveys. If treatment modules MUST be used, ensure they are in a well lit area and are the modules that have seats in them. <br> • Do NOT cancel treatment appointments for inmate-patients to participate in this interview: Skip those with scheduling conflicts and move onto the next name on the list. <br> • Provide custody staff with the script, "Reason for Appointment," which should be used to inform inmate-patients why they are being asked to participate in the survey.  Follow up with custody to ensure the script is used. <br> • Ensure translators or sign language interpreters are also scheduled for any inmate-patients with effective communication needs. | |
| 19. Notify nursing staff that auditors will need access to the "Restraint Log Checklist" for the reporting period, as stated above, prior to the audit. This is a new checklist that is kept in the MHCB nursing schedule. | |

| | |
|---|---|
| 20. Provide a **current** list of all inmate-patients currently on a five day follow-up who were never admitted to MHCB. This report is run and provided on the the day of the site visit. | |
| 21. Notify Warden, Associate Warden of Healthcare, Health Care Access Capt., and CEO or designees of tour and schedule a pre-visit check in and post-visit check out meeting with the Warden, CEO, Associate Warden of Healthcare, and Chief of Mental Health. Facility Captains are also encouraged to attend these meetings. | |
| 22. Notify the ASU Capt. and other custody staff in the affected areas of the tour. | |
| 23. Secure room/space for team to interview selected inmate-patients. | |
| 23. Arrange access to C-Files or ERMS. Auditors will need to be able to pull c-files or access ERMS on site. Ensure records staff are prepared to accommodate these requests. | |
| 24. Secure space for the assessment team to leave their personal belongings and work throughout the day. | |
| 25. Notify custody staff in ASU that the assessment teams will need access to isolation logs and custody welfare check logs. | |
| 26. Ensure CQI audit teams are provided access to the MHCB Unit Health Records for all inmate-patients in the MHCB during the time of the assessment. | |
| 27. Regional Team shall Interview staff during visit. Schedule a one hour meeting for those who wish to attend. Coordinate with facility on date/time/place. | |
| 28 Provide a current roster of all MHCB inmate-patients.*(Disregard if no MHCB at facility)* | |
| 29. On day of visit provide a list of all ASU inmate-patients currently on 21 day intake status. | |
| 30. On day of visit provide list of all ASU inmate-patients currently on 72 hour intake status including date of ASU placement. | |
| 31. Ensure that the past 5 weeks of 114-As are available in ASU for review and the auditors have a **designated area to review them.** | |
| 32. On day of visit: Provide SOMS visiting history for inmate-patients currently housed in MHCB. | |

**Other requirements to ensure a successful visit**

| | |
|---|---|
| The CMH shall have a meeting with all staff and notify them of the following:<br>• Do not make changes to group or IDTT leaders or normal processes for the audit.<br>• Institution staff shall not attend patient surveys.<br>• Introduce the auditors (or ask them to introduce themselves) when an IDTT or group is observed, and then proceed as normal. DO NOT present to the audit team members.<br>• Notify staff of the staff interview date and time. | |

| **MH Regional Team Data Collection Items (To be requested by the regional teams)** | |
|---|---|
| Percentage of staff peer reviewed (HQ QM has) - contact Ric Castillo/Briauna Gorman | |
| SPR FIT committee performance (HQ QM has) - contact Ric Castillo/Briauna Gorman | |
| MHPS committee performance (HQ QM has) - contact Andres Murillo | |
| Number of heat related illnesses (HQ has) - contact Jocelyn Sanders (compare with what institution provides) | |
| Nursing staff CPR Training - contact institution CNE | |
| Percentage of staff with completion of SRE Mentor Program - (enter results into CQIT) available here: http://teamsite/team/Programs/MHI/bh/c.o.training/SitePages/Home.aspx | |

> *Percentage of staff with completion of required suicide prevention trainings (enter results into CQIT)-available here:*
> *http://teamsite/team/Programs/MHI/bh/c.o.training/SitePages/Home.aspx*

## Attachment B – Pre-Scheduled Audit Areas

**ALL**
- Staff Interview

**MHCB**
- IDTT

**ASU**
- IDTT
- Group Survey ( 1 per yard for each program)
- Group therapy observation (2 different clinicians and groups)
- ICC

**EOP**
- IDTT
- Group Survey (1 per yard for each program)
- Group therapy observation (2 different clinicians and groups)

