1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
2                             --oOo--

3    RALPH COLEMAN, ET AL,        ) Docket No. 90-CV-520
                                  ) Sacramento, California
4                   Plaintiffs,   ) August 4, 2021
                                  ) 3:08 p.m.
5              v.                 )
                                  )
6    GAVIN NEWSOM, ET AL.,        ) Re: Further status conference
                                  )
7                   Defendants.   )

8              TRANSCRIPT OF PROCEEDINGS (Held via Zoom)
             BEFORE THE HONORABLE KIMBERLY J. MUELLER
9                  UNITED STATES DISTRICT JUDGE

10   APPEARANCES (via Zoom):

11   For the Plaintiffs:     ROSEN BIEN GALVAN & GRUNFELD, LLP by
                             MS. LISA ADRIENNE ELLS
12                           MS. CARA ELIZABETH TRAPANI
                             MR. ERNEST GALVAN
13                           101 Mission Street, Sixth Floor
                             San Francisco, CA 94105
14
                             PRISON LAW OFFICE by
15                           MR. STEVE FAMA
                             1917 Fifth Street
16                           Berkeley, CA 94710

17
          (Appearances continued next page.)
18

19

20
                    JENNIFER COULTHARD, RMR, CRR
21                     Official Court Reporter
                     501 I Street, Suite 4-200
22                      Sacramento, CA 95814
                        jenrmrcrr2@gmail.com
23                        (530)537-9312

24   Reported using mechanical steno - computer-aided transcription

25

```
 1    APPEARANCES (Via Zoom cont'd)

 2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL by
                                MS. ELISE THORN
 3                              MS. MONICA ANDERSON
                                1300 I Street, Suite 125
 4                              Sacramento, CA 94244

 5                              MR. DAMON GRANT McCLAIN
                                455 Golden Gate Avenue, Suite 11000
 6                              San Francisco, CA 94102

 7                              HANSON BRIDGETT, LLP by
                                MS. SAMANTHA DERIN WOLFF
 8                              425 Market Street, 26th Floor
                                San Francisco, CA 94105

 9

10    Also Present:             Special Master Matthew Lopes
                                Secretary Kathleen Allison,
11                              Deputy Director Dr. Amar Mehta
                                Undersecretary Diana Toche
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       SACRAMENTO, CALIFORNIA, WEDNESDAY, AUGUST 4, 2021

2                              --oOo--

3       (In open court via Zoom.)

4               THE CLERK:  The United States District Court for the

5       Eastern District of California is now in session.  Chief Judge

6       Kimberly J. Mueller now presiding.

7               Calling civil case 90-520, Coleman, et al. v. Newsom,

8       et al.  This is on for a further status conference.

9               THE COURT:  All right.  Good afternoon.  Let me call

10      role at least for lead counsel.  For plaintiffs, who is serving

11      as lead counsel here today?

12              MS. ELLS:  I am, Your Honor.  This is Lisa Ells.

13              THE COURT:  All right.  Good afternoon, Ms. Ells.

14      Would you like to introduce the other members of your team

15      present here?

16              MS. ELLS:  Yes, Your Honor.  I have with me today

17      Ernest Galvan, Cara Trapani and Steven Fama.

18              THE COURT:  All right.  Good afternoon to you all.

19              Lead for the defense?

20              MR. McCLAIN:  That's me, Your Honor; Damon McClain.

21              THE COURT:  All right.

22              MR. McCLAIN:  And with me today from the Attorney

23      General's Office are Monica Anderson and Elise Thorn.

24              THE COURT:  All right.  Good afternoon to you all.

25              Is there other counsel present?  All right.  Hearing

1   none.

2          The defendants' principles, Secretary Allison is

3   present.  Good afternoon, Secretary Allison.

4          Undersecretary Toche is present.  You're muted.

5          UNDERSECRETARY TOCHE:  Good afternoon, Your Honor.

6          THE COURT:  All right.  Good afternoon.

7          And Dr. Mehta, deputy director, is present.  You're

8   also muted.  I saw your lips moving.  You're still muted.

9          All right.  Well, you're hearing me, but we'll have to

10  figure out when you want to speak what's going on because I see

11  the mute button applied to your screen, and I'm not hearing

12  you, Dr. Mehta.

