UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | ORDER |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

       As set by court order the court held a Special Status Conference on August 4, 2021 to address two emails sent by defense counsel to the Special Master, one addressing staffing tours by defense experts and one discussing a schedule for continuous quality improvement rounding by defendants. *See* ECF Nos. 7255, 7261. Lisa Ells, Esq., Ernest Galvan, Esq., Cara Trapani, Esq., and Steven Fama, Esq. appeared as counsel for plaintiffs. Supervising Deputy Attorney General Damon McLain, Senior Assistant Attorney General Monica Anderson, and Deputy Attorney General Elise Thorn appeared as counsel for defendants. In addition, as required by court order, ECF No. 7255, and identified by defendants, California Department of Corrections and Rehabilitation (CDCR) Secretary Kathleen Allison, CDCR Undersecretary for Health Care Services Dr. Diana Toche, and CDCR Deputy Director for Mental Health Services Dr. Amar Mehta participated as the persons with full authority for defendants over the matters covered in

1

the emails. *See* Reporter's Transcript of Proceedings (8/4/21 RT), ECF No. 7267, at 3-4. Good cause appearing, the court by this order memorializes the following next steps discussed at the August 4, 2021 conference.

I.     STAFFING

The first email concerns staffing tours by defense experts scheduled for fifteen days in August and September 2021. *See* ECF No. 7261 at 4-5. In the email, counsel for defendants represent that the tours are taking place consistent with briefing they provided to the court in Fall 2020 explaining that

> defendants [had] retained experts to "conduct a comprehensive study on the CDCR 2009 Mental Health Staffing Plan ("2009 Staffing Plan"), the relationship between the 2009 Staffing Plan to general requirements of the Coleman Program Guide, and whether changes in circumstances since development of the 2009 Staffing Plan, including but not limited to changes in population levels at various levels of care, technology, the use of telepsychiatry, the use of PNPs, etc., warrant modifications to the 2009 Staffing Plan," or alternatives for discharging CDCR's staffing obligations. (ECF No. 6855-1 at 1:23-2:2.) As Defendants noted in the Declaration of James Robertson, ECF No. 6855-1, Defendants' staffing experts anticipated conducting facility tours and expected such tours to last 4 weeks. (*Id*. at 4:16-25.)

*Id*. at 4. At hearing, Dr. Mehta reported that the experts would be looking at a broad range of issues that defendants "want to keep alive and keep trying to improve . . . even within psychiatry but outside of psychiatry as well; psychology staffing, social work staffing, rec therapy and a few other positions." 8/4/21 RT, ECF No. 7267 at 8. He indicated the information gleaned from the tours would be used in upcoming settlement conferences "and also to use for [him] to be able to understand and improve our system as much as [he] can." *Id*. Secretary Allison confirmed the tours were part of CDCR's ongoing efforts to improve their system. *Id*. at 11. Plaintiffs accept defendants' representation and plan to attend the tours. *Id*. at 12.

Dr. Mehta also noted the retention of the staffing experts predates his tenure with CDCR, *id*. at 10, and referred to the absence of "full workload analyses" underlying the 2009 Staffing Plan. *Id*. at 9. As the Special Master explained at hearing, prior to development of the 2009 Staffing Plan defendants decided to "scrap" an official workload study, done at great time and expense to the State, "in favor of what they believed was a more productive, dynamic

2

process, which led to the 2009 staffing plan." *Id*. at 17-18; *see also* ECF No. 5564 at 31-36 (March 4, 2010 Letter from Special Master Lopes to Debbie Vorous, Esq. and Michael Bien, Esq.)  Additionally, as the court has repeatedly explained, defendants developed the 2009 Staffing Plan to remedy longstanding constitutional deficiencies in mental health staffing levels and, in so doing, represented to this court and to the California Legislature that "the staffing levels in the 2009 Staffing Plan were 'appropriate' and necessary to meet constitutional standards."  ECF No. 5711 at 15; *see also Coleman v. Brown*, 938 F. Supp. 2d 955, 984 (E.D.Cal. 2013) (ECF No. 4539 at 54-55).

