UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　　Defendants. | No. 2:90-cv-0520 KJM DB P<br><br><br><br>ORDER |

The question of whether defendants should be required to conduct a study to determine whether there is an unmet need for higher levels of mental health care among members of the plaintiff class is pending before the court. As the court has signaled over the past year, *see*, *e.g.*, September 3, 2020 Order, ECF No. 6846, at 27, for the reasons explained below defendants will be required to conduct that study consistent with this order and under the supervision of the Special Master as soon as practicable, complying with public health requirements necessitated by the ongoing COVID-19 pandemic.

/////

/////

1

I. BACKGROUND

On September 9, 2019, the court issued an order setting an agenda for the second quarterly status conference for that year, held on September 13, 2019.[1] September 9, 2019 Order, ECF No. 6275. One agenda item was an update on the status of defendants' plan to build 100 mental health crisis beds (MHCBs). *Id*. at 1-2. As the court explained in the order after that status conference, defendants had reduced the project to 50 MHCBs at "at California Institution for Men, putting plans for another 50 MHCBs at Richard J. Donovan (RJD) on hold." October 8, 2019 Order, ECF No. 6312, at 4. At that time, defendants anticipated construction funding might be "available as early as July 1, 2020." ECF No. 6231 at 3.[2]

Prior to the September 13, 2019 status, the Special Master provided information to the court about a rise in inmate suicides in August 2019. This information and the ongoing growth in the size of the population of mentally ill inmates in California's prisons, together with ongoing shortages in MCHBs "raise[d] significant questions in the court's mind about whether this case is anywhere close to full remediation"; as the court observed, "[w]ith respect to MHCBs in particular, it cannot be denied that, historically, deficient bed planning has plagued this case and been a bar to movement in the right direction." ECF No. 6312 at 4.

At the September 2019 status, plaintiffs raised several questions about the downsizing of the MHCB bed project, including whether the reduced project would allow defendants to decommission 73 unlicensed MHCBs[3] in the Mental Health Services Delivery

---

[1] The court held quarterly status conferences in 2019 and 2020. *See* Reporter's Transcript of Proceedings (8/28/18 RT), ECF No. 5905, at 5:17-23; *see also* ECF Nos. 6134, 6281, 6419, 6513, 6546, 6778, 6883, 6998. Beginning as of January 2021, the court is holding status conferences on a more "organic" basis, "that is, tied to what's happening in the case." Reporter's Transcript of Proceedings (1/29/21 RT), ECF No. 7049, at 6:1-5. As used in this order, the date appended to a Reporter's Transcript (RT) citation refers to the date of the status conference recorded by the transcript and not to the date the transcript was filed.

[2] Defendants' latest status report on the project shows construction funding was appropriated in a Budget Act signed by Governor Newsom on June 28, 2021, but that the project is now delayed by an action in state superior court concerning the Environmental Impact Report for the project. ECF No. 7289 at 3-4; *see also* fn 12, *infra*.

[3] On November 27, 2019, defendants reported CDCR currently had fifty-four male unlicensed crisis beds (twenty at California State Prison-Sacramento and thirty-four at the

System (MHSDS) and still provide a sufficient number of licensed MHCBs to meet demand; whether the reduced project could be timely finished; the significance, if any, "of an increase in the percentage of suicides that occur within thirty days of discharge from higher levels of care"; whether there was any "pressure on clinicians not to refer class members to higher levels of care" and what, if any, was "the significance of the declining inpatient population at Atascadero State Hospital [(ASH)] and Coalinga State Hospital [(Coalinga)]". *Id*. at 4-5.

After the status conference, the Special Master informed the court that the issues he had identified, together with the questions raised by plaintiffs, "suggest a likely need for a study similar to those conducted several times during the remedial phase to determine whether there is an unmet need for MHCB care and inpatient care in CDCR's [California Department of Corrections and Rehabilitation's] inmate population." *Id*. at 5-6. The court directed focused briefing on these issues and set them for further consideration at the December 13, 2019 quarterly status conference. *Id*. at 6.

The parties filed opening briefs on November 27, 2019, ECF Nos. 6401 (Plaintiffs' Brief); 6402 (Defendants' Brief), and responsive briefs on December 9, 2019, ECF Nos. 6410 (Plaintiffs' Reply); 6411 (Defendants' Reply). The court discussed the issue with the parties at the December 13, 2019 status conference and took the matter under submission. *See* Reporter's Transcript of Proceedings (12/13/19 RT), ECF No. 6445, at 20:24-29:23.

On March 17, 2020, the court issued an order setting the agenda for the first quarterly status conference of 2020. March 17, 2020 Order, ECF No. 6509. The agenda included discussion of improvements to the so-called "sustainable process" for "timely identification, referral and transfer of" class members to inpatient mental health care. *Id*. at 3. The court explained it had

> reached the tentative conclusion that at least one additional unmet bed needs study will be required in order for defendants to

---

California Institution for Men) and 373 male licensed crisis beds. CDCR had nineteen female unlicensed crisis beds and ten licensed crisis beds at the California Institution for Women, and twelve female licensed beds at the Central California Women's Facility. ECF No. 6402 at 2. The current number of male MHCBs has decreased to 397, *see* ECF No. 7274 at 16, but there is no showing that any unlicensed MHCBs have been decommissioned.

> demonstrate (a) that they have a sufficient number of licensed inpatient mental health beds, including mental health crisis beds; and (b) that all class members in need of inpatient mental health care are in fact being timely identified, referred, and transferred to such care.

*Id*. In view of this conclusion, the court directed the parties to "be prepared to discuss the time frame for conducting such a study and, in addition, whether they will stipulate to defendants' conducting such study under the guidance and supervision of the Special Master without further order of this court." *Id*.

Almost immediately thereafter, the onset of the COVID-19 pandemic required the court and the parties to refocus their attention on issues arising directly from the pandemic's impact on provision of mental health care to class members. As a consequence, as well as the significant limitations placed on access to California's prisons, it became clear an unmet bed needs study could not be conducted until the Special Master's team could regain access to the state prison facilities, safely and consistent with public health requirements. As recently reported at the March 25, 2021 status conference, *see* Reporter's Transcript of Proceedings (3/25/21 RT), ECF No. 7111, at 45:22-47:20, the Special Master and his team have begun the Twenty-Ninth Monitoring Round in prison institutions, and the Special Master reports the unmet bed needs study may start after the monitoring team has visited all of the institutions with psychiatric inpatient programs (PIPs), if the court confirms its tentative conclusion as it does now here.

II.     ROLE OF UNMET BED NEEDS STUDIES IN THIS ACTION

Significant delays in access to necessary inpatient mental health care are a major component of the Eighth Amendment violation requiring remediation in this action. *See Coleman v. Wilson*, 912 F. Supp. 1292, 1309 (E.D.Cal. 1995). Adequate remediation requires a sufficient number of inpatient beds to timely treat class members in need of inpatient care, adequate inpatient treatment programs, and a robust process for identification, referral, and timely transfer of these class members to necessary inpatient care. Over the past two decades, assessments of unmet need for inpatient mental health care in California's prison population have played a central role in all of these areas.

A. <u>Unidentified Needs Assessment (UNA) of 2005</u>

In 2004, the Special Master reported to the court that after four years of delay defendants were finally "committed to conducting an adequate study" of unmet need for inpatient mental health beds for class members. July 9, 2004 Order, ECF No. 1594, at 1-2. On October 5, 2004, the court adopted the Special Master's recommendation on the methodology to be used in the unidentified needs assessment (UNA) and directed defendants to complete the assessment study by March 15, 2005 and submit to the Special Master by March 31, 2005 "their plan to meet any unmet need for inpatient care documented in the assessment." October 5, 2004 Order, ECF No. 1607, at 2. That assessment "confirmed and quantified" a long-suspected significant unmet need for inpatient care among members of the plaintiff class: "UNA . . . found 512 CDCR inmates, who were not referred for inpatient DMH [Department of Mental Health[4]] care although they were clinically appropriate for such a referral, including 435 inmates in need of an intermediate level of care and 77 in need of acute inpatient care, representing respectively 14 and two percent of [CDCR]'s total EOP [Enhanced Outpatient Program] population." ECF No. 1746-3 at 81.[5]

As a result of this study, defendants submitted a long-range proposal to build "three regional facilities, each with 1,500 beds, to house expanded inpatient programs, as well as other intensive programs for CDCR inmates most seriously mentally ill and presenting the most difficult custody challenges." *Id*. at 82.[6] The projected full buildout of the plan for 2013. *Id*.

---

[4] DMH is now known as the Department of State Hospitals (DSH).

[5] Citations to page numbers in documents filed in the Court's Electronic Case Filing (ECF) system are to page numbers assigned by the ECF system and located in the upper right hand corner of the page.

[6] While this may have been the first proposal during the remedial phase of this action for consolidation of the delivery of mental health care services in a few facilities focused on delivery of such care, it was not the last. In early 2008, this court, together with the courts in three other class actions, approved agreements for construction of approximately 5,000 mental health beds and 5,000 medical beds (the so-called 10,000 bed project), consisting of seven health-care facilities with 1,500 beds each. *See* February 26, 2008 Order, ECF No. 2696, at 3; October 30, 2008 Order, ECF No. 3140, at 4. By July of 2008, state administration officials had withdrawn their support for the project and after a period of litigation between state officials and the *Plata* Receiver, the Receiver, working with then Secretary of CDCR Matt Cate and other CDCR staff,

The Special Master reported that "[t]he California General Assembly declined to fund the next phase of development of the three regional facilities . . . based essentially on the department's inability to justify adequately the nature and extent of the anticipated need for so large an undertaking." *Id*. Instead, defendants embarked on development of additional inpatient treatment units through conversion and renovation of existing space in prison facilities. *Id*. at 83-88. Defendants did not, however, identify a specific number of beds that would be required to meet the "substantial and growing need" for inpatient mental health beds for Level IV (high custody) inmates and, in any event, it was apparent the interim planning would require four years to complete and would meet "only part of the clear need." *Id*. at 85.

          B.        Mental Health Assessment and Referral Project (MHARP) of 2009-2010

In October 2006, as part of the ongoing remedial effort to achieve a sufficient number of inpatient mental health beds, the court ordered defendants to contract for a period of three years with a consultant to conduct annual population studies to project bed needs for their mental health program populations.[7] October 20, 2006 Order, ECF No. 1998, at 2.[8] Less than three years later, and only four years after completion of UNA, the possibility of unmet inpatient mental health bed needs again arose, this time through the consultant.

---

scaled back the project significantly. *See* ECF No. 3852-1 at 46-47. While the concept of clustering class members in a limited number of facilities to consolidate programs, staff, and services has never firmly taken hold in this case, information provided at the court's recent status conference by Dr. Joseph Bick, Director of Health Care Services for both CDCR and the California Correctional Health Care Services, suggests that decreased patient movement necessitated by the pandemic may have had some beneficial effect in avoiding disruption of care caused by "unintended consequences of frequent movement." *See* 3/25/21 RT, ECF No. 7111, at 22:5-19.

[7] This was not the first time defendants worked with a consultant to project mental health bed needs. *See*, *e.g.,* ECF No. 1746-3 at 98 (in 2002, defendants' consultant projected a need for 224 mental health crisis beds (MHCBs) for male inmates by 2005; by mid-2005, defendants had "the equivalent of some 175 to 180 male MHCB beds.").

[8] The court ordered that contract renewed in July 2009, July 9, 2009 Order, ECF No. 3629, at 3; to this date, defendants continue to contract with the consultant to obtain spring and fall mental health bed needs projections.

In March 2009, the consultant informed defendants and the Special Master "that there could be an unidentified need for inpatient beds among members of the plaintiff class and that the best way to determine this was to conduct an assessment." March 31, 2009 Order, ECF No. 3556, at 3. As a consequence, the Special Master recommended "that CDCR and DMH clinicians be required to, forthwith and working together, conduct on an expedited basis a modified assessment to determine whether there are unmet needs for inpatient care among members of the plaintiff class and to refer any inmates identified during this modified assessment for appropriate care." *Id*.

The court adopted the recommendation and ordered defendants to conduct the modified assessment supervised by the Special Master and his experts. *Id*. at 6; *see also* June 18, 2009 Order, ECF No. 3613, at 4 (expanding scope of assessment to "all non-desert CDCR institutions" and requiring its completion by December 31, 2009). This assessment, called the CDCR/DMH Mental Health Assessment and Referral Project or MHARP, "involved review and assessment of over 1,500 *Coleman* class members at all 28 non-desert prisons" in CDCR and resulted in the identification and referral of "almost 1,000 inmates . . . for inpatient mental health care." January 27, 2010 Order, ECF No. 3787, at 2. During this period, over 500 high custody inmates remained on waitlists for transfer to inpatient care, *id*. at 3, and by February 2010, "the wait list for inpatient had grown, . . . , to approximately 574 male inmates waiting for intermediate care and 64 male inmates waiting for acute inpatient care"; there was also "a waitlist for female admissions to inpatient care." March 31, 2010 Order, ECF No. 3831, at 2-3.

In March 2010, the court held a status conference to

> hear from defendants concerning the steps they have taken and are taking to ensure that the referral and transfer of inmates to higher levels of care is proceeding in a way that will avoid the need for any future special assessments of unmet need and will ensure that those who required inpatient care are referred and admitted in a timely manner.

*Id*. at 1-2 (quoting ECF No. 3787 at 7). The court found "defendants have, as they report, taken 'incremental steps toward establishing a sustainable process of identification and referral for those inmate-patients who need a higher level of care'" and ordered the Special Master to report

7

to the court on this process by the end of 2010.  ECF No. 3831 at 2 (quoting Defendants' Status Report, filed March 26, 2010, at 10).  The Special Master reported on the results of his review of this process in his Twenty-Second Round Monitoring Report, filed March 9, 2011.  ECF No. 3990 at 436-451.  The court also ordered defendants to develop a plan to "reduce or eliminate the waitlists for inpatient care." *Id.* at 3-4.  As discussed below, the Special Master reported to the court on that plan in June 2011.

### C. Assessment and Referral Project of 2011

On June 13, 2011, the Special Master filed a report and recommendations on defendants' plan to reduce wait lists for inpatient care required by the court's March 31, 2010 order.  ECF No. 4020.  In relevant part, he reported that referrals to inpatient care had once again declined significantly and that the new referral policies had not been fully implemented. *Id*. at 49. He reported "there has emerged a pattern of rising and falling numbers of referrals that are correlated with the occurrences of assessments." *Id*. at 56.  He therefore recommended a further assessment, modeled after MHARP, at "the original twelve identified male institutions and two female institutions." *Id*. at 59.  In anticipation of that recommendation, which they opposed, defendants on June 8, 2011 sent a letter to the Special Master setting out an alternative assessment plan.  ECF No. 4020-2 at 2.  In its July 22, 2011 order adopting in part the Special Master's June 13, 2011 recommendations, the court found that defendants' alternative assessment process "differ[ed] significantly from the MHARP process" recommended by the Special Master and that defendants had started the alternative assessment process "apparently after the Special Master's recommendation was pending before [the] court."  July 22, 2011 Order, ECF No. 4045, at 8.  The court found the Special Master's recommendation for another unmet bed needs assessment was "based on his finding that the bed need identified in MHARP more closely approximates the actual inpatient bed need than the referrals to inpatient care that are currently being generated" and that "the numbers generated by defendants' own preliminary attempt at assessment, if anything, would seem to support this finding." *Id*. at 9.  The court set an evidentiary hearing on the adequacy of defendants' alternative assessment process to identify "class members in need of inpatient care who should have [been] but were not identified through defendants' referral

8

process." *Id*. at 9-10. Ultimately, the evidentiary hearing was vacated after defendants, working diligently with the Special Master, developed a "sustainable process for identifying, referring and transferring inmates to inpatient care." July 13, 2012 Order, ECF No. 4214, at 1.

    D.  December 2015/January 2016 Review

In May 2016, the Special Master filed a special monitoring report focused on the mental health inpatient programs for class members. ECF No. 5448. No party filed objections to that report, and the court adopted its findings in full. March 8, 2017 Order, ECF No. 5573, at 2. A number of findings are key to the question now before the court:

- By 2015, the "sustainable process" the court had lauded in 2012 had "turned out to be unsustainable."

ECF No. 5448 at 24.

- Declining admissions and/or census in the *Coleman*-designated beds at ASH, particularly when accompanied by declining referrals to these beds, interfered with class members' access "to their clinically and custodially appropriate least restrictive housing unit (LRH), an important concern from a therapeutic viewpoint.

- Declining admissions and/or census in the *Coleman*-designated beds at ASH, particularly when accompanied by declining referrals to those beds, also had "a resounding ripple effect throughout all of the DSH inpatient programs which treat these patients, creating almost instantly a reshuffling for other beds at other DSH programs, and at CDCR a back-up of patients awaiting DSH placement" and "overly long" "stays in MHCBs."

/////
/////
/////
/////
/////

- This "domino effect – as avoidable as it is with consistent, appropriate use of the DSH-Atascadero beds – has been repeated all too often over many years. . . ."

*Id*. at 8-9.  Defendants' July 2017 transfer of several inpatient programs from DSH to CDCR, known as "lift and shift,"[9] does not alter the import of these key findings:  while transfer of most inpatient programs to CDCR was "conceived to improve patient access by streamlining the existing process of referral, acceptance, transfer, and admission" of class members to necessary inpatient care, *id*. at 14, ASH remains a primary inpatient mental health program for inmates eligible for treatment in a low-custody setting and, regardless of whether the other inpatient programs are operated by DSH or CDCR, utilization of the full complement of ASH beds remains critical to avoiding the adverse ripple effect for inpatient care the 2016 report describes.  *See*, *e.g.*, ECF No. 7274 at 19 (Psychiatric Inpatient Programs Census Report as of 7/19/2021, showing sixty-five percent, or 256, of the total number of 390 male low custody intermediate care facility (ICF) beds available for class members, are at ASH).  As of July 19, 2021, only 128 of the ICF beds at ASH were filled.  *Id*.

        E.     <u>March 24, 2017 Order</u>

In January 2017, the court held an evidentiary hearing "to address ongoing issues with timely access to inpatient mental health care and" MHCBs.  March 24, 2017 Order, ECF No. 5583, at 1.  The lessons learned from the history of remedial efforts and the role of unmet bed needs studies played a key role in the findings and conclusions set out in the court's order following that hearing.  Among other things, the order summarizes the clarity brought to the remedial process by the "detailed summary" contained in the Special Master's 2016 report "of the [twenty year] history of efforts to remediate this Eighth Amendment violation, the obstacles to

---

[9] "Lift and Shift" was a joint project of the CDCR and DSH defendants "that transferred responsibility from DSH to CDCR over" acute and intermediate inpatient programs located in CDCR prison institutions.  ECF No. 5779 at 24.  The Special Master worked with both agencies on the project over a five month period prior to its implementation.  *Id*.

compliance, and the numerous court orders that have been directed at achieving constitutional compliance." *Id*. at 4-5 (citing ECF No. 5548 at 22-44).

> An insufficient number of inpatient beds, or delays in placement and transfer of inmates referred for inpatient care, or both, has a chilling effect on identification and referral of class members to necessary hospital care. *See, e.g.*, [ECF No. 5448 at] 8 & n.8. Defendants' failure to consistently fill the full complement of designated low-custody inpatient beds has
>
>> a resounding ripple effect throughout all of the DSH inpatient programs which treat these patients, creating almost instantly a reshuffling for other beds at other DSH programs, and at CDCR a back-up of patients awaiting DSH placement. Stays in mental health crisis beds (MHCB) at CDCR soon become overly long, as patients are waiting for admission and transfers to the inpatient programs they need.
>
> *Id*. at 9. Three times in the past twelve years, the Special Master has guided an assessment of unmet needs for identification and referral to inpatient care. Id. at 23. The first, conducted in 2005, resulted in identification of 400 inmates in need of inpatient mental health care. *Id*. at 8 n.8. The second, in 2009, found almost 1,000 inmates in need of inpatient mental health care who had not been identified or referred to an inpatient program. *Id*. at 29. The last assessment, conducted in 2011, led to planning and implementation in 2012 of a so-called "sustainable self-monitoring process ('the sustainable process') to ensure that inmates in need of inpatient care were timely identified, referred, and transferred to such care." *Id*. at 24. As the Special Master reported, however,
>
>> the gains in access to inpatient care turned out to have been short-lived.  Over time, in each instance, the number of Coleman class members in DSH beds diminished, referrals and transfers slowed, and waitlists grew – just as they did by July 2015. The process known as the sustainable process for identification, referral and transfer of CDCR inmates to inpatient care at DSH unfortunately turned out to be unsustainable.
>
> *Id.*
>
> As described in detail by the Special Master, court orders going back to 1998 reflect the myriad efforts to address ongoing problems with access to inpatient care. *See id.* at 36-39. Defendants have presented several plans to address those problems, including plans for creation of a sufficient number of beds, both through conversion and utilization of beds at DSH hospitals and through construction of additional space at CDCR prison facilities, as well as review of custody criteria in order to increase "referrals of patients whose custody factors had previously precluded them from being placed in dorm settings or low custody beds at" Atascadero State Hospital (ASH). *Id*. at 25-35. These plans have been approved in whole or in part by the court and, where approved, ordered

> implemented. Id. at 36-39. And yet, by July 2015 the waitlists had swelled again and court intervention has once more been required. A particularly telling graph in the report shows three times in the past eight years when increases in the number of unoccupied Coleman beds at ASH have declined after issuance of court orders aimed at reducing or eliminating inpatient waitlists, followed after approximately three years by increases in unoccupied ASH beds and then declines again only after court intervention.

ECF No. 5583 at 4-6. And the court concluded its order with the fundamental finding that twenty years of remedial effort had given defendants all the tools they need to "meet the requirements of their remedial plan for timely transfer of class members to necessary inpatient mental health care":

> They have conducted at least three studies of unmet need, resulting, at different times, in identification and referral of approximately 1500 class members in need of inpatient care. Under court order, they have contracted with a consultant to project mental health bed capacity need four years into the future. Under court order, they have presented the court with short-term bed plans and long-range bed plans, they have implemented some of those plans, and they have constructed additional inpatient beds. At this point it is clear that defendants have sufficient options available to them to meet Program Guide timelines for transfer of all class members referred for inpatient care even if demand spikes or emergencies arise to temporarily reduce capacity.

Id. at 24.

### III. DISCUSSION

As discussed above, the question of whether to require a further unmet bed needs study arose initially in the context of assessing whether defendants' decision to build only 50 licensed MHCBs, deferring construction of another 50 MHCBs that were originally planned, would be sufficient to both take all unlicensed MHCBs offline and meet the long-term need for a sufficient number of licensed MHCBs.[10] In the briefing filed in November 2019, defendants contended that then recent population projections, if accurate, combined with "the past year's

---

[10] The court's July 3, 2019 and July 9, 2019 orders make clear defendants cannot continue to use unlicensed MHCBs and that a "date certain must be set for taking all temporary MHCBs offline and, as necessary, replacing them with permanent licensed MHCB units." July 9, 2019 Order, ECF No. 6214, at 18; *see also* July 3, 2019 Order, ECF No. 6212, at 7-10.

actual bed usage"[11] suggest that the 50 bed MHCB project "is expected to permit Defendants to take all unlicensed crisis beds offline once the project is completed in December 2022."[12] ECF No. 6402 at 2. Plaintiffs contend defendants have not shown how they can deactivate the existing 73 unlicensed MHCBs and meet ongoing need with the addition of only 50 MHCBs and that the existing number of unlicensed beds alone exceeds the number in the 50 bed plan. ECF No. 6401 at 4, 8. It is also clear defendants continue to operate a number of unlicensed inpatient beds, which must also be replaced with fully licensed beds. *See*, *e.g.*, April 22, 2021 Stipulation and Order, ECF No. 7133.

As the history of remediation in this area described in preceding sections of this order makes clear, defendants need both accurate mental health population projections and a fully sustainable process for continuous identification, referral, and placement of class members at the appropriate level of mental health care in order to accurately determine and plan for the number of inpatient beds, including MHCBs, required to meet the needs of the plaintiff class. Defendants' suggestion that population projections plus actual bed usage is necessarily an accurate measure of bed need misses the mark and ignores substantial history in this case. Actual inpatient bed usage is only an accurate measure of bed need if it is otherwise clear that bed usage is the result of a robust and thorough process of identification and referral of class members in need of inpatient care.

---

[11] As noted, the parties briefing was filed in late 2019.

[12] On March 29, 2021, defendants reported to the court that the expected completion date for the project had slipped to September 2023, two years after the anticipated start of construction in September 2021. ECF No. 7114 at 3. Defendants also reported at that time that the start of construction might be further delayed as a result of a state court decision finding inadequacies in the environmental impact report prepared for the project. *Id*. That prediction is confirmed by defendants' latest status report, ECF No. 7252; defendants now report the San Bernardino Superior Court found "three inadequacies in the Environmental Impact Report" for the project which must be addressed before they can proceed with the project, and that they will not be able to revise the timeline for completion of this project until the Superior Court's judgment is finalized and defendants decide whether to appeal that judgment and/or negotiate with the petitioners. ECF No. 7252 at 3.

As discussed above, over the past two years red flags that suggest a less than robust identification or referral process include a decline in referrals to ASH and/or the numbers of class members at ASH. At the September 13, 2019 status conference, which took place prior to the onset of the COVID-19 pandemic, defendants acknowledged these specific declines. *See* Reporter's Transcript of Proceedings (9/13/2019 RT), ECF No. 6349, at 23:19-22. Since COVID-19, public health and other considerations have also slowed the referrals and admissions to ASH. As of July 19, 2021, only 128 of the 256 *Coleman* inpatient beds at ASH were occupied. *See* ECF No. 7274 at 19.

In addition, at the December 13, 2019 status conference, defendants acknowledged that the sustainable process for identification and referral of inmates to inpatient care was not working as intended and that "there are some issues . . . that need to be refined." *See* 12/13/2019 RT, ECF No. 6445, at 24:4-23. Again, there is a strong inference in the record that the COVID-19 pandemic may have exacerbated these issues, given the significant restrictions on inmate movement and transfers since the onset of the pandemic.

Given all of the foregoing, defendants' contention that they should be permitted to fix the sustainable process without conducting an unmet bed needs study must be rejected. The history of this litigation shows that the absence of a robust sustainable process for identification and referral of inmates to inpatient care has inevitably led to large numbers of inmates in need of inpatient care remaining unidentified and unreferred to such care. Fixing the process puts the cart before the horse: once the sustainable process began to break down it became incumbent on defendants to take all steps available to them to find any class members in need of inpatient care who might have slipped through the cracks. The COVID-19 pandemic has only increased the urgency of this task: the freeze on inmate movement has, despite defendants' reliance on temporary mental health units and treatment in place measures, delayed transfers of inmates to necessary inpatient care; as the court found in the March 24, 2017 order, "has chilling effect on identification and referral of class members to necessary hospital care." ECF No. 5583 at 5.

Defendants must, under the supervision of the Special Master, undertake an unmet bed needs study to assess whether there are class members in need of inpatient or crisis bed care

who have not been identified or referred to necessary care. This unmet bed needs study must be sufficiently broad in scope and focused in methodology to ensure that it results in a clear and comprehensive assessment of whether there is any unmet need for access to necessary inpatient care, whether unmet need is the result of an insufficient number of beds in one or more inpatient programs or whether it is the result of an absence of necessary treatment programs. The Special Master has informed the court that there is a subset of class members with severe personality disorders associated with significant function impairments who have special treatment needs not yet available in an inpatient setting. The Special Master will be directed to ensure that the scope of the unmet bed needs study conducted in accordance with this order is sufficient to identify with specificity the size of that need and what is required to ensure that it is met, as well as to adequately identify whether there is any other ongoing unmet need for inpatient care.

The importance of a robust and adequate unmet bed needs study at this stage cannot be overstated. Only in the context of such a study can the court make a reasoned determination as to whether defendants' 50 bed MHCB plan is adequate. Only in the context of such a study can the court have confidence that meaningful repair to the sustainable process for identification, referral, and transfer of inmates to required inpatient care has been accomplished. As defendants recognize in the recent stipulation requesting one more extension of the waivers of state law in order to operate unlicensed inpatient beds at California Medical Facility (CMF), only in the context of such a study can all stakeholders be confident in the plan defendants are developing to replace unlicensed inpatient beds with fully licensed beds. *See* ECF No. 7133 at 3 (defendants are developing a long-term plan to deactivate unlicensed inpatient beds at CMF and need sufficient time to develop that plan "in response to the Special Master's upcoming inpatient program monitoring and anticipated unmet bed needs assessment.") Most importantly, as the history of this case has shown an unmet bed needs assessment is the most effective way to demonstrate the adequacy or inadequacy of defendants' progress toward remediation of the Eighth Amendment violation in class member access to inpatient mental health care.

In accordance with the above, IT IS HEREBY ORDERED that defendants shall, as soon as practicable, in accordance with this order, and under the guidance and supervision of

the Special Master who shall have final authority over the scope of and methodology for the study, undertake an assessment of whether there is unmet need for inpatient care, including acute care, intermediate care, and mental health crisis bed care, among members of the plaintiff class. Defendants shall report to the court on the outcome of that assessment within thirty days after its completion.

DATED:  September 10, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE