ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
LAUREL E. O'CONNOR, State Bar No. 305478
DAVID C. CASARRUBIAS, State Bar No. 321994
 1676 N. California Boulevard, Suite 620
 Walnut Creek, CA 94596
 Telephone: (925) 746-8460
 Fax: (925) 746-8490
 E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

**RALPH COLEMAN, et al.,**

Plaintiffs,

v.

**GAVIN NEWSOM, et al.,**

Defendants.

Case No. 2:90-cv-00520 KJM-DB (PC)

**PARTIES' SECOND JOINT STATEMENT IN RESPONSE TO JULY 26 ORDER FOR SETTLEMENT CONFERENCES**

Judge: The Hon. Kimberly J. Mueller

On July 26, 2021, the Court ordered the parties to begin a series of settlement negotiations with the assistance of a magistrate judge. (ECF No. 7246.) The July 26 order requires the parties to file a joint statement outlining specific issues for settlement related to suicide prevention and issues that "should be covered" in a settlement conference on cultural collaboration. (*Id.* at 2.) The parties are also required to identify representatives of each party who are the key problem solvers with the most knowledge of the substance of each issue, as well as those individuals with

final authority to approve any settlement. (*Id.* at 2.) The parties present below their respective statements on the issues and identification of representatives required by the July 26 order.

## DEFENDANTS' POSITION STATEMENT

### I. SUICIDE PREVENTION.

The July 26 order identified the following topics to be covered in a settlement conference on suicide prevention: (1) the foreseeability/preventability analyses made in connection with the review and reporting on inmate suicides; (2) compliance with the Special Master's expert's recommendations; (3) enforcement of activation schedules; and (4) the schedule for delegation of suicide prevention monitoring to CDCR.

### A. Foreseeability/Preventability Analyses.

Many experts question the utility of foreseeability and preventability determinations in a mortality review context.[1] Among other things, foreseeability and preventability determinations in the manner requested by the Special Master often result in arbitrary, methodologically unreliable labels, and also do not adequately acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[2] Ultimately, such narrow foreseeability and preventability determinations frequently divert attention from opportunities for improvement that will lead to system-wide quality improvement and patient safety.

That is why the field of mortality reviews itself has largely shifted away from narrow foreseeability and preventability determinations to a more holistic approach that focuses on opportunities for improvement. Under the modern view, a well-performing mortality review

---

[1] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, https://cchcs.ca.gov/wpcontent/uploads/sites/60/UCSF/Mortality-Review-Report.pdf (last accessed on 03/22/2021) (recommending that performance be tracked without relying on subjective and often variable assessments of "preventability" to emphasize quality improvement via identification of opportunities for improvement). The specific term "foreseeability" is not addressed in Dr. Brie Williams's Final Report. However, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement. (ECF No. 7182 at 4.)

[2] *Id.*

system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical education responses (immediate change) or initiatives (longer term) that are then evaluated to determine whether they yielded improvements along relevant clinical benchmarks." (ECF No. 7182 at 5.) This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death. (*Id*.) Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like "foreseeable" and "preventable" and towards assessments that focus on opportunities for improvement. (*Id* At the same time, such assessments should include staff level remediation, including training and accountability measures where appropriate.

**B.    Compliance with the Special Master's Expert's Recommendations.**

Defendants would like to propose a framework for determining substantial and durable compliance with the Special Master's expert's recommendations, for discussion at the November 1, 2021 settlement conference. The proposed framework will be circulated at least two weeks before the settlement conference.

**C.    Enforcement of Activation Schedules.**

Defendants are currently in compliance with all activation schedules, and regularly update the Special Master and Court of any changes.

**D.    The Schedule for Delegation of Suicide Prevention Monitoring to CDCR.**

Defendants would like to propose a schedule for delegation of all suicide prevention monitoring to CDCR, for discussion at the November 1, 2021 settlement conference. The proposed schedule will be circulated at least two weeks before the settlement conference.

**II.    CULTURAL COLLABORATION AND DEFENDANTS' CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN.**

The term "cultural collaboration" has been used in *Coleman* to refer to the need to address the original 1995 judgment that found CDCR's custody staff were insufficiently trained to

identify signs and symptoms of mental illness. *Coleman v. Wilson*, 912 F.Supp. 1282, 1320 (E.D. Cal. 1995).  Subsequently, the Court defined the issue to include the purported dysfunction between custody and mental health staff that discouraged inmate participation in treatment, thereby allegedly thwarting access to mental health programs.  (ECF No. 3029 at 188.)  The term focuses on the relationship between custody staff and mental health staff and the challenges they face in delivering mental health care services to *Coleman* class members.

On August 9, 2016, the Court ordered Defendants to identify and implement a comprehensive strategy to achieve successful collaboration between custody and mental health staff at all prisons that house seriously mentally ill inmates.  (ECF No. 5477 at 7, 9.)  In response to that order, Defendants developed and implemented a plan to address the issue of collaboration between mental health staff and custody staff.  Defendants' plan, called the Custody and Mental Health Partnership Plan (CMHPP), was implemented in 2018 (ECF No. 5916), and further updated in 2019.  (ECF No. 6278.)  The Special Master reviewed and reported on CDCR's plan in March 2021 (ECF No. 7074), and the Court has issued several orders approving the original plan and required updates.  (ECF Nos. 6095, 6126, 6314, and 6846.)

Defendants are concerned by Plaintiffs' attempts to expand the issues to be addressed within the scope of "cultural collaboration" and thereby perpetually move the remedial goalposts in this 31-year-old litigation.  Because the CMHPP has been almost fully implemented, with the exception of a few small items delayed due to COVID-19, the issues that should be in the focus of a settlement conference with respect to cultural collaboration are CDCR's future tracking of and reporting on compliance with the plan.

### III. IDENTIFICATION OF KEY PROBLEM SOLVERS AND INDIVIDUALS WITH SETTLEMENT AUTHORITY FOR SUICIDE PREVENTION AND CULTURAL COLLABORATION.

Defendants identify the following individuals as the key problem solvers who have the most knowledge of the substance of suicide prevention and cultural collaboration issues:  Diana Toche, Undersecretary for Health Care Services, Connie Gipson, Director of the Division of Adult Institutions, Amar Mehta, CDCR Deputy Director for the Statewide Mental Health Program, Steven Cartwright, Assistant Director for the Statewide Mental Health Program, and

[3653490.1]   4
Parties' Second Jnt. Stmt. in Resp. to July 26 Order for Settlement Conference (2:90-cv-00520 KJM-DB (PC))

17859575.1

1  Travis Williams, Mental Health Administrator for the Statewide Mental Health Program.
2  Defendants may identify additional key problem solvers as necessitated by the parties'
3  confidential settlement conference statements and preparation for the upcoming settlement
4  conference. Any additional problem solvers will be disclosed to Plaintiffs and the settlement
5  judge in advance of the settlement conference.

6  The following individuals have final authority to sign off on any settlement concerning the
7  suicide prevention and cultural collaboration issues identified in this statement: CDCR Secretary
8  Kathleen Allison.

## PLAINTIFFS' POSITION STATEMENT

### I. TIMING AND SEQUENCE OF UPCOMING SETTLEMENT CONFERENCES SET BY JULY 26 ORDER.

Plaintiffs request that this Court reconsider the timing and sequence of the two settlement conferences tentatively set by the July 26 order. The issues related to Cultural Collaboration, discussed further below, have already been the subject of initial negotiations. By contrast, many aspects of the Suicide Prevention topics are not ripe for fruitful discussion at this time due to the fact that the Special Master's suicide prevention expert is mid-way through his Fifth Re-Audit and Defendants are in midst of addressing numerous suicide prevention steps outlined in the court-ordered activation schedules. It will therefore be difficult if not impossible to fully resolve the suicide prevention topics at the forthcoming November 1 settlement conference. Plaintiffs request that the November 1 settlement conference be devoted to Cultural Collaboration issues.

### II. SUICIDE PREVENTION.

#### A. Issues in Dispute and Topics for Suicide Prevention Settlement Conference.

The suicide prevention mediation had been set for January 2022 in the July 26 order. (ECF No. 7246 at 2.) By minute order on September 15, 2021, Judge Newman advanced the suicide prevention mediation session to November 1, 2021. (ECF No. 7313.)

Plaintiffs identify the following topics and issues in dispute to be discussed related to suicide prevention.

1. **Foreseeability/preventability analyses:** Whether Defendants should be required to continue doing a foreseeability and preventability analysis as part of the Suicide Review Committee's review of each individual suicide in CDCR.  Whether, if and when Defendants assume responsibility for producing omnibus annual suicide reports from the Special Master, they should be required to include foreseeability and preventability analyses in those reports.  Whether Defendants should be required to use the court-ordered foreseeability and preventability definitions that have long been utilized by the Special Master rather than any other version of those definitions.  Whether some alternative analytical review process for evaluating aspects of accountability related to suicides should replace the existing foreseeability and preventability analysis.

2. **Compliance with Special Master's expert's recommendations:** The Court ordered Defendants to "fully implement[]" all of Mr. Hayes' recommendations "by the time of [his] fifth re-audit."  Order, Dec. 24, 2020, ECF No. 7004 at 2.  Mr. Hayes' touring for the fifth re-audit has already commenced, and Defendants have not fully implemented all of his recommendations.  *See, e.g.,* Defendants' Updated Activation Schedules for Completion of Court-Ordered Suicide Prevention Recommendations, Sept. 7, 2021, ECF No. 7299.  What mechanisms should be used to enforce the Court's order and ensure prompt full compliance with all of the court-ordered recommendations?  Should the parties agree to a process whereby Mr. Hayes can re-assess those institutions he has already toured during this round after Defendants have completed their activation of all recommendations?

3. **Enforcement of Activation Schedules:** Whether Defendants' progress in implementing the court-ordered recommendations is compliant with the Court's direction to "take all steps within [the Secretary's] authority to expedite full implementation of all of the court-ordered recommendations."  ECF No. 7004 at 2.  What mechanisms should be used to enforce Defendants' compliance with the activation schedules to avoid further slipping of the timelines?  Whether there are waivers of state law that would allow Defendants to further expedite activation of the recommendations.  *Id.*

4. **Schedule for Delegation of Monitoring to CDCR:** What process should the parties, Special Master, and Court employ to evaluate Defendants' readiness to assume self-monitoring of suicide prevention practices? Whether Defendants should meet benchmarks for each of Mr. Hayes' recommendations before they assume any responsibility for self-monitoring, and what those benchmarks should be and how they will be measured. What process should be employed for fully testing the efficacy of Defendants' Suicide Prevention CQI Tool after Defendants finish implementing Mr. Hayes' Recommendation No. 32, and whether and to what extent that depends on Defendants' forthcoming activation schedule for data remediation.

**B.    Identification of Key Problem Solvers and Individuals with Settlement Authority.**

Jenny Yelin, Lisa Ells, Michael W. Bien.

### III. CULTURAL COLLABORATION.

**A.    Issues in Dispute.**

Plaintiffs identify the following topics and issues in dispute regarding cultural collaboration:

1. <u>Excessive, Unjustified, Retaliatory and Discriminatory Uses of Force Against *Coleman* Class Members</u>. CDCR has allowed its officers to terrorize *Coleman* class members in a campaign of violence directed against persons who seek treatment or accommodation for serious mental illness. In the Northern District disability rights class action, *Armstrong,* the court found dozens of examples of officers beating and abusing incarcerated persons with serious mental illness. *Armstrong v. Newsom,* 484 F. Supp. 3d 808 (N.D. Cal. 2020); *Armstrong v. Newsom,* 2021 WL 933106 (N.D. Cal. March 11, 2021); *Armstrong v. Newsom,* 2021 WL 930454 (N.D. Cal. March 11, 2021). Mental health staff face retaliation for trying to protect incarcerated persons from staff violence. The court ordered deployment of surveillance cameras and body-worn cameras at RJD, LAC, COR, SATF, CIW and KVSP, in addition to other measures. The other measures include new processes for staff misconduct complaints, investigations and discipline, third-party monitoring, counsel's access to staff misconduct complaints and related documents, additional supervisory staffing, an early-warning system to track staff misconduct incidents involving incarcerated persons with disabilities, and modification of policies to monitor

[3653490.1]                                                           7
Parties' Second Jnt. Stmt. in Resp. to July 26 Order for Settlement Conference (2:90-cv-00520 KJM-DB (PC))

17859575.1

and control the use of pepper spray. *Armstrong,* 484 F. Supp. 3d at 850-852; *Armstrong,* 2021 WL 930454.

Ongoing investigation by *Coleman* counsel shows that staff violence against class members is pervasive and requires extension of the above-listed remedies to all CDCR facilities, as well as additional measures to protect the *Coleman* class. The revised controlled use of force and pepper spray limitations imposed after this Court's 2014 order[3] have been undermined by policies and practices that have improperly shifted almost all uses of forces to "emergency," resulting in uses of force that are not subject to video recording or other procedures agreed to in the 2014 remedy. Plaintiffs' counsel has raised this issue with Defendants' counsel by letters dated July 27, 2020 and March 5, 2021.

2. <u>False and Retaliatory Rules Violation Reports Against *Coleman* Class Members</u>. *Coleman* class members who have survived staff-inflicted violence or who have filed and pursued staff misconduct complaints against custody officers have often been subjected to false and retaliatory Rules Violation Reports. These false RVRs are transparently trumped up in order to cover up staff violence and other misconduct and retaliation against class members, usually by accusing the victim of assaulting the perpetrator. The RVR process still fails to take into account conduct that is the product of the patient's serious mental illness and the rights and abilities of patients to understand the charges and present a defense to the charges. In 2014, the *Coleman* remedy added several changes to the RVR process to protect persons with mental illness. These changes have failed. Plaintiffs' counsel notified Defendants regarding these problems by letters dated September 24, 2020 and March 5, 2021.

3. <u>Adequacy of the Custody Mental Health Partnership Plan (CMHPP)</u>. CDCR has been implementing versions of the Custody Mental Health Partnership Plan (CMHPP or Plan) since August 2017. The Plan can be found in Defendants' status report, filed on September 10, 2018, at

---

[3] *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1079-1087 (E.D. Cal. 2014); *see also, See* Stip. & Order, ECF No. 5371 (Oct. 27, 2015); Stip. & Order, ECF No. 5305 (May 4, 2015); Order, ECF No. 5196 (Aug. 11, 2014); Defs' Plans & Policies Submitted in Resp. to Apr. 10, 2014 & May 13, 2014 Orders, ECF No. 5190 (Aug. 1, 2014); Parties' Suppl'l Jt. Submission of Custody-related Policies & Orders Required by July 9, 2019 Order, ECF 6431 (Dec. 19, 2019) "(Compendium"); CDCR DOM §§ 51020.1-.24.

[3653490.1]    8
Parties' Second Jnt. Stmt. in Resp. to July 26 Order for Settlement Conference (2:90-cv-00520 KJM-DB (PC))

17859575.1

ECF No. 5916, pages 11-19.  The Court provisionally approved the Plan on February 20, 2019, subject to the condition that CDCR update the Plan to include facilities that housed CCCMS patients.  (ECF No. 6095.)  Defendants filed an update extending the Plan, with some amendments, to CCCMS facilities on September 12, 2019.  (ECF No. 6278.).  The Court approved the Plan and the Update on October 8, 2019 (ECF No. 6314).

The Plan includes broad statements of vision, values and mission to be followed by custody and clinical staff to ensure humane treatment of persons with mental illness.  (ECF No. 5916 at pages 11-12.)  The Plan then includes the following specific actions to be taken by institution leadership and staff:  (1) "Joint Rounding" of certain mental health programs by institution leaders including wardens, chief deputy wardens, medical, mental health and nursing leadership. *Id.* at 13-14.  (2) "Safe Reporting," meaning that employees must report misconduct, or any unethical or illegal activity, and cooperate fully with any investigation, and will themselves be protected from retaliation for doing so.  *Id.* at 14.  (3) Training and Quarterly Partnership Round Tables "to provide a structure for communication and exchange of information, to establish a joint and visible custody and mental health partnership in each program, and to plan and coordinate patient care activities and clinical operations with the goal of preventing lapses in care and improving patient outcomes." *Id.* at 15.  (4) "Huddles," meaning frequent brief meetings between mental health and custody staff to discuss immediate issues affecting patients. *Id.* at 15. (5) "EOP Orientation Groups" jointly led by custody and mental health staff for newly arrived patients. *Id.* at 18.

While the Plan described above is well-intentioned, the current epidemic of uncontrolled staff violence and retaliation against *Coleman* class members shows that it is not working.  The Plan should be revisited and redesigned to address current problems and supplemented with additional remedies.

4. <u>Overreliance on Restrictive Conditions of Confinement Such as "Max" Custody</u>. Despite this Court's orders in 2014 and 2015 prohibiting misuse of restrictive housing on *Coleman* class members, incarcerated persons with serious mental illness continue to be harmed disproportionately by restrictive housing practices such as "Max" custody.  Such restrictive

[3653490.1]    9
Parties' Second Jnt. Stmt. in Resp. to July 26 Order for Settlement Conference (2:90-cv-00520 KJM-DB (PC))

17859575.1

classifications are imposed and maintained without regard for the patient's current dangerousness and without regard for the negative impacts on mental health and mental health treatment. Overreliance on such restrictive classifications must be addressed at all levels of mental health care.

### B. Identification of Key Problem Solvers and Individuals with Settlement Authority.

Jessica Winter, Ernest Galvan, Lisa Ells, Michael W. Bien.

Dated: September 17, 2021

ROB BONTA
Attorney General of California
DAMON MCCLAIN
Supervising Deputy Attorney General

*/s/ Elise Owens Thorn*
ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

Dated: September 17, 2021

ROSEN BIEN GALVAN & GRUNFELD LLP

*/s/ Ernest Galvin*
ERNEST GALVIN
*Attorneys for Plaintiffs*