ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No.
308741Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
LAUREL E. O'CONNOR, State Bar No. 305478
DAVID C. CASARRUBIAS, State Bar No. 321994
HANSON BRIDGETT LLP
 1676 N. California Boulevard, Suite 620
 Walnut Creek, CA 94596
 Telephone: (925) 746-8460
 Fax: (925) 746-8490
 E-mail: PMello@hansonbridgett.com
Attorneys for Defendants

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
Special Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                            Plaintiffs,<br><br>        v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                                            Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' PRELIMINARY ACTIVATION SCHEDULES FOR COMPLETION OF COURT-ORDERED DATA REMEDIATION** |

On August 26, 2021, the Court ordered Defendants "to work under the guidance of the Special Master to develop preliminary activation schedules for completion of the data remediation currently underway" to "include Defendants' review of all contingencies of which they are aware that preclude at this time development of final activation schedules for completion of data remediation." (ECF No. 7283 at 6 - 7.) The Court further ordered Defendants to file the preliminary activation schedules by September 29, 2021. (*Id.*)

1

1      Attached is a letter from the California Department of Corrections and Rehabilitation

2  (CDCR) enclosing the preliminary activation schedules for completion of data remediation as

3  required under the August 26, 2021 order.

4                              **CERTIFICATION**

5      Defendants' counsel certifies that they reviewed the following orders relevant to this filing:

6  ECF Nos. 5092, 6846, 6996, 7216, and 7283.

7

8  Dated: September 29, 2021                    Respectfully submitted,

9                                               ROB BONTA
                                                Attorney General of California
10                                              DAMON MCCLAIN
                                                Supervising Deputy Attorney General

11

12                                              /s/ *ELISE OWENS THORN*
                                                Elise Owens Thorn
13                                              Deputy Attorney General
                                                *Attorneys for Defendants*

14

15                                              HANSON BRIDGETT LLP

16                                              /s/ *Samantha D. Wolff*
                                                PAUL B. MELLO
17                                              SAMANTHA D. WOLFF
                                                LAUREL E. O'CONNOR
18                                              DAVID C. CASARRUBIAS
                                                *Attorneys for Defendants*
19

20

21

22

23

24

25

26

27

28

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



September 29, 2021


Damon McClain, Esq.
Elise Owens Thorn, Esq.
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-5500


*VIA EMAIL ONLY*


RE:    PRELIMINARY DATA ACTIVATION SCHEDULE

Dear Mr. McClain and Ms. Thorn:

Over the years, the *Coleman* Court has noted the importance of Continuous Quality Improvement (CQI). Over the past 18 months, the California Department of Corrections and Rehabilitation (CDCR) has worked closely with the Special Master to educate his staff on CDCR's CQI data system, identify gaps, and design a thirteen-step validation and verification process for indicators used in the CQI tool (CQIT). On August 26 2021, the Court acknowledged the importance of expeditiously completing the validation and verification of data. ECF No. 7285 at 6. In that vein, the Court ordered Defendants to work under the guidance of the Special Master to develop a preliminary activation schedule for "the completion of data remediation and validation currently underway," and to file said activation schedule by September 29, 2021. *Id*. The Court also ordered that the activation schedule include "a review of all contingencies that at this time preclude the development of final activation schedules for completion of data remediation." *Id*. at 6:12-14.

In response to the Court's August 26, 2021 order, Defendants attach as Exhibit A a preliminary data remediation activation schedule which presents Defendants' understanding of the scope of the data remediation and validation currently underway, and Defendants' understanding of what defines "completion of data remediation and validation." However, it remains unclear under what conditions the Special Master and his data expert will certify Defendants' data. Until clarity on what is needed to achieve certification is provided, CDCR reserves the right to develop a new validation process and revise the attached preliminary activation schedule and related attachments.

Defendants met with the Special Master's team several times since the Court's August 26, 2021 order to discuss what should be included in the activation schedule and refine the validation and verification process to create a timeline for potential certification of the key indicators. As required by the Court's August 26, 2021 order, the activation schedule includes potential disruptions to the timeline with a designation for each contingency as having a "high," "moderate," or "low" effect on the timeline should the disruption occur. There are several unknowns in the process which may

affect the timeline, including the scope of the review process and what indicators should be certified.

On December 17, 2020, the Court ordered Defendants, under the supervision of the Special Master, to update the key indicators in CQIT and file the updated list within three months. ECF No. 6996. In that order, the Court, for the first time, defined a key indicator as an indicator that reflects a material provision of the Program Guide, Compendium, and court orders, which, when "taken as a whole and met at the requisite degree of compliance, signal constitutionally adequate compliance." *Id.* at 7:20-23. On March 17, 2021, Defendants filed a list of key indicators. ECF No. 7089. To provide the Court with additional information and context about CQIT, the list also included non-key informational quality improvement indicators that Defendants maintained did not measure material provisions of the Program Guide, compendium, or court orders. *Id.*

The parties and the Special Master continued to meet after Defendants filed their list of key indicators. However, after much discussion, the parties were unable to reach an agreement. The Court referred the matter to the Special Master, who later filed his Report on the Continuous Quality Improvement Tool Key Indicators. *See* ECF Nos. 7101, 7111, 7116, and 7151. The Special Master's Report included a list of proposed key indicators which combined both the key and non-key informational indicators from Defendants' list and also included some new indicators that were not a part of the list of indicators Defendants filed with the Court on March 17, 2021. *Id.* Defendants objected to the Special Master's list of proposed key indicators and the inclusion of indicators that did not track material provisions of the Program Guide, Compendium, or court orders or were duplicative. *See* ECF No. 7197.

Over Defendants' objections, the Court provisionally approved, with minor modification, the Special Master's list of key indicators and ordered that the Special Master test and monitor the functionality and efficacy of the indicators during the Twenty-Ninth round of monitoring. Defendants maintain that almost half of the indicators on the Special Master's list of key indicators do not measure material provisions of the Program Guide, Compendium, or court orders. Other indicators appear to be duplicative or undefined. Nonetheless, in the spirit of good-faith collaboration and full transparency, Defendants have provided timelines for the completion of both CDCR's key indicators and for all indicators provisionally approved by the Court.

As explained in the methodology section of the activation schedule, Defendants have built some additional time into the timeline that may absorb some disruptions in the process but Defendants cannot predict all possible delays. In addition to the preliminary data activation schedule, Defendants have also attached as Exhibit B an overview of the data validation and verification process to provide more context for the preliminary data activation schedule.

/ / /

/ / /

/ / /

We look forward to discussing the data validation and verification process and the preliminary data activation schedule at the October 7, 2021 status conference.

Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney
Office of Legal Affairs
California Department of Corrections and Rehabilitation

# Exhibit A

CDCR PRELIMINARY DATA ACTIVATION SCHEDULE
September 29, 2021

I.    EXECUTIVE SUMMARY

As directed by the Court, the California Department of Corrections and Rehabilitation (CDCR), under the guidance of the Special Master, developed a preliminary activation schedule for completion of the data remediation currently underway. Additionally, CDCR has included a review of all known contingencies that preclude the development of a final activation schedule for completion of data remediation.

The plan to achieve data remediation includes mechanisms designed to improve transparency, sustainability, and accuracy in CDCR's data reporting system. Over the past 18 months, CDCR has worked closely with the Special Master to identify gaps in the existing data system. This gap analysis has culminated in the design of a thirteen-step validation and verification process.[1] While this process continues to be refined, the preliminary activation schedule is based on the most recent process updated in September 2021, and an understanding that the Special Master and Plaintiffs agree that successful completion of this process will result in certification of the data. During the development of the validation and verification process, several indicators were used to test the initial review steps, and the current process has benefited from this approach.

The focus of the data validation and verification process is to certify the indicators used in CDCR's Continuous Quality Improvement Tool (CQIT). CDCR, along with the Special Master and Plaintiffs' counsel, have worked for years to develop CQIT, which was designed for the dual purpose of measuring the levels of institutional compliance with Defendant's policies and procedures and quality improvement. In December 2020, the Court ordered Defendants to update the list of key CQIT indicators and defined a key indicator as one that reflects a material provision of the Program Guide, Compendium, and orders. After many meetings and several filings, the Special Master provided a report with his list of key CQIT indicators. Defendants maintain that almost half of the indicators on the list presented by the Special Master do not measure material provisions of the Program Guide, Compendium, or court orders. Of the 148 indicators on the Special Master's list, only 73 indicators measure a material provision of the Program Guide, Compendium, or court order. However, in light of the court's July 1, 2021 order provisionally approving the Special Master's list of indicators, it remains unsettled what indicators must go through the data validation and verification process. For full transparency, Defendants have provided timelines for the completion of CDCR's key indicators, which include 277 subcomponents, and for the completion of all indicators provisionally approved by the court, which include 497 subcomponents, while reserving CDCR's objections to any requirement that indicators that do not measure a material provision of the remedy must go through the data validation and verification process or that such indicators are a part of the remedy.

As of September 29, 2021, 0% of any indicators have completed the data remediation process. Each indicator requires subcomponents comprising business rules, data elements, and glossary terms to calculate compliance accurately and achieve transparency. Another measure of progress is the degree to which subcomponents of each indicator have successfully moved through the various stages of the

---

[1] In this project, validation asks, "have the right workflows and procedures been created to meet their business requirement(s)? Do these workflows and procedures produce data sufficient to measure compliance with the business requirement? And finally, given such data, how exactly will be compliance be measured?" Verification asks, "Is the resulting system for measuring compliance doing so correctly," and seeks to answer this question by identifying software coding errors and other errors through software testing and audits. These concepts are used in several software quality assurance settings, including the IEEE P1012 Standard for System, Software and Hardware Verification and Validation.

thirteen-step validation and verification process. As a measure of incremental progress, 27% of all the steps necessary for CDCR key indicators, and 8% of all the steps necessary for the 148 indicators provisionally approved by the Court to successfully complete the data remediation process are completed. Based on the current 13-step process for data remediation, known contingencies that may slow down the process, and the estimated time and volume of work, the preliminary activation schedule is estimated to successfully process CDCR's key indicators in February 2023, and all provisionally approved indicators by December 2023.

The parties have been discussing data remediation since at least 2019, and have been working closely with the Special Master's data expert for well over a year and have created a robust validation and verification process. The Special Master's team have also confirmed that the Special Master's data expert will review and certify each indicator that goes through this process. Nonetheless, it remains unclear under what conditions certification will be achieved. Defendants will continue discussions with the Special Master and his team regarding the criteria for certification. However, until clarity on what is needed to achieve certification is provided, CDCR reserves the right to revise the validation and verification process as necessary and revise this preliminary activation schedule and related attachments.

II.    <u>ACTIVATION SCHEDULE HIGH-LEVEL OVERVIEW</u>

**Project Status:**   On Track

|  | CDCR Key Indicators[2] | All 148 Provisionally Approved Indicators |
|---|:---:|:---:|
| **Indicators Completed** | 0% | 0% |
| **Incremental Progress** | 27% | 8% |
| **Preliminary Timeline** | February 2023 | December 2023 |



*Figure 1 Preliminary Activation Timeline*

---

[2] CDCR key indicators are the indicators that Defendants believe track material provisions of the Program Guide, Compendium, and court orders. *See* ECF No. 7089-1 at 2 fn. 4. The CDCR key indicators are a subset of the indicators provisionally approved as key indicators by the Court on July 1, 2021. *See* ECF No. 7216. Defendants maintain that many of the indicators on the provisionally approved list do not track material provisions of the Program Guide, Compendium, and court orders. *See* ECF No. 7197. In the spirit of transparency, Defendants have provided timelines for the completion of the CDCR key indicators as well as all indicators provisionally approved by the Court. When discussing the two groups of indicators, the document refers to CDCR's key indicators and the additional non-key indicators, which are those that were provisionally approved by the court, but do not track material provisions of the Program Guide, Compendium, and court orders.

a. Scope of work

### i. Documentation

Each indicator has several associated business rules, data elements, and glossary items. To fully evaluate each indicator, each of the subcomponents must undergo the documentation, review, validation, and verification process. The current estimate for CDCR key indicators and subcomponents is 277. Separately, there are 200 subcomponents for the additional indicators. In addition, CDCR currently estimates that 20 reports that rely on indicators will need to be included in this process. In total, CDCR estimates that 497 subcomponents will go through this validation and verification process.

To properly document all of these components, SharePoint web pages are created and linked to each other in a way that allows users to navigate the documentation system easily. Each webpage starts with an approved template (see Appendix A in the Mental Health Data Validation and Verification Process Document), which provides direction and structure for filling out each of the 10 – 15 focus areas of documentation. The documentation is developed by and for multiple stakeholders such as Clinicians, Administrators, Lawyers, Experts, and Programmers. Consequently, it must balance the use of technical and plain language to describe various topics. This must be accomplished by supplying sufficient technical language for programming steps (i.e. a precise software specification) and, to the extent possible, using plain language to ensure a broad audience can easily understand the content.

### ii. Source Control

A system to track all updates, changes, and maintain version control, must also be implemented and sustained. Mechanisms to achieve this requirement fall into two categories: (1) system and software specifications, and (2) program source code and system parameters. The system and software documentation system used— SharePoint, includes a built-in change log, which enables a review of all past documentation. While SharePoint offers this feature automatically, it requires ongoing maintenance to ensure a user-friendly experience. Similarly, the code for the software used to create data queries and format reports is stored using Microsoft Team Foundation Server (TFS)[3], a system designed to track and log code changes. CDCR's use of SharePoint online and TFS reinforce system transparency and accuracy.

### iii. Data Validation

Data validation asks: is the system designed to correctly measure Program Guide requirements? Software validation is the process of ensuring a program's design satisfies its business requirements. In the context of data remediation, this consists of a careful review of each indicator's design (including the design of all its business rules) to ensure that it accurately measures Program Guide Requirements within a reasonable margin of error. Indicators that rely on the Electronic Health Records System (EHRS) workflows require the workflows to also comport (i.e., be validated) against Program Guide Requirements and other CDCR business requirements. Similar comments apply to indicators that depend on data derived from other systems within CDCR, such as the Strategic Offender Management System (SOMS).[4]

---

[3] TFS helps manage teams and their code, by offering a combination of version control, issue tracking, and application lifecycle management.

[4] SOMS provides several tools to help track internal and external offender movements and population management.

iv. Data Verification

Data verification asks: have the measurements been coded correctly? The detailed specification on how exactly an indicator and its business rules are intended to work is used to create a set of "software tests" (that can be run as needed). These tests help verify the indicator and business rules operate as intended within a reasonable margin of error. For example, such tests can check that the numerator and denominator in a percentage score have not overlooked any patients. Currently, the verification process has not benefitted from standardization and must be completed by individuals familiar with test writing best practices. Consequently, the current preliminary timeline cannot offer a more precise estimate of the time needed to accomplish test writing.

However, as the process is further developed, CDCR's step-by-step process for data validation with stakeholders, and then implementation of the resulting items, will be extended to include more detail on data verification. Ultimately, data verification will evaluate the entire indicator through an in-depth process to confirm the indicator is operating as intended by the approved documentation.

b. Timeline Methodology

i. Overview

The full list of CDCR key indicators and the additional indicators have an estimated 497 subcomponents, comprised of reports, business rules, data elements, and glossary items. The timeline methodology relies on a project management concept known as a continuous flow. Essentially, this establishes a process where subcomponents can move through data remediation steps independently at a consistent rate. At first, the concept of continuous flow may sound less efficient than processing whole indicators or groups of indicators because, with it, you are delivering smaller increments of progress at a time. However, it allows greater flexibility in the process whenever there is a delay and reduces the overall completion time.

ii. Continuous Flow

A pace must be defined to make the most of continuous flow. The pace for the Preliminary Activation Schedule is five subcomponents processed each week at full speed. For example, each week, the Business Rules and Methodology Review (BRMR) meeting will review five web pages. At the end of that week, the five web pages will be sent to the next step (EDA testing), and a new batch of five web pages will be reviewed at the BRMR meeting. Some data remediation steps may include a larger span of time, such as Documentation Preparation, which spans four steps each a week long. While a single batch of five web pages will take four weeks to complete documentation preparation, a new set of web pages is added as the previous week's batch moves forward to the next step. This results in five web pages completing data remediation each week.

iii. Preliminary Timeline

The preliminary timeline is based on a relatively straightforward calculation of the volume of work, divided by the expected completion rate of 5 items per week on average. If the estimated 277 subcomponents consistently processed at a rate of five per week, a total of 56 weeks would be necessary to process the CDCR key indicators, and an additional 40 weeks to process the additional indicators and subcomponents (277/5 = 55.4; 220/5 = 44; and 497/5 = 99.4). The preliminary timeline begins processing indicators at full speed (five

subcomponents per week) in January 2022. At this rate, the estimated completion of all CDCR key indicators is February 2023.  The estimated completion for all 148 provisionally approved indicators is December 2023.

#### iv.   Delays

While some delays are unavoidable, continuous flow can mitigate the impact of delays since it allows each subcomponent of the indicator to move through the process independently. While one item may take longer than expected to clear a particular step, another item may move faster than expected. The independent nature of the process allows some items to move slower and others faster without impacting the overall timeline. This is because the process can naturally adapt to fluctuations caused by faster or slower than expected progress, which reduces the unevenness of processing time.

A Delay Log will also be maintained to help track consistent sources of delay. As a diagnostic tool, the Delay Log can also help calibrate future Activation Schedules with data-informed adjustments to the projected completion date. For example, the Delay Log would highlight if one of the verification steps consistently takes longer than the allotted time. Corrective steps may include identifying and removing any barriers preventing that step from meeting its budgeted timeframe. If the barriers persist, an updated timeline may afford additional time for that step to be completed.

### III.   Contingencies

Several contingencies could impact CDCR's ability to achieve interim milestones and the overall goal of data remediation within the preliminary timeline. When possible, CDCR has adopted improvement strategies and workflow efficiencies to reduce the frequency and impact of these contingencies. The likelihood of each contingency occurring is difficult to estimate. However, if a given contingency should occur, the impact on the preliminary timeline is estimated below (Effect on Timeline).

#### a.   Moderate to High Impact Contingencies

##### i.   Expanded or Reduced List of Key Indicators

Effect on Timeline: HIGH – The list of indicators provisionally approved by the Court is currently under review by the Special Master who is tasked with testing and monitoring the indicators for functionality and efficacy during the Twenty-Ninth Monitoring Round. This will likely impact the preliminary timeline as changes are recommended.  If the number of indicators changes or the scope of the current indicators are revised, the timeline will be significantly impacted.

##### ii.   Updates to the CQI Guidebook and Other Audits

Effect on Timeline: HIGH – Changes or updates to the CQI Guidebook will impact the verification and validation steps necessary for related indicators.  Even minor changes to sampling methodology, inclusionary criteria, and audit instructions may create cascading changes and significant delays in the data remediation process. To the extent changes can be limited to unavoidable and necessary changes (as opposed to less crucial changes such as general improvement ideas), the impact on the preliminary timeline will be reduced.

iii.    Special Master's Provisionally Approved Key Indicators Not Yet Built or Clearly
Defined

Effect on Timeline: HIGH – The Special Master's provisionally approved list of key indicators
includes several indicators that are still under discussion with the Special Master to
determine if they refer to existing indicators or new indicators. These indicators are
accounted for in the timelines; however, the current timeline is based the steps need to
certify existing indicators, and does not estimate the time needed to create of new
indicators.  All new indicators will undergo the process of design, programming, testing, and
user acceptance testing which will significantly increase the timeline for completion.


iv.    Major Disagreements

Effect on Timeline: HIGH – If CDCR, Plaintiffs, or the Special Master cannot resolve major
disagreements about a subcomponent, including whether it appropriately interprets the
Program Guide or acceptable limitations, the current process will place affected indicators
on hold until the issue is resolved. Whenever this occurs, it will significantly impact the
preliminary timeline.


v.    New or Revised Policies

Effect on Timeline: HIGH – New or revised policies may be needed whenever the controlling
policy language insufficiently articulates requirements or fails to provide details necessary
for an indicator to complete data remediation.  This issue has already surfaced multiple
times, resulting in significant delays (most adding an additional six months to a year to
process).  This is primarily due to the extensive process new or revised policies undergo. In
addition to an internal development process, the Special Master and Plaintiffs have a
separate policy review process, after which, all collective bargaining units impacted by the
policy are afforded a review period and may object to the changes – creating further delays.


vi.    Verification Process

Effect on Timeline: HIGH – CDCR has established a verification process. However, no
indicators have completed that process; thus, it is unclear whether adjustments may be
necessary. The current preliminary timeline estimates that each indicator will need two
weeks for verification. Eventually, a standardized process would include multiple steps such
as review, planning, test case selection, approval, execution, and submission of findings. To
date, only one indicator has reached the verification step.


vii.    Changes or newly identified documentation components necessary to achieve data
remediation.

Effect on Timeline: HIGH – Standardized templates were created to mitigate the risk of
incomplete documentation. The templates were designed under the guidance of the Special
Master over several months and reviewed with Plaintiffs before being finalized. Any
changes to the templates would result in the need to redo the documentation for a large
number of subcomponents, which would affect the timeline significantly.

viii.   Onboarding and Training Delays Associated with New Hires

Effect on Timeline: MODERATE/HIGH – According to the U.S. Bureau of Labor Statistics, 4 million[5] Americans quit their jobs in July 2021. Resignations peaked in April 2021 and have remained abnormally high for several months, with a record-breaking 10.9 million open jobs at the end of July. Resignations are highest in the tech and health care industries. CDCR continues to explore metrics such as compensation, the time between promotions, size of pay increases, performance, and training opportunities that can help to identify trends and potential blind spots. Nevertheless, this contingency would directly impact processing speed.

ix.   Delayed Meetings

Effect on Timeline: MODERATE – Many steps in the validation and verification process require meetings between numerous stakeholders, including CDCR, the Special Master's team, and Plaintiffs' counsel. At times scheduling conflicts and competing priorities have resulted in delayed meetings. Given the past occurrences and its direct impact on the activation schedule, the risk of slowing down data remediation is currently moderate.  The extent to which this slows down the activation schedule can be mitigated by reducing the number of delayed meetings or seeking alternative ways to achieve the goals of this step outside the regularly scheduled meetings.

x.   Disruptions to Continuous Flow

Effect on Timeline: MODERATE – the current timeline relies on the concept of continuous flow. Under this model, a set number of components are reviewed each week (currently set to five per week). While some steps occur over multiple weeks, a new batch of components is scheduled to begin each week. The benefits of this method of efficient project management are quickly lost if one of the data remediation steps consistently takes longer than the allotted time. To mitigate this contingency, CDCR maintains a delay log which can be used to diagnostically determine which step(s) are taking longer than expected.

xi.   Delays to Implementing the Preliminary Activation Schedule

Effect on Timeline: MODERATE – The preliminary timeline schedule begins processing indicators at full speed (five components per week) in January 2022. Delays to this start date would have an impact on the timeline. For example, if there are unresolved data validation concerns or staffing issues in January 2022 that limit processing speed.

xii.   Incomplete feedback or no feedback received

Effect on Timeline: MODERATE – While there are several opportunities to provide feedback throughout the process, stakeholders recognize the importance of early and thorough feedback. CDCR's ability to quickly identify, research, and address potential barriers to data remediation will help subsequent steps move forward more efficiently.

---

[5] U.S. BUREAU OF LABOR STATISTICS, O. E. U. S. J. O. L. T. S. (2021, September 8). Job openings and LABOR Turnover summary. U.S. Bureau of Labor Statistics. Retrieved September 20, 2021, from https://www.bls.gov/news.release/jolts.nr0.htm.

b. Low Impact Contingencies

i. Technical limitations to the SharePoint Online platform

Effect on Timeline: LOW – Before selecting SharePoint as the documentation platform for data remediation, IT and the Special Masters Data team reviewed the strengths and weaknesses. Additionally, SharePoint continues to roll out updates and enhancements aimed at greater functionality.

ii. Extensive of Elaborate EDA[6] requested

Effect on Timeline: LOW – Some EDA requests have required more than one week. However, not all key indicators will need EDA. The current activation schedule budgets two separate weeks, with the understanding that extensive or elaborate EDA requests will be balanced out by straightforward EDA requests and circumstances under which no EDA is requested.

iii. Internal Disagreements or Unresolved Concerns

Effect on Timeline: LOW – While the frequency of occurrence may vary, the risk of slowing down the process is currently low.  This is primarily due to the process including multiple opportunities for internal stakeholders to voice concerns, reach resolutions, and, if needed, share concerns with the Special Master.

iv. Minor Disagreements

Effect on Timeline: LOW – While the frequency of occurrence may vary, the risk of slowing down the process is currently low.  Whenever this occurs, the stakeholders are notified during their review process, and enduring disagreements will be provided to Change Advisory and Prioritization Committee (CAPC) voting members so they can cast an informed vote.

v. Less than Unanimous Votes on Approved Documentation

Effect on Timeline: LOW – Whenever this occurs, the issue is elevated to the Deputy Director for resolution within a week. The occurrence of this contingency has historically been low.

vi. Unusual or Unexpected Issues Discovered during Programing

Effect on Timeline: LOW – So far, the staff involved in this step have successfully anticipated the changes necessary during programming. Additionally, not all indicators will require programming changes. Each indicator is allotted two weeks for programming. Some will take longer, and some will take less time or no time (if there are no changes to the current indicator). Overall this contingency is mitigated by the *average* estimated programming time.

---

[6] There are multiple opportunities to request Exploratory Data Analysis (EDA) during the Validation and Verification process. It is typically used to explore the limits of indicators, worst-case scenarios, and unlikely edge cases that could theoretically occur.

IV.    <u>Incremental Progress at the Indicator-Level</u>

The below chart provides the incremental progress for each of CDCR's key indicators.

| Category | CDCR Key Indicator | Incremental Progress |
|---|---|---|
| Access to Care | Timely MH Referrals | 55% |
| Access to Care | Timely PC Contacts | 44% |
| Access to Care | Timely Psychiatry Contacts | 44% |
| Access to Care | Timely IDTTs | 47% |
| Access to Care | Treatment Offered | 44% |
| Access to Care | Placement of ASU/SHU CCCMS in STRH/LTRH within Timeframes | 22% |
| Access to Care | Timely Transfers to CCCMS/EOP | 22% |
| Access to Care | Effective Communication Achieved | 44% |
| Access to Care | IDTTs in a Confidential Setting | 44% |
| Access to Care | Group Treatment in a Confidential Setting | 44% |
| Access to Care | MHSDS Patients Transferred out of Desert Institutions | 22% |
| Access to Care | Observed RC Screens Conducted in a Confidential Setting | 56% |
| Access to Care | MH Screens | 64% |
| Suicide Prevention | Timely Completion of 5/8 Day Follow Ups from MHCB, alternative housing, and DSH/PIPs. MHCB, Alternative Housing, DSH, and PIPs | 50% |
| Suicide Prevention | Patients referred to MHCB on Continuous Direct Visual Observation | 22% |
| Suicide Prevention | Housing Unit/Inmate Living Areas with emergency response equipment and Inventoried Daily | 22% |
| Suicide Prevention | Custody Follow Ups for MHCB Discharges/7497 Forms | 22% |
| Suicide Prevention | Orders Reviewed with Properly Documented Observation Orders | 22% |
| Suicide Prevention | MHCB Records with Rationale for Limited Issues of Clothing and Bedding | 22% |
| Suicide Prevention | MHCB property and privileges | 0% |
| Suicide Prevention | ASU Intake Inmates Appropriately Housed | 22% |
| Suicide Prevention | Percentage of ASU Welfare Checks audited that were not completed on time and staggered | 22% |
| Suicide Prevention | Percentage of nursing staff current with CPR training | 0% |

| Suicide Prevention | Percentage of Health Care Staff with Suicide Prevention Training | 0% |
|---|---|---|
| Suicide Prevention | Percentage of Custody Officers with Suicide Prevention Training | 44% |
| Quality of Care | IDTT Staffing | 44% |
| Quality of Care | Cases with Documentation of Appropriateness of LOC Discussed for Patients Identified by 7388B as Potentially Requiring Higher LOC | 0% |
| Quality of Care | Treatment Plans with Satisfactory Documentation | 56% |
| Quality of Care | Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers | 44% |
| Quality of Care | Treatment Plans with Documented and Implemented Pre-Release Plans | 44% |
| Quality of Care | IDTTs in which PC Intake Evaluations were Completed Prior to Initial IDTT | 44% |
| Quality of Care | IDTTs in which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT | 44% |
| Quality of Care | EOP IDTT Discussion of Clinical Appropriateness for Work, Education Accommodation | 0% |
| Specialized Custody | Percentage of RVR MHAs Where the Patient was Informed of the Limits of Confidentiality | 44% |
| Specialized Custody | RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation | 17% |
| Specialized Custody | Percentage of Days Where Heat Plan was Activated, and Alternative Out of Cell Activities were Offered to Heat Alter Patients | 0% |
| Specialized Custody | Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM | 0% |
| Specialized Custody | Percentage of 128Bs Indicating the Requirement for Mechanical Restraints that are Present for MHCB Patients | 0% |
| Specialized Custody | Thermometer Checks Completed and Accurate | 17% |
| Specialized Custody | Timely MH RVR Assessments | 17% |
| Medication Management | Medication Admin: Chronic Care Medications Historical Administration (Psychiatrist) | 0% |
| Medication Management | Medication Admin: Outpatient Provider New Medication Orders (Psychiatrist) | 0% |
| Medication Management | Diagnostic Monitoring-Antipsychotics | 0% |
| Medication Management | Diagnostic Monitoring-Clozapine | 0% |

| | | |
|---|---|---|
| Medication Management | Diagnostic Monitoring-Mood Stabilizers | 0% |
| Medication Management | Diagnostic Monitoring-Antidepressants | 0% |
| Medication Management | Diagnostic Monitoring-QT Prolongation EKG 12 Months | 0% |
| Medication Management | Continuity of Meds Upon Inter-Institutional Transfer at R&R | 0% |
| Medication Management | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | 0% |
| Medication Management | Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers | 0% |
| Medication Management | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | 0% |
| Medication Management | Continuity of Meds: Discharge/Transfer from a Community Hospital and/or DSH | 0% |
| Medication Management | Medication Compliance with PC 2602, Involuntary Meds: Court Order | 0% |
| Medication Management | Medication Compliance with PC 2602, Involuntary Meds: Med Order | 0% |
| Restricted Housing | Placement of ASU EOPs in Appropriate Housing Within Timeframes | 22% |
| Restricted Housing | ASU Pre-Screens | 94% |
| Restricted Housing | Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 Working Days | 0% |
| Restricted Housing | Percentage of ASU Screenings that Occurred Within 72 Hours of Placement of Arrival | 56% |
| Restricted Housing | ICCs with Mental Health Clinicians present, and relevant information provided | 17% |
| Restricted Housing | (LMH: in suicide prevention) Cells Reviewed Where Inmates Are Allowed Approved Entertainment Devices | 0% |
| Restricted Housing | ASU Screens that are Conducted in Confidential Settings | 0% |
| Restricted Housing | ASU Out of Cell Time Offered | 17% |
| Restricted Housing | Percentage of Weeks in which Yard was Offered According to STRH/LTRH Policy | 0% |
| Restricted Housing | Weeks in which Shower Access in ASU was Offered as Required | 0% |
| Restricted Housing | Units in which Staff can Identify NDS Patients and Have Tracking System for Phone Calls and Property | 0% |

| Utilization and Resource Management | Timely admission to MHCB | 44% |
|---|---|---|
| Suicide Prevention | Patients in Alt Housing on continuous observation and provided suicide-resistant bed | 0%*[7] |
| Suicide Prevention | Emergent/urgent MH referrals that result in SRASHEs | 44%* |
| Suicide Prevention | Percentage of timely Nursing Rounds in MHCB patients on suicide watch and suicide precaution recorded in EHRS Clearly Marked, On Time, and Documented on Correct Form | 0%* |
| Suicide Prevention | Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | 46%* |
| Suicide Prevention | Emergency Response Procedures for Self-Injurious behaviors and suicide attempts | 0%* |
| Suicide Prevention | MHCB Daily Provide Checks | 56%* |
| Restricted Housing | Psych Tech Rounds Completed According to PG Requirements | 0% |

In the spirit of further transparency, the below chart provides the incremental progress for the additional indicators.

| Category | Additional Indicators | Incremental Progress |
|---|---|---|
| Access to Care | Timely Admissions to Inpatient Care | 0%* |
| Access to Care | Inpatient Transfer Deadlines for PIPs and DSH | 0%* |
| Access to Care | Percentage of all IDTTs observed in which a health record and C-file are available | 0% |
| Access to Care | Appointments Cancelled Due to Custody | 22% |
| Access to Care | Appointments Seen as Scheduled | 22% |
| Access to Care | Housing Units where 128 MH-5s are Accessible and Available to Housing Unit Staff | 0% |
| Access to Care | Custody MH Referrals | 0% |
| Access to Care | MHSDS inmates in ASU transferred within policy requirements | 0% |
| Suicide Prevention | Safety planning to reduce suicide risk | 22%* |
| Suicide Prevention | Suicide-resistant MHCBs | 0%* |
| Suicide Prevention | APP/ICF Discharges with Clinician-to-Clinician Contact within 5 Days | 44% |

---

[7] Incremental Progress percentages with an "*" notes that these indicators are still under discussion with the Special Master to determine if they refer to existing indicators or new indicators. As discussions continue, the Special Master and Defendants may agree to remove some of these indicators if they are no longer appropriate or are part of a different indicator.

| Suicide Prevention | SRE Mentor Program | 0% |
|---|---|---|
| Suicide Prevention | SREs that Met All Audit Criteria | 56%* |
| Suicide Prevention | Discharges from MHCB with Clinician Review of D/C Summary (SRASHE) | 39%* |
| Suicide Prevention | Satisfactory SPR FIT Meeting | 0% |
| Quality of Care | Primary Clinician Continuity of Care | 17% |
| Quality of Care | Psychiatrist Continuity of Care | 17% |
| Quality of Care | IDTTs Meeting All Audit Criteria | 0% |
| Specialized Custody | RVRs Where Hearing Officer Disagreed with MH Clinician's Recommendation to Document in an Alternative Manner and Documented Rationale for Disagreement on 128B | 0% |
| Specialized Custody | RVRs Recommended for Mitigation That Were Mitigated | 0% |
| Specialized Custody | Use of Force involving MH Inmates | 0% |
| Specialized Custody | Additional Use of Force (Specificity to be determined) | 0% |
| Medication Management | Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here) | 0% |
| Restricted Housing | NDS timely expedited transfers | 0%* |
| Restricted Housing | ASU Inmates on 21-Day Intake Status with Markers Posted for initial 72 hours | 17% |
| Restricted Housing | Percentage of Unclothed Body Searches Conducted in a Private Area | 0% |
| Restricted Housing | Warden Review of Cases Over 90 Days | 0% |
| Restricted Housing | ASU LOS for MHSDS v. Non-MHSDS Patients | 0% |
| Restricted Housing | EOP Hub CCII and Captain Review for LOS Over 90 Days | 0% |
| Restricted Housing | Percentage of Inmates with LOS Over 150 Days in which ASU Case Reviews were Completed on Time | 0% |
| Restricted Housing | ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria | 0% |
| Restricted Housing | Percentage of Initial ICCs Reviewed and Held within 10 Calendar Days of Arrival | 0% |
| Restricted Housing | Number of EOP and CCCMS Patients in ASU | 0% |
| Restricted Housing | Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors | 0% |
| Restricted Housing | High Refusers Due to Custody Reasons with Documented Plan of Action | 17% |
| Restricted Housing | High Refusers in which 128B was Completed | 17% |

| | | |
|---|---|---|
| Restricted Housing | Percentage of High Refusers Due to Custody in Which a Meeting Between MH and Custody was Conducted within 7 Calendar Days | 0% |
| Restricted Housing | Inmates Who Received ASU MH Guide | 0% |
| Restricted Housing | Percentage of Psych Tech Round Documentation That Meets All Audit Criteria | 0% |
| Restricted Housing | Psych Tech Rounds Where EC and Interaction with Patient are Achieved/Attempted and Appropriate Referrals are Made as Indicated | 0% |
| Restricted Housing | Percentage of IDTTs Observed in which a Health Record and C-File were Available | 0% |
| Restricted Housing | Percentage of Peace Officers Observed to Carry their CPR Mouth Shield | 0% |
| Restricted Housing | Percentage of Eligible MHSDS Patients Receiving Milestone Credits | 0% |
| Restricted Housing | RVR MH Assessments Where All Documentation Requirements Were Met | 44% |
| Restricted Housing | RVR MH Assessments Conducted in Private Setting | 0% |
| Restricted Housing | Use of Force MH Assessments Meeting Documentation Requirements | 44% |
| Restricted Housing | Patients Discharged from DSH with Classification Casework Completed Prior to Transfer When Required | 0% |
| Restricted Housing | Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs | 0% |
| Restricted Housing | Percentage of MH-7s required completed prior to ASU placement | 0%* |
| Patient Safety | Number of Episodes of Heat Related Illness Occurring in MHSDS | 0% |
| Patient Safety | Percentage of Clinical Restraint Occurrences Meetings [sic] All of the Audit Criteria | 0% |
| Patient Safety | Seclusion, Frequency, and Duration | 6%* |
| Utilization and Resource Management | MHCB Clinical Stays within Timeframes | 22% |
| Utilization and Resource Management | Percentage of mental health OHU stays 48 hours or less | 0%* |
| Facility/Environment of Care | Adequate Group Treatment Space | 20% |
| Facility/Environment of Care | Adequate IDTT Space | 20% |

| Facility/Environment of Care | Adequate Individual Treatment Space | 20% |
|---|---|---|
| Staffing/Personnel Training, and Staff Resources | Chief Psychiatrist | 0%* |
| Staffing/Personnel Training, and Staff Resources | Chief Psychologist, Correctional Facility | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychologist, Correctional Facility (Supervisor) | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychiatrist (Supervisor), Correctional and Rehabilitative Services (Safety) | 0%* |
| Staffing/Personnel Training, and Staff Resources | Supervising Psychiatric Social Worker I, Correctional Facility | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychiatrist (Specialist), Correctional and Rehabilitative Services (Safety) | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychologist, Correctional Facility (Specialist) | 0%* |
| Staffing/Personnel Training, and Staff Resources | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0%* |
| Staffing/Personnel Training, and Staff Resources | Recreation Therapist, Correctional Facility | 0%* |
| Staffing/Personnel Training, and Staff Resources | Psychologist-Clinical, Correctional Facility | 0%* |
| Staffing/Personnel Training, and Staff Resources | Clinical Social Worker (Health/Correctional Facility) – Safety | 0%* |
| Staffing/Personnel Training, and Staff Resources | Staff that report having computers for all out of call clinical appointments | 0% |
| Staffing/Personnel Training, and Staff Resources | Percentage of healthcare staff current with suicide prevention training (duplicate from SP) | 0% |

| Staffing/Personnel Training, and Staff Resources | Allocated and filled positions | 0% |
|---|---|---|
| Additional Indicators | Including<br>• Sustainability Process<br>• ASU EOP Hub Certification (To be determined)<br>• PIP (To be developed)<br>• Custody and Mental Health Partnership Collaboration (To be developed) | 0%* |

# Exhibit B

# Mental Health Data Validation and Verification Process

In April of 2020, the California Department of Corrections and Rehabilitation (CDCR) began working with the Special Master's data expert to create a systematic validation and verification[1] process for key indicators. Initially, this work focused primarily on granting Special Master's data expert access to various data systems, reporting mechanisms, data collection tools, and any other access identified to achieve data remediation. Since that time, the project's scope has expanded to include a gap analysis (current data system v. recommended data system) and a roadmap to achieve data remediation.

Coincidentally, this project began around the same time a series of public health measures were enacted to prevent and reduce the spread of COVID-19 within CDCR. While working towards identifying and gaining necessary access to data systems, the Special Master's data team also reviewed and offered guidance on CDCR's initial analysis of COVID-19 and its impact on the mental health population.

On October 6, 2020, CDCR and the Special Master's data team members established plans to hold a series of business rules and methodology discussion meetings (BRMR). The purpose of the meetings was to achieve CDCR's need to review and update rules and methodology for indicators that CDCR reports to the *Coleman* court or the Special Master and the need for the Special Master's data team to conduct data validation and verification. The first meeting was held on October 21, 2020, and has been scheduled weekly since that date.

The broader data remediation project is designed to ensure that changes to underlying workflows, policies, and procedures that would impact the reporting system's ability to measure business requirement compliance are appropriately reviewed. Additionally, any necessary adjustments to the reporting data system must be made transparently. A vital feature of this broader project is to develop a sustainable process for achieving transparency, ensuring any bugs or other issues that impact reports are documented and that reports re reviewed regularly against business requirements.

The objectives of the data remediation project include documentation, validation, and verification of the mental health reporting system. In January 2021, the Special Master's data team recommended CDCR build a systematic way to create system documentation to effectively document, validate, and verify the mental health reporting system. Over several months, a new documentation system using Microsoft SharePoint was developed in several small workgroups. In parallel with this, a preliminary validation and verification workflow was shared in the second data and continuous quality improvement meeting on January 26, 2021. Once completed in March 2021, stakeholders, including plaintiffs, were granted access to the SharePoint site containing all documentation used to validate and verify the mental health reporting system.

---

[1] In this project, <u>validation</u> asks, "have the right workflows and procedures been created to meet their business requirement(s)? Do these workflows and procedures produce data sufficient to measure compliance with the business requirement? And finally, given such data, how exactly will be compliance be measured?" <u>Verification</u> asks, "Is the resulting system for measuring compliance doing so correctly?", and seeks to answer this question by identifying software coding errors and other errors through software testing and audits. These concepts are used in several software quality assurance settings, including the IEEE P1012 Standard for System, Software and Hardware Verification and Validation.

## I.    Critical Components

a. **Current Documentation**: Preparation of current state documentation and proposed and approved updates to all reports, indicators, business rules, and data upon which they depend. This documentation currently includes templates for the following reporting components (CDCR has reviewed templates and related items with Plaintiffs and the Special Master):
   - Reports
   - Indicators
   - Business rules
   - Data elements
   - Glossary of terms

b. Discussion with mental health leadership and *Coleman* Special Master's data team to:
   - **Candidate Documentation**: Use templates and other documentation to fully specify each report, indicator, and business rule's current intended operation (i.e., what each indicator and the business rule should be calculating)
   - **Validated Documentation**: Validate each report, indicator, and business rule that can measure compliance with its associated business requirement(s). This review process will result in a proposed operation for each reporting element and may include proposed adjustments to the intended operation and or underlying workflows and data.  The current intended operation (how it should work now) and the proposed operation (how it should measure business requirement compliance) will then be passed along for comment by other stakeholders and appropriate review within CDCR.

c. Documentation of the following:
   - Components discussed and reviewed in "a" and "b" above
   - Decisions made in business rules discussion
   - Attendance at business rules discussion
   - The rationale for decisions
   - Change Advisory and Prioritization Committee (CAPC) approval dates, and
   - Implementation dates.

     o The information above will be stored in an electronic platform that maintains version control and historical documentation. All changes to the documentation can be viewed, including the documentation, as of a specific time.
     o The Mental Health program has examined options with California Correctional Health Care System (CCHCS) Information Technology (IT) regarding the documentation platform and selected the SharePoint Online platform.

d. Workgroups to discuss questions or concerns that arise during business rule discussions. The outcome of workgroups may result in the need for updates such as the ones below.
   - Policy updates
   - Identified training needs

- Updated Electronic Health Record System (EHRS) workflows
- SOMS or EHRS changes
- Report, indicator, or business rules programming research

When such updates are required, current processes for approval such as labor negotiations and EHRS approval committees may need to follow before final discussion and documentation of the proposed report, indicator, or business rule, can be completed:

e.  Preliminary Exploratory Data Analysis and software test writing both the current intended operation and proposed operation documentation (note the purpose of testing at this point is to help identify any gaps in specification documentation before final review and approval).

f.  **Proposed Documentation**: Stakeholder Review
   o  The same documentation as developed for CAPC approval on reports, indicators, and business rules, including proposed changes, will be available for stakeholders through SharePoint.
   o  Review period
   o  Comments provided to CDCR for consideration.

g.  **Approved Documentation**: Approval by CAPC. The "Headquarters Mental Health Electronic Record and Data Change Management Policy" and associated procedures (both signed 3/16/2020) established CAPC when it required the Statewide Mental Health Program (SMHP) to maintain and utilize a standardized approval and completion process for all SMHP changes that occur in the EHRS, data reporting, and Ad Hoc data requests.

h.  **Final Documentation**: Updated programming where necessary, and **Released System**: all approved changes are going live in the data reporting systems.

i.  **Software Tests**: Final verification test design (input and output verification).  It is anticipated this test software will be rerun as needed. For each reporting component, the following status variables will be available: Pending (test being programmed or reprogrammed), Ready (test is available), Pass or Fail (the status of the reporting component being tested).

## II.  Data Remediation Plan as of September 29, 2021

Under the guidance of the Special Master, CDCR's understanding of the critical components to complete data remediation has evolved. Over the past 12 months, through several iterations and with input from Plaintiffs, an overview of the process (visualized below) has taken shape.



Many, if not most, of the steps required to achieve data remediation, were not immediately known. Instead, gaps between CDCR's previous data reporting process and the updated process were highlighted over time as CDCR Key Indicators were reviewed for data remediation. One indicator in particular, "ASU Pre Screens" has tested the process more than any other. Over its 12-month data remediation journey, the ASU Pre Screen indicator is the first to reach (but not yet complete) the final step successfully – Verification. During that time, insights to optimize the various data remediation steps were gained and significantly influenced the current data remediation process.

A detailed review of each step within the Data Remediation Overview is offered below. This includes a description of each step, what tasks need to be accomplished, and the goal or rationale for that step.

### a.  Preparation of Documentation

Using the SharePoint Online platform, prepare current state documentation for all reports, indicators, business rules, and data upon which they depend. The documentation content is memorialized on SharePoint web pages. These web pages will become the building block in the larger reporting system that increase transparency, ensure coding bugs and other issues are documented, and provide a means for all stakeholders to regularly review Key Indicators' specifications. The documentation includes standard information based on templates[2] for Reports, Indicators, Business rules, and Data elements (Appendix A). Additionally, other documentation elements such as Glossary Items will also have a dedicated space within the SharePoint platform. The goal of this step is to create accurate and transparent documents describing the current system. The SharePoint Online platform also has a built-in change management system that automatically logs changes over time.

*Tasks*
1. Gather information from various sources to complete documentation templates
2. Mental Health (MH) Quality Management (QM) team review for completeness
3. Invite Subject Matter Experts (if needed) to review documentation
4. The Chief of Quality Management reviews documentation for accuracy, conciseness, consistency, and clarity

---

[2] CDCR has reviewed templates and related items with Plaintiffs and the Special Master

### b. Internal Feedback



Once the documentation is ready for review in SharePoint, MH Leadership and various HQ and Regional teams will access the web pages. Internal feedback is emailed to the MH QM team for review. The goal is to identify potential barriers to data remediation and determine how Exploratory Data Analysis (EDA) may help subsequent steps. To help prioritize feedback, the submitter must indicate if their feedback is a potential barrier to data remediation, general question, request for EDA, improvement idea, or falls into some other feedback category.

*Tasks*

1. Make web pages available for internal feedback
2. MH Leadership and various HQ and Regional teams Submit feedback
3. MH QM team prioritizes feedback

### c. Test Writing EDA: Current Specs



After the window of time allotted for internal feedback has closed, MH Leadership and various HQ and Regional teams will meet to review feedback and request EDA as needed. The goal of EDA at this stage is to encourage data-informed decisions regarding specific changes. Suppose the feedback received includes a concern regarding an infrequent occurrence that may become a barrier to data remediation if not addressed. In this example, the frequency of this unusual occurrence and the circumstances under which it occurs will help inform proposed changes to the indicator. This step may not always be

necessary, but the results will be included for review in the SharePoint documentation. Additionally, EDA at this stage may expedite the final Verification step.

*Tasks*

1. Submit EDA requests
2. Review all feedback and EDA results
3. Update documentation as needed

### d.  Special Master's Data Team Feedback



Similar to the Internal Feedback step, once feedback and EDA results are reviewed, the Special Master's data team will access the web pages for review. This step aims to identify potential barriers to data remediation and other feedback before the Business Rules and Methodology Review (BRMR) meeting. All feedback from the Special Master's Data Team feedback is emailed to the MH QM team for review. To help prioritize feedback, the submitter must indicate if their feedback is a potential barrier to data remediation, a general question, a request for EDA, an improvement idea, or falls into another feedback category.

*Tasks*

1. Make web pages available for Special Master's Data Team feedback
2. Special Master's Data Team emails feedback to MH QM
3. MH QM prioritizes feedback

### e.  Internal CDCR Meeting



MH Leadership and various HQ and Regional teams meet to review all feedback and EDA results received. This step aims to allow CDCR to evaluate all the available information before finalizing the Candidate Documentation (current intended operation, i.e., what each indicator and the business rule should be calculating). Any changes to the documentation are automatically tracked and logged in SharePoint's change management software.

*Tasks*
1. Meet weekly
2. Review all feedback (Internal, EDA, and from the Special Master's Data team)
3. Finalize the Candidate Documentation

### f.  BRMR (Business Rules and Methodology Review) Meeting



The goals of the business rules and methodology review meeting include the following:
1. To provide the Coleman Special Master's data team information necessary for data validation and verification,
2. To ensure mental health reports, indicators, and business rules are reviewed compared to workflows, policies, and other business requirements and are updated by mental health leadership to ensure they accurately measure compliance with the Mental Health Program Guide (2018) business requirements and other business requirements.

3. To ensure detailed and understandable documentation regarding how business rules, indicators, and reports operate is available to all report users and other stakeholders such that they may verify "by hand" whether or not the system is working correctly on a case-by-case basis. For example, verify by checking whether a clinical event is counted appropriately in an indicator's denominator and numerator.

4. To ensure this same documentation provides sufficiently detailed descriptions for each report, indicator, and business rule to infer "detailed program specifications," such that the CCHCS IT testing team can write software verification test cases to determine if reports, indicators, and business rules have been coded correctly and are operating correctly.

5. To ensure change tracking procedures are followed concerning the documentation being developed such that future changes to this documentation are transparent to all stakeholders, and

6. To ensure the Mental Health program has a process for ongoing review, validation, and verification of reports, including all report components (e.g., indicators, business rules).

*Tasks*

1. Meet weekly
2. Review all feedback (Internal, EDA, and from the Special Master's Data team)
3. Finalize the Validated Documentation

### g. Test Writing EDA: Proposed Specs



After BRMR, the proposed changes may come with the requested EDA. Similar to the previous EDA step, the goal of EDA at this stage is to encourage data-informed decisions regarding specific changes. This step may not always be necessary, but the results will be included for review in the SharePoint documentation. Additionally, EDA at this stage may expedite the final Verification step.

*Tasks*

1. Submit EDA requests
2. Review all feedback and EDA results
3. Update documentation as needed

### h.  Stakeholder Review



Before CAPC, the proposed documentation for reports, indicators, business rules, data elements, and glossary items will be available for stakeholders through SharePoint. After the review period, stakeholders send written feedback to CDCR for consideration. To help prioritize feedback, the submitter must indicate if their feedback is a potential barrier to data remediation, a general question, a request for EDA, an improvement idea, or falls into another feedback category.

#### *Tasks*

1. Make web pages available for Stakeholder feedback
2. Stakeholders include
   o Plaintiffs
   o The Special Masters Team
   o Select CDCR staff working at various institutions
3. Submit feedback to CDCR
4. MH QM prioritizes feedback

### i.  Data and CQI Meeting



The Data and Continuous Quality Improvement (CQI) Meeting is scheduled every other week. During this meeting, feedback received from attendees is reviewed. This step aims to clarify feedback as needed, but this is also an opportunity to respond to specific questions from Stakeholders. Since this

occurs every other week, but previous steps occur weekly, the Data and CQI Meeting will typically review feedback received during the previous two weeks.

*Tasks*
1. Review feedback with Stakeholders
2. Answer questions
3. Confirm next steps

### j.  CAPC (Change Advisory and Prioritization Committee)



The purpose of the CAPC meeting is to maintain and utilize a standardized approval and completion process for all SMHP changes that occur in the EHRS, data reporting, and Ad Hoc data requests. It is scheduled every week. Before this meeting, all feedback, EDA results, and other relevant documents are made available to the CAPC voting members. This step aims to provide a broad range of feedback and analysis to the voting members so they can cast an informed vote – culminating in approved documentation. Anything short of a unanimous vote is automatically sent to the Deputy Director for resolution.

*Tasks*
1. Before the meeting, provide all feedback, EDA results, and other relevant information to CAPC voting members.
2. Vote on each change
3. If necessary, forward items failing to achieve a unanimous vote to the Deputy Director for resolution

### k.   Programming Approved Changes



Approved changes move forward to the programming step. This step aims to make coding changes or updates to the reporting system to reflect the approved documentation. This results in final documentation and changes being released into the system. The programming team tests the changes in a separate test environment before applying the changes to the official MH Reporting system (production environment).

*Tasks*
1. Program changes in a test environment
2. Take steps to confirm changes were applied correctly in the test environment
3. Schedule programming changes to migrate into the production environment
4. Notify stakeholders

### l.   Verification



After changes are applied to the official MH Reporting system (production environment), a separate team will be responsible for verification. The goal of verification testing is to confirm that the tested and developed indicator satisfies the business requirements. Ultimately, it should evaluate the entire indicator through an in-depth process to verify that the indicator is operating as intended by the approved documentation.

*Tasks*

1. Gather the business requirements for validation testing
2. Prepare the testing plan
3. Write the necessary test cases
4. Begin to complete testing
5. Memorialize verification results
6. Additional verification steps are unknown. CDCR is awaiting further guidance from the Special Master

### m.  Post-Certification Annual Review Cycle



At least annually, all Key Indicators will be reviewed through the data remediation process. If at any point anything impacting the Key Indicator, such as a policy or workflow changes, the indicator must again undergo the data remediation process.

*Tasks*

1. Schedule yearly review for each indicator as they complete the data remediation process
2. Schedule indicator for immediate review, if  anything impacting the Key Indicator, such as a policy or workflow, changes

# Appendix <sup>A</sup> – Documentation Templates

# Business Rule Template

Draft saved 8/20/2021

| Business Rule (Title/Number) |
| --- |
| **Effective Period** <br><br> The start and end date of the data in which the business rule applies. |
| **First Release Date:** <br><br> The date and time the business rule goes live |

| Links |
| --- |
| KPI Link |
| Workflow Link |
| On Demand Homepage Link |

## Overview

Plain language description of the Business Rule designed to ensure the reader understands as quickly, easily, and completely as possible. Plain language must be easy to read, understand,

and use,  avoiding verbose, convoluted language and jargon.

## Policy

Citing relevant policy or other business requirements.

## Rule Population

The set of individuals to which the business rule applies. A given business rule does not apply to individuals outside of the rule population. For example, if the rule population for a business rule is everyone in the ASU program, then the rule applies to all individuals while they are in ASU. The rule does not apply to individuals while they are outside of the ASU program, regardless of whether or not they were in the ASU program previously. If, for example, person A resides in the ML program from January 1 through January 10, resides in the ASU program from January 11 through January 20, and then goes back to the ML program on January 21, a rule that applies to people in the ASU program will only apply to person A from January 11 through January 20.

## Trigger

The event that triggers the initiation of the business rule. Examples:

Admission to CDCR
Referral to MHCB
Receiving a rule violation report
The Monday following a week of attending less than 50% of all offered treatment
The Sunday of a week during which resident was present in ML EOP for all 7 days

Some triggers also have trigger exceptions. For example, a rule that is triggered by arrival to ASU might not apply in cases where the resident is coming from SHU or PSU. All trigger exceptions for a given rule should also be described in the trigger event section.

## Exception

Some triggers also have trigger exceptions. For example, all trigger exceptions for a given rule should also be described in the trigger event section.

## Suspending Events

Any event that temporarily suspends or freezes the business rule's clock. An example is going out to court or a medical facility. If there was a suspending event for a given rule, then the clock for this rule would stop while the inmate/patient was out and resume where it left off when the inmate/patient returned. Most business rules do not have any suspending events.

## Fulfillment

The event(s) that satisfies the business rule regardless of compliance. For example, completing a ASU Preplacement form satisfy the "completion of ASU Preplacement" business rule.

## Time Frame

The range of time relative to a business rule's trigger date within which Fulfillment must occur. (Synonyms: Time frame). [1] Business rules that have multiple Fulfillments (e.g., an initial contact and a routine contact) can have a different timeframe for each Fulfillment. [2]

Timeframes are expressed using interval notation. For example, a timeframe of [0,24) hours means that the rule target event must be completed sometime between the trigger date and before the start of the 24th hour after the trigger date. A timeframe of [0,24] hours on the other hand, means that the target event must be completed sometime between the trigger date and by the end of the 24th hour after the trigger date. In cases where two different units of time are used, the time unit is described within the interval. For example, a rule that requires a target event to be completed from 1 calendar day before through 72 hours after the trigger event would have a timeframe of [-1 calendar day, 72 hours].

Timeframes with negative values indicate that the target event can occur prior to the trigger date. For example, a timeframe of [-1,3] calendar days means that the target event must be completed sometime between the beginning of the calendar day before the trigger date and the end of the third calendar day after the trigger date. And a timeframe of [-12,0) hours means that the target event must be completed sometime from the start of the 12th hour before the trigger date up to right before the trigger date.

## Release Note

Links to relevant release notes

## Rationale

The reason the business rule is the way it is. This section explains to end users why certain
parameter may have been chosen.

## Known Issues

Any verified problems that are impacting the accuracy of the business rule (e.g. bug, stories
etc)

## Potential limitations

Reported limitations that may systematically impact the ability of the business rule to measure
its corresponding business requirements. These limitations should be taken into consideration
by users. These limitations are specific to this particular business rule. Documentation of the
limitations included here have been reviewed and approved by Mental Health Change
Advisory Prioritization Committee (CAPC). General limitations of the MH reporting system are
discussed here. (add link here to the general limitation page)

## Verification

Information about the business rule verification results.
May include a link to an automated verification report (TBD: IT)

## Additional Info

Optional information to help clarify the business rule operation that are not included in other
sections.

## FAQs

Frequently asked questions and answers

### Approval Date

The date the Business Rule was approved by the Mental Health Change Committee (CAPC:
Change Advisory Prioritization Committee)

# Data Element Template

Draft saved 7/13/2021

## <u>Overview</u>

Plain language description of the Business Rule designed to ensure the reader understands as quickly, easily, and completely as possible. Plain language must be easy to read, understand, and use,  avoiding verbose, convoluted language and jargon.

## <u>Data Pathway</u>

Detailed information on how the data is being entered, included the data pathway

example: EHRS> MH Place in order > MH level of care
EHRS > MHPC consult routine > received start date/time



Annotated screenshot that identify all the relevant fields including information where user are required to enter data and information on default value and input validation specification.

## Automation

Information on whether or not this data element was generated automatically. If so, what is the process.
(Document on the data element that is generated by the system.)

Optional: any system generated orders, forms etc

## Known Issues

Any verified problems that are impacting the accuracy of the data element (e.g. bug, stories etc).

## Potential limitations

Reported limitations that may systematically impact the ability of the indicators to measure its
corresponding data element. These limitations should be taken into consideration by users.
These limitations are specific to this particular data element. Documentation of the limitations
included here have been reviewed and approved by Mental Health Change Advisory
Prioritization Committee (CAPC). General limitations of the MH reporting system are discussed
here. (add link here to the general limitation page)

## **Additional Information**

Optional information to help clarify the KPI operation that are not included in the other
sections.

## **Verification**

Information about the data element verification results.
May include a link to an automated verification report (TBD: IT)

## **FAQs**

Frequently asked questions and answers.

## **Data Source**

Link to an annotated query to the data used from the data element.

*need to explore: webpart with permission control. Hide from end users

**Approved date**

The date the rule was approved by the Mental Health Change Committee (CAPC: Change Advisory Prioritization Committee)

# KPI Template

Draft saved 8/20/2021

## Summary

One or two sentences describing with is being measured (e.g., average, percentage, count of x).

## Policy

References to relevant policy or other business requirements. In some cases, the actual policy language may be included.

| Numerator | Denominator |
|---|---|
| The population members for the denominator where the applicable business rule target event occurred. | The count of the total population of interest (e.g., number of all ML EOPs who...) or events (e.g., number of all MHCB admissions...). |

## Component Business Rules

The business rule(s) driving the indicator.

## Reporting Location

The institution or program which the data are being reported.

## Window and Lag

The window length and lag define the time window used to calculate the denominator. This is almost always the reporting period selected by the user (e.g., month, quarter). If the default is 0, this with be hidden from the KPI page.

## Direction

The default is higher is better. This will be hidden from the KPI page if it is default. If not, lower is better with be indicated.

## Pop-up

Click here for general pop up information

KPI specific pop up information:

## Release Note

Links to relevant release notes.

## Additional Information

Optional information to help clarify the KPI operation that are not included in the other sections.

## Rationale

The reason the KPI is the it is. This section explains to end users why certain parameters may have been chosen.

## Known Issues

Any verified problems that are impacting the accuracy of the KPI (e.g., bug, stories, etc.).

## Potential limitations

Reported limitations that may systematically impact the ability of the indicators to measure its corresponding business requirements. These limitations should be taken into consideration by users. These limitations are specific to this particular indicators. Documentation of the limitations included here have been reviewed and approved by Mental Health Change Advisory Prioritization Committee (CAPC). General limitations of the MH reporting system are discussed here. (add link here to the general limitation page).

## Verification

Information about the KPI verification results.
May include a link to an automated verification report (TBD: IT).

## FAQs

Frequently asked questions and answers.

[CAPC] **Approval Date**

| KPI (Title/Name & Number) |
| --- |
| Category |
| The subcategories where the indicator will be placed on a Performance Report |
| Business Rule Link(s) |

| Links |
| --- |
| On Demand Homepage Link |

EDA Result



# Report Template

Draft saved 7/13/2021

## <u>Overview</u>

Report is collection of data that is available on demand or generated regularly. Plain language description of the report. Language is intended to ensure the reader understands as quickly, easily, and completely as possible. Plain language must be easy to read, understand, and use, avoiding verbose, convoluted language and jargon.

## <u>Policy</u>

Citation of relevant policy.

## <u>User controlled parameters</u>

Values used by a report to filter the data that are included in that report's indicators. Examples include the start and end date of the reporting period, program(s), MHI(s), and institution.

## <u>Preset parameters</u>

Default parameters with preset values that the user cannot change without a change request.

For example, the ASU EOP Hub performance report has a preset of placement = ASU EOP Hub.

## Report data

The elements that are included in the report.
For example, links to each underlying indicator or statistic used in the report.

## Screenshots



Annotated screenshot that identify all the relevant fields including information where user are required to enter data and information on default value and input validation specification.

## Data Recency/update frequency

How recent or "fresh" the data in a report are, typically described by explaining how often the report data are refreshed. The as of date represents when the data was pulled or when the report was refreshed.

For example:
The performance report displays indicator data that are refreshed on the following schedule:

All data for the current calendar month and last 2 prior calendar months are refreshed nightly.

All data for the current calendar month and last 18 prior calendar months are refreshed weekly.

See ETL section for more information about how source data is loaded into the datawarehouse.

## Release Note

Links to relevant release notes

## Known Issues

Any verified problems that are impacting the accuracy of the report
(e.g. bug, stories etc)

## Potential limitations

Reported limitations on the report level that may systematically impact the data that is reported. These limitations should be taken into consideration by users. These limitations are specific to this particular report. Documentation of the limitations included here have been reviewed and approved by Mental Health Change Advisory Prioritization Committee (CAPC). General limitations of the MH reporting system are discussed here. (add link here to the general limitation page)

## Metadata

Metadata is data about data. A simple example of metadata for a document might include a collection of information like the author, file size, the date the document was created, and keywords to describe the document. Metadata for a music file might include the artist's name, the album, and the year it was released (obtained from lifewire.com 2/26/21).

For example: the time the report was run, the date that the MH reporting data were last refreshed.

## **Additional Information**

Optional information to help clarify the report that are not included in the other sections.

## **Verification**

Information about the data element verification results.
May include a link to an automated verification report (TBD: IT)

## **FAQs**

Frequently asked questions and answers

**Approved date**

The date the rule was approved by the Mental Health Change Committee (CAPC: Change Advisory Prioritization Committee)