1                IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF CALIFORNIA
2


3
     RALPH COLEMAN, et al.,
4          Plaintiffs,
                                     Sacramento, California
5    vs.                             No. 2:90-CV-00520
                                     Thursday, October 7, 2021
6    GAVIN NEWSOM, et al.,           3:04 p.m.
           Defendants.
7    _____/

8

9

10
                          ---o0o---
11
                   TRANSCRIPT OF PROCEEDINGS
12
         STATUS CONFERENCE; DEFENDANTS' MOTION TO STRIKE
13
       BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
14
              (Proceedings held via videoconference.)
15
                          ---o0o---
16

17

18

19

20

21    Official Court Reporter:        Thresha Spencer,
                                       CSR, RPR
22                                     501 I Street
                                       Sacramento, CA 95814
23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription

                THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

```
 1   APPEARANCES:

 2     For the Plaintiffs:           ROSEN BIEN GALVAN & GRUNFELD
                                     LLP
 3                                   101 Mission Street, 6th Floor
                                     San Francisco, CA  94105
 4                                   By:  MICHAEL BIEN
                                          ERNEST GALVAN
 5                                        LISA ELLS
                                          JENNY YELIN
 6                                        CARA TRAPANI
                                          STEVEN FAMA
 7                                   Attorneys at Law

 8
       For the Defendants:          DEPARTMENT OF JUSTICE
 9                                   1676 N. California Blvd.,
                                     Suite 620
10                                   Walnut Creek, CA  94596
                                     By:  PAUL MELLO
11                                   Attorney at Law

12                                   DEPARTMENT OF JUSTICE
                                     OFFICE OF THE ATTORNEY GENERAL
13                                   1300 I Street
                                     Sacramento, CA  95814
14                                   By:  ELISE THORN
                                     Attorney at Law
15
                                     DEPARTMENT OF JUSTICE
16                                   OFFICE OF THE ATTORNEY GENERAL
                                     455 Golden Gate Avenue,
17                                   Suite 11000
                                     San Francisco, CA  94102
18                                   By:  DAMON GRANT McCLAIN
                                          NAMRATA KOTWANI
19                                        Attorneys at Law

20                                   HANSON BRIDGETT LLP
21                                   425 Market Street, 26th Floor
                                     San Francisco, CA  94105
22                                   By:  SAMANTHA D. WOLFF
                                     Attorney at Law
23

24     (Appearances continued on following page)
25
```

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

```
 1   APPEARANCES (Continued):

 2   Special Master:             MATTHEW LOPES

 3   Suicide Prevention Specialist:   LINDSAY HAYES

 4   Also Present:               Dr. Amar Mehta
                                 Dr. Travis Williams
 5                               Dr. Steven Cartwright
                                 Christine Ciccotti
 6                               Kristopher Kent
                                 Nicholas Weber
 7                               Melissa Bentz
                                 Gregg Adamaaaaaaaaaaaaaaaaaaaaaaaaaaaa

 8

 9                        --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SACRAMENTO, CALIFORNIA, THURSDAY, OCTOBER 7, 2021, 3:04 PM

 2                            --o0o--

 3   (Admonition given.)

 4             THE CLERK:  Calling civil case 90-520; Coleman, et

 5   al., versus Newsom, et al.  This is on for a further status

 6   conference and defendants' motion to strike.

 7             THE COURT:  All right.  Appearing for plaintiffs,

 8   lead counsel?

 9             MR. BIEN:  Good afternoon, your Honor.  Michael Bien,

10   your Honor.  And appearing on behalf of plaintiff with me are

11   Ernest Galvan, Jenny Yelin, Cara Trapani, and Steven Fama of

12   the Rosen Bien Law Office.

13             THE COURT:  All right.  Good afternoon to you all.

14        And for defendants, lead counsel?

15             MR. MELLO:  Good afternoon, your Honor.  This is Paul

16   Mello.  Also appearing is Samantha Wolff from my office,

17   Ms. Thorn, Ms. Kotwani, and Mr. McClain from the AG's Office.

18   And three of our clients are also appearing, Dr. Williams,

19   Dr. Cartwright, and Dr. Mehta.

20             THE COURT:  All right.  Do you have the full names of

21   the two doctors besides Dr. Mehta?

22             MR. MELLO:  Dr. --

23             THE COURT:  I asked Ms. Schultz.

24             MR. MELLO:  Oh, I'm sorry, your Honor.

25             THE COURT:  Ms. Schultz, just checking, you have
```

 1    those for the record?

 2                THE CLERK:  Yes, your Honor.

 3                THE COURT:  All right.  And I know other people are

 4    observing within the virtual courtroom; their presence is

 5    noted.

 6        I gather Secretary Allison is not able to be here this

 7    afternoon?  I had expected she would be attending these.

 8                MR. MELLO:  Your Honor, Secretary Allison is at a

 9    conference out of town.  And, in addition, she was at two

10    all-day settlement conferences in the last couple of weeks.

11    But, yes, she is at a conference out of town.

12                THE COURT:  All right.  So Dr. Mehta is the lead

13    principal.  So I can speak to you, Dr. Mehta?

14                DR. MEHTA:  Yes, your Honor, thank you.

15                THE COURT:  All right.  I want to cover the agenda

16    items and then talk about the motion to strike.

17        Just before we dive into the agenda items, I acknowledge

18    that settlement is underway.  All I know is a brief report from

19    Judge Newman indicating it appears that settlement discussions

20    are productive, and the parties have talked about next steps,

21    next subject -- subjects to cover in settlement, and so the

22    Court is encouraged by that report.

23        And I'll talk a bit about settlement as we proceed.  I

24    should actually say I heard the same thing from the Special

25    Master.  If I could have him identify himself and any member of

1   his team appearing this afternoon.  Special Master Lopes.

2            SPECIAL MASTER:  Thank you, your Honor.  I am the

3   only member of my team appearing this afternoon.

4            THE COURT:  All right.  Is one of your experts also

5   appearing?

6            SPECIAL MASTER:  No, he is on the line.  Dr. Potter

7   is on the line as well as Lindsay Hayes, Dr. Metzner,

8   Dr. Hughes.

9            THE COURT:  I see Lindsay Hayes' name on my screen,

10  that's why I ask, so he must be behind a camera.  I've also

11  provided the Special Master the general report, without going

12  into any detail.  The settlement appears to be productive and

13  worth continuing as the parties have committed to do.

14      First to move to data remediation.

15            I have several questions, and I'd allow each side to

16  make brief comments if they want to make certain the Court is

17  aware of something.  I'm generally aware of the record.

18      I note that the defendants have filed information on their

19  efforts to document all components of each indicator -- key

20  indicators.  And I'm aware of two charts showing defendants

21  moving forward on validating those list of key indicators more

22  quickly than the entire list.  The Court approved an entire

23  list.

24      Dr. Mehta, can you help me understand, what's the timeline

25  for the others that appear to be lagging, the defendants' own

1     list of key indicators?

2              DR. MEHTA:  If I may, your Honor.  Dr. Cartwright has

3     been working very, very hard on this project.  He's really the

4     expert that I rely on.  May I ask him to respond?

5              THE COURT:  You may.  Dr. Cartwright.

6              DR. CARTWRIGHT:  Good afternoon, your Honor.  So the

7     activation schedule, the preliminary activation schedule

8     includes all provisional key indicators, reflects the timeline

9     for completion of 73 of the universally-agreed upon indicators,

10    as well as a full list of the provisional-approved key

11    indicators.  I hope we were able to make that clear in our

12    filing on the 29th.

13             THE COURT:  In answer to my specific question, I

14    understand they're all showing there, but it appears that some

15    are moving more quickly than others.  Do I have that right?

16             DR. CARTWRIGHT:  They've been placed in an order that

17    we have worked with the Special Master's team to design, and

18    that order is partially due to, you know, the lack of ambiguity

19    around certain indicators.  And so with little or no ambiguity

20    we, of course, can work forward with the progress on those as

21    we continue to understand the list.  We've released those other

22    indicators towards the end of the process.

23             THE COURT:  So the assumption is, through close work

24    with the Special Master, those will be worked out one way or

25    the other, not necessarily assuming they fall off the list; is

1    that fair?

2             DR. CARTWRIGHT:  That is what we intend, your Honor,

3    yes.

4             THE COURT:  Here's my question.  Given the work

5    that's going on, is it possible -- I understand what I have is

6    a preliminary activation schedule, so my thought is to direct

7    the defendants to file an updated schedule within three months,

8    and then a further updated schedule three months after that, so

9    in six months from now.

10    The first schedule would reflect additional work done

11    primarily by the defendants.  By the sixth month out the

12    updated schedule would reflect experience gained through the

13    Special Master's efforts, and, hopefully, exhaustion of efforts

14    to work out the list of indicators with the Special Master.

15    Your reaction, Dr. Cartwright, for that schedule?  Any

16    reason for the Court not to direct those updated schedules?

17             DR. CARTWRIGHT:  Not that I can think of.  Go

18    ahead --

19             THE COURT:  One at a --

20             MR. MELLO:  -- your Honor.

21             THE COURT:  Well, let me first hear from

22    Mr. Cartwright.  So Dr. Cartwright.  Is it Dr.?

23             DR. CARTWRIGHT:  Yes, your Honor.

24             THE COURT:  Yeah.  Yeah.  Dr. Cartwright, what is

25    your response?

1          DR. CARTWRIGHT:  To this specific question, your

2     Honor, I'm not aware of any concerns or problems with that

3     plan.

4          THE COURT:  All right.  So that would be the Court's

5     plan subject to hearing from Mr. Mello.  Before I hear from

6     Mr. Mello, let me raise a question.  I do see a cover letter

7     from Ms. Bentz that reserves the right to file something about

8     some new process.

9      So, first, I'm assuming because the lawyers work for the

10    principals that that's conveying some message from the

11    principals.

12         MR. MELLO:  A question before my client, I'm glad to

13    answer that legal question, your Honor.

14         THE COURT:  So that's a legal question?

15         MR. MELLO:  Your Honor, you're asking --

16         THE COURT:  Don't interrupt me, Mr. Mello.  Please

17    wait until I call on you, and I'll do that by saying

18    "Mr. Mello."

19      Mr. Mello seems to be saying this is raising a legal

20    question; it is talking about a new process.  So, Mr. Mello,

21    what do you have to say about that?

22         MR. MELLO:  So I think that your Honor's idea of

23    having updated schedules filed with the Court at three to

24    six months makes sense.  I understand that works for my

25    clients.

1          With respect to the executive summary and activation

2    schedule, that activation schedule sets forth our current

3    understanding of the process.  If anything is learned in the

4    process or changes, of course that would impact the schedule

5    and the process.  And we try to lay that out in the activation

6    schedule.

7          Moreover, as indicated in the activation schedule, we set

8    forth a 13-step activation schedule that, yes, identifies and

9    goes through and seeks certification of all indicators, all

10   indicators, not just the 73 that are not disputed as key

11   indicators, all indicators.

12         The remaining question, the reason why there might be some

13   uncertainty is because defendants have set forth a process they

14   are uncertain at this point as to what the process will be at

15   the end of those 13 steps for the Special Master and his expert

16   to verify.  And, secondly, what the process for the Special

17   Master and his expert to certify -- certify whether each

18   indicator has been validated at the end of the process.

19         So that's a little bit of uncertainty that we want to make

20   sure that will happen.  We assume that will happen in the next

21   several months, but that's the reason that this is uncertain.

22         Of course, things have changed.  It also has contingencies

23   identified as requested by the Court, but that three- to

24   six-month reporting schedule makes sense to us, that makes

25   sense with this plan of validating or going through the first

1    step process for five subcomponents a week and attempting to do

2    that.

3        So, with that, I can answer any question your Honor may

4    have.

5                THE COURT:  Does that fully respond to my question,

6    what does it mean to reserve the right to advance a new

7    process?  What does that mean?

8                MR. MELLO:  I don't want to interrupt you, your

9    Honor.

10               THE COURT:  Mr. Mello.

11               MR. MELLO:  Yes.  So that is if the Court or if there

12   are changes as a result of discussions with the Special Master

13   team during the data validation process, that's what that

14   means.  That means that there is new information as to what the

15   certification process will look like and what reporting of a

16   certified indicator will look like.  That's all it means.

17       They've set forth a very detailed plan for certification,

18   your Honor, and that is the schedule that everybody is

19   optimistic will go forward and will go -- and with that I think

20   that's the caveat, to the extent it's a caveat, your Honor.

21               THE COURT:  Just a general comment.  The principals

22   are here.  I'm assuming when the lawyers say things like this,

23   "reserving the right to a new process," that that is -- that

24   that's not the lawyers engaging in some kind of covering

25   action, it's following through on what the principals want.

1   And generally, I'll have more to say about this when we get to

2   the motion to strike, seeing the record with reservation of

3   rights is -- I don't know how helpful that is at this point.

4   I'm not going --

5          MR. MELLO:  May I respond?

6          THE COURT:  Dr. Mehta, you're saying this.  When we

7   see cover letters, it looks to me like a lawyer taking extra

8   steps and reserving the right to litigate something that may

9   not need to be litigated here.  I'm just saying that out loud.

10  Again, I don't need to drill down.

11      Relatedly, when I look at -- there's another part of the

12  filing here, so defendants indicate they're documenting all

13  components of each indicator and SharePoint web pager developed

14  by and for multiple stakeholders such as clinicians,

15  administrators, lawyers, experts, and programmers.

16      Just -- maybe it's a semantics thing, but this Court would

17  suggest that lawyers aren't stakeholders in the way that the

18  principals are.  Lawyers are in service of the principals.  And

19  I just -- again, I want to say it out loud, it's really

20  important at this stage of the case that, you know, lawyers

21  place at the table in the service of the principals.

22      So all of that said on data remediation.  Anything to say,

23  Mr. Bien, about what you've heard so far?

24          MR. BIEN:  Mr. Galvan is going to address this topic,

25  your Honor, thank you.

1          MR. GALVAN:  There is -- you know, we have nothing to

2    add, your Honor.

3          THE COURT:  All right.  Then I'm directing, and it

4    will appear on the docket following this hearing, filing of an

5    updated activation schedule in three months and a further

6    updated activation schedule within six months.

7       Do you have anything to add, Special Master Lopes?

8          SPECIAL MASTER:  I have nothing to add.

9          THE COURT:  All right.  In terms of process for

10   updating -- I just want to step way back here and remind us

11   all, including the Court, what this is supposed to be about.

12   The updating process was intended to provide transparency --

13   administrative transparency, just making clear what the remedy

14   was.

15      It's like, you know, I've got a treatise on the shelf, and

16   if I'm old-fashioned I get a pocket part.  That's the way we

17   talked about it at the beginning.  It's just a, you know,

18   documenting what the remedy is here.

19      When I look back at the updating process that I signed off

20   on, I have to say it was -- I'm not certain it was ever

21   followed at any point in time -- but, moreover, it's

22   unworkable.  It's obvious to me now looking back, so, moreover,

23   it is now expired.

24      So just, you know, it was a pilot, started August 3rd,

25   2020, by its own terms lasted for a year.  So we're in a gap

1    period.  And so I'm thinking hard about -- to the extent I

2    bless any replacement updating process -- I want to make

3    certain it's not setting the same kind of trap that the last

4    updating process did.

5        And I want it to be in service of just that clarity and

6    transparency, which seems critical for this case to come to a

7    conclusion.  I do see the parties' proposed replacement

8    updating process.  I'm going to take it under submission.  I've

9    talked with the Special Master, he can make a record here of

10   his position.  I'm not ready to just automatically bless it

11   today.

12       My suggestion is that we aim for a next status in January

13   where we talk about the updating process, and by then I will

14   have digested what you're proposing.  And if I have an

15   alternative that is even simpler, I'll put it out there for

16   consideration with enough time for you all to weigh -- to weigh

17   in on.

18       Also, by January, my hope would be is that we can just sort

19   out this material modification issue, which cropped up -- I

20   didn't expect it, but, you know, shame on me.  My thought

21   there, because I think it is critical to just resolve this, but

22   pragmatically and without getting stuck in a hornet's nest, my

23   thought is here to ask Judge Newman.

24       I understand you want to talk about EOP, but my thought

25   would be to ask Judge Newman to convene a further settlement

1    conference in December to talk about material modification, and

2    just see if that can't be worked out without a lot of going off

3    the rails.

4        So I know there's a current update on file.  I know

5    there's -- I don't think there's any objection.  The current

6    process does not contemplate my blessing on that, but I'm also

7    going to think about that.  I'm not necessarily thinking I need

8    to bless it once we work out the material modification issues.

9    Will it be sufficient for it to be filed and without any

10   objection, then it just is.  It's the reference until the next

11   update is filed, and the Court originally had thought every

12   year.

13       So that's what's on my mind when it comes to the updating

14   process.  The -- I think what I'd like to hear from the parties

15   is any objection to making this a focused discussion topic in

16   January?  By then I will have digested and let you know if I'm

17   inclined to bless what you're working out or if I have an

18   alternative to propose, and hopefully by then to a common sense

19   dispute resolution, the material modification issue can also be

20   clarified.  And, if need be, taken account of any updating

21   process.

22       Your comments on that, Mr. Bien, or whoever on your team

23   would respond?

24           MR. BIEN:  Ms. Ells is going to respond.

25           THE COURT:  All right.  Ms. Ells.

1    MS. ELLS:  I apologize.  Mr. Galvan is actually going

2    to respond.

3    THE COURT:  All right.  Mr. Galvan.

4    MR. GALVAN:  Your Honor, yes, seeing or taking this

5    and talking about it with Judge Newman is -- we agreed that

6    that's good.

7    Not to jump the agenda, but I know this is going to come up

8    on item 3A because there's this issue of these urgent suicide

9    prevention recommendations that I think defendants are saying

10   they can't implement until they understand the material

11   modification, but I'll let them -- I don't want to speak for

12   them.

13   So it's unclear to me whether -- if we are not dealing with

14   material modifications until December, whether that leaves

15   things hanging that shouldn't be hanging, but that's jumping

16   the agenda.

17   And then regarding the November session with Judge Newman,

18   we may want to talk about -- instead of talking about the EOP

19   population, talking about the inpatient program, the PIPs,

20   which is also an urgent problem.

21   THE COURT:  Well, we'll come back to that when we

22   talk about settlement.  I thought there had been an agreement

23   between the parties.  So no objection in January talking about

24   the updating process, trying to actually agree on an updating

25   process going forward, having a -- we're in a gap.  There's no

1    updating process in place right now.  And referring material

2    modification to Judge Newman.  No objection to any of that,

3    Mr. Galvan?

4              MR. GALVAN:  Correct, your Honor.

5              THE COURT:  And we will get to the suicide, the

6    implications for suicide remediation.

7         So for the defense, Mr. Mello, you're the lead on this?

8              MR. MELLO:  Yes, your Honor.  We have no problem

9    addressing material modification with Judge Newman.  It might

10   make sense to do that on November 1st.  But I think Mr. Galvan

11   hit on an important point which is what do we do in the

12   interim?  What do we do with current policies, and what do we

13   do in the interim?

14        And, moreover, defendants negotiated a deal with plaintiffs

15   that if that deal is agreed to by the Court will result in the

16   defendants dismissing a pending appeal.  I'm not going to argue

17   the merits of any appeal or appealability, but that is a

18   continuing issue.

19        It was our hope that the Court would agree to the process

20   negotiated by plaintiffs where they reach consensus, and then

21   shortly thereafter, after the Court agreed to that process, we

22   could then take up the issue of material modification, either

23   with Judge Newman or by way of briefing with your Honor.

24        Defendants are not conceding that there is not a -- that

25   the current process expired, they're not conceding that.  But

1   again, I'm not going to argue issues that are going to be

2   addressed by the Ninth Circuit.  But our concern is what

3   happens in the interim?  We need a definition of material

4   modification if the Court agrees to the new process, and those

5   are our concerns.

6       But, with that, I really have nothing further to add, your

7   Honor.

8           THE COURT:  All right.  I understand that position.

9   I don't do things out of -- to take things off the appellate

10  court docket.  But I'm not party to the parties' negotiations,

11  obviously, but I understand all of that.

12      Let me just ask Dr. Mehta, because you are the principal.

13  Based on what you've heard about the program, the remedial

14  plans, and the updating process, anything you want the Court to

15  know?

16          DR. MEHTA:  I appreciate the summary you gave, your

17  Honor.  That helps me understand the context, and I think our

18  goals are aligned.  We want to move as efficiently as possible

19  from identifying the problem to making the change, and the

20  quicker and simpler that process can be, the happier I am, your

21  Honor.

22          THE COURT:  All right.  That's the Court's goal,

23  which is why I'm going to take time and think about how to put

24  something in writing that is truly simple, if possible.

25      All right.  So that's the plan.  January status, we'll set

1   a date, I'll ask Ms. Schultz to remind me of that, and it will

2   include updating process.

3       And, in the meantime, we'll ask Judge Newman to see if he

4   can work out the material modifications issue.  If not, this

5   Court will, and we'll talk about scheduling once we get to

6   settlement conferences.

7       So on suicide activation schedule updates, do I understand

8   correctly, Dr. Mehta, is it that the checklist -- I'm looking

9   at the updated activation schedule filed October 4th, and it

10  does suggest the defendants are holding off on rolling out an

11  institutional audit material until the materials audit is

12  resolved.  I know Secretary Allison has said it is an issue; it

13  is a very high priority for her.

14      Do I understand correctly that the checklist has been

15  checked out and it is implementing an audit tool?

16          DR. MEHTA:  Your Honor is absolutely correct.  This

17  is our top priority.  I'm going to ask Dr. Williams to respond

18  to this, if that's okay with your Honor.

19          THE COURT:  All right.

20          DR. WILLIAMS:  So the form itself, the revised

21  checklist form has been released.  The memo announcing its

22  release and notifying the field about what specific changes

23  were made to this form from the previous form is being held up,

24  and it is the same memo is the announcement of the auditing

25  procedure and audit tool that the institutions are going to

 1   use.

 2          THE COURT:  All right.  And that's the determination

 3   of the principals, that they can't go forward given the current

 4   status?

 5          DR. WILLIAMS:  Right.  So we would like to release

 6   the memo so the field is aware of what specific changes have

 7   been made to the form.  Every form that we release has

 8   instructions on it, but we would like to draw attention to the

 9   field about these specific changes so they know what to do, and

10   they also can be held accountable for what the expectations are

11   with this new form.  That's what this memo was going to

12   announce before it got held up.

13          THE COURT:  And for Mr. Bien, is this something

14   Mr. Galvan would address given he's the one who commented

15   earlier?

16          MR. GALVAN:  Yes, your Honor.

17          THE COURT:  Mr. Galvan, so I understand your position

18   on the implementing memo on the audit tool.

19          MR. GALVAN:  Our position is that a legal question

20   about legal modification is completely irrelevant to any action

21   in the field informing the clinicians and custody staff of how

22   to do the suicide prevention.  I don't think those people in

23   the field have to think about whether this is in some

24   metaphysical sense a material modification or a remedy or a

25   separate court-ordered thing.

1    I would be shocked if they spent even one nanosecond of

2    their time thinking about that, so I think they can implement

3    now.  That's our position, your Honor.

4        THE COURT:  Have the parties met and conferred on

5    this and discussed whether or not there's some language that

6    would provide protection against any admission associated with

7    distribution, if that's what's going on here?

8        MR. GALVAN:  I first became aware in reading the

9    October 4th filing that this was an obstacle.  So, no, we have

10   not met and conferred about that.  I only really understood it

11   yesterday in preparing for this status conference that this may

12   be an obstacle.

13       THE COURT:  Let me ask the Special Master to weigh in

14   at this point.  Special Master Lopes?

15       SPECIAL MASTER:  Thank you, your Honor.  Our suicide

16   prevention expert informs me that the form is already being

17   audited at the facility level by custody supervisory personnel,

18   and it has been audited by the suicide prevention expert

19   himself.

20     And so we are left somewhat puzzled as to the legal

21   position because, in practice, the form has been rolled out and

22   implemented, and it's being audited.

23       THE COURT:  Special Master Lopes, do you see -- is

24   there not some way to practically just facilitate getting the

25   memo on the audit tool into the field, you know, without filing

1   something on the docket if someone needs to reserve a right

2   with respect to that distribution?  They can do that as between

3   the parties?  Is that an option here?  Special Master.

4         SPECIAL MASTER:  I believe it's an option, but I

5   don't quite pretend to understand why the definition of

6   "material modification" is slowing up this process, but it

7   is -- it appears to be, excuse me.

8         THE COURT:  Can I direct the Special Master to just

9   focus on this in the next seven days, reporting back to the

10  Court on whether or not some pragmatic solution can be achieved

11  without taking this before Judge Newman, either in November or

12  December -- I'm not hearing why the memo and the audit tool

13  can't be shared out with some -- you know, if a lawyer needs to

14  send a letter to preserve some right, the lawyer can do that.

15    Mr. Mello, do you want to tell me something?

16        MR. MELLO:  Yes, your Honor.  I mean, plaintiffs

17  indicated they had a content dispute.  If they do not have a

18  content dispute, that's an issue.  Whether they get to discuss

19  a content dispute first hinges upon in the current process,

20  which may have expired if the material modification

21  determination is made, and then if there is -- if it's

22  material, then the parties discuss it in one way versus

23  another.

24    If there is not a content dispute and if we're preserving

25  our argument, as you know this is a very important issue,

1    Dr. Mehta has made that clear, Dr. Williams has made that

2    clear, the secretary has made that clear, it remains.

3        But, on the other hand, we had to comply with the court

4    order, we had to comply with the 14-step process, and

5    plaintiffs had a content dispute, if there is a materiality

6    determination or dispute, we're supposed to pause.  And so

7    that's our only concern.

8        We're glad to work with the Special Master on this while

9    reserving our rights.  Again, I'm not going to go backwards in

10   this hearing, but I too am confused, your Honor.

11            THE COURT:  All right.  Special Master Lopes, I'm

12   directing you to, as efficiently as possible, including

13   principals who might be able to keep the eye on the ball here,

14   just see with the minimum number of people in the room, can you

15   just get something -- and maybe there's a gap, we're in a gap.

16   There's no updating process in effect, maybe that helps, just

17   get this one resolved.

18       And let me know in seven days so the implementing audit

19   tool can work out.  Can you work with that, Special Master

20   Lopes?

21            SPECIAL MASTER:  Absolutely, your Honor.

22            THE COURT:  So I'll look for a report in seven days

23   at that point.

24       In terms of filing suicide prevention schedule updates, I

25   know defendants request to change the schedule to monthly; the

1    Special Master informs me he's fine with that.  Any objection,

2    Mr. Bien?

3              MR. GALVAN:  No objection, your Honor.  This is

4    Mr. Galvan speaking for Mr. Bien.

5              THE COURT:  Mr. Galvan.  So I approve that monthly is

6    the new schedule.

7        Update on process of settlement discussion.  I already

8    covered that.  I thought it was appropriate to start with that,

9    just acknowledging the importance of that settlement track.

10       Does anyone want me to know anything more about the TTM

11   settlements without divulging details of settlement

12   discussions?  Mr. Bien?

13             MR. BIEN:  I just think it's proceeding in a very

14   positive manner, your Honor.

15             THE COURT:  All right.  Mr. Mello?

16             MR. MELLO:  Defendants are quite optimistic and

17   appreciate the work of Judge Newman, and are very hopeful this

18   will be resolved on November 1st, thank you.

19             THE COURT:  All right.  In terms of other settlement

20   conferences, the Court has identified with the parties' input a

21   number of topics for settlement.  And just looking ahead, the

22   Court is not inclined to micromanage this, even during this

23   session there's been talk about moving subjects around.

24       I had understood from Judge Newman and Special Master Lopes

25   that there was generally an agreement about EOP being mixed up,

 1   and that's a big ball of wax.  But if that could be introduced,

 2   at least, through an initial settlement conference in November,

 3   that is completely fine with the Court.

 4       Here's my thought for structuring settlement.  And I'm not

 5   certain I need to micromanage the -- even whether or not

 6   material modification bumps EOPs.  I would rather set broad

 7   parameters and allow the parties to work within them, to

 8   provide for the organic nature of the process to work itself

 9   out.

10       And so taking account of what I've heard today, my thought

11   would be to say -- to ask Judge Newman to work with the parties

12   to ensure that the settlement conference topics the Court has

13   identified are covered over the next year.

14       So either, you know, combined settlement conference

15   combining topics on one per topic.  Judge Newman, as you can

16   tell, has a great appetite for settlement, and I think he's

17   prepared to make the time.

18       So I would say work with him, figure out the order.  It

19   doesn't need to be -- to set the order now would make no sense

20   except to know what's coming next.  So cover all these topics

21   over the next year.  With EOP, what I would say, if really with

22   Judge Newman's blessing, with the' parties input, the Special

23   Master's input, the parties decide material modification should

24   go first, maybe not so important if we're in a gap and if the

25   suicide -- the suicide prevention issue gets worked out.

1        But, at the very least, start EOP by January.  Because my

2   hunch is EOP would take multiple sessions, but I think it makes

3   sense to get started on it.  So start EOP no later than

4   January, add in material modification.

5        Is that a sufficient parameter to allow the parties to work

6   with Judge Newman?  Judge Newman would stay in touch with me

7   without divulging details.  So I feel comfortable with a lot of

8   leeway, with the understanding that ultimately I do need to

9   sign off on any settlement.  This is not a case where you all

10  can make your own record in front of Judge Newman, you've got

11  to come to me and have me sign off.  But they can be proposed

12  resolutions.

13       So does that approach work, Mr. Bien?

14            MR. BIEN:  I'm going to pass to Lisa Ells, please.

15            THE COURT:  All right.  Ms. Ells.

16            MS. ELLS:  Good afternoon, your Honor.  I think that

17  approach is workable.  I would say there are maybe times where

18  the parties disagree as to the prioritization of various

19  topics, in which case I think we would ask that Judge Newman

20  reach out to you to get further guidance, potentially speak

21  with the Special Master.

22       I also just wanted to alert the Court that we have become

23  increasingly concerned about the crisis that is occurring in

24  the PIPs, especially since the closure to intake last week of

25  the largest PIP due to the serious staffing shortages, and that

1  coupled with the growing waitlist and the recent finding of the

2  Special Master's on-site tours, it appears to us to be a very

3  quickly deteriorating situation.

4      And we see this as a subcomponent of item four in the list

5  regarding patient care and access to higher levels of care, so

6  we will be requesting that Judge Newman prioritize the subset

7  of that item that regards the PIPs.

8      Beyond that, I think the procedure that you're discussing

9  sounds appropriate, and insofar it has worked relatively well

10 to work things out between the parties and Judge Newman in that

11 respect.

12          THE COURT:  All right.  For the defense, is this you,

13 Mr. Mello?

14          MR. MELLO:  Yes, your Honor.  Defendants agree with

15 the framework you discussed which allows us to work with Judge

16 Newman to come up with a schedule, and that makes sense to our

17 side.  Thank you.

18          THE COURT:  Anything to say about the PIPs?  I'd ask

19 Dr. Mehta as well, but if you want to -- I did note the

20 staffing issues with PIPs as reflected on what's on the Court's

21 docket at this time.

22          MR. CAPOZZI:  So I will definitely turn it over to

23 Dr. Mehta to describe that for you, your Honor.

24          THE COURT:  So Dr. Mehta, generally, anything you

25 have to say about staffing in the PIPs and response to

1    Ms. Ells' suggestion that that should be a high priority?

2            DR. MEHTA:  Thank you, your Honor.  I agree that we

3    could move that up the list, and I'm totally on board with

4    that.

5        I think we do have a plan, the temporary closure to intake

6    that Ms. Ells mentioned was a key part of the plan, and I

7    really appreciate the Special Master and the plaintiffs working

8    with us very quickly to make that happen.  That was very

9    helpful.  And so we have other plans that are in place and will

10   be, of course, sharing more and checking in as we do weekly in

11   our work groups about those plans.

12           THE COURT:  All right.  Special Master Lopes on this

13   prioritization, and anything in particular on the PIPs?

14           SPECIAL MASTER:  I think it is a prudent plan to go

15   along with the prioritization as you outlined.

16       In terms of the PIPs, that may be something that needs to

17   be moved up in order.  Dr. Mehta's done his level best to try

18   to see appropriate care is provided in the PIPs, but what is

19   beyond him is that in three of the five PIPs -- three of the

20   four PIPs that we've been to, the functional vacancy rates are

21   wholly inadequate, not only for psychiatry, psychology, social

22   workers, and it is like Dr. Mehta's prudent decision to pause

23   intake at CIW is much better, and we haven't yet gotten to San

24   Quentin.  But the first three PIPs that we went to, the

25   conditions of the limited -- because of the high vacancy rates,

 1    just untenable, just impossible to provide appropriate care.

 2            THE COURT:  All right.  Understood.  Well, I'm going

 3    to ask the Special Master to participate in discussion about

 4    prioritization as he already is.  I'll relay to Judge Newman

 5    the need to figure out by November exactly what is prioritized.

 6    Is it PIPs alone, where does material modification fit in, if

 7    it remains one of the highest priorities and more generally

 8    EOPs.  I think those are all next up from what I'm hearing.

 9    But in terms of how exactly that rolls out, again, I'll let the

10    process inform that.

11        I wanted to talk a little bit more about suicide because I

12    know there has been some talk about that being next up.  But I

13    think there's a general agreement at this point that it's not

14    next up, I would just observe the Court is waiting for

15    Mr. Hayes' audit reports with rounding done this coming spring,

16    March, April the report.  The Court would expect to see a

17    report by summer of 2022, and that will be a critical report, I

18    think, to inform discussions.

19        And again, without changing anything I just said, the

20    parties would want to take account of the information that will

21    be available to allow for the most meaningful settlement

22    discussions.  I just want to acknowledge that this is a high

23    priority of the secretary.  She has the ability to talk with

24    the Special Master, so even as I say that we're waiting on

25    information, nothing, of course, prevents, in addition to

1   working out the material modification issue as it's holding up

2   the audit tool on the memo, nothing prevents the secretary

3   communicating with the Special Master and any other party to

4   move suicide prevention along.

5       So the only other thing I would say is I understand Judge

6   Newman has put into place some guidelines for when you're in

7   settlement how you communicate about an issue that is the

8   subject of settlement.

9       So I just want to say I'm aware of all of that, I want to

10  encourage constructive discussions that can move things along

11  on parallel tracks, even if they aren't informal work groups.

12      So if I can relay to the secretary, Dr. Mehta, the ongoing

13  concern about this issue and the Court's blessing of anything

14  she can do, including informal discussions with the Special

15  Master, totally fine.

16          MR. MEHTA:  Absolutely, your Honor.

17          THE COURT:  Relatedly, on cultural collaboration,

18  again, given comments the secretary has made at past hearings

19  and in light of some of the recent news associated with Folsom,

20  you know, the Court doesn't make decisions based on what it

21  reads in the papers, but there is very troubling news coming

22  out of Folsom.  It is not an evidentiary record, but it made me

23  wonder what is the status of cameras for Folsom?  Particularly

24  given some of the information, this Court can take judicial

25  notice before it in the *Yandell* case and placement of certain

 1   custodial defendants in mental health units.

 2       Can you say anything to me about where Folsom is on the

 3   list?  I understand the secretary, with great enthusiasm,

 4   indicated there is budgeting, there is the *Armstrong* court's

 5   order, I don't believe that touches Folsom.  Is Folsom in the

 6   first round of institutions for which cameras are contemplated,

 7   Dr. Mehta?

 8           DR. MEHTA:  Your Honor, I'm not as familiar with this

 9   topic; it's been outside of my area of expertise.  May I defer

10   to my counsel?

11           THE COURT:  If counsel knows, yes, Mr. Mello.

12           MR. MELLO:  Counsel does not know.  Counsel does know

13   this is the subject of negotiations, I think, in *Armstrong*.

14   And that plaintiff's counsel is also counsel in *Armstrong*, but

15   I do not -- I do not know, I don't know if Ms. Thorn knows, but

16   I do not know anything regarding that subject, your Honor.

17       But we can, of course, report that to your Special Master

18   and he can relay that information to you.  If she doesn't know,

19   maybe he knows.

20           THE COURT:  Did you shake your head you don't know?

21           MS. THORN:  Your Honor, no, I don't know the status

22   of the full scope of the rollout and which institutions are

23   affected by that *Armstrong* plan.

24           THE COURT:  Special Master Lopes, anything to say?

25   Mr. Bien?

1          MR. BIEN:  I can report, as I think your Honor

2    stated, Sacramento is not one of the institutions covered by

3    the *Armstrong* order.  The secretary did tell us, and it's in

4    the budget, that fixed cameras will be installed in all

5    institutions.  I don't know the exact schedule for when

6    Sacramento will get -- will get its full complement of cameras.

7    Sacramento does have some cameras based on prior orders of this

8    Court from -- I don't know how long ago that was -- good ten

9    years ago or so.

10        But it's not a comprehensive camera coverage as will be in

11   the new plan.  And body-worn cameras are not -- are coming only

12   through the *Armstrong* order so far, and they do not apply at

13   Sacramento.

14          SPECIAL MASTER:  Your Honor, you're muted.

15          THE COURT:  Thank you.  Special Master Lopes, you had

16   something to add?

17          SPECIAL MASTER:  I had a conversation with the court

18   expert in *Armstrong* and *Swanson*.  If I understood him

19   correctly, the plan, as stated at this point, doesn't cover

20   this facility at this time.

21          THE COURT:  Yeah, not in *Armstrong*.  I didn't know we

22   were going beyond that with what she was seeking funding for.

23   If, Dr. Mehta, you can find out --

24          DR. MEHTA:  Sure.

25          THE COURT:  -- and Special Master Lopes knows or

 1    Mr. Mello can convey that information.

 2              DR. MEHTA:  Absolutely.

 3              THE COURT:  This dovetails with cultural

 4    collaboration, I believe.  It's important information, and

 5    if -- if there's any concern about *Armstrong* bleeding into the

 6    settlements here, I wouldn't be overly concerned about that,

 7    either Judge Newman or the Special Master can let me know that

 8    they're seeking clarification to ensure there's no concern, and

 9    I can check with Judge Wilken.

10       But I'm not -- I think it would be a matter of making

11    certain her court expert is in the loop.  So if -- I wouldn't

12    avoid covering a subject out of concerns.  Judge Wilken has her

13    orders made clear and acknowledged *Coleman* in issuing her

14    orders, just a general comment.  And again, that's something to

15    think about as you work through the settlement discussions.

16       I don't have anything more to say with respect to

17    settlement.  Is there anything else any one of you believes we

18    should cover?  Mr. Bien?

19              MR. BIEN:  No, your Honor.

20              THE COURT:  Mr. Mello?

21              MR. MELLO:  No, your Honor.

22              THE COURT:  Dr. Mehta, just checking?

23              DR. MEHTA:  No, your Honor.  Thank you.

24              THE COURT:  All right.  Special Master Lopes?

25              SPECIAL MASTER:  No, your Honor.

1          THE COURT:  All right.

2      The next item regarding whether or not we need a special

3  status to discuss presumption of program guide level care.

4  What I'd like to do is add this to the January status we're

5  talking about, so we'll talk about updating and presumption of

6  care.

7      And at that point I'll see another joint report and know

8  whether or not you're closer together on that issue.  And I

9  realize it could be tied to what's happening with vaccinations,

10  maybe boosters, whatever we know at that point in time.

11      So with that I'm prepared to talk about the motion to

12  strike unless there's anything else anyone believes is

13  encompassed by our agenda for today that we should cover.

14      Mr. Bien?

15          MR. BIEN:  No, your Honor.

16          THE COURT:  Mr. Mello?

17          MR. MELLO:  Just quickly on the new schedule for

18  reporting updates to suicide activation schedule.  Have we

19  decided on when they are due, as this Court is probably aware,

20  there are voluminous mid-month filings.  So we prefer it not

21  happen in the middle of the month.

22      And that's it, otherwise, you know, I will hand it off to

23  the Attorney General's Office for a motion to strike.  But

24  that's our only question.  I should have asked in real time

25  when you said you were amenable to monthly reporting.  I'm

1    sorry I did not.

2              THE COURT:  What is the request?  The last day of the

3    month, the first day of the month?  What do you prefer?  You're

4    muted.

5              MR. MELLO:  I'm sorry, I'll defer to Ms. Thorn.

6              THE COURT:  Ms. Thorn.

7              MS. THORN:  Your Honor, I think we preferred the last

8    filing day of the month.

9              THE COURT:  All right.  Mr. Bien, does that work for

10   you?

11             MR. BIEN:  We can adjust to it for sure, your Honor.

12             THE COURT:  That's the order, the clarification,

13   monthly means last filing day of the month.

14             DR. MEHTA:  Thank you.

15             THE COURT:  Just checking, anything further,

16   Dr. Mehta?

17             DR. MEHTA:  No, your Honor.  Thank you.

18             THE COURT:  All right.  And Special Master Lopes,

19   anything further?

20             SPECIAL MASTER:  No, your Honor.

21             THE COURT:  All right.  Actually, while I see her

22   there, Ms. Schultz, why don't we go ahead and get a date on the

23   status for January.  Is there a date you would propose for a

24   next status for this court?

25             THE CLERK:  Yes, your Honor.  January 14, 2022, at

```
 1   10:00 a.m.

 2              THE COURT:  Does that date work for you, Mr. Bien?

 3              MR. BIEN:  I think we can cover -- that's fine with

 4   us.

 5              THE COURT:  All right.  Mr. Mello?

 6              MR. MELLO:  I'm sure my wife will be happy to have me

 7   in court on her birthday.  Yes, that works for us, your Honor.

 8              THE COURT:  All right.  Well, if you want to yield to

 9   someone else, that would be fine too.

10      Dr. Mehta, that works for you?

11              DR. MEHTA:  Yes.

12              THE COURT:  The secretary, if she can be here.  I

13   know you don't speak for her, but if she can be here, and I

14   request that you convey my request that she be here on that

15   date.

16              DR. MEHTA:  Yes, your Honor, I absolutely will convey

17   that.  And that works for me, thank you.

18              THE COURT:  Special Master Lopes, that works for you?

19              SPECIAL MASTER:  Yes, your Honor.

20              THE COURT:  All right.  Then moving to the -- you can

21   confirm that, Ms. Schultz, and put that on the calendar.  I'll

22   look for a joint statement before then, and perhaps an update

23   on settlement generally.

24      On the motion to strike, I'm prepared to issue a bench

25   order.  Let me just ask, I'm assuming everything is covered by
```

 1    the briefing.  Fair enough, Mr. McClain?

 2              MS. KOTWANI:  Your Honor, I'm Namrata Kotwani from

 3    the Attorney General's Office.

 4              THE COURT:  All right.  Ms. Kotwani.

 5              MS. KOTWANI:  Good afternoon.  Yes, your Honor, we

 6    believe everything is covered by the briefing.

 7              THE COURT:  All right.  And is it Ms. Ells for the

 8    plaintiffs?

 9              MS. ELLS:  Yes, your Honor.  I think -- the only

10    point I'd like to make as sort of a practical point, which is

11    there are aspects of this pleading that defendants find

12    nonresponsive.

13        I think if that's a standard for the motion to strike,

14    there is going to be a lot more litigation in this case rather

15    than less.  And the example I would give is, you know, the

16    motion for reconsideration that defendants filed is ten pages

17    long, and nine pages of it has almost nothing to do with the

18    policy that they're seeking reconsideration of.  There's a lot

19    in there that is nonresponsive.  So if that is the standard for

20    what can be struck under this Court's December 24th order from

21    last year, I think that's going to encourage litigation.

22        There are reasonable judgment calls that parties make in

23    putting in pleadings before the Court to make a basic point.

24    There can be disagreement as to whether those are necessary to

25    make the point, but there's nothing that was in this pleading

1    that asks for additional action from this Court, there's

2    nothing that anyone alleges is untrue.  And it's not being

3    utilized to, you know, slander a party or to ask this Court to

4    do something that isn't in the form of a motion.

5         So I guess that's the only point I make is that, as a

6    practical matter, there's a long enough judgment that we can

7    quibble about as counsel for both sides that is unproductive

8    to, you know, not regarding the docket, as this Court suggests

9    is the key goal.  That's my only thought.

10             THE COURT:  Yes, Ms. Kotwani, you may respond.

11             MS. KOTWANI:  Thank you, your Honor.  To Ms. Ells'

12   point about further litigation on this matter, we did attempt

13   to informally resolve the dispute by saying the Court didn't

14   ask for the data, and we explained -- and the plaintiffs'

15   interpretation of the data -- and we explained why this was

16   disadvantaged to the defendants in the matter.

17        And so we do believe that actually it goes beyond the

18   judgment call, and it is clearly beyond what the December 24th

19   order prescribed.

20             THE COURT:  All right, understood.

21        So submitted, Ms. Kotwani?

22             MS. KOTWANI:  Yes, your Honor.

23             THE COURT:  Ms. Ells?

24             MS. ELLS:  Yes, your Honor.

25             THE COURT:  All right.  Well, again, I'm going to

1    resolve this by bench order and allow the transcript to serve

2    if anyone needs to obtain a copy of the transcript.  If the

3    prevailing party wants to order the transcript and provide this

4    in a formal proposed order to make it more clear on the docket,

5    that party may do that.

6        But regarding the document, it is certainly a concern this

7    Court has at this point.  It's not what informs the Court's

8    decision, as I'll explain.  So here is the court's order:

9        By minute order filed July 6, 2021, ECF No. 7219, the Court

10   granted defendants permission to file a motion to strike a

11   document plaintiffs filed on May 25, 2021.  Defendants timely

12   filed the motion on September 3, 2021.  That's at ECF 7298.

13   Plaintiffs have filed an opposition at ECF No. 7318, and

14   defendants have filed a reply, ECF No. 7327.

15       On March 26, 2021, the Court granted plaintiffs leave to

16   file a motion to obtain hospital-wide staffing data for the

17   three Department of State Hospitals that treat class members

18   and directed the plaintiff's motion be filed within 60 days.

19   ECF No. 7106.  In the intervening sixty-day period, plaintiffs

20   obtained the reports through a public records act request.

21   That's ECF 7183 at 2.  On May 25, 2021, plaintiffs filed a

22   "response" to the March 26, 2021, order, styling it as a

23   response, explaining they had received the data in response to

24   a public records act request and that a motion was no longer

25   necessary.

1    Plaintiffs also explained the data showed "persistent and

2    significant clinical vacancies," and that they would renew

3    their request to file a motion for data if defendants again

4    refused to provide it.  Plaintiffs appended a Declaration of

5    Lisa Ells declaration attaching the documents received in their

6    public records act request.

7        Defendants seek an order striking the May 24, 2021, filing

8    as unresponsive to the permission granted by the March 26,

9    2021, order and as containing improper argument to which

10   defendants have not had an opportunity to respond.  Defendants

11   contend the filing runs afoul of the Courts's December 24,

12   2020, order prohibiting filings that are nonresponsive to court

13   orders.  The plaintiffs contend the filing was a proper

14   reservation of rights in the event defendants again refused to

15   provide the data, and they suggest Department of State

16   Hospitals has again stopped providing the data.  In reply,

17   defendants contend plaintiffs arguably could have simply

18   informed the Court of the status of the dispute and that the

19   response they did file violates the December 24, 2020, order.

20       The Court's March 26, 2021, order granted plaintiffs

21   permission to file a motion to compel production of

22   hospital-wide staffing data.  Plaintiffs chose not to file that

23   motion within the sixty-day period because they had received

24   some records.  The records plaintiffs file are precisely the

25   type of extraneous material the Court intends by the December

1   24, 2020, order be kept out of the record.  While filing those

2   records might be proper in the context of a future concrete

3   dispute, they are not properly filed as part of notice to the

4   Court that plaintiffs are choosing not to file a motion to

5   compel.  So here defendants correctly contend that plaintiffs

6   could have simply notified the Court the dispute was resolved

7   as to past records and, as necessary, reserved their right to

8   again seek permission to compel production of such records in

9   the future.  Query whether or not a simple notice of withdrawal

10  would have been sufficient.  Defendants' September 3, 2021,

11  motion to strike is granted and plaintiffs' May 25, 2021,

12  filing is stricken.

13       That is the Court's bench order.

14       All right.  I believe that resolves all the business we

15  have today, and so with thanks to you all.  You may now sign

16  off.

17            THE CLERK:  Court is in recess.

18       (Proceedings adjourned:  4:07 p.m.)

19                      ---oOo---

20       I certify that the foregoing is a correct transcript from

21  the record of proceedings in the above-entitled matter.

22

23                      /s/ Thresha Spencer
                        THRESHA SPENCER
24                      CSR No. 11788, RPR

25