# EXHIBIT B

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 15, 2021


Paul Mello
Hanson Bridgett
1676 N. California Boulevard, Suite 620
Walnut Creek, CA 94596

Dear Mr. Mello:

Attached please find the California Department of Corrections and Rehabilitation's November 2021 Status Update for the Three-Judge Court proceeding.


Sincerely,

*Jennifer Neill*

JENNIFER NEILL
General Counsel
Office of Legal Affairs
California Department of Corrections and Rehabilitation


cc: Iram Hasan, Deputy Attorney General

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                                   GAVIN NEWSOM, GOVERNOR



## November 15, 2021 Update to the Three-Judge Court

On February 10, 2014, the Three-Judge Court extended the deadline to achieve the court-ordered reduction in the in-state adult institution population to 137.5 percent of design capacity to February 28, 2016.  (ECF Nos. 2766/5060 & 2767/5061.)  This report is CDCR's 90th report submitted since the Court issued its population-reduction order, and the 78th report submitted since February 2015, when Defendants informed the Court that the population was below the court-ordered reduction.  (ECF No. 2838/5278, filed February 17, 2015.)  It has now been over seven years since Defendants have been in full compliance with the population-reduction order. As of November 10, 2021, the State's prison population is at 115.8 percent of design capacity, up from 114.7 percent in the previous filing.  As of November 10, the State's prison population is 94,920.

### A.      Update on durability:

As previously reported, Proposition 57, the State's durable remedy that enacts many of the Court-ordered reforms as well as expands credit-earning opportunities, was approved by voters in November 2016.

On May 1, 2018, regulations for Proposition 57 were approved and made permanent. Information about these regulations can be found at: https://www.cdcr.ca.gov/proposition57/.

Later, in December 2018, the Office of Administrative Law approved two emergency regulation packages which: (1) amend the nonviolent offender parole process to distinguish between determinately and indeterminately sentenced offenders and implement a parole consideration process for indeterminately sentenced, nonviolent offenders ("Nonviolent Offender Package"); and (2) expands credit earning opportunities ("Credit Earning Package") for inmates who achieve a High School diploma or its equivalent or who complete 52 hours of programming under the Rehabilitative Achievement Credit program.  The Credit Earning Package also reduces the minimum amount of time an inmate must serve until released following a sudden award of substantial credit.  The Credit Earning Package went into effect on January 9, 2019.

The Nonviolent Offender Package went into effect on January 1, 2019.  Following the Court of Appeal's decision *In re McGhee*, effective July 9, 2019, CDCR no longer applies the previously mandated public safety screening criteria to eligible nonviolent offenders.  All eligible (determinately and indeterminately sentenced) nonviolent offenders are now referred to the Board of Parole Hearings for consideration, regardless of their in-prison behavior.  On September 10, 2019, the Office of Administrative Law approved the emergency regulations repealing the public safety screening criteria for determinately sentenced, nonviolent offenders. On March 26, 2020, the Office of Administrative Law made the emergency regulations permanent.

The California Supreme Court in the case of *In re Gadlin*, effective January 29, 2021, held persons required to register under Penal Code section 290, et seq. based on a prior conviction cannot be categorically excluded from parole consideration under Proposition 57. The Court also held the Department's regulations cannot exclude inmates for a current offense unless it is defined by the regulations as a violent felony. On April 9, 2021, the department filed emergency regulations with the Office of Administrative Law to comply with the court's decision. The Office of Administrative Law approved the emergency regulations on April 29, 2021. In addition, CDCR and the Board of Parole Hearings have made necessary changes to IT systems, policies, and procedures to implement the *Gadlin* decision. All persons who became eligible for parole consideration as a result of the *Gadlin* decision and who otherwise meet the eligibility requirements for parole consideration under Proposition 57 have been referred to the Board of Parole Hearings.

In addition, in response to the COVID-19 pandemic, pursuant to Governor Newsom's March 24, 2020 Executive Order N-36-20 and the CDCR Secretary's independent authority under California Government Code § 8658, CDCR reduced the inmate population at CDCR's institutions.

The impact of the above-described regulations include:

1. <u>Increased credit earning opportunities for all inmates except the condemned and those serving life without parole:</u>

   1,389 inmates released in October 31 2021 earned credit authorized by Proposition 57 towards their advanced release date. These inmates earned an estimated average of 234.5 days of additional credit.[1]

2. <u>Determinately sentenced nonviolent offender parole process:</u>

   CDCR began referring inmates to the Board for this process on July 1, 2017, pursuant to the emergency regulations promulgated on April 13, 2017. From July 1, 2017 through October 31, 2021, 28,876 referrals were made to the Board. As of October 31, 2021, 25,701 referrals have been reviewed on the merits, with 4,308 inmates approved for release and 21,393 denied. Additionally, 2,223 referrals have been closed because the Board's jurisdictional review of the inmates' criminal history and central file revealed they were not eligible for parole consideration. The remaining referrals are pending review, including the 30-day period for written input from inmates, victims, and prosecutors.

3. <u>Indeterminately sentenced nonviolent offender parole process:</u>

   CDCR began screening indeterminately-sentenced, nonviolent offenders for eligibility in January 2019. As of October 31, 2021, 2,961 inmates have been referred to the Board for a parole consideration hearing, of which 66 were closed because the Board's jurisdictional review of the inmates' criminal history and central file revealed they were not eligible for parole consideration. The Board conducted 1,465 hearings for

---

[1] This number does not include inmates released from fire camps.

indeterminately sentenced nonviolent offenders.  The hearings resulted in 414 grants, 940 denials, and 111 stipulations to unsuitability.  An additional 1,420 hearings were scheduled but were postponed, waived, continued, or canceled.  The remaining referrals are pending parole suitability hearings.

**B.**    **Update on Other Measures Defendants Continue to Implement:**

1.    Contracting for additional in-state capacity in county jails, community correctional facilities, private prison(s), and reduction of out-of-state beds:

Defendants have reduced the population in CDCR's 34 institutions by transferring inmates to in-state facilities.

    **a.**    Private Prison (California City):

    The current population of California City is approximately 2,112 inmates.

    **b.**    Community correctional facilities (CCFs), modified community correctional facilities (MCCFs), and Female Community Reentry Facility (FCRFs):

    The State currently has no contracted MCCF and FCRF beds.

    **c.**    Reduction of inmates housed out-of-state:

    On February 10, 2014, the Court ordered Defendants to "explore ways to attempt to reduce the number of inmates housed in out-of-state facilities to the extent feasible."  Since that time, the State has reduced the out-of-state inmate population to zero.[2]  The last inmates in out-of-state contract beds returned to California at the end of June 2019.

2.    Parole process for medically incapacitated inmates:

Due to a new approach to the enforcement of federal licensing requirements by the United States Department of Health and Human Services, Centers for Medicare & Medicaid Services (CMS), changes are being made to the State's medical parole process.  The licensing enforcement prevents the Board of Parole Hearings or Division of Adult Parole Operations from imposing any conditions on those placed on medical parole in a skilled nursing facility.  These conditions have been used to ensure placement of the person in a community facility will not pose a threat to public safety.  CMS has taken the position that no conditions can be placed on persons in community facilities, including the condition that the patient not leave the facility unless there is an emergency, or unless they have permission from their parole agent.  As the basis for this requirement, CMS is relying on a May 3, 2016 memorandum interpreting the regulations, which is attached.  These CMS enforcement measures prevent the Board and DAPO from imposing relevant and necessary conditions for an expanded medical parole placement.  For most patients this precludes a determination that the placement on expanded medical parole would not reasonably pose a threat to public safety.  As a result, at this time the

---

[2] This statistic does not include inmates housed in other states under interstate compact agreements.

Department is only processing patients who are on a ventilator for expanded medical parole consideration. In addition, only persons who are on a ventilator are being placed in the community at this time. People who are already placed on medical parole will remain in the skilled nursing facility where they are currently placed unless and until the facility receives notice from CMS that it is violating licensing requirements. As of now, only one facility has been notified of licensing violations, but CMS has informed California officials that the memorandum will be enforced at all skilled nursing facilities.

Since its inception, the process for expanded medical parole has included the following steps. Once a person is referred to the Board, an expanded medical parole hearing is held. If the person is approved for placement in a skilled nursing facility, the decision is valid for up to 120 days. The decision is forwarded to California Correctional Health Care Services (CCHCS)/Receiver's Office. CCHCS then works to find a facility in the community who will accept the patient and enforce any restrictions imposed by the Board. If CCHCS is unable to place the patient in the community within 120 days of the decision, the decision will expire and the person will remain in CDCR custody.

As of November 9, 2021, the Board has held 320 medical parole hearings under the revised procedures, resulting in 210 approvals and 110 denials. An additional 480 were scheduled, but were postponed, continued, or canceled.

3.  <u>Parole process for elderly inmates:</u>

As discussed in prior reports, the State enacted Assembly Bill 1448 on October 11, 2017, authorizing an elderly parole program for inmates age 60 or older who have served at least 25 years of incarceration. Governor Gavin Newsom signed AB 3234 last fall, lowering the age to 50 and the years served to 20 for this program. Assembly Bill 3234 however, specifically excludes persons sentenced under the Three Strikes Law or who are convicted of first-degree murder of a peace officer. The Board is required to schedule all hearings for persons eligible for a hearing as a result of AB 3234 by no later than December 31, 2022. It is projected this will result in 1,135 inmates being eligible for a parole hearing by December 31, 2022, based on that change. Necessary functionality to identify, screen, and calculate parole eligible dates for persons eligible for a parole hearing under the new law is being developed and it is anticipated that all persons newly eligible for an initial parole hearing due to AB 3234 will be scheduled for a parole hearing no later than December 31, 2022.

The Board continues to schedule eligible inmates for hearings who were not already in the Board's hearing cycle, including inmates sentenced to determinate terms. The Board also continues to give special consideration to whether age, time served, and diminished physical condition, if any, have reduced a person's risk for future violence in all parole hearings conducted for persons who meet the criteria for an elderly parole hearing. From February 11, 2014, through October 30, 2021, the Board held 5,963 hearings for inmates eligible for elderly parole, resulting in 1,759 grants, 702 denials, 501 stipulations to unsuitability, and there is currently one split vote that requires further review by the full Board. An additional 3,481 hearings were scheduled during this period but were waived, postponed, continued, or canceled.

4.   <u>Male community reentry programs:</u>

Contracts for the San Diego County, Los Angeles County, Kern County, and Butte County Male Community Reentry Programs are in place.  The State continues to review and refer eligible inmates for placement consideration.  As of November 10, 2021, 409 inmates are housed in Male Community Reentry Program facilities.

5.   <u>Expanded alternative custody program:</u>

The State's expanded alternative custody program for females, Custody to Community Treatment Reentry Program (CCTRP), provides female inmates with a range of rehabilitative services that assist with alcohol and drug recovery, employment, education, housing, family reunification, and social support.  Female inmates in the CCTRP are housed at facilities located in San Diego, Santa Fe Springs, Bakersfield, Stockton, Sacramento, and Los Angeles.  As of November 10, 2021, 278 female inmates are participating in the CCTRP.

6.   <u>Reduction of inmate population in response to COVID-19 pandemic:</u>

On March 24, 2020, Governor Newsom issued an Executive Order N-36-20 suspending the intake of new inmates into CDCR facilities for 30 days.  CDCR's Secretary extended the suspension of intake.  For the period from March 24 through August 24, 2020, intake was mostly suspended, with only very limited intake occurring in May and June 2020. On an intermittent and limited basis, CDCR resumed intake the week of August 24, 2020. In response to the recent increase of COVID-19 cases in the community and consistent with public health and health care guidance, CDCR suspended intake from county jails effective November 26, 2020, through December 27, 2020.  Intake resumed on January 11, 2021 on a limited basis, and resumed to a regular basis on April 2021.  Individual institutions may temporarily close to intake on a case-by-case basis if experiencing a COVID-19 outbreak.

Further to these efforts to reduce the population, in March 2020, CDCR's Secretary exercised independent authority under California Government Code § 8658 to transition inmates for whom CDCR staff determined that public safety risk does not preclude release to early parole or Post Release Community Supervision.  Inmates with 60 days or less remaining on their sentence (as of March 30, 2020) who were not serving a current term for a violent felony, or for a domestic violence offense, and were not required to register as a sex offender had their release to parole or Post Release Community Supervision accelerated under the Secretary's direction.  As of April 14, 2020, a total of 3,585 inmates were released as a result of the Secretary's directive and other natural attrition.

In addition, at the end of June 2020, CDCR implemented a new plan—consisting of several discretionary measures—to further safely reduce the prison population under California Government Code section 8658.  On July 10, 2020, CDCR formally announced this new plan.  Further details can be found at
https://www.cdcr.ca.gov/news/2020/07/10/cdcr-announces-additional-actions-to-reduce-

population-and-maximize-space-systemwide-to-address-covid-19/.  The first measure under this plan released inmates within 180 days of their release date on a rolling basis if they meet certain criteria.  As of November 11, 2021, 10,321 inmates have been released from CDCR's 35 institutions under this measure.  The second measure under the plan released inmates with less than a year to serve who resided in particular prisons and who met certain criteria.  As a result of this measure, 555 qualifying inmates were release early.  The third measure under the plan released medically high-risk inmates who met certain criteria and were individually approved by the Secretary for early release.  As a result of this measure, 73 people who were not otherwise eligible for release through the first two programs have been released early to date.  This early-release program was suspended on July 28, 2021, but CDCR continues to process releases for those previously deemed eligible for release under this program.

Under California Code of Regulations, Title 15, section 3043.6, an additional measure under the plan announced on July 10, 2020 awarded twelve weeks of positive programming credits to inmates who met certain criteria.  This effort was undertaken to make up for limited access to programs and credit-earning opportunities during the COVID-19 pandemic.  Additional information regarding this measure can be found at https://www.cdcr.ca.gov/covid19/positive-programming-credit-faqs/, and the Secretary's letter to the incarcerated population regarding these credits can be found at https://www.cdcr.ca.gov/covid19/letter-to-all-incarcerated-people/.  Between January 1, 2020 and December 31, 2020, CDCR awarded approximately 78,230 days of credits to eligible inmates, including approximately 64,842 days of positive programming credits.  This is an increase of more than two-fold from the previous year, when approximately 35,228 days of credits were awarded to eligible inmates between January 1, 2019 and December 31, 2019.

7.  New credit earning regulations effective May 1, 2021:

CDCR passed new credit-earning regulations effective May 1, 2021.  Significant credit-earning changes include:

- an increase in the rate at which people serving sentences for violent crimes earn credits for good conduct from 20% (one day of credit for every four days served) to 33.3% (one day of credit for every 2 days served);

- an increase in the rate at which people serving sentences for nonviolent crimes with second- or third-strike enhancements earn credits for good conduct from 33.3% (one day of credit for ever two days served) to 50% (one day of credit for each day served); and

- the creation of Minimum Security Credit, through which people assigned to minimum custody workgroups, firefighting camps, or non-firefighting camps will be awarded 30 days of credit after 30 consecutive days of custody.

The new regulations also changed disciplinary practices that previously implemented zero-credit-earning days in response to a rules violation.  Under the new regulations, incarcerated people will no longer be disciplined with zero-credit-earning days.  Instead, where appropriate, discipline will include restricting certain privileges for a limited

period, but they will continue earning Good Conduct Credits during that time. Loss of privileges could, however, limit a person's ability to earn additional credits through certain programs. CDCR anticipates that, in addition to incentivizing positive behavior, these new changes will allow more people to reduce the amount of time spent in prison.

8.   Update to design capacity:

CDCR recently completed a review of its design capacity at all 34 institutions. The purpose of the review was to identify all beds that have been taken out of service or converted to other uses, and adjust the design capacity bed number accordingly. The review included a comparison between the Strategic Offender Management System (SOMS) and the design capacity bed list, with disputes reconciled through a variety of means, including review of source documents, construction projects, and site verification. CDCR identified 672 beds that are no longer in service, either due to conversion of cells to office space, storage, treatment space, or accessible housing, or because extensive repairs would be needed to re-activate the beds. It also identified 299 beds that should be added to the design capacity, but were improperly excluded in prior counts. Thus, CDCR's design capacity was reduced by a total of 373 beds and CDCR's statewide prison design capacity was reduced to 84,710. This updated design capacity took effect on July 1, 2021, and has been reflected in subsequent weekly population reports starting on July 7, 2021.

The recent deactivations of DVI, and portions of CCI and CTF, resulted in reductions of design capacity. DVI had 1,681 design beds, CCI's Secure Level I yard had 567 design beds, and CTF's Secure Level I yard had 500 design beds. As of October 1, 2021, CDCR's statewide prison design capacity is 81,962, and is reflected in CDCR's weekly population reports (*see* Exhibit A).

# Attachment to Exhibit B

Department of Health & Human Services
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C2-21-16
Baltimore, Maryland  21244-1850



---

**Center for Clinical Standards and Quality/Survey & Certification Group**

**Ref: S&C:  16-21-ALL**
**REVISED: 12.23.2016**

**DATE:**        **May 03, 2016**

**TO:**          State Survey Agency Directors

**FROM:**      Director
                  Survey and Certification Group

**SUBJECT:**    *Updated* Guidance to Surveyors on Federal Requirements for Providing Services
                  to Justice Involved Individuals

*\*\*\*Revised to remove the requirements for, and all references to, hospital specialty units to*
*ensure that hospitals are able to meet the unique security needs for justice*
*involved individuals receiving treatment \*\*\**

---

**Memorandum Summary**

- **Surveyor Guidance:**  The Centers for Medicare & Medicaid Services (CMS) are clarifying requirements for providing services to justice involved individuals in skilled nursing facilities (SNFs), nursing facilities (NFs), and intermediate care facilities for individuals with intellectual disabilities (ICFs/IID). Specifically, this guidance seeks to assure high quality care that is consistent with essential patient rights and safety for all individuals.

- *This policy memorandum replaces S&C: 16-21-ALL published May 03, 2016.*

---

## A.  Introduction

Many States are examining the role that the health care system plays in providing vital services to individuals during and following a period of incarceration.  For example, some individuals were previously uninsured and may have long-untreated health conditions.  Others have aged in prison and may be discharged under compassionate release policies or may need specialized care for chronic or debilitating conditions.

In particular, States are considering the role that Medicaid can play in facilitating better access to health care for individuals prior to, during, and after, a stay in a correctional facility.  The Social Security Act (the Act) prohibits federal financial participation (FFP) under Medicaid for inmates of a public institution, but provides an exception to this exclusion for patients in a medical institution[1].  The CMS Center for Medicaid and Children's Health Insurance Program (CHIP)

---

[1] Section 1905(a)(29)(A) of the Act prohibits Medicaid federal financial participation (FFP) for "any such payments with respect to care or services for any individual who is an inmate of a public institution (*except as a patient in a medical institution*)" [Emphasis added].

Services (CMCS) recently issued a letter to State Health Officials (SHO) that clarifies the definition of inmate of a public institution for purposes of Medicaid eligibility and to whom this exception applies. The letter is available at: https://www.medicaid.gov/federal-policy-guidance/downloads/sho16007.pdf. Additionally, Medicare has requirements and payment limitations that would also apply.[2]

Generally, three questions are particularly pertinent to this topic:

1. ***Individual*** - Does the individual meet the inmate exception or otherwise qualify for medical services? The SHO letter explains, for example, that an individual's eligibility for Medicaid may be established during incarceration even though no FFP may be available due to their inmate status. Enrolling the individual during the period of incarceration may facilitate his or her reentry by enabling timely access to needed health services upon the individual's release from prison.[3]
2. ***Service*** – Is the service covered by Medicare or under the State's Medicaid plan, and does the individual qualify for the medical service (e.g., by virtue of assessed need and medical judgment)?
3. ***Provider*** – Does the provider of services qualify for payment by virtue of having a Medicare or Medicaid provider agreement, and maintain continuous compliance with Medicare and Medicaid Requirements for Participation (Requirements) or Conditions of Participation (CoPs)?

This memorandum addresses only the third topic – certified provider compliance with Medicare and Medicaid participation requirements.

In this memorandum, the umbrella term "justice involved individuals" includes the following three categories of individuals:

**Inmates of a public institution:** Individuals currently in custody and held involuntarily through operation of law enforcement authorities in an institution which is the responsibility of a governmental unit or over which a governmental unit exercises administrative control, such as a state or federal prisons, local jails, detention facilities, or other penal settings (e.g., boot camps, wilderness camps).

**Individuals under the care of law enforcement**: Individuals who have been taken into custody by law enforcement. Law enforcement includes local and state police, sheriffs, federal law enforcement agents, and other deputies charged with enforcing the law.

**Individuals under community supervisio**n. Individuals who are on parole, on probation, or required as an alternative to criminal prosecution by a court of law to conditions of ongoing supervision and treatment.

---

[2] This issue is described more fully in the Medicare Learning Network Publication: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Items-Services-Furnished-to-Beneficiaries-in-Custody-Under-Penal-Authority-Fact-Sheet-ICN908084.pdf

[3] The SHO letter also clarifies that individuals serving part of their sentence in halfway houses may not be subject to the payment exclusion if certain conditions apply and that individuals under community supervision are not subject to the payment exclusion. It is important to note that CMS does not certify or survey halfway houses.

## B.  Medical Institutions - Provider Requirements

To be eligible to receive Medicare or Medicaid payment, medical institutions must demonstrate continuous compliance with federal requirements.  Providers and certain certified suppliers must be certified for participation in Medicare or Medicaid and are subject to periodic, onsite recertification surveys (inspections) to assess their continued compliance, as well as to investigations that focus on particular areas that may be the subject of a complaint received by CMS or by a State Survey Agency (SA).[4]

Medicare and Medicaid CoP requirements are different for different types of providers.  For example generally:

- *Hospitals:* The CoPs focus on acute care needs of inpatients and outpatients, and recognize that there can be a very large array of situations that may be presented for treatment.

- *Psychiatric Hospitals:*  Psychiatric hospitals are subject to the same CoPs as other hospitals, except the medical record services requirement specified at 42 C.F.R. §482.24, plus two additional CoPs that focus on the unique care needs of psychiatric patients.

- *Critical Access Hospitals (CAHs):* The CoPs specific to CAHs focus on short stay, acute care needs of inpatients and outpatients, and take into account that there is a wide array of treatment situations.   However, CAHs are different Medicare/Medicaid providers than hospitals, and except for CAH psychiatric and rehabilitation units, are subject to a different set of CoPs than hospitals.

- *Nursing Homes (NHs)* – The Requirements for Long Term Care Facilities (Requirements for Participation) accommodate both short and long-range needs, with a primary focus on the fact that the nursing home often serves as the individual's residence. Resident rights, choices, and dignity are therefore important features of the statutory and regulatory requirements. The requirements for nursing homes are the same for Medicare[5] and Medicaid.[6] The Medicaid nursing home benefit may also include levels of care in addition to the skilled nursing home care that is covered in Medicare. Individuals may be admitted as a resident of a nursing home only if they meet certain level-of-care and screening requirements, such as preadmission screening and resident review (PASRR).[7]

---

[4] CMS may also deem an accreditation of a provider to be sufficient as demonstrating compliance with the CoPs, if that accreditation is conducted by a CMS-approved accrediting organization.  Deemed providers remain subject to complaint investigations conducted by CMS or SAs, as well as full validation surveys that are conducted by CMS or SAs to check on the adequacy of the accrediting organization's surveys.

[5] Sections 1819(a), (b), (c) and (d) of the Act and 42 CFR Part 483, Subpart B.

[6] Sections 1919(a), (b), (c) and (d) of the Act and 42 CFR Part 483, Subpart B.

[7] PASRR is an important tool for states to use in rebalancing services away from institutions and towards supporting people in their homes, and to comply with the Supreme Court decision, *Olmstead vs L.C.,* 527 U.S. 581 (1999), which held that, under the Americans with Disabilities Act, individuals with disabilities cannot be required to be institutionalized to receive public benefits that could be furnished in community-based settings. PASRR can also advance person-centered care planning by assuring that psychological, psychiatric, and functional needs are considered along with personal goals and preferences in planning long term care. The PASRR process requires that all applicants to Medicaid-certified Nursing Facilities be given a preliminary assessment to determine whether they *might* have mental illness or intellectual disability. This is called a "Level I screen." Those individuals

Page 4- State Survey Agency Directors

- ***Intermediate Care Facilities for Individuals with Intellectual Disabilities*** (***ICFs/IID***) – Like nursing homes, ICFs/IID must pay particular attention to resident rights, choices, and dignity. They must ensure that only individuals who need and receive active treatment are admitted.

The needs of justice involved individuals may be accommodated in the varying types of medical institutions. However careful attention needs to be paid so that these needs are met in a manner consistent with federal requirements. In some cases, institutions have been able to demonstrate compliance with federal requirements. In other situations, they have not been able to do so (in which case, depending on State law, they usually functioned under State licensure without Medicare or Medicaid payments). The provider's ability to meet these needs and remain in compliance with federal requirements depends in large part on the interaction between (a) the nature of the individual's needs, behaviors, and restrictions, (b) the manner in which those needs or restrictions are addressed in the facility, and (c) capabilities of the relevant institution.

## C.  Questions Applicable to all Provider Types

A health care institution that provides care and services to justice involved individuals must be surveyed with the federal requirements applicable to all other health care institutions in the same provider type category.

Because Medicare and Medicaid requirements vary by provider type, we cover each provider or certified supplier separately.  Any institution/facility that is regulated by Federal CoPs or Requirements for Participation in Medicare and Medicaid must adhere to those conditions or requirements and administer them in a manner that does not violate any individual's rights. However, there are key questions surveyors must ask in all settings. These include:

- ***Governance:*** Does the provider or the Department of Corrections (DOC)/Parole Board maintain control over the conditions under which the individual receives care? It would not be permissible for the DOC or Parole Board to maintain control over the conditions.

- ***Screening, Admission, Discharge***: Are federal requirements for screening and emergency care met, when applicable, e.g., the Emergency Medical Treatment and Labor Act (EMTALA)?  Are federal requirements for admission and discharge processes met? Does the institution maintain admission processes to ensure that individuals are qualified for admission and that the institution/facility is capable of providing the necessary care? Institutions should receive sufficient information prior to admission of any patient or resident (e.g., medical records, diagnoses, etc.).  Do individuals with a mental health diagnosis receive proper screening for mental health services under the preadmission

---

who test positive at Level I are then evaluated in depth, called "Level II" PASRR. The results of this evaluation result in a determination of need, determination of appropriate setting, and a set of recommendations for services to inform the individual's plan of care. Regulations governing PASRR are found in the Code of Federal Regulations, primarily at 42 CFR Part 483, Subpart C. See:  https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Delivery-Systems/Institutional-Care/Preadmission-Screening-and-Resident-Review-PASRR.html

screening and resident review (PASRR) requirements?  PASRR is a federal requirement to help ensure that individuals are not inappropriately placed in nursing homes for long term care. PASRR requires that 1) all applicants to a Medicaid-certified nursing facility be evaluated for mental illness and/or intellectual disability; 2) be offered the most appropriate setting for their needs (in the community, a nursing facility, or acute care settings); and 3) receive the services they need in those settings.[8]

- ***Assessment of Individual Need for Care and Treatment:***  Do the medical professionals at the institution or facility gather information and work in concert with other medical professionals and caregivers who have knowledge of the individual and his or her needs? Does the institution maintain processes to ensure that individuals are adequately assessed with respect to their needs for care and treatment, and are provided care that directly corresponds to their needs?

- ***Treatment***: Do the services, treatment and restrictions applied by the medical institution for the patient or resident:

    a. Derive directly and exclusively from the patient/resident assessment(s) conducted by the facility's medical professionals?
    b. Flow directly from the prescriptions and treatment plan authored by the individual's physician and provider's medical professionals who are responsible for the care of the person in the facility (versus being imposed by outside authorities unsupported by independent assessment and judgment of the practitioners who are responsible for the person's care in the certified institution)?
    c. Adequately provide the federally-required level of care and services, and meet the needs of the individual within the capability of the medical institution?  For example, do individuals in the ICF/IID or psychiatric hospital need and receive active treatment?

- ***Role:*** Does the institution/facility administer or provide treatment or restrictions that do not flow from the independent, clinical judgment of medical professionals responsible for the care of the individual in the certified institution? Is the medical institution in the position of serving as an agent of the correctional or law enforcement authority?

- ***Staffing and Training:*** Does the institution/facility have sufficient numbers and types of staff with specific training on how to provide care to an individual subject to the jurisdiction of a law enforcement or correctional agency (e.g., maintaining professional boundaries, not sharing personal information, and ensuring a safe environment)?

- ***Protections and Care for All***: Does the institution/facility meet the needs of all patients or residents, and maintain staffing, staff training and qualifications, equipment, and other

---

[8] *Ibid.*

capabilities to ensure that safety, rights and quality of care are maintained for all patients or residents?   Does the institution/facility promote and protect patient and resident rights?

These are the same questions that surveyors must ask in relationship to the treatment of all patients or residents, but because of the nature of criminal justice supervision, it is at times more challenging to accommodate the supervision requirements expected by supervising authorities and still comply with CoPs, Requirements for Participation and other CMS requirements.

We hope that this communication will aid surveyors and providers in identifying some of the important questions and considerations that should be posed in a survey, as well as serving as a resource for medical institutions to aid in their maintaining compliance with Medicare and Medicaid provider and certified supplier requirements. Therefore, in the remainder of this guidance we focus on the federal requirements for Medicare and Medicaid participation, rather than on the legal status of an individual.

## D.  Skilled Nursing Facilities (SNFs) and Nursing Facilities (NFs)

For Medicare or Medicaid to pay for care in a SNF or NF, the residents must meet Medicare or Medicaid eligibility requirements related to the level of care required in that setting (which establish the medical necessity of the services).  Regardless of payor source, the nursing home must assess all individuals' needs, and must be able to maintain compliance with the Requirements for Participation for all residents (which means offering the same rights, protections, and individualized care and services). The SNF or NF should not accept any individual where the nursing home determines that it cannot appropriately meet that individual's needs and simultaneously protect the health, safety, and rights of other individuals (e.g., other residents, staff, and visitors).

Nursing homes should work in conjunction with correctional providers to ensure that the individual's medical records and other pertinent information are available to the nursing home that is admitting the individual.

It is possible that some DOCs or law enforcement's terms of supervision may conflict with CMS requirements, if those terms affect the care and services being provided in the nursing home or if the nursing home is violating an individual's rights by enforcing the terms directly.  Under federal requirements, a nursing home cannot incorporate into care plans restrictions that violate resident rights, and cannot serve as an agent of the pertinent law enforcement or criminal justice supervisory authority by enforcing supervisory conditions or reporting violations of those conditions to officials. Additionally, there can be no integration of the criminal justice supervisory function into the essential operations or physical environment of the nursing home, such as parole officers attending inpatient care planning meetings or the DOC maintaining an office within the nursing home.

### *Resident Rights*

SNFs and NFs, as residential environments, must permit residents to have autonomy and choice, to the maximum extent practicable regarding how they wish to live their everyday lives and receive care. Federal statutes and regulations establish an array of individual rights and

safeguards. Nursing homes cannot impose conditions or restrictions that undermine resident rights and protections required by federal law. Facilities cannot require prospective residents to give up their rights as a requirement for admission. Resident rights in the nursing home include, but are not limited to the right to:

- Be free from physical or chemical restraints imposed for discipline or convenience, and not for treatment of a resident's medical condition;[9]
- Choose activities, schedules, and health care consistent with his or her interests, assessments, and plans of care [and] interact with members of the community both inside and outside the facility;[10]
- Personal privacy and confidentiality of his or her personal and clinical records;[11]
- Immediate access to any resident by the following: subject to the resident's right to deny or withdraw consent at any time, immediate family or other relatives of the resident; and subject to reasonable restrictions and the resident's right to deny or withdraw consent at any time, others who are visiting with the consent of the resident;[12]
- Be free from verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion.[13]

Also, nursing home residents must not only be able to exercise their rights as residents of the facility and as citizens of the United States, but also have the right to be free of interference, coercion, discrimination, or reprisal from the facility in exercising those rights.[14]

### *Facility Policies and Practices*

Some DOC or law enforcement terms of release or placement may conflict with the CMS requirements if the terms affect the care and services provided by the facility or violate the resident's rights. In such a case, if a facility agreed to enforce restrictive law enforcement terms applied to a resident (for example, restricting visitors), the nursing home would not be in compliance with federal requirements and would risk enforcement action and termination from participation if it did so.

The facility may not establish policies or impose conditions on the resident that result in restrictions which violate federal law and regulation outlined in 42 CFR Part 483, Subpart B. The facility must promote care for its residents in a manner and in an environment that maintains or enhances each resident's dignity and respect in full recognition of his or her individuality. Examples of prohibited facility restrictions include, but are not limited to:

---

[9] Section 1819(c)(1)(A)(ii) of the Act, and 42 CFR §483.13(a).
[10] Section 1819(c)(1)(A)(viii) of the Act and 42 CFR §483.15(b)(1) and (2).
[11] Section 1819(c)(1)(A)(iv) of the Act and 42 CFR §483.10(e).
[12] Section 1819(c)(3)(B) and (C) of the Act and 42 CFR §483.10(j)(vii) and (viii).
[13] Section 1819(c)(1)(A)(ii) of the Act and 42 CFR §483.13(b).
[14] Section 1819(c)(1) of the Act and 42 CFR §483.10(a)(1).

- The facility makes a determination as to which visitors a resident may or may not see. The resident has the right to choose his or her own visitors;[15]
- The facility requires or implements a DOC or law enforcement restriction that the individual must reside in a locked unit in the SNF or NF for reasons that are not derived directly and exclusively from the resident's assessment(s) as conducted by the facility's medical professionals;[16]
- The facility does not allow a resident to possess a personal telephone and/or denies a resident the right to conduct telephone conversations in private;[17] or,
- The facility has a requirement that a resident must wear an item (e.g., a color-coded bracelet) that indicates to staff that they are justice involved.[18]

## E.  Hospitals (Including Psychiatric)

In accordance with the requirements of the EMTALA[19], Medicare-participating hospitals that have dedicated emergency departments (DEDs) and/or specialized capabilities have certain obligations to individuals that apply to everyone including justice involved individuals.  Note that CAHs are required to provide emergency services on a 24-hour day basis and, as a result, all CAHs are subject to the EMTALA requirements.[20]  In the case of hospitals with DEDs and CAHs, they must provide an appropriate medical screening examination and when applicable, stabilizing treatment to any individual who comes to the emergency department, including justice involved individuals.

Hospitals with specialized capabilities must accept appropriate transfers from the DED of another hospital or from a CAH of any individual who requires specialized treatment capabilities, unless the receiving hospital lacks capacity to accept the transfer. Again, the law makes no distinction with respect to justice involved individuals. Therefore, hospitals subject to EMTALA, including all CAHs, do not have the option of refusing to provide services required under EMTALA to justice involved individuals.

Medicare/Medicaid participating hospitals are not criminal justice or law enforcement institutions and cannot maintain the custody of an individual for law enforcement. In order to maintain custody of the individual, the law enforcement personnel must be physically present with the individual at all times.

### *Therapeutic Interventions involving the use of Restraint or Seclusion:*

The CoPs for hospitals, which also apply to distinct part units in CAHs and psychiatric hospitals, provide that all patients have the right to be free from restraint or seclusion, but permit restraint or seclusion that is "imposed to ensure the immediate physical safety of the patient, a staff member, or others, but must be discontinued at the earliest possible time" (42 CFR § 482.13(e)). Such use of restraints or seclusion in a hospital is also subject to a variety of safeguards. For

---

[15] Section 1819(c)(3) of the Act and  42 CFR § 483.10(j)(1)
[16] 42 CFR § 483.13(a) and (b)
[17] 42 CFR § 483.10(k) and (l)
[18] 42 CFR § 483.15(a) and (b)(3).
[19] Section 1867 of the Act, and 42 CFR §§ 489.20(m), (q) and (r) and 489.24.
[20] Section 1866(a)(1)(I) and (a)(1)(N) of the Act .

example, restraints may only be used in accordance with a physician's order (or order of another licensed practitioner) after less restrictive methods have been determined to be ineffective (42 CFR § 482.13(e)).

When restraint or seclusion is used to manage violent or self-destructive patient behavior, there are further safeguards that apply. For example, when an adult patient is restrained or placed in seclusion by hospital personnel to manage violent or self-destructive behavior, the order must be reviewed at least every four hours and is renewable only up to 24 hours (42 CFR § 482.13(e)(8)). At that time a physician responsible for the care of the patient must see the patient and assess the need for continued restraint before another order for restraint or seclusion to manage violent or self-destructive behavior may be written.[21]

A justice involved individual who has been brought to the hospital for diagnosis or treatment and who simultaneously remains in the custody of the DOC or law enforcement personnel, may be subject to security measures imposed by such personnel, such as physical restraints. In order to maintain custody of the individual, the DOC/ law enforcement personnel must be physically present with the individual at all times. When enforcement personnel impose security measures, such as the use of restraint, those security measures are not governed by the CoPs, as long as the hospital does not participate in such measures. (It should be noted, however, that any request by the hospital to enforcement personnel to apply restraint to a patient in the DOC/law enforcement's custody would be considered use of restraint by the hospital, and if enforcement personnel comply with the hospital's request, then the hospital would be subject to the CoPs).

Note security personnel who are under contract with the hospital represent an extension of hospital staff. These individuals must be appropriately trained and supervised and are subject to the standards applicable under the Conditions of Participation.

Regarding the use of restraints on a justice involved individual in a hospital setting (rather than the use of restraints by health care personnel), the CMS State Operations Manual (SOM), Appendix A states the following:

> *The use of handcuffs, manacles, shackles, other chain-type restraint devices, or other restrictive devices applied by non-hospital employed or contracted law enforcement officials for custody, detention, and public safety reasons are not governed by this rule. The use of such devices are considered law enforcement restraint devices and would not be considered safe, appropriate health care restraint interventions for use by hospital staff to restrain patients. The law enforcement officers who maintain custody and direct supervision of their prisoner (the hospital's patient) are responsible for the use, application, and monitoring of these restrictive devices in accordance with Federal and State law. However, the hospital is still responsible for an appropriate patient assessment and the provision of safe, appropriate care to its patient (the law enforcement officer's prisoner).[22]*

---

[21] See 42 CFR §§ 482.13(e) and (f) and Tags A-0154 through A-0208 in Appendix A of the State Operations Manual (SOM) (Internet Only Manual, Pub. 100-07) for more details.
[22] Tag 0154, Appendix A of the SOM.

Even when restraints are applied in the hospital setting by law enforcement, the hospital is responsible for affording the patient his/her rights under the CoPs. These include the right to file a grievance,[23] participate in the development and implementation of the care plan,[24] make informed decisions regarding care,[25] and confidentiality of clinical records.[26]

### *Law Enforcement-related Medical Interventions*

If the medical intervention is performed for law enforcement purposes rather than to provide diagnosis or treatment of the patient, then the intervention would not be viewed as a health care service.  If, for example, hospital staff perform a test or an examination without clinical justification, to determine if an individual has concealed items within a body cavity, or to confirm ingestion or placement of an item, the staff would not be providing care to meet the health needs of the patient. In such a situation, the hospital must ensure that there is a lawful order by a court with appropriate jurisdiction to conduct such a search under State law.  These types of situations must be addressed in hospital policies that address both the legal authority for such interventions, as well as the specific criteria that must be met prior to carrying out such requests or directives from law enforcement.

### F.  Intermediate Care Facilities for Individuals with Intellectual Disabilities (ICF/IID)

An ICF/IID must provide active treatment and all clients admitted to the ICF/IID must be in need of such services.  The environment is developmental rather than medical and emphasis is placed upon training to enable each client to achieve their highest possible level of independence.

Because there are requirements particular to ICFs/IID, we are in the process of writing a separate communication on the topic of justice involved individuals in ICFs/IID. We invite advance questions and comments, which may be emailed to the mailbox listed below.

**Contact:**  Please send all questions to SCGQAJusticeInvolved@cms.hhs.gov.

**Effective Date:**  Immediately.  This information should be communicated with all survey and certification staff, their managers and the State/Regional Office training coordinators within 30 days of this memorandum. The contents of this letter supports activities or actions to improve patient or resident safety and increase quality and reliability of care for better outcomes.

/s/
*David R. Wright*

Attachment:  Justice Involved Individuals Scenarios

cc:  Survey and Certification Regional Office Management

---

[23] 42 CFR § 482.13(a)(2)
[24] 42 CFR § 482.13(b)(1)
[25] 42 CFR § 482.13(b)(2)
[26] 42 CFR § 482.13(d)

**Justice-Involved Individuals – SCENARIOS**

*Revised 12.23.2016*
*\*\*\*Removed Scenario 3 – Inmate Edward Treated in the Hospital\*\*\**

## Scenario 1 – Beatrice Who Has Dementia

Beatrice is a 72-year old currently incarcerated woman who was diagnosed with Alzheimer's disease at age 65. Since then, her physical and mental conditions have been steadily declining. She is able to participate in her activities of daily living but needs extensive cueing and assistance with toileting.  She is pleasant, calm, oriented to self and some family members, but cannot recall the events that led to her arrest and imprisonment.  Her family maintains contact with her and petitioned the court for compassionate release due to her advancing age as well as her physical and mental decline. Her children are unable to care for her at home and have been contacting local nursing homes for admission and long-term care. Because of Beatrice's condition the court has granted her a compassionate release without restrictions.

> ### Q: Can a nursing home with a dementia unit admit Beatrice without jeopardizing certification for Medicare or Medicaid?

A: We do not see any significant risk in this case.  The nursing home has an appropriate unit that can provide the needed services for Beatrice. Because her behavior does not appear to endanger the health, safety, or rights of other individuals, the facility is not likely to be challenged in its ability to concurrently provide a safe environment for other residents if they admit Beatrice. The situation would be the same if the correctional agency was seeking the placement because there was no family available.

## Scenario 2 –Secured Nursing Homes

XYZ Nursing Home was built to exclusively house individuals released from correctional facilities, either on compassionate release, as a condition of parole, or deemed incompetent to stand trial. The entire facility is locked and there is an onsite office maintained by the state parole board where parole officers are stationed. The nursing home has one physician who provides medical services to the residents and the residents are not free to choose their own attending physician.

All incoming mail and packages for residents are opened and searched by facility staff and any item deemed contraband is discarded. Resident rooms are searched on a daily basis for items that are not allowed, such as cell phones and picture frames containing glass or metal. Because cell phones are not allowed, there is only one telephone available for all residents and it is placed in the hallway next to the nurses' station with limited times for use and no privacy.

The nurses' station is completely enclosed in bullet-proof glass from floor to ceiling, with only a slot through which small items can be passed; similar to a bank teller's station.

> ### Q: Can XYZ Nursing Home be certified for Medicaid and would the State be able to obtain Federal Financial Participation?

A:  No.  XYZ Nursing home could not be certified for Medicare or Medicaid.  Without such certification, the State would not be eligible for Federal Financial Participation due to facility-wide policies and procedures that violate CMS' Requirements for Participation.  For example, facility restrictions placed on the individual violate:

- The resident's right to privacy in written communication and to receive mail that is unopened,

- The right to have reasonable access to the use of a telephone where calls can be made without being overheard,
- The right to choose a personal attending physician,
- The right to be free from restraint or seclusion used for discipline,
- Additionally, the facility must provide a comfortable and homelike environment and allow the resident to use his or her personal belongings to the extent possible.

However, federal requirements do not prevent a State from operating or commissioning the operation of such a specialized facility. Since certification under Medicare or Medicaid would not be available, any public funding for such a facility would generally derive from State-only and/or local sources.

## Scenario 3 – Inmate John Treated in the Hospital & Transferred to a SNF

Inmate John, with a known diagnosis of epilepsy had a seizure that caused a life-threatening airway obstruction that required tracheal intubation and use of a mechanical ventilator. He was admitted to University Hospital for care. The care team's plan was that when John no longer needed the acute level of care provided at the hospital, he would be released to a nursing home with the capability of providing ventilator care. Once he gained strength, the facility staff would gradually reduce ventilator support so that John could be extubated and breathe on his own. The prison infirmary was not properly equipped and the staff was not trained for this specialized care.

> *Q. Are there particular challenges for either the hospital or long term care facility in serving John and maintaining compliance with federal requirements?*

*Acute Care Hospital:* We do not see significant risk in the hospital's ability to serve John and maintain compliance with the hospital CoPs. The acute care CoPs, designed for short-term treatment, do not have the same patient rights that are prominent in residential care environments (such as nursing homes) that are intended to function as an individual's home. An acute care hospital may be able to provide the care John needs and also not jeopardize its participation in Medicare and Medicaid if:

- The hospital ensured that all care provided to John is provided in a manner that maintained compliance with all hospital Conditions of Participation, including the Patient's Rights CoP expressed at 42 CFR 482.13.

The hospital did not act as the agent of law enforcement in enforcing any of the restrictions placed on John by the Department of Corrections. The use of soft restraints in an intubated patient may become necessary if the patient becomes agitated and attempts to remove his endotracheal tube because serious harm or death could occur otherwise. The patient's attending physician must be notified immediately to order the restraints. The hospital must have policies and procedures regarding the use of restraints to protect the patient from extubating himself.

*Nursing Home:* A nursing home may be able to provide the care John needs and also not jeopardize its participation in Medicare and Medicaid if:

- The nursing home ensured that all care provided to John is provided in a manner that maintained compliance with all Requirements for Participation,
- The nursing home did not act as the agent of law enforcement in enforcing any restrictions placed on John by the Department of Corrections,
- The nursing home performed an adequate assessment of the resident's needs, preferences, and conditions which, in all likelihood, would involve reaching out to the responsible

caregivers of the environment(s) from which John is being transitioned to obtain pertinent information.

The determination may change as John's medical condition improves. For example, if John were successfully weaned from the ventilator in the nursing home, and if the Department of Corrections imposed additional restrictions on John, there would need to be a reassessment of whether or not the nursing home could provide care and continue to meet the Medicare/Medicaid requirements.

## Scenario 4 – Inmate Albert with Coronary Artery Disease

Inmate Albert developed mild chest pain and shortness of breath. He was transported to University Hospital and admitted to an area of the hospital that is leased by the Department of Corrections to provide inpatient medical care and services exclusively to prisoners. While under observation in the leased unit, Albert became increasingly short of breath and his chest pain worsened. The Department of Corrections clinical staff working in the leased unit determined that Albert needed an urgent medical evaluation to diagnose and treat his worsening symptoms. Albert was quickly transported to the ED of University Hospital. The medical screening examination determined Albert had blocked coronary arteries and required a coronary artery bypass graft, which was a service that could only be provided in the Medicare/Medicaid-certified area of University Hospital.

> *Q: Can University Hospital provide services to Albert and still maintain compliance with Federal requirements?*

Department of Corrections or law enforcement agencies may enter into a contract with a Medicare/Medicaid-participating hospital to lease space in order to establish an inpatient prison healthcare facility. That leased space (which may or may not be locked) cannot participate in Medicare or Medicaid and must be distinct and separate from the certified hospital. The leased space is never considered a "unit" of the Medicare/Medicaid participating hospital. Although the prison inpatient healthcare facility could contract with the leasing hospital for some services, the hospital cannot share or co-mingle staff and services with the prison facility.

However, if a patient of the contracted prison healthcare facility requires care that is beyond the capabilities of the leased space, the patient may be evaluated in the ED and if needed, be admitted to the certified hospital (i.e., physically transferred from the "prison healthcare facility") to receive services that can be billed to Medicaid. Additionally, all Medicare requirements must be met by the hospital ED and inpatient units, including the hospital CoPs and EMTALA.

Therefore, Albert could initially be admitted to the area leased by the Department of Corrections, but would not be eligible for Medicaid benefits during his stay there. When he was admitted as an inpatient to the certified area of University Hospital for his coronary artery bypass graft and ICU stay, he would be Medicaid eligible and those services could be billed to Medicaid.