**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**


**RALPH COLEMAN, et al.,**
    **Plaintiffs**

    **vs.**                      **No. 2:90-CV-0520 KJM DB**

**GAVIN NEWSOM, et al.,**
    **Defendants**
_____/


**SPECIAL MASTER'S**
**REQUEST FOR THE APPOINTMENT OF ADDITIONAL STAFF**


Pursuant to paragraph B7 of the December 11, 1995 Order of Reference in the above-captioned matter, the Special Master requests the appointment of Brett L. Johnson, M.D., Alberto F. Caton, and Michael A. Milas, Esq. to the Special Master's staff. The reasons for this request are set forth in the accompanying memorandum.

Dr. Johnson is to be compensated at the rate of two hundred fifty dollars ($250.00) per hour for his work as an expert, and at the rate of ninety dollars ($90.00) per hour for travel, plus reasonable expenses. Mr. Caton and Mr. Milas are to be compensated at the rate of two hundred thirty-five dollars ($235.00) per hour for their work as a court monitors and ninety dollars ($90.00) per hour for travel, plus reasonable expenses.

                          Respectfully submitted,

                              /s/

                        _____
                        Matthew A. Lopes, Jr.
                        Special Master

December 9, 2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
    **Plaintiffs,**

    **vs.**                             **No. 2:90-CV-0520 KJM DB**

**GAVIN NEWSOM, et al.,**
    **Defendants.**

**MEMORANDUM IN SUPPORT OF SPECIAL MASTER'S
REQUEST FOR THE APPOINTMENT OF ADDITIONAL STAFF**

In accordance with paragraph B7 of the December 11, 1995 Order of Reference in the

above-captioned matter, the Special Master submits herewith his request for the Court's approval

of the appointment of Brett L. Johnson, M.D., Alberto F. Caton, and Michael A. Milas, Esq. to

the Special Master's staff. The Special Master requests these additions to his staff in order to fill

a void created by the departure of three team members over the past nine months, with a fourth

departure imminent, as another team member currently awaits Senate confirmation for a seat on

the Rhode Island bench. In addition, unforeseen circumstances have led to the limited

availability of two experts during the same time period for an unknown duration, compounding

the impact of the reduction in staff. The loss of multiple staff during such a pivotal time in the

case has strained the Special Master's ability to efficiently and expeditiously fulfill his various

duties and responsibilities, including but not limited to those recently ordered by the Court.

The number, variety, and critical nature of the Special Master's duties and responsibilities

were remarked upon by the Court in an order issued January 7, 2020, which stated in pertinent

part:

> The work of the Special Master is divided into several areas: he and his team are
> monitoring at CDCR Headquarters, they are monitoring delivery of mental
> healthcare at institutions in the field, they are supervising ongoing work in the

1

All-Parties Workgroup, they are preparing for and participating in settlement
discussions supervised by Judge Drozd, and they are staying abreast of ongoing
litigation activity before this court.  At this critical juncture, none of those critical
tasks can give way in favor of others.  ECF No. 6441 at 7.

Two months after that order was issued, on March 4, 2020, Governor Newsom declared a

State of Emergency as part of the state's initial response to the global COVID-19 outbreak.  The

onset of the COVID-19 pandemic created immediate, additional obstacles to the delivery of

mental health care to *Coleman* class members.  The Special Master's duties and responsibilities

necessarily further expanded as a result.  On March 20, 2020, the Special Master submitted his

first report on the pandemic's effect on his current round of monitoring as well as CDCR's initial

response efforts.  ECF No. 6512.  After an initial planning meeting with the parties, court-

ordered COVID-19 task force meetings began on March 23, 2020.[1]  While task force meetings

have since concluded, the ongoing effects of the COVID-19 pandemic continue to present

challenges to the delivery of mental health care that require the attention of the Special Master.

This has resulted in the development of several workgroups, discussed further below.

In addition, the Court recently issued an order directing work to begin on an unmet needs

assessment.  ECF No. 7305.  The development and conduct of an unmet needs assessment is a

layered process estimated to take from three to six months to complete.  The Special Master's

need for adequate resources to maintain his ability to work on all projects simultaneously

remains critical, particularly during this unprecedented time in the history of the case.

---

[1] During the first quarterly status conference held on March 20, 2020, the Court directed the Special Master to
convene a COVID-19 pandemic task force as soon as possible.  ECF No. 6513.  In response to the Court's direction,
the Special Master held a meeting with the parties to discuss an approach for the court-ordered task force following
the status conference.

## THE SPECIAL MASTER'S NEED FOR ADDITIONAL RESOURCES

While each task mentioned in the Court's January 7, 2020 order remains ongoing, as previously stated, the Special Master's duties have since expanded.  The impact of the COVID-19 pandemic has required ongoing efforts to deal with its effects.  Further, a number of special projects, both new and ongoing, are currently underway.  The impact of the whistleblower report by the California Department of Corrections and Rehabilitation's (CDCR) chief psychiatrist, Dr. Michael Golding (herineafter, Golding Report) continues to reverberate.  The additional workload that stemmed from questions about the reliability of data provided by CDCR raised as a result of the Golding Report has continued into the Twenty-Ninth Monitoring Round.  The Special Master is also currently tasked with conducting a review of defendants' use of telepsychiatry, contributing to the need for additional psychiatry expertise.

### CDCR Mental Health Headquarters Monitoring

Monitoring of CDCR Mental Health Headquarters ("Central Office"), which began in July 2019 as a result of the allegations documented in the Golding Report, remains ongoing. Since the commencement of monitoring, the Special Master has maintained a constant presence in the Central Office, dedicating a Deputy Special Master, two experts, a monitor, and a paralegal to the task.  Additional expert participation may also be required depending on the subject matter.  This staffing model initially required a major shift of the Special Master's resources, resulting in a smaller number of experts and monitors available to monitor in the field, with workloads having to be adjusted accordingly.  Without additions to his staff to offset the departures and unavailability of current staff, the Special Master will again be facing the issue of being insufficiently staffed to meet the demands of his court-ordered monitoring, oversight, and reporting responsibilities.

Mental Health Care Data Remediation

Also, ongoing, is the work related to data remediation led by the Special Master's data expert, appointed in April 2020.  The need for data remediation, which became clear during the course of Central Office monitoring, also stemmed, in part, from concerns about the reliability of the data offered by CDCR and raised in the Golding Report.  The Special Master's data monitoring efforts led to the formation of two workgroups, the Business Rules and Methodology (BRMR) Workgroup and the Quality Assurance Control (QAC) Workgroup.  Both workgroups continue to meet regularly, in addition to a bi-weekly stakeholders data meeting that also occurs as part of the data remediation activities.  The volume of work involved in these efforts has required the work of a dedicated team that, in addition to the data expert, includes a Deputy Special Master and two clinical experts.  The substantial time commitment involved in these tasks limits the clinical experts' availability for other monitoring activities and contributes to the strain on the Special Master's existing resources.

Monitoring the Delivery of Mental Health Care in the Field

Additional ongoing duties include monitoring the delivery of mental health care at CDCR institutions and the Psychiatric Inpatient Programs (PIPs).  The Twenty-Ninth Monitoring Round, which commenced on May 24, 2021, is currently underway.  At the time of this writing, the Special Master had completed monitoring tours of six CDCR institutions, the five CDCR PIPs, and the California Men's Colony to assess the Mental Health Care Bed unit—a total of 12 facility assessments in a six-month time period.  The Special Master will conduct one more monitoring visit during 2021 and complete monitoring tours of the remaining CDCR institutions in 2022.  The Special Master will also be sending teams into the field to monitor the Department of State Hospital (DSH) facilities where *Coleman* class members receive mental health

treatment. As with the clinical experts assigned to data monitoring, every member of the Special Master's staff responsible for monitoring in the field also has a varying number of additional assignments for which they maintain responsibility.

Suicide Prevention Activities

The Special Master's work on varied suicide prevention efforts also remain ongoing. His suicide prevention expert's fifth re-audit of suicide prevention practices, which began simultaneously with the commencement of the Twenty-Ninth Monitoring Round, is currently underway. At the time of this writing, he had completed assessments at 14 CDCR institutions. In addition to the statewide monitoring performed by his suicide prevention expert, certain of the Special Master's experts and monitors are assigned to participate in CDCR's suicide prevention and review process, which includes review of completed suicides, attending and participating in suicide case review conferences, involvement in suicide prevention conferences, and meetings and review of suicide-related documents, policies, and memoranda.[2]

Workgroup Process

The success of the workgroup model has led to its use for several ongoing projects. In addition to the aforementioned BRMR and QAC workgroups, there are also the CDCR and DSH small workgroups, which meet weekly. Due to the range and potential complexity of agenda items, each of the workgroups require the participation of a select group of the Special Master's experts, monitors, and paralegals. This, in addition to the extensive preparatory work required in advance of each meeting, e.g., review of policies, memoranda and other documents, and pre-meetings, represents another of the assignments that all experts, monitors, and paralegals must balance as part of their regular job responsibilities.

---

[2] Since January 2021, the Special Master has also filed five reports on his expert's review of suicides completed in the California Department of Corrections and Rehabilitation. ECF Nos. 7038, 7077, 7161, 7239.

Special Projects

In addition to his regular duties and responsibilities, the Special Master is also responsible for a number of special projects either occurring concurrently or scheduled to commence in the very near future.  Those special projects include the following:

- Coordination with the *Armstrong* Court Expert and *Plata* Receiver
- Guide and supervise defendants' development of an unmet needs assessment
- Monitor defendants' provisionally-approved telepsychiatry policy
- Monitor, finalize, and report on defendants' Continuous Quality Improvement Tool key indicators
- Monitor implementation of Custody Mental Health Partnership Plan
- Participate in settlement discussions supervised by Judge Newman

Each of the special projects listed above requires or will require varying degrees of involvement from current members of the Special Master's staff in addition to their regular duties of monitoring institutions and inpatient care programs, preparing reports, and, for the clinical experts, preparing case reviews.

Reports to the Court

One of the Special Master's primary ongoing responsibilities is preparing reports to the court detailing his findings on the delivery of mental health care to *Coleman* class members, in addition to reporting on the status of various court-ordered projects.  Since the onset of the COVID-19 pandemic in March 2020, the Special Master has written 14 reports to the court on a variety of issues.  As part of his current round of monitoring tours, the Special Master is concurrently preparing reports of his findings.  In addition, upon the conclusion of the Special Master's suicide prevention expert's current round of monitoring tours, both he and the Special Master will prepare a report on the findings.

As part of monitoring in the field, every expert and monitor on the Special Master's staff must prepare an individual report after each site visit.  Experts are also responsible for preparing

clinical case reviews. The preparation of an all-encompassing monitoring round report to the court is an involved undertaking; due to the enormity of the task—which includes synthesizing data and analyzing trends and patterns for all institutions treating *Coleman* class members—the Special Master has also established a writing team, dedicating to a select group of his staff the responsibility of helping him to prepare the final reports. Members of the writing team continue to be responsible for their regular monitoring duties and any special projects to which they are assigned.

The impact of the questions raised by the Golding Report regarding the reliability of CDCR-provided data on how the Special Master must gather and report data during his monitoring visits has lingered into the Twenty-Ninth Monitoring Round. The process—which consists of extracting data via a review of a randomly generated sample of health care records for each program at an institution—is labor-intensive and requires a dedicated team of experts and monitors to perform the work involved in addition to their regular assignments.

<u>THE STRAIN ON THE SPECIAL MASTER'S CURRENT RESOURCES</u>

The above referenced workloads, projects, and responsibilities do not include the daily issues and litigation matters that remain a part of the Special Master's duties in addition to what is occurring in the institutions and Central Office. The volume of docket entries—now exceeding 7,300—speaks to the litigiousness of the case, which directly impacts the amount of work required. The number of meetings held since April 2020 on various matters, not including those already mentioned above, exceeds 140. The Special Master has been working without a full complement of staff for nearly a year, during one of the most unprecedented and challenging times in the history of case. The loss of multiple staff during such a pivotal time has significantly strained the Special Master's ability to expeditiously fulfill his various duties and

responsibilities, including but not limited to those recently ordered by the Court. During this

critical time, it is imperative that all of these tasks continue on a parallel track, uninterrupted.

Currently, the Special Master's staff has decreased by three monitors, with a fourth departure

imminent—along with the significantly decreased availability of two experts, it is clear the

workload cannot be sustained with the Special Master's current resources.

<u>USES FOR ADDITIONAL STAFF</u>

The Special Master has designated teams to cover the array of projects underway. The

appointment of additional staff would fill the void created by the loss of staff, alleviating the

strain on his existing resources and ensuring continuous full and simultaneous coverage of all

current and ongoing projects. The proposed candidates listed below would provide valuable

assistance to the Special Master in reducing the current workload of his experts and monitors,

and maintaining his capacity to monitor, evaluate, and report on the mental health care being

provided to CDCR inmates in the inpatient programs and in the prisons.

<u>CANDIDATES FOR THE COURT'S CONSIDERATION</u>

In anticipation of submitting this request for additional staff, the Special Master has

identified the following individuals as candidates for the Court's consideration. The parties have

had an opportunity to review these candidates. Plaintiffs report no objections. However, while

defendants report no objections to the qualifications of any of the proposed candidates, their

ultimate position on the Special Master's request is unclear.

**<u>Brett L. Johnson, M.D.</u>**

Dr. Johnson is a board-certified psychiatrist whose experience in correctional mental

health care would provide valuable assistance to the Special Master. Since 2019, Dr. Johnson

has worked as a psychiatrist for Rogers Behavioral Health in San Diego, California. From 2013

8

to 2017, he worked at the Richard J. Donovan Correctional Facility (RJD), where he served as a staff psychiatrist before being elevated to Chief Psychiatrist within one year.  As Chief Psychiatrist, Dr. Johnson supervised a staff of psychiatrists, psychologists, and social workers and worked collaboratively with the Chief of Mental Health and Chief Psychologist to ensure that the delivery of mental health care met Mental Health Services Delivery System Program Guide standards.  From 2007 to 2012, Dr. Johnson served as a voluntary assistant professor of psychiatry at the University of California, San Diego, in San Diego, California.

Dr. Johnson earned his Doctor of Medicine from Vanderbilt University School of Medicine in Nashville, Tennessee in 2000.  During 2000 to 2004, he completed his internship in internal medicine and residency in psychiatry at the University of California, San Diego.  He is board certified in general psychiatry and child and adolescent psychiatry.

Dr. Johnson's experience in correctional mental health care and his experience with management of mental health care in the correctional setting at RJD will provide valuable assistance to the Special Master in monitoring, analyzing, and reporting to the court on the treatment being provided to CDCR inmates in the inpatient mental health programs and in CDCR prisons.  Accordingly, the Special Master asks that Dr. Johnson be appointed to his staff. Dr. Johnson's *curriculum vitae* is attached as Exhibit A.

**<u>Alberto F. Caton</u>**

Mr. Caton's expertise is drawn from a long and distinguished career which spanned 28 years in the field of corrections for the State of California.  Throughout his career with the department, Mr. Caton served in a variety of positions, starting out as a correctional officer in 1982 and being promoted over the years to correctional sergeant, correctional lieutenant, and facility captain.  During his tenure with CDCR, Mr. Caton served six years as a facility captain in

the CDCR Office of Court Compliance.  In this assignment, he supervised a team of 14

correctional counselors and managed litigation on five class action lawsuits, including

*Armstrong*, *Clark*, and *Valdivia*.  He served as CDCR's American with Disabilities Act

coordinator and oversaw implementation of the department's Disability Placement Program and

Developmental Disabilities Program.  Mr. Caton worked with CDCR's Office of Legal Affairs,

the Office of the Attorney General, and relevant state agencies to develop and implement

policies and procedures related to compliance with court orders.  He supervised staff responsible

for conducting *Armstrong* and *Clark* monitoring tours of CDCR institutions with plaintiffs'

counsel.  He also supervised staff and worked collaboratively with plaintiffs' counsel on revising

the *Armstrong* and *Clark* remedial plans.  After his retirement from CDCR in 2009, Mr. Caton

returned to the department for a brief time as a retired annuitant, serving on teams that conducted

reviews of administrative segregation bed utilization, and assessed warehouse operations and

procurement practices.

   Mr. Caton currently works both as a correctional services consultant, having served in

this position since 2011 and as a United States Department of Justice Certified Prison Rape

Elimination Act Auditor since 2014.  As a former employee and retired annuitant of the CDCR,

Mr. Caton has extensive work experience which prepares him to readily assist the Special

Master, with minimal time needed for learning the operations of the CDCR.  Accordingly, the

Special Master asks that Mr. Caton be appointed to his staff.  Mr. Caton's *curriculum vitae* is

attached as Exhibit B.

**<u>Michael A. Milas, Esq.</u>**

   Mr. Milas graduated *cum laude* from the Roger Williams School of Law in 2019, where

he was a Dean's Scholar and received CALI Awards in Professional Legal Writing and

Technological Innovation and the Law.  Mr. Milas received his undergraduate degree from Drexel University in 2011, where he graduated with a major in Music Industry.

Since March 2020, Mr. Milas has worked for the law firm of Gunning & LaFazia, Inc. in Warwick, Rhode Island, as a civil defense attorney.  Prior to his time at Gunning & LaFazia, Inc., Mr. Milas worked at the law firm of Goodman, Shapiro & Lombardi, LLC as an associate attorney and law clerk.  Mr. Milas would assist the Special Master with on-site prison monitoring and writing of all monitoring reports as well as researching and writing of interim reports on special issues and projects, as required.  Accordingly, the Special Master asks that Mr. Milas be appointed to his staff.  Mr. Milas's *curriculum vitae* is attached as Exhibit C.

<u>CONCLUSION</u>

The appointment of these candidates would provide valuable assistance to the Special Master in reducing the current workload of his staff, alleviating the strain on his existing resources, and maintaining his capacity to monitor, evaluate, and report on the mental health care being provided to CDCR inmates in the inpatient programs and in the prisons.  For the foregoing reasons, the Special Master requests the entry of an order appointing Dr. Johnson, Mr. Caton, and Mr. Milas to his staff.

Respectfully Submitted,

/s/

_____

Matthew A. Lopes, Jr.
Special Master

December 9, 2021

Exhibit A

**Brett L. Johnson, M.D.**
**Personal Cell: 619-818-1052**
**Email: drbrettjohnson@gmail.com**

---

## Current Appointment

**Rogers Behavioral Health**
**Child, Adolescent, and Adult Psychiatrist**
**PHP/IOP Programs, San Diego**
**3/2019-Present**

**17140 Bernardo Center Dr. Ste. 300**
**San Diego, CA 92128**

My role involves seeing patients from multiple different sites across the country. I provide evidence-based medication interventions for a variety of conditions, including, but not limited to: depression; OCD; Generalized Anxiety Disorder; Social Anxiety Disorder; Body-Focused Repetitive Behaviors (e.g. skin picking and hairpulling); tic disorders and Tourette Syndrome; bipolar disorder; eating disorders; substance use disorders; and ADHD. I also provide supervision and guidance to multidisciplinary treatment teams across all sites at which I have patients. We perform extensive collaboration with outpatient providers and, where necessary, primary care providers.

In addition to my primary work roles, I have been extensively involved in multiple committees and workgroups in our organization, including:

- **Equity, Diversity, and Inclusion** (with tangible results including hiring an EDI Director, and the creation of Employee Resource Groups for LGBTQIA+ and BIPOC employees)
- **Emergency Pandemic Response Team** (lead to rapid pivot from in-person services to telehealth services in March 2019)
- **Provider Informatics Council** (responsible to reporting to senior leadership on how our electronic medical record can lead to increase efficiencies to reduce provider workload and secondarily burnout, as well as how additional information may be extracted from the clinical record to assist our Continuous Improvement Team which monitors our evidence-based practices and outcomes)
- Participation in multiple **Rapid Improvement Events**. These week-long, intensive events use Lean Six Sigma and additional principles to produce practical interventions. The events I was on focused on various topics including, suicide prevention and implementation of evidence-based practices; and optimization of billing and reimbursement while reducing provider time spent on this task.

**Former Appointment**

**Anthem Blue Cross**
**Associate Medical Director**
**10/2018-3/2019**

9655 Granite Ridge Dr.
San Diego, CA 92123

I performed reviews of cases to evaluate for meeting medical necessity for higher levels
of care. This would involve review of records and live reviews with other psychiatrists.

**Magellan Healthcare, Inc.**
**Medical Director**
**08/2017-9/2018**

2650 Camino Del Rio North
San Diego, CA 92108

I performed reviews of cases to evaluate for meeting medical necessity for higher levels
of care, as well as ongoing outpatient care. This would involve review of records and live
reviews with other psychiatrists.

**University of California, San Diego/Rady Children's Hospital San Diego**
**Inpatient Psychiatrist, Child and Adolescent Psychiatric Services**
**05/2016-10/2017**

3020 Children's Way
San Diego, CA 92123

I was an attending psychiatrist on the inpatient unit. This would involve both direct
clinical care of patients, as well as supervision of a multidisciplinary team. Additional
responsibilities included coverage of the Medical Behavioral Unit (an inpatient eating
disorder service), as well as Consult-Liaison Psychiatrist for medically complex cases
admitted to the pediatric service.

**Richard J. Donovan Correctional Facility**
**Chief Psychiatrist**
**04/2014- 05/2017**

480 Alta Road
San Diego, CA 92179

As Chief Psychiatrist, I supervised all the psychiatrists working at Donovan, as well as the psychologists and social workers working on the Mental Health Crisis Bed unit. I worked closely with other members of the executive team to creatively problem solve around complex cases. I worked with the Chief of Mental Health and the Chief Psychologist to ensure that the Mental Health Services Delivery System Program Guide was followed.

**Richard J. Donovan Correctional Facility**
**Staff Psychiatrist**
**06/2013- 04/2014**

480 Alta Rd.
San Diego, CA 92179

As a psychiatrist on the Mental Health Crisis Bed unit, I was responsible for admissions, ongoing care, and discharge of complex cases requiring 24 hour per day monitoring.

**Traditions Behavioral Health**
**Staff Psychiatrist**
**07/2012- 08/2013**

Company Headquarters: 1580 1st St.
Napa, CA 94559

I provided psychiatric care for several community mental health clinics in the greater San Diego, CA area. I saw all ages, from children to geriatric cases. Additional responsibilities included supervision of multidisciplinary treatment teams, as well as coordinating care with outside providers.

**Rady Children's Behavioral Crisis Center**
**3605 Vista Way, Ste. 258**
**Oceanside, CA 92056**
**07/2007- 06/2012**

I was the psychiatrist at a walk-in crisis clinic to provide immediate psychiatric services to patients experiencing urgent mental health concerns. Responsibilities included direct patient care, as well as supervision of a multidisciplinary team. Facilitation of inpatient admission and placement of involuntary psychiatric holds (WIC 5150 and 5585) were frequently required.

**University of California, San Diego**
**Department of Psychiatry**
**Assistant Clinical Professor (Voluntary)**
**07/2007-06/2012**

Teaching responsibilities for and supervision of medical students, residents, and child and adolescent psychiatry fellows. Main supervision site:
Rady Children's Hospital
3020 Children's Way
San Diego, CA 92123


**Private Practice**
**06/2006-10/2011**

4225 Executive Square Ste. 1130
San Diego, CA 92037

I provided ongoing medication management and psychotherapy services to private practice patients. Most of the cases were seen for both therapy and medications. While I treated all disorders, depression, anxiety, and OCD were the most common in my practice. I utilized evidence-based modalities, such as Cognitive Behavioral Therapy for depression and Exposure and Response Prevention for OCD.


**Assistant Clinical Professor, Department of Psychiatry**
**University of California, San Diego**
**Rady Children's Hospital San Diego, Staff Psychiatrist**
**Assistant Director, Obsessive-Compulsive Disorders Program**
**07/2006-06/2007**

8950 Villa La Jolla Dr.
San Diego, CA 92037

I provided direct psychiatric care as well as administration of the program. We provided care for patients of all ages who were struggling with obsessive compulsive disorder, tic and Tourette Syndrome, hoarding, skin picking, and trichotillomania (hair pulling).

## Education

- Fellowship in Child/Adolescent Psychiatry
  University of California, San Diego
  07/2004- 06/2006

  9500 Gilman Drive
  San Diego, CA 92093

- Residency in Psychiatry
  University of California, San Diego
  07/2001- 06/2004

9500 Gilman Drive
San Diego, CA 92093

- Internship in Internal Medicine
  University of California, San Diego
  07/2000- 06/2001

  9500 Gilman Drive
  San Diego, CA 92093

- Doctor of Medicine
  Vanderbilt University School of Medicine
  Degree granted 05/2000

  1161 21st Ave S #D3300
  Nashville, TN 37232

- Bachelor of Science
  Majors: Biology and French Literature
  Emory University
  Degree granted 05/1996

  201 Dowman Dr.
  Atlanta, GA 30322

## Board Status

- I am Board Certified in General Psychiatry by the American Board of Psychiatry and Neurology. Certificate number: 56848. Certified on 01/19/2007. Recertified 4/27/2018. Expiration: n/a as ABPN has moved to Continuous Maintenance of Certification (C-MOC)

- I am Board Certified in Child and Adolescent Psychiatry. Certificate number: 6497. Certified on 11/14/2008. Recertified 4/27/2018. Expiration: Expiration: n/a as ABPN has moved to Continuous Maintenance of Certification (C-MOC)

## Licensure

- I have unrestricted licenses to practice in the following states:
  - California
  - Florida
  - Tennessee
  - Illinois

     o  Washington

- DEA
- DEA X-waiver (for buprenorphine)

## Research Experience

- "Citalopram augmentation for subsyndromal depressive symptoms in patients with schizophrenia or schizoaffective disorder." Supervised by Sidney Zisook, M.D., Department of Psychiatry, University of California, San Diego,12/2002 to 06/2003.

- "The subcloning of the HHV-8 GPCR and its role in AIDS-associated Kaposi's Sarcoma." Supervised by Phillip Browning, M.D., Department of Medical Oncology, Vanderbilt University, 01/1997 to 08/1997.

- "Mitochondrial haplotype analysis of Spanish Basque Population." Supervised by Michael Brown, Ph.D. and Douglas Wallace, Ph.D. Department of Genetics and Molecular Medicine, Emory University, 01/1995 to 12/1995.

## Articles

- Chayavichitsilp P, Barrio V, and Johnson B. "Trichotillomania: Advice from a Psychiatrist." Practical Dermatology. Volume 4, Number 12; 46-7.

## Presentations

- I have done multiple presentations, including: giving nationwide webinars for over 1000 participants training therapists and psychiatrists on evidence-based practices (Exposure-Response Prevention for anxiety/OCD-spectrum conditions; Cognitive Behavioral Therapy for depression and anxiety; evidence-based psychopharmacologic strategies); suicide-prevention efforts; community outreach; and radio and television interviews. A full list can be provided, if needed.

## Teaching Experience

- Co-leader of "Advanced Psychopharmacology" an 8-month long didactics course each year for Child and Adolescent Psychiatry Fellows, 2008-2011.

- Leader of "Introduction to Pediatric Psychopharmacology", a six session "crash course" for first year psychiatry fellows. Each year from 2007-2011.

- Leader of the didactics seminar "Introduction to Human Development" for first year general psychiatry residents 03/2007.

- Organizer of the seminar series "Introduction to Child and Adolescent Psychopathology" for the second year general psychiatry residents 02/2007.

- Organizer of the "Topics in Child/Adolescent OCD and Related Disorders", a multi-disciplinary meeting scheduled weekly in the Obsessive-Compulsive Disorders Clinic, 07/2006-06/2007.

- Co-leader of "Therapeutic Interventions", a required course for the child/adolescent psychiatry fellows, 09/2006- 12/2006.

- Facilitator for Journal Club, a required course for child/adolescent psychiatry fellows, 09/2006-07/2008.

- Supervision of child psychiatry fellows, 07/2006-Present

- Supervision of child psychiatry treatment team at Rady Children's Outpatient Psychiatry, Central and Rancho Bernardo locations, 07/006-06/2007

- Small Group Facilitator, Social and Behavioral Sciences, "Human Growth and Development," University of California, San Diego, 2004 and 2005. Co-lead a group of first year medical students as they learned about stages of human development.

- Small Group Facilitator, Social and Behavioral Sciences, "Introduction to Clinical Psychiatry," University of California, San Diego, 2002. Lead a group of second year medical students as they learned the basics of a psychiatric diagnostic interview.

- Teaching Assistant, "Introduction to Problem-Based Learning," Vanderbilt University, 1997. Co-lead a group of first year medical students. Helped them to integrate basic ideas of physiology and pathology as they relate to clinical illness.

## Additional Training
- As a resident, I spent six months elective in the OCD Program at UC San Diego. I worked with Carol Mathews, M.D. in evaluating and treating patients with OCD, Tourette Syndrome, body dysmorphic disorder, trichotillomania, and related

disorders. I also spent the 2005-2006 academic year working with both Carol Mathews, M.D. and Sanjaya Saxena, M.D. on treating children and adolescents with OCD-spectrum disorders.

- From 2003-2004, I volunteered in the Genetically Handicapped Person's Clinic. I provided psychiatric consultation for patients suffering with various diagnoses including Huntington disease and various forms of spinocerebellar atrophy.

- I am allowed to prescribe buprenorphine for the treatment of opiate use disorder. DEA "X Waiver" for up to 100 patients is in place.

## References

- Provided upon request

Exhibit B



# Alberto F Caton
## Certified PREA Auditor

PO Box 582105 Elk Grove, CA 95758 | 916 717-2151 | <u>albertocaton@comcast.net</u>

I am submitting this resume because I am interested in serving with the Coleman Special Master. My correctional experience dates to February 1982.  Although I retired from the California Department of Corrections and Rehabilitation in 2009, I have remained active in the corrections field with correctional consulting work in the United States and abroad.  The following resume reflects the depth and breadth of my experience in this field.  I hope this experience is relevant to the work performed by the office of the Special Master.

## RESUME

**WORK HISTORY:**

**July 2014 – Present, US Department of Justice-Certified Prison Rape Elimination Act (PREA) Auditor**

On July 23, 2014, I was certified as a PREA auditor for adult facilities by the US Department of Justice. With this certification I am authorized to conduct PREA audits of adult prisons and jails, lockups, and community confinement facilities.  These audits are conducted to determine an agency or facility's compliance with relevant PREA standards.  The PREA standards are codified under the Code of Federal Regulations Part 115.  A PREA audit consists generally of four phases: Pre-Onsite, Onsite, Evidence Review and Interim Report, and Corrective Action and Final Report.  The process includes negotiating the terms of a written contract/agreement with the agency, posting an audit notice to inform inmates/detainees/residents of the upcoming audit and how to communicate confidentially with the auditor about sexual abuse or sexual harassment of inmates, contacting community-based advocacy agencies that provide services to inmates at the facility, extensive pre-onsite audit work and planning with facility staff.  The onsite phase includes a site review of the entire facility, staff and inmate interviews, document reviews, observing relevant processes, etc.  The posts audit phase includes review and analysis of all information received and making compliance determinations, generating the interim audit report, working collaboratively with agency/facility staff on the development of a corrective action plan, review and approval of the corrective action plan, and preparing and submitting a final audit report to the agency.

In the spring of 2015, the PREA Resource Center selected me to participate in the certified auditor field training program at the Sacramento County Main Jail.  This program provides hands-on training to certified auditors on the complete audit process described above.  To date, I have completed approximately 20 PREA audits with seven agencies, including five counties in California, the Department of Homeland Security, and most recently two state prisons in Florida.

In October 2017, the PREA Resource Center selected me as a member of its "Peer Review" team.  Under the program, teams of certified auditors conduct peer reviews of completed audit reports to evaluate the auditor's analysis of supporting evidence, as well as interpretation and application of the

standards. Peer reviewers rigorously apply analytical methodology to the work product of their fellow auditors and draw informed and critical conclusions about the reliability, accuracy, and validity of the audit report. In November 2017, I was paired with another reviewer for a peer review of the audit report for a facility in New York.

From October 2017 to December 2018, I worked as a contract employee with Creative Corrections of Beaumont Texas. In that capacity, I conducted PREA audits of three Immigration and Customs Enforcement (ICE) detention facilities.

In October 2020, I signed a contract with PREA Auditors of America, LLC of Cypress, TX to serve as an independent contractor. Under this contract, I conducted PREA audits of two Florida state prisons in January 2021 and submitted the final audit reports in June 2021.

**Jan 2011 – Present, Independent Contractor/Consultant of Correctional Services, Synergy Technology Services**

Assessment of Chilean Prison System (Jan – Feb 2011): I met with the heads of Chilean confinement facilities and their staff; toured prisons and jails to collect information on the inmate population; facility staffing; design capacity; inmate work, education, and religious programs; health care services; inmate housing; canteen; perimeter security; inmate visiting; employee training; facility infrastructure and maintenance, etc. I documented all findings in written reports and included photos of interest taken during the tours.

New Prison Design (Mar 2011): I translated documents from English to Spanish, I worked with an architect on matters related to prison design and I conducted a PowerPoint presentation (in Spanish) of proposed new prison design, staffing, and activation to representatives of relevant Chilean government agencies.

Policy Development (2012): I lead a team of California correctional experts in the development of a policy manual with 108 written policies for the Chilean prison system. The policies were based upon American Correctional Association standards and internationally accepted standards for correctional systems. Policies included: Administration, Fiscal Management, Personnel, Training and Staff Development, Management and Information Records, Physical Plant, Fire/Life Safety, Security, Inmate Discipline, Special Housing Management, Food Services, Inmate Clothing and Bedding, Sanitation and Hygiene, Health Care Services, Inmate Rights, Communication Mail and Visiting, Reception and Orientation, Inmate Property, Inmate Classification Process, Inmate Work Programs, Academic and Vocational Programs, Library Services, Recreation and Inmate Activities, Religious Services, and Citizen Involvement and Volunteers.

Development of Training Curriculum (2012): I lead a team of correctional experts in the development of a training curriculum for the Chilean prison system. The team developed a total of 59 training lesson plans derived from the policy manual.

Training for Trainers: During the summer and fall of 2012, I developed a Training for Trainers (T4T) lesson plan and prepared a team for the training phase of the project in Santiago, Chile, prior to our departure in Feb 2013. I served as the lead master-trainer of a four-person team; the team planned and presented two five-day T4T sessions in Spanish to custody managers and supervisors of the Chilean Correctional Agency. After two weeks of training, the team toured the training academies, interviewed teachers and instructors regarding the curriculum and the program in general. I also

interviewed the Chief of Training and supervised the preparation of a final report with findings and recommendations relative to the complete employee training program for the Chilean Correctional System.

**Jun 2010 – Jul 2010, Retired Annuitant, California Department of Corrections and Rehabilitation (CDCR)**

I served on a team that conducted reviews of administrative segregation bed utilization at several institutions. During this review, I reviewed inmate files, collected information relative to the inmate's placement in segregated housing, as well as classification committee decisions and actions relative to the need for retention in segregated housing or transfer to another prison. I compiled the information and prepared a report with findings and recommendations for more efficient utilization of these critical beds.

**Nov 2009 – Mar 2010, Retired Annuitant, CDCR**

I served on a two-man team that assessed warehouse operations and procurement practices ordered by the Undersecretary of Administration. This project identified waste in both headquarters and the field. I toured warehouses at several prisons selected strategically and collected data relative to information technology equipment stored in those warehouses. I met with management staff at the Department's Enterprise Information Systems Division to learn about the process of purchasing information technology equipment and the practices employed for deploying equipment to the field to support specific department programs. I prepared a report with findings and recommendations and presented it to the Agency Secretary and Cabinet staff.

**Jan 2008 – Aug 2009, Correctional Administrator, CDCR Office of Audits and Compliance**

As the chief of the Peer Review Branch, I was responsible for developing and overseeing the Department's Peer Review Program for adult facilities and parole regions. I developed and maintained a schedule for compliance/peer reviews of all adult facilities, including contract facilities. I provided administrative oversight of 13 audit teams that participated in peer reviews; the teams included staff from various department headquarters offices as well as staff from CDCR prisons. I coordinated the production of a complete audit report for the audited facility and provided written instructions to the facility's leadership on producing and submitting corrective action plans in response to audit findings. Audit teams conducted follow-up reviews as needed. The peer reviews focused on the following areas: Security and Escape Prevention, Lethal Electrified Fence, Inmate Appeals, Case Records, Administrative Segregation Due Process, Administrative Segregation Bed Utilization, Information Security, Education Programs, Armory Operations, Business Services, Risk Management Programs, Radio Communications, and Armstrong (Americans with Disabilities Act class action lawsuit) Self-Monitoring. I retired from this position on September 1, 2009

**Jul 2007 – Jan 2008, Facility Captain (Appeals Examiner), CDCR Inmate Appeals Branch**

See appeals examiner duties below.

**March 2001 - Jul 2007, Facility Captain, CDCR Office of Court Compliance**

I supervised a team of 14 Correctional Counselors-II and managed litigation on five major class action lawsuits: Armstrong, Clark, Armstrong-II, Valdivia, and Lugo.   In this capacity, I served as the

department's Americans with Disabilities Act (ADA) Coordinator and oversaw implementation of two major departmental programs for inmates with disabilities: The Disability Placement Program (DPP) and the Developmental Disabilities Program (DDP). I worked with other CDCR divisions, the CDCR Office of Legal Affairs, the Office of the Attorney General, and relevant state agencies to develop and implement policy and procedures related to compliance with court orders. I lead direct negotiations with plaintiffs' attorneys from the Prison Law Office and Rosen, Bien, and Asaro, LLP (now Rosen, Bien, Galvan, and Grunfeld, LLP). I supervised staff responsible for Armstrong and Clark monitoring tours of CDCR prisons with plaintiffs' attorneys. I supervised staff and work collaboratively with plaintiff's attorneys on revising the Armstrong and Clark remedial plans; I worked with designated health care staff on revisions to disability verification forms related to the Armstrong and Clark remedial plans; and I supervised staff in developing and providing field training, conducting compliance reviews related to the DPP and DDP, and implementing compliance measures. I developed appropriate budget requests for resources as needed and work with stakeholders to establish contracts for services as needed. I met with representatives of impacted bargaining units to negotiate the workload impact of the Armstrong and Clark remedial plans to their members in the field.

Special Assignment: From January to April 2004, I participated in a special assignment at Folsom State Prison as Facility Captain for Level II housing and the Administrative Segregation Unit (ASU). I supervised a CC-II Supervisor, a CC-II Specialist, and three Lieutenants. I chaired inmate classification committees, conducted administrative reviews of placements in administrative segregation, provided training to staff, and presented ASU cases to the Institution Classification Committee. I reviewed adjudicated rules violation reports, use of force reports, and responses to inmate appeals.

**May 1999 – Mar 2001, Facility Captain (Appeals Examiner), CDCR Inmate Appeals Branch**

I prepared formal responses to inmate appeals (grievances) on behalf of the Director of Corrections. Responses were prepared "on-the-record" or "in-the-field;" the latter required travel to institutions to review inmate files and interview staff and inmates before preparing the formal response. These responses required interpretation of a variety of policies, regulations, and state law to decide the merits of inmates' grievances. I served as subject matter expert on ADA appeals and trained other examiners on the subject. I prepared training material and provided training to field staff during department-wide conferences.

**Jun 1995 – May 1999, Correctional Counselor-II, Specialist, CDCR Institution Services Unit, Institutions Division**

I participated in meetings to brainstorm policy and procedures to implement new programs for inmates with disabilities (the DPP). I worked on developing forms, conducted surveys, toured institutions, provided training to staff in the field, and worked on implementing provisions of court orders. I developed a compliance review instrument and coordinated department-wide compliance audits. I participated in Institutions Division's Combined Audits, and I worked with staff from other offices, divisions, and other State agencies to develop policy and procedures related to ADA compliance. I worked on major budget change proposals to request resources for program implementation. I worked with architects from the Planning and Construction Division and plant operations staff at institutions to coordinate reviews to identify structural modifications needed to comply with ADA accessibility guidelines.

**Feb 1993 – May 1995, Correctional Lieutenant, CDCR Advanced Training Unit, Richard A. Magee Correctional Training Center**

I developed training lesson plans for supervisors, coordinated and delivered statutorily required training courses to supervisors, including Basic Supervision, Advanced Supervision, Sergeant's Job-Specific Training, Lieutenant's Job-Specific Training, etc. I served as the In-Service Training (IST) Manager for the Academy. I coordinated "In-Service" and "Out-Service" training for Academy employees and prepared the monthly IST Bulletin for the Academy. I represented the academy in quarterly Joint Apprenticeship Committee meetings. I also wrote the script and directed production of a training video on the department's new Correctional Officer Appraisal System.

**Jun 1990 – Feb 1993, Correctional Lieutenant, CDCR California Medical Facility**

Watch Commander: I supervised custody operations at the institution; supervised correctional sergeants assigned to central services, including outside patrol, central control, culinary, watch office, transportation, receiving and release, etc. I prepared Incident Reports and made required notifications to administrative staff, next-of-kin, and outside agencies. I coordinated emergency and mutual aid responses when requested.

Program Lieutenant: I supervised custody staff assigned to outpatient psychiatric services units, participated in Inter-Disciplinary Treatment Team meetings related to the Gates v Wilson class action law suit, conducted administrative hearings on serious rules violations reports, prepared notices for placement and hearing in administrative segregation, participated in classification committee hearings, investigated serious inmate misconduct, conducted internal affairs investigations, etc.

**Jun 1989 – Jun 1990, Correctional Counselor-I, CDCR Sierra Conservation Center**

Program Unit Counselor: I reviewed central files, interviewed inmates and prepared cases for Initial and Unit Classification Committee hearings. I prepared release program studies, documented classification committee decisions/actions, updated distributed data processing system to reflect classification committee actions, etc.

Administrative Segregation Counselor: I reviewed administrative segregation placement orders, rules violation reports, confidential reports, and prepared cases for presentation to the Institution Classification Committee. I also prepared a weekly Administrative Segregation status report for administrative staff.

**Feb 1988 – May 1989, Background Investigator, CDCR Selection and Standards Branch**

I reviewed applications for entry-level peace officer positions, identified references, employers, state and federal government agencies, and law enforcement agencies to be contacted for background information. I determined applicable provisions of State law and administrative codes in determining suitability for employment as a peace officer. I reviewed personnel files of peace officer applicants from other law enforcement agencies and conducted tape-recorded interviews with applicants to clarify discrepant information developed during the course of the background investigation, etc.

**Feb 1986 – Feb 1988, Correctional Sergeant, CDCR California Medical Facility-South (renamed CSP- Solano)**

Visiting Sergeant: I supervised a team of correctional officers and an office assistant in carrying out the institution's inmate visiting program. The team processed applications for visiting privileges,

reviewed arrest history, and prepared letters to prospective visitors. The staff also searched inmates and approved prospective visitors prior to visits.

Program Sergeant: Under the direction of the program lieutenant, I provided day-to-day supervision of housing officers, search and escort officers, yard officer, and education officer. I planned the course of action and activities for the day with the program lieutenant and supervised the correctional officers in the execution of the daily program. I supervised response to inmate disturbances and other emergencies, coordinated inmate bed moves, and placement in segregated housing when necessary. I reviewed files and interviewed newly arrived inmates to determine appropriate housing at the institution. I prepared performance reports for correctional officers and provided on-the-job training.

Outside Patrol Sergeant: I supervised correctional officers assigned to the armed perimeter observation towers and outside security operations.

Industries Patrol Sergeant: I supervised correctional officers assigned to the institution's Correctional Industries and Academic and Vocational Education programs; I met with supervisors and managers in these programs to coordinate custody operations and response as needed.

**Feb 1982 – Feb 1986, Correctional Officer, CDCR California Medical Facility**

I was responsible for ensuring safety of staff and inmates; I supervised inmates in a variety of work assignments, including main kitchen and culinary. I served as housing officer for mainline and reception center housing units, as well as search and escort officer.

**1979 – 1980, Topography and Geodesy Technician, National Geographic Institute, Panama, approximately two years.**

I conducted leveling itineraries, topographic and geodetic surveys and calculated new elevations and grid system coordinates as needed.

**EDUCATION:**

**National Institute, Panama City, Panama**
High school diploma, April 1974 - December 1976 (In Panama it was three years Junior high and three years high school)

**National University, Heredia, Costa Rica**
Technician degree (Baccalaureate of Science), in Topography and Cadastre, March 1977 – May 1979, two years, including the thesis. I completed 98 semester units.

**Sacramento City College, Sacramento, CA**
General Studies, Fall 1981 – Spring 1983, no diploma. I completed 22 semester units.

**Work-Specific Training (this is not an exhaustive list)**
**Basic Correctional Officer Academy, Norco, CA**
Feb 15 – Mar 5, 1982 (three weeks); this training included laws of arrest and seizure and Peace Officer Standards and Training certification.

**Background Investigation Procedures, Sacramento, CA**

March 1988, two weeks

**Internal Affairs Investigation, Los Gatos, CA**
May 1991, one week.

**Classroom Presentation Skills, Criterion Referenced Instruction, Galt CA**
Spring 1993, three weeks

**Interact Performance Problem-Solving, Galt, CA**
June 1993, one week.

**Interact Problem-Solving for Managers, Garden Grove, CA**
November 1994, one week.

**Management Training Program, Sacramento, CA**
Summer 1999, there months.

**National Institute of Corrections, Instructional Theory into Practice (ITIP): Training Design and Development**
1999, one week, (I do not recall the specific dates)

**Leadership Institute, California State University – Chico**
January – June 2000

**Prison Rape Elimination Act (PREA) Certification Training, Kansas City, MO**
June 2014 - Presented by the PREA Resource Center in collaboration with the US Department of Justice

**Fluent in Spanish speaking, reading, and writing**

**WORK REFERENCES:**

- **John Campbell:** (916) 698-7791, (retired CDCR administrator and project manager for the Chilean prison system assessment)

- **Richard Krupp**: (916) 524-8996, (Retired CDCR Assistant Secretary of Audits and Compliance)

- **Tim Rougeux**: (916) 300-0908, (Retired CDCR administrator)

Exhibit C

**Michael Andrew Milas**
Phone Number: 401.741.7622
Email Address: MMilas354@g.rwu.edu
Permanent Address: One Terrace Way, Lincoln R.I., 02865

---

**BAR ADMISSIONS:** State of Rhode Island, November 2019.
United States District Court, District of Rhode Island, February 2021.

**EDUCATION**
**Roger Williams University School of Law**, Bristol, RI
Juris Doctor, *cum laude*, May 2019
G.P.A.: 3.27/4.00
Honors: Dean's Scholar Recipient, CALI Awards for highest grades in SEM: Professional Legal Writing and
SEM: Technological Innovation and the Law

**Drexel University**, Philadelphia, PA
Bachelor of Science, Music Industry, June 2013

**LEGAL EXPERIENCE**
**Gunning & LaFazia, Inc.**
*Associate Attorney*                                                          *March 2020 - Present*
- Civil defense attorney responsible for case management pertaining to insurance defense and commercial tenancy.
- Drafts various motions and objections and their supporting legal memoranda, discovery documents and responses, mediation and arbitration statements, and advisory letters in connection with defense of cases.
- Researches and analyzes precedent case law in support of drafting motions, objections, and advisory letters.
- Advocates for clients through appearing for oral arguments on civil motion calendars in multiple counties.
- Conducts and defends depositions and drafts the related summaries.
- Advises clients on resolution strategies pertaining to commercial eviction actions.
- Serves as a liaison with clients to develop and execute case strategy from pre-suit stages through settlement.

**Goodman, Shapiro & Lombardi, LLC, Lincoln, R.I.**
*Associate Attorney & Law Clerk*                                           *September 2018 - March 2020*
- Developed and executed litigation strategies pertaining to condominium law, real estate transactions, and estate planning.
- Drafted pretrial memoranda, discovery documents, release and settlement agreements, purchase and sale agreements, amendments to condominium documents, and opinion and demand letters.
- Represented and advocated for clients via pre-trial conferences, control calendar hearings, mediations, and town planning board hearings.
- Conducted legal research and analysis pertaining to condominium law and real estate transactions.
- Monitored case progression for clients.

**Adler Pollock & Sheehan P.C., Providence, R.I.**
*Legal Intern*                                                             *January 2018 - September 2018*
- Conducted legal research and analysis regarding intellectual property issues.
- Drafted and amended a wide range of legal documents including reporting letters, information disclosure statements, and inventor assignments.
- Assisted in client interviews with prospective clients and developmental strategy pertaining to prospective clients.

**Langlois, Wilkins, Furtado & Metcalf, P.C., Providence, R.I.**
*Legal Intern*                                                              *September 2017 - December 2017*
- Researched and wrote legal memoranda for pre-trial motions and client letters related to pending litigation.
- Drafted summaries and briefs of subpoena documents.
- Implemented an updated in-office filing system.

## PROFESSIONAL EXPERIENCE
**JPM & Associates, Providence, R.I.**
*Lobbyist and Government Affairs Associate*                              *January 2015 - December 2017*
- Oversaw new client development and legislative monitoring.
- Assisted in securing state and municipal funding on behalf of for-profit and nonprofit clients.
- Created, developed, and implemented initiatives for government relations and community outreach on behalf of for-profit and nonprofit clients.
- Clients included: The Rhode Island Alliance of Boys & Girls Clubs, Blackstone Valley Tourism, Project GOAL, and Coastal Aeroponics L.L.C.

**MadStarBase Productions, LLC., Lincoln, R.I.**
*Founder and Owner*                                                        *October 2012 - July 2016*
- Founded Artist Services and Consulting business in music industry that provided services including concert booking, concert promotion, tour routing, and third-party marketing.
- Drafted, reviewed, and negotiated contracts related to artist booking, venue rental, business partnerships, and subcontracting agreements for musicians and venues in cities including Providence, R.I., New York City, N.Y., Boston, MA, and Philadelphia, PA.
- Clients included: The Dunkin Donuts Center, The Rhode Island Convention Center, AEG Live, The Windish Agency, and The Knitting Factory.

## VOLUNTEER  EXPERIENCE
**Mock Trial Coach, Providence Country Day School, East Providence, R.I.**
*Attorney Coach*                                                          *October 2020 - Present*
- Coaches high school Mock Trial team of alma mater.
- Provides legal advice to students related to drafting direct and cross examinations, opening and closing statements, and evidentiary objections.
- Advises students regarding courtroom procedure and etiquette, decorum with opposing counsels, and trial strategies.

**Play With Pauleta, East Providence, R.I.**
*Co-Founder*                                                              *February 2015 - July 2015*
- Co-founded the charitable soccer event "Play With Pauleta", which raised over $20,000 benefitting various East Providence, R.I. youth organizations.
- Oversaw event marketing through press initiatives such as local news and radio coverage, as well as guerrilla marketing tactics through the event "street team."
- Managed social media accounts by utilizing posting schedules and relevant online community engagement.