**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
    **Plaintiffs**

    **vs.**                                        **No. 2:90-CV-0520 KJM DB**

**GAVIN NEWSOM, et al.,**
    **Defendants**

_____

**SPECIAL MASTER'S REPORT ON HIS EXPERT'S REPORT ON SUICIDES**
**COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND**
**REHABILITATION, JANUARY 1, 2020 – DECEMBER 31, 2020**

**I.      INTRODUCTION**

    Attached is the *Coleman* Special Master's expert's Report on Completed Suicides in the

California Department of Corrections and Rehabilitation (CDCR) from January 1, 2020, through

December 31, 2020 ("Report").  This is the twenty-second report by the Special Master's expert[1]

on completed suicides by CDCR inmates.[2]  It is submitted as part of the Special Master's overall

continuing review of defendants' compliance with court-ordered remediation in this matter.

    In the last twelve months, the Special Master, inclusive of the attached Report, has filed

six reports on deaths by suicide in CDCR facilities covering the time period of 2015-2020,

_____

[1] Members of the Special Master's staff who are mental health experts are referred to collectively
as "the Special Master's expert."

[2] While this is the twenty-second report analyzing completed suicides in CDCR institutions by
year, the Special Master's expert also filed a compendium report analyzing suicide trends
between 1999-2004.  ECF No. 2339.  With that compendium report included, the attached
Report is the twenty-third suicide report by the Special Master's expert on completed suicides in
CDCR.

including: one critique of CDCR's 2015 annual suicide report, *see* ECF No. 7038-2, and five of his expert's annual suicide reports. *See* ECF Nos. 7038-3 (Special Master's expert's 2016 suicide report), 7077-1 (Special Master's expert's 2017 suicide report), 7161-1 (Special Master's expert's 2018 suicide report), 7239 (Special Master's expert's 2019 suicide report). During the six years covered by these reports, 184 incarcerated persons died by suicide in CDCR institutions. Moreover, the department's suicide rate reached new heights. *See* Report at 5 (noting CDCR's 2020 suicide rate of 27.3 per 100,000 was second only to that of 2019 (30.3 per 100,000)). In each of these years, a majority of deaths by suicide occurring within CDCR's institutions were foreseeable, preventable, or both. It is within this tragic context that the Special Master submits this Report.

As with prior reports, the Special Master's internal Suicide Report Workgroup directed and guided the development of this Report. *See* ECF No. 7038 at 2.[3] This workgroup was comprised of Lindsay M. Hayes, M.S., Jeffrey L. Metzner, M.D., Sharen Barboza, Ph.D., Kahlil A. Johnson, M.D., and Kerry C. Hughes, M.D. Dr. Sharen Barboza was the primary author of the Report. In preparing the Report, Dr. Barboza, with support from other *Coleman* experts, conducted in-depth clinical reviews and assessments of the health care records and CDCR death review reports for all CDCR inmate suicide deaths during calendar year 2020. *See* Report at 1.

II.   **FINDINGS**

Among the Special Master's expert's findings in the Report were the following:

---

[3] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system.

- In 2020, there were 31 incarcerated individuals in CDCR custody who died by suicide, resulting in the second-highest suicide rate—27.3 per 100,000—in the past 22 years. Report at 1.

- The number of suicides in CDCR institutions in 2020 corresponds to a death by suicide every 11.8 days. *Id.*

- Of the deaths by suicide in 2020, 58.1 percent were either foreseeable, preventable, or both. *Id.* at 32.

- More than two-thirds of individuals who died by suicide in 2020 were Mental Health Services Delivery System participants. *Id.* at 3.

- Hanging continued to be the primary method used by those individuals who died by suicide in 2020, comprising 77.4 percent of deaths by suicide. *Id.* at 2.

- There was a decrease in the percentage of incarcerated individuals discovered in rigor mortis in 2020 (9.7 percent) compared to 2019 (13.2 percent). None of the individuals found in rigor mortis in 2020 resided in segregated housing. *Id.*

- The majority of individuals who died by suicide in 2020 were either Caucasian (38.7 percent) or Latinx/Hispanic (29 percent). *Id.*

- Nearly 68 percent of individuals who died by suicide in 2020 had previously attempted suicide. *Id.* at 3.

- In 2020, 35.4 percent of individuals who died by suicide resided in segregated housing. *Id.* at 2. Two of these individuals, or 6.5 percent of cases, had been placed in a segregated setting within 72 hours of their death. *Id.*

- In more than three-quarters of cases with completed suicide risk evaluations (SREs), there was evidence of clinicians failing to identify or document known risk factors. *Id.* at 3.

## III.    PARTIES' RESPONSES AND OBJECTIONS TO DRAFT REPORT

On August 12, 2021, the Special Master provided the *Coleman* parties with a draft version of the Report ("Draft Report").  In accordance with regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the Draft Report.  On September 13, 2021, defendants submitted their comments and objections to the Draft Report.  *See* Letter from Dillon Hockerson, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (Sept. 13, 2021), attached hereto as Exhibit A. Plaintiffs did not submit comments or objections to the Draft Report.  After careful review and consideration, the Special Master's expert has revised and clarified portions of the Report where warranted, as discussed in further detail below.

### A.    Defendants' Response to the Draft Report

Before discussing defendants' numerous objections to the Draft Report, the Special Master wishes to comment on the tone and tenor of defendants' correspondence regarding the numerous draft reports distributed to the parties in the last year.  Simply put, defense counsel's acrimony toward the Special Master and his expert has continued to escalate.[4]  As noted in the

---

[4] Suicide monitoring and reporting are not the only areas in this case where defendants' rhetoric has become increasingly antagonistic. In correspondence to the Special Master on a variety of topics over the last year, defendants have suggested that the Special Master: attempted to deprive them of the assistance of counsel regarding the court-ordered unmet needs assessment; did not take COVID-19-related risks seriously enough when his team resumed on-site monitoring earlier this year; and generally operated as a barrier to progress regarding defendants' data remediation project.  Elsewhere, defendants wax poetic regarding the resources utilized by the Special Mastership—a not-so-subtle allusion to the baseless, inflammatory remarks made in their objections to the Special Master's Twenty-Fifth Round Monitoring Report in 2013.  There, the

Special Master's preceding reports, the Special Master and his team carefully review and

consider each of the parties' comments, critiques, and preliminary objections to the draft

reports.[5]  In many instances, defendants' preliminary objections raise factual and statistical

discrepancies that warrant attention and are addressed prior to filing the final report with the

court.  Elsewhere, however, defendants seek to relitigate settled issues in this case and expound

upon the Special Master's expert's purported ignorance of CDCR and its processes.[6]  Needless

---

court characterized defendants' remarks as an "unsupported personal attack on the integrity of
the Special Master", February 13, 2013 Order to Show Cause, ECF No. 4335 at 1, "both plainly
false and unworthy of consideration." April 5, 2013 Order, ECF No. 4539 at 27 n.26.  More
recently, the court "strongly cautioned" defendants to "desist from impugning the Special
Master's efforts" after defendants baselessly asserted that the Special Master was "thwart[ing]
their ability to implement policy changes that increase the level of care provided to the plaintiff
class."  September 21, 2021 Order, ECF No. 7323 at 8 n.6.  While defendants' attempts to
malign the Special Master's efforts in this case unfortunately are nothing new, they are indeed
"extremely disappointing and detract[] from the serious business at hand."  *Id.*

[5] As noted in this and prior reports, defendants have repeated certain objections in their responses
to most if not all of the Special Master's expert's reports drafted in the past year.  *See*
Defendants' Objections to the Special Master's Expert's Report on Suicides Completed in the
California Department of Corrections and Rehabilitation, January 1, 2019 – December 31, 2019,
ECF No. 7248 at 2-4 (objecting to the Special Master's expert's 2019 report as "redundant"); *id.*
at 4-7 (objecting to the Special Master's expert's suicide foreseeability and preventability
determinations); *id.* at 7 (objecting to the Special Master's expert's comparison between CDCR's
suicide rate and that of other large prison systems); *see also* Defendants' Objections to the
Special Master's Report on His Expert's Report on Suicides Completed in the California
Department of Corrections and Rehabilitation, January 1, 2018 – December 31, 2018, ECF No.
7182 at 2-4 (objecting to the Special Master's expert's 2018 suicide report as "redundant"); *id.* at
4-5 (objecting to the Special Master's expert's suicide foreseeability and preventability
determinations); *id.* at 7 (objecting to the Special Master's expert's comparison between CDCR's
suicide rate and that of other large prison systems); *see also* Defendants' Objections to the
Special Master's Report on His Expert's Report on Suicides Completed in the California
Department of Corrections and Rehabilitation, January 1, 2017 – December 31, 2017, ECF No.
7098 at 2-3 (objecting to the Special Master's expert's report as "redundant"); *id.* at 4-5
(objecting to the Special Master's expert's foreseeability and preventability determinations); *id.*
at 3-4 (objecting to the Special Master's expert's comparison between CDCR's suicide rate and
that of other large prison systems).

[6] For instance, in their objections to the Special Master's expert's 2019 suicide report, defendants
highlight the "Special Master's expert's apparent unfamiliarity with CDCR's [suicide case
review] process."  ECF No. 7248 at 8.  Defendants continue: "It is also unclear why the experts

to say, this is disappointing and disruptive to the remedial process.  The Special Master hopes

defendants and their attorneys are prepared to re-focus their attention on progressing toward full

implementation of the Special Master's suicide prevention expert's recommendations and

engaging in collaborative, constructive dialogue regarding suicide prevention, review, and

reporting as the parties and court prepare for upcoming discussions on suicide and suicide

prevention issues.

    1) *Foreseeability and Preventability*

    Putting aside defense counsel's litigious rhetoric and attacks on the Special Master and

his team, the record here is clear:  CDCR's suicide rate has reached new highs over the last

several years, and a significant portion of these suicides continue to be foreseeable, preventable,

or both.  As the court is aware, there is an ongoing dispute with defendants regarding the Special

Master's expert's longstanding, court-approved practice of evaluating the foreseeability and

preventability of each case of death by suicide in CDCR's institutions.  While the procedural

history of the Special Master's monitoring of suicides and suicide prevention generally and his

expert's foreseeability and preventability determinations specifically have been summarized in

---

[Drs. Metzner and Hughes] most familiar with CDCR's [suicide case review] process are not
involved in the present report, or why it appears there is no coordination between these experts."
*Id.* at 8-9; *see also* ECF No. 7239 at 47 (Defendants' informal objections to the draft 2019
suicide report, wherein defendants again opine on the Special Master's expert's "unfamiliarity of
the function with [sic] the [Suicide Risk Assessment Self-Harm Evaluations], Interdisciplinary
Plan of Cares [sic], and Patient Level Outcomes (PLO) in assisting in ongoing clinical
assessments for treatment planning.").  These statements are as offensive to Dr. Barboza's wealth
of experience as they are factually incorrect.  Drs. Metzner and Hughes, who participate in
CDCR's Suicide Case Review meetings, are key contributors to the Special Master's internal
suicide report writing workgroup, as has been noted in each of the Special Master's reports filed
in the last year.  *See* ECF No. 7038 at 2; ECF No. 7077 at 1-2; ECF No. 7161 at 1-2; ECF No.
7239 at 1-2.

prior filings, *see* ECF No. 7038 at 17-22, the defendants' repetitious objections require further comment and contextualization.

As they have repeated verbatim in prior objections, *see, e.g.*, ECF No. 7248 at 4-7, here defendants once again dramatically overstate the limitations of the Special Master's expert's determinations of suicide foreseeability and preventability.  Defendants' response to the Draft Report echoes prior objections, where they have stated that a "chorus" of experts question the utility of foreseeability and preventability determinations.  *See* ECF No. 7248 at 4.  In support of this contention, defendants cite a single report.  Exhibit A at 8 n.11.  Needless to say, one report does not a chorus make.  Defendants further impugn the Special Master's and his expert's longstanding efforts on suicide monitoring and prevention where they state:

> Among other things, foreseeability and preventability determinations in the manner requested by the Special Master often result in arbitrary, methodologically unreliable labels, and also do not adequately acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.

Exhibit A at 8; *see also* ECF No. 7248 at 4.  Nothing in the Special Master's expert's reports indicates that the ongoing crisis of suicides within CDCR institutions is not a "complex" problem.  To suggest, explicitly or impliedly, that the Special Master or his expert do not appreciate that deaths by suicide "occur in a complex system" is grossly irresponsible.

Since the chapter on suicide prevention was added to the Program Guide in 2006, defendants' remedial plan has acknowledged the fact that some suicides are preventable and that it is CDCR's policy to take action "to reduce the incidence of preventable suicides."[7]  Part of that

---

[7] The Program Guide states:

> It is the goal of the California Department of Corrections and Rehabilitation (CDCR) Suicide Prevention and Response Focused Improvement Team (SPR FIT) to prevent

process, in the Special Master's opinion, should be to first identify which suicides were in fact preventable.[8] The Special Master's expert's suicide foreseeability and preventability determinations, included in each and every report on completed suicides and endorsed by the court on numerous occasions,[9] are intended to advise the court of defendants' success or lack thereof in accomplishing their remedial goal of "reduc[ing] the incidence of preventable suicides." *See supra* note 7. While the crisis of inmate suicides is indeed "complex," the need to evaluate and identify which cases of suicide were preventable in the first place is not. Defendants' intransigence on this issue continues to baffle the Special Master.

---

inmate deaths due to suicide. … CDCR recognizes that prevention of suicide involves a team effort by every employee regardless of professional discipline or job title.

To accomplish this goal, each institution shall implement CDCR Division of Correctional Health Care Services (DCHCS) policies, described herein, regarding suicide prevention and response, via written operating procedures. The purpose of the policies is to: …

-Review suicide deaths regarding systems issues, clinical care issues, and custody response.

-Ensure that quality improvement (a.k.a. corrective action) plans are drafted and implemented, when indicated, *to reduce the incidence of preventable suicides*, improve the delivery of quality care, improve the involvement of non-healthcare staff, and contribute to the ongoing education and training.

PG 12-10-1. As noted, this language has existed in the Program Guide since the 2006 update. *See* ECF No. 1753-10 at 1 (emphasis added).

[8] In prior orders, this court has concurred with the need to identify the incidence of preventable suicides: "Defendants are responsible for development and implementation of a program to 'identify, treat, and supervise inmates at risk for suicide' and *identification of the number of preventable inmate suicides is an integral part of that responsibility*." ECF No. 4693 at 3-4 (emphasis added) (citations omitted).

[9] The court most recently endorsed the Special Master's expert's foreseeability and preventability definitions during a December 2020 status conference: "[T]o the extent defendants' separate statement going on at some length about foreseeability and preventability, referring to those definitions as the Special Master's, there's a passing acknowledgement of the Court's adoption of those definitions. The Court has adopted those definitions." Reporter's Transcript of Proceedings (RT), ECF No. 7002 at 8:10-15.

2) *Objections Based on Statistical Discrepancies*

In the response to the Draft Report, defendants requested corrections to several reported statistics, Exhibit A at 2-4, which the Special Master's expert has addressed and corrected where warranted.[10]  The Special Master's expert did not modify the Report's observations regarding patients who were at the inpatient level of care at the time of their suicide,[11] nor did she change the Report's discussion of COVID-19 related impacts on completed suicides in 2020.[12]

3) *Objections to Discussion of Inmates Housed to Address Safety Concerns*

Consistent with recent responses to the Special Master's expert's suicide reports, defendants objected to the expert's discussion of patients who died by suicide and had personal safety concerns.  Exhibit A at 4.[13]  In response to defendants' comments, the expert added a

---

[10] For instance, defendants requested corrections to the suicide rate contained in the Draft Report, which used CDCR's July 1, 2020 population as the denominator, rather than the June 30, 2020 population.  This resulted in a reduction in the suicide rate from 27.4 per 100,000 to 27.3 per 100,000.  In addition, defendants asked the Special Master's expert to recalculate the Draft Report's statement that a suicide occurred every 11.7 days in 2020, based on the fact that 2020 was a leap year.  The recalculation resulted in a difference of three one-hundredths of a day, or 43 minutes (i.e. a suicide occurred every 11.77 days (Draft Report) v. a suicide occurred every 11.8 days (Final Report)).

[11] The Special Master's expert did not change the finding contained in her report regarding the number of inmates who died by suicide that were receiving services at the inpatient level of care but did add a clarifying footnote.  Report at 3 n.5.

[12] Based on defendants' preliminary feedback, the Special Master's expert re-reviewed relevant documentation and has concluded that her findings in the Draft Report were clear and accurate.

[13] The Special Master notes that his expert first highlighted personal safety concerns among incarcerated persons dying by suicide in CDCR nearly 20 years ago.  *See* Eleventh Monitoring Report, ECF No. 1519 at 288 (discussing recommendation from the Special Master's expert's 2001 annual suicide report, including a "review and possibl[e] modif[ication of] existing policies and procedures for responding to inmates' complaints/concerns about their safety….").  As referenced in the Report's conclusion, death by suicide among inmates with personal safety concerns has again arisen in nearly four in ten suicides completed since 2017 and that "issues related to personal safety may warrant consideration in the formulation of risk for suicide." Report at 34.  Defendants' objection to this serious and obvious concern is perplexing.

clarifying footnote on the three cases that defendants incorrectly identified as Enhanced Outpatient Program (EOP) patients residing on Non-Designated Program Facility yards.  Report at 18 n.16.

     4)  *Objections Based on Lack of Comparable Data*

Defendants objected to the Special Master's expert's findings regarding the incidence of interfacility transfer and trauma history[14] among those who died by suicide in 2020 based on the inability to compare these rates to corresponding rates among the overall CDCR population.  Exhibit A at 4-5.  Where data is available to make comparisons to the overall CDCR population, the Special Master's expert has strived to include this information in the Report.  *See, e.g.*, Report at 10-11.  Moreover, as has been the case with prior reports, the Special Master's expert has noted the limitations of certain statistical comparisons, Report at 7 n.9, and, consequently, did not make changes to the Report based on these preliminary objections.

---

[14] Defendants suggest the Special Master's expert's findings regarding trauma history "imply that CDCR provides inadequate treatment to individuals positive for history of trauma."  Exhibit A at 5.  At best, defendants are reaching.  For context, here is what the Special Master's expert's report states:

> The Special Master's expert is not in a position to determine whether or not the effects of the trauma experienced by individuals who died by suicide warranted treatment or diagnosis.  This information is being included so it can be tracked over time.  Compared with previous years' findings, there was a larger percentage of individuals with histories positive for trauma and a lower percentage of those who received treatment and/or a diagnosis related to trauma in 2020.

Report at 24.

5) *Objections to Discussion of Quality Improvement Plan Process*

The Special Master's expert reviewed and considered defendants' preliminary objections to the Report's discussion of the Quality Improvement Plan process, Exhibit A at 7-8, but did not make changes to the Report based on defendants' comments.[15]

6) *Objections to Discussion of Mental Health Evaluation and Treatment Factors*

The Special Master's expert did not change the Report's discussion of Mental Health Evaluations and Treatment factors, including SREs, treatment planning, higher level of care consideration, and mental health assessments. Here, defendants restated their confusion that each and every deficiency identified in the Report was not brought to their attention in real-time by the Special Master's experts who attend CDCR's SRC meetings. Exhibit A at 6. Needless to say, the fact that the Special Master's experts provide preliminary feedback during SRC meetings in no way estops the Special Master or his expert from providing additional comments, feedback, and criticism in a formal report to the *Coleman* court upon a more extensive, exhaustive review of an individual case.

7) *Objections to Critique of Individual Suicide Case Reviews*

Defendants provided extensive responses to the Special Master's expert's critique of CDCR's individual suicide case review reports. *See* Exhibit A at 6-7; *see also id.* App. A (separate document commenting on the Special Master's expert's 2020 case summaries, attached to defendants' preliminary objection correspondence). Upon further review and where

---

[15] Defendants' preliminary objection to certain deficiencies identified during the QIP process as new "common" issues among suicides completed in CDCR did not require modification to the Report. The Report accurately identifies QIP deficiencies that have been common in prior years and continued to be identified in 2020, those that improved in 2020, and new issues that warrant monitoring going forward. Likewise, the Special Master's expert's observation that documentation regarding staff training required in response to a QIP did not allow for verification that all staff in fact received the required training stands and is a valid critique.

warranted, the Special Master's expert has clarified some of the case summaries attached to the Report in response to defendants' concerns.  *See* Report App. A at 40, 50, 143 (Special Master's expert's revisions to individual case summaries, attached to the Report).

8)  *Objections to the Special Master's Expert's Conclusions and Recommendations*

The Special Master's expert clarified certain recommendations and conclusions, Report at 33-34, in response to defendants' preliminary objections.  Exhibit A at 10-11.

## IV.    <u>CONCLUSION AND RECOMMENDATIONS</u>

In 2020, the suicide rate among incarcerated persons in CDCR's custody, 27.3 per 100,000, was the second highest in 22 years, surpassed only by the 2019 suicide rate of 30.3 per 100,000.  Report at 1.  On average, a CDCR inmate died by suicide every 11.8 days in 2020.  *Id.* Nearly 60 percent of these deaths by suicide were determined to be foreseeable, preventable, or both.  *Id.* at 32.

Defense counsel's insatiable desire to litigate rather than collaborate is reflected in the frivolity of some of their objections to the Draft Report, *see supra* note 10, and stands in stark contrast to the ongoing good-faith efforts of CDCR's civil servants dedicated to suicide prevention.  Likewise, the drumbeat of criticism of the court-adopted practice of assessing suicide foreseeability and preventability—a long-settled issue in this case—is concerning. Moving forward, the Special Master hopes that defendants and their attorneys are prepared to tone down their rhetoric and re-focus their attention on improving the quality of mental health care delivered to *Coleman* class members, fully implementing the Special Master's suicide prevention expert's recommendations, and putting themselves on a path to assuming some of the Special Master's suicide-related monitoring and reporting responsibilities.

The Special Master agrees with the conclusions and recommendations included in his expert's Report.  Because these conclusions track prior court orders and the general mission of the Suicide Prevention Management Workgroup, they need not be reiterated in additional court orders at this time.  Accordingly, the Special Master requests that the court adopt in full the attached Report by Dr. Sharen Barboza, Ph.D. on Completed Suicides in the California Department of Corrections and Rehabilitation from January 1, 2020 through December 31, 2020.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

December 21, 2021

# EXHIBIT A

STATE OF CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



September 13, 2021

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write in response to your August 12, 2021 draft Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2020 – December 31, 2020 ("the Special Master's Expert's Report" or "2020 Report"). CDCR continues to object to these reports because the Special Master's Expert's Report presumably bills CDCR tens of thousands of dollars for each report while duplicating the comprehensive self-monitoring already conducted by CDCR. CDCR publishes its own annual review of suicides, and has done so for all suicides that have occurred since 2015.[1] Indeed, later this month, CDCR will publish its 2020 Annual Suicide Report. CDCR is not aware of any other prison system in the country that critically reviewed every suicide that occurred in 2020, assessed policy violations that occurred in connection with the reported suicides, and implemented corrective actions to prevent the same or similar policy violations in the future.[2]

Your basis for continuing to produce your own duplicative reports on annual suicides is CDCR's "refus[al] to draft [its] suicide reports in a manner consistent with existing court orders with respect to foreseeability and preventability determinations." (Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017, ECF No.7077 at 4.) But, as Defendants have repeatedly stated, no court order mandates that annual suicide reports contain a "foreseeability/preventability" determination. (*See* Defendants' Objection to the Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017, ECF No. 7098 at 5.) Moreover, the utility of "foreseeability" and "preventability" determinations are highly dubious, the analyses are not consistent with current community standards and practices, and the determinations divert attention from systemic improvements that would further enhance suicide prevention efforts and

---

[1] On February 1, 2021, CDCR published its 2017-2019 Aggregate Suicide Report on its public website. CDCR's 2017-2019 Aggregate Suicide Report can be accessed on its public website at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 2/26/2021.)

[2] CDCR conducts individualized suicide reviews in accordance with its Program Guide. (*See* ECF No. 58641 at 190-91.) CDCR's individualized reports are heavily relied upon by the Special Master's experts when drafting their own reports, including providing case summaries and forming foreseeable and preventable conclusions. (*See* Special Master's Expert's Report on 2019 Suicides, ECF No. 7239.)

Special Master Lopes
Page 2

patient safety. (ECF No. 7098, at 5-6.) As discussed in Section X, the field of mortality review has largely shifted away from the narrow foreseeability and preventability determinations to a more holistic approach focused on quality improvement. (*Id*.) The Special Master's addition of an outmoded "foreseeability" and "preventability" analysis does not enhance or improve CDCR's suicide review process, nor does it warrant the production of an entirely separate report. CDCR is hopeful that this matter can be resolved during the upcoming court-ordered settlement conference so that CDCR can begin to submit annual suicide reports with the court.

Furthermore, the Special Master's Expert's Report duplicates the data and feedback already found in CDCR's own transparent reporting. CDCR's own reports, as well as CDCR's comprehensive annual suicide prevention reports to the Legislature pursuant to California Penal Code section 2064.1, provide the necessary feedback and information that will enable CDCR to fully and fairly evaluate suicides that occur within its institutions and help reduce the number of future suicides. The 2020 Report duplicates data regarding suicide trends and policy violations, and unlike CDCR, the Special Master's experts are not in a position to implement and measure the effectiveness of any Corrective Action Plans or policy revisions.

CDCR provides the following additional detailed comments and objections.

## I.    Errors With the Expert's Summarized Findings. (2020 Report at pages 1-4)

### A.    Inaccurate Calculation of 2020 Death Rate and Population.

The expert's first finding is that CDCR's suicide rate in 2020 was 27.4 deaths per 100,000. (2020 Report, at 1.) Consistent with previous reports by the Special Master, the expert calculated the rate using CDCR's population as of June 30, 2020. However, the expert incorrectly reported that CDCR's population was 113,292 incarcerated individuals. (*Id*. at 1 fn.2.) CDCR's actual population on that date was 113,403,[3] which would calculate a rate of 27.3 deaths per 100,000. Defendants request the expert to correct the rates and populations stated throughout the report.

### B.    Failure to Account for the Additional Day in a Leap Year.

In the expert's second finding, the expert states a suicide occurred every 11.7 days in 2020. Specifically, the expert calculated the deaths per day "by taking 365 days and dividing by the number of deaths by suicide." (*Id*. at 1 fn.3.) However, 2020 was a leap year. Defendants request that the calculation be made by taking 366 and dividing it by the number of suicides in 2020.

### C.    Inaccurate Rate of Death by Suicide for Male Incarcerated Individuals in 2020.

The expert's sixth finding inaccurately states that the rate of death by suicide for male incarcerated individuals was 33.7 per 100,000. (*Id*. at 2.) In 2020, CDCR's male population as of June 30, 2020 was 108,393,[4] which calculates a male suicide rate of 28.5 deaths per 100,000.

---

[3] CDCR's incarcerated male population in 2020 can be found in the "Total Population Report Monthly for Month Ending June 30, 2020" which can accessed on its public website at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/07/Tpop1d2006.pdf (last accessed 8/31/2021.)

[4] *Id*.

Defendants request the expert to correct the rate, or in alternative to provide the source and methodology for her finding of 33.7 deaths per 100,000.

This same finding is also confusing as the expert first gives the rate of death by suicide for CDCR's male population, but then states in the next sentence "[t]his is an increase over the rate of 30.9 deaths per 100,000 *incarcerated individuals* in 2019." (*Id.*, emphasis added) Defendants assume the expert meant incarcerated *male* individuals in 2019 rather than CDCR's total population of *incarcerated individuals*. Defendants request that the expert clarify this finding.

      D.     The Expert Should Clarify the 21st Finding regarding PIP Patients.

The expert's 21st finding states that there were three patients receiving services at the Psychiatric Inpatient Program (PIP) level of care and that one of those patients was "residing in Enhanced Outpatient Program (EOP) housing." (*Id.* at 3 fn.5.) This finding is confusing. While the patient may have been referred to a PIP level of care, the patient was not yet admitted to that program and thus was not "receiving services at the PIP [] level of care." This finding should be clarified to reflect that only two patients committed suicide while receiving services in a PIP.

      E.     The Number of Concerns Related to COVID-19 According to the Suicide Case Reviews Was Six.

The expert's 32nd finding states that "[i]n seven cases[] concerns related to COVID-19 appeared to likely contribute[] to the individuals' decision to die by suicide *according to the [Suicide Case Reviews (SCR)]*." (*Id.*, emphasis added.) The Statewide Mental Health Program (SMHP) only identified six cases where COVID-19 factors were identified as significant. The six SCRs also discussed that those COVID-19 factors were not always directly correlated to the suicide. Additionally, the author of one of the six cases (Case I) speculated that COVID-19 was a factor but there was insufficient evidence to support the theory. Defendants request the report be modified to reflect only five cases had a COVID-19 concerns.

## II.     The Expert's Use of CDCR's Population from December 31, 2020 Artificially Raises the Rate of Deaths By Suicides and Is Misleading. (2020 Report at page 5)

On page 5 of the 2020 Report, the expert states:

> Of note, over half of the deaths by suicide in 2020 occurred in the latter part of the year. Specifically, 17 individuals (54.8 percent) died by suicide after June 30, 2020. The CDCR population was reduced to 95,432 by December 31, 2020. If that population value were used to calculate the suicide rate for the year, the rate would have been 32.5 deaths per 100,000 incarcerated individuals.

(*Id.* at 5.) Rates of death by suicide have always been calculated by using the mid-year population, as the expert does elsewhere in the 2020 Report. Using year-end population to calculate the deaths by suicide rate is misleading. As the expert notes, the population dropped from approximately 113,000 to 95,000 in the last six months of 2020. Yet the expert uses that year-end population to calculate the suicide rate for all suicides, including those that occurred in the first half of 2020

when the population exceeded 113,000.  If such misleading statistics will remain the report, the report should also include the following equally true statistic:

> Of note, nearly half the deaths by suicide in 2020 occurred in the first half of the year.  Specifically, 14 individuals (45 percent) died by suicide *before* June 30, 2020.  The CDCR population was 123,977[5] on January 1, 2020.  If that population value were used to calculate the suicide rate for the year, the rate would have been 25.0 deaths per 100,000 incarcerated individuals.

Defendants object to the expert's use of year-end population in order to inappropriately inflate the rate of deaths by suicide.  The reference should be struck.

## III.  Inappropriate Assumptions Regarding Inmates Housed Specifically to Address Personal Safety Concerns. (2020 Report at page 18)

In section III(C)(5), "Housing Based on Safety Needs," the expert states that in addition to twelve inmates who were living on a Special Needs Yard or were in segregation for safety concerns, three other EOP patients "requested SNY status but were placed at Non-Designated Programming Facilities (NDPF) in lieu of SNY placement." (*Id*. at 18.)  The expert goes on to opine that, by adding these three patients to the other twelve, "48.4 percent…were residing in housing locations to address their safety concerns at the time of their suicide." (*Id*.)

First, the expert reads too much into the SNY designation.  SNY placement does not necessarily mean that the inmate had "safety concerns at the time of their suicide." Before making such a claim, the expert should verify that the eight SNY decedents had active safety concerns at the time of their death.  Otherwise, this statement is misleading and should be struck.

Second, with respect to the three EOP patients on NDPFs, *all* EOP patients are placed on NDPFs and have been for years.  EOP patients are not housed on SNYs.  EOP patients are placed on EOP yards for their primary health care needs and thus program with all types of patients – those who had previously been classified as SNY and those previously classified as General Population.  Thus, bundling these three patients in with the other twelve SNY or safety concern inmates is inappropriate and misleading.

## IV.  The Lack of Comparable Data Regarding Number of Times a Decedent Transferred Before Death by Suicide Provides Meaningless Findings.  (2020 Report at pages 19-20)

The expert found that decedents transferred an average of 1.8 times per year in 2020, 1.4 times per year in 2019 and 2018, 1.5 times per year in 2017, and 2.2 times per year in 2016.  However, there is no significant differences in the rates of transfers between individuals who died by suicide and CDCR's population as a whole.  Thus, the finding lacks meaning or it must be

---

[5] https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/01/Tpop1d200101.pdf (Last accessed September 8, 2021.)

caveated by including a statement that these rates are no different from CDCR's population as a whole.[6]

## V.     Findings Regarding "Trauma History" Lack Comparable Data, Imply that CDCR Provides Inadequate Treatment to Individuals Positive for History of Trauma, and Inappropriately Draws A Nexus Between Trauma History and Safety Concerns. (2020 Report at pages 23-24)

In Section III(D)(8), "Trauma History", the Special Master's expert found that "23 individuals, or 74.2 percent of the 31 individuals who died by suicide in 2020, had histories positive for trauma." (2020 Report, at 23.)  "Trauma" is not defined in the report.  The 2020 Report lacks comparable data between those who died by suicide and CDCR's total population.  "Trauma is almost ubiquitous among a male prison population, with rates of exposure to violence or traumatic events being reported as anywhere between about 62% to 100%."  (Dr. Liji Thomas, Prisoner Post Traumatic Stress (2019), https://www.news-medical.net/health/Prisoner-Post-Traumatic-Stress.aspx, last accessed September 2, 2021.)  In order for data on rates of trauma in suicide victims to be meaningful, Defendants request that the Special Master provide data comparing the suicide population to that of CDCR's total population.

Lastly, the Special Master's expert draws a tenuous nexus between individuals with a trauma history and individuals "who were housed in locations for their safety."  (*Id*. at 24.)[7]  The expert attempts to link trauma and safety concerns because the percentages of those who died by suicide are similar.  (*Id*.)[8]  However, both populations involve complex combinations of psychological, social, environmental, and physical factors alone.  Similar percentages between two separate factors that vary widely, and are both made up of numerous variables, does not automatically conclude a correlation.  Defendants request that the expert strike the attempt to correlate trauma with safety concerns.  Overall, Defendants object to the "Trauma History" section and any findings or conclusions pertaining to the section as lacking foundation, irrelevant, and misleading.  The Special Master should strike the section completely.

## VI.    Criteria Regarding Determinations of Inadequate Suicide Risk Evaluations, Mental Health Assessments, Treatment Planning, Treatment Services, and Higher Level of Care Needs are Unclear and Subjective.  (2020 Report at pages 24-26)

---

[6] Defendants had previous submitted their objection to the Special Master's expert's 2018 Report for failing to provide comparable data between the population of individuals who died by suicide with CDCR's total population to provide the necessary data to make such determinations and findings meaningful.  (Defendant's Objection Letter to the 2018 Special Master's Expert's Suicide Report, ECF No. 7161, at 17-18.)  The Special Master modified the 2018 Report by including a footnote with the following caveat: "percentages among those who died by suicide do not account for changes in base rates among the CDCR population."  (The Special Master's Expert's 2018 Suicide Report, ECF No. 7161-1, at 8 fn.10); (*see also* The Special Master's Report on his Expert's 2018 Suicide Report, ECF No. 7161, at 6 fn.8.)  The Special Master's caveat, which is also found in the 2020 Report, does not obviate the need for such comparable data in order to make any meaningful and informed determinations.

[7] The expert states that ten of the twenty-three inmates were housed in locations for safety reasons. As stated in Section III, the expert over counts the number of suicide deaths who were housed in locations for their safety.  The figure in this section may also over count the true population.

[8] At page 24 the expert states that 41.9 percent of patients who died by suicide had safety concerns.  Yet at page 18, that figure is 48.4 percent.  The Report should be clarified.

The expert's determinations made in the "Suicide Risk Evaluation," (*id*. at 24), "Mental Health Assessments" (*id*. at 25), and "Higher Level of Care Needs" (*id*.) sections of the report are subjective and the criteria the expert uses to make these determinations is unknown.

- In the "Suicide Risk Evaluation" section, the Special Master's expert identified 20 cases when a clinician failed to identify or document known risk factors during a suicide risk evaluation, and 18 cases when the suicide risk level determination was inaccurate. (*Id*. at 24.) This is contrary to the SMHP's finding of seven cases that identified issues pertaining to suicide risk evaluations, and 11 cases pertaining to inaccurate suicide risk level determinations.
- In the "Mental Health Assessment" (MHA) section, the expert found three cases with concerns related to the completion of the MHA process, whereas the SMHP found only one case. (*Id*. at 25.)
- In the "Higher Level of Care Needs" section, the expert found deficiencies in 15 cases, whereas the SMHP identified only eight cases with deficiencies. (*Id*. at 26.)

The SMHP makes determinations based on the requirements outlined in the Program Guide, CDCR's statewide policies, and SCR procedures. But the Special Master's expert does not identify the criteria used in making determinations throughout the report and her determinations do not seem to be rooted in CDCR's policies and procedures, but rather the expert's own clinical opinion. Given that CDCR's Program Guide has been found to be the remedy in this action to cure alleged constitutional deficiencies, the expert must use those policies in reviewing the care received by patients who died by suicide.

Annual suicide reports should be based on objective findings through document review and interviews with percipient witnesses, rather than on subjective clinical opinion based solely on an independent document review by the expert. The Special Master's experts who attend each individual SCR also had the opportunity to point out additional deficiencies in patient care, but did not. Defendants object to the determinations, findings, conclusions, and recommendations related to the aforementioned sections of the 2020 Report, and request the relevant sections to be struck from the report, or in the alternative, for the Special Master to provide the criteria used in making those determinations .

## VII.   Defendants Object to the Expert's Critique of Individual Suicide Case Reviews. (2020 Report at page 28-29)

CDCR's Individual Suicide Case Reviews are discussed in Section III(G). (*Id*. at 28.) All thirty-one cases were determined to be adequate, although some (Cases Q and R) were marginally so. (Id. at 29, Appendix A at 84, 88[9].) The term "marginally adequate" is vague, ambiguous, and contrary to the expert's own finding that all SCR reports are adequate. Defendants request the Special Master to clarify the discrepancy in the expert's report.

Appendix A to the 2020 Report includes case reviews of each suicide. The case reviews also include critiques of CDCR's individual suicide case reports. These critiques were raised for the first time in the 2020 Report, despite the fact that, since 2015, members of the Special Master's

---

[9] References to page numbers are to page numbers found at the bottom of Appendix A.

team have attended nearly every SCR conference and have been provided with draft reports in advance of each case conference.  Those experts have the ability to provide edits and feedback to the document, and participate during the teleconference.[10]  Yet the 2020 Report, written by some of the Special Master's experts who attended most of the 2020 SCR conferences, criticizes aspects of that same SCR process for the first time.  The Appendix to the 2020 Report identifies opportunities for improvement with several suicide reports.  CDCR continues to object to this inconsistent and costly monitoring.  CDCR addresses the expert's concerns with individual suicide reports in Attachment A to this letter.

## VIII.    Quality Improvement Plan Content and Analyses, Comments and Objections.  (2020 Report at pages 29-31)

A.    "Newly Identified Common Issues" That Are Not Common.

On page 30, the expert reported that there "were common problems identified that had not been common problems in the previous four years."  The expert lists twelve "newly identified common issues."  Defendants object to the term "common problems" or "common issues" as the data shows these problems are not common at all.  Seven of the twelve "newly identified common issues" occurred in only two cases.  Three others occurred in only three cases.  One occurred in four cases and the last occurred in five.  While some of these "issues" may not have been identified in cases in prior years, these new issues are hardly common.

B.    Quality Improvement Plans Requiring Staff Training.

First on page 30, the expert states it "was not possible to determine from the responses submitted [to Quality Improvement Plans (QIP)] whether all required staff actually received the training."  (*Id*.)  The QIPs issued by the SMHP requiring staff training directs the Chief Executive Officer (CEO) or Chief of Mental Health (CMH) to submit records to indicate that *all* necessary staff have completed the required training.  The proof of practice is a signed memorandum by the CEO or CMH.  The QIP responses reviewed by the expert included such signed proofs of practice.

Second, the expert notes that the QIPs were missing follow-up information "to ensure that training and mentoring had the desired effect and was sustainable over time."  (*Id*.)  The expert concluded that "[t]he QIP process would be greatly enhanced by the inclusion of an expectation that the efficacy of plans be measured over time."  (*Id*. at 34.)  This information is now being tracked and monitored by the Suicide Prevention and Response Focused Improvement Team's (SPRFIT) Coordinator Specialist in each Mental Health Region to ensure the training and mentoring is effective and sustainable over time.

C.    QIPs Submitted to the Office of Internal Affairs.

The expert states that "a total of six QIPs[] could not be developed nor implemented secondary to investigation requests being submitted to the Office of Internal Affairs [(OIA)]."  (*Id*.)

---

[10] "The Special Master's experts are participants in the [Suicide Case Review Committee]," and the experts "provide immediate feedback during discussions of each case."  (2020 Report, at 28-29.)

Special Master Lopes
Page 8

The Report states, "[a]lthough the [Suicide Prevention and Response Unit (SPRU)] at headquarters tries to periodically follow up with facilities to receive the subsequent [OIA] memorandum regarding completed investigations, to date, these efforts have not been successful, and Wardens have not been submitting the findings to either the SPRU or headquarters [Division of Adult Institutions (DAI)]."

The expert's finding is confusing. A referral to OIA is a "developed" QIP. It appears the concern is that there is not always proof of practice showing the resolution of the OIA process in the suicide case review QIP folders. The SMHP continues to work with DAI and the institutions to obtain the memos that close out the QIP.

## IX.    Determinations of "Foreseeability" and "Preventability" in the Manner Presented in the Report Are Counterproductive in a Mortality Review Context and Hinder Quality Improvement Effort. (2020 Report at pages 31-33)

The Special Master's Expert's Report states the "foreseeability" and "preventability" analyses can "describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgement, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides." (2020 Report at 31.) The Special Master's assumption that the foreseeability and preventability analyses can "reduce the likelihood of completed suicides" lacks factual support, is an outdated manner of conducting mortality reviews, and grossly ignores the evidence of community standards to the contrary.[11]

As previously stated, many experts question the utility of foreseeability and preventability determinations in a mortality review context. Among other things, foreseeability[12] and preventability determinations in the manner requested by the Special Master often result in arbitrary, methodologically unreliable labels, and also do not adequately acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[13] Ultimately, such narrow foreseeability and preventability determinations frequently divert attention from opportunities for improvement that will lead to system-wide quality improvement and patient safety.

That is why the field of mortality reviews itself has largely shifted away from narrow foreseeability and preventability determinations to a more holistic approach that focuses on opportunities for improvement.[14] Under the modern view, a well-performing mortality review system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical education responses (immediate change) or initiatives (longer term) that are

---

[11] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, 3-4. https://cchcs.ca.gov/wpcontent/ uploads/sites/60/UCSF/Mortality-Review-Report.pdf

[12] The specific term "foreseeability" is not addressed in Dr. Brie Williams's Final Report. However, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement.

[13] *Id.* at 4.

[14] *Id.* at 14-15 (recommending that performance be tracked without relying on subjective and often variable assessments of "preventability" to emphasize quality improvement via identification of opportunities for improvement).

then evaluated to determine whether they yielded improvements along relevant clinical benchmarks."[15]  This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death.[16]  Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like "foreseeable" and "preventable" and towards assessments that focus on opportunities for improvement.[17]  At the same time, such assessments should include staff level remediation, including training and accountability measures where appropriate.

CDCR objects to section III, *I*. "Foreseeability and Preventability" (2020 Report at 31-33), and findings drawn from the analyses (*id*. at 4).  Defendants request the Special Master to strike the section from the 2020 Report.

## X. The Expert's Foreseeable and Preventable Analyses are Subjective, Outmoded, and Lack Any Causal Relation Between Mental Health Care Provided and Suicide.

The Special Master's expert's determinations of foreseeable and preventable analyses are scattered throughout 2020 Report's Appendix A.  The determinations are highly subjective, speculative, and, in some cases, lack a nexus between the intervention that should have been taken and the suicide.  The expert's analyses often rely on little more than speculation, further undermining the utility of the foreseeable and preventable analyses.  In fact, in some cases, the expert even qualifies the already muddy definitions by opining that the cases were "likely" foreseeable (*see* Case H, at Appendix A page 40; and Case J, at Appendix A page 50) or "*may* have been prevented." (*See* Case H, at Appendix A page 40, emphasis added.)

For instance, the Special Master's expert speculates that Case A's death by suicide was preventable "as there were multiple intervention opportunities that *may* have prevented this individual's suicide." (Appendix A, at 4, emphasis added.)  In Case B, the expert speculates the death by suicide was preventable because "it was unclear if prior records had been reviewed sufficiently prior to the evaluation to identify the individual's pattern of physical complaints and deteriorating mental status.  *Had* additional data been reviewed[] the individual *may* have been referred for inclusion in the [Mental Health Services Delivery System (MHSDS)], assessed via suicide risk assessment, or referred to the MHCB." (*Id*. at 10, emphasis added.)  In Case C the death by suicide "*may*" had been prevented had clinicians "accurately assessed for suicide risk," despite Case C's constant "deni[al] of safety concerns." (*Id*. at 16, emphasis added.)  In Case H, an inmate who had not been in the MHSDS for over two years, the expert deemed the death by suicide as preventable had an "IDTT consultation [reviewed] MHSDS inclusion criteria" after a clinician assessed that Case H did not meet the criteria for inclusion. (*Id*. at 40.)  The expert's speculation of preventability relies on non-existing policies – IDTTs for inmates not part of the MHSDS.  Case Q was speculated to be preventable because the expert found "[p]roblems with risk assessment in the month before his suicide," and that "escalation of behaviors was not taken into

---

[15] *Id*. at 5.
[16] *Id*. at 4.
[17] *Id*.

consideration in the determination of suicide risk." (*Id.* at 84.)  The expert's speculation in Case Q fails to draw any nexus between the identified problems with Case Q's death by suicide.

Some of the expert's determinations fail to consider the balance of COVID-19 transfer restrictions and safety precaution policies implemented to prevent further introduction, spread, and deaths of the highly communicable virus in CDCR institutions.  For instance, the expert determined that Case G's death was preventable had clinicians assessed Case G as meeting the emergency transfer criteria for transfer to the inpatient LOC, and that had Case G met the criteria, "nursing rounds *would have likely* caught the self-harm incident." (Appendix A, at 33, emphasis added.)  Nothing in the 2020 Report suggests that Case G would have qualified for the COVID-19 emergency transfer criteria or that clinicians assessed him incorrectly.  In Case EE the expert also determined the death by suicide was preventable partially because Case EE "had been referred for an acute inpatient placement but was reduced to an ICF placement after a long delay in transfer due to the COVID-19 pandemic." (*Id.* at 163.)  No COVID-19 policy reduced patients' referrals from acute to ICF.  And both acute and ICF levels of care offer twenty-four hour nursing care.  It is unclear how a clinically backed decision to change Case EE's level of care from acute to ICF is a policy violation, let alone one that caused his death.

Defendants also request that the Special Master correct the foreseeable determination for Case T in the table on page 32 in the 2020 Report.  The table reflects that Case T was foreseeable which is contrary to the expert's determination made on page 93 in the Case Summaries.

Defendants object to the foreseeable and preventable determinations because they are speculative, subjective, and the lack of nexus between an action not taken with the death by suicide. Defendants request the Special Master to strike all analyses and determinations of foreseeable and preventable.

## XI.   Recommendations.  (2020 Report at page 33)

On page 33 of the 2020 Report, the Special Master's expert provides two recommendations.  The first recommendation made is to revise the suicide risk assessment instrument and process.  CDCR has already identified issues with the suicide risk assessment and has tried many modifications to improve the assessments.  CDCR continues to improve the instrument and process and is already coordinating with the Special Master's suicide prevention expert, Lindsay Hayes.  Defendants request that the Special Master strike this recommendation or in the alternative clarify that CDCR is already undertaking this recommendation with input and guidance of the Special Master's team.

## XII.   Objections and Comments to the Expert's Conclusions. (2020 Report at pages 33-35)

### A.   Safety Planning.

The expert concluded "[f]indings in 2020 revealed an increase over prior years with respect to the percentage of individuals with histories of inpatient placements in the year prior to their deaths, inpatient levels of care in the week prior to death by suicide, and deaths by suicide among those receiving inpatient level of care services." (*Id.* at 34.)  The expert recommended to "review [the] care provided to patients recently discharged from inpatient settings and [to form] improved

safety planning for these individuals." (*Id.*)  CDCR is already in the process of implementing corrective measures.  Specifically, DAI and SMHP has issued two joint memos regarding the matter, and the SMHP developed the Suicide Risk Management Program that targets these patients for more treatment upon discharge from an inpatient setting.

B.    Personal Safety.

The expert concludes that "[s]ince 2017, issues related to personal safety have been significant enough to warrant specialized housing for nearly 40 percent of more of those who died by suicide." (*Id.*)  The expert concludes "that issues related to personal safety may warrant consideration in the formulation of risk for suicide." (*Id.*)  CDCR has already undertaken efforts to address safety concern issues.  Specifically, the SMHP's Inpatient Referral Unit formed a Suicide Prevention Workgroup,[18] which have implemented intervention to address safety concerns.  Additionally, the SMHP is currently developing a new safety plan formulation with a specific section to focus on safety concerns.[19]  CDCR is currently implementing measures to better address individual's safety concerns.

C.    Substance Use.

The expert concluded "[d]eaths by suicide indicate that significant substance use and substance dependence were present in the histories of the vast majority of individuals who died by suicide in CDCR." (*Id.*)  The expert recommended that CDCR consider "including substance use as a risk factor for suicide as well as a target for treatment appears indicated." (*Id.*)  As the Special Master's expert may already know, substance use is already a risk factor in the current SRASHE and has been a factor for years.  Additionally, CDCR has developed and implemented the Integrated Substance Use Disorder Treatment program which manages substance use disorder treatment for incarcerated individuals.  Defendants object to the recommendation as stale and requests the Special Master to strike the recommendation from the report.

D.    QIP Process

The expert states that the "QIP process would be greatly enhanced by the inclusion of an expectation that the efficacy of plans be measured over time." (*Id.*)  As stated above, his information is now being tracked and monitored by the SPRFIT's Coordinator Specialist in each Mental Health Region to ensure the training and mentoring is effective and sustainable over time.

The expert also concluded that "[r]esults from OIA investigations are not provided to the SPRU and DAI [which] impact[s] the development of adequate corrective actions required to reduce suicides within the CDCR." (*Id.* at 35.)  However, this does not "impact the development of adequate corrective actions" as the expert opines.  The QIP recommending the hiring authority pursue an OIA investigation is the appropriate corrective action in these circumstances.

---

[18] The Special Master's team has participated in this workgroup since 2019.
[19] The SMHP is developing the new safety plans in consultation with the Special Master's team.

Special Master Lopes
Page 12


Thank you for your consideration of these objections and comments prior to finalizing this report.


Sincerely,


**/s/ Dillon Hockerson**

DILLON HOCKERSON
Attorney
Office of Legal Affairs

Attachment re Case Summaries

Cases Noted as "Opportunities for Improvement"

## I.    Case H

- Case H was an inmate who had not been in the Mental Health Services Delivery System (MHSDS) for over two years at the time of his death.  Appendix A misstates policy when stating "there was no [Interdisciplinary Treatment Team (IDTT)] consultation to review MHSDS inclusion criteria," after an assessing clinician determined Case H did not meet the criteria for inclusion in the MHSDS.  (2020 Report Appendix A, at 40.)  CDCR's policy does not require consultation with an IDTT if an assessing clinician determined an individual did not meet the criteria for inclusion into the MHSDS.
- The expert noted that there was an opportunity for improvement by issuing a QIP at the staff member involved in removing the individual's ligature.  (*Id.*)  However, a QIP was developed in order to investigate the matter.

## II.    Case I

- The expert critiques the SCR for failing to issue a QIP in response to responding staff's further delay in providing life-saving measures because of "the time taken to secure the individual in restraints."  (*Id*. at 44.)  A QIP was not issued because it is policy to apply restraints when responding to an emergency for an inmate on MAX custody, such as Case I, a necessary step to ensure staff safety.

## III.    Case K

- The expert noted an opportunity for improvement because "the Special Master's expert found that suicide prevention safety plans were not reviewed."  (*Id*. at 58.)  However, the SCR recommended appropriate QIPs to address problems regarding Case K's care.  The author of the SCR noted safety planning was included as part of treatment planning throughout Case K's inpatient placement, and found that the last Suicide Risk Assessment and Self Harm Evaluation (SRASHE) included an adequate Safety Plan Intervention (SPI).

## IV.    Case Q.

- The expert opined the report was deficient because it lacked a "discussion and critical analysis of mental health history."  (*Id*. at 84.)  However, the report discussed Case Q's mental health history starting at age 12.  And the reviewer provided a summary which detailed Case Q's symptoms, functioning, and treatment planning on a monthly basis.
- The expert noted a lack of discussion regarding the appropriateness of Case Q's placement in the Correctional Clinical Case Management System (CCCMS), (*Id*.)  The report discussed inclusion in the CCCMS as QIP number two.
- The expert noted a lack of discussion regarding "the lack of additional interventions (e.g. increased contact, Dialectical Behavior Therapy Skills [DBT]."  The lack of additional

interventions is not within the scope of the SCR.  It is not the SCR reviewer's position to determine what treatment should have been provided unless the lack of treatment was a violation of policy.  DBT would have been inappropriate considering Case Q's setting.

- The expert stated there was a lack of discussion regarding "the impact of prolonged segregation, group treatment and out-of-cell program participation."  (*Id*.)  The SCR report discussed how treatment materials were provided and documented Case Q's refusals to participate due to his guardedness, pending court case, and problems with other inmates.  The SCR reviewers avoid speculating on further "impacts" of a factor if there is no evidence to support a finding.

- The expert subjectively determined there was minimal discussion regarding "non-referral documentation," lack of critical assessment of the rationale, and failure to identify treatment modifications.  (*Id*.)  The SCR reviewer did review SRASHES, SPI, Treatment Plans, Consultation Notes, and Progress Notes in depth, and a QIP was issued for incomplete SRASHEs.

- The expert notes that the SCR "failed to discuss intervention specific to restricted housing, such as the morning check-in meeting, Custody and Mental Health Partnership Plan [(CMHPP)], and psychiatric technician notes."  (*Id*. at 85.)  Suicide Case Reviews are not program monitoring reports.  They do not report on the overall operation of mental health programs where an inmate is housed.  Defendants object to the similar comments made throughout the Case Summaries.

- The expert notes the SCR did not speculate the possible reasons why Case Q had recanted suicide ideations.  (*Id*.)  Such speculation is not within the purview of the SCR because the reports are based on objective findings.

- The expert states the SCR did not adequately address "the high numbers of transfers" Case Q experienced in three years.  (*Id*.)  There is no correlation between the number of transfers an individual experiences with higher risk for an individual to die by suicide.  Nor is there a policy on the adequate number of transfers a patient should experience, especially one that has had "11 MHCB placements" and "24 level of care changes."

- The expert critiqued the SCR because it "did not discuss the impact of terms such as 'impression management' and 'malingering.'"  (*Id*.)  The expert's statement is false as the first QIP addresses this area of concern.  (Case Q's FINAL Suicide Report, at 24, 26.)

## V.    Case R

- The expert notes that the SCR for Case R was "marginally adequate" because it failed to consider the "prolonged isolation due to COVID-19 and STRH placement."  (*Id*. at 88.)  However, there was no evidence that isolation played a significant role affecting Case R's mental health.  Case R presented as stable and often denied mental health concerns and symptoms.  The SCR report is based on evidence found in the documentation and interviews with percipient witnesses.  A QIP was issued to address the lack of treatment in STRH.

- The expert criticized the SCR for failing to issue a QIP because the psychiatrist believed Case R's anxiety stemmed from a disturbed thought process.  Case R was prescribed medication to address his anxiety after his initial psychiatry assessment on November 19, 2020.  Meanwhile

the Primary Clinician believed the anxiety was secondary to a language barrier and dislike of crowds.  It is unclear what type of QIP is appropriate for these differences in professional opinion.

- The expert states a QIP should have been issued to address the untimeliness of Case R's initial evaluation and assessment.  (*Id.*, at 89.)  The delay was due to COVID-19 quarantine measures in effect in Case R's housing unit.  The reason for the delay does not necessitate the need for a QIP.  Furthermore, CDCR stymied any negative impact from the delay by conducting a check-in prior to the initial evaluation.
- The expert states that a review of the health record did not substantiate the SCR report's statement that attributed non-confidential appointments and poor group attendance to the inmate's fear of COVID-19.  However, multiple progress notes throughout October 2020 documented Case R's refusal to leave his cell to "avoid contracting the COVID-19 virus." (Case R's Primary Clinician Progress Note, October 30, 2020, at 12:15 PDT.)
- The expert criticized the report for failing "to discuss interventions meant to mitigate risk in restricted housing, such as the morning check-in meeting, [CMHPP] huddles, and psychiatric technician contacts."  (Appendix A, at 89.)  Suicide Case Reviews are not program monitoring reports.  They do not report on the overall operation of mental health programs were an inmate is housed.

## VI. Case Y.

- In response to concerns that the Primary Clinician noted "passive" thoughts of suicide, the expert opined that the SCR report should have included "a QIP to involve training for staff on ambivalence surrounding suicide and the fact that suicidal ideation, even when fleeting, 'passive,' or intermittent, still indicates that the individual is thinking about suicide."  (*Id.* at 134.)  The expert also notes this is "another opportunity for staff training on the assessment of suicide risk" due to "the lack of understanding of the link between anxiety, restlessness, agitation, and suicide."  (*Id.*)  However, Case Y's constant reports of suicidal ideation formed the basis for his treatment and that fact is reflected in the SCR.  Case Y's constant reporting of suicidal ideation was the basis for forming treatment goals to target Case Y's anxiety symptoms, and the treatment team's decision to retain Case Y at the EOP LOC.  Additionally, QIPs were issued in response to inadequate SRASHES and Master Treatment Plans.  Any additional QIPs were unnecessary.

Objections to Other Appendix A Case Summaries

## I. Case C.

- The Special Master's expert notes that the "SCR did not address whether custody welfare rounds were implemented as a result of the modified program."  (*Id.* at 11.)  Custody welfare checks are not automatically implemented when a unit undergoes modified program.
- The expert critiqued the SCR report for failing to address the impact of restricted programming.  (*Id.* at 16.)  However, the SCR report documented that the modified program actually improved Case C's stress resulting from his safety concerns.

- The expert noted "historical information commonly included in other SCRs was not included in [Case C's] report." (*Id*.) The expert did not elaborate on what specific contents were excluded. The SCR comprehensively covered all known background factors provided in the review materials and reported on the information available.

## II.    Case E.

- The expert criticized the SCR report for lacking consideration regarding Case E's specific cultural perspectives. (*Id*. at 23.) Case E was a unique case due to his rapid deterioration and the lack of time Case E's treatment team would have to consider cultural factors as part of a treatment plan, especially due to Case E's lack of cooperation with his treatment team. The reviewer determined that Case E's suicide was attributed to a combination of peer conflicts, rapid onset of mental health symptoms, a pending criminal charge and Security Housing Unit term, and withdrawal from substances. Case E's treatment team did not have the opportunity to better understand Case E's cultural perspective, thus the SCR determined a QIP was not needed.

## III.    Case J.

- Case J was discharged from the MHSDS in March 2020, approximately two months prior to his death by suicide. The "expert noted that recent treatment plans were not reviewed to ensure IDTTs targeted the individual's suicide risk factors, suicidal thoughts, safety concerns, and noncompliance with medication and treatment." (*Id*. at 50.) Case J's prior treatment plans were discussed and the SMHP determined Case J's former treatment team had adequately diagnosed and treated Case J. Because Case J was not in the MHSDS, there were no "recent treatment plans" to review.
- The expert stated that "a QIP should have been included to address apparent diagnostic clarification issues that resulted in poor care continuity and inadequate treatment planning decisions. (*Id*.) QIP number one did address this issue. (Case J FINAL Suicide Report, at 23.)

## IV.    Case V.

- The expert critiqued the SCR for failing to review Case V's "[Mental Health Crisis Bed (MHCB)] admissions, including dates, circumstance, and length of stay, as part of the SCR." (Appendix A, at 105.) The SCR did note Case V's 2004 MHCB admission but this MHCB admission occurred over fifteen years before Case V's death. No in depth analysis was appropriate.

## V.    Case Z.

- The expert criticized the SCR for not including further consideration and review regarding Case Z's head injury. Specifically the expert reports "the medical death review noted that the head injury 'was not a nexus to the death,'" and that "this head injury was 'outside the reviewable timeframes' related to the suicide." (*Id*. at 142.) The expert's criticism is unclear.

The SCR followed proper procedure by relying on the death review which confirmed the head injury was not a nexus to the death by suicide.

- The expert expresses confusion that the SCR states that no autopsy was available. The SCR was completed on May 5, 2020. But the April 2020 autopsy was not provided to CDCR until November 2020 and thus could not be considered in the report.