**APPENDIX A**

**CASE SUMMARIES**

Case A

I.    Summary of Case

This individual was a 27-year-old Samoan man who was discovered on December 17, 2020, hanging in his single occupied Short-Term Restricted Housing (STRH) cell using a manufactured noose (bedsheet) secured by the cell door.  An extraction team opened the cell door, which broke the ligature free.  The individual was removed from his cell, the noose was removed from his neck, and life-saving measures were initiated.  He was transported to the Trauma and Triage Area (TTA), where life-saving measures were continued.  An outside ambulance arrived at the TTA, and ambulance personnel pronounced the individual as deceased.  He was receiving mental health treatment at the Enhanced Outpatient Program (EOP) level of care at the time of his death.

This individual began his first and only term within California Department of Corrections and Rehabilitation (CDCR) in June 2014, with a 58-year sentence for robbery, assault with a semiautomatic weapon, burglary, and possession of ammunition by a prohibited person.  The convictions were related to gang activity and resulted in two strikes.  While incarcerated, the individual received an additional three-year sentence for possession of an inmate-manufactured weapon.

This individual was born in Los Angeles, California but moved to San Diego in the sixth grade.  The file contained little information about his family, though his parents divorced when he was age five.  He had one older brother, two younger sisters, and four step-siblings.  He remained in contact with his father throughout his incarceration; however, there was little information about his biological mother.  The record indicated that his birth mother drank alcohol frequently throughout the individual's childhood.  He remained in contact with his older brother, who visited him several times and communicated with him by telephone.  A step-sibling had also been incarcerated for robbery.

This individual married one year prior to his incarceration and remained married at the time of his death.  While custody records documented no children, medical records referenced one child.  Custody records contained contradictory information regarding his education, but a General Educational Development (GED) certificate was in his records.  Records also indicated that the individual left school in either the eighth or eleventh grade to work and help support his family.

This individual reported a significant substance abuse history beginning at age 17 with alcohol and marijuana.  He reportedly drank every weekend to the point of "almost" blacking out.  He was also under the influence of alcohol and marijuana at the time of his commitment offense.  Based on the Probation Officer Report (POR), the individual was associated with the Deep Valley Bloods criminal group.  While he had no juvenile criminal history, he was arrested for the first time at age 18 and placed on three years formal probation while assigned to the Gang Supervision Unit.  Custody records indicated that he did well on supervision until the commitment offense, where he held other party-goers at gunpoint while demanding their money, property, and cell phones.

This individual did not receive mental health services in the community as a juvenile or an adult and did not report mental health symptoms when initially incarcerated.  In April 2019, a custody

1

officer submitted a routine referral to mental health, noting that the individual was aggressive, hostile, and had no self-control. The individual was seen several days later, and he was upset over his placement in the Administrative Segregation Unit (ASU). He was not included in the Mental Health Services Delivery System (MHSDS) nor required to be seen for follow-up after that contact. The individual subsequently submitted self-referrals due to problems sleeping, stress related to Sensitive Needs Yard (SNY) adjustment, and paranoia. He was not included in the MHSDS but was given self-help materials at times to address his reported complaints. Mental health staff occasionally conducted welfare checks to follow-up on the materials provided, but it was not until November 13, 2019, following a self-referral, that the individual was placed into the MHSDS at the Correctional Clinical Case Management System (3CMS) level of care for reporting feeling "on edge."

Following a facility transfer in February 2020, the individual was seen for an initial mental health contact and reported anxiety, problems with sleep, racing thoughts, and auditory and visual hallucinations related to adjustment to SNY status. He was frequently seen at the cell front during weekly contacts due to his refusal of confidential contacts. On February 25, 2020, the individual was informed of the death of his grandmother; he reported to mental health initially that he was doing okay. However, several weeks later, he reported to the psychiatrist that he was depressed and anxious. He had been medication non-adherent due to side effects. The individual then reported to his clinician that he was worried about how his family was doing because of Coronavirus Disease 2019 (COVID-19). He continued to attend group treatment, but his participation in individual treatment was erratic, and he disclosed little information.

The individual had active diagnoses of Depressive Disorder, recurrent, moderate; Unspecified Anxiety Disorder; Opioid-induced Depressive Disorder, with moderate or severe use disorder; and Opioid Use disorder, severe. On May 17, 2020, the individual was seen by nursing staff because he reported that he had taken handfuls of pills. Upon return from an outside hospital the following day, he was evaluated for suicidality. While the toxicology report was negative for substances, the individual was admitted to the Mental Health Crisis Bed (MHCB) due to a depressed mood and feeling stressed. During treatment, he denied suicidal ideation, and on May 20, 2020, he was discharged to the 3CMS level of care. The individual was next admitted to the MHCB on July 23, 2020, after reporting to a mental health clinician a desire to overdose on heroin. He reported feeling depressed and mentally unstable and using substances to escape things. He experienced withdrawal symptoms while in the MHCB. On July 24, 2020, he was found with a ripped safety blanket and reported suicidal ideation, resulting in increased safety checks. The individual was medication non-adherent during that time but was discharged from the MHCB on July 27, 2020. Staff did not appear to properly consider referral to a higher level of care despite the individual's lack of insight, treatment nonadherence, and recent suicidal behavior (ripping the safety blanket).

During contacts with mental health staff, the individual repeatedly reported struggling with his sobriety. On October 6, 2020, he was screened for the need for substance use treatment, which resulted in several recommendations, including participating in self-help support groups, a nursing-led substance group, and an intensive outpatient program. A referral was to have been

made to an Addiction Medicine Champion within 14 days, but the appointment was not scheduled. The individual qualified for, but was not referred to, Integrated Substance Use Disorder Treatment (ISUDT); though, he self-referred. He was not provided with ISUDT but was seen more frequently by a mental health clinician to address depression, anxiety, and developing coping skills for substance use. In November 2020, he was seen twice by mental health for suicidality and was admitted to the MHCB following the second evaluation on November 11, 2020. During this admission, the individual informed his psychiatrist that he was coming off heroin and needed a place to "kick" the addiction. The individual also reported dealing with "a lot of shit," including the death of his grandmother and one of his brothers. On November 17, 2020, he was informed that his father had died due to COVID-19 and that his stepmother was in the intensive care unit due to COVID-19. He remained treatment non-adherent while in the MHCB but was discharged to the 3CMS level of care on November 20, 2020, without proper clinical rationale for non-referral to a higher level of care.

The individual was readmitted to the MHCB during the last day of his five-day follow-up secondary to suicidality with a plan to hang himself or overdose. The Suicide Case Review (SCR) noted that the individual was seen by psychiatry on November 25 and 30, 2020, which is in keeping with Program Guide requirements but is not in keeping with customary "business rules" that "govern on-time contacts and due dates." These "business rules" indicate that patients in the MHCB should be seen by a psychiatrist at least every three days. This fact was noted as a concern that did not rise to the level of a Quality Improvement Plan (QIP) because it was consistent with Program Guide timelines. The individual was discharged from the MHCB on November 30, 2020, while reporting significant levels of depression and intermittent suicidality. He reported suicidal ideation on the first of his five-day follow-up contacts but was not readmitted to the MHCB or referred for a higher level of care. He was seen in the TTA on December 6, 2020, due to breathing problems secondary to a buprenorphine/naloxone overdose. He also had superficial cuts on his hand area. He was sent to a community hospital, returned the following day, and was readmitted to the MHCB upon his return. The individual was ultimately discharged on December 14, 2020, to an EOP level of care. The discharge occurred despite the multiple dynamic and situational risk factors, including that his father was buried on the day of discharge, his stepmother had also died, he was experiencing significant impairment, and he had recently received a Rules Violation Report (RVR) for having an inmate-manufactured weapon.

The individual was seen the day before his death by suicide for the second of his five-day follow-up contacts. He had also reportedly been told by nursing staff that he had an appointment for medication-assisted treatment (MAT) for his substance abuse issues, though no date was provided. Finally, while the individual had cooperated with COVID-19 quarantine contacts earlier in the day on December 16, 2020, he refused the contact that evening. Nothing unusual was noted at that time. No suicide note was documented in the SCR.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this death by suicide was foreseeable.  There was extensive information available regarding the individual's substance use and its effect on his suicidality and mental status.  There was also sufficient information regarding his ongoing anxiety, familial concerns, and loss of support, but those concerns were never adequately addressed based on mental health documentation. His substance use, distress, and anxiety were not adequately explored nor treated. Treatment plans were often not fully completed or completed incorrectly. Risk assessments did not adequately address situational risk factors in the determination of risk, and acute risk appeared to have been underestimated at times based on these omissions.  While acute risk was likely more accurately assessed, no appropriate interventions were provided, and the individual was discharged from the MHCB with a "high" acute risk of suicide two days before his completed suicide.  This individual was clearly becoming increasingly unstable, as evidenced by his increasing frequency of MHCB admissions and need for medical care due to an overdose following an MHCB admission.  The individual reported suicidality with a plan to hang himself or overdose.  He had multiple acute risk factors but was discharged to a single cell (though double-cell eligible) in STRH, despite requiring an EOP level of care.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this death was preventable, as there were multiple intervention opportunities that may have prevented this individual's suicide.  He was not accurately assessed diagnostically, was not scheduled for needed substance abuse treatment, and was repeatedly discharged without a clinically appropriate rationale for non-referral to a higher level of care.  Had the mental health staff properly assessed his level of distress and substance use-related risk, they may have been able to assess his suicide risk more accurately.  The individual was repeatedly not referred to a higher level of care despite multiple indications.  Even when discharged to the EOP level of care, he was not placed into an EOP but rather was placed in an STRH.  Further, there was no consideration for referral to inpatient care, though he clearly qualified for such.  Custody staff did not place the individual in an intake cell despite being discharged from the MHCB to STRH following repeated admissions due to suicidality and the most recent admission due to an overdose, one of his stated methods of suicide.  Mental health staff appeared fully aware of the devastation to the individual following the deaths of his father and stepmother, yet no appropriate therapeutic actions were taken as a result of this knowledge.

IV.    Critique of Suicide Case Review Report

The SCR was extensive and adequately completed.  The SCR offered a sufficient assessment of the precipitants to the individual's suicide and summarized relevant social, criminal, incarceration, substance use, and mental health information.  The SCR identified multiple inadequacies in the mental health care provided, custody response, and nursing documentation.  The SCR analyzed the impact of inadequacies in the mental health care on the individual's level of suicide risk and ultimate death by suicide.

V.    Analysis of Quality Improvement Plan Process

This case resulted in eight required QIPs; four regarding mental health issues, one related to custody concerns, and three to address nursing issues.

The first QIP was required to address a mental health concern related to an inadequate and inaccurate risk formulation in a Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) completed in May 2020.  The second mental health QIP was required to address an inadequately supported discharge from the MHCB to a 3CMS level of care in July 2020, given recent suicidal behavior and medication nonadherence.  The third mental health QIP was required to address multiple concerns with the discharge SRASHEs completed in July, November, and December 2020.  The final mental health QIP was required to address multiple concerns related to inadequate discharge treatment planning in November and December 2020.  The QIPs indicated that no staff corrective actions were noted even though three of the QIPs appeared to be related to the documentation of the same staff members.  While the concerns of the SCR were typically supported by the further audits and reviews completed by facility mental health supervisory staff, interventions were limited to additional training and mentoring.  One concern noted in the QIP responses was the decision by one facility to "ensure patients remain in the MHCB for an average of six days or 2 IDTTs" in response to the second concern listed above.  It was not clear to the Special Master's expert how a time-based limitation could effectively mitigate poor clinical decision-making.

The one custody QIP was required to address a delay in the activation of 911.  Custody staff did not note the need for any further action beyond retraining staff.  Of concern, the custody QIP response included a copy of the memorandum sent to staff as the means of providing training, but the sheet submitted to demonstrate evidence of staff training was blank.  This response was not adequate yet was accepted by the Suicide Case Review Committee.

The nursing QIPs were required to address incomplete emergency response documentation, inconsistent staggered suicide precaution documentation, and failure to refer the individual to appropriate substance use treatment in accordance with screening recommendations.  The responses indicated that training was provided to address the first two QIPs, and the third was addressed by describing the process taken by the nursing staff regarding prioritization of referrals;

this appeared to require no corrective action be taken, although this was not explicitly stated in the response. These responses appeared marginally adequate.

Case B

I.    Summary of Case

This individual was a 62-year-old Caucasian man who was discovered hanging from an individual-manufactured noose in his single cell on January 16, 2020. Due to a large amount of blood in the cell, responding staff donned personal protective equipment (PPE) prior to opening the cell door. The autopsy noted that prior to hanging himself with a bedsheet, the individual used a razor blade to make cuts to both inner elbows, the left side of his neck, and near the left side of his pelvis. The individual was not a participant in the MHSDS at the time of his death.

The individual entered the CDCR in May 1993 to serve 25 years to life with parole for first-degree murder. This was his first and only term. He had 11 RVRs throughout his incarceration; five included violence. The individual only had one RVR in the last two years for a fight and was found not guilty. He had denied gang involvement, and other incarcerated individuals indicated that he was well accepted, got along with all races, and avoided prison politics. At the time of his death, the individual's trust account had a zero balance. The last transaction involved the payment of restitution, resulting in "fulfilled" status. Per the SCR, the individual occupied himself with suing the state and had received five settlement judgments valued at over $166,000, though the specifics of the settlement were unknown.

The individual was born in Maine but raised in California by his widowed mother with twin brothers and one sister. He was the youngest child, and his father died before the individual was age eight. The individual's mother never remarried and lived in California until her death. While the individual initially reported no history of childhood abuse, he later reported that his mother had repeatedly taken them to the courthouse, telling them that she just could not care for them and that they would be given up for adoption. The individual reported that he and his siblings cried and pleaded with his mother, who would reportedly leave the courthouse but that the children would return home each time. The individual's mother died in approximately 2000, and his sister died in 2010. He had visits from his mother and his sister prior to their deaths, as well as a brother and a friend. His last contact visit was in October 2019. That visit was either with his brother or the friend. The individual last spoke with his brother by telephone on January 5, 2020, and these calls generally indicated a supportive relationship. However, the tenor of the final calls changed with an increased focus on the pain that the individual was experiencing and statements that included "if I don't make it." Also included were statements that he had made a will and was working to have his brother as Power-of-Attorney. In hindsight, these comments strongly suggest ambivalence about his life and contemplation of suicide. The individual ultimately told his brother not to send him a package and that he had downsized his belongings to make it easier for his brother if anything "happened" to the individual.

The individual graduated high school and attended college, reportedly quitting ten credits short of a bachelor's degree. He worked in Alaska in construction, had a real estate license, and reportedly did side jobs as a courier. The individual first used marijuana at age 18 and reported weekly usage

for two years. He reported that he first used cocaine at age 21, and that use was sporadic. He had experimented with LSD at age 19 on one occasion and indicated that he had tried methamphetamine on two occasions. The individual reported alcohol use several times per week prior to his incarceration. He had no juvenile criminal history, and his adult history included an offense for Driving Under the Influence (DUI) in 1986 and a report of domestic violence from his ex-fiancé in 1992, who subsequently filed a restraining order. His commitment offense involved shooting and killing that ex-fiancé on September 9, 1992. The individual attended two Parole Board hearings. The first resulted in a five-year extension, and the second, held in May 2017, resulted in a seven-year extension. The individual petitioned to advance that hearing, and on October 3, 2017, the Parole Board granted the advance. According to the SCR, the next scheduled hearing was to be held on April 9, 2020.

The individual had undergone a colonoscopy on November 26, 2019, and began complaining of abdominal pain a few days following that procedure. He was reportedly seen approximately 30 times by nursing staff and medical providers between that time and the time of his death. Numerous medications were tried with limited success, and numerous labs and imaging studies were ordered, though results were "unremarkable." The individual was seen by mental health staff as a result of a referral due to confusion and visual hallucinations. The individual stated that he did not want to see mental health again until his medical problems had resolved. He was sent to a community hospital twice in December 2019, though all testing showed no significant findings. In January 2020, the individual reported to medical staff that he believed that the pain he was experiencing was "God's punishment." However, no subsequent mental health referral was initiated at that time. On January 14, 2020, additional medical tests were ordered because the individual's bilirubin was rising while his red blood cell count was dropping. The individual was found deceased early the morning of January 17, 2020.

The SCR did not indicate if the individual had received mental health services in the community as a juvenile or adult. However, upon his arrival to CDCR in 1993, he was determined to require mental health services and was classified as a "Category J" with noted feelings of depression, low energy, and crying spells. In 1996, he was placed at the 3CMS level of care. In 1995, a mental health evaluation indicated that the individual had struggled with depression since age 21 and had experienced suicidal ideation twice: at the death of a friend and when his ex-fiancé broke up with him. Treatment was focused on the auditory hallucinations telling him to kill himself, and improvements were reportedly achieved through medication. The individual was moved to the EOP level of care on December 18, 2005. Apparently, there was a delay in transfer, and the individual was admitted to the MHCB on March 16, 2006. He reportedly stated that he was tired of waiting to transfer and remaining in a dorm setting, so he reported suicidality. Records indicated an increase in psychotic symptoms at that time, with reported chronic back and neck pain along with stomach issues. The individual was transferred to an EOP on July 3, 2006. A reevaluation at that time identified that he was at "medium" risk for suicide and had multiple medical issues, including chronic abdominal pain. Treatment was focused on paranoia, depression, and intermittent suicidality, though records suggested that the individual was at times resistant to treatment and hostile. Records revealed that the individual's mental status seemed to deteriorate as he complained of medical symptoms. There was a brief return to the 3CMS level of care while

in ASU in 2008, but the individual was returned to the EOP level of care. He remained at the EOP level of care until October 2014. He had been admitted to the MHCB in 2006, 2012, and 2013.

The admission to the MHCB in 2012 was considered "prophylactic" and was the result of his initial denial by the Parole Board. The last MHCB admission in 2013 was noted as being "around" his sister's death; however, she was noted to have died in 2010. In 2013, there was an incident between the individual and custody staff, and the individual ultimately covered his cell door window resulting in a cell extraction. The SCR noted that custody staff had reported an extraction was necessary because the individual had last been seen with a noose around his neck. The individual had reportedly denied a suicide attempt and was discharged back to the EOP level of care days later.

The individual had his level of care reduced from EOP to 3CMS on October 28, 2014. The SCR noted that planning had occurred prior to the level of care reduction and that the individual appeared to have agreed with the plan. He showed stability at the 3CMS level of care, as evidenced by decreased depression and "working" on the loss of his sister. Records reflected ongoing medical issues, including chronic pain and problems with his gastrointestinal system. The individual requested discharge from the MHSDS six months prior to his actual discharge, but the treatment team denied his request, preferring a longer period of demonstrated stability. He was discharged from the MHSDS on January 4, 2017. The individual was transferred to another facility on June 14, 2017.

This individual had prior diagnoses of Major Depressive Disorder, recurrent, severe, with psychotic features; Schizophrenia, paranoid type; Polysubstance Dependence; Mood Disorder; Antisocial Personality Disorder; and Narcissistic Personality Disorder. Clearly, while the mental health diagnoses may have changed over time and providers, the common characteristics they featured were symptoms of depression and psychosis. When the individual was discharged from the MHSDS, he had the diagnoses of Mood Disorder, Not Otherwise Specified (NOS) and Polysubstance Dependence, sustained full remission. The individual consistently reported two suicide attempts prior to incarceration, one in which he claimed to have tried to shoot himself in the head and another by carbon monoxide poisoning, which aligned with the breakup and murder of his ex-fiancé.

The individual was referred to mental health due to "confusion/disorientation/withdrawn" and "seeing/hearing/imagining things" on December 23, 2019. The referral also referenced that the individual had reported pain, been to the TTA multiple times in the past few weeks, had been to outside hospitals but cleared, and "does not listen to reason." The individual was seen on December 24, 2019. The individual had been frustrated with having to meet with mental health staff, and it reportedly took several yard calls to get the individual to report to his mental health appointment. He reportedly denied the need for mental health services and simply wanted someone to tell medical to do the things he wanted to be done. The clinician described the individual's thinking as linear with no evidence of psychosis and having denied suicidal ideation.

There was a suicide note documented in the SCR. It was addressed to "whomever reads this" and focused on the pain the individual had been experiencing for "50" days. The note reportedly emphasized his plea for help, feelings of being at the end of his rope, and inability to endure the pain. The individual expressed his frustration with medical staff finding a cause or effective treatment for his pain and feelings of hopelessness. The note indicated that the individual was aware that his case was being referred to a specialist but noted that the decision to commit suicide was an attempt to take matters into his own hands.

The SCR also noted: "the Senior Supervising Psychiatrist expressed concern regarding his perception of certain policies and procedures which may impact patient care. This was expressed as a broad concern, not specified in this suicide case review. Some concerns included a perception regarding perceived mandates to discharge individuals at lower levels of mental health care if they were not on medication and the perceived poor assessment of individuals not included in MHSDS when routine referrals were placed. [The facility] leadership reported that there were multiple discussions aimed at improving assessment of non-MHSDS individuals and plans to improve the screening process at [the facility]. Additionally, there were plans to increase oversight and review of individuals being discharged out of MHSDS."

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this death was not foreseeable. While the individual was frequently seen by medical staff, he had some of these complaints for years. The medical staff was responsive to the individual's concerns, ordering labs and imaging scans, sending him out to the community hospital, and seeing him frequently following the increase in his physical complaints after a colonoscopy in November 2019. In addition, custody staff submitted a referral to mental health due to the individual's behaviors, and the individual was seen timely for that referral.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this case was preventable. Multiple intervention opportunities may have prevented the individual's suicide. The individual had been experiencing an increase in pain and abdominal/gastrointestinal symptoms that were frequently communicated to medical staff/nursing despite no physical cause. While the individual had been referred to mental health once, he later began expressing thoughts to his medical provider that the pain may be God's punishment and feelings of guilt. Nursing staff also noted that the individual had visibly become more depressed and agitated following his November 2019 colonoscopy. A second

referral to mental health may have identified the individual's decompensating mental status. The individual's brother contacted the facility to discuss the individual's care. While the facility leadership had not interpreted the call to reference the individual's mental status, the brother had indicated that he had referenced his brother's prior suicide attempt. A follow-up referral by medical and/or mental health staff would have been appropriate.

When mental health staff did see the individual on December 24, 2019, it was unclear if prior records had been reviewed sufficiently prior to the evaluation to identify the individual's pattern of physical complaints and deteriorating mental status. Had additional data been reviewed and incorporated into the individual's assessment, the individual may have been referred for inclusion in the MHSDS, assessed via a suicide risk assessment, or referred to the MHCB. The individual had received mental health services for approximately 25 of his 27 years of incarceration, yet he had no such support at a time of increasing physical concerns while feeling that those concerns were not being treated to his approval leading to increased feelings of hopelessness. Only custody staff seemed to notice this and take action via a referral to mental health.

IV.    Critique of Suicide Case Review Report

The SCR was extensive and adequately completed. The SCR identified several nursing and mental health concerns and a significant problem with nursing documentation of the emergency response. The SCR analyzed the impact of precipitating factors and those concerns on the individual's ultimate death.

V.    Analysis of Quality Improvement Plan Process

This case resulted in one required QIP for nursing and two concerns not reaching the level of a recommendation (nursing, mental health). The QIP was required to address the nursing documentation surrounding the emergency response as it was noted to be lacking details related to the individual's wounds and hemostasis attempted. No staff corrective actions were noted. Retraining was provided to nursing staff and documented. The QIP process was appropriate in this case.

Case C

I.    Summary of Case

This individual was a 23-year-old Latino male who was discovered kneeling in his general population single cell leaning forward with his hands behind his back and a ligature around his neck on January 4, 2020. Staff immediately entered the cell and cut the noose using the cut-down tool; although, the noose remained around the individual's neck until it was removed in the emergency response vehicle. Staff reported that the noose had been "loose" around the individual's neck. Medical responders noted that they were unable to insert an oral airway because the individual's jaw was "clamped" shut, and upon their arrival at the facility, the individual was described as cold with stiff arms and rigid jaw, likely indicating rigor mortis. While the individual

was housed in a general population cell, it should be noted that his assigned yard had been on modified program since a large-scale incident in 2018. Custody staff described the individual as having lived in relative isolation, possibly similar to a restricted housing unit; however, further details were not provided beyond the following: incarcerated individuals were not allowed telephone calls, had limited interaction with other incarcerated individuals, and were seen by correctional counselors at the cell-front. The SCR did not address whether custody welfare rounds were implemented as a result of the modified program. The individual was receiving mental health treatment at the 3CMS level of care at the time of his death.

The individual was identified as an unreliable historian in the SCR. He was born in southern California to a single mother with five siblings. The individual's father was reportedly incarcerated for much of his childhood. At age six, the individual was removed from his mother's custody due to her substance abuse and was placed into foster care. The individual reported physical and sexual abuse in his childhood. His grandmother formally adopted him at age 14; however, he spent much of his time housed in rehabilitative or juvenile detention facilities.

The individual reported that he had acquired his GED certificate and completed some college courses while in juvenile detention. He also reported that he worked in construction, car maintenance, and demolition; however, the POR noted that his longest period of employment had been for three weeks. The individual reported a significant substance abuse history of sniffing fumes from paint cans beginning at age 11. He began using marijuana and cocaine at age 13 or 14, and he used methamphetamine at age 14. Crystal methamphetamine was reportedly his drug of choice with daily use. The individual reported that he had sought but did not complete substance abuse treatment as an adolescent. He also acknowledged occasional alcohol use.

At the time of his commitment offense, the individual was engaged to a woman 16 years his senior; she had three children. He had no biological children. The fiancée was consistently reported as the individual's next of kin in CDCR documentation. An interview with the fiancée indicated that they had been together for three years and that they were engaged. They at times fought during telephone calls, as the individual imagined that his fiancée was unfaithful. The fiancée described the relationship as tumultuous with frequent break-ups. In fact, the fiancée had written a break-up letter to the individual two weeks prior to his death, which was typical of their volatile relationship; and they may have subsequently reconciled. It should be noted that in 2018, a SRASHE was completed following the individual's receipt of a break-up letter. While the fiancée noted that she had not spoken by telephone to the individual since September 2019, he reportedly had other individuals contact her on his behalf while he was unable to make phone calls due to the "modified program" status. It was likely that the two notes found in his property were examples of his communication with her. Each note included the same telephone number with a message below. One message stated, "Nero says goodbye. He's moved on now! Forever." This was interpreted as a possible suicide note.

The individual had a prior juvenile and adult criminal history, which included in-custody placements as a juvenile and adult probation. The individual began engaging in criminal activity after joining a gang at age 13. He was identified as affiliated with the Southerners or Sureños gang. At age 14, he experienced his first arrest for grand theft of a person and burglary. The individual's criminal activities resulted in multiple community placements for rehabilitative

purposes, but he was ultimately placed in juvenile detention. He violated his probation on multiple occasions by walking away, failing to attend school, possessing and using controlled substances, and committing new crimes. It should be noted that the individual was on at least two separate active adult probation terms when he committed the instant offense.

In November 2016, the individual stole another person's car after the keys had inadvertently been left in the vehicle. The victim pursued the individual in another vehicle and attempted to reach through the windows to grab the keys when the individual punched the victim and accelerated the vehicle with the victim hanging on the side. Resulting charges included second-degree robbery, vehicle theft, evade or attempt to evade a peace officer, possession of ammunition by a prohibited person, and grand theft of a person. While in jail, an additional conviction for destruction of jail property was added after the individual broke a holding cell window causing substantial financial cost. He was incarcerated for the first time as an adult in CDCR during October 2017 to serve six years and four months.

His subsequent institutional adjustment was problematic, as evidenced by 12 RVRs, including two for violence. At least two other RVRs were originally written for violent behavior but were reduced to non-violent offenses, such as delaying or disobeying a peace officer. One RVR was pending at the time of the individual's death for fighting; although, he repeatedly stated that he was the victim of an assault. His institutional transfers were related to changes in custodial classification according to the SCR, but it was also noted that he had been a victim of an assault on at least six occasions at four different prisons by his own gang members and had been housed in ASU secondary to safety concerns. According to a confidential memorandum included in the SCR, at least one of the assaults was due to the individual not abiding by "prison politics" related to his gang affiliation. However, when offered SNY status, the individual consistently refused and insisted that he wanted to be released to the general population.

The individual arrived at his final facility on November 25, 2019, with a pending RVR for fighting from his prior institution. As previously mentioned, the facility was on modified program due to a large-scale disturbance in 2018, resulting in the individual being housed in relative isolation, according to interviewed staff. The SCR noted that all individuals on the yard were aware that the modified program was due to end on January 6, 2020. The individual arrived on single-cell status and was reportedly kept on that status due to the assaults at his prior facility. However, the individual's correctional counselor reported to suicide case review interviewers that the individual had requested to be double-celled.

The individual reported receiving mental health treatment beginning at age six for depression. He reported feelings of abandonment by his family and subsequent increases in anger and aggression. He also reported hearing voices at age 14 and receiving psychotropic medications in the community. The individual arrived at CDCR with an active prescription for olanzapine from the county jail. He was screened upon arrival to CDCR, and it was determined that he required ongoing mental health services at the 3CMS level of care. He was provided with the diagnosis of Bipolar I Disorder, severe with psychosis. On November 6, 2017, the individual requested removal from the MHSDS; at that time, he was housed in STRH following participation in a riot. He refused a treatment group on November 8, 2017, and was seen at the cell-side, where he reported that he would continue to refuse participation as he was not interested in mental health

12

treatment. The Interdisciplinary Treatment Team (IDTT) removed the individual from the MHSDS on November 14, 2017, citing his denial of mental health symptoms and the self-report that he had not taken medications in more than six months. This discharge from MHSDS was inconsistent with the Program Guide regarding removal from the 3CMS program unless the individual was determined to have inappropriately been included in the MHSDS during the reception center process. There was no documentation that such placement occurred.

The individual was assaulted when transferred to another facility in December 2017. He submitted a mental health request shortly thereafter. When seen, he reported that he had Posttraumatic Stress Disorder (PTSD) and that he was hearing the voices of demons and ghosts. The individual told the clinician that he was a Southerner and that he would check with the gang to see if he was allowed to participate in the MHSDS. He told the clinician that he would send another request if he could receive services; otherwise, he would "tough it out." The clinician documented that the individual may have been in an undiagnosed psychotic state, as he presented with concrete thinking, rambling speech, limited insight, and fragility. He was not readmitted to the MHSDS at that time. He was next seen by mental health staff following a request that also occurred after being a victim of an assault. During this contact on January 31, 2018, the individual reported daily auditory and visual hallucinations, paranoia, and anxiety. The clinician documented that the individual had perseveration, with disorganized, tangential thinking, and bizarre, paranoid delusions. The primary clinician provided a diagnosis of Schizophrenia, paranoid type, and the IDTT placed the individual at the 3CMS level of care on February 7, 2018. The individual also consented to treatment with aripiprazole for psychosis and sertraline for depression and anxiety. He later reported to his IDTT that he previously had to leave the MHSDS due to gang pressures, he currently felt committed to treatment, and he thought that his fellow gang members may not oppose his treatment.

The individual was transferred to another facility, where he was assaulted within two months. He remained in the MHSDS but reported to his psychiatrist that he was nonadherent with his psychotropic medication upon the transfer. The psychiatrist noted that the individual presented with guarded behavior, stating that he was not supposed to talk to the psychiatrist. In February 2018, a mental health clinician documented that the individual had concerns that people were calling him homosexual, which was suspected to be related to paranoid delusional thinking. The individual was assaulted on May 26, 2018 on the yard; he subsequently reported to his STRH primary clinician that he wanted to be removed from the 3CMS program, despite continued severe depression and anxiety. He was not removed from the MHSDS at that time; however, he was again transferred on June 12, 2018. In August 2018, the individual reported to his primary clinician that he had met with members of his gang, and he had been approved to meet with mental health. Treatment goals targeted improvement in self-esteem and anger rather than more pressing acute symptoms. In October 2018, the individual reported to his primary clinician that he had suicidal thoughts at times, but he "would never do it."

In January 2019, the individual was seen by mental health staff due to an urgent consult due to a Prison Rape Elimination Act (PREA) allegation made by the individual against a female kitchen

staff worker.  He alleged that she said things about his sexuality under her breath and screamed into his ear that he was "a faggot and gay."  The clinician noted that the individual exhibited psychomotor agitation and pressured speech during his interview, and he complained that he had been harassed at other facilities, but staff did not believe him.  The individual was also noted to have had two incidents of inappropriate laughter during the interview attributed to response to internal stimuli.  The clinician found that the individual was experiencing psychotic symptoms, and the allegation was investigated and ultimately found unsubstantiated.

In February 2019, the individual was seen by his primary care provider because he refused treatment and laboratory tests for Hepatitis C.  According to the medical provider, the individual reported that he was going to engage in risky behavior, so why bother with treatment or tests.
The individual continued to meet regularly with his primary clinician addressing his self-esteem issues.  He was briefly prescribed buspirone and lurasidone in April 2019 but was often medication nonadherent.  During a nonadherence appointment with psychiatry in June 2019, the individual stated that he would no longer take psychotropic medications. Gang politics typically prohibited the taking of psychotropic medications, so it was unclear if the individual stopped taking his psychotropic medications due to his gang affiliation or for other reasons.

The individual was seen in absentia by his IDTT in May 2019; the IDTT provided a diagnosis of Adjustment Disorder with mixed disturbance of mood and conduct.  In June and July 2019, when seen by mental health, he repeatedly stated that he could not be in the MHSDS due to prison politics.  On July 23, 2019, the individual was seen by the IDTT when he was removed from the MHSDS, as he promised to inform the clinician if he had problems, he was not prescribed psychotropic medication, and he had programmed at a high level.  Medication nonadherence and prison pressures were not noted in discharge documentation or addressed in treatment planning. A SRASHE completed the previous day assessed his chronic and acute risk as low.  There were multiple problems with the SRASHE and IDTT documentation noted in the SCR, and the removal from the MHSDS clearly did not conform to Program Guide requirements.

A SRASHE completed in February 2018 was the first documentation by mental health staff that noted the individual's use of self-harm as a coping tool for stress.  His final SRASHE in July 2019 did not accurately capture historical or acute risk factors.  His chronic illness (Hepatitis C), the recent increase in RVRs (three over a two-month period), and increased mood instability were not accurately reflected in that SRASHE.  The individual's anxiety and associated risk also were not reflected in the suicide assessment. Although a safety plan was not required due to the assessment of low risk, a safety plan was completed.  The safety plan did not adequately address the individual's risks, including possible substance use, use of self-harm as a coping strategy, and considerable external pressures to reject mental health services.

The individual was assaulted twice on the yard in September 2019 and subsequently placed in ASU.  Staff submitted a mental health referral on October 5, 2019, due to "hostile/poor self-control/assaultive" (behavior).  No other information was included on the referral.  The individual was seen at the cell-side on October 14, 2019, after refusing a confidential contact.  While the

individual denied the ability to participate in the MHSDS and denied current mental health symptoms, the clinician noted that he was constantly rocking and clearing his throat while speaking. The clinician recommended readmission to the MHSDS at the 3CMS level of care. A SRASHE was not completed as part of treatment planning at that time. The individual's diagnosis was listed as Adjustment Disorder with mixed anxiety and depressed mood and Unspecified Bipolar and Related Disorder. The individual refused his mental health contacts and IDTT and was reportedly terrified to be seen with mental health staff. Both the primary clinician and supervisor noted problems with treating gang-affiliated mental health patients on his assigned yard. There were only two treatment spaces due to institutional construction, and individuals could be seen by other gang members when they attended mental health appointments.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined this death was not foreseeable.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this case was preventable. There were multiple intervention opportunities that may have prevented the individual's suicide. The individual was not accurately assessed for suicide risk, and a risk assessment was not completed as part of the most recent treatment planning. The individual clearly had safety issues resulting from being a frequent victim of an assault by his gang members, although he denied safety concerns. Neither this risk nor his complex mental health status and instability were appropriately factored into the acute risk assessment. In addition, the use of self-harm as a coping mechanism was not properly incorporated into risk and treatment planning. Further, the medical staff was informed by the individual that he planned to continue a high-risk lifestyle and therefore refused treatment and monitoring for Hepatitis C; however, an indicated mental health referral was not submitted.

## IV.    Critique of Suicide Case Review Report

The SCR was adequately completed; however, some improvements were indicated. The SCR did not address the modified program and how this may have impacted the individual's mental health by increasing isolation without the supportive features required with placement in restrictive housing. Finally, historical information commonly included in other SCRs was not included in this report; however, this did not ultimately impact the adequacy of the SCR.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in eight required QIPs; five for mental health, one for custody, one for nursing, and one for the headquarters Suicide Prevention and Response Focused Improvement Team (SPRFIT).

The first mental health QIP was required to address confusing and inconsistent treatment plan documentation in May 2019, including information that was copied from previous treatment plans that were no longer accurate.  Additionally, the individual was provided with an adjustment disorder diagnosis; however, he was treated by the psychiatrist for psychotic symptoms. Additionally, there was an Individualized Plan of Care (IPOC) for depression; however, his target symptoms were listed as self-esteem and anger.  The second was related to his inappropriate discharge from the MHSDS in July 2019.  The third was required to address IDTT documentation from December 2019, which was minimal, failed to discuss recent assaults by other incarcerated individuals, contained inaccuracies, and copied information that was not updated.  The fourth mental health QIP was required to address a SRASHE completed in July 2019, which appeared to underestimate both chronic and acute risk.  Additionally, while not required, a safety plan was developed at that time, which only marginally addressed the individual's specific risk factors.  The final QIP was required to address inadequate psychiatry documentation in June 2019.

The custody QIP was required as responding officers did not immediately relieve pressure on the individual's airway upon discovery.  The nursing QIP was required as CPR was initiated on an individual in rigor mortis.

Corrective action regarding staff adherence to policies and procedures appeared indicated. Employee counseling memorandum to memorialize the review of pertinent policies with mental health, custody, and nursing staff appeared warranted, yet it did not appear that this occurred. Instead, staff was retrained on policies and procedures with which they should have already been familiar.  There appeared to be an over-reliance on retraining when stronger action was indicated.

The QIP required by headquarters SPRFIT would determine if policies and procedures could be updated related to the provision of mental health services to gang members with ongoing safety needs.  The supporting documentation of follow-up of this QIP was incomplete.  It noted that the headquarters SPRFIT met to discuss the safety concerns in this case and to identify any areas for improvement in policy and procedure; however, it noted that a subsequent meeting with the Division of Adult Institutions (DAI) in April 2020 was necessary.  No proof that the subsequent meeting occurred or any findings from that meeting were provided.

Case D

I.    <u>Summary of Case</u>

This individual was a 21-year-old Caucasian man who was found hanging from the air vent in his assigned cell by his cellmate.   Custody and medical staff were notified, Cardiopulmonary

Resuscitation (CPR) was performed, and the automated external defibrillator was applied, but no shock was advised. He was transported to the TTA, where lifesaving measures continued. He was pronounced deceased by an on-call physician on February 1, 2020, at approximately 1103 hours. The individual was not a participant in the MHSDS at the time of his death.

Information on this individual was sparse. The Strategic Offender Management System (SOMS) and the electronic health record system (EHRS) indicated he was born and raised in California. His developmental history was unstable and traumatic, having been placed in the foster care system and exposed to abuse. The individual did not graduate from high school but planned to obtain a GED during this CDCR term. He was married, and there were no reports of children. There was also no evidence of employment history. A county incident report from February 2015 revealed cannabis and alprazolam use; however, there was no information on the history or extent of his use.

The POR from June 2019 revealed an adult criminal record starting in 2016. Convictions included disorderly conduct related to drugs/alcohol intoxication, vandalism, violating a court order to prevent domestic violence, and battery. In March 2017, a restraining order was filed by his ex-girlfriend because of domestic violence. In 2018, the individual was convicted of evade/attempt to evade a peace officer while driving recklessly and vandalism, which resulted in his first prison term with a sentence of one year and four months. His controlling offense occurred in June 2019. Two officers responded to a burglary alarm at a library and observed the suspect standing next to a car parked by the entrance. When approached, he entered the car and backed it up in the direction of the officers, forcing one of them to jump out of the way to prevent being hit. The individual subsequently fled and was later detained by responding units. He was convicted of assault with a deadly weapon on a peace officer/fireman. His earliest possible release date was November 21, 2023.

The individual began his second CDCR term in July 2019. On November 20, 2019, he was transferred from the reception center to the mainline at the same institution, where he remained until his death approximately two months later, on February 1, 2020. During his brief stay within CDCR, the individual received four RVRs, one for battery on a prisoner, two for being absent from his work assignment, and one for fighting. He received his last two RVRs, one for being absent from work and the other for fighting, on January 22, 2020. There was no documentation indicating that the individual was gang affiliated.

An officer interviewed from this individual's housing unit reported that he did not notice any unusual behaviors on the day of this individual's death. An incarcerated peer reported the individual had a brother who killed himself a few years ago. The peer also denied seeing any recent changes in his behavior and described the individual as a "happy guy." The individual's former cellmate noted they had different circles of friends and described the individual as anxious and irritable. The accuracy of this information was questioned because it conflicted with an unsent letter to his girlfriend, which stated he was living with one of his "homeboys" and was hopeful life

would get better. His former cellmate denied having any other information and refused to answer any further questions.

A review of this individual's property revealed letters providing social support and a calendar suggesting he was purchasing and using substances in prison. Papers were also found with excerpts from songs ("what's the point in life?" And "love kills!"), a drawing of a tombstone and writings which stated, "death comes to all…..Suicide…..Foster Care did this…… Life's unfair……Death's uncertain." Additionally, the word "SUICIDE" was written on a 2019 calendar on March 15, which was suspected to be the date of his most recent suicide attempt, as reported by his sister. A suicide note was not found.

A review of the individual's telephone calls revealed a conversation with his sister on January 9, 2020, during which he discussed being hopeful yet depressed, talking about losing friends, having to start over from the beginning, and not having anything when released from prison. His sister also shared her thoughts related to depression and suicide, which she recurrently experienced.

A telephone interview with the individual's sister on February 21, 2020, revealed this individual had a history of prior suicide attempts. The most recent was an overdose attempt in early 2019 before incarceration. She described the individual as always feeling suicidal over the past eight years; however, being able to "pull through" and stay optimistic. She also talked about receiving a telephone call from an incarcerated peer who reported her brother was planning suicide the week prior to his death; however, the allegation was not taken seriously. She reported feeling surprised that he committed suicide, saying he appeared optimistic and hopeful during this incarceration, despite reports of feeling depressed.

This individual did not participate in the MHSDS during his two prison terms. During mental health screenings, he denied having any mental health symptoms, receiving treatment for mental health problems, or having suicidal ideation in the past or present. Additionally, there were no records indicating mental health treatment in the community; however, he reportedly had a history of suicide attempts in the community, and he had a brother who committed suicide at age 18 via hanging. Additionally, his mother attempted suicide shortly before his second incarceration and was subsequently hospitalized. Finally, his sister reported having recurrent thoughts of suicide.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert concluded this death was not foreseeable.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert concluded this death was not preventable.

IV.    Critique of Suicide Case Review Report

Overall, the SCR was an adequate summary, given the paucity of records/information on this young, incarcerated individual, both from the community and from his brief six months in prison. It included available social, criminal, institutional, substance use, and mental health histories obtained by reviewing documents from several sources and interviewing staff, incarcerated peers, and family. There was no evidence the individual ever engaged the mental health systems in the community or CDCR, despite having a family history of suicidality, and a personal history of depression, impulsivity, illicit substance use, and suicidality.

V.    Analysis of Quality Improvement Plan Processes

The Suicide Case Review did not reveal any mental health, custody, or nursing concerns nor result in any Quality Improvement Plans.

Case E

I.    Summary of Case

This individual was a 33-year-old Laotian man who was observed by custody during Guard One security checks on February 10, 2020, sitting on his toilet with a noose around his neck and the ligature fastened to an air vent above the sink in his single-bed STRH cell. He was transported to the TTA, where life-saving measures continued. He was transported to a community hospital and then to an intensive care unit on February 11, 2020. He was pronounced dead by a physician on February 13, 2020. The individual was receiving mental health services at the EOP level of care at the time of his death.

Records revealed that the individual was raised by an intact family in the San Diego area of California. His family consisted of both biological parents and an older brother. He reported a history of physical abuse by his father and being misunderstood by his family. At age 13, he joined the "oriental killer boys" (OKB) street gang and began using alcohol, marijuana, ecstasy, methamphetamines, morphine, and heroin. At age 14, a juvenile court sentenced him to community service for fighting, bringing a knife to school, and attending school while under the influence of methamphetamine. After failing to comply with a court order and stealing speakers from a car, he was sentenced to a juvenile camp where he earned a GED. The individual's history of employment was unstable. He briefly held several jobs, including assembling medical equipment, working as a sheet metal worker, and telemarketing. He was married twice, once in 2007 and again in May 2019 when he was incarcerated. He had a 16-year-old daughter at the time of his death. His parents and wife were financially and emotionally supportive, visiting him several times. His wife visited him the weekend before he died and requested information from the institution on his behavior. She noted his behavior changed significantly within the past month, telling staff he was looking beyond her rather than looking at her, and he was laughing inappropriately.

The individual's criminal history began during early adolescence after he joined OKB and started using illicit drugs. At age 19, he was arrested for battery and resisting an officer, which resulted in a three-year probation sentence. Two months into his probation, on June 11, 2005, he crashed a party with the mother of his daughter and two male friends from OKB. After engaging in several arguments, two guests were shot. The male victim died, and the female victim suffered a gunshot wound to the abdomen requiring surgical removal of organs. The court found the individual guilty of first-degree murder, attempted murder, and assault with a semi-automatic firearm with enhancements. He was sentenced to twenty-five years to life with the possibility of parole.

The individual was incarcerated in CDCR for approximately 11 years, starting at 22 years of age in April 2009 and ending with his death on February 13, 2020. He had been transferred to five different institutions, primarily due to disciplinary infractions. He also had a history of three placements in the ASU between 2009 and 2016. In 2017, the individual received four RVRs for possession of a weapon and substance use. In 2019, he received RVRs for possession of a cellular phone. On January 3, 2020, the individual and his cellmate received RVRs for fighting, and he was moved to another cell with a new cellmate. On January 4, 2020, the individual was the victim of an in-cell battery, which resulted in a serious head injury. He subsequently requested consideration for placement in the SNY. He was placed in SNY, and within one week, he stabbed another incarcerated individual in that yard. The individual was transferred to ASU and requested that adjudication of the RVR be postponed pending the District Attorney's involvement. He remained in STRH after being placed in the 3CMS level of care. Approximately two weeks later, custody reported that he appeared confused, turning in his canteen rather than his dinner tray. Within the next few days, the individual's wife visited him and called the family release of information hotline to express concerns that he displayed unusual behavior.

Staff and incarcerated peer interviews conducted by the suicide case review team, and a review of his property and recorded telephone calls revealed the use of illicit drugs in CDCR. The individual had financial and emotional support from his family, and there was no evidence indicating he had debts. An incarcerated peer noted a change in the individual's behavior approximately one week prior to his death, stating he changed from being talkative and humorous to being distant and withdrawn. Additionally, his wife described his behavior during an interview, saying he appeared to be psychotic. She also noted that his family planned to keep the reasons for his death secret due to cultural concerns.

Document reviews and family interviews did not reveal a history of mental health treatment in the community or county jail. The individual functioned adequately in CDCR without MHSDS services from 2009 to 2019. On January 4, 2020, nursing performed an ASU Pre-Placement Evaluation, which was unremarkable; however, a mental health consult was ordered because he requested to see someone for night terrors and posttraumatic stress. A mental health clinician saw the individual on January 10, 2020. He reported experiencing an anxiety rating of seven or nine out of ten. He also reported waking up at night in cold sweats with his heart racing. Additionally, he talked about having discontinued heroin one month prior. He did not want to be included in the MHSDS, and the evaluating clinician noted that his symptoms did not meet diagnostic criteria.

Consequently, a decision was made not to include him in the MHSDS. Two days later, on January 12, 2020, he assaulted another individual with a deadly weapon and was cleared by the ASU Pre-Placement Evaluation and ASU Screening Questionnaire. Three days later, on January 15, 2020, he reported suicidal ideation, triggering a call to the on-call psychiatrist and completion of the mental health place-in order for MHCB. He remained in alternative housing placement overnight and was assessed by the crisis intervention team (CIT) clinician on the next day. The CIT clinician completed the SRASHE, and the primary clinician completed the Initial Assessment Power-Form. Based on the SRASHE, the CIT clinician decided to rescind the MHCB referral and placed him in MHSDS at the 3CMS level of care.

On January 16, 2020, a psychiatric nurse practitioner requested an urgent psychiatric consult, and the individual was subsequently seen daily from January 16 to January 21, 2020, per the five-day follow-up requirement. The Safety Planning Intervention (SPI) form used during these daily contacts was deficient because information was often missing or minimal, such as reasons for living and efforts being made to meet in a confidential setting. On January 21, 2020, the individual's primary clinician met with him in a confidential setting and reported his mood was flat/indifferent, and his thought processes and speech were slow. Another clinician, who completed an RVR mental health assessment outside of a confidential setting, concluded his mental status and developmental/cognitive deficits did not contribute to his behaviors leading to the RVR. Due to the mental health assessment conclusions, the hearing officer was not required to consider alternatives when assessing the penalty. During the last week of January 2020, the individual refused to participate in treatment and his mental health primary clinician initial assessment. His mood was described as flat and guarded, and his thinking and speech were slow. His presentation was attributed to suspected drug use.

On February 4, 2020, the individual's primary clinician met with him to review the Release of Information request from his wife, allowing her to receive an update regarding his mental health. His primary clinician noted the individual's thinking was disorganized, and he reported auditory and visual hallucinations. He also reported using heroin and methamphetamine approximately one month prior. Additionally, he talked about using illicit drugs on a regular basis in prison. Documentation of suicidal ideation was unclear. The individual asked his primary clinician to tell his wife that he loved her. Later that day, he refused his psychiatry appointment. On February 5, 2020, the individual refused his IDTT, group therapy session, and initial psychiatry assessment. Additionally, the treatment team recommended he be transferred to EOP; however, they did not officially make the change until February 10, 2020. On February 7, 2020, the individual refused to participate in a confidential session with his primary clinician. He was described as confused and suspicious, and he became agitated when he discovered his level of care had been elevated to EOP. He began pounding on his door and asked his primary clinician, "What are you trying to do to me?"

Despite his unstable condition and irritation with being elevated to EOP, there was no documentation that he was seen on February 8 through 12, 2020. Additionally, he was not seen on February 13, 2020, prior to being found unresponsive at approximately 2138 hours.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this case was preventable.  Had staff recognized the severity and acuity of the individual's distress, the accumulation of stress, the deterioration of his mental status, the paucity of adaptive coping strategies, the shame he experienced thinking of his family and friends, the hopelessness he experienced thinking of his chances to be paroled and appropriately intervened in a timely manner, the likelihood of his death would have been decreased.  Additionally, there were indications from collateral sources that his mental status had changed to the point that his wife was requesting updates on his status.

IV.    Critique of Suicide Case Review Report

Overall, the SCR was an adequate summary of this case, involving a young, incarcerated individual with no prior history of mental health problems until the last six weeks of his life and no prior history of treatment until the last four weeks of his life, when he was placed in the MHSDS.  The SCR included relevant social, criminal, institutional, substance use, and mental health histories.  The SCR provided a comprehensive chronology of the significant stressors leading to his suicide.  It also provided a description of his behavior and critiques of SRASHE, safety plan, master treatment plan, IDTT documentation, five-day follow-up documentation, and psychiatry's documentation.

In addition to the identified concerns which required QIPs, three significant concerns were not identified.  The first concern involved cultural perspectives.  The SCR identified the need to consider the individual's behavior from a Laotian cultural perspective and noted his family was going to keep the cause of his death secret because it was taboo among Buddhists.  Despite acknowledging the importance of cultural factors, neither the individual's providers nor the SCR reviewers considered how mental health problems would be perceived in this Asian culture.  The stigma becomes a major obstacle to identifying and treating mental illness; consequently, mental illness tends to be shrouded by silence and shame, fostering misconceptions and minimizations of mental health problems.  The second concern involved the treatment team's tendency to minimize the severity and acuity of the individual's distress, relying on his history of never receiving mental health services, nor attempting suicide.  Clinicians tended to rely on the individual's self-report, which minimized symptoms, possibly because of shame.  During the last six weeks of his life, clinicians appeared to ignore critical red flags, repeatedly failing to explore or confront the individual with his bizarre behaviors, unusual questions, reports of hallucinations, jumbled

thoughts, and suicidal ideation. Their minimization of his distress was revealed by the manner he was informed that his level of care had been elevated from 3CMS to EOP on February 7, 2020. Since he had a history of trying to avoid the MHSDS, he responded to the news with agitation, asking the clinician, "What are you trying to do to me?" His strong response, which was likely due to shame, was never addressed by clinicians because he was not seen for the next six days, after which time he killed himself.

The third concern involved an injury when he was victimized by a cellmate on January 4, 2020, resulting in a "serious head injury." The definition of a "serious head injury" was unclear; however, it suggested a possible closed head injury with a loss of consciousness. The extent of the injury and its impact on his behavior was unclear because there was no neuropsychological screening or testing documentation. Despite this lack of clarity, it was noteworthy that his behavior, affect, logical thinking, and speech significantly changed between his pre- and post-head injury. There was no evidence that the possibility of a moderate closed head injury was ever considered. Neuropsychological screening/testing would have been helpful in rendering a diagnosis and selecting appropriate interventions to manage the individual's behavior.

V.    Analysis of Quality Improvement Plan Processes

This case resulted in four mental health concerns that rose to the level of QIPs, and one custody concern that did not rise to the level of a QIP. No nursing concerns were identified.

The first mental health QIP was required to address the one SRASHE completed on January 15, 2020, which determined his chronic risk and acute risk for suicide were both low, despite the identification of ten risk factors and three warning signs of imminent suicide risk (anxiety, agitation, and impulsivity). Additionally, the safety plan was left blank and not completed during the subsequent five-day follow-ups. A Senior Psychologist Specialist wrote a memorandum dated April 22, 2020, stating five SRASHEs and safety plans from the clinician identified in the QIP were randomly selected and audited using the chart audit tool (CAT). The results revealed 100 percent compliance with the audited criteria. The results were discussed with the identified clinician on April 22, 2020, and the clinician was provided a copy of the CAT audit criteria for SRASHEs. Additionally, the clinician completed the updated Suicide Planning Intervention Training on April 17, 2020. Identifying information for the audited SRASHEs was included, along with the training slides and participation sign-in sheets for the updated SPI training. The response adequately addressed the QIP.

The second mental health QIP was required to address two major concerns noted with the IDTT completed on February 5, 2020. The first concern involved diagnoses not being consistent with the problems listed in the clinical summary and the interventions/goals not being individualized and measurable. The primary issue resulted from the identification of substance use as a problem in the clinical summary without a corresponding diagnosis. Additionally, the absence of IPOCs for identified mental health concerns in the treatment plan limited the treatment team's ability to assess interventions and goals. The second concern involved a delay in initiating a mental health

place-in order for a level of care change from 3CMS to EOP. Without this order, communication to SOMS would not be established, along with notification to custody of the need to transfer him to an ASU EOP Hub. A Senior Psychologist Specialist wrote a memorandum dated April 30, 2020, indicating the STRH clinicians were trained on the importance of making appropriate diagnoses, initiating IPOCs, and completing placing-in level of care orders at the time of the IDTT. The training slides and training participation sign-in sheet were attached. The response adequately addressed the QIP.

A QIP was required to address the fact that documentation of the five-day follow-up evaluations was deficient in four areas, per the chart audit criteria. A Senior Psychologist Specialist wrote a memorandum dated May 8, 2020. He provided the identified clinician's audit results on five-day follow-up documentation for nine separate cases. The results suggested the observed deficits appeared to be an isolated incident. Training slides and the participation sign-in sheet were attached. The response adequately addressed the QIP.

The final mental health QIP was required to address the fact that a psychiatry progress note for medication nonadherence written by a psychiatric nurse practitioner was insufficient and lacked adequate detail and plan. The Chief Psychiatrist from the facility wrote a memorandum dated April 14, 2020. It indicated that he would supervise the identified psychiatric nurse practitioner and evaluate and monitor clinical competence. He planned to meet with the psychiatric nurse practitioners to discuss clinical practice issues and clinical cases weekly, to include supervision when dealing with challenging clinical scenarios. Follow-up documentation was not available. The response partially addressed the QIP as no follow-up information was available.

The one custody concern that did not rise to the level of a QIP was a violation related to the use of the cutdown tool, which the reviewing Captain identified at the facility. The reviewing Captain provided on-the-job training, and the In-Service Training Sign-In Sheet was provided as proof of practice. The response adequately addressed the concern.

Case F

I.    Summary of Case

This individual was a 60-year-old Caucasian man who was found hanging in his single cell on September 21, 2020, by a housing unit correctional officer conducting security rounds and passing out breakfast. The ligature was a bedsheet, twisted and looped around his neck and tied to the upper bunk. The individual was not a participant in the MHSDS at the time of his death; however, he had a history of mental health treatment at multiple levels of care. The individual was discharged from the MHSDS on June 29, 2011.

Early court records and the POR revealed the individual was an only child, born in Washington, DC. He was raised by both parents until he was approximately age five, when his parents divorced. His father had a criminal record, having served a prison sentence for robbery in New York. Shortly after the divorce, the individual and his mother moved to California. She subsequently remarried.

The individual's developmental history was unstable.  He lived in several community-based mental health facilities, group homes, foster care, juvenile hall, and California Youth Authority (CYA).  He began drinking alcohol and smoking marijuana at approximately age 14, using heroin at age 16, and phencyclidine at age 18.  He began committing robberies at approximately age 15 to pay for illicit drugs.  The individual received a high school diploma at approximately age 20 while confined in CYA.  As an adult, he held several jobs, working as a landscaper, car washer, construction worker, and machine operator.

Additionally, the individual's interpersonal relationships were unstable.  Records indicated he did not keep in touch with his parents, who reportedly died when he was incarcerated. He married at approximately age 22, while incarcerated in county jail, and was divorced five years later.  At approximately age 30, the individual became involved in a long-term relationship with the victim of his commitment offense.  They had one son and one daughter.  The individual kept in touch with the daughter until he was approximately age 56, when she discontinued contact after he was charged with attempted murder.

The individual had an extensive juvenile criminal justice record, serving approximately half of his adolescence in Juvenile Hall and CYA.  His juvenile offenses included theft, property damage, violation of probation, malicious mischief, escape from juvenile hall, assault likely to produce great bodily injury, reckless driving, drinking in public, burglary, and auto theft.  His criminal behavior continued as an adult, being charged with burglary, assault with a firearm, vehicle theft, and multiple robberies with a firearm.  He did not have a history of gang affiliation.  His controlling offense involved a series of crimes, beginning in November 2002, related to breaking and entering his ex-girlfriend's home and assaulting her.  Between February and March 2003, he committed several robberies using a firearm, using the money to support his heroin habit.  The individual was subsequently arrested and convicted of robbery with a firearm, assault with a firearm, and burglary. He was sentenced to serve 25 years.

The individual served five CDCR prison terms.  His fifth term began in September 2004 and ended with his death 16 years later, on September 21, 2020.  During his fifth prison term, his institutional adjustment was fair, punctuated by ongoing safety concerns, occasional violence resulting in ASU and Security Housing Unit (SHU) placements, and medical problems/chronic pain.  He did not have any visits during his fifth term; however, he developed and maintained close friendships, which provided him with emotional and financial support.  The individual spent eight years at one facility (50 percent of his fifth term) and three years at each of two other facilities.  During his last 11 months of life, the individual had difficulty adjusting to transfers from three different facilities. He talked to his friends about struggling with his medical problems, developing relationships with new primary care physicians, and being quarantined because of COVID-19.

The individual had an extensive child/adolescent history of mental health services and suicide attempts.  He attempted suicide several times and displayed severe behavior problems at home, school, and in the community.  His behavior resulted in psychiatric treatment at an outpatient children's psychiatric clinic and admission to the psychiatric units at two community hospitals.

Approximately seven months after beginning his fifth term, on March 31, 2005, the individual was admitted to the MHCB to evaluate and treat depression, suicidal ideation, and self-reported safety concerns. He was discharged four days later and placed in the MHSDS at the 3CMS level of care. Within two days, he attempted to hang himself and was readmitted to the MHCB. Within two weeks, he was discharged to an EOP level of care. He actively participated in treatment for depression and opioid dependence. In approximately one and one-half years, his level of care was lowered to 3CMS. He was cooperative with mental health treatment, and his psychotropic medication was discontinued. The individual was eventually removed from the MHSDS on June 29, 2011.

The individual's medical history was significant, being diagnosed with Crohn's Disease, strictures of the colon, a partial colectomy with anastomosis, a hernia post-colectomy, right perianal fistula, mild hypertension, a history of hepatitis C, and benign prostate hyperplasia. Interviewed physicians and nurses described the individual as quiet, polite, cooperative, friendly, and engaging. The nursing staff reported being shocked when they heard about his death. The reviewer's interviews with facility staff, incarcerated peers, and friends revealed that this individual tended to be quiet, polite, and respectful. A review of his property did not reveal a suicide note.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined this case was not foreseeable.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined this case was not preventable from a mental health perspective.

## IV.    Critique of Suicide Case Review Report

Overall, the SCR was an adequate review of this case, involving an incarcerated individual who became involved with the mental health system and the criminal justice system as a child and adolescent. The SCR included relevant social, criminal, institutional, substance use, and mental health histories. It also provided a description of his behavior and critiques of custody's compliance with procedures.

## V.    Analysis of Quality Improvement Plan Processes

This case review resulted in three custody concerns which rose to the level of quality improvement plans. There were no mental health or nursing QIPs.

The first concern involved custody staff applying restraints to the individual's wrists while he was hanging from a ligature, prior to supporting his body and cutting him down. The response indicated that supporting an individual's body and cutting him down before applying restraints to his wrists was not a policy. Individuals could violently wake up during medical incidents. The respondent noted that the facility leadership contacted DAI to officially challenge this issue and would not conduct training on this issue for staff, pending the challenge results. The response adequately addressed the QIP.

The second concern involved the possibility that the individual had been deceased for some time resulting in the beginning of rigor mortis. The respondent noted the Warden from the facility addressed this issue in a separate forum, and both the results of that investigation and the corrective actions were confidential. The response appeared to address the QIP, although further details would have provided a more comprehensive response.

The third concern involved property not transferring with the individual. The sending facility's Warden noted that under normal circumstances, the facility's procedure required an individual's property to be sent at the same time the individual was transferred; however, the facility contended the individual's transfer was ordered because of an emergency due to a recent COVID-19 outbreak on the unit. Since the duration of the transfer had not been determined and property contamination was in question, the Department Operational Manual (DOM) addressed temporary placements, transfers, and returns, stating in part, "individual's transferring on medical and return status to other institutions shall store their property in R&R [receiving and release] or other designated areas." When the sending facility discovered the individual was being placed at another facility, they arranged the transfer of the individual's property. Based on the after-mentioned extenuating circumstances, the sending institution believed they acted within departmental policy and procedures; therefore, no further action was recommended. The response adequately addressed the QIP.

Case G

I.    Summary of Case

This individual was a 43-year-old Caucasian man who was found lying on the floor, unresponsive in his cell on October 17, 2020. The coroner's preliminary review determined his death was likely suicide by exsanguination of a wound in his upper left extremity. During an investigation, officers discovered that he cut his upper arm with a nail clipper and slowly drained the blood into a plastic bag, likely draining some of it in the toilet to conceal his suicide from custody officers. The individual was in the MHSDS at the Intermediate Care Facility (ICF) level of care, though housed in a mainline EOP awaiting transfer to an ICF bed.

Records revealed that the individual was raised by his mother in Oregon. His father was usually absent, and he had an older brother. His developmental history was traumatic, characterized by sexual and physical abuse perpetrated by several people, including his mother's boyfriend/stepfather, a mentor from the big brother program, and his biological brother. He was never married and did not have any children. His highest level of education was the tenth grade.

There was no evidence of special education services; however, he was suspended several times for fighting and truancy. After leaving school, the individual achieved a GED certificate. As a preadolescent, he began using marijuana and alcohol. At age 17, he began using methamphetamine, which he related to his hospitalizations and arrests. The individual primarily worked as a carpenter. He discontinued gainful employment due to chronic back pain, originating from his stepfather stomping on his back when he was age 12 and from three motor vehicle accidents in the 1990s. When back pain prevented him from working, he became homeless.

The individual's adolescent involvement in the criminal justice system was unclear. He reported an arrest as a juvenile at age 13 for assault and theft. As an adult, he was arrested approximately six times, charged with indecent exposure five times, along with other offenses to include distribution of controlled substances and failure to register as a sex offender. There was no evidence of gang affiliation. At the time of his death, the individual was serving his third CDCR term. His commitment offense occurred on March 5, 2015, when pedestrians observed him masturbating in public. Police instructed him to stop masturbating and clothe himself; however, he continued masturbating and was arrested. He attributed his nudity and masturbation to being upset with his family and his methamphetamine use. He was sentenced to four years for indecent exposure, with a one-year enhancement for a prior felony conviction. He was also convicted of indecent exposure and battery on a non-prisoner, which led to an additional two-year and eight-month sentence.

The individual served approximately four years and seven months of his third term in CDCR, beginning in March 2016, when he was age 39 and ended when he died at age 43. His institutional adjustment was poor. He was moved 39 times among nine institutions. The moves were primarily due to the changes in his mental health level of care and custody status. In November 2019, he filed a PREA complaint alleging a correctional officer sexually assaulted him. An investigation found the allegation to be unsubstantiated. Additionally, in 2019 and 2020, he expressed safety concerns related to his unit and several security threat groups. Investigations revealed other individuals in his housing unit did not have a problem programming with him; however, they described him as "weird." After filing safety concerns, the individual stopped working with custody, trying to identify the threatening individuals, and stayed in his cell. He received 16 RVRs during his term, primarily for battery, indecent exposure, fighting, behavior that could lead to violence, and damage to state property. A 2018 RVR resulted in a pending trial which would likely result in a transfer to county jail on his parole date. His last RVR resulted from an escalation of aggressive behavior as he yelled obscenities towards his clinician during an individual contact on March 19, 2020.

The individual's records indicated that he had not received a visit from family or friends since 2018; however, he was visited by his legal counsel in December 2019. A review of his telephone log indicated that he had recent conversations with his mother. On September 29, 2020, he told his mother that his attorney was doing an inadequate job representing him, and on October 1, 2020, he requested a list of public defenders. The individual's mother recommended he consider a plea agreement to ensure he only had to serve one year rather than five years if found guilty. He talked about distrusting the system and noted he would likely be placed in county jail to stand trial again.

He alluded to the possibility of suicide, talking about either receiving justice or going home, saying this world was not his home. He spoke of going to a "new heaven" and a "new earth." He also talked about possibly going on a hunger strike to end his life.

An inspection of the individual's property revealed letters from his family, legal correspondence, journal entries, an address book, clothing, and books. His parents supported him emotionally and financially. Letters revealed his mother and father recommended he accept a plea deal. His mother's letters also expressed concerns about his well-being because she had not heard from him recently. His handwritten letters revealed bizarre, disorganized, and nonsensical thought processes. On the day of his death, he wrote a note saying he hoped that he did not make a mess. Another note asked questions about blood flow, specifically wanting to know which artery pumped blood to the brain. The reviewer was unsuccessful in contacting his mother. Interviews with custody officers and other incarcerated peers portrayed him as unusual and withdrawn.

The individual's health records revealed an extensive mental health history in the community prior to CDCR. He reported his first psychiatric hospitalization occurred during early adolescence after attempting suicide. He also reported at least one other psychiatric hospitalization around age 27 after attempting suicide by overdose. He had been diagnosed with Bipolar Disorder and Substance Use Disorder. The POR noted he was psychiatrically hospitalized in Oregon from 2006 to 2011, from age 29 to 34. The SCR noted he was psychiatrically hospitalized for five years after adjudication for indecent exposure.

Oregon hospital documentation indicated the individual decompensated prior to his arrest, evidenced by odd and sexually inappropriate behavior; quitting his job, discontinuing his psychotropic medication; breaking up with his partner; and consuming methamphetamine. His hospital course of treatment was compromised by his aggressive behavior and chronic back pain. Oregon hospital's psychological assessments revealed average intelligence and average attention span. Personality assessments revealed antisocial and borderline traits. He reportedly struggled with issues related to sexual trauma, which resulted in attempts to distance himself emotionally and physically from others. His diagnoses included Bipolar I Disorder, PTSD, Substance Use Disorders, and Borderline Personality Disorder with Antisocial Traits.

During his first and second terms in CDCR, the individual primarily received 3CMS and EOP levels of care with several MHCB admissions, one acute psychiatric program (APP) admission, and one ICF admission. His APP admission resulted from suicidal ideation and headbanging that required 43 sutures. Additionally, he severely injured tendons while punching several windows in the APP. His treatment team reported that his self-injuries and history of sexually inappropriate behavior functioned as a distraction from his chronic back pain and distressing emotional pain.

During the individual's third term in CDCR, he primarily received EOP and 3CMS levels of care with several MHCB admissions and six inpatient admissions. His first inpatient admission was to acute care three weeks after arriving at the reception center. He was admitted to the APP after repeatedly banging his head and endorsing suicidal ideation. Six months later, he was admitted to

the Department of State Hospitals (DSH) after two MHCB admissions and repeated self-injuries, assaults, and bizarre behaviors. He refused DSH programming and was returned to CDCR after five weeks. Approximately two months later, he was readmitted to DSH after a serious suicide attempt, disorganized thinking, labile affect, and unpredictable behavior. He attended over 80 percent of his treatment groups and was medication compliant. He was discharged to CDCR after three months. Approximately four months later, he was admitted to APP after posing a danger to staff and other individuals. Approximately five months later, he was once again placed in acute care because he refused to eat, program, shower, or attend to his activities of daily living (ADLs).

The individual's last acute inpatient admission occurred approximately one and a half years later (from September 18, 2019, to November 22, 2019), after he attempted to castrate himself. He explained his behavior by saying he wanted to become a "eunuch" for religious reasons. Additionally, he talked about wanting to decrease his sex drive. The individual denied any suicidal ideation/intent, and he did not have any insight into the severity of his behavior, attributing his behavior to his chronic back pain. His thinking tended to be disorganized, and he was occasionally hyperverbal. During this time, he also filed a PREA complaint against an officer. The complaint was investigated and classified as "unsubstantiated." After discharge from APP in November 2019, the individual was transferred three times. He was admitted to the MHCB three times during the last 11 months of his life while at the EOP level of care.

On February 19, 2020, the individual was admitted to the MHCB because he was a danger to himself after superficially cutting his arms and legs. His self-injurious behavior appeared related to grandiose delusions. The IDTT documented that he would benefit from continued support in EOP with a strong recommendation that he be referred to an ICF level of care. Within three weeks, on March 30, 2020, he was referred to the MHCB again after engaging in cutting that required treatment at an outside hospital. He was described as having a manic episode with labile affect, disorganized and delusional thinking, and an inability to program in an outpatient setting. Within two months, on May 22, 2020, he was sent to an outside hospital after using a toenail clipper to cut his neck and face. He was treated with sutures, returned to the facility, and placed in the MHCB. He minimized his injuries, denied any suicidal intent, and reported merely wanting attention. While in the MHCB, he talked about having drug debt, not wanting to die, and needing to be moved to another institution. In early June 2020, he was discharged from the MHCB, referred to ICF, and returned to the EOP pending an ICF transfer.

During the last five months of his life, the individual repeatedly reported safety concerns but refused to cooperate with the investigating officers. To protect himself, he refused to leave his cell and participate in treatment. He was regularly seen by his primary clinician and treating psychiatrist; however, he usually refused to engage in treatment. In August 2020, his primary clinician and treating psychiatrist denied seeing signs of decompensation; however, in September, he reportedly had auditory hallucinations daily and exhibited grandiose delusions, talking about creating earthquakes and the COVID-19 virus to retaliate against medical doctors who mistreated him. In the first 17 days of October 2020, he refused 22 offered treatment group sessions.

During his third term, the individual underwent 41 suicide risk evaluations and 32 SRASHEs.  In the last year of his life, he had 11 SRASHEs, with his chronic risk classification usually being high and his acute risk usually being moderate and occasionally low.  The SRASHEs occasionally lacked detail; however, their risk rationales tended to be adequate.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this death was not foreseeable; however, it was predictable given his long history of serious suicide attempts and self-injuries dating back to early adolescence.  Among his limited coping strategies, most of which were maladaptive (i.e., public masturbation, methamphetamine use, self-injuries, and social withdrawal), suicide was always an option per his comments to clinicians and his mother.  Accidental death was also a genuine possibility, given his history of methamphetamine use and extreme/severe self-injurious behavior.  His death by suicide was not a surprise given his deteriorating mental status (apparent hallucinations, delusions, and confused thinking), his significant medical problems (chronic back pain and problems walking due to his attempted castration), and his intense fear of being killed due to drug debts (involving methamphetamine).

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this case was preventable had the individual received an appropriate level of care and adequate treatment. The reviewer noted his suicide would have likely been prevented if he had been placed in an inpatient setting because, at the very least, nursing rounds would have likely caught the self-harm incident.  The delay in his transfer was related to the individual being assessed as not meeting the emergency transfer criteria in place due to the COVID-19 pandemic.

IV.    Critique of suicide Case Review Report

Overall, the SCR was an adequate summary of this case.  It included relevant social, criminal, institutional, substance use, and mental health histories.  It also provided a description of his behavior and critiques of the SRASHEs and his mental health level of care.  The SCR chronicled his institutional adjustment and involvement with the MHSDS during his third term, focusing on his last year of life.  Inpatient admissions, outside hospital trips, and MHCB placements were chronicled by dates and accompanied by brief descriptions of his clinical presentation and treatment.  Additionally, his self-injuries and provider contacts were chronicled by dates and accompanied by brief descriptions of the events.  The chronology of these events created a

historical context for clinicians to better understand the underlying drivers and phenomenological experiences of each discrete event. The chronology also clarified the fragility of his mental status and the paucity of his social supports, adaptive coping strategies, and psychological resources.

The SCR reviewer identified several technical/operational deficiencies addressed in QIPs 1, 2, and 4, and a clinical deficiency involving the SRASHE risk justification that was addressed in QIP 3. The reviewer also identified the individual's mental illness minimization as a problem but did not identify it as needing improvement. Other problems mentioned but not identified as needing improvement were the severity of his substance use disorder, the gravity of his safety concerns related to drug debt, and the disregard for his continuity of care. The underestimation of his mental illness resulted in inadequate treatment because providers focused on discrete events rather than incorporating those events into a meaningful case conceptualization, which should have created a sense of urgency as he spiraled into hopelessness and psychosis. The severity and gravity of his drug addiction and safety concerns were clearly expressed in May 2020 and dismissed after he stopped working with custody to identify the threatening individuals. He explained his behavior, saying, "I don't want to die. I don't want any of them going to the SHU." Additionally, he identified issues with continuity of care in October 2020 when he said, "you're like my 30th clinician this term; love that continuity of care in CDCR." These four deficiencies were clinically significant and required acknowledgment, along with additional training, mentoring, and/or clinical supervision.

In contrast to these core issues, the SCR contained subtle errors that proofreaders should have corrected. For example, the SCR reported the individual was received by CDCR for his first term on July 9, 2013, and entered the MHCB on July 7, 2013, two days before entering CDCR. The SCR also contained several errors attributable to carelessness (i.e., using the noun "rationale," instead of adjective "rational" and saying, "after being found guilty by reason of insanity," instead of "after being found not guilty by reason of insanity").

V.    Analysis of Quality Improvement Plan Processes

This case resulted in two mental health concerns that did not rise to the level of a QIP and four mental health concerns that rose to the level of a QIP. There were no custody or nursing concerns.

The first concern which did not rise to the level of a QIP involved the referral to ICF on June 10, 2020, and the failure to transfer him; thus, attempting to maintain him in EOP for the next four months until his death. The reviewer noted that a higher level of care could have prevented the suicide because of nursing rounds. The reviewer also noted this failure was not a policy violation because the individual did not meet the emergency transfer criteria (per a memorandum dated April 10, 2020, entitled *COVID emergency mental health treatment guidance and COVID temporary transfer guidelines and workflow).*

The second concern, which did not rise to the level of a QIP involved a SRASHE that met the CAT audit requirements; however, the justification for the risk rating likely contributed to the underestimation of the individual's mental illness and distress.

The first QIP was required to address the fact that when the individual was discharged from the MHCB to EOP level of care, the treatment team decided to support EOP placement while strongly recommending that he be referred to ICF. It was unclear why they did not refer him to the ICF level of care during the IDTT since there was no justification for delaying an ICF referral at that time. The response included a memorandum outlining the steps to refer individuals from MHCB to ICF created and distributed to the facility's psychologists, social workers, and psychiatrists. Mental health providers were also trained on the process and expectation of referring patients to the appropriate level of care. Additionally, MHCB supervisors began attending all discharge IDTTs, and supervisors/specialists would review all discharge documentation to ensure clinician to clinician contact was completed at least 24 hours prior to discharge. The memorandum and training participant sheets were present. The response technically addressed the QIP, adequately focusing on referral procedures, but failed to address the staff's lack of urgency and minimization of the individual's mental illness.

The second QIP was required to address the fact that after engaging in self-harm behavior on February 19, 2020, and March 29, 2020, there were no self-harm Power-Forms completed to document these incidents within 24 hours as required by an October 28, 2019 policy. In response, clinical staff at one facility were trained to alert the SPRFIT and complete a SRASHE when they became aware of self-harm. Since this concern was previously noted, clinicians sent weekly summaries to the program supervisor of their caseloads documenting self-harm incidents for 30 days. Program supervisors would report compliance to the SPRFIT at the end of the month. The three memorandums and the training participant sheets were attached. The response adequately addressed the operational/procedural issues identified in the QIP. At the other facility, the institution's current local operating procedure on suicide prevention was being updated, focusing on tracking and reporting. The changes would be incorporated into the operating procedure and forwarded to the Statewide Mental Health Program (SMHP) for this QIP. The original operational policies and the updated suicide attempt and self-harm policies were included, along with training slides. Participant sign-in sheets were not attached. The response partially addressed the operational/procedural issues identified in the QIP.

The third QIP was required to address the fact that when the individual was sent to an outside hospital due to self-harm behavior, his acute and chronic risk ratings were determined to be moderate on the SRASHE. The rationale provided, which was a direct copy and paste from the Reason for Assessment Section, was insufficient. In response, five randomly selected SRASHEs were audited using the CAT. The results revealed 100 percent compliance, except for one item involving the narrative of risk justification. The identified clinician agreed to attend SRASHE training and subsequent supervision. The five randomly selected SRASHEs were identified, and the CAT items were attached. The response adequately addressed the operational/procedural issues and the inadequate justification of rating acute and chronic suicide risk.

The final QIP was to address the finding that on May 22, 2020, when the individual was referred to MHCB, the consult inpatient Power-Form referring the individual to MHCB was not completed. The response indicated that ten randomly selected patient charts were audited to determine if the mental health consult inpatient Power-Form had been completed upon admission to the MHCB. Staff failed to complete the Power-Forms in 60 percent of the MHCB admissions resulting in 40 percent compliance. On December 24, 2020, MHCB and CIT staff were trained on appropriate documentation needed upon referral to the MHCB. The mental health consult inpatient Power-Form audit, training handouts, and training participation sign-in sheets were attached. The response adequately addressed the QIP.

Case H

I.     Summary of Case

This individual was a 70-year-old Caucasian man who was discovered by correctional officers unresponsive in his solely occupied Outpatient Housing Unit (OHU) cell on April 6, 2020, at approximately 0602 hours. Emergency responders noted the individual's body was "cold to the touch" with "fingers beginning to stiffen." Approximately 17 minutes after the commencement of rescue breathing, staff found that utilization of the Artificial Manual Breathing Unit (AMBU) bag did not result in a chest rise as the individual's beard had been covering a ligature wrapped around his neck. According to the SCR, staff failed to document the staff member involved and the method used for removing the ligature. The individual was pronounced dead at 0620 hours. He was not a participant in the MHSDS at the time of his death, though he received mental health treatment in various levels of care during his initial 27 years of incarceration. He had not been a participant in the MHSDS since January 2018.

The individual was born in New York and raised by his biological parents. The SCR noted the individual's father abused alcohol and was physically violent toward the individual during intoxication. The individual also had a history of sexual abuse by his uncle and brother. According to the SCR, the individual's uncle died by suicide, and his mother, father, and brother died from cancer prior to 2014.

The individual reportedly experienced "significant difficulties" with reading and writing and was unable to complete the fifth grade until age 15. The individual ultimately left school at age 16 and enlisted in the Marine Corps at age 18. During his three years of military service, he was stationed in Vietnam for ten months and was exposed to multiple traumatic events. The SCR noted that the individual began abusing substances around age 18; however, his use of alcohol and amphetamines increased when he attempted to "drown" his emotions following his return from Vietnam. The individual's substance abuse issues led to several inpatient and outpatient drug and alcohol treatment programs through the Department of Veterans Affairs (VA) prior to incarceration.

According to the SCR, the individual's adult criminal record included charges and convictions for third-degree burglary, sexual assault of an 11-year-old victim, driving under the influence, reckless driving, and disorderly conduct/resisting arrest. The individual also served a prior prison term in

Arizona for sexual assault of a developmentally delayed 19-year-old and a child under the age of 14. The SCR referenced 13 misdemeanor convictions prior to 1981 and 50 arrests for substance intoxication within 17 years of the commitment offense. The commitment offense involved multiple and repeated sexual assault acts with three separate minors over a three-year period. The individual was ultimately found guilty of 65 counts of lewd and lascivious acts with a child under the age of 14 and sentenced to 137 years in prison.

The individual entered CDCR in October 1991. He was subsequently designated SNY for safety concerns and included in the Disability Placement Program (DPP) due to his physical disabilities and specialized medical bed need. The SCR indicated that the individual received a total of three RVRs, the most recent issued in 2003. In 2010, the individual was endorsed for single-cell status due to victimization concerns and prior aggression toward cellmates. Although the individual was included in the Developmental Disabilities Program (DDP) with a designation of DD2 in 2011, he was removed from the program and assigned a Negative Disability Designation (NDD) following reevaluation in May 2012.

The SCR noted the individual received medical treatments and various accommodations for permanent physical disabilities sustained during an intentional motor vehicle accident in 1991. Medical interventions during incarceration, including surgeries to address his chronic pain and mobility issues, were unsuccessful, and the individual refused pain medication during the last decade of his life. The SCR noted the individual's physical disability, chronic pain, and safety concerns were obstacles to programming and treatment participation throughout his incarceration.

The individual attended the Board of Parole Hearings (BPH) for elderly parole consideration in January 2017 and January 2020, the latter of which resulted in denial of parole consideration for another five years. The SCR determined the individual did not receive a required Classification Committee Post Board Hearing after the January 2020 hearing, and he was not provided the BPH official transcripts until April 2, 2020.

The individual received mental health treatment through the VA prior to incarceration. The individual's exposure to trauma during military service reportedly resulted in "severe" symptoms of depression and PTSD, and he had several suicide attempts and inpatient psychiatric hospitalizations following his return from Vietnam. As previously indicated, the individual's suicide attempt in 1991 rendered him permanently disabled and eventually wheelchair dependent. The individual received MHSDS services for PTSD and Major Depressive Disorder in various levels of care during the first 27 years of his incarceration. Prior to 2012, he had multiple MHCB and DSH admissions for danger-to-self concerns. The SCR noted the individual's medical issues "impacted his willingness to comply with [mental health] treatment" throughout his inclusion in the MHSDS. In January 2013, the individual's level of care was reduced from EOP to 3CMS while he was housed in the Correctional Treatment Center (CTC).

In August 2016, the individual transferred to his final institution. Throughout 2017, the individual continued to report depression secondary to physical pain, and he was maintained in 3CMS level of care until his premature removal from the MHSDS on January 17, 2018. The SCR noted that two different clinicians documented concerning changes in the individual's mental status within a week of the mental health program discharge, including depression, distressed affect, illogical

thought process, possible perceptual disturbances, poor appetite, and limited insight. The SCR also indicated it was unclear whether the individual met MHSDS removal criteria, as the January 2018 IDTT failed to provide a clinical rationale for discontinuing services. Further, the identified facility did not offer transitional planning services, despite the individual's ongoing psychiatric symptoms and his 27-year history of MHSDS inclusion.

The individual received four mental health contacts following MHSDS removal in January 2018. During a January 23, 2018, contact, the individual described himself as "always depressed and hopeless." However, this statement did not result in a suicide risk evaluation or an IDTT consult to consider MHSDS inclusion. A nursing referral indicating that the individual was exhibiting anxious, fearful, and nervous behaviors resulted in a mental health contact on August 1, 2019. Although the mental health clinician noted the individual "needs counseling and help with anxiety managing techniques," there were no follow-up appointments scheduled, and the individual was not considered for MHSDS inclusion. In February 2020, the individual's primary physician documented a plan to refer the individual to mental health due to concerns regarding low mood, anger, and irritation; however, a referral was not submitted, and there was no consultation with mental health staff. The individual appeared to further deteriorate, and, in March 2020, the individual's primary physician noted that the individual would benefit from antidepressant medication to address increased depression and hopelessness. However, the need for psychiatric medication was not communicated to mental health staff, as the mental health referral lacked sufficient detail. The mental health referral follow-up appointment was completed at the cell front on March 12, 2020. The clinician indicated the individual was lying in bed, reporting physical pain, and feeling "sad and angry" regarding the BPH's second denial of parole. The clinician noted the individual denied suicidal ideation, opined that MHSDS inclusion was not indicated, and re-referred the individual to medical staff for chronic pain complaints. During the first week of April 2020, nursing staff submitted another mental health referral after the individual engaged in an atypical angry outburst toward medical staff; however, the mental health appointment was not completed prior to his suicide on April 6, 2020.

The individual had a significant and serious suicide attempt history prior to incarceration, including four attempted overdoses, one attempted hanging, two motor vehicle crashes, and one incident of self-stabbing. The SCR also referenced two "unsubstantiated" suicide attempts in CDCR in 2007 and 2011. The most recent suicide risk evaluation was completed in July 2015, during which the individual was assessed with moderate chronic and low acute suicide risk. In 2016, the individual informed mental health staff, "If I was suicidal, I wouldn't tell anybody."

According to the SCR, the individual had no contact with psychiatry, and he was not prescribed psychotropic medications within a year of his suicide.

Further, the SCR noted that the individual refused all pain medications and preferred a low-fat diet with daily prunes to manage his medical concerns. However, the reviewer was informed by medical staff during interviews that a registered dietician nutritionist (RDN) "overrode" the primary care physician's (PCP) order for prunes beginning in March 2020. This change reportedly triggered the individual's anger, and he filed a medical grievance within a few weeks of his death. The "outburst of anger" toward medical staff in April 2020 appeared related to the unexpected and

unexplained change to his diet, and it was significant enough to warrant custody intervention and a referral to mental health. The individual's primary physician informed the reviewer that he did not understand why the RDN discontinued the individual's prunes and noted this discipline did not participate in morning huddles for consultation. The physician also reported that the individual would have benefitted from antidepressant medication, as he appeared more depressed and hopeless during his final two months; however, this was not communicated to mental health staff. Incarcerated peers informed the reviewer that the individual was "in a lot of pain," was "upset" regarding the recent BPH decision, and that the recent medical issues were "the last straw for him."

## II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.

The Special Master's expert determined the individual's suicide was likely foreseeable had staff intervened appropriately in response to documented concerns regarding depression, hopelessness, recent receipt of bad news from the BPH, safety concerns related to a planned housing change, need for psychiatric medication, the recent increase in physical pain and medical care concerns, refusal of meals and treatment during his final weeks, and recent behavioral changes resulting in an increased number of mental health referrals. However, communication among the OHU disciplines involved in the individual's care was inadequate, and the individual was not appropriately assessed for psychiatric medication, MHSDS inclusion, and suicide risk. Thus, mental health clinicians responding to referrals relied solely on the individual's self-report regarding suicidal thoughts. This was concerning given that the individual was evaluated at the cell front during his final mental health contact, and considering the individual previously reported that he would not disclose thoughts of suicide to staff.

## III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined the individual's suicide may have been prevented had CDCR staff effectively consulted and developed a collaborative care plan to address the individual's medical concerns, dietary disagreements, declining mental status, increased suicide risk, and need for psychiatric medication and mental health treatment. Additionally, emergency response documentation indicated the individual had a shoelace wrapped around his neck during the first 17 minutes of rescue breathing, which appeared to compromise the effectiveness of lifesaving efforts as his chest was not rising. This problem was identified as a violation of policy that may have directly impacted the outcome. Further, the identified institution determined an incorrect amount and incorrect route of epinephrine was administered twice to the individual during emergency response, which resulted in medication underdosing.

Further, the Special Master's expert determined the individual was prematurely removed from the MHSDS in January 2018. Additionally, subsequent mental health referrals and contacts suggested the individual should have been returned to the MHSDS and received an updated suicide risk evaluation and safety plan. For example, in August 2019, a mental health clinician documented the individual's need for "counseling and help" to address symptoms of depression and anxiety. However, there were no follow-up appointments scheduled at that time and while not required by policy, a consultation with other members of the IDTT appeared clinically indicated but was not requested. Additionally, within two months of the individual's suicide, the individual's primary physician failed to refer the individual to mental health as planned. Further, the primary physician subsequently failed to communicate the individual's need for psychiatric medication in March 2020, despite documenting that the individual was depressed, hopeless, and would benefit from antidepressant medication.

IV.     Critique of Suicide Case Review Report

The SCR offered a sufficient assessment of the precipitants to the individual's suicide and summarized relevant social, criminal, incarceration, substance use, and mental health information. The reviewer recommended five QIPs based on their findings; however, the Special Master's expert determined the list of QIPs was inadequate. Despite the SCR referencing numerous problems that may have contributed to the individual's suicide, several were not addressed in QIPs. As such, additional QIPs were needed to address interdisciplinary consultation issues within the OHU; failure to document the staff member involved and the method used for removing the individual's ligature; the PCP's failure to submit a mental health referral in accordance with their documented plan in February 2020; the PCP's failure to consult with and/or refer the individual directly to a psychiatrist upon determining the individual would benefit from antidepressant medication in March 2020; and the PCP's failure to address the individual's distressing dietary concerns by resolving disagreements with the dietician responsible for "overriding" the physician's order. Lastly, a QIP was indicated to address the incorrect amount and route of epinephrine administered to the individual "causing an underdosing of the medication" during emergency response.

V.     Analysis of Quality Improvement Plan Process

This SCR recommended a total of five QIPs. The Special Master's expert determined that the implementation of these QIPs was adequate based on a review of supporting documentation submitted by the identified institution and headquarters staff.

QIP number one addressed the mental health clinician's failure to follow up with the individual and consider MHSDS placement in August 2019, despite documenting the individual "needs counseling and help" to address his symptoms of depression and anxiety. The institution's response for this QIP indicated CDCR no longer employed the identified clinician; however, all of the facility's psychologists and social workers received relevant training. Further, the institution

instituted corrective actions and a sustainability audit to ensure referrals and planned follow-ups were completed appropriately.

QIP number two addressed the identified facility's failure to activate the emergency medical system by contacting 911 until six minutes after the individual's body was discovered. The facility provided staff with a detailed memorandum outlining the procedure for contacting 911 during an emergency, and proof of training for involved staff was attached.

QIP number three addressed the facility's failure to complete a Post Board Review Classification Committee meeting within 15 days of the BPH decision. This QIP also noted the individual did not receive his official BPH transcripts until April 2, 2020, despite scanning the records into a database on January 24, 2020. The institution's response confirmed that the individual did not receive the Post Board Review and did not receive his transcripts until April 2, 2020. The Warden reported that correctional counselors were "provided the expectation of completing case work follow up" related to BPH reviews, and proof of training was attached. The Warden also indicated a correctional counselor was responsible for reviewing and updating all information regarding BPH action or decision to ensure an administrative error does not occur.

QIP numbers four and five addressed nursing staff's failure to identify that the individual's chest was not rising and falling during the first 17 minutes of CPR and rescue breathing. The institution's written response indicated that the two identified nurses were removed from patient care and assigned to the warehouse pending the outcome of an Office of Internal Affairs (OIA) investigation. Upcoming training plans and mock drills for all nursing staff were also discussed in the memorandum for this QIP. Additionally, the facility implemented corrective actions to address other serious emergency response issues, despite the SCR's failure to recommend QIPs for these concerns.

Case I

I.   Summary of Case

This individual was a 45-year-old Hispanic/Latinx man who was discovered by a custody officer hanging in his solely occupied condemned housing unit cell on December 14, 2020, at approximately 0350 hours. According to the incident report, the first custody officer called out to another officer for assistance, and after the second officer observed the individual hanging, the second officer announced the emergency via radio and activated their personal alarm device (PAD). The incident report further indicated that the individual's ligature was connected to the cell door, which delayed cell entry and lifesaving efforts. Custody officers eventually opened the cell door and cut the ligature above the knot using the cut-down tool; however, nursing and custody timelines for cell entry differed by approximately five minutes. Timelines referenced in the SCR also indicated restraints were placed on the individual prior to removing the remainder of the ligature from the individual's neck and implementing CPR. Activation of 911 occurred at 0355 hours, and paramedics arrived on the scene at 0414 hours. Lifesaving measures continued until

the individual was pronounced dead at 0437 hours. The individual was not a participant in the MHSDS at the time of his death or during his incarceration.

The individual was born in Illinois and primarily raised by his biological mother and stepfather in Southern California beginning at age four. The SCR noted the individual had one younger sibling. The individual previously denied a history of abuse. The individual graduated high school and attended some college courses prior to incarceration. The individual's employment history was limited to brief jobs in roofing, grocery store stocking, and department store packaging. There was no indication the individual had ever married or fathered any children.

The SCR suggested the individual drank alcohol three to four days per week in his early twenties and experimented with various other substances, including marijuana, methamphetamine, lysergic acid diethylamide (LSD), and heroin. However, cocaine appeared to be his preferred substance prior to incarceration, as he previously reported daily use during 1996.

The individual served time in juvenile hall, and his juvenile arrest record included shoplifting, second-degree robbery, and criminal conspiracy. As an adult, the individual served 90 days in jail and received three years of probation for vehicle theft and receiving stolen property. The SCR also noted the individual's gang activities in the early 1990s might have included bank fraud. The commitment offense occurred while the individual was on probation in July 1996 and reportedly involved a gang-related shooting wherein one adult victim was killed and two minors were injured. The individual pled guilty for this offense and was sentenced to 28 years to life for murder, attempted murder, gang involvement, and a convicted person in possession of a firearm.

The individual entered CDCR for his first prison term in May 1999. The SCR described the individual's initial adjustment to incarceration as "uneventful," although the individual reportedly received 34 "minor violations" while held in county jail on "out-to-court status" between 2001 and 2008. In August 2008, the individual received a death penalty sentence for first-degree murder and first-degree robbery for crimes committed in 1995, and he subsequently transferred to CDCR's condemned unit. The individual worked for the Prison Industry Authority (PIA) until he received two RVRs in 2016 for misusing mail and cellphone possession. The SCR suggested these RVRs rendered the individual ineligible for subsequent employment. The individual remained in the condemned unit for 3,344 days, and although he was considered for the Condemned Inmate Transfer Pilot Program for enhanced job placement opportunities, the individual declined to participate in the program in May 2020. The SCR noted visits from family and friends ceased in 2016 for unknown reasons, and there were no recent phone calls or letters available for review.

During interviews, correctional staff informed the reviewer that the individual "never gave staff any problems." Custody officers reported that the individual was "quiet" and "kept to himself on the unit." One officer described the individual as "a little paranoid" regarding his legal mail, adding that the individual did not want others on the tier to "hear" about the mail he was receiving. The individual also reportedly maintained an organized exercise routine, engaged in in-cell

activities, and participated in yard when offered during the pandemic; however, he could not continue attending church services during 2020 due to COVID-19 restrictions.

Regarding the individual's mental health history, the SCR noted that he received brief counseling at ages 12 and 14 for school, family, and behavioral issues. However, there was no indication that the individual was ever prescribed psychotropic medication or received subsequent mental health treatment, including during incarceration. Mental health screenings were negative upon entering CDCR and placement in the condemned unit. A few mental health contacts were completed during the individual's confinement to the condemned unit; however, these brief encounters appeared to be precautionary wellness checks following changes in laws for condemned incarcerated individuals and following another incarcerated individual's suicide. The SCR noted the individual's most recent wellness check occurred in September 2019 and that the clinician noted "no issues" at that time.

According to the SCR, there were no suicide risk evaluations completed for the individual as there was no indication he had ever attempted suicide, reported suicidal ideation, or engaged in self-harm behavior. The reviewer noted the individual's suicide appeared calculated based on the sophistication of the ligature and the individual's attempt to block entry into his cell. There was no suicide note found or obvious warning signs reported by interviewed staff.

## II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case. The Special Master's expert determined the individual's death was not foreseeable based on a review of available documentation.

## III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case. The Special Master's expert determined the individual's death was not preventable based on a review of available documentation.

## IV.    Critique of Suicide Case Review Report

The SCR provided an adequate summary of this case with relevant social, criminal, incarceration, substance use, and mental health history. The reviewer also attempted to identify possible precipitating factors to the individual's suicide based on the limited information available. The SCR recommended a QIP to address one responding custody officer's failure to complete the updated suicide prevention training prior to the individual's suicide; however, the Special Master's expert identified several issues during the emergency response that should have been addressed in the SCR's investigation and/or recommendations. First, the SCR's timeline suggested that the first officer failed to activate their PAD upon discovering the individual hanging and unresponsive in the cell. Instead, the officer called out to a second officer for assistance, and the second officer

41

subsequently approached the individual's cell, observed the individual hanging, notified the control officer of the emergency via radio, and then activated their PAD while retrieving the cut-down kit. Second, although cell entry was understandably delayed by the ligature tied around the cell door, there was a difference of five minutes between the nursing and custody timelines for cell entry. Third, there was an unexplained five-minute delay in activating 911. Lastly, despite noting the individual was unresponsive upon entry, the SCR suggested resuscitative efforts and removing the ligature from around the individual's neck were further delayed by the time taken to secure the individual in restraints.

V.    Analysis of Quality Improvement Plan Process

This case resulted in one required QIP to address the responding custody officer's failure to complete the required suicide prevention training within timeframes. The identified custody staff member subsequently completed the required training, and proof of practice was provided. The Special Master's expert determined implementation of this QIP was adequate.

Case J

I.    Summary of Case

This individual was a 37-year-old African American man who was discovered by a correctional officer hanging in his solely occupied ASU cell on May 1, 2020, at 0102 hours. The SCR's timeline indicated 911 was activated, and custody staff cut the individual down approximately five minutes later. Paramedics arrived on the scene around 0125 hours; however, despite lifesaving efforts, the individual was pronounced dead at 0143 hours. The individual was not a participant in the MHSDS at the time of his death. He previously discharged from the MHSDS on February 26, 2020.

The individual was born in northern California and was primarily raised in foster care and group homes after removal from his mother's custody at age six. The individual's father was reportedly murdered prior to the individual's first birthday, and his mother struggled with mental health and substance abuse issues. According to the SCR, the individual was exposed to abuse, drugs, violence, and criminal activity during his group home placement. As a child, the individual suffered head trauma during a seizure, struggled with a learning disability, and participated in special education classes until he ultimately left school in the ninth grade.

At the age of 14, the individual began abusing drugs and alcohol. The SCR noted that he abused various substances, including heroin, opioids, cocaine, and methamphetamine; however, the amount, frequency, duration, and recency of use were not provided. The individual became involved with the criminal justice system at an early age. The SCR referenced numerous juvenile hall placements for crimes that included battery on a school employee and assault with a deadly weapon resulting in serious bodily injury. The individual's adult criminal record included convictions for vehicle theft, hit and run, drug sales, and second-degree robbery. The individual also served one prior prison term in CDCR for multiple counts of second-degree robbery.

However, three years after paroling, the individual was arrested for second-degree robbery and sentenced to five years in prison.

The individual entered CDCR for his second and final prison term in November 2014. The SCR described the individual's adjustment to incarceration as difficult, noting the individual reported safety concerns four days after his arrival at the Reception Center. The individual received a total of 19 RVRs during his most recent prison term, including 13 for violent behavior, two for possessing a dangerous weapon, and one for disorderly sexual conduct. The two RVRs for possession of a dangerous weapon were received in 2014 and 2018 and resulted in four years added to the individual's sentence. The individual's most recent RVR was issued on March 11, 2020, for refusing assigned housing and delaying a peace officer. According to the SCR, the individual reported safety concerns throughout most of his incarceration, which resulted in transfers to other institutions or ASU placements. Most recently, the individual was placed in ASU on March 3, 2020, after refusing to participate in prison race politics and expressing concerns for his safety.

During SCR interviews, a housing unit officer reported the individual was "generally respectful," "often acted like a little boy," and verbalized his emotions more than most incarcerated individuals. Incarcerated peers informed the reviewer that the individual would "let little stuff bother him" and engage in "tantrum" behaviors, including banging or kicking his cell door when angered. One incarcerated peer informed the reviewer that the individual painted a pentagram on his cell floor and prayed, although no date for this incident was provided. Another incarcerated peer reported, "I knew he was missing some screws" and "I noticed he would talk to somebody when he was by himself…one by the name of Lever, who seemed to be an advisor to him, and another name Nigga who was more of a threat…".

According to the SCR, the individual initially received mental health treatment at age 14 for reported psychotic symptoms, including delusions and hallucinations. Prior to the individual's most recent prison term, he had five psychiatric hospitalizations, engaged in multiple suicide attempts, and received psychiatric diagnoses that included Bipolar Disorder, Paranoid Schizophrenia, Depression, and PTSD. During his first CDCR prison term between 2008 and 2012, the individual was included in the 3CMS level of care, prescribed mood-stabilizing and antipsychotic medication, and diagnosed with Mood Disorder, NOS, Polysubstance Dependence, and Antisocial Personality Disorder. Prior to entering CDCR for his most recent prison term, the individual received mental health services in county jail. He arrived at the Reception Center in 2014 with prescriptions for buspirone, olanzapine, and fluoxetine. The individual was included in 3CMS, continued on psychiatric medications, and diagnosed with Bipolar I Disorder with a "history of psychotic features."

In July 2015, the individual was admitted to the MHCB level of care for suicidal ideation, depression, paranoia, safety concerns, and auditory and visual hallucinations. The MHCB treatment team determined that the individual required an EOP level of care at discharge and changed his diagnosis to Schizoaffective Disorder. According to the SCR, the individual's symptoms and safety concerns did not improve between July 2015 and October 2016, and he received at least three additional RVRs during this time for violent behavior. In October 2016, the

individual was admitted to the MHCB and subsequently referred to an acute level of care to address suicide risk concerns.  In January 2017, the individual was discharged from acute care to the EOP level of care, and his diagnosis was changed to Schizophrenia.

The individual was housed in ASU between January and July 2017, and his diagnosis was changed to Mood Disorder with psychosis during that period.  Upon returning to mainline EOP, the individual's treatment plan was modified to address depression, mood stability, suicidal ideation, and symptoms of PTSD.  In July 2017, the individual began refusing EOP treatment and reportedly became hostile toward his primary clinician after the provider indicated his RVR behaviors were unrelated to his mental illness.  In September 2017, the individual endorsed increased depression, paranoia, and anger.  In October 2017, the individual's psychiatric medications were changed in response to his nonadherence, and he reported concern of dying "from the side effects."  However, the SCR noted the individual's medication adherence did not improve after the change, and he continued to experience "significant interpersonal conflicts" and psychiatric symptoms.

In May 2018, the individual was transferred to a Psychiatric Services Unit (PSU) to serve a SHU term for possession of a weapon.  During August 2018, the individual's primary clinician documented concerns regarding unpredictability and suicidal impulses and noted that the individual had endorsed increased depression, anxiety, paranoia, and hallucinations.  The individual returned to mainline EOP in October 2018; however, he continued to endorse psychiatric symptoms, and his EOP treatment participation fell below 50 percent.  In late 2018, the individual's primary clinician questioned whether the individual was feigning or exaggerating psychiatric symptoms, although the individual was never referred for psychological testing or a diagnostic clarification evaluation.  In January 2019, the IDTT reduced the individual's level of care to 3CMS; however, the SCR suggested that the level of care rationale was inappropriate as it noted only that the individual appeared to be "higher functioning than most EOP [individuals]."  Additionally, the IDTT did not adequately prepare the individual for the level of care change, and he reportedly acted out aggressively toward staff during the meeting.  The individual required MHCB admission for an attempted overdose later that day.  During the MHCB admission, the individual reported recurring thoughts of cutting or hanging himself due to the likelihood of an extended sentence for possession of a weapon.  The individual also informed MHCB staff that he had given up and "may kill himself once he goes back to the yard."  The individual was discharged to the 3CMS level of care and "engaged in superficial cutting and reported swallowing a razor" one week later.

The SCR suggested that the individual remained relatively stable between February and August 2019.  In September 2019, the individual's request for an EOP level of care was denied.  In December 2019, the individual's sleep medication was discontinued by a new psychiatrist, despite the individual relying on the medication since May 2019.  The Special Master's expert noted there was no alternative treatment offered to address the individual's insomnia at that time, which appeared to cause the individual distress. During a psychiatry contact on January 6, 2020, the individual was informed that his psychiatric medications would be discontinued if his medication

adherence did not improve, and the session was terminated early due to the individual's aggressive response to being denied sleep medication.

On February 11, 2020, the individual was referred to the MHCB and placed in alternative housing for suicidal ideation with a plan to hang himself. During alternative housing placement, the individual reported, "I am suicidal. Definitely suicidal. It is hard to keep going. I'm done. I want to die." The individual's MHCB referral was rescinded the following morning, and a five-day follow-up was ordered. On February 18, 2020, a psychiatrist documented that the individual was stable and discontinued all psychotropic medications. However, the SCR noted that the individual's five-day follow-ups were discontinued one day prior and that the individual had refused all mental health contacts since his release from alternative housing, including two scheduled initial primary clinician assessments.

On February 26, 2020, the IDTT convened without the individual in attendance, changed the individual's diagnosis from Mood Disorder to Antisocial Personality Disorder, and removed the individual from the MHSDS. The SCR indicated that the diagnostic change was not sufficiently justified, and the discharge did not match the clinician's plans for continuing 3CMS care in the progress notes. There was also no indication that the individual was aware of or prepared for the removal of services prior to the IDTT. Further, the IDTT's rationale for MHSDS discharge suggested they had not completed a sufficient review of the individual's record, as the treatment team inaccurately reported that the individual was included in the MHSDS for medical necessity. The treatment team also failed to consider that the individual's psychotropic medications were discontinued only one week prior and that the individual was referred to the MHCB for planning to take his own life two weeks prior. The psychologist reviewer and the headquarters psychiatrist reviewer determined the individual's removal from MHSDS was a violation of the Program Guide.

Mental health staff subsequently met with the individual in response to referrals on at least three occasions prior to his suicide. The first mental health contact occurred on April 9, 2020, after medical staff referred the individual for bizarre statements written on a healthcare request form. The individual expressed concerns that he was sick and dying "from the inside" based on a perception that his genitalia smelled like feces and that his semen smelled like "rot." Although the individual claimed he was "ok" during the brief cell-front clinical encounter, he subsequently submitted two request forms to mental health; one included a request for psychiatric medication. However, the responding clinician failed to discuss psychiatric medication and inquire about current psychiatric symptoms during the brief cell-front encounter, and there was no referral to psychiatry or follow-up scheduled. During SCR interviews, the identified clinician informed the reviewer they did not want to "bring the subject up" and "did not want to probe" due to the non-confidential nature of the cell-front contact. On April 28, 2020, the individual was referred to mental health by custody staff for oppositional behavior; however, the progress note for the brief cell-front encounter did not describe the incident with the officer or indicate whether the matter was discussed with the individual. The individual completed suicide three days later, on May 1, 2020.

The individual had eight recorded suicide attempts; half occurred during his most recent prison term. The most recent suicide attempt involved hydrogen peroxide ingestion in February 2019, while other attempts included wrist cutting, hanging, overdose, and razor blade ingestion. The SCR critically reviewed five suicide risk evaluations completed within 12 months of the individual's suicide, all of which were inadequate for various reasons. The individual's acute suicide risk was estimated as low in all suicide risk evaluations, while his chronic risk ranged from low to high. The SCR noted that risk ratings were not clearly supported in the documentation and that chronic risk should not have fluctuated significantly during such a short period of time. The suicide risk evaluation completed in January 2020 was described as "poorly developed" overall, and the February 12, 2020 suicide risk evaluation inaccurately assessed the individual's acute risk as low. The SCR also found that clinicians did not develop a suicide prevention safety plan or encourage the individual to participate in safety planning prior to discontinuing the five-day follow-ups in February 2020. The individual's final suicide risk evaluation was completed without the individual's participation on February 24, 2020, and the SCR determined the evaluating clinician discounted the individual's history of mental illness, failed to address mitigating factors, and did not appropriately justify risk ratings.

## II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.

The Special Master's expert determined the individual's death was likely foreseeable. The individual had a significant suicide attempt history and was referred to the MHCB for a plan to hang himself in February 2020; however, CDCR staff prematurely discharged the individual from the MHSDS two weeks later and completed the final suicide risk evaluation in absentia due to the individual's treatment contact refusals. As such, staff was likely unaware of changes in mental status and acute suicide risk during this period. The most recent suicide risk evaluator also wrote a dismissive statement that the individual's prior suicide attempts were "associated with impression management and intended to achieve unexpressed goals." Additionally, CDCR's prior suicide risk evaluations offered inadequate representations of suicide risk, and the individual reportedly would not engage in safety planning. Lastly, the SCR noted that the individual "reported suicidal ideation only weeks before his death" and exhibited signs of psychiatric decompensation following his removal from the MHSDS. However, during this period, clinicians did not appropriately address mental health referrals, consider MHSDS inclusion, refer the individual to psychiatry, or schedule follow-up appointments to monitor the individual more closely.

## III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined the individual's death was preventable. The individual's premature discharge from the MHSDS was both clinically inappropriate and a violation of the Program Guide. The SCR determined that, as a result of the inappropriate MHSDS discharge, the individual "could no longer easily access a support system he had previously relied on in times of crisis." The CDCR headquarters psychiatrist involved in the suicide review noted that the individual was removed from the MHSDS prior to demonstrating stability without psychiatric medication for a period of six months. In this case, the individual was removed from MHSDS within 15 days of a referral to the MHCB for planning to hang himself and within one week of discontinuing his psychiatric medications. Further, the SCR indicated that the primary clinician had documented a plan to continue 3CMS level of care and that the individual was not informed of or prepared for the removal of mental health services. This critical error should have been reversed during subsequent clinical encounters, as the individual exhibited signs of psychiatric decompensation and even requested psychiatric medication. However, clinicians completed the referral contacts as brief cell-front encounters without addressing the referral concerns or scheduling follow-up contacts. Lastly, the individual's diagnosis frequently changed without sufficient justification, and the individual's treating psychiatrist stated the individual's "diagnosis was not well clarified" and "difficult to triangulate"; however, the treatment team never attempted to resolve diagnostic uncertainties, and this appeared to compromise their clinical judgment and interventions.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate critique and summary for this case, with relevant social, criminal, incarceration, substance use, and mental health history. The reviewer also included a reasonable assessment of the precipitants to the individual's suicide. While the SCR's recommended QIPs addressed most issues highlighted in the report, the Special Master's expert noted that recent treatment plans were not reviewed to ensure IDTTs targeted the individual's suicide risk factors, suicidal thoughts, safety concerns, and noncompliance with medication and treatment.

V.    Analysis of Quality Improvement Plan Process

This case resulted in three required QIPs for the mental health department. The first QIP addressed multiple problems related to the individual's discharge from the MHSDS on February 26, 2020. The QIP noted that the individual's removal was a violation of the Program Guide, was not supported by the individual's psychiatric presentation or clinical documentation and was not accompanied by appropriate discharge planning. The SCR also indicated that the treatment team's decision to change the individual's psychiatric diagnosis upon MHSDS discharge was not sufficiently justified. The second QIP addressed mental health clinicians' failures to address referral concerns and appropriately intervene during referral appointments, including two weeks prior to the individual's suicide when he submitted a request for psychiatric medication. The third QIP focused on inadequacies found in all five suicide risk evaluations completed within a year of the individual's suicide.

The Special Master's expert determined the QIP process was inadequate for this case. Despite two separate CDCR reviewers, including one mental health headquarters psychiatrist, determining the individual's MHSDS removal was a violation of the Program Guide, the institution's leadership disputed the finding in their response to mental health headquarters. Although the facility provided a one-hour all-staff training to address all three QIPs, the training slides appeared to minimize nearly all of the SCR's findings by prefacing identified deficiencies with "Reviewer felt," instead of using language demonstrating ownership for the quality of care concerns and encouraging staff to learn from the suicide review process. The Special Master's expert was also concerned that the Program Guide violation dispute was not addressed by mental health headquarters staff prior to their release of a memorandum that stated all QIPs were completed and that no further action was necessary.

Case K

I.    Summary of Case

This individual was a 30-year-old Hispanic/Latinx man who was discovered by a correctional officer hanging approximately two feet from the ground in his solely occupied PSU cell on October 19, 2020, at 1844 hours. According to the first responding officer's incident report, "Once [the individual] was secured in handcuffs, [another officer] then proceeded to cut the noose attached to the vent which was holding [the individual] afloat." Custody staff lowered the individual to the ground and placed restraints on his legs prior to commencing CPR at 1849 hours. At 1914 hours, paramedics detected a pulse and subsequently transported the individual to a community hospital, where he received treatment until his death on October 24, 2020. The individual was receiving mental health services at the EOP level of care at the time of his death.

According to the SCR, the individual had eight half-siblings and was raised in California. The individual's mother had a history of psychiatric hospitalizations, and his father was described as a physically abusive substance user. As a child, the individual exhibited significant behavioral issues, which resulted in school suspensions, criminal charges, and a lengthy state hospital admission. The SCR noted that the individual became gang involved at age five, burned down a school gymnasium at age six, killed dogs and cats, and shot another child at age seven. The individual left school during the ninth grade, and he did not return to complete his GED. The SCR indicated the individual was charged with involuntary manslaughter at age eight; however, he was found Not Guilty by Reason of Insanity (NGRI) and committed to a state hospital until age 15.

Following his release from the state hospital at age 15, the individual primarily resided in group homes when not incarcerated. Although the individual held brief jobs in the community, drug sales and Supplemental Security Income (SSI) were his primary source of income. According to the SCR, the individual began using and selling drugs at an early age. The SCR noted that the individual experimented with nearly all drugs during late childhood and early adolescence, including intravenous heroin, hallucinogens, methamphetamine, cocaine, alcohol, and inhalants. However, the frequency, duration, amount, and recency of drug use was not provided in the SCR.

The individual's adult criminal record included three prior prison terms, multiple state hospital commitments, parole revocations, and convictions for assault with a deadly weapon, vandalism, robbery, petty theft, inflicting corporal injury on a cohabitant, terrorist threats, and substance intoxication. In June 2010, the individual was committed to a DSH facility pursuant to Penal Code 1026 for NGRI. However, in August 2011, the individual incurred new charges for stabbing another patient multiple times with a pen, and he subsequently transferred to a county jail where he assaulted a correctional officer with a manufactured weapon. In August 2013, the individual received a life sentence with the possibility of parole for the attempted premeditated murder of a peace officer and two counts of assault with a deadly weapon. However, the SCR indicated that the individual was committed to a DSH facility for inpatient mental health treatment pursuant to Welfare and Institution Code (WIC) 7301, and it appeared he remained at DSH facilities until he arrived in CDCR on May 17, 2019, for his fourth and final prison term.

The SCR indicated that the individual did not program or adjust well during his most recent incarceration. In July 2019, he was designated SNY status due to reported fears for his safety. The individual received six RVRs during his 17-month period of incarceration; three were either violent or potentially violent. The most recent RVR for battery on a peace officer was issued 14 days prior to the individual's suicide and involved the individual throwing feces at an officer while housed in the MHCB. The reviewer found that the individual had no phone calls, visits, or written correspondences during his most recent prison term. Although the individual was housed at his final institution for 15 months, the reviewer stated he was "not well known by staff" likely due to frequent housing changes, low programming, and "poor engagement with mental health and custody staff." During interviews, CDCR staff reported that the individual "usually took his meals" and showered but often declined to leave his cell and frequently refused healthcare and custodial appointments. CDCR staff also recalled the individual was often disrespectful toward staff and did not associate with other incarcerated individuals.

The individual received mental health services throughout most of his life, beginning in childhood. According to the SCR, the individual was diagnosed with Bipolar Disorder and Conduct Disorder prior to adolescence, and records suggested he may have attempted suicide as early as age nine. As an adult, the individual had multiple involuntary psychiatric hospitalizations in the community and several DSH commitments for competency to stand trial, mentally disordered offender (MDO), NGRI, and treatment pursuant to WIC 7301. The SCR also referenced ten MHCB admissions and multiple level of care placements during the individual's three prior CDCR terms. The individual's psychiatric diagnoses varied over time and included Schizoaffective Disorder, Bipolar Disorder, Schizophrenia, Borderline Intellectual Functioning, Depression, Malingering, and Antisocial Personality Disorder. While the SCR noted that some clinicians doubted the legitimacy of the individual's reported symptoms, providers retained the individual's diagnosis of Schizoaffective Disorder throughout the recent prison term. They noted significant improvements in functioning during periods of psychotropic medication adherence. However, the individual was often medication nonadherent, and it did not appear that psychiatrists pursued involuntary medication after the most recent PC 2602 order expired in July 2015.

The individual was placed in the EOP level of care upon arrival for his recent prison term; however, the majority of his EOP clinical encounters were completed as cell-front wellness checks due to high refusal rates. The individual also typically refused to engage with clinicians at the cell front, which resulted in some providers being unable to fully assess the individual's mental status. Although the individual's EOP treatment compliance was at 40 percent, there was no indication he was appropriately considered for a higher level of care, and the SCR did not state whether he was placed on a modified EOP treatment plan. Between January and February 2020, EOP treatment staff documented that the individual's high refusal rate was "volitional" and unrelated to his mental health symptoms. However, the SCR determined the basis for this claim was inadequate and noted that the individual reported symptoms of depression and psychosis during this period.

Between May and August 2020, the frequency of RVRs increased. The SCR reviewed available RVR mental health assessments during this period and noted some clinicians determined the individual's psychiatric symptoms contributed to but did not significantly influence his RVR behaviors. These evaluating clinicians noted that the individual presented with delusional psychotic perceptions, impulsivity, and impaired decision-making ability. On August 20, 2020, the individual received an RVR for possession of a deadly weapon and a referral to mental health for a crisis evaluation due to bizarre behavior. During this clinical encounter, the individual presented with mildly disorganized thoughts and a slightly anxious mood. The individual also reported a plan to attack a specific custody officer, as he believed the officer was disclosing his personal information to turn others against him; however, the individual was not referred to a higher level of care on this date. The corresponding RVR mental health assessment did not include mental health factors for the hearing officer to consider when assessing a SHU term as a penalty, and during the RVR hearing, the individual reportedly stated, "Two deer in a bucket, fuck it…I just wish I could have did it. I don't care."

On August 25, 2020, while housed in the ASU, the individual requested 3CMS level of care and claimed he had not experienced auditory hallucinations in several years. The ASU EOP IDTT subsequently convened on August 26, 2020, although a clinician noted the individual was unable to attend due to a lack of available jumpsuits. The IDTT retained the individual in EOP with a plan to provide Dialectical Behavior Therapy (DBT) to address behaviors resulting in recent RVRs.

On August 28, 2020, the individual transferred to a PSU to serve his SHU term, and his mental status began to deteriorate. The SCR suggested that the individual presented as anxious and paranoid during a cell-front encounter on September 8, 2020. On this date, the individual reported a belief that custody staff was planning a cell extraction in response to his medication refusal, and custody staff informed the clinician that the individual refused his meal due to fear of food contamination. On September 12, 2020, the individual "superficially" lacerated his forearms, reported thoughts of suicide, and required an MHCB level of care. MHCB clinicians noted the individual had "significantly decompensated" and presented with pressured speech, depressed mood, hopelessness, delusional thinking, paranoia, homicidal and suicidal ideation, and auditory

hallucinations. Additionally, the individual continued to report fear of food contamination and was on a hunger strike for two days during the early part of this admission. The treatment team retained the individual in the MHCB for 11 days without a higher level of care referral or a PC 2602 order, despite ongoing suicidal ideation, auditory hallucinations, functional impairments, and poor treatment and medication adherence. During the discharge IDTT on September 23, 2020, the individual reported ongoing suicidal ideation with thoughts of cutting his forearms lengthwise and voices telling him he had no future and should take his own life. However, the treatment team discharged the individual to the EOP level of care without a sufficient rationale, and the discharge documentation included several inaccuracies that may have influenced the premature release. For example, MHCB staff inaccurately documented that the individual "rarely" thought about suicide, had no suicide history and had not endorsed auditory hallucinations during the MHCB admission. The SCR also noted serious concerns with the discharge suicide risk evaluation, including that it underestimated the individual's suicide risk, failed to include a discharge disposition, and was inappropriately completed at the cell front via telehealth.

The individual was re-referred to the MHCB level of care within 24 hours of the September 23, 2020 discharge and placed in the facility's MHCB. The SCR noted that the individual reported feeling unable to stop thinking about killing himself and believed he was "extremely likely" to harm himself. The individual remained in the MHCB for 21 days; however, he did not receive inpatient care in accordance with Program Guide requirements. The SCR found that five of the required daily clinical contacts were not completed and that the IDTT only convened upon admission and discharge, despite the 21-day length of stay. Although a higher level of care referral appeared clinically indicated, the IDTT did not discuss or document referral considerations during this period or justify their current level of care decisions.

The MHCB clinical documentation described the individual as "quite decompensated," with paranoid delusions, command auditory hallucinations, and suicidal thoughts. However, the individual was not cooperative with treatment and unwilling to engage with mental health staff throughout most of his stay. One clinician noted evidence of improvement on October 2, 2020; however, a few days later, the individual was described as illogical with disorganized speech. On October 5, 2020, the individual received an RVR for battery after throwing feces at a custody officer through his food port. The RVR mental health assessment for the battery charge determined that the individual's symptoms contributed to the behavior and that he exhibited other bizarre behaviors around the time of the incident. The SCR indicated that the RVR hearing was postponed, pending a District Attorney referral; however, the individual completed suicide prior to adjudication.

The MHCB IDTT convened without the individual in attendance on October 15, 2020, and the individual was discharged to the EOP level of care. The IDTT claimed that the individual exhibited progress during the prior week; however, the discharge appeared to be based on the individual's self-report and request for discharge, as clinicians failed to complete contacts on October 10, 11, and 13, 2020. The SCR found that the MHCB discharge documentation inaccurately stated the individual "rarely" thought about suicide, and the discharge suicide risk

evaluation underestimated the individual's suicide risk. Mental health staff had no further contacts with the individual prior to his suicide four days later, as the first four days of his MHCB discharge, five-day follow-ups were completed by nursing staff.

The individual's active psychiatric medications included buspirone, diphenhydramine, venlafaxine, and olanzapine. Quetiapine should have been prescribed at the time of death; however, the reviewer found that the individual's antipsychotic medication erroneously expired without renewal during the MHCB admission. Although the individual informed a mental health clinician he threw feces at an officer in response to a problem with his quetiapine, the provider never followed up on his medication concern.

The SCR referenced at least four prior suicide attempts, including two intentional heroin overdoses in 1999 and 2002, one attempted hanging in 2014, and one recent incident that resulted in multiple "superficial" forearm lacerations. Although the MHCB psychiatrist documented the self-harm incident with "multiple lacerations" on September 12, 2020, the provider apparently did not communicate the concern to other clinicians, and it was not included in subsequent SRASHEs or documented on a self-harm Power-Form in accordance with policy. The SCR identified numerous deficiencies in the five suicide risk evaluations completed within a year of the individual's suicide. Specifically, the reviewer found inaccurate chronic and acute suicide risk information, missing data, overestimated mitigating factors, and underestimated suicide risk. The most recent suicide risk evaluation was completed at the time of the MHCB discharge on October 15, 2020, and the SCR determined the evaluating clinician failed to identify several "critical risk factors" and "likely underestimated" the individual's suicide risk at that time.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.

The Special Master's expert determined the individual's death was foreseeable. CDCR clinicians failed to accurately identify the individual's suicide risk and appropriately intervene to reduce the likelihood of a completed suicide. The SCR found numerous deficiencies in all suicide risk evaluations completed within a year of the individual's suicide, including inaccurate suicide risk information, critical data omissions, and risk underestimations. The individual's most recent MHCB discharge suicide risk evaluation was completed four days prior to his death, and the SCR determined the clinician "did not appropriately recognize a number of critical risk factors and likely underestimated his risk, having viewed his reported suicidality as driven by secondary gain motivators rather than true distress." Further, the reviewer noted that MHCB clinicians "did not accurately assess [the individual's] current symptomatology, which likely resulted in underestimations of suicide risk and impacted treatment planning." Lastly, the SCR found that the MHCB psychiatrist failed to inform other clinical staff of the individual's most recent self-harm or suicide attempt incident prior to MHCB admission. This suicide risk information was not included in subsequent SRASHEs or required self-harm documents as a result.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined the individual's death was preventable; CDCR did not provide adequate care or interventions in accordance with Program Guide requirements, and some of the departures appeared to contribute to the individual's death directly or indirectly. Specifically, treatment contacts, IDTTs, and higher level of care reviews did not meet Program Guide requirements during the individual's 21-day MHCB admission.  Further, the individual appeared to have been prematurely discharged from the inpatient unit twice based on inaccurate clinical information.  Except for one day in the EOP, the individual remained in the MHCB level of care from September 12, 2020 through October 15, 2020. However, the IDTT never referred the individual to a higher level of care or documented higher level of care discussions or considerations prior to the individual's MHCB discharge on October 15, 2020.  According to the SCR, the identified facility suspended routine IDTTs between April and November 2020 due to staffing shortages during the COVID-19 pandemic. While the suspension of IDTTs in the institution's MHCB was concerning, the facility's failure to review and discuss higher level of care considerations for high-risk individuals was more alarming.  Lastly, the Special Master's expert identified concerns during the emergency response that resulted in unnecessary delays in rescue interventions.   The incident reports suggested PSU officers observed the individual unresponsive and hanging two feet from the ground for four minutes in his cell, then proceeded to cuff the individual's hands behind his back prior to lifting the individual's body and cutting the ligature.  The individual was subsequently lowered to the ground, and his legs were placed in restraints prior to CPR initiation.  These delays may have contributed to the individual's death and should have been addressed in the SCR's recommendations.

IV.    Critique of Suicide Case Review Report

The SCR provided a sufficient summary of this case with relevant social, criminal, incarceration, substance use, and mental health history.  The reviewer also included a reasonable assessment of the precipitants to the individual's suicide.   While the SCR reviewed most aspects of the individual's care and recommended appropriate QIPs to address problems identified during the suicide review, the Special Master's expert found that suicide prevention safety plans were not reviewed.  Further, the SCR did not indicate whether the inpatient psychiatrist appropriately considered involuntary medication during the extended MHCB admission, despite ongoing medication nonadherence, high suicide risk, psychiatric decompensation with psychotic symptoms, and prior records suggesting significant improvements during periods of medication adherence.  Additionally, the Special Master's expert identified the aforementioned delays during the emergency response that were not addressed in the SCR.

V.     Analysis of Quality Improvement Plan Process

This case resulted in ten QIPs: eight for the mental health department, one for the nursing department, and one for custody and mental health to address jointly.

The first QIP addressed deficiencies in all five suicide risk evaluations completed within a year of the individual's suicide, including problems with suicide risk underestimations, poor justifications, and critical data omissions.  The SCR required an all-staff training on specific elements of suicide risk assessments, and the institution provided proof of practice and training materials to confirm the training was implemented.  However, the Special Master's expert determined training alone was insufficient to address the suicide risk evaluation inadequacies, as CDCR clinicians have already received more in-depth trainings on the subject.  Additionally, the suicide risk evaluations completed by the identified clinicians were not audited to determine the pervasiveness of the problem, and post-training audits were not implemented to evaluate the effectiveness of the refresher training.

The second QIP addressed ten occasions where clinicians failed to document rationales for safety observation during MHCB admissions.  The facility provided relevant training and included a plan for continued oversight and sustainability.  Local leadership also indicated they would share their audit results with headquarters for additional accountability.

The third QIP addressed the facility's planned Program Guide departure for suspending routine IDTTs between April 3, 2020, and November 16, 2020.  The institution's response indicated mental health headquarters was informed of the facility's planned suspension of IDTTs during the seven-month period.  However, it did not appear this information was shared with the *Coleman* Special Master or his team.  The Special Master's expert was also concerned that, although the facility required routine IDTTs after November 16, 2020, local leadership reported ongoing problems with routine IDTTs in their inpatient units, even after the "Program Modifications were halted."  While the CDCR mental health headquarters memorandum stated that all QIPs were completed and no further action was necessary, the facility did not resolve the issue or propose a QIP to address the Program Guide violation going forward.  Consequently, this QIP was not resolved.

The fifth QIP addressed MHCB staff's failures to review and document higher level of care referral considerations prior to the individual's discharge from the MHCB on day 21. The facility confirmed that clinicians did not document higher level of care referral considerations or current level of care rationales in treatment plans and progress notes during the admission.  MHCB staff were provided a training memorandum outlining Program Guide requirements; however, the Special Master's expert determined this intervention was insufficient.  At a minimum, the facility should have provided an interactive training with examples and conducted post-training audits to ensure the training effectively addressed the problem.

The sixth QIP addressed the facility's failure to document the individual's multiple lacerations to his forearms in September 2020 in accordance with policy. The facility confirmed that the psychiatrist did not communicate the self-harm incident to other treatment team members. Relevant training was provided, and a detailed process improvement plan was implemented. The Special Master's expert determined that the facility appropriately implemented this QIP.

The seventh QIP addressed MHCB clinicians' inaccurate assessments that contributed to suicide risk underestimations and inadequate treatment planning. The response for this item indicated that mental health headquarters identified this as a statewide problem that will be addressed with a training currently in development. The memorandum also indicated that updates on the training would be tracked during headquarters SPRFIT meetings. Relevant training was also provided to the facility's staff to address some of the concerns promptly. No further information was provided as to whether the statewide training was implemented or the expected dates for completion.

The eighth QIP addressed the facility's failure to renew the individual's expired antipsychotic medication during and subsequent to his MHCB admission. CDCR's response indicated mental health headquarters would address the electronic health record error and that a temporary process improvement plan and policy change were implemented as a short-term remedy. This appeared marginally adequate.

The ninth QIP addressed the clinician's report that the individual did not attend his IDTT due to unavailable jumpsuits in the unit. The facility indicated that the clinician's documentation was inaccurate and that the individual actually refused IDTT on this date. The facility instructed the two disciplines to communicate treatment attendance questions and concerns for accurate documentation.

The last QIP addressed suicide precaution rounds in the inpatient units between September 12, 2020, and October 15, 2020, as the reviewer found that they were not completed in accordance with policy. Nursing staff provided relevant trainings to staff and was conducting ongoing random audits for all levels of safety observation. The facility's response indicated that improvements were already noted at the time of their memorandum.

Case L

I.    Summary of Case

This individual was a 33-year-old African American man who was discovered unresponsive on the floor of his solely occupied cell on December 24, 2020, at approximately 0510 hours. The custody officer also observed a "small amount of blood" around the individual's neck and a manufactured weapon near the individual's body. Custody staff subsequently entered the individual's cell and observed three to four puncture wounds on the individual's neck. Despite lifesaving interventions, the individual was pronounced dead at 0559 hours. According to the SCR, there was a ten-minute delay in 911 activation during the emergency response. The individual was receiving mental health services at the EOP level of care at the time of his death.

The individual was born in southern California, where he resided with various family members until he entered the foster care system at age nine. At some point during the individual's childhood, he witnessed his mother attempt suicide by wrist cutting. Although the individual never married or fathered children, the SCR indicated that he had family support throughout his incarceration and regularly communicated with his biological mother. According to the SCR, the individual left high school prior to his senior year. There was no information available regarding the individual's employment history, as the SCR only indicated that he was unemployed and homeless at the time of his arrest for the commitment offense.

The individual struggled with substance abuse issues throughout most of his life. The SCR indicated that the individual began abusing alcohol and marijuana at age 12 and regularly used methamphetamine, LSD, and phencyclidine during his early twenties. The individual continued to abuse substances throughout his incarceration, including alcohol and methamphetamine, and he appeared intoxicated hours prior to his suicide. The SCR noted behavioral problems and gang affiliation at an early age. The individual's first arrest occurred at age 12, and his juvenile record included charges for robbery, assault and battery, and multiple probation violations. As an adult, the individual was arrested for assault and battery, disorderly conduct/prostitution, second-degree robbery, possession of a firearm by an ex-felon, and willful discharge of a firearm with gross negligence. The individual also served one prior prison term in CDCR. The commitment offense occurred on March 21, 2012, and resulted in convictions for criminal threat to cause great bodily injury/death and battery on a non-prisoner.

The individual entered CDCR for his second prison term in January 2013 to serve a 13-year and eight-month sentence. The SCR described the individual's adjustment to incarceration as "poor," as the individual received 15 RVRs; 13 were violent in nature and resulted in extended sentencing. At the time of his death, the District Attorney was also in the process of prosecuting the individual for a November 2019 RVR. In December 2019, the individual requested an SNY designation due to gang disaffiliation-related safety concerns. Subsequently, the individual received only one RVR in October 2020 for willfully resisting a peace officer during suspected substance intoxication. On December 21, 2020, the individual received a BPH denial of early release, although the receipt of "bad news" did not result in a mental health referral. The individual completed suicide three days later. The suicide reviewer referenced a recorded phone call between the individual and his mother two days prior to his death, during which the individual reported a perceived gang-related threat to his life and stated, "I'm about to be dead in a little while."

The individual initially received mental health services when he was psychiatrically hospitalized at age 12 or 13 for aggressive behavior and psychotic symptoms. The SCR noted that the individual did not access MHSDS services during his first CDCR term. While serving his second term in September 2018, the individual required a mental health evaluation after reporting suicidal ideation, although he was not referred for MHCB or MHSDS inclusion. Subsequently, the individual was admitted to the MHCB for danger-to-self concerns and substance intoxication in December 2018 and November 2019, and he was discharged without MHSDS inclusion. However, in December 2019, the individual required MHCB admission, and the IDTT

recommended EOP level of care at discharge. During this period, the individual received multiple RVRs, was facing another extension to his sentence, reported safety concerns related to gang disaffiliation, and exhibited "severe psychosis and mood lability" with suicidal ideation. On January 31, 2020, the individual was referred again for MHCB admission due to suicidal ideation and substance-induced mood and psychotic symptoms. Throughout 2020, the individual continued to abuse various substances, and on one occasion, reported coping with depression and anxiety by "drowning himself in alcohol." However, the SCR found numerous treatment plans during this period failed to address the individual's substance use despite retaining a diagnosis of Substance-Induced Psychotic Disorder and PTSD. On October 13, 2020, the individual was evaluated for MHCB placement due to paranoia, hallucinations, and anxiety, although he was ultimately not referred for MHCB admission. On October 23, 2020, the individual presented as intoxicated and incoherent and was placed in alternative housing awaiting MHCB admission, as the clinician noted, "he is unsafe to return to his cell in his current altered state." Although the individual experienced a panic attack and required an urgent mental health referral while in alternative housing on October 24, 2020, the evaluating clinician rescinded the MHCB referral on this date, and he returned to his regular housing unit. During November 2020, the individual briefly exhibited relative improvements in his mental status and treatment participation; however, by early December 2020, the individual was placed on modified EOP programming as a result of COVID-19 positive individuals on his unit. Consequently, he no longer had access to his group treatment or out-of-cell individual contacts.

Housing unit custody officers informed the reviewer that on December 23, 2020, the individual was "behaving completely out of the ordinary," "running around on the tier in a panic like he had to go somewhere fast," "saying he swallowed cell block cleaner," "up all night pacing in his cell," "crying, depressed, not talking or responding to questions," and repeatedly "spitting up in the trash can." The SCR also indicated that the individual informed officers that he received "bad news" about his family earlier on this date. While custody staff notified the medical department of the individual's condition, the SCR determined custody staff did not refer the individual to the mental health department. Instead, the SCR suggested medical staff referred the individual for a crisis evaluation after the individual refused medical care and signed a refusal form. During the cell-front crisis encounter at 2258 hours, the individual claimed he "wasn't trying to kill himself." The clinician indicated that they were not sure whether the individual was answering questions truthfully during the interview, as the individual presented as "cagey" and refused a confidential contact due to fearing MHCB admission. The crisis clinician documented that some suicide risk evaluation questions were not asked due to the non-confidential nature of the interview. The SCR reviewed the SRASHE completed on this date and determined that the clinician underestimated the individual's suicide risk and did not appropriately consider the impact his substance intoxication had on his psychiatric symptoms and risk. The clinician did not refer the individual for MHCB placement, and the individual was found unresponsive in his cell four to five hours later. During interviews, the crisis clinician claimed they were not informed of the individual's tearfulness, bizarre behavior, or distressed presentation prior to the December 23, 2020 interview.

The SCR identified numerous deficiencies in the six most recent suicide risk evaluations. At least five of the six suicide risk evaluations underestimated the individual's suicide risk, including the SRASHE completed hours prior to the individual's death. The suicide reviewer specifically noted the December 23, 2020 SRASHE "omitted safety concerns, recent substance abuse, increasing interpersonal isolation, current/recent anxiety/panic symptoms, mood lability, recent substance intoxication, current single-cell placement, and recent violent/assaultive behavior." The reviewer further indicated the SRASHEs failed to consider the impact the individual's substance use and intoxication had on his psychiatric symptoms and suicide risk, adding that the individual's substance use "played a significant role in his decision to end his life."

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.

The Special Master's expert determined the individual's death was foreseeable. As noted in the SCR, CDCR clinicians consistently underestimated the individual's suicide risk and failed to consider the serious impact of substance use and intoxication on the individual's psychiatric symptoms and suicide risk. The individual required MHCB level of care on December 23, 2020; however, the crisis clinician inaccurately rated the individual's acute and chronic suicide risk as low and failed to recognize his need for a higher level of care. The SCR indicated that the crisis clinician believed the individual may not have been honest during the interview; however, the clinician appeared to rely on the individual's self-report in their risk assessment, self-harm determination, and level of care decision. Further, the clinician claimed they were not informed by custody and medical staff that the individual presented as tearful, bizarre, paranoid, and distressed prior to their interview, which suggested they had not consulted and were not fully aware of the reason for the mental health referral. There was also no indication that the clinician asked the individual whether he had access to additional intoxicating substances in the cell. Lastly, it did not appear that mental health staff was informed that the individual received bad news from the BPH two days prior or that he subsequently received "bad news" during a family call on December 23, 2020, which likely elevated his suicide risk.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined the individual's death was preventable. The SCR found that custody staff did not submit a mental health referral, which would have included a rationale for the emergent contact. As previously stated, the SCR suggested that the clinician did not appropriately consult with custody staff regarding the nature of the referral, as the clinician claimed they were unaware the individual had exhibited mood lability, bizarre behavior, paranoia, and distress prior to the December 23, 2020 interview. During the mental health crisis evaluation, the

clinician appeared to rely primarily on the individual's self-report when making critical decisions regarding safety planning, despite doubting the authenticity of the individual's responses and noting he was trying to avoid MHCB admission. The numerous SRASHE risk factor omissions referenced in the SCR further suggested that the clinician had not sufficiently reviewed the individual's healthcare record. While the clinician was aware that the individual had ingested "cell block cleaner" and noted the individual exhibited a negative physical reaction to the substance throughout the interview, the clinician did not appear to consider this information in their overall risk determination and safety planning, nor did they inquire as to whether the individual had access to additional intoxicating substances in his cell. Had the crisis clinician adequately reviewed the healthcare record, completed an accurate risk assessment, collaborated with other disciplines, and appropriately referred the individual to a higher level of care for closer monitoring, the likelihood of completed suicide would have been reduced substantially.

The Special Master's expert noted that the individual's psychiatric presentation on October 23, 2020, was similar to his presentation on December 23, 2020; however, in October, staff from various disciplines appropriately collaborated to address the individual's presenting concerns. For example, the SCR noted that the individual was escorted to the TTA for substance intoxication and paranoia, remained in the TTA for four hours of observation, and referred for a mental health evaluation that resulted in MHCB admission for observation due to his altered mental status resulting from substance intoxication. Additionally, healthcare staff consulted with poison control and a telemedicine care physician on this date. A similar collaborative approach with risk-mitigating interventions should have occurred on December 23, 2020.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate summary of this case with relevant social, criminal, incarceration, substance use, and mental health history. The reviewer also included a reasonable assessment of the precipitants to the individual's suicide. While the reviewer's recommendations appropriately addressed various deficiencies discussed in their report, the Special Master's expert identified additional concerns that should have been included in the review. First, the suicide reviewer did not discuss the quality or utility of suicide prevention safety plans, as their report only indicated whether a safety plan was completed. Second, the reviewer's critique of level of care decisions and justifications was lacking, which was concerning given the individual's presentation throughout 2020, and during evaluation completed within hours of his death. Lastly, the suicide reviewer did not recommend a QIP to address the concern regarding the individual's continued access to cellblock cleaner after the housing unit officers became aware that he ingested the substance and appeared intoxicated with bizarre, erratic, and paranoid behavior.

V.    Analysis of Quality Improvement Plan Process

This case resulted in eight required QIPs. The first QIP addressed five deficient treatment plans at two different institutions, as the SCR determined the IDTT documents failed to target the individual's primary diagnosis of substance-induced psychosis. The first facility identified

facility-provided relevant training and implemented a 30-day process improvement plan that included monitoring IDTT documentation and reporting results during their Mental Health Subcommittee. The second facility found pattern of practice concerns after auditing ten treatment plans for the identified provider. The resulting corrective action plan included reviewing the provider's clinical documentation on a weekly basis and providing relevant training to all clinical staff. The Special Master's expert determined the facilities' corrective actions for this QIP were sufficient.

The second QIP addressed multiple deficiencies identified in the five suicide risk evaluations completed within a year of the individual's death at two different facilities and one clinician's failure to complete a suicide prevention safety plan at the time of MHCB referral rescission in October 2020. The first facility's corrective actions included the implementation of relevant training, mentoring, and post-training audits. The second facility audited five SRASHEs for each of the two identified clinicians and noted that all but one SRASHE failed to meet CAT criteria. Further, although both clinicians were no longer employed at the facility, the institution indicated that relevant training was provided to all staff. The Special Master's expert determined the facilities' corrective actions for this QIP were sufficient.

The third QIP separately addressed the deficient suicide risk evaluation completed hours before the individual's suicide, noting the clinician omitted critical information and underestimated the individual's suicide risk on this date. The identified clinician received relevant training and suicide risk evaluation mentoring; however, the Special Master's expert determined the facility should have implemented post-training and mentoring audits to evaluate the effectiveness of these interventions.

The fourth QIP specifically addressed mental health clinicians' failure to appropriately consider the impact the individual's substance use and intoxication had on his mental health symptoms and risk for suicide. A memorandum from mental health headquarters indicated that this item was elevated to the Deputy Director of the SMHP to develop a plan for addressing "the impact of substance abuse on suicide deaths." The response further indicated that regular updates on the action plan would be reported during headquarters SPRFIT meetings until the QIP is resolved. The Special Master's expert did not have access to planning and implementation updates for this QIP.

The fifth QIP addressed noncompliant psychiatry contacts while the individual was housed in the ASU EOP Hub between February 10, 2020, and June 1, 2020, noting the contacts were an "extreme departure from the norm." The identified facility indicated that their "ASU EOP HUB was not staffed by a psychiatrist" at the time, although mental health headquarters subsequently provided adequate coverage with telepsychiatry. The institution further indicated that in-person psychiatry has since resumed due to a higher rate of refusals for telepsychiatry appointments.

The sixth QIP addressed a problem during emergency response, as the SCR noted a ten-minute delay in 911 activation. Although custody staff received training to address this policy violation,

the facility's response indicated "medical staff did not sign as they felt it was not a nursing issue and they felt they followed policy…". The Special Master's expert found it concerning that all disciplines involved in the emergency response did not participate in the training, considering the policy states that every CDCR employee is responsible for initiating 911 when a medical emergency exists. Further, any disagreements at the local level should have been addressed by the regional or headquarters administrators.

The seventh QIP addressed custody staff's failure to submit a mental health referral during third watch, despite reporting the individual consumed "cell block cleaner" and was subsequently crying, paranoid, and engaging in odd and bizarre behavior. The institution's response indicated that custody staff contacted the mental health department by phone instead of submitting a written referral. The identified officers received training, and proof of training was provided. The Special Master's expert determined the corrective action was sufficient.

The eighth QIP addressed the facility's failure to refer the individual to mental health after receiving "bad news" regarding the BPH denial on December 21, 2020. The SMHP's response indicated a "Bad News" policy was in development and was expected to be released to the field during spring 2021.

Lastly, although the SCR did not require a QIP for the individual's access to cellblock cleaner, the facility responded that there was no formal policy or formal training provided by CDCR regarding inventory for cleaning supplies during the COVID-19 pandemic and that each housing unit was responsible for determining "how much a sufficient amount would be considered reasonable and appropriate." The Special Master's expert remained concerned that custody staff did not intervene and remove the substance on December 23, 2020, despite the individual's substance intoxication appearing to present a safety and security issue, as well as a potentially life-threatening situation.

Case M

I.    Summary of Case

This individual was a 31-year-old African American man who was found by a custody officer hanging in his solely occupied OHU cell on December 17, 2020, at approximately 1410 hours. Despite lifesaving interventions, the individual was pronounced dead at 1447 hours. The individual was receiving mental health services at the 3CMS level of care at the time of his death.

The individual was born in southern California and primarily raised by his biological mother. The SCR suggested that the individual's mother neglected him and his two brothers, as they were often left alone in the home. The individual also reported a history of sexual abuse by his brother. According to the SCR, the individual graduated high school and attended some college courses during the course of his incarceration. The individual's employment history included brief jobs as a cashier, a photographer, and assistant to United Parcel Services (UPS) drivers.

The onset of the individual's substance use occurred at age 12. As an adult, the individual's preferred substances were cocaine, methamphetamine, heroin, and various prescription medications. However, the SCR noted the individual participated in substance abuse treatment during incarceration and remained sober for three to five years prior to his death. The individual never married or fathered children. The SCR indicated that the individual had family support and regular visits prior to the COVID-19 pandemic. The individual continued to communicate with his mother after visits were suspended during COVID-19 restrictions.

Prior to the commitment offense, the individual had one arrest that did not result in formal charges. In September 2009, the individual was arrested for the commitment offense, and he received an 18-year sentence for oral copulation and rape with force/violence/fear of bodily injury. The individual entered CDCR for his first and only prison term in July 2012. Although the individual had no prior gang affiliation, the SCR indicated that he was designated SNY upon arrival due to the nature of his commitment offense. The individual reportedly adjusted well to the prison environment and dedicated his time to working in various jobs, completing college courses, focusing on his sobriety, exercising, corresponding with family on a near-daily basis, and participating in various prison programs and self-help groups. During interviews, custody officers reported that the individual was "happy go lucky," "very helpful," and "always said hi." Another officer reported that he "never had any problems" with the individual during the ten years they were acquainted.

The individual appeared to have been preparing for his BPH, as his property contained written parole plans, relapse prevention plans, impact statements, rehabilitation summaries, and letters of support from family, friends, and organizations. However, in 2020, the individual experienced a number of stressors, lost access to his support system, and could no longer engage in the activities that previously helped him cope with the prison environment. The individual's family visits were suspended during most of 2020 due to the COVID-19 pandemic, and in October 2020, he suffered a back injury that resulted in chronic pain and frequent spasms. During October and November 2020, the individual was referred for outpatient physical therapy and issued a temporary lower bunk chrono. On December 1, 2020, the individual received his first and only RVR from a Medical Assistant (MA) who claimed that the individual intentionally fell from the top bunk "to manipulate the extension of his lower bed chrono." The SCR determined that the RVR was not warranted based on Title 15's definition of "unlawful influence" and noted that the MA "made an assumption that the individual was being manipulative." The California Correctional Health Care Services (CCHCS) mortality review also noted a concern that the MA did not refer the individual to a licensed healthcare provider for evaluation. On the date of the RVR incident, the individual required OHU admission due to physical limitations due to an acute back injury. On December 15, 2020, the RVR hearing occurred in the OHU. The hearing officer found the individual guilty based on a preponderance of evidence and suspended the individual's phone privileges for 30 days. The individual completed suicide two days later.

According to the SCR, the individual first accessed mental health services in the county jail prior to his arrival in CDCR. The individual arrived at the Reception Center with active psychiatric medications and was temporarily placed in the MHSDS at the 3CMS level of care until his removal in October 2012. The individual subsequently did not access mental health services for a period

of six years. During this period, he maintained consistent employment, participated in education and self-help groups, had strong family support, and worked toward an early prison release.

Between October 2018 and June 2019, the individual received eight mental health contacts at his request. Although, the clinician determined that he did not meet MHSDS inclusion criteria, as he primarily self-referred for personal growth and situational stressors. However, in July 2019, the individual required MHSDS inclusion and was placed in the 3CMS level of care after he rated his depressive symptoms at a ten out of ten and reported a history of suicidal ideation. Subsequently, the individual was actively engaged in his individual and group treatment. In May 2020, the individual was assigned a new primary clinician and informed that his prior clinician had retired. The SCR noted that the individual was "jarred by the news" and determined that the individual should have received a referral to psychiatry based on his presentation on that date. The suicide reviewer identified multiple concerns with the care and documentation provided by the clinician around this time. Additionally, the July 2020 IDTT documentation indicated that the individual was not invited to attend "because of COVID-19 precautions," which was a violation of policy at the time.

While the mental health clinician described the individual as psychiatrically stable between August and October 2020, the individual subsequently injured his back and exhibited a decline in functioning. By the date of his OHU admission on December 1, 2020, mental health progress notes suggested the individual was psychiatrically decompensating. On December 3, 2020, the individual submitted a request for a mental health contact and indicated his "mental wellness" was "in jeopardy," and he required assistance. However, the SCR found that the referral was not completed by mental health staff because the triaging nurse failed to ensure OHU mental health staff received the request. On or around December 11, 2020, the individual's mother left a voicemail on the facility's family line requesting to speak with a mental health clinician. On December 15, 2020, a mental health clinician met with the individual at the cell front, based on the individual's quarantine status, and obtained "verbal consent" to speak with the individual's mother. During this contact, the individual also expressed frustration with his medical care and requested discharge from the OHU. Although the clinician emailed medical staff regarding the individual's quarantine and OHU status, the SCR noted that the provider did not receive a response. The clinician attempted to contact the individual's mother twice but was unable to reach her.

The suicide reviewer indicated that the individual had not met with psychiatry and was not prescribed psychiatric medications within a year of his death. The SCR further noted that the individual had not expressed interest in medication or exhibited symptoms warranting medication prior to the June 2020 IDTT.

According to the SCR, the individual consistently denied a history of suicide attempts and self-harm incidents, although he had reported a history of suicidal ideation during adolescence. The most recent suicide risk evaluation was completed in 2012, and the individual's acute and chronic risks were assessed as low. The SCR referenced the individual's primary clinician contact in May 2020 and determined that "the standard of care would indicate that the clinician would have completed a SRASHE to obtain additional information and adequately formulate risk."

II.    <u>Determination of Foreseeability</u>

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.  The Special Master's expert determined the individual's death was not foreseeable based on available information.

III.    <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.  The Special Master's expert determined the individual's suicide was not preventable based on available information; however, the overall care provided to this individual was inadequate.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR provided an adequate summary of this case with relevant social, criminal, incarceration, substance use, and mental health history.  The reviewer also included a reasonable assessment of the precipitants to the individual's suicide.  While the reviewer's recommendations were clear and appropriately addressed various deficiencies highlighted in the report, the Special Master's expert noted that the MA's failure to consult with the medical and mental health staff on the date of the RVR incident should have been addressed within QIP number four.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in six required QIPs; three for the mental health department, one for nursing, one for custody staff, and one for nursing and mental health to address jointly.

The first QIP addressed "multiple inadequacies" in the mental health care provided between May 2020 and December 2020.  The facility reviewed the identified clinician's documentation over a period of one year and identified a pattern of practice concerns. The Chief of Mental Health (CMH) subsequently referred the clinician for an Adverse Action Investigation and recommended termination based on the seriousness of the practice concerns.  The Special Master's expert determined the facility's proposed plan for implementing this QIP was adequate; however, the facility did not address the SCR's concern that incarcerated individuals were not invited to attend IDTTs due to "COVID precautions."

The second QIP addressed the Health Record Technician's (HRT) failure to submit a mental health referral with sufficient information in response to the individual's mother's request to speak with mental health staff.  The facility reviewed the incident and determined that the HRT did not violate existing policy by communicating the phone call to mental health staff via email and noted the individual's mother did not indicate her request was emergent.  However, the facility indicated existing policy would be revised to ensure the CMH is included in the email distribution list for family and friend calls and that emergent issues would require a telephone call to the CMH or

designee in addition to an email. The Special Master's expert agreed with the suicide reviewer that the process should also include a formal mental health referral entered into the electronic health record for tracking purposes.

The third QIP addressed the clinician's failure to complete a written Release of Information (ROI) in response to the individual's mother's request for mental health information, as the clinician only documented that verbal consent was obtained. The facility provided training to the identified clinician on relevant policies and provided proof of training.

The fourth QIP addressed both the nursing staff's failure to forward the individual's request for a mental health contact after referral triaging and the mental health clinician's failure to thoroughly review the healthcare record and complete an encounter based on the referral. A nurse supervisor determined "the access to care process was partially followed" by scanning and forwarding the request into the electronic health record's message pool; however, they found that the message was erroneously sent to mental health staff at the individual's prior placement outside of the OHU. OHU nursing staff received training on the healthcare request form workflow and process for routing, triaging, documenting, and using the messaging pool for referrals. The identified mental health clinician also received training regarding chart review expectations. The Special Master's expert determined the facility's response to this QIP was adequate.

The fifth QIP addressed the MA's inappropriate RVR for "unlawful influence" based on their belief that the individual intentionally fell to manipulate the extension of his lower bunk chrono. Although the identified MA received training on "scope of practice" related to determining manipulation and malingering, the facility did not address the MA's failure to consult with medical and mental health staff prior to issuing the RVR. This was especially necessary given that the individual was currently being treated for acute back pain and the MA alleged the individual had engaged in an intentional act of self-harm.

The final QIP addressed concerns regarding the RVR hearing that occurred two days prior to the individual's suicide. The SCR noted that the hearing officer found the individual guilty based on a preponderance of evidence, despite a lack of apparent evidence and "no due process violations." The suicide reviewer further indicated that the RVR was not warranted based on Title 15's definition of unlawful influence and that the medical assistant made an assumption of manipulation. Additionally, the individual had no prior RVRs, pled not guilty to the offense, and was placed in an OHU for acute back pain on the date of the RVR incident. However, these relevant facts were not considered when the hearing officer found the individual guilty and removed his phone privileges for 30 days. The institution's response indicated that the RVR was "appropriate and in compliance with CDCR mandates for individual due process rights" and that "no modification" of the RVR disposition was warranted. The facility further determined corrective actions were not required for this item. The Special Master's expert was concerned that the mental health headquarters memorandum did not address the disagreement between the facility's custody staff and the Suicide Case Review Committee for this QIP, despite noting that all QIPs were completed and that no further action was necessary. There should be a process for

resolving disagreements between the Suicide Case Review Committee and local leadership at the identified facilities.

Case N

I.  Summary of case

This individual was a 33-year-old biracial (Caucasian and Latino) man who was discovered by a correctional officer on the floor of his solely occupied STRH unit cell with fluids emitting from his mouth and nose on January 11, 2020, at 1611 hours. Although the individual presented with altered mental status, he was responsive and breathing on his own.  According to the SCR, the individual was under the influence of methamphetamine and alcohol when he ingested blood thinners and intentionally punctured his cranium with a pen.  The individual later informed medical staff that he forced a pen into his nose to "destroy the part of his mind that was violent." Correctional staff escorted the individual to the TTA for medical care by 1630 hours.  The individual subsequently received medical care at an outside hospital and returned to CDCR within 24 hours.  The facility initially placed the individual in alternative housing with a referral to MHCB; however, medical staff returned the individual to an outside hospital due to continued altered mental status, and the individual remained at outside medical facilities for a period of six months before his death from traumatic brain injury complications. Custody staff did not complete an incident package for the events on January 11, 2020, despite mental health staff notifying officers that the behavior was deemed a suicide attempt on January 15, 2020.  The individual was receiving mental health services at the 3CMS level of care when he attempted suicide; however, his level of care briefly changed to MHCB when he returned from the outside hospital on January 12, 2020.

The individual was born in central California and primarily raised by his mother and stepfather until age 13.  The SCR noted that the individual was sexually abused as a child and that his parents abused substances.  The individual left school in the eighth grade and had several school suspensions and at least one expulsion.  At age 13, the individual was arrested and placed in juvenile hall for sexually assaulting a nine-year-old female. Following his release, the individual continued to engage in criminal behavior, including burglary and assault with a deadly weapon. He spent the majority of his adolescence in group homes, juvenile hall, and the CYA.  The individual's substance use history was significant for daily methamphetamine use beginning at age 19.  He also used alcohol, cocaine, and phencyclidine on occasion.  The SCR suggested that the individual continued to struggle with substance use issues throughout his incarceration, and he was intoxicated during the suicide attempt that resulted in his eventual death.

The individual's adult criminal history included two prior prison terms and convictions for battery, drug possession, harming an elderly person, robbery, burglary, and parole violations.  The commitment offense occurred on December 3, 2014, and involved the individual stabbing his wife 42 times with a hunting knife in the presence of their two-year-old daughter.  The individual was found guilty of first-degree murder and sentenced to life in prison with the possibility of parole.

In November 2015, the individual entered CDCR for his third and final prison term. Custody staff informed the reviewer that the individual showered regularly but typically refused to attend yard. Another officer described the individual as "quiet" and indicated he "hardly came out of his cell." During the course of incarceration, the individual received an SNY designation and was issued seven RVRs: two for possession of a deadly weapon and five for assaultive behaviors. Most notably, the individual cut another incarcerated individual's neck with a manufactured weapon on June 27, 2017, and murdered a cellmate on November 9, 2018. The murder charge was referred to the District Attorney's office; however, the hearing never occurred. According to the SCR, the individual was retained in the STRH unit for 899 consecutive days before attempting suicide in January 2020. The SCR noted that DAI staff completed a classification review due to the individual's STRH length of stay. DAI determined "all appropriate classification policies and procedures were adhered to."

The individual initially received mental health services around the age of nine. During childhood, mental health treatment addressed the individual's behavioral problems and Attention Deficit Hyperactivity Disorder (ADHD). As a young adult, the individual had two involuntary inpatient psychiatric hospital admissions for dangerousness to others, bizarre behavior, and substance use. The individual's stepfather informed the reviewer that the individual also received treatment in the community for depression, anxiety, hearing voices, substance use, sociopathic behavior, and suicidal thoughts. During the individual's two prior CDCR prison terms, he received treatment in the 3CMS level of care and was diagnosed with Bipolar Disorder, Depressive Disorder, and Methamphetamine Dependence. Additionally, CDCR staff documented concerns that the individual was paranoid and may have suffered from a delusional disorder during his second term in 2013. During this period, the individual disclosed to staff that he found it difficult to ask for help due to his paranoia.

The individual arrived in CDCR from the county jail for his most recent term with antipsychotic and antidepressant medications. He was included in the 3CMS level of care at the Reception Center. Between 2015 and 2017, the individual was variably diagnosed with Schizoaffective Disorder, Psychotic Disorder Not Otherwise Specified, Polysubstance Dependence, PTSD, and "possible Bipolar Disorder with paranoid features." During the early part of 2017, the individual endorsed paranoia, visual hallucinations, and command auditory hallucinations. The individual's first and only MHCB admission prior to his final suicide attempt occurred in February 2017 for homicidal and suicidal thoughts triggered by paranoid beliefs. For example, the individual reported, "The Syndicate are after me" and "I'd rather die than live like this." MHCB staff discharged the individual to the EOP level of care after 17 days.

The individual remained noncooperative with treatment and continued to present as delusional and paranoid while in the EOP level of care. The SCR noted that the individual refused the majority of his mental health treatment groups and confidential contacts, and he was eventually placed on a modified EOP care plan. The individual also continued to abuse substances and intermittently refused his psychiatric medications during this period. In April 2018, the EOP treatment team documented that the individual continued to refuse treatment services and had "reached maximum

benefit" from the EOP level of care. However, it did not appear he met any of his treatment goals. Subsequently, the individual's level of care was reduced to 3CMS, and his diagnoses were changed to Generalized Anxiety Disorder, Paranoid Personality Disorder, and Antisocial Personality Disorder.

Throughout 2018, the individual remained in the STRH and continued to refuse treatment contacts and yard. The SCR indicated that the individual presented with paranoid and delusional beliefs during this period. For example, the individual informed mental health staff that he was being watched through his television, that officers were planning to enter his cell, and that staff was tampering with his meals. However, the primary clinician indicated that the individual was less paranoid after selecting his own food tray and washing food items in his cell. In November 2018, the individual informed a nurse he murdered his cellmate, stating, "Nurse, come here. Look I killed him. Look do you see all this blood?" The individual later informed staff that he planned to "qualify for the death penalty" by killing more people in the "remote future." Upon further questioning by mental health staff, the individual reportedly stated, "The idea isn't so much to die, it's to change my placement." However, mental health staff did not attribute the individual's statements or behaviors during this period to mental illness. In July 2019, the individual received an RVR for possession of a weapon, and his reported rationale was, "The impossible will happen here so you never know…I mean I have nothing to lose here. I'm here for life so it doesn't matter." Subsequent documentation indicated that the individual continued to refuse out-of-cell contacts, reported concerns that officers would enter his cell, and began sleeping during the day while remaining awake at night.

The individual's treatment and medication adherence issues did not improve prior to his suicide attempt in January 2020. Although treatment nonadherence was retained on his January 8, 2020 treatment plan, the IDTT opined that the individual's nonadherence was "volitional, and not the result of mental health decompensation." However, the most recent assigned psychiatric nurse practitioner reported during interviews that the individual refused group treatment to avoid people, as he would think about wanting to kill others and "stress about others wanting to kill him." Between February 2019 and the date of the individual's recent suicide attempt, the individual was consistently prescribed aripiprazole (10 mg), mirtazapine (45 mg), and oxcarbazepine (300 mg) at noon and (900 mg) in the evening.

A custody officer initiated an urgent mental health referral on January 11, 2020, for "bizarre and unusual" behavior. The officer reported that the individual was distraught, upset, paranoid, rambling, incoherent, yelling all morning, making vague threats, and banging on his cell door. The individual also reportedly stated, "They are out to get me." The responding clinician completed a cell-front encounter due to the individual's refusal to leave his cell. The provider's documentation on this date indicated that the individual behaved erratically, made bizarre statements, presented as paranoid and intoxicated, and endorsed plans to "hurt someone." Specifically, the individual stated, "It's inevitable. You would need like 50 officers to contain me and I would hate having you get possibly hurt when things went down." The individual further reported he could not trust anyone and pointed around his cell while stating, "Anyone looking in here should be able to tell

something is up." The clinician also noted the individual was "often non-compliant with his psych meds." However, the clinician inaccurately documented that there were no overt signs of distress or psychosis and that the individual's "vague homicidal ideation" did not result from "genuine acute stress." The clinician did not refer the individual to the MHCB level of care for danger to others or develop a follow-up plan for enhanced monitoring. The SCR also found that the clinician failed to conduct a sufficient risk assessment, document risk-mitigating interventions, and provide an appropriate higher level of care nonreferral rationale. The individual was discovered bleeding on the floor in his cell approximately four hours later.

According to the SCR, the individual had a long history of suicidal thoughts and behaviors, beginning in early adolescence. During interviews, the individual's stepfather indicated that he handed the individual an unloaded gun in response to the individual reporting thoughts of suicide at the age of 12; the individual reportedly broke down in tears. During adolescence, the individual engaged in cutting behaviors, although the frequency and recency were not provided in the SCR. Additionally, the individual's wife contacted CDCR during the individual's second prison term due to a "suicidal sentence" he wrote in a letter. According to the SCR, the individual variably reported two to four prior suicide attempts during his lifetime, with methods involving hanging, holding a gun, and wrist cutting. The individual reported one "unverified" suicide attempt during a prior CDCR term in 2011, stating, "I was back in prison again. I had a contract on me from the mafia, I was fighting all the time and I got tired of it." In 2014, the individual reportedly sat on the floor with a razor blade and debated cutting his neck; however, he ultimately decided the razor may not be sharp enough, and he did not "have the energy to do it."

Suicide risk evaluations completed within two years of the individual's suicide attempt consistently assessed the individual's acute suicide risk as low. The suicide reviewer expressed concern that a clinician inappropriately changed the individual's chronic suicide risk rating from high to low in a suicide risk evaluation completed on June 14, 2019, despite five prior SRASHEs indicating high chronic risk. This clinician did not provide a written justification for the change to the static risk factor. Perhaps based on the June 14, 2019 SRASHE, subsequent suicide risk evaluations continued to underestimate the individual's chronic suicide risk without justification, including on September 15, 2019, and following his most recent suicide attempt on January 12, 2020. The SCR referenced the two most recent suicide risk evaluations and noted, "The narrative of risk justification does not appear to integrate [the individual's] chronic risk factors, acute risk factors, imminent warning signs, and protective factors. This likely led to an underestimation of [the individual's] overall risk."

II.   Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case. The Special Master's expert determined the individual's suicide was not foreseeable based on available information.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined the individual's death was preventable. Clinical documentation on the date of the individual's final suicide attempt suggested that the individual presented as psychotic, unpredictable, and as a danger to others. The individual required a more thorough risk assessment and interventions to ensure his safety and the safety of others, including a referral to the MHCB level of care for closer monitoring and stabilization. As stated in the SCR, "despite evidence of homicidal ideation, non-compliance with medications, paranoia, possible substance intoxication, and bizarre and unusual behavior, there were no documented interventions to mitigate risk, no adequate plan for follow up, and documentation did not include a thorough risk evaluation with a rationale for why a higher level of care referral to MHCB was not considered." Additionally, the facility conducted their own investigation and determined that the clinician failed to conduct an adequate record review, consult with medical staff regarding possible substance intoxication, and discuss the individual's "intended, imminent violence toward custody officers" with leadership and custody staff. Had the identified mental health clinician conducted a more thorough assessment and appropriately intervened on the date of the incident, the likelihood of the individual's death by suicide might have been reduced substantially.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate summary of this case with relevant social, criminal, incarceration, substance use, and mental health history. The suicide reviewer also critically evaluated the care provided to the individual within a year of his suicide attempt and included a reasonable assessment of the precipitants to the individual's suicide. However, the Special Master's expert noted that the reviewer did not sufficiently critique suicide prevention safety plans and should have included a QIP to address the identified suicide risk evaluation deficiencies, as the data omissions and risk underestimations may have influenced the level of care decisions and clinical judgment proximate to the individual's recent suicide attempt.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required QIPs: two for the facility's mental health department, one for mental health headquarters, and one for mental health and custody to address jointly.

The first QIP addressed deficiencies in treatment plans completed between 2018 and January 2020. The SCR determined that the individual's treatment teams failed to document rationales for diagnostic changes and address the individual's "level of paranoia and violence" in treatment plans. The suicide reviewer further noted, the inadequate diagnostic assessments "may have influenced level of care placement, treatment planning, and suicide risk." Although the institution followed the SCR's recommendation by providing relevant training to identified staff, the Special

70

Master's expert determined training alone was insufficient. At a minimum, leadership should have been required to conduct post-training audits of treatment plans over time to evaluate the training's effectiveness and determine whether additional interventions were indicated to resolve treatment planning deficiencies.

The second QIP addressed the clinician's failure to intervene appropriately during the urgent clinical encounter four hours prior to the individual's suicide attempt. The response indicated that the identified clinician received relevant training; however, the Special Master's expert determined training alone was insufficient. At a minimum, leadership should have provided formal clinical supervision and monitored the clinician's documentation during a specified timeframe.

The third QIP for mental health headquarters addressed the individual's stepfather's complaint regarding the next of kin notification process. The response for this item indicated that a multidisciplinary workgroup developed a statewide next of kin notification policy, which included a communication workflow. The new policy also requires staff to report "all serious self-harm incidents" to the next of kin and the Headquarters Suicide Prevention Unit. However, the memorandum indicated that the policy had not been released to the field at the time of their response.

The final QIP for custody and mental health staff addressed custody staff's failure to complete an incident package in accordance with policy for the individual's suicide attempt. The facility's response indicated that on January 15, 2020, custody staff were informed that the individual's behavior was deemed a suicide attempt; however, the incident package was not completed. The captain and lieutenant responsible for the policy violation received relevant training to address this QIP. This response appeared adequate.

Case O

I.   Summary of Case

This individual was a 47-year-old Syrian man who was found by correctional officers hanging in his general population, single-cell on March 14, 2020. He was receiving mental health services at the EOP level of care at the time of his death.

The individual and his seven siblings were raised in an intact family. He was born in Syria and immigrated to the United States at age 15. He had a chaotic childhood and experienced physical abuse and domestic violence. He graduated high school and attended some college. He divorced after eight years of marriage and had full custody of the couple's three children. There was no history of substance abuse.

The individual's criminal history was limited to his controlling offense and driving without a license. He was admitted to his first CDCR term in August 2008 to serve life with parole for torture, three counts of corporal punishment or injury to a child, and aggravated mayhem. He had 18 RVRs while incarcerated, primarily for aggressive behavior.

His symptoms began seven years prior to his controlling offense, but there was no community mental health treatment. He was placed at the 3CMS level of care shortly after arrival to CDCR, where he remained for about one year until his level of care was changed to EOP. Shortly thereafter, he was admitted to his first of nine MHCB placements after a suicide attempt by hanging. He was then transferred to his first of eight Psychiatric Inpatient Program (PIP) admissions. Involuntary medications were approved in 2010 and renewed annually. According to the SCR, his symptoms included paranoia, persecutory delusions, negative symptoms, irritability, and self-harm behaviors. He was primarily diagnosed with Schizophrenia but alternately diagnosed with Schizoaffective Disorder and Delusional Disorder. Throughout his time in the MHSDS, he maintained that he did not have a mental illness. His cultural beliefs, which interfered with treatment participation, including medication adherence, appeared to impact his minimization and denial of symptoms.

His referral to the PIP for Grave Disability from the MHCB on November 30, 2019, was precipitated by a clozapine discontinuation. According to the SCR, PIP psychiatric documentation indicated that the individual stabilized with psychiatric medication. In contrast, a review of primary clinician documentation indicated that "it was unclear if any progress dealing with his fixated delusional belief system, insight or suicidal ideation as it pertained to housing was made." He was discharged from the PIP on March 3, 2020, to the EOP level of care. According to the SCR, his eight days in the EOP before committing suicide were unremarkable. The individual continued to deny mental health symptoms, including suicidal ideation and the need for treatment.

There was a history of at least seven suicide attempts in CDCR, five by hanging. He had a near-lethal attempt in 2016 when he cut his neck from ear to ear. He was airlifted for surgery and remained hospitalized for several days. The individual's most recent attempt was in January 2019, when he made multiple superficial lacerations on his wrists. Documentation in the SCR indicated that acute risk factors would be difficult to assess due to his suspiciousness. Overall, SRASHEs assessed him as chronic high risk with variable low risk, although six of 11 risk determinations in the past year rated his acute risk as moderate. Of note, three of four SRASHEs that rated acute risk as low were identified as problematic.

All staff interviewed were shocked by the individual's suicide, including a psychiatrist who indicated he was "adept at masking his symptoms."

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case and included relevant social, criminal, incarceration, substance use, and mental health history.  It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

Two areas warranted further discussion.  The SCR indicated that the individual had been decompensating for a period of time in mid-November 2019 before being admitted to the MHCB for grave disability.  There was no discussion of attempts, or lack thereof, by the primary clinician to consult with the psychiatrist or discussions of an apparent delay in referral to a higher level of care.  Also, continuity of care was likely disrupted by his numerous institutional transfers (32) but was not discussed.

Due to COVID-19, a full site review was not conducted, and interviews were conducted telephonically and by the use of on-site staff.  Potential limitations to the process change were not discussed in the SCR.

V.    Analysis of Quality Improvement Plan Process

This case resulted in nine required QIPs across two institutions.  There was one custody concern that that did not rise to the level of a QIP.

The first mental health QIP addressed delayed IDTTs primarily due to psychiatric staffing shortages.  The institution indicated that the issue was due to a need for training for the assigned clinician.  Adequacy of the response was unable to be assessed as the explanation was not sufficiently responsive to the original issue.

The second mental health QIP addressed the lack of clinical response to the individual's refusal rate.  In response, the institution determined that individualized treatment planning was a system-wide deficit and developed training that all staff were assigned to complete.  A review of training materials did not clearly indicate that the need to modify treatment plans or progress notes in response to refusals was addressed and is, therefore, insufficient.

The third mental health QIP addressed minimal treatment contacts offered and the lack of corresponding policy for frequency of contacts in the PIP.  In response, the Clinical Administrator developed a memorandum that specified minimal treatment hours for each discipline, except psychiatry which was included in a different memorandum.  The exclusion of psychiatry was problematic.  Further, it was unclear why the institution developed a memorandum instead of working with the other PIPs to develop a PIP policy for consistency across institutions.  This response was marginally adequate.

The fourth mental health QIP addressed problematic SRASHEs at two institutions. The inpatient facility attributed the deficit to an individual knowledge deficit, and training was provided to the identified clinician. A limited explanation was provided. This response was marginally adequate as subsequent audits to assess skill application were needed. The outpatient program found that none of the five audited SRASHSEs completed by the identified clinician were compliant. In response, training and re-mentoring were provided, but given the significant deficit and need for subsequent audits and close supervision, this response was inadequate.

The fifth mental health QIP addressed minimal documentation on five-day follow-up documentation and inadequate safety planning. In response to a finding that both identified clinicians failed audits, training was provided. This response was marginally adequate. Subsequent document audits were needed, and an assessment to ascertain the presence of a system-wide deficit was necessary.

The sixth mental health QIP addressed problematic RVR mental health assessments. This was addressed by CDCR Headquarters creating a standardized statewide training that was pending stakeholder approval.

The seventh mental health QIP addressed problematic frequency of psychiatric contacts and psychiatric documentation. In response, the Chief of Psychiatry developed a local memorandum that identified the frequency of psychiatric contacts. However, the quality of psychiatric documentation was not addressed. Further, it was unclear why this was developed separately from the memorandum identified in the third QIP and illustrates the lack of collaboration between disciplines.

The eighth mental health QIP addressed the lack of documentation of out-of-cell non-clinical activities. This was addressed at the CDCR headquarters level; however, the response lacked a specific plan to resolve this issue and was inadequate.

The ninth QIP, a custody recommendation, addressed the use of mechanical restraints, which were applied prior to using the cut-down down kit. It was determined at the headquarters level that there is a discrepancy regarding the use of mechanical restraints with general population incarcerated individuals in Title 15 and the Suicide Prevention lesson plan. This matter was under review with a plan to submit updates. Adequacy of the response was unable to be assessed as further information regarding resolution was not provided.

The custody concern that did not rise to the level of a QIP addressed the emergency response during which the entire cut-down kit was not brought to the incident. This was addressed by institutional supervisory staff, and responding officers were provided with training.

Several areas identified in the SCR warranted QIPs, including problematic PIP documentation such as lack of documentation of treatment progress by the primary clinician, psychiatric discussion of medication changes, lack of documentation of observation levels, and unclear

documentation of whether the individual had full or partial issue. Also, staff reported that multiple staffing changes and staffing shortages impacted patient care, and staff requested intensive follow-up upon discharge from an inpatient unit.

Four additional areas in the SCR identified by the Special Master's expert warranted further attention. The SCR discussed the discontinuation of the low dose of clozapine, in part, "because the provider assumed the clozapine could be easily restarted." However, because the facility was not a "clozapine initiation facility," the medication could not be resumed when the individual decompensated (four months prior to his suicide). It appears beneficial for CDCR to give this issue further attention to ensure all psychiatric providers are aware of factors that impact clozapine initiation and discontinuation. Also, during posthumous interviews with PIP psychiatric providers, there were "reservations" about the individual's clinical presentation, partly due to cultural considerations, including one provider's perception that he "did not present as someone with psychosis." The lack of consideration of an extensive history of psychotic behaviors in available documentation is an area of concern that warrants attention from CDCR. Further, the day of the individual's suicide, he was given paperwork regarding two RVRs he received for fighting prior to his inpatient admission. It is recommended that CDCR custody and mental health work together to reconsider the delivery of documentation that can be perceived as "bad news" in close proximity to significant events, such as an inpatient discharge or suicide attempt. Further, upon notification, including pre/post clinical assessment of incarcerated individuals' mental status and ability to manage the stressor appears indicated. Finally, a review of emergency response documentation indicated that a responding officer stated, "I have a hanger" when reporting the incident. This language is dehumanizing and in direct violation of the Custody and Mental Health Partnership Plan values.

Case P

I.    Summary of Case

This individual was a 64-year-old Caucasian man who was found by correctional officers hanging in his solely occupied cell on an SNY on August 19, 2020. He was receiving mental health treatment at the 3CMS level of care at the time of his death.

He was raised in New York in an intact family until his father's death when he was age nine. He dropped out of school in the tenth grade but obtained his GED. When employed, he worked in the trades. He was married and divorced three times and had three daughters from two marriages. He had an extensive substance abuse history that began during childhood with alcohol and marijuana and progressed to heroin. He began using methamphetamine in his mid-twenties, which continued throughout his incarceration.

The individual's criminal history began as an adolescent, and he was remanded to a youth offender program. As an adult, he had at least 12 arrests and was incarcerated in Arizona before his first CDCR term in 1991. He was admitted to his second CDCR term in November 1996 to serve a 35-year-to-life sentence for assault with a deadly weapon with an enhancement for personal use of a

dangerous, deadly weapon. During his controlling offense, he was shot in the left arm and neck, which resulted in chronic pain that worsened with age.

Placement on an SNY began in 2011 due to safety concerns. During his second term, he received 16 RVRs; seven were aggressive. The individual had not been in segregation since 2015. He had a BPH on November 4, 2020, and the documentation indicated he was looking forward to the hearing.

This individual's mental health history began during childhood with a report of ADHD, Bipolar Disorder, and auditory hallucinations. He had an involuntary psychiatric hospital stay in the community. While in CDCR, with the exception of non-MHSDS placement between 1997 and 2000, and a few months in 2015, he was primarily placed at the 3CMS level of care. There was an MHCB admission in 2001 after a suicide attempt and a brief EOP placement in 2003 to evaluate the presence of psychosis. The individual reported variable symptoms, including psychosis, agitation, irritability, mood variability, and sleep disturbance. In the year preceding his death, he was generally stable with no psychosis; his primary symptom was insomnia and medication requests were related to his disturbed sleep.

The individual had at least two suicide attempts via cutting and one hanging attempt that was interrupted. While in CDCR, 17 suicide risk evaluations were completed, mostly due to program or institution changes. He was generally assessed as low acute and moderate chronic risk, including the two most recent evaluations in 2019 and 2020.

The individual's medical history included chronic pain secondary a left shoulder injury, for which outside medical appointments had been scheduled but postponed due to COVID-19 protocols. The individual submitted a number of health care requests to be seen secondary to shoulder pain and expressed anger and frustration about the delays. Two days prior to his death by suicide, he complained of swelling in his feet but was told that testing (electromyography and nerve conduction test) would be postponed until after COVID-19 restrictions were lifted.

Interviewed incarcerated peers reported that this individual had a history of engaging in odd and unusual behavior, including talking to "spirits," which they attributed to drug use. Two incarcerated peers provided examples of odd behavior they observed during the day or two before his death. One incarcerated peer stated, he "froze for a few seconds standing up with his head tilted to the sky and his mouth was open…like he released a demon from his mouth." Another incarcerated peer observed him "punching…fighting back the demons." The night before he died, an incarcerated peer described him as acting "odd," and the individual told the incarcerated peer the "world is coming to an end" and that he would not be going to medication line the next morning.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not preventable.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate summary of this case and included relevant social, criminal, incarceration, substance use and mental health history.  However, critical analysis was needed for the lack of clinical rationale for varied diagnoses and lack of adequate assessment and monitoring of psychotic symptoms.  Relatedly, the SCR indicated that "when he used amphetamines, he also appeared to become more psychotic."  While possible, it was not clear from reading the SCR that he was actively using each time psychotic symptoms were documented.  The recommendations provided within the SCR followed from the content and findings of the report.

Regarding precipitants to this suicide, active drug use was assessed as a primary factor; however, drug use was not confirmed by the coroner's report.  It was unclear if the coroner's report was reviewed, as there was no memorandum indicating a review of the report.  The SCR indicated that after the individual was pronounced deceased, his body was left in front of his cell for over two hours until removed by the coroner.  There was no indication that this was at the request of the coroner, and no other reason was documented.  This is a significant area of concern given health reasons and traumatization of staff and other incarcerated individuals.  Another area of concern was that the SCR did not indicate that an unlicensed clinician completed an IDTT that was identified as problematic.  Further, following an independent record review, there was no indication that a licensed clinician co-signed this clinician's documentation.  Of note, diagnoses included in the body of the report were not included on a table of diagnoses included in the SCR.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in three required QIPs and two mental health concerns, one of which did not rise to the level of a QIP as it was not deemed proximate to the individual's death.

The first mental health QIP addressed problematic IDTT documentation.  In response, an audit of the identified clinician's documentation was conducted.  While audit results indicated that the clinician passed, training was conducted.  This response was inadequate as it did not address each factor that contributed to inadequate IDTT documentation.  Further, post-training documentation review was needed.

The second joint mental health and medical QIP addressed poor coordination of care between disciplines.  In response, clinicians were assigned to attend existing medical huddles.  This response was adequate.

The third QIP, an amendment, raised the impact of COVID-19 on delayed care.  A memorandum was provided which did not correspond to all delays in care identified in the SCR, specifically a

canceled ducat on August 18, 2020, due to re-directed nursing staff. This response was marginally adequate.

The mental health concern addressed issues with the recent documentation (SRASHE and primary clinician initial assessment) where much of the documentation was pulled forward from previous documents. The SCR noted the "structural challenges power forms present when updating mental health information." This warranted resolution from CDCR given the system-wide impact on various documents that can adversely impact case conceptualization and treatment planning when not appropriately updated.

The Special Master's expert review indicated the need for additional QIPs. An interviewed clinician indicated that the individual's disclosures regarding psychotic symptoms subsided, but the clinician was unsure why. This was a treatment goal that should have been routinely assessed during treatment contacts and documented accordingly. Additionally, a system-wide process to ensure daily review and co-signature of unlicensed staff's documentation is necessary. Finally, a system-wide process to address suicide attempts that were not brought forward after the EHRS cutover is needed.

Case Q

I.    Summary of Case

This individual was a 22-year-old native America who was found by correctional officers hanging in his solely occupied cell in a long-term restricted housing (LTRH) unit on May 26, 2020. He was receiving mental health services at the 3CMS level of care at the time of his death.

This individual was raised by his mother in a chaotic home where he was exposed to substance use, physical and emotional abuse, and neglect, resulting in foster care placement. He left school in the ninth grade and worked unskilled jobs. Substance abuse began at age 12 and continued through his incarceration. His criminal history began during adolescence and resulted in juvenile hall placement. He entered CDCR for his first term in June 2017 to serve three years for second-degree robbery and assault with force likely to produce great bodily injury. His adjustment to CDCR was poor and included SNY placement for a drug debt. The majority of the individual's incarceration was spent in ASU as a result of one of his 11 RVRs for aggressive behavior or secondary to safety concerns. In the less than three years in the CDCR, he was only in mainline housing for 57 days.

As an adolescent, the individual was prescribed psychiatric medication for sleep and anger. Within six months of transfer to CDCR, he submitted a mental health request and was ultimately placed at the 3CMS level of care. He subsequently had 24 level of care changes, alternating between 3CMS, EOP, and MHCB. He had 11 MHCB placements precipitated by suicidal ideation or auditory hallucinations. The SCR documented 1) an extensive pattern of reporting suicidal ideation only to recant at a later time and attributed suicidal ideation as a means to obtain housing change, and 2) periods of stability alternating with acute distress throughout his time in the

MHSDS, including the six months prior to his suicide. He was provided with diagnoses of Adjustment Disorder with mixed anxiety and depression, Polysubstance Dependence in a controlled environment, and Antisocial Personality Disorder. He was intermittently adherent with various prescribed psychotropic medications for treatment of psychosis, mood instability, anxiety, and depression in the year prior to his death. Psychiatric treatment was assessed as "within standards" by the SCR.

In the six months prior to his suicide, the individual had two MHCB placements for suicidal ideation. At the time of the most recent admission, February 28 through March 5, 2020, he identified a plan to hang himself, which he later recanted. After both placements, the individual was discharged to the 3CMS level of care and returned to LTRH. During clinical contacts in the month before his suicide, he presented as future-oriented with an indication that he wanted to be discharged from the MHSDS; however, during other contacts, including the day of his suicide, he reported suicidal ideation and command auditory hallucinations.

The SCR indicated that the number of reported suicide attempts varied with a maximum of three attempts and one interrupted attempt. While in CDCR, 41 SRASHEs were completed. Chronic risk was primarily assessed as moderate. Overall, acute risk varied between moderate and low, with most assessments in the moderate risk range.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. Problems with risk assessment in the month before his suicide were evident and impacted clinical assessment and intervention. On two occasions, May 5, 2020, and May 26, 2020, risk assessments were not completed as required, despite reports of suicidal ideation. A routine risk assessment completed the week before the suicide was inadequately completed and likely underestimated suicide risk. Lastly, escalation of behaviors was not taken into consideration in the determination of suicide risk.

## IV.    Critique of Suicide Case Review Report

While the SCR provided a summary of relevant details regarding social, criminal, incarceration, substance use, and mental health history, it lacked discussion of multiple pertinent clinical factors and was assessed as marginally adequate. Despite shortcomings with the discussion of relevant

mental health care, the SCR provided a thoughtful and reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

Documentation of important issues such as discussion and critical analysis of mental health history, the appropriateness of 3CMS placement and/or additional interventions (e.g., increased contacts, Dialectical Behavior Therapy skills) that could have supported 3CMS placement, the impact of prolonged segregation, group treatment and out-of-cell program participation was lacking. There was minimal discussion of non-referral documentation when a higher level of care indicator (e.g., more than three MCHB referrals in six months) was met. When non-referral documentation was discussed, the rationale was not critically assessed, and treatment modifications were not identified or assessed. Provided care was not sufficiently critiqued for individualization or the appropriateness and implementation of treatment goals. Relatedly, an independent review of the healthcare record did not indicate continuity of care for the primary clinicians and psychiatric providers. Analysis of these factors would have likely resulted in additional QIPs.

Other areas relevant to this individual's care needed discussion. While the SCR indicated that substance use continued throughout incarceration, details were not provided, nor was there discussion of its impact on his mental status or treatment interventions. The SCR also failed to discuss interventions specific to restricted housing, such as the morning check-in meeting, Custody and Mental Health Partnership Plan, and psychiatric technician notes.

The SCR provided an overview of the individual's extensive pattern of reporting suicidal ideation or attempts and then recanting, with staff accepting as truth or reality that he had not experienced suicidal ideation or made an attempt. However, there was no consideration in the SCR that he may have recanted for other reasons, such as shame, and was thus minimizing a suicide attempt or denying previous suicidal ideation, which he truly experienced. This warranted further consideration, training, and guidance regarding care and treatment in these scenarios.

Another major area of concern that was not adequately addressed in the SCR was the high number of transfers and level of care changes (24) this individual had in less than three years. The sheer number of treatment team changes was a significant concern for continuity of care and establishing rapport with the treatment team, a necessary ingredient to trust and disclosure of distress. The lack of provider consistency likely contributed to poor conceptualization of this individual's treatment needs. Consideration should be given to the development of a process to minimize the number of transfers for MHSDS patients. Further, when the number of transfers and/or level of care changes exceeds an identified number in an identified amount of time, a full document review should occur at the headquarters level to assess the provision of care and to make appropriate recommendations. An option would be to include this as part of the sustainable process review.

The SCR did not discuss the impact of terms such as "impression management" and "malingering." These terms remain pejorative and are harmful to the provision of objective, appropriate care and should be discontinued.

V.     <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in six required mental health QIPs, including two institutions and CDCR headquarters SPRFIT.  There was one mental health concern that did not rise to the level of a QIP due to lack of proximity to the date of death.  There were no nursing or custody concerns.

The first recommendation addressed inadequate safety planning but did not include problems with the completion of SRASHEs, including underestimation of risk, which were addressed in the body of the SCR.  In response to the recommendation, training was conducted with identified clinicians.  It was also indicated that all clinical staff had completed the updated safety planning webinar.  While the QIP itself only narrowly addressed identified issues, the response was marginally adequate as post-training documentation audits were needed.

The second recommendation addressed the premature and inappropriate discharge to the 3CMS level of care from the MHCB.  In response, a training memorandum that addressed assessment for and documentation of level of care changes was issued by the CMH.  Proof of practice indicated that the training time was 15 minutes.  This was a grossly inadequate response and should be revisited.  This level of clinical skill requires hands-on training and supervision, particularly for treatment of incarcerated individuals on segregation status where counter-transference reactions can be present.

The third recommendation addressed a clinician's failure to comply with the PREA policy.  In response, the CDCR headquarters SPRFIT responded that a memo would be created and disseminated.  This response was not assessed as proof of practice was unavailable.

The fourth recommendation addressed a clinician's failure to complete SRASHEs after disclosure of suicidal ideation on two occasions in the weeks prior to and on the day of his suicide.  In response, a Letter of Instruction was issued to the identified clinician with a plan for supervision over a 90-day period, focusing on IDTT and corresponding documentation.  This response was marginally adequate; it was unclear why supervision did not include daily review of progress notes, the underlying issue, and/or re-direction.

The fifth recommendation addressed a problematic SRASHE which underestimated risk.  In response, re-mentoring was completed, and efforts identified in the fourth recommendation (above) were referenced as the clinician was the same in both recommendations.  This response was marginally adequate.  Audits of SRASHEs completed after re-mentoring until sustained compliance were needed.

The sixth recommendation addressed the lack of treatment interventions and individualized assessment for the pervasive use of the term "impression management" throughout documentation.  In response, CDCR headquarters SPRFIT was exploring whether an individual plan of care for impression management existed. This response was inadequate.  It failed to address the problematic use of "impression management" terminology as discussed previously.  Additionally,

it failed to address the primary issues of concern, as indicated in the SCR, "documentation lacked…how to obtain understanding as to what was driving the 'impression management.'"

The one mental health concern addressed noncompliant five-day follow-ups.

Two additional areas in the SCR identified by the Special Master's expert warranted QIPs:

- Emergency response documentation used the term "hanger" when reporting the incident. This language was dehumanizing and in direct violation of the values in the Custody and Mental Health Partnership Plan. A system-wide response was needed.
- Healthcare documentation indicated that the individual requested to see the psychiatrist when meeting with his clinician and was told to submit a request instead of the clinician placing an order on behalf of the individual. This response was problematic and delayed care.

Case R

I.    Summary of Case

This individual was a 50-year-old Laotian man who was found by correctional officers hanging in his single cell on December 4, 2020, in STRH. He was receiving mental health services at the 3CMS level of care at the time of his death.

This individual was born in Laos and immigrated to the United States when he was age 11. After his parents separated when he was age seven, he and his three siblings were raised by their mother. He left school in the twelfth grade. He held employment in a factory. After four years of marriage, he and his wife separated, and he had limited contact with his three children. Substance use included alcohol, marijuana, and cocaine use, with regular methamphetamine use for at least six years. He was briefly involved in gang activity and had disassociated himself prior to arrival to the CDCR.

His criminal history began as an adult and included several burglaries, theft and possession of ammunition, and possession of drug paraphernalia charges. His first and only CDCR term began in May 2006, for life without parole for two counts of first-degree murder, two counts of attempted murder, and evading a police officer while driving recklessly. While incarcerated, he received 11 RVRs, many of which were for violent behavior. He was provided with single-cell status due to a history of in-cell violence. His last RVR, battery with a deadly weapon, occurred on December 30, 2019. He was subsequently placed in STRH, where he remained until his death.

The individual's first contact with mental health services occurred in county jail prior to CDCR placement, where he reported taking psychotropic medication for auditory hallucinations. Shortly after his arrival to CDCR, he was placed at the 3CMS level of care. Between 2007 and 2009, he had three MHCB admissions for suicidal ideation. Each discharge was to the 3CMS level of care, where he remained until his death. Since 2009, he was provided with diagnoses of Depressive

Disorder NOS, Psychotic Disorder NOS, and Unspecified Anxiety Disorder.  Symptoms included auditory hallucinations of familiar voices, anxiety, and situational paranoia.  Treatment goals addressed mood symptoms, auditory hallucinations, and anxiety.  He was generally adherent with mental health treatment.  According to the SCR, he was described as stable overall, including the months preceding his death.

This individual had one suicide attempt in 2007 by cutting both wrists, and he may have pointed a gun to his head prior to incarceration.  Five of the six SRASHEs administered between 2016 and 2020 assessed him with moderate chronic and low acute suicide risk.  His last SRASHE in November 2020 assessed low chronic and acute risk, and this concern was identified as requiring a QIP.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not preventable.

IV.    Critique of Suicide Case Review Report

Relevant social, criminal, incarceration, substance use factors, and an overview of mental health history were discussed in the SCR.  However, some pertinent mental health information was not discussed, and critical analysis of coordination of care was missing.  Consequently, the SCR is assessed as only marginally adequate.  The SCR provided a reasonable assessment of the precipitants to this suicide, although the prolonged isolation due to COVID-19 and STRH placement were not considered.  The recommendations provided followed from the content and findings of the report.

A major exclusion noted in the SCR was a discrepancy regarding suicidal ideation noted in the SCR and mortality review documentation.  The SCR indicated that there was no report of suicidal ideation, while the mortality review indicated that he "Claims SI [suicidal ideation]" during the initial psychiatric contact in the month prior to his suicide.  An independent review of the healthcare record confirmed the presence of suicidal ideation that was not identified by the SCR.  An independent review of the record indicated that the initial primary clinician assessment and SRASHE were completed after the psychiatric contact; however, there was no indication that the clinician was aware of the disclosure of suicidal ideation days prior.  A QIP was likely needed for the failure of the psychiatrist to follow policy regarding disclosure of suicidal ideation.

There were two significant areas of concern regarding coordination of care that were not addressed in the SCR and likely warranted QIPs. The first addressed lack of coordination between medical and mental health providers regarding the medical diagnosis of excoriation disorder/ "picking the skin." Nursing documentation referred to "multiple open lesions on his back and side" in the month prior to his suicide. In addition to lack of coordinated care for this disorder which had an underlying mental health component, a medication that was prescribed by psychiatry (hydroxyzine) was "took over" and increased by a medical provider to address the excoriation disorder. The medical provider discontinued this medication in May 2020; the SCR did not discuss whether this was communicated to psychiatry. The second coordination of care concern was between the psychiatric provider and the primary clinician. In addition to the lack of communication of suicidal ideation discussed previously, posthumous interviews with treatment providers indicated that the primary clinician conceptualized the individual's anxiety as secondary to a language barrier or due to crowds. In contrast, the psychiatrist believed the individual's anxiety originated from a disturbed thought process. However, the psychiatrist's assessment was not located in psychiatric documentation during an independent review of the record, an area of concern.

Treatment planning discussion in the SCR needed clarification and analysis. Regarding clarification, the SCR indicated that in January 2020, a treatment goal that addressed auditory hallucinations was discontinued. It was unclear if this goal was met; further, there was not consideration of the continued diagnosis of psychotic disorder in the absence of documented psychotic symptoms. Related to the needed analysis of treatment goals, an independent record review indicated mental health awareness of the excoriation diagnosis but no corresponding treatment goal to address the excoriation. The SCR failed to identify the need to include excoriation as well as the mental health aspects of this disorder as a treatment goal.

The overall appropriateness of psychiatric medication was not discussed in the SCR. Further, there was no consideration of the six-month lapse in psychiatric medication between May and November 2020, which originated from the lack of coordination between medical and mental health staff, as discussed previously.

While the SCR attributed delays to the clinician initial evaluations and assessment to COVID-19 precautions and quarantine, this reasoning was not found during an independent healthcare record review. The individual's first routine contact was not timely as it did not occur within seven days of his IDTT. QIPs were likely needed to address these noncompliant timeframes. The SCR also attributed non-confidential contacts and poor group attendance to the individual wanting to remain in his cell to mitigate exposure to COVID-19. An independent review of a sample of progress notes did not verify this explanation. Instead, documentation of staff shortages and modified programming were noted during the independent review. Lastly, the SCR failed to discuss interventions meant to mitigate risk in restricted housing, such as the morning check-in meeting, Custody and Mental Health Partnership Plan huddles, and psychiatric technician contacts.

V.    Analysis of Quality Improvement Plan Process

This case resulted in five required QIPs, including two institutions.  There were three recommendations for mental health and two for nursing.  There were no custody recommendations.

The first mental health recommendation addressed the lack of group treatment and recreation therapy contacts in the STRH.  The response was inadequate, as it was not fully responsive to the identified problem.

The second mental health recommendation addressed a deficient SRASHE.  In response, SRASHEs completed by the identified clinician were audited, and training was completed.  Proof of practice provided discrepant training times, and audited SRASHEs were not provided for review.  Adequacy was unable to be determined.

The third mental health recommendation addressed a noncompliant (timeliness) psychiatric contact and lack of documented follow-up.  The response from the Chief Psychiatrist in the memorandum addressed to headquarters was problematic and required follow-up.  Specifically, it was documented that, "It is agreed that scheduling a follow-up appointment earlier than 90 days can be good clinical practice, but it is not a requirement per current policy."  This response did not consider direction provided in the "Clinical Contacts and Documentation" memorandum on which staff was trained, which indicated that staff should "Place a new scheduling order as soon as possible and within compliance timelines if possible."  The response also failed to consider that the individual may have missed his appointment due to his mental health needs, which the SCR indicated as minimization of symptoms and disturbed thought processes.  This response was inadequate.

The fourth recommendation addressed a nursing concern of varying times of events during the emergency response.  Proof of practice was not responsive to this issue and was assessed as inadequate.

The fifth recommendation, a nursing issue, addressed a 16-minute delay of nursing staff arrival to the emergency response.  The Mental Health Compliance Lieutenant review attributed the delay to an improper radio battery connection.  Proof of practice was not responsive to this issue and was assessed as inadequate.

Case S

I.    Summary of Case

This individual was a 51-year-old Caucasian man who was found by an incarcerated peer in the shower area of his dorm with multiple lacerations to his wrist and neck that had been made with pencils on December 12, 2020.  He was alert upon discovery and airlifted to a local hospital but was pronounced deceased shortly after arrival.  The manner of death was originally classified as a

homicide and changed to suicide after the autopsy. He was not a participant in the MHSDS at the time of his death.

The individual was a California native and raised in an intact family until his parents' divorce when he was age 11. Both parents had problems with alcohol, and his father struggled with drug use. Educationally, the individual completed some college. Employment was generally commensurate with his level of education. Significant relationships included a four-year marriage during which he had one daughter and a 14-year engagement. There was a history of domestic violence and criminal threats in intimate relationships. Alcohol use was problematic for the individual and impacted criminal activity, including several driving under the influence convictions.

Criminal history began as an adolescent and resulted in juvenile hall placement. He had an extensive and varied adult criminal history that resulted in multiple arrests, fines, probation, county jail time, and five CDCR admissions. He was admitted to his fifth CDCR term in February 2019 to serve nine years for assault with a deadly weapon and second-degree robbery. His incarceration was unremarkable. He was actively involved in several prison programs and was disciplinary free.

Mental health treatment with this individual was minimal. There was one brief psychiatric hospitalization at age 18 for drug-related behavior. Following a period of sleep disturbance, the individual was treated at the 3CMS level of care in 2010, during his third CDCR term. He was assessed as low chronic and acute risk for suicide. He was diagnosed with alcohol and cannabis dependence with a provisional diagnosis of Bipolar Disorder that was later changed to Adjustment Disorder with depression. He was briefly prescribed anti-psychotic medication. The individual requested to discontinue mental health treatment within a few months, and his request was met at his annual IDTT. There was no history of suicide attempts, suicidal ideation, or self-harm.

All staff and incarcerated peer interviewees reported that they were surprised by his suicide.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

## IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case and included relevant social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the

precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

The SCR indicated that upon discovering the individual's body, an incarcerated peer waived a white flag out of the dorm window to alert staff of the medical emergency. The SCR did not discuss why staff was accessed in this manner or the potential delay in access to care it may have caused. If CDCR has any housing that does not have a custody staff post within the unit, it is recommended that CDCR implement a process for incarcerated individuals to directly and expeditiously access custody during emergencies.

Of note, there was documentation that in addition to the self-inflected wounds, ligature marks were noted around his neck. However, an explanation for the origin of the ligature marks was not provided.

V.    Analysis of Quality Improvement Plan Process

This case resulted in one joint custody and nursing QIP. Specifically, activation of the emergency system was delayed. In response, the institution implemented a plan to provide staff training on the updated local operating procedure for emergency medical response. This response was marginally adequate and would have been improved with regular drills to assess skill application.

Case T

I.    Summary of Case

This individual was a 52-year-old Caucasian man who was found by correctional officers hanging in his solely occupied ASU cell on January 5, 2020. He was not a participant in the MHSDS at the time of his death.

This individual was born and raised in Illinois. He and his five siblings were primarily raised by their mother as his father traveled for work. When home, his father, who abused alcohol, was physically and verbally abusive. He left high school prior to graduation but obtained his GED and completed two and a half years of college credit. He was intermittently employed in various labor-related jobs. He had a significant substance abuse history that continued through his incarceration; use included alcohol, marijuana, cocaine, and methamphetamine, his drug of choice. He was married with two adopted children.

He had a lengthy criminal history that began when he was age 13 and continued into adulthood. He began his third CDCR term in May 1995 to serve 11 years for possession (controlled substance and firearm) charges. In 2001, he received a life without parole sentence for first-degree murder from an incident that occurred while he was in county jail awaiting trial for the possession charges that led to his third CDCR term. While in CDCR, he received 24 RVRs; almost half were violent in nature, including a murder charge. The remainder of his RVRs were for noncompliance with

institution rules, including multiple RVRs for substance-related incidents.  Early in his third term, the individual became gang-involved but disassociated in 2007 after learning he was on a hit list. SCR documentation indicated that while he was inconsistent regarding his report of suicide attempts, his first attempt occurred in 2001 by overdose.  His first involvement with mental health treatment began four years into his third term between 2009 to 2010; he received treatment at the 3CMS level of care for depressive symptoms.  In 2012, he was placed in the MHCB for suicidal ideation, and he was discharged to the 3CMS level of care.  While in the 3CMS program, he was treated for depression until 2015, when he was discharged from the MHSDS.  Between November 2017 and June 2019, the individual had multiple MHCB admissions and two PIP admissions with discharges to the EOP level of care.  Psychiatric decompensation and inpatient admissions were generally precipitated by suicidal ideation, self-injury, paranoia, and delusions that were attributed to methamphetamine use.  After a period of stability in January 2019, he was transitioned from the EOP to the 3CMS level of care.  He was discharged from the MHSDS in June 2019 after continued stability.

In the days prior to the individual's suicide, several mental health contacts and risk assessments precipitated by self-injurious behavior and paranoia were completed.  On January 3, 2020, he was placed in alternative housing on suicide watch after engaging in self-harm.  Upon evaluation the following day, his responses were vague, and he indicated that he "did not want to be here." Regardless, he was assessed with low acute suicide risk, and the suicide watch was discontinued. Later that evening, he was returned to alternative housing on suicide watch pending MHCB placement due to opening the self-inflicted wounds from the day prior.  At that time, he presented with paranoia and impaired reality testing.  He was assessed with moderate acute suicide risk.  The next morning, the MHCB referral was rescinded, and he was assessed with low acute risk due to denial of suicidal ideation.  There was no reference to the previous day's documentation when he was described as paranoid with poor reality testing; these symptoms consistently led to inpatient treatment in the past.  He was found hanging later that evening.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable.  There were multiple treatment deficiencies in the days preceding his suicide that should have alerted staff to his risk for suicide.  These treatment deficiencies included overall poor clinical decision-making, including a failure to consider this individual's history of decompensation and previous documentation by a psychiatric provider and nursing staff, inadequate suicide risk assessments, including a failure to query suicidal ideation directly, lack of safety and treatment planning, and lack of referral to a

higher level of care. Custodial deficiencies included placement in a non-retrofitted cell in ASU upon alternative housing placement.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. The SCR included relevant social, criminal, incarceration, substance use, and mental health history. The SCR provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

There were several areas where more discussion was needed in the SCR. The SCR did not clearly explain the timing or process that led to the ASU placement for safety reasons. Relatedly, there was no discussion of interventions meant to mitigate risk in restricted housing, such as the morning check-in meeting, Custody and Mental Health Partnership Plan huddles, and psychiatric technician contacts.

Critical analysis, lacking in several areas, could have likely resulted in QIPs. The use of ASU for alternative housing was not addressed. Additionally, documentation in a 2018 SRASHE that may have underestimated risk was consistently pulled forward; this issue was not addressed. The SCR failed to critically assess and address the institution's response to safety concerns; this has long been a factor in multiple suicides and remains a stressor for many CDCR inmates. A system-wide, coordinated multi-disciplinary response to fully address safety concerns is likely needed. Lastly, during a telephone call with his wife on December 25, 2019, the individual disclosed suicidal ideation with a plan. Awareness of factor(s) that prevented his wife from contacting the institution was likely needed.

The SCR failed to discuss two pertinent and concerning factors that were discovered during a direct review of the healthcare record:

- In January 2020, the first day of five-day follow-ups was conducted on the same day suicide watch was discontinued;
- Completion of a 90-day SRASHE one year following MHCB placement was not completed in November 2019.

The coroner's report and toxicology report were documented as pending in the SCR. There was no corresponding memorandum that the report was subsequently received and reviewed. Review of the toxicology report by the Special Master's expert noted that the sample was positive for methamphetamine and amphetamine.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required QIPs; two mental health, one custody, and one joint mental health and custody.

The first mental health QIP addressed two problematic SRASHEs completed in the days prior to the individual's suicide. The response was inadequate, as it did not fully address identified concerns, proof of practice documents were minimal and incomplete, and the response failed to indicate a plan for subsequent monitoring. Of note, supportive documentation indicated closer monitoring by the headquarters regional team, a positive finding.

The second mental health QIP addressed a lack of appropriate clinical response following the individual's multiple concerning symptoms and behaviors. In accordance with the QIP, the institution conducted an audit of crisis calls, with a finding that "overall appropriate clinical judgment was used." Documentation of the method of review, the rationale for this finding, and response for inappropriate judgment were not included. This response was insufficient. Of concern was the observation that the majority of dispositions were rescinded or not referred. This was an area that warranted further inquiry by CDCR headquarters.

The custody QIP addressed the placement of the individual in a non-retrofitted intake cell in ASU. In response, a budget request was made to increase the number of retrofitted cells. This response was inadequate, as it did not address the original incident, nor did it provide guidance of how staff should manage while additional intake cells were pending approval. Of note, it was documented that the institution did not have a "sufficient number of retrofitted ASU intake cells to meet their initial ASU placement needs." Inquiry of potential systemic factors that may contribute to the number of individuals in need of ASU placement at this institution was indicated.

The joint mental health and custody QIP addressed the occurrence of a cell-front contact while the individual was housed in alternative housing on suicide watch pending MHCB placement. The institution submitted a memorandum indicating problems with lack of confidential treatment space and potential options for fully confidential space. However, additional documentation from the institution indicated a resolution for this issue was outstanding for the "last couple of years." The institution's response was insufficient, as the response did not address the clinician's failure to use alternative space that provided more confidentiality than cell-front contact. The issue of the lack of confidentiality was critically important in this case, as this individual experienced paranoia, which was described during prior clinical encounters. The lack of provision of confidential clinical encounters was concerning. Lack of confidential space at this institution was identified in the Special Master's 28th Round Monitoring Report. Access to confidential space to interview individuals in high-risk environments such as restricted and alternative housing should be addressed.

Case U

   I.   Summary of Case

This individual was a 40-year-old Hispanic man who was found by correctional officers hanging in his solely occupied STRH intake cell on February 14, 2020. He was placed in STRH due to safety concerns on February 13, 2020. He was receiving mental health services at the 3CMS level of care at the time of his death.

This individual was born in Mexico and emigrated to the United States with his parents at age five. He experienced childhood trauma including physical, sexual, and emotional abuse by two of his 13 siblings. There was a family history of mental illness. He had a grade-school education and was intermittently employed in construction. Substance abuse was extensive, began at age 12, and continued through incarceration. The individual's drug of choice was methamphetamine. He had at least one child from a six-year relationship.

According to the SCR, the individual had a significant adult criminal history that began at age 18; further details and juvenile history are unknown. He was admitted to CDCR for his first term in February 2008 to serve a 40-year to life sentence for second-degree murder and firearm enhancement. According to the SCR, he received "numerous" RVRs with seven in the year prior to his death; two were substance related. Gang involvement began in childhood and continued through incarceration. The individual was granted SNY placement due to gang-related safety concerns.

Depression began during childhood for the individual and worsened as an adult. He also experienced trauma symptoms after witnessing his brother's murder during a gang-related shooting. With the exception of a California Welfare and Institutions Code §5150 hold after an accessible plan to shoot himself, there was no history of community mental health treatment. The individual was treated at the 3CMS level of care during his first year of incarceration and then was not a participant in the MHSDS again until April 2011 when he was admitted to the MHCB and treated for psychosis. Between April 2011 and December 2017, the individual had multiple inpatient admissions (MHCB, DSH acute care and intermediate care), some of which were lengthy; he was discharged to EOP level of care. Psychiatric decompensation and inpatient admissions were generally precipitated by suicide attempts/ideation, self-injury, and psychosis. Overall, the individual was intermittently cooperative with treatment, including group treatment and irregularly adherent with psychotropic medication.

In the year prior to his suicide, documentation in the SCR indicated that while the individual continued to engage in self-injurious behavior, with the exception of two suicide watches in close proximity to a level of care change, generally, he was improving (specific details were not provided). The first suicide watch occurred eight days prior to a planned transition from EOP to 3CMS, when he reported suicidal ideation. An MHCB referral was initiated but rescinded when he recanted. On May 28, 2019, the downgrade to 3CMS occurred as planned despite the recent suicide watch. Less than a month after the transition to 3CMS, on June 17, 2019, he was again placed on suicide watch for suicidal ideation. An MHCB referral was generated but then rescinded when the individual recanted. The next day, the individual discontinued his psychiatric medications (aripiprazole, escitalopram, prazosin; he had discontinued venlafaxine in April 2019). Subsequent mental health contacts were unremarkable; although, subsequent risk assessments were identified as deficient and are discussed in the QIP section of this case summary.

This individual had at least eight suicide attempts and engaged in self-injurious behavior (frequency unknown) for stress relief, at times resulting in sutures. His chronic risk was generally rated as high and acute risk was generally rated as low.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable. This individual had a history of suicidal ideation and suicide attempts that resulted in multiple inpatient placements with extensive lengths of stay. Psychiatric stabilization occurred after prolonged treatment at the EOP level of care. Given his ongoing engagement in self-injurious behavior, intermittent treatment compliance, history of decompensation and suicidal ideation/behavior that led to inpatient treatment, it was foreseeable that he would decompensate, resulting in suicidal ideation/behavior, without the structure and regular mental health contacts provided at the EOP level of care. Further, prior to the level of care change to 3CMS, he experienced suicidal ideation and was placed on suicide watch, but the planned level of care decrease continued.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. In the year prior to his death, there were instances of poor clinical judgment regarding his level of care change; lack of appropriate clinical intervention(s) for suicidal ideation; and problematic risk assessments. Specifically, in the year prior to his suicide, he was twice referred to the MHCB for suicidal ideation. The first referral, in May 2019, occurred eight days prior to a level of care change from EOP to 3CMS. The second referral, in June 2019, occurred shortly after he transitioned to 3CMS. Both referrals were rescinded and there was no further clinical intervention other than five-day follow-ups. Documentation from the SCR indicated that both subsequent risk assessments had deficiencies including, lack of adequate responses for lifetime suicidal ideation, quality of protective factors, and a clear plan to use when suicidal.

Risk assessments completed as required in September and December 2019 following the June 17, 2019 MHCB recission were identified as inadequate and resulted in QIPs. Much of the content was pulled forward from previous documentation and not updated. Of concern, documentation from the healthcare record of multiple suicide attempts and inpatient placements was available but was not included in the risk assessment. According to the SCR, this included his denial of lifetime suicidal ideation/behavior and ongoing self-harm behavior. In addition, his risk level rating was decreased without sufficient justification.

IV.    Critique of Suicide Case Review Report

The SCR was well written, easy to follow and represented an adequate summary of this case. While more details regarding criminal history and RVRs would have been helpful, overall, the SCR included relevant social, substance use, and mental health history.  It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.

Three areas warranted critical analysis of clinical decision-making.  Over the years, and during times of decompensation, the individual reported that gang members wanted him to assault a peer; however, he did not comply resulting in safety concerns.  There was no indication that the individual assaulted the peer(s), and it does follow that gang members would repeatedly pressure him to engage in a behavior without consequences for his failure to comply.  Without discussion of this in the SCR, the issue of whether his belief was part of his mental illness and poor reality testing was not addressed.  Discussion of this issue was necessary as the individual again disclosed that gang members wanted him to assault a peer, leading to safety concerns and his placement in STRH which raises the question of missed signs of decompensation prior to placement.  The two remaining areas which warranted critical analysis were the MHCB rescission in June 2019, and the individual's treatment since May 2019 was not provided as clinically indicated.

Several other areas warranted further discussion.  Documentation in the SCR indicated that there was a recommendation for treatment to be provided in Spanish.  Further discussion of whether this was provided, barriers to, or impact on treatment non-adherence were not considered.  Relatedly, reasons for treatment non-adherence were not discussed.  Additionally, diagnoses prior to 2017 were not documented and the diagnoses provided included PTSD and Major Depression Disorder, neither of which accounted for the individual's psychotic symptoms.  Relatedly, reference to auditory hallucinations was not evident after May 2018, and rationale for exclusion was not provided.

Documentation in the SCR indicated that the individual wanted to pursue his GED and programming for vocational skills but that programs were not available in the EOP.  Reasons why this individual was unable to access these programs were not provided.

The SCR indicated that the toxicology and coroner's reports were pending.  However, upon review by the Special Master's expert, the coroner's report indicated that he was positive for opiates. There was no memorandum that the coroner's reports had been reviewed by the SCR author and potential impact.  Relatedly, prior to placement in STRH, the individual disclosed to custody staff that he had a heroin addiction.  There was no documentation in the SCR regarding referral to medical staff for assessment or withdrawal.  It is recommended that staff training on signs of withdrawal be completed and a policy and procedure be developed in which medical staff are alerted when there is the potential for withdrawal.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in six required QIPs; five mental health concerns and one nursing concern.

The first mental health QIP addressed an insufficient treatment plan from February 27, 2019. Audits of the identified clinician's treatment plans with subsequent feedback, training, and a plan for continued supervision resulted in an adequate response for this QIP. Of note, the identified clinician was employed as the institution's pre-release coordinator since mid-2008, and thus IDTTs were not a regular part of their job assignments. This re-direction of job responsibilities likely contributed to the deficiencies in the treatment plan. Factors that contributed to re-assignment to complete an IDTT outside one's job responsibilities warranted inquiry.

The second mental health QIP addressed the individual's lack of attendance at the May 28, 2019 discharge IDTT as he was not listed on the master pass list. The institution determined that he missed the appointment due to a scheduling glitch which was later remedied. In addition, custody staff have since been releasing individuals scheduled for IDTT even when they were not on the master pass list. This response was marginally adequate as it lacked the direction to mental health staff that level of care shall not be downgraded if the individual is not in attendance.

The third mental health QIP addressed a lack of documentation of self-harm behavior on Power-Forms, which likely resulted in an underestimation of risk. In response, an audit of documentation of unusual occurrences indicated 99 percent of self-harm incidents were documented. In addition, an instructional email was provided to staff regarding when to complete a SRASHE and safety plan was provided. However, audit methodology did not correspond to the identified problem, and an inquiry regarding factor(s) that contributed to the lack of completion of Power-Forms was not conducted. Consequently, the institution's response was inadequate.

The fourth mental health QIP addressed a problematic level of care change from EOP to 3CMS on May 28, 2019. In response, deficiencies found in audited documentation from the identified clinician were addressed. In addition, training materials were to be disseminated to EOP staff. This response was inadequate. The audit focused solely on the primary clinician, not the entire treatment team who was involved in making the level of care change. This is specifically concerning as the SCR indicated the "EOP treatment team had reservations about discharging him to 3CMS." Further, the audit method focused on the documentation in the master treatment plan (level of care indicator and higher level of care audit). This narrow focus excluded review of clinical documentation (routine primary clinician and psychiatric documentation) since the previous IDTT to ensure that care provided corresponded to documentation in the master treatment plan and thus, level of care decisions. This approach would have been more in alignment with the identified concerns of his functioning in the months preceding the level of care change.

The fifth mental health QIP addressed deficient SRASHEs dated September 11, 2019, and December 3, 2019. In response, audits of the identified clinician's SRASHEs were completed and re-mentoring was implemented with a plan for subsequent audits. This response was adequate.

The one nursing QIP addressed a delayed 911 call. In response, training was conducted. This response was marginally adequate; there was a need for drills to ensure skill application when responding during a stressful situation. It was unclear why this was not identified as a joint nursing and custody concern as the provided Health Care Department Operations Manual indicated that "All staff has the authority to initiate a 9-1-1 call."

For reasons that were unclear, QIPs were not created for additional deficiencies identified in the SCR. These included problematic SRASHEs completed on May 20, 2019, and June 17, 2019, and the lack of documentation from suicide watches on May 20, 2019, and June 17, 2019. Relatedly, critical analysis of the decision to rescind the MHCB referral despite missing documentation was needed.

Case V

I.    Summary of Case

This individual was a 55-year-old African American male who was discovered hanging from a braided piece of bed sheet tied to the bookcase in his single cell on January 4, 2020, at approximately 0510 hours when officers noticed a bedsheet covered his cell window. Although life-saving measures were attempted, he was pronounced dead at 0540 hours by a paramedic via telephone contact with a local hospital emergency physician. The individual was receiving mental health services at the 3CMS level of care at the time of his death.

This individual was born in Illinois and raised by both parents alongside his six siblings. The family moved to California when he was age 14 due to his father's employment. The individual reported being physically abused by his father, who was described as "strict." According to a POR, the individual began to associate with local gangs, joined the Crips from age 15 to 22, and became involved in delinquent activities. He was removed from his home twice in 1980 and 1981 and sent to the CYA. The individual graduated high school in 1981. His work history prior to incarceration included employment in manual labor and janitorial services. While at CDCR, he volunteered in the GED program and worked as a tutor. The individual was divorced and had two children. He received visits from friends and family members until 2015. The individual spoke to his sister often during his incarceration and wrote to his ex-wife until she decided to stop communicating with him.

The individual has a history of using marijuana, alcohol, and cocaine that began in adolescence and continued into adulthood. His juvenile legal history includes two arrests at age 16 for burglary and failure to obey orders in juvenile court. His adult legal history includes five arrests for escape, vehicle theft, burglary, under the influence of a controlled substance, and tampering with a vehicle.

Prior to his commitment offense, he was committed to CDCR twice, in May 1984 and March 1988, for escape and receiving stolen property and operating a vehicle without a license and hit and run. The individual's index offense occurred in May 1992 and was for robbery in the first degree, burglary in the first degree, and three counts of false imprisonment. The offense involved the

individual hiding in a hotel room closet, and when the victim re-entered the room, he emerged wearing gloves and holding a gun. He told the victim he was a hitman and was hired to kill her but that he would not because he was not paid enough. He also reassured her that he would not rape her. However, he then tied her up, blindfolded her, and began to search her person, jeans, bra, and purse while collecting valuables, including credit cards and cash. He continued to look through her other belongings and eventually notified her that he "found" what he was looking for, put her clothing back into normal position, and left. The individual was not arrested until October 1994 while committing a similar offense. He was originally convicted by a jury trial in 1995 and entered CDCR in March 1995. However, in 1988, he was resentenced to 27 years and four months in prison. The individual's sentence increased following an incident in May 2006 when he held a correctional officer hostage by holding his arm around the officer's neck while holding a shank to his neck with the other hand. The individual then barricaded himself and the officer in an office and began to make demands with threats to harm the officer if they were not met. After 11 hours, during which the crisis and hostage negotiation team conferred with him, he agreed to release the officer. He admitted that he took the officer hostage to "teach" CDCR a lesson for ignoring his requests to have his false SNY classification removed. He was convicted by a jury trial for an in-prison offense of holding a hostage by a prisoner and possession of a manufactured weapon in August 2010 and sentenced to life in prison with the possibility of parole (which started his fourth term).

During his incarceration, the individual received 14 RVRs for various offenses that ranged from battery on an incarcerated peer, taking a hostage, and delaying a peace officer. On April 10, 2010, he requested placement in SNY due to concerns for his safety. He alleged that other incarcerated individuals on the yard were writing "kites" that they would place a hit on him if he did not leave the yard. He was placed in ASU on July 2012 but requested to be removed from SNY in October 2012. His request was considered, and in the interim, he asked not to be sent to a specific facility due to concerns with other incarcerated peers there. However, the committee denied his request for removal due to his "indecisiveness" and transferred him to the identified facility despite his concerns. He was historically recommended for single-cell housing due to safety concerns, custody status, and paranoia towards other incarcerated individuals since 2006. He was in an SNY single cell at the time of his death. There was no mention of appeals in the SCR.

The individual was described as quiet by housing unit officers, and other than a minor incident with an officer, he was cooperative and showed no signs of depression. One of his incarcerated peers described him as worried about an investigation that required collecting deoxyribonucleic acid (DNA) samples from him. Another incarcerated peer reported that the individual had been using methamphetamine during the last one to two months of his life, and that may have played a role in his worsening paranoia (e.g., he told the incarcerated peer that he thought his sister was an "imposter" because she did not recall a story from childhood) during the same time. The latter incarcerated peer also mentioned that the individual was trying to quit but was unable to do so. The individual gave a note to his incarcerated peer asking him to contact the "FBI" if something happened to him. Finally, a review of his belongings after death included writings described as "bizarre and incoherent" and mostly contained Egyptian and Greek mythological references. He

also had a personal journal that, in summary, reflected content consistent with paranoia prior to his death (e.g., asking his wife about a "female agent," noting that she described him as "too paranoid," making note that his sister and wife could not recall stories from the past as points of suspicion, etc.). A review of the individual's telephone call transcripts demonstrated similar bizarre, paranoid discussion content during calls with his sister in the two months preceding his death.

According to the SCR, the individual denied a history of mental health treatment as a child or adolescent. There was no mention of family mental health history in the SCR. He reported two mental health contacts in the community, the first at age 22 or 23 when he was placed on a three-day mental health commitment because he was found "running around with a bat, fearful someone was trying to kill him." He reported being intoxicated at the time. The second incident occurred at age 29 and involved him becoming afraid someone wanted to hurt him while he was in his girlfriend's car. When the police arrived on the scene, he attacked them without an apparent reason. He was arrested, sent to detox, and subsequently released without mental health follow-up. The SCR did not address if the individual received mental health treatment while in the county jail or during his prior two terms at CDCR.

The individual was placed at the 3CMS level of care on July 26, 2002, after he complained of an increase in depression and paranoia. He was diagnosed with "mood disorder" and prescribed the antidepressants bupropion and sertraline. There was no mention of treatment for his complaint of paranoia. The SCR mentions that he "had a few MHCB admissions, primarily for danger to self" but did not indicate when they occurred, provide a review of the admission, or mention the relevant factors on the risk of danger to self. In 2004, the individual's diagnosis was changed to Schizoaffective Disorder, Depressive Type due to symptoms of paranoia, hallucinations, and depressive symptoms. Treatment with the antipsychotic medication risperidone was initiated at that time. That year, and over the next two years, the individual expressed concerns about being mislabeled as a sex offender, which ultimately culminated in him taking an officer hostage to "teach" CDCR a lesson for ignoring his complaints. He exhibited paranoia throughout the next year.

The SCR noted that between 2007 and 2011, the individual's mental health presentation remained consistent. He reported feeling suspicious of having a cellmate in 2011. In 2013, he requested to discontinue his antipsychotic medication. His request was granted, and his Schizoaffective Disorder diagnosis was listed as "by history" between 2013 and 2014. In 2014, his diagnosis was changed to Depressive Disorder NOS. By 2016, he was removed from the 3CMS level of care after several months of requests by him and after six months of not taking psychotropic medication.

The individual was referred to the 3CMS level of care again on January 11, 2017, due to complaints of depressive symptoms that included difficulty sleeping, poor appetite, weight loss, and increased anger with "violent outbursts." At that time, he also reported the stressors of losing his brother, sister, father, and mother and being far away from the remainder of his family in San Diego. He was diagnosed with Bereavement, Depressive Disorder NOS, Antisocial Personality Disorder,

rule-out PTSD, and rule-out Major Depressive Disorder. He asked to restart bupropion. In the remainder of 2017 and 2018, he trialed several antidepressants and anti-anxiety medications, continued to report depressive symptoms, and continued to report hypervigilance towards other incarcerated individuals in his yard. The individual never reported suicidal ideation or homicidal ideation during this timeframe.

The SCR noted that in January 2019, an IDTT was held but not appropriately documented. During that meeting, the individual asked not to be restarted on psychotropic medication. When seen later that month by a psychiatrist, it was noted that his prior diagnosis of Schizoaffective Disorder was unlikely given that the individual had gone a few years without antipsychotic medications and due to the onset of symptoms at age 45. He was seen emergently on February 15, 2019, due to a report of suicidal ideation after he was prevented from taking his liquid nutritional supplement to his cell to drink. However, when seen, he denied suicidal ideation and instead reported homicidal ideation. The individual was referred to custody for five-day follow-up. His rule-out diagnoses for PTSD and Major Depressive Disorder were inappropriately removed during this visit.

Between March 2019 and June 2019, the individual was restarted on mirtazapine. In July 2019, he requested to be taken off of mirtazapine due to sedation. He also requested removal from 3CMS because he did not find it helpful. His request was denied, with the primary clinician telling him he needed to be off medication for six months prior to removal from 3CMS, which he stated he understood. Later in August 2019, he indicated he was not taking his mirtazapine, and it was discontinued by psychiatry. Between September 2019 and October 2019, he remained stable, which contributed to his psychiatrist having no objections in October 2019 to the individual's removal from the 3CMS level of care. He ultimately was not removed from the 3CMS level of care.

On January 1, 2020, the individual reported chest pain and was sent to the clinic for evaluation as a medical emergency. At the clinic, he reported swallowing a "…bindle of drugs, wrapped in cellophane" and reported being fearful that the package had "opened inside of him." His vital signs were concerning for this possibly having occurred, and he was sent to an outside hospital for further evaluation. While at the hospital, the individual wrote a note to the treating physician that custody officers had sexually assaulted him. He then denied swallowing a bindle of drugs, which was corroborated when no bindle was seen on the medical scan. The individual later changed his story and said he was sexually assaulted on November 13, 2019, and also on December 27, 2019. While at the hospital on January 2, 2020, he submitted to a rectal exam as part of evidence collection after a forensic nurse indicated that a transfer to another hospital for a formal sexual assault exam was not necessary. The individual was routinely, and not urgently, referred to see mental health upon returning to the facility on January 2, 2020. A review of video footage on the days he alleged he was sexually assaulted did not corroborate the individual's claims of sexual assault.

The individual was seen by his primary care physician on January 3, 2020, and again reported being sexually assaulted by custody staff two days before his hospital visit. At that time, he was

referred for mental health screening within seven days. The individual committed suicide the next day. During follow-up interviews as part of the SCR review, neither his psychiatrist nor his primary clinician noted anything abnormal in the individual's behavior in the months prior to his death.

A review of medication management by psychiatry overall found that the psychiatric care provided over the last year of the individual's life was within the standard of care and that the documentation was adequate. The individual was assessed for suicide twice in the last year of his life, on February 15, 2019, and May 6, 2019. Both SRASHEs were deemed to have underestimated his chronic risk of suicide due to the clinicians' failures to include the individual's recent claims of past suicide attempts. The individual denied past suicide attempts until 2017 when he endorsed three prior suicide attempts. The safety plans for both assessments were found to be adequate.

The SCR identified several factors that may have played a role in the individual's decision to die by suicide, including paranoid delusions in the two months prior to his death: methamphetamine use during the two months prior to his death that likely worsened his paranoid delusions; feeling persecuted and beliefs that custody officers had sexually assaulted him; and, communicating his belief to his sister and incarcerated peer that custody officers wanted to kill him and asking his incarcerated peer to contact the authorities if something happened to him.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined the suicide was not foreseeable based on available information.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined the suicide was not preventable based on available information.

## IV.    Critique of Suicide Case Review Report

The SCR provided an overall adequate summary of this case, including relevant social, criminal, incarceration, substance use, and mental health history. The reviewer also included a reasonable assessment of the precipitants to this suicide, and recommendations followed the content and findings of the report. However, there was no review of his MHCB admissions, including dates, circumstances, and length of stay, as part of the SCR. This information may have been relevant to the review of the suicide based on when they occurred. At a minimum, an explanation should have been provided explaining why the MHCB stays were not reviewed.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in six concerns being identified, out of which only five rose to the level of a QIP: two mental health, two custody, and one nursing.

The mental health required QIPs focused on the January 2, 2019 IDTT not being documented in the Master Treatment Plan according to policy, and on the February 15, 2019 emergent mental health visit when the rule-out Major Depressive Disorder and PTSD diagnoses were inappropriately removed.  The response to QIP one was an audit of ten IDTTs, of which 90 percent were appropriately conducted.  The clinician that incorrectly documented the IDTT was retrained, with supporting evidence, on the appropriate process.  The response to QIP two was that all clinicians at the institution were provided training, with supporting evidence, on the process flow for removing diagnoses from an incarcerated individual's chart.  The responses were adequate.

The two custody QIPs dealt with custody placing waist restraints on the individual after he was discovered hanging, prior to transporting him to the TTA for further emergency medical care, and for not emergently referring the individual to see mental health when he returned from the hospital and reported he had been sexually assaulted according to the PREA standards.  The response in both QIPs was that custody responded appropriately to the situation based on policy.  At that time, policy only stated not to apply restraints if the individual was in general population housing.  Policy also stated that an emergent mental health referral was required if an incarcerated individual had been seen by a forensic nurse.  Given that was not the case for this individual, the routine mental health referral was deemed appropriate.  Training was provided to custody officers on the PREA policy with supporting documentation included.  The responses were adequate.

Finally, the nursing QIP dealt with nursing's failure to refer the individual to custody and mental health pursuant to policy after he returned from the hospital, where he reported he had been sexually assaulted in the two to five days prior.  The evaluating nurse at the facility did not know the details but did indicate "possible PREA," which should have led to a referral to custody and mental health.  Training was provided to nursing staff on the PREA policy with supporting documentation included.  The response was adequate.

Case W

I.    <u>Summary of Case</u>

This individual was a 65-year-old Mexican American male who was discovered hanging from a noose made from his bed sheet that was tied to the air vent next to his bed in his single-occupied SNY cell on September 14, 2020, at approximately 0719 hours while officers were performing security checks.  Although life-saving measures were attempted, he was pronounced dead at 0752 hours by a paramedic under direction of the base hospital.  It was noted that 911 was not contacted until six minutes after the individual was found.  The individual was receiving mental health services at the 3CMS level of care at the time of his death.

The inclusion of a detailed social and developmental history is limited in this summary due to minimal available information at the time of his death.  The individual was raised in California and had one younger and one older sister and at least one brother who was also incarcerated in CDCR at the time of the individual's death.  The individual's parents were deceased; his father died in 1998, and his mother died in 2006.  There was no documented history of childhood abuse or trauma.  The individual attended school up to and completed the eleventh grade.  He never completed high school or obtained his GED.  The individual's juvenile criminal history, starting in 1968, includes arrests for possession of marijuana, violation of curfew, immoral life, malicious mischief, rape by force, and oral copulation by force.  His documented work history solely included intermittent work as a painter between incarcerations.  He did not have a job assignment in CDCR at the time of his death.

The individual married in 1984 but appeared to have divorced at some point during his incarceration.  He had a daughter with whom he made contact before his death, according to an incarcerated peer.  The individual received support from his younger sister and niece during the incarceration.  However, his older sister terminated contact several years before his death.  The individual reported a history of using alcohol, cocaine, and heroin.  He reported a history of treatment with methadone in the community.  The individual reported ongoing intravenous use of heroin while in prison, expressed interest in buprenorphine/naloxone treatment in July 2020, and was found with drug paraphernalia (a needle) in 2019.  The individual admitted to gang involvement in California.  His criminal history included arrests for petty theft, burglary, drunk driving, robbery, receiving stolen property, resisting a peace officer, and vehicle theft; all resulted in probation or serving time in jail or state prison.  He was incarcerated in state prison four times in 1976, 1978, 1984, and 1989 with repeated returns to prison due to parole violations.

The individual's commitment offense occurred in September 1998 and involved a witness seeing him walk up to a residential address, enter a window, and then exit with items from the residence.  The individual admitted to being intoxicated at the time of the offense.  He was sentenced to 35 years to life because the commitment offense was his third strike due to two prior felony convictions.

The individual entered CDCR for his fifth prison term in March 1999.  He received eight RVRs; most were substance-related offenses, with the last occurring on November 18, 2019, for unauthorized possession of drug paraphernalia.  He requested placement in SNY due to documented enemy concerns with two gangs.  The individual was subsequently placed on SNY status on July 27, 2007, where he remained until his death.

According to the SCR, the individual had a known family history of mental illness that included a father with alcoholism and a brother with an early history of substance use and "behavioral problems."  The individual denied mental health treatment prior to his fifth incarceration at CDCR that his sister corroborated according to the SCR.  The individual was first referred to mental health on July 7, 2020, when he reported ongoing suicidal ideation during a routine nursing screening after returning from an outside hospital where he had been evaluated for abdominal pain.  When

seen by mental health, he reported a previously unreported suicide attempt two days before by placing a plastic bag over his head in an attempt to suffocate himself. The individual reported that he made the attempt while his cellmate was away and that he continued to experience ongoing suicidal ideation with thoughts of cutting his wrists and bleeding to death. The individual also reported depressive and anxiety symptoms because of his ulcerative colitis. He was sent to an outside hospital, and upon his return that same day, he was placed in the MHCB/Temporary Mental Health Unit (TMHU) and placed on suicide watch. However, he was moved from a suicide watch cell to a medical quarantine cell due to denying suicidal ideation on his return and because he needed to be placed on medical quarantine per COVID-19 protocols. There were no dual suicide resistant and medical quarantine cells at his institution. While on MHCB/TMHU status, the individual was not seen daily by mental health staff as required, one of his IDTTs was not timely, he was not invited to participate in IDTTs due to his medical quarantine status, at least one essential staff did not attend one of the IDTTs, and he continued to endorse depressive symptoms and suicidal ideation due to "chronic pain and difficulty adjusting to his medical symptoms." Also noted in the SCR was the lack of consistent observation or issue orders. He was discharged on July 15, 2021, with the rationale that he had a safety plan, his medical issues were being addressed, though there was no documented collaboration with medical staff, and because he did not have "new or worsening" symptoms. The individual was returned to the 3CMS level of care.

The five-day follow-up contacts for the individual did not occur as ordered. He was seen by mental health staff later that month and denied suicidal ideation but reported feeling stressed. On August 4, 2020, he was urgently referred to mental health due to feeling stressed and reported suicidal ideation. He also submitted his own referral that day complaining of insomnia, ongoing pain, and ringing in his ears. When evaluated by a mental health clinician, he complained of depressive symptoms, "substance use," concerns that psychotropic medications were not effective, and constant suicidal ideation with the explanation that he had not "worked up the nerve to do it." He was referred to the MHCB level of care and admitted to a TMHU. He remained on suicide watch under constant observation from August 5 to August 11, 2020. The individual denied suicidal ideation but reported chronic suicidal thoughts during the stay. His complaint of substance abuse was not addressed in treatment planning, there was no documentation that his substance use was considered as a possible contributor to his pain (i.e., heroin withdrawal), and he was given a provisional diagnosis of Depression secondary to a medical condition. Despite his provisional diagnosis, there was no notation of collaboration with medical staff regarding his ongoing complaints of pain though it continued to be identified as a significant contributor to his ongoing suicidal thoughts. His discharge diagnosis was recurrent Major Depressive Disorder. He was returned to the 3CMS level of care. However, he was not considered for referral to a higher level of care at the time of discharge despite this was his second MHCB stay in less than 30 days. Further, he was not referred for substance use treatment. One of the clinicians who saw him during this stay later reported that the individual may have "exaggerated" how well he was doing prior to discharge. The supervising psychiatrist for the MHCB/TMHU later noted that the individual's medical complaints were his major stressor, that his medication was not helping him to sleep, and that referral to a higher level of care (e.g., EOP) should have been considered.

The individual was seen as ordered for five-day follow-ups and was subsequently seen by a primary clinician for follow-up on August 25, 2020, psychiatry on September 2, 2020, and IDTT on September 10, 2020. The latter was his last contact with a mental health clinician prior to his death. He denied suicidal ideation during all visits but continued to endorse the same ongoing medical symptoms of chronic pain and ringing in his ears. The individual submitted a mental health services request on September 11, 2020, requesting a medication adjustment for difficulty sleeping.

The SCR included a review by psychiatry of the individual's medication management and relevant psychiatric history. In summary, psychiatry leadership found that the psychiatric care provided was adequate. However, there was no mention of lack of collaboration with medical, lack of consideration of ways to possibly address the individual's underlying medical symptoms (e.g., chronic pain) that were triggering his suicidal ideation (e.g., some antidepressant medications are effective at reducing chronic pain), failure to include opioid use disorder in his diagnosis list, or failure of his psychiatrist to refer him for medication-assisted therapy with buprenorphine/naloxone on July 28, 2020, when the individual requested it. The SCR noted that the individual's primary care physician was unaware of his chronic pain complaints, the ringing in his ears, and that the individual did not appear to be losing weight. She also stated she was unaware of his mental health concerns.

The SCR identified several factors that may have played a role in the individual's decision to die by suicide that included medical complaints of increasing pain over the last year of his life that led to his suicide attempt in July 2020; new onset tinnitus; mental health symptoms of depression and anxiety; anxiety associated with COVID-19; and ongoing substance use.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined the suicide was not foreseeable based on available information.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined the suicide was preventable based on available information. The individual communicated that he would not tell staff if he decided to kill himself, that he had not worked up "the nerve" to commit suicide yet, that he had an unreported attempt before his first MHCB/TMHU admission, had two MHCB/TMHU admissions less than a month apart, no significant intervention that reduced his primary risk factors for suicide (e.g., medical complaints), no collaboration of care with medical staff to address his complaints to reduce risk, no referral for substance use treatment despite his request, and no referral to a higher level of care

despite his return for a second MHCB/TMHU stay less than a month after the first. Staff had not addressed or made attempts to address the individual's major ongoing risk factors, which were his medical issues and associated pain. Yet, he was repeatedly sent back to a level of care that was inadequate for his ongoing risk and mental health treatment needs. Had the individual received appropriate interventions for his pain and other relevant complaints and been referred to a higher level of care, there is a substantial possibility that his suicide could have been prevented.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate summary of this case, including relevant social, criminal, incarceration, substance use, and mental health history. The reviewer also included a reasonable assessment of the precipitants to this suicide, and recommendations followed the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 12 recommendations, of which nine were deemed to require a QIP. The nine QIPs included six for mental health, one joint mental health and medical, one joint mental health and custody, and one joint nursing and custody.

The three recommendations that did not rise to the level of a QIP were all for mental health concerns, including not inviting the individual to his IDTTs during his first MHCB/TMHU stay; a psychiatrist restarting hydroxyzine after transfer from another institution despite it originally having been ordered by a primary care physician; and a delayed initial psychiatry contact during his first MHCB/TMHU stay. The first was appropriately dismissed as an acceptable factor of medical quarantine and inadequate treatment space. The second was appropriately addressed by a new EHRS alert informing psychiatric providers when they are ordering a medication for an individual that is not in the MHSDS. The third was deemed acceptable given all other psychiatry contacts during his MHCB/TMHU stays were timely.

The six MH QIPs focused on untimely and inadequate documentation of appropriate mental health care. The first QIP was related to failure to conduct the fifth day of a five-day follow-up in July 2020. The second QIP was related to the failure to conduct daily contacts while the individual was in the MHCB/TMHU in July and August 2020. The third QIP was required to address the fact that the IDTT completed during the individual's TMHU stay in July 2020 was late and occurred one day prior to his discharge. The fourth QIP was related to the sporadic entry of issue and observation orders during the MHCB/TMHU stays in July and August 2020. The fifth QIP was required to address the fact that the individual was given a mattress to place on the floor rather than a bed while in medical quarantine during his MHCB/TMHU admission. The sixth required QIP was related to psychiatry's failure to refer the individual for substance use treatment.

The joint mental health and medical QIP was for the failure of mental health and medical staff to collaborate on the individual's care to reduce suicide risk. The joint mental health and custody

QIP was for the failure of the correctional counselor to attend the IDTT held in July 2020 while the individual was in the MHCB/TMHU. The joint nursing and custody QIP was for failure to call 911 until six minutes after the emergency was identified.

All QIPs were adequately addressed by audits, training of relevant clinical or custody staff on appropriate policy and procedure, and/or issuing memoranda to update or inform policy and procedure.

Case X

I.    Summary of Case

This individual was a 24-year-old Hispanic/Latinx man who was found unresponsive in his solely occupied PIP cell with a t-shirt wrapped around his neck on September 29, 2020. The individual initially responded to emergency interventions but died secondary to his injuries on October 6, 2020. The individual was receiving mental health services at the acute level of care at a PIP at the time of his death. He was also a participant in the DDP and was designated as having cognitive deficits with a need for adaptive supports (DD1).

Limited information was available regarding the individual's developmental history. His parents reportedly raised him along with one sister in California. The individual's mother reported that his father had a history of substance use, and the individual witnessed domestic violence against his mother. His parents divorced, and his mother remarried. Records indicated that the individual frequently spoke with his mother via telephone during his incarceration. They last spoke on the telephone on September 26, 2020. During that conversation, the individual expressed distress about being on suicide watch and problems with his ear after placing toilet paper in it and attempted removal of the paper with a pen.

The individual reported that he graduated from high school and worked as a barber. He never married and reported having two children. Prior to his incarceration, the individual reported that he was living with his father, who provided him with financial support, yet the probation report indicated that the individual was transient at the time of his index offense. There were variable reports regarding the individual's substance use. The POR indicated that the individual experimented with marijuana during adolescence, but the individual reported use of marijuana, cocaine, and alcohol as an adult. The individual had six prior arrests, beginning as a juvenile, for crimes that included being under the influence of a controlled substance, robbery, trespassing, stalking, court-ordered returned, and obstruction of a public officer. The POR also indicated a misdemeanor arrest for harm/death to an elder/dependent adult. He served multiple terms in juvenile detention and county jail settings and was placed on probation. He received mental health treatment following crisis episodes while incarcerated in jail. He was noted to be gang-affiliated.

The individual entered CDCR in May 2019 to serve his first term of two years for the first-degree burglary. He was placed at the 3CMS level of care during the reception center process. He was

assessed for developmental disability needs during the reception process and was initially determined not to meet the criteria for the DDP. On June 3, 2019, he was referred for a California Adaptive Supports Evaluation (CASE) due to exhibiting problems with focus, following directions, and requiring repetition of requests. As a result of that evaluation, he was placed at the DD2 designation due to exhibiting a short attention span, having a poor understanding of certain concepts, requiring repetition of directions, demonstrating poor boundaries, requiring reminders to attend to his ADLs, presenting as overly compliant and could be a risk for victimization and exploitation. The SCR noted that the CASE failed to include information from the county jail, despite that information being available in the individual's records. The individual was seen for a second DDP evaluation in October 2019, reportedly at his request. However, no documentation of such a request was located in the individual's healthcare record. At the time of the evaluation, he reported that he did not require reminders to attend to his ADLs, and he was able to read and write. The evaluation appeared to rely on the individual's self-report, information from custody officers, and information from the prior CASE without evidence of a comprehensive record review. The individual was redesignated at DD1 and no longer in need of adaptive supports related to potential victimization. According to the SCR, the justification was noted as "unclear and did not include sufficient information." The SCR reviewed required meetings related to his DDP status and the inclusion of his DDP needs in relevant healthcare documents. While evidence of required documentation was present, there were some exceptions of failure to note his cognitive deficits and adaptive support needs in treatment plans and primary clinician assessments, as well as failure to complete timely review of his CASE and initial Interdisciplinary Support Team (IDST) meeting following a facility transfer in January 2020.

The individual received four RVRs while incarcerated, all related to violent behavior; the most recent occurred on July 28, 2020, for battery on staff. The individual was noted to be psychiatrically decompensated at the time of the RVR and was placed in an inpatient setting, yet he was found guilty of the battery on August 11, 2020. A Captain and Chief Disciplinary Officer requested revisions to the RVR, and the results of this revision request were pending at the time of his death. The SCR reviewed the mental health assessments that were completed in response to his four RVRs. Deficiencies were noted in all four assessments with regard to consideration of the individual's DDP status.

The SCR noted that during interviews following the individual's death, a discussion of a possible PREA incident was raised. As a result of an ongoing investigation into these events, a discussion of the incident was not included in the SCR. Additionally, video surveillance of the acute unit on the day of the individual's suicide was reviewed but could not be discussed within the SCR due to an ongoing OIA investigation.

During an interview following the individual's death, his mother reported that he had exhibited mental health symptoms and received treatment at age eight. He reportedly functioned well from age ten through age 17 and then began using drugs and exhibiting behavioral problems and signs of paranoid thinking. He was diagnosed with Bipolar Disorder at that time. His mother reported a family history of Schizophrenia and mentioned that the diagnosis of Schizophrenia had been

considered for the individual during a court hearing for a previous crime.  She indicated that the individual was in denial about his mental health needs, which often contributed to his refusal to take psychotropic medication.

Records from county jail dated from May 2019 noted that the individual required a number of crisis stabilizations and had been diagnosed with Psychotic Disorder, Schizophrenia Unspecified, Unspecified Psychosis, and Adjustment Disorder with anxiety in the past.  There was a record of a suicide attempt while in jail.  The county records also noted a history of polysubstance use, questionable cognitive impairment, and questionable seizure history.  The individual had been prescribed paliperidone palmitate, mirtazapine, and hydroxyzine at the county jail, prior to his transfer to CDCR.  The county records indicated that the individual had been hospitalized at a DSH facility in 2016 for an evaluation for competency to stand trial.  Records from this hospitalization were never requested by the individual's IDTTs during his incarceration but were requested as part of the SCR.  The DSH records noted that the individual had assaulted his stepfather with a brick and had an extensive history of mental illness and threats toward others. He was described as tangential with odd behaviors and mannerisms, concrete thinking, suspicious and paranoid thought process, and difficulty incorporating new information into his stream of thought.  He was assessed as mildly developmentally disabled with a low IQ that may have resulted from recent head trauma.  While hospitalized, he required court-ordered involuntary medications due to refusals.  He had a history of being assaulted while in the DSH facility and was fearful of others.

Upon his arrival in CDCR, the individual remained stable at the 3CMS level of care, with intermittent medication adherence problems while being treated for reported delusions, depression, and insomnia.  He was seen for an emergency consult in November 2019, after he presented with delusions, poor concentration, disorganized thoughts, loose associations, and paranoia, and he expressed suicidal ideation.  He was placed at the MHCB level of care and was guarded and uncooperative during his placement.  He minimized his symptoms, refused clinical contacts, and was not medication adherent.  The individual consistently denied suicidal ideation and reported that he refused clinical contacts out of fear for his safety from other individuals.  Despite making no progress toward treatment goals, the decision was made by the IDTT to discharge the individual to the EOP level of care after less than one week.  The SRASHE completed at discharge noted medication nonadherence, refusal to engage in safety planning, grandiosity, and paranoia.

The individual's first IDTT in the EOP was completed ten days after his arrival and included goals to target hallucinations and poor judgment.  He was not seen again for over two weeks, rather than weekly, as required by the Program Guide.  He refused to attend groups, denied the need for medication, and continued to report paranoid thoughts about being attacked by other incarcerated individuals.  On December 6, 2019, his olanzapine was discontinued, which was the last medication he had continued to be prescribed.  Over the subsequent month, the individual reported worries about being released from prison and suicidal ideation following an assault on another incarcerated individual.  The mental health assessment completed in response to the RVR for the assault determined that his behavior was not influenced by his mental illness or development

disability. Yet, a mental health assessment completed three weeks later in conjunction with two additional RVRs (for destruction of state property and fighting) noted that his mental illness and developmental disability were contributory. He was referred to a higher level of care.

On January 16, 2020, the individual was transferred to an MHCB for poor treatment adherence, multiple RVRs, and symptoms of psychosis. The SCR also noted that the referral included the fact that the individual was refusing his medications. However, the SCR failed to indicate when psychotropic medications were restarted following the discontinuation of all medications in December 2019. The individual was disorganized and uncooperative while in the MHCB and was referred to the PIP at the acute level of care. He transferred on February 5, 2020, and reported suicidality on that date. He also began taking medication following his transfer and continued taking medication and engaging in treatment over the following seven weeks. He continued to show signs of delusional thinking but denied the need for PIP and EOP levels of care and appeared to stabilize. He was discharged on March 30, 2020, to the EOP level of care.

During April 2020, the individual was seen by his IDTT, but his treatment goals were unclear and appeared to target medication and treatment adherence, although no IPOCs were created. At his initial psychiatric appointment on April 14, 2020, the individual asked if he was required to take medications, and the decision was made to start decreasing his dosage. The individual began refusing his psychotropic medications in May 2020. The SCR noted that the individual's functioning and clinical status appeared copied from week to week in the primary clinician's progress notes as the wording was identical and failed to note his medication nonadherence. During May 2020, both his primary clinician and his psychiatrist failed to note his medication nonadherence but noted that the individual reported feeling stressed about being released from prison. The individual also reported stress due to the facility being locked down due to COVID-19 restrictions, and the individual reported concerns that he believed he had cancer, though he did not.

On June 3, 2020, the individual was decreased to the 3CMS level of care, with the only rationale noted as "he continues to be on psychiatric medication." The decrease in his level of care appeared to be prompted by the individual's request. It did not consider his recent PIP admission, poor medication adherence, only being seen for cell-front contacts for the previous 60 days due to COVID-19 restrictions, or continued reports of anxiety and depression. The facility noted this as a concern during their internal review following the individual's suicide. The individual was not relocated off the EOP yard for several months due to COVID-19 movement restrictions; therefore, he was seen by his EOP primary clinician after the level of care change. The individual submitted multiple requests to be removed from DDP, and by the end of June 2020, the individual was requesting to return to the EOP level of care. During a primary clinician contact on July 1, 2020, he reported that his medications were causing hallucinations, but he was not referred to psychiatry. The individual began routinely refusing medications on this date, and on July 10, 2020, he was seen by his 3CMS psychiatrist, who discontinued his antipsychotic medication (olanzapine) and started the individual on buspirone for depression. The psychiatrist noted that the individual had decompensated following discontinuation of his antipsychotic medications and scheduled the

individual to return in two weeks. On July 16, 2020, the individual was seen by medical staff for a lump on his head, which the individual reported was due to hitting his head on "the wall on accident." There was no indication that this was referred for assessment as a self-harm incident. The individual requested to see his psychiatrist on July 17, 2020, for an increase in medications but was instead seen by his primary clinician on July 24, 2020. The primary clinician did not refer the individual to psychiatry for follow-up.

On July 28, 2020, the individual was agitated, pacing on the unit, yelling that his life was in danger, and reported suicidal ideation. He was placed in a therapeutic module while awaiting a mental health evaluation. When he was seen for a SRASHE, the individual was standing with his pants down, exposing his genitals. He reported that he had snorted his buspirone and had said he was suicidal just to be removed from the unit. He was cleared to return to his housing unit, but during the escort back, he resisted officers, was yelling, and punched one of the officers in the face. He was admitted to MHCB and was placed on maximum custody status as a result of the assault. When seen for assessments, the individual presented variably, reporting that he "just needed to get away" but then appeared disorganized, crying, reporting chest and leg pain, and exhibited tangentiality. The individual refused to attend his IDTT on July 31, 2020; consequently, a treatment plan was developed without him, targeting danger to others and verbalizing suicidal thoughts. There was no mention of psychotic symptoms nor medication nonadherence. The individual refused daily contacts, refused showers, was not eating, and appeared confused. The psychiatrist recommended a PIP referral and consideration of a PC 2602 involuntary medication evaluation, though the individual agreed to take medication on August 2, 2020.

During his mental health assessment for the RVR for the assault on the correctional officer, it was determined that the individual's mental illness, but not his development disability, contributed to his behavior. As this was his fourth RVR in the prior six months, he was considered for a behavior management plan. The individual remained disorganized while in MCHB, and the SCR noted that it was difficult to determine from documentation the privilege and observation levels for the individual during this admission. He was referred to a PIP at the acute level of care on August 7, 2020, and was transferred on August 13, 2020. On that date, he was also evaluated by a dietician who noted fluctuations in the individual's weight over the prior six months. The individual was not present for his initial IDTT on August 14, 2020, due to COVID-19 restrictions. A treatment plan was developed to address insight regarding the reason for admission and mental health symptoms; identified triggers for suicidality; aggressive behaviors; and decreasing symptoms of psychosis and improving ADLs. The SCR noted that privileges and observation levels were absent from the IDTT documentation because only psychiatrists were allowed to write such orders at the facility, and the psychiatric documentation did not include this information.

Over the following two weeks, the individual's activity levels and participation in out-of-cell activities were restricted due to COVID -19 while the individual was in a quarantine intake unit. The individual expressed that he was struggling with not being able to leave his cell. His treatment goals during this time focused on danger to others and paranoia. He was transferred to the Max Acute unit on August 28, 2020, on suicide precaution status, and was seen for his initial IDTT on

September 1, 2020. The individual reported suicidality during a primary clinician contact on September 3, 2020, including thoughts of tying his shirt around his neck and choking himself. The individual requested to be placed in a safety smock and reported that he wanted attention. The primary clinician determined that despite his statements, the individual was not suicidal but was stressed about another incarcerated individual housed next to him who was loud and aggressive. No SRASHE was completed nor change in level of observation documented. The following day, the individual was seen by a psychiatrist and noted to be tangential and disorganized. The individual again asked to be placed on one-to-one status on September 5, 2020, but then changed his mind. Later that same day, the individual reported to nursing staff that he did not feel safe with his clothes and a pen filler in his possession. He was given a safety smock and received a dose of psychotropic medication. No SRASHE was completed, despite the individual being retained in a safety smock the following day. During an IDTT on September 8, 2020, the individual was removed from observation status, and there was no change to his treatment plan to address his recent suicidality.

Over the next few days, the individual made requests to his primary clinician, psychiatrist, nursing staff, and a recreational therapist to leave his cell and to be transferred off the unit due to boredom and other incarcerated individuals talking about him. The recreation therapist noted that the individual was unable to participate in groups due to his max custody status. On September 12, 2020, the individual attempted to grab a correctional officer during evening meal pass. When seen for his IDTT on September 15, 2020, the individual was noted to be less disorganized and less tangential, though later that evening, he reported thoughts of self-harm to a nurse. He was encouraged by the nurse to see if his evening medications would be helpful and fell asleep without further incident that evening. On September 16, 2020, the individual inserted a piece of toilet paper into his ear so deeply that medical intervention was required. During the examination, the individual fell to the floor and appeared to have a seizure, but the veracity of the seizure could not be verified. The individual was taken to a community hospital as he ruptured his tympanic membrane. Despite this, he was not seen for self-harm, the incident was not recorded, and his treatment plan was not modified to address the behavior. On September 17, 2020, the individual reported to both his primary clinician and his psychiatrist that he did not like "this place" and "will do anything to get out of this place." He stated that more programming was available to him at the EOP level of care and requested to be discharged.

Between September 17 and 20, 2020, the individual was placed on suicide watch; however, the reason and time of placement were not clearly documented in the healthcare record. The only indication was nursing documentation on September 20, 2020, noting that the individual was on suicide watch secondary to danger to himself. When seen for his IDTT on September 22, 2020, the individual was still in a safety smock, but a plan was developed to discharge him the following week. It was documented that he had not engaged in self-harm or expressed suicidality in the previous week and that the individual reported that he made suicidal statements to get attention. On September 23, 2020, the individual was found standing in his darkened cell with a sock tied around his neck. His eyes and face were red. He was placed on suicide watch, but a SRASHE was not completed despite the Power-Form indicating that it could not be determined whether the

behavior was suicidal or not. The individual reported to the psychiatrist that the self-harm incident was a suicide attempt. The individual was noted by the psychiatrist to be preoccupied with the length of his penis, with some indication that other incarcerated individuals had also been commenting on the individual's penis size. He also appeared preoccupied with his sexuality during a session with his primary clinician later that day, with a comment about showing others "that I wasn't sexually active, so I got naked and tried to hang myself."

On September 26, 2020, the individual again tied something around his neck while under observation. He was noted to have a red face and a piece of black rubber wrapped around his neck but no other injuries. He was retained on suicide watch, but no SRASHE nor self-harm Power-Form were completed. Over the next two days, the individual was seen at cell-front by a psychiatrist; limited documentation was noted consisting of simple statements that the individual remained unpredictable and uncooperative. The individual reported to the psychiatrist that he was no longer suicidal on September 29, 2020, and was returned to full privileges and clothing. He was placed on 15-minute observation checks, yet there was no order for this observation level in the record. A review of psychiatric documentation indicated that the psychiatrist intended for the individual to be observed more frequently than routine nursing checks every 15 minutes. However, there was no indication of an order for 11-minute checks, which would have alerted nursing staff to the need for increased monitoring. The individual was found unresponsive secondary to tying a shirt around his neck later that evening.

Records indicated that during his incarceration, the individual received 11 SRASHEs; many appeared to underestimate his level of acute risk. The rationale for low acute-risk ratings appeared based on the individual's self-reports of no longer feeling suicidal or feigning suicidality, along with a focus on his psychotic symptoms rather than his suicide risk. Many of the SRASHEs were completed as a routine part of referring the individual to a higher level of care, and the individual occasionally refused to participate in the evaluations; consequently, the development of safety planning was minimal. The SCR noted multiple concerns with SRASHEs completed in the final year of the individual's life, including poor risk rationale, inappropriate risk ratings given the risk factors present, blank sections, copied text, and an overall underestimation of risk based on the individual's retraction of suicidal statements.

The SCR noted that there was a problematic incarcerated individual in the PIP housed next to the individual on the unit. The unit staff lack the authority to move incarcerated individuals without approval from headquarters. The primary clinician reported that requests for moving the problematic incarcerated individual were denied even though the problematic incarcerated individual was housed next to two developmentally disabled individuals. Upon further review, the SCR noted that custody staff have the authority to change bed assignments locally and are not required to obtain headquarters' approval. What was not clear is why the facility's misperception was not corrected by headquarters when the request to move the incarcerated individual was reportedly "denied."

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.

The Special Master's expert determined this individual's death was foreseeable based on the fact that the individual made two suicide attempts within a week of his lethal act, made suicidal statements leading up to his act, and had engaged in other self-harming behavior prior to his death. There was clear indication of escalation of risk and a resurgence of a decompensation pattern exhibited by the individual to which staff failed to attend properly.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined that the suicide was preventable based on the fact that the individual engaged in suicide attempts and self-injury prior to his death, highlighting the need for continued monitoring, increased clinical contact, and medication adjustments, including the consideration of PC 2602 orders. Yet, instead, the individual's level of observation was decreased, and his self-harm and suicidality needs were not targeted for treatment.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use, and mental health history. The reviewer included a review of this long and complex case and was sufficiently critical of the care the individual received prior to his death. The SCR provided a reasonable assessment of the precipitants to this suicide and the recommendations followed the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 36 required QIPs and three mental health concerns that did not rise to the level of requiring a QIP. Thirty mental health QIPs were required. Two QIPs were required to address the fact that five-day follow-ups were not completed as required. A review at the institution noted that while there was overall compliance with completion of five-day follow-up over the preceding six months when contacts were missed, they resulted from inconsistent notification of the initiation of a five-day follow-up. The response was to provide "informal training" and a handout to all clinicians related to placing five-day follow-up orders in the electronic health record. A copy of the handout was submitted with the response, along with training sign-in sheets. However, attendance by all clinical staff could not be determined. This response was mostly adequate, although follow-up to determine the sustainability of the education would have improved the response.

A QIP was required to address the fact that the individual was not seen for weekly required contacts while in the EOP in November and December 2019. The response, dated January 2021, included a review of EOP contacts over the prior six months and noted a series of deficiencies in December 2020. A corrective action plan was written to address this deficiency but focused solely on modified programming secondary to the COVID-19 pandemic, which was not a factor in the missed appointments related to this death by suicide. The corrective action plan noted that no routine individual or group contacts (except for urgent and emergent contacts and other non-routine needs) were allowed from November 23, 2020, through January 13, 2021, due to a COVID-19 outbreak at the facility. The plan did not refer to providing support or monitoring of incarcerated individuals during this time. Additionally, the response indicated that during November and December 2019, the individual had been seen weekly, and therefore, no corrective action was required. While this response was adequate with regard to the required QIP, it is concerning that incarcerated individuals were not seen, and no guidance was provided on how to ensure the safety and mental health of incarcerated individuals for nearly seven weeks.

Two QIPs (for different institutions) were required to address the fact that the individual was not seen for timely DDP contacts. One was required following his transfer to STRH on January 4, 2020, and the other required an updated CASE to be completed following a transfer to a DDP designated institution on January 16, 2020. The response related to the lack of a contact following his transfer to STRH included an audit of records for ten incarcerated individuals on DDP status placed in either ASU or STRH during the prior six months, and no concerns were noted. There was no further action taken. This response appeared inadequate as there should have at least been a review of the individual's case to determine why he was not seen as required. The second concern was addressed by reviewing ten incarcerated individuals' records for completion of a timely CASE review within required timeframes. None of the records included timely CASE reviews. The response outlined a number of steps that would be taken to ensure timely reviews and track the completion of the reviews. The response also indicated that "multiple trainings have been offered" to clinicians, and additional training would be offered. The response noted that all clinicians would be trained by the end of February 2021. A copy of the training curriculum and sign-in sheets were provided with the response. The response appeared only partially adequate because the plan's effectiveness for communicating and tracking the need for CASE reviews was not reported, nor was the follow-up to ensure that all staff had been trained.

Concerns were found related to the completion of four RVR mental health assessments that were noted to be inadequate in their assessment of the individual's mental health and developmental disability needs. Headquarters responded to this QIP, and three facilities were identified as having the same concern. The response noted that a training was under development and review, with a projected release in the summer of 2021. The response noted that quarterly updates would be provided. This response appeared adequate.

A QIP was required to address the fact that it did not appear that a correctional counselor was present at two IDTT meetings in the MHCB in January and February 2020. The response included an audit of ten IDTT meetings completed during the previous three months, and all were noted to

include required staff members. The response noted one potential issue was that IDTTs are held daily, and there was no plan for coverage for correctional counselors on weekends and holidays. The matter was being reviewed by institutional leadership, but no further information was provided, nor was there a plan to provide follow-up information. This response was not adequate as the issue at hand was not addressed.

There were concerns noted with documentation of the individual's level of observation and clothing allowances in daily progress notes in January and July 2020. The response indicated that the individual's documentation was reviewed to identify specific concerns, including a lack of or vague justification for the level of observation and one note that included neither the level of observation nor a justification. An additional ten random records were reviewed for both psychiatrists and psychologists. Nearly all were found to be deficient with regard to documenting the level of observation and appropriate rationale. Training was provided to all clinicians regarding appropriate documentation, and three memorandums were produced. Follow-up training was again provided. A plan to randomly audit records for improvement weekly was developed, and the response noted that results would be provided to headquarters. The memoranda and verification of training were submitted. This response appeared adequate.

A QIP was required to address the fact that only psychiatry staff were allowed to order levels of observation and clothing while the individual was in the PIP. The required response was to include a review of the issue and an updated local operating procedure (LOP). Psychologists were trained to initiate orders, and an LOP was created and submitted with the response. Training on the new LOP was planned for February 2021, and the curriculum was included with the response. The training verification was submitted. This response appeared adequate.

A QIP was required related to nearly identical progress notes written by the individual's primary clinician from April through May 2020. The concern was noted as the individual's level of care was subsequently decreased in June 2020, despite no change in his documented level of treatment progress. A review of ten progress notes was completed, and deficiencies were identified. As the primary clinician was also identified for corrective action in other QIPs for this case, progressive discipline was pursued. This response appeared adequate.

The individual had his level of care decreased to 3CMS in June 2020, despite recent inpatient admissions and a discharge from a PIP only two months prior. Additionally, the individual was nonadherent with medications, continued to report hallucinations, delusion, and paranoia, exhibited disorganization, and had a depressed mood. The QIP response was to include a review of ten healthcare records where a lower level of care decision was made by the identified clinician, yet no additional cases for this clinician met the criteria. However, the response noted that the clinician was identified in a number of additional QIPs and was to be the subject of progressive discipline. Additionally, an audit of other lower level of care decisions made by members of the individual's IDTT was reviewed, and it was noted that the supervisor had not been present during any of these meetings. The identified clinician was no longer employed at CDCR, and additional measures were initiated, including the development of a discharge readiness tool, reporting all

upcoming discharge IDTTs to the facility's mental health leadership every Friday, and tracking supervisor attendance at discharge IDTTs. The response appeared appropriate, though the provision of follow-up information would have completed the quality improvement process.

A QIP was required to address the fact that the individual reported to his primary clinician that he was experiencing an increase in hallucinations and requested to speak with his psychiatrist in July 2020, but he was not referred to psychiatry. The response indicated that all staff were trained (via memoranda) in the mental health consult process on June 23, 2020, and would be retrained on referring to psychiatry by February 5, 2021. Copies of the memoranda and sign-in sheets were provided with the response to address the latter training, yet it could not be determined if "all staff" were trained. Additionally, there was no supporting documentation related to the training provided in June 2020. Further, a training conducted prior to the individual's death by suicide was likely inadequate, as evidenced by the failure in this case. The identified clinician in this case was identified in a number of additional QIPs and was to be the subject of progressive discipline. The response was marginally adequate as the training process appeared insufficient, and there was no follow-up to determine if the second training resulted in the desired outcome given the failure of the first training to produce consistent staff behavior.

The individual requested to be seen by psychiatry on July 17, 2020, but was not. Instead, he was seen by his primary clinician on July 24, 2020. This required a QIP. The response included a description of events surrounding the processing of the individual's request, which described a change of the assigned psychiatrist for the individual. However, the change occurred on July 8, 2020; therefore, it was unclear to the Special Master's expert how this impacted a request submitted ten days later. The response indicated that the psychiatrist was not notified about the request. The corrective action included "retraining" the schedulers on how to process referrals and noted that supervisors "are now familiar" with the identified issue and "now more attentive" to the process. This response was inadequate as no supporting documentation was provided, and there was no indication of a plan to ensure that the process had been improved.

A QIP was required to address poor treatment planning during an MHCB admission in July 2020. Goals focused on the individual's danger to others and his verbalization of suicidal ideation but did not address the individual's psychotic symptoms and nonadherence with medications, which appeared to be the reasons for his admission. The goals were unchanged throughout his stay. An audit of ten treatment plans was completed and noted that three of the ten lacked individualized treatment goals addressing the triggers leading to the MHCB admission. All MHCB clinicians were trained, and ongoing training was planned. Additionally, master treatment plans were to be audited monthly for the identified clinicians until 100 percent compliance was achieved. This response appeared adequate, yet it could not be determined if all staff were trained from the sign-in sheets provided.

Upon his arrival at the PIP in August 2020, the individual was on quarantine status due to COVID-19 restrictions and was not invited to attend two IDTT meetings that occurred on August 14 and August 20, 2020, respectively. The SCR noted that incarcerated individuals could only be

excluded due to clinical reasons. The response indicated that the individual was in quarantine and placed on "airborne precautions" until the result of his COVID-19 test was obtained. A review of the healthcare record noted that the individual was tested upon arrival on August 14, 2020, with negative results returned on August 16, 2020. This would have allowed the individual to attend his IDTT meeting on August 20, 2020. The facility failed to note this fact in their response, and as such, the response was inadequate and did not address the issue identified in the SCR. The facility took action to review additional treatment plans (the number of plans was not included in the response) and noted that "the majority" of incarcerated individuals attended their IDTTs with "two incidents" where the individual did not attend due to COVID-19 quarantine. Training was provided through a memorandum that made no reference to COVID-19 restrictions. Sign-in sheets were provided, although it could not be determined if all staff were trained. Overall, this response was not adequate to remedy the identified concern.

A headquarters' QIP was required to address the fact that despite making suicidal statements, having a plan to tie a shirt around his neck and choke himself, and requesting a safety smock on September 3, 2020, the primary clinician determined that the individual was seeking attention and did not complete a SRASHE or review the individual's level of observation. The SCR noted that this may also have been related to the fact that only psychiatrists were allowed to order observation levels at the facility. The QIP was required to address the lack of a suicide prevention policy for the PIPs. The policy was drafted and released in January 2021 and included requirements for completing SRASHEs following suicidal statements or self-harm incidents. Facilities with PIPs were directed to train staff within 30 days and submit proof of training to headquarters. There was no training verification located in the response for the identified facility, yet in response to QIP number 18, the facility noted that it planned to conduct training in February 2021. This response was partially adequate.

A headquarters QIP was required to address the fact that there were no documented daily contacts with either psychiatry or a primary clinician on two dates in September 2020, while the individual was placed on suicide watch/suicide precautions. The QIP was assigned to headquarters, and the frequency of clinical contacts in the PIP was under review at the time the QIP response was submitted. The policy referenced in response to the previous QIP stated that contacts were to be required daily with documentation. This response appeared adequate.

During an IDTT on September 8, 2020, the treatment plan goals were not updated to reflect the individual's recent suicidality and evident disorganization. Additionally, the individual's progress toward the identified treatment goal related to his danger to others was not documented. An IPOC was also not created to address this individual's ongoing danger to himself. Five treatment plans were audited, and a pattern of deficiencies was found in these areas. The response indicated that there was a conversation with the identified clinician who acknowledged the need for a treatment goal and IPOC to address self-harm in cases such as this. It was also noted that all PIP clinicians would receive mandatory training related to the suicide policy for PIP and treatment planning. The response noted that evidence of training would be submitted to headquarters. This response

appeared partially adequate, as a plan to continue to review the treatment plans of the identified clinician for improvement appeared necessary as well.

A QIP was required to address the fact that the individual received "very little programming" on the Max Acute unit in the PIP despite his distress related to his isolation. The facility was directed to develop an LOP to address this issue. The facility's response noted that an audit was completed regarding the total number of treatment hours and non-clinical hours provided to incarcerated individuals in September 2019 and September 2020. The audit indicated that more hours were provided in September 2020 than in September 2019, yet the facility did not report whether the hours were provided in-cell or out-of-cell. Failure to address in-cell versus out-of-cell treatment limited the applicability of the audit to the concern identified by the QIP requirement. The response also indicated that there was no requirement regarding the number of hours a PIP incarcerated individual should receive. An LOP was developed to require daily contacts for each patient on the Max unit by either a psychiatrist or primary clinician, in addition to a rehabilitation therapist and "additional procedures" for DDP incarcerated individuals. The response indicated that a sergeant and senior psychologist supervisor would be located in the building to address any barriers to care "as they arise." A review of the LOP noted that the only reference to DDP incarcerated individuals was that they should be evaluated within 24-hours of arrival and that documentation should include the individual's DDP status and "any Adaptive supports offered." The LOP did not include the need for identification of what supports the individual would require while in the Max unit. Additionally, the LOP did not address the issue of out-of-cell treatment hours other than to state that out-of-cell treatment should occur, or documentation should clearly indicate why it did not occur. This response was partially adequate to address the identified concern in this case.

On September 15, 2020, the individual reported thoughts of self-harm to a nurse who was completing rounds; however, this was not reported to mental health staff. This QIP was assigned to headquarters to address the need for emergent referrals in such instances in policy. The issue was directly addressed in the policy released in January 2021. This response appeared adequate.

A QIP was required to address the fact that on September 23, 2020, the individual made a noose and tied it around his neck. He later reported the intent to die, red marks were evident on his neck for days, and his eyes were red at the time of the incident. Despite these facts, a self-harm Power-Form was not completed, the incident was not recorded as a suicide attempt, a SRASHE was not completed, and the individual's treatment plan was not updated to address suicidality. This QIP was assigned to headquarters to address through policy. The policy was developed to include specific requirements for completing a SRASHE when suicidal statements or self-harm incidents occur. While not mentioned in the response, a review of the policy revealed that completion of a Power-Form was required. This response appeared adequate.

On September 26, 2020, the individual wrapped a piece of rubber from his sandal around his neck while on suicide watch. A SRASHE was not completed, a self-harm Power-Form was not completed, and no modifications were made to the individual's treatment plan to address

suicidality. Similar to the previous QIP requirements, this QIP was assigned to headquarters to address through policy. The policy was developed to include specific requirements for completing a SRASHE when suicidal statements or self-harm incidents occur. In this response, direct reference to relevant sections of the policy was included. This response appeared adequate.

There was clear evidence that another peer was victimizing the individual on the unit; however, facility staff reported that they were unable to relocate the other incarcerated individual without permission from headquarters. Staff reported that they requested permission but were denied, though this appeared to be a misperception as local staff had the authority to relocate incarcerated individuals on the unit. A QIP was required to clarify and address this issue through the development of an LOP. The response noted that an LOP was developed but was under review by statewide leadership. As such, the facility was given a 30-day extension, yet no further information was made available. This response was not adequate without documentation of follow-up.

A QIP was required of headquarters to address the fact that there was no policy to address the assessment and treatment of DDP incarcerated individuals in the PIPs. The SCR noted that due to the individual's victimization on the PIP, consideration for elevation to a DD2 designation appeared warranted. The response indicated that "negotiations" were continuing regarding policy development, but a memorandum was released on January 28, 2021, noting a new Power-Form related to victimization concerns to be completed every 30 days for DDP incarcerated individuals in the PIPs. Follow-up would be monitored and reported by DDP leadership. This response appeared adequate.

A QIP was required to address the fact that prior treatment records related to the individual's inpatient hospitalization for incompetency to stand trial in 2016 were never sought despite the hospitalization being referenced in clinical documentation in the healthcare record. The records were reviewed as part of the SCR process and noted similar behavior patterns while at DSH. The SCR included that the records would have supported the initiation of a PC 2602 and would likely have impacted treatment planning, suicide risk determinations, and medications. The response was to include a review of local policy to determine if an LOP was needed or if one was not followed at two facilities. The response from one facility indicated that there was no LOP, but the facility would wait for the statewide policy before creating a local policy. The headquarters' portion of the required QIP noted that despite identifying this issue in 2019 and creating a policy stating that a release of information was not required when requesting DSH records, the process for releasing the new policy was still "routing through the HQ [headquarters] policy unit." The second facility made no reference to a local policy but issued a memorandum instructing staff to review records and request DSH records as needed. Overall, these responses were mostly adequate.

Concerns were found with multiple SRASHEs completed from November 2019 through January 2020 specific to acute risk determinations. The concern was primarily related to a pattern of questioning the individual's suicide risk, given his tendency to deny suicidality following self-

118

harm acts and focusing on his psychotic symptoms rather than assessing his suicide risk. Headquarters developed a training to address the assessment of suicide risk in complex cases and provided a schedule for planned delivery of the training statewide. All facilities submitted memoranda indicating that staff would attend the training, and verification would be provided. This response appeared partially adequate, as further monitoring of suicide risk determinations at the facility level appeared indicated.

A headquarters' QIP was required to address the lack of a statewide suicide prevention policy for the PIPs. As mentioned in response to other QIPs, the policy was developed and released. This response was adequate.

A QIP was required to address the fact that on the morning of September 29, 2020, the individual was seen by his psychiatrist for a routine appointment and was noted to be tearful, denied suicidal ideation, and requested that his clothing be returned (he was in a safety smock). As a result, the individual was returned to full clothing issue and was removed from increased observation. He later used a piece of his clothing to asphyxiate himself. The SCR noted that there was no clear documentation as to why additional observation was not warranted given his recent suicide attempts. The QIP was to include an LOP to address the issue and associated training. The response indicated that healthcare record reviews were completed and noted similar concerns in other records. The response stated, "Provider specific concerns were reviewed locally and further action is being taken," with no additional information on what this action would include. Three previously written memoranda from headquarters were reshared with staff, the statewide policy was incorporated into local policy, and the facility noted the plan to train staff on the PIP suicide prevention policy released in January 2019. The response noted that 30 random audits would be completed monthly to ensure clothing issue and observation orders were documented appropriately. This response was adequate.

Clinical documentation written while the individual was housed on the PIP was insufficient to justify orders for observation and clothing issued to the individual while under observation. This QIP was required to be addressed by psychiatry. The response to this QIP was the same as the previous QIP and appeared adequate.

The final mental health QIP was related to a reference to a "contract for safety" in a psychiatry note. CDCR policy prohibits reliance on, or reference to, such contracts. The identified clinician was "enrolled in the suicide prevention and SRASHE training course," which reportedly discusses the use of safety contracting. This response appeared adequate.

The one custody concern that required a QIP was related to a timeline violation for the completion of an ASU Placement and Classification Hearing. The facility noted that a review was completed and determined that the delay was related to the transfer of the individual to an MHCB and an administrative error that resulted in the ASU placement order failing to follow the individual. The individual was seen immediately after the error was discovered, and identified staff were trained on proper procedure. This response appeared adequate.

Three joint Warden/Chief Executive Officer concerns required QIPs. They included delayed activation of 911, staff failure to recognize and report a potential PREA issue, and concerns that welfare checks were not completed as required. In response to the first QIP, a memorandum was sent to all staff clarifying the process for immediate activation of 911 during an emergency. This response appeared adequate. The second and third QIPs were referred for OIA investigations, and no further information was available.

Two nursing concerns required QIPs: both related to inadequate documentation. The first response indicated that supervisory follow-up was completed, mock drills were completed, and retraining was conducted to address all identified issues. Proof of training was submitted. This response appeared adequate. The second response indicated that there were barriers associated with timely documentation required within the electronic healthcare record. The response included a number of procedures, memoranda, and staffing requests to properly address corrective action. This response appeared adequate.

The three mental health concerns that did not rise to the level of requiring QIPs included an inappropriate discharge from the MHCB in November 2019, inappropriate treatment goals during an MHCB admission in July 2020, and a failure of psychiatry to note the individual's medication nonadherence during an IDTT in June 2020. All three concerns were seen as noncontributory to the individual's suicide but were noted as problematic. The final concern related to psychiatry had been addressed prior to the development of the SCR. This appeared appropriate.

Case Y

I.    Summary of Case

This individual was a 28-year-old Hispanic/Latinx man who was discovered hanging in his solely occupied cell by custody staff conducting count on August 26, 2020. Emergency response documentation noted that despite being designated as medium custody and housed in general population, the individual was handcuffed prior to the noose being cut by staff. The handcuffs then had to be removed during the administration of life-saving interventions. The individual was receiving mental health services at the EOP level of care at the time of death.

The individual was born and raised in California. When he was age two, his father murdered his mother and was incarcerated in CDCR at the time of the death review. Following the murder, the individual and his four siblings were raised by his grandmother and were free of abuse and trauma. However, in either 2007 or 2015, the individual was a passenger in a car accident during which his brother, who was fleeing from law enforcement, was killed. Another brother was reportedly fatally shot after an incident with law enforcement in 2018. The individual received a high school diploma; he was reportedly enrolled in special education classes starting in the third grade. He reported multiple school suspensions and expulsion for aggressive and disruptive behavior. The individual reported that he used alcohol and methamphetamine daily since the age of 13. He reported periods of sobriety, with at least one inpatient stay for substance use treatment in 2016.

He also reported infrequent use of marijuana, cocaine, and "spice" during adolescence and young adulthood. He was affiliated with a gang. The individual never married and had no children.

This individual was arrested four times as a juvenile for burglary, robbery, criminal threats, public intoxication, petty theft, and assault with a deadly weapon. He was arrested six times as an adult beginning in 2012 for resisting an officer, assault with force likely to cause grave bodily harm, battery on a peace officer, threaten with intent to terrorize, threaten a public official, use of a controlled substance, and vandalism.

The individual entered CDCR in December 2019 for the second time to serve a four-year sentence for assault with the intent to commit a specific sex offense. The individual received an additional five-year enhancement for prior felony convictions. The victim was a stranger. At the time of his arrest, police officers noted that he was heavily intoxicated with alcohol. On the day of his arrival to CDCR, he was assaulted by two other incarcerated individuals and was threatened with further assault should he return to the reception center. He was placed in ASU for his protection and reported that he was a gang dropout and feared for his safety, given the nature of his crime. He requested placement in an SNY and was housed in a non-designated yard at the time of his death. The individual was administered a SRASHE on December 18, 2019, which rated his chronic and acute risk for suicide as low. The SCR noted that the low chronic risk determination appeared inaccurate given his mental health symptoms, history of suicidal ideation, substance abuse, commitment offense, and being a gang dropout.

During his incarceration, the individual received four RVRs for fighting, behavior which could lead to violence, refusing to provide a urine sample, and threating staff. He received his last RVR on March 21, 2020. He received no visits during his incarceration, but records indicated telephone calls with his grandmother and an uncle. During these telephone calls, the individual reported experiencing difficulty related to the limited time out of his cell due to COVID-19 restrictions. Following his death, a note was discovered in his cell instructing staff to call his grandmother; a phone number was included.

Healthcare records indicated that the individual was not included in the MHSDS during his initial incarceration because he refused services. Reception Center documentation in 2017 noted that he had been diagnosed with Major Depressive Disorder and was prescribed olanzapine and mirtazapine prior to placement within CDCR. Upon reception to CDCR during his second and final term, county jail records noted multiple drug use disorders and active prescription for psychotropic medications. When received in CDCR, he reported intermittent auditory hallucinations since age 15 and significant depressive symptoms since the death of his brother in 2018. He reported "fleeting" thoughts of suicide by hanging in the days prior to his reception but denied any desire to die. He also reported hopelessness and insomnia. On December 23, 2019, the individual was placed at the 3CMS level of care. He was seen by a psychiatrist the following day and reported symptoms of significant depression, anxiety, panic attacks, and auditory hallucinations. The individual reported to the psychiatrist that he had been prescribed haloperidol and mirtazapine in county jail but stopped taking them due to side effects. He denied suicidal

ideation. He was given a diagnosis of Major Depressive Disorder with psychotic features and was prescribed escitalopram. The psychiatrist documented a follow-up with the individual in two weeks, but the follow-up did not occur.

The individual was transferred from the reception center on December 27, 2019, and was seen for an initial mental health contact on January 16, 2020. He reported previous episodes of auditory hallucinations and paranoia when intoxicated on methamphetamine. He also reported being placed at mental health facilities for observation but was released "after a few hours." He reported anxiety and insomnia. The individual submitted a healthcare request to see psychiatry on February 5, 2020. He was seen via telepsychiatry on February 13, 2020, and reported that his symptoms of depression and auditory hallucinations had resolved, he was free from suicidal ideation, but he was still experiencing anxiety. His dose of escitalopram was increased. He attended his IDTT meeting on February 25, 2020, and reported anxiety, irritability, and medication effectiveness. An IPOC was initiated to address moderate anxiety. The SCR noted that the IDTT documentation was poor and did not clearly indicate what transpired during the meeting.

In March 2020, the individual received three RVRs, was noted to have been intoxicated at least twice, refused a cellmate, was hostile toward staff, and reported suicidal ideation. Documentation related to a mental health consult on March 23, 2020 indicated that he may have had a drug debt and was engaging in "impression management" to secure a housing move. The individual reportedly threatened self-harm/suicidal behavior if he returned to his housing unit, and he was referred to the MHCB on that date. Upon admission to the MHCB, the individual reported suicidal ideation with a plan to hang himself or overdose, as well as symptoms of depression and auditory hallucinations. A SRASHE completed on that date determined that his chronic risk for suicide was low and his acute risk for suicide was moderate. The SCR noted that the chronic risk determination failed to consider a number of factors and appeared to be an underestimation of risk. His diagnosis was changed from Major Depressive Disorder with psychotic features to Adjustment Disorder with depressed mood without clear rationale beyond referencing the fact that the individual had difficulty coping with the loss of his family members. His escitalopram was discontinued, and he was prescribed divalproex sodium, olanzapine, buspirone, and hydroxyzine. A SRASHE was completed on March 24, 2020, which determined that both his chronic and acute risk levels were low. The SCR noted that the justification for these levels was not sufficiently documented.

The individual reported symptoms of depression, anxiety, and suicidal ideation when seen by the psychiatrist on March 30, 2020. On that same date, he was seen for an RVR mental health assessment which was noted to be comprehensive and thorough. The clinician determined that mental health symptoms did not appear to play a role in his behavior that resulted in the RVRs, but the individual was likely intoxicated at the time. The clinician noted that the individual may have been exaggerating his mental health symptoms in order to receive medications with effects similar to illicit substances. The following day, a psychiatrist documented that the individual endorsed suicidal ideation and mood swings, but the psychiatrist opined that the individual may have been exaggerating his symptoms to remain in the MHCB. The individual was discharged

from the MCHB during an IDTT meeting on April 1, 2020. Documentation indicated that the individual was exaggerating his symptoms but may have been suffering from grief and depression due to family losses which could be addressed in an outpatient setting. The individual denied suicidal ideation during the meeting. A SRASHE completed on that date determined the individual's risk for suicide to be low for both chronic and acute risk factors, yet the rationale justifying those ratings was noted to be poor. The safety plan developed on that date appeared complete and accurate.

Two days later, on April 3, 2020, the individual reported suicidal ideation with a plan to hang himself with a bedsheet and was admitted to the MHCB. When evaluated the following day, the individual reported suicidal ideation, depression, and hopelessness, yet documentation indicated that he appeared to be exaggerating his symptoms. A SRASHE was completed and noted that the individual had a number of risk factors but was determined to be at low chronic and acute risk for suicide. The rationale provided in the SRASHE noted that his risk factors did not appear to interfere with his ability to function. An assessment of functioning is not the role of the SRASHE; the SRASHE is completed to determine risk for suicide, regardless of the individual's current ability to function. On April 5, 2020, the individual was seen at the cell front by a psychiatrist who noted that the individual reported depressive symptoms and suicidal ideation but did not want an increase in medications. The individual was described as argumentative, demanding, and intrusive during the contact. The individual was discharged from the MCHB to the EOP level of care during an IDTT meeting the following day. IDTT documentation was noted to be sparse. An accompanying nursing note indicated that the individual endorsed suicidal ideation, homicidal ideation, auditory hallucinations, visual hallucinations, anxiety, and depression. The clinician's discharge summary noted that the individual denied suicidal ideation, was euthymic, calm, had an organized thought process, and did not appear to be responding to internal stimuli. A SRASHE completed on that date noted that when the individual was confronted with the IDTT's opinion that he appeared to be fabricating his symptoms, he refused to participate further in the meeting. The SRASHE determined that the individual's risk for suicide was low for both chronic and acute risk without proper justification for those determinations. Additionally, the individual refused to engage in safety planning, which should also have been considered a factor in his increased risk.

The individual was seen for a routine psychiatry session on April 11, 2020, and requested that his buspirone be discontinued due to sedating side effects, which negatively impacted his ability to program. After consulting the psychiatrist, the decision was made to move his morning dose to later in the day. The individual denied suicidal and homicidal ideation but reported auditory hallucinations, which he believed were being helped by the olanzapine. During an IDTT meeting on April 30, 2020, the individual reported that he wanted to stop taking his divalproex sodium for fear of developing hypertension. He denied suicidal ideation, and it was noted that he did not appear to be responding to internal stimuli despite reporting intermittent auditory hallucinations.

On May 7, 2020, the individual reported depression and stated that he believed he would eventually kill himself, although he denied any active thoughts or a plan during a session with his psychiatrist. The psychiatrist noted that the individual appeared hypomanic but agreed to reduce the dose of

divalproex sodium at the individual's request. The individual continued to report auditory hallucinations. On May 20, 2020, the individual was seen by his primary clinician and reported that he believed he may have "ruined" his life and believed it was "only going to get worse." He denied suicidal ideation and completed the parts of his safety plan that he had refused to complete when last in the MHCB; however, he was unable to finish the final few questions. The individual attended his IDTT on May 28, 2020, where he reported intermittent passive suicidal ideation, hopelessness, depression, anger, and stress during the prior month. He also discussed his medication non-adherence. The IDTT noted that despite his reports of hallucinations, he did not appear to be responding to internal stimuli but would be monitored and assessed over time.

During contacts with his psychiatrist and primary clinician in June 2020, the individual reported thoughts of suicide, including throwing himself off the tier. He reported that he believed suicide was "being weak" and described death as "scary." The individual was reportedly unable to complete his safety plan because he did not know how to answer the questions. The individual learned that his grandfather had passed away and reported that this caused him to think about suicide, but he had no plans to hurt himself. On June 15, 2020, his psychiatrist discontinued the divalproex sodium and increased the doses of olanzapine and hydroxyzine. At his IDTT in June 2020, the individual reported ongoing passive suicidal ideation and hopelessness. Documentation noted that he denied suicidal ideation but was ambivalent about harming himself in the future. The SRASHE completed on June 17, 2020 determined both his chronic and acute risk for suicide to be low. Justification for the acute rating appeared adequate, but the rationale to support the low chronic risk rating appeared to rest solely on the absence of previous suicide attempts.

On July 2, 2020, the individual submitted a request to see the psychiatrist as soon as possible. On July 5, 2020, he was seen and reported occasional suicidal ideation without an active plan but voiced no concerns with his medications. During this session, he reported two previous suicide attempts, which had not been documented previously. He again submitted a request to see the psychiatrist on July 7, 2020, and was seen on July 8, 2020. He reported depressive symptoms and ruminating thoughts regarding the death of his brother and his grandfather. He reported increased anxiety, insomnia, dry mouth, heart palpitations, and a "fear of death." The psychiatrist discontinued his olanzapine and added aripiprazole and mirtazapine. On July 9, 2020, the individual was seen by his primary clinician, who noted that the individual would be seen twice weekly for sessions due to his chronic suicidal ideation and his current COVID-19 quarantine status. He was removed from biweekly sessions on July 22, 2020, after being taken off quarantine and allowed to attend programming and socialize. The individual reported experiencing physical symptoms of anxiety, stating, "I can feel my blood pumping through my arms and legs," and reported that he would sometimes punch the walls due to increased anger and distress. The clinician asked to see his hands, and no abrasions were evident. The individual endorsed passive suicidal ideation and auditory hallucinations but did not appear to be responding to internal stimuli. The individual again reported passive suicidal ideation during a session on July 31, 2020, but noted that if his anxiety decreased, so would his thoughts of suicide. Later that day, the individual submitted a healthcare request stating that he was experiencing significant anxiety and thoughts of wanting to hurt himself. He was seen by the CIT, which noted that he denied active suicidal

ideation or a plan but requested medications to decrease his anxiety. Documentation indicated that the individual was trying to "lobby" for fast-acting anxiolytic medication. He was returned to his housing unit. A SRASHE was completed in response to the crisis intervention and noted that his chronic risk for suicide was moderate and his acute risk was low. While both ratings were determined to be appropriate based on the identified risk factors, the justification for the chronic risk rating was noted to be "lacking depth" in the SCR.

During sessions with his psychiatrist and primary clinician in early August 2020, the individual reported auditory hallucinations, anxiety, and physical symptoms associated with his anxiety. He received requested adjustments to his medication regimen despite occasional nonadherence. The individual reported that he was skipping medication to determine if they were contributing to his anxiety. The individual denied suicidal ideation with the psychiatrist but reported passive suicidal ideation to his primary clinician. The individual attended his IDTT on August 13, 2020, and reported continued anxiety and depression despite the medication changes. He requested further medication increases. He was encouraged to use coping skills and resources available within the EOP. His primary clinician saw the individual on August 19, 2020, one day before his scheduled transfer to another facility. He reported "feeling pretty good" about the transfer but continued to report significant anxiety and depression. The individual reported that he stopped taking his aripiprazole to determine if the medication was causing anxiety and was encouraged to speak with his psychiatrist about the issue.

Following his transfer on August 20, 2020, the individual was placed on quarantine status due to COVID-19 restrictions. When seen by his primary clinician for an initial assessment on August 25, 2020, he reported anxiety and restlessness but denied suicidal ideation. He was then seen for a "wellness check" on August 26, 2020, where he continued to report significant anxiety and depression, as well as noting a "bad feeling and antsy-ness." The individual requested to see the psychiatrist, and the clinician notified the scheduler to move the individual's psychiatrist appointment to take place sooner than originally scheduled. The individual was to be seen for another wellness check the following day but died by suicide later that afternoon.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.

The Special Master's expert determined this individual's death was foreseeable based on the fact that for months leading up to his death, the individual expressed that he was hopeless, anxious, depressed, and experiencing suicidal thoughts. He asked for adjustments to his medications and made requests to see clinicians more often than he was scheduled in an attempt to obtain assistance for his distress. These factors clearly indicated an increased risk of suicide for the individual.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable based on the fact that given the individual's reported symptoms, increased distress, and failure to gain relief from the medications and coping skills being provided to him, he was not considered for a higher level of care, was not evaluated for a change in his suicide risk level, and did not appear to have adequate treatment planning to address his needs. Had his IDTT appropriately identified his needs, properly assessed his risks, and developed an adequate treatment plan to address his needs, the likelihood of suicide would have been reduced. Additionally, given his ongoing thoughts of suicide and experience of symptoms despite interventions, a consideration for a higher level of care appeared indicated and likely could have reduced his risk for death by suicide.

IV.    Critique of Suicide Case Review Report

The SCR provided a mostly adequate clinical summary of this case with relevant social, criminal, incarceration, substance use, and mental health history. It summarized concerns identified with assessments and the care provided to the individual during his incarceration. Of concern was the fact that in a number of clinical progress notes, the individual reported "passive" thoughts of suicide along with ways in which he could kill himself, yet clinicians documented that the individual denied suicidal ideation during these sessions. This issue should have been discussed and considered for a QIP to involve training for staff on ambivalence surrounding suicide and the fact that suicidal ideation, even when fleeting, "passive," or intermittent, still indicates that the individual is thinking about suicide. Exploration of these types of thoughts is recommended to ensure that the thoughts, however fleeting, passive, or intermittent, do not represent an elevated risk. Additionally, the lack of understanding of the link between anxiety, restlessness, agitation, and suicide appeared to be another opportunity for staff training on the assessment of suicide risk. In a number of sessions, the individual reported extreme anxiety and distressing, inescapable physical experiences due to this anxiety, and yet no documentation appeared to consider the link between these experiences and the individual's risk for suicide.

V.    Analysis of Quality Improvement Plan Process

This case resulted in five required QIPs, four related to mental health and one related to custody. The first mental health QIP was required to address the lack of comprehensive documentation resulting from the IDTT meeting on February 25, 2020. The documentation failed to address the individual's expression of symptoms, functioning, needs, and adaptation to the facility and only documented the individual's discussion of his medications. The SCR noted that these failures in documentation likely negatively impacted treatment planning at the time, as well as future IDTT discussions. Five treatment plans authored by the identified clinician were audited and revealed that the clinician consistently failed to document the individual's current concerns, level of

functioning, or clinical presentation. The QIP response indicated that the identified clinician met with a named individual with the prefix "Dr." (no further information about who this individual was, the person's discipline, or the person's role within the facility were provided) for two hours to receive training on completing a master treatment plan based on the audit tool criteria. A clarifying memorandum was submitted later, which provided additional detail about the "informal training" provided. Additionally, the identified clinician attended a higher level of care training, and it was noted that the clinician's work would be reviewed during quarterly audits, and follow-up training would be provided as needed. This response appeared mostly adequate.

The second QIP was required to address the fact that during a psychiatric appointment on December 24, 2019, the individual was indicated to have a follow-up appointment in two weeks but was transferred and not seen for seven weeks. This violated the individually-ordered follow-up timeframe for this individual and the overall standing requirement that individuals be seen prior to their IDTT following a transfer (in 14 days or less). The response included a memorandum dated prior to the individual's death (March 16, 2020) which clarified the requirement that individuals need to be seen for evaluation by the psychiatrist prior to their IDTT. There was no further indication that this memorandum was received by or reviewed by any involved psychiatrist or scheduler involved in this case. This response was inadequate as clearly, its release in March 2020 did not impact the deficiencies in this case; therefore, it is unclear how merely submitting this memorandum back to the SMHP as a response to a QIP related to a death in August 2020 was deemed an acceptable corrective action.

The third mental health QIP was required to address deficiencies within the SRASHEs completed on March 24, April 1, April 4, April 6, and June 17, 2020. The concerns included poor justification for determined risk levels and inappropriate risk determinations based on the identified risk factors. The QIP was also required to address the fact that within the SRASHE completed on April 4, 2020, there was a reference to his acute risk being rated as low secondary to a lack of observable impairments in functioning. The SCR noted that suicide risk can still be high in individuals who are functioning without impairment and that this should not have been used as the sole basis for a low risk determination. The response indicated that three individual clinicians authored these SRASHEs. Each identified clinician had five additional SRASHEs audited by two different supervisors. Two of the identified clinicians' SRASHEs were found to meet audit criteria, and they were provided on-the-job training regarding chronic risk, acute risk, and risk justification using slides from a headquarters-approved training curriculum. The third identified clinician, who authored three of the problematic SRASHEs, did not include adequate risk justification in any of the SRASHEs audited, and it was noted that the language used in the SRASHEs was "exactly the same" in three of the cases despite differing chronic and acute risk factors being present, different case presentations and different protective factors. The clinician was referred to suicide risk evaluation mentoring and was also referred at the supervisory level for peer review. This response appeared adequate.

The fourth QIP was required to address the sparse documentation on the individual's treatment plan at the time of discharge from the MHCB to the EOP level of care on April 6, 2020.

Additionally, documentation produced by the primary clinician contradicted the documentation authored by the nurse who was present at the IDTT. The SCR concluded that these discrepancies should have been discussed and resolved and likely impacted treatment planning. The response indicated that a review was conducted and found that the nursing documentation appeared appropriate and accurate while the documentation authored by the mental health clinician was "inappropriate." The identified clinician was referred for a supervisory review, and all clinicians assigned to IDTTs completed training to address IDTT documentation related to the concerns raised in this case. The training curriculum and evidence of training were provided. This response appeared adequate.

One custody QIP was required to address the use of restraints during the emergency response prior to the individual's body being supported and cut down from the noose. The individual's custody designation was medium, and he was residing in a general population housing unit. The response indicated that "The Correctional Officer" involved in the incident was trained in proper procedure, and a sign-in sheet was submitted, which included a single name. A review of the incident reports indicated that two officers were conducting rounds and discovered the individual, and a sergeant arrived on the scene prior to the cell being opened and the hanging individual being handcuffed. The sergeant and the psychiatric technician who responded made no mention of the use of handcuffs in their incident reports. Further, it is unclear why the other officer or the sergeant who were on the scene were not provided training as neither appeared to intervene or correct the officer who handcuffed the individual. It appeared that further action and training of more individuals were required to address this issue fully.

Case Z

I.    Summary of Case

This individual was a 28-year-old Caucasian man who was discovered unresponsive under a blanket in his solely occupied cell on March 9, 2020. The individual had a plastic bag over his head, tied with a piece of cloth, and an additional ligature around his neck. Despite life-saving measures, he was pronounced dead less than one hour after discovery. Due to a miscommunication during emergency procedures, the call to 911 was delayed by 16 to 18 minutes. The individual was receiving mental health services at the EOP level of care at the time of death.

There was limited information available regarding the individual's history beyond self-report, and the individual often provided inconsistent information. He was reportedly born in Ohio and raised by his mother following his parents' divorce when he was nine years old. He reported continued contact with his father until his death when the individual was age 12. He denied experiencing trauma or abuse in childhood. He reportedly had two sisters, one of which may have been diagnosed with schizophrenia. The individual reported being in special education during high school and receiving his high school diploma. Upon reception into CDCR, he was not placed within the DDP program. The individual was single and had no children, although he occasionally reported having a son.

The individual reported a limited employment history. He reported moving to California in 2011 to open a marijuana dispensary. Though, following his arrival to California, he was frequently homeless, transient, and earned money through criminal activities. He had multiple drug-related offenses up until the time of his arrest for his index offense. The individual provided varied accounts of drug and alcohol use and differing accounts of drug and alcohol treatment programs. Overall, it appeared that he abused alcohol and drugs since adolescence, including marijuana, methamphetamine, and cocaine. The individual had no known gang affiliations.

The individual entered CDCR for his first term in June 2019 to serve a two-year sentence for two counts of second-degree robbery after grabbing cash from the hand of a cashier at a fast-food restaurant. The individual reportedly had an extensive criminal history that began in adolescence. In California, he was arrested at least 17 times and spent six terms in county jail between 2013 and 2018. He also had a number of warrants and probation violations. At the time of his arrest for his index crime, the state of Ohio placed a detainer on the individual for extradition to face charges for two counts of aggravated murder, two counts of murder, aggravated robbery, cruelty to companion animals, and domestic violence. The SCR noted that these offenses included the murder of his mother.

The individual received one RVR for fighting in July 2019, during which he was shot in the head with a rubber bullet by a correctional officer for failing to obey verbal orders. The shot resulted in the individual experiencing an intracranial hemorrhage, temporal bone fracture, and post-concussive symptoms. Prior to his fight, the individual had requested placement in an SNY due to his fears related to his mental health status. SNY status was granted, and he signed the necessary documents for SNY placement in a non-designated yard in February 2020. However, the documentation included a checkmark that the individual did not agree to placement on a non-designated yard. There was no further indication as to the inconsistencies in these documents. The SCR noted that despite the individual having a lower security level (Level I), he was ineligible for housing assignments at that security level due to his detainer for violent crimes in Ohio. Documentation indicated that the individual was to be transported to Ohio for a court proceeding in December 2019; however, it appeared that he was not cleared for transport by CDCR custody. The individual was in an acute PIP setting at that time. The SCR noted that the IDTT in the PIP did not appear to be aware of the denial of transport, however, and continued to work with the individual to prepare for his upcoming hearing and travel. The SCR noted that the individual had no personal possessions and no records of telephone calls or visits while incarcerated.

The individual reported receiving mental health services in adolescence, though later described the onset of mental health problems beginning when he was age 18. He reported being placed in psychiatric facilities three to four times related to suicidality; at least two admissions were involuntary. However, none of his reported hospitalizations were consistent with his reported age or likely geographic location at the times reported. It is unknown if these reports were fabricated or misremembered secondary to his mental illness. Records from the county jail indicated that while housed there, the individual spent the majority of his time in mental health housing and was provided with diagnoses of Adjustment Disorder with mixed disturbance of emotions and conduct,

as well as a Substance-Related Disorder. The individual reported that he attempted suicide twice in county jail, yet these incidents were not included in the records provided by the county.

During his initial CDCR reception center medical screening, the individual reported experiencing auditory hallucinations telling him to hurt others. He was referred immediately to be seen by the CIT. During the CIT evaluation, he reported thoughts of feeling like he would be better off dead. He also reported attempts to kill himself during the four months prior, the period following his mother's murder. The individual reported that being alone and taking medications helped reduce the voices. He also reported paranoid ideation that others followed him, were plotting against him, poisoned him, and inserted thoughts into his head. Later in the interview, he denied suicidal or homicidal ideation and was able to articulate plans for the future, as well as coping skills. The CIT clinician placed the individual on "Aftercare Program contacts" until his initial mental health intake could be completed. The individual refused his intake mental health assessment scheduled for eight days after his arrival to CDCR. He reported that he did not want to receive mental health services, though he reported that his psychotropic medications were helpful. He was placed at the 3CMS level of care despite this refusal.

The individual agreed to attend his initial psychiatric evaluation appointment on July 8, 2019 (three days later), during which he reported a history of schizophrenia, psychosis, depressed mood, passive suicidal ideation, and daily auditory hallucinations telling him to hurt himself and others. The individual reported that he did not trust the voices and understood that they were part of his mental illness. He was noted to be mildly anxious with flat affect. The individual had a fight with his cellmate on July 22, 2019, during which he was shot with a rubber bullet and suffered a traumatic brain injury (TBI). He returned from the community hospital the following day and reported being suicidal. He threatened to bite someone (non-specific), was aggressive and agitated, and demanded to be placed on suicide watch. He was seen by the CIT the following day, appeared lethargic and disorganized, and endorsed suicidal ideation, depression, anxiety, pain, anger, and agitation. He was placed at the MHCB level of care and transferred on July 24, 2019.

While in the MHCB, he frequently refused activities, vitals, and showers. At admission, he reported strong headaches related to the TBI, but these appeared to diminish over time. Of note, there was little evidence of follow-up assessments by medical or mental health staff as to the ultimate consequences of this head injury. The individual refused all out-of-cell contacts with clinicians and the recreation therapist and often refused to engage with staff at the cell door. He reported continued suicidal ideation and command hallucinations to kill himself and others. He was referred to an acute inpatient setting on August 2, 2019, and was transferred on August 16, 2019. He remained at the inpatient level of care through February 6, 2020. During his inpatient stay, he reported that he visualized hurting others and sometimes acting on those feelings. As a result, he was moved to solo programming until more effective coping skills could be identified. This did not occur, and the individual spent nearly his entire inpatient stay in solo programming and frequently required custody restraints. The SCR noted that documentation during the early part of his admission to the PIP was unclear as there were group notes between August 15 and October 10, 2019, despite the individual being placed on solo programming on September 6, 2019.

130

There was also noted to be minimal documentation in the non-clinician activity tracker on the unit. Records indicated that the individual met inconsistently with his assigned primary clinicians, yet he attended most of his scheduled IDTT meetings. Additionally, a review of psychiatric records from August 16, 2019, to September 17, 2019, noted weekly notes, which is not in keeping with documentation requirements and expectations.

Documentation revealed that the individual's IDTT members believed that he may have been refusing treatment in order to prolong his stay within the PIP. The individual was noted as stating that he hoped to remain in CDCR and was willing to assault someone to avoid his trial in Ohio. The individual appeared resistant to reporting symptom improvement. As noted above, his endorsement of homicidal ideation and thoughts of hurting others were perceived as credible, and he was not allowed to program or leave his cell without mechanical restraints. Further, he was only seen in therapeutic modules for one-to-one sessions. Whenever attempts were made to reduce the use of restraints, the individual escalated his homicidal threats. The SCR noted that while discussions of restraint use and attempted reduction were located in the treatment planning section of the individual's records, there was little documentation related to orders for the use of or cancellation of restraints elsewhere in the individual's records.

Records indicated that during December 2019 and January 2020, the individual reported that his medications were not helping and asked that they be discontinued. As a result, the individual's injectable haloperidol was stopped, other medications were adjusted, and his hydroxyzine was changed from daily to "as needed." On January 21, 2020, the psychiatrist noted that there was no change in reported auditory hallucinations and no self-injury or violence toward others despite these changes. The psychiatrist concluded that there was a high likelihood that the individual was exaggerating his symptoms to avoid facing the pending case in Ohio. On February 4, 2020, the inpatient IDTT concluded that the individual had met maximum program benefit. The treatment team contemplated reducing the individual's level of care to an ICF level of care; however, they considered his minimal efforts in treatment, the incongruity of reported symptoms, desire to avoid criminal charges, and the absence of impulsivity as indicators that he could be discharged to the EOP level of care.

The individual was placed at the EOP level of care at the reception center on February 6, 2020. He continued to refuse to engage in treatment and refused his initial IDTT. During a February 20, 2020 IDTT meeting, the treatment team added daily contacts with the individual to encourage group participation and increased his primary clinician contacts to twice per week. On February 21, 2020, custody staff referred the individual to CIT because he reported ongoing auditory command hallucinations to hurt himself and threatening voices that stated that other identified incarcerated individuals would stab or beat him to death if he did not hurt himself. He was referred to the MHCB and placed there until March 2, 2020. While in the MHCB, he ate his meals, took scheduled showers, was medication adherent, and spent his time reading books or sleeping in his cell. He reported thoughts of harming others, suicidal ideation and was noted to endorse psychotic symptoms despite no signs of distraction by internal stimuli. On February 26, 2020, custody issued a "restraint chrono" after the individual threatened to hurt the next person who entered his cell.

On March 2, 2020, the IDTT discharged the individual back to the EOP level of care, noting that he had stabilized, engaged in treatment, and was able to develop a safety plan. At the time of discharge, the individual continued to report suicidal ideation with no plan and command auditory hallucinations.

During the six days he was at the EOP level of care prior to his death, he was seen by his primary clinician and was reported to be preoccupied with his pending case in Ohio. He reported that he did not want to cause people more pain. Despite agreeing to discharge to the EOP level of care, the individual refused most groups and reported that he felt uncomfortable in social settings and talking in front of others. He was diagnosed with Major Depressive Disorder with psychotic features and was prescribed haloperidol, olanzapine, sertraline, mirtazapine, hydroxyzine, and divalproex sodium at the time of his death.

The individual reported having tried to kill himself five to eight times prior to his death, including suicide attempts by overdose, hanging, and suffocation. His last attempt was while in county jail in 2019 by suffocation with a plastic bag. The SCR noted that despite a number of these reported attempts occurring during the individual's stay in county jail and within CDCR, none had been witnessed by staff or documented. Despite this, the individual reported a number of attempts to kill himself by making a noose, shoving toilet paper down his throat, putting a plastic bag over his head, tying ligatures around his neck, and attempting self-strangulation. He reported that his suicidality was related to depression, command auditory hallucinations, and ruminative anxiety about his pending Ohio case. He reported that he did not have effective coping skills and noted that he felt unable to resist his command hallucinations.

During his stay in CDCR, the individual had 17 SRASHEs completed. Three SRASHEs were completed during his inpatient stay within the PIP; however, despite the initiation of discussions regarding safety planning at the time of admission, a safety plan was not completed at the time of his inpatient discharge. He was assessed to have a high chronic risk and moderate acute risk for suicide at the time of discharge. Upon arrival at the EOP level of care within the reception center on February 6, 2020, a SRASHE was completed as the individual reported suicidal ideation. He was assessed to have high chronic risk for suicide but low acute risk, and no safety plan was created. The following day, another SRASHE was completed, and he was assessed to be at high chronic risk and moderate acute risk for suicide; no safety plan was created. The individual was on five-day follow-up contacts at the time. When seen on February 11, 2020, by his primary clinician, a SRASHE was completed, and a safety plan "update" was documented, despite no previous safety plan being present in the record.

During the week prior to his death, six SRASHEs were completed, and each was noted to have problems. The SRASHE completed at the time of discharge from the MHCB on March 2, 2020, assessed his acute risk for suicide as low based on the fact that he had participated in treatment and was motivated to return to the EOP level of care. The risk ratings did not consider his continued suicidal ideation reported at the time. A SRASHE was completed on March 5, 2020, after the individual had reportedly attempted to "crush his trachea" three days earlier and continued

to report suicidal ideation. He was assessed as having high chronic and high acute risk for suicide with minimal justification for those risk levels. He was referred to CIT as a result. The CIT clinician completed a SRASHE, decreased the individual's chronic risk for suicide from high to moderate since the individual was "constantly reporting SI even when affect and behavior are incongruent," and included a plan for him to "continue" his participation in treatment despite his high refusal rate.

The SRASHE completed on March 6, 2020, rated the individual's chronic risk for suicide as high and his acute risk as moderate, despite a number of acute risk factors, including suicidal ideation, a recent suicide attempt, command hallucinations, hopelessness, anger, depression, anxiety, mood swings, loss of social support, and isolation all being documented on the risk evaluation. The SRASHE noted that the individual would not follow through on the command auditory hallucinations to hurt himself because he stated, "I don't have anything to use on me. I don't have pencils."

On March 7, 2020, the individual was seen for the fifth of his five-day follow-up contacts, and his responses warranted a referral to the CIT. He reported feeling suicidal, having constant thoughts to hurt himself, and reporting that he was highly likely to kill himself within the coming week. The CIT clinician evaluated him, and while initially endorsing suicidal ideation, he recanted and reported experiencing chronic depression. The CIT clinician referenced the individual's ability to use his safety plan despite its poor and limited content. Surprisingly, on March 8, 2020, the individual denied all suicidality, had no acute or imminent warning signs, and stated, "I'm fine right now, not feeling suicidal, for myself." On the day of his death, March 9, 2020, a SRASHE was completed, and the individual again denied all suicidal ideation and reported the ability to use his coping skills to manage suicidal thoughts. His acute risk was rated as low, despite having tried to "crush his trachea" four or five days prior, and that the three most recent SRASHE's indicated moderate and high acute risk.

All four SRASHEs completed between March 6, 2020, and the date of the individual's death on March 9, 2020, were noted to be over-reliant on the underdeveloped safety plan, which included the individual's participation in group programming despite his high refusal rate. Additionally, a number of areas within the safety plan included entries that indicated that the individual had reported "no one I can talk to" and "nothing" he could do to reduce his risk. This was concerning as the safety plan repeatedly included entries indicating that the individual had no plan; however, clinicians referred to this plan as a means to protect the individual against suicide without any updates or changes. Three of the SRASHEs included 30-minute welfare checks by custody and appeared to rely on unrealistic protective factors and judged (negatively) the individual's inconsistent self-reports and high symptom reporting. The risk ratings included reductions in both chronic and acute risk despite no documented changes in his presentation.

II.    <u>Determination of Foreseeability</u>

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.

The Special Master's expert determined this individual's death was foreseeable based on the fact that the individual reported suicidal ideation nearly daily in the days prior to his death and also reported trying to strangle himself during that time. Additionally, no clinician was able to develop an adequate safety plan with the individual to address his suicide risk.

III.    <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable based on the fact that despite continued suicidal statements, no adequate safety plan was ever developed to assist the individual in managing these thoughts. In fact, the safety plan included quotes from the individual indicating that he had no plan for safety and no one to turn to with his concerns. Still, no action was taken to assist the individual in developing a plan or addressing his needs. Additionally, when the individual did express suicidal thoughts in the week prior to his death, he was seen by crisis clinicians who did not fully assess nor address these thoughts and failed to develop adequate safety plans. Additionally, clinical staff clearly recognized the increased risk for suicide, as they increased the frequency of custody welfare checks without increasing treatment provision or interventions to mitigate the identified risks.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use, and mental health history. The SCR noted that the period following this head injury was "outside the reviewable timeframes" related to the suicide; therefore, no QIP was created to address this issue. Similarly, the medical death review noted that the head injury "was not a nexus to the death." It was not clear to the Special Master's expert how these determinations were made in the absence of adequate assessment results, as the SCR noted that the patient "received little intervention from medical and/or mental health, including psychoeducation and treatment associated with possible sequelae post-TBI." More specifically, the effects of the head injury may have extended into the "reviewable timeframe" and could have been "a nexus" to the death, but no medical nor mental health professional had ever conducted a further assessment to determine if this was indeed the case.

The SCR report noted that autopsy results were unavailable at the time of the report, yet the case review meeting occurred on April 27, 2020, and the report was submitted on May 5, 2020. The autopsy report available in the records was dated April 16, 2020, and the toxicology report was

dated April 2, 2020, with a hand-written noted that it was received on the same date. It is unclear to the Special Master's expert how the results of these reports were not available to the author of the SCR.

V.    Analysis of Quality Improvement Plan Process

This case resulted in ten required QIPs: nine related to mental health and one related to custody. The first mental health QIP was required to address deficiencies in the six SRASHEs completed in the week prior to the individual's death by suicide, including problems with an overreliance on non-viable protective factors and poor risk determinations. All six SRASHEs were reviewed, and it was determined that further training was needed. The training was completed for all clinical staff. Evidence of training was submitted along with the results of the audit. This response appeared adequate, although it could not be determined if all staff were trained.

The second QIP was required to address the poor safety plan development, which began with a SRASHE completed on February 11, 2020, and continued through the course of the following seven SRASHE contacts. These plans included unchanged quotes from the individual, many of which included statements that the individual had no plan and no one with whom to talk about his suicidality. All six SRASHEs were reviewed, and it was determined that further training was needed. The training was completed for all clinical staff. Evidence of training was submitted along with the results of the audit. This response appeared adequate, although it could not be determined if all staff were trained.

The third mental health QIP was required to address the fact that three of the SRASHEs completed prior to the individual's death used custody welfare checks in lieu of placement at a higher level of care. All three SRASHEs were reviewed, and it was determined that more training was needed for all clinical staff. The training was completed, and evidence of training was submitted along with the results of the audit. This response appeared adequate, although it could not be determined if all staff were trained.

The fourth QIP was required to address the "paucity" of group and progress notes during the individual's stay within the PIP. Specifically, following his "solo" programming placement, little to no information was documented regarding what programming the individual received while in the inpatient setting. A review was conducted and determined that the deficiency was not unique to the case of this individual and that all staff needed training. A two-hour training was completed, and the curricula were submitted. The response indicated that while most staff was trained, 20 percent were scheduled for training, and the additional information would be submitted. Evidence of training was not submitted. The review also determined that the current policy regarding solo programming was unclear; consequently, the policy was revoked, and another was under development. Emails that were submitted with the response indicated that the updated policy was forwarded, although it was not attached to the response available to the Special Master's expert. This response was only partially adequate.

A fifth QIP was assigned to be developed by headquarters' SPRFIT to address the fact that the IDTT did not appear to complete the issuance and cancellation of "restraint chronos" on a regular basis. In response, a joint memorandum was created by the DAI and the Division of Health Care Services (DHCS) on the use of mechanical restraints in inpatient units. It was noted to be under review at the time the response was submitted. No further information was submitted. This response was not adequate.

The sixth QIP was required to address the fact that after six months of placement at the acute inpatient level of care, the individual was discharged to the EOP level of care without a safety plan. The response indicated that the treating clinician required on-the-job training, and all staff were required to attend training related to safety planning. At the time of the submission, all staff had not yet been trained. This response was partially adequate and included evidence of training for only one clinician.

A seventh QIP was required to address the fact that no safety plan was completed with the individual upon his placement into the EOP level of care after his discharge from an inpatient setting despite being seen for two SRASHEs upon his return. Additionally, the individual was seen for five-day follow-up contacts with no review nor attempt to complete a safety plan. The response indicated that the two inpatient SRASHEs were reviewed along with documentation from the five-day follow-ups. Training was provided to all staff, except those on leave. A copy of the training was emailed to that staff. Additionally, a memorandum was sent to staff reminding them of the need to complete safety plans with individuals in the MHCB and those discharged from inpatient care. Copies of the training curriculum and sign-in sheets were provided, although it could not be determined if all staff were trained. This response was partially adequate.

A statewide concern regarding the failure of the inpatient team to make entries regarding non-clinical activities and behavioral observations required an eighth QIP. Policy requires tracking of these activities for PIP patients. The response indicated that there were plans to initiate "continuous monitoring" of the tracking on non-clinical activities, and PIP institutions had increased the number of staff trained to use the tracking system. The response reported that tracking had improved. Online training was also made available. This response appeared adequate.

The ninth mental health QIP was required to address the lack of required psychiatric documentation during the individual's inpatient stay. The response indicated that local policy did not clearly communicate expectations requiring the frequency of documentation for psychiatrists. A local memorandum was created specifying expectations for inpatient psychiatric documentation. The response indicated that the facility was in the process of training psychiatrists and updates would be provided. No further information was submitted beyond a copy of the memorandum. This response was partially adequate as it included no evidence of training.

The final QIP was required of custody to address the delays in contacting 911 following the discovery of the individual. The supervisor determined that additional training was required. The

involved staff members were trained on local policy and procedure. Evidence of training was submitted for three staff. This response appeared adequate.

Case AA

I.    Summary of Case

This individual was a 42-year-old African American man who was discovered hanging from a pipe in the five-man dormitory bathroom on November 27, 2020. Another incarcerated individual called for assistance, and officers responded. The individual was receiving mental health treatment at the 3CMS level of care at the time of his death.

Records indicate that the individual was born in California and raised primarily by his father, who was physically and emotionally abusive. His mother was addicted to drugs and not involved in his childhood. Both of his parents died prior to his incarceration within CDCR. The individual had three siblings, one of whom had a history of mental illness. The individual completed high school and attended one year of community college. He was consistently employed primarily as a truck driver. He was married, and they had one daughter. He was separated from his wife; however, he was staying with her at the time of his index offense in 2005 when his estranged wife told the individual that she wanted a divorce and he killed her. The individual claimed that the act was self-defense as she had stabbed him. He was found with a laceration on his arm and was unresponsive following the incident.

The individual began using alcohol and drugs in high school, including hallucinogens, LSD, and marijuana. He was using alcohol and marijuana two to three times per week and methamphetamine intravenously, on occasion, until five years prior to his incarceration. He was arrested once at age 16 for bringing a BB gun to school. The case was dropped, and he had no other arrests prior to his index offense. He reported being in a gang.

The individual entered CDCR for the first and only time in April 2009 to serve a life sentence with the possibility of parole for first-degree murder. While incarcerated, he received eight RVRs, the most recent on the day of his death for possession of a cell phone. The SCR noted that other incarcerated individuals reported that his cell phone was his "lifeline." He died by suicide two and a half hours after the cell phone was confiscated. The individual was placed on SNY status in May 2009 due to his crime and history of gang involvement. The SNY designation was removed in June 2018 following a facility transfer. The individual filed four appeals requesting single-cell placement during his incarceration, the last one in July 2018. He did not meet the criteria for a single cell. He maintained contact with his sisters, his daughter, and a female friend during his incarceration through letters and telephone calls. A hand-written suicide note was found in his shorts pocket. The note contained the following statement, "police just came saw rope hanging and said nothing." This was noted as an area of concern in the SCR and required QIP.

Records indicated that the individual received mental health treatment at age six for symptoms of depression. He reported his mother's drug addiction triggered the depression. The SCR noted that he was seen by a psychiatrist and was not compliant with treatment, but it noted that the individual was not prescribed psychotropic medication. Upon reception into CDCR, the individual responded negatively to all mental health questions, yet he was placed at the 3CMS level of care for a qualifying mental disorder. When seen for his full mental health assessment, he reported stress and depression but denied a history of suicide attempts. He stated that he had "thought of rather not be living," and the clinician determined that he could be at risk for suicide given the length of his sentence. He met with a psychiatrist later that month and was prescribed mirtazapine for depression, anxiety, and insomnia. Fluoxetine was added in December 2009. The individual reported headaches over the following months, and both medications were discontinued. He was removed from the 3CMS level of care in July 2010.

The individual was placed back at the 3CMS level of care in February 2013. However, there was no indication in the healthcare record until his IDTT meeting on March 7, 2013, which indicated the placement was due to medical necessity; no mental health diagnosis was provided. Subsequent documentation indicated that he was experiencing anxiety related to his eyesight issues secondary to diabetes. The SCR noted that the individual was diagnosed with Type I diabetes at age 15 and began experiencing vision problems in 2012. He was removed from the 3CMS level of care in January 2016 due to nonadherence with routine follow-up appointments.

The individual was placed back at the 3CMS level of care in August 2017, at his request, for anxiety related to his visual impairment. He was diagnosed with an Anxiety Disorder NOS and prescribed hydroxyzine. The hydroxyzine was discontinued in January 2018. He met routinely with his primary clinician and reported feeling "stuck" with depression, anxiety about his visual impairment and vulnerability, his family history, his daughter, and the guilt surrounding his crime. He consistently denied suicidal ideation, intent, or plan. Although his clinicians encouraged him to consider taking psychotropic medications during many sessions, he consistently refused, stating that he did not feel like himself when taking medication.

The individual transferred to another facility in June 2018 and reported that he found the new environment stressful. He was upset about not having a single cell and reported anxiety and paranoia as a result. He was considered for discharge from the MHSDS in December 2018, but his primary clinician noted that a discharge would likely place him at risk for decompensation. In January 2019, the individual reported that he considered asking to be placed at the EOP level of care due to an increase in depression. His primary clinician noted that he suffered from "chronic depression, anxiety, alogia, and anhedonia." Over the coming months, he reported anxiety secondary to his visual impairment and carrying the "burden" of his index offense. He reported a continued lack of motivation, feeling numb, and ongoing depression. In February 2019, the individual's visual impairment was confirmed by medical staff, and he was designated with a disability of permanent visual impairment.

In December 2019, the individual reported that he felt he could never forgive himself for his crime and that he did not deserve forgiveness. Despite a plan to follow-up with him in three weeks, his primary clinician did not see him again until March 2020, when he reported problems sleeping and the inability to "shut off his mind."

On March 18, 2020, the individual met with his IDTT to determine his appropriateness for being a hospice worker, a position he was interested in filling. It was determined that he was stable and capable of volunteering in hospice. Despite his frequent reports of anxiety, the treatment plan did not list it on his treatment plan as a goal or target of treatment. Depression was noted as the focus of treatment, and he had diagnoses of both Major Depressive Disorder, recurrent, mild, and Dysthymia. He was also diagnosed with an Unspecified Personality Disorder.

In April 2020, the individual reported increased motivation and improvement in his mood due to having contact with his daughter. There was a plan to follow up with him in two to three weeks, but he was not seen again until August 2020, well beyond the 90-day Program Guide requirement. In August 2020, he was also seen by a psychiatrist. And while he was not interested in psychotropic medication, he agreed to take melatonin as needed for sleep. During that session, he reported lifelong depression, ongoing anxiety, intermittent hopelessness/helplessness, mild anhedonia, low motivation, insomnia, and rumination. Records indicated that he did not consistently take melatonin and last requested it on November 8, 2020.

The individual submitted a healthcare request on October 1, 2020, because "something has triggered a large increase of my anxiety and it's having a very negative affect [sic] on me overall." A psychiatrist attempted to see him on October 8, 2020, but was unable as the individual was "under hard quarantine due to COVID suspicions." He was seen at the cell-side by a nurse practitioner, but the individual reported he would prefer to see his primary clinician. A primary clinician consult was ordered on October 6, 2020, in response to his healthcare request, but his scheduled session on October 12, 2020, was canceled and co-signed by a supervisor; no reason for the cancellation was documented. Another session was scheduled and canceled on October 19, 2020, due to quarantine status. The individual was finally seen on October 22, 2020. This was his last contact with his primary clinician prior to his death. He reported that he had requested the contact due to anxiety about a housing move that did not occur. He was noted to be worried about his daughter's concern for him and expressed "mild anxiety," but no suicidal or homicidal ideation.

The individual had one documented suicide attempt in 2005 by hanging, following his arrest for his index offense. He also reported that at age 15, he neglected his diabetes after arguing with his father. There was no reported history of self-harm. Over the course of his incarceration, there was one SRASHE completed on April 19, 2018, following an institutional transfer. He reported thoughts of being dead in the month prior but reported that he would not act on those thoughts. His chronic and acute risk were both assessed to be moderate, and his safety plan appeared appropriate.

At the time of his death, the individual was being treated for hypertension, hyperlipidemia, legal blindness (with chronic partial detachment of retina of his left eye), Type I Diabetes, and chronic pain syndrome. He was seen regularly, and his medical conditions were under variable control, resulting in the need for regular adjustments to his medical care plan. The individual was adherent with his medical care plan. While he was under two-week quarantine for COVID-19 on three occasions, all four COVID-19 tests he was administered results were negative.

The coroner's report and autopsy were not available for review.

## II.   Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this individual's death was not foreseeable.

## III.   Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case. The Special Master's expert determined the suicide was not preventable.

## IV.   Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use, and mental health history. The reviewer included a reasonable assessment of the precipitants to this suicide and the recommendations followed the content and findings of the report.

## V.   Analysis of Quality Improvement Plan Process

This case resulted in four required QIPs; three to address mental health concerns and one for a custody concern. The first mental health QIP was required to address the March 18, 2020 IDTT meeting, which failed to include anxiety as a target for treatment. Additionally, the treatment plan included conflicting diagnoses of Major Depressive Disorder, recurrent, mild, and Dysthymia. The response indicated that ten treatment plans authored by the identified clinician were audited and revealed an inconsistent pattern of incomplete documentation. The response indicated that the findings were discussed with the program supervisor, who would provide feedback and instruction to the employee. This response was not adequate.

A second mental health QIP was required to address the fact that the individual's primary clinician failed to meet with him in accordance with Program Guide timeliness between April 2020 and August 2020. Compliance rates for the facility were reviewed to determine if there was a systemic problem, and one was not identified. The response indicated that "follow-up with the identified clinician will occur." This response was not adequate.

The third mental health QIP was required to address the response to a healthcare request submitted on October 1, 2020. Multiple concerns were identified, including triaging/scheduling, placing mental health consult orders, cancellation of a routine consult without accompanying explanation, as well as missed timelines for the clinician response. A review of responses to healthcare requests at the facility noted a number of areas of concern. Two memoranda were written in response. One was targeted to address the proper routing procedure for requests, and the other to address required response timelines and the proper procedure for completion, cancellation, and rescheduling. Both were emailed to all relevant staff and were included with the QIP response. This response appeared adequate.

The custody QIP was required to investigate the fact that the individual wrote a suicide note that custody staff had seen a rope hanging and did not intervene or respond. This issue was referred for an OIA investigation, and no further information was available.

Case BB

I.   Summary of Case

This individual was a 30-year-old Caucasian man who was discovered hanging in his solely occupied STRH cell by custody staff during Guard One checks on August 7, 2020. The individual was placed in STRH for safety reasons hours before his death, though he was not at the 3CMS level of care. The individual was not placed in an intake cell and was not assigned a cellmate. He was not a participant in MHSDS at the time of his death.

The SCR noted that there was minimal background information available about the individual's history, but a document entitled "My Life Story" was found in his property following his death. The document indicated that the individual came from a large family including two brothers and eight sisters, and his parents separated when he was very young. He maintained contact with his mother during his incarceration; she was listed as his next of kin. The individual was reportedly raised by his father from age five to nine but was removed at age nine by Child Protective Services (CPS) after narcotics were found in the home. The document indicated that his father drowned saving the individual's life when the individual was age 11. Following the loss of his father, the individual began engaging in fights and spent the remainder of his adolescence in foster care, group homes, and incarceration. The POR indicated that the individual graduated from high school. He never married and had no children. There was no evidence that the individual received any visits during his incarceration, and there were no available telephone records for him.

The individual began using alcohol and marijuana at age 15. While incarcerated, he received a number of RVRs for refusing to provide a urine sample. The individual had a significant juvenile criminal record, starting at age 11 with charges including several counts of assault and battery, disturbing the peace, destruction of property, threats to harm or kill, brandishing a weapon, petty theft, and resisting arrest. He was incarcerated as a juvenile for some of those crimes. Records also indicated that the individual was incarcerated as a juvenile in the state of Colorado. As an

adult, he was arrested for petty theft, destruction of property, battery, and resisting arrest. He served time in county jail and had probation requirements.

The individual entered CDCR in January 2012 to serve a 26-year sentence for assault with a firearm, use of a firearm, inflicting great bodily injury, and robbery. The individual was convicted of shooting a security guard who had arrested the individual two days prior. While at the CDCR reception center following his incarceration, he received an additional four-year sentence for assault with a deadly weapon on another incarcerated individual. He received 17 RVRs while incarcerated; six were for refusing to provide a urine sample and eight for violence, including attempted murder in 2018. His final RVR on August 3, 2020, was for fighting. The individual had several placements in ASU and SHU for disciplinary reasons during his incarceration. His records indicated minimal participation in CDCR programming, but there was evidence of completion of in-cell self-help materials. There was an indication in his custody record that he may have associated with a prison gang, and this appeared to play a role in his request for SNY status and placement in an STRH cell prior to his death. The SCR noted that in May 2020, the individual witnessed the killing of another incarcerated individual, a friend, and may have sought protection related to this incident.

Records indicated that the individual was required to attend mental health services as a juvenile, but the details were unknown. At the time of his arrest, the individual reported that he was taking medication for depression, had ADHD, organic brain damage, and suffered the effects of trauma-related to his father's death. During the reception process in CDCR, the individual was seen by a psychiatrist after refusing to take the medications he had been prescribed in county jail to address mood dysfunction and sleep disturbance. The individual reported a suicide attempt at age 12 by ingesting charcoal but declined mental health services at that time and was not included in the MHSDS at any point in his incarceration. He was screened on a number of occasions prior to placement in restrictive housing but reported no symptoms and was not referred for further evaluations.

The individual was evaluated by a psychologist on January 14, 2020, following an acute drug overdose. The individual required medical treatment, yet toxicology results were not found in the healthcare record. The individual was guarded during the evaluation but was future-oriented and not in any distress. The overdose did not appear to be an act of deliberate self-harm. A SRASHE was completed at the time and rated both his chronic and acute suicide risk as low. Given the individual's history, the chronic risk level appeared to be an underestimate. Further, the SRASHE did not include a safety plan, likely because his acute risk was assessed to be low. There was also no indication for a follow-up plan. During an internal review after his death, the facility noted this as a concern and reportedly took steps to address this issue through training, oversight, and mentoring. The individual was screened on August 7, 2020 (the day of his death) during an ASU pre-placement screen and completion of the ASU screening questionnaire. Neither were noted to be remarkable, and the psychiatric technician who completed the screening questionnaire characterized the interaction as "very routine."

The Special Master's expert noted that the autopsy report indicated that a 1 x 0.5 cm plastic bag filled with white powder was located inside the individual's left ear. No further information on this substance was available, and this substance was not referenced in the documents available for review in this case. The autopsy noted that the only substances in the individual's body at the time of death were caffeine and naloxone, the latter of which was administered during life-saving interventions.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this individual's death was not foreseeable.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case. The Special Master's expert determined the suicide was not preventable, although follow-up with the individual following his overdose in January 2020 was likely indicated.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary. The reviewer included a reasonable assessment of the precipitants to this suicide and the recommendations followed the content and findings of the report. Of concern was the fact that despite the autopsy report being included in the available file, there was no indication that the report had been reviewed by the Suicide Case Review Committee as there was no reference to the fact that a white powder was found in a bag in the individual's ear during the autopsy.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required QIPs, both related to custody concerns. The first was required to address the fact that the individual was within his first 72 hours of ASU placement but was not housed in an appropriate intake cell, nor was he assigned a compatible cellmate. This was referred to OIA for investigation, and no further information regarding that investigation was available. The response also indicated that a memorandum was issued at the facility level to clarify the requirements related to ASU placement during the first 72 hours.

The second QIP was required to address the fact that the time between custody checks prior to the individual's death exceeded the 35-minute maximum. The time from the last check to the time the individual was discovered was approximately 40 minutes. This was referred to OIA for investigation, and no further information regarding that investigation was available. This QIP requires that appropriate action be taken once those results are made available, and therefore follow-up is indicated.

Case CC

I.    Summary of Case

This individual was a 31-year-old Hispanic/Latinx man who was discovered hanging in his solely occupied ASU cell by custody staff during custody checks on October 12, 2020.  The individual's window was covered with cardboard.  He was receiving mental health treatment at the 3CMS level of care at the time of his death.

The individual was raised in California by this mother and stepfather, along with three sisters.  He reported, "I grew up around violence and drugs all my life."  The individual reported that he was a good athlete from childhood to early adolescence, when he began using marijuana on a daily basis, drinking alcohol socially, and experimenting with ecstasy during his sophomore year of high school.  He was arrested at age 15 for shoplifting and eventually dropped out of school.  He later obtained his GED and attended one semester of community college.

As an adult, he was arrested for the first time at age 19 following a high-speed chase with police officers in a stolen car.  He spent time in a county jail where he was charged with assault on a custodial officer.  Later, while on probation, he attempted to sell methamphetamine to an undercover officer.  His index offense involved shooting a person with whom he had a physical altercation during the two weeks before the offense.  The victim and two friends confronted the individual and pushed his pregnant girlfriend.  The individual drew a handgun, fired three shots, killing the victim.  The individual entered CDCR in May 2011 for his first and only term to serve 50 years to life with the possibility of parole for first-degree murder, attempted murder, and possession of a firearm by an ex-felon.  His girlfriend was charged as a co-defendant; therefore, she was unable to visit the individual during his incarceration.  During his incarceration, the individual had 67 visits, most from his sisters, mother, and son.  It appeared that he did not have visits from his son over three years, but his ten-year-old son visited in March 2020.  This was the last visit the individual received prior to his death.

The individual received 20 RVRs; the most recent was received the day prior to his death by suicide for assaulting his cellmate.  The majority of his RVRs were related to violence or threats of violence.  He had 17 ASU placements for disciplinary and safety reasons and was affiliated with a Security Threat Group (STG) early in his incarceration.  The affiliation resulted in violence and threats of violence both from and toward the individual in 2015, 2017, 2018, and 2019.  Each time, the individual refused SNY placement.  Instead, he requested a transfer to another facility despite the serious stated custody staff concerns related to his safety, including the fact that the individual had assaulted a high-ranking gang member and disassociated himself from his own gang, making an assault against him highly likely.  In July 2019, the individual requested consideration for placement in an SNY after formally disaffiliating from gang membership.  In November 2019, the individual assaulted his cellmate and another incarcerated individual on the following day.  In response to the second assault, the individual was the victim of a four-on-one attack by gang members.  The individual was placed in the ASU as a result of these incidents.

On February 26, 2020, the individual was included in the 3CMS level of care and transferred to another facility due to his MHSDS designation. Following his release from ASU, the individual experienced a number of cell transfers, and on July 30, 2020, the individual received an RVR for attacking his cellmate; the case was referred for prosecution. During decontaminated in the shower following the use of chemical agents to end the assault, the individual assaulted a correctional officer and received another RVR. Consequently, he returned to the ASU, where he briefly had a cellmate but then resided alone for over a month. The individual was due to be transferred to an STRH, but the individual did not meet the guidelines for "essential transfer" pursuant to the "COVID Emergency Health Treatment Guidance for MAX Custody Patients" memorandum. Additionally, the individual filed a grievance alleging excessive use of force by staff during the July 30, 2020 incident. The grievance was pending at the time of his death.

On October 11, 2020, the individual requested to be housed with another incarcerated individual who was a former member of the gang from which the individual disassociated. There did not appear to be documented enemy concerns; though, it was later discovered that there was the potential for a conflict. Within an hour of being housed together, the individual assaulted his new cellmate after calling custody staff to witness the fight. Chemical agents were used to stop the fight, and the individual was rehoused in a single cell. Eight hours later, the individual was discovered to have killed himself.

There was no indication that the individual received mental health services prior to incarceration. His first contact with mental health staff during incarceration occurred in July 2012, when he self-referred for services to address sleep disturbance and distress regarding an appeal. He did not appear to meet the criteria for inclusion in the MHSDS at the time, but he saw a psychologist on a few occasions. In November 2019, an urgent referral for a mental health evaluation was initiated after the individual refused to participate in the ASU pre-placement screening. He denied any symptoms and was not included in the MHSDS at that time. The individual submitted five requests to see a mental health clinician between November 2019 and February 2020. During a contact on February 11, 2020, the individual reported anxiety and depression and asked to be placed at the 3CMS level of care but became frustrated when asked to describe his symptoms. He did not appear to meet the criteria for inclusion in the MHSDS but subsequently submitted two self-referrals in the following two weeks describing excessive sleep, decreased appetite, and lack of motivation to socialize or exercise. During an evaluation on February 26, 2020, he also expressed problems with concentration and stress related to family issues. A suicide risk evaluation and initial mental health evaluation were completed, and the individual was placed in the MHSDS at the 3CMS level of care with a diagnosis of Unspecified Anxiety Disorder. During the SRASHE, the individual denied any history of self-harm or suicide attempts and did not evidence any warning signs for suicide. He was determined to be a low chronic and acute risk for suicide. While the risk assessment appeared accurate, the documented rationale was of poor quality.

As noted above, the individual transferred to another facility on March 1, 2020, as a result of his placement in the MHSDS. An IDTT meeting was held on April 9, 2020, but it was unclear from the documentation whether the individual attended the meeting. The treatment plan was

incomplete, with several sections left blank. There was no rationale documented for placement at the 3CMS level of care, and the goal-setting section was blank. During April through September 2020, the individual was seen by five different psychiatrists; self-referrals prompted these visits. The individual asked for a prescription for stimulant medication for ADHD and complained of anxiety and stress. He was prescribed a low dose of fluoxetine in August 2020 and low-dose atomoxetine in late August and early September 2020. The individual was marginally adherent with medications and decided to stop taking them as he found them ineffective. He continued to request stimulant medications several times. All medications were discontinued as of September 24, 2020.

The individual received 3CMS services in mainline housing through July 30, 2020. After receiving an RVR for assaulting a peace officer, he was transferred to ASU on July 31, 2020. He continued receiving 3CMS services in ASU and was seen weekly for individual treatment. An IDTT was held on August 5, 2020, and again, the treatment plan's content was minimal, with many sections left blank. The treatment plan was not updated regarding progress, new symptoms/problems, collateral information, or goal-setting. It did not discuss the individual's level of functioning. The diagnosis on the treatment plan continued to list Unspecified Anxiety Disorder, yet much of the content described his reports of symptoms of ADHD. Within three weeks of his placement in ASU, his assigned primary clinician left service, and the individual was subsequently seen by a different clinician each week. During a contact with his primary clinician on September 24, 2020, the individual requested that every other contact occur at the cell front. The reason for this request was not documented. Documentation indicated that the individual denied suicidal ideation and hallucinations and evidenced no signs of depression or psychosis. For his final primary clinician contact on October 5, 2020, he was seen at the cell front after he declined a confidential setting. The individual reported doing well and did not voice any concerns. He reported that he intended to attend his next session in a confidential setting.

Documentation of treatment for this individual did not include any evidence of group treatment. It was reported that the facility did not believe they were required to provide group treatment, as the institution does not have an STRH and the individual was in an ASU. As noted above, the individual was not transferred to an STRH due to COVID restrictions. The SCR noted that lack of structured out-of-cell treatment "does not appear to be a clear violation of policy," but "this level of support would have been required if he had transferred to an STRH."

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this individual's death was not foreseeable.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case. The Special Master's expert determined the suicide was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use, and mental health history.  The reviewer included a reasonable assessment of the precipitants to this suicide and the recommendations followed the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required QIPs: one for mental health and three for custody.  The mental health QIP was required to address poor treatment planning on April 9, 2020 and August 5, 2020, completed by two different clinicians.  As noted above, the content of these treatment plans was sparse, and the diagnosis did not correspond with the individual's reported symptoms.  The response included an audit of five treatment plans authored by one of the identified clinicians.  The other clinician had separated from employment several months prior.  None of the audited treatment plans passed the CAT criteria, and all revealed issues similar to those identified in the QIP.  Training and specific feedback were provided to the identified clinician.  Training was also extended to other clinicians working within the treatment teams assigned to the same yard. Supporting documentation and evidence of training were provided.  The response indicated that three to five of the identified clinician's treatment plans would be audited per month with feedback to be provided.  No further follow-up was provided.  This response appeared adequate; however, follow-up information on the efficacy of the response would have enhanced the findings.

The first custody QIP was required to address the fact that responding staff did not don appropriate personal protective equipment prior to entering the cell.  The response indicated that the Warden reviewed the incident and found that proper personal protective equipment was not donned by responding staff.  Training was provided to the staff, and evidence was provided.  This response appeared adequate.

The second custody QIP was required to address the fact that the unit supervisor was not appropriately signing off on weekly tracking of the individual's participation in yard and showers on form CDCR 114-A.  In response, the Warden conducted a review of CDCR 114-As in ASU and noted the referenced failure of the supervisor to sign off on the forms properly.  Training was provided to identified staff.  This response appeared adequate.

The third custody QIP was required to address the fact that there may have been a policy violation concerning the presence of a window covering on the individual's cell during the final Guard One check completed on the day of his death.  This issue was referred to OIA, and no further information was available.

Case DD

I. Summary of Case

This individual was a 39-year-old Hispanic/Latinx man who was discovered hanging in his solely occupied SNY cell on June 20, 2020. The individual was not a participant in MHSDS at the time of his death.

The individual was reportedly raised by both parents in Mexico until 1994 when the family immigrated to the U.S. He became a permanent resident at age 14. The SCR noted that he resided with his mother; his father was incarcerated. The individual's primary language was noted as Spanish. He dropped out of school after completing the ninth grade and began working as a field laborer. He began using substances at age 17, including daily alcohol consumption and eventually daily methamphetamine use. He reported using until the day of his arrest for his index crime. He stated that he completed an Alcoholic Anonymous outpatient program in 2010 after attending twice per week for three months. The individual was married from 1999 to 2015 and had four children, three of whom were the victims of his crimes.

This individual reported gang involvement from 1997 to 2001. He was previously arrested for driving under the influence in 2007 and 2010 and driving while license suspended in 2007. He entered CDCR in January 2020 to serve his first term of 38 years for multiple charges of continuous sex abuse of a child under 14 years, sexual penetration by force/violence/fear with victim under 14, and lewd and lascivious acts with a child under 14 with force/violence/fear. Upon his arrival in CDCR, he requested SNY placement related to being a gang "dropout" and "other safety concerns." He received no RVRs while incarcerated. He also did not have any visits. On June 12, 2020, the individual was the victim of battery by two other incarcerated individuals and was relocated in a cell by himself, although he was eligible for a cellmate. The assault resulted in a laceration over his eye that required sutures that were scheduled for removal on June 19, 2020, the day before his death. Because the wound had not closed, he was rescheduled for June 22, 2020.

The individual reported no history of mental health services in the community or during incarceration. The individual was screened three times, by either medical or mental health staff, during routine reception center processing and a subsequent transfer. A nurse practitioner also saw him for a routine appointment two weeks prior to his suicide. The individual denied mental health needs and suicidal ideation during all contacts. He left a suicide note, written in Spanish, addressed to his sister, explaining the reasons for his suicide and apologizing to his family for his crimes and the suicide.

II. Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this individual's death was not foreseeable.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case.  The Special Master's expert determined the suicide was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate summary of this case with relevant known social, criminal, incarceration, substance use, and mental health history included.  The reviewer included a reasonable assessment of the precipitants to this suicide, and the recommendation followed from the findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in one required QIP for nursing related to the fact that the responding nurse placed a C-collar on the individual's neck over a piece of the noose that remained after he was cut down.  The responding nurse was interviewed, and the nurse's training records were reviewed.  During the discussion with the nurse, policies were reviewed, including those most relevant to emergency responses.  Training forms and competency forms were completed to document the review of the information with the nurse.  The nurse moved into a position without patient contact.  The response appeared adequate.

Additionally, one concern did not rise to the level of a QIP related to custody staff not removing the noose from the individual's neck during CPR, which was a violation of policy.  On-the-job training was provided to staff as a result.   It is not clear why this policy violation, which could have impacted the ability to preserve life, was not serious enough to warrant a QIP.

Case EE

I.    Summary of Case

This individual was a 58-year-old Caucasian man who was discovered hanging in his solely occupied PIP cell by a licensed vocational nurse while delivering medications on December 17, 2020.  The individual was receiving mental health care at the ICF level of care at the time of his death.

The SCR noted that the individual was a poor historian and that some of the information in his reported history was inconsistent.  The individual was reportedly born in Washington, DC, and raised in California with three siblings.  He reported being exposed to conflict between his parents and being abused by his parents.  His mother was noted to be emotionally abusive, and his father was sexually abusive to him beginning when he was age nine.  Both parents were reported to be alcoholics.  The individual reported dropping out of high school in the twelfth grade but obtained his GED and an Associate of Arts degree later.  Records were unclear about his marital status, but it appeared that he may have been divorced and possibly had two children.

Records confirmed that the individual served in the U.S. Army for almost three years beginning in 1981 and was honorably discharged. Yet, a POR noted that he was discharged due to being "drunk and mouthy." The individual was noted to have had significant substance use issues that hampered his ability to remain employed. He began inhaling glue as an adolescent, then began using alcohol, LSD, amphetamines, cocaine, crack, marijuana, and opioids. His substance use resulted in blackouts, accidental overdose, driving under the influence, homelessness, and stealing medications from his mother. In 1999, the individual reported that LSD had allowed demons to enter his body and damage his brain, making him unable to resist internal impulses. He was arrested once prior to his index offense for driving while intoxicated. He had no juvenile criminal history.

The individual entered CDCR for the first time in January 2000 to serve a life sentence with the possibility of parole for multiple counts of lewd and lascivious acts with a child under 14, oral copulation with a child under 14, and corporal punishment or injury to a child. He was included in the 3CMS level of care at the time of his reception processing. In February 2000, he reported safety concerns related to fears of retaliation, and in March 2000, he stated that he needed protection from his previous cellmate. These reports were unsubstantiated, and the individual was endorsed for placement in the mainline general population. Upon arrival, he refused housing and was placed in ASU. He reported that he needed protection from "white gangs in general" and had been in protective custody while in county jail due to the publicity regarding his crime. He was eventually endorsed to an SNY but continued to have interpersonal issues with his peers. His inability to house with other incarcerated persons caused him distress and eventually precipitated the need for inpatient psychiatric care. He was able to program and work successfully. While incarcerated, he received 11 RVRs, the most recent received in August 2020. In August 2019, he received an RVR for battery on a peace officer, and that case was in litigation at the time of his death. Records indicated that the individual had 12 phone calls with his sister during the final nine months of his life.

The individual had an extensive mental health history and had received mental health services within CDCR at all levels of care. Prior to his incarceration, the individual received mental health services as an adolescent secondary to substance use, anger, social withdrawal, and behavioral issues. Later, he sought outpatient mental health treatment to cope with the death of his father. The individual reported that he had been diagnosed with "severe panic disorder" and Bipolar Disorder while in the community and was prescribed lithium, fluoxetine, and buspirone. Records indicated that the individual had a history of impulsivity, including engaging in self-injurious behavior. The individual engaged in nine prior suicide attempts; the most recent occurred on August 27, 2020, by hanging.

The individual was placed at the 3CMS level of care within two days of being received in CDCR. His diagnoses at that time included Adjustment Disorder with Depressed Mood, Anxiety Disorder, Substance-Induced Psychotic Disorder, Depressive Disorder Not Otherwise Specified, Pedophilia, Polysubstance Dependence, Borderline Personality Disorder, and Antisocial Personality Disorder. He was mainly treated at the 3CMS and EOP levels of care throughout his incarceration but had 11 MHCB placements, one APP admission, and two ICF admissions. Early treatment targets included adjustment issues, depression, anxiety, poor sleep, and poor appetite, but as his functioning worsened, he required treatment to address emotional lability, paranoia, persecutory

thinking, impulsivity, and interpersonal difficulties. Behaviorally, the individual engaged in self-injury, suicide attempts, impulsive acts, and aggressive behavior. His first admission to the MHCB occurred in October 2001, and his first suicide attempt while incarcerated occurred in January 2002. Following that attempt by cutting his forearms, he was admitted to an inpatient setting for 57 days. Upon return to CDCR, he remained stable for almost two years and was readmitted to the MHCB in November 2004 for suicidal ideation and again later that month for medication adjustment and monitoring.

He remained stable in an outpatient setting (either 3CMS or EOP) through October 2014, when he was discharged from the MHSDS. He was briefly placed back at the 3CMS level of care in 2015 but did not require mental health services again until July 2019, when he attempted to kill himself. In 2019, the individual was admitted to the MHCB three times and the PIP twice. The individual reported feeling hopeless following a transfer to a facility far from his sister, the requirement to live in a dorm setting, and anxiety about other incarcerated persons learning of his crime. Upon discharge from an inpatient setting to the 3CMS level of care in August 2019, the individual received an RVR for battery on a peace officer and was placed in STRH. He reported that he was having a panic attack when he assaulted the officer and was now hopeless about making parole and was placed in the MHCB. The individual was discharged to STRH but returned to the MHCB one week later, reporting safety concerns related to his crime and stating that he would find a way to kill himself rather than be hurt by other incarcerated persons. From the MHCB, he was transferred to the acute level of care after making minimal progress and being seen as high risk for suicide. Upon admission in September 2019, he was diagnosed with Major Depressive Disorder, Single Episode, Moderate and Borderline Personality Disorder. Treatment was offered to target his depression and suicidal ideation, but the individual remained isolative and refused services. In October 2019, the individual was seen to have made progress and was recommended for transfer to an ICF. The treatment team recommended single-cell housing, but the Inpatient Referral Unit (IRU) recommended an unlocked dorm, despite his maximum security status and the individual's statements about feeling unsafe in a dorm setting. The IRU justified this recommendation by stating that dorm housing "will assist in his overall treatment goals and addressing his fears."

Following his initial IDTT meeting in the ICF on November 11, 2019, he was placed in a four-man cell; within hours, the individual reported having a razor and experiencing suicidal ideation. He reported to staff that the cellmates were asking about his crime and he felt "set up." Over the following few months, the individual refused to be housed with others, became uncooperative, refused to speak to the treatment team, and received an RVR for refusing to be moved to another multi-person cell. He tried to strangle himself with a pair of boxers and went on a hunger strike. On December 10, 2019, he was placed on one-to-one observation with full safety precautions. During his mental health assessment for the above RVR, it was determined that his mental health condition did not contribute to his behavior, but no progress note was entered into the health record. Custody staff eventually dismissed the RVR. The individual's treatment team consulted with headquarters IRU regarding his care, and the recommendation was to work with the individual to move past his anxiety. The individual remained adamant about being single-celled and stated that his hunger strike was a suicide attempt. He was eventually placed on temporary single-cell status on December 27, 2019. The following day, he received an RVR for willfully resisting an officer and was placed on maximum custody status with a single-cell designation. Once placed in a single cell, he denied suicidal ideation and resumed programming.

Records indicated that during February 2020, the individual was not seen by his primary clinician nor psychiatry in keeping with his treatment plan. In early March 2020, the individual stated that he was on a hunger strike with the goals of obtaining permanent single-cell status, having his RVR dismissed, and transferring to a facility closer to his sister. He ended his hunger strike after two weeks, despite his demands not being met. When the issue of discharge was raised in April 2020, the individual engaged in self-harm by scratching himself with a hard piece of plastic on his ankles. He was placed on suicide watch and continued to escalate, re-engaging in a hunger strike, engaging in self-harm, and refusing medical care. He was admitted to the TTA on April 30, 2020, due to weakness, lightheadedness, dehydration, and orthostatic hypotension. He refused medical care, stating that the staff was prolonging his life when he wanted to end it. He went to a community hospital, returned to the CTC, was discharged, and then returned to the CTC again over the course of the following week. He remained on one-to-one status in the CTC and continued to endorse suicidal ideation. Clinical documentation indicated that the individual feared returning to the PIP. On May 21, 2020, his suicide watch was discontinued, and he was placed temporarily in the PIP while awaiting transfer to an EOP. The SCR noted that documentation during his PIP placement was difficult to follow regarding privileges and observation levels. The SCR noted that only the psychiatrist was allowed to document orders at the facility's PIP.

The individual transferred to an EOP on July 15, 2020, but within 24 hours, he lacerated his wrists and ankles, resulting in placement in a TMHU with a referral to an MHCB. The MHCB referral was rescinded on July 21, 2020, after the individual reported that he did not give the yard a chance upon transfer. He was seen for a five-day follow-up and noted ongoing anxiety. During his initial IDTT on July 30, 2020, the individual reported he wanted to be transitioned to the 3CMS level of care. Treatment goals were set for him to be free from self-injury for six months and to engage in positive peer interactions. The following day, the individual was referred to the MHCB after lacerating his wrists and ankles and reporting that he had tried to strangle himself with a towel. The individual stated that he wanted to return to a PIP. The IDTT decided to hold the individual at the MHCB level of care and to pursue a PC 2602 order. This decision was later changed, given the individual's medication adherence. He was transferred to the EOP level of care on August 10, 2020 and was seen appropriately for his five-day follow-ups. On August 27, 2020, the individual attempted suicide by hanging himself. He required life-saving interventions and was hospitalized for four days. He returned from the hospital to the MHCB level of care. On September 4, 2020, he was referred to the PIP at the acute level of care but was retained at the MHCB level of care due to not meeting the criteria for an emergency transfer under CDCR COVID-19 policy.

The individual remained at the MHCB for an extended time and reported being frustrated and suspicious regarding the delay. He reported an increase in suicidal ideation. The SCR noted that documentation regarding the individual's level of observation during this time was unclear. Due to the extended delay in transfer, the IDTT decided to rescind the referral to acute care and placed a referral for ICF level of care on October 28, 2020. The decision appeared to be well-justified, noting a decrease in acute suicide risk but ongoing needs to address chronic suicide risk, frustration tolerance, and interpersonal issues. During this time, the psychiatrist who treated the individual reported that he believed the individual was chronically suicidal given the length of his sentence and his inability to be transferred to a DSH facility closer to his sister. There was noted to be frustration among the treatment team related to the emergency transfer criteria and long delays.

The individual was transferred to an ICF on November 5, 2020. During his intake assessments, the individual was noted as stable and expressing increased hopefulness about his situation. His initial treatment plan was noted to be incomplete because it was not updated, did not include a diagnosis, did not include a housing recommendation, did not include a plan for the individual's treatment, did not specify his level of observation, and did not address safety planning. Documentation from his primary clinician in November 2020 noted that the individual was assessed and cleared for court, yet no updated SRASHE was found in the health records. The individual was diagnosed with Generalized Anxiety Disorder, Major Depressive Disorder, recurrent, Antisocial Personality Disorder, and Borderline Personality Disorder, and he was assigned one IPOC for Danger-To-Self. He was recommended for single-cell housing, but the documentation did not reflect clinical justification nor any indication that previous housing recommendations and rationales were reviewed. On November 28, 2020, the individual was informed that he was moving to a multi-person cell as a safety precaution for his eventual step-down to a lower level of care. He was also informed of an upcoming court date on January 12, 2021. The individual reported that he had accepted that he would not be released from prison and that he had told his sister that he would no longer try to harm himself. The individual was seen at the cell-front and was not offered any out-of-cell treatment due to COVID-19 restrictions. He was also not allowed to participate in his IDTT on December 7, 2020, but after the meeting, he was informed that he would be transferred to a dorm setting. The individual indicated that he was not pleased with that decision and feared that others would harass him. He was seen at the cell front over the following days and appeared stable, but on December 15, 2020, the individual was noted to be sitting on his bed but did not make eye contact with the primary clinician who came to his door. He was seen by a psychiatrist at the cell front on December 17, 2020, and reported that he was doing okay, had no issues, and denied suicidal ideation.

A review of records indicated that between November 5 and December 17, 2020, the individual was scheduled for 51 treatment hours, with only 21 hours being offered. He attended 17 hours and refused four hours. Sixteen of the 17 hours offered were for group treatment, and the individual attended 12 of those hours. Only six groups were documented in the healthcare record, and one of those groups appeared to have been an individual session.

The individual's psychiatric care was reviewed in the SCR and noted that at the time of his death, the individual was prescribed olanzapine, fluoxetine, buspirone, melatonin, hydroxyzine, *pro re nata* (PRN), and benztropine PRN. Over the course of the previous year, he was also prescribed escitalopram, sertraline, venlafaxine, trazodone, and haloperidol. During his most recent placement in an ICF, his psychiatric care was noted to be adequate, but during a previous ICF placement, he was not seen for several months by psychiatry.

Records indicated that the individual reported a suicide attempt and acts of self-injury while an adolescent and a suicide attempt by driving off a freeway ramp as an adult following his father's death. There was one documented suicide attempt while the individual was in county jail prior to entering CDCR. During his incarceration, the individual reported suicidal ideation at various times, usually triggered by safety concerns. He engaged in acts of self-injury beginning in 2000. He attempted suicide on five occasions from 2001 through 2004. Records indicate that he was free from documented self-harm and suicide attempts from 2005 until July 2019, when he attempted to overdose on medication and later cut his forearm and ankle. He reported that he

engaged in these behaviors due to being overwhelmed living in a dorm setting and safety concerns related to his crime. He engaged in self-harm over multiple days in April 2020 and again in July 2020, related to similar concerns. He attempted suicide for the final time in August 2020, prior to his death by suicide in December 2020.

Ten SRASHEs were completed during the final year of his life, with estimated acute risk ranging from low to high. Chronic risk was consistently assessed as high across all ten SRASHEs. There were several concerns noted among the SRASHEs completed during the final year of his life, including poor risk rationale, inadequate risk determinations, failure to consider significant risk factors, failure to identify warning signs, poor safety planning, an overreliance on the individual's self-report, failure to review the safety plan with the individual, failure to update previous safety plans, and over-estimation of the effectiveness of his protective factors.

## II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this individual's death was not foreseeable.

## III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable based on the fact that the individual's treatment in the final months of his life was poorly planned, inadequate, and the treatment team failed to assess the individual's risk for suicide appropriately. Despite the fact that the individual had been referred for an acute inpatient placement but was reduced to an ICF placement after a long delay in transfer due to the COVID-19 pandemic, the IDTT at the ICF did not assess the individual prior to the IDTT meeting, failed to create or update the individual's treatment plan to address his current needs, and failed to complete a SRASHE at the time of admission. Additionally, the individual's level of suicide risk was directly impacted by his housing placement, and just prior to his suicide, he was informed that he would be moving to an undesired housing location. Had the IDTT properly assessed the individual's needs and risks, they would have recognized the heightened risk and been able to develop treatment interventions to target his needs.

## IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use, and mental health history. The reviewer included a reasonable analysis of the precipitants to this suicide, and the recommendations followed the content and findings of the report. The SCR lacked in its discussion of the treatment interventions provided to the individual and documentation of treatment progress.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 20 required QIPs. Fifteen of the QIPs were related to mental health care, one was related to a custody concern, one was a joint nursing/custody concern, and there were three nursing concerns.

The first mental health concern required a QIP to address the lack of IPOCs or treatment interventions to address the reasons for the individual's clinical placement in an inpatient setting and the lack of a diagnosis in his IDTT documentation on November 4, 2019. The inpatient team also failed to include a housing review. The response indicated that the failure to include this information was due to the "Special Master Treatment Plan" Power-Form used by the IDTT, which was a shortened version of the treatment plan to be used outside of minimum treatment requirements. The response indicated that the policy around using this form needed to be modified to make its use clear. The updated policy was approved, and the staff was trained on its use. Training was also provided on least restrictive housing reviews. A copy of the updated policy, training curricula, and evidence of training were provided, although it could not be determined from the training sheets that all staff were trained. This response appeared adequate.

The second mental health QIP was required to address IDTT documentation from November 12 and December 9, 2019; neither addressed housing needs despite housing being a significant risk factor for the individual. The response indicated that these lapses were again due to using the "Special" treatment plan Power-Form. The corrective action was the same as provided in response to the first QIP. The response appeared adequate.

A third QIP was required to address the mental health assessments completed on December 8, 2019, and January 8, 2020, related to the individual's RVRs. Neither assessment included a progress note in the healthcare record detailing the evaluation and the rationale for the clinical decisions, which determined that the individual's mental health needs did not impact his behavior in the offenses. The response indicated that all clinical staff was trained on the requirements associated with RVR reviews, and evidence was provided. However, it could not be determined that all staff were trained. Additionally, the facility noted a limited number of the staff had received the court-approved training for completion of RVR mental health assessments; therefore, there was a plan to train all psychologists and social workers in the coming months. This response appeared adequate.

The fourth mental health QIP was required to address the fact that the individual was not seen in accordance with his treatment plan in January and February 2020. A review revealed that the appointments had been appropriately scheduled but inappropriately canceled by the assigned clinician. It was noted that the clinician was no longer working at the facility at the time of the QIP response. The facility updated local policy related to monitoring and overseeing the scheduling and completion of appointments to include notification of supervisors when appointments are canceled. Training was provided to staff, and the curriculum and proof of training were submitted, along with the updated policy. This response appeared adequate.

The fifth mental health QIP was required to address the fact that the decision to discharge the individual from the PIP to the EOP in May 2020 was poorly supported by documentation and by

the individual's presentation prior to the discharge.  The response indicated that the PIP was using a discharge readiness tool, but the use had not been formalized in policy.  The policy was updated to mandate utilizing this tool as "the center of a mentoring process," and a copy of the draft policy was submitted with the response.  The response noted that training would be provided once the policy was adopted. This response appeared adequate.

A sixth mental health QIP was required to address the fact that from July 30 to August 10, 2020, it was difficult to determine the levels of privileges and observation of the individual while in the MHCB.  There was no rationale, and there were questions related to appropriate transitions between levels of observation.  The response indicated, "these deficiencies were the result of simple oversight," and noted that a template was created for notes to include levels of issue and observation.  The response noted, "We believe our corrective action plan will prevent this type of error in the future," but there was no plan to track its effectiveness.  The response included evidence that three individuals were trained.  This response was marginally adequate.

Multiple concerns related to SRASHEs completed in July, August, and October 2020 were required to be addressed through the seventh QIP.  These concerns were specifically addressed in the body of the report above.  The response included training that covered many relevant topics and reference articles related to topics in the training.  Evidence that training was provided was included, though it could not be determined if these staff members represented the entire team at the facility.  Additionally, the two clinicians responsible for the SRASHEs identified met with the SPRFIT coordinator at the facility for individual feedback.  This response appeared adequate.

An eighth QIP was required to address the fact that the individual was not seen by his primary clinician for an initial assessment nor a SRASHE prior to his initial IDTT following admission to the PIP in November 2020.  The response from the facility noted that local and statewide policy did not require an assessment prior to the initial IDTT in November 2020.  Additionally, it was noted that the individual arrived on a Thursday afternoon and the facility staffing is "limited on weekends," and that the process for assignment of initial assessments was not supportive of timely completion for arrivals later in the week.  A new process was implemented to alert a supervisor to new admissions later in the week with a plan to monitor improvement.  Training was provided with evidence of attendance and the curriculum.  However, the response appeared inadequate in its discussion of how an IDTT could have developed an adequate plan without completing initial assessments.

The ninth mental health QIP was required to address the fact that the initial IDTT in November 2020 did not appear to be updated, did not include a diagnosis, and did not include treatment interventions to target the reason for the admission.  The response to this QIP was the same as QIP number one, which appeared adequate.

The tenth QIP was required to address the least restrictive housing recommendation from November 16, 2020, which failed to provide clinical justification for the single-cell recommendation and provided no evidence that previous housing recommendations were considered in the decision.  The response indicated that the housing assignment received by the facility on November 5, 2020, indicated that the individual was to be placed in a single cell and, therefore, they disagreed that the issue had been addressed incorrectly.  The facility did "agree"

with the concern about the quality of documentation. A lengthy narrative attempted to explain the complexities around housing for this individual, including the need to coordinate with custody and balance risks of suicide against risks of violence, yet only marginally referenced the lack of such considerations in the individual's actual documentation. The response noted that training was provided to staff on making housing decisions in complex cases. The curriculum and staff attendance sheets were provided. This response appeared to be mostly adequate, albeit defensive, and likely, the facility's concerns with the QIP should have been raised during the SCR process rather than in the QIP response.

The eleventh QIP for mental health was required to address multiple concerns related to the individual's privileges and levels of observation while in a PIP in 2019 and 2020. Specifically, the concerns were related to poor documentation of rationale, concerns with appropriate transitions through levels of observation, and concerns related to only psychiatry placing orders. The response indicated that training was provided to all psychologists and psychiatrists. The response also noted that a "Licensed Psychologist of the Day" process was instituted to allow one individual to be responsible for such orders daily. This response appeared adequate, although it could not be determined if all staff were trained.

The twelfth mental health QIP was required to address the fact that of the 15 groups the individual attended in November and December 2020, only six were properly documented in the healthcare record. The response indicated that the identified concerns warranted review beyond this particular individual's records to include all PIP patients. The review attempted to determine if the omissions were due to factors beyond individual clinician practice. The response concluded that this was not the case but appeared to be due to individual clinical documentation issues. A training on documentation standards was provided to all staff who conduct group treatment, and plans were implemented to monitor a sample of group notes weekly. This response appeared adequate.

The thirteenth QIP for mental health was also required for headquarters to address the ability of the PIP to retrofit their cells for safety. The staff at the facility expressed concerns about future safety risks with the current cells following the individual's death by suicide. The response indicated that headquarters was currently working on a plan with the facility, and progress would be tracked. This response appeared adequate.

The fourteenth mental health QIP was addressed to headquarters and required that considerations related to an individual's desire for a transfer closer to family be considered for future IDTT trainings. The response indicated that the topic was being considered for training, and progress would be tracked. This response appeared adequate.

The final mental health QIP was required to address the fact that the individual was not seen by psychiatry in accordance with requirements for inpatient licensure. The lapses were noted as "extreme departures" from expectations. The facility's response included issues related to psychiatry vacancies and the process of scheduling and tracking psychiatry documentation. The response noted that the tracking of psychiatry documentation had been external to the electronic health record during the time when the lapses occurred but had been changed in October 2020.

The response indicated that tracking would continue. This response appeared marginally adequate as the individual responsibility of psychiatrists to document clinical care appeared to be ignored.

The one QIP required for custody was related to the fact that responding custody staff failed to bring a cut-down kit to the cell in response to the emergency. The SCR noted that medical staff had trauma shears and were able to cut the noose, so while the lapse did not impede intervention in this case, it was still a notable concern. The response indicated that custody staff would receive on-the-job training on suicide prevention yearly and also twice per month during scheduled training days. Evidence of one training session was provided, although it could not be determined if all staff were trained. This response appeared adequate.

The joint/custody QIP was required to address the fact that on December 10, 2019, the individual was placed in an observation room on one-to-one observation with full safety precautions and, after an hour, tried to strangle himself under the blanket using his shirt. The custody response included no discussion of any review of the incident to identify the cause of the lapse but indicated the same training schedule would be provided as in the response above. The content of the training was the policy regarding MHCB placement. This portion of the response appeared partially adequate as it is not clear what the lapse was that resulted in the individual's suicide attempt. The nursing response to this QIP noted that the individual had possession of a blue shirt, which was not allowed while on suicide watch but did not discuss how this may have occurred. The response noted that training was provided with evidence submitted. This portion of the response was also partially adequate because it is not clear that the cause of the lapse was addressed.

The first nursing QIP was required to address the fact that the individual was noted to be on a hunger strike, and yet nursing staff documented that the individual occasionally drank and ate. The response noted that staff would be trained on policies related to hunger strikes. This response appeared mostly adequate, although it is not clear that the root cause of the lapse was a knowledge deficit.

The second nursing QIP was required to address the fact that in August 2020, the individual's toxicology testing revealed opioid use, and providers did not address this; no substance use screening was completed, nor was a referral made. The response included a six-line memorandum which stated that there was no substance use treatment program at the facility in August 2020, that COVID-19 impacted the substance use treatment program, there was no local policy related to substance use treatment, and physicians were trained on the substance use treatment programs. The training apparently included review of a memorandum describing the substance use treatment program released in January 2020, along with meeting minutes and attendance records from the entire year of 2020, the majority of which occurred prior to the concern noted in August 2020. The topics covered were varied and included review of the January 2020 memorandum in early 2020, but no evidence that the issue identified in this QIP was covered after the death of this individual by suicide. This response was inadequate.

The final QIP for nursing was required to address multiple violations in meeting the 15-minute compliance requirement for call system safety rounds. The response indicated that training was provided. This response appeared mostly adequate, although it is not clear that the root cause of the lapse was a knowledge deficit.

**APPENDIX B1**


**DEMOGRAPHICS OF INCARCERATED INDIVIDUALS**

**WHO DIED BY SUICIDE IN 2020**

Demographics of Incarcerated Individuals Who Died by Suicide in 2020

| Case | Facility | Age | Gender | Ethnicity | Marital Status | LOC | Primary Diagnosis | Current PC2602 | Medical Issues |
|------|----------|-----|--------|-----------|----------------|-----|-------------------|----------------|----------------|
| A | HDSP | 27 | Male | Other | Married | EOP | Mood Disorder | No | Yes |
| B | CTF | 62 | Male | Caucasian | Never Married | Non-MHSDS | None | No | Yes |
| C | COR | 23 | Male | Hispanic/Latinx | Never Married | CCCMS | Adjustment Disorder | No | Yes |
| D | WSP | 21 | Male | Caucasian | Married | Non-MHSDS | None | No | Yes |
| E | KVSP | 33 | Male | Asian | Married | EOP | Psychotic Disorder | No | No |
| F | SAC | 60 | Male | Caucasian | Divorced | Non-MHSDS | None | No | Yes |
| G | KVSP | 43 | Male | Caucasian | Never Married | CDCR PIP/ICF | Mood Disorder | No | Yes |
| H | CHCF | 70 | Male | Caucasian | Never Married | Non-MHSDS | None | No | Yes |
| I | SQSP | 45 | Male | Hispanic/Latinx | Never Married | Non-MHSDS | None | No | Yes |
| J | CCI | 37 | Male | African American | Never Married | Non-MHSDS | Mood Disorder | No | Yes |
| K | SAC | 49 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | No | Yes |
| L | SAC | 33 | Male | African American | Never Married | EOP | Psychotic Disorder | No | No |
| M | CIM | 31 | Male | African American | Never Married | CCCMS | Adjustment Disorder | No | Yes |
| N | LAC | 33 | Male | Caucasian | Married | CCCMS | Personality Disorder | No | Yes |
| O | MCSP | 47 | Male | Other | Divorced | EOP | Psychotic Disorder | Yes | Yes |
| P | CTF | 64 | Male | Caucasian | Divorced | CCCMS | Mood Disorder | No | Yes |
| Q | COR | 22 | Male | Native American | Never Married | CCCMS | Adjustment Disorder | No | No |
| R | CCI | 50 | Male | Asian | Divorced | CCCMS | Mood Disorder | No | Yes |
| S | CCC | 51 | Male | Caucasian | Divorced | Non-MHSDS | None | No | No |
| T | CCI | 52 | Male | Caucasian | Married | Non-MHSDS | None | No | Yes |
| U | LAC | 40 | Male | Hispanic/Latinx | Never Married | CCCMS | Trauma-Related Disorder | No | Yes |
| V | HDSP | 55 | Male | African American | Divorced | CCCMS | Mood Disorder | No | Yes |
| W | CTF | 65 | Male | Hispanic/Latinx | Divorced | CCCMS | Mood Disorder | No | Yes |
| X | CHCF | 24 | Male | Hispanic/Latinx | Never Married | CDCR Acute | Psychotic Disorder | No | No |
| Y | RJD | 28 | Male | Hispanic/Latinx | Never Married | EOP | Mood Disorder | No | No |
| Z | WSP | 28 | Male | Caucasian | Never Married | EOP | Mood Disorder | No | Yes |
| AA | CMF | 42 | Male | African American | Widowed | CCCMS | Adjustment Disorder | No | Yes |
| BB | HDSP | 30 | Male | Caucasian | Never Married | Non-MHSDS | None | No | No |
| CC | MCSP | 31 | Male | Hispanic/Latinx | Never Married | CCCMS | Anxiety Disorder | No | No |
| DD | CCI | 39 | Male | Hispanic/Latinx | Divorced | Non-MHSDS | None | No | No |
| EE | SVSP | 58 | Male | Caucasian | Divorced | CDCR PIP/ICF | Anxiety Disorder | No | Yes |

**APPENDIX B2**


**HISTORY AND SUICIDE EVENT CHARACTERISTICS**

Inmate History and Suicide Event Characteristics

| Case | Crime Type | Method | Housing | Cell Type | MH Hx while Incarcerated | MH Hx Before Incarceration | Prior Self-Harm | Previous Suicide Attempt | Substance Use Hx |
|------|-----------|--------|---------|-----------|--------------------------|----------------------------|-----------------|--------------------------|------------------|
| A | Violent | Hanging | STRH | Single | Yes | Yes | Yes | Yes | Yes |
| B | Violent | Hanging | GP Yard | Single | Yes | No | No | Yes | Yes |
| C | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | No | Yes |
| D | Violent | Hanging | GP Yard | Double - cellmate present | No | No | No | Yes | Yes |
| E | Violent | Hanging | STRH | Single | Yes | No | No | No | Yes |
| F | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| G | Sex Offense | Cutting | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| H | Sex Offense | Other Asphyxiation | OHU | Single | Yes | Yes | No | Yes | Yes |
| I | Violent | Hanging | Condemned | Single | No | Yes | No | No | Yes |
| J | Violent | Hanging | ASU | Single | Yes | Yes | No | Yes | Yes |
| K | Violent | Hanging | PSU | Single | Yes | Yes | Yes | Yes | Yes |
| L | Violent | Other | GP Yard | Single | Yes | No | No | No | Yes |
| M | Sex Offense | Hanging | OHU | Single | Yes | No | No | No | Yes |
| N | Violent | Other | STRH | Single | Yes | Yes | Yes | Yes | Yes |
| O | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | Yes | No |
| P | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| Q | Violent | Hanging | LTRH | Single | Yes | Yes | No | Yes | Yes |
| R | Violent | Hanging | GP Yard | Single | Yes | No | No | Yes | Yes |
| S | Violent | Other | GP Yard | Dorm | Yes | No | No | No | Yes |
| T | Violent | Hanging | ASU | Single | Yes | No | Yes | Yes | Yes |
| U | Violent | Hanging | STRH | Single | Yes | Yes | Yes | Yes | Yes |
| V | Violent | Hanging | GP Yard | Single | Yes | Yes | No | No | Yes |
| W | Non-violent property | Hanging | GP Yard | Single | Yes | No | No | Yes | Yes |
| X | Non-violent property | Other Asphyxiation | PIP | Single | Yes | Yes | Yes | Yes | Yes |
| Y | Sex Offense | Hanging | GP Yard | Single | Yes | No | No | No | Yes |
| Z | Violent | Other Asphyxiation | RC | Single | Yes | Yes | Yes | Yes | Yes |
| AA | Violent | Hanging | GP Yard | dorm | Yes | Yes | No | Yes | Yes |
| BB | Violent | Hanging | STRH | Single | No | Yes | No | Yes | Yes |
| CC | Violent | Hanging | ASU | Single | Yes | No | No | No | Yes |
| DD | Sex Offense | Hanging | GP Yard | Single | No | No | No | No | Yes |
| EE | Sex Offense | Hanging | PIP | Single | Yes | Yes | Yes | Yes | Yes |

**APPENDIX B3**

**IDENTIFIED ASSESSMENT, TREATMENT AND**

**COMMUNICATION CONCERS**

Identified Assessment, Treatment and Communication Concerns

| Case | Suicide Risk Evaluation Omissions | Suicide Risk Level Appropriate | Other Suicide Risk Evaluation Issues | Mental Health Assessment Problems | Treatment Planning Problems | Treatment Problems | Failure to Refer to HLOC | Problems with Interdisciplinary Consultation |
|------|------|------|------|------|------|------|------|------|
| A | Yes | No | Yes | No | Yes | Yes | Yes | No |
| B | Yes | Yes | No | Yes | N/A | N/A | Yes | Yes |
| C | Yes | No | Yes | Yes | Yes | Yes | No | Yes |
| D | N/A | N/A | N/A | No | N/A | N/A | N/A | N/A |
| E | Yes | No | No | Yes | Yes | Yes | Yes | No |
| F | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| G | Yes | No | Yes | Yes | Yes | Yes | Yes | No |
| H | Yes | N/A | No | Yes | N/A | Yes | Yes | Yes |
| I | N/A | N/A | N/A | N/A | N/A | N/A | No | N/A |
| J | Yes | No | Yes | Yes | Yes | Yes | N/A | Yes |
| K | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |
| L | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |
| M | Yes | N/A | No | Yes | Yes | Yes | Yes | Yes |
| N | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |
| O | No | No | Yes | No | No | No | No | No |
| P | No | Yes | Yes | No | Yes | No | No | No |
| Q | No | No | Yes | Yes | Yes | No | No | No |
| R | No | No | No | No | No | No | No | No |
| S | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| T | No | No | Yes | Yes | N/A | N/A | Yes | No |
| U | No | No | Yes | Yes | Yes | Yes | No | No |
| V | Yes | No | No | Yes | Yes | Yes | No | Yes |
| W | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes |
| X | Yes | No | Yes | Yes | Yes | No | Yes | Yes |
| Y | Yes | No | No | Yes | Yes | No | No | Yes |
| Z | Yes | No | Yes | No | Yes | Yes | Yes | No |
| AA | Yes | Yes | No | No | Yes | No | No | No |
| BB | Yes | Yes | Yes | No | N/A | N/A | No | No |
| CC | Yes | Yes | Yes | No | Yes | Yes | No | No |
| DD | N/A | N/A | N/A | N/A | N/A | N/A | No | No |
| EE | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |

**APPENDIX B4**

**COMMON PROBLEMS IDENTIFIED AS REQUIRING A**

**QUALITY IMPROVEMENT PLAN**

Common Problems Identified as Requiring a Quality Improvement Plan

| Identified Issue Requiring Quality Improvement Plan | Number of Cases | Percentage of Cases with QIPs |
|---|---|---|
| Failure to conduct confidential contacts | 2 | 6.7% |
| CPR/AED Issues | 2 | 6.7% |
| Failure to make adequate custody checks | 2 | 6.7% |
| Five-day follow-ups not tied to safety plan | 2 | 6.7% |
| Failure to conduct an adequate record review | 2 | 6.7% |
| Failure to update IDTT documentation | 2 | 6.7% |
| Cell/structural safety issues | 2 | 6.7% |
| Failure to provide property/privileges | 2 | 6.7% |
| Emergency medical care Issues | 2 | 6.7% |
| Inadequate staff training | 2 | 6.7% |
| Only psychiatry allowed to issue observation orders | 2 | 6.7% |
| RVR mental health assessment problems | 2 | 6.7% |
| Failure to address victimization issues | 2 | 6.7% |
| PREA concerns not addressed | 2 | 6.7% |
| Incomplete five-day follow-ups | 3 | 10.0% |
| Treatment and treatment plan disconnect | 3 | 10.0% |
| Failure to log/track self-harm incidents | 3 | 10.0% |
| Lack of clear policy | 3 | 10.0% |
| Failure to document observation orders or provide rationale | 3 | 10.0% |
| Lack of out of cell programming | 3 | 10.0% |
| Poor/conflicting emergency response documentation | 4 | 13.3% |
| Improper use of restraints during emergency response | 4 | 13.3% |
| Over-reliance on patient self-report | 5 | 16.7% |
| Diagnostic issues | 5 | 16.7% |
| Nursing documentation Issues | 5 | 16.7% |
| Failure to complete required SRASHE | 5 | 16.7% |
| Referral or mental health contact required timelines not met | 5 | 16.7% |
| Failure to conduct required mental health contacts | 7 | 23.3% |
| Poor safety planning | 7 | 23.3% |
| Delays in 9-1-1 or alarm activation | 9 | 30.0% |
| Poor risk assessment rationale | 9 | 30.0% |
| Communication or referral issues | 10 | 33.3% |
| Inaccurate or inadequate mental health documentation (includes copy/paste issues) | 11 | 36.7% |
| Inappropriate LOC or not referred to higher LOC | 12 | 40.0% |
| Inadequate risk determination | 13 | 43.3% |
| Inadequate treatment planning | 15 | 50.0% |

**APPENDIX C**

**SPECIAL MASTER'S EXPERTS'**

**CURRICULA VITAE**

**Sharen E. Barboza, Ph.D., CCHP-MH, CiWPP**
Licensed Clinical Psychologist (NY 015436/FL PY9637)

## EDUCATION

### Fairleigh Dickinson University, Teaneck, New Jersey

*Ph.D., Clinical Psychology*                                                      9/2001
Dissertation                                                                       2/2001
   Discriminant validity of the Abel Screen for Sexual Interest in juvenile sex offenders
   who admit and deny their offenses

### Tufts University, Medford, Massachusetts

*M.S., Experimental Psychology*                                                    5/1994
*B.S., Psychology*, Cum Laude, Magna Cum Laude en thesi                             5/1992

## CERTIFICATIONS

### Certificate in Wholebeing Positive Psychology

*Wholebeing Institute*                                                             9/2019

## HONORS/AWARDS

### 2018 B. Jaye Anno Award of Excellence in Communication

*National Commission on Correctional Health Care*                                  10/2018
   This award pays tribute to innovative, well-executed communications that have had a
   positive impact on the field of correctional health care, or to individuals for bodies of
   work. The award is named after NCCHC's cofounder and first vice president.
   https://www.ncchc.org/excellence-in-communication-2018

## WORK EXPERIENCE

### Correctional Mental Health Consultant/Expert/Trainer

*Barboza Consulting, LLC*                                                          5/2013-Present
   Provide consultation to correctional systems on behavioral and mental health services.
   Conduct a comprehensive analysis of current services and programs, comparing those
   to national standards.  Offer training for clinical and correctional staff on the
   implementation of behavioral health programs and services including self-injury
   reduction, suicide prevention, managing mental illness in corrections, correctional
   stress/burnout, and other topics as requested. Provide expert witness evaluation,
   consultation, and opinion.

   ***Court Appointed Expert, Correctional Mental Health*** (3/2020 - present). United
   States District Court of the Eastern District of California – Ordered by Honorable
   Kimberly J. Mueller, Chief United States District Judge, for a class action lawsuit,
   Coleman et. al vs. Newsom et. al. As a member of a multi-disciplinary team,
   provide expert consultation to the Special Master, Mathew A. Lopes, Esq., as part
   of an ongoing monitoring process of the California Department of Corrections and
   Rehabilitation and Department of State Hospitals mental health system.

**Vice President**
**Mental Health/Clinical Operations – Mental Health**
*MHM/Centurion*, Vienna, Virginia                                                              9/2014-4/2020
> Supervisors:  Jane Haddad, Psy.D.; Julie Mueller, RN, MBA, Johnny Wu,
> M.D.
> Oversaw national clinical operations of mental health services provided by
> the company.  Supervised the Clinical Operations mental health team,
> audited clinical services and contract/standards compliance of mental
> health services being provided within correctional and forensic settings.
> Created and collaborated on the development of therapeutic program
> curricula for seriously mentally ill individuals, individuals who engage in
> self-injury, and sexual offenders.  Developed and delivered training
> programs to mental health, medical, and corrections professionals.
> Provided consultation to correctional systems regarding mental health,
> behavior change and sexual offender programming.  Assisted with new
> business development.

**Director of Clinical Operations**
*MHM Services, Inc.*, Vienna, Virginia                                                           10/2008-9/2014
> Supervisor:  Jane Haddad, Psy.D.
> Served as a director of the clinical operations team, overseeing the
> auditing of clinical services and contract compliance of mental health
> services being provided within correctional and forensic settings.  Created
> and collaborated on the development of therapeutic program curricula for
> seriously mentally ill individuals, individuals who self-injure and sexual
> offenders.  Developed and deliver training programs to mental health,
> medical health, and corrections professionals.  Provided consultation to
> correctional systems regarding mental health, behavior change and sexual
> offender programming.  Assisted with new business development and
> supervision of clinical operations staff.

**Senior Clinical Operations Specialist**
*MHM Services, Inc.*, Vienna, Virginia                                                           2/2007-10/2008
> Supervisor:  Jane Haddad, Psy.D.
> Served as a senior member of the clinical operations team, auditing clinical
> services and contract compliance of mental health services being provided
> within correctional and forensic settings.  Created and collaborated on the
> development of therapeutic program curricula; developed and delivered
> training programs to mental health, medical health, and corrections
> professionals; and provided consultation to correctional systems regarding
> mental health and sexual offender programming.

### Director, Sex Offender Treatment Program

*NYS OMH & Central New York Psychiatric Center*, Marcy, New York          11/2005-2/2007

> <u>Deputy Commissioner:</u> Richard Miraglia, C.S.W.
> <u>Executive Director</u>:  Donald Sawyer, Ph.D., MBA
> Served as clinical expert consultant in the development of the Sex
> Offender commitment initiative in New York.  Consulted to the Division of
> Forensic Services in the development of the comprehensive evaluation and
> treatment process for civilly committed sex offenders in New York State.
> Consulted to the Commissioner of OMH and the Department of Budget
> regarding this initiative.  Provided weekly consultation, staff training, and
> clinical supervision to multidisciplinary teams at Manhattan Psychiatric
> Center and Kirby Forensic Psychiatric Center.   Made contacts and visited
> with civil commitment programs in other states and developed an
> inpatient treatment program for this population including intake
> assessment process and outcome measurements.  Participated in all
> aspects of program development: consulting on construction, developing
> and implementing policy, hiring staff, creating staff training programs,
> coordinating risk assessments, supervising clinical and direct care staff,
> preparing clinicians for court testimony, and overseeing community
> reintegration planning

### Chief Psychologist

*Central New York Psychiatric Center*, Marcy, New York          1/2004-2/2007

> <u>Executive Director</u>:  Donald Sawyer, Ph.D., MBA
> Served as Chief of Psychology Department for a state psychiatric facility
> treating patients incarcerated within New York State; developed,
> monitored, and maintained standards of performance for psychologists
> throughout the system; developed policies and procedures related to the
> delivery of psychological services (e.g., suicide risk assessment and
> prevention, violence risk assessment and prevention, behavioral
> management policies and programs, special housing unit (SHU) services,
> psychological assessment); provided supervision to psychologists and
> psychology student interns; developed and conducted research regarding
> initiatives and programs; coordinated system-wide risk assessment
> initiative; coordinated system-wide implementation and maintenance of
> behavioral management program; recruited and hired psychologists;
> consulted to physicians, administration, and risk managers with regard to
> public safety, accreditation, and quality of care.

### Licensed Psychologist/ Psychologist II

*Bedford Hills Correctional Facility*, Bedford Hills, New York          9/2001-1/2004

> <u>Supervisors</u>:  Carolyn Subin, Ph.D., David Stang, Ph.D.
> Provided individual psychotherapy to incarcerated women at a maximum
> security correctional facility; conducted assessments of suicidal and
> homicidal ideation & intent; provided mental health consultation and
> assessment to women in solitary confinement; consulted to Department of
> Corrections regarding mentally ill inmates with lengthy confinement

sanctions; provided supervision to Ph.D. level psychologists for licensure; provided mental health training to Department of Corrections staff; participated in crisis intervention and inpatient referral process.

### Sex Offender Risk Assessment Consultant

*Juvenile Sexual Offender Treatment Program*

*Westchester Jewish Community Services*, Hartsdale, New York          8/2001-10/2003

Supervisor:  Kenneth Lau, CSW

Assessed the re-offense risk for adolescents accused of committing sexual offenses within Westchester County, NY; provided pre-sentencing consultation to the courts regarding supervision and treatment needs as well as further assessments and/or agency involvement

### Director, Adolescent Sexual Abuse Program

*Iowa State Training School for Boys*, Eldora, Iowa          1/1995-8/1996

Supervisor:  William Fields, Clinical Director

Treated adolescent male offenders & victims of sexual abuse using group and individual therapy; assessed adolescents; supervised staff of 15-20 and provided training; provided sex education to delinquent male adolescents; received 175 hours of training meeting certification requirements as Sex Offender Treatment Provider for the State of Iowa. Clinical populations included: BD, LD, ADD, ADHD, Pedophilia, Oppositional-Defiant Disorder, Conduct Disorder.

## EDITORIAL DUTIES

### Health Affairs

*Reviewer*          3/2020 -Present

### International Journal of Prisoner Health

*Editorial Board Member*          10/2013-Present

### Journal of Correctional Health Care

*Reviewer*          10/2018-Present

## EXPERT WITNESS & CASE CONSULTANT

United States Direct Court; Maine

*Retained by defendant – consultation only*          2017

United States Direct Court; Western District of Wisconsin

*Retained by defendant – consultation only*          2020

United States Direct Court; Central District of California

*Retained by plaintiffs*          2021

## COMMITTEE MEMBERSHIPS/AFFILIATIONS

### Mental Health Standards Committee

*Member*

National Commission on Correctional Health Care    11/2020 - Present

**NCCHC Correctional Health Foundation**
*Board Member/Chair Elect (2021)*    4/2019-Present
National Commission on Correctional Health Care

**Education Committee**
*Member*    10/2018-Present
National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Mental Health Subcommittee/Task Force**
*Member*    1/2014-Present
National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Board of Trustees**
*Appointed Trustee*    3/2014-11/2017
National Commission on Correctional Health Care    11/2020-Present

**Mental Health Subcommittee**
*Member*    4/2013-4/2017
American Correctional Association

SPECIALIZED TRAINING

**Leading from Your Strengths:  Positive Psychology and Professional Development**
*Kripalu Center for Yoga and Health*
M. Sirois, Psy.D.    11/2017

**The Prison Rape Elimination Act: Understanding the Law and How to Meet Compliance**
*National Commission on Correctional Healthcare*
A. Moss    10/2012

**Sex Offender Treatment**
*NYS Office of Mental Health, Division of Forensic Services*
A. Schlank, Ph.D.    2/2007

**PCL-R Training**
R. Hare, Ph.D., A. Forth, Ph.D.    11/2006

**Using the Structured Risk Assessment Model to Guide Treatment Planning**
D. Thornton, Ph.D., R. Mann, M.Sc. L. Daniels, MSSW    9/2006

**Penile Plethysmography Training – Level I & Level II**
*Monarch -- Behavioral Technologies Inc.,* Salt Lake City, UT
P. Byrne, Ph.D.    6/2006

**Sex Offender Risk Assessment**

*NYS Office of Mental Health, Division of Forensic Services.*
D. Doren, Ph.D., D. Epperson, Ph.D., D. Anderson, Ph.D.                    3/2006

**Legal/Ethical Issues in Mental Health**

*Specialized Training Services, Inc.*
Philip Resnick, MD                    6/2004

**Risk Assessment of the Mentally Ill**

*Specialized Training Services, Inc.*
Philip Resnick, MD                    6/2004

**Intensive DBT Training**

*Behavioral Tech, Inc.*
Cindy Sanderson, Ph.D.                    10/2001

TEACHING EXPERIENCE

**Facilitator for Executive Manager in Correctional Healthcare Training (EMCHT)**

*National Institute of Corrections*, Aurora, Colorado                    5/2014-9/2015

**Adjunct Professor**

*Hamilton College*, Clinton, New York                    1/2005-5/2005

**Instructor**

*Marist College*, Goshen Extension Site, Goshen, New York                    5/2001-8/2001
*Fairleigh Dickinson University*, Teaneck, New Jersey
5/1997–12/1998

**Adjunct Instructor**

*Correctional Release Center*, Newton, Iowa                    8/1994-1/1995
*Des Moines Area Community College*, Ankeny, Iowa                    9/1994-12/1994

PUBLICATIONS

Barboza, S., Blair, R., Cook, G., Elliott, W., and Kern, E. (2019). *Suicide Prevention and Resource Guide: National Response for Suicide Prevention in Corrections.* Chicago, IL. National Commission on Correctional Health Care. www.ncchc.org/suicide-prevention-plan

Boren, E. A., Folk, J. B., Loya, J. M., Tangney, J. P., Barboza, S. E. and Wilson, J. S. (2018), The Suicidal Inmate: A Comparison of Inmates Who Attempt Versus Complete Suicide. *Suicide and Life Threatening Behavior*, 48(5), 570-579. DOI: 10.1111/sltb.12374

Folk, J. B., Loya, J. M., Boren, E. A., Tangney, J. P., Wilson, J. S., & Barboza, S. E. (in press). Differences between inmates who attempt suicide and who die by suicide: Staff-identified psychological and treatment-related risk factors. *Psychological Services.*

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Barboza, S., Wilson, J. S., Bonieskie, L., & Holwager, J. (2016). Effectiveness of a Self-Administered Intervention for Criminal Thinking: Taking a Chance on Change. *Psychological Services*, 13(3), 272-82.

Barboza, S. (2016).  Elevating personality disorders:  Changes and challenges in treating incarcerated patients.  *The International Association for Correctional and Forensic Psychology Newsletter*, 48(2), 11-12.

Disabato, D., Folk, J. Wilson, J.S., Barboza, S., Daylor, J. & Tangney, J.  (2015). Psychometric validation of a simplified form of the PICTS in low-reading level populations.  *Journal of Psychopathology and Behavioral Assessment*,38(3), 456-64.

Andrade, J.T., Wilson, J.S., Franko, E., Deitsch, J. & Barboza, S. (2014).  Developing the Evidence Base for Reducing Chronic Inmate Self-Injury: Outcome Measures for Behavior Management.  *Corrections Today*, 76(6), 30-35.

Barboza, S. & Wilson, J. (2013).  Your Patient is My Patient:  The Need for Integrated Medical-Mental Health Care for Inmates with Serious Mental Illness.  *CorrDocs*, 17(5).

Barboza, S. & Wilson, J.S. (2011).  Behavior Management Plans Decrease Inmate Self-Injury.  *Corrections Today*, 73(5).

Wilson, J. & Barboza, S. (2010). The Looming Challenge of Dementia in Corrections. *CorrectCare*, 24(2), 12-14.

Way, B. B., Sawyer, D. A., Barboza, S., & Nash, R. (2007). Inmate suicide and time spent in special disciplinary housing in New York state prison. *Psychiatric Services*, 58, 558-560.

Abel, G. G., Jordan, A., Rouleau, J. L., Emerick, R., Barboza-Whitehead, S., and Osborn, C. (2004). The use of visual reaction time to identify male adolescent child molesters and the frequencies of their acts. *Sexual Abuse: A Journal of Research and Treatment*, 16 (3), 255-265.

PRESENTATIONS

Barboza, S. "Understanding Personality Disorders: Practical Insights for Nurses" Workshop presented at the National Commission on Correctional Healthcare Conference, October 2019, Fort Lauderdale, FL.

Barboza, S. "Self-Injurious Behavior and Trauma Informed Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Barboza, S. "Vicarious Trauma and Self-Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Masotta, M. & Barboza, S. "Bipolar Disorder, Borderline Personality Disorder and PTSD: Improving Diagnostic Accuracy" Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Riley, K. & Barboza, S. "Continuous Quality Improvement: Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Cox, J & Barboza, S. "An In-Depth Review of NCCHC's 2015 Standards for Mental Health Services" Pre-Conference seminar at National Commission on Correctional Healthcare Conference, November 2017, Chicago, IL; October, 2018, Las Vegas, NV; April 2019, Nashville, TN and October, 2019, Fort Lauderdale, FL.

Barboza, S "Hazardous Duty: The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare National Conference, October 2015, Dallas, TX and October, 2019, Fort Lauderdale, FL.

Barboza, S & Riley, K. "Continuous Quality Improvement: Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S., Andrade, J.T., & Wilson, J.S. "Trauma in the Practice of Correctional Medicine." Workshop presented at the American College of Correctional Physicians Fall Conference, October, 2018, Las Vegas, NV.

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients." Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S. "The Value of Positivity in Correctional Mental Health." Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Gibson, B., Kern, E., Barboza, S. "The National Response Plan for Suicide Prevention in Corrections." Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S. "Measuring Mental Health Treatment Outcomes: Building an Evidence Base" Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S. & Wilson, J.S. "Trauma-Informed Care: How We Can Better Support Our Patients" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S. "Continuous Quality Improvement: Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S. "CCHP-MH Exam Content Review Course" National Commission on Correctional Healthcare sponsored webinar, April 12, 2018.

Barboza, S. "Use of Behavior Management Plans to Reduce Self-Injury." National Commission on Correctional Healthcare sponsored webinar, February 21, 2018.

Barboza, S. "Practical Behavior Management Strategies: Decreasing Self-Injurious Behavior" Luncheon presentation at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. "CCHP-MH Content Review Course." Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. & Kearns, J.D. "Crisis Intervention: Planning and Implementing Effective Strategies." Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S & Puerini, M. "Personality Disorder in Corrections – Affliction, Identity, Label" Workshop at the National Commission on Correctional Healthcare Conference, October 2016, Las Vegas, NV

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients" Workshop at the National Commission on Correctional Healthcare Correctional Mental Health Care Conference, July 2016, Boston, MA.

Barboza, S. Wilson, J.S., McGinty, M., and Brown, L. "Creating Practice-Based Evidence for Mental Health Treatment in Corrections" Workshop presented at the National Commission on Correctional Health Care National Conference, October 2015, Dallas, TX.

Barboza, S "Hazardous Duty: The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2015, New Orleans, LA.

Barboza, S. & McGinty, M. "Practice-Based Evidence: Creating Evidence for Mental Health Treatment in Corrections" Workshop presented at the American Correctional Health Services Association National Conference, March 2015, Orlando, FL.

Barboza, S. & Wilson, J.S. "Hazardous Duty: The Invisible Effects of Working in Corrections" Workshop presented at the American Correctional Health Services Association Multidisciplinary Educational Conference, March 2014, New Orleans, LA.

Barboza, S. & Ammons, L. "How Can I Tell If It's Working: Measuring Mental Health Treatment Outcomes." Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Simpson, M. & Barboza, S. "Times They Are a Changing: DSM-5 and the Impact on Corrections." Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Wilson, J.S., Barboza, S. & Andrade, J. "Behavior Management: Strategies for Individual and Group Programs." Workshop presented at National Commission on Correctional Health Care Correctional Mental Health Care Conference, July 2013, Las Vegas, NV.

Barboza, S. "Mental Health in Corrections: An Overview for Health Care Leaders" Workshop presented at Correctional Health Care Leadership Institute, July 2012, Chicago, IL.

Shaw-Taylor, E.; Baker, M.; Tyler, C. & Barboza, S. "Taking a Chance on Change: In-Cell Programming Success in Maryland" Workshop offered at American Correctional Association Congress of Corrections, July, 2012, Denver, CO.

DeGroot, J.; Cadreche, M.; & Barboza, S. "Managing Self Harm by Standardizing the Definition, Tracking its Prevalence, and Using a Behavioral Plan" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

DeGroot, J.; Thompson, J. M.; Jackson, J. & Barboza, S. "It's Not Mental Illness, It's Just Behavior: Identifying and Treating Personality Disorders Rather Than Dismissing Them" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

Barboza, S. & Wilson, J.S. "Evidence for the Efficacy of Behavioral Interventions in Reducing Self-Injury" Workshop offered at NCCHC Conference, May, 2011, Phoenix, AZ.

Barboza, S. & Wilson, J.S. "Real Results: Successful Reduction in Self-Injury in Correctional Settings." Workshop offered at American Correctional Health Services Association Conference, April, 2011, Orlando, FL.

Barboza, S. & Wilson, J.S. "Let's Get Practical: Real Answers to Inmate Self-Injury." Workshop offered at North American Association of Wardens and Superintendents Conference, April, 2011, Baton Rouge, LA.

Barboza, S. & Wilson, J.S. "Behavior Management – Effective Reduction in Self-Injury." Workshop offered at American Correctional Association Winter Conference, February, 2011, San Antonio, TX.

Wilson, J.S. & Barboza, S. "Addressing the Rising Prevalence of Dementia in Inmate Populations" Pre-Conference Seminar offered at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Wilson, J.S.; Barboza, S.; & Andrade, J. "Ending It All: Data Informed Suicide Prevention." Presentation at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Barboza, S. & Wilson, J.S. "Bringing Recovery Inside the Walls: Recovery-Oriented Treatment Plans." Presentation at CMHS National GAINS Center Conference, February, 2010, Orlando, FL.

Wilson, J.S. & Barboza, S. "In Search of Solutions: Does Behavior Management Work?" Presentation at ACHSA Multidisciplinary Professional Development Conference, February 2010, Portland, OR.

Barboza, S. "Mental Health Risk Management." Invited speaker, Academy of Correctional Health Professionals Regional Seminar, June, 2009, Farmington, CT.

Barboza, S. "Mental Health Risk Management." Invited speaker, Academy of Correctional Health Professionals Regional Seminar, May, 2009, Fairfax, VA.

Andrade, J. T. & Barboza, S. "Taking a Chance on Change: Treating Offenders in Restricted Housing." Presentation at Mental Health in Corrections Conference, Forest Institute sponsored, April, 2009, Kansas City, MO.

Barboza, S. "Prison Rape Elimination Act & Draft Standards: Implications for Mental Health Practice." Presentation at Caulking the Seams of Continuity Conference, Drexel University Behavioral Healthcare Education, December 2008, Grantville, PA.

Barboza, S. "Documenting Progress: Writing Good Progress Notes Based on Good Treatment Plans." Presentation at Unlock the Mystery Conference, Indiana Department of Corrections, June 2008, Indianapolis, IN.

Wilson, J.S., and Barboza, S. "Autonomy, Safety, and Connection: Ethical Challenges in Working with Self-Injurious Inmates" Presentation at Mental Health in Corrections Consortium Symposium, April 2008, Kansas City, MO.

Barboza, S. "Strategies for Modifying Programming for Inmates Significantly Impaired by Mental Illness" Presentation at National Conference on Correctional Health Care, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE sponsored, October 2007, Nashville, TN.

Abel, G. G., Barboza-Whitehead, S., & Rouleau, J. L. "Usefulness of Visual Reaction Times with Adolescents." Paper presentation at Association for the Treatment of Sexual Abusers Conference, October 2003, Saint Louis, MO

Barboza-Whitehead, S., Abel, G. G., & Reddy, L. A. "A Model for Discriminating Juvenile Sex Offenders Who Deny from Those Who Admit Using the Abel Screen for Sexual Interest." Poster presented at Association for the Treatment of Sexual Abusers Conference, September 1999, Lake Buena Vista, FL

**POSTER**

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Bonieskie, L.,… Barboza, S. & Wilson, J. S. (2017, November). Effectiveness of a self-administered intervention for criminal thinking among inmates in restrictive housing. Poster to be presented at the Annual Meeting of the Association for Behavioral and Cognitive Therapies, San Diego, CA.

**Mary Perrien, Ph.D.**
3313 W. Cherry Lane, Suite 333
Meridian, ID 83642
(208) 965-0875
mperrien@safesocietysolutions.com

| | | |
|---|---|---|
| **EDUCATION** | **University of Hawaii, Manoa** | |
| | Doctor of Philosophy, Clinical Psychology | 1998 |
| | Master of Arts, Clinical Psychology | 1994 |
| | | |
| | **San Jose State University** | |
| | Bachelor of Arts, Psychology | 1991 |
| | | |
| **LICENSURE STATUS** | PSY18582 (California) | |
| | PSY 202317 (Idaho) | |
| | | |
| **TRAINING** | Internship in Clinical Psychology | 1997-1998 |
| | Atascadero State Hospital | |
| | Atascadero, California | |
| | | |
| **PROFESSIONAL EXPERIENCE** | **Expert Consultant** | 3/2019-present |
| | Correct Care Solutions, LLC | |
| | | |
| | **Expert Consultant** | 2017-11/2020 |
| | Alabama Department of Corrections | |
| | | |
| | **Expert Consultant** | 2014-2015 |
| | Idaho Department of Correction | |
| | | |
| | **Expert Consultant** | 2012-2014 |
| | Ohio Department of Rehabilitation and Correction | |
| | | |
| | **Expert Consultant** | 2012-2013 |
| | National Institute of Corrections | |
| | | |
| | **Expert Consultant** | 2011-2012 |
| | Illinois Department of Corrections | |
| | | |
| | **Safe Society Solutions, LLC** | 2010 to present |
| | Sole Proprietor, forensic evaluator and expert | |
| | Witness (for defendants and plaintiffs) practice | |
| | | |
| | **Expert Consultant** | 2010-present |
| | Department of Homeland Security, Civil Rights | |
| | and Civil Liberties (function as a subcontractor) | |

**PROFESSIONAL**
**EXPERIENCE**
**Continued**

**Expert Consultant**                                        2007 to present
United States District Court, Eastern
District of California (*Coleman et al. v. Newsom et al.*)
Case No. 90-0520 LKK-JFM

**Chief, Division of Education and Treatment**              2006-2010
Idaho State Department of Correction

**Chief Psychologist/Director of Mental Health**           2005-2006
Idaho State Department of Correction

**Chief Psychologist/Director of Mental Health**           2003-2005
    **Services – Correctional Facility**
California State Prison at Corcoran

**Senior Psychologist, Supervisor – Correctional**         2001-2003
    **Facility**
California State Prison at Corcoran

**Psychologist - Clinical, Correctional Facility**         2000-2001
California State Prison at Corcoran

**Staff Psychologist**                                     1998-2000
Federal Correctional Institution, Butner

**Therapist/Researcher**                                   1996-1997
Honolulu Police Department

**Therapist/Group Facilitator**                            1994-1997
Child & Family Services, Hawaii

**Therapist/Group Facilitator**                            1994-1997
Department of Public Safety, Hawaii

**TEACHING**
**EXPERIENCE**

**Guest Lecturer, various Psychology and**                 2006-2014
    **Criminology courses**
**Boise State University**

**Instructor, Correctional Peace Officers Standards**      2006-2014
    **& Training Academy (Idaho)**

**Lecturer**                                               multiple 1994-1997
**Department of Psychology, University of Hawaii**

**PUBLICATIONS &
TECHNICAL
REPORTS**

Perrien, M. and O'Keefe, M. (2015). Disciplinary Infractions and Restricted Housing. In *Oxford Textbook of Correctional Psychiatry.* New York NY: Oxford University Press.

Perrien, M. (2010). Mental Health Guidelines and Documentation for Psychotherapists. In *Manual of Forms and Guidelines for Correctional Mental Health.* Washington DC: American Psychiatric Publications.

Perrien, M. (2009). Sex offenders: Analysis of best practice and current practice in Idaho for case disposition, assessment, treatment and supervision. A Report provided to the Idaho Criminal Justice Commission.

Perrien, M. (2008). Sex offenders: The current practices in the State of Idaho for case disposition, assessment, treatment and supervision. A Report provided to the Idaho Criminal Justice Commission.

Kunitake, M., Perrien, M., Yokoi, E., Perrone, P., Green, T., Sakamoto-Cheung, S., & Richmond, J. (1997). Felony sexual assault arrests in Hawaii. <u>Crime Trend Series: State of Hawaii Department of the Attorney General</u>, 5(2), 1-9.

**PRESENTATIONS**

Perrien, M. (September 2009). Presenter at the annual Idaho District Judges Retreat Training, Twin Falls, Idaho.

Perrien, M. (January-March 2009). Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2009). Presenter at the annual Idaho District Judges Seminar. Boise, ID.

Perrien, M. (December 2008). Educating correctional officers to respond to medical emergencies. A paper presented at the conference Operational Excellence in Correctional Healthcare, Las Vegas, NV.

Perrien, M. (September 2008). Panel Presenter at the annual Idaho District Judges Retreat Training. Sun Valley, Idaho.

Perrien, M. (January-March 2008). Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2008). Presenter at the annual Idaho District Judges Seminar. Boise, ID.

Perrien, M. (September 2007). Panel Presenter at the annual Idaho District Judges Retreat Training. Sun Valley, Idaho.

Perrien, M. (January-March 2007). Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2007). Panel Presenter at the annual Idaho District Judges Seminar, Boise, Idaho.

**PRESENTATIONS**
**Continued**

Perrien, M. (November 2006).  Suicide Risk Management in Corrections.  Paper presented at the Idaho Suicide Prevention Action Network Conference, Boise, Idaho.

Perrien, M. (November 2006).  Mental Health Care in Corrections and Community Corrections.  Presentation to District 7 Judges, Idaho Falls, Idaho.

Perrien, M. (October 2006).  Correctional Mental Health Care in Idaho. Presentation to the Mental Health and Substance Abuse Treatment Delivery Systems Interim Legislative Committee.

Perrien, M. and Muller, C. (June 2006).  Cultural Competence and Multi-cultural Psychology.  Paper presented at the Idaho Mental Health Coalition Conference, Boise, Idaho.

Perrien, M. (April 2006).  Sex Offender Treatment in Correctional Setting.  Paper presented at the annual National Commission on Correctional Health Care Updates Conference, Las Vegas, Nevada.

Perrien, M. (November 2005).  Sex Offender Risk Assessment.  A training for clinical staff employed by the Idaho Department of Correction and Corrections Corporation of America.

Perrien, M. (October 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Boise, Idaho.

Perrien, M. (September 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Pocatello, Idaho.

Perrien, M. (April 2003).  Cultural Competence and Multi-cultural Mental Health Services.  A training workshop presented to mental health staff at CSP-Corcoran.

Perrien, M. (2002, multiple).  Forensic Evaluations and Courtroom Expert Testimony. A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2001, multiple).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2000, February).  The Assessment, Treatment, Management and Community Supervision of the Sex Offender.  A training workshop provided to U.S.Probation Officers, Long Island, NY.

Perrien, M. (1999, July).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for predoctoral interns presented at the Federal Correctional Institution at Butner.

Perrien, M. (1999, April).  Psychopathy and the Hare Psychopathy Checklist Revised.  A training workshop for doctoral and masters level staff in the Sex Offender Treatment Program at the Federal Correctional Institution at Butner.

**PRESENTATIONS**

**Continued**          Perrien, M. & Kunitake, M. (1997, February).  Demographic characteristics of felony sex assault arrestees in Hawaii.  Paper presented to the Hawaii State Legislature at an Informational Symposium on Community Notification of Sex Offenders in Honolulu, Hawaii.

Perrien, M. & Kunitake, M. (1997, February).  Registration and community notification of sex offenders in Hawaii.  Paper presented at the annual meeting of the Western Society of Criminology conference in Honolulu, Hawaii.

Perrien, M. & Marsella, A.J. (1996, April).  Reported frequencies and perceived severity ratings of traumatic and near-traumatic events among college students.  Paper presented at the meeting of the Western Psychological Association, Santa Clara, California.

**ASSOCIATIONS/MEMBERSHIP**
American Psychological Association, member
American Psychology-Law Society, member
Association for Behavioral and Cognitive Therapies, member
Association for the Treatment of Sexual Abusers, clinical member
National Commission on Correctional Health Care, member
World Professional Association for Transgender Health, member

**COMMUNITY APPOINTMENTS**
Idaho State Planning Council on Mental Health, appointed by the Governor, 2009 and 2010.

**EXPERT WITNESS & CONSULTING**
*Abdiwali Musse v King County et al.* (2020 to present) Assessment of adequacy of care and risk assessment in the assault in custody of jail detainee. Pending expert discovery. King County Superior Court, State of Washington, Seattle Courthouse (Retained by plaintiff, report and possible deposition with testimony expected).

*Lorenzo Mays, et al v County of Sacramento.* (2020 to present) Monitoring Expert. Assessment of implementation of consent decree for mental health services in county jail. U.S. District Court, Eastern Division (Appointed via agreement by both parties).

*Toby Meagher, et al v King County, et al.* (2019 to present) Assessment of adequacy of care in the assault in custody of jail detainee. Pending hearing. U.S. District Court, Western District of Washington (Retained by plaintiff, report and deposition with testimony expected).

*Edward Braggs, et al v Jefferson Dunn (ADOC), et al.* (2018-present) Multiple court-ordered assessment reports including suicide prevention and functional segregation. U.S. District Court, Middle District of Alabama, Northern Division (Retained by defendants).

*The estate of Marc Moreno v Benton County Sheriff et al. (December 2017)* Assessment of adequacy of care in the death in custody of jail detainee. Case in mediation. Benton County, Washington. (Retained by plaintiff, report).

*The estate of Mathew Ajibade et al v Wilcher et al. (June 2017)* Assessment of adequacy of care in the death in custody of jail detainee. Case set for trial; deposition taken. U.S. District Court, Southern District of Georgia. (Retained by plaintiff, report and deposition testimony).

**EXPERT WITNESS & CONSULTING Continued**

*Potter v State of Idaho Department of Health and Welfare.* (May 2017) Provided expert testimony regarding the reliability and validity of recovered memories as well as the adequacy of investigations into allegations of sexual abuse. Idaho state hearing, appeal of finding. (Retained by defendant, report and testimony).

*The estate of Gordon Powell v Barnes et al.* (May 2017) Assessment of mental health staff and the adequacy of care in the murder of an inmate. U.S. District Court, Western District of Washington. (Retained by plaintiff, report).

*Edward Braggs v Jeffrey Dunn (Alabama Department of Correction) (2017)* Expert consultation to defendants post-litigation regarding adequacy and needs of current mental health service delivery system; provide expert assistance in mediation process; provide expert testimony and assistance in failed mediation trial matters, conducted staffing and suicide prevention assessment. (Retained by defendant, report and trial testimony)

*Disability Rights Florida, Inc. v Julie Jones, Secretary Florida Department of Corrections, et al.* (2016-2017) Consulting expert to plaintiffs to conduct assessments of the inpatient units at all facilities except for Dade Correctional Institution and develop recommendations on issues of mental health treatment, staffing, training and quality improvement. U.S. District Court, middle District of Florida. (Retained by plaintiff, report)

*Walker v Wall, Director, Rhode Island Department of Corrections et al.* (February 2016) Evaluated adequacy of care in post-PREA incident. Provided deposition testimony. U.S. District Court, District of Rhode Island. (Retained by defendant, report and deposition testimony).

# Maria Masotta, Psy.D.

Licensed in MA #8411 and CT #003747
maria@drmariamasotta.com
www.drmariamasotta.com
P.O. Box 36, Rockfall, CT 06481
203-747-4443

---

## Education

University of Massachusetts Medical School, Law and Psychiatry Program, Worcester, Massachusetts, Certificate Program in Forensic Mental Health (8/31/06)

Psy.D.  Nova Southeastern University – Fort Lauderdale, Florida
Clinical Psychology with a Specialization in Forensic Psychology (8/97-8/02)

M.S.  Nova Southeastern University – Fort Lauderdale, Florida  (8/97-6/99)
Clinical Psychology

B.A.  Hartwick College – Oneonta, New York  (8/93-12/96)
Major in Psychology

---

## Clinical Experience

**Consultant** – Miami Dade County Corrections and Rehabilitation Department (MDCR) - (6/18-present).  MDCR is large jail system that incarcerates over 5,000 detainees. Provide clinical consultation to MDCR healthcare and custody leadership personnel to assist with compliance with a Department of Justice Consent Agreement.

**Contractor** – Department of Homeland Security/Civil Rights and Civil Liberties – (4/17-present). Conduct assessment of behavioral health programs in detention centers that detain Immigration and Customs Enforcement (ICE) detainees. This includes a review of policies and procedures, interviews with detainees and staff and review of relevant documentation.  Analyses, conclusions and recommendations are provided via a comprehensive summary report.

**Court Appointed Expert, Correctional Mental Health** (8/14- present). United States District Court of the Eastern District of California – Ordered by Honorable Lawrence K. Karlton, Senior District Judge, for a class action lawsuit, Coleman et. al vs. Brown et. al. As a member of a multi-disciplinary team, provide expert consultation to the Special Master, Mathew A. Lopes, Esq., as part of an ongoing monitoring process of the California Department of Corrections and Rehabilitation and Department of State Hospitals mental health system.

***Forensic Psychologist*** – FHS/MHM (5/13-8/17) Worcester District Court Clinic – Worcester, Massachusetts (Center for Health and Development (2/07-12/10) Conduct court-ordered forensic evaluations for central Massachusetts courts. Evaluations include involuntary commitment for psychiatric treatment, commitment for substance abuse, aid-in-sentencing, competency to stand trial and criminal responsibility.

***Clinical Psychologist –*** MedOptions of Massachusetts (10/12-1/15). Provide psycho-diagnostic evaluations, behavioral management, psychological testing, guardianship evaluations and psychotherapy to individuals residing in nursing homes for short- term rehabilitation or long-term care. Psychological issues range from mild to severe dementia, loss/grief, substance abuse and serious and persistent mental illness.

***Psychologist –*** MHM Correctional Services, Inc – Massachusetts Treatment Center, Bridgewater, Massachusetts. (8/12-10/12). Provide treatment planning, individual psychotherapy and crisis intervention to incarcerated men who have been convicted of a sexual offense or have been civilly committed as a Sexually Dangerous Person.

***Regional Clinical Director/Regional Comprehensive Quality Improvement Manager*** – MHM Correctional Services, Inc –Regional Office – Norton, Massachusetts (3/12-8/12). Provide clinical support, leadership and supervision to clinical staff throughout the mental health prison programs in Massachusetts. Respond to inmate grievance appeals. Provide clinical support for Department of Mental Health segregation audits and Department of Corrections quarterly meetings at various prisons. Provide clinical consultation to mental health and correctional staff in the management of mentally ill inmates. Coordinate with the Department of Corrections Training Academy and mental health staff to schedule annual suicide prevention training. Oversee quality improvement activities including staff credentialing and peer reviews.

***Senior Clinical Operations Specialist*** – MHM Correctional Services, Inc. (10/10 –3/12) This position required travel throughout the United States approximately 50% of the time to provide training and clinical consultation to mental health staff in the management of inmates with severe and persistent mental illness and significant self-injurious behavior. Assist in the development of behavior management treatment plans. Assist in the implementation of clinical programming and policies. Develop staff training, clinical guidelines and group psychotherapy protocols. Conduct clinical audits to ensure contract compliance. Co-facilitate a company-wide conference call focusing on the gender responsive needs of female offenders.

***Mental Health Director*** – MHM/Forensic Health Services - Massachusetts Correctional Institute-Framingham- Framingham, Massachusetts (7/07- 9/10) Supervise multidisciplinary team of social workers, psychologist, and psychiatrists who provide counseling and crisis intervention services to incarcerated women. Collaborate with correctional and medical personnel in developing treatment plans for women to assist in their ability to manage the penal environment and make recommendations in respect to disciplinary issues. Serve as the Chief Psychologist for Department of Corrections/MHM system-wide psychologists. On-call for after hours crisis intervention for medical and security personnel. Provide individual, group psychotherapy and crisis intervention serves to incarcerated women.

***Staff Psychologist-*** UMASS Correctional Health- Massachusetts Correctional Institute-Framingham – Framingham, Massachusetts (9/02 – 2/06, 11/06 – 7/07) Serve as designated back-up for mental health director in periods of absence, provide on-site and off-site coverage. Provide treatment planning, individual and group psychotherapy to incarcerated women who are awaiting trial or sentenced for a wide variety of misdemeanor and felony convictions. Treatment typically addresses adjustment issues, trauma history, substance abuse, domestic violence and family discord. Additional responsibilities include conducting intake evaluations, psychological testing, and assessing the mental health status of women housed in segregation. Provide crisis counseling and assess and monitor women who are acutely at risk of harm to themselves or others. Supervise UMASS pre-doctoral clinical psychology interns. Attend and participate in daily triage meetings, educate and consult with corrections staff as indicated. Served as the mental health liaison for the Prison Pup Partnership program, which involves selection of inmates and ongoing evaluation of fitness to serve as a handler, as well as facilitating team-building activities. Developed and co-facilitated intern seminar for master's level interns on various clinical issues. Created administrative forms to facilitate communication between court personnel and prison mental health staff; to document group treatment; to assist with crisis assessment; and to aid in compliance of documentation of clinical issues for quarterly audits. Created and maintained monthly award for clinical excellence for mental health staff. Coordinate monthly crisis coverage schedule. Facilitate monthly staff meeting and quarterly full-day staff seminar. Maintain security of psychological testing materials and assign cases to peers. Developed and facilitate case conferences for challenging clinical cases. Serve as the mental health representative for the institution's training committee and provide weekly training to correctional officers regarding mental health issues. Organized fund raiser for institutional staff, collected and donated money to victims of the 2004 Tsunami.

***Independent Contractor*** – MHM/Forensic Health Services, Worcester County (5/06 – present). Conduct pre-arraignment evaluations pursuant to M.G.L. Chapter 123, Section 18(a). Evaluations are conducted after-hours on an on-call basis for detainees deemed to be experiencing a psychiatric emergency.

***Independent Contractor*** – University of Massachusetts Medical School (10/1/06 – 11/29/06) – Conduct psychological testing at Souza Baranowski Correctional Center, a maximum security penal institution for men.

***Forensic Psychologist*** – Center for Health and Development, Fitchburg District Court Clinic – Fitchburg, Massachusetts (2/06 – 11/06) Conduct court-ordered forensic evaluations for central Massachusetts courts. Evaluations include involuntary commitment for psychiatric treatment, commitment for substance abuse, aid-in-sentencing, competency to stand trial and criminal responsibility.

***Psychology Intern-*** University of Massachusetts Medical School/Worcester State Hospital – Worcester, Massachusetts (9/01- 8/02) Attended seminars on Neuropsychology, Substance Abuse, Malingering, and Psychopharmacology. Attended Law and Psychiatry Rounds and Grand Rounds. Rotations included: Child Family Forensic Center, Outpatient Psychiatry Service-Anger Management Program, Community Healthlink – Homeless Outreach Assistance Program, and Bridgewater State Hospital – Maximum Security Unit. Supervised by: Jack Terry, Ph.D., Bill Warnken, Psy.D., ABPP, Anne Johnson, Ph.D., David Holtzen, Ph.D, Linda Cavallero, Ph.D., Gerri Fuhrman, Ph.D., Gregg Januszewski Psy.D., and Alan Rosenbaum, Ph.D .

Bridgewater State Hospital – Maximum Security Unit – As a member of the multidisciplinary treatment team, provided therapeutic services to patients. Co-facilitated a unit based violence prevention group and provided individual therapy to patients diagnoses included Schizophrenia, Bipolar Disorder, Borderline Personality Disorder, and Mood Disorder NOS. Evaluated a patient diagnosed with Bipolar Disorder and Borderline Personality Disorder for recommitment and wrote the recommitment evaluation. Conducted psychological testing with patients and communicated results to treatment team.

Massachusetts Correctional Institute-Framingham – Served as a Primary Care Clinician for female inmates, designed treatment plans, and provided weekly therapy. Diagnoses included Major Depression, Borderline Personality Disorder, ands Post-Traumatic Stress Disorder. Conducted psychological testing with inmates and communicated results to referral source.

Child Family Forensic Center – Conducted psychological evaluations with families referred by the Worcester Probate and Family Court. Assessed inter-parental conflict, domestic violence, substance abuse, and mental health history and made visitation and custody recommendations. Evaluation included an interview with both parents and children and collateral contacts as deemed appropriate. Appointed and served as a Guardian ad Litem to determine the best interests of the child. Evaluation included numerous interviews of both parents and child, review of collateral records, and collateral contacts.

Outpatient Psychiatry Service – Anger Management Program – Conducted intakes for anger management program. Co-facilitated a men's anger management group and women's anger management group. Many of the group members were involved in domestic violence and are referred by the Worcester District Court.

Community Healthlink – Homeless Outreach Assistance Program - Conducted psychological testing with homeless clients as referred by the treatment team. Communicate results to the treatment team.

***Psychology Trainee*** – Public Defender's Office, Broward County Courthouse – Fort Lauderdale, Florida (8/99-9/00). Conducted full battery psychological evaluations with inmates with violent felony charges. Communicated results to attorneys and peers during case conference. In addition, assisted with competency and sanity evaluations and conducted an evaluation to determine competency to stand trial with an individual with a felony charge. Rotated through: Broward County Main Jail, Broward County Mental Health Court, Juvenile Detention Center, and Crisis Street Stabilization Unit. Supervisors: Lenore Walker, Ed.D. ABPP, David Shapiro, Ph.D., Hilda Besner, Ph.D., Michael Brannon, Psy.D., and Ross Seligson, Ph.D.

Broward County Main Jail- Evaluated approximately 134 detainees arrested for misdemeanor charges to assess for the presence of mental illness. Detainees willing to seek mental health treatment were qualified for Mental Health Court. Made recommendations through consultation with Public Defender and testified as necessary. Qualified as an expert by magistrate on duty.

Broward County Mental Health Court- Court specializes in mental health treatment for individuals that committed misdemeanor offenses. Conducted approximately 107 brief psychological assessments with detainee's including evaluation of competency to proceed, risk assessment,

mental status, psychosocial history, treatment compliance, and treatment and placement needs. Made recommendations to the Public Defender and provided testimony as needed to Honorable Judge Ginger Lerner-Wren. Qualified to as an expert to provide testimony.

Juvenile Detention Center- Evaluated approximately 29 female adolescents for competency to proceed and a wide range of factors including educational needs, previous delinquent behavior, medical concerns, mental health history, family issues, and history of abuse.  Juveniles ranged from 12-17 years of age, representing a wide range of ethnic and cultural backgrounds. Recommendations provided to Public Defender and Legal Aid attorney assisting the adolescents with civil and legal needs.

Crisis Street Stabilization Unit- Facility is an inpatient psychiatric hospital, primarily providing services for indigent patients.  Conducted approximately 38 risk assessment evaluations with involuntarily hospitalized patients.  Assessment of ability to care for self and potential for harm to self or others, despite a wide range of psychotic diagnoses, mood disorders, and dual diagnosis issues, was of primary concern.  Made dangerousness recommendations to the Public Defender.

***Psychology Trainee -*** Nova Community Clinic for Older Adults (NCCOA), Nova Southeastern University Community Mental Health Center - Fort Lauderdale, Florida (6/98-4/99). NCCOA is a specialty clinic within the Community Mental Health Center that serves clients ages 55 and older. Provided outpatient cognitive-behavioral individual and group psychotherapy, targeting symptoms of depression and anxiety disorders. Duties consisted of treatment planning,  medical record, weekly supervision, case presentations, crisis intervention, case presentations, and attending a bi-monthly Cognitive-Behavioral Seminar. Intake evaluations included administration and interpretation of the Structured Clinical Interview for DSM- IV, Mini-Mental Status Exam, Beck Anxiety Inventory, Geriatric Depression Scale, Wolpe Lazarus Assertiveness Scale, and selected subtests from the Wechsler Adult Intelligence Scale-Revised and Wechsler Memory Scale-Revised.  Supervisor, William Kelleher, Ph.D.

***Forensic Psychology Assistant -*** The Institute for Behavioral Sciences and the Law - Plantation, Florida (9/00-12/00). This is a private practice that provides both clinical and forensic evaluations. Assisted with psychological evaluations (WAIS-III Rorschach, MMPI-II MCMI-III) and conducted clinical interviews with detainee's pending trial for competency, downward departure, and substance abuse evaluations.  Supervisor, Michael Brannon, Psy.D.

***Therapist -*** Broward Partnership for the Homeless Incorporated - Fort Lauderdale, Florida (7/99-6/01). Broward County funded position for one Nova Southeastern student to provide on-site psychological evaluations, crisis intervention, and outpatient therapy, with adults, children, and families residing at the shelter. Group psychotherapy was also conducted in a psycho-educational format focusing on goal achievement and parenting skills. Individuals have presented with a variety of Axis I and Axis II disorders including depression, anxiety, suicidal behavior, bipolar disorder, psychotic disorders, social skills deficits, and substance abuse. Other duties consisted of documentation in medical record, weekly supervision, treatment planning, consultation with Case

Management staff and facilitating educational seminars with Residential Coordinator staff. Supervisor, Ana Martinez, Psy.D.

***Therapist*** - Brown Schools of Florida at Sunrise - Weston, Florida (8/99-12/99). Program is a residential treatment facility for emotionally disturbed adolescents. Provided group psychotherapy several times a week and conducted psychosocial evaluations. Other duties included treatment planning, documentation, crisis intervention, and consultation with the clinical team. Supervisor, Andrew Cutler, M.S.W.

***Psychological Consultant -*** Family Assessment Center, The Brown Schools of Florida - Fort Lauderdale, Florida (2/99-5/99). Program is an emergency shelter that houses children and adolescents that have been detained by the Department of Children and Families.  Conducted mental health screenings and psychological evaluations to assess the child's mental health and made placement recommendations to the Broward County Court System and Department of Children and Families.  Provided crisis intervention.  Supervisor, Michael Brannon, Psy.D.

***Mental Health Consultant*** - M.E. Chiles Program, Nova Southeastern University Community Mental Health Center - Fort Lauderdale, Florida (6/98-12/98). Conducted mental health evaluations at foster homes with children and adolescents detained by the Department of Children and Families. Provided individual psychotherapy with foster children and a court-ordered parent. Duties consisted of assessing the child's mental health  and making placement recommendations to the Broward County Court System and Department of Children and Families. Supervisor, Mary Centrone, Psy.D.

***Recreational Therapist*** - Alzheimer's Resource Center of Connecticut - Southington, Connecticut (1/97-3/97). Facility provides psychological, medical, housing and recreational services to residents diagnosed with Alzheimer's Disease. Facilitated recreational activities with residents including arts and crafts, music therapy, reminisce, nature walks, exercise, and fine dining on a one-on-one or group basis to stimulate their senses and improve their quality of life.

***Certified Hospice Volunteer*** - Catskills Area Hospice - Oneonta, New York (3/96- 12/96). Participated in training that focused on death and dying with the terminally ill and ways to provide support for family members. Co-facilitated a children's bereavement group.

***Pre-School Teacher*** -Young Men's Christian Academy - Southington, Connecticut (Summers of 1995, 1996). Acted as a Pre-School teacher for children ages 3-5. Designed lesson plans appropriate to the children's level of development focusing on safety and awareness, outer space, and the human body. Implemented lesson plan providing education on the human body. Supervised children's activities and intervened as necessary, at times utilizing behavior modification.

---

## Supervisory Experience

***Co-Assistant Director of Psychology Intern Training*** – University of Massachusetts Medical School/ Worcester State Hospital- Worcester, Massachusetts (8/06- 8/07). Program is an American Psychological Association approved training site for pre-doctoral psychology interns. Participate in weekly group supervision, provide individual supervision, assist in the selection of interns, coordinate didactic seminars. Coordinate and develop year-long, weekly didactic seminars.

***Coordinator*** - Nova Community Clinic for Older Adults, Nova Southeastern University Community Mental Health Center - Fort Lauderdale, Florida (6/99- 6/01). Duties included orienting and training first and second year practicum students and serving as a liaison between students, Clinic Director, and the department of Quality Improvement. Co-facilitated bi-monthly staff meetings, conducted chart reviews on student's caseloads to assure compliance with clinic, Medicaid, and Medicare guidelines and screened new clients for intake and assigned to an appropriate student. In addition, monitored students' assessment data to confirm consistency between assessment data and diagnosis. Updated assessment package in collaboration with a graduate assistant, supervisor, and Charles Golden, Ph.D. Also trained students on administration, scoring, and interpretation of assessment packet. Supervisor, William Kelleher, Ph.D.

***Lead Peer Interviewer*** - Nova Southeastern University - Fort Lauderdale, Florida (March 2001, March 2000). Interviewed clinical psychology doctoral applicants to determine appropriateness for program and made recommendations to selection committee as to their suitability.

***Peer Interviewer***- Nova Southeastern University - Fort Lauderdale, Florida (April 1999). Interviewed clinical psychology doctoral applicants to determine appropriateness for program and made recommendations to selection committee as to their suitability.

---

# Presentations

A Forensically-Informed Model for Providing Mental Health Consultations to the Disciplinary Process: National Commission on Correctional Health Care, Las Vegas, Nevada, July 10, 2011. Co-presenter with Stephen DeLisi, PhD.

Self-Harm Behavior and the Female Offender: Minimizing the Risks: National Commission on Correctional Health Care, Phoenix, Arizona, May 24, 2011. Lead presenter with Joel T. Andrade, LICSW, PhD.

Suicide and Self-Harm Risk Assessment within Correctional Settings: Avoiding Common Pitfalls. 4th Annual Academic and Health Policy Conference on Correctional Health, UMASS Medical School , March 10, 2011. Lead presenter with Joel T. Andrade, LICSW, PhD

Vicarious Traumatization in Corrections: Recognition, Response and Prevention: American Correctional Association, San Antonio, Texas, January 30, 2011.

Vicarious Traumatization in Correctional Healthcare: Recognition, Response and Prevention: Educational Luncheon: National Commission on Correctional Health Care, Boston,

Massachusetts. July 11, 2010.

Gender Responsive, Trauma Informed Services for Female Offenders:  Bridging Research and Practice:  3rd Annual Academic and Health Policy Conference on Correctional Health, UMASS Medical School/Nova Southeastern University, Fort Lauderdale, FL.  December 3, 2009.  Co-presenter with Judith Willison, LICSW.

PREA Standards:  Considerations Unique to Female Offenders:  Blending New Challenges with Emerging Ideas, 13th National Workshop on Adult and Juvenile Female Offenders, Jackson, MS. October 10, 2009.  Co-presenter with Sharen Barboza, PhD., and Judith Willison LICSW.

Group Treatment for Newly Incarcerated Women:  Managing Sleep Disturbance, Anxiety and Depression:  National Commission on Correctional Health Care, Chicago, Illinois.  October 22, 2008.  Lead presenter with Morgan McGinty, MSW.

Gender Responsive Services for Girls and Women in the Justice System:  Forensic Health Services, UMASS Boston.  May 6, 2008.

Gender Responsive Training:  New Mexico State University, Grants, New Mexico.  December 17, 2007

Managing the Female Offender:  Trends in the Mental Health Evaluation.  February 1, 2005.

Identifying Mental Illness and Building Rapport. Presented to the staff at the Broward Partnership for the Homeless Incorporated. October 30, 2000

---

# Research Experience

***Doctoral Directed Study*** (Fall 2000) Detecting feigned cognitive deficits by identifying the presence of intact memory using symptom validity testing.  Chairperson, Charlie Golden, Ph.D., ABPP.

***Research Practicum III*** (Fall 2000)  Analyzed data obtained from Juvenile Assessment Questionnaire, to examine contributing factors to delinquent behavior.  Supervised by Lenore Walker, Ed.D., ABPP.

***Research Practicum II*** (Summer 2000)  Developed coding program for data obtained from Juvenile Assessment Questionnaire  in collaboration with Al Sellers, Ph.D. and coded data. Supervised by Lenore Walker, Ed.D., ABPP.

***Research Practicum I (***Winter 2000). Developed Juvenile Assessment Questionnaire to be utilized with female detainees and trained peers in administration of inventory.  Supervised by Lenore Walker, Ed.D., ABPP.

***Undergraduate Thesis*** (1995).  Left-handedness and dyslexia:  An analysis of the higher frequencies of left-handedness in the dyslexic population.  Chairperson, Lynn Elmore, Ph.D.

***Undergraduate Directed Study*** (1995).  Analyzed the controversies surrounding the inclusion of Self-Defeating Personality Disorder in <u>DSM-III,</u> <u>DSM-III-R,</u> and <u>DSM-IV.</u>  Supervised by Ronald Heyduk, Ph.D.

## Publications

Masotta, M.  (2011).  Vicarious Traumatization:  Recognition, Response, and Prevention.  *CorrDocs:  Society of Correctional Physician Newsletter.*  Volume 14, Issue 1. Posted June 15, 2011.

Masotta, M (2011).  Vicarious Traumatization:  A Guide to Recognizing, Responding to, and Preventing a Serious Consequence of Providing Mental Health Care in Jails, Prisons and Community Corrections.  *Corrections and Mental Health:  An Update of the National Institute of Corrections.*  March 11, 2011.

## Teaching Experience

***Assistant Professor*** – (8/13-5/15) Framingham State University, Department of Psychology and Philosophy, Framingham, MA.  In this full-time position responsibilities include teaching undergraduate psychology courses (Abnormal Psychology, Social Psychology, Human Relations and Group Dynamics).  Responsibilities also include advising 32 undergraduate psychology majors and serving as a member on the Graduate Committee.

***Visiting Assistant Professor*** – Framingham State University, Mental Health Counseling Program, Department of Graduate and Continuing Education, Framingham, MA,

       Orientation to Counseling (Fall 2004- 2011, 2013, 2018, 2021)
       Professional Issues in Mental Health Counseling (Spring 2004 – 2013, 2016)
       Assessment, Diagnosis and Treatment Planning (Summer 2012)
       Theories of Psychotherapy and Counseling (Spring 2011)
       Theories and Methods of Psychological Testing (Summer 2004- 2006, 2015)
       Problems of Substance Abuse (Summer 2009, 2011, 2015, 2020)
       Group Processes in Counseling (Summer 2006- 2010, 2014)
       Counseling Internship I (Fall 2005)
       Understanding Social Science Research (Fall 2003, 2 sections)

***Teaching Assistant*** – *Psychobiology; Nova Southeastern University – Fort Lauderdale, Florida (Winter 2000)*

# Awards

Recipient of the National Health Service Corps Loan Repayment Program, 2009
Recipient of Department of Correction; Professional Excellence Contract Health Care Award, 2010
Nominated for Department of Correction; Professional Excellence Contract Health Care Award, 2008
Designated Forensic Psychologist, 2008
Departmental Distinction, Hartwick College, 1996
Cum Laude, Hartwick College, 1996
Dean's List, Hartwick College, 1995-1996
Psi Chi National Honor Society, 1995

JAMES FRANCIS DEGROOT, PH.D.
Atlanta, GA 30319
Phone: 770-356-1830
upcjdegroot@gmail.com

## Education

WRIGHT STATE UNIVERSITY, DAYTON, OHIO
Psychology Postdoctoral Program 1983-1985

CATHOLIC UNIVERSITY OF AMERICA, WASHINGTON, D.C.
Doctor of Philosophy 1977-1984

ANTIOCH UNIVERSITY, COLUMBIA, MARYLAND
Master of Arts 1974-1977

CARDINAL STRITCH COLLEGE, MILWAUKEE, WISCONSIN
Bachelor of Arts 1967-1971

## License

Licensed Clinical Psychologist in Georgia, 1986 to Present

## Clinical, Correctional and Forensic Experience: Georgia Department of Corrections

➢ **State-Wide Mental Health Consultant,** January 2020-Present (February 2020)
**Employed as a Part-time Employee by Centurion, a vendor contracted by the Georgia Department of Corrections (GDC)**
Consult with the State-Wide Clinical Director and be a liaison between the State-ide Clinical Director and the State-Wide Mental Health Director, focusing on: programs for mentally ill offenders in Restrictive Housing; programs for mentally ill offenders with Substance  Use Disorders; and mental health policies and procedures.

➢ **State-Wide Clinical Director**, 2017-2020
**Employed by Centurion, a vendor contracted by the Georgia Department of Corrections (GDC)**
Centurion is responsible for hiring and delivering mental health services to an offender population of approximately 55,000 of whom 11,500 are diagnosed with a mental illness. I directly supervised 18 facility Clinical Directors and 17 staff psychologists, managed 24 facility Mental Health Administrative Directors, collaborated with the Centurion Regional Medical Director (a psychiatrist), oversee 250+ mental healthcare providers, and helped coordinate

operations with the leadership of Georgia Department of Corrections in order to deliver quality and timely mental health services.

➢ **State-Wide Mental Health Director,** 1994-2017
**Employed by the State, Georgia Department of Corrections (GDC)**
Responsible for the delivery of mental health services to inmates and detainees who were diagnosed with a mental illness. I spent much of the fist 10 years working on civil rights litigation with experts and attorneys on two certified class action complaints (Guthrie v Evans and Cason v Seckinger) and on one complaint which was never certified as a class and dropped by plaintiffs after two years, (Fluellen v Wetherington). During that time, we made major revisions to the mental health policies and procedures. The number of offenders receiving mental health services continually grew from 2,000 in 1994 to 11,500 in 2019. The severity, complexity and acuity of mental illness also increased. Consequently, I worked closely with GDC leadership and attorneys from the Attorney General's Office on a myriad of issues to include restrictive housing, implementation of the Prison Rape Elimination Act (PREA), transgender offenders, suicides, drugs, and gangs.

➢ **Staff Psychologist at GA's Maximum-Security Prison,** 2988-1994
**Employed by the State as a part-time employee**
I began working at GA State Prison (GSP) shortly after the tenure of Special Master Vincent Nathan. I was responsible for implementing of a consent decree resulting from Guthrie v Evans and for updating Judge Anthony Alaimo on the status of GSP's mental health delivery system. I worked closely with Warden A. G. Thomas, Commissioner Alan Ault, Assistant AGs, and the Medical College of GA which was providing psychiatric services. During this time, critical incidents at GSP declined and the consent decree became a model for upcoming major revisions in GDC's MH Policies and Procedures.

## Clinical, Correctional and Forensic Experience: Independent Practice

➢ **Mental Health Expert for the Office of the Special Master in the Ninth Circuit on Coleman v Newsom,** October 2019-Present (October 2020)
Responsible for monitoring California Department of Correctional Rehabilitation's (CDCR) implementation of court orders and writing reports for the Special Master.

➢ **Mental Health Expert for the Department of Homeland Security (DHS),** 2016-Present (February 2020)

**Subcontracted to work as part of a team investigating OIG mental health complaints from ICE detainees.**

Responsible for investigating both the specific detainee complaints on the delivery of mental health services and the facility's overall mental health compliance with the National Detention Standards, other applicable professional standards, and best practices. The results of the investigation are presented to facility leadership during an out-briefing and a formal report is written by each team member for DHS.

➢ **Independent Forensic Mental Health Evaluator of VA Complaints,** 2013-Present (February 2020)

Conduct a comprehensive mental health assessment on Viet Nam, Iraqi, and Afghanistan veterans complaining of combat related PTSD and TBI. The evaluation consists of reviewing the veteran's medical and military records, interviewing both collateral informants and the veteran, and administering psychological tests. The results are discussed with a team of attorneys who are Emory University fellows from the Emory Veteran's Clinic, and supervising attorneys from King & Spalding and/or from Ogletree, Deakins, Nash, Smoak & Stewart. A formal report is written for a VA hearing.

➢ **Contracted with the Dept. of Labor as an Independent Forensic Mental Health Evaluator,** 2008-Present (February 2020)

Evaluate individuals who filed disability claims with the Social Security Administration. The claimants are interviewed, psychological tests are usually administered, collateral informants are interviewed, and collateral documents are reviewed. Formal reports are written and submitted in a timely manner for an administrative hearing.

➢ **Psychology Consultant and Direct Care Provider for the GA Department of Juvenile Justice**, 2008-2016

Worked part-time, providing: direct care at a number of facilities (Augusta Youth Development Center, Bill Ireland YDC, and Emanuel YDC); consultation with DJJ leadership by performing psychological autopsies on two juveniles who committed suicide; consultation to DJJ HR by performing Fitness-for-Duty evaluations on custody staff; and clinical supervision for direct care providers in the field.

> **Independent Clinical & Forensic Mental Health Evaluator on Miscellaneous Cases,** 1988-2014

Over 26 years, I served as plaintiff and defendant expert on variety of cases. For example, I testified for a number of defendants on deliberate indifference and wrongful death cases in county jails. I also served as an expert witness in adult and juvenile criminal cases, performing competency and responsibility evaluations. I was an expert in one capital punishment case, testifying on behalf of the defendant who was represented by the Southern Center for Human Rights.

In 2010 and 2011 I consulted with The Moss Group as a PREA auditor, participating in PREA audits of ICE facilities managed by Correctional Corporation of America (CCA).

While practicing on St. Simon's Island and in Atlanta, I had contracts with Glynn County School System and with Atlanta City Schools to perform psychological evaluations on students to determine if they qualified for special education services.

Additionally, while teaching at the Medical College of GA, I worked for Richmond County Family Court performing evaluations on families to assist two judges with cases involving custody and termination of parental rights.

## Clinical, Correctional and Forensic Experience: Elected /Appointed Professional Positions

> **International Association for Correctional and Forensic Psychology (IACFP)**
> **At-Large Board Member** and Chair of the Nominating Committee, January 2019-Present (February 2020)
> **Past President** and Chair of the Nominating Committee, January 2017-December 2018
> **President**, January 2015-December 2016
> **President-Elect**, January 2013-December 2014

> **American Board of Correctional Psychology (ABCP)**
> **At-Large Board Member**, January 2018-Present (August 2019)
> Working with the American Board of Professional Psychology (ABPP), the American Psychological Association and other professional associations to create an ABPP subspecialty board certification for Correctional Psychology.

> **National Institute of Corrections, Mental Health Network (NIC)**

**Administrative Committee, Chair**, 2014-2015

**Administrative Committee, Member,** 2011-2014

**Steering Committee, Member,** 2010-2011

**Suicide & Self Injurious Behavior Committee, Chair**,2009-2010

➢ **GA's National Alliance for the Mentally Ill (NAMI)**
**Board Member and Nominating Committee Chair**, 2011-2014

➢ **GA's Crisis Intervention Team (CIT)**
**Advisory Board Member**, 2007-2010
**Steering Committee Member**, 2008-2011

➢ **The Governor's Mental Health Summit**
**Member**, 2006-2009

➢ **GA's Reentry Impact Program**
**Member**, 2005-2008

➢ **GA's Mental Health Planning & Advisory Council (GMHPAC)**
**Member** 2006-2015

➢ **Association for the Advancement of Behavior Therapy (AABT)**
**Legislative Committee, Chair**, 2000-2003

## ACADEMIC APPOINTMENTS

2007-2013 Member of GA State University Institutional Review Board, Atlanta, GA

1990-2016 Clinical Professor of Psychiatry, the Medical College of Georgia, Augusta, GA

1987-1990 Assistant Professor of Psychiatry, the Medical College of Georgia, Augusta, GA

1986-1988 Clinical Faculty, Psychiatry Residence & Child Psychiatry Fellowship at Eisenhower Army Medical
        Center, Fort Gordon, GA

1986-1988 Clinical Psychology Internship at Eisenhower Army Medical Center, Fort Gordon, GA.

1981-1983 Clinical Faculty for the General Psychiatry Residence and Child Psychiatry Fellowship at Letterman Army Medical Center, San Francisco, California.

1978-1979  Psychology Instructor, Prince's George's Community College, Largo, Maryland

1977-1979  Teaching Assistant, Catholic University of American, Washington, D.C.

# Military Service

➤ **Duties**
I served as a Captain in the US Army. I worked as a clinical psychologist at Eisenhower Army Medical Center (Fort Gordon, Georgia) and at Letterman Army Medical Center (Presidio in San Francisco, CA). During both tours of duty, I provided direct care to active duty service members and their dependents and I clinically supervised psychology practicum students, psychology interns, and child-adolescent psychiatry fellows.

➤ **MILITARY EDUCATION**
1987 Command and General Staff College, Correspondence
1986 Officer Advanced Courses at the Academy of Health Sciences, San Antonio, Texas
1981 Officer Basic Course at the Academy of Health Sciences, San Antonio, Texas

➤ **MILITARY AWARDS**
1986      Army Commendation Medal
1981 Army Commendation Medal

## PROFESSIONAL PRESENTATIONS

**1994-Current**
As the current State-wide Clinical Director and previous Mental Health Director for Georgia Department of Corrections, between 1994 and 2019 I've presented papers at state, national and international professional meetings and universities at least every few months.  I also testified in numerous hearings to include a PREA Commission Hearing while they were writing the Prison Rape Elimination Act of 2003 and a NIC Advisory Board Public Hearing entitled "Balancing Fiscal Challenges, Performance-Based Budgeting and Public Safety". Details for any of the above will be provided upon request.

**NATIONAL**

June 1995          "What's Love Got to Do With It?  The Dynamics of Family Violence and Its Implications for the Criminal Justice and Mental Health Systems," (with Annette Z. Henderson).  Presented at the Fifth Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri.

August 1994          "When Staff Burn Out, Students Follow: The Mental Health Consultant's Role in Attenuating Staff's Stress through Consultation and Training." Presented at Job Corps Annual Meeting for Mental Health Consultants in Los Angeles, California.

May 1994          "The Inevitability of the Mental Health Professional Being Sued by Inmates,"(with Margaret Severson).   Presented at the Fourth Annual

|  | Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
|---|---|
| March 1994 | "An Update on the Georgia Prison Study," (with A.R. Bruhn and K. Feigenbaum).   Presented at the Society of Personality Assessment's Mid-Winter Meeting in Chicago, Illinois. |
| May 1993 | "Identification of Unsolved Issues with the Early Memory Procedures: Assessing Violence Potential."  Presented at the Third Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
| March 1993 | "Predicting Aggression Potential with the Early Memory Procedure: The Georgia Prison Study," (with A.R. Bruhn and K. Feigenbaum).  Presented at the Society of Personality Assessment's Mid-Winter Meeting in San Francisco, California. |
| May 1992 | "Hurdles in the Implementation of Treatment Programs in Correctional Settings: A Constructivist's Ruminations from a Maximum Security Prison," (with Joe Owens and Janice Deal).  Presented at the Second Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
| March 1992 | "Identifying and Treating the Basis for Delinquent Behavior via Early Memories."   Presented at the Society of Personality Assessment's Mid-winter meeting in Washington, D.C. |
| August 1989 | Effects of Abuse on Perspective-Talking Skills in Children," (with Fred Garland as primary, Linda Christiansen and Anthony Zold).  Presented at the American Psychological Association's Annual Convention in New Orleans, Louisiana. |
| August 1989 | "The World According to a Distressed Truck Driver: Constructivist Perspectives," (with Fred Garland).   Presented at the American Psychological Association's Annual Convention in New Orleans, Louisiana. |
| March 1989 | "The Rorschach As a Measure of Behavior."  Presented to graduate students and faculty at Stanford University in Palo Alto, California. |
| February 1989 | "Continuity-Discontinuing in Child-Adult Psychopathology: A Structural-Developmental Perspective," (with Stephen N. Xenakis). Presented at the AMEDD Clinical Psychology Short Course, sponsored by the Office of the Surgeon General and held in Augusta, Georgia. |
| October 1988 | "Clinical Consideration in Using Parent-Child Rating Scales," (with P.S. Jensen and S.N. Xenakis).  Presented at the 35th Annual Meeting of the American Academy of Child and Adolescent Psychiatry held in Seattle, Washington. |
| October 1988 | "Parents at Risk: An Epidemiological Investigation," (with P.S. Jenson and L.J. Bloedan).   Presented at the World Psychiatric Association Regional Symposium held in Washington, D.C. |

August 1988      "Children at Risk: Psychopathology Correlates in Clinical and Community Samples," (with L.J. Bloedan and P.S. Jensen). Presented at the annual meeting of the American Psychological Association held in Atlanta, Georgia.

May 1988      "Concept of Self in ADD Children:  An Application of Piaget and Projective Testing." Presented as part of a symposium entitled "ADD: Psychosocial Issues in Treatment and Research." Presented at the 41st Annual Meeting of the American Psychiatric Association held in Montreal, Canada.

May 1988      "Contributions and Limitations of Projective Tests in the Diagnosis and Treatment of ADHA." Paper presented to Seoul National Psychiatric Institute in Seoul, Korea.

October 1987      "Interrater Agreement Vis-a-Vis Child Behavior Problems: Research Issues, New Evidence, and Future Direction," (with P.S. Jensen). Presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, Washington, D.C.

March 1987      "A Model of Psychological Interventions for Consultations and Liasion with Medical Clinics," (with R.C. Hulsebus, F.M. Tomayo and R. Sullivan). Presented at the U.S. Army Neuropsychology and Behavioral Medicine Conference, San Francisco, California.

March 1987      "Relationships Between Parents' Self-Reported Symptoms and Their Perceptions of Their Children's Symptoms: Implications for Using Parent-Child Rating Scales," (with P.S. Jenson and S.N. Xenakis). Presented at the U.S. Army Neuropsychology and Behavioral Medicine Conference, San Francisco, California.

February 1987      "A Constructivist-Structural Model of Development with Clinical Implications." Presented at the U.S. Army Child and Family Psychiatry Conference, Honolulu, Hawaii.

## STATE

May 1988      "The Mind of the Hyperactive Child." Paper presented at a one-ay seminar entitled, "Working with Families: Parenting the Behavior Disorder Child," sponsored by Charter Hospital of Augusta and the Medical College of Georgia; held in August, Georgia.

February 1988      "Therapeutic Consideration with Military Families.  "Presented at the Georgia Psychological Association's Mid-winter Conference, Calloway Gardens, Pine Mountain, Georgia.

February 1988      "Identifying and Managing Problems in Preschool Children." Presented at Open Door Preschool for the Staff Development in August, Georgia.

October 1987      "Working with Resistant Families."  Presented at one-day continuing education workshop for public school teachers, sponsored by Charter

Hospital of August and the Medical College of Georgia; held in August, Georgia.

April 1987          "Typical and Atypical Development Problems."  Presented to the Mothers' League of Augusta, sponsored by St. Joseph's Hospital in Augusta, Georgia.

February 1987      "Learning Disabilities: A Development-Neuropsychological Perspective." Presented at a one-day continuing education workshop for special education teachers, sponsored by Richmond County Public School and the Medical College of Georgia, August, Georgia.

October 1986       "Developmental Issues and the Foster Child."  Presented to the Foster Parent Associations of Colombia County in Martinez, Georgia.

February 1988      "A Constructivist Approach to Moral Development."  Presented in Psychiatry Grand Rounds, Medical College of Georgia, Augusta, Georgia.

December 1987      "Instruments and Interview: How to Make Them Work."  Presented a the Research Workshop sponsored by Eisenhower Army Medical Center and the Medical College of Georgia, Fort Gordon, Georgia.

November 1987      "A Developmental Model of the Self."  Presented at Psychiatry Grand Rounds, Eisenhower Army Medical Center, Fort Gordon, Georgia.

## Professional Publications

DeGroot, J.F., (2015). A Roadmap for Providing Psychiatric Services to Incarcerated Veterans: A challenging Subspecialty. In R. L. Trestman et. al. (Ed.), *Correctional Psychiatry* (pp. 310-314). Oxford Press.

DeGroot, J.F." Behavior Therapy in Correctional Settings." The Behavior Therapist, 2003, Vol.26#1.

Jensen, P.S., Xenakis, S.N., Davis, H., and DeGroot, J.F.: "Child Psychopathology Rating Scales and Interrater Agreement:  Child and Family Characteristics." American Academy of Child and Adolescent Psychiatry, 1988, 17:4, p. 451-461

Jensen, P.S., Xenakis, S.N., Davis, H., and DeGroot, J.F.: "Child Psychopathology Rating Scales and Interrater Agreement:  Child and Family Characteristics." American Academy of Child and Adolescent Psychiatry, 1988, 17:4, p. 451-461.

DeGroot, J.F., Hulsebus, R.C. Tamayo, F.M., and Sullivan, R: "A Model of Psychological Interventions for Consultation and Liaison with Medical Clinics." Proceedings of the 1987 AMEDD Clinical Psychology Short Course, 1987, p. 103-112.

DeGroot, J.F., Jensen, P.S., and Xenakis, S.N.: "Relationships Between Parents: Self-Reported Symptoms and Their Perceptions of Their Children's Symptoms:

Implications for Using Parent-Child Scales." Proceeding for the 1987 AMEDD Clinical Psychology Short Course, 1987, p. 153-162.


DeGroot, J.F.: "Effects of Person Perception on the Development of Children's Moral Judgment." The Journal of Genetic Psychology, 1982, 141, p. 41-48.

Ross, B. and DeGroot, J.F.: "How Adolescents Combine Probabilities." The Journal of Psychology, 1982, 110, p. 75-90.

# BRIAN JOSEPH MAIN, Psy.D.

## CLINICAL & FORENSIC PSYCHOLOGIST

9655 Granite Ridge Drive • Ste 200 • San Diego, CA 92123
Phone: (619) 316-1466 • e-mail: PsyDocMain@gmail.com
CA License # PSY23222

---

## SPECIALTY AREAS

Forensic Evaluations / Expert Testimony
Clinical Consultation
Risk Assessment & Management
Correctional Psychology
Suicide Prevention
Healthcare Quality Management

Cognitive Behavioral Therapy
Personality Disorders / Malingering
Cultural Diversity/ LGBTQ
Domestic Violence / Sexual Assault
Complex Trauma / PTSD
Substance Abuse / Relapse Prevention

## PROFESSIONAL EXPERIENCE

**FEDERAL COURT APPOINTED EXPERT - CORRECTIONAL MENTAL HEALTH** – California                                                                          10/2019 –Present
*Federal Court Expert in Class Action Lawsuit (Coleman vs Brown et al.)*
- Provide expert consultation to Special Master, Mathew A. Lopes, Esq., and his team.
- Monitor the mental health care provided in the California Department of Corrections and Rehabilitation (CDCR) and Department of State Hospitals (DSH), including suicide prevention practices, inpatient and outpatient treatment, and quality management
- Serve as part of an interdisciplinary team with a common goal of ensuring identified class members receive constitutionally adequate mental health care within CDCR and DSH

**FORENSIC HEALTH SERVICES** (MHM) – Massachusetts                         01/2016 – 5/2019
*Forensic Psychologist*
- Conduct court ordered forensic evaluations for district and superior courts: Competency to Stand Trial; Criminal Responsibility; Civil Commitments, Aid in Sentencing, etc.
- Testify as an Expert Witness
- Provide consultation to judges, attorneys, probation officers/law enforcement
- Facilitate psychoeducation to court personnel and members of the community

**CALIFORNIA DEPARTMENT OF CORRECTIONS - RICHARD J. DONOVAN CORRECTIONAL FACILITY -** San Diego, CA                                          06/2014 – 12/2015
*Chief Psychologist*
- Provide management/oversight for one of the largest correctional mental health programs in California with inpatient/outpatient programs for offenders with high acuity mental illness, intellectual disabilities, high risk medical issues, end of life care, high risk suicide/self-harm, transgender support needs, protective custody, and segregation

- Collaborate with correctional healthcare and custody staff to ensure compliance with evidence based and court ordered treatment mandates
- Participate in the recruitment and retention of correctional health care staff
- Participate in quality management efforts and chair various committees
- Develop, implement, and refine programs and healthcare policies and procedures
- Implement progressive discipline measures for staff accountability and patient safety
- Provide consultation to other state and county facilities regarding best practices for treatment and offender management

**DEPARTMENT OF STATE HOSPITALS -** Sacramento, CA                    12/2013 – 06/2014
*Consulting Forensic Psychologist*
- Conducted evaluations of individuals referred as potentially Mentally Disordered Offenders and Sexually Violent Predators (SVP)
- Conducted in depth forensic reports based on forensic interview, testing, and chart review
- Testify at Sexually Violent Predator & Mentally Disordered Offender hearings
- Quality reviews of forensic evaluations authored by other evaluators for quality assurance
- Conducted risk assessments for Sexually Violent Predators/ Mentally Disordered Offenders

**RICHARD J. DONOVAN CORRECTIONAL FACILITY -** San Diego, CA      8/2011 – 12/2013
*Senior Psychologist Specialist; Inpatient Unit Clinical Director; Suicide Prevention and Response Coordinator*
- Served as the mental health clinical director of a 14 bed inpatient psychiatric unit
- Developed, implemented, and provided oversight of mental health policies and procedures
- Facilitated trainings for various healthcare disciplines and custody staff on emergency response and suicide prevention
- Quality management through extensive healthcare record reviews, staff training, and development/implementation of quality improvement plans
- Developed and chaired multidisciplinary clinical case conferences for high risk patients
- Developed tools for tracking inmate suicide/self-injury risk, high utilization of inpatient services, and hospital transfers
- Interviewed and hired contract mental health staff

**NORTH KERN STATE PRISON -** Delano, CA                            5/2009 – 8/2011
*Clinical Psychologist; Chief of Mental Health*
- Management and oversight for all mental health programs in the institution
- Developed, implemented, and provided oversight of mental health policies and procedures
- Ensured compliance with court mandates and best practices for mental health services
- Maintained appropriate staffing through effective recruitment and retention efforts
- Provided ongoing training and progressive discipline to all mental health staff as needed
- Diagnostic screening of mental illness and developmental disabilities
- Psychological Assessment and intervention for inmates with rape and exhibitionism offenses during incarceration
- Emergency "on-call" crisis intervention and suicide risk assessment
- Psycho-education and process groups with chronically and severely mentally disordered offenders, including intellectually disables inmates
- Long-term weekly individual treatment for mainline "lifer" inmates

- Facilitate weekly individual/group supervision for pre-licensed clinicians accruing their post-doctoral hours

**SHARPER FUTURE -** San Diego, CA                                    8/2005 – 10/2007; 11/2008 – 5/2009
*Psychologist-Court Mandated Offender Evaluator and Treatment Provider*
- Group and individual therapy sessions with a diverse group of adult *male and female* perpetrators of sexual assault, including *developmentally delayed* offenders
- Psychological assessments for the courts/probation/parole departments for the purpose of diagnosis, treatment planning, and recommendations for managing offenders' risk in the community.
- Psychological testing: Static-99, Abel (measure of sexual interest), SONAR, MCMI-III, MMPI-II, K-BIT, HCL-R, and other measures as needed
- Psychoeducation on topics of healthy sexuality, interpersonal skills, relapse prevention, victim empathy, self-esteem, criminal thinking, and emotion regulation
- Psychological Assessment of parents for the Child Welfare Department
- Group/individual psychotherapy for dually diagnosed federal probationers and parolees
- Initiate and maintain ongoing communication with persons responsible for the supervision of offenders in the community to enhance public safety

**James Reavis, Psy.D. - Psychological Corporation -** San Diego, CA          11/2007 – 11/2008
*Sex Offender Treatment Provider and Evaluator*
- In depth forensic evaluations on pre-adjudicated and adjudicated sexual offenders
- Facilitate psychodynamic group and individual psychotherapy with adult male and female perpetrators of sexual assault
- Psychoeducation on topics of healthy sexuality, interpersonal skills, relapse prevention, victim empathy, criminal thinking, emotion regulation, and self-care
- Administer and score a variety of psychological tests including Cognistat, AASI- Screening Measure of Sexual Interest, SONAR, MCMI-III, HCL-R, and Static-99
- Adhere to the "Containment Model" for risk management (e.g. open communication with the County Probation Department regarding changes in offenders' risk for recidivism)

**D. Wexler, Ph.D. - Relationship Training Institute (RTI) -** San Diego, CA       6/2007 – 6/2008
*Domestic Violence Offender Treatment Provider*
*Individual/Couples/Family Therapy Provider*
- Group and individual psychotherapy with court mandated male and female *perpetrators* of intimate partner violence (CBT-Relapse Prevention and Interpersonal Therapy methods)
- Group psychotherapy targeting the impact of substance abuse and other risk factors on parenting and intimate relationships
- Individual counseling to *victims* of intimate partner violence
- Assessment and treatment for *children* who have been exposed to intimate partner/family violence
- Interpret and synthesize data from psychological testing to identify, classify, and develop treatment plans for a range of psychological disorders
- Provide treatment to community based referrals in San Diego County

**Ellen G. Stein, Ph.D. - Clinical and Forensic Psychology -** San Diego, CA       9/2006 – 4/2008
*Private Practice Clinician* - Psychological Assistant to Ellen G. Stein, Ph.D.

- Individuals, couples, and group short-term and long-term psychotherapy
- Targets in treatment: chemical dependency, PTSD, anxiety and mood disorders, LGBT, sexuality, trauma, personal growth, and phase of life problems
- Routine Assessment of clients and administration of psychological testing for diagnostic and treatment purposes

**Community Research Foundation -** San Diego, CA                    6/2004 – 10/2005
*Psychosocial Rehabilitation Specialist* – Residential Inpatient Facility
- Group and individual brief therapy to homeless and mentally ill patients in acute crisis
- Treatment targets: substance abuse, emotion regulation, activities of daily living, coping and interpersonal skills, and emotion regulation
- Psychological testing for diagnostic and treatment purposes using the MCMI-III and MMPI-II
- Ongoing assessment and monitoring of indicators for suicidality, homicidality, and grave disability

**EDUCATION – APA ACCREDITED UNIVERSITY FOR MASTERS AND DOCTORATE**
    ***California School of Professional Psychology/Alliant University-***San Diego, CA  8/2005 - 5/2008
     Psy.D. in Clinical Psychology, *Forensic Emphasis,* GPA: 3.8

    ***California School of Professional Psychology/Alliant University-***San Diego, CA  9/2003 – 5/2005
     M.A. in Psychology, GPA: 3.8

    ***California State University, Long Beach-***Long Beach, CA                    1/2002 – 5/2003
     B.A. in Psychology, *Magna Cum Laude,* GPA: 3.9

**REFERENCES AVAILABLE UPON REQUEST**

# Kahlil A. Johnson, M.D.

Phone: 240-495-9555
Email: kjohnson@kahliljohnsonpsychiatry.com

## LICENSES AND CERTIFICATIONS:

Current Board Certifications in General and Forensic Psychiatry by the American Board of Psychiatry and Neurology
Current Washington, D.C. and Maryland Medical Licenses
Current Washington, D.C. and Maryland Controlled Substances License
Current DEA License

## POST-GRADUATE TRAINING:

**Forensic Psychiatry Fellow, Saint Elizabeths Hospital, Washington, D.C., July 2016 to June 2017**
Forensic Psychiatry Fellow at Saint Elizabeths Hospital which is part of the Washington D.C. Department of Behavioral Health (DBH). Rotations include: Saint Elizabeths Hospital Forensic Consult Service, Washington D.C. Jail, Comprehensive Psychiatric Emergency Program, Washington D.C. Superior Court Mental Health Urgent Care Clinic, D.C. DBH Outpatient Competency Restoration Program, and the George Washington University Human Rights Clinic.

**Congressional Fellow, American Psychiatric Association, Washington, D.C., January 2009 to November 2009**
Jeanne Spurlock Congressional Health Policy Fellow in the Office of Congressman Edolphus Towns (New York-10[th] Congressional District).

**Psychiatry Resident, George Washington University Hospital, Washington, D.C., June 2005 to June 2009**
Administrative Chief Resident, July 2008 to December 2008; Administrator of Medication Management Clinic, July 2008 to December 2008; Resident Representative, Hospital Emergency Preparedness Committee, July 2006 to December 2009.

## EDUCATION:

**George Washington University School of Public Health, Washington, D.C., September 2006 to July 2008**
Partial coursework completed for a Masters of Public Health

**M.D., Howard University College of Medicine, Washington, D.C., May 2004**
President, Class of 2004 Student Council
Chair, Class of 2004 Scholarship Committee
Recipient, Dr. Charles A. Pinderhughes Psychiatry Scholarship
Delegate, Student National Medical Association
Group Leader, Department of Pediatrics Youth Anger Management Initiative
Student Leader Representative, Liaison Committee for Medical Education
Student Tutor, Howard University College of Medicine Psychiatry Course

**Fellow, University of Regensburg, Regensburg, Germany, September 2003**
Certificate of International Telemedicine Applications, Asklepios International Telemedicine Consortium

**B.S., Howard University, Washington, DC, May 1999**
Major: Biology; Minor: Chemistry

## ACADEMIC APPOINTMENTS:

**Clinical Assistant Professor, May 2020 to Present**
Department of Psychiatry
University of Maryland School of Medicine
Baltimore, MD

**Assistant Professor, August 2017 to Present**
Department of Psychiatry and Behavioral Sciences
George Washington University School of Medicine and Health Sciences
Washington, DC

**Clinical Faculty, July 2015 to 2018**
Forensic Psychiatry Fellowship Program
Saint Elizabeths Hospital
Washington, DC

# WORK EXPERIENCE:

**Emergency Psychiatrist, University of Maryland Medical Center, May 2020 to Present**
- Provide comprehensive emergency psychiatric assessment and treatment, including medication management and crisis and supportive psychotherapy, to patients who are in Psychiatric Emergency Service; and when requested to the hospital psychiatry consultation-liaison service and the emergency department.
- Conduct evaluations for presence of suicidal thoughts, plans and risk as well as evaluations for risk for violence; and, provide evaluation and stabilizing treatment of psychiatric disorders including but not limited to serious mental illnesses, substance use disorders, and underlying medical causes of symptoms presenting as a mental illness.
- Arrange admission to the appropriate level of care for continued treatment when warranted including inpatient, partial hospitalization, and outpatient psychiatric and substance use treatment services.
- Provide clinical and formal instruction on the field of psychiatry to Psychiatry Residents.

**Psychiatric Hospitalist, George Washington University Hospital, August 2017 to Present**
- Provide comprehensive psychiatric assessment and treatment, including medication management and psychotherapy, to inpatients who are on the psychiatry unit, consultation-liaison service, or in the emergency room.
- Conduct evaluations for the decisional capacity, presence of suicidal thoughts, plans and risk as well as evaluations for risk for violence, and underlying medical causes of symptoms presenting as a mental illness.
- Provide clinical and formal instruction on the field of psychiatry to Psychiatry and Neurology Residents, and, Medical and Physician Assistant Students.
- Responsibilities also include: participating in hospital committees, quality improvement endeavors, assisting with educational seminars for residents and medical students, forensic psychiatry evaluations, and participation in research.

**Independent Mental Health Monitor, May 2017 to Present**
- Provide recommendations on evidence-based correctional psychiatry in a jail setting in accordance with the U.S. Department of Justice Consent or Settlement Agreements (CA/SA) with various departments of corrections and/or jail health care provider companies.
- Collaborate with a multi-disciplinary court-appointed team that includes Independent Monitors, Attorneys, and correctional professionals with specialization in correctional standards of operation and policy for officers, evidence-based correctional medicine, and safety in a correctional setting.
- Areas of focus for clinical recommendations include, but are not limited to, psychiatric assessment and treatment, including medication management, psychotherapy, behavioral management, and crisis intervention for patients incarcerated in correctional facilities with psychiatric illness or who presented with psychiatric symptoms.
- Provide recommendations on mental health policies, grievances, quality improvement, and peer review.
- Review incidents of suicide, suicide attempt, self-harm, and violence involving mentally ill patients.
- Work with correctional and correctional health care company leadership on an as needed basis for all areas of focus above.
- Perform site visits to all correctional facilities to assess the progress of all parties towards meeting the

directives in the CA/SA, prepare a report of the findings, and report the findings to the court.
- Provide regular reports to the court regarding the progress of the correctional staff and the correctional health care provider in meeting the directives in the CA/SA.
- Participate in monthly meetings with all parties.

**Owner, Kahlil Johnson Psychiatry, LLC, May 2017 to Present**
- Evaluate and assess human behavior and mental health within a legal context and assist the court, legal professionals, or others with cases involving parties who may have mental disabilities and disorders that interest with my areas of expertise.
- Perform psychiatric assessment and forensic evaluations of persons in correctional institutions, secure hospitals, the community, and other settings.
- Areas of focus include but are not limited to: Correctional Psychiatry, Asylum and Immigration, Competency to Stand Trial, Decisional Capacity, Criminal Responsibility, Risk Assessment, Fitness-for-Duty, and Disability Assessment.

**Psychiatrist, MedOptions, Inc., September 2016 to September 2017**
- Provide psychiatric assessment and treatment, including medication and behavioral management, to patients residing in assisted living and skilled nursing facilities who are in need of evaluation for psychiatric illness or who present with psychiatric symptoms due to underlying medical illness.
- Perform decisional capacity evaluations on patients with dementia or other illnesses.
- Conduct evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence.
- Work with a collaborative treatment team that includes psychiatric nurse practitioners, psychologists, and clinical social workers.
- Coordinate patient care with facility clinicians and administrators.

**Psychiatric Consultant, Bread for the City, May 2013 to July 2016**
- Led monthly on-site meetings to provide training that includes evidenced-based diagnosis, treatment, and best-practice chronic care management of common outpatient psychiatric conditions.
- Reviewed cases with both primary care providers and social work staff and advised on best-practice evidence-based treatment.
- Provided non-urgent Psychiatric consultation via phone, email, or text message with a 24-hour response time and served as an informational resource for psychiatric and mental health service options in the District of Columbia.

**Director of Psychiatry, Unity Health Care, Inc., January 2012 to June 2016**
- Ensured all Psychiatry providers observed HIPAA and other local and federal compliance regulations and functioned collaboratively with the health and human services offered at Unity Healthy Care, Inc. and the Washington, D.C. Department of Corrections and that all personnel of the Department were compliant with the administrative policies and procedures of both organizations.
- Identified, implemented, and supervised the clinical delivery of best practice behavioral healthcare.
- Ensured that Psychiatry providers were fully trained in all aspects of their work; especially in crisis intervention and suicide prevention at the Washington, D.C. Department of Corrections.
- Monitored psychiatric and mental health providers to assure accuracy and quality in their work. Also, periodically monitored psychiatric and mental health records, provided appropriate feedback and took corrective action, when necessary.
- Oversaw and conducted peer review of Psychiatric Providers.
- Established collaborations and partnerships with mental health providers within the District of Columbia and with national networks of Community Health Centers and Departments of Correction.
- Participated effectively as a representative of Unity Health Care, Inc. with the Washington D.C. Departments of Mental Health and Corrections, other offices of the District of Columbia, and local and national community/advocacy groups.
- Prepared testimony on mental health policy and testified under oath on behalf of Unity Health Care, Inc.
- Assessed opportunities to increase reimbursement for mental health services.
- Collaborated with the Medical and Health Center Directors to provide leadership and ensure coverage for all

Unity Health Care, Inc. sites and services.
- Provided leadership with Unity Health Care, Inc. quality improvement efforts, including outside agency evaluation and accreditation review.
- Performed the clinical duties of an adult Psychiatrist at Unity Health Care, Inc. at the Washington, D.C. Department of Corrections, and various Community Health Centers in Washington, D.C.

**Lead Psychiatrist at Washington D.C. Jail, Unity Health Care, Inc., August 2011 to January 2012**
- Developed comprehensive and therapeutic treatment plans for assigned caseload and provided direct services based on established treatment.
- Managed on-site crisis intervention.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.
- Assisted with educational seminars for Unity Health Care, Inc. and the Washington, D.C. Department of Corrections staff, and interviewing potential new hires for psychiatric staff. Supervised the Psychiatrists at the D.C. Central Detention Facility and Central Treatment Facility.
- Performed duties as assigned, which included but were not limited to: psychiatry peer review and quality improvement activities, attending the Washington, D.C. Department of Corrections Quality Improvement monthly meetings, directing the Psychiatry monthly meetings, and attending other meetings as assigned.
- Worked closely with the Mental Health Coordinator, Health Services Administrator, and Medical Director on tasks involving overall mental health care management to effectively promote quality of care, operational efficiency, problem-solving, etc.
- Coordinated psychiatry schedule to include approval of scheduled absences and ensure psychiatry coverage.
- Collaborated to improve or maintain provider/staff/patient satisfaction, quality of care, and productivity, provided feedback to the Medical Director and completed annual psychiatric provider evaluations.
- Represented Unity Health Care, Inc. in city-based mental health functions as determined by the Medical Director of Correctional Medicine.
- Oriented new psychiatric providers to site and served as a psychiatric resource to all providers at site.

**Staff Psychiatrist at Washington D.C. Jail, Unity Health Care, Inc., November 2009 to August 2011**
- Provided comprehensive psychiatric assessment and treatment, including medication management, to inmates who had a previous history of mental illness or who are in need of evaluation for possible mental illness.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.
- Interviewed potential new hires for psychiatric staff.
- Responsibilities also included: participating in quality improvement endeavors at the facility, updating jail mental health policies and clinical procedures, assisting with educational seminars for Unity Health Care, Inc. and Washington, D.C. Department of Corrections staff.

**Congressional Fellow, American Psychiatric Association, January 2009 to November 2009**
- Jeanne Spurlock Congressional Health Policy Fellow in the Office of Congressman Edolphus Towns, Chairman of the Committee on Oversight and Government Reform (NY-10th Congressional District), acting as a liaison between the Congressman, constituents, private and public sector representatives and Congressional staff regarding health policy.
- Advised and briefed the Congressman on proposed legislation, laws and contemporary issues of debate within health policy, including providing the Congressman with talking points for speeches and language regarding health care for presentations and letters to Congressional members and constituents.
- Prepared and delivered remarks on the Congressman's behalf.
- Researched health care issues for the Health Counsel on the Committee of Oversight and Government Reform and interviewed expert and lay witnesses for pre-hearing investigation and information gathering.
- Presented on the Health Care Reform Initiative at a Health Care Town Hall meeting, held in Brooklyn, NY and assisted with its planning.
- Facilitated negotiations to include two of the Congressman's bills in the current House of Representatives Affordable Health Choices Act (H.R. 3200). Duties also included writing and altering bill language before

the presentation of bills to the House of Representatives Clerk's Office for assignment of a bill number, performing district health care site visits on behalf of the Congressional office with the Deputy Chief of Staff and staffing several events for the Congressman.

**PRN Psychiatrist, Washington D.C. Jail, Unity Health Care, Inc., February 2008 to November 2009**
- Provided comprehensive psychiatric assessment and treatment, including medication management, to inmates who have a previous history of mental illness or who are in need of evaluation for possible mental illness.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.

**Core Member, Homeland Security Institute Panel on Community Perception of New Technology, August 2007 to February 200**
- Worked with a multi-specialty panel of experts drawn from a cross section of all relevant professions to provide expert opinion on the potential population impact of new technologies in consideration for use by the U.S. Department of Homeland Security.
- Provided specific expert opinion on the potential medical, psychiatric, and behavioral impacts of the new technologies under consideration for use.
- Provided written feedback upon request.

**Research Intern, American Psychiatric Association, August 2004 to February 2005**
- Assisted with the implementation and preparation of a grant proposal for a psychiatric study examining first episode of antipsychotic use.
- Conducted literature reviews for treatment patterns of Attention Deficit Hyperactivity Disorder and literature reviews to identify strategies that have been effective in bringing about quality improvement in physicians' practices, and reported that information to the Director of the American Psychiatric Institute for Research and Education for presentation to the American Board of Psychiatry and Neurology for the physician practice recertification proposal.

## PUBLICATIONS & ARTICLES:

- Johnson K.  The Road to Health Policy: One Resident's Story.  American Journal of Psychiatry Resident's Online Journal, pg. 4, May 2009.
- Maxwell C.J., Reddy R., White-Coleman D, Taylor G.L., Johnson K.A.  A Comparison of Pre/Post-Menopausal HIV Infected African American Women at a Minority Teaching Hospital. Presented at the 15th International AIDS Conference, Bangkok (Thailand), July 11- 16, 2004.  Printed in the International Proceedings by Medimond, Bologna, Italy; pg. 127-131.  Vol. ISBN 88-7587-065-9.

## MEDIA:
- Arehart-Treichel, J. Nothing Bars This Psychiatrist From Helping Inmates. Psychiatric News, March 2, 2012, Vol 47 (5), pg. 12-29.
- Hausman, K. Resident Finds Rewards Atop Capitol Hill. Psychiatric News, April 2, 2010, Vol 45 (7), pg. 11.

## PRESENTATIONS:

- **"Excellence in Mental Health Advocacy: Case Studies in the Nongovernmental, Federal, and Legislative Arena"** Session, American Psychiatric Association Annual Meeting, May 2019
- **"Depression in Primary Care"** George Washington University School of Medicine and Health Sciences, recurring 3rd year medical student primary care clerkship lecture, March 2019 to present
- **"Substance Related Disorders"** George Washington University School of Medicine and Health Sciences, part of the annual 2nd year medical student Brain and Behavior lecture series, September 2018 to present
- **"Managing Psychiatric Emergencies: A Brief Guide for the Intern"** George Washington University Department of Psychiatry, Annual Lecture, June 2018

- **"Violence Risk: Practice Relevance"** George Washington University Department of Psychiatry, Grand Rounds, January 2018
- **"Risk Factors for Terrorism: A Literature Review"** St. Elizabeths Hospital Forensic Psychiatry Fellowship, Washington, D.C., Presentation, May 2017
- **"The Appropriateness of Psychiatric Diagnosis and Psychotropic Medication Prescribing"** St. Elizabeths Hospital Forensic Psychiatry Fellowship, at the Washington, D.C. Department of Corrections, QI Study Presentation, December 2016
- **"The Appropriateness of Psychotropic Prescribing Practices"** Unity Health Care, Inc., at the Washington, D.C. Department of Corrections, QI Study Presentation, December 2010
- **"Psychiatric Disorders and Treatment Options"** Unity Health Care, Inc. at the Washington, D.C. Department of Corrections, Quarterly Mental Health Correctional Officer's Training, November 2009 to June 2016
- **"Interactions Between ART and Psychiatric Medications"** with Andrew Catanzaro, M.D., Unity Health Care, Inc., Washington, D.C. Department of Corrections Provider Meeting, May 2010
- **"America Can't Afford to Wait for Healthcare Reform"** Health Reform Town Hall, U.S. Representative Ed Towns, May 2009 **"The Man Who Can't Stop Swallowing Sharp Objects: Medical Ethics and Management Limitations in Patients with Chronic Factitious Disorder"** Issue Workshop, American Psychiatric Association Annual Meeting, May 2008
- **"Factitious Disorder: Clinical, Ethical and Legal Management Issues"** Morbidity and Mortality Conference, November 2007
- **"Dying, Death, and Bereavement"** George Washington University Department of Psychiatry, Medical Illness Conference, August 2007
- **"Uncontrollable Swallowing: A Case Conference"** Medical Illness Conference, July 2007
- **"Near Death Experiences: A Closer Look"** George Washington University Department of Psychiatry, Grand Rounds, January 2007

## PROFESSIONAL MEMBERSHIPS:
American Psychiatric Association
American Academy of Psychiatry and the Law
National Commission on Correctional Health Care

## LANGUAGE PROFICIENCY:
Fluent in English.
Beginners level Spanish

# APPENDIX D

## **ACRONYMS AND ABBREVIATIONS**

3CMS:                   Correctional Clinical Case Management System

AC:                     Adjustment Center

ADA:                    Americans with Disabilities Act

ADHD:                   Attention Deficit Hyperactivity Disorder

ADLs:                   Activities of Daily Living

AED:                    Automated External Defibrillator

AHU:                    Alternative Housing Unit

AIMS:                   Abnormal Involuntary Movement Scale

AMBU:                   Artificial Manual Breathing Unit

APP:                    Acute Psychiatric Program

ASH:                    Atascadero State Hospital

ASP:                    Avenal State Prison

ASU:                    Administrative Segregation Unit

ATP:                    Adenosine Triphosphate

BPH:                    Board of Prison Hearing

BVM:                    Bag Valve Mask

CAMS:                   Collaborative Assessment and Management of Suicidality

CAP:                    Corrective Action Plan

CASE:                   California Adaptive Support Evaluation

| | |
|---|---|
| CAT: | Chart Audit Tool |
| CBT: | Cognitive Behavioral Therapy |
| CCAT: | Coordinated Clinical Assessment Team |
| CCC: | California Correctional Center |
| CCHCS: | California Correctional Health Care Services |
| CCI: | California Correctional Institution |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| Centinela: | Centinela State Prison |
| CHCF: | California Health Care Facility |
| CIM: | California Institution for Men |
| CIT: | Crisis Intervention Team |
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CME: | Chief Medical Executive |
| CMF: | California Medical Facility |
| CMH: | Chief of Mental Health |
| CONREP: | Conditional Release Program |
| COVID-19: | Coronavirus Disease 2019 |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |

| | |
|---|---|
| CQIT: | Continuous Quality Improvement Tool |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| C-SSRS: | Columbia-Suicide Severity Rating Scale |
| CT: | computerized tomography |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility |
| CVSP: | Chuckawalla Valley State Prison |
| CYA: | California Youth Authority |
| DAI: | Division of Adult Institutions |
| DBT: | Dialectical Behavior Therapy |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmental Disability Program |
| DEC: | Disability and Effective Communication |
| DNA: | Deoxyribonucleic Acid |
| DNR: | Do Not Resuscitate |

| | |
|---|---|
| DRC: | Death Review Committee |
| DSH: | Department of State Hospitals |
| DSM-5: | Diagnostic and Statistical Manual of Mental Disorders – 5th Edition |
| DVI: | Deuel Vocational Institution |
| ECF: | Electronic Case File |
| EHRS: | Electronic Health Records System |
| ETOH: | Ethyl Alcohol |
| EOP: | Enhanced Outpatient Program |
| FIT: | Focused Improvement Team |
| Folsom: | Folsom State Prison |
| FWF: | Folsom Women's Facility |
| GED: | General Educational Development |
| GP: | General Population |
| HDSP: | High Desert State Prison |
| HIPAA: | Health Insurance Portability and Accountability Act |
| HIV/AIDS: | Human Immunodeficiency Virus/Acquired Immunodeficiency Syndrome |
| HLOC: | Higher Level of Care |
| HQ: | Headquarters |
| HRL: | High Risk List |
| HS: | *Hora Somni*/Hour of Sleep |

ICC:                    Institutional Classification Committee

ICE:                    Immigration and Customs Enforcement

ICF:                    Intermediate Care Facility

IDTT:                   Interdisciplinary Treatment Team

IDST:                   Interdisciplinary Support Team

IEX:                    Indecent Exposure

IP:                     Inmate Patient

IPOC:                   Individualized Plan of Care

IRU:                    Inpatient Review Unit

ISP:                    Ironwood State Prison

ISU:                    Investigative Services Unit

ISUDT:                  Integrated Substance Use Disorder Treatment

KOP:                    Keep On Person

KVSP:                   Kern Valley State Prison

LMS:                    Learning Management System

LOC:                    Level of Care

LOP:                    Local Operating Procedure

LRH:                    Least Restrictive Housing

LSD:                    lysergic acid diethylamide

LTRH:                   Long-Term Restricted Housing

MAR:                    Medication Administration Record

MCSP:                   Mule Creek State Prison

MDO:                    Mentally Disordered Offender

MHCB:                   Mental Health Crisis Bed

MHHQ:                   Mental Health Headquarters

MHSDS:                  Mental Health Services Delivery System

MHPC:                   Mental Health Primary Clinician

MHTS:                   Mental Health Tracking System

MOU:                    Memorandum of Understanding

NGRI:                   Not Guilty by Reason of Insanity

NKSP:                   North Kern State Prison

NOS:                    Not Otherwise Specified

NPPC:                   Nursing Professional Practice Committee

OC:                     oleoresin capsicum

OHU:                    Outpatient Housing Unit

OIA:                    Office of Internal Affairs

OLA:                    Office of Legal Affairs

OP:                     Operating Procedure

PAD:                    Personal Alarm Device

PBSP:                   Pelican Bay State Prison

| | |
|---|---|
| PBST: | Positive Behavioral Support Team |
| PBSTP: | Positive Behavioral Support Team Plan |
| PC: | California Penal Code |
| PCP: | Primary Care Physician |
| PIA: | Prison Industries Authority |
| PIP: | Psychiatric Inpatient Program |
| PIWP: | Performance Improvement Work Plan |
| POLST: | Physician Orders for Life Sustaining Treatment |
| POR: | Probation Officer Report |
| PPE: | Personal Protective Equipment |
| PPF: | Progressive Programming Facility |
| PREA: | Prison Rape Elimination Act |
| PRN: | *pro re nata* (when necessary) |
| PSH: | Patton State Hospital |
| PSU: | Psychiatric Services Unit |
| PTSD: | Posttraumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| R&R: | Receiving and Release |
| RC: | Reception Center |

RJD:                    Richard J. Donovan Correctional Facility

ROI:                    Release of Information

RVR:                    Rules Violation Report

SCC:                    Sierra Conservation Center

SCR:                    Suicide Case Review

SCRC:                   Suicide Case Review Committee

SCU:                    Supportive Care Unit

SHU:                    Security Housing Unit

SI:                     Suicidal Ideation

SIB:                    Self-Injurious Behavior

SMHP:                   Statewide Mental Health Program

SNY:                    Sensitive Needs Yard

SOMS:                   Strategic Offender Management System

SPI:                    Safety Planning Intervention

SPMW:                   Suicide Prevention Management Workgroup

SPRFIT:                 Suicide Prevention and Response Focused Improvement Team

SQ:                     San Quentin State Prison

SRASHE:                 Suicide Risk Assessment and Self-Harm Evaluation

SRE:                    Suicide Risk Evaluation

SSI:                    Supplemental Security Income

STG:                    Security Threat Group

STRH:             Short-Term Restricted Housing

SVPP:             Salinas Valley Psychiatric Program

SVSP:             Salinas Valley State Prison

TABE:             Test of Adult Basic Education

TBI:              Traumatic Brain Injury

TCMP:             Transitional Case Management Program

TTA:              Triage and Treatment Area

UCC:              Unit Classification Committee

VA:               Department of Veterans Affairs

VSP:              Valley State Prison

WIC:              California Welfare and Institutions Code

WSP:              Wasco State Prison