ROB BONTA, State Bar No. 202668
Attorney General of California
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
LAUREL E. O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE: 925-746-8460
FACSIMILE: 925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

|  |  |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520- KJM-DB |
| Plaintiffs, | **DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT ON HIS EXPERT'S REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, JANUARY 1, 2020-DECEMBER 31, 2020 [ECF No. 7405]** |
| v. | |
| GAVIN NEWSOM, et al. | |
| Defendants. | |
|  | Judge: Hon. Kimberly J. Mueller |

## INTRODUCTION

Defendants submit the following objections to the Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2020 – December 31, 2020 (hereafter the "Special Master's 2020 Suicide Report" or "Report"). ECF No. 7405.

Before addressing the substance of the Special Master's Report, Defendants must note that they are disheartened with the Special Master's comments on the tone and tenor of Defendants' correspondence, especially within the context of a suicide report. *Id.* at 4.[1] Defendants have made good faith efforts to address difficulties in the relationship with the Special Master and his team of experts and monitors in the context of this case. While Defendants disagree with the Special Master's remarks, a point-by-point refutation of his complaints would be both unproductive and inappropriate, especially in the context of a report on suicides.[2]

However, the Special Master's comments reflect a broader and more serious issue, namely, that the working relationship between the Special Master and Defendants has become strained. Defendants remain committed to working with the parties and Special Master to resolve this case, however, continuing that work remains challenging given ongoing difficulties between the Special Master and Defendants, as evidenced by the Special Master's 2020 Suicide Report.

Defendants are hopeful that in the future, the Special Master will not utilize these reports, or others, to broadcast out-of-context criticisms of Defendants and their attorneys from an

---

[1] References to page numbers for documents filed in the Court's Electronic Case Filing (ECF) system are to page numbers assigned by the ECF system.

[2] Notably, during the December 18, 2020 status conference, the Court admonished the parties as follows: "The Court does not anticipate continuing to churn any issues that the parties may want to talk about. This is not a *Coleman* salon. . . . [I]n the future, unless I have invited a brief, I'm not calling for briefing unless it appears in support of a motion. . . . To the extent there is other larding of the docket with legal positions, those are not allowed, and they will be stricken if they still appear." ECF No. 7002 at 6:21-7:15. Although the Court's statement was directed at the parties, it appears that this admonition should apply with equal force to the Special Master whose gratuitous commentary in the underlying Report goes far afield from his responsibilities to simply review and report on Defendants' compliance with court-ordered remediation in the suicide context. *See, e.g.* ECF No. 7405 at 4-5, fn. 4.

---

asymmetric position as an arm of the Court. With that stated, Defendants respectfully request that the Court sustain the following objections to the Special Master's 2020 Suicide Report.

<u>**OBJECTIONS TO THE SPECIAL MASTER'S REPORT**</u>

As Defendants explained in their previous objections to the Special Master's and his expert's suicide reports, the Special Master's expert's report mostly duplicates self-monitoring already conducted by CDCR and CDCR's own comprehensive report on suicides that occurred in 2020. As discussed in more detail below, CDCR's own self-critical, independent review of suicides completed in 2020, published on October 1, 2021, is just one component of a robust suicide prevention system found in no other state correctional system.[3] That review not only includes CDCR's findings but also identifies a range of measures to enhance suicide prevention and response efforts. *See* ECF No. 7405 at 15-16. Duplicative reports by the Special Master— reports that now include inappropriate posturing—do nothing to further the goal of ending this case and provide no additional information or greater transparency than that already included in Defendants' robust suicide reports.

**A.** **The Report is redundant, provides only limited additional information than CDCR's own Suicide Report, and largely confirms the findings and conclusions in CDCR's annual report.**

Defendants object to the Special Master's 2020 Suicide Report in its entirety on the ground that it is duplicative of the comprehensive self-monitoring already conducted by CDCR. *See* ECF No. 7405 at 15-16 (CDCR's objection to Special Master's draft 2020 Suicide Report because it duplicates self-monitoring already conducted by CDCR). The primary difference between the Special Master's expert's Report and CDCR's own report is that the former includes a needlessly controversial and outmoded foreseeability/preventability analysis, and the latter does not. *See* § B, *infra* (highlighting issues with the foreseeability/preventability analysis). Otherwise, CDCR and the Special Master's expert are crafting very similar reports.

---

[3] On October 1, 2021, CDCR published its 2020 Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation ("2020 Suicide Report") on its public website at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/CDCR-2020-SB-960.pdf. A courtesy copy is attached to this filing as **Exhibit 1**.

DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON 2020 SUICIDES

18153005.3

CDCR published its 2020 suicide statistics in its 2020 Suicide Report, reflecting CDCR's commitment to advancing its robust self-monitoring efforts and to transparency by allowing mental health clinicians, nurses, and custody staff who work directly with the patient population to have access to this valuable information. *See* CDCR's 2020 Suicide Report available at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/CDCR-2020-SB-960.pdf (last accessed on 12/28/2021). CDCR's own suicide report demonstrates that CDCR honestly and critically assessed every suicide that occurred in 2020, including assessing policy violations and implementing corrective actions to prevent future violations. *Compare id. with* ECF No. 7405-1 at 1-35. As a direct result of Defendants' reports, including CDCR's comprehensive annual suicide prevention report to the Legislature pursuant to California Penal Code section 2064.1, Defendants will be better able to prevent and reduce the number of completed suicides within its institutions.

Furthermore, and as Defendants noted in their previous objections to the Special Master's suicide reports, Defendants are unaware of any other prison system in the country that reviews each suicide as thoroughly and rigorously as CDCR, and then seeks to incorporate lessons from each suicide into its practice.[4] ECF Nos. 7248 at 3; 7052 at 3; 7098 at 2; 7182 at 3. This demonstrates CDCR's commitment to best practices, critical self-analysis, and improvement. This Court should encourage the Special Master to take steps that support and enhance these self-monitoring efforts, not pursue his own parallel (and redundant) track.

As such, Defendants request that the Court sustain Defendants' objection so that the Special Master can refocus his time and energy from matters that are already the subject of multiple monitoring reports by CDCR to issues that require additional work to fully achieve a sustainable remedy. *See* ECF No. 6996 (order acknowledging a variety of interim steps that still need to be monitored and completed to attain a full and durable remedy).

/ / /

---

[4] Notably, CDCR prepares a comprehensive suicide report for every suicide as required by the Program Guide. *See* ECF No. 5864-1 at 190-91 (Program Guide's "Suicide Death Review" requirement). Further, draft reports are provided to the Special Master for his and his expert's review, and final reports are provided to both the Special Master and Plaintiffs' counsel. *See* ECF No. 7248-1 at 2. The Court should remand suicide reporting responsibilities back to Defendants.

**B.** **Objections related to problematic foreseeability/preventability determinations.**

1.    The Report, as with prior reports, includes overly simplistic determinations of "foreseeability" and "preventability" that are counterproductive in a mortality review context and hinder quality improvement.

The Report continues to include an overly simplistic analysis of foreseeability and preventability even though a chorus of experts question the utility of these determinations in a mortality review context.[5] That chorus includes not only Dr. Williams and her team at UCSF, but also experts at other community integrated health care systems that conduct mortality review of related systems at San Francisco General Hospital, Kaiser of Northern California, Mayo Clinic, and the VA.[6] Thus, the Special Master misses the mark when he criticizes Defendants for citing "a single report" in order to retort that "one report does not a chorus make." ECF No. 7405 at 7. It also suggests that despite Defendants' repeated objections to the Special Master's continued use of counterproductive "foreseeability" and "preventability" determinations wherein they have cited to the Williams report (*see, e.g.*, ECF No. 7248 at 4-7), the Special Master's team has not considered the actual merits of Defendants' objections based on the scientific findings of Dr. Williams and others.

Furthermore, the Special Master's insistence on including these counterproductive determinations in suicide reports (ECF No. 7405-1 at 31-33) not only often results in arbitrary, methodologically unreliable labels, but also fails to acknowledge the discussion that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[7] Instead, Defendants' use of the phrase "complex system" was misinterpreted as a personal attack, rather than as it was intended, in

---

[5] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, 3-4. https://cchcs.ca.gov/wp-content/uploads/sites/60/UCSF/Mortality-Review-Report.pdf (last accessed on 12/28/2021) (hereafter "Williams"). While the specific term "foreseeability" is not addressed in Dr. Williams's Final Report, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement.

[6] Williams, *supra* note 5 at 1.

[7] *Id.* at 4.

reference to its use in the Williams report. *See* ECF No. 7405 at 7.[8] But because the Special Master continues to disregard the Williams report, and instead insists on including these counterproductive terms in his reports purely for the sake of consistency with outdated phrasing, the Special Master's standards continue to fall "irresponsibly" behind modern advances in clinical determination. *See* ECF No. 7405 at 7 (Special Master's report stating that Defendants' suggestion that he or his expert do not appreciate that deaths by suicide "occur in a complex system" is "grossly irresponsible").

Moreover, the Special Master says that, in prior orders, this court has concurred with the need to identify the incidence of preventable suicides, and has further endorsed his foreseeability and preventability definitions. ECF No. 7405 at 8. While that may be true, the Court's prior orders never overruled Defendants' objections to the Special Master's expert including an outdated foreseeability/preventability analysis in their suicide reports. Indeed, those orders merely reflect that if the Special Master's suicide report is going to include a foreseeability/preventability analysis, that analysis may use the Court-approved definitions for those terms. *See*, ECF No. 4693 (order affirming the Special Master's definitions of "foreseeable" and "preventable" without mandating that he include a foreseeability/preventability analysis in future suicide reports). Defendants' objection on this specific point has never been overruled. Thus, Defendants' preservation of this issue for the Court to consider in the first instance—*based on contemporary science*—should be neither "intransigen[t]" nor "baffl[ing]" as the Special Master states. ECF No. 7405 at 8.

The latter point is key: contemporary science no longer supports foreseeability and preventability analyses. As Defendants have previously shown, narrow and methodologically problematic foreseeability and preventability determinations frequently divert attention away from opportunities for improvement that will lead to system-wide quality improvement *and patient safety*. Under the modern view, a well-performing mortality review system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical

---

[8] *Id.* at 2, 4.

DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON 2020 SUICIDES

education responses (immediate change) or initiatives (longer term) that are then evaluated to determine whether they yielded improvements along relevant clinical benchmarks."[9] This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death.[10] Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like "foreseeable" and "preventable" and towards assessments that focus on opportunities for improvement.[11]

As such, Defendants object to the entirety of Section III, subsection I, "Foreseeability and Preventability" of the Special Master's expert's report.[12] *See* ECF No. 7405-1 at 31-33; *see also,* ECF No. 7405 at 15-16, 22-23 (CDCR's response to Special Master's draft 2020 Suicide Report reflecting CDCR's objection to the entirety of the Special Master's expert's foreseeability/preventability analysis).

    2.    The Report's foreseeable and preventable analyses are speculative, subjective, outmoded, and lack any causal relation between the mental health care provided and suicide.

The Special Master's expert's determinations of foreseeable and preventable analyses are scattered throughout Appendix A of the 2020 Report. ECF No. 7405-2. The determinations are highly subjective, speculative, and some analyses lack a nexus between the intervention that should have been taken and the suicide. The expert's analyses often rely on little more than speculation, further undermining the utility of the foreseeable and preventable analyses. In fact, in some cases, the expert even qualifies the already muddy definitions by opining that the cases were "likely" foreseeable (*see* ECF No. 7405-2 at 38 (Case H, Determination of Foreseeability"), and

---

[9] *Id.* at 5.

[10] *Id.* at 4.

[11] *Id.*

[12] To be clear, this objection is aimed at the entirety of the foreseeability/preventability *analysis* and not merely at how those terms are specifically defined.

*id.* at 47 (Case J, Determination of Foreseeability)), or "*may* have been prevented" (*see id.* at 38 (Case H, Determination of Preventability, emphasis added).

For instance, the Special Master's expert speculates that Case A's death by suicide was preventable "as there were multiple intervention opportunities that *may* have prevented this individual's suicide." *Id.* at 5, emphasis added. In Case B, the expert speculates the death by suicide was preventable because "it was unclear if prior records had been reviewed sufficiently prior to the evaluation to identify the individual's pattern of physical complaints and deteriorating mental status. *Had* additional data been reviewed[] the individual *may* have been referred for inclusion in the [Mental Health Services Delivery System (MHSDS)], assessed via suicide risk assessment, or referred to the MHCB." *Id.* at 11, emphasis added. In Case C the death by suicide "*may*" have been prevented had clinicians "accurately assessed for suicide risk," despite Case C's constant "deni[al] of safety concerns." *Id.* at 16, emphasis added. Case Q was speculated to be preventable because the expert found "[p]roblems with risk assessment in the month before his suicide," and that "escalation of behaviors was not taken into consideration in the determination of suicide risk." *Id*. at 80. The expert's speculation in Case Q fails to draw any nexus between the identified problems with Case Q's death by suicide.

Some of the expert's determinations fail to consider the balance of COVID-19 transfer restrictions and safety precaution policies implemented to prevent further introduction, spread, and deaths of the highly communicable virus in CDCR institutions. For instance, the expert determined that Case G's death was preventable had clinicians assessed Case G as meeting the emergency transfer criteria for transfer to the inpatient Level of Care (LOC), and that had Case G met the criteria, "nursing rounds *would have likely* caught the self-harm incident." *Id.* at 32, emphasis added. Nothing in the 2020 Report suggests that Case G would have qualified for the COVID-19 emergency transfer criteria or that clinicians assessed him incorrectly. In Case EE the expert also determined the death by suicide was preventable partially because Case EE "had been referred for an acute inpatient placement but was reduced to an ICF placement after a long delay in transfer due to the COVID-19 pandemic." *Id.* at 155. However, as Defendants explained in their informal objections, no COVID-19 policy reduced patients' referrals from acute to ICF. ECF No.

18153005.3

1   7405 at 24. And both acute and ICF levels of care offer twenty-four hour nursing care. *Id.* It is

2   thus unclear how a clinically supported decision to change Case EE's level of care from acute to

3   ICF is a policy violation, let alone one that caused his death.

4        For these reasons, CDCR informally objected to the Special Master's expert's outmoded

5   foreseeable and preventable determinations in the 2020 Report, and requested that they be

6   stricken, because the analyses are speculative, subjective, and the lack of nexus between an action

7   not taken with the death by suicide. ECF No. 7405 at 23-24. The Special Master disregarded

8   virtually all of Defendants' objections. Accordingly, Defendants reassert their objections here and

9   ask that the Court strike all of the Special Master's expert's outmoded foreseeability and

10  preventability determinations in the 2020 Report.

11  **C.    The Report includes numerical errors reflected in the Special Master's expert's
           summarized findings that should be stricken for lacking foundation and being
12         unsupported by the evidence.**

13       The Special Master's expert's hastily summarized finding states as follows: "In seven

14  cases, or 22.6 percent, concerns related to COVID-19 appeared to have likely contributed to the

15  individuals' decisions to die by suicide *according to* [*CDCR's Individual Suicide Case Reviews*

16  (SCRs)]. ECF No. 7405-1 at 4, emphasis added. As Defendants explained in their informal

17  objections, the Statewide Mental Health Program (SMHP) only identified six cases where

18  COVID-19 factors were identified as significant. ECF No. 7405 at 17. The six SCRs also

19  discussed that those COVID-19 factors were not always directly correlated to the suicide. *Id.*

20  Additionally, the author of one of the six cases (Case I) speculated that COVID-19 was a factor

21  but there was insufficient evidence to support the theory. *Id.* For these reasons, Defendants

22  requested in their informal objections that the Report be modified to reflect only five cases had

23  COVID-19 concerns. *Id.*. The Special Master disregarded this objection. Accordingly, Defendants

24  reassert their objection here and ask that the Court strike the Special Master's expert's summarized

25  finding in the 2020 Report because it lacks foundation and is unsupported by the evidence.

26  **D.    The Report includes inappropriate assumptions regarding inmates housed
           specifically to address personal safety concerns that should be stricken for lacking
27         foundation.**

28       In the "Housing Based on Safety Needs" section of the Report, the Special Master's expert

states that in addition to twelve inmates who were living on a Special Needs Yard (SNY) or were in segregation for safety concerns, three other EOP patients "requested SNY status but were placed at Non-Designated Programming Facilities (NDPF) in lieu of SNY placement." ECF No. 7405-1 at 18. The expert goes on to opine that, by adding these three patients to the other twelve, "48.4 percent . . . were residing in housing locations to address their safety concerns at the time of their suicide." *Id.* Defendants informally objected by noting that SNY placement does not necessarily mean that the inmate had "safety concerns at the time of their suicide," and that before making such a claim, the Special Master's expert should verify that the SNY decedents had active safety concerns at the time of their death. ECF No. 7405 at 18. Otherwise, the statement would be misleading. *Id.* The Special Master disregarded this objection. Accordingly, Defendants reassert their objection here and ask that the Court strike the Special Master's expert's opinion that 48.8 percent of those who died by suicide in 2020, were residing in housing locations to address their safety concerns" because it lacks foundation.

E.     **The Report includes findings related to interfacility transfers that should be stricken because they have no probative value.**

In the "Interfacility Transfers" section of the Report, the Special Master's expert found that decedents transferred an average of 1.8 times per year in 2020, 1.4 times per year in 2019 and 2018, 1.5 times per year in 2017, and 2.2 times per year in 2016. ECF No. 7405-1 at 20. However, as Defendants explained in their informal objections, there is no significant difference in the rates of transfers between individuals who died by suicide and CDCR's population as a whole. ECF No. 7405 at 18. Thus, Defendants informally objected, noting that the findings lack meaning and should therefore be stricken. *Id.* Alternatively, Defendants requested that the Special Master caveat this section by including a statement that these rates are no different from CDCR's population as a whole. *Id.* at 19. The Special Master disregarded this objection. Accordingly, Defendants reassert their objection here and ask that the Court strike the "Interfacility Transfers" section of the report in its entirety because it has no probative value. *See* Fed. R. Evid. § 403.

/ / /

/ / /

**F.** **The Report includes findings regarding "Trauma History" that should be stricken because they are vague and ambiguous, lack foundation, are irrelevant, and because whatever probative value they have is significantly outweighed by their danger to mislead the Court.**

In the "Trauma History" section of the Report, the Special Master's expert found that "23 individuals, or 74.2 percent of the 31 individuals who died by suicide in 2020, had histories positive for trauma." ECF No. 7405-1 at 23. Defendants informally objected to this section of the report for several reasons (explained below) that were not addressed by the Special Master. ECF No. 7405 at 19.

First, "trauma" is not defined in the report and is therefore vague and ambiguous. Second, the 2020 Report lacks comparable data between those who died by suicide and CDCR's total population. "Trauma is almost ubiquitous among a male prison population, with rates of exposure to violence or traumatic events being reported as anywhere between about 62% to 100%."[13] In order for data on rates of trauma in suicide victims to be meaningful to the Court, the Special Master should provide data comparing the suicide population to that of CDCR's total population. Otherwise, whatever standalone probative value this information has is significantly outweighed by the danger to mislead the Court. *See* Fed. R. Evid. § 403.

Lastly, the Special Master's expert draws a tenuous nexus between individuals with a trauma history and individuals "who were housed in locations for their safety." ECF No. 7405-1 at 24. The expert attempts to link trauma and safety concerns because the percentages of those who died by suicide are similar. *Id.* However, as Defendants explained in their informal objections, both populations involve complex combinations of psychological, social, environmental, and physical factors alone. ECF No. 7405 at 19. Similar percentages between two separate factors that vary widely, and are both made up of numerous variables, does not automatically result in a correlation. Thus, this finding lacks foundation and has the potential to mislead the Court. On this basis, Defendants request that the Court strike the Special Master's expert's attempt to correlate trauma with safety concerns.

---

[13] Dr. Liji Thomas, Prisoner Post Traumatic Stress (2019), https://www.news-medical.net/health/Prisoner-Post-Traumatic-Stress.aspx, (last accessed December 28, 2021).

18153005.3

Overall, Defendants object to the "Trauma History" section in the Report and any findings or conclusions pertaining to the section as lacking foundation, irrelevant, and misleading. *See id.* at 19 (informally objecting on this ground). The Court should strike the section in its entirety.

**G.     The Report includes unclear and subjective criteria that requires clarification.**

As Defendants explained in their informal objections, the expert's determinations made in the "Suicide Risk Evaluations," (ECF No. 7405-1 at 24-25), "Mental Health Assessments" (*id.* at 25), and "Higher Level of Care Needs" (*id.* at 26-27) sections of the report are subjective and the criteria the expert uses to make these determinations is unknown. ECF No. 7405 at 19-20.

In the "Suicide Risk Evaluation" section, the Special Master's expert identified 20 cases when a clinician failed to identify or document known risk factors during a suicide risk evaluation, and 18 cases when the suicide risk level determination was inaccurate. ECF No. 7405-1 at 24-25. As Defendants explained in their informal objections, this is contrary to the SMHP's finding of seven cases that identified issues pertaining to suicide risk evaluations, and 11 cases pertaining to inaccurate suicide risk level determinations. ECF No. 7405 at 20. In the "Mental Health Assessment" (MHA) section, the expert found three cases with concerns related to the completion of the MHA process, whereas the SMHP found only one case. *Compare* ECF No. 7405-1 at 25, *with* ECF No. 7405 at 20. In the "Higher Level of Care Needs" section, the expert found deficiencies in 15 cases, whereas the SMHP identified only eight cases with deficiencies. *Compare* ECF No. 7405-1 at 26-27, *with* ECF No. 7405 at 20.

The SMHP makes determinations based on the requirements outlined in the Program Guide, CDCR's statewide policies, and SCR procedures. ECF No. 7405 at 20. But the Special Master's expert does not identify the criteria used in making determinations throughout the Report and her determinations do not seem to be rooted in CDCR's policies and procedures, but rather the expert's own clinical opinion. Given that CDCR's Program Guide has been found to be the remedy in this action to cure alleged constitutional deficiencies, the expert must use those policies in reviewing the care received by patients who died by suicide.

Annual suicide reports should be based on objective findings through document review and interviews with percipient witnesses, rather than on subjective clinical opinion based solely on

a document review by the Special Master's expert. The Special Master's experts who attend each individual SCR also had the opportunity to point out additional deficiencies in patient care, but did not.[14] Defendants therefore object to the determinations, findings, conclusions, and recommendations related to the aforementioned sections of the 2020 Report, and request the relevant sections to be stricken from the report, or in the alternative, for the Special Master to amend the Report to provide the criteria used in making those determinations.

**H.      The Report includes puzzling critiques of CDCR's SCRs despite the Office of the Special Master's heavy involvement in the SCR process.**

CDCR's "Individual Suicide Case Reviews" are discussed in Section III(G) of the Report. ECF No. 7405-1 at 29. All thirty-one cases were determined to be adequate (*id.*), although some (Cases Q and R) were deemed "marginally adequate" (ECF No. 7405-2 at 80, 84). As Defendants explained in their informal objections, the term "marginally adequate" is vague, ambiguous, and contrary to the expert's own finding that all SCR reports are adequate. ECF No. 7405 at 20-21. Defendants request the Court order the Special Master to clarify this discrepancy in his expert's report.

Appendix A to the 2020 Report includes case reviews of each suicide. ECF No. 7405-2. The case reviews also include critiques of CDCR's individual suicide case reports. These critiques were raised for the first time in the 2020 Report, despite the fact that, since 2015, members of the Special Master's team have attended nearly every SCR conference and are provided draft reports in advance of each case conference. *See* ECF No. 7248-1 at 2. Those experts have the ability to provide edits and feedback to the document, and participate during the teleconference. *Id.* Yet the

---

[14] In response to Defendants' informal objections, the Special Master opined that "the fact that the Special Master's experts provide preliminary feedback during SCRC meetings in no way estops the Special Master or his expert from providing additional comments, feedback, and criticism in a formal report to the *Coleman* court upon a more extensive, exhaustive review of an individual case." ECF No. 7405 at 11. This response only partially responds to Defendants' informal objection and avoids entirely Defendants' point that "[a]nnual suicide reports should be based on objective findings through document review and interviews with percipient witnesses, rather than on subjective clinical opinion based solely on an independent document review by the Special Master's expert." ECF No. 7405 at 20.

2020 Suicide Report, written by some of the Special Master's experts who attended most of the 2020 SCR conferences, criticizes aspects of that same SCR process for the first time. Appendix A to the 2020 Report identifies opportunities for improvement with several suicide reports. ECF No. 7405-2. CDCR continues to object to this inconsistent and costly monitoring that deems SCRs adequate on the one hand, but then critiques those same SCRs as needing improvement[15]:

| Case H, ECF No. 7405-2 at 39. | • Case H was an inmate who had not been in the Mental Health Services Delivery System (MHSDS) for over two years at the time of his death. As explained informally, Appendix A misstates policy by stating "there was no [Interdisciplinary Treatment Team (IDTT)] consultation to review MHSDS inclusion criteria," after an assessing clinician determined Case H did not meet the criteria for inclusion in the MHSDS. ECF No. 7405 at 27. CDCR's policy does not require consultation with an IDTT if an assessing clinician determined an individual did not meet the criteria for inclusion into the MHSDS. *Id.*<br>• The expert noted that there was an opportunity for improvement by issuing a QIP at the staff member involved in removing the individual's ligature. However, a QIP was developed in order to investigate the matter. *Id.* |
|---|---|
| Case I, ECF No. 7405-2 at 42-43. | • The expert critiques the SCR for failing to issue a QIP in response to responding staff's further delay in providing life-saving measures because of "the time taken to secure the individual in restraints." A QIP was not issued because it is policy to apply restraints when responding to an emergency for an inmate on MAX custody, such as Case I, a necessary step to ensure staff safety. ECF No. 7405 at 27. |
| Case K, ECF No. 7405-2 at 54 | • The expert noted an opportunity for improvement because "the Special Master's expert found that suicide prevention safety plans were not reviewed." However, as Defendants explained in their informal objections, the SCR recommended appropriate QIPs to address problems regarding Case K's care. ECF No. 7405 at 27. The author of the SCR noted safety planning was included as part of treatment planning throughout Case K's inpatient placement, and found that the last Suicide Risk Assessment and Self Harm Evaluation (SRASHE) included an adequate Safety Plan Intervention (SPI). *Id.* |
| Case Q, ECF No. 7405-2 at 80-81 | • The expert opined the report was deficient because it lacked a "discussion and critical analysis of mental health history." However, as Defendants explained in their informal objections, the report discussed Case Q's mental health history starting at age 12. ECF No. 7405 at 27. And the reviewer provided a summary which detailed Case Q's symptoms, functioning, and treatment planning on a monthly basis. *Id.*<br>• The expert noted a lack of discussion regarding the appropriateness of Case Q's placement in the Correctional Clinical Case Management System (CCCMS). The report discussed inclusion in the CCCMS as QIP number two. *Id.*<br>• The expert noted a lack of discussion regarding "the lack of additional |

[15] The Special Master states that his expert "clarified some of the case summaries attached to the Report in response to defendants' concerns" and cites to pages 40, 50, and 143 as the places where revisions have been made. ECF No. 7405 at 12. Defendants reviewed those pages and were unable to identify any clarifications.

Case No. 2:90-CV-00520- KJM-DB

DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON 2020 SUICIDES

18153005.3

| | | interventions (e.g. increased contact, Dialectical Behavior Therapy Skills [DBT])." The lack of additional interventions is not within the scope of the SCR. *Id.* It is not the SCR reviewer's position to determine what treatment should have been provided unless the lack of treatment was a violation of policy. *Id.* DBT would have been inappropriate considering Case Q's setting. *Id.* at 27-28. |
|---|---|---|
| | | • The expert stated there was a lack of discussion regarding "the impact of prolonged segregation, group treatment and out-of-cell program participation." The SCR report discussed how treatment materials were provided and documented Case Q's refusals to participate due to his guardedness, pending court case, and problems with other inmates. *Id.* at 28. The SCR reviewers avoid speculating on further "impacts" of a factor if there is no evidence to support a finding. *Id.* |
| | | • The expert subjectively determined there was minimal discussion regarding "non-referral documentation," lack of critical assessment of the rationale, and failure to identify treatment modifications. The SCR reviewer did review SRASHES, SPI, Treatment Plans, Consultation Notes, and Progress Notes in depth, and a QIP was issued for incomplete SRASHEs. *Id.* |
| | | • The expert notes that the SCR "failed to discuss intervention specific to restricted housing, such as the morning check-in meeting, Custody and Mental Health Partnership Plan [(CMHPP)], and psychiatric technician notes." Suicide Case Reviews are not program monitoring reports. *Id.* They do not report on the overall operation of mental health programs where an inmate is housed. *Id.* Defendants informally objected to the similar comments made throughout the Case Summaries, and reassert those objections here. *Id.* |
| | | • The expert notes the SCR did not speculate the possible reasons why Case Q had recanted suicide ideations. Such speculation is not within the purview of the SCR because the reports are based on objective findings. *Id.* |
| | | • The expert states the SCR did not adequately address "the high numbers of transfers" Case Q experienced in three years. There is no correlation between the number of transfers an individual experiences with higher risk for an individual to die by suicide. *Id.* Nor is there a policy on the adequate number of transfers a patient should experience, especially one that has had "11 MHCB placements" and "24 level of care changes." *Id.* |
| | | • The expert critiqued the SCR because it "did not discuss the impact of terms such as 'impression management' and 'malingering.'" The expert's statement is false as the first QIP addresses this area of concern. *Id.* |
| Case R, ECF No. 7405-2 at 84-85 | | • The expert notes that the SCR for Case R was "marginally adequate" because it failed to consider the "prolonged isolation due to COVID-19 and STRH placement." However, there was no evidence that isolation played a significant role affecting Case R's mental health. ECF No. 7405 at 28. Case R presented as stable and often denied mental health concerns and symptoms. *Id.* The SCR report is based on evidence found in the documentation and interviews with percipient witnesses. *Id.* A QIP was issued to address the lack of treatment in STRH. *Id.* |
| | | • The expert criticized the SCR for failing to issue a QIP because the psychiatrist believed Case R's anxiety stemmed from a disturbed thought process. Case R was prescribed medication to address his anxiety after his initial psychiatry assessment on November 19, 2020. |

18153005.3

| | | |
|---|---|---|
| | | *Id.* Meanwhile the Primary Clinician believed the anxiety was secondary to a language barrier and dislike of crowds. *Id.* at 28-29. It is unclear what type of QIP is appropriate for these differences in professional opinion. |
| | | • The expert states a QIP should have been issued to address the untimeliness of Case R's initial evaluation and assessment. The delay was due to COVID-19 quarantine measures in effect in Case R's housing unit. *Id.* at 29. The reason for the delay does not necessitate the need for a QIP. *Id.* Furthermore, CDCR stymied any negative impact from the delay by conducting a check-in prior to the initial evaluation. *Id.* |
| | | • The expert states that a review of the health record did not substantiate the SCR report's statement that attributed non-confidential appointments and poor group attendance to the inmate's fear of COVID-19. However, multiple progress notes throughout October 2020 documented Case R's refusal to leave his cell to "avoid contracting the COVID-19 virus." *Id.* |
| | | • The expert criticized the report for failing "to discuss interventions meant to mitigate risk in restricted housing, such as the morning check-in meeting, [CMHPP] huddles, and psychiatric technician contacts." Suicide Case Reviews are not program monitoring reports. *Id.* They do not report on the overall operation of mental health programs where an inmate is housed. *Id.* |
| | Case Y, ECF No. 7405-2 at 127. | • In response to concerns that the Primary Clinician noted "passive" thoughts of suicide, the expert opined that the SCR report should have included "a QIP to involve training for staff on ambivalence surrounding suicide and the fact that suicidal ideation, even when fleeting, 'passive,' or intermittent, still indicates that the individual is thinking about suicide." The expert also notes this is "another opportunity for staff training on the assessment of suicide risk" due to "the lack of understanding of the link between anxiety, restlessness, agitation, and suicide." However, Case Y's constant reports of suicidal ideation formed the basis for his treatment and that fact is reflected in the SCR. ECF No. 7405 at 29. Case Y's constant reporting of suicidal ideation was the basis for forming treatment goals to target Case Y's anxiety symptoms, and the treatment team's decision to retain Case Y at the EOP LOC. *Id.* Additionally, QIPs were issued in response to inadequate SRASHES and Master Treatment Plans. *Id.* Any additional QIPs were unnecessary. *Id.* |
| | Case C, ECF No. 7405-2 at 12, 16. | • The Special Master's expert notes that the "SCR did not address whether custody welfare rounds were implemented as a result of the modified program." As Defendants noted in their informal objections, custody welfare checks are not automatically implemented when a unit undergoes modified program. ECF No. 7405 at 29. |
| | | • The expert critiqued the SCR report for failing to address the impact of restricted programming. However, the SCR report documented that the modified program actually improved Case C's stress resulting from his safety concerns. *Id.* |
| | | • The expert noted "historical information commonly included in other SCRs was not included in [Case C's] report." The expert did not |

Case No. 2:90-CV-00520- KJM-DB
DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON 2020 SUICIDES

| | | |
|---|---|---|
| | | elaborate on what specific contents were excluded. *Id.* at 30. The SCR comprehensively covered all known background factors provided in the review materials and reported on the information available. *Id.* |
| Case E, ECF No. 7405-2 at 23-24. | • | The expert criticized the SCR report for lacking consideration regarding Case E's specific cultural perspectives. Case E was a unique case due to his rapid deterioration and the lack of time Case E's treatment team would have to consider cultural factors as part of a treatment plan, especially due to Case E's lack of cooperation with his treatment team. ECF No. 7405 at 30. The reviewer determined that Case E's suicide was attributed to a combination of peer conflicts, rapid onset of mental health symptoms, a pending criminal charge and Security Housing Unit term, and withdrawal from substances. *Id.* Case E's treatment team did not have the opportunity to better understand Case E's cultural perspective, thus the SCR determined a QIP was not needed. *Id.* |
| Case J, ECF No. 7405-2 at 48. | • | Case J was discharged from the MHSDS in March 2020, approximately two months prior to his death by suicide. ECF No. 7405 at 30. The "expert noted that recent treatment plans were not reviewed to ensure IDTTs targeted the individual's suicide risk factors, suicidal thoughts, safety concerns, and noncompliance with medication and treatment." Case J's prior treatment plans were discussed and the SMHP determined Case J's former treatment team had adequately diagnosed and treated Case J. *Id.* Because Case J was not in the MHSDS, there were no "recent treatment plans" to review. *Id.* |
| Case V, ECF No. 7405-2 at 100. | • | The expert critiqued the SCR for failing to review Case V's "[Mental Health Crisis Bed (MHCB)] admissions, including dates, circumstance, and length of stay, as part of the SCR." The SCR did note Case V's 2004 MHCB admission but this MHCB admission occurred over fifteen years before Case V's death. ECF No. 7405 at 30. No in depth analysis was appropriate. *Id.* |
| Case Z, ECF No. 7405-2 at 135. | • | The expert criticized the SCR for not including further consideration and review regarding Case Z's head injury. Specifically the expert reports "the medical death review noted that the head injury 'was not a nexus to the death,'" and that "this head injury was 'outside the reviewable timeframes' related to the suicide." The expert's criticism is unclear. ECF No. 7405 at 30. The SCR followed proper procedure by relying on the death review which confirmed the head injury was not a nexus to the death by suicide. *Id.* at 31. |
| | • | The expert expresses confusion that the SCR states that no autopsy was available. The SCR was completed on May 5, 2020. *Id.* But the April 2020 autopsy was not provided to CDCR until November 2020 and thus could not be considered in the report. *Id.* SCRs must be completed within sixty days of death, per the Program Guide. Autopsy reports are not usually available within that timeframe. |

Case No. 2:90-CV-00520- KJM-DB

DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON 2020 SUICIDES

18153005.3

In sum, and as noted in Defendants' informal objections, the expert's criticisms of CDCR's SCRs are inconsistent with the monitoring conducted by the Special Master's experts who attend the SCR conference. *See* ECF No. 7405 at 20-21, 27-29. Accordingly, Defendants request that the Court sustain Defendants' objections and order the Special Master to amend his report to add the clarifications included in the table, *supra*.

**I.      The Report includes information that is overstated or betrays a fundamental misunderstanding of CDCR's programming.**

1.      "Newly Identified Common Issues" that are not common.

The Special Master's expert reported that there "were common problems identified that had not been common problems in the previous four years." ECF No. 7405-1 at 30. The expert lists twelve "newly identified common issues." *Id.* Defendants informally objected to the term "common problems" or "common issues" as the data shows these problems are not common at all: seven of the twelve "newly identified common issues" occurred in only two cases; three others occurred in only three cases; one occurred in four cases; and, the last occurred in five. ECF No. 7405 at 21. As Defendants explained, while some of these "issues" may not have been identified in cases in prior years, these new issues are hardly common. *Id.* The Special Master disregarded this objection, stating that the Report "accurately identifies [Quality Improvement Plans] deficiencies that have been common in prior years and continued to be identified in 2020, those that improved in 2020, and new issues that warrant monitoring going forward." ECF No. 7405 at 11 n. 15. The Special Master's response avoids Defendants' concerns entirely, opting to keep the misleading terminology. Thus, the Court should sustain the objection because the terminology used is overstated and has the potential to mislead the Court and the public.

2.      Quality Improvement Plans (QIPs) requiring staff training.

The Special Master's expert states that it "was not possible to determine from the responses submitted [to QIPs] was whether all required staff actually received the training." ECF No. 7405-1 at 30. However, as Defendants explained in their informal objections, the QIPs issued by the SMHP requiring staff training directs the Chief Executive Officer (CEO) or Chief of Mental Health (CMH) to submit records to indicate that all necessary staff have completed the

1   required training. ECF No. 7405 at 21. The proof of practice is a signed memorandum by the CEO

2   or CMH. *Id.* The QIP responses reviewed by the expert included such signed proofs of practice.

3   *Id.* Thus, as the Special Master knows, it is always possible to determine from the responses

4   submitted to QIPs whether all required staff actually received the training.[16]

5          3.      QIPs submitted to the Office of Internal Affairs

6          The Special Master's expert states that "a total of six QIPs[] could not be developed nor

7   implemented secondary to investigation requests being submitted to the Office of Internal Affairs

8   [(OIA)]." ECF No. 7405-1 at 30-31. The Report states, "[a]lthough the [Suicide Prevention and

9   Response Unit (SPRU)] at headquarters tries to periodically follow up with facilities to receive the

10  subsequent [OIA] memorandum regarding completed investigations, to date, these efforts have not

11  been successful, and Wardens have not been submitting the findings to either the SPRU or

12  headquarters [Division of Adult Institutions (DAI)]." *Id.* at 31. As Defendants explained in their

13  informal objections, the expert's finding is confusing. ECF No. 7405 at 22. A referral to OIA is a

14  "developed" QIP. *Id.* It appears that the Special Master's concern is that there is not always proof

15  of practice showing the resolution of the OIA process in the suicide case review QIP folders. The

16  SMHP continues to work with DAI and the institutions to obtain the memoranda that close out the

17  QIP. *Id.* The Special Master disregarded this objection, but because the information regarding this

18  process is readily available to him and his experts, the Court should sustain the objection and order

19  the Special Master to clarify this finding.

20         4.      Safety Planning

21         The Special Master's expert concluded "[f]indings in 2020 revealed an increase over prior

22  years with respect to the percentage of individuals with histories of inpatient placements in the

23

24  ───────────────────────

    [16] In response to Defendants' informal objections, the Special Master stated "Likewise, the Special
25  Master's expert's observation that documentation regarding staff training required in response to a
    QIP did not allow for verification that all staff in fact received the required training stands and is a
26  valid critique." ECF No. 7405 at 11 n. 15. This is conclusory. Defendants objected because when a
    QIP is issued, the staff attends the necessary training, and then the CEO or CMH signs a memo
27  confirming that all required staff attended the training. It is unclear what more CDCR needs to
    provide in order to "allow for verification that all staff *in fact* received the required training."
28  (ECF No. 7405 at 11 n. 15, emphasis added.)

year prior to their deaths, inpatient levels of care in the week prior to death by suicide, and deaths by suicide among those receiving inpatient level of care services." ECF No. 7405-1 at 34. The expert recommended to "review [the] care provided to patients recently discharged from inpatient settings and [to form] improved safety planning for these individuals." *Id.* As Defendants noted in their informal objections, CDCR is already in the process of implementing corrective measures. ECF No. 7405 at 24-25. Specifically, DAI and SMHP have issued two joint memoranda regarding the matter, and the SMHP developed the Suicide Risk Management Program that targets these patients for more treatment upon discharge from an inpatient setting. The Special Master disregarded this objection. The Court should sustain Defendants objection and have the Special Master revise his report to mention that the CDCR is already in the process of implementing corrective measures.

### 5.    QIP Process

The Special Master's expert concluded that "[r]esults from OIA investigations are not provided to the SPRU and DAI [which] impact[s] the development of adequate corrective actions required to reduce suicides within the CDCR." ECF No. 7405-1 at 34. However, as Defendants noted in their informal objections, this does not "impact the development of adequate corrective actions" as the expert opines. ECF No. 7405 at 25. The QIP recommending that the hiring authority pursue an OIA investigation is the appropriate corrective action in these circumstances. *Id.* The Special Master disregarded this objection. The Court should sustain Defendants' objection and have the Special Master revise his report to reflect that the QIP recommending the hiring authority pursue an OIA investigation is the appropriate corrective action in these circumstances.

### **CONCLUSION**

The Special Master's suicide report is largely duplicative of CDCR's own suicide report and now includes unnecessary commentary and complaints against Defendants and their attorneys. Defendants' Suicide Reports demonstrate that CDCR honestly and critically assessed every suicide that occurred in 2020 and show that CDCR has a sustainable process in place for assessing policy violations and implementing corrective action. The Court should sustain Defendants' objections.

## <u>CERTIFICATION</u>

In preparing these objections, Defendants counsel reviewed the following Court orders relevant to the issues in this filing, ECF Nos.: 1536, 4394, 4539, 4693, and 6996.

DATED:  January 3, 2022                    HANSON BRIDGETT LLP


By:      *s/ Samantha D. Wolff*
_____
PAUL B. MELLO
SAMANTHA D. WOLFF
LAUREL E. O'CONNOR
DAVID C. CASARRUBIAS
Attorneys for Defendants


DATED:  January 3, 2022                    Respectfully Submitted,

ROB BONTA
Attorney General of California
Damon McClain
Supervising Deputy Attorney General

By:      *s/ Elise Owens Thorn*
_____
ELISE OWENS THORN
Deputy Attorney General
Attorneys for Defendants