# Exhibit 1



# Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation

**Conducted per Penal Code 2064.1**
**October 1, 2021**

## PREFACE

Each suicide in prison is a devastating tragedy that takes a profound toll on family and friends separated from their loved ones by distance and incarceration. Each suicide also significantly impacts staff and other inmates within the California Department of Corrections and Rehabilitation (CDCR).

This report, submitted pursuant to Penal Code Section 2064.1, provides information about suicide prevention initiatives and progress made during the calendar year 2020. Previously, this report was published as two separate publications: (1) The Annual Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation published annually on October 1 to satisfy the requirements of Penal Code 2064.1 and (2) The Annual Report of Suicides in the California Department of Corrections and Rehabilitation, published annually. Starting this year and moving forward, both of those reports are integrated and published in one single annual report. This report will consist of an Executive Summary of CDCR's mental health efforts and successes over the prior calendar year and a section that provides a more in-depth look at notable key trends emerging from the suicide-related deaths that occurred that same year.

## EXECUTIVE SUMMARY

In 2020, 136,304 individuals spent at least one night confined in the state prison system. Out of that population, 31 individuals died by suicide. This was a decrease from the previous year and the first time in almost a decade where there were no female suicides. Twenty one of the 31 suicide decedents were participants in mental health programs and 18 of these decedents has a previous suicide attempt in the community and/or CDCR. There were no differences in race/ethnicity from previous years however, the age group with the most suicides was 25-34 in 2020 as opposed to 35-44 in the previous year. Suicides clustered more frequently at institutions with higher security levels (Level III or Level IV) than institutions with lower security levels (Level I or Level II), consistent with previous years. Additionally, the vast majority of self-harm incidents were non- suicidal, consistent with prior years.

Each and every suicide within the Department is one too many and must be carefully examined for lessons and insights on how to prevent similar tragedies in the future. For over thirty years, the Department has dedicated tens of millions of dollars to developing a robust suicide prevention program employing nationally established best practices and a comprehensive system of quality mental health care for patients with which few other state correctional systems, if any, can compare. CDCR provides *all* CDCR staff members suicide prevention training every year, ensures all potential first responders to suicides in progress are trained in emergency procedures and life-saving skills such as cardiopulmonary resuscitation and basic life support, extensively trains the Department's talented and dedicated mental health clinicians in suicide risk assessment and risk management, has systems in place for identifying individuals at risk of suicide and referring them to proper care, provides special care for individuals who are placed in higher-risk administrative segregation settings, and regularly offers individuals suicide prevention information through videos, pamphlets, and institutional suicide prevention events.

The Department has a comprehensive system of suicide risk evaluations, treatment plans, and suicide prevention programs in place. Since 1995, CDCR has fully funded all of the operations of the *Coleman* Special Master, who was appointed by the federal district court for the Eastern District of California. The Special Master monitors CDCR's mental health care system and reports his findings and recommendations to the *Coleman* court. The *Coleman* Special Master's team, referred to as the Office of Special Master's (OSM), includes dozens of experts, consultants, and attorneys, all of whom are funded by the state. The Special Master and his team also work closely with the numerous *Coleman* plaintiffs' counsel at the Prison Law Office (PLO), and the law firm Rosen, Bien, Galvan and Grunfeld LLP, to develop and implement policies on suicide prevention and response. These activities are also funded by the state, as is the litigation against the state filed by the *Coleman* plaintiffs' counsel. CDCR has further

implemented dozens of recommendations from five separate audit reports by the OSM suicide prevention expert since 2015. Many of the policies and procedures aimed at suicide prevention and response are compiled in the court-ordered Mental Health Services Delivery System (MHSDS) Program Guide (PG).

The COVID-19 pandemic affected all aspects of medical and mental health care in CDCR. Despite changes necessitated by the COVID-19 emergency, the Department's mental health program was able to continue providing services by expanding telepsychiatry and creating temporary mental health housing units for treating those individuals whose transfer to higher levels of care were delayed as a result of COVID-19 movement restrictions. The Department worked closely with the *Coleman* parties and the federal Receiver, who oversees the medical operations of the Department and is appointed under *Plata v. Newsom*, to craft policies and procedures that provided safeguards for patients and staff alike.

Progress in implementing each of the Penal Code requirements is discussed at length in this report. The following is a summary of the findings:

*Suicide Risk Evaluations*: In 2020, Department clinicians conducted more than 5,000 suicide risk evaluations per month on average, totaling over 60,000 suicide risk evaluations over the course of the year. The monthly average includes almost 3,900 evaluations completed in compliance with the PG requirements  plus over 1,100 evaluations completed by clinicians based on perceived clinical need. Seventy-seven percent (77%) of suicide risk evaluations during the year were completed pursuant to policy requirements (e.g., admissions and discharges from inpatient psychiatric settings, required follow-up evaluations, and others), and the remainder were completed based on clinicians' judgment of clinical need.

Each risk evaluation is a complex clinical task that requires department clinicians to make important judgments despite uncertainty. According to the Department's policy, risk evaluations occur whenever an individual expresses suicidal ideation, makes threats, or makes a suicide attempt; at a number of key evaluation points; and during known higher risk times for the patient. To address the ongoing challenge of completing these evaluations at a consistent high quality, the Department has performed system-wide training, has revised the form used by clinicians to document these risk evaluations, and has provided specialized training to clinicians on Safety Planning Intervention.

*Treatment Plans*: The Department is more than 90% successful in completing treatment plans within 72 hours of admission to a Mental Health Crisis Bed (MHCB) unit. It continues its efforts to ensure that the treatment plans meet quality standards set by the Statewide Mental Health Program (SMHP) through improved training and the use of quality improvement tools and audits.

*Training*: The Department conducts a broad range of suicide prevention and response trainings. By the end of 2020 (and despite the restrictions on in-person trainings occasioned by the COVID-19 emergency), 89% of employees had completed their annual training. This average reflects high rates of compliance of custody, health care, and mental health staff.

*Court Recommendations Agreed to and Adopted by the Department*: Compliance with the OSM recommendations is a continuously evolving effort. The OSM's initial suicide audit from 2015 included 32 recommendations, which have been addressed and implemented or which are the subject of current policy development and physical plant improvements. The parties later agreed to remove three recommendations. Each successive re-audit has raised issues or concerns that the Department continues to address, and each resolution builds upon the suicide prevention expert's previous recommendations, which are described more fully in this report. As of December 3, 2020, the *Coleman* court has found the Department to be in compliance with 11 of the remaining recommendations and partial compliance with one more. The Department is currently working with the OSM and the parties to implement the remaining 17 recommendations of the court.

The Department has almost reached total compliance with several of the OSM's recommendations: For example, institutions have demonstrated greater than 90% compliance with the Department's 30-minute welfare check policy in administrative segregation units (ASUs) in 2020.

***Next-of-Kin (NOK) Notification***: During 2020, CDCR and the California Correctional Health Care Services (CCHCS) designed a NOK notification system that was implemented in early 2021.

***Departmental Initiatives***: In addition to initiatives taken in cooperation with the *Coleman* Special Master and plaintiffs' counsel, the Department has undertaken numerous suicide prevention projects. The Department has identified specific points in time when incarcerated individuals are at increased risk, including: arrival at a reception center, the 90 days after discharge from inpatient psychiatric settings, and when facing new charges or civil commitment. The Department is also analyzing serious suicide attempts for ways to improve prevention.

In spite of the COVID-19 pandemic, many of the Department's suicide prevention projects saw progress in 2020. Construction activities for MHCB unit improvements and the addition of more retrofitted cells in ASUs continued. The development and implementation of policies essential to improve the Department's suicide prevention mission also continued, including the high-risk management plan, the suicide prevention policies for the Psychiatric Inpatient Programs (PIPs), the next-of-kin (NOK) notification plan, and the implementation of the Transitional Help Rehabilitation in a Violence-Free Environment (THRIVE) program in the Department's two large reception center institutions. Development of initiatives begun prior to 2020, such as the institutional review of serious suicide attempts, the revision of the safety planning intervention, and the update for local suicide prevention programs, continued during the year. Unlike in previous years, there were no significant recommendations for changes or updates to policies or procedures flowing from the suicide case review process during 2020.

CDCR continues to focus on improving and expanding its suicide prevention practices, including by assessing the effectiveness of its initiatives and monitoring their quality and sustainability. The lessons learned from the suicides that occurred in 2020 are invaluable, and the analysis of these deaths are an essential part of a robust suicide prevention system.

Previous reports in this series proved helpful to the Department and the State of California in identifying areas where progress needs to be made and areas that require more innovative thinking to address the needs of those who are most vulnerable. This report provides an update on the progress the Department has made in those areas in 2020. The Department looks forward to documenting its improvements annually to the Legislature.

## INTRODUCTION

In the United States (U.S.) at large, 1.4 million suicide attempts were reported in 2019.[1] The number of adult suicides in the U.S. increased by more than 50% between 2000 and 2019, from fewer than 30,000 per year to over 45,000 per year, while the overall U.S. population has grown by only 22%. The current rate of suicides in the U.S. is the highest rate in the country since the 1930s, during the Great Depression.[2]

Figure 1 U.S. Adult Suicide Rates by Sex, 2000-2019*



* **Data accessed June 9, 2021, from CDC Web-based Injury Statistics Query and Reporting System (WISQARS), https://www.cdc.gov/injury/wisqars/fatal.html**

Suicide prevention is a societal and complex public health problem that has frustrated the efforts of federal, state, and local agencies alike. In the U.S., suicide has long been more prevalent in jails than in prisons, and there have been significant increases in the number of suicides in jails in recent years. Among those detained in U.S. jails, the rate of suicide increased from 39 per 100,000 in 2005 to 42 per 100,000 in 2010. It reached 52 per 100,000 in 2015 before dropping in 2018 to 46 per 100,000.[3]

The rate of suicide for those incarcerated in all state prisons nationwide ranged from 14 per 100,000 to 26 per 100,000 from 2001 to 2018.[4] The rates of suicide among adult males in the U.S. and those in jails and prisons are shown in Figure 2. Nationwide data for suicides in jails and prisons since 2018 is not yet available.

---

1 National Institutes of Mental Health: https://nimh.nih.gov/health/statistics/suicide, accessed on 6/9/21

2 Drapeau, C. W., & McIntosh, J. L. (for the American Association of Suicidology). (2020). *U.S.A. suicide: 2018 Official final data.* Washington, DC: American Association of Suicidology, dated February 12, 2020, downloaded from http://www.suicidology.org.

3 *Mortality in Local Jails, 2000-2018 – Statistical Tables* (NCJ 256002, Bureau of Justice Statistics, February 2020)

4 *Mortality in State and Federal Prisons, 2000-2018 – Statistical Tables* (NCJ 255970, Bureau of Justice Statistics, February, 2020)

Figure 2. Comparison of Suicide Rates*



**\* Most recent data from Bureau of Justice Statistics, CDCR, and WISQARS.**

　　　In prison systems, suicide deaths have multiple contributing factors that can include longstanding medical and mental health issues, court and sentencing issues, issues involving family, lack of purposeful activity, conditions of the specific prison environment, and the stress of adjusting to incarceration.[5] In 1990, CDCR began tracking the annual suicide frequency and rate. The annual rate of suicide for each year is shown below in Figure 3. The highest rate of suicide occurred in 2019, 30.3 per 100,000, and 38 suicides in total. In 2020, the Department's rate of suicide declined to 27.3 per 100,000, with 31 suicides total.[6]

---

5 https://www.psychiatryadvisor.com/home/topics/suicide-and-self-harm/preventing-suicide-in-prison-inmates/
6 The CDCR suicide rate uses the mid-year June 30 CDCR population.

Figure 3. Rate of Suicide in CDCR, 1990-2020



Over the last thirty years, CDCR has expended significant resources to develop and fully implement policies to improve the Department's suicide prevention program. Federal court oversight of those efforts continues with the Special Master's expert conducting five comprehensive audits of the suicide prevention efforts at individual prisons and reporting his findings to the federal court following each audit. The most recent audit was conducted from November 2018 through December 2019 and reported in September 2020.

CDCR has a comprehensive system in place for suicide risk screening and evaluation, treatment planning, and suicide prevention and remains committed to continuing to work and improve upon what is already in place. The Department has made significant improvements in the development of its Statewide MHSDS. With respect to suicide prevention and response, these improvements include new and enhanced suicide prevention training for all staff, specialized emergency procedures training for all potential first responders to suicide attempts in progress, and training for mental health clinicians on suicide risk assessment and treatment planning. Taking a public health approach to suicide prevention, the Department's prevention programs target both those actively receiving mental health treatment and those who do not. Additionally, the Department provides patients with a range of mental health services and has created a referral procedure for mental health evaluations, including procedures for protecting individuals during particularly vulnerable periods. The Department has implemented suicide screening procedures and provides the prison population with suicide prevention information through videos, pamphlets, and institutional suicide prevention events.

In 2020, 31 inmates died by suicide in the CDCR. This was a decrease from 2019, when there were 38 suicides. During the twenty-years spanning 2001 through 2020, CDCR averaged 31 suicides per year. The rate of suicide in CDCR during 2020 was 27.3 suicide deaths per 100,000 incarcerated individuals. The U.S. Bureau of Justice

Statistics estimates the suicide rate among state prison inmates nationally was 26 per 100,000 in 2018.[7] The rate of suicide among adult males in California has climbed steadily since 2000, reaching a rate of 22.6 per 100,000 in 2019.[8]

***Summary of 2020 Suicides***: Suicides occurred in 16 CDCR institutions in 2020. Twenty-four (77%) suicides occurred among incarcerated persons with violent offense histories. Just over one-third occurred in segregated housing units,[9] and 68% of suicides occurred in high-custody programs (Level III and Level IV). Seventy-one percent of incarcerated individuals who died by suicide in 2020 were sentenced to eleven years or more. Sixty-eight percent of the suicides in 2020 occurred among those participating in mental health treatment, including seven (23%) suicides among Enhanced Outpatient Program (EOP) participants, eleven (35%) in the Correctional Clinical Case Management System (CCCMS) population, and three (10%) individuals receiving inpatient psychiatric care. Nine individuals who died by suicide in 2020 (29%) had been psychiatrically hospitalized during the year prior to their deaths. Eighteen incarcerated persons who died by suicide in 2020 (58%) had made one (32%) or more (26%) suicide attempts during their lives.

***COVID-19 Pandemic***: On January 21, 2020, the first case of COVID-19 was identified in the United States,[10] and the first confirmed COVID-19 death in California occurred just 38 days later, on February 28, 2021.[11] On March 4, 2020,[12] Governor Newsom declared a state emergency and public health measures to prevent and reduce the spread of COVID-19 within CDCR was developed. The contagiousness and lethality of the virus required significant changes to the delivery of mental health services — traditional approaches to services like group treatment needed to be redesigned to meet public health guidelines. In consultation with OSM and with input from the *Coleman* plaintiffs' counsel, changes to the SMHP required the Department to think differently about the delivery of treatment services. This process challenged assumptions about telehealth and telepsychiatry services, the impact of reduced movement, and the importance of continuity of care.

In the spring of 2020, CDCR provided employees with specialized directions for handling mental health services during COVID-19. The memos were drafted by clinical leadership at Headquarters with input from the OSM and were deemed necessary to help reduce exposure to patients as well as mental health staff. These challenges lead to interim changes in practice and/or policy exceptions not otherwise allowed by the PG.

## PROGRESS TOWARD COMPLETING ADEQUATE SUICIDE RISK EVALUATIONS.

It is CDCR's goal to ensure that suicide risk evaluations are completed accurately and timely and are adequate and appropriate. The Suicide Risk Assessment and Self-Harm Evaluation (SRASHE), a set of electronic forms in the Electronic Healthcare Record System (EHRS), is the primary way that suicide risk evaluations are documented for the record. It is composed of 1) a standardized set of questions about suicide-related ideation and behavior – the Columbia-Suicide Severity Rating Scale;[13] 2) a review of the individual's history of self-injury; 3) a checklist of risk and

---

[7] Carson, E.A. (2020). Mortality in State and Federal Prisons, 2001-2018 – Statistical Tables, Report NCJ 256002. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC.

[8] Centers for Disease Control and Prevention, Web-based Inquiry Statistics Query and Reporting System (WISQARS), https://cdc/gov/injury/wisqars.html. Accessed June 7, 2021

[9] These include Administrative Segregation, Security Housing Units, Short-Term Restricted Housing, Long-Term Restricted Housing, Psychiatric Services Unites, and Condemned Housing.

[10] Taylor, D. B. (2021, March 17). A Timeline of the Coronavirus Pandemic. The New York Times. https://www.nytimes.com/article/coronavirus-timeline.html.

[11] Johns Hopkins University & Medicine. (2021, May 2). Coronavirus Resource Center. Johns Hopkins Coronavirus Resource Center. https://coronavirus.jhu.edu/.

[12] California, S. of. (2020, March 5). Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19. California Governor. https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/.

[13] See: https://cssrs.columbia.edu/

protective factors and warning signs; 4) a risk formulation and its justification; and 5) a safety plan,[14] if appropriate. Under the Department's policies, a suicide risk evaluation is conducted whenever any individual expresses suicidal ideation, makes threats, or makes a suicide attempt; at a number of key evaluation points; and during known high-risk times.

***Risk Evaluation Audits Using the Chart Audit Tool****:* The SMHP uses a standardized audit method — the Chart Audit Tool — for evaluating the quality of key mental health documents. Audits are conducted on a quarterly basis, with results available to the mental health leadership at institutions, regional mental health administrators, and headquarters. Each quarter, a sample of risk evaluation forms is audited for quality. Each mental health clinician is audited at least twice per year for risk evaluation form completion and quality, using criteria first proffered by the California State Auditor in its 2017 report.[15] In 2020, after the implementation of new chart audit questions, the pass rate fluctuated between 50% and 74%. Common reasons for a risk evaluation form to fail an audit include poor justification of suicide risk, under-estimation of suicide risk, and non-individualized treatment planning.

***Suicide Risk Assessment Training****:* By the end of 2019, 94% of all mental health clinical staff had received a comprehensive training to address the key factors in completing suicide risk assessments. In 2020, live training was halted due to inability to meet in person attributable to the COVID-19 pandemic. Live training was restarted at some institutions by the end of the year. Despite this, the rate of compliance system-wide remained over 95%.

## PROGRESS TOWARD COMPLETING 72-HOUR TREATMENT PLANS IN A SUFFICIENT MANNER

It is the Department's goal to ensure that a full treatment plan in MHCB units is completed for all patients as required (within 72 hours).[16] Treatment plans establish the goals and interventions patients receive at all levels of need for mental health services. Patients in crisis are transferred to a MHCB unit, where an evaluation and initial treatment plan is developed within 24 hours of admission.[17] The 72-hour treatment plan is discussed in the patient's Interdisciplinary Treatment Team (IDTT) meeting in the MHCB unit, which the patient attends. Treatment teams are composed of, at a minimum, the patient's assigned psychiatrist and primary clinician (typically a psychologist), a member of the MHCB unit nursing staff, and a correctional counselor. The team members are responsible for ensuring that the treatment plan created is within timelines and meets the quality standards set by the Department.

In 2017, the State Auditor's Report cited the completion and quality of the 72-hour treatment plans in MHCB units as a chief concern. The State Auditor noted several incidents where sections of the 72-hour treatment plans were left blank and reported several other deficiencies. Those deficiencies included: inadequate treatment methods, including a lack of information on the frequency of interventions and who was responsible for the intervention; poor post-discharge follow-up plans; poor treatment goals or goals without measurable outcomes; and missing documentation of medication dosage and frequency.

To remedy these deficiencies, the Department undertook the following efforts:

- Training to Improve the Quality of 72-hour Treatment Plans: CDCR expends considerable resources to train for appropriate treatment team processes and treatment planning quality. Quarterly audits are conducted both in person by Regional Mental Health teams and in quarterly chart

---

14 A suicide "safety plan" is a series of individualized and concrete statements that are developed in collaboration with a patient to lower the risk of suicide attempt in the near-term.
15 See: https://www.auditor.ca.gov/pdfs/reports/2016-131.pdf; page 23
16 MHSDS Program Guide page 12-5-12
17 MHSDS Program Guide page 12-5-11

documentation audits. Training[18] designed to improve the quality of 72-hour treatment planning was developed and delivered during 2019 and 2020 in all institutions that have MHCB units. The training emphasizes the importance of the treatment plan to MHCB supervisors and clinicians. The training focuses on the role of the 72-hour treatment planning conference in suicide prevention and crisis resolution and reinforces good treatment team practice and high-quality documentation. The training complements existing treatment team process training.

- Audits of Treatment Plans: MHCB treatment plan audits are required for both 72-hour treatment plans and discharge treatment plans. Results of chart audits are monitored by regional and institutional mental health supervisors and managers. Audits ask whether a summary of mental health symptoms and treatment is present; if the diagnosis and clinical summary are consistent with the problems found; whether medications are listed that target symptoms; if the goals and interventions include individualized, measurable objectives; if progress was discussed among team members and with the patient; if there is a meaningful discussion of a discharge plan or future treatment needs; if the rationale for the level of care is sound; and whether the plan is updated to reflect current functioning. Audits are conducted by clinical supervisors or senior psychologists who oversee the programs. Auditors use findings to provide feedback to staff and develop plans to improve documentation. Audit items can be revised periodically based on departmental priorities or due to changes to treatment planning forms. Revisions to the MHCB treatment team audit are currently in process and under review by the Coleman litigation parties.

- The audit results related to quality of MHCB treatment planning documentation fluctuated during 2020, ranging from 62% to 75% of MHCB treatment plans complying with all audit criteria.[19] In 2020, the audits were as follows: for Quarter 1, there were 273 audits with a 70% pass rate; for Quarter 2, there were 258 audits with a 65% pass rate; for Quarter 3, there were 263 audits with a 62% pass rate; and for Quarter 4, there were 298 audits with a 75% pass rate.

- The Department has set a standard for institutions to pass 85% of audited treatment planning documents. Institutions with pass rates under 85% are required to develop and implement corrective action plans to remedy the quality of their documentation for all audits that are included in the statewide performance improvement priorities. Currently, quality of suicide risk evaluations is included as one of the priorities, and corrective action plans are sent to Regional Mental Health leadership each month. Institutions may also set Performance Improvement Work Plans to prioritize treatment plan quality through the site's Quality Management Committee.

- Timeliness of MHCB Master Treatment Plans: The timeliness of MHCB Master Treatment Plans is tracked by the Performance Report, a tool used for quality management purposes. Timeliness is defined by policy as whether a treatment planning session has occurred within 72 hours of admission for initial treatment plans, and within seven days since the initial treatment planning session for routine treatment plans. In 2020, the overall timeliness of treatment plans completed by MHCB treatment teams was at least 90%. Almost 20,000 MHCB treatment team sessions were conducted, with 7,280 Initial or 72-hour, and 12,539 Routine treatment plans completed. Timeliness of routine treatment plans in MCHBs, including discharge treatment plans ranged from 89% to 95% in each quarter of 2020. The compliance for initial treatment plans ranged from 91% to 93% in each quarter of 2020.[20]

## PROGRESS TOWARD ENSURING THAT ALL REQUIRED STAFF RECEIVE TRAINING RELATED TO SUICIDE PREVENTION AND RESPONSE

---

18 Other IDTT Trainings currently exist, such as "IDTT: An overview of the clinical thinking and process," a seven-hour training for treatment planning for all levels of care.
19 Due to the COVID=19 emergency, CAT audits were halted in Q2 2020.
20 Performance Report "Timely IDTTs" data extracted on 6/7/2021

CDCR has a number of suicide prevention and response trainings, some of which are required for all staff members and some that are for specific disciplines. Some suicide prevention training is meant to be provided over a brief period, such as training on a new procedure or an updated form. Other suicide prevention training is meant to be ongoing, used both as a way for new employees to learn suicide prevention and response practices and to update staff members about their responsibilities in these areas.

The Department has efforts underway to improve how staff training is tracked. These efforts range from granular, institution-specific generation of compliance data and tracking, with supervisors expected to ensure compliance of staff members in completing training, to broad efforts to adopt sophisticated training compliance tools using the intra-departmental Learning Management System (LMS). The LMS is a computer-based teaching and tracking tool that provides online training with options for offering recorded video and for requiring embedded knowledge checks. Each staff member is notified via email of the need to complete required trainings. The email includes a link to the LMS site. The LMS system automatically records information about training completion status which is accessible to the SMHP and Division of Adult Institutions for compliance tracking.

Revisions to existing In-Service Training (IST) curricula were completed and adopted by the Department's Office of Training and Professional Development (OTPD) in late 2019. Subsequently, live training for new IST facilitators was conducted in all regions in December 2019 and January 2020. The mental health and suicide prevention training for the correctional officer academy courses was revised during 2020 and began delivery in June 2021.

When individual employees are non-compliant with required training, several routes can be taken to identify and remedy the lack of compliance. Non-compliance is identified by IST offices at institutions via the use of compliance tracking logs. Lists of non-compliant staff are sent to the supervisors of each discipline. For CCHCS employees, compliance is tracked with the LMS. The CCHCS Staff Development Unit reports this data directly to the SMHP, which then sends the information to the institutional Chief Executive Officers (CEOs). This information is also given to the regional Suicide Prevention and Response Focused Improvement Team (SPRFIT) coordinators who can follow up with the local institutions.

In addition to the annual training delivered to all disciplines and new employees, custodial officers and nursing staff receive additional suicide prevention and response trainings. Compliance with required cardiopulmonary resuscitation and Basic Life Support classes is also tracked for potential first responders (custody and nursing), psychiatrists, and psychiatric nurse practitioners.[21]

In 2015, the SMHP created a specialized training unit for the purposes of tracking training compliance, developing new clinical training when needed, and revising existing training as needed. The training unit keeps record of institutional compliance with mandatory suicide risk assessment and evaluation training and all suicide prevention and response training. For non-in-service training, such as classes specific to mental health suicide risk evaluation training, compliance lists are maintained at the institution and information is entered into a local tracking log. Copies of tracking logs are sent to and maintained by the training unit, which reviews institutional compliance and alerts regional and institutional staff to follow up on compliance. For training held within the LMS system, compliance data is automatically tabulated and both individual staff members and their managers are alerted to any non-compliance issues. Compliance with mandatory training is also an issue reviewed at an employee's probationary and/or annual evaluations.

The Department provides a broad training in suicide prevention and response to all employees upon their initial hiring and annually thereafter. Suicide prevention training is provided through the IST departments at all

---

21 Memorandum dated 12/3/18, *Psychiatry and Psychiatric Nurse Practitioners Basic Life Support Certification,* tracking occurs through the Credentialing and Privileging Support Unit.

institutions. In its 2017 report, the State Auditor identified variable attendance at this training between disciplines, with custodial attendance percentages often above those of mental health and other health care personnel. Improved compliance with this training is noted within all staff disciplines. In 2020, 48,598 staff members were required to take this training: of these, 26,754 custody staff and 12,932 health care staff completed the training, with an overall compliance rate of 91%.[22]

In an effort to ensure that medical and mental health program staff comply with annual training requirements, Headquarters and Regional Mental Health staff track compliance and send updates and reminders to CEOs, Wardens, Chief Nursing Executives, and Chiefs of Mental Health. These institutional leaders are responsible for ensuring that their staff are attending required training. Compliance data about suicide prevention-specific trainings is reviewed by the statewide SPRFIT Committee and non-compliance results in the regional Suicide Prevention Coordinator working with the institution to establish corrective action.

Mental health clinicians receive a significant number of additional tailored suicide risk evaluation and risk management classes as a requirement of employment. For mental health staff, the training related to suicide prevention is mandatory and tracked for compliance. Several additional training courses are available to CDCR clinicians as optional trainings. These courses provide mental health clinicians with opportunities to enhance skills when evaluating or working with suicidal patients. Several of these courses have Continuing Education Units (CEUs) available as well.

In 2019, the Department introduced a comprehensive Safety Planning Initiative training to address ongoing concerns related to deficient safety planning found in both internal and external audits of suicide risk assessments. Additionally, CDCR updated and delivered the seven-hour Suicide Risk Evaluation course in 2019. Institutions are required to train newly hired mental health clinicians within 90 days on the topic of suicide prevention and institutional mental health leadership is responsible for tracking completion of required training within this period.

---

22 Data on custodial staff is from Division of Adult Institutions. Data for CCHCS and SMHP staff are from CCHCS Staff Development Unit. Health care staff include mental health, medical, nursing, ancillary, and administrative staff and does not include staff on long-term leave.

## DESCRIPTION OF THE DEPARTMENT'S PROGRESS IN IMPLEMENTING THE RECOMMENDATIONS MADE BY THE SPECIAL MASTER REGARDING INMATE SUICIDES AND ATTEMPTS, TO INCLUDE THE RESULTS OF ANY AUDITS THE DEPARTMENT CONDUCTS, AT THE HEADQUARTERS OR REGIONAL LEVEL, AS PART OF ITS PLANNED AUDIT PROCESS TO MEASURE THE SUCCESS OF CHANGES THE DEPARTMENT IMPLEMENTS AS A RESULT OF THESE RECOMMENDATIONS

On July 12, 2013, the *Coleman* court ordered CDCR, the *Coleman* Plaintiffs, and the Special Master to convene a Suicide Prevention Management Workgroup. In 2015, the Special Master's expert, Lindsay Hayes, made 32 recommendations related to suicide prevention practices, which were ordered to be implemented by the court that same year.[23] Since 2015, CDCR has worked to implement the recommendations made by the workgroup and continues to meet with the OSM's experts to discuss progress on those recommendations. In 2018, three of those recommendations were withdrawn.[24]

The OSM's expert has completed four audits since the first in 2013 and has issued five reports on these audits. Mr. Hayes' most recent audit covered 20 prisons visited between November 2018 and December 2019 and the report was filed in September 2020. Due to the COVID-19 pandemic, all in-person monitoring activities of the OSM were cancelled in early 2020. Mr. Hayes' next re-audit started in May 2021.

As noted in the State Auditor's report (page 51), CDCR has "addressed the majority of the suicide expert's January 2015 report." Since the October 2015 summary of progress, CDCR has either substantially completed or implemented the recommendations made by Mr. Hayes.

For issues developed as part of the Hayes audits, Corrective Action Plans (CAPs) were written and then monitored. The status of CAPs related to Mr. Hayes' findings are categorized and described below. The report of the Fourth Re-Audit along with recommendations by the Special Master was filed on September 23, 2020.[25] One significant finding of the Special Master's Report on His Expert's Fourth Re-Audit is that the Department has fully or partially implemented 12 of the 29 remaining recommendations. The status of CAPs related to Mr. Hayes' findings are categorized and described below.[26]

- Initial Health Screening and Receiving and Release (R&R) Environment: CAPs related to the clarity of questions on the intake screening form were completed by the end of 2018. The most recent audit found continued problems with issues related to confidentiality and privacy in the screening environment. Mr. Hayes found that 15 of 20 institutions audited had adequate screening practices in their R&R areas, similar to his previous findings.

- Five institutions have open CAP items related to confidentiality and physical plant issues in R&R areas. California Correctional Institution (CCI) has identified an interim solution to its physical plant issues and the Region III suicide prevention coordinator is monitoring their progress toward a permanent solution. PVSP has completed its physical plant modifications and all R&R screenings are occurring in a confidential setting.

- The changes at CMF, CMC, and San Quentin (SQ) have been completed through training and local observation, however, confirmation of compliance has not been completed through observation

---

23 Electronic Court Filing (ECF) 5259, filed 1/14/15, and ECF 5271, filed 2/3/15

24 ECF 5762, filed 1/25/18

25 ECF 6879, filed 9/23/20

26 Order of items corresponds to Mr. Hayes' most recent re-audit.

by the regional suicide prevention coordinator. Monitoring is scheduled for the second and third quarters of 2021.

- Psychiatric Technician Practices: In 2017 Lindsay Hayes' report of his Second Re-Audit found that Psychiatric Technicians at three institutions did not meet standards for administrative segregation rounds. CAPs were developed and in his 2018 Third Re-Audit report he found that all 35 institutions had adequate Psychiatric Technician rounding practices. A process of ongoing fidelity checks of rounding was in place at each site under the supervision of the Chief Nursing Executives. The expert's 2020 Fourth Re-Audit report recommended that CAPs be developed for five institutions to address deficiencies in Psychiatric Technician practices.

  Work is ongoing on improving PT practices in the five institutions. During 2020 an audit system was implemented whereby nursing supervisors complete quarterly audits of Psychiatric Technician rounds to ensure that rounds were completed consistent with policy. These audits have been reported to the institutional suicide prevention coordinators. Starting in 2021, the Regional Chief Nursing Executives have been reporting the results of fidelity checks to the statewide SPRFIT committee.

- Retrofitted Cells in MHCB Units: In 2018, Mr. Hayes reported that three institutions did not meet all specifications for retrofitted cells in the MHCB units. Retrofitting was completed at all three institutions by January 31, 2019. The Fourth Re-Audit report notes that 17 of 18 audited institutions were compliant with this requirement. As of the spring of 2021 the renovations of the MHCB at CCWF has not been completed, although it is scheduled for construction in the fourth quarter of 2021. While not completed, if an individual is on suicide watch, they are on one-to-one observation. If on suicide precautions, nursing conducts checks every 11 minutes.

- Use of Suicide Resistant Cells for Those Newly Admitted to Administrative Segregation: Individuals placed in administrative segregation are to be housed in single-occupancy suicide resistant intake cells for the first 72 hours of their placement. They may occasionally need to be placed in non-intake cells, which is permissible, if housed with another individual.

  Mr. Hayes' Fourth Re-Audit report noted problems with seven institutions related to either retaining inmates in intake cells for longer than 72 hours or placing some new arrivals in administrative segregation in non-intake cells. Mr. Hayes recommends CAPs be developed for the seven institutions to create "additional retrofitted cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available."

  The 2020 Budget Act included funds to convert 64 existing ASU cells in 14 institutions to ASU intake cells. Design efforts for these conversions were underway in late 2020. As of the spring of 2021, 51 new intake cells have completed the design phase in eight institutions. The next phase of design and construction will focus on 14 new intake cells at six institutions. It is anticipated that the cells will come on line as they are completed with all cells completed by March 30, 2022.

- MHCB Practices for Observation Status, Clothing, and Privileges: Three issues related to MHCB practices were identified: Problems with nursing documentation of observation of suicidal patients, errors in allowable property for patients, and the provision of out-of-cell activities and other privileges (e.g., access to a telephone).

  The Fourth Re-Audit found improvements in a number of institutions. Regional teams continue to audit the suicide observation practices in MHCBs across the state and the court's expert recommends that each of the dozen "chronically deficient" institutions complete a review of observation orders and engage the local nursing leadership in this effort.

The CCHCS nursing program has begun an aggressive audit program to improve the documentation of suicide precaution rounding in the MHCB units. Audits directed from headquarters are occurring monthly. In addition, as of May 2021, and as part of the "reboot" of institutional SPRFIT committees, four institutions have been designated to test a new electronic system to automate suicide precaution rounding.

As of June 2021, physical plant renovations at COR, CCWF, and WSP to allow out-of-cell time for MHCB patients are either completed (WSP), in the design phase (CCWF), or are being monitored by the regional suicide prevention coordinator. The Department's Facility Planning, Construction and Management (FPCM) is finalizing a proposal for renovations at a fourth institution (COR).

In addition, several institutions (SOL, LAC, and SATF) have made changes to local procedures to insure that observation schedules, out-of-cell privileges, and proper patient issue are in compliance with statewide policy. Regional suicide prevention coordinators actively monitor these institutions.

- <u>30-Minute Welfare Checks in Segregated Housing</u>: Mr. Hayes recommended CAPs for any institution with a compliance rate of less than 90% for 30-minute checks within segregated housing facilities. All institutions were found to meet or surpass this compliance rate in 2019. In his Fourth Re-Audit, Mr. Hayes found greater than 90% compliance and made no recommendations. The Department continues to audit this indicator in all institutions. In 2020, the Department's overall average compliance with the 30-minute checks was 95%.

- <u>Mental Health Referrals and Suicide Risk Evaluations</u>: In the previous audit of institutions (2018), Mr. Hayes found a compliance rate of 74% for the 23 institutions audited. In his 2020 report, he notes that seven of 20 institutions remain below 90% compliance with completion of suicide risk evaluations when required, such as for emergency mental health referrals or upon discharge from Alternative Housing, which is described in detail in page 15.

  Changes were made to the EHRS to ensure that when orders for Urgent Mental Health Consults are placed by a clinician, the clinician may not include self-injurious behavior or suicidal ideation as a reason for the consult. This change in the EHRS was completed in the winter of 2021 and was available to users in February 2021. In addition, weekly audits of Emergent and Urgent consults are being completed by the regional suicide prevention coordinators and then reported to the statewide SPRFIT committee.

- <u>Suicide Risk Evaluation Trainings</u>: In 2018, compliance with required suicide risk evaluation trainings was over 90% in all but two institutions. By the end of 2019, compliance in the 35 institutions was over 90%. Training compliance in 2020, despite the disruptions due to the COVID-19 pandemic, was 90% statewide.

- <u>Safety Planning for Suicidal Individuals</u>: In both 2017 and 2018, Mr. Hayes noted difficulties with the quality of safety plans written within suicide risk evaluations. During discussions, CDCR and Mr. Hayes agreed to supervisory[27] monitoring of all safety plans written in suicide risk evaluations at the time of discharge from MHCB. The supervisory reviews are designed to ensure that MHCB discharge safety plans were of good quality, reflected consultation with receiving treatment teams when indicated, and helped to ensure risk management efforts were described effectively.

  In his most recent audit of 20 institutions, Mr. Hayes found deficiencies in the safety planning process at a majority of the institutions visited. In collaboration with Mr. Hayes and other members

---

[27] While MHCB program supervisors are the most likely reviewers of discharge safety plans, at times a qualified designee, such as a SPRFIT coordinator or covering Sr. Psychologist, Supervisor or Specialist may act as a reviewer.

of the OSM, the Department began a process in the fall of 2020 to re-design the safety plan intervention. Currently, the Department is reviewing policy language and building the necessary forms in the EHRS. The next step will be to engage in a test of the new process at an institution and modify based upon its use with patients. It is anticipated that the plan will be finalized, approved, and implemented in late November 2021.

- MHCB and Alternative Housing Discharge - Efficacy of Custody Welfare Checks and Five-Day Follow-Up: When patients are discharged from either Alternative Housing or MHCB, custody officers in housing units must make welfare checks every 30 minutes for at least 24 hours. After the first 24 hours, a mental health clinician must evaluate the patient and notify the housing officers about the patient's adjustment to the unit. This process can re-occur at 24-hour intervals for up to 72-hours. Additionally, when a patient is discharged from either Alternative Housing or MHCB, mental health clinicians must re-evaluate the patient daily, recording their assessment on a Five-Day Follow-Up form. The form requires clinicians to ask about suicidal thoughts, signs of distress, while instructing the clinician to review MHCB discharge documents, and to review and/or revise the patient's safety plan.

  In early 2020, discussions began about modifications to the Inpatient and Alternative Housing Custody Check Sheet, CDCR 7497 form and the necessary training. By late 2020, the form had been finalized and was approved pending labor notifications and approval. The new form was released to the field in the spring of 2021. A standardized audit tool and guide was also released to the field in summer 2021, which will require institutional mental health and custody staff to review the CDCR 7497 forms for compliance on barriers to full compliance with policy. Any deficiencies found in this auditing process will be reviewed and approved by the regional Suicide Prevention Coordinators.

  In his most recent audit, Mr. Hayes found that most audited institutions complete at least one of two pages in the CDCR 7497 form correctly more than 80% of the time, but overall only one of 20 audited institutions were completing the full two-page report satisfactorily. He recommended that CAPs be developed for the non-compliant institutions.

- Local Suicide Prevention Programs: In February 2018 and in response to a court order, the SMHP issued a memorandum outlining enhancements for local SPRFITs. Mr. Hayes' Fourth Re-Audit report recommended prioritizing the completion of local LOPs and High Risk Management Programs. In addition, he recommends further work with the local institutions on "bad news" policies and implementing the Root Cause Analysis (RCA) policy, which is currently being reviewed for possible changes. While the RCA policy is being reviewed for possible changes institutions continue to be required to complete thorough reviews of all serious suicide attempts.

  In 2020, the SMHP designed and wrote a new, comprehensive high-risk policy. This new policy, known as the Suicide Risk Management Program standardizes inclusionary and exclusionary criteria for patients to be placed into the program. Additionally, the policy outlines specific expectations for modifications, or enhancements, to treatment that are required for patients in the program. The master treatment plan was modified to allow for documentation of the specific treatment goals for patients in the program. The policy was released to the field in summer 2021 and training was provided to all clinical staff. A "bad news notification" policy was developed by the SMHP in 2020. It was approved by the court's Special Master and has been implemented as of the spring of 2021. LOPs for institutional SPRFIT committees are reviewed for compliance with policy on an ongoing basis by the new Regional SPRFIT coordinators during their regular site visits. In 2020, an agreement was reached with the Special Master that the Department's mental health quality improvement unit would work more closely with the federal Receiver's quality management unit. This agreement has produced a pilot program for local SPRFIT committees to

use a specialized suicide prevention dashboard and engage in a more structured and quality-based approach to the committee's work regarding suicide prevention initiatives. Included in the "reboot" are new agenda templates, self-assessments, and training related to the quality management mission of the local committees. The pilot program is in the testing phase, with the first results anticipated in the summer of 2021. The Department expects the new SPRFIT Committee policy to be released to all institutions in early 2022.

- <u>Continuous Quality Improvement (CQI)</u>: CDCR, in consultation with Mr. Hayes and the OSM, has agreed to monitor 19 suicide prevention audit items through a CQI process. In 2018, the Department worked with the OSM on a final CQI report format. This format integrates suicide prevention audit findings with other CQI assessments, with the comprehensive group of findings detailed in a written report. The CQI Tool (CQIT) involves reviewers from multiple disciplines within each institution (e.g., custody, nursing, and mental health disciplines) to ensure that the audit is done comprehensively. A self-audit guidebook containing these items was distributed to institutions. The CQIT is currently under discussion with the *Coleman* Special Master and plaintiffs' counsel.

  In the Fourth Re-Audit report, Mr. Hayes reiterated the necessity of including all 19 audit items in any tool or report used to evaluate an institution's suicide prevention program. As part of the collaboration between CCHCS quality management and SMHP quality management, a manual self-assessment tool has been developed as an interim tool to be utilized by institutional SPRFIT Committees until a more fully automated one can be finalized.

- <u>Suicide Prevention Training</u>: Mr. Hayes attended selected in service training (IST) annual suicide prevention classes held within audited institutions. He opined that the course content was too large for a two-hour class, yet still did not include important topics. Mr. Hayes made recommendations for course content that has been since integrated into a revised training. The revised training was reviewed by Mr. Hayes and sent to the OTPD in the spring of 2020 for review.

  In his Fourth Re-Audit report, Mr. Hayes recommended that eight institutions develop CAPs to improve training compliance.

  The mental health program's training unit, which tracks training compliance for all suicide prevention trainings reports that in 2020 the overall compliance with the seven-hour suicide risk evaluation training was over 95%. The overall rate for IST suicide prevention training was also over 90% for the entire system in 2020. Training for suicide risk assessment mentoring was 84% for the year and compliance with safety planning intervention training was 95%.

- <u>Reception Center Suicides</u>: This item was raised in 2018; specifically, there was a cluster of suicides in Reception Center institutions during the year. Reception Centers are prisons where individuals committed to the Department are received from county jails for initial processing. Some of the issues identified as impacting suicide prevention in reception included inconsistent posting of suicide prevention posters and difficulties receiving jail mental health records in a timely manner. Regional Mental Health Compliance Teams are directed to inspect reception center institutions for suicide prevention posters on a routine basis. The SMHP released a memorandum to the field in January 2021 providing direction to reception center mental health clinicians regarding expectations for obtaining and reviewing jail records for newly received individuals.

  The THRIVE program is underway at WSP and NKSP. CDCR's Division of Rehabilitative Programs (DRP) has been working with subject matter experts within the Department to develop an orientation for offenders in Reception Centers. DRP's goal is to place modules and video content on eReader tablets that will be checked out to offenders. The modules provide an overview of credit earning, rehabilitative programs, basic institutional rules, appeals process, disability policies and procedures, financial responsibilities, and family visiting. DRP has been working with SMHP to

develop a module specifically informing offenders how to take care of their physical and mental health while in prison. The development of this module for the THRIVE program was initially halted in 2020 due to the COVID-19 pandemic, but work on the program has resumed.

A number of initiatives have been developed and implemented to reduce the time needed to move patients in crisis from their current location to a MHCB.

***Use of Alternative Housing for Suicidal Individuals***: Patients housed in Alternative Housing are to be transferred to MHCB units within 24 hours unless their referrals to MHCBs are rescinded. In 2020, despite the disruptions caused by the COVID-19 pandemic, compliance with transfers from Alternative Housing was 92%.

***MHCB Transfer Timelines***: CDCR has initiated several statewide initiatives for oversight and improvement of timelines for transfer from Alternative Housing to MHCB. A specific quality management report was developed in 2018 to help ensure timely transfers. Assigned headquarters staff members in the Inpatient Referral Unit send out alerts, review missed transfer timelines, and ensure institutional action plans are developed to prevent future missed timelines. Barriers to timely transfers were identified and addressed through a number of actions impacting CDCR transportation staff practices, medical clearance procedures, and improved communication between centralized population management staff members and local classification representatives at institutions.

Although timely admissions to MHCB units were disrupted by the COVID-19 pandemic starting in March 2020, the Department maintained an overall timeline compliance rate of 86% for the year. For the first six months of 2020, the compliance rate was 90% while for the second half was 79%.[28]

***Improving Transfer Timelines for Female Patients***: In 2019, the Department established an additional unlicensed MHCB unit for female patients that has dramatically decreased the number of female patients waiting over 24 hours for transfer. The unit was established at California Institution for Women and provides additional beds which allows for compliance with mandated transfer timelines.

***Flex Units***: Flex units are designed to adjust as needed between different levels of inpatient care. Three levels of inpatient care are available to meet patient needs: Intermediate Care Facility (ICF), Acute Psychiatric Program (APP), and MHCB. The existence of flex units ensures no single inpatient program has on-going problems with delays in admissions. Thus, these units adjust to patient needs in order to address any possible wait time issues for MHCBs. A more detailed plan is expected to be completed after an in-person space survey at each location to determine the number of beds that can be designated as APP and ICF based on treatment space. Discussions about a flex-bed policy continued during 2020 but a formal policy and procedure were delayed due to the COVID-19 pandemic.

In early 2020, due to the COVID-19 pandemic, the *Coleman* court postponed all in-person monitoring activities. Other processes such as participation in headquarters suicide prevention meetings, suicide case review conferences, and ongoing discussions between the Department and the *Coleman* parties continued via remote meetings. As noted above, the OSM's suicide expert's Fourth Re-Audit report was filed in September 2020. In addition, the OSM filed a report in January 2021 on suicides that occurred in CDCR in 2015. During 2020, the court held a series of status conferences which were primarily focused on COVID-related issues such as transfer timelines, coordination with the Receiver's health care services, quarantine measures, and admissions to higher levels of mental health care. The *Coleman* court's fourth quarterly status conference was held on December 18, 2020, and focused on staffing and suicide prevention. The court issued orders in December 2020, adopting Mr. Hayes' Fourth Re-Audit Report and recommendations in full. These recommendations are the subject of Mr. Hayes' fifth rounding cycle which began in May 2021.

---

28 Data from Performance Report, Timely MHCB Admissions indicator.

Indicators of suicidal distress among the incarcerated population declined during the COVID-19 pandemic. Between the end of the first quarter of 2020 and the beginning of 2021, instances of self-injury fell: serious suicide attempts (self-injury with intent to die) declined in the outpatient setting by 39%; non-suicidal self-injury in the outpatient setting declined by 38% and all self-injury in the outpatient setting declined by 37%. The overall frequency of Mental Health Referrals was reduced. For instance, Emergent referrals (those that require a response within four hours) declined by 27% from the first quarter of 2020 to the first quarter of 2021. Likewise, Urgent referrals (which require a 24-hour turnaround) declined by 9%, and Routine referrals (which require a one-week turnaround) declined by 22% over the same period.

## PROGRESS IN IDENTIFYING AND IMPLEMENTING INITIATIVES DESIGNED TO REDUCE RISK FACTORS ASSOCIATED WITH SUICIDE

There are many potential sources of information to consider in identifying initiatives for suicide prevention: the input and innovation of institutional staff and leadership, input from the incarcerated population and their family or loved ones, information from the field of suicidology, the results of suicide reviews and reviews of serious incidents of self-injury, quality management reviews, the findings of the Department's informatics system and healthcare data warehouse, the dissemination of best practices at institutions, the practices of other agencies or states, the review of community or agency suicides or suicide attempts, insights from formal research on correctional populations, and the adoption and implementation of Crisis Intervention Teams.

All incarcerated persons in CDCR, patients and non-patients alike, are important sources of information about the issues affecting them individually and as a group, what external stressors may be contributing to the development of suicidal thoughts and behaviors in some individuals, and what they find helpful to reduce the risk for suicide. Individuals incarcerated in CDCR may tell custody officers, nurses, or other staff members about certain stressors, such as peers who are in danger from other peers. Men and women living in CDCR may divulge personal issues or stressors contributing to their thoughts of suicide and identify those unique risk factors that may have application beyond the individual case.

The field of suicidology is represented nationally by the American Association of Suicidology (AAS). Most major suicide prevention agencies are members or affiliates of the AAS. CDCR is a corporate member of AAS, meaning any staff member employed by CDCR may join the AAS without cost, which allows the staff member to gain access to the association's journal *Suicide and Life-Threatening Behavior*, informational webinars, libraries, and discounted attendance fees to AAS events. CDCR staff are reminded how to join and access AAS materials routinely via videoconferences, with documents regarding how to join the AAS posted on the suicide prevention SharePoint site. SMHP staff attend the annual AAS conference and have given presentations and trainings for correctional staff from across the country.

Reviews of suicide deaths and attempts inform the practice of suicide prevention. The pace of efforts derived from findings from suicide reviews and investigations of suicide attempts slowed in 2020, but below are three important projects that emerged from suicide case reviews:

- PIP and MHCB unit discharge workgroup.

- PIP suicide prevention program coordinator positions were filled in all PIP programs during 2020.

- Release of the PIP suicide prevention policy.

There are many quality management processes occurring at institutions, as well as Patient Safety and Quality Management Committees at institutions. These institutional efforts are supported by regional healthcare, mental health, nursing, and custody staff members. The various quality management activities monitor many

institutional functions, highlighting when programs are underperforming, and leading to innovation in determining how quality can be improved. In 2020, CDCR began hiring a Suicide Prevention Coordinator for each of CDCR's four regions. These new positions will be part of the Suicide Response and Prevention unit in Headquarters but based in their respective regions. Two positions were filled in late 2020 and the remaining two in 2021. These positions give the Department's suicide prevention efforts an extended reach and allow regular site visits at institutions to provide oversight and support for local SPRFIT Coordinators. They are active participants in the suicide review process and suicide prevention quality management activities.

Currently, CCHCS Quality Management provides comprehensive management and executive reports, operational tools, resources for local committees and subcommittees, leadership tools and training, and best practice information to institutions. The Quality Management portal contains, for example, information on conducting Performance Improvement Work Plans and Lean Six Sigma projects. Institutional leadership can review performance on a variety of metrics across units, programs, and facilities over periods of time, allowing leaders to adjust staffing, identify and address problems, and manage compliance issues.

The Mental Health Performance Report, a computerized quality management tool, among other indicators, supplies metrics to mental health leadership regarding quality and compliance, including timeliness of transfers and required evaluations, the number of treatment hours received by patients at different levels of care, and so forth. The quality and timeliness of suicide risk evaluations, five-day follow-ups, treatment plans, inpatient discharges, outpatient appointments, and amount of treatment scheduled and completed is updated and reported daily. Compliance rates can be compared between institutions and can be addressed by regional resources, as well as institutional leadership. The Performance Report is updated regularly to reflect changes in program requirements.

This robust mental health quality management structure and reporting capability has led to a natural process of information and best practices sharing. Institutional programs that are not meeting standards often reach out to institutions that are meeting standards. Alternatively, regional staff members export what is working in one institution to other institutions in their region as best practices and as ways to improve on specific indicators. For example, institutions which were not meeting compliance standards regarding the completion of MHCB Discharge Custody Checks were assisted by regional staff by identifying methods used by high-performing institutions. In addition, CEOs at institutions meet with institutional quality management staff members and with other executives regularly, allowing for information to be passed from high-performing institutions to other sites. Best practices (discussed further below) can be highlighted in discussions within and between institutions.

The SMHP and the Receiver's medical staff jointly administer a healthcare data warehouse to house information and analyze system-wide data. The warehouse is a repository for data from the EHRS and other health care databases. The warehouse links to the Department's custodial data system, Strategic Offender Management System (SOMS). This wealth of data is then aggregated and disseminated for quality improvement purposes. The use of informatics allows mental health leadership to look at "big picture" items, sharing this information with other stakeholders (e.g., custody leadership).

The Department in collaboration with the Receiver's medical staff have implemented numerous ways in which staff members and institutions can inform others or review best practices. Staff members at all levels are able to become involved in learning and using tools for performance improvement, with opportunities to inform institutional leadership and statewide leadership on specific projects or issues. Several methods are available to train staff in leadership skills, focused improvement projects, and projects that promote efficiency. In turn, each of these methods result in identifying best practices, which are then available for dissemination.

In early 2020, CDCR established a workgroup to redesign institution SPRFIT processes, incorporating the most current quality improvement techniques and best practices – a project referred to as the SPRFIT Reboot. Among other changes, the SPRFIT Reboot:

- Standardizes the set of metrics (automated, as well as audit-based) assigned to local SPRFITs.
- Provides an automated SPRFIT Report that draws from the Enterprise Data Warehouse to monitor performance of critical processes and identify emerging risks to patients.
- Assigns a risk score to identified quality problems, assisting institutions in prioritizing improvement projects.
- Offers a structured approach to problem analysis and development and testing of interventions, using Lean Six Sigma tools and techniques.
- Streamlines and standardizes SPRFIT agenda, minutes, and report-out documentation.

Four institutions (San Quentin, CCWF, ASP, and CIM) began testing the SPRFIT Reboot processes and tools in April 2021; the test phase is anticipated to conclude in fall 2021. Based on the results of the test phase, the CDCR will refine the SPRFIT Reboot changes and implement improvements statewide.

Lean Six Sigma (L6S) is a leadership and management style that uses data to improve efficiency within complex systems. Completed L6S Green Belt and Black Belt projects are posted in the CCHCS Quality Management portal, with links to project descriptions and presentations. Although L6S projects are institution specific, what is learned from each project is shared as a potential best practice, such that other institutions may benefit. A "best practices" link is currently under construction and will disseminate information from L6S projects. A selection of projects with the potential to reduce risk factors associated with suicide currently found in the L6S library[29] include:

- Improving the CDCR 7497 process: The CDCR 7497 records a process involving custody checks and mental health evaluation following a patient's return from a psychiatric hospitalization. The finalization of the new 7497 post-discharge process occurred in 2020 and after discussions with labor representatives was finalized in early 2021.

- Improving compliance with pre-placement screening for segregated housing intakes: A pre-placement screening form is used that includes direct questions about suicidal thoughts or behaviors. This project improved compliance rates at CCI from a baseline of 75% compliance to 99% compliance by improving notification of nursing of segregated housing arrivals, adding a checklist for new placements, updating LOPs, and clarifying the requirement to complete the screen with nursing staff.

- Improving transfer of CCCMS[30] patients from Reception Centers to mainline institutions: This project was implemented at North Kern State Prison (NKSP) during 2019. The project identified a number of inflection points where improvements can be made. The project resulted in minor improvements in transfer times than what was expected due to uncontrollable issues brought upon by the COVID-19 pandemic, such as quarantined buildings that impact timely processing of transfers of these patients.

***Inpatient Discharge Work Group***: Recognizing that the risk of suicide is elevated in the period after a patient discharges from PIP units, the SMHP has been working to improve outcomes in this group. This is especially important since 20 suicide deaths in 2019 were among this population. The workgroup began work in the fall of 2018 and since mid-2020 has met over 30 times with representatives of the SMHP, DAI, and the OSM. Among the recommendations are: post-discharge psychotherapeutic groups; better documentation of clinical needs and

---

29 http://cchcssites/dept/QI/default.aspx
30 The Correctional Clinical Case Management System is the lowest level of mental health care in the CDCR.

condition in the Master Treatment Plans; better processes to evaluate safety concerns and other custodial issues; and a better referral process for mental health teams to communicate needs to custody.

*Suicide Prevention SharePoint Site:* Like most SharePoint sites, the Suicide Prevention SharePoint allows users to share documents, post articles of interests, and share training materials. The site currently contains over 320 research or clinical articles, archived suicide prevention slide shows from monthly instructional video conference presentations (2011 to present), instructions on joining the AAS, groups of presentations made at the CDCR's Suicide Summits, contact lists for institutional suicide prevention program coordinators and headquarters suicide prevention staff, resources for staff suicide prevention, and resources for the entire CDCR population (videos, pamphlets, and posters). The information sharing occurring on SharePoint sites is another way of disseminating best practice information.

The SMHP has started to revise its intranet site with a best practices library. The library is available to all CDCR intranet users. Once created, existing documents from other sites that are not readily available to all users will be added to the library in archival fashion, such as best practice information from the Suicide Prevention SharePoint site.

*Statewide Suicide Prevention Coordinator Conference Calls*: In addition to monthly suicide prevention video conferences that can be viewed by all staff, Suicide Prevention Program coordinators from headquarters and from all institutions have held quarterly conference since 2014 to discuss issues impacting suicide prevention efforts statewide. These calls continued during 2020.

*Leadership Meetings Related to Suicide Prevention*: In past years, the SMHP has held three Mental Health Leadership conferences and one three-day Suicide Prevention Summit conference annually. Mental Health Leadership conferences are meant to disseminate best practice information in a variety of areas, including suicide prevention. The Suicide Summit is focused more specifically on advancements within the Department as to policy, procedure, best practices, innovations, and interventions to improve suicide prevention and response. No leadership meetings were held in 2020 because of the COVID-19 emergency.

In 2020, topics presented at the Suicide Summit included: "Suicide Among Justice Involved Veterans," "Discharge Readiness Tool," "Using the CAPSSIP to Inform Suicide Risk Evaluations and Interventions," "Talk Saves Lives: An Introduction to Suicide Prevention," "Employee Health and Wellness," "Overview of the Suicide Case Review Process in CDCR," "Differentiating Genuine from Feigned Suicidality in Corrections," "Review of CDCR Suicide Deaths & Self-Harm: 2015-2019," "History of Suicide Prevention in CDCR," "Rule Violation or Suicide Attempt? The Role of Managers in Complex Cases," and "Addressing Suicide Prevention at a Community Level: Development and Pilot of a Novel Community-Based Suicide Prevention Learning Collaborative." All presentations from the 2020 Suicide Summit are found on the Suicide Prevention SharePoint site.

*Psychiatry Trainings and Consultants*: Psychiatrists and other interested staff are able to attend weekly Grand Rounds and earn Continuing Medical Education credits. Grand Rounds offer presentations from academic and forensic psychiatrists, and is broadcast throughout the state using video-conferencing technology. Much of the content of the series is related to psychopharmacology and psychiatric illness, but there is also a lecture series on forensics and the assessment of suicidality. These educational sessions encourage the use of evidence-based best practices in forensic settings. On August 24, 2020, the CDCR implemented a telepsychiatry policy,  which enabled psychiatrists to utilize videoconferencing to facilitate real-time evaluations and treatment for the patient.

The statewide psychiatry program's psychopharmacological consultant continues to be available for consultation statewide. She also has access to additional consultation services with the Department of State Hospital's experts. Psychopharmacological approaches are important as some psychiatric medications, for example,

Clozapine[31] and Lithium,[32] are associated with lower suicide rates among vulnerable patients with particular diagnoses. In addition, psychopharmacological treatment itself lowers all causes of death (including suicidality) among patients with serious mental illness.[33] The expertise of the consulting psychiatrist, and her relationship with and ability to consult with nationally renowned experts, supported CDCR psychiatrists in 2020, helped patients to improve, and ultimately helped to decrease suicidality and deaths from other causes. In 2020, the Department's consultant received an average of 33 consultation requests each week. Consultations originated from 24 CDCR institutions plus telepsychiatry physicians serving 18 institutions

Beginning in 2018, CDCR implemented the U.S. Substance Abuse and Mental Health Services Administration's evidenced-based *Illness Management and Recovery[34]* group curriculum to address co-occurring disorders in CDCR's EOP population. In addition, at the end of 2019, Medication-Assisted Treatment (MAT) became available in all CDCR institutions, with medications such as buprenorphine, methadone, and naloxone available as treatment options. As of the end of 2020, the Integrated Substance Use Disorder Treatment (ISUDT) program was providing MAT to over 7,000 patients in the Department.[35]

In addition to expanding CDCR's telepsychiatry services during the COVID-19 emergency period, telehealth services were proposed for psychologists and social workers. Emergency authorization for psychologists and social workers to provide telehealth services was given at the end of March 2020. Quarantines and transfer restrictions increased the demand for mental health services as patients were "treated in place" while awaiting transfer to a facility with a mental health program for their assigned level of care. Staffing was further impacted by social distancing requirements and personal vulnerabilities that required some staff to telework. Telehealth was well received by patients – with few appointment refusals. Telehealth has allowed the desert institutions (Centinela, Chuckawalla Valley, Ironwood, and Calipatria state prisons) to broadly maintain required care with no major deficiencies. As staffing steadied, the use of telehealth provided by psychologists or social workers was reduced.

***Crisis Intervention Teams***: Previous reports to the Legislature noted the establishment of Crisis Intervention Teams in CDCR institutions. These teams have been aligned through a partnership between mental health, nursing and custodial personnel to provide an interdisciplinary team to intervene in crisis situations. If an individual reports a desire to kill themself, the team will evaluate the situation, identify sources of distress, attempt to resolve or mitigate the sources of distress at the point of service, and arrange follow-up (which may or may not include placement in an inpatient unit). For example, if an individual is distressed by a perceived lack of medical attention, the presence of a nurse may help to clear any misunderstanding. A relatively common example of the value of a Crisis Intervention Team is suicidal thoughts associated with interpersonal conflicts. These conflicts can create significant distress and can quickly develop into significant fears for one's safety. Whereas mental health clinicians may not be able to address safety concerns directly, they can work collaboratively with custody personnel who may be able to work out a reasonable solution, thus relieving the distress. The Crisis Intervention Teams help to problem-solve issues related to prison life that may not be directly related to a mental health issue.

The initial Crisis Intervention Teams were established at 22 institutions between late 2018 and early 2020. In 2020, the teams had 7,822 contacts with individuals, an average of 650 each month. Fifteen percent

31Meltzer, H., et al. (2003) Clozapine Treatment for Suicidality in Schizophrenia, Archives of General Psychiatry, 60(1):82-91. doi:10.1001/archpsyc.60.1.82

32 Lewitzka, U., et al. (2015). The suicide prevention effect of lithium: more than 20 years of evidence. International Journal of Bipolar Disorders, 3: 15. https://doi.org/10.1186/s40345-015-0032-2

33 Tiihonen, J., et al. (2009). 11-year follow-up of mortality in patients with schizophrenia: a population-based cohort study. The Lancet, 374, 620-627. DOI:10.1016/S0140- 6736(09)60742-X

34 https://store.samhsa.gov/product/Illness-Management-and-Recovery-Evidence-Based-Practices-EBP-KIT/SMA09-4463

35 Data accessed on June 25, 2021 from the ISUDT dashboard. Public data is available at: ISUDT Dashboard | CCHCS (ca.gov).

(N = 1,173) of the contacts resulted in admission to a MHCB unit. Nineteen percent (N = 1,524) were returned to their housing, one percent (N = 49) were provided conflict resolution skills and returned to their housing unit, and one percent (N = 51) were educated regarding a custody process. The resolution of an additional 721 contacts were a mix of referrals to mental health, housing changes, referrals to volunteer groups, and custody consultations. Prior to the inception of CITs, it was most likely that a much higher proportion of individuals with crisis issues would have been admitted to costly inpatient psychiatric beds around the state.

## DESCRIPTION OF THE DEPARTMENT'S EFFORTS AND PROGRESS TO EXPAND UPON ITS PROCESS OF NOTIFICATION PURSUANT TO PENAL CODE SECTION 5022, INCLUDING EXPANSION OF THOSE NOTIFICATIONS IN CASES OF SUICIDE ATTEMPTS WHEN DEEMED APPROPRIATE BY THE DEPARTMENT, AND WHEN INMATES HAVE CONSENTED TO ALLOW RELEASE OF THAT INFORMATION

CDCR is committed to expanding the process for notifying next of kin, to include events involving an individual who commits an act of self-injury with the intent to die, while ensuring that it complies with federal laws designed to protect patients' medical records and other health information.

The Department collects and maintains notification lists, commonly referred to as Next of Kin designations. A CDCR Next-of-Kin form is completed regularly and is renewed least annually with all individuals who agree to do so. However, in order to provide protected personal healthcare information to a Next-of-Kin designee, the individual must also complete a Health Care Release of Information form, which allows a patient to designate an individual to receive protected health information for medical and mental health purposes.

During 2020 the Department assembled a workgroup involving the SMHP and CCHCS. IA policy was written and delivered to the field in the spring of 2021. A tracking process is part of the new Health Care Department Operations Manual (HCDOM) requirements.

## STATISTICAL SUMMARY OF 2020 SUICIDES

This section of the report focuses primarily on the 31 suicide-related deaths that occurred in CDCR during 2020, identifying key findings and comparing these trends with the Department's historical data. In addition, given that prison suicides occur in larger national and state contexts, CDCR's 2020 data are compared with national figures for state prison suicides and with community suicide rates in California.

The primary sources of data for this section are the suicide case reviews completed by highly trained staff of the SMHP with input from the OSM's experts. Additional data is obtained from CDCR's Office of Research (OOR), the CCHCS's Death Review Committee (DRC) reports, information from prior CDCR annual suicide reports, and publicly available information regarding suicide rates in community and incarcerated settings. Suicide case review reports were independently reviewed by senior clinical staff of the SMHP to assess trends in data or in qualitative findings.

## SUICIDE DEFINITIONS AND TERMS USED

The MHSDS Program Guide, 2018 Revision, provides definitions of suicide and suicide attempts. Several terms used in the last 2009 revision of the PG are now considered obsolete within the field of suicidology and will not be used in this report. Specifically, the terms "self-mutilation" and "suicide gesture" are found in the MHSDS PGs, 2018 Revision; however, a less-pejorative term, "non-suicidal self-injury" or NSSI, is used in this report and refers to self-injury for reasons other than death by suicide.

- Suicide: An intentional self-injurious behavior that causes or leads to death.

- <u>Suicide Attempt</u>: An intentional self-injurious behavior which is apparently designed to deliberately end one's life and may require medical and/or custody intervention to reduce the likelihood of death or serious injury.
- <u>Suicidal Ideation</u>: Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing[36] (that is, dying by) suicide or the passive desire to be dead.
- <u>Suicidal Intent</u>: The intention to deliberately end one's own life.
- <u>Self-injurious Behavior</u>: A behavior that causes, or is likely to cause, physical self-injury.

---

[36] The term" 'committing" is not used by current suicidal experts, as the term implies some sort of success in carrying out a pledge or obligation. The favored term is straightforward —" died by suicide."

## REVIEW OF FINDINGS

The annual suicide rate in CDCR in 2020 was 27.3 deaths per 100,000 incarcerated individuals, based on 31 suicides. The 2020 rate was the first decrease after five straight years of increases. The rate reached 30.3 in 2019, the highest since 1985. The rate of suicide in CDCR institutions and contract facilities has been at least 20 per 100,000 in 12 of the last 20 years. Figure 4 shows the annual rate, frequency, and population of CDCR since 2001. The dotted lines represent the corresponding trends.[37]

Figure 4. *CDCR Suicide Rate, Frequency, and Population), 2001-2020*



The rate of suicide averaged almost 40 per 100,000 in the 1980s, dropping to an average of 16 per 100,000 in the 1990s as the incarcerated population grew by 72%. In the 2000s, the rate averaged 18 per 100,000 as the population peaked in 2007 and then began to decline. From 2010 through 2019, the rate averaged 23 per 100,000 even though CDCR's incarcerated population fell by 29% due to litigation, decreasing crime rates, criminal justice reform, and the passage of Assembly Bill (AB) 109 (Public Safety Realignment) in 2011. The average annual number of suicides rose from 16 in the 1980s, to 20 in the 1990s, to 33 per year in the 2000s, and since 2010 down to 31 per year.

## SOCIODEMOGRAPHIC FACTORS.

Sociodemographic characteristics do not directly cause suicide but are important risk factors with indirect effects. Table 1 below presents the male, female, and overall frequency and rates of suicide in CDCR since the end of 2000.

---

37 CDCR population counts are from the Office of Research June 30th Monthly Report of Population. Suicide counts are from the CDCR Statewide Mental Health Program (SMHP).

*Gender*: In 2020, all CDCR suicides were by men, at a rate of 28.5 per 100,000 males. During the previous five years, 2015 through 2019, nine women and 144 men died by suicide in CDCR custody.

Table 1. *Annual Frequency, Population, and Rate of Suicide, by Gender and Total, 2001-2020\**

| Year | Male Frequency | Male Pop | Male Rate | Female Frequency | Female Pop | Female Rate | Total Frequency | Total Pop | Total Rate |
|---|---|---|---|---|---|---|---|---|---|
| 2001 | 29 | 150,785 | 19.2 | 1 | 10,712 | 9.3 | 30 | 161,497 | 18.6 |
| 2002 | 22 | 148,153 | 14.8 | 0 | 9,826 | 0.0 | 22 | 157,979 | 13.9 |
| 2003 | 37 | 150,851 | 24.5 | 0 | 10,080 | 0.0 | 37 | 160,931 | 23.0 |
| 2004 | 23 | 152,859 | 15.0 | 3 | 10,641 | 28.2 | 26 | 163,500 | 15.9 |
| 2005 | 37 | 153,323 | 24.1 | 0 | 10,856 | 0.0 | 37 | 164,179 | 22.5 |
| 2006 | 39 | 160,812 | 24.3 | 4 | 11,749 | 34.0 | 43 | 172,561 | 24.9 |
| 2007 | 33 | 161,424 | 20.4 | 1 | 11,888 | 8.4 | 34 | 173,312 | 19.6 |
| 2008 | 36 | 159,581 | 22.6 | 0 | 11,392 | 0.0 | 36 | 170,973 | 21.1 |
| 2009 | 25 | 156,805 | 15.9 | 0 | 11,027 | 0.0 | 25 | 167,832 | 14.9 |
| 2010 | 34 | 155,721 | 21.8 | 1 | 10,096 | 9.9 | 35 | 165,817 | 21.1 |
| 2011 | 33 | 152,803 | 21.6 | 0 | 9,565 | 0.0 | 33 | 162,368 | 20.3 |
| 2012 | 32 | 128,829 | 24.8 | 1 | 6,409 | 15.6 | 33 | 135,238 | 24.4 |
| 2013 | 29 | 126,992 | 22.8 | 1 | 5,919 | 16.9 | 30 | 132,911 | 22.6 |
| 2014 | 21 | 129,268 | 16.2 | 2 | 6,216 | 32.2 | 23 | 135,484 | 17.0 |
| 2015 | 22 | 123,268 | 17.8 | 2 | 5,632 | 35.5 | 24 | 128,900 | 18.6 |
| 2016 | 24 | 122,874 | 19.5 | 3 | 5,769 | 52.0 | 27 | 128,643 | 21.0 |
| 2017 | 28 | 125,289 | 22.3 | 2 | 5,971 | 33.5 | 30 | 131,260 | 22.9 |
| 2018 | 33 | 123,511 | 26.7 | 1 | 5,906 | 16.9 | 34 | 129,417 | 26.3 |
| 2019 | 37 | 119,781 | 30.9 | 1 | 5,691 | 17.6 | 38 | 125,472 | 30.3 |
| 2020 | 31 | 108,682 | 28.5 | 0 | 4,721 | 0.0 | 31 | 113,403 | 27.3 |
| 2001 to 2020 | 605 | 2,811,611 | 21.5 | 23 | 170,066 | 13.5 | 628 | 2,981,677 | 21.1 |
| 2011 to 2020 | 290 | 1,261,297 | 23.0 | 13 | 61,799 | 21.0 | 303 | 1,323,096 | 22.9 |

\*All populations are mid-year monthly as of June 30th of each year. Total population includes camps, institutions, in-state and out-of-state contract beds.

*Race/Ethnicity*: Of the 31 suicide deaths in 2020, five (16%) were by Black individuals, nine (29%) were by Hispanic individuals, 12 (39%) were by White individuals, and five (16%) were by individuals of Other racial/ethnic groups (two Laotian, one Native American, one Samoan, and one Syrian).  After a rise in the proportion of Hispanic suicides from 2016 through 2018, Hispanic suicide deaths declined in 2019 and again in 2020. Compared to the 2020 and five-year (2016-2020) average population proportions of ethnic/racial groups in CDCR (Table 2), there were fewer Black and Hispanic suicides in 2020 and more by Whites and Other racial/ethnic groups than would be expected from the population proportions.

Table 2. *Frequency & Percent of CDCR Suicide Decedents by Race/Ethnicity Group, 2016-2020*

| Racial/Ethnic Group | 2016 | 2017 | 2018 | 2019 | **2020** | Population % 2015-2020 |
|---|---|---|---|---|---|---|
| Black | 4 (15%) | 5 (17%) | 1 (3%) | 8 (21%) | **5 (16%)** | 29% |
| Hispanic | 11 (41%) | 15 (50%) | 17 (50%) | 11 (29%) | **9 (29%)** | 44% |
| White | 9 (33%) | 7 (23%) | 9 (26%) | 13 (34%) | **12 (39%)** | 21% |
| Other | 3 (11%) | 3 (10%) | 7 (21%) | 6 (16%) | **5 (16%)** | 7% |

**Age:** Table 3 shows annual age group suicides for the five-year period 2016 through 2020, the percentage of suicides in each group, and the CDCR population percentage of that age group for the five years. In 2020, 56% (14) of the total suicides occurred among those individuals aged 25 to 44, while the proportion of the CDCR incarcerated population in that age group was 66%. The proportions of age group suicides in 2020 did not differ significantly from the overall age group percentages of the CDCR population during the previous four years 2016-2019.

The average age of a suicide decedent in 2020 was 42 years. The average age of CDCR all inmates in 2020 was 42 years. Between 2016 through 2020, the average age of suicide decedents had from a low of 33.5 years in 2017 to a high of 43.6 years in 2016.

Table 3. *Frequency & Percent of CDCR Suicide Decedents by Age Group, 2016-2020*

| Age Group | 2016 | 2017 | 2018 | 2019 | **2020** | Population % 2016-2020 |
|---|---|---|---|---|---|---|
| 18-24 | 1 (4%) | 5 (17%) | 3 (9%) | 1 (3%) | **4 (13%)** | 8% |
| 25-34 | 7 (26%) | 11 (37%) | 11 (32%) | 10 (26%) | **9 (29%)** | 30% |
| 35-44 | 11 (41%) | 11 (37%) | 9 (27%) | 15 (40%) | **5 (16%)** | 33% |
| 45-54 | 1 (4%) | 2 (7%) | 8 (24%) | 9 (24%) | **6 (19%)** | 16% |
| 55+ | 7 (26%) | 1 (3%) | 3 (9%) | 3 (8%) | **7 (23%)** | 13% |

**Marital Status**: Of the 31 individuals who died by suicide in CDCR during 2020, four (13%) were married at the time of their death, seven (23%) were divorced, 18 (58%) were single, and two (7%) were widowed. The 2020 rate of marriage is similar to the period 2017-2019, when only 12% of 102 individuals who died by suicide were married at the time of their deaths.

**Education, Juvenile Criminal History, and Work History**: In 2020, 11 (36%) of the 31 had less than a high school education. Another ten (33%) had finished 12 years of schooling and eight (17%) had a GED certificate. Two individuals (7%) had college degrees. Four (13%) had special education classes and one (3%) decedent was a participant in the Clark intellectual disabilities program at the DD1 level. The DD1 designation is assigned when individuals require minor prompting or coaching for activities of daily living that may impact the individual's ability to adapt to the prison environment.

Among the 31 individuals in CDCR custody who died by suicide in 2020, 21 (68%) had a history of crime as juveniles with an average age at first arrest of 14 years. Of these, 19 (63%) had some level of gang involvement either inside or outside of prison.

Twenty-nine (94%) of the 2020 suicide decedents had information about employment outside CDCR. Of these, 27 (87%) had some employment history and of these, all were unskilled workers.

*Languages Spoken*: For 27 (97%) of 2020's suicide decedents, English was their primary spoken language. Three individuals (10%) spoke primarily Spanish, and one (3%) spoke Arabic.

*Health Factors:* Incarcerated populations have higher rates of both chronic medical conditions and infectious diseases than members of the community at large[38] and medical conditions increase the risk of suicide-related thinking and behavior[39].

Twelve (40%) of the 30 individuals for whom information was available and who died by suicide in 2020 had what reviewers considered "serious, painful, or life-threatening conditions" at, or close to, the time of their death. The proportion of decedents identified with serious medical conditions in 2020 was more than twice the proportion for the years 2017 through 2019, when it was 15 percent. The 2020 conditions included Crohn's disease, active hepatitis C, significant gastrointestinal problems, blindness, and traumatic brain injury (TBI). Several of the decedents had chronic pain syndromes related to previous injuries or encounters with law enforcement. Most of the 12 had multiple conditions. For instance, one individual was identified as suffering from hypertension, hyperlipidemia, legal blindness (with chronic partial detachment of retina of his left eye), Type-1 diabetes, and chronic pain syndrome. Another suffered from severe spinal injury from a suicide attempt more than 25 years prior. Reviewers identified two individuals whose medical conditions (TBI and several back pain) were not adequately treated.

*Temporal Factors*: Over the years, annual reports have inspected the distribution of suicides by custody watches (1st, 2nd, 3rd), day of week, quarter of year, and month to see if it was more likely that suicide deaths occurred during one temporal domain rather than another.

The distribution of 2020 suicides by day of week, time of day (watch), day of week, month, quarter, and time of year were tested against the hypothesis that all things being equal, suicides would be distributed evenly across these temporal sequences. The analyses found that, in 2020, no day of week, time of day, month, quarter, or the holiday season was statistically more likely to have more suicide deaths than any other.

It is commonly believed suicide increases around the winter holidays of Thanksgiving and Christmas.[40] Data from the Centers for Disease Control shows that spring and early summer typically have a higher number of suicides, and CDCR's data over the long-term mirrors this finding. In 2020, November had fewer suicides compared to the ten-year average while December and January had more. It is not unexpected that the number of suicides in a month will fluctuate around the long-term average. Figure 5 shows the 2020 monthly number of suicides compared to the ten-year average, 2010-2019.

In 2020, Mondays, Thursdays, and Fridays had six suicides each, Saturdays had eight, two each occurred on Tuesdays and Wednesdays, and one occurred on a Sunday. First watch (10 PM to 6 AM) had eleven suicides, 2nd watch (6 AM to 2 PM) had eight suicides, and 3rd watch (2 PM to 10 PM) had 12 suicides.

---

[38] Maruschak, L.M. & Berzofsky, M. (2016). "Medical Problems of State and Federal Prisoners and Jail Individuals, 2011-12." Report NCJ 251920. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC. Available at: https://www.bjs.gov/pub/pdf/mpsfpji1112.pdf.

[39] Ahmedani, B. K., Peterson, E. L., Hu, Y., Rossom, R. C., Lynch, F., Lu, C. Y., et al. (2017). Major Physical Health Conditions and Risk of Suicide. *American Journal of Preventive Medicine*, *53*(3), 308–315. https://doi.org/10.1016/j.amepre.2017.04.001

[40] See: Suicide Rate is Lower During Holidays, But Holiday-Suicide Myth Persists | The Annenberg Public Policy Center of the University of Pennsylvania

Figure 5. *Monthly Suicides, 2020 and 2010-2019 Average*



## CUSTODIAL AND CORRECTIONAL FACTORS

*Institution at Time of Death*: In 2020, suicides occurred in 16 CDCR institutions (Table 4). Institutions vary in the number of patients in the institution's mental health program, the mental health mission of the facility, the predominance of violent offenders at the site, and the total number of individuals at the institution. Fluctuations in the number of suicides occurring at an institution due to cluster effects,[41] changes in the use or mental health mission of the institution, and other factors. There are also subsets of suicides that occur during, or upon, transfer of an individual from one institution to another, further complicating the interpretation of *why* suicides occur at certain institutions more frequently than others.

Suicides are more frequent in institutions with intensive mental health programming (e.g., EOP institutions). Suicides are also more frequent in higher security (Level III or Level IV) institutions than in lower security settings. The institutions that have the highest average annual suicides are those such as California State Prison (CSP) Sacramento (SAC), Salinas Valley State Prison (SVSP), CSP Los Angeles County (LAC), or Kern Valley State Prison (KVSP), where high security Level IV incarcerated individuals are housed and being treated for severe and chronic mental health and behavior problems. Other factors may increase an institution's overall suicide frequency. An example of this is that SQ housed individuals who are overwhelmingly at Level III and lower yet has a small population (approximately 695 at the end of 2020) of condemned individuals.

---

41 Clusters of suicides can occur temporally or by location. See: Hawton, K., Linsell, L., Adeniji, T., Sariaslan, A., and Fazel, S. (2014). "Self-harm in prisons in England and Wales: An epidemiological study of prevalence, risk factors, clustering, and subsequent suicide." *Lancet, 383.*

Table 4. *2020 CDCR Suicides by Institution, Security Level and Available Mental Health Programs*[42]

| Institution | Level I and II | Level III | Level IV | Mental Health Programs Available |
|---|---|---|---|---|
| California Correctional Institution | 0 | 0 | 4 | CCCMS |
| CSP Sacramento | 0 | 1 | 2 | CCCMS, EOP, EOP-ASU, PSU, MHCB |
| Correctional Training Facility | 3 | 0 | 0 | CCCMS |
| High Desert State Prison | 0 | 0 | 3 | CCCMS, MHCB |
| CSP Corcoran | 0 | 0 | 2 | CCCMS, EOP, EOP-ASU, MHCB |
| CSP Los Angeles County | 0 | 0 | 2 | CCCMS, EOP, EOP-ASU, MHCB |
| Kern Valley State Prison | 0 | 0 | 2 | CCCMS, EOP, MHCB |
| Mule Creek State Prison | 0 | 0 | 2 | CCCMS, EOP, EOP-ASU, MHCB |
| Wasco State Prison | 1 | 1 | 0 | CCCMS, MHCB |
| California Health Care Facility | 2 | 0 | 0 | CCCMS, EOP, EOP-ASU, MHCB, PIP |
| California Medical Facility | 1 | 0 | 0 | CCCMS, EOP, EOP-ASU, MHCB, PIP |
| Richard J. Donovan Correctional Facility | 0 | 1 | 0 | CCCMS, EOP, EOP-ASU, MHCB |
| San Quentin State Prison | 0 | 0 | 1 | CCCMS, EOP, MHCB, Condemned PIP |
| Salinas Valley State Prison | 1 | 0 | 0 | CCCMS, EOP, MHCB, PIP |
| California Correctional Center | 1 | 0 | 0 | No Mental Health |
| California Institution for Men | 1 | 0 | 0 | CCCMS, MHCB |
| Total (percent) | 10 (32%) | 3 (10%) | 18 (58%) | |

Table 5 presents the data on suicides in each institution over the ten-year period 2011-2020 along with the average number per year per institution. Fourteen institutions had, on average, at least one suicide per year. These 14 institutions accounted for 73% of all suicides over the 10 years, with an average of 16 per year.

---

42 Levels of mental health care are: Correctional Clinical Case Management System (CCCMS); Enhanced Outpatient Program (EOP); Mental Health Crisis Bed (MHCB); and Psychiatric Inpatient Program (PIP)

Table 5. *Frequency of Suicide by CDCR Institution, 2011 thru 2020, 10-Year Total, and 10-Year Annual Average*[43]

| Institution | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | **2020** | 10-Year Total | Annual Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| California Correctional Institute | 2 | 1 | 1 | 3 | 1 | 2 | 0 | 2 | 2 | **4** | 18 | 1.8 |
| CSP Sacramento | 3 | 1 | 1 | 2 | 3 | 3 | 1 | 2 | 9 | **3** | 28 | 2.8 |
| Salinas Valley State Prison (SP) | 2 | 6 | 2 | 2 | 0 | 4 | 2 | 2 | 1 | **1** | 22 | 2.2 |
| San Quentin SP | 2 | 3 | 3 | 2 | 3 | 0 | 2 | 2 | 1 | **1** | 19 | 1.9 |
| CSP LA County | 3 | 1 | 1 | 0 | 0 | 2 | 4 | 2 | 2 | **2** | 17 | 1.7 |
| Corcoran SP | 0 | 1 | 2 | 0 | 2 | 0 | 2 | 3 | 4 | **2** | 16 | 1.6 |
| Deuel Vocational Institute | 2 | 2 | 0 | 0 | 3 | 0 | 4 | 1 | 3 | **0** | 15 | 1.5 |
| Kern Valley SP | 0 | 0 | 1 | 1 | 0 | 3 | 1 | 5 | 2 | **2** | 15 | 1.5 |
| California Medical Facility | 2 | 1 | 2 | 1 | 2 | 0 | 2 | 0 | 3 | **1** | 14 | 1.4 |
| RJ Donovan | 0 | 2 | 3 | 1 | 2 | 0 | 1 | 4 | 0 | **1** | 14 | 1.4 |
| Mule Creek SP | 0 | 1 | 2 | 2 | 0 | 0 | 2 | 2 | 2 | **2** | 13 | 1.3 |
| California Men's Colony | 4 | 0 | 0 | 0 | 3 | 3 | 0 | 1 | 0 | **0** | 11 | 1.1 |
| California Institute for Women | 0 | 1 | 1 | 2 | 2 | 2 | 1 | 0 | 1 | **0** | 10 | 1.0 |
| High Desert SP | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 1 | **3** | 10 | 1.0 |
| Correctional Training Facility | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 1 | **3** | 9 | 0.9 |
| Pleasant Valley SP | 3 | 2 | 1 | 0 | 0 | 2 | 0 | 0 | 1 | **0** | 9 | 0.9 |
| Wasco SP | 1 | 1 | 1 | 0 | 0 | 0 | 4 | 0 | 0 | **2** | 9 | 0.9 |
| Folsom SP | 1 | 3 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | **0** | 8 | 0.8 |
| California Institute for Men | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | **1** | 6 | 0.6 |
| California Health Care Facility | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | **2** | 5 | 0.6 |
| Pelican Bay SP | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | **0** | 5 | 0.5 |
| California Correctional Center | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | **1** | 4 | 0.4 |
| Out-of-State Institutions | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | **0** | 4 | 0.5 |
| North Kern SP | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 2 | **0** | 4 | 0.4 |
| Substance Abuse & Training Facility | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | **0** | 4 | 0.4 |
| CSP Solano | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | **0** | 4 | 0.4 |
| Central California Women's Facility | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | **0** | 3 | 0.3 |
| Avenal SP | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 2 | 0.2 |
| Calipatria SP | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 2 | 0.2 |
| Centinela SP | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 1 | 0.1 |
| Sierra Conservation Center | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 1 | 0.1 |
| Valley SP | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 1 | 0.1 |
| Total | 33 | 33 | 30 | 23 | 25 | 26 | 30 | 34 | 38 | **31** | 303 | 30.3 |

---

43 Chuckawalla Valley SP, Ironwood SP, and California City CF had no suicides during the ten years 2011-2020.

*Housing Type*: Incarcerated individuals in CDCR are housed in a variety of physical settings, from dormitory settings with up to 200 people, to the most common type, celled housing, which house one or two persons. Table 6 presents the number and percentage of suicides in each type of CDCR housing for five years from 2015 through 2019, and for 2020.

The types of housing where an incarcerated person lives can be associated with prison-related difficulties. For instance, individuals entering CDCR with a new prison term or whose parole has been revoked are initially housed in Reception Center institutions. During 2020, one individual died by suicide in a Reception Center institution. Starting in late 2020, reception center services were consolidated to two male institutions (WSP and NKSP) and one female (CCWF).

Table 6. *Frequency and Percent of Housing Placements of CDCR Suicide Decedents, 2015-2019 and 2020*

| Housing Type | 2015-2019 | **2020** |
|---|---|---|
| Administrative Segregation (including EOP Hub units) | 34 (22%) | **3 (10%)** |
| Condemned Housing | 3 (2%) | **1 (3%)** |
| Psychiatric Services Units | 7 (5%) | **1 (3%)** |
| Short-Term Restricted Housing | 6 (4%) | **5 (16%)** |
| Long-Term Restricted Housing | 0 (0%) | **1 (3%)** |
| Security Housing Units | 2 (1%) | **0 (0%)** |
| Psychiatric Inpatient Program (PIP) | 1 (1%) | **2 (6%)** |
| Reception Centers | 14 (9%) | **1 (3%)** |
| Outpatient Housing Unit (Medical) | 0 (0%) | **2 (6%)** |
| Correctional Treatment Center/MHCB | 7 (5%) | **0 (0%)** |
| General Population | 79 (52%) | **15 (48%)** |

*Segregated Housing*: Individuals alleged to be, or found, guilty of committing disciplinary infractions are typically placed in segregated housing. If found guilty, sanctions can include loss of time credits, loss of privileges, or other consequences. Incarcerated individuals can also be placed in segregated housing at their own request for protection due to perceived interpersonal safety risk.[44] At the end of 2020, 4,111 individuals, 4.3% of the total CDCR population, were housed in segregated housing.

The units and cells in these units are often physically similar to other housing units. But the regulations and routines of segregated housing restrict an individual's movements and privileges, which can affect their mental status and functioning. The conditions of confinement in segregated housing may result in significant distress for some people, and for some, placement in segregated housing increases the risk of self-injury.

Over the last twenty years CDCR has implemented policies and programs to increase mental health services and to reduce the risk of suicide in segregated housing. In the early 2000s, the department created specialized ASU "Hub" units and Psychiatric Services Units (PSU) for EOP patients. In 2015, CDCR developed the Short-Term and Long-Term Restricted Housing (STRH/LTRH) units for incarcerated persons at the Correctional Clinical Case Management System (CCCMS) level. These units correspond to the ASU and Security Housing Units, respectively.

---

[44] For this report, segregated housing includes Administrative Segregation (ASU), Short-Term Restricted Housing, Long-Term Restrictive Housing, ASU Hubs, Security Housing Units, Psychiatric Services Units, and Condemned housing.

During 2020, 11 (35%) suicide decedents were housed in CDCR segregated housing units. Of these, seven were participants in the MHSDS – four at the CCCMS level of care and three at the EOP level of care. One condemned man died by suicide and was not a participant in the MHSDS at the time of his death. Eight individuals were housed in either ASU or STRH while one was in PSU and one in LTRH.

Because of the small number of individuals and the number of suicides in these units, suicide rates for segregated housing are higher than the rest of CDCR (218 per 100,000 in ASU/STRH for the period 2015-2019). Figure 6 shows the number and percentage of total CDCR suicides that occurred in ASU and STRH from 2011 through 2020. Both the annual total of suicides and the percentage of total CDCR suicides that occurred in ASU/STRH has trended downward over the last ten years. This is, in part, due to the decrease in individuals housed in ASU/STRH during this period, from 3,624 in 2015 to 2,955 in 2020.

Figure 6. Percentage of Suicides in ASU and STRH, 2011-2020



| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Frequency | 15 | 15 | 16 | 15 | 8 | 8 | 11 | 10 | 13 | 8 |
| Percentage | 45% | 45% | 43% | 65% | 29% | 30% | 37% | 29% | 34% | 26% |

Frequency ——  Percentage ——  Frequency Trend -----  Percentage Trend -----

***Time in ASU/STRH Housing***: The initial few days in ASU or STRH can be very stressful for some individuals, especially those who are in mental health treatment. Similarly, extended stays (greater than 30 days) can also lead to a deterioration of an individual's mental well-being.[45] In 2007, the department began a program to retrofit a number of ASU cells as "intake" cells. These cells have physical modifications, which include removing ligature attachment sites to increase the safety of the cells. Incarcerated people who are moved to either ASU or STRH are assigned to these cells for their initial 72 hours in the unit before transitioning to regular ASU or STRH housing.

In 2020, eight individuals were in ASU or STRH at the time of their death. For seven of these individuals the average time from ASU/STRH entry to suicide was 24 days with a range from hours to 73 days and median length of stay of three days.[46] During the 5 years prior to 2020, the average length of stay in ASU and STRH prior to death was 61 days and the median was 20 days (N = 40).

---

45 Haney, C. (2018). Restricting the use of solitary confinement. *Annual Review of Criminology, 1.* 285-310. https://doi.org/10.1146/annurev-criminol-032317-092326
46 An additional individual died in an outside hospital from complications of a self-inflicted injury while he was housed in ASU. This individual had a complicated history involving in-cell homicide. He had been in STRH or EOP ASU Hub units for almost 900 days when he self-injured. This amount of time in segregated housing is an extreme outlier. If he were included in the average, it would be 133 days from entry to suicide and the median would be 16.

**Offense Type:** A common finding in state prisons is the high proportion of suicides among individuals whose commitment offenses were crimes against persons.[47] Individuals incarcerated for a violent crime have a rate of suicide death more than twice the rate for those committed for non-violent crimes.[48] Table 7 shows the number and proportion types of crimes committed by CDCR suicide decedents in the five years from 2015 through 2019, 2020, and the overall proportion of these crimes of the CDCR population.

Table 7. *Frequency and Percent of Commitment Offenses of CDCR Suicide Decedents, 2015-2019, 2020, and CDCR Proportions for 2020*

| Type of Offense | Five Years 2015-2019 | **2020** | CDCR Population Proportions in 2020 |
|---|---|---|---|
| Violent Crimes | 116 (76%) | **24 (77%)** | 70% |
| Property Crimes | 21 (14%) | **2 (7%)** | 7% |
| Sex Crimes | 15 (10%) | **5 (16%)** | 15% |
| Other Crimes | 1 (1%) | **0 (0%)** | 8% |

**Security Level:** In 2020, 18 of 31 (58%) suicide decedents had Level IV classification points, the highest security level (Table 8). This compares to only 28% of all individuals in CDCR custody. Three (10%) decedents were at Level III whereas 17% of all individuals in CDCR were at that security level. The remaining 10 (33%) suicide decedents were at Levels I and II compared to 55% of incarcerated individuals in CDCR. None of the 31 decedents were unclassified, as happens when they are housed in reception center institutions in the first weeks of incarceration or for other reasons.  As can be seen in Table 8, the pattern of classification levels in 2020 was similar to that of the five previous years, when over 70% of individuals who died by suicide in CDCR were Level IV.

Table 8. *Frequency and Percent of Security Levels of CDCR Suicide Decedents, 2015-2019, 2020, and CDCR Proportions in 2020*

| Security Level | Five Years 2015-2019 | 2020 | CDCR Population Proportions in 2020 |
|---|---|---|---|
| Level IV | 84 (55%) | **18 (58%)** | 28% |
| Level III | 28 (18%) | **3 (10%)** | 17% |
| Level II | 25 (16%) | **8 (26%)** | 47% |
| Level I | 5 (3%) | **2 (7%)** | 8% |
| Unclassified | 11 (7%) | **0 (0%)** | 1% |

**Sentence Length:** Another variable unique to suicides in correctional settings is sentence length: total length of sentence; how much time an incarcerated person has served prior to their suicide death; and how much time they have left to serve in prison at the time of their death. These variables are captured in Tables 9, 10, and 11.

Length of sentence can have implications for the mental state of incarcerated individuals at the beginning of their prison term. Table 9 presents the sentence lengths of suicide decedents during 2015-2019 and 2020. In both the 2015-2019 year composite and in 2020, over 60% of individuals who died by suicide in CDCR had either a long term sentences (20+ years) or a life sentence without the possibility of parole (LWOP).

---

47 Most inmates are charged and found guilty of multiple charges. The charges in Table 7 are the primary charges. The CDCR and the California Department of Justice define crimes against persons as violent offenses and make a distinction between those crimes and property and other crimes. Although sex crimes are considered crimes against persons, they are separated out in this report. See https://openjustice.doj.ca.gov/resources/glossary
48 Mumola, C. (2005), Bureau of Justice Statistics, located at: http://www.bjs.gov/content/pub/pdf/ardus05.pdf

Table 9. *Frequency and Percent of Sentence Length of CDCR Suicide Decedents, 2015-2019 and 2020*

| Sentence Length | 2015-19 | 2020 |
|---|---|---|
| 1-5 years | 22 (14%) | 5 (16%) |
| 6-10 years | 18 (12%) | 4 (13%) |
| 11-20 years | 20 (13%) | 1 (3%) |
| 21+ years | 38 (25%) | 6 (19%) |
| Life w/ Possible Parole | 35 (23%) | 12 (39%) |
| Life w/out Parole | 16 (11%) | 2 (7%) |
| Condemned | 4 (3%) | 1 (3%) |

Table 10 shows time spent in CDCR during the current admission by individuals who died by suicide in the 2015-2019 composite and in 2020. During 2020, the amount of time served at the time of death ranged from five months to more than 28 years. In 2020, 20 (65%) decedents had served more than 11 years in CDCR custody. The eight men who had served over 20 years each had more than 192 total years in custody at the time of their deaths and accounted for 57% of all the time served by the 31 suicide decedents.

Table 10. *Frequency and Percent of Time Served at Time of Death of CDCR Suicide Decedents, 2015-2019 and 2020*

| Time Served | 2015-2019 | 2020 |
|---|---|---|
| 0-1 year | 37 (24%) | 4 (13%) |
| 1-5 years | 42 (28%) | 8 (19%) |
| 6-10 years | 26 (17%) | 6 (23%) |
| 11-20 years | 36 (24%) | 5 (39%) |
| 21+ years | 12 (8%) | 8 (26%) |

Table 11 shows the length of time remaining in sentences for those who died by suicide in the 2015-2019 composite and in 2020. Three individuals had no release date because they were condemned or sentenced to life without parole. Over half (N = 16) had more than 16 years left to serve, as opposed to only 25% in the previous five years.

Table 11. *Frequency and Percent of Time Left to Serve of CDCR Suicide Decedents, 2015-2019 and 2020*

| Time Left to Serve | 2015-2019 | 2020 |
|---|---|---|
| 0-1 year | 30 (20%) | 4 (13%) |
| 1-5 years | 47 (31%) | 8 (26%) |
| 6-10 years | 18 (12%) | 2 (7%) |
| 11-15 years | 20 (13%) | 1 (3%) |
| 16+ years | 38 (25%) | 16 (52%) |

***Cell Occupancy:*** It is typical for individuals to attempt suicide when they are alone in their assigned housing. They may be alone because they have not been assigned a cellmate, are assigned a single cell, they are housed in single-cell-designated housing (CTC, MHCB, or ASU/STRH intake cells), or their cellmate is away from the cell. In 2020, 28 (90%) suicide decedents were either housed on single-cell status (N = 17, 55%) or were housed alone although eligible for a cellmate (N = 11, 36%) at the time of their death. One man died while his cellmate was present, and two died in dormitory settings – one by ingestion/insertion in the bathroom and the other by poisoning. These figures are like the previous three-year period when 91% of suicide decedents were housed alone at the time of their deaths.

***Job/School Assignment***: In 2020, of the 30 individuals who had information available, 15 (50%) had a job or school assignment during their incarceration. From 2015 through 2019, among the 153 incarcerated persons who died by suicide, 103 individuals (33%) had a job or school assignment.

***Method of Suicide***: As in most years, ligature hanging predominated as the method of suicide with 24 individuals (77%) using it in 2020. This is less than the 81% of suicides by hanging between 2015 and 2019. In 2020, two individuals (7%) died by laceration and subsequent exsanguination, three (10%) individuals by asphyxiation, and two (7%) died after stabbing themselves with sharp objects.[49] Figure 7 shows the proportions of the different methods of suicide from 2015 through 2019 and 2020.

Figure 7. Method of Suicide, 2015-2019 and 2020



## MENTAL HEALTH FACTORS

***Mental Health Level of Care***. CDCR's MHSDS is divided into levels of care corresponding to increasing intensity of treatment. CCCMS and EOP are out-patient programs. The MHCB units and the Acute and Intermediate PIPs are licensed inpatient programs with 24-hour nursing care provided.

In both the community and correctional settings, individuals suffering from mental illness are overrepresented in the number of suicide deaths. In 2020, 68% (N = 21) of incarcerated persons who died by suicide in CDCR were participants in the MHSDS. Of those individuals not in the MHSDS at the time of their death, one had been discharged from the MHSDS 65 days prior to his death; one had been at the CCCMS level of care within the previous year; two had been at the CCCMS level of care within five years; and two had been at the CCCMS level of care almost ten years prior to their deaths. Four suicide decedents had never received mental health treatment in CDCR. Table 12 shows the frequency of suicides among the levels of care for 2011 through 2020 and the percent of total annual suicides for each year.

---

49 One of the two self-stabbing victims recovered initially but was then hospitalized for almost six months and expired from an infection. But for the initial wound, he would have lived.

Table 12. *Frequency of Suicide by MHSDS Level of Care and Percent of Total Annual Suicides, 2011-2020*

| Year | CCCMS | EOP | Inpatient | Percent of Total Annual Suicide Deaths in MHSDS |
|------|-------|-----|-----------|--------------------------------------------------|
| 2011 | 10 | 13 | 0 | 70% |
| 2012 | 12 | 5 | 1 | 55% |
| 2013 | 9 | 6 | 1 | 53% |
| 2014 | 12 | 9 | 1 | 96% |
| 2015 | 9 | 5 | 0 | 58% |
| 2016 | 7 | 15 | 0 | 82% |
| 2017 | 8 | 10 | 2 | 67% |
| 2018 | 12 | 10 | 1 | 68% |
| 2019 | 11 | 16 | 0 | 71% |
| **2020** | 11 | 7 | 3 | 68% |
| Total | 101 | 96 | 9 | 68% |

Table 13 shows the annual suicide rates of those incarcerated persons receiving mental health treatment in CDCR, those not receiving treatment, and the total CDCR populations from 2011 through 2020.[50] The 10-year rate of suicide for those individuals receiving mental health treatment is more than five times the rate for individuals not receiving treatment, a reflection of the close association of mental disorders with suicide death.

> **Mental Health Treatment Prior to Incarceration:** 21 (67%) of suicide decedents in 2020 had indications in their records that they had treatment for mental health problems in the community. Most of these individuals reported treatment as children or adolescents. This proportion is comparable to the 57% of individuals who died by suicide from 2017 through 2019 and reported some history of mental health treatment in the community.

Table 13. *Suicide Rate (per 100,000) of Mental Health, Non-Mental Health, & Total CDCR Populations, 2011-2020*

| Year | Mental Health Population | Non-Mental Health Population | Total Population Rate |
|------|--------------------------|------------------------------|------------------------|
| 2011 | 61.9 | 8.8 | 20.3 |
| 2012 | 53.6 | 16.0 | 25.9 |
| 2013 | 46.4 | 15.5 | 24.1 |
| 2014 | 56.3 | 2.2 | 18.2 |
| 2015 | 40.4 | 9.8 | 18.6 |
| 2016 | 58.3 | 5.5 | 21.0 |
| 2017 | 51.9 | 10.8 | 23.0 |
| 2018 | 60.9 | 12.0 | 26.3 |
| 2019 | 74.7 | 12.5 | 30.3 |
| **2020** | **70.7** | **13.2** | **17.3** |
| 10-Year Average | 57.5 | 10.6 | 22.5 |

> **Screening on Initial Arrival to CDCR:** All newly arrived individuals are administered an initial health screening questionnaire that contains some mental health questions. Within seven days upon arrival, a brief mental health screening questionnaire will also be administered. The questionnaires cast a relatively wide net to identify individuals

---

[50] This information was obtained from the CCHCS Health Care Placement Oversight Programs (HCPOP) monthly trends reports and the CDCR Office of Research Data Points series. The population totals vary slightly from other referenced population totals within this report, as the data from HCPOP is collected at different points of time and utilizes total population average.

who need in-depth evaluation. Those who screen positive on the health screening are referred to the mental health program. Those who screen positive on the mental health screening are provided a fuller mental health evaluation within 18 days of arrival.

Of the 31 individuals who died by suicide during 2020, four had arrived within one year of their death. Of the four, two were found to require further mental health evaluations and were placed in the MHSDS.

**Psychiatric Medication:** Of the 20 suicide decedents receiving mental health treatment at the time of their deaths, 15 (71%) were prescribed psychiatric medications as part of their treatment. Suicide case reviewers noted that medication compliance (either outright refusal or intermittent adherence) was an issue in 10 (67%) of those who were prescribed psychiatric medications.

A small number of MHSDS patients are subject to involuntary psychiatric medication orders per Penal Code Section 2602 due to severe mental illness and poor compliance with prescribed medications.[51] In 2020, one mental health patient was subject to an involuntary medication order at the time of his death.

**History of Admissions to CDCR Psychiatric Inpatient Programs:** Both in the community[52] and in correctional settings, one of the highest risk periods for suicide is after discharge from inpatient psychiatric hospitalization. Twenty-four (77%) of 31 suicide decedents in 2020 had been hospitalized in a CDCR inpatient psychiatric facility some time during their CDCR tenure, although only 21 were currently in the MHSDS at the time of their death.[53]

Nine (47%) of the 19 individuals who were at the CCCMS or EOP (i.e. outpatient) levels of care at the time of their death had been discharged from a CDCR inpatient psychiatric program within 12 months of their death. Eight had been discharged from MHCB units and one from a PIP. The average length of time from MHCB discharge to death was 118 days with a range of three to 318. One individual died eight days after being discharged from a PIP.

The rate of recent psychiatric hospitalizations for suicide decedents receiving mental health treatment in 2020 (47%) was identical to that of the three previous years. Additionally, the overall rate of psychiatric hospitalization for suicide decedents in 2020 was almost identical to that of the 2017-2019 period: 77% in 2020 compared to 76% during 2017-2019.

**Psychiatric Diagnoses:** The mental health diagnoses of individuals who died by suicide during 2020 and the previous three years are summarized in Table 14. Although many individuals use and abuse alcohol and illegal substances while incarcerated, substance-related and alcohol use diagnoses in Table 14 are included *only* when formally reported as a diagnosis in the medical record. All diagnoses are based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-V). Comorbidity is the rule rather than the exception among mental health patients, thus eight (38%) of 2020 suicide decedents had two diagnoses recorded and four (19%) had three.

---

51 Penal Code § 2602 provides for the involuntary administration of psychiatric medication if a psychiatrist determines that an inmate suffers from a "serious mental disorder" and "as a result of that disorder, the inmate is gravely disabled and does not have the capacity to refuse treatment with psychiatric medications or is a danger to self or others." Inmates are entitled to a hearing and the psychiatrist must certify that alternative methods of treatment "are unlikely to meet the needs of the patient."
52 Chung, D. T., Ryan, C. J., Hadzi-Pavlovic, D., Singh, S. P., Stanton, C., & Large, M. M. (2017). Suicide Rates after Discharge from Psychiatric Facilities. *JAMA Psychiatry*, *74*(7), 694 9. doi.org/10.1001/jamapsychiatry.2017.1044
53 Two of the three individuals not in the MHSDS at the time of their death had previously been hospitalized in inpatient psychiatric unit while in CDCR. One had a PIP hospitalization approximately 8-1/2 years prior to his death while the other had been treated in an MHCB unit.

Of the 21 individuals with DSM-V mental health disorders in 2020, the most common category of disorder was mood disorders (33%), which include Major Depressive Disorder, Depressive Disorder Not-Otherwise-Specified, Bipolar Disorder, and Mood Disorder Not-Otherwise-Specified. The next largest group was personality disorders (29%), followed by psychotic disorders (Schizophrenia, Schizoaffective Disorder, Delusional Disorder, and Psychotic Disorder Not-Otherwise-Specified) and adjustment disorders (both at 24%). Of note are that anxiety disorder (19%) and post-traumatic stress disorder (14%) were more prevalent in 2020 than in the previous three years.

Table 14. *Frequency of Mental Health Diagnoses of Suicide Decedents, 2020 and 2017-2019*

| Diagnosis | 2020 | 2017-2019 |
|---|---|---|
| Major Depressive Disorder | 33 | 25 |
| Depressive Disorder Not-Otherwise-Specified | 5 | 3 |
| Bipolar Disorder | 1 | 9 |
| Mood Disorder Not-Otherwise-Specified | 0 | 9 |
| Schizophrenia and Schizoaffective Disorder | 14 | 33 |
| Psychotic Disorder Not-Otherwise-Specified | 5 | 11 |
| Delusional Disorder | 5 | 0 |
| Anxiety Disorder | 19 | 4 |
| Adjustment Disorder | 24 | 19 |
| Post-Traumatic Stress Disorder | 14 | 4 |
| Personality Disorders | 29 | 31 |
| Alcohol Abuse or Dependence | 5 | 7 |
| Any Substance Use-related Disorder | 14 | 35 |
| Other Diagnoses | 0 | 1 |

## SUICIDE ATTEMPT HISTORY

In 2020, 58% (N = 18) of suicide decedents had a history of suicide attempts in the community and/or while in CDCR custody. Of these, four (13%) had evidence in the records of community suicide attempts but no attempts in CDCR custody. There was evidence by self-report or documentation that eight (44%) had multiple suicide attempts in the past. The overall percentage of 2020 suicide decedents with a history of suicide attempts was lower than in the five previous years, when, on average, 69% of suicide decedents had a history of CDCR or community suicide attempts.

*Suicide Precipitants and Behavior:* Individuals who kill themselves often experience significant interpersonal or life events in the weeks or months prior to death. These events are often identified as "precipitating" events that play a role in triggering an individual's decision to make a suicide attempt. Additionally, individuals can be "driven" to suicidal thinking and behavior by mental processes, such as the symptoms of a mental disorder, negative life events, or a collection of psychosocial stressors.[54] The frequency and percentage of total precipitants or drivers of suicides listed or suspected by CDCR suicide reviewers are presented in Table 15. In many cases, the precipitants or drivers were not entirely clear or definitively established. Rather, those identified by suicide case reviewers should be considered clinically presumptive about each individual's idiosyncratic reasons for ending their life, based on available records and information reviewed posthumously.

Rarely can one precipitant or driver be identified as the sole reason someone killed themselves. More often, there are multiple precursors that accumulate on top of pre-existing vulnerabilities. Reviewers identified 65 separate precipitants and drivers among the 31 suicides. The frequency of precipitants and drivers is greater than the total

---

54 Tucker, R.P., Crowley, K.J., Davidson, C.L. & Gutierrez, P.M. (2015). Risk factors, warning signs, and drivers of suicide: What are they, how do they differ, and why does it matter? *Suicide Life-Threatening Behavior 45*, 679-689.

number of suicides, as nearly all suicide case reviews identified more than one precursor. Seven individuals (23%) appeared to have only one significant precipitant or driver.

In 2020, mental health symptoms were identified by reviewers as significant in 15 (48%) of suicide decedents, the most frequent precipitant or driver found, and similar to previous years. Nine individuals (29%) had what might be termed crises of despair, isolation, loss, and hopelessness which appeared to drive them to attempt suicide. This category accounted for 14% of all the precipitants or drivers.

The interpersonal culture of prison may include coercion and threats of outright violence.[55] Thus, the general category of "safety concerns" figured prominently in multiple suicides during 2020. These concerns can center on prison gang issues, threats based on a commitment offense (particularly sex crimes), gambling or drug debts, intellectual disability status, or medical vulnerabilities (perceived or real). Reviewers identified 12 (39%) instances where the record suggested that safety concerns were a precipitant or driver to an individual's suicide death. This category accounted for 19% of all precipitants or drivers, the second largest driver with mental health symptoms being the largest.

Table 15. *Suspected Precipitants/Drivers of Suicide in CDCR, 2020*

| Precipitant and Drivers Category | Frequency | Percentage of All Precipitants and Drivers Identified |
|---|---|---|
| Mental health symptoms, e.g., anxiety, psychosis, depression | 15 | 23% |
| Safety concerns, drug debts, fears of victimization | 12 | 19% |
| Crises of despair and hopelessness, interpersonal losses, isolation, loneliness, | 9 | 14% |
| Medical illness and/or pain issues; medical disability | 8 | 12% |
| Substance-related issues (use, withdrawal, etc.) | 8 | 12% |
| Custodial issues (adverse transfer, long sentence, poor adjustment to prison, new charges, new court proceedings, etc.) | 6 | 9% |
| COVID-19 issues (fears about illness; loss of support through illness) | 3 | 5% |
| Board of Prison Hearings issues | 2 | 3% |
| Family history of suicide | 1 | 2% |
| History of childhood trauma | 1 | 2% |

Medical illness, chronic pain, and medical disability were found to contribute to eight suicides (26%) and 12% of all the precipitants or drivers in 2020. New criminal charges, disciplinary actions (Rules Violation Reports or RVRs), in-prison disruptions, Board of Parole Hearings issues, and other custodial or judicial issues contributed to six (19%) suicide deaths in 2020.

Most individuals enter prison with an increased risk for suicide-related thinking and behavior because of lifestyle, developmental vulnerabilities (e.g., childhood adversity), criminal background, and medical co-morbidities. However, a few suicides each year appear to have no proximal precipitating factors or triggers for death. In 2020, one individual who died by suicide did not appear to have any proximal cause of death.

---

55 See e.g., Toch, H. & Adams, K. (2002). *Acting Out: Maladaptive Behavior in Confinement*. American Psychological Association, Washington, DC.

Of the 31 individuals who died by suicide during 2020, seven (23%) left suicide notes. This percentage is higher than that (one in six) found in community samples,[56] but lower than the 37% in the previous five years of CDCR suicide deaths.

## CDCR, U.S. STATE PRISON AND CALIFORNIA SUICIDE RATES

The most recent estimates of state prison suicide rates published by the Bureau of Justice Statistics are for the years 2001 through 2018. The Bureau estimated the national state prison suicide rate in 2018 to be 26 per 100,000 incarcerated individuals.[57]

The appropriate community comparison for suicide rates of CDCR incarcerated individuals is California men, 18 years of age and older. The most recent data available is for 2019 and shows that adult men in California had a suicide rate of 22.6 per 100,000.[58] CDCR's suicide rate in 2020 was 27.3 per 100,000.

## DETERMINATION OF UNKNOWN CAUSES OF DEATH.

When a death occurs in CDCR for which there is no obvious cause, it is classified as an "Unknown Death." These cases receive special attention until the cause and manner of death is determined, particularly when suicidal intent needs to be determined in a timely fashion or is unclear. If a death notification lists the cause of death as unknown or undetermined, the SMHP tracks the case until the death is classified. In some instances, the cause and manner of death is quickly classified during an institutional medical review. In other cases, the cause of death remains undetermined pending the receipt of autopsy or toxicology results. In such cases, the CCHCS DRC will investigate the death and produce an initial cause of death as well as a final cause and manner of death determination. In the meantime, the SMHP communicates with the institution and with the DRC about these cases until the cause and manner of death is finalized. A member of the SMHP also sits on the DRC to ensure all unknown deaths are reviewed and, when applicable, that the possibility of suicide has been closely and objectively considered. The SMHP member of the DRC may discuss unknown or undetermined death with the headquarters SPRFIT committee, particularly when a history of suicide attempts is present or if there's some suspicion an overdose was intentional, rather than accidental.

The following guidelines for suicide reviewers are used to determine unknown deaths:

*Reviewer Guidelines for Determination of Unknown Deaths*

1. Review the method of death to determine if there may have been an alternative reason (other than suicide) for the behavior (e.g., autoerotic asphyxiation, confusion, inability to form intent, purposeful intoxication, etc.).

2. If an overdose on substances, is it reasonable that the substance (illicit or prescribed) may have been used to become intoxicated? (e.g., Tylenol is not likely to be used to become intoxicated; Klonopin may be).

3. Review recent mental health history and any past history of suicide attempts/self-injury behavior (check self-harm log). Did the individual:
   • Voice suicidal ideation (including conditional suicidal ideation)?

---

56 See Gelder, Mayou, and Geddes (2005). "Incidence of note-leaving remains constant despite increasing suicide rates." *Psychiatry and Clinical Neurosciences,* 4(1). And also: Cerel, J., Moore, M., Brown, et al. (2014). "Who leaves suicide notes? A six-year population-based study." *Suicide and Life-Threatening Behavior 45*(3), 326-334. https://dx.doi.org/10.1111/sltb.12131
57 The *Plata* Three-Judge panel recognized in 2011 that state-by-state comparisons are of "limited value" when they fail to "control for demographics of each state's inmate population." ECF No. 3641 at 88.
58 CDC Fatal injury data accessed on May 31, 2021: https://webappa.cdc.gov/sasweb/ncipc/mortrate.html

- Have admissions to a MHCB unit?
- Engage in self-injury behavior?
- Have a history of depression or mood disturbance?
- Have a history of psychosis?

4. Review substance abuse history.
   - What substances were used?
   - Have there been any past overdoses?
   - If yes, what did the individual say about them at the time?
   - What substance abuse treatment was offered?
   - How recent are reports of current use?

5. Review recent custodial information.
   - Was the individual facing criminal charges?
   - Did the individual lose an appeal?
   - Did the individual have any recent losses?
   - Was there any "bad news" readily apparent?

6. Review medical information for the presence of:
   - Chronic pain
   - Terminal illness

7. Was there a suicide note or a note that could be construed as such?

## SELF-INJURY INCIDENTS, INCLUDING SUICIDE ATTEMPTS.

Self-injury among incarcerated persons is a serious problem. A 2011 national survey collected data from 39 state and federal prison systems in the United States. The study's authors found that "in the average prison system less than 2% of individuals per year engaged in self-injurious behavior...."[59] Most systems surveyed reported that these types of incidents are at least somewhat disruptive to facility operations and consumed significant mental health resources.[60]

In 2017, CDCR established an electronic system to track incidents of self-injury. Suicide prevention coordinators in each institution enter data about intent, medical severity, method, and disposition into the electronic health record system. The On-Demand reporting system generates a real-time report available statewide that can be used to track individuals and injuries across all settings.

In 2020, the system reported 5,472 separate incidents of self-injury by 2,088 unique individuals.[61] The majority of these incidents (N = 4,285) resulted in no or minor injury. Most incidents of self-injury during 2020 (4,539, or 88% of all reported self-injury where the intent was known) were non-suicidal (Table 16). However, 616 (12%) were considered suicide attempts (self-injury with intent to die), of which 31 (0.6% of total incidents and 5% of all incidents with intent) resulted in death (suicides) (Table 17). There were also 317 incidents where intent could not be determined. Of these 13 had severe injuries and 79 had moderate.

---

59 Although two percent may appear small, across a national state prison population of more than 1.3 million individuals, two percent is more than 25,000 individuals who have self-harmed themselves

60 Appelbaum, K., Savageau, J., Trestman, R., Metzner, J., & Baillargeon, J. (2011). A national survey of self- injurious behavior in American prisons. *Psychiatric Services 62*(3), 285. https://dx.doi.org/10.1176/ps.62.3.pss6203_0285

61 Seventeen incidents (0.3%) had no data about intent and/or injury severity and were excluded from this analysis.

Table 16. *Non-Suicidal Self-injury Incidents in CDCR by Mental Health Level of Care and Injury Severity, 2020 (excluding incidents with unknown intent)*

| Level of Care | No Injury | Minor | Moderate | Severe |
|---|---|---|---|---|
| GP | 21 | 65 | 30 | 1 |
| CCCMS | 156 | 347 | 78 | 9 |
| EOP | 286 | 860 | 165 | 23 |
| MHCB | 137 | 412 | 59 | 6 |
| ICF | 163 | 879 | 169 | 18 |
| ACUTE | 112 | 481 | 55 | 7 |
| Total | 875 | 3,044 | 556 | 64 |

Of the 585 non-lethal incidents with intent to die, 219 (37%) had moderate or severe injury ("serious" attempts) and comprised 4% of all self-injury incidents with or without intent to die. Of the incidents considered serious non-lethal suicide attempts, 74 (34%) were by individuals at the EOP level of care, 53 (24%) were at the CCCMS level of care, 75 (34%) were among psychiatric inpatients, and the remaining 17 (8%) were either not in the MHSDS or were in a Reception Center. During 2020, ten individuals made two serious suicide attempts and 16 individuals made three or more serious suicide attempts. The most common methods used in serious attempts were laceration (N = 85), poisoning (N = 41), hanging (N = 24), and insertion/ingestion (N = 19). Jumping (N = 4), asphyxiation (N = 5), and combinations (N = 41) made up the remaining incidents.

Table 17. *Self-Injury Incidents in CDCR with Intent to Die, by Mental Health Level of Care and Injury Severity, 2020 (excluding incidents with unknown intent)*

| Level of Care | No Injury | Minor | Moderate | Severe | Death |
|---|---|---|---|---|---|
| GP | 12 | 12 | 12 | 5 | 10 |
| CCCMS | 39 | 49 | 37 | 16 | 11 |
| EOP | 42 | 67 | 57 | 17 | 7 |
| MHCB | 28 | 42 | 18 | 9 | 0 |
| ICF | 11 | 27 | 28 | 10 | 2 |
| Acute | 9 | 28 | 7 | 3 | 1 |
| Total | 141 | 225 | 159 | 60 | 31 |

Of the 4,539 incidents of non-suicidal self-injury, 620 (14%) were classified as moderate or severe in medical severity. The most common methods of NSSI were laceration and ingestion or insertion. More than 95% of the NSSI lacerations were classified as No Apparent or Minor Injury. Of the ingestion or insertion injuries, 77% were classed as "No Apparent or Minor Injury." Overall, 92% of unique individuals with non-suicidal self-injury were participants in the MHSDS, with 63% at the CCCMS and EOP levels of care.

## DETERMINATION AND TRACKING OF QUALITY IMPROVEMENT PLANS.

Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case. QIPs are developed based on concerns or departures from policies and procedures identified by custody, nursing, medical, and mental health case reviewers. The plans are designed to remedy specific issues raised within each review, though in some cases the plans developed address statewide policy or prevention initiatives.

During 2020, 202 QIPs were generated for 31 Suicide Case Reviews, an average of approximately seven QIPs per suicide review with a range of zero to 36. Figure 8 shows the percentage of QIPs for the four domains during the five

year period from 2015 to 2019 and for 2020. The largest number of QIPs are directed to Mental Health services, followed by Nursing, and then Custody. The proportion of QIPs in each domain in 2020 was not significantly different than for the 2015 through 2019 period. QIPs focused on mental health services continued to predominate during the report period with just over 60% of all QIPs.

## AUDITS OF SUICIDE REVIEW QUALITY

Suicide case reviews are audited for the presence or absence of 15 elements considered necessary for an adequate review. The 15 elements can be found in Table 16. In the five years before 2020 overall compliance with audit items was high. Of 75 items over the five years, only four audit items fell below 90%, a compliance rate of 95%.

Figure 8. *Proportion of Suicide Case Review QIPs by Domain, 2020 and 2015- 2019*



The compliance rate in 2020 was 99%. No categories fell below 90% compliance. However, there were three categories that were not at 100% compliant: comprehensive nature of the Institutional Function section (94% compliance of 31 applicable cases), the quality of the past-year's suicide risk assessments (96% compliance in 24 applicable reviews), and the Quality Improvement Plans recommendations being adequate to address the concerns (97% compliance in 31 applicable reviews). Not all cases have all audit items, and so the number of applicable cases is often less than the number of total cases over the three years. The audit was completed by SMHP senior staff who do not write suicide case review reports but participate in the review of cases. Audit results are presented in Table 16.

Table 16. Results of Quality Audits, 2020 Suicide Case Review Reports

| Audit Item | Applicable Cases | Compliance |
|---|---|---|
| 1. Does the Executive Summary describe the means of death, the emergency response taken, and the Mental Health (MH) LOC of the patient? | 31 | 100% |
| 2. Are the sources for the Suicide Case Review (SCR) identified? | 31 | 100% |
| 3. Are substance abuse issues reported, if applicable? | 29 | 100% |
| 4. Does the Institutional Functioning section include information on institutional behavior, including disciplinary history? | 29 | 94% |
| 5. Does the Mental Health History review the adequacy of mental health care and screening? | 31 | 100% |
| 6. Are medical concerns discussed (e.g., chronic pain, terminal illness) or is the absence of medical conditions noted? | 31 | 100% |
| 7. Is the quality of the most recent suicide risk evaluations (past year) reviewed, with comment on risk level, safety planning, and risk and protective factors? | 23 | 96% |
| 8. Does the Suicide History section review all prior attempts, as applicable? | 24 | 100% |
| 9. Are significant pre-suicide events discussed (e.g., receipt of bad news or existence of a safety concern)? | 31 | 100% |
| 10. Was a risk formulation offered specific as to why the person was vulnerable to suicide? | 31 | 100% |
| 11. Does the review comment on the adequacy of the emergency response? | 31 | 100% |
| 12. Are all violations of policy and breaches of standards of care in mental health, medical, and nursing addressed in the reviewer's concerns, if applicable? | 31 | 100% |
| 13. Were custody policies followed? If not, were violations noted in the report? | 31 | 100% |
| 14. Were all concerns raised by reviewers (custody, nursing, and mental health) represented in Quality Improvement Plan recommendations? | 31 | 100% |
| 15. Were the Quality Improvement Plan recommendations adequate to address the concerns? (e.g., QIP should not simply say conduct an inquiry and report findings). | 31 | 97% |
| Compliant Items/Total Items | 445 | 99% |

## TIMELINESS OF SUICIDE CASE REVIEWS AND SUICIDE REPORTS

The process of responding to suicides, completing reviews, writing, and editing reports, tracking QIP compliance, and so on, is complex. Timelines for each step of suicide response are specified in the MHSDS PG, 2018 Revision. Internal deadlines have also been developed to ensure timelines for each step of the suicide response process are met. The number of days for each step of the response to a suicide as specified in the PG are shown in Table 18.

Table 18. *Suicide Case Review Tasks and Timelines as Specified by the MHSDS Program Guide*

| Case Review Actions | Number of Days after the DOD within which the action must be completed |
|---|---|
| Suicide reviewer assigned | 2 |
| Site visit | 7 |
| Institutional Internal Review submitted to the SMHP | 10 |
| Custody & Nursing Report due to MH reviewer | 22 |
| Suicide report received by the SMHP | 25 |
| Suicide Case Review conference | 45 |
| Final suicide report to institution approved and signed by MH/DAI | 60 |
| QIPs completed at the Institution and submitted to the SMHP | 60 (30 days from the receipt of the final report) |
| Final QIP Report reviewed and approved/signed by MH and DAI leadership | 120 |
| Final QIP report electronically transmitted to the OSM | 180 |

In reviewing the timeliness of the reporting and review process for 2020 suicides:

- Assignment of the suicide reviewer was completed within two days in 24 (77%) of 31 cases, and within four days in 28 of 31 cases (90%).

- Review team (mental health and custody) site visits were disrupted during 2020 due to COVID-19 restrictions on travel and entry to institutions. Of the 31 cases for review in 2020, site visits were completed for 18 (58%). Of the 18 site visits, only six (33%) were completed within seven days of the date of the individual's death. Fifty percent (N = 9) were completed within ten days of the date of death.

- Seventeen (55%) of reports were completed within 25 days of death and an additional four (13%) within 28 days. The remaining ten reports were received from between 31 to 46 days after the individual's death.

- The average time for a draft report to be transmitted to the OSM was 29 days from the date of death. Four reports (13%) were sent more than 40 days after the date of death.

- Eighteen SCR meetings (58%) were held on time. Eight (26%) additional meetings were held within one week of the required timeframe. The remaining five late meetings ranged from 12 to 33 days late.

After suicide reports are reviewed at the SCR meeting, final edits are completed, and a finished report will be sent to the institutions within 60 days after the date of death. In 2020, 29 reports (94%) were sent to institutions within 63 days (ten within 60 days). The other two reports were sent at 72 and 73 days after the date of death.

QIPs are required to be reported back to headquarters where they are reviewed and eventually transmitted to the OSM. The timeframe for return of completed QIPs to headquarters is 120-days post-death. In 2020, six reports (19%) were returned by the 120-day mark. The remaining 25 (81%) were all completed by 135 days post-death.

## COMMONALITIES IN INDIVIDUAL CASE REVIEWS

Case reviewers found a number of commonalities among the 31 suicides in 2020.  Most of these variables are systemic issues that cross disciplinary and professional lines. Case reviews assess elements such as an individual's care, functioning, and behavior in the year leading up to their death and evaluate the institutional response to the suicide attempt.

When an element is found to be lacking or of poor quality, the reviewer will almost always recommend a QIP be implemented. For instance, risk assessments are scrutinized closely to make sure they capture the essential elements, thus are accurate reflections of the individual's current risk state. Other elements of cases may or may not result in QIPs, depending on the severity of deviation from policy and procedure, how directly the element is related to the suicide death, and other issues tangential to the suicide. In SCR reports, reviewers *may* comment on what was done well within an institution and *may* state areas where policy was correctly followed. However, these comments are not required, as it is assumed staff members follow policy and will act professionally in their work with individuals. In contrast, reviewers *must* identify departures from policy or from standards of care by creating formal QIPs applicable to each identified issue. Reviewers may also point to clinical, medical, or custodial practices that could be improved either at an institutional level or throughout all institutions; these practice suggestions can be addressed through QIP processes as well. Institutional responses to QIPs are sent to the SMHP and DAI leadership for review. If a QIP response is inadequate, the SMHP and DAI will request clarification, additional development, or implementation of the QIP, and QIPs are not considered final until approved at the headquarters level.

A review of areas of concern found that 83% (N = 19) of 23 applicable cases[62] found deficiencies in risk assessment practices; 87% (N = 20) had poor treatment planning practices; and the quality of mental health contacts was deficient in 30% (N = 7) of cases. Other issues that prompted QIPs were nursing services (including suicide watch practices and documentation) (10% of cases); the adequacy of "wellness checks" in segregated housing (10%); emergency response issues, particularly delays in calling 911 (55%); inadequate welfare checks in segregated housing (3%); poor coordination between medical and mental health staff (6%). Two cases (6%) involved individuals found deceased and in rigor mortis, a significant problem in recent years. One case involved a failure to report Prison Rape Elimination Act (PREA) allegations. Finally, the COVID-19 pandemic in 2020 had both direct and indirect effects upon four cases. Some of these issues involved failure to interview patients due to quarantine and delayed transfers to higher levels of mental health care. The indirect effects of the COVID-19 are more difficult to assess, but in at least two cases the deaths of family members were noted by reviewers to have had an impact on the final days and weeks of individuals who died by suicide in CDCR.

An area of primary concern across all cases is the adequacy of suicide risk assessment and formulation, and subsequent management of that risk. Not all individuals living in CDCR exhibit overt suicide risk, but the department's overall system of mental health screenings, suicide risk evaluations, staff suicide risk awareness, and trainings is designed to detect clinically significant risk and treat it accordingly. Eighty-three percent of applicable cases had problems with at least one suicide risk evaluation or the clinical management of the assessed level of risk. Problems can include overall quality concerns; poor documentation of risk factors; problems with risk formulation; and failure

---

[62] Some areas of concern apply to all individual deaths. Others such as risk assessment and treatment planning may only apply to those in the MHSDS at the time of their death. In 2020 23 individuals were either in the MHSDS at the time of their death or had been in during the period reviewed by reviewers.

to complete suicide risk evaluations when they were required by clinical standards or policies. Problems in documentation, risk formulation, or failure to complete a risk evaluation can lead to errors in risk management. Poor risk assessment leads directly to inadequate risk management, which may include levels of monitoring, safety planning, or follow-up with providers.

Poor quality mental health treatment planning can affect an individual's ability to adequately program in the prison environment. Suicide risk assessment and formulation of risk is an important aspect of treatment planning. Additionally, if suicide risk is not recognized by clinicians and their team, then adequate management of that risk is not possible. Of the 23 applicable cases in 2020, 87% were judged by case reviewers to have had inadequate treatment planning. Issues noted included poor discharge planning from inpatient settings, efforts to deal with poor treatment participation, and inadequate recognition of and efforts to deal with chronic suicidal ideation.

The quality of contacts with mental health staff can make a difference in outcomes for an individual. Good quality interactions act as modelling of positive and prosocial interactions and increase the probability of changing behavior. On the other hand, poor quality or simply the lack of contacts can alienate an individual from mental health treatment and lead to distrust of and distancing from mental health staff. In 2020, reviewers found that seven individuals (30%) who died by suicide had poor quality mental health contacts at some time in the year prior to their death.

Aspects of nursing practices considered in suicide case reviews include nurse and licensed psychiatric technician (LPT) rounds, nursing observations when required for individuals in segregated housing settings and inpatient settings, and while a patient is on suicide watch or precautions either in alternative housing or in MHCB. Additionally, nursing documentation and knowledge of procedures during emergency response efforts are considered by reviewers. Typically, problems in any of these areas will yield a mention of concern and findings in CCHCS death reviews. In 2020, nursing reviewers found deficiencies in nursing practices in six cases (19%) involving documentation of suicide rounding, coordination of care, and delays in responding to emergency sites.

Monitoring of individuals either in high-risk housing (such as ASU) or in a medical settings while the individual is on suicide watch are important components of suicide prevention. In three cases (10%) during 2020, custody checks in an ASU and STRH were judged as inadequate and not conducted per policy. Two of these individuals were found with evidence of rigor mortis despite evidence of earlier security and wellness checks.[63]

A prompt, vigorous, and timely emergency response can save a life. The response of custody, nursing, and health care staff is considered in CDCR's ratings of emergency response. Reviewers had concerns focused on emergency response in 17 (55%) of suicide death cases during 2020. Nine of the cases involved delays in calling 911. Other cases involved removal of a ligature, cut-down tool issues, donning Personal Protective Equipment, and one case of nursing delays. Three cases involved the placement of handcuffs or other mechanical restraints on unconscious individuals during the rescue activities.

Rigor mortis is a condition of the body after death that involves stiffening of the musculature due to postmortem chemical reactions and indicates a person has been deceased for a period ranging from two to six hours.

---

63 Rigor mortis is "the state of postmortem stiffening." It "starts developing within 1 to 2 hours after death," "becomes apparent in the small muscle groups first" including "eyelids, lower jaw, face," "but on an average it may be said to commence 2-4 hours after death…" Kori (2018). Time since death from rigor mortis: Forensic perspective," *Journal of Forensic Sciences and Criminal Investigation, 9 (5), 1-9.*

## SUICIDE RESPONSE PROCEDURES

The process of responding to and reviewing suicide deaths is governed by the MHSDS Program Guide, 2019 Revision, and internal timelines of the Suicide Prevention Program of the Mental Health Program.

**Reporting of a suicide to stakeholders:** When an inmate dies by suicide, members of the SMHP complete two formal notification processes. First, a death notification is written and sent to the OSM and contains details of the suicide. Second, a summary of the suicide is composed and sent to the Deputy Director of the SMHP and the Undersecretary of the DHCS as well as the Governor's office. The Public Information Officer at the institution is assigned with any local notifications or reports regarding the death, including notifying the next of kin of the suicide.

**Institutional internal review process**: The internal process for reviewing suicides at CDCR institutions includes reviews by mental health, custody, and nursing/medical personnel employed at that site. The reviews are conducted first within disciplines and then within joint institutional reviews, such as during SPRFIT and emergency medical response committee meetings.

Each CDCR institution has a SPRFIT committee, chaired by a Senior Psychologist Specialist assigned to coordinate local prevention and response efforts. The institution's SPRFIT is established and maintained by the Mental Health Program subcommittee, with both committees being part of local Quality Management Committee.45 Each institutional SPRFIT is responsible for monitoring and tracking all self-harm events, ensuring that appropriate treatment and follow- up interventions occur. When deaths by suicide occur, the local SPRFIT coordinator is required to notify the SMHP, to provide assistance to mental health, custody, and nursing suicide reviewers, and to ensure the implementation of QIPs resulting from the suicide review.

**External review processes**: CDCR's response to suicides includes external reviews by nursing, medical, custody, and mental health staff. Within three days of the suicide, headquarters reviewers from each discipline are assigned to review the case. The role of each discipline's review is discussed separately below, but these disciplines collaborate with each other during the suicide review process, sharing initial findings, conducting reviews together, etc.

Trained custody and mental health reviewers conduct an on-site visit together within seven days of a suicide. Reviewers inspect the deceased's property, listen to recorded phone calls, check trust account records, and talk with the institutional Investigative Services Unit (ISU). Reviewers evaluate emergency response actions and review the medical and mental health services rendered in the case, if applicable. Reviewers will also talk with officers, clinicians, work or school supervisors, and cellmates who may have known the patient. Reviewers may gather information from other sources as well, e.g., interviews of family members. After thorough chart review, reports are generated by each discipline, with a combined report, the Suicide Report, distributed and discussed in the SCR.

SCR meetings review findings in the case within and across disciplines while sharing information with institutional leadership. The Suicide Report contains QIPs that are presented at the SCR; these plans cross disciplines as well. Nursing, medical, and mental health disciplines additionally have peer review bodies that are able to review staff performance when indicated. The external review process is completed when all QIPs have been successfully implemented or resolved in the case.

**DAI Mental Health Compliance Team (MHCT) reviews:** The reviews completed by DAI's MHCT focus on the performance of custody staff members related to the suicide. The MHCT member reviews custody documentation and institutional records (i.e., SOMS). The MHCT member's role is to determine whether departmental suicide

prevention practices and policies were followed by custody staff involved in the case. The MHCT reviewer, for example, evaluates whether custody officers followed procedure during the emergency response, how quickly the response was called once the suicide attempt was discovered, and whether all custody staff responding to the incident had received required training (e.g., in CPR) within set timelines (e.g., annually). The context of the suicide may necessitate additional review items. Most notably, if the individual was in a segregated housing unit at the time of the suicide, the MHCT reviewer will evaluate performance on tasks such as timeliness and quality of welfare checks, as specified by policy, whether inmates new to an ASU were placed in intake cells, and so forth. The MHCT reviewer also constructs a timeline for the emergency response and for significant events leading up to the suicide. Finally, the MHCT reviewer will document any concerns noted and will recommend corrective action/QIPs.

**Nursing reviews:** At the same time as a suicide is reviewed by DAI's MHCT, a Nurse Consultant Program Reviewer (NCPR) is assigned by a Headquarters Chief Nurse Executive. The NCPR does not make an on-site visit, but reviews all health care record documentation as to the quality of nursing care in the case. LPT practice is also covered within the nursing review. The NCPR and mental health case reviewer frequently consult on cases during the review period.

The NCPR generates a Nursing Death Review Summary (NDRS). The NDRS lists the primary cause of death, notes whether coexisting conditions were present prior to the death, summarizes medical history, reports what medications and medical treatment the patient was receiving, and documents significant events that occurred medically for the patient prior to and at the time of discovery. The NCPR determines if nursing standards of care were met within the emergency response to the suicide and whether nursing standards of care were met in the overall medical care of the patient prior to the time of death.

**CCHCS Death Review Committee:** The CCHCS Death Review Committee reviews all causes of inmate mortality within CDCR. When a suicide occurs, the Death Review Committee assigns a physician to serve as the medical reviewer. This physician works with the NCPR to examine all aspects of health care received by the patient and will yield an opinion as to the cause of death. As needed, the SMHP reviewer may also consult with the CCHCS physician reviewer. The physician and NCPR produce a Combined Death Review Summary (CDRS) on each case. The CDRS contains both an administrative review and a clinical mortality review of the case. In cases of suicide, the suicide report (discussed above) is reviewed by the Death Review Committee and addends or is integrated with the CDRS.47 The findings of the NDRS and CDRS are then considered by the CCHCS Death Review Committee for corrective actions on either an institutional or individual basis. 47 CCHCS Health Care Department Operating Manual (HCDOM), Sec. 1.2.10

**Statewide Mental Health Program (SMHP) reviews:** Simultaneous to custody, medical, and nursing reviews, a trained member of the SMHP is assigned to review each suicide. The assigned Mental Health Suicide Reviewer, typically a Senior Psychologist Specialist, is tasked with completing a Suicide Case Review. The Mental Health Suicide Reviewer schedules an on-site visit with the institution and is accompanied by the custody reviewer. The site-visit is conducted within seven calendar days of the death. The site review consists of an inspection of the location of the suicide and of the means used in the death, an inspection of the deceased's personal property, and interviews of inmates, officers, medical, or mental health staff members who knew, interacted with, and/or treated the deceased. The deceased's property is inspected to see if there is any information present related to the suicide, such as a suicide note, letters to the inmate informing he/she of bad news, and other information associated death. Interviews focus on behavior and statements made in the days prior to the suicide, with questions about anything the deceased may have said about being distressed or suicidal in past days, weeks, or months. Photographs of the scene at the time of death and photographs of the autopsy are made available, as are phone records, trust accounts, toxicology reports, and other information. The Mental Health Suicide Reviewer may contact family

members of the deceased to gain additional information about the individual's state of mind, statements made prior to the suicide, etc.

In addition to the on-site review, the Mental Health Suicide Reviewer reviews extensive documentation from medical and custodial files. The focus of the Mental Health Suicide Reviewer will vary based on the factors in the case, though all relevant information is reviewed in each case. In some cases, the review will concentrate on mental health treatment received while at CDCR; in others, on the quality of suicide risk assessment; in yet others, on the presence or absence of distress when an inmate is placed in administrative segregation, and so on. SMHP psychiatry staff review the psychiatric care and consult with the Mental Health Suicide Reviewer. The Mental Health Suicide Reviewer will review information from each of the institutions where the deceased resided and will look at whether mental health policy and procedure was followed at each setting.

**Determination and tracking of QIPs**: Each Suicide Case Review report may include formal QIPs as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing, medical, or mental health case reviewers. QIPs may represent areas of deviation from policy or procedure, departures from standards of care, or systemic issues that require examination, modification, or innovation. QIPs may be written for any discipline and can focus on the specific institution where the suicide occurred. Occasionally a QIP will request that an institution's warden determine whether a formal investigation take place involving one or more aspects of a death. If systemic issues are identified, the QIP can be directed to the SMHP SPRFIT, a team that can address statewide policies and practices. The DCHS SPRFIT team includes representatives from nursing, custody, legal, mental health, and mental health quality management. This representation allows the team to review issues and find solutions in a manner that is inclusive of disciplines and effective in addressing problems.

SCR meetings are held by teleconference so that staff from the institution can attend. During the meeting, the case reviewer will read sections of the Suicide Report. The Suicide Case Review Committee (SCRC) is made up of members of the CDCR SMHP, DAI MHCT, Nursing Executives, CDCR's Office of Legal Affairs, and medical personnel (as needed). The SCRC also discusses the QIPs raised within the Suicide Case Review with the institution. Institutional staff can respond to or clarify concerns raised in the report, can raise additional concerns, or can discuss ways of meeting the requirements of QIPs. Since late 2015, experts from the OSM are present by phone and, having reviewed the draft report, may raise additional concerns or issues. QIPs can also be written as pending concerns that need to be addressed if a fact or finding awaits further information, such as awaiting the results of a coroner's report to determine the time of death.

**Audits of Suicide Case Review Quality:** The DHCS Quality Management Unit audits all SCRs for fifteen items. The Suicide Case Reviews are scored with required elements marked present or absent.

## DATA SOURCES AND METHODS

**Data Sources**: Rates of suicide are calculated using data from the SMHP and the CDCR OOR. CDCR population data varies slightly by source and counting rules. The OOR maintains and publishes weekly and monthly population reports.

The SMHP is notified of deaths throughout the CDCR system, including institutions, camps, in-state contract beds (California City Correctional Facility and privately-run community correctional facilities), and Department of State Hospital facilities.

The figures for mental health and non-mental health populations in the body of this report were obtained from the monthly trends report of the OOR. Over the years, the OOR has also published a variety of reports about individual characteristics. Most recently, these statistics have been aggregated in an annual report entitled, "Data Points." Figures in the tables indicating statewide proportions of age, ethnicity/race, commitment crimes, mental health level of care, and security level were calculated using the year-end population figures from the OOR Data Points publications and directly from the OOR via their "Data Concierge Service."[64]

The SMHP suicide prevention program maintains a series of databases for tracking and reporting purposes. Custodial and individual characteristics of individuals who die by suicide are collected by suicide reviewers as part of their review. Data collected by reviewers is aggregated and is the source for many of the report's tables in the sections on custodial and mental health characteristics.

Beginning with the implementation of EHRS in 2016, data about self-injury incidents has been collected via a Self-Harm PowerForm (computer screens that allow staff to enter information about the incident). The aggregated data is used to produce an On-Demand report available as part of the mental health program's quality management reporting. Definitions of self-injury are taken, in part, from the Centers for Disease Control and Prevention's (CDC) Self- Directed Violence Nomenclature manual.[65]

Self-injury data from 2020 was inspected for accuracy. Of the 5,472 incidents recorded in the database, less than one percent were found to be in error. These errors were inspected, and the most likely explanation was data entry errors. These reports were excluded from this analysis.

The data for rates of suicide for California was downloaded from the fatal injury data section of the CDC's Web-based Injury Statistics and Query Reporting System (WISQARS)[66] which allows the user to filter for a variety of demographic variables.

**Methods:** Rates of suicide are calculated on an annual basis and standardized by the number per 100,000 to make comparisons between large samples and populations. When the number of deaths is small (twenty or less), the rates are not considered reliable, become overly sensitive, and lead to "large, but meaningless increases or decreases." Although this report provides rates for groups of less than twenty (e.g., for female suicides in Table 1) readers are cautioned to not over-interpret these findings.

---

64 See https://www.cdcr.ca.gov/research/offender-outcomes-characteristics/offender-data-points
65 Crosby AE, Ortega L, Melanson C. Self-directed Violence Surveillance: Uniform Definitions and Recommended Data Elements, Version 1.0. Atlanta (GA): Centers for Disease Control and Prevention, National Center for Injury Prevention and Control; 2011.
66 See https://webappa.cdc.gov/sasweb/ncipc/mortrate.html

Best practices dictate that mortality rates are calculated using the population at risk in the denominator.[67] Because prison populations can fluctuate over a 12-month period, choice of time-point is important. Bureau of Justice Statistics mortality reports for state prisoners used mid-year prison system populations[68] until ten years ago when the Bureau switched to end-of-year prison system populations.[69] CDCR's annual reports of suicides, as well as those of the experts from the OSM, have most often used the mid-year total population as the denominator for rate calculations. Other experts have used the total of incarcerated individuals in institutions and fire camps in the denominator, which neglects more than 2,000 individuals under CDCR and CCHCS jurisdiction. Table 18 presents how differences in choice of denominator can produce different estimates of the annual CDCR suicide rate.

Table 18. *Suicide Rates by Choice of Denominator (Population at Risk), 2020*

| CDCR Monthly Population Report | Suicides | Population at Risk | Suicide Rate |
|---|---|---|---|
| Total Population, June 30, 2020 | 31 | 113,403 | 27.3 |
| Institutions/Camps Only, June 30, 2020 | 31 | 108,393 | 28.6 |
| Total Population, Dec. 31, 2020 | 31 | 95,432 | 32.5 |
| Institutions/Camps Only, Dec. 31, 2020 | 31 | 92,116 | 33.7 |

Another concern is how best to make comparisons with other prison systems, as has been presented in previous reports. The federal Bureau of Justice Statistics collects, aggregates, and publishes data on state prison suicides pursuant to the Death in Custody Reporting Act of 2000. The most recent compilation was published in 2020 and included mortality rates for a variety of causes of deaths including suicide for the years 2001 through 2018.

The demographics are important when comparing state prison systems who may draw from demographically divers underlying populations. The Three-Judge Court Panel pointed out in 2011 that state-by-state comparisons are of "limited value" when they fail to "control for demographics of each state's inmate population."[70] Suicide rates vary by age and racial/ethnic group. For example, in the community Hispanic suicide rates are lower than for Whites. Similarly, suicide rates for older individuals are higher than corresponding rates for younger individuals. [71] Incarcerated Hispanic individuals comprise over 40% of CDCR's population, while states with large prison systems, such as Florida and New York, the proportion of Hispanic incarcerated individuals is much smaller.[72] Demographic data on individual state prison systems and suicide deaths is not easily obtainable and has been reported by the BJS only as aggregate figures in their presentation of the causes of death or in aggregate reports of all state incarcerated populations. The ability to fully calculate and make meaningful comparisons with other states is thus limited. It is worth noting that over the years that CDCR and the OSM have been producing annual reports on suicide, these types of fine-grained analyses have not been presented.

Finally, rate calculations can fluctuate more widely for female individuals than the rate for men (see Table 1), as the female population is smaller than one-twentieth of the male population (4,721 vs. 113,403 at mid-year in 2020). To illustrate, 2017 and 2018 had remarkably similar female incarcerated populations (5,971 and 5,906) and yet because there was one less suicide in 2018 than in 2017 (one vs. two), the rate of suicide in 2018 was 36% less. Also, in 2018,

67 See Siegel, J. S., & Swanson, D. A. (Eds.). (2004). *The methods and materials of demography* (2nd ed., p. 269). San Diego, CA: Elsevier Academic Press.

68 Mumola, C. (2005). Suicide and homicide in state prisons and local jails. Report NCJ 210036. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC.

69 Carson, E.A. (2020) Mortality in state and federal prisons, 2001-2018 – statistical tables. Report NCJ 256002. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC.

70 *Coleman v Newsom*, Electric Court Filing Number 3641 at 88.

71 See e.g., https://suicidology.org/wp-content/uploads/2020/02/2018datapgsv2_Final.pdf

72 See, e.g.: http://www.dc.state.fl.us/pub/annual/1819/FDC_AR2018-19.pdf and https://doccs.ny.gov/system/files /documents/2019/09/Under%20Custody%20Report%202018.pdf

for instance, a decline of one suicide in male individual deaths would have lowered the rate from 26.7 to 25.9, a difference of three percent.