# Exhibit A

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                                GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



February 4, 2022

Damon McClain, Esq.
Elise Thorn, Esq.
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-550

VIA EMAIL

RE: Revised CDCR Data Activation Schedule: 90-Day Update

Dear Mr. McClain and Ms. Thorn:

On Friday, January 7, 2022, CDCR noticed the calculations for all provisionally approved indicators remained unchanged for four consecutive weeks, despite the underlying work progressing steadily. CDCR performed a quick audit to determine the cause and discovered coding errors were contributing to miscalculations.

On Wednesday, January 12, 2022, CDCR established a dual authentication team to conduct a full audit, which took approximately two weeks. The audit uncovered several coding issues that led to miscalculations of the progress toward completion of Data Remediation. The results of the analysis identify two primary sources of the miscalculations:

- Initial coding to track the four-week preparation step failed to include three of the four weeks of progress. This coding error was exclusive to the progress of all provisionally approved indicators, which resulted in a slower rate of incremental progress.

- Changes to the tracking system aimed at monitoring responses from Plaintiffs' counsel, the Special Master's team, and CDCR's Office of Legal Affairs during stakeholder review were inadvertently added to the overall timeline. This negatively impacted the incremental progress calculations, and the miscalculations were exacerbated by the delayed stakeholder feedback from the Special Masters team.

CDCR has resolved these coding issues and established preventative measures to address the root causes of the miscalculations. While the audit helped CDCR identify coding errors and establish ongoing preventive measures, the issues were discovered after the January 7, 2022 Data Activation Schedule was filed. Based on our current findings and updated calculations, the following graphs and figures have changed:

- Figure 2 CDCR Key Indicators Remaining Work (as of 12/31/21) on page 4[1]
- Figure 3 All Provisionally Approved Key Indicators Remaining Work (as of 12/31/21) on Page 5
- Figure 4 Estimated Impact of Contingency: Delayed CQI Guidebook Updates on Page 8
- Figure 5 Estimated Impact of Contingency: Updated Verification Process on Page 10
- Figure 7 Incremental Progress of Data Subcomponents Completed at Each Step in the Data Validation and Verification Process as of 12/31/21 on page 13

There are also text changes in the body of the document and changes to the incremental progress list in section IV based on the updated calculations. These revisions are in track changes so it is easy for the reader to determine what was updated.

Respectfully,

*/s/ Melissa C. Bentz*

MELISSA C. BENTZ
Attorney
Office of Legal Affairs

---

[1] All page numbers are based on the numbering in Attachment A.

# ATTACHMENT A

CDCR DATA ACTIVATION SCHEDULE: 90-DAY UPDATE
January 7, 2022

I.    EXECUTIVE SUMMARY

Since Defendants filed the Preliminary Data Activation Schedule on September 29, 2021, incremental progress on CDCR key indicators[1] increased from 27% to ~~43~~42%, and incremental progress on all provisionally approved key indicators increased from 8% to ~~18~~33%. Because of this progress and all of the work previously completed, and the dedicated efforts of CDCR staff to mitigate any delays, significant strides have been made over the past three months to achieve data remediation. CDCR remained on track with its original activation schedule, with some components currently ahead of schedule. But continued progress depends on other stakeholders, including Plaintiffs and the Special Master, to fully participate in the process laid out in Defendants' remediation plan. Further, despite the parties' substantial investment of time and resources over the past two years and repeated efforts by Defendants to obtain clarity, the process for completing data remediation remains unclear.

When Plaintiffs and the Special Master followed the established Data Validation and Verification process (ECF No. 7334 at 24-36), CDCR made steady progress towards data remediation. Most of the indicators processed over the past three months were relatively straightforward. Processing less complex indicators first allowed CDCR to test the data remediation process at full speed. This strategy uncovered some improvement opportunities – such as the process of collecting and responding to feedback from all stakeholders. During October and November, CDCR completed all required data remediation steps successfully (i.e., processing five items per week and achieving timeliness at each step). Delays, as described below, occurred in December that prevented CDCR from processing items at full speed. Moving forward, the remaining indicators will be increasingly complex. Consequently, even though CDCR has successfully completed data remediation steps for less complex indicators ahead of schedule, that lead-time will likely be used to process more complicated indicators and mitigate contingencies that may move the overall estimated completion date.

The delays in December were primarily due to the occurrence of several significant contingencies, including:

1.  Plaintiffs' and the Special Master's decision to provide incremental feedback on CDCR's Continuous Quality Improvement (CQI) Guidebook. CDCR had anticipated review of the CQIT Guidebook would occur as it has previously, outside of the data remediation process, whereas the Plaintiffs and Special Master wish to review using an incremental approach. CDCR is concerned that such review will significantly delay when a finalized CQI Guidebook can be reviewed for approval, in turn delaying remediation of all CQI indicators and subcomponents in the data remediation process. Both Plaintiffs and the Special Master verbalized a desire to review items in a manner that will mitigate such a delay. However, CDCR believes this is a missed opportunity for Plaintiffs and the Special Master to help avoid future delays.

---

[1] CDCR key indicators are the indicators that Defendants believe track material provisions of the Program Guide, Compendium, and court orders. *See* ECF No. 7089-1 at 2 fn. 4. The CDCR key indicators are a subset of the indicators provisionally approved as key indicators by the Court on July 1, 2021. *See* ECF No. 7216. Defendants maintain that many of the indicators on the provisionally approved list do not track material provisions of the Program Guide, Compendium, and court orders. *See* ECF No. 7197. In the spirit of transparency, Defendants have provided timelines for the completion of the CDCR key indicators as well as all indicators provisionally approved by the Court. When discussing the two groups of indicators, the document refers to CDCR's key indicators and the additional non-key indicators, which are those that were provisionally approved by the court, but do not track material provisions of the Program Guide, Compendium, and court orders.

Nevertheless, CDCR will do its best to mitigate the delays created by this contingency and sincerely hopes it will not substantially impact the data remediation timeline.

2. <u>The recommendations by the Special Master's data expert to significantly increase the number of steps in the verification process.</u> As noted in the original activation schedule, some details of the verification process of the data remediation process were still in development since no items at that time were available for verification. CDCR now has eight indicators completing this step of the data remediation process. Based on the verification workflow developed under the guidance of the Special Master's Data Expert, CDCR anticipates the Verification Step will take significantly longer than the two weeks per indicator as initially budgeted.

3. <u>The Special Master's decision to withhold written comments during stakeholder review,</u> and instead utilize time during BRMR meetings, reserved to review new items, to provide stakeholder feedback verbally. CDCR is concerned by the Special Master's decision to stop offering written feedback as previously agreed upon. Given the size and complexity of data remediation, only offering verbal feedback increases the risk of miscommunication, unintentional delays, and appears inconsistent with our shared goals of increased transparency and timely resolution of such a critical project.

CDCR did not become aware of these contingencies until November 2021. CDCR estimates that if <u>all</u> these contingencies are not mitigated, data remediation may not be completed until mid-2025, if not later.

Questions also remain about the final step in the data remediation process, during which the Special Master's data expert will certify whether Defendant's have achieved data remediation. The Special Master's team confirmed that the Special Master's data expert would review and certify each indicator that goes through the Data Validation and Verification Process. During the December 14, 2021 Data Discussion, CDCR raised several questions to the Special Master regarding the details of his data expert's certification. The Special Master's team shared that the Special Master's data expert anticipates that it will take a week for him to certify each indicator once it passes verification. CDCR's understanding is that the Special Master's data expert will certify each indicator based on whether the indicator completed the validation and verification process, and whether there are any significant disagreements on the indicator, such as whether the indicator accurately reflects the policy it is designed to measure. Upon completion of his review, the data expert will summarize his findings to the Special Master and share that information in the Data Discussions. CDCR requested that the Special Master's data expert's findings be presented in writing as his determinations are made. CDCR understands that the Special Master will not provide such determinations in writing.

Although the Special Master provided some further information on the process for final certification, other questions raised by CDCR remain unanswered, such as how and when the Special Master will notify the Court of his data expert's findings, how the parties will respond if necessary, and what criteria the data expert will use to determine whether there are significant disagreements that prevent certification of an indicator. Further, CDCR is concerned that potential disputes on policy interpretations or on what some of the parties would like an indicator to measure (as opposed to what the indicator needs to measure) could prevent data remediation of all indicators. Such disputes are not properly within the scope of data remediation, which is primarily meant to ensure that each indicator is measuring what it purports to measure.

CDCR is concerned that without regular written updates on the Special Master's certification status, the Court and the parties will not have a clear understanding or record of his findings or the reasons

supporting those findings until 2024 or later. Such a delayed written report by the Special Master's data expert or the Special Master lacks the transparency this process was created to achieve and may lead to confusion in the data remediation process. Further, the lack of reporting could deprive CDCR of the ability to dispute any decision by the Special Master's data expert to not remediate an indicator until 2024, which would delay complete remediation until after those disputes are resolved. CDCR proposes that this item be added to the agenda for discussion with the Court at the status conference.

Until clarity on what exactly is needed to achieve certification is provided and other unanswered questions and concerns are addressed, CDCR reserves the right to develop a new validation process and revise the preliminary activation schedule and related attachments.

II.     ACTIVATION SCHEDULE HIGH-LEVEL OVERVIEW



*Figure 1 Updated Activation Timeline*

| CDCR Key Indicators | | | | |
|---|---|---|---|---|
| **Status[2]** | On Track | **Incremental Progress as of 12/31/21[3]** | | |
| | | Completed | ~~43~~42% | Remaining | ~~57~~58% |
| Indicators Verified by CDCR | 0 | Indicators Certified by Special Master | | 0 |



*Figure 2 CDCR Key Indicators Remaining Work (as of 12/31/21)*

---

[2] Work completed before September 29, 2021 was used to design and test the current data remediation process. As such, it could not be systematically tracked over time.

[3] Linear Forecast: A standard graphing option offered in Microsoft Excel to calculate, or predict, a future value by using existing values. The future value is a y-value for a given x-value. The existing values are known x-values and y-values, and the future value is predicted by using linear regression.

| All Provisionally Approved Key Indicators | | | | | |
|---|---|---|---|---|---|
| **Status** | On Track | **Incremental Progress as of 12/31/21** | | | |
| | | Completed | ~~18~~33% | Remaining | ~~82~~67% |
| Indicators Verified by CDCR | 0 | Indicators Certified by Special Master | | | 0 |



*Figure 3 All Provisionally Approved Key Indicators Remaining Work (as of 12/31/21)*

III.    <u>Contingencies</u>

As discussed previously, several contingencies could impact CDCR's ability to achieve interim milestones and the overall goal of data remediation within the preliminary timeline. Indeed, several contingencies arose in the past 90 days – some of which have yet to be resolved fully. Whenever possible, CDCR has adopted improvement strategies and workflow efficiencies to reduce the frequency and impact of these contingencies. Nonetheless, several contingencies discussed below may seriously jeopardize CDCR's ability to complete this project on time. These contingencies include unilateral deviations by stakeholders from the data activation schedule, the refusal by stakeholders to provide holistic feedback to the CQI Guidebook, the lack of written feedback from the Special Master, and an unclear data certification process. Any of these contingencies may significantly and catastrophically delay the timeline for completion.

CDCR believes that several of these contingencies are entirely avoidable. Managing contingencies draws staff and resources away from the Data Validation and Verification Process. Avoiding contingencies altogether would significantly improve the likelihood of completing data remediation within the preliminary timeline.

   **a. Contingencies Jeopardizing the Activation Schedule Between 9/29/2021 and 12/31/2021**

   i. Updates to the CQI Guidebook and Other Audits

Missed Opportunity to Avoid Future Delays: During the November 9, 2021 data discussion, both the Special Master and Plaintiffs reported that they would no longer offer comprehensive feedback to the CQI Guidebook[4], despite following this practice since the creation of the Guidebook. Instead, they indicated a preference for providing incremental feedback as individual subcomponents are processed through data remediation, contrary to CDCR's request. This issue was also discussed during the November 30, 2021 data discussion and again during the January 4, 2022 data discussion. During these discussions, CDCR explained how declining to provide comprehensive feedback before CQI indicators undergo data remediation steps is a missed opportunity to avoid future delays easily.

Both the Special Master and Plaintiffs were afforded an opportunity to review the current CQI Guidebook and offer comprehensive feedback before CQI indicators were scheduled for data remediation.[5] The CQI Tool is a carefully constructed audit that includes several interdependent sub-audits. The CQI Guidebook contains instructions on collecting data and questions that feed into a large number of provisionally approved indicators. However, because CDCR drafted the Guidebook to support auditors and collect information in the most efficient way onsite, which questions feed into which indicators are not obvious from the structure of the Guidebook. Before making any line-item changes, it is essential to fully understand how the Guidebook is organized and structured as a measurement tool to avoid making edits that could inadvertently duplicate questions asked elsewhere in the Guidebook. For this reason, since its inception, the CQI Guidebook has undergone comprehensive reviews with the Special Master's team before adopting any changes.

Furthermore, changes or updates to the CQI Guidebook will impact the verification and validation steps necessary for related indicators. Even minor changes to sampling methodology, inclusionary criteria, and audit questions or instructions may create cascading changes and significant delays in the data remediation process. To the extent changes can be limited to unavoidable and necessary changes (as opposed to less crucial changes such as general improvement ideas), the impact on the preliminary timeline will be reduced.

Impact on the Activation Schedule: During the drafting of the activation schedule, neither the Special Master nor Plaintiffs signaled an unwillingness to provide comprehensive feedback on the CQI Guidebook. Accordingly, projected timelines and completion dates forecasted in the preliminary activation schedule were based in part on receiving

---

[4] Plaintiffs provided feedback but confirmed that they would not participate in future opportunities to provide comprehensive feedback before CQI indicators undergo Data Remediation steps.

[5] CDCR provided the revised guidebook to the Special Master's team on June 1, 2021. CDCR followed up on July 26, 2021. While CDCR was informed on August 10, 2021 that they would receive written feedback to the guidebook, none has yet to materialize despite subsequent requests. It was not until November 3, 2021 that CDCR was informed that no holistic feedback would be forthcoming. The Special Master's team only promised written feedback to relevant portions of the CQI guidebook as they came up for discussion.

comprehensive feedback. The subsequent decision to not provide comprehensive feedback introduced a new variable not accounted for by the original timeline.

Incremental feedback focusing on individual questions or sub-audit groupings neglects the framework, context, and overall cohesiveness of the CQI Guidebook. For example, suppose a narrow review of the group treatment space audit questions was reviewed. Without reviewing the full CQI Guidebook, stakeholders may advocate for the audit questions to assess the confidential group treatment space required by the Program Guide. Then months later, when conducting a narrow review of the confidential treatment space audit questions, stakeholders would discover that separate audit questions specific to confidential group space already exist. If changes were made to the initial audit regarding adequate group treatment space to include whether the space was confidential, there would be duplicative questions in the CQI Guidebook, leading to redundant or overlapping indicators. This sort of unnecessary confusion and duplicative work has historically been avoided by offering comprehensive feedback for review in totality before making and changes to the CQI Guidebook. Regrettably, CDCR's efforts to explain how this would create unnecessary delays to the data remediation timeline did not sway the stakeholders to continue the comprehensive review process previously followed.

As explained above, changes to one part of the CQI Guidebook may inadvertently impact other sections. However, CDCR cannot know this until all feedback is received and reviewed. Continuing with incremental feedback may unintentionally require changes to the audit that would not be immediately apparent and lead CDCR to revise indicators previously changed based on stakeholder feedback after the indicator is already certified. The Preliminary Activation Schedule filed on September 29, 2021, anticipated stakeholders would continue to provide comprehensive feedback to the CQI Guidebook, and CDCR would evaluate and adopt changes before data remediation steps. Subsequently, suggested changes related to data remediation (such as measurement methodology) would be considered within the context of a recently updated Guidebook from stakeholders offering informed feedback.

Potential Delays: Moving forward, both the Special Master and Plaintiffs have confirmed they will provide incremental feedback. CDCR anticipates this will create delays in achieving data remediation that the preliminary activation schedule does not anticipate. To the extent possible, CDCR will work with the parties to mitigate any delays but expects future updates will include the impact of these timeline delays. Both plaintiffs and the Special Master have verbalized a desire to organize items reviewed in a manner that will not require such a delay.

A more concerning scenario may arise if Plaintiff's or Special Master's incremental feedback significantly alters the current CQI Guidebook. Under this circumstance, CDCR will need to place all CQI-related key indicators on hold after receiving incremental feedback during stakeholder review, at least until a partially reviewed CQI guidebook is released. CDCR will then need to continue to do "releases" of the CQI guidebook, with partial reviews completed by stakeholders, effectively redoing each audit until after the last CQI-related key indicator completes stakeholder review. At that time, CDCR can conduct a comprehensive review of all recommended changes received incrementally before finalizing the entire Guidebook and voting to approve all changes. In effect, this means that while the impacted indicators would move through stakeholder review, they would not proceed to the Change

Advisory and Prioritization Committee (CAPC) until the next release of the CQI Guidebook, which would account for the stakeholder feedback received up until each release date, causing numerous indicators to be stuck partway through the process. This process will result in redundant reviews of audits and constant changes. Once CDCR receives the stakeholder feedback on all CQI Guidebook items, CDCR would review and finalize the Guidebook as a whole. However, such a severe disruption to the continuous flow[6] of the process would significantly affect the timeline for completion. It will result in redundant reviews of the same audits and their instructions. The precise impact this will have on the preliminary timeline is difficult to estimate, but if this occurs, CDCR estimates a delay in the preliminary timeline of up to 18 months[7].



_____

[6] The timeline methodology relies on a project management concept known as a continuous flow. Essentially, this establishes a process where subcomponents can move through data remediation steps independently at a consistent rate. At first, the concept of continuous flow may sound less efficient than processing whole indicators or groups of indicators because, with it, you are delivering smaller increments of progress at a time. However, it allows greater flexibility in the process whenever there is a delay and reduces the overall completion time. For example, each week, the Business Rules and Methodology Review (BRMR) meeting will review five web pages. At the end of that week, the five web pages will be sent to the next step (EDA testing), and a new batch of five web pages will be reviewed at the BRMR meeting. Some data remediation steps may include a larger span of time, such as Documentation Preparation, which spans four steps each a week long. While a single batch of five web pages will take four weeks to complete documentation preparation, a new set of web pages is added as the previous week's batch moves forward to the next step. This results in five web pages completing data remediation each week.

[7] A delay of up to 18 months is still accurate. However, because we are currently more ahead of scheduled than previously calculated, the new projected delay is November 2024, as depicted by figure 4.

*Figure 4 Estimated Impact of Contingency: Delayed CQI Guidebook Updates*

ii.   Verification Process

The September 21 preliminary activation schedule was based on the information available at the time. CDCR estimated in the previous activation schedule that each indicator would need two weeks to complete the verification process. However, on November 24, 2021, the Special Master's Data Expert reviewed a detailed verification process with CDCR, including 36 sub-steps, which he believes are necessary to achieve data remediation. Eight indicators have reached the verification step to date, but none have completed the updated process. CDCR anticipates that at least one indicator will complete the verification process in January 2022 and be certified by the Special Master's data expert by February 2022. However, because no indicator has completed the updated verification process, it is difficult to estimate the typical time necessary for an average indicator to complete the new process. As additional indicators successfully move through the new verification steps, CDCR can update the preliminary data remediation timeline.

The updated verification steps currently being tested include:
- Write verification scripts
- Verification test status add to tracking
- Add tolerance level in tracking
- Run test, look at discrepancies and categorize discrepancies
- Programming and Verification Team Meeting
- Fix testing code, programming code, and documentation
- Development Environment Pass or Fail
- Release to stage
- Confirm code release to stage
- Determine Stage test pass
- Release form: release to Production Environment
- Confirm code: release to Production Environment
- Work with Release team to conduct Initial test in Production Environment
- Add/Schedule automated testing

A preliminary estimate is that the updated verification steps will add three to six months[8] to the timeline.

---

[8] A delay of up to six months is still accurate. However, because we are currently more ahead of scheduled than previously calculated, the new projected delay is December 2023, as depicted by figure 5.



*Figure 5 Estimated Impact of Contingency: Updated Verification Process*

Additionally, the Special Master's data expert must still complete his certification process, and that process is beyond CDCR's control, which is why it is not included in this activation schedule. As noted above, CDCR has questions and concerns about the certification process.

### iii.    Expanded or Reduced List of Key Indicators

The list of indicators provisionally approved by the Court is currently under review by the Special Master who is tasked with testing and monitoring the indicators for functionality and efficacy during the Twenty-Ninth Monitoring Round. While the current monitoring round has not yet concluded, there have already been changes to the provisionally approved Key Indicators list. Some indicators, like "Timely MH Referrals," include several business rules. During the initial review of these indicators, CDCR and the Special Master's Data Team have tentatively agreed to separate these indicators into smaller groupings of business rules. This process created new indicators. The "Incremental Progress at the Indicator-Level" section below shows where this has occurred. Additionally, it also indicates tentative name changes to Key Indicators.

### iv.    Delayed Meetings and Inefficiencies Resulting from the Special Master's Refusal to Provide Feedback in Writing

Many steps in the Data Validation and Verification Process require meetings between numerous stakeholders, including CDCR, the Special Master's team, and Plaintiffs' counsel. Since the October 7, 2021 Status Conference, several meetings necessary to complete data remediation on time were canceled to accommodate holidays and onsite auditing. As previously discussed, the extent to which this slows down the activation schedule can be mitigated by reducing the number of delayed meetings or seeking alternative ways to

achieve the goals of this step outside the regularly scheduled meetings. Accordingly, CDCR began responding to stakeholder review feedback in writing to mitigate the delays associated with postponing the Data and CQI meeting a total of five weeks over the past two months.

CDCR provides data elements to the Plaintiffs and the Special Master for review on a weekly basis. Plaintiffs and the Special Master then have one week to provide written feedback as part of "stakeholder review."  Stakeholder review comments are then discussed at the next data meeting, which generally occurs every other week. However, due to cancellations of data meetings, CDCR began providing written responses to the comments provided by the Plaintiffs and the Special Master. Any remaining questions or concerns were then discussed at the next scheduled all parties data meeting. While CDCR's response letters were initially meant only to mitigate the effect of delayed or canceled data meetings, the letters actually provide transparency by detailing each stakeholder's comment and response. This provides a straightforward way to easily track what suggestions are accepted and focus the discussions in the data meetings on outstanding questions or concerns. Thus, the benefits of the response letters to a process that was created to foster transparency and trust between the parties and the Special Master should not be overlooked.

As a result of CDCR's written responses to stakeholder review, the Special Master's team stopped providing written comments. Instead, the Special Master's data team began providing verbal feedback during the BRMR meetings. The BRMR meetings were not designed to review comments received during stakeholder review. As evidenced below, the BRMR meetings were created to facilitate discussion between CDCR and the Special Master's team before items are put forward for stakeholder review.



*Figure 6 Special Master's Team Proposed Change to Provide Stakeholder Feedback at BRMR meeting*

This is a major deviation from the Data Validation and Verification Process as indicators are discussed in BRMR before stakeholder review and discussed again with the same participants in that forum. Thus, the time necessary to move new indicators forward through BRMR is now being taken up by re-reviewing items in stakeholder review and creating a less transparent process for all stakeholders. The Special Master's team has not provided a clear rationale for their unilateral deviation from the data activation process. Instead, they have simply stated that the Special Master's team will not provide written feedback so long as CDCR provides response letters to that feedback.[9] This seems contrary

---

[9] Plaintiffs have not raised any objections to receiving written response to their stakeholder review.

to the spirit of transparency and trust this process is meant to foster. Each week the lack of feedback increases the risk of delays. This situation raises a new contingency not previously considered: Stakeholders Deviating from the Established Data Validation and Verification Process.

v.    Stakeholders Deviating from the Established Data Validation and Verification Process[10]

The plan to achieve data remediation includes mechanisms designed to improve transparency, sustainability, and accuracy in CDCR's data reporting system. Since April 2020, CDCR has worked closely with the Special Master's data expert to identify gaps in the existing data system. This gap analysis has culminated in designing a thirteen-step validation and verification process. It is based upon an understanding that the Special Master and Plaintiffs agree that successful completion of this process will result in certification of the data. Should the Special Master or Plaintiffs unilaterally decide not to comply with the Data Validation and Verification Process workflow, the path to data remediation will need to be redesigned, threatening the progress already achieved and lengthening the estimated time for completion. CDCR is committed to the Data Validation and Verification Process (ECF No. 7334 at 24-36) and adding any efficiencies to be gained, such as CDCR's letters responding to comments provided during stakeholder review. But should stakeholders deviate from the process, CDCR will adhere to the timeline as planned to complete all aspects of data remediation within CDCR's control. This may result in some stakeholder feedback not being incorporated into the process should it not be received in writing and in a timely manner.

CDCR is hopeful this will not occur since nearly two years and countless resources have been invested in designing a comprehensive process to achieve data remediation. However, it may be unavoidable if stakeholders continue deviating from the Data Validation and Verification Process.

Should CDCR move forward without input from the Special Master's team during stakeholder review, this will not hinder any stakeholders' ability to provide feedback. As demonstrated below, the Special Master's team has numerous opportunities before stakeholder review to provide feedback regarding each data subcomponent. The below diagram also shows that progress through the Data Validation and Verification Process decreases at the BRMR stage and decreases even more at the stages of stakeholder review and the Data and CQI meeting. Thus, further delays due to lack of written and timely feedback cannot be countenanced. Continued deviation from the workflow without mitigation by CDCR will result in a significant delay in the timeline.

---

[10] Added to the list of contingencies on 12/31/2021

*Figure 7 Incremental Progress of Data Subcomponents Completed at Each Step in the Data Validation and Verification Process as of 12/31/21*

### vi.    Incomplete Feedback or No Feedback Received

As previously discussed, there are several opportunities to provide feedback throughout the process, and stakeholders recognize the importance of early and thorough feedback. CDCR's ability to quickly identify, research, and address potential barriers to data remediation is essential to ensure the data remediation proceeds efficiently. CDCR appreciates that Plaintiffs have consistently provided timely stakeholder feedback. However, as mentioned above, CDCR has not recently or consistently received written or timely feedback from the Special Master's team. In addition, CDCR's internal team has not consistently provided timely input in the initial data remediation steps. While the impact of this delay is smaller than the delays caused by the five preceding contingencies, it is important to hold CDCR to the same standards of review and recognize opportunities for improvement.

The cause of this delay is due to the large volume of emails necessary to notify and receive feedback from CDCR's internal team. When delays occur, it impacts subsequent review steps whenever meetings or official feedback includes recommended changes that could have easily been addressed early on. To date, CDCR's efforts to mitigate the delayed feedback from CDCR's internal team has not impacted the preliminary timeline. Additionally, CDCR is close to implementing a technical solution that will improve the mechanisms for collecting internal feedback. If successful, the technical solution will significantly reduce or eliminate the need to rely on email to notify, review, and coordinate multiple versions of suggested edits. CDCR would also invite stakeholders to benefit from this technical solution, though it is unlikely to resolve the stakeholder concerns stemming from a desire to provide incremental CQI Guidebook feedback and avoid written responses to feedback from CDCR.

### vii.    New or Revised Policies

Over the last 90 days, nine business rules have continued to be delayed while policy updates are reviewed. So far, the impact of this delay on the preliminary timeline has been mitigated by the efficiencies gained during other data remediation steps. At times, new or revised policies may be needed whenever the controlling policy language insufficiently articulates requirements or fails to provide details necessary for an indicator to complete data remediation. In the past, when new or revised policies are needed, it has resulted in a 6 - 12 month delay for the indicator. This is primarily due to the extensive process new or revised

policies undergo. In addition to an internal development process, the Special Master and Plaintiffs have a separate policy review process. After both of those processes, all collective bargaining units impacted by the policy are afforded a review period and may object to the changes.

### viii.   Disruptions to Continuous Flow

The current timeline relies on the concept of continuous flow. Under this model, a set number of components are reviewed each week (currently set to five per week). While some steps occur over multiple weeks, a new batch of components is scheduled to begin each week. The benefits of this method of efficient project management are quickly lost if one of the data remediation steps consistently takes longer than the allotted time. To mitigate this contingency, CDCR maintains a delay log which can be used to diagnostically determine which step(s) are taking longer than expected.

Several of the aforementioned contingencies directly impact continuous flow. Over the past 90 days, the most significant disruptions to continuous flow include:

- Updates to the CQI Guidebook and Other Audits
- New or Revised Policies
- Delayed Meetings
- Stakeholders Deviating from the Established Data Validation and Verification Process

### ix.   The Special Master's Provisionally Approved Key Indicators Are Not Yet Built or Clearly Defined

The Special Master's provisionally approved list of key indicators includes several indicators still under discussion with the Special Master to determine if they refer to existing or new indicators. On November 8, 2021, CDCR sent the Special Master a list identifying 33 indicators (89 Business Rules) falling into this contingency category. As of December 31, 2021, the Special Master's team provided feedback indicating:

- Mismatched names: 35 appear to be existing indicators
- New items: 9 appear to refer to new indicators/business rules
- Awaiting further discussion: 40
- Duplicate and/or Decommission: 5

Since several of the indicators (with slightly different names) were already accounted for in the preliminary timeline, and the others remain at various levels of review, no immediate impact to the timeline has occurred. The additional work necessary to distinguish new indicators from ones with slightly different names was not included in the preliminary timeline. So far, CDCR has found ways to navigate this contingency not to affect the preliminary timelines.

x.   Extensive or Elaborate EDA[11] requested

Over the past 90 days, 15 extensive or elaborate EDA requests have been logged. The Preliminary Activation Schedule recognizes that some EDA requests will require more than one week, and not all key indicators will need EDA. The current activation schedule budgets two separate weeks, with the understanding that extensive or elaborate EDA requests will be balanced out by straightforward EDA requests and circumstances under which no EDA is requested. So far, the balance has kept the extensive or elaborate EDA requests from impacting the timeline.

xi.   Minor Disagreements

Whenever this occurs, the stakeholders are notified during their review process, and enduring disagreements will be provided to CAPC voting members so they can cast an informed vote. Several disagreements have been noted over the past 90 days and are (or soon will be) highlighted for Stakeholders and CAPC to review. CDCR has engaged in extensive conversations with the Special Master's Data team to avoid disagreements – delaying some subcomponents for several months. These delays were mitigated by other items moving through the process expeditiously. As the number of straightforward indicators dwindles, the impact of disagreements and multi-month discussions will push out the preliminary timeline.

xii.   Changes to Core Methodology[12]

CDCR has used underlying or core approaches to calculating compliance for many years. For example, CDCR compares appointments or services that must be offered to patients in a given timeframe (denominator) to the number of actual appointments or services offered (numerator). Then (in general terms) the methodology divides the numerator~~denominator~~ by the denominator ~~numerator~~ to calculate compliance. Any changes to the core methodology would require most, if not all indicators to be recoded. While this has not occurred yet, BRMR is exploring some changes to CDCR's current core methodologies. A change on this scale was not included in the Preliminary Activation Schedule, and would almost certainly impact the current timeline.

In addition to the contingencies that occurred over the past 90 days, there are other potential contingencies, such as major disagreements, that may occur in the future. These potential contingencies were included in the Preliminary Activation Schedule filed on September 29, 2021. ECF No. 7334. CDCR will continue to provide updates on contingencies that occur and the effect on the timeline in future filings.

---

[11] There are multiple opportunities to request Exploratory Data Analysis (EDA) during the Validation and Verification process. It is typically used to explore the limits of indicators, worst-case scenarios, and unlikely edge cases that theoretically could occur.
[12] Added to the list of contingencies on 12/31/2021

IV.    Incremental Progress at the Indicator-Level

The below chart provides the incremental progress for each of CDCR's key indicators.

| Category | CDCR Key Indicator | Updated Name and/or Split Indicators[13] | Incremental Progress |
|---|---|---|---|
| Access to Care | Timely MH Referrals | | 55% |
| Access to Care | Timely PC Contacts | | 49% |
| Access to Care | Timely Psychiatry Contacts | | 47% |
| Access to Care | Timely IDTTs | | 47% |
| Access to Care | Treatment Offered | | 51% |
| Access to Care | Placement of ASU/SHU CCCMS in STRH/LTRH within Timeframes | | 67% |
| Access to Care | Timely Transfers to CCCMS/EOP | | 22% |
| Access to Care | Effective Communication Achieved | | ~~89~~67% |
| Access to Care | IDTTs in a Confidential Setting | | 78% |
| Access to Care | Group Treatment in a Confidential Setting | | 94% |
| Access to Care | MHSDS Patients Transferred out of Desert Institutions | | 22% |
| Access to Care | Observed RC Screens Conducted in a Confidential Setting | | 78% |
| Access to Care | MH Screens | 1.  ASU PreScreens<br>2.  ASU GP Screens<br>3.  RC Screens | 95%<br>71%<br>~~85~~61% |
| Suicide Prevention | Timely Completion of 5/8 Day Follow Ups from MHCB, alternative housing, and DSH/PIPs. MHCB, Alternative Housing, DSH, and PIPs | Discharge Follow Ups | 56% |

---

[13] Updated names and split indicators are as of 12/31/2021 and have not been approved by CDCR or the Special Master.

| Suicide Prevention | Patients referred to MHCB on Continuous Direct Visual Observation | | 56% |
|---|---|---|---|
| Suicide Prevention | Housing Unit/Inmate Living Areas with emergency response equipment and Inventoried Daily | | 56% |
| Suicide Prevention | Custody Follow Ups for MHCB Discharges/7497 Forms | | 22% |
| Suicide Prevention | Orders Reviewed with Properly Documented Observation Orders | | 56% |
| Suicide Prevention | MHCB Records with Rationale for Limited Issues of Clothing and Bedding | | 56% |
| Suicide Prevention | MHCB property and privileges | | 0% |
| Suicide Prevention | ASU Intake Inmates Appropriately Housed | | 67% |
| Suicide Prevention | Percentage of ASU Welfare Checks audited that were not completed on time and staggered | | 22% |
| Suicide Prevention | Percentage of nursing staff current with CPR training | Nursing staff current with CPR training | 15% |
| Suicide Prevention | Percentage of Health Care Staff with Suicide Prevention Training | | 15% |
| Suicide Prevention | Percentage of Custody Officers with Suicide Prevention Training | Custody Officers with suicide prevention training | 67% |
| Quality of Care | IDTT Staffing | | 50% |
| Quality of Care | Cases with Documentation of Appropriateness of LOC Discussed for Patients Identified by 7388B as Potentially Requiring Higher LOC | | 56% |

| Quality of Care | Treatment Plans with Satisfactory Documentation | | 94% |
|---|---|---|---|
| Quality of Care | Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers | | 56% |
| Quality of Care | Treatment Plans with Documented and Implemented Pre-Release Plans | | 94% |
| Quality of Care | IDTTs in which PC Intake Evaluations were Completed Prior to Initial IDTT | | 61% |
| Quality of Care | IDTTs in which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT | | 61% |
| Quality of Care | EOP IDTT Discussion of Clinical Appropriateness for Work, Education Accommodation | | 67% |
| Specialized Custody | Percentage of RVR MHAs Where the Patient was Informed of the Limits of Confidentiality | | 94% |
| Specialized Custody | RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation | | 67% |
| Specialized Custody | Percentage of Days Where Heat Plan was Activated, and Alternative Out of Cell Activities were Offered to Heat Alter Patients | | 44% |
| Specialized Custody | Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM | Percentage of MHCB patients placed in TTM within policy requirement | 56% |
| Specialized Custody | Percentage of 128Bs Indicating the Requirement for Mechanical Restraints that are Present for MHCB Patients | | 39% |
| Specialized Custody | Thermometer Checks Completed and Accurate | | 67% |

| | | | |
|---|---|---|---|
| Specialized Custody | Timely MH RVR Assessments | | 44% |
| Medication Management | Medication Admin: Chronic Care Medications Historical Administration (Psychiatrist) | | 0% |
| Medication Management | Medication Admin: Outpatient Provider New Medication Orders (Psychiatrist) | Medication Admin: Chronic Care Medications Historical Administration (Psychiatrist) | 0% |
| Medication Management | Diagnostic Monitoring-Antipsychotics | | ~~0~~22% |
| Medication Management | Diagnostic Monitoring-Clozapine | | 0% |
| Medication Management | Diagnostic Monitoring-Mood Stabilizers | | 0% |
| Medication Management | Diagnostic Monitoring-Antidepressants | | 0% |
| Medication Management | Diagnostic Monitoring-QT Prolongation EKG 12 Months | | 0% |
| Medication Management | Continuity of Meds Upon Inter-Institutional Transfer at R&R | | 0% |
| Medication Management | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | | 0% |
| Medication Management | Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers | | 0% |
| Medication Management | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | | 0% |
| Medication Management | Continuity of Meds: Discharge/Transfer from a Community Hospital and/or DSH | | 0% |
| Medication Management | Medication Compliance with PC 2602, Involuntary Meds: Court Order | | 0% |

| Medication Management | Medication Compliance with PC 2602, Involuntary Meds: Med Order | | 0% |
|---|---|---|---|
| Restricted Housing | Placement of ASU EOPs in Appropriate Housing Within Timeframes | | 22% |
| Restricted Housing | ASU Pre-Screens | New indicator, previously part of "Timely MH Screens" indicator | 94% |
| Restricted Housing | Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 Working Days | | 22% |
| Restricted Housing | Percentage of ASU Screenings that Occurred Within 72 Hours of Placement of Arrival | | 56% |
| Restricted Housing | ICCs with Mental Health Clinicians present, and relevant information provided | | 67% |
| Restricted Housing | (LMH: in suicide prevention) Cells Reviewed Where Inmates Are Allowed Approved Entertainment Devices | Cells reviewed where inmates are allowed approved entertainment devices | 22% |
| Restricted Housing | ASU Screens that are Conducted in Confidential Settings | | 22% |
| Restricted Housing | ASU Out of Cell Time Offered | | 22% |
| Restricted Housing | Percentage of Weeks in which Yard was Offered According to STRH/LTRH Policy | | 22% |
| Restricted Housing | Weeks in which Shower Access in ASU was Offered as Required | | 22% |
| Restricted Housing | Units in which Staff can Identify NDS Patients and Have Tracking System for Phone Calls and Property | | ~~22~~19% |

| Utilization and Resource Management | Timely admission to MHCB | | 56% |
|---|---|---|---|
| Suicide Prevention | Patients in Alt Housing on continuous observation and provided suicide-resistant bed | 1. Percentage of patients in alt housing with a bed<br>2. Patients referred to MHCB on continuous direct visual observation | 0%*[14] |
| Suicide Prevention | Emergent/urgent MH referrals that result in SRASHEs | Suicide Risk Evaluation | 54%* |
| Suicide Prevention | Percentage of timely Nursing Rounds in MHCB patients on suicide watch and suicide precaution recorded in EHRS Clearly Marked, On Time, and Documented on Correct Form | 1. Timely documentation of suicide watch<br>2. Timely documentation of suicide precaution<br>3. Percentage of nursing rounds clearly marked, on time, and documented on correct form | 0%*<br><br>0%*<br><br>0%* |
| Suicide Prevention | Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | | 0%* |
| Suicide Prevention | Emergency Response Procedures for Self-Injurious behaviors and suicide attempts | | 0%* |
| Suicide Prevention | MHCB Daily Provide Checks | | 56%* |
| Restricted Housing | Psych Tech Rounds Completed According to PG Requirements | | 0% |

In the spirit of further transparency, the below chart provides the incremental progress for the additional indicators.

---

[14] Incremental Progress percentages with an "*" notes that these indicators are still under discussion with the Special Master to determine if they refer to existing indicators or new indicators. As discussions continue, the Special Master and Defendants may agree to remove some of these indicators if they are no longer appropriate or are part of a different indicator.

| Category | Additional Indicators | Updated Name and/or Split Indicators[15] | Incremental Progress |
|---|---|---|---|
| Access to Care | Timely Admissions to Inpatient Care | | 0%* |
| Access to Care | Inpatient Transfer Deadlines for PIPs and DSH | | 0%* |
| Access to Care | Percentage of all IDTTs observed in which a health record and C-file are available | Percentage of all IDTTs observed in which a health record and SOMS are available | 56% |
| Access to Care | Appointments Cancelled Due to Custody | | 56% |
| Access to Care | Appointments Seen as Scheduled | | 22% |
| Access to Care | Housing Units where 128 MH-5s are Accessible and Available to Housing Unit Staff | | 56% |
| Access to Care | Custody MH Referrals | | ~~7~~22% |
| Access to Care | MHSDS inmates in ASU transferred within policy requirements | | 0% |
| Suicide Prevention | Safety planning to reduce suicide risk | | 22%* |
| Suicide Prevention | Suicide-resistant MHCBs | | 0%* |
| Suicide Prevention | APP/ICF Discharges with Clinician-to-Clinician Contact within 5 Days | Acute/ICF Discharges with Clinician to Clinician Contact within 5 Days | 56% |
| Suicide Prevention | SRE Mentor Program | | 44% |
| Suicide Prevention | SREs that Met All Audit Criteria | Quality of Selected SRASHE Documentation | 94%* |
| Suicide Prevention | Discharges from MHCB with Clinician Review of D/C Summary (SRASHE) | | 56%* |
| Suicide Prevention | Satisfactory SPR FIT Meeting | | 22% |

---

[15] Updated names and split indicators are as of 12/31/2021 and have not been approved by CDCR or the Special Master.

| | | | |
|---|---|---|---|
| Quality of Care | Primary Clinician Continuity of Care | | ~~17~~22% |
| Quality of Care | Psychiatrist Continuity of Care | | ~~17~~22% |
| Quality of Care | IDTTs Meeting All Audit Criteria | IDTTs with observed interactive process | 56% |
| Specialized Custody | RVRs Where Hearing Officer Disagreed with MH Clinician's Recommendation to Document in an Alternative Manner and Documented Rationale for Disagreement on 128B | | 56% |
| Specialized Custody | RVRs Recommended for Mitigation That Were Mitigated | | 56% |
| Specialized Custody | Use of Force involving MH Inmates | | 56% |
| Specialized Custody | Additional Use of Force (Specificity to be determined) | UOF involving MH inmates | 56% |
| Medication Management | Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here) | | 0% |
| Restricted Housing | NDS timely expedited transfers | Percentage of required NDS transfers that occurred within 72 hours | 0%* |
| Restricted Housing | ASU Inmates on 21-Day Intake Status with Markers Posted for initial 72 hours | ASU Inmates on 21-Day Intake Status with Markers Posted | 44% |
| Restricted Housing | Percentage of Unclothed Body Searches Conducted in a Private Area | | 22% |
| Restricted Housing | Warden Review of Cases Over 90 Days | | ~~22~~15% |
| Restricted Housing | ASU LOS for MHSDS v. Non-MHSDS Patients | | 0% |
| Restricted Housing | EOP Hub CCII and Captain Review for LOS Over 90 Days | | ~~22~~20% |

| Restricted Housing | Percentage of Inmates with LOS Over 150 Days in which ASU Case Reviews were Completed on Time | | ~~22~~15% |
|---|---|---|---|
| Restricted Housing | ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria | | 22% |
| Restricted Housing | Percentage of Initial ICCs Reviewed and Held within 10 Calendar Days of Arrival | | ~~22~~19% |
| Restricted Housing | Number of EOP and CCCMS Patients in ASU | | 0% |
| Restricted Housing | Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors | | 22% |
| Restricted Housing | High Refusers Due to Custody Reasons with Documented Plan of Action | | 56% |
| Restricted Housing | High Refusers in which 128B was Completed | | 56% |
| Restricted Housing | Percentage of High Refusers Due to Custody in Which a Meeting Between MH and Custody was Conducted within 7 Calendar Days | | 22% |
| Restricted Housing | Inmates Who Received ASU MH Guide | | ~~22~~19% |
| Restricted Housing | Percentage of Psych Tech Round Documentation That Meets All Audit Criteria | | 0% |
| Restricted Housing | Psych Tech Rounds Where EC and Interaction with Patient are Achieved/Attempted and Appropriate Referrals are Made as Indicated | | 0% |
| Restricted Housing | Percentage of IDTTs Observed in which a Health Record and C-File were Available | Percentage of all IDTTs observed in which a health record and SOMS are available | 56% |

| | | | |
|---|---|---|---|
| Restricted Housing | Percentage of Peace Officers Observed to Carry their CPR Mouth Shield | | 56% |
| Restricted Housing | Percentage of Eligible MHSDS Patients Receiving Milestone Credits | | 0% |
| Restricted Housing | RVR MH Assessments Where All Documentation Requirements Were Met | RVR assessments where documentation requirements were met | 94% |
| Restricted Housing | RVR MH Assessments Conducted in Private Setting | | 22% |
| Restricted Housing | Use of Force MH Assessments Meeting Documentation Requirements | | 56% |
| Restricted Housing | Patients Discharged from DSH with Classification Casework Completed Prior to Transfer When Required | | ~~22~~19% |
| Restricted Housing | Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs | Numbers and Percentage of RVRs by level of care (CCCMS, EOP, MHCB, ICF, and ACUTE patients, non- MHSDS) | ~~22~~7% |
| Restricted Housing | Percentage of MH-7s required completed prior to ASU placement | ASU PreScreens | 95%* |
| Patient Safety | Number of Episodes of Heat Related Illness Occurring in MHSDS | | ~~22~~17% |
| Patient Safety | Percentage of Clinical Restraint Occurrences Meetings [sic] All of the Audit Criteria | | ~~22~~19% |
| Patient Safety | Seclusion, Frequency, and Duration | Seclusion Rate | 6%* |
| Utilization and Resource Management | MHCB Clinical Stays within Timeframes | | 50% |

| | | | |
|---|---|---|---|
| Utilization and Resource Management | Percentage of mental health OHU stays 48 hours or less | | 0%* |
| Facility/Environment of Care | Adequate Group Treatment Space | | 78% |
| Facility/Environment of Care | Adequate IDTT Space | | 78% |
| Facility/Environment of Care | Adequate Individual Treatment Space | | 78% |
| Staffing/Personnel Training, and Staff Resources | Chief Psychiatrist | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Chief Psychologist, Correctional Facility | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychologist, Correctional Facility (Supervisor) | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychiatrist (Supervisor), Correctional and Rehabilitative Services (Safety) | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Supervising Psychiatric Social Worker I, Correctional Facility | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychiatrist (Specialist), Correctional and Rehabilitative Services (Safety) | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychologist, Correctional Facility (Specialist) | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Recreation Therapist, Correctional Facility | | 0%* |

| | | | |
|---|---|---|---|
| Staffing/Personnel Training, and Staff Resources | Psychologist-Clinical, Correctional Facility | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Clinical Social Worker (Health/Correctional Facility) – Safety | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Staff that report having computers for all out of call clinical appointments | | 0% |
| Staffing/Personnel Training, and Staff Resources | Percentage of healthcare staff current with suicide prevention training (duplicate from SP) | | 0% |
| Staffing/Personnel Training, and Staff Resources | Allocated and filled positions | | 0% |
| Additional Indicators | Including<br><br>• Sustainability Process<br>• ASU EOP Hub Certification (To be determined)<br>• PIP (To be developed)<br>• Custody and Mental Health Partnership Collaboration (To be developed) | | 0%* |