```
1                 IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
2


3
     RALPH COLEMAN, et al.,
4          Plaintiffs,
                                        Sacramento, California
5    vs.                                No. 2:90-CV-00520-KJM-DB
                                        Friday, February 11, 2022
6    GAVIN NEWSOM, et al.,              2:04 p.m.
           Defendants.
7    _____/

8

9

10
                            ---o0o---
11
                    TRANSCRIPT OF PROCEEDINGS
12
                       STATUS CONFERENCE
13
        BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
14
              (Proceedings held via videoconference.)
15
                            ---o0o---
16

17

18

19   Official Court Reporter:        Thresha Spencer,
                                      CSR, RPR
20                                    501 I Street
                                      Sacramento, CA 95814
21

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription
```

```
 1   APPEARANCES:

 2     For the Plaintiffs:            ROSEN BIEN GALVAN & GRUNFELD
                                      LLP
 3                                    101 Mission Street, 6th Floor
                                      San Francisco, CA  94105
 4                                    By:  MICHAEL BIEN
                                           ERNEST GALVAN
 5                                         LISA ELLS
                                           JENNY YELIN
 6                                         CARA TRAPANI
                                           STEVEN FAMA
 7                                    Attorneys at Law

 8
                                      PRISON LAW OFFICE
 9                                    1917 Fifth Street
                                      Berkeley, CA  94710
10                                    By:  MARGOT KNIGHT MENDELSON
                                      Attorney at Law
11

12     For the Defendants:           DEPARTMENT OF JUSTICE
                                      1676 N. California Blvd.,
13                                    Suite 620
                                      Walnut Creek, CA  94596
14                                    By:  PAUL MELLO
                                      Attorney at Law
15
                                      DEPARTMENT OF JUSTICE
16                                    OFFICE OF THE ATTORNEY GENERAL
                                      1300 I Street
17                                    Sacramento, CA  95814
                                      By:  ELISE THORN
18                                    Attorney at Law

19                                    DEPARTMENT OF JUSTICE
                                      OFFICE OF THE ATTORNEY GENERAL
20                                    455 Golden Gate Avenue,
                                      Suite 11000
21                                    San Francisco, CA  94102
                                      By:  DAMON GRANT McCLAIN
22                                    Attorney at Law

23

24

25     (Appearances continued on following page)
```

```
 1    APPEARANCES (Continued):

 2
      Special Master:              MATTHEW LOPES
 3

 4    Also Present:                Kathleen Allison
                                   Dr. Amar Mehta
 5                                 Dr. Steven Cartwright
                                   Dr. Travis Williams
 6                                 Kristopher Kent
                                   Nicholas Weber
 7                                 Monica Anderson
                                   Namrata Kotwani
 8                                 Laurel O'Connor
                                   David Cassarrubias
 9                                 Melissa Bentz
                                   Nicholas Weber
10                                 Christine Ciccotti
                                   Antonia Radditz
11                                 David Sanders

12

13                       --o0o--

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SACRAMENTO, CALIFORNIA, FRIDAY, FEBRUARY 11, 2022, 2:04 PM
 2                          --o0o--
 3   (Proceedings were held via the Zoom application.)
 4             THE CLERK:  Calling civil case 90-520; Coleman, et
 5   al., versus Newsom, et al.  This is on for a further status
 6   conference.
 7             THE COURT:  All right.  Good afternoon.  I'm going to
 8   ask for appearances and a lead counsel to then identify members
 9   of the team.  And I just want to clarify, this is status, this
10   is housekeeping, case management, and so I am not wearing my
11   robe.
12      My plan is for future sessions such as this, we'll be in
13   the courtroom; thus, we're in the virtual courtroom.  But if I
14   don't need to issue orders -- I may have my robe handy as I do
15   here today -- but I'm not -- I just want to clarify.  Right now
16   I'm the case management judge and we're in problem-solving
17   mode, a global picture.  So that's why you see me without my
18   robe, if you even notice those kinds of details on Zoom.
19      So for the plaintiffs, who is acting as lead counsel today?
20             MR. GALVAN:  Good afternoon, your Honor.  Ernest
21   Galvan.  And with me are Michael Bien, Lisa Ells, Jenny Yelin,
22   Steve Fama, Margot Mendelson, and Cara Trapani.
23             THE COURT:  All right.  Good afternoon to all of you.
24      And lead for the defense?
25             MR. MELLO:  Good afternoon, your Honor.  Paul Mello.
```

1  I'm joined by Elise Thorn, Damon McClain, and I don't know if

2  I'm missing clients on our team.

3      I am also joined by our clients Secretary Allison, Doctors

4  Mehta, Cartwright, and Williams.  Thank you.

5              THE COURT:  All right.  I do see Ms. Kotwani, just so

6  that's clear.  And I see Secretary Allison.  Good afternoon

7  Secretary Allison.

8              SECRETARY ALLISON:  Hello, your Honor.

9              THE COURT:  Hello.  Is there any member of your team

10  who has not been identified?

11              SECRETARY ALLISON:  No, ma'am.

12              THE COURT:  All right.  Is there anyone appearing who

13  has not been identified in terms of appearing this afternoon?

14  If so, please speak up now.

15              SECRETARY ALLISON:  I apologize, I do have additional

16  counsel on the line; I didn't see them.  I didn't realize there

17  were two screens.  We do have Nick Weber, Melissa Bentz, and

18  Christine Ciccotti on the line as well.

19              THE COURT:  All right.  Thank you.  I thought there

20  were a few folks we hadn't picked up.

21              MR. SANDERS:  Your Honor, this is David Sanders from

22  California Correctional Peace Officers Association, just sort

23  of monitoring.

24              THE COURT:  All right.  I was going to ask.  I didn't

25  think I heard your name, but noted that you're monitoring.

 1         Anyone else who's appearing who's name has not been called

 2    or who has not identified themselves?

 3         All right.  So I did publish an agenda.  I just wanted to

 4    let you know some additional thoughts I had.  Under "staffing,"

 5    I would like to talk briefly about the status of the

 6    telepsychiatry pilot.

 7         And then under "additional items," the things I just want

 8    to tick off.  I just want to talk briefly about settlement with

 9    respect to the guard one cases and TTMs, just to make certain

10    we're on the same page there.  And just note items on the

11    planning calendar with respect to DHS staffing review, max

12    custody and the PIPs, data remediation, and then I also want to

13    just check in on the notice regarding the regulation-making

14    process.

15         So let me ask, first, Mr. Galvan, any other issue that

16    plaintiffs want discussed this afternoon?

17              MR. GALVAN:  No, your Honor.

18              THE COURT:  Mr. Mello, for the defense?

19              MR. MELLO:  It sounds like you touched on data

20    remediation.  We filed an errata and know that we wanted to

21    speak to that issue, your Honor.  Thank you.

22              THE COURT:  All right.  Secretary Allison, just

23    checking with you.  I know you're represented, but you're one

24    of the key problem solvers here in my mind, so anything else

25    you wanted to talk about?

 1              SECRETARY ALLISON:  Not at this time.  I'm not aware

 2    of any other major pending issues.

 3              THE COURT:  All right.  Thank you.

 4       So on the return to program guide level of care, I just

 5    wanted to touch base and let you know what I'm thinking and see

 6    if anyone disagrees with this, because otherwise I -- my

 7    tentative is to issue a simple order just clarifying.

 8       It appears to the Court that the need for further reporting

 9    on COVID-19 departures is obviated by the upcoming 29th round

10    report.  And, you know, clearly the backdrop is COVID is here

11    to stay, and so we're just all learning how to live with it.

12    We're going to live with it, I assume, for the rest of my life,

13    certainly my life as a judge.

14       So to the extent the Special Master finds deficiencies in

15    any areas that he's monitoring as measured by the proposed CQIT

16    indicators and identifies the deficiencies as tied to COVID,

17    then I would be made aware of that through his report, and then

18    we could address deficiencies.

19       Is there any reason not to proceed in that way and,

20    therefore, just make very clear that any Court action is

21    deferred pending the filing of the complete 29th round

22    monitoring report?

23       Let me ask Mr. Galvan, your thoughts based on that

24    suggestion?

25              MR. GALVAN:  Your Honor, I met and conferred with

1   defense counsel about this agenda item.  What we were going to

2   propose was that the monthly filing should end, and the parties

3   should meet and confer to resolve disputes we have about the

4   remaining departures.  In the filings there are five departures

5   that the defense had listed as needed to go on indefinitely

6   that we believe should be terminated.

7       We were going to propose that we spend the next 30 days

8   trying to work out that dispute, and that if we can't work out

9   those disputes, that we would ask for leave to present them by

10  motion.

11      And the reason I think that that might be preferable to

12  waiting for the 29th report is the 29th report, my

13  understanding, isn't coming until the fall of this year.  And,

14  from plaintiffs' point of view, the things that are still

15  lacking in treatment and other programs for our clients should

16  be remedied sooner than that.  So that's why we prefer the more

17  advanced timeline.

18          THE COURT:  All right.  Well, if you've met and

19  conferred and are making that joint proposal, let me just

20  check.

21      Mr. Mello, that's your joint proposal?

22          MR. MELLO:  Yeah.  That's very much -- Mr. Galvan has

23  stated we're working well together.  We met and conferred; we

24  think that makes sense.

25      Also, I totally agree with Mr. Galvan that waiting until

1    the end of the 29th round on certain things may be problematic,

2    so that is the deal that we agreed to and I'm very supportive

3    of it.  Thank you, Mr. Galvan.

4         THE COURT:  All right.  Well, I'm prepared to bless

5    that.  It doesn't preclude the Special Master from pointing out

6    in the 29th round report any deficiencies that he and his team

7    believe are tied to ongoing COVID-19 management practices.

8       Agreed, Mr. Galvan?

9         MR. GALVAN:  Yes, your Honor.

10        THE COURT:  Mr. Mello?

11        MR. MELLO:  Yes, your Honor.

12        THE COURT:  All right.  Well, then I will do a minute

13   order following this hearing, bless that proposal, note that

14   you'll meet and confer.  And if you don't resolve all the

15   outstanding issues here, then you will seek leave to file a

16   motion.

17      All right.  Secretary Allison, generally, in terms of the

18   COVID-19 management practices, is there anything you believe

19   the Court should know, just programatically?

20        SECRETARY ALLISON:  Sure.  Sure.  Well, as of this

21   morning we have 3,093 active cases amongst the population,

22   1,631 amongst the staff.  We currently have three in outside

23   hospitals, and, of course, we monitor this very, very closely.

24   We've implemented a variety of measures to keep the population

25   safe to include closing the intake, opening the intake at

1    different times as recommended by our healthcare professionals

2    as well as public health guidance.

3        So we're following all of those as it relates to, you know,

4    masking protocols and a variety of different things.  We are

5    hopeful as we -- you know, just like when the community saw a

6    big spike in Omicron and then a sudden dip, we are seeing the

7    exact same thing amongst our population.  So we are hopeful

8    that we will be able to -- but we did have to do a modified

9    program statewide for a couple of weeks just to kind of catch

10   our breath, kind of try to contain this as best as possible.

11   And we're hopeful we'll go off that modified program on Monday

12   the 14th, and then we will go back to the individual

13   case-by-case based on what we call the roadmap to reopening so

14   that based on individual institutions and at individual yards

15   be able to program based on their current outbreak.

16       And so we're hopeful to get that going here very, very

17   soon, and look forward to getting some kind of -- more

18   operational stuff and more programming back within our

19   facilities.

20            THE COURT:  All right.  And I know there are

21   outstanding issues related to vaccinations, but -- I don't need

22   to hear more about the status of vaccination programs right

23   now.

24            SECRETARY ALLISON:  Well, our numbers are actually --

25   so 82 percent of the population is vaccinated and 72 percent of

1  our staff, which is a pretty significant increase from just a

2  month ago.  And so we are following the California Department

3  of Public Health's order as it relates to vaccines.  So we're

4  definitely hopeful that -- we're actually tracking -- compared

5  to the national standards, we're actually looking pretty good

6  as far as vaccination numbers.

7            THE COURT:  Okay.  Thank you for sharing that; those

8  numbers are higher than I would have expected.

9      All right.  On the DHS evidentiary hearing, I've seen the

10  responses to my order asking why I shouldn't find the issues

11  raised at the October 23rd, 2020, hearing moot.  In fact, I'm

12  prepared to issue an order shortly finding that the issues are,

13  in fact, moot.  I have everything before me to make a final

14  decision on that question, correct, Mr. Galvan?

15            MR. GALVAN:  Yes, your Honor.  Although I think the

16  facts, as we briefed them, that was back in September, a lot of

17  time has passed since then, but I don't think it's that

18  significantly different since September.  So, yes, your Honor,

19  you do have everything.

20            THE COURT:  All right.  Mr. Mello?

21            MR. MELLO:  I think it is fully briefed, and I won't

22  restate our position on DHS should we prevail and it is not

23  moot, because the issue of whether they should take emergency

24  action is still out there, but I believe you have that in front

25  of you, your Honor.  Thank you.

 1                    THE COURT:  On the question of resumption of

 2      assessing fines for delays in transfer, here's the question:

 3      Would the plaintiffs say I should separately -- assume I find

 4      the issues raised on October of 2020 moot and given plaintiffs'

 5      position, should I say if you want the Court to focus on what

 6      you've said most recently, seek to bring a motion within

 7      14 days to tee up formally whether or not I need to grant

 8      permission for ongoing application of COVID-19 exceptions to

 9      transfers?

10          On that issue specifically, Mr. Galvan?

11                    MR. GALVAN:  Your Honor, let me see if I understand

12      the question.  Plaintiffs would be required within 14 days of

13      the Court's order to move for the resumption of the contempt

14      sanctions for delay of transfers; is that right?

15                    THE COURT:  Taking account of the COVID backdrop.  If

16      you really believe such a motion is warranted and you'd seek --

17      you know, you'd meet and confer and you'd seek -- maybe 14 days

18      is a bit aggressive, but is that the way to resolve any

19      outstanding issue here?  That's really the case management

20      question.  Should I signal -- all right.

21                    MR. GALVAN:  Well, I was going to also add, your

22      Honor, I agree 14 days is short for that.  I think 30 days

23      would be more workable.

24                    THE COURT:  All right.  Any thoughts on any other way

25      to account for what plaintiff is bringing to the Court's

1   attention?

2          MR. GALVAN:  Your Honor, I think what you've

3   identified is the one that is best grounded in the existing

4   orders, and so it certainly does get us to a remedy quicker if

5   we already have that framework in place.  So, no, I wouldn't

6   offer anything else.

7          THE COURT:  Your thoughts on this, Mr. Mello?

8          MR. MELLO:  I know that the parties were meeting and

9   conferring on these subjects, and I would hope that we would

10   continue to meet and confer on these subjects in light of the

11   backdrop that is the pandemic.  But I have no additional

12   thoughts, your Honor.

13          THE COURT:  All right.  I'll provide for the 30 days.

14   And again, that will be an order following hearing -- or

15   following status.  Following status.

16      All right.  Anything else on -- well, on staffing?  Here

17   are my other issues.  There are two staffing motions out there

18   given the way the Court is now proceeding.  There's a motion to

19   clarify application of the ten percent vacancy rate, a motion

20   to modify the 2009 staffing plan.

21      Can I clarify that those are submitted and I'll resolve

22   them shortly, Mr. Galvan?

23          MR. GALVAN:  I would like to defer to Ms. Ells on

24   that.

25          THE COURT:  All right.  Ms. Ells?

1          MS. ELLS:  Thank you, your Honor.  We have met and

2    conferred with defendants on this issue, and we would like

3    seven days to try and resolve anything that we can around these

4    two motions.  If we can't resolve them by next Friday, we'll

5    submit something to the Court asking that they be ruled on.

6          THE COURT:  All right.  Mr. Mello, agreed?

7          MR. MELLO:  I believe that is the agreement, your

8    Honor.  Maybe -- I think we may have considered maybe some

9    supplemental briefing, but that is the agreement we are going

10   to meet and confer for a week, your Honor.  Thank you.  And

11   thank you, Ms. Ells.

12         THE COURT:  All right.  I'll look for an update then

13   in seven days.  And if you're requesting the opportunity to

14   provide supplemental briefing, clarify how many pages and what

15   that supplemental briefing would cover.

16      All right.  In terms of the ongoing staffing shortages in

17   the PIPs.  I mean, I gather the global picture is that the

18   total staffing numbers are looking not bad, it's the PIPs -- or

19   at least some plaintiffs think there's a serious problem -- and

20   some of the numbers do raise questions about PIP staffing.

21      The Special Master is in the field with the 29th round

22   monitoring and I believe can get to the Court an accelerated

23   report on PIP staffing.  And so split that off as a subset of

24   the 29th round report that would be filed sooner rather than

25   later.  I'm inclined to ask him to do that.  Any reason not to?

1    Is this also Ms. Ells?

2            MS. ELLS:  Yes, your Honor.  We think that is

3    appropriate and warranted.

4            THE COURT:  Mr. Mello?

5            MR. MELLO:  I know that there's action on staffing,

6    but I didn't anticipate you going there, your Honor, so I think

7    that's fine, your Honor.

8            THE COURT:  At least it gets information before the

9    Court -- the parties and the Court.  So Secretary Allison here,

10   is there anything that you want the Court to know about what's

11   going on in the PIPs with staffing or do you want to wait and

12   see the Special Master's report?

13           SECRETARY ALLISON:  Well, I do want to highlight

14   something, your Honor.  The state is committed to providing

15   mental health care to our sickest patients as evident by the

16   narrative statement released in the governor's budget.  The

17   state is committed -- so his statement in the budget states,

18   "The state is committed to the delivery of mental health

19   services to the population with continued efforts to provide

20   proper staffing for those who require our highest level of

21   care."

22       So he's highlighting his commitment; we're going through

23   that process currently.

24           THE COURT:  All right.  Noted.

25       On telepsychiatry -- Ms. Ells, I'm sorry.  Ms. Ells?

1          MS. ELLS:  Could I make one more statement?  I think

2  I wanted to make clear that we certainly appreciate the

3  expediting of the Special Master's PIP report.  We've been

4  meeting and conferring with defendants for a few months now

5  about these issues which are of great concern to us.

6     We have requested aggressive action from them with a plan

7  for attacking this problem, which is getting worse month to

8  month.  And so we have requested action within a month; we may

9  be seeking leave with the Court to file a motion if we don't

10 feel like things are progressing quickly enough, and I just

11 wanted to highlight that for the Court.  Defendants are already

12 aware of that.

13          THE COURT:  All right.  Thank you.  I think all of us

14 would benefit from keeping this on the front burner for now.

15 And with the Special Master focusing on that, it will give us

16 all something to review together.

17     On the telepsychiatry pilot, I think I had mentioned this

18 previously.  The pilot ends April 1st, and then the Court

19 previously has set in place a pretty long schedule for parties

20 determining whether any alterations are needed.  If disputes,

21 they go to the Special Master, the Special Master ultimately

22 makes recommendations on any disagreements, and then there is

23 an objection period taking us all the way almost to the end of

24 the year.

25     My question is:  Is there -- based on how that pilot is

1    going, is there a way to re-visit the schedule and shorten it?

2    Are people prepared to address that today, Mr. Galvan?

3                MR. GALVAN:  Your Honor, I've looked at the schedule,

4    and it does take us out to October 28th.  I went and mapped out

5    all the dates.  That would be the last day for the parties to

6    respond to the Special Master's telepsychiatry report, if

7    necessary.

8        There are points in the schedule where the process could

9    naturally end.  I mean, they could end May 1st if the parties

10   determine that no alterations are necessary, for example.  Or

11   it could end on May 31st if the parties agree on alterations.

12   And it could end on June 30th if -- well, June 30th is when the

13   parties would submit disputes to the Special Master.  But even

14   after that there's a 30-day period where the Special Master is

15   working on it.

16       So there are points where we could, without modifying the

17   schedule, we could resolve it all earlier if we reach

18   agreement.

19       I don't know from how the pilot is going how likely that is

20   because I'm not sure yet what defendants are going to propose

21   as a result of that.

22                THE COURT:  Okay.  Who is speaking on this for the

23   defense?  Mr. Mello?

24                MR. MELLO:  Yeah.  I think Mr. Galvan is -- we are of

25   like mind as to the fact that the process may end earlier.

1   Obviously, as mentioned in the lessons learned report, you

2   know, the landscape has changed.  But I -- I think maybe at the

3   end of the process if we're unable to reach agreement, maybe

4   some of those deadlines at the end could be tightened up.  But

5   I think those initial first three or so make a lot of sense to

6   allow the parties to meet and confer and work with the Special

7   Master on the front end.  Because maybe we will hit one of

8   those earlier dates that Mr. Galvan spoke to.

9           THE COURT:  All right.  So does it make sense for the

10  Court to just underscore the May 31st date on my internal

11  planning calendar in thinking about future dates for statuses?

12    Because I might want to, you know, shine the spotlight on

13  this issue again as soon as possible after May 31st to see if

14  we can expedite the schedule if there are disagreements

15  outstanding.

16    So that's what you're saying, right?  May 31st, within

17  seven days or so after May 31st the Court could check in on

18  that, Mr. Galvan?

19           MR. GALVAN:  Yes.  That's right, your Honor.  Because

20  at that point you'd know whether we reached a deal or whether

21  we're going to start using up the Special Master's energy.

22           THE COURT:  All right.  Mr. Mello?

23           MR. MELLO:  I agree, your Honor.

24           THE COURT:  All right.  Then I'll tentatively think

25  about a status in that early June time frame to check in on

 1    that unless you tell me it's all resolved by the end of May.

 2        All right.  Anything else on telepsychiatry?  Secretary

 3    Allison, do you want the Court to know anything on this pilot?

 4            SECRETARY ALLISON:  I will defer to Dr. Mehta.

 5            THE COURT:  Dr. Mehta?

 6            DR. MEHTA:  Thank you, your Honor.  You know,

 7    telepsychiatry is near and dear to my heart.  We're very proud

 8    of it.  I'm looking forward to talking with the plaintiffs and

 9    resolving it, but I think that's a perfect schedule, your

10    Honor.

11            THE COURT:  All right.  Very good.

12        Suicide prevention, which I know is near and dear to the

13    secretary's heart.  Here's what I'm seeing.

14        First, I am aware that the Special Master is going to be

15    filing a report on trend lines over the past five years on or

16    about February 21st, so that's -- I'll be seeing that quite

17    shortly now.

18        I've also noted the recent update to the activation

19    schedules, changing one deadline.  But upon some further

20    checking, I don't think the Special Master or the -- his expert

21    see any issue there, and I've previously heard from the defense

22    that they believe the schedule is on track.

23        And I'm expecting the fifth re-audit report to be

24    circulated by July 1st and filed with the Court by

25    September 1st, so that September 1st deadline.  And I don't

1    think that can be expedited unless someone tells me otherwise.

2    That September 1st deadline would drive my checking in again.

3        There is this issue, however.  I understand from the

4    Special Master that he's had some discussions, they're taking

5    account of some, you know, personal schedules, but he is

6    discussing with the secretary the foreseeability and

7    preventability issue.  And so my suggestion is, is to request

8    that the Special Master report to me by the end of April, that

9    that would give enough time.

10       And so I wanted to ask the secretary, does she agree that

11   that's a generous but not too long a time for the Special

12   Master and you to exhaust your discussions about resolving that

13   issue?

14       First of all, let me ask Special Master Lopes, am I stating

15   correctly your thoughts?

16            SPECIAL MASTER:  Yes, your Honor, you have.  I have

17   worked very closely with the secretary on many projects in the

18   past, and I'm confident that we can reach an agreement that

19   will be acceptable to you and to the plaintiffs.

20            THE COURT:  All right.  Does that sound right to you,

21   Secretary Allison?

22            SECRETARY ALLISON:  Yes, we look forward to those

23   further conversations.  And as Matty said, we've worked a lot

24   on things over many, many years together.

25            THE COURT:  All right.  So I will confirm following

1    this hearing that the Special Master will report to me by

2    April 30th.  And if there's a specific proposal, there would be

3    an objection period, if there is any objection, and I would try

4    to resolve that as promptly as possible.

5        Anything else on suicides, even though that's a cursory

6    review, I mean, this is definitely a front burner issue.

7        Anything further, Mr. Galvan?

8            MR. GALVAN:  Not if Ms. Ells doesn't have anything,

9    your Honor.

10            THE COURT:  Ms. Ells?

11            MS. ELLS:  No, your Honor.

12            THE COURT:  Mr. Mello?

13            MR. MELLO:  Nothing further, your Honor.

14            THE COURT:  All right.  Secretary Allison, here, is

15    there anything else you would like the Court to know?

16            SECRETARY ALLISON:  Nothing further.

17            THE COURT:  All right.  Unmet bed needs, which I

18    understand is a bit of a thorny issue right now.  Let's just

19    talk about it and see if the Court can play a role in

20    clarifying.

21        Who's the principal on point for unmet bed needs?

22    Mr. Mello?

23            MR. MELLO:  Dr. Mehta.

24            THE COURT:  Dr. Mehta, all right.  Does that sound

25    right to you, Secretary Allison?

1          SECRETARY ALLISON:  Yes, ma'am.

2          THE COURT:  Okay.  So here's what I understand.  That

3    Special Master -- and he can correct me if I'm wrong -- has

4    reported that planning is 90 percent complete as to phase

5    one -- there's some issues regarding correctional officer

6    input -- not complete as to phase two.  I had ordered to try to

7    get folks off the dime here, that planning be completed by the

8    9th.

9          Just for -- you know, I've reviewed information -- because

10   this is not the first time there's been an unmet bed need

11   study.  So I have reviewed, just to get a sense of what's the

12   time something like this should take, recognizing there are

13   many balls in the air.

14         But in 2009 when there were a lot of balls in the air,

15   phase one was complete within 29 days from the date of the

16   Court's order, and the full report was complete in just under a

17   year.

18         And right now the parties are on some kind of process that

19   just -- is much expanded at a time when it's really critical to

20   get this done, now that it's been ordered.  I realize the

21   people may not be happy with the Court's ordering, but it's

22   ordered.

23         So, I mean, my thought is that there can't be any further

24   delays here if you look back at the Court's prior order.  And

25   my question is, is there any lack of clarity about the order

1    issued on September 13th of 2021?  Docket 7305, if it is the

2    defendants' as soon as practical -- I didn't think I needed to

3    put a date in but I've since reconsidered -- under the guidance

4    and supervision of the Special Master who shall have final

5    authority over the scope of and methodology for the study

6    undertaken assessment.

7        So that's the overarching question I'm going to come back

8    and ask, particularly Dr. Mehta or Mr. Mello, in the first

9    instance to answer.  Is there some lack of clarity there?

10   Because, if not, here's my understanding -- again, the Special

11   Master can correct me if he thinks I got this wrong -- but he's

12   thinking that the full assessment could be completed by

13   September of this year.

14       And so my thought would be to ask him, given the authority

15   given him in that September order to file promptly -- he can

16   tell me how long he needs -- an executive summary of the plan

17   and a schedule for completion allowing for the study to move

18   forward without further delay.

19       I'm aware of the possible proposal to take over projecting

20   needs without renewing the contract with Navigant Consulting.

21   I can't get into the weeds on that one.  But if the Special

22   Master tells me there's a dispute that needs to be resolved,

23   then I'm going to say, "How does that get before me as promptly

24   as possible so I can resolve it?"

25       Or does the Special Master, in light of the September

1   order, have authority just to say, "Well, I note the defense

2   position but here's how we're proceeding."  And the time has

3   passed to try to work things out, it's just got to get going.

4   That's my view.

5       Because it dovetails some other things on the calendar that

6   need to be treated as tied confirmed dates, so that's kind of

7   an overview.

8       Special Master Lopes, do I have right your thought that the

9   assessment can be done by September?

10          SPECIAL MASTER:  Yes, your Honor.  The actual touring

11  and evaluation, to the extent that they are necessary, can be

12  done in that period of time.  And then, as you said, the

13  original MHARP took roughly a year, so there's a period that

14  the defendants would have to spend writing up their report and

15  working with us on that, so that it wouldn't be before the

16  Court probably until the end of the year.  But, yes, the

17  evaluations that need to take place and the tours that

18  accompany those could be completed in that time.

19      And to your point, your Honor, if you ordered me to put

20  together a proposal in the form of an executive summary, we

21  could do that within two weeks.

22          THE COURT:  All right.  So who wants to respond first

23  to this?  Is this Mr. Mello or Dr. Mehta?

24          MR. MELLO:  I can start, your Honor, if I may.

25      So I think that the fact that there may be a dispute as to

1  methodology, and it goes to your order that says that the

2  Special Master will have the final say on methodology.  I think

3  the way to resolve that issue is to get the methodology would

4  be to get the Special Master's methodology in a report that

5  sets forth with specificity that methodology would be helpful

6  for defendants.

7      I think defendants would like to comment on it before the

8  Court ordered a specific methodology, but if it's going to be

9  put in writing, then I think that would be helpful for our

10  clients.  Because I think there is -- there are some disputes

11  that are not resolved at this point with respect to

12  methodology.

13      And with that I can turn it to Dr. Mehta if he has anything

14  more, but that's sort of the threshold issue, your Honor.

15          THE COURT:  Dr. Mehta?

16          DR. MEHTA:  Yes.  Thank you, your Honor.  You know,

17  CDCR is more or less done with our part of the plan.  There's,

18  I think, one small issue remaining, but other than that it's

19  more or less done.

20      We know our system really well, we know how to make this

21  study useful to our system and a real benefit, and that's what

22  we designed the study around.

23      In terms of the schedule, your Honor, I must be honest, I

24  have some concern.  You know, we've created a Lindsey Hayes

25  schedule, we've created a data remediation schedule.  We keep

1    adding things on and not changing the existing schedules

2    despite the additional workload.  And, of course, not to

3    mention COVID on top of everything else.  And I don't mean to

4    say things were easy in 2009, but it is a lot of different

5    priorities to try to keep together, your Honor.

6         We've initially proposed having a rate rather than a

7    specific date to finish on where we can complete a certain

8    number of hundreds of evaluations per month.  It's very hard to

9    predict what the total size of the pool is going to be, and

10   it's very hard to predict what will happen with COVID.

11        And in every one of our UNA meetings we've all agreed that

12   we should not be going into them if it's difficult or unsafe or

13   it's going to overburden the institution, we shouldn't be

14   stopping other processes which are important for maintaining

15   quality of care for 30,000 patients that we treat every day.

16   And keeping that program running is a huge responsibility in

17   addition to everything else.

18        We certainly keep the Court priorities front and center, to

19   be very clear, but we have all of these different things going

20   on at the same time that we want to do the study properly and

21   in a way that will be helpful, and I'm not sure that

22   September 1st would allow us to do that.

23             THE COURT:  So if the Special Master gives me a

24   proposed plan spelling out methodology within 14 days, you're

25   asking for a chance to object to that?

 1                    DR. MEHTA:  I would -- I'm sorry.  Please, go ahead.

 2                    MR. MELLO:  No.  I think defendants would like the

 3      opportunity to comment on it before methodology is selected,

 4      your Honor.  And would do that quickly because I think they've

 5      done a ton of planning already in coordination with the Special

 6      Master's team.

 7                    THE COURT:  All right.  Let me ask Mr. Galvan.  Do

 8      plaintiffs have a view on how to move this forward as promptly

 9      as possible?

10                    MR. GALVAN:  I'll defer to Ms. Ells on that one, your

11      Honor.

12                    THE COURT:  All right.  Ms. Ells?

13                    MS. ELLS:  Your Honor, we have been involved in the

14      planning meetings, and we have grave concerns about numerous

15      aspects of defendants' proposal.  Key parts of it are still not

16      completed even though the planning deadline passed two days

17      ago.

18        And at this point we spent so much time on planning, and,

19      frankly, defendants' proposal looks to us like they're a

20      sustainable process which this Court has already made clear is

21      not an acceptable approach.

22        At this point the Court should just ask the Special Master

23      to submit the methodology.  Defendants' understood from the

24      start the Court's order said that he has final say over the

25      methodology.  Allowing for an objection period right now would

1   only delay resolution and starting this process.

2      Defendants' proposed timeline at this point wouldn't even

3   start until July and it is estimated to take more than two

4   years, so there's a serious disconnect in the urgency of this

5   project.  We know that there are some other priorities for

6   defendants that are not court ordered, like their forthcoming

7   CQIT tours, and those can be deferred if there are resource

8   issues.

9      This is something that has been pending for or needed for

10  three years, and it's time to move forward and complete it as

11  quickly as possible.  Not only because there are patients out

12  there, we believe -- we believe there are many patients out

13  there who need inpatient care and have not been identified --

14  but also the bed planning is inherently tied to the results of

15  this process.

16     So we think it's important to just move forward with the

17  original plan that your Honor laid out in the September order.

18          THE COURT:  All right.  And I do have that order in

19  front of me to remind myself what I said about it.

20     All right.  Anything else anyone wants me to know about

21  this?  I'll think about it and issue something shortly.

22          SPECIAL MASTER:  Your Honor, if I may.  I agree with

23  everything that Attorney Ells just stated.  The longer that we

24  go on, the more this project will be delayed.  It's important

25  to understand if there is an unmet bed need.  If there's not

1   and it is a cornerstone of defendants' argument that there's

2   sustainability.  If there is an unmet bed need then it drives

3   everything:  It drives telepsychiatry, it drives the bed

4   planning, it drives all the resources that need to be brought

5   to bear here.

6       Your Honor, this isn't new.  We've done these studies at

7   least three or four times in this case, and it's taken longer

8   to do this study development than it had one of its

9   predecessors.  And it's just mind boggling to me that it's

10  taken so long.  I think, in part, the defendants have rooted

11  their position in the sustainability of their sustainability

12  effort that they have, and they haven't really focused clearly

13  on the Court's order saying the sustainable process is

14  unsustainable.

15      So when we have conversations to discuss the use of the

16  sustainability process, it almost flies in the face of the

17  order and it causes significant delays.

18      I believe that we should -- we should move on, I'll put the

19  methodology in, and I think we should start the process.

20      Dr. Mehta is right that there is -- you know, COVID is a

21  factor in terms of whether tours need to be discontinued at a

22  certain point.  If there's an outbreak, we certainly want

23  everyone to be safe.  But, your Honor, the 2009 period -- and

24  Dr. Mehta wasn't here for that -- was the most explosive year

25  in the Court's history in this case.  We had the three judge

 1   court that was just wrapping up, we had an MHARP, we had bed

 2   planning, we had training around bed planning, we had two

 3   Special Master's reports, we were in Court continuously.  And

 4   the defendants in their bed planning had to come up with a

 5   long-term, short-term, an intermediate-term bed planning

 6   effort, and they were constantly going back to the legislature

 7   and through the various processes to make sure that

 8   previously-ordered bed facilities were brought online.

 9       So there were constant efforts by the department that were

10   herculean to make sure that treatment space, like the one at

11   CMF, was brought online, but they had to go through all

12   different sorts of funding mechanisms that the state requires

13   to get those things done.  So we were meeting constantly, and

14   our efforts were exhausted.

15       That is -- clearly we weren't in a pandemic, I fully

16   acknowledge that.  Okay, now that we will, to your point, your

17   Honor, have to live with for the rest of our lives.  But I

18   would be remiss if I let it lay out there the statement that or

19   the feeling that, excuse me, this is a more explosive time.

20       This is a difficult time, we have a lot of reports, we have

21   a lot of deadlines, but everyone is committed to ending this

22   case.

23       And in order to end the case we all have to roll up our

24   sleeves and stick to those timelines.  Further delays for this

25   project, I think, would be -- could possibly be harmful to

1  patients who need the additional care.

2      Conversely, it's a strong marker if there is no need, that

3  the defendants have moved in the right direction in this case

4  and have an argument about sustainability.

5          THE COURT:  Understood.  I understood that general

6  interrelationship with sustainability.

7      Dr. Mehta?

8          DR. MEHTA:  Thank you, your Honor.

9          MR. MELLO:  May I be heard too, your Honor?

10         THE COURT:  Wait.  Only one at a time.  Who wants to

11  speak?  Dr. Mehta and Mr. Mello?

12         DR. MEHTA:  Yes, your Honor -- Mr. Mello.

13         MR. MELLO:  Just real quick.  I would just point out,

14  your Honor, that we're very happy that the Special Master, his

15  methodology will be put forth.

16     I think this Court has now heard descriptions of our

17  concerns and thoughts and descriptions of our purported

18  methodology, but I think it would be -- it would lack some

19  process if we would not have the opportunity to actually put

20  those comments and thoughts in our methodology -- proposed

21  methodology in writing for the Court to consider before

22  ordering it.  It wouldn't take a lot of time.

23     But with that I will defer to Dr. Mehta for additional

24  information.  Thank you.

25         THE COURT:  All right.  Dr. Mehta?

 1          DR. MEHTA:  Thank you, your Honor.  I disagree very

 2   strongly with some of the characterizations that Mr. Lopes

 3   made, with all due respect.

 4       We are not trying to run SusPro as an UNA.  I've been

 5   surprised at how little everyone seems to understand what

 6   SusPro actually is despite the fact that we keep filing these

 7   reports.

 8       MHARP and SusPro have a lot in common.  There's a lot of

 9   similarities that we dispute because they were built that way.

10   And that may be where some of the confusion is coming from.

11   But we started -- and I don't know how anyone could see

12   anything different in our workers.  We started with the

13   criteria of MHARP and literally talked about each one and

14   modified it to meet the new world that we're in today.

15       In 2009 we didn't have an electronic medical record, we

16   didn't have a lot of -- we didn't have any sort of telemedicine

17   which has happened over the last decade plus since MHARP.

18   There were a lot of different things in MHARP that simply don't

19   make it directly applicable to our current thing.

20       And if I'm being honest, I'm concerned that if the Special

21   Master writes a report and there's no opportunity for us to

22   comment, they will mandate or include things that are simply

23   not practical within the system as it exists today.  And that's

24   been one of the difficulties that we've been having, your

25   Honor, in reaching agreement is, as I said, we know our system

1   very well, and there are aspects of this that we're very --

2   we're struggling with.

3        We want to get this done as quickly as possible, but it

4   can't work both ways.  If we're told to do things that we can't

5   accomplish and accomplish them in any reported time frame, I

6   just don't see how that's possible, your Honor.

7             THE COURT:  I may need to follow up with more focused

8   discussion on this, but help me understand.  What's the -- so

9   when would you say the study with the report to the Court could

10  be fully completed?  If Special Master says completion of the

11  assessment by September, report by the end of the year, what's

12  your schedule?

13            DR. MEHTA:  Your Honor, I have not seen a written

14  account of what the Special Master's proposed policy is, so

15  it's hard to say how long that would take because we haven't

16  seen that yet.

17       But I do think that the schedule that we set out is, I

18  think, reasonable.  I think it can be accelerated, I don't

19  think it requires two years from starting, but I think it is

20  definitely longer than September, your Honor.

21            THE COURT:  The other thing is, I'm looking at

22  certain dates that I think are perhaps connected to what

23  happens with the unmet bed need study.  And that is, for

24  example, CMF L-1 deactivation.  Right now there's a plan due to

25  the Special Master and the plaintiffs April 22nd, a waiver

1    expires October 15th.

2        So at this point the Court sees those dates as firm.  Do

3    you -- can those dates be firm regardless of what happens with

4    the unmet bed need study?  Dr. Mehta?

5            DR. MEHTA:  Sorry, excuse me.  Yes, your Honor, I do

6    believe so.  I think that we are -- that is working on

7    projections and past data which helps us figure the range of

8    need that we have, and I do think we can continue those

9    conversations.

10       By no means do I deny the connection, you're absolutely

11   correct on that, but I think we can still make progress on

12   that.

13           THE COURT:  With waiver expiring October?

14           DR. MEHTA:  Yes, your Honor.  So with having a plan

15   for -- with everyone's comment in April, your Honor.

16           THE COURT:  All right.  Let me think about what I've

17   heard, and again, I might want to talk with you again more even

18   next week about this because we cannot delay any further.

19           DR. MEHTA:  Thank you, your Honor.

20           THE COURT:  All right.  Let's just touch base on --

21   on settlement, I just wanted to say this:  I understand the

22   parties want to seek settlement regarding the guard one cases.

23       With that, please make a request to me saying exactly what

24   you want, scope, timeline, who would be involved so that I can

25   approve that or not.

1          On TTMs, I've already approved the parties' stipulation.

2    Just let me -- just notify me if you are going to Judge Newman

3    and tell me what you're taking to him so I know.  I'm not

4    changing my approval of the stip, but just so -- so I have

5    that, again, on my radar.

6          MR. MELLO:  I'm sorry, your Honor, I want to make

7    sure I understand.  With respect to the dispute, the complaint

8    in there with regard to that stipulation, is that what you're

9    referring to, your Honor?

10          THE COURT:  Is there a stipulation before me?  I'm

11    sorry, I don't have every document in front of me that's been

12    filed in this docket which has now reached how many?

13          MR. MELLO:  No, no, no.  We presented it to the

14    Special Master, I'm sorry, and I apologize.

15          THE COURT:  Ahh.

16          MR. MELLO:  But you are referring to that dispute,

17    the guard one issue and the complaint?  I just wanted to make

18    sure I was following.  Thank you, your Honor.

19          THE COURT:  Those are the two issues right now.  One

20    will go to Judge Newman under the TTM stip, just notify me.

21    The other one I have not approved just going to Judge Newman

22    regarding the guard one cases.

23          MR. MELLO:  Okay.  Thank you, your Honor.

24          THE COURT:  And then in terms of -- I just wanted

25    to -- let's leave data remediation, because I understand the

 1     defense wants to talk about that.

 2         I just wanted to make certain we were on the same page, if

 3     I can find my notes here.  There is, I believe, still pending

 4     before me your September 29th filing, docket 7332, joint

 5     response regarding the August 3rd order, 2020.

 6         I've now issued the February 7th order confirming how I see

 7     the CQIT process unfolding and how that suspends the need for

 8     filing a program guide update this coming fall.

 9         I understand that, nevertheless, I now have the joint

10     notice and annual updating process agreement to the extent it

11     applies to the regulatory and policy making process.  So it's

12     Exhibit A, docket 7332-1.

13         I think there might be some changes to the language to

14     reflect my February 7th order, but am I right that the parties

15     understand that that joint notice and annual updating process

16     agreement is before me for consideration, because I'm prepared

17     to address that.

18         Mr. Galvan?

19             MR. GALVAN:  Yes, your Honor.  The parties didn't

20     withdraw it so it is -- it is still before the Court.  And from

21     plaintiffs' point of view it would be useful to have a notice

22     process when they're going to change things.  So the annual

23     updating part, I think, is somewhat mooted by the February

24     order that your Honor referred to, but the notice part is still

25     useful.

1    I have not talked to defendants about this; I don't know

2    their position.

3            THE COURT:  Well, I wanted to -- because I -- I think

4    I put on a date by which you would let me know, you didn't, and

5    I had said that if I didn't hear otherwise then I would turn to

6    the September 29th filing, and so because I have heard nothing

7    else, that's what I'm doing now.

8            MR. GALVAN:  Yes, your Honor.  Actually, we did

9    talk -- the parties did talk about an alternative exhibit in

10   the form of the pared-down version that had gone along with the

11   remedial plan process, but then we decided not to submit that

12   so I think -- I think all the parties then understood that

13   things would revert back to docket 7332.  That's my

14   understanding.

15           THE COURT:  All right.  Mr. Mello?

16           MR. MELLO:  Yeah, I won't speak to the issues on the

17   in camera and the settlement issues, but I believe that the 929

18   filing is still out there, though I do believe it may be

19   impacted obviously by your subsequent orders.

20       And again, with respect to that filing, that filing and

21   that process was part of a larger resolution and issue when the

22   defendants filed that Exhibit A.  And so I think the landscape

23   has changed in light of subsequent orders.

24       But, yes, we cannot withdraw what we filed on the 29th, it

25   is still before the Court, but I do believe the landscape has

1    changed in light of subsequent orders and actions.  Thank you.

2          THE COURT:  My question is, do you want me to modify

3    the joint notice at 7332-1, or do you want to meet and confer

4    and let me know if you agree on how it would be modified to

5    take account of the February 7th order?

6       Mr. Galvan -- or Mr. Mello, you can go first.

7          MR. MELLO:  You know, I think we would like to meet

8    and confer again more on the subject because there are some

9    unknowns out there, but I think we prefer to meet and confer.

10      But, of course, your Honor can do what she sees fit with

11   that September 29th filing, but I think defendants would prefer

12   to meet with opposing counsel, meet and confer.

13         THE COURT:  All right, Mr. Galvan, agree, meet and

14   confer might be useful just to clarify in light of the

15   February 7th order?

16         MR. GALVAN:  Yes, your Honor.

17         THE COURT:  How much time do you need to propose --

18   what I would say is keeping the spirit of 7332-1 but modifying

19   it in light of the February 7th order?

20         MR. GALVAN:  I would suggest 14 days, your Honor.

21         THE COURT:  Mr. Mello, does that work?

22         MR. MELLO:  14 days makes sense to me.  And again, it

23   will be a meet and confer.  I don't want to create false -- any

24   false expectations that we've reached an agreement.  I think we

25   may reach agreement, we are working well with plaintiffs'

1     counsel, but I don't want to create a false expectation that we

2     will do that.  I just don't know yet, your Honor.

3                THE COURT:  All right, 14 days.  I'll hold off for

4     14 days, and I'll confirm that up in a minute order following

5     this hearing.

6        I just want to put dates out there based on what I believe

7     is on the calendar.  Dr. Mehta mentioned there are a lot of --

8     there are a lot of moving parts, but that's always been the

9     case in this case.

10       So in terms of max custody in the PIPs, I have that on the

11    calendar -- there's a March 9th implementation date with a

12    September 9th report to the Court.  That's on track.  Is this

13    for Secretary Allison, or who is the person to just confirm

14    that's on track?

15       Mr. Mello.

16                MR. MELLO:  I think that's on track, your Honor.  I

17    mean, there is some question as to when the stipulation was

18    approved, but I think that is on track, your Honor, and we are

19    achieving the March date that you gave, your Honor.

20                THE COURT:  In terms of the DHS staffing review,

21    there's a year-long monitoring period that's ending March 28th,

22    and so my assumption is the Special Master will report on that

23    in the 29th round.

24       Agreed, Mr. Mello?

25                MR. MELLO:  I believe that is correct, your Honor.

 1          THE COURT:  All right.  Anything to say on those

 2    issues, Mr. Galvan?

 3          MR. GALVAN:  No, your Honor.  My reckoning matches

 4    the Court's reckoning.

 5          THE COURT:  All right.  Is there anything else before

 6    we talk about data remediation?

 7       Mr. Galvan?

 8          MR. GALVAN:  No, your Honor.

 9          THE COURT:  Mr. Mello?

10          MR. MELLO:  No, your Honor.

11          THE COURT:  Secretary Allison?

12          SECRETARY ALLISON:  No, your Honor.

13          THE COURT:  Special Master Lopes?

14          SPECIAL MASTER:  No, your Honor.

15          THE COURT:  All right.  So data remediation, I see an

16    April date coming up.  April 7th for an update that I believe

17    the defendants will be filing.

18       I don't know if Special Master Lopes wants to say more

19    before I hear from the parties.  I know, Mr. Mello, you said

20    you wanted to address this.

21       I had asked the Special Master if this can be expedited

22    because it's so critical.  I believe his understanding is that

23    that it is going to take some time, and so I'll let him briefly

24    explain what he's told me just so it's out there, and then I'll

25    hear whatever Mr. Mello has to say and then plaintiffs.

 1      Special Master Lopes.

 2          SPECIAL MASTER:  Thank you, your Honor.  Generally, I

 3  just want to say that we have -- my data expert and my team

 4  meet with the defendants throughout every week and have had

 5  countless meetings with them, and we then have had biweekly

 6  data meetings to review what is being done.

 7      We've had some disputes but we've had great successes, and

 8  my team believes that we're still on schedule with the

 9  activation schedule that is already before us.

10      There was a filing that was made recently which seems to

11  indicate that it would shave time off of the process as well,

12  and we are in discussions with the defendants to have the

13  plaintiffs join in on our regular meetings, which means we'll

14  be getting real-time input from the plaintiffs.  And barring

15  unforeseen circumstances, we should all be able to meet the

16  deadlines that have already been set.

17      I hesitate to say that that schedule could be accelerated.

18  Many of the same people who are working on data remediation for

19  the defendants are working on all of these other deadlines and

20  projects as well.  The same with my team.

21      The defendants have put in, as I understand it, a so-called

22  PCP or made a budgetary request for additional staff,

23  programmers, and the like, and -- but that budget process goes

24  through June, and then you have to hire the people and then

25  they have to come in and be trained.

1      But certainly once those folks are on board then there may

2   be some chance to move forward.  But technical writers, subject

3   matter experts, data scientists, the defendants just don't have

4   enough bandwidth right now.  And I'm not sure that they have --

5   again, they have a lot of people who are doing good work, but

6   they're all doing some of these other projects that we're

7   talking about as well.  Accelerating that timeline might cause

8   them to have to duplicate themselves or replicate themselves;

9   it's going to be challenging.

10          THE COURT:  All right.  Mr. Mello, your thoughts?

11          MR. MELLO:  I, again, want to turn it over to

12   Dr. Cartwright who is running this project for the department.

13   But, initially, I think you wanted to speak to the errata just

14   for complete transparency that was alluded to earlier, and I

15   think you wanted to speak to where we are and the fact that

16   there's some uncertainty at the end of the process and how that

17   makes determining when we will be through data remediation for

18   a particular item or all items difficult really to pin down.

19      And so we're like looking for a little bit of guidance from

20   the Court on that particular issue.  But I'll turn it over to

21   Dr. Cartwright just to update you and speak to those issues.

22   Thank you, your Honor.

23          THE COURT:  All right.  Dr. Cartwright.

24          DR. CARTWRIGHT:  Thank you.  In addition to the

25   details that were filed in the errata, I just wanted to

1    underscore that my team identified the potential

2    miscalculation.  We conducted a full audit and we fixed the

3    root causes for that calculation, we've established enhanced

4    procedures.  And the result, as was mentioned, is that our

5    current calculation shows that we're a bit more ahead of

6    schedule than we initially filed earlier this year.  But that

7    is with known work, and so, you know, we have a certain number

8    of steps that have been defined, a certain number of

9    provisionally-improved key indicators that we know about.

10        However, we still have concerns with some of the delays and

11    the items that we mentioned in our original filing that could

12    threaten the overall timeline.  They still remain, to some

13    extent, although we are working closely and very hard to

14    mitigate them.

15        But we also -- we don't fully understand how data

16    remediation is achieved.  There's some steps towards the end of

17    the process that aren't clear, they haven't been defined, and

18    so it's difficult for us to fully say that -- with confidence

19    that the timeline -- we're completely on time with the

20    projected data remediation timeline.

21            THE COURT:  All right.  I do see the -- I notice the

22    errata, I have not studied it carefully, but I did see that it

23    has been filed, so I will take a closer look at that.

24        All right.  Just so I'm clear, are you suggesting that

25    there is more the Court can do?

1           MR. MELLO:  Steve, I can take that.  I think that we

2    are hoping that the Court can provide some clarity as to the

3    process by which individual indicators are taken up, how they

4    are reported on in terms of whether or not in writing --

5    whether they're reported on whether or not they have made it

6    through data remediation or not, an opportunity to address

7    whether or not a particular item, if it isn't approved or

8    through the data remediation process.  So those last steps that

9    are the data remediation expert steps, we're looking for some

10   clarity on that.

11      We put sort of that information in one of the early

12   activation schedules, but we're looking for that clarity.

13      And also note some sort of description as to why something

14   might not be provided or deemed to be through the process, why

15   it fails data remediation or not.

16      I think we're looking for sort of three specific answers to

17   those questions so that Dr. Cartwright's team could really put

18   an end date on this and possibly speed it up.

19      And I think there's also concern about taking up all the

20   indicators at the end of the process and not doing them

21   individually.  Because it would afford us the opportunity to,

22   one, learn from individual circumstances, and also, two, not

23   wait until the end and respond to everything at once.

24      But again, Dr. Cartwright is the expert, and to the extent

25   I don't have that right and that's not what you're looking for,

1  Dr. Cartwright, feel free to chime in.

2      Thank you for the opportunity to speak to these issues,

3  your Honor.

4          THE COURT:  Dr. Cartwright?

5          DR. CARTWRIGHT:  Nothing further to add, your Honor,

6  that's exactly right.  Those are the issues towards the end

7  that we're looking to seek clarity on, really how the process

8  will be certified at the end of each of the indicators being

9  reviewed.

10         THE COURT:  Special Master Lopes, in a nutshell, just

11 give me your view.  I think it may be that in the same way that

12 I need to drill down on the unmet bed needs study, it may be

13 data remediation or something I drill down on sooner rather

14 than later, have some more -- a little bit more time than with

15 unmet bed needs.

16     So, in a nutshell, tell me what you're thinking, Special

17 Master Lopes, in response to what you've heard.

18         SPECIAL MASTER:  I'm thinking that these concerns are

19 overblown.  I think that we've spent more time working with the

20 defendants on data remediation than we have at any other time

21 for any other project.

22     The data expert has regular meetings with Dr. Cartwright

23 and his team; he has regular meetings with Dr. Leidner.  We

24 have an indicator that, if I understand it correctly, the

25 defendants have already gone through the remediation process

1    with what they are essentially asking for, in my view, is that

2    they want court reports along the way when, in fact, we're

3    working together as a team.

4        And so I don't know that there's any other way for us to

5    give them better information than the daily, weekly, hourly

6    meetings that we're having together.  And I do believe that

7    it's an appropriate time, perhaps at the next status

8    conference -- to the extent your Honor feels the same -- to

9    have Dr. Potter here would be very important because he's the

10   subject matter expert, he's the expert in this area, and he

11   could, in a granular way, let you know all the steps that are

12   being taken.  But I can only say that the data remediation

13   process has been one of the most intense, regularly-scheduled

14   reviews that we have conducted in this case.

15             THE COURT:  Well, it sounds to me as if it makes

16   sense to set a status on data remediation as soon as possible

17   following the second update due on April 7th.  Does that make

18   sense?

19             SPECIAL MASTER:  Absolutely.

20             THE COURT:  Have Dr. Potter here, Dr. Cartwright.

21   And the Court would be focusing on the three points Mr. Mello

22   raised.  Are there -- just looking closely at the process, and

23   is there any way without adding to the burdens, that the Court

24   can provide guidance to streamline and have things move along?

25       Let me just ask plaintiffs, does a status following the

1    second update due April 2nd make sense?

2        Mr. Galvan?

3            MR. GALVAN:  I'll defer to Ms. Trapani.

4            THE COURT:  Ms. Trapani.

5            MS. TRAPANI:  Hello, your Honor.  Yes, that makes

6    sense to us, and I also want to echo what Special Master Lopes

7    said, and Dr. Cartwright mentioned that this has been a very

8    complex process, we've been meeting constantly.

9        And since the defendants filed their updated activation

10   schedule, we are going to engage in a new revision to the

11   process where we'll be attending more of those meetings and

12   hopefully cutting out some of the later steps.  That's going to

13   get going in early March, and so we're hopeful -- that was

14   intending for both of us to shave off some time, and we're

15   hopeful we could have an update for you by the time of

16   April 7th.

17           THE COURT:  All right.  Does that time framework for

18   you, Mr. Mello?

19           MR. MELLO:  Yes, I think it might be helpful too if

20   defendants or the parties could submit a writing prior to

21   that -- to that status conference just with -- maybe to really

22   focus the issues -- those three issues that I probably didn't

23   do justice on; this is a very important project.  But that

24   makes sense to us, your Honor.  Thank you.

25           THE COURT:  All right.  That will be the plan then.

1    So we'll have a -- I'll currently plan to put a status on the

2    calendar following May 31st for the telepsychiatry pilot, that

3    would be a primary agenda item, but also something mid-April in

4    data remediation.  One could be more focused than the other.

5    It seems data remediation might take a whole -- a whole

6    session.

7        And then I'm going to think carefully about the unmet bed

8    needs study.  And if I need a follow up, I'll set a phone call.

9    If I just need -- do I need all of you, or if Ms. Schultz just

10   tells Mr. Galvan and Mr. Mello, "Here are the Court's follow-up

11   questions," then they can identify who needs to be on a call if

12   I want another call early next week on that?

13       Does that process work for you, Mr. Galvan?

14           MR. GALVAN:  Yes, your Honor.

15           THE COURT:  Mr. Mello?

16           MR. MELLO:  Yes, your Honor.

17           THE COURT:  All right.

18       I think we've covered everything I mentioned at the

19   beginning.  Anything else at this point, Special Master Lopes,

20   that I missed?

21           SPECIAL MASTER:  No, your Honor.  But I would like to

22   offer if there is a call next week, I would need to have -- or

23   I would recommend that a couple of the experts from my team

24   join in who have studied -- who have done most of these studies

25   before.  I don't think anybody from the defendants have done

1    one of the studies, and it would be helpful to get that

2    perspective.

3              THE COURT:  Yeah.  Given the -- there's clearly some

4    passion behind Dr. Mehta's comments here, and I do want to make

5    certain I fully understand, but also it keeps us on track.

6       So -- but I'm happy to hear from everyone.  You know, I

7    could just hear from the Special Master's experts offline, but

8    I think it makes sense to be transparent here.

9       So I'll follow up with you and let you know if I need more

10   early next week before I make a final decision on that.

11      Anything else, Mr. Galvan?

12             MR. GALVAN:  No, your Honor.

13             THE COURT:  Mr. Mello?

14             MR. MELLO:  No, your Honor.

15             THE COURT:  And Secretary Allison, anything else that

16   you would like the Court to know?

17             SECRETARY ALLISON:  No, ma'am -- no, your Honor.

18             THE COURT:  All right.  Well, thank you very much.  I

19   will get some statuses on the calendar for mid-April/early June

20   and let you know on the bed needs study.

21      And then if at any point you jointly think we need a status

22   like this just to do housekeeping and to focus calendaring, let

23   me know.

24      All right.  Thank you very much.  Have a good weekend.

25             MR. GALVAN:  Thank you, your Honor.

1          THE CLERK:  Court is in recess.

2          (Proceedings adjourned:  3:16 p.m.)

3                    ---o0o---

4     I certify that the foregoing is a correct transcript from the

5     record of proceedings in the above-entitled matter.

6

7                         /s/ Thresha Spencer
                          THRESHA SPENCER
8                         CSR No. 11788, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25