1                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
2


3
       RALPH COLEMAN, et al.,
4             Plaintiffs,
                                        Sacramento, California
5      vs.                              No. 2:90-CV-00520-KJM-DB
                                        Wednesday, February 23, 2022
6      GAVIN NEWSOM, et al.,            1:04 p.m.
              Defendants.
7      _____/

8

9

10                              ---o0o---

11                      TRANSCRIPT OF PROCEEDINGS
12
                        FURTHER STATUS CONFERENCE
13
           BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
14
                 (Proceedings held via videoconference.)
15
                                ---o0o---
16

17

18

19     Official Court Reporter:        Thresha Spencer,
                                        CSR, RPR
20                                      501 I Street
                                        Sacramento, CA 95814
21

22

23

24
       Proceedings recorded by mechanical stenography, transcript
25     produced by computer-aided transcription

```
1    APPEARANCES:

2      For the Plaintiffs:              ROSEN BIEN GALVAN & GRUNFELD
                                         LLP
3                                        101 Mission Street, 6th Floor
                                         San Francisco, CA  94105
4                                        By:  MICHAEL BIEN
                                              THOMAS NOLAN
5                                              JENNY YELIN
                                         Attorneys at Law
6

7
        For the Defendants:             DEPARTMENT OF JUSTICE
8                                        1676 N. California Blvd.,
                                         Suite 620
9                                        Walnut Creek, CA  94596
                                         By:  PAUL MELLO
10                                       Attorney at Law

11                                       DEPARTMENT OF JUSTICE
                                         OFFICE OF THE ATTORNEY GENERAL
12                                       1300 I Street
                                         Sacramento, CA  95814
13                                       By:  ELISE THORN
                                         Attorney at Law
14
                                         DEPARTMENT OF JUSTICE
15                                       OFFICE OF THE ATTORNEY GENERAL
                                         455 Golden Gate Avenue,
16                                       Suite 11000
                                         San Francisco, CA  94102
17                                       By:  DAMON GRANT McCLAIN
                                         Attorney at Law
18

19
        Special Master:                 MATTHEW LOPES
20

21

22

23

24

25      (Appearances continued on following page)
```

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

```
 1   APPEARANCES (Continued):

 2

     Also Present:                Dr. Amar Mehta
 3                                Dr. Katherine Warburton
                                  Dr. Jeffrey Metzner
 4                                Kristopher Kent
                                  Nicholas Weber
 5                                Namrata Kotwani
                                  David Cassarrubias
 6                                Melissa Bentz
                                  Christine Ciccotti
 7                                James Spurling
                                  Kerry Walsh
 8                                Dr. Mary Perrien
                                  Sharen Barboza
 9

10

11
                          --o0o--
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SACRAMENTO, CALIFORNIA, WEDNESDAY, FEBRUARY 23, 2022, 1:04 PM

2                              --o0o--

3    (Proceedings were held via the Zoom application.)

4            THE CLERK:  The United States District Court for the

5    Eastern District of California is now in session.  Chief Judge

6    Kimberly J. Mueller now presiding.

7        Calling civil case 90-520; Coleman, et al. versus Newsom,

8    et al.  This is on for a further status conference.

9            THE COURT:  All right.  Good afternoon.  Lead counsel

10   for plaintiffs.

11           MR. BIEN:  Good afternoon, your Honor.  Michael Bien

12   appearing with Jenny Yelin and Tom Nolan.

13           THE COURT:  All right.  Good afternoon to you.

14       Lead for the defense.

15           MR. MELLO:  Good afternoon, your Honor.  Paul Mello

16   with Samantha Wolff, Damon McClain, and Elise Thorn.  In

17   addition, our clients, Dr. Mehta from CDCR and Dr. Warburton

18   from DSH, are on as well.  Thank you.

19           THE COURT:  All right.  Good afternoon to all of you.

20       The Special Master is present.  Could you please identify

21   your team, who is present, Mr. Lopes?

22           SPECIAL MASTER:  Yes, your Honor.  We have

23   Dr. Jeffrey Metzner, Dr. Mary Perrien, Dr. Sharen Barboza, and

24   Kerry Walsh joining me.

25           THE COURT:  All right.  Good afternoon to all of you.

1   And I see someone just clarified through their naming on

2   Zoom that they're monitoring.  That's J. Spurling.

3          MR. SPURLING:  For OIT.  That's right, your Honor,

4   for the Office of the Inspector General.

5          THE COURT:  All right.  I was just checking your

6   affiliation.

7          MR. SPURLING:  Thank you.

8          THE COURT:  All right.  This is a further status.

9   I'm in case management mode.  It's really just following on an

10  issue that arose during the last status.  And so I just want to

11  clarify the parameters at least for today.

12     I am not contemplating reconsideration.  I heard some folks

13  might be thinking that, currently I'm not.  I'm just following

14  up what I was hearing at the last session in order to

15  understand.

16     I assume you've figured this out about me.  If curiosity

17  would have killed a cat, I'm way past my nine lives.  I want to

18  know what's going on enough to when I sign an order I

19  understand what it means and what the implications are.  And

20  I'm committed to the principle of understanding as much as I

21  need to as the judge presiding in this case.

22     So the status is there are times when I'm a judge deciding

23  a disputed issue -- hopefully much narrowed at this point --

24  and sometimes in good faith I'm just trying to make certain I

25  understand what's going on in case there are case management

1    approaches that occur to me, case management approaches that we

2    can refine.  So that's why I'm here.  So I hope some of you are

3    here to educate me.

4        I have gotten somewhat of a briefing from the Special

5    Master and members of his team.  So what I would like to do --

6    I have questions, I think I would direct them to Dr. Mehta, and

7    if he wanted to yield to someone else, he's more than welcome

8    to, of course.

9        I'll have a few questions for Mr. Mello.  This is based on

10   what got said at the last status.

11       And I may ask the Special Master to clarify am I getting

12   that right, and I'll give him an opportunity at key times to

13   weigh in if he wishes to.

14       So really what I wanted to better understand, first for

15   you, Dr. Mehta.  I think at one point during the last status I

16   got the impression you were saying you had not seen a written

17   description of the methodology the Special Master's team was

18   proposing.  You might have used the word "policy."  Is that a

19   fair characterization of your position?

20            DR. MEHTA:  Yes, your Honor.

21            THE COURT:  So help me.  I think the Special Master's

22   team thinks that starting in mid-November of last year

23   Dr. Metzner did send an email to you, Dr. Warburton, Lisa Ells,

24   and Kerry Walsh that included attachments or zip folders, DMH,

25   MHARP folder, and an UNA folder.  And I think the Special

1    Master's team thinks that the material provided did describe

2    the methodology being proposed.

3        So I'm trying to -- I know there's a dispute, but to the

4    extent you think you haven't heard the methodology explained, I

5    want to give the Special Master's folks a chance to point to

6    what they believe makes it perfectly clear.

7        Do you know what I'm talking about when I refer to

8    Dr. Mehta's email of November 17th, 2021?

9            DR. MEHTA:  Yes, absolutely, your Honor.  I can

10   clarify if you'd like, but I, of course -- you can kind of call

11   us in the order that you prefer to hear.

12           THE COURT:  Well, I'd like you to -- so why did that

13   not provide you with a description of the proposed methodology?

14           DR. MEHTA:  Yeah.  So those were absolutely very

15   helpful documents, I don't mean to disregard that.  They were

16   mainly a description of what occurred during MHARP, and then

17   what occurred during the prior UNA, prior to MHARP as well.

18       Over the weeks that we've been working with the Special

19   Master, we've mainly been focusing on how to implement the

20   differences from the last MHARP.  Like things have changed a

21   lot.  I mean, the entire question in a sense is different.  In

22   the last MHARP we were -- the last UNA, we were looking at

23   whether patients were being admitted to DSH because CDCR didn't

24   have any PIPs, like that was all pre lift and shift.

25       And so now everything the CDCR wants to admit gets

1   admitted.  If DHS says yes or no, they may stay in their our

2   PIP versus their PIP, but they're admitted.  Everybody is

3   admitted.

4       So this isn't a question about that level of the

5   gatekeeping anymore, it's a question about CDCR's internal

6   gatekeeping, which is a very different assessment in my mind.

7       So I totally agree the MHARP documents have been helpful,

8   and we've reviewed every one of those documents with the

9   Special Master's team; they've been wonderful about that, no

10  question.  But there's a lot of differences.

11      We didn't have EHRS, we had no electronic medical record

12  system last time, so people had to go on site and read the

13  paper charts.  That's different this time.  We didn't have the

14  experience with telemedicine.

15      And then, frankly, just the last one, we've been operating

16  under the instruction to cast the widest possible net here,

17  which we absolutely have been doing.

18      So we've already identified, I think, that our list is

19  going to be many, many more patients than the last UNA.  Even

20  though our total population in the prison is smaller, we're

21  casting a very wide net, as we said.

22          THE COURT:  Total population of mental health

23  patients -- of mental health patients?

24          DR. MEHTA:  I'm sorry, I just meant for the whole

25  prison.  If it was closer to 150,000 during the last time, it

1  is about 100,000.  With all the COVID changes I don't know the

2  exact numbers, but that's my understanding, your Honor.

3          THE COURT:  I meant for essentially the Coleman

4  class.

5      Well, just help me understand.  So you were clear on what

6  the Special Master's team was proposing at the beginning of

7  discussions, and then there were -- as I understand it, there

8  were at least seven, probably more, meetings where the Special

9  Master's team took input from you and others on your team to

10  refine the methodology to take account of what you're saying.

11      You agree there were a series of meetings leading up to

12  January 31st of 2022?

13          DR. MEHTA:  Yes, your Honor, definitely.  Uh-huh.

14          THE COURT:  And is the methodology with respect to

15  Phase I, is that -- is that, in your mind, now resolved and

16  agreed upon?

17          DR. MEHTA:  So Phase I being the collecting of the

18  list.  Yes, yes, your Honor.  We actually did tweak -- so the

19  documents that they originally sent us in that email, again,

20  was just what was done during MHARP.  They weren't how we would

21  do things now.

22          THE COURT:  But there's been a lot of water under the

23  bridge.

24          DR. MEHTA:  Yes, yes.

25          THE COURT:  And so seven meetings, discussion, Phase

1    I criteria, and methods of identification of inmates to be

2    studied.

3        I'm going to ask the Special Master.  Is it your mind

4    still, as you sit here today, is Phase I mostly agreed to or

5    all agreed to?

6            SPECIAL MASTER:  Your Honor, if I may ask Dr. Jeff

7    Metzner to answer that question.

8            THE COURT:  Let me first ask Dr. Mehta.  Do you think

9    it is, Dr. Mehta?

10            DR. MEHTA:  Yes.  For Phase I for collecting the

11    list, I think that is mostly agreed upon.  We shared the

12    criteria.

13            THE COURT:  All right.  Dr. Metzner, do you agree as

14    of today Phase I?

15            DR. METZNER:  I would say that it is mostly agreed

16    upon.  There is one point that is not yet agreed upon is how

17    the screening information that's going to be provided by

18    correctional officers, how that is -- the exact mechanics of

19    that, but I would say 90 percent of Phase I is agreed upon, and

20    all of that came from the MHARP methodology which we refined

21    going from twelve criteria to, I think, we're down to seven

22    criteria.

23            THE COURT:  Okay.  So most of what we're talking

24    about today, I think, is Phase II, which is the proposed

25    methodology reviewed by team comprising clinicians, the Special

1    Master's team with access to correctional counselors as needed.

2    And here, Dr. Mehta, just help me understand if you agree with

3    this.

4        I think the Special Master's team believes that at the end

5    of the meeting on January 31st, 2022, there was agreement that

6    the next step would be for CDCR to have operationalized the

7    specific creation of teams and other details of the agreed-upon

8    methodology.

9        Do you agree with that?

10            DR. MEHTA:  Yes, your Honor.

11            THE COURT:  All right.  But then instead of coming

12   back with an operational proposal, it was at that point the

13   defendants came back with a different plan.

14       Do you agree with that?

15            DR. MEHTA:  We did create an interdisciplinary

16   consultant team to work with any sort of confusing cases or

17   ambiguous cases.  But, yes, your Honor, we also did try to

18   streamline the evaluation process and keep it with the people

19   who know the process and the patients best.

20            THE COURT:  So can you understand that the Special

21   Master's team would think that's walking away from the progress

22   that had been accomplished on Phase II -- towards finalizing

23   Phase II?

24            DR. MEHTA:  Yes, your Honor.  You know, my

25   understanding was that we were told to bring a proposal next

1  time.  You know, we said this is how it was done last time,

2  bring your proposal next visit -- I mean, next meeting.  And

3  that's what I thought our brief was to do, and my whole team

4  thought that as well.

5      So we had brought that forward.  We hadn't sort of

6  previously agreed upon it -- or on any specifics of that.  We

7  had just reviewed, you know, the prior documentation.

8              THE COURT:  All right.  Well, and I'm not here to --

9              DR. MEHTA:  Sure.

10             THE COURT:  -- engage in a fact-finding exercise.

11     But is one of the key differences -- you mentioned

12  streamlining and -- so the Special Master's methodology would

13  involve a team component, and that -- is that the primary area

14  where the defendants are balking at this point?

15             DR. MEHTA:  I think so, your Honor.  We have a

16  clinician who does the review, and then a second clinician who

17  does a certain amount of statistically-significant checking on

18  those reviews.

19     The Special Master's proposal verbally is done, as I

20  understand it, is that they would have that reviewer then

21  present every single patient to a larger group who has no other

22  information about the patient other than what was just

23  presented to them by the one who actually did the research.

24     So we felt that that was a step of not -- not contributing,

25  but if that independent researcher was finding anything

1  confusing or concerning, they could bring that back to the

2  interdisciplinary team.

3           THE COURT:  So is the methodology you're recommending

4  fundamentally based in the SusPro method?

5           DR. MEHTA:  No.  No, your Honor.  This is a different

6  sort of thing altogether; this is just for this process.  The

7  SusPro process has a whole team audit component that is

8  separate.

9           THE COURT:  So no part of SusPro informs what you

10  would like if the Special Master agreed to it?

11           DR. MEHTA:  If we're talking about Phase II, your

12  Honor, that's true.  We didn't pick this method because of any

13  resemblance to SusPro or take this from any existing SusPro

14  documentation.  Phase I, I can clarify, if that's an issue

15  later.

16           THE COURT:  Well, given the progress made on Phase I,

17  I'm not certain it is such an issue, but the Special Master can

18  tell me if he -- if he disagrees.

19      So is it your opinion that the method you're proposing

20  achieves the same qualitative results, and will it provide

21  information on the same number of persons as the Special

22  Master's methodology will?

23           DR. MEHTA:  Yes, your Honor, I strongly believe that.

24  I think it's a good system, and it will get to the same result.

25           THE COURT:  I think that's where the disagreement is,

1    because I think one is more of a robust team approach.  Special

2    Master's team is agreeing to some remote presence, as I

3    understand it.  But I think it's number of inmates evaluated

4    and team versus fewer people at the table-making evaluations,

5    and a lack of certainty about the quality of the evaluation

6    that results.

7        Let me just ask the Special Master now.  Am I summarizing

8    that correctly?

9            SPECIAL MASTER:  I believe you're accurate, your

10   Honor.  And, if you don't mind, again I would turn to

11   Dr. Metzner.

12           THE COURT:  Dr. Metzner, do you agree with that?  And

13   can you -- just restate, in the simplest terms for the

14   generalist like this judge, the points of disagreement.  And do

15   you agree that SusPro is not informing anything that you're

16   hearing from the defendants, as you understand it?

17           DR. METZNER:  So, your Honor, first I would -- let me

18   first give a disagreement.  Dr. Mehta said what we were

19   proposing verbally.  What we've proposed was MHARP Phase II,

20   and we started out by saying that's the infrastructure that we

21   want to use, but we were open to revisions of that methodology.

22       And until we got the operationalization of CDCR's proposal,

23   that was the first time that we ever heard such a revision.

24   And why we were so surprised, of course we had never heard that

25   revision, we expected to see operationalization of Phase II as

1   was done in MHARP.  So that's the first disagreement.

2       We also have a -- we're just not -- we strongly disagree

3   that it's going to result in the same kind of result because

4   they're two very different processes involved.

5       And the team approach -- consulting team approach that CDCR

6   is recommending is that they have a consulting team available

7   if requested in contrast to our model where there is a team

8   that reviews every person who gets reviews from Phase I.

9       And then the second major difference is the CDCR approach

10  allows the IDTT team to resolve any differences between the

11  primary viewer and a yet-to-be-determined percentage of

12  secondary reviewers.  And so if there's a disagreement, that

13  goes to the IDTT.

14      Under our model, if there's any disagreements, it gets

15  resolved via the team approach.  And based on our MHARP

16  experience, they all got resolved that way.

17          THE COURT:  Dr. Mehta, is it correct that under your

18  current proposal disagreements would go to the IDTT?

19          DR. MEHTA:  I don't think that that's actually a

20  characterization that fits what we're trying to do.  So in our

21  case if the two reviewers disagree, the IDTT -- it's not there

22  to resolve the dispute.  A recommendation to reassess the

23  patient goes to the IDTT team.  And they're told this reviewer

24  came to this conclusion, that reviewer came to another one.

25      In the team-based approach, the patient recommendation is

1    sent to the IDTT and doesn't include any of that disagreement

2    information.  So it's actually, in my view, less information.

3        In both cases the IDTT makes the ultimate decision.  We

4    can't order people who are independently licensed to follow a

5    particular recommendation, the same way you can't order a

6    surgeon to perform an appendectomy, you know, if they don't

7    agree with the assessment.

8        So in both cases there's the recommendation that goes to

9    the IDTT who is ultimately responsible for making the decision.

10   That -- to me that's the same in both.  I'm not sure I see the

11   distinction there.

12          THE COURT:  Dr. Metzner, agree they're the same?

13          DR. METZNER:  Not at all.

14          THE COURT:  Yeah.  And I'm not hearing they're the

15   same at all, Dr. Mehta.

16          DR. MEHTA:  Okay.  So --

17          THE COURT:  So one question about -- you agree that

18   information will go to the IDTT, doesn't your method assume

19   that the IDTTs are functionally adequately?

20          DR. MEHTA:  Well, so there's a recommendation for

21   reassessment, but that's the same recommendation that would

22   come out of a team-based approach that the OSM has described.

23          THE COURT:  Is it the case that in many reviews under

24   your methodology there won't be a second independent reviewer?

25          DR. MEHTA:  Yes, your Honor.  So we have a system to

1  determine statistical significance for interrater reliability

2  in that we're doing things in a consistent way.  That's another

3  thing, I think, with the team-based approach, there is not

4  actually a statistically-significantly system to compare those

5  team assessments to something else.  There isn't a -- you know,

6  if the team makes a certain kind of recommendation at the

7  beginning of the study and a different one at the end of the

8  study, there isn't any second look at what the team is

9  deciding.

10     So the way that we're designing this is to have

11  well-accepted statistical methods to validate the assessments.

12          THE COURT:  On interrater reliability, that approach

13  doesn't determine whether the decision to refer or not to refer

14  is valid, right?

15          DR. MEHTA:  Absolutely.  Neither system has an

16  independent measure of validity, because neither system is

17  comparing to some absolute standard.  So you're right, we have

18  reliability, but validity is a totally separate question.

19          THE COURT:  So there could be 100 percent interrater

20  reliability regarding a referral, but the decision may not be

21  appropriate if the clinical judgment is faulty.

22     You agree with that?

23          DR. MEHTA:  Yes, your Honor, just the same as it

24  could be with the team-based approach.

25          THE COURT:  Dr. Metzner, you agree that there's that

1   same risk with the team-based approach?

2          DR. METZNER:  No, for the following reasons.  First

3   of all, under the CDCR approach if -- if you're -- if you don't

4   get a second review, they have not yet determined what

5   percentage of the cases are going to get a second review, and

6   the decision is made to not refer.  No one else looks at that

7   period.  That doesn't go to IDTT.

8       The only thing that goes to the IDTT is if someone is

9   referred, whether there's agreement or not.  And in contrast to

10  the MHARP approach, everyone gets reviewed by a team.

11      The second thing that I would say, my understanding, and I

12  think it's -- unless Dr. Mehta can correct me, I think it's not

13  accidental that they're not yet able to tell us what percentage

14  of cases under their model are going to get a second review.

15      Because my understanding talking to our psychologists, that

16  the statistical method that they're proposing is not the right

17  method to be using for what they're proposing.  And if you need

18  more details on that, either Dr. Perrien or Dr. Barboza can

19  give you those details.

20          THE COURT:  And the percentage, Dr. Mehta, can you

21  provide that?

22          DR. MEHTA:  Yeah.  This is the first I'm hearing that

23  that statistical method in total is inappropriate.  We do

24  have -- so we had asked some of our data people to simply

25  crunch the numbers.  It's an established -- as an established

1    statistical method that we're using.  And so we can provide

2    that, absolutely, it's just what the equation spits out.  Like

3    if this many are checked, then that is a

4    statistically-significant sample out of your total number.

5        And so we can absolutely provide that, but I had not heard,

6    up until this point, that there was concern about the larger

7    statistical method, which seems entirely appropriate to this

8    use.

9            THE COURT:  Dr. Mehta, you are using a sampling

10    approach?

11            DR. MEHTA:  Yes.

12            THE COURT:  And your methodology would not review the

13    entire universe of inmates who should be identified for

14    consideration for referral to inpatient care, agreed?

15            DR. MEHTA:  No, your Honor.  Every person would get a

16    review; not every person would get a second review.  But every

17    person would get a primary review, every patient.

18            THE COURT:  And that's the sampling that would

19    determine the second review?

20            DR. MEHTA:  Right.  The second review would be a

21    certain number determined by the statistical method, correct.

22            THE COURT:  And what's the percentage you would

23    expect to qualify for the second review?

24            DR. MEHTA:  I apologize that I don't have that at the

25    moment.  I do know that we did take that to the people who are

1  better than I at crunching data.  But I apologize, I don't have

2  that at the moment.

3      I do think that that is something we can provide very

4  quickly, though, outside of this, your Honor.

5              THE COURT:  Just help me understand your relationship

6  to the folks conducting the review.  How much delegation, how

7  far down the chain of command does this go such that you may

8  not be hands-on when it matters?

9              DR. MEHTA:  Yeah.  So we're anticipating that the

10  reviewers -- so there's a few different ways we can approach

11  it, but the reviewers will often be from the regional teams or

12  directly monitored by the regional mental health administrator.

13      So it would be the reviewer, the regional mental health

14  administrator, one of four regions, and then basically that

15  goes straight to Dr. Cartwright and myself who are jointly

16  supervising us.  I'm sorry, Dr. Cartwright, our assistant

17  deputy director.

18              THE COURT:  Right.  He was on the last call.

19              DR. MEHTA:  Right.  Right.

20              THE COURT:  Anything else you want to point out,

21  Special Master Lopes or Dr. Metzner, in response to what you've

22  heard from Dr. Mehta?

23              DR. METZNER:  Yes, Judge.  The reason Dr. Mehta

24  hasn't heard what I just said about the statistical method is

25  the first time we heard about it was our last meeting, and I

1    still think when he -- I think it's not accidental that we

2    don't have that percentage.  Because to use that statistical

3    method, you need to know what percentage of times that each

4    reviewer historically makes the referral to inpatient care.

5        And I don't think that's knowable.  And if you don't know

6    that, as I understand it, this method is not valid.

7            THE COURT:  Agreed that that's the first time the

8    Special Master's team heard about that proposal at the last

9    meeting, Dr. Mehta?

10           DR. MEHTA:  Yes, your Honor.  That's absolutely

11   correct.  That's fair.

12           THE COURT:  All right.  Let me just ask another

13   question because I -- it sounds concerning on the surface, and

14   I just want to understand it.  I understand that some folks on

15   the defense side are saying that way back in 2009 -- during the

16   2009 MHARP process that mental health staff felt bullied and

17   intimidated -- this might have come from Dr. Warburton -- but

18   only in the recent past.

19       I understand the Special Master and his team to be saying,

20   "Never heard that before," and so I don't know if you're the

21   one to answer this, Dr. Mehta, but where can the Court find in

22   the record that this issue was ever surfaced in connection with

23   the 2009 MHARP?  You would think if this was a concern, that

24   the Court -- there would be some record of it.  So I'd like to

25   know where that is.  Because if that's going on, I do need to

 1    know about that.

 2        So can you tell me where it is in the record in connection

 3    with the 2009 MHARP?

 4            DR. MEHTA:  I can defer, as you said both to

 5    Dr. Warburton who mentioned it earlier and to our legal team to

 6    see if they have some additional information.  But I can just

 7    say in my personal experience I have heard that many times as

 8    well, both for the 2009 MHARP and for the condemned inmate

 9    inpatient bed need study that occurred at San Quentin alone.

10    That there were clinicians that were in the IDTTs or in the

11    things that were asked, you know, "Is it at all possible that

12    this patient could benefit from an inpatient stay or things,"

13    and felt that they were really pressured into that -- into that

14    decision.

15        But I would like to ask Dr. Warburton and our lead counsel

16    if they have more specific locations in the record we might be

17    able to point to, your Honor.

18            THE COURT:  That's the kind of thing, you know,

19    behind-the-back complaint that get -- to come forward how many

20    years later?  Thirteen years later?  So where in the record can

21    I find it, Dr. Warburton, if this was an issue then?

22            DR. WARBURTON:  I'm not aware of anywhere in the

23    record you might find it, your Honor.

24            THE COURT:  All right.

25            MR. MELLO:  Your Honor, if I may.  I'm not sure it's

1   in the record.  If you would like defendants and their clients

2   to start identifying times where they feel that these things

3   are occurring and to include that in the record.  I mean,

4   that's something we can contemplate.  But I'm not aware of

5   concerns from 2009.

6       I know we spent a lot of time talking about things in the

7   past, especially with respect to this particular project.  But

8   if that's something that the Court would like to see in filings

9   or updates for those types of allegations, of course it's not

10  easy to make those allegations, it's difficult.  But if the

11  Court is interested in that, we can coordinate with our clients

12  and include that in the future, if you would like.

13          THE COURT:  I'm not directing you to do anything.

14  I'm just saying for -- I mean, I think the Special Master's

15  team has been very surprised to hear that, they let me know

16  about it.  I used the words "good faith" at the beginning of

17  this process.  You all know -- I mean, some of you have been

18  here for this whole time -- how many work groups, meetings on

19  site, so for that kind of thing to get buried and brought out

20  now, it's just -- I can give it no weight unless you can point

21  me to something in the record where the Court was put on notice

22  or the Special Master was put on notice and something really

23  serious was ignored.

24      So that you can't -- if you're going to play fair, you've

25  got to surface that immediately.  And if they're your

1   clinicians that have concerns, Dr. Mehta, it seems to me you

2   could provide a method for them to let you know immediately.

3   And then you call the secretary and she calls the Special

4   Master.  It's just for that kind of thing to come out now, it's

5   just -- it makes no sense.  It makes no sense.

6        MR. MELLO:  Your Honor, on that point how do we put

7   in the record if the secretary calls the Special Master and has

8   a conversation on an issue that's been raised to Dr. Mehta?  I

9   just want to make sure I understand the process so that in a

10  year or in two years if the Court is looking for something in

11  the record, it's in the record.  I'm trying to understand a

12  process just to make sure that the record is clear, your Honor.

13       THE COURT:  I think you have enough ingenuity and

14  tools in your toolset, Mr. Mello, that you could figure that

15  out.  Emails memorializing -- I'm not giving you legal

16  advice -- but there are ways to memorialize.  And if this is

17  really an issue and one that cannot be worked out given the

18  longstanding good relationship between the secretary and the

19  Special Master, I mean, really, I'm surfacing this because this

20  should just never ever be an issue, never ever ever.

21      Because I've now heard "I can't find it in the record."  If

22  it was in the record I'd go check it, and I'd make certain I

23  knew what it said.  That's all.  It's just surfacing it because

24  at this late date in the case, it can't be a reason for not

25  moving forward with an unmet bed needs study.  That's really --

```
 1                 DR. MEHTA:  Your Honor.

 2                 THE COURT:  Dr. Mehta.

 3                 DR. MEHTA:  If I may.  I completely agree with you.

 4    I wish the CDCR had documented things differently or in more

 5    detail at the time.

 6        I would -- referring specifically to the Court record -- I

 7    didn't realize that emails from the time would also qualify,

 8    but I just don't want to say that those don't exist because I'm

 9    not sure about that.  I don't believe that there is anything

10    filed, but I can try to at least see if there has been a

11    different discussion that had been going on.

12                 THE COURT:  Dr. Mehta, the way Courts think about

13    this, there is a concept called laches.  You know, it's been

14    how many years, thirteen years?  I'm really just surfacing it,

15    I don't want to go off on a tangent here.

16                 DR. MEHTA:  Okay.

17                 THE COURT:  But don't waste your time going looking

18    for it at this point.  It's really -- these things should not

19    fester.  You know, if this kind of thing festers and then it

20    gets used as an excuse now to not cooperate with the Special

21    Master, I'm not saying that's what's going on, but the fact

22    that it's come up along the way with these long delays in

23    getting the unmet bed needs study going just causes me concern.

24        Special Master Lopes, you wanted to say something?

25                 SPECIAL MASTER:  Yes, your Honor.  I don't want to
```

 1    belabor this point, but I've been in touch with and had solid

 2    working relationships with almost every secretary since I've

 3    been the Special Master, regularly-scheduled meetings.  In

 4    fact, one of the secretaries just resigned or retired from my

 5    team.

 6         Also during MHARP, I believe that the chief legal counsel

 7    was Ben Rice.  I was on the phone with Ben Rice almost daily

 8    for a multitude of reasons during that time.  I have never

 9    heard anything like this.  And had I heard something along

10    these lines and felt that my team was acting inappropriately, I

11    would have immediately investigated that and taken all steps to

12    make sure that that didn't occur.

13         But I can only say that at the time of these reviews, I was

14    in touch regularly with the secretaries and their chief legal

15    counsels and the DAGs assigned to the case.  I have never heard

16    this allegation before.  I have never received an email or any

17    sort of communication along these lines that I can recall,

18    none.

19              THE COURT:  All right.  This is just air clearing to

20    hopefully put this issue behind everyone.

21         Mr. Bien, anything you or a member of your team want me to

22    know based on what you've heard so far?

23              MR. BIEN:  I'm going to turn it over to Tom Nolan who

24    has participated not only in the process here but in several

25    prior MHARPs.

1          THE COURT:  All right, Mr. Nolan.

2          MR. NOLAN:  Thank you, your Honor.  I just want to

3     emphasize that I think we agree with Dr. Metzner and with

4     everything the Special Master's team has said.  And I want to

5     emphasize that all of the past UNA studies, I observed them, I

6     was on site for many of them.  And one of the reasons we have

7     confidence in the methodology from the prior UNA studies is

8     they were very collaborative.  And, honestly, it was very

9     impressive, including CDCR's own clinicians' participation was

10    very impressive.

11         Each case would get presented by a primary reviewer to a

12    team of three or four other clinicians, including members of

13    the Special Master's team, including higher-level CDCR

14    clinicians, including DSH clinicians.  And it was a very -- we

15    had a great deal of confidence in the result because there was

16    a lot of talent on display, giving very careful considerations

17    to whether or not each person needed inpatient care.  And it

18    was a very impressive process, and MHARP was a pretty good

19    predictor of need over the last decade, so I think it was a

20    very successful process as well.

21         And so we think the collaboration is really key in getting

22    a good quality result of what the actual need is.  And we think

23    under defendants' model a lot of the time the decision can be

24    made by one psychologist acting alone.  And there's not going

25    to be involvement with psychiatrists, there's not going to be

1  the same kind of collaboration.  The collaboration team is

2  purely voluntary under defendants' method.

3      And so we would be very uneasy with that method.  And I

4  will just say, you know, I thought the old -- the UNA processes

5  were very collaborative.  You know, we went out to San Quentin

6  in the 2014 mini UNA there to talk to custody staff at 1:00 in

7  the morning on death row and asked them who they've seen that

8  needed inpatient care, and everybody was very attentive to

9  CDCR's staff and CDCR's clinicians and really took their

10  experience into account.

11      And, you know, the one other thing I just wanted to say is

12  we want this process to get moving, we really think it's

13  important to do this study soon.

14      During the last status conference your Honor spoke about,

15  you know, the other things that are dependent on getting this

16  done.  And defendants' proposal is to start this in July, and

17  there was a suggestion it could take a year or two years to

18  complete.

19      And so I think, you know, what we would like to propose is

20  that, you know, we agree the Special Master needs to take

21  charge of the UNA at this point.  And, you know, we'd request

22  that he provide the parties with an edited version of the

23  defendants' plan or his new version, his new plan, and that the

24  parties could provide written comments to the Special Master as

25  opposed to some kind of formal objections which would take more

1    time and further delay this process.

2            THE COURT:  Right.  Understood.

3        So, Mr. Mello, I think at the last status you suggested by

4    a question or a comment that you thought it was this Court that

5    would ultimately decide the methodology.  Is that what you

6    think?  And, if so, why?

7            MR. MELLO:  So I think that the Court has not -- a

8    methodology has not been established in that this Court, if I

9    understand, is that the Special Master will have the final say

10   on the methodology.  So I assume that, and very similar to what

11   Mr. Nolan said, which is that the Special Master -- because

12   we've heard a lot would present the methodology that he

13   proposes in writing, that the defendants would have the

14   opportunity or the parties would have the opportunity to

15   quickly comment on that proposed methodology.  And that the

16   Court would then indicate that it's either approving the

17   Special Master's methodology or approving a revised

18   methodology.

19       So I think the record needs to be clear here that if the

20   methodology is not CDCR's methodology, the record should be

21   clear on that.  But the methodology is the Special Master's

22   team's methodology should have the opportunity beyond Dr. Mehta

23   trying to respond to the Court's questions in real time to put

24   on the record what our concerns are and why we believe that our

25   proposed methodology suffices.  And that then a methodology

1    could be selected.  That's all I was saying.

2        I think we are generally in agreement with what plaintiffs'

3    counsel -- we think it should be formal, it should be on the

4    record, and it should be in writing.

5        We've heard lots of pieces, we've heard that there were

6    pieces of it.  I think just for clarity's sake, your Honor,

7    that's what defendants would like.  And I think because as well

8    as I think Dr. Mehta did in responding to the examination, I

9    think the real question is can we put forth in writing our

10   position, and then a decision can be made on methodology.  I

11   don't think it needs to take a great deal of time, but I think

12   just simple process that this is the Special Master's

13   methodology, the record should be clear and we should be able

14   to comment on it.  That's all I was suggesting, your Honor.

15            THE COURT:  And the delegation isn't sufficient to

16   allow the Special Master to just make the decision now based on

17   my September order?

18            MR. MELLO:  To make the decision.  I mean, we heard a

19   description of the methodology.  I think that all parties would

20   benefit from a methodology in writing on the record in a clear

21   and concise way and an opportunity to speak to it.

22            MR. NOLAN:  Your Honor, can I respond to that?

23            THE COURT:  Who is that?

24            MR. NOLAN:  This is Tom Nolan.

25            THE COURT:  All right.  Yes, that's fine.

 1                    MR. NOLAN:  Yeah, I'm sorry.  Just to be --

 2                    THE COURT:  Were you done, Mr. Mello?  I understand

 3      the point.  Had you finished?

 4                    MR. MELLO:  Yes, your Honor.

 5                    THE COURT:  All right.  All right.  Mr. Nolan.

 6                    MR. NOLAN:  Your Honor, we do think that delegation

 7      is sufficient.  We don't think the Court needs to weigh in, but

 8      we do think that the Special Master should give the parties in

 9      a work group or in a distinct formal meeting the opportunity to

10      respond one last time, you know, not in an extended process,

11      we've already met twelve times or something to discuss

12      defendants' plan.  So we don't think it needs to be filed in

13      the record or formal objections need to be made.  I think

14      that's just going to delay everything.

15                    THE COURT:  All right.  I have no further questions.

16         Is there anything else anyone wants me to know on this

17      topic?  Thank you for the tutorial, more just satisfying my

18      curiosity, is I think it is important for me to understand

19      these things and I have a better sense now.

20         So anything further, Mr. Bien?

21                    MR. BIEN:  No, your Honor.

22                    THE COURT:  Mr. Mello?

23                    MR. MELLO:  No, your Honor.

24                    THE COURT:  Special Master Lopes?

25                    SPECIAL MASTER:  No, your Honor.

```
 1                THE COURT:  All right.

 2                MR. MELLO:  Your Honor, may we take up a -- there are

 3      a couple outstanding items.  Can we ask about those, like the

 4      referral, the Lipsey referral, can we ask about that?

 5                THE COURT:  That would be fine.  I do have that in

 6      front of me.  I picked a jury yesterday; I resolved a TRO this

 7      morning.  I have the Lipsey, so I will look at that hopefully

 8      now in the next day or so.

 9                MR. MELLO:  Okay.

10                THE COURT:  And then there's something else as well.

11                MR. MELLO:  I think it's ECF 7470, and with respect

12      to the staffing motions.

13                THE COURT:  Yeah.

14                MR. MELLO:  Once we hear from your Honor under the

15      agreement the parties reached, defendants would have ten days

16      to file this.  So we'll wait to hear from your Honor on that;

17      we won't submit anything until we hear.

18                THE COURT:  I do acknowledge those two things, so

19      they're on my radar.

20                MR. MELLO:  Thank you.

21                THE COURT:  All right.  Special Master Lopes, did you

22      say "nothing else"?

23                SPECIAL MASTER:  I said "nothing further," yes.

24                THE COURT:  All right.  Thank you all very much.  You

25      may sign off.
```

1          THE CLERK:  Court is in recess.

2       (Proceedings adjourned:  1:51 p.m.)

3                     ---o0o---

4   I certify that the foregoing is a correct transcript from the

5   record of proceedings in the above-entitled matter.

6

7                    /s/ Thresha Spencer
                     THRESHA SPENCER
8                    CSR No. 11788, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25