**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.,
    **Plaintiffs**

    **vs.**                                 **No. 2:90-CV-0520 KJM DB**

GAVIN NEWSOM, et al.,
    **Defendants**

_____

**SPECIAL MASTER'S REPORT ON HIS EXPERT'S SUMMARY OF FINDINGS:**
**DEATHS BY SUICIDE IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS**
**AND REHABILITATION FROM JANUARY 1, 2013 THROUGH DECEMBER 31, 2020**

## I.    INTRODUCTION

Attached is the *Coleman* Special Master's expert's Summary of Findings: Deaths by Suicide in the California Department of Corrections and Rehabilitation From January 1, 2013 Through December 31, 2020 (hereinafter "Report").  Considering the number of suicide reports filed in recent months and the persistently high suicide rate within CDCR, the Special Master's expert drafted this Report in order to present the Court and parties with "a broader analysis of data and findings in prior annual reports," consistent with prior efforts in this case.  Special Master's Psychiatric Experts' Review of Completed Suicides in the California Department of Corrections and Rehabilitation in Calendar Years 1999 Through 2004, ECF No. 2339 at 2.[1]

More specifically, the Special Master and his expert present this Report with the following goals in mind:

> In an effort to provide a summary of information that can be useful to CDCR and the court in making determinations about the needs for improvement within CDCR relative to suicides, the findings in this report are focused on modifiable

_____

[1] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system.

risk factors, environmental factors, and clinical factors that can be targeted for
intervention or changes in practice as a means to reduce suicides, based solely
upon information gathered from deaths by suicide between 2013 and 2020.

Report at 1.  Accordingly, the Report "highlights those issues which can move CDCR toward

improved suicide prevention practices."  *Id.*

## II.   THE SPECIAL MASTER'S EXPERT'S FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS

### A.   The Special Master's Expert's Findings

Between 2013-2020, 237 incarcerated persons died by suicide in CDCR institutions.

Among the Special Master's expert's findings regarding these deaths by suicide were the

following:[2]

- For the eight-year period, the suicide rate was 23.1 deaths by suicide per 100,000

  incarcerated persons.  The suicide rates in 2014 and 2015 were lower than the eight-year

  average; the suicide rates in 2018, 2019, and 2020 exceeded the eight-year average.

  Report at 2.

- The suicide rate rose each year from 2014 to 2019, reaching an all-time high of more than

  30 deaths per 100,000 in 2019.  *Id.*

- More than 80 percent of deaths by suicide from 2013-2020 occurred by hanging.  *Id.* at 3.

- The percentage of deaths by suicide that occurred in segregated settings decreased in the

  years following the implementation of electronic monitoring in those settings, though the

---

[2] The findings summarized here are organized as they are in the Report.  *See* Report at 1
("Findings and discussion of the findings are organized according to identified risk factors and
other elements of analysis.").  Some of the Special Master's expert's findings cover the entire
2013-2020 time period, while others highlight observed trends in a portion of the eight-year
period.

percentage of incarcerated persons who died by suicide in segregated housing found in rigor mortis did not decrease materially. *Id.* at 4-5.

- In each year since 2017, incarcerated persons housed in locations to address personal safety concerns consistently comprised more than a third of cases. *Id.* at 10.

- In 2015, cases with concerns regarding custody checks or nursing checks comprised 38 percent of cases. Since that time, these cases have consistently comprised less than or equal to 20 percent of cases. *Id.* at 12.

- Seventy percent of incarcerated individuals who died by suicide in the eight-year period were Mental Health Services Delivery System (MHSDS) participants. *Id.* at 13.

- Since 2016, near or in excess of 50 percent of incarcerated individuals who died by suicide had histories positive for trauma. *Id.* at 16.

- Between 2013-2020, nearly 80 percent of those cases where the incarcerated person received a suicide risk evaluation (SRE) during their incarceration evidenced problems or concerns with at least one SRE. *Id.* at 17.

- Near or in excess of two-thirds of cases evidenced problems or concerns regarding treatment planning each year since 2017. *Id.* at 21.

- Nine percent of deaths by suicide between 2016-2020 occurred within one week of the incarcerated person's discharge from an inpatient setting. *Id.* at 25.

- From 2013-2017, at least two-thirds of cases were determined to be foreseeable or preventable, including a troubling 89 percent of cases in in 2016. Between 2018-2020, a majority of cases were determined to be either foreseeable or preventable. *Id.* at 28.

- The percentage of CDCR's suicide case reviews determined to be adequate steadily increased beginning in 2016; in 2019 and 2020, the Special Master's expert determined virtually all suicide case reviews to be adequate. *Id.* at 29.

B.    <u>**The Special Master's Conclusions and Recommendations**</u>

The Special Master's expert's analysis of deaths by suicide between 2013-2020 resulted in the following conclusions:

The implementation of CDCR's suicide prevention policy and the *GuardOne* system for monitoring incarcerated individuals housed in segregated settings appeared to have reduced the percentage of suicides in segregated settings. However, the relative percentage of deaths by suicide in segregation was higher than expected given the overall percentage of incarcerated individuals housed in segregated settings, supporting the high-risk nature of these environments.

The percentage of cases which revealed concerns related to custody checks/nursing rounds has decreased in the years since 2015.

Analyses revealed that between 26 and 38 percent of the incarcerated individuals whose histories are positive for traumatic experiences have received treatment or a diagnosis related to the experience of trauma.  Research with incarcerated populations has established a relationship between trauma and suicide/suicidal behavior.  Increasing staff awareness of this relationship may prove beneficial in the reduction of suicides.

Continued challenges in the completion of mental health assessments have been evident over the previous eight years.  CDCR is aware of these challenges and was enhancing training related to mental health assessments at the time of this report.

Findings revealed a concern with respect to the percentage of individuals with histories of psychiatric inpatient placements in the year prior to their deaths, those discharged from inpatient levels of care in the week prior to death by suicide, and deaths by suicide among those receiving inpatient level of care services.  A review of care provided to patients recently discharged from inpatient settings and improved safety planning for these individuals appears warranted.

Failure to refer individuals to a higher level of care when indicated has been a problem over the previous eight years, evidenced in 35 percent of the cases.  For the past two years, these failures have been present in over 40 percent of the cases of those who died by suicide.

Issues related to personal safety have been significant enough to warrant specialized housing for nearly 40 percent or more of those who died by suicide during the previous four years.  It appears that issues related to personal safety may warrant consideration in the formulation of risk for suicide.  It was reported that CDCR is working to address this issue.

The QIP process would be greatly enhanced by the inclusion of an expectation that the efficacy of plans be measured over time, to include plans enacted following OIA investigations.  It was reported that CDCR has initiated a process to measure the efficacy of quality improvement initiatives, yet the impact of that process has not yet been realized relative to suicide prevention.

Report at 31-32.

Based on these findings and conclusions, the Special Master's expert made two formal

recommendations, as follows:

CDCR clinicians struggle with the identification of risk factors that impact suicide, determination of the patient's level of risk as derived from identified risk factors, and documentation of appropriate rationale for risk level determinations.  Training, mentoring and supervision do not appear to have adequately addressed the concerns.  The suicide risk assessment instrument and process should be revised, and the Special Master's expert is aware that CDCR has previously attempted modifications to improve the assessments and was working on additional revisions at the time of this report.

In the majority of suicides during the previous eight years, problems related to mental health treatment planning and the delivery of mental health treatment were identified.  Training and supervision completed to date do not appear to have adequately addressed the issues.  The format and process for developing and implementing mental health master treatment plans as well as safety plans should be revised.

*Id.* at 33.  As indicated herein, the Special Master agrees with the conclusions and

recommendations included in his expert's Report and recommends the report be adopted.


III.      **PARTIES' RESPONSES AND OBJECTIONS TO THE DRAFT REPORT**

As required by the Order of Reference, ECF No. 640 at 4-5, and consistent with

longstanding practice in this case, the Special Master provides draft reports to the parties to

afford them the opportunity to have their concerns and objections considered prior to filing.

Given the length and complexity of the Special Master's compliance reports, correction of typographical errors and statistical discrepancies is an ordinary part of the process of reviewing and finalizing draft reports.

Accordingly, on December 22, 2021, the Special Master provided the *Coleman* parties with a draft version of the Report ("Draft Report"). The parties were given 30 days to submit to the Special Master any comments or objections to the Draft Report. On January 21, 2022, defendants submitted their comments and objections to the Draft Report. *See* Letter from Dillon Hockerson, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (Jan. 21, 2022), attached hereto as Exhibit A. Plaintiffs did not submit comments or objections to the Draft Report. After careful review and consideration of defendants' comments and objections, the Special Master's expert revised and clarified portions of the Report where warranted, as discussed in further detail below.

A.   **Defendants' Response to the Draft Report**

While defendants indicated they conducted only a "limited review" of the Draft Report, they nonetheless objected to the Draft Report in its entirety. Exhibit A at 1-2.[3] Defendants attributed their cursory review of the Draft Report to the presence of "various statistical errors" which "call[ed] into question the validity of the numbers and percentages found throughout this report." *Id.* at 2.[4]

---

[3] Defendants indicated their review of the Draft Report was limited to the following six categories: "(1) Suicide Methods, (2) death by suicides in the Segregation Unit, (3) descendants found with rigor mortis, (4) housing designation, (5) the level of care, and (6) the [number] of cases that had concerns or problems relating to Suicide Risk Evaluations." Exhibit A at 2 n.3.

[4] The Special Master notes there are some statistics included in the Special Master's expert's annual suicide reports that are not applicable to all cases each year. By way of example, only a subset of cases will have mental health treatment plans or suicide risk evaluations. In earlier reports of the Special Master's expert, the percentage of all cases was included in the main

In their informal objections to the Draft Report, defendants overstated both the extent and significance of statistical discrepancies contained in the Draft Report.  Notably, none of the revisions made to the final Report materially altered the Special Master's expert's findings, nor did they require changes to the Special Master's expert's conclusions or recommendations.

More concerning, defendants attempted to use the presence of immaterial statistical discrepancies in the Draft Report to avoid confronting the Special Master's expert's findings, conclusions, and recommendations and to distract from the stark reality facing their system. Between 2013-2020, 237 incarcerated persons died by suicide.  The suicide rate in CDCR rose each year between 2014-2019, reaching a disturbing new high of more than 30 deaths per 100,000 incarcerated persons in 2019.  During the period under review, defendants remained deficient in some of the same areas identified in the Special Master's expert's first annual suicide report, filed more than twenty years ago.[5]  Between 2013-2020, four in five cases featured

---

report, and those cases that were not applicable were identified in the tables included in Appendix B of the respective report.  *See, e.g.*, Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2013 – December 31, 2013, ECF No. 5399 at 11 ("Treatment planning was inadequate in almost half (14 or 46.7 percent) of the 30 suicide cases reviewed."); *id.* at 33 (displaying table containing Special Master's expert's findings regarding treatment planning adequacy and identifying those cases where treatment plans were not completed ("N/A")).  More recently, the Special Master's expert has reported on the percent of applicable cases.  *See, e.g.*, Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2020 – December 31, 2020, ECF No. 7405-1 at 25 ("Twenty-two individuals … were noted to have treatment plans developed at some point during their incarceration …. In 20 of those cases, or 90.9 percent, there was evidence of problems specifically related to mental health treatment planning.").  For clarity and consistency, statistical tables in the final Report were revised to include both the percentages of all cases and the percentages of applicable cases in these categories.

[5] *See* December 3, 2020 Order, ECF No. 6973 at 8 ("It is settled in this action that defendants' constitutional obligation with respect to suicide prevention is to 'take and adequately implement all reasonable steps to the remedy' the 'pattern of identifiable and describable inadequacies in suicide prevention in the CDCR' that has been repeatedly identified and described for almost two decades." (quoting *Coleman v. Brown*, 938 F. Supp.2d 955, 979 (E.D. Cal. 2013)).

inadequacies in suicide risk assessment, a majority of cases evidenced deficient mental health assessments, treatment planning, and mental health treatment services, and, sadly most of these deaths by suicide were determined to be foreseeable or preventable.

As the court has repeatedly stated, defendants' obligation to remedy these and other longstanding deficiencies in their suicide prevention program is well-settled in this case. *See supra* note 5. Defendants have had ample time to remedy these inadequacies. Rather than quibble over typos contained in a draft compliance report, CDCR "would be better served by acknowledging the crisis, fully implementing and sustaining all of the recommendations previously submitted by the Special Master's suicide prevention experts, and focusing its efforts on significantly reducing the number of preventable and foreseeable suicides" occurring in its institutions. ECF No. 7038 at 27.

### 1.   Suicide Methods

First, defendants stated the statistics regarding suicide methods contained in the Draft Report were incorrect. Exhibit A at 3. Upon review of the Draft Report's discussion of suicide methods, the Special Master's expert identified and corrected one typographical error in the narrative portion of the Draft Report.[6] Contrary to their statement otherwise, defendants did not

---

[6] On page 3 of the Draft Report, the narrative mistakenly identified three individuals as dying by "other" means; the final Report was updated with the correct statistic: "[A]nd *four* individuals, or two percent, died by other means." Report at 3 (emphasis added). While there was an error in the Draft Report's narrative, the percentages contained in the Draft Report's statistical table were consistent with the figures contained in previously filed reports. *See* ECF No. 5399 at 14 (Special Master's expert's 2013 suicide report, discussing suicides by method); ECF No. 5428 at 15 (Special Master's expert's 2014 suicide report, discussing suicides by method); ECF No. 7038-1 at 16-17 (CDCR's 2015 suicide report, discussing suicides by method); ECF No. 7038-3 at 8 (Special Master's expert's 2016 suicide report, discussing suicides by method); ECF No. 7077-1 at 6 (Special Master's expert's 2017 suicide report, discussing suicides by method); ECF No. 7161-1 at 8 (Special Master's expert's 2018 suicide report, discussing suicides by method); ECF No. 7239 at 14-15 (Special Master's expert's 2019 suicide report, discussing suicides by

object to any of the alleged discrepancies regarding suicide methods in their objections to the underlying reports.[7]

## 2. Deaths by Suicide in the Segregation Unit

Defendants stated the Special Master's expert's statistics regarding the number of individuals who died by suicide in restrictive housing settings were incorrect.  Exhibit A at 3.[8] Upon review, the Special Master's expert identified and corrected one typographical error in a table displaying deaths in segregated housing contained in the Draft Report.[9]

## 3. Decedents Found with Rigor Mortis

In their preliminary objections to the Draft Report, defendants identified discrepancies in the Special Master's expert's reported statistics regarding decedents found in rigor mortis. Exhibit A at 3-4.[10]  The typographical error regarding the number of suicides in segregated

---

method); ECF No. 7405-1 at 7 (Special Master's expert's 2020 suicide report, discussing suicides by method).

[7] Notably, the court adopted the Special Master's expert's 2013 and 2014 suicide reports in full. March 25, 2016 Order, ECF No. 5426 (adopting Special Master's expert's 2013 suicide report in full); June 27, 2016 Order, ECF No. 5459 (adopting Special Master's expert's 2014 suicide report in full).

[8] In their informal objections to the Draft Report, CDCR stated their records indicated 29 deaths by suicide in segregated settings in 2013 and 2014.  *See* Exhibit A at 3 ("The [Draft Report] states there were thirty-one deaths by suicide in segregated housing between 2013 and 2014 but CDCR only found twenty-nine such deaths.").  Significantly, CDCR's figures are inconsistent with historical data contained in their 2015 suicide report.  *See* ECF No. 7038-1 at 30 (displaying table indicating 27 deaths by suicide in segregated settings between 2013 (14 cases) and 2014 (13 cases)).

[9] For 2016, the Draft Report's table indicated there were 11 deaths by suicide in segregated housing; the correct number for 2016 was ten deaths by suicide in segregated housing.  *See* ECF No. 7038-3 at 18 ("When taken together, [in 2016] ten inmates…were in some form of restrictive housing when they engaged in the behavior that resulted in death by suicide.").

[10] The Special Master notes rigor mortis statistics cited in defendants' informal objections are inconsistent with CDCR's 2015 annual suicide report.  *Compare* Exhibit A at 4 (displaying table

settings in 2016 discussed above, *see supra* Part III(A)(2), impacted two rigor mortis statistics contained in the same table: the percentage of decedents housed in segregated settings found in rigor mortis, and the percentage of those found in rigor mortis housed in segregated settings. Additionally, the Draft Report contained a typographical error regarding the number of individuals found in rigor mortis in segregated settings in 2016.[11]  These figures were corrected in the final version of the Report.  *See* Report at 5.

Except for the corrections noted above, the rigor mortis statistics contained in the Draft Report were consistent with the Special Master's expert's underlying suicide reports. Defendants did not object to any of the previously reported rigor mortis statistics.[12]  Considering the foregoing, defendants once again overstated the significance of these alleged discrepancies.

---

"correcting" the Special Master's report of two decedents found in rigor mortis in 2015 to three), *with* CDCR 2015 Suicide Report, ECF No. 7038-1 at 48 ("In 2015, only one case was found to be in rigor mortis at discovery."); *compare* Exhibit A at 4 (displaying table "correcting" the Special Master's expert's report of four decedents found in rigor mortis in 2014 to one), *with* ECF No. 7038-1 at 48 ("In 2015, only one case was found to be in rigor mortis at discovery… *By comparison, four cases were found in rigor mortis in 2014*.") (emphasis added).

[11] The table contained in the Draft Report reported three individuals found in rigor mortis in 2016 resided in segregated housing.  The Special Master's expert's 2016 report actually reported two such cases.  ECF No. 7038-3 at 10 ("In 2016, two inmates (7.4%) [discovered in rigor mortis] were housed in a restrictive housing unit.").

[12] In a prior report, the Special Master's expert highlighted the fact that defendants' use of a different definition of rigor mortis – from Wikipedia –impacted the rigor mortis findings in 2015. *See* ECF No. 7038-2 at 6-7.  ("The Special Master's experts noted that the [CDCR] 2015 Annual Suicide Report indicated that there was one inmate found in rigor mortis at the time of death. Citing Wikipedia, the 2015 CDCR Annual Suicide Report defined rigor mortis as a condition that indicates a person has been deceased for four hours. In previous reports by the Special Master's experts, a period of two to four hours was used to define when rigor mortis begins, citing the *Collins English Dictionary* (2003 ed.). The change in definition impacted the classification of rigor mortis for the deaths in 2015 based on the SCRs. Using the Special Master's previous definition of rigor mortis and body temperature at the time of death, an additional case was found in the early stages of rigor mortis based on the estimated time of the death and the details of the emergency medical response.  This finding increases the number of cases in 2015 found in rigor mortis from one to two.").

4.      **Housing Designation**

Defendants identified discrepancies between their records and the Special Master's expert's findings regarding housing types of those who died by suicide from 2013-2020.  Exhibit A at 4.[13]  The Special Master's expert reviewed the housing designation data contained in the Draft Report and made corrections when warranted.  First, the "housing type" table included in the Draft Report contained the typographical error discussed above regarding the number of decedents who resided in segregated settings at the time of their deaths by suicide in 2016.  *See supra* Part III(A)(2).  With the correction contained in the final Report, the Special Master's expert's findings regarding segregated settings match CDCR's representations regarding their records.[14]

In addition, the Special Master's expert corrected a typographical error in the Draft Report that resulted in the overreporting of one 2015 case in the "medical setting" category. Report at 6-7.  The final Report also clarifies that deaths by suicide in Mental Health Crisis Bed units are included in the "inpatient setting" category.[15]  *Id.* at 6 n.6.  With these clarifications, the housing type data contained in the Report matches the Special Master's expert's findings contained in the underlying reports, to which defendants never objected.

---

[13] It is unclear if the Special Master's expert's findings regarding suicides in Reception Centers matches CDCR's records as they did not provide this data in their informal objections.

[14] *Compare* Exhibit A at 4 (reporting 94 total cases where decedents resided in segregated settings from 2013-2020), *with* Report at 5 ("Ninety-four individuals, or 40 percent, were housed in a segregated setting.").

[15] The Draft Report had included two MHCB cases in 2017 and one MHCB case in 2018 in the "medical setting" category.

5.      **Level of Care**

Defendants raised nine specific statistical discrepancies regarding incarcerated persons'

mental health level of care at the time of their deaths by suicide contained in the Draft Report.

Exhibit A at 5.  Upon review, the Special Master's expert found two data points in 2015 (3CMS -

38 percent; and non-MHSDS - 42 percent) that were mistakenly transposed in the Draft Report.

This error is corrected in the final Report.  Report at 13.  The final Report also corrected a

typographical error in the 2020 column of the table, revising the percent of 3CMS patients down

to 35 percent from 36 percent.  *Id.*  The source of the remaining discrepancies is unclear, as the

percentages contained in the Report match the Special Master's expert's findings from prior

reports[16] to which defendants never objected.

6.      **Number of Cases with Concerns or Problems Relating to Suicide Risk**
        **Evaluations**

Finally, defendants objected to the Draft Report's data regarding the number of cases

with concerns or problems related to suicide risk evaluations, stating that the data included in the

Draft Report were inconsistent with CDCR's records.  Exhibit A at 5.[17]  The Special Master's

---

[16] *See* ECF No. 5399 at 13 (Special Master's expert's 2013 suicide report, discussing suicides by mental health level of care); ECF No. 5428 at 14-15 (Special Master's expert's 2014 suicide report, discussing suicides by mental health level of care); ECF No. 7038-1 at 17 (CDCR's 2015 suicide report, discussing suicides by mental health level of care); ECF No. 7038-3 at 20-21 (Special Master's expert's 2016 suicide report, discussing suicides by mental health level of care); ECF No. 7077-1 at 18-19 (Special Master's expert's 2017 suicide report, discussing suicides by mental health level of care); ECF No. 7161-1 at 20-21 (Special Master's expert's 2018 suicide report, discussing suicides by mental health level of care); ECF No. 7239 at 27 (Special Master's expert's 2019 suicide report, discussing suicides by mental health level of care); ECF No. 7405-1 at 20-21 (Special Master's expert's 2020 suicide report, discussing suicides by mental health level of care).

[17] Defendants objected to the use of "unclear criteria" in determining the adequacy of SREs. Exhibit A at 5.  In the Special Master's expert's annual suicide reports, concerns or problems with SREs were determined based on the content of the SCRs authored by CDCR staff.  Not all issues identified within the SCR resulted in quality improvement recommendations, yet the

expert reviewed the data regarding suicide risk evaluations to ensure consistency with the underlying reports.  For the 2013-2020 time period, the number of cases where suicide risk evaluations were completed was revised to 194 cases from 197 cases; the number of cases with concerns or problems related to suicide risk evaluations was revised to 153 cases from 157. Report at 17.  This resulted in a negligible difference of 0.8% in the total percentage of problematic suicide risk evaluations over the eight-year period.[18]  Additionally, the statistical table contained in the final Report was revised to ensure the percentage of cases with concerns or problems relating to suicide risk evaluations was presented consistently with the underlying reports.  *See supra* note 4. The table included in the final Report includes corrected annual percentages which align with the Special Master's expert's findings from the respective underlying reports.  Report at 18.[19]

---

problems were specifically noted and categorized into areas of concern by the Special Master's expert.  For example, if the SCR noted that the clinician who completed an SRE failed to identify risk factors documented in the patient's record, but the SCR did not determine that concern to require a quality improvement plan, the Special Master's expert still considered the failure to identify a documented risk factor as a "concern/problem."

[18] The Draft Report's figure was 79.7 percent (157 problematic cases divided by 197 applicable cases); the final Report's figure is 78.9 percent (153 problematic cases divided by 194 applicable cases).

[19] Regarding 2015, the final Report reflects the number of cases (ten) where "problems with at least one suicide risk evaluation were found" as reported in CDCR's 2015 suicide report.  ECF No. 7038-1 at 46.  CDCR's 2015 report does not include the number of cases where suicide risk evaluations were completed.  The Special Master's expert's review of the contents of CDCR's 2015 suicide case reviews indicated that there were 21 cases where suicide risk evaluations were completed.  The "applicable cases" percentage included in the final Report's table is based on that calculation (ten problematic cases divided by 21 cases where suicide risk evaluations were completed, or 48 percent).  The Special Master's expert's review of these suicide case reviews revealed that there were 14 cases (67 percent) where CDCR staff clearly noted concerns with the suicide risk evaluations in the suicide case review.  For purposes of consistency, CDCR's figure (ten cases) was included in the final Report, though it is unclear why CDCR's report excluded four problematic cases in their calculation.

IV.     **CONCLUSION AND RECOMMENDATIONS**

As the Special Master's expert notes in the Report, 237 incarcerated persons died by suicide in CDCR institutions between 2013-2020.  Report at 2.  The suicide rate among incarcerated persons in CDCR custody rose steadily each year between 2014-2019, reaching an all-time high of 30.3 deaths by suicide per 100,000 incarcerated persons in 2019.  *Id.* Throughout the years covered in the Report, "deficiencies and challenges associated with the evaluation of suicide risk have been problematic within CDCR," with 79 percent of suicide risk evaluations evidencing deficiencies.  *Id.* at 17.  A majority of cases evidenced deficiencies in mental health assessments, treatment planning, and treatment services.  *Id.* at 19-22.  Likewise, each year a majority of cases was determined to be either foreseeable or preventable.  *Id.* at 28.

For decades, defendants' suicide prevention efforts have been inadequate.  *See supra* note 5.  Faced with this reality, CDCR has chosen to squabble over typographical errors and has repeatedly attempted to rewrite the law of this case.  The *de minimis* statistical discrepancies[20] defendants identified in their preliminary objections to the Draft Report should not distract from defendants' demonstrated inability to stem the tide of preventable suicides occurring in CDCR institutions through 2020.

Relatedly, defendants have still not yet fully implemented the Special Master's suicide prevention expert's recommendations some seven years after the court first ordered their implementation.  As the court noted in its December 3, 2020 order, "it is settled in this action that defendants' Eighth Amendment obligation is to adequately implement all reasonable steps" including implementation of the Special Master's suicide prevention expert's recommendations

---

[20] As noted, the minor corrections and clarifications made to the final Report did not impact the Special Master's expert's conclusions or recommendations.

"to reduce the pattern of foreseeable or preventable inadequacies in clinical judgment and administrative action or inaction involved in inmate suicides."  ECF No. 6973 at 9.[21]  The time has long since passed for defendants to complete remediation of suicide prevention-related inadequacies the Special Master's experts have repeatedly identified over many years and allow the court to assess the durability of defendants' remedial efforts.

The Special Master expects the parties will receive this Report in the manner it is intended: "[T]o provide a summary of information that can be useful to CDCR and the court in making determinations about the needs for improvement within CDCR relative to suicides" and to "highlight[] those issues which can move CDCR toward improved suicide prevention practices."  Report at 1.

The Special Master agrees with the conclusions and recommendations included in his expert's Report.  Because these conclusions and recommendations track prior court orders, they need not be reiterated in additional court orders at this time.  Accordingly, the Special Master requests that the court adopt in full the attached Report by Dr. Sharen Barboza, Ph.D. regarding deaths by suicide in CDCR from 2013-2020.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

March 23, 2022

---

[21] *See* ECF No. 6973 at 9 n7 ("Eighth Amendment compliance in this area of this action will require both adequate implementation of the [Special Master's suicide prevention expert's] twenty-nine recommendations as well as remediation of the pattern of identifiable and describable inadequacies in the annual report on inmate suicides.").

# EXHIBIT A

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 21, 2022


Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919


VIA EMAIL


Special Master Lopes:


      I write in response to your December 22, 2021 draft Summary of Findings: Deaths by Suicide in the California Department of Corrections and Rehabilitation from January 1, 2013, Through December 31, 2020 (Report).  CDCR objects to this unexpected Report in its entirety as it is redundant and duplicative of the Special Master's expert's own annual suicide reports,[1] most of which duplicate the self-monitoring efforts conducted by the CDCR from 2015 to 2020.[2]  Both CDCR and the Special Master's experts have already critically reviewed every suicide that occurred in 2013 through 2020.  CDCR reviews every suicide death via individual suicide reports and, since 2015, publishes annual suicide reports in a similar manner as the Special Master does for each calendar year.  The Special Master's rationale to reassess 237 deaths by suicide over the past nine years is unclear especially when the Special Master has already reported his findings of trends, recommendations, and conclusions in each of his annual suicide reports.  In fact, the Special Master has provided reports covering calendar years 2015 through 2020 within the last twelve months, and the current Report does not provide any new findings or insight into the individuals' death by suicide.

---

[1] *See* OSM's 2013 Suicide Report, ECF No. 5399; OSM's 2014 Suicide Report, ECF Nos. 5427, 5428; OSM's and CDCR's 2015 Suicide Report, ECF Nos. 7038 at 2 fn.2, 7038-1, 7038-2; OSM's 2016 Suicide Report, ECF Nos. 7038, 7038-3; OSM's 2017 Suicide Report, ECF No. 7077; OSM's 2018 Suicide Report ECF 7161; OSM's 2019 Suicide Report ECF No. 7239; OSM's 2020 Suicide Report, ECF No. 7405.

[2] *See* CDCR's 2015 Annual Report on Suicides, ECF No. 7038-1; CDCR's 2016 Annual Report on Suicides (https://cchcs.ca.gov/wp-content/uploads/sites/60/SR/2016-Annual-Suicide-Report.pdf) (last accessed on 1/11/2022); CDCR's 2017-2019 Aggregate Report on Suicides (https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf) (last accessed on 1/11/2022); CDCR's 2020 Annual Report on Suicide Prevention and Response (https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/CDCR-2020-SB-960.pdf) (last accessed on 1/22/2022).

Special Master Lopes
Page 2

Equally troubling are the various statistical errors discovered in this report through CDCR's limited review.[3]  Examples of those errors are discussed below, but their presence calls into question the validity of the numbers and percentages found throughout this report.  Because CDCR's brief review of this report revealed many of the same statistical errors previously brought to the Special Master's attention, CDCR deemed this report unreliable and did not complete a thorough review of the Report.

I.      **Data Discrepancies between the Special Master's Expert's Findings with CDCR's Records.**

CDCR has identified a number of data discrepancies.  Despite the limited review, CDCR has concerns with the statistical findings within the Report especially when compared to CDCR's review of its 237 Suicide Case Review reports (SCRs).  CDCR objects to the Report as unreliable due to the statistical discrepancies.  In addition, CDCR objects to the Report because it fails to provide methodology for the Special Master's expert's findings.

A.      Examples of Statistical Discrepancies.

The Report is based on numerous statistical discrepancies that directly conflict with CDCR's records.  One explanation for these discrepancies could be that the Report's "primary sources of information . . . were the Special Master's experts' previously filed reports regarding completed suicides from 2013 through 2020."  (Report at 1.)  Defendants have filed objections to each of the Special Master's experts' suicide reports from 2016 through 2020, which are still pending resolution by the Court.  Defendants' objections identified numerous concerns with the statistics used by the Special Master's experts to form what appear to be unreliable trends, recommendations, and conclusions in the 2016 through 2020 reports.[4]  These same discrepancies identified in prior reports appear to have been adopted into this Report as well.  A brief summary of the discrepancies found is as follows:

---

[3] CDCR's limited review consisted of reviewing its 237 Suicide Case Review reports and compared its findings of: (1) Suicide Methods, (2) death by suicides in the Segregation Unit, (3) descendants found with rigor mortis, (4) housing designation, (5) the level of care, and (6) the amount of cases that had concerns or problems relating to Suicide Risk Evaluations.

[4] *See* Defendants' Objections to OSM's 2016 Suicide Report, ECF No. 7052; Defendants' Objections to OSM's 2017 Suicide Report, ECF No. 7098; Defendants' Objections to OSM's 2018 Suicide Report, ECF No. 7182; Defendants' Objections to OSM's 2019 Suicide Report, ECF No. 7248; Defendants' Objections to OSM's 20201 Suicide Report, ECF No. 7409.

Special Master Lopes
Page 3

- The data presented on suicide method on pages 3 and 4 are incorrect.  The tables below illustrate the discrepancy between the expert's findings and the records maintained by CDCR.

| Suicide Method Pie Chart Data, Page 3 | | |
|---|---|---|
| **Method** | **Expert's Findings** | **CDCR's Findings** |
| **Hanging** | 191 (81%) | 190 (80%) |
| **Exsanguination** | 14 (6%) | 15 (6%) |
| **Asphyxiation** | 13 (5%) | 13 (5%) |
| **Overdose** | 10 (4%) | 9 (4%) |
| **Jumping** | 5 (2%) | 6 (3%) |
| **Other** | 3 (2%) | 3 (1%) |
| **TOTAL** | 236 | 236 |

| Special Master's Expert's Findings with CDCR Corrections in Red (Table Page 4) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| **Hanging** | 80% | 87% | 83% | 70% | 87% | ~~74%~~ 71% | 87% | 77% |
| **Exsanguination/Cutting** | ~~7%~~ 3% | 0% | 0% | 7% | 10% | 9% | ~~8%~~ 5% | ~~3%~~ 10% |
| **Other Asphyxiation** | 7% | 4% | 4% | ~~11%~~ 7% | 0% | ~~6%~~ 9% | ~~3%~~ 5% | 10% |
| **Overdose** | 7% | 4% | 8% | 4% | 0% | 12% | 0% | 0% |
| **Jumping** | 0% | 4% | 4% | ~~4%~~ 7% | 3% | 0% | 3% | 0% |
| **Other** | ~~0%~~ 3% | 0% | 0% | 4% | 0% | 0% | 0% | ~~10%~~ 3% |

- The numbers and percentages of individuals who died by suicide in segregated housing and the number of individuals found in rigor mortis reported on pages 4-5, and 7-8 are incorrect. The Report states that there were thirty-one deaths by suicide in segregated housing between 2013 and 2014 but CDCR only found twenty-nine such deaths.  The report states that sixty-four deaths by suicide occurred in a segregated setting between 2015 and 2020 but CDCR only found sixty-three.

- In regards to rigor mortis, the expert found that "[s]ix of the nine individuals found in rigor mortis [in 2013 and 2014] were housed in a segregated unit at the time of their death, representing 19 percent of suicides that occurred in segregated housing."  (Report at 4.)  However, CDCR identified only five rigor mortis deaths in 2013 and 2014, inclusive.  Of those, only three were found in a segregated housing.  The expert also found that "[t]welve of the 32 individuals found in rigor mortis were housed in a segregated setting [between 2015 and 2020] at the time of their deaths, representing 19 percent of the suicides in segregated housing since 2015."  (Id.)  For that same time period, CDCR found thirty-three cases of rigor mortis, of which eleven were in segregated housing at the time of their death.  Additionally, the table at page 5 of the Report inherited these flaws:

Special Master Lopes
Page 4

| Special Master's Expert's Findings with CDCR Corrections in Red (Table Page 5) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Total Number of Suicides | 30 | 23 | 24 | 27 | 30 | 34 | 38 | 31 |
| Individuals Found in Rigor Mortis | ~~5~~ 4 | ~~4~~ 1 | ~~2~~ 3 | 9 | 4 | ~~10~~ 4 | 5 | 3 |
| % Found in Rigor Mortis | ~~17%~~ 13% | ~~17%~~ 4% | ~~8%~~ 13% | 33% | 13% | ~~29%~~ 12% | 13% | 10% |
| Suicides in Segregated Settings | 16 | 15 | 9 | ~~11~~ 9 | 11 | 10 | ~~12~~ 13 | 11 |
| Individuals in Segregated Settings Found in Rigor Mortis | ~~3~~ 2 | ~~3~~ 1 | ~~0~~ 2 | ~~3~~ 1 | 3 | ~~5~~ 4 | 1 | 0 |
| % in Segregated Settings Found in Rigor Mortis | ~~19%~~ 13% | ~~20%~~ 7% | ~~0%~~ 22% | ~~27%~~ 11% | 27% | ~~50%~~ 40% | 8% | 0% |
| % of Those Found in Rigor Mortis Housed in Segregated Settings | ~~60%~~ 50% | ~~75%~~ 100% | ~~0%~~ 67% | ~~33%~~ 11% | 75% | ~~50%~~ 100% | 20% | 0% |

- On pages 5-6, the numbers reported regarding housing types of individuals who died by suicide are incorrect.  The discrepancies are illustrated in the table below:

| Expert's Findings as Reported on Page 5, Section (B)(1) Housing Type | | |
|---|---|---|
| Setting | Expert's Finding | CDCR Records |
| General Population | 114 | 115 |
| Segregation | 95 | 94 |
| Medical Setting | 8 | 7 |
| "Psychiatric Inpatient Setting" | 5 | 6 |

- On pages 12-13, the numbers and percentages reported for suicides in each the Mental Health levels of care are incorrect.  Likewise, the percentage table (and the pie graph on which it likely relies) is incorrect. The discrepancies are illustrated in the tables below:

| Expert's Findings as Reported on Page 12, Section (C)(1) Mental Health Services Levels | | |
|---|---|---|
| Level of Care | Expert's Findings | CDCR Records |
| MHSDS | 166 | 164 |
| EOP | 82 | 79 |
| CCCMS | 76 | 77 |
| Inpatient | 8 | 8[5] |
| General Population | 71 | 73 |

---

[5] Four at the Mental Health Crisis Bed LOC, three at the Intermediate LOC, and one at the Acute LOC.

| Special Master's Expert's Findings with CDCR Corrections in Red (Table Page 13) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| CCCMS | ~~27%~~ 30% | ~~39%~~ 43% | ~~42%~~ 38% | 26% | 27% | 35% | 29% | ~~36%~~ 35% |
| EOP | ~~23%~~ 20% | ~~48%~~ 43% | 21% | 56% | 33% | ~~32%~~ 29% | 42% | 23% |
| Inpatient | 3% | 4% | 0% | 0% | 7% | 3% | 0% | 10% |
| GP (Non) | 47% | 9% | ~~38%~~ 42% | 19% | 33% | ~~29%~~ 32% | 29% | 32% |

- The Special Master's expert's analysis of Suicide Risk Evaluations (SRE) uses unclear criteria and the expert's findings are inconsistent with CDCR records on these same cases. On page 17, the Report states that 197 out of the 237 individuals that died by suicide received at least one SRE and that of those 197 cases, 157, or 80%, "evidenced concerns or problems within at least one SRE prior to their deaths by suicide." (Report at 17.) As the report lacks any source data or analysis, CDCR is unable to validate or review these conclusory findings. The table on page 17 regarding "Percentages of Cases with SRE Concerns/Problems" by year is inconsistent with CDCR's own records as is illustrated in the table below:

| Year | Report's Findings: % of cases with SRE Concerns/Problems | CDCR Data: Suicide deaths that received SRE | CDCR Data: Number of Deficiencies | CDCR Data: Percentages of Deficiencies |
|---|---|---|---|---|
| 2013 | 38% | 25 | 20 | 80% |
| 2014 | 85% | 22 | 14 | 64% |
| 2015 | 90% | 18 | 9 | 50% |
| 2016 | 68% | 24 | 13 | 54% |
| 2017 | 88% | 21 | 16 | 76% |
| 2018 | 100% | 25 | 20 | 80% |
| 2019 | 81% | 32 | 23 | 72% |
| 2020 | 81% | 27 | 19 | 70% |
| TOTAL | 80% | 194 | 134 | 69% |

As mentioned above, given the amount of data used in the Report and the time and resources required to conduct a comprehensive analysis of the Report in its entirety, CDCR conducted a limited review of the Report. Despite the limited review, the discrepancies substantiate CDCR's objection that the Report is unreliable.

B.  Examples of the Special Master's Expert's Findings that Lack Methodology or Sources

CDCR also objects to the Report as unreliable because it fails to disclose the methodology and sources underlying several findings. Examples of such missing information include: a lack of source data showing how the experts calculated the total segregation population found on page

Special Master Lopes
Page 6

7; a lack of methodology on pages 9-10 regarding the expert's determination of whether an individual was housed in the Administrative Segregation Unit for safety concerns or for disciplinary infractions; and a lack of methodology in determining whether an individual evidenced a history of trauma on pages 15-16. Coupled with the statistical irregularities found throughout the report, a lack of clear methodology and underlying data significantly minimizes the validity and usefulness of the Report.

**II.    Conclusion.**

CDCR objects to the Report in its entirety because it lacks value, duplicates the work of the Special Master's and Defendants' prior reports on suicides, and contains numerous statistical and methodological flaws rendering it unreliable.

Sincerely,


/s/ **Dillon Hockerson**

DILLON HOCKERSON
Attorney
Office of Legal Affairs

**Sharen Barboza, Ph.D.**
**37 Norton Avenue**
**Clinton, NY 13323**
**sharen@sharenbarboza.com**

**SUMMARY OF FINDINGS:**
**DEATHS BY SUICIDE IN THE CALIFORNIA DEPARTMENT OF**
**CORRECTIONS AND REHABILITATION**
**FROM JANUARY 1, 2013 THROUGH DECEMBER 31, 2020**

## I.     Introduction and Summary of the Findings

This report is the *Coleman* Special Master's expert's summary of findings related to deaths by suicide of individuals incarcerated within the California Department of Corrections and Rehabilitation (CDCR) from 2013 through 2020. It is submitted as part of the Special Master's continuing review of the defendant's compliance with court-ordered remediation in the matter of *Coleman v. Newsom*, No. CIV S-90-0520 KJM KJN E.D. Cal.

The primary sources of information for this report were the Special Master's expert's previously filed reports regarding completed suicides from 2013 through 2020 as well as the data used to author these reports. These prior reports were based on information gathered from individual Suicide Case Reviews (SCRs) completed by members of CDCR's Statewide Mental Health Program (SMHP) in collaboration with input and feedback from the Suicide Case Review Committee (SCRC); the reports on implementation of Quality Improvement Plans (QIPs) submitted by each institution and/or headquarters in response to the recommendations in each SCR; individual patient healthcare records; coroners' reports, when available; California Correctional Health Care Services (CCHCS) Final Combined Death Review Summaries; CDCR Initial Inmate Death Reports (Form 7229-A); CDCR Inmate Suicide reports (Form 7229-B); and CDCR Incident Report Packages (Form 837).

In an effort to provide a summary of information that can be useful to CDCR and the court in making determinations about the needs for improvement within CDCR relative to suicides, the findings in this report are focused on modifiable risk factors, environmental factors, and clinical factors that can be targeted for intervention or changes in practice as a means to reduce suicides, based solely upon information gathered from deaths by suicide between 2013 and 2020. The report does not constitute a comprehensive summary of all findings over the previous eight years but highlights those issues which can move CDCR toward improved suicide prevention practices.

## II.     Format

The following report is presented in a narrative format supported by tables and charts. It includes a summary of findings and comparisons across time related to the deaths by suicide from 2013 through 2020, when data was available. The report ends with recommendations and conclusions.

Findings and discussion of the findings are organized according to identified risk factors and other elements of analysis including:

1

- Suicide Incident Factors
- Individual Risk Factors
- Institutional/Environmental Risk Factors
- Mental Health Risk Factors
- Mental Health Evaluation and Treatment Factors
- Emergency Response Factors
- Evaluation of Suicide Reports and Quality Improvement Plans
- Foreseeability and Preventability Determinations
- Conclusions
- Recommendations

## III.   **Findings and Discussion**

There were 237 deaths by suicide among incarcerated individuals in CDCR institutions from 2013-2020.  The overall suicide rate across the eight years from 2013-2020 was 23.1 deaths by suicide per 100,000 incarcerated individuals.  The table and chart that follow include rates, incarcerated populations, and suicides by year for comparison purposes.  As can be seen from these trends, the suicide rate increased steadily from 2014 through 2019, with a decrease in the suicide rate being noted in 2020 following the highest rate in the previous eight years in 2019.  For the previous three years (2018, 2019, 2020) the suicide rates in CDCR have exceeded the eight-year average.  The suicide rates in 2014 and 2015 were lower than the eight-year average.

CDCR Suicide Rates per 100,000<br>2013-2020

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Number of Deaths by Suicide** | 30 | 23 | 24 | 27 | 30 | 34 | 38 | 31 |
| **CDCR Population[1]** | 132,827 | 135,481 | 128,900 | 128,641 | 131,260 | 129,417 | 125,472 | 113,403 |
| **CDCR Suicide Rate** | 22.6 | 17 | 18.6 | 21 | 22.9 | 26.3 | 30.3 | 27.3 |

---

[1] The CDCR populations listed include both in-state and out-of-state incarcerated individuals, when applicable, as of June 30th of each year.



### A.   <u>Suicide Incident Factors</u>

This section reviews the factors associated with the suicidal event, including its method and the presence of rigor mortis upon discovery.

### 1.   **Method of Suicide**

The majority of deaths by suicide from 2013 through 2020, 191 cases or 81 percent, occurred by hanging. Fourteen incarcerated individuals, or six percent, died by exsanguination/cutting; 13 individuals, or five percent, died from asphyxiation by a method other than hanging; ten individuals, or four percent, died by overdose; five individuals, or two percent, died by jumping; and four individuals, or two percent, died by other means.[2]



---

[2] Three individuals died secondary to puncture wounds and the fourth died secondary to a failure to thrive (from not eating or drinking) following a suicide attempt by jumping.

The table below represents the percentages of methods resulting in death by suicide by year.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Hanging** | 80% | 87% | 83% | 70% | 87% | 74% | 87% | 77% |
| **Exsanguination/Cutting** | 7% | 0% | 0% | 7% | 10% | 9% | 8% | 3% |
| **Other Asphyxiation** | 7% | 4% | 4% | 11% | 0% | 6% | 3% | 10% |
| **Overdose** | 7% | 4% | 8% | 4% | 0% | 12% | 0% | 0% |
| **Jumping** | 0% | 4% | 4% | 4% | 3% | 0% | 3% | 0% |
| **Other** | 0% | 0% | 0% | 4% | 0% | 0% | 0% | 10% |

These findings reinforce what is known about suicide in prison, that hanging is the most lethal method available to incarcerated individuals and the method used most often by those who die by suicide in incarcerated settings. CDCR has made efforts to increase the number of suicide resistant cells in segregated and inpatient settings, has updated training for all staff on suicide risk, and has implemented increased monitoring of individuals known to have suicide risk or recently discharged from inpatient settings.

### 2.     Rigor Mortis

Rigor mortis is evidenced by muscle stiffening, or a decrease in body temperature which signifies that an individual had likely been dead for at least two hours prior to discovery.[3] As segregated settings were known to be environments where the risk for deaths by suicide was increased, the CDCR implemented a monitoring system in segregated settings which required custody checks be completed on every individual in a segregated setting at least twice per hour with intervals not to exceed 35 minutes. Initially implemented with manual documentation of custody checks in 2006, the process was revised in May 2014 to include electronic verification with *GuardOne* technology. Given that rigor mortis does not present in the body of deceased individual for at least two hours, rigor mortis should not be present in individuals who died in segregated settings if custody checks were completed timely and in accordance with policy which requires visualization of a living, breathing individual.

Between 2013 and 2014, there were 53 deaths by suicide within CDCR. Thirty-one of the 53 deaths by suicide, or 59 percent, occurred in segregated housing.[4] Six of the nine individuals found in rigor mortis during those years were housed in a segregated unit at the time of their death, representing 19 percent of suicides that occurred in segregated housing.

Since 2015, there have been 184 suicides in CDCR. Sixty-three of those 184 deaths, or 34 percent, occurred in segregated settings. Eleven of the 33 individuals found in rigor mortis were housed in a segregated setting at the time of their deaths. These eleven deaths represented 17 percent of the 63 suicides in segregated housing since 2015. While the overall percentage of individuals who

---

[3] Kori (2018). Time since death from rigor mortis: Forensic perspective," *Journal of Forensic Sciences and Criminal Investigation, 9 (5), 001-009.*

[4] Segregated housing refers to an administrative segregation unit (ASU), security housing unit (SHU), short-term restricted housing unit (STRH), long-term restricted housing unit (LTRH), psychiatric services unit (PSU) and condemned housing.

died by suicide in segregated settings has decreased, the percentage of individuals who died by suicide in segregated housing found in rigor mortis has not decreased materially with the implementation of electronic monitoring.

However, analyses of these data by year revealed variability over time.  As can be seen in the table below, in 2015 and 2020, none of the individuals who died by suicide in a segregated setting were found in rigor mortis, yet in 2017 three-quarters and in 2018 half of the individuals found in rigor mortis were housed in segregated settings.  These findings suggest that the impact of monitoring individuals in segregated settings has been inconsistent, even with the implementation of the *GuardOne* system.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Total Number of Suicides** | 30 | 23 | 24 | 27 | 30 | 34 | 38 | 31 |
| **Individuals Found in Rigor Mortis** | 5 | 4 | 2 | 9 | 4 | 10 | 5 | 3 |
| **Percentage Found in Rigor Mortis** | 17% | 17% | 8% | 33% | 13% | 29% | 13% | 10% |
| **Suicides in Segregated Settings** | 16 | 15 | 9 | 10 | 11 | 10 | 12 | 11 |
| **Individuals in Segregated Settings Found in Rigor Mortis** | 3 | 3 | 0 | 2 | 3 | 5 | 1 | 0 |
| **Percentage in Segregated Settings Found in Rigor Mortis** | 19% | 20% | 0% | 20% | 27% | 50% | 8% | 0% |
| **Percentage of Those Found in Rigor Mortis Housed in Segregated Settings** | 60% | 75% | 0% | 22% | 75% | 50% | 20% | 0% |

## B.    Institutional/Environmental Risk Factors

In this section, issues related to institutional and environmental factors among those who died by suicide are reviewed. These include housing type, housing based on individual safety needs, cell type, and concerns with custody checks/nursing rounds.

### 1.    Housing Type

At the time of their suicidal acts,[5] 116 individuals, or 49 percent of the 237 individuals who died by suicide between 2013 and 2020, were housed in a general population (GP) setting.  Ninety-four individuals, or 40 percent, were housed in a segregated setting; 15 individuals, or six percent, were housed in a Reception Center (RC) setting; eight individuals, or three percent, were housed in a

---

[5] The term "suicidal act" used throughout this report refers to the behavior engaged in by the incarcerated individual which ultimately resulted in death.

psychiatric inpatient setting;[6] and four individuals, or two percent, were housed in a medical setting.[7]



When housing type was examined by year, the results revealed that since 2015, there has been a reduction in the percentage of suicides occurring in segregated housing.[8]   In 2017, there was a statistically significant increase in suicides in RC settings.  In response, CDCR was court-ordered to direct staff to routinely inspect RCs for proper placement of suicide prevention posters and develop a systemic process for reviewing records, including mental health records from county jails following an individual's reception into CDCR. While there was a decrease in suicides in RCs in 2018, these improvements were not sustained in 2019.[9]   In 2020, it can by hypothesized that the low number of suicides in RCs may have been impacted by the reduction in transfers into CDCR from county jails secondary to the pandemic.   Data regarding suicides and housing type are summarized in the table and chart that follow.

|                                   | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|-----------------------------------|------|------|------|------|------|------|------|------|
| **All Suicides**                  | **30** | **23** | **24** | **27** | **30** | **34** | **38** | **31** |
| **Number of Suicides in GP**      | 13   | 6    | 12[10] | 17  | 12   | 20   | 21   | 15   |
| **Percentage of Suicides in GP**  | 43%  | 26%  | 50%  | 63%  | 40%  | 59%  | 55%  | 48%  |

[6] Here, psychiatric inpatient settings include Psychiatric Inpatient Program (PIP) housing units (acute and intermediate levels of care) and Mental Health Crisis Beds (MHCB).

[7] Medical settings included Correctional Treatment Centers (CTCs) and Outpatient Housing Units (OHUs).

[8] The decreases in the percentage of suicides in segregated housing in 2018 and 2019 were statistically significant.

[9] The increase in suicides in RC settings in 2019 was statistically significant.

[10] In their 2015 suicide report, CDCR reported 11 suicides in general population housing and one in a sensitive needs yard.  For consistency with the Special Master's expert's reports, this sensitive needs yard case was included in the general population category.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Number of Suicides in Segregated Housing** | 16 | 15 | 9 | 10 | 11 | 10 | 12 | 11 |
| **Percentage of Suicides in Segregated Housing** | 53% | 65% | 38% | 37% | 37% | 29% | 32% | 35% |
| **Number of Suicides in Inpatient Settings** | 1 | 1 | 0 | 0 | 2 | 1 | 1[11] | 2 |
| **Percentage of Suicides in Inpatient Settings** | 3% | 4% | 0% | 0% | 7% | 3% | 3% | 6% |
| **Number of Suicides in Medical Housing** | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 2 |
| **Percentage of Suicides in Medical Housing** | 0% | 0% | 4% | 0% | 0% | 3% | 0% | 6% |
| **Number of Suicides in RCs** | 0 | 1 | 2 | 0 | 5 | 2 | 4 | 1 |
| **Percentage of Suicides in RCs** | 0% | 4% | 8% | 0% | 17% | 6% | 11% | 3% |



As suicide in segregated settings is a serious concern for most correctional systems, the relative decrease in the percentage of suicides occurring within segregated settings in CDCR over the previous six years was examined more closely. Specifically, two elements were examined. First, it was noted that the overall population of incarcerated individuals held in segregated settings decreased by over 33 percent between June 2015 and June 2016. To account for these changes in the overall number of individuals housed in segregated settings, suicide rates per 100,000 incarcerated individuals from 2014 through 2019 were compared to suicide rates for incarcerated

---

[11] The individual who died by suicide was housed in an inpatient setting but had been discharged to a lower level of care two days prior to his death.

individuals housed in segregation settings during those same timeframes.[12]  As the data in the table below reveal, the rate of deaths by suicide in segregated housing increased following the reduction of the number of incarcerated individuals housed in those settings.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | TOTAL |
|---|---|---|---|---|---|---|---|
| **Segregation Population** | 9,364 | 8,095 | 5,362 | 4,588 | 4,539 | 4,943 | **36,911** |
| **Suicides in Segregation** | 15 | 9 | 10 | 11 | 10 | 12 | **67** |
| **Suicide Rate in Segregation per 100,000** | 160.2 | 111.2 | 186.5 | 239.8 | 220.3 | 242.8 | **181.5** |



A second analysis was completed to determine the relative percentages of suicides in segregation compared to the overall CDCR population in segregation.  These data revealed a disproportionate percentage of incarcerated individuals housed in segregation died by suicide.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | TOTAL |
|---|---|---|---|---|---|---|---|
| **Percentage of Suicides in Segregation** | 65% | 38% | 37% | 37% | 29% | 32% | **38%** |
| **Percentage of the CDCR Population in Segregation** | 7% | 6% | 4% | 3% | 4% | 4% | **5%** |

---

[12] Data regarding the percentage of the CDCR population housed in segregated settings in 2020 was not available at the time of this report.



For years, concerns have existed about deaths by suicide of individuals who were recently placed in a segregated setting.  CDCR policy requires that individuals placed in segregation be housed in a retrofitted cell, or with a cellmate, for the first 72 hours following segregation placement. Despite this, the Special Master's suicide prevention expert noted in his fourth reaudit report that seven institutions continued to have problems related to proper use of these intake cells.  CDCR has budgeted funds to retrofit additional cells and developed a corrective action plan to better manage the proper utilization of these new intake cells.

Between 2013 and 2020, there were five instances, or two percent of cases, where individuals were not properly housed in a retrofitted intake cell upon placement in segregated housing. Additionally, there were seven instances, or three percent of cases, where individuals were able to engage in a lethal suicidal act while housed in a retrofitted intake cell.[13]

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Suicide in Intake Cell** | 0% | 0% | 13% | 0% | 3% | 3% | 3% | 3% |
| **Suicide Not in Intake Cell When Indicated** | 3% | 9% | 0% | 0% | 3% | 0% | 0% | 3% |
| **Any Suicide within 72 Hours of Placement in Segregated Housing** | 3% | 9% | 13% | 0% | 7% | 3% | 3% | 6% |

---

[13] In 2018, the individual who died in an intake cell did so by overdose of prescribed keep-on-person medication, thus the suicide-resistant nature of the cell was not relevant in this case.



### 2.    Housing Based on Safety Needs

Research regarding suicide deaths in correctional settings has identified increased risk among individuals who are concerned about their personal safety during incarceration.[14]  In CDCR, individuals who expressed concerns about their personal safety have been placed in Sensitive Needs Yards (SNYs) and/or in an Administrative Segregation Unit (ASU) to address these concerns.  From 2013 through 2020, 75 individuals, or 32 percent of those who died by suicide, were housed in a location specifically to address their expressed safety concerns.  Percentages of deaths by suicide for individuals housed in locations to address their safety concerns are found in the table below and revealed that these percentages began rising after 2014 and, since 2017, this group consistently represented over one-third of those who died by suicide.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentage of Individuals Housed in Locations for Safety Concerns at the Time of Death by Suicide** | 38% | 9% | 13% | 22% | 53% | 50% | 39% | 39% |

---

[14] Daniel, AE & Fleming, J (2005). Serious suicide attempts in a state correctional system and strategies to prevent suicide.  *The Journal of Psychiatry & Law*, 33(2); Boren, EA, et al (2018) The suicidal inmate: A comparison of inmates who attempt versus complete suicide.  *Suicide and Life Threatening Behavior*, 48(5); Folk, JB, et al. (2018) Differences between inmates who attempt suicide and who die by suicide:  Staff-identified psychological and treatment-related risk factors.  *Psychological Services*, 15(3); Dear, Thomson, Hall, & Howells (2001). Non-fatal self-harm in Western Australian prisons: Who, where, when, and why. *Australian & New Zealand Journal of Criminology*, 34, 47-66.



### 3.    Cell Type

Of the 237 deaths by suicide which occurred between 2013 and 2020, 170 individuals, or 72 percent, were housed in single-cells at the time of their suicidal acts.  Fifty-three individuals, or 22 percent, were housed in double-cells; eight individuals, or three percent, engaged in suicidal acts in locations outside of their cells; and six individuals, or 2.5 percent, were housed in a dormitory setting.  The chart below depicts the percentage of deaths by suicide by cell type from 2013 through 2020.  CDCR has reported an awareness of the risks associated with single-cell housing and has reportedly worked to reduce single-cell housing when it is not required secondary to the specific needs of the incarcerated individual.



### 4.    Custody Checks/Nursing Rounds

The adequacy of custody checks/nursing rounds related to deaths by suicide has been a concern identified during suicide reviews between 2013 and 2020.  Across these eight years, inadequate

custody checks/nursing rounds were identified in 43, or 18 percent, of the 237 deaths by suicide. Specifically, 26 of these cases, or 60 percent, occurred in segregated settings and involved concerns related to custody checks. An additional 14 cases, or 33 percent, involved concerns related to custody checks in general population settings as a result of improper window coverings, concerns related to a failure to visualize a "living/breathing" individual during rounds, and improper documentation regarding population counts. Three cases, or seven percent, were related to concerns with nursing rounds in inpatient and infirmary settings. In one case, concerns were noted for both custody and nursing checks for a patient housed in a PIP.

An analysis of these data by year revealed that, after 2015, when custody check/nursing round concerns were noted in 38 percent of the deaths by suicide, the percentage of cases with these concerns has remained at or below 20 percent.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percent of Suicides with Custody Check Problems** | 27% | 13% | 29% | 15% | 20% | 15% | 13% | 0% |
| **Percent of Suicides with Nursing Rounds Problems** | 3% | 0% | 21% | 4% | 0% | 0% | 3% | 3% |
| **Percent of Suicides with Custody Check/Nursing Rounds Problems** | **30%** | **13%** | **38%**[15] | **19%** | **20%** | **15%** | **13%**[16] | **3%** |



Percent of Suicides with Custody Check/Nursing Rounds Issues

C. **Mental Health Risk Factors**

This section reviews mental health conditions and mental health risk factors known to be associated with suicide. More specifically, issues related to incarcerated individuals' levels of

---

[15] Three cases had both custody and nursing concerns.

[16] One case had both custody and nursing concerns.

care, prior suicide attempts, prior self-injurious behaviors, substance use, court-ordered involuntary medications, and trauma histories are discussed.

### 1.      Mental Health Service Levels

Of the 237 individuals who died by suicide between 2013 and 2020, the majority (165 individuals, or 70 percent) were receiving mental health services within the Mental Health Services Delivery System (MHSDS) at the time of their deaths.  Overall, 82 individuals, or 35 percent of those who died by suicide, were receiving services at the Enhanced Outpatient Program (EOP) level of care. Seventy-five individuals, or 32 percent were receiving services at the Correctional Clinical Case Management System (3CMS) level of care; and eight individuals, or three percent, were receiving inpatient level of care services at the time of their deaths.  Specifically, four individuals (two percent) were receiving services at the Mental Health Crisis Bed (MHCB) level of care; three individuals (one percent) were receiving services at the Intermediate Care Facility (ICF) level of care; and one individual (less than one percent) was receiving services at the Acute Psychiatric Program (APP) level of care.  The remaining 72 individuals, or 30 percent, were not receiving mental health services within MHSDS at the time of their deaths.



Percentages of MHSDS levels of care among those who died by suicide each year are included in the table and chart below.

|            | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|------------|------|------|------|------|------|------|------|------|
| **3CMS**       | 27%  | 39%  | 38%  | 26%  | 27%  | 35%  | 29%  | 35%  |
| **EOP**        | 23%  | 48%  | 21%  | 56%  | 33%  | 32%  | 42%  | 23%  |
| **Inpatient[17]** | 3%   | 4%   | 0%   | 0%   | 7%   | 3%   | 0%   | 10%  |
| **Non-MHSDS**  | 47%  | 9%   | 42%  | 19%  | 33%  | 29%  | 29%  | 32%  |

---

[17] Includes MHCB, ICF and APP levels of care.

13



### 2. Substance Use History

Of the 184 individuals who died by suicide between 2015 and 2020, 169, or 92 percent, reported histories of significant substance use beyond experimentation.  Of note, CDCR implemented medication-assisted treatment (MAT) at all institutions in 2019 and Integrated Substance Use Disorder Treatment (ISUDT) in 2020.

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| **Percentage with Significant Substance Use Issues** | 100% | 89% | 97% | 79% | 92% | 97% |



14

### 3.    Previous Non-suicidal Self-Injury and Previous Suicide Attempts

Of the 237 individuals who died by suicide between 2013 and 2020, 166, or 70 percent, engaged in either non-suicidal self-injury (NSSI), a suicide attempt (SA), or engaged in both behaviors prior to their deaths.  As evident in the table below, except for 2013 and 2015, the majority of those who died by suicide had these risk factors present in their histories.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentage who Engaged in NSSI/SA/Both** | 43% | 87% | 67% | 78% | 97% | 71% | 76% | 71% |

Since 2015, NSSI and SA have been examined separately in the histories of those individuals who died by suicide.  Between 2015 and 2020, 184 individuals died by suicide and 133 individuals, or 72 percent, engaged in NSSI, a SA, or both behaviors.  Specifically, 73 individuals, or 40 percent, engaged in non-suicidal self-injury; 125 individuals, or 68 percent, engaged in a previous suicide attempt, and 53 individuals, or 29 percent, engaged in both behaviors prior to their deaths.  The percentage values for these behaviors, by year, are contained in the table that follows.

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| **Percentage who Engaged in NSSI** | 33% | 33% | 37% | 41% | 47% | 42% |
| **Percentage who Engaged in SA** | 63% | 74% | 73% | 62% | 68% | 68% |
| **Percentage who Engaged in Both Behaviors** | 29% | 33% | 13% | 15% | 42% | 39% |



### 4.    Involuntary Medications

Suicide risk is increased among patients whose symptom severity and psychiatric decompensation result in impaired insight, medication nonadherence, and determinations that they are not competent to make treatment decisions in their own best interests.[18]  Between 2013 and 2020, 23

---

[18] Torrey, E.,& Zdanowicz, M. (2001).  Outpatient commitment:  what, why, and for whom. *Psychiatric Services Online*, https://doi.org/10.1176/appi.ps.52.3.337; Roy A (1982) Risk factors

individuals, or 10 percent of those who died by suicide, were under court orders (PC 2602) for involuntary psychotropic medications at the time of death.  Across the eight years, there was variability in the number of individuals who were receiving involuntary medications at the time of their deaths by suicide as indicated in the table below.  There do not appear to be any identifiable trends in these data.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentage of Patients on a PC 2602 at time of death** | 3% | 13% | 13% | 26% | 3% | 9% | 11% | 3% |

### 5.   Trauma History

Since 2016, the Special Master's expert has reviewed the histories of those who died by suicide for evidence of trauma, a risk factor for suicide[19] which can be addressed in treatment.  Available documentation indicated that 91 of the 160 individuals who died by suicide between 2016 and 2020, or 57 percent, had histories positive for trauma.  Twenty-eight of those 91 individuals, or 31 percent, received formal treatment and/or a diagnosis to address symptoms of trauma while incarcerated.  The Special Master's expert is not in a position to determine whether or not the effects of the trauma experienced by individuals who died by suicide warranted treatment or a diagnosis.  This information was included in the annual reports so that it could be tracked over time.  The table and chart below reflect comparative data over the previous five years and revealed that with the exception of 2019, a majority of individuals who died by suicide had histories positive for trauma and with the exception of 2016, less than one-third had received formal treatment to address past trauma.

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| **Percentage of Suicides with Trauma Histories** | 59% | 53% | 56% | 45% | 74% |
| **Percentage with Trauma who Received Treatment or Diagnosis** | 38% | 31% | 32% | 29% | 26% |

---

for suicide in psychiatric patients. *Archives of General Psychiatry,* 39, 1089-1095; DeHert, M., McKenzie, & K., Peuskens, J (2001).  Risk factors for suicide in young people suffering from schizophrenia: a long-term follow-up study, *Schizophrenia Research* 47, 127-134.

[19] Facer-Irwin E, Blackwood NJ, Bird A, et al. PTSD in prison settings: A systematic review and meta-analysis of comorbid mental disorders and problematic behaviours. PLoS ONE. 2019;14(9).; Marzano L, Hawton K, Rivlin A, Smith EN, Piper M, Fazel S. Prevention of suicidal behavior in prisons: An overview of initiatives based on a systematic review of research on near-lethal suicide attempts. Crisis: The Journal of Crisis Intervention and Suicide Prevention, 2016; 37(5):323-334. Centers for Disease Control. (2016) Preventing multiple forms of violence: A strategic vision for connecting the dots. Atlanta, GA: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control; Agorastos, A, et al. (2014). The cumulative effect of different childhood trauma types on self-reported symptoms of adult male depression and PTSD, substance abuse and health-related quality of life in a large active-duty military cohort. *Journal of Psychiatric Research*, 58, 46–54; Ford, J. D., & Gómez, J. M. (2015). Self-injury and suicidality: The impact of trauma and dissociation. *Journal of Trauma & Dissociation*, 16, 225–231.



### D.   Mental Health Evaluation and Treatment Factors

In this section, issues related to the evaluation and treatment of identified mental health needs among incarcerated individuals who died by suicide are reviewed.  This section examines the quality and content of suicide risk evaluations, mental health assessments, treatment plans, treatment delivery, higher level of care needs, and recent inpatient placements.

### 1.   Suicide Risk Evaluations

Deficiencies and challenges associated with the evaluation of suicide risk have been problematic within CDCR for a number of years. Since 2013, CDCR has provided a seven-hour training to mental health staff once every two years related to the evaluation of suicide risk.  The training curriculum was updated twice between 2017 and 2019.  CDCR reported that, by the end of 2019, 94 percent of all mental health staff had received the updated training.  Additionally, CDCR reported that they updated their suicide risk evaluation (SRE) monitoring process and training in 2015, 2016 and 2018 along with augmenting the SRE process with enhancements in the electronic health record.  Since 2017, CDCR completed audits, at least twice per year, of the SREs completed by every mental health clinician.  In 2020, CDCR reported that the "passing" rate from these audits ranged from 50 percent to 74 percent quarterly.  As can be seen from the data that follow, despite these efforts, suicide risk evaluation has been and continues to be a serious concern.

One hundred ninety-four of the 237 individuals who died by suicide between 2013 and 2020, or 82 percent, underwent an SRE at some time during their incarceration within CDCR.  One hundred fifty-three of those 194 cases, or 78.9 percent, evidenced concerns or problems within at least one SRE prior to their deaths by suicide.  As indicated in the table below, in six of the eight years reviewed in this report,[20] concerns and problems with SREs have exceeded two-thirds of the cases.

---

[20] In their 2015 suicide report, CDCR reported ten cases where "problems with at least one suicide risk evaluation were found."  ECF No. 7038-1 at 46.  CDCR's 2015 report does not include the number of cases where suicide risk evaluations were completed, though the Special

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentage of Total Cases with SRE Concerns/Problems** | 27% | 70% | 42% | 67% | 67% | 71% | 82% | 84% |
| **Percentage of Applicable Cases with SRE Concerns/Problems** | 38% | 80% | 48% | 72% | 95% | 86% | 97% | 100% |



Since 2016, the Special Master's expert has examined the specific concerns and problems noted within SREs in an attempt to highlight the areas of most concern that could be targeted for improvement and intervention. The Special Master's expert has consistently found deficiencies in suicide risk evaluations due to poor risk justification, underestimation of suicide risk, and non-individualized treatment planning. The table that follows includes the percentage of cases where specific concerns/problems were noted. The variability over the previous five years indicated that there has been no sustained improvement in the quality of these evaluations despite considerable training and effort on the part of CDCR.

---

Master's expert's review of the contents of CDCR's suicide case reviews for 2015 indicated that there were 21 cases where suicide risk evaluations were completed. For purposes of consistency, the percentage included here (48 percent) is based on CDCR's findings in their 2015 report. The Special Master's expert's review of CDCR's 2015 suicide case reviews revealed that there were 14 cases (67 percent) where CDCR staff explicitly noted concerns with the suicide risk evaluations in the suicide case review. It is unclear why CDCR's report did not include four problematic cases in their calculation.

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| **Failure to Identify Known Risk Factors** | 33% | 17% | 61% | 75% | 77% |
| **Risk Level not Clearly Derived from the Evaluation or Available Information** | 56% | 43% | 68% | 44% | 69% |
| **Other Problems[21]** | 56% | 63% | 64% | 66% | 65% |



Problems related to the proper completion of suicide risk evaluations is known to CDCR mental health leadership and they have attempted to address concerns through changes in forms, increased training, routine auditing, and individual mentoring of clinicians.  At the time of this report, CDCR mental health leadership was working on plans to update the suicide risk evaluation form, process and associated trainings.

### 2. Mental Health Assessments

Between 2013 and 2020, mental health assessments (MHAs) were completed with 226 of the individuals who died by suicide (95 percent).  Of those, 127 cases, or 56 percent, evidenced problems related to the completion of mental health assessments. These problems included failure to complete assessments as required, assessments which failed to consider available clinical information, unresolved diagnostic concerns, assessments held in nonconfidential settings, poor quality assessments, incomplete assessments, and assessments that were not timely, among others.

---

[21] Other suicide risk evaluation concerns included incomplete suicide risk evaluations, including blank sections, pulling forward inaccurate information on the electronic health record, risk evaluations that were not appropriately updated, no identification or description of protective factors, poorly written narratives, significant omission of information, cell-front evaluations without rationale, lack of a disposition and over-reliance on patient self-report, among others.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentage of Total Cases with Problematic MHAs** | 63% | 74% | 46% | 56% | 53% | 41% | 42% | 58% |
| **Percentage of Applicable Cases with Problematic MHAs** | 66% | 74% | 57% | 56% | 57% | 44% | 44% | 67% |



### 3.    Treatment Planning

CDCR has recognized the challenges their mental health staff have with treatment planning and safety planning.  Specifically, efforts in training specific to treatment planning within the MHCBs and safety planning have been a focus of improvement efforts over the past few years.  In 2019 and 2020, training was delivered to all institutions with MHCBs regarding treatment plan development and audits were completed routinely.  Additionally, in 2019, CDCR initiated training for staff focused on safety planning.  During a recent audit, the Special Master's suicide prevention expert found deficiencies in safety planning at the vast majority of institutions that were assessed.  At the time of this writing, a safety planning policy was being developed and there were pilots being conducted across a sample of CDCR facilities testing an updated safety plan template.

Of the individuals who died by suicide between 2013 and 2020, 192, or 81 percent, were noted to have treatment plans developed at some point during their incarceration, either in the form of Interdisciplinary Treatment Team (IDTT) master treatment plans or safety plans developed to mitigate suicide risk.  Of those individuals with documented treatment plans, 125, or 65 percent,

20

were noted to have concerns or problems within their treatment plans. These problems included failure to complete a treatment plan as required, failure to identify the patient's mental health needs within the treatment plan despite those needs being documented elsewhere, poor goal-setting, lack of interventions to treat the patient's identified needs, failure to document diagnoses, failure to justify changes in diagnoses, failure to update the treatment plans in light of changes in patient functioning, inconsistencies within the plan, failure to develop an adequate safety plan, lack of required membership in the IDTT, and failure to create individual plans of care (IPOCs).

The percentage of cases with problematic treatment plans or concerns regarding treatment planning by year are included in the table and chart that follow. Despite considerable effort and training of staff, problems persist in most cases year after year.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentages of Total Cases with Treatment Planning Concerns** | 47% | 65% | 29% | 59% | 53% | 50% | 53% | 65% |
| **Percentages of Applicable Cases with Treatment Planning Concerns** | 56% | 65% | 44% | 59% | 70% | 68% | 65% | 91% |



Suicides with Concerns Related to Treatment Planning by Year

### 4.      Treatment Services

From 2013 through 2020, 209 individuals, or 88 percent, were identified as requiring treatment interventions, either related to routine treatment for mental health needs or interventions to reduce the risk for suicide.  The reviews revealed that, in 134 of these cases, or 64 percent, there were problems related to the delivery of mental health treatment.  These problems included failure to provide interventions as outlined in the treatment plan/safety plan or as required by the *Program Guide*.  Additionally, there were failures in documenting treatment interventions and treatment progress, along with treatment interventions failing to address the patient's target symptoms.

The percentage of cases with identified problems related to the delivery of treatment by year are included in the table and chart that follow and consistently revealed that treatment concerns existed in the majority of cases.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentages of Total Cases with Treatment Concerns** | 60% | 70% | 50% | 59% | 67% | 47% | 53% | 52% |
| **Percentage of Applicable Cases with Treatment Concerns** | 62% | 70% | 57% | 59% | 83% | 55% | 65% | 70% |



### 5.      Higher Level of Care Needs

In 95 cases, or 40 percent of those who died by suicide between 2013 and 2020, there was evidence of a failure to refer the patient to a higher level of care (HLOC) when clinically indicated or required by the *Program Guide*.  In many cases, findings resulted from the fact that, despite the patient meeting criteria for consideration of referral to a higher level of care, the IDTT failed to

refer the individual. In some cases, there was an inappropriate reduction in the patient's level of care without clear justification or rationale, including a few cases where there appeared to be premature, inadequately justified removal from MHSDS.

The percentage of cases with identified problems related to a failure to refer the patient to a HLOC when clinically indicated or required by the *Program Guide* by year are included in the table and chart below.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentages of Cases with Problems Regarding HLOC needs** | 20% | 39% | 37.5% | 67% | 53% | 18% | 42% | 48% |



refer the individual. In some cases...

Percentage of Cases with Failures to Place in HLOC

### 6.    Inpatient Placement Within Past Year

Since 2015, the Special Master's expert has been reviewing deaths by suicide to determine the proximity of death to any recent psychiatric inpatient placement. Between 2015 and 2020, 184 individuals died by suicide. Sixty-eight of those 184, or 37 percent, had been placed at an inpatient level of care (LOC) during the previous 12 months. As can be seen from the data by year in the table and chart that follow, this group has consistently represented close to or in excess of one-third of those who died by suicide. The concern highlighted by this fact is that these individuals were known to have serious mental health concerns and were transferred to the highest level of care available within CDCR within the prior year and yet died by suicide.

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| **Percentage of Suicides in an Inpatient LOC within Previous 12 Months** | 33% | 48% | 33% | 32% | 37% | 39% |



Between 2013 and 2020, eight individuals who died by suicide, or three percent, were either housed in an inpatient setting or receiving services at the inpatient level of care[22] at the time of their suicidal acts.  Deaths by suicide in the inpatient setting were absent for three of the previous eight years but have consistently occurred within the past four years, with ten percent of those who died by suicide dying while at an inpatient level of care in 2020.  Of note, responsibility for the delivery of inpatient care within CDCR shifted from the Department of State Hospitals (DSH) to CDCR in July 2017.  Since that time, there have been between one and three deaths by suicide per year among those at the inpatient level of care, all within CDCR inpatient settings.  No suicides occurred within DSH hospitals during that time period.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentage of Suicides at Inpatient LOC or Setting at the Time of the Suicidal Act** | 3% | 4% | 0% | 0% | 7% | 3% | 3% | 10% |

---

[22] In 2019, one patient who died by suicide was housed in an inpatient setting but had been discharged two days prior to his death by suicide.  In 2020, one patient who had been placed at the inpatient level of care had not yet been transferred and was residing in an EOP setting.



Significant attention has been paid to the appropriate monitoring of patients who were recently discharged from an inpatient setting. Monitoring of patients discharged from an MHCB level of care includes 30-minute checks by custody staff for at least the first 24 hours and up to 72 hours depending on the determination of a mental health clinician. Additionally, patients discharged from any inpatient setting are required to be evaluated by a mental health clinician daily for the five days following discharge. Ongoing challenges related to this monitoring have been noted by the Special Master's suicide prevention expert and CDCR has focused on auditing compliance with follow-up expectations routinely. Despite this fact, 15 individuals, or nine percent, of the 160 deaths by suicide that occurred between 2016 and 2020 happened within one week of a patient's discharge from an inpatient setting, ranging from one to four cases per year.

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| **Percentage of Suicides within One Week of Inpatient Discharge** | 4% | 10% | 6% | 16% | 10% |



E.      **Emergency Response Factors**

This section examines staff response after discovery of an incarcerated individual following a suicidal act.  Included here are any identified issues related to Cardiopulmonary Resuscitation (CPR)/Automated External Defibrillator (AED) use and other identified problems with the emergency response process.

Between 2013 and 2020, 103 cases, or 43 percent, evidenced concerns related to emergency response procedures.  In addition to concerns related to the application and/or procedure of CPR/AED, concerns included delays in activating 9-1-1, delays in providing emergency care, delays in activating personal alarms, failure to arrive at the scene with the full cut-down kit, failure to properly support the individual's body during cut-down from hanging, poor or conflicting documentation of emergency response procedures, delays in the arrival of nursing staff to the scene, delayed cell entry, placement of a supportive collar on a patient while the noose was still present, failure to recognize that a string was across the individual's neck during emergency medical procedures, and failure on the part of staff to don required personal protective equipment.

The percentage of cases with identified problems related to emergency response procedures by year are included in the table and chart below.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentage of Suicides with Emergency Response Issues** | 20% | 22% | 42% | 59% | 60% | 41% | 45% | 55% |



Since 2018, the Special Master's expert has reported on cases in which there were concerns related to the application of restraints/handcuffs by custody staff prior to the initiation of emergency care.[23]  The concerns in these cases arose from the individuals not being housed in high security

---

[23] California Code of Regulations Title 15, Section 3268.2(b) states, "Mechanical means of physical restraint may be used only under the following circumstances: (1) When transporting a person between locations. (2) When a person's history, present behavior, apparent emotional

settings and/or the individuals being nonresponsive during the application of restraints/handcuffs. In 2020, four cases, or 13 percent, included concerns related to the use of restraints/handcuffs prior to the implementation of emergency procedures; in 2019 there were three cases (8 percent); and in 2018 there were five cases (15 percent). In all, 12 percent of the cases of those who died by suicide between 2018 and 2020 evidenced concerns related to the use of restraints/handcuffs prior the implementation of emergency procedures.

### F.     Foreseeability and Preventability

The Special Master's expert consistently provided an opinion regarding the foreseeability and preventability of the deaths by suicide each year between 2013 and 2020. The terms "foreseeable" and "preventable" are used in this report as they have been in previous reports authored by the Special Master's expert. They describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgement, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides. The definitions below are the court-approved definitions of foreseeable and preventable.

> The term "foreseeable" refers to those cases in which available information about an inmate indicates the presence of substantial or high risk for suicide, and requires reasonable clinical, custodial, and/or administrative intervention(s). Assessment of the degree of risk may be high, moderate, or low to none. This is an important component in determining foreseeability. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide. Interventions may include but are not limited to changes in clinical level of care, placement on suicide precautions or suicide watch, and changes in housing including utilization of safe cells and transfers to higher levels of care, as well as clinically appropriate treatment and management services which may include but not be limited to increased contacts/assessments by mental health professionals, medication management review and changes, other therapeutic interventions and measures, and/or changes in level of care, including short-term changes such as utilization of MHCBs and/or longer term level-of-care changes including transfer to DSH programs. Individuals evaluated as "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation with appropriate treatment and management by clinical staff of the potential for self-injury and/or suicidal ideation or activity.

> The term "preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required by existing policy, reflected in the Program Guide and/or local operating

---

state, or other conditions present a reasonable likelihood that he or she may become violent or attempt to escape. (3) When directed by licensed health care clinicians, to prevent a person from attempting suicide or inflicting injury to himself or herself."

procedures.  Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff. The emergency response is reviewed not only by DCHCS mental health staff but also by DCHCS medical staff as part of the death review summary process, as well as by this reviewer.

The table and chart below include the Special Master's expert's findings of the percentage of cases determined to foreseeable, preventable or both for the years of 2013 through 2020.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Foreseeable** | 23% | 52% | 54% | 59% | 43% | 32% | 37% | 29% |
| **Preventable** | 63% | 65% | 79% | 85% | 77% | 53% | 61% | 58% |
| **Either Foreseeable or Preventable** | 67% | 74% | 79% | 89% | 77% | 53% | 61% | 58% |



### G.    Individual Suicide Case Reviews and Quality Improvement Plans

CDCR mental health leadership authored SCRs for every individual who died by suicide between 2013 and 2020.  Each year, these SCRs were reviewed by the Special Master's expert and were noted to be comprehensive, including important and critical information regarding the incarcerated individuals' mental health and criminal histories, institutional functioning, stressors that may have led to the suicides, and critical analysis regarding causative factors. These SCRs also provided recommendations for improvements and corrective actions regarding identified issues in the course of the care of the individual who died by suicide. Since 2015, experts from the Special Master's team have attended suicide case review meetings and provided immediate feedback during discussions of each case.  During completion of the Special Master's expert review of suicides annually, completed SCRs were examined in detail.  Between 2013 and 2020, the adequacy of these SCRs was assessed along with the quality improvement plan recommendations generated from these reports.  With the exception of 2015, when the quality of the SCRs was assessed

internally by CDCR leadership, the Special Master's expert has opined individually on each CDCR SCR.

From 2013 through 2020, 168, or 71 percent, of the 237 SCRs produced by CDCR were determined to be without significant concerns and were of adequate quality. The table that follows presents the percentages by year.

| | 2013 | 2014 | 2015[24] | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Percentage of SCRs Determined to be of Adequate Quality** | 40% | 22% | 75% | 63% | 73% | 76% | 97% | 100% |

Since 2016, the Special Master's expert has examined the individual concerns and problems identified within the CDCR SCRs that required development of quality improvement plans (QIPs). Over the past five years, 152 out of 160 cases, or 95 percent, have required the development of QIPs to address identified deficiencies, policy violations, or problematic practices determined to have had an impact on the death by suicide or occurred proximate to the death by suicide and were thus considered relevant and in need of action to address the concern. In these 152 cases, 27 identified issues were found to have occurred in at least four of the five years and included at least five separate occurrences during the five-year time period. The table in Appendix A lists the 27 recurring issues along with the number of times QIPs were required to address the issue between 2016 and 2020 and the number of years the issue appeared as problematic.

From 2016 to 2020, 21 specific concerns, or 14 percent of all concerns requiring QIPs, were identified every year during that five-year period. More specifically, these issues were identified as requiring a QIP in 2016 and then again in at least one case of a death by suicide every subsequent year through 2020. Of more serious concern, 13 issues which required development of a QIP were present in more than one case in every year between 2016 and 2020. Of note, a number of the concerns identified have been raised elsewhere in this report and have been identified by CDCR as requiring attention and action. The requirement of a QIP signifies that CDCR leadership identified the concern within a case and found that concern to be related to the individual's death by suicide. The issue was not simply a problem identified during review of the death but was noted to have been related to the death in some way, either by its effect on the outcome or by its proximity to the individual's suicidal act. Those issues and their frequency each year are included in the table that follows.

---

[24] In 2015, CDCR leadership analyzed each SCR using a 15-item scale. CDCR reported on the presence of absence of the 15 elements in each report and concluded that out of a possible 352 different opportunities to meet these 15 elements (there were eight instances where the required item was determined to be not applicable and therefore removed from analysis), 339 were present and 13 were absent. This was determined as meaning the SCRs met "quality standards" 96 percent of the time. While it was not possible to determine the total number of SCRs that were included within the 13 items assessed to be absent, it was noted that one item (a review of the quality of suicide risk evaluations) was absent from six SCRs. As such, this conservative value was used as an indication of the number of SCRs assessed to have significant concerns.

|  | 2016 | 2017 | 2018 | 2019 | 2020 | Total Cases | % of Cases |
|---|---|---|---|---|---|---|---|
| **CPR/AED issues** | 6 | 3 | 4 | 6 | 2 | **21** | **14%** |
| **Failure to make adequate custody checks** | 5 | 5 | 5 | 6 | 2 | **23** | **15%** |
| **Disconnect between treatment and treatment plan** | 9 | 3 | 5 | 3 | 3 | **23** | **15%** |
| **Failure to conduct adequate record review** | 4 | 8 | 8 | 3 | 2 | **25** | **16%** |
| **Nursing documentation Issues** | 9 | 8 | 5 | 6 | 5 | **33** | **22%** |
| **Failure to complete a suicide risk evaluation** | 3 | 10 | 6 | 15 | 5 | **39** | **26%** |
| **Delays in 9-1-1 or alarm activation** | 11 | 14 | 5 | 9 | 9 | **48** | **32%** |
| **Inaccurate/inadequate mental health documentation** | 5 | 14 | 10 | 9 | 11 | **49** | **32%** |
| **Inappropriate LOC/Not referred to HLOC** | 3 | 13 | 8 | 17 | 12 | **53** | **35%** |
| **Communication or referral issues** | 12 | 10 | 9 | 14 | 10 | **55** | **36%** |
| **Poor safety planning** | 9 | 11 | 15 | 14 | 7 | **56** | **37%** |
| **Inadequate treatment planning** | 10 | 8 | 13 | 16 | 15 | **62** | **41%** |
| **Poor risk assessment rationale** | 12 | 12 | 14 | 18 | 9 | **65** | **43%** |

Additional concerns have been identified by the Special Master's expert related to the quality improvement process in prior years. These concerns have focused on two main areas: inadequate follow-up on the efficacy of QIPs and failure to implement QIPs secondary to ongoing investigations. The first issue has been identified for years and includes, in part, that the majority of QIPs have focused solely on training staff. QIP responses included evidence that training was provided through inclusion of the training curricula and staff attendance records in the reports on the implementation of QIPs. In addition to training, when clinical concerns were raised regarding mental health services, training was supplemented by mental health record audits and mentoring to target the specific needs of individual staff members. What was missing from these QIPs was standard follow-up tracking to ensure that training and mentoring had the desired effect over time. Simply providing training for staff has proved inadequate in several areas for at least the past eight years. Evidence for this includes the fact that despite ongoing training efforts discussed throughout this report and provided by CDCR year after year, the same problems persist. QIPs are effective when they include examination of the problem and identification of the root cause of the concern. Only when the cause of the concern is identified can a plan be developed for targeting the problem through a quality improvement plan. When QIPs are ineffective, as evidenced by the same problem occurring time and again, standard quality improvement processes include a reexamination of the root cause of the issue, not continued implementation of the same failed QIPs year after year. There is ample evidence that training does not appear to fully address the concerns associated with deaths by suicide that have been identified year after year.

The second identified concern is related to the fact that, between 2017 and 2019, 24 cases or 24 percent of the 102 cases for those who died by suicide during these years, included QIPs that could

not be developed secondary to internal investigations.  In these cases, the suicide reports noted that QIPs could not be developed nor implemented secondary to investigation requests being submitted to the Office of Internal Affairs (OIA) for possible staff misconduct.  The Suicide Prevention and Response Unit (SPRU) reported that Division of Adult Institutions (DAI) had one year to close an investigation regarding alleged custody misconduct and health care had three years.  It was reported that the SPRU tried to periodically follow up with facilities to receive the subsequent memorandum regarding completed investigations. To date, these efforts had not been successful and Wardens had not been submitting the findings to either the SPRU or DAI.  CDCR previously responded to these concerns by asserting that the OIA investigation was the QIP.  It is not clear how this can be the case.  If an OIA investigation reveals staff misconduct, lack of proper procedures, faulty training, or some other deficiency, the QIP would be the plan developed secondary to the findings of the investigation, not the investigation itself.  The quality improvement process should include the resolution of identified issues.  If an OIA investigation resulted in a finding and a subsequent corrective action, those should be included in the quality improvement process for the identified issue and reported back to CDCR mental health leadership for tracking over time.

## IV.   Conclusion

Over the previous eight years, CDCR has engaged in a number of efforts to reduce deaths by suicide within their institutions.  These efforts have included numerous trainings, updated processes, mentoring, auditing, monitoring, and tracking as well as the establishment of committees, workgroups, and specific mental health staff positions at the institutional, regional and headquarters levels to address suicide prevention.  For example, CDCR has recently engaged in a number of suicide prevention initiatives including, but not limited to, quality management processes, establishment of four regional Suicide Prevention and Response Focused Improvement Team (SPRFIT) clinical positions, updating the safety planning form, updating the suicide risk evaluation form, performance tracking, establishment of a workgroup to redesign the SPRFIT processes, and updating the monitoring process following MHCB discharges.  Suicide prevention video-conferences are held monthly, led by a senior clinician from headquarters to review suicides and trends in suicides within the department, brief staff on new or revised policies and procedures, notify staff of suicide prevention trainings and resources, discuss findings from the Special Master's suicide prevention expert's tours of institutions, and provide training.  Annual suicide summits were expanded to include three days between 2017 to 2021 and included institutional chiefs of mental health, SPRFIT coordinators, custody leadership, nursing leadership, and mental health headquarters staff.  Topics included the definition of self-harm, the suicide attempt database, review of SPRFIT duties, best practices, a review of trends in suicide within the department, new initiatives, quality improvement processes, suicide prevention audit items, psychotropic medications used to reduce risk of self-harm, and the Special Master's suicide prevention expert tour findings.

Despite CDCR's ongoing, considerable efforts, suicides by incarcerated individuals continue to be a serious concern.  The foregoing discussion of factors related to deaths by suicide has resulted in the following conclusions regarding suicide prevention efforts.

- The implementation of CDCR's suicide prevention policy and the *GuardOne* system for monitoring incarcerated individuals housed in segregated settings appeared to have

reduced the percentage of suicides in segregated settings.  However, the relative percentage of deaths by suicide in segregation was higher than expected given the overall percentage of incarcerated individuals housed in segregated settings, supporting the high-risk nature of these environments.

- The percentage of cases which revealed concerns related to custody checks/nursing rounds has decreased in the years since 2015.

- Analyses revealed that between 26 and 38 percent of the incarcerated individuals whose histories are positive for traumatic experiences have received treatment or a diagnosis related to the experience of trauma.  Research with incarcerated populations has established a relationship between trauma and suicide/suicidal behavior.  Increasing staff awareness of this relationship may prove beneficial in the reduction of suicides.

- Continued challenges in the completion of mental health assessments have been evident over the previous eight years.  CDCR is aware of these challenges and was enhancing training related to mental health assessments at the time of this report.

- Findings revealed a concern with respect to the percentage of individuals with histories of psychiatric inpatient placements in the year prior to their deaths, those discharged from inpatient levels of care in the week prior to death by suicide, and deaths by suicide among those receiving inpatient level of care services.  A review of care provided to patients recently discharged from inpatient settings and improved safety planning for these individuals appears warranted.

- Failure to refer individuals to a higher level of care when indicated has been a problem over the previous eight years, evidenced in 35 percent of the cases.  For the past two years, these failures have been present in over 40 percent of the cases of those who died by suicide.

- Issues related to personal safety have been significant enough to warrant specialized housing for nearly 40 percent or more of those who died by suicide during the previous four years.  It appears that issues related to personal safety may warrant consideration in the formulation of risk for suicide.  It was reported that CDCR is working to address this issue.

- The QIP process would be greatly enhanced by the inclusion of an expectation that the efficacy of plans be measured over time, to include plans enacted following OIA investigations.  It was reported that CDCR has initiated a process to measure the efficacy of quality improvement initiatives, yet the impact of that process has not yet been realized relative to suicide prevention.

## V.    Recommendations

Beyond the conclusions noted above, two serious concerns warranted formal recommendations regarding suicide prevention practices within CDCR.

- CDCR clinicians struggle with the identification of risk factors that impact suicide, determination of the patient's level of risk as derived from identified risk factors, and documentation of appropriate rationale for risk level determinations. Training, mentoring and supervision do not appear to have adequately addressed the concerns. The suicide risk assessment instrument and process should be revised, and the Special Master's expert is aware that CDCR has previously attempted modifications to improve the assessments and was working on additional revisions at the time of this report.

- In the majority of suicides during the previous eight years, problems related to mental health treatment planning and the delivery of mental health treatment were identified. Training and supervision completed to date do not appear to have adequately addressed the issues. The format and process for developing and implementing mental health master treatment plans as well as safety plans should be revised.

The Special Master will continue to provide support to CDCR on addressing deficiencies noted in this report. Additionally, the Special Master's experts will continue to provide guidance to CDCR during their suicide case review process, development and review of suicide-related policies and procedures, as well as quality improvement initiatives and sustainable process efforts.

Respectfully Submitted,

*/s/ Sharen Barboza, Ph.D.*

Sharen Barboza, Ph.D.

33

**APPENDIX A**

**COMMON CONCERNS IDENTIFIED AS REQUIRING A**

**QUALITY IMPROVEMENT PLAN**

**2016-2020**

| | Total Cases | Percentage of Cases | Years Identified |
|---|---|---|---|
| Inadequate staff training | 5 | 3% | 4 |
| Failure to conduct confidential contacts | 11 | 7% | 4 |
| Failure to take pressure off body/improper cut down | 11 | 7% | 5 |
| Failure to provide appropriate property/privileges | 12 | 8% | 5 |
| Over-reliance on patient self-report | 14 | 9% | 5 |
| Psychiatric technician rounds not completed/inaccurate | 14 | 9% | 5 |
| Cell/structural/safety issues | 15 | 10% | 4 |
| Poor/conflicting emergency response documentation | 16 | 11% | 4 |
| Failure to update mental health assessments | 16 | 11% | 5 |
| Incomplete five-day follow ups | 16 | 11% | 5 |
| CPR/AED Issues | 21 | 14% | 5 |
| Failure to arrive at scene with entire cut-down kit | 21 | 14% | 5 |
| Medication Issues | 21 | 14% | 5 |
| Failure to make adequate custody checks | 23 | 15% | 5 |
| Disconnect between treatment and the treatment plan | 23 | 15% | 5 |
| Failure to conduct an adequate record review | 25 | 16% | 5 |
| Referral or mental health contact timelines not met | 27 | 18% | 4 |
| Nursing documentation issues | 33 | 22% | 5 |
| Failure to complete a suicide risk evaluation | 39 | 26% | 5 |
| Delays in 9-1-1 or alarm activation | 48 | 32% | 5 |
| Inaccurate/inadequate mental health documentation | 49 | 32% | 5 |
| Inadequate risk determination | 52 | 34% | 4 |
| Inappropriate LOC/Not referred to HLOC | 53 | 35% | 5 |
| Communication or referral problems | 55 | 36% | 5 |
| Poor safety planning | 56 | 37% | 5 |
| Inadequate treatment planning | 62 | 41% | 5 |
| Poor risk assessment rationale | 65 | 43% | 5 |

**APPENDIX B**

**SPECIAL MASTER'S EXPERT'S**

**CURRICULA VITAE**

## Sharen E. Barboza, Ph.D., CCHP-MH, CiWPP
**Licensed Clinical Psychologist (NY 015436/FL PY9637)**

### EDUCATION

**Fairleigh Dickinson University**, Teaneck, New Jersey

*Ph.D., Clinical Psychology* — 9/2001

Dissertation — 2/2001
Discriminant validity of the Abel Screen for Sexual Interest in juvenile sex offenders who admit and deny their offenses

**Tufts University**, Medford, Massachusetts

*M.S., Experimental Psychology* — 5/1994

*B.S., Psychology*, Cum Laude, Magna Cum Laude en thesi — 5/1992

### CERTIFICATIONS

**Certificate in Wholebeing Positive Psychology**

*Wholebeing Institute* — 9/2019

### HONORS/AWARDS

**2018 B. Jaye Anno Award of Excellence in Communication**

*National Commission on Correctional Health Care* — 10/2018
This award pays tribute to innovative, well-executed communications that have had a positive impact on the field of correctional health care, or to individuals for bodies of work. The award is named after NCCHC's cofounder and first vice president. https://www.ncchc.org/excellence-in-communication-2018

### WORK EXPERIENCE

**Correctional Mental Health Consultant/Expert/Trainer**

*Barboza Consulting, LLC* — 5/2013-Present
Provide consultation to correctional systems on behavioral and mental health services. Conduct a comprehensive analysis of current services and programs, comparing those to national standards. Offer training for clinical and correctional staff on the implementation of behavioral health programs and services including self-injury reduction, suicide prevention, managing mental illness in corrections, correctional stress/burnout, and other topics as requested. Provide expert witness evaluation, consultation, and opinion.

***Court Appointed Expert, Correctional Mental Health*** (3/2020 - present). United States District Court of the Eastern District of California – Ordered by Honorable Kimberly J. Mueller, Chief United States District Judge, for a class action lawsuit, Coleman et. al vs. Newsom et. al. As a member of a multi-disciplinary team, provide expert consultation to the Special Master, Mathew A. Lopes, Esq., as part of an ongoing monitoring process of the California Department of Corrections and Rehabilitation and Department of State Hospitals mental health system.

**Vice President**
**Mental Health/Clinical Operations – Mental Health**
*MHM/Centurion*, Vienna, Virginia                                                    9/2014-4/2020
> Supervisors:  Jane Haddad, Psy.D.; Julie Mueller, RN, MBA, Johnny Wu, M.D.
> Oversaw national clinical operations of mental health services provided by the company.  Supervised the Clinical Operations mental health team, audited clinical services and contract/standards compliance of mental health services being provided within correctional and forensic settings.  Created and collaborated on the development of therapeutic program curricula for seriously mentally ill individuals, individuals who engage in self-injury, and sexual offenders.  Developed and delivered training programs to mental health, medical, and corrections professionals.  Provided consultation to correctional systems regarding mental health, behavior change and sexual offender programming.  Assisted with new business development.

**Director of Clinical Operations**
*MHM Services, Inc.*, Vienna, Virginia                                            10/2008-9/2014
> Supervisor:  Jane Haddad, Psy.D.
> Served as a director of the clinical operations team, overseeing the auditing of clinical services and contract compliance of mental health services being provided within correctional and forensic settings.  Created and collaborated on the development of therapeutic program curricula for seriously mentally ill individuals, individuals who self-injure and sexual offenders.  Developed and deliver training programs to mental health, medical health, and corrections professionals.  Provided consultation to correctional systems regarding mental health, behavior change and sexual offender programming.  Assisted with new business development and supervision of clinical operations staff.

**Senior Clinical Operations Specialist**
*MHM Services, Inc.*, Vienna, Virginia                                            2/2007-10/2008
> Supervisor:  Jane Haddad, Psy.D.
> Served as a senior member of the clinical operations team, auditing clinical services and contract compliance of mental health services being provided within correctional and forensic settings.  Created and collaborated on the development of therapeutic program curricula; developed and delivered training programs to mental health, medical health, and corrections professionals; and provided consultation to correctional systems regarding mental health and sexual offender programming.

**Director, Sex Offender Treatment Program**

*NYS OMH & Central New York Psychiatric Center*, Marcy, New York                    11/2005-2/2007

> Deputy Commissioner: Richard Miraglia, C.S.W.
>
> Executive Director:  Donald Sawyer, Ph.D., MBA
>
> Served as clinical expert consultant in the development of the Sex
> Offender commitment initiative in New York.  Consulted to the Division of
> Forensic Services in the development of the comprehensive evaluation and
> treatment process for civilly committed sex offenders in New York State.
> Consulted to the Commissioner of OMH and the Department of Budget
> regarding this initiative.  Provided weekly consultation, staff training, and
> clinical supervision to multidisciplinary teams at Manhattan Psychiatric
> Center and Kirby Forensic Psychiatric Center.   Made contacts and visited
> with civil commitment programs in other states and developed an
> inpatient treatment program for this population including intake
> assessment process and outcome measurements.  Participated in all
> aspects of program development: consulting on construction, developing
> and implementing policy, hiring staff, creating staff training programs,
> coordinating risk assessments, supervising clinical and direct care staff,
> preparing clinicians for court testimony, and overseeing community
> reintegration planning

**Chief Psychologist**

*Central New York Psychiatric Center*, Marcy, New York                    1/2004-2/2007

> Executive Director:  Donald Sawyer, Ph.D., MBA
>
> Served as Chief of Psychology Department for a state psychiatric facility
> treating patients incarcerated within New York State; developed,
> monitored, and maintained standards of performance for psychologists
> throughout the system; developed policies and procedures related to the
> delivery of psychological services (e.g., suicide risk assessment and
> prevention, violence risk assessment and prevention, behavioral
> management policies and programs, special housing unit (SHU) services,
> psychological assessment); provided supervision to psychologists and
> psychology student interns; developed and conducted research regarding
> initiatives and programs; coordinated system-wide risk assessment
> initiative; coordinated system-wide implementation and maintenance of
> behavioral management program; recruited and hired psychologists;
> consulted to physicians, administration, and risk managers with regard to
> public safety, accreditation, and quality of care.

**Licensed Psychologist/ Psychologist II**

*Bedford Hills Correctional Facility*, Bedford Hills, New York                    9/2001-1/2004

> Supervisors:  Carolyn Subin, Ph.D., David Stang, Ph.D.
>
> Provided individual psychotherapy to incarcerated women at a maximum
> security correctional facility; conducted assessments of suicidal and
> homicidal ideation & intent; provided mental health consultation and
> assessment to women in solitary confinement; consulted to Department of
> Corrections regarding mentally ill inmates with lengthy confinement

sanctions; provided supervision to Ph.D. level psychologists for licensure; provided mental health training to Department of Corrections staff; participated in crisis intervention and inpatient referral process.

### Sex Offender Risk Assessment Consultant
*Juvenile Sexual Offender Treatment Program*
*Westchester Jewish Community Services*, Hartsdale, New York                8/2001-10/2003
    <u>Supervisor</u>:  Kenneth Lau, CSW
    Assessed the re-offense risk for adolescents accused of committing sexual offenses within Westchester County, NY; provided pre-sentencing consultation to the courts regarding supervision and treatment needs as well as further assessments and/or agency involvement

### Director, Adolescent Sexual Abuse Program
*Iowa State Training School for Boys*, Eldora, Iowa                1/1995-8/1996
    <u>Supervisor</u>:  William Fields, Clinical Director
    Treated adolescent male offenders & victims of sexual abuse using group and individual therapy; assessed adolescents; supervised staff of 15-20 and provided training; provided sex education to delinquent male adolescents; received 175 hours of training meeting certification requirements as Sex Offender Treatment Provider for the State of Iowa. Clinical populations included: BD, LD, ADD, ADHD, Pedophilia, Oppositional-Defiant Disorder, Conduct Disorder.

## EDITORIAL DUTIES
### Health Affairs
*Reviewer*                3/2020 -Present

### International Journal of Prisoner Health
*Editorial Board Member*                10/2013-Present

### Journal of Correctional Health Care
*Reviewer*                10/2018-Present

## EXPERT WITNESS & CASE CONSULTANT

United States Direct Court; Maine
*Retained by defendant – consultation only*                2017

United States Direct Court; Western District of Wisconsin
*Retained by defendant – consultation only*                2020

United States Direct Court; Central District of California
*Retained by plaintiffs*                2021

## COMMITTEE MEMBERSHIPS/AFFILIATIONS
### Mental Health Standards Committee
*Member*

National Commission on Correctional Health Care      11/2020 - Present

**NCCHC Correctional Health Foundation**
*Board Member/Chair Elect (2021)*      4/2019-Present
National Commission on Correctional Health Care

**Education Committee**
*Member*      10/2018-Present
National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Mental Health Subcommittee/Task Force**
*Member*      1/2014-Present
National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Board of Trustees**
*Appointed Trustee*      3/2014-11/2017
National Commission on Correctional Health Care      11/2020-Present

**Mental Health Subcommittee**
*Member*      4/2013-4/2017
American Correctional Association

SPECIALIZED TRAINING

**Leading from Your Strengths:  Positive Psychology and Professional Development**
*Kripalu Center for Yoga and Health*
M. Sirois, Psy.D.      11/2017

**The Prison Rape Elimination Act: Understanding the Law and How to Meet Compliance**
*National Commission on Correctional Healthcare*
A. Moss      10/2012

**Sex Offender Treatment**
*NYS Office of Mental Health, Division of Forensic Services*
A. Schlank, Ph.D.      2/2007

**PCL-R Training**
R. Hare, Ph.D., A. Forth, Ph.D.      11/2006

**Using the Structured Risk Assessment Model to Guide Treatment Planning**
D. Thornton, Ph.D., R. Mann, M.Sc. L. Daniels, MSSW      9/2006

**Penile Plethysmography Training – Level I & Level II**
*Monarch -- Behavioral Technologies Inc.*, Salt Lake City, UT
P. Byrne, Ph.D.      6/2006

**Sex Offender Risk Assessment**

*NYS Office of Mental Health, Division of Forensic Services.*
D. Doren, Ph.D., D. Epperson, Ph.D., D. Anderson, Ph.D.                3/2006

**Legal/Ethical Issues in Mental Health**

*Specialized Training Services, Inc.*
Philip Resnick, MD                6/2004

**Risk Assessment of the Mentally Ill**

*Specialized Training Services, Inc.*
Philip Resnick, MD                6/2004

**Intensive DBT Training**

*Behavioral Tech, Inc.*
Cindy Sanderson, Ph.D.                10/2001

TEACHING EXPERIENCE

**Facilitator for Executive Manager in Correctional Healthcare Training (EMCHT)**

*National Institute of Corrections*, Aurora, Colorado                5/2014-9/2015

**Adjunct Professor**

*Hamilton College*, Clinton, New York                1/2005-5/2005

**Instructor**

*Marist College*, Goshen Extension Site, Goshen, New York                5/2001-8/2001

*Fairleigh Dickinson University*, Teaneck, New Jersey
5/1997–12/1998

**Adjunct Instructor**

*Correctional Release Center*, Newton, Iowa                8/1994-1/1995
*Des Moines Area Community College*, Ankeny, Iowa                9/1994-12/1994

PUBLICATIONS

Barboza, S., Blair, R., Cook, G., Elliott, W., and Kern, E. (2019).  *Suicide Prevention and Resource Guide: National Response for Suicide Prevention in Corrections.* Chicago, IL.  National Commission on Correctional Health Care. www.ncchc.org/suicide-prevention-plan

Boren, E. A., Folk, J. B., Loya, J. M., Tangney, J. P., Barboza, S. E. and Wilson, J. S. (2018), The Suicidal Inmate: A Comparison of Inmates Who Attempt Versus Complete Suicide.  *Suicide and Life Threatening Behavior*, 48(5), 570-579. DOI: 10.1111/sltb.12374

Folk, J. B., Loya, J. M., Boren, E. A., Tangney, J. P., Wilson, J. S., & Barboza, S. E. (in press). Differences between inmates who attempt suicide and who die by suicide: Staff-identified psychological and treatment-related risk factors. *Psychological Services.*

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Barboza, S., Wilson, J. S., Bonieskie, L., & Holwager, J. (2016). Effectiveness of a Self-Administered Intervention for Criminal Thinking: Taking a Chance on Change. *Psychological Services*, 13(3), 272-82.

Barboza, S. (2016).  Elevating personality disorders:  Changes and challenges in treating incarcerated patients.  *The International Association for Correctional and Forensic Psychology Newsletter*, 48(2), 11-12.

Disabato, D., Folk, J. Wilson, J.S., Barboza, S., Daylor, J. & Tangney, J.  (2015). Psychometric validation of a simplified form of the PICTS in low-reading level populations.  *Journal of Psychopathology and Behavioral Assessment*,38(3), 456-64.

Andrade, J.T., Wilson, J.S., Franko, E., Deitsch, J. & Barboza, S. (2014).  Developing the Evidence Base for Reducing Chronic Inmate Self-Injury: Outcome Measures for Behavior Management.  *Corrections Today*, 76(6), 30-35.

Barboza, S. & Wilson, J. (2013).  Your Patient is My Patient:  The Need for Integrated Medical-Mental Health Care for Inmates with Serious Mental Illness.  *CorrDocs*, 17(5).

Barboza, S. & Wilson, J.S. (2011).  Behavior Management Plans Decrease Inmate Self-Injury.  *Corrections Today*, 73(5).

Wilson, J. & Barboza, S. (2010). The Looming Challenge of Dementia in Corrections. *CorrectCare*, 24(2), 12-14.

Way, B. B., Sawyer, D. A., Barboza, S., & Nash, R. (2007). Inmate suicide and time spent in special disciplinary housing in New York state prison. *Psychiatric Services*, $\underline{58}$, 558-560.

Abel, G. G., Jordan, A., Rouleau, J. L., Emerick, R., Barboza-Whitehead, S., and Osborn, C. (2004). The use of visual reaction time to identify male adolescent child molesters and the frequencies of their acts. *Sexual Abuse: A Journal of Research and Treatment*, $\underline{16}$ (3), 255-265.

**PRESENTATIONS**

Barboza, S. "Understanding Personality Disorders: Practical Insights for Nurses" Workshop presented at the National Commission on Correctional Healthcare Conference, October 2019, Fort Lauderdale, FL.

Barboza, S. "Self-Injurious Behavior and Trauma Informed Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Barboza, S. "Vicarious Trauma and Self-Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Masotta, M. & Barboza, S. "Bipolar Disorder, Borderline Personality Disorder and PTSD:  Improving Diagnostic Accuracy" Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Riley, K. & Barboza, S.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Cox, J & Barboza, S.  "An In-Depth Review of NCCHC's 2015 Standards for Mental Health Services" Pre-Conference seminar at National Commission on Correctional Healthcare Conference, November 2017, Chicago, IL; October, 2018, Las Vegas, NV; April 2019, Nashville, TN and October, 2019, Fort Lauderdale, FL.

Barboza, S "Hazardous Duty:  The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare National Conference, October 2015, Dallas, TX and October, 2019, Fort Lauderdale, FL.

Barboza, S & Riley, K.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S., Andrade, J.T., & Wilson, J.S.  "Trauma in the Practice of Correctional Medicine."  Workshop presented at the American College of Correctional Physicians Fall Conference, October, 2018, Las Vegas, NV.

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients."  Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S. "The Value of Positivity in Correctional Mental Health."  Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Gibson, B., Kern, E., Barboza, S. "The National Response Plan for Suicide Prevention in Corrections."  Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S.  "Measuring Mental Health Treatment Outcomes: Building an Evidence Base" Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S. & Wilson, J.S.  "Trauma-Informed Care:  How We Can Better Support Our Patients" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S.  "CCHP-MH Exam Content Review Course" National Commission on Correctional Healthcare sponsored webinar, April 12, 2018.

Barboza, S.  "Use of Behavior Management Plans to Reduce Self-Injury."  National Commission on Correctional Healthcare sponsored webinar, February 21, 2018.

Barboza, S. "Practical Behavior Management Strategies:  Decreasing Self-Injurious Behavior" Luncheon presentation at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. "CCHP-MH Content Review Course."  Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. & Kearns, J.D. "Crisis Intervention:  Planning and Implementing Effective Strategies."  Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S & Puerini, M.  "Personality Disorder in Corrections – Affliction, Identity, Label" Workshop at the National Commission on Correctional Healthcare Conference, October 2016, Las Vegas, NV

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients" Workshop at the National Commission on Correctional Healthcare Correctional Mental Health Care Conference, July 2016, Boston, MA.

Barboza, S. Wilson, J.S., McGinty, M., and Brown, L.  "Creating Practice-Based Evidence for Mental Health Treatment in Corrections" Workshop presented at the National Commission on Correctional Health Care National Conference, October 2015, Dallas, TX.

Barboza, S "Hazardous Duty:  The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2015, New Orleans, LA.

Barboza, S. & McGinty, M.  "Practice-Based Evidence:  Creating Evidence for Mental Health Treatment in Corrections" Workshop presented at the American Correctional Health Services Association National Conference, March 2015, Orlando, FL.

Barboza, S. & Wilson, J.S.  "Hazardous Duty:  The Invisible Effects of Working in Corrections" Workshop presented at the American Correctional Health Services Association Multidisciplinary Educational Conference, March 2014, New Orleans, LA.

Barboza, S. & Ammons, L.  "How Can I Tell If It's Working:  Measuring Mental Health Treatment Outcomes."  Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Simpson, M. & Barboza, S. "Times They Are a Changing:  DSM-5 and the Impact on Corrections."  Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Wilson, J.S., Barboza, S. & Andrade, J.  "Behavior Management:  Strategies for Individual and Group Programs."  Workshop presented at National Commission on Correctional Health Care Correctional Mental Health Care Conference, July 2013, Las Vegas, NV.

Barboza, S.  "Mental Health in Corrections:  An Overview for Health Care Leaders" Workshop presented at Correctional Health Care Leadership Institute, July 2012, Chicago, IL.

Shaw-Taylor, E.; Baker, M.; Tyler, C. & Barboza, S.  "Taking a Chance on Change: In-Cell Programming Success in Maryland" Workshop offered at American Correctional Association Congress of Corrections, July, 2012, Denver, CO.

DeGroot, J.; Cadreche, M.; & Barboza, S.  "Managing Self Harm by Standardizing the Definition, Tracking its Prevalence, and Using a Behavioral Plan" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

DeGroot, J.; Thompson, J. M.; Jackson, J. & Barboza, S.  "It's Not Mental Illness, It's Just Behavior: Identifying and Treating Personality Disorders Rather Than Dismissing Them" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

Barboza, S. & Wilson, J.S.  "Evidence for the Efficacy of Behavioral Interventions in Reducing Self-Injury" Workshop offered at NCCHC Conference, May, 2011, Phoenix, AZ.

Barboza, S. & Wilson, J.S.  "Real Results: Successful Reduction in Self-Injury in Correctional Settings."  Workshop offered at American Correctional Health Services Association Conference, April, 2011, Orlando, FL.

Barboza, S. & Wilson, J.S.  "Let's Get Practical:  Real Answers to Inmate Self-Injury."  Workshop offered at North American Association of Wardens and Superintendents Conference, April, 2011, Baton Rouge, LA.

Barboza, S. & Wilson, J.S.  "Behavior Management – Effective Reduction in Self-Injury."  Workshop offered at American Correctional Association Winter Conference, February, 2011, San Antonio, TX.

Wilson, J.S. & Barboza, S.  "Addressing the Rising Prevalence of Dementia in Inmate Populations" Pre-Conference Seminar offered at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Wilson, J.S.; Barboza, S.; & Andrade, J.  "Ending It All:  Data Informed Suicide Prevention."  Presentation at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Barboza, S. & Wilson, J.S.  "Bringing Recovery Inside the Walls: Recovery-Oriented Treatment Plans."  Presentation at CMHS National GAINS Center Conference, February, 2010, Orlando, FL.

Wilson, J.S. & Barboza, S.  "In Search of Solutions:  Does Behavior Management Work?"  Presentation at ACHSA Multidisciplinary Professional Development Conference, February 2010, Portland, OR.

Barboza, S.  "Mental Health Risk Management."  Invited speaker, Academy of Correctional Health Professionals Regional Seminar, June, 2009, Farmington, CT.

Barboza, S.  "Mental Health Risk Management."  Invited speaker, Academy of Correctional Health Professionals Regional Seminar, May, 2009, Fairfax, VA.

Andrade, J. T. & Barboza, S.  "Taking a Chance on Change: Treating Offenders in Restricted Housing."  Presentation at Mental Health in Corrections Conference, Forest Institute sponsored, April, 2009, Kansas City, MO.

Barboza, S.  "Prison Rape Elimination Act & Draft Standards:  Implications for Mental Health Practice."  Presentation at Caulking the Seams of Continuity Conference, Drexel University Behavioral Healthcare Education, December 2008, Grantville, PA.

Barboza, S.  "Documenting Progress:  Writing Good Progress Notes Based on Good Treatment Plans."  Presentation at Unlock the Mystery Conference, Indiana Department of Corrections, June 2008, Indianapolis, IN.

Wilson, J.S., and Barboza, S. "Autonomy, Safety, and Connection:  Ethical Challenges in Working with Self-Injurious Inmates" Presentation at Mental Health in Corrections Consortium Symposium, April 2008, Kansas City, MO.

Barboza, S. "Strategies for Modifying Programming for Inmates Significantly Impaired by Mental Illness" Presentation at National Conference on Correctional Health Care, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE sponsored, October 2007, Nashville, TN.

Abel, G. G., Barboza-Whitehead, S., & Rouleau, J. L. "Usefulness of Visual Reaction Times with Adolescents." Paper presentation at Association for the Treatment of Sexual Abusers Conference, October 2003, Saint Louis, MO

Barboza-Whitehead, S., Abel, G. G., & Reddy, L. A. "A Model for Discriminating Juvenile Sex Offenders Who Deny from Those Who Admit Using the Abel Screen for Sexual Interest."  Poster presented at Association for the Treatment of Sexual Abusers Conference, September 1999, Lake Buena Vista, FL

**POSTER**

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Bonieskie, L.,… Barboza, S. & Wilson, J. S. (2017, November). Effectiveness of a self-administered intervention for criminal thinking among inmates in restrictive housing. Poster to be presented at the Annual Meeting of the Association for Behavioral and Cognitive Therapies, San Diego, CA.

**APPENDIX C**

**ACRONYMS AND ABBREVIATIONS**

## ACRONYMS AND ABBREVIATIONS

3CMS:               Correctional Clinical Case Management System

AED:                Automated External Defibrillator

APP:                Acute Psychiatric Program

ASU:                Administrative Segregation Unit

CAP:                Corrective Action Plan

CCHCS:              California Correctional Health Care Services

CDCR:               California Department of Corrections and Rehabilitation

CPR:                Cardiopulmonary Resuscitation

CTC:                Correctional Treatment Center

DAI:                Division of Adult Institutions

DCHCS:              Division of Correctional Health Care Services

DSH:                Department of State Hospitals

ECF:                Electronic Case File

EOP:                Enhanced Outpatient Program

FIT:                Focused Improvement Team

GP:                 General Population

HLOC:               Higher Level of Care

ICF:                Intermediate Care Facility

IDTT:               Interdisciplinary Treatment Team

| | |
|---|---|
| IPOC: | Individualized Plan of Care |
| ISUDT: | Integrated Substance Use Disorder Treatment |
| LOC: | Level of Care |
| LTRH: | Long-Term Restricted Housing |
| MAT: | Medication-Assisted Treatment |
| MHA: | Mental Health Assessment |
| MHCB: | Mental Health Crisis Bed |
| MHSDS: | Mental Health Services Delivery System |
| NSSI: | Non-Suicidal Self-Injury |
| OHU: | Outpatient Housing Unit |
| OIA: | Office of Internal Affairs |
| PIP: | Psychiatric Inpatient Program |
| PSU: | Psychiatric Services Unit |
| PTSD: | Posttraumatic Stress Disorder |
| QIP: | Quality Improvement Plan |
| RC: | Reception Center |
| SA: | Suicide Attempt |
| SCR: | Suicide Case Review |
| SCRC: | Suicide Case Review Committee |
| SHU: | Security Housing Unit |
| SMHP: | Statewide Mental Health Program |

SNY:                    Sensitive Needs Yard

SPRFIT:                 Suicide Prevention and Response Focused Improvement Team

SPRU:                   Suicide Prevention and Response Unit

SRE:                    Suicide Risk Evaluation

STRH:                   Short-Term Restricted Housing