# EXHIBIT A

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                          GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



April 7, 2022

Paul Mello, Esq.
Samantha Wolff, Esq.
Hanson Bridgett
425 Market Street, 26th Floor
San Francisco, CA 94105

*VIA EMAIL ONLY*

RE:      Updated CDCR Data Activation Schedule

Dear Mr. Mello and Ms. Wolff:

Attached please find CDCR's updated Data Activation Schedule.

Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney
Office of Legal Affairs
California Department of Corrections and Rehabilitation

UPDATED CDCR DATA ACTIVATION SCHEDULE

April 7, 2022

I.    EXECUTIVE SUMMARY

Since Defendants filed the most recent Data Activation Schedule on February 2, 2022, progress has significantly slowed. Indicators are not being certified by the Special Master. New requirements are being imposed on the process. And as a result, the cushion built in to allow completion of this project by December 2023 has been cut in half. In sum, there is a significant risk we will miss our target date.

The February 2 activation schedule estimated that 17-18 indicators would have completed all the data remediation steps by now. But, as of March 30, 2022, the Special Master's Data Expert has only certified one indicator after working with CDCR for two years. It is unclear if the Special Master has certified this indicator. Consequently, the parties are 2.8-month behind schedule for verifying indicators. Moreover, while incremental pre-certification progress for all of the provisionally approved key indicators continues to be ahead of schedule, that progress has decreased from 5.1 months ahead of schedule (as of December 31, 2021) to only 2.5 months. Several new delays and ongoing contingencies contributed to slower progress over the past three months.

The most significant delay impacting the activation timeline over the past three months occurred when the project transitioned to the new pilot data remediation plan on February 2, 2022. The steps to achieve Data Remediation and the order in which they are completed were changed to mitigate contingencies created by the Special Master, such as the delays created by the 36-step verification process and the Special Master's decision to discontinue incremental written feedback. The pilot data remediation plan was designed to avoid delays by collapsing unnecessary steps and streamlining the review process. As of March 30, 2022, the pilot data remediation plan has had mixed success in that it has increased transparency but not efficiency.

Additional risks of delay identified since the February 2 filing include the Special Master's Data Expert's stated need for live data collection during Continuous Quality Improvement (CQI) Tours before completing data remediation. CDCR and the Special Master's team have identified a mitigation plan to avoid delays associated with the need for live data collection and the contingency specified in the previous filing regarding incremental feedback to the CQI Guidebook. Although efforts will be made to mitigate those delays, separate delays were discovered when CDCR identified several new subcomponents (nine glossary items and data elements) were identified as necessary to document the provisionally approved key indicators fully. These new subcomponents were added to the review process extending the overall timeline.

Given the ongoing number of delays and challenges, necessary revisions and plans to mitigate these delays, and significant risks of further delay uncovered in the past six months, CDCR believes regular 90-day updates to the Court are essential and should continue. Data remediation is a stated priority for the parties and the Special Master, and regular updates from CDCR will ensure the process remains transparent and focused on timely completion. Regular updates allow the Court to be apprised of continuing or new contingencies and areas in which the parties need guidance from the Court. At the last status conference, CDCR indicated that concerns remained about the final step in the data remediation process – certification.

CDCR also has concerns about the scope of the Data Remediation process. Since the submission of the initial preliminary Data Activation Schedule, the Data Remediation process has been expanded or revised several times, often in response to delays or challenges caused by the Special Master and Plaintiffs' counsel. In addition, numerous indicators have been paused or delayed due to recommendations, including creating new policies, expanding current policies, expanding the scope of the indicator, and revising the CQI Guidebook questions despite the Special Master's team being part of the creation and revisions to the questions since the creation of the Guidebook. The Special Master's Data Expert has also recommended expanding data collection for indicators beyond what is currently required as part of the Special Master's monitoring. Even when indicators make it through BRMR with minimal changes, it takes each indicator more than one two-hour meeting to pass through this stage. This is despite the fact that the Data Remediation process anticipates that five items (or roughly two indicators) will be completed each week. Only one indicator has completed BRMR and moved on through the process between December 31, 2021 and March 30, 2022. The Data Remediation process is not meant to be an overhaul of CDCR's data system, or the forum to wordsmith indicators, expand the scope, or add requirements above and beyond what is currently being done by the Special Master during his monitoring. Rather, it's intended to assess whether CDCR's indicators measure what they purport to measure.

Until clarity on what exactly is needed to achieve certification is provided and other concerns are addressed, CDCR reserves the right to develop an independent validation process and revise the activation schedule and related attachments.

II.    DATA REMEDIATION WORKFLOW CHANGED ON FEBRUARY 2, 2022 (PILOT PLAN)

CDCR finalized the preliminary data activation schedule in September 2021 after 18 months of working with the Special Master's team and Plaintiffs on the scope, design, purpose, and plan to achieve data remediation. At the time, CDCR noted that the preliminary timeline estimated a two-week window to verify indicators. However, a more precise estimate of the time needed to accomplish test writing could not be offered since no indicator had reached the verification step. On November 24, 2021, the Special Master's Data Expert presented an updated verification plan for the first time, which included 36 sub-steps not previously identified as part of data remediation. CDCR expressed its concern to the data expert that the preliminary activation timeline did not account for the time needed for each indicator to complete these new additional sub-steps or the time necessary for CDCR to establish the infrastructure needed to properly complete the newly identified steps (e.g., mental health and IT staff, technical resources, and an agreed-upon interdepartmental plan to complete the work). The Data Expert maintained that the updated verification plan was always a data remediation requirement, although that was not set forth in the initial Data Remediation workflow agreed to by the Special Master's Data Expert and was never expressly discussed in any data remediation meetings.

In December 2021, the Special Master unilaterally decided to discontinue all written feedback during the stakeholder review step, and began providing verbal feedback in meetings that were scheduled to address other data remediation steps. For example, on December 9, 2021, the Deputy Special Master responded to CDCR's request that we continue to receive feedback on the indicators in writing by stating that the Special Master's comments would be presented verbally in BRMR. At the December 14, 2021, Data Discussion, the Deputy Special Master further stated that the Special Master would not exchange letters with Defendants regarding stakeholder feedback on indicators. Instead, the Special Master's feedback would be provided verbally if CDCR continued to provide written responses to the stakeholder feedback. The Special Master's decision changed the Validation and Verification process his

team helped CDCR finalize in September 2021, which required that the Special Master e-mail written feedback after each stakeholder review. CDCR explained how deviating from the agreed-upon data remediation plan in this way would significantly delay the progress and create a less transparent process for all stakeholders. The Special Master's team has not provided a clear rationale for its unilateral deviation from the agreed-upon data activation process other than disliking that CDCR's Office of Legal Affairs responded to the comments and questions in writing.

**Data Remediation Plan with Annotated Contingencies**



*Figure 1 Data Remediation Plan Annotated with Contingencies identified on November 24, 2021 and December 2021*

The agreed-upon preliminary activation schedule, the steps to achieve Data Remediation, and the order in which the steps are completed are incompatible with the multiple contingencies made known to CDCR on November 24, 2021, and December 2021. The Special Master had many opportunities to identify these contingencies before the preliminary activation schedule was finalized but failed to do so or to forecast that further steps would be added to the process.

Suppose these issues had been raised during one of the 16 biweekly Data and CQI meetings leading up to the preliminary activation schedule filing. In that case, the activation schedule and timeline could have been altered to account for such contingencies from the start. In January 2022, in response to the newly identified contingencies and the delays to the timeline, CDCR engaged with all stakeholders to redesign the Data Remediation process. The updated workflow agreed upon (below) could theoretically offset and avoid delays by collapsing steps and streamlining the review process. On February 2, 2022, all stakeholders agreed to begin piloting the new workflow. It was further agreed that CDCR would replace the previous validation and verification process with the piloted process if the new workflow increased transparency and efficiency. As of March 30, 2022, the pilot workflow has increased transparency but not efficiency due to the significant amount of time spent discussing each data element. As discussed further below, the current timeline is based on the assumption that five data elements will move through each step of the process each week. However, to date, the goal has rarely been accomplished. If this pace continues, the ultimate timeline will be significantly delayed. CDCR will continue to monitor the success of the pilot process before determining if it should replace the previously agreed upon process or if further adjustments are required.

**Pilot Data Remediation Plan from February 2, 2022 – Present**



*Figure 2 Pilot Data Remediation Plan*

Pilot Plan Impact on Data Remediation Activation Schedule: The activation timeline was delayed by at least two months when CDCR and stakeholders transitioned to the Pilot Remediation Plan. The two-month delay was caused by several factors, including the necessity to pause the BRMR meetings for several weeks, re-routing indicators to complete remediation steps that were not included in the pilot plan, the time required for all stakeholders to get acclimated to the pilot plan, and time needed to set up the new verification steps. This delay can be seen in figure 4 below, in both the incremental process showing reverse progress and the delays in the verification of indicators showing verification progress is 2.8 months behind.

While the pilot data remediation process caused the most considerable delay, other factors contributed to delays in the verification process. Some of these delays were within CDCR's control (e.g., taking an extra week to two weeks to review testing results). However, the remaining delays were outside of CDCR's control, including delays created by the electronic healthcare record system, which the manufacturer must address; diverting staff to support the Unmet Bed Needs Assessment project; and the need to develop a new system to correct data entry errors discovered during the verification step.

Even if all of the verification delays could have been avoided, the activation schedule expected 17-18 indicators to be verified by March 30, 2022. Since only 12 indicators have reached the verification step, delays occurring earlier in the process (described in the contingency section below) are also contributing to the verification delays.

III.    ACTIVATION SCHEDULE HIGH-LEVEL OVERVIEW



*Figure 3 Updated Activation Timeline*

## Data Remediation Progress Report – as of March 30, 2022

| | | INCREMENTAL PROGRESS | | |
|---|---|---|---|---|
| **Group of Key Indicators** | **Remaining Work (Actual)** | **Remaining Work (Originally Projected)** | **Status** | **Early or Late** |
| All Provisionally Approved | 66% | 76% | Early | 2.5 Months |
| CDCR Key Indicators | 60% | | N/A | |

| | | VERIFIED AND CERTIFIED INDICATORS | | |
|---|---|---|---|---|
| **Stage of Work Completed** | **Remaining Indicators to Be Verified or Certified (Actual)** | **Remaining Indicators to Be Verified (Originally Projected)** | **Status** | **Early or Late** |
| CDCR Verified | 99% | 88% | Late | 2.8 Months |
| Special Master Certified | 99% | | N/A | |



*Figure 4 All Provisionally Approved Key Indicators Remaining Work (as of 3/30/22)*

<u>Incremental Progress</u> is the degree to which subcomponents of each indicator have successfully moved through the various stages of the data remediation process. As of March 30, 2022, 40% of all the steps necessary for CDCR key indicators and 34% of all the steps required for all the provisionally approved indicators to complete the data remediation process had been achieved. The incremental process for CDCR key indicators was included on a separate graph in previous filings. At that time, CDCR planned to complete all the CDCR key indicators first, as they were universally agreed upon. However, due to the multiple contingencies described below, all CDCR key indicators can no longer be processed first without creating significant delays. The incremental progress of CDCR key indicators is included in figure 4, but a visual representation of the expected timeline is no longer practical. The first chart in figure 4 shows the percent "Remaining Work (Actual)" (the percent of work remaining to be completed) and the percent of "Remaining Work (Originally Projected)" (the percent of work that should be remaining based on the

timeline set out in the initial preliminary Data Activation Schedule). Taken together, these percentages show how far ahead or behind schedule progress is. Incremental progress for all provisionally approved indicators is currently ahead of schedule (2.5 months). While this would seem to be a sign of progress, as of the February 2022 filing, CDCR was 5.1 months ahead of schedule, demonstrating that progress over the previous three months has slowed significantly.

Verified Indicators include indicators that have completed all verification steps. The second chart in figure 4 shows the percent "Remaining Work (Actual)" (the percent of work remaining to be completed) and the percent of "Remaining Indicators to be Verified (Originally Projected)" (the percent of indicators that should be remaining based on the timeline set out in the initial preliminary Data Activation Schedule). Taken together, these percentages show how far ahead or behind schedule progress is. As of March 30, 2022, only two indicators have achieved this milestone. Beginning January 1, 2022, the activation schedule anticipated 1-2 indicators completing the verification process each week. Thus by the end of March 2022, 17-18 indicators should have been verified. Due to several contingencies discussed below, that progress is approximately 2.8 months behind schedule.

Certified Indicators are reviewed and certified by the Special Master's Data Expert. On February 14, 2022, the Special Master's Data Expert stated that he certified the ASU Pre-Screen indicator. CDCR's understanding is that the Special Master's Data Expert will review and certify each indicator that goes through the Data Validation and Verification Process. The Special Master anticipates that his Data Expert will take a week to review each indicator once it passes verification. Once the Special Master's Data Expert has concluded his review, he has stated that he will provide verbal confirmation of his findings. CDCR has repeatedly requested more information from the Special Master regarding the certification process and written notification of any results.

New Estimated Timeline Completion – January 2024: The estimated completion date for all provisionally approved indicators has been extended three weeks to January 26, 2024. The three-week extension is due to two factors that impact the calculated timeline[1]. First, although the data remediation pilot plan was designed to avoid many delays, such as the four-week delay created by the 36-step verification process, it also adds one extra week to the activation schedule timeline. Second, CDCR identified nine new subcomponents that are necessary for indicators to achieve data remediation. The subcomponents include new glossary items and several additional data element pages. These nine items were not previously identified or accounted for in the timeline.


IV.      CONTINGENCIES

Several delays and challenges arose since the last Data Activation Schedule that impacted CDCR's ability to achieve interim milestones and the overall goal of data remediation within the activation schedule timeline. Whenever possible, CDCR has adopted improvement strategies and workflow efficiencies to reduce the frequency and impact of these contingencies. On multiple occasions, the Special Master's team and Plaintiffs have voiced their willingness to help reduce delays in any way they can while insisting that the delays' root cause could not be undone. Managing these delays and challenges draws staff and resources away from the planned workload necessary for indicators to complete the Data Validation and Verification Process.

---

[1] The preliminary timeline was based on a relatively straightforward calculation of the volume of work, divided by the expected completion rate of five items per week on average. Additional subcomponents or an increased number of weeks to complete the data remediation process would extend the timeline

### A.   CQI Guidebook Incremental Updates and Real-World Data Collection

On November 9, 2021, the Special Master and Plaintiffs notified CDCR that they would no longer offer a comprehensive review of the CQI Guidebook. This was surprising since CDCR sent a draft copy of the proposed CQI Guidebook changes to the Special Master's team on July 26, 2021, and to Plaintiffs on August 5, 2021, with the understanding that they would provide comprehensive feedback. In fact, the Plaintiffs provided comprehensive feedback on the CQI Guidebook on August 31, 2021, but later stated that they would provide additional feedback on the CQI Guidebook during data remediation despite having just provided numerous comments and proposed edits. CDCR explained the many ways the decision to provide incremental feedback would negatively impact the data remediation plan, (e.g., increased workload, redundant reviews, high risk of delay, and cascading changes requiring the traditional comprehensive review they were no longer willing to participate in with CDCR) but the Special Master and Plaintiffs still refused.

Then, on March 14, 2022, the Special Master's Data Expert confirmed that CQI tours must occur before completing data remediation since he said the final step of verification requires live data. This primarily affects the 51 CQI Guidebook indicators that are only used during onsite tours and are not used routinely to collect data. This requirement for CQI tours was a surprise to CDCR. During previous discussions with the Special Master's team, they emphasized the opposite (that data remediation must be completed before conducting CQI tours). Part of the Special Master's refusal to provide comprehensive feedback to the CQI Guidebook was that CDCR did not need such feedback until they were required to conduct CQI tours, which he believed should not occur until data remediation was complete. Upon learning that CQI tours are now required to complete data remediation, CDCR educated the Special Master's team on the various impacts this apparent reversal of expectation would create on the timeline (e.g., the time needed to update the CQI guidebook, tool, training materials, and offer updated training – two months; the time needed to conduct a the CQI tours – five months; and finally, the time required to complete the final verification steps – two months). When presented with CDCR's concerns, the Special Master's Data Expert indicated that collecting real-world or live data has always been a data remediation requirement for all indicators.

### Pilot Data Remediation Plan with Annotated Contingencies



*Figure 5 Data Remediation Plan Annotated with Contingencies Identified on November 9, 2021, and March 14, 2022*

Both revelations are incompatible with the September 2021 preliminary activation schedule, the February 2022 pilot plan implementation, and the Special Master's insistence that CQI tours cannot commence until data remediation is complete. While the Special Master's Data Expert confirmed that live data collection has always been a requirement, he did not ever express that this requirement included the CQI onsite indicators or inform CDCR that CQI tours are necessary to complete data remediation until after CDCR implemented plans to conduct data remediation steps and CQI tours separately.

<u>Current Plan to Mitigate these Contingencies</u>: To mitigate both delays, CDCR has developed a two-pronged approach (below). If no additional issues arise that impact this mitigation plan, this strategy could entirely eliminate the delays created by incremental feedback and the need for live data collection during CQI tours.

1. *Plan To Mitigate Delays Related To CQI Guidebook Incremental Updates* – CDCR will prioritize the 51 provisionally approved key CQI indicators that rely on data collected using the CQI Tool in the data remediation process, thus allowing the Plaintiffs and the Special Master to provide all comments on the CQI Guidebook well before the end of the data remediation timeline.  As of March 30, 2022, thirteen CQIT indicators have been approved by Change Advisory and Prioritization Committee (CAPC). At least half (25) of the CQIT indicators still need to go through BRMR. Prioritizing the review of these indicators could reduce the 18-month delay created by incremental feedback down to eight months if successful.

2. *Plan To Mitigate Delays Related To Live Data Collection* – To mitigate the eight months of delay left over from the first prong, CDCR plans to complete all steps up to verification for the 51 provisionally approved key CQIT indicators by October 31, 2022. If successful, beginning in 2023, CDCR could simultaneously update CQI (Guidebook, Tool, and training) and conduct CQI tours to collect live data while processing other indicators in the data remediation process. This will negate the need to wait until the end of Data Remediation to conduct CQI tours and gather live data, thus eliminating the remaining eight-month delay.

B.   **Timely Compliance Methodology**

In August 2021, the Special Master's Data Expert expressed concerns with CDCR's historical approach to calculating timely compliance (e.g., timely psychiatry and primary clinician contacts and timely interdisciplinary treatment teams). CDCR's historical approach to calculating timely compliance has generally been to divide the time in compliance over the total time under review (e.g., three weeks in compliance over a four-week review period equals 75% compliance).

On August 16, 2021, the Special Master's Data Expert presented an overview of six options to measure compliance. One of the methodologies reviewed was CDCR's current methodology, sometimes referred to as "patient-weeks compliant."  During that presentation, the data expert reported that while CDCR's current methodology takes the amount of time overdue into account, it gives credit for the time before a service is late (e.g., if a routine contact is due at the end of the month, the first three weeks of the month would be considered compliant because the service was not yet late), and was non-intuitive. He also presented an alternative methodology that takes an all-or-nothing approach to measure compliance. Under the all-or-nothing approach, all monthly services would be measured as 100% if all services were offered on time or 0% if one or more services were not offered on time. For example, every weekly clinical contact requirement within a calendar month would be 0% if one or more of the required contacts were offered late.

The data expert has acknowledged a preference for the all-or-nothing approach. Between January 5, 2022, and January 19, 2022, the Special Master's Data Expert presented his recommended methodology over three BRMR meetings. On April 4, 2022, the data expert shared a link[2] to the National Quality Forum website, recommending CDCR review the measure description for "Optimal Diabetes Care." This description explains how to measure if diabetes is optimally managed using the all-or-none composite measure – "considered to be the gold standard, reflecting best patient outcomes." However, the same description also confirms that measuring the individual treatment components (such as blood pressure, medication, and labs) separately is "particularly helpful in quality improvement efforts to better understand where opportunities exist in moving the patients toward achieving all of the desired outcomes."

The National Quality Forum website also includes measure descriptions for mental health care. For example, the description of "Follow-Up After Emergency Department Visit for Mental Illness"[3] indicates two separate rates should be reported (follow-up within 7 days and follow-up within 30 days). Many other mental health care measures appear to follow this approach focusing on measuring the individual treatment components. To date, CDCR has not located any mental health care measures recommending an all-or-nothing approach.

CDCR has started a small workgroup with its data and clinical experts to review various methods for calculating timely compliance. This workgroup aims to thoroughly review all the options, identify a few methods to test with actual data, and develop reference documents so that CDCR can make an informed decision on the matter. At least 14 indicators are affected by this contingency and are currently pending a decision to move forward.

---

[2] https://www.qualityforum.org/Qps/MeasureDetails.aspx?standardID=3&print=0&entityTypeID=3
[3] https://www.qualityforum.org/QPS/MeasureDetails.aspx?standardID=1850&print=0&entityTypeID=1

Current Plan to Mitigate this Contingency: There is no agreed upon plan to address this contingency. Once CDCR confirms a methodology, the indicators will be assessed through the data remediation process. There is no way to estimate the resulting delay since it is unclear when these items will be ready for data remediation and whether the Special Master's Data Expert will certify these indicators with the methodology used to calculate compliance.

### C.   Expanding the Scope of this Project Beyond Data Remediation

The Mental Health Data Validation and Verification Process document lists the objectives of the data remediation project, including documentation, validation, and verification of the mental health reporting system. It further defines the validation process as follows:

> "Validate each report, indicator, and business rule that can measure compliance with its associated business requirement(s). This review process will result in a proposed operation for each reporting element and may include proposed adjustments to the intended operation and or underlying workflows and data. The current intended operation (how it should work now) and the proposed operation (how it should measure business requirement compliance) will then be passed along for comment by other stakeholders and appropriate review within CDCR."

The activation schedule was built with these definitions in mind. This understanding contributed significantly to the projected workflow where each process step is constantly processing five items per week. However, very few BRMR meetings (where validated documentation is achieved) have successfully processed five items in one week. The lag time is not immediately apparent in the incremental progress above because BRMR meetings began on October 6, 2020. The lead time generated by starting almost a year before the preliminary activation schedule started (September 29, 2021) is quickly dwindling. Only one indicator (inclusive of three data elements) has successfully moved on from the BRMR step between December 31, 2021 and March 30, 2022.

Some of this delay can be attributed to reviewing the Data Expert's recommended timely compliance methodology and the impact of adopting the new pilot remediation plan. At the same time, the BRMR meeting could not pass a straightforward indicator like "Percentage of Unclothed Body Searches Conducted in a Private Area" during a 2-hour meeting. Time spent reviewing this indicator included a 10-minute explanation from the data expert on why the word "audited" must be added to the documentation and where it should be placed. The Special Master's Data Expert also told CDCR that new requirements (e.g., minimum percent of staff talked to, employee level traceability) were necessary even though the Special Master's team does not include these requirements in their rounding and did not identify these audit elements during the initial design or many updates to CQIT. This indicator eventually completed the BRMR process during a second two-hour meeting on March 30, 2022.

Additionally, all five diagnostic monitoring MAPIP indicators are on hold, pending a policy review meeting after the Special Master's team raised policy concerns. On March 29, 2022, the Discharge Follow-ups indicator was also placed on a policy hold after the Special Master's team, and Plaintiffs raised concerns about policy interpretation. On a fairly regular basis, Plaintiffs advocate for indicator and policy expansions arguing that the current state of the policy and indicator are barriers to data remediation.  Very recently, during the April 6, 2022, BRMR meeting the stakeholders successfully

reviewed all the agenda items. While those conversations are not yet complete, this was a promising sign of progress when the stakeholders agree to focus on the major concerns.

As defined by the Mental Health Data Validation and Verification Process, validation does not include policy or indicator expansion. The data remediation process CDCR agreed to follow does and the timeline developed in response to this process does not include the creation of a new policy, expanded policy, or expanded indicator. Yet, every indicator reviewed by the Special Master's team and Plaintiffs (approximately 50 – 60 indicators) has required changes to achieve data remediation. While CDCR agrees that any major policy gaps or flaws should be raised and remedied, most comments seek to change or expand well-established policy, revise long-standing indicators that the Special Master's team created alongside CDCR, or add new requirements. This process is increasingly becoming an overhaul of long-established and court-approved policies and processes rather than a transparency check or data validation project. In short, the scope of the data remediation process seems to evolve continually and expand without any clear boundaries. But the Data Remediation process is not meant to be an overhaul of CDCR's data system, or used to wordsmith indicators, expand the scope, or add requirements above and beyond what is currently being done by the Special Master during his monitoring. It's intended to evaluate whether CDCR's indicator measure what they purport to measure.

This issue has been raised several times with the Special Master's Data Expert, and most recently, on March 28, 2022. In response, the expert stated that not every indicator would require a change, but if the Special Master's team disagrees with the policy or the way CDCR measures it, those disagreements must be resolved before the data expert certifies the indicators. Although this is the Data Expert's position, in practice, changes have been recommended to every indicator thus far, and those changes are not limited to clarifying policy interpretation or methodology.

Current Plan to Mitigate this Contingency: On March 29, 2022, CDCR informed both the Special Master's team and Plaintiffs that this contingency was a growing concern. Moving forward, so-called 'barriers to data remediation' identified by the Special Master's team or Plaintiffs would require a clear rationale. The only way to truly mitigate this contingency is to stick to a narrower scope in discussions, but CDCR does not have control over this issue. If we keep along with the expanded scope and in-depth discussions, the timeline will quickly be delayed as we are not successfully moving the requisite number of items through BRMR to maintain the timeline.

### D. Changes or Newly Identified Documentation Components Necessary to Achieve Data Remediation

On February 7, 2022, the Special Master's Data Expert identified revisions to the standardized documentation templates necessary to achieve data remediation. Standardized templates were created to mitigate the risk of incomplete documentation. The templates were designed under the guidance of the Special Master's data expert over several months and reviewed with Plaintiffs before being finalized prior to the filing of the September 2021 Data Activation Schedule. Any changes to the templates could result in the need to revise the documentation for a large number of subcomponents, which may affect the timeline. The changes identified include a table of contents for version control and adding additional information to the business rules template to identify the latest release date.

Current Plan to Mitigate this Contingency: Once approved, CDCR will apply the updates to the standardized documentation templates. For all documents partway through the data remediation

process, CDCR will apply the template updates before the documents move on to the next step. This approach should avoid any significant delays typically associated with changing the document templates.

V.    Incremental Progress at the Indicator-Level

The below chart provides the incremental progress for each of CDCR's key indicators as of March 30, 2022.

| Category | CDCR Key Indicator | Updated Name and/or Split Indicators[4] | Incremental Progress |
|---|---|---|---|
| Access to Care | Timely MH Referrals | 1. Timely MH Referrals<br>2. Timely response to Critical Med non-adherence notification<br><br>3. Timely response to Non-critical Med non-adherence notification | 49%<br>27%<br><br><br>28% |
| Access to Care | Timely PC Contacts | | 44% |
| Access to Care | Timely Psychiatry Contacts | | 39% |
| Access to Care | Timely IDTTs | | 34% |
| Access to Care | Treatment Offered | | 40% |
| Access to Care | Placement of ASU/SHU CCCMS in STRH/LTRH within Timeframes | | 66% |
| Access to Care | Timely Transfers to CCCMS/EOP | | 15% |
| Access to Care | Effective Communication Achieved | | 95% |
| Access to Care | IDTTs in a Confidential Setting | | 85% |
| Access to Care | Group Treatment in a Confidential Setting | | 95% |
| Access to Care | MHSDS Patients Transferred out of Desert Institutions | | 15% |
| Access to Care | Observed RC Screens Conducted in a Confidential Setting | | 60% |
| Access to Care | MH Screens | 1. ASU PreScreens<br>2. ASU GP Screens<br>3. RC Screens | 100%<br>100%<br>95% |

---

[4] Updated names and split indicators are as of 12/31/2021 and have not been approved by CDCR or the Special Master.

| | | | |
|---|---|---|---|
| Suicide Prevention | Timely Completion of 5/8 Day Follow Ups from MHCB, alternative housing, and DSH/PIPs. MHCB, Alternative Housing, DSH, and PIPs | Discharge Follow Ups | 55% |
| Suicide Prevention | Patients referred to MHCB on Continuous Direct Visual Observation | | 55% |
| Suicide Prevention | Housing Unit/Inmate Living Areas with emergency response equipment and Inventoried Daily | | 50% |
| Suicide Prevention | Custody Follow Ups for MHCB Discharges/7497 Forms | | 20% |
| Suicide Prevention | Orders Reviewed with Properly Documented Observation Orders | | 55% |
| Suicide Prevention | MHCB Records with Rationale for Limited Issues of Clothing and Bedding | | 55% |
| Suicide Prevention | MHCB property and privileges | | 0% |
| Suicide Prevention | ASU Intake Inmates Appropriately Housed | | 60% |
| Suicide Prevention | Percentage of ASU Welfare Checks audited that were not completed on time and staggered | | 15% |
| Suicide Prevention | Percentage of nursing staff current with CPR training | Nursing staff current with CPR training | 10% |
| Suicide Prevention | Percentage of Health Care Staff with Suicide Prevention Training | | 0% |
| Suicide Prevention | Percentage of Custody Officers with Suicide Prevention Training | Custody Officers with suicide prevention training | 60% |
| Quality of Care | IDTT Staffing | | 40% |

| | | | |
|---|---|---|---|
| Quality of Care | Cases with Documentation of Appropriateness of LOC Discussed for Patients Identified by 7388B as Potentially Requiring Higher LOC | | 55% |
| Quality of Care | Treatment Plans with Satisfactory Documentation | | 95% |
| Quality of Care | Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers | | 55% |
| Quality of Care | Treatment Plans with Documented and Implemented Pre-Release Plans | | 95% |
| Quality of Care | IDTTs in which PC Intake Evaluations were Completed Prior to Initial IDTT | | 60% |
| Quality of Care | IDTTs in which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT | | 60% |
| Quality of Care | EOP IDTT Discussion of Clinical Appropriateness for Work, Education Accommodation | | 60% |
| Specialized Custody | Percentage of RVR MHAs Where the Patient was Informed of the Limits of Confidentiality | | 95% |
| Specialized Custody | RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation | | 60% |
| Specialized Custody | Percentage of Days Where Heat Plan was Activated, and Alternative Out of Cell Activities were Offered to Heat Alter Patients | | 30% |
| Specialized Custody | Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM | Percentage of MHCB patients placed in TTM within policy requirement | 50% |

| Specialized Custody | Percentage of 128Bs Indicating the Requirement for Mechanical Restraints that are Present for MHCB Patients | | 30% |
|---|---|---|---|
| Specialized Custody | Thermometer Checks Completed and Accurate | | 60% |
| Specialized Custody | Timely MH RVR Assessments | | 37% |
| Medication Management | Medication Admin: Chronic Care Medications Historical Administration (Psychiatrist) | | 0% |
| Medication Management | Medication Admin: Outpatient Provider New Medication Orders (Psychiatrist) | Medication Admin: Chronic Care Medications Historical Administration (Psychiatrist) | 0% |
| Medication Management | Diagnostic Monitoring-Antipsychotics | | 45% |
| Medication Management | Diagnostic Monitoring-Clozapine | | 35% |
| Medication Management | Diagnostic Monitoring-Mood Stabilizers | | 35% |
| Medication Management | Diagnostic Monitoring-Antidepressants | | 35% |
| Medication Management | Diagnostic Monitoring-QT Prolongation EKG 12 Months | | 35% |
| Medication Management | Continuity of Meds Upon Inter-Institutional Transfer at R&R | | 0% |
| Medication Management | Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU) | | 0% |
| Medication Management | Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers | | 0% |
| Medication Management | Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU | | 0% |
| Medication Management | Continuity of Meds: Discharge/Transfer from a | | 0% |

| | Community Hospital and/or DSH | | |
|---|---|---|---|
| Medication Management | Medication Compliance with PC 2602, Involuntary Meds: Court Order | | 0% |
| Medication Management | Medication Compliance with PC 2602, Involuntary Meds: Med Order | | 0% |
| Restricted Housing | Placement of ASU EOPs in Appropriate Housing Within Timeframes | | 30% |
| Restricted Housing | ASU Pre-Screens | New indicator, previously part of "Timely MH Screens" indicator | 100% |
| Restricted Housing | Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 Working Days | | 0% |
| Restricted Housing | Percentage of ASU Screenings that Occurred Within 72 Hours of Placement of Arrival | Duplicate. ASU GP Screen progress is also tracked under MH Screens | 100% |
| Restricted Housing | ICCs with Mental Health Clinicians present, and relevant information provided | | 60% |
| Restricted Housing | (LMH: in suicide prevention) Cells Reviewed Where Inmates Are Allowed Approved Entertainment Devices | Cells reviewed where inmates are allowed approved entertainment devices | 40% |
| Restricted Housing | ASU Screens that are Conducted in Confidential Settings | | 10% |
| Restricted Housing | ASU Out of Cell Time Offered | | 30% |
| Restricted Housing | Percentage of Weeks in which Yard was Offered According to STRH/LTRH Policy | | 35% |
| Restricted Housing | Weeks in which Shower Access in ASU was Offered as Required | | 20% |

| Restricted Housing | Units in which Staff can Identify NDS Patients and Have Tracking System for Phone Calls and Property | | 30% |
|---|---|---|---|
| Utilization and Resource Management | Timely admission to MHCB | | 50% |
| Suicide Prevention | Patients in Alt Housing on continuous observation and provided suicide-resistant bed | 1. Percentage of patients in alt housing with a bed<br>2. Patients referred to MHCB on continuous direct visual observation | 43%*[5] |
| Suicide Prevention | Emergent/urgent MH referrals that result in SRASHEs | Suicide Risk Evaluation | 47%* |
| Suicide Prevention | Percentage of timely Nursing Rounds in MHCB patients on suicide watch and suicide precaution recorded in EHRS Clearly Marked, On Time, and Documented on Correct Form | 1. Timely documentation of suicide watch<br>2. Timely documentation of suicide precaution<br>3. Percentage of nursing rounds clearly marked, on time, and documented on correct form | 0%*<br><br>0%*<br><br>0%* |
| Suicide Prevention | Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used | 1. Percentage of Observed Reception Center MH Screens in Confidential Setting<br>2. Percentage of Observed R&R Screens in Confidential Setting  and Correct Documentation Used | 40%* |
| Suicide Prevention | Emergency Response Procedures for Self-Injurious behaviors and suicide attempts | | 0%* |
| Suicide Prevention | MHCB Daily Provide Checks | | 50%* |

[5] Incremental Progress percentages with an "*" notes that these indicators are still under discussion with the Special Master to determine if they refer to existing indicators or new indicators. As discussions continue, the Special Master and Defendants may agree to remove some of these indicators if they are no longer appropriate or are part of a different indicator.

| Restricted Housing | Psych Tech Rounds Completed According to PG Requirements | | 0% |
|---|---|---|---|

In the spirit of further transparency, the below chart provides the incremental progress for the additional indicators.

| Category | Additional Indicators | Updated Name and/or Split Indicators[6] | Incremental Progress |
|---|---|---|---|
| Access to Care | Timely Admissions to Inpatient Care | | 0%* |
| Access to Care | Inpatient Transfer Deadlines for PIPs and DSH | | 0%* |
| Access to Care | Percentage of all IDTTs observed in which a health record and C-file are available | Percentage of all IDTTs observed in which a health record and SOMS are available | 60% |
| Access to Care | Appointments Cancelled Due to Custody | | 30% |
| Access to Care | Appointments Seen as Scheduled | | 15% |
| Access to Care | Housing Units where 128 MH-5s are Accessible and Available to Housing Unit Staff | | 55% |
| Access to Care | Custody MH Referrals | | 40% |
| Access to Care | MHSDS inmates in ASU transferred within policy requirements | | 0% |
| Suicide Prevention | Safety planning to reduce suicide risk | | 15% |
| Suicide Prevention | Suicide-resistant MHCBs | | 0% |
| Suicide Prevention | APP/ICF Discharges with Clinician-to-Clinician Contact within 5 Days | Acute/ICF Discharges with Clinician to Clinician Contact within 5 Days | 55% |
| Suicide Prevention | SRE Mentor Program | | 25% |
| Suicide Prevention | SREs that Met All Audit Criteria | Quality of Selected SRASHE Documentation | 95% |

---

[6] Updated names and split indicators are as of 12/31/2021 and have not been approved by CDCR or the Special Master.

| Suicide Prevention | Discharges from MHCB with Clinician Review of D/C Summary (SRASHE) | | 55% |
|---|---|---|---|
| Suicide Prevention | Satisfactory SPR FIT Meeting | | 25% |
| Quality of Care | Primary Clinician Continuity of Care | | 15% |
| Quality of Care | Psychiatrist Continuity of Care | | 15% |
| Quality of Care | IDTTs Meeting All Audit Criteria | IDTTs with observed interactive process | 60% |
| Specialized Custody | RVRs Where Hearing Officer Disagreed with MH Clinician's Recommendation to Document in an Alternative Manner and Documented Rationale for Disagreement on 128B | | 55% |
| Specialized Custody | RVRs Recommended for Mitigation That Were Mitigated | | 50% |
| Specialized Custody | Use of Force involving MH Inmates | | 55% |
| Specialized Custody | Additional Use of Force (Specificity to be determined) | Duplicate: Use of Force involving MH Inmates | 55% |
| Medication Management | Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here) | | 0% |
| Restricted Housing | NDS timely expedited transfers | Percentage of required NDS transfers that occurred within 72 hours | 30% |
| Restricted Housing | ASU Inmates on 21-Day Intake Status with Markers Posted for initial 72 hours | ASU Inmates on 21-Day Intake Status with Markers Posted | 25% |
| Restricted Housing | Percentage of Unclothed Body Searches Conducted in a Private Area | | 50% |
| Restricted Housing | Warden Review of Cases Over 90 Days | | 10% |

| Restricted Housing | ASU LOS for MHSDS v. Non-MHSDS Patients | | 0% |
|---|---|---|---|
| Restricted Housing | EOP Hub CCII and Captain Review for LOS Over 90 Days | | 15% |
| Restricted Housing | Percentage of Inmates with LOS Over 150 Days in which ASU Case Reviews were Completed on Time | | 10% |
| Restricted Housing | ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria | | 30% |
| Restricted Housing | Percentage of Initial ICCs Reviewed and Held within 10 Calendar Days of Arrival | | 30% |
| Restricted Housing | Number of EOP and CCCMS Patients in ASU | | 0% |
| Restricted Housing | Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors | | 15% |
| Restricted Housing | High Refusers Due to Custody Reasons with Documented Plan of Action | | 55% |
| Restricted Housing | High Refusers in which 128B was Completed | | 55% |
| Restricted Housing | Percentage of High Refusers Due to Custody in Which a Meeting Between MH and Custody was Conducted within 7 Calendar Days | | 30% |
| Restricted Housing | Inmates Who Received ASU MH Guide | | 30% |
| Restricted Housing | Percentage of Psych Tech Round Documentation That Meets All Audit Criteria | | 0% |
| Restricted Housing | Psych Tech Rounds Where EC and Interaction with Patient are Achieved/Attempted and | | 0% |

| | Appropriate Referrals are Made as Indicated | | |
|---|---|---|---|
| Restricted Housing | Percentage of IDTTs Observed in which a Health Record and C-File were Available | Percentage of all IDTTs observed in which a health record and SOMS are available | 60% |
| Restricted Housing | Percentage of Peace Officers Observed to Carry their CPR Mouth Shield | | 55% |
| Restricted Housing | Percentage of Eligible MHSDS Patients Receiving Milestone Credits | | 0% |
| Restricted Housing | RVR MH Assessments Where All Documentation Requirements Were Met | RVR assessments where documentation requirements were met | 95% |
| Restricted Housing | RVR MH Assessments Conducted in Private Setting | | 0% |
| Restricted Housing | Use of Force MH Assessments Meeting Documentation Requirements | | 55% |
| Restricted Housing | Patients Discharged from DSH with Classification Casework Completed Prior to Transfer When Required | | 20% |
| Restricted Housing | Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs | Numbers and Percentage of RVRs by level of care (CCCMS, EOP, MHCB, ICF, and ACUTE patients, non- MHSDS) | 5% |
| Restricted Housing | Percentage of MH-7s required completed prior to ASU placement | Duplicate: ASU PreScreens | 100% |
| Patient Safety | Number of Episodes of Heat Related Illness Occurring in MHSDS | | 20% |
| Patient Safety | Percentage of Clinical Restraint Occurrences Meetings [sic] All of the Audit Criteria | | 30% |
| Patient Safety | Seclusion, Frequency, and Duration | Seclusion Rate | 4% |

| | | | |
|---|---|---|---|
| Utilization and Resource Management | MHCB Clinical Stays within Timeframes | | 45% |
| Utilization and Resource Management | Percentage of mental health OHU stays 48 hours or less | | 0% |
| Facility/Environment of Care | Adequate Group Treatment Space | | 60% |
| Facility/Environment of Care | Adequate IDTT Space | | 60% |
| Facility/Environment of Care | Adequate Individual Treatment Space | | 60% |
| Staffing/Personnel Training, and Staff Resources | Chief Psychiatrist | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Chief Psychologist, Correctional Facility | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychologist, Correctional Facility (Supervisor) | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychiatrist (Supervisor), Correctional and Rehabilitative Services (Safety) | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Supervising Psychiatric Social Worker I, Correctional Facility | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychiatrist (Specialist), Correctional and Rehabilitative Services (Safety) | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Senior Psychologist, Correctional Facility (Specialist) | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | | 0%* |

| Staffing/Personnel Training, and Staff Resources | Recreation Therapist, Correctional Facility | | 0%* |
|---|---|---|---|
| Staffing/Personnel Training, and Staff Resources | Psychologist-Clinical, Correctional Facility | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Clinical Social Worker (Health/Correctional Facility) – Safety | | 0%* |
| Staffing/Personnel Training, and Staff Resources | Staff that report having computers for all out of call clinical appointments | | 0% |
| Staffing/Personnel Training, and Staff Resources | Percentage of healthcare staff current with suicide prevention training (duplicate from SP) | | 0% |
| Staffing/Personnel Training, and Staff Resources | Allocated and filled positions | | 0% |
| Additional Indicators | Including<br><br>• Sustainability Process<br>• ASU EOP Hub Certification (To be determined)<br>• PIP (To be developed)<br>• Custody and Mental Health Partnership Collaboration (To be developed) | | 0%* |