# EXHIBIT C



December 18, 2020

*Via Electronic Mail*

Elise Owens Thorn
Deputy Attorney General
California Department of Justice
1300 I Street, Suite 125
PO Box 944255
Sacramento, CA 94244-2550

Dear Elise:

      This letter is in response to your November 30, 2020 letter regarding the Special Master's data expert's, Daniel F. Potter, Ph.D. ("Dr. Potter"), ongoing work with numerous of defendants' employees regarding CDCR's mental health data system. Defendants chose to send this letter less than 16 hours before a COVID-19 Task Force ("Task Force") meeting that the defendants knew was to include an update from Dr. Potter as well as a chance for them to question and receive answers. As the Special Master expressed to defendants at the December 1, 2020 Task Force meeting, he was as disappointed in defendants' decision to send the letter as he was with its content. The seriousness of your allegations requires specific responses in order to clarify the record. Accordingly, this letter is intended to formally respond to certain of defendants' claims as well as summarize the progress we have made working together since your correspondence was sent.

      In your letter, you express defendants' "concerns regarding the scope and pace of the work being performed by" Dr. Potter. You allege that Dr. Potter "may be exceeding the scope of his initial appointment" and that his work "lacks focus and any set parameters." Accordingly, defendants have asked for "additional details on what he intends to accomplish as your data expert." Specifically, you requested "details on Dr. Potter's plan to review, assess, and report on necessary corrective actions for CDCR's data and quality assurance programs" and suggest Dr. Potter should "clarify that his work is tied to the issues raised by the neutral expert's findings on the Golding report, the need to establish trust [] in CDCR's data systems, and whether CDCR's data systems are accurately assessing compliance with existing CDCR policy." Finally, you request that Dr. Potter "list each of his goals, and for each goal the steps he is taking to address the goal and the timeframe for completion of work under the goal."

      Reading your November 30, 2020 letter, one might be left with the impression that defendants are in the dark as to Dr. Potter's activities. Notwithstanding defense counsel's suggestions to the contrary, the Special Master and Dr. Potter have kept defendants fully

Elise Owens Thorn
Deputy Attorney General
California Department of Justice
Page 2

informed regarding Dr. Potter's activities throughout his appointment. As you know, Dr. Potter has participated in dozens of meetings with defendants' staff during the last seven months, some of which included defendants' lawyers. Simply put, the level of feigned ignorance displayed in your letter does not comport with the facts and should not be allowed to distort the record.

Moreover, defendants' contention that Dr. Potter is working outside of the scope of his court ordered appointment is plainly without merit. Prior to Dr. Potter's appointment and in consideration of the court's findings during the Golding proceedings, the court granted the Special Master with broad access to defendants' data systems: "[D]efendants must arrange for the Special Master [to] forthwith be given access to all of the business rules defendants are currently using to process mental health data and generate informational reports related to delivery of constitutionally adequate mental health care to members of the plaintiff class", including business rules used by CCHCS's Quality Management Section. ECF No. 6435 at 2; *see also id.* at 4. In addition, the court has ordered defendants to "ensure that the Special Master is included in all discussions that concern the use of the CCHCS Quality Management Section to manage CDCR Mental Health data and shall respond promptly to any and all steps the Special Master may require of them during this process." *Id.* at 4. Moreover, the need for data-related remediation in this case is broader than the specific remedial tasks arising from the Golding proceedings. *See, e.g.*, ECF No. 6441 at 6 (recognizing the importance of resolving data issues to defendants' ability to develop and implement the CQIT tool).

In addition to the broad access the court has provided the Special Master with regarding defendants' data systems, his request to hire additional staff was broad in scope and indicated his intent to "hire an expert in data quality management who would be responsible for advising [the Special Master] on *all mental health data-related issues* and also working with both CDCR and the *Plata* Receiver's Quality Management departments on the same." ECF No. 6461 at 3 (emphasis added). The request to hire additional staff provided important context for the breadth of data related issues requiring expert advice and consultation:

> As Central Office monitoring continued, it became apparent that the Special Master had not been provided with a complete understanding of the relationship between CDCR mental health leadership and the *Plata* Receiver and exactly how the two entities were working together on mental health issues—the process for generating, storing, validating, and reporting mental health care data being one major example. This, coupled with the many questions about the reliability of data provided by CDCR raised as a result of the Golding Report, has resulted in an additional workload, unforeseen at the commencement of Central Office monitoring, which necessitates the Special Master's establishment of a dedicated team to monitor data-related issues. *Id.*; *see* ECF No. 6604 at 2.

Defendants did not object to either of the relevant requests to hire additional staff or the court's order's appointing Dr. Potter. Nor did the defendants object to the Special Master's June 8, 2020 status report updating the court and the parties with specificity on Dr. Potter's activities. ECF No. 6705. The record is clear as to the breadth of Dr. Potter's scope of work. Nothing in the court orders following the Golding proceedings, the Special Master's requests to hire additional staff, or the court

Elise Owens Thorn
Deputy Attorney General
California Department of Justice
Page 3

order granting his requests for additional staff limits Dr. Potter's scope of work to only Golding related remediation.

You have also called the pace of Dr. Potter's work into question. At the time of your letter, Dr. Potter was six months into his appointment as the Special Master's data expert. As you know, it took nearly two of those months for CDCR to provision Dr. Potter with the access needed to begin familiarizing himself with CDCR's data systems. Moreover, the amount of work CDCR must undertake to remediate its various data systems is profound. There are many factors influencing the pace of this data-related work which are clearly outside of Dr. Potter (or the Special Master's) control. These include but are not limited to CDCR's current system's lack of proper documentation, change management systems, or source control. By way of comparison, a consultant of the *Plata* Receiver recently took some 14 months to validate 16 data points on a more mature data system than we are faced with in this case.[1]

As to the EOP ASU Hub indicators, that work has taken place in the small work group setting with the pace of work dictated by the painstaking nature of the task and lack of necessary documentation. That work is continuing apace thanks to the diligent efforts of the workgroup members.

The Special Master shares the desire to see Dr. Potter complete his work and for CDCR to develop data systems that are accurate, reliable, transparent, and sustainable. However, the work must be done correctly. Under the circumstances described above, to intimate that Dr. Potter has wasted time, is behind schedule, or that his work lacks focus is irresponsible and unproductive.

Given the importance of mental health related data remediation to defendants' ability to durably remediate ongoing constitutional violations in CDCR institutions, the Special Master will continue to ensure that there is full transparency and understanding of Dr. Potter's work. This has been the Special Master's approach throughout Dr. Potter's brief but productive tenure in this case and will continue to be going forward.

Fortunately, in the weeks since the November 30th letter, we have worked together to make progress on several of the items raised in your letter and otherwise bridge any gaps in knowledge regarding the data work group's activities. Since your November 30th letter, you have participated in two Task Force meetings where Dr. Potter presented and fielded questions from the parties, as well as two teleconferences focused solely on data related issues.

As a result of these recent discussions, it is apparent there is consensus on several important items. For instance, during a December 14, 2020 teleconference defendants agreed that Dr. Potter's work encompasses multiple interdependent projects. Contrary to the requests contained in your November 30th letter, defendants also agreed that determining firm timelines for each of the December

---

[1] The *Plata* Receiver's validation project was significantly more limited in scope than the review Dr. Potter is undertaking. By way of example the study commissioned by the Receiver assessed whether each measure's outputs, as reported on the dashboard, were accurately computed in accordance with a glossary of definitions provided to the consultants as a starting point; by contrast, the CDCR MH Data System lacks essential documentation to permit Dr. Potter to begin the validation phase of his work which necessarily increases the time and resources needed to complete data remediation tasks.

Elise Owens Thorn
Deputy Attorney General
California Department of Justice
Page 4


11, 2020 court order's five data projects would be challenging at present time. Finally, there appears to be agreement among the parties to use the COVID-19 Task Force's small workgroup process as a model for the *Coleman* stakeholders to collaborate on the various mental health-related data projects.

    The Special Master, and he hopes counsel, is encouraged by the progress made in recent weeks. Together, we are approaching an agreement to develop a plan to create reasonable deliverables leading to validation of the ASU EOP Hub certification and CQIT indicators, the verification of the software processes which translate the indicators into numbers and percentages, and change management and documentation systems which will make those accomplishments sustainable.

    All stakeholders have worked tirelessly during these unprecedented and unpredictable times. We are making important progress and must not lose sight of what we can accomplish when we work together. The Special Master looks forward to building on the progress made in the December 14th and 15th meetings and continuing to address the critically important data-related remedial issues in this case.

Sincerely,

  /s/

Kerry F. Walsh
Deputy Special Master

