DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO DEFENDANTS' UPDATED ACTIVATION SCHEDULES FOR COMPLETION OF COURT-ORDERED DATA REMEDIATION [ECF NO. 7523]**

Judge: Hon. Kimberly J. Mueller
Date: April 22, 2022
Time: 2:00 p.m.
Crtrm: 3, 15th Floor, Sacramento

# TABLE OF CONTENTS

Page

I. DEFENDANTS' FIRST ISSUE STATEMENT IGNORES THE FACTS THAT GAVE RISE TO THE DATA REMEDIATION PROCESS ........................ 1

II. DEFENDANTS' SECOND ISSUE STATEMENT IGNORES THAT POLICY INTERPRETATION IS NECESSARILY INTERTWINED WITH ENSURING THAT DEFENDANTS' DATA IS NOT MISLEADING.................... 5

III. DEFENDANTS' THIRD ISSUE STATEMENT BELIES DATA INDUSTRY STANDARDS REQUIRING FLEXIBILITY ..................................... 8

IV. DEFENDANTS' FOURTH ISSUE STATEMENT WOULD INHIBIT END-TO-END CERTIFICATION AND RESULT IN EXCESSIVE LITIGATION ...... 13

V. THE SPECIAL MASTER HAS ALREADY SIGNALED AGREEMENT AS TO DEFENDANTS' FIFTH ISSUE STATEMENT ........................................ 14

VI. DEFENDANTS' SIXTH ISSUE STATEMENT DOES NOT COMPORT WITH THE CURRENT VERIFICATION AND VALIDATION PROCESS, WHICH REQUIRES HOLISTIC CERTIFICATION AS THE FINAL STEP ....... 14

VII. CONCLUSION ........................................................................................ 15

CERTIFICATION ........................................................................................... 15

Consistent with the Court's February 15, 2022 Minute Order (ECF No. 7462), Defendants filed their Updated Activation Schedules for Completion of Court-Ordered Data Remediation on April 7, 2022, and included six issue statements, explained in detail in the report attached as Exhibit A to their filing, that Defendants claim require the Court's clarification. Defs.' Updated Data Schedules, ECF No. 7523 at 3 (Apr. 7, 2022). While Plaintiffs strongly disagree with many of Defendants' factual representations in their twenty-seven page report, Plaintiffs limit their response to addressing Defendants' six stated issues, as required by the Court's February 15, 2022 Minute Order (ECF No. 7462).

## I. DEFENDANTS' FIRST ISSUE STATEMENT IGNORES THE FACTS THAT GAVE RISE TO THE DATA REMEDIATION PROCESS

Defendants' first request—that the Court "confirm that the Data Remediation process is not meant to overhaul CDCR's data system, but instead is focused on the quality and accuracy of the data and ensuring that the data elements measure what they purport to measure"—blatantly disregards the history of this case and undermines the fundamental purpose of the process. *See* Defs.' Updated Data Schedules, ECF No. 7523 at 3 (Apr. 7, 2022). The Data Remediation process originated directly from CDCR Statewide Chief Psychiatrist Dr. Michael Golding's October 4, 2018 whistleblower report and the ensuing proceedings, which culminated in a four-day evidentiary hearing in October 2019 and extensive, scathing oral findings by the Court on October 23, 2019 (ECF No. 6380), later memorialized in its December 17, 2019 Order (ECF No. 6427).

In that Order, the Court held that "defendants have knowingly presented misleading information to the court in numerous areas critical to the remedy in this case and measuring compliance with that remedy." Dec. 17, 2019 Order, ECF No. 6427 at 41; *see also id.* at 22 ("[T]he weight of the evidence and the reasonable inferences to be drawn from the totality of the record before the court fully supports the finding that as to [two of the three] issues covered at hearing, defendants have engaged in knowing presentation of misleading information to the court and to the Special Master."). This included "misleadingly with[olding] information in an effort to make compliance numbers look

better" and a "focus on compiling data to show that care was adequate, with the court as the audience." *Id.* at 39-40, 45. The Court found that Defendants had "lost complete sight of the reasons remediation is required here" due to their "laser focus … to obtain termination of court supervision." *Id.* at 44. The Court further found that Defendants' "litigation tactics have wholly missed the significance of the constitutional rights of the thousands of mentally ill persons defendants have in their custody," an approach that has "exacted a steep, steep price at the expense of the plaintiff class." *Id.* at 44, 46.

Defendants' knowing presentation of false and misleading data to the Court and Special Master (as well as Plaintiffs) for their own litigation gains destroyed any possibility of trust in Defendants' automated data systems. The Court emphasized that "the record must be corrected and all necessary steps taken to ensure transparency and accuracy in reporting going forward" and to restore "the trust between the parties and between and among the parties and the court's Special Master … that is essential to successful completion of the remedy in this case." Aug. 14, 2019 Order, ECF No. 6242 at 3-4; *see also* Rptr. Tr. of Proceedings, Oct. 23, 2019, ECF No. 6380 at 40:16-20 (directing that "[t]he data must be pulled together, gathered and collected in a form that allows the defendants ultimately, when they truly can, accurately to demonstrate to the Court that the Constitution is finally satisfied).

Accordingly, the "parties agreed the Special Master should be authorized to hire his own data expert as part of the ongoing remedial process." Jan. 7, 2020 Order, ECF No. 6441 at 4; *see also* Apr. 29, 2020 Order, ECF No. 6646 at 1 (granting Special Master's request to appoint Daniel F. Potter, Ph.D., CAIA, as his data expert). To kickstart the process, the Court ordered CDCR to provide the Special Master "access to all of the business rules defendants are currently using" and include the Special Master "in all discussions that concern the use of the CCHCS Quality Management Section to manage CDCR Mental Health data." Dec. 23, 2019 Order, ECF No. 6435 at 2-3. The Court also ordered that "there will be full transparency. If any stakeholder has a question about whether information should be shared, it should be shared. Everyone involved should err

on the side of transparency." Jan. 7, 2020 Order, ECF No. 6441 at 2.

After familiarizing himself with Defendants' data, the Special Master's Data Expert articulated that "[t]he watchwords for an acceptable data system are accuracy, transparency, and sustainability. Unfortunately, defendants' mental health data systems are not currently sufficient on any of these fronts." *See* App'x A to Special Master's Twenty-Eighth Round Monitoring Report – Special Master's Data Expert Report (hereafter "2021 Data Expert Report"), ECF No. 7074 at 219 (Mar. 5, 2021). The Data Expert opined that in order to create an adequate data management system that can produce certifiably accurate compliance data, "the business rules must be designed with fidelity to the dictates of the Program Guide and rely on data that is appropriate to achieve the intended purpose." *Id.* at 218. Achieving this purpose "requires both careful review of [an indicator's] design to determine if it will indeed correctly measure its business requirement, and comparison of its intended operation with its actual operation." *Id.* at 218-19. While the Special Master did not make a formal recommendation regarding the Data Expert's findings, he strongly recommended that Defendants work under his guidance and supervision to take all necessary actions to develop, document, and maintain a data system in accordance with professional standards. *Id.* at 241-42. Defendants did not file objections to any of these principles in the report, and the Court subsequently adopted it. *See* July 14, 2021 Order, ECF No 7229 at 8. The current Data Remediation process was developed soon after.

Against this backdrop, it cannot be credibly argued that the only purpose of Data Remediation is to ensure Defendants' current data specifications are technically accurate, without regard to whether the data also reports whether patients are receiving the care to which they are entitled under the Program Guide and other requirements necessary to remediate the Eighth Amendment violations. *See* Sept. 3, 2020 Order, ECF No. 6846 at 4 (citing *Coleman v. Brown*, 756 Fed. Appx. 677, 679 (9th Cir. 2018)); Feb. 7, 2022 Order, ECF No. 7456 at 2; *see also* Rptr. Tr. of Proceedings, Oct. 23, 2019, ECF No. 6380 at 40:16-20 (data must be remediated with end goal of accurately "demonstrat[ing] to the

Court that the Constitution is finally satisfied."). Indeed, the Court ordered Defendants to develop the Continuous Quality Improvement Tool (CQIT) for this precise reason—to "self-monitor and, as necessary, self-correct inadequacies in the delivery of mental health care to the thousands of seriously mentally ill inmates incarcerated in California's prisons." Mar. 3, 2014 Order, ECF No. 5092 at 5. The fact that "the court ultimately will use the CQIT reports as part of an overall determination of compliance with constitutional standards and durability of the remedy" makes it even more critical that the Data Remediation process assess the entirety of Defendants' data system and ensure it aligns with court-ordered mandates. *See* Sept. 3, 2020 Order, ECF No. 6846 at 24; *see also* Aug. 26, 2021 Order, ECF No. 7285 at 5 ("CDCR's global mental health data management system will be a major source of information for using CQIT to monitor institutional delivery of mental health care; consequently completion of the data remediation and validation now underway is a necessary prerequisite to the use of CQIT.").

Defendants' desired approach of certifying the technical accuracy of their data without regard to whether the business rules even properly reflect the requirements of the court-ordered remedies in the first place would utterly fail to establish trust in Defendants' ability to self-diagnose and self-correct future constitutional violations. Ensuring that a data element measures what it says it measures has very little to do with whether it correctly measures the minimum treatment standards that govern this case. Said differently, Defendants are asking this Court to bless a Data Remediation process that focuses solely on verification ("is the product built correctly?") and ignores validation ("did we build the right product?"). But the Data Expert has indicated both are needed to certify that Defendants' mental health data systems are remediated. *See* 2021 Data Expert Report, ECF No. 7074 at 219, n.57 (Mar. 5, 2021). Indeed, Defendants' own data remediation proposal highlights the critical nature of the core validation step they now seek to skip. *See* Defs.' Prelim. Data Activation Schedule, ECF No. 7334 at 9 (Sept. 29, 2021) ("Data validation asks: is the system designed to correctly measure Program Guide requirements? … In the context of data remediation, this consists of a careful review of

each indicator's design (including the design of all its business rules) to ensure that it accurately measures Program Guide Requirements within a reasonable margin of error.").

Adopting Defendants' proposed truncated scope would read the remediation concept out of this process altogether. Not only does it completely defeat the parties' efforts to rebuild trust and undermine Defendants' stated goal of readying CQIT for use in sustainable self-monitoring of the constitutional remedy, it would result, once again, in a system where artificially inflated compliance ratings could mask a reality of unconstitutional mental health care. If everyone agrees Defendants' mental health reporting data accurately measures something, but that something is different than the requirements of this case and the Constitution, the Data Remediation process would be a colossal waste of time and resources that does absolutely nothing to move Defendants closer to ending federal oversight. The Court should reject Defendants' first request.

## II. DEFENDANTS' SECOND ISSUE STATEMENT IGNORES THAT POLICY INTERPRETATION IS NECESSARILY INTERTWINED WITH ENSURING THAT DEFENDANTS' DATA IS NOT MISLEADING

Defendants' second request—that the Court "confirm that the Data Remediation process is not the appropriate forum to resolve disagreements regarding how a policy related to the delivery of mental health care should be interpreted"—at best ignores, and at worst intentionally disregards, the facts that gave rise to this process. *See* Defs.' Updated Data Schedules, ECF No. 7523 at 3 (Apr. 7, 2022). Defendants were not required to undertake Data Remediation because of simple coding errors. It was necessitated by the Court's finding that Defendants *knowingly* provided misleading information, calling into question the reliability of their entire data system. *See* Dec. 17, 2019 Order, ECF No. 6427 at 40. The evidence underpinning that holding included *policy decisions* Defendants intentionally made in an effort to artificially inflate compliance and cover up woefully inadequate care. For example, Defendants covertly redefined "monthly" to extend timelines between Enhanced Outpatient (EOP) psychiatry appointments from 30 days to 45 days. *See id.* at 29-30; *see also id.* at 45 ("In approving the change from 30 to 45 days, Dr. Ceballos facilitated dashboards turning to green overnight. A dashboard that's green,

makes it look as if a remedy is complete."). The Court also found Defendants' decision to count all psychiatry contacts, even non-confidential ones, towards compliance was erroneous under the Program Guide. *See* Aug. 14, 2019 Order, ECF No. 6242 at 7-8.

Defendants have already agreed to correct policy errors in the current Data Remediation process. For example, the ASU Pre-Screen indicator (which is one of the two finalized indicators as of the date of this filing) measures compliance with the Program Guide requirement that "[a]ll inmates are screened by medical personnel for possible suicide risk, safety concerns, and mental health problems before placement in ASU." 2021 Program Guide, Section 12-7-2, ECF No. 7333-1 at 127 (Sept. 29, 2021). The process uncovered that the prior business rule allowed compliance for pre-screens conducted up to ten hours *after* a patient was placed in segregation. Given that this clearly violated the Program Guide requirement that the screens occur *before* placement given the known dangers of segregation for mentally ill people, Defendants agreed to change the rule.

A similar issue involves the indicators that comprise Defendants' Medication Administration Process Improvement Program (MAPIP) audit tool, developed in coordination with the *Plata* Receiver and the Special Master following the Court's original holding that CDCR's medication management violated the Eighth Amendment. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal. 1995).[1] The current business rules for these indicators do not account for the fact that patients who start a new psychotropic medication, or who are on multiple psychotropic medications at once, require renewed baseline and other periodic monitoring. The timeframes in the business rules also do not align with the MAPIP requirements. For example, the current rules report compliance for informed consent that is obtained *weeks after* the patient starts a new medication.

---

[1] The Special Master has endorsed use of MAPIP as a remedial measure, and the Court has adopted his reports. *See, e.g.*, Special Master's Twenty-Sixth Round Monitoring Report, ECF No. 5439 at 45-46 (May 6, 2016); Special Master's Twenty-Seventh Round Monitoring Report, ECF No. 5779 at 77-78 (Feb. 13, 2018); Aug. 9, 2016 Order, ECF No. 5477 (adopting Twenty-Sixth Round Report); July 12, 2018 Order, ECF No. 5852 (adopting Twenty-Seventh Round Report).

In another example, Defendants have indicators titled "Adequate Group Treatment Space," "Adequate Individual Treatment Space," and "Adequate IDTT Treatment Space." But none of these indicators actually measure whether there is sufficient treatment space at a given institution to provide constitutional-level care to the patients housed there. They solely look at ventilation, sufficient seating, etc. While these issues are also important, the titles of these indicators render them misleading because an institution could score 100% while having only a single treatment room to serve hundreds of mentally ill patients.

Defendants have argued that these types of policy disputes fall outside the scope of the Data Remediation process because the indicators were created with the Special Master's input in 2012. But the Special Master was never involved in development of Defendants' business rules. Even if he was, that does not excuse the need to correct errors in the business rules which, if allowed to stand, will generate fundamentally misleading data that does not capture the actual Program Guide requirements. The need for a close look at these issues, with specific data expertise, is precisely why the Court authorized the Special Master to hire a specialized Data Expert.

To be clear, Plaintiffs do not seek to expand or re-write the operative remedial plans in this case. As evidenced by the above examples, agreement on the governing policy obligations is a necessary part of ensuring Defendants' data accurately measures the correct requirements for a minimally adequate mental health system. Defendants themselves have from the start recognized that policy updates may be required to address issues that arise during stakeholder review discussions of the business rules. *See* Defs' Data Validation Workflow, Ex. B to ECF No. 7734 at 25 (Sept. 29, 2021); *see also* Errata to CDCR Data Activation Schedule: 90 Day Update, ECF No. 7457-1 at 19 (Feb. 7, 2022) (recognizing "new or revised policies may be needed whenever the controlling policy language insufficiently articulates requirements or fails to provide details necessary for an indicator to complete data remediation"). In fact, the parties have already resolved many of these types of disputes through the weekly data meetings and letters. In the few instances where the parties did not reach agreement, or identified policy or indicator gaps

that may need to be addressed to ensure CQIT can serve its ultimate goal of accurately measuring the court-ordered remedy and supplanting Special Master monitoring, Plaintiffs have documented the dispute in a monthly letter to the Data Expert and Defendants, which allows the indicator to proceed through the process without delay. This appears consistent with Defendants' stated desire to address "significant gaps in existing policy" as part of the remediation process. *See* Defs.' Updated Data Schedules, ECF No. 7523 at 3 (Apr. 7, 2022). Incorporating policy interpretation and discussion into the process is the only way trust can be established in Defendants' ability to self-monitor and self-correct unconstitutional mental health care. As discussed in Section I, *supra*, the Court has indicated this is the ultimate lens through which it will assess Defendants' data in order to one day end federal oversight. *See, e.g.*, Aug. 26, 2021 Order, ECF No. 7285 at 5. For all these reasons, the Court should not confirm Defendants' second issue statement.

## III. DEFENDANTS' THIRD ISSUE STATEMENT BELIES DATA INDUSTRY STANDARDS REQUIRING FLEXIBILITY

Defendants' third request—that the Court confirm that "the Special Master and his expert can no longer impose new conditions on certification"—is unreasonable. *See* Defs.' Updated Data Schedules, ECF No. 7523 at 3 (Apr. 7, 2022). Defendants recognized the importance of flexibility and the need to evolve in their Preliminary Data Activation Schedule. *See* ECF No. 7334 at 10, 26 (Sept. 29, 2021). They requested revisions to the process as recently as February 2022 by asking all stakeholders to participate in the weekly Business Rules and Methodology Review (BRMR) meetings. *See* Defs.' Updated Data Schedules, ECF No. 7523-1 at 3 (Apr. 7, 2022). Plaintiffs acquiesced, and have provided written feedback on all data elements within Defendants' requested seven-day timeframe each week since October 2021.

Moreover, the Data Expert has recognized that "[a]ssessing a complex data and reporting system used by a sprawling organization such as CDCR is an arduous task even under optimal or usual circumstances." 2021 Data Expert Report, ECF No. 7074 at 219-20 (Mar. 5, 2021). Here, "the circumstances are neither optimal nor usual." *Id.* at 220. The

system "was developed predominantly by highly capable and dedicated laypeople" and in a "disordered state" when the Data Expert was appointed. *Id.* at 224. Accordingly, there are likely still unknown unknowns, as is the norm in data development projects.

Defendants' filing suggests that Plaintiffs and the Special Master are the sole perpetrators of delay. This is disingenuous and utterly incorrect. If Defendants were to describe the precise step at which each indicator is currently in the process, rather than just the percentage completed, their Incremental Progress at the Indicator-Level table (ECF No. 7523-1 at 14-25) would almost certainly reveal that much of the backlog is due to Defendants. Defendants track this detailed information. *See* Defs.' Prelim. Data Activation Schedule, ECF No. 7334 at 36 (Sept. 29, 2021) ("A Delay Log will also be maintained to help track consistent sources of delay."). It is telling they do not provide it.

Defendants complain repeatedly (but vaguely and without substantiation) that the Special Master is causing delays in the process by refusing to provide written comments and end-to-end feedback on their CQI Guidebook. But they are in meetings with the Special Master's team and experts on an almost daily basis, where they receive feedback and can ask any clarifying questions they need to continue the remediation process. And Plaintiffs' and the Special Master's determination that it is inefficient (and potentially *deficient*) to comment on Defendants' CQI Guidebook in a vacuum rather than examining it together with the data elements into which the Guidebook instructions and audit questions feed makes perfect sense. Indeed, this approach has already identified multiple disconnects between Defendants' data elements and business rules and the underlying audit instructions and questions from the Guidebook that may not have been obvious if review of the Guidebook was completed without knowledge of how that audit information was used in Defendants' reporting and data systems.

Moreover, Plaintiffs understand that many indicators currently in the verification process cannot be completed because the requisite CDCR staff have both failed to provide the Data Expert the documentation needed to write the required tests, and failed to resolve identified discrepancies once those tests are written. This resorts in manufactured scarcity

at both ends of the process, which could likely be resolved if CDCR devoted sufficient resources to this project. But the reality is, as Defendants acknowledge in their recent budget request for additional mental health data staff, they are woefully understaffed—which is primary driver of the delays about which they now complain. *See* Budget Request 5225-119-BCP-2022-GB (Jan. 10, 2022) (requesting $3.1 million and ongoing funding for 22 staff positions "to support additional Mental Health (MH) reporting tasks, a new data validation project[,] … and to address increased reporting requests"), *available at* https://esd.dof.ca.gov/Documents/bcp/2223/FY2223_ORG5225_BCP5079.pdf.

Defendants' complaint that the verification process is 36 steps is also rife with misleading omissions. *See, e.g.*, Defs.' Updated Data Schedules, ECF No. 7523-1 at 9 (Apr. 7, 2022). Nowhere in their filing do Defendants acknowledge that the Data Expert only recommended this verification process because Defendants lacked any process at all when he was appointed, and could not come up with a testing framework when requested. Instead, Defendants requested the Data Expert's assistance in developing an appropriate process, and when he recommended one, they agreed to it. Moreover, the number of steps is irrelevant, and Defendants identify none that could reasonably be eliminated while still ensuring an appropriate remediation process. The Data Expert could have described the process in far fewer steps, but he chose to be explicit for the benefit of Defendants so that all handoffs would be clear given Defendants' utterly inadequate data systems to date and history of disorganization. *See* Ex. B to Defs.' Updated Data Schedules, ECF No. 7523-3 at 4 (Dec. 18, 2020 K. Walsh Ltr. to E. Thorn noting CDCR's mental health reporting system lacked proper documentation, change management systems, or source control at start of data remediation process); Rptr. Tr. of Proceedings, Dec. 13, 2019, ECF No. 6420, at 13:16-19, 14:1-7 (at hearing, the Court described Defendants' filing of mental health department organizational charts as "reporting channels and committees and subcommittees and perhaps sub subcommittees, and sub sub subcommittees" and commented "[H]ow can this structure possibly fit with good management, best management practices? ... [I]t looks to me as if there are spider webs running everywhere

that can only clutter communication and impede good communication"). Defendants' complaints about the validation process fall flat given they offered no viable alternative.

Defendants' filing also fails to mention that despite demanding strict seven-day response deadlines of other stakeholders, they apply no deadlines whatsoever to themselves. Of the nearly 15 stakeholder review letters commenting on data elements Plaintiffs have submitted each week per Defendants' request since January 2021, Defendants have responded to just three. Plaintiffs have outstanding comments on multiple sets of data elements awaiting Defendants' response that have been pending since as far back as December 2021, despite the fact that Defendants' own process commits them to responding to feedback on a timely basis so that remaining disputes can be discussed at the standing biweekly Data and CQI meetings. *See* Defs.' Prelim. Data Activation Schedule Process, ECF No. 7334 at 33-34 (Sept. 29, 2021) (noting Data and CQI meeting is intended as an "opportunity to respond to specific questions from Stakeholders" and "will typically review feedback received during the previous two weeks"). Indeed, at two of the last three Data and CQI meetings, Defendants provided no responsive letters to pending stakeholder comments at all, causing the meetings to end early for want of anything to discuss. In addition, Defendants have declined Plaintiffs' and the Data Expert's repeated offers to provide feedback on more data elements and/or to convene additional meetings each week to speed the process along. Not to mention that Defendants devote time at the start of each BRMR meeting to reviewing an internal policy agenda that appears unorganized and wrought with inefficiencies, with multiple agenda items reported to have made no progress week after week, yet fault the Data Expert for encouraging Defendants to use precise language in their business rules to ensure accuracy in reporting – which is a core part of his expertise and court-ordered mandate. *See* Defs.' Updated Data Schedules, ECF No. 7523-1 at 13 (Apr. 7, 2022).

As to the Data Expert's need for live data to verify and validate the CQIT indicators, Defendants' claim that they will need seven months to train for and conduct tours to achieve this misses the mark. *See id.* at 10. First, as Defendants informed this

Court last Fall, they have already been preparing for many months to conduct their own CQI tours this Spring. *See* Defs.' Submission of Docs Re: July 30, 2021 Minute Order, ECF No. 7261 at 7-10 (Aug. 3, 2021). It is therefore unclear why any additional delay in the data activation process should reasonably be attributed to the need for CQI data at all. Moreover, Defendants' hyperbolic claims are overblown. The Data Expert has never expressed he needs live data from all institutions, or even more than one. He also indicated that artificial data can be used to run tests in the meantime. Ultimately there is no question that a data reporting system that, like CDCR's, relies heavily on inputs generated by on-site CQI audits cannot be fully validated and verified without those audits. But Defendants have catastrophized the Data Expert's request in what appears to be an attempted end run around the Court's clear orders that full-blown testing of CQIT should resume only once the data on which it relies can be trusted. *See* Jan. 7, 2020 Order, ECF No. 6441 at 10; Aug. 26, 2021 Order, ECF No. 7285 at 4-6.

Plaintiffs disagree that requiring Defendants to provide regular 90-day updates on their Data Activation Schedule would be productive. *See* Defs.' Updated Data Schedules, ECF No. 7523 at 3 (Apr. 7, 2022). Defendants' updates to date have not contained information to which they do not already have access and are riddled with unsubstantiated accusations that have sown more conflict, distrust, and tension rather than move the process forward. If Defendants are allowed to continue to provide unsworn reports that misconstrue the record, Plaintiffs must be provided an opportunity to respond, and Defendants should be required to provide more accurate reporting on where exactly in the process the roadblocks and delays are occurring. But as this Court has recognized, "the long history of this case shows all too clearly that in the past at least full throttle litigation generally has served to delay forward progress and thrown dust into the gears of the kind of productive working relationship required between and among the parties and the Special Master." Aug. 14, 2019 Order, ECF No. 6242 at 4. Accordingly, the Court should not confirm Defendants' third issue statement, or grant their request to provide 90-day updates to the Court.

## IV. DEFENDANTS' FOURTH ISSUE STATEMENT WOULD INHIBIT END-TO-END CERTIFICATION AND RESULT IN EXCESSIVE LITIGATION

In their fourth issue statement, Defendants request the Court to confirm that "the Special Master will provide certification decisions of individual indicators in writing and on at least a quarterly basis, and that the parties will have an opportunity to respond or object as appropriate." *See* Defs.' Updated Data Schedules, ECF No. 7523 at 3 (Apr. 7, 2022). However, requiring periodic updates does not make sense here because the mental health data system is comprised of interconnected parts and requires end-to-end certification that the entire system is working in an accurate, transparent, and sustainable way. *See generally* 2021 Data Expert Report, ECF No. 7074 at 235-42 (Mar. 5, 2021). Moreover, periodic updates would undoubtedly result in litigation and further delay.

The Special Master has described his plan several times throughout the Data Remediation process to treat it as he would any other monitoring report, with oral feedback provided on an interim basis followed by a formal written report at the end of the process. This is logical and an appropriate use of the Special Master's resources. Defendants have essentially unfettered access to the Special Master's data team and his Data Expert. They are supplied near-constant oral feedback, including from the Data Expert who has committed to providing oral reports as to each indicator's status (i.e., whether there are outstanding disputes or full agreement) within seven days of the indicator completing the verification process. Two indicators have already reached this threshold, and there are no outstanding disputes as to either. The Special Master has further explained that unless otherwise ordered, he plans to prepare a final report once the Data Remediation process is complete, consistent with the Order of Reference. As always, the parties will have ample opportunity to respond and, if necessary, file objections. Since the Data Expert has helped Defendants implement redlining and version control within their data system, all changes and disputes are meticulously memorialized in the code of the indicators themselves. As noted above, Plaintiffs also send global roll-up letters to Defendants and the Data Expert on a monthly basis to memorialize disputes. With this level of documentation, periodic

reports are not necessary and will result in piecemeal reports (and wasteful litigation) in lieu of one comprehensive document assessing the entire process and making appropriate recommendations from a systemic approach. The Special Master's current approach is efficient, comports with the normal practice of this case, and reduces the risk of unending litigation. It also rightfully preserves the Special Master's resources so he can focus on monitoring the care being provided to class members on the ground—which remains woefully inadequate—instead of spending time memorializing comments his data team and expert are already providing directly to Defendants on a routine basis. The Court should reject Defendants' fourth issue statement.

## V. THE SPECIAL MASTER HAS ALREADY SIGNALED AGREEMENT AS TO DEFENDANTS' FIFTH ISSUE STATEMENT

Defendants' fifth issue statement requests confirmation that "any decisions denying certification of an individual indicator will include a clear rationale explaining in writing why that indicator is not certified." Defs.' Updated Data Schedules, ECF No. 7523 at 3 (Apr. 7, 2022). As noted in Section IV, *supra*, the Special Master has on numerous occasions explained his intent to submit a final written report once the Data Remediation process is complete.

## VI. DEFENDANTS' SIXTH ISSUE STATEMENT DOES NOT COMPORT WITH THE CURRENT VERIFICATION AND VALIDATION PROCESS, WHICH REQUIRES HOLISTIC CERTIFICATION AS THE FINAL STEP

Defendants' sixth issue statement seeks to confirm that "[u]pon initial certification of each indicator, … recertification of the indicator is not necessary absent that indicator undergoing a substantial change." Defs.' Updated Data Schedules, ECF No. 7523 at 4 (Apr. 7, 2022). The Court should not entertain this request. As noted in Section IV, *supra*, while remediation of each indicator may occur incrementally, the Special Master and his Data Expert have stated their intent to reserve judgment on holistic certification until the entire system is working in an accurate, transparent, and sustainable way. *See generally* 2021 Data Expert Report, ECF No. 7074 at 235-42 (Mar. 5, 2021). Moreover, the tests written for each indicator run continually. If a test fails while Data Remediation is

ongoing, the Data Expert should have the ability to review that issue and Defendants' proposed resolution. Similarly, if Defendants make material changes to an indicator's business rules, those changes will trigger a new round of Stakeholder review. *See* Defs.' Prelim. Data Activation Schedule, ECF No. 7334 at 36 (Sept. 29, 2021) ("If at any point anything impacting the Key Indicator, such as a policy or workflow changes, the indicator must again undergo the data remediation process."). Finally, Defendants committed to an annual review process where, on at least a yearly basis, "all Key Indicators will be reviewed through the data remediation process." *Id.* at 36. Defendants' desire to curtail full and appropriate remediation once again ignores their history of wrongfully misusing data to their own litigation ends, at the expense of the *Coleman* class. Given his oversight of the entire process, the Data Expert will necessarily engage in the annual review cycles until this Court concludes the Data Remediation process is fully and finally complete.

## VII. CONCLUSION

For all the foregoing reasons, the Court should not confirm any of Defendants' six requested issue statements.

## CERTIFICATION

Plaintiffs' counsel certifies that she reviewed the following orders relevant to this filing: ECF No. 7462; ECF No. 7456; ECF No. 7285; ECF No 7229; ECF No. 6846; ECF No. 6646; ECF No. 6441; ECF No. 6435; ECF No. 6427; ECF No. 6380; ECF No. 6242; ECF No. 5852; ECF No. 5477; ECF No. 5092.

DATED: April 14, 2022

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Cara E. Trapani*
Cara E. Trapani

Attorneys for Plaintiffs