IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.,
     Plaintiffs,

                       Sacramento, California
vs.                     No. 2:90-CV-00520-KJM-DB
                       Friday, April 22, 2022
GAVIN NEWSOM, et al.,       2:10 p.m.
     Defendants.
_____/


---o0o---

TRANSCRIPT OF PROCEEDINGS

FURTHER STATUS CONFERENCE

BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE

---o0o---


Official Court Reporter:     Thresha Spencer,
                          CSR, RPR
                          501 I Street
                          Sacramento, CA 95814


*Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription*

```
 1   APPEARANCES:

 2     For the Plaintiffs:           ROSEN BIEN GALVAN & GRUNFELD
                                     LLP
 3                                   101 Mission Street, 6th Floor
                                     San Francisco, CA  94105
 4                                   By:  MICHAEL BIEN (via Zoom)
                                          CARA TRAPANI (via Zoom)
 5                                        LISA ELLS (via Zoom)
                                     Attorneys at Law
 6

 7
       For the Defendants:          DEPARTMENT OF JUSTICE
 8                                   1676 N. California Blvd.,
                                     Suite 620
 9                                   Walnut Creek, CA  94596
                                     By:  PAUL MELLO
10                                   Attorney at Law

11                                   DEPARTMENT OF JUSTICE
                                     OFFICE OF THE ATTORNEY GENERAL
12                                   1300 I Street
                                     Sacramento, CA  95814
13                                   By:  ELISE THORN
                                     Attorney at Law
14
                                     DEPARTMENT OF JUSTICE
15                                   OFFICE OF THE ATTORNEY GENERAL
                                     455 Golden Gate Avenue,
16                                   Suite 11000
                                     San Francisco, CA  94102
17                                   By:  DAMON GRANT McCLAIN
                                     Attorney at Law
18
                                     HANSON BRIDGETT, LLP
19                                   425 Market Street, 26th Floor
                                     San Francisco, CA  94105
20                                   By:  SAMANTHA DERIN WOLFF
                                     Attorney at Law
21

22

23     (Appearances continued on following page)

24

25
```

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

```
 1    APPEARANCES (Continued):

 2

 3    Special Master:              MATTHEW LOPES

 4
      Special Master Team:         MOHAMEDU JONES
 5                                 HENRY DLUGACZ
                                   DR. DANIEL POTTER
 6                                 DR. JEFFREY METZNER

 7
      Also Present:                DR. AMAR MEHTA
 8                                 DR. STEVEN CARTWRIGHT
                                   GREGG ADAM
 9

10

11
                        --o0o--
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            SACRAMENTO, CALIFORNIA, FRIDAY, APRIL 22, 2022, 2:10 PM

 2                              --o0o--

 3   (In live court.)

 4            THE CLERK:  Calling civil case 90-0520; Coleman

 5   versus Newsom.  This matter is on for further status

 6   conference, your Honor.

 7            THE COURT:  All right.  Good afternoon.  We're making

 8   this up as we go along, but it seems the courtroom is set up as

 9   well as possible under the circumstances.

10      I think I'll ask Ms. Kennison, if it's not asking too much,

11   is it possible to move that one plexiglass screen?

12            THE CLERK:  I believe so, your Honor.

13            THE COURT:  I think it's pretty lightweight.  I

14   understand there's no one behind the big screen.  I just want

15   to make certain I can see everyone.  I'm glad to know that

16   everyone is on the same side; that's very encouraging.

17      All right.  Thank you, Ms. Kennison, I think that's a bit

18   better.

19      All right.  So let me call roll, and that way we'll make

20   certain those who are appearing through the Zoom format can

21   hear.

22      For the plaintiff, Mr. Bien.

23            MR. BIEN:  Yes, your Honor, and thank you for

24   accommodating us today.

25            THE COURT:  All right.  Mr. Galvan is in the
```

 1   courtroom, right -- oh, he's not.  Is he not appearing?  All

 2   right.  Not appearing.

 3        Ms. Ells?

 4             MS. ELLS:  Good afternoon, your Honor.

 5             THE COURT:  Good afternoon, Ms. Ells.

 6        Ms. Trapani?

 7             MS. TRAPANI:  Good afternoon, your Honor.

 8             THE COURT:  Good afternoon to you.

 9        So Ms. Yelin, Mr. Fama not present; is that correct?  All

10   right.

11        And then for the defense, Mr. McClain?

12             MR. McCLAIN:  Right here, your Honor.

13             THE COURT:  Good afternoon, Mr. McClain.

14        Mr. Mello?

15             MR. MELLO:  Good afternoon, your Honor.

16             THE COURT:  And Ms. Thorn?

17             MS. THORN:  Yes, good afternoon.

18             THE COURT:  All right.  Good afternoon to all of you.

19        And then the principals.  Secretary Allison?

20             MR. MELLO:  Not present, your Honor.

21             THE COURT:  Why is that?

22             MR. MELLO:  I -- we thought we were here to discuss

23   bed capacity and data remediation; she is not available this

24   afternoon for this.

25             THE COURT:  Has she delegated the full authority for

1    this to someone?

2              MR. MELLO:  The two principals who are here today are

3    Dr. Cartwright and Dr. Mehta who can speak to the issues.

4              THE COURT:  Do they have a delegation of authority?

5              MR. MELLO:  Yes, they are here to speak to those

6    issues, your Honor.

7              THE COURT:  Is Undersecretary Toche here?

8              MR. MELLO:  Yes.

9              THE COURT:  All right.  That may fill the gap.  Good

10   afternoon, Undersecretary Toche, thank you for being here.

11      Is there anyone else the defense team would like to

12   identify for the record, Mr. McClain?

13             MR. McCLAIN:  I don't know that we need to, no.

14             THE COURT:  Can you speak into the microphone,

15   please.

16             MR. McCLAIN:  No, no one else to introduce.

17             THE COURT:  All right.  The Special Master is

18   present.

19             SPECIAL MASTER:  Yes, your Honor.

20             THE COURT:  And could you introduce the members of

21   your team present, Special Master Lopes?

22             SPECIAL MASTER:  Yes, your Honor.  To my right is

23   Deputy Special Master Mohamedu Jones.  We have Henry Dlugacz,

24   one of the Court's experts, and Dr. Dan Potter, Court's data

25   expert.

 1          THE COURT:  All right.  Good afternoon to you all.

 2      I know there are other people monitoring the proceedings,

 3  but I don't feel the need to call roll unless anyone disagrees.

 4      This is the second time the Court had expected Secretary

 5  Allison and I wasn't advised she couldn't be present, so I --

 6  I'm thinking about how much we can get done in her absence

 7  today.

 8      Given that Undersecretary Toche is here, I'm going to take

 9  advantage of her presence because I believe she's a very

10  important player in this.

11      But in the future if Secretary Allison believes she is not

12  needed or cannot make it, I need to know in advance, because

13  otherwise I reserve the right to continue this kind of status

14  and convene as soon as possible when she can be present.

15          MR. MELLO:  Your Honor?

16          THE COURT:  Yes.

17          MR. MELLO:  Can we coordinate on dates in the future

18  when we book hearing dates?  And, in fact, we wanted to talk to

19  the Court about the June 3rd date for those very reasons,

20  scheduling in the future.  That might solve some of these

21  issues.

22          THE COURT:  Absolutely.

23          MR. MELLO:  Thank you, your Honor.

24          THE COURT:  The key is to do it well in advance.  It

25  can be -- dates can be coordinated with the courtroom deputy.

1  And, you know, fool me once, fool me twice, but at some point I

2  do lose patience.

3          MR. MELLO:  To be clear, your Honor, I don't think we

4  were trying to fool anybody.

5          THE COURT:  I'm using that colloquially.

6     I wanted to start by acknowledging what appeared to be some

7  positive signs.  I haven't had time to study or hear a full

8  report from the Special Master, but I do want to acknowledge

9  providing -- that the defendants providing to the Special

10 Master slightly ahead of the schedule the CMF L-1 deactivation

11 plan.

12    First glance, from what I understand, it expands the use of

13 flex beds; that appears to be a positive sign.  The staffing

14 proposal, the salary increases and increased retention bonuses,

15 again, appears to be a very positive sign.  So wherever I can,

16 I want to accentuate the positive so as to minimize the

17 negative.  And I'm encouraged by those, at least on first

18 glance.

19    On data remediation, following that theme, I'm going to

20 accentuate, to the extent possible, the positive.  I just want

21 to clarify, and I guess I would ask counsel to carry this back

22 to Secretary Allison, and if obtaining a copy of the transcript

23 is the way to do that, I just wanted her to hear this as well.

24    The Court has tried to structure rules for filings, and

25 looking back at some of those rules at this point, they

1   potentially make work for myself that I don't think I need to

2   engage in at this point.

3      I require that parties review key prior orders to make

4   certain they're focusing their thinking correctly.  I've

5   suggested they can meet and confer and agree on the same set of

6   relevant orders.

7      With respect to the parties' filings here on the data

8   remediation question, the parties have not agreed, it's clear,

9   on which orders matter.  And the defense filings omit, in the

10  Court's view, orders that are critical to focusing minds on

11  data remediation.

12     So rather than spend a lot of time on that issue, I'm just

13  making clear that rather than deciding whether or not to strike

14  anything or make a formal pronouncement, I'm simply

15  disregarding a lot of what's been filed.  I think I can glean

16  the few things that matter, but there's -- there appears to be

17  unnecessary legal argument and hyperbole, and I just -- the

18  Court doesn't have time for that, even if some people do.

19     So if the secretary herself, and I'd add the

20  undersecretary, if there's a personal plea to the Court that I

21  review every word in a filing, I'll pay attention to that, and

22  I'll assume that those key principals have reviewed every word

23  and embraced it.  But unless or until then, at this point

24  rather than trying to enforce orders that have been

25  well-intentioned efforts to avoid docket clutter and focus

1   minds, I just reserve the right to disregard.

2       If I don't rely on a filing, if it's not in the form of a

3   motion that's been approved, I reserve the right to disregard.

4       So what I do want to talk about today are two things:  And

5   that is timing and staffing, and what's really going on here in

6   the data remediation process.

7       I have taken some time to understand some, the Special

8   Master's perspective and that of Dr. Potter, so I'm going to

9   put some assumptions out there, and if anyone disagrees with

10  me, they can let me know.

11      And then I have some thoughts for steps going forward, and

12  they involve Secretary Allison as well as Undersecretary Toche.

13      So again, I'll think about whether or not I need the

14  secretary to appear for me to hear from her directly.

15      So I think it's obvious from what the Court does give some

16  weight to, that the defendants are saying they have

17  insufficient mental health IT staff available for data

18  remediation -- for the current data remediation project, and

19  without additional staff remediation is slowed.

20      I also understand the current thinking is that

21  December 2023 is a valid end point for data remediation.  I

22  look at that date and I -- I'm not blessing that at this point.

23  My specific request is for the parties to meet, for the Special

24  Master to meet with the undersecretary and the secretary, and

25  ultimately we'll come back to this, but identify ways to

1    streamline the process, eliminate some of the tangents that

2    appear to be developing, and see if that date can be even

3    further telescoped.  I think it needs to be earlier than

4    December 2023.

5        On that note, and it may be the undersecretary who can best

6    answer this question for me in the secretary's absence, to the

7    extent there's a staffing deficit, I recognize the budget

8    appears -- there's a budget change proposal that appears to

9    provide for more staffing, but is the staffing need -- is it

10   for short-term staff over the next however many months to focus

11   on this project to get it to the point of full functionality,

12   and then the need for that stuff staff will receive.

13       So if it's a short-term influx of staff that's required, is

14   that how the budget proposal is structured?  And, secondly, are

15   there alternatives that the state is exhausting?

16       I recognize that we paid attention to the distinct roles of

17   the Receiver versus the Special Master, but, for example, are

18   there resources in the Receiver's shop that could be

19   temporarily reassigned to focus on the needs here?

20       And I don't -- I'm not making a joke here, believe me.

21   Could the Governor task National Guard IT persons?  There are

22   specialties within the guard, and are there not resources

23   available that are nimble, that are highly qualified, that can

24   be focused with a laser focus on the needs here without taking

25   the time to hire up in an era where it's difficult to hire?

1       So if there's an attorney who wants to take that in the

2   first instance, but ultimately I would like to hear the

3   undersecretary's thought in this.  Who is the attorney to tell

4   me first what they think?

5               MR. MELLO:  Good afternoon, your Honor, Mr. Mello.

6   I'll take that on first.

7       So, first, I think Dr. Cartwright is here to discuss those

8   issues, and I believe Dr. Toche would defer to Dr. Cartwright

9   on the issues of data remediation since he is the lead on this

10  project, number one.

11      Number two, I think that the foundational premise that this

12  is a -- that the process of this data remediation project is

13  slowed primarily based upon staffing issues, I think

14  Dr. Cartwright could explain that that is not the case and that

15  significant staff are assigned to this project.

16      I know that there are 14, I believe, full-time persons who

17  are currently assigned to this project.  I think the concerns,

18  and again, Dr. Cartwright can speak to them, I think the

19  concerns go to what is the breadth of this project and what are

20  the end steps of the project.

21      Notwithstanding the fact that we've been going at this for

22  two years, only one indicator has been certified by the data

23  expert, and so I think fundamentally we can speak to the

24  staffing issue, but we don't believe that the staffing issue is

25  the fundamental reason as to where we are.

 1        But again, we're here to talk solutions.  Dr. Cartwright's

 2   activation schedule -- that was filed with the Court --

 3   demonstrated what issues had arisen in the process.  Remember

 4   the fundamental basis for that document is, "Here are the

 5   impediments that might slow us down," we self-identified some,

 6   we talked about some, and then we talked about solutions where

 7   Dr. Cartwright can speak to those issues.

 8        And I don't think there's a great deal of focus on our

 9   filing on staffing being the impediment to completion of this

10   process, number one.

11        Number two, I also think it's important to sort of hear

12   out.  Again, we're not -- defendants are not identifying

13   staffing as the fundamental basis to slowing down this process.

14   We're talking about the breadth of this process and what are

15   the end steps so that we can certify indicators individually.

16        But again, I could defer to Dr. Cartwright if the Court has

17   any specific questions, but I don't think we're saying that

18   staffing is the primary driver of not being able to meet a

19   December 2023 deadline or earlier which I think defendants

20   would be encouraged by.

21             THE COURT:  So there's no inference to be drawn from

22   the budget change proposal, January 2022, seeking 22 additional

23   positions?

24             MR. MELLO:  Again, they have asked for additional

25   positions, I think, number one.  Number two, there are 14

 1   persons who are currently working on this.  Dr. Cartwright can

 2   speak to how much they are working on it.

 3       In addition, it's not like somebody comes in immediately

 4   and is available to start working on the project, but again, I

 5   don't want to get in front of Dr. Cartwright if you have a

 6   specific question for him as the project manager.

 7           THE COURT:  Well, if you -- so, Dr. Cartwright, no

 8   more staff needed to move this project along as quickly as

 9   possible, as efficiently as possible, and get ahead of that

10   December 2023 deadline?

11           DR. CARTWRIGHT:  First, good --

12           THE COURT:  The defendants have in mind that I'm not

13   blessing?

14           DR. CARTWRIGHT:  Yes, your Honor.  And, first, good

15   afternoon, thank you for the opportunity to speak today.  I

16   know this is an incredibly complicated project, and I'm happy

17   to answer questions, speak with you directly, and help us move

18   along as efficiently as possible.

19       To the question about staffing, Mr. Mello is correct.  We

20   currently have 14 full-time staff dedicated to this project,

21   and we are in the process of recruiting 10 more.

22       Those are immediate positions that we wanted to fill so

23   that we could start to make process as soon as possible, but

24   they are not full-time permanent positions, and that's what the

25   budget proposal would seek to make permanent.

1           THE COURT:  But is there a need for -- is there not a

2   short-term need, for lack of a better word, strike force?  To

3   get certain work done that will not necessarily require bulking

4   up?

5           DR. CARTWRIGHT:  Your Honor, I don't see it that way,

6   and for two reasons:  One, a short-term task force would need

7   to be trained on the very complicated systems that we currently

8   use.

9       Dr. Potter took some number of months to get up to speed on

10  everything, and in order to have like a short-term task force

11  we would need to factor that in.

12      The other major concern that we have is the number of

13  changes to the data remediation process that have happened in

14  the last few months.  Because we're still trying to figure out

15  and put in place mitigation plans in order to address those

16  potential contingencies that I mentioned in the activation

17  schedule, we're still trying to sort out how best those are

18  going to work out.

19      So it's not clear to me that having a number of people

20  added to the project today would actually make us go any

21  faster.  And at some point, your Honor, it doesn't matter how

22  many people we add, the process takes as long as it takes

23  because we want to get it right.

24          THE COURT:  So the 14 people, what are their job

25  titles?  Is Dr. Leidner one of those or not?

1          DR. CARTWRIGHT:  Dr. Leidner is a part of the

2    project; he is not --

3          THE COURT:  Is he one of the 14?

4          DR. CARTWRIGHT:  No, your Honor.  He does work on it,

5    but I didn't count him in the 14 because he's not full time

6    dedicated to the project.

7          THE COURT:  All right.

8          DR. CARTWRIGHT:  Off the top of my head, we have a

9    research data manager, some hospital program specialists, also

10   research data specialists, research data analysts, associate

11   government program analysts, and other support staff.

12         THE COURT:  Let me just ask Special Master, if I may.

13   Can I ask Dr. Potter or Mr. Dlugacz?  You acknowledge those 14

14   persons working on this project, and they're part of the

15   meetings that you're participating in?

16         DR. POTTER:  I have never seen an org chart with

17   those people listed and I don't know their names.  My primary

18   contacts in the process have been Ms. Leung, Pak Yan Leung, one

19   of their technical people, and Dr. Cartwright.  So behind the

20   scenes there may be 14 people working, but I am not aware of

21   their org chart for it.

22         THE COURT:  All right.  Anything to say on the

23   staffing issue?  I believe it's the plaintiffs who pointed me

24   to the budget change proposal.

25     Mr. Bien, are you the lead on this or is someone else?

1                MR. BIEN:  Ms. Trapani will be covering it.

2                THE COURT:  I'm sorry -- Ms. Trapani, all right.

3                MS. TRAPANI:  Yes, I'll be taking this issue for the

4    Court.

5        We think the budget proposal speaks for itself in the

6    request for 22 additional positions, as you identified, your

7    Honor.  The thing that we understand about the delay in the

8    process is that there's -- when we get documents and --

9    documentation of the business rules, there's often a lack of

10   uniformity, and we understand that the data expert shares those

11   concerns.

12       It often causes us to be unclear on what things are being

13   measured in the first instance.  And having additional staff,

14   especially centralized few staff to do all of the technical

15   writing, we believe would assist in speeding up the process.

16       We also understand that there are delays in the

17   verification steps which plaintiffs aren't directly involved

18   in, but from the biweekly meetings that we engage in with all

19   the parties, we have a window into how that process is working,

20   as we said in our brief.

21       We understand that a lot of the delays are due to test

22   writings not being completed within the CDCR mental health IT

23   team in a timely fashion, and we think additional staff would

24   assist with that process.

25                THE COURT:  All right.  Is Undersecretary Toche

 1   prepared to let the Court know what she may be thinking about

 2   this issue; that is, the timeline for completion of data

 3   remediation as it relates to staffing?

 4        MR. MELLO:  I think -- your Honor, Mr. Mello.  I

 5   think Undersecretary Toche would say that she would defer the

 6   discussion of this topic to Dr. Cartwright, but -- do you

 7   disagree?

 8        UNDERSECRETARY TOCHE:  No.

 9        MR. MELLO:  And Dr. Mehta may have something to say,

10   if your Honor would like.

11        THE COURT:  All right.  If you want to say something,

12   you may.

13        DR. MEHTA:  Thank you, your Honor.  I just wanted to

14   reassure that we hired, you know, those 14 people, a lot of

15   those people came from other positions in our department and

16   knew our system quite well, and we took them away from those

17   jobs and put them on this project and then hired behind them to

18   the other positions.

19     We have a retired annuitant, so we're taking advantage of

20   the people with the expertise that will take up the least

21   spinoff time and the least education time at the beginning of

22   the process.

23     And at some point the bottleneck becomes the number of

24   hours available for meetings every week.  We spend a lot of

25   hours on this every week in meetings, and that's -- you know,

1  having the information prepared for that meeting and then doing

2  the actions that result from that meeting's decisions, it still

3  requires that number of hours be spent in meetings.

4          THE COURT:  Are the 14 people -- what percentage of

5  their time, 100 percent of their time on this?

6          DR. CARTWRIGHT:  Yes, your Honor.

7          DR. MEHTA:  Yes.  And we're not waiting for that

8  authority.  We went ahead and got them on the project right

9  away.

10         THE COURT:  So you're saying the 14 is subsumed in

11 the 22?

12         DR. CARTWRIGHT:  I believe so.

13         THE COURT:  There's a net eight?

14         DR. MEHTA:  Yes, your Honor, exactly.

15         THE COURT:  And that doesn't include Dr. Leidner.

16 You said he's not full time on this project.  What's your

17 understanding of what percentage of time he does spend on the

18 project?  If one of you who's willing to speak to the Court

19 this afternoon knows.

20         DR. CARTWRIGHT:  Yes, your Honor, Dr. Cartwright.  My

21 understanding is that he meets with Dr. Potter five days a

22 week.  On average, I think it's two to three hours at least a

23 day.  Although Dr. Potter certainly could speak to his

24 experience with Dr. Leidner; he's also involved in some of our

25 other meetings.

 1          I'll say in general someone is meeting with the Special

 2   Master's team, from our team five days a week.  On average,

 3   it's between 16 to 24 hours of meetings per week.  And that

 4   doesn't account -- that doesn't include the time we take to,

 5   you know, do the work that is necessary to move things forward,

 6   prepare for the meetings.

 7          I hear plaintiffs, Ms. Trapani, mention that there is, you

 8   know, issues with our grammar sometimes or maybe not being

 9   clear in our documentation.  There are certainly opportunities

10   for us to improve, and we own that, and we are looking to

11   improve it.  But those aren't the major delays that are causing

12   to rework our entire data remediation plan to account for a new

13   pilot plan or re-prioritize all of the indicators so that we

14   can avoid the significant delays that I mentioned in the

15   activation schedule.

16              THE COURT:  We're going to talk about how things

17   might be streamlined.  I'll accentuate the positive, I

18   appreciate the departments owning that -- there do appear to be

19   deficits, from what I'm hearing, in the --

20              DR. CARTWRIGHT:  Yes, your Honor.

21              THE COURT:  -- the technical capabilities available.

22   And so I realize there are a number of bodies, whether or not

23   there are sufficient numbers of technical writers, that's not

24   clear to the Court at all.  This is not my field, obviously.

25          I've told the Special Master and Dr. Potter I'm a person of

1   words, and I would not presume to second guess you,

2   Dr. Cartwright, or Dr. Potter, or anyone who really knows this

3   stuff.

4       But right now there's something a bit miasmic about what

5   the Court is reading and hearing, and we need to cut through

6   some of that and really ensure that this is moving forward.

7       I do -- my tentative thought is I am going to ask the --

8   I'm going to have a continuation of the status conference.  I'm

9   going to suggest that we do a focused follow up tentatively on

10  May 6th just to hear back from the secretary and the

11  undersecretary their responses to the Court's suggestions this

12  afternoon on streamlining.  Particularly with proper staffing,

13  how much more quickly can data remediation be concluded?

14      In terms of what's going on here, I just want to -- I want

15  to clarify the Court's assumption -- I don't think there's any

16  disagreement with this -- but I assume that what the

17  defendants, with the Special Master's oversight access to

18  Dr. Potter with plaintiffs in the room, that there is

19  development of a written process for writing business rule and

20  key indicator specifications for coding and for validating,

21  verifying, and certifying data produced by the coded

22  specifications as necessary to mental health data remediation.

23      So that's what is going on, just to simplify things.

24  Here's my question.  I understand that Dr. Potter has guided

25  the creation of those processes which are now operational, and

1    so the focus now needs to be on functionality.

2        Does anyone disagree with that?  Dr. Cartwright?

3            DR. CARTWRIGHT:  Your Honor, I think I understand the

4    question, but I might just ask -- are you asking me if

5    Dr. Potter has given us a full understanding of what is

6    expected, and it is now on my team to make it happen?

7            THE COURT:  I don't think that's quite what I'm

8    saying.

9            DR. CARTWRIGHT:  Okay.

10           THE COURT:  I'm trying to use -- the reason I'm

11   reading is I'm trying to use language that you all understand.

12       So is it -- have the processes been -- are the processes

13   now created and operational, is that language you understand?

14           DR. CARTWRIGHT:  Yes, your Honor.  What I would say

15   is that since September 29th, 2021, when we filed our

16   preliminary activation timeline, we have been operating under a

17   very specific data remediation plan.  And the first two months

18   of that plan went very smoothly, there were no changes, and we

19   actually at one point achieved -- I think we were five and a

20   half months ahead of schedule -- ahead of the December 2023

21   schedule.

22       At some point, though, towards the end of November and

23   December, the process had to change.  There was new variables

24   being introduced, the --

25           THE COURT:  It would help me if you use the active

1    voice.

2              DR. CARTWRIGHT:  Yes, your Honor.

3              THE COURT:  The variables didn't come out of thin

4    air.  So even if it's -- people would disagree with it here,

5    just let me know what you're really saying.

6              DR. CARTWRIGHT:  Yes, your Honor, absolutely.  In

7    some cases the Special Master's team introduced new variables,

8    they needed -- well, they explained to us that the verification

9    stuff that was previously discussed actually needed to be much

10   more comprehensive, and that's where the term the 36-step

11   verification process is discussed in the activation schedule.

12        Also, the Special Master's team decided to no longer offer

13   us written feedback during the stakeholder review portion of

14   the activation schedule, the data remediation plan.

15        Also, the guidebook for our continuous quality improvement

16   tool, we had anticipated comprehensive feedback upfront, but we

17   were told towards the end of November that both plaintiffs and

18   the Special Master would no longer offer us comprehensive

19   feedback.  That they, moving forward, would only offer

20   incremental feedback.  They have given a very clear rationale

21   to their thinking.  Whether we agree or not, you know,

22   reasonable people can disagree in this world.

23        It does not change the fact that this was a new variable

24   introduced after the timeline.  And the final variable or the

25   major issue that impacted our timeline is that we actually need

1    live data collected during CQIT tours before data remediation

2    can be completed.  The final step of data remediation must have

3    live data in order to be fully certified.

4        I'm happy to report -- and it's in the activation

5    schedule -- that all four of those currently have a mitigation

6    plan.  One of them is -- or two of them, rather --

7            THE COURT:  So here's my --

8            DR. CARTWRIGHT:  Yes.

9            THE COURT:  And I've heard that there's -- about

10   these issues.  But do you agree with the operational versus

11   functional line?  That the focus now should be on

12   functionality, or is what you're talking about, do you think

13   that affects whether or not -- whether or not the processes are

14   now operational?

15           DR. CARTWRIGHT:  Yes, your Honor.  My thinking on

16   this is that in order for it to be operational, we need to have

17   a stabilized plan.  If it continues to change each month with

18   new variables being introduced by any of the parties or the

19   Special Master's team, it is difficult for us to operationalize

20   that and make meaningful progress.

21       As it stands, and the reason -- I'm sorry I wasn't clear --

22   the reason I brought up those examples was to point out that it

23   hasn't really been a stabilized process, it continues to

24   change, and we are trying our best to move with those changes.

25       Dr. Potter recently commented that our ability to be

1   flexible in the process is remarkable.  But that is where we

2   are.  And to your question, your Honor, it is difficult for us

3   to operationalize or move forward as the process continues to

4   change.

5              THE COURT:  Well, I understand that there are some

6   conflicts arising because of possible gaps in policy, and some

7   of it may involve interpretation of the program guide.  I mean,

8   is that what you're referencing?  Is that the root of what's

9   going on here in your mind, Dr. Cartwright?

10             DR. CARTWRIGHT:  Your Honor, the four issues I

11  brought up that have a mitigation plan aren't quite covered by

12  what I think you're bringing up now.  The policy -- if I may --

13             THE COURT:  Okay.  So let me ask the Special Master

14  if he wants to say anything first in response.  But I need to

15  understand, because I had thought the Special Master and

16  Dr. Potter understood that Dr. Potter had moved the processes

17  to the point where they are now operational.

18     Special Master Lopes, do I misunderstand, or what's your

19  response to what you're hearing?

20             SPECIAL MASTER:  Your Honor, if I may, I would like

21  to have Dr. Potter address that, please.

22             THE COURT:  All right.

23             DR. POTTER:  Yes.  Good afternoon, Judge.  The

24  process, I believe, you know, from my outside perspective, has

25  been operationalized.  They are taking the steps in their

1   remediation plan which are essentially the same ones as in

2   their preliminary activation schedule.

3       They rearranged a little bit, I think to its betterment.

4   The issues that are raised here are -- I disagree that they are

5   substantive.  I think that, you know, the question about, you

6   know, collecting live CQIT data, you know, that's been

7   addressed in private formats repeatedly.  The suggestion was

8   that synthetic data could be used to write verification tests

9   and a limited sample of data could be collected.

10      And then I essentially told them that, you know, if you

11  want to report remediated data, you have to collect remediated

12  data.  And that's just -- it's like rhetorical and

13  tautological, right?

14      Like if you have data and you want to state it's

15  remediated, you've had to have gone through the process of

16  doing that, and so it's puzzling why this is a surprise, it is

17  true about the automatic indicator as well.

18      If you want to report data from on demand that's been

19  remediated, then you have to go through this process.  So I'm

20  puzzled with this claim that it represents a huge deviation.  I

21  realize it may be a surprise to CDCR because they didn't

22  perhaps anticipate this reality when they were embarking on

23  this process, but it's kind of a natural, logical conclusion

24  about the process of data remediation.

25      The verification step, that complexity is just a detailed

1    summary of essentially their current software development

2    process where the hand-off between the testing team and the

3    reporting team, which is running the test, is formalized to

4    make sure that neither team is, like, gotten ahead of.  And so

5    it's detailed, but it could have been described in three steps.

6        So the focus on 36 steps is just -- it was a careful

7    document, and it's a kind of step-by-step approach, but, you

8    know, that step itself with the right staffing could be

9    completed very quickly.

10       In my long experience with these kind of processes and

11   projects, once, you know, a certain number of issues have been

12   resolved, there's kind of a pattern for the sorts of

13   constraints and bugs that will be encountered, and then going

14   forward there's an agile process where the people working on

15   the process realize, "Oh, this is an issue, we could address

16   this sooner," it all goes a lot faster.

17       And so I'm assuming that, you know, as we go down this

18   process it will go more quickly.  And so my perspective is it's

19   a big project, it needs to be addressed in an agile way.  I

20   think, you know, on a practical front CDCR has been doing so,

21   the rest of these issues I can't -- and I'm very intimately

22   connected with the process -- I can't quite wrap my head around

23   why they need to be brought to the front or why there's this

24   idea that no more changes are possible.

25       You know, there are many unknowns in this process.  The

 1  data system was not developed --

 2          THE COURT:  Well, let me -- I'm just focusing on this

 3  operational versus functionality.

 4          DR. POTTER:  Yeah.  Okay, sorry.

 5          THE COURT:  You know, you risk losing the Court.

 6  Again, I'm not --

 7          DR. POTTER:  Yes.  It is operationalized in my eyes.

 8  I feel like they're taking the steps necessary, which people

 9  may be frustrated, they may be slow, but they will lead to

10  remediation of the data and a clear, you know, identification

11  of outstanding issues around certain indicators and practices.

12          THE COURT:  So let me ask plaintiffs, anything to say

13  on this point?

14      Ms. Trapani, are you the person to address this?

15          MS. TRAPANI:  Yes, your Honor.  I have been the lead

16  on this project for plaintiffs' counsel.  And the way that I've

17  thought about it when listening to your question, your Honor,

18  is that there was an initial phase where we were building the

19  car, so to speak, we were putting the pieces together.

20      Now we're in the test driving phase, and sometimes you

21  discover during that test driving phase that there are things

22  that need to get tinkered, and we're going back and revising

23  them as they arise, but we couldn't have foreseen them in the

24  beginning.  And that's what occurred with the new pilot process

25  that we embarked on in March of 2022, just a couple of weeks

 1   ago.

 2       So I'm hopeful that we're going to be getting things off

 3   the ground a little bit more quickly as we all adjust to this

 4   new process, and in the meantime we're also starting to address

 5   some global issues that involve multiple indicators, such as

 6   the topic of sampling methodology and things like that which if

 7   we can address those upfront as we're doing now, it will

 8   increase the speed as we go down the line.

 9           THE COURT:  All right.  Well, so far we have two

10   follow-up items that I'd like to hear more about in a couple of

11   weeks.  One is timeline as related to staffing.  The second is,

12   is there any clarity the Court can provide to confirm, or not,

13   whether or not the operational phase is effectively done

14   subject to tinkering?

15       So let me move on to this other issues which I was

16   signaling, and that is the gaps in policies or conflicts

17   between existing policies and interpretation of the program

18   guide that are being uncovered during indicator remediation,

19   which is the writing of accurate business rules and key

20   indicator specifications.

21       So I want to try to provide some clarity here.  I think the

22   Court can prescribe a process that can act as a funnel, and

23   hopefully the funnel is never unstopped.  But I think the

24   parties could use some -- some guidance.  And I think

25   fundamentally data, the data remediation project should not be

1   resolving policy disputes.

2        The data should be an aid of remediation, and if there are

3   disputes -- clarifying those for the Court, to the extent the

4   Court needs to be involved.  It may be the Court doesn't need

5   to step in at any point and decide any Eighth Amendment

6   questions at this late stage of the case.

7        But here's the process in consultation with the Special

8   Master and Dr. Potter that I am suggesting, and so let me know

9   if you have concerns about this -- this approach to addressing

10  these conflicts that have arisen in assuring that they don't

11  take unnecessary time delaying the full functioning of the data

12  system.

13       So I understand that the Special Master believes that

14  Dr. Potter, working with Dr. Leidner, in that constructive

15  relationship which has developed and is necessary, CDCR

16  programmers working under you, I assume Dr. Cartwright, can

17  write code to provide data analysis to quantify the extent and

18  nature of any gaps or conflicts.

19       And, in other words, where there is a gap or a conflict

20  related to an indicator, that means the key stakeholders, and

21  when I say "stakeholders," I've clarified this before, I mean

22  the principals, the people who know the business that is at the

23  heart of the case, the undersecretaries, the secretaries, the

24  Dr. Mehtas, the clinicians.

25       So the steps that would happen if a conflict really is

1    evident.  First, business rule and key indicator specifications

2    can be written to capture the data for the scope that everyone

3    agrees on, the scope of the issue.

4        And, second, additional analysis can be provided to clarify

5    the extent of the gap and the parties' positions.  That's using

6    very broad language, but I understand it's the kind of language

7    that a Dr. Potter -- you and Dr. Cartwright -- would use.

8        The point is the data would be -- would be refined, and do

9    you need time to consult with Mr. Mello, Dr. Cartwright?  I see

10   he's whispering in your ear.

11           DR. CARTWRIGHT:  Apologies.  No, your Honor, that's

12   okay.

13           THE COURT:  So the question is, if the Court

14   prescribes that process, then the clarification of the extent

15   of the gap based on the data, if the parties with that

16   additional information can't resolve the dispute, then it would

17   go -- the Special Master would take the issue to the secretary

18   and the undersecretary, and they would see if from where they

19   sit they can close the gap, or if they need further

20   clarification of the data.

21       And if those persons working together cannot, then the

22   issue could be brought to the Court with any focused questions

23   that the parties or any one party might think the Court needs

24   to resolve.

25       Would that process work, based on what you know about

1    conflicts that are arising, Dr. Cartwright?

2         DR. CARTWRIGHT:  Your Honor, I can't immediately

3    agree that that would solve the problem, and if I may offer why

4    I think it would be insufficient.

5       In -- when we're going through the policies, CDCR starts

6    off with how we understand -- we wrote the policies and how we

7    understand them to be interpreted.  And then we are very

8    transparent with everyone involved, and we show how we intend

9    to measure that policy.

10      The conflict comes up when either the Special Master's team

11   or plaintiffs believe that we have misinterpreted our policies

12   or -- and, in some cases, where what is written in black and

13   white is not actually what we should be doing, and they are

14   encouraging us to broaden the scope of the indicator or broaden

15   the scope of how much of the policy it measures.

16      I -- I'm hearing this for the first time, so I apologize,

17   your Honor, the plan that you outlined.  But I find it

18   difficult to see how data would help with that problem.

19         THE COURT:  Well, maybe there are some problems that

20   don't need data, but they still go through this process.  You

21   could ask, is there data that would help refine the problem?

22   And, if not, move it up as quickly as possible to the

23   undersecretary and the secretary with the Special Master.

24   Exhaust, exhaust, exhaust, and if need be, then request the

25   chance to bring it to the Court in a focused motion.

1    I'm going to ask the plaintiffs the same question, but I

2    think -- it does seem to be things are getting bogged down

3    here.  I don't think the program guide, from what I am hearing,

4    the program guide doesn't spell out everything.  And so one

5    question is gap filling, and the data folks shouldn't be gap

6    filling if there's a policy determination.  But, ultimately,

7    that's, you know, the secretary might be able to clarify that.

8    It shouldn't be stuck in -- in a group of -- I mean, I

9    understand it's important to have all these folks in these

10   meetings, but there's got to be a way if we're using the car

11   analogy, if there's a, you know, a bump in the road, there's

12   got to be a way to get past that.

13   So we can put this on the list to follow up in two weeks

14   on, but in the meantime do you have some other thoughts,

15   Dr. Cartwright, about how to expedite getting past these

16   conflicts?

17        DR. CARTWRIGHT:  Your Honor, our hope was that we

18   could clarify that today, so I appreciate you bringing it up,

19   and looking at ways to confirm that the way CDCR understood

20   this process, that we would look at our policies and our

21   understanding of them and how we measure them and make that

22   very transparent, and move that through the data remediation

23   process.

24   And that if there was any kind of disagreement or dispute,

25   all of, you know, plaintiffs and the Special Master have tools

1    by which they can use to resolve those conflicts outside of

2    data remediation, but it wouldn't -- I think this is a shared

3    goal, your Honor, that it wouldn't slow the process down.

4            THE COURT:  All right.  Your thoughts on this,

5    Ms. Trapani?

6            MS. TRAPANI:  Thank you, your Honor.  I think there

7    are two issues here that may be getting somewhat conflated.

8    The first issue is that when we see a business rule that

9    doesn't map onto the black letter policy of the program guide,

10   our approach has been to address that with -- among the people

11   in the data process -- because the problem there is the way

12   that the data specification is written.

13       And an example of that is the issue we discovered with the

14   ASU prescreen requirement where the program guide says before a

15   patient enters segregation, they must receive a screening for

16   their risk of suicidal ideation.  And we learned that the way

17   the business rule was written allowed for compliance with that

18   requirement if the screen occurred after they already arrived

19   to segregation.  So that was more of a technical fix of mapping

20   policy into the data specification.

21       The other issue has to do with filling gaps, as you

22   described.  And an example of that that has come up has related

23   to MAPIPs.  Specifically, there are requirements in the MAPIP

24   policy that set out different measurements that must occur when

25   a patient starts a psychiatric medication such as getting an

1    EKG on a certain time frame.  But there's no specific language

2    as to whether a patient who starts a new psychiatric medication

3    or a second psychiatric medication on top of the first one,

4    whether they need to restart the timeline, so to speak, on all

5    of those measurements.

6       And that's a policy discussion that is occurring currently

7    on the sidelines of the data remediation process, amongst the

8    clinicians, and we think that that's an appropriate way to

9    resolve disputes like that.

10          THE COURT:  I'm sorry, who is involved in resolving

11   that?

12          MS. TRAPANI:  The Special Master's clinical experts

13   as well as CDCR's clinical experts.

14          THE COURT:  And there's a work group?

15          MS. TRAPANI:  That's my understanding, yes.  I'm not

16   sure if there is a formal work group because this is, from my

17   understanding, the main policy dispute that has come up in this

18   process thus far.  But because it relates to psychiatry, my

19   understanding is that it is CDCR's psychiatrists who are

20   discussing it internally, and they're going to be having a

21   larger discussion with the experts on the Special Master team

22   about this.

23          THE COURT:  So where is the ASU prescreen issue in

24   your view at this point?

25          MS. TRAPANI:  That is the first indicator -- no, that

1  is the indicator that was remediated.  We agreed to fix the

2  rule, and defendants agreed that the business rule was not

3  written in alignment with the program guide, and so that was

4  corrected.

5          THE COURT:  So do you think the current processes are

6  working then effectively, without any need for support?

7          MS. TRAPANI:  I do.  I do, yes.  And I think our

8  number of meetings are assisting with that.  Like I mentioned

9  before, we have started a new process so it is taking some time

10  to get used to things, and there are delays, as set forth in

11  our brief, that have not always been the fault of plaintiffs

12  and the Special Master, especially getting us feedback on

13  things when we've written letters.  There's a backlog there

14  that's causing delay.

15      But, overall, I do think that we are moving in the right

16  direction.

17          THE COURT:  All right.  I want to talk a bit about

18  activation schedules and then next steps.  My thought is to, at

19  this point, have the Special Master confer with the secretary

20  and the undersecretary -- undersecretary, as it makes sense

21  here, regarding a refined template for possible uses and

22  activation schedule.

23      I think there is a format for scheduling that would match

24  more with the goal of streamlining, while recognizing there's a

25  lot to work through here -- I know there's a lot to work

1    through here.

2        So I'm going to ask the Special Master to share a proposed

3    template with the secretary and all those involved, and then we

4    can hear more about that in two weeks.

5        Just so it's clear, I've made -- I've told the Special

6    Master that if the Special Master and the parties agree that an

7    indicator can come off of the list, I don't need to approve

8    that.  So you all have, you know, veto power.  But if the

9    parties -- maybe if you want to memorialize that in a

10   stipulation just for the record, that's fine, but I don't need

11   to hold up the process by thinking about that.

12       In terms of the next steps, I am going to direct the

13   Special Master to follow up with Undersecretary Toche,

14   Secretary Allison, Dr. Potter, and Dr. Leidner to discuss

15   everything we've talked about this afternoon with an eye to

16   streamlining data remediation.  But the goals being to move

17   forward the functionality of data remediation, preserving

18   captured data as needed for remediation, and, if necessary, to

19   aid the Court in resolution of any substantive issues that come

20   to light.

21       And the focus of the Special Master discussion should be on

22   the timeline overall as related to staffing resources.  I would

23   like to understand if all the available resources have been

24   capped in the way that really matches the need here to move

25   this forward as quickly as possible.

1    I want to hear more about the concerns Dr. Cartwright is

2  raising about whether or not the system currently is fully

3  operationalized, you know, are there serious concerns here or

4  is it more tweaking, putting oil in the tank, as Ms. Trapani

5  suggests?

6    And then I'd like the parties to think about my proposal.

7  It may be ultimately, Dr. Cartwright, you agree with

8  Ms. Trapani?  Do you agree with her that the current processes

9  are working as evidenced by what's happened with the ASU

10  prescreening and what's happening with the MAPIP issue?

11         DR. CARTWRIGHT:  Your Honor, I appreciate

12  Ms. Trapani's example of ASU prescreen.  It is a good

13  opportunity to point out that we don't disagree on everything,

14  and when there are opportunities for us to improve, we

15  voluntarily do so without the kind of disagreement process that

16  I think we're trying to avoid, and the ASU prescreen is a good

17  example of that.

18    To use her metaphor, you know, tinkering with the car.

19  From my perspective it isn't a matter of changing the oil or

20  adding air to the tire, it's more akin to replacing the

21  transmission or overhauling the body of the car itself that is

22  slowing us down.

23    If we could try to stabilize that and use, you know, kind

24  of an agreed-upon process, and I tinkering would be well within

25  our ability to manage and make progress moving forward.

1              THE COURT:  All right.  My question would be, what is

2    the way to identify those issues, exhaust them as quickly as

3    possible, and move them up the chain?  So that, to me, is

4    consistent with streamlining, that rather than getting bogged

5    down, stuck in the mud.

6              DR. CARTWRIGHT:  Uh-huh.

7              THE COURT:  That there's got to be a way to recognize

8    when there's something where the tires are spinning.  Does that

9    sound right to you, Dr. Cartwright?

10             DR. CARTWRIGHT:  Your Honor, I think I understand.

11   Not just disagreements, but also wholesale changes to the

12   process if we can agree on that at our level also using, I

13   think, the process you're encouraging us to consider to elevate

14   that and see if it can be agreed upon to help move the process

15   forward more efficiently.

16             THE COURT:  And I don't -- yeah, there's going to be

17   disagreement about whether or not there is wholesale changes to

18   the process.  The question is, is there anything there the

19   Court ultimately needs to resolve the dispute or are there

20   people within CDCR?  Can the secretary or the undersecretary,

21   from where they sit, see a way to resolve that in consultation

22   with the Special Master?

23        That's what I would like to encourage.  You know, if

24   there's something there for me -- I don't know if that kind of

25   issue that you're raising really raises Eighth Amendment, so I

 1    don't know that I need to get involved at that point.

 2        But if there's something the parties can't resolve once

 3    it's reached the highest levels, then I've told the Special

 4    Master I want to know about it without delay because I may be

 5    able to at least shine a light on it or think about the tools

 6    available to resolve that dispute.

 7        All right.  Anything else on data remediation?

 8            MR. MELLO:  Your Honor, if I may.

 9            THE COURT:  Let me start with the plaintiffs -- and

10    anything from the plaintiffs?  Is it Ms. Trapani, I guess

11    you're the point person on this so I'll ask you.

12            MS. TRAPANI:  I think -- your Honor, I think your

13    idea of having some kind of deadline or an avenue to elevate

14    disputes where, when they do ripen, it's clear that the parties

15    are on opposite sides would be helpful.  I don't think we're

16    there yet with the MAPIP example that I provided to you, but if

17    there is, down the line, a known disagreement as to that issue,

18    then it would be helpful to have an avenue to resolve that

19    sooner rather than later possibly.  But I'm open to discussing

20    that with defendants further.

21            THE COURT:  All right.  So think -- maybe there's

22    just a simpler process, and if you want to use MAPIP as an

23    example for thinking about it.

24        All right.  Mr. Mello?

25            MR. MELLO:  Yeah, so -- thank you, your Honor.

1    So we've spent a great deal of time today, I think, talking

2    about the front end of this project deemed data remediation.

3    We haven't talked -- and our request for clarification sought

4    some sort of guidance as to the back end of the process; that

5    is, are we individually verifying indicators, when does that

6    occur, how does that occur, how is that reported?

7    And there's been no discussion on that, I think that

8    defendants would like some clarity on that issue.  And,

9    obviously, it's defendants' position, and I think

10   Dr. Cartwright can speak to it more clearly, that we believe

11   that we should receive verification or lack of verification of

12   individual indicators on a regular basis in writing.

13   And I think that would also help the process.  If we focus

14   only on the beginning and we never move all the way through the

15   process, we still don't know what the end goal is at this

16   point.  And I think that that's also important.  Okay, we're

17   talking about the front, but let's also talk about the end.

18   And not just an end as to date, but an end as to verification

19   of a particular indicator.  Thank you.

20        THE COURT:  Let me just ask the Special Master before

21   I ask if Ms. Trapani has anything she wants to say for the

22   record here today on that point.

23   I have the impression that the template for activation

24   going forward, that the Special Master and Dr. Potter have in

25   mind might be responsive, in part, to what Mr. Mello has said.

1    Is that fair?

2                SPECIAL MASTER:  I agree completely, your Honor.

3                THE COURT:  All right.  Dr. Potter, is that fair?

4                DR. POTTER:  Yes.  Yes, I mentioned that when an

5    indicator has been remediated, it means that there's some tests

6    that are being run to make sure that it is producing accurate

7    results.  And, you know, if those tests indicate that the

8    indicator is no longer functioning, I cannot imagine that CDCR

9    would want to portray that indicator as having been remediated

10   because it's clearly not working correctly.  So language is

11   important here.

12               THE COURT:  All right.  So there is -- we'll --

13   you'll have a chance to have seen the template between now and

14   about two weeks from now, whatever works for Secretary Allison

15   and the undersecretary, and you can let me know if that's going

16   to guide the process forward.

17        Anything you want to say on this point, Ms. Trapani?

18               MS. TRAPANI:  Yes, your Honor.  We think it's

19   incredibly important that the Special Master focus his

20   resources, as he has been, in the field monitoring the

21   willfully inadequate care that our clients are currently

22   receiving in the institutions.

23        And as we defendants have made clear earlier in this

24   hearing, they have daily access to the data expert who is

25   providing oral feedback at every turn of this process.  We're

1    meeting weekly, and to require the Special Master on top of his

2    very important monitoring duties, including the upcoming UNA

3    study to report on incremental steps of this process, would be

4    a waste of his resources.

5         THE COURT:  All right.  Well, you two will have a

6    chance to see the template that the Court is considering based

7    on Dr. Potter's suggestion, so we can talk more about that in

8    about two weeks.

9      I had some questions, as I signalled in the minute order,

10   on a staffing and bed capacity.  Now, is this for Dr. Mehta

11   possibly?

12        DR. MEHTA:  Yes, your Honor.

13        THE COURT:  So I'm just -- in terms of beds, and the

14   secretary herself referenced the budget process.  And, you

15   know, Courts read newspapers, there's a massive surplus.  And

16   so in terms of beds as a possible capital project, I'm just --

17   can you tell me -- looking back at the fall 2021 population

18   projections for casting a shortfall in the number of beds for

19   male inmates in EOP ad seg units, psychiatric services units,

20   and ICFs, is it possible that that shortfall is being addressed

21   to current budgeting?

22        DR. MEHTA:  Sorry, just to clarify, your Honor is

23   specifically talking about ICF?

24        THE COURT:  EOP ad seg, PSUs, ICF.

25        DR. MEHTA:  Thank you, your Honor.  The projections

1   that were from the last set have not sort of kept pace with the

2   actual numbers as we've seen them occur, so there is a new set

3   of projections coming out shortly after what's called the May

4   revise, and we're going to use those to be able to have, I

5   think, a more accurate picture.

6      But for different aspects of that we have different plans.

7   The plan to shut down CMF L-1 is addressing the ICF shortage,

8   and then the EOP -- and the EOP ad seg shortages, we want to

9   make sure that projections are as close as possible to the

10  actuals so we can plan for that eventuality specifically.

11          THE COURT:  But the thought is that that shortfall

12  could be cured?  Whatever the shortfall is based on updated

13  numbers?

14          DR. MEHTA:  Yeah.  Unfortunately, I can't speak to

15  what those projections will show next time, but I just know

16  that they're not keeping pace with the actual numbers at this

17  point.  So, yes, we would be able to update our projections and

18  have a more specific plan.

19          THE COURT:  It's one thing to plan; it's one thing to

20  fund.

21          DR. MEHTA:  Very true, your Honor.

22          THE COURT:  It sounds like you're talking about the

23  planning.

24          DR. MEHTA:  Yes, your Honor.  Just for us to be able

25  to decide what to fund, yes.

1          THE COURT:  What about licensing of beds, does the

2   current budget allow for a full licensing of mental health

3   beds?

4          DR. MEHTA:  Yes, your Honor.  So that's part of that

5   L-1 plan.

6          THE COURT:  All right.

7          DR. MEHTA:  The license that is given to an inpatient

8   bed or a CTC bed in our system can be used for any of the

9   levels of care that we use for inpatient.  It's not a separate

10  license for the different ones, so the flex policy is taking

11  advantage of that.

12     And then the other aspect of that is that we could use

13  five- or six-person cells, put one person in them.  And if we

14  have a shortage in certain types of cells, like single cells,

15  we could accommodate that shortage that way because we have the

16  fair capacity at other levels of care, other restrictive

17  housing level.

18          THE COURT:  And then finally on staffing, it looks as

19  if there is a proposal for -- that's taking account of

20  recruitment challenges and retention historically.

21          DR. MEHTA:  Absolutely, your Honor.  And this is what

22  I spend the majority of my week on as well as trying to figure

23  out solutions to this or ways that we can move forward.

24     The -- you know, the Special Master's economist report from

25  a few years ago show there's so many complications here.  But

1    the two things that we were able to do that are scheduled to go

2    into effect on May 1st, pending negotiations, those two -- it

3    took a huge amount of work and heavy lifting from CDCRs, and

4    we're optimistic that that will help make a difference there.

5        I don't know that it will solve everything, but we are

6    optimistic that it is going to give us a boost.

7            THE COURT:  Is authorizing new positions going to

8    exacerbate the problem?  In terms of more positions harder to

9    fill or the proposals are taking account of the whole ball of

10   wax there?

11           DR. MEHTA:  I believe I understand.  I would say the

12   whole ball of wax.  The shortages that we have are generally

13   for on site clinicians of psychologists, social workers,

14   including some psychiatrists, although, as we've seen, that's

15   gotten a bit better.

16       So we wouldn't be adding allocations to that unless there

17   were, you know, big shifts in population, big changes, and

18   we're just kind of following that trend line and making sure we

19   adhere to it as best we can.

20           THE COURT:  All right.  Well, I'll watch with

21   interest.

22       Again, I mean, I started the status with observing some

23   positive signs there, and I appreciate all the attention that's

24   been paid to that, and hopefully it's very brief.

25           DR. MEHTA:  Thank you, your Honor.

1          THE COURT:  If all the beds can get licensed, that

2   would be great, and the flex proposals sound very -- very

3   constructive and hopeful.

4          DR. MEHTA:  Thank you, your Honor.

5          THE COURT:  All right.  Well, I'll ask if there's

6   anything else anyone wants to say, but, otherwise, I'll ask

7   Ms. Kennison to work with the parties to identify a date as

8   close as possible to May 6th.  I'm not going to put it on the

9   record now, but finding a date that is realistic for the

10  secretary and the undersecretary to reappear with essential

11  counsel for our follow-up discussion.

12      Anything else you'd like to say, Mr. Bien, at this point,

13  or Ms. Trapani or Ms. Ells?

14          MR. BIEN:  Your Honor, I think that the Court has

15  raised population issues on bed shortages and staffing

16  shortages again and again, and we all know that the gaps

17  persist.  And the -- I'm concerned when defendants say that

18  they're not making construction plans or planning based on

19  their own population projections and process that happened in

20  the fall, and they're going to wait for the spring.

21      If you wait for the spring, then you can always wait for

22  the next fall, which is six months later, and construction

23  projects take, you know, four or five years.

24      So, you know, I didn't hear an answer from Dr. Mehta.  You

25  know, the L-1 plan just came out.  I don't think there's

1    anything in the budget about the L-1 plan.  I don't think

2    that's what he -- you asked that question, I don't think he

3    answered it.

4        There's still time in the May revise, it hasn't been

5    finalized.  I don't know what's really going on, only they

6    know, and then the legislature obviously has to -- is a party

7    to all that too.

8        But I think we are concerned by the absolute numbers that

9    the Coleman class continues to increase in size and acuity.

10   And, you know, that continues to be an issue, and we have --

11   would like to see some direct discussion of that issue, what

12   steps can be taken to address population, what is the effect of

13   the creditoring adjustments that the defendants are

14   implementing and proposing, and what do they project.  What

15   methods are they willing to implement, what are they discussing

16   to address this issue, because we'll never come into compliance

17   unless we do something to control the ever growing size of the

18   class.

19       We're now at the unfortunate level of one in three

20   incarcerated people in the system are Coleman class members,

21   astronomically more than we were at the time of the prejudge

22   court trial.  So that's the real reason why we can't come into

23   compliance.  It's very, very difficult, and there are lots of

24   factors affecting this, but we have to start facing that in

25   some way, shape, or form in order to, you know, bring the case

1    towards conclusion.

2           THE COURT:  Is there a specific status or a specific

3    role the Court can play?  I mean, I see the 50 beds in the

4    budget, it's -- but this Court doesn't -- and I can sign some

5    waivers.  I remember when those 50 beds, half of what was

6    projected, you know, when we discussed those.  There is

7    typically a lead time.

8       Is there any power this Court has?  There is a huge

9    opportunity, it appears on the one time for capital projects

10   right now, a lot of tension on the mentally ill population on

11   the streets of the state.  The Court assumes that a number of

12   them are going to end up in the state prison as members of the

13   Coleman class.  It's --

14           MR. BIEN:  Agreed.

15           THE COURT:  It's very frustrating to the Court, but

16   the Court also understands the limitations in its role.  And I

17   can try the data remediation, if there's more I can do, please

18   let me know, anyone, if the defendants need the Court's

19   permission/help/order.

20      And I know the budget change language says I ordered the

21   CQIT indicators, you know, I preliminary approved, but if an

22   order helps make a pitch to the legislatures who can

23   appropriate, please let me know.

24      This is where, you know, I'm out of my wheelhouse at this

25   point.  I can read the reports, I can tear my hair out, but I

1  do -- despite what some on the defense team may think -- I

2  understand my limits to my role.  But if there is something

3  that can be teed up now, I know there's a May revise.  I know

4  there are new numbers coming out.

5         MR. BIEN:  Your Honor --

6         THE COURT:  I can hope and pray that the defense --

7  the secretary, the undersecretary, the Governor are paying

8  careful attention to Coleman, and that's a piece of the puzzle.

9  It would be good for the State of California if Coleman got

10  resolved and the mentally ill in the prisons were receiving

11  constitutionally-adequate care.  There is no question.

12      Is there more that you think the Court can facilitate or I

13  should do in response to a request for a motion or order or the

14  parties can bring me the stipulation, Mr. Bien.

15         MR. BIEN:  I did not mean to suggest that I think

16  more building is necessary as a solution; I really don't think

17  that's the solution.

18      I think that more planning of how recruiting people into

19  prison, who's getting in there, how people are getting out of

20  prison, creditoring DPH, a lot of things like that.  We were

21  going to have a settlement conference about this topic, and, of

22  course, we're free to meet without the Court ordering us to

23  meet, and, you know, we would like to do that.  And, you know,

24  I hope -- I hope that we'll have an opportunity to have a

25  discussion about that rather than, you know, moving through

1   court orders.  The court orders obviously would eventually

2   require a brief of court if it was directly population, and

3   that would be more litigation rather than solutions here that

4   we all know would be better for society and the prison system.

5          THE COURT:  Well, I think I've made clear.  If

6   there's this focused request for settlement, you can bring that

7   to me.  I don't know how a settlement conference now would

8   dovetail with the budget process, and the state does appear to

9   be thinking about some alternatives with the CARE court option

10  and -- I mean, if there's a focused settlement conference the

11  parties want to request, I'll entertain that.

12     Judge Newman has signaled he could be open to that.  It's

13  got to be whatever happens there needs to take account of what

14  else is happening.

15     So if you want to make a proposal, Mr. Bien, with the

16  defense, feel free.  I guess I assumed -- I've assumed there

17  are capital projects that would benefit the Coleman class even

18  if it's not building construction, but I -- there needs to be

19  enough space and it needs to be quality space.

20          MR. BIEN:  There certainly are the unlicensed units,

21  and we will take a look at defendants' proposal that we saw

22  yesterday late on that L-1 and the other projects.

23     You know, certainly there can be improvements in treatment

24  space, access, and recreation space, and offices for clinicians

25  that would improve the quality of treatment, recruitment, and

1    retention of staff.

2        It is also our view that if defendants were -- well, the

3    defense could make better use of the existing resources, which

4    I assume is part of the L-1 plan, you know, better -- there are

5    empty beds, and, yes, there are people waiting for beds, and

6    that is always frustrating for us and I'm sure the Court.

7        And so we're hoping that this plan addresses that too, and

8    it sounds like from Dr. Mehta's statement today that there is

9    some effort to have some flexibility in terms of how beds are

10   used.

11       We still think that there are too many people restricted to

12   the higher security units and not enough people allowed to go

13   to DSH and lower security units, and that is an artificial

14   barrier that has to be addressed.

15           THE COURT:  All right.  Well, again, let me know if

16   you want -- I mean, if you want to go on an expedited basis to

17   some settlement that might inform what the defense is thinking

18   at this critical stage of time, let me know.

19       Based on what I've seen and some cases in the past, it

20   would appear that CDCR could also use a whole lot of paint and

21   at least paint some spaces to freshen them and create a better

22   environment for not -- for the employees and for the

23   incarcerated mentally ill.

24       Anything anyone from the defense wants to say in response

25   to Mr. Bien's observations?

1        MR. MELLO:  No, we've heard Mr. Bien.  I don't think

2   defendants are looking for any additional orders.

3        We would like to discuss scheduling.  I know you wanted to

4   work with your clerk, and we wanted to speak to the 6/3 date

5   and see if the Court was amenable to moving that status to

6   6/10, which we've discussed with plaintiff's counsel, and it

7   works with them if it works with your Honor, the 6/3 status.

8        THE COURT:  It appears not based on the calendar, the

9   summary calendar I have in front of me.

10       MR. MELLO:  Okay.

11       THE COURT:  So this is where it is really just best,

12  given the numbers that you have to compare notes with, for you

13  to work with Ms. Kennison who is covering for Ms. Schultz,

14  whoever is the courtroom deputy at the time.

15       MR. MELLO:  And then one other as to this potential

16  5/6.  Is there any possibility to combine?  Again, the

17  secretary of CDCR has a very full calendar.  Maybe to combine

18  those two status conferences to one status conference so that

19  she can be at both and impact her calendar.

20       Would you like us to meet and confer with, I think,

21  plaintiffs' counsel, they're on screen, and then suggest some

22  dates?

23       Is the Court amenable to one status as opposed to two

24  statuses, and is two weeks enough time to digest whatever is

25  coming on data remediation?  Is two weeks, even if 5/6 works,

```
 1   is that sufficient time is one question, your Honor.

 2            THE COURT:  Well, let me think about whether or not I

 3   can combine the two.  I haven't looked carefully enough at what

 4   the agenda might look like for that.  The parties are free to

 5   meet and confer and let me know their positions on that.

 6            MR. MELLO:  Thank you, your Honor.

 7            THE COURT:  And identify all possible dates that work

 8   with the Court and the parties.

 9            MR. MELLO:  Thank you.

10            THE COURT:  So if you do that, then I can ultimately

11   set the next status.

12       I don't want data remediation to be delayed.  I think

13   there's some basic process issues that can be clarified now to

14   just streamline and move that forward.

15            MR. MELLO:  Thank you.

16            THE COURT:  All right.  Anything else, Special Master

17   Lopes, that you want to say?

18            SPECIAL MASTER:  Thank you, your Honor.

19       As it applies to data remediation, I'm heartened to hear

20   there are 14 full-time positions dedicated to working on data

21   remediation.  Dr. Potter feels -- I don't think he fleshed this

22   out -- that the staffing is inadequate.

23       I would like to see and will ask for the defendants to

24   provide me with a list and the qualifications of the

25   individuals -- the 14 individuals.
```

 1      If I understand Dr. Potter correctly, he also feels that

 2   there is a real need for trained technical writers to help

 3   through the process, and I don't believe that he fleshed that

 4   out at all.

 5      So while CDCR has had a number of talented people working

 6   on this project, I don't believe that Dr. Potter thinks that

 7   all of them may fit the need for the technical writing that

 8   needs to be done on a regular basis.  And that may slow the

 9   process down somewhat.

10      In terms of other issues, your Honor, I echo your

11   sentiments that I'm overjoyed as well that there are staffing

12   salary increases that are at play.  The report or proposal came

13   to us last night, so I haven't had a chance to look at it

14   fully.  It seems to be directed at the PIPs.

15      What we're finding in the field right now is that there are

16   severe staffing shortages.  There's psychiatric staffing for

17   the first time, I believe, is at the 90 percent rate or

18   someplace thereabouts, but there are significant staffing

19   shortages for case managers.

20      And it would be -- when you're talking about things that

21   may come up in a budget cycle, I don't know whether it's too

22   late for proposals to go in about trying to adjust staffing

23   salaries for those individuals too.  We're in the middle of the

24   29th round of monitoring, and we're finding almost everywhere

25   we go that the number of case manager vacancies is soaring, and

1     that's concerning.

2         Also, it was good to see that the staffing salary increases

3     occurred because your labor economist was pointing to that in

4     2020, and so that and conditions -- working conditions were two

5     of his major concerns.

6         As it applies to unlicensed beds, I think we're all happy

7     to hear that L-1 will be taken offline.  I don't know much

8     about that proposal, again, I didn't get that until last night.

9     I think there's -- there is going to have to be a lot of

10    discussions about flex bed policy, to the extent that it is

11    like the CMC flex bed policy which would essentially put

12    inpatient services into the MHCBs now which are licensed for

13    other purposes as well.

14        So, technically, one could be put in those facilities, but

15    it's unclear whether there will be staff and appropriate staff

16    there to provide the services.  It will be interesting to flesh

17    that proposal out and see where that takes us.

18        The licensed beds, unlicensed beds.  The C5-C6 -- so called

19    C5-C6 units at Salinas Valley are technically licensed, but

20    they came about in planning that was ordered in roughly 2009 or

21    2010, and they were then supposed to be temporary beds.  And it

22    is my hope when we get to talking about bed planning, we will

23    have discussions about how to take C5 and C6 offline, and I may

24    be a little unclear on this, but there also may be some

25    temporary beds, roughly 19 at CIW, that should be coming

1    offline at some point.

2        And I think that covers it, your Honor.  Thank you.

3            THE COURT:  All right.  Two things.  One, we should

4    note, it's true you got the L-1 deactivation plan last night,

5    but it was a day ahead of schedule, I believe.  It is not as if

6    it was last minute, but it was before the status.

7            SPECIAL MASTER:  We've been asking for their planning

8    on L-1 for months now, your Honor.

9            THE COURT:  I think I had set a date.

10            SPECIAL MASTER:  That's true, they made the date.

11            THE COURT:  A reason for me to set deadlines,

12    perhaps.

13        The other thing is in terms of the information you're

14    gathering in the current monitoring round, are you sharing that

15    fully with the defendants in case it could inform what they're

16    looking at in the budget process?

17            SPECIAL MASTER:  Yes, your Honor.  We have an exit

18    conference at the end of every site inspection.

19            THE COURT:  Does that include -- is Dr. Mehta in

20    those?

21            SPECIAL MASTER:  And I've had discussions with

22    Undersecretary Toche and --

23            THE COURT:  All right.  So there's full transparency

24    there, real-time transparency?

25            DR. MEHTA:  Yes.

1            THE COURT:  All right.  I wanted to make certain I

2     understood that because that sounds like important data.  All

3     right.  Thank you very much.  We're in recess.

4            THE CLERK:  Court is adjourned.

5        (Proceedings adjourned:  3:42 p.m.)

6                        ---o0o---

7     I certify that the foregoing is a correct transcript from the

8     record of proceedings in the above-entitled matter.

9

10                         /s/ Thresha Spencer
                         THRESHA SPENCER
11                         CSR No. 11788, RPR

12

13

14

15

16

17

18

19

20

21

22

23

24

25