# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
   **Plaintiffs**

          **v.**                    **No. CIV S-90-0520 KJM DB P**

**GAVIN NEWSOM, et al.,**
   **Defendants**

**TWENTY-NINTH MONITORING ROUND REPORT - PART A: SPECIAL MASTER'S MONITORING REPORT ON THE PSYCHIATRIC INPATIENT PROGRAMS FOR MENTAL HEALTH PATIENTS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
May 17, 2022

## <u>ACRONYMS AND ABBREVIATIONS</u>

3CMS: Correctional Clinical Case Management System

ADLs: Activities of Daily Living

AGPA: Associate Governmental Program Analyst

APP: Acute Psychiatric Program

ASH: Atascadero State Hospital

ASU: Administrative Segregation Unit

CAP: Corrective Action Plan

CBT: Cognitive Behavioral Therapy

CC I: Correctional Counselor I

CC II: Correctional Counselor II

CCAT: Coordinated Clinical Assessment Team

CCHCS: California Correctional Health Care Services

CCWF: Central California Women's Facility

CDCR: California Department of Corrections and Rehabilitation

CEO: Chief Executive Officer

CHCF: California Health Care Facility

CHCF-PIP: California Health Care Facility Psychiatric Inpatient Program

CIM: California Institution for Men

CIW: California Institution for Women

CIW-PIP: California Institution for Women Psychiatric Inpatient Program

CMC: California Men's Colony

CMF: California Medical Facility

CMF-PIP: California Medical Facility Psychiatric Inpatient Program

CNA: Certified Nursing Assistant

CPR: Cardiopulmonary Resuscitation

CSATF: California Substance Abuse Treatment Facility

CSP/Corcoran: California State Prison/Corcoran

CSP/LAC: California State Prison/Los Angeles County

CSP/Sac: California State Prison/Sacramento

CTC: Correctional Treatment Center

CTF: Correctional Training Facility

CTQ: Confined to Quarters

DBT: Dialectical Behavior Therapy

DDP: Developmental Disability Program

DSH: Department of State Hospitals

EHRS: Electronic Health Records System

EMRRC: Emergency Medical Response Review Committee

EOP: Enhanced Outpatient Program

EPRD: Estimated Parole/Release Date

eUHR: Electronic Unit Health Record

FTE: Full-Time Equivalent

GED: General Education Development

HCITC: High Custody Intermediate Treatment Center

HCPOP: Health Care Placement Oversight Program

HCDOM: Health Care Department Operations Manual

HDSP: High Desert State Prison

ICC: Institutional Classification Committee

ICF: Intermediate Care Facility

IPOC Interdisciplinary Plan of Care

IDTT: Interdisciplinary Treatment Team

IEX: Indecent Exposure

IST: In-Service Training

IRU: Inpatient Referral Unit

KVSP: Kern Valley State Prison

LOP: Local Operating Procedure

LRH: Least Restrictive Housing

LVN: Licensed Vocational Nurse

MCSP: Mule Creek State Prison

MDO: Mentally Disordered Offender

MHCB: Mental Health Crisis Bed

MHPS: Mental Health Program Subcommittee

MHSDS: Mental Health Services Delivery System

MRMC: Medical Risk Management Committee

NCAT: Non-Clinical Activity Tracker

OHU: Outpatient Housing Unit

OP: Operational Procedure

OSS: Office Services Supervisor

PIWP: Performance Improvement Work Plan

PBSP: Positive Behavioral Support Plan

PBST: Positive Behavioral Support Team

PC: California Penal Code

PIA: Prison Industries Authority

PIP: Psychiatric Inpatient Program

PRC: Program Review Committee

PREA: Prison Rape Elimination Act

PSC: Patient Safety Committee

PSSC: Psychology Specialist Services Committee

PSH: Patton State Hospital

PSU: Psychiatric Services Unit

PTSD: Post-Traumatic Stress Disorder

QIP: Quality Improvement Plan

QIT: Quality Improvement Team

QMC: Quality Management Committee

QPIP: Quality and Performance Improvement Program

RJD: Richard J. Donovan Correctional Facility

RMC: Risk Management Committee

RN: Registered Nurse

RVR: Rules Violation Report

SHU: Security Housing Unit

SI: Suicidal Ideation

SIB: Self-Injurious Behavior

SOMS: Strategic Offender Management System

SPRFIT: Suicide Prevention and Response Focused Improvement Team

SRN: Supervising Registered Nurse

SQ: San Quentin State Prison

SQ-PIP: San Quentin State Prison Psychiatric Inpatient Program

SRASHE: Suicide Risk and Self-Harm Evaluation

SRE: Suicide Risk Evaluation

STEP: System to Encourage Progress

SVSP-PIP: Salinas Valley State Prison Psychiatric Inpatient Program

SVSP: Salinas Valley State Prison

TMHU: Temporary Mental Health Housing Units

TCMP: Transitional Case Management Program

TTM: Therapeutic Treatment Modules

TTA: Triage and Treatment Area

UCC: Unit Classification Committees

VAC: Vacuum-Assisted Closure

WIC: California Welfare and Institutions Code

## TABLE OF CONTENTS

ACRONYMS AND ABBREVIATIONS ........................................................ i

INTRODUCTION ........................................................................... 1

Parties' Responses to Draft Report ................................................... 5

Plaintiffs' Response to the Draft Report ............................................. 5

I.      "Reasons for Delays in Inpatient Admissions" ................................ 5

II.     "Patient Disciplinary Process" ............................................. 5

III.    "Use of Force" ............................................................. 8

Defendants' Response to the Draft Report ............................................ 9

I.      "The Special Master Understates the Success of the Lift and Shift" ......... 11

II.     "Defendants are Appropriately Identifying and Referring Patients to DSH" ... 12

III.    "Least Restrictive Housing" ............................................... 13

IV.     STEP Program .............................................................. 15

V.      CHCF-PIP .................................................................. 15

VI.     CIW-PIP ................................................................... 16

VII.    Recommendations .......................................................... 20

PART I.  UPDATE ON THE STATE OF ACCESS TO MENTAL HEALTH INPATIENT
CARE FOR COLEMAN CLASS MEMBERS ................................................... 23

A.      Update on Monitoring Activities and Policy Development ..................... 25

B.      Defendants' Continued Reliance on Unlicensed Beds and Expanded Use of Non-PIP
        Beds ...................................................................... 27

        1.      Unlicensed Beds ................................................... 27

        2.      Expanded Utilization of Non-PIP Beds .............................. 28

C.      Therapeutic Treatment Modules (TTMs) ...................................... 29

D.      Summary of Special Master's Suicide Prevention Expert's Baseline Assessment of
        Suicide Prevention Practices in the PIPs .................................. 31

1.      Background ................................................................ 31

2.      Summary of Special Master's Suicide Prevention Expert's Findings ................. 32

E.     Areas of Focus: Issues Defendants Need to Address Regarding Inpatient Care ............. 37

1.      Staffing Vacancies ................................................................ 37

       a)      Staffing Vacancies at Lift and Shift PIPs ..................................... 38

       b)      Staffing Vacancies at CDCR-Developed PIPs .................................. 39

       c)      Closure of CHCF-PIP to New Admissions ..................................... 41

       d)      Inpatient Staffing Plans ...................................................... 42

2.      Referrals and Transfers ............................................................ 43

       a)      Referrals .................................................................... 44

       b)      Transfers to DSH Facilities .................................................. 47

       c)      Transfers to CDCR PIPs ...................................................... 48

3.      Least Restrictive Housing (LRH) Placements ....................................... 49

4.      Access to DSH Programs .......................................................... 50

5.      Clinical Services and Treatment in Inpatient Programs: Treatment Planning, Group Therapy, and Individual Treatment ........................................... 51

       a)      Treatment Planning .......................................................... 52

       b)      Group Therapy .............................................................. 53

       c)      Individual Treatment ........................................................ 55

PART II.  THE SPECIAL MASTER'S FINDINGS AT THE PSYCHIATRIC INPATIENT PROGRAMS .......................................................................... 56

A.     STAFFING ............................................................................ 56

1.      CMF-PIP, CMF L1-PIP, CHCF-PIP and SVSP-PIP ............................... 62

2.      CIW-PIP and SQ-PIP .............................................................. 67

3.      CMC MHCB "Acute Care" .......................................................... 69

B.     TREATMENT AND CLINICAL SERVICES ................................................ 69

1.    CMF-PIP, CMF L1-PIP, CHCF-PIP and SVSP-PIP ........................................... 72

    a)    IDTTs ................................................................................................... 72

    b)    Group Therapy ...................................................................................... 75

    c)    Individual Treatment ........................................................................... 79

    d)    Solo Programming ............................................................................... 83

    e)    Psychiatric Services ............................................................................ 83

    f)    Other Treatment Issues ....................................................................... 84

        i.    Involuntary Medications (PC 2602) .............................................. 84

        ii.    Behavioral Management ................................................................ 84

        iii.    Morning and End of Shift Meetings .............................................. 85

        iv.    Treatment Space ........................................................................... 86

2.    CIW-PIP and SQ-PIP ................................................................................... 86

    a)    IDTTs ................................................................................................... 86

    b)    Group Therapy ...................................................................................... 87

    c)    Individual Treatment ........................................................................... 88

    d)    Solo Programming ............................................................................... 90

    e)    Psychiatric Services ............................................................................ 90

    f)    Other Treatment Issues ....................................................................... 90

        i.    Involuntary Medications (PC 2602) .............................................. 90

        ii.    Behavioral Management ................................................................ 90

        iii.    Morning and End of Shift Meetings .............................................. 91

        iv.    Treatment Space ........................................................................... 91

        v.    Unit Temperatures ........................................................................ 92

3.    CMC MHCB "Acute Care" ............................................................................. 92

    a)    IDTTs ................................................................................................... 92

b)  Group Therapy ....................................................................... 92

c)  Individual Treatment ............................................................. 93

d)  Other Treatment Issues ......................................................... 93

i.  Involuntary Medications (PC 2602) .................................. 93

ii.  Behavioral Management ................................................... 93

iii.  Treatment Space ............................................................. 93

C.  QUALITY OF CARE ISSUES IN IDTTS AND TREATMENT PLANNING IN THE INPATIENT CARE PROGRAMS ......................................................... 94

1.  Inadequate Interdisciplinary Treatment Team (IDTT) Processes .......................... 95

2.  Inaccurate Diagnoses ........................................................ 96

3.  Treatment Planning Failures ............................................... 98

4.  Deficiencies Regarding Least Restrictive Housing (LRH) ............................... 101

5.  Deficiencies in Quality of Clinical Documentation ............................. 103

D.  PATIENT ACCESS TO TREATMENT ................................................... 106

1.  CMF-PIP, CMF L1-PIP, CHCF-PIP, and SVSP-PIP .......................... 107

2.  CIW-PIP and SQ-PIP ....................................................... 108

3.  CMC MHCB "Acute Care" .................................................. 109

E.  REFERRALS AND TRANSFERS ....................................................... 109

1.  CMF-PIP, CMF L1-PIP, CHCF-PIP and SVSP-PIP .......................... 109

2.  CIW-PIP and SQ-PIP ....................................................... 111

3.  CMC MHCB "Acute Care" .................................................. 112

F.  ADMISSIONS AND DISCHARGES ..................................................... 112

1.  CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP .......................... 112

2.  CIW-PIP and SQ PIP ....................................................... 114

3.  CMC MHCB "Acute Care" .................................................. 114

G.  LEAST RESTRICTIVE HOUSING ...................................................... 115

1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ......................................... 115

2.    CIW-PIP and SQ-PIP........................................................................................ 116

H.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE........................... 116

Patient Disciplinary Process ................................................................................................ 116

1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ......................................... 117

2.    CIW-PIP and SQ-PIP........................................................................................ 119

3.    CMC MHCB "Acute Care" ................................................................................ 119

Use of Force ......................................................................................................................... 120

1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ......................................... 120

2.    CIW-PIP and SQ-PIP........................................................................................ 122

3.    CMC MHCB "Acute Care" ................................................................................ 123

I.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINTS ..... 123

1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ......................................... 123

2.    CIW-PIP and SQ-PIP........................................................................................ 124

3.    CMC MHCB "Acute Care" ................................................................................ 124

J.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS........................ 124

1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ......................................... 125

2.    CIW-PIP and SQ-PIP........................................................................................ 126

K.    QUALITY MANAGEMENT AND UTILIZATION REVIEW ................................. 127

1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ......................................... 127

2.    CIW-PIP and SQ-PIP........................................................................................ 129

3.    CMC MHCB "Acute Care" ................................................................................ 130

L.    PATIENT COMPLAINTS/PATIENT SATISFACTION ............................................. 131

1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ......................................... 131

2.    CIW-PIP and SQ-PIP........................................................................................ 132

          3.      CMC MHCB "Acute Care" ........................................................................ 133

M.      CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN ................................. 133

          1.      CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ...................................... 133

          2.      CIW-PIP and SQ-PIP ........................................................................................ 136

          3.      CMC MHCB "Acute Care" ........................................................................ 138

N.      *COLEMAN* POSTINGS ................................................................................................ 138

          1.      CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ...................................... 138

          2.      CIW-PIP and SQ-PIP ........................................................................................ 139

          3.      CMC MHCB "Acute Care" ........................................................................ 139

O.      LAUNDRY AND SUPPLY ISSUES .......................................................................... 139

          1.      CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ...................................... 139

          2.      CIW-PIP and SQ-PIP ........................................................................................ 140

          3.      CMC MHCB "Acute Care" ........................................................................ 140

P.      VISITATION/PRIVILEGES/TELEPHONE ACCESS.................................................. 140

          1.      CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ...................................... 141

          2.      CIW-PIP and SQ-PIP ........................................................................................ 143

          3.      CMC MHCB "Acute Care" ........................................................................ 143

Q.      LAW LIBRARY ACCESS............................................................................................ 144

          1.      CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ...................................... 144

          2.      CIW-PIP and SQ-PIP ........................................................................................ 144

          3.      CMC MHCB "Acute Care" ........................................................................ 145

R.      EDUCATION ................................................................................................................ 145

          1.      CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ...................................... 145

          2.      CIW-PIP and SQ-PIP ........................................................................................ 145

          3.      CMC MHCB "Acute Care" ........................................................................ 146

S.      PROGRAM ACCESS .................................................................. 146

        1.      CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP ........................................ 146

        2.      CIW-PIP and SQ-PIP .................................................. 146

        3.      CMC MHCB "Acute Care" ............................................... 147

CONCLUSION AND RECOMMENDATIONS ...................................................... 147

RECOMMENDATIONS ............................................................................. 151


INSTITUTIONAL SUMMARIES ..................................................................153

APPENDIX A1 - CMF-PIP ....................................................................153

APPENDIX A2 - CMF L1-PIP ...............................................................199

APPENDIX A3 - CHCF-PIP ..................................................................217

APPENDIX A4 - SVSP-PIP ...................................................................267

APPENDIX A5 - CIW-PIP .....................................................................311

APPENDIX A6 - SQ-PIP ........................................................................340

APPENDIX A7 - CMC MHCB "Acute Care" ...................................................365

CLINICAL CASE REVIEWS .....................................................................381

APPENDIX B1 - CMF-PIP ....................................................................381

APPENDIX B2 - CMF L1-PIP ...............................................................398

APPENDIX B3 - CHCF PIP ..................................................................408

APPENDIX B4 - SVSP-PIP ...................................................................432

APPENDIX B5 - CIW-PIP .....................................................................452

APPENDIX B6 - SQ-PIP ........................................................................465

APPENDIX B7 - CMC MHCB "Acute Care" ...................................................484

## **INTRODUCTION**

This report encompasses the Special Master's full review of the inpatient mental health care at the following six California Department of Corrections and Rehabilitation (CDCR) programs: California Medical Facility Psychiatric Inpatient Program (CMF-PIP), California Medical Facility L1 Psychiatric Inpatient Program (CMF L1-PIP), California Health Care Facility Psychiatric Inpatient Program (CHCF-PIP), Salinas Valley State Prison Psychiatric Inpatient Program (SVSP-PIP), California Institution for Women Psychiatric Inpatient Program (CIW-PIP), and San Quentin Psychiatric Inpatient Program (SQ-PIP). In addition, the report includes a targeted review of the California Men's Colony's (CMC) Unit B, a Mental Health Crisis Bed (MHCB) unit (CMC MHCB "Acute Care") that CDCR temporarily set up to provide inpatient mental health care to patients at the acute care level. The monitor[1] conducted all inspections on-site with each program receiving two- to five-day visits between May 24, 2021, and October 26, 2021. Finally, this report includes a summary of the Special Master's suicide prevention expert's baseline assessment of suicide prevention practices in the PIPs,[2] which is summarized herein. *See infra* Part I(D).

Upon completion of the monitoring tours, it was clear the dire conditions at CDCR's three largest PIPs – CMF-PIP, CHCF-PIP, and SVSP-PIP (hereinafter collectively referred to as the "Lift and Shift PIPs") – required the Special Master to submit this standalone PIP monitoring

---

[1] While collected data and findings in this report are the result of members of different monitoring teams, the various monitors are collectively referred to as "the monitor." The Special Master's staff of mental health experts are collectively referred to as "the monitor's expert."

[2] The Special Master's suicide prevention expert's baseline assessment includes findings from suicide prevention audits conducted at CMF-PIP, CMF L1-PIP, CHCF-PIP, SVSP-PIP, CIW-PIP, and SQ-PIP. As indicated herein, a full report of the Special Master's suicide prevention expert's findings and recommendations, including those related to inpatient programs, will be included in his forthcoming Fifth Re-Audit Report later this year.

report separate from the balance of the Twenty-Ninth Monitoring Round inpatient care review.

Thereafter, the court ordered the Special Master to "expedite the filing of that part of his Twenty-

Ninth Monitoring Round Report that reports on defendants' psychiatric inpatient programs

(PIPs), including his findings with respect to staffing in the PIPs." February 15, 2022 Order,

ECF No. 7462.[3] The Special Master had previously described these programs, which CDCR

assumed responsibility for after the Lift and Shift in 2017, as "institutional program failures."

Special Master's Report on the Current Status of *Coleman* Class Members' Access to Inpatient

Care in the Department of State Hospitals (DSH), ECF No. 6565 at 17. Sadly, conditions at the

Lift and Shift PIPs have only deteriorated further. While the Special Master initially was

optimistic at the prospects of the Lift and Shift to improve access to adequate inpatient mental

health services for *Coleman* class members, *see* ECF No. 5894 at 16, the initiative, at this

juncture, for reasons explained in further detail herein, has proved to be a failure.

In contrast, the CIW-PIP and SQ-PIP continue to provide more adequate mental health

care to *Coleman* patients.[4] This is consistent with the Special Master's findings in prior

assessments of defendants' inpatient mental health care programs. *See, e.g.*, Special Master's

---

[3] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system. References to page numbers in the Report are to page numbers at the bottom of each page.

[4] The Special Master notes CDCR's plan to move condemned incarcerated persons out of SQ's condemned housing unit into other custodially appropriate CDCR facilities and to "repurpose[e] areas previously used for housing the condemned population." *See* CDCR FY 2022-2023 Proposed Budget Summary at CR 5, available at https://www.ebudget.ca.gov/2022-23/pdf/GovernorsBudget/5210.pdf. SQ-PIP was originally established to provide inpatient care primarily to the condemned population. Whether and to what extent CDCR's repurposing of condemned housing units will impact SQ-PIP is unclear at this time. Given that the SQ-PIP has been one of CDCR's higher performing inpatient programs, the future of SQ-PIP should be carefully considered as part of this initiative and in CDCR's mental health bed planning going forward.

Report on Adequacy of Inpatient Mental Health Care for Inmates of the California Department of Corrections and Rehabilitation, ECF No. 5156 at 51 ("…[A]t the CIW-PIP, treatment and clinical services were better overall than they were at…[SVSP-PIP], [CMF-PIP], and the CHCF[-PIP]."); Special Master's Monitoring Reports on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation, ECF No. 5448 at 43 ("Indications from the CIW-PIP and the SQ-PIP thus far are that they have taken root and are maturing as viable, successful programs.").

As in preceding reports, the monitoring focus areas were:

A. Staffing

B. Treatment and Clinical Services

C. Quality of Care Issues in the Interdisciplinary Treatment Teams (IDTTs) and Treatment Planning in the Inpatient Programs

D. Patient Access to Treatment

E. Referrals and Transfers

F. Admissions and Discharges

G. Least Restrictive Housing

H. Patient Disciplinary Process and the Use of Force

I. Use of Observation Cells/Rooms, Seclusion, and Restraint

J. Emergency Response, and the Death Review Process

K. Quality Management and Utilization Review

L. Patient Complaints/Patient Satisfaction

M. Custody and Mental Health Partnership Plan

N. *Coleman* Postings

O.  Laundry and Supply Issues

P.  Visitation/Privileges/Telephone Access

Q.  Law Library Access

R.  Education

S.  Program Access

Following the format of the preceding inpatient report, this report is comprised of two major sections.  Part I provides an update on the state of access to inpatient mental health care for *Coleman* class members, including a discussion of five previously identified core areas—staffing vacancies, referrals and transfers, LRH placements, access to DSH facilities, and clinical services and treatment in inpatient programs—which defendants must address to sustain any progress that has been achieved related to problems with access to and the provision of adequate mental health care for incarcerated persons in CDCR custody.  *See* Special Master's 2018 Inpatient Care Report, ECF No. 5894 at 17 (identifying these five core areas); *see also* Special Master's 2021 Inpatient Care Report, ECF No. 7039 at 37 (discussing same).

Part II of this report contains the Special Master's summaries of his findings at the six CDCR-PIPs and CMC MHCB "Acute Care" unit, temporarily set up to provide acute care in an MHCB.  The summaries are organized by monitoring focus area (*i.e.* items A through S listed above).

The Special Master's individual summaries of his findings at each of the six CDCR PIPs and CMC MHCB "Acute Care" are provided in Appendices A1-A7.  His expert's clinical case reviews for these programs are found in Appendices B1-B7.

4

**Parties' Responses to Draft Report**

On March 10, 2022, the Special Master provided the *Coleman* parties with a draft version of the Report ("Draft Report").  The parties were given 30 days to submit to the Special Master any comments or objections to the Draft Report.  On April 11, 2022, plaintiffs and defendants each submitted comments and objections to the Draft Report.  *See* Letter from Cara E. Trapani, Esq., Plaintiffs' Counsel, to Special Master Lopes (April 11, 2022), attached hereto at Exhibit A; Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 11, 2022), attached hereto as Exhibit B.

The Special Master carefully reviewed the parties' comments and objections and made changes to the final version of the Report as warranted.  The Special Master's responses to the parties' respective comments to the Draft Report are discussed in greater detail below.

**Plaintiffs' Response to the Draft Report**

> I.    **"Reasons for Delays in Inpatient Admissions"**

Regarding the Draft Report's discussion of defendants' use of COVID-19 related exceptions to inpatient transfer timelines, plaintiffs requested that the Special Master attach correspondence between the parties on this issue.  Exhibit A at 2.  The correspondence plaintiffs' counsel referred to was added to the final Report's exhibits.  *See* Exhibit C; *see also infra* note 34.

> II.    **"Patient Disciplinary Process"**

Plaintiffs' response to the Draft Report recognized that it provided helpful statistics on the "timeliness and confidentiality of Mental Health Assessments (MHAs) and the number of times a clinician recommended mitigation and the hearing officer documented consideration of the MHA."  Exhibit A at 2.  However, plaintiffs requested additional information about several

aspects of the patient disciplinary process. The Draft Report addressed many of the issues plaintiffs raised in their response to the Draft Report.

Plaintiffs sought additional information concerning four facets of the patient disciplinary process. First, they requested that "the Final Report evaluate whether the clinician's decision whether to recommend mitigation in *each* reviewed case was clinically appropriate, as well as whether the hearing officer's decision was justified based on the circumstances." Exhibit A at 2 (emphasis added). In the Draft Report, the patient disciplinary process was assessed as it has been in preceding inpatient care reports, with a primary focus on: the number of rules violation reports (RVRs) issued; the number of RVRs issued to Mental Health Services Delivery System (MHSDS) participants; staff attendance at mental health assessment training; whether custody officers timely sent the mental health assessments to mental health for completion of the assessment; and whether mental health staff timely completed the assessments and returned them to custody staff. Similar to prior inpatient care reports, the patient disciplinary process was also assessed by reviewing the number of cases where the clinician determined mental illness contributed to the RVR behavior, whether clinicians recommended penalty mitigation, and whether hearing officers considered the clinicians' recommendation and actually mitigated penalties.

Nonetheless, it is important to note that the Draft Report did review the appropriateness of some clinicians' mitigation recommendations, and whether the hearing officer's decision was justified under the circumstances. The Draft Report made findings on these subjects in cases from CMF L1-PIP, CHCF-PIP, SVSP-PIP, and SQ-PIP. *See* Appendix A2 at 212-13 (discussing hearing officer's failure to consider patient's mental illness at the time of the RVR offense at CMF L1-PIP); Appendix A3 at 252-53 (discussing clinician's failure to suggest appropriate

mitigation at CHCF-PIP); *see also* Appendix A4 at 299-300 (discussing SVSP-PIP RVRs with penalty mitigation recommendations); Appendix A6 at 357 (discussing propriety of clinician's mitigation recommendation at SQ-PIP and hearing officers' failure to adequately document consideration of mental health assessments).

Second, plaintiffs requested that the Final Report "include data on the number of CHCF-PIP RVRs that included a mitigation recommendation in the MHA." Exhibit A at 2. Notably, the Draft Report provided this information for the reviewed sample. Appendix A3 at 253 ("Regarding the consideration of mental health assessments in the assessment of penalties, 15 of 16 or 94 percent of [CHCF-PIP] cases for whom the clinician recommended mitigation were mitigated, and there was documentation of the mitigation.").

Third, plaintiffs also requested "that the Final Report include information on whether any of the reviewed MHAs recommended that the RVR be documented in an alternate manner, and, if so, whether the Captain agreed." Exhibit A at 2. As the Draft Report indicated, one reviewed RVR from CMF L-1-PIP "articulated the reasons why the RVR should be documented in an alternative manner," further noting that provided documentation did not include a captain's review. Appendix A2 at 212-13.

Fourth, plaintiffs expressed concern "that a sample size of 20 RVRs per institution may not be large enough to adequately monitor whether MHAs are completed appropriately…." Exhibit A at 2. Plaintiffs therefore requested that future reports rely on a sampling methodology that was tied to the number of RVRs issued, or to an institution's patient population. As to the RVR sample size, the Draft Report's methodology was consistent with that of preceding inpatient reports, where the Special Master has typically reviewed a sample size of up to approximately 20 RVRs per institution. *See, e.g.*, The Special Master's Monitoring Report

on the Mental Health Inpatient Care Programs for Inmates of the California Department of

Corrections and Rehabilitation, ECF No. 7039 at 92-94.  The methodology used here is

consistent with that employed in preceding reports and includes record reviews and staff and

patient interviews.  The samples reviewed, assessed in the context of the Special Master's

monitoring team's cumulative experience monitoring these institutions and the other data

gathered during the monitoring tours, were sufficient to enable the Special Master to evaluate

compliance with RVR policies related to the *Coleman* class.

      **III.**    **"Use of Force"**

    The Draft Report indicated a total of 256 immediate use of force incidents but only two

controlled use of force episodes at the PIPs during the review period.  Plaintiffs suggested that

this disparity implied "that controlled use of force protections are not always used when they

should be."  Exhibit A at 3.  Plaintiffs thus requested that the Final Report "evaluate a subset of

these 200+ immediate use of force incidents, including video footage where applicable, to

monitor whether the incidents were correctly treated as immediate, or whether de-escalation

efforts, involvement of mental health staff, and all the other safeguards required for controlled

uses of force were warranted."  *Id.*

    Consistent with plaintiffs' request, the Draft Report included the monitor's review of a

"subset" of immediate use of force incidents.  Specifically, 39 immediate use of force incidents,

or 15 percent of all use of force episodes, were evaluated including review of video footage in

some cases.  This review revealed that the majority were properly classified as immediate uses of

force.  Notably, the monitor's review revealed problems with some designations of immediate

uses of force incidents.  The Draft Report made findings on this subject in cases from the CMF-

PIP, SVSP-PIP, and SQ-PIP.  *See* Appendix A1 at 185-86 (discussing concerns with lack of

videorecording for two reviewed CMF-PIP use of force incidents); Appendix A4 at 301

8

(discussing lack of justification for immediate use of force in one of eight reviewed incidents at

SVSP-PIP); Appendix A6 at 358 (discussing immediate use of force incident at SQ-PIP which

should have been classified as controlled use of force). The Special Master will consider

conducting a targeted review of any disparity between controlled and immediate uses of force in

the next monitoring round.

**Defendants' Response to the Draft Report**

In their response to the Draft Report, CDCR acknowledged certain challenges their

inpatient programs faced during the monitoring round but attributed deficiencies described in the

Draft Report almost entirely to the continued impact of the COVID-19 pandemic. Exhibit B at 1.

Accordingly, defendants argued the Draft Report's discussion of conditions in the PIPs was

"hyperbolic" and was "neither justified nor [did] it further the shared goal of improving care."

*Id.* The Special Master disagrees with defendants' assessment of the Draft Report.

For more than two years, the Special Master and the parties have spent considerable time

working together to identify and implement strategies to provide adequate mental health care to

*Coleman* class members at all levels of care notwithstanding the challenges and limitations

presented by the COVID-19 pandemic. The Draft Report explicitly acknowledged the impact of

COVID-19 on mental health care delivery during the monitoring round but put those findings in

the proper historical context. *See infra* p. 147 ("Programming restrictions resulting from

defendants' COVID-19 related policies impacted the amount and types of treatment offered to

*Coleman* patients at all the PIPs, though the record is clear that these problems existed long

before the onset of the COVID-19 pandemic."). While certain disruptions to the delivery of

mental health care in CDCR's prisons were expected in the early months of the pandemic, as the

court has made clear, *Coleman* class members' Eighth Amendment rights have not been abrogated by the presence of a public health emergency.[5]

Moreover, many of the deficiencies identified in the Report have been longstanding and at times seemingly intractable. Against this historical backdrop, the Special Master would be doing a disservice to the court and the parties if he did not present his candid assessment of conditions in the PIPs following his team's comprehensive on-site monitoring tours, which began more than a year after the onset of the COVID-19 pandemic. Sugar-coating the monitor's and monitor's expert's findings from the field would do nothing to improve the care provided to the *Coleman* class.

Finally, defendants' suggestion that the Special Master's findings were unfair or improperly balanced against the backdrop of the COVID-19 pandemic is belied by the content of the Draft Report, which included the Special Master's recommendation to move CIW-PIP and SQ-PIP to paper review in the next monitoring round, a significant step toward reducing the scope of the Mastership. *See infra* p. 152.

Responses to defendants' specific objections are included below.

_____

[5] *See* July 28, 2020 Order, ECF No. 6791 at 3 ("[T]he court emphasizes that the Program Guide is based in Eighth Amendment requirements for the delivery of mental health care to California's seriously mentally ill prisoners….Departures below the requirements of the Program Guide that provide less access to mental health care than required by the Program Guide likely fall below constitutional minima….[T]he court continues to expect defendants will comply with the requirements of the Program Guide to the full extent possible while also complying with the best public health practices applicable to those persons in the *Coleman* class under the circumstances of the COVID-19 pandemic."); *see also* August 3, 2020 Order, ECF No. 6806 at 14 ("[A]s must be acknowledged here, the COVID-19 pandemic has caused defendants to temporarily depart from a number of Program Guide requirements. As the court explained in [its July 28, 2020 order], the Program Guide is based in Eighth Amendment requirements and, although the court has yet to issue an opinion on whether and if so for how long the pandemic might justify emergency departures from Eighth Amendment requirements, the Program Guide and other court-approved remedies provide the Eighth Amendment floor. Defendants cannot subject class members indefinitely to conditions that violate the Eighth Amendment.") (citations omitted).

I.     **"The Special Master Understates the Success of the Lift and Shift"**

Defendants first objected to the Special Master's characterization of the Lift-and-Shift as a failure to date: "The evidence based on the PIP's overall performance does not support this characterization and assessment." Exhibit B at 1. In contrast to the Draft Report's extensive documentation of observed deficiencies in the Lift-and-Shift PIPs, defendants provided no data regarding the "overall performance" of the PIPs to support their argument, but rather provided a list of accomplishments since the time of the Lift-and-Shift.[6] Some of the accomplishments defendants cited were not finalized until after the Special Master distributed the Draft Report to the parties. In other cases, defendants did not move forward on their "successes" until they were under court order to act.[7] Finally, defendants' concerns ring hollow in light of the fact the Special Master discussed most of these accomplishments in this Report or in prior reports.[8]

---

[6] Defendants listed the following accomplishments as evidence of the success of the Lift and Shift: compliance with inpatient transfer timelines; elimination of Solo Programming and Discretionary Program Status; establishment of a systemwide System to Encourage Progress (STEP) program policy in March 2022; standardization of PIP policies which began shortly after the Lift and Shift in 2017; the PIP Staffing Plan and Suicide Prevention Policy; development of confidential treatment space for facilities C5 and C6 at SVSP-PIP; and resolution on the use of therapeutic treatment modules in inpatient settings. Exhibit B at 2.

[7] At the December 22, 2020 status conference, the court ordered defendants to file the PIP Suicide Prevention policy. *See* Reporter's Transcript, ECF No. 7002 at 58; *see also* December 24, 2020 Order, ECF No. 7004 at 1-2. Likewise, the court ordered defendants to file their PIP Staffing Plan in a May 14, 2021 minute order. ECF No. 7162.

[8] Regarding compliance with inpatient transfer timelines, *see infra* p. 44 ("The Special Master noted defendants' relative improvement in timely transferring patients to inpatient care programs in prior reports….However, policies defendants implemented to mitigate the spread of COVID-19 restricted mental health programming and patient movement and thwarted defendants' prior progress in timely transferring patients to inpatient care."). Regarding the PIP Staffing Plan and Suicide Prevention Policy, *see infra* p. 26 ("Included among the[] policies [discussed in All-Parties and small workgroup settings] were several milestones related to inpatient care, namely the filing and issuance of the PIP Suicide Prevention Policy and the respective staffing plans for DSH and CDCR's PIPs.") (citations omitted); *see also infra* Part I(E)(1)(d) (discussing the PIP

While some of the accomplishments CDCR cited could help to build the foundation of a constitutionally adequate inpatient mental health care system, they did not in any way alter the Special Master's assessment of conditions in the Lift-and-Shift PIPs during the monitoring round. To date, the care provided in the Lift-and-Shift PIPs has proven to be far from adequate. The Special Master stands ready to work constructively with the parties and court to improve the care provided to the *Coleman* class in these programs.

## II.    "Defendants are Appropriately Identifying and Referring Patients to DSH"

Defendants objected to the Draft Report's discussion of the historically low patient censuses at DSH facilities during the monitoring round, characterized the Draft Report as "brimming with references to Defendants alleged failure to refer patients to DSH," Exhibit B at 2, and noted that the Draft Report made "little reference" to the small workgroup process the Special Master oversees. Exhibit B at 3 n.3. Contrary to defendants' assertion, the Draft Report explicitly acknowledged the monitor's expert's role in overseeing referrals to DSH through the small workgroup process. *See infra* p. 25 ("The Special Master and his expert continue to closely monitor inpatient referrals and admissions through the small workgroups established after the onset of the COVID-19 pandemic."). The Draft Report accurately reported on the Special Master's identification of low patient counts at DSH as a concern and his contemporaneous efforts to encourage defendants to transfer eligible patients to DSH-Atascadero and DSH-Coalinga.

The discussion of DSH bed utilization is based on the Special Master's experience on this case for more than two decades. Both the low levels of referrals to inpatient care and high

---

staffing plan generally); *see also infra* Part I(D)(1) (discussing the PIP Suicide Prevention Policy generally). Regarding therapeutic treatment modules, *see supra* Part I(C) (discussing therapeutic treatment modules generally).

numbers of vacant beds at DSH facilities during the review period were highlighted in the Draft

Report.  *See infra* Parts I(E)(2), I(E)(4).  As the court and Special Master previously observed,

low patient counts at DSH facilities combined with low referral rates to inpatient care have

historically signaled broader problems with *Coleman* class member access to inpatient care.  *See*

Sept. 13, 2021 Order, ECF No. 7305 at 9 ("Declining admissions and/or census in the *Coleman*-

designated beds at [Atascadero State Hospital], particularly when accompanied by declining

referrals to those beds, also had 'a resounding ripple effect throughout all of the DSH inpatient

programs which treat these patients, creating almost instantly a reshuffling for other beds at other

[inpatient] programs, and at CDCR a back-up of patients awaiting [inpatient] placement' and

'overly long' 'stays in MHCBs.'") (quoting Special Master's 2016 Inpatient Care Report, ECF

No. 5448 at 9).  The Report's discussion of referrals to DSH is best read in this historical

context.[9]

      Importantly, the Draft Report expressly qualified the Access to DSH Programs section

with the following:

> It is premature to reach conclusions regarding the adequacy of access to inpatient
> care generally and DSH programs specifically, in part because the planning for
> the court-ordered unidentified needs assessment, which will determine the extent
> to which there is an unidentified need for inpatient mental health services among
> *Coleman* class members, is ongoing.

*Infra* p. 51.

### III.　"Least Restrictive Housing"

      Defendants objected to the Draft Report's discussion of Least Restrictive Housing,

characterizing the Draft Report as "misleading."  Specifically, defendants requested the Special

---

[9] As noted in the Report, the factors identified in the Report (low DSH census, low inpatient referral rates) were previously described by the court as "red flags" which pre-dated the COVID-19 pandemic.  *See infra* note 35.

Master revise the Report to "clarify that it is discussing the *custodial* LRH."  Exhibit B at 4 (emphasis in original).  The final Report includes the requested clarification regarding "custodial" LRH.  *See infra* note 37.

Defendants further highlighted the following: "Each patient is assigned a custodial LRH (single cell, multi person cell, locked dorms, or unlocked dorms) but clinical factors determine whether a patient can function at that LRH."  Exhibit B at 4.  Across programs, the monitor's expert consistently found treatment teams failing to address LRH during IDTTs, which can lead to patients lingering in more restrictive and less therapeutic housing than is custodially necessary.  *See infra* p. 102 ("Observed IDTTs in the Lift and Shift PIPs did not consistently discuss LRH."); *id.* ("Review of randomly selected records for purposes of assessing IDTTs' attention to LRH at the Lift and Shift PIPs indicated major deficiencies regarding LRH in these PIPs."); *but see id.* ("At CIW-PIP, LRH levels of patients were reviewed during IDTTs.").  Accordingly, the Report appropriately includes discussion of deficiencies in the clinical process defendants pointed to in their preliminary objections.

In their preliminary objections, CDCR further stated: "While CDCR agrees that patients should be treated in the least restrictive environment, the barrier to moving patients to those settings are not custodial or administrative, but are based on each patient's individual clinical factors."  While in some cases individual clinical factors may present a barrier to movement to a less restrictive environment, the treatment team's wholesale failure to address these individual clinical factors during IDTT – as the monitor's expert observed consistently across PIPs – is an entirely separate issue which is fully discussed in the Report.  Accordingly, no additional changes were made to the Report's discussion of LRH.

IV.    **STEP Program**

Defendants objected to the Draft Report's discussion of the System to Encourage

Progress (STEP) program.  Specifically, defendants stated: "It is unclear what the Special Master

is monitoring in this respect as the statewide PIP STEP policy was not issued until March 15,

2022, months after his teams' visits to the PIPs."  Exhibit B at 4.  For clarification, among other

areas, the Special Master monitors and evaluates access to treatment issues in CDCR facilities

and the extent to which policies – statewide or local – impact patient access to treatment.  The

Special Master has included discussion of the STEP program, which has existed locally in some

PIPs for years, in several of his preceding monitoring reports on inpatient care.  *See infra* p. 106

("Notably, most PIPs used the STEP program to assess patients' treatment progress….The STEP

program was previously described in detail in the 2018 Inpatient Care Report.") (citing ECF No.

5894 at 58-61).

V.    **CHCF-PIP**

Defendants' response to the Draft Report also noted that "(t)he Special Master levels

significant criticism at the performance of the CHCF-PIP."  Exhibit B at 4.  Defendants further

opined that the CHCF-PIP program "has undergone extensive restructuring over the past six

months," while the Special Master "significantly minimizes the work done at CHCF-PIP" in

closing the facility due to staffing levels, and subsequently reopening.  *Id.*  Defendants also

asserted that "(t)he significant drop in census has allowed CHCF clinicians to provide more

focused care on their patient population…"  *Id.* at 5.

However, in response to the Draft Report's considerable findings of substantial

inadequacies in the CHCF-PIP's provided treatment, defendants merely offered an

unsubstantiated statement that "the turnaround appears to be working."  *Id.* at 5.  Defendants did

not provide any details or specificity about the nature of any purported restructuring, retraining

and/or care team consolidation, nor any verifiable, objective data that could attempt to shed light on whether the CHCF-PIP was on the road to establishing a constitutionally adequate inpatient mental health care system. Defendants also failed to provide any useful data to support the assertion that the "CHCF-PIP reopened when units with patients were fully staffed and continues to reopen gradually as units reach staffing requirements." *Id.* at 4. Given the facility's historic staffing shortages, it is axiomatic that providing credible data of any staffing improvements would be critical.

After all, since opening in 2013, the CHCF-PIP has failed to recruit, hire, and retain the necessary staff to enable the facility to sufficiently fill established staffing positions and thereby meet the inpatient care needs of the *Coleman* class. At the time of the site visit, CHCF-PIP had functional vacancy rates of 30 percent or greater for all four major disciplines, including alarming respective functional vacancy rates of 55 and 60 percent for psychology and social work. *Infra* p. 56. Moreover, the California Correctional Health Services (CCHCS) Psychiatric Inpatient Program Staffing Report for February 2022, which was provided in March 2022 as part of the monthly report, indicated functional vacancy rates of 22 percent for psychiatry, 61 percent for psychology, 53 percent for clinical social workers, and 51 percent for RTs. *See* Exhibit D. Significantly, the vacancy rates for two of these four disciplines were higher in February 2022 than during the CHCF-PIP site visit in July 2021. Defendants' own data clearly refutes their meritless statement of improved CHCF-PIP staffing.

## VI.    **CIW-PIP**

Defendants' response to the Draft Report also noted objections to several findings about the CIW-PIP's suicide prevention process, as well as findings concerning staffing vacancy rates, observed IDTT meetings, and use of force training.

16

As to defendants' objections to the Draft Report's findings about the CIW-PIP's suicide prevention process, it should first be emphasized that the Draft Report only provided a brief overview of findings from the suicide prevention assessments. The Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation will be filed at a later date and will address in detail all of its findings.

Defendants objected to the Draft Report's criticism of deficiencies with CIW-PIP's observed intake screening process. Exhibit B at 5. The Special Master's suicide prevention expert found the door to the nurse's office remained open, with two correctional officers inside and near the patient. Further, the nurse did not ask all of the required mental health/suicide risk questions on the initial intake screening form, including whether the patient was currently suicidal. Defendants responded that "[t]he officers present during health screenings are the same officers that participate in the unit's IDTT…," and, as such, they "are held to the same confidentiality standards as the healthcare staff performing the screening." *Id*. However, defendants' defense of the CIW-PIP's intake screening process misses the mark because it is irrelevant that the officers who were present could also attend the patient's IDTT. Rather, practice in the Receiving and Release units required these officers to be physically outside of the nurse's office to maintain the screening's confidentiality.

Defendants also objected to the Draft Report's findings that a provider did not consistently see patients on suicide observation status for daily contacts on weekends and, in several cases, on Fridays. Exhibit B at 5. However, policy provides for daily clinical rounds for patients on suicide watch and suicide precaution status. *See* CDCR/CCHCS Policy 12.11.2104.P1, Psychiatric Inpatient Program Treatment Planning and Procedures: Suicide Prevention and Response, ECF No. 7010 at 10 [hereinafter PIP Suicide Prevention Policy].

Defendants' responded that the "CIW-PIP independently identified this issue in May 2021 and started an audit to increase weekend contacts…." *Id.* The Special Master did not make changes to the Report based on defendants' comments.

Defendants also objected to the Draft Report's findings about the CIW-PIP's utilization of a 60-minute level of 'enhanced observation' given the requirement for regular nursing rounds to observe non-suicidal patients at 15-minute intervals, and the institution's use of 'behavioral' suicide watch, which the PIP suicide prevention policy did not authorize.[10] Defendants reported that all non-suicidal CIW-PIP patients were seen at least every 15 minutes but that "[t]hose on 60 minute checks are seen every fifteen minutes for regular checks and every hour for an enhanced check-in where extra time is spent with the patient as part of the step down process from suicide precautions." *Id.* at 5-6. Moreover, defendants reported that CIW-PIP stopped using "behavior suicide watch" after the monitoring tour. *Id.* at 6. The Special Master did not make any changes to the Report based on defendants' comments.

As for defendants' objections to the Draft Report's findings that some CIW-PIP clinicians struggled with providing suicide observation status patients with amenities such as books and other reading materials, defendants responded that "(p)atients on watch cannot have materials unless approved by the treatment team. Patients on precautions may have property unless the treatment team justifies restricting access." *Id.* at 6. The Special Master and his suicide prevention expert disagree with defendants' statement of policy here. PIP policy permits

---

[10] CDCR's PIP Suicide Prevention Policy provides in pertinent part that "(o)nly Suicide Watch and Suicide Precaution orders shall be utilized for suicidal patients. Terms such as behavioral observation, psychiatric observation, mental health observation, Q-5, Q-10, Q-15, etc. shall be prohibited for ordering the observation of suicidal patients." PIP Suicide Prevention Policy, ECF No. 7010 at 12.

patients on suicide observation status to be provided with a book and other paper materials based on the provider's clinical judgment.[11]

Defendants' assertion that the high psychiatrist and psychologist functional vacancy rates that the Draft Report cited were the rates for CIW as a whole, and not the CIW-PIP, was inaccurate. Exhibit B at 6. The Draft Report's cited information was the staffing data that the CIW-PIP reported in response to the document request for the CIW-PIP site visit on September 13 – 14, 2021. The cited staffing data reflected the CIW-PIP's considerably smaller mental health staffing and not CIW's much larger mental health staff.

As for IDTT observation, the Special Master did not make any changes to the Draft Report's findings that the CIW-PIP failed to adequately cover case conceptualization, functional impairments, safety planning, and substance use based on defendants' objection. Defendants' sole rebuttal to the Draft Report's findings was that "CIW-PIP staff cover conceptualization before the patient comes into the room because it is often too difficult for the patient to hear some of the information being discussed…If a patient is at a place where they can hear the conceptualization information, then CIW-PIP staff will share it with them." *Id.* at 6. Notwithstanding defendants' statement, during the CIW-PIP site visit the monitor's expert was present for IDTTs before patients entered the room and after they left the IDTT meetings and did not observe any discussions about case conceptualization.

Defendants also objected to the Draft Report's statement that "CIW-PIP institution-wide training data indicated that 65 percent of custody staff and 69 percent of mental health staff

---

[11] *See* PIP Suicide Prevention Policy, ECF No. 7010 at 12 ("Unless clinically contraindicated, per clinician's order, patients on Suicide Watch or Precaution status shall be provided religious or other reading material that does not contain staples or paperclips or any other items that may pose a risk to the patient.").

completed the required use of force policy training." Exhibit B at 6. In objecting, defendants

opined that CDCR staff had "the whole calendar year to complete the training, so the statistics

are based on how many staff had completed the training at the time of the CIW-PIP site visit in

September 2021." *Id.* In response, the Special Master clarified the use of force training

discussion in the CIW-PIP institutional summary. *See infra* p. 122; *see also* Appendix A5 at

328-29.

## VII.    Recommendations

Defendants commented on all three of the Draft Report's recommendations. As to

Recommendation 1,[12] which seeks to order CDCR to develop a comprehensive plan within 30

days to remedy the Lift and Shift PIPs' seriously deficient staffing levels, defendants opined that

such an order was not "necessary to ensure that CDCR continues to work to increase the PIP

staffing fill rate." Exhibit B at 6. Defendants further replied that "CDCR and CCHCS continue

to work together on recruitment of new staff" and that, "given the myriad other projects currently

being undertaken by CDCR, … thirty days is insufficient to develop a draft, meet and confer,

and finalize the plan." *Id.*

To the contrary, the Special Master believes that entry of such an order to develop a

comprehensive staffing plan is critical to attempt to rectify the Lift and Shift PIPs' anemic

staffing fill-rates. As noted throughout the Draft Report, these wholly deficient staffing levels

continue to deprive the Lift and Shift patients of access to constitutionally adequate inpatient

care. *See e.g., infra* Part II(A) (discussing significant staffing vacancies at the Lift and Shift

PIPs). Given the consequential staffing vacancy rates for all four disciplines reported on herein,

---

[12] *Infra* p. 151 ("Recommendation 1: That CDCR be ordered to develop a comprehensive plan
within 30 days, under the guidance and supervision of the Special Master, and with input from
the plaintiffs as appropriate, to remedy the seriously deficient staffing levels at the Lift and Shift
PIPs identified in this report.").

and defendants' failure to adequately recruit and maintain sufficient staff to provide acceptable treatment for the Lift and Shift PIP patients, the entry of the requested staffing order to develop a comprehensive staffing plan within 30 days is critical.

Recommendation 2[13] is consistent with the recommendation outlined in the Special Master's 2021 Inpatient Care Report. It requires CDCR to develop minimum standards to provide "structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, consistent with a psychiatric inpatient level of care, ... develop plans to provide such structured therapeutic activities consistent with the established minimum standards, ... [and] also develop and implement a system for tracking and reporting adherence to the standards developed." *Infra* p. 151-52.

In objecting to this recommendation, defendants stated that it mirrored the first recommendation from the Special Master's January 2021 Report on CDCR's Mental Health Inpatient Care Programs, ECF No. 7039 at 118, which remains pending before the court. Defendants also opined that this recommendation was "too vague and not tied to specific, identified issues in the report." Exhibit B at 7. Further, defendants added that "(t)he recommendation does not indicate whether it calls for a specific plan to address every criticism in the report and only with respect to those programs that fall short, or whether it is a more

---

[13] In the Final Report, Recommendation 2 includes clarifying language as emphasized in the following citation. *See infra* p. 151-52 ("Recommendation 2: Consistent with the recommendations contained in the Special Master's 2021 Inpatient Care Report, to the extent necessary to remedy any deficiencies identified in this report, within 90 days CDCR, under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, shall develop minimum standards for the provision of structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, consistent with a psychiatric inpatient level of care, and shall develop plans to provide such structured therapeutic activities, *unstructured out-of-cell activities, treatment planning, and individual treatment* consistent with the established minimum standards. CDCR shall also develop and implement a system for tracking and reporting adherence to the standards developed.") (emphasis added).

general recommendation for systemic improvements at all of the inpatient programs." *Id.*
Defendants nonetheless indicated a willingness to working with the Special Master "to clarify
the required components of the plans requested in this recommendation" but requested that any
such order on this recommendation "recognize the need for greater clarity." *Id.*

Defendants' objection attempts to confuse a very clear recommendation. The second
recommendation seeks to improve provided PIP treatment by establishing specific, objective,
and verifiable minimum standards for the provision of structured therapeutic activities,
unstructured out-of-cell activities, treatment planning, and individual treatment in order to
provide PIP patients with adequate inpatient care. Thereafter, effective programming in
accordance with these minimum standards shall be developed, implemented, and tracked. All of
these efforts will be undertaken under the Special Master's guidance and supervision, and with
appropriate input from the plaintiffs.

Critically, the second recommendation is in response to the woefully inadequate inpatient
mental health treatment being provided to *Coleman* class members. As reported throughout this
Report, offered structured therapeutic treatment in the PIPs typically was not driven by
individualized assessments of patients' clinical needs, but rather by institutional staffing levels.
Across programs, staffing limitations adversely affected provided treatment and typically
resulted in the inability to offer core clinical groups. Further, as the Special Master has
previously reported, there were many reported instances of *Coleman* class members receiving
more mental health care in an enhanced outpatient program (EOP) in the prisons than in the
PIPs, which held true both pre- and post-COVID-19. *Infra* pp. 147-48 (citing ECF No. 7039 at
21).

Given such inadequate treatment, CDCR must develop minimum standards for the provision of structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, develop plans to provide such treatment that were consistent with these minimum standards, and develop and implement a system that tracked and reported adherence to the developed standards.

As for Recommendation 3,[14] the Special Master acknowledges CDCR's appreciation of the Special Master's recommendation to convert monitoring the CIW-PIP and SQ-PIP to paper monitoring. Although not a specific recommendation, the Special Master also acknowledges defendants' concurrence that CDCR include the CIW-PIP and SQ-PIP "among the first institutions where CDCR utilized CQIT when it is re-booted after data remediation is complete.'" Exhibit B at 7.

## PART I.

## UPDATE ON THE STATE OF ACCESS TO MENTAL HEALTH INPATIENT CARE FOR COLEMAN CLASS MEMBERS

With the commencement of the Twenty-Ninth Monitoring Round, the Special Master resumed full on-site monitoring for the first time since March 2020 when on-site monitoring was suspended to "mitigate the public health risks to *Coleman* class members and others while continuing to perform his duties and responsibilities with minimal to no interruptions." ECF No. 6512 at 3. After 14 months of remote monitoring and cognizant of the woeful conditions found at the Lift and Shift PIPs in the preceding round, the Special Master prioritized CDCR institutions with PIPs when planning the resumption of on-site monitoring. *See* May 14, 2021 Reporter's Transcript of Proceedings, ECF No. 7180 at 8:11-22. Between May and October

---

[14] *Infra* p. 152 ("Recommendation 3: That the Special Master be directed to review the CIW-PIP and SQ-PIP via paper review in the next monitoring round.").

2021, five-day monitoring tours were scheduled at each of the Lift and Shift PIPs (CMF-PIP,

CHCF-PIP, and SVSP-PIP[15]) and CMF L1-PIP; the monitoring tours at CIW-PIP, SQ-PIP, and

CMC MHCB "Acute Care" were two days each, given the smaller size of the PIP populations at

those institutions.

Unlike preceding inpatient reports, this is a report focused on conditions at the CDCR

PIPs and does not include an assessment of the DSH programs.  In accordance with the court's

February 15, 2022 order to produce an accelerated report on the PIPs, ECF No. 7462, the Special

Master submits this report prior to the completion of the Twenty-Ninth Monitoring Round so that

the court can consider its findings and recommendations forthwith.

As will be demonstrated below, the Lift and Shift PIPs are in a crisis, primarily driven by

deficiencies that have plagued defendants' mental health care system throughout the long history

of this case, including dangerously high staffing vacancies at some programs.  The *Coleman*

class[16] cannot afford further delays in remedying the staffing crisis that exists in the Lift and

Shift PIPs.

---

[15] The August 2021 monitoring tour at SVSP-PIP was cut short after three days due to a potential
COVID-19 exposure.

[16] Notably, reductions in the size of the *Coleman* population have not kept pace with decreases in
the overall incarcerated persons population.  As of February 7, 2022, the MHSDS population
was 32,024, just eight percent lower than at the time of the Three Judge Court proceedings in
2008.  *Compare* Statement of Undisputed Facts Regarding Phase I Issues, ECF No. 3301 at 3
("As of August 29, 2008, there were 34,831 prisoners identified by CDCR as receiving services
in the Mental Health Delivery System."), *with* Attachment A appended to Letter from Nicholas
Weber, CDCR Office of Legal Affairs, to Special Master Lopes (February 10, 2022), attached
hereto as Exhibit E (reporting MHSDS population of 32,024 as of February 7, 2022).  During the
same period, the total incarcerated persons population decreased by 38.5 percent.  *Compare* ECF
No. 3301 at 3 ("The total CDCR prisoner population housed in in-state institutions…was
156,352."), *with* CDCR Weekly Population Report as of February 9, 2022, available at
https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2022/02/Tpop1d220209.pdf
(reporting total in-state population of 96,075).  In addition, on a relative basis, the *Coleman* class

A.    **UPDATE ON MONITORING ACTIVITIES AND POLICY DEVELOPMENT**

The Special Master's monitoring responsibilities are extensive. *See, e.g.*, ECF No. 7391 at 4-8 (discussing the Special Master's monitoring responsibilities, reporting obligations, and special projects). In addition to conducting on-site monitoring tours of defendants' mental health programs, the Special Master closely monitors CDCR Mental Health Headquarters, *see id.* at 4, oversees ongoing data remediation efforts related to the Golding proceedings, *see id.* at 5, monitors numerous suicide prevention related activities, *see id.* at 6, and attends to a variety of special projects. *See id.* at 7. Moreover, the evolution of CDCR's policies responding to the COVID-19 pandemic continued to require close monitoring during the review period. *See generally* December 15, 2021 Joint Report Addressing Current COVID-19 Related Departures from Program Guide Requirements, ECF No. 7401 (discussing numerous COVID-19 related policies). The Special Master and his expert continue to closely monitor inpatient referrals and admissions through the small workgroups established after the onset of the COVID-19 pandemic.[17]

---

now has higher acuity needs than at the time of the 2008 Three Judge Court proceedings, reflected in part by the significant increase in size of the EOP population (27 percent) during a time where the overall population declined substantially. *Compare* ECF No. 3301 at 3 (reporting 5,023 EOP patients, including 359 Psychiatric Services Unit patients, as of August 29, 2008), *with* Exhibit E (reporting EOP population of 6,376). Finally, CDCR's Fall 2021 Mental Health Bed Needs Study projects additional increases in the need for mental health beds over the next two fiscal years compared to prior projections. *See* ECF No. 7421 at 7 ("The California Department of Corrections and Rehabilitation (CDCR) Fall 2021 total mental health bed need is higher compared to the Spring 2021 Study for FY 2022 (by 7,053 or 23.5 percent).").

[17] As previously reported, the small workgroups now attend to a variety of projects:

The success of the workgroup model has led to its use for several ongoing projects. In addition to the aforementioned [Business Rules and Methodology] and [Quality Assurance Control] workgroups, there are also the CDCR and DSH small workgroups, which meet weekly. Due to the range and potential

During the monitoring round, the Special Master and parties participated in dozens of meetings, including small workgroup and the All-Parties meeting settings, where at least 37 specific policies were reviewed and discussed, including more than a dozen specific policies or plans related to inpatient care. Included among these policies were several milestones related to inpatient care, namely the filing and issuance of the PIP Suicide Prevention Policy, ECF No. 7010, and the respective staffing plans for the DSH hospitals and CDCR's PIPs. ECF Nos. 7078 (DSH's Inpatient Staffing Plan), 7245 (CDCR's PIP Staffing Plan); *see infra* Part I(E)(1)(d) (discussing defendants' inpatient staffing plans).[18] The Special Master acknowledges and appreciates the great deal of effort dedicated to developing and reviewing these and other policies during the monitoring round. The Special Master further acknowledges the progress defendants have made in developing adequate policies and procedures during the mastership. Particularly, finalization of the inpatient staffing plans is a positive development in an otherwise bleak report on the state of inpatient mental health care for the *Coleman* class.

---

complexity of agenda items, each of the workgroups require the participation of a select group of the Special Master's experts, monitors, and paralegals. This, in addition to the extensive preparatory work required in advance of each meeting, e.g., review of policies, memoranda and other documents, and pre-meetings, represents another of the assignments that all experts, monitors, and paralegals must balance as part of their regular job responsibilities.

ECF No. 7391 at 6.

[18] Since the Draft Report was distributed to the parties, defendants sent several additional policies to the Special Master and plaintiffs for review. CDCR sent the final version of the statewide STEP Program policy on March 15, 2022. *See* Exhibit F. In addition, as part of a package of documents related to CDCR's plan to deactivate CMF L1-PIP, CDCR distributed its draft Flex Bed policy on April 21, 2022. *See* Email and attachments from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (April 21, 2022), attached hereto as Exhibit G.

Well-crafted policies alone will not ensure adequate mental health care is provided to *Coleman* class members. The ongoing implementation of the PIP staffing plan – and deployment of resources appropriated to support its implementation – presents defendants with yet another opportunity to remedy longstanding deficiencies.[19]

## B.    DEFENDANTS' CONTINUED RELIANCE ON UNLICENSED BEDS AND EXPANDED USE OF NON-PIP BEDS

### 1.    Unlicensed Beds

At the time of the monitoring tours, defendants continued to rely on unlicensed inpatient beds to house *Coleman* class members in need of inpatient mental health care. *See* September 13, 2021 Order, ECF No. 7305 at 13 (discussing defendants' operation of "unlicensed inpatient beds, which must also be replaced with fully licensed beds."). On April 22, 2021, the court approved a fourth extension of a waiver of state licensing requirements needed to operate 70 unlicensed beds on the first floor of the L-Wing at the California Medical Facility (CMF L1-PIP) as intermediate care beds. April 22, 2021 Stipulation and Order, ECF No. 7133 at 3-5. The parties cited the continued need to use the unlicensed beds at CMF L1-PIP to "provide additional inpatient care pending planned construction and activation of new flexible beds." *Id.* at 3. Moreover, CDCR indicated its goal was to "end its reliance on unlicensed units to house and

---

[19] On April 21, 2022, CDCR notified the Special Master and plaintiffs of pending compensation increases for PIP clinicians. First, "CDCR recently noticed the unions about a 15% pay differential for civil service psychologists, social workers, psychiatrists, psychiatric technicians, and rehabilitation/recreation therapists physically working in one of CDCR's five Psychiatric Inpatient Programs." Email from Melissa Bentz, Esq., CDCR Office of Legal Affairs to Special Master Lopes and plaintiffs' counsel (April 21, 2022), attached hereto as Exhibit H. In addition, retention bonuses, which are currently provided to civil service psychiatrists, are planned to be extended to civil service psychologists. The frequency of retention bonuses for both classes will increase. *Id.* As of the time of this writing, these proposals were intended to take effect on May 1, 2022, subject to labor negotiations. Finally, CDCR indicated that CDCR "entered into a new contract for registry psychiatrists, psychologists, psychiatric nurse practitioners, social workers, and recreational/rehabilitation therapists," which included increased rates for psychologists, social workers, and recreational/rehabilitation therapists. *Id.*

treat *Coleman* class members needing inpatient mental health care." *Id.* Finally, defendants "plan to immediately begin developing a long-term plan to deactivate the 70 beds in L-1 and replace the unit with fully licensed inpatient beds." *Id.* On April 21, 2022, defendants provided CDCR's plan to deactivate CMF L1-PIP and associated draft policies and procedures, including a draft Flex Bed policy. *See* Exhibit G. At the time of this Report's writing, the plan and policies were under consideration and discussion among the parties.

## 2.    Expanded Utilization of Non-PIP Beds

While under court order to develop a plan to decommission unlicensed inpatient beds, defendants' response to a large waitlist for inpatient care resulted in the expanded use of non-PIP beds to provide inpatient services to *Coleman* patients.[20] In April 2021, CDCR informed the Special Master and plaintiffs of its intention to utilize 12 beds in California Men's Colony's (CMC) Mental Health Crisis Bed (MHCB) unit (CMC MHCB "Acute Care") to provide acute care to *Coleman* patients in order to help address an urgent inpatient waitlist problem.[21] The Special Master immediately expressed grave concern with the implications of allowing crisis beds that, while permitted to provide inpatient services under their state license, were never designed, intended, or programmed to provide that level of care to *Coleman* patients. Nor were these crisis beds considered as potential flex beds during bed planning discussions. As an alternative to opening new temporary units, the Special Master implored defendants to refer clinically and custodially eligible patients to DSH facilities, where significant numbers of

---

[20] In addition, during the monitoring round the SQ-PIP further opened its doors to non-condemned acute care patients from outside institutions to increase the number of available acute care beds within CDCR's PIPs. Relatedly, CHCF-PIP began utilizing 18 MHCBs for acute care patients during the monitoring round. *See* Appendix A3 at 222.

[21] Findings from the focused monitoring tour at CMC MHCB "Acute Care" unit are contained herein. *See generally* Appendix A7 (discussing 12 MHCB beds utilized for acute care patients).

*Coleman* designated beds were available, *see infra* Part I(E)(4), in order to free up capacity in the PIPs and address CDCR's inpatient waitlist problem.  Finally – and significantly – the proposal to provide acute care in CMC's MHCB came in the absence of a statewide policy governing the use of so-called "flex beds."[22]  As of April 27, 2021, CMC's MHCB "Acute Care" had begun providing acute care services to *Coleman* patients and, to date, defendants have not signaled any end to the indefinite use of these temporary beds.[23]

C.     **THERAPEUTIC TREATMENT MODULES (TTMS)**

In the preceding inpatient care report, the Special Master stated that "[t]he use of therapeutic treatment modules (TTMs) continued to be a point of contention between the parties."  ECF No. 7039 at 35.  Further, the Special Master reported that plaintiffs remained "resolutely opposed to the use of TTMs in inpatient programs," and that "the parties ha[d] bargained to an impasse" on the issue.  *Id.* at 36.  Following a July 20, 2021 *In Camera* Midlitigation Status Conference, the court issued an order referring the TTM dispute to settlement conference in order to enable the parties to determine "whether their current impasse can be broken or, instead, whether the court needs to set a briefing schedule to resolve this dispute."  ECF No. 7246 at 1-2.  Thereafter, the settlement magistrate judge scheduled three settlement conferences, the first of which occurred on September 15, 2021.  On November 4,

---

[22] At least as early as March 2021, defendants indicated that they were working on a draft flex bed policy to be presented to the Special Master and plaintiffs for their consideration.  As of the time of the Draft Report's distribution, a draft policy had not been distributed even to the CDCR small workgroup for preliminary feedback.  The lack of a systemwide policy for the use of flex beds to provide inpatient care was of concern to the Special Master, particularly in light of the expanded use of non-PIP beds to provide inpatient care that occurred during the monitoring round. As noted above, on April 21, 2022 defendants distributed a draft flex bed policy to the Special Master and plaintiffs for review and consideration.  *See supra* note 18.

[23] CDCR's CMF L1-PIP deactivation plan appears to envision the continued use of CMC's MHCB beds to provide inpatient care indefinitely.  *See* Exhibit G at 3.

2021, the parties filed a Stipulation and [Proposed] Order Approving Defendants' Plan to Treat

Maximum Custody Patients in Psychiatric Inpatient Programs.  ECF No. 7366.  The court issued

an order approving in part and conditionally approving in part the stipulation and proposed order

on December 9, 2021.[24]  ECF No. 7392.  Following two *in camera* status conferences on the

Program Guide updating process, the court issued an order granting final approval of the parties'

stipulation regarding the use of TTMs in inpatient settings.  February 7, 2022 Order, ECF No.

7456 at 3-4.  On April 14, 2022, CDCR notified the Special Master and plaintiffs' counsel of its

intent to install TTMs in two individual treatment rooms in CMF-PIP's 64-bed intermediate care

unit,[25] subject to plaintiffs right to comment and meet and confer in accordance with the court's

December 9, 2021 order.  ECF No. 7392 at 2.

    Findings from the review period and at the time of the site visits could not be clearer:

many *Coleman* patients on maximum custody status received virtually no structured treatment

---

[24] On January 4, 2022, defendants requested leave of court to file a motion to amend the court's
December 9, 2021 order because the order "added conditional language…to which Defendants
did not agree."  ECF No. 7411 at 1.  Specifically, defendants requested that the court strike the
objectionable language from the order or, "alternatively, set aside the stipulation for lack of
mutual assent."  *Id.*  On January 10, 2022, defendants filed a notice of appeal of the court's
December 9, 2021 order to the United States Court of Appeals for the Ninth Circuit.  *See*
Defendants' Notice of Appeal, ECF No. 7416.  Defendants' appeal was voluntarily dismissed as
of March 1, 2022.  ECF No. 7484.

[25] *See* Email from Melissa Bentz, Esq., CDCR Office of Legal Affairs to Special Master Lopes
and plaintiffs' counsel (April 14, 2022), attached hereto as Exhibit I.

and limited out-of-cell time during the monitoring round[26] and have not for years.[27]  Remedying
this deficiency is essential for these class members to receive treatment consistent with their
rights under the Eighth Amendment.

### D.    SUMMARY OF SPECIAL MASTER'S SUICIDE PREVENTION EXPERT'S BASELINE ASSESSMENT OF SUICIDE PREVENTION PRACTICES IN THE PIPS

#### 1.    Background

On December 30, 2020, CDCR filed its "Psychiatric Inpatient Program Treatment
Planning and Procedures: Suicide Prevention and Response."  *See* ECF No. 7010.  Developed in
conjunction with the Special Master's team, this policy for the first time promulgated
requirements for the identification and management of suicidal patients in CDCR's PIPs.  Such
requirements included, but were not limited to, suicide prevention training; assessment of suicide
risk upon admission, during placement, and upon discharge; observation of suicidal patients;
placement of suicidal patients in suicide-resistant rooms; provision of clothing commensurate
with the level of suicide risk; provision of out-of-cell activities; and safety planning.

---

[26] *See, e.g.*, *infra* p. 77 ("CHCF-PIP did not identify and separately calculate the average number of offered and attended hours per MAX custody patient though these patients received the least amount of out-of-cell treatment at the PIP.  CHCF-PIP staff acknowledged the lack of treatment for MAX custody patients."); *infra* p. 80 ("Treatment for CHCF-PIP MAX custody patients was in a state of crisis."); *infra* p. 70 ("Notably, many SVSP-PIP MAX custody patients had either limited or no group treatment, and minimal out-of-cell time"); *infra* p. 77 ("[SVSP-PIP] [p]atients attended a weekly average of almost two hours of group treatment.  Some MAX custody patients had no group treatment."); *infra* p. 78 ("[SVSP-PIP] C5 MAX custody patients received yard for three one-hour intervals on Saturday and Sunday; otherwise, they were generally locked in their cells.")*.*

[27] *See, e.g.*, 2018 Inpatient Care Report, ECF No. 5894 at 163 ("Out-of-cell time provided to Maximum Custody patients [at CMF-PIP] was inadequate."); *id.* at 197 ("At the time of the site visit, groups were not provided to Maximum Custody patients in CMF L1-PIP."); 2014 Inpatient Care Report, ECF No. 5156 at 186 ("[CHCF-PIP] [p]atients on maximum custody status were provided with minimal programming without individualized clinical justification.").

The Special Master's suicide prevention expert conducted a baseline assessment of suicide prevention practices at CMF-PIP, CMF L1-PIP, CHCF-PIP, SVSP-PIP, CIW-PIP, and SQ-PIP during 2021.  The assessment was conducted in conjunction with the Special Master's team's overall assessment of the delivery of mental health care in the PIPs.  The assessment found inadequate suicide prevention practices in each of the programs.  Although a full report of findings will be provided at a later date, given the fact that many of these findings are emergent and involve life safety issues regarding the identification and management of suicidal patients, a summary of preliminary findings is provided below.

### 2.     Summary of Special Master's Suicide Prevention Expert's Findings

There were disparate practices observed at most of the PIPs regarding suicide risk identification for incoming patients during the intake screening process.  For example, although nursing staff at CHCF-PIP were completing the Initial Health Screening form for incoming patients, a nurse was observed to be not asking the patient each of mental health and suicide risk questions on the Initial Health Screening form.  Nursing staff at both CMF-PIP and SVSP-PIP did not utilize the Initial Health Screening form for incoming patients; rather, only the "Admission Assessment and History" and "Acute/ICF Nursing Assessment" forms were completed and neither form contained any suicide risk questions.  The intake screening process at CIW-PIP was very deficient, with the door to the nurse's office remaining open, two correctional officers remaining inside the office in close proximity to the patient, and the nurse not asking all of the required mental health/suicide risk questions on the Initial Intake Screening form (including if the patient was currently suicidal).  However, CIW-PIP had an excellent practice of a PIP psychiatrist observing the nurse's intake screening for incoming patients and completing the Initial Psychiatric Assessment immediately thereafter.

Except for SQ-PIP, which had a local practice of completing Suicide Risk Assessments and Self-Harm Evaluations (SRASHEs) on all patients on a regular monthly basis regardless of whether or not they presented with suicide ideation (SI) and/or self-injurious behavior (SIB), low compliance rates for completion of SRASHEs for urgent/emergent mental health referrals, as well as upon admission and discharge from the PIP, were found in the other assessed programs. At CIW-PIP, compliance rates could not be calculated because required SRASHEs were not always completed on weekends.

When completed, SRASHEs were almost always done by psychology and social work staff, and not psychiatry, in the PIPs. Psychiatrists were primarily responsible for the daily management of patients on suicide observation, with psychology and social work staff rarely, if ever, providing daily assessment of suicide risk for patients.

At CMF-PIP, not all cells designated to house suicidal patients were suicide-resistant. At SVSP-PIP, none of the cells utilized to house suicidal patients were suicide-resistant. These dangerous cells were first identified following a patient suicide in the program in December 2020.

Except for CMF-PIP and CIW-PIP, suicidal patients in the other assessed PIPs were not always adequately observed on suicide precaution status at 15-minute intervals. At most of the PIPs, there were inappropriate practices regarding the proper levels of observation for both suicidal and non-suicidal patients. At CMF-PIP, progress notes and provider orders regarding levels of observation were often confusing, with clinicians not distinguishing between Suicide Precaution status and non-suicide observation at 15-minute intervals. At CHCF-PIP, the required term of "Suicide Precaution" was not utilized by any staff; rather, "stags," "mental health observation," or "Q-11" was written in progress notes. At SVSP-PIP, Suicide Watch was

33

utilized as the preferred observation level for suicidal patients, either because providers were reluctant to place suicidal patients in non-suicide resistant cells without constant observation and/or providers relied on nursing personnel to conduct regular rounds at 15-minute intervals (meant for non-suicidal patients) rather than order Suicide Precaution status which required continued daily assessment.  In addition, patients on suicide observation status at SVSP-PIP were not always assessed daily and orders for discharge from Suicide Watch and Suicide Precaution were sometimes received without documentation that the patient was assessed by the provider. At CIW-PIP, patients on suicide observation status were consistently not seen by a provider on weekends and, in several cases, not seen on Fridays.  In addition, it was unclear why a 60-minute level of "enhanced observation" was utilized at CIW-PIP when non-suicidal patients were required to be observed during regular nursing rounds at 15-minute intervals and the practice of utilizing "Behavioral" Suicide Watch at CIW-PIP was not authorized in the PIP suicide prevention policy.

At most of the PIPs, there were inappropriate practices regarding proper clothing and possessions for patients on suicide observation status.  At CMF-PIP, some patients *not* on suicide observation status were clothed in either a safety smock or partial issue clothing.  At CHCF-PIP, most suicidal patients were dressed in "full issue" of blue shirts and pants, but *not* issued t-shirts and boxers because psychiatry believed these items could be easily torn and made into a ligature, whereas they incorrectly assumed pants and shirts could not.  At CIW-PIP, some clinicians struggled with providing patients on suicide observation status with basic amenities such as books and other reading material. At SQ-PIP, a few patients assessed as *not* requiring suicide observation were placed on "behavior observation" status with only "partial issue" and not "full issue."

At most of the PIPs, there were practices regarding out-of-cell activities for suicidal patients that were contrary to appropriate patient care. At CMF-PIP, most patients on suicide observation status were not provided yard or other out-of-cell activities. At CHCF-PIP, a review of records could not determine whether dayroom/yard privileges were consistently offered to maximum security patients. At SVSP-PIP, although two housing units had multiple yards (including "walk-alone yards") for patients on maximum-security status, there was unreliable data regarding patients on suicide observation status receiving dayroom/yard privileges.

Observed IDTT meetings were inconsistent in the PIPs. Although there was good treatment team representation, most meetings were deficient, with inadequate discussion regarding suicide risk histories, current suicide risk, and safety planning to reduce further recurrence of suicidal ideation.

Safety planning was inadequate within all of the PIPs. Supervisory review of discharging SRASHEs and safety plans were untimely, not occurring at all, or incorrectly determining that safety plans were not required. "Contracting for safety" was found in several psychiatric progress and/or nursing notes at CMF-PIP, SVSP-PIP, and CIW-PIP.

High rates of compliance with cardiopulmonary resuscitation (CPR) training for both custody and medical staff were found in all of the PIPs. Except for CMF-PIP and CHCF-PIP, high rates of compliance with annual Suicide Prevention Training were found in the other three PIPs.

Apart from CHCF-PIP, monthly Suicide Prevention and Response Focused Improvement Team (SPRFIT) meetings at the other four programs did not always meet the quorum of all required members. Many of the above cited deficiencies found by the Special Master's suicide prevention expert were neither identified and/or addressed by the SPRFITs in each PIP.

There were four patient suicides in the PIPs during the suicide prevention expert's review period. CHCF-PIP experienced a patient suicide on September 29, 2020, that resulted in 36 quality improvement plans (QIPs) distributed amongst multiple facilities, with 18 QIPs specific to CHCF-PIP. These deficiencies included the incorrect practice of only allowing psychiatry to write observation and clothing issue orders; inadequate programming for maximum security patients; untimely clinical contacts; under-estimation of suicide risk; use of "contracting for safety;" inadequate IDTT meetings (including meetings held without the patient); failure to complete multiple required SRASHEs; inadequate nursing rounds; and emergency medical response. SVSP-PIP experienced two patient suicides on December 17, 2020, and January 30, 2021, respectively. These deaths resulted in 50 QIPs distributed amongst multiple facilities, with 26 QIPs specific to SVSP-PIP. These deficiencies included treatment, least restrictive housing, and rules violation report (RVR) decisions; untimely clinical contacts; inadequate IDTT meetings, including decisions regarding transfer to lower levels of care; failure to complete required SRASHEs; deficiencies in observation and clothing issues; and emergency medical response. CIW-PIP experienced one patient suicide on April 8, 2021, resulting in 15 QIPs distributed amongst multiple facilities, with seven QIPs specific to CIW-PIP. These deficiencies included the patient not being seen on a daily basis (including weekends) by providers while on suicide observation status; placement on "enhanced observation" status at 60-minute intervals with limited clothing items; multiple incidents of self-harm that were not adequately documented; violation of the Developmental Disability Program requirement for reporting victimization; multiple violations of 15-minute regular nursing rounds; and failure to place the patient on suicide observation status following an incident of self-injurious behavior.

E.    **AREAS OF FOCUS: ISSUES DEFENDANTS NEED TO ADDRESS REGARDING INPATIENT CARE**

In his 2018 Inpatient Care Report, the Special Master identified five areas of focus requiring defendants' attention in order to develop and sustain an adequate inpatient mental health system.  ECF No. 5894 at 17-27 (identifying and discussing the five areas of focus).  During the monitoring round, defendants' performance in these five areas of focus – staffing vacancies, referrals and transfers, least restrictive housing placements, access to DSH facilities, and clinical services and treatment in inpatient programs – tracked the Special Master's historical assessments of defendants' inpatient mental health delivery system: uneven performance among the PIPs.  Some programs – namely CIW-PIP and SQ-PIP – generally delivered adequate inpatient mental health care.  While smaller in size, CIW-PIP and SQ-PIP were confronted with similar challenges to those faced by the Lift and Shift PIPs but appeared better able to deliver adequate care in the face of those challenges.  In contrast, the Lift and Shift PIPs were unable to meet the needs of their patients and delivered inadequate care.  A detailed discussion of each area of focus is included below.

1.    **Staffing Vacancies**

The most alarming findings included in the Report relate to the unacceptably high staffing vacancies across the four key inpatient mental health clinical disciplines (psychiatry, psychology, social work, and recreation therapy) in the Lift and Shift PIPs.  As reported below, conditions at CHCF-PIP "had reached a state of emergency due to their staffing vacancies" at the time of the monitoring tour.  Appendix A3 at 218.  Interviewed staff reported concerns about low morale and burnout among staff.  *See id*. ("Recognizing the dire situation, CHCF-PIP's leadership and regional team requested the Special Master's support for closure of units within the PIP to prevent further staff burnout and reduce the likelihood of negative patient

37

outcomes."); *see also* Appendix A4 at 286 ("An interviewed [SVSP-PIP] C5 clinical supervisor expressed concern with the number of unlicensed staff and with staff being overworked"). In addition, high rates of staff turnover and poor continuity of care were reported at multiple PIPs. *See* Appendix A1 at 162-63 ("CMF-PIP experienced significant staff turnover resulting in a lack of continuity of care at the intermediate level of care and a lack of familiarity with expectations and policies in the PIP intermediate care program."); Appendix A3 at 227 ("Healthcare record reviews revealed that [CHCF-PIP] patients were seen by several different psychiatrists and psychologists throughout their stays, negatively impacting continuity of care."); *id.* at 246 ("[CHCF-PIP] staff of all disciplines reported frequent redirection to cover other units or tasks. This resulted in a lack of continuity of care that was confirmed by many patient complaints.").

### a)    Staffing Vacancies at Lift and Shift PIPs

The Lift and Shift PIPs were the worst performers in terms of staffing. Staffing vacancies at these three institutions were consistent with or, in some cases, significantly worse than the rates observed at the time of the court's denial of defendants' motion to terminate proceedings in 2013,[28] where the court stated, "[c]hronic understaffing continues to hamper the delivery of constitutionally adequate [mental health] care and is a central part of the ongoing constitutional violation in this action." April 5, 2013 Order, ECF No. 4539 at 62. None of the Lift and Shift PIPs approached compliance with the court's maximum ten percent vacancy rate order at the time of the respective monitoring tours. Two PIPs (CMF-PIP and CHCF-PIP) failed

---

[28] "The Special Master reports a vacancy rate among staff psychiatrists of 42 percent, with use of contract psychiatrists reducing that rate to 26 percent. The vacancy rate among staff psychologists and social workers was reported at 21 and 24 percent respectively. Contractors reduced those vacancy rates to 17 and 20 percent, respectively." April 5, 2013 Order, ECF No. 4539 at 56-57 (citations omitted).

to fill near or in excess of 50 percent of psychology positions, even when accounting for registry staff positions. At SVSP-PIP, there were no civil servants filling allocated psychiatry positions. Appendix A4 at 272. Each of the Lift and Shift PIPs had psychiatry vacancy rates near or more than 30 percent. *See infra* Part II(A). All the Lift and Shift PIPs had functional vacancy rates near or in excess of 50 percent for social workers. *See infra* Part II(A). Finally, each of the Lift and Shift PIPs had recreation therapist functional vacancy rates near or in excess of 30 percent. *See infra* Part II(A). Vacancy rates for each of the four clinical positions at the Lift and Shift PIPs are summarized below.

**Functional Vacancy Rates[29] – Lift and Shift PIPs at Time of Site Visits**

|  | CMF-PIP | CHCF-PIP | SVSP-PIP |
|---|---|---|---|
| **Psychiatry** | 37 percent | 30 percent | 29 percent |
| **Psychology** | 49 percent | 55 percent | 20 percent |
| **Social Workers** | 68 percent | 60 percent | 46 percent |
| **Recreation Therapists** | 37 percent | 38 percent | 29 percent |

**b)    Staffing Vacancies at CDCR-Developed PIPs**

While the CDCR-Developed PIPs (CMF L1-PIP, CIW-PIP, and SQ-PIP) faced staffing challenges in certain disciplines at the time of the respective monitoring tours, staffing vacancies at these programs were not at the seriously inadequate levels observed in the Lift and Shift PIPs. Of these programs, CMF L1-PIP was the only one that failed to comply with the court's ten percent vacancy rate order across all four disciplines. *See infra* p. 63. CIW-PIP had significant functional vacancy rates among psychiatrists and psychologists (33 percent functional vacancy rate for each discipline), but clinical social workers and recreation therapists were fully staffed. *See infra* p. 68. At SQ-PIP, psychiatry and psychology were fully staffed, but there were

---

[29] Functional vacancy rates are calculated by adding the number of filled civil service positions and the number of filled registry positions and dividing that sum by the number of allocated positions. Where applicable, civil service vacancy rates are included in the respective institutional summaries for each PIP.

significant functional vacancies among clinical social workers (44 percent) and recreation therapists (17 percent).  *See infra* p. 68.  Vacancy rates for the non-Lift and Shift PIPs are summarized in the table below.

**Functional Vacancy Rates – CMF L1-PIP, CIW-PIP, SQ-PIP at the Time of the Site Visits**

|  | CMF L1-PIP | CIW-PIP | SQ-PIP |
|---|---|---|---|
| **Psychiatry** | 20 percent | 33 percent | 0 percent |
| **Psychology** | 20 percent | 33 percent | 0 percent |
| **Social Workers** | 60 percent | 0 percent | 44 percent |
| **Recreation Therapists** | 20 percent | 0 percent | 17 percent |

Since the court's October 1, 2017 order requiring defendants' compliance with the June 13, 2002 order regarding staffing vacancies, defendants have undertaken several initiatives intended to alleviate the impact of their persistent inability to recruit and retain adequate levels of mental health clinical staff through the continuum of mental health care.  *See, e.g.*, Stipulation and Order Approving CDCR's Telepsychiatry Policy, ECF No. 6539; January 27, 2021 Order, ECF No. 7035 (approving defendants' proposed psychiatric nurse practitioner policy).  While these efforts appear to have had an early positive impact on overall staffing levels in CDCR's outpatient mental health programs, *see, e.g.*, Defendants' November 2021 Monthly Psychiatry Vacancy Report, ECF No. 7408 at 5 (reporting a CDCR-wide psychiatry fill rate of 91 percent, which would be 88 percent but for the inclusion of psychiatric nurse practitioners), none had resulted in any progress reducing staffing vacancies at the Lift and Shift PIPs at the time of the monitoring tours.[30]

---

[30] As noted, CDCR recently notified the Special Master and plaintiffs regarding proposed compensation increases for PIP clinicians.  *See supra* note 19.

### c)     Closure of CHCF-PIP to New Admissions

During the monitoring round, the staffing crisis directly led to reduced access to inpatient care at CHCF-PIP.  As reported herein, CHCF-PIP was in a staffing crisis at the time of the July 2021 monitoring tour.  *See* Appendix A3 at 218.  In discussions with the monitor's expert during the monitoring tour, CHCF-PIP's leadership and regional team suggested closing the PIP to new admissions as a temporary solution to the staffing crisis and resultant poor quality of care.  *See id.*  By September 2021, CDCR leadership raised the proposal to close CHCF-PIP to new admissions to give the beleaguered institutional staff breathing room and reduce the high risk of bad outcomes posed by the vacancy rates among clinical staff at CHCF-PIP.  After small workgroup and all-parties discussions on the proposed closure, on September 27, 2021,[31] CDCR provided written notification to the Special Master and plaintiffs that CHCF-PIP would be closed to admission for 30 days to allow time for CDCR to "reasses CHCF PIP's staffing and capacity concerns."  Email from Nicholas Weber, CDCR Office of Legal Affairs, to Special Master Lopes and Plaintiffs' counsel, September 27, 2021, attached hereto as Exhibit J.  The initial 30-day closure was extended three times, and CHCF-PIP remained closed to new admissions through January 27, 2022.  Emails from Nicholas Weber, CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel dated October 29, 2021, December 1, 2021, December 27, 2021, discussing extensions of CHCF-PIP closure, attached hereto as Exhibit K.  As of January 28, 2022, CDCR reported that external transfers to CHCF-PIP had resumed.  *See* Exhibit E.

---

[31] Data provided to the court as of the same date the Special Master and plaintiffs received written notice of the CHCF-PIP intake closure revealed that there was a total PIP waitlist of 168 patients.  Defendants' Census, Waitlists, and Transfer Timelines Compliance Reports for Inpatient Mental Health Care, ECF No. 7349 (reporting waitlist data as of September 27, 2021).  Of these 168 waitlisted patients, 83, or 49 percent, had been waiting longer than Program Guide transfer timelines.  *Id.* at 10.

While CHCF-PIP reopened to admissions, at a February 15, 2022 all-parties meetings, CDCR reported that CHCF-PIP could only accept ten acute care patients per week at current staffing levels.  During an all-parties meeting on March 1, 2022, CDCR acknowledged continued staffing shortages at CHCF-PIP and indicated they had not established an upward limit of patients that could be admitted to the program at current staffing levels.  As of March 28, 2022, CDCR reported 98 patients on the inpatient waitlist, including 35 at the acute care level and 63 at the intermediate care level.  Twelve acute care referrals had been pending for more than ten days; 11 intermediate care referrals had been pending for more than 30 days.  Email from Nicholas Weber, Esq., CDCR Office of Legal Affairs to Special Master Lopes and plaintiffs' counsel (March 29, 2022), attached hereto as Exhibit L.

### d) Inpatient Staffing Plans

Despite CDCR's persistent failure to adequately staff their PIPs, there were two staffing related milestones that occurred during the review period: the development and preliminary implementation of inpatient staffing plans for both DSH's inpatient programs and CDCR's PIPs. *See supra* Part I(A).  Since 2017, DSH has been under court order to develop and implement inpatient staffing plans for *Coleman* patients.  After an extensive meet and confer process, DSH-defendants filed their staffing plan on March 11, 2021, ECF No. 7078, which the court provisionally approved on March 26, 2021.  ECF No. 7108.  In the court's March 26, 2021 order, the Special Master was directed to "include in his Twenty-Ninth Round Monitoring Report a report and recommendations concerning final approval of the plan."  *Id.* at 1-2.  The Special Master's report on the DSH Staffing Plan will be included in a forthcoming report after

completion of monitoring tours at the three DSH hospitals providing inpatient mental health services to *Coleman* patients.[32]

Progress was also made with respect to CDCR's PIP staffing plan. In July 2021, defendants filed their PIP staffing plan, which included adjusted staff-to-patient ratios[33] at the intermediate care level and created new supervisory positions. ECF No. 7245 at 4-5. Accordingly – and considering the significant historical and ongoing challenges defendants face in safely and adequately staffing their PIPs – the PIP staffing plan will continue to be subject to the Special Master's close monitoring moving forward.

### 2. Referrals and Transfers

The remedy in this case has always recognized the importance of timely referral and transfer of *Coleman* class members to inpatient settings, including DSH programs. *See* September 13, 2021 Order, ECF No. 7305 at 4 ("Significant delays in access to necessary inpatient mental health care are a major component of the Eighth Amendment violation requiring remediation in this action. Adequate remediation requires a sufficient number of inpatient beds to timely treat class members in need of inpatient care, adequate inpatient treatment programs, and a robust process for identification, referral, and timely transfer of these class members to necessary inpatient care." (citing *Coleman v. Wilson*, 912 F. Supp. 1292, 1309 (E.D.Cal. 1995)).

---

[32] The Special Master's monitoring tours at the three DSH programs occurred as scheduled on the following dates: Coalinga State Hospital – February 22-23, 2022; Patton State Hospital – March 1-2, 2022; Atascadero State Hospital – March 8-10, 2022.

[33] Staff-to-patient ratios were adjusted as follows: "CDCR's PIP Staffing Plan for the 2021-2022 fiscal year…maintains the previously established ratio for the [acute] level of care [1:15] and provides adjusted ratios for the [intermediate] level of care [1:30]…." ECF No. 7245 at 4. Previously, staff-to-patient ratios at the intermediate level of care were 1:35. *Id.* In addition, the plan notes that CIW-PIP and SQ-PIP "can be flexed between [intermediate] and [acute care]" and therefore "the entire programs are staffed at the [acute] ratio." *Id.* at 5 n.4.

The Special Master noted defendants' relative improvement in timely transferring patients to inpatient care programs in prior reports.  *See* Special Master's 2018 Inpatient Care Report, ECF No. 5894 at 19 (reporting "[d]efendants achieved substantial strides in timely transferring referred patients to acute and intermediate inpatient care" during the six-month period following a court order directing the Special Master to "closely supervise" inpatient transfers); Special Master's 2021 Inpatient Care Report, ECF No. 7039 at 41 (reporting defendants "maintained their 'substantial strides in timely transferring referred patients'" to inpatient care in the time period preceding the COVID-19 pandemic).  However, policies defendants implemented to mitigate the spread of COVID-19 restricted mental health programming and patient movement and thwarted defendants' prior progress in timely transferring patients to inpatient care.[34]  The spread of the COVID-19 omicron variant resulted in thousands of staff and inmate COVID-19 cases, beginning in December 2021, and continuing through February 2022.  Indeed, the ominous cloud of the COVID-19 pandemic continues to impact mental health care in significant ways.

### a)    Referrals

While defendants were faced with waitlists for inpatient care that had swelled to more than 300 by January 2021, *see* ECF No. 7060 at 13 (reporting a waitlist for inpatient care of 327 patients, including 94 at the acute care level and 233 at the intermediate care level), CDCR referred significantly fewer patients to inpatient care compared to the preceding round, a trend

---

[34] The extent to which patient movement should be restricted at this stage of the COVID-19 pandemic is an ongoing dispute between the parties.  *See* Plaintiffs' Response to Order to Show Cause, ECF No. 7119 at 11 (arguing defendants' "across-the-board assertions that scores of delays were due to 'Covid-19'" were not a "proper use of the medical exception" to Program Guide transfer timelines); *see also* Exhibit C (correspondence between parties regarding inpatient transfer timelines).

that began at the beginning of the pandemic.[35]  The relatively low number of inpatient referrals

occurred despite defendants' loosening of COVID-19 related programming and movement

restrictions and widespread availability of vaccines and testing during the monitoring round.

*See, e.g.*, Defendants' November 2021 Census, Waitlists, and Transfer Timelines Compliance

Reports for Inpatient Mental Health Care, ECF No. 7422 at 11 ("In February 2021, as adequate

testing and quarantine protocols were in place and the vaccine because [sic] widely available,

CDCR began movement of PIP patients again.").  Between August 2017 and March 2020, the

total number of monthly referrals to inpatient care – inclusive of referrals to both acute care and

intermediate care – was consistently near to or well in excess of 300, as displayed in the chart

below, which reflects data included in defendants' monthly inpatient census and waitlist

reports.[36]

---

[35] While the number of inpatient referrals was relatively higher prior to the onset of the COVID-19 pandemic, the court identified certain pre-pandemic "red flags that suggest a less than robust [inpatient] identification or referral process."  *See* September 13, 2021 Order, ECF No. 7305 at 14.  Defendants acknowledged a downward trend in referrals to DSH-Atascadero at a status conference on September 13, 2019.  *Id.*  (citations omitted).  Moreover, at a December 13, 2019 status conference, "defendants acknowledged that the sustainable process for identification and referral of inmates to inpatient care was not working as intended and that 'there are some issues…that need to be refined.'"  *Id.*  (citations omitted).

[36] *See* ECF Nos. 6128 at 15 (March 2019); 6152 at 15 (April 2019); 6198 at 15 (May 2019); 6222 at 15 (June 2019); 6245 at 15 (July 2019); 6286 at 15 (August 2019); 6342 at 15 (September 2019); 6394 at 15 (October 2019); 6423 at 15 (November 2019); 6446 at 15 (December 2019); 6470 at 15 (January 2020); 6505 at 17 (February 2020); 6611 at 16 (March 2020); 6670 at 16 (April 2020); 6719 at 19 (May 2020); 6762 at 20 (June 2020); 6823 at 21 (July 2020); 6867 at 21 (August 2020); 6912 at 21 (September 2020); 6956 at 22 (October 2020); 6990 at 19 (November 2020); 7023 at 21 (December 2020); 7060 at 21 (January 2021); 7085-2 at 12 (February 2021); 7123 at 17 (March 2021); 7171 at 21 (April 2021); 7210 at 21 (May 2021); 7234 at 21 (June 2021); 7274 at 22 (July 2021); 7316 at 22 (August 2021); 7349 at 21 (September 2021); 7373 at 19 (October 2021); 7399 at 21 (November 2021); 7422 at 21 (December 2021).  Data which predates the review periods discussed in this report are included to provide additional historical context and assist in evaluating the impact of COVID-19 on inpatient mental health referrals.



In March 2020, defendants reported referring 351 patients to inpatient care. ECF No. 6611 at 16. In April 2020, the first full month of CDCR operations being impacted by policies implemented to mitigate the spread of COVID-19, referrals to inpatient care fell to 201. ECF No. 6670 at 16. Between May 2020 and February 2021, prior to CDCR's reopening, referrals generally ranged between 100 to 200 per month, with more than 200 patients referred in June 2020 (214 referrals) and February 2021 (216 referrals). *See supra* note 36. Since CDCR's February 2021 "reopening", inpatient referrals ranged from a low of 140 to a high of 282 per month. *See supra* note 36.

While referrals increased during 2021, the overall number of monthly referrals is still substantially below comparable referrals figures from the pre-COVID-19 era. Between March 2019 and March 2020, CDCR averaged 388 referrals to inpatient care per month, with a range of

335 to 483.  During the period most impacted by defendants' COVID-19 related policies (April

2020 – February 2021), CDCR averaged 165 referrals to inpatient care per month, with a range

of 110 to 216.  Between March 2021 and December 2021, the average number of referrals

increased to 212 per month but remained significantly lower than the pre-COVID-19 monthly

average of 388 referrals.

The monitor's findings from the field confirmed what defendants' monthly referral

reports indicated:  low levels of referral to inpatient care across programs compared to the

preceding monitoring round.  *See, e.g.*, *infra* p. 109 (reporting 134 acute care referrals to CMF-

PIP compared to 436 in the preceding round, and 79 intermediate care referrals to CMF-PIP

compared to 288 in the preceding round); *infra* p. 110 (reporting "a 52 percent decrease" in

referrals to CMF L1-PIP compared to the prior round); *infra* p. 111 (reporting "nearly a 50

percent decrease" in acute care referrals to CIW-PIP compared to the prior round).

<b>b)</b> <b><u>Transfers to DSH Facilities</u></b>

Throughout the pandemic, the court, Special Master, and parties prioritized inpatient

transfers for *Coleman* class members, and the Special Master continues to closely monitor

transfers through the established small workgroup process.  At times and as documented in the

preceding inpatient report, waitlists for inpatient care at DSH facilities swelled during the early

months of the pandemic, *see* Special Master's 2021 Inpatient Report, ECF No. 7039 at 20-27,

but decreased during the monitoring round.  *See, e.g.*, March 26, 2021 Order, ECF No. 7107 at 2

(discussing improvements in waitlists and transfer timelines to DSH).  A decrease in the waitlist

for DSH inpatient care, however, does not signify an improvement in access to care if patients

are not being properly identified and referred to the inpatient level of care in the first instance.

*See* September 13, 2021 Order, ECF No. 7305 at 13 ("Defendants' suggestion that population

projections plus actual bed usage is necessarily an accurate measure of bed need misses the mark and ignores substantial history in this case.  Actual inpatient bed usage is only an accurate measure of bed need if it is otherwise clear that bed usage is the result of a robust and thorough process of identification and referral of class members in need of inpatient care."); *see also infra* Part I(E)(4) (discussing concerns with access to DSH generally).

**c)**    <u>**Transfers to CDCR PIPs**</u>

While DSH access began improving from a waitlist perspective compared to the preceding round, access to inpatient care in the CDCR PIPs was inadequate.  Defendants struggled to balance the need to reduce the inpatient waitlist, which had grown to more than 300 by early 2021, *see* ECF No. 7060 at 13 (reporting a waitlist for inpatient care of 327 patients in January 2021), with the reality that the largest PIPs were not adequately staffed to service their existing patient population, let alone an influx of hundreds of new admissions.  Moreover, defendants failed to meet Program Guide transfer timelines for patients transferring to both the acute and intermediate care level, though defendants almost uniformly attributed delays in inpatient transfers to COVID-19-related transfer restrictions.  Acute care transfers were noncompliant at CMF-PIP, CHCF-PIP, and SQ-PIP; intermediate care transfers were noncompliant at CMF-PIP, CHCF-PIP, and CIW-PIP.  *See infra* p. 110 (reporting 70 percent of acute care transfers to CMF-PIP were not timely, and 54 percent of intermediate care transfers to CMF-PIP were not timely; reporting 55 percent of reviewed acute care transfers to CHCF-PIP were not timely, and 63 percent of reviewed intermediate care transfers to CHCF-PIP were not timely); *infra* p. 111 (reporting 64 percent of acute care transfers to SQ-PIP were not timely, while all transfers to intermediate care were timely); *infra* p. 111 (reporting all acute care

48

transfers to CIW-PIP were timely, while three of 11 or 27 percent of intermediate care transfers were not timely).

The developments discussed herein and the Special Master's findings from the field provide further support for the necessity of "at least one additional unmet bed needs study." March 17, 2020 Order, ECF No. 6509 at 3. The unmet needs assessment will provide the court, Special Master, and parties with information sufficient to determine whether the "red flags" identified by the court, September 13, 2021 Order, ECF No. 7305 at 14, are indeed the result of chronic and continuing inadequacies in defendants' referral process. On the other hand, the unmet needs assessment could reveal that CDCR's referral process is adequate and that there is no unmet need for inpatient care.

### 3.    Least Restrictive Housing (LRH) Placements

Consistent with findings from the preceding report on inpatient care, defendants continue to house significant numbers of PIP patients above their designated least restrictive housing (LRH) level, though findings from the field and defendants' monthly filings indicate the number of patients housed outside their LRH has decreased recently.[37] The decrease in PIP patients housed above their LRH was one of the few positive findings regarding the Lift and Shift PIPs during the monitoring round. *See* Part II(G). While defendants report that the aggregate number of patients housed in more restrictive settings than their designated LRH has decreased, findings from the field regarding the frequency and quality of treatment team consideration of LRH during IDTT were not encouraging. *See, e.g.*, *infra* p. 115 ("…IDTTs did not regularly address LRH designations in reviewed cases.").

---

[37] For clarification, the Report's discussion of LRH refers to custodial LRH.

4.    **Access to DSH Programs**

Access to DSH programs[38] was a concern throughout the monitoring round.  Defendants'

monthly inpatient census reports indicated historically low *Coleman* patient censuses at both

DSH-Atascadero and DSH-Coalinga during the round.  *E.g.* ECF No. 7123 at 4 (reporting

March 29, 2021 *Coleman* census at DSH-Atascadero of 138 patients, leaving 118 available

beds); ECF No. 7210 at 6 (reporting May 24, 2021 *Coleman* census at DSH-Atascadero of 127

patients, leaving 129 available beds); ECF No. 7373 at 6 (reporting October 25, 2021 *Coleman*

census at DSH-Atascadero of 137, leaving 117 available beds).  With more than 100 of DSH-

Atascadero's 256 *Coleman*-designated beds routinely remaining empty during the monitoring

round, the Special Master identified the low *Coleman* patient counts at DSH facilities as a

concern in a variety of workgroup and All-Parties meetings and urged defendants to admit

eligible patients to DSH programs to alleviate stress elsewhere in defendants' inpatient mental

health care system.

Failure to utilize the full complement of *Coleman*-designated DSH beds has historically

created problems throughout the inpatient system:

> The significance of non-use of the designated 256 DSH-Atascadero beds for
> *Coleman* class members goes far beyond a diminution of availability of beds at
> DSH-Atascadero for these patients.  As a low-custody program, when its beds are
> not being filled by CDCR patients, there is serious interference with patients'
> access to their clinically and custodially appropriate least restrictive housing
> (LRH) – a very important concern from a therapeutic standpoint.  Further, when
> DSH-Atascadero beds are not open to CDCR patients, there is a resounding ripple
> effect throughout all of the…inpatient programs which treat these patients,
> creating almost instantly a re-shuffling for other beds at other [inpatient]

---

[38] Access to DSH's inpatient programs was the subject of a focused evidentiary hearing on
October 23, 2020.  ECF No. 6923.  On March 26, 2021, the court issued an order to show cause
"why the court should not find moot the matters raised at the October 23, 2020 evidentiary
hearing."  March 26, 2021 Order, ECF No. 7107 at 3.  The order to show cause was based in part
on the Special Master's informal reports to the court regarding the status of *Coleman* class
member referral and transfer to DSH institutions as well as the parties' joint reports regarding the
same.  *Id.* at 2.

> programs, and at CDCR a back-up of patients awaiting [inpatient] placement.
> Stays in mental health crisis beds (MHCB) at CDCR soon become overly long, as
> patients are waiting for admission and transfer[] to the inpatient programs they
> need.  This domino effect – as avoidable as it is with consistent, appropriate use
> of the DSH-Atascadero beds – has been repeated all too often over many years….

*See, e.g.*, Special Master's 2016 Inpatient Report, ECF No. 5448 at 9; *see also* September 13,

2021 Order, ECF No. 7305 at 10 (discussing the importance of "utilization of the full

complement of ASH beds" as "critical to avoiding the adverse ripple effect for inpatient care the

[Special Master's] 2016 report describes.").

It is premature to reach conclusions regarding the adequacy of access to inpatient care

generally and DSH programs specifically, in part because the planning for the court-ordered

unidentified needs assessment, which will determine the extent to which there is an unidentified

need for inpatient mental health services among *Coleman* class members, is ongoing.  *See*

*generally* February 25, 2022 Order, ECF No. 7477.

### 5.    Clinical Services and Treatment in Inpatient Programs: Treatment Planning, Group Therapy, and Individual Treatment

For years, the Special Master has identified inadequacies related to treatment planning,

and the amount, quality, and tracking of group and individual structured therapeutic activities.

*See* Special Master's 2018 Inpatient Report, ECF No. 5894 at 27 (discussing inadequacies

related to group and individual treatment).[39]  The lack of a minimum standard for treatment

---

[39] In his 2018 report, the Special Master noted the following:

> Across programs, structured and unstructured out-of-cell activities were found
> wanting during site visits.  Improving the system and quality of structured and
> unstructured out-of-cell activities is one of the outstanding issues that require the
> attention of CDCR and DSH.  Offering adequate hours of appropriate core and
> non-core group activities, as well as adequate hours of access to out-of-cell
> activities that meet the clinical needs of patients in the various inpatient programs,
> are priorities that need to be addressed by CDCR and DSH.  Accurately tracking
> and reporting all structured and unstructured out-of-cell activities offered and

combined with the staffing crisis facing the Lift and Shift PIPs resulted in patients being offered woefully inadequate amounts of structured mental health treatment.  At the time of the monitoring tours, CDCR still had no operational systemwide policy establishing minimum standards for the amount of structured and unstructured out-of-cell time provided to PIP patients. *See* 2021 Inpatient Care Report, ECF No. 7039 at 118 (recommending defendants be required to "develop plans within 90 days to provide structured therapeutic activities, unstructured out-of-cell-activities, treatment planning, and individual treatment, including for maximum custody patients consistent with a psychiatric inpatient level of care, as well as implement a system for tracking and reporting adherence to the standards developed.").  Consistent with the findings from prior reports, CIW-PIP and SQ-PIP continue to outperform the Lift and Shift PIPs in the quality of treatment planning, group treatment, individual treatment, and behavior management.[40]

### a)  <u>Treatment Planning</u>

Observed deficiencies in treatment planning were generally more severe in the Lift and Shift PIPs than the CDCR-developed PIPs.  Both on-site observation of the Lift and Shift PIP interdisciplinary treatment team (IDTT) meetings as well the monitor's expert's case reviews revealed multiple deficiencies in treatment planning processes and documentation.  *See generally infra* Part II(C).  The monitor's expert's observations of IDTTs at multiple PIPs revealed significant concerns with IDTT meetings. *See* Appendix A1 at 164-66 (discussing CMF-PIP

---

received is a necessary step required to remedy the issues surrounding the most used treatment modality in the inpatient programs.

ECF No. 5894 at 27.

[40] *See infra* Part II(B).

treatment team members' difficulty redirecting agitated patients, needing to be prompted by the IDTT facilitator for input, or being slow to respond or non-responsive to the patients' expressed needs in IDTT meetings); Appendix A2 at 204 (describing "one genuinely concerning initial IDTT" at CMF L1-PIP where the treatment team failed to appropriately inquire or intervene when patient expressed current suicidal ideation); *see also* Appendix A3 at 229-30 (noting mental health clinician's inappropriate interaction with a developmentally disabled patient during an IDTT meeting at CHCF-PIP).  Staffing vacancies at multiple PIPs negatively impacted the quality of treatment planning during the review period.  *See* Appendix A1 at 164 (highlighting impact of staffing turnover on quality of treatment planning process at CMF-PIP); *id.* at 166 (discussing negative impact of CMF-PIP staffing vacancies on supervision of IDTT process even though "closer clinical supervision of the process was sorely needed."); *see also* Appendix A3 at 229 (noting that at CHCF-PIP, "[c]overing staff for the various disciplines were unfamiliar with the patients and did not provide necessary feedback regarding progress or lack thereof, despite having access to patients' electronic records….").

While deficiencies were noted on a case-by-case basis at CIW-PIP and SQ-PIP, *see, e.g.*, *infra* Part II(C)(3), treatment planning at those programs was adequate.  Detailed discussions of additional treatment planning related findings are included herein.  *See generally infra* Parts II(B) and (C).

### b)      <u>Group Therapy</u>

Group treatment provided during the review period was inadequate.  Perhaps more than any other treatment modality, group treatment was uniquely impacted by pandemic-related restrictions, namely social-distancing limitations on the number of group participants in a given session.  The Special Master acknowledges these challenges and appreciates the importance of

accounting for public health guidance during these times.  However, a review of the findings reported herein confirms that deficiencies in group treatment provided in the PIPs were by no means exclusively the result of the COVID-19 pandemic.  Long-standing staffing vacancies left clinicians with high caseloads and, consequently, limited to no time to conduct core mental health groups.  As a result, the bulk of group therapy provided during the round at many programs were recreation groups, or, in some cases, nursing led groups.[41]  In addition, assignment of patients to groups were found to be based not on the patients' mental health needs but, rather, on staffing availability.  *See* Appendix A1 at 167-68 ("[At CMF-PIP,] [t]he decision to assign a patient to a group run by a recreation therapist was made by the schedulers without input from the treatment team and was based on making sure that patients were assigned to at least some groups each week.").  SVSP-PIP continued to lack sufficient treatment space to conduct groups in confidential settings.  *See* Appendix A4 at 281 ("Three observed [SVSP-PIP unit] C5 groups were all conducted in the dayroom, which afforded neither visual nor auditory confidentiality…").[42]

Group treatment deficiencies existed at SQ-PIP and CIW-PIP, though to a lesser extent than the Lift and Shift PIPs.  Group therapy at SQ-PIP, like the Lift and Shift PIPs, was primarily provided by recreation therapists, and the amount of offered structured treatment activity generally and core clinical groups specifically needed to increase.  Appendix A6 at 349.  Unlike the Lift and Shift PIPs, group assignments at CIW-PIP were made with input from the treatment

---

[41] *See, e.g.*, Appendix A1 at 167 (CMF-PIP Institutional Summary, reporting "[r]ecreation therapists provided 74 percent of all PIP [acute care] group therapies and 26 percent were provided by nursing staff.  Primary clinicians were not providing groups [to acute care patients] due to staffing shortages in the clinical social worker and psychologist positions.").

[42] In their response to the Draft Report, defendants noted that new confidential group treatment space for SVSP-PIP's C5 and C6 populations opened on March 14, 2022.  Exhibit B at 2.

team and patient.  *See* Appendix A5 at 319 (discussing group assignment process, including

asking patients about their group preferences and "clinical staff …conven[ing] to determine

group assignments based on the patients' interests, clinical needs, and an adequate balance of

clinical core and recreation groups.").  The monitor's expert found the "content and process of

the groups" to be "adequate, and the sessions were engaging and supportive."  Appendix A5 at

320.

c)    <strong><u>Individual Treatment</u></strong>

The need to "develop[] and implement[] meaningful guidelines and training staff

regarding the provision of adequate individual treatment" in the inpatient programs was

identified as a core issue requiring defendants' attention years ago.  ECF No. 5894 at 27.  At the

time of the monitoring tours, there was a patchwork of standards for frequency of individual

treatment across the PIPs, driven by staffing inadequacies rather than the needs of PIP patients.

*See, e.g.*, Appendix A6 at 349 ("SQ-PIP staff had yet to conceptualize the minimum amount of

out-of-cell structured therapeutic activity that the program should offer to acute care

patients.").[43]

During the monitoring round, timeliness of individual treatment varied.  In addition,

some programs continued to lack sufficient treatment space to offer all patients adequate

amounts of confidential individual treatment.  Patient interviews and record reviews confirmed

that many individual clinical contacts occurred non-confidentially at cell-front during the round.

*See, e.g.*, *infra* p. 81 (noting patient reports of frequent cell-front psychiatry contacts on multiple

---

[43] Notably, due to their chronic inability to comply with state licensing law standards governing individual treatment, at least one program (CHCF-PIP) was granted a program flex which operated as a waiver of state law, allowing the program to offer less treatment than would otherwise be required.  Appendix A3 at 237.

units at SVSP-PIP); *infra* p. 89 (reporting 69 percent of CIW-PIP intermediate care individual psychiatry contacts were confidential); *but see infra* p. 80 (reporting that psychiatry contacts at CHCF-PIP were "typically confidential" according to patient interviews).

Consistent with the findings from the preceding inpatient care report, there continued to be a need to "develop plans…to provide structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, including for maximum custody patients consistent with a psychiatric inpatient level of care." Special Master's 2021 Inpatient Care Report, ECF No. 7039 at 118. Likewise, the ongoing need to "implement a system for tracking and reporting" treatment hours, *id.*, was apparent to the monitor's expert during the monitoring round.

## PART II.

## THE SPECIAL MASTER'S FINDINGS AT THE PSYCHIATRIC INPATIENT PROGRAMS

### A.    STAFFING

One of the requirements to end federal court oversight of CDCR is full implementation of defendants' staffing plan. ECF No. 5711 at 1. Despite the court-approved PIP Staffing Plan being in place, alarming staffing shortages for many disciplines continued to plague the PIPs.

Notably, at the time of the site visits, many PIPs reported considerably higher staffing vacancies for some disciplines than for the prior review period. Staffing vacancies were especially egregious at CMF-PIP, CHCF-PIP, and SVSP-PIP. Specifically, CMF-PIP reported substantial psychiatry and psychology functional vacancy rates of 37 and 49 percent respectively, a 68 percent functional vacancy rate for social work, and a 37 percent recreation therapy vacancy rate. CHCF-PIP also identified serious functional vacancy rates of 30 for psychiatry, 55 percent for psychology, 60 percent for social work, and 38 percent for recreation

therapy.  At SVSP-PIP, all 11.2 psychiatry positions were vacant; however, contractors reduced the psychiatry functional vacancy rate to 29 percent.  SVSP-PIP also reported respective psychology and social worker functional vacancy rates of 20 and 46 percent.  The recreation therapy vacancy rate was 29 percent.  Notably, CMF L1-PIP indicated 20 percent vacancy rates for psychiatry, psychology, and recreation therapy, and 60 percent for social work.

Although less pronounced, during the site visits, CIW-PIP and SQ-PIP also reported considerable staffing vacancies.  CIW-PIP reported that both the psychiatry functional vacancy rate and the psychology vacancy rate were 33 percent; however, all CIW-PIP social worker and recreation therapy positions were filled.  SQ-PIP indicated no staffing vacancies for psychiatry or psychology but respective social worker and recreation therapy vacancy rates of 44 and 17 percent.  The consequential result of these treatment staffing shortages was the provision of inadequate care.

Moreover, multiple leadership positions were also not filled by permanent staff, but by staff in acting/out of class capacities; this was especially pronounced at CMF-PIP and CHCF-PIP.  When staff act out-of-class, their original positions may remain vacant or may be filled by other staff acting out-of-class.  Notably, when line staff is appointed to act out-of-class in a supervisory position, their treatment responsibilities may be assigned to other staff or left unattended thereby potentially affecting the PIP's capability for providing appropriate care.

A February 4, 2022 CCHCS PIP Integration Staffing report supplied by CDCR[44] showed that four of seven or 57 percent of chief psychiatrist positions for all PIPs were filled.  For senior psychiatrists, one of five positions or 20 percent were filled.  Of the nine chief psychologist positions, six or 67 percent were filled.  The data indicated that all 16 senior psychologist

---

[44] *See* CCHCS PIP Integration Report, as of February 4, 2022, attached hereto as Exhibit M.

supervisor positions were filled but, without explanation, reported a fill rate of 95 percent.  Of 30

senior psychologist specialist positions, 21 or 70 percent were filled.  Four of 6.6 supervising

social work positions or 61 percent were filled.  CDCR did not utilize registry staff for these

classifications.



The CCHCS PIP Integration Staffing report showed that with registry staff, 82.8 of 97.4

or 85 percent of staff psychiatrist positions were filled.  Of the 129.9 psychologist positions, with

registry staff, 83.75 or 64 percent were filled.  For licensed social workers, including registry

staff, 53 of 94.8 positions or 56 percent were filled.  There were 96.60 recreation therapist

positions of which, with registry staff, 63 or 65 percent were filled. [45]

---

[45] According to the most recent PIP Integration Report, as of April 15, 2022, vacancies in the
four clinical disciplines have not materially changed since the Draft Report was distributed to the
parties.  With registry staff included, 81 percent of staff psychiatrist positions were filled; 63
percent of staff psychologist positions were filled; 54 percent of licensed social worker positions
were filled; and 66 percent of recreation therapist positions were filled.  *See* CCHCS PIP
Integration Report, as of April 15, 2022, attached hereto as Exhibit N.



The CCHCS PIP Integration Staffing report indicated that, for all PIPs, including those positions that used registry staff, there was a 43 percent vacancy for chief psychiatrists, 80 percent vacancy for senior psychiatrists and 15 percent vacancy for staff psychiatrists. For psychology, the vacancy rates were 33 percent for chief psychologists, five percent for senior psychologist supervisors, 30 percent for senior psychologist specialists, and 36 percent for staff psychologists. Positions for supervising psychiatric social workers were 39 percent vacant and, for licensed social workers, the vacancy was 44 percent. There was a 35 percent vacancy for recreation therapists.



According to CDCR's Monthly Reports posted February 2022 covering December 2021, the staffing vacancies for psychiatrists, psychologists, social workers, and recreation therapists combined were 58 percent at CMF-PIP, 37 percent at CMF L1-PIP, 44 percent at CHCF-PIP, 35 percent at SVSP-PIP and 18 percent at CIW-PIP.  SQ-PIP had no vacancies for these positions.



Mental Health Staffing Vacancy Rates by Institution, as of December 2021*

| | CMF | CMF L1 | CHCF | SVSP | CIW | SQ |
|---|---|---|---|---|---|---|
| ■ Vacancy Rate | 58% | 37% | 44% | 35% | 18% | -1% |

* Source: 'Psychiatric Inpatient Program Staffing Report' CDCR Secure Website for Monthly Reports, posted February 2022, covering the period of December 2021

The staff-to-patient ratios for all inpatient care programs were 1:15 for the admissions and acute care units and either 1:30 or 1:35 for intermediate care.[46]  These ratios applied to psychiatrists, psychologists, social workers, and recreation therapists.  At CIW-PIP and SQ-PIP, the 1:15 acute care caseload ratio also applied to intermediate care patients because these two PIPs could flex beds between the acute and intermediate levels of care as needed.

As discussed in more detail below, many programs did not meet the established staff-to-patient ratios.  Inpatient care programs were also less likely to meet the ratio based on actual bed capacity, as opposed to the reported census.

---

[46] Notably, the implementation of the PIP Staffing Plan for the 2021 – 2022 fiscal year changed the intermediate care staff-to-patient ratio from 1:35 to 1:30.  CMF-PIP's site visit was prior to the implementation of the PIP Staffing Plan, when the staff-to-patient ratios for intermediate care increased from 1:35 to 1:30.

Mental health program staffing for each PIP is discussed in detail below.

### 1.    CMF-PIP, CMF L1-PIP, CHCF-PIP and SVSP-PIP

At the time of the site visit at CMF-PIP, the executive director had assumed the chief psychiatrist's responsibilities. The clinical and hospital administrators' positions were vacant; however, the hospital administrator's position was covered in an acting capacity. There were vacancies for two of five program directors, two of four program assistants, and the nurse coordinator.

The chief psychiatrist position was vacant but other staff reportedly covered the responsibilities. Both senior psychiatrist positions were also vacant; one position was covered by an acting psychiatrist. The psychiatry functional vacancy rate of 37 percent improved from 52 percent in the prior review period.

The chief psychologist's position was vacant but covered in an acting capacity; this resulted in a vacancy for one of two senior psychologist supervisor positions. Positions for two of four senior psychologist specialists were also vacant. There was an astounding 78 percent psychology vacancy rate, though registry staff reduced it to 49 percent, which was still higher than the 31 percent in the prior review period. Two psychologists were unlicensed.

Staff on loan from headquarters filled one of two supervising social worker positions. The social worker functional vacancy rate was an alarming 68 percent, which was significantly higher than the 15 percent vacancy in the preceding review period. Two social workers were unlicensed. The 37 percent recreation therapy vacancy rate was sizeable in comparison to the 11 percent in the prior review period.

The nurse practitioner vacancy rate was 75 percent. The single supervising registered nurse (SRN) III position was vacant. There was a 32 percent vacancy rate for SRNs and a 39

percent functional vacancy rate for registered nurses (RNs). The psych tech vacancy rate was 17 percent.

On May 25, 2021, 337 of 396 or 85 percent of CMF-PIP's beds were filled. The admissions unit housed 37 patients and there were 177 acute care and 123 intermediate care patients. Based on the census and the 1:15 caseload ratio for the admissions' unit, both CMF-PIP admissions units met the psychiatry staffing ratio. One of two admissions' units met the ratio for psychology and recreation therapy but not for social work. Notably, based on bed capacity, neither admissions unit met caseload ratios for the four disciplines.

CMF-PIP had a 1:15 acute care staffing ratio for all four disciplines. Based on the census, all six acute care units met the ratio for psychiatry and four of six met it for bed capacity. For psychologists, given the census, only two of six units met the caseload ratio; based on bed capacity, only one of six satisfied it. Based on the census or bed capacity, none of the six acute care units met the ratio for social work, and only one of six met it for recreation therapy.

CMF-PIP's intermediate care staffing ratio for the four disciplines was 1:35 during the site visit. Based on the census, all four units met the ratio for psychiatry but only two of four satisfied it for bed capacity. For both psychology and social work, two of four intermediate care units met the ratio for the census but only one of four met it for bed capacity. All four units met the ratio for recreation therapy based on either the census or bed capacity.

At CMF L1-PIP, positions for the program director and program assistant were vacant; staff in acting capacities covered the program assistant's position.

The senior psychiatrist supervisor position was vacant; it had been filled during the prior review period. The vacancy rate was 20 percent for psychiatry, psychology, and recreation therapy, and 60 percent for social work.

Regarding CMF L1-PIP, on May 25, 2021, 31 of 66 or 47 percent of the beds were filled. Based on its site visit census, the unit met the staffing ratio for psychiatry, psychology, and recreation therapy, but not for social work. During the prior review period, all four disciplines met the ratio.

Since opening in 2013, CHCF-PIP was unsuccessful in adequately filling its staffing positions to meet *Coleman* class members' treatment needs; serious staffing vacancies and high staff turnover rates continued to plague the institution. By the time of the site visit, CHCF-PIP's chronic staffing shortages were at a crisis level. Consequently, CHCF-PIP's leadership and regional team requested that the Special Master support the closure of some PIP units.

During the site visit at CHCF-PIP, positions for the executive director and clinical administrator were both filled out of class; the psychiatry and social work chiefs' positions were functionally vacant as their staff were acting in other capacities. Four of five program director positions were also filled out of class. Although two of three program assistant positions were filled, one was also filled out of class.

The two senior supervising psychiatry positions were vacant; both were also vacant during the prior review period's revisit of CHCF-PIP in March 2020. The 30 percent psychiatry functional vacancy rate marginally decreased from 38 percent during the revisit.

One of two positions each for senior psychologist supervisors and senior psychologist specialists were both filled out of class. The psychology functional vacancy rate was 55 percent, which increased appreciably from 21 percent since the revisit. Two psychologists were unlicensed at the time of the site visit.

Positions for two supervising psychiatric social workers were filled but one was filled out of class by staff on loan from another institution. The 66 percent social worker functional

vacancy rate was significantly higher than the prior review period's 32 percent. Two social workers were unlicensed.

Two of three senior recreation therapist positions were filled out of class. The 38 percent recreation therapist functional vacancy rate was significantly higher than the prior revisit's 13 percent.

Vacancy rates were 26 percent for SRNs, 11 percent for RNs, 13 percent for senior psych techs and 23 percent for psych techs.

Data provided during the site visit indicated that on July 19, 2021, CHCF-PIP operated 514 beds, which was 20 less than during the prior review period. Of the 184 acute care beds, 160 or 87 percent were filled and 312 of 330 or 95 percent of intermediate care beds were also filled.

For acute care, based on either the census or bed capacity, four of five of CHCF-PIP's units met the 1:15 psychiatry staffing ratio, but none of the five units met the ratio for psychology. For social work, two of five units met the ratio based on the census; one of five met it for bed capacity. For recreation therapy, four of five units met the ratio based on the census but only three of five met it for bed capacity. For the maximum custody unit, psychiatry met the staffing ratio based on the census and bed capacity, but psychology, social work, and recreation therapy did not.

For intermediate care, CHCF-PIP met the 1:30 staffing ratio for psychiatry and recreation therapy for all ten units based on the census or bed capacity. Six of ten units met the ratio for psychology, as did four of ten for social work based on the census or bed capacity. In the maximum custody unit, psychiatry, psychology, and recreation therapy met the ratio based on the census or bed capacity but social work did not.

65

SVSP-PIP's staffing problems included low retention rates for civil service psychologists and social workers. At the time of the site visit, across all disciplines only one-third of current staff were in the same positions as they held in December 2019. Mental health leadership reported that most staff lacked experience.

At the time of the site visit, SVSP-PIP's chief psychiatrist position was filled in an acting capacity by the senior psychiatrist supervisor, resulting in the latter position's vacancy. All 11.2 psychiatry positions were vacant; however, contractors reduced the functional vacancy rate to 29 percent, which was lower than the prior review period's 40 percent.

There were respective vacancy rates of 33 and 82 percent for senior psychologist supervisors and specialists; only one of 5.6 of the latter positions were filled. The psychology functional vacancy rate of 46 percent was appreciably higher than the prior review period's zero percent. Five psychologists were unlicensed.

The social worker vacancy rate of 46 percent was also substantially higher than the ten percent functional vacancy rate of the prior review period. Two social workers were unlicensed. Recreation therapists had a 29 percent vacancy rate.

The 23 percent psych tech functional vacancy rate improved from the prior review period's 43 percent. Similarly, the respective functional vacancy rates of 40 and 43 percent for RNs and certified nursing assistants (CNAs) were also considerably higher than the eight and zero percent functional vacancy rates of the previous review period. The zero functional vacancy rate for licensed vocational nurses (LVNs) was an improvement from the 22 percent of the prior review period.

SVSP-PIP had an overall 1:30 intermediate care staffing ratio for the four major disciplines at the time of the site visit. Notably, the Staffing Plan for fiscal year 2021 – 2022

also established a 1:15 ratio for PC 1370 patients; SVSP-PIP housed seven such patients during the site visit.

On August 24, 2021, 214 of 246 or 87 percent of SVSP-PIP's 246 beds were occupied. Based on the reported census or bed capacity, three of four units satisfied the psychiatry staffing ratio but only one of four units satisfied the ratio for psychology and two of four met it for social work. Recreation therapy caseload ratios were not provided.

<u>Telepsychiatry</u>

Due to CMF-PIP's severe staffing shortages, two telepsychiatrists provided services for intermediate care patients during parts of the review period. One telepsychiatrist provided services for the entire review period; another provided them for four of six months. Telepsychiatry's uses included individual clinical contacts, IDTTs, and crisis calls.

CMF L1-PIP did not use telepsychiatry during the reporting period.

At SVSP-PIP, COVID-19 resulted in two registry psychiatrists working as telepsychiatrists during the review period. Telepsychiatry was used on 1,321 occasions for individual clinical contacts and for 393 IDTT meetings.[47]

CHCF-PIP did not have an established telepsychiatry position. However, staffing shortages resulted in its use during the first two months of the review period for 56 IDTTs and 370 individual clinical contacts; 99 percent of the latter were for intermediate care patients.

## 2.    CIW-PIP and SQ-PIP

During the site visit, CIW-PIP reported that it had not implemented the staffing changes contained in the staffing charts and data provided to the Special Master on April 19, 2021.

---

[47] On May 5, 2022, CDCR notified the Special Master and plaintiffs' counsel that "a telepsychiatrist has been assigned to the SVSP PIP for 30 consecutive calendar days." Email from Melissa Bentz, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (May 5, 2022), attached hereto as Exhibit O.

The senior psychologist supervisor filled the executive director position.

The position for the chief psychiatrist was filled but the senior psychiatrist supervisor's position was vacant.  The psychiatry functional vacancy rate was 33 percent.

The chief psychologist position was filled.  The psychology vacancy rate was 33 percent. During the prior review period, all psychology positions were filled.

Four social worker and four recreation therapist positions were filled.

All SRN, RN, senior psych tech, psych tech, and LVN positions were filled.

On September 10, 2021, 19 of 45 or 42 percent of CIW-PIP's beds were occupied.  Based on its census, CIW-PIP met the staffing ratios for all four disciplines.

SQ-PIP reported significant turnover among supervisory and line staff since the prior review period including personnel changes among nearly all line staff psychologists and social workers and some changes in clinical and custody leadership.

Positions for the program assistant, clinical administrator, and medical director were vacant though other staff covered the functions of the latter two positions.  There were no psychiatry or psychology staffing vacancies.  The 44 percent social worker vacancy rate was an improvement over the prior review period's 72 percent.  The vacancy rate for recreation therapists was 17 percent.

Positions for two supervising registered nurses were filled.  There were respective vacancy rates of 17 and 14 percent for psych techs and CNAs.

During the site visit, on October 25, 2021, 32 of 40 or 80 percent of SQ-PIP's beds were filled.  SQ-PIP's 1:15 acute care staff-to-patient ratio also applied to intermediate care patients because SQ-PIP beds were flexed between the acute and intermediate levels of care and MHCBs.

Psychiatry, psychology, and recreation therapy caseloads were all within the ratio, but social work caseloads exceeded it.

Telepsychiatry

Neither CIW-PIP nor SQ-PIP used telepsychiatry during the review period.

### 3.    CMC MHCB "Acute Care"

On July 20, 2021, CMC MHCB "Acute Care" housed ten acute care patients.  The MHCB's supervisor supervised the acute care patients; a supervising psychologist was also assigned to the unit.  Additional staff included one full-time psychiatrist, two full-time psychologists, and four recreation therapists.  The psychiatrist and psychologist staggered their work schedules to provide coverage seven days weekly.  Though the psychologists and psychiatrist were originally dedicated solely to the MHCB "Acute Care" beds, due to the staffing shortages on the MHCB side where two clinicians were on long term leave, CMC reported that they were increasingly assigned to also provide care to patients receiving MHCB care.  On occasion the psychologists were also required to respond to crisis interventions or other clinical activities in other levels of care.  As a result, the adequacy of staffing for the "Acute Care" beds could not be separated from staffing needs in the rest of the MHCB and other parts of CMC.  Some mental health staff providing services in CMC MHCB "Acute Care" noted that they were on the verge of "burnout".

Telepsychiatry

Telepsychiatry was not used in CMC MHCB "Acute Care" unit at the time of the site visit.

### B.    TREATMENT AND CLINICAL SERVICES

Observed IDTT meetings demonstrated considerable variability in quality.  IDTTs at CMF-PIP ranged from appropriate to concerning; at CMF L1-PIP, they ranged from minimally

adequate to very concerning. CHCF-PIP IDTTs typically revealed varying levels of appropriate treatment and many deficiencies. IDTTs in CHCF-PIP's "flex" acute care unit were adequately run with appropriate collaboration. SVSP-PIP treatment team meetings demonstrated numerous concerns, including the lack of correctional counselor attendance.

CIW-PIP IDTTs varied in quality but were typically collaborative. SQ-PIP IDTT meetings were of appropriate quality and all treatment team members attended. IDTTs in CMC MHCB "Acute Care" were observed to be appropriate.

There were typically significant issues with the PIP's group treatment, although some programs' group therapy was adequate. CMF-PIP acute care staff expressed concern with the lack of core groups; out-of-cell therapeutic activities for acute care patients were also insufficient. CMF-PIP intermediate care patients repeatedly requested additional clinical groups. CMF L1-PIP patients received inadequate out-of-cell and structured activity hours but expressed satisfaction with group quality. CHCF-PIP offered patients inadequate group treatment and insufficient core groups. There was a general lack of group treatment for CHCF-PIP MAX custody patients, while the facility's "flex" acute care unit did not offer clinical groups. The quality of SVSP-PIP groups was seriously hindered by a lack of confidential treatment space. Notably, many SVSP-PIP MAX custody patients had either limited or no group treatment and minimal out-of-cell time.

Observed CIW-PIP groups had adequate content. At SQ-PIP, observed groups typically engaged patients, who requested additional clinical groups specific to their diagnoses. Observed groups in CMC MHCB "Acute Care" demonstrated effective rapport with patients.

Individual clinical contacts at CMF-PIP and CMF L1-PIP were typically untimely. Multiple CHCF-PIP individual contacts were untimely. CHCF-PIP MAX custody patients

received minimal individual treatment.  The individual treatment provided to SVSP-PIP patients varied.  Notably, SVSP-PIP's C5 treatment space was insufficient to offer all patients confidential weekly psychiatry and primary clinician contacts; however, most C6 patients reported receiving beneficial, confidential weekly primary clinician contacts.  Overall, TC1 individual treatment was variable; TC2 patients reported helpful weekly psychiatry and primary clinician sessions.

Multiple CIW-PIP individual treatment contacts were timely and others untimely; however, clinical staff reported insufficient time to see patients.  Most SQ-PIP staff and patients reported that patients had daily access to individual out-of-cell clinical contacts.  CMC MHCB "Acute Care" staff reported that one-to-one psychiatry and primary clinician contacts regularly occurred.

As for behavioral management, CMF-PIP's Positive Behavioral Support Team (PBST) had insufficient resources; CMF L1-PIP did not use the PBST.  Reviewed CHCF-PIP behavior plans revealed numerous shortcomings.  SVSP-PIP lacked a PBST and its efforts to address self-injurious behavior through consultation and behavior plans were inadequate; reviewed SVSP-PIP behavior plans were also variable in content and quality.

Reviewed CIW-PIP Positive Behavioral Support Plans (PBSPs) identified specific target behaviors and detailed functional analyses.  Reviewed SQ-PIP behavior plans and updates were of a higher quality than during the prior site visit.  CMC MHCB "Acute Care" staff stated that behavior plans could be helpful but indicated that their use required an additional clinician for development and implementation.

1.     **CMF-PIP, CMF L1-PIP, CHCF-PIP and SVSP-PIP**

a)     **IDTTs**

At CMF-PIP, all required staff and patients attended observed IDTTs for acute care. However, IDTT quality ranged from appropriate to concerning. Multiple IDTTs were typically characterized by lack of discussion of the STEP process or treatment plans; only one mentioned the patient's LRH. The IDTTs' conduct in dayrooms was not clinically appropriate in some instances due to considerable background noise.

Review of a sample of healthcare records for CMF-PIP's acute care program demonstrated that 86 percent of initial IDTTs were timely and attended by required staff. Only 66 percent of routine IDTTs were timely and necessary staff were present 80 percent of the time.

For CMF-PIP's intermediate care program, the quality of IDTTs varied across treatment teams and, at times, within teams. All required participants were present. However, IDTTs did not typically discuss treatment plans nor discharge planning and did not consistently address LRH or STEP levels. Clinical conceptualizations were not always presented and diagnoses frequently were not mentioned. Treatment teams were also not as integrated as some observed teams during the prior review period, resulting in a less clinically valuable process. For many patients, the recreation therapist provided some of the most therapeutically valuable input.

A selection of reviewed healthcare records for CMF-PIP intermediate care patients found the timely conduct of 75 percent of initial IDTTs. Fifty percent of "10-day" IDTTs for patients who required them were also timely. Eighty-three percent of routine IDTTs were timely.

Observed IDTTs at CMF L1-PIP were held in the dayroom which presented many distractions. Although required team members attended, IDTT quality ranged from minimally adequate to very concerning. The IDTTs consistently reviewed diagnoses, medications, treatment adherence, STEP levels, pertinent historical data, and LRH. Among the striking

shortcomings, treatment decisions were typically determined by individual members without collaborative discussion. Rationales for retaining patients out of LRH were often arbitrary. The IDTTs also did not discuss treatment goals in measurable terms and neglected to report on treatment barriers and patient progress toward discharge objectives.

Notably, CMF L1-PIP data reported the timely completion of 89 percent of IDTTs. However, reviewed healthcare records revealed inadequate treatment planning documentation at CMF L1-PIP. Deficiencies were consistently identified in documentation of treatment and LRH obstacles, patients' treatment responses, clinical summary updates, treatment and discharge goals, treatment interventions, and rationales for level of care and LRH decisions.

All required disciplines and patients typically attended observed CHCF-PIP acute care IDTTs. Psychiatrists appropriately reviewed medications and recreation therapists effectively engaged patients and discussed treatment goals and obstacles. In contrast, most PCs asked a standardized list of questions; contributions of some correctional counselors and nurses were limited. IDTT members also routinely addressed treatment-related matters individually with patients rather than through collaborative discussions. There was a lack of discussion of diagnoses and symptoms, LRH, STEP levels, therapeutic interventions, and treatment progress. Notably, the compliance rates for timely completion of initial and routine IDTTs was, respectively, 100 and 90 percent.

Observed CHCF-PIP IDTTs for intermediate care patients also illustrated many deficiencies. Among them, treatment teams often neglected to discuss measurable treatment objectives, level of care rationales, LRH barriers, STEP levels, and discharge criteria. Several IDTTs also neglected to address barriers to progress, safety planning, and treatment plan modifications when clinically indicated. Several PCs' contributions were limited to scripted

questions.  Notably, CHCF-PIP timely completed all intermediate care initial IDTTs with all required treatment team members attending.  Routine IDTTs were timely 83 percent of the time.

None of the observed IDTTs in CHCF-PIPs "flex" acute care unit began on time.  None were attended by all required team members; psych techs and recreation therapists did not attend any observed IDTTs.  Nonetheless, the IDTTs were adequately run with appropriate collaboration among attending disciplines.  The IDTTs addressed patients' level of care and most adequately addressed treatment plan goals, safety planning, and case conceptualization.  For the "flex" unit, 60 percent of reviewed healthcare records included satisfactorily documented treatment plans; 80 percent had clear discharge goals.

For CHCF's "overflow" MAX custody patients housed in intermediate care units, observed IDTTs and record review indicated that IDTTs routinely developed treatment plans with unachievable goals and interventions due to a lack of available programming for these patients.

At SVSP-PIP, observed IDTTs typically demonstrated multiple shortcomings. Reviewed treatment plans were often hard to decipher and lacked specificity.  Recreation therapists did not attend IDTTs due to staffing vacancies and the need to provide groups.  This was alarming because recreation therapists provided most group therapy and typically had the most patient contact.

Observed SVSP-PIP IDTTs on C5 and C6 often failed to address many critical matters including referral rationales, case conceptualization, various medication issues, diagnostic information, and discharge objectives among other issues.  The C6 IDTTs also highlighted the need for training on behavioral assessments and plans when indicated.  The IDTTs also neglected to reference information from recreation therapist progress notes or collateral contacts.

Reviewed IDTT-developed treatment plans for TC1 patients often lacked specific staff interventions to achieve treatment goals.  Notably, interviewed TC1 patients reported knowing their diagnoses and treatment goals and stated that IDTTs were collaborative.

Observed TC2 IDTTs reviewed treatment plans and had useful interdisciplinary discussion and quality primary clinician summaries; however, they minimally addressed group treatment.

Review of a sample of healthcare records for C5 patients to assess IDTT timeliness found that 83 percent of initial IDTTs were timely, as were 86 percent of routine IDTTs.  Notably, correctional counselors typically did not attend IDTTs.

Assessment of a sample of healthcare records for C6 patients revealed the timely conduct of all initial IDTTs.  However, required staff were present at only 14 percent and the correctional counselor was always the absent staff member.  Ninety percent of routine IDTTs were also timely.  Required staff were present at only 27 percent and correctional counselors were typically absent.

For TC1 patients, reviewed healthcare records found the timely conduct of all initial IDTTs.  Required staff were present at 44 percent; again, the correctional counselor was always the absent staff member.  Ninety-six percent of routine IDTTs were timely with required staff present 70 percent of the time.  With one exception, the correctional counselor did not attend.

### b)    <u>Group Therapy</u>

At CMF-PIP, recreation therapist provided three-quarters of groups and nursing provided the remainder.  In the acute care program, PCs did not provide groups due to staff shortages and staff admitted the lack of core groups was concerning.  Further, schedulers assigned acute care patients to groups without treatment team input.  Notably, out-of-cell structured therapeutic

activities for acute care patients was inadequate; data for three months reported offering approximately 3.5 weekly hours of out-of-cell therapeutic hours of which patients attended slightly more than two hours.

For CMF-PIP intermediate care patients, the facility was unable to provide the average number of groups or group hours per patient.  Interviewed intermediate care patients repeatedly requested clinical groups, groups that were linked to their diagnoses, and those that could help them manage the correctional environment.

CMF L1-PIP data for structured and unstructured activity hours was conflicting and unreliable yet demonstrated that patients did not receive adequate out-of-cell and structured activity hours.  Patients nonetheless reported being generally satisfied with group quality.  Observed groups led by recreation therapist and psych techs were adequate and engaged patients.  An observed clinician-led group had a thoughtful and organized curriculum but was inappropriate for most group members and lacked group discussion or interaction.

CHCF-PIP group treatment comprised 70 percent of offered treatment.  In March 2021, the facility restarted nursing groups.  Provided group treatment data was unreliable but reflected offering acute and intermediate care patients less than four hours of weekly mental health treatment.  This was very concerning given patients' level of acuity.  Fifty-two percent of offered treatment was canceled.

During the site visit, CHCF-PIP's acute care program had between eight and 13 weekly recreation therapist-led groups, but only two weekly clinical groups.  Recreation therapist-led treatment was inadequate to address acute care patients' needs.  Observed acute care groups revealed engaged facilitators who were aware of patients' needs.  However, most interviewed

acute care patients reported that groups were not helpful and expressed the need for more group treatment of better quality.

Recreation therapists ran most intermediate care groups; clinicians offered only one or two weekly clinical groups in intermediate care units. Both clinicians and patients complained about the lack of core groups. Observed CHCF-PIP intermediate care groups included a clinician-led Dialectical Behavioral Therapy (DBT) group that started late and primarily consisted of reading handouts with minimal discussion and patient interaction, a music therapy group of excellent quality, and a recreation therapist-led group that failed to consider participants' functional levels.

CHCF-PIP's "flex" acute care unit did not offer clinical or nursing groups. One recreation therapist provided groups for one to two hours weekly per patient. However, the offered group treatment was not in line with patients' required treatment plans or in accordance with expectations for an acute care program. Tellingly, the groups generally consisted of movie watching, card playing, and similar activities.

CHCF-PIP did not identify and separately calculate the average number of offered and attended hours per MAX custody patient though these patients received the least amount of out-of-cell treatment at the PIP. CHCF-PIP staff acknowledged the lack of treatment for MAX custody patients. CHCF-PIP MAX custody patients housed outside of MAX custody units—the so-called "overflow" MAX custody patients—received even less treatment and recreation due to the competition for limited space and staff in the non-max units. These patients had extremely limited out-of-cell time and were not offered groups.

At SVSP-PIP, groups were of variable quality and markedly hindered by the lack of confidential treatment space. Reportedly inaccurate treatment data indicated that groups

77

provided 74 percent of treatment with recreation therapists providing 55 percent.  Only approximately two-thirds of scheduled groups occurred during the review period.  Patients attended a weekly average of almost two hours of group treatment.  Some MAX custody patients had no group treatment.

Group treatment on C5 was inadequate, mask wearing was inconsistent, and there were no groups for MAX custody patients.  Mental health leadership and patients reported that non-maximum custody patients were offered between 3.5 and 4.5 hours of daily out-of-cell time consisting of group, yard, and dayroom; between one and two daily hours of group was offered every weekday.  C5 MAX custody patients received yard for three one-hour intervals on Saturday and Sunday; otherwise, they were generally locked in their cells.  Three observed C5 groups conducted in the nonconfidential dayroom revealed multiple, serious distractions.

On C6, non-maximum custody patients reported being offered between five and ten weekly hours of group treatment of which only two hours were core groups, and approximately 2.5 daily hours of combined dayroom and yard.  C6 patients generally spoke highly of clinician-led core groups but were very dissatisfied with recreation therapy groups.  The quality of an observed clinician-led dayroom group was compromised by distractions due to the group's setting.  The facilitator was nonetheless well-organized and knowledgeable, and patients actively participated.  One observed recreation therapy group was adequate and another lacked structure and therapeutic value.  C6 MAX custody patients were reportedly not offered groups and had minimal out-of-cell time that consisted of one daily hour of yard and weekly individual clinical contacts.

Staff reported offering most TC1 patients from two to four weekly groups.  Non-maximum custody patients reported attending three; MAX custody patients reported

participating in two to four weekly groups.  Patients all reported being offered insufficient treatment hours and wanting more clinically relevant groups.  TC1 groups were reportedly cancelled with some regularity due to custody.  Recreation therapists did not participate in IDTTs which was very concerning since the subjects of recreation therapist-led groups were solely the decisions of recreation therapists and, therefore, were unable to provide needed information to the treatment team.

MAX custody patients reported benefiting from observed recreation therapist-led groups.

TC1 non-maximum custody patients reported receiving one hour of dayroom three to four days weekly.  TC1 MAX custody patients reported no dayroom access.  Yard was provided daily for all patients regardless of security status for between 90 minutes and two hours.

TC2 non-maximum custody patients generally reported being offered two 50-minute weekly groups which they described as helpful, though only a few reported being offered core groups.  They also reported being offered 1.5 daily hours of yard and one hour of dayroom every other day.  Offered weekend yard time was for two hours per session.  Notably, TC2 MAX custody patients' very limited group treatment was restricted to weekends.

c)      **Individual Treatment**

For the CMF-PIP acute care program, healthcare records reviewed found that 63 percent of initial psychiatry evaluations were timely, as were 70 percent of routine psychiatry contacts. For primary clinician evaluations, 50 percent of initial contacts were timely, as were 56 percent of routine contacts.

In the CMF-PIP intermediate care program, a review of records indicated that all initial psychiatry evaluations were timely, as were 40 percent of routine psychiatry contacts.  For primary clinician evaluations, 100 percent of initial contacts and 68 percent of routine contacts

were timely.

A review of healthcare records at CMF L1-PIP for individual clinical contacts revealed that, prior to initial IDTTs, no patients received initial primary clinician assessments; 90 percent did not receive initial psychiatry assessments. Quarantined patients confirmed weekly primary clinician and psychiatry contacts in the dayroom.

Regarding CHCF-PIP acute care program, a review of healthcare records found all initial psychiatry evaluations occurring timely. Forty-six percent of routine psychiatry contacts occurred at least every 72 hours; 85 percent were compliant under the seven-day approved "flex" policy. Initial primary clinician assessments occurred on average 4.1 days after patient admission. Notably, the frequency of routine primary clinician contacts varied considerably and ranged from 4.75 to 44.5 days.

Healthcare records reviewed for CHCF-PIP intermediate care patients revealed the timely completion of two-thirds of initial primary clinician assessments and the offering of routine primary clinician contacts every other week. Non-maximum custody patients were offered confidential contacts; some "overflow" MAX custody patients reported many non-confidential primary clinician contacts. Patients' perception of primary clinician contacts varied; some reported satisfactory care, while others characterized the contacts as brief "check-ins."

As for psychiatry contacts for CHCF-PIP's intermediate care patients, reviewed healthcare records found the timely completion of all initial assessments and 90 percent of routine contacts. Patients spoke highly of psychiatry contacts which were typically confidential.

Treatment for CHCF-PIP MAX custody patients was in a state of crisis. Due to general staffing shortages, MAX custody patients' clinical contacts were typically limited to biweekly primary clinician contacts and weekly psychiatry contacts. "Overflow" MAX custody patients

typically had primary clinician contacts every other week; however, patients complained that the contacts were often non-confidential cell-front "check-ins." Overall, MAX custody patients had minimal out-of-cell time.

Healthcare records for CHCF-PIP's "flex" acute care unit patients that were reviewed indicated that psychiatrists saw patients every one to two days; psychologists saw them weekly. Reviewed records reflected timely completion of 100 percent of initial psychiatric assessments though supporting documentation was limited. Primary clinician initial assessments were timely completed in 70 percent of cases but assessment quality varied. Initial assessments were conducted confidentially.

SVSP-PIP reported that patients received an average of 23 minutes of individual weekly primary clinician contacts; confidentiality varied.

On C5, interviewed clinical leadership and reviewed appointment schedules indicated insufficient treatment space to offer all patients confidential weekly psychiatry and primary clinician contacts. Some patients reported consistent confidential individual clinical sessions while others stated that all or most psychiatry contacts occurred at cell-front.

On C6, most interviewed patients reported being offered beneficial, confidential weekly primary clinician contacts. Psychiatry contacts on the unit were also scheduled weekly though several patients reported that psychiatry contacts were at cell-front.

Interviewed TC1 patients typically reported seeing their psychiatrists and PCs weekly. Several non-maximum custody patients reported that psychiatrists saw them in front of other patients when they were on the yard for brief "check-ins" which record review confirmed. Some patients reported that custody staff was not responsive to their urgent needs to speak with mental health resulting in the escalation of their behavior.

Overall, TC1 clinical care was variable.  Some PCs used individual sessions to address patients' needs and support their progress toward treatment goals which was demonstrated by adequate documentation of provided interventions and their rationales.  Other clinicians' documentation was primarily an update of the patient's status and did not indicate provided treatment or patients' treatment goal progress.  PCs were also challenged by the provision of services to patients who refused treatment, were argumentative, or who engaged in self-injury for secondary gain.

TC2 patients reported helpful confidential weekly sessions with their psychiatrist and PC.  However, TC2 was typically staffed by correctional officers who were not regularly assigned to the unit, resulting in increased cancellations and/or delays in providing treatment.

A selection of healthcare records was reviewed for C5 patients for the timeliness of individual clinical contacts revealed all initial psychiatry evaluations and 28 percent of routine psychiatry contacts to be timely.  As for primary clinician contacts, 17 percent of initial contacts and 37 percent of routine contacts were timely.

To assess clinical contacts, a sample of records of C6 patients reviewed found that 71 percent had timely initial psychiatry evaluations; 57 percent were confidential.  Ninety-two percent of routine psychiatry contacts were timely; ten percent were confidential.  As for primary clinician evaluations, 71 percent of initial evaluations and 70 percent of routine contacts were timely.

For TC1 patients, reviewed healthcare records found 78 percent of initial psychiatry evaluations to be timely; 55 percent were confidential.  Seventy-four percent of routine psychiatry contacts were also timely; 51 percent were confidential.  For primary clinician

contacts, 78 percent of initial evaluations were timely, as were 53 percent of routine contacts; of the latter, 65 percent were conducted confidentially.

### d)    Solo Programming[48]

CMF-PIP, including the L1 unit, phased out solo programming. The only exception was due to COVID-19 public health guidelines.

CHCF-PIP used solo programming for all MAX patients and for specific intermediate and acute care non-MAX patients.

SVSP-PIP did not use solo programming during the review period.

### e)    Psychiatric Services

CMF L1-PIP non-quarantined patients reported weekly confidential contacts with assigned psychiatrists. They further reported that psychiatrists answered their medication questions and timely responded to verbal or written requests.

CHCF-PIP psychiatrists assigned to the acute care program reported good patient access. However, they also reported frustration with the limited available treatment for patients and the minimal availability for consultation about diagnostic clarification from psychological testing as well as support from the PBST for patients who engaged in self-injury. In CHCF-PIP's "flex" acute care unit, psychiatrists were not provided training on the provision of care in an acute care setting.

Interviewed civil service staff psychiatrists assigned to SVSP-PIP's TC2 unit reported no medication continuity issues.

---

[48] A PIP patient would be placed in solo programming status when the patient exhibited symptoms that were so severe that they interfered with the patient's ability to benefit from group treatment activities or if group interaction might be harmful to the solo programming patient, and that the group would be disrupted by the patient's presence to the disadvantage of other patients in the group.

**f)**      <u>**Other Treatment Issues**</u>

**i.**      <u>**Involuntary Medications (PC 2602)**</u>

At CMF-PIP, 65 acute and 30 intermediate care patients had active PC 2602 orders at the time of the site visit. One PC 2602 petition was denied and another was withdrawn. The treating psychiatrist did not renew one PC 2602 order.

Twelve CMF L1-PIP patients had active PC 2602 orders at the time of the site visit.

CHCF did not delineate PIP PC 2602 orders separately from the outpatient programs.

Sixty-two SVSP-PIP patients were on active PC 2602 orders for involuntary psychotropic medications during the review period. All PC 2602s were timely renewed.

**ii.**      <u>**Behavioral Management**</u>

CMF-PIP's PBST provided specialized behavioral consultation and services for patients who engaged in disruptive or dangerous behavior that did not respond to conventional treatment. The PBST conducted behavioral assessments and developed and implemented PBSPs to help patients replace maladaptive behaviors with positive ones. However, CMF-PIP's PBST had insufficient resources despite an ongoing demand for its services.

CMF L1-PIP did not use the PBST and there were no referrals or implemented plans.

Reviewed CHCF-PIP behavior plans revealed numerous shortcomings. Among them, behavior guidelines operated like written staff suggestions instead of a true behavior plan. Reviewed plans also had multiple behavior targets instead of focusing on one specific area until the patient attained some success. The plans also failed to provide a clinical rationale or justification for the included multiple behavioral targets.

SVSP-PIP's attempts at addressing self-injurious behavior through consultation and behavior plans were inadequate. The facility did not have a PBST and lacked a local operation procedure (LOP) to develop behavior plans. Accordingly, there was a tremendous need for a

formal team or identified clinician to specifically formulate plans and address self-injury. A local policy on self-injurious patient behavior implemented in June 2021 required the monitoring of patient self-harm incidents. Notably, review of 16 such incidents found many shortcomings including a lack of patient consultation notes and adequate treatment recommendations.

SVSP-PIP also lacked a formal training program to develop or implement behavior plans. PCs had responsibility for communicating plans' provisions to staff, but it was unclear how behavior plans could be properly implemented without staff training.

Reviewed behavior plans for four SVSP-PIP patients found variability in content and quality. Among other shortcomings, they did not include specific and measurable goals and there was no evidence of their discussion with staff or formal implementation and tracking. Some plans also lacked incentives to support patient change and were not developed collaboratively with patients.

### iii.    Morning and End of Shift Meetings

All required staff attended observed acute care end of shift meetings at CMF-PIP. Addressed topics included patient behavioral changes, medication non-adherence, new arrivals and discharges, and various medical and mental health concerns. The meetings' quality demonstrated significant variability. An observed end of shift meeting for the intermediate care program in CMF-PIP revealed discussion of pertinent unit and patient-related information, including medication non-adherence, programming refusals, and medical and mental health needs.

A nurse facilitated an observed end of shift meeting in CMF L1-PIP. Overall, the meeting was sufficiently collaborative and meaningful.

Observed huddles in CHCF-PIP acute care program were neither structured, comprehensive, nor efficient. Staff spent considerable time reviewing who was not in their units

rather than identifying patients of concern and discussing ways to address unit issues. An observed inadequate huddle for the intermediate care program found most attendees disengaged. While relevant patient information was provided, the meeting was rushed and lacked collaborative discussion.

An observed SVSP-PIP end of shift meeting on TC1 included relevant disciplines. Some patient discussions were adequate; for others, including upcoming admissions and medication refusals, there were minimal details. Observed TC2 end-of-shift meetings demonstrated useful multidisciplinary discussion.

### iv.    Treatment Space

CMF-PIP treatment space was largely adequate despite loud background noise in some dayrooms. However, staff had to walk through some dayrooms to get to other areas which compromised confidentiality.

CHCF-PIP treatment space was adequate and private for individual contacts, group treatment, and IDTTs. Further, in June 2021, the facility designated space in each unit for dayroom to increase out-of-cell time.

At SVSP-PIP, interviewed clinical leadership on C5 reported inadequate treatment space to offer all patients weekly confidential sessions with their psychiatrist and PC.

### 2.    CIW-PIP and SQ-PIP

### a)    IDTTs

Observed CIW-PIP IDTTs for intermediate care patients included collaborative participation with patients; psychiatrists and custody officers effectively engaged patients and nurses addressed medical concerns. However, there was minimal participation from the social worker, correctional counselor I (CC I), and recreation therapist. The IDTTs typically incorporated adequate reviews of diagnoses, medications, patient functioning, treatment plans,

group participation, and discharge planning.  Notably, they did not adequately cover case conceptualization, functional impairments, safety planning, and substance use.

A sample of healthcare records for CIW-PIP intermediate care patients was reviewed to assess IDTT timeliness found the timely completion of all initial IDTTs with required staff present.  All routine IDTTs were also timely with requisite staff present 97 percent of the time.

At SQ-PIP, observation of IDTT meetings and the treatment planning process for non-condemned acute care and condemned intermediate care patients revealed all treatment team members attending.  There was appropriate interdisciplinary discussion with specific references to treatment plans during SQ-PIP observed IDTTs.

To assess timeliness of IDTTs and staff participation, a selection of healthcare records of SQ-PIP acute care patients was reviewed and found all initial IDTTs conducted timely; 80 percent included required staff.  Ninety-four percent of routine IDTTs also occurred timely; 91 percent included all required staff members.

A sample of reviewed healthcare records for intermediate care patients revealed that 90 percent of initial IDTTs were timely.  Required staff were present at all initial IDTTs and patients were present at 90 percent.  Ninety-three percent of routine IDTTs also occurred timely with requisite staff always present and patients present 47 percent of the time.

### b)      <u>Group Therapy</u>

On Demand reports for CIW-PIP did not accurately calculate offered and attended treatment hours for acute care patients.  The facility thus provided locally maintained data, which reflected patients' attendance at a monthly average of 1.7 hours of structured treatment during a five-month period.

Reported data indicated the offering to CIW-PIP intermediate care patients of an average of four weekly hours of group; patients attended approximately three weekly hours. When examined separately from the total population, CIW-PIP MAX custody patients were offered a weekly average of 1.7 hours of group therapy and attended one hour. Notably, 27 percent of offered groups were cancelled.

Observed clinical and nursing-led treatment groups were all engaging, supportive, and confidential with adequate content and patients' active participation.

SQ-PIP offered an average of 6.04 weekly hours of out-of-cell structured therapeutic activities to acute care patients, of which patients attended an average of 4.18 hours. Recreation therapists provided most group therapy. Core out-of-cell therapy groups comprised less than 50 percent of offered group treatment.

SQ-PIP's intermediate care program offered an average of approximately 15 weekly hours of structured treatment to patients, of which patients attended approximately seven hours. The quality of observed groups was typically dependent on the facilitator. Patients were nonetheless generally engaged in groups. Interviewed patients requested additional clinical groups that were specific to their diagnoses as well as art and music groups. They also reported disliking the lack of treatment continuity due to frequent treatment team changes.

Condemned intermediate care patients reported that yard access with a recreation therapist was limited to once weekly; however, they had daily access to the stand-alone yards for ten weekly hours.

### c) Individual Treatment

During the site visit, CIW-PIP housed one acute care patient. The patient's healthcare record did not document initial psychiatry or primary clinician assessments. However, all

routine psychiatry contacts were timely, and the patient received at least two weekly primary clinician contacts as required.

Record review for CIW-PIP intermediate care patients reflected the timeliness of all initial primary clinician evaluations.  However, only 77 percent of weekly routine primary clinician contacts were timely; 63 percent were confidential.  All initial psychiatry evaluations were timely and confidential.  Eighty-three percent of routine psychiatry contacts were timely; 69 percent were confidential.

Record review for CIW-PIP intermediate care patients also revealed adequate treatment plans with sufficient documentation; in 88 percent of reviewed cases, primary clinician notes corresponded to treatment plans.  There was documentation of effective communication and primary clinician continuity of care in three-quarters of reviewed cases; psychiatry continuity of care was present in just 38 percent.

Notably, interviewed CIW-PIP clinical staff reported inadequate time to see patients.

Most SQ-PIP staff and patients reported that patients had daily access to individual out-of-cell clinical contacts.  The contacts' duration was reportedly based on clinical need and patient choice.

Reviewed acute care patients' healthcare records to assess the timeliness of individual clinical contacts revealed the timely conduct of all initial psychiatry evaluations.  Eighty-eight percent of patients had timely routine psychiatry contacts.  As for primary clinician contacts, 80 percent of initial evaluations and 81 percent of routine sessions were timely.

Healthcare records for intermediate care patients that were reviewed found that 80 percent of initial psychiatry assessments were timely and occurred confidentially; 80 percent of

routine psychiatry contacts were also timely.  As for primary clinician contacts, 90 percent of initial assessments and 88 percent of routine contacts were timely.

### d)     Solo Programming

CIW-PIP staff reported individual discussions of the reasons for solo programming with patients and its documentation in treatment plans.  There were no reports with data on the duration, range, or reasons for solo programming.

### e)     Psychiatric Services

During intermediate care IDTTs at CIW-PIP, psychiatry effectively engaged with patients and appeared to know their needs and histories.

At SQ-PIP, psychiatrists met with their caseload patients at least once every 72 hours but generally more frequently.

### f)     Other Treatment Issues

#### i.     Involuntary Medications (PC 2602)

During the site visit, nine CIW-PIP patients had active PC 2602 orders for involuntary medications.

During the review period, SQ-PIP had 12 patients on active PC 2602 orders.

#### ii.     Behavioral Management

CIW's LOP for the use of PBSPs adequately supported their development and implementation.  However, tracking data indicated that most PBSPs were not completed within assigned timeframes.  A CIW-PIP quality improvement study compiling three months of data found that none of the plans or implementation processes met the 90 percent compliance thresholds at any point.

Reviewed comprehensive plans for patients treated with PBSPs identified specific target behaviors along with the frequency and intensity of the behaviors prior to the plans'

implementation.  Functional analyses were comprehensive.  Most plans included replacement behaviors; however, one-half focused solely on reducing target behaviors without providing support for more adaptive behaviors in violation of policy.  Reviewed PBSPs also revealed that none of the plans provided for subsequent actions when the target behaviors returned or increased.

SQ-PIP assigned a senior psychologist specialist to the PBST.  In contrast to the preceding monitoring round, this senior psychologist specialist was able to dedicate their full attention to behavior planning and did not have other clinical duties.  This clinician's full-time assignment to PBST resulted in the development of more comprehensive, higher quality behavior plans and updates to behavior plans compared to the preceding monitoring round.

### iii.    Morning and End of Shift Meetings

The monitoring team was not able to observe morning meetings during the site visit at CIW-PIP.

In SQ-PIP, an observed morning end of shift meeting was well-attended and included verbal reports on all patients and review of their daily schedules and expiring medications, among other matters.  The meeting had adequate staff interaction.  Multiple disciplines also attended an observed SQ-PIP afternoon end of shift meeting which was like the morning meeting but much more abbreviated; most scheduling and other issues reviewed in the morning were completed and there was minimal staff verbal interaction in the afternoon.  Notably, these meetings relied on a script that was not designed for the PIP setting.

### iv.    Treatment Space

CIW-PIP's acute and intermediate care programs had adequate treatment space.

SQ-PIP treatment space was sufficient and included an IDTT room and multiple dayrooms and group rooms. All treatment space was confidential. Notably, TTM arrangement was inadequate and not always conducive for group interaction.

### v.    Unit Temperatures

Temperature regulation in SQ-PIP remained a chronic issue and some cells were much colder than others. Facility management believed that the cold cells were due to some patients blocking their cell vents which impacted other cells' temperatures.

### 3.    CMC MHCB "Acute Care"

#### a)    IDTTs

At CMC MHCB "Acute Care," observed IDTTs indicated necessary staff in attendance. The IDTTs included case conceptualizations and effectively included patients in the treatment team process. The psychiatrist also asked each patient about their diagnosis and medications and inquired about side effects. Recreation therapists were engaged in the team meeting. However, the CC I/Correctional Counselor II (CC II) and nursing staff minimally participated.

#### b)    Group Therapy

CMC MHCB "Acute Care" patients were offered approximately 12 weekly hours of structured out-of-cell activities; eight of ten patients during the site visit attended 80 percent or more of offered hours. Notably, MHCB leadership expressed a lack of clarity as to the expectations for structured treatment hours for acute care patients and reported receiving directions that such treatment ranged from ten to 20 weekly hours or an unspecified number of hours greater than ten.

Psychologists reported attempting to offer at least one daily group per patient, which included ongoing DBT-informed groups. Review of day-to-day contacts for patients showed irregular entries for this clinical activity.

Observed clinician-led groups demonstrated excellent rapport with patients.  However, group treatment was adversely impacted by scheduling conflicts with other groups.  Observed recreation therapist-led groups effectively engaged patients.

### c)  Individual Treatment

CMC MHCB "Acute Care" staff reported that one-to-one psychiatry and primary clinician contacts occurred regularly.  Primary clinician contacts showed reasonable continuity of care.  Review of psychiatry contacts showed that between 50 to 70 percent appeared to have occurred with the assigned psychiatrist

### d)  Other Treatment Issues

### i.  Involuntary Medications (PC 2602)

At the time of the site visit, three CMC MHCB "Acute Care" patients were on PC 2602 status for involuntary medications.

### ii.  Behavioral Management

CMC MHCB "Acute Care" clinical staff believed that the majority of the unit's patients had significant personality disorders.  Targeted chart reviews by the monitor's expert indicated that the majority had primary psychotic or mood disorder diagnoses.  Although staff expressed that behavior plans could be helpful, they opined that their use required an additional dedicated clinician to develop and implement the plans.

### iii.  Treatment Space

Treatment space at the CMC MHCB "Acute Care" unit was inadequate and included two rooms for groups, IDTTs, and other meeting purposes.  However, individual clinical contacts occurred in inadequate one-to-one rooms and group and IDTT rooms when they were not otherwise in use and outdoors in the recreation yard.  Staff and patients reported that the outdoor

space was not a clinically appropriate milieu.  Clinicians further opined that sharing clinical

space with MHCB patients was clinically limiting.

### C.    QUALITY OF CARE ISSUES IN IDTTS AND TREATMENT PLANNING IN THE INPATIENT CARE PROGRAMS

In his last Monitoring Report on the Mental Health Inpatient Care Programs for Inmates

of the California Department of Corrections and Rehabilitation, the Special Master reported that

"although there were some instances in which the IDTT process [in the PIPs] was working as

intended, certain inadequacies remained."  ECF No. 7039 at 75.  Unfortunately, this remains the

case in this report.

As in the prior review, this review found that while some PIPs — notably the CDCR-

developed PIPs (CIW-PIP, SQ-PIP, and CMF L1-PIP) — generally provided more appropriate

mental health care to patients, ongoing inadequacies in the quality of care provided in the Lift

and Shift PIPs (CMF-PIP, CHCF-PIP, and SVSP-PIP) urgently require the focused attention of

CDCR mental health leadership as priorities for remediation to address known failures in the

care provided to PIP patients housed in them.

As discussed below, multiple IDTTs failed to engage in useful team collaboration though

required team members were usually present.  Moreover, as demonstrated through the findings

of randomly selected chart reviews reported below, IDTTs failed to develop effective treatment

plans to address patients' mental health symptoms and functional impairments and struggled

with consistently documenting treatment plans.  IDTTs did not consistently address patients'

STEP levels or LRH and, if they were addressed at all, did not do so appropriately.  In multiple

reviewed cases, the mental health diagnoses of patients remained unsettled throughout their PIP

stays.  These are fundamental mental health care issues that the CDCR defendants must deal with

to achieve adequacy of care in their PIP programs.

### 1.    Inadequate Interdisciplinary Treatment Team (IDTT) Processes

The IDTT is responsible for directing, coordinating, and managing the care and services provided to a patient as indicated to address the patient's serious mental illness.  Treatment teams fulfill this obligation by completing a person-centered active treatment plan designed to address the patient's symptoms, risk level, and functional impairments.  Treatment plans, including interventions, must be updated by the treatment team as the patient progresses or fails to progress.  A person-centered approach requires that the patient's individual strengths and weaknesses be recognized and woven into their treatment planning.

Appropriate treatment planning is not generic but, rather, takes patients' individual factors into account.  The treatment team must be cohesive, work with the patient collaboratively, and ensure that the patient understands their treatment plans to the best of their ability.  Patient collaboration in development of the treatment plan increases the likelihood of treatment adherence and assists in helping the patient understand their role in treatment.

As reported in detail above, *see supra* Part II(B), observed IDTTs in the Lift and Shift PIPs revealed that treatment teams in those programs continued to struggle with fundamental mental health care requirements.  IDTTs in those PIPs did not consistently discuss critical mental health care issues including patients' diagnoses, symptoms, and treatment progress, nor did they develop effective therapeutic interventions, treatment plans, or discharge planning when indicated.  Moreover, multiple IDTTs in the Lift and Shift PIPs also failed to consistently address patients' LRH and STEP levels.  Required staff attended observed IDTTs in the Lift and Shift PIPs, a few of which were held in the patients' absence due to refusals, particularly in the acute care program.

In contrast, observed treatment teams at CDCR-developed PIPs (CMF L1-PIP, CIW-PIP, and SQ-PIP) and in CMC MHCB "Acute Care" beds tended to exhibit more effective treatment

team processes and, in general, appropriately addressed patients' mental health treatment needs. All required staff attended IDTTs observed in the CDCR-developed PIPs and in CMC MHCB "Acute Care." A small number of these IDTTs were held in absentia due to patient refusals.

CMF L1-PIP's IDTTs were generally consistent in reviewing patients' diagnoses and medications, adherence to treatment, STEP levels, and LRH. However, in observed IDTTs during the site visit, team collaboration at CMF L1-PIP was minimal; treatment decisions were observed to be typically determined by a single clinician rather than by the team. IDTTs at CIW-PIP included effective collaboration among team members and engagement with patients. Moreover, CIW-PIP teams adequately addressed patients' diagnoses, medications, treatment planning, patient functioning, group participation, and discharge planning as required. However, IDTTs at CIW-PIP failed to appropriately address case conceptualization and did not adequately deal with patients' functional impairments, safety planning, and substance use in all cases.

At SQ-PIP, observed IDTTs for non-condemned acute care and condemned intermediate care patients revealed effective treatment planning processes. SQ-PIP IDTTs were observed to be adequate with appropriate interdisciplinary discussions and included specific references to patients' treatment plans. IDTTs observed at CMC MHCB "Acute Care" included case conceptualizations and effectively included patients in the treatment team process.

## 2. <u>Inaccurate Diagnoses</u>

Identifying an accurate diagnosis is the first step in understanding the patient's mental health treatment needs and developing the patient's treatment plan. Mental health treatment, from psychotropic medications prescribed to specific therapeutic interventions, varies by disorder. An accurate diagnosis is necessary to evaluate and implement the treatments that are likely to be successful with the patient.

As described in detail below, in the random records reviewed, multiple records showed that many patients in the Lift and Shift PIPs required diagnostic clarification which had not occurred, or the rationale for provided diagnoses was not supported in the record, or there were diagnostic inconsistencies in patients' records.

Issues with patients' diagnoses were found to be far less common in the random record reviews conducted for the CDCR-developed PIPs.

Diagnostic clarification was needed for [CHCF-PIP Patient A], [CHCF-PIP Patient D], [CHCF-PIP Patient V], [CMF-PIP Patient C], [CMF-PIP Patient D], [CMF-PIP Patient G], [CMF-PIP Patient H], [SVSP-PIP Patient A], and [SVSP-PIP Patient D].  Although the referring institution requested diagnostic clarification in their initial referral of [SVSP-PIP Patient L], SVSP-PIP's treatment teams did not attempt to resolve diagnostic uncertainties regarding this patient.

Psychiatric care provided to [CHCF-PIP Patient F] evidenced poor diagnostic assessment.  The record of [CMF-PIP Patient B] showed a need for diagnostic clarification, provision of a rationale for diagnoses, and arriving at diagnostic consistency between providers. Collaboration was needed among treatment providers regarding the diagnoses of [CMF-PIP Patient J] because his diagnoses varied by provider.  The case formulations for [SVSP-PIP Patient M] conflicted with the IDTT's diagnoses.  Notwithstanding that it planned to conduct psychological testing to clarify [SVSP-PIP Patient O]'s diagnosis as part of developing an effective treatment plan, the IDTT failed to follow through with the testing plan.  Although diagnostic clarification was necessary for adequate treatment and level of care planning, during the two-year intermediate care admission of [SVSP-PIP Patient P], the process to clarify his diagnosis was slow and minimal.

3.     <u>**Treatment Planning Failures**</u>

Treatment plans are a necessary and required function of appropriate mental health care and treatment.  Treatment plans are mental health care action plans in that they specify treatment targets (*i.e.*, problems), treatment goals, intervention type, frequency and duration, and team member responsibility.  They provide a guide to the treatment team and patient and serve as roadmaps of care.

Individualized treatment plans are vital to adequate treatment and must be developed to attend to the specific needs of the patient, covering their strengths and weaknesses.  Treatment plans should be detailed and sufficiently specific so that the patient and treatment team are clear about the needed treatment.  A sufficient treatment plan offers the treatment team a measure by which to assess treatment progress towards achieving stated goals and what aspects may need modification as treatment progresses or fails to progress.  When care is transferred, which is a frequent expected occurrence in CDCR's mental health programs, the next treatment team will be able to understand the treatment a patient was previously receiving as well as where to start in planning next steps in the patient's care.  When treatment plans fail to accurately reflect the patient's received mental health care, the succeeding team is presented with an avoidable handicap when a patient comes into their care.

Review of random records selected from the Lift and Shift PIPs as reported below reflected continuing inadequacies in treatment planning in those PIPs.

The treatment needs of [CMF-PIP Patient A] and [CMF-PIP Patient C] were not fully addressed in their treatment plans.  Also, for [CMF-PIP Patient C], his treatment plan failed to fully address his progress towards his treatment goals.  The treatment plan for [CMF-PIP Patient B] was insufficient.  There were deficiencies in treatment planning for [CMF-PIP Patient D].  Treatment plans for [CMF-PIP Patient M] was often found to be duplicative from one IDTT to

another.  In the case of [CMF-PIP Patient O], his treatment plans tended to be redundant and failed to discuss treatment strategies to address his mental health care needs.

CHCF-PIP Patient B's treatment plan lacked case conceptualization and did not contain treatment interventions to address his depression other than psychiatric medications.  Treatment planning for [CHCF-PIP Patient D] was insufficient; clinically indicated treatment needs were not targeted as treatment goals.  In the case of [CHCF-PIP Patient E], his treatment planning was insufficient because it failed to address his individual clinical needs.  Primary clinician contacts with [CHCF-PIP Patient F] rarely evidenced treatment required in his treatment plan.  [CHCF-PIP Patient G]'s treatment plan offered very little evidence of treatment interventions that were designed to increase his participation in treatment besides the initiation of a PC 2602 involuntary antipsychotic medication.

The treatment goals in the treatment plan of [CHCF-PIP Patient J] failed to address his functional capacity deficits though did address his self-harm behavior.  Offered treatment to [CHCF-PIP Patient O] did not conform to the treatment plan indication of weekly primary clinician contacts.  Overall, [CHCF-PIP Patient Q]'s treatment plan was ineffective and was not modified to attend to his lack of treatment progress.  The team did not develop an adequate treatment plan during admission to address the treatment needs of [CHCF-PIP Patient R], notwithstanding the clear and useful recommendations of the referring IDTT.  The individual plans of care of [CHCF-PIP Patient T] were not relevant to the patient.

Documented treatment needs identified during admission regarding medication non-adherence, assaultive behavior, self-care, depressed mood, and psychotic symptoms were not addressed in [CHCF-PIP Patient U]'s treatment plan.  During [CHCF-PIP Patient V]'s admission, specific treatment needs including medication non-adherence, suicidal ideation, and

self-harm were identified; however, his treatment plan was not appropriately developed to address these concerns.  The treatment plan of [CHCF-PIP Patient W] was not modified to address his current mental health needs.  Although [CHCF-PIP Patient X]'s treatment plans proved to be ineffective, the IDTT failed to modify them in response to lack of progress or to address newly identified concerns.

The treatment needs of [SVSP-PIP Patient A] were not adequately addressed in his treatment plan.  [SVSP-PIP Patient B]'s treatment plan lacked a clear implementation plan regarding treatment interventions to address his pattern of treatment refusals, prolonged self-injurious behavior, and his impulsivity and aggressive actions.  Appropriate treatment interventions to improve treatment compliance of [SVSP-PIP Patient D] were needed.  Treatment planning was not individualized for [SVSP-PIP Patient E].  The treatment goal to address [SVSP-PIP Patient H]'s polydipsia (excessive water intake) was developed but was not measurable.  Goals to address psychotic symptoms and medication adherence in the treatment plan of [SVSP-PIP Patient I] were not identified.

The treatment plan of [SVSP-PIP Patient K] was not developed timely.  Treatment plans failed to address documented mental health concerns throughout [SVSP-PIP Patient J]'s admission in the PIP including refusal of medication, lack of participation in treatment, mood symptoms, and paranoid ideation.  The single individual plan of care for self-harm for [SVSP-PIP Patient N] was never modified in response to evidence of its ineffectiveness.  [SVSP-PIP Patient P]'s treatment plan was not modified in response to the lack of progress since May 2020.  Treatment plans of [SVSP-PIP Patient Q] were not modified in response to the patient's lack of progress toward addressing his targeted treatment non-compliance.  The IDTT failed to develop an adequate treatment plan for [SVSP-PIP Patient T].

In general, treatment planning at the CDCR-developed PIPs was more effective.  In contrast to the prevalence of treatment planning failures demonstrated through randomly selected record reviews of the Lift and Shift PIPs above, review of random records of CMF L1-PIP and review of the records of all CMC MHCB "Acute Care" patients revealed that treatment planning was more effective in those programs.  However, [CMC MHCB "Acute Care" Patient" G]'s treatment plans failed to address his presenting mental health problems, including mood issues and medication non-adherence.  Treatment plans developed for [CMC MHCB "Acute Care" Patient" H] failed to appropriately target mental health issues documented during his admission to acute care or problems documented in the referral which included ongoing anxiety, depression, and command auditory hallucinations to self-harm.

Treatment planning at CIW-PIP and SQ-PIP was also markedly more effective than at the Lift and Shift PIPs; however, record review of [CIW-PIP Patient J] revealed that this patient's treatment was not individualized because of the absence of appropriate collaboration between treatment providers.  Reviews of random records at SQ-PIP similarly did not indicate a prevalence of major treatment planning issues; however, the records showed that the treatment plans of [SQ-PIP Patient D], [SQ-PIP Patient E], [SQ-PIP Patient F], and [SQ-PIP Patient G] were insufficient because of failure to actively address treatment refusals.  In the case of [SQ-PIP Patient S], his treatment plans were not modified to address treatment non-compliance and lack of treatment progress.

### 4.  Deficiencies Regarding Least Restrictive Housing (LRH)

Consideration and placement of patients in their least restrictive housing (LRH) in inpatient settings are required by both CDCR and DSH.  CDCR's IDTTs are required to review patients' LRH as a clinical function and develop adequate treatment plans with measurable goals to assist patients to transfer to their LRH.

Observed IDTTs in the Lift and Shift PIPs did not consistently discuss LRH.  In CMF L1-PIP, the rationales offered by the IDTTs for retaining patients out of LRH were vague and often based on arbitrary observation timeframes, instead of progress toward measurable objectives stemming from specific LRH barriers.  At CIW-PIP, LRH levels of patients were reviewed during IDTTs.  During the site visit, there were no patients housed in SQ-PIP intermediate care program above their LRH.

Review of randomly selected records for the purposes of assessing IDTTs' attention to LRH at the Lift and Shift PIPs indicated major deficiencies regarding LRH in these PIPs.

Treatment planning for [CMF-PIP Patient A] did not fully address his treatment needs and goals regarding transfer to his LRH.  The treatment plan of [CMF-PIP Patient C] failed to fully address his treatment needs or progress toward treatment goals regarding achieving his documented LRH.  The treatment plan of [CMF-PIP Patient E] lacked treatment interventions to assist him in gaining a transfer to his LRH.  For [CMF-PIP Patient F], his treatment plan was inadequate as it did not address factors that were barriers to a transfer to his LRH because there was no clear clinical rationale, treatment goals, or interventions developed for him in this regard.  Regarding [CMF-PIP Patient G], documentation in his record did not provide support for the identified reason for deferring his transfer to his LRH and the treatment team did not develop treatment goals or interventions to address the identified barrier to placement in his LRH.  The clinical reason for the deferred transfer to LRH of [CMF-PIP Patient H] was not clear in the record; treatment goals and interventions to assist the patient to reach his LRH were not provided in his treatment plan.

While consideration of LRH by [CHCF-PIP Patient F]'s IDTT was adequate, and its decision to move the patient to his LRH was appropriate, the IDTT failed to act to do so.  The

IDTT failed to identify treatment goals and interventions to assist [CHCF-PIP Patient H] in achieving his LRH.  The barriers to achieving his LRH were not appropriately included in treatment planning for [CHCF-PIP Patient I].  [CHCF-PIP Patient J]'s chart contained conflicting information regarding barriers to his LRH transfer.  Treatment plans developed for [CHCF-PIP Patient R] did not address barriers to achieving his LRH.  Notably, treatment plans did not address barriers to the patient's LRH and the LRH justification sections of each treatment plan for [CHCF-PIP Patient R] developed during admission included the same copied and pasted statement.

Justification for housing placement out of [SVSP-PIP Patient F]'s LRH varied and was unclear and inconsistent. Mental health staff failed to state what specifically precluded this patient's transfer to his LRH.  There was no sufficient explanation for housing [SVSP-PIP Patient I] in a single cell which was not his LRH and treatment interventions to facilitate his transfer to his LRH were not identified by the IDTT.  While it was promising that a goal was developed for [SVSP-PIP Patient H] to address polydipsia which, in part, was preventing transfer to his LRH, the goal was not measurable and the IDTT did not clearly establish a baseline or specify a frequency to monitor change in the patient.  After [SVSP-PIP Patient J]'s referral to DSH was subsequently rescinded, the treatment team failed to develop goals in his treatment plans to address symptoms that precluded his transfer to his LRH.

### 5.    Deficiencies in Quality of Clinical Documentation

Proper clinical documentation in treatment plans and clinical notes are essential requirements of adequate treatment planning and the provision of appropriate mental health care. Review of random records at the several Lift and Shift institutions found failures to document treatment goals and interventions to achieve the goals, deficiency in the quality of clinical documentation, and minimal and insufficient progress notes by clinicians.

Record reviews of the sample of randomly selected CMF L1-PIP patients did not reveal substantive issues with clinical documentation.  Regarding CIW-PIP and SQ-PIP, review of random records demonstrated minimal issues with clinical documentation in patients' records. Record review of all CMC MHCB "Acute Care" patients similarly revealed few issues regarding clinical documentation.

The Lift and Shift PIPs exhibited multiple failures regarding clinical documentation as discussed in detail below.

Clinicians treating [CMF-PIP Patient A] failed to document treatment interventions and details were insufficient for appropriate continuity of care.  In the case of [CMF-PIP Patient B], the reasons for the patient's lengthy stay at the acute level of care were not supported in the record.  The quality of psychiatry documentation was found to be deficient in the case of [CMF-PIP Patient D] and generic in the case of [CMF-PIP Patient I].  The health care records of [CMF-PIP Patient E and Patient G] did not have documented treatment intervention to assist with transfer to their LRH.  Treatment goals and interventions were not documented in the record of [CMF-PIP Patient H].  Primary clinician progress notes for [CMF-PIP Patient J] were insufficient.  Treatment plan and progress notes were minimal in the case of [CMF-PIP Patient L].  [CMF-PIP Patient O]'s treatment plans and primary clinician notes were redundant.

CHCF-PIP Patient D's healthcare record did not contain documentation specific to his symptoms that would assist with treatment planning and continuity of care.  Documentation was not sufficient for appropriate continuity of care in the case of [CHCF-PIP Patient E] or to support the individual plan of care in his healthcare records.  Documentation of the justification for placement outside of [CHCF-PIP Patient F]'s LRH was unclear and inconsistent.  CHCF-PIP failed to document the treatment goals and interventions needed to assist [CHCF-PIP Patient H

and CHCF-PIP Patient I] in achieving their treatment goals and LRH. Documentation regarding

the care provided to [CHCF-PIP Patient I] was inadequate. The discharge summary of [CHCF-

PIP Patient K] inaccurately indicated that he actively engaged in cognitive behavior therapy

without evidence other than reference to a single primary clinician session. Important sections of

[CHCF-PIP Patient T]'s treatment plan were found to be either incorrect or not completed at all.

The IDTT of [CHCF-PIP Patient U] failed to document treatment interventions to reduce self-

harm and suicidal ideation.

Documentation in the treatment plan of [SVSP-PIP Patient B] was insufficient to assist

with treatment planning and continuity of care. There was insufficient documentation to support

the individual plans of care in the record of [SVSP-PIP Patient E] and appropriate continuity of

care. Documentation regarding justification for placing [SVSP-PIP Patient F] out of his LRH

varied and was unclear and inconsistent. There was no clear documentation of the baseline

regarding [SVSP-PIP Patient H]'s polydipsia and ongoing frequency to monitor change in his

mental health was not documented. There was inconsistent documentation in the record of

[SVSP-PIP Patient J] and documentation was unclear regarding his LRH after the DSH's

recission of his referral. The primary clinician failed to document treatment interventions during

cell-front encounters with [SVSP-PIP Patient K]. Staff failed to update clinical summaries

regarding [SVSP-PIP Patient L] and level of care rationales were not documented. SVSP-PIP

clinicians' general practice of copying and pasting critical patient information including for

[SVSP-PIP Patient M] hampered an assessment of whether the patient was progressing in

treatment and whether he was at the appropriate level of care. Treatment objectives developed

by the referring institution were copied and pasted in SVSP-PIP's treatment plans of [SVSP-PIP

Patient S]. Additionally, his treatment plan documentation was not updated and responsive to

the patient's treatment progress over time.  Clinical summaries in the record of [SVSP-PIP Patient T] were not updated to include current symptoms, functioning, and response to treatment.

The findings above underscore that resolving program deficiencies must be prioritized by the CDCR defendants as necessary to instituting adequate mental health care, particularly in the Lift and Shift PIPs.  As demonstrated above, attention must be paid to facilitating effective treatment team processes in the PIPs that enable IDTTs to carry out their central functions of providing appropriate diagnoses, resolving variances in diagnoses, developing adequate treatment plans and interventions that contain measurable goals and implementing them, addressing barriers to LRH placements, and appropriately documenting the care provided or needed to be provided to patients.

### D.    PATIENT ACCESS TO TREATMENT

During the reporting period, most inpatient programs had policies that sought to create expectations for patient conduct, manage patient treatment progress, and monitor access to programming and privileges.  These policies encouraged positive patient conduct and treatment participation through structured objective-oriented programming.  Notably, most PIPs used the STEP program to assess patients' treatment progress.  The STEP program consisted of benchmarks that outlined expectations for patient behavior and included specific requirements that patients had to meet to advance through the program.  The STEP program was previously described in detail in the 2018 Inpatient Care Report.  ECF No. 5894 at 58 – 61.[49]

Overall, the PIPs struggled with implementation of the STEP program.  CMF-PIP and CHCF-PIP inconsistently implemented the STEP system.  At CMF L1-PIP, patient STEP level decisions were not a collaborative process.  SVSP-PIP discontinued use of the STEP system.

---

[49] On March 15, 2022, CDCR distributed the final version of its statewide STEP program policy. Exhibit F.

Following elimination of the Discretionary Program Status (DPS) option, CIW-PIP staff indicated concerns about managing confrontational patients. Staffing vacancies prevented implementation of SQ-PIP's newly developed STEP program. CMC MHCB "Acute Care" had not implemented a STEP program for acute care patients at the time of the site visit.

### 1.    CMF-PIP, CMF L1-PIP, CHCF-PIP, and SVSP-PIP

CMF-PIP inconsistently implemented the STEP system in both the acute and intermediate care programs. A revised LOP dated March 2021 typically standardized acute care incentives while permitting individualization. Conversely, each housing unit program in the intermediate care program determined STEP incentives due to differences in "physical plant and milieu." The salience of some provided examples of STEP level incentives was questionable.

Observed CMF-PIP IDTTs and reviewed treatment plans did not routinely assess STEP levels or address patient STEP level progress as required. Interviewed patients reported uncertainty about the STEP program's goals and incentives. Some staff were knowledgeable about the STEP program while others were not.

CMF L1-PIP reported full implementation of the STEP program pursuant to a March 2021 STEP policy revision. All CMF L1-PIP patients were in the STEP program. Although IDTT treatment teams consistently addressed STEP levels and referenced STEP program incentives, one treatment team member determined patient STEP levels without collaborative team discussion. Some patients reported not understanding the expectations for STEP advancement.

CHCF-PIP inconsistently implemented the STEP program; program standardization and staff training were also pending promulgation of a revised policy. Interviewed staff reported uncertainty about the STEP program, resulting in inconsistent adherence.

Observed CHCF-PIP IDTTs revealed minimal STEP level discussions. Treatment teams were unclear about the assignment of STEP levels and the most appropriate way to increase or decrease them. Reviewed treatment plans also did not address STEP levels. Patients reported uncertainty about their current STEP levels and viewed the program as arbitrary; some believed that patients advanced through STEP levels based on whether staff liked them.

SVSP-PIP previously discontinued use of the STEP program.

### 2. __CIW-PIP and SQ-PIP__

CIW-PIP's STEP program utilized IDTT assessments and patient input to establish incentive point values toward patients' STEP advancement. The LOP indicated that STEP advancement was based on patients' satisfaction of certain minimum requirements by following rules, respecting others, participating in treatment, maintaining medication adherence, and progressing toward goals. With each STEP level advancement, patients earned increased access to state-issued appliances, recreational materials, supplies, and games. During the review period, all CIW-PIP patients participated in the STEP program at some point.

Interviewed CIW-PIP staff also expressed concerns about managing aggressive patients following the facility's elimination of the DPS option which was used to address the safety needs of patients who did not meet MAX custody status criteria but nonetheless presented aggressively.

Newly admitted SQ-PIP patients were placed on a 72-hour orientation and assessment phase, which ended with their initial IDTT. At the time of the site visit, SQ-PIP had developed a STEP level system; however, several factors prevented implementation. Among them, SQ-PIP was awaiting release of the statewide STEP policy while staff vacancies, including the lack of a program director and program assistant for significant periods, negatively impacted STEP implementation.

### 3.    CMC MHCB "Acute Care"

During the site visit, CMC MHCB "Acute Care" had not implemented the STEP level system for acute care patients.  However, there was timely review of patients to consider programming without custody restraints.

### E.    REFERRALS AND TRANSFERS

There were significant decreases in acute and intermediate care referrals since the Twenty-Eighth Monitoring Round.  CHCF-PIP and SVSP-PIP did not provide reliable referral data for patients endorsed to the programs during the review period.  For acute care referrals, only patients endorsed to CIW transferred within the ten-day Program Guide timeframe; CMF-PIP, CHCF-PIP, and SQ-PIP did not meet required timeframes.  Three patients waited longer than ten days for acceptance to CMC MHCB "Acute Care" at the time of the site visit.  For intermediate care, patients endorsed to SVSP-PIP and SQ-PIP transferred within 30 days. Intermediate care transfers to CMF-PIP, CHCF-PIP, and CIW-PIP did not meet timeframe guidelines.

### 1.    CMF-PIP, CMF L1-PIP, CHCF-PIP and SVSP-PIP

On May 25, 2021, 337 of 396 or 85 percent of CMF-PIP's beds were filled.  There were 134 referrals of patients who were endorsed to acute care at CMF-PIP during the review period which was a marked decrease from the 436 referred and endorsed during the preceding review period.  Similarly, there were 79 referrals endorsed to CMF-PIP during the review period for intermediate care which was a significant decrease from the 288 referrals reported in the Special Master's Twenty-Eighth Monitoring Round Report.  One acute care patient was rejected as not clinically appropriate and two patients were rejected from intermediate care because they were not appropriate for a locked dorm setting.  Fourteen referrals to CMF-PIP were rescinded; recission data did not differentiate between the acute and intermediate care programs.

Seventy percent of acute care patient transfers to CMF-PIP took longer than ten days after endorsement during the review period.  For intermediate care patients, 54 percent took longer than 30 days for admission after referral.

On May 25, 2021, 31 of 66 or 47 percent of the beds in CMF L1-PIP were filled.  Sixty referrals were endorsed to CMF L1-PIP during the review period which was a 52 percent decrease from the 115 endorsements reported in the Twenty-Eighth Monitoring Round Report.  Twenty-one patients were rejected and 14 referrals were rescinded.

On July 19, 2021, CHCF-PIP operated 514 beds, or 20 less than during the prior review period.  Of the 184 acute care beds, 160 or 87 percent were filled while 312 of 330 or 95 percent of intermediate care beds were also filled.  Due to a reportedly low MHCB census during the review period, CDCR "flexed" MHCBs to acute care beds at CHCF (CHCF Acute Care "Flex Beds").  Acute care patient admissions at CHCF Acute Care "Flex Beds" began in April 2021.  On July 19, 2021, all 18 CHCF Acute Care "Flex Beds" was filled.

CHCF-PIP did not provide reliable data regarding the total number of referrals to the program during the review period.  However, a reviewed sample of 131 admissions to the acute care program revealed that 55 percent took longer than ten days for admission.  Further, a reviewed sample of intermediate care patients showed that 63 percent of admissions took longer than 30 days.  CHCF-PIP reported zero rejections to the program since January 2021.

On August 24, 2021, 214 of 246 or 87 percent of SVSP-PIP's 246 beds were occupied.  SVSP-PIP did not provide reliable data regarding the total number of patients referred to the program during the review period.  However, data for patients at the time of the site visit revealed that 96 percent of transfers occurred within the 30-day Program Guide timeframe requirement for intermediate care referrals.

## 2.    **CIW-PIP and SQ-PIP**

On September 10, 2021, 19 of 45 or 42 percent of CIW-PIP's beds were occupied.  There were 22 patients referred to CIW-PIP during the review period which was nearly a 50 percent decrease from the 43 referrals during the preceding monitoring period.  Eleven patients were referred to acute care and 11 were referred to intermediate care.  Of those, CIW-PIP rejected one acute care referral and one intermediate care referral.  No referrals were rescinded.  All acute transfers occurred within the Program Guide ten-day transfer guideline.  Three intermediate care transfers took longer than 30 days.  No reasons for the delays were provided.

On October 25, 2021, 32 of 40 or 80 percent of SQ-PIP's beds were filled.  During the review period, 14 patients were referred to acute care and 15 patients to intermediate care at SQ-PIP.  All acute referrals to SQ-PIP were from institutions other than SQ and all intermediate care referrals were from SQ.  Sixty-four percent of acute care referrals transferred beyond the ten-day transfer timeframe.  All patients transferred to intermediate care within 30 days as required.



Acute and Intermediate PIP Bed Fill Rates*
*CDCR data provided during site visit

| | CMF | CMF L1 | CHCF | SVSP | CIW | SQ |
|---|---|---|---|---|---|---|
| Fill Rate | 85% | 47% | 92% | 87% | 42% | 80% |

### 3. CMC MHCB "Acute Care"

CDCR also transferred patients to CMC MHCB to provide acute level of care. Patients were admitted to those beds through the CDCR Inpatient Referral Unit (IRU) referral process, and those patients were included in PIP referral data.

CMC began admitting acute patients to CMC MHCB "Acute Care" on April 27, 2021. On July 21, 2021, ten patients were receiving acute care treatment in CMC MHCB. Two referrals were rescinded during the review period. One recission was due to medical reasons and one due to CMC not being a Clozaril administration institution. On July 21, 2021, three patients were referred to CMC MHCB "Acute Care"; those patients were waiting for decisions for 21, 20, and 15 days.

### F. ADMISSIONS AND DISCHARGES

As reported above, there were significant decreases in acute and intermediate care referrals since the Twenty-Eighth Monitoring Round which resulted in meaningful reductions in admissions to PIPs.

COVID-19 movement restrictions impacted transfers after clinical discharges across PIPs during the review period.

### 1. CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

CMF-PIP admitted 147 patients to acute care and 75 patients to intermediate care during the review period. The average length of stay was 258 days in acute care and 288 days at the intermediate level of care. CMF-PIP discharged 103 patients from acute care and 90 patients from intermediate care during the review period. For acute care patients, 79 percent were subjected to administrative delays after clinical discharge ranging from one to 371 days. Nearly all - 95 percent of intermediate care patients - experienced administrative delays once clinically

discharged with a range of one to 221 days. COVID-19 movement restrictions, testing requirements, and quarantines significantly impacted discharges.

During the review period, CMF L1-PIP admitted 25 patients; their average length of stay was 167 days. CMF L1-PIP discharged 54 patients during the review period. In late 2020, clinically discharged patients experienced delays ranging from one to 120 days; however, by March 2021, administrative delays decreased to an average of 17 days.

CHCF-PIP admitted 170 patients to acute care and 93 patients to intermediate care during the review period. The average length of stay for acute care patients was 191 days, and intermediate care patients averaged 357 days. CHCF-PIP discharged 74 patients from acute care and 123 patients from intermediate care during the review period. All acute care patients and 76 percent of intermediate care patients experienced administrative delays after clinical discharge. Eighteen acute care patients were admitted to CHCF Acute Care "Flex Beds" between April and July 2021. At the time of the site visit, 11 of the 18 patients housed in CHCF Acute Care "Flex Beds" were clinically discharged and awaiting transfer to EOPs and intermediate level of care programs. The eight patients discharged to intermediate care were waiting an average of 16 days; EOP patients had been waiting an average of 22 days. Delays ranged from 26 days to 495 days for acute care patients and one day to 307 days for intermediate care patients. Reasons for delays ranged from COVID-19 movement restrictions to missing documentation and requests for updated information from receiving institutions.

SVSP-PIP did not provide the total number of patients admitted during the review period. SVSP-PIP discharged 141 patients during the review period. For 118 of those patients for whom complete data was provided, the average clinical length of stay was 267 days. The average

physical length of stay for those patients was 275 days.  Sixty-three percent of patients took longer than five days to transfer after clinical discharge.

### 2.    CIW-PIP and SQ PIP

CIW-PIP admitted ten patients to acute care and ten patients to intermediate care during the review period.  During the review period, there were 27 discharges from CIW-PIP, two from acute care, and 25 from intermediate care.  The average length of stay for the two patients discharged from acute care was 7.5 days; both patients paroled.  For the 25 patients discharged from CIW-PIP intermediate care program, five remained in intermediate care for just over one year to 7.5 years.  For the remaining 20 patients, their average length of stay was 134 days and ranged from 40 days to 306 days.

SQ-PIP admitted 14 patients to acute care and 17 patients to intermediate care during the review period.  The average length of stay was 38 days for acute care patients in SQ-PIP during the site visit.  For intermediate care patients in SQ-PIP at the time of the site visit, stays ranged from three days to more than seven years.  SQ-PIP discharged 13 patients each from acute and intermediate care during the review period.  The average length of stay for patients discharged from acute and intermediate care was 45 days and 383 days, respectively.

### 3.    CMC MHCB "Acute Care"

A total of 17 acute care patients were admitted to CMC MHCB between April 27 and July 21, 2021.  Seven patients were discharged from the unit during that same period; two transferred to DSH-Atascadero, one to CMF-PIP acute care, and one to SVSP-PIP; three were transferred to mainline EOPs.  For the patient census on July 20, 2021, during the site visit, the average length of stay was 40 days, ranging from six to 75 days.

G.    **LEAST RESTRICTIVE HOUSING**

During the review period, there was a downward trend of patients housed above their LRH designation in the PIPs. Improvement was noted at CMF-PIP, CHCF-PIP and SVSP-PIP, though IDTTs did not regularly address LRH designations in reviewed cases. However, there was continuing need for improvement regarding notification to IRU and treatment teams of changes in patients' classifications.

1.    **CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP**

On May 21, 2021, CMF-PIP had 63 patients housed above their LRH designation which was a decrease from 89 patients during the preceding monitoring period. Of those, 16 patients were housed in single cells, 32 were housed in locked dorms, and 15 were housed in multi-person cells. LRH designations were addressed during observed institutional classification committees (ICCs) and unit classification committees (UCCs). However, LRH designation was not routinely reviewed in observed IDTTs.

In seven of ten or 70 percent of reviewed healthcare records, CMF L1-PIP patients were housed in more restricted housing than their LRH designation. LRH designations were considered during observed IDTTs at CMF L1-PIP; however, rationales for retaining patients out of their LRH were vague and based on arbitrary observation timeframes as opposed to progress toward measurable objectives stemming from specific LRH barriers.

On July 19, 2021, 129 CHCF-PIP patients were housed above their LRH designation which was a reported decrease from 163 patients during May 2021. LRH designations were reviewed during observed ICCs though not during observed IDTTs.

SVSP-PIP did not provide data for patients housed above their LRH designation during the review period. On August 20, 2021, SVSP-PIP housed 69 patients above their LRH designation which was a decrease from 99 patients during the preceding monitoring period. Of

those, 41 patients or 59 percent were housed in single cells and 28 patients were housed in multi-person cells. LRH designations were addressed and changed during observed ICCs; however, the executive director acknowledged that SVSP-PIP did not have a process to ensure timely delivery of the classification committee chronos to the IRU and the patient's treatment team as required. LRH designation was not routinely discussed during observed IDTTs.

 2. **CIW-PIP and SQ-PIP**

At the time of the site visit, two intermediate care patients were housed above their LRH designation at CIW-PIP. CIW-PIP reported that LRH designations were reviewed during IDTTs.

On October 25, 2021, no patients were housed above their LRH designation in SQ-PIP.

**H.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE**

**Patient Disciplinary Process**

During the review period, CMF-PIP was the only PIP that demonstrated compliance with timely request of a mental health assessment after the issuance of an RVR. CMF-PIP, CIW-PIP, and SQ-PIP mental health staff completed and returned mental health assessments within timeframe guidelines. CHCF-PIP was compliant with completion of mental health assessments in a confidential setting. CIW-PIP reported offering confidential settings for completion of mental health assessments though all patients refused during the review period. Hearing officers documented consideration of the mental health assessments at SVSP-PIP, CMF-PIP, CHCF-PIP, and CIW-PIP. CMF was the only institution that met 90 percent compliance for custody staff completion of the Inmate Disciplinary Process Mental Health Assessment training; SVSP-PIP was just shy at 89 percent. Except for SVSP-PIP, PIPs did not meet the training requirement for mental health staff. However, although SVSP clinicians were trained, one social worker completed all mental health assessments in the randomly reviewed sample.

### 1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

CMF-PIP, including CMF L1-PIP, issued RVRs to 89 acute care patients and 147 intermediate care patients during the review period.  A review of 19 of those RVRs revealed that custody staff timely requested mental health assessments for all of them.  Sixty-eight percent of mental health assessments were completed in a confidential setting.  Clinicians recommended mitigation in nine or 47 percent of reviewed cases.  Hearing officers documented those penalties were mitigated based on the clinicians' recommendations in 66 percent of those cases.  Of notable concern, three of the randomly selected RVRs resulted after the patients covered their cell windows reportedly to attract the attention of mental health providers.

CMF reported that institution-wide, including CMF-PIP and CMF L1-PIP, 98 percent of required custody staff completed mandatory RVR training.  Unchanged from the preceding monitoring period, only 62 percent of required mental health staff attended the disciplinary process training.

CHCF-PIP issued 97 RVRs to acute care patients and 339 RVRs to intermediate care patients for a total of 436 RVRs during the review period.  In 15 or 75 percent of 20 randomly selected and reviewed RVRs, custody staff timely requested mental health assessments.  Mental health staff completed and returned the assessments within timeframe guidelines in 75 percent of reviewed cases.  All documentation requirements were met in 19 or 95 percent of reviewed RVRs and all patients were assigned a staff assistant.  Mental health assessments were completed in confidential settings unless patients refused or if the building was on quarantine due to COVID-19.  Documentation indicated that all patients were informed of the limits of confidentiality of the mental health assessment.  The hearing officer's consideration of mental health assessments and mitigation of penalties was documented in 94 percent of reviewed cases.

CHCF-PIP did not provide data regarding the completion of the Inmate Disciplinary Process Mental Health Assessment training for custody staff.  For mental health staff, nine clinicians or 11 percent completed the training.

There were 215 RVRs issued to patients in SVSP-PIP during the review period.  A review of 22 randomly selected RVRs revealed that custody staff timely referred nine, or 41 percent, to mental health for assessment completion.  Mental health clinicians completed and returned assessments timely in 12 cases or 55 percent.  Two patients refused mental health assessments.  Eight assessments or 40 percent were conducted in confidential settings as the clinician noted a lack of available private space.  Unchanged from the preceding monitoring period, one social worker completed all the mental health assessments reviewed and used verbatim language regarding mitigation in nearly 60 percent of those cases.  Mitigation recommendations were limited to continued family contact and in-cell appliances.  Regarding mental health factors that the ICC should consider when assessing a security housing unit (SHU) term, the clinician again utilized canned language verbatim in 73 percent of reviewed cases.  For five reviewed ICC chronos, documentation revealed consideration of patients' mental illness when assessing SHU terms.

Hearing officers documented consideration of mental health assessments in all reviewed RVRs and penalties were mitigated in 73 percent of cases.  Of note, six patients received emergency medication injections due to their agitated state following their RVR behaviors.  However, none of those mental health assessments indicated that the patients' mental illness strongly influenced or contributed to the behavior that led to the RVRs.

For SVSP-PIP custody staff required to receive RVR training, 89 percent received the training.  Completion of RVR training by mental health clinicians improved since the preceding

monitoring period; 70 percent of psychologists and 100 percent of social workers attended the training.  Additionally, three registry mental health clinicians participated in the training.

### 2. CIW-PIP and SQ-PIP

During the review period, 17 RVRs were issued to patients in CIW-PIP.  A review of six randomly selected RVRs revealed that custody staff timely requested mental health assessments in five or 83 percent of cases.  All reviewed mental health assessments were completed and returned timely and patients refused a confidential location to complete the assessment in all reviewed cases.  The clinician recommended mitigation in all reviewed cases and the hearing officer documented penalties and mitigation in each.

Fifty-five percent or less of custody staff that required the mental health assessment training completed the training.  For mental health, only one staff member completed the required training.

Two RVRs were issued to patients in SQ-PIP.  Custody staff failed to timely refer both RVRs for mental health assessments.  Mental health staff completed and returned both assessments within timeframe guidelines.  One clinician inappropriately recommended that the patient continue to have access to mental health treatment and religious services; these services cannot be denied due to an RVR.  Further, hearing officers failed to document consideration of the information the hearing officer should consider from the mental health assessment.

### 3. CMC MHCB "Acute Care"

CMC issued two RVRs to one acute patient in CMC MHCB "Acute Care."  For the adjudicated RVR, the mental health assessment was completed timely and indicated that the patient's mental illness contributed to the behavior.  One RVR was pending a hearing at the time of the site visit.

**Use of Force**

There were two controlled use of force incidents across all PIPs during the review period. Only the SVSP-PIP incident completed the supervisory review process by the time of the site visit. SVSP-PIP complied with CDCR policy during the incident. CDCR policy was followed for all immediate use of force incidents reviewed for CHCF-PIP and CIW-PIP. One of eight immediate use of force incidents reviewed at SVSP-PIP, one of two reviewed at SQ-PIP, and two of ten reviewed at CMF-PIP all did not meet all policy requirements. Problems with access to video recording equipment was noted at SVSP-PIP and CMF-PIP.

Over 90 percent of custody staff at SVSP-PIP, CMF-PIP, and CHCF-PIP completed the required use of force policy training; SQ-PIP reported an 89 percent completion rate. None of the mental health staffs across the CDCR PIPs were 90 percent compliant with completion of the training.

1.    **CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP**

CMF-PIP reported 57 use of force incidents during the review period including one controlled use of force and 56 immediate use of force incidents. The controlled use of force incident involved a PC 2602 involuntary medication order; a copy of the use of force incident package was not provided because it had not completed executive review. Problems were noted in two of the ten reviewed immediate use of force incidents. One involved the application of leg restraints and handcuffs on a Level II, medium-custody patient for escort to a PC 2602 court-ordered hearing. Once the restraints were applied, the patient refused to sit down and the officer immediately used physical force to gain compliance. The incident documentation did not include a justification why a Level II medium-custody patient required restraints to be escorted to the PC 2602 hearing. The patient was not issued an RVR for this encounter.

A second incident involved a cell entry for PC 2602 court-ordered medication administration. As a cell entry team entered the cell, the patient struck the shield with his fists and attempted to leave the cell. Staff utilized physical force, including three baton strikes, to gain control of the patient. Given that the cell entry was to enforce a court-ordered PC 2602 medication, the incident should have been video recorded. Additionally, CMF-PIP did not video record any of the emergency welfare-check cell entry incidents even though they had time to assemble and obtain a shield, baton, and restraints. CDCR regional staff noted that video cameras were not retained in every unit.

Over 90 percent of required custody staff completed use of force policy training at CMF-PIP. For mental health staff, 43 percent attended the required training.

CMF L1-PIP data was not separated from the above-included CMF-PIP data. One immediate use of force incident package from CMF L1-PIP omitted vital information that the patient was shouting that he was going to kill himself. This information was included in the resultant RVR issued for a battery on a peace officer.

During the review period, there were 97 immediate use of force incidents and no controlled use of force incidents at CHCF-PIP. A review of 16 randomly selected immediate use of force incidents revealed compliance with applicable CDCR policy including timely supervisory reviews and appropriate referrals to mental health staff when indicated.

All required CHCF-PIP custody staff completed use of force policy training in 2021. Sixty percent of mental health staff attended the required training.

SVSP-PIP reported one controlled use of force incident and 93 immediate use of force incidents during the review period. SVSP-PIP staff complied with CDCR policy during the controlled use of force incident. Seven of eight or 87 percent of reviewed immediate use of force

incidents complied with applicable CDCR policy. The incident that did not conform to CDCR policy involved a cell entry for the administration of involuntary medication. The patient refused to submit to mechanical restraints during that incident and custody staff entered the cell and utilized physical force to apply the restraints. As a result of the incident, the patient received an RVR for resisting a peace officer which violated the CDCR policy that RVRs shall not be issued when the behavior occurred in connection with a cell extraction to administer involuntary medication. Additionally, SVSP-PIP staff failed to video-record the incident which was required since the patient refused medication and was on a one-to-one suicide observation. During the site visit, SVSP-PIP staff reported that video cameras were not maintained in the housing units. Further, the reviewed incident report did not indicate a clear justification for an immediate use of force.

SVSP provided institution-wide use of force training data that included SVSP-PIP. Data indicated 100 percent compliance for completion by the warden, chief deputy warden, correctional administrators, captains, lieutenants, and sergeants, and 99 percent of custody officers. Further, 100 percent of the PIP executive staff completed the training as did seven of ten or 70 percent of psychologists and all six social workers. No psychiatrists completed the training.

## 2. CIW-PIP and SQ-PIP

CIW-PIP reported six immediate use of force incidents during the review period. There were no controlled use of force incidents. All six immediate use of force incidents completed the review process and no issues were noted.

CIW institution-wide training data, which included data from January 2021 to the time of the monitoring tour, indicated that 65 percent of custody staff and 69 percent of mental health staff completed the required use of force policy training.

There were three immediate use of force incidents and no controlled use of force incidents at SQ-PIP during the review period.  Two of the immediate use of force incidents completed the supervisory review process at the time of the site visit.  Of those, one incident revealed compliance with applicable CDCR policy.  The second incident report did not document an imminent threat that justified the immediate use of force and the supervisory review noted that the incident should have been a controlled use of force.

Institution-wide training data for SQ revealed 100 percent compliance for completion of use of force policy training by the warden, chief deputy warden, associate wardens, and captains.  Eighty-eight percent of the remaining custody staff completed the training.  For mental health staff, 100 percent of supervisory staff and 80 percent of psychologists and social workers attended the required training.

### 3. CMC MHCB "Acute Care"

CMC MHCB "Acute Care" program reported one immediate use of force incident since April 2021.  Documentation of supervisory review of this use of force incident was not available at the time of the site visit.

### I. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINTS

There were data reliability issues regarding restraint utilization at SVSP-PIP and CIW-PIP for the review period.  CDCR policies and procedures were followed for the two instances of restraint usage at CMF-PIP and the one instance at CHCF-PIP during the review period.

### 1. CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

CMF-PIP had two instances of restraint during the reporting period; all procedures and orders were appropriately documented in both instances.

CMF L1-PIP did not utilize seclusion or restraints during the review period.

CHCF-PIP did not utilize seclusion during the review period. There was one five-point restraint episode for one patient that lasted less than 24 hours. Appropriate documentation was maintained including required nursing checks for the incident.

At SVSP-PIP, patients in seclusion were housed in wet cells in TC1 and TC2. During the review period, there were 18 seclusion incidents of which nine involved one patient. Seclusion incidents averaged 15.2 hours and ranged from four hours to 37 hours.

SVSP-PIP's restraint logs indicated the use of restraints for one patient on two consecutive days for three and 4.2 hours, respectively.

### 2.    CIW-PIP and SQ-PIP

Tracking mechanisms for seclusion and restraints at CIW-PIP were not reliable during the review period or at the time of the site visit. Different data was indicated in CIW-PIP pre-site visit data, the on-site log, and the Restraint Report. The number of incidents of seclusion varied from four to six and restraint incidents varied from zero to 12 depending on the report.

CIW-PIP had four observation rooms. Two observation rooms were equipped for restraint use. CIW-PIP utilized two rooms for seclusion which were suicide resistant with padded floors, no sink or toilet, and a grate on the floor.

SQ-PIP did not report any seclusion or restraint incidents during the review period.

### 3.    CMC MHCB "Acute Care"

There were no patients placed in seclusion or restraint in CMC MHCB "Acute Care" since opening in April 2021.

### J.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

All the PIPs had emergency response processes in place in addition to death review processes that addressed patient deaths. Notably, reviewed CMF-PIP Emergency Medical Response Review Committee (EMRRC) minutes did not reflect whether the facility adequately

responded to emergencies or maintained tracking logs. CHCF-PIP had a multi-tiered risk

management review process that analyzed high-risk behaviors and cases where interventions

were unsuccessful and there were barriers to recommended actions. SVSP-PIP's emergency

response process included the Risk Management Committee's (RMC) review of tracking

systems for patients or behaviors reflecting high patient risk. CIW's EMRRC comprehensively

addressed CIW-PIP-related issues. Reviewed EMRRC meeting minutes for SQ-PIP addressed

emergency response-related matters.

### 1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

Reviewed CMF-PIP EMRRC minutes did not indicate whether the facility appropriately

responded to emergencies or maintained tracking logs documenting them. There were two

deaths at CMF-PIP during the review period. At the time of the site visit, a root cause analysis

was underway for one of them.

 CHCF-PIP reported 82 Code 3 events during which the EMRRC identified 50

deficiencies consisting of delayed 911 and alarm activations and clinician documentation, and

communication barrier concerns. CHCF In-Service Training (IST) conducted mental health and

custody staff training for some of them. There was also mental health staff training on the early

signs of patient distress.

CHCF-PIP had a three-level risk management review process. Prior to this review,

treatment teams reviewed incidents and identified triggers, high-risk conditions, and contributing

factors. The first level of review was a Program Review Committee (PRC) assessment of high-

risk behavior patients or patients who had a psychiatric incident and met certain Health Care

Department Operations Manual (HCDOM)-defined criteria. The PRC focused on risk

identification and developing action plans to reduce the risks. PRC recommendations were

provided to the treatment team.

The second level involved either a Psychology Specialist Services Committee (PSSC) or RMC meeting.  The PSSC reviewed PRC-recommended cases where interventions were ineffective and there were barriers to recommended actions and then provided the treatment team with recommendations and action plans.  The Medical Risk Management Committee (MRMC) reviewed patients referred by primary clinicians or the PRC and provided medical management consultation.  The third level of review included the Correctional Clinical Assessment Teams (CCATs).

One CHCF-PIP patient died in May 2021.  The SPRFIT at CHCF was responsible for attending to a patient's death report.  CHCF-PIP did not provide details regarding the process.

SVSP-PIP's emergency response process included the RMC's review of tracking systems for patients or behaviors indicating increased patient risk.  The RMC met two to three times monthly, was chaired by the chief psychiatrist, and always achieved quorums.  Reviewed matters included patients under continuous observation or suicide watch, patient abuse allegations, battery/assaults on staff, restraint, seclusion, and SIB.  SVSP-PIP reported four patient deaths including one by asphyxiation for which a suicide death review was conducted.

## 2.    **CIW-PIP and SQ-PIP**

CIW's institutional EMRRC met monthly and addressed CIW-PIP-related issues.  EMRRC meeting minutes were comprehensive and included detailed follow-ups for prior action items.  The Patient Safety Committee (PSC) also met monthly, achieved quorums, and addressed CIW-PIP-related topics.

There was one CIW-PIP patient suicide during the review period.  The institution chartered a root cause analysis for the suicide and the EMRRC and PSC reviewed it.  The PSC report on the suicide following examination of the patient's file found 57 issues.  The summary

of the institution's death review identified the patient's untimely referral for a positive behavior support plan as a system issue.

At SQ-PIP, monthly PSC meetings addressed PIP-related issues concerning nurse administered/direct observation therapy, the backlog in laboratory testing and screening, medication adherence concerns, and use of force procedures during medical emergencies. Reviewed EMRRC meeting minutes addressed emergent and urgent transports and case reviews, suspected overdoses, and suicide tracking. There were no patient deaths at SQ-PIP during the review period.

### K.    QUALITY MANAGEMENT AND UTILIZATION REVIEW

All the PIPs had a quality management process though utilization management/review was less common. Quality management programs at CMF-PIP, CHCF-PIP, SVSP-PIP, and CIW-PIP were incorporated into institutional mental health programs and acted in collaboration with them. CMF quality management also had responsibility for quality-related issues at CMF L1-PIP. SQ-PIP's subcommittee meetings addressed quality issues. Notably, SVSP-PIP's quality management objectives demonstrated uneven progress. During the review period, CHCF-PIP and SQ-PIP utilization review committees met though CIW-PIP's utilization management committee did not. CMF-PIP and SVSP-PIP did not have utilization management committees.

#### 1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

CMF-PIP had a quality management and training unit that worked collaboratively with CMF's mental health quality management unit; the latter was also responsible for quality management for CMF L1-PIP and outpatient programs. The quality management and training unit participated in numerous other initiatives including quality management meetings with CMF's outpatient programs, mental health quality management support webinars, Electronic

Health Records System (EHRS) training, Corrective Action Plan (CAP) meetings, and the monthly statewide quality management conference. CMF-PIP was also integrated into standing CMF committees including the Quality Management Committee (QMC), mental health subcommittee, PSC, and EMRRC and CMF healthcare trainings.

COVID-19 resulted in the suspension of CMF-PIP's utilization management committee in March 2020. Nonetheless, during the review period, CMF held four institutional utilization management committee meetings and addressed PIP issues.

CHCF-PIP's quality management program was adequate, merged into the institutional mental health quality management program, and acted collaboratively with CHCF's mental health subcommittee. PIP program directors submitted monthly memoranda to CHCF mental health subcommittee on the acute and intermediate care programs. The memoranda addressed PIP performance report indicators on mental health referrals, IDTT meetings, appointments seen as scheduled and cancelled due to custody, structured treatment, suicide risk evaluations, patient physical discharges, and group treatment among other issues. The memoranda typically included a root cause/reason and an action plan for non-compliant indicators.

The utilization review committee met three times monthly. Recurring agenda items included prior meetings' action items and out of LRH reviews. The utilization review committee discontinued addressing the length of stay reviews, ending necessary in-depth reviews of patients with extended lengths of stay.

CHCF-PIP's 13-indicator master treatment plan audits revealed non-compliance for completion of master treatment plans.

SVSP's institutional quality management program incorporated PIP quality management. Like the prior review period, the PIP's primary quality management vehicle was the Quality and Performance Improvement Program (QPIP) subcommittee.

The QPIP subcommittee presented a quality and performance improvement plan to SVSP's Local Governing Body and QMC annually.  The plan identified five goals for 2020 – 2021.  Notably, progress on these objectives was uneven.  Neither goal of providing patients with ten weekly hours of mental health treatment and maintaining timeframe compliance for the frequency of physician notes was met.  However, the PIP satisfied objectives for reducing patient self-harm incidents, improving the quality of nursing documentation, and implementing a process to track patient treatment satisfaction.

SVSP's QMC met monthly and attained quorums.  It addressed PIP-related items such as self-harm trends, higher level of care orders for PIP patients discharged from SVSP outpatient programs, and the QPIP subcommittee plan for 2021 – 2022.

SVSP's mental health subcommittee met for five of six months.  Addressed matters included patient higher level of care considerations, referrals, transfers, and five-day follow-up.

SVSP-PIP did not have a utilization management committee or a patient improvement program during the review period.

## 2. CIW-PIP and SQ-PIP

CIW-PIP's quality management program was integrated into CIW's institutional quality management structure.  The institutional mental health subcommittee provided PIP oversight and reported to CIW's QMC.  Notably, this structure was different than during the prior review period; several committees that previously covered CIW-PIP-related quality management activities no longer operated.  CIW-PIP had both an active SPRFIT and a utilization review committee.

CIW-PIP's Performance Improvement Work Plan (PIWP) for 2021 included several PIP-related quality management goals including aligning PIP policies to required performance metrics, using behavioral support plans for PIP patients, and improving the timeliness of PIP IDTTs. Other PIP-related active quality improvement projects during the review period included implementing a daily PIP huddle and initiating the PIP SPRFIT.

Notably, CIW-PIP SPRFIT addressed patient self-harm incidents and suicides and suicide attempts. Only one of five meetings achieved a quorum.

There were six PSC meetings at CIW. All achieved quorums. PIP-related issues addressed systems surveillance, quality improvement, and the Joint Commission.

CIW-PIP's utilization management committee did not meet. During the prior review period, utilization management met monthly. PIP leadership identified this reporting period's lack of meetings as a concern.

SQ-PIP's monthly subcommittee meeting minutes noted standing agenda items that included quality-related issues, system surveillance, and operations. System surveillance included clinical, custody, nursing, and training and evaluation audits. The subcommittee always achieved a quorum which was an improvement from the prior review period.

SQ-PIP's subcommittee initiated one Quality Improvement Team (QIT) and two CAPs. The QIT addressed non-compliant IDTT content audits; however, there were continuing implementation delays. The two CAPs addressed untimely suicide risk evaluations by providing for additional training and adding discussion of suicide risk evaluations to morning huddles.

SQ-PIP did not prepare formal meeting minutes for the utilization review committee.

### 3. CMC MHCB "Acute Care"

A CMC audit for June 2021 reviewed suicide risk assessments, IDTT timeliness and staffing, and mental health referrals for acute care patients. The audit found that 38 percent of

SRASHEs were untimely, but there was 100 percent compliance for timely IDTTs and mental health referral responses.

### L.        PATIENT COMPLAINTS/PATIENT SATISFACTION

During the review period, CHCF-PIP and CIW-PIP suspended patient satisfaction surveys due to COVID-19 protocols.  CMF-PIP and CMF L1-PIP did not administer surveys due to limited staffing.  SVSP-PIP and SQ-PIP administered surveys and complaints varied from access to treatment to law library concerns across programs.

### 1.        CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

During the review period, patient surveys were not administered to patients due to staffing vacancies at CMF-PIP.  Interviewed acute and intermediate care patients raised concerns regarding access to the library, laundry, property, yard, visitation, and dayroom.  CMF-PIP patients expressed frustration with the lack of out-of-cell time.

CMF L1-PIP paused patient satisfaction surveys due to staffing limitations during the review period.  Interviewed patients reported adequate access to group treatment and frequent access to yard and dayroom.  Patient complaints included the lack of access to radios and televisions while on COVID-19 quarantine.

CHCF-PIP staff reported that patient satisfaction surveys were suspended due to COVID-19 protocols during the review period.  There was no date provided for the resumption of the surveys.  At the time of the site visit, CHCF-PIP cleared the previously reported backlog of grievances and the grievance process was folded into the CCHCS system as planned.  CHCF-PIP patients filed 395 CDCR Form 602s and ten staff complaints during the review period.  Common grievances included insufficient access to yard and groups, delays in receipt of property and canteen, and the lack of radios and televisions in acute care units.  All ten staff complaints were for inappropriate staff interactions and none violated CDCR policy.

At SVSP-PIP, 52 patients completed satisfaction surveys. Common complaints included insufficient treatment hours, staffing shortages and staff redirections, lack of programming for MAX custody status patients, and issues with law library and meals. Positive patient survey answers included staff responsiveness to patient requests for help and effective treatment plans and individual treatment sessions.

### 2.    CIW-PIP and SQ-PIP

There were three patient appeals filed at CIW-PIP during the review period. All appeals alleged staff misconduct; no policy violation was found in any appeals. CIW-PIP staff reported suspending patient satisfaction surveys due to COVID-19 pandemic protocols during the first quarter of 2021. Eight surveys were completed during the second quarter. Patients indicated satisfaction with medication management, group treatment, and communication with treatment staff regarding their mental health care. Concerns included the number of groups offered, food, and the amount of offered recreation and yard time.

During the review period, no patients filed staff complaints at SQ-PIP; staff reported improved communication between patients and mental health and custody staff. SQ-PIP also utilized a patient advocate who routinely walked the unit listening to patient concerns and connected patients with necessary resources. SQ-PIP administered one patient satisfaction survey in March 2021; the scheduled September 2021 survey was delayed pending the arrival of the new program assistant. Nine patients completed the March 2021 survey. Results were shared with staff during meetings.

The inpatient council at SQ-PIP was suspended in early 2020 due to low patient participation.

3.    **CMC MHCB "Acute Care"**

Filing of CDCR Form 602s and staff complaints were not assessed during the special tour of CMC MHCB "Acute Care."

M.    **CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN**

Although all PIPs implemented the Custody and Mental Health Partnership Plan (CMHPP), the nature of implementation varied by institution.  LOPs for CMF-PIP, CHCF-PIP, and SQ-PIP were current and generally consistent with statewide CMHPP mandates.  CIW-PIP's LOP was not consistent with the state-wide CMHPP policy.  LOPs for CHCF-PIP and SVSP-PIP were not current.

There was executive leadership joint rounding at CMF L1-PIP, SVSP-PIP, CIW-PIP, and SQ-PIP.  Due to COVID-19, CHCF-PIP did not conduct the executive leadership joint rounding.  CHCF-PIP reported that mental health and custody leadership conducted weekly PIP yard walks at CHCF, including in the PIP.

All PIPs conducted huddles.  Reviewed CHCF-PIP huddle reports were detailed.  Observed SVSP-PIP huddles reflected thorough discussion of pertinent issues; CHCF-PIP huddles found staff knowledgeable about patients.  However, SVSP-PIP, CMF-PIP, CMF L1-PIP, and CIW-PIP reported shockingly low attendance by either custody or required staff.

SVSP-PIP reported noncompliance for attendance at quarterly partnership training.  CMF-PIP could not determine who attended and, due to COVID-19, CHCF-PIP did not conduct the training.  For annual partnership off-post training, CMF-PIP reported institution-wide compliance while CIW-PIP and SQ-PIP reported institution-wide noncompliance.  CHCF-PIP and SVSP-PIP did not report data on attendance at the off-post training.

1.    **CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP**

CMF's CMHPP LOP was consistent with statewide requirements.

Reviewed second and third watch CMF-PIP huddle reports found that only 19 percent had all required staff in attendance.

Patients filed 12 staff complaints during the review period.  Three complaints addressed Prison Rape Elimination Act (PREA) matters; others addressed the denial of property, medication delivery, discrimination, and unlicensed staff providing treatment.  No staff were reassigned due to these complaints.

As for training, quarterly partnership training sign-in sheets did not include relevant information to determine the percentage of staff who attended.  Institution-wide, the annual partnership off-post training was attended by approximately 99 percent of custody staff and by 91 percent of "PIP-CCHCS" staff.  Annual training attendance by specific mental health job classifications was not provided.

Executive joint rounding occurred in CMF L1-PIP once during the review period.  No issues were noted.

Although CMF L-1 PIP huddles occurred on second and third watch, reviewed huddle reports indicated custody's attendance at only 12 percent.  A nurse facilitated an observed third watch huddle which all required disciplines attended.  Issues addressed by the huddle included new arrivals, patients awaiting medical appointments, medication expiration, transfers, IDTTs, and quarantined patients.

CHCF-PIP's CMHPP LOP was dated January 2019 and had not been updated within the past year as policy required.  Otherwise, the LOP complied with statewide policy.

CHCF-PIP reported that, due to COVID-19, it was unable to conduct executive leadership joint rounding.  Mental health and custody leadership nonetheless reported undertaking weekly PIP yard walks but documentation was not provided.

In May 2021, CHCF-PIP captain issued a memorandum to custody staff instructing them to attend huddles and discuss certain patient-related issues.  Reported data on PIP unit huddle attendance by discipline for second watch during the review period found custody attendance ranging from 64 to 89 percent; psychiatrist attendance ranged from 75 to 87 percent; psychologist attendance from 75 to 91 percent; social worker attendance from 78 to 95 percent; recreation therapist attendance from 71 to 96 percent; and nursing attendance from 77 to 95 percent.  Reviewed huddle reports from July 2021 were completed in detail and confirmed comparable attendance rates by these disciplines.

An observed third watch huddle in CHCF-PIP reflected required staff's attendance. Custody staff was engaged, asked relevant questions, and informed mental health staff of patient concerns.  Mental health staff discussed all unit patients in detail.  All attending staff were knowledgeable of the patient population and were aware of pending transfers, current behaviors, and medication compliance.

CHCF-PIP custody and mental health staff also held ten meetings between April and July 2021.  The meetings typically addressed security-related issues such as patients covering room windows, one-on-one suicide watch issue orders, the writing of RVRs for indecent exposure (IEX), pat-downs of patients attending group treatment, and maximum custody patients.

Nine CHCF-PIP staff complaints addressed unprofessional behavior, harassment, and bias.  Eight were found not to involve a staff policy violation; the remaining complaint lacked a response.  No staff members were moved to another post due to a patient complaint.

Reportedly due to COVID-19, quarterly partnership training did not occur.  CHCF-PIP did not provide information on staff attendance at the annual partnership off-post training but reported that 724 staff did not attend.

SVSP's LOP for the CMHPP was not current and was last revised in March 2020.

The warden's executive staff meetings did not document executive leadership joint rounding. Tellingly, QMC minutes reported the monthly rounding as a standing agenda item and noted the rounding of PIP unit TC1. Mental health subcommittee meeting minutes also identified the CMHPP as an agenda item and addressed huddles, including custody's lack of attendance.

Reviewed second and third watch huddle reports noted psychiatry's attendance at 76 percent; custody and nursing staff were present at 38 and 99 percent of huddles, respectively. Observation of a third watch huddle for units TC1 and TC2 revealed the presence of required attendees and thorough discussion of relevant topics.

During the review period, patients filed 123 grievances alleging excessive use of force and harassment, denial of treatment, complaints related to IDTTs, RVRs, mail and property, and lack of access to phone calls and the law library. Three grievances were approved.

As for training, the quarterly round table partnership trained 71 percent of custody staff in 2020 and 48 percent in 2021. During 2020 and 2021, 78 and 86 percent of mental health and nursing staff, respectively, completed the training. Attendance at the annual partnership off-post training was not reported.

## 2.    CIW-PIP and SQ-PIP

CIW's LOP for the CMHPP and statewide mandates were inconsistent.

Executive joint rounding occurred in CIW-PIP in May 2021 during which staff reported improved relationships among disciplines. Nonetheless, staff reported tensions due to COVID-19, which were reportedly linked to poor communication of policy changes. An interviewed patient reported custody and mental health staff being helpful and referenced more challenging relations with medical staff. CIW's leadership acknowledged that information obtained during

joint rounding was not properly disseminated to staff but mental health leadership reported correcting this oversight.

Review of second and third watch CIW-PIP huddle reports revealed that only 25 percent reflected attendance by required attendees. Huddles were not conducted in the PIP during weekends.

Three appeals for patients housed in CIW-PIP alleging inappropriate staff behavior resulted in the redirection of CIW-PIP staff.

An institution-wide CIW report on annual partnership off-post training stated that only 15 percent of correctional leadership and officers completed the training; the alarming rate of non-attendance was attributed to COVID-19-related coverage issues. Overall, CIW reported that 69 percent of mental health staff attended the annual training.

Review of SQ's CMHPP LOP dated December 2020 indicated general consistency with statewide requirements.

Executive leadership joint rounding occurred in SQ-PIP during July 2021. All required members attended the rounding. Interviewed staff reported good rapport and communication on the unit. Interviewed patients reported being comfortable with staff responsiveness and receiving ducats for scheduled appointments. Patient requests included more one-on-one time with clinicians and more yard and group activities, especially for condemned patients. Reviewed minutes from monthly executive staff meetings reflected discussions of the outcomes from monthly rounding.

Observed second and third watch huddles revealed required staff in attendance. The chief psychiatrist facilitated an observed second watch huddle. Notably, custody staff provided

very little input.  In addition to the huddles, during weekdays there was a joint Correctional Treatment Center (CTC)/PIP management collaboration meeting.

As for the annual partnership off-post training, institution-wide data reported that 75 percent of custody and 60 percent of mental health staff attended the training.

### 3.    CMC MHCB "Acute Care"

CMC custody officers were reportedly generally unsupportive of using MHCB beds for acute care.  The monitor was unable to interview custody officers who were regularly assigned to the unit because they were unavailable during the site visit.  The manner that custody actions hampered clinical activities, including patients' unwillingness to take part in clinical activities due to certain custody officers' actions, delays in issuing personal property, and restricted yard access was obvious during the site visit.  Patients raised these issues in interviews and during observed IDTTs and groups.

### N.    *COLEMAN* POSTINGS

All PIPs were generally compliant with *Coleman* postings in English and Spanish in areas accessible to patients.

### 1.    CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

*Coleman* postings were displayed in English and Spanish in all toured housing units at CMF-PIP, CMF L1-PIP, and CHCF-PIP.

Institutional audits conducted at SVSP-PIP during 2021 resulted in updating and replacing *Coleman* postings in housing units.  Another institutional audit conducted during June 2021 found *Coleman* postings appropriately placed in all units.  Due to COVID-19 staff exposure during the site visit, the monitor was unable to observe whether *Coleman* notices were posted in areas accessible to patients in the housing units.

### 2. CIW-PIP and SQ-PIP

At CIW-PIP, *Coleman* posters were observed in each toured housing unit except the Walker unit though a poster was hung before the end of the site visit.

Current *Coleman* posters in English and Spanish were observed throughout SQ-PIP, including in the IDTT and group rooms.

### 3. CMC MHCB "Acute Care"

Display of *Coleman* posters were not assessed during the special tour of CMC MHCB "Acute Care."

## O. LAUNDRY AND SUPPLY ISSUES

Problems with laundry lingered at SVSP-PIP, CMF-PIP, and CMF L1-PIP throughout the review period and at the time of the site visits. Laundry issues improved at CHCF-PIP and CIW-PIP patients noted occasional but not persistent issues such as the lack of larger-sized undergarments. No laundry and supply issues were reported at SQ-PIP.

### 1. CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

At CMF-PIP, laundry issues remained unchanged throughout the review period and at the time of the site visit. Problems included an inadequate supply of laundry, provision of clean laundry, and an insufficient supply of appropriate-sized clothing. Clothing was, at times, returned dirty and some clothing was missing or replaced by clothing other than what was sent by the patient. In acute care, laundry storage rooms contained less than the needed supply of clothes each patient required under licensing standards. There was an adequate supply of patient clothing in the High Custody Intermediate Treatment Center (HCITC) laundry storage room.

Patients in CMF-PIP reported sufficient soap, tooth powder, and toilet paper supplies. Patients complained of no longer being provided deodorant and the ineffectiveness of the provided shavers. There were no issues reported with mattresses or linen supplies.

At CMF L1-PIP, patients reported an adequate supply of clothes. However, patients reported issues with laundry being returned dirty or not returned at all.

Laundry issues at CHCF-PIP improved since the preceding monitoring period. The LOP was updated to ensure an adequate supply of laundry and linen and staff assessed clothing sizes for better fitting clothing for patients.

Longstanding laundry issues persisted at SVSP-PIP. Notably, there were insufficient staffing and inventory as well as a misuse of supplies. Patient-damaged clothing and linens, reduced amounts of clothing and linens returned to the institution following off-site laundering by the Prison Industries Authority (PIA), and misuse of supplies contributed to shortages. Laundry lockers were organized, stacked, and labeled.

### 2.    CIW-PIP and SQ-PIP

CIW-PIP did not maintain logs or complete audits for laundry and supply issues during the review period. CIW-PIP maintained extra laundry supplies on the unit with access to additional supplies from the institution's central warehouse. Patient complaints regarding laundry were limited to occasional stained or damaged returned laundry and an insufficient supply of larger-sized undergarments.

In August 2021, SQ-PIP revised its LOP on laundry and supplies. There were no reported laundry or supply issues during the review period.

### 3.    CMC MHCB "Acute Care"

Laundry was not assessed during the special tour of CMC MHCB "Acute Care."

### P.    VISITATION/PRIVILEGES/TELEPHONE ACCESS

Delays in receipt of property continued at SVSP-PIP, CHCF-PIP, and CMC MHCB "Acute Care." Previously reported property issues improved at CMF-PIP. SQ-PIP reported some delays from sending institutions. No property issues were reported at CIW-PIP.

Eighty-five percent of SVSP-patients had televisions though patients and staff acknowledged a shortage of radios. Radios were available for patients at CHCF-PIP and SQ-PIP intermediate programs. Radios and televisions were not provided to acute care patients.

PIPs suspended in-person visitation due to COVID-19 protocols and virtual visitation was implemented. PIPs utilized CDCR's Roadmap to Reopening during the reporting period and at the time of the site visits. CIW-PIP had not resumed in-person visitation at the time of the site visit on September 13, 2021.

There were no issues reported regarding access to telephones at CHCF-PIP, including acute "flex beds," CIW-PIP, and SQ-PIP. Patients at CMF-PIP reported 15-minute telephone access that was often ended early by custody staff. CMF L1-PIP patients reported adequate access to telephones but a lack of privacy due to the location of the phones.

    1.    **CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP**

Property distribution significantly improved at CMF-PIP; however, some delays from sending institutions persisted. Quarterly packages were allowed consistent with custody level and privilege group.

In-person visitation resumed in April 2021 and patients had access to in-person and virtual visits at CMF-PIP and CMF L1-PIP. MAX custody status patients were limited to non-contact visitation. Telephone and canteen privileges were determined through patient STEP level and IDTT approval. Staff limited telephone calls to 15 minutes and patients complained that, at times, custody staff ended calls early.

At CMF L1-PIP, 15-minute telephone calls were offered once daily. Patients complained of a lack of privacy during telephone calls due to the location of the telephone.

Property issues persisted at CHCF-PIP due to staffing limitations, delay in forwarding from the sending institution, and a broken x-ray machine. Property was not issued to patients

within 15 days of arrival and delays resulted in increased patient agitation and CDCR Form 602

filings.  Significant staffing shortages impeded patient canteen access and orders were delayed

for one week to ten days.  Stock issues and storage space related to increased demand further

impacted access to canteen during the review period.

CDCR's radio/television issuance policy was intended to incentivize out-of-cell

participation in dayroom, leisure, and socialization activities.  CHCF-PIP did not issue radios or

televisions to acute care patients per the CDCR PIP policy.  Radios were provided to

intermediate care patients.

During the review period, video visitation was utilized due to COVID-19 protocols at

CHCF-PIP.  On July 19, 2021, CHCF-PIP was reopening visitation according to CDCR's

"Roadmap to Reopening."

There were no issues with access to telephones at CHCF-PIP during the review period;

several units installed video phones for patient use.

CHCF-PIP utilized the non-clinical activity tracker (NCAT) to capture non-ducated

activities including visitation, telephone use, dayroom and yard participation.

There were no significant property issues noted at SVSP-PIP.  On August 23, 2021, 85

percent of SVSP-PIP patients had televisions.  SVSP-PIP had a radio loaner program though

interviewed patients reported not receiving loaner radios.  SVSP-PIP staff noted occasional radio

shortages due to patients taking them at discharge.

SVSP-PIP provided NCAT data including access to dayroom, yard, meals, showers, and

telephone calls during the review period.  However, SVSP-PIP did not provide the NCAT data in

a manner readily usable to determine if the data was validated, reviewed, and/or used by staff or

management for treatment, supervision, or quality improvement

###    2.    CIW-PIP and SQ-PIP

Patients' STEP levels did not impact their access to personal property in CIW-PIP; only IDTTs could restrict access to property for documented safety reasons.  Regarding delays, CIW-PIP directed staff to contact sending institutions for patients that did not receive their property within 72 hours of arrival.

CIW-PIP adhered to CIW institution-wide visitation policy, which required ICC and IDTT approval.  Unless approved by IDTT, all visits were non-contact for CIW-PIP patients. During the review period, visitation was limited due to COVID-19 pandemic protocols. Visitation occurred each Saturday and Sunday; there was no restriction on the length of visits. As of September 13, 2021, in-person visitation had not resumed.

IDTT and patient STEP level determined telephone access at CIW-PIP.  There were no issues reported regarding access during the review period or at the time of the site visit.

During the site visit, SQ-PIP staff reported ongoing delays with receiving patient property from other PIPs.  Loaner radios and televisions were available for patients.

SQ-PIP custody staff documented visitation, telephone use, and dayroom and yard participation using the NCAT.  On October 25, 2021, at the time of the site visit, SQ-PIP patient visitation was compliant with the CDCR Roadmap to Reopening memorandum dated May 27, 2021.  SQ-PIP patients reported adequate access to telephones, including video phones.

###    3.    CMC MHCB "Acute Care"

At CMC MHCB "Acute Care," patients reported problems with timely access to their personal property.  At the time of the site visit on July 27, 2021, CMC MHCB "Acute Care," which had been operational since April 2021 was in the process of identifying an appropriate storage area for patient property.

### Q.     LAW LIBRARY ACCESS

Patients at SVSP-PIP and CMF L1-PIP reported difficulties accessing the law library. CMF-PIP patients reported adequate access to kiosks but no assistance with their operation when needed. At CHCF-PIP, CIW-PIP, and SQ-PIP, patients reported adequate law library access and assistance when needed. At SQ-PIP, the quick start guide for the law library kiosk was available only in English.

### 1.     CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

Most CMF-PIP patients' access to the law library was limited to the library paging system. Patients complained of a lack of awareness of available materials which limited their ability to make requests through this system. Law library kiosks were available on some units though patients complained of the lack of assistance with kiosk operation.

At the time of the site visit, patients reported that the law library kiosk at CMF L1-PIP did not work. Patients were permitted to request materials through the library paging system.

CHCF-PIP's law library was fully staffed during the review period. All observed kiosks were working and instructions for their use were available at the kiosk during the site visit. Library staff was available to assist patients when needed.

At SVSP-PIP, patients continued to report difficulties accessing the computerized library system because it was not user-friendly and was only in Spanish. Patients further reported that they were unable to make copies when needed.

### 2.     CIW-PIP and SQ-PIP

Law library access improved at CIW-PIP since the preceding monitoring round. A law library kiosk located in the dayroom was available to CIW-PIP patients during the review period and at the time of the site visit. Patient interviews and review of logs indicated adequate access to the law library and assistance in operation and form completion when needed.

SQ-PIP patients indicated adequate law library kiosk access and assistance with its operation when necessary. The kiosks contained a quick start guide though it was only in English.

### 3. CMC MHCB "Acute Care"

Law library access was not assessed during the special tour of CMC MHCB "Acute Care."

### R. EDUCATION

During the review period, education was not offered to patients at CMF L1-PIP, CHCF-PIP, and SQ-PIP. CMF-PIP, CIW-PIP and SVSP-PIP offered a limited education program.

### 1. CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP

CMF-PIP began offering general education development (GED) preparation self-study materials to intermediate care patients approximately two months prior to the site visit. On May 24, 2021, two patients were enrolled and one patient passed the GED test during the site visit.

At CMF L1-PIP, interviewed patients reported no education program offered during the review period or at the time of the site visit.

Patients in CHCF-PIP did not have access to education during the review period.

Ten patients were enrolled in an alternative education program at SVSP-PIP at the time of the site visit. SVSP-PIP staff expressed the desire to enroll more patients in education courses.

### 2. CIW-PIP and SQ-PIP

At the time of the CIW-PIP site visit, one two-hour education class was offered once a week. Patients were eligible to receive milestone credits for education participation.

No SQ-PIP patients participated in education programs during the review period.

3. **CMC MHCB "Acute Care"**

Patients' access to education was not assessed during the special tour of CMC MHCB "Acute Care."

S. **PROGRAM ACCESS**

No patients held jobs at SVSP-PIP, CMF-PIP, CMF L1-PIP, and SQ-PIP. During the review period, patients at SVSP-PIP, CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP earned milestone credits.

1. **CMF-PIP, CMF L1-P1P, CHCF-PIP, and SVSP-PIP**

No patients at CMF-PIP held job assignments. From November 1, 2020 through April 30, 2021, 49 percent of acute care patients and 49 percent of intermediate care patients earned at least one milestone credit.

Patients reported no available job assignments in CMF L1-PIP.

At CHCF-PIP, 76 percent of acute care patients earned milestone credits and 84 percent of intermediate care patients earned credits.

No SVSP-PIP patients held job assignments or other unit responsibilities at the time of the site visit. SVSP-PIP reported that 42 patients earned milestone credits during the reporting period. However, they did not provide information regarding the number of milestone credits earned or when they were earned. Additionally, SVSP-PIP did not identify patients eligible to earn the credits.

2. **CIW-PIP and SQ-PIP**

All patients at CIW-PIP were eligible to earn milestone credits. During the review period, 20 intermediate care patients and one acute patient earned credits.

No SQ-PIP patients had job assignments or pay numbers during the review period or at the time of the site visit. Eight acute care patients and one intermediate care patient earned a total of 45 milestone credits during the review period.

### 3.    CMC MHCB "Acute Care"

Program access was not assessed during the special tour of CMC MHCB "Acute Care."

### CONCLUSION AND RECOMMENDATIONS

This report's findings confirm that *Coleman* class members in the Lift and Shift PIPs continue to receive woefully inadequate inpatient mental health care. Transfer of responsibility to operate CMF-PIP, CHCF-PIP, and SVSP-PIP from DSH to CDCR via the Lift and Shift has failed the *Coleman* class. While specific inadequacies at the other CDCR-developed PIPs exist, these programs consistently outperform their Lift and Shift peer institutions. Because of the relative adequacy of inpatient mental health care provided at CIW-PIP and SQ-PIP, the Special Master will recommend paper reviews of those institutions in the next monitoring round. CDCR should also include CIW-PIP and SQ among the first institutions where CDCR utilizes CQIT when it is re-booted after data remediation is complete. The remaining CDCR inpatient programs (CMF-PIP, CMF L1-PIP, CHCF-PIP, and SVSP-PIP) will continue to be monitored via on-site monitoring.

Programming restrictions resulting from defendants' COVID-19-related policies impacted the amount and types of treatment offered to *Coleman* patients at all the PIPs, though the record is clear that these problems existed long before the onset of the COVID-19 pandemic. Indeed, the monitor found that structured therapeutic treatment in the PIPs was commonly driven by staffing levels rather than individualized assessment of patients' clinical needs. Across programs, core clinical groups were rarely offered due to staffing limitations. Moreover, as has been found in prior reports, *see, e.g.*, Special Master's Monitoring Report on the Mental Health

Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation, ECF No. 7039 at 21 ("In certain cases, class members can receive more mental health care in an EOP program in the prisons than in a PIP, which holds true either pre- or post-COVID-19."), PIP patients often received fewer hours of treatment than is required for EOP patients during the monitoring round. *See*, *e.g.*, Appendix A3 at 219 ("In intermediate care, treatment was well below what is required for CDCR's … enhanced outpatient program (EOP) level of care and was limited to medication management and brief check-ins."); Appendix A6 at 349 (noting acute care patients at SQ-PIP received an average of 6.04 hours of structured therapeutic activities and highlighting the fact that "the number of weekly hours should be significantly more than the minimum of ten weekly hours offered to EOP program patients.").

At the time of the monitoring tours, clinical staffing vacancies at the Lift and Shift PIPs were at dangerously high levels. The staffing crisis directly led to reduced access to inpatient care during the round. Because of the risk of continuing to admit new patients to CHCF-PIP at then-existing staffing levels, CDCR shut down the program to admissions for four months. Without any apparent improvement in CHCF-PIP's staffing levels, *see, e.g.*, Defendants' Monthly Psychiatry Vacancy Report – January 2022, ECF No. 7481 at 5 (reporting 32 percent vacancy rate among psychiatrists at CHCF-PIP, inclusive of registry staff), CDCR re-opened the program to admissions as of January 28, 2022. Given the monitor's findings from the CHCF-PIP monitoring tour and the lack of any improvement in staffing levels, the Special Master remains concerned about that program's ability to operate safely at current staffing levels.

CDCR must take immediate action to remedy these serious staffing-related deficiencies at the Lift and Shift PIPs. The risk of operating these programs at current staffing vacancies is

grave and unacceptable. CDCR will not be able to deliver anything close to adequate inpatient mental health care in the Lift and Shift PIPs unless these staffing deficiencies are remedied.

During the monitoring round, CDCR's decision-making regarding the PIPs at times appeared erratic and was often driven by the need to respond to one crisis after another. For instance, when faced with a significant waitlist for inpatient mental health care, rather than utilize all inpatient beds available to the *Coleman* class, including those at DSH-Atascadero and DSH-Coalinga, CDCR hastily established a unit in CMC MHCB to provide acute inpatient care—a level of care the unit was never designed nor intended to provide. The failure to utilize *Coleman*-designated DSH beds quickly overwhelmed the Lift and Shift PIPs at a time when these programs were already dangerously understaffed.

The report's findings are even more concerning when considering MHSDS population trends, as discussed above and displayed in the charts below.[50]



---

[50] See *supra* note 16 for sources of population data contained in these charts.





As noted above, declines in the MHSDS population have not kept pace with those of the overall CDCR population. *See supra* note 16. Moreover, the EOP population has grown 27 percent compared to the time of the 2008 Three-Judge Court proceedings. During the same time-period, the overall CDCR population *decreased* by nearly 40 percent. Knowing that many patients utilizing inpatient mental health care in CDCR come from and return to EOP programs, the growth of this population is particularly concerning in light of this report's findings. While

the Special Master's Twenty-Ninth Round Monitoring of CDCR's outpatient programs is

ongoing, the significant growth of the EOP population since the time of the Three-Judge Court

proceedings in 2008 may require CDCR to consider targeted EOP population reductions and

"potential clustering of higher-acuity mentally ill inmates at those institutions where it has been

shown that mental health staff can be more readily attracted and retained."  August 9, 2016

Order, ECF No. 5477 at 5.

The focus areas first highlighted in the Special Master's 2018 Inpatient Report – staffing

vacancies, referrals and transfers, least restrictive housing placements, access to DSH facilities,

and clinical services and treatment in inpatient programs – "offer defendants clear and specific

targets" that must be addressed in order to provide adequate inpatient care to *Coleman* patients.

Special Master's 2021 Inpatient Care Report, ECF No. 7039 at 116.  The findings contained

herein indicate these areas of focus continue to "require [defendants'] full engagement and

attention."  *Id.* at 118.  The *Coleman* class cannot afford further delays in remedying these long-

standing deficiencies.

## RECOMMENDATIONS

In view of the findings contained herein, the Special Master recommends that the

Coleman court enter an order directing the following:

1.  That CDCR be ordered to develop a comprehensive plan within 30 days, under
    the guidance and supervision of the Special Master, and with input from the
    plaintiffs as appropriate, to remedy the seriously deficient staffing levels at the
    Lift and Shift PIPs identified in this report.

2.  Consistent with the recommendations contained in the Special Master's 2021
    Inpatient Care Report, to the extent necessary to remedy any deficiencies
    identified in this report, within 90 days CDCR, under the guidance and
    supervision of the Special Master, and with input from the plaintiffs as
    appropriate, shall develop minimum standards for the provision of structured
    therapeutic activities, unstructured out-of-cell activities, treatment planning, and
    individual treatment, consistent with a psychiatric inpatient level of care, and shall
    develop plans to provide such structured therapeutic activities, unstructured out-

of-cell activities, treatment planning, and individual treatment consistent with the established minimum standards.  CDCR shall also develop and implement a system for tracking and reporting adherence to the standards developed.

3.      That the Special Master be directed to review the CIW-PIP and SQ-PIP via paper review in the next monitoring round.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr., Esq.*
Matthew A. Lopes, Jr., Esq.
Special Master

May 17, 2022

APPENDIX A1
California Medical Facility Psychiatric Inpatient Program (CMF-PIP)

**California Medical Facility Psychiatric Inpatient Program (CMF-PIP)**
May 24, 2021 – May 28, 2021

## SUMMARY OF THE FINDINGS

- There remained significant functional vacancies among treating staff at CMF-PIP.

- CMF-PIP did not meet required staff-to-patient ratios in all units.

- CMF-PIP reorganized the leadership and supervisory structure in April 2020 in response to the COVID-19 pandemic.

- CMF-PIP continued to struggle to provide adequate mental health treatment in acute care units for multiple reasons, among them, inadequate staffing and physical plant challenges.

- The quality of IDTTs across the acute and intermediate care programs varied from adequate to inadequate.

- Inadequate IDTTs across programs were characterized by lack of attention to or discussion of treatment plans.

- Observed IDTTs did not consistently discuss the STEP process or LRH.

- Primary clinicians were not providing groups due to staffing shortages.  Group treatment across programs consisted primarily of activities therapies.

- Nursing-led treatment groups were initiated in February 2021 in order to supplement the treatment program.  Groups included, health and wellness, life skills, and substance abuse.

- The amount of unstructured out-of-cell time offered to patients was inadequate, but had recently began to improve.

- As a result of psychiatrist vacancies, recent policies on frequency of psychiatric contacts for PIP patients had not been successfully implemented in the acute care program.

- Routine psychiatry and primary clinician contacts were not occurring as required.

- Clinical contacts did not consistently occur in confidential settings as required.

- Due to staffing changes, the Positive Behavior Support Team was suspended in March 2020; services were fully reinstated in November 2020.

- Observed morning and end of shift meetings in the acute care program demonstrated significant variability with regard to staff participation.

- The STEP level system was inconsistently implemented in both the acute and intermediate care programs.

- Referral timeframes were not met during the review period.

- Patients were not admitted to the acute and intermediate care programs at CMF-PIP within timeframes.

- The majority of discharges from CMF-PIP were administratively delayed following clinical discharges.

- With two exceptions, all required custody staff received RVR training; 68 percent of required mental health staff received the training.

- Approximately 96 percent of all required custody staff was compliant with use of force training; mental health staff was non-compliant.

- There was one controlled use of force incident during the review period.

- There were two deaths during the review period.

- CMF-PIP was fully integrated into the standing CMF committees, including the mental health subcommittee.

- CMF-PIP had a quality management and training unit that worked in collaboration with CMF's mental health quality management unit.

- The CMF-PIP utilization management committee was suspended in March 2020 due to the COVID-19 pandemic and a redirection of supervisory services.

- Across programs, interviewed patients were generally uninformed about how to access services available to them.

- Many patients and some staff continued to express concern with CMF-PIP's ability to provide patients with sufficient and clean laundry.

- Observation of some laundry storage rooms revealed minimal additional clean clothing.

- Although property distribution had significantly improved from the preceding monitoring visit, CMF continued to have a list of patients whose property never arrived.

- Patients were receiving visitation and telephone privileges.

- There were no pre-release groups during the review period due to the COVID-19 pandemic.

## CENSUS

On May 25, 2021, the CMF-PIP operated 396 beds. There were 62 beds in the admissions unit, 188 acute care beds, and 146 intermediate care beds. Thirty-seven or 60 percent of the 62 beds in the admissions unit were filled. The 25 unoccupied beds included 15 that were on hold pending admissions and ten for endorsed patients awaiting clinical acceptance. All 62 beds in the admissions unit were flex beds and could accommodate acute or intermediate care patients.

Of the 188 acute care beds, nine were offline due to COVID-19. Of the remaining 179 acute care beds, 177 were filled, including 14 beds for patients in quarantine/isolation. Two beds were on hold pending admissions. No beds were redlined.

In the 146-bed intermediate care program, eight beds were offline due to COVID-19. Of the remaining 138 beds, 123 were filled, including 25 beds in quarantine/isolation. One bed was unassigned, one bed was held for a patient out to hospital, and 13 beds were held pending admissions. No beds were redlined.

None of the CMF-PIP beds were considered as overflow housing.

## STAFFING

### Administrative, Clinical, and Correctional Staffing

On May 25, 2021, the position of executive director was filled; the executive director also assumed the responsibilities of the chief psychiatrist. The clinical administrator and hospital administrator positions were vacant, but the hospital administrator's position was covered by

staff in an acting capacity. Mental health leadership reported that they were restricted from filling the clinical and hospital administrator positions. Three of five program director positions were filled, with one acting as the hospital administrator. Two of four program assistant positions were filled. The nurse coordinator position was vacant.

Chief Psychiatrist: The chief psychiatrist position was vacant; however, the executive director covered the chief psychiatrist's responsibilities.

Senior Psychiatrists: Both senior psychiatrist supervisor positions were vacant, however one of the positions was covered by staff in an acting capacity.

Psychiatrists: Seven of 28.5 established staff psychiatrist positions were filled, for a 75 percent vacancy rate. As previously stated, one staff psychiatrist was acting as a senior psychiatrist supervisor. Ten contractors and one full-time telepsychiatrist were utilized, resulting in a psychiatry functional vacancy rate of 37 percent.

Chief Psychologist: The chief psychologist position was vacant, but covered by staff in an acting capacity.

Senior Psychologists: Both senior psychologist supervisor positions were filled, with one of the senior psychologist supervisors acting as the chief psychologist. Two of four senior psychologist specialist positions were filled, leaving a 50 percent vacancy rate.

Psychologists: Six of 27.5 established psychologist positions were filled, for a 78 percent vacancy rate. Eight contractors reduced the functional vacancy rate to 49 percent. Two civil service psychologists were unlicensed.

Supervising Social Workers: One of two supervising social worker positions was filled by a social worker that was on loan from headquarters.

Social Workers:  Eight of 27 social worker positions were filled, resulting in a vacancy rate of 70 percent.  A 0.75 contractor reduced the social worker functional vacancy rate to 68 percent.  Two civil service social workers were unlicensed.

Recreation Therapists:  Of 27 recreation therapist positions, 17 were filled, for a 37 percent vacancy rate.

Nurse Practitioners:  Of four established positions, one was filled, for a 75 percent vacancy rate.

Supervising Registered Nurse (SRN) III:  The SRN III position was vacant.

SRNs:  Seventeen of the 25 established SRN positions were filled, for a vacancy rate of 32 percent.

Registered Nurses (RN):  Of 162.45 established RN positions, 84 were filled, for a vacancy rate of 48 percent.  The use of 15 contractors reduced the functional vacancy rate to 39 percent.

Psych Techs:  Of 46.79 psych tech positions, 39 were filled for a vacancy rate of 17 percent.

Licensed Vocational Nurses (LVNs)/Certified Nursing Assistants (CNAs):  Of 124.39 established positions to fill behind the phased-out MTA positions, there were 66 civil service and 54 registry staff, for a functional vacancy rate of four percent.

Correctional Staff:  The institution reported vacancies among the custodial staff assigned to the CMF-PIP.  It reported filling them daily but did not provide additional information.

Telepsychiatry:  During the review period, the CMF-PIP utilized two telepsychiatrists in intermediate care to provide coverage due to severe staffing shortages.  One telepsychiatrist started in unit A-2 on May 4, 2020 and was still at the institution.  A second telepsychiatrist was

utilized in unit A-3 from September 22, 2020 to February 26, 2021. Mental health leadership reported that telepsychiatry was used for one-on-one clinical contacts, IDTTs, emergencies, crisis calls, and other matters, but was never used for the Psychiatrist on Duty or for suicide-related matters. Each telepsychiatry position was a 40-hour weekly position. Mental health leadership further reported that the institution had informed the Statewide Mental Health Program that it had used telepsychiatry for more than 30 days.

The institution reported maintaining its own personnel office and staff to recruit for all clinical classifications. It reported working with CDCR headquarters staff and CCHCS human resources in these recruitment initiatives. Such ongoing efforts included the formation of workgroups to explore creative ways to attract civil service applicants, and plans to make presentations at universities, advertise with professional groups and national boards, and other types of direct networking.

### Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

CDCR's established staffing ratio in the admissions unit was 1:15 for psychiatry, psychology, recreation therapy, and social work. Based on the reported census on May 25, 2021, both of the CMF-PIP's admissions units met the staffing ratio for psychiatrists and one of two units each met this ratio for psychologists and recreation therapists; neither unit met the ratio for social workers. However, based on bed capacity, none of the four disciplines met this caseload ratio.

The established staffing ratio for all four disciplines for acute care patients was also 1:15. Based on the reported census, all six of the CMF-PIP's acute care units met this ratio for psychiatry, but only four of six units met it based on bed capacity. For psychologists, given the census, four of six acute care units did not meet the caseload ratio; based on bed capacity, five of

six units did not meet the ratio. As for social workers, none of the six acute care units met caseload ratios based on the census or bed capacity. For recreation therapists, five of six acute care units did not meet the caseload ratios based on the census or bed capacity.

CDCR's established staffing ratio for the four disciplines for intermediate care patients was 1:35. Given the census, all four units met the staffing ratio for psychiatry, but only two of four units met it for bed capacity. Two of four intermediate care units met the staffing ratio for psychologists based on the census, but three of four units did not meet it based on bed capacity. For social workers, based on the census, two of four intermediate care units met the staffing ratio; based on bed capacity, three of four units did not meet the ratio. All four intermediate care units met the caseload ratio for recreation therapists based on both the census and bed capacity.

### Staff Training

There were four CMF-PIP seminar trainings during February and March 2021 that addressed treatment implementation collaboration. The trainings addressed suicidality and non-suicidal self-injury from a Dialectic Behavior Therapy perspective.

## TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### Acute Care Program

CMF-PIP reorganized their leadership and supervisory structure during April 2020 in order to facilitate changes more quickly in response to the COVID-19 pandemic. Development of a specialized clinical leadership team included as members senior psychologist specialists, clinical supervisors, and management staff. This team rounded on a daily basis and ordered consults as indicated. During May 2020, a discharge review process was implemented, which included chart review and consultation by a clinical supervisor prior to discharge.

Since April 2020, the CMF-PIP has experienced significant staffing shortages related to medical leaves, quarantines, isolations, school closures and other pandemic-related issues. These

shortages were recently exacerbated by staff leaving the CDCR system due to reported non-competitive salaries. Telework was initiated on a conservative basis, essentially being limited to staff with direct COVID-19 impacts.

Recreation therapists initiated frequent cell-front rounds and provided increased provisions of in-cell supplies. These bachelor-level therapists also completed individual contacts as a substitute for group treatment for patients placed on a quarantine status. The PBST was temporality suspended during the start of the pandemic and re-started during November 2020.

In sum, the CMF-PIP continued to struggle providing adequate mental health treatment in acute treatment units for multiple reasons, specifically, the result of inadequate staffing, and physical plant challenges. The amount of out-of-cell structured therapeutic time offered to acute care patients was particularly inadequate and not just due to COVID-19 issues.

Intermediate Care Program

The CMF-PIP intermediate program consisted of units A-2, A-3, P-3, and the High Custody Intermediate Treatment Center (HCITC) or "64-bed unit." There were 178 licensed intermediate care beds (HCITC and locked dorms combined). In addition, eight beds in the A-3 intermediate care locked dorm unit had been designated as unavailable since June 1, 2020 due to COVID-19 social distancing and limiting dorm sizes to eight patients. Thirty-two intermediate care single cell beds within the C and D units of the HCITC were designated as admission and quarantine space for the CMF-PIP.

The CMF-PIP reorganized the leadership and supervisory structure in April 2020 reportedly in response to the COVID-19 pandemic. This was done in an effort to be able to respond and implement changes more quickly and efficiently, although it was unclear if that outcome was realized. Because of increased staffing shortages during the pandemic, a specialized team was developed to ensure patient care needs were addressed. The team consisted

161

of clinical leadership including senior psychologist specialists and clinical supervisors and managers. Daily rounding by this team was reportedly conducted on all patients and clinical consults were ordered as indicated. There was no evidence provided to supply compliance with these reported operational changes. A discharge review process was implemented in May 2020 with all teams receiving chart review and clinical consultation by a psychology specialist or clinical supervisor prior to initiating discharge of a patient. This discharge review process was still in effect throughout the review period and at the time of the site visit as confirmed during staff interviews.

Throughout the course of the COVID-19 pandemic, telework was utilized although mental health management reported that it was used conservatively. Mental health staff were still expected to complete all clinical contacts in person and in confidential settings. Recreation therapists were required to complete frequent cell-front rounding and increased provision of in-cell supplies. Each time a treatment unit was placed on quarantine, the recreation therapists completed individual contacts in lieu of group treatment. Patients who were not on quarantine had been offered in person, out-of-cell treatment groups whenever possible throughout the pandemic. At the onset of the pandemic, the psychological assessment service and the PBST were temporarily suspended to redirect resources to covering patient care. These services were re-instituted in November 2020.

Similar to previous inpatient report findings, CMF-PIP continued to face significant problems in the intermediate care program during the review period. Facility physical plant issues and staffing allocation and/or vacancy issues continued to severely limit its ability to deliver adequate treatment, clinical services, and programming to its patients. In addition, CMF-PIP experienced significant staff turnover resulting in a lack of continuity of care at the

intermediate level of care and a lack of familiarity with expectations and policies in the PIP intermediate care program.

1.    **Interdisciplinary Treatment Teams (IDTTs)**

<u>Acute Care Program</u>

During the site visit, the monitor's expert observed the IDTTs of 18 patients in acute care units P-2, Q-1, Q-3, S-1, and S-2. All of the required members of the IDTTs were present, although one IDTT's CC II was present via a telehealth process, which was problematic due to audio issues. Patients attended the IDTTs. The quality of the IDTTs ranged from good to problematic. The STEP process was not discussed in any of the IDTTs. Problematic IDTTs were characterized by lack of mention or discussion of treatment plans. IDTTs in unit S-2 reviewed two patients who quickly became very agitated. Mental health staff had some difficulty structuring these patients. The custody officers were able to de-escalate the situation in a reasonable manner.

None of the observed IDTTs were initial IDTTs. None of the IDTTs mentioned the patient's LRH except during the S-1 IDTT. The dayrooms in each of the units were used for the IDTT process, which was not clinically appropriate in several of the units (Q-3, S-2) due to significant background noise (e.g., outside ventilation unit).

Eight of ten patients required initial IDTTs during the review period. Seven of eight, or 86 percent of initial IDTTs occurred within 72 hours. Required staff were present at seven or 86 percent of initial IDTTs.

Ten patients required routine (i.e. seven-day) IDTTs during the review period. There were 38 expected timeframes during the review period. Of the 38 expected timeframes, 25 or 66 percent occurred within seven days. Of the 40 routine IDTTs reviewed, required staff were

present at 32 or 80 percent of routine IDTTs.

Intermediate Care Program

Multiple IDTTs were observed during the site visit.  These IDTTs varied in quality across treatment teams, and at times even within treatment teams.  All required participants were present with laptops, but patients were not consistently told of the purpose of the IDTT.  The treatment plan was not discussed, nor was discharge planning, even with impending discharge. Treatment team participants typically had to be prompted by the IDTT facilitator for input. Treatment teams, perhaps due to staffing turnover, were not as integrated as some teams observed during the preceding site visit, resulting in a less clinically valuable treatment team process.

For many of the patients, the recreation therapist provided some of the most therapeutically valuable input of all team members regarding the patients' progress (or lack thereof) and discussion of group treatment.  There was no clinical conceptualization presented during any of the treatment team meetings observed and even diagnosis was often not mentioned.  The lack of a clinical presentation may have contributed to the lack of discussion regarding actual treatment plans.  Staff members reported that they had not been able to schedule patients individually in a clinically meaningful way.  However, even when patients reported significant symptoms, clinical staff were slow to respond or non-responsive to the patients' expressed needs in IDTT.  Psychiatry focused on medication effects or simply asked the patients if they had any questions for them, remaining silent if the patient had no questions.

At one point, a patient with an extensive history of self-injurious behavior discussed his fears about his medical condition and stated, "if I go blind I will kill myself."  After other concerning statements with no response by members of the team, the nurse finally asked the

patient if he felt safe and explored risk of self-injury and keeping safe.  Another patient had

recently withdrawn from opioids (Suboxone) but the impact of that on his immediate well-being

and treatment were not explored.  In yet another case, it was concerning that for a patient with

significant treatment non-compliance, only motivational interviewing was discussed as an

intervention and the PBST was not considered although indicated given the history of lengthy

non-compliance.  There were no clinical rationales provided for these IDTT inadequacies.

Mental health staff did acknowledge that while structured treatment had been improving, it was

occurring slowly.  Groups often did not begin on time and patients were still often seen cell

front.

        The observed treatment teams also did not consistently discuss least restrictive housing

(LRH) or STEP levels.  For those patients in the HCITC, not all of them were actually maximum

(MAX) custody.  The team reported that there were far fewer MAX patients than in the past

though patients complained that they were still treated in many ways as MAX patients.

Treatment teams did not typically mention LRH, even in those cases where the patient was out of

LRH.  In one treatment team where LRH was minimally discussed, the clinician wanted the

patient to be able to be placed in a multi-person cell, but the recreation therapist was resistant.

The psychiatrist, nurse, and CC I did not participate in the discussion, underscoring the lack of

comprehensive integration of the team process and lack of understanding of their roles regarding

LRH.  STEP level was also not discussed consistently.  Eventually, once the monitor's expert

inquired about STEP level, it was sporadically and inadequately addressed.  Patients reported

being uncertain about their STEP levels and feeling as though it didn't matter what level they

were assigned.  Clearly the STEP program was not effectively implemented, and staff did not

appear to understand how it should be integrated into the existing treatment program.

While mental health supervisors mentioned an inability to closely monitor IDTTs due to staffing issues and the pandemic, closer clinical supervision of the process was sorely needed. While most clinical and nursing members should understand how treatment teams work and have experience in them, the observed treatment teams were in significant need of training, modeling and accountability to improve.

Four of ten patients required initial IDTTs during the review period. Three of four or 75 percent of initial IDTTs occurred within 72 hours. Four of ten patients required "10-day" IDTTs during the review period; two of four, or 50 percent of "10-day" IDTTs occurred timely.

Nine patients required routine (i.e. 30-day) IDTTs during the review period. There were 18 expected timeframes during the review period. Of the 18 expected timeframes, 15 or 83 percent occurred within 30 days.

### **Group Therapy**

Acute Care Program

Following the December 2019 monitoring visit, CMF-PIP increased the expected hours of group treatment to 16 hours per week, which was not sustainable to the pandemic-related issues such as increased staffing vacancies and/or absences.

During the months of February and April 2021, the hours of out-of-cell structured therapeutic activities, offered on average to each acute care patient ranged from 3.5 to 3.78 hours and the average attended out-of-cell therapeutic activities ranged from 2.18 to 2.26 hours per week. These statistics were not significantly different than other weeks during the review period. During a meeting with acute care staff, it was reported that patients were generally offered five to six hours per week of structured therapeutic activities although they were all activities

therapies.  Staff were in agreement that the lack of core mental health groups, due to staff vacancies, was very inadequate.

Nursing Lead Treatment Groups (NLTGs) were initiated on February 16, 2021 in order to supplement the treatment program.  It was not clear the percentage of NLTGs that was provided by each nursing discipline (i.e., psychiatric technicians, LPNs or RNs).  Nursing groups were reported to focus on healthy living.

Recreation therapists provided 74 percent of all PIP group therapies and 26 percent were provided by nursing staff.  Primary clinicians were not providing groups due to staffing shortages in the clinical social worker and psychologist positions.  CMF-PIP recreation therapist groups included music and art therapy, DBT, anger management, relaxation and meditation, and recreation.

Groups in the acute care program were mainly provided in O-1 and O-2 during weekdays.  Dayroom groups were scheduled during weekends when O-Wing treatment spaces were not available.  For acute care maximum security patients, groups were provided in O-313 and O-317.  Individual contacts occurred in the Q-3 interview room and in the dayroom.

Group room capacities during the review period ranged from four to eight patients depending on dayroom size.

Acute care groups were assigned by patient cohorts determined by housing.  Since the preceding monitoring visit, office technicians had been utilized as mental health schedulers in order to expand the scheduling team.

Information was obtained from a recreation therapist regarding the scheduling and decision process specific to assigning patients to groups.  The decision to assign a patient to a group run by a recreation therapist was made by the schedulers without input from the treatment

team and was based on making sure that patients were assigned to at least some groups each week.  The schedule for assigned groups for any patient changed weekly.  The specific assigned groups had different patients each week.  The patients did not receive a schedule of their assigned groups and did not learn which group they would be offered until the custody officers approached them immediately prior to the group with the offer.  Even when a group started late, which may occur for a variety of reasons, the group ended as originally scheduled.  In general, afternoon groups were better attended than morning groups.

The group assignment process was supposed to include feedback from the recreation therapists concerning whether the fit for the patient in the assigned group is clinically appropriate via the IDTT process.  However, based on observation of numerous IDTTs, such input was neither solicited nor received.

Group treatments were primarily activities therapies, which are an important component of out-of-cell structured therapeutic activities, but do not adequately compensate for the lack of core mental health treatment.  The process of group assignment was not treatment based but understandable related to the staffing vacancies, limited programming space and COVID-19 issues.

Staff reported that scheduling issues were due to a communication issue between the schedulers and the treatment teams, which would be remedied.

The monitor's expert observed one coping skills group facilitated by a recreation therapist for acute care patients in P-2.  The facilitator reported the group typically had one attendee, despite scheduling eight patients.  However, on this date, three patients attended.  The group started nine minutes late due to custody escorting delays.  Although the space was generally sufficient for group treatment, the facilitator was unable to play music as planned and

the volume of the group occurring next door was moderately distracting during relaxation exercises. Participants were actively engaged in the group discussion and exercises, and the overall quality of the group was adequate.

The monitor's expert attended a S-1 acute care stress management group. Five patients were signed up for the group; however, only two attended. The group was facilitated by a recreation therapist who turned on a TV bowling game. While the two patients were bowling, the recreation therapist facilitated a discussion on several topics, to include their commitment offenses, anger management, preparing for parole, and finding employment.

The monitor's expert briefly observed a leisure group provided to seven S-2 patients. The group started ten minutes late due to apparent escort issues. This Friday group was designed to provide entertainment via watching a movie, although the length of the group (scheduled for one hour but only lasting 50 minutes due to the late start) would not allow the group to watch the complete movie.

Intermediate Care Program

The CMF-PIP intermediate care program had increased the expected hours of group treatment provided by recreation therapists to 16 hours per week. This was not sustained due to the onset of the pandemic and continued decreases in mental health staffing. In order to supplement the intermediate care program, CMF-PIP initiated NLTGs on February 16, 2021, and had eight groups scheduled weekly on A-2, A-3 and P-3. The NLTGs were offered to the locked dormitories in February through April 2021. These groups were tracked on a separate system (rehabilitative achievement credits groups) that would not merge or input into the On Demand report system. Consequently, no average amount of hours per patient could be provided. CMF-PIP did provide spreadsheets that included detailed information about the NLTGs. While the

169

data was not presented in a manner that allowed for a calculation of average groups or hours per patient, there did appear to have been a significant number of hours offered with the largest amount offered in March 2021. Groups included life skills, substance abuse, and health and wellness.

The majority of group therapy provided during the review period and at the time of the site visit was provided by recreation therapists. Approximately one in four, or 26 percent of groups were provided by nursing. There were no treatment groups facilitated by a clinician for much of the review period or at the time of the site visit. Interviewed patients repeatedly requested clinical groups, groups that were more linked to their diagnoses and/or symptoms, and groups that would help them manage in the correctional environment as well as when released. While the CMF-PIP could provide a total number of treatment group hours across the PIP, management could not provide the average number of groups or group hours per patient.

### Unstructured Activities/Non-Clinical Activity Tracking

#### Acute Care Program

With decreasing COVID-19 restrictions since May 2021, CMF-PIP increased the patients' access to out-of-cell time. Non-clinical activity tracking (NCAT) data included any "non-therapeutic" time out-of-cell such as attending an ICC, taking a shower, meals out of cell, etc. Data had not been analyzed in the context of NCAT refusals. NCAT hours were reported to have increased to 12 hours per week (average across all programs at CMF, but not weighted to account for patient census in each program). It was not accurate to state the average PIP patient was receiving 12 hours per week of NCAT time. For example, the average NCAT time offered to acute care patients from January 2020 through April 2021 ranged from 0.5 hours to 8.6 hours as demonstrated by the data provided.

The unstructured out-of-cell time offered to acute care patients was also inadequate but was beginning to recently improve, based on information obtained from patients. Based on patient reports, it was likely that the NCAT process underestimated the actual unstructured out-of-cell time offered to acute care patients.

Intermediate Care Program

CMF-PIP had committed to increasing unstructured out-of-cell time tracked as NCAT hours. While the intermediate care program reported averaging 12 hours per week, NCAT time was presented with intermediate and acute care combined, not allowing for a specific report for the intermediate care program. However, there was monthly NCAT data provided for the intermediate care program and it averaged 4.4 hours per week each month. The amount of NCAT provided was very low for December 2020 and January 2021 (less than two hours) but had increased to an average of six plus hours attended by February and March 2021.

**Individual Treatment**

Acute Care Program

The monitor reviewed the records of ten acute care patients. No patients were removed from the sample. For psychiatry contacts, of the ten patients reviewed, eight required initial psychiatry evaluations during the review period. Five of eight, or 63 percent occurred within 72 hours. Ten patients required routine psychiatry contacts during the review period. There were 40 expected timeframes during the review period. Of 40 expected timeframes, 28 or 70 percent occurred as required by policy. Of the 50 contacts reviewed, 40 or 80 percent were done in a confidential setting. Some of the contacts were done cell-front, yet the psychiatrists marked the appointments as confidential.

Of the ten patients, eight required initial primary clinician evaluations during the review period. Four of eight, or 50 percent of initial primary clinician evaluations occurred within 72

hours. Ten patients required routine primary clinician contacts during the review period. There were 41 expected timeframes. Of those 41 expected timeframes, 23 or 56 percent occurred at least every seven days. Of the 51 contacts reviewed, 33 or 65 percent were done in a confidential setting, this was mostly due to patients refusing a confidential appointment.

Intermediate Care Program

The monitor reviewed the records of ten intermediate care patients. Of the ten patients reviewed, four required initial psychiatry evaluations during the review period. Four of four, or 100 percent occurred within 72 hours.

Ten patients required routine psychiatry contacts during the review period. There were 43 expected timeframes during the review period. Of the 43 expected timeframes, 17 or 40 percent occurred as required by policy. Of concern, records for two patients revealed significant lapses between routine psychiatry contacts. In one case, the patient's electronic health record did not indicate a psychiatry contact for the entire months of November and December. This patient had two contacts during the month of January (one of which occurred cell front due to the inmate's refusal) and did not have another documented psychiatry contact for the months of February, March, or April 2021. The second patient did not have any documented psychiatry contacts for the months of November 2020, December 2020, March 2021, or April 2021.

Of the ten patients reviewed, four required initial primary clinician evaluations during the review period. Four of four, or 100 percent of initial primary clinician evaluations occurred within 72 hours.

Eight patients required routine (i.e. weekly) primary clinician contacts during the review period. There were 37 expected timeframes. Of the 37 expected timeframes, 25 or 68 percent occurred within seven days.

### Solo Treatment Activity/Solo Programming

Acute Care Program

Solo programming was eliminated at CMF-PIP prior to the preceding monitoring round and had been eliminated from the STEP process by the time of the site visit. The only exception was related to COVID-19 public health guidelines.

### Other Treatment Issues

#### Involuntary Medications

A total of 95 patients were on an active PC 2602 order during the review period of which 65 were acute care patients and 30 were intermediate care patients. CMF-PIP had one PC 2602 involuntary medications petition denied and one petition withdrawn. One PC 2602 order was not renewed by the treating psychiatrist.

#### Behavioral Management

The CMF-PIP provided specialized behavioral consultation and services through the Positive Behavior Support Team (PBST) for patients who engaged in a variety of disruptive or dangerous behavior that did not respond to conventional treatment interventions, or who refused (or were unable due to mental illness) to participate in recommended treatment. The PBST was a consultative service that conducted behavioral assessments and developed and implemented Positive Behavior Support (PBS) plans for PIP patients to assist the patient in learning and maintaining positive behaviors while replacing maladaptive behaviors. The PBST provided consultation to IDTTs, provided relevant staff trainings, and engaged in outcome evaluations.

Since the monitoring visit in December 2019, the CMF-PIP PBST experienced staffing changes. In December 2019, the PBST consisted of a staff psychologist, part-time social worker, and music therapist. The social worker was removed from PBST in January 2020 due to a primary clinician shortage and returned briefly to PBST in February 2020. In the first week of

March 2020, the PBST psychologist and social worker were reassigned as full-time unit primary clinicians due to staff shortages. Full PBST services were suspended at that time. The music therapist, under the supervision of the chief psychologist, continued individual contacts with existing PBST patients. During this period of PBST suspension, no formal PBS plans were written, however the music therapist provided individual contacts with new referrals as clinically indicated. While CMF-PIP characterized some of what the music therapist did during that time as behavioral consultation, that clinical activity was actually beyond the scope of the music therapist and should not have been considered as such.

In May 2020, a senior psychologist specialist was hired for PBST. Throughout the course of the COVID-19 pandemic, the senior psychologist specialist functioned in multiple additional roles including rounding of units, discharge reviews, and overall clinical consultation. PBST services were not fully reinstated until November 2020 and only consisted of the senior psychologist specialist and music therapist. PBST provided a variety of services including behavioral consultation and assisting clinicians in developing unit behavioral interventions or unit behavior plans. The PBST continued to complete functional behavior analysis and behavioral plans based on staff report, although the ability to complete those tasks would be drastically reduced due to staffing reductions.

Since reestablishing the PBST in November 2020, eight patients received PBST behavior plans or updated plans. Of the eight patients who received services by the PBST since November 2020, five had a previous plan or consult completed while only three were new to the PBST. It appeared that the PBST focused on existing patients with little room to take on new patients. This was not surprising in light of the limited PBST resources and personnel.

Finally, PBST plans were requested but the executive director of the CMF-PIP indicated that copies of plans could not be produced as in years past when PBST maintained copies of their plans in a binder for easy access.  However, the monitor's expert was told that PBST plans were located in the medical record.  Cases were selected for review where a plan had been indicated as entered in the chart with an associated date.  Those charts were reviewed starting with the indicated date range (plan completed date and plan entered in chart date).  No PBST plans could be located in those charts.  The review period was expanded, but still without success locating PBST plans in the selected charts.  Despite expanding the search timeframes, opening all documents regardless of their title, no PBST plans were located in the chart.  It should be noted that in only four cases, all of which had earlier plans, was an updated or new plan reportedly created.  It was unclear if CDCR had developed an "approved" Cerner form for PBST plans, but the assessment of the CMF-PIP would have been aided by the ability to review existing plans.  It did appear that the CMF-PIP had insufficient PBST resources despite ongoing demand for such services.

### Morning and End of Shift Meetings

Acute Care Program

Morning and afternoon end of shift meetings were observed in units Q-1, Q-3, P-1, P-2 and S-1.  All required participants were in attendance.  Nursing was the primary discipline providing information during the huddle.  The nurse provided attendees with relevant patient and unit updates.  Topics included behavioral changes, medication non-adherence, program refusals, new arrivals, discharges, and various medical and mental health concerns.  In general, the meetings were interactive or engaging.  However, the S-1 and P-1 meetings were characterized by all disciplines actively participating.  The quality of the meetings demonstrated significant

175

variability.  Most could significantly improve if the there was more participation by the various disciplines in attendance as occurred in the S-1 and P-1 meetings.

<u>Intermediate Care Program</u>

The monitor's expert observed one morning meeting in A-3 on May 26, 2021. Representatives from the various health care disciplines attended the meeting and discussed relevant unit and patient-related information, including behavioral and risk concerns, medication non-adherence, programming refusals, and medical and mental health needs.  During this meeting, the unit psychiatrist expressed concern and frustration that his patient's medication was changed from "crush and float" to whole pills, despite his documented warnings in the health care record; it appeared this patient subsequently decompensated based on their discussion.

**Treatment Space**

A monitor reviewed all spaces used for mental health treatment in the PIP.  All of the treatment spaces in O-Tower were adequate.  For the acute care program, treatment space was adequate in S-1.  Throughout the visit, the monitors noted issues with loud background noise in the P-1, P-2, S-2, Q-1, Q-2, and Q-3 day rooms and the Q-1 interview room.  Staff also needed to walk through the S-2 and Q-2 dayrooms to get to other areas, affecting the confidentiality of the space.  For the intermediate care program, treatment space was adequate in the HCITC, A-2 and A-3.  Confidentiality was an issue in the P-3 and L-1 dayrooms, since staff needed to walk through those rooms to get to other areas.  At the time of the site visit, A-2's music therapy room was being used to store music equipment and staff reported it was not being used for patient treatment.

**PATIENT ACCESS TO TREATMENT**

The System To Encourage Progress (STEP) level system was inconsistently implemented in both the acute and intermediate care programs. The LOP was provided with a revision date noted of March 17, 2021. The LOP indicated that there were two STEP levels in the acute care program and three STEP levels in the intermediate care program. While incentives in the acute care program were generally standardized by the LOP while allowing individualization, incentives for each STEP in the intermediate care program were to be determined by "each program." This appeared to reference housing units due to the differences in "physical plant and milieu." Despite this, examples of incentives were provided for each STEP level. The salience of the incentives seemed questionable (e.g., folders) but salience was expected to be determined on an individual level. The LOP could have provided more ideas for staff at each level to assist staff in identification of the most salient reinforcers.

In the acute care program, the majority of patients were at the highest STEP level, STEP 2. Seventeen patients were maintained at STEP 1 with 148 maintained at STEP 2. However, patients were disproportionately held at STEP 1 in the intermediate care program: 41 patients plus 30 patients in Admission and Quarantine compared to just 25 patients at STEP 2 and 20 patients at STEP 3. Even if excluding those on quarantine, the number of patients at the first STEP was double that at the other STEPs. It was clear that treatment teams were not routinely reviewing STEP levels or addressing progress through those levels as required by the LOP in either program (acute or intermediate). Observed IDTTs were not addressing STEP levels routinely and were not noting the patient's level or behaviors needed to progress. The STEP system was not addressed in accordance with policy during the observed IDTTs. Multiple treatment plans from the acute and intermediate care programs were reviewed and found to not

identify the patient's current STEP level, individualized incentives, individualized goals for progress through the STEPs, or any reference to the patient's STEP level at all.

Interviewed patients reported that they were unclear regarding the goals or incentives of the STEP program. When unit staff were queried, they were not equally familiar with the STEP policy, with some staff able to describe elements of the LOP while other staff admitted that they were unsure.

The first element to ensuring adequate implementation of the STEP LOP would be to re-train all staff and then audit IDTTs and treatment plans to ensure that the STEP level, individualized behavioral goals, and individualized incentives were addressed in accordance with the policy. It would be very beneficial for CMF-PIP to begin such a process for its acute and intermediate care programs.

## REFERRALS AND TRANSFERS

During the review period, 134 patients were referred to acute care and 79 patients were referred to intermediate care. CMF-PIP rejected one patient from acute care as clinically inappropriate, and rejected two patients from intermediate care as they were not appropriate for locked dorm setting. Fourteen referrals to CMF-PIP were rescinded during the review period; rescissions were not separated by acute or intermediate care.

No referral timeframes were met during the review period. It took an average of 14 days, with a range of zero to 113 days, from referral to endorsement for acute care patients. For intermediate care patients, it took an average of 24 days from referral to endorsement. CMF-PIP failed to meet the 24-hour and ten-day timeframes for acceptance once endorsed for acute and intermediate care, respectively. CMF-PIP reported that during the review period, multiple factors impeded their ability to meet acceptance timelines. Beginning in February 2021, Health

Care Placement Oversight Program (HCPOP) began endorsing patients to the level of care as opposed to a designated bed. During this process, CMF-PIP received numerous endorsements for single-cell intermediate care when there were no beds available. As a result, delays in acceptance for those patients occurred until a bed was available at their endorsed level of care.

Further, CMF-PIP staff reported that the inpatient referral unit (IRU) now prioritized which patients require a decision immediately and which patients CMF-PIP should prioritize for review at any given time. Additionally, during the review period, HCPOP sent endorsements in bulk at the beginning of the week (typically Mondays), sometimes ten or more endorsements in one day. Due to low staffing, CMF-PIP was unable to review and meet timeframe guidelines for this volume. CMF-PIP informed IRU of this problem. In addition, CMF-PIP required additional information for many referrals, including charts that required updating from the sending institution, patients with active medical holds that needed to be removed for acceptance and transport, patients on active quarantine at the time of endorsement, patients referred to locked dorm settings with CPAPs, patients pending off-site appointments or medical appointments prior to transfer, and patients on enhanced observation that could not be accommodated at the level of care endorsed to such as locked dorm intermediate care. Lastly, the CMF-PIP admissions and discharge unit (ADU) experienced staffing shortages during the reporting period due to COVID-19. In January 2021, ADU nursing staff was redirected to patient care.

On May 25, 2021, for the 177 acute care patients, acceptance took an average of six days with a range of zero to 43 days. For the 123 intermediate care patients, the average time for acceptance was 18 days, with a range of zero to 118 days.

As of May 21, 2021, 14 patients were endorsed and pending acceptance from CMF-PIP.

**ADMISSIONS AND DISCHARGES**

    1.      **Admissions**

During the review period, CMF-PIP reported 147 admissions to acute care and 75 admissions to intermediate care.  HCPOP referral and admission data revealed that 70 percent of acute care patient admissions took longer than ten days.  Acute care patients took an average of 23.45 days from IRU referral to admission with a range of 11 to 118 days.  The average for patients waiting over ten days was 31 days.  For intermediate care patients, 54 percent took longer than 30 days for admission after IRU referral with a range of 33 to 168 days.  The average for patients waiting over 30 days was 73.5 days.

Twenty patients (13 acute and seven intermediate) admitted to the CMF-PIP during the review period had complex medical needs.

As of May 21, 2021, there were ten patients (one acute and nine intermediate care) whose referrals were received from ADU/IRU, and CMF-PIP had made no decision.  The patient referred to acute care had been waiting eight days, and three patients referred to intermediate care over ten days.  For the acute care referral, additional information was needed from the referring institution; the patient was accepted and admitted on May 26, 2021.  For the intermediate care referrals, one delay was the result of a CPAP issue, and the patient needed re-endorsement to a single cell; one endorsement required more information from the referring institution SVSP, which had not replied as of May 28, 2021.  The third was a result of CMF-PIP delays, and the patient was accepted on May 28, 2021.

On May 21, 2021, there were no patients at CMF-PIP awaiting an internal transfer.

As of May 21, 2021, one acute care patient and two intermediate care patients were accepted to CMF-PIP but not yet admitted.  The acute care patient was accepted two days prior,

and the two intermediate care patients were accepted one day prior. All three patients were admitted by the end of the day on May 21, 2021. Reasons for delays were not provided.

Four patients were admitted to CMF-PIP from the California State Prison/Sacramento (CSP/Sac) Psychiatric Services Unit (PSU). None were within 21 days of discharge from the facility.

### Discharges

The average length of stay for patients in acute care during the review period was 258 days, and for patients at the intermediate level of care, the average length of stay was 288 days. CMF-PIP discharged 103 patients from acute care and 90 patients from intermediate care during the review period. For acute care patients, 79 percent were subjected to administrative delays after clinical discharge, ranging from one to 371 days, and 95 percent of intermediate care patients experienced administrative delays, with a range from one to 221 days. COVID-19 movement restrictions, testing requirements, and quarantines significantly impacted discharges. Additionally, a review of a random selection of cases revealed bed availability issues. However, while slightly increased, these numbers were similar to those during the preceding review period.

On May 28, 2021, eight acute care patients and four intermediate care patients were clinically discharged but remained at CMF-PIP. For acute care patients, four were awaiting transport since receipt of COVID testing results; two referrals were incomplete by CMF-PIP; one patient was waiting acceptance from L-1, and one referral was pending acceptance after receipt of further information. For the intermediate care patients, two were finishing quarantine, one was pending Polymerase Chain Reaction (PCR) COVID-19 test results, and one was accepted by CHCF on May 27, 2021 and was waiting for transport.

**LEAST RESTRICTIVE HOUSING**

On May 21, 2021, CMF-PIP had 63 patients housed above their LRH, 16 patients were housed in single cells, 32 were housed in locked dorms, and 15 were housed in multi-person cells. During the review period, an average of 21 patients eligible for unlocked dorm housing were housed out of their LRH. For patients eligible for locked dorm or multi-person cells during the review period, an average of 31 patients were housed out of their LRH.

The review process for patients housed outside their LRH included weekly audits utilizing instructions from IRU for all unlocked dorm eligible patients. Audits for patients who were either locked dorm or multi-person cell eligible were performed monthly. Supervisors audited to check for any concerns to alert appropriate staff and then provided the audits weekly to the Quality Management and Training staff who reviewed then provided the information to IRU every Thursday.

Staff reported that the IRU had been very responsive to lowering patients' LRH, and it was taking more than one week but less than one month at the time of the site visit. CMF-PIP reported that LRH was discussed during every ICC and UCC, and the monitor confirmed this through observation of committee meetings.

The monitor attended several ICC and UCC meetings during the site visit. The committees appeared motivated to remove MAX custody status for all patients reviewed. Once the committee decided on the patient's LRH, the patient had to wait for his next regularly scheduled IDTT for the team to determine if it was clinically appropriate to move to the lower status. There were no special IDTTs to facilitate a faster process. As previously reported above, IDTTs were not routinely discussing LRH; therefore, many patients could remain housed outside their LRH level longer than necessary.

Audits demonstrated continued issues regarding timely referrals of patients to their appropriate LRH level, which were, in part, related to quarantines and frequent changes in the mental health staff.

**PATIENT DISCIPLINARY PROCESS**

The institution reported a total of 118 custody staff members were required to attend mental health assessment training from 2020 through 2021.  Of this number, all five correctional administrators, all six captains and all 28 lieutenants attended the training, as did 75 of 77 sergeants, for 98 percent compliance.  With regards to mental health staff, the institution reported an overall compliance rate of 62 percent for mental health staff required to attend the training.

CMF-PIP reported 89 acute care RVRs and 147 intermediate care RVRs for a total of 236 RVRs during the reporting period.  RVRs were reviewed for timeliness of the request for and receipt of mental health assessments, the timeliness of the receipt of necessary documents by the patient for the hearing, and for timeliness of completion of the RVR hearings.  The review also considered the senior hearing officer's deference to the mental health assessment and any recommendations for mitigation.

A random selection of 19 RVRs were reviewed, 11 were issued to acute care patients and eight were issued to intermediate care patients.  Mental health assessments were requested 100 percent of the time and all mental health assessments were timely requested and timely received.

In seven of 19 cases, or 39 percent, deadlines were not met for timely completion of the RVR hearing.  Of the 19 mental health assessments completed, 13 or 68 percent were completed in a confidential setting.  A staff assistant was assigned in all RVRs reviewed.  In nine, or 47 percent of the RVRs reviewed, the clinician found that the patient's mental illness contributed to the behavior that led to the RVR and recommended the hearing officer consider mitigation of

penalties.  In one instance, the hearing officer found the patient to be not guilty and the RVR was dismissed, and in five other instances, for a total of 67 percent of the time, the hearing officer accepted the recommendations in the mental health assessment and mitigated the patients' penalties.

Specific concerns that came up during the review of the RVR process included the elimination of yard and dayroom for patients in the PIP as a penalty for an RVR.  As the pandemic had already severely limited the amount of out-of-cell time for patients in the PIP, the elimination of dayroom and yard in the penalty phase of the RVR served to remove the already very low out-of-cell time that had been preserved in the PIP, and in some instances leaving patients confined to their cells for nearly 24 hours a day.  In addition, three of the randomly selected RVRs reviewed were the result of patients "boarding up" or covering up with paper any easily accessible view into their cells.  The patients reported doing this in order to get the attention of a mental health provider or prescriptions they anticipated receiving but would not get to them or were late.  Often this process resulted in custody officers entering their cells to check on them, and patient RVRs often followed from the interaction.

## USE OF FORCE

Regarding use of force training, the institution provided the following data for the institution as a whole.  For custody staff 100 percent of warden, chief deputy warden, correctional administrators, captains, lieutenants, and sergeants attended the mandatory use of force training.  For correctional officers, 661 of 709 or 93 percent attended the required use of force training.  For mental health staff, the chief psychologist and chief of mental health attended the use of force training.  Five of the 12 supervising psychologists, supervising psychiatrists, and supervising social workers or 41 percent attended the use of force training.  For psychologists, 33

of 58 or 57 percent, five of 30 psychiatrists or 16 percent, zero of two psychiatric nurse practitioners, and nine of 21 social workers or 43 percent attended the required use of force training.

The institution reported a total of 57 use of force incidents during the reporting period. There was one controlled use of force incident and 56 immediate use of force incidents. The one controlled use of force incident was the result of a PC 2602 involuntary medications order. A copy of the controlled use of force incident package was not provided by the institution as it had not completed the executive review.

The monitor reviewed ten immediate use of force incident packets. Of the incident packages reviewed, three were due to the patient resisting staff during an escort, two due to a patient throwing an unknown liquid on staff, one was to comply with a PC 2604 court order for feeding, two were for an emergency cell entry to conduct a welfare check, and two were the result of staff assaults.

The monitor had concerns with two of the reviewed immediate use of force incidents that were classified as immediate use of force. The first incident involved the application of leg restraints and handcuffs on a Level II, medium custody patient in order to escort him to a PC 2604 court ordered feeding. A custody officer had applied leg restraints on the patient, then as they retrieved handcuffs from their duty belt, the patient stood up and stepped towards the custody officer. The custody officer ordered the patient to sit back down, to which the patient refused. The custody officer immediately used physical force and forced the patient onto the bed. The custody officer ordered the patient to place his hands behind his back, the patient complied, at which point the officer was able to apply handcuffs. The incident documentation did not explain why a Level II medium custody patient had to be restrained in order to escort him

to the court-ordered PC 2604 feeding.  If custody staff had a security concern which led them to believe the restraining of the patient was necessary, then the entire interaction with the patient should have been video recorded.  If there was no identifiable security concern, the restraining of a Level II medium custody patient was questionable.  The patient was not issued an RVR as a result of this incident.

The second incident stated the purpose of the cell entry was for the patient to receive their court ordered PC 2602 medication.  The incident package also stated that the patient's cell door window was covered.  A cell entry team was assembled, staff donned safety equipment and entered the cell.  Upon unlocking the cell door, the patient struck the shield with his fists and attempted to exit the cell.  Staff utilized physical force and three baton strikes in order to gain control of the patient.  Based on the stated reason for the cell entry, to enforce a court-ordered PC 2602 for medication the incident should have been video recorded.

The institution reported no change to the use of force policy since the previous monitoring visit.

As part of the use of force review the monitor identified 15 incidents where immediate force was used, and the patient received an RVR.  The monitor reviewed eight cases including the incident package and the relevant RVR.

Five of the incidents involved a patient covering their cell door windows and staff initiating an emergency welfare check cell entry, two incidents occurred after an officer unlocked the patient's cell door and the patient hit the officer's shield with their fists, and one incident occurred during escorts.  In none of the emergency welfare check cell entry incidents did staff utilize a video recording device, even though staff had time to assemble, obtain a shield, baton,

and restraints.  The monitor was informed by regional custody staff that video cameras were placed in housing units Q-3, P-3, I-3, M-3, the 64-bed unit and the MHCB on May 5, 2021.

## UNUSUAL OCCURRENCESS/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

The institution reported that they no longer used the Special Incident Reports (SIRs).

The log of serious incidents was maintained by the quality management team and reflected 318 reportable incidents during the review period.  Of the serious incidents reported, 205 or 65 percent related to reports of self-injurious behaviors, with the remainder related to a myriad of additional areas, including medical conditions, falls, and patient-on-patient assaults.

## USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

All but two CMF-PIP observation rooms were clean with available toilets.  Staff explained that the two observation rooms without toilets were not utilized.  Staff reported that they did not complete observation room logs.

During the review period, there were only two episodes of the use of restraints for mental health purposes that involved the same patient.  This patient was restrained for 3.5 hours during April 7, 2021 and for five hours during April 8, 2021.  All restraint-related procedures and orders were appropriately documented.

## EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

1. **Emergency Response**

During the CMF-PIP site visit, the monitor was unable to determine whether there was prompt, appropriate response to emergencies, or whether tracking logs were kept.  Although undocumented in the EMRRC minutes, the Quality Management Council minutes for March 29, 2021 and April 26, 2021 contained a list of the cases reviewed in the EMRRC, however the time period was unclear and both lists were identical, which raised the question of accuracy in the

documentation.  The monitor requested information on the cases reviewed by the EMRRC during the reporting period as well as any available logs and was told by PIP staff that CMF staff managed those committees and documents.

**Death Review Process**

The institution reported two deaths during the review period.  One was during November 2020 and the other during January 2021.  A root cause analysis was underway for the January death.

## QUALITY MANAGEMENT AND UTILIZATION REVIEW

The CMF-PIP had a quality management and training unit.  The unit was comprised of one Program Director (the position was vacant at the time of the site visit), one Training Officer II, two Training Officers I, and two Associate Governmental Program Analysts (AGPAs).  The unit worked in collaboration with CMF's mental health quality management unit, which was responsible for CMF L-1 and the outpatient quality management unit.  The CMF-PIP quality management and training unit worked with CMF mental health quality management and clinical supervisors "to cross-train, review, drill down, correct, and document relevant information pertaining to On Demand and internal performance indicators including CAPs."

The quality management and training unit participated in weekly quality management meetings with CMF outpatient programs, bi-weekly MHQM Support Webinars and EHRS ongoing training, monthly CAPs meetings, the monthly statewide quality management conference, monthly pre-quality management conference webinar, and monthly post-quality management webinar.

The program reported that all of the aforementioned meetings occurred at their respective intervals for the duration of the review period.  The program further reported that CMF-PIP was

fully integrated into the standing CMF committees including the mental health subcommittee, patient safety committee, emergency medical response and review committee and the quality management committee. CMF-PIP was integrated into all CMF health care trainings and adhered to all CCHCS trainings, policies, and schedules.

The CMF-PIP utilization management committee was suspended on March 28, 2020 due to the COVID-19 pandemic and redirection of supervisory resources. No CMF-PIP utilization management committee meetings were held during the review period. No EHR audits, patient reports or continued stay reviews were completed during the review period.

CMF-PIP did provide minutes from the CMF utilization management committee for review. Four meetings were held during the review period. PIP-related items included: an "open and ongoing" action item to "Focus on self-harm and foreign body objects. PIP to start using their new High Risk Program."

**PATIENT COMPLAINTS/PATIENT SATISFACTION**

Patients were interviewed both cell front and in small groups, regarding concerns about access to the library, laundry, property, yard, visitation, and dayroom. Interviewed acute and intermediate care patients were generally uninformed about how to access services available to them, such as the law library or how to locate property they reported to be missing. Patients expressed frustration with the lack of out-of-cell time provided to them.

Patient satisfaction surveys were not administered to patients at CMF-PIP. PIP leadership reported that staffing vacancies were directly linked to the inability to perform patient satisfaction surveys, and they would be able to resume them completing them once they had sufficient staff to do so.

Acute Care Patient Interviews

On May 25, 2021, the monitor's expert interviewed seven Unit Q-2 patients in a group setting and five Unit P-2 patients in a similar setting. These patients confirmed being offered two one-hour groups per week with several patients being offered three to four groups per week. Unit Q-2 patients reported being offered two hours per weekday of outdoor yard and recently being offered four hours of outdoor yard on Saturdays and Sundays. Unit P-2 patients reported being offered two hours per day of yard time on a daily basis. All the patients reported being offered one hour of dayroom time following dinner.

These patients all confirmed meeting with their primary clinician on a weekly basis and with their psychiatrist weekly as well. The duration of these meetings generally lasted about 15 minutes. One of the patients complained about very limited confidentiality due to these meetings occurring in the dayroom.

Many of these patients reported not being familiar with their treatment plans. Few of these patients expressed an understanding of the STEP process. The most common recommendation for program improvement was to increase the programming within the acute care program. Most of these patients reported that the group treatment was helpful.

## CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

The institution provided a copy of the LOP, which was consistent with the statewide requirements. CMF-PIP was not an identified pilot institution for the specialized bed consolidated care huddles.

The institution reported 12 staff complaints were filed during the review period, which include three PREA complaints. The issues raised in the complaints included denial of property, method of medication delivery, discrimination, unlicensed staff providing treatment, offered

contraband, and unknown.  Ten of the staff complaints had a response provided at the institution level of review and two were pending a response.  If the patients were not satisfied with the institution's response they were directed to send the complaint to the headquarters level of review.  The institution reported that no staff were reassigned to another post due to a staff complaint.

The monitor reviewed a total of 197 huddle reports which occurred on Second and Third Watch for housing units, A-2, A-3, HCTIC A/B, HCTIC C/D, P-1, P-2, P-3, Q-1, Q-2, Q-3, S-1, and S-2.  A total of 37 or 19 percent of the huddles reviewed had the required attendees including custody staff.

A report was provided on the number of custody staff institution-wide who attended the annual custody and mental health partnership training.  The report indicated seven administrators, six captains, 27 lieutenants, 72 sergeants and 609 officers attended the annual training.  The report also indicated five sergeants/lieutenants or CC IIs did not attend the training.  The report provided did not break out mental health staff by job classification and reported a total of 269 "PIP-CCHCS" staff attended the annual training and 27 PIP-CCHCS staff did not attend the annual training.  Due to the lack of details of which mental health job classifications attended the annual training, a determination of compliance could not be made by the monitor.  The institution reported they did not have any other collaborative training offered during the review period.

Regarding quarterly partnership training, the institution provided sign-in sheets for the fourth quarter of 2020, October through December 2020, and the first quarter of 2021 covering January through March 2021.  The staff required to attend the quarterly partnership training were the custody and mental health staff assigned to the mental health housing units.  CDCR was not

able to generate a list of those staff in order to determine compliance. Several sign-in sheets provided to the monitor did not have a date. The 2020 fourth quarter partnership training was a lesson plan titled, Boundaries and Confidentiality, and the 2021 first quarter lesson plan was titled, Mental Illness, Staff Perceptions, and Misrepresenting Symptoms.

### *COLEMAN* POSTINGS

The *Coleman* notice in English and Spanish was posted in prominent areas that were accessible to patients in all visited CMF-PIP units, including P-1, P-3, Q-1, Q-2, Q-3, S-1 and the HCITC.

### LAUNDRY AND SUPPLY ISSUES

Although the institution reported that it was addressing various problems with the laundry service, some of the issues identified during the December 2019 site visit persisted. Many patients and some staff continued to express concern with the CMF-PIP's ability to provide patients with sufficient and clean laundry. It was the responsibility of nursing staff to communicate with the laundry warehouse for clothing and linens. Mattress exchanges were the combined responsibility of nursing and environmental services.

The institution provided distinct types of laundry service for acute and intermediate care patients. The laundry service for acute care patients was through the closet program. This was a one-to-one laundry exchange that occurred when patients showered and exchanged their dirty blues, whites, and other clothing items for clean replacements. Their soiled clothing was then transported to CSP/Solano for laundering. Intermediate care patients placed their laundry in a mesh bag, which was also laundered at CSP/Solano. While being cleaned, the clothing of the intermediate care patients was not supposed to leave the mesh bag.

Many patients expressed frustration with the laundry system. They reported an insufficient amount of clothing and/or having clothes of the wrong size. Intermediate care patients also reported many instances when the laundered clothing returned to them in their mesh bags was not the same clothing they had sent out and/or of clothing being returned dirty. Some staff also reported that the laundry service remained broken, that there was insufficient clothing for all patients, and that they often provided patients with clothing of the wrong size. As a result, some patients washed their CDCR-issued clothes in their cells.

Licensing required laundry storage rooms in the acute care units to be equipped with a minimum of two additional sets of clothing for each patient. However, observation of some of these storage rooms revealed minimal additional clean clothing, which was especially pronounced for smaller clothing sizes; most available extra clothing was extra-large. An observed laundry storage room in the HCITC had an adequate amount of patient clothing.

The institution reported that it had established a workgroup to address problems with the laundry service. This workgroup had yet to produce written documentation or a report with findings.

Patients reported having sufficient supplies of soap, tooth powder and toilet paper. They complained about no longer being provided with deodorant. They expressed dissatisfaction with the effectiveness of provided shavers. Patients did not indicate problems with mattresses or with the mattress exchange program. Most reported having sufficient sheets and blankets.

## PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

Property distribution had significantly improved from the preceding monitoring visit, although one aspect of the distribution process remained problematic. CMF continued to have a list of patients whose property never arrived from a prior institution. In most instances, it was

necessary for the patient to file a property grievance in an effort to track down the missing property. During the reporting period, 132 property grievances were filed by patients and of those, 21 grievances filed by 16 different patients remained unresolved. All property provided to a PIP patient was approved by their IDTT or primary clinician before it was delivered to the patient. A document that identified the date, time and property delivered was signed by the patient upon receipt.

Quarterly packages were allowed consistent with custody level and privilege group. Some items patients were not allowed to have included razors, safety razors, shoelaces, chains and necklaces, except as approved for religious reasons, full-sized writing implements, and plastic tooth flossing implements.

CMF-PIP patients were receiving both visitation and telephone privileges. Access to visitation for PIP patients was determined by IDTT. In-person visitation had resumed in April 2021. Patients had access to both in-person and virtual visits. PIP patients were not allowed family visits and MAX custody patients were only allowed non-contact visitation. Virtual visits occurred on Saturdays, while in-person visits were held on Sundays. All visitation was arranged through the visitation services unit.

Telephone and canteen privileges were made available to PIP patients pursuant to their STEP level and IDTT approval. In some units, telephone logs were maintained that identified the time for patient calls. Calls were limited to 15 minutes. In the HCITC, patients complained that, at times, custody staff required them to end their calls early.

## LAW LIBRARY ACCESS

With the exception of A Tower, CMF-PIP patients were not allowed to go to the law library. For the most part, PIP patients' access to the law library was limited to their ability to

request materials through the library paging system.  Housing units A-3, P-1, and the HCITC

each had a law library kiosk available to them on the unit.  However, multiple patients

complained that it was difficult to request materials because they were unaware of the materials

that were available to them, received no assistance with the library kiosk and did not know how

to utilize them.  In addition, patients reported they were not familiar with the library paging

system.  More informed patients expressed the ability to obtain the assistance of the librarian by

completing a request for interview and the librarian would visit with them.

## HEAT PLAN

The heat plan was not in effect during the review period, but was in operation at the time

of the site visit.  The institution reported the activation of eight Stage I heat alerts during May

2021, which occurred between May 3 and 11 and May 30 – 31.  Review of the Daily Activity

Reports (DARs) reflected heat alert activation, but only one reviewed DAR reported the offering

of additional dayroom to patients due to the heat alert.  No patients experienced a heat-related

illness during any of the Stage I heat alerts in May 2021.

Custody officers, including interviewed officers on P-1, P-3, Q-1, Q-2, Q-3, S-1, and the

HCITC were typically knowledgeable of the heat plan.

Some observed housing units had the current, daily list of patients who were prescribed

heat sensitive medications.  In others, however, custody officers relied on a list that was up to

several weeks old.

The monitor's review of the logs indicated the recording of temperatures according to

policy.  All housing units had thermometers on the walls and hand-held thermometers that

permitted officers to record the temperature at any location within the unit.  However, some wall

thermometers were located extremely close to fans.  Custody officers were typically unable to

explain how the thermometers were calibrated and/or how they knew the thermometers were accurate.

CMF-PIP's yards were not covered, had minimal shade and lacked functioning mister systems. However, most observed housing unit officers supervising yard appeared to be observing patients for any potential signs of heat-related illnesses.

A review of the CMF Institutional Heat Protocols dated April 2021 indicated compliance with the CCHCS 2021 "Heat Plans and Updates" directive.

The institution reported that, except for eight custody officers who were either on long-term sick leave or worker's compensation, 100 percent of officers completed the heat-related pathologies on the job training for 2020.

## PRE-RELEASE PLANNING

CMF-PIP had 33 patients during the review period with release dates within 90 days. Fourteen were determined to be mentally disordered offender (MDO) positive and were transferred to DSH-Atascadero. The mental health pre-release coordinator started reviewing patients' records approximately six months prior to their scheduled release. She initially focused on patients with more significant mental health issues in case the patient's release date was moved forward.

She reported that she initially met with a patient between 30 and 45 days before their scheduled release date. Her efforts focused on attempting to make sure that, following release, the patient had identification, transportation, clothing, food, and housing, as well as addressing medication issues. Her data was reported in a well-organized spreadsheet. If the patient signed a release, she also made telephone calls on his behalf.

Her pre-release efforts also included assessing a patient's state of mind and whether he could function outside of the facility.  She thus reviewed the clinical team's pre-release patient assessment and tried to coordinate her pre-release efforts with the clinical team so that patients' re-entry plans were incorporated into treatment plans.

Although the Transitional Case Management Program (TCMP) was separate from her role, the pre-release coordinator also tracked patients' progress with the TCMP social workers assigned to the institution.  In this regard, her spreadsheet of patients' pre-release planning progress included information on the TCMP process, including applications and approvals for benefits such as Medi-Cal, and with the Veterans Administration and Social Security Administration.

There were no pre-release groups in the CMF-PIP during the review period due to COVID-19.

At the time of the site visit, there were 33 patients who were either released or within 90 days of release from the CMF-PIP.  The spreadsheet provided did not indicate whether the patients were at the acute or intermediate level of care.  However, all patients received pre-release planning or were committed as Mentally Disordered Offenders to the Department of State Hospitals (DSH).

**PROGRAM ACCESS**

Historically, PIP patients were not provided educational activities or classes.  However, within the two months previous to the site visit, Graduate Equivalency Diploma (GED) preparation self-study materials were offered cell-front to intermediate care patients who demonstrated an interest in participation.  At the time of the site visit, it was reported that two PIP patients were enrolled in GED preparation program, and one of the two patients successfully

took and passed the GED test during the site visit. The school principal expressed an interest in expanding educational services to PIP patients, however, reported that they did not have the staff to provide ongoing cell-front services in the PIP.

PIP patients did not hold any institutional or voluntary jobs as inpatients are not assigned pay numbers.

A report dated November 1, 2020 to April 30, 2021 indicated that for the average census of 130 acute patients in the PIP, 64, or 49 percent of them earned at least one milestone credit, and for the average census of 105 intermediate care patients in the program during the same period of time, 51, or 49 percent earned at least one milestone credit.

<u>APPENDIX A2</u>
California Medical Facility L1 Psychiatric Inpatient Program
(CMF L1-PIP)

**California Medical Facility L1 Psychiatric Inpatient Program**
**(CMF L1-PIP)**
May 24, 2021 – May 28, 2021

## I.    SUMMARY OF THE FINDINGS

- Significant staffing vacancies in psychiatry, psychology, social work, registered nurses, and psych techs were present in the CMF L1-PIP.

- IDTTs varied from minimally adequate to very concerning.

- IDTT decisions were routinely determined by individual members without collaborative discussions.

- IDTT's rationales for retaining patients out of LRH were vague and often based on arbitrary observation timeframes, instead of progress toward measurable objectives stemming from specific LRH barriers.

- During the review period, patients did not receive the appropriate out-of-cell and structured activity hours due to COVID-19-related restrictions, including an outbreak at the facility.

- Patients were generally satisfied with the quality of the groups offered.

- CMF L1-PIP admitted 25 patients during the review period; 54 patients were discharged.

- Seclusions and restraints were not utilized during the review period.

- Custody officers did not regularly attend second and third watch huddles.

- Custody officers were typically familiar with the heat plan.

- Education and job assignments were not offered to patients in CMF L1-PIP.

## CENSUS

On May 25, 2021, the CMF L1-PIP had a bed capacity of 66 beds, of which 31 beds or 47 percent were occupied. Five beds were filled by patients on quarantine. Two beds were held pending admissions. The remaining 33 beds were unassigned. No beds were redlined. The CMF L1-PIP did not contain flex beds and was not used for overflow housing.

It was reported that the census was low due to COVID-19.  From November 2020 through February 2021, there was no patient movement into or out of the unit.

## STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

At the time of the site visit, the program director position was vacant.  The program assistant position was also vacant, but covered by a recreation therapist acting out of class.

Chief Psychologist:  The chief psychologist position was filled.

Senior Psychiatrist:  The senior psychiatrist supervisor position was vacant.

Psychiatrists:  Two registry psychiatrists filled 2.5 full-time equivalent (FTE) positions, resulting in a 20percent functional vacancy rate.  In addition to duties in the CMF L-1 PIP, one psychiatrist had a 15-patient caseload, which included eight EOP patients, on G-wing; the other psychiatrist also had 36 patients on G-wing, including ten EOP patients.

Senior Psychologists/Senior Psychologist Specialist:  The 0.3 senior psychologist supervisor position was filled by a 1.0 civil service position, which also covered the 0.4 senior psychologist specialist position.

Psychologists:  Two of 2.5 psychologist positions were filled, for a 20percent vacancy rate.

Social Workers:  One of 2.5 established social worker positions was filled, for a 60percent vacancy rate.

Recreation Therapists:  Three recreation therapists filled 2.5 established positions, but one recreation therapist was acting out of class as the program assistant, resulting in a 20 percent vacancy rate for recreation therapy.

Senior Registered Nurses (SRNs):  All five SRN positions were filled.

Registered Nurses (RN):  Ten of 12 established RN positions were filled, for a 17percent vacancy rate.

Licensed Vocational Nurses (LVNs):  All six LVN positions were filled.

Senior Psych Techs:  All five senior psych tech positions were filled.

Psych Techs:  Of 23 psych tech positions, 20 were filled, leaving a 13percent vacancy rate.

All CMF L1-PIP staff were licensed.  None were "on loan" from other programs.

Telepsychiatry was not used during the review period or at the time of the site visit.

**Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

Based on the CMF L-1 PIP's census of 31 patients, the unit met the 1:30 staffing ratio for psychiatrists, psychologists and recreation therapists, but just missed it for social workers.

**Staff Training**

All six CMF L1-PIP mental health staff who were required to attend a one-time safety planning training attended it, reflecting 100percent compliance.  Five of six or 83 percent of the mental health staff who were required to complete the biennial suicide risk evaluation (SRE) seven-hour SRASHE core competency completed the training.  CMF L1-PIP mental health staff attended the four virtual seminar trainings during February and March 2021 that addressed treatment implementation collaboration.

**TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

1. **Interdisciplinary Treatment Teams (IDTTs)**

CMF L-1-PIP's IDTT data indicated that 51 of 56, or 91 percent, of IDTTs in L1 were timely completed during the review period.

The Special Master's expert observed five IDTTs during the site visit.

IDTTs occurred in the unit dayroom, which presented a number of distractions through large windows on both sides.  One set of windows offered visibility to high foot traffic in the unit hallway, while the other set of windows offered visibility to a "chow hall" used for dining and group treatment space.

All required IDTT members were present during onsite observation and utilized laptops to access relevant patient information.  The overall quality of observed IDTTs varied across clinicians and treatment teams, ranging from minimally adequate to very concerning.

While all IDTT members contributed information relative to their disciplines, treatment decisions were routinely determined by individual members without collaborative discussion. Critical treatment decisions, such as allowable items, STEP advancement, and LRH readiness, were routinely determined by only one IDTT member.  During the second day of IDTT observation, a recreation therapist participated via teleconference.  Although the staff member's shared input was valuable, she could not be seen and was unable to engage the patient and treatment team in an interactive discussion.

Although observed IDTTs consistently reviewed diagnoses, medications, treatment adherence, STEP levels, RVR histories, relevant historical data, medical concerns, allowable items, and LRH, there were notable shortcomings.  IDTT's rationales for retaining patients out of LRH were vague and often based on arbitrary observation timeframes, instead of progress toward measurable objectives stemming from specific LRH barriers.  For example, one patient was informed he would not be considered for unlocked dorm until after "a couple of months" of observation.  Another clinician informed the IDTT, prior to her patient entering the room, that her patient would be retained out of LRH solely for "time to adjust."  IDTTs also did not discuss patients' treatment goals in measurable terms.  For example, one clinician informed a low

203

functioning patient that the patient's "main goal" was achieving stabilization "through improved functioning." Except for medication and recreation activities, planned treatment interventions were not consistently discussed during IDTTs. Additionally, IDTTs failed to report on progress toward treatment and discharge objectives, barriers to treatment, and whether treatment modifications were indicated based on new symptoms or lack of progress.

The monitor's expert observed one genuinely concerning initial IDTT for a patient who arrived in the unit 24 hours prior. Neither the primary clinician nor the psychiatrist was familiar with the patient since they had not completed their initial assessments or a SRASHE prior to the IDTT. Although this patient endorsed current suicidal ideation during the meeting, the treatment team dismissed the patient to his cell and recommended full issue of allowable items without appropriate intervention or inquiry. The monitor's expert intervened to ensure the patient's safety; however, the primary clinician was resistant to feedback and argued she had "an idea" about the patient's suicide risk, despite her failure to assess the patient since his arrival. As there was no sense of urgency from the primary clinician, and the other IDTT members remained silent, the monitor's expert worked with CMF LI-PIP leadership to ensure the patient received an emergent suicide risk evaluation and further review of allowable items. The primary clinician involved in this incident also behaved inappropriately when another clinician discussed a patients' medical history with the patient in the room. In response to hearing the patient received treatment for an abscess on his buttocks, the clinician laughed audibly while saying, "Oh my God!"

Treatment planning documentation was inadequate in ten of ten healthcare records reviewed. Deficiencies were consistently identified in documentation of treatment and LRH obstacles, patients' response to treatment, clinical summary updates, treatment and discharge

goals, treatment interventions, and rationales for level of care and LRH decisions.  Of the ten patients reviewed, seven were out of their LRH.  However, consistent with the monitor's expert's onsite IDTT observations, clinicians primarily based LRH transfer decisions on vague goals and arbitrary time spent in the unit.  For example, primary clinicians documented statements such as, "If the patient programs well and has no issues for two to three months, he will be referred to locked dorm."  Documented level of care justifications was similarly vague or absent in reviewed healthcare records.  For example, clinicians routinely wrote statements such as their patient would "display behavior appropriate for a lower level of care."  The monitor's expert also found that, even when referring institutions listed clear and measurable treatment objectives in their intermediate care referral documentation, CMF L1-PIP treatment teams did not integrate these useful recommendations in their own treatment plans.

The healthcare records review also revealed effective communication was inconsistently documented for patients without an assigned physical or developmental disability code (i.e., DPH, DPV, DD1).  Documentation of effective communication varied by provider for the 40 percent of reviewed patients without disability codes; psychiatrists appeared to document effective communication in the body of their progress notes more often than primary clinicians.

Psychiatry, nursing, and counselors were consistent in their efforts to establish effective communication during observed IDTTs; whereas only one of three primary clinicians ensured effective communication was achieved.  Additionally, one of the three primary clinicians repeatedly used clinical jargon when interacting with patients during IDTTs.

**Group Therapy**

Although data pertaining to structured and unstructured activity hours was unreliable, the data consistently showed that patients did not receive the appropriate out-of-cell and structured

activity hours.  Out-of-cell structured and unstructured activity hours were inadequate throughout the current review period due to COVID-19-related restrictions, including an outbreak at the facility.

Data was unreliable due to unexplained discrepancies between data sets submitted in monthly Executive Summary Reports and CMF L1-PIP's Daily Wing Activity Reports.  CMF L1-PIP leadership were unable to explain some of the discrepancies in the reviewed data sets.

Regarding daily out-of-cell time, Daily Wing Activity Reports noted a decline in out-of-cell time offered in March and April 2021, while monthly Executive Summary Reports showed an increase in the out-of-cell time offered.  Notwithstanding inconsistencies, both reports showed that during the review period patients were only offered at least ten out-of-cell hour in November 2020.  The April 2021 Executive Summary Report also showed that patients were offered at least ten out of cell hours.

**CMF L1 PIP Average Daily Out-Of-Cell Hours Reported in Daily Wing Activity Reports**

|          | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|----------|--------|--------|--------|--------|--------|--------|
| Offered  | 10.31  | 5.57   | 2.63   | 8.54   | 6.57   | 7.61   |
| Attended | 4.75   | 3.26   | 2.28   | 2.98   | 2.94   | 2.38   |
| Refused  | 5.57   | 2.31   | .35    | 5.56   | 3.64   | 5.23   |

**CMF L1-PIP Average Daily Out-Of-Cell Hours Reported in Executive Summary Reports**

|          | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 |
|----------|--------|--------|--------|--------|--------|--------|
| Offered[1] | 10.46  | 5.22   | 3      | 8.99   | 9.9    | 10     |

During onsite monitoring, patients were routinely scheduled for a minimum of 14 hours of weekly group treatment after completing quarantine and orientation.  During May 2021, individual patients were offered between nine and 17 hours of weekly structured treatment.  At

---

[1] Hours attended and refused were not consistently provided in CDCR's Executive Summaries.

the time of the site visit, the CMF L1-PIP offered five one-hour nursing led RAC groups, eight recreation therapy groups, ten yard groups, and nine clinician-led treatment groups per week.

Group treatment was primarily offered in O-Wing for non-quarantined patients. While the space was generally adequate, patients were required to travel a moderate distance from the housing unit and sounds from neighboring group rooms were moderately distracting.

Overall, interviewed patients were generally satisfied with the quality of the groups offered. The monitor's expert's observations of an RT, clinician, and psych tech-led group generally confirmed patient's satisfaction. The recreation therapy group focused on mindfulness and relaxation exercises. All patients were engaged throughout the session, and the overall quality of the group was adequate. The monitor's expert attempted to observe a case management group; however, the assigned clinician was on vacation and the covering recreation therapist showed a movie.

The clinician-led group was entitled "Awareness Therapy." The facilitator appeared to have a thoughtful and organized curriculum, but it was inappropriate for most of the group members. Group discussion and interaction did not occur. The facilitator utilized a word-seek puzzle and handout exercises to facilitate a discussion of personal strengths; he also used a Likert Scale to facilitate a discussion on the meaning of life. The test administration instructions were confusing for three of the group members along with the scoring system and the interpretation of their scores. The facilitator also persistently worked individually with these three group members; however, they were unable to understand the purpose of the exercise. Despite their difficulties, the five group members stayed for the entire group.

Two psych techs co-facilitated a group entitled "Substance Abuse." The five attendees were interested in the topic, asked a lot of questions, and stayed for the entire group. The quality of this group was adequate.

CMF L1-PIP reportedly did not have a need for foreign language groups during the review period, although some in-cell clinical packets were translated in preparation for foreign language speaking patients.

Treatment groups and yard were not offered to quarantined patients.

**Individual Treatment**

The monitor's expert review of ten healthcare records revealed primary clinicians and psychiatrists routinely failed to complete initial assessments prior to initial IDTTs. Prior to initial IDTTs, none of the ten reviewed patients received their initial primary clinician assessments, while 90 percent had not received their initial psychiatric assessments. The percentage for non-compliant initial psychiatric assessments may have been higher; however, it was difficult to determine whether one initial psychiatric assessment was completed before or after IDTT as the documentation was entered in the electronic record one day after the meeting was held.

Quarantined patients confirmed weekly primary clinician and psychiatry contacts were offered in the dayroom. Recreation therapists distributed and collected in-cell leisure materials and clinical packets to quarantined patients daily. Clinical assignments reportedly consisted of clinically based worksheets that addressed "anxiety, depression, isolation, coping, mindfulness, journaling, and cognitive behavior therapy strategies." According to CMF L1-PIP leadership, recreation therapists and primary clinicians ensured patients sufficiently understood each clinical

assignment and helped with assignment completion as needed.  Each completed clinical packet as one-hour of structured treatment and tracked completed assignments for milestone credits.

### Solo Treatment Activity/Solo Programming

Although CMF L1-PIP phased out solo programming, CMF reported that in accordance with public health guidelines "when a patient or unit is placed on quarantine due to COVID-19 or other illness, programming must be conducted solo and therefore patients identified on the shift report as quarantined are offered solo programming."

### Psychiatric Services

During patient interviews, non-quarantined CMP L1-PIP patients reported weekly contacts with their assigned psychiatrist in a confidential setting.  Quarantined patients confirmed psychiatry contacts were offered weekly in the dayroom.  All interviewed CMF L1-PIP patients reported that psychiatrists answered their medication questions and responded to verbal or written requests in a timely manner.

### Other Treatment Issues

#### A.     Involuntary Medications (PC 2602)

During the review period, there were 12 patients on an active PC 2602 involuntary medication order.

#### Behavioral Management

PBST was not utilized during the review period.  There were no PBST referrals or plans developed or implemented during this timeframe.

#### Morning and End of Shift Meetings

One end of shift meeting was observed during the site visit.  The meeting was chaired by nursing.  Representatives from the various disciplines attended and shared relevant unit, staff,

and patient updates.  Behavioral, medication, and treatment non-compliance concerns were also discussed during the meeting.  Overall, the interdisciplinary meeting was sufficiently collaborative and meaningful.

## PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

Discretionary Program Status (DPS) had not been utilized since August 2018.  During the review period, 66 patients were in the STEP program.  At the time of the site visit, all current patients, including those on quarantine, were in the STEP program.  CMF L1-PIP did not provide sufficient information to determine how much time patients spent at each STEP.

CMF L1-PIP reported that the STEP program was fully implemented in accordance with the March 17, 2021 STEP policy revision.  Patients' STEP levels were consistently discussed during IDTTs.  Recreation therapy materials were distributed during IDTTs based on STEP progression.  However, as mentioned above, STEP levels were determined by one IDTT member without a collaborative team discussion.  Although treatment teams routinely referenced STEP program incentives, several patients indicated they did not understand expectations for advancing to the next STEP level.

STEP program incentives included recreation therapy supplies, hand crank radios, and televisions.  However, implementation of the STEP program resulted in quarantined patients being denied hand crank radios during their quarantine and orientation period.  This practice was concerning given the limited programming available to quarantined patients and considering many intermediate care facility (ICF) level of care patients relied on music to cope with psychiatric symptoms.

The monitor's expert found that improvements were needed in the implementation of the STEP incentive program. Specifically, patients should be fully informed and reminded of expectations for advancement; STEP progression and obstacles should be routinely reviewed during IDTTs and integrated into treatment plans; incentives should be expanded and more patient specific; and STEP level advancement should be determined by the entire treatment team. CMF L1-PIP should also consider offering entertainment devices to quarantined patients when safe to do so, given the limited out-of-cell programming offered to these new arrivals.

## REFERRALS AND TRANSFERS

Sixty patients were referred for admission to CMF-PIP L-1 during the review period. Twenty one patients were rejected, 14 referrals were rescinded and 25 patients were transferred.

## ADMISSIONS AND DISCHARGES

1. **Admissions**

There were 25 patients admitted to the CMF L1-PIP during the review period; the average length of patients' stay was 167 days. The median length of stay was 94 days; stays ranged from 0.8 to 206 days.

At the time of the site visit, the average length of stay was 47 days, with a median length of stay of 41 days; stays ranged from two to 215 days.

**Discharges**

There were 54 patients discharged during the review period. The institution did not provide information as to the discharge level of care or transfer location. The range of days between date of clinical discharge and date of physical discharge was one to 120 days. For November and December 2020, and January 2021, the delay in physical discharge averaged 50

days. For February and March 2021, the average delay was seventeen days. The delays in transfers were attributed to COVID-19.

## PATIENT DISCIPLINARY PROCESS

Although, RVRs in CMF's PIP and L1 were discussed in the CMF-PIP report, there was one troubling RVR in the CMF L1-PIP that the monitor reviewed for this report. The RVR was referred to mental health and the mental health assessment was completed and returned to custody staff within policy timelines. The patient was assigned a staff assistant as required by policy. The circumstances of the RVR were the patient had covered his cell door windows and was yelling that he was going to kill himself. Staff assembled an emergency cell entry team, and entered the cell, at which time the patient struck the officer's shield. Custody staff utilized physical force to restrain the patient. The patient was evaluated by medical staff and cleared to be rehoused in L1. The mental health assessment for this RVR indicated the patient's mental illness "strongly influenced" the behavior and clinical staff recommended the RVR be documented in an alternative manner. The MHA also recommended the patient retain phone privileges and access to yard and dayroom. The mental health assessment was thorough, used layperson terms, and articulated the reasons why the RVR should be documented in an alternative manner.

The documentation provided did not include a captain's review, which was required based on the clinician's recommendation, nor did the senior hearing officer address this error. The senior hearing officer found the patient guilty, and stated in their consideration of the mental health assessment documentation and recommendation, that "during the disciplinary hearing that the subject did not exhibit any evidence of impairment in his ability to effectively present his position, as evidenced by his participation in the hearing process and his answering and asking

questions appropriately. During the hearing, the subject appeared coherent and was able to respond to specific details regarding the alleged offense." The senior hearing officer's documented consideration did not address that the patient's mental illness at the time of the offense "strongly influenced" the behavior, or the mental health assessment's recommendation to document the RVR in an alternative manner. The senior hearing officer elected to apply the assessment of the patient at the time of the hearing rather than the clinician's finding and found the patient guilty and assessed 150 days loss of credit and 90 days loss of phone privileges. The 90-day loss of phone privileges was not consistent with the recommendation made by the clinician on the mental health assessment. The chief disciplinary officer did not correct the senior hearing officer's errors and affirmed the hearing results.

## USE OF FORCE

The institution provided a report of all use of force for Facility A which included use of force incidents for CMF L1-PIP. One incident of immediate use of force was reviewed involving a CMF L1-PIP patient. This incident was discussed in the patient disciplinary process section. The incident package stated the patient would be issued an RVR for battery on a peace officer and be referred to the district attorney for possible prosecution. The immediate use of force incident package was not consistent with the RVR issued to the patient because of this use of force. The RVR stated the patient was yelling that he was going to kill himself, which was not included in the use of force incident package.

## UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

The institution reported they no longer use the unusual occurrence report. Any incident was reported on a CDCR 837 Incident Report.

## USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

CMF L1-PIP unit did not utilize seclusion or restraints during the review period.

## PATIENT COMPLAINTS/PATIENT SATISFACTION

CMF L1-PIP did not complete patient satisfaction surveys due to staffing.  During interviews, patients reported that there were several groups and the treatment provided was generally good.  They also reported that there was frequent daily access to yard and dayroom.

Patients also voiced several complaints.  For instance, they were unable to obtain a radio or television until they were removed from quarantine status.  Patients reported being forced to accept a cellmate without being provided time to locate a compatible cellmate.

## CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

Executive joint rounding occurred in CMF L1-PIP once during the review period; no issues were noted.

Huddles were occurring on second and third watch; however, custody was present for only two of 16 huddle forms reviewed or 12 percent of the time.

A third watch staff huddle was observed on May 24, 2021.  All staff disciplines were represented including custody, nursing, psychology, social work, and psychiatry.  The huddle was facilitated by a nurse.  The huddle included discussions regarding new arrivals, patients pending medical appointments, recent transfers out of CMF L1-PIP, medication expiration, transfers pending, completed IDTTs, and patients on quarantine status.  The correctional officer asked about a patient who was screaming in the unit on a regular basis.  The officer asked for recommendations on how to address the behavior.  The clinical staff were aware of the patient's behavior and provided recommendations.

***COLEMAN* POSTINGS**

The current *Coleman* notice was posted in English and in Spanish.

**LAUNDRY AND SUPPLY ISSUES**

While some patients reported no issues with laundry service, others expressed challenges consistent with the previous monitoring round. Patients' complaints included not receiving their laundry back and/or laundry being returned dirty. As a result, some CMF L1-PIP patients washed their own clothes. They further reported always washing their personal non-CDCR issued clothes because they would be stolen if they were sent out for laundering. One patient reported not having a mesh bag to have his clothes laundered. Otherwise, patients reported having adequate blues and whites and receiving three weekly showers.

**PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS**

Patients complained that there was lack of privacy on phone calls as the telephone was located near the unit's exit. Interviewed CMF L1-PIP patients reported that telephone calls were offered once per day for 15 minutes.

**LAW LIBRARY ACCESS**

The patients reported the law library Kiosk did not work. Patients were permitted to request materials through the library paging system.

**HEAT PLAN**

Custody officers were typically familiar with the heat plan and its specific requirements at each stage. The unit contained the daily current list of patients who were prescribed heat sensitive medications. Although custody officers reported that patients were provided with accommodations when yard was cancelled or shortened due to a heat activation, they were unable to provide written documentation of such accommodations.

All officers completed the heat related pathologies on the job training for 2020.

## PRE-RELEASE PLANNING

There were no CMF L1-PIP patients within 90 days of their release date during the review period.

## PROGRAM ACCESS

Patients reported there were no education or job assignments for patients in the CMF L1-PIP.

## ISSUES/CONCERNS REGARDING DOCUMENT PRODUCTION

Similar to previous monitoring rounds, CMF was unable to separate CMF L1-PIP data from the larger PIP. These areas were discussed within the larger CMF-PIP report. To the extent that information specific to CMF L1-PIP was gleaned from patient and staff interviews, it was placed within this report.

<u>APPENDIX A3</u>
California Health Care Facility Psychiatric Inpatient Program
(CHCF-PIP)

**California Health Care Facility Psychiatric Inpatient Program
(CHCF-PIP)**
July 19, 2021 – July 23, 2021

Since opening in 2013, CHCF-PIP has been unable to fill the necessary staff positions to effectively meet the needs of *Coleman* class members. Over the past eight years, interventions by CDCR's Mental Health Headquarters and regional administrators have not been sustainable, in part due to staffing vacancies and high turnover rates. At the time of this monitoring visit, the CHCF-PIP had reached a state of emergency due to their staffing vacancies. As a result, PIP continued to fail to adequately meet the needs of *Coleman* class members.

CHCF-PIP leadership was aware of the various program deficiencies. During this site visit, CHCF-PIP leadership indicated the facility had developed a "bad reputation" that was negatively impacting recruitment of qualified staff, increasing staff burnout and heightened the risks of negative patient outcomes. Recognizing the dire situation, CHCF-PIP's leadership and regional team requested the Special Master support closure of units within the PIP to prevent further staff burnout and reduce the likelihood of negative patient outcomes. Due to staffing shortages, on September 28, 2021, CDCR closed the CHCF-PIP to admissions, which suspension was lifted on January 28, 2022.

Unfortunately, however, CHCF-PIP did not have a clear long-term plan to resolve the very serious concerns discussed in detail below that directly negatively affected patient care.

I.    **SUMMARY OF THE FINDINGS**

- On July 23, 2021, ten of the 15 CHCF-PIP units were on confined to quarters (CTQ) status, thus limiting access to patients during the site visit.

- CHCF-PIP's critically low staffing levels had a significant impact on mental health care throughout the review period and at the time of the site visit.

- All staffing positions including supervisory staff and line staff had substantial vacancies which affected staffing ratios and resulted in inadequate patient care.

- Although CHCF-PIP did not have established telepsychiatry positions, telepsychiatry was utilized during December 2020 and January 2021 due to critical staffing shortages.

- Psychiatrists reported limited treatment available to patients beyond psychotropic medications and recreation therapy.

- IDTTs conducted in acute and intermediate care were deficient and needed substantial improvements.

- Acute and intermediate care patients were offered less than four hours of weekly mental health treatment during the review period; the vast majority of treatment offered was recreation groups.

- Fifty-two percent of group treatment in the acute and intermediate care programs was canceled and access to groups was limited for newly admitted patients.

- Starting in March 2021, CHCF-PIP offered Nursing Led Therapeutic Groups (NLTGs); however, 50 percent of NLTGs were canceled during the review period.

- CHCF-PIP management staff indicated that they received approval from state licensing allowing for weekly psychiatry contacts instead of the previously required 72- hour psychiatry contacts during the review period.

- In acute care, treatment provided by primary clinicians was inadequate and not consistent with treatment plan documentation; psychiatry contacts were limited to ten to 20 minutes.

- The acute care program lacked sufficient confidential treatment space for individual contacts.

- In intermediate care, treatment was well below what is required for CDCR's lower acuity enhanced outpatient program (EOP) level of care and was limited to medication management and brief check-ins.

- CHCF-PIP's Positive Behavioral Support Team (PBST) unit was dismantled and reduced to one senior psychologist specialist.

- Treatment for MAX custody patients at CHCF-PIP was in a state of crisis at the time of the site visit as they received little to no clinical treatment.

- CHCF-PIP did not have a local operating procedure to support the use of the 18 MHCBs in unit A2B as acute care beds.

219

- Continuity of care among psychiatrists and psychologists in A2B was a significant problem and training was not provided to mental health or nursing staff prior to the change from MHCB to acute care beds.

- Patients housed on A2B were seen every one to two days by psychiatry and weekly by a psychologist.

- Clinical and nursing groups were not offered to acute care patients in A2B during the review period or at the time of the visit, IDTTs in the unit were inadequate, the quality of individual treatment planning and individual treatment sessions for A2B patients varied from adequate to cursory, and out-of-cell time for acute care patients in A2B was limited to yard, phone, and recreation therapy.

- The STEP program at CHCF-PIP was inconsistently implemented STEP levels were rarely discussed in observed IDTTs and reviewed treatment plans.

- STEP level was rarely discussed in the observed IDTTs and reviewed treatment plans.

- CHCF-PIP did not provide referral data in a format amenable to calculating the total number of referrals endorsed specifically to CHCF-PIP during the review period.

- Exceptions and reasons for delays in admissions to the CHCF-PIP were not provided other than COVID-19 movement restrictions.

- On July 19, 2021, 129 patients were housed above their least restrictive housing (LRH) at CHCF-PIP; LRH was not reviewed during observed IDTTs.

- CHCF-PIP had an adequate quality management program.

- CHCF-PIP was not compliant with the majority of the CMHPP requirements.

- Due to critically low staffing, CHCF-PIP did not assign a full-time pre-release coordinator during the review period.

- The pre-release planning group was disbanded due to COVID-19 related restrictions; there were no pre-release groups offered during the site visit.

## **CENSUS**

On July 19, 2021, CHCF-PIP operated 514 beds, 20 fewer beds than during the Twenty-Eighth Monitoring round. There were 184 acute care beds and 330 intermediate care beds.

Of the 184 acute care beds, 160 or 87 percent were filled. The 24 unoccupied acute care beds included one that was redlined, one assigned to a patient who was out to the community hospital, three reserved for accepted patients pending admission, and six vacant isolation room beds.

Of the 330 intermediate care beds, 312 or 95 percent were filled. The 18 unoccupied beds included one for a patient out to the community hospital, seven reserved for accepted patients pending admission, and nine vacant isolation room beds. No beds were redlined.

Forty-four acute care patients and 64 intermediate care patients were on maximum (MAX) custody status. CHCF-PIP designated two units that exclusively housed acute and intermediate care maximum custody patients. However, because these units were full, many MAX custody patients were housed in other units. On July 19, 2021, 19 of 44 or 43 percent of acute care patients on MAX custody status were housed in non-MAX custody acute care units. Similarly, 39 of the 64 or 61 percent of MAX custody intermediate care patients were housed in other intermediate care units.

There were 18 isolation room beds, of which seven were for acute care patients, and 11 were for intermediate care patients. Isolation room beds were used for patients with certain active health symptoms, such as COVID-19 and tuberculosis. At the time of the site visit, one of the acute care isolation room beds and two of the intermediate care isolation room beds were filled.

CHCF-PIP flexed 25 acute care beds to treat intermediate care patients during the review period due to patient medical acuity or COVID-19 preventing patient movement. On July 19, 2021, 16 beds remained flexed and were occupied by intermediate care patients. Once vacated,

four beds would convert back to acute care beds; however, pursuant to a headquarters directive, the remaining 12 beds would remain flex beds.

In April 2021, CHCF-PIP converted 18 MHCBs in housing unit A2B to acute care inpatient beds. At the time of the site visit, all 18 beds were filled; seven patients were receiving treatment at the acute level of care, three had been discharged to the EOP level of care, and eight had been discharged to the intermediate level of care. Discharged patients were awaiting transfer. Six of the 18 patients on A2B were on MAX status.

## STAFFING

CHCF-PIP experienced significant staffing shortages during the review period and at the time of the site visit, which severely impacted the inpatient care provided in both the acute and intermediate settings. CHCF-PIP leadership reported a myriad of reasons for the staffing vacancies. The most notable was the staff's perception that, during the COVID-19 pandemic, the institution had become increasingly punitive and safer, higher-paying job opportunities were available outside of CDCR.

CHCF-PIP recruitment efforts throughout the review period were largely unsuccessful.

1.  **Administrative, Clinical, and Correctional Staffing**

A senior psychologist supervisor filled the executive director position, and the chief of social work filled the clinical administrator position; both were filled out of class. The chief psychiatrist filled the medical director position. The executive director, clinical administrator, and medical director composed the CHCF-PIP's executive team.

Positions for the chief psychiatrist and chief of social work were functionally vacant because staff for these two positions were acting in other capacities, as noted above. The chief psychologist position was filled.

Four of five program director positions were filled by staff acting out of class, namely, a senior psychiatric social worker, senior recreation therapist, unit supervisor, and program assistant. Two of three program assistant positions were filled; one of the positions was filled out of class by a unit supervisor.

Senior Psychiatrists: Both positions for senior supervising psychiatrists were vacant.

Psychiatrists: Nineteen of 33 psychiatry positions were filled for a 42 percent vacancy rate. Four contractors reduced the functional vacancy rate to 30 percent.

Senior Psychologists: One of two senior psychologist supervisor positions was filled out of class by a staff psychologist; one of two senior psychologist specialist positions was filled out of class by a staff psychologist.

Psychologists: Four of 29 psychology positions were filled for an 86 percent vacancy rate. Nine contractors reduced the functional vacancy rate to 55 percent. Two civil servant psychologists were unlicensed.

Supervising Psychiatric Social Workers: Both supervising psychiatric social worker positions were filled; one was filled out of class by staff on loan from Mule Creek State Prison (MCSP).

Social Workers: Eleven of 32.7 social worker positions were filled for a 66 percent vacancy rate. Two contractors reduced the functional vacancy rate to 60 percent. Two civil servant social workers were unlicensed.

Senior Recreation Therapists: Two of three senior recreation therapist positions were filled out of class by one recreation therapist and another on loan from CHCF.

Recreation Therapists: Fifteen of 32 recreation therapist positions were filled, for a 53 percent vacancy rate. Five contractors reduced the functional vacancy rate to 38 percent.

Nursing Coordinators:  Four of five nursing coordinator positions were filled; one was filled out of class by a unit supervisor, while two others were filled out of class by registered nurses on loan from CHCF.

Supervising Registered Nurses (SRNs):  Twelve of 23 supervising registered nurse positions were filled for a 48 percent vacancy rate.  Three limited-term SRN IIs and two registered nurses acting out of class reduced the functional vacancy rate to 26 percent.

Registered Nurses (RNs):  Of 174 positions, 149 were filled for a 14 percent vacancy rate.  Five limited-term registered nurses reduced the functional vacancy rate to 11 percent.

Certified Nursing Assistants (CNAs):  CHCF-PIP did not have any CNA positions, but 52 CNA contractors worked at the institution.

Licensed Vocational Nurses (LVNs):  CHCF-PIP did not have any LVN positions but had three LVN contractors.

Senior Psych Techs:  Twenty-six of 30 established senior psych tech positions were filled for a 13 percent vacancy rate.

Psych Techs:  Of 350 psych tech positions, 269 were filled for a 23 percent vacancy rate.

Unit Supervisors:  Eleven of 18 positions for unit supervisors were filled, for a vacancy rate of 39 percent.  Two out of class senior psych techs reduced the functional vacancy rate to 28 percent.

Associated Government Program Analyst (AGPA):  Ten of 13 AGPA positions were filled for a vacancy rate of 23 percent.

Health Services Specialists:  One of two health services specialist positions was filled.

Correctional Staff:  Positions for the warden, the chief deputy warden, correctional administrator, and the captain were filled.  Four lieutenant positions and 12 sergeant positions were filled.  Civil servant employees filled all 164 correctional officer positions.

CHCF-PIP reported that no staff had dual appointments.

Telepsychiatry:  Telepsychiatry was not an established position at CHCF-PIP.  However, due to staffing shortages, CHCF-PIP utilized telepsychiatry during December 2020 and January 2021 for IDTTs and individual clinical contacts.  Telepsychiatrists were teamed with an on-site CNA to assist with the process.  CHCF did not use telepsychiatry for the Psychiatrist on Duty.

For IDTTs, CHCF-PIP utilized telepsychiatry 56 times in December 2020 and January 2021.  The institution did not distinguish whether they were for acute care patients or intermediate care patients.

Additionally, during December 2020 and January 2021, telepsychiatry provided 370 individual clinical contacts, predominantly for intermediate care patients.  There were 423 telepsychiatry appointments for intermediate care patients, of which 367 were completed, 39 were canceled, and patients refused 17.  There were also five telepsychiatry appointments scheduled for acute care patients; three were completed, one was canceled, and one was refused.

CHCF-PIP reported that telepsychiatry was not used for more than 30 consecutive days during the reporting period.  CHCF-PIP did not use telepsychiatry at the time of the site visit.

**Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

On July 19, 2021, four of the five acute care units met the 1:15 staffing ratio for psychiatrists.  None of the acute care units met the ratio for psychology based on the current census and bed capacity.  For social work, two of five acute care units met the staffing ratio based on the current census, but only one of five met it based on bed capacity.  For recreation

therapy, four of five acute care units met the ratio based on the current census, but only three of five met it based on bed capacity. For the acute care MAX custody unit, psychiatry met the staffing ratio based on the current census or bed capacity, though psychology, social work, and recreation therapy did not.

CHCF-PIP met the 1:30 staffing ratio for psychiatry and recreation therapy in all ten intermediate care units based on current census or bed capacity. Six of the ten intermediate care units met the ratio based on the census or bed capacity for psychology. Four of ten intermediate care units met the ratio based on the census or bed capacity for social work. In the intermediate care MAX custody unit, psychiatry, psychology, and recreation therapy met the required ratio based on the reported census or bed capacity, but social work did not.

### Staff Training

CHCF-PIP was unable to provide training data specific to the PIP versus the entire CHCF institution. In 2020, annual block training was completed by 1,566 of 2,256 or 69 percent of all staff. Forty-one PIP staff completed new employee orientation (NEO) during the reporting period. One of 93 mental health clinicians or one percent and seven of 587 or 1.2 percent of nursing staff were compliant with completion of heat plan training.

Provided data for Inmate Disciplinary Process Mental Health Assessment training revealed nine of 81 or 11 percent of mental health clinicians and 56 of 481 or 12 percent of mental health nursing staff completed the training. Data relative to completion by custody personnel was not provided.

### TREATMENT, CLINICAL SERVICES AND PROGRAMMING

During the site visit, the monitor and monitor's expert had limited access to patients due to a significant number of units on CTQ status. The CTQ status was due to exposure to unit staff

who received positive COVID-19 test results.  On July 23, 2021, ten of the 15 CHCF-PIP units were on CTQ status.

Acute Care Program

In the CHCF-PIP acute care program, units A2A, B1A, B1B, B2A, B2B housed non-MAX acute care patients.  Unit B4A was the designated for housing of MAX custody acute care patients.  As noted above, the number of patients in need of MAX inpatient housing exceeded the capacity of the MAX units.

Unit A2B was a flex unit that could house and treat patients needing acute or MHCB level of care.   CHCF-PIP did not have a local operating procedure to support the use of these beds as acute inpatient beds.  Leadership and staffing in A2B remained under the CHCF outpatient structure, thus creating challenges with appropriate staffing levels and offering appropriate inpatient levels of programming.  Healthcare record reviews revealed that patients were seen by several different psychiatrists and psychologists throughout their stays, negatively impacting continuity of care.  Continuity of care across psychologists was evident in six of the ten or 60 percent of reviewed cases.  For psychiatrists, none of the records reviewed demonstrated continuity of care across providers.

Interviewed A2B staff reported a lack of preparation relative to treating patients at the acute level of care.  Nursing staff reported that they did not receive any training on the expectations of an acute unit and were aware that patients were not receiving treatment in accordance with their needs.  Out-of-cell time for acute care patients in A2B was limited to yard, phone, and recreation therapy.

Psychiatrists were not provided training on the provision of care within an acute care setting.  Psychiatrists noted that their schedules varied throughout the day and included patients

227

from both MHCB and A2B, making preparation difficult as they were often switching between patients at levels of care.

<u>Intermediate Care Program</u>

Intermediate care patients were housed in units B3A, B3B, B5A, B5B, B6A, B6B, B7A, B7B, B8A, and B8B.  While some overflow MAX custody patients were housed across the various intermediate care units, B4B was the designated housing unit for these patients.

    **1.**    **<u>Interdisciplinary Treatment Teams (IDTTs)</u>**

<u>Acute Care Program</u>

CHCF-PIP's acute program was 100 percent compliant with completing initial IDTTs within 72- hours of arrival.  Compliance for completing routine acute care IDTTs within seven days was at 90 percent; however, patients' assigned providers were not consistently present in the IDTTs as required.

The monitor's expert observed 30 acute care IDTTs during onsite monitoring, two of which were completed with patients in absentia.  All observed IDTTs were conducted in confidential rooms with adequate space and social distancing.  Computers were available for staff to access patient information.  All required disciplines attended the observed acute care IDTTs, although the patients' *assigned* treatment providers were not consistently present for these meetings.  Additionally, the attending correctional counselor was not always the patient's assigned counselor.

Psychiatrists in the acute care IDTTs appropriately reviewed medications, provided education, and inquired about medication side effects.  Recreation therapists appeared most familiar with the patients, engaged easily with patients, and explored patients' personal goals and specific coping skills.  Recreation therapists consistently discussed patients' progress, new

treatment goals, and solutions to address treatment obstacles.  In contrast, most primary

clinicians appeared to follow a standardized list of questions posed to patients during the

meeting, and the quality of follow-up questions to patient responses was variable.  Some

correctional counselor contributions during IDTTs were limited to reviewing lists of RVRs

during the course of incarceration without explaining their relevance to the patient's current

situation.  Covering staff for the various disciplines were unfamiliar with the patients and did not

provide necessary feedback regarding progress or lack thereof, despite having access to patients'

electronic records in the room.  Nursing staff input during acute care IDTTs was generally

limited to asking patients whether they had any medical issues they wanted addressed.

IDTT members routinely addressed treatment-related matters individually with patients

instead of engaging in collaborative discussions.  Typically, one team member facilitated the

IDTT, asked other team members whether they had something to contribute, and finally, asked

patients whether they had anything to add.  Often missing from acute care IDTT discussions

were diagnoses and symptoms, least restrictive housing (LRH), STEP levels, therapeutic

interventions, progress toward treatment objectives, and treatment modifications based on lack of

progress when indicated.

In one observed IDTT, a nurse referenced the patient's upcoming x-ray appointment

without providing the underlying reason. The monitor's expert subsequently learned the x-ray

was related to an incident of self-injury that had occurred several days prior; however, it was not

discussed during IDTT despite its relevance to treatment and risk.  In another observed IDTT,

the treatment team discussed consideration of an involuntary medication order without

mentioning the plan to the patient or explaining their rationale for not sharing the information.

Additionally, when this patient entered the IDTT room, the psychologist inappropriately stated,

"the team knows that you're [Developmental Disability Program] DDP," rather than communicating an understanding of the patient's intellectual capacity and the potential need for assistance.

The monitor's expert noted CHCF-PIP's acute care IDTTs needed significant improvement.

The monitor's expert observed six IDTT meetings on A2B, the MHCB "flex" acute unit. Due to COVID-19 restrictions, three were observed remotely. None of the IDTTs began at their scheduled time. During one day of the site visit, the IDTT schedule reflected a 0900 hour start time; however, the meeting did not begin until 1210 hours. On the next day, the IDTTs began nearly 30 minutes late. Delays were attributed to team members being assigned to cover MHCB IDTTs at the same time. All required participants were not in attendance for any of the observed IDTTs for A2B, and there were no psych techs nor recreation therapists present in any of the meetings observed. The CC I was not the patient's assigned CC I for three observed meetings. Three patients refused to attend, and the meetings were conducted in absentia.

IDTTs in the MHCB "flex" acute unit were conducted in confidential rooms with adequate space, and staff had computer access to patient records. A senior psychologist supervisor facilitated the IDTTs, which were adequately run with appropriate collaboration among all attending disciplines, and the patient's level of care was discussed and adequately justified. Treatment plan goals were clearly stated in five of the six or 83 percent of observed IDTTs. The goals were objective, measurable, and realistic in four of the six or 67 percent of the cases. Treatment goals were appropriate to the patient's needs in five of the six or 83 percent of the meetings. Treatment interventions were discussed in three of the six or 50 percent of IDTTs, and in those three cases, the interventions were appropriate to the patient's needs and goals.

Treatment plans were individualized in four of the six or 67 percent of the cases, and safety planning was adequately discussed in five of the six or 83 percent of the meetings.  Case conceptualization was appropriate and discussed in four of the six or 67 percent of observed IDTTs.

Review of healthcare records showed that the quality of individual treatment planning for MHCB "flex" acute care patients was variable; those completed by the assigned psychologist were appropriate and adequate.  However, other psychologists engaged in cursory treatment planning that was not individualized, and documentation often contained boilerplate language across multiple contacts and across multiple patients.  Six of ten or 60 percent of reviewed healthcare records included satisfactorily documented treatment plans.  Clear discharge goals and expectations and clear statements regarding progress toward treatment goals were included in eight of the ten or 80 percent of cases reviewed.  Only one of the two or 50 percent of the cases of high refuser patients contained evidence of thoughtful consideration regarding the patient's reasons for refusals and development of interventions.

Intermediate Care Program

CHCF-PIP completed initial IDTTs in intermediate care with required member attendance within 72 hours; however, patients' assigned providers were not consistently present as required.  Routine IDTTs were timely in only five of six or 83 percent of cases.

IDTT space was adequate, and required members had laptops for accessing patient information in all but one of the observed intermediate care IDTTs.

The monitor's expert observed a total of 15 intermediate care IDTTs in five different housing units and noted deficiencies in several areas.  The treatment teams often failed to discuss specific discharge criteria, barriers to LRH, STEP levels, measurable treatment objectives, and

231

level of care rationales.  Several treatment teams also failed to address barriers to progress, safety planning, and the need for treatment plan modifications when clinically indicated.  At least two observed treatment teams operated in silos, awaiting their turn to share discipline-specific information instead of deciding the course of treatment as a collaborative care team.  One of the observed treatment teams consistently excluded patients from the initial IDTT discussions and offered no rationale for this practice.  Several primary clinicians' contributions were limited to scripted questions, clearly compromising the quality of the interactions with patients and the treatment team.  One clinician failed to ask follow-up questions when the patient's response to scripted questions suggested the possible risk of self-harm.  The general lack of structure to the intermediate care IDTTs resulted in unnecessarily long meetings.

### **Group Therapy**

<u>Acute and Intermediate Care</u>

CHCF-PIP reported that group treatment was offered on all acute and intermediate care units and that group treatment comprised 70 percent of all treatment hours offered in the PIP. CHCF-PIP did not separate group treatment hours in the provided data. Further, the combined individual and group treatment hour data for the review period was unreliable when comparing custody officers' manual tracking results and results obtained from CDCR's OnDemand system. Nevertheless, results from both sources revealed that patients in the acute and intermediate care programs at CHCF-PIP were offered less than four hours of weekly mental health treatment during the review period.  This lack of treatment was very concerning given the level of impairment, symptoms, and acuity typical of patients at both levels of care.

During the review period, 52 percent of group treatment in the acute and intermediate care programs was canceled with a range of cancellation from four percent to 96 percent; 96

percent canceled during December 2020, four percent canceled during January 2021, 38 percent canceled during February 2021, 65 percent canceled during March 2021, 43 percent canceled during April 2021, and 64 percent canceled during May 2021.

Despite CHCF-PIP leadership acknowledging that "prolonged isolation" during the pandemic "likely" had a negative impact on class members' symptoms and functioning, efforts to increase treatment to more appropriate levels during and after the review period were reportedly thwarted by critically low staffing levels, MAX custody status program limitations, and units intermittently placed on CTQ status as a result of COVID-19 exposure.

Acute Care Program

On July 19, 2021, CHCF-PIP's acute program had between eight and 13 weekly recreation therapy groups and only two weekly clinical groups scheduled. The monitor's expert noted that treatment provided primarily by RTs was inadequate to address the needs of the acute care patients. Additionally, there were no English-as-a-second language groups offered for monolingual non-English speaking patients.

The monitor's expert observed group treatment on all acute units except the acute care MAX custody unit. Group rooms provided sufficient space for treatment, though due to COVID-19 social distancing measures, rooms that accommodated eight to ten patients were limited to four to five patients.

Group facilitators were engaged and appeared sensitive to the needs of the patients during group observation. Group facilitators indicated they approached patients on the unit prior to starting the group to motivate participation and invite other patients to attend in place of patients who planned to refuse. However, staff reported that the current practice of assigning patients to groups at the beginning of each quarter meant that newly admitted patients may not be able to

attend a group regularly until the beginning of the next quarter.  In addition to limiting access to groups for newly admitted patients, this type of group treatment assignment did not account for changes in patient needs over the course of treatment.  Group assignment would likely be more beneficial if it was linked to a patient's treatment plan and needs, which could change over 12 weeks.

Interviewed patients expressed the need for more group treatment and better treatment group quality.  Most acute care patients indicated that they did not find the groups helpful and only attended group to leave their cells.

No clinical or nursing groups were offered to acute care patients in A2B, the MHCB "flex" acute care unit during the review period or at the time of the site visit.  RT groups were provided by one RT assigned to the unit.  Staff reported that patients on MAX status were not offered groups due to the group room's lack of therapeutic treatment modules.  RT groups generally consisted of watching movies, playing cards, listening to music and/or engaging in art projects.  Healthcare record reviews reflected RT documentation inappropriately referenced groups targeted to support MHCB level of care patients instead of acute level of care.  None of the reviewed patients received the level or amount of group treatment listed in their treatment plans.

The MHCB "flex" acute unit was on CTQ status during the two weeks preceding the monitor's site visit.  That status was continued for another two weeks, which included the time of the site visit, after a staff member arrived for work and received a positive COVID-19 test result. As a result, treatment was scheduled for individual patients only.

234

Of note, during the site visit, correctional officers in the MHCB "flex" acute unit were observed often not wearing masks over their noses and mouths, but instead, they were under their chins until approached by the monitor's expert.

<u>Intermediate Care Program</u>

Throughout the review period, CHCF-PIP consistently offered less than four hours of weekly structured treatment activities to intermediate care patients. Treatment within the PIP was primarily limited by unit quarantine status, staffing vacancies, and COVID-19 restrictions, which limited 12-patient group room capacity to six patients. During the site visit, the number of intermediate care units on CTQ status resulted in the suspension of treatment groups and fewer opportunities for observation.

RTs facilitated the majority of intermediate care treatment groups at CHCF-PPIP. Most intermediate care units offered only one or two weekly clinician-led groups. Both clinical staff and patients complained that core groups were lacking and that most groups were limited to music, games, and "coloring."

The monitor's expert observed three intermediate care groups during the site visit, including one clinician-led DBT group, one music therapy group, and one RT coloring group. The quality of the music therapy group was excellent; the group facilitator used instruments to teach coping, insight, and social skills. The clinician-led DBT group started 15-minutes late and primarily consisted of reading handouts with minimal discussion and opportunities for patient interaction. The RT facilitating the coloring group did not consider participants' functional levels and three higher functioning patients appeared under-stimulated by coloring pages from a coloring book. Patients in the group would have likely benefited more by providing a range of

art supplies to meet the needs of patients with variable skill sets and integrate therapeutic elements whenever possible to improve the quality of groups.

CHCF-PIP did not have treatment group waitlists during the review period or at the time of the site visit.

Nursing Lead Therapeutic Groups (NLTG)

NLTGs were provided to patients in the CHCF-PIP, and eligible patients received rehabilitative achievement credits (RACs) that could be used toward prison sentence reduction. NLTGs at CHCH-PIP restarted in March and April of 2021 and were limited to three to five patients to allow for social distancing. NLTGs were conducted on the third watch to increase therapeutic activities during this timeframe and to avoid interference with second watch activities.

At the time of the site visit, only registered nurses and psychiatric technicians were facilitating NLTG groups at CHCF-PIP. Nursing staff reported that they conducted individual interviews with patients who did not attend the group. If patients did not benefit from a particular group, other groups were presented based on the patient's interest. Interviewed infection control and supervising registered nurses reported that 50 percent of NLTGs were canceled due to staff shortages or when only one patient was willing to attend. Nursing staff also indicated that NLTG groups, at times, conflicted with yard and showers on the unit.

Patient Interviews

Interviewed intermediate care patients expressed frustration with the recent removal of guitars in the program, as therapeutic tools and programming had already been limited since the onset of the COVID-19 pandemic.

**Individual Treatment**

Acute Care Program

CHCF-PIP did not have a policy in place governing the frequency of primary clinician contacts. The monitor randomly selected ten CHCF-PIP acute care patients to assess compliance with psychiatric contacts using information documented in patients' treatment plans.

CHCF-PIP management staff indicated that they received approval from state licensing allowing for weekly psychiatry contacts instead of the previously required 72- hour psychiatry contacts. Of the ten patients reviewed, eight required initial psychiatry evaluations during the review period. Of those, 100 percent occurred within 72 hours of admission. For routine psychiatric contacts, 46 percent of the sample occurred at least every 72 hours. However, 85 percent of routine psychiatric contacts were compliant under the seven-day approved flex policy during the review period.

For the eight acute care patients who required initial primary clinician assessments, the average number of days between admission and initial primary clinician assessments was 4.1 days, with a range of zero to nine days. The frequency of routine primary clinician contacts varied significantly during the review period. Some acute care patients received weekly contacts, and others had appointment gaps for as long as two months. For the nine patients in the random sample who were seen by their primary clinician at least twice for routine contacts, the average number of days between contacts ranged from 4.75 days to 44.5 days per patient.

The monitor's expert found the primary clinician contact frequency data concerning regarding continuity of care for those seen beyond the established frequency, considering the nature of the acute care population. The monitor's expert's record reviews also suggested that,

when primary clinician contacts were completed, treatment was inadequate and not consistent with treatment plan documentation.

CHCF-PIP provided data regarding patient participation in individual treatment sessions by unit. On average, patients received between 19 and 24 minutes of weekly primary clinician contacts and between ten and 20 minutes of weekly psychiatry contacts. Additionally, recreation therapists experienced difficulty meeting with patients due to insufficient staffing.

Healthcare record reviews indicated that patients in the MHCB "flex" acute care program were seen every one to two days by psychiatry and weekly by a psychologist. Recreation therapy groups were offered for one to two hours per week for each patient; however, in no case was the treatment offered in line with the patient's treatment plan or in accordance with expectations for treatment to be provided at an acute level of care. While 100 percent of initial psychiatric assessments were completed timely, it was unclear whether the required patient interview was completed as most of the documentation was historical information pulled forward from prior entries. Assessment of patient diagnosis and initial indications of treatment needs were often not included. Further, some psychiatric documentation referenced patients being treated at the MCHB level of care and reflected crisis services with plans of rapid discharge instead of longer-term acute care treatment. Psychiatric notes were at times cursory with little consideration of treatment progress, changing treatment needs or plans. For example, in at least two cases, psychiatrists failed to acknowledge a previous psychiatrist's planned interventions and changed medications in a manner that contradicted a previous psychiatrist's plans or failed to address recent changes in patient status evident in the record. Specifically, in one case, a psychiatrist failed to document changes in the patient's needs following an act of self-injurious behavior.

Primary clinician initial assessments were timely completed in seven of ten or 70 percent of cases reviewed; the quality of the assessments varied. It appeared that the one psychologist assigned to the unit completed comprehensive and thoughtful initial assessments. In contrast, the covering psychologists completed a review of the patients' records, pulled forward most documentation, and included minimal documentation related to the patient's disposition or treatment needs. Initial assessments were conducted in a confidential location, and effective communication was documented in eight of ten or 80 percent of reviewed cases.

During acute patient interviews, several patients reported that they needed to yell "man down" in order to meet individually with a mental health clinician on the unit.

Intermediate Care Program

Similar to the acute program, individual treatment provided to intermediate care patients was primarily limited to medication management and weekly or every other week brief check-ins with primary clinicians. The mental health treatment available to intermediate care patients in the CHCF-PIP was well below what is required for CDCR's lower acuity enhanced outpatient program (EOP) level of care.

A limited sample of intermediate care patient records revealed that 67 percent of initial primary clinician assessments were completed within 72 hours of arrival. Intermediate care patients were generally offered primary clinician contacts every other week. Non-maximum custody patients were offered confidential individual contacts with their primary clinicians and psychiatrists. However, some of the maximum custody overflow patients reported a high frequency of non-confidential contacts with their primary clinicians due to non-maximum patients housed on their units. Patients' perception of primary clinician contacts varied, with

some reporting satisfactory care and others complaining contacts were limited to brief "check-ins."

The monitor's review of healthcare records revealed that CHCF-PIP was 100 percent compliant with completing initial assessments by psychiatry. Further, routine psychiatric encounters were timely in 90 percent of reviewed cases. Psychiatry contacts were scheduled every seven days for intermediate care patients, and interviewed patients spoke highly of their psychiatry contacts, which were most often completed face-to-face in confidential settings.

Individual recreation therapy contacts were offered weekly.

**Other Treatment Issues**

        **A.**        **Behavioral Management/Positive Behavioral Support Team (PBST)**

CHCF-PIP's PBST unit had been dismantled since the preceding monitoring period, and the program's quality seriously suffered as a result. The previous structure of the PBST at CHCF-PIP was highly productive, and while unit staff did not always utilize PBST when indicated, they had reported that PBST services were helpful and meaningful. The PBST unit, which was previously comprised of four full-time staff members, had been reduced to one Senior Psychologist Specialist. The assigned PBST psychologist had previously seen patients individually and successfully used this model to create incentives for adherence to behavior plans. However, during the site visit, the monitor's expert learned that the PBST psychologist was no longer permitted to carry a caseload or engage in direct patient contact, which indicated that the critical element of a patient interview completed as part of a necessary functional behavior assessment, was unlikely to occur. The monitor's expert further noted that PBST would be unable to complete their necessary tasks without direct patient contact.

During the review period, there were 44 plans for Behavior Guidelines completed.  Of those, 23 remained active at the time of the site visit, and 21 had been discontinued (eight were discharged, four were no longer needed, and nine were due to the decrease in staffing "restructure").  While patient activities obviously decreased, there were 96 confidential individual sessions provided by PBST during the monitoring period.  PBST also attended 14 IDTTs, 155 shift reports, and multiple management and quality management committees (e.g., Psychology Specialist Services Committee, Program Review Committee).  Current behavioral plans had been updated as recently as June 16, 2021; however, the PBST's ability to produce and update the behavior guidelines significantly decreased with staff loss.  For example, the senior psychologist specialist typically provided a monthly report on PBST activities but did not do so for May, June, and July 2021.

During the site visit, the monitor reviewed CHCF-PIP's current behavioral plans. The plans continued to inappropriately indicate that the patient should not be allowed to see the plan. Patients should be involved in the planning and implementing of behavior management plans or guidelines to increase their effectiveness.  The behavior guidelines continued to operate more like a set of written suggestions to staff on how to interact with the patient rather than an appropriate behavioral plan, and they did not identify a system of reinforcement that the PBST or patients could easily utilize.  The reviewed plans had multiple behavior targets, rather than focusing on one specific area until the patient reached a point of success.  The plans also failed to provide a clinical rationale or justification for the included multiple behavioral targets. Additionally, the underlying functions of and connections between the targeted behaviors were not well explained.

Multiple clinicians complained about the loss of PBST as a resource during staff interviews. The monitor's expert also found that PBST was clinically indicated for several patients observed in IDTTs, interviews, and healthcare record reviews.

The PBST in its current state was inadequate for addressing the needs of CHCF-PIP patients.

### Morning and End of Shift Meetings

#### Acute Care Program

Observed huddles in the acute care program were neither structured nor efficient. While huddles made an effort to adhere to the huddle format, the staff spent a significant amount of time reviewing who they did *not* have in their units rather than identifying patients of concern and discussing ways to address problems on the unit as a team. The meetings resembled shift-change reviews rather than a meaningful, comprehensive, efficient huddle.

#### Intermediate Care Program

The monitor's expert observed one afternoon intermediate care huddle. Nursing staff led the meeting and read patient updates from printed documents. Most attendees were disengaged, and one staff member was observed sleeping throughout the brief meeting. While the nurse provided relevant patient information, the meeting was rushed and lacked collaborative discussion. Additionally, the meeting started 20 minutes late, which resulted in a scheduled DBT group starting 15 minutes late. The quality of this huddle was inadequate.

### Treatment Space

The monitor observed individual treatment space in housing units 301B, 302A, 302B, 303A, 303B, 305A, 305B, 307A, and 307B. All units had one treatment room for individual clinical contacts, two larger rooms used for groups or IDTTs, and a small patio for yard and

outdoor recreation therapy groups.  The treatment space was clean, air-conditioned, had

acceptable lighting, and provided for privacy and confidentiality.  In mid-June 2021, CHCF-PIP

designated space in each unit for dayroom to increase opportunities for out-of-cell time.  The

dayroom space was sufficient and included a television and chairs spread apart to allow for

social distancing.

### MAX Custody

Treatment for MAX custody patients at CHCF-PIP was in a state of crisis that required

creative problem-solving and substantial efforts for resolution.  It is important to note that

patients in MAX custody at CHCF-PIP received very little treatment other than medication

management.  The number of maximum MAX custody patients in the CHCF-PIP has reduced

since the Special Master last Monitoring Report on the Mental Health Inpatient Care Programs

filed on January 28, 2021.  ECF 7039.  This resulted from a specific project that reviewed all

MAX custody status patients to reduce their custody level where warranted.  At the time of the

site visit, there were 108 MAX custody patients at CHCF-PIP.  Two units, B4A and B4B, were

designated as MAX custody units.

The monitor's expert determined that MAX custody patients housed outside of the MAX

units received the least amount of access to treatment activities and recreation due to competition

for limited space and staff in those non-max units.  While it was more beneficial to be housed in

the two designated MAX units, those two units failed to provide adequate levels of treatment.

CHCF-PIP staff acknowledged the lack of treatment activity for MAX patients at acute and

intermediate care levels.  CHCF-PIP management staff also reported that custody officer staffing

negatively impacted MAX custody patients' access to completion of individual contacts and

IDTTs. This resulted in MAX custody patients receiving little to no clinical treatment and inadequate treatment for their level of care.

Once the designated units were filled, MAX custody patients were dispersed throughout various units in the PIP during the review period and at the time of the site visit. CHCF-PIP leadership confirmed that there were up to four MAX custody patients in each of the non-maximum units. Although a CHCF-PIP program supervisor explained that they did not cluster the overflow patients to allow for more out-of-cell time within a more therapeutic milieu, treatment for those patients was primarily limited to medication management, and out of cell time was extremely limited. The overflow MAX patients were not offered treatment groups nor weekly primary clinician contacts. Primary clinician contacts for these patients typically occurred every other week, and the patients complained that the contacts were often non-confidential cell front check-ins.

CHCF-PIP leadership reported that staffing limitations prevented them from offering overflow MAX patients more frequent primary clinician contacts in lieu of other unavailable services. While in-cell recreation therapy packets were provided, the overflow MAX custody patients complained that the packets offered no therapeutic benefits or clinical content. CHCF-PIP leadership also confirmed that several overflow MAX custody patients did not have access to working radios.

The psychologist positions in both of the MAX custody units were vacant. Also, one recreation therapist covered both units, as well as non-max units at times. These staffing vacancies resulted in less access to treatment for MAX custody patients. Additionally, psychology attendance in IDTTs for these patients was variable. At times, social workers attempted to supplement psychologist duties; however, both disciplines were required to provide

care in PIPS, as a result, complex MAX custody patients were denied access to necessary treatment.

Documentation of unit treatment schedules was not accurate as treatment was reportedly often canceled due to a lack of clinical or custody staff. CHCF-PIP did not identify and separately calculate the average number of hours per MAX patient offered and attended during the monitoring period. However, given CHCF-PIP's severe staffing shortages and inability to identify alternative secure ways to provide treatment to MAX patients, these patients received the least amount of out-of-cell treatment at the PIP. More treatment would have been available to the MAX custody acute and intermediate care patients had they been housed in EOPs rather than CHCF-PIP.

Treatment for MAX custody patients in acute and intermediate care was most often limited to in-cell RT packets, biweekly primary clinician contacts, weekly psychiatry contacts, and minimal out-of-cell time. CHCF-PIP staff continued to attribute the lack of group treatment for MAX custody patients to a lack of available TTMs. CHCF-PIP also had difficulties offering individual treatment on a routine basis to the MAX custody patients, and staff attributed this concern to general staffing shortages and lack of available coverage during staff absences. This resulted in an inadequate amount of treatment to reduce psychiatric symptoms and improve their functional behavior and mental status.

The monitor's expert's observations of IDTTs, patient interviews, and healthcare record reviews revealed that IDTTs routinely developed treatment plans with unachievable goals and interventions due to the lack of available programming for overflow MAX custody patients. The monitor's expert also found several treatment plans written as though these patients had access to programming. The monitor's expert observed one IDTT wherein the patient expressed

frustration regarding his inability to demonstrate discharge readiness without opportunities to leave his cell and program in accordance with the treatment team's expectations.

### Staff Interview

Acute Care Program

During the site visit, staff working in the acute program met with the monitor's team. Staff of all disciplines reported frequent redirection to cover other units or tasks. This resulted in a lack of continuity of care that was confirmed by many patient complaints (e.g., "I just want to see one person so that I don't have to keep telling my story").

Psychiatrists reported frustration with the limited treatment available to patients beyond psychotropic medications and recreation therapy. They noted that the psychologists and social workers were often hindered by administrative tasks and unavailable to provide patients with therapeutic support and group treatment. The psychiatrists also reported that there was limited to no availability for consultation regarding diagnostic clarification from psychological testing and support for patients who engaged in self-injury from the PBST. Psychiatrists reported that they had ready access to patients and confidential treatment space as needed.

Intermediate Care Program Interviews

Psychiatry staff reported difficulty reaching pharmacy staff and noted that at times pharmacists overrode their medication orders without adequate communication.

Mental health and nursing staff reported feeling overworked and underappreciated.

There was building tension and resentment between psychiatrists and psychologists over psychiatry's alleged refusal to assist with increasing amounts of paperwork.

CHCF and regional leadership expressed interest in shutting down PIP beds in order to provide adequate care with current staffing levels.

**PATIENT ACCESS TO TREATMENT**

### System to Encourage Progress (STEP) Program

The STEP program at CHCF-PIP was inconsistently implemented. CHCF-PIP's efforts to standardize this program and train staff were in limbo pending promulgation of a revised policy, which had been pending from headquarters since at least March 2021. Current PIP staff appeared uncertain about the STEP program, and the lack of certainty resulted in inconsistent adherence. Further, CHCF-PIP leadership noted the lack of functional electrical outlets to be an obstacle to developing meaningful incentives for patients in the acute care program.

During the site visit, STEP level was rarely discussed in the observed IDTTs. When prompted by the monitor's expert, treatment teams remained unclear about how to assign levels and the most appropriate way to increase or decrease a patient's STEP level. Additionally, patients' STEP levels were rarely addressed in reviewed treatment plans. Patients were equally confused and reported uncertainty about their current STEP level. Those patients aware of their STEP level could not identify specific criteria or incentives based on their current STEP level. Interviewed patients viewed the program as arbitrary and reported that patients moved to levels with more salient reinforcers based on whether they were liked by unit staff.

CHCF-PIP staff conflated fundamental concepts such as maximum custody status and STEP 1 of the STEP program. For example, one clinician reported there was no STEP program in acute care because those patients were not permitted radios or televisions. Another clinician noted a patient as STEP 1 for treatment groups, STEP 2 for leisure groups, and solo programming for any other activities. There was no clinical rationale for these idiosyncratic deviations from existing policy and standards of care.

STEP progress was not regularly discussed during IDTTs and indicated that huddles were the preferred forum for these discussions due to their frequency of occurrence and additional input from floor staff.  However, the monitor's expert observed a huddle during which only cursory reference to a small number of patients' STEPs was made near the end of the huddle.

Pre-site data indicated that most acute care patients were split evenly between STEP levels 1 and 2; there are only two STEPS in acute care.  Most intermediate care patients were on STEP 3, the highest level.

CHCF-PIP reported that 63 acute care patients were on STEP 1, eight of which were on solo status.  Eighty-four acute patients were on STEP 2, two of whom were on solo status.  Although facility staff indicated that the STEP program in acute care was designed to have only two steps, 32 acute patients were listed on STEP 3, one of whom was designated as STEP 3 ICF.  The remaining acute patients were reported to be simply on "MAX" or "CTQ" status.

At the time of the site visit, in intermediate care, 12 patients were on STEP 1; four of those patients were admitted over 30 days before the visit.  Three patients were on STEP 1 MAX; two were admitted over 30 days prior to the visit.  Four intermediate care patients were on STEP 1 solo; two were admitted more than 30 days before the site visit.

Eight intermediate care patients were on STEP 2; six of those patients were admitted greater than 30 days prior to the site visit.  One intermediate care patient was on STEP 2 MAX; he was admitted in August 2020.

The majority of the 182 intermediate care patients were on STEP 3; three were on STEP 3 MAX, and 23 were on STEP 3 solo status.  Seven intermediate care patients were listed as "MAX" as their STEP, and two other patients were new arrivals with no STEP assigned.

## REFERRALS AND TRANSFERS

CHCF-PIP reported that the admissions and discharge unit (ADU) was understaffed and needed additional support, including at least one clinician to review referrals and one additional AGPA to help maintain tracking.  The ADU coordinator began in the position in January 2021, and the current AGPA was the third AGPA holding that position during the review period.

CHCF-PIP did not provide referral data in a format amenable to calculating the total number of referrals endorsed specifically to CHCF-PIP during the review period.  The data provided included system-wide PIP referrals, not solely those endorsed to CHCF-PIP, as well as referrals to the PIP, from the PIP, and to MHCBs.  The monitor was unable to garner recission and rejection statistics from the data presented, though CHCF-PIP ADU staff reported no rejections since January 2021.

## ADMISSIONS AND DISCHARGES

### 1.    Admissions

During the review period, CHCF-PIP reported 263 admissions, including 170 admissions to acute care and 93 admissions to intermediate care.  The monitor manually sorted and reviewed a sample of 131 admissions to CHCF-PIP acute care during the review period.  Of those, 72 or 55 percent of referrals took longer than ten days for admission with a range of 11 to 68 days.  A sample of 32 intermediate care referrals during the review period revealed that 20 or 63 percent took longer than 30 days to transfer with a range of 31 to 145 days.  Exceptions and reasons for delays were not provided other than COVID-19 movement restrictions.

During the review period, acceptance decisions by CHCF-PIP were not timely for acute care patients.  Intermediate care decisions were timely.  OnDemand Report data indicated that

neither acute nor intermediate care admissions occurred within 72 hours after acceptance during the review period; CHCF-PIP staff reported COVID-19 quarantine as the reason for the delays.

CHCF-PIP did not track patients admitted to the PIP with complex medical needs.

On July 18, 2021, seven intermediate care patients and no acute care patients had been accepted for admission to CHCF-PIP but were not yet admitted. All seven patients had been waiting two days with the note indicating "waiting for transfer."

CHCF-PIP could not produce data relative to the number of patients admitted to the PIP from a security housing unit. Staff indicated they could not gather this information from the Strategic Offender Management System (SOMS).

**Discharges**

The average length of stay for patients in acute care during the review period was 191.3 days. For patients at the intermediate level of care, the average length of stay was 357 days. CHCF-PIP discharged 74 patients from acute care and 123 patients from intermediate care during the review period. Complete data was available for 64 acute care and 108 intermediate care patients. All acute care patients and 76 percent of intermediate care patients experienced administrative delays after clinical discharge. Delays in acute care ranged from 26 days to 495 days and in intermediate care ranged from one day to 307 days.

Data provided by CHCF-PIP inaccurately indicated MHCB level of care for patients receiving acute level of care in the MHCB "flex" beds. The average length of stay for acute care patients in A2B during the review period was 46 days, including an average of 22 days waiting to transfer to an ICF after clinical discharge. For patients receiving treatment in A2B during the site visit, the average clinical length of stay was 42 days. For the patients who had been discharged to the EOP level of care, their average clinical length of stay was 31 days, for those

discharged to an ICF level of care, the average clinical length of stay was 47 days, and for those who had not yet been discharged at the time of the site review, their average length of stay was 28 days. Discharged patients from the MHCB "flex" beds waited an average of 22 days to transfer to EOP and 16 days to transfer to intermediate care programs.

Regarding discharges from MHCB "flex" beds during the review period, five of seven or 71 percent reflected appropriate discharge decisions. Of concern, however, was one discharge made for a patient engaging in frequent self-injurious behavior and was on 1:1 suicide watch, in a suicide smock, and possession of a piece of razor in his cell at the time of his discharge IDTT meeting. Another patient was documented as engaging in odd, agitated, violent behavior and sexually exposing himself, yet was discharged to an EOP.

Interviewed treatment teams and patients in intermediate care perceived that discharges were slower during the review period. CHCF-PIP leadership attributed discharge delays to changes in staff in the various units, as newly assigned clinicians reportedly preferred to observe patients on the unit instead of relying on healthcare records to determine discharge readiness.

Reasons for delays following clinical discharge from CHCF-PIP included COVID-19 movement restrictions, patient refusal to submit to COVID-19 testing prior to transfer, referrals to DSH-Atascadero (they have 30 days to accept or reject); missing documentation and requests from the receiving institution for updated information; and LRH issues (at the time of the site visit, multi-person cell and locked dorms had limited availability).

Discharge summaries were timely and clinically meaningful in five of seven or 71 percent of reviewed cases. Though, many discharge summaries appeared to embellish the actual treatment provided. For example, discharge summaries indicated that patients received cognitive

behavioral treatment or dialectical behavior therapy during their inpatient stays, yet progress notes reflected little treatment with these patients.

Discharged Patients were referred to substance use treatment when indicated.

CHCF-PIP did not provide a list of patients clinically discharged who remained in a bed in the facility at the time of the site visit.

## LEAST RESTRICTIVE HOUSING

On July 19, 2021, CHCF-PIP reported 129 patients were housed above their LRH, a reported decrease since May 2021, when it reached 163 patients.  CHCF-PIP reported increased attention and efforts to decrease LRH as quickly as possible.  Efforts included a project that reviewed patients' LRH every week.

CHCF-PIP staff reported that LRH was reviewed during ICC and IDTT.  LRH was reviewed and considered during ICC's observed by the monitor during the site visit.  LRH was not discussed during IDTTs observed by the monitor's expert.

## PATIENT DISCIPLINARY PROCESS

CHCF-PIP issued 436 RVRs during the review period; 97 were issued to acute care patients, and 339 were issued to intermediate care patients.  The monitor reviewed a random sample of 20 adjudicated RVRs from acute and intermediate care.

Fifteen of 20 or 75 percent of reviewed RVRs were referred, completed, and timely returned.  One mental health assessment was referred four days late, and four were not returned to custody within eight days with a range of one to seven days overdue.

Clinicians met all documentation requirements for 19 of 20 reviewed mental health assessments; one mental health assessment did not meet documentation requirements.  In that

case, the clinician indicated that penalties should be mitigated but did not provide information to suggest the appropriate mitigation.  All patients were assigned a staff assistant.

CHCF-PIP clinicians completed mental health assessments in confidential settings unless inmates refused or in one case when the building was on quarantine.   All patients were informed of the limits of confidentially.

Regarding the consideration of mental health assessments in the assessment of penalties, 15 of 16 or 94 percent of cases for whom the clinician recommended mitigation were mitigated, and there was documentation of the mitigation.

## **USE OF FORCE**

CHCF-PIP reported that for 2021 of 93 mental health staff members, 60 or 65 percent received use of force policy training.  Of the 560 mental health nursing staff members, 95 or 17 percent received use of force policy training.  All required correctional staff completed use of force policy training, including the warden, chief deputy warden, correctional administrator, and captain.

CHCF-PIP reported a total of 97 immediate use of force incidents during the review period.  There was no controlled use of force incidents or use of force incidents resulting from a PC2602 medication order.  The monitor reviewed 16 immediate use of force packets, observed video for six of eight use of force incidents, and interviewed two patients involved in the observed videotaped use of force incidents.

Eight of 16 or 50 percent of the reviewed incident packets resulted from an assault, battery, or resisting a peace officer.  In all instances, the patients received RVRs, and in five of the eight incidents, the patients were moved to administrative segregation.  One incident resulted attempted murder charge, as the patient had COVID19.  Four involved the use of oleoresin

capsicum spray during self-mutilation incidents.  The remaining incidents reviewed involved disobeying orders, threatening staff or assault on another inmate.  All required levels of review were timely and documented in the sample.

Based on the event's severity, emergent, urgent, or routine mental health referrals were made for all reviewed use of force incidents.  For incidents involving self-mutilation, clinical follow-up and patient and room decontamination documentation was included in each report.

## UNUSUAL OCCURRENCE/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

CHCF-PIP reported 310 unusual occurrences during the reporting period, including eight for hunger strikes, 114 for self-inflicted injuries, suicide ideation or self-harm threats, 26 for patients' foreign body insertions, 54 for medication concerns, 18 for hospital admissions, 26 for physical, sexual assaults or gassing, and ten related to criminal actions.  The remaining incidents were either unidentified or included falls and unwitnessed patient events.

Pursuant to a headquarter memorandum dated September 1, 2020, CHCF-PIP reported all serious incidents, unusual occurrences, near misses or sentinel events as "unusual occurrences." The change was implemented for PIPs to follow the same process of reporting unusual occurrences as all other CDCR institutions.  As a result, all incidents in the CHCF-PIP were reported to CCHCS through electronic Health Care Incident Reporting utilizing established protocols for reporting unusual occurrences at all CDCR institutions.

## USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

During the review period, CHCF-PIP utilized five-point restraints for one patient on one occasion in March 2021.  In that case, restraints were discontinued in less than 24 hours. Appropriate documentation was maintained, including required nursing checks.  Interviewed

CHCF-PIP nursing staff was knowledgeable regarding restraint procedures. CHCF-PIP did not use seclusion cells.

## EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.    Emergency Response

During the review period, there were 82 Code 3 events at CHCF-PIP. During those, the EMRRC identified 50 deficiencies, including eight delayed 911 activations, 12 delayed alarm activations, 17 documentation concerns, ten clinician concerns, and three communication barrier concerns. CHCF IST conducted training for mental health and custody staff regarding the timeliness of calling 911, accurate documentation, and proper communication of all Code 3 events regardless of severity to ensure notification of the triage and treatment area (TTA) and standby emergency medical services (SEMS). Training was also provided to mental health staff regarding recognition of early signs of distress. This training was included as a required annual and orientation training.

### Death Review Process

No deaths occurred in the PIP during the review period from November 20, 2020, through April 30, 2021. One patient died in May 2021; the CHCF SPRFIT handled all patient death reports.

## QUALITY MANAGEMENT AND UTILIZATION REVIEW

During the spring of 2020, the CHCF-PIP Patient Improvement Program was changed to the Compliance Program. The Compliance Program handled issues related to licensing, Joint Commission, and PIP policies. At the time of the site visit, the CHCF-PIP had two program directors for each level of care. PIP staff reported that the current program director structure was put in place on April 1, 2021. Prior to April, there was one program director for each level of

care.  Staff reported that the CHCF-PIP quality management process had been merged into CHCF's mental health quality management process.  As a result, PIP-related quality management activities were performed in collaboration with CHCF's mental health subcommittee.

As part of the CHCF quality management process, the PIP program directors prepared a monthly memorandum for submission to the CHCF mental health subcommittee.  Prior to April 2021, there were separate memorandums prepared for the acute care and intermediate care programs; however, the information was consolidated into a single monthly memorandum under the new structure.  Memorandums during the review period contained a review of monthly data on PIP performance report indicators related to mental health referrals, IDTTs, appointments seen as scheduled, suicide risk evaluations, timely RVR assessments, PIP mental health indicator errors, unresolved pending appointments, physical discharge within timeframes, NCATs, structured treatment, appointments canceled due to custody, and group treatment in a confidential setting.  Except for suicide risk evaluations, which were monitored by the SPRFIT, the memorandum included a root cause/reason and a plan of correction/action for each indicator found to be out of compliance.  PIP staff provided a report on the contents of the monthly memorandums at the CHCF mental health subcommittee meetings.

Documents indicated that the utilization management committee met three times per month during the review period.  Reviewed minutes for the review period revealed recurring substantive agenda items included out-of-LRH reviews and over length of stay reviews.  According to the minutes, the agenda did not stray from covering these items during the review period.  Interviewed PIP staff reported that despite the recurring note in the minutes that discussion on the agenda item "over LOS reviews" was postponed due to COVID-19 movement

restriction, in practice, those discussions were discontinued indefinitely, and at the direction of the executive director, the utilization management committee became solely focused on "out of LRH reviews."  As a result, the necessary in-depth reviews of patients with extended lengths of stay did not occur.  During the week of the site visit, the UM nurse was redirected to other duties.

CHCF-PIP discontinued the Prospective, Concurrent, and Continued Stay Reviews.  The CHCF-PIP executive director determined that the processes regarding these reviews in the MOU between DSH and CDCR pertained to DSH only and did not need to continue under CDCR-PIP.

The monitor reviewed the results of CHCF-PIP's master treatment plan audits.  The master treatment plan audit consisted of 13 indicators, some of them having multiple parts.  CHCF-PIP did not achieve compliance related to completing master treatment plans, and CHCF-PIP did not provide a stand-alone document regarding these audits explaining the methodology used, the results, the assessment of the results, and corrective action plans if indicated.  During the reporting period from December 2020 through May 2021, compliance ranged from 80 to 87 percent each month.

**Risk Management Processes**

During the review period, CHCF-PIP reported the death of one patient.  Patient death reports were handled by the CHCF SPRFIT.

CHCF-PIP had a three-level risk management review process.  The first level involved a Program Review Committee (PRC) meeting review of patients with high-risk behavior or who have had a psychiatric incident and met one or more criteria as defined in the relevant HCDOM sections. The PRC focused on identifying the risks and developing action plans to reduce the relevant risks contributing to the incident(s). The PRC provided their recommendation to the

treatment team. The treatment team may also initiate a review by the PRC for consultation purposes when needed.

The second level review involved either a Psychology Specialist Service Committee (PSSC) meeting or MRMC meeting.  The PSSC reviewed cases recommended by the PRC where interventions were ineffective, and there were barriers to recommended actions.  The PSSC provided recommendations and action plans to the treatment team based on their clinical review of the patient.  The MRMC reviewed any patients referred by the Primary Care Physician (PCP) or PRC and provided consultation to the treatment team/PCP regarding the medical management of patients.

The third level of review included CCATs.

Prior to the three-level review process, CHCF PIP reported that the treatment team reviewed all incidents and identified triggers, high-risk conditions, and contributing factors to incidents.  The review reportedly included a review of the patient's treatment plan, which was revised as clinically appropriate.

Reviewed MRMC minutes from January and February 2021 were consistent with the above description of the MRMC meetings.  Minutes of the PRC from December 2020, March, April, and May of 2021 were reviewed, and they were consistent with the above description of the PRC meetings.  Minutes of the PSSC meetings from December 2020 through May 2021 were also reviewed, and they were consistent with the above description of the PSSC meetings.

With the monthly focus on key performance report indicators, CHCF-PIP had an adequate quality management program.  However, it would benefit the PIP's quality improvement efforts to expand their focus beyond a simple monthly analysis of the key performance report indicators.

**PATIENT COMPLAINTS/PATIENT SATISFACTION**

CHCF-PIP patients filed 395 grievances and ten staff complaints during the review period. The previous backlog of cases was cleared, and the grievance process folded into the CCHCS system as planned. Common grievances included insufficient access to yard and groups, delays in receipt of property and canteen, and the lack of radios or televisions in acute units.

Ten staff complaints were filed for inappropriate staff interactions, including talking to patients in a demeaning and threatening manner, providing inaccurate treatment information, and grabbing patients during escort. All ten complaints were found not to violate CDCR policy. Due to COVID-19 protocols, patient satisfaction surveys were suspended during the review period; there was no date when surveys would resume.

**CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN (CMHPP)**

CHCF-PIP was not compliant with the majority of the CMHPP requirements. While huddles occurred, attendance by required staff was not consistent, and CHCF's inability to provide an IST report of who attended mandatory partnership training was concerning as this was a standard IST report.

The CHCF-PIP LOP was dated January 2019 and was not updated within the past year as required by policy. Though not updated, the LOP was compliant with statewide policy.

The institution reported that due to COVID-19, CHCF-PIP was not able to complete joint rounding by institution leadership; joint rounding summary documentation of programs rounded, topics identified, and staff completing the rounding; joint rounding reported at the executive staff meeting; and joint rounding reported at quality management committee and mental health subcommittee.

Ten meetings with CHCF-PIP custody and mental health staff occurred from April through July 2021; however, the provided notes of the meetings did not include which staff attended. Most issues discussed during the meetings related to custody and security issues, including patients covering room windows, one-on-one suicide watch issue orders, writing of RVRs for IEX, pat-down search of all patients attending group treatment, MAX custody patients, and allowable property and electronic devices for patients.

The institution reported that the executive director, assistant nurse executive, associate warden, and captain assigned to the PIP conducted weekly yard walks. However, documentation of the completion of yard walks was not provided. The institution reported completion of virtual monthly Town Hall meetings, though meetings occurred during May and June only, and CHCF-PIP could not provide a list of attendees.

On May 20, 2021, the CHCF-PIP captain issued a memorandum to custody staff instructing them to attend huddles and discuss areas including new admissions and transfers, patients on hunger strike, patient's grooming and shower compliance, durable medical equipment, patients on suicide watch, ducats and patient movement, RVRs and informational chronos issued, window coverings and any other safety or security issue.

Quarterly partnership or collaborative training for custody and mental health staff did not occur during the review period due to COVID-19.

CHCF-PIP could not provide a report of custody and mental health staff who attended the mandated annual all-staff partnership training; however, they provided a list of 724 staff who did not attend the training. The list included but was not limited to 284 psych techs, 164 nurses, 18 psychologists, 22 psychiatrists, 30 RTs, 20 social workers, 29 senior psych techs, and 54 CNAs.

Regarding staff misconduct data, CHCF-PIP provided nine staff complaints for review. Complaint allegations included unprofessional behavior, harassment, and bias. Eight of the nine complaints found that staff did not violate CDCR policy, and one complaint did not have a response. No staff members were moved to another post due to a patient allegation/complaint during the review period.

CHCF-PIP monitored all huddle attendance by discipline for second watch during the review period for all PIP units and reported the information to the mental health subcommittee and nurse supervisory staff. Reviewed data indicated during the review period, custody presence ranged from 64 percent to 89 percent; psychiatrists attendance ranged from 75 percent to 87 percent; psychologists attendance ranged from 75 to 91 percent; nursing staff attendance ranged from 77 percent to 95 percent; social workers attendance ranged from 78 percent to 95 percent; and recreation therapist attendance ranged from 71 percent to 96 percent. The monitor's review of 29 daily huddle reports during July 2021 revealed similar rates of attendance with psychiatrists in attendance 86 percent of the time, a psychologist or social worker in attendance 76 percent of the time, a recreation therapist in attendance 79 percent of the time, a registered nurse in attendance 97 percent of the time, and a correctional officer or sergeant in attendance 69 percent of the time. Reviewed reports were completed in detail as required.

The monitor observed a third-watch huddle on July 22, 2021. All required staff were in attendance, and custody staff was engaged, asked specific relevant questions, and informed mental health staff of patients' issues and concerns. The required huddle form was utilized, and mental health staff discussed, in detail, every patient on the unit. Mental health and custody staff were knowledgeable of the entire patient population, including new arrivals, pending transfers,

current behaviors, medication compliance, pending or returning patients from surgery, and patients who had recently received bad news.

### *COLEMAN* POSTINGS

The *Coleman* notice in English and Spanish was posted in all toured CHCF-PIP units.

### LAUNDRY AND SUPPLY ISSUES

The monitor's observations and interviews with patients, warehouse supervisors, and program staff indicated that laundry and supply issues had improved since the prior Monitoring Report on the Mental Health Inpatient Care Programs.  The operational procedure for laundry was updated to require stock assessment three times per week to ensure adequate laundry and linen levels.  Additionally, staff assessed clothing sizes for better fitting clothing for patients.

Housing unit cleaning was provided through an outside contractor; a review of shower cleaning logs indicated that cleaning occurred once per day in accordance with contract requirements.  During COVID-19, cleaning services increased to four times per day.  CHCF-PIP staff reported attendance of cleaning supervisors who monitored cleaning staff, equipment, and log maintenance.

### PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

Property issues persisted at CHCF-PIP during the review period, and every interviewed patient and staff member raised concerns during the site visit.  Numerous issues were attributed to the delays in patients' receipt of property.  Patient Management Unit (PMU) staffing shortage significantly impacted delays as the PMU only had one staff member who received and x-rayed property; scanned the property for the property cards; packaged restricted property; logged and stored property for patients on a one-to-one; distributed property to patients; and prepared property for patient discharge for all 17 units.

CHCF-PIP did not meet the current policy requirement that property must be issued within 15 days of the patient's arrival. Staff reported it would take approximately one month with additional staff to eliminate the current backlog. Without the addition of more permanent PMU staff, backlogs would reoccur. At CHCF, PIP patient property occupied over two thirds of the PMU storage.

Other issues that impacted property delays included sending institutions' delay in forwarding patient property and the breakdown of the x-ray machine for six weeks.

CHCF-PIP staff reported that delays in receipt of property increased patient agitation and 602s regarding property.

Access to canteen was also a significant issue during the review period and at the time of the site visit. CHCF-PIP staff reported a considerable staffing shortage with 50 percent less staff than the preceding monitoring round. Shortages resulted in a backlog of canteen orders of between one week to ten days behind. Additionally, patients' receipt of stimulus checks increased workload as patients who did not normally order from canteen began ordering at the maximum allowable level. The stock of items needed to fill orders fell short, and when stock orders increased to meet demand, there was insufficient storage space.

Pursuant to statewide PIP policy, acute care patients were not provided radios and televisions.

Radios were provided to intermediate care patients. CHCF-PIP staff reported that it took several months to process a purchase order for radios.

Video visiting was utilized during COVID-19. At the time of the on-site review, visitation was reopening pursuant to headquarters' Roadmap to Recovery.

There were no issues with access to telephones during the review period. Several units installed video phones, and the monitor observed patients using them.

CHCF-PIP utilized the Non-Clinical Activity Tracker (NCAT) to capture non-ducated activities during the review period and tracking responsibility moved from mental health to custody staff in October 2020. Daily entries in NCAT included yard, shower, linen exchange, telephone, visitation, open leisure, law library, STEP, supplies, and religious activities. Data included offered, attended, and refused activities and was maintained for 24 hours then uploaded to the On-Demand report.

## LAW LIBRARY ACCESS

CHCF-PIP's law library policy was unchanged, and the library was fully staffed during the review period. All observed kiosks were working, and instructions for their use were available at the kiosk. Additionally, staff was available to assist patients if needed.

Portable law library carts were available for patients that were restricted to their room.

## HEAT PLAN

The heat plan was in effect for one month during the review period; it was also in effect at the time of the site visit.

CHCF's Facility Heat Plan complied with the CCHCS 2021 "Heat Plans and Updates" directive. The monitor's review of documents indicated that CHCF did not monitor the outside temperature hourly during the one month of the review period, as required. Because all CHCF-PIP buildings were air-conditioned, housing unit officers were not required to record inside building temperatures unless the air conditioning malfunctioned. Interviewed officers reported that the air conditioning had never malfunctioned during their tenure at CHCF-PIP. There were no State II or Stage III heat alerts at CHCF-PIP during the review period.

The monitor visited nine housing units; however, due to CTQ status, the monitor did not visit the remaining eight CHCF-PIP housing units.  Knowledge of the heat plan varied among interviewed officers.

Interviewed custody officers were aware of the heat risk list of patients, which they reported was produced weekly, not daily, and they knew how to access the list online.

All CHCF-PIP housing units had thermometers that recorded the units' ambient temperature.  Most interviewed custody officers were unable to explain how the thermometers were calibrated and/or whether they were accurate.

Interviewed custody officers had a wide range of responses when asked whether patients were offered accommodations when a heat alert canceled yard ranging from offering patients additional dayroom time to re-housing patients in their cells.  While officers were unable to provide written verification of accommodations, review of logbooks and NCATs reflected activation and deactivation of heat alerts and the offering of dayroom to patients.  Other units, including 301B, reported activation of a heat alert in the Non-Clinical Activity Tracker (NCAT). None of the reviewed Daily Activity Reports (DARs) indicated the offering of additional dayroom to patients due to a heat alert.

There were no heat-related illnesses during the review period.

Interviewed custody officers reported that they observed patients attending yard and were able to identify some signs of heat stress symptoms.

In accordance with policy, the heat plan monthly summary report (CDCR Form 7711-1) for May 2021 was submitted to the CDCR statewide heat plan coordinator.

**PRE-RELEASE PLANNING**

Due to the critically low staffing, CHCF-PIP was unable to assign a full-time pre-release coordinator.  The assigned pre-release coordinator maintained a patient caseload until April 2021 and subsequently continued to be redirected for coverage at least twice per week.  During the review period, the pre-release coordinator attempted to offer a pre-release planning group; however, the group was disbanded due to COVID-19 related restrictions. The remaining modules were completed individually with patients.  There were no pre-release groups offered during the site visit.

Tracking and organization of pre-release planning at CHCF-PIP needed improvement. During the review period, four patients were discharged to the community without pre-release services, although the coordinator was unable to provide answers regarding missing data from the logs.

CHCF-PIP leadership and the pre-release coordinator were hopeful that pre-release services would improve during the subsequent quarter; however, it would likely be challenging given current staffing limitations and higher priority coverage needs.

**PROGRAM ACCESS**

Patients in the CHCF-PIP did not have access to education during the review period. Of the 119 acute care patients, 91 or 76 percent earned milestone credits.  Of the 374 intermediate care patients, 315 or 84 percent earned milestone credits.

<u>APPENDIX A4</u>
Salinas Valley State Prison Psychiatric Inpatient Program
(SVSP-PIP)

**Salinas Valley State Prison Psychiatric Inpatient Program (SVSP-PIP)**
August 23, 2021 – August 25, 2021

## I.    SUMMARY OF THE FINDINGS

- There were significant staffing vacancies at the SVSP-PIP, including vacancies for all civil service psychiatry positions, and high vacancies for civil service psychologist specialists, psychologists, social workers, and recreation therapists. The use of contractors reduced vacancies, but functional vacancy rates for these disciplines remained high.

- Two registry psychiatrists worked as telepsychiatrists during most of the review period. At the time of the site visit, the institution did not use telepsychiatry.

- Based on the census and bed capacity, three of four SVSP-PIP units met the staffing ratio for psychiatry, but only one of four units met it for psychology, and two of four met the ratio for social work. The institution did not provide caseload ratios for recreation therapy.

- The SVSP-PIP reported significant difficulties retaining staff.

- Observed IDTTs varied from adequate to inadequate; many demonstrated multiple deficits, and there were significant variations in quality, in what they addressed clinically, and in treatment team members' contributions.

- Recreation therapists were no longer part of the IDTT treatment team and had been directed to facilitate groups. There also was no formal mechanism for RTs to provide input into IDTTs or for them to receive information from treatment teams.

- Reviewed treatment plans were often hard to decipher and typically lacked specificity as to staff interventions to support patients to achieve their goals.

- During some IDTTs and groups, staff and patients did not properly wear masks.

- The SVSP-PIP provided insufficient group treatment for an inpatient care program.

- Observed groups were of variable quality and were negatively impacted by the lack of confidentiality.

- There was a need for more clinically led core groups, which patients found beneficial; patients generally expressed dissatisfaction with the quality of RT-led groups.

- Maximum custody patients on some units had no group treatment; others had insufficient group treatment.

- Some groups were reportedly cancelled regularly due to the lack of available custody staff.

- Across the four housing units, there was significant variability in the amount of group, yard, and dayroom provided to patients.

- There was insufficient treatment space to offer all patients weekly confidential psychiatry and primary clinician contacts.

- Reviewed documentation of individual clinical contacts was variable in quality and applicability to patients' documented treatment goals.

- Interviewed psychiatrists reported no issues with medication continuity.

- The SVSP-PIP had some local policies that addressed patients who engaged in self-injurious behaviors; however, staff had not been trained on behavioral management and did not receive training when individual behavior plans were developed.

- Review of patients' behavior plans indicated variability in their content.

- Most observed morning and end of shift huddles demonstrated a useful multidisciplinary approach.

- The institution did not provide review period referral, transfer, admissions, or discharge data in a manner that could be properly analyzed.

- The SVSP-PIP did not provide data for patients who were housed outside their LRH during the review period.

- Review of a sample of RVRs revealed noncompliance for custody staff's timely referral of mental health assessments to mental health, and for mental health staff's timely return of the completed assessments back to custody.

- Review of the one controlled use of force incident revealed compliance with applicable policy.

- There were 12 patient self-harm episodes during the review period, including six suicide attempts; one resulted in the patient's death.

- The SVSP-PIP had a robust quality management program, although progress on the quality and performance improvement program's goals for 2020 – 2021 was variable.

- The quality management committee, mental health subcommittee, and risk management committee regularly met during the review period.

- Common patient complaints reported on surveys included insufficient treatment hours, staffing shortages, and a lack of programming for maximum custody patients.

- Executive leadership joint rounding occurred in the SVSP-PIP during the review period.

- The SVSP-PIP reported several barriers impacting effective laundry operations, including insufficient staffing and inventory, and the misuse of supplies.

- The SVSP-PIP did not have a designated pre-release coordinator or a formalized pre-release planning program.

## CENSUS

The SVSP-PIP's intermediate care facility operated 246 beds in two 180 housing units on C Yard, in C5 and C6, and in two stand-alone units, in TC1 and TC2. There were 202 single-celled beds and 44 multi-person cells. C5 and C6 each contained 58 single-celled beds. TCI had 56 beds, of which 32 were single-celled and six were multi-person; each multi-person cell housed four patients. TC2 had 74 beds, of which 54 were single-celled and ten were multi-person; each multi-person cell housed two patients.

On August 24, 2021, the SVSP-PIP's housed 214 patients, representing 87 percent of bed capacity. Of the 202 single-celled beds, 178 or 88 percent were filled, including four beds occupied by patients on quarantine status. Of the 24 unoccupied single-celled beds, two patients were out to court, three were out to the hospital, 16 had been assigned to in-coming patients, and three beds were available for patients. Of the 16 assigned beds, five were assigned to accepted patients pending transfer, eight were assigned to endorsed patients awaiting acceptance, one was assigned to a patient pending endorsement, and two beds were assigned to rejected patients awaiting the final rescission notice. No beds were redlined.

Thirty-six or 82 percent of the SVSP-PIP's 44 multi-person beds were occupied, including one bed occupied by a solo quarantined patient. Of the eight unoccupied multi-person beds, one patient was out to the hospital and 12 patients had been assigned to the remaining seven available beds. Specifically, one bed was assigned to an accepted patient who was pending transfer, and four were assigned to endorsed patients awaiting acceptance. Four more beds were being held for patients who were currently housed in single-celled beds and had refused their assigned multi-person beds, two multi-person beds were being held for quarantined patients, and one bed was held for a patient under suicide watch who was then housed in a single-cell bed. No beds were redlined.

Forty patients were on maximum custody status. There were four maximum custody patients in C5, three in C6, 22 in TC1, and 11 in TC2.

## STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

At the time of the site visit, positions for the executive director, hospital administrator, and chief of nursing were filled. The chief psychiatrist position was covered by a staff member in an acting capacity.

The position for the chief psychologist was filled. The clinical administrator's position was vacant. Two of 2.2 program director positions were filled, but one was filled out-of-class by a social worker. There was a nursing coordinator, but no established position. The program assistant position was filled.

Senior Psychiatrist: The senior psychiatrist supervisor covered the chief psychiatrist's position, resulting in a vacancy for the senior psychiatrist supervisor.

271

Psychiatrists:  All 11.2 civil service psychiatry positions were vacant.  Eight contractors reduced the functional vacancy rate to 29 percent.

Senior Psychologists:  One of 1.5 senior psychologist supervisor positions was filled, for a 33 percent vacancy rate.  Of 5.6 senior psychologist specialist positions, one was filled, for an 82 percent vacancy rate.

Psychologists:  Six of 11.2 psychology positions were filled, for a 46 percent vacancy rate.   Three contractors reduced the functional vacancy rate to 20 percent.  Five psychologists were unlicensed.

Supervising Psychiatric Social Worker:  The 0.8 position for the supervising psychiatric social worker was vacant.

Social Workers:  Six of 11.2 social worker positions were filled, for a 46 percent vacancy rate.  Two social workers were unlicensed.

Recreation Therapists:  Eight of 11.2 recreation therapist positions were filled, for a 29 percent vacancy rate.

Supervising Registered Nurses (SRNs):  Fifteen of 24.3 SRN positions were filled, for a 38 percent vacancy rate.

Registered Nurses (RNs):  Of 78.6 positions, 43 were filled for a 45 percent vacancy rate. Four contractors reduced the functional vacancy rate to 40 percent.

Certified Nursing Assistants (CNAs):  Of 93.8 CNA positions, 14 were filled, for an 85 percent vacancy rate.  Thirty-nine contractors reduced the functional vacancy rate to 43 percent.

Licensed Vocational Nurses (LVNs):  Eighteen of the 24.8 LVN positions were filled, for a 27 percent vacancy rate.  Thirteen contractors eliminated the functional vacancy rate and provided additional coverage.

Senior Psych Techs:  Both senior psych tech positions were filled.

Psych Techs:  Of 24.8 psych tech positions, 16 were filled for a 35 percent vacancy rate. Three contractors reduced the functional vacancy rate to 23 percent.

Office Services Supervisor (OSS) II:  The 1.6 OSS II position was vacant.

Associated Government Program Analyst (AGPA):  Two of 7.5 AGPA positions were filled, for a vacancy rate of 73 percent.

Clerical Positions:  Fourteen of 19.7 mental health clerical positions were filled, for a 29 percent vacancy rate.

The SVSP-PIP did not have any staff on loan from other programs.

Notably, the institution reported that the PIP Staffing Plan signed by the Governor on July 12, 2021 would create significant staffing changes at the SVSP-PIP.  Among them, it assigned one additional psychiatrist, psychologist, social worker, and recreation therapist to the institution, as well as a team of senior psychologists.  The PIP Staffing Plan also reduced program director staff and one program assistant position but added one supervising social worker.

**Telepsychiatry**

Due to elevated COVID-19 risk factors, two SVSP-PIP registry psychiatrists worked as telepsychiatrists in C5 and C6 from January through June 2021.  During this period, telepsychiatry was used on 393 occasions for IDTT meetings and 1,321 times for individual clinical contacts.  The institution did not use telepsychiatry after-hours or for the Psychiatrist on Duty.  In June 2021, the two telepsychiatrists returned to the institution as onsite registry psychiatrists.

At the time of the site visit, the SVSP-PIP did not use telepsychiatry.[2]

The SVSP-PIP's telepsychiatry LOP had been revised in June 2021.

**Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

There was a 1:30 staffing ratio for intermediate care for the four disciplines of psychiatry, psychology, social work, and recreation therapy, but pursuant to the new PIP staffing plan for FY 2021 – 2022, there was a 1:15 staffing ratio for PC 1370 patients.  During the site visit, TC1 and TC2 housed two and five PC 1370 patients, respectively.

As for psychiatrists, three of four units met the staffing ratio based on both the reported census and bed capacity.  For psychologists, one of four units met the caseload ratio based on the census and bed capacity; for social workers, two of four units met this ratio based on the census and bed capacity.  Though requested, the SVSP-PIP did not provide caseload ratios for recreation therapy.

**Staffing Shortages and Recruitment Efforts**

The SVSP-PIP reported numerous problems in its efforts to improve staffing.  The institution employed no civil service psychiatrists.  Also of grave concern was the low retention rate for civil service psychologists and social workers.  Across all disciplines, only one-third of the SVSP-PIP's current staff were in the same positions as they were in as of December 2019. Mental health leadership admitted that most SVSP-PIP staff were inexperienced.

As to staff retention, there was a continuing pattern of psychologists and social workers leaving the SVSP-PIP for employment at the Correctional Training Facility (CTF).  Mental

---

[2] On May 5, 2022, CDCR notified the Special Master and plaintiffs' counsel that "a telepsychiatrist has been assigned to the SVSP PIP for 30 consecutive calendar days."  Email from Melissa Bentz, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (May 5, 2022), attached hereto as Exhibit O.

health leadership believed that some staff made an intentional decision to initially seek employment at the SVSP-PIP and then transfer to CTF, which had a significantly less clinically-intense patient population but an identical pay scale to the SVSP-PIP.

### MTA Transition Plan

At the time of the Special Master's last site visit in December 2019, two of four SVSP-PIP units had completed the MTA transition. As of this site visit, all units had finished the transition; there were no MTAs at SVSP at the time of the site visit.

## TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1.    Interdisciplinary Treatment Teams (IDTTs)

Observed IDTT meetings typically demonstrated multiple deficits. These shortcomings included significant variations in interdisciplinary discussions, and treatment team member's contributions at IDTTs. Reviewed treatment plans were often difficult to decipher and typically lacked specificity.

Notably, recreation therapists did not attend IDTTs. Since approximately January 2021 and at the direction of SVSP-PIP leadership, staffing vacancies and the need for RTs to provide groups had resulted in RTs no longer being part of the treatment team. Although the Program Guide did not mandate their attendance at IDTTs, RTs provided most group treatment and often had the most patient contact. Because of RT's useful clinical input, interviewed psychologists and RTs reported their non-attendance as a negative change. There was also no formal mechanism to either allow RTs to provide IDTT input or for them to receive information from treatment teams.

On C5, an observed IDTT exemplified numerous shortcomings. Among them, the IDTT failed to discuss relevant historical information, the referral rationale, case conceptualization,

medication indications and side effects, planned treatment interventions other than medications, diagnostic information, treatment progress or obstacles to progress, the length of current admission, and discharge objectives.

During this C5 IDTT, the patient reported command auditory hallucinations with voices telling him to end his life.  Notably, the primary clinician's one follow-up question only inquired whether he was experiencing suicidal "thoughts."  The patient appeared confused by this question and replied "no."  The primary clinician continued with the IDTT without appropriately assessing imminent suicide risk or reviewing safety planning.

A nurse in attendance reported that the patient frequently engaged in fighting due to anger issues and command auditory hallucinations.  The IDTT agreed that the patient would benefit from anger management groups.  However, there was no mention of referring him to such groups and the primary clinician indicated that they did not know whether such groups were available.

The monitor's expert shared his concerns about this IDTT with mental health leadership. The response was that the observed clinician was a recently hired unlicensed social worker who needed additional training.

Ten observed IDTTs on C6 all took place in small confidential rooms.  All required treatment team members attended and accessed computers for additional information.  Notably, the IDTTs did not reference information from RT progress notes or collateral contacts.

Each C6 IDTT member contributed to discussions and appropriately interacted with patients; however, treatment team contributions varied considerably.  The counselor's contributions were useful; they appropriately established effective communication by summarizing the IDTT discussions in simpler terms and asking patients to paraphrase pertinent

information.  However, nursing staff did not provide meaningful input or reference patients'

medical records.

Observed C6 IDTTs also revealed the failure to routinely review case conceptualizations,

the reasons for patient admissions, diagnostic information, medication compliance, and level of

care rationales.  When clinically indicated, behavioral assessments and plans were missing from

discussions.  The IDTT reviewed discharge objectives for only one patient, despite several others

inquiring about discharge.  While the treatment team routinely reviewed LRH, it rarely addressed

specific LRH obstacles.

Tellingly, to attempt to address inappropriate discharges, the SVSP-PIP had implemented

a discharge readiness tool and an interdisciplinary manager review process for all patients

considered for discharge.  The IDTTs were aware of this new discharge policy.

Observed C6 IDTTs highlighted the need for additional training to develop adequate case

conceptualizations, behavioral assessments, and behavior plans to effectively meet the needs of

intermediate care patients.

The monitor's expert reviewed records, including IDTT documentation and treatment

plans, for 11 TC1 patients.  Reviewed treatment plans were challenging to decipher; many listed

goals in two separate sections.  First, treatment goals were included in the patient's individual

plans of care (IPOCs) and were often generic, related to identifying triggers for

symptoms/behaviors, and acquiring coping skills.  Second, most treatment plans included a

separate list of treatment goals entitled Treatment Outcome Expectations (TOEs) which were

different from those listed in the IPOCs.  For example, one patient had a single IPOC for "grave

disability" which outlined goals focusing on hygiene, improved decision making, and learning

positive coping skills, several interventions to achieve them, and several specific achievable

outcomes.  The TOES included increasing mood stability and decreasing hallucinations and delusions; however, none of these symptoms were mentioned in the IPOC.

Reviewed IDTT-developed treatment plans were often general and lacked specificity as to staff interventions to support the patient to achieve treatment goals.  This was especially apparent in treatment plans for patients who were admitted for being incompetent to stand trial.  The treatment goals sought to enable the patient to assist in court proceedings; however, there was no information about the factors that were preventing him from assisting in court proceedings.  Therefore, treatment interventions were not designed to target the patients' symptoms.  Subsequently, record reviews also typically revealed that individual PCs were not documenting the interventions to support patients' treatment goals.

Six interviewed TC1 patients reported being aware of their diagnoses and treatment goals and felt that IDTTs were collaborative; however, one patient reported not wanting to attend IDTTs because he felt it sometimes felt like an interrogation.  This patient stated that he preferred to discuss his treatment goals and progress individually with his PC.

Observation of 12 IDTTs on TC2 indicated that clinicians typically performed initial mental health assessments prior to the IDTT.  Interdisciplinary discussion during the IDTT was helpful and the primary clinician summaries were very good.  IDTT meetings also reviewed current treatment plans.  However, group treatment discussions were largely very limited.  The IDTTs were also significantly compromised by RTs not being part of them and by the absence of a process to obtain information from RTs.  Patients typically attended IDTTs and were engaged.

Patients' treatment schedules, including groups and individual sessions, were given to TC2 patients in writing during the IDTT.  However, group assignment was not driven by the treatment plan, but was based on schedule availability.

During the TC2 IDTTS, patients typically did not properly wear masks, although staff reminded patients to properly wear them. Throughout all observed TC2 IDTTs, one nurse improperly wore her mask.

Healthcare record review on TC2 also revealed that master treatment plans (MTP) reflected a cut and paste process; this was evidenced by many plans indicating that ten groups were to be provided, as well as each MTP containing similar misspellings.

The monitor reviewed the healthcare records of ten C5 patients to assess the timeliness of IDTTs. Five of six or 83 percent of patients who required initial IDTTs had them within 72 hours of admission. Correctional counselors only attended two of six initial IDTTs.

Ten C5 patients required routine (i.e. 30-day) IDTTs. There were 29 expected timeframes for routine IDTTs during the review period. Twenty-five of 29 or 86 percent occurred timely. However, according to EHRS documentation, correctional counselors only attended 15 percent of these IDTTs.

The monitor also reviewed the healthcare records of 20 C6 patients to assess IDTT timeliness. Certain factors led to the removal of five cases from the assessment. This left 15 cases for review.

All seven patients who required initial IDTTs had them within 72 hours of admission. Required staff were present at one of seven or 14 percent; the correctional counselor was always the staff member not in attendance.

Fifteen C6 patients required routine IDTTs. There were 40 expected timeframes during the review period. Thirty-six or 90 percent of routine IDTTs occurred timely. For the 48 routine IDTTs, required staff were present at 13 or 27 percent. With one exception, the correctional counselor was not in attendance.

279

The monitor also reviewed healthcare records of 20 TC1 patients to assess IDTT timeliness. Certain factors led to the removal of one case from the assessment. This left 19 cases for review.

All nine TC1 patients who required initial IDTTs had them within 72 hours of admission. Required staff were present at four of nine or 44 percent; the correctional counselor was always the staff member not in attendance.

Nineteen patients required routine IDTTs. There were 47 expected timeframes during the review period. Forty-eight of 50 or 96 percent of routine IDTTs for TC1 patients occurred timely. Required staff were present at 43 of 61 or 70 percent of routine IDTTs. With one exception, the correctional counselor did not attend IDTTs.

### **Group Therapy**

SVSP-PIP tracked group therapy through the electronic unit health record (eUHR). Data review and discussions with mental health leadership and staff revealed inaccuracies in provided group treatment data.

This data reported that on average 74 percent of delivered treatment hours to SVSP-PIP patients was through group treatment. RTs reportedly provided 56 percent of groups. Patients attended a weekly average of 1.97 hours of group treatment, with RTs providing 1.1 hours.

The institution further reported that only 64.5 percent of scheduled groups occurred. The unavailability of group facilitators led to the cancellation of 47 percent of groups; 14 percent were cancelled due to staff redirection. Patients refused 53 percent of groups.

Overall, SVSP-PIP groups were of variable quality and were significantly hindered by the lack of confidential treatment space. Interviewed patients requested more clinically relevant

groups. Maximum custody patients on some units had no group treatment; others had insufficient group treatment.

On C5, provided group treatment was inadequate, and there were no groups for maximum custody patients. C5 group quality also varied and was negatively impacted by the lack of confidentiality. Moreover, patient mask wearing during groups was inconsistent and group facilitators typically did not address this issue. Group observation also revealed staff improperly wearing masks.

Interviewed mental health leadership and C5 patients reported that non-maximum custody patients were offered between one and two daily hours of group every weekday, as well 90 minutes of yard, and approximately one daily hour of dayroom for an approximate total of 3.5 to 4.5 daily hours of out-of-cell time. Patients stated that this amount of out-of-cell time was insufficient. Notably, dayroom time was also used for showers, phone calls, and laundry pick-up.

Group offerings and patient group refusals were discussed with the supervising psychologist, who stated that the program could be enhanced by increasing core group offerings and less reliance on supplemental groups. Mental health leadership further indicated that group refusals were related to several factors, including some patients' lack of treatment motivation, the less motivating way custody staff offered groups to patients in comparison to the previously utilized MTAs, and the nonconfidential group settings.

Three observed C5 groups were all conducted in the dayroom, which afforded neither visual nor auditory confidentiality and revealed multiple, serious distractions. Among them, nearby patient non-group participants talked loudly, a psychiatrist conducted cell-side visits, a

patient was being discharged, lunch was distributed, and custody staff entered and exited the unit.

Two interviewed C5 maximum custody patients both reported not receiving group treatment, which leadership confirmed. Maximum custody patients received yard for three one-hour intervals on Saturday and Sunday. As such, they were generally locked in their cells except for these very brief periods.

On C6, interviewed patients reported the assignment of treatment groups during IDTTs. Non-maximum custody patients reported being offered between five and ten weekly hours of group treatment, but only two hours of core groups. They also reported being offered 1.5 daily hours of yard and between 45 minutes and one hour of daily dayroom; however, like the patients on C5, they had to use the allotted dayroom time for phone calls, laundry, and showers.

Interviewed C6 patients generally spoke highly of clinician-led core groups; most wanted more than two weekly hours. However, they were very dissatisfied with the quality of RT groups, reporting that some RTs sat and conversed with custody officers after turning on a movie or assigning an activity and did not actively participate in the group activity.

The monitor's expert observed three C6 treatment groups; one clinician-led core group and two RT groups. The core group started ten minutes late. While the dayroom setting compromised group quality, the psychologist was well-organized, engaging, and knowledgeable about the subject matter. All patients actively participated and appeared to find therapeutic value in the presented material.

One observed RT group was adequate. The other RT group lacked structure and therapeutic value and was limited to playing a poor-quality documentary video without providing

an introduction or context. During the group, the RT typed on his laptop in a corner while the patients turned away from the television and engaged in conversations.

C6 patients reported that the non-confidential dayroom was a distracting environment for groups, which was confirmed by observation. During observed groups, notable distractions included conversations by nearby cell-front patients, intercom announcements, patients banging on doors, audible radios/televisions from within cells, and other noises from general unit activity. It was not surprising that C6 patients reported that the lack of confidential group treatment negatively impacted their treatment progress and that they were more guarded during group in the presence of custody staff. Patients also reported that groups were often cancelled or started late and/or ended early.

Interviewed C6 maximum custody patients reported having minimal out-of-cell time. They were not offered groups. They further reported being offered one daily hour of yard and weekly individual contacts with psychiatrists and PCs.

SVSP-PIP provided documentation for C6 also reported that NCAT data was unreliable and did not capture patient refusals. The institution did not provide separate structured and unstructured activity hour data for any C6 patients.

On TC1, staff reported that most patients were offered between two and four weekly groups. Non-maximum custody patients reported attending three weekly groups, while maximum custody patients reported participating in two to four weekly groups. This group treatment was much less than what was expected for an inpatient treatment unit. Interviewed patients all reported not being offered enough treatment hours, as well as wanting more clinically relevant groups. Group size was limited to three maximum custody patients or six non-maximum custody patients.

The provided TC1 group schedule for July through October 2021 noted 58 weekly groups; 32 were reportedly led by RTs, 12 by nursing, and 14 by psychologists. Despite what was reported, there were no nursing-led groups during the site visit; the psych tech who facilitated them was on an extended leave. Moreover, nine of the schedule's 14 psychologist-led groups were listed as being facilitated by clinicians who no longer worked on the unit. Three others were listed as including maximum custody patients, but during the site visit psychologist-led groups were not offered to maximum custody patients.

Notably, the subjects of the RT-led groups were the decisions of RTs without input from psychiatrists or psychologists. As RTs did not participate in IDTTs, the treatment team did not provide formal input into group content; however, a psychologist stated that patient needs were informally discussed with RTs.

TC1 groups were reported to be cancelled with some regularity due to custody staff's engagement in other activities. Most recently, groups were cancelled due to many patients being on suicide watch and insufficient nursing staff to provide coverage.

The monitor's expert attended five TCI groups; three for non-maximum custody patients and two for maximum custody patients. For the three non-maximum custody groups, two of three facilitators went to the patients' cells to encourage refusing patients to attend; the third facilitator did not attempt to persuade refusing patients to attend group.

For non-maximum custody patients, an observed RT-led anger management group found patients reading a worksheet and discussing its content. Patient discussion was often off-topic, the RT did not effectively redirect the discussion, and patients had little active reflection about the reviewed material. Observed psychologist-led groups were engaging with thoughtful patient-

led discussions with relevant comments and reflections. The psychologists effectively supported patient discussion, reframed comments, and redirected conversations as clinically indicated.

Both observed maximum custody groups were led by RTs. The patients reported that the groups were beneficial but noted only receiving RT-led groups.

Interviewed TCI non-maximum custody patients reported dayroom being limited to one hour, three to four days weekly; phone access was limited to four times weekly for 15 minutes. Patients noted that the unit only used one available space for dayroom activities, which severely limited the number of patients who could access dayroom. Maximum custody patients reported no dayroom access and only being allowed phone access once monthly. Yard was provided for between 90 minutes and two hours daily to all patients regardless of security status. Some non-maximum custody patients added that their access to treatment and dayroom was often cancelled due to disruptive maximum custody patients.

On TC2, the monitor's expert observed three RT-led treatment groups for non-maximum custody patients; two were Xbox groups. Interviewed patients in three separate settings typically reported being offered two 50-minute weekly groups; some reported being offered three to four weekly groups. Patients described the groups as helpful, but only a few reported being offered core treatments groups. The attempted observation of two additional RT groups was unsuccessful as both were cancelled due to correctional officer shortages.

TC2 patients also reported being offered 1.5 daily hours of yard and one hour of dayroom every other day. Offered weekend yard time was for two hours per session.

Maximum custody patients on TC2 had very limited group treatment, which was restricted to weekends and was by way of the therapeutic modules located in TC1.

285

**Individual Treatment**

Provided data reported that during the review period SVSP-PIP patients received an average of 23 minutes of weekly individual primary clinician contacts. However, across all units, the amount of individual patient treatment, and its confidentiality, varied.

C5 clinical staff consisted of two psychiatrists, one psychologist, and two social workers. Only one of the three PCs was licensed. The two psychiatrists staggered their schedules to provide coverage six days weekly. Psychiatrists assigned to C6 provided coverage for C5 patients on the remaining day. The clinical supervisor reported that one psychology position was vacant, which raised clinical caseloads. This was confirmed by review of provided information, which reported four treatment teams with respective caseloads of nine, 12, 13, and 17 patients. Psychiatrists and clinicians were assigned to more than one team so that PC's actual caseloads ranged from 15 to 17 patients; psychiatry caseloads were between 25 and 26 patients. An interviewed C5 clinical supervisor expressed concern with the number of unlicensed staff and with staff being overworked.

On C5, individual treatment, when offered, took place in former group treatment rooms unless the contacts were cell front. Interviewed clinical leadership and reviewed appointment schedules reported inadequate treatment space to offer all patients weekly confidential sessions with their primary clinician and psychiatrist. Patient and staff interviews also revealed inconsistencies regarding the frequency of individual clinical contacts and their confidentiality. Some patients reported consistent confidential individual sessions with PCs and psychiatrists; others reported that all or most of their psychiatry contacts took place at cell front and without the offer of a confidential contact.

Two interviewed C5 maximum custody patients both reported receiving weekly psychiatry and primary clinician contacts, and confidential primary clinician sessions. One of the maximum custody patients reported confidential psychiatry contacts; the other reported cell-side psychiatry contacts. Both requested additional programing.

C6 clinical staff primarily conducted individual contacts in confidential rooms. Most interviewed C6 patients reported that primary clinician contacts were offered weekly in a confidential setting and were beneficial. Psychiatry contacts in C6 were also scheduled once weekly; however, several patients assigned to the same part-time weekend psychiatrist stated that only cell-front contacts were offered.

During the site visit, three psychiatrists assigned to TC1 had respective caseloads of 24, 22, and four patients. Three psychologists, two of whom were unlicensed, were assigned as primary clinicians for the unit's patients. Primary clinician caseloads ranged from 15 to 19 patients. One of the unlicensed psychologists was supervised by a licensed psychologist who no longer worked on the unit. Reviewed healthcare records lacked evidence of supervisory reviews for the unlicensed psychologists.

Six interviewed TC1 patients typically reported seeing their psychiatrists and PCs weekly. Several non-maximum custody patients reported that the psychiatrist saw them when they were on the yard for brief "check-ins" in front of other patients, which record review corroborated. Some patients reported occasionally having simultaneous individual sessions with their psychiatrist and PC, which record review confirmed. It was further reported by some patients that custody staff was not responsive to their urgent needs to speak with mental health. This resulted in patients escalating their behavior so they could be seen by their clinicians.

Review of one TC1 maximum custody patient's healthcare record noted that his psychiatrist saw him weekly until August 5, 2021 but had not seen him since that date. His weekly appointments were noted to have been cancelled.

Review of 11 TC1 patient records for key indicator performance benchmarks revealed the completion of initial primary clinician and psychiatry evaluations prior to the initial IDTT 67 and 100 percent of the time, respectively. This review also found the consistent documentation of effective communication for clinical contacts 73 percent of the time, and that treatment plans included implemented pre-release plans 71 percent of the time. Health care records of high refusers included documented reasons and interventions to address the refusals zero percent of the time, while primary clinician contacts were consistently held in a confidential setting 55 percent of the time. There was appropriate higher level of care consideration reviews for all reviewed cases.

From a quality standpoint, there was variability in care on TC1. Some PCs used individual sessions to address patients' needs and support their progress toward treatment goals, with sufficient documentation of the interventions provided, and their rationales. However, for other clinicians the documentation was primarily an update of the patient's status, without an indication of the provided treatment or whether the patient made progress toward treatment goals. PCs were also challenged by the provision of services to patients who refused treatment, were argumentative, or who engaged in self-injury for secondary gain. In these cases, patient contacts were more likely to be brief and completed at cell front. For patients who refused treatment sessions, there was no evidence that treatment plans or interventions were adjusted to address high refusal rates or to attempt to engage them more effectively.

Interviewed TC2 patients reported confidential weekly sessions with their primary clinician and psychiatrist for between 15 and 45 minutes. They reported the sessions to be helpful. However, TC2 was typically staffed by correctional officers who were not regularly assigned to the unit. This resulted in increased cancellations and/or delays in providing both individual and group treatment.

The monitor reviewed the healthcare records of ten C5 patients for the timeliness of individual clinical contacts. All six patients who required initial psychiatry evaluations had them within 72 hours and prior to the IDTT. There were 46 expected timeframes for routine psychiatry contacts. Thirteen of 46, or 28 percent occurred timely.

Six of ten C5 patients required initial primary clinician assessments. One of six, or 17 percent occurred within 72 hours and prior to the IDTT. Notably, records documenting the occurrence of initial primary clinician evaluations was not located in EHRS for three patients in the sample. Of the 38 expected timeframes for routine primary clinician contacts, 14 or 37 percent occurred timely.

The monitor also reviewed the records of 20 C6 patients to assess the timeliness of individual clinical contacts. Certain factors led to the removal of five cases from the assessment. This left 15 cases for review.

Five of seven, or 71 percent of patients who required initial psychiatric evaluations had them within 72 hours and before the initial IDTT. Four of seven of these contacts occurred in a confidential setting. The telepsychiatrist saw one patient.

Fourteen patients required routine psychiatry contacts. Of the 62 expected timeframes for these contacts, 57 or 92 percent occurred as required by policy. Of the 70 completed routine psychiatry contacts, seven or ten percent were conducted confidentially.

Five of seven, or 71 percent of patients who required initial primary clinician evaluations had them within 72 hours and before the initial IDTT.

Fourteen patients required routine primary clinician contacts. Of the 56 expected timeframes for these contacts, 39 or 70 percent occurred as required by policy. Of the 61 completed routine primary clinician contacts, 42 or 69 percent were conducted confidentially.

The monitor also reviewed the healthcare records of 20 TC1 patients to assess the timeliness of individual clinical contacts. Certain factors led to the removal of one case from the assessment. This left 19 cases for review.

Seven of nine, or 78 percent of patients who required initial psychiatry evaluations had them within 72 hours and before the initial IDTT. Five of nine of these contacts occurred in a confidential setting. A telepsychiatrist saw two patients.

Nineteen patients required routine psychiatry contacts. Of the 76 expected timeframes for these contacts, 55 or 74 percent occurred as required by policy. Of the 81 completed routine psychiatry contacts, 42 or 51 percent were conducted in a confidential setting.

Seven of nine, or 78 percent of patients who required initial primary clinician evaluations had them within 72 hours and before the initial IDTT.

Nineteen patients required routine primary clinician contacts. Of the 70 expected timeframes for these contacts, 37 or 53 percent occurred as required by policy. Of the 69 completed routine primary clinician contacts, 45 or 65 percent were conducted confidentially.

**Solo Programming**

Based on custodial and/or clinical factors, a non-maximum security patient could be placed in solo programming, which required them to participate in structured therapeutic activities alone

because they were deemed not clinically ready to program with others.  The SVSP-PIP did not use solo programming for any patient during the reporting period or at the time of the site visit.

### Psychiatric Services

Six interviewed civil service staff psychiatrists assigned to TC2 reported that there were no issues with medication continuity.  However, they reported significant issues with patients who received medication-assisted treatment (MAT) diverting their prescribed Suboxone to others.  These patients also were not receiving the MAT talking therapies; coordination between the PIP and MAT staff was essentially nonexistent.

Interviewed psychiatrists reported good communication with RTs, which was inconsistent with information that RTs provided.

### Other Treatment Issues

#### A. Involuntary Medications (PC 2602)

Sixty-two patients were on active PC 2602 orders for involuntary psychotropic medications during the review period.  All PC 2602s were reported to be timely renewed.

#### Behavioral Management

The SVSP-PIP did not have a Positive Behavioral Support Team (PBST) and lacked an LOP to develop behavior plans.  However, a local policy entitled "Complex Cases–PIP Manager Reviews" had been implemented in June 2021 to address patients who engaged in self-injurious behavior.  This policy required the SPRFIT coordinator to daily monitor self-harm incidents to determine whether any patients had harmed themselves on two or more occasions during the prior 72 hours.  Clinical and custody leadership and representatives were to provide treatment planning reviews and recommendations to the patient's treatment team.

The SPRFIT coordinator provided tracking information from May through July 2021 for cases meeting this threshold.  This information reflected 16 separate incidents involving seven patients who required consultations for self-harm incidents.  All seven patients' records were reviewed.  Notably, there was a single consultation note in the eUHR for patients with multiple tracking form entries, but no further documented evidence of these consultations despite patients' behavior subsequently meeting the established threshold.  Specifically, in three instances a single consultation note addressed two separate incidents, for two instances an earlier consultation note was referenced as having addressed the subsequent issue, and for five instances there was no evidence of a consultation documented after the initial consultation.  The tracking form did not include one of the consultations provided to a patient with a behavior plan.

The content of the consultation documentation also varied widely for these seven patients.  Whereas the first patient had treatment recommendations, for the second it was reported that treatment recommendations could not be provided secondary to the patient's behavior being primarily driven by antisocial personality traits and his desire to control his housing assignment.  For the third patient, the consultation note indicated the need for diagnostic clarification, non-formulary medication review, and review of the patient's progress and treatment plan updating; however, there were no recommendations concerning the patient's self-injury.  For the fourth patient, only one of three required patient consultations occurred, while recommendations focused on self-injury factors but did not address treatment needs.  The fifth patient's consultation indicated six questions for treatment team consideration but lacked recommendations.  The sixth patient's record lacked evidence of supervisory team consultation and did not reference treatment recommendations.  The final case documented discussions

between a supervisor and the treatment team as to the need to update treatment goals but lacked significant specific recommendations.

SVSP-PIP LOP 506 entitled "PIP: Chronic Self-Injury Risk Mitigation" provided staff with the ability to limit patient access to certain metal objects, such as staples and paper clips, that could be used for self-injury.  The policy also gave IDTTs the authority to limit patient access to these items through treatment planning.  These plans were to be reviewed at least every 14 days.  Reviewed cases indicated that routine or special IDTTs were held to discuss limiting patients' access to the items; reviewed progress notes also evidenced review of the limitations every 14 days, as well as subsequent reviews during IDTTs.

Notably, the institution lacked formal training programs to develop or implement behavior plans.  PCs were responsible for communicating the plans' provisions to staff.  Given that behavior plans' implementation was reliant on the consistency of staff responses to specific patient behaviors, it was unclear how these plans could be successfully implemented without adequate staff training.

Mental health leadership identified four patients who had formal behavior plans during the review period.  Review of the plans found them to be variable in content and quality.  They did not include short-term, specific, measurable, and achievable goals.  There was also no evidence that the plans were discussed with staff, implemented in any formal way, or tracked or updated during the review period.

Reviewed documentation revealed that nursing staff and recreation therapists monitoring patient behaviors did not reference behavior plans or the expected staff responses that the behavior plans outlined.  In all four reviewed records for patients with formal behavior plans, only psychiatrists and PCs referenced them.

Of the four reviewed behavior plans, two were similar in content and focused on staff responses to the patients' behavior. However, they lacked incentives to support patient behavioral change and were not collaboratively developed with patients.

The third behavior plan was developed collaboratively with the patient and indicated that the safety plan was the foundation for his behavioral change. Nonetheless, there was a separate document, entitled "Behavioral Plan," which directed staff not to allow the patient to see the plan. Moreover, the patient's healthcare record did not reference the behavior plan. The "Behavioral Plan" document was neither dated nor entered into the healthcare record; its implementation date was thus unknown. The behavior plan included bullets about targeted behaviors and their function, and generalized goals that were neither objective nor measurable. Much of the plan focused on staff's response to the patient's behavior and restrictions that should be implemented. Although there were two bullets listing "good behavior rewards," none of the incentives were listed as positive coping skills or resources in the patient's safety plan; it was thus unlikely that these reinforcers were individualized to the patient or collaboratively identified.

The fourth case contained no reference in any documentation entered into the eUHR during the review period to any behavior plan that was being developed. A separate behavior plan document was also provided for this patient. The plan did not include a functional analysis nor any incentives. It focused on staff's restrictive responses to the patient's negative behaviors and expectations for the patient to engage in offered treatment.

Although SVSP-PIP leadership and staff were attempting to address self-injurious behavior through consultation and behavior plans, they were not doing so adequately. Given the large number of patients who engaged in frequent self-injury, there was a need for a formal team

or at least an identified assigned clinician to specifically formulate plans and address self-injury. SVSP-PIP leadership acknowledged this need.

### Morning and End of Shift Meetings

During the site visit, an observed afternoon end of shift meeting conducted on TCI included relevant disciplines.  For some topics, patient discussions were of adequate detail and length to cover identified issues; for others, such as upcoming admissions and medication refusals, patient lists were provided without further details.

Two days of observation of the TC2 morning and afternoon huddles demonstrated a very useful multidisciplinary discussion by attending staff.  A RN led huddle discussions.  Notably, a minority of healthcare staff were not properly wearing their masks.

## PATIENT ACCESS TO TREATMENT

The SVSP-PIP discontinued use of the STEP program in November 2019.

## REFERRALS AND TRANSFERS

SVSP-PIP did not provide review period referral and transfer data in a manner that could be properly analyzed.  Rather, provided patient referral data was in a PDF format, as opposed to the requested Excel format, and was not filtered for the review period but provided information as far back as 2017; it included neither rejections nor recissions.  The data also lacked requested information regarding timeframe compliance for referrals to HCPOP endorsement.

For patient acceptance after endorsement, the SVSP-PIP provided complete data for 203 patients or 93 percent of its August 26, 2021, census.  The SVSP-PIP was not compliant for meeting the required timeframes for acceptance or rejection after referral; the institution took more than ten days to accept 86 patients or 38 percent of the 203 patients.  The average time for patient acceptance for decisions that took more than ten days was 16 days and ranged from 11 to

54 days.  Few reasons were provided for these delays, but included endorsement changes to multi-person cells, and patients being out to medical, refusing housing, and being confined to quarters due to COVID-19.

## ADMISSIONS AND DISCHARGES

### 1.    Admissions

As reported above, the total number of review period admissions could not be calculated from provided data.  As such, admissions compliance data was garnered from the list of current SVSP-PIP patients on August 26, 2021.

SVSP-PIP provided admission dates for 173 patients or 79 percent of the 219 patients housed there on August 26, 2021.  Of these patients, 166 or 96 percent were admitted within 30 days of referral.  For the seven patients who took longer than 30 days, the average time from referral to admission was 51 days, with a range of 31 to 126 days.

As for patient admissions following acceptance, the institution provided data for 161 of 219 or 74 percent of the institution's patients on August 26, 2021.  These patients' average time from acceptance to admission was 3.45 days and ranged from zero to 24 days.  Thirty-eight percent or 61 patients took longer than three days to transfer following acceptance.

No patients with complex medical needs were admitted to the SVSP-PIP during the review period.

At the time of the site visit, seven patients who had been referred/endorsed to the SVSP-PIP were awaiting decisions on acceptance or rejection.  These patients were waiting for an average of ten days, with a range of three to 22 days; the patient waiting 22 days was re-endorsed for a multi-person cell.

During the site visit, 11 patients who the SVSP-PIP had accepted were awaiting transport to the institution.  All were waiting longer than three days; the average wait was 14 days.  One patient's delay was due to a COVID-19 quarantine, and another was noted as PC 1370.  No other reasons for delay were provided.

SVSP-PIP reported that it did not track and SOMS could not provide information regarding patients admitted from PSUs.

**__Discharges__**

SVSP-PIP reported 141 discharges during the review period, of whom 21 patients had entries of "N/A" or "none" for the clinical discharge date on the Excel report.

Excluding the 21 "N/A" or "none" patients, and two additional patients for whom complete data was not provided, the average length of stay from admission to physical discharge for the remaining 118 patients was 275 days, with a range of 18 to 741 days.  The average length of stay from admission to clinical discharge was 267 days and ranged from five to 722 days.  Sixty-three percent of discharged patients took longer than five days to physically transfer after clinical discharge.

For the 119 patients for whom the SVSP-PIP tracked clinician-to-clinician contacts following discharge, 64 patients or 54 percent had such documented contacts following discharge.

At the time of the site visit, the SVSP-PIP did not report any discharged patients who were awaiting transfer.

## LEAST RESTRICTIVE HOUSING

The SVSP-PIP did not provide data for patients who were housed outside their LRH during the review period.  On August 20, 2021, the SVSP-PIP housed 69 patients outside their LRH; there were 41 patients housed in single cells and 28 in multi-person cells.

The SVSP-PIP's executive director reported that, pursuant to policy, a designated program director completed weekly audits for all LRH patients who were housed in unlocked dorms.  The audit was forwarded to headquarters for validation.  The remaining patients outside their LRH were reviewed monthly on a rotating basis.

The correctional counselor led observed ICCs, which also included the chief deputy warden, a captain, mental health clinician, and staff assistant.  During ICCs, the mental health clinician asked two scripted questions of every patient, namely, how they felt and whether they were okay to proceed with the ICC.  Otherwise, the mental health clinician failed to interact with the patient unless asked a specific question.

Observed ICCs addressed LRH and removed the maximum custody status for three patients.  Two of the patients were at their LRH (single-cell), and the third's LRH was multi-person cell.  The committee indicated that the third patient's LRH would also be addressed at IDTT.  However, consultation with the monitor's expert revealed that IDTTs did not routinely address LRH.

For patients whose custody factors changed during ICC, including patients released from maximum custody, the mental health ICC/UCC representative was required to provide the classification committee chrono to the IRU and the patient's treatment team within three business days.  Notably, the executive director reported no process in place to verify whether this

occurred.  Consequently, patients potentially waited until their next scheduled IDTT for this housing classification to change.

## PATIENT DISCIPLINARY PROCESS

The institution reported that 100 percent of SVSP-PIP executive staff and social workers, and seven of ten psychologists, completed the mental health assessment training.  No psychiatrists attended.  The training was also attended by three of 11 or 27 percent of registry psychiatrists, psychologists, and social workers.  For custody staff, eight of nine or 89 percent of correctional administrators, two of six captains, 12 of 30 or 40 percent of lieutenants, and 54 of 86 or 63 percent of sergeants, completed the training.  Custody officers' attendance at the training was not reported.

The SVSP-PIP issued 215 RVRs to patients during the review period, of which the monitor reviewed a random sample of 22.  Of the reviewed RVRs, custody timely referred nine or 41 percent to mental health for completion of mental health assessments; mental health staff timely completed the assessments and returned them to custody in 12 or 55 percent of cases.

Eight or 36 percent of mental health assessments were completed in a private setting. Patients agreed to a cell-front interview in another eight cases.  In four or 18 percent of cases, the clinician reported a lack of private space to conduct the assessment interview; however, these four patients agreed to cell-front interviews.  Patients declined the assessment interview in the remaining two cases.  All reviewed RVRs indicated the assignment of a staff assistant.

Many mental health assessments used limited language that was nearly verbatim. Tellingly, the same social worker completed all assessments.  All 22 reviewed assessments recommended penalty mitigation, but in only four or 18 percent did clinicians state that the patient's RVR behavior had a nexus to their mental illness.  Moreover, in 59 percent of reviewed

mental health assessments, the recommended mitigation was "I/p reports that his in-cell appliances and family contacts are coping skills he utilizes to maintain his mental health stability." The suggested mitigation of five assessments was family contact, while two recommended in-cell appliances.

The responses to question five of the mental health assessment, which addressed the mental health factors that the ICC should consider when assessing a SHU term, were neither responsive nor useful. In 16 of 22 or 73 percent of cases, the clinician's response was, "(i)f found guilty of the offense, I/P will be able to gain access to the mental health services delivery system in any level of care while in the custody of CDCR."

Hearing officers documented consideration of mental health assessments in 100 percent of the reviewed cases and mitigated patient penalties in 16 or 73 percent. In six RVRs, patients received an emergency medication injection due to their agitated state following the RVR-documented behavior. Notably, in all six cases, the clinicians' mental health assessments reported that the patient's mental illness neither strongly influenced nor contributed to the behavior that led to the RVR.

Review of five ICC chronos revealed that ICCs documented consideration of the patients' mental illness and mental health recommendations when assessing a SHU term.

## USE OF FORCE

SVSP did not report use of force training data that was exclusive to the institution's PIP; instead, provided data was for the entire institution. As for custody staff, there was 100 percent compliance for completion of use of force training by the warden, chief deputy warden, correctional administrators, captains, lieutenants, and sergeants. For custody officers, 713 of 719 completed the training. It was further reported that 100 percent of PIP executive staff completed

the training, as did seven of ten psychologists and all six social workers.  No psychiatrists received the training.

During the review period, there was one controlled use of force incident and 93 immediate use of force incidents.  Document review and video observation of the controlled use of force episode indicated compliance with applicable CDCR policy.

Seven of eight reviewed immediate use of force incidents complied with applicable CDCR policy.  The one use of force incident that the monitor deemed noncompliant involved a cell entry to administer involuntary medication.  The incident report stated that a psychiatrist ordered the administration of emergency medication for a patient on a one-to-one suicide watch due to his self-decompensation, threatening behavior, and agitation.  The patient's refusal to submit to handcuffs resulted in custody staff entering the cell and using physical force to handcuff him, permitting medical staff to administer the medication.  The patient was issued an RVR for resisting a peace officer.  Notably, however, applicable policy stated that RVRs shall not be issued when the occurred behavior was in connection with a cell extraction to administer involuntary medication.

Furthermore, this use of force incident should have been video recorded as staff knew the patient had refused medication and was on a one-to-one suicide observation.  However, the PIP housing units did not have video cameras.  The incident report also did not indicate any clear justification for an immediate use of force.

Staff should be instructed to use video cameras in all situations where the patient may become disruptive and/or when mental health or medical staff was ordered to conduct a cell entry to administer involuntary medication.

## UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

The SVSP-PIP no longer used Special Incident Reports (SIRs), which had been replaced by reports of unusual occurrences or adverse events. From January through June 2021, the institution reported 79 unusual occurrences. There were 12 patient self-harm incidents, including six suicide attempts; one resulted in the patient's death. The remaining unusual occurrences reflected other matters, including foreign body ingestions, aggressive acts toward staff members, assaults involving physical altercations between patients, patient falls, and fires set by patients.

There were no sentinel events or patient abuse incidents during the review period.

## USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

Patients in seclusion were housed in wet cells in TC1 or TC2. The PIP did not use seclusion cells for patient "timeouts" and relied on patients' regular housing cells for suicide watch or suicide precaution when the patient was housed in a single cell.

During the review period, the SVSP-PIP reported 18 seclusion incidents; nine involved the same patient. Seclusion incidents averaged 15.2 hours and ranged from approximately four to 37 hours.

Reviewed monthly logs reported the use of restraints for only one patient, who was restrained on consecutive days for three and 4.2 hours, respectively. While not reflected in the logs, risk management committee meeting minutes dated March 4, 2021, reported a single 34-minute use of five-point restraint; the minutes did not report the actual date of the restraint. The meeting minutes further reported that prior to the restraint the patient was engaged in multiple incidents of self-harm and had been placed on suicide watch.

**EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS**

    1.        **Emergency Response**

The SVSP-PIP's emergency response process included the Risk Management Committee's (RMC) review of tracking systems for patients or behaviors indicating increased patient risk. The RMC met two to three times monthly, was chaired by the chief psychiatrist, and always achieved quorums with required committee members or their designees in attendance. Reviewed matters included patients under continuous observation or suicide watch, patient abuse allegations, battery/assaults on staff, restraint, seclusion, unusual occurrences, and self-injurious behaviors (SIB). A reviewed clinical restraint incident was deemed appropriate following a patient's multiple self-harm incidents.

    **Death Review Process**

There were four patient deaths during the review period. There was one death by asphyxiation of a patient who was found with a cloth tied around his neck. CDCR reported holding a suicide death review for this patient. Two other patients died from COVID-19 related illnesses, and one died from cardiac arrest.

**QUALITY MANAGEMENT AND UTILIZATION REVIEW**

The SVSP-PIP's quality management activities were incorporated into the SVSP's institutional quality management program. The primary SVSP-PIP quality management vehicle was the quality and performance improvement program (QPIP) subcommittee. The QPIP subcommittee was required to annually present a quality and performance improvement plan to SVSP's local governing body and quality management committee.

The QPIP subcommittee's improvement plan identified five goals for 2020 - 2021. Progress on these goals was variable. Due to COVID-19 restrictions, the provision of ten weekly

hours of mental health treatment to patients was not met during most of the fiscal year. This objective was revised for 2021-2022 and now required ten hours of combined clinical and non-clinical out-of-cell time. The SVSP-PIP was also unable to maintain compliance with timeframes for the frequency of physician notes. The goal of reducing self-harm incidents by using an unauthorized item while under a property restriction order (e.g., suicide watch) by 50 percent was met. Similarly, the goals of improving the quality of daily nursing documentation and implementing a process to track and record patient treatment satisfaction were also met.

The institution's QMC met six times during the review period and always achieved a quorum. SVSP-PIP-related issues that the QMC addressed included self-harm trends, higher level of care orders for PIP patients discharged from SVSP outpatient programs, and QPIP goals and updates on the QPIP subcommittee plan for 2021 - 2022.

The mental health program subcommittee met monthly for five of six months of the review period. Each meeting included an inpatient coordinator report, which typically addressed patient higher level of care considerations, referrals, transfers, five-day follow-up, and other inpatient care issues.

The PIP did not have a utilization management committee or a patient improvement program during the review period.

## PATIENT COMPLAINTS/PATIENT SATISFACTION

During the review period, 52 patients completed surveys. Common patient complaints included insufficient treatment hours, staffing shortages and staff redirections from providing treatment groups, the lack of programming for maximum custody patients, and issues with the law library and meals. Positive patient survey results included staff responses to patient requests for help, and effective treatment plans and individual treatment sessions.

## CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

The LOP for the CMHPP was not current; its last revision was in March 2020. The LOP also lacked language regarding the SVSP-PIP's participation in CDCR's Specialized Bed Complete Care Model (SBCCM) pilot, which required institutions to use a revised huddle report form that included more information than what was required on the CMHPP huddle report form.

Review of 136 huddle reports from second and third watch revealed seven that were not on the required SBCCM huddle form. Huddle report review also indicated that a psychiatrist was documented as being present at 106 huddles or 76 percent, custody staff was present at 52 or 38 percent, and nursing staff attended 134 or 99 percent of huddles.

Observation of one third watch huddle for units TC1 and TC2 revealed all required attendees to be present with a nurse as facilitator. Discussion at the observed huddle was thorough with attendees discussing all relevant topics.

The institution reported that it did not document executive joint rounding at the warden's executive staff meetings. However, the QMC and mental health subcommittee reported this rounding.

Reviewed QMC meeting minutes indicated that executive joint rounding was a monthly standing agenda item throughout the review period. The QMC meeting minutes reported that, due to COVID-19 outbreaks, the rounding had not occurred in January or February 2021. However, QMC meeting minutes reported that the rounding took place from March through June 2021. The June executive leadership joint rounding was of PIP unit TC1. Reviewed QMC meeting minutes did not reflect patient complaints but noted that they had requested additional groups.

Reviewed mental health subcommittee meeting minutes for five months all listed the CMHPP as an agenda item. The meeting minutes included information about huddles, including the lack of custody staff in attendance, and information on joint supervisory rounding and patient advisory council meetings.

Patients filed 123 grievances during the review period. Grievances included allegations of excessive use of force and harassment, denial of mental health treatment and medical care, issues related to IDTTs and the issuance of RVRs, denial of mail, packages and other property issues, and access to phone calls and the law library. Three grievances were approved, 18 were under investigation, and the remaining grievances were either disapproved, rejected, or denied.

The SVSP-PIP did not report on attendance at the annual partnership off-post training.

The institution reported that quarterly round table partnership training entitled "Partnership in a Correctional Environment" was provided from August 2020 through August 2021. Furthermore, 646 of 914 or 71 percent of custody staff were trained in 2020 and 453 of 942 or 48 percent of custody staff were trained in 2021. During 2020 and 2021, 73 of 94 or 78 percent of mental health staff and 150 of 174 or 86 percent of nursing staff completed this training.

### *COLEMAN* POSTINGS

Due to the site visit terminating early due to a COVID-19 exposure, the monitor was unable to determine whether the *Coleman* notice was prominently posted in the housing units in areas accessible to patients. However, the institution reported conducting quarterly audits as to the presence of *Coleman* postings. One all-unit audit by the quality management department in March 2021 led to the placement of *Coleman* replacement postings. Another audit by members

of the hospital administrator's team and the quality management department in June 2021 found

that all units contained required *Coleman* postings.

## LAUNDRY AND SUPPLY ISSUES

The SVSP-PIP was responsible for its managing laundry operations that included

assessing patient clothing and linen needs, maintaining laundry stock, and collecting dirty

laundry and linens. The material and stores supervisor managed laundry operations.

PIA handled the actual laundering of patients' clothing and linens.

The institution reported several barriers impacting its ability to effectively manage

laundry operations, including insufficient staffing and inventory, and the misuse of supplies.

With one staff member's assumption of laundry operations previously performed by multiple

staff, some staff were working overtime to attempt to effectively maintain laundry operations.

Damage to clothing and linens caused by patients also impacted supplies, as did the reduced

amount of clothing items and linens that were returned to the institution following laundering

off-site by PIA. Notably, the monitor observed blankets and towels being used to prop open

doors and to wipe up spills.

Observed clothing and linens in the laundry lockers were organized, stacked, and labeled.

Staff reported checking in with transgendered patients about their clothing needs.

PRIDE conducted shower cleaning. Review of shower cleaning logs indicated that

shower cleaning occurred four times daily due to COVID-19.

## PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

Two correctional officers and a relief staff member managed property inventory and its

issuance. They reported that property typically arrived with the patient. Upon arrival, property

was x-rayed and inventoried, and signed for by the patient.  Custody officers also completed property cards.

The observed property area was clean and well-organized.  Reviewed property cards for several patients who complained about not having received property revealed that all had a current property card reflecting inventoried property and its delivery date, which the patient had signed.  In those instances when property did not arrive and the patient filed a grievance, property staff contacted the sending facility.  Staff reported that most delayed property was from the other PIPs.  Eighty-five percent of SVSP-PIP patients had televisions.

The institution had a radio loaner program and a binder that identified patients who received loaner radios.  However, some patients reported not receiving loaner radios.  SVSP-PIP reported that occasionally there was a radio shortage as the radio loaners were not always collected following patient discharge.

The SVSP-PIP had updated several visiting policies, including video and in-person visiting, in response to COVID-19.

Non-clinical activity tracker (NCAT) data included a spreadsheet containing over 101,000 appointments reflecting dayroom, yard, meals, showers, and phone calls, and whether the patient had attended or refused the appointments.  However, the data was not filtered and it was unclear whether it was validated, reviewed, and/or used by staff or management for treatment, supervision, or quality improvement.

## LAW LIBRARY ACCESS

During the review period, 52 patients completed patient satisfaction surveys.  Notably, the law library and patient access to it was the lowest scored survey item.  Patients reported not

understanding how to use the computerized library system, that it was not user friendly, and that it was only in Spanish.  They further reported being unable to make copies when needed.

## HEAT PLAN

The heat plan was in effect during May and June 2021, and at the time of the site visit.

Review of the SVSP LOP 410 Heat Plan ("HP LOP"), as revised in May 2021, reflected compliance with the CCHCS 2021 "Heat Plans and Updates" directive.  Record review indicated the hourly logging of the outside air temperature according to policy.

There were no heat alerts in May 2021.  There were two Stage I heat alerts in June 2021, but no Stage II or Stage III heat alerts.  No patients experienced heat-related illnesses during the review period.  Review of Daily Activity Reports (DARs) for the two days when there was a heat alert reflected their activation.  However, the DARs did not report the offering of additional dayroom as a patient accommodation.  Notably, the HP LOP required documenting all reasonable accommodations provided to heat-risk patients during a heat alert on the DAR.

The institution reported completion of the heat-related pathologies on the job training by 457 custody officers, including 39 sergeants, 13 lieutenants, two correctional administrators, four captains, one CC III, four CC IIs, 16 CC Is, and 378 correctional officers.

## PRE-RELEASE PLANNING

SVSP-PIP did not have a designated pre-release coordinator or a formalized pre-release planning program during the review period or at the time of the site visit.  Mental health leadership initially reported that the number of patients being released was relatively small and, as such, there was no need to assign a pre-release coordinator.  However, provided data revealed that 20 patients were scheduled for release between January and June 2021, of which seven were

committed to DSH as OMD and 13 were eligible for pre-release services prior to community release.

Mental health leadership reported relying on the statewide pre-release coordinator for notifications regarding upcoming release dates and CCAT meetings, and that PCs were responsible for patients' pre-release planning needs. However, the mental health department did not monitor compliance for obtaining post-release community supervision releases of information, checking the status of TCMP benefits applications, communicating with TCMP staff, or integrating pre-release goals into treatment plans.

SVSP-PIP offered one pre-release planning group during the review period. A social worker facilitated this group, which was only offered to TC2 patients between May and July 2021. At the time of the site visit, no pre-release groups were offered, despite some patients reporting a need. SVSP-PIP also did not have plans to offer pre-release planning groups soon. Mental health leadership was uncertain whether primary clinicians reviewed the statewide pre-release planning group modules during individual contacts with eligible patients in lieu of pre-release planning groups.

## PROGRAM ACCESS

No SVSP-PIP patients had job assignments or other unit responsibilities. The institution reported that 42 patients earned milestone credits during the reporting period; however, it did not provide information on the number of milestone credits earned or when they were earned. The SVSP-PIP also did not identify those patients who were eligible to earn the credit.

## EDUCATION

Ten patients were enrolled in an alternative education program. SVSP-PIP staff recommended enrolling more patients in education courses.

<u>APPENDIX A5</u>
California Institution for Women Psychiatric Inpatient Program
(CIW-PIP)

**California Institution for Women Psychiatric Inpatient Program (CIW-PIP)**
September 13, 2021 - September 14, 2021

I.    **SUMMARY OF THE FINDINGS**

- At the time of the site visit, institution-wide, CIW was in Phase I of the COVID-19 reopening plan, which allowed for only essential individual clinical contacts, cell-front medication administration, and cell-front feeding.

- On September 10, 2021, one acute care patient and 18 intermediate care patients were receiving treatment in the 45 bed CIW-PIP.

- The chief psychiatrist and chief psychologist positions were filled; the senior psychiatrist supervisor position was vacant, and there was no established senior psychologist supervisor position.

- With the use of one contractor, there was a 33 percent functional vacancy rate for psychiatry.

- There was a 33 percent psychologist vacancy rate.

- There was no established supervising social worker position at the CIW-PIP, and all of the four established social worker positions were filled.

- All recreation therapist, SRN, RN, LVN, senior psych tech, and psych tech positions were filled.

- All 19 custodial staff positions assigned to the CIW-PIP were filled.

- CIW-PIP reported that it did not utilize telepsychiatry either during the reporting period or at the time of the site visit.

- All staff-to-patient ratios were met for both acute and intermediate programs.

- During the review period, acute patients attended an average of 1.7 hours of structured treatment each month.

- For intermediate care patients, non-MAX custody patients were offered an average of four hours per week and attended just over three hours per week during the review period.

- Intermediate care MAX custody patients were offered an average of 1.7 hours of group therapy per week and attended one hour.

- All ten patients transferred to acute care were transferred within ten days.

- Seven of the ten patients transferred to intermediate care were transferred timely.

- There was one CIW-PIP patient death by suicide in April 2021; a root cause analysis was chartered.

- CIW's institution-wide LOP regarding the custody and mental health partnership plan (CMHPP) was not consistent with statewide requirements.

- Five CIW-PIP staff were redirected due to staff misconduct.

- Fifteen percent of custody staff completed the annual custody and mental health partnership training; the high rates of non-attendance resulted from coverage issues due to the COVID 19 pandemic.

- CIW reported that 69 percent of mental health staff completed annual custody and mental health partnership training.

- Executive joint rounding was completed monthly though the information was not distributed to staff properly.

## CENSUS

On September 10, 2021, the CIW-PIP operated 45 beds flex beds that accommodated acute and intermediate care patients. One acute care patient and 18 intermediate care patients filled 19 beds or 42 percent, including all seven isolation beds. There were 26 unoccupied beds, including three beds reserved for pending admissions. No beds were redlined.

## STAFFING

### 1. Administrative, Clinical, and Correctional Staffing

On September 10, 2021, the executive director position was filled by a senior psychologist supervisor. CIW-PIP did not have established clinical administrator, hospital administrator, or medical director positions. The program director position and the one program assistant position were filled. CIW-PIP did not have a nurse coordinator position.

Chief Psychiatrist: The chief psychiatrist position was filled.

Senior Psychiatrist: The one senior psychiatrist supervisor position was vacant.

Psychiatrists: One of three established staff psychiatrist positions was filled for a 67 percent vacancy rate. One contractor was utilized, resulting in a functional vacancy rate of 33 percent.

Chief Psychologist: The chief psychologist position was filled and covered both the CIW-PIP and mental health outpatient programs.

Senior Psychologist: There was no established senior psychologist supervisor position at the CIW-PIP.

Psychologists: Two of three established psychologist positions were filled, for a 33 percent vacancy rate. No psychologist contractors were used at the time of the site visit.

Supervising Social Worker: There was no established supervising social worker position at the CIW-PIP.

Social Workers: All four established social worker positions were filled.

Recreation Therapists: All four established recreation therapist positions were filled.

Supervising Registered Nurse (SRN): The SRN position was filled.

Registered Nurses (RN): All five established RN positions were filled.

Senior Psych Techs: All six established senior psych tech positions were filled.

Psych Techs: All 32 established psych tech positions were filled.

Licensed Vocational Nurses (LVNs)/Certified Nursing Assistants (CNAs): All five established LVN positions were filled. CIW-PIP reported that it did not utilize CNAs.

Correctional Staff: All 19 custody staff positions assigned to the CIW-PIP were filled.

Telepsychiatry: CIW-PIP reported that it did not utilize telepsychiatry either during the reporting period or at the time of the site visit.

Clerical: All three established office technician positions were filled.

At the time of the site visit, the institution reported that it had not implemented any of the projected PIP staffing changes contained in the CIW-PIP staffing charts and data provided to the Special Master on April 19, 2021.

### Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

CDCR's established staffing ratio in its PIPs for psychiatry, psychology, recreation therapy, and social work was 1:15 for acute programs and 1:30 for intermediate programs.

CIW-PIP met the staffing ratio for all four disciplines based on its census at the time of the site visit. The CIW-PIP reported that it did not use traditional staff to patient ratios in its treatment program based on its size and combined acute and intermediate services. Caseloads were balanced by census/population and evenly distributed among three teams (at the time of the site visit). Each team consisted of one assigned primary psychiatrist, psychologist, social worker, and recreation therapist.

### Staff Training

During the review period, in addition to new employee orientation and overview, CIW-PIP provided multiple trainings to staff. Staff training covered a broad range of subject matters including, but not limited to, suicide prevention, the Custody and Mental Health Partnership Plan (CMHPP), use of force, RVRs (including mental health assessment), working with transgender patients, intersex & non-binary patients, EHRS training, patient access to care, and behavioral support.

## TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1. Interdisciplinary Treatment Teams (IDTTs)

#### Acute Care Program

At the time of the monitoring visit, there was one patient at the acute level of care in the CIW-PIP. The patient had been in the CIW-PIP since August 17, 2021, and had changed from intermediate level of care to acute level of care during that time. There was no initial IDTT documented in the patient's electronic health record. The patient's routine IDTTs occurred every seven days as required, though necessary members were in attendance only 25 percent of the time. Notably, the correctional counselor did not attend three of the patients' IDTTs.

#### Intermediate Care Program

A sample of eight CIW-PIP intermediate care patients who were in the CIW-PIP during the review period was used to perform record reviews to assess compliance with Program Guide requirements regarding contacts.

Three patients in the sample required initial IDTTs during the review period, and electronic health record reviews indicated that 100 percent occurred within 72 hours. All required staff was present in those cases. For eight patients who required routine IDTTs, 100 percent occurred within 30 days as required. Requisite staff was present 97 percent of the time, and patients attended 90 percent of the time.

The monitor's expert observed three intermediate level of care IDTTs: a special IDTT to address a patient's self-injurious behavior, a routine 30-day IDTT, and a new admission 72-hour IDTT. Due to the COVID quarantine status of the patient, the 72-hour IDTT was observed remotely.

All observed IDTTs included collaborative participation with the patient. Required members were present for the initial IDTT meeting; a correctional counselor was not present for the special IDTT. For the recently admitted patient, initial assessments were completed prior to the IDTT, and the two other IDTTs included adequate reviews of diagnoses, medications, side effects, patient functioning, group participation/expectations, treatment plans, step levels and rationale for these levels and discharge planning. The special IDTT focused on the patient's recent crisis.

Areas not adequately covered during the observed IDTTs included case conceptualization, functional impairments, patients referred to groups, safety planning, and substance use.

Social worker participation was not adequate during the observed IDTTs. Two social workers participated in the three observed IDTTs, and they did not appear familiar with the patients, their histories, or their current needs. In two of the meetings, the social workers did not appear to be attending to the content discussed by the other staff and the patients and asked inappropriate questions or repeated already asked questions. In one meeting, the social worker failed to answer questions asked by the patient who had recently engaged in self-injury and insisted that the patient should have the skills needed to tolerate frustration because the social worker had provided the patient with "packets" the weekend prior. Additionally, during the initial IDTT, the social worker failed to establish effective communication with the patient. The social worker attempted to develop treatment goals with the patient using rating scales, but the patient could not understand the rating structure. Rather than adjusting the means used to measure the patient's progress, the social worker continued to ask the patient for numerical ratings until the psychologist interjected with other options for the patient.

The CC I minimally participated during the IDTTs, responding only to questions asked of them rather than actively participating in the treatment team discussions.  However, the custody officers present in the IDTTs were engaged and provided useful information about patient functioning.  Nurses provided input regarding patients' medical concerns, and recreation therapists participated minimally.  Psychiatry engaged with patients effectively and appeared to know the patients' needs and histories.

The monitor's expert interviewed five patients who reported attending their IDTTs every 30 days.  Patients were aware of their treatment goals and felt that their IDTT meetings were generally collaborative.

### **Group Therapy**

#### Acute Care Program

During the site visit, CDCR regional staff reported that On Demand reports did not accurately calculate offered and accepted treatment hours for patients at the acute level of care; therefore, CIW-PIP provided locally maintained tracking data for the monitor's expert's review.  The data did not state the number of structured therapeutic treatment hours offered to patients in the acute program.  According to the data, the number of acute patients during March through July 2021 ranged between one and three; they attended between zero and 5.5 hours of structured treatment during each month for an average of 1.7 hours of structured treatment attended weekly.

#### Intermediate Care Program

According to the pre-site data, the average group therapy offered to all intermediate care patients was four hours per week during the review period.  They attended just over three hours

per week. However, when examined separately from the total population, MAX custody patients were offered an average of 1.7 hours of group therapy per week and attended one hour.

Pre-site data indicated that an average of 27 percent of groups in intermediate level of care were canceled during the review period. Further, groups were often disrupted due to alarm activation on the unit. When personal alarms were activated on the unit, staff were required to leave the group treatment room to allow custody officers to respond to the emergency. This disruption occurred during all groups observed during the site visit.

Interviewed patients and staff reported that most patients were scheduled for two groups per day, resulting in ten hours of scheduled group contacts per week. However, all *scheduled* groups were not offered to patients, given CIW-PIP's data that showed patients were offered an average of four hours per week of group treatment during the review period. Additionally, CIW-PIP reported that MAX custody patients and/or those with histories of violent and aggressive behavior currently managed by a Positive Behavioral Support Plan (PBSP) were not scheduled for groups routinely.

CIW-PIP offered 11-week treatment cycles with one week break during which staff determined future group offerings for the next cycle. Patients were provided with a list of all groups offered and asked to indicate which groups they wanted to attend, with the goal of attending two groups each day. All clinical staff then convened to determine group assignments based on the patients' interests, clinical needs, and an adequate balance of clinical core and recreation groups. No foreign language groups were offered at the time of the site visit.

Three group sessions were observed during the site visit: two clinical groups led by a social worker and one nursing-led treatment group focused on health management. All groups were held in confidential settings with adequate space for social distancing. All groups included

two staff, one facilitator and a psych tech who functioned as a co-facilitator. Groups included two to three patients. The content and process of the groups were adequate, and the sessions were engaging and supportive. Patients were active participants in all groups observed.

**Individual Treatment**

Acute Care Program

At the time of the monitoring visit, there was one patient receiving acute level of care. No initial psychiatry or primary clinician assessments were documented in the patient's electronic health record. All routine psychiatry contacts for this patient occurred within 72 hours, and the patient received at least two primary clinician contacts per week as required by local policy.

Intermediate Care Program

A review of eight patients' electronic health records indicated that 100 percent of initial primary clinician evaluations occurred within 72 hours of the initial IDTT. For the seven patients who required weekly routine primary clinician contacts, 77 percent occurred within seven days, and 63 percent were conducted in confidential settings. Reasons for non-confidential settings included modified program and patient refusals.

Three reviewed patients required initial psychiatry evaluations during the review period. Of those, 100 percent occurred within 72 hours and before the initial IDTT. Further, they were conducted in confidential settings.

Seven patients required routine psychiatry contacts during the review period, and 83 percent occurred as required. Sixty-nine percent of those contacts were conducted in a confidential setting. Reasons for appointments conducted in non-confidential settings included modified programming and patient refusals.

320

The monitor's expert reviewed eight randomly selected electronic health records of intermediate level of care patients at the CIW-PIP. Those records revealed adequate treatment plans with satisfactory documentation in all cases and primary clinician notes corresponded to treatment plans in seven, or 88 percent, of the cases. Effective communication was documented in six or 75 percent of cases. Two of three, or 67 percent of applicable cases, had treatment plans with implemented pre-release plans. In the three cases where patients had high levels of refusals, two or 67 percent had documented reasons and interventions. Continuity of care for primary clinicians was present in six of eight, or 75 percent, of cases. Psychiatry continuity of care was present in three of eight, or 38 percent, of reviewed cases.

Interviewed CIW-PIP clinical staff reported inadequate time to see their patients. Staff described highly structured daily schedules with many days filled by morning meetings, groups, and IDTTs, thus limiting time for individual treatment and adequate documentation. Further, similar to the aforementioned group treatment issue, there were frequent disruptions in care due to behavioral outbursts on the unit. These outbursts resulted in the suspension of all clinical contacts on the unit for the duration of the disruption/crisis, as was observed on more than one occasion during the site visit.

Interviewed patients noted that they were able to access care in emergency and non-emergency situations by alerting the nursing staff performing rounds. However, three patients reported that on occasion, nursing staff closed the door to the nurses' station and could not hear patients asking for help.

**Solo Treatment Activity/Solo Programming**

CIW-PIP staff reported that there were no On Demand Reports available to produce data regarding duration, range, or reasons for solo programming. Reasons for solo programming

were discussed individually with the patient and treatment team and documented in each patient's treatment plan.

## Other Treatment Issues

### A. Involuntary Medications

At the time of the site visit, there were nine patients on active PC 2602 orders for involuntary medications.

### Behavioral Management

CIW's local operational procedure (HC Operational Procedure (OP) 217) regarding the use of Positive Behavioral Support Plans (PBSPs) adequately supported the development and implementation of PBSPs. CIW-PIP tracking data revealed that most PBSPs could not be drafted and completed within the assigned timeframes, though the LOP timeframes were relatively short (14 days) and likely inadequate to support a thoughtful and comprehensive functional analysis and resulting plan. CIW-PIP completed a quality improvement study that included data from May through July 2021. This study indicated that none of the plans or implementation processes around the plans met the 90 percent compliance thresholds at any point during the review period. These findings were consistent with the conclusions of the monitor's expert's review of these plans.

The monitor's expert reviewed five electronic health records for patients treated with PBSPs. Comprehensive plans were documented in four of the five records or 80 percent of cases. For the fifth patient, a summary of the plan was included in the patient's master treatment plan, but the comprehensive PBSP could not be located in the electronic health record. The four reviewed comprehensive plans included specific target behaviors along with the frequency and intensity of those behaviors prior to the implementation of the plan. Functional analyses were

comprehensive and included analyses of the triggers, consequences, and potential function of the target behaviors. Three plans included clear replacement behaviors that were to be supported, while two plans focused solely on the reduction of the target behaviors without providing support for more adaptive behaviors. This was in violation of the PBSP policy, which clearly stated that PBSPs are "not exclusively focused on the elimination of unwanted behaviors."

In one PBSP, it was noted that the plan called for a patient to lose incentive points after exhibiting the target behavior. This is considered punishment, which was not supported in the use of behavior management and was also in direct conflict with PIP policy which did not allow for patients to have incentive points removed or lost after they have been earned.

The monitor's expert noted a very serious concern during the review of the records for two patients being treated under PBSPs. Both patients had target behaviors of headbanging. For both patients, their PBSPs were comprehensive and included support for alternative behaviors. In both records, at some point in July 2021, language was added to their treatment plans which stated that staff was specifically not to engage in attempting to de-escalate the patient when they engaged in headbanging but were instead to activate their alarms and immediately place the patients in restraints.

A review of all PBSPs revealed that none of the plans included provisions for actions to be taken when the target behaviors returned or increased. Often during the implementation of plans to support behavior change, relapses occur. Quality behavior plans should include provisions for supporting patients during relapses by returning to earlier phases of the plans that proved effective, rather than resorting to punishments that are not indicated as therapeutic supports for behavior change.

Discussion of the patient's progress during IDTT meetings was variable and sometimes included specific documentation of patient progress. At other times there was passing reference to the patient having a PBSP without discussion of specific behaviors or progress under the plan.

Documentation and observed meetings supported the fact that staff was routinely trained on implementing PBSPs during end-of-shift meetings.

### Treatment Space

There was adequate treatment space for acute and intermediate care at the CIW-PIP.

## PATIENT ACCESS TO TREATMENT

The System to Encourage Progress (STEP) Program at CIW-PIP was developed to support patients in advancing through the program. The program was designed to reinforce positive and prosocial behavior that encourages patient progress and access to greater levels of programming. All patients were encouraged to participate in the STEP Program/Incentive program.

On arrival at the CIW-PIP, nursing staff provided patients with an orientation packet that included the rules and expectations for minimum requirements for STEP level advancement. Through IDTT assessment and patient input, incentive point values were established during the IDTT. Incentive points were earned as outlined in the treatment plan and could be used weekly to obtain items from the incentive store. Point values could be re-allocated by the IDTT when clinically indicated to encourage progress toward goals.

According to the CIW-PIP STEP LOP, in order to advance through the STEP levels, patients must meet minimum requirements by following rules, respecting others, participating in treatment activities, attaining or maintaining medication adherence, and making progress toward

goals. With each STEP level advancement, patients earned increased access to state-issued appliances, recreation materials, supplies for in-cell activities, and games.

During the review period, all 27 CIW-PIP patients participated in the STEP Program at some point. At different times during the review period, different patients spent some period of time in other housing (e.g., out to court, hospital, discharge from PIP, Patton), and others spent significant amounts of time on MAX custody status. The highest average period of time over the six-month review period was spent at Stage I with a mean of 216 days, Stage II with a mean of 200 days, and Stage III with a mean of 195 days.

In light of the movement in and out of the PIP, the various Stages of the STEP program were no longer overly concerning. However, CIW-PIP staff should attend to the progression of patients through the STEP levels and analyze the length of time patients spend to prevent lingering at the lower end of the levels. CIW-PIP did not conform to the timelines for the policy for the STEP Program when looking at average lengths of time per Stage. Patients should realize success in their progression through the STEP levels (Stages), and targets should be adjusted if not achievable in reasonable amounts of time to lessen patient frustration.

Additionally, during interviews, staff raised concerns regarding the management of aggressive patients since removing the Discretionary Program Status (DPS) as an option. Previously, DPS was used to address safety needs for patients who did not meet the criteria for MAX custody status but still presented aggressively. Staff reported that they now evaluated patient safety prior to groups, used two custody officers to escort patients to groups, and used the non-contact room initially before moving the patients into groups. Staff further reported that psychotropic medications and PBSPs were used as interventions with these patients.

## REFERRALS AND TRANSFERS

During the review period, 11 patients were referred to acute care and 11 patients were referred to intermediate care at the CIW-PIP. One patient at each level of care was rejected. The referral to acute care was rejected because the need for vision impairment support was unavailable in the CIW-PIP. The referral to intermediate care was rejected because the patient did not meet admission criteria as was programming, medication compliant, and stable.

Referral and transfer data revealed that all ten patients transferred to acute care were transferred within the ten-day transfer timeframe. Three patients were already admitted to the CIW-PIP prior to the date of HCPOP endorsement. Regarding the remaining seven, it took an average of 2.8 days, with a range of one to four days, from date of referral to date of endorsement for acute care patients, and an average of 1.7 days, with a range of one to four days, from endorsement to admission.

For three of the ten patients transferred to intermediate care, the number of days from date of referral to date of IRU action and date of HCPOP endorsement was 32, 33, and 60 days respectively. There was no documentation provided explaining these delays. The remaining seven patients took an average of 4.8 days, with a range of one to nine days, from date of referral to date of endorsement. For all ten patients transferred to CIW-PIP during the review period, it took an average of 3.1 days, with a range of two to five days from endorsement to admission.

## ADMISSIONS AND DISCHARGES

### 1.    Admissions

During the review period, CIW-PIP reported ten admissions to acute care and ten admissions to intermediate care.

The institution reported that all patients admitted during the review period had complex medical needs.  They reported no patients were accepted and waiting for admission or awaiting a decision at the time of the site visit.  CIW also reported that six patients were admitted from administrative segregation and one from the PSU during the review period.

### Discharges

CIW-PIP discharged two patients from acute care and 25 patients from intermediate care during the review period.  The average length of stay for patients discharged from acute care was 7.5 days; both patients paroled.  Of the 25 patients discharged from the CIW-PIP intermediate care program, five patients had remained in intermediate care for a period of just over one year to 7.5 years.  For the remaining 20 patients, their average length of stay was 134 days, ranging from 40 days to 306 days.  Regarding patients discharged from intermediate care, seven were discharged to the Department of State Hospitals-Patton (DSH-Patton), two paroled, no information was provided regarding one, and the remaining patients were discharged to CIW or Central California Women's Facility (CCWF).

## LEAST RESTRICTIVE HOUSING

Two patients housed in intermediate care at the CIW-PIP at the time of the site visit were above their least restrictive housing (LRH) levels.   Staff reported that the LRH levels of patients were reviewed during IDTTs.

## PATIENT DISCIPLINARY PROCESS

The RVR training data provided by CIW-PIP for both mental health and custody staff was institution-wide and not exclusive to the PIP.

CIW reported that for custody staff requiring mental health assessment training, none of the four correctional administrators attended, two of four, or 50 percent of captains attended,

three of 19, or 16 percent of lieutenants attended, and nine of 55, or 16 percent of sergeants attended. For mental health staff, only one completed the mental health training for a two percent compliance rate.

A random sample of six RVR packets from the list of 17 provided in the PIP materials was selected for review. Mental health assessments were requested timely in five of six or 83 percent of the cases. All mental health assessments were completed and returned timely. In the six reviewed RVRs, it was documented that all patients refused a confidential location for the mental health assessment. Staff assistant assignment was documented in five of six, or 83 percent of the cases reviewed. The clinician recommended mitigation in all six cases, and there was credit loss mitigation or mitigation of penalties by the senior hearing officer in every instance. In one case, the senior hearing officer reduced the penalty to a counseling chrono, and no credit loss or penalties were imposed, despite a guilty finding.

## USE OF FORCE

The training data provided by CIW-PIP for both mental health and custody staff was institution-wide and not exclusive to the PIP.

CIW-PIP provided a use of force DOM policy last reviewed in May 2021. Highlighted changes to the policy related to the use of safety triangles and use of force reporting requirements.

There were six immediate use of force incidents during the review period, and there was no controlled use of force incidents. The status of each use of force incident was noted as closed. There was no use of force incidents associated with the administration of PC 2602 medications.

According to the information provided by staff, which included data from January 2021 to the time of the monitoring tour, of the 67 mental health staff required to participate in use of

328

force training, 46 staff members or 69 percent completed the training. For custody staff, of the 491 required to receive the use of force training, 321, or 65 percent, received the training.

## UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

According to the documentation provided, there were 15 unusual occurrences during the review period, including four in February, five in March, one in April, two in June, and three in July. Thirteen of those were reported to the Department of Public Health. Reasons for the incidents included assaultive to peers, assaultive to staff, allegations of PREA, aggressive to self, staff misconduct allegation, and accident. There were no unusual occurrences generated related to seclusion and restraint.

## USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

Tracking mechanisms for restraints and seclusion at CIW-PIP were not reliable during the review period or at the time of the site visit. Pre-site data indicated five incidents of seclusion and no incidents of restraint, though the on-site log indicated four incidents of restraint and no incidents of seclusion. Finally, the "Restraint Report" noted 12 incidents of restraint and six of seclusion. Thus, the data was highly unreliable and unusable. One identified problem was that each unit (unit A/B and unit C/D) maintained separate logs that needed to be combined.

CIW-PIP had four observation rooms, two on each side (A/B and C/D). The observation rooms were used for observation as well as several other purposes, including restraints, putting a patient there while their room was being cleaned, or as a quiet place when a patient needed a self-requested time out. Each observation room was identical, including a bed, sink, and toilet. Two rooms (one on each side) were equipped for restraint use. CIW-PIP utilized two rooms for seclusion that were suicide resistant with padded floors, no sink or toilet, and a grate on the floor.

## EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

There was one CIW-PIP patient death by suicide in April 2021.  CIW reported that the institution's Chief Executive Officer (CEO) formally chartered a root cause analysis regarding the patient's death.  The patient's suicide was reviewed during the Emergency Medical Response and Review Committee (EMRRC) meeting held on May 12, 2021, and during the Patient Safety Committee meeting held on May 14, 2021.  Untimely referral for a Positive Behavior Support Plan was identified as a system issue in the summary of the institution's death review of the suicide.  At the July 9, 2021 Patient Safety Committee meeting, a further report on the patient's suicide was presented, which indicated "57 issues were found after extensive review of the [patient's] file."

The institutional EMRRC met monthly during the review period and discussed CIW-PIP-related issues, including the patient death reported above.  Meeting minutes were comprehensive and included detailed follow-ups on action items from previous meetings.  Emergency transports, emergency response, death review, quarterly drill dates, and performance reports were regularly discussed.

The institution's Patient Safety Committee met monthly during the review period, achieved quorums at each meeting, and discussed CIW-PIP-related topics.

## QUALITY MANAGEMENT AND UTILIZATION REVIEW

CIW-PIP's quality management program was integrated into the institution's overall quality management structure.  The institution's Mental Health Program Subcommittee (MHPS) provided oversight of the CIW-PIP.  The MHPS reported to the institution's Quality Management Committee (QMC).  The CIW-PIP had a SPRFIT Committee and a Utilization Management Committee.  This structure was different than was observed in the preceding

monitoring round, and it appeared that several committees and subcommittees that previously covered CIW-PIP-related quality management activities were no longer operational.  Provided documents confirmed that the restructuring of CIW-PIP oversight was initiated in 2019, with the institution incorporating quality management oversight of the CIW-PIP within existing institutional subcommittees.

CIW's Performance Improvement Work Plan (PIWP) for 2021 included several PIP-related quality management goals, including aligning PIP policies to required performance metrics, utilizing behavioral support plans for PIP patients, and improving timeliness of PIP IDTTs.  Other PIP-related quality improvement projects active during the review period included implementation of a daily PIP huddle, launching the PIP's SPRFIT, and improving timeliness of mental health documentation in the PIP.  Two Lean Six Sigma projects were active during the review period (Reducing: (1) Overdoses and (2) Foreign Body Insertions / Ingestions); a third related to improving timeliness of mental health contacts in the PIPs was reportedly scheduled to launch after the conclusion of the site visit, in October 2021.  Interviewed civil servants confirmed that PIP quality improvement projects and goals were developed from a number of sources, including headquarters and regional initiatives, locally-driven projects, responses to sentinel events, and Joint Commission accreditation requirements.

The PIP SPRFIT Committee held five meetings during the review period but achieved a quorum at only one, or 20 percent of meetings.  Patient self-harm events, suicide attempts, and completed suicides were discussed.  Where applicable, corrective action plans and QIPs were reviewed.

The institution's Patient Safety Committee held six meetings during the review period and achieved a quorum at 100 percent of meetings.  PIP issues were discussed across three broad

categories of topics included on Patient Safety Committee agendas: systems surveillance, quality improvement opportunities, and Joint Commission.

The PIP's Utilization Management (UM) Committee did not meet during the review period. PIP leadership identified the lack of regular meetings as an issue and determined that PIP UM Committee meetings would be held in conjunction with the institution's UM Committee going forward.

The monitor reviewed three corrective action plans developed and/or implemented during the review period. One, related to timeliness of UM IDTTs, was marked as completed due to reported sustained compliance with the metric under review. Two others derived from sentinel events resulting from patient self-harm incidents. The action items contained within one of the corrective action plans were marked as complete, and the other was partially completed.

## PATIENT COMPLAINTS/PATIENT SATISFACTION

There were three patient appeals filed in the CIW-PIP during the review period, all related to allegations of staff misconduct. All three cases were closed after an investigation that found no violation of policy and no intervention was required.

CIW-PIP staff reported that patient satisfaction surveys were not issued during the first quarter of 2021 due to the COVID 19 pandemic. During the second quarter, eight surveys were received. Surveyed patients indicated satisfaction with medication management, groups, and communication regarding their illness. Patients indicated that they would like to see improvements in the number of groups offered, the food served, and the amount of recreation time and showers offered.

## CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

CIW's institution-wide LOP regarding the custody and mental health partnership plan (CMHPP) was not consistent with statewide requirements. Statewide requirements indicated completion of huddles in the MHCB and PIP housing units on second and third watch; however, CIW's LOP required huddles on second and third watch in the MHCB but not the PIP. Further, CIW-PIP did not pilot specialized bed consolidated care huddles on second watch during the period under review.

Of 24 patient appeals during the review period, three occurred while the patients were in the CIW-PIP. These complaints alleged inappropriate behavior by staff. Five CIW-PIP staff were redirected due to staff misconduct.

The monitor reviewed 154 huddle reports which occurred on second and third watch in the CIW-PIP during the reporting period. A total of 39, or 25 percent, had the required attendees present. Huddles were not conducted on the weekends in the CIW-PIP during the review period.

CIW provided an institution-wide report regarding annual CMHPP training for custody staff, which demonstrated that significant numbers of mental health and custody staff had not attended annual CMHPP training. Of 491 custody staff, 73 completed partnership training for a compliance rate of 15 percent. Five of six, or 83 percent of correctional administrators completed the required training, none of the four captains completed the training, three of 22, or 14 percent of lieutenants completed the training, 11 of 56, or 20 percent of sergeants, ten of 20, or 50 percent of correctional counselors, and 44 of 383, or 11 percent of correctional officers completed the partnership training. The CMHPP coordinator reported that the high rates of non-attendance resulted from coverage issues due to the COVID 19 pandemic. CIW reported a plan

to institute modified programming once or twice a month until the end of 2021 to allow staff completion of required trainings.

Regarding CMHPP training for mental health staff, CIW reported that multiple mental health staff did not receive the required annual training.  CIW reported that 69 percent completed annual CMHPP training, including three of six, or 50 percent of supervising psychiatrists, psychologists, or social workers, nine of 12, or 75 percent of psychiatrists, 17 of 23, or 74 percent of psychologists, seven of 12, or 58 percent of social workers and nine of 11, or 82 percent of recreation therapists.

The CIW-PIP program supervisor reported that training was virtual since the COVID-19 pandemic, and the resultant interactions between the disciplines were more limited.  CIW-PIP continued to require that all staff attend.

Executive joint rounding was completed in the CIW-PIP on May 25, 2021; standard questions were asked, and the staff interviewed included a custody sergeant and a licensed visiting nurse.  Reviewed documentation indicated that staff interviewed during the rounding reported improved relationships between disciplines; some tensions were noted during the COVID-19 pandemic, often linked to poor communication of policy changes as they were occurring—additional complaints related to operational matters such as difficulties accessing supplies, poor wi-fi and internet connections.

A single patient was interviewed during the joint rounding who reported no issues with custody and mental health staff and noted both were helpful to her.  The patient referenced more challenging relations with the medical staff on the unit.  The only request made was to resume college correspondence classes.

Though joint rounding occurred monthly, the CIW's leadership acknowledged that the information gleaned during joint rounding was not properly distributed to the required committees for dissemination to staff.  The chief of mental health reported this oversight was corrected in August 2021, and the information was currently shared at the weekly Warden's meeting and with the quality management committee and the mental health subcommittee, as required in the plan.

### *COLEMAN* POSTINGS

*Coleman* posters were observed in each toured housing unit except the Walker unit.  A poster was hung in the Walker unit before the end of the site visit.

### LAUNDRY AND SUPPLY ISSUES

CIW-PIP did not complete audits, reports, or logs for laundry and supply issues during the review period.

All CIW-PIP laundry was sent to California Institution for Men (CIM).  CIW-PIP maintained extra laundry supplies on the unit, and additional supplies could be ordered from the central warehouse if needed.  Interviewed inmates noted that some laundry was returned stained or damaged on occasion.  Some patients also reported an insufficient supply of larger-sized undergarments.

### PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

The CIW institution-wide policy covered CIW-PIP visitation.  According to the policy, ICC and IDTT release was required to allow visitation for CIW-PIP patients.  Further, unless approved by IDTT, all visits were non-contact for CIW-PIP patients.  Visitation was limited during the review period due to the COVID 19 pandemic.  Patients reported that visitation was

scheduled each Saturday and Sunday, and there was no restriction on the length of the visit.  In-person visitation was not occurring at the time of the site visit.

Telephone access was determined by IDTT and the patient's Step level.  At Step I, patients were allowed one call per week; at Step II, patients were permitted two calls per week; at Step III, patients were allowed three calls per week.  Patients at all Step levels could be granted more calls if clinically indicated.

Property issuance was not tied to Step levels and could only be restricted by the IDTT for a documented and justified safety reason.  For internal transfers from CIW-EOP or CIW-MHCB to the CIW-PIP, policy required patients' property to be transferred directly with them.  CIW staff was directed that if a patient transferred from another institution and did not receive their property within 72 hours of arrival in the PIP, the sending institution needed to be contacted to resolve the issue.

**LAW LIBRARY ACCESS**

The CIW library staff included a senior librarian, librarian, and library technical assistant; all three positions were filled.  Because CIW-PIP patients were not able to leave the PIP to go to the library, a law library kiosk was available for PIP patients in the PIP dayroom.  Access was available by request, and PIP patients were also able to utilize the library paging system.  The paging system required patients to submit a request for legal material to the law library, and the library staff delivered the materials to the patients.

Library staff reported that paging requests were generally returned to the patients within 24 hours after receipt.  At the time of the site visit, the PIP dayroom kiosk was operational. Library staff and recreation therapists assisted patients with library requests.  Additionally, patients had access to electronic books on their computer tablets.

CIW-PIP staff confirmed regular use of the dayroom kiosk by patients and provided sign-in logs that reflected two to four patients signed up daily throughout the review period.

## EDUCATION

One education class was held once a week for two hours for CIW-PIP patients who wanted to attend.  The class was conducted in the PIP by an instructor assigned through the education program.  The instructor assessed each patient who attended to determine their academic level, after which each patient received independent assignments consistent with their grade level.  The instructor reported that the class was held regularly but could be canceled due to COVID-19 outbreaks or insufficient staffing; cancellations were reportedly infrequent.  Patients were eligible to receive milestone credits for education participation; however, it was rare due to patients' limited time in the PIP.

## HEAT PLAN

CIW's Operational Procedure Institutional Heat Plan 414 was updated in June 2021 and complied with headquarters' directives.  CIW did not provide data regarding custody and mental health training regarding the heat plan.

The CIW-PIP was air-conditioned.  Institution-wide, CIW experienced 39 Stage I, five Stage II, and no Stage III heat alerts during the review period.  There were no heat-related illnesses during the review period.  Weekly heat risk lists were generated electronically with hard copies provided to facility lieutenants, the classification and parole representative, the food manager, the outpatient housing unit (OHU), and the mental health department.  Electronic copies were emailed to the litigation coordinator, associate warden, facility captains, prison industry authority, education, and medical staff.   A review of daily activity reports for the month

of July did not reflect documentation of reasonable accommodation during stage I heat alerts other than first watch who routinely checked the N/A box.

CIW's litigation coordinator submitted monthly heat reports to CDCR headquarters during the review period.

## PRE-RELEASE PLANNING

CIW's institution-wide pre-release unit assisted CIW-PIP patients in the release planning process when necessary. CIW-PIP patients were monitored weekly beginning six months from their earliest possible release date. In addition to the CDCR pre-release coordinators, services were provided by the Transitional Case Management Program (TCMP) social workers. TCMP social workers assisted patients scheduled for release with obtaining a California identification card and completing applications for benefits such as Medi-Cal, Social Security Insurance (SSI), and/or Veteran's benefits. CIW-PIP pre-release staff reported challenges related to TCMP's assistance with timely completion of California identification card applications which impacted patients' ability to complete applications for SSI, Veterans benefits and/or Medi-Cal upon release.

The CIW pre-release coordinators initiated the Pre-Release Planning Assessment (PRPA) as well as the Request for Information (ROI) and forwarded them to the patient's primary clinician for completion. Once the assessment was completed, the pre-release coordinator attended to any identified urgent needs. Additionally, the coordinators regularly participated in several meetings that addressed discharge concerns, including the weekly Intensive Substance Use Disorder Treatment (ISUDT) pre-release meeting, a monthly statewide mental health pre-release coordinators meeting, and required Coordinated Clinical Assessment Team (CCAT)

meetings.  The staff also attended annual training for institutional mental health pre-release coordinators.

Pre-release groups were suspended at the onset of the COVID 19 pandemic in March 2020.  The groups resumed for a short two-week period during November 2020; however, they were again discontinued and had not resumed at the time of the visit.

During the review period, patients within 120 days of release, and in many instances, within six months of release, received assistance from the CIW-PIP pre-release coordinators and TCMP social workers.  CIW pre-release planners reported assisting five patients in the PIP who were within 120 days of release at the time of the site visit.  No patients were released directly from the CIW-PIP during the review period.

## PROGRAM ACCESS

### Unclothed Body Searches

Unclothed body searches were performed in observation rooms and other available rooms that allowed for privacy in the CIW-PIP.  When needed, a privacy screen was placed in front of the door.  Interviewed custody staff were familiar with the August 19, 2021 memorandum directing body cameras to be shut off during unclothed body searches and reported that the policy was being followed.

### Earned milestone credits

All patients were eligible to earn milestone credits, and staff reported that patients were earning milestone credits as eligible.  The facility provided a report documenting that 20 intermediate care and one acute care patient earned milestone credits during the review period.

<u>APPENDIX A6</u>
San Quentin Psychiatric Inpatient Program
(SQ-PIP)

**San Quentin Psychiatric Inpatient Program (SQ-PIP)**
October 25, 2021 – October 26, 2021

## I.    SUMMARY OF THE FINDINGS

- There was adequate staffing for psychiatry and psychology, including supervisors and specialists, but significant vacancies for social workers and recreation therapists.

- The SQ-PIP did not use telepsychiatry during the review period.

- The caseloads of psychiatrists, psychologists, and recreation therapists were all within mandated ratios; however, social worker caseloads exceeded the established ratio.

- The SQ-PIP had adopted a flex bed policy in response to a chronically high PIP census that specified a prioritization of bed usage.

- Condemned and non-condemned patients had inadequate access to group treatment and yard.

- The SQ-PIP's flex bed LOP led to clinical and custody practices regarding non-condemned acute care patients who were presumed to require mechanical restraints when they were transported outside their cells.

- The condemned were considered MAX custody patients, with all the associated security practices; this had resulted in a significant negative impact on their treatment access due to limited programming space.

- The site visit revealed treatment obstacles related to staff and patients not properly wearing masks.

- Observed IDTTs were of very good quality and revealed good interdisciplinary discussion, with specific treatment plan references.  However, staff reported that custody officers frequently did not attend IDTTs.

- Acute care patients received an unweighted average of 4.18 weekly hours of out-of-cell structured therapeutic hours.

- Core therapy groups accounted for less than 50 percent of all offered group treatment.

- SQ-PIP staff had not yet conceptualized the minimum number of average weekly hours of out-of-cell structured therapeutic activity that the program should offer to acute care patients.

- The quality of observed group therapy for intermediate care patients was typically dependent on the facilitator; patients were generally engaged in group treatment.

- Interviewed intermediate care patients requested additional clinical groups specific to their diagnoses and functional deficits, and groups that included activities such as art and music.

- Interviewed condemned intermediate care patients expressed dissatisfaction with both restart chairs and therapeutic treatment modules (TTMs).

- Most patients and staff reported that patients had daily access to individual out-of-cell clinical contacts.

- Reviewed behavior plans and associated updates were of much higher quality than during the previous monitoring round.

- Temperature regulation in the SQ-PIP remained a chronic problem; some cells were much colder than others.

- The SQ-PIP reported no longer using the Steps Toward Accomplishment, Growth, and Education (STAGE) level system. Instead, it had developed a System To Encourage Progress (STEP) level system, which was awaiting implementation.

- Approximately two-thirds of acute care referrals to the SQ-PIP transferred beyond the ten-day transfer timeline; all patient transfers to intermediate care at the SQ-PIP were timely.

- Interviewed staff reported that improved communication between patients and mental health and custody staff had helped the SQ-PIP become more proactive in the resolution of patient concerns.

- Review of monthly executive staff meeting minutes for the reporting period reflected discussions of monthly executive leadership joint rounding.

- During executive leadership joint rounding, staff reported good rapport and communication within the SQ-PIP; patients reported feeling comfortable with staff responsiveness to their needs and receiving ducats for scheduled appointments.

- Staff reported difficulties in receiving patient property from certain institutions, as well as delays from other PIPs.

- SQ-PIP patients were not offered pre-release groups.

## CENSUS

The SQ-PIP was a 40-bed unit located within a 50-bed licensed CTC. The PIP's 40 beds were interchangeable and could be used for acute and intermediate care, and as MHCBs. Although the SQ-PIP primarily served the inpatient needs of SQ's condemned population, up to 16 of the 40 beds were currently used to treat non-condemned acute care patients from other institutions.

On October 25, 2021, the SQ-PIP housed 32 patients, representing 80 percent of its bed capacity. There were 14 non-condemned acute care patients from other institutions and 18 condemned intermediate care SQ patients.

## STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

The positions for the executive director, program director, and nurse coordinator were filled. The program assistant position was vacant. The clinical administrator and medical director positions were also vacant; however, their functions were covered by the hospital administrator and senior psychiatrist supervisor, respectively.

Senior Psychiatrist Supervisor:  The senior psychiatrist supervisor position was filled.

Psychiatrists:  There were 3.5 civil service psychiatrists and a 0.5 registry psychiatrist covering 2.7 psychiatry positions.

Senior Psychologist Supervisor:  A 0.5 senior psychologist supervisor filled the 0.4 established position.

Senior Psychologist Specialist:  One senior psychologist specialist filled the 0.4 established position.

Psychologists:  Three civil service psychologists filled 2.7 positions.

<u>Social Workers</u>:  Two of 3.6 social worker positions were filled, for a 44 percent vacancy rate.

<u>Recreation Therapists</u>:  Three of 3.6 recreation therapist positions were filled, for a 17 percent vacancy rate.

<u>Supervising Registered Nurses</u>:  Both positions for supervising registered nurses were filled.

<u>Registered Nurses (RNs)</u>:  Of 11 RN positions, 10.62 were filled.

<u>Senior Psych Techs</u>:  All six senior psych tech positions were filled.

<u>Psych Techs</u>:  Of 31.86 psych tech positions, 26.55 were filled, for a 17 percent vacancy rate.

<u>Licensed Vocational Nurses (LVNs)</u>:  All 10.62 LVN positions were filled.

<u>Certified Nursing Assistants (CNAs)</u>:  Seven of 8.1 CNA positions were filled, for a 14 percent vacancy rate.

**<u>Telepsychiatry</u>**

The SQ-PIP did not use telepsychiatry during the review period.

**<u>Staff-to-Patient Ratios and the Adequacy of Clinical Staffing</u>**

Leadership reported that the SQ-PIP was staffed to be within the acute care staff-to-patient ratio of 1:15. This ratio also applied to intermediate care patients because SQ-PIP beds were flexed between the acute and intermediate levels of care, and MHCBs.  The caseloads of psychiatrists, psychologists, and recreation therapists were all within mandated ratios; however, social worker caseloads exceeded the established ratio.

There was significant turnover among supervisory and line staff since the last site visit. Among line staff, there had been personnel changes among nearly all psychologists and social

workers during the last year. There also had been some changes in the leadership for clinicians and custody.

**Staff Training**

The SQ-PIP's clinical director had implemented increased training, mentoring, and clinical supervision, including weekly PIP staff meetings, that focused on quality treatment plans. This training included formats for the treatment plan's clinical summary and patient progress, which had been revised to incorporate active behavior plans. Effective treatment planning at the SQ-PIP nonetheless required further clinical focus. The clinical director's weekly PIP staff meetings had also implemented case conferences.

The SQ-PIP's LOP for staff training required annual review of staff training curricula. New SQ-PIP employees were required to complete trainings on the statewide healthcare new employee orientation, correctional treatment orientation, and PIP new employee orientation and therapeutic strategies and interventions.

**TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

The SQ-PIP had previously been directed to expand its treatment mission to now provide programming for up to 16 non-condemned acute care patients, in addition to the acute, intermediate, and MHCB care provided to the condemned population. In response to a chronically high PIP census, the SQ-PIP had also adopted a flex bed policy that specified a prioritization of bed usage. The first bed priority was for condemned intermediate care patients; the fourth was for non-condemned MHCB patients. However, no non-condemned, MHCB patients were admitted to the SQ-PIP's MHCB during the review period.

As for treatment, condemned and non-condemned acute care patients did not program together. An unintended consequence of this practice was that each population had less access to

345

group treatment and yard.  Furthermore, because the census for condemned acute care patients was generally very low and did not exceed two patients during the review period, these patients typically participated in groups with condemned intermediate care patients.

The SQ-PIP's flex bed LOP had not been updated since 2018 and was outdated.  Staff reported that this policy had not caused confusion in the context of acute and intermediate care and MHCB treatment protocols and goals for either clinical or custody staff.  Nonetheless, there were issues with clinical and custody practices that were specific to non-condemned acute care patients.  Among them, all non-condemned and non-maximum custody acute care patients were presumed to require mechanical restraints when being transported outside of their cells. Discussion of this issue with mental health and custody leadership during the site visit resulted in the initiation of a process to change this practice.

Furthermore, the condemned were considered to be MAX custody patients, with all the associated security practices.  Notably, condemned patients had consistently refused to participate in groups that utilized restart chairs, related to their transport to groups, which was significantly different from the transport process involved in the use of TTMs.  This resulted in a significant negative impact on condemned patients' treatment access due to limited programming space.

The monitor's expert recommended consultations with headquarters so that non-condemned, MAX-custody acute care patients were no longer referred to the SQ-PIP due to logistical concerns related to the use of TTMs.  Specifically, since the SQ-PIP's non-condemned bed allocation was 16, and most referrals were of non-maximum custody patients, it was difficult to have adequate programming space for both MAX and non-maximum custody patients.  Unlike condemned acute care patients, who programmed with condemned intermediate care patients,

non-condemned non-maximum custody patients could not program with non-condemned MAX custody patients in a group setting.  Yet another option would be for the SQ-PIP to only admit non-condemned MAX custody patient referrals.

The Joint Commission conducted a three-year reaccreditation of the SQ-PIP in August 2021.  Overall, findings as to provided care were positive and the Joint Commission reaccredited the SQ-PIP with the understanding that nine identified performance issues requiring corrective action would be corrected; these matters were being addressed at the time of the site visit.

The site visit also revealed treatment obstacles related to staff and patients not properly wearing masks.  Specifically, multiple SQ-PIP staff on the treatment unit were either not wearing masks or wore them below the nose.  During observed groups, most patients did not keep their masks on.  Facilitators also did not instruct patients on how to properly wear their masks or that they were required to keep them on.

### 1.    Interdisciplinary Treatment Teams (IDTTs)

Observation of IDTTs and the treatment planning process for three non-condemned acute care and two condemned intermediate care patients found all treatment team members to be in attendance; however, several members attended telephonically.  Observed IDTTs were of very good quality and revealed good interdisciplinary discussion, with specific references to treatment plans.  The IDTT room had adequate space and all patients reviewed were placed in the room's single TTM, with the subsequent removal of handcuffs.

Staff reported that custody officers frequently did not attend IDTTs; however, it was not uncommon for specific custody officers to attend.  Although correctional counselors' regular IDTT attendance was very helpful, line staff custody officers provided another important perspective that needed to be heard.

The SQ-PIP conducted quality improvement IDTT audits with an emphasis on IDTT timeliness.  In addition, master treatment plans were reviewed on a monthly and random basis as to content issues, including diagnoses, symptoms, discharge criteria, and treatment summaries. Compliance levels above 85 percent were typically found.

The monitor reviewed a random sample of healthcare records of ten acute care patients from a spreadsheet provided by CDCR of patients who were admitted to the SQ-PIP during the review period for the timeliness of IDTTs.  All ten patients required initial IDTTs during the review period.  Ten of ten, or 100 percent, occurred within 72 hours of admission and were compliant.  Eight of ten initial IDTTs, or 80 percent, included all required staff members.

For these ten acute care patients, there were 33 expected timeframes for routine IDTTs. Thirty-one of 33, or 94 percent, occurred within seven days and were compliant.  Thirty of 33 routine IDTTs, or 91 percent, included all required staff members, and were also compliant.

The monitor also reviewed the healthcare records of 16 intermediate care patients to assess IDTT timeliness.

Ten of these 16 intermediate care patients required initial IDTTs.  Nine of ten, or 90 percent, had their initial IDTTs within 72 hours of admission.  All staff were present at all IDTTs.  Patients were present at nine of ten, or 90 percent, of initial IDTTs.

For these 16 intermediate care patients, there were 43 expected timeframes for routine IDTTs.  Forty of 43, or 93 percent, occurred within 30 days and were timely.  Required staff attended all routine IDTTs.  Patients were present at 23 of 49, or 47 percent, of routine IDTTs. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician; however, assignment was not clearly discernable for all cases.

**Group Therapy**

Acute Care

The average number of weekly out-of-cell structured therapeutic activities offered to acute care patients during the review period ranged from 3.4 to 9.3 hours with an unweighted average of 6.04 hours. The average number of weekly out-of-cell structured therapeutic activities received by acute care patients ranged from two to 5.5 hours with an unweighted average of 4.18 hours. Recreation therapists provided most group therapy; however, SQ-PIP staff were planning to increase the weekly number of core therapy groups that psychologists and social workers offered. Four percent of scheduled groups were cancelled.

The number of weekly hours of out-of-cell structured therapeutic activities provided to acute care patients needed to increase significantly. The percentage of core out-of-cell therapy groups also needed to increase; it was currently less than 50 percent of all offered group treatment.

Until recently, the amount of out-of-cell structured therapeutic activities provided to acute care patients had been significantly curtailed due to COVID-19 and social distancing requirements. Furthermore, SQ-PIP staff had yet to conceptualize the minimum amount of out-of-cell structured therapeutic activity that the program should offer to acute care patients. Notably, the number of weekly hours should be significantly more than the minimum of ten weekly hours offered to EOP program patients.

During the site visit, the monitor's expert interviewed four non-condemned acute care patients in a group setting. Based on their medical records, the patients provided an unreliable history of the frequency of their clinical contacts. Patients reported being offered three to seven weekly groups and seven weekly hours of unstructured yard time in the walk-alone yards.

349

However, their provided information was not particularly helpful due to their unreliability as historians, which appeared, in part, related to their mental illnesses.

<u>Intermediate Care</u>

The intermediate care treatment program offered an average of approximately 15 weekly hours of structured treatment per patient during the reporting period, with an average refusal rate of 53 percent (approximately seven hours attended).

Observed treatment groups differed in their content and process.  Group quality was often dependent on the facilitator, even when the facilitator utilized manualized treatment, which was treatment that was laid out in chapters with instructions for the facilitator.  Patients were generally engaged with the group and all facilitators made repeated efforts to include all group members, including those who were hesitant to speak.  However, reviewed EHRS documentation as to group therapy typically did not provide necessary details.  In fact, at times it was difficult to tell if the patient had attended the group.

Patients reported that they disliked the lack of continuity in treatment due to multiple treatment team changes throughout their admission.  Management indicated that the bulk of such changes were due to staff retirement and/or movement.  Staff movement was sometimes due to staff requests and at other times due to the need to move team members to other areas where they would be a better fit.  Interviewed patients requested additional clinical groups specific to their diagnoses and functional deficits, and groups that included activities such as art and music.

During the site visit, the monitor's expert interviewed five condemned intermediate care patients in a group setting.  The patients expressed significant dissatisfaction with the restart chairs due to reported back problems and physical discomfort while sitting in them.  They also generally reported disliking the TTMs, which they deemed dehumanizing.

The interviewed condemned intermediate care patients further reported that their yard access with a recreation therapist was currently limited to once weekly; however, they had daily access to the stand-alone yards for a total of ten weekly hours.  The patients further reported having daily access to individual meetings with a mental health clinician with the option of a confidential clinical session in an out-of-cell setting for 30 to 45 minutes.  These intermediate care patients generally found the out-of-cell structured therapies to be helpful.

**<u>Individual Treatment</u>**

Most patients and staff reported that patients had daily access to individual out-of-cell clinical contacts.  However, only recently had the SQ-PIP used a management information system to track these contacts.  The institution also needed a better tracking system to determine the percentage of contacts that occurred out-of-cell and the reasons for any contacts not occurring out-of-cell.  The duration of individual clinical contacts was reportedly based on clinical need and patient choice.

The monitor reviewed a random sample of healthcare records of ten acute care patients from a spreadsheet provided by CDCR of patients who were admitted to the SQ-PIP during the review period for the timeliness of individual clinical contacts.  All ten patients required initial psychiatry evaluations and had them within 72 hours of admission.  Of the 50 expected timeframes for routine psychiatry contacts, 44 or 88 percent occurred at least every 72 hours as required.

All ten acute care patients required initial primary clinician evaluations.  Eight of 10, or 80 percent, occurred within 72 hours of admission.  Of the 90 expected timeframes for routine primary clinician contacts, 73 or 81 percent occurred timely.

The monitor also reviewed the healthcare records of 16 intermediate care patients to assess the timeliness of individual clinical contacts. Eight of ten, or 80 percent, of patients who required initial psychiatry assessments had them within 72 hours of admission and prior to the initial IDTT. Eight of ten, or 80 percent, occurred in a confidential setting. Of the 65 expected timeframes for routine psychiatry contacts, 52 or 80 percent occurred within three or seven days, depending on the patients' treatment plans, and were compliant. Of the 71 psychiatry contacts reviewed, 44 appointments, or 62 percent, occurred in a confidential setting. When reasons were provided, non-confidential psychiatry appointments were reported to be due to patient refusals.

Ten of 16 intermediate care patients required initial primary clinician assessments. Nine of ten, or 90 percent, occurred within 72 hours of admission and prior to the IDTT. All ten or 100 percent occurred in a confidential setting. Of the 65 expected timeframes for routine primary clinician contacts, 57 or 88 percent occurred every seven days and were compliant. Of the 71 primary clinicians contacts reviewed, 62 appointments, or 87 percent, occurred in a confidential setting. When reasons for non-confidential appointments were provided, they were reported to be due to patient refusals.

### Psychiatric Services

Psychiatrists met with their caseload patients at least once every 72 hours, and generally more frequently.

### Other Treatment Issues

#### A. Involuntary Medications (PC 2602)

During the review period, there were 12 patients on active PC 2602 orders for involuntary medications. The PC 2602 process had been initiated for another patient but had not yet been heard.

352

**Behavioral Management**

The Positive Behavioral Support Team (PBST) provided specialized behavioral consultation and services for patients who engaged in a variety of disruptive and/or dangerous behaviors that did not respond to conventional treatment interventions, or who refused or were unable due to mental illness, to participate in recommended treatment. During the prior monitoring round, the PBST was only a consultative service; however, it had since been expanded to be part of the treatment team. The PBST also provided consultations to IDTTs and staff trainings and engaged in outcome evaluations through the revision of treatment plans.

The senior psychologist specialist assigned to the PBST was now 100-percent dedicated to this position. During the last site visit, she was the clinical director with associated duties that severely limited her ability to complete behavior plans. The total dedication of her time to the PBST helped with the development of more comprehensive behavior plans, and with the updating of others. During the review period, two new behavior plans were developed; two others were updated, for a total of four active behavior plans.

Reviewed behavior plans and associated updates were found to be of higher quality than during the prior site visit. Notably, behavior plans were not overly inclusive, with specific interventions, and were understandable to the SQ-PIP staff.

**Morning and End of Shift Meetings**

Observed morning and afternoon end of shift meetings were very different. The morning meeting was well attended by custody and mental health staff, which was related to the larger pool of staff who worked during second watch. The morning meeting began with the nurse's brief verbal report of each patient on the unit. Thereafter, the morning meeting followed the script for the huddle process; it included a review of patients' daily schedules, and patients

whose medications would soon be expiring, among other matters.  The meeting reflected a fair amount of staff interaction.

The afternoon end of shift meeting was also led by a nurse and attended by multiple disciplines, including custody staff; however, significantly less staff attended the afternoon meeting related to third watch's decreased staffing allocations.  The afternoon end of shift meeting was like the morning meeting but was much more abbreviated as most of the scheduling and other issues reviewed during the morning meeting had been completed.  There was also minimal verbal interaction among staff during the afternoon end of shift meeting.

Notably, the huddle process relied on a script that was not designed for the PIP setting.

### Unit Temperatures

As previously reported, temperature regulation in the SQ-PIP was a chronic problem; some cells were much colder than others.  Staff indicated that when patients reported being cold, the door to the yard at the end of the unit was closed and patients were given extra blankets.  Facility management believed that the cold cells were the result of some patients blocking their cell vents, which impacted other cells' temperatures.  Management reported that they would investigate this issue further but believed it was a custody issue that needed to be addressed by stopping patients from blocking their cell vents.

### Treatment Space

Treatment space in the SQ-PIP was sufficient but the arrangement of the TTMs was inadequate.  Staff reported that SQ-PIP treatment space included an IDTT room with TTMs and two dayrooms; one contained the law library kiosk and the other had three restart chairs.  There was also one group room with four TTMs and another with eight TTMs.  The SQ-PIP also used three other group rooms that each contained between eight and ten TTMs; however, other

programs used these three group rooms after hours and on weekends. Additionally, the SQ-PIP yard had eight TTMs and a group module that was used for recreation or custody groups. All treatment spaces were confidential, with telephones, and computers or computer access. Notably, TTM arrangement was not always conducive for group interaction.

## PATIENT ACCESS TO TREATMENT

Newly admitted SQ-PIP patients were placed on a 72-hour orientation and assessment phase, which ended with their initial IDTT. Otherwise, SQ-PIP mental health management and staff reported no longer using the STAGE level system. Instead, the institution had developed a STEP level system, but several factors had prevented its implementation. Among them, the SQ-PIP was awaiting release of the statewide STEP policy, while its lack of a program director and program assistant for a significant period since the prior site visit had negatively impacted implementation of the STEP level system.

## REFERRALS AND TRANSFERS

During the review period, there were 14 patient referrals to acute care and 15 to intermediate care. Notably, all acute care referrals to the SQ-PIP were from institutions other than SQ; all intermediate care referrals were from SQ.

Nine of 14 or 64 percent of acute care referrals were transferred beyond the ten-day transfer timeframe from the endorsement date. It took an average of 17 days, with a range of four to 28 days, from the referral date to the date of endorsement for acute care patients. For acute care patients admitted beyond transfer timelines, it took an average of 21 days, with a range of 13 to 28 days, from endorsement to admission.

Of the 17 patients who transferred to intermediate care, 15 or 88 percent were endorsed on the day of referral. All patient transfers to intermediate care were timely.

The SQ-PIP did not reject any referrals during the review period.

## ADMISSIONS AND DISCHARGES

### 1.    Admissions

The SQ-PIP reported 14 acute care and 17 intermediate care admissions during the review period.  At the time of the site visit, one patient was endorsed and pending acceptance from the SQ-PIP; another had been accepted but not admitted.

During the site visit, acute care patients' lengths of stay averaged 38 days.  For intermediate care patients, four patients had stays that ranged from over two to more than seven years.  Two other patients had respective stays of eight and four months.  The remaining patients had an average length of stay of 20 days, with a range of three to 22 days.

No patients admitted to the SQ-PIP during the review period had complex medical needs or were admitted from a SHU.

### Discharges

During the review period, the SQ-PIP discharged 13 patients each from acute and intermediate care.  The average length of stay for patients discharged from acute and intermediate care was 45 and 383 days, respectively.  Three patients discharged from acute care remained in the same unit for their intermediate care program.

## LEAST RESTRICTIVE HOUSING

There were no patients who were housed in the SQ-PIP intermediate care program who were above their LRH.  None required LRH review due to their custody level.

## PATIENT DISCIPLINARY PROCESS

The SQ-PIP held a webinar mental health assessment training in April 2021 for mental health staff.  However, because the training was by webinar, there were no sign-in sheets.  As for

custody staff's attendance at mental health assessment training, the institution reported 100 percent attendance by the warden, chief deputy warden, and associate wardens, and attendance by 31 of 34 or 91 percent of lieutenants, and 52 of 77 or 68 percent of sergeants.

Two RVRs were issued to patients for behaviors that occurred while they were housed in the SQ-PIP. Custody did not timely refer either RVR to mental health for completion of the assessment. Mental health staff timely completed and returned both assessments to custody.

The clinician who completed the assessments provided relevant information using laymen's terms for the hearing officer to consider during RVR adjudication in response to question number three on the mental health assessment. In response to question number four, regarding mitigation, on one assessment the clinician recommended that the patient continue to have access to mental health treatment and religious services. Notably, these two recommendations were inappropriate as the hearing officer could not assess a penalty limiting patients' access to mental health treatment or religious services.

Moreover, in neither of the two RVRs did the hearing officer adequately document consideration of mental health information during RVR adjudication. Instead, in both cases the hearing officer quoted the response to mental health assessment question number four, relative to penalty mitigation, instead of referring to the response to assessment question number three, which was information that the hearing officer should have considered. Other than reference the wrong mental health assessment response, the hearing officer did not document any consideration, which was inadequate.

## USE OF FORCE

Provided data on use of force training was not exclusive to the SQ-PIP but was for the entire institution. As for custody's attendance at this training, there was 100 percent compliance

for completion of training by the warden, chief deputy warden, associate wardens, and captains. Twenty-six of 34 or 76 percent of lieutenants completed the training, as did 57 of 77 or 74 percent of sergeants, and 711 of 783 or 91 percent of correctional officers.

As for mental health staff, the institution reported that 100 percent of mental health supervisory staff to include the chief psychologist, chief of mental health, chief psychiatrist, and psychiatry, psychology, and social worker supervisors, as well as psychiatrists, attended the use of force training. Twenty-three of 30 or 77 percent of psychologists attended the training, as did 13 of 15 or 87 percent of social workers.

During the review period, there were no controlled use of force incidents. Of the three immediate use of force incidents, the monitor reviewed two of them for compliance with applicable policy; the third incident had not completed the review process.

In one of the two reviewed immediate use of force incidents, the patient's medication refusal led to a psychiatrist ordering an immediate emergency medication pending a PC 2602 hearing. The psychiatrist documented in EHRS that the patient was a threat to himself if medication was not immediately administered; the on-site sergeant also documented the belief that the patient would self-harm but did not report what the patient was doing to support this statement. The incident report also did not document the imminent threat that justified the immediate use of force. Notably, the second line supervisor's review of the incident report stated that based on the totality of the circumstances, this incident should have been a controlled use of force.

## UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

The SQ-PIP no longer separately reported serious incidents, near misses, or sentinel events. All were now reported as unusual occurrences. There were 69 unusual occurrences

during the review period, including patient accidents, injuries, falls, and wound care, medication and PC 2602 concerns, self-harm incidents, hunger strikes, and patients needing medical devices or equipment.

**USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT**

There were no seclusion or restraint episodes during the reporting period.

**EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS**

There were no patient deaths in the SQ-PIP during the review period.

Patient safety committee meetings were held monthly. Reviewed meeting minutes for five months of the reporting period revealed SQ-PIP-related discussions concerning nurse administered/direct observation therapy, the backlog in laboratory testing and screening, medication adherence concerns, and use of force procedures during medical emergencies.

Review of meeting minutes for the emergency medical response and review committee for four months of the reporting period reflected discussion of emergent and urgent transports from the SQ-PIP, suspected overdoses and suicide tracking, and review of emergent and urgent case reviews when discrepancies were found.

**QUALITY MANAGEMENT AND UTILIZATION REVIEW**

Reviewed minutes from the SQ-PIP's monthly subcommittee meetings indicated standing agenda items, requiring audits and reports, and updates on pending action items. The standing agenda items included quality-related issues, system surveillance, administrative and operations matters, and previous action items. System surveillance included various audit items related to custody, nursing, dietary, clinical, training/evaluation, and administrative operations. The subcommittee achieved a quorum for all months of the review period, which was an improvement from the prior site visit.

The SQ-PIP subcommittee initiated one QIT and two CAPs during the review period. The QIT was formed in April 2021 to address IDTT content audits following several months of non-compliance. However, several factors, including improved compliance and training on the IDTT content audit, led to continuing delays in the QIT's implementation during the review period. The two CAPs addressed untimely suicide risk evaluations by providing for further training and adding discussion of suicide risk evaluations to morning huddles.

The SQ-PIP did not complete formal meeting minutes for the utilization management committee. Instead, the institution provided meeting agendas with patients' names and master treatment plans, and forms documenting continued reviews.

## PATIENT COMPLAINTS/PATIENT SATISFACTION

No patient complaints were filed during the review period. Interviewed staff reported that improved communication between patients and mental health and custody staff had helped the SQ-PIP to become more proactive in resolving patients' concerns. Notably, observed interactions between custody officers and patients were respectful.

The SQ-PIP had a patient advocate who routinely walked through the unit, talking with patients and listening to their concerns. The patient advocate interacted with patients to connect them with necessary resources, or, as an unbiased individual, explained situations to them from another perspective.

The SQ-PIP administered a patient satisfaction survey in March 2021; another patient survey scheduled for September 2021 had been delayed pending the arrival of the new program assistant. Nine patients, some with patient advocate's assistance, completed the survey, with ten of 24 questions achieving a score below 85 percent. Staff reported that survey results were shared with staff during meetings.

The inpatient council had been suspended in early 2020 due to patients' unwillingness to participate.

## CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

Review of SQ's Custody and Mental Health Partnership Plan LOP dated December 2020 indicated general consistency with statewide requirements.

Observed second and third watch huddles revealed all required staff members to be in attendance and included in-person attendees and attendees by telephone. The chief psychiatrist facilitated an observed second watch huddle. Staff used the Kardex during huddles to review patients' appointments and discuss concerns. Notably, custody staff provided very little input during huddles.

The SQ-PIP further reported that in addition to huddles, during weekdays there was a joint CTC/PIP management collaboration meeting.

Executive leadership joint rounding occurred in the SQ-PIP in July of 2021. All required members attended the rounding. The rounding team followed the prepared script for asking questions of staff and patients. Interviewed staff reported good rapport and communication within the unit. However, staff also reported the need for additional examination rooms for patients, as well as new equipment such as computers and laptops. Interviewed patients reported being comfortable with staff responsiveness and receiving ducats for scheduled appointments. Patient requests included more one-on-one time with clinicians, and more yard and group activities, especially for condemned patients.

Reviewed minutes from monthly executive staff meetings reflected discussions of the outcomes from the monthly rounding.

As for attendance at the annual custody and mental health partnership training, provided information for custody for the entire institution reported that 715 of 958 or 75 percent of correctional leadership and officers attended this annual training.  As for SQ-PIP mental health staff, the chief psychiatrist, chief psychologist, senior psychiatrist supervisor, three of four senior psychologist supervisors, five of 11 psychiatrists, 15 of 24 psychologists, the supervising psychiatric social worker, and eight of 15 clinical social workers, or a total of 35 of 58 or 60 percent of mental health staff, attended the annual custody and mental health training.

### *COLEMAN* POSTINGS

There were current *Coleman* posters in English and Spanish throughout the SQ-PIP, including IDTT and group rooms.  Notably, several interviewed patients reported that they were not familiar with the *Coleman* case.

### LAUNDRY AND SUPPLY ISSUES

The SQ-PIP revised its LOP on laundry and supplies in August 2021.

Custody staff recorded showers, and clothing and linen exchange, on the non-clinical activity tracker (NCAT).  Staff reported having adequate supplies of clothing, suicide smocks, and blankets, which observed clean linen rooms confirmed.  Staff further reported working with housekeeping to keep track of dirty laundry that was sent out for laundering; this included making telephone calls to follow-up with missing items.

### PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

Patient visitation was in accordance with the May 27, 2021 Roadmap to Reopening memorandum.  Patients had access to telephones, including video phone calls. Custody staff recorded visitation, telephone use, and dayroom and yard participation on the NCAT.

The one assigned property officer to the SQ-PIP worked closely with staff to maintain contact with the sending facility if property did not arrive with the patient. Staff reported having difficulty receiving patient property from several prisons, as well as delays from the other PIPS. Loaner radios and televisions were available for patients.

**LAW LIBRARY ACCESS**

One of four librarians on staff was assigned to the SQ-PIP. Library staff reported that kiosks were checked weekly to make sure they were working; observation during the site visit indicated that the kiosks were operational. The kiosks contained a quick start guide, currently only in English, and information on education services in both English and Spanish. Interviewed patients reported that they could ask correctional officers to contact the librarian in those instances when the patient required assistance with the kiosk.

**HEAT PLAN**

There was an updated heat plan LOP dated May 2021 and an addendum dated August 2021. There were no Stage I, Stage II, or Stage III heat alerts during the review period. Custody staff had the daily list of patients who were prescribed heat sensitive medications; they were also familiar with the heat plan and were able to explain the requirements of its respective stages. The thermometer in the SQ-PIP was working and centrally located even though the unit was air-conditioned.

**PRE-RELEASE PLANNING**

The SQ-PIP had two institutional mental health pre-release coordinators who tracked patients' release dates using CDCR's On-demand reports and the 60-day pre-parole reports provided by the statewide mental health pre-release coordinator. The pre-release coordinator typically initiated the pre-release planning assessment (PRPA) within 60 days of patient release;

the request for information (ROI) was initiated within 45 days of patient release and was forwarded to the patient's primary clinician for completion.

The pre-release coordinator participated in CCAT meetings for patients released from the SQ-PIP.  PIP patients were not offered pre-release groups.

Two of three patients who were scheduled for release during the review period transferred from the SQ-PIP prior to their scheduled release; the third patient was released to parole.  The PRPA and ROI for all scheduled PIP releases were completed timely.

## PROGRAM ACCESS

During the reporting period, no SQ-PIP patients had job assignments or pay numbers. Eight acute care and one intermediate care patient earned a total of 45 milestone credits.

## EDUCATION

No SQ-PIP patients participated in education programs during the review period.

APPENDIX A7
California Men's Colony (CMC) MHCB "Acute Care"

## California Men's Colony (CMC) MHCB-"Acute Care"
July 21, 2021 – July 22, 2021

This was a targeted on-site review from July 21-22, 2021 of the MHCB beds at CMC that were being utilized to treat acute care patients on a temporary and emergency basis. CMC reported that the implementation date was April 28, 2021; the first patient was placed in the unit on April 27, 2021.

## I.    SUMMARY OF THE FINDINGS

- Overall, the creation of an inpatient treatment milieu was hampered by the lack of a dayroom, the limited buy-in for the program across all disciplines, uneven experience with inpatient settings among staff, limited training and preparation for the opening of the unit, and the generally ad hoc nature of the treatment provided by a dedicated clinical team.

- The unit staff's efforts tended to mitigate some of the deficits noted during the site visit, but it was clear that this model was not sustainable.

- Staff and leadership acknowledged that limitations related to the unit's physical plant and concerns related to custody and clinical staffing issues needed to be addressed.

- Notably, staff members' efforts were hampered by a lack of knowledge as to how long CDCR planned to utilize these beds to provide acute care treatment.

- While unit staff were not aware of the duration of time CDCR planned to treat acute care patients in the unit, regional staff indicated that Statewide Mental Health Headquarters staff indicated that the institution should be prepared to use the unit for acute care patients for up to one year. Without intervention, the current state of the unit did not appear to be sustainable for that length of time.

## CENSUS

On July 20, 2021, ten patients at the acute level of care were in CMC MCHB, Unit B, beds B1 through B12.

**STAFFING**

    1.    **Administrative, Clinical, and Correctional Staffing**

Administratively, the MHCB beds where the acute patients were placed were supervised by the MHCB supervisor. A supervising psychologist was assigned to Unit B.

At the time of the site visit, clinician staffing for the acute care patients consisted of two full-time psychologists, one full-time psychiatrist, and four recreation therapists. The psychiatrist was scheduled Sundays to Wednesdays, and the two psychologists staggered their workdays to provide seven day per week coverage. The recreation therapists assigned to Unit B also provided services in the MHCB as did nursing staff assigned to Unit B. No telepsychiatry or telehealth was utilized in the Unit.

A sergeant was responsible for the entire MHCB, which included Unit B where the acute patients were housed. There was one officer on first watch, and two officers on second and third watch in Unit B.

    **Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

CDCR's established staffing ratio in an acute unit was 1:15 for psychiatry, psychology, social work, and recreation therapy; no social worker was assigned to Unit B at the time of the site visit. Based on the reported census on July 21, 2021, and the bed capacity designated, the CMC MHCB met the staffing ratio for the disciplines providing acute care.

However, while the psychologists and psychiatrist were originally dedicated solely to treating the acute care patients, due to the staffing shortages on the remaining MHCB units where two clinicians were on long term leave, CMC reported that the Unit B clinicians were increasingly assigned to also cover other units. On occasion, the assigned psychologists were also required to respond to crisis interventions or other clinical activities in other levels of care.

As a result, the adequacy of staffing of the acute care beds could not be separated from staffing needs in the rest of the MHCB and other parts of CMC.  During staff interviews, some mental health staff in Unit B noted that they were on the verge of "burnout."

**Staff Training**

Overall, staff and leadership in CMC Unit B reported what they perceived as insufficient training and preparation concerning the functioning of an acute care unit and how it differed from an MHCB.  The senior psychologist overseeing Unit B, although concerned and eager to learn, did not have experience with inpatient treatment settings.  Staff indicated that a significant misconception during the early stages of implementation was that an acute care unit did not differ significantly from an MHCB.  The need for additional training for staff of all disciplines was observed during the site visit.

Pre-site visit documentation and communication with clinicians during the site visit confirmed that on April 14, 2021, headquarters provided an acute level of care overview training, and on April 21, 2021, a flex bed training.  Both a "brainstorming" meeting with mental health, nursing, and custody took place and a training on structure and implementation of the acute care unit were conducted on April 22, 2021.  A training for recreation therapists and activation occurred on April 28, 2021, the same day the acute care unit was activated.

According to the chief nursing executive (CNE), nursing attended training with mental health.  SVSP-PIP offered to train nursing staff; however, the training did not pertain to the management of acute patients since SVSP-PIP housed intermediate level of care patients only.  Nursing did not receive nursing psychiatric inpatient program (PIP) policies from headquarters and developed their own locally.  The CNE reportedly planned to reach out to CMF-PIP and CHCF-PIP nursing leadership for additional information regarding PIPs.  The CNE utilized the

Correctional Treatment Center Policies and Procedures, Chapter 3 Mental Health Policy & Procedure Sections 17: Documentation Guidelines in Acute Beds; Section 18: Managing Aggressive Behaviors in Acute Beds; Section 19: Prevention and Management of Self -Abuse or Self-Injurious Behavior in Acute Beds; Section 20: Nursing Care Plans in Acute Beds; Section 21: Call System Safety Rounds in Acute Beds; Section 22: Documentation Guidelines for Acute Beds; Section 23: Registered Nurse progress Notes.

CMC had also discussed using CNAs to assist acute patients in Unit B with activities of daily living (ADLs). Additional internal training and "brainstorming" for psychologists and psychiatrists were conducted amongst the clinical staff based on the needs of the patients. With respect to custody training, the monitor reviewed the past six months of training attended in person or completed via on-the job training (OJT). Of the nine custody staff assigned to Unit B, at the time of the site visit, only one custody staff member had completed an on-the job training titled, "PIP policy and procedure-patient policies non-clinical out of cell time."

**TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

1. **Interdisciplinary Treatment Teams (IDTTs)**

The monitor's expert observed all IDTTs that were scheduled during the site visit. The patients sat uncuffed in the therapeutic treatment modules with the door open. Staff reported that because of the size of the room, this was the available seating for patients. All required staff was present at observed IDTTs. Introductions occurred, and a brief case conceptualization was presented to the attendees with each patient's permission. Patients were included and asked to share their progress, strengths, what interventions they found helpful and which they did not, as well as their thoughts about future interventions and plans. The psychiatrist asked each patient about their diagnosis, about their medications, and if the medications were beneficial or not and

inquired about any side effects.  The CC I/CC II and nursing staff did not interact unless asked and at one point the nursing representative left the room for an unknown reason.  The RTs were appropriately engaged.  The senior psychologist was also present and engaged appropriately with the patient.  She indicated that she attended these IDTTs as frequently as her other duties permitted.  All discussions were individualized and engaging.

With regard to an initial IDTT observed, the psychiatrist had evaluated the patient prior to the IDTT meeting.

Overall, patients in Unit B expressed satisfaction with and appreciation for the treatment provided while they acknowledged the challenges staff faced in opening a new unit.

**Group Therapy**

Structured Therapeutic Activities

MHCB leadership expressed a lack of clarity concerning the expectations for structured treatment hours for acute care patients indicating that directions they received ranged from ten hours weekly, to 20 hours weekly, to an unspecified number of hours greater than ten.

Structured therapeutic hours consisted of one-on-one clinical contact with a psychiatrist and psychologist and groups with a psychologist and recreation therapist.

Since inception, acute patients in the MHCB beds were offered approximately 12 hours of structured out-of-cell activities a week with eight of ten of the current patients attending 80 percent or more of hours offered.  Of the ten acute care patients in the MHCB during the site visit, four patients attended 100 percent of offered structured therapeutic hours; one attended 99 percent of offered structured therapeutic hours, one attended 96 percent of offered structured therapeutic hours; two attended 84 and 80 percent of offered structured therapeutic hours, respectively.  For the remaining two patients, one did not attend approximately 50 percent of

370

treatment offered due to concerns with custody and Prison Rape Elimination Act (PREA) concerns, and one patient was gravely disabled and did not function adequately to attend more than 34 percent of offered activities.

Clinical Groups

The psychologists reported that they strove to offer at least one group per patient per day; patients were divided into two cohorts based roughly on functional level.  The psychologists reported conducting DBT-informed groups on an ongoing basis. Review of day-to-day contacts for the patients on the unit showed sporadic and irregular entries for this clinical activity.  This appeared to reflect the ad hoc and improvised nature of the treatment provided despite the assiduous efforts of the unit's dedicated clinical staff.

The monitor's expert observed two clinician run groups.  In each group, the clinician demonstrated an excellent rapport with the patients.  However, both groups also exemplified the challenges the Unit faced.  In one group, scheduled for an hour, the patients utilized the first 28 minutes expressing their concerns about custody and nursing staff, especially on the first watch. They expressed significant concerns about one custody officer, which was repeated by other patients to the monitor's expert.  These concerns were reported to the warden and other custody leadership by the Special Master's team.  As the clinician was transitioning to the purported topic, mindfulness, an RT entered the room and announced that her group was scheduled to begin in two minutes.  As a result, the group was terminated a half hour early.  The location of the second group, which was well conducted and clinically meaningful to the patients, changed scheduled locations from a group room to the yard, to eventually being run in a group room.

<u>Recreation Therapist Groups</u>

Recreation therapy (RT) groups were offered, provided, and observed by the monitor's expert on July 20 and 21, 2021. The RT group observed on July 20, 2021 was held outside, and attended by seven patients, which was the maximum capacity for groups, complying with the current social distancing requirements. The RT engaged the patients through music. Each patient talked about the types of music they enjoyed and the reasons they enjoyed it. The RT discussed the different genres and explored how the music made each patient feel. Clinical staff said the RT conducting the outdoor group was instrumental in developing the RT curriculum and collaborating with clinical staff to ensure the RT groups were integrated with the clinical groups and individual interventions in the patient's master treatment plans. All patients and the RT complied with PPE requirements in this group.

The observed RT group on July 21, 2021, was also a music group. The group was inside, and four patients attended, which was the maximum number based on the social distancing requirements. All four patients participated and after three patients requested specific songs, the group was asked to identify a genre all could enjoy. The RT actively listened, respectively engaged with the patients and each participant verbalized how the group benefited them. Participants in this group also complied with PPEs.

No nursing-led-therapeutic groups (NTLG) were occurring in Unit B at the time of the site visit. The chief nursing executive (CNE) reported the groups were planned to begin in August 2021. A list of all NLTG groups and a schedule for planned groups on second and third watch Monday through Thursday was provided by staff.

<u>Unstructured Activities</u>

a) Yard

The monitor reviewed documentation covering 57 complete weeks of offering of yard including CDCR-Form 114-As.  Only three out of the fifty-seven weeks, or five percent were documented as having offered ten or more hours of yard during the week.  Acute care patients in the CMC-MHCB averaged 6.1 hours per week of yard.

There was no minimum requirement for offering of yard within an acute program, however it was discussed with staff that CMC ought to explore ways to provide patients with additional time out of cell, including third watch yard.

b)  Showers

The monitor reviewed a total of 49 weeks of 114-As.  Three showers were offered per week in 43 out of the 49 weeks reviewed or 88 percent of the time.

**Individual Treatment**

Staff reported that one-to-one contacts with patients occurred regularly by both psychiatry and psychology staff.  Psychology contacts showed reasonable continuity of care.  Timely psychiatrist contacts by the assigned psychiatrist ranged from approximately 50 to 70 percent.  Other contacts were dispersed among the several other psychiatrists who covered the MHCB.

**Other Treatment Issues**

**A.  Involuntary Medications**

At the time of the site visit, three patients were on PC 2602 status for involuntary medications.

**Behavioral Management**

Clinical staff expressed the belief that the majority of the 17 patients treated had significant personality disorders.  Targeted chart reviews by the monitor's expert indicated that

the majority had primary psychotic or mood disorder diagnoses.  Related to the behavioral issues which appeared to animate staff's focus on the patients' personality disorders, the team inquired about the use of behavioral plans.  Staff expressed the belief that they would be helpful but that they required an additional dedicated clinician to develop these plans and aid in their implementation.  An additional barrier to effective use of behavioral plans was the fluid nature of the treatment provided and the lack of buy-in from all disciplines.  These concerns would make consistent implementation difficult.

### Morning and End of Shift Meetings

A total of 34 huddle reports from April, May, June and July 2021 were reviewed for attendance of all required classifications.

Only one out of the 34 huddle reports reviewed did not have all required staff in attendance.  An observed third watch huddle was detailed, patient specific, and with all staff participating.  Review of documentation showed that the various huddles covered returns from higher level of care, patients new to the unit within the past 72 hours, patient exhibiting odd, unusual, bizarre or aggressive behaviors, patient with medication changes that could produce behavioral effects, patients receiving bad news within the past 72 hours or who had a parole board hearing within seven days, canceled groups/clinical contacts, quarterly roundtables partnership training, heat alerts and planned alternate activities, difficult discharges that day, discussion of one-to-ones, staffing matters, and housing unit issues.

### Treatment Space

There were two rooms used in Unit B that could accommodate up to four patients to comply with social distancing.  The rooms were used for groups, IDTTs, and other meeting purposes, i.e., clinical contacts and PC 2602 discussions for acute and MHCB patients.

Individual contacts took place in a variety of settings ranging from inadequate one-to-one rooms to group and IDTT rooms when not in use, to outdoors in the recreation yard. There were two one-to-one rooms. The clinician sat on one side and the patient on the other, separated by plexiglass; a microphone was used to communicate. Clinical staff found the rooms to be generally inadequate. The complaints were that the microphone did not work and there was a delay in communication relay. These rooms were not adequate for one-to-one contacts without functioning microphones.

The issue with treatment space was related to both the inadequate physical plant as well as the ad hoc nature of the clinical programming in Unit B. Clinical staff interviewed expressed these concerns although their responses varied with some utilizing them reluctantly and others refusing to use them at all.

There were outdoor individual exercise yards which were also used for clinical and recreation groups. According to staff and patients interviewed, available outdoor space was not a clinically appropriate milieu. Patients reported feeling like they were in a secured housing unit (SHU) during groups held outside and did not understand why they could not program together outside when they programmed together inside. In addition, clinicians stated the sharing of clinical space with MHCB patients was clinically limited. An acute milieu setting was difficult to establish with no day room, shared space, and individual exercise yards.

**PATIENT ACCESS TO TREATMENT**

At the time of the site visit, the System To Encourage Progress (STEP) level system was not implemented for acute care patients in the CMC MHCB. Every patient was reviewed timely for consideration of custody restraints. All patients were cleared to program without custody restraints by a correctional sergeant.

**REFERRALS AND TRANSFERS**

The first acute care patient placed in the Unit B arrived on April 27, 2021, from CMC's MHCB. Subsequent patients arrived on April 30, 2021, May 3, 5, 6, 10, June 14, 15, 18, 29, 30 and July 14, 2021. At the time of the site visit, there were three patients pending a referral to the CMC MHCB for acute care treatment who had been waiting since June 30, July 1 and July 6, 2021, respectively. Two referrals to these beds were rescinded, one due to medical reasons and one due to CMC not being a Clozaril institution.

The sole patient on MAX custody status was the initial patient transferred to the unit. Leadership informed the team that they were told by headquarters that this patient transferred before the decision was made to not house MAX patients in these MHCB-Acute Care beds. No other patients were at this custody status

**ADMISSIONS AND DISCHARGES**

1. **Admissions**

A total of 17 acute care patients were admitted into CMC's MHCB Unit B between April 27 and July 21, 2021.

**Discharges**

At the time of the site visit, the current patient population length of stay as of July 20, 2021, ranged from six to 75 days with an average length of stay of 40 days. Seven patients who transferred out of the unit prior to the site visit were discharged as follows: two patients to DSH-Atascadero, one to CMF-PIP Acute, one to CMC-mainline EOP, one to Richard J. Donovan Correctional Facility (RJD) mainline EOP, one to CSP/Sac mainline EOP, and one to SVSP-PIP.

## PATIENT DISCIPLINARY PROCESS

Two RVRs were issued to one acute care patient in Unit B MHCB, the initial "MAX" patient. One RVR was heard; the patient was found guilty and assessed 30-days loss of credit. The mental health assessment was completed timely and indicated the patient's mental illness contributed to the behavior. One RVR was pending a hearing at the time of the site visit.

## USE OF FORCE

There was one use of force which occurred involving a battery on a peace officer. The force used included physical, baton, and oleoresin capsicum foam. The patient received two medical evaluations (CDCR-7219s). One immediately after the incident which noted pain, redness, and swollen area on the patient's right forearm. It was important to note the officer who used the baton stated they struck the patient nine times on the left forearm.

The second CDCR-7219 was completed after the patient returned from an outside hospital. On the second CDCR-7219, additional injuries were noted including a bruise on the patient's forehead, pain in the right shoulder, swelling on the left forearm, and an abrasion on the patient's left leg. No investigation was initiated. The monitor discussed a potential referral for investigation of the case.

## UNUSUAL OCCURRENCESS/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

No unusual occurrences, serious incidents, near misses, or sentinel events were reported since the placement of acute care patients in CMC MHCB.

## USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

No patients in Unit B had been placed in seclusion or restraint since the acute care unit's inception.

**EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS**

**1.    Emergency Response**

There had been no emergency response regarding an acute patient in Unit B since the acute care unit's inception.

**Death Review Process**

No patient in Unit B had died since the acute care unit's inception.

**QUALITY MANAGEMENT AND UTILIZATION REVIEW**

On July 15, 2021, the mental health subcommittee met and reviewed the results of an audit covering the period of June 1 to June 30, 2021. A health program specialist reviewed On-demand reports to determine adherence with certain acute care requirements regarding suicide risk assessments, IDTT timeliness and staffing, and mental health referrals.  Eight SRASHEs were reviewed of which three were not timely completed.  Of 39 IDTTs, all were found to be completed on time.

Forty-two master treatment plans were reported to have contributions from all required disciplines.  Ten mental health consults, eight emergency, one routine for the psychiatrist and one routine for the primary clinician, were all found to have been responded to in a timely manner.  The subcommittee reviewed the EHRS to further assess all instances of non-compliance with these measures.  Of note, an 85 percent threshold was utilized.  All measures were found to be compliant at 100 percent except for SRASHEs which were reported to be 63 percent compliant.  As a result, the MHCB director sent an email to the acute care providers reminding them of the requirement that discharge SHASHEs be conducted.

## PATIENT COMPLAINTS/PATIENT SATISFACTION

On July 20, 2021, seven patients were interviewed during the outside RT group. The patients all reported the clinical team's interventions were beneficial. Four RTs worked with the acute and MHCB patients and the statements made about the RTs were that the groups were interactive, "not boring," beneficial, and allowed the patients to explore their creative sides. Interviewed patients expressed concern that the unit staff did not have experience operating an acute care unit before. Two patients stated that nurses on first watch did not conduct rounds every fifteen minutes, and they consistently were unable to receive their PRN (as needed) medications because nurses were not conducting rounds on first watch. Four of the seven patients identified a custody office by name as disrespecting patients, intimidating patients by taking or keeping his baton out, and verbally and non-verbally threatening/terrorizing patients. One patient had a PREA complaint against the same officer and felt threatened by the officer because of his race. The patient drew very specific pictures of the alleged assault and stated his constant fear. The patient said he was not actively suicidal or homicidal but was in a constant state of anxiety. The patient said the officer was not supposed to come on the unit but was allowed to and looked in the patient's room to intimidate the patient. The patient said he reported the officer to his clinical staff and others and filed a PREA complaint. The monitor reported the patient's allegations to the acute care clinical staff, warden and chief deputy warden.

The CNE was contacted about the concerns with first watch nursing staff and provided the Special Master's expert rounding documents for July 10, 11, 12, 13, 15,16, 18, and 19, 2021. As a result, CMC nursing leadership spoke to the first watch nurses regarding these concerns. The first watch nursing staff reported that when a patient was sleeping, nursing would not wake them on first watch and stated rounds did occur and medication was given if requested.

Similar concerns appeared to animate a July 6, 2021, incident where five acute care patients refused to reenter the building from the yard protesting what they perceived as their needs not being met.

## CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

Custody staff was reported to be generally unsupportive of using the beds for acute care. However, the monitor's ability to interview custody staff members was hampered by the fact that the staff members regularly assigned to these beds were at an off-site union meeting concerning the use of MHCB beds for acute care patients on the days of the monitoring tour. The ways in which custody-related concerns intruded into clinical activities, such as patients' reluctance to engage in clinical activities because of certain custody officers' behavior, delay in issuance of personal property following transfer, and very limited access to yard, was notable throughout the visit as they were raised by patients in interviews, during IDTTs and during groups observed. Clinical staff, too, endorsed concerns in this regard.

## LAUNDRY AND SUPPLY ISSUES

Clothing exchange was offered 38 weeks out of 49 weeks, or 78 percent of the time. Linen exchange was offered 13 weeks out of the 49 weeks, or 27 percent of the time.

## PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

Patients reported problems with timely access to their personal property. The unit was in the process of identifying an appropriate place to store patient property.

**APPENDIX B1**
**CMF-PIP**
**June 2021**

**Patient A**

This 43-year-old patient was admitted to acute level of care on February 9, 2020 after a suicide attempt by swallowing razors.  At the time of the healthcare record review he had been in acute care for over a year and three months and was housed on Q1 in a single cell with a least restricted housing (LRH) designation of locked dorms.  He was diagnosed with unspecified schizophrenia, unspecified psychosis and major depressive disorder.  He was prescribed antipsychotics and antidepressants.  His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.  Documentation between February 2021 and May 2021 was reviewed.

This patient had a long history of intermediate level of care since his admission to CDCR in August 2019.  Psychiatric decompensation occurred when he was housed with peers; attributed to a sexual assault during a previous incarceration.

He was seen by the same providers who consistently documented effective communication.  While primary clinician and psychiatric contacts generally occurred weekly they did not consistently occur every seven days.  Timeliness of IDTTs varied and majority of time between IDTTs exceeded seven days.

Overall, documentation of this patient's functioning and symptoms lacked sufficient detail and treatment interventions during routine contacts were lacking.  Updates to treatment plans were minimal. Treatment goals, consistent with the reason for admission addressed self-harm, but remained unchanged despite an absence of self-harm behavior and ideation.  Treatment goals were not implemented to address his treatment needs including isolation, depression, lack of programming, LRH and trauma.

There was documentation of a plan for discharge, but details were unclear.

Findings

This patient's care was inadequate in both timing and quality.  Treatment planning did not fully address his treatment needs, including transfer to his LRH, and documentation of treatment interventions was lacking.  The lack of detail in clinical documentation was insufficient for continuity of care.  There was no documentation to support the extensive placement in acute care and/or barriers to transfer/discharge.

**Patient B**

This 40-year-old patient was admitted to acute care on August 4, 2020.  Diagnoses in the official place of record included unspecified mood and schizophrenia, unspecified but different diagnoses were evident in provider documentation.  A PC 2602 for danger to self and grave disability was active and included anti-psychotics, anti-anxiety and anti-depressant medications.  His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.  At the time of the review, he was housed on Q3.

During the three months of care that were reviewed (February 2021 and May 2021), he refused the majority of contacts including primary clinician and psychiatric contacts resulting in cell-

front contacts. Relatedly, IDTT was regularly conducted in absentia. Following refusals, contacts were scheduled for the next week, even when more immediate clinical follow-up was needed. During a cell-front contact with the primary clinician, he responded "no" when asked if he was fine; of concern there was no documentation of further assessment or clinical intervention. In another example, after missing five consecutive meals, the planned follow-up was a week, despite a recent hunger strike that resulted in an outside medical hospital referral.

He was appropriately referred for psychological testing for diagnostic clarification. Results indicated diagnoses of anti-social personality disorder and malingering (for psychosis) with safety concerns as a possible precipitant for symptom exaggeration. Testing results were not fully integrated into the treatment plan nor was there any attempt by providers to understand what led to symptom exaggeration or further assessment of safety concerns.

Treatment planning was insufficient. Overall, documentation in treatment plans did not provide an update of functioning and symptoms since the previous IDTT. While there were multiple treatment goals to address medical issues, goals for reported symptoms of depression, anxiety or auditory hallucinations were not implemented. For reasons that were unclear, a goal of appropriate behavior was his primary psychiatric treatment goal. Despite a history of self-harm behavior, the precipitant that led to acute level of care, self-harm was not included as a treatment goal until late April 2021; almost two weeks after a self-inflicted laceration that required ten sutures.

One of three incidents of self-harm behavior was not included in clinical documentation, suggesting a need for improved multi-disciplinary collaboration. Documentation of rationale for placement on suicide watch, access to property, level of observation and discharge was not clear.

Overall, primary clinician and psychiatric contacts occurred every 7 days while IDTTs did not. During the month of May, he did not attend any of the offered nine (recreation) treatment groups he was offered. Treatment interventions were not documented in clinician progress notes. There was poor continuity of care by providers. Effective communication was rarely documented for clinical contacts.

<u>Findings</u>

Delayed IDTTs and the quality of care contribute to the assessment that this patient's care was inadequate. Diagnostic clarification, rationale for diagnoses and diagnostic consistency between providers was needed. Collaborative care and treatment planning were insufficient. Treatment refusals were not addressed in the treatment plan and attempts to understand the reasons for refusals was not documented. Clinical contacts did not occur as clinically warranted, an indication of a rigid approach to treatment and poor clinical judgment. While the referral to psychological testing was a strength in this case, the lack of integration by treatment providers minimized usefulness. There was no documentation to support the extensive placement in acute care and/or barriers to transfer/discharge.

**Patient C**

This 26-year-old patient was admitted to the PIP from CMF MHCB after he decompensated in an administrative segregation unit (ASU) on December 18, 2020. He was diagnosed with

anxiety disorder and major depressive disorder in the official place of record although there were additional diagnoses listed on his treatment plan. He was prescribed an antidepressant, an antipsychotic and antianxiety medication. His healthcare record was randomly selected from the PIP census to assess adequacy of care for patients at the acute level of care. He was housed in S unit at the time of the review.

Initial treatment planning was impacted by the lack of coordinated treatment team conceptualization. Specifically, content in the initial primary clinician assessment and IDTT were copied directly from the psychiatric assessment with no indication that the content was not original. Initial treatment goals, which lacked a baseline assessment, addressed self-harm and anxiety but did not address depression, hopelessness or disturbed sleep, additional symptoms that contributed to the reason for admission. With the exception of a goal of depression being added at the April 8, 2021 IDTT, there here was no change to initial treatment goals throughout his hospitalization despite a plan for discharge to ICF at the May 24, 2021 IDTT.

In addition to problems with quality, there were delays in care including the initial primary clinician assessment, routine IDTTs and psychiatric contacts between February 2021 and mid-May. Group treatment was minimal during the month of May, in which he attended three of five hours of offered groups.

Similar to need for improved coordination of care in treatment planning, a review of provider notes (between April and May 2021) indicated a lack of communication regarding the patient's functioning. For example, disclosures to the primary clinician regarding suicidal ideation were not referenced in psychiatric documentation. Relatedly, pertinent details from clinical contacts regarding mental status and functioning were not summarized in treatment plan updates. Primary clinician documentation reflected utilization of appropriate therapeutic techniques during treatment sessions however, they were not in alignment with interventions documented in the treatment plan. He was generally seen by the same providers although documentation of effective communication was not found.

Although his LRH was locked dorms, he was initially clinically recommended for a single cell due to a risk of victimization. For reasons that were unclear, risk of victimization was replaced with violence within the past year. Specific details regarding barriers to LRH were not provided, nor were treatment goals or clear interventions to assist in achievement of LRH documented.

Findings

Poor quality and delays contributed to assessment of this patient's care as inadequate. Need for improved case conceptualization, diagnostic clarification and coordination of care likely impacted treatment planning which did not fully address his treatment needs or progress toward treatment goals, including achieving his documented LRH. Treatment interventions were not in alignment with treatment goals and progress toward discharge was not supported in documentation. Access to group treatment was poor. Lastly, there was no documentation that supported the reason for the lengthy stay at acute level of care.

**Patient D**

This 33-year-old patient had a long history of self-injurious behavior.  His admission to acute level of care on February 1, 2021 was precipitated by a hanging attempt that occurred shortly after his discharge from intermediate level of care.  Multiple diagnoses included: anxiety disorder, bipolar disorder, major depressive disorder, mental disorder not otherwise specified and post-traumatic stress disorder.  He was prescribed a mood stabilizer, anti-depressants and medication for anxiety.  His healthcare record was randomly selected from the PIP census to assess adequacy of care for patients at the acute level of care. At the time of the review, he was housed on S2.

The initial psychiatric assessment was timely and of adequate quality.  Treatment goals in the initial treatment plan and each subsequent treatment plan update primarily addressed his medical needs.  A goal for "mood state" was not sufficiently individualized as it did not address his long history of self-harm behavior or psychiatric documentation of anxiety or depression.  Treatment plan update documentation was virtually unchanged between regular IDTT meetings, meaning a summary of his functioning, mental status and treatment progress (or lack thereof) was not routinely documented.  Further, pertinent information from all providers was not included.  As an example, documentation of hallucinations and paranoia in psychiatric documentation was not included on the treatment plan update.

Documentation indicated a long history of problematic substance use that led to inclusion in the integrated substance use disorder treatment program (ISUDT).  Integration between acute treatment providers and ISUDT was needed.  In addition, substance use was not included as a treatment goal for him.

Documentation of routine primary clinician contacts was useful and included appropriate treatment interventions, despite lack of inclusion on the treatment plan.  In contrast, psychiatric documentation lacked sufficient detail.  For example, psychiatric documentation from May 8, 2021 indicated that he had engaged in self-harm behavior with no indication of timing or circumstance.  Further, there was no clear context for documentation to "continue current safety measures" and "ok to keep clothes".  A review of the record indicated that he was not placed on suicide watch; no rationale was provided nor was a comprehensive risk assessment conducted.  Additionally, there were frequent grammatical errors that made it difficult to discern documentation.  The following was from psychiatric documentation from May 12, 2021, "I realized that I do try to make an attempt if it is very serious and he could medical that survived the last attempts."

Continuity of care was good.  Psychiatric and primary clinician contacts and IDTT did not occur as required by institutional policy.  Documentation of effective communication was not located.

Findings

A strength of this case was documentation of treatment interventions by the primary clinician. However, this strength did not counterbalance the deficiencies found in this case regarding timeliness and quality of psychiatric documentation and treatment planning, rendering this patient's care inadequate.  Additional areas of concern were lack of diagnostic clarification; need

for integration between ISUDT and mental health treatment; and insufficient documentation for his extended length of stay.

**Patient E**

This 45-year-old patient was treated at the intermediate level of care on L1 and was diagnosed with unspecified mood disorder.  He was prescribed Zyprexa, Depakote and Remeron for psychosis, mood stabilization and depression, respectively.  His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

His least restricted housing was unlocked dorms.  However, between late March and June 2021, he was clinically recommended for a locked dorm.  Identified factors were 1) a pattern of agitation, disruptive and difficult to redirect behavior and 2) significant history of aggression in a less restrictive housing.  Of note, there was no further specificity regarding these barriers and no update toward progress on treatment plans.

Documentation on treatment plans, routine psychiatric and primary clinician contacts did not address the underlying reason, goals or interventions to assisting him in achieving a transfer to LRH.

Findings

Treatment to address LRH was inadequate.  Specificity regarding barriers, status of progress (or lack thereof) and documentation regarding treatment interventions to assist him in gaining a transfer to his LRH was lacking.  A positive finding was the consistency of contacts by the psychiatrist and primary clinician and documentation of effective communication.

**Patient F**

This 42-year-old patient was being treated for schizophrenia on A3 at ICF level of care.  He was prescribed Paliperidone, Depakote and Wellbutrin for delusions, mood and depressions, respectively.  His healthcare record was randomly selected adequacy of care with a focus on LRH.

His LRH, for the reporting period was identified as unlocked dorms but he was clinically recommended for locked dorms due to victimization concerns and delusions that result in behaviors that are violent or disruptive.  Clinical rationale provided in various treatment plans was, "risk of self-injury and victimization" or "now at baseline and presents as stable…" was insufficient.

During the reporting period, he had at least two different psychiatrists and three different clinicians; none of which documented treatment goals or interventions that clearly targeted LRH during routine contacts or treatment plans.

Effective communication was documented for the majority of clinical contacts.

Findings

Treatment to address factors that were barriers to a transfer to LRH was inadequate due to lack of clear clinical rationale and lack of treatment goals and interventions.

**Patient G**

This 42-year-old being treated at the intermediate level of care for various diagnoses which included bipolar disorder, major depressive disorder, psychosis and schizoaffective disorder. He was prescribed Cogentin, Prozac and Lithium for side effects, depression and mood dysregulation, respectively. His healthcare record was randomly selected to assess adequate treatment to facilitate a transfer to his least restrictive housing, unlocked dorms.

As background, while he was treated at acute level of care, he was clinically recommended for unlocked dorms and appropriately referred to Atascadero State Hospital (ASH). The referral was rejected and while awaiting the appeal outcome, he was discharged from acute and transferred to an intermediate unit within the institution. This transfer resulted in a change to his clinical housing recommendation to locked dorms. There was no documentation of the rationale for the change, nor was there documentation of precipitating event that would warrant the change. The identified reason for the need to defer transfer to his LRH was "command hallucinations/internal stimuli that severely impact functioning and result in behaviors that are violent and/or disruptive." However, these symptoms were not documented in clinical documentation while he was treated at intermediate care.

There were no clear treatment goals or interventions to address the identified barrier to a transfer to his LRH in routine provider contacts and treatment plans between March and May 2021.

Continuity of care for providers was good and effective communication was consistently documented.

Findings

Treatment to address barriers to LRH transfer was inadequate. Documentation did not support the identified reason for the deferment nor were treatment goals or interventions documented to address the identified barrier. Diagnostic clarification was needed.

**Patient H**

This 56-year-old patient was diagnosed with major depressive disorder and borderline personality disorder. He was prescribed Duloxetine for depression. His healthcare record was randomly selected to assess adequacy of treatment to facilitate a transfer to his least restrictive housing, unlocked dorms.

He was clinically recommended for unlocked dorms during his April 2, 2021 IDTT but for reasons that were unclear, the recommendation changed to locked dorms during IDTTs on April 30th and May 28, 2021. Of note, the change coincided with a treatment team change. The reason for deferred transfer to LRH was discrepant. Specifically, the following reason was selected from multiple available options: "unable to negotiate the complexities of a less restrictive housing environment due to functional capacity." This reason was in contrast to the documented explanation, where the clinician indicated that he did not have a functional

387

impairment and symptoms were consistent with borderline personality disorder. Regardless, there was no documentation of treatment goals or interventions in treatment plans or provider documentation to address LRH.

Provider continuity of care was an area of concern, particularly given his diagnosis of borderline personality disorder. Effective communication was not documented in the majority of clinical documentation.

Of note, documentation from his first contact with his primary clinician, indicated that the clinician was an unlicensed social worker. Subsequent documentation did not indicate the lack of licensure or supervisory review of clinical documentation.

Findings

This patient's care regarding LRH was inadequate. The clinical reason for the deferred transfer to LRH was unclear and treatment goals and interventions were not documented in clinical documentation. Diagnostic clarification and supervisory review of clinical documentation for unlicensed staff was needed.

## Patient I

This 39-year-old patient had a long history of mental illness and had been treated on the high custody unit for over a year at the time of the case review. Diagnoses varied by provider and included schizophrenia, mood disturbance, antisocial personality disorder and psychosis. He was medication compliant on account of a PC 2602 order and prescribed Valproic Acid (mood stabilizer) and anti-psychotics (Haldol and Olanzapine). His healthcare record was randomly selected from the PIP roster to assess adequacy of care for high custody PIP patients with a focus on documentation between April and May 2021.

Documentation indicated that since placement on the high custody unit his symptoms had not improved. According to primary clinician documentation, he was actively psychotic with symptoms of delusions, paranoia, visual hallucinations, poor reality testing and disorganized thinking. In contrast, psychiatric documentation did not indicate observation of psychosis.

Primary clinician documentation provided an adequate overview of his symptoms. He was generally seen every seven days by his primary clinician, but psychiatric contacts were not timely and occurred monthly as opposed to every seven days as required by institutional policy. Further, quality of psychiatric documentation was generic with minimal change between contacts. Rationale for medication changes was unclear. Grammatical errors were problematic. As an example, documentation from May 25, 2021 indicated, "I noticed he take [sic] Depakote 500 mg QAM. However, he has been taking it for months longtime [sic]."

He had a pattern of refusing individual contacts and was seen cell side by providers. Refusals were attributed to his mental illness. While an individual plan of care was established for treatment refusals, there was no baseline to assess appropriateness or progress of the established goal. IDTT documentation from May 6, 2021 indicated that he would be "encouraged" to participate in treatment.

Overall treatment planning needed improvement. Established IPOCs for treatment non-adherence and mood state needed improvement. It was unclear why the "mood state" IPOC was needed and IPOCs to address his active symptoms were not included. Further, IDTT documentation was difficult to decipher documentation as clinical summaries were copied from previous IDTTs but the lack of date made it impossible to assess timeframe.

Documentation of LRH was unclear. Specially, according to IDTT documentation he was appropriately recommended for single cell housing on account of his symptoms and risk of aggression. However, it was unclear why primary clinician documentation indicated a plan to discuss an ASH referral (April 30, 2021) and multi-person dorms cells with him (May 14, 2021), particularly after there were reports that he had been yelling in his cell.

Findings

This patient's care was inadequate on account of timing of psychiatric care and overall deficient quality of care. A significant concern was the ongoing lack of participation by this patient in treatment and lack of efforts to engage him. A behavioral plan with meaningful incentives was needed. Collaboration between treatment providers regarding his mental status and diagnoses was needed. The lack of consistent documentation of psychosis is an area of concern. The documented lack of observation of symptoms and generic nature of psychiatric documentation raises concerns about the length and comprehensive nature of the contact. Continuity of care was good and effective communication was documented regularly.

**Patient J**

This 38-year-old patient was being treated at the intermediate level of care on the high custody unit for a year at the time of review. Diagnoses in the official place of record of major depressive disorder and psychosis were removed without clear justification. However, identified problems included clinical diagnoses of antisocial personality disorder and major depressive disorder. He was not prescribed psychiatric medication. His healthcare record was randomly selected from the high custody roster to assess adequacy of care. Reviewed documentation focused on January through May 2021.

Inpatient treatment began in 2019 after a serious suicide attempt via overdose where he was found unresponsive and required intubation. He was admitted to the MHCB and referred to acute level of care and subsequently referred to intermediate level of care.

Treatment goals developed by mental health staff targeted depressed mood, non-compliance and mood state. Goals were generally not measurable, interventions were not clearly identified or clearly documented in routine contacts. For reasons that were unclear psychotropic medication use was established as a treatment goal despite discontinuing prescribed Lithium in January 2021. There was no goal for substance use despite a long history of substance abuse that was conceptualized as having partly contributed to his depression and paranoia.

Overall, provider contact was consistent. Primary clinician contacts did not consistently occur every seven days and documentation of functioning and mental status was minimal. There were large gaps in psychiatric care, and, at times, documentation was unclear. As an example, documentation from February 12, 2021 stated, "Was seen in state issued white and her the blue

pajamas made fair eye contact but he was constantly looking around in the dayroom and the asked me already listening to my conversation he was told that it is their busy talking with each other you do not have to worry about this because we are here to help you…"  Effective communication was not documented in provider notes.

Since admission, he isolated in his cell and refused treatment contacts.  While he attributed refusals to a lack of confidence in PIP staff, alternative reasons for his isolation such as paranoia were not considered as contributing to isolation.

A referral to Atascadero State Hospital was rescinded in April 2021.  Documentation from the unlocked dorm review on April 22, 2021 recommended that he be considered for continued ICF level of care in a multi-person cell or locked dorm with "eventual discharge to EOP."  However, on May 13, 2021 a discharge IDTT was held where it was documented that he was "nearing maximum benefit" and was "more appropriate for EOP."  The rationale for discharge was that he "has no functional impairments other than isolation" which was assessed as volitional and due to his Antisocial Personality Disorder.

Findings

This patient's care was inadequate.  There were significant gaps in psychiatric treatment and the quality of primary clinician and psychiatric documentation was insufficient.  There was a lack of collaboration between treatment providers and insufficient response to treatment refusals.  Diagnostic clarification was needed with inclusion of criteria to support diagnosis.  Discharge rationale, planning and coordination of care to EOP treatment providers was insufficient.  Treatment planning and safety planning needed improvement.

**Patient K**

Patient K was a 40-year-old male who was transferred from temporary mental health housing unit (TMHU)/MHCB at the California State Prison/Sacramento (CSP/Sac) to CMF MHCB on June 5, 2020, due to active suicidal ideation, hopelessness, depression, anxiety, and a history of attempting suicide.  After 17 days, he was discharged from MHCB to an APP level of care for being a danger to himself and reporting suicidal ideation.  He received APP level of care for 14 months and was subsequently transferred to CSP/Sac EOP on September 2, 2021.

His psychiatric symptoms included suicidal ideation, a history of suicide attempts, self-injurious behavior, polysubstance abuse, auditory hallucinations related to illicit drug use, depression, anxiety, and hypomania.  His psychiatric diagnoses included post-traumatic stress disorder (PTSD), a bipolar II disorder, a major depressive disorder, and an unspecified anxiety disorder.  While being treated in APP, he had an emergency appendectomy in April 2021, requiring external hospitalization.

CMF's mental health treatment focused on suicidality, psychotic symptoms, anxiety, and depression.  He was pharmacologically treated with Thorazine, Clozapine, Lithium, Remeron, and BuSpar.  Nonpharmacological treatment included cognitive behavioral therapy, supportive therapy, psychoeducational groups, and insight-oriented interventions.

His anxiety and depressive symptoms began to improve in June 2021. He reported fewer symptoms and became involved in establishing a Christian community on the unit, and began to participate in Bible study groups. He occasionally reported anxiety related to past trauma. On June 10, 2021 he reported having been assaulted at High Desert State Prison (HDSP) by two inmates, who thought he was gay. He related the assault to his diagnosis of PTSD and reported being admitted to MHCB two days after the assault. He also talked about having struggled with transgender issues and taking hormones for two months. When queried about his experiences, he told his primary clinician that he would be open to discussing it in greater detail during upcoming sessions. Approximately three weeks later, on June 29, 2021, he talked about being discharged soon because he met his treatment goals. He also expressed safety concerns related to a former cellmate at CSP/Sac. He talked about his cellmate's history of approaching him in a violent and sexual way, resulting in decompensation and MHCB placement in May 2020. He added that he did not want to file a PREA complaint; however, he requested his primary clinician ask his correctional counselor to file an CDCR Form 812, "Notice of Critical Case Information-Safety of Person" to identify his enemies.

Since he was less symptomatic, he also requested his psychotropic medication be discontinued. On June 30, 2021, his lithium was reduced and on July 6, 2021, it was discontinued. Additionally, he expressed a desire to be discharged to a lower level of care, preferably Correctional Clinical Case Management (3CMS). His primary clinician informed him patients from APP were discharged to an EOP level of care, prior to being discharged to 3CMS. In August 2021, he was referred and endorsed to EOP at CSP/Sac and transferred in September 2021.

Findings

The overall mental care provided at CMF PIP was inadequate. Despite struggling with substance use disorders (alcohol and methamphetamine), PTSD related to violence, and anxiety/depression related to sexuality, there was no evidence he received appropriate interventions or education related to any of those disorders. These gaps in treatment were significant because they were interrelated and had a history of resulting in at least two MHCB placements.

Additionally, there was no evidence the patient's safety concerns were resolved. The primary clinician reportedly informed the patient's correctional counselor, but there was no documentation that the issue was resolved with the patient.

Finally, there was a minimization of the primary clinician's report of hypomanic symptoms (flight of ideas regarding various religious issues and recklessly spending money at the canteen to purchase items for the entire unit). There was no documentation of the connection between those symptoms manifesting themselves after his mood stabilizer had been discontinued the previous month. Psychiatry, rather than formally assessing the patient for hypomania; merely stated the patient did not demonstrate hypomanic symptoms during their latest interactions. Psychiatry described the patient as very active and curious, and noted that there were no signs of depression.

**Patient L**

Patient L was a 38-year-old MAX custody male, who was transferred from Kern Valley State Prison (KVSP) to CMF on May 6, 2021 and discharged to EOP at CSP/Sac on November 4, 2021.

He had a history of receiving mental health treatment at the 3CMS, EOP, and MHCB levels of care.  In April 2021, he was placed in alternative housing, admitted to an MHCB, and hospitalized twice in Delano Regional Medical Center, once for substance induced psychosis and again for self-injurious behavior.  Since clinicians determined he needed long-term stabilization, he was referred and endorsed to CMF APP.

He had several significant psychiatric diagnoses to include a schizoaffective disorder-bipolar type, a major depressive disorder with psychotic features, a post-traumatic stress disorder, an adjustment disorder with mixed anxiety and depressed mood, a substance use disorder, and an antisocial personality disorder.  His APP level of care treatment focused on hypomania and depression.  Treatment consisted of involuntary antipsychotic and antidepressant medication (Thorazine, Seroquel Wellbutrin, and Prozac), psychoeducational services to improve social functioning, individual therapy to increase coping skills to mitigate his symptoms, and substance abuse treatment.

During individual therapy, the patient talked about being overwhelmed with stress related to his grandmother's death and his mother's stroke.  His coping strategies appeared limited to abusing substances.  He was regularly seen by his primary clinician and treating psychiatrist who noted an underlying persistent psychotic disorganization, bizarre thoughts, and depression.  He was responsive to treatment and began reaching baseline level of functioning by July 1, 2021. Five months later, he was discharged to CSP/Sac EOP.

<u>Findings</u>

Mental health services provided to this patient were adequate.  Clinicians were able to stabilize and return him to baseline.  He was discharged from APP to an EOP level of care in a relatively short period of time.

Treatment plans and progress notes were minimalistic, providing limited information on this patient's complex presentation and on effective treatment interventions for the receiving treatment team.

**Patient M**

Patient M was a 55-year-old male who was transferred from CHCF to CMF on June 23, 2020 and discharged to the California Substance Abuse Treatment Facility (CSATF) on June 3, 2021, with an estimated parole/release date (EPRD) of October 8, 2021.  He was admitted to CMF ICF A 2 locked dorm. Prior placements included APP, MHCB, and EOP.

Patient M had a history of multiple crisis bed and acute level of care admissions due to agitation and aggressive/violent behavior.  He also had a history of being a danger to others due to agitation, paranoia, and psychotic symptoms (auditory hallucinations and disorganized thinking).

He was diagnosed with a schizoaffective disorder, bipolar type; an alcohol use disorder; and a stimulant use disorder.

He was treated in ICF unit A2 with individual treatment from his primary clinician and treating psychiatrist. He also attended psychoeducational groups. In November 2020, his mental status deteriorated. His thinking became illogical and disorganized. He presented as grandiose and paranoid delusional, and with magical thinking. During an IDTT on November 12, 2020, he was irritable, angry, and hostile, with limited insight. He also complained that the medication was not helping him. Since he was a danger to others, the treatment team recommended he be placed in a more restrictive environment (A3 and P2) for observation and medication adjustment. After approximately, three weeks, he was returned to ICF, unit A-2. His presentation improved during the next few months. At an IDTT on February 16, 2022, he was logical and future oriented, talking about his upcoming early parole release date in October 2021. During an IDTT meeting on June 3, 2021, the treatment team concluded he met his treatment outcome expectations by not exhibiting threatening or hostile behavior. He also demonstrated the acquisition of coping skills to regulate emotions, tolerate distress, and control negative thoughts. Additionally, he behaved appropriate during group and individual contacts, demonstrated insight, compliantly took his medication, understood the importance of medication, and denied having any safety concerns. He was discharged from CMF PIP to CSATF EOP on June 4, 2021.

<u>Findings</u>

His overall mental health care was marginally adequate. Treatment plans and progress notes in the healthcare record were minimalistic and often duplicative from one IDTT and treatment session to another. Additionally, there was no documentation explaining Patient M's decompensation in November 2020, and there was minimal documentation on the interventions utilized to improve his mental status. Individual sessions were often similar to checks on his mental status. The treatment goals, interventions, and documentation of progress were often unclear. Additionally, Patient M was placed on a one-to-one suicide watch while he was in P-3, despite a lack of evidence indicating that he was a danger to himself. The rationale for this suicide watch observation was never explained in the healthcare documentation.

**Patient N**

Patient N was a 33-year-old male, who was transferred from the California State Prison/Los Angeles County (CSP/LAC) MHCB to CMF ICF on November 20, 2019 and discharged to SVSP on October 29, 2021. He was sentenced to serve life in prison.

Patient N had a history of substance use disorders which appeared related to auditory hallucinations, paranoid ideation, and safety concerns involving other inmates. At CSP/LAC he reported that he would harm himself rather than being harmed by others. On November 8, 2019, he was transferred to an outside hospital and placed in ICU after swallowing one gram of methamphetamine. When he returned to CSP/LAC, he was placed in MHCB for 12 days and transferred to CMF APP. On November 27, 2019, he was administered a SRASHE which revealed moderate chronic and acute suicide risk levels. His inpatient housing recommendation was a multi-person cell (two and four); however, a transfer to his least restrictive housing was deferred due to a significant history of aggression in less restrictive housing environments.

His primary psychiatric diagnoses were a major depressive disorder, recurrent with psychotic features, opioid and amphetamine substance use disorders, and posttraumatic stress disorder. At CMF, he participated in the medication assisted treatment (MAT) program and in psycho-pharmacological and traditional individual and group mental health treatment. Psychiatric medications included Prozac, Abilify, and Trileptal. The goal of individual and group therapy was to help him develop the ability to challenge negative thinking to reduce depression, hopelessness, grief, and suicidal ideation.

He had a history of attempting suicide several times at CMF in APP (2020), and in ICF L-1 (early 2021) by strangulation, hanging and suffocation, respectively. He had been preparing to discharge to EOP level of care prior to his suicide attempts. He was transferred back to APP S-1 on March 3,2021. His May 5, 2021, treatment plan indicated that he would be considered for a referral to his LRH at ICF locked dorm when he met treatment goals in APP. On May 5, 2021 a SRASHE indicated his chronic and acute suicide risk levels were high and respectively. On May 14, 2021, he was transferred to ICF/A-2 locked dorm following his APP/S-1 admission. While in ICF, threats were written in his name, resulting in movement off the unit and placement on Max custody.

Findings

Patient N received adequate care at CMF PIP. He struggled with opioid and amphetamine substance use disorders, posttraumatic stress disorder, and a major depressive disorder with psychotic features. He suffered several family losses and struggled with being sentenced to prison for life. CMF managed his self-destructive behavior and treated the psychiatric issues for 23 months. He was medication compliant and actively participated in treatment; however, his condition repeatedly improved and then deteriorated resulting in being moved back and forth between restrictive and less restrictive housing. Documentation was adequate, identifying the goals and interventions, along with improvement and/or deterioration.

**Patient O**

Patient O was a 30-year-old male who was referred from SQ EOP to an ICF level of care during an IDTT on February 10, 2021. He was transferred to CMF ICF on April 1, 2021.

Patient O was placed in MHSDS in August 2011 and received 3CMS, EOP, MHCB, PIP and DSH levels of care. He had a history of being psychiatrically diagnosed with schizophrenia, and several substance use disorders to include opioids, amphetamines, and cannabis. He also had a history of self-harm and grave disability.

Between February and April 2021, while he was awaiting transfer, he began decompensating per reports from mental health and custody. He was described as hostile and assaultive, endorsing auditory and visual hallucinations, and presenting with tangential and semi-disorganized thinking.

A SRASHE administered on April 5, 2021 indicated his chronic and acute suicide risk levels were high and moderate, respectively. The assessment also revealed a history of multiple suicide attempts. Additionally, he had a history of being admitted to MHCB for suicidality and

psychotic symptoms, despite his denials of suicidal ideation and minimization of paranoid delusions and auditory hallucinations.

During an IDTT at CMF on the May 5, 2021, he presented with positive signs of psychosis including disorganization and delusional beliefs.  On June 29, 2021, a PC 2602 order for involuntary medication was initially granted.  While at CMF, his medication was changed from Prolixin PO, Prolixin Decanoate, Effexor XR and BuSpar to Haldol Decanoate and Olanzapine.

Treatment consisted of psychotropic medication, individual therapy, and psychoeducational groups.  A review of the record revealed the treatment team, primary clinicians, and treating psychiatrist met regularly with the patient who was described as having a tenuous grasp on reality.  His record revealed he had delusions of grandeur related to wealth, focusing on his EPRD of January 1, 2023.  Additionally, his record revealed that he frequently refused to meet with his treating clinicians, especially his primary clinician.

Findings

The mental health care provided to patient O was inadequate.  Treatment plans and the primary clinicians progress notes tended to be redundant, documenting minimal change or discussions of treatment strategies.  The treatment team and the primary clinician acknowledged his limited insight, denial of symptoms, and frequent refusal to meet with them; however, there was no documentation indicating the treatment team discussed possible reasons for the patient's refusal to engage in treatment.  There was also no documentation of the treatment team trying to identify motivational strategies, incentives, and interventions to prepare him for his upcoming reentry into the community.  The primary clinician frequently documented that he provided supportive listening and reinforcement for utilizing coping skills and attending treatment.  These techniques were good; however, they suggested that treatment was passive.  Along with listening and reinforcing, the treatment team should have focused on the patient's identified goals, namely getting out of prison, avoiding drugs, and managing his paranoia.

**Patient P**

Patient P was a 39-year-old male who entered CDCR in June 2001 at 19 years of age.  He was serving a life sentence with the possibility of parole.  He was transferred from SVSP to CMF on January 27, 2020.

Patient P had an extensive history of mental health treatment in CDCR, starting at the reception center.  Over the past 20 years, his level of mental health care fluctuated between 3CMS, EOP, MHCB, and PIP.  His diagnosis was schizophrenia with catatonia.  His current inpatient placement started in December 2019 at SVSP due to grave disability.  He was transferred to a CMF/acute lockdown unit and subsequently placed on single cell status.  He was transferred to HCITC due to his risk for violence toward others and his acute psychiatric symptoms.

At CMF, he continued to respond to internal stimuli, to be a danger to others, and to inaccurately perceive reality.  Despite the treatment team's efforts, he did not attend individual or group treatment sessions.  The treatment team noted his lack of progress was due to active psychotic symptoms.  They described him as being disorganized and hypo-verbal, responding to internal

stimulus.  Per a PC 2602 involuntary medication order, he was being treated with Haldol decanoate, Zyprexa, and Depakote.

On May 27, 2021, his primary clinician asked him about an LRH transfer to a multi-person cell.  In response, he stated that it was not a good idea due to his protected status.  His unclear response was interpreted as reflecting resistance to having a cell mate, consistent with his paranoia.

The treatment team continually recommended single cell due to the presence of delusions which resulted in behaviors that were violent and disruptive.  They noted he remained in an active phase of psychosis, which manifested as paranoid and disorganized thinking.  His behavior continued to be unpredictable, with a high risk for violence due to his lack of insight into his symptoms.  With these symptoms, he was not suitable for dorm or multi-cell living.

Prior to his August 2021 IDTT, he discussed treatment goals with his primary clinician at cell-front and agreed to attend his primary clinician and treating psychiatrist's appointments, and two RT groups in 30 days.  Since he did not attend any appointments, the September treatment team expressed concern about his decreasing engagement in treatment and decided to add nonadherence to a treatment IPOC.  His primary clinician also changed the time of their individual therapy session from early morning to 12 noon for September 24, 2021.  Despite this effort, the patient refused to attend the individual session in a confidential setting.  Consequently, the primary clinician spoke with him briefly at cell-front.

On October 14, 2021 he once again refused to come out of his cell for a routine IDTT.  The treatment team noted that he had a treatment nonadherence IPOC in place since he was refusing individual contacts with the treatment team.  At cell-front, he denied psychotic symptoms, suicidal/homicidal ideation and auditory/visual hallucinations.  There was no evidence of any acute distress.

On November 15, 2021 the patient met with the treatment team.  His hygiene was good, and he was alert and calm.  There was no evidence of any internal stimuli, and his thinking was linear and goal directed.  His speech was clear. He was sleeping and eating well.  He and the treating psychiatrist discussed medications.  Since he was stable on psychotropic medication with minimal psychotic symptoms, the team discussed the possibility of discharging him to EOP.

Findings

The mental health care provided to this patient was marginally adequate because the treatment team did not explore all treatment options such as requesting consultation with a psychopharmacological specialist and/or requesting a CCAT.  This patient had been actively psychotic for several years.  To the CMF PIP treatment team's credit, they did not give up attempting to treat him psycho-pharmacologically and with traditional individual and group therapy/programming.  Their efforts showed promise on November 15, 2021 when he attended the monthly IDTT meeting with no obvious psychotic symptoms.  The adequacy of the care provided by the treatment team was illustrated by his appearance at the November 2021 IDTT, and by the absence of any serious injuries to himself or others over the past two years.

**Patient Q**

Patient Q was a 65-year-old male who was transferred from CSP/LAC to CMF on March 29, 2021.  He had an EPRD of August 24, 2029.

He entered CDCR in 1992.  His mental health care fluctuated between 3CMS, EOP, MHCB, and ICF.  Since he was placed in MHCB for attempted suicide in 2009, his level of care fluctuated between EOP and ICF.

He was admitted to CMF ICF due to concerns of cognitive decline, illustrated by repeatedly asking custody officers their names and wandering in the day room, as if confused.  A neuropsychological evaluation was requested for diagnostic clarification to determine the presence or extent of any cognitive decline.  These results would be used to inform his treatment plan on appropriate interventions, appropriate housing, and appropriate supports to enhance functioning.

At CMF, he was diagnosed with an unspecified neurocognitive disorder, an antisocial personality disorder, an opioid use disorder, and an adjustment disorder with mixed anxiety and depressed mood.  He primarily complained of racing thoughts, memory problems related to fights/head trauma, and receiving inadequate mental health services.  Staff reportedly observed him wandering around the day room as if confused and reported disorganized, rambling and tangential thinking.  During IDTT and individual sessions, the patient repeatedly reported auditory hallucinations which he was able to manage and repeatedly expressed safety concerns.

April 28, June 23, and July 22, 2021 IDTTs noted that this patient would be referred for testing and be discharged to EOP after testing was completed.  The December 27, 2021 IDTT noted his reports of auditory hallucinations and racing thoughts along with his refusal to take antipsychotic medication.  They also noted that he had not made much progress during his eight-month hospitalization at CMF ICF, stating he was originally admitted due to concerns of cognitive decline.  During his time at CMF, they did not observe any severe cognitive symptoms.  The team and patient also discussed a possible discharge to an EOP level of care; however, the patient expressed safety concerns and stated he would likely be stabbed if he was discharged to EOP.

<u>Findings</u>

The care provided to this patient was inadequate.  He was originally referred for a neuropsychological evaluation for diagnostic clarification to assist in the development of a meaningful treatment plan.  The patient expressed concerns involving his cognitive functioning and racing thoughts.  He also repeatedly expressed safety concerns and requested group therapy.  He had not been neuropsychological evaluated.  There was no evidence that his safety concerns were resolved.  And he did not perceive any therapy or psychoeducational groups.

**APPENDIX B2**
**CMF L1-PIP**
**June 2021**

**Patient A**

Patient A's healthcare record was reviewed to determine the adequacy of his CMF-PIP-ICF-L1 mental health care, delivered during the review period. To determine treatment adequacy, the review focused on the treatment plan's case conceptualization, goals, interventions and implementation.

Patient A was a 53-year-old male, convicted of assault with a deadly weapon, and criminal threat to cause grave bodily injury/death. He was sentenced to his third prison term, serving 11 years with an early parole release date of 2023.

His developmental history was reportedly chaotic and traumatic. He was separated from his mother at seven years of age and immigrated to America with his father and grandmother who physically abused him. Documents revealed his father broke both of his arms with a baseball bat at 11 years of age. He was diagnosed with cancer at 13 and both sold and used methamphetamine by 15. He graduated from high school and held several jobs prior to being incarcerated. He continued using illicit substances in the community and while incarcerated, exacerbating his physical aggression, lack of insight, and erratic behaviors. Record reviews revealed that his decompensations were likely associated with medication noncompliance and/or illicit substance use.

Documents indicated he had a long history of mental health problems; however, the details were unknown. As a child/adolescent, he was suspected of having an attention deficit hyperactivity disorder. He reported his family used physical punishment to control his impulsivity and increase his attention span. As an adult, he had a history of being diagnosed with a schizoaffective disorder bipolar type versus a bipolar I disorder, and substance use disorders. He received outpatient care, both at the correctional clinical case management system (3CMS) and EOP levels of care during his second prison term. He once again received 3CMS and EOP levels of care during his third term and was elevated in December 2021 to MHCB and ICF levels of care because of increased mania.

Prior to being admitted to CMF L1 PIP, he had been receiving EOP and MHCB levels of care at RJD. On March 15, 2021, he was transferred to CMF L1 PIP. He received his 72-hour and 10-day IDTTs in a timely. He also received his initial psychiatric, psychological and recreational therapist assessments in a timely manner, along with his suicide risk assessment self-harm evaluation. His first 30-day IDTT occurred on April 22, 2021.

Assessments and clinicians' progress notes revealed he had problems with medication compliance, manic episodes, illicit substance use, inadequate coping skills, mood instability, violent behavior, and limited insight.

His treatment plan case conceptualization integrated a chaotic and traumatic developmental history with an unstable and criminogenic familial environment, resulting in his criminal behavior, mental illness, and illicit drug use to help cope with his stressful environment. The treatment plan goals focused on managing manic episodes, increasing medication compliance, increasing adaptive coping skills, and managing anger. Identified strengths included being intelligent, thoughtful, goal oriented, and treatment engaged. His treatment plan also noted he

was in his least restrictive environment in L1 PIP, namely a multi-person ICF cell.  Treatment consisted of two individual contacts per week, one from his primary clinician and the other from his treating psychiatrist, and 15 offered groups per week.  Data from April 2021 revealed he attended 74% of the offered groups and was increased to Step two in the program.  He was motivated by having an early parole release date and by developing skills to avoid returning to prison.  During his seven weeks in CMF L1 PIP, he had at least nine individual psychiatric contacts and nine individual primary clinician contacts, which tended to occur in confidential settings.  He also had daily contact with a recreational therapist and/or a psychiatric technician.  The content of the individual sessions was consistent with his treatment plan and revealed the presence of therapeutic relationships.  Treatment plan goals included maintaining his medication compliance, managing his mania, improving coping skills, and stabilizing his mood.

Findings

The patient was receiving appropriate care in the L1 intermediate care program at CMF.  His level of care and LRH were both appropriate.  The multidisciplinary treatment team members worked collaboratively with each other and with the patient.  He was seen timely by individual team members and by the entire IDTT.  Treatment was effective, as evidenced by increased medication compliance with decreased psychotic symptoms and aggressive/violent behavior.

**Patient B**

Patient B's health record was reviewed to determine the adequacy of his mental health care, delivered at CMF PIP L1 during the review period.  To determine treatment adequacy, the review focused on the treatment plan's case conceptualization, goals, interventions and implementation.

Patient B was a 57-year-old male, serving his sixth prison term, convicted of assault with force likely to produce grave bodily injury, and vandalism after breaking his girlfriend's car window during a domestic fight.  He was sentenced to serve four-years and eight-months with an early parole release date of November 6, 2022.  His adjustment to prison during this term was poor, evidenced by 12 RVRs between December 2018 and January 2020, his Max custody status, and ASU placement.  As a juvenile, he was arrested several times for robbery/burglary and placed in California's Youth Authority.  He was charged and convicted as an adult at 18 years of age. He served five prison terms over 15 years and subsequently lived in the community for 14 years, until his current incarceration.

He reported being the middle child of eight children, who were raised by parents of Mexican heritage in San Diego, California.  He described his parents' marriage as problematic, saying they were often separated.  He reported a history of feeling neglected by his parents and denied any recent contact with his family.  He also reported being the only sibling with a criminal justice record.  Despite doing well academically, he dropped out of school in the eighth grade, due to his rebellious nature.  He became involved in gang activities and started using marijuana between 13 and 14 years of age.  His drugs of choice were methamphetamine, cocaine, and cannabis.  While living in the community, he reported working as a landscape worker and truck driver.

During an initial mental health assessment, he reluctantly talked about his community mental health history reporting hospitalizations in community psychiatric hospitals and in the Department of State Hospital - Atascadero. He admitted to previously reporting suicide attempts in the community; however, he currently denied those reports, stating he previously lied because he was angry for being in prison due to a trivial offense and to being in a mental health system where he did not trust the clinicians. He was also upset with his PC 2602 order, saying he felt as if psychiatry was trying to control him.

His treatment plans revealed significant medical problems (chronic lower back pain and hepatitis C), and mental health problems (a schizoaffective disorder, posttraumatic stress disorder, major depressive disorder, and both opioid and amphetamine substance use disorders). Over the past three years, his levels of care changed from receiving outpatient services, to crisis bed services, to inpatient levels of care. His least restrictive housing assignment was achieved when he was moved from a single ICF cell to a multi-person ICF cell on April 1, 2021. This LRH change was attributable to stabilization of his psychotic symptoms, evidenced by decreased delusional thinking/disorganization, and increased engagement in mental health treatment. The LRH transfer was recommended to provide him with an opportunity to adjust to living with a cellmate while in an inpatient setting where he would continue to receive clinical oversight.

The recommendations from the sending ICF single cell treatment team included helping him develop insight into the management of his psychotic symptoms by identifying signs of decompensation and triggers that resulted in distress, and by recognizing the importance of complying with his antipsychotic and mood stabilizing medications. Additionally, the sending treatment team recommended the receiving treatment team work on improving his emotional regulation, distress tolerance, and prosocial communication skills. The latter recommendations were emphasized because the sending team assumed, with the stabilization of his psychotic symptoms, his PTSD and substance use disorder symptoms would reemerge and become primary drivers of behavior. Additionally, they recommended continuation of the Seeking Safety Treatment Protocol along with active participation in parole planning, with a focus on treatment that challenged criminal thinking, facilitated relapse prevention planning, and enhanced prosocial skills to support living independently in the community.

He was moved from CMF- PIP- ICF- P3 (single cell) to CMF- PIP- ICF- L1 (multi-person cell) without incident on April 1, 2021. His 72-hour and 10-day IDTTs occurred in a timely manner. During his 10-day IDTT, he expressed interest in exploring the freedoms and services offered in L1 PIP, along with a desire to address his anger which he described as the source of his difficulties. During his first four weeks in L1 PIP, he had four individual contacts with his primary clinician, five individual contacts with his treating psychiatrist, and one individual contact with his ISUDT MAT physician. His individual contacts occurred in confidential settings. The ISUDT MAT physician's documentation revealed compliance with Suboxone, a review of relapse prevention strategies, a discussion of thought blocking, and utilization of motivational interviewing. Psychiatry's documentation suggested a working relationship, which allowed psychiatry to adjust his antipsychotic and mood stabilizing medications. His primary clinician's documentation revealed that he was struggling with issues of trust, safety, and both emotional and behavioral regulation. He also questioned the usefulness of understanding events which triggered his anger and violent behavior. He reported the anger management group, rather than teaching him skills to manage his anger, was triggering his anger. He often talked about his

long-term goals, saying he wanted to restore his status in society by working, enjoying activities and holding his head high when he encountered law enforcement.

Findings

During Patient B's L-1 intermediate level of care at CMF, his IDTT and assessments were timely, and his participation in programs and individual treatment (MHPCs, MHMD, & MAT position) were remarkable; however, his clinicians worked in silos rather than collaboratively. There was no evidence that his treatment team discussed critical issues or developed problem solving strategies to solve foundational issues involving trust, control, therapeutic relationships, confidentiality, and treatment efficacy. Specific examples included a distrust of psychiatry due to a PC 2602 order, a distrust of the primary clinician due to sharing information with psychiatry, and an exacerbation of his anger by the anger management group facilitator due to his anger being triggered rather managed. The primary motivator, which Patient B repeatedly shared with the treatment team, was his desire to develop coping skills to help him manage/control his mental health and substance use issues in the community. Without the team collaboratively addressing these critical issues, their individual and group efforts would be compromised.

**Patient C**

Patient C was a 34-year-old male discharged from CHCF Acute Psychiatric Program (APP) single cell to CMF ICF L1 multi person cell on March 10, 2021. On May 22, 2021 he was discharged from CMF ICF L1 to EOP at CSP/Sac.

Patient C was admitted to CHCF APP in September 2020 with an extensive history of self-injurious behavior involving symptoms of depression, anxiety, and auditory hallucinations. When he was discharged to ICF on March 10, 2021, he was diagnosed with a bipolar-I disorder, a borderline personality disorder, an antisocial personality disorder, and a substance use disorder. He was being treated with antidepressant and antipsychotic medications to include Prozac, Zyprexa, Seroquel, and Depakote.

On March 11, 2021, he signed a medication consent for Zyprexa, Seroquel, and Trileptal. His 72-hour IDTT met on March 11, 2021. He reported wanting to work on his depression and auditory hallucinations. He also agreed to work on reducing/eliminating self-injurious behavior. His diagnoses were discussed with him along with his factitious and malingering diagnoses, focusing on therapeutic implications. The utilization of current coping skills was discussed on March 11, 2021. The treatment plan dated March 16, 2021 noted that he would discharge to an EOP level of care when appropriate. During the next several weeks he became engaged in programming, actively participating in his individual treatment.

During his April 8, 2021 IDTT, he reported mild to no depressive and psychotic symptoms. He also had not engaged in attention seeking or self-harm behaviors. His stability was discussed by the team along with his tendency to injure himself when he was transferred to EOP. He reported learning new coping skills which would help him manage stressful situations by himself. During his April 26, 2021 individual treatment session with his primary clinician, the patient worked on his Cognitive Behavioral Therapy (CBT) ABC worksheet and began to discuss an EOP discharge. On April 29, 2021 he was hospitalized for vomiting blood and discharged from the

402

hospital on April 30, 2021. He was subsequently placed in quarantine until May 15, 2021. On May 4, 2021, the IDTT team and patient discussed his progress and stability, noting that he was on schedule for an EOP discharge. They also noted that he achieved STEP 3.

From May 8 through May 12, 2021, he was hospitalized for abdominal pain. Surgeon did not recommend any surgical interventions. He was given supportive care and pain control. He was returned to the TTA and back to his unit where he was placed on one-to-one observation to ensure that he remained safe from possible self-injury and received immediate care for any further medical emergencies. On May 15, 2020 this patient informed his primary clinician that he was fine and did not have any suicidal or homicidal ideation. He was placed in an observation cell close to nursing and custody stations for increased monitoring. A SRASHE administered on May 16, 2021 revealed high and low acute and chronic suicide risk levels, respectively. He filed two PREA allegations on May 15 and 17, 2021. On May 18, 2021, the treatment team clinically discharged him to EOP noting that he may require medical observation because he was likely to complain of medical problems. On May 18, 2021, he also told his primary clinician that he was fine. He was discharged to CSP/Sac EOP on May 21, 2021.

Findings

The care provided to this patient in CMF ICF L1 was adequate. The interdisciplinary treatment team collaboratively worked closely with the patient, candidly discussed his maladaptive coping strategies and worked with him to develop adaptive strategies. Maladaptive strategies were not reinforced, given the treatment team's timely and appropriate EOP discharge.

**Patient D**

Patient D was a 24-year-old male who was transferred from CSP/Sac to CMF ICF L1 on March 8, 2021 and returned to CSP/Sac on May 12, 2021.

This patient was admitted for being gravely disabled, with paranoid delusions, tangential thoughts, and impulsive behavior. Clinicians noted that he was a danger to himself due to injuries he could sustain from aggressive behavior related to his psychosis.

He had a complex history of mental health disorders, medical problems, cognitive/intellectual challenges, and social interpersonal concerns. His psychiatric symptoms included emotional dysregulation, paranoid delusions, tangential thinking, and auditory hallucinations. His psychiatric diagnoses included schizophrenia spectrum disorders and/or a schizoaffective disorder, depressed type. His medical problems included an enlarged thyroid gland and elevated serum prolactin levels. His intellectual challenges were revealed on April 14 with a DD assessment revealing difficulty remembering information, understanding rules, and managing/completing paperwork. His social/interpersonal concerns were related to his impaired thinking and poorly regulated emotions. He was also concerned about getting along with a cellmate because he was homosexual.

The treatment team and patient reviewed these issues and collaboratively agreed to actively practice various coping skills to manage his psychotic thinking, auditory hallucinations, and mood instability. Additionally, this patient agreed to work with psychiatry to adjust his psychotropic medications. An aggressive treatment plan was developed and implemented. He

progressed to step-2 and told the treatment team on April 29, 2021, that he no longer needed an ICF level of care.  The treatment team agreed with him and prepared him for an EOP discharge on May 12, 2021.

<u>Findings</u>

The care provided to this patient was adequate.  The patient and treatment team collaboratively worked identifying problems, establishing measurable goals, and developing/practicing coping strategies to achieve those goals.

**Patient E**

Patient E was a 30-year-old male who was transferred from CHCF ICF single cell to CMF ICF L1 multi-person cell on March 25, 2021.

This patient was referred for stabilization of nonspecific homicidal ideation without associated behaviors.  He had a history of being disorganized, easily agitated, and staring at staff with clenched fists.  He was placed on a PC 2602 for grave disability while at CHCF. He had been diagnosed with an unspecified schizophrenia, a schizoaffective disorder, and a bipolar disorder.  He had also been psychopharmacological treated with Depakote and Zyprexa.

His LRH was unlocked dorms, but he was referred to a multi-person cell to habituate him to a cellmate.  At CHCF, he had a history of refusing treatment and avoiding treatment team meetings.  Consequently, the treatment team was not surprised when he refused to attend the 72-hour IDTT.  Due to his unwillingness to attend, his issue would exclude sharps and cans until he could be seen and evaluated, due to his history of homicidal ideation and threats.  The team also agreed to consider a referral to unlocked dorms moving forward.

He frequently refused sessions with his primary clinician and treating psychiatrist.  He also refused to attend his 10-day IDTT, despite efforts by his clinicians to persuade him to attend.  While on quarantine, he came out of his cell for medication and shower.  Additionally, he had been eating his meals.  The recreational therapist reported that he expressed a desire to go back to an outpatient setting.  The treatment team decided to continue observing him before deciding placement.

Treatment team observations included noting that his ADLs were within normal limits, he showered regularly, ate regularly, and went to the day room to groom his hair and beard.  He also went to the yard once; however, when he learned there was no basketball, he requested to return to his cell.  Additionally, he was getting along well with his cellmate.

Since he refused confidential sessions, the treating psychiatrist met with him at cell-front on April 8, 16 and 23, 2021.  He repeatedly stated that he was okay and denied any side effects from medication.

To explore treatment options, a CCAT was requested and held on May 4, 2021 with staff from CMF, HQ, and MCSP, the receiving facility.  Given observed improvements he made at CMF and his ability to cell with others, the CCAT team agreed that he had reached adequate stability to be transitioned to an outpatient level of care.  The treatment team continued to work with him

on adjusting to EOP housing, planning for his parole, and increasing his insight into his mental illness. On May 25, 2021 he was discharged to MCSP EOP.

<u>Findings</u>

The care provided by CMF ICF L1 to this patient was adequate. Clinicians made every effort to engage him in treatment; however, he elected to refuse treatment. The treatment team observed and collateral informants reported that he maintained his ADLs, kept his cell neat, regularly showered and ate, and developed a relationship with his cellmate. The treatment team also explored treatment options by requesting and participating in a CCAT.

**Patient F**

Patient F was a 47-year-old male who was transferred from RJD to CMF ICF L1 on April 7, 2021 and discharged approximately nine weeks later to MCSP.

A mental health IRU housing review dated April 1, 2021, recommended this patient be transferred to a multi person cell, rather than a single cell. The purpose of the transfer was to treat this patient's chronic delusions of persecution involving purposeful harassment and food being poisoned. IRU noted his symptoms resulted in restricted food intake and weight loss, 20 pounds in the past nine months. He was diagnosed with a psychotic delusional disorder and was not being treated with psychotropic medication; consequently, the IRU team recommended a PC 2602 be considered. Despite being unmedicated, the IRU team also noted he was actively participating in his EOP treatment, including group therapy. Consequently, they recommended his LRH be reassessed after he become compliant with the prescribed medication.

This patient was resistant to being transported to CMF ICF L1, resulting in a transfer to ASU on April 6, 2021. He claimed that he had an enemy at CMF and thus refused to be transported. After talking with his primary clinician and treating psychiatrist on April 7, 2021, he agreed to exit the cell and be transported to CMF.

The 10-day IDTT reported that psychological testing was needed to determine if his paranoia was psychotic or whether he was malingering. This patient was concerned with having a cellmate and being served old and rotten food. He also requested rehabilitation because he felt that he might be released due to the injustice of his conviction and incarceration. He told staff that he was waiting for stimulus money but thought someone was keeping it from him.

On May 4, 2021 an administrative hearing officer approved a PC 2602 involuntary medication order. After the hearing, the treating psychiatrist met with the patient and decided to prescribe Benadryl to help him sleep and build a bridge to other options, rather than starting treatment with antipsychotic medication against his will.

During the patient's 30-day IDTT, he was told that his new LRH was unlocked dorms and the team was considering a referral to Atascadero State Hospital or a discharge to EOP. The patient rambled in a paranoid and delusional manner about being targeted in every prison and expressed concern about his two options. After considering his options, he agreed to the LRH ASH unlocked dorm option. The treatment plan noted his delusional thinking was revealed during the IDTT.

405

On May 18, 2021 the treating psychiatrist noted this patient appeared to have fixed delusions and paranoia involving several aspects of his life to include food and danger from custody and other inmates. The psychiatrist also noted that some clinicians doubted his delusions, paranoia, and thought disorder. Consequently, he recommended this patient be referred for a psychological assessment.

On May 27, 2021 the patient appeared for a special IDTT to discuss rescinding his referral to ASH and submitting a referral to an EOP level of care. The patient agreed with the team's recommendation. To support their decision, the team reported he gained over 6 pounds in the last several weeks and began to program concluding he did not need an inpatient level of care for paranoid delusions. Additionally, they questioned the validity of his delusional symptoms and requested psychological assessment. They reported being unable to complete a psychological assessment because their resources were insufficient; however, they noted that he could be assessed in an EOP setting.

The treating psychiatrist also saw him individually on May 27, 2021 and concluded that it was unclear if he was delusional or malingering. Consequently, he once again recommended psychological testing and decided to continue using Benadryl as needed. He supported the team's decision to discharge him to an EOP level of care.

On May 29, 2021, this patient received an RVR for disrespect with the potential for violence. When questioned about his behavior in the day room, he talked about being intermittently harassed by custody officers.

Findings

The care provided in this patient was inadequate. He was transferred from RJD to CMF ICF L1 to receive a higher level of care than he was receiving in EOP at RJD. The IRU housing review team concluded he needed a higher level of care, noting that he was decompensating, becoming increasingly delusional. The IRU team also requested consideration for a PC 2602 involuntary medication orders. A PC 2602 request was filed and approved by an administrative hearing officer; however, this patient did not receive antipsychotic medication for his delusions. The treatment team questioned the validity of a delusional disorder diagnosis and requested diagnostic clarification with psychological testing. Since they did not have the resources to complete the assessment, they recommended the receiving MCSP EOP team conduct that evaluation.

**Patient G**

Patient G was a 33-year-old male who was transferred from CIM to CMF ICF L1 on May 13, 2021. He was subsequently transferred to RJD on October 23, 2021.

This patient entered CDCR in 2016 and started receiving mental health services on February 20, 2021. On February 17, 2021 he was placed in ASU for enemy concerns and four days later he was admitted to MHCB after reporting suicidal ideation with a plan to hang himself. He was subsequently referred to ICF due to an inability to modulate his emotions resulting in becoming a potential danger to himself.

The treatment team diagnosed him with a major depressive disorder-recurrent episode, severe, an opioid use disorder, and an amphetamine use disorder. Additionally, the MTP psychiatry review noted he was being psychiatrically treated with Strattera and Clonidine for an attention deficit hyperactivity disorder, and with Zoloft for a major depressive disorder. His substance use disorders were treated in the medication assisted treatment program (MAT); however, he exhibited an ambivalence in his desire to stop using illicit drugs. He was also being treated with Suboxone for his opioid use.

On October 18, 2021, the IDTT reported that he refused over 50 percent of programming offered to include IDTTs. They reported that he made minimal progress in the program, and that he lacked participation due to his defiant attitude. They concluded his primary issue appeared to be drug use. They also reported he was not even in the pre-contemplative stage, craving and wanting to use drugs. The team determined that due to his attitude and behavior, there was not much they could do to help him. They concluded he did not want to put in the required work; thus, they would discharge him to an EOP level of care.

Significant issues occurring during his CMF hospitalization included positive drug tests, conflicts with his primary clinician and treatment team, self-harm to include reports of swallowing foreign objects and self-inflicted lacerations, and the team's case conceptualization of his emotional dysregulation being attributed to a traumatic brain injury and extensive substance abuse.

Findings

The care provided by CMF ICF L1 to this patient was inadequate. This patient was transferred to CMF ICF L1 because of his emotional dysregulation/reactivity. While being treated in ICF, the team discovered he also had substance use disorders and psychiatry discovered he had an attention deficit hyperactivity disorder. The former was being treated with MAT by ISUDT and the latter was being treated with medication by psychiatry. Unfortunately, the case conceptualization never integrated mental health with psychiatry and ISUDT. Rather than setting treatment plan goals from a holistic perspective, mental health focused on his depression and self-injurious behavior, blaming his treatment disengagement on his substance use problems, and ignoring the implications of his attention deficit hyperactivity disorder.

**APPENDIX B3**
**CHCF-PIP**
**August 2021**

**Patient A**

This 34-year-old patient was admitted to acute level of care on July 9, 2021. He was housed on A2A at the time of the review.  Diagnoses varied by provider and included major depressive disorder and various personality disorders (antisocial, borderline and narcissistic).  He was on PC 2602 and was prescribed antipsychotic, antidepressant and antianxiety medications.  His healthcare record was randomly selected from the acute PIP roster to assess adequacy of care for patients at the acute level of care.

He was admitted from the MHCB due to ongoing suicidal ideation and a recent suicide attempt precipitated by safety concerns.  He had an extensive history of suicide attempts and suicidal ideation attributed to various stressors.

The psychiatry and primary clinician assessments included relevant clinical information and were comprehensive.  However, the majority of the psychiatric assessment was copied from previous provider documentation and therefore lacked an individualized conceptualization of the patient's current status and treatment needs

The initial and ten-day treatment plans were timely, however, despite an expectation for two subsequent treatment plans at the time of the review, none were found. Treatment goals and interventions were appropriate and addressed suicidal ideation and need for improved coping skills, including distress tolerance.  Goals were objective and measurable but were not always realistic based on chronic and moderate risk assessments.  The safety plan was reasonable although of concern, the safety plan included outdated language, e.g., "contacted for safety."

According to the treatment plan psychiatric and primary clinician contacts were to occur weekly. While not consistently timely, routine primary clinician contacts were comprehensive and demonstrated appropriate clinical interventions.  Routine psychiatric contacts were individualized and thorough.

Group treatment, via in-cell programming, attributed to unit quarantine was minimal.

Findings

Documentation of treatment was thorough and provided clinically useful information.  However, delays in treatment planning impacted the provision of mental health care for this individual which is assessed as adequate but marginal.  Diagnostic clarification was needed.

**Patient B**

This 52-year-old patient was admitted to acute level of care on May 23, 2021. He was housed on B1A at the time of the review.  He was diagnosed with major depressive disorder and dysthymia. He was prescribed antianxiety, antipsychotic, antidepressant and mood stabilizing medications for chronic depression and suicidal ideation.  His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

Initial assessments lacked sufficient individualization as much of the documentation was pulled forward from previous providers.  Treatment planning addressed danger to self with a goal to

reduce suicidal ideation and a therapeutic intervention to foster a therapeutic alliance. Goals to address depression and additional interventions were not identified.

Clinical documentation varied by provider but overall lacked sufficient clinical detail to fully appreciate his functioning, progress in treatment, symptoms and treatment needs. Overall, treatment frequency was not in alignment with the treatment plan and there were gaps in primary clinician contacts with the lengthiest between June 21, 2021 and July 13, 2021.

While there were limitations due to quarantine, group treatment was minimal for the last three weeks in July with a range of none to five hours weekly. Group treatment was primarily offered by the rehab therapist. Of note, the patient was asked for more treatment.

He was assessed as high acute and chronic risk, but no safety plan was developed.

Findings

This patient's care was inadequate. Case conceptualization was needed to assist with treatment planning. Treatment goals needed improvement and documentation of treatment interventions other than psychiatric medication were lacking in treatment plans and routine primary clinician documentation. Delays in contacts were concerning and quality of documentation did not provide sufficient clinical information for continuity of care. A safety plan was needed.

**Patient C**

This 46-year-old patient was admitted to acute level of care on May 28, 2021. He was housed on B1B at the time of the review. He was diagnosed with bipolar I disorder, amphetamine-type substance use disorder, antisocial personality disorder and probable generalized anxiety disorder. He was prescribed antipsychotic and antidepressant medication. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

This patient was admitted to the PIP from the MHCB after a foreign body ingestion. He had a long history of inpatient treatment and self-harm behaviors. The initial psychiatric assessment was completed on the day of admission while the initial primary clinician assessment was completed four days after admission. Both evaluations were thorough and provided useful historical and current clinical information. There was no safety plan developed upon admission. Presenting problems included depressed mood, suicidal and homicidal ideation and intermittent auditory hallucinations. However, treatment goals narrowly targeted danger to self with a goal to reduce self-harm behaviors. Cognitive behavior therapy, an appropriate intervention, was identified.

Documentation of provider contacts provided useful information and appropriate treatment interventions, however there were delays between primary clinician contacts. IDTTs generally occurred every seven days although there were two instances where there were close to two-week gaps between IDTTs. Clinical summaries provided useful summaries between IDTTs.

Group treatment, offered by a recreational therapist occurred four hours or less a week.

Of note, there were multiple provider changes with no explanation for the change.

<u>Findings</u>

This patient's care was inadequate on account of need for improved treatment and safety planning, lack of continuity of care, gaps in primary clinician contacts and IDTTs and insufficient group contacts.

**Patient D**

This 22-year-old patient was admitted to acute level of care on June 26, 2021.  He was housed on B2A at the time of the review.  Diagnoses varied by provider and location and included major depression with psychosis, anxiety disorder, post-traumatic stress disorder and opioid abuse.  He was prescribed antidepressants and antipsychotics.  He was admitted to the PIP from the MHCB following self-harm behavior precipitated by two major losses (grandfather and son).  His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

Overall, documentation was deficient problematic, and provision of treatment was insufficient. The initial psychiatric assessment lacked individualization as the majority of documentation was copied from previous providers.  The initial primary clinician assessment dated June 28, 2021 was incomplete and documented as "in progress" for the duration of his acute hospitalization. Treatment goals identified during his initial IDTT addressed self-harm behavior with an intervention of empathy but additional treatment goals to address reports of recent substance use, depression and grief were not identified.  There was no documentation for weekly IDTTs, and only one primary clinician contact from July 8, 2021, was located during his hospitalization. Clinical rationale for discharge to intermediate level of care on August 5, 2021 was not located.

Provision of group treatment was problematic.  There was documentation of only one group contact on July 8, 2021, during his acute stay.

<u>Findings</u>

This patient's care was inadequate.  The quality of provider initial assessments and treatment planning was insufficient.  Clinically indicated treatment needs (grief, depression, substance use) were not targeted as treatment goals and additional clinical interventions for the self-harm goal was needed.  This patient's care was inadequate on account of insufficient provision of evaluation and treatment.  There were gaps in IDTTs and primary clinician contacts and frequency of group treatment insufficient.  Diagnostic clarification and clinical rationale for discharge was needed.

**Patient E**

This 63-year-old patient was admitted to acute level of care on June 21, 2021.  He was housed on B4A at the time of the review.  He was diagnosed with schizophrenia and delusional disorder. He was prescribed antipsychotics and antidepressants.  His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

411

He had an extensive psychiatric history which included previous intermediate care admissions, PC 2602, suicide attempts and suicidal ideation. After a period of psychiatric stability, he decompensated and experienced paranoid delusions and passive suicidal ideation. His decompensation occurred shortly after recovery from a medical coma secondary to COVID-19. His recovery left him medically compromised including inability to walk or stand independently; memory problems and brain damage.

His initial psychiatric assessment provided useful clinical information and the suicide risk assessment was adequate. The initial primary clinician assessment was not individualized as clinical information was copied from the treating psychiatrist and previous providers. There were gaps between routine primary clinician and psychiatric contacts during the month of July with a twenty-one-day delay between July 2 and July 23, 2021. Clinical documentation was brief and lacked documentation regarding treatment interventions other than medication.

Initial IDTT documentation included nursing goals for ineffective coping but no clear psychiatric goals. Subsequent IDTT documentation addressed danger to self with goals to reduce suicidal ideation and utilize coping skills for depression and anxiety. Interventions were not identified. Goals for grief and loss were indicated but not included.

Group treatment, provided by a recreational therapist, during the month of July 2021 was insufficient with a range of one to two hours weekly.

Findings

This patient's care was inadequate. Treatment planning and overall provision of care was insufficient and did not address this patient's individual clinical needs.

**Patient F**

This 27-year-old patient was being treated at the ICF level of care and was diagnosed with schizophrenia and unspecified psychosis. He was prescribed fluoxetine and olanzapine. His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

There were concerns with psychiatric documentation. His treating psychiatrist consistently noted the patient's diagnoses as Major Depressive Disorder and methamphetamine intoxication and made no reference to the patient's PC 2602 order despite the fact that the order expired and was renewed during the review period. There was also no mention of the patient being under an involuntary medication order in any IDTT meeting. Otherwise, treatment goals appeared appropriate to the patient's needs. Primary clinician contacts did not occur as required; the patient was not seen between May 18, 2021 and July 31, 2021 despite the decision to discharge the patient during an IDTT in June. Of the eight primary clinician contacts that occurred during the seven months reviewed, evidence of active treatment as outlined in the treatment plan was evidenced twice. Groups were offered to the patient between two and seven times per month, but he was not offered the 10 hours a week outlined in his treatment plan. Evidence of in-cell programming was minimal.

412

His least restricted housing was designated as multi-person cell. However, he was housed in a single cell on account of a history of aggressive behavior including two peer assaults on the unit. A treatment goal was established to address his aggressive behavior and was intermittently addressed in treatment. After he achieved his treatment goal of abstaining from assaults for sixty days, he was referred to a multi-person cell, yet this did not occur, nor were any steps taken to discharge the patient despite the team decision to discharge him in June 2021.

Findings

Treatment of this patient at the ICF level of care was inadequate. Psychiatric care evidenced poor diagnostic assessment and a lack of documentation regarding the patient's involuntary medication status and inconsistent acknowledgement of discharge decisions. Primary clinician contacts did not occur as required and rarely evidenced treatment in accordance with the treatment plan. Consideration of LRH was adequate but despite a decision to move the patient to his LRH, steps to do so were not taken.

**Patient G**

This 29-year-old patient was diagnosed with schizoaffective disorder, bipolar type. He was prescribed Sertraline, Paliperidone, Valproic Acid and Benztropine under a PC 2602 order. His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

The patient refused all medication and treatment offered from January through May 2021 at which point a PC 2602 order was granted, and he began to take prescribed medications. Staff attempted to engage the patient at cell-front with limited success. Primary clinician and psychiatric progress notes during this time varied very little from note to note. His care was transferred to another psychiatrist in May and documentation was improved. However, routine primary clinician contacts ceased in May and did not resume again during the review period. Groups were not offered to the patient during the review period given his level of agitation and risk for violence. Two RVR assessments and a SRASHE completed during the review period were clinically adequate.

His least restricted housing was multi person cell. However, he was housed in a single cell secondary violent behavior. It was documented that his mental health was unstable, he was easily agitated and had poor impulse control. Additionally, he experienced paranoia, homicidal ideation and was preoccupied with killing/mass murder. Goals to reduce anger, violent behavior and homicidal ideation were documented in January and February IDTTs but were replaced by goals to address treatment nonadherence for the remainder of the review period.

Findings

Treatment at the ICF level of care was inadequate. Individual interventions were challenging due to patient refusals and psychiatric interventions appeared appropriate throughout the review period, but primary clinician contacts were non-existent for three of the months reviewed. Additionally, besides the initiation of medications under a PC 2602 order, there was little evidence of the interventions noted in the treatment plan designed to increase patient participation in treatment. On a positive note, the primary clinician was able to obtain a release

413

of information to talk with the patient's grandmother which evidenced some improvement in the patient's mental status later in the review period.

## Patient H

This 62-year-old patient was treated at the ICF level of care and was diagnosed with major depression, schizophrenia and unspecified psychosis. He was prescribed Haloperidol, Buspirone, Benztropine and Mirtazapine. His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

Initial assessments appeared comprehensive and were completed prior to his initial IDTT which appeared to address his current needs; however, depression, auditory hallucinations, suicidal ideation and self-injury were all entered under a single IPOC for self-harm. His least restrictive housing was locked dorms, but he was housed in a single cell due to lack of stability, significant agitation and difficulty getting along with peers.

Documentation on treatment plans, routine psychiatric contacts and primary clinician contacts were status updates and did not reflect active treatment beyond medications which were unchanged despite limited progress during the review period. The patient was offered a single clinical group and a number of "tier groups" by recreational therapists. Treatment plan updates were minimal and reflected the same content over time which was not verified by the documentation in the record. Treatment and treatment planning did not address the underlying reasons for the patient's single cells status. In addition, once his agitation improved and he was socializing with peers without incident, the IDTT recommendation for single cell was not re-considered. Psychiatric contacts occurred as required but primary clinician contacts were rare and not in accordance with the treatment plan.

Findings

Treatment was inadequate. Treatment goals and interventions to assist this patient in achieving his identified goals and his LRH were not documented on the treatment plan or during routine clinical contacts beyond use of medication, a single clinical group and "tier groups" by the RT.

## Patient I

This 27-year-old patient was diagnosed with schizophrenia. He was admitted to the PIP on March 23, 2021 due to psychosis that interfered with his activities of daily living. He was not prescribed medications at admission due to refusal but was eventually prescribed antipsychotic medication under a PC 2602. His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

The initial psychiatric assessment was completed timely and appeared comprehensive. The need for a PC 2602 was documented by the psychiatrist on March 23, 2021 but was not submitted until May 17, 2021 despite continued decompensation as evidenced by yelling in his cell, active delusions, and not attending to ADLs. An initial primary clinician assessment was not completed until nearly 30 days after admission and was minimally adequate. The assessment noted that the patient was participating in sessions with his primary clinician and yet there was a single primary clinician contact in the record during the first month of his stay. His initial IDTT

414

was designed to target his delusions and included a goal to increase medication adherence without any interventions to support that goal and did not include discussion of the fact that medications were not prescribed for this patient.

Medications were first prescribed on March 31, 2021 yet there was no clinical encounter entered in the health record on that date. Subsequent psychiatric contacts made no mention of medication adherence until April 28, 2021 when it was documented that a PC 2602 would be pursued which was done on May 17, 2021. The reason for the delay in submission was not clear. The medication administration record did not evidence any entries except medication orders prior to June 2, 2021 and therefore medication refusals could not be verified.

Despite indication that he was easily agitated in IDTT documentation, incidents were not readily documented in early clinical documentation. Treatment goals were established to address delusions but there were no goals for agitation. Treatment goals for delusions were unrealistic. His least restricted housing was unlocked dorms but throughout his stay he was housed in a single cell at the recommendation of IDTT on account of grandiose delusions and agitation. There were large gaps in primary clinician contacts and no contacts were entered after May 26, 2021. Documentation did not address interventions identified to assist him in achieving a transfer to LRH or those ordered in the treatment plan. Specifically, neither psychiatric nor primary clinician contacts addressed underlying reasons for medication non-compliance or considered interventions to improve treatment compliance.

Of note, he was released on parole as a mentally disordered offender to Atascadero State Hospital where housing consists of unlocked dorms in mid-July 2021.

Findings

This patient's treatment needs were not timely or appropriately addressed and treatment to address LRH was inadequate. Barriers to achieving LRH (delusions and agitation) were not appropriately included in treatment planning or routine provider contacts. Primary clinician contacts with this patient were minimal, totaling five contacts (all but one cell-front) during his nearly four-month stay in ICF and initiation of a PC 2602 request was unnecessarily delayed without adequate justification.

**Patient J**

This 39-year-old patient was diagnosed with schizoaffective disorder, major depressive disorder with psychosis, post-traumatic stress disorder and borderline personality disorder. He was prescribed antidepressant and antipsychotic medications. His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

The patient's mental health treatment was impacted by his physical health needs secondary to previous self-injury requiring medical monitoring, hospital admissions and changes to his psychotropic medications including discontinuation of clozapine which had proved helpful in the past. Psychiatric contacts were thorough and occurred weekly. Primary clinician contacts were rare, including no contacts between May 24, 2021 and July 8, 2021 despite the treatment plan indicating that bi-weekly sessions would be held, and effective medications having been discontinued.

415

His least restrictive housing was unlocked dorms, but he was housed in a single cell. Rationale for single cell housing in the designated section of IDTT documentation stated that the patient was unable to navigate functional complexities of LRH but lacked sufficient clinical rationale for this statement. Documentation in the clinical summary of the IDTT indicated that the treatment team wanted him to abstain from self-harm behavior for a period of sixty days prior to a transfer to LRH as of June 2, 2021. For reasons that were unclear, documentation in the IDTT treatment plan on July 28, 2021, which was just shy of the required sixty days, was changed to abstain for 70 days. Goals and interventions to address danger to self were established and were measurable and objective although the indicated interventions were not provided. The was no evidence that any groups were offered to this patient.

Findings

Treatment was inadequate. Beyond medication and weekly psychiatric contacts regarding medication and physical health needs, no treatment interventions were provided to this patient. Conflicting information was documented regarding barriers to LRH transfer. Sufficient clinical rationale was not provided to support inability to navigate due to functional capacity. Treatment goals addressed self-harm behavior and did not address functional capacity deficits. There was no documentation of clinical interventions to achieve treatment goals or LRH in routine clinical contacts. Lastly, despite meeting the stated goal of abstaining from self-injurious behavior for sixty days, for reasons that were unclear the goal was extended to seventy days.

**Patient K**

This 44-year-old patient was scheduled for his acute inpatient IDTT meeting during the site review but refused to attend. This healthcare record was reviewed to examine the fact that the patient was noted to have been discharged to the EOP level of care but had been refusing psychiatry, primary clinician, and nursing contacts and groups. The patient was also reportedly not taking his psychotropic medication and had engaged in self-injurious behavior in response to auditory hallucinations in the past. He was diagnosed with unspecified bipolar or related disorder and amphetamine-induced psychotic disorder and was prescribe chlorpromazine PRN.

The healthcare record indicated that that patient had been admitted to the acute level of care on June 11, 2021 from an EOP setting and it was noted that the referral indicated the need for consideration of a PC 2602. A psychiatric contact note on June 21, 2021 stated that the patient did not meet criteria for a PC 2602 with no further explanation or rationale. While the patient was initially willing to take medications on an as-needed basis, he was unwilling to take medications prescribed daily to address his auditory hallucinations which were reportedly distressing to the patient. The majority of his contacts with psychiatrists were held cell-front. Of note, one psychiatric contact was documented as having to be terminated because the patient was on "close custody checks." Between admission and the decision to discharge the patient, he was seen by three different PCs on five occasions. Only one session indicated a therapeutic interaction. The other contacts evidenced status notes, and most were held cell-front and one was held in the yard with other patients present.

Given his level of functioning, which was primarily assessed by his IDTT to be adequate based on his hygiene, appetite, sleep and engagement in nine recreational therapy groups since his

416

admission, the IDTT determined on July 12, 2021 that he could be discharged to a EOP level of care and function well in that setting. Following that decision, the patient began refusing all clinical contacts and was attending only recreational therapy groups. He was seen cell-front by his IDTT for all subsequent meetings and was noted to be agitated, uncooperative and guarded. The primary clinician noted that the patient was attending recreational groups, showering, keeping his cell tidy and eating without concern. The patient reported experiencing auditory hallucinations but was not taking his medications. Despite the patient's lack of treatment due to limited offerings and patient refusals, the discharge summary noted that a number of therapeutic interactions had occurred with the patient during treatment sessions with his PC.

Findings

Based on documentation, it appeared that the decision to discharge this patient to a lower level of care was appropriate given his level of functioning which did not evidence the need for an acute level of care. Of concern, however, was the limited treatment offered to the patient while he was receiving acute inpatient services and the inaccurate discharge summary which indicated that the patient had actively engaged in cognitive behavioral therapy when there was no evidence of such beyond a single primary clinician session on June 26, 2021. Additionally, there were concerns that a patient's treatment session with a psychiatrist was terminated because the patient was on "close custody checks." This should not have occurred.

**Patient L**

This 35-year-old patient was receiving services at the acute level of care. His case was reviewed as he was absent from his discharge IDTT meeting, which was scheduled at the time of the site review, due to the fact that he was on 1:1 suicide watch, in a smock, and in possession of a piece of razor in his cell at the time the meeting. The patient was admitted to in acute level of care from the ICF level of care on June 4, 2021 secondary to frequent self-injury. He was diagnosed with borderline personality disorder and antisocial personality disorder at admission and a diagnosis of Bipolar I disorder was added during his acute stay. The patient was on a PC 2602 order secondary to danger to himself and was prescribed gabapentin, risperidone, melatonin and diphenhydramine. The primary clinician inaccurately documented in a progress note and within the discharge summary that the PC 2602 order had been dismissed based on information provided by the patient.

Despite the fact that the IDTT indicated that his self-injurious behavior appeared to be motivated by his desire to influence his environment, his treatment goals targeted suicidal ideation. Discharge criteria included freedom from self-injury for 90 days. Throughout his stay, the patient was frequently placed on 1:1 suicide watch. He continued to present as irritable and aggressive, punching and kicking his cell and refusing to shower. On July 19, 2021, the IDTT concluded that the patient had reached maximum benefit at the acute level of care and planned to discharge him to the ICF level of care the following week. Documentation indicated that the IDTT believe the patient could benefit from "more structured, longer-term treatment" for behavior believed to be "a reflection of a personality disorder." The psychiatrist recommended a trial of clozapine be considered at the ICF level of care. The patient engaged in self-injury on July 23, 2021.

The patient was seen as required by psychiatrists but had contact with seven different providers during his stay. Primary clinician contacts were held weekly with the exception of one week where the patient was not seen for 12 days. The patient's record reflected some attempt to support the patient with coping skills and cognitive interventions. The patient was provided with nine recreational therapy groups but no clinical groups during his stay. The patient frequently complained about the lack of treatment on the unit and filed a formal grievance during his stay secondary to the lack of clinical groups offered.

The psychiatric discharge plan including limited information about the patient's course of treatment and response to treatment while at the acute level of care. It included no recommendations for follow-up.

On July 11, 2021, a discharge SRASHE was completed although the patient refused to participate. Subsequent attempts to conduct SRASHEs following incidents of self-injury on July 18, 2021 and July 23, 2021 were also refused by the patient. All SRASHEs noted high chronic risk and moderate acute risk for suicide. There were safety plans documented in the latter SRASHEs with information pulled forward from previous assessments due to the patient's refusal to participate.

Findings

This patient's treatment while at the acute level of care was inadequate and did not address the reason for admission. The patient was discharged to a lower level of care despite failing to meet his established treatment goals. The was a lack of continuity of care in the delivery of psychiatric services and limited psychotherapeutic intervention provided. Primary clinician documentation was inaccurate with regard to the status of the patient's PC 2602.

**Patient M**

This 35-year-old patient was housed at the acute level of care. His record was reviewed because it was noted that he was referred from MHCB level of care to the acute level of care but did not get transferred for 30 days yet during the site review, it was reported that there was no waitlist for acute care beds. He was diagnosed with schizoaffective disorder, depressive type and amphetamine dependance. He was prescribed Benztropine, Risperidone, Sertraline, Lamotrigine, Clonidine, and Olanzapine.

The patient was placed at the MHCB level of care on May 15, 2021. The patient did not stabilize within the first week, despite medication changes and he was discharged from MHCB to an acute level of care on May 25, 2021. Nursing documentation indicated that he was sent for a COVID screening per protocol on May 26, 2021, evidenced no signs or symptoms of COVID illness and reported that his COVID test on May 17, 2021 was negative. Nursing documentation on May 27, 2021 indicated that the patient was vaccinated on May 21, 2021 and thus the medical hold was discontinued. He also tested negative for COVID on May 27, 2021.

The patient was seen in accordance with the Program Guide by psychiatrists and PCs throughout his stay in MHCB, although some primary clinician contacts were noted to be held cell-front. The patient remained on 1:1 suicide watch in a smock through June 8, 2021. On June 11, 2021, a primary clinician noted that there had been a COVID outbreak in the CHCF inpatient program,

which was likely the reason for the delayed transfer.  This was the first note about the delayed transfer found in the patient's record.  However, this entry was clearly an assumption as later on that same date, there was an entry in the record which noted that the patient's transfer to CMC acute inpatient level of care was denied because the referring psychiatrist had recommended clozapine be initiated upon transfer and clozapine was not provided at CMC.  The patient was transferred to the acute "flex" unit at CHCF on June 15, 2021, 30 days after being referred.

<u>Finding</u>

The delayed transfer to an acute inpatient setting was not justified nor adequately documented in the patient's healthcare record.  It appeared that the patient had been referred to CMC's MHCB acute inpatient unit on May 15, 2021 with a recommendation for initiation of clozapine.  No response regarding the referral for transfer occurred for 27 days; the patient was eventually denied transfer due to the medication request.  Once referred to CHCF acute level of care, the patient transferred less than four days later.

**Patient N**

This 33-year-old patient was receiving services at the acute inpatient level of care.  He was diagnosed with antisocial personality disorder, Bipolar I disorder, most recent episode manic with psychotic features; borderline personality disorder; factitious disorder; malingering; and substance use disorder.  He was on a PC 2602 order and was prescribed Haloperidol by injection and Diphenhydramine PRN.

His healthcare record was reviewed for a routine random assessment of inpatient services.  During the healthcare record review, it was noted that the patient alleged having been penetrated by a correctional officer and also reported that he performed oral sex on the officer.  He reported the alleged assault to nursing staff and refused a nursing assessment following the report.  A health care services form (7362) was completed on the day of the assault by a nurse, which noted that Investigative Services Unit (ISU) staff would come and speak to the patient but made no reference for the need for an emergent mental health consult, as indicated by policy.  The patient was seen for by the IDTT the following day, yet no mention of the alleged sexual assault was documented.  Later that day and the following day, the patient engaged in multiple episodes of self-injurious behavior.  A SRASHE was attempted in relation to the self-injurious episodes three days after the alleged sexual assault incident, but the patient refused.  There was no reference to the assault allegation.  The first mention of the sexual assault allegation by mental health staff was in a SRASHE completed with the patient 14 days after the alleged incident.

<u>Findings</u>

Response to the patient's reports of sexual assault was not adequate and not in line with policy requirements.  Of note, the record for this patient included a history of reporting being sexually assaulted by officers which may have contributed to staff's decisions not to adhere to policy in this case which was not an acceptable rationale.

**Patient O**

This 55- year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at CHCF-PIP.  The patient was admitted to the intermediate program at CHCF-PIP on March 28, 2021.  The referring institution noted the patient had not been responsive to "interventions staged at the EOP [level of care]."  His psychiatric diagnoses during admission were Mood Disorder and Antisocial Personality Disorder.  There was also a documented history of suicide attempts, self-injurious behavior, substance abuse, and chronic pain.

Behaviors documented during the course of the PIP admission included self-injurious behaviors, an alleged exposure incident, brief hunger strikes, assaultive behavior, verbal abuse of staff, and other acts of aggression.  The patient also received multiple RVRs, remained on SOLO programming, and ultimately transferred to the PIP's MAX custody unit in early July 2021.

The IDTT treatment plans for this patient were inadequate and not modified in response to the patient's worsening presentation over time.  For example, treatment plans did not address the patient's ongoing self-injurious behaviors or the behaviors that led to his MAX custody placement during admission.  Although the IDTT appropriately referred the patient for a PBST evaluation on April 15, 2021, there was no evidence that the behavioral assessment or plan occurred.

The most recent SRASHE, dated May 25, 2021, assessed the patient's chronic suicide risk as high and acute suicide risk as moderate.  The most recent suicide prevention safety plan was completed incorrectly and included vague statements that rendered it virtually useless.  During mid-August 2021, the patient reportedly engaged in two separate incidents of self-harm.  He cut on himself on August 14, 2021, and he inserted an object into his anus and ingested "40 unknown pills" on August 15, 2021.  Although the patient was appropriately placed on suicide watch, neither a SRASHE nor a safety plan were completed for the two incidents.  The self-harm "power-form" was not completed as required by policy for the August 15, 2021 self-harm incident.

Despite treatment plans indicating primary clinician contacts would be offered weekly, the primary clinician did not meet with the patient between July 30, 2021 and August 19, 2021.  When the primary clinician did follow up on August 19, 2021, the notes contained no reference to the two recent self-harm incidents during the contact.

Findings

The care provided to this patient at CHCF-PIP was inadequate.  The primary clinician's initial assessment was never completed during the course of the patient's PIP admission.  The frequency of primary clinician encounters was not consistent with the IDTT's treatment plans, which noted weekly contacts would be offered.  Treatment plans were ineffective and not modified in response to the patient's lack of progress and self-harming behaviors during admission.  There was no follow through after the IDTT recommended a PBST referral in April 2021. SRASHEs and self-harm power-forms were not completed as required for the two self-harm incidents in August 2021.  It was unclear whether the primary clinician was informed of

the two self-harm incidents that occurred in August 2021, as the primary clinician did not meet with the patient in response to these events and did not discuss the incidents with the patient on August 19, 2021.

**Patient P**

This 55-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at CHCF-PIP.  The patient transferred from CHCF-PIP's acute program to their intermediate care program in late August 2019 to receive further treatment for danger-to-self concerns.  During intermediate care admission, the patient was diagnosed with Schizoaffective Disorder and prescribed psychiatric medication for symptoms of psychosis and anxiety.  A PC 2602 involuntary medication order was renewed in January 2021.  The patient's history was significant for two prior suicide attempts and two self-harm incidents, the most recent of which occurred in June 2019.

The mental health treatment targeted the patient's auditory hallucinations, suicidal ideation, and mood dysregulation.  Throughout the current admission, clinicians documented skills the patient acquired as a result of their treatment interventions.  Psychiatry adjusted the patient's medications during admission, and also noted the patient had responded positively.  The record referenced objective signs of improvement throughout 2021, including the patient's job assignment as a porter, attendance in treatment groups, medication adherence, and a lack of self-harm incidents and RVRs after October 2020.

Although the IDTT clinical summaries were not updated in January or February 2021, subsequent summaries offered very clear descriptions of the patient's current symptoms, functioning, and response to treatment.  Progress toward treatment objectives was also clearly documented in monthly IDTT records after February 2021.  The IDTT's decision to discharge this patient to EOP level of care on July 13, 2021 was well supported in the clinical documentation, and discharge notes offered useful recommendations for care continuity in the outpatient setting.

Findings

The intermediate care provided to this patient at CHCF-PIP was adequate; his treatment appropriately targeted his needs.  Changes in his skills as a result of treatment interventions were documented as was his progress towards treatment objectives.  The decision to discharge him to EOP was well supported in the records and the discharge notes were suitable regarding continuity of care.

**Patient Q**

This 59-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at CHCF-PIP.  The patient transferred from CHCF-PIP's acute program to their intermediate care program in late January 2020.  The patient was diagnosed with Schizophrenia and Antisocial Personality Disorder.  Psychiatry prescribed antipsychotic and mood stabilizing medications, and there was an active PC 2602 involuntary medication order during admission.  The healthcare record referenced a history of self-harm incidents and multiple suicide attempts, the most recent of which occurred in 2001.  The suicide

risk evaluation completed on February 6, 2020 assessed the patient chronic suicide risk as high and acute suicide risk as moderate.

The IDTT developed one IPOC to address the patient's delusions. The patient did not exhibit improvements during 2021, and providers noted concerns with medication and treatment non-adherence beginning in April 2021. However, treatment plans were not modified to address these concerns.

The frequency of individual psychiatry and primary clinician contacts was concerning. Routine psychiatry contacts were required "every 7 days." However, it is noted that there were no individual psychiatry contacts offered between October 4 and October 20 or between November 1 and December 13, 2021. While treatment plans consistently noted individual primary clinician contacts would be offered "once a week," there were significant gaps between primary clinician contacts throughout 2021. For example, there were no individual primary clinician contacts offered between March 15 and April 16; April 16 and May 26; June 4 and June 14; and June 25 and August 12, 2021. The most significant primary clinician contact interval occurred between September 27, 2021 and December 16, 2021. Further, the primary clinician only offered cell-front wellness checks between April 16 and June 14, 2021.

The patient refused all treatment and programming during 2021. In August 2021, the IDTT noted the patient "continues to display symptoms of ineffective coping," and the primary clinician opined that the severity of the patient's delusions were impairing his ability to engage in "meaningful communication." Subsequent IDTT documentation suggested the patient may be functioning "at baseline," although providers had no plans to discharge the patient due to his current level of functioning requiring intermediate care.

<u>Findings</u>

While this patient was appropriately retained in intermediate care, the care provided at CHCF-PIP was inadequate. Treatment appeared limited to medication management and cell-front check- ins. The frequency of primary clinician contacts was insufficient for this level of care, and the contacts were not offered in accordance with IDTT treatment plans. Treatment plans were not modified to address new issues that arose during admission or in response to the patient's overall lack of progress. The one IPOC that was developed and retained throughout admission was not useful.

**Patient R**

This 35-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at CHCF-PIP. The patient was admitted to CHCF-PIP in early March 2021. The referring institution requested that treatment address the patient's mood lability, psychotic symptoms, disorganized thoughts, and bizarre behavior.

During the PIP admission, the patient was diagnosed with Schizoaffective Disorder, Bipolar Type, and treated with antipsychotic, mood stabilizing, and antidepressant medications. A suicide risk evaluation, completed upon admission, assessed the patient's chronic and acute suicide risk as low.

Intermediate care treatment plans targeted only the patient's depressed mood, despite the referring facility's request to address psychotic symptoms, substance use, and treatment non-compliance during admission.  The IDTT's proposed treatment interventions were limited to the recreation therapist offering support and providing a calendar to track exercise activities. There were no interventions assigned to the primary clinician.  Additionally, treatment plans did not address barriers to the patient's LRH of multi-person cell (MPC).  The LRH justification sections of each treatment plan during admission included the same copied and pasted statement indicating the patient was "new to the unit as of 3/5/21."

The primary clinician did not complete their initial assessment prior to the initial IDTT or offer routine primary clinician contacts "once a week" as indicated in IDTT treatment plans throughout the current admission.  After arriving to the PIP in March 2021, there were no primary clinician contacts offered between March 17, 2021 and June 8, 2021, and it was the patient who initiated the June 8, 2021 contact.  After June 8, the primary clinician typically followed up every two weeks; although there was another significant gap between contacts from August 11, 2021 through October 8, 2021.  When routine primary clinician contacts were offered, they typically occurred at cell-front, either as a result of patient refusals or due to unit quarantine status.  While psychiatry met with the patient more often than the primary clinician, routine psychiatry encounters also did not occur "every 7 days" as documented in treatment plans.

On August 26, 2021, the IDTT's rationale for retaining the patient in intermediate care was, "[The patient] has yet to fully engage consistently in both groups and individual sessions due to unit being on CTQ over multiple times."  Although treatment participation did not improve after this IDTT, and routine primary clinician contacts were not offered between August 26 and October 8, 2021, the IDTT documented a plan to discharge the patient less than one month later on September 23, 2021.  Clinical rationales for discharge and level of care were not documented on this date.

The patient discharged to EOP level of care on October 21, 2021.  Discharge documentation indicated the patient was "minimally engaged in treatment overall," but "attends to his ADLs without prompting," "kept his cell adequately cleaned," and "can appropriately respond to staff's directions."  However, none of the three perceived discharge achievements were relevant to this patient or the referring institution's treatment outcome expectations.

Findings

The care provided to this intermediate care patient at CHCF-PIP was inadequate.  Mental health treatment appeared to be limited to medication management and occasional participation in recreation therapy groups.  The primary clinician was minimally involved in this patient's care throughout the admission, as evidenced by the low frequency of primary clinician contacts, high frequency of non-confidential primary clinician contacts, and the lack of therapeutic interventions assigned to and implemented by the PC.  The primary clinician also failed to complete their initial assessment of the patient timely, and they did not develop an adequate treatment plan during admission.  Treatment plans did not address barriers to the patient's LRH and the LRH justification sections of each treatment plan during admission included the same copied and pasted statement.  IDTT treatment plans and discharge rationales failed to address

this patient's specific treatment needs, despite the referring facility offering clear and useful recommendations prior to admission. Lastly, the SRASHE completed in March 2021 appeared to underestimate the patient's chronic suicide risk.

**Patient S**

This 28-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at CHCF-PIP. The patient was admitted to the intermediate care program in September 2020. His psychiatric diagnoses were Adjustment Disorder and Antisocial Personality Disorder. No psychiatric medications were prescribed. The patient had a developmental disability code of DD2 and an LRH of multi-person cell (MPC). A SRASHE completed on September 22, 2020 assessed the patient's acute and chronic suicide risk as low.

During intermediate care admission, the patient exhibited high impulsivity, difficulty following instructions, anxiety, suicidal ideation, and concerns for his safety. Suicide watch was ordered on multiple occasions in response to suicidal statements; although the patient admitted several times that he preferred 1:1 observation to keep himself "out of trouble."

The patient regularly participated in individual treatment contacts and groups when offered, although he remained in SOLO programming throughout most of the admission.

IDTT clinical summaries offered useful updates on current symptoms, functioning, and response to treatment. The intermediate care treatment plan initially included only one mental health IPOC for self-harm; however, it was subsequently modified to address the patient's anger with cognitive behavior therapy in July 2021. LRH readiness was also discussed during IDTTs. In September 2021, a third IPOC was added for pre-release planning, and the patient began meeting with the pre-release coordinator in preparation for his December 2021 parole date.

Psychiatry typically met with the patient more often than once per week. primary clinician contacts typically occurred weekly; however, for unknown reasons, there were no routine primary clinician contacts offered between July 19, 2021 and August 23, 2021.

On November 9, 2021, the IDTT discharged the patient to EOP level of care, noting he had not been prescribed psychiatric medication and was not "not exhibiting any psychiatric symptoms."

Findings

The overall care provided to this patient at CHCF-PIP was adequate. Treatment efforts appeared to improve after July 2021, and the IDTT clearly documented progress with symptoms and functioning during the months preceding discharge. There were, however, unexplained gaps between primary clinician contacts, despite IDTT treatment plans indicating weekly contacts would occur.

**Patient T**

This 27-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at CHCF-PIP. The patient received treatment in the acute program from June 29, 2021 through November 2, 2021. Prior to the June 2021 admission date,

the patient was depressed, exhibited poor self-care, and intentionally injured himself in response to auditory hallucinations. The referring institution noted that the patient's acute suicide risk was high, that he would not cooperate with safety planning, and that he had "no strong protective factors" to mitigate suicide risk.

While the psychiatrist completed their initial assessment of the patient within 24 hours of admission and prior to the initial IDTT, the primary clinician's initial assessment did not occur until eight days later.

During the acute care admission at CHCF-PIP, the patient was diagnosed with Schizoaffective Disorder, Bipolar Type, and prescribed psychotropic medications for symptoms of anxiety, depression, and psychosis. Psychiatry notes also referenced an active PC 2602 involuntary medication order. Clozapine was prescribed in August 2021, and the patient subsequently exhibited objective improvements in symptoms and functioning.

The acute care treatment plan included one mental health IPOC for grave disability; although interventions for this treatment target were absent, and the accompanying goals were vague and not patient specific. For example, one goal indicated the patient's improved self-care would be measured by "eating meals by the next IDTT interval." However, the goal did not provide a baseline or target number of meals for tracking progress and there was no indication this patient had been refusing meals. In fact, the referring institution noted he was "eating all meals." Additionally, the treatment plan was not revised to address treatment non-compliance or prominent symptoms of depression, anxiety, and psychosis observed during admission.

Nearly all individual contacts with the PC, recreation therapist, and psychiatrist were completed at cell-front due to patient refusals. However, psychiatry and primary clinician contacts often occurred more frequently than planned, and progress notes provided useful information for tracking the patient's symptoms, functioning, and response to treatment over time. The primary clinician also documented meaningful and relevant treatment interventions when the patient did engage in cell-front or confidential contacts during admission.

The patient discharged to intermediate care on November 9, 2021. The discharge SRASHE assessed the patient chronic risk as high and acute risk as moderate. A suicide prevention safety plan was appropriately completed on the date of discharge.

Findings

The overall care provided to the acute care patient at CHCF-PIP appeared adequate. Despite the patient's resistance to engage in treatment, progress notes suggested providers intervened appropriately, monitored the patient frequently, and resolved the more acute concerns prior to discharge. The IDTT also appropriately referred the patient for intermediate care to address ongoing psychiatric concerns prior to outpatient discharge. The SRASHE and safety plan were completed timely and appropriately. However, treatment planning documentation was an area of concern, as IPOCs were not relevant to this patient and important sections of the document were either incorrect or not completed at all.

**Patient U**

This 33-year-old transgender patient was randomly selected for healthcare record review to assess the quality of mental health services provided at CHCF-PIP's acute care program.  Prior to admission, the patient received intermediate treatment at ASH until her discharge to EOP level of care in December 2020.  Due to a staff assault at ASH, the patient was designated MAX custody and placed in a PSU.  In February 2021, the patient was referred from an MHCB to acute care following an incident of self-injurious behavior.  She arrived at CHCF-PIP on or around March 1, 2021 and remained on MAX custody status throughout the admission.  The patient was diagnosed with Schizophrenia, Schizoaffective Disorder, Borderline Personality Disorder, Gender Dysphoria, and Opioid Use Disorder.  She was prescribed Risperidone for psychotic symptoms and Venlafaxine for depressive symptoms.  The patient had engaged in numerous incidents of self-harm during 2020 and 2021; her chronic and acute suicide risk was assessed as high during this admission on July 24, 2021.

Treatment plans for this patient were incomplete.  The IDTT developed only one mental health IPOC for "danger to self," and, initially, the IPOC was assigned to a recreation therapist who was expected to "help the patient improve function" and "provide access to positive coping skill exploration" during recreation therapy encounters.  A substance abuse IPOC was pulled forward from another institution without a renewal date, and it was never removed or updated for the current setting.  In late March 2021, minor adjustments were made to the danger to self IPOC; however, they did not improve the quality or usefulness of the treatment plan, as there were no interventions specific to the goal of reducing self-harm and suicidal ideation.  The patient had expressed a desire to work on auditory hallucinations and depression upon admission, but these targets were never incorporated in the treatment plans.

A review of the primary clinician's progress notes authored between August and November 2021 also did not provide clarification regarding treatment interventions offered during admission.  The clinician's notes either failed to mention treatment interventions or provided a vague statement such as "continue with current treatment plan and meet with [primary clinician] regularly to address her [mental health] needs."

In April 2021, the IDTT noted the patient's "mood has changed for the worse."  The patient was reportedly refusing nearly all medications and not cooperating with clinicians when they approached her cell door.  In May 2021, the IDTT described the patient as "psychotic," "tangential," "condescending," and disorganized.  The patient had recently shaved only the front of her head, while leaving long hair in other places.  She also demanded discharge and "changes to all of her psychotropic medications" during IDTT.  In July 2021, the patient received an RVR for battery on a peace officer and required 1:1 suicide watch after swallowing a razor.  A PC 2602 involuntary medication order was granted around this time. In September 2021, psychiatry continued to describe the patient's psychotic symptoms as "severe" and noted the patient continued to refuse mental health treatment contacts.

In September 2021, the IDTT indicated that the patient would likely be discharged to EOP.  Subsequently, on October 15, 2021, the IDTT completed discharge paperwork indicating the patient was discharging to intermediate care.  However, it appeared the discharge did not occur, as the patient continued to receive acute care through December 2021.  Since clinicians failed to

document level of care justifications throughout the current admission, the reason for the discharge rescission was somewhat unclear.

Findings

The care provided to this acute care patient at CHCF-PIP was inadequate.  While the IDTT appropriately pursued a PC 2602 order in June 2021, treatment plans failed to address several concerns documented during the course of admission, including treatment non-adherence, assaultive behavior, self-care, depressed mood, and psychotic symptoms.  The IDTT also failed to document treatment interventions specific to reducing self-harm and suicidal ideation. Further, it was unclear whether the primary clinician was offering treatment interventions during individual encounters.  Lastly, the IDTT's decision to retain this patient in acute care was never documented during the course of admission, including when there was apparent uncertainty about the discharge level of care and when the discharge was rescinded in October 2021.

**Patient V**

This 43-year-old patient's healthcare record was reviewed to assess the quality of mental health services provided at CHCF-PIP's intermediate care program.  The patient arrived at CHCF-PIP in March 2021 and was housed in a non-MAX custody unit despite his MAX custody status. During a monitoring visit on July 22, 2021, the patient requested to speak with the monitor's expert and reported that he was on a hunger strike due to a lack of mental health treatment for MAX custody patients in his housing unit.  The patient also stated that he had recently engaged in self-harm by cutting.

According to the healthcare record, the patient was diagnosed with Bipolar I Disorder and Antisocial Personality Disorder.  He was prescribed Cymbalta, Benadryl, and Ativan. Psychiatric symptoms documented during admission included feelings of hopelessness and helplessness, suicidal ideation, self-injurious behavior, auditory hallucinations, depressed and labile mood, agitation and anger, poor sleep, impulsivity, and impaired concentration and memory.  The patient also suffered a traumatic brain injury (TBI) in 2003 and was being monitored for a spinal infection, chronic physical pain, and seizures.  He required a wheelchair or cane for mobility.

IDTT documentation suggested the patient's TBI resulted in ongoing problems with impulse control, emotion regulation, distress tolerance, response inhibition, and memory and concentration.  A recent suicide risk evaluation also indicated his TBI led to concrete thinking and "impairments in controlling and directing his behavior."

The treatment plan included only one mental health IPOC for depressed mood.  The accompanying intervention was unrelated to the treatment target, and documented goals were unrealistic for this patient.  Subsequent treatment plans were not appropriately modified to address concerns documented during the PIP admission, including suicidal ideation, self-harm, destruction of property, anger, grief, and medication refusals.

While the frequency of psychiatry contacts remained in compliance with the IDTT treatment plan during admission, treatment groups and primary clinician contacts deviated consistently. The IDTT repeatedly documented that the patient would be offered 10 hours of weekly treatment

groups; however, the patient only received occasional recreation therapy activities at cell-front. Despite treatment plans indicating primary clinician contacts would be offered weekly, records suggested they typically occurred every two weeks. The primary clinician's progress notes did not provide clarification regarding treatment interventions offered during individual encounters, which were primarily completed at cell-front. The primary clinician's initial assessment also was not completed prior to the initial IDTT as required.

The patient was maintained on suicide from July 12 through July 20, 2021. During this period, psychiatry noted the patient was very depressed, "not taking meds," experiencing intermittent suicidal ideation, and reporting a "plan to hang himself." On July 19, 2021, the psychiatrist continued to document that the patient was "not doing well," angry, and endorsing suicidal thoughts. However, the nurse's suicide watch documentation during this period indicated the patient had access to items in his cell that were not permitted by current psychiatry orders and that custody staff were aware of the concern.

The most recent suicide risk evaluation indicated the patient had three to nine prior suicide attempts, the most recent of which involved wrist cutting in January 2021. Documentation also referenced self-injurious behavior incidents in January, February, and July 2021. However, the IDTT documentation incorrectly stated that the patient's acute suicide risk was low, despite the presence of multiple acute risk factors and contrary documentation during admission.

Findings

The care provided to this MAX custody intermediate care patient at CHCF-PIP was inadequate. This record review confirmed the patient was not receiving mental health treatment beyond medication management in his housing unit. Primary clinician contacts and treatment groups were not offered in accordance with the IDTT's treatment plan. Treatment plans were not appropriately modified to address serious concerns documented during the course of admission, including medication non-adherence, RVR behaviors, suicidal ideation, and self-harm. Psychiatry orders regarding allowable items during 1:1 suicide watch observation were not followed. The primary clinician did not appear to offer interventions to address suicide risk and self-harming behaviors during individual encounters, and the IDTT documentation underestimated the patient's acute suicide risk as low. Lastly, the treatment team also should have considered a referral for neuropsychological testing and diagnostic clarification due to conflicting documentation regarding the impact of the patient's traumatic brain injury on his behavior and symptoms.

**Patient W**

This 53-year-old MAX custody patient was randomly selected for healthcare record review to assess the quality of mental health services provided at CHCF-PIP. The patient transferred from RJD's MHCB to CHCF-PIP's acute care program on June 22, 2021 to address grave disability concerns. The patient was admitted to the referring institution's MHCB from 3CMS level of care, at which time he was described as unkempt, hopeless, helpless, medication non-adherent, and passively suicidal. The patient had at least three self-reported suicide attempts in his lifetime, the most recent of which occurred in 2011. A petition for an involuntary medication order was granted two weeks prior to the acute admission at CHCF-PIP. The patient was

subsequently prescribed mood stabilizing and injectable antipsychotic medication.  His psychiatric diagnoses were Schizoaffective Disorder, Depressive Type, Major Depressive Disorder, Single Episode, and Cocaine Abuse.

Despite grave disability concerns documented by the referring facility, the primary clinician at CHCF-PIP described the patient as "currently stable" upon admission.  The clinician further noted the patient had been attending to his activities of daily living, reporting "doing well," compliant with medication, and denying thoughts of suicide.

The IDTT developed one mental health IPOC for grave disability.  The accompanying treatment goals were to "decrease grave disability – rated as a 4 or below," "decrease [suicidal ideation] rating to 2 or below," and "attend at least 70% of treatment by 30 days."  However, the IDTT failed to document treatment interventions and baseline ratings for grave disability and suicidal ideation to track progress in a meaningful way.  Further, the primary clinician's initial assessment suggested the goals for grave disability and suicidal ideation had already been achieved.

The psychiatrist and primary clinician completed their initial assessments prior to the initial IDTT.  The treatment plan indicated the psychiatrist would follow up every 72 hours and the primary clinician would follow up weekly.  While psychiatry contacts generally occurred as planned, there were at least two occurrences where the primary clinician followed up at two-week intervals.  The primary clinician's progress notes suggested all routine primary clinician contacts completed during admission were limited to brief check-ins without treatment interventions or psychoeducation.

The patient did not have access to treatment groups in the acute program.  The healthcare record suggested MAX custody patients were only offered cell-front activities in the unit.  Although the patient participated in in-cell activities in June and July 2021, he refused all activities during the month of August 2021.  The IDTT noted on August 4, 2021 that the patient was stressed, disturbed, bored, and frustrated due to the lack of treatment and programming in the acute care program.

One covering clinician completed the level of care rationale section to justify retaining the patient in acute care on July 8, 2021.  After this date, the level of care rationales were either not completed or inaccurately stated "[not applicable]."

On September 22, 2021, the patient discharged to EOP level of care.  During the discharge IDTT the patient stated, "I'm looking forward to getting more treatment at EOP."  The discharge SRASHE assessed his chronic suicide risk as high and his acute risk as moderate. A suicide prevention safety plan was completed.

Findings

The care provided to this MAX custody patient in the acute care program at CHCF-PIP was inadequate.  During the three-month admission, treatment was limited to medication management, in-cell materials, and brief check-ins.  Group treatment and psychotherapy were not provided.  The treatment team never developed an adequate treatment plan with interventions and relevant goals.  Documentation suggested the patient had already achieved two of three

IDTT treatment goals prior to arrival, and the goal of participating in 70 percent of offered treatment for 30 days was achieved after the first month.  However, treatment plans were never modified to meet the patient's current needs, and the IDTT failed to justify their decision to retain the patient in the highly restrictive acute care program after July 8, 2021.

**Patient X**

This 48-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care at CHCF-PIP.  The patient was initially admitted to CHCF-PIP's acute program in March 2019.  He subsequently transferred to the PIP's intermediate program in October 2019.  The patient had a developmental disability code of DD2 and he was diagnosed with Major Depressive Disorder and Antisocial Personality Disorder.  Psychiatry prescribed Lexapro and Duloxetine during admission.  The most recent suicide risk evaluation, completed in 2019, assessed the patient's chronic and acute suicide risk as high.  The patient was in a single cell with an LRH of multi-person cell (MPC).

Prior to March 2021, IDTT treatment plans targeted suicidal ideation, self-harming behaviors, and group treatment non-compliance.  Documented interventions included providing in-cell materials and encouraging the patient to "verbalize treatment concerns with staff."  In March 2021, an IPOC was added to target general treatment non-adherence.  However, despite psychiatry documenting depression, grief, and behavior issues resulting in RVRs during admission, these concerns were not addressed in the IDTT treatment plans.

While psychiatry contacts were generally offered in accordance with IDTT treatment plans, the frequency of primary clinician contacts deviated significantly.  Treatment plan consistently indicated primary clinician contacts would be offered weekly; however, the healthcare record suggested these contacts often occurred every three to four weeks.  Most concerning was the lack of routine primary clinician contacts during a three-month period between April 9 and July 9, 2021.

During a cell-front primary clinician encounter on April 9, 2021, the clinician was unable to assess the patient's mental status due to the patient's lack of responsiveness.  While the clinician noted they would share the bizarre behaviors observed on this date with the IDTT, there was no discussion mentioned in IDTT documentation and no follow up primary clinician contact for three months.  During the subsequent encounter on July 9, 2021, a primary clinician informed the patient at cell-front that the IDTT planned to transfer him to his LRH of multi-person cell.  The patient subsequently "gassed" a nurse and was placed on suicide watch after reporting suicidal ideation with a plan to hang himself.  Documentation around this time suggested the patient was attempting to avoid transfer to his LRH by acting out.

IDTT documentation indicated that, although the patient remained medication adherent and attended to his activities of daily living (ADLs) during admission, treatment progress was "difficult to ascertain" as a result of his refusal to leave the cell.  The patient did not participate in mental health treatment or other programming at all during 2021.  He also refused to participate in IDTTs and in-cell activities.  However, IDTT did not indicate the underlying reason for the refusals or modify their ineffective treatment approach after March 2021.

In October 2021, clinicians documented objective signs of improvement, including that the patient "remains happy/content in his room."  During this month, the IDTT discussed plans to discharge the patient to EOP level of care.  However, as of December 1, 2021, the patient remained in intermediate care at CHCF-PIP.

Findings

The care provided to this intermediate care patient at CHCF-PIP was inadequate and seemingly limited to medication management.  Treatment plans proved to be ineffective, and they were not modified in response to the patient's lack of progress or to address new concerns documented during admission (e.g., depression, grief, and RVR behaviors).  The IDTT should have considered a functional behavior assessment and a behavior plan with incentives to address the refusals and other behavior concerns noted during admission.  The frequency of primary clinician contacts conflicted with the IDTT's planned frequency throughout the admission.

**APPENDIX B4**
**SVSP-PIP**
**August 23, 2021 – August 25, 2021**

**Patient A**

This 40-year-old patient was admitted to ICF level of care from acute on June 28, 2019.  Clinical documentation indicated an extensive history of serious mental illness and a pattern of medication non-compliance that resulted in decompensation.  While there was no diagnosis in the official place of record, diagnoses varied including schizoaffective disorder and antisocial personality disorder with consideration for obsessive compulsive disorder.  He was prescribed antipsychotics and a mood stabilizer under PC 2602.  For reasons that were unclear the PC 2602 briefly lapsed in mid-August 2021.  His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.  At the time of the review, he was housed on TC1.

Reviewed treatment plans indicated that documentation was virtually unchanged and offered little information regarding current symptoms, functional impairment and response to treatment.  In addition, select documentation was copied from a previous provider, but the original author and date was unknown.  Treatment goals identified by mental health were not in alignment with treatment outcome expectations and for reasons that were unclear, focused on a reduction in depression despite his primary issue being documented psychosis in provider routine contacts.

Overall, in contrast to psychiatric documentation, primary clinician documentation generally described him as psychotic.  Interventions to address his treatment needs and pattern of refusals, other than encouragement to attend, were not documented.

Of note, some routine provider documentation (June 8th, July 20th and July 27th, 2021) had insufficient content including no mental status exam.

Findings

This patient's care was inadequate.  The lapse in the PC 2602 was of significant concern.  Treatment planning documentation was deficient, and his treatment needs were not adequately addressed in the treatment plan or routine contacts.  Varying provider assessments regarding his clinical presentation warranted discussion in the treatment plan.  Interventions to increase treatment engagement were needed but not documented.  A behavior plan could have been useful.  Diagnostic clarification was needed.

**Patient B**

This 38-year-old patient was housed on TC1 at the PIP where he was admitted for psychiatric treatment on March 16, 2020.  Diagnosis varied by location but included affective psychosis, schizoaffective disorder, unspecified mood disorder and anxiety disorder.  He was prescribed a mood stabilizer and an injectable antipsychotic.  His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

Documentation indicated a long history of psychosis, self-injurious behavior (insertion and ingestion) and aggressive behavior.  He was briefly discharged from the PIP on April 12, 2021 due to a need for surgery in mid-April 2021 after swallowing a pen filler and returned six days later.  Upon his return, an initial psychiatric assessment was completed but lacked recent clinical

information such as context of the recent foreign body ingestion.  No initial primary clinician assessment was located.

Treatment planning documentation was virtually unchanged and offered little information regarding current symptoms, functional impairment and response to treatment.  Relatedly, it appeared that select information was copied from a previous provider, but the original author and date was unknown and there was no indication that this information was copied other than it appeared outdated to the reader.  IPOCs appropriately addressed self-harm behavior, impulsivity, and foreign body ingestion but rationale for selected goals was unclear.  Interventions included self-monitoring, cognitive-behavioral interventions and utilization of empathy to foster a therapeutic alliance.

There was conflicting documentation in completed SRASHEs regarding his most recent self-harm behavior.  Specifically, in the April 20, 2021 SRASHE it was documented that his last incident of self-harm behavior occurred on April 15, 2020, but in another section it was documented that the most recent incident occurred in early April 2021.  A safety plan was clinically indicated for this patient but was not completed until a subsequent SRASHE (June 21, 2021) due to the ingestion of three spoons.  Despite the ingestion that prompted the completion of the SRASHE, documentation indicated this his most recent self-harm incident occurred on February 28, 2021.  Risk assessment was likely underestimated in the April SRASHE but appropriately updated in the June SRASHE.

With the exception of several primary clinician contacts in confidential settings, the majority of this patient's clinical contacts occurred cell-front.  At times, cell-front contacts were documented by the psychiatrist as due to his impulsivity but treatment interventions to address impulsivity were not clearly documented.  Overall, documentation in routine contacts was brief and provided very little detail regarding interventions, when provided.  There was documentation of incidents of spitting at staff, including the psychiatrist, kicking staff, ingestions and suicide watches.  However, information that would have been useful in treatment planning such as frequency, context or precipitants was not included.  Access to items he was prone to ingesting were restricted but were not routinely assessed.  Lastly, there was documentation that psychological testing would be useful (May 13, 2021) but it was not pursued; the rationale was unclear but it appears that it was not pursued due to prior refusals; despite the documented clinical utility of psychological testing, further attempts to engage him were not located.

There was documentation that he wanted to attend group treatment but that officers did not escort him.  There was no documentation of follow-up on this or attempts to ensure group contact.  A review of group documentation indicated a pattern of no shows with no follow up contact by the group leader.  When he did attend, documentation was insufficient to determine content.

Findings

This patient's care was inadequate.  Overall, documentation was insufficient to assist with treatment planning and continuity of care. Clear implementation of treatment interventions for this patient's pattern of refusals and prolonged self-injurious, impulsivity and aggressive behavior were lacking.  A functional behavioral analysis and behavior management plan was

needed.  Diagnostic clarification and follow-up on lack of escort to group treatment were warranted.

**Patient C**

This 44-year-old patient was admitted to ICF level of care on April 1, 2020.  He was diagnosed with major depressive disorder, post-traumatic stress disorder and antisocial personality disorder.  He was prescribed antidepressants.  His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.  At the time of the review he was housed on TC1.

Updates to treatment plans documented his overall functioning and stressors needed improvement regarding current symptoms, functional impairment and response to treatment, including specific assessment toward goals which addressed depressed mood and danger to self.  Interventions included utilization of empathy and cognitive-behavioral skills.

After a period of stability and an increase in antisocial behaviors he was assessed as having met discharge criteria and was informed of this without sufficient time to process the transition, particularly given his trauma history and overly lengthy hospitalization at the PIP.  Subsequently, he presented as distressed and decompensated.  Multiple SRASHEs were completed in July 2021 due to reports of self-harm behavior.  Documentation was thoughtful and comprehensive, and the safety plan was specific and individualized.  He was consistently assessed as high chronic and low acute risk.  While the rationale was thorough, acute risk was likely underestimated as his proclivity toward substance use and suspected access to substances was not considered.

Overall, routine primary clinician and psychiatric contacts included sufficient clinician documentation and interventions.  However, during the month of July when he presented as distressed regarding discharge, clearer interventions to assist him with the transition were needed.

The patient was found unresponsive on August 6, 2021 and treated at an outside hospital for two days for an intentional overdose before returning to the PIP.  The initial psychiatric assessment described it as a "serious" overdose.  Documentation indicated that the suicide attempt was not due to a mental illness, but an attempt to thwart his discharge to EOP.  Prior to his discharge to EOP on August 26, 2021, clinical interventions to address his distress regarding discharge were lacking.

Findings

Prior to discussion of discharge, documentation of this patient's care was adequate.  While the decision to discharge him appeared appropriate and was later supported by a CCAT (August 17, 2021), there was a lack of appropriate transition and discharge planning for this patient, rendering his care inadequate.

**Patient D**

This 32-year-old patient was transferred from another PIP ICF to this institution's ICF level of care on August 16, 2021 and housed on TC 2.  Various diagnoses were in reviewed documents

including several psychotic disorders, and for reasons that were unclear, an adjustment disorder. He was prescribed Haldol and Zyprexa and was under a PC 2602 order. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

The current inpatient admission was for grave disability although specific details regarding impact on functioning were missing. Both the initial psychiatric and primary clinician assessments were inadequate as multiple sections were incomplete and there was no explanation provided. He refused his initial psychiatric assessment, and the majority of documentation was copied from previous providers. Sections from the initial primary clinician assessment were copied from the initial psychiatric assessment. Documentation indicated that he had a long history of psychosis with multiple psychiatric hospitalizations and a pattern of treatment non-compliance.

IDTT documentation was sparse. Individual plans of care appropriately addressed grave disability and treatment non-compliance. However, rationale for specific goals, such as "improve decision making" was unclear. Consistent with documentation he refused the majority of his routine and group contacts. There was no documentation to describe observations of the patient or his cell in refusal documentation. Documentation of the one psychiatric contact he attended provided useful clinical information and rationale for a medication change.

He was assessed as moderate chronic and acute risk on the SRASHE, however clinical rationale was not provided.

Findings

This patient's care was inadequate. Overall, documentation lacked specificity regarding specific symptoms and impact on functioning that would assist with targeted treatment planning and continuity of care. Aggressive treatment interventions to improve treatment compliance were needed. A functional analysis and meaningful incentives were clinically indicated to increase out-of-cell time. Diagnostic clarification was warranted.

**Patient E**

This 42-year-old patient was admitted to ICF level of care on July 7, 2021 from the MHCB after decompensating in short-term restricted housing. Treatment outcome expectations were focused on anxiety, distress tolerance and coping skills for aggressive behavior. There was no diagnosis documented in the official place of record or initial primary clinician assessment. Diagnoses located in the psychiatric documentation included schizophrenia and major depressive disorder. He was prescribed Haldol and Wellbutrin. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care. At the time of the review he was housed on TC2.

Completed sections of the initial psychiatric assessment provided clinically useful information, but some pertinent sections were left blank. Documentation in the initial primary clinician assessment was in need of improvement. Specifically, the presenting problem only stated that he was "struggling with AH [auditory hallucinations]" and there was no current information regarding symptoms or functional impairment in the clinical summary and case formulation

section which was not updated appropriately. This same content was copied into documentation for the next three IDTTs.

Rationale for IPOCs and related goals was unknown. Specifically, despite no documentation in initial assessments of delusions, an IPOC for delusions was implemented. An IPOC of danger to self was implemented with a goal to be free from self-harm for one week despite no recent suicidal ideation or self-harm behavior. An additional IPOC for danger to others with a goal to be free from explosive episodes for one week was also documented despite no recent aggressive behavior. The one established IPOC that was in alignment with established treatment outcome expectations addressed anxiety, however, the goal to attend one group was unrealistic as it was also documented that he was unable to attend group due to MAX status.

Routine primary clinician and psychiatric contacts described him as stable. Psychiatric treatment focused on auditory hallucinations and depression. Content was variable ranging from thorough to minimally useful clinical information. At times, mental status was not provided or was insufficient, (e.g. "pleasant and relaxed"). Primary clinician documentation only included a mental status update with no documentation on functioning or treatment interventions.

Findings

This patient's care was inadequate. Documentation was insufficient for appropriate continuity of care. Treatment planning was not individualized; treatment interventions were limited to psychiatric medications and there was insufficient documentation to support the IPOCs in the record.

**Patient F**

This 41-year-old patient was admitted to the PIP after a suicide attempt. He was prescribed Wellbutrin, Trileptal and Zyprexa. There were multiple diagnoses that varied by provider and warranted clarification including bipolar disorder and personality disorders (anti-social and borderline). His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

His least restricted housing was unlocked dorm but he was housed in a multiperson cell. IRU documentation prior to facility admission on May 18, 2021 indicated that he was ineligible for his LRH due to receiving medication assisted therapy (MAT) for his opioid cravings. The IRU recommended locked dorms. The only time this rationale was reflected in PIP provider documentation was in a June 11, 2021 primary clinician note.

Overall, documentation regarding justification for housing placement out of his LRH varied and was unclear and inconsistent with the IRU rationale that MAT participation prevented a transfer to unlocked dorms. At his initial IDTT and two subsequent IDTTs, he was recommended for locked dorms with the justification that he was unable to negotiate the complexities of LRH due to functional capacity however, further explanation for the deferred transfer was incomplete. During July 21st and August 19th, 2021 IDTTs, documentation recommended multi-person cell again due to inability to negotiate complexities of LRH. However, this rationale was selected from the various options because "No check boxes above apply checked due to needing to pick an option. HCPOP referral due to enemy concerns at LD [locked dorm]. Team feels I/P [inmate

patient] is ready for D/C [discharge] and I/P does not need further care at ICF/ULD [unlocked dorm]."

Routine provider notes also varied regarding justification. Some psychiatric documentation indicated that because the facility did not have an unlocked dorm, he was housed in a multi person cell. Primary clinician documentation in early July 2021 indicated that a transfer to his LRH was not clinically appropriate as he was in the beginning process of discharge although documentation of discharge was not clearly documented. Regardless of the varied justifications, there was no documentation specifying what precluded a transfer to unlocked dorms, nor were treatment goals or interventions to assist with the transfer documented.

Findings

Overall, documentation regarding LRH was inadequate. Documentation regarding justification for housing placement out of his LRH varied and was unclear and inconsistent. The lack of clarity by providers regarding this patient's LRH and lack of consideration for IRU rationale suggested a lack of understanding of LRH; notably mental health staff did not document what specifically precluded the patient's transfer to his LRH.

**Patient G**

This 48-year-old patient was diagnosed with major depression with psychosis; amphetamine type use disorder and opioid use disorder. He was prescribed antianxiety, antipsychotic and antidepressant medications with which he was compliant. His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

Documentation beginning with his June 21, 2021 treatment plan indicated least restricted housing was locked dorms but due to anxiety and paranoia when housed with more than one cellmate, a multi-person cell was recommended. A measurable goal to reduce anxiety was implemented but a clear intervention was not identified. With the exception of psychiatric utilization of motivational interviewing for two contacts following the June 21, 2021 IDTT, routine provider contacts indicated that least restrictive housing was rarely addressed. Of note, psychiatric documentation from August 10th and 17th, 2021 when LRH was addressed was unchanged

Findings

Treatment to address LRH was on the right track and assessed as adequate but marginal because a clear intervention to reduce anxiety was not identified nor implemented.

**Patient H**

This 42-year-old patient was diagnosed with schizophrenia. He was prescribed Clozapine, Cogentin and Zoloft. His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

For several months, his least restricted housing was multiperson cell, however he was housed in a single cell due to polydipsia (excessive water intake) that required monitoring of his water

intake.  Treatment goals were developed to address his polydipsia (gain insight and manage independently) and reluctance to live with peers.  However, treatment interventions to address polydipsia, which was one of the barriers to transfer to his LRH were not documented in treatment planning or routine contacts.

Findings

Treatment to address LRH was inadequate.  While it was promising that a goal to address polydipsia, which prevented transfer to his LRH was developed, the goal was not measurable and clear documentation of baseline and ongoing frequency to monitor change were not documented.

**Patient I**

This 57-year-old patient was diagnosed with schizophrenia.  Symptoms included auditory and visual hallucinations, paranoia, and disorganization.  He refused psychiatric medication and was being monitored for consideration for PC 2602 order.  Rationale for why he did not meet criteria for PC 2602 was not documented.  His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.

His least restricted housing was unlocked dorms, but he was housed in a single cell due to agitation and disruptive behavior.  Additional explanation was not provided.  Goals to assist with transfer to LRH included a reduction in irritability, improved emotional regulation and for reasons that were not clearly documented, a reduction in self-harm.  Routine provider contacts did not include identified (or other) treatment interventions to facilitate a LRH transfer.

Findings

Documentation regarding the care provided to this patient was inadequate; goals to address psychotic symptoms and medication adherence which contributed to his irritability were not identified.  In addition to deficits identified above, there was insufficient explanation for his single cell housing, and treatment interventions to facilitate his transfer to his LRH were not identified.

**Patient J**

This 52-year-old patient was admitted to the facility on October 29, 2019.  He had a long history of serious mental illness with PIP admissions dating back to 2012 during previous prison terms.  He was diagnosed with schizophrenia and prescribed antipsychotic, antianxiety and mood stabilizing medications.  His healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing.  A roster provided by CDCR indicated that his LRH was multiperson cell and that he was housed in a single cell.

Clinical documentation indicted that his LRH has historically been multiperson cell.  Although not routinely or clearly articulated, he was housed in a single cell due to severe psychosis and polydipsia (excessive water intake) that required restriction and monitoring of his water intake.  Due to an approaching ERPD and assessment as an offender with a mental health disorder (OMHD) the IRU recommended that he be referred to the unlocked dorms at Atascadero State Hospital (ASH) to assist with discharge planning.  The referral was rescinded as he was assessed

by ASH as not clinically appropriate due to ongoing psychosis and repetitive disruptive behavior with which IRU agreed.

Documentation regarding LRH following the recission was unclear.  According to IDTT documentation (July 15, 2021 and August 11, 2021) his LRH remained unlocked dorms.  However, inconsistent with his treatment plan, primary clinician documentation (August 12th and 19th) indicated that his LRH was multi-person cell and he remained housed in a single cell.  At the time of these contacts, a trial without water restriction was being attempted but no status update was provided.

Regardless, of the discrepancy in LRH documentation, similar to treatment planning prior to the ASH referral, there were no mental health provider goals in treatment plans or routine provider contacts to address symptoms that precluded LRH transfer (psychosis, disruptive behavior and polydipsia).

<u>Findings</u>

Treatment to address LRH was inadequate and documentation regarding LRH after the DSH recission was unclear.  There were no goals in treatment plans or routine provider contacts to address symptoms that precluded LRH transfer (psychosis, disruptive behavior and polydipsia).  Of note, his primary clinician was documented as a "psych intern"; credentials of the primary clinician were unclear, and no supervisory co-signature was located.  Additional areas of significant concern were delays in primary clinician contacts and inconsistent documentation in the record.

**Patient K**

This 43-year-old MAX custody patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SVSP-PIP.  The patient transferred from CSP/Sac's PSU to SVSP-PIP's intermediate care program on August 18, 2021.  Concerns documented prior to the PIP admission included multiple MHCB admissions, elevated self-harm risk, isolation, refusal to program and engage in treatment, decompensation, command auditory hallucinations, confusion, agitation, medication non-compliance, and paranoid delusions that resulted in fear of leaving his cell.  The patient's psychiatric diagnoses were Schizoaffective Disorder, Bipolar Disorder, and Antisocial Personality Disorder.  Psychiatric medications included Trileptal, Thorazine, Benadryl, Effexor, Zyprexa, propranolol, and Vistaril.  The patient's most recent involuntary medication order had expired in March 2021, and subsequent psychiatric providers determined the patient no longer met PC 2602 criteria.

During intermediate care admission, the patient presented as agitated, disruptive, and anxious.  He continued to refuse treatment and programming, submitted at least two healthcare grievances, received three RVRs, and repeatedly requested discharge from SVSP-PIP due to frustration with medical and custody staff.  RVRs issued during PIP admission were for battery on a peace officer, battery on a non-prisoner, and delaying a peace officer.  Clinicians at SVSP-PIP determined the patient's psychiatric symptoms did not influence his behaviors resulting in the three RVRs.

The IDTT treatment plan was not developed until one month after admission and one day prior to discharge on September 15, 2021. As such, the plan was not implemented during admission.

While psychiatry contacts were compliant with licensing requirements, the patient received only two routine primary clinician contacts at cell-front during the course of admission. The other two primary clinician contacts were used for intake assessment on August 19, 2021 and discharge paperwork on September 16, 2021. There were no treatment interventions offered during the two routine primary clinician cell-front encounters. The plan section of the PC's progress notes only stated that they would "continue to conduct wellness checks on this patient"; however, there was no documented rationale for the non-confidential contacts.

During a cell-front encounter on August 21, 2021, the treating psychiatrist described the patient as agitated, and noted that the interview was pre-maturely terminated after the patient stated, "You are making me scared…you are a scary person…you should not have come to my door." On September 8, 2021, the patient presented as highly anxious during a cell-front psychiatry encounter and pleaded to be discharged.

The discharge rationale section on September 15, 2021 stated only that the "Patient will be discharged." Discharge documentation, dated September 16, 2021, indicated the patient participated in IDTT and individual contacts, remained compliant with medication, and had not exhibited paranoia during admission. The discharge summary further indicated the patient was dissatisfied with staff, "no longer interested in receiving care [at SVSP-PIP]," and "most likely has Antisocial personality Disorder instead of a chronic, severe mental illness." The psychiatrist's discharge summary, dated September 16, 2021, noted the patient refused to program in the PIP, "gassed [custody officers] and held the food port hostage on multiple occasions," and repeatedly requested discharge due to nursing "not bringing him diapers and extra food."

The patient discharged to EOP level of care less than one month after PIP admission, and he was returned to the PSU at CSP/Sac on or around September 16, 2021.

Findings

The care provided to this MAX custody intermediate care patient at SVSP-PIP was inadequate. The mental health treatment was seemingly limited to medication management and two primary clinician cell-front wellness checks. The treatment plan was not developed timely. The primary clinician did not document treatment interventions during cell-front encounters or write a justification for the non-confidential contacts. Treatment efforts should have addressed the patient's interpersonal problems with staff and the behaviors that resulted in three RVRs during admission. Additionally, the level of care rationales and statements about the patient's diagnosis at discharge were not sufficiently justified.

**Patient L**

This 50-year-old MAX custody patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SVSP-PIP. The patient transferred from CSP/Sac's PSU to SVSP-PIP's intermediate care program on July 6, 2021 with a request for diagnostic clarification. The referring institution noted the patient presented with "repetitive

obsessive paranoid and persecutory delusions." Referring clinicians also indicated the patient's paranoid delusions resulted in refusal of mental health treatment, assaultive behavior toward custody staff, and a lack of cooperation with medical staff. The patient's psychiatric diagnoses were Schizophrenia, Paranoid Type, and Antisocial Personality Disorder.

During intermediate care admission, the patient continued to present with paranoia and reported concerns that custody and other staff were poisoning his food. Mental health staff described the patient as "reclusive to his cell" and "relatively prolific" in writing CDCR Form 602s related to food tampering. The patient refused psychiatric medication and all mental health services, asserting that he did not suffer from a mental illness.

The IDTT treatment plan was not developed until almost one month after admission on August 2, 2021. The one mental health IPOC targeted delusions and included a goal of reducing feelings of distress to eight or below. However, there was no baseline measure included to track progress, and treatment interventions were absent. On September 23, 2021, a psychology intern removed the IPOC for delusions, despite psychiatry documenting ongoing concerns regarding food tampering delusions. Additionally, there were no IPOCs developed to address the patient's treatment and medication refusals. IDTT clinical summaries were not modified to include updates on current symptoms and functioning, and the section of the treatment plan that required an explanation for retaining the patient in his current level of care was never completed.

All psychiatry and primary clinician contacts were completed at cell-front due to refusals. There was no evidence of therapeutic interventions offered during any of the primary clinician's cell-front encounters, including attempts to encourage participation in treatment. The primary clinician began noting "currently prescribed psych meds" in progress notes after August 2021; however, there were no psychiatric medications prescribed.

The quality of psychiatry notes improved following a change in providers on September 13, 2021. The new psychiatrist documented diagnostic rule outs for Paranoid Personality Disorder, Bipolar Disorder, Substance Induced Psychotic Disorder, and Malingering. However, there was no documentation of efforts to resolve diagnostic uncertainties or apparent diagnostic disagreements with the primary clinician, which were necessary for adequate treatment planning and level of care decisions.

As of October 4, 2021, the patient remained in intermediate care at SVSP-PIP with no evidence of progress or changes in presentation, no modification of treatment plans, and no attempts to resolve diagnostic disagreements.

Findings

The care provided to this MAX custody patient in intermediate care was inadequate. Treatment teams never attempted to resolve diagnostic uncertainties, despite CSP/Sac requesting diagnostic clarification in their initial referral. Treatment plans failed to address concerns documented throughout admission, including refusal of medication, lack of participation in treatment, mood symptoms, and paranoid ideation. Clinical summaries were never updated, and level of care rationales were not documented. Lastly, the primary clinician's interventions were limited to

442

cell-front wellness checks without therapeutic interventions aimed at building trust and rapport and increasing treatment participation.

**Patient M**

This 55- year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SVSP-PIP. The patient was initially admitted to SVSP-PIP on April 15, 2020 due to "continuously deteriorating symptoms" and "inability to maintain at EOP [level of care]."

The patient's psychiatric diagnoses were Bipolar Disorder and Antisocial Personality Disorder. Symptoms observed during the course of the PIP admission included grandiose delusions, mania, disorganized thoughts and speech, auditory and visual hallucinations, difficulty managing activities of daily living, and poor reality testing. However, while providers' clinical progress notes described the patient as manic and psychotic, IDTT case conceptualizations repeatedly stated, "He seems to seek constant entertainment and is likely very easily bored which results in behavior that may at times look manic or delusional." The patient's psychiatric medications included lithium for mood stabilization, Buspar and Hydroxyzine for anxiety, Olanzapine for mood stabilization and psychosis, and Mirtazapine for depression.

Treatment plans did not include planned interventions and they did not sufficiently target the patient's primary problems. The treatment plans also had not been updated in the last seven months. While there were no significant concerns specific to medication and psychiatric care, it was unclear what the primary clinician was offering during their individual contacts. The primary clinician routinely copied and pasted a vague statement indicating the patient was being monitored and "encouraged to use appropriate coping skills when he is experiencing challenges." However, there were no interventions specific to cell maintenance, hygiene, and management of mood and psychotic symptoms. The patient's response to treatment efforts also was not documented.

The IDTT clinical summaries contained the same copied and pasted information for eight months, which resulted in misleading statements about the patient's current presentation. For example, the summary consistently stated, "[the patient] has been observed in the past 2 weeks searching the trash and at times eating food he finds there." The IDTT documentation did not include level of care justifications and updates on current symptoms, functioning, and treatment response.

Additionally, a review of IDTT records revealed nursing had been absent during seven consecutive treatment team meetings between February and July 2021. On January 27, 2021, a CNA attended to represent nursing.

Findings

The care and clinical documentation for this SVSP-PIP patient were inadequate. In general, SVSP-PIP clinicians' practice of copying and pasting critical patient information made it very difficult to determine whether the patient was progressing in treatment and whether he was at the appropriate level of care. The level of care justification sections also were not completed during intermediate care admission. The case formulations conflicted with the IDTT's diagnoses and

providers' progress notes; however, there were no documented attempts to resolve diagnostic uncertainties for effective treatment planning. The existing treatment plan was ineffective and not modified over time to target the patient's presenting problems and include interventions. Lastly, the primary clinician's progress notes did not clarify whether treatment efforts were specifically targeting concerns noted during admission and whether the patient was responding positively to interventions that may have been implemented.

**Patient N**

This 39-year-old MAX custody patient was randomly selected for healthcare record review to assess the quality of intermediate care services provided at SVSP-PIP. The patient was initially admitted to CHCF-PIP for acute care in March 2020. He subsequently transferred from CHCF-PIP's intermediate program to SVSP-PIP on March 12, 2021 for further intermediate care in his LRH of locked dorm. The psychiatric diagnoses during admission were Schizoaffective Disorder, Bipolar Type, and "Depression." Psychotropic medications included Zoloft, Zyprexa, and Benadryl. The patient reported a history of 50 or more suicide attempts and numerous self-harm incidents.

An RVR was issued for refusing dorm housing within two weeks of the patient's arrival in the PIP. In July and August 2021, he received RVRs for "behavior that could lead to violence" and battery on a peace officer, which resulted in his MAX custody placement around August 2021.

Following placement in MAX custody, group treatment was no longer offered and the majority of individual treatment contacts were completed at cell-front. Despite the treatment plan including "weekly" primary clinician contacts, routine primary clinician contacts were not offered between July 7, 2021 and August 10, 2021 or between May 19, 2021 and June 3, 2021. In June 2021, the patient submitted a 602 form requesting a different primary clinician and had complained about the frequency of primary clinician contacts around this time.

The various IDTT treatment plans did not include level of care justifications or updates on treatment progress, obstacles, and responses. At times, the level of care justification sections simply stated, "N/A." However, the IDTT did indicate that the patient continued to report symptoms "consistent with severe depressed mood," tended to "isolate and withdraw," "endorsed frequent episodes of [suicidal ideation]," and presented with "selective mutism, hopelessness, and negative ruminations." While the treatment plan was modified to address LRH barriers during admission, there were no additional IPOCs or interventions targeting the patient's depressive symptoms or RVR behaviors. Additionally, despite the patient's MAX custody status preventing him from attending treatment groups in his assigned housing unit, the IDTT treatment plans repeatedly noted that "groups" would be used as an intervention to address LRH and that the patient would be offered 10 hours of weekly treatment groups.

On September 15, 2021, the IDTT determined the patient "met discharge criteria" and was appropriate for EOP level of care and placement in administrative segregation. However, the decrease in level of care was not justified in the clinical documentation. In fact, there was more evidence suggesting the patient was not sufficiently prepared for discharge given he had not met his treatment objectives and had been on suicide watch less than one week prior due to a self-injurious behavior incident. Further, clinical documentation during September 2021 indicated,

"safety cannot be assured at lower [level of care]" and "[patient] remains unstable to be placed in his LRH" and continues to present with depressed mood, frequent episodes of [suicidal ideation]," and hopelessness.

The patient engaged in multiple incidents of self-injurious behavior during the SVSP-PIP admission, and he had been placed on suicide watch in March, May, June, August, September, and October 2021. The discharge SRASHE assessed the patient's chronic suicide risk as high and acute risk as low. However, the clinician appeared to underestimate the patient's acute suicide risk, likely due to inaccuracies in the acute risk factor section. For example, the clinician failed to consider that the patient had presented with recent depressive symptoms, anxiety, interpersonal isolation, and hopelessness. Even the patient's safety plan stated "I'm isolated all the time over here."

After the clinical discharge on September 15, 2021, the patient was retained on 1:1 suicide watch until the date of his transfer to CMC for EOP level of care. IDTT documentation, dated October 6, 2021, noted the patient "has been on 1:1 suicide/self-harm watch deemed as a primary gain mechanism to delay/avert the discharge." The IDTT did not fill out the section for "discharge plan/criteria/comments" on this date.

On October 6, 2021, the patient transferred from SVSP-PIP to CMC where he endorsed suicidal ideation and was referred for MHCB placement. As of October 8, 2021, the patient was receiving services in the MHCB at KVSP.

Findings

The care provided to this MAX custody intermediate care patient at SVSP-PIP was inadequate. Prior to MAX custody placement, treatment plans and interventions failed to target the patient's depression, anxiety, and hopelessness. The one IPOC for self-harm was never modified in response to evidence of ineffectiveness. Following the patient's placement on MAX custody status, treatment was limited to medication management and cell-front wellness checks, despite the patient's worsening presentation, apparent need for more intensive treatment, and his own request for additional services. The IDTT's decision to discharge the patient to a lower level of care was premature, as the patient had not met his treatment objectives, continued to be described as unstable, depressed, and hopeless, and required 1:1 suicide watch until the date of his transfer to CMC's administrative segregation unit. Further, the discharging clinician did not complete the discharge suicide risk evaluation accurately, and this resulted in underestimating the patient's acute suicide risk.

**Patient O**

This 39-year-old MAX custody patient was randomly selected for healthcare record review to assess the quality of intermediate care services provided at SVSP-PIP. The patient was initially admitted to the acute care program at CHCF-PIP in November 2019 to address assaultive and self-injurious behaviors in the context of psychotic symptoms. The patient subsequently transferred to SVSP-PIP for intermediate care on or around March 18, 2020. Records indicated the patient had an extensive and very serious self-injurious behavior history that included lacerations, object insertions, and foreign body ingestions. The patient also had four abdominal

surgeries and multiple hospitalizations related to self-harming behaviors. SVSP-PIP diagnosed the patient with Schizoaffective Disorder and prescribed mood stabilizing and injectable antipsychotic medications during admission. The most recent SRASHE completed in June 2021 assessed the patient's chronic risk as high and acute suicide risk as moderate.

During intermediate care admission, the patient continued to engage in self-injurious behavior through June 2021. In April 2021, the patient required hospitalization after swallowing pen fillers. The patient also reportedly assaulted or attempted to assault custody and healthcare staff at SVSP-PIP through September 2021, and he received 18 RVRs for violent behavior, six of which were issued during 2021. Only one of the RVR mental health assessments in 2021 found a possible nexus between the patient's mental health symptoms and RVR behavior.

In June 2021, the IDTT questioned the accuracy of the patient's diagnosis and recommended psychological testing for diagnostic clarification and treatment planning purposes; however, this recommendation was copied and pasted in subsequent treatment plans through November 2021 with no evidence of follow through. The IDTT also documented uncertainty regarding the function of and antecedents to the patient's aggressive and self-harming behaviors, adding that there were "no clear indications the behavior is impulsive." However, the IDTT did not consider a PBST referral or a functional behavior assessment and plan.

All individual contacts with primary clinicians and psychiatry were completed at cell-front between August and November 2021, most often due to patient refusals. The patient's group treatment participation also declined during this period. However, providers did not document the reasons for the patient's refusals or their attempts to encourage out of cell participation.

IDTT clinical summaries were never updated to include current symptoms, functioning, and treatment response during admission. Level of care justifications also were not provided, and this section of the treatment plan was either missing a rationale or limited to "yes" and "NA."

Findings

The care provided to this MAX custody intermediate care patient at SVSP-PIP was inadequate. The IDTT failed to follow through with their plan for psychological testing to clarify the patient's diagnosis and develop an effective treatment plan. The IDTT also never attempted to resolve their admitted lack of understanding regarding the function of the patient's violent and self-harming behaviors, which resulted in serious consequences including threats to his life and recurring RVRs with time added to his sentence. The patient's participation in treatment had declined over the past 90 days, and, while the IDTT noted a goal of increasing treatment participation to 80 percent, they failed to document and implement interventions toward achieving this goal. Lastly, the IDTT documentation was missing critical data, including level of care rationales, barriers to treatment progress, and updates on current symptoms and functioning.

**Patient P**

This 59-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care services provided at SVSP-PIP. The patient was initially admitted to the PIP on September 9, 2019 due to grave disability concerns and unwillingness to program and communicate with mental health staff. The referring institution also requested

446

neuropsychological testing to rule out dementia. Prior records indicated the patient believed staff were "brainwashing" him during verbal interactions and that he only responded to mental health staff by repeatedly yelling "No!" in a distressed tone. The patient's psychiatric diagnoses were Delusional Disorder and Schizotypal Personality Disorder. Prescribed psychotropic medications included paliperidone and sertraline. A PC 2602 involuntary medication order for grave disability was granted and renewed during the PIP admission.

Over the course of two years in intermediate care, observed improvements were limited to a reduction in verbal outbursts toward staff. The patient continued to isolate in his cell and refused all out of cell programming and in-cell activities. All mental health treatment contacts were completed at cell-front due to refusals.

IDTT treatment plans included mental health IPOCs for grave disability and treatment adherence. However, treatment goals were not measurable and interventions were vague. Despite the patient's lack of group treatment participation over the course of two years, the one proposed treatment intervention was inappropriately assigned to a group therapist. The treatment plan also was not updated after May 2020 despite the patient's lack of progress since that time.

Clinical notes suggested the IDTT remained uncertain about the patient's psychiatric diagnoses and treatment needs throughout the PIP admission. For example, the primary clinician repeatedly documented that it was "unclear" whether the patient's symptoms and treatment resistance were "due to psychosis, delusions or depressed mood." In an attempt to clarify the patient's diagnosis, the IDTT noted in April 2021 that the patient had been referred for an MRI to rule out "brain damage," although he refused. The primary clinician also conducted a thorough record review and noted significant changes in presentation after a head injury in 2016. While the IDTT planned to refer the patient for a "cognitive assessment" to clarify the diagnosis, there was no evidence of follow through found in the healthcare record.

Findings

The care provided to this intermediate care patient at SVSP-PIP was inadequate. Diagnostic clarification was necessary for adequate treatment and level of care planning; however, during the two-year intermediate care admission, efforts to clarify the diagnosis were slow and minimal. The patient's treatment plan was ineffective and had not been modified in response to the lack of progress since May 2020. Further, the IDTT did not write justifications for the current treatment setting or modify their discharge expectations to include realistic objectives.

**Patient Q**

This 34-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care services provided at SVSP-PIP. The patient was referred from CMF-PIP's acute program for intermediate care and arrived at SVSP-PIP on or around July 27, 2021. The referring facility described patient as paranoid, hesitant about attending 1:1 sessions, and "not sufficiently stable on PC 2602 medications." Expected treatment outcomes listed in the intermediate care referral included participation in 75 percent of out of cell programming for two months, 100 percent compliance with PC 2602 medications, and a decrease paranoia through developing new coping skills. The patient's psychiatric diagnosis was Schizoaffective Disorder

447

and he had an active PC 2602 medication order that was granted for grave disability and danger to others. Psychotropic medications during admission included olanzapine, oxcarbazepine, and paliperidone. A July 21, 2021 SRASHE assessed the patient's chronic suicide risk as moderate and his acute risk as low. There was reportedly no history of suicide attempts or self-harm incidents.

Despite treatment planning recommendations documented in the referral, the IDTT developed only one mental health IPOC to address treatment non-adherence during the PIP admission. The patient's paranoia was not addressed in the IDTT treatment plan, despite being identified as a contributing factor to out of cell programming refusals. Additionally, new problems identified during admission did not result in changes to the treatment plans, including poor cell conditions and verbal threats to stab or kill staff. The IDTT also did not document level of care justifications in treatment plans throughout the admission. All treatment contacts were completed at cell-front due to the patient's refusals.

The patient's psychiatric medications were adjusted in October 2021. However, IDTT documentation through November 2021 continued to describe the patient as selectively mute and unwilling to engage with mental health staff.

Findings

The care provided to this intermediate care patient at SVSP-PIP was inadequate. Treatment was limited to cell-front wellness checks and medication management. While the IDTT targeted treatment non-compliance, treatment plans were never modified in response to the patient's lack of progress. Further, treatment plans failed to address problems identified during the current admission, including poor cell conditions and behaviors that could result in RVRs. Lastly, the IDTT documentation did not provide level of care justifications or updates on current symptoms, functioning, and response to treatment, which made it difficult to track the patient's evolving treatment needs.

**Patient R**

This 22-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care services provided at SVSP-PIP. The patient was referred to SVSP-PIP in 2019 and described as having "longstanding baseline psychotic symptoms," including paranoia and auditory and visual hallucinations. Psychiatric diagnoses included Schizoaffective Disorder, Unspecified Depressive Disorder, Substance Induced Psychotic Disorder, and Antisocial Personality Disorder. Zyprexa, Abilify, and Remeron were prescribed during the intermediate care admission. The most recent SRASHE assessed the patient's chronic suicide as high and acute risk as moderate. His LRH was multi person cell (MPC).

IDTT documentation was very difficult to follow as a result of inaccurate and inconsistent patient information. For example, IDTT clinical summaries between August 2020 and July 2021 noted, "the treatment team feel he is stable and ready for discharge," and, the patient will be "referred to administration for approval to discharge." However, the patient remained in intermediate care through the date of this review in November 2021, and IDTT notes did not explain when and why the treatment team decided to retain the patient in intermediate care.

Further, IDTT documentation throughout the admission did not include level of care justifications.

Treatment plans targeted anxiety, substance use, impulsive behavior, self-harm, and LRH obstacles. While some treatment objectives were unrealistic and interventions were not always clear, the plans were modified with improvements during the course of admission.

A review of clinical progress notes suggested the patient's symptoms and functioning may have worsened around December 2020 or January 2021. The patient also evidenced signs of further decompensation during MAX custody placements between March and June 2021. However, following his release from MAX custody placement, the patient appeared to respond well to treatment efforts, as evidenced by quoted statements from the patient, a referral to his LRH, and objective improvements noted in the healthcare record. By November 2021, the patient appeared stable and the IDTT was considering discharge to EOP level of care.

Findings

Despite serious documentation issues identified during this record review, the overall care provided to this intermediate care patient at SVSP-PIP appeared adequate. Treatment plans appropriately targeted the referral concerns, new problems identified during admission, and obstacles to LRH. Once LRH concerns were resolved, the patient was appropriately referred to a multi person cell. The patient appeared to respond positively to mental health providers' interventions during 2021. The documentation issues should be addressed by SVSP-PIP leadership promptly, as IDTTs consistently failed to provide level of care justifications and the IDTT clinical summaries retained misleading statements about the patient's stability and discharge readiness for 11-months.

**Patient S**

This 22-year-old patient was randomly selected for healthcare record review to assess the quality of intermediate care services provided at SVSP-PIP. The patient transferred from CHCF-PIP's acute program to SVSP-PIP for intermediate care on or around October 8, 2019 "for further stabilization." Psychiatric illness included Major Depressive Disorder, Antisocial Personality Disorder, and Borderline Personality Disorder. Although the IDTT noted that the patient would benefit from treatment to lower his "PTSD symptoms," PTSD was never added as a diagnosis. During the PIP admission, the patient had an active PC 2602 involuntary medication order.

Since January 2020, the treatment plan included only one mental health IPOC for depressed mood. Within this IPOC, a recreation therapist was assigned to address the patient's indecent exposure (IEX) behavior, although how this would be accomplished and why it was assigned to a recreation therapist instead of a clinician was unclear. Treatment objectives developed by the referring institution were copied and pasted in SVSP-PIP's treatment plans, but the IDTT at SVSP-PIP did not incorporate their planned interventions to address these targets. The IDTT eventually added LRH obstacles as a target in the treatment plan; however, interventions were either absent or limited to "groups and 1:1s."

Between February 2021 and August 2021, the patient continued to report elevated anxiety and depressive symptoms with intermittent auditory and visual hallucinations. Although the IDTT

449

did not provide level of care justifications or update clinical summaries to include current symptoms, functioning, and response to treatment, some records suggested the patient's presentation and treatment compliance worsened after June 2021. The IDTT noted that he was participating in less than 50 percent of treatment and that he received an RVR for behavior that could lead to violence in July 2021. Clinicians routinely noted the patient would threaten violence toward cellmates when they attempted to discuss his LRH of multi-person cell (MPC). Additionally, on July 28, 2021, the IDTT noted that the patient had "not gone three months without harming himself" and continued to report depressed mood and suicidal ideation.

Suicide watch was ordered at least four times in July and August 2021. On July 18, 2021, the patient lacerated his forearm and was placed on suicide watch. On July 25, 2021, the patient was refused his PC 2602 medications and was placed on suicide watch after "boarding up" and setting two fires in his cell. He was subsequently maintained on suicide watch from July 25, 2021 through July 31, 2021. The most recent suicide watch placement ended on August 6, 2021.

In August 2021, the primary clinician wrote that single cell was recommended "based on the severity of psychological instability as demonstrated in patient's current symptoms including recurrent engaging in [self-injurious behavior]." The primary clinician also noted during this month that the patient "expressed deep concerns regarding his ailing uncle with terminal illness."

Despite the lack of supporting documentation and evidence of discharge preparation during treatment encounters, the IDTT discharged the patient to EOP level of care on September 15, 2021. The IDTT claimed the patient met discharge criteria without a sufficient explanation.

The discharge SRASHE assessed the patient's chronic risk as high and acute risk as low. However, the clinician appeared to underestimate the patient's acute suicide risk and failed to note recent suicidal ideation and anxiety in the acute risk factor section of the SRASHE. The acute risk justification section noted "23 minor Self-Harm incidents at PIP dating back to 12/4/21." The self-harm incidents at SVSP-PIP were attributed to "environmental stressors around family issues" and "secondary gain."

Findings

The care provided to this patient at SVSP-PIP was inadequate. Treatment plans were not modified to address documented "PTSD symptoms," self-harm behaviors, threats, and other behaviors that might result in additional RVRs. Treatment objectives developed by the referring institution were copied and pasted in SVSP-PIP's treatment plans. Treatment interventions for existing targets were vague, and the IDTT's documentation did not provide updates on the patient's response to treatment efforts over time. Additionally, a recreation therapist was inappropriately assigned to address the patient's IEX behavior instead of a trained mental health clinician. The IDTT's level of care decisions were not justified during the course of admission, and the abrupt decision to discharge to a lower level of care in September 2021 was not sufficiently justified or supported in other clinical documentation.

**Patient T**

This healthcare record was reviewed in response to concerns raised in plaintiffs' August 16, 2021 pre-site letter to the Special Master. Plaintiffs' counsel indicated the patient perceived that

his primary clinician had been pressuring him to discharge to a lower level of care and that the treatment team did not agree on his readiness for discharge.

The 44-year-old patient was admitted to SVSP-PIP's intermediate care program in April 2020 for ongoing danger to self (DTS) concerns. Prior to the intermediate care admission, the patient engaged in a serious suicide attempt that resulted in surgery to repair damaged tendons and blood vessels. The patient's psychiatric diagnoses included Major Depressive Disorder, PTSD, Opiate Use Disorder, and Borderline and Antisocial Personality Disorders. Symptoms referenced during admission included depression, anxiety, hopelessness, nightmares, reduced sleep, intermittent suicidal ideation, self-injurious behavior, "skin picking," and possible delusions. The patient attempted suicide at least twice and had a long history of cutting on his chest and in between his legs. The June 1, 2021 SRASHE assessed the patient's chronic suicide risk as high and acute suicide risk as low.

The primary clinician noted they had been addressing the patient's trauma in treatment for several months and that the patient made "progress on treatment goals and [expected outcomes]." However, there were no examples of progress provided, and measurable progress toward treatment objectives was not found in recent IDTT documents or clinician progress notes.

The patient shared some treatment concerns during psychiatry contacts in July and August 2021. For example, on July 29, 2021, the patient described his primary clinician as "overburdened with work." The psychiatrist also noted the high frequency of group treatment cancellations were a cause of frustration for the patient.

The treating psychiatrist documented a few incidents of self-injurious behavior in late July and early August 2021. The patient reportedly cut on his thigh on July 29, 2021 and engaged in "skin picking" on three occasions between August 5, 2021 and August 12, 2021. The psychiatrist also opined that the patient's skin picking might result from a delusion involving bugs under the skin. However, it was unclear whether the psychiatrist informed the primary clinician of the recent self-harming behaviors, as they were not discussed in the PC's progress notes, and there was no SRASHE or self-harm power-form completed for the cutting incident on July 29, 2021.

A review of progress notes through September 2021 suggested the primary clinician was discussing discharge with the patient, although there was no planned discharge date noted in the records.

Findings

The care, assessment, and clinical documentation for this patient were inadequate. The IDTT did not develop an adequate case conceptualization or treatment plan for this patient, and the most recent SRASHE appeared to underestimate the patient's risk due to internal inconsistencies. The level of care was not justified and clinical summaries were not updated to include current symptoms, functioning, and response to treatment. Care collaboration was also an area of concern, as the psychiatrist and primary clinician did not appear to be sharing critical patient information, including their observed changes in symptoms and risk and the patient's need for further assessment and intervention.

**APPENDIX B5**
**CIW-PIP**
**September 13, 2021 – September 17, 2021**

**Patient A**

This 23-year-old patient was admitted to acute level of care on July 26, 2021 from the MHCB for suicidal ideation with intent.  She had two incidents of self-injurious behavior in the MHCB.  She was diagnosed with attention deficit hyperactivity disorder, bipolar disorder and post-traumatic stress disorder.  She was prescribed anti-psychotic, mood stabilizer, anti-depressant, and anti-anxiety medications.  Her healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

Overall, initial evaluations provided relevant and useful clinical background. While the psychiatric evaluation was individualized and included relevant clinical history and current treatment needs, the social worker and psychologist initial evaluations focused on her history and needed improvement in documentation of her current treatment needs.

Clinical summaries in treatment plans were clear and provided useful information of treatment between IDTTs.  A treatment goal on reviewed treatment plans was to reduce suicidal ideation.  It was unclear how this would be achieved as the only notable intervention was to foster a therapeutic alliance.  Documentation from the primary clinician indicated that treatment interventions appropriately addressed depression/sadness, distress tolerance and sleep disturbance; however, these symptoms were not added to treatment plan updates.  Psychiatric documentation included rationale for psychiatric medication.

While in the PIP, she was placed on suicide watch following suicidal ideation and self-injurious behavior.  Documentation for rationale to continue or discontinue the suicide watch and access to property was not located in clinician documentation.  The completed risk assessment was appropriate, thorough, and individualized; however, a safety plan was not completed although clinically indicated.  She was consistently assessed as high chronic risk but there was a change from high acute risk to moderate risk which was an area of concern.  Specifically, a discharge SRASHE was completed on August 13, 2021 at which time she was assessed as high acute risk.  Four days later, a SRASHE was completed after she engaged in self-injurious behavior and she was assessed as moderate acute risk.

<u>Findings</u>

This patient's care was adequate, but documentation of all treatment needs is needed in treatment plans for continuity of care.  Appropriate suicide watch rationale documentation was needed.  Change in acute risk was an area of concern.  Of note, there was no indication of supervisory review or co-signature for documentation completed by an intern, an area of significant concern.

**Patient B**

This 44-year-old patient was admitted to Acute level of care on August 19, 2021.  She was admitted to the PIP from the MHCB after a pattern of self-injurious behavior and substance use precipitated by multiple psychosocial stressors.  Her healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

Initial evaluations varied by provider but overall provided useful and clinically relevant documentation.  Treatment planning flowed from issues identified during the initial evaluations

and targeted substance abuse and self-harm with appropriate interventions. However, treatment planning would have been improved if identified symptoms of depression, anxiety, sleep disturbance and grief were incorporated into treatment planning. She was assessed as high chronic and moderate low risk for suicide. Of concern, impulsivity, identified as a factor in her self-harm behavior, was not addressed in treatment planning.

Diagnoses included borderline personality disorder, antisocial personality disorder and alcohol dependence. However, diagnostic criteria to support diagnoses was not documented. Psychiatric medications included an antipsychotic and antidepressant.

Routine contact documentation varied by provider. Overall, documentation provided appropriate clinical interventions and current functioning.

Findings

This patient's care was adequate but needed improvement in diagnostic documentation and treatment planning.

**Patient C**

This 25-year-old, DD1 patient was admitted to Acute level of care on May 12, 2021. She was admitted to the PIP from the MHCB due to a need for stabilization of psychiatric symptoms. She had a long history of mental illness and medication non-compliance. She was diagnosed with schizoaffective disorder. After a period of medication non-compliance, a PC 2602 was ordered in September 2021. Her medication regimen included anti-psychotics, antidepressants, antianxiety medications and a medication for side effects. She was expected to parole to Patton State Hospital following assessment as an offender with mental health disorder (OMHD). Her healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

The initial psychiatric assessment was comprehensive and provided useful historical and current clinical information which included command auditory hallucinations, paranoia, anxiety, depression and nightmares. She refused initial assessments with the psychologist and social worker. Subsequent attempts to complete the evaluation were not located. Consequently, the majority of documentation was copied from previous providers and lacked sufficient individual consideration of her current treatment needs.

Her course in treatment varied. Initially, there were multiple incidents of disrobing and lack of programming. A period of stability and improved group participation was followed by increased isolation and medication non-compliance. Consequently, she decompensated and experienced auditory and visual hallucinations, delusions and behavior dyscontrol (purposely urinating on the floor, throwing food/water).

Treatment goals were not updated in accordance with changes in psychiatric symptoms or changes in functioning. Specifically, throughout reviewed treatment, treatment goals remained focused on impulsivity and discharge planning.

IDTT documentation needed improvement in summaries regarding symptoms and overall behavior/functioning, treatment needs/response between IDTTs. As an example, routine provider contact documentation described continued psychosis, which was not clearly documented in IDTT documentation. Reviewed provider routine contact documentation was thorough and overall provided a useful overview of her functioning and symptoms; although primary clinician documentation would have been improved with consistent documentation of treatment interventions.

At the time of admission, she was assessed as high acute and chronic risk. Three months later her risk was changed to low acute and chronic risk. Clear rationale for the rationale and change was not documented.

Findings

This patient's care was adequate but marginal. Initial and routine treatment planning narrowly addressed treatment needs. Further, treatment planning documentation was not appropriately updated regarding her status between IDTTs, documentation that is necessary for continuity of care. Clear risk assessment rationale was needed.

**Patient D**

This 32-year-old DD1 patient was admitted to acute level of care on June 29, 2021. She was transferred to the PIP from the MHCB due to ongoing self-injurious behavior requiring continuous suicide watch. She had an extensive history of self-harm and suicide attempts and was assessed as high chronic risk for suicide with variable acute risk. There was a diagnosis of major depression with psychotic features across documentation. Additional documentation of post-traumatic stress disorder, panic disorder and cluster b traits was only located in psychiatric documentation. Under PC 2602 she was prescribed antipsychotics, antianxiety and side effect medication. Her healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

The initial psychiatric assessment was thorough and included relevant historical and current psychiatric needs as well as a rationale for diagnosis. It was difficult to determine original and previous documentation in the initial psychologist assessment and individualization of current treatment needs was needed.

IDTT documentation provided a useful historical summary and portrayed her current status on the day of IDTT but lacked a useful summary of symptoms, functioning and treatment response between IDTTs. Initial treatment goals addressed anxiety, head banging and danger to others but for reasons that were not clearly documented were changed on the August 26th 2021 IDTT to address self-harm and auditory hallucinations. Depressive symptoms, "severe" in nature, documented on the initial psychiatric evaluation were not identified as a treatment goal.

Overall, routine primary clinician documentation provided a useful summary of the patient's current status and treatment interventions. Treatment interventions were clinically appropriate although not in alignment with the treatment plan. Despite initial psychiatric documentation of significant anxiety and depression, routine psychiatric documentation described her as stable. There was no clear explanation for the change in symptoms. Routine psychiatric documentation

provided a useful summary of rationale for medications but overall was minimally changed between contacts.

<u>Findings</u>

This patient's care was adequate, but documentation needed improvement. Coordination of care between providers (psychiatrist and primary clinician) was needed.

**Patient E**

This 49-year-old patient was admitted to acute level of care on March 16, 2021 from the MHCB for ongoing self-injurious behavior. Diagnoses which varied by provider and location in the record included schizoaffective disorder, panic disorder and post-traumatic stress disorder. A PC 2602 was in place and she was prescribed anti-psychotics, antidepressant, antianxiety and mood stabilizer medications and a medication for side effects. Her healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care, but a review of her record indicated she was receiving intermediate level of care.

This was her third admission to the PIP in six months. She returned to the PIP a month after her previous discharge after an overdose in EOP and continued to engage in self-injurious behavior while in the MHCB. Her self-injurious behavior continued into mid-May and then subsided. She was consistently assessed as high chronic risk and high acute risk for the majority of risk assessments.

Overall, initial evaluations provided relevant psychosocial history but lacked an individualized assessment of current treatment needs including current symptoms and functional impairments.

Treatment planning addressed self-harm, swallowing and danger to others. With the exception of an intervention to help her identify appropriate ways to express anger, interventions were limited to fostering a therapeutic alliance. Overall, treatment goals were not actively addressed during routine contacts. Relatedly, symptoms targeted by the psychiatrist were not included as treatment goals or considered during primary clinician contacts.

Documentation of treatment interventions were not clearly documented until a primary clinician change in mid-August 2021 when her previous primary clinician's (an intern) clinical rotation ended. Treatment interventions documented by her new clinician were clinically appropriate although not in alignment with those identified on the treatment plan.

<u>Findings</u>

Overall, this patient's care was adequate but marginal. Initial assessment documentation of current treatment needs was needed for individualized treatment planning. Rationale for diagnosis and coordination of care between psychiatry and primary clinicians was needed. A behavioral management plan or at the very least a functional analysis for her self-injurious behavior was needed. Review and co-signature of psychology intern documentation was not located, a significant area of concern.

**Patient F**

This 26-year-old patient was admitted for her third PIP admission on April 27, 2021 for self-injurious behavior which was initially attributed to impulsivity and auditory hallucinations. She was diagnosed with schizoaffective disorder and post-traumatic stress disorder. She was prescribed multiple psychiatric medications including antipsychotics, antidepressants and antianxiety medications. She had a long history of polysubstance use and was a participant in the medication assisted therapy (MAT) program. Her healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

The initial psychiatric and psychologist assessments were comprehensive and covered relevant psychosocial history and current treatment needs. The psychologist assessment included a thoughtful conceptualization regarding her recent ingestion of a foreign body that required medical intervention. Routine contact documentation was thorough and included appropriate treatment interventions although interventions were not in alignment with the treatment plan.

Treatment goals addressed substance use and self-harm behavior but there was no goal for impulsivity or auditory hallucinations despite initial assessment that these were precipitants to self-harm behavior. Relatedly, distress tolerance was not added as a goal when it was determined that anger and upsetting emotions were also precipitants. Despite ongoing self-injurious behavior, for reasons that were unclear, the self-harm goal was removed from documentation on August 23, 2021 and new IPOCS for ineffective coping, psychotropic medications and discharge planning were added.

Documentation indicated that a positive behavioral support plan (PBSP) was developed, a positive finding. However, the plan was not locatable in EHRS.

In general, rationale for changes to suicide watch/precautions was needed.

Findings

Overall, this complex patient's care was adequate, but documentation needed improvement. Location of the PBSP should be clear for continuity of care and treatment goals should be added in accordance with a patient's treatment needs. A substance use diagnosis was not clearly documented. There was no indication of review or co-signature of documentation by an intern.

**Patient G**

This 33-year-old patient was admitted to acute level of care on May 5, 2021 for continued psychosis that required stabilization. She was admitted to CDCR on March 3, 2021. She was diagnosed with schizoaffective disorder. At the time of admission, she was non-compliant with prescribed psychiatric medication. Her healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

Initial assessment documentation completed by the social worker and psychologist was virtually the same, an area of concern. The psychiatric initial evaluation included relevant current and historical clinical information. Treatment goals targeted delusions and anger, although the

rationale to focus on anger was unclear. A goal to address medication non-compliance and out of cell contact with her clinician was needed but not included.

Throughout her hospitalization, she remained psychotic, in part due to medication non-compliance and resistance to medication changes. After a trial of Latuda (antipsychotic) with multiple dosage increases, her psychosis remained minimally improved. The psychiatrist assessed her as unable to make medical decisions and medication changes were made. Subsequently, her psychosis improved but she remained psychotic. PC 2602 discussions occurred but it was consistently determined that she did not meet criteria for gravely disabled.

She was seen regularly by a pre-release coordinator during the month of September as she was due to be released on post-release community supervision on October 7, 2021. She was assessed as psychiatrically stable and was released to a shelter.

Findings

This patient's care was adequate but marginal. There was insufficient documentation to support that she did not meet criteria for PC 2602 or that she was sufficiently capable of caring for herself upon discharge and therefore did not meet criteria for 5150. There was no consideration that she was able to tend to ADLs within the confines of a psychiatric program under close multidisciplinary supervision. Further, her lack of insight, poor judgment and inconsistent medication compliance were not considered.

**Patient H**

This 55-year-old patient was diagnosed with schizoaffective disorder, bipolar type and was prescribed antipsychotic and mood stabilizing medication. She had a long history of mental illness with multiple admissions to Patton State Hospital (PSH) since her CDCR admission in 2002. Her healthcare record was randomly selected to assess adequacy of care with a focus on least restrictive housing. She was admitted to the PIP on June 29, 2021after decompensating in EOP.

Her least restricted housing was unlocked dorms, but she was housed in a single cell due to delusions and aggressive behavior as assessed by the treatment team and IRU. Documentation indicated that once psychiatrically stabilized with less aggressive behavior she would be re-assessed for transfer to LRH. To achieve LRH she was to be seventy-five percent compliant with treatment and maintain appropriate behavior for thirty days. Her individual plan of care (IPOC) targeted delusions but there was no IPOC for aggressive behavior.

Documentation from the August 25, 2021 IDTT indicated that she met her LRH goals and would be referred to PSH.

Findings

Treatment to address LRH was adequate. Targeting all symptoms/behaviors that impact LRH and clear documentation of progress toward LRH goals was needed.

**Patient I**

This 39-year-old, gender dysphoric, DD2 patient had an extensive history of mental illness and self-harm that has resulted in serious injury on multiple occasions. He (used on account of the patient's gender dysphoria) was diagnosed with major depression disorder and schizoaffective disorder. A PC 2602 was ordered and he was prescribed multiple anti-psychotics as well as anti-anxiety and anti-depressant medications. His healthcare record was randomly selected to assess adequacy of care for MAX custody patients.

While at ICF level of care in early March 2021 he had several incidents of self-injurious behavior by various methods. He was also placed on MAX status after a staff assault. On March 7, he was medically hospitalized and required a craniotomy from his head banging. He returned to the institution two weeks later. Upon return, his level of care was changed to acute and a positive behavior support plan was initiated. After a period of stability, he decompensated in August 2021 and was intermittently placed on suicide watch/precaution with four-point restraints and required to wear a helmet/spit mask due to head banging, in part precipitated to an approaching transfer to PSH on MDO status.

When stable, he attended max custody groups. He was seen regularly by his primary clinician and psychiatrist and frequently through special IDTTs. Appropriate interventions were utilized during IDTTs and routine primary clinician contacts.

Findings

This complex patient's care was adequate. Reviewed documentation was thorough and provided clinically useful summaries of mental status, functioning and progress between IDTTs. It was unclear if the positive behavior support plan was developed collaboratively with the patient or if incentives were realistic and individualized; an area in need of improvement.

**Patient J**

This 22-year-old patient was admitted to ICF level of care on August 5, 2021. Her healthcare record was randomly selected to assess adequacy of care for Max custody patients. She was assessed as Max custody due to a battery charge on a peace officer March 11, 2021. Following her admission to segregation her behavior decompensated and between mid-June and her PIP admission she had three MHCB admissions due to unstable behavior.

Initial assessment documentation was variable. She refused the evaluation with the social worker which resulted in much of the documentation being copied from previous evaluations. Despite meeting with the psychologist for the initial evaluation, much of documentation was copied from previous providers and thus was not individualized to her current treatment needs. The initial psychiatric evaluation was concise and provided relevant clinical details regarding her current treatment needs.

Treatment goals addressed anger and impulsive behavior but did not include her report of depression to the psychiatrist. Additionally, treatment planning did not address symptoms targeted by psychiatric medication (anxiety, agitation, mood instability, nightmares and anxiety) which were more specific than her initial goals. Inclusion of these symptoms would have made

459

for more individualized treatment planning.  According to her IDTT on September 8, 2021, she had been refusing primary clinician appointments which was not included as a treatment goal.

During her first month in the PIP, she had eight special IDTTs in response to various incidents of behavioral dyscontrol (boarding up, holding the food port/telephone hostage).  Restrictions were implemented but targeted interventions or IPOC updates were not utilized.  A behavior management plan or at minimum a functional behavioral analysis to better understand precipitants and maintaining factors was not utilized.

Diagnostic clarification and documentation of criteria to meet diagnosis was needed given discrepancy in psychiatric documentation (major depression, panic disorder, post traumatic stress disorder, intermittent explosive disorder, antisocial personality disorder and a rule out of unspecified bipolar disorder) and the diagnosis in the official place of record (bipolar disorder unspecified).  A PC 2602 was approved on August 26, 2021 and she was prescribed anti-psychotic, anti-depressant, mood stabilizer and anti-anxiety medications.

She was approved to attend groups but group documentation was minimal and well below a clinically sufficient number of hours.

Findings

Treatment was inadequate.  Collaboration between treatment providers was needed to individualize treatment planning.  Despite lack of progress and continued problematic behavior, treatment goals were not updated or re-assessed, including consideration of a behavior management plan or psychological testing.

**Patient K**

Patient K was a 37-year-old female who was serving her first term, entering CDCR in March 2017 with a sentence of 50-years to life for murder. She had multiple admissions to PIP and MHCB between 2017 and 2021.  Recently she was treated for being highly delusional and responding to internal stimuli in MHCB at CCWF from March 24, 2021 to April 7, 2021.  On April 8, 2021 she was transferred to CIW ICF based on the danger to other and significant impairment criteria, for longer-term treatment in a structured setting.  Additionally, a nonemergent involuntary medication order was extended due to grave disability from April 6, 2021, to April 6, 2022.

Patient K had an extensive history of severe mental health problems and substance abuse, with several community psychiatric hospitalizations. She was also under conservatorship for grave disability from October 11, 2016, to October 11, 2017.

Significant psychiatric symptoms included disorganized/tangential thinking, aggressive/assaultive behavior, suicidal behavior, and self-injurious behavior such as headbanging related to command auditory hallucinations.  She was diagnosed with a schizoaffective disorder, classified with a severe vision impairment (DPP-DPV), and repeatedly placed on Max custody following aggressive and/or disrespectful behavior, (i.e., spitting on a nursing staff in October 2021).

She also had a history of refusing pharmacological and nonpharmacological treatment, decompensating, and subsequently complying with pharmacological and nonpharmacological treatment. Pharmacological treatments included antipsychotic and antidepressant medications which were constantly being adjusted. Nonpharmacological treatment consisted of individual cognitive behavioral therapy and psychoeducational groups. The patient identified the following three treatment goals, sleeping better, getting rid of fear and torment, and improving her feelings of despair. Over time her treatment plan goals were modified. They included improving medication compliance, improving her ability to manage stress, developing strategies to improve reality testing, developing coping skills to manage auditory hallucinations, developing strategies to safely manage negative thoughts and emotions without hurting herself/others, increasing out of cell activities, developing cognitive behavioral skills to address destructive thoughts and feelings of distress, and critically examining delusional beliefs.

She was placed on suicide watch in June 2021 and periodically classified as Max custody. Due to her instability, frequent treatment refusal, and aggressive/assaultive behavior, she remained in Step 1 for at least eight months. Along with 30-day IDTTs, the treatment team frequently met in special IDTTs to address inappropriate behavior and consider treatment strategies (i.e., placing her on a modified program). Attendance during the IDTTs was good and clinicians spent a lot of time providing services to achieve and maintain stability. Showing signs of improvement, she was removed from Max custody by ICC in December 2021, she achieved Step 3 and started school in January 2022.

Findings

The mental health care delivered to this patient was marginally adequate.

This patient had an extensive history of serious mental illness, with command hallucinations, paranoid delusions, disorganized and tangential thinking, labile affect, and impulsive/aggressive behaviors directed toward herself and others. She also had a history of being psychiatrically hospitalized in the community and in CDCR. She often refused treatment and discontinued medications resulting in acute decompensation with psychotic symptoms and involuntary treatment to stabilize her again. The cycle of stabilization and decompensation repeated itself throughout her ICF placement.

The treatment team responded to her situational needs, regularly meeting for 30-day IDTTs and special IDTTs. During their meetings they focused on the immediate crisis, rather than on strategies to interdict the recursive pattern of stabilization, decompensation, and stabilization ad infinitum. A review of her medical record revealed that two evidence-based long-term solutions had been identified and recommended: namely, consultation with a psychopharmacological specialist and the development of a PBSP. The psychopharmacological specialist had been consulted and a clozapine trial was initiated; however, the trial was discontinued because the patient was noncompliant. Given this medications efficacy, it was unclear why a subsequent trial was not considered and initiated. Additionally, a special IDTT recommended a PBSP be developed to address her aggressive and disrespectful behavior; however, the recommendation was never implemented. Given the long-term efficacy of both interventions, it was unclear why they were not implemented.

461

**Patient L**

Patient L was 40-year-old transgender patient (woman to man) with an extensive mental health history beginning at 12 years of age with a psychiatric hospitalization for methamphetamine induced psychosis. Auditory hallucinations began at 16 years of age and worsened by 24 years of age. He also had a long history of placements in California Youth Authority, DSH-Patton, and CDCR with 3CMS, EOP, PIP, and MHCB levels of care, dating back to 2004.

Patient L was received in CDCR on April 29, 2016, from DSH-Patton as a California Welfare and Institutions Code (WIC) 7301, after assaulting staff and patients. He was subsequently treated in PIP for approximately four-years from June 2016 to April 2020. His response to treatment was limited until clozapine was initiated in December 2019, decreasing his psychotic symptoms and irritability, and increasing his reality testing. During a special IDTT on April 20, 2020, the team reported he met his treatment outcome expectations and recommended a step-down level of care to EOP. To facilitate a smooth transition, he was placed on the high-risk list for 60 days to increase treatment and monitoring. Despite the EOP team's effort he did not adapt well to EOP resulting in MHCB placements and an ICF discharge on June 22, 2020.

Patient L has been treated in CIW ICF for the past 19 months, from June 2020 through January 2022. Treatment goals focused on complying with medication, reaching out to staff during difficult times, eliminating suicidal ideation and self-injurious behavior, eliminating staff and patient assaults, developing strategies to manage anger, decreasing paranoid and somatic delusions/complaints, developing self-soothing skills, and attending 100 percent of the groups offered. Interventions included weekly individual therapy to develop insight into self-injury and develop coping skills to eliminate that behavior, weekly medication reviews with the treating psychiatrist, and weekly rehabilitative therapy in groups.

The patient's response to treatment was limited. Minimal progress was made in transferring him to DSH-Patton or to EOP. The patient was never admitted to MHCB, and he never assaulted a staff member or peer; however, he was frequently placed on suicide precautions and suicide watch, resulting in special IDTTs. Despite his lack of progress, the treatment plan goals and interventions were seldom changed.

Findings

The mental health care provided to this patient was marginally adequate.

This patient had a history of chronic and severe mental illness characterized by auditory hallucinations; paranoid, grandiose, and somatic delusions; suicide attempts; self-injurious behavior; agitation and assaultive behavior; and substance use disorders. These problems manifested themselves during childhood and became worse with age resulting in long-term psychiatric hospitalizations, involuntary medication orders, and in WIC7301 placement.

Treatment team members provided programming/services daily and they frequently met with the patient during special IDTTs. To the treatment team's credit, this patient did not assault anyone or make any serious suicide attempts during his 19-month ICF hospitalization; however, this patient's behavior/mental status was being maintained by interventions rather than being improved.

462

The treatment team was not actively engaged in bringing about change, evidenced by redundant and duplicative documentation, static goals, and static interventions. Transferring to a lower level of care was not the focus of treatment and rarely discussed. Treatment goals and interventions did not strategically focus on the patient's LRH. Many of the patient's problem behaviors could have been more effectively addressed with positive behavior support plans.

**Patient M**

Patient M was a 60-year-old female, who was born and raised in Vietnam. She moved to the United States as an adolescent with her family after the Vietnam War in the late 1970s. She had an extensive history of mental health symptoms and psychiatric hospitalizations dating back to the 1980s. Since 1994, she spent most of her life in state psychiatric hospitals and in CDCR. She was admitted to PIP on September 19, 2012 and placed on WIC 7301 on August 1, 2017.

She was diagnosed with a schizoaffective disorder, bipolar type with grandiose delusions and command auditory hallucinations telling her to kill herself and attack others. Her family reported that she was physically traumatized by an explosion during the Vietnam war, which likely resulted in a traumatic brain injury. She attempted suicide multiple times. The suicide attempts were usually the result of impulsive behavior and tended to be low lethality. Her SRASHE's chronic suicide risk was high due to her ongoing auditory hallucinations and aggressive acts against herself and others. Her acute suicide risk was low. Her hallucinations and delusions had a long history of strongly influenced her behavior despite numerous medication trials.

She was also diagnosed with several physical health problems to include chronic back pain, diabetes, hypertension, and chronic kidney disease. Her treatment needs were further complicated by her DD2 status with adaptive support needs for communication, ADLs, and read/writing.

Mental health treatment consisted of PIP placement since September 2012, pharmacological interventions, and positive behavior support therapy which worked well because she responded to positive reinforcement. IDTT meetings occurred monthly with special treatment team meetings held as needed between regularly scheduled IDTTs. The treatment team meetings had a history of being well attended by her primary clinician, correctional counselor, treating psychiatrist, registered nurse, psychiatric technician, and rehabilitation therapist.

Psychopharmacological treatment consisted of antipsychotic medications to include Prolixin, Depakote, Zyprexa, and Cogentin. Nonpharmacological treatment focused on her positive behavior support plan. Target behaviors where her refusal to come out of her cell for group treatment and her tendency to throw liquids and objects in her cell. Her primary clinician modeled and practiced coping skills with her, especially breathing techniques to help her manage her chronic auditory hallucinations and to regulate anger/frustration. Treatment team members to include custody also addressed her adaptive support needs which included assistance with communication, ADLs, and reading/writing.

This patient had a history of being seen regularly by her providers, seeing her primary clinician twice a week, her treating psychiatrist once a week and her recreational therapist once or twice a

week.  She recently achieved Step 3 and was removed from Max custody during an ICC meeting on December 30, 2021; however, she remained on solo programming and two-custody officer escort.  Her primary treatment goal was to discharge her from PIP and return her to the state psychiatric hospital when she was able to safely program with others in an unlocked dorm.

Findings

The mental health care provided to this patient was adequate.  Her treatment team met with her regularly, addressed her symptoms and behaviors and provide support to her.  Treatment plans and progress notes clearly identified and updated treatment goals, progress in achieving those goals, and treatment intervention.

**APPENDIX B6**
**SQ-PIP**
**November 15, 2021**

**Patient A**

This 43-year-old patient was admitted to acute level of care on April 19, 2021 from MHCB due to acute psychosis including bizarre and disorganized behaviors which were attributed to medication non-compliance. He was diagnosed with schizophrenia. A PC 2602 order was in place, and he was prescribed antipsychotic and antidepressant medication as well as an agent for side effects. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

This patient had a long history of psychosis which resulted in multiple inpatient admissions since he began his third term in 2015. When not at the inpatient level of care, he had primarily been at the EOP level of care. At the time of his current admission, he was confused and responding to internal stimuli.

The initial psychologist assessment included relevant current and historical clinical information. However, when previous provider documentation was copied, the date, author and level or care were not clearly documented. Initial treatment goals of treatment non-compliance and grave disability were continued throughout his admission. Useful clinician summaries regarding the patient's functioning were included in routine IDTT documentation.

Overall, he was non-compliant with provider contacts despite attempts to engage him. Routine provider documentation was thorough and there were instances of providers working collaboratively to engage him in treatment contacts. Reviewed group notes indicated a pattern of non-compliance.

During his course of treatment his symptoms improved but further stabilization was needed. He was appropriately referred to intermediate level of care during his September 1, 2021 IDTT and transferred on October 25, 2021. The psychiatric discharge summary was thorough and provided a useful review of his course of treatment.

Findings

This patient's care was adequate. A targeted behavior plan to address treatment non-compliance could have been useful.

**Patient B**

This 31-year-old patient was admitted to acute level of care on September 1, 2021 from the MHCB where he was being treated for manic symptoms and suicidal ideation with plan and intent. Across providers and documentation, he was diagnosed with bipolar disorder although additional diagnoses of unspecified anxiety, schizoaffective disorder varied by provider. Under a newly ordered PC 2602, he was prescribed antipsychotic and antidepressant medication. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

Psychologist initial assessment and initial IDTT documentation included relevant historical information and recent clinical information, but an overview of current clinical needs was not clearly documented. The initial psychiatric assessment was insufficient and lacked

466

individualization. The chief complaint in the initial psychiatric assessment was "DTS" (danger to self); no other details were provided. Historical information appeared copied from the psychologist initial assessment.

The individual plan of care addressed danger to self with a focus on suicidal ideation and self-harm behaviors at the initial IDTT. However, auditory hallucinations identified in initial documentation as the precipitant to his suicidal ideation, were not targeted nor were identified mood symptoms included. A baseline assessment to reduce suicidal ideation to a two or lower was not located. Engagement in group treatment was variable. When he attended group, description of his mental status and functioning varied by provider. There was no documentation regarding progress (or lack thereof) regarding treatment goals. Group topics were predominantly recreational in nature. The rationale for assignment to anger management group was unclear.

Documentation of routine provider contacts addressed his clinical needs and documentation of his mental status, functioning and clinical interventions was generally descriptive and indicated that he stabilized over time. However, sufficient summaries of his care were not included in routine IDTTs and treatment planning was not updated to address treatment needs.

Suicide risk assessments were completed regularly. Overall, he was assessed as moderate chronic and acute risk with one exception on October 7, 2021 when he was assessed as high chronic risk. The rationale for the change to high and return to moderate after a subsequent assessment was unclear. Of note, he was assessed as high chronic risk at the time of his MHCB admission and the change to moderate chronic risk at the time of his PIP admission was unclear.

<u>Findings</u>

This patient's care was adequate but improvements were needed. Despite deficits in initial assessments and subsequent treatment planning, documentation of care in routine contacts was sufficient. Rationale for change in suicide risk assessment was needed. Group assignment and documentation needed individualization. Of note, documentation that had been copied from previous providers did not include relevant original information such as date, author or level of care.

**Patient C**

This 33-year-old patient was admitted to acute level of care on September 14, 2021 for stabilization of self-harm behavior and depressive symptoms. Diagnoses varied by location and provider and included major depression and antisocial and borderline personality disorders. He was prescribed an antidepressant and an antipsychotic for agitation, as needed. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

This patient had a history of self-injurious behavior, suicide attempts and conditional suicidal statements. He was admitted to a MHCB following a suicide attempt in which he ingested razors which he attributed to multiple losses and segregation placement. A foreign body was confirmed by x-ray. Two days prior to the PIP transfer, he fashioned a noose and put it around his neck. Upon admission to the PIP he reported continued depressive symptoms including intermittent suicidal ideation and hopelessness.

Initial evaluations provided relevant historical and recent clinical documentation but needed improvement in current treatment needs. Treatment planning appropriately targeted a reduction in suicidal ideation and self-harm behaviors and aimed to increase coping skills and identification of triggers. Associated depressive symptoms were not targeted and a baseline assessment of suicidal ideation was not located to assess progress toward change and appropriateness of goal. A goal to address treatment refusals was needed but not included. The only documented intervention was development of therapeutic alliance.

Overall, contacts occurred at cell-front due to his refusal to leave his cell. He was frequently described as watching television. Appropriate clinical interventions to assist with coping skills and distress tolerance were documented by the psychologist. Psychiatric documentation included rationale for medication changes and patient resistance to changes.

Reviewed group notes indicated that he generally attended group treatment. Group documentation lacked individualization regarding his progress toward treatment needs.

Risk assessment rationale documentation needed improvement. Risk factors were identified but clear rationale for assessment was needed. Chronic risk at the time of admission was unable to be determined as he was endorsed as both high and moderate risk. Acute risk at the time of admission was assessed as moderate but there was no consideration of his placement of a noose around his neck several days prior while in the MHCB. A safety plan was clinically indicated but not completed.

Findings

This patient's care was adequate but marginally adequate. Documentation of current treatment needs during initial assessments, treatment planning (relevant goals and interventions), risk assessment and group documentation needed improvement.

**Patient D**

This 54-year-old patient was admitted to acute level of care on September 29, 2021 from the MHCB for stabilization of ongoing psychosis. He was diagnosed with schizophrenia and prescribed antipsychotic medication under a newly ordered PC 2602. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

He had an extensive history of inpatient psychiatric treatment for his mental illness. There was no history of suicide attempts. At the time of admission, he was assessed as low chronic and moderate acute risk. Risk factors were identified but clear rationale for assessment was needed.

Documentation from initial assessments conveyed a grossly psychotic and disorganized individual. Documentation indicated that he was admitted to the PIP from the MHCB due to danger to others and grave disability. Grave disability was targeted as a treatment goal; although behaviors that warranted grave disability were not specified. Consequently, progress was difficult to assess. There was no goal for danger to others or identified psychiatric symptoms. An adequate summary of his mental status and functioning was provided during routine IDTTs

468

although a summary of progress toward his treatment goal was not clearly documented nor were his treatment refusals discussed.

Routine contacts provided descriptive summaries of his disorganized thought processes and mental status. Overall, he refused individual contacts and was seen cell-front. A goal to address treatment non-compliance was needed but not implemented. His mental status slowly improved over time with medication adjustments.

He was assigned a mental health education group in mid-October 2021 but consistently refused. It was not clear why he was not offered recreational groups.

<u>Findings</u>

This patient's care was inadequate. This psychotic patient was seen cell-front for brief wellness checks. Treatment planning was insufficient and treatment refusals were not actively addressed. Group programming was limited and, based on his mental status, recreational programming was more appropriate than a therapy group. Clinical rationale for risk assessment was needed. Documentation that was copied from previous providers needed indication of original author, date and level of care.

**Patient E**

This 43-year-old patient was admitted to acute level of care on September 30, 2021 after his psychotic symptoms failed to stabilize in the MHCB. He was diagnosed with schizophrenia and prescribed antipsychotic medications. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the acute level of care.

Upon admission to the PIP, he remained non-compliant with psychiatric medication and was responding to internal preoccupation. Shortly after admission he began taking antipsychotic medication. A previous PC 2602 expired in 2020. Initial psychologist assessment documentation indicated that the "MHMD" had pursued a PC 2602 but it was unclear if this referred to the PIP or MHCB psychiatrist. Further, the status of the PC 2602 was not located in reviewed documentation.

Initial assessment documentation was based on healthcare record review. Documentation was useful, but details regarding his current clinical status and functioning was needed. Of note, source information was not provided from documentation that had been copied from other providers.

For reasons that were unclear, treatment goals to address his psychiatric needs were not implemented until October 14, 2021. At that time, grave disability was targeted as a treatment goal and remained the only goal through November 4, 2021. Medication compliance was included with grave disability. Of note, specific behaviors that resulted in grave disability were not specified and thus progress was difficult to assess. There were no goals for identified psychiatric symptoms or observed behaviors such as yelling or attending to ADLs. He often refused out of cell contacts with providers, although the rationale for cell-front contacts (individual and group) was not consistently documented and treatment refusals were included as treatment goals.

469

Clinical rationale for observation level and access to property was not clearly documented.

<u>Findings</u>

This patient's care was inadequate due to insufficient treatment planning, failure to actively address treatment refusals and need for clear documentation regarding the status of the PC 2602 and observation level.

**Patient F**

This 65-year-old condemned patient was admitted to ICF level of care on July 2, 2019. He was diagnosed with schizophrenia. Under PC 2602 he was prescribed antipsychotic and antidepressant medications. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the ICF level of care.

This patient had an extensive history of treatment resistant symptoms including paranoid delusions and auditory hallucinations. After a period of stability in EOP he decompensated and was admitted to the MHCB where he failed to stabilize. Specifically, a combination of medication non-compliance and methamphetamine use led to an increase in psychosis. Consequently, his delusion that food was poisoned resulted in substantial weight loss and he was admitted to inpatient for grave disability.

In August 2021, electroconvulsive therapy (ECT) was initiated to address refractory symptoms. Documentation indicated that he benefitted from the treatment and delusions regarding custody staff were less pervasive.

Reviewed treatment plans targeted delusions, an individual plan of care initiated in July 2020. Goals and interventions were appropriate. A goal to address his substance use, a documented precipitant to decompensation was needed but not included. Sufficient summaries of his mental status, functioning and response to treatment were provided in monthly IDTT clinical summaries. Delusions regarding custody staff were described but reality testing was needed. Overall, summaries reflected documentation provided in routine provider contacts. Clinician interventions were primarily supportive in nature.

Group attendance was variable. Rationale for group assignment was not clear and relation to treatment goals and progress was not clear.

<u>Findings</u>

This patient's care was adequate but marginally adequate. Reality testing was lacking during routine contacts clinical interventions and treatment planning for substance use was needed. Failure to sufficiently address these treatment needs would likely result in decompensation once discharged from the PIP.

**Patient G**

This 51-year-old condemned patient was admitted to ICF level of care on April 28, 2021. Provider diagnosis of schizophrenia was not included in the official place of record. He was

prescribed antipsychotic medication. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the ICF level of care.

He had no major mental health history and was not in the MHSDS at the time of admission. He may have been placed in 3CMS in 2000 upon admission to the facility but records were unclear. Prior to his ICF admission he was delirious and required outside medical treatment for hyponatremia where his sodium levels were life threateningly low due to excessive water intake. The excessive water intake was attributed to his delusions.

Treatment planning initially addressed his delusions with appropriate goals and interventions. However, on August 26, 2021 this individual plan of care was removed and replaced with danger to others. The rationale for the change was not clearly documented. Identified symptoms (delusions, auditory hallucinations) were not targeted.

Clinical summaries of reviewed IDTTs provided useful information including a pattern of individual, group and IDTT refusals since he was admitted that were not timely addressed. A positive behavior support team consult was not considered until September 23, 2021 but was not pursued.

IDTT documentation from October 28, 2021 indicated that his sodium levels were low again. Documentation indicated that he was medication compliant and routine blood draws indicated that levels were appropriate. However, he remained delusional and continued to isolate in his cell. Recent routine contacts described him as laying on the floor in front of his cell door as opposed to previous observation when he was watching television, a decline in his functioning.

Findings

This patient's care was inadequate. This complex psychotic patient continued to isolate and was seen cell-front for brief wellness checks for six months. Treatment planning was insufficient and treatment refusals were not actively addressed. Of note, there was no indication that documentation from an intern was reviewed or co-signed by a licensed clinician.

**Patient H**

This 41-year-old condemned patient was admitted to ICF level of care on July 16, 2021 and discharged on November 3, 2021. He was diagnosed with bipolar disorder by providers with additional diagnoses of attention deficit hyperactivity disorder, anxiety, post-traumatic stress disorder and opioid use disorder located in his record. He was prescribed Abilify, Topomax, Seroquel, Clonidine and Strattera under PC 2602 for danger to self, danger to others and grave disability. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the ICF level of care.

He had a long history of MHCB and PIP admissions for psychosis and mood symptoms. He was re-admitted to the PIP five weeks after discharge from the PIP. The current admission occurred after a suicide attempt via overdose. He attributed the overdose to the death of his fiancée. His individual plan of care (IPOC) targeted depression with a reasonable goal to reduce depressed mood from a ten to a six. Additional identified depressive symptoms were not targeted nor were there IPOCs for danger to self, substance use or grief which were identified treatment needs.

IDTT documentation of functioning between IDTTs and routine provider documentation was useful and included relevant mental status, functioning and clinical interventions. Routine psychiatric documentation provided thorough review of medication rationale.

Reviewed group documentation indicated that he frequently refused. Group assignment rationale and progress toward treatment goals was not clearly documented. In contrast, the discharge summary was brief and did not sufficiently convey this patient's course of treatment, necessary for continuity of care.

Multiple risk assessments were completed throughout his PIP stay. At the time of admission, he was assessed as high chronic and acute risk with a discharge assessment of high chronic and low to moderate acute risk. Rationale for risk assessment and changes to risk needed improvement. His safety plan was reasonable but could have been improved with specificity and inclusion of MAT refusals as a warning sign.

<u>Findings</u>

This patient's care was adequate but marginally adequate. The exclusion of substance use as a treatment goal, an identified precipitant was necessary for sustained stabilization. Risk assessment and safety planning needed improvement. Rationale for group assignment and documentation of alignment and progress toward treatment goals was needed.

**Patient I**

This 46-year-old condemned patient was admitted to ICF level of care on September 8, 2021 from EOP. Providers agreed on a diagnosis of major depressive disorder. Additional diagnoses located in his record included generalized anxiety disorder and opioid use disorder. He was prescribed an antidepressant and Vistaril for his anxiety. He was in the MAT program. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the ICF level of care.

He had a lifetime history of depression. He was admitted to the PIP after experiencing homicidal ideation toward an officer and an exacerbation of anxiety and depression, precipitated by multiple familial and institutional stressors. As background, in April 2021 he had a suicide attempt which resulted in a PIP admission. The suicide attempt was attributed to marital discord which was his primary stressor during this admission as the couple was discussing divorce.

Initial assessments, IDTT and routine provider documentation provided useful discussion of his treatment needs and clinical interventions. IPOCs addressed anger but depression, anxiety and danger to others were not addressed. However, while not identified on the treatment plan, these treatment needs were addressed during routine contacts.

Reviewed group documentation indicated that he frequently refused group. Rationale for group assignment was not documented. When he did attend, progress toward treatment goals was not documented.

The initial risk assessment determined that he was low chronic and acute risk, likely an underestimate of his risk. Subsequent risk assessments increased his risk to moderate chronic

472

and acute. Clear rationale for assessments was needed. Safety planning needed improvement. Specifically, while his wife was identified as someone he could talk to, there was no documentation that also indicated that his wife was also a major stressor and their relationship was a precipitant to his only suicide attempt several months prior.

Findings

This patient's overall care was adequate but treatment planning and group documentation, risk assessment rationale and safety planning needed improvement.

**Patient J**

This 42-year-old condemned patient was admitted to ICF level of care on September 21, 2021 from the MHCB for further stabilization. His involvement in the MHSDS since incarceration in 2006 included two MHCB admissions in 2020. He was diagnosed with somatic disorder and refused psychiatric medications. His healthcare record was randomly selected from the PIP roster to assess adequacy of care for patients at the ICF level of care.

He has a history of serious hunger strikes that have been potentially life threatening. After a hunger strike in November 2020, which required outside hospitalization he was treated at the CTC until his discharge in September 2021. He refused to leave the CTC which resulted in a use of force and MHCB referral and the present PIP admission. Documentation indicated that he was odd and there was a question of psychosis. His belief that chronic pain issues were not sufficiently treated were a precipitant to his hunger strikes. An extensive medical work-up was unremarkable.

His sole individual plan of care focused on grave disability. However, the specific behaviors that warranted this goal were not clearly documented and progress was unable to be determined. Identified treatment needs such as chronic pain, anger, depression and desire not to return to his condemned housing unit were not addressed in treatment planning. When he refused individual contacts treatment providers documented attempts to engage him and build rapport. Psychiatric contacts indicated ongoing education and encouragement regarding psychiatric medication. Overall, provider routine contact documentation was clinically useful.

He refused group treatment which he attributed to his ongoing pain which interfered with his ability to stand or walk.

He was assessed as moderate chronic acute risk of harm. He refused to participate in safety planning at the time of admission. An updated safety plan was needed once he engaged in treatment.

Findings

This complex, treatment resistant patient's care was adequate but marginally adequate. Underlying issues that precipitated hunger strikes and impaired functioning were not targeted in treatment planning. Symptoms/behaviors of grave disability was not clearly identified to assess treatment progress.

**Patient K**

This 61-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP. The patient had been retained in intermediate care at SQ-PIP since 2015. His LRH was single cell due to his condemned status.

The patient's psychiatric diagnosis was Schizophrenia, Catatonic Type, and he was prescribed antipsychotic and mood stabilizing medications. A PC 2602 medication order remained active during admission. Psychiatry noted the patient had treatment resistant Schizophrenia, blindness in one eye, adrenal insufficiency, and other high risk medical concerns. Treatment obstacles documented throughout 2021 included the patient's treatment non-compliance, incontinence, slowed cognition, possible medication "cheeking," delusions, disorganized thinking, and required prompting to complete activities of daily living (ADLs).

During admission, individual psychiatry and primary clinician contacts were offered at least weekly in accordance with the IDTT treatment plans. Psychiatry continued to adjust the patient's medications and worked collaboratively with medical staff to closely monitor the patient's medication response and adherence. Throughout 2021, the treatment team continued modify treatment approaches to address the patient's attention to self-care and medication and treatment non-compliance. A PBSP was implemented to improve activities of daily living (ADLs) and increase participation in out of cell activities, such as yard and treatment groups. "Immediate incentives" were provided for mental health treatment participation. The IDTT tracked progress by using custody's NCAT data. Weekly progress updates were also completed and entered into the healthcare record. By the end of 2021, the patient's participation in treatment groups nearly doubled at 33 percent.

The treatment team documented plans to discharge this patient to EOP level of care in late 2020, noting that, despite ongoing symptoms and functional deficits related to his Schizophrenia diagnosis, the patient appeared to be at baseline. However, the patient required "indefinite placement in an OHU setting" upon discharge from the PIP, and as of December 2021, the patient was still awaiting an available OHU bed.

Findings

The care provided by the mental health staff at SQ-PIP was adequate. Despite documenting an informal clinical discharge to EOP level of care in late 2020, the treatment team continued to closely monitor the patient, modify their treatment approaches, and track progress in measurable terms whenever possible. IDTT documentation provided useful updates on current symptoms, functioning, response to treatment efforts, and obstacles to OHU transfer. The IDTT also documented clear rationales for treatment planning and level of care decisions. Further, the patient appeared to benefit from the treatment team's interventions over the last year.

**Patient L**

This 61-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP. The healthcare record suggested this patient spent a great deal of time in intermediate care between 2014 and 2021. Although the patient was

briefly released to EOP in April 2019, he returned to the inpatient setting four months later in August 2019. Since August 2019, the patient had remained in intermediate care at SQ-PIP.

The patient was diagnosed with Schizophrenia and prescribed antipsychotic, antidepressant, and mood stabilizing medications.  There was an active PC 2602 order during the current admission.  The healthcare record also indicated the patient suffered from a neurocognitive disorder and had fairly significant physical limitations as a result of his chronic medical conditions.

Treatment plans targeted delusions, treatment non-adherence, activities of daily living (ADLs), social skills, range of motion activities to reduce skin legions, incontinence, and expressive language skills.  Treatment outcome expectations were realistic and measurable.  The IDTT implemented a PBSP with incentives to increase out of cell programming, treatment participation, and attention to ADLs.  Treatment plan effectiveness was routinely reviewed during IDTTs, and plans were revised as needed.  The IDTT also documented ongoing collaborative discussions with the behavioral specialist and physician.  Additionally, the IDTT submitted referrals for neuropsychological testing to clarify the extent of the patient's cognitive limitations and for an electroconvulsive therapy (ECT) assessment to address treatment resistant symptoms.

While the patient's psychotic symptoms remained in the severe range and grave disability concerns remained moderate, the IDTT noted significant progress in some areas of functioning as a result of the PBSP.  Between May and November 2021, the patient's program participation increased from 55 percent to 75 percent.  As of November 2021, the patient was also completing medical related walks three to four times per week, having fewer episodes of incontinence, and evidencing increased prosocial behavior on the unit.  The IDTT also indicated the patient had responded well to a new routine that involved morning groups and afternoon in-cell activities to keep him awake and occupied.

Findings

The care provided to this intermediate care patient at SQ-PIP was adequate.  Treatment planning was collaborative, patient specific, and routinely modified for improved effectiveness.  A positive behavior support plan was developed with incentives to address treatment obstacles.  Progress toward treatment objectives was recorded in measurable terms.  The IDTT also appropriately referred the patient for necessary assessments to clarify diagnostic questions and explore treatment alternatives.  Additionally, clinical documentation was thorough and provided clear justifications for the treatment team's decisions.

**Patient M**

This 40-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP.  Prior to intermediate care admission, the patient received an RVR and was subsequently admitted to San Quentin's MHCB due to danger-to-other concerns.  The healthcare record indicated the patient had been struggling with medication non-adherence and "depressive/manic episodes" for at least six months.

The patient was diagnosed with Bipolar I Disorder and prescribed antipsychotic, mood stabilizing, and anxiolytic medications.  IDTT treatment plans targeted the patient's anger,

agitation, mood fluctuations, substance use, and non-compliance with mental health treatment and medication. Interventions included cognitive behavior therapy, relapse prevention, psychoeducation, educational videos, art supplies, and teaching and practicing new coping skills. Routine psychiatry and primary clinician contacts occurred weekly in accordance with treatment plans. Providers' interventions during individual contacts were relevant to the patient's discharge objectives.

By August 2021, the patient was described as treatment compliant, no longer endorsing anxiety and mood symptoms, and able to manage his anger with new coping skills acquired during admission. The treatment team also referenced a quote from the patient indicating he was satisfied with the mental health services provided in the PIP.

The treatment team continued to document progress and evidence of increased stabilization through October 2021. On October 7, 2021, primary clinicians from the PIP and EOP program met with the patient for a joint session to develop a transitional plan of care prior to discharge. The patient agreed to the discharge plan and expressed readiness for outpatient care. The SRASHE and safety plan were also updated prior to discharge.

Findings

The care and discharge planning for this patient were adequate. The IDTT developed and implemented patient specific treatment plans and appropriately documented progress in measurable terms throughout admission. The patient clearly benefitted from the treatment provided. Clinical documentation included clear updates on current symptoms, functioning, response to treatment, and discharge readiness. Additionally, the joint session with the EOP clinician was an excellent intervention to ensure a smooth transition from the inpatient to outpatient setting.

**Patient N**

This 39-year-old condemned status patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP. The patient was admitted to intermediate care from San Quentin's EOP program on August 20, 2021 for "significant impairment due to mental illness." The referring treatment team noted worsening depressive symptoms, reduced participation in programming, and impaired self-care. SQ-PIP staff were familiar with the patient due to multiple prior PIP admissions.

The patient was diagnosed with Schizoaffective Disorder, Bipolar Type, and prescribed antipsychotic, antidepressant, and mood stabilizing medications. There was an active PC 2602 involuntary medication order in place since 2019. Symptoms and behaviors documented during the current admission included auditory hallucinations, paranoia, anxiety and panic, isolation, mood lability, chronic pain, and suicidal ideation. The most recent SRASHE assessed his chronic suicide risk as high and his acute risk as moderate. Although the patient had no suicide attempts or self-injurious behavior incidents since 2017, there was a brief MHCB admission for suicidal ideation in July 2021.

The IDTT treatment plan addressed the primary concerns resulting in the current PIP admission, including self-care, suicidal ideation, depression, anxiety, psychotic symptoms, and chronic pain.

Treatment goals were realistic and measurable, and interventions were clear and evidenced based. Baseline measures for depression, anxiety, and out of cell programming were documented during the initial IDTT. The IDTT reviewed treatment plan effectiveness during monthly meetings and documented clear justifications for retaining the patient in intermediate care. Additionally, in October 2021, the IDTT considered a PBSP referral and documented their rationale for not referring the patient at that time.

During admission, the treating psychiatrist conducted a thorough review of the patient's medication history and closely monitored the patient's response to medication changes. Psychiatry also documented plans to collaborate with the patient's physician to address chronic pain issues. Additionally, in December 2021, psychiatry addressed the patient's anxiety related to a pending surgery with educational videos and a lesson on anatomy with the use of a plastic model spine.

PC progress notes and clinical summaries provided clear updates on treatment progress and obstacles, as well as current symptoms and functioning. The primary clinician met with the patient at least once per week and documented patient specific interventions during each encounter.

In December 2021, the IDTT's treatment approaches were slightly modified to include additional patient specific considerations. The IDTT also coordinated a contact with the Chaplain at the patient's request.

As of December 2021, the patient had demonstrated progress toward treatment objectives. His group treatment participation increased from 17 percent to 28 percent, he was regularly attending primary clinician and psychiatry contacts, and he was agreeable to working toward 40% compliance over the next month.

Findings

The care provide to this patient was adequate. Treatment plans addressed the patient's presenting concerns and they were routinely revised to address new problems and obstacles for increased effectiveness. Treatment progress was reported in measurable terms whenever possible. Providers' interventions during individual encounters were meaningful and consistent with treatment goals. Additionally, the clinical documentation was well organized and offered clear updates and treatment decision rationales.

**Patient O**

This 55-year-old condemned status patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP. The patient was referred for intermediate care from San Quentin's MHCB on or around October 3, 2021 due to homicidal ideation involving staff, hypomania, poor impulse control, hypersexuality, and "non-psychotic paranoia." Prior to the MHCB admission in September 2021, the patient had discontinued his mood stabilizing medication against medical advice, engaged in indecent exposure (IEX), received two RVRs, and required a cell extraction after boarding up and tying his cell door shut.

During intermediate care admission, the patient was diagnosed with Unspecified Depressive Disorder, with anxious distress; and prescribed medications for depression and impulsivity. The IDTT also noted a rule out diagnosis of PTSD. The most recent SRASHE assessed the patient's chronic suicide risk as high and his acute risk as low.

IDTT treatment plans targeted anger and impulsivity, noting that these were contributing factors to recent RVRs. The associated goals were measurable and realistic. Treatment interventions were clear. Psychiatry noted plans to review and modify medications during admission, and medication adjustment continued through December 2021. The IDTT also discussed whether a PBSP was clinically indicated and documented their rationale for not referring the patient at the time. IDTT clinical summaries included necessary updates on current treatment progress and obstacles. Additionally, treatment team members documented efforts to advocate on behalf of the patient, including to coordinate referrals to medical staff and elevate a custody complaint to administrative staff.

Individual contacts with the primary clinician and psychiatrist occurred at least weekly in accordance with IDTT treatment plans. Clinical notes for individual contacts suggested implemented treatment interventions were meaningful to the patient and consistent with documented treatment goals. The IDTT indicated the patient was offered up to four groups per day at one point; although in November 2021, the team agreed to reduce the number of groups to two per day at the patient's request.

As of November 2021, the patient was participating in 82 percent of groups offered, 100 percent compliant with psychiatric medications, and exhibiting some progress with impulse control and anger management. The IDTT completed a treatment satisfaction survey with the patient and noted medications were rated as "extremely helpful" for mood management; other aspects of treatment were rated as "moderately helpful."

In November 2021, the patient reported difficulties managing his anger with a specific custody officer on the unit, adding that the officer responsible for escorting him to groups was the officer "bringing charges against him." The IDTT identified this as an obstacle to treatment and appropriately elevated the matter to administrative staff.

Findings

The care provided to this intermediate care patient was adequate. The IDTT advocated on the patient's behalf when indicated and appropriately considered the patient's input in various treatment decisions. Treatment plans targeted the symptoms and behaviors that resulted in the current inpatient admission and recent RVRs. Treatment plans were also routinely reviewed and modified for increased effectiveness during admission. Additionally, the frequency and content of individual and group treatment contacts were consistent with the patient's treatment objectives.

**Patient P**

This 57-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP. The patient received treatment in the acute care program at SQ-PIP from August 2, 2021 through December 29, 2021. The patient was referred

from a CTC where he was receiving long term medical care and assistance with basic tasks such as feeding and bathing.  A CTC to CTC transfer was coordinated, and the acute referral requested that treatment address the patient's psychotic and depressive symptoms, "extreme agitation," refusal to leave his bed, and unwillingness to accept assistance with self-care.

The patient was diagnosed with Schizophrenia and prescribed mood stabilizing and antipsychotic medication, including Clozapine.  He also suffered from cognitive limitations and multiple medical issues.  The healthcare record noted a developmental disability code of DD3.

The acute care treatment plan targeted psychotic symptoms, distress, out of cell programming, and throwing of food.  The IDTT documented baseline measures to track progress during admission.  Treatment plans were collaborative and goals were developed with consideration for the patient's cognitive and physical abilities and current setting in the CTC.

IDTTs were at times held in the patient's CTC cell when he was unable or unwilling to leave his bed.  IDTTs routinely reviewed treatment progress and obstacles, revised plans when indicated, and discussed whether the patient was appropriate for a behavior plan.  The treatment team also documented consultations with medical providers and submitted referrals as needed.  Clinical progress notes suggested individual treatment contacts were offered in accordance with IDTT treatment plans, with both providers following up every 72-hours.

During the course of admission, mental health treatment was disrupted by the patient's serious medical issues.  For example, he was hospitalized in the community for approximately two weeks in late October 2021 and required IV antibiotics upon return.  During this period, treatment teams continued to adjust the patient's psychiatric medications and offer meaningful interventions.

Despite a number of treatment obstacles, there was evidence of progress toward treatment goals by December 2021.  On December 15, 2021, the IDTT recommended discharge and further treatment in intermediate care.

<u>Findings</u>

The care provided to this patient in the acute care program at SQ-PIP was adequate.  Treatment plans were patient specific, collaborative, and regularly reviewed and modified for effectiveness.  Additionally, the patient appeared to benefit from the care provided, and he was appropriately discharged to intermediate care for further inpatient treatment.

**Patient Q**

This 29-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP.  The patient received treatment in the acute care program at SQ-PIP from around September 8, 2021 through November 20, 2021.  The referring institution noted concerns with persecutory delusions, disorganized thinking, impulsivity, violence, and increased risk of harm to self and others in the context of command auditory hallucinations.  The patient was diagnosed with Bipolar I Disorder, with psychotic features, and prescribed mood stabilizing, antipsychotic, and anxiolytic medications during admission.  The

healthcare record referenced a history of suicide attempts and self-injurious behavior incidents, the most recent of which occurred in July 2021.

The patient was designated MAX custody during admission due to an RVR for battery on an inmate in July 2021. The IDTT routinely reviewed the patient's need for mechanical restraints and documented rationales for retaining handcuffs during the initial phase of admission. The IDTT no longer recommended "cuffing" after the November 4, 2021 IDTT. The patient's LRH was single cell, and mental health staff documented rationales for retaining the patient in a single cell throughout the current admission.

Treatment plans targeted the patient's thoughts of harming others, anger, auditory hallucinations, ineffective coping, and medication non-compliance. The IDTT noted that progress would be tracked in measurable terms. While some treatment interventions were vague in the IDTT documentation, progress notes provided greater detail regarding interventions used to assist the patient in achieving his treatment objectives. The IDTT also routinely documented rationales for retaining the patient in the acute level of care.

The primary clinician and psychiatrist completed their initial assessments of the patient prior to the initial IDTT as required. Routine individual contacts with the primary clinician and psychiatrist generally occurred every 72-hours in accordance with IDTT treatment plans. Clinical notes were thorough and appropriately included mental status examination results, a description of treatment interventions offered, and an update on current treatment obstacles and progress.

The patient exhibited objective improvements during the course of admission. The IDTT noted that, although the patient continued to isolate and withdraw at times, he was calmer, "socially engaging," and participating in more out of cell programming. The IDTT further noted the patient was "no longer evidencing manic agitation or psychotic [symptom] paranoia." The patient also reported a decrease in auditory hallucinations as a result of voluntary medication adherence. The IDTT began preparing the patient for discharge on November 4, 2021, noting that the patient was in agreement. On November 20, 2021, the patient discharged to EOP level of care. SQ-PIP staff documented detailed treatment recommendations for the outpatient treatment team to consider. A discharge SRASHE and safety plan were completed on this date as well.

Findings

The care provided to this patient was adequate. Clinical notes were comprehensive, included results of mental status examination, described treatment interventions offered to meet the patient's needs, and updated any current treatment progress as well as obstacles. A discharge SRASHE and a safety plan were appropriately completed.

**Patient R**

This 38-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP. The patient received treatment in the acute care program at SQ-PIP from September 29, 2021 through November 16, 2021. The referring

institutions suggested the patient required inpatient care to address suicidal thoughts, self-harm, depressed mood, and paranoid ideation.

The patient was diagnosed with Unspecified Schizophrenia Spectrum Disorder, Delusional Disorder, and Amphetamine Type Substance Use Disorder. He had an active PC 2602 involuntary medication order and was prescribed antipsychotic, antidepressant, and anxiolytic medications during admission.  The healthcare record also referenced a history of suicide attempts and self-injurious behavior incidents, the most recent of which resulted in 16 forearm stitches on August 4, 2021.

IDTT treatment plans targeted programming compliance, anxiety, self-harm, and social skills. Measurable treatment objectives and specific cognitive behavior therapy interventions were included in the plan.

Routine primary clinician and psychiatry contacts generally occurred every 72-hours in accordance with treatment plans.  However, while the psychiatrist's initial assessment was completed prior to the initial IDTT, as required, the primary clinician's initial assessment was not.

The patient regularly participated in treatment groups through the end of October 2021. However, in November 2021, the patient complained that groups were no longer offered, and it was difficult to interpret the reason based on record review alone.

By November 2021, the IDTT documented progress toward treatment objectives and discharge readiness.  The primary clinician completed a discharge suicide risk evaluation and SRASHE prior to discharge.

The healthcare record confirmed the patient met with the pre-release coordinator to assess his discharge needs and coordinate services prior to his release date of November 16, 2021. Additionally, the primary clinician documented release planning discussions during more recent individual appointments.  Pre-release planning documentation referenced correspondences between the pre-release coordinator and parole agent to arrange for transfer to a community program.  The patient discharge and paroled from SQ-PIP on November 16, 2021.

Findings

The overall care and attention to pre-release planning at SQ-PIP were adequate.  The IDTT documented progress toward treatment objectives and the patient's readiness for discharge.  A discharge suicide risk evaluation and SRASHE were appropriately completed prior to discharge.

**Patient S**

This 31-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP.  The patient was admitted to the acute care program at SQ-PIP on September 29, 2021.  The referral concerns included paranoid delusions, command auditory hallucinations, "acute victimization concerns, psychotic disorganization, and manic mood elevation."  The healthcare record referenced a suicide attempt in February 2021, and the patient's most recent SRASHE assessed his chronic and acute suicide risk as moderate.

481

The IDTT considered diagnoses for Bipolar Disorder and Schizoaffective Disorder during admission. The patient was prescribed mood stabilizing and antipsychotic medication, and a PC 2602 involuntary medication order was pursued and granted.

Treatment plans targeted "danger to self," medication non-adherence, psychotic symptoms, and symptoms of depression and anxiety. Psychiatry addressed medication compliance issues by submitting a petition for an involuntary medication order. The treatment plan interventions for primary clinicians were often vague and limited to discussions with the patient; although primary clinician progress notes referenced more specific interventions implemented during clinical encounters. Despite noting a high rate of treatment refusals throughout admission, the IDTT did not integrate treatment non-compliance concerns in the acute care treatment plans. In November 2021, the IDTT considered a PBSP referral; however, they did not submit the referral or document a clear non-referral justification.

The primary clinician and psychiatrist completed their initial assessments of the patient prior to the initial IDTT as required. Routine individual contacts with the primary clinician and psychiatrist generally occurred every 72 hours in accordance with IDTT treatment plans.

Documented progress was generally limited to the absence of reported thoughts of self-harm during PIP admission. The patient remained treatment non-compliant and rarely left his cell. He routinely refused individual contacts, treatment groups, and medications. In November 2021, the patient reportedly urinated on the dayroom floor and engaged in "hostile and aggressive behaviors" warranting a return to mechanical restraints during escorts.

As of December 27, 2021, the patient remained on cuffing status in acute care due to agitation and disorganized thoughts and behaviors. Although IDTT documentation in December 2021 referenced occasional attendance in group and individual encounters, records did not clarify the treatment team's interventions to address the issue, and attendance data was not reported in measurable terms to track progress.

Findings

With the exception of medication interventions, the mental health treatment was inadequate. The primary clinician's treatment interventions were unclear and goals were not consistently described in measurable terms to track progress. Despite IDTTs routinely documenting treatment non-compliance and a lack of treatment progress, treatment plans were not modified to address this obvious barrier. New behavioral concerns documented during admission also were not appropriately integrated in treatment plans. Despite records suggesting the patient was appropriate for a PBSP referral to address current obstacles, the IDTT did not submit the referral or document a sufficient non-referral rationale.

**Patient T**

This 46-year-old patient was randomly selected for healthcare record review to assess the quality of mental health services provided at SQ-PIP. The patient was admitted to the acute care program on October 5, 2021. The referring institution noted he cut his throat prior to MHCB admission, and continued to present as a danger to himself with significant safety concerns.

The patient was diagnosed with Major Depressive Disorder, Substance Use Disorder, and Antisocial Personality Disorder. Prescribed psychotropic medications targeted mood stabilization and anxiety during admission. The healthcare record referenced three suicide attempts and prior self-injurious behavior incidents.

Treatment plans targeted suicidal ideation, self-harm, and mood symptoms. Measurable objectives and meaningful interventions were included. A suicide risk assessment and safety plan were completed during the first week of admission and psychiatric medications were adjusted throughout the admission. In response to the patient's safety concerns, the IDTT noted in December 2021 that they planned to "hold off" on discharge until the ISU investigation was completed.

While psychiatry completed their initial assessment of the patient prior to the initial IDTT, as required, the PC's initial assessment was not completed until one week after. Routine individual contacts with the primary clinician and psychiatrist generally occurred every 72-hours in accordance with treatment plans. Clinical progress notes referenced useful interventions implemented during individual contacts. Providers also documented objective and subjective progress toward treatment objectives; however, the patient continued to report significant safety concerns, passive suicidal ideation, and depressed mood.

IDTT clinical summaries provided useful updates on current symptoms, functioning, and response to treatment. By December 2021, the IDTT noted a lack of self-harming behavior during admission, as well as increased compliance with medication, treatment participation, yard, and in cell activities.

The patient was still in the acute care program at the time of this review.

<u>Findings</u>

Overall, the care provided to this acute care patient at SQ-PIP was adequate. Treatment plans were appropriate for addressing the patient's mood symptoms, suicide risk, and underlying safety concerns. Treatment progress and obstacles were clearly documented, as were the IDTT's level of care rationales and discharge considerations.

**APPENDIX B7**
**CMC MHCB "Acute Care"**
**June 16, 2021**

**Patient A**

This 38-year-old patient was admitted to the acute level of care on May 10, 2021 to address mood stability, self-harm/self-injurious behavior, auditory hallucinations and anxiety.  He was diagnosed with schizoaffective disorder.  He was prescribed Zyprexa, Lithium and Vistaril for psychosis, mood stabilization and anxiety respectively.  His healthcare record was selected from the acute census to assess adequacy of care in the institution's temporary acute unit.

Initial assessments and the initial IDTT were timely.  The psychiatric assessment was thorough and appropriate.  The quality of the primary clinician assessment covered relevant clinical information but did not portray an individualized assessment.  While psychiatric provider varied, routine psychiatric contacts occurred every 72 hours and primary clinician contacts generally occurred every 72 hours with the same clinician.  Provider documentation included relevant clinical assessment, current status and treatment interventions.  Treatment interventions (grounding, mindfulness, distraction techniques) were appropriate and generally aligned with the treatment plan.  Effective communication was generally addressed in contacts and varied by provider.

Treatment planning needed improvement.  Symptoms that led to admission were not fully addressed in treatment goals and rationale for chosen goals was unclear.  Collaboration between providers was not clearly evident in routine documentation or in treatment plans in which the clinical summary appeared based on primary clinician documentation.  In addition, rationale for documentation in the clinical summary from the June 15, 2021 IDTT, "presented with borderline personality traits this week" was unclear.

Documentation indicated that he was engaged in daily group treatment offered by the recreational therapy.  However, it was unclear if treatment was consistently offered out of cell.

<u>Findings</u>

This patient's care was adequate.  Provider contacts occurred regularly, and documentation provided sufficient clinical detail for any subsequent clinician to be aware of the status of his symptoms and interventions utilized.  Documentation of group programming and treatment planning needed improvement.

**Patient B**

This 27-year-old patient was admitted to acute level of care on May 5, 2021 for stabilization of depression and suicidal ideation.  He was diagnosed with schizoaffective disorder and borderline personality disorder.  He was prescribed Lithium, Abilify, Cogentin and Vistaril for mood stability, psychosis, side effects and sleep respectively.  His healthcare record was selected from the acute census to assess adequacy of care in the institution's temporary acute unit.

His initial psychiatric assessment was timely and thorough.  The primary clinician assessment was timely but lacked individualized assessment as much of the documentation was the same as the psychiatric assessment completed the day before; of note, there was no clear indication that documentation was not original.  His initial IDTT documentation was timely and followed from initial assessments.  Treatment goals were in alignment with the reason for admission and

interventions of mindfulness and cognitive-behavior techniques were appropriate. Documentation in weekly IDTTs provided a useful summary of his progress in although collaboration with psychiatric care was not clear.

The treatment plan indicated that psychiatric contacts would occur every 72 hours and every 48 hours with the psychologist.  Psychiatric contacts were in alignment with the treatment plan while psychologist contacts were variable with no more than approximately 96 hours between contacts.  Overall, documentation was useful and provided an overview of his functioning and interventions.   The majority of routine primary clinician contacts occurred with the same clinician while psychiatric providers regularly changed.

He engaged in minor self-injurious behavior a few times while in the unit.  Risk assessments were appropriately completed.  Of note, documentation regarding access to property, "full" or "partial issue" was noted, but the decision-making process and rationale was not clearly documented.

Documentation indicated that he was engaged in daily group treatment offered by a recreational therapist.  However, it was unclear if treatment was consistently offered out of cell.  He also attended a weekly Dialectical Behavior group with his primary clinician which was appropriate for his clinical needs.

Effective communication was not consistently documented.

<u>Findings</u>

This patient's care was adequate.  Overall, clinical documentation was very good and included relevant clinical information and appropriate interventions.

**Patient C**

This 28-year-old patient was admitted to acute level of care on June 14, 2021 for grave disability due to psychosis.  He was diagnosed with schizophrenia, unspecified.  There was a prescription for Zyprexa, an antipsychotic which he refused to take.  His healthcare record was selected from the acute census to assess adequacy of care in the institution's temporary acute unit.

He appeared to have been decompensating which resulted in his first MHCB admission and current APP admission.  Symptoms included suspiciousness, paranoia, isolating, poor eating, lack of showering, confused, odd behavior, laying down in the fetal position and appeared to be responding to internal stimuli.

He refused both his psychiatric and primary clinician initial assessments, and both were reliant on record review.  The psychiatric assessment was of good quality with an individualized approach.  In contrast, the majority of the documentation in the primary clinician assessment was pulled forward from previous documentation.  In addition to the impact this had on current and individualized conceptualization, if was often unclear from where the documentation originated. Both assessments were timely.  There was no initial IDTT documentation located.

The patient refused provider contacts which occurred every 72 hours. Psychiatric documentation was thorough and descriptive. However, despite consideration of a PC 2602 for ongoing psychosis on June 16, 2021 ("will likely benefit") and June 19, 2021 (PC 2602 was "prudent") there was no clear documentation of a plan for implementation. Continuity of care was disrupted by the change in providers.

He refused daily group programming which included a recreational therapy group and/or yard since his admission.

There was documentation of effective communication.

<u>Findings</u>

This patient's care was inadequate. The primary issue was that despite documentation of the benefit of a PC 2602, there was no clear plan to initiate a PC 2602 petition which was necessary to treat this patient's ongoing symptoms of psychosis. Further, the quality of the primary clinician assessment and lack of initial treatment plan were deficiencies. Given his paranoia, the change in providers, which disrupts the development of trust and a therapeutic relationship was an area of concern. A strength was the frequency of clinical contacts and attempts to engage him despite a pattern of refusals.

**Patient D**

This 40-year-old Hmong and Thai patient was receiving mental health treatment at the acute level of care at CMC MHCB. He was provided with several diagnoses which included Major Depressive Disorder with psychotic features and Adjustment Disorders. He was serving a life with parole sentence, with a minimum of 161 years related to various sexual crimes with minors. He had Level 2 classification points.

The patient had a history of depressed mood, anxiety, panic attacks, insomnia, auditory hallucinations, and paranoia related to tainted food as well as general safety concerns related to his charges. He received treatment at the EOP and 3CMS levels of care at MCSP.

His most recent symptoms included suicidal ideation, racing thoughts, insomnia and hopelessness.

The healthcare record indicated that although Hmong was his primary language, he understood most words in English but needed assistance with complicated terminology.

He had a history of suicide attempts; the last attempt occurred in 2019; he reported a hanging attempt which he did not reveal to anyone until much later.

The patient was previously housed at MCSP in the EOP. He was admitted to the CHCF MHCB due to suicidal ideation; upon discharge to the California State Prison/Corcoran (CSP/Corcoran) EOP, he reported active suicidal ideation and concerns for his safety. He was transferred from the CSP/Corcoran MHCB to CMC MHCB. The patient had five MHCB admissions since his CDCR incarceration in August 2019, and there were three MHCB admissions since February 27, 2021.

It appeared that he was admitted to the CMC MHCB on May 6, 2021. During this acute care hospitalization, the patient had intermittent treatment adherence. He at times resisted confidential sessions with the primary clinician, completion of treatment materials and he had sporadic medication adherence with resistance to medication adjustments. He frequently verbalized the need for ongoing inpatient treatment, but he did not accept or fully participate in treatment provided. He remained with chronic suicidal ideation, depression, and hopelessness.

The patient reportedly had self-injurious behavior on June 15, 2021, due to increased depression, resulting in return to safety issue. A SRASHE was completed which noted that the patient scratched his arm with a spoon resulting in visible welts; he had active suicidal ideation at that time. This behavior was characterized as self-injurious behavior and not a suicide attempt. The patient was not cooperative with the completion of the SRASHE. He was assessed with high chronic and acute suicide risk. No safety plan was developed, as the patient remained in acute care.

On June 23, 2021, he reportedly showed renewed interest in programming and medication adherence. On June 28 and June 29, 2021, the patient had increased suicidal ideation with thoughts of hanging himself and making a noose of towel strips; he was returned to safety issue at that time. At that time, he was not thought to be stable for ICF transfer.

Current treatment included psychotherapy three times per week. There was documentation that a translator was utilized for most clinical contacts. At the time of the June 29, 2021 IDTT, the patient had not met treatment goals for discharge.

His LRH was single cell. Transfer to LRH was deferred according to the treatment team as specialized treatment (e.g., DBT) in which the patient was participating was not available in the hospitals that offered his LRH.

At the time of review, the patient was prescribed Zoloft 25 mg per day and hydroxyzine on an as needed basis. He had also previously been prescribed Prozac, Celexa, Zyprexa and Seroquel.

Findings

The care provided to this patient in the CMC MHCB appeared adequate. As he remained with ongoing suicidal ideation, it appeared that the acute level of care was appropriate. Of note was the patient's lack of engagement in treatment and poor treatment adherence. During his short stay in CDCR, he had multiple inpatient admissions and safety concerns regarding return to prison due to his charges. Consideration should be given augmenting treatment planning and to more aggressively engaging the patient in treatment to allow better functioning upon his return to an outpatient setting. The treatment plan included current IPOCs for MH depressed mood, danger to self, and mood state; these identified treatment goals were appropriate for this patient. Treatment included CBT and DBT interventions to address symptoms with weekly IDTTs. Regarding medication management, the patient was only prescribed Zoloft, an antidepressant medication at a very low dosage, as well as Hydroxyzine on an as needed basis. It did not appear that the patient's depressive symptoms were resolved, and consideration should be given to maximizing the antidepressant dosage or switching to another antidepressant medication; although it was noted that medication adherence was an issue of concern. There was

488

documentation that the psychiatrist attempted to address his treatment nonadherence and discussed alternative medications which the patient rejected. Additional IPOCs regarding treatment adherence, including medication adherence, should also be considered. IDTTs and clinical contacts with the psychiatrist and primary clinician were timely and consistent; however, the patient's treatment adherence was problematic. Based upon the information in the healthcare record, it was difficult to determine the hours of programming provided to assess the adequacy of treatment provided.

**Patient E**

This 45-year-old patient was receiving mental health services at the acute level of care at CMC MHCB. He was transferred from the C CSP/Corcoran MHCB to CMC MHCB for ongoing stabilization of suicidal ideation with plan, mood symptoms and psychosis; additionally, he reported safety concerns, recent death of his brother and paranoia. He was provided with a diagnosis of Schizoaffective Disorder, bipolar type.

The patient had three MHCB admissions in the preceding six months, the most recent occurred from April 1, 2021 to April 7, 2021 for suicidal ideation with plan and general homicidal ideation; he was readmitted on April 11, 2021 for similar reasons. As his symptoms did not stabilize in the MHCB, he was transferred to acute care for stabilization on May 3, 2021.

The patient had a history of DSH admissions during 2018 and 2019. He also had a recent history of superficial cutting on April 2, 2021. He has received mental health services in CDCR at the 3CMS, EOP and MHCB levels of care.

Current symptoms included severe depression with threats of suicide if returned to the yard.

He was prescribed Mirtazapine, Lexapro and Zyprexa. The patient did report recent methamphetamine, cannabis and alcohol use prior to CSP/Corcoran transfer on March 15, 2021.

During the course of acute care treatment, the patient exhibited resolution of suicidal ideation and depressive symptoms improved. He was reportedly medication adherent. Documentation also indicated that the patient was an active participant in treatment. He was referred to ICF for continued treatment and stabilization with a level of care change to ICF on June 24, 2021.

The treatment plan included current IPOCs for depressed mood, self-care deficit and mood state.

A SRASHE was completed on June 8, 2021, in anticipation of discharge to the ICF level of care.

The SRASHE noted moderate chronic and low acute risk for suicide.

The IDTT determined that the patient's LRH was unlocked dorm; and the IRU determination was consistent.

<u>Findings</u>

The care provided to this patient at CMC MHCB appeared adequate. The patient showed improvement during the course of his treatment and appeared appropriate for transfer to the ICF

level of care. His primary reason for admission, suicidality and depression appeared significantly improved after acute care treatment at CMC MHCB. Treatment goals were appropriate; an additional IPOC regarding substance use should also have been included. This should, hopefully, be addressed during ICF treatment. IDTTs and clinical contacts with the psychiatrist and primary clinician were timely and consistent. Based upon the information in the healthcare record, it was difficult to determine the hours of programming provided to assess the adequacy of treatment provided.

**Patient F**

This 55-year-old patient was admitted to CMC MHCB on June 16, 2021, following a suicide attempt by hanging. This patient was provided with several diagnoses which included the following: PTSD, Antisocial Personality Disorder, Borderline Personality Disorder, Anxiety Disorder and Major Depressive Disorder.

The patient had a long history of mental health treatment in CDCR as well as prior to incarceration; his suicide history began at age ten with multiple suicide attempts. He reported a significant history of childhood trauma. Documentation indicated several DSH admissions, acute care treatment, 16 MHCB placements, as well as treatment at the EOP and 3CMS levels of care. He had four suicide attempts that were considered near lethal while incarcerated as well as a history of non-lethal self-harm behaviors thought "secondary to characterological traits with alternative motives."

The last suicide attempts occurred on May 15, 2021, when he tied a sheet around his neck; he was subsequently referred to the CHCF MHCB. He had another similar incident on May 21, 2021, while in the MHCB in which he tied a piece of torn fabric to his neck and fastened it the ADA support bar of the toilet. He was subsequently referred for acute level of care.

A SRASHE completed on the day of arrival noted high chronic and low acute risk for suicide.

The initial Acute ICF Master Treatment Plan was dated June 17. 2021. IPOCs were developed for worthlessness/guilt, depressed mood, and mood state. The treatment plan also noted the LRH as unlocked dorm.

The patient was prescribed olanzapine 10 mg in am and Zydis 15 mg at bedtime, Lamictal 150 mg per day, Vistaril as needed and Prazosin 32 mg at bedtime.

Progress notes indicated that the patient progressed during acute care treatment. He was an active participant in treatment with attendance in groups and individual therapy. The patient was referred to ICF around July 1, 2021, and another SRASHE was completed at that time. The assessment noted that, the patient had denied suicidal ideation at the time of his last suicide attempt that prompted this admission; it was "not premeditated, planned or plotted". The patient was reported motivated for change with focus on the future at that time. The results of this assessment were similar to the prior assessment with noted high chronic and low acute risk for suicide.

He was seen by the psychiatrist on July 7, 2021; at that time, the patient indicated that he continued to struggle with his past trauma, and he requested treatment for trauma at ASH.

490

There was documentation of primary clinician contacts on the following dates: June 16, June 19, June 22, June 24, June 29, July 1, and July 6.

There was documentation of psychiatric contacts on the following dates: June 16, June 19, June 22, June 25, June 28, July 1, July 4, and July 7.

Findings

The overall care provided to this patient appeared to be appropriate. He initially presented after a suicide attempt, and his acute symptoms appeared resolved with improvement in symptoms and involvement in acute care programming. Referral for ICF level of care appeared appropriate. Treatment goals also appeared appropriate; however, documentation was limited that the patient's long history of suicidal behavior was addressed. Review of the mood state IPOC documented that under the indicators section, suicidal ideation had been activated, which was clinically appropriate. Review of clinical contacts with the psychiatrist, psychologist and IDTTs were timely with minor exceptions noted. There appeared to be some lapses in clinical contacts with the psychologist which did not occur every 72 hours as required. Based upon the information in the healthcare record, it was difficult to determine the hours of programming provided to assess the adequacy of treatment provided.

**Patient G**

This 38-year-old male patient transferred to CMC for APP level of care on May 10, 2021 from CSP-SAC's MHCB to address his ongoing suicidal ideation, depressive symptoms, and grief. At the time of MHCB admission at CSP-SAC, the patient endorsed suicidal ideation with a plan to cut his neck or hang himself. The patient's history included treatment with antipsychotic medication and two admissions to ICF and APP between 2018 and 2019. Psychiatric diagnoses at CMC included PTSD, Borderline Personality Disorder, and Major Depressive Disorder, recurrent episode, moderate. Although psychiatric medications were changed during the CMC-APP admission, at the time of this review, the patient was prescribed Ability (5mg), Trileptal (900 mg / 300 mg / 600 mg), Vistaril (as a PRN for anxiety and sleep), and Prazosin (1 mg). Additionally, a trial of lithium was initiated three days prior to the patient's CMC-APP discharge date of June 30, 2021. The healthcare record indicated that while three of the patient's reported suicide attempts were removed from the suicide grid in November 2020, due to a lack of evidence, the patient continued to report an intentional overdose in 2019. CMC clinicians documented a total of seven "verified" self-injurious behavior incidents, all of which involved "minor injury" without intent to die. The patient reportedly had engaged in cutting since age 22, and he informed his CMC-APP psychiatrist that he enjoyed the pain caused by his cutting behavior. Documentation further indicated the patient made a suicide pact with his cousin and had been experiencing survivor's guilt since his cousin completed suicide.

During the course of APP admission, the patient presented with medication non-adherence issues and continued to endorse depressed mood, urges to self-harm, hopelessness, multiple suicidal thoughts per day, and poor concentration, motivation, and energy. However, the CMC MHCB treatment plan included only one IPOC for self-harm that was initiated on May 12, 2021.

Recreation therapy hours were offered up to three times per day during APP admission; however, the corresponding progress notes were difficult to interpret, and suggested recreation therapy hours were limited to yard, games, or movies.  DBT clinician led groups were primarily video groups offered at inconsistent intervals.

IDTTs were completed timely with all required attendees.  Psychiatry contacts were offered in confidential settings and in accordance with the patient's IDTT treatment plan.  Documentation of allowable items was available in each psychiatry progress note reviewed.

On May 28, 2021, a clinician providing coverage approached the patient's cell door to complete a routine primary clinician contact without offering a confidential contact.  The clinician instructed the patient to put on a shirt before speaking with them; however, the patient complained that it was too hot to wear a shirt and requested ice chips before refusing to engage with the provider any further.

While the IDTT's "planned treatment frequency" consistently indicated individual primary clinician contacts would occur every 72-hours, progress notes suggested individual contacts were offered less frequently for reasons that were not explained or acknowledged in clinical notes.  For example, individual primary clinician contacts were not completed between June 10 and June 15, 2021 and between June 15 and June 30, 2021.  This deviation was especially concerning given the patient engaged in self-harm on June 10 and June 27 and was discharged from APP on June 30, 2021.

The patient's most recent suicide risk evaluation, completed at the time of CMC MHCB discharge on June 30, 2021, assessed the patients' chronic risk as high and his acute risk as moderate.  The patient engaged in at least three self-harm incidents during the course of his admission.  However, only two of three self-harm incidents had corresponding Self-Harm Powerforms available in EHRS (5/18 and 6/10).  The patient's self-harm incident on June 27, 2021, three days prior to APP discharge, was not documented on a Self-Harm Powerform.

The patient was discharged to ICF level of care on June 30, 2021.

<u>Findings</u>

The overall care provide to this patient was inadequate.  The frequency of primary clinician contacts was inadequate for APP level of care and failed to meet the IDTT's agreed upon timeframes.  Group treatment notes did not provide sufficient information regarding the nature and structure of activities offered.  Treatment plans failed to address the patient's presenting problems, including mood issues and medication non-adherence.  The patient had only one IPOC developed for self-harm; however, he never achieved the IDTT's treatment goal of no self-harm incidents for seven days before discharging to a lower level of care, and this was not explained in the discharge rationale.  A self-harm incident three days prior to a lower level of care discharge was not documented in accordance with existing policy.  Safety planning was clinically indicated based on three incidents of self-harm during admission; however, this was not integrated into the existing treatment plan.  Additionally, there was an unexplained copied and pasted statement in most psychiatry and primary clinician progress notes that read, "potential for lack of continuity of care."

Note: It appeared this patient was not offered an individual primary clinician contact for eight days after his discharge from APP to ICF level of care at CMC. Only one primary clinician led video group occurred during this timeframe.

**Patient H**

This 44-year-old male patient's healthcare record was reviewed to evaluate the quality of care provided in CMC's temporary acute level of care unit. The patient was referred to an acute psychiatric program (APP) from CSP-Sac's MHCB on April 28, 2021, and he arrived at CMC on May 10, 2021. The patient was initially admitted for inpatient care due to suicidal ideation, ongoing urges to self-harm, auditory hallucinations, and symptoms of depression and anxiety. Medical concerns included back pain, asthma, and a seizure history. Psychiatric diagnoses were Schizoaffective Disorder and Major Depressive Disorder. The patient had an active PC 2602 order, and was prescribed Ability, Remeron, Zoloft, and Vistaril at the time of this review. The psychiatrist noted the patient was medication adherent and did not require back up medications for refusals during APP admission.

IDTTs were timely and primary clinician and psychiatric initial assessments were documented prior to the patient's initial IDTT. Level of care decisions and rationales were generally appropriate. The patient's APP treatment plans only addressed suicidal ideation, despite the APP referral and progress notes indicating ongoing command auditory hallucinations, anxiety, and depression. Although the IDTT added depression to the May 30, 2021 treatment plan, the patient was clinically discharged to ICF level of care the following day.

On June 23, 2021, it was unclear whether the required nursing representative attended the patient's IDTT. The authoring clinician checked "present" without including identifying information for this discipline. The IDTT documented plans to offer 12- hours of group treatment as well as psychiatry and primary clinician contacts at 72-hour intervals.

Recreation therapy groups were typically offered two to three times per day. While psychiatry contacts occurred timely, primary clinician contacts were not completed in accordance with the treatment plan during May 2021. Primary clinician contacts also appeared to be divided between two different clinicians throughout the APP admission. Both clinicians consistently documented vague treatment interventions that were not aligned with the IDTT's treatment plan or specific to the patient's presenting concerns. For example, clinicians routinely copied and pasted a statement indicating that they "discussed" dialectical behavior therapy (DBT) or used motivational interviewing "to increase treatment motivation." However, this patient was described as treatment compliant and as an active treatment participant.

Recreation therapy group progress notes suggested activities were limited to yard, games, or movies. As the majority of group notes were completed using a set of poorly organized check boxes, they were difficult to interpret and lacked sufficient detail. For example, the checkboxes suggested that two to three times per day, recreation therapists completed cell-front groups, distributed daily news sheets, and offered a yard or movie activity. Adding further confusion, some group notes checked the "no" box for "group," while also indicating the patient attended group. It appeared only two clinician led groups were offered during the course of this patient's APP admission from May 10, 2021 through June 1, 2021.

The patient's healthcare record referenced four prior suicide attempts, with one in the community, one in county jail, and two at LAC.  He also had two self-harm incidents that involved cutting in 2015.  While CSP-Sac's April 20, 2021 SRASHE rated the patient's acute suicide risk as high, CMC MHCB's June 1, 2021 discharge SRASHE rated the patient's acute suicide risk as low.  CMC MHCB's discharge SRASHE appeared to underestimate the patient's acute suicide risk, perhaps as a result of the clinician's failure to accurately document risk factors that were present.  For example, the SRASHE failed to note that the patient had endorsed psychotic symptoms or active suicidal ideation within a three-month period, had documented physical pain, and had prior sex offenses.

Mental health providers routinely documented effective communication and updated safety observation and allowable items during clinical encounters.

This patient was clinically discharged from APP to ICF level of care on June 1, 2021.

Findings

The quality of care and clinical documentation in the temporary APP unit at CMC was inadequate for this patient.  Individual primary clinician contacts were not offered in accordance with the IDTT treatment plan.  Primary clinician progress notes lacked sufficient detail regarding interventions and the patient's response to treatment, and the plan section included a copied and pasted statement routinely found in other patient's progress notes.  The patient's discharge SRASHE underestimated his acute suicide risk.  Treatment plans did not appropriately target concerns documented during APP admission or problems noted in the APP referral, including the patient's ongoing anxiety, depression, and command auditory hallucinations to self-harm.  Recreation therapy group notes were difficult to interpret and did not provide sufficient information regarding the nature or structure of group, yard, or cell-front activities.

**Patient I**

This 39-year-old patient was the only MAX custody patient housed in CMC's temporary APP unit between April 28, 2021 and June 16, 2021.  The patient was EOP level of care at SVSP prior to his initial MHCB placement and APP referral.  The APP referral was submitted for depression, anxiety, self-reported auditory hallucinations, paranoid ideation, multiple MHCB referrals, and repeated acts of self-injurious behavior.  The patient's suicide history was significant for multiple incidents of self-injurious behavior and 30 suicide attempts.  Psychiatric diagnoses included Major Depressive Disorder and Borderline and Antisocial Personality Disorder.  The patient's active psychiatric medications included Lithium (900 mg) for mood stabilization, Invega (12 mg) for psychosis, and Vistaril (100 mg) for insomnia.  According to the healthcare record, the patient was medication non-adherent and received an RVR for behavior that could lead to violence during a five-day hunger strike between April 30, 2021 and May 4, 2021.  After the hunger strike ended, medication adherence did not appear to be an issue.  The patient's RVR mental health assessment indicated there was "a mild connection" between his symptoms and RVR behavior during the period of non-adherence.

IDTTs were timely and included all required attendees. IDTT documentation indicated IDTTs were held in the "chow-hall" with the patient confined in a TTM.  Psychiatry and primary

494

clinician initial assessments were completed prior to the initial IDTT. Throughout the APP admission at CMC, the patient's MAX custody status was recognized as a treatment obstacle that often resulted in distress and triggered thoughts and acts of self-harm. As such, with the exception of the counselor, IDTT members recommended removal of the patient's MAX custody status. However, the IDTT documentation did not indicate plans to address the disagreement.

Despite the patient's MAX custody status, the healthcare record suggested recreation therapy groups were routinely offered twice per day and that DBT groups were offered intermittently throughout the course of admission. Group notes, however, did not clarify whether other patients were present or whether the "group" was modified to meet the needs of one patient.

The IDTT's planned frequency of treatment indicated the patient would receive primary clinician contacts every 48 hours and psychiatry contacts every 72 hours. The IDTT also wrote that the patient would receive one hour of pre-release groups per week despite his earliest release date occurring in 2045. Specific treatment targets were not included in the IDTT treatment plan. Instead of generating IPOCs to address specific treatment concerns, the IDTT labeled the one IPOC "DBT," which is an intervention and not a target. This IPOC also did not include measurable treatment objectives.

PC and psychiatry contacts were completed within IDTT treatment plan timeframes, with numerous clinician contacts occurring in response to staff referrals. Allowable items were routinely updated in progress notes.

The patient engaged in self-harm on three occasions during his CMC-APP admission. Self-Harm Powerforms were completed in accordance with policy for the May 13 and May 28, 2021 incidents; however, the corresponding SRASHEs were not completed until 48 hours later. On June 14, 2021, a psychiatrist noted the patient ingested pieces of a metal can and reported no reasons for living. However, a Self-Harm Powerform and SRASHE were never completed in for this incident. The most recent SRASHE at CMC was completed on May 30, 2021, at which time the clinician assessed the patient's chronic risk as high and acute risk as moderate.

On June 16, 2021, the patient transferred to CMF-APP for further care due to his MAX custody status.

Effective communication was not consistently documented in mental health records during APP admission.

<u>Findings</u>

The clinical documentation and APP care were inadequate for this patient. IPOCs did not directly address the patient's repeated self-harm incidents. SRASHEs were not completed timely. A Self-Harm Powerform and SRASHE were not completed in accordance with policy for the foreign body ingestion incident on June 14, 2021, despite the patient also reporting no reasons for living. Group treatment notes lacked sufficient detail, including how "groups" were modified for one patient. Plans for addressing the IDTT disagreement regarding MAX custody status were not documented in the record. Similar to other patient record reviews, primary clinician progress notes often relied on copied and pasted statements such as DBT was "discussed" and motivational interviewing was used "to increase treatment motivation."

CDCR's failure to expedite this patient's transfer to an established APP program appeared to negatively impact treatment progress and reportedly contributed to repeated acts of self-harm during the CMC MHCB admission.  The patient's healthcare record also did not include a valid reason for the delayed transfer.  Lastly, the primary clinician entered a discharge summary on May 24, 2021 indicating that it was a late entry for an April 2021 discharge.