# EXHIBIT A



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

April 11, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>
Matthew A. Lopes, Jr.
Coleman Special Master
Pannone Lopes Devereaux & O'Gara LLC
1301 Atwood Ave., Suite 215 N
Johnston, RI 02919
mlopes@pldolaw.com

  Re: *Coleman v. Newsom*: Comments on the Special Master's Draft Report on
     the Mental Health Inpatient Care Programs dated March 10, 2022
     <u>Our File No. 0489-03</u>

Dear Special Master Lopes:

  This letter is in response to the Special Master's Draft Monitoring Report on the
Mental Health Inpatient Care Programs ("Draft Report"). Though unsurprising given our
clients' reports and from attending the Special Master's on-site inspections of CDCR's
Psychiatric Inpatient Programs ("PIPs"), the Draft Report's findings of untenable
conditions in the Lift and Shift PIPs (SVSP, CHCF, and CMF) are extremely distressing.
As stated throughout the Draft Report, these programs are "in crisis, primarily driven by
deficiencies that have plagued defendants' mental health care system throughout the long
history of this case, including dangerously high staffing vacancies at some programs."
Draft Report at 13. The Draft Report contains countless examples of how the treatment
provided to the majority of the most acutely mentally ill patients in the state is woefully
inadequate. And despite overall reductions in the prison population, the mental health
caseload has increased. For these and all the reasons described in the Draft Report, we
agree that Lift and Shift has "proved to be a failure." *Id.* at 9. As we have said numerous
times, including in our letters dated October 15, 2021 and December 10, 2021, CDCR
must take immediate action to provide minimally adequate inpatient care in the CHCF,
CMF, and SVSP PIPs and break the cycle of CDCR's inability to hire and retain
sufficient clinical staff, which only reinforces the lack of treatment.

  We comment on three issues contained in the Draft Report below.

[3892553.2]

Matthew A. Lopes, Jr.
April 11, 2022
Page 2

## I.      Reasons for Delays in Inpatient Admissions

The Draft Report references CDCR's use of the COVID-19 exception for nearly all delayed inpatient transfers. *See, e.g.*, Draft Report at 206[1] ("Exceptions and reasons for delays in admissions to the CHCF-PIP were not provided other than COVID-19 movement restrictions."). The Draft Report also references the parties' ongoing dispute about this issue in footnote 18, on page 31. We request that the footnote be updated to include reference not only to Plaintiffs' Response to Order to Show Cause, ECF No. 7119 at 11 (Apr. 9, 2021), but also the series of letters the parties have exchanged since that date on this subject. *See* Dec. 17, 2021 Ltr. from J. Winter; Jan. 7, 2022 Ltr. from E. Thorn; Feb. 10, 2022 Ltr. from J. Winter.

## II.     Patient Disciplinary Process

The Draft Report provides statistics on timeliness and confidentiality of Mental Health Assessments (MHAs) and the number of times a clinician recommended mitigation and the hearing officer documented consideration of the MHA. Draft Report at 103-06. While this information is helpful, it does not provide sufficient insight into whether the reviewed Rules Violation Reports (RVRs) were appropriate under the circumstances. Other than one example—where the monitor references six patients at SVSP-PIP who received emergency medication injections following their RVR behaviors but the clinicians found that the patients' mental illnesses neither strongly influenced or contributed to their behavior—there is little detail provided to illustrate the status of the RVR remedy. *See* Draft Report at 105. We therefore request that the Final Report evaluate whether the clinician's decision whether to recommend mitigation in each reviewed case was clinically appropriate, as well as whether the hearing officer's decision was justified based on the circumstances.

Additionally, we request that the Final Report include data on the number of CHCF-PIP RVRs that included a mitigation recommendation in the MHA. *See* Draft Report at 104 (only data on the final custody decision is included). We also request that the Final Report include information on whether any of the reviewed MHAs recommended that the RVR be documented in an alternate manner, and, if so, whether the Captain agreed.

Finally, as noted in our recent data letters on the RVR/MHA indicators, we are concerned that a sample size of 20 RVRs per institution may not be large enough to adequately monitor whether the MHAs are completed appropriately and whether custody

---

[1] All references to page numbers contained herein correspond to the page numbers in the bottom center of the Draft Report.

Matthew A. Lopes, Jr.
April 11, 2022
Page 3

staff follow the recommendations when appropriate. *See, e.g.*, Mar. 25, 2022 Ltr. From
C. Trapani; Mar. 11, 2022 Ltr. From T. Nolan. We therefore request that in future reports
the monitor consider using a sampling methodology that is tied to the number of RVRs
issued, or to the population.

## III.    Use of Force

The Draft Report provides statistics on the number of immediate and controlled
uses of force at each PIP during the review period. Notably, there were only two
controlled use of force incidents across all PIPs during the review period, as compared to
**256** immediate use of force incidents across all PIPs in the same timeframe (56 at CMF-
PIP, 97 at CHCF-PIP, 93 at SVSP-PIP, 6 at CIW-PIP, 3 at SQ-PIP, and 1 at CMC
MHCB "Acute Care"). *See* Draft Report at 106-10. This gross disparity in controlled
versus immediate force suggests that controlled use of force protections are not always
used when they should be. We request that the Final Report evaluate a subset of these
200+ immediate use of force incidents, including video footage where applicable, to
monitor whether the incidents were correctly treated as immediate, or whether de-
escalation efforts, involvement of mental health staff, and all the other safeguards
required for controlled uses of force were warranted. We have asked for this type of
review in the past, especially in light of the *Armstrong* court's finding that "Defendants'
UOF or staff misconduct data likely are under-representative of the actual UOF or staff
misconduct incidents that take place …" *Armstrong v. Newsom*, No. 94-CV-02307 CW,
2020 WL 5511523, at *17 (ND. Cal. Sept. 8, 2020); *see also* Feb. 2, 2021 Ltr. from A.
Gourse to M. Lopes Re: Pls' Comments on Draft 28th Round Monitoring Report at 5-6;
July 12, 2021 Pre-Tour Memo Re: CHCF-PIP from C. Trapani at 6-8.

Without an assessment of whether the incidents have been misclassified as
immediate rather than controlled, there is insufficient information for the Draft Report's
finding that "CDCR policy was followed for all immediate use of force incidents
reviewed for CHCF-PIP ...." Draft Report at 106; *see also id.* at 108 ("A review of 16
randomly selected immediate use of force incidents [at CHCF-PIP] revealed compliance
with applicable CDCR policy. … Seven of eight or 87 percent of reviewed immediate use
of force incidents [at SVSP-PIP] complied with CDCR policy."). For example, evidence
of custody-manufactured "emergency" incidents allowing immediate use of force was
provided in the *Armstrong* staff misconduct litigation. *See, e.g.*, *Armstrong* ECF No.
2922 at 20-21; *Armstrong* ECF No. 2948 at 12; *Armstrong v. Newsom*, 475 F. Supp. 3d
1038, 1048-49 (N.D. Cal. 2020); *see also* Sept. 24 Nolan Letter at 7-8. In addition, one
of the use of force videos that the Special Master team viewed during the CHCF-PIP site
visit last summer (also available **here**) shows officers' using excessive force on class
member ███████████ on February 13, 2021. Although Mr. ███ was in the
MHCB at the time and will therefore presumably be included in the separate 29th Round

Matthew A. Lopes, Jr.
April 11, 2022
Page 4


Report, he had previously been in the PIP.  The video shows officers throwing Mr.
███████'s wheelchair out of the cell, then throwing him out of the cell, while handcuffed,
into a pool of water and then shoving him into the ground.  This immediate use of force
incident was excessive and does not appear to meet policy requirements.[2]

      Thank you for the opportunity to comment on the comprehensive Draft Report.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:  Cara E. Trapani

CET:aa
Enclosures
  cc:    Coleman Co-Counsel      Nick Weber
        Adriano Hrvatin          Elise Thorn
        Namrata Kotwani        Damon McClain
        Paul Mello              Melissa Bentz
        Samantha Wolff         Carrie Stafford
        Sundeep Thind          Dillon Hockerson
        Antonina Raddatz       Christine Ciccotti
        Kristopher Kent

---

[2] There is a minor typographical error in the following underlined text on page 108:
"Seven of eight or 87 percent of reviewed <u>intermediate</u> use of force incidents complied
with applicable CDCR policy" (should say ***immediate***).

# EXHIBIT B

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



April 11, 2022

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

RE: 29th Round Inpatient Report

Special Master Lopes,

I write regarding your March 12, 2022 draft Twenty-Ninth Monitoring Round Report – Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for Mental Health Patients of the California Department of Corrections and Rehabilitation (CDCR).  (Hereinafter Inpatient Report)  CDCR appreciates your review and comments on the status of CDCR's inpatient programs.

CDCR is committed to providing constitutionally adequate care to patients receiving treatment in its Psychiatric Inpatient Programs (PIP).  And CDCR recognizes the difficulties in providing care within the PIPs during the pandemic.  CDCR healthcare providers working in PIPs were directly impacted by the COVID-19 pandemic, personally and professionally, and for over two years have worked tirelessly on providing the best possible care under the circumstances while mitigating the spread of a deadly disease throughout the treatment facilities.  The impacts of COVID-19 on healthcare and other frontline workers have been well documented throughout the pandemic.  CDCR is not immune from these issues as its healthcare workers are part of the larger community of workers throughout California and the nation.

Against this backdrop, some of the hyperbolic language found in the Inpatient Report is neither justified nor does it further the shared goal of improving care.

CDCR's comments and objections to your Inpatient Report are below.

I.      The Special Master Understates the Success of the Lift and Shift

The Special Master opines that the Lift and Shift "has proven to be a failure."  (Inpatient Report at 15.)[1]  The evidence based on the PIP's overall performance does not support this characterization and assessment.  While improving care in the PIPs remains a priority for CDCR,

---

[1] References to pages numbers are to the PDF page number.

since the Lift and Shift occurred, there have been a number of significant successes. Amongst those successes are:

- Compliant transfer timeframes – Not three months after the Lift and Shift, CDCR established full compliance with inpatient transfer timeframes in September 2017.
- The elimination of Solo Programming.
- The elimination of Discretionary Program Status via CDCR's October 5, 2020 memo Psychiatric Inpatient Program Patient and Staff Safety Policy and Procedure.
- The establishment of a system-wide STEP policy in March 2022.
- Standardization of PIP policies, which began shortly after Lift and Shift in 2017.
- Development of a PIP staffing plan in 2021. (See ECF No. 7245.)
- Development of a standardized PIP suicide prevention policy via CDCR's January 6, 2021 memo re Psychiatric Inpatient Program Treatment Planning and Procedures Suicide Prevention and Response and its October 22, 2021 memo re Completion of Suicide Risk Assessments and Self-Harm Evaluations in Psychiatric Inpatient Program Settings.
- Identification and utilization of confidential group treatment space for the Salinas Valley State Prison PIP's C5 and C6 population. The group space opened on March 14, 2022 and the yard retrofits will be completed by summer 2022.
- Resolution on the use of Therapeutic Treatment Modules for Maximum Security patients housed within PIPs.

CDCR acknowledges the challenges in operating the PIPs over the past several years. But the Special Master seems to ignore that, less than three years after the Lift and Shift, the CDCR PIPs were forced to adapt to adverse conditions created by a historically unprecedented global pandemic. While CDCR staff have worked tirelessly to improve the operation of and the care provided within the PIPs, the pace of progress in improving the PIPs must be weighed against the ongoing COVID-19 pandemic. CDCR remains committed to providing adequate care in its PIPs but categorically rejects the Special Master's assessment that the Lift and Shift PIPs are "failures." CDCR looks forward to working constructively with the Special Master to improve care offered in the PIPs as they emerge from the COVID-19 pandemic.

II.    Defendants are Appropriately Identifying and Referring Patients to DSH

The Special Master's experts have overseen referrals to DSH over the past two years. Yet the report is brimming with references to Defendants alleged failure to refer patients to DSH beds. For instance, when CDCR opened ten acute beds at California Men's Colony well-functioning crisis bed, the "Special Master implored defendants to refer clinically and custodially eligible patients to DSH facilities." (Id. at 22.) The Special Master also stated that "[w]ith more than 100 of DSH-Atascadero's 256 Coleman-designated beds routinely remaining empty during the monitoring round, the Special Master identified the low Coleman patient counts at DSH facilities as a concern in a variety of workgroup and All-Parties meetings and urged defendants to admit eligible patients to DSH programs to alleviate stress elsewhere in defendants' inpatient mental health care system." (Id. at 43.) Finally, the Special Master concludes that "when faced with a significant waitlist for inpatient mental health care, rather than utilize all inpatient beds available to the Coleman class, including those at DSH-Atascadero and DSH-Coalinga, CDCR hastily established a unit in CMC MHCB to provide acute inpatient care."

While it is true that the DSH bed census was less than full during the monitoring period, nothing in the record supports the implication that CDCR was not identifying and referring all eligible patients to DSH. Since the pandemic began in April 2020, CDCR and DSH have discussed over 500 referrals and approximately 150 rescissions with the Special Master's experts in the small workgroup.[2] Clinical considerations about these patient referrals, rescissions, and rejections were continually discussed, with the concurrence of the Special Master's experts, in the weekly small workgroup. In fact, Defendants are unaware of any patient decisions that were discussed in the small workgroup to which the Special Master's experts disagreed with the Defendants' clinical decision-making.[3]

Moreover, in an effort to try to further identify patients who are clinically and custodially appropriate for care at DSH, in March/April 2020, DSH and CDCR, under the monitoring of the Special Master, reviewed 73 patients who were at a more restrictive ICF setting to assess whether they could be moved to their LRH of Unlocked Dorms. And then again in May 2020, CDCR and DSH reviewed another 40 patients with a LRH for Locked Dorm to determine whether they could be custodially cleared by HCPOP such that their LRH could be changed to Unlocked Dorms to provide greater access to DSH beds for patients awaiting ICF treatment.

Furthermore, the implication that there are patients on the waitlist or within the PIPs themselves that could go to DSH but aren't is false.[4] CDCR's Inpatient Referral Unit regularly reviews all patients on the waitlist as well as their LRH for clinical appropriateness. And as detailed above, at least twice in the past two years, CDCR and DSH have joined together under the supervision of the Special Master to review the entire ICF waitlist and patients housed outside of their unlocked dorm LRH in order to identify potential DSH referrals. This review occurs weekly as well as part of the CDCR/DSH Small Workgroup attended by the Special Master's experts, who have active involvement and express clinical opinions consistent with CDCR and DSH determinations. That workgroup has been in effect since the early days of the pandemic in 2020.

In sum, the list of PIP and waitlist patients with an unlocked dorm LRH has been repeatedly scrubbed under the direct supervision of the Special Master's experts. The Special Master's conclusion that the DSH beds have been underutilized is unsupported and troubling given the near constant supervision of the waitlist.

---

[2] Patients rescinded via the small workgroup are redirected to other CDCR inpatient beds at the ICF or APP level of care.

[3] Surprisingly, little reference is made in the Inpatient Report to the weekly CDCR/DSH Small Workgroup, which has met on a weekly basis since April 2020. The workgroup oversees all ICF referrals to DSH and has undertaken extensive reviews of the ICF waitlist to identify and review patients clinically and custodially eligible to go to DSH. It is attended by the Special Master's experts, and cases are discussed in significant detail with the experts, leading to noticeably improved understanding of the transfer systems and working together on the difficulties associated with them.

[4] The Special Master appears to suggest there may be unidentified patients who are neither in the PIP nor on the inpatient waitlist eligible to go to DSH. However, finding these hypothetical patients would not help reduce the existing inpatient waitlist. (A decrease in the waitlist for DSH inpatient care, however, does not signify an improvement in access to care if patients are not being properly identified and referred to the inpatient level of care in the first instance. (Id. at 40))

III.    Least Restrictive Housing

The Inpatient Report implies that CDCR is improperly housing too many patients outside of their LRH. (Id. at 42) The report also notes that "defendants' monthly filings indicate that the number of patients housed outside their LRH has decreased recently." (Id.) This statement is misleading. The report should clarify that it is discussing the *custodial* LRH. Each patient is assigned a custodial LRH (single cell, multi person cell, locked dorms, or unlocked dorms) but clinical factors determine whether a patient can function at that LRH. (See October 20, 2021 policy 12.11.2101(A), Treatment Planning and Procedures: Referral and Admission Policy and Procedure and June 30, 2017 policy 12.11.2111 Housing Review/Least Restrictive Housing.) Thus, a patient's LRH is not just determined by his custodial designation but also his clinical factors that determine whether a patient is stable enough to be housed at the particular bed type. While CDCR agrees that patients should be treated in the least restrictive environment, the barrier to moving patients to those settings are not custodial or administrative, but are based on each patient's individual clinical factors.

IV.    STEP Program

The Inpatient Report contains numerous references to the STEP program, including analysis of its use at the various CDCR PIPs. (See Inpatient Report at 99-101.) It is unclear what the Special Master is monitoring in this respect as the statewide PIP STEP policy was not issued until March 15, 2022, months after his teams' visits to the PIPs.

V.    California Healthcare Facility (CHCF) PIP

The Special Master levels significant criticism at the performance of the CHCF-PIP. However, the CHCF-PIP, which notably was granted Joint Commission accreditation on March 28, 2022 for its behavioral health care and human services programs, has undergone extensive restructuring over the past six months.[5] Although the Special Master reports that CHCF PIP was closed for several months due to staffing levels and then reopened "[w]ithout any apparent improvement in CHCF-PIP's staffing levels," he significantly minimizes the work done at CHCF-PIP as well as the plan to safely reopen the units. (Inpatient Report at 141. See also page 209, et seq.) CHCF-PIP was temporarily closed to external intake and PIP staff underwent extensive retraining and consolidation of care teams. While closed to external intake, CHCF PIP's population dropped by a third from 91% to 62% of capacity. CHCF PIP reopened when units with patients were fully staffed and continues to reopen gradually as units reach staffing requirements.

---

[5] The Special Master has found that "it is critically important that CDCR seek, obtain and maintain accreditation with the Joint Commission on Accreditation of Healthcare Organizations." (Special Master Report and Recommendations on Defendants' August 2007 Supplemental Bed Plan, ECF No. 2432 at 13-14.)



The significant drop in census has allowed CHCF clinicians to provide more focused care on their patient population while also slowly ramping up rates of intake and reactivating housing units with consolidated care teams. And the turnaround appears to be working. CDCR's goal is to ensure better quality care to the patients housed within the CHCF PIP and this reboot, along with critical staffing and retention measures being pursued, is a critical piece of that plan.

VI.    California Institution for Women (CIW) PIP

The Special Master notes at page 26 that "[t]he intake screening process at CIW-PIP was very deficient, with the door to the Nurse's Office remaining open, two correctional officers remaining inside the office in close proximity to the patient, and the nurse not asking all of the required mental health/suicide risk questions on the Initial Intake Screening form (including if the patient was currently suicidal)." The officers present during health screenings are the same officers that participate in the unit's IDTT and are held to the same confidentiality standards as healthcare staff performing the screening. CIW-PIP is monitoring this issue in its local SPRFIT.

At page 27, the Special Master finds that "[a]t CIW-PIP, patients on suicide observation status were consistently not seen by a provider on weekends and, in several cases, not seen on Fridays. In addition, it was unclear why a 60-minute level of "enhanced observation" was utilized at CIW-PIP when non-suicidal patients were required to be observed during regular nursing rounds at 15-minute intervals and the practice of utilizing "Behavioral" Suicide Watch at CIW-PIP was not authorized in the PIP suicide prevention policy." CIW-PIP independently identified this issue in May 2021 and started an audit to increase weekend contacts to 100%. Regarding the 60 minute intervals, all patients are seen at least every fifteen minutes in the PIP. Those on 60 minute checks are seen for every fifteen minutes for regular checks and every hour for an enhanced check-in where extra time is spent with the patient as part of the step down process

from suicide precautions. Finally, CIW has stopped using behavior suicide watch and will only use continuous one to one suicide watch for all patients in need of that precaution.

At page 28, the Special Master finds that "[a]t CIW-PIP, some clinicians struggled with providing patients on suicide observation status with basic amenities such as books and other reading material." This criticism misses the mark. CIW-PIP is compliant with suicide watch and precaution property policies. Patients on watch cannot have materials unless approved by the treatment team. Patients on precautions may have property unless the treatment team justifies restricting access.

At pages 33, 50, and 60, the Special Master notes that CIW-PIP had high psychiatrist and psychologist functional vacancy rates. However, the rates the Special Master cited were for CIW as a whole, not the PIP program. CIW-PIP was fully staffed for its patient population at the time of its visit and prioritizes higher level of care patients when its census increases.

At pages 80 and 89, the Special Master found, regarding IDTTs, that CIW-IP "did not adequately cover case conceptualization, functional impairments, safety planning, and substance use." CIW-PIP staff cover conceptualization before the patient comes into the room because it is often too difficult for the patient to hear some of the information being discussed and could be detrimental to their mental health. If a patient is at a place where they can hear the conceptualization information, then CIW-PIP staff will share it with them.

At page 115, the Special Master finds that "CIW institution-wide training data indicated that 65 percent of custody staff and 69 percent of mental health staff completed the required use of force policy training." CDCR staff have the whole calendar year to complete the training, so the statistics cited are based on how many staff had completed the training at the time of the CIW-PIP site visit in September 2021. The report should reflect that fact.

VII.    Recommendations

   a.    Recommendation No. 1

The Special Master's first recommendation states that "CDCR be ordered to develop a comprehensive plan within 30 days, under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, to remedy the seriously deficient staffing levels at the Lift and Shift PIPs identified in this report." (Id. at 144.) CDCR continues to take every effort to improve staffing fill rates at its PIPs, especially in light of impacts on healthcare staff during the COVID-19 pandemic. No order is necessary to ensure that CDCR continues to work to increase the PIP staffing fill rate. CDCR and CCHCS continue to work together on recruitment of new staff. And given the myriad other projects currently being undertaken by CDCR, including the unmet bed needs assessment and ongoing data remediation discussions, thirty days is insufficient to develop a draft, meet and confer, and finalize the plan.

   b.    Recommendation No. 2

The Special Master's second recommendation, which recommends CDCR develop minimum standards for the provision of structured therapeutic activates, unstructured out-of-cell activities,

treatment planning, and individual treatment, mirrors his first recommendation from his January 28, 2021 Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation. (Compare Draft Inpatient Report at 144 and ECF No. 7039 at 118.) That 2021 Report is pending before the court and Defendants have already filed objections to this same recommendation. (See ECF No. 7051 at 9.) Defendants maintain their objection to this recommendation in full. As stated in Defendants' February 8, 2021 objections, the recommendation is too vague and not tied to specific, identified issues in the report. The recommendation does not indicate whether it calls for a specific plan to address every criticism in the report and only with respect to those programs that fall short, or whether it is a more general recommendation for systemic improvements at all of the inpatient programs. Defendants are committed to working with the Special Master to clarify the required components of the plans requested in this recommendation. Any order issued on this recommendation should recognize the need for greater clarity.

Subject to the foregoing objections and requests for clarification, CDCR expects to develop and submit plans to the Special Master within the requested timeframe once ordered.

       c.   Recommendation No. 3

CDCR appreciates the Special Master's recommendation to convert monitoring the CIW-PIP and SQ-PIP to paper monitoring as well as his recommendation that CDCR include CIW-PIP and SQ-PIP "among the first institutions where CDCR utilized CQIT when it is re-booted after data remediation is complete." (Inpatient Report at 140, 144.) CDCR looks forward to conducting CQIT tours at CIW-PIP and SQ-PIP with a PIP-specific CQI tool. CDCR, however, does not need to wait until data remediation is complete to pilot its CQI tool at institutions, including CIW or SQ.


Sincerely

*/s/ Nick Weber*

NICK WEBER
Attorney
California Department of Corrections and Rehabilitation
Office of Legal Affairs

# EXHIBIT C



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jessica Winter
Email: jwinter@rbgg.com

December 17, 2021

VIA ELECTRONIC MAIL ONLY

> **PRIVILEGED AND
> CONFIDENTIAL**
>
> **SUBJECT TO
> PROTECTIVE ORDERS**

CDCR OLA Team
Carrie Stafford
Nick Weber
Melissa Bentz
Dillon Hockerson
Sundeep Thind
Carrie.Stafford@cdcr.ca.gov
Nicholas.Weber@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov
Sundeep.Thind@cdcr.ca.gov

      Re:   *Coleman v. Newsom*: Inpatient Transfer Delays and Claimed COVID-19
              Exceptions
              Our File No. 0489-3

Dear CDCR OLA:

      Plaintiffs have been concerned for some time that Defendants have been
improperly claiming blanket COVID-19 exceptions for nearly every one of the seriously
delayed inpatient transfers they report monthly. It has become increasingly apparent that
the cause of the delays is not properly attributed to COVID-19, but instead is a function
of inpatient bed shortages caused at least in part by chronic and severe PIP staffing
shortages that have forced Defendants to take increasing numbers of inpatient beds
offline. This includes the 25 CMF PIP beds that remain offline—nine of which have
been offline for almost three years, and 16 more of which were closed in August of this
year as the staffing crisis grew more dire—as well as the total closure of CHCF PIP—
CDCR's largest inpatient hospital—to admissions almost three months ago. *See* Exhibit
4 at 3-4 (Defendants' Nov. 12, 2021 Mission Change letter reporting that 25 CMF PIP

[3838553.1]

PRIVILEGED AND CONFIDENTIAL
CDCR OLA Team
December 17, 2021
Page 2

beds are offline due to staffing shortages, along with the September 28, 2021 closure of the CHCF PIP to intake for the same reasons); Exhibit 2 at 1 (Defendants' response to advocacy for class member awaiting transfer to SVSP PIP bed, noting "The timeline for acceptance was delayed beyond the required three working days *due to staffing issues at SVSP's PIP*." (emphasis added)).  These shortages have apparently led Defendants to once again ration much-needed inpatient care in contravention of the Program Guide by imposing some sort of pre-transfer emergent review process, even while more than 150 *Coleman* beds in DSH facilities remain unfilled.  *See* Defs' Census, Waitlists, & Transfer Timelines Compliance Reports for Inpatient Mental Health Care, ECF No. 7399 at 6 (Dec. 15, 2021) (showing 110 available beds at ASH; 27 at CSH; and 19 at PSH).  As we have repeatedly informed you, Defendants' failures to provide timely and appropriate inpatient care, including by failing to address the dangerous staffing shortages on an emergency basis, are unconstitutional and must be urgently addressed.  *See generally* Oct. 15 & Dec. 10 letters from C. Trapani to Defs re Unconstitutional PIP Conditions. The lengthy waits for inpatient care cannot be attributed to COVID-19, and we object to Defendants' attempts to excuse the unconstitutional delays by claiming a blanket COVID-19 exception.

In the most recent inpatient census and waitlists report, Defendants claimed COVID-19 exceptions for the delayed transfers of 32 patients to ICF and 47 patients to acute care; Defendants claimed no other exceptions.  *See id.* at 23, 25.  The transfers for which Defendants claimed exceptions represented 43.4% of the total number of transfers Defendants reported for November 2021.  *Id.* at 21.  In total, the class members for whom Defendants claimed exceptions in November 2021 waited 940 days past transfer timelines to transfer to acute care and 493 days past timelines to transfer to ICF care— 1,433 days total.  *Id.* at 23, 25.

Plaintiffs have recently sent several queries based on our concerns.  *See* Exhibits 1, 2 (advocacies for class members ██████████ and ██████, both pending transfer to ICF); *cf.* Exhibit 3 (delayed discharge from MHCB of class member ██████ due to lack of beds).  In each of these cases, Defendants acknowledged a general lack of bed capacity and resulting delays in transfers.  *See id.*

To better understand this issue, Plaintiffs completed in-depth records reviews for 13 randomly-selected class members for whom Defendants claimed COVID-19

\ \ \

\ \ \

[3838553.1]

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA Team
December 17, 2021
Page 3

exceptions in their October 2021 inpatient census and waitlists reporting, ECF No. 7378 at 26, 29-30 (Nov. 15, 2021). The thirteen class members are:



| First Name | Last Name | CDCR No. |
|---|---|---|
|  |  |  |

After reviewing each of these 13 class members' records, we were not able to identify a single instance where there appeared to be a specific, individualized COVID-19-related reason for the claimed transfer delay. For example, these class members' records do not reflect that the class members were delayed due to the quarantine of the class members' housing units, their positive COVID-19 tests or COVID-19 infections, COVID-19 symptoms, or excusable delays in the COVID-19 testing process.

Instead, due to limited bed availability caused in part by chronic and persistent staffing shortages, Defendants appear to have resurrected essentially the same emergent transfer criteria that they informed us in a February 8, 2021 directive they had discontinued, now imposing an "expedited transfer" standard to at least some inpatient referrals.[1] *See* Dec. 15, 2021 Jt. Report Addressing Current COVID-19-Related Departures from Program Guide Req'ts, ECF No. 7401 at 4 (Dec. 15, 2021) (excerpt of February 8 Directive); Exhibit 2 (Defendants' response to advocacy for Mr. ███████ ████████, stating: "CDCR clinicians reviewed Mr. ████████'s recent clinical

---

[1] The February 8 directive referenced expedited transfers, but did not indicate that Defendants would implement a practice of screening all new inpatient referrals for transfer before allowing those referrals to go forward, and certainly not that that screening process would continue indefinitely as it apparently has for the last 10 months.

PRIVILEGED AND CONFIDENTIAL
CDCR OLA Team
December 17, 2021
Page 4

documentation and determined he . . . does not necessitate expedited transfer to the Psychiatric Inpatient Program.  Please be aware that all institutions and treatment teams can request an expedited transfer for a patient at any time if the patient's clinical presentation changes or worsens.").

While Defendants notified us that there would be "rare" instances in which class members would be accepted into the CHCF PIP following its closure to admissions on September 28, 2021, application of the "expedited transfer" policy has not been limited to CHCF PIP transfers.

For example, Mr. ▮▮▮▮▮▮▮▮▮▮, was referred to ICF on July 22 but did not transfer until October 22, 2021.  He had a negative COVID-19 test on July 22, the day of his referral, and his LRH was determined to be single cell.  A month later, on August 21, he was found unresponsive due to substance abuse and sent to an outside emergency room.  He returned from the emergency room the next day, and was admitted to MHCB after receiving a negative COVID-19 test.  He tested negative for COVID-19 again on September 3.  Due to risk related to his substance abuse, he remained in an MHCB until he was sent out to court on September 17, following another negative COVID-19 test result.  Mr. ▮▮▮▮▮▮ had another negative COVID-19 test result on September 22.  On October 9, a psychiatrist noted that Mr. ▮▮▮▮▮▮ July 22 referral to ICF had been "expedited," but that he still had not transferred.  After a negative COVID-19 test on October 21, he finally transferred to SVSP PIP on October 22.  In summary, Mr. ▮▮▮▮▮▮ had four negative COVID-19 tests during the pendency of his ICF referral, and went out to court and to an outside hospital, but was not able to transfer to an ICF bed for three months, notwithstanding his clinicians' determination of his need for an "expedited" transfer.

Mr. ▮▮▮▮▮▮▮▮▮, was referred to ICF on August 16, 2021 and medically cleared for transfer on the same date.  On August 18, more than a month before the CHCF PIP was closed to intake, and six months after the emergent transfer standard was lifted, his primary clinician told him that his ICF referral "could take 2-3 months."  Mr. ▮▮▮▮▮▮ had a negative COVID-19 test on September 23, and his clinicians requested that his transfer be expedited on September 27, one day before the closure of the CHCF PIP to intake.  He was not transferred to an ICF bed until October 28, 2021.

In several other instances, class members repeatedly tested negative for COVID-19 and/or were medically cleared for transfer, but still waited long past timelines.  Mr. ▮▮▮▮▮▮▮, was referred to ICF care on August 31, 2021.  He screened negative for COVID-19 on September 3, 11 and 23, and October 1, 3, 5, 6, 9 and 11.  He tested negative for COVID-19 on September 27, 28, and 29, and October 5, 9, and 12, 2021.

PRIVILEGED AND CONFIDENTIAL
CDCR OLA Team
December 17, 2021
Page 5

He eventually transferred on October 21, 2021. Mr. ███████████, was both referred and medically cleared for transfer to acute care on September 22, 2021. He was not transferred until October 27, 2021. Mr. ███████████, was referred and medically cleared for transfer to acute care on September 16, but was not transferred until October 18, 2021.[2]

     The foregoing shows that Defendants are excusing class members' transfers to inpatient care for months at a time due to a blanket policy created to address a lack of inpatient bed availability linked directly to insufficient numbers of clinical staff, rather than as a result of an individualized case-by-case analysis of COVID-19 factors, like testing, exposure-related quarantine, or actual COVID-19 symptoms or cases. While the Special Master's recent tours show that care in the PIPs remains deficient, the records for those stuck in an MHCB while awaiting their delayed PIP transfer reveal their struggles with the restrictive setting, including with the lack of access to property, programming, and sufficient bedding and clothing to stay warm.

     If Defendants disagree with this assessment, please provide any and all documentation or justification that incorporates a specific COVID-19-related reason for each of these delays, on an individualized, case-by-case basis. If there is no such documentation, Defendants must review and correct the COVID-19 exceptions they have misleadingly claimed to the Court. In addition, please identify who within CDCR is responsible for claiming these exceptions and who is approving the reports for filing with the Court.

     Please also provide us with a description and any written policy document memorializing the expedited transfer screening process, along with the dates when it was implemented and its intended duration.

     Please also explain whether and to what extent class members' LRH is being accounted for during the inpatient referral and admission process, as well as how LRH is reevaluated once class members have reached an inpatient bed. As described above, more than 100 ASH beds remain unfilled, along with dozens of beds at Patton and CSH. If single-cell ICF beds are in short supply, are Defendants taking steps to move class members whose LRHs have changed, or who are housed outside their LRH, out of single

---

[2] Defendants acknowledged in their September 27 notification of the closure of the CHCF PIP that some class members pending transfer to the acute level of care may remain in MHCB past transfer timelines. The generalized lack of bed availability due to the staffing-related closure of the CHCF PIP does not justify claiming a "COVID-19" exception to transfer timelines for resulting delays.

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA Team
December 17, 2021
Page 6

cell beds and into beds at lower LRHs?  Notably, single-cell LRH issues were apparent from the records of Mr. ███████████, Mr. ████████, and Mr. ███████.  What is the status of Defendants' revisions to their LRH/Housing Review policy?

Plaintiffs look forward to further discussion of these important issues.  Because the same staffing shortages are causing at least in part both the systemic delays in transfers to inpatient care and the constitutionally inadequate levels of mental health treatment being provided to class members in the PIPs, we ask that Defendants respond to this letter in conjunction with their response to Cara Trapani's October 15 and December 10 letters, in the first week of January.

<div style="text-align: right;">

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jessica Winter*

By:   Jessica Winter

</div>

JW:JW
Attachments: Exhibits 1-4

cc: *Coleman* co-counsel
   *Coleman* Special Master Team
   Adriano Hrvatin
   Elise Thorn
   Damon McClain
   Namrata Kotwani

   Paul Mello
   Samantha Wolff
   Sean Rashkis
   Nina Raddatz
   Christine Ciccotti
   Kristopher Kent

# Exhibit 1

| | |
|---|---|
| **From:** | Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov> |
| **Sent:** | Friday, December 10, 2021 9:03 AM |
| **To:** | Jessica Winter |
| **Cc:** | Coleman Team - RBG Only; Steve Fama; Tania Amarillas; Coleman Special Master Team; Adriano.Hrvatin@doj.ca.gov; Elise Thorn; 'Damon McClain'; Namrata Kotwani; Pmello@hansonbridgett.com; SWolff@hansonbridgett.com; CDCR OLA Coleman CAT Mailbox; Stafford, Carrie@CDCR; Nick Weber; Melissa Bentz; Thind, Sundeep@CDCR; Rashkis, Sean@DSH-S; Nina Raddatz; christine.ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S |
| **Subject:** | RE: Coleman: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ICF (DSH) transfer pending for 60 days [IWOV-DMS.FID6429] |

[EXTERNAL] Notice: This message comes from an external sender.

Dear Jessica,

I write in response to Plaintiffs' December 7th email requesting information regarding Mr. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, delayed transfer to an Intermediate Care Facility (ICF) bed.  In response, Mr. ▮▮▮▮▮ custody factors limits his placement to an ICF single cell, which are all currently filled in the California Department of Corrections and Rehabilitation (CDCR).  Mr. ▮▮▮▮▮▮▮▮ is currently on the waitlist for transferring to an ICF single cell bed.  CDCR clinicians reviewed Mr. ▮▮▮▮▮▮▮▮ recent clinical documentation and determined he appears to be safely housed in the Mental Health Crisis Bed at the Substance Abuse Treatment Facility, and does not necessitate expedite transfer to the Psychiatric Inpatient Program.  Please be aware that all institutions and treatment teams can request an expedited transfer for a patient at any time if the patient's clinical presentation changes or worsens.

In response to Plaintiffs' question of whether Mr. ▮▮▮▮▮▮▮ has access to his clinically appropriate property and a second blanket, he has access to all of his clinically appropriate property and a second blanket.  The MHCB at SATF has a standard practice of providing all patients with two safety blankets in the winter months.

Feel free to contact me if you would like to discuss further.

Sincerely,

Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

**From:** Jessica Winter <JWinter@rbgg.com>
**Sent:** Tuesday, December 7, 2021 10:02 AM
**To:** Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; christine.ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S

<Kristopher.Kent@dsh.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Tania Amarillas <tania@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Adriano.Hrvatin@doj.ca.gov; Elise Thorn <Elise.Thorn@doj.ca.gov>; 'Damon McClain' <Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Pmello@hansonbridgett.com; SWolff@hansonbridgett.com; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** Coleman: ███████████████, ICF (DSH) transfer pending for 60 days [IWOV-DMS.FID6429]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear CDCR and DSH,

We understand that ███████████████, has been pending transfer to DSH for approaching 60 days.  (His records indicate he will transfer to DSH ICF, although it is possible that he is awaiting transfer to a PIP.)  He has been held in the SATF MHCB during that time, and there does not appear to be a medical reason that he continues to be housed in the CTC.  In the MHCB, he does not have access to some of his desired property and he has requested and been approved for a second blanket.

Why has Mr. ██████████ been waiting so long to transfer to an ICF bed?  Is he in fact eligible for transfer to DSH?

Thank you for your anticipated prompt response.

Sincerely,

Jessica Winter



**ROSEN BIEN GALVAN & GRUNFELD LLP**

**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile
jwinter@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at jwinter@rbgg.com.

# Exhibit 2

**From:**     Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:**     Wednesday, October 27, 2021 1:27 PM
**To:**       Jessica Winter
**Cc:**       Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team; adriano.hrvatin@doj.ca.gov;
              Elise Thorn; 'Damon.McClain@doj.ca.gov'; v_Namrata.Kotwani@doj.ca.gov; Paul B. Mello; Samantha
              Wolff; Rashkis, Sean@DSH-S; Nina Raddatz; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S;
              CDCR OLA Coleman CAT Mailbox; Stafford, Carrie@CDCR; Nick Weber; Melissa Bentz; Thind,
              Sundeep@CDCR
**Subject:**  RE: Coleman v. Newsom: ICF transfer pending for 3 months, ███████████████    [IWOV-
              DMS.FID6429]

---

[EXTERNAL] Notice: This message comes from an external sender.

Dear Jessica,

I write in response to Plaintiff's October 15, 2021 email regarding Mr. ████████████, delayed transfer from California Institution for Men's (CIM) Mental Health Crisis Bed (MHCB) to an Intermediate Care Facility (ICF) unit.  First, in response to Plaintiffs' request for the status of Mr. ██████ referral to an ICF unit, ██████ was endorsed to the Psychiatric Inpatient Program (PIP) at Salinas Valley State Prison (SVSP) on October 15, 2021, and accepted on October 25, 2021.  Mr. ██████ is expected to transfer sometime this week.  The timeline for acceptance was delayed beyond the required three working days due to staffing issues at SVSP's PIP.

Second, Plaintiffs request information regarding the cause of Mr. ██████ delayed transfer from CIM's MHCB to an ICF bed at Mr. ██████ Least Restrictive Housing (LRH) designation.  Mr. ██████ referral was received by the Inpatient Referral Unit on August 31, 2021.  Mr. ██████ refused to consent to transfer to an ICF unit which resulted in a due process hearing that was completed on September 7, 2021.  Delays were further exacerbated due to Mr. ██████ LRH designation as ICF single cell. ICF single cells are very limited due to the high number of referrals to those beds, and number of beds placed aside to establish admission beds for unvaccinated ICF patients prior to being placed into a multi-person cell.

Third, Plaintiffs' ask whether the California Department of Corrections and Rehabilitation (CDCR) is extending its practice of holding patients referred to the APP level of care (LOC) in the MHCB to patients referred to the ICF LOC.  In response, CDCR is holding patients referred to ICF LOC in the MHCB only if the patient cannot safely discharge to a lower LOC while waiting to transfer to an ICF unit.

Fourth, Plaintiffs note that Mr. ██████ is not receiving optimal mental health treatment while waiting for transfer to an ICF unit.  In response, staff at CIM's MHCB have been employing several treatment methods in order to improve Mr. ██████ mental health symptoms.  For example, Mr. ██████ is offered daily confidential treatment, and is being provided psychotherapy sessions four-to-five times a week.  The psychotherapy sessions focuses on assisting Mr. ██████ to self-soothe and identify areas of distress via Cognitive Behavior Therapy.  In the event Mr. ██████ refuses to exit his cell for confidential treatment, staff have encouraged him to leave his cell, and if unsuccessful, staff will offer him cell-front treatment.

Lastly, in response to Plaintiffs' statement that Mr. ██████ was denied a sweatshirt on October 12, 2021, Mr. ██████ Primary Clinician informed him that sweatshirts are not available to patients in the MHCB but he would be allowed to have another blanket.  (*See* October 12, 2021 Mental Health Primary Clinician Note.)

Feel free to contact me if you would like to discuss further.

Sincerely,

Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

**From:** Jessica Winter <JWinter@rbgg.com>
**Sent:** Friday, October 15, 2021 11:59 AM
**To:** Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; adriano.hrvatin@doj.ca.gov; Elise Thorn <Elise.Thorn@doj.ca.gov>; 'Damon.McClain@doj.ca.gov' <Damon.McClain@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; RSilberfeld@RobinsKaplan.com; GDanas@robinskaplan.com; Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** Coleman v. Newsom: ICF transfer pending for 3 months, ███████ [IWOV-DMS.FID6429]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear OLA,

Plaintiffs write regarding class member ███████, currently housed in the MHCB at CIM.

Mr. ███████ has been housed in the MHCB at CIM since July 20, 2021.  He is not coping well in the highly restrictive MHCB setting and is suffering from depression, anxiety, auditory hallucination, nightmares, racing thoughts, suicidal ideation, and hopelessness.

Mr. ███████ records show that on July 20, 2021 he was transferred from RJD to the CIM MHCB after he attempted suicide by overdose.  Notes also indicate that Mr. ███████ was referred for transfer to the ICF level of mental health care on July 24, 2021 – four days after arriving at the MHCB – but he has yet to be accepted to the ICF level of care so he has been awaiting transfer in the MHCB since then.  *See* ███████ MH Master Treatment Plan dated October 6, 2021.

As Mr. ███████ continues to wait for transfer to a higher level of mental health care his mental health condition continues to suffer.  He does not come out of his cell for mental health appointments or meetings with his IDTT.  On October 12, 2021, he told his mental health primary clinician that he did not like to come out of his cell because he did not like to be cuffed when transported to his meetings and he did not like to be in the modules.  Also on October 12, 2021, he reported to his primary clinician that it was cold in his cell.  When he asked if could have an extra sweatshirt, staff refused because he is in MHCB where extra issue is not allowed.  His October 14, 2021 master treatment plan, which does not indicate he will be transferred to the ICF level of care, states:

"Patient continues to require higher level of care He is not meeting his treatment goals and requires assistance in development of coping skills to mitigate hopelessness And get assistance in changing world view as this view of being targeted by staff drives irritability depression and hopelessness and increases desire to want to end his life."

Please let us know the status of Mr. ███████ ICF referral. Why has Mr. ███████ been waiting so long in an MHCB to be transferred to a higher level of mental health care? We understand that due to issues with PIP bed capacity, Defendants may hold acute patients longer in MHCBs. Is the same practice occurring for patients referred to the ICF level of care?

Please transfer Mr. ███████ to the ICF level of care, at his least restrictive housing designation, as soon as possible.

Sincerely,

Jessica Winter

 **ROSEN BIEN GALVAN & GRUNFELD LLP**

**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile
jwinter@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at jwinter@rbgg.com.

# Exhibit 3

| | |
|---|---|
| **From:** | Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov> |
| **Sent:** | Thursday, November 4, 2021 11:27 AM |
| **To:** | Jessica Winter |
| **Cc:** | Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team; adriano.hrvatin@doj.ca.gov; Elise Thorn; Stafford, Carrie@CDCR; Nick Weber; Melissa Bentz; Thind, Sundeep@CDCR; v_Damon.McClain@doj.ca.gov; v_Namrata.Kotwani@doj.ca.gov; Paul B. Mello; Samantha Wolff; Rashkis, Sean@DSH-S; Nina Raddatz; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S; CDCR OLA Coleman CAT Mailbox |
| **Subject:** | RE: Coleman: Delayed physical discharge from CMF MHCB - ▮▮▮▮▮▮▮▮▮▮ IWOV-DMS.FID6429] |

[EXTERNAL] Notice: This message comes from an external sender.

Dear Jessica,

▮▮▮▮▮▮ was scheduled to transfer to California Medical Facility's Outpatient Housing Unit (OHU) on October 24th.  The transfer was delayed due to a leak in the roof and there were no longer available beds.  The roof was repaired on November 3rd, and ▮▮▮▮▮▮ was transferred to the OHU soon after.

Feel free to contact me if you would like to discuss further.

Sincerely,

Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

**From:** Jessica Winter <JWinter@rbgg.com>
**Sent:** Thursday, November 4, 2021 10:53 AM
**To:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; adriano.hrvatin@doj.ca.gov; Elise Thorn <Elise.Thorn@doj.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** RE: Coleman: Delayed physical discharge from CMF MHCB - ▮▮▮▮▮▮▮▮▮▮ [IWOV-DMS.FID6429]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks Dillon.  Looking forward to the further information.

---

**From:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:** Wednesday, November 3, 2021 3:55 PM
**To:** Jessica Winter <JWinter@rbgg.com>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; adriano.hrvatin@doj.ca.gov; Elise Thorn <Elise.Thorn@doj.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>; Nina Raddatz <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** RE: Coleman: Delayed physical discharge from CMF MHCB - ███████████ [IWOV-DMS.FID6429]

[EXTERNAL] Notice: This message comes from an external sender.

Dear Jessica,

OLA is in receipt of Plaintiffs' email regarding ███████████, delayed transfer from a Mental Health Crisis Bed (MHC) to an Outpatient Housing Unit (OHU).  In response, ████████ transferred out of California Medical Facility's MHCB into an OHU today, November 3rd.  Additionally, OLA will provide responsive information regarding the delayed transfer soon.


Sincerely,

Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

---

**From:** Jessica Winter <JWinter@rbgg.com>
**Sent:** Wednesday, November 3, 2021 3:48 PM
**To:** Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; adriano.hrvatin@doj.ca.gov; Elise Thorn <Elise.Thorn@doj.ca.gov>; v_Damon.McClain@doj.ca.gov <Damon.McClain@doj.ca.gov>; v_Namrata.Kotwani@doj.ca.gov <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** Coleman: Delayed physical discharge from CMF MHCB - ███████████ [IWOV-DMS.FID6429]

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear OLA,

Plaintiffs write regarding class member ███████████.

███████ (a transgender class member whose chosen name is "███████" and who uses she/her/hers pronouns) reported yesterday that she is housed in an MHCB unit and had been clinically discharged but is waiting to be physically transferred to another housing unit.

Records indicate that ███████ was admitted to the MHCB on October 21, 2021 after reporting suicidal ideation. *See* Oct. 21, 2021 SRASHE for █████, █████. She was clinically discharged from the MHCB on October 24, 2021. *See* Oct. 24, 2021 MH Master Treatment Plan for ███████. As of this morning, however, ███████ continues to be housed in the MHCB unit, apparently awaiting an open OHU bed. *See id.*

The Program Guide requires patients to physically transfer out of the MHCB within 72 hours of being clinically discharged. *See* ECF 7333-1 at 422.

Please let us know the status of ███████ physical transfer out of the MHCB. What has caused the delay in her physical transfer out of the MHCB?

Jessica Winter

 **ROSEN BIEN GALVAN & GRUNFELD** LLP

**101 Mission Street, Sixth Floor**
**San Francisco, CA 94105**
(415) 433-6830 telephone
(415) 433-7104 facsimile
jwinter@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at jwinter@rbgg.com.

# Exhibit 4

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 12, 2021

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write regarding mission changes, the CHCF ASU EOP Hub, current and planned crisis and inpatient bed closures, and tele-psychiatry office space. This letter updates and includes information from my October 20, 2021 letter which the parties were unable to discuss during their November 9, 2021, meeting.

1.  Mission Changes

| Institution | Bed Type | Housing Unit | # Of Beds | Reason | Date |
|---|---|---|---|---|---|
| **SVSP** | EOP-III | A-4 | -150 | Convert to SNY III | Nov. 21, 2021 |
| **SAC** | LTRH | B-8 | 75 | Convert to EOP IV | January 2022 |
| **SAC** | EOP IV | B5 and B6 | -150 | Convert to GP IV | January 2022 |

On November 21, 2021, CDCR will deactivate 150 level III EOP beds at Salinas Valley State Prison and convert them to level III SNY. Patients from the closed building will be housed in A-5 EOP or transferred to MCSP, RJD or, for those with level II scores, a level II EOP institution.

CDCR also deactivated the SAC LTRH on October 11, 2021. LTRH inmates were moved to the COR LTRH or remained in SAC's STRH if there are staff separation or cocci concerns. While that building remains empty, SAC will reactivate the unit as a level IV EOP housing unit in January 2022. That reactivation will coincide with the deactivation of the level IV EOP housing units in buildings B5 and B6. B5 and B6 patients will be placed in B8 or transferred to open level IV EOP beds at other institutions, such as LAC.

2.  CHCF ASU EOP Hub Temporary Closure

CDCR will temporarily deactivate the CHCF ASU EOP Hub due to custody staffing and the low population of the unit. Patients will be transferred to open ASU EOP Hub beds at CMF. As of November 9, 2021, the unit had six patients. CDCR will provide notice when the unit reactivates.

Special Master Lopes
Page 2

3. Crisis and Inpatient Beds

The following is a list of closed or soon to be closed crisis or inpatient beds.  Updates appear in red.

| Institution | Deactivation | Cells | Reason | Activation Date |
|---|---|---|---|---|
| PVSP MHCB | February 19, 2019 | 6 | CTC Repair | December 2021 |
| CMF PIP | April 29, 2019 | 25 | Staffing | TBD |
| CMF PIP A3 | April 23, 2020 | 8 | COVID-19 | TBD |
| CMF PIP | January 3, 2022 | 16 | Flex Retrofit | February 7, 2022 |
| CMF PIP | February 15, 2022 | 16 | Flex Retrofit | March 30, 2022 |
| CCWF MHCB | November 8, 2021 | 12 | Suicide Prevention | May 1, 2022 |
| CHCF PIP | Sept. 28, 2021 | - | Staffing | TBD |

a. Pleasant Valley State Prison Crisis Bed

Pleasant Valley State Prison's Correctional Treatment Center and crisis bed closed on February 19, 2019 due to roof damage as a result of rain storms.  As a result of the damage, the interior of the building was severely damaged.  The work was temporarily stalled during much of 2020 due to COVID 19.  The unit was expected to reopen by the end of May 2021 however, fire alarm system repairs continue.  The estimated completion date was August 31, 2021, however the fire alarm did not pass inspection.  The nursing station also was not fully operational on time.  The nursing station is anticipated to be completed by October 4, 2021 and state fire marshal inspection will follow.  The State Fire Marshal was scheduled to visit on November 10, 2021, but the visit did not occur.  PVSP will reopen pending State Fire Marshal approval and subsequent labor notice.

b. California Medical Facility Psychiatric Inpatient Program

Due to staffing vacancies, California Medical Facility (CMF) Psychiatric Inpatient Program (PIP), has taken twenty-five beds offline.  Nine of the beds have been offline since April 2019 and another sixteen were taken offline in August 2021.  In addition, CMF PIP has taken down eight dorm beds in unit A3, in order to achieve physical distancing due to COVID 19.  Two were taken down in April 2020 and an additional six in October 2020.

On January 3, 2022, CDCR will deactivate sixteen beds in CMF's sixty-four bed unit for suicide prevention retrofits consistent with CDCR's plan to classify thirty-two of those beds as flex beds.  CDCR will modify the remaining sixteen beginning in mid-February 2022.  These retrofits will allow the beds to safely flex between acute, intermediate, and crisis bed levels of care.  Currently, the unit has sixteen beds held vacant due to staffing.  Should those sixteen beds remain closed when the project starts, CDCR will rotate the patients in the impacted wings through the empty sixteen bed wing in order to avoid additional bed closures.

Special Master Lopes
Page 3

      c.   Central California Women's Facility Mental Health Crisis Bed

On November 8, 2021 CDCR deactivated the crisis bed at Central California Women's Facility (CCWF) for suicide prevention retrofits. The project is expected to take approximately six months. Female patients in need of crisis bed services will be referred and transferred to California Institution for Women's crisis bed or Walker unit during the time CCWF is offline.

      d.   California Health Care Facility Psychiatric Inpatient Program

As previously reported, CDCR stopped intake to the CHCF PIP on September 28, 2021 for thirty days. CDCR extended that closure for an additional thirty days on October 29, 2021. As a result of the closure, CHCF PIP's census has been reduced by nearly 100 patients. Currently 100 of its 201 acute beds are occupied. ICF beds remain full, with only eight vacancies. The PIP closure has allowed staff to consolidate care teams and focus on patient care and discharge planning. CDCR remains focused on implementing the PIP's discharge readiness tool, assisting with local workflows, establishing close regional and headquarters monitoring, and prioritizing staffing of the program.

   4.  San Quentin State Prison PIP

As stated on the last Mission Change call, CDCR has increased the capacity for non-condemned patients from ten to sixteen. The prioritization for San Quentin PIP bed usage is as follows:

- First Priority - PIP-ICF Patients (Condemned only)
- Second Priority - PIP Acute Patients (Condemned only)
- Third Priority - PIP MHCB Patients (Condemned only)
- Fourth Priority - Non-Condemned MHCB Acute or ICF Patients

   5.  California State Prison, Sacramento Mental Health Crisis Bed Unit (SAC MHCBU)

During the last Mission Change call, Plaintiffs asked when the SAC MHCBU closed to intake. SAC MHCBU closed to intake on July 6, 2021.

/

/

/

/

/

/

Special Master Lopes
Page 4

6. Telepsychiatry Office Space

CDCR currently operates one hundred three telepsychiatry offices at six locations.

| Location | Number of Offices |
|---|---|
| Elk Grove, CA | 16 Offices |
| San Quentin, CA | 15 Offices |
| Rancho Cucamonga, CA | 29 Offices |
| Diamond Bar, CA | 16 Offices |
| Santa Ana, CA | 22 Offices |
| Fresno, CA | 5 Offices |
| SUBTOTAL | 103 Offices |

Sincerely,

*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs

# ATTACHMENT A

Mental Health Services Delivery System
(MHSDS) Management Information
Summary (MIS) Report

November 8, 2021

**MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS)**
**MANAGEMENT INFORMATION SUMMARY (MIS) REPORT**
4/8/2022

| Level of Care | Housing Program | MALES | | | FEMALES | | |
|---|---|---|---|---|---|---|---|
| | | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
| **Correctional Clinical Case Management System (CCCMS)** | | **26,500** | **22,739** | | **2,250** | **1,844** | |
| CCCMS | Reception Center (RC) | | 1,446 | | | 59 | |
| | General Population (GP) | | 19,682 | | | 1,665 | |
| | Enhanced Outpatient Program (EOP) | | 129 | | | 0 | |
| | Mental Health Crisis Bed (MHCB) | | 0 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 0 | | | 0 | |
| | Specialized Medical Beds Housing | | 515 | | | 24 | |
| | Administrative Segregation Unit (ASU) | | 237 | | | 73 | |
| | Condemned | | 116 | | | 10 | |
| | Long Term Restricted Housing Unit (LTRH)[6] | 270 | 120 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 1 | | | 0 | |
| | Psychiatric Services Unit (PSU) | | 3 | | | 0 | |
| | Security Housing Unit (SHU) | | 0 | | | 13 | |
| | Short Term Restricted Housing Unit (STRH)[6] | 1,125 | 490 | | | 0 | |
| **Enhanced Outpatient Program (EOP)** | | **6,859** | **6,164** | | **225** | **147** | |
| EOP | Reception Center (RC) | | 128 | | | 1 | |
| | General Population (GP) | | 162 | | | 26 | |
| | Enhanced Outpatient Program (EOP) | 6,102 | 4,899 | | 195 | 102 | |
| | Mental Health Crisis Bed (MHCB) | | 11 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 25 | | | 0 | |
| | Specialized Medical Beds Housing | | 267 | | | 3 | |
| | Administrative Segregation Unit (ASU) | 585 | 415 | 80 | 20 | 7 | 0 |
| | Condemned | | 69 | | | 0 | |
| | Long Term Restricted Housing Unit (LTRH) | | 9 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 5 | | | 0 | |
| | Psychiatric Services Unit (PSU) | 172 | 139 | 39 | 10 | 8 | 1 |
| | Security Housing Unit (SHU) | | 0 | | | 0 | |
| | Short Term Restricted Housing Unit (STRH) | | 35 | | | 0 | |

| Level of Care | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
|---|---|---|---|---|---|---|
| **Mental Health Crisis Bed (MHCB)[7]** | **397** | **229** | **5** | **41** | **13** | **0** |
| **Psychiatric Inpatient Programs:** **Intermediate Care Facility (ICF)** | **1,129** | **862** | **41** | | | |
| Low Custody | 390 | 228 | 7 | | | |
| *Atascadero State Hospital (ASH)* | 256 | 143 | 6 | | | |
| *Coalinga State Hospital (CSH)* | 50 | 25 | 0 | | | |
| *California Medical Facility (CMF)* | 84 | 60 | 1 | | | |
| High Custody | 739 | 634 | 34 | | | |
| *California Health Care Facility (CHCF)* | 331 | 310 | 3 | | | |
| *CMF Single Cells* | 94 | 60 | 1 | | | |
| *CMF Multi Cells* | 68 | 45 | 11 | | | |
| *SVPP Single Cells* | 202 | 183 | 13 | | | |
| *Salinas Valley Psychiatric Program (SVPP) Multi Cells* | 44 | 36 | 6 | | | |
| **Acute Psychiatric Program (APP)** | **419** | **300** | **5** | | | |
| CHCF | 201 | 100 | 0 | | | |
| CMF | 218 | 200 | 5 | | | |
| **Psychiatric Inpatient Program (PIP)** | **52** | **42** | **0** | **75** | **29** | **3** |
| *California Institution for Women (CIW)* | | | | 45 | 19 | 2 |
| *Patton State Hospital (PSH)* | | | | 30 | 10 | 1 |
| SQ | 40 | 17 | 0 | | | |
| SQ (Non-condemned) | 0 | 15 | 0 | | | |
| MH Flex Institution(s)/Program(s)[7] | 12 | 10 | 0 | | | |
| **Penal Code 2974s (Parolees)[5]** | | **2** | | | | |
| Metro State Hospital (MSH) | | 0 | | | | |
| Napa State Hospital (NSH) | | 2 | | | | |
| Patton State Hospital (PSH) | | 0 | | | | |
| **TOTALS (excluding Parolees)** | **35,356** | **30,336** | **170** | **2,591** | **2,033** | **4** |

| | Total Capacity | Total Census[1] | Total Awaiting Placement[2] | Total Over Timeframes[3] | CENSUS PERCENTAGES | |
|---|---|---|---|---|---|---|
| | | | | | % MHSDS | % CDCR[4] |
| CCCMS | 28,750 | 24,583 | | | 75.95% | 24.71% |
| EOP | 6,297 | 5,693 | | | 17.59% | 5.72% |
| EOP-ASU/NDS/STRH | 605 | 462 | 80 | 29 | 1.43% | 0.46% |
| EOP-PSU/LTRH/SHU | 182 | 156 | 40 | 5 | 0.48% | 0.16% |
| MHCB | 438 | 242 | 5 | 0 | 0.75% | 0.24% |
| PSYCHIATRIC INPATIENT | 1,675 | 1,233 | 49 | 21 | 3.81% | 1.24% |
| **GRAND TOTAL** | **37,947** | **32,369** | **174** | **55** | **100.00%** | **32.54%** |

[1] Census sources: EDS for CCCMS, EOP; HEART for MHCB; RIPA reports for ICF, APP, and PIP programs.
[2] Awaiting Placement = The sum of inmates waiting to be placed in a bed at a specific level of care. Those awaiting placement to ICF, APP, and PIP include referrals that have been custodially reviewed by HCPOP and are awaiting bed availability, inpatient program acceptance, or transfer to the inpatient program as of the reporting date (based on the Referrals to Inpatient Programs Application (RIPA)).
[3] Total Over Timeframes = The number of referrals that are beyond Mental Health Program Guide transfer timeframes: EOP-ASU includes cases in non-hubs waiting > 30 days, PSU includes cases with an original CSR endorsement date > 60 days, MHCB includes referrals > 24 hours, Psychiatric Inpatient includes Intermediate referrals > 30 days and Acute referrals > 10 days.
[4] CDCR pop as of 11/3/21 (OISB). Based on Total In-State Institution Population and Out of State (COCF).
[5] Census numbers are tracked and updated by Department of State Hospital (DSH).
[6] LTRH and STRH capacity numbers obtained from the PMU Weekly Population Summary Report dated March 6, 2020.
[7] MH beds flexed to Acute and/or ICF at institutions that do not have a PIP program.

*ROB BONTA*
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public:  (916) 445-9555
Telephone:  (916) 210-7318
Facsimile:  (916) 324-5205
E-Mail:  Elise.Thorn@doj.ca.gov

January 7, 2022

*Via electronic Mail*
Jessica Winters, Esq.
Rosen Bien Galvan & Grundfeld LLP
101 Mission Street, 6th Floor
San Francisco, CA 94105-1738

RE:    Coleman v. Newsom, et al.,
       United States District Court, Eastern District of California, Case No. 2:90-cv-00520
       KJM-DB (PC)

Dear Jessica:

        This responds to your December 17, 2021 letter concerning Defendants' reporting of
COVID-19 based exceptions on the inpatient transfer compliance reports.

        The effects of the unprecedented and ever-evolving COVID-19 pandemic are
systemwide, and have impacted staffing, bed availability, and patient movement in often
unpredictable ways.  As Defendants have reported for months—and discussed with the Plaintiffs
and Special Master many times—COVID directly impacts CDCR's ability to transfer patients to
inpatient programs within Program Guide timelines for reasons that are not just based on
individualistic criteria.  (*See* ECF Nos. 7274 at 12, 7316 at 12, 7349 at 11, 7378 at 14, and 7399
at 11.)  Plaintiffs erroneously conclude that Defendants "are excusing class members' transfers to
inpatient care for months at a time due to a blanket policy created to address a lack of inpatient
bed availability linked directly to insufficient numbers of clinical staff, rather than as a result of
an individualized case-by-case analysis of COVID-19 factors, like testing, exposure-related
quarantine, or actual COVID-19 symptoms or cases."  But the inpatient transfer timelines
exceptions policy does not require CDCR to establish that the individuals transferred beyond
Program Guide timelines each had COVID or were suspected of having COVID while waiting to
transfer to an inpatient program.  Such a limitation would effectively nullify the transfer
timelines exceptions by excluding pandemic conditions outside of Defendants' control that
directly interfere with patient movement and transfers.

        Prior to COVID, Defendants had nearly perfect compliance with transfer timelines to
inpatient programs for more than two years.  Then, at the beginning of the pandemic, CDCR
stopped movement of patients, with limited exceptions, in order to mitigate the spread of COVID
amongst inmates and staff.  In February 2021, after the advent of vaccines and the availability of
adequate testing and quarantine protocols, CDCR began movement of PIP patients again.  But by

Jessica Winters, Esq.
January 7, 2022
Page 2

this time, CDCR's PIP waitlist had swelled.  Although CDCR moved expeditiously to reduce the
COVID backlog, this put tremendous stress on PIPs, which were forced to complete intakes at an
increased rate while simultaneously continuing to mitigate the ongoing COVID risk.  During this
time, CDCR focused extensively on admissions and clearing the patient waitlist in as expeditious
of a manner as possible, and less on processing discharges. The steady flow of intakes and
discharges was also severely disrupted, straining the system in ways it was not designed to
accommodate by creating large cohorts of patients that would become ready for discharge at the
same time. In addition, social distancing requirements within the PIPs and other programs that
were imposed in consultation with the federal Plata Receiver in order to protect patients, reduced
the availability of treatment, slowing the clinical progress of patients already in a PIP bed.  This
in turn increased the length of stay, further reducing bed availability.

It is also undisputed that the COVID-19 pandemic has had a negative impact on the
availability of healthcare staff nationwide.  Before COVID-19, the CHCF PIP was adequately
staffed with Primary Clinicians (PCs).  Since the start of the COVID-19 Pandemic, CHCF PIP
has seen its PC staffing levels drop significantly.  In some cases, that is directly attributable to
COVID infection.  But that is not the only impact of COVID.  Nationwide, as a result of the
COVID-19 pandemic, millions of staff have quit, changed jobs, or otherwise re-evaluated their
employment options leading to the largest shift in employment in known history, referred to as
the Great Resignation.  Healthcare fields are not immune from the Great Resignation, and some
research suggests healthcare fields are more impacted.[1]  Indeed, healthcare professionals have
changed jobs in droves, seeking less stressful employment after a year and a half of COVID
management.  CDCR has felt these impacts as well.

The referral process that has been in place and continues to be used to expedite the
reviews of patients for transfer to inpatient programs does not delay referrals, as your letter
suggests. The February 8, 2021 directive (that you received on February 11, 2021) provides that
the Inpatient Referral Unit (IRU) and HCPOP will facilitate the referral process.  The directive
does not state that CDCR will eliminate the ability to expedite transfers. Consistent with policy
and procedure, IRU clinicians continue to review every inpatient referral to ensure the referral is
complete.  The one change made to the referral process to address the conditions caused by the
pandemic is the movement of referrals to HCPOP in the order of oldest to newest as beds
become available for endorsement.  This change does not stand in the way of expedited referrals
based on clinical judgement.

As Defendants have reported, CDCR is closely monitoring all inpatient transfers and
applying appropriate exceptions to the inpatient transfer timelines only after careful,

---

[1]  *See* https://morningconsult.com/2021/10/04/health-care-workers-series-part-2-workforce/
(18% or nearly one in five health care workers quit during COVID); and
https://altarum.org/sites/default/files/uploaded-publication-files/SHSS-Labor-
Brief_Sept_2021.pdf (health care employment is down half a million workers).

Jessica Winters, Esq.
January 7, 2022
Page 3

individualized review.  CDCR's  reliance on COVID as an exception to the inpatient transfer
timelines is justified.  As described above, CDCR's IRU has reviewed each patient to determine
the impact of their case factors, and based on that review designated reported exceptions to the
transfer timelines as COVID-related.   There is nothing misleading about the exceptions reported
to the Court in the monthly inpatient reports.  It has been characterized consistently in the
monthly inpatient reports filing that Deputy Director Amar Mehta, M.D. reviews and approves
each month, and has included an explanation of the basis for the COVID-19 exceptions with the
reports since August 2021.

       Finally, you request information concerning the Least Restrictive Housing policy.  CDCR
has previously explained that HCPOP continues to review referrals to identify patients' LRH and
clinicians continue to review and have input concerning the patients' appropriate placement in
their assigned LRH.  CDCR and DSH continue to review all referrals together, and discuss any
clinical disagreements in the small workgroup under the guidance and with input from the
Special Master's psychiatric experts.  CDCR is sending all DSH-eligible patients to DSH, with
Dr. Metzner's input and approval.  But this does not mean that every patient with an Unlocked
Dorm LRH is sent to DSH.  There are some patients who may be custodially indicated for
treatment in DSH, but who are not clinically indicated for an Unlocked Dorm setting due to a
number of factors, including: disruptive behaviors; victimization of lower functioning patients;
patients with Polydipsia who require water monitoring/control; patients who actively require
means restriction for ongoing engagement in self-injurious behavior (SIB); and those who, due to
mental illness, are too disruptive or paranoid to tolerate living with others at the time of referral.
The IRU Senior Specialists regularly review and track patients in the PIPs with an Unlocked
Dorm or Locked Dorm LRH and communicate with the PIP teams and leadership to refer
patients if they appear clinically indicated  for an Unlocked Dorm placement, where the referral
is sent to DSH for consideration. On some occasions, IRU will request a "pre-review" from DSH
to determine if a patient is clinically indicated for the unlocked dorms and/or treatment
recommendations if the patient is to remain in a PIP setting.

       As always, CDCR remains open to discussing the foregoing with you and answering any
questions you may have concerning the information provided in this letter.

                          Sincerely,

                          */s/ Elise Owens Thorn*

                          ELISE OWENS THORN
                          Deputy Attorney General

                   For    ROB BONTA
                          Attorney General

cc:     Coleman Special Master
        Coleman Co-Counsel



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jessica Winter
Email:  jwinter@rbgg.com

February 10, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>

Elise Owens Thorn
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244-2550
Elise.Thorn@doj.ca.gov

  Re: *Coleman v. Newsom*: Response to January 7, 2022 Letter Regarding
    Claimed Exceptions to Inpatient Transfer Timelines
    <u>Our File No. 0489-03</u>

Dear Elise:

  This is in response to your January 7, 2022 letter regarding Defendants' claimed
exceptions to inpatient transfer timelines.  We appreciate your response, but do not agree
with the premises of your letter.  Plaintiffs continue to object to Defendants' legally
unsupported and blanket approach to claiming "COVID-19" inpatient transfer exceptions
and to the misleading reporting Defendants have filed and continue to file with the Court,
a year after COVID-19-related inpatient transfer restrictions were lifted.

  First, your letter asserts that the COVID-19 exceptions policy allows CDCR to
claim inpatient exceptions in the manner it has been doing.  The parties have not agreed
on and the Court has not ordered or sanctioned a COVID-19-specific exceptions policy.
Instead, the parties have looked to the medical exception and unusual circumstances
exceptions for guidance.  *See, e.g.*, Oct. 23, 2020 Ev'ry Hrg. Tr., ECF No. 6935 at 94:15-
19, 113:6-12 (Nov. 2, 2020) (referring to "Medical Hold" as applicable exception); Jt.
List of Witnesses & Exs. for Ev'ry Hrg. Concerning Class Member Access to DSH
Programs, ECF No. 6900 at 8 (Oct. 9, 2020) (showing Defendants' reliance on existing
exceptions to inpatient transfers for purposes of DSH hearing).  The parties have placed
particular emphasis on the medical conditions exception given that COVID-19 is a
medical condition and the balancing of COVID risks versus individual class members'
mental health needs, coupled with available COVID-19 mitigation strategies, is

[3858903.3]

Elise Owens Thorn
February 10, 2022
Page 2

inherently medical.  The medical conditions exception, copied below, requires an individualized and ongoing analysis of the specific medical circumstances that prevent a class member from transferring in compliance with court-ordered timelines, and then requires each class member to transfer within five calendar days of resolution of the medical issue.

**Medical Conditions:**

If a patient has a medical condition that cannot be treated at a PIP and *that is deemed more urgent than the mental health treatment need at or after the time of the referral, as determined by a joint team of medical and mental health clinicians, a medical hold shall be ordered.  The relative urgency of the medical and mental health needs shall be continually monitored by the joint team, and mental health staff shall document the reasons that the medical need continues to outweigh the mental health need as dictated by the patient's condition*.  The Headquarters Inpatient Referral Unit (IRU) is responsible for tracking each exception to ensure transfer as soon as the exception is resolved.  If resolution of the medical issue delays CDCR's ability to transfer the patient to the PIP within the transfer timelines, upon clearance for transfer and acceptance to a PIP, the patient shall be transferred to the next available inpatient bed commensurate with the referral.  That transfer shall be completed within five (5) calendar days of resolution of the medical issue for Acute referrals and within five (5) calendar days for ICF referrals.

*See* Addendum to 12.11.2101(A) PIP Policy & Procedure Referral & Admission (ECF No. 5744) (emphasis added).  But you agree in your letter that Defendants are claiming exceptions "not just based on individualistic criteria," contrary to the narrow, agreed-upon, and court-ordered medical conditions exception.

In addition, the unusual circumstances exception requires that the exceptional circumstances be outside CDCR's control.  *See id.* at 2.  But the systemic failures you rely on—inadequate staffing, insufficient inpatient bed availability in the PIPs, and movement restrictions—are entirely within Defendants' control.  They are based on Defendants' current and historical policy choices.  *See, e.g.*, Jan. 9, 2022 Ltr. from E. Thorn to C. Trapani & J. Winter re PIP Staffing & CHCF PIP Plan, at 2-3 (Defendants' declining or delaying potential remedies for extreme staffing shortages at PIPs); Feb. 1, 2022 COVID-19 Screening & Testing Matrix for Patient Movement at 1 (declaring as "necessary" "movement of MHSDS patients as required by the Program Guide").  Nor was this exception ever anticipated to apply across-the-board for months' or years' worth

[3858903.3]

Elise Owens Thorn
February 10, 2022
Page 3

of inpatient transfers.  Neither exception applies wholesale to excuse untimely inpatient
transfers on an indefinite basis.

Indeed, while the pandemic may have exacerbated the problem, staffing shortages
in the PIPs preexisted COVID-19.  *See* Special Master Report on Current Status of Class
Members' Access to Inpatient Care, ECF No. 6565 at 17-18 (Apr. 2, 2020) ("In the
period preceding the onset of the COVID-19 pandemic, staffing vacancies and the lack of
appropriate treatment at CHCF-PIP, CMF-PIP, and SVSP-PIP were known to CDCR, the
Special Master and plaintiffs' counsel to have seriously limited what mental health care
was available to patients in these programs," which the Special Master characterized as
"institutional program failures").  And Defendants closed beds at CMF PIP due to
inadequate staffing long before the pandemic.

Similarly, DSH beds, which are well staffed by comparison and could more than
clear the backlog of patients waiting for inpatient care, have been underused for decades.
As to Defendants' claims that current delays are due to a "bottleneck" in admissions and
discharges caused by COVID-19 movement restrictions, those restrictions ended a year
ago and cannot explain why the "bottleneck" has still not been resolved.  Defendants
cannot blame COVID-19 for longstanding problems they have simply refused to fix.

Second, your letter makes apparent the following:

1) Every month for at least six months, Defendants have claimed misleading
COVID-19 exceptions to excuse almost every delayed inpatient transfer based on
systemic and persistent shortages in staffing, the unavailability of CDCR inpatient beds,
and purported bottlenecks in processing class member admissions to and discharges from
inpatient beds, which have now lasted a full year.  Defendants do not plan to correct their
reporting, are continuing to assert these invalid exceptions after receiving our objections,
and give no indication they intend to stop.  *See* Defs' Census, Waitlists, & Transfer
Timelines Compliance Reports for Inpatient Mental Health Care, ECF No. 7422 Ex. F
(Jan. 18, 2022) (claiming one "Medical Hold" exception and 43 "COVID-19"
exceptions).

2) In none of the cases cited in my December 17 letter[1] was there a specific,
individualized review of COVID-19-related factors, including, for example, the

---

[1] My December 17 letter discussed inpatient referrals originated in July, August, and
September 2021 and reported as exceptions in Defendants' November data.  These
claimed exceptions were for referrals initiated months after inpatient transfer restrictions
were lifted on February 8, 2021 and well before the recent Omicron surge.

Elise Owens Thorn
February 10, 2022
Page 4

quarantine of the class members' housing units, their positive COVID-19 tests or COVID-19 infections, COVID-19 symptoms, or excusable delays in the COVID-19 testing process that justified the claimed exception. Multiple class members were medically cleared for transfer upon or shortly after their referral and tested and/or screened negative for COVID-19 multiple times before their transfer.

3) Defendants are continuing to apply an emergent transfer standard to class members' inpatient referrals, under the guise of the "expedited transfer" standard, notwithstanding their representation to Plaintiffs, the Special Master, and the Court that the emergent transfer standard was discontinued in February 2021. Defendants are applying this expedited transfer standard to all PIPs. Even where patients' referrals have been "expedited," it may still take weeks for those patients to transfer to a PIP bed.

4) The PIPs have not been able to provide adequate inpatient care during most of 2021,[2] which among other things has caused delays in class members' discharge from inpatient treatment.

5) You do not contest that class members awaiting transfer to an inpatient bed in MHCBs are struggling with the restrictive settings in the MHCBs.

Third, even assuming it is appropriate for Defendants to apply an "expedited transfer" review process to inpatient referrals, which Plaintiffs do not concede, Defendants did not provide any written policy describing the process for reviewing patients' cases for "expedited transfer" to an inpatient setting, or the date of that policy's implementation and its expected duration. As far as Plaintiffs are aware, no such policy exists.

Finally, your generalized assertion that the LRH process is working and that class members "may" not be able to transfer to their LRH due to clinical factors does not address the evidence that DSH beds for *Coleman* class members are at half capacity or less, and that Defendants report having too few high-custody inpatient beds while simultaneously reporting dozens of available beds at lower-custody settings in the PIPs.

---

[2] Care in the PIPs has been inadequate for years. *See* Special Master Report on Current Status of Class Members' Access to Inpatient Care, ECF No. 6565, at 17-18 (Apr. 2, 2020); Special Master's Monitoring Report on Mental Health Inpatient Care Programs for Inmates of CDCR, ECF No. 5894 at 26 (Aug. 30, 2018) (treatment planning inadequate across facilities), 27 (group therapy "found wanting" across facilities during site visits), 27 ("Individual treatment was rarely offered or provided across inpatient programs, and where provided was either woefully inadequate, or not accurately tracked.")

Elise Owens Thorn
February 10, 2022
Page 5

*See* Defs' Census, Waitlists, & Transfer Timelines Compliance Reports for Inpatient Mental Health Care, ECF No. 7422 Exs. A (110 available beds at ASH, 33 available at CSH, and 19 available at PSH as of December 27, 2021), C (40 beds available in non-single-cell PIP settings as of December 27, 2021, less 8 dorm beds offline for physical distancing) (Jan. 18, 2022).

The LRH process is not functioning and has not been functioning for some time. *See* Special Master's Monitoring Report on Mental Health Care Programs for Inmates of CDCR, ECF No. 7039 at 42 ("Similar to the findings in the 2018 Inpatient Care Report, current findings also indicate that defendants continued to struggle with plac[ing] . . . patients in their LRH."); *e.g.*, 60-61, 62, 70-71 (Jan. 28, 2021) (IDTTs at all three large CDCR PIPs regularly failed to discuss LRH). Yet Defendants also did not provide information regarding the status of revisions to the LRH/Housing Review policy following Plaintiffs' and the Special Master team's feedback, which in part was meant to address dysfunctional aspects of the LRH process.

Defendants have asserted that COVID-19 prevents them from timely transferring class members to inpatient care and make clear they will continue doing so. If COVID-19 is truly the cause of the delays, Defendants must take emergency steps, as they did earlier in the pandemic. That includes emergency reinstatement of population reduction measures previously used during the pandemic. It also includes emergency implementation of salary increases, hiring bonuses or other measures to address the massive staffing shortages, none of which are included in the Governor's budget. And it must include emergency steps to place patients needing inpatient care in empty DSH beds.

By March 1, 2022, please provide us with your response stating what steps Defendants will take to eliminate the unconstitutional denial of timely access to inpatient care that Defendants attribute to the pandemic so that we may timely assess what, if any, additional action will be necessary to protect the rights of the *Coleman* class.

In addition, please inform us whether you will file something to correct the record regarding the Census, Waitlists, and Transfer Timelines Compliance Reports to inform the Court that the claimed Covid-19 exceptions include not only direct delays due to patients' condition, quarantine, and isolation, but also secondary effects having nothing

\ \ \

\ \ \

\ \ \

[3858903.3]

Elise Owens Thorn
February 10, 2022
Page 6

to do with patients, such as staffing shortages.  If you do not file a correction, we will
have to file our own report to the Court pointing out these inaccuracies.

<div style="margin-left:50%">

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jessica Winter*

By:   Jessica Winter

</div>

JW:aa

cc:  Co-counsel
    *Coleman* Special Master Team
    Adriano Hrvatin
    Namrata Kotwani
    Paul Mello
    Samantha Wolff

    Carrie Stafford
    Nick Weber
    Melissa Bentz
    Dillon Hockerson
    Sundeep Thind
    Nina Raddatz

    Christine Ciccotti
    Kristopher Kent

[3858903.3]

# EXHIBIT D

DIVISION OF HEALTH CARE SERVICES
Psychiatric Inpatient Program Staffing Report
February 2022

## California Institution for Women - Psychiatric Inpatient Program

| Class Code | Classifications | Governor's Budget Authorized Positions (1) | Allocated Blanket Positions (2) | Total Positions | Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 9288 | Senior Psychologist, Supervisor | 0.00 | 1.50 | 1.50 | 1.50 | 0.00 | 0.00 | 1.50 | 0.00 | 0% |
| 8103 | Program Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 8102 | Program Assistant | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9761 | Senior Psychiatrist, Supervisor | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9287 | Senior Psychologist, Specialist | 0.00 | 0.50 | 0.50 | 0.50 | 0.00 | 0.00 | 0.50 | 0.00 | 0% |
| 9283 | Psychologist, Clinical | 2.00 | 1.00 | 3.00 | 3.00 | 0.00 | 0.00 | 3.00 | 0.00 | 0% |
| 9758 | Staff Psychiatrist | 2.00 | 1.00 | 3.00 | 1.00 | 1.00 | 0.00 | 2.00 | 1.00 | 33% |
| 9872 | Clinical Social Worker | 4.00 | 0.00 | 4.00 | 3.00 | 0.00 | 0.00 | 3.00 | 1.00 | 25% |
| 9286 | Recreation Therapist | 4.00 | 0.00 | 4.00 | 4.00 | 0.00 | 0.00 | 4.00 | 0.00 | 0% |
| 8253 | Psychiatric Technician | 32.00 | 0.00 | 32.00 | 32.00 | 0.00 | 0.00 | 32.00 | 0.00 | 0% |
| 8252 | Senior Psychiatric Technician | 6.00 | 0.00 | 6.00 | 6.00 | 0.00 | 0.00 | 6.00 | 0.00 | 0% |
| 8104 | Unit Supervisor | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| | **GRAND TOTAL** | **54.00** | **4.00** | **58.00** | **55.00** | **1.00** | **0.00** | **56.00** | **2.00** | **3%** |

(1) Authorized positions are based on the number of positions in the Governor's 2017/18 budget.

(2) Positions allocated per memorandum dated 1/27/15.

(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.

(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

DIVISION OF HEALTH CARE SERVICES
Psychiatric Inpatient Program Staffing Report
February 2022

## California Medical Facility - Psychiatric Inpatient Program

| Class Code | Classifications | Governor's Budget Authorized Positions (1) | Allocated Blanket Positions (2) | Total Positions | Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 9859 | Chief Psychologist | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100% |
| 9288 | Senior Psychologist, Supervisor | 0.30 | 0.00 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.30 | 100% |
| 8103 | Program Director | 0.00 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 8102 | Program Assistant | 0.00 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9761 | Senior Psychiatrist, Supervisor | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100% |
| 9287 | Senior Psychologist, Specialist | 0.40 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 100% |
| 9283 | Psychologist, Clinical | 2.50 | 0.00 | 2.50 | 1.00 | 1.00 | 0.00 | 2.00 | 0.50 | 20% |
| 9758 | Staff Psychiatrist | 2.50 | 0.00 | 2.50 | 0.00 | 2.00 | 0.00 | 2.00 | 0.50 | 20% |
| 9872 | Clinical Social Worker | 2.50 | 0.00 | 2.50 | 0.00 | 0.00 | 0.00 | 0.00 | 2.50 | 100% |
| 9286 | Recreation Therapist | 2.50 | 0.00 | 2.50 | 2.50 | 0.00 | 0.00 | 2.50 | 0.00 | 0% |
| | **GRAND TOTAL** | **10.70** | **4.00** | **14.70** | **5.50** | **3.00** | **0.00** | **8.50** | **6.20** | **42%** |

(1) Authorized positions are based on the number of positions in the Governor's 2017/18 budget.

(2) Positions allocated per memorandum dated 5/15/17.

(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.

(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

DIVISION OF HEALTH CARE SERVICES
Psychiatric Inpatient Program Staffing Report
February 2022

## San Quentin - Psychiatric Inpatient Program

| Class Code | Classifications | Governor's Budget Authorized Positions (1) | Total Positions | Filled Civil Service Positions (2) | Contracted FTE (3) | Overtime FTE (3) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|
| 9859 | Chief Psychologist | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9288 | Senior Psychologist, Supervisor | 0.40 | 0.40 | 0.50 | 0.00 | 0.00 | 0.50 | -0.10 | -25% |
| 8103 | Program Director | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 8102 | Program Assistant | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9761 | Senior Psychiatrist, Supervisor | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100% |
| 9287 | Senior Psychologist, Specialist | 0.40 | 0.40 | 1.00 | 0.00 | 0.00 | 1.00 | -0.60 | -150% |
| 9283 | Psychologist, Clinical | 2.70 | 2.70 | 3.00 | 0.00 | 0.00 | 3.00 | -0.30 | -11% |
| 9758 | Staff Psychiatrist | 2.70 | 2.70 | 1.50 | 1.00 | 0.00 | 2.50 | 0.20 | 7% |
| 9872 | Clinical Social Worker | 3.60 | 3.60 | 2.00 | 0.00 | 0.00 | 2.00 | 1.60 | 44% |
| 9286 | Recreation Therapist | 3.60 | 3.60 | 3.00 | 0.00 | 0.00 | 3.00 | 0.60 | 17% |
| | **GRAND TOTAL** | **17.40** | **17.40** | **14.00** | **1.00** | **0.00** | **15.00** | **2.40** | **14%** |

(1) Authorized positions are based on the number of positions in the Governor's 2017/18 budget.

(2) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.

(3) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Psychiatric Inpatient Program Staff
February 2022
Report submitted March 2022

**CHCF PIP**

| Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|
| **Mental Health Staffing** | | | | | | | | | |
| Psychologist | 34.25 | 0.00 | 34.25 | 10.00 | 3.35 | 0.00 | 13.35 | 20.90 | 61.02% |
| Psychiatrist | 33.00 | 0.00 | 33.00 | 14.00 | 11.59 | 0.00 | 25.59 | 7.41 | 22.45% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 29.20 | 0.00 | 29.20 | 12.00 | 1.82 | 0.00 | 13.82 | 15.38 | 52.67% |
| Rehabilitation Therapist / Recreation Therapist | 31.85 | 0.00 | 31.85 | 14.00 | 1.52 | 0.00 | 15.52 | 16.33 | 51.27% |
| **Total, Mental Health Staffing** | 128.30 | 0.00 | 128.30 | 50.00 | 18.28 | 0.00 | 68.28 | 60.02 | 46.78% |
| **Direct Care Nursing Staff** | | | | | | | | | |
| Psychiatric Technician | 210.60 | 0.00 | 210.60 | 234.00 | 3.93 | 6.46 | 244.39 | 0.00 | 0.00% |
| Registered Nurse | 264.60 | 0.00 | 264.60 | 157.00 | 16.64 | 0.86 | 174.50 | 90.10 | 34.05% |
| **Total, Direct Care Nursing Staff** | 475.20 | 0.00 | 475.20 | 391.00 | 20.57 | 7.32 | 418.89 | 56.31 | 11.85% |
| **Administrative Staff** | | | | | | | | | |
| Chief Psychiatrist | 1.00 | 0.00 | 1.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| Supervising Psychiatric Social Worker | 1.90 | 0.00 | 1.90 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| Chief Psychologist | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100.00% |
| Senior Psychologist, Supervisor | 4.35 | 0.00 | 4.35 | 4.00 | 0.00 | 0.00 | 4.00 | 0.35 | 8.05% |
| Senior Psychiatrist, Supervisor | 2.00 | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.00 | 100.00% |
| Supervising Registered Nurses | 72.10 | 0.00 | 72.10 | 33.00 | 0.00 | 0.00 | 33.00 | 39.10 | 54.23% |
| **TOTAL** | 685.85 | 0.00 | 685.85 | 482.00 | 38.85 | 7.32 | 528.17 | 157.68 | 22.99% |

(1) Authorized positions are based on the number of positions in the Governor's 2021/22 budget.

(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2021/22 budget. They are established at a point in time based on need of the facilities.

(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.

(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Psychiatric Inpatient Program Staff
February 2022
Report submitted March 2022

CMF PIP

| Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|
| **Mental Health Staffing** | | | | | | | | | |
| Psychologist | 32.45 | 0.00 | 32.45 | 5.00 | 4.94 | 0.00 | 9.94 | 22.51 | 69.37% |
| Psychiatrist | 31.20 | 0.00 | 31.20 | 6.00 | 15.51 | 0.00 | 21.51 | 9.69 | 31.06% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 27.40 | 0.00 | 27.40 | 5.00 | 0.00 | 0.00 | 5.00 | 22.40 | 81.75% |
| Rehabilitation Therapist / Recreation Therapist | 30.05 | 0.00 | 30.05 | 10.00 | 0.00 | 0.00 | 10.00 | 20.05 | 66.72% |
| **Total, Mental Health Staffing** | 121.10 | 0.00 | 121.10 | 26.00 | 20.45 | 0.00 | 46.45 | 74.65 | 61.64% |
| **Direct Care Nursing Staff** | | | | | | | | | |
| Psychiatric Technician | 56.60 | 0.00 | 56.60 | 40.00 | 2.09 | 9.57 | 51.66 | 4.94 | 8.73% |
| Registered Nurse | 176.00 | 0.00 | 176.00 | 95.00 | 18.05 | 17.05 | 130.10 | 45.90 | 26.08% |
| **Total, Direct Care Nursing Staff** | 232.60 | 0.00 | 232.60 | 135.00 | 20.14 | 26.62 | 181.76 | 50.84 | 21.86% |
| **Administrative Staff** | | | | | | | | | |
| Chief Psychiatrist | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Supervising Psychiatric Social Worker | 1.90 | 0.00 | 1.90 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| Chief Psychologist | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Senior Psychologist, Supervisor | 4.05 | 0.00 | 4.05 | 1.00 | 0.00 | 0.00 | 1.00 | 3.05 | 75.31% |
| Senior Psychiatrist, Supervisor | 2.00 | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.00 | 100.00% |
| Supervising Registered Nurses | 48.60 | 0.00 | 48.60 | 22.00 | 0.00 | 2.42 | 24.42 | 24.18 | 49.75% |
| **TOTAL** | 412.25 | 0.00 | 412.25 | 188.00 | 40.59 | 29.04 | 257.63 | 154.62 | 37.51% |

(1) Authorized positions are based on the number of positions in the Governor's 2021/22 budget.
(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2021/22 budget. They are established at a point in time based on need of the facilities.
(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.
(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Psychiatric Inpatient Program Staff
February 2022
Report submitted March 2022

SVSP PIP

| Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|
| **Mental Health Staffing** | | | | | | | | | |
| Psychologist | 11.20 | 0.00 | 11.20 | 2.00 | 2.67 | 0.00 | 4.67 | 6.53 | 58.30% |
| Psychiatrist | 11.20 | 0.00 | 11.20 | 0.50 | 5.59 | 0.00 | 6.09 | 5.11 | 45.63% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 11.20 | 0.00 | 11.20 | 6.00 | 0.00 | 0.00 | 6.00 | 5.20 | 46.43% |
| Rehabilitation Therapist / Recreation Therapist | 11.20 | 0.00 | 11.20 | 9.00 | 0.86 | 0.00 | 9.86 | 1.34 | 11.96% |
| **Total, Mental Health Staffing** | 44.80 | 0.00 | 44.80 | 17.50 | 9.12 | 0.00 | 26.62 | 18.18 | 40.58% |
| **Direct Care Nursing Staff** | | | | | | | | | |
| Psychiatric Technician | 24.80 | 0.00 | 24.80 | 15.00 | 1.80 | 0.78 | 17.58 | 7.22 | 29.11% |
| Registered Nurse | 78.60 | 0.00 | 78.60 | 48.00 | 5.21 | 0.14 | 53.35 | 25.25 | 32.12% |
| **Total, Direct Care Nursing Staff** | 103.40 | 0.00 | 103.40 | 63.00 | 7.01 | 0.92 | 70.93 | 32.47 | 31.40% |
| **Administrative Staff** | | | | | | | | | |
| Chief Psychiatrist | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100.00% |
| Supervising Psychiatric Social Worker | 0.80 | 0.00 | 0.80 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Chief Psychologist | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Senior Psychologist, Supervisor | 1.50 | 0.00 | 1.50 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| Senior Psychiatrist, Supervisor | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Supervising Registered Nurses | 20.00 | 0.00 | 25.30 | 20.00 | 0.00 | 1.90 | 21.90 | 3.40 | 13.44% |
| **TOTAL** | 178.80 | 0.00 | 178.80 | 105.50 | 16.13 | 2.82 | 124.45 | 54.35 | 30.40% |

(1) Authorized positions are based on the number of positions in the Governor's 2021/22 budget.
(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2021/22 budget. They are established at a point in time based on need of the facilities.
(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.
(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

# EXHIBIT E

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



February 10, 2022

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write regarding mission changes, crisis and inpatient bed closures, and tele-psychiatry office space.

1.  Mission Changes

No mission changes in the Enhanced Outpatient Program or in mental health restricted housing units are expected at this time.

2.  Crisis and Inpatient Beds

The following is a list of closed crisis beds or inpatient beds.

| Institution | Deactivation | Cells | Reason | Activation Date |
|---|---|---|---|---|
| **PVSP MHCB** | February 19, 2019 | 6 | CTC Repair | TBD |
| **CMF PIP** | April 29, 2019 | 9 | Staffing | TBD |
| **CMF PIP A3** | April 23, 2020 | 8 | COVID-19 | TBD |
| **CCWF MHCB** | November 8, 2021 | 12 | Suicide Prevention | May 1, 2022 |

a.  Pleasant Valley State Prison Crisis Bed

Pleasant Valley State Prison's Correctional Treatment Center and crisis bed closed on February 19, 2019 due to roof damage as a result of rain storms. As a result of the damage, the interior of the building was severely damaged. The work was temporarily stalled during much of 2020 due to COVID 19. The two outstanding projects are the fire alarm system and the nursing call station. The fire alarm project is awaiting state fire marshal review while the nursing call station has been delayed due to COVID exposure amongst the vendor team.

Special Master Lopes
Page 2

      b.   California Medical Facility Psychiatric Inpatient Program

Due to staffing vacancies, California Medical Facility (CMF) Psychiatric Inpatient Program (PIP), has taken nine beds offline. Those nine beds have been offline since April 2019. Another sixteen were taken offline in August 2021. However, those beds are now reactivated as PIP admissions beds in light of the December 27, 2021 revision to the Movement Matrix. In addition, CMF PIP has taken down eight dorm beds in unit A3, in order to achieve physical distancing due to COVID 19. Two were taken down in April 2020 and an additional six in October 2020.

      c.   Central California Women's Facility Mental Health Crisis Bed

On November 8, 2021 CDCR deactivated the crisis bed at Central California Women's Facility (CCWF) for suicide prevention retrofits. The project is expected to take approximately six months. Female patients in need of crisis bed services will be referred and transferred to California Institution for Women's crisis bed or Walker unit during the time CCWF is offline. CIW's MHCBs reopened for external movement on February 10, 2022.

      d.   California Health Care Facility Psychiatric Inpatient Program

As previously reported, CDCR stopped intake to the CHCF PIP on September 28, 2021. CDCR last extended that closure for an additional thirty days on December 27, 2021. The PIP reopened for external transfers on January 28, 2022.

   3.   Telepsychiatry Office Space

CDCR currently operates one hundred three telepsychiatry offices at six locations.

| Location | Number of Offices |
| --- | --- |
| Elk Grove, CA | 16 Offices |
| San Quentin, CA | 15 Offices |
| Rancho Cucamonga, CA | 29 Offices |
| Diamond Bar, CA | 16 Offices |
| Santa Ana, CA | 22 Offices |
| Fresno, CA | 5 Offices |
| SUBTOTAL | 103 Offices |

Sincerely,

*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs

# ATTACHMENT A

Mental Health Services Delivery System (MHSDS) Management Information Summary (MIS) Report

February 7, 2022

# MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS)
## MANAGEMENT INFORMATION SUMMARY (MIS) REPORT
3/31/2020

| Level of Care | Housing Program | MALES | | | FEMALES | | |
|---|---|---|---|---|---|---|---|
| | | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
| **Correctional Clinical Case Management System (CCCMS)** | | **26,500** | **22,591** | | **2,250** | **1,754** | |
| CCCMS | Reception Center (RC) | | 1,844 | | | 46 | |
| | General Population (GP) | | 19,218 | | | 1,606 | |
| | Enhanced Outpatient Program (EOP) | | 95 | | | 0 | |
| | Mental Health Crisis Bed (MHCB) | | 1 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 1 | | | 0 | |
| | Specialized Medical Beds Housing | | 494 | | | 21 | |
| | Administrative Segregation Unit (ASU) | | 248 | | | 62 | |
| | Condemned | | 111 | | | 11 | |
| | Long Term Restricted Housing Unit (LTRH)[6] | 270 | 122 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 1 | | | 0 | |
| | Psychiatric Services Unit (PSU) | | 0 | | | 0 | |
| | Security Housing Unit (SHU) | | 0 | | | 8 | |
| | Short Term Restricted Housing Unit (STRH)[6] | 1,125 | 456 | | | 0 | |
| **Enhanced Outpatient Program (EOP)** | | **6,709** | **6,238** | | **225** | **138** | |
| EOP | Reception Center (RC) | | 153 | | | 0 | |
| | General Population (GP) | | 370 | | | 24 | |
| | Enhanced Outpatient Program (EOP) | 5,952 | 4,700 | | 195 | 94 | |
| | Mental Health Crisis Bed (MHCB) | | 8 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 15 | | | 0 | |
| | Specialized Medical Beds Housing | | 272 | | | 2 | |
| | Administrative Segregation Unit (ASU) | 585 | 446 | 152 | 20 | 14 | 0 |
| | Condemned | | 68 | | | 0 | |
| | Long Term Restricted Housing Unit (LTRH) | | 0 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 15 | | | 0 | |
| | Psychiatric Services Unit (PSU) | 172 | 135 | 53 | 10 | 4 | 0 |
| | Security Housing Unit (SHU) | | 0 | | | 0 | |
| | Short Term Restricted Housing Unit (STRH) | | 56 | | | 0 | |

| Level of Care | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
|---|---|---|---|---|---|---|
| **Mental Health Crisis Bed (MHCB)[7]** | **401** | **202** | **5** | **41** | **8** | **0** |
| **Psychiatric Inpatient Programs: Intermediate Care Facility (ICF)** | **1,129** | **778** | **28** | | | |
| Low Custody | 390 | 194 | 11 | | | |
| *Atascadero State Hospital (ASH)* | 256 | 137 | 6 | | | |
| *Coalinga State Hospital (CSH)* | 50 | 20 | 3 | | | |
| *California Medical Facility (CMF)* | 84 | 37 | 2 | | | |
| High Custody | 739 | 584 | 17 | | | |
| *California Health Care Facility (CHCF)* | 331 | 260 | 1 | | | |
| *CMF Single Cells* | 94 | 56 | 2 | | | |
| *CMF Multi Cells* | 68 | 48 | 7 | | | |
| *SVPP Single Cells* | 202 | 188 | 5 | | | |
| *Salinas Valley Psychiatric Program (SVPP) Multi Cells* | 44 | 32 | 2 | | | |
| **Acute Psychiatric Program (APP)** | **415** | **235** | **32** | | | |
| CHCF | 197 | 48 | 14 | | | |
| CMF | 218 | 187 | 18 | | | |
| **Psychiatric Inpatient Program (PIP)** | **52** | **39** | **1** | **75** | **41** | **3** |
| California Institution for Women (CIW) | | | | 45 | 30 | 0 |
| Patton State Hospital (PSH) | | | | 30 | 11 | 3 |
| SQ | 40 | 13 | 1 | | | |
| SQ (Non-condemned) | 0 | 16 | 0 | | | |
| MH Flex Institution(s)/Program(s)[7] | 12 | 10 | 0 | | | |
| **Penal Code 2974s (Parolees)[5]** | | **1** | | | | |
| Metro State Hospital (MSH) | | 0 | | | | |
| Napa State Hospital (NSH) | | 1 | | | | |
| Patton State Hospital (PSH) | | 0 | | | | |
| **TOTALS (excluding Parolees)** | **35,206** | **30,083** | **271** | **2,591** | **1,941** | **3** |

| | Total Capacity | Total Census[1] | Total Awaiting Placement[2] | Total Over Timeframes[3] | % MHSDS | % CDCR[4] |
|---|---|---|---|---|---|---|
| | | | | | CENSUS PERCENTAGES | |
| CCCMS | 28,750 | 24,345 | | | 76.02% | 25.18% |
| EOP | 6,147 | 5,706 | | | 17.82% | 5.90% |
| EOP-ASU/NDS/STRH | 605 | 531 | 152 | 102 | 1.66% | 0.55% |
| EOP-PSU/LTRH/SHU | 182 | 139 | 53 | 13 | 0.43% | 0.14% |
| MHCB | 442 | 210 | 5 | 0 | 0.66% | 0.22% |
| PSYCHIATRIC INPATIENT | 1,671 | 1,093 | 64 | 37 | 3.41% | 1.13% |
| GRAND TOTAL | 37,797 | 32,024 | 274 | 152 | 100.00% | 33.12% |

[1] Census sources: EDS for CCCMS, EOP; HEART for MHCB; RIPA reports for ICF, APP, and PIP programs.

[2] Awaiting Placement = The sum of inmates waiting to be placed in a bed at a specific level of care. Those awaiting placement to ICF, APP, and PIP include referrals that have been custodially reviewed by HCPOP and are awaiting bed availability, inpatient program acceptance, or transfer to the inpatient program as of the reporting date (based on the Referrals to Inpatient Programs Application (RIPA)).

[3] Total Over Timeframes = The number of referrals that are beyond Mental Health Program Guide transfer timeframes: EOP-ASU includes cases in non-hubs waiting > 30 days, PSU includes cases with an original CSR endorsement date > 60 days, MHCB includes referrals > 24 hours, Psychiatric Inpatient includes Intermediate referrals > 30 days and Acute referrals > 10 days.

[4] CDCR pop as of 2/2/22 (OISB). Based on Total In-State Institution Population and Out of State (COCF).

[5] Census numbers are tracked and updated by Department of State Hospital (DSH).

[6] LTRH and STRH capacity numbers obtained from the PMU Weekly Population Summary Report dated March 6, 2020.

[7] MH beds flexed to Acute and/or ICF at institutions that do not have a PIP program.

# EXHIBIT F

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR |
| **To:** | Coleman Team - RBG Only (ColemanTeam-RBGOnly@rbgg.com); Coleman Special Master Team (ColemanSpecialMasterTeam@rbgg.com); Steven Fama (sfama@prisonlaw.com); elise.thorn@doj.ca.gov; Namrata Kotwani; Paul Mello; Samantha Wolff (SWolff@hansonbridgett.com); Bentz, Melissa@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR |
| **Subject:** | Coleman - STEP Policy |
| **Date:** | Tuesday, March 15, 2022 5:13:16 PM |
| **Attachments:** | MH HQ Memo - PIP Treatment Planning and Procedures - STEP Program.pdf |

All,

Attached is the final signed PIP Treatment Planning and Procedures STEP Program policy.

Nick Weber

Attorney

Department of Corrections & Rehabilitation

1515 S Street, Suite 314S

Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

DocuSign Envelope ID: 0DAB042C-C5FE-47A5-81DA-03A70A0CBC72

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | 3/15/2022 |
| **To:** | Associate Directors, Division of Adult Institutions |
| | Chief Executive Officers |
| | Chief Nurse Executives |
| | Chief/Senior Psychiatrists |
| | Chiefs of Mental Health |
| | Psychiatric Inpatient Program Executive Directors |
| | Wardens |

**From:**

*DocuSigned by:*
**Amar Mehta**
—46AE21AE5D5B4D3...
AMAR MEHTA, M.D.
Deputy Director
Statewide Mental Health Program

JARED D. LOZANO
Deputy Director
Division of Adult Institutions

BARBARA BARNEY-KNOX
Deputy Director, Nursing
California Correctional Health Care Services

*DocuSigned by:*
*Jackie Clark*
—BC11BF286D1E4FB...
JACKIE CLARK
Deputy Director
Institution Operations

| | |
|---|---|
| **Subject:** | **PSYCHIATRIC INPATIENT PROGRAM TREATMENT PLANNING AND PROCEDURES: SYSTEM TO ENCOURAGE PROGRESS (STEP) PROGRAM** |

This memorandum announces the release of the Psychiatric Inpatient Program (PIP) 12.11.2108 Treatment Planning and Procedures: System to Encourage Progress (STEP) program (attached). This policy provides guidance to the field regarding requirements for the STEP treatment progression model for patients in the PIP. The STEP program provides positive reinforcement, allowing patients to earn incentives which are in addition to property and privileges allowed by the IPs' custodial work group/privilege group in accordance with California Code of Regulations, Title 15.

Wardens and Chief Executive Officers (CEOs) at institutions that have a PIP and California Men's Colony shall ensure Training-for-Trainers (T4T) training for leadership (see below for required T4T participants) is completed using Course Code – 11063092 and submit a proof of practice memorandum within 30 days from the date of this memorandum. Wardens shall also ensure all custodial managers (Captains, Correctional Administrators), supervisors (Sergeants, Lieutenants, Correctional Counselor II Supervisors, Correctional Counselor III) and officers assigned to the PIP receive On-the-Job Training (OJT) (Read and Sign) using the Course Code – 11062850 within 60 days from the date of this memorandum and submit a proof of practice memorandum to their respective mission's Associate Director. CEOs shall ensure applicable healthcare staff in the PIP receive OJT (Read and Sign) using the Course Code-11062850 within 60 days from the date of this

DocuSign Envelope ID: 0DAB042C-C5FE-47A5-81DA-03A70A0CBC72

# MEMORANDUM

memorandum and submit a proof of practice memorandum to the respective Regional Mental Health Administrators.

T4T training will be required for the following California Department of Corrections and Rehabilitation (CDCR) PIP and California Men's Colony Mental Health, Nursing and Custody Leadership:

**PIP Leadership:** Executive Director, Chief Psychiatrist, Mental Health Supervisors, Chief of Mental Health, CEO.

**Custody:** Warden and Chief Deputy Warden. They can extend the invite to other Custody leadership overseeing the PIP.

**Nursing:** Chief Nurse Executives, designees, Nurse Instructors and Mental Health Educators.

A training announcement and TEAMS training invitation with more information is forthcoming, including the following training dates:

| Session # | Institutions | Dates | Times | Location | Course Code |
|---|---|---|---|---|---|
| 1 | CMF PIP and CIW PIP | Wednesday, March 23, 2022 | 9:00 am – 10:30 am | Teams | 11063092 |
| 2 | SVSP PIP, SQ PIP, CMC APP | Tuesday, March 29, 2022 | 9:00 am – 10:30 am | Teams | 11063092 |
| 3 | CHCF PIP | Wednesday, March 30, 2022 | 9:00 am – 10:30 am | Teams | 11063092 |

Please ensure all impacted Post Orders and Local Operating Procedures (LOP) are updated within 60 days to reflect these changes. The revision may be included as a supplement to be included in the next scheduled revision of the LOP.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email in Global as: CDCR MHPolicyUnit@CDCR (m_MHPolicyUnit@cdcr.ca.gov).

Attachment

cc: Laurie Ball
    Joseph Bick, M.D.
    Amber Carda, Psy.D.
    Steven Cartwright, Psy.D.
    Laura Ceballos, Ph.D.
    Laura Eldridge
    Marcie Flores, HQ CNE
    Michael Golding, M.D.

DocuSign Envelope ID: 0DAB042C-C5FE-47A5-81DA-03A70A0CBC72

# MEMORANDUM

Gretchen Huntington, Psy.D.
Jennifer Johnson
Sophia Le, M.D.
Jared Lozano
Toni Martello, M.D.
Daisy Minter, Ph.D.
Kimberly Seibel
Lourdes White
Sircoya Williams
Travis Williams, Psy.D.
IST Managers
Regional Chief Nurse Executives
Regional Health Care Executives
Regional Mental Health Administrators

| | | |
|---|---|---|
| **VOLUME 12:** MENTAL HEALTH SERVICES | Effective Date: | 3/15/2022 |
| **CHAPTER 11:** CORRECTIONAL TREATMENT CENTER: PSYCHIATRIC INPATIENT PROGRAM | Revision Date(s): | |
| | Supersedes: | |
| **12.11.2108** TREATMENT AND PLANNING PROCEDURES – STEP PROGRAM | Attachments: | Yes ☒ No ☐ |

**Policy**

All patients in the Psychiatric Inpatient Program (PIP) shall be enrolled in the System to Encourage Progress (STEP) treatment progression model.

The STEP program provides positive reinforcement, allowing patients to earn incentives that are in addition to property and privileges allowed by the patient's custodial work group/privilege group in accordance with Title 15, and allowable per PIP Policy 12.11.1408 Patient Allowable Items/Contraband. Specifically, the following items shall not be restricted unless documented and justified with a clinical order and justification that support risk to the patient if allowed: canteen amount and frequency, possession of personal property (including televisions and electronics), yard, dayroom, quarterly packages, family/visiting, yard, and access to library and chapel.

The purpose of this policy is to maximize the adaptive functioning of each patient to the best of their ability. Patients' goals shall be set in accordance with their capability to reach the individualized goals. Patients with functional impairment due to developmental disability shall have goals modified to their level of ability to ensure successful progression through the STEP Program.

Patients shall be included in the development of their treatment goals during Interdisciplinary Treatment Team (IDTT).

All items earned through the STEP program, with the exception of State Owned Radios and Televisions become the patient's property and shall not be removed as a penalty for future behavior or STEP reduction. State Owned Radios and Televisions, if earned through the STEP Program are property of the PIP and will be returned prior to patient transfer to another PIP or DSH facility or discharge from the PIP.

**Definitions**

**Admission:** A Staff or Senior Psychiatrist, or a licensed Clinical or Senior Psychologist, who is credentialed and has admitting privileges as determined by the organized medical staff at an inpatient program, completes orders to place a patient in the inpatient program.

**Clinical Discharge:** When the IDTT determines the patient no longer meets criteria for the Level of Care (LOC) and is clinically released from that LOC. Clinical discharge requires the agreement of the attending psychiatrist, and the primary clinician. Disagreements regarding clinical discharge can be raised to the medical director for resolution.

**Individualized Solo Treatment:** Treatment for patients who will not benefit from group therapy, or for whom group therapy may be detrimental. This includes individual therapy without interaction with other patients.

**Inpatient Referral Unit (IRU):** The CDCR Headquarters Mental Health unit responsible for review and facilitation of all CDCR referrals to Acute and Intermediate levels of inpatient care.

**Mechanical Restraints:** Handcuffs, leg irons, and waist chains when applied by custody staff shall not be considered a clinical intervention.

**Psychiatric Inpatient Program (PIP)**: An Acute or Intermediate level of care program operated by CDCR.

**Responsibilities**

The Executive Directors (ED) of the PIPs and the Associate Warden, Health Care Access Unit, or designee, shall be responsible for consistent implementation of this policy.

Each ED shall prepare a corresponding program procedure, which shall include staff roles and responsibilities for oversight and management of the Acute and Intermediate STEP programs at their facility.

**Purpose**

The STEP program recognizes and promotes the responsible functioning of each patient in order to establish a consistent treatment progression model across the PIPs that reinforces positive patient behaviors through individualized positive incentives.

**Procedure**

Upon admission to the PIP, patients shall receive a patient orientation packet or handbook, which includes the relevant *STEP Placement and Incentive Chart (*Attachments A and B*)*. When appropriate, staff shall provide this information to patients' family members. This STEP Program education shall include the specific requirements for advancement. Staff shall provide necessary observation, assessment, evaluation, guidance, counseling and documentation of the patient's progress.

The *Statewide approved STEP Incentives List* (Attachment C) shall be provided to PIP patients with the STEP Program education.  Inclusion of additional items not identified on Attachment C may be approved by the Warden and Chief Executive Officer, and then approved by the Statewide Mental Health Program and Division of Adult Institutions leadership, if the items fall within the Authorized Personal Property Schedule matrix (DOM Article 43 – Inmate Property, 54030.1, Appendix A and CCR, Title 15, Division 3, Section 3190).

Individualized incentives and requirements to earn points toward incentives shall be approved for each patient by the IDTT as part of the patient's Master Treatment Plan. Patients may "bank" points, or spend points to receive incentives. Once a patient earns points, they cannot be taken away for problematic behavior; however, a patient can be restricted from using their points to receive incentives for a specific period of time, based on behavior identified in their Master Treatment Plan.  The maximum number of points that can be "banked" by any patient is 1400.  Points can be used for incentives only while they are admitted to a PIP.  When a patient discharges from PIP, they may use their remaining points for incentives, or forfeit the points. Routine privileges allowed based on the patient's custody designation, such as phone calls, shall not be restricted by the STEP incentive program.

**<u>IDTT</u>**

At a minimum, the patient's STEP level shall be reviewed with the patient at each IDTT conference. Requirements for advancement shall also be discussed, including any additional or modified individual requirements that the IDTT may approve. The clinician representing the treatment team at the Institutional Classification Committee (ICC)/Unit Classification Committee (UCC) shall provide information regarding risk and treatment progress to ICC/UCC. This information may inform the ICC/UCC decision regarding use or removal of custodial safety measures, including use of mechanical restraints.

**Placement and Incentives**

The STEP program shall be administered according to the *STEP Placement and Incentive Chart* (Attachments A and B). A patient's STEP level is not the sole determining factor for a patient's readiness to transition to the next level of care, to less restrictive housing, or discharge to outpatient housing. When a patient is not maintaining the criteria defined for their STEP level, the IDTT or special treatment team may determine that a STEP adjustment is necessary. When it is determined that reduction of STEP may be necessary, an IDTT or special treatment team conference shall be held the next business day. The IDTT or special treatment team shall meet with the patient and:

- Discuss the reason for the STEP adjustment.

- Discuss what criteria the patient must meet to return to the previously earned STEP.

- Document the discussion, criteria, and decision in the treatment plan.

I.  **ACUTE STEP PROGRAM**

The Acute STEP Program used within the PIPs providing Acute care includes:

**Clinical Assessment and Orientation**: Clinical Assessment and Orientation shall occur upon admission and prior to the 7-day treatment planning conference, completed within seven calendar days of admission. Following Assessment and Orientation, the patient will transition to either STEP 1 or STEP 2.

Patients shall not be confined to their cells during orientation status and shall receive treatment and activities commensurate with their initial safety plan and clinical assessment. During orientation, patients shall receive a comprehensive treatment evaluation and treatment plan, shall be oriented to procedures for programming with others, shall be given an overview of the STEP program, including any individualized goals or target behaviors for advancing to the next level, and shall be involved in maximum possible treatment and out of cell time.

**STEP 1**: The patient will move to STEP 1 if the IDTT determines that clinical factors indicate a need for an individualized solo treatment program. The criteria for solo programming includes symptoms that are so severe that they interfere with the patient's ability to benefit from group treatment activities, and that are so severe that the group activity of others would definitely be disrupted by the patient's presence in the group, preventing effective treatment delivery to other members. Solo programming is not used to punish behavior, or incentivize behavior, it is used because it is the most appropriate modality for delivering clinical care, when group interaction may be harmful to the solo programming patient. This program and criteria for advancement to STEP 2 shall be developed and documented in the patient's treatment plan and shall be reviewed during IDTT, at intervals no longer than every seven days, to determine whether the patient is ready to program with others, and whether current treatment interventions are sufficient to help the patient meet this goal. Patients on solo program shall be provided with recreational and treatment materials designed to reduce boredom and isolation, unless clinically contraindicated and restricted by an order in the electronic healthcare record (including justification based on safety of the patient and/or staff) and shall receive out of cell individual treatment to include recreational exercise yard.  Patients restricted from group treatment based on hygiene shall receive assistance to improve their hygiene as part of their treatment plan.

Every effort shall be made to move the patient from solo to group treatment as soon as possible. Patients who remain in the Acute program on solo treatment for more than 30 days shall be referred by a representative of the IDTT for managerial review.

Managers shall be designated by the Warden, CEO, and Executive Director of the PIP to review the patient's treatment plan along with representatives from the Statewide MH HQ regional team within one week of referral and to document in the health care record any recommendations related to interventions to move the patient from solo to group treatment. The IRU shall review the plan from the institution/regional level, and shall schedule case conferences as clinically indicated, including HQ managers from MH (including psychiatry), DAI, and Nursing, to discuss intervention options.

**STEP 2:** The patient will either move directly to STEP 2 from assessment and orientation or from STEP 1 once the IDTT determines, based on the clinical evaluation, that the patient is ready to program with others. An individualized group treatment program shall be developed and documented in the patient's treatment plan.

If a patient is restricted from group treatment for clinical reasons, the IDTT or special treatment team may determine when the patient is ready to return to group treatment.

Incentives shall be used as part of a patient's individualized treatment plan as determined by the IDTT. At minimum, the IDTT shall identify one incentive likely to motivate the patient to participate fully in the program and progress toward discharge.

## II. INTERMEDIATE STEP PROGRAM

The Intermediate STEP Program is used within PIPs providing Intermediate Care Facilities (ICF) care. The Intermediate STEP Program consists of progressive levels allowing patients to earn incentives while considering their individual level of functioning, risk factors and participation.

The STEP levels identify treatment participation benchmarks for advancement; however, the IDTT may tailor the STEP Program to meet individual patient needs. Individualized modifications to the STEP Program shall be specified in the patient's treatment plan. Patients on Maximum Custody status are included in the STEP Program and are eligible for STEP incentives. The Intermediate STEP Program levels include:

**Clinical Assessment and Orientation**: Patients admitted to the program shall be on Clinical Assessment and Orientation status until the initial IDTT review, unless the patient was housed in the same treatment unit prior to admission making Assessment and Orientation unnecessary. Patients admitted from another level of care within the same PIP shall receive orientation to the ICF program and shall be immediately eligible for STEP 1. Treatment shall be provided based on IDTT assessment of individual patient factors and interests. Assessment and orientation shall not extend beyond ten calendar days of admission. Property shall be provided consistent with regulatory requirements (DOM Section 54030.1) and Appendix A: Authorized Personal Property Schedule; San Quentin State Prison Operational Procedure 608 - Condemned Manual, and PIP Policy 12.11.1408 Security: Patient Allowable Items/Contraband, which restricts certain items due to the inpatient setting and patient safety) unless clinically contraindicated.

**STEP 1**: Patients on STEP 1 participate in treatment activities outlined in their individualized treatment plan, which may include solo and/or group programming as clinically indicated. The criteria for solo programming includes symptoms that are so severe that they interfere with the patient's ability to benefit from group treatment activities, and that are so severe that the group activity of others would definitely be disrupted by the patient's presence in the group, preventing effective treatment delivery to other members. Solo programming is not used to punish behavior, or incentivize behavior, it is used because it is the most appropriate modality for delivering clinical

care, when group interaction may be harmful to the solo programming patient. An IDTT shall be held at intervals no longer than every seven days for patients on solo programming to determine whether the patient is ready to program with others, and whether current treatment interventions are sufficient to help the patient meet this goal.

The goal of STEP 1 in the ICF program is to transition patients into socialization and full implementation of their treatment plan.

1.  Incentives and allowable property shall be provided consistent with guidelines in the *ICF STEP Placement and Incentive Chart* (Attachment B).

2.  Criteria for advancement to STEP 2 are detailed in the *ICF STEP Placement and Incentive Chart* (Attachment B). The IDTT shall develop patient-specific criteria for advancement to STEP 2 and document these criteria in the patient's treatment plan. When establishing the criteria, the IDTT may consider relevant factors, which include, but are not limited to:
    a.  Maintaining hygiene and room cleanliness
    b.  Respecting the rights and property of others (peers and staff)
    c.  Maintaining psychiatric medication adherence, if applicable
    d.  Demonstrating progress toward attaining treatment objectives
    e.  Interacting appropriately with others (peers and staff), and demonstrating respect for the rights and property of others.
    f.  Following community rules.

**STEP 2**: Patients who demonstrate readiness to assume greater responsibility by meeting the criteria defined by their IDTT shall advance to STEP 2.

1.  Incentives and allowable property shall be provided consistent with guidelines provided in the *ICF STEP Placement and Incentive Chart* (Attachment B).

Criteria for advancement to STEP 3 are detailed in the *ICF STEP Placement and Incentive Chart* (Attachment B); in addition to these criteria, the IDTT shall develop patient-specific criteria for advancement to STEP 3 and document these criteria in the patient's treatment plan. When establishing the criteria, the IDTT may consider factors, which include, but are not limited to:
    a.  Maintaining hygiene and room cleanliness
    b.  Maintaining psychiatric medication adherence, if applicable
    c.  Demonstrating progress toward attaining treatment objectives
    d.  Attending/participating in community meetings
    e.  Interacting appropriately with others (peers and staff), including demonstrating respect for the rights and property of others. .
    f.  Following community rules.
    g.  Recovering from lapses in judgment/behavior without serious disruption
    h.  Demonstrating motivation for treatment

**STEP 3:** Patients at STEP 3 actively engage in treatment to understand their mental illness, further develop coping skills, and develop aftercare plans.

1.  Incentives and allowable property shall be provided consistent with guidelines provided in the *ICF STEP Placement and Incentive Chart* (Attachment B).

2.  To maintain STEP 3, patients shall be fully engaged in their treatment as evidenced by:
    a.  Demonstrating continued respect for the rights and property of others
    b.  Continuing to participate in at least 75% of offered individualized treatment
    c.  Demonstrating progress toward attaining treatment objectives

In addition, the IDTT shall develop patient-specific criteria for maintenance of STEP 3, and document these criteria in the patient's treatment plan. When establishing the criteria, the IDTT may consider relevant factors, which include, but are not limited to:

    a.  Maintaining hygiene and room cleanliness
    b.  Maintaining psychiatric medication adherence, if applicable
    c.  Attending/participating in community meetings
    d.  Interacting and socializing appropriately with others (peers and staff)
    e.  Following community rules
    f.  Recovering from lapses in judgment/behavior without serious disruption
    g.  Demonstrating motivation for treatment
    h.  Demonstrating positive leadership skills with peers

## III. STEP MONITORING

At a minimum, the IDTT is responsible for reviewing the patient's STEP at every IDTT meeting. The IDTT shall provide a STEP level report to program directors at least weekly. The program director shall use the information to implement performance improvement plans as appropriate. The STEP level report shall include:

1. Patient Name/CDCR#
2. Current STEP
3. Length of time on current STEP

Each PIP shall assign designated staff to maintain a tracking log of patient points, and shall include in the local operating procedure a system for communication between staff, and from staff to patients, regarding patient points earned. The primary clinician for each patient shall be responsible for ensuring that the patient's logged points are properly calculated based on the patient-specific behaviors required to earn points.

## IV. TRANSFERS BETWEEN PIPs

Upon transfer to another PIP at the same level of care, the receiving IDTT shall retain the STEP level previously earned after Assessment and Orientation. If the previous STEP level is contraindicated due to a change in the patient's behavior that no longer meets criteria for the previous STEP, the IDTT shall document the rationale for adjusting the STEP and the criteria to progress through STEPs in the initial IDTT. Patients whose STEP level is decreased shall be provided with enhanced patient safety measures as determined by IDTT.

| **References** | California Code of Regulations, Title 15<br>California Code of Regulations, Title 22<br>Joint Commission Accreditation Standards CTS.05.03.01<br>California Department of Corrections and Rehabilitation, Department Operations Manual Section 54030.1 and Appendix A: Authorized Personal Property Schedule<br>San Quentin State Prison Operational Procedure 608 - Condemned Manual 28 CFR Section 35.130 (b)(1)(iv) |
|---|---|
| **Questions** | If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR |

## ATTACHMENT A – ACUTE STEP PLACEMENT AND INCENTIVES

| | STEP Behavioral Eligibility Requirements | Treatment Goals for Eligibility for Advancement to Next Step | Behavioral Goals for Eligibility for Advancement to Next Step | Prompts | Incentives |
|---|---|---|---|---|---|
| ASSESSMENT AND ORIENTATION | Starts at Admission and lasts up to 7 calendar days maximum | In development by IDTT | • Respects others & their property.<br>• Follows unit & community rules.<br>• Follows staff direction. | Frequent prompting | N/A |
| STEP 1<br><br>The criteria for solo programming includes symptoms that are so severe that they interfere with the patient's ability to benefit from group treatment activities, and that are so severe that the group activity of others would definitely be disrupted by the patient's presence in the group. Solo programming is not used to punish behavior, or incentivize behavior, it is used because it is the most appropriate modality for delivering clinical care, when group interaction may be harmful to the solo programming patient<br><br>Patient will move directly to STEP 2 if the IDTT determines the clinical evaluation indicates the patient is ready to program with others. | Begins upon completion of assessment and orientation and within 7 calendar day (maximum) IDTT review.<br><br>• Individualized treatment plan for solo treatment developed.<br><br>• Treatment goals are formulated in the Master Treatment Plan.<br><br>Goals for STEP 1:<br><br>• Respects others & their property.<br><br>• Follows unit & community rules.<br><br>• Follows staff direction. | To move to STEP 2, patients must meet individual treatment goals, which might include:<br><br>• Attaining or maintaining medication adherence.<br><br>• Demonstrating progress toward attaining treatment objectives. | To move to STEP 2, patients must meet individual behavioral goals, which might include:<br><br>• Participates in goal-setting.<br><br>• Maintains personal hygiene & cell cleanliness.<br><br>• Respects others & their property.<br><br>• Appropriate social interaction.<br><br>• Follows unit & community rules.<br><br>• Follows staff direction.<br><br>• Respects community property. | Frequent prompting | • In-cell recreation and study materials per RT treatment plan.<br>• Participation in game tournaments<br>• In cell writing materials and/or folders<br>• Art supplies<br>• Other incentives may be used as clinically indicated and approved by the IDTT |

## ATTACHMENT A - ACUTE STEP PLACEMENT AND INCENTIVES

| STEP 2 | | | |
|---|---|---|---|
| An individualized treatment program that includes group treatment and socialization will be developed. | Patients are expected to continue to:<br>• Participate in treatment activities, as agreed by IDTT.<br>• Maintain medication adherence if applicable.<br>• Demonstrate progress toward attaining treatment objectives. | Patients are expected to continue to:<br>• Maintain hygiene and room cleanliness.<br>• Respect the rights and property of others.<br>• Respect community property.<br>• Follow unit & community rules.<br>• Follow staff direction.<br>• Interact and socialize appropriately with others (peers and staff) as able. | Frequent prompting | • In-cell recreation and study materials per RT treatment plan.<br>• Participation in game tournaments<br>• In cell writing materials and/or folders<br>• Art supplies<br>• Certificate of achievement<br>• Eligible for Patient of the Month<br>• Other incentives may be used as clinically indicated and approved by the IDTT |

IDTT may restrict any incentive item based on a patient's individualized treatment plan. STEP level for patients who disrupt, disturb, provoke or are verbally assaultive, or fail to participate in treatment will be reevaluated by the IDTT for the appropriate STEP.

## ATTACHMENT B - PIP ICF STEP PLACEMENT AND INCENTIVES

| STEP / TX Focus | ASSESSMENT AND ORIENTATION (Admission to 10 days maximum) | STEP 1 | STEP 2 | STEP 3 |
|---|---|---|---|---|
| STEP Behavioral Eligibility Requirements | Under assessment | Automatic placement at STEP 1 on completion of assessment, ICC/UCC, and 10 day (maximum) IDTT. Behavioral problems are formulated in the Master Treatment Plan with measurable behavioral goals. | Demonstrates improvement in meeting individualized behavioral goal(s) in Master Treatment Plan. Demonstrates respect for the rights and property of others for a time period recommended by IDTT, not to exceed 30 days. Attended at least 50% of offered individualized treatment for 30 days, or attendance as specified by IDTT. | Demonstrates significant improvement in meeting individualized behavioral goal(s) in Master Treatment Plan for at least 30 days. Demonstrates respect for the rights and property of others for a time period recommended by IDTT, not to exceed 45 days. Attends at least 75% of offered individualized treatment for 30 days, or attendance as specified by IDTT. To maintain STEP 3, patients must attend at least 75% of individualized hours of treatment activities and remain disciplinary free. |
| Treatment Goals | In development by IDTT | Patients who meet treatment goals but fail behavioral expectations remain in stage. | Patient has met STEP 1 behavioral expectations for 30 days. Patient is making an effort to meet treatment goals. | Patient has met STEP 2 behavioral expectations for 30 days. Patient has met at least 50% of treatment goals. |
| Behavioral Expectations | None; Observational period | • Participates in goal-setting, as is able.<br>• Maintains personal hygiene & cell.<br>• Recovers from lapses of judgment.<br>• Respects others & their property.<br>• Social interaction is appropriate.<br>• Follows unit & community rules.<br>• Follows staff direction. | • Participates in goal-setting.<br>• Maintains personal hygiene & cell.<br>• Recovers from lapses of judgment w/o disruption to TX plan.<br>• Respects others & their property.<br>• Interaction with others is appropriate.<br>• Follows unit & community rules.<br>• Follows staff direction.<br>• Participates in core/enrichment groups, as agreed by IDTT.<br>• Returns treatment assignments. | • Participates in goal-setting.<br>• Maintains personal hygiene & cell.<br>• Recovers from lapses of judgment w/o disruption to TX plan.<br>• Respects others & their property.<br>• Interaction with others is appropriate.<br>• Follows community rules.<br>• Follows staff direction.<br>• Participates in core/enrichment groups, as agreed by IDTT.<br>• Returns treatment assignments.<br>• May participate in Council Meetings. |

## ATTACHMENT B - PIP ICF STEP PLACEMENT AND INCENTIVES

| STEP / TX Focus | ASSESSMENT AND ORIENTATION (Admission to 10 days maximum) | STEP 1 | STEP 2 | STEP 3 |
|---|---|---|---|---|
| Prompts | None expected | Frequent prompting | Moderate-to-Minimal prompting | Minimal or no prompting needed |
| Incentives | N/A | • Attendance in club activities.<br>• In-cell recreation and study materials per RT treatment plan.<br>• Earn points for incentive store (based on local procedure). Spend points based on individualized treatment plan. | • Attendance in club activities.<br>• In-cell recreation and study materials per RT treatment plan.<br>• Earn and spend points in incentive store (based on local procedure).<br>• Certificate of achievement.<br>• May participate in Council Meetings.<br>• Eligible for IP Council except Pres/VP.<br>• Attendance in all club activities<br>• Hand held games as available for checkout.<br>• Eligible for Patient of the Month.<br>• Crank Radio as available for checkout. | • Attendance in club activities.<br>• In-cell recreation and study materials per RT treatment plan.<br>• Earn and spend points in incentive store (based on local procedure).<br>• Certificate of achievement.<br>• May participate in Council Meetings.<br>• Eligible for IP Council – All offices.<br>• Attendance in all club activities.<br>• Hand held games and/or CD player as available for checkout.<br>• Eligible for Patient of the Month.<br>• Eligible For Weekly game participation.<br>• Movie/Treat Activities (May include mural painting, attending performances, special groups.<br>• Loaner Television as available for checkout. |

IDTT may restrict any incentive item based on a patients individualized treatment plan.  STEP level for IPs who disrupt, disturb, provoke or are verbally assaultive, or fail to participate
in treatment shall be reevaluated by the IDTT for the appropriate STEP.

| Item # | Item Description | Point Cost | Item Purchase Limit (per store visit) | MALE APP SC | MALE ICF SC | MALE ICF MPC | MALE ICF LD | FEMALE APP | FEMALE ICF |
|---|---|---|---|---|---|---|---|---|---|
| | **Personal Care Items** | | | **STEP REQUIRED** | | | | | |
| 1 | (2in1) Shampoo plus Conditioner (different from standard issue) | 400 | 1 | | | | | | |
| 2 | Shampoo (different from standard issue) | 300 | 1 | | | | | | |
| 3 | Conditioner (different from standard issue) | 300 | 1 | | | | | | |
| 4 | Lotion-10oz (different from standard issue) | 300 | 1 | | | | | | |
| 5 | Body Wash (various) | 300 | 1 | | | | | | |
| 6 | Bar Soap (various) (different from standard issue) | 200 | 6 | | | | | | |
| 7 | Deodorant (various) (different from standard issue) | 200 | 4 | | | Step 1 | | | |
| 8 | Palm Brush | 300 | 1 | | | | | | |
| 9 | Hair Oil (various) | 500 | 1 | | | | | | |
| 10 | Lip ointment (various) | 300 | 2 | | | | | | |
| 11 | Pomade | 500 | 1 | | | | | | |
| 12 | Face Moisturizer | 300 | 2 | | | | | | |
| 13 | Toothpaste (various) (different from standard issue) | 300 | 1 | | | | | | |
| 14 | Mouthwash (various) | 300 | 2 | | | | | | |
| 15 | Hair Ties (various) (no metal) | 100 | 10 | | | | | | |
| 16 | Styling Gel (various) | 600 | 1 | | | Step 2 | | | |
| 17 | Eyeshadow (various) | 600 | 2 | | | | | | |
| 18 | Toothbrush (different from standard issue) | 300 | 2 | | | | | | |
| 19 | Soap Dish | 300 | 1 | ■ | Step 2 | | | ■ | 2 |
| 20 | Retractable Eyepencil-Black (consistent sizing w/ reg pencil) | 500 | 1 | 2 | 3 | 3 | 3 | 2 | 3 |
| 21 | Black Mascara (consistent sizing w/ reg pencil) | 500 | 1 | 2 | 3 | 3 | 3 | 2 | 3 |
| 22 | Lip Gloss (various) | 400 | 2 | 2 | 3 | 3 | 3 | 2 | 3 |
| | **Art and misc supplies** | | | **STEP REQUIRED** | | | | | |
| 23 | Pencil Top Eraser | 100 | 1 | | | | | | |
| 24 | Large Eraser | 150 | 1 | | | | | | |
| 25 | Joke Book - Use Library | 200 | 1 | | | | | | |
| 26 | Bristol pad | 150 | 1 | | | | | | |
| 27 | Coloring books | 200 | 1 | | | | | | |
| 28 | Note Pad | 200 | 1 | | | Step 1 | | | |
| 29 | 2 Colored Pocket Folders | 300 | 1 | | | | | | |
| 30 | Sudoku Book | 300 | 1 | | | | | | |
| 31 | Word Search Book | 200 | 1 | | | | | | |
| 32 | Crossword Puzzle Book | 300 | 1 | | | | | | |
| 33 | 26 ounce plastic green bowl | 400 | 1 | | | | | | |
| 34 | Plastic mug | 400 | 1 | | | | | | |
| 35 | All Occasion Greeting Cards (each) | 250 | 5 | | | | | | |
| 36 | Postcards | 200 | 5 | | | | | | |
| 37 | Writing Tablet *or* Comp Book | 400 | 1 | | | | | | |
| 38 | Art Supplies - Up to $5.00 item cost | 200 | 1 | | | Step 2 | | | |
| 39 | Art Supplies - Up to $10.00 item cost | 400 | 1 | | | | | | |
| 40 | AA Rechargable Batteries | 500 | 1 | | | | | | |
| 41 | Art Supplies - Up to $20.00 item cost | 600 | 1 | 2 | 3 | 3 | 3 | 2 | 3 |
| | **Social Events and Special Items** | | | **STEP REQUIRED** | | | | | |
| 42 | One hour game time | 500 | 1 | | | Step 1 | | | |
| 43 | Participation in Game Tournaments w/ a choice snack *snack list* | 500 | 1 | | | | | | |
| 44 | Garden Social *supply list* | 500 | 1 | | | | | | |
| 45 | Radios (state owned) | 1,000 | 1 | | | Step 2 | | | |
| 46 | Popcorn Social *supply list* | 500 | 1 | | | | | | |
| 47 | Movie Social w/ choice of snack *snack list* | 700 | 1 | | | | | | |
| 48 | TV (state owned) | 1,200 | 1 | ■ | 3 | 3 | 3 | 2 | 3 |
| 49 | Institution Special Events *as available* | 900 | 1 | 2 | 3 | 3 | 3 | 2 | 3 |
| 50 | Guest Speaker Social (Warden, CEO, ED, etc) | 600 | 1 | 2 | 3 | 3 | 3 | 2 | 3 |
| | **Food Items for Social Events** | | | | | | | | |
| 51 | Fun Size Candies (sugar free) | N/A | 5 | | | | | | |
| 52 | Sugar Free Rootbeer Barrels | N/A | 5 | | | | | | |
| 53 | Rice Krispie Treats—Original or M&M | N/A | 2 | | | | | | |
| 54 | Corn Nuts-Picante OR Ranch | N/A | 2 | | | N/A | | | |
| 55 | Fritos | N/A | 2 | | | | | | |
| 56 | Popcorn (microwave) | N/A | 1 bag | | | | | | |
| 57 | Nature Trails Chewy Granola Bars | N/A | 2 | | | | | | |
| 58 | Nature Valley Crunchy Granola Bars | N/A | 2 | | | | | | |

# EXHIBIT G

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR |
| **To:** | Coleman Team - RBG Only (ColemanTeam-RBGOnly@rbgg.com); Coleman Special Master Team (ColemanSpecialMasterTeam@rbgg.com); Steven Fama (sfama@prisonlaw.com) |
| **Cc:** | elise.thorn@doj.ca.gov; Namrata Kotwani; Bentz, Melissa@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Damon McClain (Damon.McClain@doj.ca.gov); Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Christine Ciccotti; Raddatz, Antonina@DSH-S; Kent, Kristopher@DSH-S |
| **Subject:** | Coleman - Plan to Deactivate CMF-PIP L1 and Draft Flex Bed Policy and Procedure |
| **Date:** | Thursday, April 21, 2022 7:41:49 PM |
| **Attachments:** | Plan to Deactivate CMF PIP L1.pdf |
| | DRAFT Policy - 12.11.2103 Use of Inpatient Flex Beds MHCB APP ICF 0.pdf |
| | DRAFT Procedure - 12.11.2103 (P1) Use of Inpatient Flex Beds MHCB APP ICF.pdf |
| | DRAFT Memo - I-Flex Bed Activation.pdf |
| | Attachment B- Inpatient Flex Bed LOP Template.pdf |
| | Attachment A - Designation of I-Flex Beds.pdf |

All,

In accordance with the April 22, 2021 Order regarding CMF-PIP L1, attached is CDCR's plan to deactivate L1. Related to that plan, also attached is the draft Flex Bed Policy and Procedure. We look forward to discussing both the plan and the draft flex bed documents with the Special Master and Plaintiffs.

Please let me know if you have any questions.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA 95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

<u>California Department of Corrections and Rehabilitation's Plan to</u>
<u>Decommission CMF-PIP L1 and Other Unlicensed Inpatient Beds</u>

I.    Introduction and Background

On April 14, 2017, the Court approved the parties' stipulation to waive licensing requirements so that the California Department of Corrections and Rehabilitation (CDCR) could convert the first floor of the L-Wing at the California Medical Facility Psychiatric Inpatient Program (CMF-PIP L1) into Intermediate Care Facility (ICF) level of care beds.[1]  The period covered under the 2017 order waiving state licensing requirements was extended three times, through April 15, 2021. After further negotiation, a fourth stipulation was approved, extending the waiver an additional eighteen months to October 15, 2022.  (ECF No. 7133.)  Under that stipulation, Defendants are to "develop a plan to deactivate the beds in L-1 and replace the unit with fully licensed beds at the number and custodial level required by patient need" and to provide the plan to the Special Master and Plaintiffs by April 22, 2022.  (*Id.* at 4.)

In that same stipulation, Defendants voiced their commitment to end their reliance on not only unlicensed CMF-PIP L1 beds, but inpatient beds statewide.  (*Id.* at 3.)  Below is that plan.

II.    Unlicensed Bed Capacity and Inpatient and Crisis Bed Projections

CDCR currently operates the following unlicensed beds:

- Sixty-eight (68) ICF beds at CMF-PIP L1,
- Nineteen (19) flexible[2] use mental health crisis and PIP beds at California Institution for Women (CIW),
- Thirty-four (34) mental health crisis beds (MHCB) at California Institution for Men (CIM), and
- Twenty (20) MHCBs at California State Prison, Sacramento (SAC)[3].

In addition, CDCR maintains 116 ICF beds at Salinas Valley State Prison (SVSP) PIP that were previously classified temporary but are licensed.

Defendants currently operate 2,113 mental health Correctional Treatment Center (CTC) beds, of which 1,972 are licensed.  The Fall 2021 Mental Health Bed Need Study projects a need for 1,886 PIP and crisis beds through Fiscal Year 2022.[4]  (ECF No. 7421 at 7.)  Notably, while the Fall 2021 study projects a need for additional ICF high custody beds, such as those at CMF-PIP L1, those beds are more than offset by the study's projection that CDCR will need fewer ICF low custody beds, flexible use "PIP" beds[5], Acute Psychiatric Program (APP) beds, and MHCBs in the same timeframe.

---

[1] The waiver of state law was limited to California Health and Safety Code section 1250(j) and California Code of Regulations, Title 22, sections 79501 through 79861.  (See ECF No. 7133 at 3.)
[2] Flexible use beds are those whose level of care can change between intermediate, acute, and/or crisis care as needed to meet bed demand.  CIW Walker Unit's flexible use beds can flex between all three levels of care.
[3] Although counted within CDCR's crisis bed capacity, SAC's unlicensed beds have not been used since July 2021.
[4] Those projections are currently being updated and the spring 2022 projections are expected by mid-May 2022 with the Governor's May Revision to the budget.
[5] Such as those at CIW and San Quentin where beds are already used flexibly between intermediate and acute care.

| LOC/Program | Capacity (4/11/22) | FY 2022 Projection | Difference |
|---|---|---|---|
| ICF Low Custody | 390 | 305 | -(85) |
| ICF High Custody | 739 | 837 | 98 |
| APP | 419 | 352 | -(67) |
| PIP (CIW/PSH/SQ/CMC) | 127 | 75 | -(52) |
| MHCB | 438 | 317 | -(121) |
| TOTAL | 2,113 | 1,886 | -(227) |

III.    Plan to Decommission CMF-PIP L1

CDCR will take a multipronged approach to increase inpatient and crisis bed flexibility, therefore allowing CDCR to permanently decommission CMF-PIP L1 in the coming months and no later than October 15, 2022 contingent on implementing the plans outlined below.  CDCR will be able to absorb the loss of CMF-PIP L1's sixty-eight high custody ICF beds by flexing other high custody single cell beds in less demand, such as those in APP or MHCBs, and by converting underutilized multi-person cells or dorms to accommodate patients in need of higher custody ICF housing programs.

A.  Statewide Inpatient Flex Bed Policy and Procedure

For years, CDCR has successfully flexed many inpatient beds between the ICF, APP, and MHCB levels of care without any problems.  CDCR, however, has not had a formal policy outlining the process for flexing beds between the three levels of care.  Attached to this plan is CDCR's draft Inpatient Flex Bed Policy and Procedure.  CDCR plans to finalize this policy over the next several months.

As part of the work in developing this policy and procedure, CDCR preliminarily identified inpatient beds that would be appropriate to flex.  Those beds include:

- All PIP and MHCBs at California Healthcare Facility (CHCF).  CHCF inpatient beds are designed to be flexed between all three levels of inpatient care.
- Fifty (50) MHCBs at California Medical Facility.
- 218 APP beds at California Medical Facility.
- Ten (10) MHCBs at Salinas Valley State Prison.
- Twelve (12) MHCBs at California Men's Colony.
- Forty (40) PIP beds at San Quentin PIP.
- Forty-five (45) PIP beds at California Institution for Women PIP.

Increasing flexibility for these beds will allow CDCR to fully decommission CMF-PIP L1.  All the beds identified above are high custody beds that can be flexed to ICF care as needed.

In addition to using existing beds more efficiently, flexing offers significant benefits for the delivery of care to patients as well.  Flexing a bed while keeping a patient in the same place leads to less time wasted in transfers, less time lost when the patient has to re-adjust to a new facility, increased continuity of care, less time lost when an entirely new treatment team has to familiarize themselves with the patient, and a huge savings in time and work for the clinicians as a result of fewer admissions and discharges - time that can be redirected to direct patient treatment.  Flexing beds will

also reduce lengths of stay as patients who flex in place will not have to wait for admission or discharge processes before moving on to a new level of care.

      B.   Reassessing the Use of Multi-Person Cells and Locked Dorms

Demand for multi-person cell and locked dorm ICF beds has historically trailed demand for single cell ICF beds.  For instance, as of April 11, 2022, forty-five of seventy-six available locked dorm beds[6] at CMF are empty.  As part of CDCR's flexible approach to bed use, CDCR will reclassify some multi-person cells or locked dorms as single or double cells as needed.  As a result, CDCR could yield up to twenty-eight additional single cell beds as necessary.  The beds identified for this flex are as follows:

<u>CMF-PIP A1 and A2</u>

- Five four-bed dorms
- Six eight-bed dorms
- One sixteen-bed dorm

<u>SVSP-PIP TC2</u>

- Six four-bed cells
- Ten two-bed cells

As part of CDCR's review of these beds, CDCR is working with the Health Care Population Oversight Program to refine how least restrictive housing designations are assigned for multi-person cells and locked dorms as there are significant physical plant overlaps between beds at SVSP- and CMF-PIP.  For instance, SVSP-PIP has six four-bed cells classified as multi-person cells while CMF-PIP has five four-bed dorms classified as locked dorms.

Finally, CDCR will consider whether to utilize some two-person cells at SVSP-PIP for acute care as needed.  While all APP beds are currently single cells, some APP patients may benefit from a double cell environment.  CDCR will consider, on a case by case basis, assigning APP patients to the ten two-bed cells at SVSP-PIP.

      C.   Additional Initiatives to Improve Bed Utilization

CDCR is undertaking many other initiatives to improve bed utilization.  These include:

- <u>Improving physical discharge timelines after clinical discharge.</u>  Moving patients out of beds more quickly reduces waitlists and lengths of stay.  Improving these timelines is largely contingent on pandemic conditions and staffing.
- <u>Full utilization of the new PIP STEP Policy and Procedure.</u>  The PIP STEP Policy and Procedure was released on March 15, 2022 which encourages greater patient engagement in treatment, clearer milestones, higher staff satisfaction, and reduced lengths of clinical stay.
- <u>Clozapine initiatives.</u>  Clozapine is widely recognized as a medication that is both underutilized and highly successful at improving outcomes.  CDCR initiatives to increase appropriate prescribing involve coordination with nursing, lab services, pharmacy, and psychiatrist prescribers and supervisors.  CDCR has purchased clozapine handbooks for every psychiatrist which provides extensive support and guidelines for prescribers.

---

[6] Eight additional locked dorm beds are offline due to COVID social distancing.

IV.    Other Unlicensed Beds

Discussed below is CDCR's plan to end reliance on the remaining unlicensed beds.

A.    CIW's Walker Unit and CIM's Crisis Bed

CIW runs an unlicensed nineteen bed single cell inpatient unit (Walker Unit) that provides care at the ICF, APP, and MHCB levels of care for female patients.  (See ECF No. 5931.)  CIM runs an unlicensed thirty-four bed crisis bed unit for male patients.  CDCR plans to deactivate both units when CIM's new fifty bed inpatient unit is constructed and activated.[7]  The fifty-bed unit will be flexible to all three levels of inpatient care and can be used for both male and female patients.  Although this plan results in a reduction in three beds overall, the crisis beds at CIM and the Walker Unit at CIW rarely reach capacity.  In 2021, the CIM crisis bed had an average census of twenty-six patients while the CIW crisis beds, including Walker Unit, had an average census of seven patients over the same timeframe.  As of this writing, CIW Walker Unit has eight patients.

B.    CSP-SAC Unlicensed Crisis Bed Unit

CDCR stopped admission to the twenty unlicensed crisis beds at SAC on July 6, 2021.  The loss of beds has been functionally absorbed by other licensed crisis beds so far.  The Fall 2021 Mental Health Bed Need Study projects a need for only 317 crisis beds out of a statewide capacity of 438.  Accordingly, CDCR will make a final decision on deactivating the unit by December 31, 2022.

V.    Appropriate Confidential Treatment Space for Licensed Beds at SVSP-PIP C5 and C6

The Special Master has opined that the ICF program in SVSP-PIP's C5 and C6 lacks adequate confidential group treatment space.  In an effort to mitigate these concerns, beginning in 2021, CDCR identified four confidential treatment spaces in the adjacent vocational buildings on SVSP's C-Facility.  Those spaces began operating on March 14, 2022.  In order to increase outdoor recreation time to these patients, SVSP is in the process of retrofitting the yard adjacent to units C5 and C6.  This retrofit is expected to be complete by summer 2022, thereby completing the group space project.

---

[7] The fifty-bed project is on hold pending environmental impact litigation.  A hearing to move the project forward is scheduled for May 9, 2022.  The project is otherwise funded for the fiscal year and the State Fire Marshal's drawing approval is valid until December 31, 2022.

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER 11:**<br>CORRECTIONAL TREATMENT CENTER: PSYCHIATRIC INPATIENT PROGRAM | Revision Date(s): | |
| | Supersedes: | |
| **12.11.2103**<br>USE OF INPATIENT FLEX BEDS – MENTAL HEALTH CRISIS BED, ACUTE PSYCHIATRIC PROGRAM, AND INTERMEDIATE CARE FACILITY | Attachments: | Yes ☒ No ☐ |
| | Director Approval | |

**Policy**

To assist with inpatient level of care and least restrictive housing needs, provide timely access to care, and meet Mental Health Services Delivery System Program Guide (2021 Revision) requirements, designated inpatient beds are used as Inpatient Flex (I-FLEX) Beds. These physical beds can be used for Mental Health Crisis Bed (MHCB), Acute Psychiatric Program (APP), or Intermediate Care Facility (ICF) level of care (LOC) based on statewide need as determined by Corrections Services in consultation with the Statewide Mental Health Program, Inpatient Referral Unit (IRU).

**Responsibilities**

Warden and Chief Executive Officer (CEO) are responsible for developing a Local Operating Procedure (LOP) based on the attached I-FLEX Bed LOP Template (Attachment B) to clearly designate the level of care of each patient in an I-FLEX Bed, and to provide individualized treatment meeting requirements for the designated level of care.

CEO and management team are responsible for ensuring adequate staffing at the level that requires the maximum number of staff, since beds may be flexed at any time.

All staff treating patients in I-FLEX Beds must be trained on the policy and procedures related to treating patients at the MHCB, APP, and ICF levels of care.

Implementation of this policy must be done in coordination with the I-FLEX Procedures.

**Purpose[1]**

I-FLEX beds offer a more agile approach to patient needs throughout the statewide system by ensuring that patients requiring 24-hour inpatient care for mental health disorders are referred, accepted, and admitted for treatment per the Mental Health Services Delivery System Program Guide requirements, with the goal of ensuring continuity of care.

**References**

Mental Health Services Delivery System Program Guide – Chapters 5 and 6

Statewide Mental Health PIP Policy 12.11.2101 (A) – Referral and Admission

Statewide Mental Health PIP Policy 12.11.2101 (B) – Discharge

Statewide Mental Health PIP Policy 12.11.2109 – Treatment Planning and Procedures – Treatment Planning

Statewide Mental Health PIP Policy 12.11.2100 – Housing Review

---

[1] *This policy is intended to reflect best practices in a correctional setting and should be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations. Nothing contained herein is intended to address what is required to satisfy constitutional obligations.*

| **Questions** | If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr. |

| **VOLUME 12:** MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER 11:** CORRECTIONAL TREATMENT CENTER: PSYCHIATRIC INPATIENT PROGRAM | Revision Date(s): | |
| | Supersedes: | |
| **12.11.2103** USE OF INPATIENT FLEX BEDS – MENTAL HEALTH CRISIS BED, ACUTE PSYCHIATRIC PROGRAM, AND INTERMEDIATE CARE FACILITY | Attachments: | Yes ☒ No ☐ |
| | Director Approval: | |

| | ***Procedure*** |
|---|---|
| **1.** | Use of I-FLEX Beds for treatment of patients requiring MHCB, Acute, or ICF Level of Care (LOC) must occur when Corrections Services, in consultation with IRU, identifies there is bed need for a specific level of inpatient care. |
| | Current referral and admission procedures and timelines for admission will not be impacted by the designation of I-FLEX Beds.  Patients in I-FLEX Beds must be referred to a new level of care as clinically indicated, according to the Electronic Health Care Records System (EHRS) workflow and PIP Policy 12.11.2101 (A) – Referral and Admission for inpatient referrals. |
| | If an MHCB patient in an I-FLEX Bed is referred to Acute or ICF level of care, the treatment team must change the mental health LOC (also known as MHI) and initiate Acute or ICF referral process per current procedure and prepare the patient for possible transfer to another unit where they will continue Acute or ICF care. |
| | When it is initially determined that beds will be designated as I-FLEX Corrections Services will notify California Department of Corrections and Rehabilitation Population Management Unit when a bed requires the I-FLEX designation in the Strategic Offender Management System. Once beds are designated as I-FLEX, Corrections Services will be responsible for internally tracking beds as MHCB, APP and ICF via the Referrals to Inpatient Programs Application (RIPA). Necessary reports will be made available to I-FLEX designated inpatient programs for operational purposes. Patients must not be physically transferred within the I-FLEX unit without an endorsement and acceptance, unless such a move is needed for psychiatric emergencies (see Emergency Moves section of PIP Policy 12.11.2101 (A) – Referral and Admission). |
| | When a patient is endorsed and admitted to a new level of care within the same facility's I-FLEX unit without moving to a different unit, the receiving treatment team is not required to complete new intake evaluations, as the patient continues to remain in the same licensed unit. The acceptance unit must initiate acceptance, admission, and housing arrival orders per current procedure |
| | When there is bed need for multiple LOCs, I-FLEX Beds located in a MHCB must be used in the following priority order:<br><br>1. MHCB<br>2. APP<br>3. ICF |

When there is a bed need for multiple LOCs, I-Flex Beds located in CHCF PIP or CMF PIP must be used in the following priority order:

1. APP
2. ICF

San Quentin beds must be used in the following priority order:

1. APP Condemned
2. ICF Condemned
3. MHCB Condemned
4. APP Non-condemned
5. ICF Non-condemned
6. MHCB Non-condemned

IRU may recommend Corrections Services endorsement of patients to specific locations when Clozapine initiation/maintenance, psychological testing, and/or patients requiring dual medical and inpatient psychiatric treatment may be clinically indicated.

| 2. | **Changing Level of Care to Acute or ICF** |
|----|--------------------------------------------|
|    | 1. Patients in I-FLEX Beds must be referred to an Acute or ICF LOC as clinically indicated, consistent with PIP Policy 12.11.2101 (A) – Referral and Admission. |
|    | 2. If a patient in an I-FLEX Bed is referred to a different inpatient LOC, the treatment team must change the mental health LOC and initiate Acute or ICF referral process per current procedure; and prepare the patient for possible transfer to another unit where they will continue inpatient care. |
|    | 3. If a patient in an I-FLEX Bed is referred to a new LOC, and is endorsed to the same unit at the new LOC, the receiving treatment team must not be required to complete new intake evaluations, as the patient continues to remain in the same licensed unit. The acceptance unit must initiate acceptance, admission, and housing arrival orders per current procedure. |
|    | 4. If a patient is moving to a different I-FLEX bed in accordance with a new LOC referral and endorsement, but is not moving to a different unit the receiving treatment team is not required to complete new intake evaluations as the patient continues to remain in the same licensed facility. The acceptance unit must initiate acceptance, admission, and housing arrival orders per current procedure. |
|    | 5. If a patient is physically transferred to a different institution due to a LOC change and endorsement, the receiving treatment team must complete mental health and medical intakes as required by California Code of Regulations, Title 22. The acceptance unit at the receiving facility must initiate acceptance, admission, and housing arrival orders per current procedure. |
| 3. | **Provision of Treatment** |
|    | When a patient in an I-FLEX bed is referred to a different LOC, and the bed is flexed to allow the patient to receive the new level of treatment in the same bed, the patient must begin receiving treatment consistent with requirements for the new LOC as soon as the patient is endorsed, accepted, and admitted at the new LOC. |

| 4. | **Discharges from I-FLEX Beds** |
|---|---|
| | 1. If an Acute or ICF LOC patient in an I-FLEX Bed is discharged, the treatment team must follow discharge procedures and policy in accordance with PIP Policy 12.11.2101 (B) - Discharge. |
| | 2. If a MHCB LOC patient in an I-FLEX Bed is discharged, the treatment team must follow discharge policy and procedures in accordance with the Mental Health Services Delivery System Program Guide Chapter 5 – MHCB and memorandum dated September 18, 2018 titled "Updated Mental Health Crisis Bed – Referral, Referral Rescission, and Discharge Policy and Procedures." |
| | 3. If the treatment team is discharging a patient from an I-FLEX Bed and referring the patient to Acute or ICF LOC, the treatment team must refer the patient in accordance with PIP Policy 12.11.2101 (A) – Referral and Admission; and EHRS workflow. |



 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

| | |
|---|---|
| **Date:** | |

| | |
|---|---|
| **To:** | Chief Executive Officers |
| | CDCR CCHCS Institutional Mental Health Leadership |
| | Regional Health Care Executives |
| | Associate Directors, Division of Adult Institutions |
| | Wardens |
| | Classification and Parole Representatives |

| | | |
|---|---|---|
| **From:** | | |
| | AMAR MEHTA, M.D. | JACKIE CLARK |
| | Deputy Director | Deputy Director |
| | Statewide Mental Health Program | Institution Operations |
| | | |
| | JARED D. LOZANO | |
| | Deputy Director | |
| | Division of Adult Institutions | |

| | |
|---|---|
| **Subject:** | **RELEASE OF USE OF INPATIENT FLEX BEDS POLICY AND PROCEDURE** |

Currently, most California Department of Corrections and Rehabilitation mental health inpatient beds are designated as either Mental Health Crisis Bed (MHCB), Acute Psychiatric Program (APP), **or** Intermediate Care Facility (ICF) level of care, and the patient is physically moved to a different location if they need a different level of care.

At some locations, inpatient beds serve multiple purposes. Physical beds that can change between inpatient levels of care are called Inpatient Flex Beds (I-FLEX).

**Designation of New Flex Beds:**

Effective immediately, the following are designated as I-FLEX Beds:

- Psychiatric Inpatient Program (PIP) APP beds – May flex between APP and ICF
- California Health Care Facility (CHCF) MHCB – May flex between MHCB, APP, and ICF
- California Men's Colony (CMC) MHCB* - May flex between MHCB, APP, and ICF
- California Medical Facility (CMF) MHCB - May flex between MHCB, APP, and ICF
- Salinas Valley State Prison MHCB - May flex between MHCB, APP, and ICF

*This location is able to flex a portion of the inpatient capacity based on treatment space.

# MEMORANDUM

Institutions with licensed MHCBs may be designated after an onsite review of programming and treatment space. All current I-Flex beds are listed on Attachment A.

Leadership at each facility with I-FLEX beds listed above is responsible for developing a Local Operating Procedure (LOP) based on the attached I-FLEX Bed LOP Template (Attachment B) to clearly designate the level of care of each patient in an I-FLEX Bed, and to provide individualized treatment meeting requirements of the designated level of care. Each facility must send their LOP to the Mental Health Policy Unit by email:  CDCR MHPolicyUnit@CDCR within 30 days of receipt of this memorandum.

Prior to operating I-FLEX beds, all staff treating patients in I-FLEX Beds must receive the standardized training from headquarters regarding policy and procedure related to treating patients at MHCB, APP, and ICF level of care. Training with staff must be completed within 60 days of the receipt of this memorandum.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email:  CDCR MHPolicyUnit@CDCR.

Attachments

cc:  Steven Cartwright, Psy.D.
     Kimberly Seibel
     Adam Fouch
     Tennille Atchley
     Travis Williams, Psy.D.
     Michael Golding, M.D.
     Toni Martello, M.D.
     Sophia Le, M.D.
     Erick Rizzotto, M.D.
     Amber Carda, Psy.D.
     Daisy Minter, Ph.D.
     Gretchen Huntington, Psy.D.
     Pak Yan Leung
     Laurie Ball
     Jennifer Johnson
     Sircoya Williams
     Lourdes White
     Regional Mental Health Administrators

**Designation of I-Flex Beds**

Effective immediately, the following beds are designated as I-FLEX Beds:

**May flex between Mental Health Crisis Bed (MHCB), Acute Psychiatric Program (APP), and Intermediate Care Facilities (ICF)**

- California Men's Colony MHCB – 12 beds
- California Health Care Facility (CHCF) MHCB – 98 beds
- California Medical Facility (CMF) MHCB – 50 beds
- Salinas Valley State Prison MHCB – 10 beds

**May flex between APP and ICF**

- All CHCF Acute – 214 beds
- All CMF Acute – 218 beds

Note: Number of beds are based on Fiscal Year 2021/2022 staffed capacity.

**Attachment B**

## Inpatient Flex Bed Local Operating Procedure Template

## IDENTIFICATION AND TRACKING OF INPATIENT FLEX BEDS (MHCB/APP/ICF)

Purpose:  Institutions with Inpatient Flex (I-FLEX) Beds shall clearly designate and track the level of care (LOC) of patients assigned to these beds in order to ensure that patients receive clinically appropriate care based on their mental health LOC.

Identification and Tracking Procedure

The LOC of each patient in an I-FLEX bed shall be clearly identified and monitored through use of a readily-available tracking system in real-time basis. Tracking shall specify each patient's current LOC.  Tracking shall also identify which patients are pending endorsement to a new LOC, which patients have been endorsed to current bed I-FLEX bed, and which patients have been endorsed to a different location and are awaiting transfer.
*<ADD LOCAL PROCEDURE TO IDENTIFY AND TRACK THE LOC OF EACH PATIENT IN I-FLEX BEDS>*

Information updated in the tracking system shall be communicated by/through use of
*<ADD LOCAL PROCEDURE TO COMMUNICATE BED STATUS INFORMATION/UPDATES. Examples of this may include: noting on cell door with a magnet, disseminating on a status report or end of shift report, updating on a bed map or nursing station communication board >*

The LOC of each patient in an I-FLEX bed shall be reviewed daily during
*<ADD LOCAL PROCEDURE TO BE UTILIZED TO REVIEW INFORMATION ACROSS DISCIPLINES.  Examples of this may include daily huddles or nursing rounds>*

Identification of Treatment Team Responsible for Care

When a patient in an I-FLEX bed is referred to a different level of care, and the bed is flexed to allow the patient to receive the new level of treatment in the same bed, the patient may be re-assigned to a new treatment team responsible for providing services at their new LOC.
*<ADD LOCAL PROCEDURE TO BE USED TO ASSIGN TREATMENT TEAM RESPONSIBLE FOR PATIENT CARE>*

# EXHIBIT H

**From:** "Bentz, Melissa@CDCR" <Melissa.Bentz@cdcr.ca.gov>
**Date:** April 21, 2022 at 7:00:38 PM PDT
**To:** Lopes Matthew <mlopes@pldolaw.com>, Jones Mohamedu <mjones@pldolaw.com>, "Walsh Kerry F." <kwalsh@pldolaw.com>, Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>, Steve Fama <sfama@prisonlaw.com>
**Cc:** "Paul B. Mello" <PmelIo@hansonbridgett.com>, "Sam Wolff" <swolff@hansonbridgett.com> <swolff@hansonbridgett.com>, Elise Thorn <Elise.Thorn@doj.ca.gov>, Damon McClain <Damon.McClain@doj.ca.gov>, Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>, "Neill, Jennifer@CDCR" <Jennifer.Neill@cdcr.ca.gov>, "Weber, Nicholas@CDCR" <Nicholas.Weber@cdcr.ca.gov>, "Hockerson, Dillon@CDCR" <Dillon.Hockerson@cdcr.ca.gov>, "Thind, Sundeep@CDCR" <Sundeep.Thind@cdcr.ca.gov>
**Subject: Coleman: PIP Pay Differential, Expansion of Bonuses, and Increase in Registry Rates**

Special Master Lopes and Plaintiffs' counsel,

CDCR has been working diligently to improve mental health staffing at our institutions. As part of this effort, CDCR recently noticed the unions about a 15% pay differential for civil service psychologists, social workers, psychiatrists, psychiatric technicians, and rehabilitation/recreation therapists physically working in one of CDCR's five Psychiatric Inpatient Programs (PIPs). The proposal also expands the previously established on-site civil service psychiatrist retention bonuses at to civil service psychologists, expands the bonuses to all institutions, and expands the number of allowable $5,000 bonuses. Previously, a $5,000 bonus was available after completion of 6, 24, 60, and 84 months of state service. The new proposal would allow bonuses at 3, 6, 9, 12, 24, 60, and 84 months. CDCR proposed an effective date of May 1, 2022 for both proposals. However, that date is contingent upon the completion of union negotiations and is thus subject to change.

In addition to the pay differential in the PIPs and the expansion of bonuses, CDCR has also entered into a new contract for registry psychiatrists, psychologists, psychiatric nurse practitioners, social workers, and recreational/rehabilitation therapists. Below is a chart comparing the current contract rates with the new contract rates. The new registry contract will go into effect on May 1, 2022.

| | Old Contract Tiers: 16-00467[1] | | | | | New Contract Tiers: 21-00147[2] | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Tiers** | **PSYT** | **PSYL** | **PNP** | **LCSW** | **RT** | **Tiers** | **PSYT** | **PSYL** | **PNP** | **LCSW** | **RT** |
| Tier 1 | $ 265.00 | $ 90.00 | $ 136.00 | $ 64.00 | $ 57.00 | Tier 1 | $ 265.00 | $ 140.00 | $ 128.00 | $ 103.00 | $ 92.00 |
| Tier 2 | $ 285.00 | $ 100.00 | N/A | $ 73.00 | $ 79.00 | Tier 2 | $ 285.00 | $ 153.00 | $ 136.00 | $ 113.00 | $ 100.00 |
| Tier 3 | $ 316.00 | $ 120.00 | N/A | $ 86.00 | N/A | Tier 3 | $ 316.00 | $ 168.00 | $ 141.00 | $ 128.00 | $ 115.00 |
| Tier 4 | $ 340.00 | $ 140.00 | | | | Tier 4 | $ 340.00 | $ 193.00 | | | |
| Tier 5 | $ 365.00 | $ 155.00 | | | | Tier 5 | $ 365.00 | $ 200.00 | | | |
| Tier 6 | $ 390.00 | | | | | Tier 6 | $ 390.00 | | | | |
| Tier 7 | $ 415.00 | | | | | Tier 7 | $ 415.00 | | | | |
| Tier 8 | $ 440.00 | | | | | Tier 8 | $ 440.00 | | | | |

Notes:
All rates include the hourly rates and overhead charges. New rates are effective 5/1/2022.

[1] Overhead rates in contract number 16-00467 are as follows: Psychiatrist (PSYT) $65.00, Psychologist (PSYL) $15.00/$25.00, Psychiatric Nurse Practitioner (PNP) $30.00, Licensed Clinical Social Worker (LCSW) $18.00, Recreation Therapist (RT) $12.00.

[2] Overhead rates in contract number 21-00147 are as follows: Psychiatrist (PSYT) $65.00, Psychologist (PSYL) $38.00, Psychiatric Nurse Practitioner (PNP) $30.00, Licensed Clinical Social Worker (LCSW) $38.00, Recreation Therapist (RT) $25.00.

CDCR believes the implementation of these proposals will help increase mental health staffing at the PIPs and elsewhere and hopes to see results from these proposals soon.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT I

| | |
|---|---|
| **From:** | Guarino, Nicholas R. |
| **To:** | Coleman - ENTIRE TEAM |
| **Subject:** | Fwd: Coleman: Installation of TTMs in CMF 64-Bed Unit |
| **Date:** | Thursday, April 21, 2022 8:53:15 AM |

**From:** "Bentz, Melissa@CDCR" <Melissa.Bentz@cdcr.ca.gov>
**Date:** April 14, 2022 at 4:53:02 PM EDT
**To:** Lisa Ells <LElls@rbgg.com>, "Michael W. Bien" <MBien@rbgg.com>, egalvan@rbgg.com, Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>, Lopes Matthew <mlopes@pldlaw.com>, Jones Mohamedu <mjones@pldlaw.com>, "Walsh Kerry F." <kwalsh@pldlaw.com>
**Cc:** "Paul B. Mello" <Pmello@hansonbridgett.com>, "Sam Wolff (swolff@hansonbridgett.com)" <swolff@hansonbridgett.com>, Elise Thorn <Elise.Thorn@doj.ca.gov>, "Damon McClain (Damon.McClain@doj.ca.gov)" <Damon.McClain@doj.ca.gov>, Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>, "Weber, Nicholas@CDCR" <Nicholas.Weber@cdcr.ca.gov>, "Thind, Sundeep@CDCR" <Sundeep.Thind@cdcr.ca.gov>, "Hockerson, Dillon@CDCR" <Dillon.Hockerson@cdcr.ca.gov>, "Mehta, Amar@CDCR" <Amar.Mehta@cdcr.ca.gov>, "Ball, Laurie@CDCR" <Laurie.Ball@cdcr.ca.gov>
**Subject: Coleman: Installation of TTMs in CMF 64-Bed Unit**

Good afternoon,

I write to inform you that CMF would like to install therapeutic treatment modules (TTMs) in two of the individual treatment rooms the 64-bed unit. There are four available individual treatment rooms in the 64-bed unit, but TTMs would only be installed in the treatment rooms on A wing and B wing. The individual treatment rooms are large enough to accommodate a TTM and chair for a patient, as well as seating for a clinician. Therefore, the installation of TTMs in two individual treatment rooms will not impede the use of those spaces for non-MAX patients. The TTMs are necessary to accommodate MAX custody patients in the 64-bed unit. Over the last year, there have been 32 MAX custody patients housed in that unit.

Per the Court's December 9, 2021 order (ECF No. 7392), Plaintiffs have 30 days to respond regarding the proposed number and placement of TTMs. The parties can also meet and confer during those 30 days as necessary. Please let me know if you have any questions or if you would like to discuss.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385


**Nicholas R. Guarino, Paralegal**

nguarino@pldolaw.com
P 401.824.5189

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215N
1301 Atwood Avenue   Johnston, RI  02919
www.pldolaw.com   •   Legal Disclaimer

# EXHIBIT J

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR |
| **To:** | Coleman Team - RBG Only (ColemanTeam-RBGOnly@rbgg.com); Coleman Special Master Team (ColemanSpecialMasterTeam@rbgg.com); Steven Fama (sfama@prisonlaw.com); elise.thorn@doj.ca.gov; Namrata Kotwani; Paul B. Mello; Samantha Wolff; Bentz, Melissa@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR |
| **Cc:** | Mehta, Amar@CDCR; Cartwright, Steven@CDCR; Ceballos, Laura@CDCR |
| **Subject:** | Coleman - CHCF PIP Temporary Suspension of Intake |
| **Date:** | Monday, September 27, 2021 5:01:45 PM |

All,

Consistent with our discussion on Friday, September 24, 2021, CDCR will temporarily suspend intake to the CHCF PIP beginning on Tuesday, September 28, 2021. During the following 30 days, CDCR will reassess CHCF PIP's staffing and capacity concerns. CDCR will allow placement of patients into CHCF PIP under narrow exceptions over the next 30 days, including patients who have exceptionally high suicide risk and may benefit from CHCF's retrofitted cells, certain acute patients who cannot wait in the MHCB (and who cannot be placed at CMF, SQ, or CMC PIP), or acute patients who have enemy concerns at other acute programs. CDCR expects such patients to be rare, if any.

Over the next 30 days, CDCR will continue to discuss the status of this pause and CDCR's plans for CHCF PIP with the Plaintiffs and the Special Master team. Please let me know if you have any questions.


Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT K

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR |
| **To:** | Coleman Team - RBG Only; Coleman Special Master Team; Steven Fama; elise.thorn@doj.ca.gov; Namrata Kotwani; Paul B. Mello; Samantha Wolff; Bentz, Melissa@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR |
| **Cc:** | Mehta, Amar@CDCR; Cartwright, Steven@CDCR; Ceballos, Laura@CDCR |
| **Subject:** | RE: Coleman - CHCF PIP Temporary Suspension of Intake |
| **Date:** | Friday, October 29, 2021 7:32:06 PM |

All,

I write to follow up on the suspension of intake to CHCF PIP. CDCR will extend the suspension of intake to CHCF PIP for an additional thirty days. Although progress has been made at reducing CHCF PIP's census to a more manageable level, additional work is required to ensure adequate staffing is in place before resuming intake. CDCR will more fully discuss the status of CHCF PIP at the settlement conference scheduled for November 1, 2021.

Nick Weber

Attorney

Department of Corrections & Rehabilitation

1515 S Street, Suite 314S

Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Weber, Nicholas@CDCR
**Sent:** Monday, September 27, 2021 2:01 PM
**To:** Coleman Team - RBG Only (ColemanTeam-RBGOnly@rbgg.com) <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team (ColemanSpecialMasterTeam@rbgg.com) <ColemanSpecialMasterTeam@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>; elise.thorn@doj.ca.gov; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Bentz, Melissa@CDCR (Melissa.Bentz@cdcr.ca.gov) <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR (Dillon.Hockerson@cdcr.ca.gov) <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>
**Cc:** Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>
**Subject:** Coleman - CHCF PIP Temporary Suspension of Intake

All,

Consistent with our discussion on Friday, September 24, 2021, CDCR will temporarily suspend intake to the CHCF PIP beginning on Tuesday, September 28, 2021.  During the following 30 days, CDCR will reassess CHCF PIP's staffing and capacity concerns.  CDCR will allow placement of patients into CHCF PIP under narrow exceptions over the next 30 days, including patients who have exceptionally high suicide risk and may benefit from CHCF's retrofitted cells, certain acute patients who cannot wait in the MHCB (and who cannot be placed at CMF, SQ, or CMC PIP), or acute patients who have enemy concerns at other acute programs.  CDCR expects such patients to be rare, if any.

Over the next 30 days, CDCR will continue to discuss the status of this pause and CDCR's plans for CHCF PIP with the Plaintiffs and the Special Master team.  Please let me know if you have any questions.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR |
| **To:** | Coleman Team - RBG Only; Coleman Special Master Team; Steven Fama; elise.thorn@doj.ca.gov; Namrata Kotwani; Paul B. Mello; Samantha Wolff; Bentz, Melissa@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR |
| **Cc:** | Mehta, Amar@CDCR; Cartwright, Steven@CDCR; Ceballos, Laura@CDCR |
| **Subject:** | RE: Coleman - CHCF PIP Temporary Suspension of Intake |
| **Date:** | Wednesday, December 1, 2021 1:48:04 PM |

All,

I write to follow up on the suspension of intake to CHCF PIP.  As discussed during the Data and CQIT call yesterday, CDCR will extend the intake closure for an additional thirty days.  Please let me know if you have any questions.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Weber, Nicholas@CDCR
**Sent:** Friday, October 29, 2021 4:32 PM
**To:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Steven Fama <sfama@prisonlaw.com>; elise.thorn@doj.ca.gov; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>
**Cc:** Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; 'Ceballos, Laura@CDCR' <Laura.Ceballos@cdcr.ca.gov>
**Subject:** RE: Coleman - CHCF PIP Temporary Suspension of Intake

All,

I write to follow up on the suspension of intake to CHCF PIP.  CDCR will extend the suspension of intake to CHCF PIP for an additional thirty days.  Although progress has been made at reducing CHCF PIP's census to a more manageable level, additional work is required to ensure adequate staffing is

in place before resuming intake.  CDCR will more fully discuss the status of CHCF PIP at the settlement conference scheduled for November 1, 2021.


Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Weber, Nicholas@CDCR
**Sent:** Monday, September 27, 2021 2:01 PM
**To:** Coleman Team - RBG Only (ColemanTeam-RBGOnly@rbgg.com) <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team (ColemanSpecialMasterTeam@rbgg.com) <ColemanSpecialMasterTeam@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>; elise.thorn@doj.ca.gov; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Bentz, Melissa@CDCR (Melissa.Bentz@cdcr.ca.gov) <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR (Dillon.Hockerson@cdcr.ca.gov) <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>
**Cc:** Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>
**Subject:** Coleman - CHCF PIP Temporary Suspension of Intake

All,

Consistent with our discussion on Friday, September 24, 2021, CDCR will temporarily suspend intake to the CHCF PIP beginning on Tuesday, September 28, 2021.  During the following 30 days, CDCR will reassess CHCF PIP's staffing and capacity concerns.  CDCR will allow placement of patients into CHCF PIP under narrow exceptions over the next 30 days, including patients who have exceptionally high suicide risk and may benefit from CHCF's retrofitted cells, certain acute patients who cannot wait in the MHCB (and who cannot be placed at CMF, SQ, or CMC PIP), or acute patients who have enemy concerns at other acute programs.  CDCR expects such patients to be rare, if any.

Over the next 30 days, CDCR will continue to discuss the status of this pause and CDCR's plans for CHCF PIP with the Plaintiffs and the Special Master team.  Please let me know if you have any questions.

Nick Weber

Attorney

Department of Corrections & Rehabilitation

1515 S Street, Suite 314S

Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR |
| **To:** | Coleman Team - RBG Only; Coleman Special Master Team; Steven Fama; elise.thorn@doj.ca.gov; Namrata Kotwani; Paul B. Mello; Samantha Wolff; Bentz, Melissa@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR |
| **Cc:** | Mehta, Amar@CDCR; Cartwright, Steven@CDCR; Ceballos, Laura@CDCR |
| **Subject:** | RE: Coleman - CHCF PIP Temporary Suspension of Intake |
| **Date:** | Monday, December 27, 2021 1:46:15 PM |

All,

I write regarding the intake closure at CHCF PIP.  CDCR will extend the intake closure an additional thirty days through January 27, 2022.


Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


---

**From:** Weber, Nicholas@CDCR
**Sent:** Wednesday, December 1, 2021 10:48 AM
**To:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Steven Fama <sfama@prisonlaw.com>; elise.thorn@doj.ca.gov; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>
**Cc:** Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; 'Ceballos, Laura@CDCR' <Laura.Ceballos@cdcr.ca.gov>
**Subject:** RE: Coleman - CHCF PIP Temporary Suspension of Intake

All,

I write to follow up on the suspension of intake to CHCF PIP.  As discussed during the Data and CQIT call yesterday, CDCR will extend the intake closure for an additional thirty days.  Please let me know if you have any questions.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Weber, Nicholas@CDCR
**Sent:** Friday, October 29, 2021 4:32 PM
**To:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Steven Fama <sfama@prisonlaw.com>; elise.thorn@doj.ca.gov; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>
**Cc:** Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; 'Ceballos, Laura@CDCR' <Laura.Ceballos@cdcr.ca.gov>
**Subject:** RE: Coleman - CHCF PIP Temporary Suspension of Intake


All,

I write to follow up on the suspension of intake to CHCF PIP.  CDCR will extend the suspension of intake to CHCF PIP for an additional thirty days.  Although progress has been made at reducing CHCF PIP's census to a more manageable level, additional work is required to ensure adequate staffing is in place before resuming intake.  CDCR will more fully discuss the status of CHCF PIP at the settlement conference scheduled for November 1, 2021.


Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended

recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Weber, Nicholas@CDCR
**Sent:** Monday, September 27, 2021 2:01 PM
**To:** Coleman Team - RBG Only (ColemanTeam-RBGOnly@rbgg.com) <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team (ColemanSpecialMasterTeam@rbgg.com) <ColemanSpecialMasterTeam@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>; elise.thorn@doj.ca.gov; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR (Dillon.Hockerson@cdcr.ca.gov) <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>
**Cc:** Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>
**Subject:** Coleman - CHCF PIP Temporary Suspension of Intake

All,

Consistent with our discussion on Friday, September 24, 2021, CDCR will temporarily suspend intake to the CHCF PIP beginning on Tuesday, September 28, 2021.  During the following 30 days, CDCR will reassess CHCF PIP's staffing and capacity concerns.  CDCR will allow placement of patients into CHCF PIP under narrow exceptions over the next 30 days, including patients who have exceptionally high suicide risk and may benefit from CHCF's retrofitted cells, certain acute patients who cannot wait in the MHCB (and who cannot be placed at CMF, SQ, or CMC PIP), or acute patients who have enemy concerns at other acute programs.  CDCR expects such patients to be rare, if any.

Over the next 30 days, CDCR will continue to discuss the status of this pause and CDCR's plans for CHCF PIP with the Plaintiffs and the Special Master team.  Please let me know if you have any questions.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate

applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT L

| | |
|---|---|
| From: | Weber, Nicholas@CDCR |
| To: | Jessica Winter; Lisa Ells; Marc Shinn-Krantz; Bentz, Melissa@CDCR; Hockerson, Dillon@CDCR; Stafford, Carrie@CDCR; Thind, Sundeep@CDCR |
| Cc: | Raddatz, Antonina@DSH-S; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S; Damon McClain; Elise Thorn; Namrata Kotwani; Paul B. Mello; Samantha Wolff; Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team |
| Subject: | RE: Coleman - Inpatient Waitlist/Transfers Data [IWOV-DMS.FID6429] |
| Date: | Tuesday, March 29, 2022 12:43:21 PM |

Jessica,

Data is as of yesterday March 28.

1. Pending APP/ICF Referrals

| | MHCB/OP | | PIP to PIP | | TOTAL | |
|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female |
| APP | 33 | 1 | 1 | 0 | 34 | 1 |
| ICF | 43 | 1 | 19 | 0 | 62 | 1 |
| Total | 76 | 2 | 20 | 0 | 96 | 2 |

2. Current Over/Under Timeline Buckets
   - Acute:

| APP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP |
|---|---|---|---|---|
| | 0-10 Days | | Over 10 Days | |
| Total | 22 | 1 | 12 | 0 |

   - ICF:

| ICF | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP |
|---|---|---|---|---|---|---|---|---|
| | 0-30 Days | | 31-60 Days | | 61-90 Days | | Over 90 Days | |
| Total | 34 | 18 | 10 | 1 | 0 | 0 | 0 | 0 |

3. Acute Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP[1] | 218 | 0 | 0 | 183 | 9 | 13 | 13 |
| CHCF-PIP[2] | 201 | 0 | 7 | 73 | 0 | 6 | 115 |
| CMC[3] | 12 | 0 | 0 | 9 | 1 | 0 | 2 |
| Total | 431 | 0 | 7 | 265 | 10 | 19 | 130 |

[1] 9 APP beds offline due to staff shortages

[2] 7 APP ISO beds held vacant for patients that may become COVID positive

[3] 2 beds to remain vacant per MH leadership

4. ICF Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP Single Cell | 94 | 16 | 0 | 59 | 0 | 6 | 13 |
| CMF-PIP L1 MPC | 68 | 6 | 0 | 45 | 0 | 6 | 11 |
| CMF-PIP Locked Dorm[4] | 84 | 0 | 0 | 30 | 8 | 4 | 42 |
| CHCF-PIP Single Cell[5] | 331 | 0 | 11 | 218 | 0 | 8 | 94 |
| SVSP-PIP Single Cell | 202 | 8 | 0 | 187 | 0 | 4 | 3 |
| SVSP-PIP MPC | 44 | 0 | 0 | 33 | 0 | 4 | 7 |
| DSH ASH | 256 | 0 | 0 | 122 | 0 | 0 | 134 |
| DSH CSH | 50 | 0 | 0 | 15 | 0 | 1 | 34 |
| Total | 1129 | 30 | 11 | 709 | 8 | 33 | 338 |

[4] 8 beds redlined to create space for social distancing

[5] 11 ICF ISO beds held vacant for patients that may become COVID positive

5. Male Condemned Census and Capacity

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| SQ-PIP | 40 | 0 | 0 | 12 | 0 | 0 | |
| SQ-PIP (non-condemned) | | | | 16 | | 1 | |
| Total | 40 | 0 | 0 | 28 | 0 | 1 | 11 |

6. Female Census and Capacity

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| DSH PSH | 30 | 0 | 0 | 10 | 0 | 0 | 20 |
| CIW-PIP | 45 | 0 | 0 | 29 | 0 | 1 | 15 |
| Total | 75 | 0 | 0 | 39 | 0 | 1 | 35 |

7. Total Admitted Transfers

Local Facility MHCB/OP: Patients admitted from MHCB/OP to a local on-site PIP (i.e. CHCF to CHCF-PIP)
External MHCB/OP: Patients admitted from MHCB/OP to an external PIP
Internal PIP: Patients admitted to/from APP or ICF LOC (APP to ICF, ICF to APP, ICF to ICF)

| LOC | Local Facility MHCB/OP | | EXTERNAL MHCB/OP | | INTERNAL PIP | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female | Male | Female |
| APP | 0 | 1 | 15 | 0 | 0 | 0 | 15 | 1 |
| ICF | 0 | 0 | 9 | 0 | 5 | 1 | 14 | 1 |
| Total | 0 | 1 | 24 | 0 | 5 | 1 | 29 | 2 |

**From:** Jessica Winter <JWinter@rbgg.com>
**Sent:** Tuesday, March 29, 2022 9:16 AM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Lisa Ells <LElls@rbgg.com>; Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Cc:** Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>
**Subject:** RE: Coleman - Inpatient Waitlist/Transfers Data [IWOV-DMS.FID6429]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Nick,

Can you please update and circulate the information below as of today?

Thanks,

Jessica

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Monday, March 14, 2022 3:47 PM
**To:** Lisa Ells <LElls@rbgg.com>; Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Cc:** Nina Raddatz <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>;

Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>
**Subject:** RE: Coleman - Inpatient Waitlist/Transfers Data [IWOV-DMS.FID6429]

[EXTERNAL] Notice: This message comes from an external sender.

See below as of today:

1. Pending APP/ICF Referrals

|  | MHCB/OP | | PIP to PIP | | TOTAL | |
|---|---|---|---|---|---|---|
|  | Male | Female | Male | Female | Male | Female |
| APP | 28 | 0 | 2 | 0 | 30 | 0 |
| ICF | 46 | 1 | 18 | 0 | 64 | 1 |
| Total | 74 | 1 | 20 | 0 | 94 | 1 |

2. Current Over/Under Timeline Buckets
   - Acute:

| APP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP |
|---|---|---|---|---|
|  | 0-10 Days | | Over 10 Days | |
| Total | 18 | 2 | 10 | 0 |

   - ICF:

| ICF | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | PIP to PIP | MHCB/OP |
|---|---|---|---|---|---|---|---|---|
|  | 0-30 Days | | 31-60 Days | | 61-90 Days | | Over 90 Days[1] | |
| Total | 40 | 17 | 6 | 1 | 0 | 0 | 0 | 1 |

[1] Currently being tracked as a complex medical case. IP's ICF referral has been complete since 11/18/2021 but currently cannot transfer due to medical hold (IP requires offsite ortho specialty care).

3. Acute Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP[1] | 218 | 0 | 0 | 189 | 10 | 15 | 4 |
| CHCF-PIP[2] | 201 | 0 | 9 | 68 | 1 | 5 | 118 |
| CMC[3] | 12 | 0 | 0 | 10 | 0 | 0 | 2 |
| Total | 431 | 0 | 9 | 267 | 11 | 20 | 124 |

[1] 9 APP beds offline due to staff shortages

[2] 9 APP ISO beds held vacant for patients that may become COVID positive.

[3] 2 beds to remain vacant per MH leadership

4. ICF Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP Single Cell | 94 | 32 | 0 | 52 | 0 | 9 | 1 |
| CMF-PIP L1 MPC | 68 | 6 | 0 | 48 | 0 | 7 | 7 |
| CMF-PIP Locked Dorm[4] | 84 | 0 | 0 | 32 | 8 | 0 | 44 |
| CHCF-PIP Single Cell[5] | 331 | 0 | 9 | 227 | 1 | 2 | 92 |
| SVSP-PIP Single Cell | 202 | 8 | 0 | 190 | 0 | 4 | 0 |
| SVSP-PIP MPC | 44 | 0 | 0 | 37 | 0 | 2 | 5 |
| DSH ASH | 256 | 0 | 0 | 128 | 0 | 2 | 126 |
| DSH CSH | 50 | 0 | 0 | 17 | 0 | 0 | 33 |
| Total | 1129 | 46 | 9 | 731 | 9 | 26 | 308 |

<sup>4</sup> 8 beds redlined to create space for social distancing

<sup>5</sup> 9 ICF ISO beds held vacant for patients that may become COVID positive

5. Male Condemned Census and Capacity

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| SQ-PIP | 40 | 0 | 0 | 14 | 0 | 0 | |
| SQ-PIP (non-condemned) | | | | 20 | | 0 | |
| Total | 40 | 0 | 0 | 34 | 0 | 0 | 6 |

6. Female Census and Capacity

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| DSH PSH | 30 | 0 | 0 | 10 | 0 | 0 | 20 |
| CIW-PIP | 45 | 0 | 0 | 30 | 0 | 1 | 14 |
| Total | 75 | 0 | 0 | 40 | 0 | 1 | 34 |

7. Total Admitted Transfers

Local Facility MHCB/OP: Patients admitted from MHCB/OP to a local on-site PIP (i.e. CHCF to CHCF-PIP)

External MHCB/OP: Patients admitted from MHCB/OP to an external PIP

Internal PIP: Patients admitted to/from APP or ICF LOC (APP to ICF, ICF to APP, ICF to ICF)

| | Local Facility MHCB/OP | | EXTERNAL MHCB/OP | | INTERNAL PIP | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| LOC | Male | Female | Male | Female | Male | Female | Male | Female |
| APP | 1 | 1 | 14 | 0 | 1 | 0 | 16 | 1 |
| ICF | 1 | 0 | 9 | 0 | 3 | 0 | 13 | 0 |
| Total | 2 | 1 | 23 | 0 | 4 | 0 | 29 | 1 |

---

**From:** Lisa Ells <LElls@rbgg.com>
**Sent:** Monday, March 14, 2022 3:01 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Cc:** Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>
**Subject:** RE: Coleman - Inpatient Waitlist/Transfers Data [IWOV-DMS.FID6429]

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Nick,

Could we get an updated version of this in advance of the meeting tomorrow please?  Thanks.

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Tuesday, February 15, 2022 11:07 AM
**To:** Lisa Ells <LElls@rbgg.com>; Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Cc:** Nina Raddatz <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>

**Subject:** RE: Coleman - Inpatient Waitlist/Transfers Data [IWOV-DMS.FID6429]

[EXTERNAL] Notice: This message comes from an external sender.

Yes.  From yesterday February 14.

1. Pending APP/ICF Referrals

|  | MHCB/OP | | PIP to PIP | | TOTAL | |
|---|---|---|---|---|---|---|
|  | Male | Female | Male | Female | Male | Female |
| APP | 59 | 0 | 2 | 0 | 61 | 0 |
| ICF | 54 | 1 | 11 | 0 | 65 | 1 |
| Total | 113 | 1 | 13 | 0 | 126 | 1 |

2. Acute Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP[1, 2] | 218 | 0 | 0 | 196 | 9 | 10 | 3 |
| CHCF-PIP[3] | 201 | 0 | 9 | 51 | 0 | 20 | 121 |
| CMC[4] | 12 | 0 | 0 | 10 | 0 | 0 | 2 |
| Total | 431 | 0 | 9 | 257 | 9 | 30 | 126 |

[1] 9 APP beds offline due to staff shortages

[2] 13 ICF to APP CHCF Bed conversions; 1 ICF patient is still occupying an APP bed.

[3] 9 APP ISO beds held vacant for patients that may become COVID positive.

[4] 2 beds to remain vacant per MH leadership

3. ICF Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP Single Cell | 94 | 32 | 0 | 55 | 1 | 5 | 1 |
| CMF-PIP L1 MPC | 68 | 6 | 0 | 46 | 0 | 5 | 11 |
| CMF-PIP Locked Dorm[5] | 84 | 0 | 0 | 36 | 8 | 3 | 37 |
| CHCF-PIP Single Cell[6] | 331 | 0 | 9 | 254 | 0 | 1 | 67 |
| SVSP-PIP Single Cell | 202 | 8 | 0 | 189 | 0 | 5 | 0 |
| SVSP-PIP MPC | 44 | 0 | 0 | 32 | 0 | 3 | 9 |
| DSH ASH | 256 | 0 | 0 | 140 | 0 | 6 | 110 |
| DSH CSH | 50 | 0 | 0 | 21 | 0 | 3 | 26 |
| Total | 1129 | 46 | 9 | 773 | 9 | 31 | 261 |

[5] 8 beds redlined to create space for social distancing

[6] 9 ICF ISO beds held vacant for patients that may become COVID positive

4. Male Condemned Census and Capacity

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| SQ-PIP | 40 | 0 | 0 | 15 | 0 | 1 |  |
| SQ-PIP (non-condemned) |  |  |  | 14 |  | 0 |  |
| Total | 40 | 0 | 0 | 29 | 0 | 1 | 10 |

5. Female Census and Capacity

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| DSH PSH | 30 | 0 | 0 | 11 | 0 | 4 | 15 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CIW-PIP | 45 | 0 | 0 | 30 | 0 | 1 | 14 |
| Total | 75 | 0 | 0 | 41 | 0 | 5 | 29 |

6. Total Admitted Transfers

Local Facility MHCB/OP: Patients admitted from MHCB/OP to a local on-site PIP (i.e. CHCF to CHCF-PIP)

External MHCB/OP: Patients admitted from MHCB/OP to an external PIP

Internal PIP: Patients admitted to/from APP or ICF LOC (APP to ICF, ICF to APP, ICF to ICF)

| | Local Facility MHCB/OP | | EXTERNAL MHCB/OP | | INTERNAL PIP | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| LOC | Male | Female | Male | Female | Male | Female | Male | Female |
| APP | 5 | 0 | 13 | 0 | 2 | 0 | 20 | 0 |
| ICF | 1 | 0 | 9 | 0 | 5 | 1 | 15 | 1 |
| Total | 6 | 0 | 22 | 0 | 7 | 1 | 35 | 1 |

7. Current Over/Under Timeline Buckets

- Acute:

| APP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP |
|---|---|---|---|---|
| | 0-10 Days | | Over 10 Days | |
| Total | 28 | 2 | 31 | 0 |

- ICF:

| ICF | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | PIP to PIP | MHCB/OP |
|---|---|---|---|---|---|---|---|---|
| | 0-30 Days | | 31-60 Days | | 61-90 Days | | Over 90 Days | |
| Total | 45 | 11 | 9 | 0 | 1 | 0 | 0 | 0 |

Nick Weber

Attorney

Department of Corrections & Rehabilitation

1515 S Street, Suite 314S

Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Lisa Ells <LElls@rbgg.com>
**Sent:** Tuesday, February 15, 2022 10:44 AM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Cc:** Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>
**Subject:** RE: Coleman - Inpatient Waitlist/Transfers Data [IWOV-DMS.FID6429]

> CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Nick,

Could you please circulate updated numbers on the below?  Thanks.

---

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>

**Sent:** Tuesday, January 18, 2022 10:51 AM
**To:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Cc:** Nina Raddatz <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>
**Subject:** RE: Coleman - Inpatient Waitlist/Transfers Data [IWOV-DMS.FID6429]

[EXTERNAL] Notice: This message comes from an external sender.

Marc,

Below is data pulled from the week of 1/10 – 1/17/22.

1. Pending APP/ICF Referrals

|  | MHCB/OP | | PIP to PIP | | TOTAL | |
|---|---|---|---|---|---|---|
|  | Male | Female | Male | Female | Male | Female |
| APP | 84 | 0 | 3 | 0 | 87 | 0 |
| ICF | 41 | 1 | 35 | 0 | 76 | 1 |
| Total | 125 | 1 | 38 | 0 | 163 | 1 |

2. Acute Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP[1, 2] | 218 | 0 | 0 | 203 | 9 | 4 | 2 |
| CHCF-PIP[3] | 201 | 0 | 9 | 59 | 1 | 2 | 130 |
| CMC[4] | 12 | 0 | 0 | 8 | 0 | 1 | 3 |
| Total | 431 | 0 | 9 | 270 | 10 | 7 | 135 |

[1] 9 APP beds offline due to staff shortages

[2] 13 ICF to APP CHCF Bed conversions; 1 ICF patient is still occupying an APP bed

[3] 9 APP ISO beds held vacant for patients that may become COVID positive.

[4] 2 beds to remain vacant per MH leadership

3. ICF Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP Single Cell[5] | 94 | 32 | 0 | 60 | 0 | 1 | 1 |
| CMF-PIP L1 MPC | 68 | 6 | 0 | 45 | 0 | 13 | 4 |
| CMF-PIP Locked Dorm[6] | 84 | 0 | 0 | 45 | 8 | 3 | 28 |
| CHCF-PIP Single Cell[7] | 331 | 0 | 9 | 271 | 1 | 12 | 38 |
| SVSP-PIP Single Cell | 202 | 8 | 0 | 189 | 2 | 4 | -1 |
| SVSP-PIP MPC | 44 | 0 | 0 | 32 | 0 | 3 | 9 |
| DSH ASH | 256 | 0 | 0 | 134 | 0 | 2 | 120 |
| DSH CSH | 50 | 0 | 0 | 20 | 0 | 0 | 30 |
| Total | 1129 | 46 | 9 | 796 | 11 | 38 | 229 |

[5] 16 beds offline due to staff shortages

[6] 8 beds redlined to create space for social distancing

[7] 9 ICF ISO beds held vacant for patients that may become COVID positive

4. Male Condemned Census and Capacity

|  |  |  |  |  | Endorsed |  |
|---|---|---|---|---|---|---|

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| SQ-PIP | 40 | 0 | 0 | 16 | 0 | 0 | |
| SQ-PIP (non-condemned) | | | | 15 | | 0 | |
| Total | 40 | 0 | 0 | 31 | 0 | 0 | 9 |

5. Female Census and Capacity

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| DSH PSH | 30 | 0 | 0 | 11 | 0 | 0 | 19 |
| CIW-PIP | 45 | 0 | 0 | 28 | 0 | 1 | 16 |
| Total | 75 | 0 | 0 | 39 | 0 | 1 | 35 |

6. Total Admitted Transfers

Local Facility MHCB/OP: Patients admitted from MHCB/OP to a local on-site PIP (i.e. CHCF to CHCF-PIP)
External MHCB/OP: Patients admitted from MHCB/OP to an external PIP
Internal PIP: Patients admitted to/from APP or ICF LOC (APP to ICF, ICF to APP, ICF to ICF)

| | Local Facility MHCB/OP | | EXTERNAL MHCB/OP | | INTERNAL PIP | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| LOC | Male | Female | Male | Female | Male | Female | Male | Female |
| APP | 1 | 2 | 4 | 0 | 1 | 0 | 6 | 2 |
| ICF | 2 | 0 | 9 | 0 | 2 | 1 | 13 | 1 |
| Total | 3 | 2 | 13 | 0 | 3 | 1 | 19 | 3 |

7. Current Over/Under Timeline Buckets
- Acute:

| APP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP |
|---|---|---|---|---|
| | 0-10 Days | | Over 10 Days | |
| Total | 20 | 2 | 64 | 1 |

- ICF:

| ICF | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | PIP to PIP | MHCB/OP |
|---|---|---|---|---|---|---|---|---|
| | 0-30 Days | | 31-60 Days | | 61-90 Days | | Over 90 Days | |
| Total | 33 | 19 | 7 | 16 | 2 | 0 | 0 | 0 |

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA 95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Weber, Nicholas@CDCR
**Sent:** Thursday, January 6, 2022 5:13 PM
**To:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Cc:** Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>;

Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>
**Subject:** RE: Coleman - Inpatient Waitlist/Transfers Data [IWOV-DMS.FID6429]

Marc,

Below is similar data from the week of December 27 through January 2.

1. Pending APP/ICF Referrals

|  | MHCB/OP | | PIP to PIP | | TOTAL | |
|---|---|---|---|---|---|---|
|  | Male | Female | Male | Female | Male | Female |
| APP | 80 | 0 | 3 | 0 | 83 | 0 |
| ICF | 54 | 1 | 37 | 0 | 91 | 1 |
| Total | 134 | 1 | 40 | 0 | 174 | 1 |

2. Acute Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP[1, 2] | 218 | 0 | 0 | 197 | 9 | 10 | 2 |
| CHCF-PIP[3] | 201 | 0 | 9 | 61 | 0 | 1 | 130 |
| CMC[4] | 12 | 0 | 0 | 10 | 0 | 1 | 1 |
| Total | 431 | 0 | 9 | 268 | 9 | 12 | 133 |

[1] 9 APP beds offline due to staff shortages

[2] 13 ICF to APP CHCF Bed conversions; 3 ICF patients are still occupying the APP beds

[3] 9 APP ISO beds held vacant for patients that may become COVID positive.

[4] 2 beds to remain vacant per MH leadership

3. ICF Census and Capacity (per RIPA Census and Pending point-in-time as of today)

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| CMF-PIP Single Cell[5] | 94 | 16 | 0 | 60 | 16 | 3 | -1 |
| CMF-PIP L1 MPC | 68 | 6 | 0 | 47 | 0 | 12 | 3 |
| CMF-PIP Locked Dorm[6] | 84 | 0 | 0 | 53 | 8 | 7 | 16 |
| CHCF-PIP Single Cell[7] | 331 | 0 | 9 | 275 | 1 | 12 | 34 |
| SVSP-PIP Single Cell | 202 | 5 | 0 | 186 | 2 | 7 | 2 |
| SVSP-PIP MPC | 44 | 0 | 0 | 34 | 0 | 4 | 6 |
| DSH ASH | 256 | 0 | 0 | 141 | 0 | 0 | 115 |
| DSH CSH | 50 | 0 | 0 | 20 | 0 | 0 | 30 |
| Total | 1129 | 27 | 9 | 816 | 27 | 45 | 205 |

[5] 16 beds offline due to staff shortages

[6] 8 beds redlined to create space for social distancing

[7] 9 ICF ISO beds held vacant for patients that may become COVID positive

4. Male Condemned Census and Capacity

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| SQ-PIP | 40 | 0 | 0 | 17 | 0 | 0 |  |
| SQ-PIP (non-condemned) |  |  |  | 15 |  | 0 |  |

| Total | 40 | 0 | 0 | 32 | 0 | 0 | 8 |
|---|---|---|---|---|---|---|---|

5. Female Census and Capacity

| Facility | Capacity | Admission Beds | ISO Beds | Beds Occupied | Redlined Beds | Endorsed or Accepted | Beds Available |
|---|---|---|---|---|---|---|---|
| DSH PSH | 30 | 0 | 0 | 11 | 0 | 0 | 19 |
| CIW-PIP | 45 | 0 | 0 | 27 | 0 | 0 | 18 |
| Total | 75 | 0 | 0 | 38 | 0 | 0 | 37 |

6. Total Admitted Transfers

Local Facility MHCB/OP: Patients admitted from MHCB/OP to a local on-site PIP (i.e. CHCF to CHCF-PIP)
External MHCB/OP: Patients admitted from MHCB/OP to an external PIP
Internal PIP: Patients admitted to/from APP or ICF LOC (APP to ICF, ICF to APP, ICF to ICF)

|  | Local Facility MHCB/OP | | EXTERNAL MHCB/OP | | INTERNAL PIP | | TOTAL | |
|---|---|---|---|---|---|---|---|---|
| LOC | Male | Female | Male | Female | Male | Female | Male | Female |
| APP | 0 | 3 | 6 | 1 | 1 | 0 | 7 | 4 |
| ICF | 1 | 0 | 6 | 0 | 3 | 2 | 10 | 2 |
| Total | 1 | 3 | 12 | 0 | 4 | 2 | 17 | 6 |

7. Current Over/Under Timeline Buckets (Excluding COVID Exceptions)
- Acute:

| APP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP |
|---|---|---|---|---|
|  | 0-10 Days | | Over 10 Days | |
| Total | 26 | 3 | 54 | 0 |

- ICF:

| ICF | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | MHCB/OP | PIP to PIP | PIP to PIP | MHCB/OP |
|---|---|---|---|---|---|---|---|---|
|  | 0-30 Days | | 31-60 Days | | 61-90 Days | | Over 90 Days | |
| Total | 41 | 31 | 13 | 6 | 1 | 0 | 0 | 0 |

---

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Thursday, January 6, 2022 5:04 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Cc:** Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Christine.Ciccotti@dsh.ca.gov; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Thind, Sundeep@DSH-S <Sundeep.Thind@dsh.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>
**Subject:** Coleman - Inpatient Waitlist/Transfers Data [IWOV-DMS.FID6429]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear OLA Team,

In light of the apparent COVID-19 Omicron wave, we request that you circulate an updated version of the Inpatient Waitlist/Transfers data that Defendants previously periodically circulated, including in the attached email from Nick on April 26, 2021—the requested data is in Sections 8(a) through 8(g) of that email.

We ask that you update and circulate this data bi-weekly for the next two months.

Best,
Marc

**Marc J. Shinn-Krantz**
(he/him)
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
MShinn-Krantz@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at mshinn-krantz@rbgg.com.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT M



CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## Total Filled

Total PY: 2767.10
PIP PY: 2274.50
Additional PY for CIW/SQ: 492.60

## Filled by Institution

## Filled by Category

## Filled by Classification

Notes:

- CIW and SQ authority and fill rates include PIP and non-PIP.
- Authority and fill rates include established classifications and non-converted classifications for Civil Service only. Fill rate percentages include Civil Service and Registry.
- Authority has been reconciled with Fiscal.
- Changes may be due to staffing model adjustments, separations, transfers, promotions, retirements, etc.
- * Registry is not utilized for this classification.

Last Modified: 2/4/22

# EXHIBIT N



CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## Total Filled

Total PY: 2767.10
PIP PY: 2274.50
Additional PY for CIW/SQ: 492.60

## Filled by Institution

## Filled by Category

## Filled by Classification

Notes:

- CIW and SQ authority and fill rates include PIP and non-PIP.
- Authority and fill rates include established classifications and non-converted classifications for Civil Service only. Fill rate percentages include Civil Service and Registry.
- Authority has been reconciled with Fiscal.
- Changes may be due to staffing model adjustments, separations, transfers, promotions, retirements, etc.
- * Registry is not utilized for this classification.

Last Modified: 4/15/22

# EXHIBIT O

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Lopes Matthew; Jones Mohamedu; Walsh Kerry F.; Millham, Sofia A.; Coleman Team - RBG Only; Steve Fama |
| **Cc:** | Weber, Nicholas@CDCR; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR; Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; Martello, Toni@CDCR; Mehta, Amar@CDCR; Genetin, Arianna@CDCR |
| **Subject:** | Coleman: Notice of the Use of Telepsychiatry in the SVSP PIP |
| **Date:** | Thursday, May 5, 2022 5:08:00 PM |

All,

Per the provisional Telepsychiatry Policy, CDCR shall provide notice to the Special Master and Plaintiffs' counsel if a telepsychiatrist is required to serve in a PIP for more than 30 consecutive calendar days. As of today, a telepsychiatrist has been assigned to the SVSP PIP for 30 consecutive calendar days. Consistent with the provisional telepsychiatry policy, CDCR will provide a plan to address the use of telepsychiatry in the SVSP PIP within 30 calendar days from the provision of notice.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.