**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
   **Plaintiffs**

   **vs.**                              **No. 2:90-CV-0520 KJM DB**

**GAVIN NEWSOM, et al.,**
   **Defendants**

---

**SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S PROPOSAL FOR ASSUMING THE ANNUAL SUICIDE MONITORING REPORT**

For more than two decades, the *Coleman* Special Master and his expert[1] have reported annually to the court regarding suicides among incarcerated persons housed in CDCR institutions.  In the first annual suicide report, reporting on deaths by suicides among incarcerated persons in CDCR custody between October 1998 – December 1999, the Special Master's expert observed:

> Based on this analysis of suicides in the CDC[R], it is clear that the defendants'
> continuing effort to limit suicides is dependent on their ability to enforce
> compliance with existing program guides for the delivery of mental health care
> services.  In those cases where serious lapses occurred in the provision of services
> mandated by departmental program guides, resulting in potentially preventable
> suicides, a variety of causes contributed, including inadequate resources, a lack of
> efficient supervision, inconsistent quality review and management and serious
> gaps in the training of both clinical and custody staffs.  No amount of clarity in
> the articulation of suicide prevention policies and procedures can compensate for
> these deficiencies.[2]

---

[1] Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."  Where applicable, the Special Master's suicide prevention expert, Mr. Lindsay Hayes, is referred to as "the Special Master's suicide prevention expert."

[2] *Coleman* Suicide Report, appended to the Special Master's Sixth Round Monitoring Report, filed October 6, 2000, ECF No. 1213 at 6 [hereinafter First *Coleman* Suicide Report].

Accordingly, identifying "potentially preventable suicides" and making recommendations to prevent their occurrence has been at the core of the Special Master's monitoring of suicides among incarcerated persons in this case from the beginning.

In the annual suicide report for calendar year 2000, the Special Master's expert formalized definitions of the terms "foreseeable" and "preventable" and began analyzing each case of death by suicide using these definitions and determining whether each death by suicide was foreseeable and/or preventable.  *See* Ninth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, ECF No. 1373-1 at Ex. V pp. 1-2 (defining "foreseeable" and "preventable" as used in the 2000 suicide report); *see also id.* at 4 (table that includes Special Master's expert's foreseeability/ preventability determinations for suicides completed in calendar year 2000).  Subsequently, the Special Master's expert's foreseeability and preventability determinations were adopted by this court[3] and relied upon by the Three-Judge Court[4] and the Supreme Court of the United States[5] to assess defendants' suicide prevention efforts.

Since the filing of the First *Coleman* Suicide Report, defendants' suicide prevention record has been mixed.  While CDCR's suicide rate has fluctuated over time, it has consistently remained above the national average for state correctional systems, exceeding 30 deaths by suicide per 100,000 incarcerated persons in 2019.  ECF No. 7239-1 at 12.  ("CDCR's suicide rate of 30.3 suicides per 100,000 [incarcerated persons] in 2019 places it above its 21-year average of

---

[3] *See, e.g.*, July 12, 2013 Order, ECF No. 4693 at 2-4, 5 (overruling defendants' objections to the Special Master's expert's foreseeability and preventability definitions and determinations contained in the First Half 2012 Suicide Report).

[4] August 4, 2009 Order, ECF No. 3641 at 86-87.

[5] *Brown v. Plata*, 563 U.S. 493, 504 (2011) (citations omitted).

20.1 per 100,000.").  In some respects, the Special Master's expert's observations from the First *Coleman* Suicide Report remain true today: "inadequate resources" and deficiencies in staff supervision and training and corrective action implementation have inhibited CDCR's ability to forestall preventable suicides at various times over the last two decades.  *See supra* note 2 and accompanying text.

As discussed in the Special Master's 2013-2020 Suicide Summary Report, "inadequate follow-up on the efficacy of Quality Improvement Plans (QIPs)" has been a concern "for years." ECF No. 7511 at 52.[6]  Moreover, in a July 3, 2019 order, the court described CDCR's initial implementation of the Special Master's suicide prevention expert's recommendations as "dragging out and taking too long." ECF No. 6212 at 14.  The Special Master's suicide prevention expert noted CDCR's more recent progress implementing his recommendations in his Fourth Re-Audit Report[7] and will provide a further update in his forthcoming Fifth Re-Audit Report.

---

[6] *See* Summary of Findings: Deaths by Suicide in the California Department of Corrections and Rehabilitation From January 1, 2013 Through December 31, 2020, ECF No. 7511 at 52 ("What was missing from these QIPs was standard follow-up tracking to ensure that training and mentoring had the desired effect over time.  Simply providing training for staff has proved inadequate in several areas for at least the past eight years. … QIPs are effective when they include examination of the problem and identification of the root cause of the concern.  Only when the cause of the concern is identified can a plan be developed for targeting the problem through a quality improvement plan.  When QIPs are ineffective, as evidenced by the same problem occurring time and again, standard quality improvement processes include a reexamination of the root cause of the issue, not continued implementation of the same failed QIPs year after year.").

[7] *See* Special Master's Report on His Expert's Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation, ECF No. 6879 at 27 (recommending the court find defendants in compliance with the implementations of 11 of the Special Master's suicide prevention expert's recommendations, and in partial compliance with one additional recommendation).

Despite these shortcomings, for years the Special Master, his expert, and his suicide prevention expert have believed CDCR's suicide case review process and the individual suicide case reviews resulting therefrom to be comprehensive. *See, e.g.*, The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation, ECF No. 5993-1 at 29-30 ("A considerable strength of the CDCR suicide prevention program is the Suicide Case Review process.… [CDCR's individual] Suicide Reports have been found to be not only very comprehensive but have provided thoughtful and targeted QIPs for correcting deficiencies and improving suicide prevention practices.").

Based in part on CDCR's demonstrated and sustained ability to conduct comprehensive suicide case reviews, the Special Master first considered recommending delegation of the annual suicide report to CDCR in advance of drafting the 2015 suicide report. *See* ECF No. 7038 at 3-4, 11-17 (describing prior efforts to delegate the annual suicide report writing responsibility to defendants). Initial discussions with the parties about the potential delegation of the annual suicide report began in 2015. *Id.* at 11-12. The Special Master agreed to permit CDCR to draft the annual suicide report for calendar year 2015 under his expert's supervision. *Id.* at 11. CDCR agreed to apply the court-adopted definitions of "foreseeable" and "preventable" in their 2015 report. *Id.* at 12. At the recommendation of the Special Master's expert and in aid of the goal of delegating the annual suicide report to CDCR, CDCR's Suicide Case Review Committee began making foreseeability and preventability determinations during suicide case reviews in August 2015. *Id.*

Subsequently, CDCR representatives and other administration officials expressed misgivings about the foreseeability and preventability determinations, citing concerns about tort liability exposure. *Id.* at 12-13. By early 2018, CDCR had altered the court-adopted definitions

of foreseeable and preventable in its draft 2015 annual suicide report. *Id.* at 14-15.  Despite the Special Master's repeated efforts to persuade CDCR to draft the 2015 annual suicide report in conformance with his expert's court-approved process, discussions regarding the delegation of the suicide report to CDCR reached an impasse in 2020.  *See id.* at 16-17.

In 2021, the Special Master and CDCR Secretary Kathleen Allison revived discussions regarding the annual suicide report.  Following a July 20, 2021 In Camera Midlitigation Status Conference, the court issued an order referring several suicide prevention-related topics to a January 2022 settlement conference.  July 26, 2021 Order, ECF No. 7246 at 2.  Included among the issues referred to settlement conference was the continued use of "foreseeability/preventability analyses" in the annual suicide report.  *Id.*  On September 3, 2021, the court issued a minute order setting the agenda for the October 7, 2021 status conference,[8] including a discussion of "whether the November 1, 2021 settlement conference should focus on suicide prevention, cultural collaboration, or a different issue."  ECF No. 7325.  At the October 7, 2021 status conference, the court signaled its desire to defer formal settlement discussions on suicide prevention issues until the Special Master's suicide prevention expert completed his Fifth Re-Audit Round.  October 7, 2021 Reporter's Transcript of Proceedings, ECF No. 7345 at 29:11-18.  However, the court made it clear that Secretary Allison, the Special Master, and the parties' respective counsel were free to communicate to "move suicide prevention along."  *Id.* at 30: 3-4.

In a February 15, 2022 minute order, the court set an April 30, 2022 deadline for the Special Master and Secretary Allison to conclude discussions regarding the use of foreseeability/preventability determinations in the annual suicide report.  The court reset the

---

[8] The October 7, 2021 status conference was originally scheduled for October 1, 2021 and rescheduled to October 7, 2021 via minute order on September 27, 2021.  ECF No. 7328.

deadline to May 31, 2022 in an April 22, 2022 minute order, ECF No. 7536, and subsequently reset the deadline for the Special Master to report to the court to June 14, 2022 in a May 31, 2022 minute order.  ECF No. 7560.

Formal meetings between the Special Master, Secretary Allison, the Special Master's clinical experts and suicide prevention expert, and CDCR staff were held on March 24, 2022, and April 14, 2022.  On April 5, 2022, CDCR sent the Special Master an initial draft of a proposal outlining the conditions under which the annual suicide report writing responsibility would be delegated to CDCR.  The April 5, 2022 draft proposal was discussed during the April 14, 2022 meeting.  After the April 14, 2022 meeting, the Special Master's expert held two small workgroup meetings with CDCR clinicians to further discuss CDCR's annual suicide report proposal.

The Special Master and his expert briefed plaintiffs' counsel on CDCR's draft annual suicide report proposal during a teleconference on May 9, 2022.  CDCR sent a revised draft to the Special Master and plaintiffs' counsel on May 24, 2022.  Plaintiffs' counsel participated in meetings with the Special Master and defendants on May 26, 2022 to discuss CDCR's proposal. Defense counsel sent a revised version of their annual suicide report proposal on June 6, 2022. Based on all-parties discussions during a June 7, 2022 meeting, CDCR distributed a further revised version of their proposal on June 7, 2022.  The Special Master and parties again met on June 14, 2022 to further discuss CDCR's annual suicide report proposal.

Consistent with the court's May 31, 2022 order, ECF No. 7560, on June 14, 2022, the Special Master reported to the court on the outcome of discussions regarding the annual suicide report. The court granted the Special Master's request for a 14-day period "to file a report and recommendations on the outcome of those discussions."  June 14, 2022 Order, ECF No. 7570.

On June 28, 2022, the Special Master and parties met to finalize the terms of CDCR's Annual Suicide Report Proposal. During the June 28, 2020 meeting, all parties confirmed their assent to the terms of the final version CDCR's Annual Suicide Report Proposal, which is attached to this report. *See* CDCR'S Proposal for Assuming the Annual Suicide Monitoring Report, attached hereto at Appendix A [hereinafter CDCR Annual Suicide Report Proposal].

CDCR'S ANNUAL SUICIDE REPORT PROPOSAL

The CDCR Annual Suicide Report Proposal indicates that if approved by the court, CDCR will assume responsibility for drafting and filing the annual suicide report, which will "track the contents and analysis" historically contained in the Special Master's expert's reports. Appendix A at 1. CDCR proposes to continue its existing practice of combining the annual suicide report in this case with a statutorily required report to the California legislature. *Id.* The CDCR proposal omits foreseeability and preventability determinations and proposes, in the alternative, enhancements to the annual suicide report's discussion of QIPs and the inclusion of each individual suicide case review, which will be appended to the annual report and conditionally lodged under seal. *Id.* at 1-2[9]

---

[9] CDCR's Annual Suicide Report Proposal includes the following language:

> In lieu of drafting a comprehensive suicide case review for each suicide report and appending them to the annual suicide report, CDCR will instead append, and conditionally lodge under seal, each individual suicide case review, and any addendum reports, with the annual suicide report. The identifying patient information contained within the suicide reviews and any addendum reports is sensitive, private, confidential, and subject to the protective order entered in this action on February 25, 2020 (Protective Order, ECF No. 6482). CDCR will follow the requirements under the February 25, 2020 order and LR 141 for the conditional filing of documents under seal.

Appendix A at 2.

Significantly, this alternative approach includes detailed tracking and reporting on

corrective actions and QIPs, including institutional and statewide trends.  Appendix A at 1-2.

While the annual suicide reports CDCR has drafted to date report "on the determination and

tracking of QIPs," in its proposal CDCR indicates it "is committed to enhancing this section in

the annual suicide report to contain a comprehensive review of the QIPs for each discipline."  *Id.*

Further, CDCR indicates its annual report under the alternative proposal will distinguish between

local QIPs and those "assigned to the statewide suicide prevention program for issues that are

more systemic."  *Id.* at 2.  For those statewide systemic deficiencies, "the report will identify

what meaningful steps are being taken to address the deficiency and improve the policies

associated with care expected at the institutional level."  *Id.*  CDCR will report on trends in QIPs,

including "frequency of repeated QIPs that are assigned to particular institutions, and frequency

in which QIPs are assigned to the statewide suicide prevention program."  *Id.*  Finally,

> [A]n analysis of the efficacy of the QIPs will be reported, including reporting on
> the ongoing work of CDCR's Suicide Prevention Coordinators in each region
> with institutions to ensure that the QIPs as designed were appropriate to
> effectively address the problems in the first instance and that sustained
> improvement has been made.  A description of ongoing work with institutions by
> CDCR's Suicide Prevention Coordinators in each region will be included to
> discuss the work being done to ensure sustained improvement has been made.

*Id.*  This last enhancement to CDCR's suicide report is noteworthy in light of the Special

Master's expert's stated concerns with the efficacy of suicide-prevention QIPs to date.  *See supra*

note 6 and accompanying text.

One of the most significant improvements to CDCR's suicide report proposal compared

to the annual suicide reports CDCR has drafted to date is the attachment of each individual

suicide case review to the annual report.  As proposed, these individual suicide case reviews will

be appended to the annual report and conditionally lodged with the court under seal in

accordance with local rules and the existing protective order in this case.  *See* Appendix A at 2; *see also supra* note 9.  The Special Master's expert has historically found CDCR's individual suicide case reviews to be comprehensive, so this enhancement will provide the court and parties with adequate information regarding deficiencies identified in each case of death by suicide among incarcerated persons in CDCR custody.

The attached proposal includes a process for plaintiffs and the Special Master to provide preliminary comments to CDCR's draft annual suicide reports within 30 days of receipt, similar to current practice regarding the Special Master's draft monitoring reports.  Appendix A at 3.  After the 30-day preliminary review period ends, defendants will proceed with finalizing and filing the annual suicide report, including a cover report responding to the plaintiffs' objections and the Special Master's comments to the draft report.  *Id.*  The parties and Special Master have agreed to the following process for the plaintiffs and Special Master to respond to CDCR's filed annual report:   Plaintiffs will have a ten-day period to file formal objections to CDCR's filed annual report; the Special Master will file a report on CDCR's annual suicide report if the court so directs.  *Id.*  Consistent with current practice for the Special Master's monitoring reports, plaintiffs' objections and the Special Master's report will be limited to those issues raised in their respective preliminary comments and objections to the draft report unless the final report raises "new information…that was not included in the draft report."  *Id.*

Finally, CDCR's proposal appropriately envisions a preliminary approval covering the annual suicide report for calendar year 2021.  Within 30 days of the court's adoption of the 2021 annual suicide report, "the parties, under the guidance of the Special Master, shall meet and confer and the Special Master shall file a brief recommendation with the court as to whether this proposal should become final."  *Id.*  This provisional approval period will enable the court,

Special Master, and parties to evaluate the process outlined herein prior to approving full
delegation of the annual suicide report writing responsibilities to CDCR.

<u>CONCLUSION AND RECOMMENDATION</u>

The Special Master has carefully reviewed and considered CDCR's proposal to assume
responsibility for drafting and filing the annual suicide report in this case and recommends that
the court adopt CDCR's proposal subject to the provisional approval process outlined therein.[10]

For two decades, the Special Master's expert's annual suicide reports and the
foreseeability and preventability determinations contained therein have guided the court and
parties in evaluating the constitutional adequacy of CDCR's suicide prevention policies and
practices.  The *Coleman* court, the Three-Judge Court, and the Supreme Court of the United
States have each relied on the Special Master's expert's foreseeability and preventability in their
respective consideration of the adequacy of CDCR's suicide prevention program.  *See supra*
notes 3-4 and accompanying text.  Accordingly, moving away from the use of foreseeability and
preventability determinations is a significant step in this case and one the Special Master does
not take lightly.  While the Special Master's expert's foreseeability and preventability
determinations have proven to be appropriate and useful tools to assess CDCR's suicide
prevention program, going forward the alternative approach proposed by defendants will provide

---

[10] The Special Master's recommendation to adopt this proposal does not and should not, in a
vacuum, be interpreted as a determination that CDCR's suicide prevention program is
constitutionally adequate.  The Special Master and his expert have concluded that one
component of CDCR's program – the suicide case review and reporting process as modified by
the attached proposal – represents an adequate alternative to the annual suicide reports
historically authored by the Special Master's expert in this case.  As the court has made clear,
constitutional compliance relating to deaths by suicide among incarcerated persons "require[s]
both adequate implementation of the [Special Master's suicide prevention expert's] twenty-nine
recommendations as well as remediation of the pattern of identifiable and describable
inadequacies in the annual reports on inmate suicides."  December 3, 2020 Order, ECF No. 6973
at 9 n.7.

the court, parties, and Special Master with a sufficient record to evaluate the constitutional adequacy of CDCR's suicide prevention program.

Discussions about the potential delegation of the annual suicide report began seven years ago.  *See* ECF No. 7038 at 11-12.  The recommendation contained in this report was by no means an inevitability.  Indeed, the dispute about the Special Master's expert's foreseeability and preventability determinations appeared at times to be intractable.  In that vein, the Special Master acknowledges and appreciates Secretary Allison's personal commitment to overcoming the impasse regarding the annual suicide report and moving this case forward.  The Special Master looks forward to working with Secretary Allison to resolve other disputes in this case and ultimately improving the mental health care provided to *Coleman* class members.

Accordingly, the Special Master recommends the court adopt the attached CDCR Annual Suicide Report Proposal, which has been agreed to by the parties and Special Master, subject to the provisional approval process outlined therein.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr. Esq.
Special Master

June 28, 2022

# Appendix A

CDCR's Proposal for Assuming the Annual Suicide Monitoring Report

*Content of the CDCR Annual Suicide Report*

At the request of the Special Master, CDCR hereby submits the following proposal to assume the duties of writing and filing the annual suicide monitoring report from the Special Master, which was developed in consultation with the Special Master's experts.  Just as they currently do, CDCR's reports will continue to track the contents and analysis found in the reports written by the Office of the Special Master. Specifically, CDCR will report on:

- Suicide Incident Factors
- Individual Risk Factors
- Institutional/Environmental Risk Factors
- Mental Health Risk Factors
- Mental Health Evaluation and Treatment Factors
- Emergency Response Factors
- Individual Suicide Case Review Analyses
- Quality Improvement Plan Content and Analyses
- Recommendations
- Conclusions

It should be noted that CDCR is responsible for producing a similar report to the California Legislature, pursuant to SB960 (2018).  In 2021, CDCR merged its annual report and the report submitted to the Legislature due to the overlap of content.  CDCR will continue this practice moving forward. The specific expectations to report to the Legislature are:

- Progress toward completing adequate suicide risk evaluations
- Progress toward completing 72-hour treatment plans in a sufficient manner
- Progress toward ensuring that all required staff receive training related to suicide prevention and response
- A description of the Department's progress in implementing the recommendations made by the Special Master regarding inmate suicides and attempts, to include the results of any audits the Department conducts at the Headquarters or Regional level, as part of its planned process to measure the success of changes the Department implements as a result of these recommendations
- Progress in identifying and implementing initiatives designed to reduce risk factors associated with suicide
- Description of the Department's efforts and progress to expand upon its process of notification pursuant to Penal Code Section 5022, including expansion of those notifications in cases of suicide attempts when deemed appropriate by the Department, and when inmates have consented to allow release of that information.

*Quality Improvement Plans (QIPs)*

CDCR will include a review of the identified areas for improvement within the suicide case reviews that lead to the assignment of QIPs, which provide a framework for how well current policies, procedures, and practices surrounding suicide prevention are serving our patients.  Currently, CDCR reports on the

[4103318.3]

determination and tracking of QIPs in its annual suicide report.  It reports on the number of QIPs for each discipline and the average number of QIPs assigned per suicide case review.

CDCR is committed to enhancing this section in the annual suicide report to contain a comprehensive review of the QIPs for each discipline.  The section will focus on the trends of QIPs, per discipline. A breakdown of the various categories of QIPs tracked by CDCR is attached.  As part of the annual report, CDCR will categorize QIPs based on categories in the attachment, and report on the frequency or trends of QIPs in each category for a given year.  CDCR maintains the right to modify this list, depending on emerging trends or absence of particular QIPs identified in the suicide case reviews each year, and to revise or eliminate overlapping categories.

The QIP section of the annual suicide report will identify the number of QIPs assigned to institutions vs. those assigned to the statewide suicide prevention program for issues that are more systemic, rather than localized. For those systemic issues, the report will identify what meaningful steps are being taken to address the deficiency and improve the policies associated with care expected at the institutional level.

In the narrative of this section of the report, focus will be placed on an analysis of the more frequent QIPs that are assigned. The analysis will consider the trends of similar QIPs, frequency of repeated QIPs assigned to particular institutions, and frequency in which QIPs are assigned to the statewide suicide prevention program.  CDCR will review QIPs across years for institutions that experienced multiple suicides and across institutions to better understand whether more targeted initiatives are needed.

The narrative will also include discussion about whether the QIPs have been fully implemented, and if not, what the delays and barriers are to full implementation. Additionally, an analysis of the efficacy of the QIPs will be reported, including reporting on the ongoing work of CDCR's Suicide Prevention Coordinators in each region with institutions to ensure that the QIPS as designed were appropriate to effectively address the problems in the first instance and that sustained improvement has been made.  A description of ongoing work with institutions by CDCR's Suicide Prevention Coordinators in each region will be included to discuss the work being done to ensure sustained improvement has been made.

Compared to foreseeability/preventability determinations, this approach is focused on improving systems, which is the purpose of quality improvement plans that are devised as the result of the suicide case review.  From a clinical and custodial perspective, reporting on this information furthers the overall ambition of CDCR/CCHCS to cultivate a culture of continuous learning and improvement.

*Comprehensive Case Reviews*

Because CDCR conducts a comprehensive suicide case review, which analyzes all aspects of the factors surrounding a suicide and develops findings and quality improvement plans, it is redundant to generate additional reviews of each suicide. In lieu of drafting a comprehensive suicide case review for each suicide report and appending them to the annual suicide report, CDCR will instead append, and conditionally lodge under seal, each individual suicide case review, and any addendum reports, with the annual suicide report.  The identifying patient information contained within the suicide reviews and any addendum reports is sensitive, private, confidential, and subject to the protective order entered in this action on February 25, 2020.  (Protective Order, ECF No. 6482.)  CDCR will follow the requirements under the February 25, 2020 order and LR 141 for the conditional filing of documents under seal.

[4103318.3]

Nothing in this proposal precludes litigants in other matters from obtaining the suicide reviews or addendum reports if they are otherwise legally entitled to receive them.

*Input of Stakeholders in the Annual Suicide Report*

CDCR values the expertise and diverse perspectives of the external stakeholders involved in the Coleman case. As such, CDCR welcomes feedback by the Special Master and the Plaintiffs as we develop each year's report.  As part of the drafting of the annual suicide report, CDCR will provide the Special Master and Plaintiffs thirty days to review and comment on a complete draft of each annual suicide report. After the thirty-day period ends, CDCR will review the recommendations from the Special Master and Plaintiffs, finalize the report, and file the report with the court. The filed report will include copies of any feedback received from Plaintiffs or the Special Master.  The final report will include a cover report that provides a response to that feedback.  Thereafter, Plaintiffs will have 10 days to file formal objections to the final report with the Court.  All formal objections and comments shall be identical to those objections and comments previously submitted by the Plaintiffs or the Special Master in response to the draft report, except that Plaintiffs and the Special Master may raise, as appropriate, objections and comments to new information, if any, in the final report that was not included in the draft report. Defendants will have ten (10) days to seek leave of court to file responses  to Plaintiffs' formal objections.  The Special Master will respond to the final report if the Court so directs.  The finalized report will also be uploaded to the CDCR and CCHCS public webpages.

Within thirty (30) days after adoption of the 2021 Annual Suicide Report by the court, the parties, under the guidance of the Special Master, shall meet and confer and the Special Master shall file a brief recommendation with the court as to whether this proposal should become final.