DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
BRENDA MUÑOZ – 328813
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.,<br><br>  Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' 2021 ANNUAL SUICIDE REPORT (ECF NO. 7615)**<br><br>Judge: Hon. Kimberly J. Mueller |

**INTRODUCTION**

Defendants' 2021 annual suicide report, ECF No. 7615 ("Defendants' Report" or "2021 Report" or "Report"), is their first attempt to assume responsibility for annual suicide reporting to the Court pursuant to the pilot process the Court recently approved. *See* Report and Recommendation Regarding the California Department of Corrections and Rehabilitation's Proposal for Assuming the Annual Suicide Monitoring Report ("Suicide Reporting Plan"), ECF No. 7574; Order (Jul. 25, 2022), ECF No. 7592.  While Defendants' Report provides some valuable insight and analysis of the 2021 suicides, it fails to comply with foundational elements of the court-ordered Suicide Reporting Plan. Defendants must address the deficiencies in the 2021 Report in order to prove that they are ready to take over the annual reporting function in future years.

Specifically, the Report omits content and analysis of the suicides found in prior Special Master reports, particularly sections that would highlight deficiencies in Defendants' suicide prevention practices.  These components must be included, as the Suicide Reporting Plan mandates that CDCR's report "track the contents and analysis found in the reports." *See* Suicide Reporting Plan at 13; *see also* Aug. 29, 2022 Order at 10 n.4 (providing that "[t]he content and analysis of the annual suicide reports will continue to cover the *same* topics" (emphasis added)).  The Report is also missing essential components of the analysis of QIPs, which are required by the Suicide Reporting Plan and are necessary to replace the determinations of foreseeability and preventability, which have long provided a systemic examination of gaps in Defendants' suicide prevention efforts. *See Brown v. Plata*, 563 U.S. 493 (2011).

The Court should order Defendants to file a revised 2021 Report that fully complies with the requirements of the Suicide Reporting Plan before agreeing to adopt it in lieu of the Special Master's reporting.

**I.    DEFENDANTS' REPORT IS MISSING KEY REQUIRED ELEMENTS OF THE REQUIRED QIP ANALYSIS**

The foreseeability and preventability standard has historically provided specific

guidance to CDCR on how to identify and fix practices and lapses that increase risk of suicides. *See Brown*, 563 U.S. at 493. Pursuant to the Suicide Reporting Plan, the parties agreed that Defendants' reports may forego that analysis, but must instead include an enhanced and in-depth analysis of its system to remedy suicide prevention deficiencies with Quality Improvement Plans (QIPs). The Plan requires Defendants' suicide report to include several elements in its QIP analysis, including but not limited to (1) "an analysis of the efficacy of the QIPs," (2) "a review of the identified areas for improvement within the suicide case reviews that lead to the assignment of QIPs," and (3) "discussion about whether the QIPs have been fully implemented, and if not, what the delays and barriers are to full implementation." Suicide Reporting Plan at 13-14.

With the omission of the foreseeability and preventability analyses, the required QIP analysis is the key tool for reporting on the efficacy of CDCR's existing suicide prevention practices and CDCR's efforts to improve those practices to resolve identified deficiencies. Plaintiffs' agreement to the closely negotiated pilot process was premised on Defendants' willingness to include the specific components of the QIP analysis required by the Suicide Reporting Plan. Unfortunately, Defendants' Report fails to include several key components of the necessary analysis of QIPs. The Court should not adopt the 2021 Report without an expansion of the QIP section.

### A. The Report Lacks an Analysis of QIP Efficacy and Reveals that Defendants Are Not Prepared to Report on This Point

Defendants' 2021 suicide report does not include any analysis of QIP efficacy. *See* Defendants' Report at 89-95. Instead, the Report describes a *process* adopted in 2021 for analyzing QIP efficacy and asserts that CDCR will include an analysis of QIP efficacy in future annual suicide reports once Regional SPRFIT coordinators are able to gather additional information. Apparently, Defendants do not yet have the information necessary to report on efficacy of the 2021 QIPs. Defendants' Report at 9, 90.

In May and June of this year, when the Suicide Reporting plan was negotiated, Defendants were presumably well aware that they would be unable to include an analysis

1  of QIP efficacy in their 2021 suicide report, yet they committed to the Plan without
2  disclosing this fact to the Plaintiffs and the Special Master or requesting revisions to the
3  Plan during negotiations to account for their inability to include a QIP efficacy analysis in
4  their 2021 Report.  Regardless, the court-ordered Suicide Reporting Plan does not exempt
5  Defendants from reporting on QIP efficacy in their 2021 suicide report.  Defendants'
6  omission strongly indicates that Defendants cannot at this point demonstrate to the parties
7  and Court that can provide this important analysis in a robust, self-critical manner, raising
8  serious concerns about whether they are ready to take over the annual reporting function
9  on an on-going basis.

### B. The Report Must Analyze the Problems Underlying the QIPs

11  The Suicide Reporting Plan requires that Defendants' Report include a "review of
12  the identified areas for improvement within the suicide case reviews that lead to the
13  assignment of QIPs."  Suicide Reporting Plan at 13.  The Plan also requires that
14  Defendants' Report include analysis comparable to that in the Special Master's prior
15  suicide reports.  The Special Master's prior reports contain a concise list of every specific
16  underlying problem common to more than one suicide that led to a QIP in each year, such
17  as "failure to conduct confidential contacts" or "failure to make adequate custody checks,"
18  and how many cases involved each problem.  *See, e.g.*, Special Master's 2020 Suicide
19  Report App'x B4 (Dec. 21, 2021), ECF No. 7405-2 at 167 ("Special Master's 2020 Suicide
20  Report").

21  Defendants' Report does not include analysis of underlying deficiencies comparable
22  to that found in the Special Master's prior annual suicide reports.  *See* Defendants' Report
23  at 90-96.  The Report purports to identify common underlying problems but many of the
24  descriptions of the problems are so vague that the Report fails to convey the essence of the
25  problems.  *See*, *e.g.*, *id.* at 95-96 (vague descriptions of problems including "issues with
26  the SRASHE and/or Self-Harm assessments," "poor quality mental health contacts,"
27  "improper documentation," and "cut-down tool issues").  In response to Plaintiffs' similar
28  comments on the Draft Report, Defendants added minimal additional information into the

body of the Final 2021 Report and an Appendix B, which contains a table that lists common underlying deficiencies that led to QIPs. *Id.* at 9, 29-30, 103-06. However, Appendix B does not contain any actual analysis of the 2021 suicides. *Id.* at 103-06. Appendix B lists only *examples* of types of deficiencies that were categorized under each major problem issue area set forth in tables in the body of the Report. *Id.* at 92-94 (tables listing categories of deficiencies); *id.* at 104-06. The Report does not provide in Appendix B or anywhere else a comprehensive list of specific, clearly described common deficiencies identified in the 2021 suicides that led to QIPs or identify in how many cases each deficiency was identified. *Id.*

This is not a mere technical violation of the Suicide Reporting Plan. Clearly and comprehensively identifying the common underlying deficiencies that led to QIPs is necessary for CDCR to identify and fix the policy violations or gaps which contributed to suicides in 2021—especially across institutions or programs—and discern whether specific suicide prevention measures are in need of improvement. The Court should require Defendants to further revise this section of their report (and Appendix B) to include this more detailed analysis.

**C.   Defendants Must Report on the Implementation of QIPs**

The Report is also deficient because it fails to clearly describe how many of the 2021 QIPs have been fully implemented. The Report also omits any discussion of what the barriers are to implementation for QIPs that have not yet been fully implemented, which the Suicide Reporting Plan requires be included. Suicide Reporting Plan at 14. Defendants declined to add this information in response to Plaintiffs' comments on the draft report, arguing that Plaintiffs can obtain additional information regarding QIP implementation by reviewing individual suicide reports and QIP reports. Defendants' Report at 9-10.

Defendants are wrong in asserting the QIP implementation information required by the Suicide Reporting Plan is duplicative. The information about QIPs available in individual QIP reports lacks the necessary macro-level examination of trends in QIP

implementation across the board that could identify common barriers to implementation essential for systemic improvement.

Defendants also fundamentally misunderstand the annual suicide reporting function, which is to provide transparent reporting to the Court, Special Master, Plaintiffs, and the public about suicide trends in CDCR and systemic efforts to fix deficiencies in suicide prevention strategies. Defendants do not file the individual QIP reports on the docket, either publicly or under seal, and the individual suicide reports that are lodged under seal are produced prior to the due dates for the QIPs, so provide no insight into their implementation. The Court should mandate that Defendants include an analysis of QIP implementation in their Report as a condition to approving it.

## II. DEFENDANTS' FAILURE TO PROVIDE ANALYSIS OF EMERGENCY RESPONSES IN A MANNER COMPARABLE TO THAT FOUND IN THE SPECIAL MASTER'S SUICIDE REPORTS EVIDENCES A LACK OF PREPAREDNESS TO TAKE OVER THE SUICIDE REPORTING FUNCTION

The Suicide Reporting Plan requires that Defendants report on "emergency response factors." Suicide Reporting Plan at 13. To track the content and analysis found in the Special Master's prior reports as required by the Suicide Reporting Plan, the Report must specifically include the number of cases involving each emergency-response related deficiency identified by suicide reviewers, the trend across years in the number of cases involving emergency response deficiencies, and discuss how many cases involved application of cuffs or restraints to patients before or during administration of emergency medical care as well as the trend over years in the number of such cases. *See* Special Master's 2020 Suicide Report at 27-28; Special Master's 2019 Suicide Report (Jul. 16, 2021), ECF No. 7239 at 33-34 ("Special Master's 2019 Suicide Report").

Defendants' Report falls far short of meeting these requirements. In fact, it contains only *one sentence* about emergency response issues in 2021 suicides: "Reviewers had concerns focused on emergency response in 3 of the 15 suicide death cases during 2021 to include cut-down tool issues, donning Personal Protective Equipment, and delay to call 911." Defendants' Report at 96. The Report does not identify how many 2021 cases

involved each emergency-response-related deficiency, and does not analyze the trend over years in cases involving emergency response deficiencies or address whether 2021 cases involved application of restraints to patients before or during provision of emergency medical care. *Id.* This is true even though Plaintiffs identified three 2021 suicides involving the improper use of restraints by staff during the emergency response in a March 1, 2022 letter to Defendants, to which Plaintiffs received no response.

Plaintiffs requested that Defendants add this information into the final Report. Defendants' Report at 32-33. Defendants declined to do so, claiming they would include more comprehensive discussions of emergency response issues in future reports as regional SPRFIT coordinators gather more information. *Id.* at 10. Defendants' response implies that they currently lack the information necessary to report the required information. *Id.* But Defendants' own suicide documentation already includes this information, and the Special Master's annual suicide reports have included detailed reporting on emergency response deficiencies for years, without the support of regional SPRFIT coordinators. *See* Special Master's 2020 Suicide Report at 27-28; Special Master's 2019 Suicide Report at 33-34.

The emergency response process is one of the most critical aspects of suicide prevention. Defendants' refusal to report to the Court information about this major issue as required by the Suicide Reporting Plan does not evidence the transparent, thorough reporting necessary for Defendants to take over the suicide reporting function permanently. The Court should require Defendants to incorporate this analysis into their 2021 Report before it adopts it.

### III. DEFENDANTS' REPORT LACKS REQUIRED ANALYSIS OF 2021 SUICIDES

Defendants' Report fails to include some required analysis of 2021 suicides. Defendants' Report lacks statistics and trends of suicides along several metrics found in the Special Master's prior reports that Defendant's report must track, including: (1) inadequate and absent mental health assessments, *see, e.g.,* Special Master's 2020 Suicide

Report at 3, 25; Special Master's 2019 Suicide Report at 31; (2) failures of staff to communicate between disciplines regarding patients, *see, e.g.*, Special Master's 2020 Suicide Report at 27; Special Master's 2019 Report at 33; (3) patients in the Developmental Disability Program,[1] *see, e.g.*, Special Master's 2020 Suicide Report at 3, 22; Special Master's 2019 Suicide Report at 3, 28; and (4) failures to provide required mental healthcare related to the ongoing COVID-19 pandemic, *see, e.g.*, Special Master's 2020 Suicide Report at 26. *See* Defendants' Report at 70-85, 95-96.[2]

Defendants' response to this concern in Plaintiffs' comments on the draft report vaguely implies that these issues were not present in the 2021 suicides. *Id.* at 11. However, the Special Master's most recent reports demonstrate that these issues have been salient to CDCR suicides for years. *See, e.g.*, Special Master's 2020 Suicide Report at 3, 22, 25-27; Special Master's 2019 Suicide Report at 3, 28, 31, 33. Given this history, Defendants' Report must be clear. If the 2021 suicides did not involve any of these types of deficiencies or any incarcerated people in the Developmental Disability Program, then the Report should say that. Otherwise, the Report must include analysis of the 2021 suicides along these metrics to "track the contents and analysis found in the reports written by the Office of the Special Master." Suicide Reporting Plan at 13; *see also* Aug. 29, 2022 Order at 10 n.4 (providing that "[t]he content and analysis of the annual suicide reports will continue to cover the *same* topics" (emphasis added)).

---

[1] Defendants incorrectly claim that pages 33-34 of their Report (ECF No. 7615 at 73-74) contains analysis of 2021 suicides involving incarcerated people in the Developmental Disability Program. ECF No. 7615 at 11. Neither these pages, the surrounding pages, nor any other part of the Report contains this required analysis.

[2] Defendants assert that there were four 2021 suicides that involved a need for a higher level of care. Defendants' Report at 80. This despite the fact that Plaintiffs identified eight 2021 suicides that involved a failure to refer to a higher level of care in their March 1, 2022 letter to Defendants. Because the Report provides so little detail regarding the issues involved in the four 2021 suicides that Defendants identify, it is impossible to determine the reason for this large discrepancy between the parties' tallies of such suicides.

## IV. OTHER SECTIONS OF THE REPORT DEMONSTRATE THAT DEFENDANTS ARE NOT COMMITTED TO PROVIDING A NEUTRAL, SELF-CRITICAL ANALYSIS

The Court should order Defendants to make other significant revisions to their Report before agreeing to adopt it.

First, Defendants 2021 Report is required to include a discussion of suicides that occurred shortly after discharge from inpatient care, including providing the trend over years of suicides involving this issue. *See* Aug. 29, 2022 Order at 10 n.4; Suicide Reporting Plan at 13; Special Master's 2020 Suicide Report at 27; Special Master's 2019 Suicide Report at 11, 32-33. Defendants' Report includes only two sentences addressing 2021 suicides that occurred after discharge from inpatient care,[3] and the Report lacks the required analysis of the trend over years in such suicides found in the Special Master's prior reports. Defendants' Report at 81. Instead, the bulk of this section is a one-sided, self-congratulatory description of Defendants' new Suicide Risk Management Program (SRMP) that appears designed simply to signal that Defendants are addressing the problem without providing any details. The Report does not clearly explain the connection between the trend of suicides after discharges from inpatient care and the development of the SRMP. It also fails to explain why Defendants overhauled their prior program (called the High Risk Management Program), why the changes to the program are anticipated to improve outcomes, whether and how Defendants will monitor whether the overhauled program actually results in improved outcomes, or whether there is any evidence already available showing the impact of the overhauled program. *Id.* The Report must include these components in order for this section to be meaningful and useful.

Second, Plaintiffs dispute whether the short discussion on telehealth is warranted in a section of the Report titled "Progress in Identifying and Implementing Initiatives

---

[3] Defendants report that they identified only three patients who were discharged from inpatient care within twelve months of their deaths. Defendants' Report at 81. But in their March 1, 2022 letter to Defendants, Plaintiffs identified at least four patients who were discharged from inpatient care within approximately one month of their deaths in 2021. Defendants neither responded to that letter, nor explain the discrepancy in the report.

Designed to Reduce Risk Factors Associated with Suicide." Defendants' Report at 60, 64-65. CDCR embraced telehealth to meet staffing targets, not because of any evidence that telehealth prevents suicide. CDCR has pointed to no evidence from inside or outside of CDCR that the replacement of on-site clinicians with on-screen clinicians reduces the risk of suicide. CDCR's failure to staff on-site positions increases the isolation of incarcerated people from human contact, putting them further at risk.

## CONCLUSION

Permanently transferring the annual suicide reporting function to Defendants would be a significant step toward the long-term goal of self-monitoring in this case. Unfortunately, Defendants' 2021 Report demonstrates that Defendants are not yet ready for this significant responsibility.

Plaintiffs respectfully request that the Court decline to adopt Defendants' 2021 Report as drafted, and order Defendants to file a revised 2021 suicide report that contains all the content and analysis required by the Suicide Reporting Plan, including: (1) an analysis of QIP efficacy; (2) a clear and comprehensive list of common underlying problems that led to issuance of QIPs; (3) a clear summary of QIP implementation; (4) an analysis of emergency response problems comparable to that found in the Special Master's annual suicide reports; (5) an analysis of the 2021 suicide reports that involved the specific issues discussed in Section III, *supra;* (6) an analysis of suicides after discharge from inpatient care that is comparable to that found in prior Special Master reports; and (7) removal of the section on tele-mental health discussed in Section IV, *supra*. To the extent that Defendants are unable to report on any specific issue required by the Suicide Reporting Plan, Defendants should be required to state that plainly in the revised Report as well as to state the reason that they are unable to comply with the reporting requirement. Only with these necessary changes can the parties and Special Master engage in a meaningful discussion of Defendants' capability to permanently take over annual suicide reporting, as contemplated by the Court's August 29, 2022 order.

///

# CERTIFICATION

Plaintiffs' counsel certifies that he reviewed the following orders relevant to this filing: ECF No. 7609; ECF No. 7592; ECF No. 5850.

DATED: October 11, 2022       Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Michael S. Nunez*
    Michael S. Nunez

Attorneys for Plaintiffs