# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
   **Plaintiffs**

  **v.**                 **No. CIV S-90-0520 KJM DB P**

**GAVIN NEWSOM, et al.,**
   **Defendants**

**TWENTY-NINTH MONITORING ROUND REPORT - PART B: SPECIAL MASTER'S MONITORING REPORT ON THE INPATIENT MENTAL HEALTH CARE PROGRAMS AT THE CALIFORNIA DEPARTMENT OF STATE HOSPITALS**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
October 14, 2022

## ACRONYMS AND ABBREVIATIONS

ADLs: Activities of Daily Living

AIMS: Abnormal Involuntary Movement Scale

ART: Annual Review Training

C-SSRS: Columbia Suicide Severity Rating Scale

CBT: Cognitive Behavioral Therapy

CC I: Correctional Counselor I

CCWF: Central California Women's Facility

CDCR: California Department of Corrections and Rehabilitation

CDPH: California Department of Public Health

CHCF: California Health Care Facility

CHCF-PIP: California Health Care Facility – Psychiatric Inpatient Program

CIM: California Institution for Men

CIW: California Institution for Women

CIW-PIP: California Institution for Women – Psychiatric Inpatient Program

CMC: California Men's Colony

CMF: California Medical Facility

CMF-PIP: California Medical Facility – Psychiatric Inpatient Program

COAC: Clinical Operations Advisory Council

CPR: Cardiopulmonary Resuscitation

CQI: Continuous Quality Improvement

CSATF: California Substance Abuse Treatment Facility

CSP/LAC: California State Prison/Los Angeles County

DBT: Dialectical Behavior Therapy

i

DDP: Developmental Disability Program

DPS: Department of Police Services

DSH: Department of State Hospitals

DSH-Atascadero: Atascadero State Hospital

DSH-Coalinga: Coalinga State Hospital

DSH-Patton: Patton State Hospital

ECT: Electroconclusive Therapy

EMDR: Eye Movement Desensitization and Reprocessing

FTE: Full-Time Equivalent

GED: General Education Development

HAC: Hospital Advisory Council

HAS: Hospital Access System

HIPAA: Health Insurance Portability and Accountability Act

HSS: Health Service Specialist

ICF: Intermediate Care Facility

IDTT: Interdisciplinary Treatment Team

LRH: Least Restrictive Housing

MAPP: My Activity Participation Plan

MAT: Medication-Assisted Treatment

MHCB: Mental Health Crisis Bed

MIRC: Mortality Interdisciplinary Review Committee

MOU: Memorandum of Understanding

OCD: Obsessive Compulsive Disorder

OMHD: Offender with a Mental Health Disorder

PBSP: Positive Behavioral Support Plan

PBST: Positive Behavior Support Treatment

PC: California Penal Code

PC 1026: Not Guilty by Reason of Insanity

PC 2962: Offender with a Mental Health Disorder

PCR: Polymerase Chain Reaction

PIP: Psychiatric Inpatient Program

PRN: *Pro re nata**

PTCM: Psych Tech Case Manager

PTSD: Post-Traumatic Stress Disorder

PVSP: Pleasant Valley State Prison

QC: Quality Council

QIP: Quality Improvement Plan

QMT: Quality Management Teams

RJD: Richard J. Donovan Correctional Facility

RN: Registered Nurse

RVR: Rules Violation Report

SIR: Serious Incident Report

SQ: San Quentin State Prison

SQ-PIP: San Quentin State Prison – Psychiatry Inpatient Program

SVSP: Salinas Valley State Prison

---

* *Pro re nata* refers to medications patients are able to use as needed.

TCMP: Transitional Case Management Program

TOE: Treatment Outcome Expectation

TSI: Therapeutic Strategies and Interventions

UMC: Utilization Management Committee

UNA: Unmet Needs Assessment

VSP: Valley State Prison

WaRMSS: Wellness and Recovery Model Support System

WRAP: Wellness Recovery Action Plan

## TABLE OF CONTENTS

ACRONYMS AND ABBREVIATIONS ..................................................... i

INTRODUCTION ........................................................................ 1

PART I. ............................................................................... 11

    A. Update on the Special Master's Monitoring Activities and DSH-Related Policy
       Developments and Milestones ............................................... 12

      1. Update on the Special Master's Monitoring Activities............... 13

      2. Impact of COVID-19 on the Provision of Inpatient Mental Health Care at
         DSH Hospitals ........................................................... 13

      3. DSH Inpatient Staffing Plan .......................................... 17

      4. Update on DSH's Continuous Quality Improvement (CQI) Program....... 19

    B. Assessment of the Three Department of State's Hospitals Providing Care to
       *Coleman* Class ............................................................ 22

      1. Staffing............................................................... 23

      2. Access to DSH Facilities ............................................. 24

      3. Clinical Services and Treatment in Inpatient Programs: Treatment Planning,
         Group Therapy, and Individual Treatment .............................. 29

PART II. THE SPECIAL MASTER'S FINDINGS AT THE DEPARTMENT OF STATE
HOSPITALS ........................................................................... 37

    A. CENSUS ................................................................... 37

    B. STAFFING ................................................................. 39

    C. TREATMENT AND CLINICAL SERVICES ..................................... 44

      1. Interdisciplinary Treatment Teams (IDTTs)........................... 46

      2. Group Therapy ........................................................ 47

      3. Individual Treatment................................................. 50

      4. Psychiatric Services ................................................. 51

      5. Other Treatment Issues ............................................... 52

D.  QUALITY OF CARE IN THE HOSPITAL PROGRAMS.............................................. 55

E.  PATIENT ACCESS TO TREATMENT ........................................................... 56

Patient Orientation, Discretionary Program Status (DPS), and Stages:  Standards and
Procedures.........................................................................................56

F.  REFERRALS AND TRANSFERS.................................................................. 57

G.  ADMISSIONS AND DISCHARGES .............................................................. 57

H.  PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE........................... 58

Patient Disciplinary Process ................................................................... 58

I.  UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR
MISSES/SENTINEL EVENTS...................................................................... 59

J.  USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT ......... 60

K.  SUICIDE PREVENTION............................................................................. 61

L.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS......................... 63

M.  QUALITY MANAGEMENT AND UTILIZATION REVIEW ...................................... 63

N.  PATIENT COMPLAINTS/PATIENT SATISFACTION ................................................. 66

O.  *COLEMAN* POSTINGS................................................................................ 67

P.  LAUNDRY AND SUPPLY ISSUES ................................................................. 67

Q.  VISITATION/PRIVILEGES/TELEPHONE ACCESS.................................................... 68

R.  LAW LIBRARY ACCESS.............................................................................. 69

S.  MILESTONE CREDITS ............................................................................... 69

CONCLUSION AND RECOMMENDATIONS ........................................................... 70

RECOMMENDATIONS ....................................................................................... 72

APPENDIX A Activities of the Special Master Since the Submission of the Twenty-
Ninth Round Report – Part A:  Special Master's Monitoring Report on the Psychiatric
Inpatient Programs for Mental Health Patients of the California Department of
Corrections and Rehabilitation on  May 17, 2022 ..................................................... 73

APPENDIX B1 Atascadero State Hospital (DSH-Atascadero)..................................... 76

APPENDIX B2 Coalinga State Hospital (DSH-Coalinga)........................................................ 106

APPENDIX B3 Patton State Hospital (DSH-Patton) ................................................................ 125

APPENDIX C1 Atascadero State Hospital (DSH-Atascadero) Case Reviews ......................... 145

APPENDIX C2 Coalinga State Hospital (DSH-Coalinga) Case Reviews ................................ 154

APPENDIX C3 Patton State Hospital (DSH-Patton) Case Reviews......................................... 164

## INTRODUCTION

This report encompasses the Special Master's full review of the inpatient mental health care programs at the California Department of State Hospitals (DSH) facilities that provide treatment to patients incarcerated in California Department of Corrections and Rehabilitation (CDCR) institutions: Atascadero State Hospital (DSH-Atascadero), Coalinga State Hospital (DSH-Coalinga), and Patton State Hospital (DSH-Patton). The Special Master previously filed his Twenty-Ninth Round Monitoring Report Part A Report on CDCR's Psychiatric Inpatient Programs (PIPs) on May 17, 2022. ECF No. 7555 [hereinafter "PIP Report"]; *see* August 29, 2022 Order, ECF No. 7608 (adopting the Special Master's findings in the Special Master's 29th Round Monitoring Report Part A in full, referring the Special Master's first and second recommendations to focused discussions between the Special Master and CDCR Secretary Allison, and adopting the Special Master's third recommendation in full).

The monitor[1] conducted on-site inspections at DSH-Atascadero, DSH-Coalinga, and DSH-Patton with each program receiving two to three-day visits between February and March 2022. These were the first on-site monitoring tours of the DSH programs since the onset of the COVID-19 pandemic.

As in preceding reports, the monitoring focus areas were:

    A. Census

    B. Staffing

    C. Treatment and Clinical Services

    D. Quality of Care Issues in the Hospital Programs

---

[1] While the collected data and findings in this report reflect the findings of different monitoring teams, the various monitors are collectively referred to as "the monitor." The Special Master's staff of mental health experts are collectively referred to as "the monitor's expert."

E.  Patient Access to Treatment

F.  Referrals and Transfers

G.  Admissions and Discharges

H.  Patient Disciplinary Process and the Use of Force

I.  Unusual Occurrences/Serious Incidents/Near Misses/Sentinel Events

J.  Use of Observation Cells/Rooms, Seclusion, and Restraint

K.  Suicide Prevention

L.  Emergency Response and the Death Review Process

M.  Quality Management and Utilization Review

N.  Patient Complaints/Patient Satisfaction

O.  *Coleman* Postings

P.  Laundry and Supply Issues

Q.  Visitation/Privileges/Telephone Access

R.  Law Library Access

S.  Milestone Credits

Following the format of preceding inpatient reports, this report is comprised of two major sections.  Part I provides an update on the Special Master's monitoring activities and DSH-related policy developments and milestones.  Part I also provides updates to the five core areas[2] "defendants must address to sustain any progress that has been achieved related to problems with access to and the provision of adequate [inpatient] mental health care for" class members. Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates

---

[2] The five core areas are staffing vacancies, referrals and transfers, least restrictive housing placements, access to DSH facilities, and clinical services and treatment in inpatient programs. *See* ECF No. 5894 at 17-20 (identifying these five core areas).

of the California Department of Corrections and Rehabilitation, ECF No. 7039 at 11 [hereinafter Special Master's 2021 Inpatient Care Report].  Part II of this report contains the Special Master's summaries of his findings from the monitoring tours at the three DSH hospitals providing inpatient mental health care to *Coleman* class members.  The Special Master's individual summaries of his findings at each of the DSH hospitals are provided in Appendices B1-B3; his expert's record reviews for these programs are found in Appendices C1-C3.

**Response to Parties' Comments and Objections to the Draft Report**

On July 28, 2022, the Special Master provided the *Coleman* parties with a draft version of the Report ("Draft Report").  The parties were given 30 days to submit to the Special Master any comments or objections to the Draft Report.  On August 29, 2022, plaintiffs and defendants each submitted comments and objections to the Draft Report.  *See* Letter from Amy Xu, Esq., Plaintiffs' Counsel, to Special Master Lopes (Aug. 29, 2022), attached hereto as Exhibit A; Letter from Namrata Kotwani, Esq., Deputy Attorney General, to Special Master Lopes (Aug. 29, 2022), attached hereto as Exhibit B.

The Special Master carefully reviewed the parties' comments and objections and made changes to the final version of the Report as warranted.  The Special Master's responses to the parties' respective comments to the Draft Report are discussed in greater detail below.

**Plaintiffs' Response to the Draft Report**

In their comments to the Draft Report, plaintiffs urged the Special Master to "supplement the Conclusions and Recommendations section of the Draft Report to address the quality and quantity of inpatient mental health treatment being provided" to *Coleman* patients at DSH's inpatient programs.  Exhibit A at 1.  Specifically, plaintiffs requested that the Special Master include "more robust conclusions about the treatment and clinical services provided at DSH

hospitals and a recommendation directing the DSH defendants to develop a plan within 90 days
to remedy any deficiencies identified in the report." *Id.* at 3. While the Special Master shares
many of plaintiffs' concerns, he declined to revise the Report in response to this request.

While the monitor's expert identified deficiencies in the quantity and quality of inpatient
treatment provided to *Coleman* class members during the monitoring tours, the Special Master
has long recognized the vital role of the DSH hospitals to defendants' inpatient mental health
system and their relative adequacy compared to the CDCR PIPs.[3] *See, e.g.*, Special Master's
Report on Adequacy of Inpatient Mental Health Care for Inmates of the California Department
of Corrections and Rehabilitation, ECF No. 5156 at 51 ("Some general observations can be
drawn at this point. One is that at the two exclusively DSH-run programs at [DSH-]A[tascadero]
and [DSH-]C[oalinga], and at the exclusively CDCR-run program at the CIW PIP, treatment and
clinical services were better overall than they were at the combined DSH/CDCR-operated
programs at [SVSP-PIP], [CMF-PIP], and the CHCF[-PIP]."); Special Master's 2021 Inpatient
Care Report, ECF No. 7039 at 116 ("[T]he PIPs are underperforming in providing appropriate
mental health care to *Coleman* class members, and while the DSH hospitals provide more
appropriate care, class members encounter difficulties in gaining admission in their programs.").

As stated in the Draft Report, "[t]he potential negative impacts of the limited number of
hours of treatment offered to *Coleman* patients were mitigated in part by the presence of an

---

[3] Notably, in his PIP Report, the Special Master distinguished between "the dire conditions at
CDCR's three largest PIPs – CMF-PIP, CHCF-PIP, and SVSP-PIP (hereinafter collectively
referred to as the 'Lift and Shift PIPs')", ECF No. 7555 at 1, and the "relative adequacy of
inpatient mental health care provided at CIW-PIP and SQ-PIP." *Id.* at 160. The Special
Master's findings led to his recommendation that CIW-PIP and SQ-PIP be monitored via paper
review in the next monitoring round. *Id.* at 165; *see infra* note 4. For clarity and consistency
with the PIP Report, the Special Master changed one reference to the "CDCR PIPs" contained in
the Draft Report to refer specifically to the "Lift and Shift PIPs." *See infra* p. 72.

established therapeutic milieu where patients reported the treatment they were receiving was helpful." *See infra* p. 16.   Among other findings, the monitoring tours revealed "clinically adequate care considering COVID-19 limitations" delivered to *Coleman* patients as reflected in the monitor's expert's clinical case reviews at DSH-Atascadero.  *See infra* p. 34.  As the Draft Report made clear, "generally those *Coleman* class members who are admitted to DSH beds receive higher quality inpatient mental health care than what is provided in the Lift and Shift PIPs."  *See infra* p. 72.  The department's deployment of its "robust CQI process" is also expected to "bolster" the quality of care provided to *Coleman* patients in the next monitoring round.  *See infra* p. 72.

The Special Master shares plaintiffs' concerns with the deficiencies in treatment hours offered and delivered to *Coleman* patients and will continue to monitor these issues via paper review in the next monitoring round.  However, considering the totality of the findings reported on herein, the Special Master is satisfied that the deficiencies in the quality and quantity of treatment provided to *Coleman* class members can be addressed without the aid of additional targeted recommendations or court orders.

Plaintiffs also requested that the Draft Report's second recommendation – that the court order the Special Master "to review the DSH's hospitals via paper review in the next monitoring round" – be removed in light of the court's August 29th order.[4]  The Special Master concurs that this recommendation is no longer necessary in light of the court's recent order and, accordingly, removed the recommendation from the final Report.

---

[4] On August 29, 2022, the court issued an order adopting the findings contained in the Special Master's 29th Round Monitoring Report Part A, and ordered in part: "Going forward, the Special Master shall have full authority to determine how he will accomplish his monitoring duties at each institution and he may proceed by institutional visits, paper review, or some combination of the two, without seeking further leave of court."  ECF No. 7608 at 6.

**Defendants' Response to the Draft Report**

In their preliminary comments and objections, defendants identified "a few points of clarification and comments concerning the Report and request[ed] that the Report be revised accordingly."  Exhibit B at 1.

*Access to DSH and Inpatient Transfers*

First, defendants requested clarification to the Draft Report's discussion of *Coleman* patients' access to DSH hospitals and argued the Draft Report's discussion of relevant case history regarding *Coleman* patient access to DSH hospitals was "misleading."  *See* Exhibit B at 1-2 ("[T]he [Draft] Report fails to describe DSH's continued and ongoing success of admitting almost all referred patients within 30 days since the lift-and-shift in 2017. . . . Except for COVID-related delays, DSH has an almost 100% rate of timely transfers to inpatient care for patients accepted for referral."); *id.* at 2 (arguing the Draft Report's reference to the court's orders requiring utilization of *Coleman*-designated beds at DSH-Atascadero was "misleading because DSH accepts all appropriate *Coleman* referrals for treatment at its facilities and did so during the monitoring period."); *id.* at 3 (requesting the Draft Report's discussion of transfer timeline compliance at DSH-Atascadero be clarified "to emphasize that almost all delays in transfers occurred during pandemic surges when patients were quarantined.").

Rather than present "misleading" information, the Draft Report provided a brief overview of important historical developments regarding access to inpatient care to place this Report's findings in proper context.  *See infra* pp. 11-12.  Moreover, the Draft Report included a section discussing the COVID-19 pandemic's continuing impact on *Coleman* class members' access to DSH hospitals.  *See infra* pp. 13-17.  Among other observations, this section of the Draft Report highlighted positive developments since the preceding monitoring round, including the

significant reduction in the inpatient waitlist for DSH's three hospitals with *Coleman*-designated beds and compliance with transfer timelines for two of the three DSH hospitals during the review period. *See infra* pp. 13-15.[5]  Regarding referrals to inpatient care, the Draft Report appropriately reserved judgment regarding the adequacy of defendants' referral process in light of the ongoing court-ordered unidentified needs assessment. *Infra* p. 15.  While the Special Master disagrees that the Draft Report was at all misleading, for clarity, language was added to a footnote to highlight defendants' progress in improving transfer timeline compliance prior to the onset of the COVID-19 pandemic. *See infra* note 9.

*Staffing Vacancies*

Regarding the Draft Report's discussion of clinical vacancy rates at DSH-Atascadero, defendants requested the final report "reflect that the vacancy rate for psychiatrist positions when including contract psychiatrists is ten percent."  Exhibit B at 2; *see also id.* at 4.  The Special Master did not revise this discussion in the Report because, in documents submitted to the monitor in advance of the monitoring tour, DSH-Atascadero reported an 11 percent functional vacancy rate for psychiatry, including contractors.  Likewise, the Draft Report accurately reported the functional vacancy rate in nursing reported to the monitor by DSH-Atascadero (31 percent).  In response to defendants' concerns, Exhibit B at 4, the final Report includes a clarifying footnote with DSH's explanation that "[A]t the time of the Special Master's Experts'

---

[5] Documentation provided to the monitor prior to the monitoring tour at DSH-Atascadero (the only DSH hospital where noncompliance with inpatient transfer timelines was reported) did not allow for confirmation of DSH's statement that "almost all delays in transfers occurred during pandemic surges when patients were quarantined."  However, the Draft Report noted that DSH-Atascadero staff attributed delays in *discharges* from the hospital to "COVID-19 quarantines at either DSH-Atascadero or receiving CDCR institutions."  *Infra* p. 56.

visit, the hospital-wide vacancy rate was 18%. The vacancies are balanced among the programs offered at the institution." *Infra* note 32.

*Group Treatment Hours*

Defendants noted the Special Master's expert's calculation of average weekly hours of core group treatment attended (5.38 hours per patient per week) at DSH-Atascadero conflicted with the department's CQI data (5.85 hours per patient per week). Exhibit B at 3. It should be noted the Special Master's expert's independent calculation of average treatment hours attended was necessitated by an anomaly in the data DSH provided in advance of the monitoring tour. *See* Appendix B1 at 87 (describing data provided to the monitor's expert indicating *Coleman* patients on average attended significantly more hours of "core groups" per week (12 hours per patient per week) than were offered (7.1 hours per patient per week)). While the source of the discrepancy between the monitor's expert's calculation and DSH's CQI data is unclear, the Final Report includes a footnote indicating DSH reported its CQI data reflected an average of 5.85 hours of core group treatment attended during the review period. *Infra* note 34.

*Individual Treatment*

Regarding the Draft Report's discussion of individual treatment, DSH requested revisions to acknowledge their legal argument that "utilizing group therapy over individual therapy after the application of sound clinical judgment is not a violation of Eighth Amendment or evidence of inadequate care." Exhibit B at 3. The Special Master declined to revise the Report to incorporate this legal argument.

In addition, DSH noted that individual treatment is provided to *Coleman* patients "when clinically indicated" and group treatment is provided "when clinicians believe a patient will benefit and clinical goals will be appropriately met through group therapy." *Id.* The Special

Master did not revise the Draft Report's discussion of the paucity of individual treatment provided at the DSH hospitals.

Finally, DSH requested the final Report to "note that DSH's utilization of the group therapy model was required by the remediation under the Civil Rights of Institutionalized Persons Act (CRIPA)." The Special Master included a footnote acknowledging DSH's comments regarding its CRIPA remedial efforts. *Infra* note 28.

*Clinical Case Reviews*

DSH objected to the Special Master's expert's findings in two clinical case reviews: one from DSH-Coalinga (Patient A) and one from DSH-Patton (Patient E).

Regarding DSH-Coalinga Patient A, DSH stated: "Patient A's treatment was found to be inadequate because a psychologist's initial assessment recommended biweekly individual therapy which was not provided." Exhibit B at 5. Contrary to DSH's assertion, the Special Master's expert did not determine the care provided to this patient to be inadequate *solely* on the lack of individual treatment provided during the review. The lack of individual treatment was one of several inadequacies identified in this case review. The findings of inadequacy reflected the Special Master's expert's findings after a thorough review of the patient's health record, which also evidenced failure to modify the patient's treatment plan in response to ineffectiveness and the lack of group treatment provided. *See* Appendix C2 at 156. Accordingly, the Special Master declined to modify the findings from the case review.

Regarding DSH-Patton Patient E, DSH objected to the Draft Report's discussion of the contradictory information regarding the patient's level of suicide risk: "The fact that the records reflect Patient E's fluctuating suicide risk is not an indication of inadequate care or cause for concern, and those assertions should therefore be removed from the Report." Exhibit B at 6.

The Special Master's expert's finding of inadequacy was not based solely on the presence of fluctuating suicide risk documented in the patient's record, but also the lack of "evidence-based interventions such as Dialectical Behavioral Therapy or a behavioral plan to reduce engaging in self-harm and dealing with frequent suicidal ideation."  Appendix C3 at 171.  Accordingly, the Special Master declined to revise his expert's findings in this clinical case review.

*Additional Points of Clarification*

Defendants requested several clarifications to the Draft Report.  In response, the final Report incorporates clarifications regarding: the use of the term "out-of-cell", Exhibit B at 2; the description of DSH-Atascadero unit 24 as an "admissions unit," *id.* at 3; the role of psychiatric technicians in scheduling groups, *id.* at 5; and the description of DSH-Patton's *Coleman* unit containing "licensed acute care beds," *id.* at 4.  *See infra* pp. 16, 38, 47, 127.  The final Report also includes a footnote noting that DSH reported the lack of psychiatry representation on DSH-Atascadero's Suicide Prevention Committee was remedied after the monitoring tour at DSH-Atascadero.  *See infra* note 33.

The Special Master declined to modify the discussion of the DSH treatment team composition as requested, Exhibit B at 2, because the Draft Report accurately reported the contents of the department's Staffing Plan as filed with the court.  *See* ECF No. 7078-1 at 1 ("DSH uses an interdisciplinary clinical treatment team approach to provide inpatient psychiatric treatment.  The *core team includes the treating psychiatrist, psychologist, clinical social worker, and rehabilitation therapist*.") (emphasis added).

Finally, DSH-defendants objected to the Draft Report's discussion of inappropriate clinical interactions observed during IDTTs at DSH-Patton and requested that "such observations … be raised contemporaneously so they may be addressed immediately."  Exhibit B at 4.  The

10

Draft Report's discussion speaks for itself, *infra* p. 131, and, for the record, the monitor's expert brought these concerns to DSH-Patton institutional leadership and DSH headquarters staff contemporaneously.

## PART I.

*Coleman* class members' access to inpatient mental health care at DSH hospitals has long been an issue of critical significance throughout the history of this case.  *See generally* Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the CDCR, ECF No. 5448 at 24 [hereinafter "Special Master's 2016 Inpatient Care Report"] ("Access to inpatient care at DSH-Atascadero for CDCR inmates has been particularly problematic throughout the history of *Coleman*.  It was identified in the *Coleman* remedial order of 1995 and persists to this day."); *see id.* at 24-40; *see also* June 27, 2006 Order, ECF No. 1855 at 2 ("[DSH] plays a critical role in creating sustainable and effective solutions for inpatient care within the California Department of Corrections and Rehabilitation … [and] for multiple reasons, [DSH] is failing to address specific court-ordered remedies.").  Repeatedly confronted with either low utilization of *Coleman*-designated DSH beds, long waitlists for inpatient care, or both, by the end of 2015 the court had issued more than a dozen orders requiring DSH to utilize available beds at DSH-Atascadero for *Coleman* class members.  *See* Special Master's 2016 Inpatient Care Report, ECF No. 5448 at 36-38 (citing 13 court orders issued between May 1998 – August 2015 requiring utilization of intermediate care beds at DSH-Atascadero for *Coleman* class members).[6]  While inadequate access to DSH programs has been persistent and well-

---

[6] For instance, in response to a low census of *Coleman* patients in DSH-Atascadero beds in 2007, *see* June 28, 2007 Order, ECF No. 2301 at 3 ("Defendants are providing to class members only twenty-six percent of the beds at [DSH-Atascadero] called for by their [2006 bed] plan.  That is unacceptable."), the court ordered defendants to develop "a plan for making available the full complement of 231 intermediate care beds for *Coleman* class members referred to [DSH-

documented in this case, for patients who do receive care in DSH hospitals, the Special Master previously described DSH-Atascadero and DSH-Coalinga as "constant performers for the *Coleman* class." ECF No. 7039 at 20.

### A.    Update on the Special Master's Monitoring Activities and DSH-Related Policy Developments and Milestones[7]

The three DSH hospitals with beds dedicated to providing inpatient mental health care to *Coleman* class members remained vital components of defendants' inpatient mental health system during the review period. Similar to the preceding monitoring round, restrictions on programming and patient movement secondary to the COVID-19 pandemic negatively impacted both access to and provision of inpatient mental health care to *Coleman* class members at DSH hospitals. Subpart I.A.1 provides an update on the Special Master's monitoring activities since the filing of his PIP Report in May 2022. Subpart I.A.2 discusses the impact of the COVID-19 pandemic on the provision of care at DSH hospitals.

In addition, progress was made both on DSH's staffing plan and DSH's continuous quality improvement program during the review period. Subparts I.A.3 and I.A.4 provide updates on both of these important components of DSH's inpatient program.

---

Atascadero] for treatment." *Id.* at 4. In a June 18, 2009 order, the court approved defendants' short- and intermediate-term plans to "provide a full complement of 256 intermediate care beds at [DSH-Atascadero] to *Coleman* class members…subject to the condition that [DSH] will admit *Coleman* class members to those beds at a rate of not less than ten per week until all 256 beds are filled by Coleman class members not later than October 31, 2009." ECF No. 3613 at 4.

[7] Activities of the Special Master Since the Submission of the Twenty-Ninth Round Report – Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for Mental Health Patients of the California Department of Corrections and Rehabilitation on May 17, 2022, Appendix A.

### 1. <u>Update on the Special Master's Monitoring Activities</u>

As noted in the PIP Report, "the Special Master's monitoring responsibilities are extensive." ECF No. 7555 at 38. Significant developments since the filing of the PIP Report include the conclusion of discussions among the Special Master and parties regarding CDCR's Annual Suicide Report Proposal, resolving a longstanding dispute regarding the use of the terms "foreseeable" and "preventable" in the annual suicide report in this case. *See* ECF No. 7574 at 13-15. With the agreement of the parties, the Special Master recommended provisionally delegating the annual suicide report writing responsibilities to CDCR. This significant milestone capped off seven years of negotiations and will position defendants to demonstrate their ability to self-monitor suicides occurring in their institutions.[8]

In addition, the Special Master and his expert continued to supervise defendants' court-ordered unidentified needs assessment (UNA). September 13, 2021 Order, ECF No. 7305 at 15-16. At the time of the writing of the Draft PIP Report, the UNA was still in the planning stages. ECF No. 7555 at 64. The UNA commenced on April 4, 2022 with the start of the Phase 1 review at the Richard J. Donovan Correctional Facility (RJD). As of the time of this writing, UNA reviews at the remaining institutions were scheduled to be completed in November 2022. Defendants are under court order to file a "written report on the results of the unmet bed needs assessment" by December 31, 2022. February 25, 2022 Order, ECF No. 7477.

### 2. <u>Impact of COVID-19 on the Provision of Inpatient Mental Health Care at DSH Hospitals</u>

#### a. **Impact on Waitlists, Transfers, and Referrals**

---

[8] The court adopted the Special Master's Report Regarding CDCR's Proposal for Assuming the Annual Suicide Report in an August 2, 2022 order, ECF No. 7598, and CDCR filed its 2021 annual suicide report on September 29, 2022. ECF No. 7615.

During the review period, the COVID-19 pandemic continued to impact access to inpatient care, though waitlists and transfer timelines to DSH hospitals improved compared to the first year of the pandemic.[9]  The Special Master's expert continued to closely monitor referrals, admissions, and transfers to DSH hospitals through the DSH small workgroup established in the early weeks of the COVID-19 pandemic.  Throughout the review period, DSH provided periodic written notice to the Special Master and plaintiffs regarding the quarantine status of *Coleman*-designated housing units at DSH hospitals and updates to COVID-19-related policies.

Compared to the preceding monitoring round, waitlists for transfer to DSH were significantly lower in recent months, as reflected in defendants' monthly inpatient census, waitlist and transfer reports.  *See, e.g.*, ECF Nos. 7590 at 7 (reporting a total of four *Coleman* patients awaiting transfer to DSH hospitals, with none waiting beyond Program Guide transfer timelines as of June 27, 2022); 7552 at 6 (reporting a total of six *Coleman* patients awaiting transfer to DSH hospitals, with none waiting beyond Program Guide transfer timelines as of April 25, 2022).  Moreover, transfers to DSH-Coalinga and DSH-Patton were compliant with Program Guide transfer timelines and transfers to DSH-Atascadero were timely in 87 percent of

---

[9] In his 2021 Inpatient Care Report, the Special Master noted "defendants had maintained their 'substantial strides in timely transferring referred patients to acute and intermediate care' that was reported in the 2018 Inpatient Care Report."  ECF No. 7039 at 41.  The Special Master also described the myriad of impacts of the COVID-19 pandemic on inpatient mental health programming generally and referral and transfer to DSH hospitals specifically.  *See, e.g.*, *id.* at 20-28.  Significantly, in the preceding monitoring period, DSH-defendants closed the three *Coleman*-designated hospitals to *Coleman* class member admissions for 30 days in an effort to prevent the introduction of COVID-19 into DSH facilities.  *Id.* at 21.  After DSH reopened to *Coleman* class member admissions in April 2020, referrals to DSH dropped precipitously and significant numbers of *Coleman*-designated beds remained empty.  *Id.* At 42.  Despite the drop in referrals, waitlists for DSH programs remained high throughout 2020.  *See id.*; *see also* PIP Report, ECF No. 7555 at 57-58.

cases.  *Infra* p. 57 ("Of 101 referrals resulting in transfer to DSH-Atascadero, 88 or 87 percent

transferred timely.  The 12 patients who transferred to DSH-Coalinga all transferred timely.  All

eight patients referred to DSH-Patton's were accepted and transferred timely.").

Referrals to DSH hospitals decreased compared to the prior review period.  *Infra* p.57

("The 115 male patients who were referred to DSH represented a 65 percent decrease from the

prior review period.").  Similarly, patient censuses at DSH-Atascadero and DSH-Coalinga

remained low during the review period and have yet to approach pre-pandemic levels.[10]  *See*

*infra* p. 38 ("[D]uring the site visit *Coleman* patients comprised 53 percent of [DSH-

Atascadero's *Coleman*-designated] bed capacity. . . . DSH's current *Coleman* patient population

had markedly decreased by 45 percent since the prior review.");  *see also* ECF No. 7039 at 21-22

(discussing "a steady and, at times dramatic, decline in class member admissions after" DSH's

March 2020 closure of DSH hospitals to *Coleman* patients secondary to the COVID-19

pandemic).  While the low levels of referrals to inpatient care could reflect systemic problems

identifying and referring patients in need of higher levels of care, as the Special Master noted in

the PIP Report, "[i]t is premature to reach conclusions regarding the adequacy of access to

inpatient care generally and DSH programs specifically" because the court-order UNA is

ongoing.  ECF No. 7555 at 64.[11]

---

[10] As the Special Master has observed at various times during the course of this case, consistent
utilization of *Coleman*-designated beds –particularly those at DSH-Atascadero – is necessary to
ensure the proper, efficient operation of defendants' inpatient mental health system. Large
numbers of vacant beds have historically "reflect[ed] a larger issue of class members not being
referred for inpatient care." ECF No. 7039 at 26.

[11] *See also* ECF No. 7555 at 62 ("The unmet needs assessment will provide the court, Special
Master, and parties with information sufficient to determine whether the 'red flags' identified by
the court [in a September 13, 2021 order] are indeed the result of chronic and continuing
inadequacies in defendants' referral process.  On the other hand, the unmet needs assessment
could reveal that CDCR's referral process is adequate and that there is no unmet need for
inpatient care.").

### b.    Impact on Provision of Inpatient Mental Health Treatment

At each DSH hospital with *Coleman*-designated beds, restrictions on mental health

programming and treatment designed to mitigate the spread of COVID-19 limited the amount of

structured treatment offered to class members during the review period.  For instance, at DSH-

Atascadero, the "treatment mall" was closed secondary to COVID-19-related mitigation policies.

Appendix B1 at 83-84 (discussing the impact of the closure of DSH-Atascadero's treatment mall

on the amount of treatment offered to *Coleman* patients).  Prior to the COVID-19 pandemic,

DSH-Atascadero patients received treatment, privileges, and participated in activities consistent

with their Hospital Access System (HAS) level in the "treatment mall."  With the closure of the

"treatment mall," treatment was provided in housing units during the review period and was

therefore subject to the availability of treatment space in the housing units.  *Id.*  Consequently,

inpatient mental health treatment provided to *Coleman* patients residing at DSH-Atascadero

during the review period was quantitatively inadequate.  *See infra* p. 84 (DSH-Atascadero's

group "treatment hours were inadequate for an inpatient setting but were acceptable in the

context of current COVID-19 limitations.").

The potential negative impacts of the limited number of hours of treatment offered to

*Coleman* patients were mitigated in part by the presence of an established therapeutic milieu

where patients reported the treatment they were receiving was helpful.  *See infra* pp. 89-90

("Seven Unit 30 patients interviewed in two group settings about their experiences at DSH-

Atascadero uniformly agreed that the hospital's treatment program benefited them and was better

than the treatment offered at CDCR. . . . They described very good access to the psychiatrist and

other clinicians and did not indicate medication management issues.  Patients generally described

treatment groups as helpful.").  Moreover, the Special Master's expert's review of medical

records revealed adequate care being provided to *Coleman* patients at DSH-Atascadero taking

16

into consideration limitations on treatment hours secondary to the pandemic. *See infra* p. 34. As COVID-19 limitations are lifted as appropriate, DSH will need to increase the hours of structured therapeutic treatment offered to *Coleman* patients.

### 3.    DSH Inpatient Staffing Plan

As the Special Master noted in the PIP Report, the court provisionally approved DSH's inpatient staffing plan[12] on March 26, 2021. ECF No. 7555 at 55 (citing ECF Nos. 7078, 7108). DSH's staffing plan described the composition of the treatment team, including one of each of the following disciplines: psychiatry, psychology, clinical social work, and rehabilitation therapy. ECF No. 7078-1 at 1.[13] DSH provided an update "on how DSH maintains compliance

---

[12] In its March 8, 2017 order adopting the Special Master's 2016 Inpatient Care Report, the court ordered DSH to "continue to work on their staffing plan for their inpatient programs that treat *Coleman* class members." ECF No. 5573 at 3. Moreover, "[t]he plan should be developed in coordination with CDCR's development of its own mental health staffing plan … under the guidance of the Special Master." *Id.* In an October 10, 2017, order, the court directed the "DSH defendants to complete development and full implementation of their mental health staffing plan within the one-year time frame set by this order." ECF No. 5711 at 29. In 2018, DSH shared several draft staffing plans to the Special Master, though the Special Master found those draft plans to be deficient. *See* Special Master's 2021 Inpatient Care Report, ECF No. 7039 at 38 ("The plans submitted by DSH were wholly inadequate. They were ill-thought out, poorly crafted, concept papers, most generously described as a plan for a plan."); *see also* DSH Inpatient Staffing Plan, ECF No. 7078-1 at 1 ("DSH provided its initial staffing plan to the *Coleman* court in July 2016, to which the Special Master expressed concerns over the plan's level of detail."). After a series of all-parties meetings on various draft staffing plans in 2018, discussions on DSH's staffing plan were paused until CDCR completed its staffing plan. *Id.* Thereafter, proceedings related to Dr. Michael Golding's whistleblower report stalled further development of DSH's staffing plan. *Id.* at 39.

[13] Notably, in several places the staffing plan identified individual treatment as part of DSH's treatment planning process. *See* ECF No. 7078-1 at 1 ("Each discipline within the treatment team works together to develop a treatment plan, diagnosis, delivery of *one-to-one* and group treatment, goal setting and medication management.") (emphasis added); *id.* at 4 ("The majority of time and requirements are for long-term treatment goals and objectives that are identified and monitored through monthly treatment plans and conferences and advanced with various therapeutic interventions and treatment modalities such as group and *individual therapy*.") (emphasis added). However, as noted in the report, individual treatment is seldomly provided to *Coleman* class members receiving inpatient mental health care in DSH hospitals.

with staffing orders and ratios, addresses natural staff attrition, and the steps it has taken when staffing levels fluctuate." *Id.*  Further, the staffing plan discussed the staff-to-patient ratio of 1:35 for *Coleman* intermediate care units, established in 2012, and the number of treatment teams (12) allocated across the three DSH hospitals providing inpatient mental health care to *Coleman* class members.  *Id.* at 1-2.  Based on a staffing study commissioned by DSH, California's enacted 2020-2021 state budget partially funded a proposal which would in part result in a revised staff-to-patient ratio of 1:30 for *Coleman* intermediate care units and the addition of one treatment team across the three hospitals.  *Id.* at 3-6.[14]

The DSH staffing plan also provided information on the department's efforts to increase compensation for psychiatrists, *id.* at 9, and describes the department's internship, fellowship, and residency programs, *id.* at 7-9, which "act as a feeder into the DSH system."  *Id.* at 7.  Finally, the DSH staffing plan described the department's efforts to recruit and retain clinical staff.  *Id*. at 11-14.

This Report includes findings regarding clinical staffing at the three DSH hospitals, including compliance with the DSH staffing plan's revised clinician-to-patient ratios.  *See infra* pp. 39-43.  The Special Master previously described the filing of DSH's staffing plan as a "milestone" in this case.  Special Master's Twenty-Ninth Monitoring Round Report – Part A, ECF No. 7555 at 39.  Given the myriad of challenges defendants face with clinical staffing for all disciplines, compliance with DSH's staffing plan will need to be monitored going forward.  In accordance with the court's March 26, 2021 order, this Report includes the Special Master's recommendation regarding DSH's staffing plan.  *See infra* p. 72.

---

[14] "Additionally, the new [staff-to-patient] ratio [of 1:30] will only impact DSH-Atascadero's allocated positions since it increases the required staffing levels above what they are currently allocating."  ECF No. 7078-1 at 6.

4.    **Update on DSH's Continuous Quality Improvement (CQI) Program**

It is well settled that "an adequate quality improvement process is…an essential component of the remedy" in this case.  July 1, 2021 Order, ECF No. 7216 at 3; *see Coleman v. Wilson*, 912 F. Supp. 1282, 1308 (E.D. Cal. 1995) ("A quality assurance program and a quality improvement process are required parts of the remedy in this action.").  In his 2016 Inpatient Care Report, the Special Master observed: "What the *Coleman* court and the Special Master have said with regard [to] the importance of a sound quality improvement program for the treatment of *Coleman* class members in CDCR mental health programs holds no less true for those class members who are being treated within the DSH inpatient programs." ECF No. 5448 at 81.[15]

DSH's continuous quality management structure at the time of the Special Master's 2016 Inpatient Care Report "did not equip DSH with the ability to diagnose and resolve on a lasting basis its problems with the quality of care delivered at its five programs for *Coleman* class members."  ECF No. 5448 at 82.  Deficiencies in analyzing performance indicators, identifying improvement opportunities, generating "meaningful reports" on improvement opportunities, and implementing lasting remedies were noted.  *Id.*  Specific deficiencies with the interdisciplinary treatment team (IDTT) process at DSH's programs were noted.  *See id.* at 83  ("There was no evidence that DSH's quality management systems presently in place provided the requisite capacity to diagnose and resolve these and other IDTT-related issues.").

---

[15] Importantly, the 2016 Inpatient Care Report was filed prior to the Lift-and-Shift, wherein CDCR assumed responsibility for operating the California Medical Facility - Psychiatric Inpatient Program (CMF-PIP), the Salinas Valley State Prison - Psychiatric Inpatient Program (SVSP-PIP), and California Health Care Facility – Psychiatric Inpatient Program (CHCF-PIP), which had previously been managed by DSH.  Accordingly, the 2016 report acknowledged that the California Institution for Women – Psychiatric Inpatient Program (CIW-PIP) and the San Quentin State Prison – Psychiatric Inpatient Program (SQ-PIP), as "inpatient programs developed and operated by CDCR," were subject to CDCR's continuous quality improvement process.  ECF No. 5448 at 81 n.33.

Based in part on these findings, the Special Master recommended that the court order DSH to develop a plan to create a continuous quality improvement process for its inpatient programs providing services to *Coleman* class members. *Id.* at 121. As the Special Master made clear, "development of a sound quality improvement program for use within DSH is not only indicated, but is critical to resolving in a lasting way the array of issues with the care delivered in those programs that are discussed in this report." *Id.* at 81. Finally, "[f]rom a more long-term perspective, an effective continuous [quality improvement] program is a critical step towards assumption of self-monitoring and eventual removal from court oversight." *Id.* at 83.

The court adopted the Special Master's 2016 inpatient care report, including his recommendation that DSH develop a plan for the creation of a continuous quality improvement process, in a March 7, 2017 order. ECF No. 5573 at 3. DSH defendants were directed to "utilize CDCR as its consultant in this endeavor, availing themselves of the expertise and strategies developed by CDCR staff and the progress achieved thus far by CDCR in its development of its own CQI process." *Id.*; *see* Special Master's 2016 Inpatient Care Report, ECF No. 5448 at 81-82 (discussing potential benefits of DSH "coordinat[ing] and partner[ing] with CDCR's CQI process…").

In early 2021, the Special Master's expert reconvened meetings with DSH clinicians to consult with them about DSH's continuous quality improvement process. *See* Email from Lucas Hennes, Deputy Attorney General to Special Master Lopes, February 11, 2021, attached hereto as Exhibit C. DSH shared sample CQI reports with the Special Master's expert. In DSH's summary of its CQI process, the department provided an overview of its "clinically driven approach" to CQI. *See* Email from Namrata Kotwani, Deputy Attorney General to Special Master Lopes, September 23, 2021, attached hereto as Exhibit D at 29. DSH indicated its CQI

20

program consists of "four major components: the Clinical Operations Division, the Quality Improvement Division, the Patient Safety Organization / Patient Safety Evaluation System, and local efforts at each state hospital." *Id*.  Moreover, DSH described its "Statewide Indicator Revision Project," which began in April 2021 "to implement recommendations regarding the revision and standardization of statewide indicators from the *Coleman* Special Master team." *Id*. at 38.

During the consultations with DSH, the Special Master's expert found DSH's CQI process and the reports resulting therefrom to be not only adequate, but also comprehensive— which was a marked improvement from the earlier iterations of DSH's CQI program.  It was clear at that time that DSH had carefully considered the Special Master's expert's prior feedback regarding the department's CQI process and made substantive improvements to their process.

After the conclusion of discussions with the Special Master's expert, on September 23, 2021, DSH distributed a document summarizing its CQI process, a template of its Governing Body Report, and Governing Body Reports for each of the three DSH hospitals providing inpatient mental health care to *Coleman* patients covering July 2020 – December 2020 to plaintiffs' counsel.  *See* Exhibit D.[16]  In an October 19, 2021 letter to DSH, plaintiffs' counsel provided comments and questions about DSH's CQI process and the documents provided on September 23, 2021.  *See* Email from Thomas Nolan, Plaintiffs' Counsel to Special Master Lopes, October 19, 2021, attached hereto as Exhibit F.  The Special Master and parties met to discuss DSH's CQI process and address plaintiffs' comments, questions, and concerns on

_____

[16] DSH subsequently provided Governing Body Reports for DSH-Atascadero, DSH-Coalinga, and DSH-Patton covering January 2021 – June 2021 via email on September 28, 2021.  *See* Email from Namrata Kotwani, Deputy Attorney General to Special Master Lopes, September 28, 2021, attached hereto as Exhibit E.

January 7, 2022, and June 21, 2022.  On July 5, 2022, during an All-Parties' meeting, plaintiffs' counsel confirmed their satisfaction with the adequacy of DSH's CQI process.

B.     **Assessment of the Three Department of State's Hospitals Providing Care to *Coleman* Class**

Assessment of the DSH hospitals focused on staffing, access to DSH facilities, referrals and transfers, admissions, and clinical services, each of which is discussed in detail below. Evaluation of clinical services at each of the three DSH hospitals showed that treatment planning, group therapy, individual treatment, and the quality of care provided to *Coleman* class members varied.

As reported above, a staffing study commissioned by DSH resulted in the enactment of state budget 2020-2021 that partially funded a proposal which would result in a revised staff-to-patient ratio of 1:30 for *Coleman* intermediate care units at each hospital, along with the addition of one treatment team at DSH-Atascadero.  The Twenty-Ninth Monitoring Round's site visits to the *Coleman* units at DSH hospitals found DSH-Atascadero struggling to comply with the DSH staffing plan, while DSH-Coalinga and DSH-Patton were compliant.

Access to DSH hospitals is integral to providing appropriate inpatient care to *Coleman* class members and ending court oversight.  As is discussed in detail below, the designated *Coleman* beds were significantly underutilized during and, after the review period, continued a trend that began at the start of the COVID-19 pandemic.  As noted, the ongoing UNA study will provide the court, Special Master, and parties with information on the extent of any unmet need for higher levels of care among *Coleman* class members.

22

1.    **Staffing**

As discussed in detail below, DSH's staffing vacancy rates at DSH-Atascadero exceeded ten percent for the four treating disciplines.  *See infra* Part II(B).  DSH-Atascadero also did not comply with the DSH staffing plan's required clinician-to-patient ratios.  *See infra* Part II(B).

DSH-Atascadero's Program V, where *Coleman* class members are housed and receive treatment, reported functional vacancy rates above ten percent for the four major disciplines of psychiatry, psychology, social work, and rehabilitation therapy, including 22 percent vacancy rates for psychology and rehabilitation therapy.  The hospital also reported nursing vacancies.

All executive leadership and program management positions at DSH-Atascadero were filled.

Regarding staff-to-patient ratios, during the site visit, all four of Program V's intermediate care treatment units at DSH-Atascadero that housed *Coleman* patients had clinician-to-patient ratios for psychiatry, psychology, social work, and rehabilitation therapy that exceeded both the original 1:35 clinician-to-patient ratio, and the 1:30 ratio in the DSH staffing plan.

DSH must fully implement its staffing plan at DSH-Atascadero to address these staffing shortcomings.

By contrast, both DSH-Coalinga's Unit 11 and DSH-Patton's Unit 33 reported that all psychiatry, psychology, social work, and rehabilitation therapy positions, including those for seniors and supervisors, were filled.  Both hospitals reported nursing staff vacancies.  *Infra* Part II(B).

At DSH-Coalinga and DSH-Patton, all staff-to-patient caseload ratios for psychiatry, psychology, social work, and rehabilitation therapy were within established ratios.  *Id.*

All executive leadership and program management positions at these two hospitals were also filled.  *Id.*

2.    <u>**Access to DSH Facilities**</u>

As stated above, *Coleman* patients' continued timely access to DSH hospital beds, and especially to such beds at DSH-Atascadero, is a critical component of ending federal court oversight. The Special Master's 2016 Inpatient Care Report provided a detailed historical analysis concerning problems with CDCR patients' ability to access inpatient care at DSH-Atascadero. ECF No. 5448 at 24-40. In this regard, the 2016 Inpatient Care Report emphasized that "(t)he *Coleman* court has repeatedly ordered DSH to utilize the intermediate care beds at DSH-Atascadero to treat *Coleman* class members." *Id.* at 36. Relatedly, the Special Master's 2018 Inpatient Care Report[17] affirmed that "(p)roviding timely access to DSH beds for all CDCR inmates who meet clinical and custodial requirements for placement at DSH-Atascadero, DSH-Coalinga, and DSH-Patton is essential to the remedial process in the *Coleman* case." Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation, ECF No. 5894 at 22 [hereinafter Special Master's 2018 Inpatient Care Report]. This assessment was echoed by the Special Master's 2021 Inpatient Care Report,[18] which noted that:

> Throughout the *Coleman* case, it has been shown that when CDCR patients are unable to access beds at DSH hospitals, it has ripple effects throughout the inpatient care system. The Court has recognized that the lack of access to DSH hospitals upsets appropriate admissions along the continuum of inpatient care, which backs up the system and leads to swelling waitlists. ECF No. 7039 at 43-44 (citing ECF No. 5448 at 36.)

___

[17] The court adopted the Special Master's 2018 Inpatient Care Report in full on July 5, 2022. Order, ECF No. 7581.

[18] The court adopted the Special Master's findings in his 2021 Inpatient Care Report in full on August 17, 2022. Order, ECF No. 7605.

24

For the review period of July 1, 2021 through December 31, 2021, as well as the four months after this period, all three DSH facility censuses were considerably below their designated *Coleman* capacity.

### Referrals and Transfers

The 2018 and 2021 Inpatient Care Reports identified timely patient referrals and transfers as an area of focus. ECF No. 5894 and ECF No. 7555. In this regard, this Court has recognized that "'the absence of timely access to appropriate levels of care at every point in the system' is evidence of an ongoing constitutional violation." ECF No. 5894 at 19 (citing Order, entered April 5, 2013, (ECF No. 4539 at 46).

It must also be noted that, despite the COVID-19 pandemic, institutions are still required to timely refer and transfer patients to DSH. As the Court has previously ordered, defendants were to "continue to comply with the requirements of the Program Guide to the full extent possible consistent with public health best practices for members of the *Coleman* class in the circumstances of the COVID-19 pandemic." ECF No. 7039 at 41 (citing ECF No. 6791 at 5).

During the review period, the Special Master monitored DSH census, referrals, waitlists, transfers, admissions to and discharges from DSH's inpatient care programs. The DSH small workgroup, which included the monitor's experts were actively engaged with DSH hospital referrals and admissions during part of the review period.

Notably, there was a significant decrease in the number of referrals to DSH during the review period. Compared to the prior review period, there was a 65 percent decrease in the number of *Coleman* patients who were referred to DSH-Atascadero and DSH-Coalinga, while referrals to DSH-Patton declined by 47 percent.

Not all DSH referrals to DSH-Atascadero transferred timely. Specifically, of the 115 *Coleman* male patients who were transferred to DSH-Atascadero, 88 of 101 or 87 percent timely transferred within 30 days. All 12 patients who were transferred to DSH-Coalinga were transferred to the hospital timely. Further, all eight transfers to DSH-Patton were also transferred timely.

### DSH-Atascadero and DSH-Coalinga *Coleman* Beds Utilization

As of July 26, August 30, and September 27, 2021, reporting data filed with the court reflected that only 51, 54, and 57 percent of the 256 *Coleman* class beds at DSH-Atascadero were filled with *Coleman* patients.[19] These reports further indicated that on these same three dates given above, for DSH-Coalinga, 62, 54, and 52 percent of the 50 beds allocated for *Coleman* class patients were filled.[20]

These reports further demonstrated that on October 25, November 29, and December 27, 2021, 54, 57, and 57 percent of the *Coleman* class beds at DSH-Atascadero were occupied.[21] During this same period, reports for DSH-Coalinga indicated that 50, 46, and 34 percent of the *Coleman* beds were filled.[22]

---

[19] ECF No. 7274 at 7, ECF No. 7316 at 7, ECF No. 7349 at 6.

[20] ECF No. 7274 at 7, ECF No. 7316 at 7, ECF No. 7349 at 6.

[21] ECF No. 7373 at 6, ECF No. 7399 at 6, ECF No. 7422 at 6.

[22] ECF No. 7373 at 6, ECF No. 7399 at 6, ECF No. 7422 at 6.



This data thus showed that, during the review period, an average of approximately 55 percent of the *Coleman* class beds at DSH-Atascadero were filled with *Coleman* patients while approximately 50 percent of DSH-Coalinga's beds were filled.

In their reports covering January, February, March, and April 2022, defendants reported 52, 57, 48, and 43 percent of DSH-Atascadero's *Coleman* beds were filled with *Coleman* patients, respectively.[23]  For these same dates, reporting for DSH-Coalinga reflected that 40, 42, 30, and 32 percent of the *Coleman* beds were occupied.[24]

**DSH-Patton *Coleman* Beds Utilization**

DSH-Patton designated 30 beds for *Coleman* patients.  As of July 26, August 30, and September 27, 2021, reporting data filed with the court revealed that 43, 33, and 37 percent of

---

[23] ECF No. 7463 at 6, ECF No. 7499 at 6, ECF No. 7529 at 6, ECF No. 7552 at 6.

[24] ECF No. 7463 at 6, ECF No. 7499 at 6, ECF No. 7529 at 6, ECF No. 7552 at 6.

DSH-Patton's *Coleman* beds were filled.[25]  Further, as of October 25, November 29, and

December 27, 2021, 30, 37, and 37 percent of DSH-Patton's beds were filled by *Coleman* class

members.[26]  This data thus showed that during the review period, only approximately 36 percent

of DSH-Patton's *Coleman* beds were filled.



Moreover, for each of the three months after the review period, as of January 31,

February 28, and March 28, 2022, 33 percent of the *Coleman* class beds at DSH-Patton were

filled.  On April 25, 2022, only 23 percent of these beds were occupied.[27]

---

[25] ECF No. 7274 at 7, ECF No. 7316 at 7, ECF No. 7349 at 6.

[26] ECF No. 7373 at 6, ECF No. 7399 at 6, ECF No. 7422 at 6.

[27] ECF No. 7463 at 6, ECF No. 7499 at 6, ECF No. 7529 at 6, ECF No. 7552 at 6.



Despite the COVID-19 pandemic, defendants still have a duty to transfer suitable patients to the DSH hospitals.  Since *Coleman* patients filled only approximately 55 percent of the beds at DSH-Atascadero, 50 percent of the beds at DSH-Coalinga, and 36 percent of the beds at DSH-Patton during the review period, the Special Master will continue to review and analyze the percentage of DSH beds occupied by *Coleman* patients to ensure that they have adequate access to DSH beds.

### 3. Clinical Services and Treatment in Inpatient Programs: Treatment Planning, Group Therapy, and Individual Treatment

There was ongoing variance across DSH hospitals with clinical services regarding treatment planning, group therapy, and individual treatment and the quality of care provided *Coleman* class members in the DSH inpatient programs.  Clinical services and treatment varied within DSH-Atascadero.

### Treatment Planning

As the Special Master reported in his PIP Report, the interdisciplinary treatment team "is

responsible for directing, coordinating, and managing the care and services provided to a patient as indicated to address the patient's serious mental illness.  Treatment teams fulfill this obligation by completing a person-centered active treatment plan designed to address the patient's symptoms, risk level, and functional impairments."  ECF No. 7555 at 108.

> "The treatment team must be cohesive, work with the patient collaboratively, and ensure that the patient understands their treatment plans to the best of their ability.  Patient collaboration in development of the treatment plan increases the likelihood of treatment adherence and assists in helping the patient understand their role in treatment."  *Id.*

The quality of IDTTs varied across DSH hospitals and within hospitals.

Observed IDTTs at all the hospitals typically found required treatment team members in attendance.  DSH-Atascadero's Unit 32 IDTTs were collaborative and interdisciplinary and addressed treatment progress, medication management, current symptoms, and group attendance.  Observed Unit 30 IDTTs at DSH-Atascadero discussed treatment progress, with treatment teams briefly reviewing treatment plans with each patient.  *See* Part II(B)(1).

By contrast, observed IDTTs at DSH-Atascadero's Unit 34 lacked robust participation from all treatment team members.  Unit 34 IDTT discussions did not reflect collaboration and failed to address patients' group assignment and group participation related to treatment goals, despite group treatment being the hospital's primary treatment modality.  *See* Part II(B)(1).

Observed DSH-Coalinga IDTT meetings were adequately conducted but would have benefited from greater team member discussion.  Treatment teams also presented substantial clinical information prior to patients joining the IDTT even though there was no clinical rationale for excluding patients from such initial discussions.  *See* Part II(B)(1).

DSH-Patton IDTTs demonstrated a collaborative process that adequately reviewed patients' treatment plans and progress toward measurable objectives.  However, the IDTTs did

not consistently address patients' diagnoses, case conceptualizations, or medication adherence. *See* Part II(B)(1).

As noted herein, observed IDTTs at the DSH hospitals varied in quality during the monitoring tours. Accordingly, assessment and improvement of IDTT quality should remain a central component of the DSH CQI process. DSH must also provide training to improve the overall quality and effectiveness of the IDTTs. This training should also address the structure and required topics that the IDTTs should address to improve this vital clinical process.

### **Group Therapy**

All three hospitals utilized group treatment, which consisted of both core and supplemental activities, as the primary treatment modality.

At DSH-Atascadero, core groups accounted for 61 percent of provided group treatment; the monitor's expert's independent calculation determined that *Coleman* patients attended a weekly average of 5.38 hours of core groups. *See infra* note 34. *Coleman* patients also attended a weekly average of five hours of supplemental groups. However, DSH-Atascadero's patients' weekly treatment hours varied by unit. Observed groups at DSH-Atascadero reflected both well-led and poorly facilitated groups that demonstrated both active patient engagement and other groups monopolized by some patients. Interviewed patients provided mixed reviews of the hospital's treatment program but reported that it was better than the treatment offered at CDCR. They also generally described treatment groups as helpful. *See* Part II(B)(2).

Group therapy at DSH-Coalinga accounted for over 99 percent of treatment. The hospital reported that patients attended a weekly average of 6.8 hours of core groups and 4.67 hours of supplemental groups. Observed groups reflected both appropriate patient engagement and at

least one group of questionable utility due to the covered material's advanced nature. *See* Part II(B)(2).

DSH-Patton *Coleman* patients attended a weekly average of 5.4 hours of group and individual treatment. An observed anger management group facilitated by two social workers was clinical in nature and revealed the facilitators making relevant comments and engaging patients. *See* Part II(B)(2).

Because group treatment overwhelmingly was the primary treatment mechanism at all three hospitals, DSH must establish minimum standards for the provision of groups. As previously stated in the Special Master's 2018 and 2021 Inpatient Care Reports, DSH must improve the "system and quality of structured and unstructured out-of-cell activities." ECF No. 7039 at 49-50 (citing ECF No. 5894 at 27). Further, as the Special Master has previously reported, "(o)ffering adequate hours of appropriate core and non-core group activities, as well as adequate hours of access to out-of-cell activities that meet the clinical needs of patients in the various inpatient programs are priorities that need to be addressed by … DSH." *Id.*

**Individual Treatment**

All three hospitals provided minimal individual treatment.

DSH-Atascadero did not typically provide individual treatment based on an institutional culture that appeared to view individual treatment as not essential to providing adequate care.[28] During the site visit, five to ten percent of DSH-Atascadero patients regularly received individual therapy. On average, patients received less than one weekly hour of individual treatment. Some

---

[28] In their response to the Draft Report, defendants noted the following: "…DSH's utilization of the group therapy model was required by the remediation program agreed to during litigation brought by the U.S. Department of Justice under the Civil Rights of Institutionalized Persons Act (CRIPA)." Exhibit B at 3.

DSH-Atascadero patients expressed dissatisfaction with this lack of individual therapy.  *See* Part II(B)(3).

There was a similar lack of individual treatment for *Coleman* patients at DSH-Coalinga. During the review period, the hospital provided a total of 29 individual treatment hours to patients, representing only 0.2 percent of all offered treatment.  *See* Part II(B)(3).

At DSH-Patton, there were a total of 100 completed individual therapy sessions for *Coleman* patients during the review period. However, because the reported data did not indicate the number of individual sessions per patient, the adequacy of provided individual therapy could not be determined.  *See* Part II(B)(3).

DSH must address the minimal amount of individual treatment provided at the hospitals through the development and implementation of effective guidelines regarding meaningful indicated individual treatment for members of the *Coleman* class.  DSH must also train staff to provide such individual treatment and provide appropriate supervision regarding this aspect of patient care.  *See, e.g.*, Special Master's 2021 Inpatient Care Report, ECF No. 7039 at 51 ("The need to develop and implement meaningful individual treatment guidelines and tracking systems, as well as train staff regarding providing adequate individual treatment in the inpatient programs, continued to need addressing by CDCR and DSH."); *id.* at 117 ("[I]n the case of DSH-Atascadero and DSH-Coalinga, patients did not have access to sufficient individual treatment."); Special Master's 2018 Inpatient Care Report, ECF No. 5894 at 27 ("Individual treatment was rarely offered or provided across inpatient programs, and where provided was either woefully inadequate, or not accurately tracked.  Developing and implementing meaningful guidelines and training staff regarding the provision of adequate individual treatment must be addressed by CDCR and DSH.").

**Quality of Care Provided to Patients at DSH Hospitals**

Treatment and documentation of treatment are vital requirements of adequate care. Treatment must be provided to attend to the specific needs of the patient, including identified goals and clinical interventions, and should be modified as clinically indicated during the course of treatment. Documentation of treatment provided should be detailed and sufficiently specific; patients' medical records should clearly document all treatment provided to patients.

Like in all prior reviews, as a function of monitoring, the monitor's expert randomly selected samples of records at each hospital to assess the quality of care provided to *Coleman* class members in each DSH hospital. The findings are presented below.

A.     **DSH-Atascadero**[29]

Review of random records selected from DSH-Atascadero reflected that Patients A, B, C, E, F, G, H, J, K and L received clinically adequate care considering COVID-19 limitations. Clinical interventions for Patient C were appropriate and it was documented that the patient had improved with treatment. Patient D, a chronically and severely mentally ill patient, was benefiting from treatment, "although his treatment is limited both by COVID-19 limitations and his limited insight into the nature of his illness."

There was "close coordination between mental health, medical and custody to address [the] complex clinical and custodial issues" of Patient J and the treatment team of Patient L documented close collaboration among team members in his medical records. Patient L was making progress toward achieving his treatment goals at the time of the site visit. The treatment team's decision to focus treatment on Patient L's "psychotic and mood symptoms appears

---

[29] The monitor's expert's full assessment of the quality of care provided to *Coleman* class members at DSH-Atascadero is attached at Appendix C1.

clinically adequate." Although Patient K persistently declined medications, review of his medical record showed that he apparently did not meet criteria for involuntary medications. While treatment documentation for Patients A, B, and C needed improvement to aid continuity of care, treatment documentation for Patients E, F, G, and I was appropriate.

B.    **DSH-Coalinga**[30]

Random record reviews at DSH-Coalinga indicated that the care provided to Patients C, D, E, F, G and H at DSH-Coalinga was adequate. The treatment team's decision to discharge Patient C to another unit for his safety while continuing to monitor him pending his transfer back to CDCR was clinically appropriate. For Patient D, the treatment team appropriately developed treatment plans to address the treatment outcome expectation of the referral institution in addition to treatment issues that were identified at the time of his admission. When Patient F was unable to attend groups, the principal treatment modality at the hospital, the treatment team increased the frequency of individual contacts with the patient. Each member of the treatment team closely followed the patient in that period. Patients G's treatment team worked with the patient regarding his coping and distress tolerance skills; his medication management appeared to be adequate. Treatment notes indicated that Patient H's psychotic and mood symptoms significantly improved and the treatment actively engaged with the patient to mitigate medication side effects.

In contrast, Patient A did not receive adequate care at DSH-Coalinga. While the treatment team developed appropriate treatment plans, the team did not modify treatment responsive to evidence of ineffectiveness "and the patient's worsening presentation during

---

[30] The monitor's expert's full assessment of the quality of care provided to *Coleman* class members at DSH-Coalinga is attached at Appendix C2.

admission."  Additionally, recommended biweekly individual therapy sessions were not offered.
Care provided to Patient B at DSH-Coalinga was also inadequate.  The treatment team failed to
follow through with the clinically indicated intervention of recommended weekly individual
therapy.

C.    **DSH-Patton**[31]

Review of random records at DSH-Patton revealed that the care provided to Patients A
and F at the hospital was adequate.  However, the clinical notes did not appropriately document
clinical interventions for Patient A and the response to such interventions.  In the case of Patient
F, while the treatment goals remained unchanged during the patient's hospital stay, there
appeared to be extensive interdisciplinary collaboration, notably when the patient began to refuse
medications.

The record reviews indicated that the treatment of Patient B at DSH-Patton was not
adequate; the initial treatment plan and case history were completed later than required, clinical
documentation was generic, and recommended testing for possible cognitive issues remained
unfulfilled.  In the case of Patient C, documentation was conflicting and inaccurate.  In addition,
routine psychology progress notes were not present in the record of Patient C.  Patient D's
treatment at DSH-Patton was inadequate and clinical interdisciplinary collaboration was lacking.
Treatment provided to Patient E at DSH-Patton was also inadequate; treatment goals and
discharge criteria did not incorporate appropriate treatment interventions.

These findings show meaningful variation in the adequacy of care provided to *Coleman*
patients and the need for DSH to focus attention on remediating the issues discovered in the

---

[31] The monitor's expert's full assessment of the quality of care provided to *Coleman* class
members at DSH-Patton is attached at Appendix C3.

records through further training, enhanced supervision, and effective utilization of the recently approved CQI process.

As a function of the CQI process, DSH's planned record reviews would appraise whether patient treatment plans were finalized according to hospital policy, indicated group attendance percentage as part of the current interventions/clinical summary of a patient and documented information about the patient's current clinical status as it related to their treatment. Moreover, during the CQI health record review process, DSH would evaluate whether treatment-focused statements were written for each identified area of treatment to ensure that they were measurable and included at least one corresponding objective and stated clinical intervention. The Clinical Operations Advisory Council (COAC), which is also a part of the CQI process, will undertake periodic onsite visits. During these tours, the COAC will conduct records and audit reviews, observe treatment planning conferences in-person, and attend core treatment groups and supplemental activities.

The DSH CQI process as described above is designed to improve the quality of care provided to patients and documented in the medical records. These CQI activities closely simulate the Special Master's monitoring. The CQI reports, which will continue to be included in the Special Master's document requests for future monitoring rounds, will enable the Special Master to effectively monitor the quality of care provided to *Coleman* patients in DSH hospitals, evaluate the application of the CQI process, and engage with DSH to remedy identified issues.

<u>**PART II.**</u>
<u>**THE SPECIAL MASTER'S FINDINGS AT THE DEPARTMENT OF STATE HOSPITALS**</u>

A.    <u>**CENSUS**</u>

On March 7, 2022, DSH-Atascadero reported a patient population of 954, including 136 CDCR patients, in the hospital pursuant to California Penal Code (PC) 2684 (*Coleman* patients

or *Coleman* class members). As DSH-Atascadero was required to designate 256 beds for *Coleman* patients, during the site visit *Coleman* patients comprised 53 percent of the hospital's bed capacity. By contrast, during the preceding review period, which was reported in the Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation, DSH-Atascadero's 249 *Coleman* patients represented 97 percent of bed capacity. ECF No. 7039 at 52. DSH-Atascadero's current *Coleman* patient population had markedly decreased by 44 percent since the prior review.

DSH-Atascadero's Program V intermediate care treatment units housed 131, or 96 percent, of the hospital's 136 *Coleman* patients. Program V's Unit 30 reported a census of 43 patients including 24 *Coleman* class members; Unit 32's census of 46 patients included 42 *Coleman* patients; Unit 33's census of 43 patients included 41 *Coleman* class members; and Unit 34's census of 46 patients included 24 *Coleman* class members. Unvaccinated *Coleman* patients were housed in cohorts in admissions units. Two *Coleman* patients were in cohorts in Program V's unit 24; two others were in cohorts in unit 12, which was a non-Program V housing unit. DSH-Atascadero's medical unit housed one *Coleman* class member.

In addition to housing 131 *Coleman* patients, Program V housed 125 non-*Coleman* patients, totaling 256 patients. Program V beds occupied by non-*Coleman* class members included patients who were not guilty by reason of insanity (PC 1026) and offenders with a mental health disorder (OMHDs, PC 2962). The 131 *Coleman* patients occupied 51 percent of Program V's beds.

During the site visit, DSH-Coalinga housed 21 *Coleman* patients including 17 who were quarantined on *Coleman* Unit 21 and four others quarantined on admissions unit MA-1 pending transfer to Unit 21. DSH-Coalinga's *Coleman* census was 57 percent lower than the 49-patient

census reported for the prior review.  During this review period, DSH-Coalinga's monthly *Coleman* census averaged 25 patients which was considerably less than the prior review's average monthly census of 44 *Coleman* patients.

DSH-Patton operated a 30-bed facility that treated PC 2684 *Coleman* patients within the 50-bed Unit 33, which was an unlocked dormitory setting containing licensed intermediate care beds that provided acute and intermediate care.  On March 1, 2022, Unit 33's 42 patients consisted of ten PC 2684 *Coleman* class members, 31 PC 1370 patients, and one OMHD patient. The OMHD patient had been a *Coleman* patient who had transitioned to OMHD but had yet to transfer from Unit 33.

Nine of ten *Coleman* patients housed at DSH-Patton received intermediate levels of care; the remaining patient was at the acute level of care.  During the review period, the hospital's *Coleman* patient census averaged nine patients, which was less than the average census of ten to fifteen *Coleman* patients documented in the prior report.

### B.    STAFFING

The inpatient care hospitals reported adequate staffing except for notable vacancies at DSH-Atascadero.

DSH-Atascadero's Program V reported functional vacancy rates above ten percent for psychiatrists, psychologists, social workers, and rehabilitation therapists.  In contrast, DSH-Coalinga's Unit 11 and DSH-Patton' Unit 33 reported that all positions for psychiatry, psychology, social work, and rehabilitation therapy were filled.

As for staff-to-patient ratios for the four disciplines, all four of Program V's intermediate care units at DSH-Atascadero that housed *Coleman* patients had staff-to-patient clinical ratios exceeding the designated 1:35 established ratio and the 1:30 ratio outlined in the Department of State Hospitals' Inpatient Staffing Plan (Staffing Plan), ECF No. 7078, which the Court

provisionally approved subject to monitoring by the Special Master. ECF No. 7108. Staff-to-patient ratios for these four disciplines at DSH-Coalinga and DSH-Patton all satisfied the established ratio.

DSH-Atascadero's Program V reported that all five of its executive positions were filled. Permanent staff filled positions for the executive director, hospital administrator, and nurse administrator; staff in acting capacities assigned from programs that did not treat *Coleman* class members filled the medical director and clinical administrator positions. The management positions of program director, program assistant, and nursing coordinator were also filled.

The chief psychiatrist position at DSH-Atascadero was vacant but filled in an acting capacity by clinical staff assigned from another hospital program. The senior psychiatrist position had been vacant since 2011.

Significantly, DSH-Atascadero had a 67 percent psychiatry vacancy rate which was comparable to the 62.5 percent psychiatry vacancy rate reported for the prior review period. ECF No. 7039 at 52. Contractors reduced the functional vacancy rate to 11 percent, which was an improvement from the prior review period's 25 percent psychiatry functional vacancy rate. *Id.*

Although the supervising psychologist position for DSH-Atascadero was vacant, a supervising psychologist from another hospital program provided 0.5 full-time equivalent (FTE) services for a 50 percent vacancy rate. The psychologist vacancy rate was 22 percent which was higher than the prior review period's 12.5 percent psychology functional vacancy rate.

DSH-Atascadero's supervising social worker position was filled. The social worker vacancy rate was 11 percent; the prior report noted that all social worker positions were filled. *Id.*

The supervising rehabilitation therapist position was filled.  The vacancy rate for rehabilitation therapists was 22 percent which was higher than the prior review period's 12.5 percent.  *Id.*

There was a 31 percent vacancy rate for RNs at DSH-Atascadero,[32] which was markedly higher than the prior review period's zero percent.  *Id.*  There were respective vacancy rates of 17 and 11 percent for senior psych techs and psych techs.

DSH-Atascadero had designated clinician-to-patient ratios of 1:15 for the admissions unit and 1:35 for intermediate care for psychiatry, psychology, social work, and rehabilitation therapy.  The Staffing Plan referenced above recommended changing this ratio to 1:30 for intermediate care.

On March 7, 2022, DSH-Atascadero housed 131 *Coleman* class members in Program V's four units.  Each unit's assigned clinical staffing included one psychiatrist, one psychologist, one social worker, and one rehabilitation therapist.  Tellingly, all four of Program V's intermediate care treatment units housing *Coleman* patients had clinician-to-patient ratios for psychiatry, psychology, social work, and rehabilitation therapy that exceeded the designated 1:35 ratio and the 1:30 ratio outlined in the Staffing Plan.

All of DSH-Coalinga's leadership positions were filled including those for the executive director, clinical, hospital, and nurse administrators, medical director, chief of psychiatry, program director, and program assistant.

---

[32] While DSH-Atascadero reported a 31 percent vacancy rate prior to the monitoring tour, in their response to the Draft Report, defendants provided the following information: "[A]t the time of the Special Master's Experts' visit, the hospital-wide vacancy rate was 18%.  The vacancies are balanced among the programs offered at the institution."  Exhibit B at 4.

The senior psychiatrist position at DSH-Coalinga was filled. Of the two psychiatrists assigned to Unit 21, the telepsychiatrist provided services to *Coleman* patients and an on-site psychiatrist was reassigned to provide services elsewhere in the hospital.

Positions for all psychologists, social workers, and rehabilitation therapists, including supervisors at DSH-Coalinga, were filled. All nursing positions were also filled. Although all senior psych tech positions were filled, psych techs had a nine percent vacancy rate. Notably, during the prior review period, all DSH-Coalinga clinical positions, including psych techs, were filled.

On February 22, 2022, DSH-Coalinga housed 21 *Coleman* patients, 17 of whom were in Unit 21 and the other four were in the admissions unit pending transfer to Unit 21. Based on the reported census, all staff-to-patient caseload ratios for psychiatry, psychology, social work, and rehabilitation therapy satisfied the established ratio.

DSH-Patton reported that positions for the executive director, chief psychiatrist, nurse, clinical, and hospital administrators, program director, and program assistant were all filled. The medical director's position was filled in an acting capacity.

The senior psychiatrist position at DSH-Patton was also filled. Two psychiatry positions were filled by a civil servant psychiatrist and a contractor who had filled the position for more than one year. Positions for all psychologists, social workers, and rehabilitation therapists, including supervisors, were filled. One psychologist and one social worker were unlicensed.

Registered nurses reported a 33 percent vacancy rate at DSH-Patton. All senior psych tech positions were filled but there was a 38 percent psych tech vacancy rate. Except for registered nurses, psych techs, and one psychiatrist, civil servants filled all of Unit 33's clinical positions during the review period and at the time of the site visit.

42

On March 1, 2022, DSH-Patton's Unit 33 housed 42 patients including ten *Coleman* class members. Similar to the prior review period, DSH-Patton met all staff-to-patient clinical ratios. Moreover, Unit 33 clinical staff exclusively provided services to Unit 33 patients and the intake/quarantine *Coleman* patients housed on Unit 30. Staff assigned to these two units were not redirected to provide clinical services to other hospital units.

Telepsychiatry

DSH-Atascadero reported that the hospital did not have allocated telepsychiatry positions and did not use telepsychiatry during the reporting period or at the time of the site visit.

A telepsychiatrist located at another DSH facility provided services for Unit 21 patients at DSH-Coalinga at the time of the visit. *Coleman* patients generally reported satisfaction with telepsychiatry. However, because DSH-Coalinga used paper charts, specific documents were uploaded for the telepsychiatrist's review prior to the patient's initial session. This resulted in telepsychiatrists' lacking complete access to all patients' records which raised questions about the adequacy of psychiatric care. DSH-Coalinga did not report problems with telepsychiatry refusals or significant telepsychiatry technological issues. However, DSH-Coalinga chart notes for telepsychiatry treatment were labeled as "face-to-face" encounters. The chief psychiatrist reported that in-person and telehealth encounters were considered equivalent.

DSH-Patton's Unit 33 did not have allocated telepsychiatry positions. Telepsychiatry was neither used in Unit 33 nor for *Coleman* patients housed in Unit 30's intake/quarantine unit.

Staff Training

DSH-Atascadero reported 90 percent compliance for all required trainings for psychiatrists, psychologists, social workers, and rehabilitation therapists. These disciplines completed necessary trainings for therapeutic strategies and interventions (TSI), the Health

Insurance Portability and Accountability Act (HIPAA), patients' rights, pain management, mandatory abuse and neglect reporting, and suicide review.  There was also compliance for designated clinicians' completion of CPR training.

All DSH-Coalinga staff were required to complete annual review training (ART) focusing on patients' rights, suicide awareness, unit security, and infection control.

On DSH-Patton's Unit 33, 63 percent of clinical staff completed the annual suicide prevention and intervention training, as did 20 percent of nursing staff in Program 4 (which was where Unit 33 was located).  Nursing staff's training completion was significantly lower than the prior review period's 93 percent.

## C.    TREATMENT AND CLINICAL SERVICES

Like prior DSH-Atascadero site assessments, Program V functioned like a hospital that provided mental health treatment to CDCR and OMHD patients.  In this regard, Program V units at DSH-Atascadero had established therapeutic milieus.  Interviewed patients uniformly stated that they benefitted from DSH-Atascadero's treatment but expressed some concerns about restrictions related to COVID-19.

Observed IDTT meetings at the three hospitals revealed significant variations in quality, including disparities among hospital units and differences in treatment team member collaboration and participation.

At DSH-Atascadero, IDTT meetings on Unit 34 lacked collaborative discussion and many team members minimally participated.  Unit 32 IDTTs, by contrast, demonstrated collaborative and interdisciplinary treatment teams with all disciplines actively participating.

Observed DSH-Coalinga IDTTs were adequately conducted but required greater team member discussion. IDTT meetings at DSH-Patton revealed collaborative discussions.

All three hospitals reported that group therapy was the primary treatment modality and

consisted of both core treatment groups and supplemental activities.

DSH-Atascadero patients attended a weekly average of 5.38 hours of core groups and five hours of supplemental activities.  *See infra* note 34.

Patients at DSH-Patton attended a weekly average of 5.4 hours of group and individual treatment.

DSH-Coalinga was unable to accurately report in-person group treatment attendance.

Observed groups at DSH-Atascadero ranged from effective to inadequate.  There were groups that were well-led with active patient involvement but also groups that were poorly run and monopolized by some patients.  Some groups presented relevant information; others were essentially unstructured recreation opportunities.

Observed DSH-Coalinga groups revealed one with good patient engagement and another of questionable utility due to the subject matter's advanced nature.

An observed DSH-Patton anger management group showed the facilitators making relevant comments and engaging patients.

All three hospitals provided minimal individual therapy.  DSH-Atascadero only regularly provided individual treatment to between five and ten percent of patients, reflecting a hospital culture that did not believe that this treatment was necessary.

DSH-Coalinga reported that individual treatment for *Coleman* patients comprised only 0.2 percent of offered treatment.

As reported in prior site visits, the monitor's expert had concerns about the limited use of individual therapy for *Coleman* patients at DSH-Patton.  Because DSH-Patton data did not report actual individual patient sessions, the adequacy of individual therapy could not be determined.

45

There was adequate psychiatric care at all three hospitals. Neither DSH-Atascadero patients nor staff reported psychiatry continuity of care challenges; patients similarly indicated satisfaction with psychiatry services.

The chart review at DSH-Coalinga revealed timely psychiatry contacts.

DSH-Patton did not report challenges with psychiatric continuity of care and *Coleman* patients at the hospital expressed satisfaction with psychiatry services.

DSH-Atascadero's psychiatrists and nursing staff demonstrated a clear understanding of protocols for monitoring clozapine. Both DSH-Coalinga and DSH-Patton had comprehensive clozapine policies. Further, medication management and laboratory monitoring at DSH-Coalinga were compliant.

As discussed in detail below, the hospitals did not utilize behavioral management.

1.    **Interdisciplinary Treatment Teams (IDTTs)**

DSH-Atascadero staff reported that IDTTs focused on patients' treatment goal progress and current functioning instead of summarizing patient viability since the prior IDTT. Observed IDTTs typically found staff and patients in attendance.

On Unit 34, treatment team members were aware of patients' mental health issues. However, most IDTT members provided minimal input during IDTTs. Observed IDTTs also did not include truly collaborative discussions about patients' treatment needs and progress. Despite groups being the primary treatment modality, IDTTs did not discuss patients' group participation in relation to treatment goals. Interviewed Unit 34 patients were also unaware of their treatment goals. In contrast, Unit 32 IDTTs revealed collaborative and interdisciplinary treatment teams with active discussion by all disciplines. The IDTTs addressed treatment progress, medication management, current symptoms, and group attendance among other issues. Unit 30 IDTTs discussed patient treatment progress, reviewed treatment plans with patients, and gave patients

the opportunity to participate and ask questions.  Interviewed DSH-Atascadero patients reported monthly meetings with their treatment teams and general familiarity with treatment plans.

DSH-Coalinga reported that patients attended 92 percent of treatment team meetings. Observed IDTTs were adequately conducted but also reflected areas of concern.  All required disciplines attended, and participated in, offering relevant information.  Nonetheless, IDTTs would have benefited from more robust team member discussion.  Treatment teams also presented substantial clinical information prior to patients joining the IDTT; however, there was no clinical rationale for excluding patients from initial discussions.  The monitor's expert also observed good treatment team attention to engaging patients who were reluctant to attend IDTTs.

All relevant disciplines attended observed IDTTs at DSH-Patton.  Treatment team members knew the patients, and there were collaborative discussions that included valuable input and in-depth reviews of patients' mental health and medical needs in addition to sufficient reviews of patients' treatment plans and progress toward measurable objectives.  However, observed IDTTs failed to consistently address patients' diagnoses, case conceptualizations, or medication adherence.  The monitor's expert also observed two staff members behave inappropriately toward patients during IDTTs; one psychiatrist was highly confrontational with an already escalating patient and, during another IDTT, a clinician made condescending statements to a discharging female patient.

## 2.    Group Therapy

DSH-Atascadero staff reported that group assignment was based on treatment team discussions, treatment outcome expectations (TOEs), and patient input and interests.  However, group assignment was not assigned or discussed during IDTTs.  Rather, DSH-Atascadero staff reported that psych techs developed patients' group schedules based on clinician recommendations derived from initial patient evaluations and patient input.

DSH-Atascadero's provided treatment hours were inadequate for an inpatient setting but were acceptable in the context of current COVID-19 limitations. In this regard, the hospital's established therapeutic milieu was a significant mitigator to the limited number of provided treatment hours which reflected significant efforts by DSH-Atascadero staff.

Core groups accounted for 61 percent of group treatment at DSH-Atascadero. *Coleman* patients were offered a weekly average of 7.1 hours of core groups; the monitor's expert calculated that DSH-Atascadero patients attended a weekly average of 5.38 hours of group. Supplemental groups, which were not scheduled, accounted for the remainder of group treatment. *Coleman* patients attended a weekly average of five hours of supplemental groups.

Observed DSH-Atascadero groups on Unit 34 revealed one that was well-led by a facilitator who had appropriate rapport with actively participating patients and another that was poorly facilitated and dominated by two patients. Neither group leader encouraged group discussion between patients. An observed group on Unit 32 presented relevant information and reflected active patient engagement. On Unit 30, one observed group was well-organized with active patient participation while another was essentially an unstructured recreation opportunity.

Interviewed patients expressed satisfaction with the hospital's therapeutic milieu and agreed that DSH-Atascadero's treatment program was beneficial and better than CDCR treatment. Many indicated that treatment groups were helpful and reported having treatment needs that were related to group topics.

At DSH-Coalinga, group treatment accounted for more than 99 percent of treatment and was also comprised of both core and supplemental treatment activities. Treatment plans designated patients' enrollment in core groups such as Dialectical Behavioral Therapy and Managing Mental Illness. In contrast, patients were not assigned to supplemental group

48

activities such as beading and karaoke; instead, patients could attend or not on their own volition.

The hospital reported that patients attended a weekly average of 6.8 hours of core groups and 4.67 hours of supplemental groups.  Notably, between July 6 and December 13, 2021, 115 groups were cancelled.  Following group cancellation, patients were provided with information packets addressing the group's theme.  Patients who returned a completed packet were reported as having attended the group.  Because data for in-person group attendance and packet completion for cancelled groups was commingled, DSH-Coalinga was unable to accurately report in-person group treatment attendance.

One observed group conducted by two behavioral specialists at DSH-Coalinga reflected good patient engagement.  Another was of questionable utility because of the advanced nature of the covered material.

At DSH-Patton, group activities were also the primary treatment modality for *Coleman* patients.  Core groups incorporated a variety of methodologies including Cognitive Behavioral Therapy (CBT), substance use treatment, and symptom management.  Supplemental group activities included movies and games.  During the review period, Unit 33 *Coleman* patients attended a weekly average of 5.4 hours of scheduled group and individual treatment of which patients refused 26 percent.

An observed anger management group was clinical in nature and explored anger-related thoughts and feelings.  The facilitators made relevant, validating, and appropriate comments, and engaged patients.  An observed therapeutic community meeting revealed motivational discussions, a review of unit rules, and discussion of communal living concerns.

Although DSH-Patton therapeutic group space was generally adequate, some groups were conducted outdoors in the non-confidential courtyard; during unit-wide quarantine periods, all treatment groups were held there.

### 3.   Individual Treatment

As discussed in prior reports, DSH-Atascadero did not typically provide individual treatment, reflecting an institutional culture that did not perceive this treatment to be essential. During the site visit, individual treatment was regularly provided to between five and ten percent of patients. Tellingly, patients attended a weekly average of 0.7 hours of individual treatment. Some DSH-Atascadero patients expressed dissatisfaction with the lack of individual therapy.

DSH-Coalinga data, supported by chart review and on-site interviews, similarly revealed a paucity of individual treatment for *Coleman* patients. Individual treatment comprised only 0.2 percent of all offered treatment. Across the reporting period, a total of 29 hours of individual treatment were provided to nine patients.

During prior DSH-Patton site visits, the monitor's expert raised the limited use of individual therapy for *Coleman* patients as a concern. During the review period, the hospital reported increasing individual therapy hours reflecting 100 completed individual therapy sessions for *Coleman* patients. However, because the data did not indicate the number of individual patient sessions, the adequacy of individual therapy could not be ascertained.

Historically, individual psychotherapy was not a scheduled part of patient treatment at DSH-Patton and had not been consistently tracked. Beginning in August 2021, the hospital began scheduling patients for individual psychotherapy resulting in improved tracking of patient treatment hours. Nonetheless, DSH-Patton reported ongoing challenges tracking unscheduled supplemental treatment contacts including the individual psychotherapy that frequently occurred.

4.    **Psychiatric Services**

On-site psychiatrists performed all psychiatric care at DSH-Atascadero.  Neither patients nor staff reported continuity of care challenges and there were no reported challenges with receiving medications, which patients confirmed.  Patients also indicated satisfaction with the quality and utility of psychiatry services, as well as very good access and adequate time with psychiatrists.  All reviewed charts complied with the frequency requirements of psychiatry contacts.  The monitor's expert observed robust medication safety procedures in place.

At DSH-Coalinga, reviewed charts indicated the conduct of initial psychiatry evaluations on the date of patient admission with timely follow-up visits.  Medication management and laboratory monitoring were also compliant.  However, the psychiatrist reported receiving limited information on new admissions from CDCR.

DSH-Patton did not report any challenges with psychiatric continuity of care.  Reviewed records of current patients revealed the timely completion of initial psychiatry evaluations and suggested that routine psychiatry contacts occurred more often than once monthly.  Psychiatrists were reportedly available to see patients seven days per week.

DSH-Patton psychiatrists did not report any difficulties obtaining non-formulary medications and indicated good working relationships with other disciplines.  Nursing staff demonstrated a good understanding of medication safety practices.  Interviewed *Coleman* patients reported satisfaction with psychiatry services.

Clozapine

DSH-Atascadero reported prescribing clozapine to between 14 and 23 *Coleman* patients monthly.  There were nine clozapine initiations during the review period.  Psychiatry and nursing staff demonstrated a clear understanding of protocols for monitoring clozapine.

DSH-Coalinga's clozapine policies were comprehensive and within the standard of care. Psychiatry reported prescribing clozapine to "several" *Coleman* patients. Chart reviews of two patients who were prescribed clozapine indicated that their care was consistent with DSH policy and good standards of care.

DSH-Patton had a comprehensive clozapine policy. Psychiatry leadership reported admitting one new patient during the review period who was prescribed clozapine; five others had new starts on the medication. Record review of patients prescribed clozapine did not reveal any significant deviations from the standard of care.

### 5. Other Treatment Issues

#### a. Involuntary Medications (PC 2602)

During the review period, DSH-Atascadero admitted 23 patients with PC 2602 involuntary medication orders. Five new petitions were submitted, ten orders were renewed, and seven were allowed to expire. There were no reported use of force incidents while administering involuntary medications.

Fifteen DSH-Coalinga *Coleman* patients were prescribed PC 2602 medications. No use of force was required for their administration.

DSH-Patton admitted one patient with a PC 2602 order which was renewed. Two new PC 2602 petitions were approved. There were no non-renewals of involuntary medication orders. Justifications for PC 2602 orders were clearly documented in reviewed records.

#### b. Behavioral Management

Staff at DSH-Atascadero opined that behavioral management plans were not the best tool for *Coleman* patients due, in part, to patients' improved behavior following hospital admission.

DSH-Coalinga patients did not have active Positive Behavior Support Plans (PBSPs). Leadership further reported that the hospital had staff complete behavioral assessments and PBSPs, yet there were no *Coleman* patients who needed these services.

DSH-Patton did not have Positive Behavior Support Treatment (PBST) referrals or plans during the review period. Leadership also reported that the hospital's PBST was disbanded in 2012 and there were no trained clinicians to provide this treatment.

### c.    Pre-release Planning

During the site visit, DSH-Atascadero housed 21 patients who had 90 days or less until parole. Although staff reported that social workers discussed discharge planning with patients, reviewed charts were neither detailed nor individualized to patients' unique discharge needs. Further, staff reported that patients' treatment goals included re-entry planning; however, reviewed treatment plans did not clearly incorporate re-entry plans.

Transitional case management program (TCMP) contacts with patients were expected to occur within 90 to 120 days of patient release. Notably, documentation that tracked TCMP contact dates for all patients released from DSH-Atascadero reported that TCMP saw most patients less than 90 days from their parole date with ranges from five to approximately 60 days. Moreover, patients denied discharge readiness discussions with their treatment teams; they further reported only becoming aware of discharge when they were given a COVID-19 test which the treatment team confirmed.

DSH-Coalinga patients were assisted with medical benefits and social security applications through the TCMP prior to parole. However, the TCMP saw only one of eight discharged patients more than 90 days prior to parole.

Like the preceding round, DSH-Patton did not track or provide pre-release planning

pursuant to the Memorandum of Understanding (MOU) between DSH and CDCR.  Staff also were not aware of some MOU requirements for providing clinical and logistical pre-release planning.  During the site visit, the monitor's expert identified two *Coleman* patients with upcoming site visits who had not received pre-release services.

### d.    Access to Meaningful Jobs and Educational Opportunities

DSH-Atascadero staff reported that, due to COVID-19 restrictions, patient work opportunities were severely curtailed to in-unit positions such as housekeeping, unit laundry, and food service, significantly limiting available employment opportunities.  Forty-seven *Coleman* patients participated in in-person educational activities for brief periods.

DSH-Coalinga reported that, on average, 13 *Coleman* patients held meaningful jobs of more than five weekly hours.  During the site visit, no *Coleman* patients were enrolled in college correspondence courses or the general education development (GED) program.

No DSH-Patton *Coleman* patients held work assignments and none were enrolled in education or vocational programs.  Interviewed patients at DSH-Patton were not aware of work, education, or vocational opportunities.

### e.    End-of-Shift Meetings

Two observed end-of-shift meetings at DSH-Atascadero reflected discussion of key clinical and other patient information.

No end-of-shift meetings were observed during the site visit at DSH-Coalinga.

An observed end-of-shift meeting at DSH-Patton was comprehensive and productive.  Addressed issues included recent and upcoming admissions and discharges, the status of patients on 1:1 supervision, and patients whose behavior warranted attention or who received PRN medications, among other matters.

**f.  Offenders with a Mental Health Disorder (OMHD) in a *Coleman* Unit at DSH-Atascadero**

The monitor's expert reviewed treatment in DSH-Atascadero's Unit 30 to assess the impact of treating *Coleman* and OMHD patients in the same unit.  As noted above, although during the review period between 60 and 90 percent of Unit 30's patients were *Coleman* class members, the unit also housed OMHD patients.  Staff generally described *Coleman* patients as much more appreciative of being at DSH-Atascadero than the OMHDs.  OMHD patients were also reported to require a disproportionate amount of clinical time.

Staff further reported that, at times, the mixing of the two populations created challenges due to *Coleman* class members' perception that OMHD patients did not bear and/or did not care about the consequences of their misbehavior.  This had led to physical fights between the patients.  Though not ideal, the mixing of *Coleman* and OMHD patients on the same unit appeared workable.

**g.  Clinical Documentation at DSH-Patton**

DSH-Patton had concerning clinical documentation practices.  Instead of writing progress notes for all therapeutic encounters, the hospital permitted providers to prepare monthly clinical summaries.  In addition, there was no clinical documentation for groups.  Such practices deviated from the standard of care and were especially concerning given the acuity of the *Coleman* population.  This lack of clinical documentation also presented obstacles to continuity of care, proof of practice, quality assurance, and treatment progress tracking.

**D.    QUALITY OF CARE IN THE HOSPITAL PROGRAMS**

The established therapeutic milieus in all three hospitals were appropriate.  Observed IDTTs showed variance - some significant - among hospitals' units and in treatment teams.

There were IDTTs that were treatment driven and collaborative and others that required more involvement and engagement by team members in treatment discussions.

The amount of structured therapeutic activities, which was the primary treatment modality provided to hospital patients, was inadequate for an inpatient setting but was acceptable in the context of COVID-19 limitations.  However, prior to the onset of the COVID-19 pandemic, the hospitals were also not offering sufficient therapeutic treatment hours to *Coleman* class members.

Minimal individual therapy was provided to patients in the DSH hospitals which appeared to emanate from long-standing hospital culture.

Chart reviews of patients at the three hospitals indicated appropriate care was provided to patients as it related to the amount of treatment groups offered and the paucity of individual treatment available to patients.

E.    **PATIENT ACCESS TO TREATMENT**

**Patient Orientation, Discretionary Program Status (DPS), and Stages:  Standards and Procedures**

DSH-Atascadero and DSH-Coalinga used the HAS to promote positive patient behavior, treatment participation, and access to programming and privileges.  However, COVID-19 restrictions resulted in patients not having access to some of the privileges specified by the HAS. DSH-Patton did not use the HAS.

At DSH-Atascadero, the HAS consisted of a five-level system that provided more patient privileges and greater hospital mobility as the patient advanced from Level 1 through Level 5. Patients were admitted at Level 1 and advanced as their treatment team deemed clinically appropriate.  Due to COVID-19 restrictions, patients at Level 3 and above did not have access to

some privileges specified by policy. Staff reported that there had been no official changes to the administrative directive governing the HAS.

DSH-Coalinga also used the HAS system to provide levels of access to off-unit hospital services and activities. Leadership reported that, like the prior review period, the HAS system had been reviewed but no changes were made. The hospital reported that 13 patients had their HAS level placed on hold or lowered during the review period. Although Unit 21 patients generally required an escort when off-unit, during the review period, even most escorted off-unit access was curtailed for *Coleman* patients. Leadership opined that this made the HAS policy irrelevant for *Coleman* patients.

Public health considerations led DSH-Patton to use Unit 30 as the COVID-19 quarantine admissions unit. Unit 30 patients received confidential contacts with a social worker and their assigned psychiatrist, rehabilitation therapy contacts, and entertainment devices. DSH-Patton further reported that all *Coleman* class members had access to inner-compound privileges, referred to as "Grounds." Patients without Grounds privileges were escorted to treatment, appointments, and other activities.

## F.    REFERRALS AND TRANSFERS

The 115 male patients who were referred to DSH represented a 65 percent decrease from the prior review period. Of 101 referrals resulting in transfer to DSH-Atascadero, 88 or 87 percent transferred timely. The 12 patients who transferred to DSH-Coalinga all transferred timely. All eight patients referred to DSH-Patton were accepted and transferred timely.

## G.    ADMISSIONS AND DISCHARGES

There were significant declines in the number of patient admissions to the hospitals. In comparison to the prior review period, patient admissions declined 65 percent at DSH-Atascadero, 77 percent at DSH-Coalinga, and 47 percent at DSH-Patton.

DSH-Atascadero admitted 101 *Coleman* patients and discharged 91. The average time between clinical and physical discharge was 12.9 days with ranges from zero to 134 days. The hospital attributed the discharge delays to COVID-19 quarantines at either DSH-Atascadero or receiving CDCR institutions. However, physical discharge delays of more than four months were excessive even with COVID-19-related limitations.

DSH-Coalinga's 12 admissions included three direct admissions from CMF-PIP and one from CHCF-PIP. The remaining admissions were from non-PIP CDCR facilities. The number of admissions was significantly less than what was reported for the prior review period when there were 53 admissions.

DSH-Coalinga discharged 25 patients during the reporting period. These patients' stays averaged 180 days. Sixteen patients remained on Unit 21 for an average of eight days beyond clinical discharge. Three patients were discharged within 72 hours of clinical discharge.

DSH-Patton admitted eight patients during the review period which was markedly less than the prior review period's 15 admissions. For intermediate care patients, the average time from receipt of the referral to admission was 15.7 days. The acute care patient was admitted five days after referral receipt. DSH-Patton directly accepted admissions from CDCR.

DSH-Patton discharged nine intermediate level of care patients. The average length of stay was 239 days. Seven patients experienced delays after clinical discharge ranging from two to 12 days. No reasons for the delays were provided.

**H.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE**

**Patient Disciplinary Process**

DSH-Atascadero and DSH-Coalinga issued rules violation reports (RVRs) during the reporting period; mental health assessments were completed for most of them. DSH-Patton did not issue any RVRs during the review period.

DSH-Atascadero submitted 27 RVRs to the California Medical Center (CMC) for action. Mental health assessments were completed for 25 of the RVRs. Staff who witnessed the incident completed the RVR; a non-treating psychologist completed the mental health assessment. DSH-Atascadero did not provide the completed RVRs packages, which were reportedly in CDCR's possession, to the monitor to review.

DSH-Coalinga submitted three disciplinary hearing worksheets to Pleasant Valley State Prison (PVSP) for review as RVRs. Mental health assessments were completed for two of them. CDCR dismissed two of the disciplinary hearing worksheets; the third resulted in a counseling chrono.

DSH-Patton did not complete any disciplinary hearing worksheets during the review period and no RVRs were issued.

### Use of Force

DSH-Atascadero reported four use of force incidents during the review period. None met the criteria for review by the incident management review committee.

Neither DSH-Coalinga nor DSH-Patton reported use of force episodes involving *Coleman* class members.

## I.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

There were serious incident reports (SIRs) at all three hospitals; two also reported unusual occurrences.

DSH-Atascadero reported a total of 319 SIRs of which 25 percent were for aggression, 24 percent were for medical reasons, and 22 percent were for suicide/self-harm; another 29 percent were classified as "other."

DSH-Coalinga reported 31 SIRs. There were four episodes of suicide-related behavior (not resulting in deaths), six related to patients' medical/health safety, 19 involving aggressive behavior primarily towards patients/staff, and other rule violations such as contraband possession.

DSH-Coalinga also reported one unusual occurrence involving the breach of HIPAA. The incident involved the release of DSH-Coalinga's roster at the federal district court's request to determine patient eligibility for filing fee waivers when submitting a lawsuit. The released rosters disclosed patients' names, legal commitments, admission dates, and other relevant information. The action plan to resolve this breach included the district court's destruction of all received rosters and notifying current and former impacted patients and DSH staff training to provide education on data protection.

DSH-Patton reported 162 SIRs involving *Coleman* patients. Notably, one patient generated 49 percent of *Coleman* patient SIRs, of which 95 percent were related to her placement on 1:1 observation. Seventeen SIRs, or ten percent, were related to suicidal ideation, self-harm ideation, or acts of self-harm. The hospital also reported three unusual occurrences involving *Coleman* patients. Two involved the same patient but in neither case were deficiencies noted. CDPH was investigating the third incident.

### J.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

All three hospitals reported restraint episodes; DSH-Atascadero also reported seclusion incidents. Reviewed charts of patients requiring restraints indicated adequate clinical rationales.

DSH-Atascadero did not use observation cells. The hospital reported 16 seclusion episodes averaging 12.69 hours and 26 restraint incidents averaging 17.96 hours. Twelve restraint incidents were non-ambulatory and utilized a specialized chair. Nursing staff reported

that non-ambulatory restraints were used for patients at risk of harm to self or others but did not require full-bed restraint. The remaining 14 episodes were full-bed restraints.

Patients in seclusion or restraints were always on 1:1 observation. Two reviewed charts of patients requiring restraints both contained clear clinical rationales for restraint use and appropriate monitoring of circulation, sensation, and range of motion.

DSH-Coalinga reported two restraint incidents. The clinical justification for restraint use, provided medications, and release from restraints were adequate; documentation was consistent with the hospital's administrative directive. DSH-Coalinga did not report any seclusion episodes.

A healthcare record review indicated adequate justification for DSH-Patton's one restraint episode. Interviewed staff demonstrated a good understanding of safety practices for restraint use. There were no seclusion incidents at DSH-Patton.

**K.    SUICIDE PREVENTION**

None of the hospitals reported suicides during the review period. All hospitals utilized suicide prevention initiatives. Both DSH-Atascadero and DSH-Coalinga had implemented anti-ligature efforts to identify hospital areas of increased risk for potential patient hanging.

There were no completed suicides or serious suicide attempts at DSH-Atascadero. There also were no self-injury incidents for *Coleman* patients that were severe enough to require emergency medical attention.

The hospital conducted monthly suicide prevention committee meetings. Although the administrative directive required a "medical staff" member to attend, reviewed minutes did not

reflect a physician's attendance.[33]  An observed meeting found committee members reporting that they closely monitored aggressive acts and assaults; these acts reportedly correlated with patient suicidality risk.  The committee confirmed receiving updated suicide risk assessments for patients admitted from CDCR and indicated a need to resume quarterly suicide prevention meetings between DSH and CDCR.

DSH-Atascadero had created a ligature "heat map" highlighting hospital areas of increased risk for possible patient hanging.  There were many such ligature points due to the age of the buildings.  Nursing reported that this ligature "heat map" permitted staff to provide increased monitoring of these areas.

There were no attempted or completed suicides at DSH-Coalinga.  The hospital reported completing suicide risk assessments for all new patients within 24 hours of admission with the suicide risk level determining the frequency of future reassessments.

DSH-Coalinga staff were required to participate in suicide prevention and risk reduction trainings.  The hospital also reported that it had begun training Unit 21 staff on suicide crisis responses.  Leadership reported that DSH-Coalinga's participation in a DSH-wide anti-ligature risk reduction program sought to identify high risk areas for potential building redesign.

DSH-Patton reported no suicides or serious incidents related to self-injurious behavior. Review of ten SIRs for aggression toward self by *Coleman* patients indicated that only four were related to patient self-harm; none appeared to be suicide attempts or serious self-injuries.

---

[33] In their response to the Draft Report, defendants noted DSH-Atascadero added psychiatry representation to the hospital's suicide prevention committee after the monitoring tour.  Exhibit B at 5.

DSH-Patton policy made nursing, psychiatry, and psychology staff responsible for conducting suicide risk assessments.  During admissions, nursing staff performed initial suicide risk screenings.

### L.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

All three hospitals had an emergency response process.  None of the hospitals reported patient deaths during the reporting period.

DSH-Atascadero held multiple drills including those for medical emergencies.  Review of the hospital's medical emergency response evaluation audit indicated review of appropriate topics.  Most reported 100 percent compliance; all scored above 90 percent.  No *Coleman* class members died during the reporting period.

Due to COVID-19, DSH-Coalinga's mock emergency response drills followed an "abbreviated mock code schedule and modified process."  There were no patient deaths.

DSH-Patton's Unit 33 typically held mock emergency response drills with other units; only one of five was solely conducted on Unit 33.  The hospital further reported that Unit 33 did not conduct one of six required drills.  Otherwise, completed mock drill documentation indicated compliance.  Unit 33 did not report any code blue occurrences or deaths.

### M.    QUALITY MANAGEMENT AND UTILIZATION REVIEW

All three hospitals had robust, multi-layered quality improvement programs with multiple components comprised of numerous committees that the quality council supervised; risk and utilization management were also incorporated.

DSH-Atascadero continued to maintain complex and robust quality improvement and risk management programs with an extensive network of subcommittees that reported to the quality council and risk management utilization review committee.  There were several quality improvement plans and action items that various committees monitored.  The hospital also

conducted audits targeting areas of concern.

The quality council was chaired by the executive director, typically met weekly, and functioned as an oversight committee tasked with identifying and monitoring quality improvement projects. Meeting minutes generally included comprehensive summaries and various committees' reports. Agenda items included program proposals, action items, staff trainings, and staff recruitment and retention efforts. Audit outcome data and quality improvement plans were also discussed during the meetings.

DSH-Atascadero's risk management quality improvement structure addressed mortality, suicide prevention, violence, risk management, utilization, medication, high risk assessment, and treatment support. The risk management utilization review committee generally met monthly and reported information relevant to the use of restraints, seclusion, suicide prevention, and information from other committees. The suicide prevention, medical risk management, program review, facility review, treatment support, and violence prevention committees all reported to the risk management utilization review committee.

DSH-Atascadero also had a hospital advisory council (HAC) patient involvement quality improvement body. The HAC was designed to provide patients with opportunities to practice self-efficacy; patients were also able to make suggestions for improvement and had input into policy and programs.

Due to prior issues regarding the methodology and use of treatment plan audit data, DSH-Atascadero conducted quantitative treatment plan audits. Of 137 reviewed treatment plans, 89 percent were reported as compliant, a two percent decrease since the prior reporting period. Deficient areas included timely completion, inaccurate recorded group treatment hours, lack of approved interventions, documented coping skills, and reasons for hospital admission.

64

DSH-Coalinga continued to have a robust, multi-layered quality improvement program (QIP). Stated QIP goals included appropriate assessment and documentation of incidents and corrective actions to prevent recurrence.

The quality council, which the executive director oversaw, met monthly, supervised quality improvement, and chartered quality management teams (QMTs) to address problems. Additional hospital committees included the medical executive committee and the clinical management team; their duties included operational, administrative, and clinical oversight of the quality management subcommittees and chartering necessary QMTs. Quality management subcommittees were responsible for monitoring specific quality improvement efforts while QMTs clarified problems, collected data, and provided recommendations.

DSH-Coalinga's risk management system also included a robust approach with two primary components: the treatment plan team which addressed specific risks and benefits of patients' therapeutic and rehabilitative interventions, and the risk management program which identified immediate and long-term patient high-risk situations and suggested actions to reduce risk. The utilization management committee reviewed patients' treatment and recommended their continued stay in the program or appropriateness for discharge.

DSH-Patton's quality management program continued to be guided by DSH Policy Directive 9000 and several local administrative directives and nursing policies and procedures. The quality council met monthly and oversaw the quality management program and routinely reviewed violence data, performance improvement projects, and individual departments and programs. The quality improvement process included tracking of core group treatment and individual therapy hours.

The hospital also conducted routine and specialty audits including admission risk and

hazard risk assessments, high-risk profile analyses, and environmental audits. DSH-Patton used results from quality assurance and quality improvement audits to improve processes, adjust policies, and conduct trainings. However, action plans were often not submitted due to the COVID-19 pandemic.

A utilization management committee was established in August 2021 to meet the expectations of the MOU between DSH and CDCR to review *Coleman* patients' lengths of stay. Meetings were held every two weeks and discussed the Unit 33 census and patients' lengths of stay and treatment progress. Reviewed minutes revealed adequate discussions of patients' treatment progress and ongoing needs.

Since the prior site visit, DSH-Patton had experienced unannounced visits by both the Joint Commission and the California Department of Public Health (CDPH). The Joint Commission's findings led to the development and implementation of a hospital-wide audit.

### N.    PATIENT COMPLAINTS/PATIENT SATISFACTION

Patient surveys completed at two of three hospitals generally indicated satisfaction with provided treatment. Nonetheless, patients filed 140 complaints at DSH-Atascadero, 58 complaints against DSH-Coalinga, and eight complaints with Disability Rights California against DSH-Patton.

Patient satisfaction survey results for DSH-Atascadero's *Coleman* patients exceeded 90 percent for nine of 14 queries. However, 43 *Coleman* patients made a total of 140 complaints about the provision of mental health and medical care, personal possessions, advocacy services, treatment record confidentiality, and various daily living issues. DSH-Atascadero's updated September 2021 administrative directive on patient complaints clarified that patient abuse/neglect complaints had to be investigated and addressed the appeals process. Patients nonetheless reported an unclear appeals process and the executive director's lack of response to

their appeals.  Standards and compliance staff further reported that the hospital did not have a record of patient appeals.

DSH-Coalinga reported that only two patients who were discharged from the *Coleman* unit completed the patient survey.  Both strongly agreed that they were appropriately referred to DSH-Coalinga and that staff encouraged their participation in treatment planning.  Overall, both patients reported that DSH-Coalinga's treatment program was extremely helpful.

The California Office of Patients' Rights at DSH-Coalinga received 54 complaints from 12 *Coleman* patients.  DSH-Coalinga also received four complaints through external affairs.  The complaints addressed concerns about confidentiality, involuntary medications, and daily living and legal issues, among other matters.

DSH-Patton did not conduct patient satisfaction surveys during the review period. However, eight patient complaints were filed with Disability Rights California that addressed mental health treatment, daily living and legal issues, and other matters.  DSH-Patton was unaware of these complaints' outcomes at the time of the site visit.

### O.    *COLEMAN* POSTINGS

The monitor observed *Coleman* posters in English and Spanish in patient-accessible areas in housing units with *Coleman* patients at DSH-Atascadero, in a patient accessible showcase on Unit 21 at DSH-Coalinga, and in Unit 33 at DSH-Patton.

### P.    LAUNDRY AND SUPPLY ISSUES

All three hospitals had adequate supplies of bed linens and patient clothing and typically reported sufficient supplies of personal hygiene items.

Observed laundry and supply areas at DSH-Atascadero revealed adequate supplies of bed linens and clothing.  Patients were provided with clean clothes three times weekly; bed linens were exchanged weekly.

DSH-Coalinga's *Coleman* unit had an abundant supply of patient clothing, bed sheets, blankets, and towels; new laundry and linen supplies were delivered daily. There was also an ample supply of personal hygiene and cleaning supplies. DSH-Coalinga reported that three ply surgical masks and hand sanitizer were available to patients upon request.

At DSH-Patton, there were no patient complaints about laundry or supplies and there were adequate supplies of clothing, linen, and hygiene and grooming items.

Q.    **VISITATION/PRIVILEGES/TELEPHONE ACCESS**

During the review period, COVID-19 restrictions led all three hospitals to utilize tele-visitation to supplement in-person visiting; the latter was typically used for non-quarantined patients. Reported property issues were limited to delays or infrequent non-receipt of patient property from CDCR institutions. There were no patient complaints about telephone access.

DSH-Atascadero resumed in-person visitation in April 2021 for non-quarantined housing units following its suspension due to COVID-19. The hospital also used tele-visiting during the review period. Initial technical difficulties with tele-visitation were substantially resolved by the site visit. It was further reported that, going forward, the hospital planned to use both tele-visits and in-person visitation. DSH-Atascadero *Coleman* patients reported that personal property took four to six weeks to arrive from CDCR institutions.

During the reporting period, DSH-Coalinga's Unit 21 used virtual visitation, which was available once daily for 30 minutes, for *Coleman* patients. In-person visitation was available for non-quarantined units.

DSH-Coalinga patients had daily access to the community dayroom which had two telephones with no limitations on use. Patients also had yard access several times weekly and access to the canteen, barber shop, restaurant, post office, and library. Hospital leadership reported that the non-receipt of patient property from CDCR rarely occurred. Tellingly, the lack

68

of electrical outlets in the *Coleman* unit prevented patients' use of personal entertainment devices.

In April 2020, DSH-Patton launched it tele-visitation program to facilitate visitation during the pandemic. Staff reported that this program had increased patients' social support and that it had continued with the resumption of in-person visitation in April 2021. No issues were noted with the arrival of, or access to, patient personal property upon admission. There were no patient complaints about telephone access.

R.    **LAW LIBRARY ACCESS**

COVID-19 restrictions typically limited patients' access to the law library.

During the site visit, patient access to DSH-Atascadero's library was restricted due to COVID-19 mitigation policies. However, the hospital gave in-person library access to patients representing themselves in legal matters. Other patients had to request reading and legal research materials which were delivered to them.

DSH-Coalinga denied quarantined patients' physical access to the library. When not on quarantine, Unit 21 was scheduled for one weekly hour of library. Frequently, a library kiosk was brought to the unit for patient use.

DSH-Patton patients had no complaints about law library access. Staff and patients indicated patient access to one computer kiosk and the ability to print legal forms, court directories, and attorney lists. The librarian provided materials to patients who could not physically go to the law library.

S.    **MILESTONE CREDITS**

DSH-Atascadero staff indicated that CDCR was responsible for calculating *Coleman* patients' milestone credits during their hospital stay.

Both DSH-Coalinga and DSH-Patton reported that previous issues with CDCR's inability to record milestone credits had been resolved.

### CONCLUSION AND RECOMMENDATIONS

Overall, the established hospital therapeutic milieu that existed at each DSH facility helped to mitigate the shortfalls presented and discussed in this report. Relatedly, the therapeutic environment at the DSH hospitals was more conducive to the provision of inpatient mental health care to *Coleman* class members than that of CDCR's PIPs. The monitor's expert's findings continued to reflect the importance of *Coleman*-designated beds at DSH facilities to defendants' inpatient mental health care system. As such, the Special Master remains concerned with the ongoing underutilization of *Coleman*-designated beds at DSH hospitals. Defendants must continue to focus their efforts on identifying and referring all eligible patients to DSH beds and removing barriers to admission to DSH hospitals. It is possible that the UNA study will increase the number of *Coleman* class members treated at DSH.

Clinical staffing vacancies remained a primary concern across all of defendants' inpatient mental health programs during the review period. While two of three DSH hospitals (DSH-Coalinga and DSH-Patton) were compliant with minimum staffing requirements, the hospital with the most *Coleman*-designated beds, DSH-Atascadero, was noncompliant.

The court first ordered DSH to develop an inpatient staffing plan five years ago. ECF No. 5573 at 3. After receiving considerable feedback from the Special Master and plaintiffs' counsel, DSH filed its staffing plan on March 11, 2021, ECF No. 7078, which the court provisionally approved in a March 25, 2021 order. ECF No. 7108 at 1. As required by the March 25, 2021 order, this report includes the Special Master's findings obtained during the one-year provisional approval of DSH's staffing plan.

DSH's provisionally approved staffing plan appropriately reduced staff-to-patient ratios for *Coleman* patients resulting in an additional treatment team being allocated to DSH-Atascadero.  Moreover, the staffing plan provided an overview of a number of DSH's ongoing recruitment and retention efforts.  Like their CDCR counterparts, DSH must continue to explore and utilize all available resources to bolster its recruitment and retention efforts and maintain adequate clinical staffing levels in light of the major challenges defendants face with clinical staffing in all disciplines.  DSH must fully implement its staffing plan at DSH-Atascadero and maintain observed compliance at DSH-Coalinga and DSH-Patton.  The Special Master will continue to monitor compliance with the staffing plan and clinician-to-patient ratios going forward as part of his regular monitoring responsibilities.  However, the Special Master and his expert previously found DSH's provisionally approved staffing plan to be adequate and nothing reported herein changed that assessment.  Accordingly, the Special Master recommends the court approve DSH's staffing plan.

As noted herein, the Special Master and parties worked together during the review period to move DSH's CQI program forward.  During this process, the Special Master and his expert have found DSH's CQI process robust.  As of July 5, 2022, having received substantive feedback from plaintiffs' counsel through multiple all-parties meetings, the Special Master informed the parties of his determination that DSH's CQI process was adequate and provided final approval to defendants to implement it.  The Special Master will monitor DSH's CQI process going forward as part of his regular monitoring responsibilities.

DSH's full implementation and compliance with its filed inpatient Staffing Plan combined with the department's robust CQI system is expected to strengthen capacity in the hospitals to provide appropriate care to *Coleman* class members.  While the Special Master

remains concerned about the underutilization of DSH beds, generally those *Coleman* class members who are admitted to DSH beds receive higher quality inpatient mental health care than what is provided in the Lift and Shift PIPs.  *See* ECF No. 7555 at 14 (defining "Lift and Shift PIPs" as comprising CDCR's largest PIPs: CMF-PIP, CHCF-PIP, and SVSP-PIP); *see also supra* note 3.  The relative adequacy of the care provided at DSH hospitals will be further bolstered by its robust CQI process.  Accordingly, effective ongoing monitoring of the DSH hospitals may be achieved by paper review during the next monitoring round with the Special Master retaining his authority to resume site visits should he deem that in-person site visits are warranted.

## <u>RECOMMENDATIONS</u>

In view of the findings contained herein, the Special Master recommends that the *Coleman* court enter an order directing the following:

1. That defendants' Department of State Hospital's Inpatient Staffing Plan filed on March 11, 2021, ECF No. 7078-1, be approved.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr., Esq.
Special Master

October 14, 2022

**APPENDIX A**

**Activities of the Special Master Since the Submission of the Twenty-Ninth Round Report –
Part A:  Special Master's Monitoring Report on the Psychiatric Inpatient Programs for
Mental Health Patients of the California Department of Corrections and Rehabilitation on
May 17, 2022**

**ACTIVITIES OF THE SPECIAL MASTER SINCE THE SUBMISSION OF THE TWENTY-NINTH MONITORING ROUND REPORT - PART A: SPECIAL MASTER'S MONITORING REPORT ON THE PSYCHIATRIC INPATIENT PROGRAMS FOR MENTAL HEALTH PATIENTS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ON MAY 17, 2022**

### 29TH ROUND MONITORING TOURS

- FSP/FWF – May 17, 2022 to May 19, 2022
- NKSP - May 17, 2022 to May 19, 2022
- CTF – May 24, 2022 to May 26, 2022
- CCI – July 12, 2022 to July 14, 2022
- PVSP – July 19, 2022 to July 21, 2022
- HDSP – July 26, 2022 to July 28, 2022
- SCC – August 9, 2022 to August 11, 2022
- PBSP – August 16, 2022 to August 18, 2022
- WSP – August 23, 2022 to August 25, 2022
- ASP – August 30, 2022 to September 1, 2022

### ALL PARTIES MEETINGS

- Policy Meetings – Two meetings

### DATA REMEDIATION ACTIVITIES

- Resolution of Certain Data Remediation Issues, including Data Activation Schedule Template and Dispute Resolution Process (ECF 7556)
- Data and CQI Meetings – Eight meetings
- Business Rules and Methodology Review Workgroup – 20 meetings
- Verification Meeting with CCHCS – 43 meetings
- Quality Assurance Certification Workgroup – 18 meetings
- Technical Writing Meetings with Dr. Robert Canning, Mental Health – Nine meetings

### ANNUAL SUICIDE REPORT NEGOTIATIONS AND SUICIDE PREVENTION

- Special Master's Report and Recommendation Regarding the California Department of Corrections and Rehabilitation's Proposal for Assuming the Annual Suicide Monitoring Report, filed June 28, 2022 (ECF No. 7574)
- The Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs, draft circulated to the parties on July 1, 2022
- All Parties Meeting– Three meetings
- Meetings with Secretary Kathleen Allison – One meeting

74

**COURT COORDINATION MEETINGS – Three meetings**

**SMALL WORKGROUP MEETINGS**

- DSH Small Workgroup – 15 meetings

**UNA MEETINGS**

- Case Presentations – 180 meetings
- Dispute Resolutions – 19 meetings
- Trainings – 14 trainings
- Patient Interviews – Ten patient interviews

**POLICIES**

- Psychiatry Contact Requirements for Patients in the MHSDS Prior to IDTT Memorandum  - Issued to the field June 23, 2022
- Crisis Intervention Team (CIT) Policy – Revised and issued to the field July 6, 2022
- SRE Mentoring Policy –Issued to the field July 12, 2022
- Mental Health and Custody Staff Reporting Safety Concerns, Issued to the field September 21, 2022

**TELEPSYCHIATRY**

**Hub Tours**

- Fresno Hub – August 16, 2022
- Elk Grove Hub – August 17, 2022
- San Quentin Hub – August 18, 2022
- Diamond Bar Hub– August 23, 2022
- Santa Ana Hub – August 24, 2022

**Meetings with Secretary Allison – Two meetings**

**APPENDIX B1**
**Atascadero State Hospital (DSH-Atascadero)**

**DSH-Atascadero**
March 8 - 10, 2022

## I.    SUMMARY OF FINDINGS

- At the time of the site visit, DSH-Atascadero's *Coleman* census of 136 patients was 45 percent lower than the hospital's census of 249 *Coleman* patients that was reported during the prior paper review in February 2020.

- Program V, where *Coleman* patients were typically housed, had 131 *Coleman* patients and 125 non-*Coleman* class members, for a total of 256 patients.

- DSH-Atascadero's executive positions were filled by permanent staff and by staff serving in acting capacities.

- The chief psychiatrist position was vacant but filled in an acting capacity.

- There was a 67 percent vacancy rate for psychiatrists, which contractors reduced to an 11 percent functional vacancy rate.

- There was a 50 percent functional vacancy rate for supervising psychologists.

- The psychology vacancy rate was 22 percent.

- The supervising social worker position was filled; there was an 11 percent vacancy rate for social workers.

- The supervising rehabilitation therapist position was filled; there was a 22 percent vacancy rate for rehabilitation therapists.

- There was a 17 percent vacancy rate for senior psych techs and an 11 percent psych tech vacancy rate.

- All six *Coleman* unit supervisor positions were filled.

- DSH-Atascadero did not have allocated telepsychiatry positions and did not use telepsychiatry during the reporting period or at the time of the site visit.

- In all four of Program V's intermediate care treatment units that housed *Coleman* patients during the site visit, the clinician-to-patient ratios for psychiatry, psychology, social work, and rehabilitation therapy significantly exceeded the designated 1:35 clinician-to-patient ratio, and the 1:30 ratio outlined in the Staffing Plan.

- DSH-Atascadero functioned as a hospital that provided mental health treatment to CDCR and OMHD patients.

- Program V units had established therapeutic milieus.

- Treatment limitations at DSH-Atascadero due to COVID-19 resulted in the closure of the hospital's treatment mall, resulting in all treatment activities being held either on the housing units or in the units' recreation yards.

- DSH-Atascadero staff were appropriately providing mental health services to *Coleman* patients under the current COVID-19 limitations.

- DSH-Atascadero staff recognized that the current treatment hours provided to *Coleman* patients were not adequate for an inpatient setting but were acceptable in the context of current COVID-19 limitations.

- The hospital's established therapeutic milieu was a significant mitigator to the limited number of treatment hours being provided.

- The quality of several observed IDTTs indicated variable input from psychology, minimal social worker participation, a lack of collaborative discussion, and no discussion of patients' group participation, although group therapy was the primary treatment modality.

- Other observed IDTTs were collaborative and interdisciplinary, and demonstrated active clinical discussion of treatment progress and treatment outcomes.

- *Coleman* patients were offered an average of 7.1 hours of core group per patient per week with a range off 1.91 to 8.97 hours.

- The hours of supplemental group offered per *Coleman* patient per week was five hours with a range of 3.07 to 7.44 hours for all *Coleman* patients.

- Across designated *Coleman* units the range of delivered treatment was 9.1 to 15.8 hours for each patient per week.

- Observed patient groups varied, with some groups well-led with appropriate patient engagement; in others, patients were not as engaged.

- Interviewed patients confirmed meeting with their treatment teams monthly, being generally familiar with their treatment plans, and described very good access to psychiatrists and other clinicians.

- DSH-Atascadero did not commonly provide individual treatment.

- Chart reviews indicated compliance with frequency of psychiatry contacts, ordered laboratory studies, and performance of comprehensive and timely physical examinations for side effects.

- Staff stated that the mixing of *Coleman* and OHMD patients at times created challenges

because *Coleman* patients tended to perceive that OHMDs did not bear and/or not care about the consequences of their misbehaviors.

- The mixing of *Coleman* patients on the same unit with OMHDs was much less than ideal but appeared workable.

- There were no uses of force to administer involuntary medications.

- Staff reported that behavioral management plans were not the best tool for *Coleman* patients, in part due to patients' improved behavior upon hospital admission; further, patients were often discharged from the hospital when they engaged in behaviors that warranted a behavioral management plan.

- Re-entry planning was reported by staff to be included in the patient's treatment goals; however, a review of patient records indicated that re-entry plans were not clearly incorporated into treatment plans.

- During observed morning and evening end-of-shift meetings, there was discussion of key clinical and other information about each patient on the units.

- Patient work opportunities were severely curtailed due to COVID-19 restrictions.

- Aztec Adult School offered distance learning.

- DSH-Atascadero continued to use the HAS during the reporting period.

- Compared to the preceding review period, when 331 male *Coleman* patients were referred to DSH, referrals decreased by 65 percent.

- Eighty-eight patient referrals, or 87 percent, transferred within 30 days and were compliant with Program Guide inpatient transfer timeframe requirements.

- Compared to the preceding reporting period, when 290 *Coleman* patients were admitted to DSH-Atascadero, admissions declined by 65 percent.

- DSH-Atascadero reported no completed suicides or serious suicide attempts during the review period.

- DSH-Atascadero continued to maintain complex and robust quality improvement and risk management programs with numerous subcommittees that reported to the quality council and risk management committee.

- DSH staff indicated that CDCR was responsible for calculating milestone credits for *Coleman* patients during their hospital stay using data uploaded by DSH that was based on received treatment.

II.    **CENSUS**

On March 7, 2022, DSH-Atascadero reported a total patient population of 954, which included 136 CDCR patients in the hospital pursuant to California Penal Code (PC) 2684 (*Coleman* patients or *Coleman* class members).  As DSH-Atascadero was required to designate 256 beds for *Coleman* patients, during the site visit *Coleman* patients comprised 53 percent of bed capacity.  Compared to the prior review period, when DSH-Atascadero housed 249 *Coleman* patients, representing 97 percent of the hospital's bed capacity, DSH-Atascadero's *Coleman* population had decreased by 44 percent.

DSH-Atascadero's Program V intermediate care treatment units housed 131, or 96 percent, of the hospital's 136 *Coleman* patients in Program V Units 30, 32, 33, and 34.  Unit 30 housed 43 patients, including 24 *Coleman* class members; Unit 32 had a census of 46 patients that included 42 *Coleman* patients; Unit 33's census of 43 patients included 41 *Coleman* class members; and 24 of the 46 patients in Unit 34 were *Coleman* class members.  Unvaccinated patients were housed in cohorts in admissions units.  There were two *Coleman* class members in cohorts housed in Program V's admissions Unit 24.  Two other *Coleman* patients were in cohorts in admissions Unit 12, which was a non-Program V housing unit.  The hospitals' medical unit housed one *Coleman* patient.

In addition to housing 131 *Coleman* patients, Program V also housed 125 non-*Coleman* class members, for a total of 256 patients.  Program V beds occupied by non-*Coleman* class members included patients who were not guilty by reason of insanity (PC 1026) and OMHDs, PC 2962.

There were no least restrictive housing (LRH) concerns for Program V as the intermediate care bed units were unlocked dorms.

III.    **STAFFING**

1.    **Administrative and Clinical Staffing**

DSH-Atascadero reported that all five of Program V's executive positions were filled.

Permanent staff filled positions for the executive director, hospital administrator, and nurse

administrator.  Staff in acting capacities assigned to programs that did not treat *Coleman* patients

filled positions for the medical director and clinical administrator.  Program V's three

management positions of program director, program assistant, and nursing coordinator were also

filled by permanent staff.

> Chief Psychiatrist:  The chief psychiatrist position was vacant but filled in an acting
>
> capacity by clinical staff assigned from a hospital program that did not treat *Coleman*
>
> class members.
>
> Senior Psychiatrist:  The senior psychiatrist position was vacant since 2011.
>
> Psychiatrists:  Three of nine psychiatry positions were filled, for a 67 percent vacancy
>
> rate.  Contractors reduced vacancies to one, for an 11 percent functional vacancy rate.
>
> Supervising Psychologist:  The supervising psychologist position was vacant.  A
>
> supervising psychologist assigned to Program IV provided 0.5 FTE services, resulting in a
>
> 50 percent functional vacancy rate.
>
> Psychologists:  Seven of nine psychology positions were filled, for a 22 percent vacancy
>
> rate.
>
> Supervising Social Worker:  The supervising social worker position was filled.
>
> Social Workers:  Eight of nine social worker positions were filled, for an 11 percent
>
> vacancy rate.
>
> Supervising Rehabilitation Therapist:  The supervising rehabilitation therapist position

was filled.

Rehabilitation Therapists:  Seven of nine rehabilitation therapist positions were filled, for a 22 percent vacancy rate.

Registered Nurses (RNs):  Twenty-four of 35 RN positions were filled, for a 31 percent vacancy rate.

Senior Psych Techs:  Of 18 senior psych tech positions, 15 were filled, for a 17 percent vacancy rate.

Psych Techs:  Ninety-three of 104 psych tech positions were filled, leaving a functional vacancy rate of 11 percent.

Unit Supervisors:  All six *Coleman* unit supervisor positions were filled.

Correctional Staff:  Staff reported that CDCR assigned two correctional counselors to DSH-Atascadero to provide custodial services to patients for new admissions, parole, appeals, RVRs, and other custodial matters.

DSH-Atascadero used Department of Police Services (DPS) staff for security.  The DPS chief was under the supervision of both DSH and DSH-Atascadero and reported directly to the hospital administrator.

## 2.    **Telepsychiatry**

DSH-Atascadero reported that the hospital did not have allocated telepsychiatry positions and did not use telepsychiatry during the reporting period or at the time of the site visit.  Staff further reported that the hospital did not have future plans to utilize telepsychiatry.

## 3.    **Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

Each of Program V's housing units was assigned clinical staffing that included one psychiatrist, one psychologist, one social worker, and one rehabilitation therapist.  DSH-

Atascadero's designated clinician-to-patient ratios for these four disciplines was 1:15 in the admissions unit and 1:35 for intermediate care. DSH's Staffing Plan had recommended changing this ratio to 1:30 for intermediate care.

In all four of Program V's intermediate care treatment units that housed *Coleman* patients at the time of the site visit, the clinician-to-patient ratios for psychiatry, psychology, social work, and rehabilitation therapy significantly exceeded the designated 1:35 clinician-to-patient ratio, as well as the recommended 1:30 ratio contained in the DSH Staffing Plan.

### 4.    **Staff Training**

DSH-Atascadero reported 90 percent compliance for all required trainings for psychiatrists, psychologists, social workers, and rehabilitation therapists. These disciplines completed necessary trainings for TSI, HIPAA, patient's rights, pain management, mandatory reporting of abuse and neglect, and suicide review. There was also compliance for designated clinicians' completion of cardiopulmonary resuscitation (CPR) training.

## IV.    **TREATMENT AND CLINICAL SERVICES**

Similar to the prior review period, DSH-Atascadero's Program V operated like a hospital that provided mental health treatment to CDCR and OMHD patients as opposed to functioning like a prison that provided mental health treatment to inmates. Notably, Program V units had established therapeutic milieus and *Coleman* patients uniformly reported benefitting from offered treatment. Nonetheless, patients expressed some concerns as to current limitations that were related to COVID-19 issues.

These COVID-19 treatment limitations resulted from the closure of the treatment mall, which meant that all treatment activities were held either on the housing units or in the units' recreation yards. Related to the limited number of multipurpose group rooms on the units and

staffing issues, the average number of hours of structured therapeutic activities offered to patients was very limited.

Staff reported that, due to COVID-19 protocols, it was not unusual for patients to be housed on an admissions unit for more than 30 days. Staff further indicated that while on an admissions unit, patients received a comprehensive assessment by all disciplines, while treatment plans were developed and implemented. Staff further reported that treatment plans developed in the admissions unit were required to reflect the TOEs summarized in CDCR's referral package. Starting not long before the site visit, staff reported that most *Coleman* patients were no longer being admitted to admission units; instead, they were directly admitted to treatment units pursuant to current COVID-19 protocols.

Given COVID-19 limitations, DSH-Atascadero staff were appropriately providing mental health services to *Coleman* patients. However, staff further recognized that current provided treatment hours were inadequate for an inpatient setting but were acceptable in the context of current COVID-19 limitations. It was undeniable that the hospital's therapeutic milieu was a significant mitigator to the limited number of provided treatment hours, reflecting significant effort by DSH-Atascadero staff.

Staff also reported the need for either Spanish-speaking clinicians or access for Spanish speaking only *Coleman* patients to a Spanish-speaking treatment unit.

## 1. Interdisciplinary Treatment Teams (IDTTs)

Observed Unit 34 IDTTs found treatment rooms that were adequate in terms of space, temperature, and lighting. The treatment teams used paper chart medical records. Staff further reported that treatment teams focused on patients' current viability, as opposed to summarizing patients' functioning since the last treatment team meeting and specific treatment goal progress,

which healthcare record reviews confirmed.  Treatment teams further reported their belief that they could not change CDCR-developed TOEs.

Seven observed Unit 34 IDTTs (one initial, six routine) found all required staff in attendance for all but one IDTT.  Treatment team members were empathic and aware of patients' mental health issues.  The unit psychiatrist led treatment team meetings and asked a series of mental status and functioning questions that included questions on group attendance.  While the psychologist's input was variable during the psychiatrist's assessment, remaining team members waited until prompted by the psychiatrist and then only provided minimal input.  Additionally, although there were opportunities for all team members to participate, IDTT discussions were not truly collaborative as to patients' treatment needs and treatment goal progress.  Further, while group was DSH-Atascadero's primary treatment modality, there was no discussion of patients' assignment to groups or group participation related to treatment goals.  IDTTs also missed opportunities to address low group attendance.

The social worker supervisor rarely participated in observed IDTTs.  When she did, she acknowledged not reviewing patients' healthcare records.  For reasons that were unclear and concerning, the social work supervisor asked an obviously low functioning seriously mentally ill patient about his discharge plans.  The patient subsequently became visibly distressed, and the psychiatrist redirected the conversation.  After the patient left the room, the treatment team reported that the plan was to continue the patient's hospitalization long-term.

One IDTT patient was discharging and returning to CDCR.  Although it would be anticipated that an overview of his course of treatment, treatment progress, and areas for improvement would be discussed during the IDTT, however, this did not occur.  The treatment team was also not aware of the patient's reaction to his pending discharge in advance of the

IDTT.

Observation of four IDTTs for four patients on Unit 32 found all required treatment team members to be present.  The psychiatrist facilitated the IDTTs, which were collaborative and interdisciplinary, with all attendees' active discussion.  There were brief discussions prior to patients entering the room.  TOEs were clearly projected on a screen for all team members to view.  Treatment team members also encouraged patients to review their TOEs with them as the team reviewed each goal.  Treatment progress, level of risk, medication management, current symptoms, group attendance, and possible employment at the hospital were also discussed during IDTTs.

Observed treatment team meetings for four patients on Unit 30 found all required disciplines, as well as patients, in attendance.  IDTT members provided input and patients were given opportunities to participate and ask questions.  There was discussion of treatment progress and interested patients were provided with a copy of their treatment plan.  Treatment teams briefly reviewed treatment plans with each patient during the IDTTs.

### 2.    Group Therapy

The treatment mall had been closed since the pandemic's onset, which resulted in all treatment being provided on the units or in units' shared recreation yards.  The monitor's expert observed that this had led to a blurring of previous distinctions between core therapy groups and supplemental treatment activities.

Staff reported that group assignment was contingent on TOEs, treatment team discussions, and patient input with an emphasis on patient interests.  In those instances when a group was unavailable for a patient's needs, individual therapy and/or a consulting clinician would be considered.  Unit 34 staff reported that the psych tech developed a patient's group

schedules after the patient's initial IDTT based on provider recommendations gleaned from initial evaluations and patient input.  It was not clear why IDTTs did not discuss or assign groups.

During the review period, core groups accounted for 61 percent of provided treatment to 229 *Coleman* patients.  Core groups offered to patients averaged 7.1 weekly hours with a range of 1.91 to 8.97 hours for all *Coleman* patients.  Although DSH-Atascadero reported that the average amount of core groups attended by *Coleman* patients was 12 weekly hours, the monitor's expert's independent data calculation yielded 5.38 hours[34] and ranged from 1.77 to 6.91 hours.

Supplemental groups were not scheduled for patients but were posted.  Patients could attend any supplemental group, which accounted for 39 percent of provided treatment to 232 patients during the review period.  The weekly number of hours of supplemental group offered per patient was five hours and ranged from 3.07 to 7.44 hours for all *Coleman* patients.  *Coleman* patients attended a weekly average of five hours of supplemental groups, with a range from three to 7.44 hours.

*Coleman* patients' weekly treatment hours, which included core and supplemental groups, and individual treatment, varied by DSH-Atascadero unit.  Across designated *Coleman* units, delivered treatment ranged from 9.1 to 15.8 weekly hours.  Specifically, Unit 30 offered 15.8 weekly hours of treatment per patient, with patients attending 13.5 weekly hours.  For Unit 32, the hospital offered 8.7 weekly hours per patient; patients attended an average of 7.1 weekly hours.  Unit 33 offered 14 weekly hours of treatment, with patients attending 11.9 weekly hours.

---

[34] In their response to the Draft Report, defendants noted a discrepancy between the monitor's expert's calculation (5.38 hours per patient per week) and DSH's CQI data (5.85 hours per patient per week.  Exhibit B at 3.

On Unit 34, 13.9 hours of weekly treatment was offered; patients attended 12.7 weekly hours.

Where limited hours were offered, staff reported that this was related to treatment space limitations within the unit, staffing vacancies, and COVID-19 restrictions. Unit 30 staff reported providing patients with a copy of their group schedule; staff reminders to patients to attend group were atypical. Some patients attributed their low group attendance to not having copies of their group schedule or needing reminders to attend groups.

Observation of two Unit 34 core groups revealed a poorly facilitated group monopolized by two patients, and a well-led group with appropriate patient engagement. However, neither facilitator encouraged group discussion between patients, which was a key ingredient and the underpinning of the role of group therapy.

In one of the observed groups, on aggression reduction, there were nine patients in attendance. A covering psychologist led this de-escalation group as the assigned unit psychologist was in training. During the group, the psychologist posed various questions to participants about de-escalation to facilitate conversation; however, conversation primarily occurred between two active patient participants as the remaining patients were disengaged.

Seven patients attended the other observed Unit 34 group, which addressed mental health wellness. A unit psychologist led the group, which focused on mood and anger management. With guidance and instruction, patients completed a handout that they applied to their recent mood. At the group leader's request, the patients then discussed their experiences. The group facilitator assisted patients with psychoeducation and offered examples of the kinds of experiences the group was addressing to assist patients. All patients were actively engaged; the facilitating psychologist was empathetic and had appropriate rapport with patients, who appeared to respect the facilitator.

Approximately 20 patients attended an observed mental health and wellness group on Unit 32. Patients were actively engaged. The group leader presented relevant information using patient-appropriate language.

Unit 30 groups were also observed. A psychologist-led stress management group attended by 16 patients was well-organized and demonstrated many patients' active participation. An observed mental health wellness group in the recreational yard revealed a social worker interacting with patients. This activity was essentially an unstructured patient recreational opportunity.

Unit 34 patients interviewed after group observations expressed satisfaction with the hospital's therapeutic milieu. Approximately half reported having treatment needs that were related to the group topic. Overall, however, patients provided mixed reviews about offered treatment. They attributed dissatisfaction to a lack of notification regarding discharge, lack of individual therapy, lack of individualized treatment, including unsatisfactory ("boring, laughable") group treatment, and COVID-19 restrictions. Patients further reported a lack of treatment for depression, and also requested trauma treatment. Patients were also unaware of their treatment goals, which was consistent with the lack of clear discussion about treatment goals during observed IDTTs.

Seven Unit 30 patients interviewed in two group settings about their experiences at DSH-Atascadero uniformly agreed that the hospital's treatment program benefitted them and was better than the treatment offered at CDCR. Nearly all had either been in a CDCR psychiatric inpatient unit or an enhanced outpatient program (EOP) prior to their transfer to DSH-Atascadero. Most of these patients had been at DSH-Atascadero for six to 12 months, though several were new admissions to Unit 30. None had been at DSH-Atascadero when the treatment

mall was open.

These patients reported meeting with their treatment teams monthly and being generally familiar with their treatment plans. They described very good access to the psychiatrist and other clinicians and did not indicate medication management issues. Patients generally described treatment groups as helpful. One patient complained about the lack of access to dialectical behavioral therapy. Patients further indicated that group size ranged from ten to 20 patients and that groups typically lasted for 45 minutes. Patients also reported daily access to outdoor recreational therapy.

Staff reported that patients were offered a minimum of one daily hour of outdoor recreational time, which at times was increased to ten weekly hours.

### 3.    Individual Treatment

As prior reports discussed, DSH-Atascadero did not commonly provide individual treatment, reflecting an institutional culture that did not perceive this treatment as essential. Individual treatment at DSH-Atascadero remained low during the site visit with between five and ten percent of patients regularly receiving individual therapy. Specifically, individual treatment was provided to 76 patients in the *Coleman* class, which was comparable to the 73 patients who reportedly received individual treatment during the prior site visit. The average number of scheduled and patient-attended treatment hours was less than one (0.7) weekly hour. Notably, some DSH-Atascadero patients expressed dissatisfaction with the lack of individual therapy. However, when individual treatment was utilized on Unit 34, patient's healthcare record documentation was comprehensive and clinically appropriate. Individual treatment sessions were typically approximately 30 minutes.

The Unit 34 psychologist reported that individual treatment was provided for several reasons, including treatment team recommendation, suicide risk, patient request, clinical need-based group or unit observation(s), and increased distress.

Reviewed charts reflected compliance for the frequency of psychiatry, psychology, and social work contacts.

### 4.    Psychiatric Services

On-site psychiatrists performed all psychiatric care.  Neither staff nor patients reported psychiatry continuity of care challenges.  Psychiatrists were expected to perform all initial psychiatric evaluations within 24 hours of patient admission.  They subsequently completed two weeks of weekly notes, which were followed by monthly notes.  Any significant medication changes or changes in patients' clinical status required an additional note.

All reviewed charts complied with required frequencies for psychiatry contacts. Psychiatrists also ordered laboratory studies and performed physical examinations for side effects in a comprehensive and timely manner.  While reviewed minutes noted pharmacy staffing challenges, there were no reported challenges with patients receiving medications.  Psychiatrists also reported no difficulties obtaining non-formulary medications.  Observation revealed robust medication safety procedures in place.

Several patients interviewed in a group setting all reported high levels of satisfaction with both the quality and utility of psychiatry services, as well as adequate time with the psychiatrist.

### 5.    Other Treatment Issues

#### A.    Involuntary Medications (PC 2602)

During the review period, DSH-Atascadero admitted 23 patients with PC 2602 involuntary medication orders.  Five new petitions were submitted, ten orders were renewed, and

91

seven were permitted to expire.  DSH-Atascadero was unable to provide the number of

submitted petitions that were denied.  There were no uses of force to administer involuntary

medications.

### B.    Clozapine

DSH-Atascadero reported prescribing clozapine to between 14 and 23 *Coleman*

patients on a monthly basis during the review period.  There were also nine clozapine

initiations.  Psychiatry and nursing staff demonstrated a clear understanding of blood work,

medical, and safety requirements that were necessary for this medication.  All patients who

were prescribed clozapine were monitored by both their attending physician and the hospital's

clozapine clinic.

### C.    Offenders with a Mental Health Disorder (OMHD) in a *Coleman* Unit

The monitor's expert reviewed Unit 30 to assess the impact of treating *Coleman* class

members and OMHD patients on the same unit.  While during the review period *Coleman*

patients typically comprised between 60 and 90 percent of Unit 30's patients; the unit also

housed OMHD patients.  At the time of the site visit, there had been an increasing number of

OMHDs admitted to Unit 30, which was reportedly related to pressure put on DSH-Atascadero

to admit PC 1370 patients from California jails.  Staff reported that OMHD patients required a

disproportionate amount of clinical time.  Staff further described *Coleman* patients as generally

being much more appreciative of being at DSH-Atascadero when compared to the OMHDs.

Staff stated that mixing these two patient populations at times created challenges because

*Coleman* patients tended to perceive that OHMD patients did not bear and/or not care about the

consequences of their misbehaviors.  This had led to physical fights between the two classes of

patients.  Staff also indicated that OMHDs could be classified into long-term versus short-term

OMHDs based on their current length of stay, with each group tending to exhibit different dynamics.  Unit 30 staff described long-term OMHDs as being more difficult to treat and/or manage.  The mixing of PC 2684 patients on the same unit with OMHDs was much less than ideal but appeared workable.

### D.    Behavioral Management

Staff opined that behavioral management plans were not the best tool for *Coleman* patients, in part due to patients' improved behavior upon hospital admission.  DSH-Atascadero further indicated that behavioral management plans were not utilized with *Coleman* patients because these patients were often discharged from the hospital when they engaged in behaviors that warranted a behavioral management plan.

### E.    Pre-Release Planning

Pre-site data indicated that at the time of the site visit, 21 patients had 90 days or less until parole.  A focused healthcare record review of three charts indicated social workers' completion of discharge summaries.  However, reviewed chart documentation was neither detailed nor individualized to patients' unique treatment and discharge needs.  Rather, reviewed documentation indicated generic statements that the patient would be discharged once TOEs were met.  Re-entry documentation also varied as to patients' specific plan upon discharge.  Although documentation reflected the provision of resource information, specificity was not provided.  Staff reported that patient's treatment goals included re-entry planning, but reviewed patient records indicated that treatment plans did not clearly incorporate re-entry plans.

TCMPs were expected to occur with patients within 90 to 120 days of patient release.  DSH-Atascadero indicated that TCMP staff regularly met with patients at the hospital.  However, reviewed documentation that tracked TCMP contacts for all patients released from

DSH-Atascadero reported that TCMP saw most released patients less than 90 days from their parole date, with a range of five to approximately 60 days.  TCMP did not see two patients; documentation in the record noted "N/A-Covid."

Unit 34 patients reported only learning about an upcoming discharge when they were given a COVID-19 test.  Patients denied any discussion of discharge readiness with treatment team providers.  Treatment teams confirmed that patients were not made aware of discharge dates due to health and safety reasons but became aware of upcoming discharges with the COVID-19 test.  While it was reasonable that staff would not disclose a specific discharge date, it would be beneficial if staff were to discuss discharge readiness with patients as clinically indicated.

During an observed IDTT, a patient stated that he expected to be discharged because he was given a COVID-19 test.  However, there was no discussion of discharge logistics.  There also was no summary of treatment progress and relapse prevention other than a brief statement by the rehabilitation therapist.

### F.    Access to Meaningful Jobs and Educational Opportunities

Staff reported that COVID-19 restrictions had severely curtailed patient employment assignments to in-unit positions such as housekeeping, unit laundry, and food service, which significantly restricted patient employment opportunities at DSH-Atascadero.

The Aztec Adult School offered distance learning to patients.  Instructional materials were provided through the mail and included weekly homework assignments.  Forty-seven *Coleman* patients participated in in-person educational activities that included academic disciplines including math, reading, and writing.

### G.    End-of-Shift Meetings

Observed end-of-shift meetings on Units 30 and 32 revealed treatment staff who were either ending or starting their shifts in attendance. Staff ending their shifts discussed observations and patient concerns to prepare staff who were beginning their shifts. During the meeting, key clinical and other information regarding each patient on the units was discussed. In Unit 32, the information was projected on a wall for all attendees to view.

## V.    PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

During the review period, DSH-Atascadero continued to use the HAS to promote positive patient behavior and treatment participation, and to access programming and privileges. The HAS was composed of a series of steps, from Level 1 through Level 5. Each step afforded more privileges, including greater mobility throughout the hospital. Patients were admitted at Level I, and advanced as their treatment team deemed clinically appropriate. Staff indicated that there had been no official changes in the administrative directive governing the HAS; however, due to COVID-19, informal changes had been made.

DSH-Atascadero's administrative directive outlined various patient privileges at each step level. Level 1 was for recently admitted patients and for patients with a "seriously altered mental status" who could not safely leave the unit without supervision. Level 1 patients thus required a staff escort to leave their unit. Level 2 patients were allowed to leave their unit without a staff escort and could go to a single destination prior to returning to their unit. Level 3 patients had to have repeatedly demonstrated an ability to behave in a safe manner off-unit and could go to a maximum of three destinations prior to returning to their unit. Patients at Level 3 and above were also eligible for jobs. Level 4 patients had demonstrated the ability to remain safe and secure for a minimum of 90 consecutive days; they had the same privileges as Level 3.

Finally, Level 5 patients were deemed "community placement ready" and were able to go to up to six destinations prior to returning to their unit. To qualify for Level 5, the treatment team had to recommend community placement, and the patient had to be accepted by the conditional release program. Staff reported that patients at Level 3 and above did not have access to some privileges specified in the policy, which was a temporary change due to COVID-19 restrictions.

During the site visit, DSH-Atascadero staff had begun the process of reopening the treatment mall. Staff reported that the hospital had opened access to the barbershop, and that the canteen was slated next for re-opening.

*Coleman* class member data as of December 31, 2021, reported the following number of patients at these HAS levels: HAS Level 1 had 22 patients; Level 2 had 15 patients; Level 3 had 45 patients; and Level 4 had 60 patients. There were no *Coleman* patients at Level 5. Notably, *Coleman* patients spent an average of the following number of days at each level: Level 1: 32 days; Level 2: 19 days; Level 3: 63 days; and Level 4: 177 days.

## VI.    REFERRALS AND TRANSFERS

### 1.    Referrals

During the review period, 115 *Coleman* patients were referred to DSH. Because male referrals to DSH were not hospital-specific, this number of referrals also included referrals who were ultimately admitted to DSH-Coalinga. Two referrals were rejected. Reasons for rejection were not provided.

### 2.    Transfers

Of 101 referrals that resulted in a patient transfer to DSH-Atascadero, 88 or 87 percent were timely transferred within 30 days.

## VII.    ADMISSIONS AND DISCHARGES

1.    **Admissions**

There were 101 *Coleman* patient admissions to DSH-Atascadero, with an average of 17

monthly admissions ranging between 12 to 27. Compared to the prior review period, when

DSH-Atascadero admitted 290 *Coleman* patients, admissions declined by 65 percent.

2.    **Discharges**

DSH-Atascadero discharged 91 patients during the review period. The hospital

discharged 81 patients to CDCR facilities and ten others to other DSH hospitals. Monthly

discharges to CDCR ranged from seven to 19 patients; monthly discharges to other DSH

hospitals ranged from zero to three patients.

The average time between clinical and physical discharge was 12.9 days and ranged from

zero to 134 days. DSH-Atascadero attributed all discharge delays to COVID-19 quarantines at

either the hospital or the receiving institution. However, physical discharge delays of more than

four months were excessive even with COVID-19-related limitations.

VII.    **PATIENT DISCIPLINARY PROCESS**

During the review period, DSH-Atascadero submitted 27 RVRs to the California Men's

Colony. Mental health assessments were completed for 25 of the RVRs. No explanation was

provided for the two RVRs where mental health assessments were not completed.

Staff who witnessed the incident completed the RVR; a non-treating psychologist

completed the mental health assessment. The psychologist reviewed incident documentation and

spoke with the patient and staff to determine whether there were mental health factors that would

cause the patient to have difficulty understanding the disciplinary process, as well as whether the

patient's behavior was strongly influenced by symptoms of mental illness and/or developmental

disabilities/cognitive deficits. Thereafter, the non-treating psychologist completed their portion

of the mental health assessment and included a rationale for findings.  The assessment was then reviewed by the supervising psychologist and the clinical administrator.

DSH-Atascadero did not provide completed RVRs packages, which were in CDCR's possession.

## IX.    USE OF FORCE

DSH-Atascadero reported four use of force incidents during the review period.  None met criteria for review by the incident management review committee, which was the body responsible for identifying programmatic and systemic issues and ensuring that recommendations for corrective/preventative measures were presented to the appropriate departments.

The institution's use of force policy (OPS Lexipol Policy 300, Use of Force) was updated on December 1, 2021.

## X.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

DSH-Atascadero reported a total of 319 SIRs.  Of these, 79 or 25 percent were for aggression, 78 or 24 percent were for medical reasons, 70 or 22 percent were for suicide/self-harm, and 92 or 29 percent were classified as other.

## XI.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

DSH-Atascadero did not use observation cells.  The hospital reported 16 seclusion incidents, averaging 12.69 hours each, and ranging in length from 0.17 to 29.92 hours.  The hospital's seclusion room was clean and contained a safety mattress.  However, there was no toilet in the room, but there was a restroom just outside the seclusion room.

There were also 26 restraint incidents, which averaged 17.96 hours, and ranged from 1.33 to 116.83 hours.  Twelve restraint incidents were non-ambulatory and utilized a special chair.

The non-ambulatory restraint chair was clean and appeared to be in good working order. Nursing staff reported that non-ambulatory restraints were used for patients at risk of harm to self or others who did not require full-bed restraint. The remaining 14 incidents involved full-bed restraints. The restraint room was clean and contained a raised bed with a mattress, with attached restraints. However, the room lacked a toilet. If patients in restraints needed to use the bathroom, a bedpan was used.

Patients in seclusion or restraints were always on 1:1 observation. Nursing leadership reported that staff underwent specialized training prior to being allowed to perform 1:1 observation.

Two reviewed charts of patients requiring restraints both contained clear clinical rationales for restraint use, and appropriate monitoring of circulation, sensation, and range of motion.

## XII.  **SUICIDE PREVENTION**

There were no completed suicides or serious suicide attempts at DSH-Atascadero. There also were no self-injury incidents for *Coleman* patients that were severe enough to require emergency medical attention. The facility reported that its last completed suicide was in 2007, by way of hanging.

The hospital conducted monthly suicide prevention committee meetings, in accordance with the administrative directive. Although the administrative directive required a "medical staff" member to attend, reviewed minutes did not reflect a physician's attendance. Reviewed minutes for December 2021 stated that the meeting was truncated, due to competing demands. Minutes also reflected difficulty obtaining suicide assessments from CDCR institutions. Psychiatry leadership reported that this had vastly improved, and that the hospital now regularly

99

received the necessary clinical information.

An observed suicide prevention committee meeting found committee members reporting that they closely monitored aggressive acts and assaults; these acts reportedly correlated with patient suicidality risk. The committee confirmed receiving updated suicide risk assessments for patients admitted from CDCR and indicated a need to resume quarterly suicide prevention meetings between DSH and CDCR.

DSH-Atascadero had created a ligature "heat map" highlighting hospital areas of increased risk for possible patient hanging. There were many such ligature points due to the buildings' age. There was also a plan to remedy them; however, given how extensive they were, the project, which also involved the Joint Commission, was scheduled to take seven years. Nursing further reported that this ligature "heat map" permitted staff to provide increased monitoring of these areas. On the observed unit, nursing staff demonstrated understanding of the location, contents, and use of the ligature risk binder.

## XIII.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.  Emergency Response

DSH-Atascadero held multiple drills, including those for medical emergencies. Due to COVID-19 restrictions, the drills required modification, which overall, were adequate. Review of the hospital's medical emergency response evaluation audit indicated review of adequate topics. Most reported 100 percent compliance; all scored above 90 percent. No *Coleman* class members died during the reporting period.

### 2.  Death Review Process

The mortality interdisciplinary review committee (MIRC) met on an ad hoc basis whenever a patient died. No *Coleman* class members died during the review period.

## XIV.   QUALITY MANAGEMENT AND UTILIZATION REVIEW

DSH-Atascadero continued to maintain complex and robust quality improvement and risk management programs with an extensive array of subcommittees reporting to the quality council and risk management utilization review committee.  There were several quality improvement plans and action items that various committees monitored.  The hospital also conducted audits targeting areas of concern; however, the methodology and utilization of audit results remained unclear based on the reports' formatting.

The quality council was chaired by the executive director, typically met weekly via WebEx, and functioned as an oversight committee, identifying and monitoring quality improvement projects.  The quality council included membership from medical staff, administration, program management, discipline chiefs, and the standards compliance director.  Quality council meeting agendas included as a standing item a tracking grid covering quality council recommendations, status, action items, and pertinent timelines.  Agenda items included program proposals, action items, staff trainings, and staff recruitment and retention efforts.  Reviewed meeting minutes generally included comprehensive summaries and various committees' reports.  Audit outcome data and quality improvement plans were also discussed during the meetings.  There was an annual governing report (January - June 2021) and a quarterly report (May – July 2021).

DSH-Atascadero's risk management quality improvement structure addressed mortality, suicide prevention, violence, risk management, utilization, medication, high risk assessment, and treatment support.  The risk management utilization review committee generally met monthly and reported information relevant to the use of restraints, seclusion, suicide prevention, and information from other committees.  The utilization management committee generally met every

101

two weeks. Reviewed meeting minutes reflected treatment summaries and obstacles to discharge. The suicide prevention, medical risk management, program review, facility review, treatment support, and violence prevention committees all reported to the risk management utilization review committee. Reviewed meeting minutes reflected that various subcommittees' status updates were routinely monitored and discussed.

DSH-Atascadero also had a HAC patient involvement quality improvement body. The HAC was designed to provide patients with opportunities to practice self-efficacy; patients were also able to make suggestions for improvement and had input into policy and programs. Staff reported that the HAC had been particularly helpful in response to COVID-19 issues.

Due to prior issues regarding the methodology and use of treatment plan audit data, DSH-Atascadero conducted quantitative treatment plan audits. Of 137 reviewed treatment plans, 89 percent were reported as compliant, a two percent decrease since the prior reporting period. Deficient areas included timely completion, inaccurate recorded group treatment hours, lack of approved interventions, documented coping skills, and reasons for hospital admission.

DSH-Atascadero developed and implemented several action plans during the review period. Among them, the quality council identified the need to monitor treatment hours, enrollments, and attendance to ensure the proper provision of clinical care. Further, the violence prevention committee developed a work group to address aggressive acts during pill lines.

A hospital-wide quality improvement initiative specific to nursing notes indicated issues with the timeliness of notes. Tellingly, descriptions of patients' overall progress toward treatment and discharge goals lacked sufficient detail, among other quality issues.

DSH-Atascadero also conducted an annual strategic planning session that focused on accreditation, human resources, safety issues, treatment, and other subjects relevant to the

hospital's operations.

DSH-Atascadero received its updated CDPH license in November 2019.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

Patient satisfaction survey results for DSH-Atascadero's *Coleman* patients exceeded 90 percent for nine of 14 queries.  Queries that failed to achieve 90 percent satisfaction included those about patients' feeling safe telling staff about self-injurious ideation, and whether staff explained patients' rights, educated patients about their medications, and asked patients which groups they would like to have been offered.

Forty-three *Coleman* patients made a total of 140 complaints about the provision of mental health and medical care, personal possessions, advocacy services, treatment record confidentiality, and various daily living issues.  DSH-Atascadero's updated September 2021 administrative directive on patient complaints clarified that patient abuse/neglect complaints had to be investigated and addressed the appeals process.  Patients nonetheless reported an unclear appeals process and the executive director's lack of response to their appeals.  Standards and compliance staff further reported that the hospital did not have a record of patient appeals.

## XVI.    *COLEMAN* POSTINGS

The monitor observed *Coleman* posters in English and Spanish in patient accessible areas in non-quarantined housing units with *Coleman* patients at DSH-Atascadero.  The hospital also provided results of the executive director's inspection team's compliance reports conducted during the review period, which found that 100 percent of *Coleman* housing units had appropriate *Coleman* posters in both English and Spanish.

## XVII.    LAUNDRY AND SUPPLY ISSUES

Observed laundry and supply areas on two non-quarantined DSH-Atascadero units that

housed *Coleman* patients revealed adequate supplies of bed linens and clothing.  Patients were provided with clean clothes three times weekly and bed linens were exchanged weekly, which was consistent with institutional policy.  A unit supervisor reported that clothing and other items were laundered off-site.  It was further reported that when there were problems with the supply of clothing in different sizes, clean clothing was obtained from other units until a new laundry order was placed.

## XVIII. VISITATION/PRIVILEGES/TELEPHONE ACCESS

DSH-Atascadero resumed in-person visitation in April 2021 for non-quarantined housing units following its suspension due to COVID-19.  The hospital also used tele-visiting during the review period.  Staff reported that initial technical difficulties with the roll-out of tele-visiting had been substantially resolved by the site visit.  It was further reported that, going forward, the hospital planned to use both tele-visits and in-person visitation, which would be augmented by COVID-19-related protocols.

Unit 34 *Coleman* patients reported that personal property took four to six weeks to arrive from sending CDCR institutions.

## XIX. LAW LIBRARY ACCESS

During the site visit, patient access to DSH-Atascadero's library was restricted due to COVID-19 mitigation policies.  However, the hospital gave in-person library access to patients representing themselves in legal matters.  Other patients had to request reading and legal research materials, which were delivered to them in their housing units.  Prior to access being restricted due to COVID-19-related policies, the hospital's administrative directive, which was last updated in September 2021, permitted patient access to the library on a first-come, first-served basis with a maximum of 15 patients at a time.  This policy was consistent with the prior

review period.

## XX.  **MILESTONE CREDITS**

Staff indicated that CDCR was responsible for calculating milestone credits for *Coleman* patients during their stay in the hospital.  DSH's information technology system daily uploaded data and information about the treatment that *Coleman* patients received to a CDCR database, which CDCR used to calculate milestone credits.  Although DSH staff further reported that on December 23, 2021, it had been informed of a data glitch affecting the calculation of milestone credits, this glitch had been resolved by the time of the site visit.

<u>**APPENDIX B2**</u>
<u>**Coalinga State Hospital (DSH-Coalinga)**</u>

**DSH - Coalinga**
February 22 – 23, 2022

I.    **SUMMARY OF FINDINGS**

- At the time of the site visit, DSH-Coalinga's *Coleman* census of 21 patients was 57 percent lower than the hospital's census of 49 *Coleman* patients that was reported during the prior paper review in January 2020.

- During the review period, DSH-Coalinga's monthly *Coleman* census averaged 25 patients.

- DSH-Coalinga reported that virtually all administrative and clinical staffing positions were filled.

- Although two psychiatrists were assigned to *Coleman* Unit 21, only the telepsychiatrist provided services to *Coleman* patients; the on-site psychiatrist assigned to Unit 21 had been reassigned to provide services elsewhere in the hospital.

- No significant challenges nor technical issues were reported with telepsychiatry's use to treat patients, while patients' typically reported satisfaction with telepsychiatry.

- Chart notes for patients who were seen by telepsychiatry were labeled as "face-to-face" encounters.

- All DSH-Coalinga staff-to-patient clinical ratios were within established requirements.

- Observed IDTTs were adequately conducted but also demonstrated areas of concern.

- Group treatment accounted for more than 99 percent of patient treatment and was the predominant mode of treatment.

- Patients were offered a weekly average of 8.4 hours of core groups and attended 6.8 weekly hours.

- Group attendance data provided for *Coleman* patients could not be accurately measured.

- There was an ongoing paucity of individual treatment for *Coleman* patients, with individual treatment comprising merely 0.2 percent of all offered treatment.

- Except for medical treatment, off-unit access was curtailed for *Coleman* patients during the review period, which made the HAS policy essentially irrelevant for *Coleman* patients.

- There were no use of force incidents during the review period.

107

- There were no attempted or completed suicides by *Coleman* patients.

## II.   CENSUS

During the site visit, DSH-Coalinga housed 21 *Coleman* patients, of whom 17 were quarantined on *Coleman* Unit 21, and four others were quarantined on admissions unit MA-1 pending transfer to Unit 21.  DSH-Coalinga's *Coleman* census was 57 percent lower than its reported census of 49 patients during the prior paper review in January 2020.  During the review period, the monthly *Coleman* census averaged 25 patients; the prior review period reported an average monthly census of 44 *Coleman* patients.

## III.   STAFFING

### 1.   Administrative and Clinical Staffing

All leadership positions were filled during the reporting period, including those for the executive director, clinical, hospital, and nurse administrators, medical director, chief of psychiatry, program director, and program assistant.

Senior Psychiatrist:  The senior psychiatrist position was filled.

Psychiatrists:  Of two psychiatrists assigned to Unit 21, the telepsychiatrist provided services to *Coleman* patients, while an on-site psychiatrist had been reassigned to provide services elsewhere in the hospital.

Supervising Psychologist:  The supervising psychologist position was filled.

Psychologists:  Both psychologist positions were filled.

Supervising Social Worker:  The supervising social worker position was filled.

Social Workers:  Both social worker positions were filled.

Supervising Rehabilitation Therapist:  The supervising rehabilitation therapist position was filled.

Rehabilitation Therapists:  Both rehabilitation therapist positions were filled.

108

<u>Nursing Coordinator</u>:  The nursing coordinator position was filled.

<u>Nurse Practitioner:</u>  The nurse practitioner position was filled.

<u>Registered Nurses (RNs)</u>:  All seven RN positions were filled.

<u>Senior Psych Techs</u>:  Three senior psych tech positions were filled.

<u>Psych Techs</u>:  Twenty-nine of 32 psych tech positions were filled for a nine percent vacancy rate.

<u>Health Service Specialist (HSS)</u>:  The HSS position was filled.

### 1.    **Telepsychiatry**

A telepsychiatrist located at another DSH facility provided services for Unit 21 during the site visit.  No significant challenges were reported with the use of telepsychiatry to treat *Coleman* patients; patients' generally reported satisfaction with telepsychiatry.  Patient telepsychiatry sessions were weekly for the first 12 weeks, then monthly, or as clinically indicated.  The telepsychiatrist visited DSH-Coalinga once monthly and met with patients in person during on-site visits.

The psych tech case manager (PTCM) assisted the telepsychiatrist by scheduling patients' treatment team meetings and being present during telepsychiatry sessions.  The same PTCM was generally used; however, psychiatry leadership shared concerns about patients' feeling uncomfortable when there was a covering PTCM.  Because DSH-Coalinga relied on paper charts, specific documents were uploaded for the telepsychiatrist's review prior to the patient's initial session.  This practice meant that the telepsychiatrist lacked complete access to the full patient's records raising questions regarding the adequacy of psychiatric care provided to *Coleman* patients.  Additionally, portions of the notes were handwritten, and the legibility of some notes was poor.

No significant telepsychiatry technological issues were reported and there were back-up plans in case of such challenges.  Such back-up plans included speaking with the patient over the telephone, seeing the patient when on-site, or, in urgent cases, treating the patient with an in-person psychiatrist.

DSH-Coalinga did not report any problems with patient telepsychiatry refusals.  However, if they occurred, the telepsychiatrist saw the patient during an on-site visit.  Further, DSH-Coalinga lacked mobile telepsychiatry equipment for those instances when a patient refused or was unable to come to the telepsychiatry room.

Notably, chart notes for patients treated by telepsychiatrists were labeled as "face-to-face" encounters.  The chief psychiatrist reported that in person and telehealth encounters were considered equivalent.

### 3. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

All DSH-Coalinga staff-to-patient caseload ratios for psychiatry, psychology, social work, and rehabilitation therapy were within established staffing ratios.  Staff reported that, because two treatment teams were assigned to *Coleman* patients, Unit 21 would also satisfy staffing ratios if the unit was fully occupied.

### 4. Staff Training

Each staff member was required to complete ART focusing on patients' rights, suicide awareness, unit security, and infection control.  Several psychologists and a social worker also attended a mental health assessment training for RVR completion.

## IV.     TREATMENT AND CLINICAL SERVICES

### 1.     Interdisciplinary Treatment Teams (IDTTs)

Treatment plans were one component of the Wellness and Recovery Model Support System (WaRMSS) treatment model which described treatment planning areas as "focus" items. The 11 identified primary focus areas were psychiatric and psychological, social skills, dangerousness and impulsivity, hope and spirituality, substance abuse, medical, health, wellness, legal, school and education, occupational skills, leisure and recreation, and community integration.

Observed treatment team meetings were adequately conducted but also reflected areas of concern.  All required disciplines attended the meetings; no technical difficulties occurred during the telepsychiatrist's remote attendance.  The Correctional Counselor I (CC I) was not expected to attend treatment team meetings but staff indicated that patients had adequate access to correctional counselors.  While all treatment team members participated in discussions and offered relevant patient information, observed meetings would have benefited from greater discussion among team members.  Observed IDTTs had access to patients' paper charts; however, in some instances, relevant information such as group attendance or property-related issues were not available.

Treatment teams presented substantial clinical information prior to patients joining the IDTT.  However, there was no clinical rationale for excluding patients from these initial discussions; the monitor's expert noted that both the treatment team and patients would have benefited from patients' inclusion in pre-meeting discussions.

Treatment plans were projected onto a screen but not actually read or referred to during the IDTT.  The plans' projection was also not within patients' line of sight and thus limited their

utility to prompt a review with the patient of treatment goals and progress toward them.  Overall, it was unclear whether patients understood the updated treatment goals.

During IDTT observation, the treatment team expressed concern that one patient had not received a pending neuropsychological evaluation which was to be completed prior to his May 2022 parole date.  The monitor's expert addressed this concern with mental health leadership, who agreed to follow-up.  The monitor's expert was subsequently informed that the patient was scheduled for this evaluation on March 3, 2022.

Provided data indicated that patients attended 159 of 173, or 92 percent of treatment team meetings during the reporting period.  Tellingly, the monitor's expert observed good treatment team attention to engaging patients who were reluctant to attend IDTT meetings.

## 2. Group Therapy

Group therapy continued to be the predominant treatment modality for DSH-Coalinga patients and accounted for over 99 percent of treatment.  Groups were also the preferred method of treatment during the significant period when Unit 21 was quarantined; however, group offerings were also significantly curtailed during quarantine.

Group treatment consisted of both core and supplemental treatment activities.  Treatment plans designated patients' enrollment in core groups including Dialectical Behavior Therapy and Managing Mental Illness, which was co-led by a behavioral specialist paired with either a psychologist or social worker.  Approximately six to eight core group activities were scheduled Monday through Friday from 9:00 a.m. to 3:00 p.m.

In contrast, patients were not assigned to supplemental activities, but attended them as desired.  Supplemental groups included activities such as beading and karaoke.

DSH-Coalinga reported offering patients a weekly average of 8.4 hours of core groups, with patients attending a weekly average of 6.8 hours. An average of 42.7 weekly hours of supplemental groups were offered; patients attended an average of 4.67 hours weekly.

An observed group conducted by two behavioral specialists demonstrated good patient engagement. However, another observed group was of questionable utility because of the advanced nature of the covered material.

When groups were cancelled, patients were provided with information packets from a clinical workbook that addressed the group's theme. Patients were reported as having attended the group if they returned a completed packet. Because data for in-person group attendance and packet completion for cancelled groups was commingled, the facility was unable to accurately report in-person attendance at group treatment.

Unit 21's low census also presented challenges with the provision of group treatment. During the site visit, some scheduled groups were cancelled because there were no eligible patients; another scheduled group had only one group participant. Moreover, between July 6 and December 13, 2021, 115 groups were cancelled. Of these, 94 or 82 percent were cancelled due to quarantine or "other" reasons, 18 or 16 percent were cancelled because of coverage or staffing issues, and three were cancelled for other reasons.

Tellingly, until approximately three weeks before the site visit, staff who were not regularly assigned to Unit 21 were not permitted to enter the unit to provide services when regularly assigned staff were unavailable. This practice had since been changed providing that off-unit staff wore full personal protective equipment.

3.     **Individual Treatment**

Pre-site data, supported by chart reviews and on-site interviews, demonstrated a

continued paucity of individual treatment for *Coleman* patients.  Across the reporting period, nine patients were provided a total of 29 hours of individual treatment.  Individual treatment comprised only 0.2 percent of all offered treatment, including periods when the unit was on quarantine and group activities were significantly curtailed.

Although one clinician recommended weekly or biweekly individual therapy for two patients following admission, a record review indicated that individual treatment sessions did not occur over the ensuing four to five months.  Nonetheless, during treatment team meetings, the monitor's expert noted two instances when the psychologist repeated offers to engage patients who had previously refused individual therapy sessions.

During the prior review, hospital leadership indicated that the low number of reported individual treatment hours could in part be the result of ineffective tracking and that the actual amount of provided individual treatment could be higher.  At that time, DSH-Coalinga reported that a QIP would be implemented in March 2020 toward improving documentation of individual therapy within the My Activity Participation Plan (MAPP) module in WaRMSS.  During this site visit, quality management staff reported that the project had been successful and the reported individual treatment data was accurate.  The QIP did not result in an increase in offered or provided individual treatment in comparison to the prior review period.

### 4.    <u>Psychiatric Services</u>

Four randomly selected reviewed charts revealed the conduct of initial psychiatry evaluations on the date of patients' admission.  Follow-up visits were timely.  Medication management and required laboratory monitoring were also compliant with policy.

The psychiatrist reported receiving limited information on new patient admissions from CDCR facilities.  The psychiatrist further reported providing his contact information for patients

114

who returned to CDCR to permit the receiving facility to contact him for collateral information. He indicated receiving calls from receiving institutions "most of the time."

## 5.    **Other Treatment Issues**

### A.    **Involuntary Medications (PC 2602)**

During the reporting period, 15 *Coleman* patients were prescribed PC 2602 involuntary medications. Eight of these patients remained in Unit 21 at the time of the site visit. No use of force was required to administer involuntary medications during the review period.

### B.    **Clozapine**

Reviewed clozapine policies were found to be comprehensive and within the standard of care. The chief psychiatrist had to approve all new clozapine prescriptions.

Psychiatry reported that "several" *Coleman* patients were prescribed clozapine. The monitor's expert's chart review for two patients who were prescribed clozapine revealed that the provision of care to these patients' was consistent with DSH policy and good standards of care.

### C.    **Behavioral Management**

DSH-Coalinga did not have active PBSPs at the time of the site visit or during the reporting period. Leadership further reported that the hospital had available staff to complete behavioral assessments and PBSPs but no *Coleman* patients needed these services.

### D.    **Pre-release Planning**

Patients were assisted with medical benefits and social security applications through the TCMP prior to parole. Six of eight patients who paroled received TCMP services more than 30 days prior to parole; TCMP saw another patient more than 90 days prior to the parole date. Additional pre-release services offered to patients included the Wellness Recovery Action Plan (WRAP) and Transitioning Back to CDCR groups.

E.      **Access to Meaningful Jobs and Educational Opportunities**

DSH-Coalinga reported that, on average, 13 *Coleman* patients held meaningful jobs of more than five weekly hours during the reporting period.

*Coleman* patients had access to on-line college correspondence courses and the GED program since the spring of 2021.  However, they lacked access to adult basic education programs and the educational services that were available to other DSH-Coalinga patients. During the site visit, no *Coleman* patients were enrolled in college correspondence courses or the GED program.

V.      **PATIENT ACCESS TO TREATMENT**

**Patient Orientation, Discretionary Program Status (DPS) and Stages:  Standards and Procedures**

As a public health measure, DSH-Coalinga housed newly admitted patients on MA-1 and MA-2 where they received periodic polymerase chain reaction (PCR) tests for COVID-19 before being moved to Unit 21.  Except for group treatment, Unit 21 staff generally offered treatment services to the newly admitted patients.  Although admissions unit patients had access to tablets and televisions upon request, and the patient orientation booklet noted tablets' availability, staff neglected to make patients sufficiently aware of the resources' availability.  During the site visit, two interviewed *Coleman* patients housed on MA-1 were not aware that they could request tablets.

DSH-Coalinga provided a list of all patients on HAS status which indicated that 13 patients had their HAS level placed on hold or lowered at some point in time during the review period.  The HAS system provided levels of access to off-unit hospital services and activities. Leadership reported that, like the prior review period, the HAS system had been reviewed but no changes were made.  Although Unit 21 patients generally required an escort when they were off

116

the unit, during the review period, even escorted off-unit access was curtailed for *Coleman* patients except for off-unit activities related to necessary medical treatment. Leadership opined that this rendered the HAS policy irrelevant for Unit 21 patients.

## VI.    REFERRALS AND TRANSFERS

Fourteen patients were referred to DSH-Coalinga during the review period. Two referrals were rejected. For the 12 admitted patients, DSH-Coalinga reported an average of 13.5 days from the date the referrals were released to DSH until the patients' admission. All 12 patient transfers to DSH-Coalinga were timely.

## VII.    ADMISSIONS AND DISCHARGES

### 1.    Admissions

Of the 12 admissions to DSH-Coalinga, there were three direct admissions from the CMF-PIP and one from the CHCF-PIP. The remaining admissions were from non-PIP CDCR facilities. The number of admissions to DSH-Coalinga declined by 77 percent from the prior review period, when there were 53 admissions.

### 2.    Discharges

DSH-Coalinga discharged 25 patients during the reporting period. Of these discharges, four patients were paroled, two were discharged to DSH-Atascadero to the OMHD program, and the remaining 19 patients were discharged to CDCR institutions. Discharged patients' stays averaged 180 days.

Sixteen patients remained on Unit 21 for an average of eight days beyond their clinical discharge date. However, three patients were discharged within 72 hours of clinical discharge.

## VIII.   PATIENT DISCIPLINARY PROCESS

DSH-Coalinga submitted three disciplinary hearing worksheets to PVSP for review as RVRs.  Two of three resulted in the completion of mental health assessments.  Both assessments were completed confidentially but only one was timely completed.  CDCR dismissed two of three disciplinary hearing worksheets; the third resulted in a counseling chrono.

## IX.   USE OF FORCE

There were no use of force incidents during the review period.

## X.   UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

DSH-Coalinga reported one unusual occurrence involving a HIPAA breach.  The incident involved the release of DSH-Coalinga's roster at the federal district court's request on three dates during 2013, 2016, and 2019 to determine patient eligibility for filing fee waivers when submitting a lawsuit.  The released rosters disclosed patients' names, case numbers, legal commitments, admission dates, and other pertinent information.  The action plan to resolve this breach included the district court's destruction of all received rosters and providing notification to current and former impacted patients.  Staff training was also revised to provide DSH staff with further education on data protection.

Thirty-one serious incidents were reported during the review period.  There were four incidents of suicide-related behavior (not death), six related to patients' medical/health safety, 19 of aggressive behavior primarily towards patients/staff, and other rule violations such as contraband possession.

## XI.   USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

During the reporting period, there were two restraint incidents for two different patients. The clinical justifications for restraint use, provided medications, and release from restraints

were adequate.  The restraint documentation was also consistent with DSH-Coalinga's administrative directive.

There were no seclusion episodes during the reporting period.

## XII.  SUICIDE PREVENTION

During the review period, there were no attempted or completed suicides.

DSH-Coalinga reported completing suicide risk assessments for all new patients within 24 hours of admission, with the suicide risk level determining the reassessment.  Patients designated as low risk were typically reassessed annually, those with moderate risk were reviewed quarterly, and high-risk patients were reassessed monthly.  Instances of suicidal ideation or attempts required prompt reassessment.

Staff were required to participate in suicide prevention and risk reduction trainings; there was a two-hour training upon hire in new employee orientation and 45-minute annual trainings. DSH-Coalinga further reported that the psychology department had begun training Unit 21 staff on suicide crisis responses.  This enhanced training began in December 2021 and was expected to be completed by April 2022.

Leadership reported that DSH-Coalinga's participation in a DSH-wide anti-ligature risk reduction program was aimed at identifying high risk areas for potential redesign.

## XIII.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.    Emergency Response

Mock emergency response drills were conducted prior to COVID-19.  However, due to the pandemic, an "abbreviated mock code schedule and modified process" was in effect.

### 2.    Death Review Process

There were no patient deaths during the reporting period.

## XIV.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

DSH-Coalinga continued to have a robust, multi-layered QIP.  Stated QIP goals included appropriate assessment and documentation of incidents and corrective actions to prevent recurrence.  The hospital reported some limitations on activities during the reporting period due to public health measures driven by COVID-19 responses.

The quality council, which was overseen by the executive director, supervised quality improvement and served as a hub for all quality improvement activities.  Quality council members included the clinical administrator, medical director, nurse and hospital administrators, director of quality improvement, chiefs of psychiatry and psychology, program director, and chief physician and surgeon.  The quality council met monthly and chartered QMTs to address identified problems.

Other committees from different areas of the hospital included the medical executive committee and the clinical management team.  These committees' duties included operational, administrative, and clinical oversight of the quality management subcommittees, and chartering QMTs when necessary.  Quality management subcommittees were responsible for monitoring specific quality improvement efforts, while QMTs clarified problems, collected data, and provided recommendations.  QMTs provided monthly reports.

DSH-Coalinga's risk management system also included a robust approach with two primary components.  These components were the treatment plan team, which addressed the specific risks and benefits of patients' therapeutic and rehabilitation interventions, and the risk management program which identified immediate and long-term patient high-risk situations and suggested actions to reduce risk.  The treatment plan team placed *Coleman* patients on a high-

risk list for enhanced monitoring according to specific policy criteria. Behavioral and medical factors including aggression to self or others and indicia of suicide risk were often considered.

The utilization management committee (UMC) met twice monthly for three months of the review period and once monthly for the other three months. The UMC reviewed patients' treatment and recommended their continued stay in the program or appropriateness for discharge.

DSH-Coalinga also conducted monthly treatment plan audits for Unit 21's patients that were designed to assess whether documentation was timely completed rather than reviewing treatment plans' quality or clinical appropriateness. While the audits typically found compliance for complete and timely documentation, they failed to identify any useful clinical areas for improvement. Leadership recognized this limitation and described efforts to improve the process.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

DSH-Coalinga reported that only two patients who were discharged from the *Coleman* unit during the review period completed the patient survey. Both patients strongly agreed that they were appropriately referred to DSH-Coalinga. They both also strongly concurred that they had been provided with required information about Unit 21's rules and expectations, that staff encouraged their participation in treatment planning, and that they felt safe at the hospital and had sufficient time outside their rooms. Both patients also reported feeling better upon discharge than when they were admitted to DSH-Coalinga and that, overall, the program treatment they received was extremely helpful.

The California Office of Patients' Rights at DSH-Coalinga reported 54 complaints by 12 *Coleman* patients to their office; two complaints were subsequently withdrawn. The complaints

addressed concerns about access/use of personal possessions, treatment and record confidentiality, daily living issues, involuntary medications, legal issues, medical care and treatment, and telephone use, among other matters.

DSH-Coalinga also received four complaints through external affairs.

## XVI.  *COLEMAN* POSTINGS

Letter-sized *Coleman* posters in English and Spanish were present in a patient accessible showcase on Unit 21.

## XVII.  LAUNDRY AND SUPPLY ISSUES

DSH-Coalinga reported that three ply surgical masks and hand sanitizer were available to patients upon request; hand sanitizer was also available in the dayroom during meals.  Sanitizing wipes were also continuously available to patients during the day to wipe down telephones and other surfaces.  Patients' use of face coverings was voluntary.  DSH-Coalinga reported encouraging and even incentivizing patients to wear them; however, only some observed Unit 21 patients wore face coverings.

The *Coleman* unit had an abundant supply of patient clothing, bed sheets, blankets, and towels, while new laundry and linen supplies were ordered and delivered daily.  Suicide smocks were not available on Unit 21 but were reported to be accessible through central supply.  There also was an ample supply of personal hygiene supplies such as soap, shampoo, toothpaste, and toothbrushes, and sufficient cleaning supplies.  Patients had access to daily showers.

## XVIII. VISITATION/PRIVILEGES/TELEPHONE ACCESS

All DSH-Coalinga visiting was virtual when a housing unit was under quarantine. During the reporting period, Unit 21 utilized virtual visitation which was available once daily for 30 minutes for *Coleman* unit patients.  In-person visitation was reportedly available for non-

quarantined units; individual visitors were required to adhere to all necessary COVID-19 protocols which included providing proof of vaccination and a negative COVID-19 test.

Patients had daily access to the large community dayroom from 7:00 a.m. to 2:00 p.m. The dayroom had two telephones with no limitations on use.  Unit 21 patients also had yard access on a rotational basis several times weekly.  A new and expanded gymnasium was under construction.

Canteen orders were taken three times weekly and generally filled within one day and delivered to the housing unit.  Patients also earned points for participation in unit activities and were able to use them to make purchases in the point store.  Patients could order meals from DSH-Coalinga's restaurant.

DSH-Coalinga contained a mall-like area where patient services including a barber shop, restaurant, post office, and library were located.  However, *Coleman* patients were only allowed to visit this area with an escort.

Facility leadership reported that property issues were typically related to patients' not receiving their property from a CDCR institution; however, this rarely occurred.  Yet another property matter was the lack of electrical outlets in the *Coleman* unit which prevented patients from using personal entertainment devices.  Unit 21 was one of only two housing units without electrical outlets in the rooms.

## XIX.  LAW LIBRARY ACCESS

Quarantined patients were denied physical access to the library.  When not on quarantine, Unit 21 was scheduled for one weekly hour of library.  More often, a library kiosk was brought to Unit 21 for patient use.  The library and computer lab shared staff and both were closed during the site visit due to COVID-19-related staffing shortages.

## XX.    <u>MILESTONE CREDITS</u>

DSH-Coalinga reported that a previous concern regarding CDCR's inability to record milestone credits for patients had been resolved.

## **APPENDIX B3**
## **Patton State Hospital (DSH-Patton)**

**Department of State Hospitals - Patton (DSH - Patton)**
March 1 – 2, 2022

I.    **SUMMARY OF FINDINGS**

- DSH-Patton operated a 30-bed facility that treated PC 2684 *Coleman* patients within the 50-bed Unit 33.

- On March 1, 2022, Unit 33's 42 patients consisted of ten *Coleman* class members, 31 PC 1370 patients, and one PC 2962 OMHD patient.

- DSH-Patton averaged nine *Coleman* patients during the review period.

- All Unit 33 psychiatry, psychology, social work, and rehabilitation therapy positions were filled.  However, there were respective vacancy rates of 33 and 38 percent for RNs and psych techs.

- Telepsychiatry was not used for *Coleman* patients and DSH-Patton did not report any future plans for its use with *Coleman* class members.

- All staff-to-patient clinical ratios satisfied established requirements.

- Unit 33 clinical staff were not redirected to cover other hospital-wide clinical vacancies but did provide treatment for *Coleman* class members on intake/quarantine Unit 30.

- All relevant disciplines attended observed IDTTs, which were collaborative and sufficiently reviewed treatment plans and patients' progress toward measurable goals. However, observed IDTTs did not consistently address patients' diagnoses, case conceptualizations, or medication adherence.

- During the review period, Unit 33 *Coleman* patients were offered a weekly average of 8.7 hours of scheduled group and individual treatment and attended a weekly average of 5.4 hours.

- Group therapy consisting of core groups and supplemental group activities were the primary treatment modality for *Coleman* patients.

- Provided data did not indicate the amount of offered individual treatment per patient.

- DSH-Patton's clinical documentation practices deviated from the standard of care.

- There were no challenges with psychiatric continuity of care, and psychiatrists reported a good working relationship with other disciplines.  Interviewed *Coleman* patients reported satisfaction with psychiatry services.

126

- DSH-Patton leadership reported disbanding its PBST; therefore, there were no trained clinicians to provide this treatment.

- Similar to the preceding round, DSH-Patton did not track or provide pre-release planning according to the MOU.

- An observed end-of-shift meeting was comprehensive, productive, and useful.

- During the review period, eight patients were referred to DSH-Patton; no referrals were rejected.

- DSH-Patton did not complete any disciplinary hearing worksheets during the review period and no RVRs were issued.

- There were no use of force incidents involving *Coleman* patients.

- There were no seclusion incidents during the reporting period.

- There were no suicides during the review period.

- There were adequate supplies of patient clothing, linen, and hygiene and grooming items.

- Patients reported sufficient access to radios, and no issues were noted with access to patient personal property upon admission to DSH-Patton.

## II.    CENSUS

DSH-Patton operated a 30-bed facility that treated PC 2684 *Coleman* patients within the 50-bed Unit 33.  Unit 33 housed patients in rooms in an unlocked dormitory setting containing licensed beds that provided both acute and intermediate inpatient mental health care.

On March 1, 2022, Unit 33's 42 patients consisted of ten PC 2684 *Coleman* class members, 31 PC 1370 patients, and one PC 2962 OMHD.  The OMHD patient had previously been a *Coleman* class member and had transitioned to OMHD but had not been transferred from Unit 33 at the time of the site visit.  The OMHD patient was temporarily housed in Unit 33 for medication-assisted treatment (MAT) training purposes; DSH-Patton was implementing a pilot program to provide *Coleman* patients with access to MAT during admission.

127

Nine of ten current *Coleman* patients received intermediate level of care; the remaining patient received acute care. DSH-Patton's *Coleman* patient census during the review period averaged nine patients, which was slightly less than the prior reporting period's average census of ten to 15 *Coleman* patients.

## III.   **STAFFING**

Except for nursing, psych techs, and one psychiatrist, civil servants filled all Unit 33 clinical positions during the review period and at the time of the site visit. Unit 33 had two treatment teams; each one included one psychiatrist, psychologist, social worker, rehabilitation therapist, as well as nursing staff and psych techs. Psychiatrists were available to see patents on the unit seven days a week.

### 1.   **Administrative and Clinical Staffing**

On March 1, 2022, positions for DSH-Patton's executive director, chief psychiatrist, nurse, clinical, and hospital administrators, program director, and program assistant were filled. The same person had filled the medical director's position in an acting capacity for over two years. All Unit 33 psychiatry, psychology, social work, and rehabilitation therapy positions were filled.

Senior Psychiatrist:  The senior psychiatrist position was filled.

Psychiatrists:  A civil servant filled one of two psychiatry positions; a consistent contractor filled the second position for more than one year.

Supervising Psychologist:  The supervising psychologist position was filled.

Psychologists:  Both psychology positions were filled. One psychologist was unlicensed.

Supervising Social Worker:  The supervising social worker position was filled.

<u>Social Workers</u>:  Both social worker positions were filled.  One social worker was unlicensed.  Although social work interns were not used during the review period, at the time of the site visit one social work intern provided supervised services on Unit 33.

<u>Supervising Rehabilitation Therapist</u>:  The supervising rehabilitation therapist position was filled.

<u>Rehabilitation Therapists</u>:  Both rehabilitation therapist positions were filled.  One rehabilitation therapy intern provided five to ten weekly hours of services for Unit 33.

<u>Unit Supervisor</u>:  The unit supervisor position was filled.

<u>Registered Nurses (RNs)</u>:  Six of nine RN positions were filled, for a 33 percent vacancy rate.

<u>Senior Psych Techs</u>:  All three senior psych tech positions were filled.

<u>Psych Techs</u>:  Eighteen of 29 psych tech positions were filled, for a 38 percent vacancy rate.

<u>Health Services Specialist (HSS)</u>:  All three HSS positions were filled.

**2.    Telepsychiatry**

Unit 33 did not have allocated telepsychiatry positions.  Telepsychiatry was neither used in Unit 33 nor for *Coleman* patients housed in Unit 30's intake/quarantine unit.  DSH-Patton did not report any plans for the future use of telepsychiatry with *Coleman* class members.

**3.    Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

DSH-Patton met all staff-to-patient clinical ratios.  Moreover, Unit 33 clinical staff exclusively provided services to Unit 33 patients and the intake/quarantine *Coleman* patients housed on Unit 30.  Given Unit 33's maximum capacity of 50 patients and the limited number of admissions to the intake unit, the staff-to-patient ratio did not exceed 1:25 during the review

period or at the time of the site visit.  Though DSH-Patton reported hospital-wide clinical

vacancies, Unit 33 clinical staff were not redirected to provide services on other units.

    **4.**    **Staff Training**

On Unit 33, 63 percent of clinical staff completed the annual suicide prevention and

intervention training, as did 20 percent of nursing staff in Program 4 (where Unit 33 was

located).  Nursing staff's training completion was significantly lower than the prior review

period's reported 93 percent training completion.

All psychologists were trained on the use of the Columbia Suicide Severity Rating Scale

(C-SSRS) in November 2019.  Newly hired psychologists were to be trained on the C-SSRS

during their first month of employment; however, data on new psychologists' training was not

provided.

Thirty-seven percent of Unit 33 clinical staff and ten percent of nursing staff completed

the TSI training.

DSH-Patton had not conducted training on the completion of mental health assessments

for RVRs since September 2019.

**IV.**    **TREATMENT AND CLINICAL SERVICES**

    **1.**    **Interdisciplinary Treatment Teams (IDTTs)**

Six observed IDTTs all occurred confidentially in sufficient space to allow treatment

team members to socially distance themselves.  However, one *Coleman* expert and 15 DSH staff

attended the first day of site visit IDTTs, impeding the ability to adequately social distance.

All relevant disciplines attended the IDTTs, with additional staff invited to attend based

on need.  For example, patients on 1:1 suicide watch were accompanied by their assigned

observers for information sharing and safety purposes.  Treatment team members knew the

patients and IDTT discussions were collaborative and included valuable input and in-depth reviews of patients' mental health and medical needs. The IDTTs also sufficiently reviewed patients' treatment plans and progress toward measurable objectives. Nonetheless, observed IDTTs did not consistently address patients' diagnoses, case conceptualizations, or medication adherence.

The monitor's expert observed two staff members behave inappropriately toward patients during IDTTs. The first incident involved a psychiatrist who had recently placed the patient in restraints for aggressive behavior during a recent on-call shift. During the IDTT, the psychiatrist, who was not the patient's assigned provider, was highly confrontational with an already escalating patient for approximately ten minutes while arguing the details of events leading up to the restraint incident. At one point, when arguing about objective signs of aggression, the psychiatrist stood up, put her fist within several inches of the patient's cheek, and asked whether the patient would consider that act aggressive. The assigned psychologist eventually intervened and attempted to de-escalate the situation by changing the subject. After the patient left the room, the psychiatrist apologized to staff for "monopolizing" the conversation, adding that the patient's behavior resulted in "a very long shift." During another observed IDTT, a clinician made condescending statements to a discharging female patient, including telling her she was "so cute" and describing her as a "quiet little presence."

## 2.    Treatment Hours

During the review period, Unit 33 *Coleman* patients were offered a weekly average of 8.7 hours of scheduled group and individual treatment and attended a weekly average of 5.4 hours. Offered weekly treatment ranged from 4.3 to 12.6 hours per patient. Patients refused 26 percent of treatment, while 16 percent of scheduled group and individual contacts were cancelled. The

most common reason for treatment cancellation was "other," followed by "coverage/staffing." DSH-Patton also recently began tracking some unscheduled or unplanned treatment sessions, which suggested an additional average of 40 minutes of weekly therapeutic contacts per patient during the review period.

Historically, individual psychotherapy was not a scheduled part of patient treatment at DSH-Patton and had not been consistently tracked. However, beginning in August 2021, the institution began scheduling patients for individual psychotherapy, resulting in improved tracking of offered treatment hours. Although improvements were noted in tracking these scheduled individual psychotherapy contacts, the institution reported ongoing challenges tracking the unscheduled supplemental treatment contacts that frequently occurred.

### 3. Group Therapy

Therapeutic group activities were the primary treatment modality for *Coleman* patients at DSH-Patton. Group activities consisted of both core treatment groups and supplemental group activities facilitated by psychologists, social workers, psychiatrists, and recreation therapists. Core groups were co-facilitated and incorporated a variety of methodologies, including CBT, substance use treatment, and symptom management. Although some core groups focused on specific Dialectical Behavior Treatment (DBT) skills, Unit 33 did not have a DBT-certified staff member. Supplemental group activities included movies, games, holiday parties, and ice cream socials. DSH-Patton also had a weekly pet therapy program.

An observed anger management group that four patients attended also included a non-*Coleman* OMHD patient. Two social workers facilitated the group, which was clinical in nature and utilized worksheets and scenarios to explore anger-related thoughts and feelings. The

facilitators made relevant, validating, and appropriate comments, and engaged patients in a meaningful way ultimately encouraging them to provide mutual support to one another.

An observed therapeutic community meeting that all Unit 33 patients attended revealed motivational discussions, a review of unit rules, and discussion of communal living concerns. Overall, the meeting appeared beneficial to participating patients.

Although therapeutic group space was generally adequate, some groups were conducted outdoors in the non-confidential courtyard; during unit-wide quarantine periods, all treatment groups were held there. Additionally, during quarantine periods, patients were offered increased individual "supportive" contacts consisting of brief check-ins and time for processing daily stressors. Scheduled individual psychotherapy and psychiatry contacts continued to occur confidentially during quarantine periods.

### 4.    <u>Individual Treatment</u>

Prior DSH-Patton site visits raised the limited use of individual therapy for *Coleman* patients as a concern. During the review period, DSH-Patton reported increasing individual therapy hours, with data reporting 119 scheduled individual therapy sessions for *Coleman* patients, of which 100 were completed and 19 were cancelled. The reasons for cancellations were listed as "other." Notably, the data did not provide the number of individual sessions provided per patient. Given the lack of patient-specific data, it could not be determined whether offered individual therapy was adequate.

### 5.    <u>Clinical Documentation</u>

DSH-Patton's clinical documentation practices were concerning. Instead of writing progress notes for each therapeutic encounter, the institution allowed providers (psychiatrists, primary clinicians, rehabilitation therapists, and group facilitators) to prepare monthly clinical

summaries. There was also no clinical documentation for groups for the entire review period, despite groups being the primary treatment modality for *Coleman* patients. DSH-Patton's documentation practices deviated from the standard of care and were especially concerning given the acuity of the *Coleman* population.

This lack of clinical documentation also presented obstacles to continuity of care, proof of practice, quality assurance, and treatment progress tracking. Due to the COVID-19 pandemic, there were unexpected staff absences, and covering providers needed to rely on clinical documentation to make informed treatment decisions. Further, covering providers did not necessarily have access to updated and accurate patient information.

The monitor's expert's review of healthcare records also revealed generic summaries that occasionally referenced individual sessions. However, this documentation also failed to consistently include dates, duration, and content of individual encounters.

## 6.    **Psychiatric Services**

Both psychiatrists who covered Unit 33 had provided services on the unit for one and two years, respectively. There were thus no challenges with psychiatric continuity of care.

Four reviewed current patients' healthcare records revealed the completion of initial psychiatry evaluations within 24-hours of admission. DSH-Patton reported basing the frequency of routine psychiatry contacts on clinical need; the minimum frequency of contacts was not in the local policy or covered by the MOU. Reviewed healthcare records suggested that psychiatry contacts occurred more often than once monthly; however, as described above in the clinical documentation section, corresponding notes for most psychiatry contacts were only written monthly.

Psychiatrists reported a good working relationship with other disciplines, including pharmacy and nursing.  Nursing staff demonstrated a good understanding of medication safety practices.  Interviewed *Coleman* patients reported being satisfied with psychiatry services and knew the process for requesting additional psychiatry and other mental health contacts.

DSH-Patton did not have a comprehensive tracking system for medication management. Leadership reported that such tracking would be available when DSH moved from paper to electronic records, which was expected to occur in 2025.

Psychiatrists did not report any difficulties obtaining non-formulary medications.  Non-formulary requests were reviewed on-site and were typically approved within one business day. Most non-formulary medications were for medication side effects.

During the site visit, DSH-Patton was undertaking a MAT pilot program for patients with opioid use disorder.  On March 1, 2022, one patient was receiving MAT with buprenorphine. DSH-Patton reported that historically CDCR patients receiving MAT were required to taper and discontinue their MAT prior to DSH admission.  DSH-Patton psychiatry staff reported that in less than one year, the institution would be able to treat *Coleman* patients on various forms of MAT, including buprenorphine, naltrexone, and methadone.

On March 1, 2022, one *Coleman* patient participated in electroconvulsive therapy (ECT) and was being closely monitored.

### 7.    Other Treatment Issues

#### A.    Involuntary Medications (PC 2602)

During the reporting period, DSH-Patton admitted one patient with a PC 2602 involuntary medication order, which was renewed.  Both new petitions for PC 2602 orders made during the review period were approved.  There were no non-renewals of involuntary medication

orders.  Psychiatry leadership further reported that there was no use of injectable medications due to patients refusing oral medications.

Justification for PC 2602 orders was clearly documented in reviewed healthcare records and the administrative law judge's order was in all reviewed charts.  However, DSH-Patton lacked a clear process to report the number of PC 2602 cases to headquarters.

### B.    **Clozapine**

DSH-Patton's clozapine policy was comprehensive.  Psychiatry leadership reported that during the review period one patient entered the facility on clozapine; five others had new starts on the medication.  One patient was unable to tolerate the medication's side effects, and clozapine was subsequently discontinued.  Reviewed records of patients prescribed clozapine did not reveal any significant deviations from the standard of care.

### C.    **Behavioral Management**

DSH-Patton had no PBST referrals or plans during the review period.  Leadership further reported that the institution's PBST had been disbanded in 2012, and there were no trained clinicians to provide this evidence-based treatment.

During an observed IDTT, the monitor's expert identified a patient who would benefit from a behavioral assessment and plan to address self-harming conduct.  DSH-Patton leadership agreed and stated that they would explore necessary behavioral interventions for the patient, though such interventions were limited due to the lack of trained PBST staff.

### D.    **Pre-release Planning**

Similar to the preceding round, DSH-Patton did not track or provide pre-release planning according to the MOU.  Moreover, staff were not aware of some MOU requirements, including

the provision of clinical and logistical pre-release planning within one year of patients' release to maximize opportunities for successful community transition.

During the site visit, the monitor's expert identified two *Coleman* patients with upcoming release dates who had not received pre-release services and were not tracked. Tellingly, one of the patients had an April 2022 release date and had not received services despite reporting elevated stress related to her release.

### E.      Access to Meaningful Jobs and Educational Opportunities

There were no *Coleman* patients in education programs during the review period or at the time of the site visit. However, DSH-Patton reported that patients had access to literature on how to enroll in correspondence education courses.

During the review period, vocational programs were referral-based, and no *Coleman* patients were referred to them. Further, no *Coleman* patients held a work assignment. Interviewed patients were not aware of any of these educational, vocational, or employment opportunities.

### F.      End-of-Shift Meetings

End-of-shift meetings were scheduled twice daily, at 8:30 a.m. and 2:30 p.m. An observed end-of-shift meeting led by the charge nurse was comprehensive, productive, and useful. Addressed issues included the patient census, recent and upcoming admissions and discharges, the status of patients on 1:1 supervision, patients going to court, and patients whose behavior warranted attention or who received PRN medications.

## V.     PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS) and Stages:  Standards and Procedures

As a public health measure, DSH-Patton used Unit 30 as the admissions COVID-19 quarantine unit. Prior to February 2022, patients remained on Unit 30 for 14 days; thereafter, the length of time for quarantining new admissions was reduced to ten days.

Unit 30 patients received confidential contacts with a social worker and their assigned psychiatrist, rehabilitation therapy contacts, and entertainment devices. The frequency of contacts with each discipline varied.

Since the start of the review period in July 2021, Unit 33 had been placed on quarantine status on five occasions. The most recent quarantine period had lasted ten days and ended three days prior to the site visit.

DSH-Patton reported that all *Coleman* class members had access to inner-compound privileges referred to as "Grounds," which followed a gender-specific schedule. Patients without Grounds privileges were escorted to treatment, appointments, or other activities.

## VI.  REFERRALS AND TRANSFERS

During the review period, eight patients were referred to DSH-Patton. No referrals were rejected. All intermediate care acceptances occurred within the required three days. The one acute care acceptance took two business days instead of one due to a miscommunication about the patient's level of care. Compared to the prior review period, when 115 patients were referred to DSH-Patton, referrals declined by 47 percent. All eight patients were transferred timely to DSH-Patton.

## VII.  ADMISSIONS AND DISCHARGES

### 1.  Admissions

There were eight admissions to DSH-Patton during the review period, which were 47 percent less admissions than the 15 reported for the prior reporting period. For intermediate care

patients, the average time from receipt of the completed referral to admission was 15.7 days, with a range of six to 20 days. The acute care patient was admitted five days after receipt of the referral.

DSH-Patton directly accepted admissions from CDCR. All referrals and admissions were from CIW, including the CIW-PIP, mental health crisis bed (MHCB), and EOP.

### 2. **Discharges**

During the review period, DSH-Patton discharged nine intermediate level of care patients. Five patients were discharged to CIW, two to the Central California Women's Facility (CCWF), one patient remained at DSH-Patton as an OMHD, and one patient was discharged to CIW for direct release to parole. The average length of stay from admission to physical discharge was 239 days, with a range of 11 to 874 days. Seven patients experienced delays after clinical discharge ranging from two to 12 days. No reasons for the delays were provided.

## VIII.    PATIENT DISCIPLINARY PROCESS

DSH-Patton did not complete any disciplinary hearing worksheets during the review period and no RVRs were issued.

## IX.    USE OF FORCE

DSH-Patton reported no use of force incidents involving *Coleman* class members.

## X.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

There were three unusual occurrences involving two *Coleman* patients during the review period. One involved alleged staff neglect following a patient's report that another patient assaulted her in front of staff. Review of the incident report revealed that staff was present, and no assault occurred; no deficiency was identified. The second incident involved the same patient who reported dizziness, hypotension, and a headache requiring medical intervention at a local

139

hospital; again, no deficiency was noted.  The third incident involving a non-displaced fracture was under investigation by CDPH.  All three incidents contained adequate documentation.

There were 293 SIRs completed for 18 individual patients on Unit 33.  *Coleman* patients generated 162 or 55 percent of SIRs.  The number of SIRs completed per *Coleman* patient ranged from two to 80; one patient generated 49 percent of SIRs for *Coleman* patients.  Ninety-five percent of that patient's SIRs related to her placement on 1:1 observation before or after scheduled ECT.  Seventeen SIRs, or ten percent, were related to suicidal ideation, self-harm ideation, or acts of self-harm.  Forty SIRs, or 25 percent, were related to verbal or physical acts of aggression involving *Coleman* patients as either victims or aggressors.

## XI.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

There was one restraint episode during the reporting period; healthcare record review indicated adequate justification for the restraint.

The restraint room had an elevated bed with restraints pre-attached.  There was no toilet and nursing staff reported utilizing a bedpan for restrained patients.  Notably, interviewed staff demonstrated a good understanding of safety practices for patients requiring restraints.

There were no seclusion incidents during the review period.  The seclusion room was available if patients wanted to use it voluntarily.  The room only contained a bed with a safety mattress.

## XII.    SUICIDE PREVENTION

During the review period, there were no suicides or serious incidents related to self-injurious behavior at DSH-Patton.  The monitor's expert reviewed ten SIRs for aggression toward self by four *Coleman* patients.  The review indicated that only four of the logged incidents were related to patient self-harm.  Those incidents involved superficial scratches and

bites or resulted from one patient punching her locker; none appeared to be suicide attempts or serious self-injuries.

DSH-Patton policy made nursing, psychiatry, and psychology staff responsible for conducting suicide risk assessments. During admissions, nursing staff performed initial suicide risk screenings. Positive screens were subsequently followed up with a psychiatry assessment, which was to be conducted within one hour for acute risk patients and within eight hours for those presenting with non-acute risk. Patients placed on enhanced observation following a high-risk admission assessment were to be assessed by a psychologist using the C-SSRS. Non-acute patients, as well as those with negative suicide screenings, were assessed by a psychologist using the C-SSRS within seven days of admission. Ongoing suicide risk assessments were to be completed, as indicated, throughout a patient's stay at DSH-Patton.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1. Emergency Response

Mock emergency response drills involved nurses, supervising psych techs, and psych techs. During the review period, Unit 33's mock emergency response drills were held in conjunction with other units; however, one of five completed drills was conducted solely on Unit 33. DSH-Patton reported that Unit 33 did not conduct one of six required drills. The reason for the missed drill was not reported, but provided documentation indicated that hospital-wide missed drills occurred due to COVID-19 protocols, quarantine status, and staff shortages. Otherwise, completed mock drill documentation indicated compliance.

No code blue occurrences were reported during the review period.

### 2. Death Review Process

Unit 33 did not report any deaths during the review period.

XIV. **QUALITY MANAGEMENT AND UTILIZATION REVIEW**

DSH-Patton's quality management program continued to be guided by DSH Policy Directive 9000 and several local administrative directives and nursing policies and procedures. The quality council (QC) oversaw the quality management program. During the review period, the QC met monthly and routinely reviewed violence data, performance improvement projects, and individual departments and programs.

The quality improvement process included tracking of core group treatment and individual therapy hours utilizing an electronic data management system. Scheduling and tracking improvements resulted in increased patient enrollment for an average of 11 weekly hours of core treatment per patient in recent months; improvements in individual therapy participation were also reported. Nonetheless, challenges in tracking supplemental hours remained.

Since the prior site visit, DSH-Patton had experienced unannounced visits by both the Joint Commission and the CDPH. The Joint Commission's findings following an on-site visit in March 2020 led to the development and implementation of a hospital-wide audit; data was used to address ongoing inadequacies. The CDPH's unannounced site-visit completed in December 2021 did not identify any deficiencies on Unit 33.

DSH-Patton also conducted routine and specialty audits throughout the review period. These audits included admission risk and hazard risk assessments, high-risk profile analyses, and environmental audits. Routine monthly audits were also modified based on previous audits' findings, while specialty audits were developed from routine auditing. However, from April 2020 through April 2021, monthly audit completion decreased due to the redirection of staff because of COVID-19.

DSH-Patton used results from quality assurance and quality improvement audits to improve processes, adjust policies, and conduct trainings.  Deficiencies identified by routine audits were provided to program management staff, who provided action plans to the quality management team.  However, action plans were often not submitted due to the COVID-19 pandemic.  Notably, a follow-up environmental audit scheduled for January 2022 was delayed secondary to COVID-19.

A utilization management committee was established in August 2021 to meet the expectations of the MOU between DSH and CDCR to review *Coleman* patients' lengths of stay. Beginning in August 2021, meetings were held every two weeks and discussed the Unit 33 of length of stay reviews for patients being treated on Unit 33 for more than 180 days and concurrent reviews for patients with 90-day lengths of stay.  Minutes revealed adequate discussions of patients' treatment progress and ongoing needs.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

DSH-Patton did not conduct patient satisfaction surveys during the review period. However, eight patient complaints were filed with Disability Rights California.  The complaints addressed access/use of personal possessions, daily living issues, legal matters, and mental health treatment, among other issues.  Outcomes of the complaints had not been shared with DSH-Patton at the time of the site visit.

## XVI.   *COLEMAN* POSTINGS

On March 2, 2022, the monitor observed *Coleman* posters in English and Spanish in Unit 33.

## XVII.  <u>LAUNDRY AND SUPPLY ISSUES</u>

During the site visit, there were no patient complaints about laundry or supply issues. There were also adequate supplies of clothing, linen, and hygiene and grooming items.  Patients reported sufficient access to radios.

No issues were noted with the arrival of, or access to, patient personal property upon admission to DSH-Patton.  Computer tablets were available for patient use to increase recreational activities; tablets were also available for patients on quarantine and isolation status.

## XVIII. <u>VISITATION/PRIVILEGES/TELEPHONE ACCESS</u>

On April 30, 2020, DSH-Patton launched its tele-visitation program to facilitate visitation during COVID-19.  DSH-Patton staff reported that this program increased patients' social support and family connections and that it had continued with the resumption of in-person visitation.  In consultation with the Department of Public Health, DSH-Patton resumed in-person visitation on April 27, 2021.

There were no complaints about telephone access during the site visit.

## XIX.  <u>LAW LIBRARY ACCESS</u>

There were no complaints about patients' access to the law library.  Patients and staff reported patient access to one computer kiosk with Lexis/Nexis and the ability to print legal forms, codes, court directories, and attorney lists.  If a patient could not physically go to the law library, the librarian was contacted, and materials were provided to the patient.  Assistance with kiosk operation and form completion was also provided.

## XX.  <u>MILESTONE CREDITS</u>

DSH-Patton reported that the issue related to CDCR's inability to record milestone credits for patients had been resolved.

**APPENDIX C1**
**Atascadero State Hospital (DSH-Atascadero)**
**Case Reviews**

**Atascadero State Hospital (DSH-Atascadero)**
**March 2022**

**Patient A**

This sixty-year-old patient was admitted to the hospital on June 25, 2021.  He was diagnosed with Borderline Personality Disorder, Bipolar I Disorder and Opioid, Cocaine, Cannabis and Alcohol Use disorders.  Psychiatric medication included lamotrigine, clozapine, and Vistaril.  His healthcare record was reviewed to assess adequacy of care after he reported to the monitor's expert that he was not seen in response to two psychiatric sick call requests.  A review of documentation indicated that psychiatric follow-up did occur.

Initial evaluations were very good; documentation was thorough and included documentation of psychosocial history and treatment needs.  Treatment goals developed by hospital staff were in alignment with treatment outcome expectations established by CDCR staff.  However, a summary of identified symptoms, functioning and provided treatment was not included on documentation of treatment team reviews.  Group assignment was not clearly aligned with treatment goals and was not clearly individualized.  For example, it was not documented how assignment to aggression reduction, a core group, would address a goal to develop insight "with a view to decreasing" suicidal ideation.

Provider documentation was thorough and included clear documentation of clinical interventions including individual therapy with the psychologist.  The psychologist provided eye movement desensitization and reprocessing (EMDR), an appropriate intervention for trauma symptoms, utilized a reward system to motivate the patient to attend to activities of daily living (ADLs) and discussed various DBT interventions.

Documentation of group participation was not located in the healthcare record.

Findings

This patient's care was adequate within the context of COVID-19 limitations.  Documentation needed improvement for continuity of care.  Specifically, treatment planning documentation needed clear delineation of group assignment and inclusion of a summary of provider contacts between treatment plan reviews.

**Patient B**

This long-term, forty-seven-year-old patient was admitted to the hospital on August 12, 2019.  He was diagnosed with Schizoaffective Disorder, Bipolar Type and prescribed several antipsychotics and Vistaril under PC 2602.

Treatment outcome expectations were implemented as treatment goals and included a reduction in psychosis and improved distress management, insight, judgment and ability to function at EOP level of care.  Summaries of progress toward treatment goals was documented but, in some instances, remained unchanged.  Group programming was the primary treatment intervention and included core groups of aggression reduction, healthy living, mental health wellness, sponsor group and staying safe.  Rationale for these groups to assist with meeting treatment needs was

146

not documented. While it was documented that he was enrolled in ten hours of treatment groups per week and attended 60 percent of groups, clear progress toward treatment goals was not documented and group documentation was not included in the healthcare record.

Overall, provider documentation was comprehensive and indicated that he remained psychotic with symptom improvement with medication.

<u>Findings</u>

This patient's care was adequate within the context of COVID-19 limitations. Documentation needed improvement for continuity of care. Specifically, treatment planning documentation needed clear delineation of group assignment and a summary of provider contacts with treatment progress between treatment plan reviews.

**Patient C**

This fifty-three-year-old patient was admitted to the hospital on May 7, 2021. He was diagnosed with Major Depressive Disorder, Antisocial Personality Disorder and Alcohol Use Disorder. He was prescribed abilify, buspar, Zoloft and Vistaril. His healthcare record was reviewed to assess adequacy of care after he reported that he was unexpectedly being discharged from the hospital without prior discussion of discharge planning.

Treatment outcome expectations included decrease depression, develop grounding techniques and coping skills. Treatment goals or 'foci,' developed by the hospital treatment team were in alignment with CDCR outcome expectations. Treatment team documentation provided a summary of treatment with the psychologist and patient response to medication. Assigned groups included sponsor groups, aggression reduction, DBT, healthy living and mental health wellness. Rationale for group assignment to address treatment needs was not clearly documented. Group attendance was documented but there was no documentation of group participation or progress toward treatment goals.

Documentation of progress toward treatment was not clearly tied to treatment expectations. For example, progress for a goal to develop three grounding techniques was "Reports 1:1 DBT is helping…" however, specific detail regarding techniques was not included. Additionally, another goal to develop coping skills, progress was documented as "'It's all mental'" I don't find anything helpful. I lose interest, even in basketball quickly."

Documentation indicated that his depression originated from his controlling offense, a drunk driving incident that resulted in a death. Subsequently, he experienced ongoing regrets that were not targeted in treatment. Relatedly, he was admitted to the hospital due to ongoing suicidal ideation and documentation indicated that he was assessed as moderate risk of harm to himself but treatment did not specifically target suicidal ideation. It was not clear why he was not enrolled in the Staying Safe group or the Preparing for Discharge group.

Contact with the psychologist occurred at least monthly, and DBT skills were discussed. Documentation was thorough as were quarterly social work and rehabilitation therapy documentation. Monthly psychiatric documentation was comprehensive and included an appropriate rationale for diagnoses.

Documentation indicated that he was to be discharged on March 10, 2022. Prior to this date there were no individualized documentation regarding discharge readiness and ability to safely management in CDCR. IDTT documentation was not available for review. However, observation of his discharge IDTT indicated insufficient discharge planning discussion.

Findings

This patient's care was adequate but marginally so within the context of COVID-19 limitations. Overall, clinical interventions were appropriate and there is documentation that he improved with treatment. However, documentation needed improvement with targeting identified treatment needs, particularly suicidal ideation, rationale for treatment/group assignment and discharge planning.

**Patient D**

Patient D was 49-year-old man, who was admitted to DSH-Atascadero on March 12, 2021 with the diagnosis of schizophrenia, polysubstance abuse disorder, diabetes, and a variety of other medical diagnoses. A comprehensive psychiatric examination was completed, which indicated that upon transfer he was floridly psychotic and selectively mute. He had been transferred from Valley State Prison (VSP).

Monthly notes for the psychiatrist were present that provided useful clinical information. Nursing weekly progress notes were present in his healthcare records. Quarterly social work notes and quarterly rehabilitation therapy notes were also present. Notes by the psychologist varied and were present generally on at least a quarterly basis. Patient D was noted not to be attending groups on a regular basis despite reminders from staff.

His treatment plan was updated during December 2021. Patient D was noted to show limited insight into the nature of his illness. He required prompting to complete his ADLs. The patient was encouraged to be more active in his treatment.

This patient was briefly interviewed in a group setting by a *Coleman* expert. He was very silent during the group interview and was not very engaged in the process.

Findings

Patient has a chronic and severe mental illness and clearly has benefited from treatment, although his treatment is limited both by COVID-19 limitations and his limited insight into the nature of his illness. He was receiving an appropriate level of mental health care in the context of the COVID-19 treatment limitations.

**Patient E**

This 39-year-old man was admitted to DSH-Atascadero on June 4, 2021 from CHCF, where he had been placed on involuntary medications. A comprehensive psychiatric examination was completed upon admission. Diagnoses included schizophrenia and polysubstance use disorder. His healthcare record was reviewed for the period of time covering the monitoring (July-December 2021). Comprehensive notes by a psychiatrist were present in his healthcare record

148

although such notes from January-March 2022 were absent. His PC 2602 status was scheduled to expire February 25, 2022. His psychiatrist documented during November 8, 2021 the decision not to renew the PC 2602 because the patient no longer represented a danger to himself.

A comprehensive and clinically appropriate treatment plan was present.

Nursing weekly progress notes were present in his healthcare record.

Notes by the psychologist were present on a weekly basis. Social worker notes were present on a quarterly basis as were rehabilitation therapist's notes.

This patient was interviewed in a group setting and expressed satisfaction with the treatment being provided to him at DSH-Atascadero. He reported receiving about 8-10 therapy groups per week.

Findings

This patient was receiving adequate treatment in the context of significant COVID-19 limitations regarding access to therapy groups. In general, documentation was reasonable although the psychiatrist appeared to have recently been behind in his monthly progress notes.

**Patient F**

This 49-year-old man was transferred from CMF to DSH-Atascadero on August 13, 2021. His admission psychiatric evaluation, which was comprehensive in nature, was consistent with the diagnoses of bipolar I disorder, manic, with psychotic features. Monthly psychiatrist's notes provided relevant clinical information. His bipolar symptoms have stabilized with the use of appropriate medications and group therapies.

Quarterly progress notes by the team social worker and by the rehabilitation therapist were present as were nursing weekly progress notes. Progress notes by the psychologist was generally written on a quarterly basis although at times more frequently.

This patient's current treatment plan focused on decreasing his psychotic symptoms. He was noted to be participating in about five hours per week of supplemental activities during the past 90 days. He was encouraged to attend at least 10 hours per week of rehab therapy treatment services. He was enrolled in troop six hours of treatment groups per week due to COVID-19 treatment limitations. He attended about 70 percent of this schedule treatment hours. This patient continued to be on a PC 2602 status.

During a group interview, patient 3 expressed satisfaction with the treatment program at DSH-Atascadero. A *Coleman* expert observed his treatment team meeting, which involved active discussion by all team members as well as patient 3.

Findings

This patient was receiving adequate treatment in the context of significant COVID-19 limitations regarding access to therapy groups. The documentation in the healthcare records was good.

149

**Patient G**

This 67-year-old man was admitted to DSH-Atascadero on November 12, 2021.  His comprehensive psychiatric admission note indicated a history of bipolar I disorder.  The patient was referred to DSH-Atascadero from CHCF-PIP.  Useful monthly progress notes by his psychiatrist were present in the healthcare record except for the month of January 2022.

Nursing progress notes were present on a weekly basis.  Quarterly progress notes by the social worker and rehabilitation therapist were present.  Psychologist notes were written after this patient attended therapy groups conducted by the psychologist.

The most recent treatment plan indicated that this patient has been attending group therapy on a regular basis.  Treatment outcome expectations included decreasing his depressive symptoms, medication adherence and improving his coping skills.

During a group interview, the patient reported satisfaction with the treatment program at DSH-Atascadero.  A *Coleman* expert observed his treatment team meeting, which involved active discussion by all team members as well as the patient.

Findings

This patient was receiving clinically appropriate treatment in the context of significant COVID-19 limitations regarding access to therapy groups.  The documentation in the healthcare records was good.

**Patient H**

This 40-year-old man was admitted to DSH-Atascadero on February 17, 2022.  His admission psychiatrist's note was comprehensive in content and consistent with the diagnoses of a major depressive disorder with psychotic features and a borderline personality disorder.  Timely initial assessment notes and subsequent progress notes were presents from the disciplines of psychology, social work, rehabilitation and nursing services.  The treatment plan was clinically appropriate.

The patient has a long history of self-harming behaviors.  DBT was recommended in his treatment plan, but is currently not available due to the closing of the treatment mall.  He is currently working with the unit psychologist in a weekly "Staying Safe/THRIVE" group to develop an individualized safety plan.

Findings

This patient is in the early stages of his hospitalization.  Lack of DBT treatment at the present time due to COVID-19 will likely be a significant barrier in meeting his treatment goals.  In the context of COVID-19 treatment limitations, the patient is receiving appropriate treatment.

**Patient I**

This 27-year-old man was admitted to DSH-Atascadero on October 13, 2022. His comprehensive psychiatric admission evaluation was completed the same day. His presentation was consistent with the diagnoses of schizoaffective disorder, bipolar type, amphetamine use disorder, severe and cannabis use disorder, moderate. He had been transferred from the California Institution for Men (CIM) due to suicidal ideation and psychotic symptoms.

Documentation in his healthcare record was present on a regular basis (as required) by all the relevant mental health disciplines. Review of his January 21, 2022 treatment plan indicated that he was enrolled in five hours of treatment groups per week. His EBRD was October 16, 2022.

A *Coleman* expert attended his treatment team meeting during March 10, 2022. He was not demonstrating any psychotic symptoms. He was complaining of drowsiness which appeared related to his psychotropic medications, which were going to be adjusted by his psychiatrist.

Findings

This patient was receiving adequate treatment in the context of significant COVID-19 limitations regarding access to therapy groups. The documentation in the healthcare records was good.

**Patient J**

This 43-year-old male patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero. The patient arrived at DSH-Atascadero on January 21, 2021, from the MHCB level of care at California Substance Abuse Treatment Facility (CSATF). The patient was admitted to MHCB due to self-harm from cutting and banging his head, as well as for worsening depression and psychotic symptoms. CDCR diagnoses were Major Depressive Disorder and Generalized Anxiety Disorder. His medications at time of admission were fluoxetine, mirtazapine, and olanzapine. The patient was under an involuntary medication order (PC 2602).

Initially, the patient was actively involved in his treatment, frequently attending 100 percent of his scheduled treatment groups. Treatment team notes reflected continued clinical progress. Due to his compliance with taking medications, his psychiatrist did not renew his PC 2602 which expired on July 16, 2021.

When the patient learned of his impending discharge to a CDCR facility, he went on a series of hunger strikes. Documentation reported extensive safety concerns at several CDCR institutions. The mental health and medical treatment teams demonstrated close collaboration. The patient consumed enough fluids as to avoid having to be sent to an outside facility for medical treatment. His treatment team worked closely with custody to address his safety concerns. With his safety concerns addressed, the patient agreed to end his hunger strike. At the time of the site visit, the patient was being transferred to the CMF-L1 program. This allowed the patient to return to the CDCR system, yet continue to have close clinical monitoring.

<u>Findings</u>

The care provided to this patient at the intermediate level of care was adequate.  Documentation clearly showed close coordination between mental health, medical, and custody to address his complex clinical and custodial issues.

**Patient K**

This 35-year-old male patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero, based on concerns voiced in the Plaintiff's letter. These concerns centered around COVID-19 related changes to the facility's process granting additional privileges.  DSH-Atascadero employed the HAS, which was a system of Levels from 1 through 5, with higher levels granting more privileges.

The patient was admitted from the CIM MHCB on November 5, 2021.  His diagnoses at time of admission were Major Depressive Disorder and possible Post-Traumatic Stress Disorder.  While he had declined medications for approximately one year prior to MHCB, the patient agreed to start sertraline while in the MHCB.  Upon admission to DSH-Atascadero, sertraline was discontinued, and duloxetine was initiated.  The patient was not on an involuntary medication order (PC 2602).  At time of admission, the patient was assessed to be at moderate risk of suicide, low risk of self-injury, and moderate risk of violence.  The patient declined medications, stating that he preferred to be treated with individual and group therapy.  Documentation was clear that he denied thoughts of harming himself or others. The psychiatrist clearly documented that the patient did not meet criteria for involuntary medications.

On November 14, 2021, a peer assaulted the patient.  While notes reflected that the patient had concerns that this assault influenced a reduction in his Level status, this was supported in neither the medical record, nor when the monitor's expert spoke with unit leadership.  The patient was on HAS Level 1, per protocol, at time of admission.  He had been raised to Level 3 by the end of November 2021.  Due to restrictions necessitated by the COVID-19 pandemic, some of the privileges usually afforded to patients at Level 3 or above had to be paused.

His progress continued and he had met all his treatment goals by February 2022.  At the time of the site visit, the patient was clinically discharged and was awaiting transfer to RJD.

<u>Findings</u>

The care provided to this patient at the intermediate level of care was adequate.  Multiple attempts were made to have him start medications; however, he declined.  Based on the review of his chart, he did not appear to meet criteria for involuntary medications.

DSH-Atascadero did have to restrict certain privileges, due to the ongoing COVID-19 pandemic. At the time of the site visit, the facility had begun relaxing these restrictions.  DSH-Atascadero had a clear plan to advance these further over the upcoming weeks, subject to revision based on the evolving nature of the ongoing COVID-19 pandemic.

**Patient L**

This 53-year-old male patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Atascadero. The patient was at CHCF, where he underwent several medication changes. Due to clinical decompensation, including hearing auditory hallucinations telling him to harm others, he was admitted to acute care at CMF on June 17, 2021. While at CMF, the patient was placed on clozapine. The patient was transferred to DSH-Atascadero on September 21, 2021. Upon his admission to DSH-Atascadero, the patient was diagnosed with Schizophrenia and Obsessive-Compulsive Disorder (OCD). The patient was prescribed clozapine, olanzapine, and sertraline. The patient was under an involuntary medication order (PC 2602).

The patient had a complicated past psychiatric history, including multiple suicide attempts. His last suicide attempt was in 2000, via hanging. The patient had a history of hospital stays, including being treated at DSH-Atascadero in 2018.

At the time of admission to DSH-Atascadero, the patient's psychotic symptoms had improved. He had general paranoia, but it was not directed at any particular person. He denied auditory hallucinations. Records indicated that the patient wanted treatment for his OCD. Notes reflected an emphasis on treating his psychotic disorder. The patient was treated with medications, along with individual and group therapy. Notes reflected continued clinical progress.

<u>Findings</u>

The care provided to this patient at the intermediate level of care was adequate. Treatment team notes documented close collaboration among team members. The patient was making progress towards his treatment goals. While the patient reportedly wanted to focus treatment on his OCD, the treatment team's decision to focus on his psychotic and mood symptoms appears clinically adequate.

**APPENDIX C2**
**Coalinga State Hospital (DSH-Coalinga)**
**Case Reviews**

**Coalinga State Hospital (DSH-Coalinga)**
**February 20, 2022**

**Patient A**

This 35-year-old patient was selected for healthcare record review to assess the quality of intermediate care provided at DSH-Coalinga. The patient transferred to DSH-Coalinga from the California State Prison at Los Angeles County (CSP/LAC) in September 2021 with recommendations for inpatient treatment to address depression and chronic suicidal ideation. Records noted a history of substance use, suicide attempts, and self-harm by cutting on various parts of his body. His most recent suicide attempt involved overdosing on prescription medication in January 2021.

The patient was diagnosed with Major Depressive Disorder and Post-Traumatic Stress Disorder (PTSD). His psychiatric symptoms during admission included depressed mood, daily thoughts of suicide, hopelessness, and chronic pain. He was prescribed sertraline (50 mg) and mirtazapine (45 mg) for depression, melatonin (10 mg) for sleep, and hydroxyzine (50 mg) as needed for anxiety. The prescriber noted a plan to monitor the patient for serotonin syndrome due to prescribing two antidepressant medications.

The initial treatment plan targeted suicidal ideation, nightmares, depression, stress management, treatment participation, and emotion dysregulation. Treatment goals were realistic and documented in measurable terms with baseline ratings for tracking progress. Most proposed treatment interventions were evidenced based. Subsequent treatment plans included updates on current symptoms, functioning, and treatment progress.

The initial psychiatric assessment was completed timely, and subsequent psychiatry contacts occurred at least monthly. The assigned primary clinician's assessment of the patient on September 16, 2021 resulted in recommendations for trauma treatment with biweekly individual therapy sessions. However, as of February 23, 2022, only one individual therapy session occurred during admission. All other primary clinician contacts were used for completing monthly suicide risk assessments for treatment team meetings.

As DSH-Coalinga's group hour data included hours spent working on self-help packets or workbooks when group treatment was unavailable, it was difficult to determine the frequency of group contacts offered during the review period. However, nursing documentation for this patient included several quotes that suggested group treatment was often limited during this patient's admission. For example, on September 18, 2021, a quote from the patient read, "we are not doing any groups right now." On November 17, 2021 and January 16, 2022, the patient reportedly stated, "We haven't really gone to [groups]" due to "lock down." On February 16, 2022, the patient informed nursing, "there have been no groups [because] of quarantine."

Although the patient was described as compliant with treatment, medication, and programming on the unit, he continued to present as distressed with prominent PTSD and mood symptoms throughout his admission. A December 7, 2021 progress note indicated the patient was in distress, not sleeping, and reporting that he would do anything to avoid sleep due to "bad" nightmares. The psychologist's monthly suicide risk assessment note for February 2022 noted

155

the patient continued to report high ratings for depression and anxiety, chronic suicidal ideation, limited sleep, and knuckle chewing when anxious. The clinician added that, despite providing the patient with a "stress ball," he continued to chew on his knuckles to cope with anxiety. There were no treatment interventions documented during this contact. On February 16, 2022, nursing wrote that the tele-psychiatrist had increased the patient's psychiatric medication dosage; however, the patient continued to report, "But still hasn't worked yet."

Findings

The intermediate care provided to this patient was inadequate. Although treatment plans were well written, they required modification in response to evidence of ineffectiveness and the patient's worsening presentation during admission. Additionally, the psychologist's initial assessment resulted in recommendations for biweekly individual therapy to address trauma related symptoms; however, the provider never followed through with offering individual therapy sessions despite documenting ongoing trauma related distress throughout the current admission. Even when treatment groups were limited or suspended during COVID-19 related programming modifications, the individual therapy sessions were not offered to this patient.

**Patient B**

This 40-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at DSH-Coalinga. The patient was admitted in September 2021. The healthcare record referenced a history of self-harming behavior, substance abuse, mood swings, depression, anxiety, psychosis, panic attacks, and multiple incidents of exhibitionism. The most recent incident of self-harm occurred in early July 2021. At the time of the most recent suicide risk assessment, the patient was determined to have moderate chronic suicide risk and low acute risk.

The patient was diagnosed with PTSD and Major Depressive Disorder, severe. His psychiatric medications were changed during the current admission, and the most recent active medication list included fluvoxamine and doxepin for depression, antipsychotic medication, melatonin for sleep, and leuprorelin for hormone suppression and sexual behavior management. The initial treatment plan targeted depression symptoms, suicidal ideation, thoughts of self-harm, medication adherence, and indecent exposure. Goals were measurable and realistic. Subsequent treatment plans were revised monthly and included relevant updates on current symptoms, functioning, and response to inpatient care.

The primary clinician completed their suicide risk evaluation and initial assessment timely on September 17, 2021. This provider's assessment resulted in recommendations for "weekly individual therapy sessions," however, as of February 2022, weekly therapy sessions were not been offered.

On September 18, 2021, the patient was placed on 1:1 suicide watch after engaging in self-harm. The patient subsequently met with his primary clinician two days later on September 20, 2021, and reported that he had been feeling hopeless and isolated in the quarantine unit prior to the self-harm incident.

On October 23, 2021, the patient was again placed on 1:1 suicide watch after endorsing thoughts of suicide by hanging. The October 2021 treatment team meeting summary indicated the

156

psychologist would offer daily check-ins and weekly individual therapy sessions; however, still, there were no weekly therapy sessions offered to this patient. Additionally, during a suicide risk assessment on October 26, 2021, the patient continued to report hopelessness and depressed mood.

On November 10, 2021, the clinician documented that the patient would begin EMDR therapy the following week to address trauma, self-esteem, and suicidal ideation. Subsequently, there was only one documented individual encounter that appeared to occur at the patient's request on November 23, 2021. During the November 23, 2021 contact, the patient was "agitated" and he requested discharge, refused vitals, and made self-deprecating statements. There were no therapeutic interventions documented on this date.

It appeared one trauma therapy session may have occurred on or around November 24, 2021, as the November 29, 2021 treatment team summary referenced an EMDR contact. The treatment team note further indicated that the patient experienced increased urges to masturbate and was found masturbating in a room not assigned to him following the EMDR session. However, there was no progress note for the referenced EMDR session.

During a suicide risk assessment on January 14, 2022, the patient continued to report feeling hopeless, depressed, and anxious. The most recent clinical summary in February 2022 indicated the patient continued to report chronic suicidal ideation, high ratings for depression, and catastrophic thinking. However, the clinician suggested the patient demonstrated some progress by questioning the validity of his depressive thinking, participating in group treatment, and utilizing new coping skills.

Findings

The care provided to this intermediate care patient was inadequate. The primary clinician's initial assessment resulted in a recommendation for "weekly" individual therapy, which never occurred despite ongoing evidence of psychiatric instability and increased risk for self-harm. Weekly individual treatment was recommended a second time on October 23, 2021, after the patient required suicide watch on two occasions and engaged in an incident of self-harm. EMDR was also recommended; however, it appeared that only one EMDR therapy session was offered. The EMDR session referenced in the November 2021 treatment team summary did not have a corresponding progress note, which was especially concerning given the patient responded poorly to the intervention. As such, while the treatment team appropriately recognized treatment enhancements were needed to address this patient's symptoms and behaviors, they failed to follow through with clinically indicated interventions.

**Patient C**

This 35-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at DSH-Coalinga during his brief admission between October 4, 2021 and October 14, 2021. The patient was referred to DSH-Coalinga from CMF to address depression, self-harming behaviors, anxiety, and psychosis.

The patient's psychiatric diagnoses were Schizoaffective Disorder, Bipolar Type, and Borderline Personality Disorder. Effexor was prescribed for depression and anxiety. Records referenced a

history of substance abuse and noted the patient appeared to be withdrawing from opiates upon admission to the quarantine unit.

The primary clinician completed their initial assessment timely on October 5, 2021. The clinician noted that treatment groups were assigned and that individual therapy would be offered.

On October 7, 2021, in response to learning the patient sent a letter to a staff member's home address, the treatment team discussed maintaining appropriate boundaries. The patient subsequently became angry, flipped a table in the dayroom, endorsed thoughts of self-harm, and was placed on enhanced observation.

On October 14, 2021, the patient was discharged. Records indicated that, for the safety of the staff member, DSH-Coalinga referred this patient for further intermediate care at a different facility.

The patient remained at DSH-Coalinga on administrative days until his transfer on October 25, 2021. While on administrative days, he had two incidents that resulted in enhanced observation for his safety. On October 21, 2021, his acute suicide risk was assessed as high. On October 25, 2021, the patient said he did not see the point in living and he reportedly punched glass and injured his knuckles on this date.

The patient transferred to SVSP later on October 25, 2021.

Findings

Although mental health treatment was minimal, clinical interventions for this patient during his brief admission were adequate. The treatment team's decision to discharge the patient to another intermediate care program was appropriate. DSH-Coalinga continued to monitor the patient closely for his safety until the time of transfer to SVSP-PIP.

**Patient D**

This 47-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at DSH-Coalinga. The patient transferred to DSH-Coalinga on May 28, 2021 for further treatment to address self-harming behaviors and significant functional impairments. Records noted a recent history of smearing feces, flooding his cell, psychotic symptoms, and disorganized behavior. The patient had a history of suicide attempts, the most recent of which occurred in February 2021.

Psychiatric diagnoses during admission included Bipolar I Disorder and Borderline Personality Disorder. The patient had an active PC 2602 involuntary medication order, and was prescribed Olanzapine (5 mg), Venlafaxine (75 mg), Hydroxyzine Pamoate (50 mg), and Benztropine Mesylate (1 mg).

The initial psychiatric assessment was completed timely on May 28, 2021. Psychiatry met with the patient more often than once per month during the first two months of admission. The psychologist's initial assessment occurred on June 1, 2021, and this provider subsequently met with the patient one to two times per month; although the individual contacts were generally

used for completing suicide risk assessments.  For unknown reasons, the assigned social worker's initial assessment was not completed until approximately one month after the patient's arrival on June 24, 2021, and this provider met with the patient monthly thereafter.

The treatment plan targeted depression, anxiety, hypomania, suicidal ideation, social skills, and medication adherence. Treatment goals were documented in measurable terms.  Planned interventions included evidence-based treatments such as DBT and CBT.

During the first two months of admission, the patient continued to exhibit depressive symptoms and one-to-one suicide watch was ordered on two occasions.  However, by August 2021, the treatment team began documenting objective signs of treatment progress.  The most recent treatment team note, dated September 23, 2021, indicated the patient's symptoms were at baseline with "excellent" treatment attendance and medication adherence.  His acute suicide risk was assessed as low and he was reportedly observed "smiling and happy" on the unit.

The treatment team began preparing the patient for discharge in late September 2021.  Records around this time indicated the patient was attending a "Transition Back to CDCR" group.  On or around October 1, 2021, the patient discharged to EOP level of care with a planned transfer to PVSP.

Findings

The care provided to this intermediate care patient at DSH-Coalinga was adequate.  The psychiatrist's initial assessment was timely. All mental health assessments were comprehensive and consistent across disciplines.  Treatment plans addressed the referring institution's TOEs and other relevant issues identified during admission.  The clinical documentation provided necessary updates on current symptoms, functioning, and progress toward discharge objectives.  The discharge to EOP level of care was justified and well supported by the treatment team's notes. Interventions for ensuring a smooth transition back to CDCR were also appropriate.

**Patient E**

This patient's chart was reviewed in response to the issue raised in plaintiffs' pre-site visit letter raising concerns about how DSH-Coalinga dealt with the patient's Spanish dominance.  The patient was admitted to DSH on September 15, 2021 with a diagnosis of Schizoaffective Disorder, Depressive type.  Upon transfer from VSP the patient was floridly psychotic experiencing auditory hallucinations and demonstrating disorganized thinking; his condition had not improved during treatment at the EOP level of care.

His history was positive for a suicide attempt by hanging in 2016.  He immigrated to the United States at age 15 from Mexico where he attained a third-grade education.  Auditory hallucinations first began around age 16 although the patient started substance use around age 12.  A psychosocial assessment noted that CDCR records indicated a history of traumatic brain injury, but the details were not documented or further explored.

Initial assessments upon arrival at DSH-Coalinga noted that Spanish speaking interpreters were utilized to assist. Despite this, staff could not assess suicide risk because the patient was unable to answer inquiries. In January 2022, the patient was screened for suicide risk where he was

assessed as a low suicide risk although he reported command hallucinations to harm himself and poor medication compliance.

Initially, the patient was seen by the on-site psychiatrist who noted on September 22, 2021 a "language barrier" and the need for assistance from an interpreter. Early notes indicated the patient's continued confusion even when an interpreter was utilized. The patient reported not understanding what the purpose of groups were or why he was hospitalized, at times requesting to return to CDCR.

The patient periodically reported command hallucinations directing him to cut himself. Notes variously indicated that the patient was seen utilizing the language line, a certified interpreter, with the assistance of Spanish speaking staff, that the clinician spoke Spanish, or at times no mention of how effective communication was achieved was documented. The patient participated in a treatment team meeting of January 5, 2022 where he was noted to respond to questions posed in English although he spoke mostly Spanish and was more comfortable communicating in that language. He did not attend his February 3, 2022 treatment team meeting. He was offered a copy of his treatment plan but declined. It was not clear whether the patient could read English sufficiently to comprehend his treatment plan.

In November and December, the patient was reported to have attended approximately half of his scheduled groups. Whether the patient could comprehend the groups' content or supplemental materials was not clear. Notes in December 2021 indicated improved group attendance.

The patient transferred to the telepsychiatrist caseload in December 2021. By February 10, 2022 he reported feeling better following the change from Zyprexa to Geodon.

Findings

This patient showed gradual improvement during the course of his hospitalization at DSH-Coalinga, more recently demonstrating improved group attendance and a good response to a change in his antipsychotic medications. The issue of effective communication was not assessed as comprehensively as it could have been in a patient with a complex presentation of Spanish dominance, a third-grade education, psychotic symptoms, a long history of substance use, and a report from CDCR of a traumatic brain injury. At times, notes indicated that a certified interpreter was utilized, other times Spanish speaking staff assisted, and at times the issue was not addressed in documentation. It was unclear whether the patient could comprehend the contents of groups, or the materials utilized or whether he could read English sufficiently to assimilate the contents of his treatment plan. Although his response to and engagement with treatment improved somewhat over time and over the course of his hospitalization the treatment he received was adequate a more consistent and comprehensive approach to the issue of effective communication could have facilitated the process.

**Patient F**

This 53-year-old male patient was selected for health care record review to assess the quality of care he received while at the intermediate level of care at DSH-Coalinga.  The chart was selected based on concerns voiced in the Plaintiffs' letter regarding the mental health care received when the patient was on the facility's medical unit from January 11, 2022, through February 14, 2022.  The patient was admitted to DSH-Coalinga on May 21, 2021.  Psychiatric diagnoses included schizophrenia, amphetamine use disorder, and cannabis use disorder.  The patient was under an involuntary medication order (PC 2602) throughout the review period.  His medications were clozapine and aripiprazole, with a backup injection of olanzapine, if he refused clozapine.

A C-SSRS dated November 22, 2021, December 22, 2021, and January 31, 2022, assessed his suicide risk level as low.

On January 11, 2022, the patient had two episodes that were concerning for possible seizures.  He was sent to an outside medical facility for evaluation and returned the same day.  He was started on levetiracetam for presumed seizures.  The medical record reflected close consideration of the risks and benefits of continuing the clozapine because this medication might increase the risk of seizures in some individuals.  The patient's psychiatrist continued the patient's clozapine.  During this time, he received individual, but not group, treatment.  While on the medical unit, the patient was seen frequently by the psychologist, social worker, and recreation therapist, who treated him on his usual unit.  The patient was given clinical packets to complete.  Follow-up notes reflected that he reportedly found this information helpful.

The patient required treatment on the medical unit until February 14, 2022.  The patient was seen by his social worker and recreation therapist prior to transfer back to his usual unit.  The patient had close clinical follow-up upon return to his regular unit.  The psychologist saw him on February 15, 2022.

Findings

The care provided to this intermediate level of care patient at DSH-Coalinga was adequate.  For a period of time, he was unable to attend groups, which was the principal treatment modality used by this facility.  In response, the treatment team increased the frequency of the patient's individual contacts.  The psychiatrist, psychologist, social worker, and recreation therapist closely followed the patient.  Notably, poor legibility of certain handwritten records, most notably by physicians, impeded this review.

**Patient G**

This 36-year-old male patient was randomly selected for health care record review to assess the quality of intermediate level of care provided at DSH-Coalinga.  The patient arrived at the facility on June 4, 2021, from CHCF.  The reasons for referral were suicidal ideation, auditory hallucinations, and poor impulse control.  The patient was taking haloperidol, divalproex, and benztropine.  He was not under an involuntary medication order (PC 2602).

The patient was part of the Developmental Disability Program (DDP), and was assessed at DD3, which was the level that required the most support.  Facility documentation noted the use of

simple language, repeating important concepts, and having the patient explain matters in his own words.

While in treatment at DSH-Coalinga, the patient had three episodes of self-injury on June 24, 2021, June 30, 2021, and July 11, 2021. All incidents involved the patient banging his head. The incident on July 11, 2021, resulted in the patient's placement in five-point restraints, after less restrictive interventions were unsuccessful. The facility worked with the patient on coping skills and offered him the use of a helmet when he felt frustrated and wanted to bang his head.

On September 20, 2021, a peer reportedly called the patient names and the patient responded by punching the peer several times.

The patient was assessed at moderate risk of aggression and low risk for suicide.

The patient was discharged to the EOP level of care on October 1, 2021. Medications at the time of discharge were haloperidol, divalproex, and benztropine.

<u>Findings</u>

The intermediate level of care provided to this patient was adequate. The facility attempted to work with the patient on coping and distress tolerance skills. Medication management appeared adequate and considered the patient's relevant medical conditions.

**Patient H**

This 37-year-old male patient was randomly selected for health care record review to assess the quality of intermediate level of care provided at DSH-Coalinga. The patient was transferred from CDCR on December 30, 2021, due to grave disability. Medical records indicated that prior to admission to DSH-Coalinga, the patient was taken off clozapine due to weight gain.

Diagnoses at the time of admission included schizophrenia and gender dysphoria, with a consideration of borderline personality disorder. The patient was on an involuntary medication order (PC 2602). Medications at the time of admission included clozapine, haloperidol, benztropine, and venlafaxine, as well as an injection of olanzapine if the patient refused clozapine.

The patient was also seen during treatment team. He confirmed that his pronouns were he/him. However, the patient had resumed hormonal treatment with estradiol. The patient disagreed with his schizophrenia diagnosis. He also was able to list multiple coping skills that he could utilize.

Medical records from the patient's psychiatrist, psychologist, and social worker all reflected gradual improvement in the patient's psychosis symptoms. He was tapered off benztropine. He gained a substantial amount of weight, at least partly due to resuming clozapine. The treatment team actively engaged the patient in health-maintenance behaviors. According to reviewed available documentation, the patient's mood had improved, and he was not experiencing suicidal ideation.

Findings

The care provided to this patient at the intermediate level of care was adequate.  Notes reflected that the patient had made significant improvement in both his psychotic and mood symptoms. The treatment team was actively working with him to mitigate side effects such as weight gain, which in the past had led to the patient wanting to stop medications.

**APPENDIX C3**
**Patton State Hospital (DSH-Patton)**
**Case Reviews**

**Patton State Hospital (DSH-Patton)**
**March 2022**


**Patient A**

This patient was admitted to the intermediate care facility (ICF) level of care at DSH-Patton on September 21, 2021 from CIW. She was prescribed fluphenazine and lithium. Admission assessments by nursing, psychiatry, psychology, and rehabilitation therapy were completed timely and appeared adequate. The psychological assessment included completion of a C-SSRS which determined the patient to be at low risk for suicide and appeared adequate. A psychosocial history was completed on October 7, 2021, the date the patient transferred to the unit after quarantine and was inclusive of patient interview information along with information gathered from the record and admission assessments.

A case history along with a seven-day initial treatment plan was completed on October 14, 2021. Diagnoses included unspecified schizophrenia and amphetamine use disorder, moderate. Three subsequent treatment plans were included in the record and adequately reviewed patient treatment progress and participation in groups. Required members were present at treatment team meetings, including the patient, and meetings included patient history, reason for admission, and a review of the patient's TOEs provided by CDCR. The treatment interventions were weekly meetings with the psychiatrist, recreation therapy groups and a substance use group facilitated by the psychiatrist, individual psychotherapy (no frequency or discipline noted), community meetings and anger management. The treatment plans listed the treatment services in which the patient was enrolled, but not dates of delivery. Rate of participation in groups was regularly reviewed and documented. The January treatment plan noted that the patient's TOEs had been met.

Progress notes were entered into the patient's treatment plan monthly by all disciplines. recreation therapy notes clearly discussed treatment goals and progress. They included patient group participation and overall response, but individual group information was not included. Social work notes referenced providing the patient with support and discussed patient participation in groups but not content or frequency. Individual therapy information was not included in social work notes. Psychiatry notes were written monthly and included an accounting of individual weekly contacts. The notes were comprehensive. Five psychology notes were included in the record from September through December. The notes were generic, did not mention individual therapy and were similar across entries. There were no monthly psychology notes for January or February.

<u>Findings</u>

Treatment of this patient was adequate although there were concerns about the lack of documentation regarding the delivery of treatment by social work and psychology. These notes did not adequately document interventions and patient response.

**Patient B**

This patient was admitted to the ICF at DSH-Patton on October 27, 2021 from CIW. She was diagnosed with unspecified schizophrenia and other psychotic disorder, alcohol use disorder, and amphetamine-type substance use disorder, severe. She was prescribed fluphenazine decanoate, clozapine, lithium, hydroxyzine, haloperidol PRN, lorazepam PRN, and diphenhydramine PRN. Admission nursing and psychiatric assessments were completed on the day of admission, appeared comprehensive, and included necessary suicide risk evaluations. The initial psychological assessment was completed late, on November 2, 2021, appeared comprehensive, and included completion of a C-SSRS which noted low risk and was adequate. Of note, the psychologist noted the presence of possible cognitive deficits and memory problems and recommended further screening/testing by the patient's treatment team once removed from quarantine status. There was no evidence in the record that the issue was noted nor addressed by the patient's treatment team. The recreation therapist's initial assessment was adequate. The case history included minimal content and was finalized later than required, on February 11, 2022.

Documentation indicated that the patient transferred to Unit 33 on November 22, 2021, more than three weeks after her arrival at DSH-Patton. The patient had been refusing COVID-19 testing but it was unclear from available documentation the reason her quarantine period was extended. Her initial seven-day treatment plan was completed late, on December 2, 2021 and noted that the patient "will be enrolled in treatment" but did not specify further. During a monthly treatment plan review in January, it was noted that the patient reported attending groups, which were limited due to COVID-19 restrictions, but there was no evidence that group attendance was validated nor hours of treatment reported. There was no mention of the patient's individual therapy with the unit psychologist which had been documented in the psychologist's monthly notes for December. Additionally, progress on two of her TOEs was listed as "just arrived" despite the patient having been on the unit well over a month. In February, treatment progress was reviewed, the patient had begun individual therapy with a social work intern and the patient had been enrolled in a number of groups. Treatment team meetings included all required participants.

Rehabilitation therapy notes were inadequate and included nearly the same content week after week during the patient's first two months following admission. Groups were noted to be on hold in many of the notes yet patient's functioning on the unit was routinely reviewed. Social work monthly notes consistently included a diagnosis that differed from the treatment plan without explanation. Two individual therapy sessions with an intern were documented in the record, many days after the date of the session. The notes were cosigned by a licensed social worker. The content was similar from note to note and marginally adequate. In a monthly note for February, the social worker noted that accurate group attendance information was not available for the patient with no further explanation. Psychology monthly notes were only entered for November and December. A note signed on November 24, 2021 noted that the patient had been seen in a monthly treatment conference, yet nowhere else in the record was a treatment conference noted before December 2, 2021. Monthly psychiatric notes were comprehensive and clearly listed each contact with the patient. Appropriate laboratory monitoring was noted and patient progress clearly documented.

Of note, discharge documentation regarding a hospital stay for another patient was located in this patient's record.

Findings

Treatment of this patient was not adequate. The initial treatment plan and case history were completed later than required. The patient's enrollment in groups appeared to be delayed and documented participation in groups was not available in the record. Monthly RT, Social work and psychology documentation was inadequate and generic. Social work notes had a discrepant diagnosis with no explanation. A recommendation for screening/testing for possible cognitive deficits identified during the initial psychological assessment was not fulfilled nor discussed by the patient's treatment team.

**Patient C**

This patient was admitted to DSH-Patton from CIW on July 16, 2021. She was diagnosed with unspecified schizophrenia or other psychotic disorder; cannabis use disorder, severe; alcohol use disorder, severe; r/o malingering; unspecified personality disorder. She was prescribed clozapine, fluphenazine, hydroxyzine, oxcarbazepine, zolpidem tartrate PRN and olanzapine PRN. The patient was legally blind and was on 1:1 monitoring to assist with ADLs and mitigate fall risk. She had a number of medical conditions.

Of note, a copy of this patient's record was sent following the site visit and was incomplete. No admission paperwork was provided, including the C-SSRS, and double-sided social work notes were only scanned on one side. A review of the remaining documentation was completed.

Treatment team meetings occurred monthly and included all required attendees, including the patient. Her symptoms, medications, treatment progress, group participation, and functioning were reviewed. Two concerns were identified. The first was that the intervention listed to address the patient's goal of increasing coping skills when she was feeling helpless and hopeless was an anger management group. It is unclear how this intervention addressed the identified problem. Second, all treatment plans listed the C-SSRS findings as resulting in both low risk and moderate risk, in separate locations on the document. As the C-SSRS was not available, the risk score could not be verified; however, given the patient's history of multiple suicide attempts including a suicide gesture which precipitated her DSH-Patton admission, it is unclear how her risk could have been assessed as low at admission.

Quarterly rehabilitation therapy notes were included in the record, one from October and one from January. They were of adequate quality. Social work notes could not be fully assessed as only half of each note was provided. However, many of the notes stated that patient "reports she is still [sic] experiencing AH and VH however she has been observed by unit staff or her 1:1 staff responding to unseen stimuli for the majority of her admission to DSH-Patton." It seems from the context that the intent was that staff did not see the patient responding to internal stimuli, however the same errors were copied from note to note. Monthly psychiatric notes were comprehensive and of good quality. The only concern was that the patient had one Abnormal Involuntary Movement Scale (AIMS) in the record completed in July, which noted no involuntary movements, yet subsequent psychiatric notes in August, September and October

documented the patient's experience of tremors likely secondary to fluphenazine. Additional AIMS appeared necessary. Psychiatry notes indicated the presence of suicidal ideation on occasion but noted risk as low as patient did not have access to "razors or pills." Two monthly psychology notes were available from October and December. The content was superficial and rated the patient's suicide risk as low without rationale and no reference to the C-SSRS or formal follow-up assessments.

Findings

Treatment of this patient was inadequate due to inaccurate and conflicting documentation in the record and the absence of routine progress notes by psychology. There was minimal information regarding the treatment provided to the patient beyond medications and noting her group participation rates. One caveat is that not all documentation was provided and additional information may have been contained elsewhere in the record.

**Patient D**

This 57-year-old female patient was selected for health care record review to assess the quality of intermediate level of care provided at DSH-Patton. The patient had two prior DSH-Patton admissions, with one in 2017 and another in 2020. The patient arrived at DSH-Patton for the current admission on September 21, 2021, to address worsening symptoms in the context of medication refusals. The patient was reported to have symptoms of psychosis, depression, and anxiety. Inpatient records for the two prior admissions suggested diagnostic uncertainty. The patient was diagnosed with schizophrenia and PTSD. Pertinent medical diagnoses included heart and kidney disease.

On September 21, 2021, the patient was admitted to DSH-Patton's COVID-19 observation unit. The patient refused the initial psychiatry assessment, suicide risk assessment, medications, and blood work.

On September 27, 2021, the patient attempted to escape from the unit several times, scratched staff, and was placed in five-point restraints for 16.6 hours. Staff did not administer psychiatric medication. Instead, notes reflected that she was encouraged to ask for an as-needed medication.

After multiple attempts, the patient eventually participated in risk assessments. A security assessment, dated September 27, 2021, determined her level of risk was "alert." A September 28, 2021, suicide and self-harm risk assessment indicated her imminent risk was "moderate/high." However, the patient's October 5, 2021, treatment plan noted "low" suicide risk. Further, this treatment plan stated both safety and homicide risk levels were "low". Of note, her controlling offense was listed variously as murder or manslaughter.

On October 20, 2021, the patient insisted that she was to be released. She required an injection of medication due to her level of agitation on this date. The psychiatrist filed a petition for involuntary medications, which was granted on November 5, 2021. The patient subsequently complied with oral medications and her psychotic symptoms reportedly improved.

Of note, the record indicated at multiple points that the patient disagreed with her diagnosis of psychosis. She reportedly stated that the treatment team misunderstood her culture of origin and misinterpreted her beliefs to be driven by a psychotic disorder.

Psychology notes were present at least monthly. However, monthly notes oftentimes had only the month and year, with no date, and there were no psychology notes after December 2021. This final note stated that the treatment team was putting interventions in place to address her "frequent complaining" and that the patient had not made clinical progress during admission. In contrast, psychiatry documentation reflected clinical improvement.

The diagnostic uncertainty continued during her most recent treatment episode at DSH-Patton.

Notes from her psychologist listed diagnoses as "depression, anxiety, and psychotic" symptoms. The discharge diagnosis listed by her psychiatrist was unspecified schizophrenia spectrum and other psychotic disorder; however, the possibility of major depressive disorder with psychotic features, or schizoaffective disorder, depressed type were also listed. Further, the nursing discharge summary listed schizophrenia, but also included an additional diagnosis of generalized anxiety disorder.

The patient was clinically discharged on January 25, 2022. Due to ongoing institutional quarantines in place, the patient remained at DSH-Patton on administrative days until her transfer to CIW on March 1, 2022. The patient was prescribed olanzapine at the time of discharge.

Findings

The intermediate level of care provided to this patient was inadequate. Conflicting documentation regarding the patient's diagnoses, levels of risk for suicide, self-harm, safety, and homicide was of particular concern and suggested a lack of interdisciplinary collaboration. Documentation also suggested discrepant views regarding the patient's level of improvement during admission, which ranged from none to significant improvement. Consideration of psychological testing for diagnostic clarification was warranted. Cultural considerations were of critical importance in this case; however, they were not sufficiently incorporated into the treatment plan. The clinical justification for the use of restraints appeared sound; however, the reason medications were not administered was unclear and very concerning, especially considering her history of cardiac and kidney disease and the length of time she spent struggling to escape her restraints. Finally, the decision to pursue an involuntary medication order appeared clinically appropriate; however, the record was unclear as to what caused a delay in filing the petition.

**Patient E**

This 28-year-old female patient's health care record was reviewed to assess the quality of treatment provided at the intermediate level of care at DSH-Patton. The patient had a long history of mental health treatment beginning in adolescence. In 2019, she had a serious suicide attempt via overdose of lithium, which required treatment in the intensive care unit. She was admitted to DSH-Patton on December 16, 2021. She was referred to DSH due to frequent MHCB admissions, frequently due to suicidality. Prior diagnoses included borderline personality disorder, PTSD, major depressive disorder, and anxiety. During the current

admission, she was diagnosed with unspecified depressive disorder, amphetamine use disorder, alcohol use disorder, and borderline personality disorder. The patient was not on an involuntary medication order.

Upon arrival to DSH-Patton, the patient was admitted to the COVID-19 observation unit and placed on 1:1 suicide watch due to risk of self-injury. Records around this time noted that she bit herself and endorsed daily suicidal ideation.

A psychology note from December 2021 stated that risk of dangerousness to self and others were both deemed "low." On December 17, 2021, the patient reported suicidal ideation with a plan to hang herself. The assessing psychologist completed a suicide risk assessment and rated the patient at "high" risk for suicide and "moderate" risk for self-harm; the patient was placed on 1:1 observation. Due to ongoing self-injurious behavior, a repeat suicide risk assessment was completed on December 22, 2021, at which time her risk of suicide and self-harm were both assessed as "high." There were no other suicide risk assessments provided to the monitor's expert for review.

A treatment plan, dated January 4, 2022, and finalized on January 18, 2022, stated that the patient was "largely asymptomatic with some behavioral issues of attention seeking." Her current levels of suicide and self-harm risk were rated as low, despite the patient being retained on 1:1 observation for risk of danger to self.

A treatment team note from February 8, 2022, described that the patient's homicide, assault, security, suicide, and self-injurious behavior risk as "low". The treatment plan was signed by the patient, but only by limited members of the treatment team.

A psychiatrist's note, dated January 26, 2022, indicated that treatment groups were on hold due to staffing shortages secondary to COVID-19. On January 29, 2022, the patient engaged in self-harm and was placed on 1:1 observation until February 1, 2022. On February 9, 2022, the patient reported suicidal ideation and received an injection of chlorpromazine at her request.

On February 24, 2022, the patient scratched herself and was noted to be highly agitated. She was given oral medications to assist with agitation. Later that day, she required restraints due to aggressive actions toward another staff member, and she received injectable ziprasidone and lorazepam. She was released from restraints after 1.5 hours. Also on February 24, 2022, the patient reported taking a mixture of five different pills from another patient. Although the patient recanted the following day, on February 24, 2022, she was released from restraints and allowed to return to her room to fall asleep. While no signs of medication toxicity were noted by the psychiatrist, the rationale as to why a medical evaluation was not obtained was unclear.

Notes from March 1, 2022 and March 2, 2022, reflected that the patient continued to have strong self-harm urges.

Psychiatric medications were adjusted during admission. Her regimen included divalproex, mirtazapine, quetiapine, sertraline, venlafaxine, and naltrexone.

<u>Findings</u>

The intermediate level of care provided to this patient was inadequate. The contradictory information regarding the patient's level of risk for suicide and for self-injurious behavior was of particular concern. Some assessments stated that her level of risk was low, while other documents within a short time period documented that she was at high risk. Treatment goals and discharge criteria did not incorporate evidence-based interventions such as Dialectic Behavioral Therapy or a behavioral plan to reduce engaging in self-harm and dealing with frequent suicidal ideation.

**Patient F**

This 72-year-old female was selected for health care record review to assess the quality of intermediate level of care provided at DSH-Patton. She had a long history of suicidality, beginning in adolescence. She was treated at DSH-Patton from 1997 - 2016 after multiple suicide attempts, the most serious of which involved cutting her neck. During that hospitalization, the patient was treated with medications and ECT. On November 19, 2020, the patient transferred from the CIW-PIP, where she was treated since September 30, 2020, after a suicide attempt by cutting her arm. She was diagnosed with bipolar disorder, type I, unspecified personality disorder, and unspecified somatic symptom and related disorder. Medications at the time of admission to DSH-Patton were quetiapine and sertraline. The patient was not under an involuntary medication order.

The patient initially attended and actively participated in her treatment, which included individual and group therapy, and medication management. Despite these interventions, the patient repeatedly stated that she would die by suicide if she returned to CDCR.

In November 2021, the patient was diagnosed with multiple medical issues. Her group attendance decreased because of medical issues, staffing shortages, and group cancelations due to COVID-19.

On January 18, 2022, the patient tested positive for COVID-19 and required transfer to a quarantine unit where she remained until February 8, 2022. Despite medication changes, the patient could not identify reasons for living and gave away her property. She did not eat or take medications for several days. The treatment team met with her daily to encourage her to take medications. The patient began eating and showering. The patient reported that she was experiencing a manic episode but that she liked the feeling. The psychiatrist opined that the patient had the capacity to make decisions regarding her medications and did not qualify for involuntary medications. On February 23, 2022, the patient was paranoid, reporting that she did not trust her psychiatrist or internist.

<u>Findings</u>

The care provided to this patient at the intermediate level of care at DSH-Patton appeared adequate, yet with several areas of clinical concern. The patient had worsening depression, hopelessness, possible manic symptoms, and gave away her property. While she denied suicidal thoughts, this constellation of symptoms was concerning, especially in a person with an extensive history of suicide attempts. While the psychiatrist made medication changes, the

treatment team did not make substantial changes to the treatment plan.  The goals listed from CDCR remained essentially unchanged from the time of admission.  Documentation suggested extensive interdisciplinary collaboration, especially when the patient began to refuse medications.  Chart review was limited by multiple handwritten notes, many of which were difficult to read.