# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
    **Plaintiffs,**

    **vs.**                                                          **No. CIV S-90-0520 KJM DB P**

**GAVIN NEWSOM, et al.,**
    **Defendants.**


### SPECIAL MASTER'S REPORT ON
### HIS EXPERT'S FIFTH RE-AUDIT AND UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION AND BASELINE AUDIT OF SUICIDE PREVENTION PRACTICES IN THE PSYCHIATRIC INPATIENT PROGRAMS


Attached is the sixth report from the *Coleman* Special Master's expert, Lindsay M. Hayes, entitled, "The Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs." The attached is a follow-up to Mr. Hayes' fifth report to the Special Master and the Court on suicide prevention practices in CDCR prisons, "The Fourth Re-Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," filed on September 23, 2020. ECF No. 6879-1. These reports are submitted as part of the Special Master's continuing review of defendants' compliance with court-ordered remediation in this matter.

## I.    BACKGROUND

On July 12, 2013, the *Coleman* court issued an order directing the establishment of the Suicide Prevention Management Workgroup (SPMW) to work under the guidance of the Special Master to address and resolve the problem of persistently elevated rates of suicide among

incarcerated persons housed in CDCR prisons.  ECF No. 4693 at 5-6.[1]  After several meetings, the SPMW determined that an expert assessment of CDCR's suicide prevention practices was necessary.  ECF No. 5259 at 1.  In response, the Special Master requested, and the Court approved Mr. Hayes' appointment as an expert in suicide prevention practices.[2]  ECF No. 4857.

Upon his appointment, the Special Master directed Mr. Hayes to conduct an assessment of suicide prevention practices in CDCR prisons.  Mr. Hayes' first audit, which began on November 12, 2013 and concluded on July 24, 2014, covered all 34 prisons.  Mr. Hayes filed his initial audit report, "An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" on January 14, 2015; it contained 33 recommendations.  *See generally* ECF No. 5259.  On February 3, 2015, the Court issued an order directing defendants to adopt the recommendations and directing the Special Master to provide an update to the Court on defendants' progress in their implementation.  ECF No. 5271.

Mr. Hayes' first re-audit covered 18 prisons; it began on February 2, 2015 and concluded on July 24, 2015.  His second audit report, "A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation." was filed on January 13, 2016.  ECF No. 5396.  At the time of the writing of Mr. Hayes' second audit report, discussion on three of the initial 33 recommendations had been postponed for six months and they remained unresolved as a result.[3]  *Id*. at 31 n.7.  The second audit report contained a

---

[1] Citations to page numbers for documents filed in the Court's Electronic Case Filing (ECF) system are to the page number assigned by the ECF system.

[2] "Mr. Hayes is [] the foremost leading authority in the field of suicide prevention within jails, prisons, and juvenile facilities, having provided suicide prevention services to hundreds of local and state jurisdictions in all 50 states.  In addition to his work on the *Coleman* case, he has been appointed as a federal court monitor and as an expert to Special Masters/Court Monitors in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction.  Mr. Hayes has conducted the only five national studies of jail, prison, and juvenile suicide, and has authored more than [100] publications in the area of suicide prevention within jail, prison, and juvenile facilities."  ECF No. 5993 at 2.

[3] Those three recommendations were:  Recommendation 14:  Any inmate discharged from suicide observation status and arriving in administrative segregation from either an MHCB or alternative housing should be initially housed in

recommendation that defendants continue to fully adopt the recommendations contained in Mr.

Hayes' initial audit report.[4]  *Id*.  The report also included a recommendation that Mr. Hayes

conduct a re-audit of those prisons which chronically struggled with their suicide prevention

programs, in addition to almost all prisons with MHCBs.  *Id*. at 32.  On April 4, 2016, the Court

issued an order adopting the report in full.  ECF No. 5429.

Mr. Hayes' second re-audit covered 23 prisons; it began on February 23, 2016, and

concluded on November 9, 2016.  His third audit report, "The Second Re-Audit and Update of

Suicide Prevention Practices in the Prisons of the California Department of Corrections and

Rehabilitation," was filed on September 7, 2017.  ECF No. 5671-1.  By the time of the writing of

his third audit report, Mr. Hayes had determined that the three unresolved recommendations—

14, 15, and 16—were no longer warranted.  He recommended that they be withdrawn and that

the February 3, 2015 order adopting the recommendations be modified accordingly.  Mr. Hayes

also recommended a further re-audit of those prisons that chronically struggled with their suicide

prevention programs.

The Court issued an order adopting the third audit report in full on January 24, 2018.

ECF No. 5762.  The recommendation to withdraw the three unresolved recommendations was

adopted and the February 3, 2015 order was deemed modified accordingly.  *Id*. at 3.  The Special

Master was directed to provide the Court with an updated report on the status of "defendants'

---

a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an
individual treatment plan; Recommendation 15: Newly admitted administrative segregation inmates should not be
considered protected from suicide risk by being double-celled.  They should be placed in suicide-resistant, retrofitted
cells; Recommendation 16:  Based on current data indicating that risk of suicide in administrative segregation
extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and
determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly
admitted inmates.

[4] By the time of Mr. Hayes' first re-audit, it was determined that Recommendation 30 was duplicative of
Recommendation 14.  Consequently, it has not been counted amongst the measures audited by Mr. Hayes beyond
his initial 2015 audit.  Beginning with Mr. Hayes' second audit report, references to the initial recommendations
count the total as 32.

continued implementation of the initial recommendations and the development of related corrective action plans (CAPs)." *Id*. at 4.[5]

Mr. Hayes' third re-audit covered 23 prisons; it began on May 23, 2017 and concluded on February 15, 2018. His fourth audit report, "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," was filed on November 5, 2018. ECF No. 5993-1. In his fourth audit report, Mr. Hayes recommended that CDCR continue their efforts to fully implement his previous recommendations, as well as develop CAPs based upon deficiencies he found during the third re-audit. *Id*. at 38. As he had in past reports, Mr. Hayes also recommended a re-inspection of select CDCR facilities that chronically struggled with their suicide prevention programs. *Id*.

On July 3, 2019, the Court issued an order adopting Mr. Hayes' fourth audit report in full. ECF No. 6212. The Court found that although some progress was being made in the implementation of the court-ordered suicide prevention measures, there nonetheless remained a substantial amount of work to be done, and complete implementation was "dragging out and taking too long." *Id*. at 14. Defendants were ordered to "continue with, and expedite, implementation of the remaining 29 initial recommendations and [] develop corrective action plans based upon deficiencies found in Mr. Hayes' most recent assessment." *Id*. The Special Master was directed to provide the Court with an updated report on "the status of defendants' implementation of the initial recommendations and the development of related corrective action plans." *Id*.

---

[5] The Court also ordered defendants to complete additional steps related to the replacement of inadequate vent grates at California State Prison/Corcoran, planned retrofit work at the California Institution for Men (CIM), and a revised SPRFIT policy. ECF No. 5762 at 4. In his third re-audit report, Mr. Hayes reported that defendants had complied with all three provisions of the Court's order. ECF No. 5993-1 at 7, 24, 60 n.20, and 93 n.21.

Following a December 13, 2019 third quarterly status conference, on January 7, 2020, the Court issued an order stating that if the Special Master and Mr. Hayes were unable to report defendants' full compliance at the end of the fourth re-audit period, their reporting should include specific recommendations for steps defendants must take to implement any recommendations that remained incomplete, and a date certain for the commencement of the fifth re-audit.  ECF No. 6441 at 8.

Mr. Hayes' fourth re-audit covered 20 prisons; it began on November 13, 2018 and concluded on December 18, 2019.  His fifth audit report, "The Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," was filed on September 23, 2020.  ECF No. 6879-1.  As the Special Master and Mr. Hayes were unable to report defendants' full compliance upon completion of the fourth re-audit, the Special Master's report included a list of 18 outstanding recommendations and the actions required to complete their implementation.  ECF 6879 at 16-25.

On September 3, 2020, the Court issued an order confirming "the framework developed over the past twenty-five years for the requirements defendants must satisfy to achieve compliance with the Constitution and against which their progress toward constitutional compliance is being measured."  ECF No. 6846 at 2.  In that order, the Court directed defendants to complete any outstanding work on Mr. Hayes' initial recommendations prior to the commencement of the fifth re-audit.  *Id*. at 22.  "[T]he Special Master [was] directed to keep defendants informed of his plans for scheduling the fifth re-audit."  *Id*.

On December 3, 2020, the Court issued an order adopting Mr. Hayes' fifth audit report in full.  ECF 6973.  The order also amended the Court's February 2, 2015 order (ECF 5271) to "specifically include that the findings in Mr. Hayes' original audit report are adopted in full."  *Id*.

at 12. The Court overruled defendants' objections to the way Mr. Hayes has historically measured compliance with Recommendation 21's suicide precaution and suicide watch observation requirements and adopted the "90- and 100-percent compliance standards recommended by the Special Master for determining compliance with Mr. Hayes' recommendations." *Id*. at 5, 7, 9, and 10.

In an order issued on December 24, 2020, defendants were directed to fully implement recommendations 1, 3, 6, 7, 8, 9, 10, 12, 13, 17, 18, 20, 21, 26, 28, 29, 31 and the remaining parts of 32, by the time of Mr. Hayes' fifth re-audit, with recommendations 12, 13, 17, and 21 designated as top priority for action. ECF 7004 at 2. The order clarified that the recommendations were now court-ordered requirements.[6] Defendants were further directed to complete and file proposed activation schedules for the outstanding recommendations, to "include, as defendants deem[ed] necessary, interim deadlines toward completion of the recommendations and identification of all persons responsible for completing each step." *Id*. The proposed activation schedules for recommendations 12, 13, 17, and 21 were to be filed by January 15, 2021; with the remainder due on January 25, 2021.[7] *Id*. Pursuant to the court's order, defendants filed the first in a series of suicide prevention activation schedules on January 15, 2021. ECF 7024.

The report on Mr. Hayes' fifth re-audit of CDCR's suicide prevention practices filed herewith is submitted as an update to his September 23, 2020 report.

---

[6] "To the extent the record reflects these measures as recommendations, they have been recommended by the Special Master and his expert; they have now been ordered by the court and therefore are requirements." ECF 7004 at 2 fn1.
[7] The Court also directed "CDCR Secretary Kathleen Allison [to] take all steps within her authority to expedite full implementation of all of the court-ordered recommendations" and indicated its willingness to consider any requests for waivers of state law to expedite implementation. *Id*. at 2.

II.  **THE FIFTH RE-AUDIT OF CDCR SUICIDE PREVENTION PRACTICES AND DRAFT REPORT**

For his fifth re-audit, Mr. Hayes selected 23 prisons based upon their operation of MHCB units, his findings during previous audits of chronic struggles with their suicide prevention programs, their housing a significant population of *Coleman* class members, and/or the prison experiencing multiple suicides.  As with Mr. Hayes' previous audits, his fifth re-audit consisted of both on-site institutional inspections and reviews of inmate suicide case files from the selected institutions.  Mr. Hayes also conducted a baseline assessment of suicide prevention practices within CDCR's five psychiatric inpatient programs (PIPs).  This baseline assessment was authorized by the Special Master following an increase in patient suicides within CDCR's PIPs during 2020-2021, as well as release of its "Psychiatric Inpatient Program Treatment Planning and Procedures: Suicide Prevention and Response," Policy No. 12.11.2104.P1., in December 2020.  The fifth re-audit began on May 24, 2021, and concluded on April 22, 2022.

On July 1, 2022, Mr. Hayes' fifth re-audit report was distributed in draft form to the *Coleman* parties for comments and/or objections to be submitted to the Special Master no later than 30 days thereafter.  On July 29, 2022, plaintiffs' counsel submitted their comments to the draft report.[8]  Defendants' counsel submitted their comments and objections to the draft report on August 1, 2022.[9]

---

[8] *See* Appendix A, Letter from plaintiffs' counsel, Jenny Yelin, to Special Master Lopes (July 29, 2022). Plaintiffs' response to the draft report included certain confidential information, as a result, the letter attached as Appendix A is a redacted copy of plaintiffs' response with the confidential information omitted.

[9] *See* Appendix B, Letter from Melissa Bentz, Attorney, CDCR Office of Legal Affairs to Special Master Lopes (August 1, 2022).  The attachments to defendants' response to the draft report included certain confidential information, as a result, the attachments to the letter attached as Appendix B were redacted and the confidential information omitted.

A. **Parties' Responses to the Draft Report**

    1. **Plaintiffs' Response to the Draft Report**

In their July 29, 2022 response, plaintiffs indicated their general agreement with the draft report's recommendations and conclusions. Plaintiffs' response primarily focused on a request to include recommendations related to the report section on 30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs, and Condemned Units, wherein Mr. Hayes noted that defendants' high compliance rate for Guard One welfare checks had been diminished by five suicides at three institutions where the decedents had been found in rigor mortis or irregularities were found in timely Guard One checks at time of death. Specifically, plaintiffs requested the inclusion of recommendations for CDCR to develop CAPs for the three institutions where the suicides occurred "to address deficiencies in their welfare check processes, since there were either no QIPs related to the welfare check issues or the follow-up to the QIPs was incomplete and/or insufficient."[10]

Mr. Hayes determined that the changes to his report suggested by plaintiffs were not warranted in light of the Court's August 3, 2022 adoption of the Special Master's recommendation to delegate the responsibility for writing the annual inmate suicide report to CDCR. ECF No. 7598. Under the adopted proposal, CDCR will inherit numerous new responsibilities, including, but not limited to, the "comprehensive review of the QIPs for each discipline." ECF 7574 at 14. This process will include a determination "about whether the QIPs have been fully implemented, and if not, what the delays and barriers are to full implementation." *Id*. The Special Master, who will closely monitor this process, is hopeful that increased scrutiny of developed QIPs by CDCR will adequately address plaintiffs' concern.

---

[10] *See* Appendix A at 2.

**2. <u>Defendants' Response to the Draft Report</u>**

Defendants' response to the draft report is divided into six sections that can generally be categorized as follows: objections related to Mr. Hayes' findings on the status of implementation of suicide prevention recommendations; requests for changes, clarifications, and updates; and comments and updates regarding individual institutions. Defendants' response, organized by topic, is discussed in further detail below.

**a. <u>Comments and Objections Regarding Mr. Hayes' Findings on CDCR's Implementation of Suicide Prevention Recommendations</u>**

**i. <u>Request to Change the Findings for Recommendations 1 and 9 to Reflect Full Implementation</u>**

At the time of the writing of the draft report, full implementation of Recommendation 1[11] was pending Mr. Hayes' observation of live training given at the Basic Correctional Officers Academy. Mr. Hayes has since observed the training during July 2022, as a result, Recommendation 1 has been updated in the final report to reflect full implementation.[12]

At the time of the writing of the draft report, Recommendation 9 was pending full implementation, in part, because defendants were still revising the draft SRE mentoring policy. The revised policy has since been completed, reviewed by Mr. Hayes, and on July 12, 2022, was released statewide by defendants. The current status of Recommendation 9 has been updated in the report to reflect this development.[13] However, despite what appears to be defendants'

---

[11] Recommendation 1: Expand the length and content of the pre-service "Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e., including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent Coleman and/or SPRFIT audits of suicide prevention practices.

[12] *See infra*, Table 1 (p. 5) and Section M (p. 50).

[13] *See infra*, Table 1 (p. 6) and Section I (p. 37).

assertion to the contrary, Recommendation 9 has not yet been fully implemented. Recommendation 9 includes completion of SRASHEs and SRE training, both of which continue to remain deficient.[14]

<div align="center">

ii.    <u>Objections to Mr. Hayes' Findings on the Status of CDCR's Implementation of the 18 Remaining Recommendations</u>

</div>

In their August 1, 2022 response, defendants object "to Mr. Hayes' findings regarding CDCR's implementation of the eighteen remaining recommendations, including his finding that CDCR has failed to implement those recommendations."[15]  As defendants correctly note in their response, one of the requirements for a determination that a recommendation has been fully implemented is a finding of compliance with the related suicide prevention measure.[16] Defendants' response indicates that they have abandoned this court-approved measure of full implementation in favor of their own "concept of implementation," which, inexplicably, does not take compliance into account.[17]  As a result, each of defendants' objections related to compliance is based upon the use of their own standard for measuring implementation.

Defendants offer no explanation for this, making it difficult to interpret their actions as anything other than an attempt to circumvent the Court's findings regarding their previous objection to the compliance standards lodged in response to Mr. Hayes' fourth re-audit report. ECF 6898 at 2-3; 4-5.  As the court stated in its December 3, 2020 order,

> Defendants' object that these proposed compliance standards exceed the requirements of the Eighth Amendment and that adoption of them would violate the Prison Litigation Reform Act's "needs-narrowness-intrusiveness requirements by replacing the applicable 'substantial compliance' standard with one that is inconsistent with the Eighth

---

[14] Further, defendants' most recent activation schedules filed August 1, 2022 states, "Recommendation 9, requiring additional training for SRE mentors, was estimated to be completed by August 31, 2022.  The recommendation is now estimated to be completed by October 31, 2022, because the last training session is scheduled for the end of October."  ECF 7596 at 2.

[15] *See* Appendix B at 2.

[16] *Id.*

[17] *Id.*

<div align="center">10</div>

Amendment." ECF No. 6898 at 5. Defendants' objection betrays a fundamental misunderstanding of the nature of the recommendations. ECF 6973 at 8.[18]

The Special Master is puzzled by defendants' repeated argument against a requirement that is now settled case law. The Court's instruction regarding the linkage of the compliance thresholds to the recommendations and their role in providing guidance for defendants on when the Special Master will report to the Court that, in his view, a particular suicide prevention measure has been sufficiently implemented, was clear. Equally clear, was the Court's clarification that the recommendations serve as interim steps on the path to defendants meeting their Eighth Amendment obligations related to suicide prevention.

To the extent that defendants' objections to Mr. Hayes' findings regarding implementation of the recommendations are based upon defendants' disregard of the Court's approved measure of full implementation, there is nothing more to be said.

With regard to defendants' confusion as to which recommendations require a compliance threshold of 90 percent versus that of 100 percent, the "remaining five recommendations" they reference in their response, 1, 6, 7, 8, and 12,[19] with one exception, all require 90 percent compliance. Recommendation 1, which required development and implementation of a revised pre-service suicide prevention curriculum, and is now considered fully implemented, did not have a compliance threshold attached.

---

[18] In a corresponding footnote, the court added that, "[the] report and recommendations before the court in no way usurp the court's role; they are in fact submitted as ordered by the court." ECF 6973 at 8 n6. The Court went on to explain that "[t]he Special Master's recommendations, if adopted, provide guidance for defendants regarding when he will report to the court that, in his view, they have sufficiently implemented a particular suicide measure recommended by Mr. Hayes as required by this court." *Id*. at 9. The recommendations are interim steps "designed to bring defendants significantly closer to meeting their Eighth Amendment obligations in the area of suicide prevention," however, the decision of whether defendants have succeeded in meeting those obligations would ultimately be up to the Court. *Id*. at 9-10

[19] *See* Appendix B at 2.

Defendants specifically object to the draft report's "findings and recommendations regarding CDCR's current implementation status for recommendations 3, 7, 8, 12, 13, 18, 20, 28, 29, and portions of 32 because the [draft] report shows CDCR has implemented each recommendation, even if it has not met the [required] compliance threshold."[20]  As previously explained, the flaw with defendants' reasoning is that they are excluding the compliance threshold from their definition of full implementation.  As defendants' response indicates, the draft report acknowledges the steps they have taken towards implementation and reports on all of defendants' progress to date as documented in their suicide prevention activation schedules.

   As stated in Mr. Hayes' fifth re-audit report, defendants have *fully* implemented three of the 18 outstanding recommendations according to the Court's approved standard.  The remaining 15 recommendations remain at various stages of implementation.  In their response, defendants asserted that they have taken action to implement tools that will increase compliance rates with the outstanding recommendations.  That is a necessary step, but only part of the task required to achieve full implementation of an outstanding recommendation.  Defendants must also ensure that those tools are being used as intended and are having the desired result in increasing compliance to achieve full implementation.

Defendants' objections to each recommendation generally fall into two categories, 1) disagreement with the compliance component in some form and 2) disagreement with Mr. Hayes' established standard of measurement—with some recommendations falling into both categories.

---

[20] *Id*. at 2-3.

*Compliance Component of Full Implementation*

Defendants state their objections to the compliance component attached to Recommendations 3, 7, 8, 10, 12, 13, 18, 20, 21, 28, 29, and 32.  As previously discussed, the Court has already adopted the recommendations of which the compliance component is a part of in its order of December 3, 2020.  As such, there is no utility in discussing the objections to each recommendation separately.

*Established Methodology*

Defendants object to the standards of measurement employed by Mr. Hayes with regard to Recommendations 3 and 10.  With regard to Recommendation 3, defendants object to Mr. Hayes' findings regarding compliance with annual suicide prevention training based on annual being defined as every 12 months.  In support of their objection, defendants' state that the definition of the term annual is in dispute, is currently being discussed in the data remediation process, and will likely go through dispute resolution.[21]

With regard to Recommendation 10, defendants assert that "over time, Mr. Hayes has shifted this recommendation from looking at whether the quality of SREs is audited and instead focuses on whether a SRASHE is completed when it should be completed."[22]  Defendants also state that in own their statewide monitoring over a 16-month period they found "SREs being completed appropriately after an emergent MH consult for suicidality" with compliance rates ranging from 94 to 98 percent.[23]  It is important to note that defendants' monitoring only addresses emergent, not urgent, mental health referrals.

---

[21] *See* Appendix B at 4.
[22] *Id.* at 5.
[23] *Id*.

Mr. Hayes' methodology has remained consistent. Since his very first audit of CDCR's suicide prevention practices in 2013-2014, he has consistently reviewed the applicable suicide prevention Program Guide requirements using the same methodology throughout each of his successive audits. As it relates to Recommendation 3 and his review of compliance with annual suicide prevention training, Mr. Hayes has used the same metric of 12 months in all of his previous reports.[24] Defendants have never before objected to this. Prior to any outcome, the discussion regarding the definition of "annual" currently taking place in the data remediation process, does not warrant any change to Mr. Hayes' established methodology with regard to Recommendation 3.

Defendants' claim that, "over time, Mr. Hayes has shifted" what he reviews in relation to Recommendation 10 is incorrect.[25] As stated above, Mr. Hayes has consistently used the same methodology for all his audit reports. During each of his audits of CDCR's suicide prevention practices, Mr. Hayes has reviewed and reported on whether SREs/SRASHEs were completed in response to both urgent and emergent referrals for SI/SIB.[26] With regard to defendants' comparison regarding their own statewide review of the completion of SREs after an emergent mental health consult, most of the failures that Mr. Hayes reported on in the draft report pertained to *urgent* referrals for Danger to Self (i.e., SI/SIB) *not* resulting in SRASHEs.

It is worth noting that defendants' previous methodology-related objections launched in response to Mr. Hayes fourth re-audit report were overruled by the court. ECF 6973 at 5-7.

---

[24] ECF 5259 at 6-9; ECF 5396 at 4-6; ECF 5671-1 at 18-19; ECF 5993-1 at 25-28; ECF 6879-1 at 33-34.
[25] *See* Appendix B at 5.
[26] ECF 5259 at 12-14; ECF 5396 at 8, 9; ECF 5671-1 at 13, 14; ECF 5993-1 at 16, 17; ECF 6879-1 at 20.

**b. Recommendations that Require Monitoring on an Ongoing Basis and Marked as Ongoing on CDCR's Suicide Prevention Activation Schedules are Complete and should be Considered Fully Implemented**

In their response, defendants request that Mr. Hayes amend his report to reflect that recommendations that require ongoing monitoring and are marked as such in CDCR's suicide prevention activation schedules, are fully implemented.[27] This appears to be another attempt by defendants to sidestep the compliance component of full implementation. As previously discussed above, and as acknowledged in defendants' response, if the related suicide prevention measure has not been found to meet the compliance standard, an outstanding recommendation does not meet the criteria for full implementation. Recommendations that require a status of ongoing by definition, such as Recommendation 21, which requires continuous monitoring of the observation of suicidal patients, are not exempt from meeting the compliance standard of the related suicide prevention measure, just as those marked complete on the suicide prevention activation schedules are not.

**c. Objection to the Recommendation to Develop Corrective Action Plans Regarding Crisis Intervention Teams in Section I, "Mental Health Referrals and Suicide Risk Evaluations"**

Defendants objected to Mr. Hayes' "findings of deficiencies and areas of non-compliance" related to the Crisis Intervention Team (CIT) process and his resulting recommendation to develop a CAP for the CIT process, reasoning that "the CIT process is outside of the scope of the *Coleman* requirements for suicide prevention monitoring and is not a part of the original twenty-nine court-ordered recommendations."[28] Defendants requested that all references to the CIT process be stricken from the report.

---

[27] *See* Appendix B at 10.
[28] *See* Appendix B at 10.

Defendants are mistaken in their interpretation of Mr. Hayes' intention behind the recommendation. Mr. Hayes' recommendation related to the CIT process was not intended to denote a finding of non-compliance with the process. In fact, the draft report states that the majority of the CIT programs did not have any observed problems. Mr. Hayes' recommendation was based upon his observation of problematic practices during the fifth re-audit that he would be remiss not to bring to CDCR's attention.[29] However, understanding the confusion that may have been caused by the wording in that section of the report, Mr. Hayes has revised the report for clarity. *See infra* p. 39.

### d. Request to Update Current Findings in Section O, "Suicide Case Reviews"

In the report section on Suicide Case Reviews, Mr. Hayes reported on the suicide case review process, wherein he discussed QIPs. One of his findings regarding the process related to the repetitive nature of the deficiencies that were documented. Specifically, the draft report stated, "[t]he strength of the Suicide Case Review process remains the comprehensiveness of each review; a weakness is the repetitive nature of the deficiencies." *See infra*, p. 55. Defendants requested that the clause describing the repetitive nature of the deficiencies as a weakness be stricken from the report. The request is based on their interpretation that the statement is a critique of how frequently issues are identified, however, defendants misunderstand. The statement represents Mr. Hayes' finding that repetitive deficiencies remain uncorrected. In fact, CDCR has previously acknowledged this issue, and as they cite in their response, have committed to fixing it.[30]

---

[29] "Although the majority (13 of 19 or 68 percent) of the CIT programs did not have any observed problems, there were a few _noteworthy problematic practices_ observed in some CIT programs." (Emphasis added.) *See infra* at 38.
[30] *See* Appendix B at 10.

### e. Objection and Request for Clarification Regarding the Recommendation in Section P, "Reception Center Practices"

Defendants asserted that Mr. Hayes' finding that proof of practice demonstrating compliance with CDCR's Reception Center Suicide Prevention Reporting Expectations memorandum was not reflected in any of the reception centers' SPRFIT meeting minutes was incorrect, because Wasco State Prison (WSP) was able to demonstrate compliance. Defendants requested the report be amended "to reflect that WSP has submitted proof of practice in the SPRFIT Committee meeting minutes."[31]

Repeating a recommendation from the fourth re-audit report, the draft report stated that CDCR should provide verification to the Special Master that all reception center facilities are aware of their suicide prevention responsibilities. Defendants requested "clarification on what is required to 'provide verification to the Special Master."[32] As just discussed, proof of practice regarding compliance with CDCR's Reception Center Suicide Prevention Reporting Expectations memorandum should be reflected in monthly SPRFIT meeting minutes for each of the three reception centers.

### f. Comments and Updates Regarding Individual Institutions

In this section of their response, defendants made five requests for changes to the draft report. The first was a request that corrective actions taken after the completion of Mr. Hayes' assessment, specifically, CCWF's completion of an LOP addendum, be included in the final report.[33]

Two requests were for revisions based upon information submitted by defendants which they suggested proved that parts of the report were inaccurate. One request related to the review

---

[31] *Id.* at 11.
[32] *Id.*
[33] *See* Appendix B at 11.

17

of SRASHEs at CMF,[34] the other to High Desert State Prison's (HDSP) compliance with the SRE mentoring program.[35]  A fourth request was related to defendants' disagreement with Mr. Hayes' criticism of an observed IDTT meeting at MCSP.  In this instance, defendants requested the reference be stricken from the report.[36]

Finally, defendants requested a change based upon their incorrect interpretation and application of CDCR's Program Guide and SPRFIT policy as it relates to what constitutes a quorum.  Specifically, defendants requested that the report be changed to reflect that the HDSP SPRFIT achieved a quorum during all meetings because the policy "permits the CMH to act in the absence of [sic] Chief Psychiatrist and it is accepted practice at desert institutions, which have no psychiatry staff, to omit psychiatry as a required member for a quorum."[37]  First, despite its moniker, HDSP is not classified as a desert institution in the *Coleman* case.  Second, HDSP was not without psychiatry staff, the institution utilized telepsychiatry.  Third, the policy defendants reference states that the attendance of the chief of mental health is permitted in the absence of the chief psychiatrist "depending on the classification of the CMH at the institution."[38]  The classification of the chief of mental health at HDSP was a psychologist, not a psychiatrist, therefore, the chief of mental health could not be the designee for psychiatry at SPRFIT meetings.

To the extent that defendants' requests for revisions were deemed appropriate, changes were incorporated into the report.  (*See infra* pp. 5, 6, 37, 39, 50, 51, 68, and 281.)

---

[34] *Id.*
[35] *Id*. at 12.
[36] *Id*. at 11-12.
[37] *Id*. at 12.
[38] *See* Appendix B, Attachment 4.

Beyond minor edits, Mr. Hayes made ten changes and/or additions to this report since it was submitted to the parties in draft form. (*See infra* pp. 10, 35, 37, 43, 53, 69, 71, 77, 79, and 280.)

## III.    ASSESSMENT OF PIP SUICIDE PREVENTION PRACTICES

As previously stated, in addition to completing his fifth re-audit of CDCR's suicide prevention practices, Mr. Hayes also performed his first baseline assessment of suicide prevention practices in the PIPs. When CDCR assumed responsibility and control over acute and intermediate care programs located within CDCR through the Lift and Shift process in July 2017, there was uncertainty and confusion from PIP clinicians regarding whether or not existing CDCR suicide prevention policies applied to the PIPs. Most of the PIP clinicians were from the Department of State Hospitals (DSH) and therefore unfamiliar with existing CDCR policies.

In September 2019, Mr. Hayes conducted an assessment of the CHCF-PIP as part of the Special Master's monitoring tour of the program. The impetus for Mr. Hayes' assessment was a patient suicide in August 2019. CDCR's subsequent review of the August 2019 suicide found multiple deficiencies in suicide prevention practices at CHCF-PIP, as well as multiple circumstances surrounding the suicide, both of which were directly related to the lack of a suicide prevention policy for the PIPs. As a result of the CHCF-PIP assessment, the Special Master and Mr. Hayes recommended, at a minimum, that CDCR develop a PIP-specific suicide prevention policy.[39]

---

[39] In The Special Master's Monitoring Report on the Mental Health Inpatient Care Programs For Inmates of the California Department of Corrections and Rehabilitation filed on January 28, 2021, he reported, "…two suicides occurred in the acute program at CHCF-PIP since the end of the monitoring tours: August 17, 2019 and September 29, 2020. The Special Master is aware that the PIPs do not presently have suicide prevention policies in place, which needs to be addressed." ECF 7039 at 117-118.

During 2020-2021, there were four other patient suicides in the PIPs, one at CHCF-PIP on September 29, 2020, two at SVSP-PIP on December 17, 2020 and January 30, 2021, and one at CIW-PIP on April 8, 2021. These four suicides resulted in identification of over 100 deficiencies that required corrective action, many related to the lack of adequate suicide prevention practices and policy.

During a December 20, 2020 status conference, the Court read a summary of the September 29, 2020 CHCF-PIP patient suicide into the record. ECF 7002 at 55-57. The Court went on to note that of the 30 recommendations for corrective action identified during CDCR's review of the case, "most appear tied back to the lack of a written suicide prevention policy, not only at that PIP but no policy in any PIP." *Id*. at 57. The Court further stated the following:

> Assuming I have that right, it's incomprehensible to this Court, and I understand that this is an area where I intend to try to take the reins more tightly and starting with ordering that a policy for the PIPs be provided to the Special Master pronto and that that be provided for final approval within ten days at the outside.
>
> I understand the Special Master's expert has been requesting a policy since August of 2019. Here's a case where the Court with the Special Master had hoped that the defendants could demonstrate that they can get a hold of this issue, demonstrate the ability to get all of the Special Master's experts' recommendations implemented. *Id*.

The Court's order resulted in expedited release of defendants' "Psychiatric Inpatient Program Treatment Planning and Procedures: Suicide Prevention and Response," Policy No. 12.11.2104.P1, on December 31, 2020. As noted in his attached report, Mr. Hayes' baseline assessment of PIP suicide prevention practices—the first comprehensive assessment of suicide prevention practices within CDCR's PIPs—was conducted to assess the efficacy of the new PIP suicide prevention policy.

Neither party commented on or raised objections to the portions of the draft report detailing Mr. Hayes' assessment of PIP suicide prevention practices or the resulting recommendations.[40]

## IV.    CURRENT COMPLIANCE STATUS AND REMAINING STEPS

As outlined in Mr. Hayes' report attached hereto, defendants were unable to comply with the court's December 24, 2020 order directing them to fully implement recommendations 1, 3, 6, 7, 8, 9, 10, 12, 13, 17, 18, 20, 21, 26, 28, 29, 31 and the remaining parts of 32, by the time of his fifth re-audit.  Consistent with the Court's January 7, 2020 directive,[41] a list of the recommendations that remain to be completely and durably implemented and the steps defendants must take to do so are outlined below.  Also included below is a list of the recommendations that have successfully been implemented by defendants.

### A.    Recommendations Successfully Implemented by Defendants

At the conclusion of the fourth re-audit, of the original 29 recommendations, defendants had succeeded in fully implementing 11 and had success with the partial implementation of another, leaving 17 recommendations that remained to be fully implemented, and one that required further partial implementation to achieve full compliance.[42]  Since that time, defendants have had additional, although limited, success with fully implementing the remaining

---

[40] Paragraph A(5) of the Order of Reference in this matter states in pertinent part, "…the special master shall serve, upon one designated representative of counsel for plaintiffs and one designated representative of counsel for defendants, a copy of each compliance report in draft form, and shall afford counsel a reasonable time within which to submit to the special master specific, written objections."  ECF 640 at 4.  "The court will entertain no objection to the report unless an identical objection was previously submitted to the special master in the form of specific written objection in accordance with the provisions of paragraph A(5) above."  *Id.* at 8.

[41] The Court's January 7, 2020 order directed that if the Special Master and Mr. Hayes were unable to report defendants' full compliance at the conclusion of the fourth re-audit, the reporting on the fourth re-audit should include "specific recommendations for each step defendants must take to implement any items that remain incomplete, as well as a date certain on which the fifth re-audit round will commence."  ECF No. 6441 at 8.

[42] Recommendation 32 has multiple parts, resulting in separate compliance statuses for each measure.

outstanding recommendations. The recommendations that defendants have successfully

implemented following Mr. Hayes' fifth re-audit include the following:

- Recommendation 1 – Expand the length and content of the pre-service "Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e., including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent Coleman and/or SPRFIT audits of suicide prevention practices.

- Recommendation 6 – Intake screening should be conducted only in the nurse's office within an R&R unit.

- Recommendation 26 – Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed.

With regard to the recommendations listed above, defendants' successful

implementation, coupled with their sustained compliance over the course of successive audits,

remains a clear demonstration to the Court and the Special Master of defendants' comprehension

of the recommendations and the steps required for implementation and sustainability.

Defendants must now turn their complete attention towards the implementation of the remaining

recommendations.

B. **Roadmap to Full Implementation of the 15 Remaining Recommendations**

Recommendations 3, 7, 8, 9, 10, 12, 13, 17, 18, 20, 21, 28, 29, 31, and 32 remain in

varying stages of implementation. Each recommendation and the necessary steps preceding a

determination of compliance with its full implementation are detailed below.

- Recommendation 3 – Ensure that all custody and health care staff receive both pre-service and annual suicide prevention training.

The current status of defendants' compliance with implementation of this

recommendation is reported in Table 1 on page 5 and Section M on page 50 of Mr. Hayes' fifth

re-audit report.  In order to achieve compliance with implementation of this recommendation,

defendants must ensure that at least 90 percent of custody, medical, and mental health staff at all

audited CDCR facilities receive annual suicide prevention training.  Each discipline must have at

least 90 percent compliance.  Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 7 – The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process.

The current status of defendants' compliance with the implementation of this

recommendation is reported in Table 1 on page 5 and Section A on page 12 of Mr. Hayes' fifth

re-audit report.  Compliance with the implementation of this recommendation requires

defendants to ensure that nurse's office doors are always closed and that nurses consistently ask

all 15 mental health/suicide risk questions on the Initial Health Screening form.  CDCR should

develop CAPs for the five facilities (California Correctional Institution (CCI), California State

Prison/Sacramento, North Kern State Prison, Pelican Bay State Prison, and WSP) found to have

deficiencies in this area.  Compliance with the implementation of this recommendation will be

achieved upon completion of all of the aforementioned steps.

- Recommendation 8 – Nurse and officer safety should remain the top priority during the intake screening process.  If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality.

The current status of defendants' compliance with the implementation of this

recommendation is reported in Table 1 on pages 5 and 6 and Section A on page 12 of Mr. Hayes'

fifth re-audit report.  As Recommendation 8 is closely tied to Recommendation 7, the steps

required to achieve compliance are similar.  Upon completion of the steps outlined for

Recommendation 7 above, to include the screening process completed outside the presence of custody personnel, compliance with the implementation of Recommendation 8 will be also achieved.

- Recommendation 9 – CDCR should revise its SRE Mentoring Program to eliminate its "graduation" component after completion of two adequate assessments, conduct ongoing mentoring throughout the year, and audit clinicians' SREs on a regularly scheduled basis.

Compliance with the implementation of this recommendation will require defendants to ensure that at least 90 percent of mental health clinicians at each audited CDCR facility are compliant with the requirements of both the seven-hour SRE training and SRE mentoring program. The current status of defendants' compliance with this recommendation is reported in Table 1 on page 6 and Section I on page 37 of Mr. Hayes' fifth re-audit report. Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 10 – Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis.

Completion of suicide risk evaluations for inmates presenting as possible risks for suicide must be automatic; therefore, 100 percent compliance is required for this measure, because failure to complete such evaluations can result in death by suicide within CDCR facilities. In order to achieve compliance with the implementation of Recommendation 10, defendants should ensure through the SPRFIT or other process that Suicide Risk Assessment and Self Harm Evaluations (SRASHEs) are always completed for inmates presenting as possible risk for suicide at each audited CDCR facility. The current status of defendants' compliance with this recommendation is reported in Table 1 on page 6 and Section I on page 35 of Mr. Hayes' fifth re-audit report. Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 12 – CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those

within their first 72 hours of their housing in the unit) and the inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status).

The current status of defendants' implementation of this recommendation is reported in Table 1 on page 6 and Section D on pages 17-18 of Mr. Hayes' fifth re-audit report.  In order to achieve compliance, CDCR should develop CAPs at CCI, California Medical Facility, California Substance Abuse Treatment Facility, and California State Prison, Los Angeles County to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in suicide-resistant new intake cells for the first 72 hours of administrative segregation confinement.

- Recommendation 13 – CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours.

The current status of defendants' implementation of this recommendation is reported in Table 1 on page 6 and Section D on pages 17-18 of Mr. Hayes' fifth re-audit report.  To achieve compliance with the implementation of this recommendation, defendants must ensure that each audited CDCR facility maintain at least 90 percent compliance with adequate practices regarding the suicide-resistant housing of newly admitted inmates into administrative segregation during their first 72 hours of placement.  Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 17 – CDCR should adopt the recommendations made in connection with SREs set forth above,[43] which will also improve treatment planning contained in the SREs section above.

Defendants' compliance with safety plan development for suicidal patients is reported in Table 1 on page 6 and Section J on pages 40-41 of Mr. Hayes' fifth re-audit report.  To achieve compliance with the implementation of this recommendation, defendants need to implement the

---

[43] Recommendations 9 and 10.

new safety planning model[44] and ensure that each audited CDCR facility maintains adequate treatment (safety) plans in at least 90 percent of reviewed cases. Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 18 – CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment."

The current status of defendants' compliance with implementation of this recommendation is reported in Table 1 on pages 6-7 and Section J on page 41 of Mr. Hayes' fifth re-audit report. In order to achieve compliance, defendants must ensure that at least 90 percent of mental health clinicians at each audited CDCR facility are compliant with the requirements of the new safety planning training.

- Recommendation 20 – CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs.

Mr. Hayes' fourth re-audit refocused on psych tech practices when observation of deficiencies was found in some facilities. The current status of defendants' implementation of this recommendation is reported in Table 1 on page 7 and Section B on page 15 of Mr. Hayes' fifth re-audit report. Compliance will require defendants to ensure that each audited CDCR facility maintain at least 90 percent compliance with adequate psych tech practices by accurately completing Psych Tech Daily Rounds Forms for all MHSDS inmates in administrative segregation and SHUs. Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 21 – CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal

---

[44] On October 5, 2022, CDCR notified the Special Master that implementation of the new safety planning program was going to be delayed until February 28, 2023 without further explanation. *See* Appendix C, Letter from Dillon Hockerson, Attorney, CDCR Office of Legal Affairs to Special Master Lopes (October 5, 2022).

inmates: (1) observation at staggered intervals not exceeding every 15 minutes on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch.

The current status of defendants' implementation of this recommendation is reported in Table 1 on page 7 and Section F on page 21 of Mr. Hayes' fifth re-audit report. Observation of suicidal patients must be automatic; therefore, 100 percent compliance is required because failure to observe a suicidal patient can result in death by suicide within CDCR facilities. To achieve compliance with the implementation of this recommendation, defendants should ensure that all suicidal patients are always observed on either Suicide Precaution or Suicide Watch at each audited facility. Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 28 – All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred.

The current status of compliance with the implementation of this recommendation is reported in Table 1 on page 7 and Section K on page 44 of Mr. Hayes' fifth re-audit report. In order to achieve compliance, defendants should ensure that custody personnel in each audited CDCR facility adequately complete the second page of the two-page "Discharge Custody Check Sheet" (CDCR MH-7497) form in at least 90 percent of reviewed cases. Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 29 – The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan. No other frequency of observation should be authorized.

The current status of the implementation of this recommendation is reported in Table 1 on page 7 and Section K on page 44 of Mr. Hayes' fifth re-audit report. In order to achieve compliance, defendants should ensure that mental health personnel in each audited CDCR

facility adequately complete the first page of the two-page "Discharge Custody Check Sheet" (CDCR MH-7497) form in at least 90 percent of reviewed cases.  Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 31 – CDCR under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.

The current status of the implementation of this recommendation is reported in Table 1 on pages 7-8 and Section L on page 46 of Mr. Hayes' fifth re-audit report.  In order to achieve compliance, defendants should enact its new SPRFIT "reboot" process and ensure that each audited CDCR facility maintain at least 90 percent compliance with adequate SPRFIT practices that are consistent with the SPRFIT policy. Mr. Hayes will audit this item during the sixth re-audit.

- Recommendation 32 – CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues: Privileges for Inmates in MHCBs, Continuous Quality Improvement, and Reception Centers.

The current implementation status of this recommendation as it relates to Privileges for Inmates in MHCBs is reported in Table 1 on page 8 and Section G on page 27 of Mr. Hayes' fifth re-audit report.  In order to achieve compliance, defendants should ensure that each audited CDCR facility with a MHCB unit maintain at least 90 percent compliance with adequate practices regarding possessions and privileges afforded MHCB patients as required by policy. Mr. Hayes will audit this item during the sixth re-audit.

The current status of the implementation of the recommendation as relates to Continuous Quality Improvement is reported in Table 1 on page 8 and Section N on page 52 of Mr. Hayes' fifth re-audit report.  In order to achieve compliance, two steps are required.  First, defendants should incorporate all of Mr. Hayes' 19 Suicide Prevention Audit Checklist measures into their

CQI guidebook(s).  Second, any CQI audit report of a facility's suicide prevention practices should be formatted to contain data on all 19 suicide prevention measures.

The current status of the implementation of the recommendation as it relates to Reception Centers is reported in Table 1 on page 8, and Section P on page 56 of Mr. Hayes' fifth re-audit report.  In order to achieve compliance, defendants should provide verification to the Special Master that all reception center facilities[45] are aware of their suicide prevention responsibilities. Those responsibilities include the following: (1) placement of suicide prevention posters in the offices utilized for direct patient care by reception center nurses and diagnostic clinicians, as well as reception center housing unit bulletin boards and pill call windows; (2) diagnostic clinicians being required to review the nurse's Initial Health Screening form, any county jail records, and other pertinent documents contained within the Electronic Health Records System and the Strategic Offender Management System for each inmate; (3) diagnostic clinicians completing the Mental Health Screening Interview form are to request that the inmate sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form during the screening process if a prior history of mental health treatment is reported; and (4) diagnostic clinicians completing the Mental Health Screening Interview form are required to complete a SRASHE if the screening and/or inmate's behavior suggests a possible current risk for suicide.

C.  **PIP Recommendations**

Mr. Hayes' assessment of suicide prevention practices in CDCR's PIPs resulted in 16 recommendations.  A description of each as presented in Mr. Hayes' attached report follows below.

- Develop a CAP to ensure uniformity during the nursing intake screening process within the PIPs whereby all PIPs utilize the current Initial Health Screening form (which

---

[45] At the time of this writing those included Central California Women's Facility, NKSP, and WSP.

contains adequate mental health and suicide risk questions) or revise either the "Admission Assessment and History" and "Acute/ICF Nursing Assessment" forms to include adequate mental health and suicide risk questions.

- Develop a CAP to ensure that SRASHEs are always completed consistent with the requirements of the PIP suicide prevention policy, including by psychiatry in all programs, as well as by CIW-PIP clinicians on the weekend.

- Develop CAPs at both CMF-PIP and SVSP-PIP to ensure that all cells designated to house suicidal patients are suicide-resistant.

- Develop a CAP to ensure that only Suicide Precaution and Suicide Watch statuses are permitted for the observation for suicidal patients, and that terms such "stags," "mental health observation," "Q-11," "behavioral suicide watch," and "enhanced observation" are prohibited to be used in provider orders and progress notes.

- Develop a CAP to ensure that regular nursing rounds conducted at 15-minute intervals (meant for non-suicidal patients) should never be utilized as a substitute for Suicide Precaution status.

- Develop CAPs at both SVSP-PIP and CIW-PIP to ensure patients on suicide observation status are always assessed on a daily basis, and that orders for discharge from Suicide Watch and Suicide Precaution at SVSP-PIP are only completed following an assessment by a provider.

- Develop CAPs at CMF-PIP, CHCF-PIP, SVSP-PIP, and SQ-PIP to ensure that all patients on suicide observation status are always adequately observed.

- Develop CAPs at CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP to ensure that all provider orders regarding clothing and possessions are clinically justified in medical charts, and that patients not on Suicide Watch or Suicide Precaution are provided all clothing and possessions.

- Develop a CAP for all PIPs to ensure that suicidal patients have access to out-of-cell activities that are clinically justified, including those on maximum-security status.

- Develop a CAP to improve the reliability of data generated from the Mental Health NCAT (Non-Clinical Activity Tracking) database regarding out-of-cell activities.

- Develop a CAP in improve the consistency of IDTT meetings for suicidal patients within all of the PIPs, to include adequate case presentations; higher level of care discussions (during meetings for ICF patients); adequate discussion regarding suicide risk histories; current suicide risk and observation; clothing, possessions, and out-of-cell activities; and safety planning to reduce further recurrence of SI.

- Develop a CAP to improve the adequacy of safety planning within all of the PIPs, as well as a CAP to enforce the PIP suicide prevention policy requirement for supervisory review of a safety plan prior to, or during the IDTT in which the discharging SRASHE is completed.  In addition, both CAPs should include clear guidance that a patient's current low acute risk at discharge and/or refusal or lack of cooperation for safety plan development should never be considered reasons for exemption to both safety plan development and supervisory review.

- Develop a CAP to ensure that "contracting for safety" is not utilized in either the assessment of suicide risk or documentation of decision-making within the PIPs.

- Develop CAPs to increase custody, medical, and mental health staff compliance for annual suicide prevention training at CMF-PIP and CHCF-PIP.

- Develop CAPs to increase mental health clinician compliance rates for both SRE mentoring program and seven-hour SRE training at CMF-PIP, CHCF-PIP, and SVSP-PIP.

- Develop a CAP to ensure that SPRFITs at each PIP meet required monthly meetings quorums, and that deficient suicide prevention practices, including those cited in this reviewer's report, are remedied.  *See infra*, pp. 70-71


## IV.    <u>CONCLUSION AND RECOMMENDATIONS</u>

The Special Master continues to share the concerns expressed by Mr. Hayes in each of his audit reports.  While defendants have continued to make incremental progress since the fourth re-audit in fully implementing the remaining outstanding recommendations, there remains much work to be done.

As reported above, by the time of this writing, defendants had successfully implemented 14 of Mr. Hayes' initial recommendations, demonstrating both their comprehension and ability to execute.  Defendants must continue to build upon that momentum and complete implementation of the 15 remaining recommendations.

Mr. Hayes will begin the sixth re-audit assessments in selected CDCR facilities and the second assessment of the five PIPs in early 2023.  Currently, Mr. Hayes continues to observe the

statewide mental health program's weekly and monthly Suicide Prevention and Response Unit meetings via teleconference.

In view of all of the foregoing, the Special Master requests that:

(1) The Court find defendants in compliance with the implementation of Recommendations 1, 6, and 26.[46]

(2) The Court order defendants to implement the 16 initial recommendations and develop corrective action plans based upon deficiencies found during Mr. Hayes' baseline assessment of suicide prevention practices in CDCR's PIPs.

(3) The Court order the Special Master to provide an update report to the Court on the status of defendants' continued implementation of the remaining 15 outstanding recommendations and the development of corrective action plans to address the deficiencies found in PIP suicide prevention practices.

<div style="margin-left:50%;">

Respectfully submitted,


/s/*Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

</div>

October 24, 2022

---

[46] With regard to the remaining 15 outstanding recommendations—3, 7, 8, 9, 10, 12, 13, 17, 18, 20, 21, 28, 29, 31, and the remaining parts of 32—defendants should continue their court-ordered efforts towards full implementation without further delays, focusing on ways to accelerate the process wherever possible.

# APPENDIX A



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jenny S. Yelin
Email: jyelin@rbgg.com

July 29, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>

Matthew A. Lopes, Jr.
Coleman Special Master
Pannone Lopes Devereaux & O'Gara
317 Iron Horse Way, Suite 301
Providence, RI
mlopes@pldolaw.com

      Re:    *Coleman v. Newsom*: Plaintiffs' Comments on Draft Fifth Re-Audit and
              Update of Suicide Prevention Practices in the CDCR
              <u>Our File No. 0489-03</u>

Dear All:

     We write to provide Plaintiffs' comments on the Draft Fifth Re-Audit and Update
of Suicide Prevention Practices in the CDCR by Lindsay M. Hayes, M.S., dated July 1,
2022 ("Draft Report"). The Draft Report details serious deficiencies in the suicide
prevention practices at the 23 re-audited prisons. Plaintiffs generally agree with
Mr. Hayes' recommendations and conclusions and appreciate the thoroughness of his
review and analysis.

     In his discussion of 30-Minute Welfare Checks in Administrative Segregation,
SHUs, PSUs, and Condemned Units, Mr. Hayes notes that the audited institutions had
very high rates of compliance for Guard One checks of individuals in segregation units—
above 90% at 21 out of 22 institutions and just below 90% in the STRH at one institution,
KVSP. *See* Draft Rpt. at 33. Nonetheless, Mr. Hayes notes that "[t]his high rate of
compliance was diminished by the fact that three facilities (CIM, HDSP, and SVSP)
experienced five inmate suicides in administrative segregation during 2020-2022 in
which decedents were either found in rigor mortis or irregularities were found in timely
Guard One checks at time of death." *Id.*; *see also id.* at 9; *id.* at 10 n.3.

     The Draft Report offers no recommendations related to this issue. We request that
Mr. Hayes consider including in the final report a recommendation related to these Guard

[4130127.1]

PRIVILEGED AND CONFIDENTIAL
Matthew A. Lopes, Jr.
July 29, 2022
Page 2

One failures that contributed to five suicides over the course of 2 ½ years.  Specifically, please include recommendations that CDCR develop CAPs for the three institutions where the five suicides implicating this issue occurred to address deficiencies in their welfare check processes, since there were either no QIPs related to the welfare check issues or the follow-up to the QIPs was incomplete and/or insufficient:

      **1.** ███████████████████**, HDSP STRH, DOD August 7, 2020**: The Final Suicide Report ("FSR") included a QIP related to the fact that there was an interval longer than 35 minutes between welfare checks.  The FSR required that the "Warden or designee at HDSP shall conduct a review of this concern and determine if any additional actions and/or training is required."  The Final QIP Report dated October 6, 2020 states only that the institution initiated a Form 989 Request for Administrative Review to "determine if any additional actions and/or training is required."  No further action appears to have been taken, and Plaintiffs never received any information about the results of the Administrative Review.

      **2.** ███████████████████**, HDSP STRH, DOD December 17, 2020**: The FSR notes that paramedics identified rigor mortis in Mr. ███████ at 2:25, and there "may have been early signs of rigor mortis at 0147 hours," but concludes "the Guard One check completed at 0114 hours was within compliance," which seems improbable given how long rigor mortis takes to set in.  There was no QIP related to the welfare check issue.

      **3.** ███████████████████**, SVSP STRH, DOD April 22, 2021:** Mr. Hayes' Draft report notes that Mr. ███████ was found in rigor mortis.  Draft Rpt. at 241.  The FSR states that the Warden had "submitted a CDCR 989 based on the discrepancy found between the medical report and the Guard 1 timeline," and required a memorandum following completion of the 989 process "describing any actions taken to address these problems."  The August 10, 2021 Final QIP report notes only that the 989 review would take place, but does not include the results of the review or what action, if any, would be taken to address the problems.  Plaintiffs have also not received any later memorandum regarding this suicide.

      **4.** ███████████████████ **CIM ASU, DOD July 8, 2021:**  The Final Suicide Report notes that "[a]lthough it was noted the prior Guard One check was in compliance with departmental policy, there was documentation in the patient healthcare record regarding the condition of Inmate ███████ body upon discovery that would suggest the need for further inquiry" and requires the Warden or designee to review the issue and submit a memorandum describing any actions taken to address the issue.  The Final QIP Report dated September 27, 2021 states only that the institution would "review the autopsy report when available.  Should a significant time lapse be noted between the

**PRIVILEGED AND CONFIDENTIAL**
Matthew A. Lopes, Jr.
July 29, 2022
Page 3

Coroner's time of death and the Guard 1 checks, further inquiry/investigation will be considered." Possibly because the coroner's report states that Mr. ███ was "dead on arrival" and does not examine more precisely when he may have died, there was no further follow-up on this QIP.

     **5.** ███████████, **CIM ASU, DOD August 12, 2021:** The Final Suicide Report notes that "[a]lthough it was noted the prior Guard 1 check was in compliance with departmental policy, there was documentation in the 837 crime incident report regarding the condition of Inmate ██████ body upon discovery that would suggest the need for further inquiry" and requires the Warden to conduct a review of the issue and submit a memorandum describing any actions taken to address the concern. The October 22, 2021 Final QIP Report states only that the institution would "review the autopsy report when available. Should a significant time lapse be noted between the Coroner's time of death and the Guard 1 checks, further inquiry/investigation will be considered." Possibly because the coroner's report appears to have used the time paramedics pronounced Mr. ██████ dead as his official time of death (0245) without examining more precisely when he may have died, there was no further follow-up on this QIP.

     None of the QIPs listed above appear to have resulted in any change in policy, additional training, or other action designed to improve welfare check compliance at the three institutions. CDCR must address the issue of whether Guard One is working as intended to ensure that welfare checks are actually performed. If officers are simply touching the Guard One Pipe to the button without actually looking into the cell, than the "Guard One compliance" figures are meaningless. Additional measures are necessary, such as using surveillance video to audit whether officers are actually conducting the required checks, or just doing the bare minimum necessary to ensure that the Guard One Pipe records that the officer passed by the cell.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4130127.1]

**PRIVILEGED AND CONFIDENTIAL**
Matthew A. Lopes, Jr.
July 29, 2022
Page 4


We hope Mr. Hayes will consider adding a recommendation related to this issue in his final report.

<div style="text-align: center">

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jenny S. Yelin*

By:  Jenny S. Yelin

</div>

JSY:aa
cc:  *Coleman* Co-counsel  Adriano Hrvatin  Carrie Stafford
  *Coleman* Special Master Team Paul Mello  Sundeep Thind
  Elise Thorn  Samantha Wolff  Antonina Raddatz
  Namrata Kotwani  Nick Weber  Christine Ciccotti
  Damon McClain  Dillon Hockerson  Kristopher Kent

# APPENDIX B

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



August 1, 2022


Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215N
Johnston, RI 02919


VIA EMAIL ONLY


Dear Special Mater Lopes,

I write in regards to Lindsay Hayes' draft report "The Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and  Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs" (Report) provided to Defendants on July 1, 2022.  The California Department of Corrections and Rehabilitation (CDCR) provides comments and objections to the Draft Report's findings regarding CDCR's implementation of the remaining 18 Court-Ordered Suicide Prevention Recommendations; a new recommendation regarding CDCR's Crisis Intervention Treatment; and findings at specific institutions.

## I.      Comments and Objections Regarding Mr. Hayes' Findings on CDCR's Implementation of Suicide Prevention Recommendations.

### A.      The Findings for Recommendations 1 and 9 Need To Reflect That They Have Been Fully Implemented.

In regards to Recommendation 1, the Report found implementation "pending because, due to the COVID-19 pandemic, this reviewer was unable to observe live presentation of the curriculum at the Basic Correctional Officers Academy (BCOA) during the assessment period, but will observe the four-hour training at the BCOA via Teams in July 2022." (Report at 5.)  Mr. Hayes has since reviewed the live training via Microsoft Teams and CDCR requests the Report be updated to reflect full implementation of Recommendation 1.

In regards to Recommendation 9, the Report states "[t]o date, CDCR is currently revising the draft [SRE Mentoring] policy again."  (*Id.* at 6.)  On June 22, 2022, Mr. Hayes reviewed CDCR's revised draft policy and recommended it move forward for distribution to stakeholders.  The SRE Mentoring policy was approved and released statewide on July 12, 2022.  CDCR requests the Report be updated to reflect the current status of Recommendation 9.

Special Master Lopes
Page 2

    B.    <u>Objections to Mr. Hayes' Findings on the Status of CDCR's Implementation of the Eighteen Remaining Recommendations</u>

CDCR objects to Mr. Hayes' findings regarding CDCR's implementation of the eighteen remaining recommendations, including his finding that CDCR has failed to implement those recommendations. Mr. Hayes complains that the recommendations are not fully implemented because the various plans, policies, and audits developed by CDCR to implement the recommendations are not being complied with at a satisfactory level. (Report at 5-8, 12, 15, 17-18, 19, 21, 27, 35, 41, 44, 50, 56.) In its December 24, 2020 Order, the Court ordered CDCR to fully implement the eighteen recommendations "by the time of Mr. Hayes' fifth re-audit." (ECF No. 7004 at 2.) In a previous order, the Court identified thirteen out of the eighteen recommendations as requiring CDCR to meet a compliance threshold of 90 percent or 100 percent. (December 3, 2020 Order, ECF No. 6973 at 7-8.) It appears that Mr. Hayes requires 100 percent compliance with the remaining five recommendations, as evidenced by his ever-evolving recommendations for CDCR to implement Corrective Action Plans (CAP) for any deficiency he may happen to discover during his on-site tours.

Since the Court's December 3, 2020 Order, CDCR has taken administrative action to implement monitoring tools and audits that will increase compliance rates with Mr. Hayes' outstanding recommendations. (*See* Defendant's June 30, 2022 Updated Activation Schedules for completion of Court-Ordered Suicide Prevention Recommendations, ECF No. 7578 at 5-14.) After completing his 5th Re-Audit tours, Mr. Hayes found that "16 of the 18 remaining recommendations have not been fully implemented," generally because CDCR did not meet a 90 or 100 percent compliance rate. (Report at 5-8.) CDCR's assessment of the status of implementation of these eighteen recommendations differs from Mr. Hayes' assessment in large part because Mr. Hayes' definition of implementation of a recommendation is different from CDCR's concept of implementation of a policy or plan. Based on the 4th Re-Audit report and the December 3, 2020 order, a recommendation is not considered implemented until CDCR has achieved the 90 or 100 percent compliance. CDCR's concept of implementation reported in its activation schedules for completion of the court-ordered suicide prevention recommendations does not take a compliance measure into account. Instead, it focuses on actual development and use or application of a policy, plan, or audit. Some of the recommendations Mr. Hayes has found to be not fully implemented, largely because statewide compliance has not reached his thresholds, are reported as complete in the updated activation schedules Defendants filed on June 30, 2022. For example, Recommendation 10 requires that the quality of completed SRASHE's must be audited monthly, and this must be done at the 100% standard. The Hayes report found that only one institution did this perfectly so CDCR has not implemented this recommendation. But the June 30, 2022 updated activation schedules show this recommendation as completed. (ECF No. 7578 at 6.) This is also a concern for the implementation of recommendations that require ongoing monitoring for policies and procedures that are in place but have to achieve the Hayes threshold or that could dip below the threshold after Hayes determines compliance reached and the recommendation implemented.

As outlined in Table 1 below, CDCR has completed construction projects, issued memos and policies, hired additional leadership staff, and implemented tools to monitor compliance at the Headquarters, Regional, and institutional levels. CDCR objects to the Report's findings and

recommendations regarding CDCR's current implementation status for recommendations 3[1], 7[2], 8[3], 10[4], 12[5], 13[6], 18[7], 20[8], 21[9], 28[10], 29[11], and portions of 32[12][13] because the report shows CDCR has implemented each recommendation, even if it has not met the desired compliance threshold.

**Table 1:**

| Hayes' Findings Regarding the Recommendation | CDCR's Methods to Implement Recommendation |
|---|---|
| **<u>Recommendation 3</u>: Ensure that all custody and health care staff receive both pre-service and annual suicide prevention training. Mr. Hayes found that "there continue to be audited facilities with disciplines…under 90 percent compliance with annual** | CDCR issued a memo, "Enhancements to the Suicide Prevention and Response Focused Improvement Teams", dated February 2, 2018, requiring monthly reporting of compliance during local SPRFIT Committees, which are then monitored during the Statewide SPRFIT Committees. Corrective Action Plans are issued |

---

[1] "CDCR should develop CAPs for annual suicide prevention IST in the four facilities (CCI, CHCF, CIW, and RJD) that were below 90-percent compliance for suicide prevention training for two or more disciplines." (Report at 51.)

[2] "CDCR should develop CAPs for the five facilities (CCI, CSP/Sac, NKSP, PBSP, and WSP)." (Report at 14.)

[3] "CDCR should develop CAPs for the five facilities (CCI, CSP/Sac, NKSP, PBSP, and WSP)." (Report at 14.)

[4] "Although all CDCR facilities should be at 100 percent compliance with completion of SRASHEs for emergent/urgent mental health referrals involving SI and SIB, at a minimum, CAPs should be developed for the nine facilities (CIM, CMC, CSATF, CSP/LAC, KVSP, MCSP, NKSP, SVSP, and WSP) that were under 90 percent compliance during this assessment." (Report at 39.)

[5] "During this current assessment, 82 percent (18 of 22) of the audited facilities were found to have adequate practices, an improvement from 65 percent in the previous assessment. Problems found in four facilities (CCI, CMF, CSATF, and CSP/LAC) included inmates placed in unsafe cells because all new intake cells were occupied; in other cases, new intake cells were available, but custody staff had not appropriately relocated the inmates." (Report at 18.)

[6] CDCR objects to the portion of the recommendation that "it develop CAPs in CCI, CMF, CSATF, and CSP/LAC to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in suicide-resistant new intake cells for the first 72 hours of administrative segregation confinement." (Report at 19.)

[7] "A CAP should be developed for the six facilities (CMF, CSATF, CSP/LAC, KVSP, MCSP, and SVSP) that were under 90 percent compliance with safety planning completion at MHCB discharge. A CAP should be developed to ensure that all CDCR facilities with MHCB units are in compliance with the 'Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans' policy requiring review and revision (when appropriate) of safety plans prior to, or during, discharge IDTT meetings." (Report at 43.)

[8] "CDCR should develop CAPs for the three facilities (CIM, CSATF, and SQ) referenced above to correct PT deficiencies in their restrictive housing units." (Report at 15.)

[9] The relevant portion of the recommendation CDCR objects to is "CDCR needs to revise the CAP to ensure that its 'Mental Health Observations Reporting Tool,' along with facility level nursing leadership oversight and responsibility, results in accelerated compliance with this issue."

[10] "Develop CAPs for the 21 facilities that were below 90-percent compliance with Page 1and/or Page 2 of the 'Discharge Custody Check Sheet' (CDCR MH-7497) form." (Report at 45.)

[11] "Develop CAPs for the 21 facilities that were below 90-percent compliance with Page 1and/or Page 2 of the 'Discharge Custody Check Sheet' (CDCR MH-7497) form." (*Id.*)

[12] In regards to "Privileges for Inmates in MHCBs": "[d]espite issuance of the six memoranda cited above, practices in this area remained inconsistent and the preceding (fourth re-audit) assessment found that only 67 percent (12 of 18) of the audited facilities with active MHCB units had adequate practices regarding possessions and privileges provided to MHCB patients." (Report at 29.)

[13] In regards to "Reception Centers": "[a]lthough no new recommendations are offered, this reviewer's prior recommendation from the fourth re-audit report is reiterated again – 'CDCR should provide verification to the Special Master that all RC facilities (CCWF, NKSP, and WSP) are aware of their suicide prevention responsibilities." (Report at 57.)

| | |
|---|---|
| **suicide prevention training." (Report at 5.)** | for institutions not meeting the 90 percent compliance threshold. CDCR disagrees that non-compliance at some institutions represents systemic non-compliance. There is also a dispute as what the term annual means, be it one per calendar year or every twelve months. This is currently being discussed in the data remediation process and will likely go through dispute resolution. Until that dispute is resolved, CDCR objects to Mr. Haye compliance result that measure based on once every twelve months. |
| <u>**Recommendation 7**</u>**: The nurse's office should be of sufficient size to conduct adequate intake screening and the door to the office (which should contain a large viewing window) should remain closed during the screening process. Mr. Hayes found that "there continue to be multiple audited facilities in which nurse's office doors were not closed (or had open bars), and adequate screening was not accomplished because nurses did not always ask all 15 mental health/suicide risk questions on the Initial Health Screening form." (Report at 5.)** | In regards to appropriate office space, Mr. Hayes notes there is ongoing construction at NKSP and WSP as part of the Health Care Facility Improvement Project. (Report at 12, 175.) In the interim, CDCR will continue to implement alternative practices to ensure confidentiality and privacy, i.e. noise cancelling machines and privacy curtains.<br><br>In regards to adequately asking all fifteen questions on the intake screening form, Headquarters Nursing has created training, and conducted live webinars with individual institutional leadership and staff to assist staff in complying with this requirement. Oversight and monitoring will continue at the Regional and Institutional levels. However, this is primarily a compliance issue based on Mr. Hayes' review of a handful of nurses who did not ask all questions on the intake screening form. CDCR disagrees that non-compliance in a handful of cases represents systemic non-compliance. |
| <u>**Recommendation 8**</u>**: Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality. Mr. Hayes found that "there continue to be a few audited facilities in which intake nurses did not feel comfortable** | Staff are aware that if there is a safety concern, they can perform the screening in a least restrictive setting, which includes the use of Therapeutic Treatment Modules when available. However, this is primarily a compliance issue based on Mr. Hayes' review of a handful of institutions where there were concerns about the confidentiality of the initial health screenings. CDCR disagrees that non-compliance at a few institutions represents systemic non-compliance. |

Special Master Lopes
Page 5

| | |
|---|---|
| **conducting intake screening without the presence of custody personnel and/or screening took place without adequate privacy and confidentiality for inmate." (Report at 5-6.)** | |
| <u>**Recommendation 10**</u>**: Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis. Mr. Hayes found that "completion of SRASHEs for inmates presenting as possible risk for suicide by expressing SI and/or engaging in SIB requires 100 percent compliance, and only one of the facilities was at 100 percent compliance." (Report at 6.)** | CDCR has fully implemented this recommendation. SPRFITs at each institution do audit the quality of completed SREs. However, over time, Mr. Hayes has shifted this recommendation from looking at whether the quality of SREs is audited and instead focuses on whether a SRASHE is completed when it should be completed. Mental Health has implemented a clear policy regarding when a Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) is required. Further EHRS was updated to provide alerts and prompts when an individual reports Danger to Self or Suicidal Ideation for an urgent referral when it should be an emergent referral. Mental Health Regional Specialists work on a monthly basis with their designated institutions to assess timeliness and whether a SRASHE should have been completed in instances of emergent consult orders. Additionally, this concern is a standing item at the statewide SPRFIT Committee, where all instances of non-compliance with directives to complete SRASHEs when suicidal ideation is indicated, are evaluated and recommendations for remediation are identified. Despite all of this, Mr. Hayes has determined that this recommendation has not been fully implemented primarily because CDCR has not reached 100 percent compliance on completing SRASHEs when necessary. Compared to Mr. Hayes' snapshot review of what institutions are actually doing due to the limited sample size of 30 to 35 cases per institution (see Appendix A) reviewed during his two-to-three day on-site examinations (Report at 2), CDCR monitors performance statewide and can demonstrate a very high compliance rate of SREs being completed appropriately after an emergent MH consult for suicidality over a 16-month period. CDCR's compliance rates from March 2021 to June 2022, analyzing nearly 16,000 emergent referrals for |

| | suicidal ideation, ranged from 94 to 98 percent.[14] While this does not meet Mr. Hayes' 100 percent compliance threshold, it is far from deficient. CDCR disagrees that meeting a 100 percent compliance threshold is necessary to represents systemic compliance. |
|---|---|
| **Recommendation 12**: CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72 hours of their housing in the unit) and the inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status). Mr. Hayes found that "despite CDCR's incremental construction project for new retrofitted new intake cells during 2021-2022, at least two of the audited facilities reported, and this reviewer observed, an inadequate number of new intake cells." (Report at 6.) | On March 30, 2022, CDCR completed the construction of the 64 new suicide resistant intake cells throughout the state based on Mr. Hayes' previous recommendations. Rather than build new cells a new recommendation put forth by Mr. Hayes on page 19, CDCR should focus on enforcing its existing policy of housing only newly admitted inmates in retrofitted the cells, which is the focus of Recommendation 13. Per Mr. Hayes, there were twenty-one out of the twenty-three audited institutions, or 91 percent, that did have sufficient intake cells. Thus, this is primarily a compliance issue. CDCR disagrees that non-compliance at two institutions, based on an allegedly insufficient number of intake cells, represents systemic non-compliance. |
| **Recommendation 13**: CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours. Mr. Hayes found that "there continue to be a few audited facilities in which new intake cells were available, but custody staff had not appropriately relocated the inmates." (Report at 6.) | On February 17, 2021, CDCR developed a manual tracking tool of intake cell usage, and on October 3, 2021, implemented an automated tracking tool. On April 27, 2022, CDCR issued a policy regarding the expectations of tracking intake cell usage in SOMS. CDCR will continue to monitor this issue and track patient placement in intake cells. However, this is primarily a compliance issue. CDCR disagrees that non-compliance at a few institutions represents systemic non-compliance. |
| **Recommendation 18**: CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, | CDCR has designated the Statewide SPRFIT committee to monitor compliance with completion of the prior safety planning training. CDCR had 22 out of the 23 audited facilities with over 90 percent compliance with training, "with only NKSP below the threshold at 83 |

---

[14] The data from Chart 1 was compiled from CCHCS's OnDemand Performance Report which has currently not been validated by the Special Master's Data Expert. The chart only measures compliance with emergent referrals.

| | |
|---|---|
| **"Safety/Treatment Planning for Suicide Risk Assessment."** Mr. Hayes found that "although most of the audited facilities had compliance rates over 90 percent for safety planning intervention (SPI) training, the SPI model was problematic and is being replaced, thus a new training program is required." | percent." (Report at 43.) Mr. Hayes' finding that this recommendation has not been fully implemented seems to be based partially on compliance. CDCR disagrees that non-compliance at one institution represents systemic non-compliance. Mr. Hayes also seems to deem this item as not fully implemented due to the decision to create and roll out new safety plan training. While CDCR agrees that a better safety planning concept and training are appropriate, that does not mean that the prior concept, which was approved by Mr. Hayes, is constitutionally defective. As noted in CDCR's monthly Suicide Prevention Activation Schedule, CDCR is close to completing the new safety planning concept and anticipate rolling out training before the end of the year. |
| <u>Recommendation 20</u>: CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs. Mr. Hayes found that "psych techs in several audited facilities did not accurately complete the Psych Tech Daily Rounds Form for MHSDS inmates and/or did not speak with non-caseload inmates during daily administrative segregation rounds." (Report at 7.) | CDCR has developed an audit arising from a recommendation in Mr. Hayes' 4th Re-Audit Report (ECF No. 6879-1 at 9).    Nursing Supervisors conduct quarterly audits of the Psych Tech rounds in restricted housing units to ensure daily rounds were completed consistent with policy and the fidelity of the rounds, and submit the audits to the institution's SPRFIT coordinator on the 5th of every month. However, this is primarily a compliance issue based on Mr. Hayes' review of a handful of psych tech rounds. In his rounds, Mr. Hayes only found deficiencies at three institutions. CDCR disagrees that non-compliance at three institutions based on a review of a handful of staff members represents systemic non-compliance. |
| <u>Recommendation 21</u>: CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates (1) observation at staggered intervals not exceeding every 15 minutes on Suicide Precaution ... Mr. Hayes found that "although CDCR developed an automated 'Mental Health Observations Reporting Tool' designed to assist nursing supervisors | CCHCS QM released the Mental Health Observation Reporting Tool, which allows institutional nursing supervisors to monitor Program Guide compliance in early 2022, just before Mr. Hayes started his review. Therefore, this new tool was not fully implemented or ingrained in staff routines by the time Mr. Hayes started rounding. Regional and Institutional Chief Nursing Executives will review the tool's compliance percentages monthly and discuss areas of improvement. However, this is primarily a compliance issue because Mr. Hayes |

| | |
|---|---|
| **in auditing the observation of suicidal patients in MHCB units, none of the audited facilities with MHCB units achieved the required 100 percent compliance with this measure."** (Report at 7.) | found that staff had not achieved 100 percent compliance. CDCR disagrees that failure to achieve 100 percent compliance at any institutions or system-wide represents systemic non-compliance. |
| <u>**Recommendation 28**</u>: **All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred. Mr. Hayes found that "low compliance rates were found in almost all audited facilities regarding the custody personnel requirement to accurately complete Page 2 of the 'Discharge Custody Check Sheet' (CDCR MH-7497) form. (Report at 7.)** | On June 3, 2021, CDCR modified page 2 of the Form 7497 to make it easier to document when custody checks are performed. On October 19, 2021, CDCR released an audit tool to the institution to measure compliance of completing page 2. Thus, staff were still getting comfortable with the new form and local audit when Mr. Hayes began his rounding. The Suicide Prevention Committee has been monitoring compliance rates and has been issuing Corrective Action Plans to institutions that are underperforming. Thus, this is primarily a compliance issue. CDCR disagrees that compliance below 90 percent at any institution or state-wide represents systemic non-compliance. |
| <u>**Recommendation 29**</u>: **The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan. No other frequency of observation should be authorized. Mr. Hayes found that "low compliance rates were found in almost all audited facilities regarding mental health clinician requirement to accurately complete Page 1 of the 'Discharge Custody Check Sheet' (CDCR MH-7497) form." (Report at 7.)** | On June 3, 2021, CDCR modified page 1 of the Form 7497 to make it easier for clinicians to document their rationale. On October 29, 2021, CDCR released an audit tool to the institution to measure compliance of completing page 1. Thus, staff were still getting comfortable with the new form and local audit when Mr. Hayes began his rounding. The Suicide Prevention Committee has been monitoring compliance rates and has been issuing Corrective Action Plans to institutions when necessary. However, this is primarily a compliance issue. CDCR disagrees that compliance below 90 percent at any institution or state-wide represents systemic non-compliance. |
| <u>**Recommendation 32**</u>: **Reception Centers (RC). Mr. Hayes found that "there were some problems in CDCR's three Reception Centers regarding diagnostic clinicians consistently reviewing nurses' Initial Health** | On January 27, 2021, CDCR released an expectation memo to RC and has been monitoring the RCs for sustainability. Regional Specialist are working closely with the three RCs, CCWF, NKSP, and WSP, to resolve ongoing deficiencies. However, Mr. Hayes' |

| | |
|---|---|
| **Screening forms and county jail records, as well SPRFIT coordinators at these facilities collecting data and assessing compliance with reception center responsibilities." (Report at 8.)** | determination that this item has not been fully implemented is primarily a compliance issue. This is based on findings at one institution of incomplete RC practices and questions about that availability of documents for review by one clinician at another RC. CDCR disagrees that non-compliance at one institution or by a limited number of clinicians represents systemic non-compliance. |

CDCR gathers and analyzes comprehensive data from each institution and implements narrowly tailored CAPs, as needed. The tools CDCR has put in place demonstrate that CDCR has achieved implementation of the twelve identified Recommendations in Table 1, although compliance may have not yet reached Mr. Hayes' standards. Monitoring the plans and policies, and correcting deficiencies identified during monitoring will always be an ongoing component of CDCR's suicide prevention program. Perfect compliance may be a goal, but it should not be required in order to demonstrate that CDCR has a sustainable and constitutionally adequate suicide prevention program. Although patient safety is an essential attribute of any healthcare system, perfect systems are not realistic. CDCR is not aware of any community or national standard that advocates for a standard of 100 percent compliance to prove systemic constitutional compliance. For example, according to a publication by the World Health Organization on patient safety: "[t]o err is human, and expecting flawless performance from human beings working in complex, high-stress environments is unrealistic. Assuming that individual perfection is possible will not improve safety."[15]

## II.   Recommendations that Require Monitoring on an Ongoing Basis and Marked as Ongoing on CDCR's Suicide Prevention Activation Schedules, Like Recommendation 21, are Complete and should be Considered Fully Implemented.

At page 26 of the Report, Mr. Hayes' Recommendations for Section F, "Practices for Observing MHCB Patients", states that:

> CCHCS's automated "Mental Health Observations Reporting Tool" is an effective instrument to measure compliance with the required observation of suicidal MHCB patients. Defendants' most recent Suicide Prevention Activation Schedules (ECF 7562, filed May 31, 2022), did not contain a completion date for this issue (Recommendation 21: Observation of Suicidal Patients), simply stating that monitoring was "Ongoing" and "Nursing headquarters continues to meet monthly with the Regional Chief Nurse Executives (CNEs) and/or institutional CNEs and invite the Regional Health Care Executives, as optional attendees, to review the results of the MH Observation Reporting Tool compliance percentage." CDCR needs to revise the CAP to ensure that its "Mental Health Observations Reporting Tool," along with facility level nursing leadership oversight and responsibility, results in accelerated compliance with this issue.

---

[15]*See* https://www.who.int/news-room/fact-sheets/detail/patient-safety. Last accessed on July 23, 2022.

The date of completion for Recommendation 21 is marked as "ongoing" because Mr. Hayes has set the compliance threshold at 100 percent and the item requires continuous monitoring. Recommendation 21 was *de facto* implemented as of February 28, 2022, the date when the automated Mental Health Observations Reporting Tool was rolled out statewide. The tool assists staff statewide to conduct hundreds of thousands checks on a monthly basis, and allows nursing leadership at the headquarters, regional, and institutional levels to meet monthly and discuss options to improve timely checks. CDCR requests the Report be corrected to reflect that recommendations that require ongoing monitoring and are marked as ongoing on CDCR's Suicide Prevention Activation Schedules are fully implemented.

III.   **Objection to the Recommendation to Develop Corrective Action Plans Regarding Crisis Intervention Teams in Section I, "Mental Health Referrals and Suicide Risk Evaluations."**

CDCR objects to the recommendation to "[d]evelop a CAP for the [Crisis Intervention Team (CIT)] process that ensures referred inmates receive continuous observation prior to the CIT arrival, reasonable privacy and confidentiality during the encounter, full team participation (by clinician, nurse, and lieutenant or sergeant), adequate assessment by the clinician (including SRASHE completion for cases involving suicidal behavior), and accurate completion of CIT Power Forms in EHRS." (Report at 39.) CDCR independently developed and implemented the CIT process in 2018 without direction from the Special Master or his team. The CIT program is not part of the Program Guide. CDCR has shared the policy and procedures with stakeholders and appreciates feedback on how to improve the program. Nonetheless, CDCR objects to the Report's findings of deficiencies and areas of non-compliance because the CIT process is outside the scope of *Coleman* requirements for suicide prevention monitoring and is not a part of the original twenty-nine court ordered recommendations. CDCR requests that any references to the CIT be struck from Report because it expands upon the scope of the already established and adopted recommendations.

IV.   **Request to Update Current Findings in Section O, "Suicide Case Reviews."**

The Report outlines the number of Quality Improvement Plans (QIP) issued throughout the Suicide Case Reviews and notes "a weakness is the repetitive nature of the deficiencies." (Report at 55.) CDCR requests that this clause be struck from the report because it is not a finding related to the Suicide Case Reviews, but is instead a critique of how frequently issues are identified within CDCR's suicide prevention system.

The Report should also note that CDCR is committed to more fully analyzing trends in QIPs within its Annual Suicide Reports. (See Special Master's Report and Recommendation Regarding the California Department of Corrections and Rehabilitation's Proposal for Assuming the Annual Suicide Monitoring Report, Appendix A, ECF No. 7574 at 14.) Specifically,

> [t]he narrative will also include discussion about whether the QIPs have been fully implemented, and if not, what the delays and barriers are to full implementation. Additionally, an analysis of the efficacy of the QIPs will be reported, including reporting on the ongoing work of CDCR's Suicide Prevention Coordinators in each region with institutions to ensure that the QIPS as designed were appropriate to

effectively address the problems in the first instance and that sustained improvement has been made. A description of ongoing work with institutions by CDCR's Suicide Prevention Coordinators in each region will be included to discuss the work being done to ensure sustained improvement has been made.

(*Id.*)

## V.    Objection and Request for Clarification Regarding the Recommendation in Section P, "Reception Center Practices."

On page 57, the Report states "required data or other 'proof of practice' regarding compliance with CDCR's 'Reception Center Suicide Prevention Reporting Expectations' memorandum were not reflected in monthly SPRFIT meeting minutes for any of the three RCs."  This is untrue because WSP's SPRFIT Committee meeting minutes from March through June documented the monthly audit of posters, that all other audits will be performed on a quarterly basis, and an attachment noting the quarterly audit's baseline findings.  (See Attachment 1.)  If the Report is not corrected to reflect full implementation of Recommendation 32 (Reception Centers) as requested above, CDCR requests that the Report be updated to reflect that WSP has submitted proof of practice in the SPRFIT Committee minutes.

Additionally, the Report states that "CDCR should provide verification to the Special Master that all RC facilities . . . are aware of their suicide prevention responsibilities."  (Report at 57.)  CDCR requests clarification on what is required to "provide verification to the Special Master."

## VI.    Comments and Updates Regarding Individual Institutions.

First, on page 49, the Report indicates that CCWF did not have a Local Operating Procedure (LOP) addressing "Inmate-Patients Receiving Bad News" and "Suicide Risk Management Program" (SRMP).  CCWF has since completed an addendum to their existing self-harm LOP to include procedures for inmate-patients that receive bad news and the SRMP.  (Attachment 2.)  CDCR requests that the Report be updated to reflect LOPs have been created.

Second, on page 77, the Report asserts that California Medical Facility's SPRFIT minutes had "no indication of discharge SRASHEs and safety plans being reviewed."  With respect to discharge SRASHEs, this is inaccurate.  Each month's minutes reported compliance with SRASHE timelines, including SRASHEs following discharge from the MHCB.  (Attachment 3 at 8.)  CDCR requests the report to clarify whether the quality of SRASHEs and safety plans were not being reviewed monthly.

Third, on page 221, the Report states that during an Interdisciplinary Treatment Team meeting (IDTT) at MCSP, "[t]here was little discussion about the patient's prior history of suicide, inquiry regarding the reason(s) for current SI, or introduction to safety planning."  This is not a valid criticism.  While there may have been little discussion regarding the patient's history of prior suicide attempts, the purpose of an IDTT is to discuss plans for treatment rather than an in-depth discussion of a patient's history.  Although the treatment team can ask the patient of the symptoms causing SI during the IDTT, those assessments occur and are more appropriately addressed during

the clinical meetings held before an IDTT.  CDCR requests that this criticism is struck from the Report.

Fourth, on page 279, the Report states that High Desert State Prison's (HDSP) SPRFIT meetings did not achieve quorum from September 2021 to February 2022 because a Chief Psychiatrist, Senior Psychiatrist, or a designated telepsychiatrist was not in attendance.  This is not consistent with CDCR's policy, which explicitly permits the Chief of Mental Health (CMH) to act in the absence of Chief Psychiatrist and it is accepted practice at desert institutions, which have no psychiatry staff, to omit psychiatry as a required member for a quorum.  (Attachment 4 at 8fn.2.)  The meeting minutes reflect that the CMH attended five of the meetings and the acting CMH attended the sixth meeting, resulting in a quorum in all meetings.  CDCR requests that the Report be updated including the corresponding statements in the Audit Summary on page 288.

Lastly, on pages 279-80, the Report incorrectly reports that "as of March 2022, only 62 percent of mental health clinicians had completed the SRE mentoring program."  This contradicts the HDSP's SPRFIT minutes for March reporting compliance at 95.45 percent.  CDCR requests the Report be updated to reflect 96 percent of mental health clinicians completed the SRE mentoring program.

Feel free to contact me if you would like to discuss CDCR's objections and comments.

Respectfully,

*/s/ Melissa C. Bentz*

MELISSA C. BENTZ
Attorney
Office of Legal Affairs

Attachments

1. Excerpts from Wasco State Prison's SPRFIT Committee Minutes.
2. CCWF "Notification of Inmate Bad News" and "Suicide Risk Management Program" Local Operating Procedures Addendum.
3. CMF's March 15, 2022, SPRFIT Committee Minutes.
4. Memorandum, "Enhancements to the Suicide Prevention and Response Focused Improvement Teams", dated February 2, 2018.

cc:    *Coleman* Plaintiffs' Counsel
       *Coleman* Court's Special Master's Team
       *Coleman* Office of the Attorney General's Team
       Hanson Bridgett LLP
       *Coleman* CDCR Team

Attachment 1

Attachment 2

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

| CENTRAL CALIFORNIA WOMEN'S FACILITY | Effective Date: 05/2021 |
|---|---|
| OPERATIONAL PROCEDURE | Next Revision: 04/2022 |
| MH-004  NOTIFICATION OF INMATE BAD NEWS | Attachments: Yes ☐ No ☒ |

## I. POLICY

A. To enhance suicide prevention efforts, the California Department of Corrections and Rehabilitation (CDCR) recognizes that interventions may be required for inmates receiving bad news from various sources. Communication across disciplines is paramount during sensitive times when inmates may have difficulty processing emotions and feelings related to receiving bad news.

B. As CDCR continues to focus on preventing inmate suicide, procedures for intervention during these difficult times for inmates must be established. All staff are responsible for suicide prevention in CDCR institutions. As such, it is expected that enhanced communication related to potential risk factors known to be associated with suicide will occur at all levels of the organization. To that end, CDCR and California Correctional Health Care Services (CCHCS) have developed several strategies to ensure inmates receive the appropriate attention and support for these difficult times.

## II. APPROVAL AND REVIEW

This Local Operational Procedure (LOP) will be reviewed annually in the month of April by the Warden, Chief Executive Officer (CEO), and necessary staff to ensure all affected policies and procedures are updated and accurate.

## III. RESPONSIBILITY

A. The Warden and CEO have overall responsibility for the operation of this procedure.

B. The Associate Warden, Health Care Operations and Chief of Mental Health (CMH) are responsible for monitoring and implementation of this procedure.

C. The Health Care Access Unit Correctional Captain and CMH are responsible for overseeing the application and adherence to the mandates of this procedure.

## IV. PROCEDURE

A. Any discovery of bad news that is disclosed to a staff member must be documented and reported based on established policies, procedures, and workflows.

B. **Out to Court Hearings**

1. When an inmate returns from an out to court proceeding or video court appearance, information about the outcomes of these hearings shall be communicated to the receiving mental health level of care or program, per Clinician-of-the-Day schedule located on the CCHCS Central California Women's Faclity (CCWF) SharePoint site, to allow for a clinical contact to occur.

a. Receiving and Release (R&R) Nursing Screening

1) When the inmate enters the R&R setting, the assigned nurse shall complete the Initial Health Screening – Female 2.1 PowerForm in the Electronic Health Record System (EHRS).

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

    2) If the inmate discloses distressing information related to the court proceedings or appears to be distressed during the screening, the nurse shall initiate an urgent or emergent Mental Health Consult Order in EHRS, depending upon the inmate's presentation.

  b. Out to Court Desk Communication

    1) The Correctional Case Records Manager shall ensure the Out to Court Coordinator distributes a list of all inmates scheduled for court hearings once a week to the Suicide Prevention and Response Focused Improvement Team (SPRFIT) Coordinator and designee. The SPRFIT Coordinator or designee shall review this list and identify those patients in the Mental Health Services Delivery System (MHSDS) and forward it to the assigned Mental Health Primary Clinician (MHPC). When a mental health patient returns from a court hearing, the MHPC shall schedule a routine clinical contact, unless information suggests a need for an urgent contact, meet with the patient, and assess the patient's adjustment to the hearing results. For patients scheduled for a hearing covering multiple days and returns to the facility each day, the mental health contact shall not occur until the court proceedings' conclusion unless the nurse screening conducted in R&R indicates a need for urgent or emergent follow-up.

  c. Transportation/Escort Officer Communication

    1) If the transportation officers escorting the inmate back from the court proceedings are made aware of potentially upsetting results from court hearings, the custodial staff shall notify the R&R nurse conducting the screening, who shall complete and submit an urgent CDCR 128-MH-5 through the CCWF process. CDCR forms can be located on Lifeline, Health Care Department Operations Manual (HCDOM) Resources, Forms.

    2) When an escort officer escorts an inmate from a video court appearance held inside CCWF, the inmate shall be brought to Triage and Treatment Area (TTA) to allow for nursing to complete the patient's screening to determine if a referral to mental health is warranted. In the event of an emergent situation, the officer shall escort the inmate to the TTA for an emergent consult with mental health clinical staff.

C. **Board of Parole Hearings**

  1. If an inmate receives a potentially upsetting result from a Board of Parole Hearings (BPH) hearing, such as a parole denial, a referral to the mental health department shall be made.

  2. Custody staff, on behalf of the Commissioners and Deputy Commissioners, shall contact the CMH by email or phone extension, located on CCHCS SharePoint site, if an inmate sitting for a hearing displays distress related to the results of the hearing. Information related to the inmate's presentation during the hearing shall be relayed to the mental health department by submitting an urgent mental health referral. Whenever possible, the MHPC shall be the person to make contact with the inmate.

  3. The BPH Case Records Technician (CRT) shall run the Proceedings Report within the Boards Information Technology System (BITS) and provide the information to the SPRFIT Coordinator every week. This report contains the outcome of the hearing and is updated each night.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

    a. The SPRFIT Coordinator shall disseminate this information to clinical staff, who will review the document and identify any inmates on their caseload who have had a BPH hearing. The MHPC shall review the inmate's medical record to determine an appropriate follow-up with the patient to discuss his or her adjustment to the hearing results.

    b. For inmates in the Suicide Risk Management Program, the patient shall be seen on an urgent basis to discuss the BPH hearing outcome results.

4. Classification hearings shall conduct post-board classification on an inmate within 15 days of receipt of official notice of a BPH decision regarding the inmate. The Unit Classification Committee shall generate an urgent referral to mental health if the inmate expresses distress or appears upset by the decision.

5. In the event, an inmate receives the notification of the Governor overturning BPH's decision to grant parole for a life-term inmate, or when the Governor decides, en banc, to return the case to BPH for further review of their decision, the inmate's Correctional Counselor I and a mental health clinician shall meet with the patient together to provide the news to the inmate.

D. **Notifications of Death/Injury/Serious Illness of Family Members**

1. When an inmate is notified of the death, injury, or serious illness of a family member, the staff person involved in this notification shall complete an urgent or emergent CDCR 128-MH-5 Mental Health Referral for follow-up with the inmate. The CDCR 128-MH-5 shall include documentation of the information of which the inmate was made aware.

2. If during the course of communication with an inmate, a staff member is informed by the inmate of the death, injury, or serious illness of a family member, that staff person shall complete an urgent or emergent CDCR 128-MH-5 Mental Health referral for follow up with the inmate. The CDCR 128-MH-5 shall include documentation of the information of which the inmate was made aware.

E. **Notification of Medical-related Bad News**

1. In the event a patient receives a diagnosis of a serious/high-risk medical condition or experiences significant worsening of a previously diagnosed medical condition which may shorten the patient's life or cause significant morbidity, the medical staff will evaluate the patient's response and refer him or her to mental health for evaluation as clinically indicated. Especially in cases when there are limited treatment options available for the patient's serious condition, or the bad news was unexpected, medical staff will assess the patient's response to the news and offer to refer the patient for an urgent mental health consult as needed.

F. **Notification of Bad News from Chaplaincy Services or other Institutional Staff**

1. If a member of the chaplaincy at the institution receives bad news based upon contacts with inmates, or contacts with the inmate's family, the chaplain shall submit an urgent CDCR 128-MH-5 Mental Health Referral to the mental health department, documenting the bad news discussed with the inmate, as appropriate based upon professional code of ethics.

G. **Mental Health Response to Bad News**

1. When the mental health clinician receives a referral regarding bad news, the referral shall be entered into EHRS as an urgent consult to be completed within 24 hours of receiving the sending entity's information.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

2. If the inmate is not currently a participant in the MHSDS, the clinician responding to the urgent consult order shall complete a confidential clinical contact. Based upon the patient's presentation and overall response to the bad news, the clinician may:
   a. Consider scheduling an Interdisciplinary Treatment Team for placement in the MHSDS.
   b. Provide supportive services for a limited time to support and monitor their response to the news.
3. If the inmate is currently a participant in the MHSDS, the MHPC shall update the Master Treatment Plan to address the stressors associated with the bad news and determine if modifications to the interventions and goals are necessary.
4. If, as a result of the mental health referral, a mental health clinician determines that an inmate is at heightened risk of suicide or self-harm, the procedures outlined in the MH-005 Suicide Prevention and Response LOP shall be triggered to provide the appropriate level of care and observation for the patient, up to and including one-on-one observation or referral to a higher level of care.

## V. REFERENCES

- CDCR and CCHCS memorandum dated February 2, 2018, "Enhancements to the Suicide Prevention and Response Focused Improvement Teams"
- Department Operations Manual, 52060.9 Emergency Calls
- California Code of Regulations, Title 15 3376 Classification Committees
- Lifeline, HCDOM Resources, Forms
- CCWF LOP, MH-005 Suicide Prevention and Response

## VI. APPROVAL

R. DE LA CERDA                        DATE
Chief Executive Officer
Central California Women's Facility

M. PALLARES                        DATE
Warden (A)
Central California Women's Facility

**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**

| CENTRAL CALIFORNIA WOMEN'S FACILITY | Effective Date: 07/2021 |
|---|---|
| OPERATIONAL PROCEDURE (ADDENDUM) | Next Revision: 03/2022 |
| MH-013 SUICIDE RISK MANAGEMENT PROGRAM | Attachments: Yes ☐ No ☒ |

## I.  POLICY

A.  The Mental Health Services Delivery System (MHSDS) recognizes that patients in the California Department of Corrections and Rehabilitation's (CDCR's) outpatient setting with elevated risk for suicide require increased treatment services. The Suicide Risk Management Program (SRMP) was established to provide specialized and individualized services and supports to these patients to target and decrease their identified suicide risk. The SRMP is part of CCWF's suicide prevention program. As such, CCWF's Suicide Prevention and Response Focused Improvement Team (SPRFIT) shall maintain and track the program under the Chief of Mental Health's (CMH's) direction.

B.  Patients who meet the criteria for placement in the SRMP shall receive increased treatment planning services, including accelerated Inter-disciplinary Treatment Team (IDTT) timeframes and individualized treatment. Mental health staff shall provide multi-disciplinary communication regarding those patients included in the SRMP in various settings.

C.  The IDTT can consider patients for removal from the SRMP after 30 calendar days, or in the case of Psychiatric Inpatient Program (PIP)/Department of State Hospital (DSH) discharged patients after 90 calendar days.

## II.  APPROVAL AND REVIEW

This Local Operational Procedure (LOP) will be reviewed annually by the Chief Executive Officer (CEO) and submitted to the Warden for final approval by the month of March.

## III. RESPONSIBILITY

A.  The CEO, Chief Psychiatrist, and CMH, or their designees, are responsible for ensuring the appropriate indicated training is provided to all mental health staff as determined necessary to ensure understanding and implementation of the policy.

B.  The Warden is responsible for custody's adherence to this policy.

## IV. PROCEDURE

A.  **Placement in the SRMP**

1.  The IDTT may place patients into the SRMP at any time as clinically indicated, but shall place patients in the program if they meet one or more of the following criteria:

    a.  Three or more Mental Health Crisis Bed (MHCB) admissions in past four months.

    b.  Assessed with a High Acute rating, if not admitted to an inpatient setting on the Suicide Risk Assessment and Self Harm Evaluation (SRASHE).

    c.  Discharged from DSH or PIP if the admission reason was for Danger to Self (DTS) or if the patient engaged in self-harm or met criteria for DTS during the course of their treatment.

    d.  Have had one or more self-injurious behaviors within the last 30 calendar days,

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

      with a medical severity of three.

    e. Other identified reasons for inclusion identified by the IDTT

B. **Initial Treament Planning for SRMP Patients**

1. Within seven calendar days of identification for inclusion in the SRMP, the Mental Health Primary Clinician (MHPC) shall bring the patient to an IDTT for placement in the SRMP, identify targets for treatment, and develop treatment goals for suicide risk reduction. The MHPC shall complete the SRMP tab of the Mental Health (MH) Master Treatment Plan in the Electronic Health Record System (EHRS), which includes developing specific treatment interventions to address the reason for inclusion in the SRMP.

2. The IDTT shall identify specific risk factors and warning signs to be targeted to reduce the patient's suicide risk. Based upon the most recent Safety Plan and clinical presentation, the team will also identify the treatment modalities that are likely to affect these factors and warning signs. The IDTT shall consider the patient's relative strengths and weaknesses when determining the best treatment course to address their risk. This justification shall be documented within the MH Master Treatment Plan.

3. CCWF shall use available and appropriate treatments for patients included in the SRMP. These can include:

    a. Collaborative Assessment and Management of Suicidality (CAMS) treatment.

    b. Additional individual contacts focused explicitly on developing coping skills to manage suicidality. These contacts can also be used for enhancing safety planning.

    c. Group treatment to focus on the reason for inclusion in the SRMP.

4. The following group treatment options are included in the Group Treatment SharePoint site, as available. These options are not all-inclusive; if there are CCWF-specific risk factors identified, the treatment team can develop an alternative intervention that best addresses the specific risk factors. Group treatment options for patients in the SRMP include, but are not limited to:

    a. Group/Individual Modality Options

        1) Dialectical Behavior Therapy (DBT) informed treatment

        2) A Journey Toward Health and Hope – Suicide Attempt Survivors Guide – process group

        3) Interventions for Self-Harm

        4) Suicide Resource for Counselors

        5) Preventing Suicide Program Activities Guide

        6) Thinking for a Change

        7) Diagnosis specific treatment modalities

        8) Decision-making group

        9) A Therapist's Guide to Brief Cognitive Behavioral Therapy (CBT)

        10) START – NOW – CBT workbook

        11) Trauma-Focused CBT workbook

        12) Wiley – Handbook of Brief CBT

        13) Co-Occurring Disorders Treatment Workbook

        14) Coping Skills Toolkit

        15) Alphabet of Coping Skills Interventions

        16) Face your feelings, Distress Tolerance

        17) Return from Higher LOC Group (process group)

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

18) Interpersonal Skills Manual
19) Modified DBT Group Therapy Manual
20) Life Skills Support Group
21) Understanding Your Illness-Schizophrenia
22) CBT for Psychotic Symptoms
23) Social Skills Training for the Seriously Mentally Ill
24) Panic Workbook
25) 12-Week Anger Management Program
26) When Anger Hurts
27) Mindfulness-Based Stress Reduction Training Manual
28) Personal Care Activities of Daily Living

b. If offering specialized treatment on an individual basis, could consider:
   1) Modified DBT Group Therapy Manual
   2) CBT
   3) Diagnosis-Specific Self-Help workbooks
   4) Stress and relaxation
   5) Building Self-Compassion Workbook

C. **Documentation of Progress in the SRMP**
   1. The MHPC shall:
      a. Document Treatment progress during routine IDTTs.
      b. Complete the SRMP Treatment Progress and Updates section within the SRMP tab of the MH Master Treatment Plan.
      c. Include updates for ongoing progress and response to treatment.
      d. Modify treatment based on progress.
      e. Solicit feedback from all IDTT members related to treatment or intervention recommendations for the patient and document these recommendations in the MH Master Treatment Plan.

D. **Communication Regarding Patients Included in the SRMP**
   1. CCWF's SPRFIT committee shall track SRMP patients. At a minimum, it shall include a monthly review during SPRFIT meetings.
   2. In segregated housing units, patients included in the SRMP shall be reviewed by mental health, custody, and health care staff during morning huddles.
   3. For GP-EOP programs, patients included in the SRMP shall be discussed by mental health, custody, and health care staff during partnership huddles.

E. **Removal from the SRMP**
   1. Criteria for Removal from SRMP
      a. IDTTs can consider patients for removal from the SRMP at 30 calendar days (90 calendar days for DSH/PIP discharges) after placement in the SRMP. Removal criteria are the following:
         1) Level of Acute risk on the SRASHE for at a minimum of 30 calendar days (90 calendar days for DSH/PIP discharges) post-IDTT is assessed as Low; and,
         2) Substantial progress on treatment goals from initial SRMP IDTT, defined as reduced suicide risk, resolution of, or a significant decrease in, mental health symptoms related to the reason for inclusion in the SRMP; and,
         3) Patient no longer meets one of the mandatory inclusionary criteria:
            a) The time since discharge from PIP/DSH has been more than 90 calendar

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

<blockquote>
days.
b) The patient has less than three MHCB admissions in the past four months.
c) The primary clinician has assessed the patient's suicide risk in the most recent SRASHE as low.
d) The patient has not engaged in self-harm with a medical severity of three within the past 30 calendar days.
</blockquote>

2. Process for Removal from SRMP
   a. Before removal, the primary clinician shall complete a new SRASHE, and ensure the patient meets the other criteria for the program removal. The patient is then taken to IDTT within 18 calendar days for discussion regarding removal from the program. If approved, the primary clinician shall complete the SRMP Removal section in the SRMP tab of the MH Master Treatment Plan documenting that the following indicators have been met:
      1) Acute risk assessed as low for a minimum of 30 calendar days.
      2) The reason for inclusion in the SRMP has been resolved.
   b. The clinician shall document the response to treatment and the treatment results in EHRS.

## V. REFERENCE
- MHSDS Program Guide, 2018 Revision, Volume 12 Mental Health Services, Chapter 7 Special Mental Health Needs and Services, Section 12.07.701 (P1) Suicide Risk Management Program

## VI. APPROVAL

R. DE LA CERDA     7-26-21    DATE
Chief Executive Officer
Central California Women's Facility

M. PALLARES     7/30/21    DATE
Warden (A)
Central California Women's Facility

Attachment 3

# Attachment 4

 **CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES


# MEMORANDUM

| | |
|---|---|
| **Date:** | 2/2/2018 |
| **To:** | Wardens |
| | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief Nurse Executives |
| | Suicide Prevention and Response Focused Improvement Team Coordinators |
| **From:** | |

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program

JEFF MACOMBER
Deputy Director, Facility Operations
Division of Adult Institutions

JANE ROBINSON
Statewide Chief Nurse Executive
California Correctional Health Care Services

| | |
|---|---|
| **Subject:** | **ENHANCEMENTS TO THE SUICIDE PREVENTION AND RESPONSE FOCUSED IMPROVEMENT TEAMS** |

This memorandum clarifies, modifies, and establishes requirements and responsibilities of the Suicide Prevention and Response Focused Improvement Team (SPRFIT). Each SPRFIT shall provide employees with training and guidance on suicide prevention, response, reporting, and review for the purpose of reducing the risk of suicide. Some existing SPRFIT requirements have been clarified or modified to promote optimal functioning of institution SPRFITs. Other responsibilities have been newly established in response to systemic concerns noted in Suicide Case Reviews and reviews of the California Department of Corrections and Rehabilitation (CDCR) Suicide Prevention and Response Program.

<u>SPRFIT Membership and Meeting Attendance Requirements</u>

The SPRFIT shall include members or designees listed in the SPRFIT Membership (Attached).

<u>Frequency of Meetings</u>

Each SPRFIT shall meet at least monthly.

# MEMORANDUM

Attendance Requirements

A SPRFIT meeting shall include mandatory members or designees to establish a quorum. Designees are only allowed if the mandatory member is absent or must attend to an emergency or other critical situation.

SPRFIT Reporting

Each SPRFIT shall submit to the Mental Health Program (MHP) Subcommittee and the Division of Health Care Services (DHCS) MHP Subcommittee by the 5th of each month:

- A complete, standardized management report.
- Meeting minutes.
- A log of suicide prevention activities.

Responsibilities

To comply with all CDCR policies and procedures relating to suicide prevention each SPRFIT shall:

1. Monitor compliance with required suicide prevention related training for custody and health care staff. Training shall be coordinated with the local In-Service Training unit as appropriate. Implement training regarding suicide prevention and response by ensuring:

   - All custody and health care staff receive the in-person Suicide Prevention training.
   - All **new** employees receive the in-person Suicide Prevention module during New Employee Orientation.
   - All mental health clinicians receive the 7-hour Suicide Risk Assessment training every two years.
   - An adequate number of trained Suicide Risk Evaluation (SRE) mentors are available to mentor other clinicians in need of SRE mentoring.
   - SRE mentoring occurs for new employees within 90 days from the date of hire, and every two years thereafter, except for clinicians regularly assigned to work in a Mental Health Crisis Bed Unit (MHCB), who receive mentoring annually.
   - Annual review and training updates are provided to SRE mentors.

2. Review Suicide Watch and Precaution procedures to ensure they are being implemented.

3. Collaborate with the institution Emergency Medical Response Committee (EMRC) to:

   - Review all suicides and suicide attempts requiring cardiopulmonary resuscitation and/or other medical procedures.

- Review custody cell entry and cut-down procedures for all suicides and suicide attempts.
- Provide data on self-harm incidents with or without intent to die.

4. Monitor and track all self-harm incidents, unknown deaths, and deaths by suicide using self-harm definitions and classification including a review of the appropriateness of treatment plans and five-day follow-ups. The SPRFIT shall:

- Accurately enter all self-harm incidents in the Electronic Health Record System within ten calendar days after the incident occurred.
- Aggregate institution data to present to the institution MHP Subcommittee.
- Analyze trends in institution self-harm data.
- Notify relevant staff of all self-harm incidents.
- Consult with mental health clinicians, Division of Adult Institutions (DAI) staff and Nursing as indicated.
- Ensure all serious self-harm incidents are accurately reported on a CDCR 837 Crime/Incident Report.

5. Review and track all custody wellness check procedures as stated in the memorandums Revision of Mental Health Crisis Bed Discharge Custody Checks Policy dated January 27, 2016 and Addendum – Revision of Mental Health Crisis Bed Discharge Custody Checks Policy, dated September 1, 2017 (Attached).

6. Ensure all required documentation for suicide death reporting is forwarded to the DHCS SPRFIT in adherence with timeframes specified in the Mental Health Services Delivery Program Guide, 2009 Revision, pages 12-10-24 to 12-10-25.

7. Provide oversight for the implementation of DHCS issued Quality Improvement Plans (QIPs) with input and assistance from the institution Mental Health Program and EMRC subcommittees. Responses to QIPs shall be:

- Reviewed and approved by the Chief Executive Officer and Warden prior to submission to the DHCS SPRFIT.
- Completed and submitted to the DHCS SPRFIT within the specified timeframes.

8. Conduct institution self-assessments related to compliance with suicide prevention items using the audit items developed by the Statewide Mental Health Program (SMHP) Quality Improvement Unit. The SMHP regional teams shall conduct periodic reviews of each institution's compliance with these items. In addition, each institution SPRFIT shall conduct a semi-annual self-assessment to ensure compliance with suicide prevention practices, review the results, and develop remedies during the SPRFIT meeting.

9. During each SPRFIT meeting, review institution suicide prevention practices, issues, and changes in operations that require special attention and response to determine areas for improvement. Reviews shall include, but are not limited to, responding to proposed and enacted legislation, changing institution conditions (such as changes in yards or missions), changes in inmate demographics, or institution challenges.

10. Monitor and address issues that may impact suicide prevention, including physical plant issues. Some examples may include use and location of Alternative Housing, intake cells in Administrative Segregation Units and MHCB cells. The SPRFIT, in conjunction with Facilities Management, shall monitor the progress of any needed retrofits. The SPRFIT shall collect data, monitor trends and identify areas where suicide prevention efforts need strengthening.

11. Monitor compliance and review quality of five-day follow-ups and Suicide Risk Assessments and Self-Harm Evaluations (SRASHEs). The SPRFIT shall develop Performance Improvement Plans to address poor compliance with the five-day follow-ups and SRASHEs. Chart Audit Tool results of five-day follow-ups and SRASHEs shall be reviewed to ensure they are clinically appropriate and safety plans are adequate. The SPRFIT shall develop Performance Improvement Plans as needed.

12. Conduct semi-annual aggregate Root Cause Analyses (RCA) of serious suicide attempts[1], supplemented by a mental health clinical review. Serious suicide attempts do not include those incidents in which the self-reported injury is determined to be unfounded.

Every six months, the institution shall select the five most serious incidents during the prior six months, defined by degree of injury, to develop the semi-annual aggregate RCA. If there are fewer than five, the aggregate RCA must include all incidents from that time period. The RCA shall be presented at the next SPRFIT meeting for discussion and review. The RCA and mental health clinical review discussion shall include:

- Mental health history and course, if applicable.
- A discussion of the unique factors that influenced the inmate's decision to take his or her life.
- Identification of risk factors.
- Relevant clinical issues.
- Process and systems issues to include the functioning, interaction and integration of various organizational components.
- Adequacy of emergency response (in conjunction with the EMRC).
- Contributing findings and plan of action.

---

[1] Defined as self-harm incidents in which the severity is classified as "3" using the Center for Disease Control, Self-Directed Violence Surveillance classification system (Injury is severe, requiring intensive medical/surgical management coupled with intent to die).

13. Provide assistance and coordination for the activities of the visiting SMHP and DAI Suicide Case Reviewers. The SPRFIT coordinator shall:

- Share information and work closely with the SMHP and DAI Suicide Case Reviewers to ensure completeness and accuracy of reviews.
- Facilitate on-site reviews, including review of property, site and interview with staff members.
- Forward a written internal review to the SMHP and DAI assigned Suicide Case Reviewer no later than ten business days from the date of death.
- Provide support and coordinate review requests for the SMHP and DAI suicide case review process (reporting, gathering data, etc.).
- Coordinate the response to the suicide case review.

14. Maintain a High-Risk Management Program consistent with the Department's suicide prevention and risk evaluation policies and practices. It is intended to assist in identifying patients who may be at an increased risk for self-harm or death by suicide and to ensure mental health clinicians receive critical clinical information to adequately evaluate patients and provide additional interventions to address high-risk factors. The institution Suicide Prevention and Response LOP shall include a description of the High Risk Management Program that includes the following:

- Criteria for identifying high-risk patients.
- Procedures for monitoring high-risk patients.
- Procedures for distribution of the high-risk list, including to health care and custody staff.
- Procedures for managing patients who are high utilizers of higher levels of care.
- Additional clinical services provided to high-risk patients.
- Procedures for reviews of high-risk patients.
- Criteria and procedure for removal from the high-risk list.

15. Implement procedures to address potential risk for inmates who return from court after receiving verdicts or judgments or information concerning parole grants from the Board of Parole Hearings that could be distressing. The institution Suicide Prevention and Response LOP shall include procedures for:

- Identification of inmates who received "bad news."
- Screening and assessment of these inmates.
- Crisis intervention services to be provided, if needed.
- Clinical follow-up.

16. Provide inmates access to mental health services to obtain bereavement counseling and/or peer support to process grief and stress in the aftermath of a serious suicide attempt, or loss of a family member/significant other/peer. Services shall be available to

all inmates, regardless of participation in the Mental Health Services Delivery System (MHSDS). Services should be time-limited and focused on providing support to inmates who report experiencing grief over the loss. Services may include:

- Support groups.
- Individualized counseling.
- Enhanced clinician monitoring for elevated risk.
- Conjoint sessions with a chaplain.
- Placement into MHSDS or a higher level of care.

17. Ensure the SPRFIT coordinator attends the Inmate Advisory Council (IAC) and Inmate Family Council (IFC) meetings at least once every six months. The SPRFIT coordinator shall provide the IAC and the IFC with the following:

- Information on suicide prevention and Mental Health Program services and resources.
- Information regarding mental health referrals (inmate self-referral or family member referral).
- Information regarding warning signs for suicide.
- Suicide prevention pamphlets and posters for distribution.

18. Ensure suicide prevention related materials (e.g. pamphlets for inmates and families and posters) are disseminated on an ongoing basis.

19. Develop institution performance improvement plans when deficiencies or opportunities for improvement with regard to suicide prevention are identified. Performance improvement plans shall include specific action items, assigned responsible parties and due dates. Outcomes of performance improvement plans shall be monitored and tracked, and revisions made as needed.

Local Operating Procedures

Institutions shall revise their SPRFIT LOP to include the above requirements and responsibilities and ensure consistency with DHCS policies regarding suicide prevention and response by March 1, 2018. The institution's Suicide Prevention and Response LOP shall be updated at least annually and sent to the DHCS through the standard Quality Management process for review and approval.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.

Any custody related questions should be directed to the Mental Health Compliance Team, Division of Adult Institutions by email: DAI-MHCompliance@cdcr.ca.gov.

Any health care questions should be directed to the SMHP SPRFIT via email:

# MEMORANDUM

CDCR MHProgramSuicidePreventionandResponse@cdcr.

Attachments

cc: Brittany Brizendine, Psy.D.
    Angela Ponciano
    Amy Eargle, Ph.D.
    Laura Ceballos, Ph.D.
    Michael Golding, M.D.
    Edward Kaftarian, M.D.
    Kevin Kuich, M.D.
    John Rekart, Ph.D.
    James Vess, Ph.D.
    Shama Chaiken, Ph.D.
    Travis Williams, Psy.D.
    Jennifer Johnson
    Kathleen Allison
    Kelly Mitchell
    Dawn Lorey
    Marcie Flores
    Regional Mental Health Administrators
    Regional Health Care Executives
    Associate Directors, Division of Adult Institutions
    Regional Nurse Executives

## Suicide Prevention and Response Focused Improvement Teams Membership

The institution SPRFT membership shall include:

- SPRFIT Coordinator (Chairperson) or designee[1]
- Chief Psychiatrist or designee[2]
- Chief Psychologist or designee[2]
- Supervising Registered Nurse
- Senior Psychiatric Technician or Psychiatric Technician (preferably from the Administrative Segregation Unit, [ASU], Short-Term Restricted Housing Unit or the ASU Enhanced Outpatient Program Hub, if the institution has one)
- Correctional Health Services Administrator or designee[3]
- Inpatient Coordinator or designee
- Associate Warden Health Care Access or designee[4]

Additional SPRFIT membership may be included as appropriate and in accordance with the institution needs and mission. SPRFIT membership may also include, but is not limited to, the following classifications:

- Chief of Mental Health [5]
- Senior Psychiatrist
- Senior Psychologist
- Staff Psychiatrist (assigned to Mental Health Crisis Bed)
- Staff Psychologist (assigned to Mental Health Crisis Bed)
- Standards and Compliance Coordinator
- Litigation Coordinator
- Associate Warden
- Facility Captain
- ASU Lieutenant/Sergeant
- Reception Center Lieutenant/Sergeant
- Classification and Parole Representative
- Administrative/Clerical Support
- PC 2602 Coordinator

---

[1] Must be a Senior Psychologist, Specialist except at institutions without a Senior Psychologist, Specialist position. Designee's classification shall not be lower than a Senior Psychologist, Specialist except at institutions without a Senior Psychologist, Specialist position.

[2] Senior Psychiatrist/Senior Psychologist attendance shall meet quorum requirement in institutions without Chief Psychiatrist/Chief Psychologist positions. Designees shall not be at a level below a Senior Psychiatrist, Specialist or a Senior Psychologist, Specialist except at institutions without those positions. Attendance by the Chief of Mental Health shall satisfy the requirement for the Chief Psychologist or Chief Psychiatrist attendance, depending on classification of the CMH at the institution.

[3] As applicable.

[4] Designee must be a classification no lower than a Captain.

[5] If the Chief Psychologist or Chief Psychiatrist in attendance is not the Chief of Mental Health, the Chief of Mental Health is an optional member.

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date   :   September 1, 2017

To     :   Associate Directors, Division of Adult Institutions
           Wardens
           Regional Health Care Executives
           Chief Executive Officers
           Chiefs of Mental Health

Subject:   **ADDENDUM - REVISION OF MENTAL HEALTH CRISIS BED DISCHARGE CUSTODY CHECKS POLICY**

The memorandum titled, "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy," dated January 27, 2016, revised the Mental Health Services Delivery System (MHSDS) Program Guide, 2009 revision, and required 30-minute custody checks be conducted on inmate-patients discharged from a Mental Health Crisis Bed (MHCB) who were admitted for suicidal ideation, threats, or attempts.

Effective immediately, 30-minute custody checks shall be completed on all inmate-patients discharged from Alternative Housing when clinically indicated. This is consistent with the MHSDS Program Guide, 2009 revision, which authorizes custody checks on inmate-patients returned from Outpatient Housing Units (now identified as Alternative Housing).

If you have any custody-related questions, please contact Eric Hobbs, Captain, Mental Health Compliance Team, at (916) 324-7956 or Eric.Hobbs@cdcr.ca.gov. If you have any questions regarding mental health policies, please contact Robert Horon, Senior Psychologist, Specialist, Clinical Support, Division of Health Care Services, at (916) 691-6858 or Robert.Horon@cdcr.ca.gov.


KATHLEEN ALLISON                          KATHERINE TEBROCK, Esq.
Director                                  Deputy Director
Division of Adult Institutions            Statewide Mental Health Program


JANE ROBINSON
Deputy Director (A)
Statewide Chief Nurse Executive (A)
Nursing Services Branch

Attachments

cc:   Jeff Macomber      Eric Hobbs          Michael Golding
      Connie Gipson      Laura Ceballos      Robert Horon
      Kelly Mitchell     Amy Eargle          Marcie Flores
      Dawn Lorey         Angela Ponciano     Mental Health Regional Administrators

State of California                                           Department of Corrections and Rehabilitation

# Memorandum

Date  :   January 27, 2016

To    :   Associate Directors, Division of Adult Institutions
          Wardens
          Regional Health Care Executives
          Chief Executive Officers
          Chiefs of Mental Health

Subject :  **REVISION OF MENTAL HEALTH CRISIS BED DISCHARGE CUSTODY
           CHECKS POLICY**

In an effort to improve the continuity of clinical care for inmate-patients (IPs)
discharged from a Mental Health Crisis Bed (MHCB), several revisions to the
MHCB discharge process as outlined in the Mental Health Services Delivery
System (MHSDS) Program Guide (2009 Revision) are being implemented. The
following are staff responsibilities regarding IPs who have been discharged from a
MHCB to a general population housing or segregated housing unit:

## IP MHCB DISCHARGE TO GENERAL POPULATION HOUSING UNITS

Upon the discharge of an IP admitted to the MHCB for suicidality, the MHCB
discharging clinician shall initiate the newly created California Department of
Corrections and Rehabilitation (CDCR) MH-7497, *Mental Health Crisis Bed (MHCB)
Discharge Custody Check Sheet* prior to physical discharge. The discharging
clinician shall ensure the form is provided to transporting/escorting staff who will
deliver the form to the receiving institution's Central Control staff. Central Control
staff at the receiving institution shall document the IP's new housing information on
the form and ensure the form is sent with the IP to the housing unit.

Once the IP has physically arrived at the receiving housing unit, staff shall conduct
a personal observation within the housing unit on the IP every 30 minutes during
the initial 24 hours of placement. Housing unit staff shall document all custody
checks on the MHCB Discharge Custody Check Sheet using the observations
legend listed on the CDCR MH-7497. When IPs are released from the housing unit
to participate in programs outside of the housing unit, staff shall note the IP is "Out
to Program" on the MHCB Discharge Custody Check Sheet until his/her return to
the housing unit. Housing unit staff is not required to have the IP return to the
housing unit to conduct the MHCB discharge custody checks. When an IP returns
to the housing unit from program activities, housing unit staff shall note the arrival
time on the MHCB Discharge Custody Check Sheet, and continue the MHCB
discharge custody checks as directed above.

Associate Directors, Division of Adult Institutions
Wardens
Regional Health Care Executives
Chief Executive Officers
Chiefs of Mental Health
Page 2

Upon completion of the initial 24 hours after arriving to the unit, a mental health clinician shall report to the IP's housing unit, discuss the IP's observed behavior with custody staff, and conduct a confidential clinical evaluation with the IP. The evaluation will determine whether to continue or discontinue the MHCB discharge custody checks or refer the IP for admission back to an MHCB based upon suicide risk. The mental health clinician shall document this decision on the MHCB Discharge Custody Check Sheet. Should the checks be continued, a mental health clinician is required to reevaluate the IP every 24 hours until checks are discontinued. The custody checks shall not be extended beyond 72 hours after discharge from a MHCB. If an IP requires checks beyond 72 hours, the IP shall be readmitted to the MHCB. Institutions shall retain all original MHCB Discharge Custody Check Sheets for a minimum of three years at the institution, and additional four years in departmental records retention.

<u>Weekends and Holidays</u>

When MHCB discharge custody checks end on a weekend or holiday, a designated mental health clinician shall conduct the evaluation when available. If a mental health clinician is unavailable, the evaluation may be conducted by a psychiatric technician. The psychiatric technician will see the patient and contact the on call use of force mental health clinician for a decision regarding continuation of checks. The on call provider shall determine if the MHCB discharge custody checks may be discontinued and is responsible for documenting the basis of this decision on a progress note. The psychiatric technician shall document the continuation or discontinuation of checks on the MHCB Discharge Custody Check Sheet, noting the date, time, and name of on call provider consulted.

## IP MHCB DISCHARGE TO SEGREGATED HOUSING UNITS

On May 9, 2014, the California Department Corrections and Rehabilitation implemented the Security/Welfare Check Procedure in all Administrative Segregation, Condemned, Psychiatric Services, and Security Housing Units. This procedure directs staff to conduct a security/welfare check at staggered intervals on all inmates assigned to segregated housing units twice an hour (not to exceed 35 minutes between checks) during their entire length of stay. The implementation of the Security/Welfare Check Procedure has rendered the MHCB discharge custody checks redundant when the IP is discharged to a segregated housing unit.

With this revision to the MHCB discharge policy, segregated housing units that have implemented the Security/Welfare Check Procedure shall no longer conduct MHCB discharge custody checks of IPs solely due to discharge from an MHCB.

Associate Directors, Division of Adult Institutions
Wardens
Regional Health Care Executives
Chief Executive Officers
Chiefs of Mental Health
Page 3

The Security/Welfare Check by definition ensures custody staff is accounting for
IPs at established intervals. However, this revision does not apply to Segregated
Housing Units that do not conduct Security/Welfare Checks on all three watches.
Housing units meeting these criteria shall be required to log the MHCB discharge
custody checks as indicated above during times when the security/welfare checks
are not required per existing policy.

Please ensure all impacted Post Orders and local operating procedures (LOP) are
immediately updated to reflect these changes. The revision(s) may be included as a
supplement to be included in the next scheduled revision of the impacted
document. Additionally, each institution shall provide verification of completion to
your institution's LOP via memorandum to your respective Mission Associate
Director and a copy to Eric Hobbs, Correctional Lieutenant, Division of Adult
Institutions, Mental Health Compliance Team within 30 calendar days from
issuance of this memorandum.

If you have any custody related questions regarding this directive, please contact
Lieutenant Hobbs at (916) 322-1725.

KELLY HARRINGTON
Director
Division of Adult Institutions

KATHERINE TEBROCK
Deputy Director
Statewide Mental Health Program

CHERYL SCHUTT, RN, BSN
Statewide Chief Nurse Executive
Nursing Services
California Correctional Health Care Services

Attachments

cc: Kathleen Allison          Laura Ceballos
    Ralph M. Diaz             Amy Eargle
    Eric Hobbs                Marcie Flores

STATE OF CALIFORNIA

**Mental Health Crisis Bed (MHCB)**
**Discharge Custody Check Sheet**
CDCR MH-7497 (01/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Form: Page 1 of 2
Instructions: Page 3 and 4

| I. Discharging Information |
|---|

| Inmate Name: | CDCR #: | Date of Discharge from MHCB: |
|---|---|---|

Discharging LOC:          MHCB Discharging Institution:

MHCB Discharging Clinician:

| II. Receiving Institution Information |
|---|

Receiving Institution:          Assigned Housing Unit:

Date/Time of Arrival to Housing Unit:

| III. Clinical Evaluation |
|---|

*When MHCB discharge custody checks end on a weekend or holiday, a designated mental health clinician shall conduct the evaluation when available. If a mental health clinician is unavailable, the evaluation may be conducted by a psychiatric technician. The psychiatric technician will see the patient and contact the on call use of force mental health clinician for a decision regarding continuation of checks. The on call provider shall determine if the MHCB discharge custody checks may be discontinued and is responsible for documenting the basis of this decision on a progress note.

**Day 1 (Initial 24 Hours after Discharge from MHCB)**

Mental Health Clinician:                                Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician:                                 Date/Time of Evaluation:

Consulting MH Clinician:                               Date/Time of Consult:

☐ Discontinue Custody Checks

☐ Continue Custody Checks

☐ Refer to MHCB          Date and Time of Referral:

**Day 2**

Mental Health Clinician:                                Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician:                                 Date/Time of Evaluation:

Consulting MH Clinician:                               Date/Time of Consult:

☐ Discontinue Custody Checks

☐ Continue Custody Checks

☐ Refer to MHCB          Date and Time of Referral:

**Day 3**

Mental Health Clinician:                                Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician:                                 Date/Time of Evaluation:

Consulting MH Clinician:                               Date/Time of Consult:

☐ Discontinue Custody Checks

☐ Refer to MHCB          Date and Time of Referral:

**DISTRIBUTION - Copies: Health Records, Health Care Access Unit Captain**
**SCANNING LOCATION - Outpatient; MHNt/TxPln - Progress Note**

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
**Mental Health Crisis Bed (MHCB)**
**Discharge Custody Check Sheet**                                    Form: Page 2 of 2
CDCR MH-7497 (01/16)                                    Instructions: Page 3 and 4

| IV. Custody Checks |
|---|

Inmate Name: _____     CDCR #: _____     Assigned Housing Unit: _____

**Observation Legend:**

| | | |
|---|---|---|
| 1 - Arrival to Unit | 5 - In Cell - Talking to Cell Mate | 9 - Out to Program |
| 2 - In Cell-Sleeping/Laying Down | 6 - In Cell-Eating | 10 - Return from Program |
| 3 - In Cell Misc. | 7 - Day Room-Activities | 11 - Supervisor Review of MHCB Custody Discharge Checks |
| 4 - In Cell-Watching TV/Reading | 8 - Showering | 12 - Emergency |

| Date | Time | Observation | Print Name | Comments |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**DISTRIBUTION** - Copies: Health Records, Health Care Access Unit Captain
**SCANNING LOCATION - Outpatient;** MHNt/TxPln - Progress Note

STATE OF CALIFORNIA

**MENTAL HEALTH CRISIS BED (MHCB)**
**DISCHARGE CUSTODY CHECK SHEET**
CDCR MH-7497 (01/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**Instructions**

**Purpose of Form**: The **CDCR MH-7497 (8/15),** Mental Health Crisis Bed (MHCB) Discharge Custody Check is used for patients who were admitted to a MHCB for suicidality and have subsequently been discharged.  It is used to document the following:

1. All custody checks are being conducted at least every 30 minutes, ensuring the patient is not engaging in any self-injurious behavior.
2. Clinical evaluations should determine if the patient requires continued 30 minute checks or if custody checks can be discontinued.  If it is determined the patient cannot be safely removed from custody checks 72 hours after being discharged, he/she will be referred back to MHCB.

**I.   Discharging Information**
**This section is to be completed by a mental health clinician.**

1. Enter the patient's name
2. Enter the patient's CDCR number.
3. Enter the date of discharge from MHCB.
4. Enter the patients discharging level of care using the dropdown box.
5. Enter the institution from which the patient is being discharged.
6. Enter the name of the discharging clinician.

**II.   Receiving Institution Information**

1. Receiving Institution Section:  The discharging clinician shall enter the institution location to which the patient is being discharged.
   a) Once the receiving institution section is complete and the name of the receiving institution is entered, MHCB staff shall print the CDCR MH-7497 Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet and provide to transporting/escorting custody staff.  The CDCR MH-7497 Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet shall accompany the patient to the receiving institution and housing unit.
   b) Transporting/escorting staff shall provide the form to Central Control at the receiving institution wherein the assigned housing portion shall be completed by Central Control staff.
   c) Assigned Housing Unit: Central Control staff at the receiving institution shall write the patient's housing unit and cell number.
   d) Upon the patient's arrival into the unit, housing unit staff will write in the date and time.

**III.   Clinical Evaluation**
**This section is to be completed by Mental Health Clinician or Psychiatric Technician.**

1. On each day, check the relevant box that establishes if checks shall be discontinued, continued, or if the patient shall be referred to the MHCB.
2. Date, time, and sign in the section for each day.
3. Document clinical information regarding the patient encounter on the CDCR MH-7230-B, Interdisciplinary Progress Note - Five Day Follow-Up form. Supplemental information may be documented on a mental health progress note.
4. On day 3, if the clinician believes ongoing custody checks are required, the "refer to MHCB" box shall be checked and the patient referred to MHCB.

**IV.   Custody Checks**
**To be completed by custody staff conducting checks. One entry per check is required.**

1. Enter the patient's name
2. Enter the patient's CDCR #
3. Enter the patient's assigned housing unit
4. Date: Write date of each check conducted
5. Time: Write the time the check was conducted and do not write times in advance.
6. Observation: Write the number(s) from the legend best describing the behavior or activity that was observed during the check.

STATE OF CALIFORNIA                                                 DEPARTMENT OF CORRECTIONS AND REHABILITATION
**MENTAL HEALTH CRISIS BED (MHCB)**
**DISCHARGE CUSTODY CHECK SHEET**
CDCR MH-7497 (01/16)

7.  Print Name: Once the information is written in, the staff member conducting the custody check shall print his/her name legibly.

8.  Comments: Complete this section to provide any additional information that needs to be communicated to the mental health clinician or psychiatric technician. If based on what staff observes during the custody check, he/she believes the patient is a danger to self or others or is exhibiting unusual and/or bizarre behavior, custody staff shall immediately contact Mental Health Services and submit a CDCR 128-MH5 Mental Health Referral Chrono. This section shall be utilized to document the date and time the patient was referred to Mental Health Services. In the event an emergency occurs within or outside of the housing unit requiring custody staff to respond that prevents them from conducting the custody check, the date, time and nature of the emergency shall be documented in the comment section at the bottom of page two. In the event this occurs, custody staff shall resume the custody checks as soon as possible.

## V.  Additional Information

1.  When custody supervisors are conducting reviews of the form during tours of the unit, the custody supervisor shall fill in the date and time, and note the appropriate observation code. Once the information is filled in, the custody supervisor reviewing the form shall print and sign his/her name legibly.
2.  If at any time custody staff discovers the patient has not been evaluated by Mental Health Services within established timeframes, staff shall notify their custody supervisor, who will contact Mental Health Services.
3.  If the patients housing assignment changes, print the new housing unit information on page two of the form.
4.  When all the custody check information on page two has been filled in, initiate an additional page two of the form, print the patient's current information and continue documenting the custody checks. All additional pages printed to document the custody checks shall be kept together with page one of the form.



| | | |
|---|---|---|
| | DEPARTMENT OF CORRECTIONS AND REHABILITATION | **Number:** 16-02 |
| | | **Date Issued:** |
| | INFORMATIONAL BULLETIN | |
| | SUBJECT: ANNOUNCING THE RELEASE OF CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION FORM; CDCR MH-7497 (01/16), MENTAL HEALTH CRISIS BED (MHCB) DISCHARGE CUSTODY CHECK SHEET. | 1/26/16 |

The purpose of this Informational Bulletin (IB) is to announce the release of a California Department of Corrections and Rehabilitation (CDCR) form CDCR MH-7497 (01/16), Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet, by the Division of Health Care Services (DHCS) Mental Health Program. The form shall be used as directed, by DHCS staff to document the various requirements of the program.

Effective immediately, the form is available electronically in "fill and print" version accessible via the CDCR intranet at: http://intranet/Pro/dhcs/mentalhealth/Pages/New-QMforms.aspx  If intranet access is not available, the form can be ordered in print from California Prison Industry Authority (CALPIA), on Form CDCR 1853 (Rev. 07/07) Reproduction Order.

<u>New Form</u>

- **CDCR MH-7497 (01/16), Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet.** A four pages, single-sided form, on 8½"X11" white bond paper, with instructions at the back of the form, in sets of 167.

Please inform all persons concerned as to the contents of this IB and direct any inquiries to Christina Gritsch, Staff Services Analyst, Policy Support, Statewide Mental Health Program, Division of Health Care Services, at 916-691-0311 or via e-mail at Christina.Gritsch@cdcr.ca.gov.

*Original signed by:*


TIMOTHY M. LOCKWOOD, Chief
Regulation and Policy Management Branch
Division of Administrative Services

# APPENDIX C

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 5, 2022


Special Master Lopes
Pannone Lopes Deveraux and O'Gara LLC
Northwoods Office Park, Suite 215N
1201 Atwood Avenue
Johnston, RI 02919


<u>**VIA ELECTRONIC MAIL ONLY**</u>


Dear Special Master Lopes,

I write to provide notice, in accordance with the May 27, 2021 minute order, that a suicide prevention project reported on Defendants' August 1, 2022 Implementation Schedule (Docket No. 7596) has been delayed.  In the May 27, 2021, Minute Order, the Court ordered that Defendants shall "notify the Special Master immediately whenever a determination is made that a [suicide prevention] project will be delayed and, not later than ten days after notice is provided to the Special Master, to file an activation schedule updated to reflect the new projected completion date."  (Docket No. 7187.)  During the October 7, 2021 Status Conference, the Court granted Defendants' request to file an updated activation schedule on a monthly basis.  (Docket No. 7339.)   Defendants provide notice that Recommendation 17: Safety Planning (Field Notification and Training), is now estimated to be completed by February 28, 2023.

Feel free to contact me if you have any questions about the changes to the activation schedule.


Respectfully,


/s/ Dillon Hockerson

DILLON HOCKERSON
Attorney
Office of Legal Affairs