**CCCMS**
- IDTT
- Group Survey (1 per yard for each program)

**LTRH/STRH**
- IDTT
- Group Survey (1 per yard for each program)
- Group therapy observation (2 different clinicians and groups)
- ICC

~~**SHU**~~
- ~~IDTT~~
- ~~ICC~~
- ~~Group Survey (1 per yard for each program)~~
- ~~Patient group observation—only if groups are offered in their SHU (2 different clinicians and groups).~~

**PSU**
- IDTT
- ICC
- Group Survey (1 per yard for each program)

- Group Therapy Observation (2 different clinicians and groups)

RC
- Group Survey (1 per yard for each program)

RC EOP
- Group Observation
- IDTT observation
- Group Survey (1 per yard for each program)

Condemned
- IDTT
- ICC
- Group Survey (1 per yard for each program)
- Group Therapy Observation

Desert Institution
- Group Survey (1 per yard for each program)

## Attachment C – Custody Escort Officer Script

**"Script" for Custody Escort Officers Regarding the Reason for the Group Appointment**

Custody officers: Please give each inmate the reason they are being escorted to the patient group interview appointment. Below is a script you can use.

"A small group of mental health clinicians and administrators from CDCR's headquarters in Sacramento would like to interview you regarding your level of satisfaction with the treatment you are receiving here at _____.

This interview will be in a small group with other inmates and is completely voluntary. The staff are not taking down anyone's names and the results will be kept anonymous." The results will be used to help the mental health program improve the treatment provided.

## Attachment D – Restraint Checklist

Use this worksheet to detail the actions of staff (Nursing, Medical, Mental Health and Custody) for all restraint occurrences and within 24 hours of order termination. Intended goals are 1) determining if all policies, procedures, regulations were followed within timelines 2) were each of the items met for each restraint episode 3) if not , what areas were deficient and 4) what is the corrective action plan to address those areas. Upon completion, file this worksheet in a notebook that is kept in the MHCB nursing station.

| CDC #_____I-P Name(Last)<br><br>Employee_____Date | Yes | No | NA | Comments |
|---|---|---|---|---|
| 1. If the patient is medically compromised, was a physician contacted prior to or immediately after the placement in restraints? | ☐ | ☐ | ☐ | |
| 2. If the patient is medically compromised or disabled, were all necessary steps to safeguard his/her safety taken?<br>This includes , at a minimum:<br>• contact to a physician prior to or immediately after placement into restraints notifying him or her of a medically compromised inmate's placement into restraints<br>• immediately upon notification, physician order of discontinuation from restraints or order of special measures/treatments to be taken to safeguard the patient's medical condition | ☐ | ☐ | ☐ | |
| 3. Were at least three (3) custody staff present, with CTC staff, for the application of restraints? | ☐ | ☐ | | |
| 4. Did the RN perform a mental status and physical assessment of the patient immediately upon placement in restraints? | ☐ | ☐ | | |

60

| | | | |
|---|---|---|---|
| 5. Did the RN document (respond "yes" only if all criteria are met):<br>　　▢　The need for initiation of restraints<br>　　•　A description of the patient's behavior and other relevant factors upon which the patient was determined to be a danger to self or others.<br>　　▢　Staff action taken to utilize all alternatives.<br>　　▢　Information about reasons for restraints.<br>　　▢　Conditions for release.<br>　　•　The patient's response to restraints.<br>　　▢　If applicable, injuries to the patient? | ☐ | ☐ | |
| 6. Was a soft cloth or bandage applied to the extremity before applying the restraints? | ☐ | ☐ | |
| 7. Was the Watch Commander and Chief Psychiatrist or designee notified upon the order for placement in restraints? | ☐ | ☐ | |
| 8. Did an authorized clinician give verbal or written order within one hour of notification of placement in restraints? | ☐ | ☐ | |
| 9. Was the initial order issued four hours or less? | ☐ | ☐ | |
| 10. Was a face to face evaluation conducted by an authorized clinician or a qualified RN prior to the expiration of the initial order (within 4 hours)? | ☐ | ☐ | |
| 11. If the clinician conducting the initial face to face evaluation was not a physician/psychiatrist, was a physician/psychiatrist consulted within four hours of the initial order to review current medications and any contraindications? | ☐ | ☐ | |
| 12. Was each extremity checked every fifteen minutes? | ☐ | ☐ | |
| 13. Were fluids, nourishment and bathroom breaks provided every 15 minutes as needed and practicable? | ☐ | ☐ | |

61

| | | | |
|---|---|---|---|
| 14. Was range of motion performed for two minutes on each limb every one hour unless the patient was too agitated or assaultive to safely remove restraints?<br>• Was range of motion (or inability to perform range of motion) documented on a restraint/seclusion record? | ☐ | ☐ | |
| 15. Were hourly assessments conducted by the RN? | ☐ | ☐ | |
| 16. Did the RN document the need for continuation and provide justification regarding the elements of the emergency necessitating restraints on a progress note? | ☐ | ☐ | |
| 17. Did the RN contact an authorized clinician every 4 hours to provide a description of current behavior? | ☐ | ☐ | ☐ |
| 18. Did the authorized clinician or RN conduct a face to face evaluation every 8 hours? | ☐ | ☐ | ☐ |
| 19. If the initial order was given via telephone did the authorized clinician sign the order within 24 hours? | ☐ | ☐ | ☐ |
| 20. Did the authorized clinician write an order every 24 hours with a treatment plan that specifies rationale for restraints and behavioral goals for removal of restraints? | ☐ | ☐ | ☐ |
| 21. Did psychiatrist conduct a face to face evaluation every 24 hours? | ☐ | ☐ | ☐ |
| 22. Were restraints terminated when conditions of release were met, when the patient identified behavior or danger to self or others were no longer present, or when it would be harmful for the patient to remain in restraints due to medical contraindications? | ☐ | ☐ | ☐ |
| 23. Was the restraint log kept and updated? | ☐ | ☐ | ☐ |

| | | | |
|---|---|---|---|
| 24. If a staff or patient injury occurred, was an adverse sentinel event reporting form completed and submitted? | ☐ | ☐ | ☐ |

## Attachment E – Regional Technical Instructions

1. Log in to tablet
2. To change LAN settings
   - Tools
   - internet options
   - connections
   - LAN settings
   - Unclick "use a proxy server for your LAN" when not in CCHCS network (ie. Working via vpn).
3. Log in to VPN
   - Click on VPN icon (bottom right of computer)
   - Enter VPN.CPHCS.CA.GOV
   - First login first name.last name, password is Welcome!
   - Change password, and re-enter (jot it down as it will not change).
4. Upload CQIT Tool
   - Click on update/install tool link included in "On Site Audit Guidebook"
   - Select "open"
5. Check CQIT installation
   - Click on circular CQIT icon
   - Security Warning at top of page, options – select "enable this content"
   - Click next in tool to make sure it works properly.
6. Refresh Patient Lists
   - Click on "refresh patient lists" button on home page of CQIT
7. Upload data
   - Click on "upload data to server" button on the CQIT home page at the conclusion of your visit. This must be done while connected to VPN.

- o If attempt is unsuccessful it is likely due to slow internet speed. This may happen with a poor hot spot connection.

## Attachment F – Report Writing Outline

Please see separate attachment entitled Report Writing Outline.

## Attachment G – How to Run the Non-Disciplinary Segregation Report (NDS) in SOMS

1. Click on the "Prison" tab
2. Select Inmate Record
3. Select Inmate Search
4. Under Current Location – Select desired location
5. For ~~Classification :~~ Area:
    1) Custody: Select "MAX"
    2) NDS Placement: Select "Yes"
6. Click on "Search" button

*A list of all inmate patients assigned to the selected institution on NDS status will appear.*





Click "Search" at the top of the screen.



The user can use the dropdown box at the bottom of the screen to export the list into excel if they choose. Clicking "Show All Inmates" will list all inmates on one page.

## Attachment H – CQI Entrance Talking Points

- Introduce every member of the team
- State the purpose of the visit: To provide information to you (the institution leadership and staff) to use as part of their own self-monitoring and improvement system.
- Provide an overview of the schedule
- Indicate when (and where) data will be available (MH performance report within a week of the visit).
- Indicate when they can expect a written report.
- What has changed over past year that has impacted your program and we may not know about?
  - New units
  - Mission changes
- Are there any other anticipated changes upcoming?
- Review performance data and ask any clarification questions.
  - Include all performance data such as MAPIP and chart reviews (all are on performance report).
- Discuss staffing: Which positions are nearly filled, where they are having difficulty – ask if there is anything you need to be aware of that has impacted their ability to staff.

68

- Ask if there is any particular area they would like for you to pay attention to on the visit.
- Ask if there are any other questions or comments
- Request the doc request binders (one for custody and one for MH regional teams)

## Attachment I – Case Selection Review Guidelines

### Case Review Selection Guidelines

- Obtain a random targeted sample.
  - (E.g. random of all EOP inmates if we are looking at something specific to EOP).
- May Include patients who are seen on a visit or when approached on a visit, or if there are complaints on a patient interview.
- Reviews may be done as a result of a specific issue/question
- Consider reviews if something comes up regarding RVRs, Use of Force, or other custody issues.
- Do case reviews at desert institutions.
- For efficiency – when you review a chart based upon an observation on site, do the chart review the same day.
- Ask custody Lieutenants to provide cases to you for review.
  - (E.g. MHSDS inmate with multiple RVRs, use of force or controlled use of force incidents – particularly ICF, ACUTE, MHCB LOC, or when there are cases where

content of SOMS says patient wasn't seen despite asking multiple times, etc. Lieutenants refer to MH reviewer for case review).

### Case Review Writing Guidelines
- Include identifying information
- Explicitly state why case was reviewed (ask yourself, why did I review the case).
- Provide a concise history for context.
    - (E.g. patient X has been at MCSP EOP for xxx, dx, brief chronology, course "what has happened to this person". If its years of info, you can say, what time period you reviewed and acknowledge you didn't review years of info.)
- Associate the case with big picture (staff and patient interviews, observation, chart audit and timelines data).
- Most important: Provide overall assessment, findings, and recommendations. Were there any problems or not? Give conclusion and outcome.
- Reference the cases in text, give sequential numbers so you can footnote/reference them.
- All docs, report and case reviews separately should be a standalone document.
- Look at all case reviews and pull out themes – this will be evident after review from the cases.

## Attachment J – Exit Interview Talking Points
### Mental Health Exit
Program Overview:
- Indicate if the institution passed on MH items
- Vacancy Rates
- Program changes, census
- Status of any housing considerations
    - Transfer timelines: percent transferred within required timelines
Access to Care:
- Timely PC contacts: percentage and note pt survey responses and observations
- Timely Psy contacts: percentage and note pt survey responses and observations
- Timely IDTTs: percentage and note pt survey responses and observations
- Medication continuity/access: note MAPIP results and pt survey responses and observations

- Refusals: Note performance report "tx hours attended" percentage and augment with pt survey results, staff survey results, and observations.  (WHY are pts refusing a lot if refusing a lot. If pts mostly go to tx, what does the institution do to accomplish this?).
  - For refusals in ASU EOP – were the discussions between PC and custody held to address issues?
- If any other access issues identified, note what these were. If exceptional practices are in place to improve access, note this.

Quality of Care:
By Yard/Program:
- Quality of IDTTS: Overall good or not. Note areas for improvement. Note if something was done exceptionally well.
- Quality of Groups: Overall good or not. Note areas for improvement. Note if something was done exceptionally well.
- Treatment space assessment (confidential? Is there enough?)
- Are groups offered in CCCMS? If so, is there a waitlist?

MHCB:
- Cleanliness of cells
  - Was there a log?
- Were patients given full issue unless they were on suicide watch or precaution (which was clearly noted in chart).
- For those on 1:1 watch was person actively watching (not reading, etc).
- Were nursing 15 min. check sheets on the door and staggered on time?

Alt Housing:
- From performance report: percent of MHCB referrals transferred within 24 hours "timely transfers to MHCB"
- How many were in alt housing?
- Were cells in use consistent with location order of policy?
- Were cells clean?
- Was everyone on 1:1 watch?
- Did every Alt housing cell have a bed and toilet?

Segregation:
By Yard/Program:
- Clinician input at ICC and custody consideration

R&R:
- Was the correct form used and were all questions asked for the nurse intake screen?
- Was the screen conducted in confidential setting? If not, why?

Custody Exit – To be presented by the MHCT Regional Lieutenants
Overall:
- Indicate if the institution passed on custody items and provide the % score when applicable
- Percent of custody staff who completed CPR training

- Percent of custody staff who completed suicide prevention training
- RVRs
  - Percent issued to CCCMS:
  - Percent issued to EOP:
  - Percent issued to MHCB:
  - Percent of RVRs with recommended mitigation, and percent mitigation considered. Percent mitigated.

By Program/Yard:
- Heat Plan:
  - Did staff log correctly and consistently per policy?
  - Were alternative activities provided (when applicable, if not applicable because temps never rose above 90 indicate this)
- CPR shields: Percent of staff on each yard with these on person
- MH referrals (128-MH5): percent of staff on each yard with knowledge of how to refer
- If referral forms were not on a yard, state where they need them.
- Did all buildings have complete suicide cut down kits accessible and with proper inventory?
- MHCB custody discharge checks: Percent completed on time (once every 30 min) per policy
- Coleman Posters – Are they present?  Are they the correct version?

Segregation (ASU, ASU EOP HUB, STRH, LTRH, ~~SHU~~, PSU, Condemned):
- Tx module placement and cleanliness.
- Guard One %. If there is an overflow housing unit, were the manual checks documented correctly and %.
- % for out of cell time
- % for showers
- ICC - % of inmates seen within 10 days of ASU or STRH placement
- Intake Cells
  - Did they have placards?
  - Are they placing inmates in intake cells as required?
  - Were inmates identified that required intake cells and were not in one?
- Entertainment Appliances/Hand Cranked Radios – Distributed upon admission and up to 21 days or longer?
- Unclothed Body Searches (ASU EOP and PSU) – Conducted in a private setting?
- Non-Disciplinary Segregation (NDS) – Is there an appropriate tracking of NDS inmates and their privileges (phone calls, property)?

MHCB:
- Were inmates not on max custody status escorted without mechanical restraints? For those who were, was there a 128B with appropriate justification for use of restraints?
- Does the institution use Tx Modules for group and/or individual therapy for those inmates NOT on mechanical restraint status?  If so, is there appropriate justification?

Attachment K – Security Desks

CATALOG › METAL PRODUCTS › CORRECTIONS & DETENTION › SECURITY BOOTHS AND DESKS › Security Desk › **BACK** ‹     🖶 PRINT



**CORRECTIONS & DETENTION**
### SECURITY BOOTHS AND DESKS
SECURITY DESK **Item# 797100**

Lexan screen not included. Please refer to item # 797200 when ordering the lexan add-on.

All metal security desk chair made with heavy duty replacement vinyl seat and back cushions. Desk surface adjustable for easy accessibility. Includes security fasteners- floor anchoring hardware not included. Dimensions: 34-1/8''H x 47- 3/4''D x 30-3/4''W. Security desk is delivered assembled.

**PRODUCT NO.** 797100.1000     **$1,995.00 Each**

| COLOR | QUANTITY |
|-------|----------|

CATALOG › METAL PRODUCTS › CORRECTIONS & DETENTION › SECURITY BOOTHS AND DESKS ›
Lexan Insert Only for Security Desk › **BACK** ‹     🖶 PRINT



**CORRECTIONS & DETENTION**
### SECURITY BOOTHS AND DESKS
LEXAN INSERT ONLY FOR SECURITY DESK **Item# 797201**

Cut-to-size, predrilled for easy attachment.

**PRODUCT NO.** 797201.1000     **$89.00 Each**

| OPTION | QUANTITY |
|--------|----------|
| Clear Lexan | 1 ± |

**ADD TO CART**

ENTER

74

CATALOG › METAL PRODUCTS › CORRECTIONS & DETENTION › SECURITY BOOTHS AND DESKS ›
Security Desk With Removable Chair - Wheelchair Accessible › **BACK** ‹      PRINT



CORRECTIONS & DETENTION
**SECURITY BOOTHS AND DESKS**

SECURITY DESK WITH REMOVABLE CHAIR - WHEELCHAIR ACCESSIBLE Item# 797101

Lexan screen not included. Please refer to item # 797200 when ordering the lexan add-on.

All metal security desk chair made with heavy duty replacement vinyl seat and back cushions. Desk surface adjustable for easy accessibility. Pin lock release and pull bar on chair back allows easy chair removal for wheelchair access. Includes security fasteners- floor anchoring hardware not included. Dimensions: 34-1/8"H x 52"D x 22"W. Security desk is delivered assembled.

PRODUCT NO.   797101.1000       $2,095.00 Each

## Attachment L – Treatment Modules and Security Booths



CATALOG > METAL PRODUCTS > CORRECTIONS & DETENTION > SECURITY BOOTHS AND DESKS >
Treatment Module > **BACK** <                                                    PRINT

CORRECTIONS & DETENTION
**SECURITY BOOTHS AND DESKS**
TREATMENT MODULE **Item# 795100**

Built in Desk with Floor Mounted Stool. Heavy Steel and steel mesh construction.  Door slam prevention.  Lexan on front and two sides.

Dimensions: 77.5"H x 37.5"D x 35"W

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

View Metal Finish Options
Recycled Content Certificate

FINISH      HINGE SIDE      QUANTITY



CATALOG > METAL PRODUCTS > CORRECTIONS & DETENTION > SECURITY BOOTHS AND DESKS >
Treatment Module - Wheelchair > **BACK** <                                      PRINT

CORRECTIONS & DETENTION
**SECURITY BOOTHS AND DESKS**
TREATMENT MODULE - WHEELCHAIR **Item# 795101**

Built in Desk with Stool. Desk and stool are spring loaded and flip up for wheelchair access. Heavy Steel and steel mesh construction. Door slam prevention. Lexan on front and two sides.

This unit is delivered in two parts and requires final assembly and tac welding on site after delivery.

Wheelchair accessible. 78.06"H x 54.09"D x 42.50"W

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

Recycled Content Certificate

76

CATALOG  >  METAL PRODUCTS  >  CORRECTIONS & DETENTION  >  SECURITY BOOTHS AND DESKS  >  Security Booth  >  BACK  <        🖨 PRINT



**CORRECTIONS & DETENTION**

**SECURITY BOOTHS AND DESKS**

SECURITY BOOTH **Item# 794100**

Heavy steel and steel mesh construction. Multipoint locking door. Cuffing slot. Door slam prevention. 30"W x 25"D x 78"H. Weight 295 lbs.

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

**View Metal Finish Options**

| FINISH | HINGE SIDE | QUANTITY |
|--------|-----------|----------|
| Autumn Haze Lite Gray | | 1 ± |
| | | ADD TO CART |

CATALOG  >  METAL PRODUCTS  >  CORRECTIONS & DETENTION  >  SECURITY BOOTHS AND DESKS  >        🖨 PRINT
Security Holding Module - Wheelchair Accessible  >  **BACK**  <



**CORRECTIONS & DETENTION**

**SECURITY BOOTHS AND DESKS**

SECURITY HOLDING MODULE - WHEELCHAIR ACCESSIBLE **Item# 795200**

Our largest Treatment Module will comfortably accommodate full wheelchair motion including 360 degree turning. We have also incorporated a built in flip up stool in the corner to allow for standard usage. Heavy steel and steel mesh construction. Door slam prevention. Dimensions:  64"W x 67.79"D x 78.2"H.

This unit is delivered in 4 parts and requires final assembly and tack welding on site after delivery.

Available lite gray color and left hinge - right handle configuration only.

**PRODUCT NO.** 795200.1000    **$4,915.00 Each**

| FINISH | HINGE SIDE | QUANTITY |
|--------|-----------|----------|



CATALOG › METAL PRODUCTS › CORRECTIONS & DETENTION › SECURITY BOOTHS AND DESKS ›
Security Booth - Stool › BACK ‹                                                    🖨 PRINT

**CORRECTIONS & DETENTION**
**SECURITY BOOTHS AND DESKS**
SECURITY BOOTH - STOOL Item# 794101

Heavy steel and steel mesh construction. Multipoint locking door. Cuffing slot. Door slam prevention. 30"W x 36"D x 78"H. Weight 295 lbs.

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

| FINISH | HINGE SIDE | QUANTITY |
|--------|-----------|----------|
| Autumn Haze | | 1 ± |
| Lite Gray | | ADD TO CART |



**CORRECTIONS & DETENTION**
**SECURITY BOOTHS AND DESKS**
SECURITY LIBRARY BOOTH Item# 794300

Built in steel desk and book slot. Floor mounted stainless steel seat. Heavy steel and steel mesh construction. Multipoint locking door. Cuffing slot. Door slam prevention. 30"W x 49.5"D x 78"H. Weight: 470 lbs.

This item is not the Mental Health Programming Module. Please refer to Item #795100.

*Please note when ordering: Left hinge denotes right handle side and right hinge denotes left handle side.

**View Metal Finish Options**

78