13          DEPUTY DIRECTOR MEHTA:  Okay.  Sorry about that.

14          THE COURT:  There we go.  Now I hear you.

15          DEPUTY DIRECTOR MEHTA:  Oh, you hear me?  Okay.

16  Great.  Thank you.

17          THE COURT:  All right.  I understand other persons are

18  monitoring.

19          Let me just ask, is anyone who's monitoring the

20  hearing planning to or requesting to address the Court?  If so,

21  please raise your hand, so I can see you on the screen and then

22  call on you.

23          I see no raised hands, so I am just noting that the

24  Court's calendar identifies who's monitoring the proceedings.

25          And then the Special Master is present.  Special

1    Master Lopes, you can see and hear the Court?

2            SPECIAL MASTER LOPES:  Yes, I can, Your Honor.

3            THE COURT:  Is there any other member of your team

4    present?

5            SPECIAL MASTER LOPES:  Yes, Your Honor, but no one

6    will be presenting or speaking.

7            THE COURT:  All right.  Let me understand, in terms of

8    the principles, there are two issues I want to discuss in the

9    context of case management, staffing and CQIT, in light of the

10   emails about touring.  So is there a division among the

11   principles, Secretary Allison?  Who's on point for staffing,

12   who's on point for CQIT?

13           SECRETARY ALLISON:  I would say Dr. Mehta is probably

14   the best to address both of those issues --

15           THE COURT:  All right.

16           SECRETARY ALLISON:  -- along with our counsel.

17           THE COURT:  All right.  Acting at your direction and

18   the direction of Undersecretary Toche, is that a fair

19   characterization of what you just said?

20           SECRETARY ALLISON:  Yes, ma'am.

21           THE COURT:  All right.  So here is -- let me just

22   frame this.  I want to -- we've done some case management

23   recently.  I want to talk more about case management and what

24   more the Court might be doing in that realm of the case.  I'm

25   not thinking about substance today.  I may reference a few

1   substantive issues, but just thinking about case management,

2   the Court's focus at this point, in terms of what it is paying

3   attention to, it knows is going on and sees as moving the case

4   forward to resolution; the 29th round monitoring is underway.

5   There are the settlement conferences.  We have yet to work out

6   the exact schedule, but the settlement conferences the parties

7   have agreed to, the Court has signaled the first one is set

8   before Judge Newman.  That's a focused settlement conference,

9   but I'm going to be setting more throughout the next year, at

10  least.  I'm prepared to think about the order and the schedule

11  for those, but I expect that those will be moving forward as

12  promptly as possible.

13          And then I certainly am aware of the critical role of

14  data, and particularly as it relates to CQIT.  So that's where

15  I do have some questions, and I'll start with Dr. Mehta.  But

16  the background questions I will come back to and ask you at the

17  end of our discussion.  My backdrop questions in terms of case

18  management are:  Is there any reason I should not further

19  clarify that there's a moratorium on litigation?  I've already

20  said motions you need permission from me.  But why would I not

21  at this point, given all the good effort moving towards

22  resolutions, why would I not say moratorium on litigation to

23  clarify that as the default?  If there's an emergency

24  exception, of course, a party could still request filing of a

25  motion.  But rather than even have to deal with requests for

1   motions, just moratorium.

2        Also, just to clarify, my view is that discovery has

3   closed.  There's a carveout in the Lipsey matter given the

4   Guard1 issues, but that's a carveout.  Discovery is closed.

5        And in thinking about the constructive activity that

6   is going on and just to signal where I'm heading with this, why

7   would I not instruct the Special Master to decline the

8   invitation to attend any staffing tours if they go forward?  I

9   mean, that's -- you know, ultimately that's not my call, but if

10  the staffing tours go forward, why would I not instruct the

11  Special Master not to attend those because his energies need to

12  be focused on 29th round monitoring, the settlement conferences

13  and, to the extent he has a role to play, helping get the data

14  to a point where meaningful CQIT touring can occur?  I'll come

15  back to those questions, but I wanted to flag them for you.

16       On staffing, here's where I think we are with

17  staffing:  The Court has issued orders.  What's left really,

18  the narrow issues left in staffing, I've identified some in the

19  settlement conference framework, but fundamentally the

20  telepsychiatry pilot needs to be completed.  There is a motion

21  pending that I authorized on the chiefs and the supervisors.

22       I also just want to make certain the parties know I am

23  aware of what appear to be the current numbers on occupancy, so

24  I know what's going on there.  And I'm not making an official

25  pronouncement, but I'm inclined to defer -- I certainly haven't

1    teed up for any time soon revisiting enforcement.  You know,

2    maybe that issue is moot.  Maybe settlement moots it entirely.

3    But so when I look at staffing, I think what's left is very

4    much narrowed.  And so against that backdrop, Dr. Mehta, just

5    can you tell me do I have that wrong?  Is staff -- I've

6    decided -- there have been disputes, certainly; I've decided

7    them.  Why is it not that the proper focus should be on

8    monitoring, resolving the pending motion, settlement?  Why is

9    there a need for touring where the Special Master is notified

10   and invited to attend?

11            DEPUTY DIRECTOR MEHTA:  Good afternoon, Your Honor.

12   So around September of last year I believe we filed that when

13   we were retaining the staffing experts.  Over the next four

14   months or so, we worked out a lot of the psychiatry staffing

15   issues, and I think that went very well as well.  I would say

16   that that was kind of a small part of the whole universe of

17   staffing issues that we want to keep alive and keep trying to

18   improve, so not -- even within psychiatry but outside of

19   psychiatry as well; psychology staffing, social work staffing,

20   rec therapy and a few other positions.  The tours by the

21   staffing experts I think are going to be looking at a broader

22   range of things, just giving us more information to be able to

23   take into the settlement conferences and also to use for me to

24   be able to understand and improve our system as much as I can.

25            We, of course, won't do any action without discussion,

1    but that was I think the intent of it, and it had started prior

2    to the agreements and then seemed to be answering different

3    questions so was continued and shouldn't take any resources

4    away from what we need, you know, to do for settlement

5    conferences and everything, absolutely.  We'll be bringing

6    everything to bear on that problem.

7              THE COURT:  I've looked back -- I've created -- I

8    mean, I actually have a timeline of all of these -- so I see

9    the September 2020 declaration.  There's a lot of water under

10   the bridge since then --

11             DEPUTY DIRECTOR MEHTA:  Sure.

12             THE COURT:  -- so you're saying it's to gather

13   information for you as a principle to think globally about

14   what?  I understand you're saying gathering information to

15   inform settlement conferences.  What else is out there that may

16   not be identified on the settlement conference subject matter

17   list that you would identify as something you need to gather

18   information on to be ready for a discussion?  Is there

19   something I haven't focused on to date?

20             DEPUTY DIRECTOR MEHTA:  No, Your Honor.  I think it's

21   been great, but I would say that I think the 2009 staffing

22   plan -- well before my time, I don't claim any special

23   knowledge -- did a lot without full workload analyses or actual

24   breakdown of what the different hours are expected -- what the

25   different tasks are expected to take in terms of the hours per

1    week, things like that, so I -- you know, as I'm trying to make

2    sure that we maintain high enough staffing levels and it seems

3    the target is moving with COVID and everything, I've been

4    trying to make sure that the staff that we do have is adequate

5    for the job that we're asking them to do and whether we have

6    spare capacity to be able to add more things or need more help

7    to complete the things that we need to complete.  So I would

8    say that that was a big part of it.  There wasn't any workload

9    analysis.  I'm coming into this kind of new.  I have a lot of

10   questions that we didn't have real answers for that I thought

11   might be helpful, but I will say that the retaining of those

12   experts, those predate me, so I don't claim to be responsible

13   in that sense, but I do feel it would be helpful, Your Honor.

14          THE COURT:  All right.  So you're the one overseeing

15   this.  You're the one driving what information is being

16   gathered during the tours?

17          DEPUTY DIRECTOR MEHTA:  I am trying to maintain some

18   independence so that they can give us their own view.  So, so

19   far I've really only spoken to them when they interviewed me

20   and our headquarter staff about our roles and the jobs that we

21   do, but I do very much feel that their results are going to be

22   beneficial to me to be able to help our program.

23          THE COURT:  All right.  Anything to add to this,

24   Secretary Allison?

25          SECRETARY ALLISON:  So the only thing I want to say is

1   that we absolutely support everything that you're doing with

2   settlement and really appreciate it.

3          I will say these few items were in the works before we

4   had that settlement conference.  The letters were being drafted

5   and already on their way.  It's just part of our efforts to

6   further improve our system.  That's what we're trying to do

7   here.  I don't think -- I think we're all in lockstep with what

8   needs to happen as far as improving the system or, you know,

9   identifying any short or -- you know, in particular with CQIT,

10  and I realize we're not there yet, but also with staffing for

11  us to have an opportunity to look at that to see if there's

12  other options for us.

13         As Dr. Mehta said, he's new in his role and he's

14  trying to have a full understanding of what are some options

15  for him going forward as well as CQIT is being part of, you

16  know, identifying any particular concerns, be able to test out

17  that tool.  So, like I said, these are in the works and we

18  certainly hope that we're supported going forward.

19         THE COURT:  All right.  Just checking.  Undersecretary

20  Toche, anything on this?

21         UNDERSECRETARY TOCHE:  It's always hard to go last,

22  Judge, because everybody's already said everything.  So, no, I

23  have nothing additional to add.

24         THE COURT:  All right.  Well, I'm actually going to

25  call on the plaintiffs next, so we'll see.

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1          Ms. Ells, just given what you've heard, is there

2      anything you want the Court to know?  Again, thinking about

3      this from a case management perspective.  And I will circle

4      back and ask my fundamental questions once I'm through with

5      CQIT as well, but anything on the staffing tours you want the

6      Court to know at this point in time?

7          MS. ELLS:  No, Your Honor, just that we're heartened

8      to hear that the intent of the tours is to improve the system,

9      and we look forward to attending and appreciate the

10     opportunity.

11         THE COURT:  All right.  Then on CQIT.  Again, starting

12     with Dr. Mehta.  First, let me say the Court is pleased to see

13     a focus on CQIT.  It's been some time.  In the past it seemed

14     as if the effort to get closure on CQIT as a tool languished,

15     to say the least.  And I realize data issues intervened, but on

16     the data point first, Dr. Mehta, you would agree, wouldn't you,

17     that for meaningful CQIT touring -- your proposal is spring of

18     2022, that that's when such tours would begin, I gather, at the

19     earliest -- but for meaningful touring, there needs to be --

20     the CDCR data certification process needs to be completed,

21     correct, including validation and verification?

22         DEPUTY DIRECTOR MEHTA:  Yes, Your Honor.  I would say

23     there's two parts that I'm looking at.  On the one hand is the

24     indicators, and that's what we're working very hard on with the

25     Special Master's expert, Dr. Potter and others.  That's where

1    we're really focusing our attention.  We do want to get that

2    done, and I think that's a common goal for everyone.

3           The CQI tours that we're proposing would have a

4    different purpose.  The manual that we shared, the guidebook

5    that we shared doesn't say anything about needing data

6    validation requirements or anything like that.  It's more about

7    the questions that we ask when we're looking at these issues

8    from a quality improvement standpoint, more about the questions

9    we want the institution to be asking their own system, sort of

10   internal querying.

11          We also -- we haven't done this, as you said, for a

12   while, since I think 2018 and we didn't even write the reports

13   at that point, so we want to give our current staff, the

14   regional staff who will be reporting a lot of this, some

15   experience and some ability to fine tune their audit process.

16          This will be paired with the sustainable process

17   audits, the sus pro audits that we do.  We have a major audit

18   and a minor every quarter, so this will be paired with a minor

19   audit for the sus pro.  It won't be a separate trip or anything

20   like that.  It will really just be a way that they can start to

21   train up on all of these things.

22          I will say as well that over the last few years we've

23   gotten a lot of feedback from the field about, "Hey, this

24   doesn't quite capture what we're doing, it would be better to

25   do it this way," or something like that.  And we feel like we

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1    have an obligation to the field to be able to say, "We're

2    rolling out those changes that you guys suggested; we agreed."

3    It's not so much about the indicator piece.  I think we

4    absolutely are 100 percent ready to wait for that indicator

5    piece to be done before we say that that -- you know, that

6    those numbers are -- mean anything other than what we've all

7    discussed.

8              THE COURT:  Help me understand that last bit.  I mean,

9    I realize you may not be happy with my provisional approval of

10   the indicator list; but, as I understand it, the 29th round is

11   likely to be concluding by the spring.  It may be that I don't

12   see a final recommendation unless I put approval of the

13   indicators on a faster track and ask the Special Master to pull

14   those out.  I'm just brainstorming here, so I don't know what

15   he's thinking as he's hearing me, but I likely, on the normal

16   track, would not see a final recommendations from him on

17   indicators, indicators alone.  It might even be a year from

18   now.  So are you saying that you're ready to wait for the

19   Court's final decision on that following the 29th round

20   monitoring, or are you opening up a parallel track here?  Help

21   me understand that.

22             DEPUTY DIRECTOR MEHTA:  Yeah.  Sorry.  I probably

23   didn't use the right words.  So to do the indicator

24   certification, the data validation process requires mainly our

25   headquarters people, quality management, largely Dr. Steven

1    Cartwright, who's awesome, and that's done in the headquarters

2    setting.  The CQI tours are done by the regional teams, the

3    regional mental health administrators who visit the

4    institutions and kind of do a lot of that auditing and

5    tracking.  We think those things can proceed in parallel

6    without creating any conflict.

7           The process of performing the audit and improving that

8    process is really the goal with the CQI guidebook and starting

9    those in spring of next year; whereas, the indicator thing

10   will -- I just meant to say that will proceed however Your

11   Honor or others decide it proceeds, and that shouldn't have any

12   bearing in a sense.  We want to be able to practice our touring

13   separately.

14          THE COURT:  Is this the same touring that at one point

15   the Special Master's team was working closely with the

16   defendants on?  And so it was a collaborative effort with the

17   goal of getting the defense teams ready with the Special

18   Master's full blessing to take CQIT and run with it

19   independently.  So this now you're talking about a different

20   approach to testing that touring, right?

21          DEPUTY DIRECTOR MEHTA:  I believe that is the same

22   thing, Your Honor.  The main difference is we've made all these

23   edits to the guidebook since then, which haven't been reviewed.

24   We haven't been able to sort of get through them because of all

25   of the other questions about indicators and things, so we want

1    to test out a lot of those improvements and get that

2    implemented without having to wait for indicators because we

3    feel like they can both happen, if that makes sense.

4         THE COURT:  Well, let me ask this:  You haven't

5    really -- to the extent that data verification is critical,

6    ultimately, to meaningful CQIT touring -- and that may follow

7    both what you're discussing and the Special Master's ultimate

8    report to the Court on the provisional indicators -- it had

9    occurred to me, with some input from the Special Master's team,

10   that one way to move this forward so everything comes together,

11   again proactively, is to ask for, by the time of the October

12   status I currently have set, activation schedules for the tasks

13   related to the data piece; the data certification, the

14   validation and verification of the business rules.  So does it

15   make sense for me to add that to the October status and ask for

16   activation schedules to insure data is on track for everything

17   to come together in the best possible way, Dr. Mehta?

18        DEPUTY DIRECTOR MEHTA:  I think we're zooming in on

19   the process that's going to work best with data, but there are

20   aspects that we haven't tried yet, and that includes a

21   stakeholder review.  That's a bit of a question mark how long

22   that's going to take.  So we can schedule and plan out when we

23   will be done with data prep or a certain type of this testing

24   that we run on all of the rules before our larger discussion,

25   but then the later stages there it's very hard to predict those

1    timelines.  I don't mean it's impossible, and we all want to be

2    able to have goals like, you know, mile markers just so we know

3    where we are; but until we've taken a few things through that

4    whole process, it may be hard to narrow it down.  With that

5    being said, I understand the utility in having concrete goals

6    even if we need to change them as we go, and so yeah.  Sure.

7              THE COURT:  All right.  I mean, basically, it's a

8    punch list.

9              DEPUTY DIRECTOR MEHTA:  Yeah, right.

10             THE COURT:  Pretty major construction project here.

11             Let me ask Ms. Ells, anything to say on this point?

12             MS. ELLS:  No, Your Honor.

13             THE COURT:  Let me ask the Special Master.  Based on

14   what you've heard, anything you want to say about CQIT and what

15   you've heard from Dr. Mehta?

16             SPECIAL MASTER LOPES:  Your Honor, may I go back to

17   the staffing first, please.

18             THE COURT:  All right.

19             SPECIAL MASTER LOPES:  Sorry.  I just wanted to

20   explain for the record that Dr. Mehta wasn't working, I

21   believe, at CDCR when there was an official workload study done

22   on the staffing, and that workload study took a great deal of

23   time and of great cost to the State, and the State decided to

24   scrap the workload study in favor of what they believed was a

25   more productive, dynamic process, which led to the 2009

1    staffing plan.  So I just wanted to clear up that there's

2    already been an effort to do a workload study that stalled and

3    failed.

4           Also, I wanted to note that we engaged in a process

5    last fall to look at modifications to the 2009 staffing plan

6    that were requested by the defendants.  It was never brought up

7    during that period of time that there would be a further review

8    of the process, whether it's for psychologists or rec

9    therapists or -- that didn't come up at all.  So it was

10   surprising, perhaps, that -- to receive the email that we

11   received suggesting that there was a need for a new review.  I

12   just want to add that.

13          In terms of CQIT, we made the recommendation and made

14   a recommendation that the CQI process begin.  We are very

15   supportive of that process.  We have worked on the guidebook.

16   The most recent guidebook we have stalled.  We bargained to an

17   impasse on at least one item.  But, largely speaking, it's my

18   belief that the parallel tours conducted during the 29th round

19   are only going to circumvent the process of looking at the

20   indicators.

21          I also believe strongly that the -- there were

22   problems with the CQIT touring process that occurred in the

23   past.  We had two separate CQIT touring rounds, one in 2016,

24   one in 2018.  The one in 2016 got off to a good start, but it

25   took an average of 234 days to get one single report on one

1      single facility.  And there were at least three reports that

2      took over 300 days to complete.

3              In the second round of CQIT tours, we couldn't agree

4      on a way to put together a system-wide report based on the 10

5      individual reports that were to be produced.  Those

6      negotiations stalled, and we never received a report during

7      that time.

8              So in the first round, it took 234 days to receive a

9      report on one -- per institution, if you will, on average.  In

10     the second round we didn't receive any.

11             I've read someplace that that was because of the

12     Golding matter, yet the tours were being conducted after the

13     Golding report was issued.  So those tours finished a month or

14     two after the Golding report, but we never saw a report.  We

15     never had an agreement on how to evaluate on a system-wide

16     basis all of those tours.

17             So when approached about this, it seems like the

18     parallel tours are just that.  They collide with possibly the

19     ability to evaluate key indicators and it leads to a process

20     that, while important and the way out of the case ultimately, I

21     still believe that -- I believed it then, I believe it now --

22     is premature.

23             And when you add to that the data validation aspects

24     and efforts that are being made to evaluate all forms of data,

25     this seems like leapfrogging, if you will, to try to move ahead

1    something that isn't mature enough yet, and it's premature.

2          But again, in addition to just having the indicators

3    process, the CQIT tours that were already conducted, while

4    promising, led to poor results in that we couldn't get reports

5    that were complete, that were timely and we couldn't get an

6    agreement on how to synthesize the reports.  In other words,

7    instead of having 10 reports on 10 institutions, how do they

8    compare?  How do they compare per issue?  We could never get an

9    agreement on that.

10          So I'm open to collaboration and looking at this more

11   carefully, but to just receive an email where the leapfrogging

12   is going to occur doesn't seem to be productive at this time.

13          THE COURT:  All right.  And the Court does understand

14   the Special Master's position.  Given that the -- I mean, I did

15   say, and I wasn't corrected, Dr. Mehta, the earliest the CQIT

16   tours that the defense -- the defendants currently contemplate

17   would begin is spring of 2022, correct?

18          DEPUTY DIRECTOR MEHTA:  Yes, Your Honor.

19          Can I just add one thing briefly?

20          THE COURT:  Uh-huh.

21          DEPUTY DIRECTOR MEHTA:  I don't -- I defer to

22   Mr. Lopes in all of these issues.  I will just say, though,

23   that I'm happy to go on record saying that this is not a way

24   for us to file for termination or speed -- you know, do any

25   kind of end-run on getting anything off the books or out of the

1    case or anything like that.  I'm happy to go on record to say

2    that.  This is not a preliminary build-up to that.

3         Practicing, the way that we do these CQIT tours, is

4    exactly why we want to start them.  You know, being able to

5    prepare the reports in a timely manner.  I've been looking into

6    what some of the delays were last time in preparation for

7    hopefully being able to fix them, and I think we found where

8    some of those blocks were.  And I believe we have some

9    completed reports that weren't then sent in because of various

10   reasons.  So fixing some of those gaps or at least finding them

11   is part of the reason we would like to start those tours, Your

12   Honor.

13        THE COURT:  All right.  Secretary Allison?

14        SECRETARY ALLISON:  Yes, Your Honor.  I want to add,

15   though, one of the reasons why we postponed the starting in the

16   spring was to afford the Special Master time to complete his

17   22nd round; so if he chose to join us, he could.

18        THE COURT:  All right.  29th round.

19        SECRETARY ALLISON:  Sorry.  I'm dating myself.  I've

20   been around a long time.

21        THE COURT:  29th round.

22        And that's the Court's observations that I think -- I

23   think with some meet and confer, some of the CQIT issues, there

24   could be if not collaboration, some dovetailing in a way that

25   makes sense, doesn't duplicate, doesn't cost more, particularly

1    with CQIT.  I do -- do I hear you saying that -- I'm still

2    inclined to ask the defendants to meet with Special Master

3    Lopes to develop activation schedules on the data piece to keep

4    that on track.  Any problem with that, Dr. Mehta?

5              DEPUTY DIRECTOR MEHTA:  Not other than what I've

6    mentioned, Your Honor, which is that some of the steps which

7    haven't been done yet we can't really know what to expect.  But

8    as long as Your Honor understands that we may need to ask for a

9    lot of modifications as we learn more, then yes, Your Honor, I

10   understand.

11             THE COURT:  All right.  And back to my global

12   questions just to help frame this to make certain that we've

13   got the same ground rules going, any reason for me not -- to

14   clarify, we've got a moratorium on litigation.  Parties can

15   still move on an emergency basis for a motion and clarify that

16   discovery is closed.  Again, a party, as in the Lipsey matter,

17   could move for reopening if it really is needed.  So any reason

18   not to clarify those two things?  Who would address this

19   question?  Would this be Mr. McClain for the defendants?

20             MR. McCLAIN:  Yes, Your Honor.

21             THE COURT:  All right.

22             MR. McCLAIN:  You want me to address the question now?

23             THE COURT:  Yes.

24             MR. McCLAIN:  Okay.  So I guess I don't know exactly

25   what a moratorium on litigation means, but, I mean, I can tell

1   you, and I'll just be reiterating what Dr. Mehta said, which is

2   that defendants are not currently contemplating any litigation.

3   The Court already has in place an order requiring that a party

4   seek leave before filing anything.

5          In addition, as I'm sure you recall, there is also an

6   order with respect to a termination motion requiring 6 months

7   notice, you know, so I don't know that another order is needed.

8   You know, a moratorium, though, again, I'm not sure exactly

9   what that means.  If that's some sort of an order, I'm not

10  sure, but it really doesn't have any impact on defendants

11  currently because we're not planning to litigate anything.

12  We're gearing up for the settlement discussions.  Defendants

13  are excited to engage in that process.  We want to come to the

14  table with as much information and ideas and proposals as we

15  can, and these two efforts that we've been discussing today

16  should really help us do that.

17         THE COURT:  All right.  Understood.  I think what the

18  moratorium language would just clarify is, it would strengthen

19  the message that parties need to seek advance approval to file

20  a motion, making clear that that's the exception.  It's clearly

21  the exception.

22         And while a party would be allowed to seek the filing

23  of a motion if some exigency arises, the default would be no

24  motion practice, and it just -- you know, there's a lot of

25  history here.  Some of you have history that this Court does

1    not have.  It would just clarify that this is really the path

2    we're all on and I think eliminate the potential for folks to

3    overreact if there's good faith action.  I'm encouraged by what

4    I hear today, but it just clarifies that this is the path we're

5    on.

6              So Ms. Ells, your thoughts on that?

7              MS. ELLS:  Your Honor, Mr. Galvan will address this.

8              THE COURT:  All right.  Mr. Galvan?

9              MR. GALVAN:  Your Honor, thank you.  I agree with

10   Mr. McClain that the existing leave process from the December

11   24th order does the job because it allows the Court to review

12   any proposed motion to determine whether it creates a case

13   management problem that collides with existing settlement

14   efforts.  So our position is that no additional order is

15   necessary.

16             That's partly informed by the fact that we are meeting

17   and conferring with defendants over issues regarding the use of

18   force and rules violations asserted against Coleman class

19   members that arise from the extensive discovery and evidence in

20   the *Armstrong* disability litigation, and so we're already in a

21   process that might result in motions about discovery and

22   videos, for example, of use-of-force incidents.

23             And to the extent that the parties would benefit, for

24   example, by clarifying what can be produced and what can't be

25   produced to the plaintiffs and the Special Master, we would

1    hate to lose the opportunity to bring such motions because of a

2    broad moratorium.

3            So I think the upshot is, I think Mr. McClain is

4    correct, the existing order does the job.

5            THE COURT:  All right.  I'll go back and look at that

6    language.  These, of course, are attorneys speaking to me.

7            Let me just ask Secretary Allison if she relies

8    entirely on what her attorney has said, or if there's anything

9    more she wants me to know?

10            SECRETARY ALLISON:  No.  I feel very comfortable that

11   I think we're all on the right path as far as the settlement

12   conversations, and we've said it out loud here today.  We

13   have -- these two issues have absolutely nothing to do with

14   termination.  I feel very strongly that we are on the right

15   path for this agency and for the best care of our patients, so

16   I feel very comfortable with what has been said here.

17            THE COURT:  All right.  Thank you.

18            And then my final questions really are:  On staffing,

19   any response to my inclination to instruct the Special Master

20   not to attend the staffing tours, to keep his focus where it

21   needs to be?  Anything to say about that, Mr. McClain?

22            MR. McCLAIN:  I don't think so, Your Honor.  It's, you

23   know, defendant's view that's completely up to the Special

24   Master.  Defendants invited the Special Master to attend, but

25   it's only an invitation.  No one will be offended if he doesn't

1    want to dedicate resources to that right now.

2            THE COURT:  Well, just so it's clear, this is the

3    Court saying it's inclined to instruct him.  This is not

4    Special Master Lopes telling me he does not want to attend.

5    This is the Court trying to make certain that the Special

6    Master's energies are spent moving us along the path towards

7    settlement, towards constructive resolution.  So it's a -- if

8    he doesn't attend, it's because the Court has told him not.

9            MR. McCLAIN:  Okay.

10           THE COURT:  It's not a bad cop/good cop routine here.

11   I'm just being the bad cop.

12           MR. McCLAIN:  Understood, Your Honor.  Defendants

13   wouldn't have anything to say about that.

14           THE COURT:  Ms. Ells, any observations you want the

15   Court to be aware of?

16           MS. ELLS:  No, Your Honor.  We have no objection to

17   that.

18           THE COURT:  All right.  And then on CQIT, I'm going to

19   direct the parties to meet and confer, at least discuss the

20   possibility of creating activation schedules, show me what

21   those would look like based on what you know today regarding

22   the data certification process and we'll discuss that at the

23   October status.  So I think that will help move a piece of

24   what's going on with CQIT along.

25           And I do think -- yeah.  Secretary Allison?  Oh.  I

1   thought I saw a hand raised.

2           So we'll discuss this at the October status and maybe,

3   you know, some dovetailing, some efficient dovetailing of what

4   the Special Master is doing in the 29th round and what the

5   defendants are contemplating.  Maybe we see a way that that

6   dovetails and there is some collaboration to move that forward.

7           Again, I'm encouraged that the defendants are turning

8   back to that and wanting to pick up that baton again.  So I'll

9   put an order out clarifying that.  I'll look back at my

10  December order and see if it's sufficient to send a message

11  that motions should be far and few between at this point, that

12  we're just working to get this done.

13          All right.  Anything else you would like me to know,

14  Secretary Allison?

15          SECRETARY ALLISON:  No, ma'am.  Thank you for your

16  time.

17          THE COURT:  Undersecretary Toche, just checking?

18          UNDERSECRETARY TOCHE:  No, ma'am.  Thank you.

19          THE COURT:  Dr. Mehta?

20          DEPUTY DIRECTOR MEHTA:  Thank you, Your Honor.  That

21  was great.

22          THE COURT:  All right.  Mr. McClain?

23          MR. McCLAIN:  Nothing further, Your Honor.  Thank you.

24          THE COURT:  Ms. Ells?

25          MS. ELLS:  No, Your Honor.  Thank you.

1      THE COURT:  All right.  Thank you very much.  You may

2   sign off.

3      (Concluded at 3:50 p.m.)

4

5               C E R T I F I C A T E

6

7      I certify that the foregoing is a true and correct

8   transcript of the record of proceedings in the above-entitled

9   matter.

10   _____        August 6, 2021
     JENNIFER L. COULTHARD, RMR, CRR            DATE
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25