The Fall 2020 briefing cited in defendants' email was filed in response to a court order concerning enforcement of the staffing remedy.  *See* ECF No. 7261 at 4 (citing ECF No. 6855-1, filed with ECF No. 6853 in response to July 30, 2020 Order, ECF No. 6794).  After consideration of that briefing, the court authorized

> defendants to make such minimal modifications to the Staffing Plan as are required to include a role for psychiatric nurse practitioners (PNPs) and to reflect the proposals made in the September 8, 2020 letter authored by Melissa Bentz, Esq.," to "consult with the Special Master and the Task Force as appropriate to ensure that their proposed modifications are the product of consensus of all stakeholders to the maximum extent possible" and to file the proposed revisions and policy on or before December 11, 2020. November 4, 2020 Order, ECF No. 6938, at 8.

ECF No. 7035 at 1.  The parties and the Special Master worked diligently on the tasks required by the November 4, 2020 order, and the court approved the proposed revisions together with a proposed policy for use of psychiatric nurse practitioners.  *Id*. at 2.  Systemwide staff vacancy rates among psychiatrists have recently been below the court ordered ten percent vacancy rate. *See*, *e.g.*, ECF Nos. 7253 at 4, 7214 at 5, 7188 at 5.  As the court noted at hearing, it is not making any official finding at this time regarding durable compliance with the staffing remedy; it also has not revisited the question of enforcement and is not inclined to do so at this time.  *See* 8/4/21 RT, ECF No. 7267, at 7-8.  As the court previously noted in its minute order of July 30, 2021, "[i]n addition, the court has resolved the staffing issues defendants' email to the Special Master suggests are unresolved, *see* ECF Nos. 6938, 7305."  ECF No. 7255.  To the extent any disputes over staffing remain, they are very narrow.  There are two motions regarding staffing submitted

for decision, ECF Nos. 7118, 7250, and any remaining disputes will be the subject of an upcoming settlement conference. 8/4/21 RT, ECF No. 7267, at 8.

Given the foregoing, the court accepts defendants' representation at hearing that the staffing tours will be conducted consistent with Dr. Mehta's ongoing responsibilities as Deputy Director of Mental Health Care to continue to improve CDCR's delivery of mental health care to class members, to anticipate and solve any issues related to staffing, and to inform defendants' participation in the court-ordered settlement process. As reviewed above, the court has resolved the issues that were presented in the briefing cited in defendants' recent email, and any connection between the tours and those issues is moot. Accordingly, the court confirms its instruction to the Special Master not to attend the staffing tours so that his energy and resources can remain focused on the Twenty-Ninth Monitoring Round and participation in all upcoming settlement conferences.

II.   CONTINUOUS QUALITY IMPROVEMENT TOURS

The second email concerns continuous quality improvement (CQI) tours defendants plan to conduct at eight prison institutions in the spring of 2022 and proposed revisions to the CQI On Site Audit Guidebook. *See* ECF No. 7261 at 7-10. As required by court order, during the Special Master's Twenty-Ninth Monitoring Round, which is currently ongoing, the Special Master is testing and monitoring "the functionality and efficacy" of the list of key indicators provisionally approved by the court for use in the Continuous Quality Improvement Tool (CQIT), which will be an integral part of the CQI process. ECF No. 7216 at 14. As the court has explained, "the 'key indicators' in CQIT 'signify the material provisions of the Program Guide and the Compendium that must be durably implemented' in order to satisfy the Eighth Amendment." *Id*. at 4 (citing ECF No. 6846 at 28; ECF No. 6996 at 8). The Special Master is to report his findings on the CQIT key indicators to the court as part of his Twenty-Ninth Monitoring Round Report. *Id*. Because the CQIT key indicators are pending final approval, and because use of CQIT is dependent in the first instance on completion of ongoing data remediation, the Special Master is not using CQIT itself as part of his monitoring process during the Twenty-Ninth Round. Instead, he is using the process he has relied on for the past twenty-

4

eight monitoring rounds, *see, e.g.*, ECF No. 7074 at 19 (Twenty-Eighth Round Monitoring Report describing onsite monitoring visits, paper reviews, and "hybrid Electronic Health Records System (EHRS) paper reviews"), and, at the same time, evaluating the efficacy of the provisionally approved list of CQIT indicators as part of an overall transition to defendants' ultimate assumption of self-monitoring through the CQI process, *see, e.g.*, ECF No. 7216 at 9 n.5 (quoting ECF No. 5092 at 4-5).

At hearing, Dr. Mehta explained the purpose of the proposed tours is to refine and test at an institutional level the audit process that defendants will follow as the transition to CQI monitoring is accomplished. 8/4/21 RT, ECF No. 7267 at 13. According to Dr. Mehta, the proposed tours will not involve or conflict in any way with the court's process for evaluating and giving final approval to a complete list of CQIT indicators. *See id*. at 14-15. Dr. Mehta explained that data remediation and validation is ongoing with staff at CDCR headquarters while the CQI audit process is conducted by CDCR regional mental health administrators, and he is of the view that both tasks "can proceed in parallel without creating any conflict." *Id*. at 14-15. Secretary Allison explained that defendants decided to set these tours for the spring so that the Special Master would have time to complete his Twenty-Ninth Monitoring Round and, if he chose to do so subject to the court's approval, join the tours. *Id*. at 21.

As all stakeholders agree, and the court has repeatedly said, the goal is development and implementation of a continuous quality improvement process that will ultimately allow defendants to assume responsibility for monitoring and improvement of their mental health care delivery system. *See, e.g.*, ECF No. 6996 at 7. CQIT is a tool that includes the list of key indicators that must be measured during that process to ensure the monitoring is comprehensive. CDCR's global mental health data management system will be a major source of information for using CQIT to monitor institutional delivery of mental health care; consequently completion of the data remediation and validation now underway is a necessary prerequisite to the use of CQIT. The other necessary prerequisite is the court's final approval of the list of CQIT key indicators. *See, e.g.*, ECF No. 7216.

1 　　　　　The court remains focused on bringing this case to a successful conclusion as
2 efficiently, cost-effectively and collaboratively as reasonably possible.  To that end, the court
3 makes no formal finding about whether defendants can or should retest the CQI audit process
4 next spring separately from completion of CQIT without wasting time and resources; the court
5 expects this is something the Special Master working with Secretary Allison, Undersecretary
6 Toche and Dr. Mehta will be able to determine.  At the same time, the court recognizes the
7 urgency that must attend satisfactory completion of data remediation, as CQIT cannot be
8 implemented until the data on which it depends can be validated and verified.  Accordingly,
9 recognizing the parties are meeting and conferring on this topic, defendants also will be directed
10 to work under the guidance of the Special Master to develop preliminary activation schedules for
11 completion of data remediation and to file those preliminary activation schedules by September
12 29, 2021.  To the extent feasible, defendants shall include with the preliminary activation
13 schedules a review of all contingencies that at this time preclude development of final activation
14 schedules for completion of data remediation.  Given its importance, the court will place this
15 matter on the agenda for the October 1, 2021 status conference.

16 III.　　GOING FORWARD

17 　　　　　At hearing, the court discussed with the parties whether it should impose a
18 moratorium on further motion practice pending completion of the settlement conference process
19 now underway.  The court has carefully considered the arguments of counsel as well as the
20 representations of Secretary Allison and Dr. Mehta of their full commitment to the settlement
21 process and that neither of the matters raised in defendants' emails are in any way a prelude to a
22 termination motion.  The court also has reviewed controlling court orders.  At this time, the court
23 finds that for now the governing orders are adequate to ensure a proper focus by all concerned
24 going forward.

25 IV.　　CONCLUSION

26 　　　　　In accordance with the above, IT IS HEREBY ORDERED that defendants are
27 directed to work under the guidance of the Special Master to develop preliminary activation
28 schedules for completion of the data remediation  currently underway.  Defendants shall include

with the preliminary activation schedules a review of all contingencies of which they are aware that preclude at this time development of final activation schedules for completion of data remediation. The preliminary activation schedules shall be filed by September 29, 2021. The court will place data remediation on the agenda for the October 1, 2021 status conference.

DATED: August 25, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE