**The Fifth Re-Audit and Update of Suicide Prevention Practices
in the Prisons of the California Department of
Corrections and Rehabilitation
and
Baseline Audit of Suicide Prevention Practices
in the
Psychiatric Inpatient Programs**

Lindsay M. Hayes, M.S.
October 24, 2022

## I.     Introduction

This report is submitted as an update to this reviewer's preceding report, "The Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation [CDCR]" (ECF No. 6879-1, filed September 23, 2020).  The preceding report covered this reviewer's findings from a fourth re-audit of suicide prevention practices at 20 selected CDCR prisons.  That report recommended that prisons which chronically struggled with their suicide prevention programs, as well as almost all prisons that contained Mental Health Crisis Bed (MHCB) units, undergo continued re-inspection, and that the defendants continue to work with the Special Master and Suicide Prevention Management Workgroup (SPMW) on outstanding initiatives previously committed to by CDCR.

This report is the sixth overall audit of CDCR suicide prevention practices and covers this reviewer's recent re-audit at 23 selected CDCR prisons and an audit of the five psychiatric inpatient programs (PIPs).  The on-site re-audit began on May 24, 2021 and concluded on April 22, 2022.   The details and methodology of the re-audit/review process are discussed in Part II, below.  Part III summarizes the status of the defendants' Suicide Prevention Activation Schedules.  Part IV contains a summary of this reviewer's findings from the facility assessments during this fifth re-audit, including a summary of the initial recommendations contained in this reviewer's initial audit report and the accompanying report by the Special Master (ECF No. 5258, filed January 14, 2015).  When appropriate, necessary corrective actions are offered to accelerate the defendants' full compliance with the initial court-approved recommendation.  Part V summarizes the reviewer's baseline assessment of suicide prevention practices within the five PIPs conducted between May and October 2021.  Part VI covers this reviewer's conclusion and recommendations.  Lastly, Appendix A presents a prison-by-prison discussion of this reviewer's findings at each of the 23 re-audited prisons, together with summaries of CDCR Suicide Case Reviews of 42 inmate suicides in those prisons during the review period of January 2020 through April 2022.  The PIP suicide prevention assessments are found in Appendix B.

## II.     Methodology

This reviewer's selection of 23 CDCR prisons for on-site re-auditing was based on a variety of reasons, including their operation of MHCB units, findings during previous audit(s) that their suicide prevention practices were chronically problematic, having a significant population of inmates on the Mental Health Services Delivery System (MHSDS) caseload,

and/or the facility experiencing multiple inmate suicides.   As in the previous audits, with one exception, this reviewer's re-audit consisted of a two-day on-site examination of suicide prevention practices at each of the prisons.  The one exception was California State Prison, Sacramento, which necessitated a three-day on-site examination.

In addition, at the request of the Special Master, this reviewer conducted a baseline assessment of suicide prevention practices within CDCR's five PIPs.  These assessments, each consisting of between two to three-day on-site examinations, were conducted in conjunction with the Special Master's overall assessment of the delivery of mental health care in the PIPs.  The 23 audited prisons and five audited PIPs and the dates of their on-site assessments were:

1. California Medical Facility (CMF) PIP and Prison: May 24 – May 28, 2021
2. California State Prison, Sacramento (CSP/Sac): June 15 – June 17, 2021
3. Wasco State Prison (WSP): July 6 – July 7, 2021
4. California Correctional Institution (CCI): July 8 – July 9, 2021
5. California Health Care Facility (CHCF) PIP and Prison: July 8 – July 23, 2021
6. Richard J. Donovan Correctional Facility (RJD): August 11 – August 12, 2021
7. Salinas Valley State Prison (SVSP) PIP: August 23 – August 25, 2021
8. California Institution for Women (CIW) PIP and Prison: Sept. 13 – September 15, 2021
9. California Institution for Men (CIM): Sept. 16 – September 17, 2021
10. Central California Women's Facility (CCWF): October 13 – October 14, 2021
11. San Quentin State Prison (SQ) PIP and Prison: October 25 – October 27, 2021
12. California State Prison, Solano (CSP/Solano): October 28 – October 29, 2021
13. North Kern State Prison (NKSP): November 15 – November 16, 2021
14. Kern Valley State Prison (KVSP): November 17 – November 18, 2021
15. California Men's Colony (CMC): December 7 – December 8, 2021
16. California Substance Abuse Treatment Facility (CSATF): February 7 – February 8, 2022
17. California State Prison, Corcoran (CSP/Corcoran): February 9 – February 10, 2022
18. Mule Creek State Prison (MCSP): February 24 – February 25, 2022
19. Salinas Valley State Prison (SVSP): March 22 – March 23, 2022
20. Correctional Training Facility (CTF): March 24 – March 25, 2022
21. California State Prison, Los Angeles County (CSP/LAC): April 4 – April 5, 2022
22. Pleasant Valley State Prison (PVSP): April 6 – April 7, 2022
23. High Desert State Prison (HDSP): April 18 – April 19, 2022
24. Pelican Bay State Prison (PBSP): April 21 – April 22, 2022

At each prison site, this reviewer examined the facility's performance with the following suicide prevention measurement tools:

- Thoroughness and degree of privacy afforded during the intake screening process at all facilities, as well as the Reception Center (RC) process at three facilities
- Psychiatric technician (PT) practices in restrictive housing units
- MHCB practices, including verification of required observation of suicidal patients
- Use of suicide-resistant, retrofitted cells for MHCB patients and new-intake inmates assigned to administrative segregation units (ASU)
- Use of alternative housing for inmates awaiting transfer to MHCBs

- Suicide risk assessments for emergent/urgent mental health referrals and admittance/ discharge from an MHCB or alternative housing
- Safety planning for suicidal inmates/MHCB supervisory review of safety plans
- Appropriate follow-up services provided by clinical and custody staff to inmates discharged from an MHCB or alternative housing
- Custody rounds in restrictive housing units
- Emergency medical response equipment in housing units
- Compliance with cardiopulmonary resuscitation (CPR) and suicide prevention training
- Review of meeting minutes, quorums, and required procedures of the local Suicide Prevention and Response Focused Improvement Teams (SPRFITs)

At the PIPs, this reviewer assessed the defendants' compliance with its "Psychiatric Inpatient Program Treatment Planning and Procedures: Suicide Prevention and Response," policy (No. 12.11.2104.P1), effective December 31, 2020. The assessment included, but was not limited to, examination of suicide prevention training; assessment of suicide risk upon admission, during placement, and upon discharge; observation of suicidal patients; placement of suicidal patients in suicide-resistant rooms; provision of clothing commensurate with the level of suicide risk; provision of out-of-cell activities; and safety planning.

All suicides which occurred during the review period in the audited prisons were reviewed through examination of the patients' health care records via the Electronic Health Record System (EHRS), CDCR Suicide Reports, and Quality Improvement Plans (QIPs).

In addition, although there were no SPMWs scheduled during the review period, this reviewer participated in monthly Suicide Prevention Updates meetings in which Suicide Prevention and Response Unit (SPRU) leadership provided updates regarding implementation of the Suicide Prevention Activation Schedule. This reviewer and several other members of the *Coleman* Special Master team also attended weekly SPRU team meetings, monthly statewide SPRFIT meetings, periodic Inpatient Referral Unit (IRU) Suicide Prevention Workgroup meetings, as well as two CDCR Statewide Mental Health Program (SMHP) multiple-day Suicide Prevention Summits on October 27-29, 2020 and October 20-21, 2021. Finally, at the direction of the Special Master, this reviewer and other members of the *Coleman* Special Master team regularly participated in development and/or review of multiple CDCR suicide prevention-related policies, including, but not limited to, Safety Planning, Patients Receiving Bad News, Crisis Intervention Team (CIT), Suicide Risk Management Program (SRMP), Suicide Risk Mentoring Program (and Training), RC Suicide Prevention Reporting Expectations, MHCB Discharge Custody Checks, SPRFIT Reboot, Suicide Risk Assessment Revision, and the PIP Suicide Prevention Policy.

## III. Status of Defendants' Suicide Prevention Activation Schedule

The *Coleman* court issued an order adopting this reviewer's fourth re-audit report in full on December 3, 2020. ECF No. 6973. In that order, the court also addressed objections by the defendants regarding this reviewer's measurement of compliance with Suicide Precaution and Suicide Watch observation requirements, and the 90 percent and 100 percent compliance standards recommended by the Special Master for determining compliance with this reviewer's

recommendations. The court also addressed the defendants' request for additional guidance from this reviewer regarding the "data and metrics" used during the suicide prevention assessments. The court overruled defendants' objections, stating that this reviewer's "methodology is sound for the purposes of assessing whether defendants are in fact using the tools available to them to cure the longstanding failure to meet the *Program Guide* requirements for observation of suicidal inmates." ECF No. 6973 at 7. The court further held that its "adoption of the Special Master's recommendation concerning particular percentage compliance standards with respect to individual provisions of the remedy does not violate the requirements of 18 U.S.C., Section 3626 (A)(1)(a) by moving away from the requirement of the Eighth Amendment." *Id*. at 9. Finally, with regard to this reviewer providing additional guidance regarding data and metrics, the court found that the exit meetings after each site visit and the "detailed information provided in the report" provided defendants sufficient information to guide them "in the necessary remedial effort required before the start of [the] fifth round re-audit." *Id* at 10. The court also found that defendants had made no showing that persuaded the court to require a change in this reviewer's "well-established and transparent auditing practices." *Id*.

On December 24, 2020, the *Coleman* court issued an order directing defendants to complete the implementation of recommendations 1, 3, 6, 7, 8, 9, 10, 12, 13, 17, 18, 20, 21, 26, 28, 29, 31 and the remaining parts of 32, by the time of this reviewer's fifth re-audit. ECF No. 7004. The order further directed defendants to file proposed activation schedules for recommendations 12, 13, 17, and 21 on or before January 15, 2021 and to the extent feasible, by January 25, 2021 for the remaining recommendations. *Id* at 2.

In response to the court's order, on January 15, 2021, defendants filed the first in a series of "Defendants' Activation Schedules for Completion of Court-Ordered Suicide Prevention Recommendations," hereinafter referred to as "Suicide Prevention Activation Schedules," which included the activation schedules for all 18 suicide prevention recommendations remaining to be fully implemented. ECF No. 7024. Defendants reported the "planned complete" dates for full implementation of the remaining 18 recommendations would be incrementally scheduled between January 2021 and December 2021, with one exception related to the construction of new intake cells for ASUs, scheduled to be completed by March 30, 2022. *Id*. at 4.

In the "Parties' Second Joint Statement in Response to July 26 Order for Settlement Conferences" filed with the court on September 17, 2021, defendants stated that they were "currently *in compliance* (emphasis added) with all activation schedules, and regularly update[d] the Special Master and Court of any changes." ECF No. 7319 at 3.

On April 4, 2022, defendants filed their objections to the Special Master's Report on his Expert's Summary of Suicides from 2013-2020. ECF No. 7522. Defendants reported that as of March 30, 2022 they had *completed* all but five of the 29 recommendations, and that the work to complete those five was scheduled to be done by June 30, 2022. *Id*. at 3. However, in their Suicide Prevention Activation Schedules filed on May 31, 2022, (ECF No. 7562), defendants reported that implementation of Recommendation 17 (safety planning) would be completed by September 30, 2022, and Recommendation 31 (the SPRFIT Reboot) would be completed by December 30, 2022.

On September 3, 2020, the *Coleman* court ordered "that defendants must complete any and all remaining work so that Mr. Hayes can report full compliance in his fifth re-audit report." ECF No. 6846 at 5. The re-audit began in May 2021, as did the baseline assessment of suicide prevention practices in the five PIP programs.

As indicated in Table 1 and Table 2 below, findings from this fifth re-audit of suicide prevention practices are not encouraging – 15 of the 18 remaining recommendations have not been fully implemented. Table 1 lists each of the 18 "Suicide Prevention Recommendations Remaining to Be Fully Implemented," as well as a brief summary of their current status following completion of the fifth re-audit:

## TABLE 1

| Court-Ordered Recommendations | Implementation Status |
|---|---|
| Recommendation 1: Expand the length and content of the pre-service "Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e., including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices. | *Full implementation has been achieved; the expanded four-hour training curriculum, entitled "Inmate Suicide Prevention" Lesson Plan (Version 1.0), and 155-slide PowerPoint presentation was finalized and approved for instruction in December 2020. Implementation was achieved when this reviewer observed live presentation of the curriculum at the Basic Correctional Officers Academy (BCOA) via Teams in July 2022. See page 50 of this report for details.* |
| Recommendation 3: Ensure that all custody and health care staff receive both pre-service and annual suicide prevention training. | *Full implementation has not been achieved; there continue to be multiple audited facilities with disciplines (custody, medical, and mental health) under 90 percent compliance with annual suicide prevention training. See page 50 of this report for details.* |
| Recommendation 6: Intake screening should be conducted only in the nurse's office within an R&R unit. | *Full implementation has been achieved; the current review found that audited facilities conducted intake screening in the nurse's office within the R&R unit. See page 12 of this report for details.* |
| Recommendation 7: The nurse's office should be of sufficient size to conduct adequate intake screening and the door to the office (which should contain a large viewing window) should remain closed during the screening process. | *Full implementation has not been achieved; there continue to be multiple audited facilities in which nurse's office doors were not closed (or had open bars), and adequate screening was not accomplished because nurses did not always ask all 15 mental health/suicide risk questions on the Initial Health Screening form. See page 12 of this report for details.* |
| Recommendation 8: Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security | *Full implementation has not been achieved; there continue to be a few audited facilities in which intake nurses did not feel comfortable conducting intake screening without the presence* |

5

| **Court-Ordered Recommendations** | **Implementation Status** |
|---|---|
| classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality. | *of custody personnel and/or screening took place without adequate privacy and confidentiality for inmate. See page 12 of this report for details.* |
| <u>Recommendation 9</u>:  CDCR should revise its SRE Mentoring Program to eliminate its "graduation" component after completion of two adequate assessments, conduct ongoing mentoring throughout the year, and audit clinicians' SREs on a regularly scheduled basis. | *Full implementation has <u>not</u> been achieved; multiple audited facilities had compliance rates below 90 percent for both the seven-hour SRE training and SRE mentoring training See page 35 of this report for details.* |
| <u>Recommendation 10</u>:  Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis. | *Full implementation has <u>not</u> been achieved; completion of SRASHEs for inmates presenting as possible risk for suicide by expressing SI and/or engaging in SIB requires 100 percent compliance, and only one of the facilities was at 100 percent compliance. See page 35 of this report for more details.* |
| <u>Recommendation 12</u>:  CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72 hours of their housing in the unit) and the inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status). | *Full implementation has <u>not</u> been achieved; despite CDCR's incremental construction project for new retrofitted new intake cells during 2021-2022, at least two of the audited facilities reported, and this reviewer observed, an inadequate number of new intake cells. See pages 17-18 of this report for more details.* |
| <u>Recommendation 13</u>:  CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours. | *Full implementation has <u>not</u> been achieved; there continue to be a few audited facilities in which new intake cells were available, but custody staff had not appropriately relocated the inmates.  See pages 17-18 of this report for more details.* |
| <u>Recommendation 17</u>:  CDCR should adopt the recommendations made in connection with SREs (Recommendations 9 and 10) set forth above, which will also improve treatment planning contained in the SREs section above. | *Full implementation has <u>not</u> been achieved; the safety planning model is still being revised based upon prior problematic practices in plan development (with the new program now estimated to start by February 28, 2023), multiple audited facilities with MHCB units were under 90 percent compliance with safety planning completion at MHCB discharge, and few audited facilities conducted timely supervisory review of discharge safety plans. See page 40 of this report for more details.* |
| <u>Recommendation 18</u>:  CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment." | *Full implementation has <u>not</u> been achieved; although most of the audited facilities had compliance rates over 90 percent for safety planning intervention (SPI) training, the SPI model was problematic and is being replaced, thus a new training program is required. See page 41 of this report for more details.* |

| Court-Ordered Recommendations | Implementation Status |
|---|---|
| Recommendation 20: CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs. | *Full implementation has not been achieved; psych techs in several audited facilities did not accurately complete the Psych Tech Daily Rounds Form for MHSDS inmates and/or did not speak with non-caseload inmates during daily administrative segregation rounds. See page 15 of this report for more details.* |
| Recommendation 21: CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch. | *Full implementation has not been achieved; although CDCR developed an automated "Mental Health Observations Reporting Tool" designed to assist nursing supervisors in auditing the observation of suicidal patients in MHCB units, none of the audited facilities with MHCB units achieved the required 100 percent compliance with this measure. In addition, the current assessment found that several facilities were placing suicidal patients on non-suicide observation status at 30-minute intervals. See page 21 of this report for more details.* |
| Recommendation 26: Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed. | *Full implementation has been achieved; inmates housed in alternative housing in almost all of the audited facilities are provided a suicide-resistant bed and released within 24 hours. See page 19 of this report for more details.* |
| Recommendation 28: All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred. | *Full implementation has not been achieved; low compliance rates were found in almost all audited facilities regarding the custody personnel requirement to accurately complete Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form. See page 44 of this report for more details.* |
| Recommendation 29: The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan. No other frequency of observation should be authorized. | *Full implementation has not been achieved; low compliance rates were found in almost all audited facilities regarding mental health clinician requirement to accurately complete Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form. See page 44 of this report for more details.* |
| Recommendation 31: CDCR under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool. | *Full implementation has not been achieved; the SPRFIT process is still being "rebooted," with the new program estimated to start December 30, 2022. In addition, many audited facilities continue to have problems maintaining monthly meeting quorums, some facilities had either no SPRFIT local operation procedure (LOP) or LOPs that were inconsistent with the current SPRFIT memorandum, multiple facilities did not have LOPs addressing "Inmate-Patients* |

| Court-Ordered Recommendations | Implementation Status |
|---|---|
| | *Receiving Bad News" and the "Suicide Risk Management Program"(SRMP), as well as did not track SRMP patients and report their current statuses during monthly SPRFIT meetings minutes, most facilities did not conduct semi-annual root cause analyzes for serious suicide attempts (or case summaries to be discussed during monthly meetings), and most facilities did not review both the quality and clinical appropriateness of completed SRASHEs, and report findings in meeting minutes. See page 46 of this report for more details.* |
| Recommendation 32:  CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues: Privileges for Inmates in MHCBs, Continuous Quality Improvement, and Reception Centers. *See* ECF No. 6879 at 24-25 for specific discussion of remaining parts of this recommendation to be implemented. | *Full implementation has <u>not</u> been achieved; multiple audited facilities with MHCB units had problematic practices regarding <u>Privileges for Inmates in MHCBs</u>, ranged from MHCB patients not receiving out-of-cell activities due to their maximum-security custody status, misunderstanding/misinterpretation of COVID-19 quarantine directives, incorrect belief that patients could only receive out-of-cell activities when they were approved for "full issue" clothing, and clinical misuse of safety smocks (see page 27). Regarding <u>Continuous Quality Improvement</u>, this reviewer received the first draft of CDCR's "Suicide Prevention On-Site Audit Guidebook" on May 10, 2022 and it is currently being reviewed (see page 52). Finally, there were some problems in CDCR's three <u>Reception Centers</u> regarding diagnostic clinicians consistently reviewing nurses' Initial Health Screening forms and county jail records, as well SPRFIT coordinators at these facilities collecting data and assessing compliance with reception center responsibilities (see page 56).* |

Many of the recommendations in the Suicide Prevention Activation Schedules are marked as "ongoing" in the "Actual Completion Date" column.  Although the defendants have responded to each of the 18 remaining suicide prevention recommendations, and completed several notable construction projects (e.g., suicide-resistant new intake cells systemwide, installation of doors to intake nurses' offices at CCI, a small management yard adjacent to CCWF's MHCB unit, etc.), they have not yet fully implemented all of the recommendations nor sustained adequate suicide prevention practices.  It would be more appropriate to conclude that the 18 remaining suicide prevention recommendations remain in various stages of implementation.

## IV.    Summary of Suicide Prevention Practices in CDCR's Prison Facilities

Although the current reassessment again found continued progress at varied speeds, certain problematic practices continued to fester.  As indicated in Table 2 below, improvement continued to be found in the areas of PT rounds in restrictive housing units, use of suicide-resistant cells for newly admitted administrative segregation inmates, use of alternative housing, suicide-resistant MHCBs, and local SPRFITs maintaining LOPs for "Inmate-Patients Receiving Bad News."

In the areas related to initial health screening, and completion of Suicide Risk Assessment and Self-Harm Evaluations (SRASHEs) for emergent/urgent mental health referrals related to suicide risk, there were varying degrees of progress. Although some facilities corrected previous deficiencies related to the provision of reasonable privacy and confidentiality with Receiving and Release (R&R) units, others regressed, with nursing staff observed to not be thoroughly completing the intake screening process. And although most emergent mental health referrals for suicidal behavior resulted in completion of SRASHEs, the same was not always true for urgent referrals. Results also continued to be mixed for areas related to clinically-ordered privileges (out-of-cell activities) for MHCB patients and local SPRFIT policies and practices, whereas significant problems remained related to completion of "Discharge Custody Check Sheet" (CDCR MH-7497) forms by clinical and custody personnel for patients discharged from MHCBs and alternative housing. The review found little improvement with nursing staff adequately observing suicidal patients in MHCBs, however, it was anticipated that a new automated "Mental Health Observations Reporting Tool" would provide nursing supervisors with a more efficient mechanism to monitor the observation of suicidal patients, resulting in higher compliance rates in the future. There also continued to be problems associated with reviewing relevant documents by diagnostic clinicians during the RC process.

Finally, all 22 audited facilities with activated restrictive housing units had compliance rates well over 90 percent for 30-minute custody checks in those units via Guard One, but these high compliance rates were diminished by the fact that five inmates who committed suicide in restrictive housing units during the review period were found to be in various states of rigor mortis or there were irregularities in the required custody checks at the time of death. High rates of compliance continued to be found in CPR training of custody and medical staff, as well as the presence of emergency response equipment in inspected housing units. Although the adequacy of safety planning for patients discharged from MHCBs was not formally reviewed during the fifth re-audit because the process is currently being revised, all but one audited facility had compliance rates well over 90 percent for clinicians trained in safety planning. This reviewer and other members of the Special Master's team continued to view the suicide case review process as being very comprehensive.

Consistent with previous suicide prevention assessment reports, the following report provides: (1) a brief summary of each of the main suicide prevention measurement tools and their relationship to this reviewer's original 29 recommendations, (2) current findings related to the implementation status of the remaining 18 recommendations and the reassessment of the 23 audited CDCR facilities, and, (3) any further recommendations to remedy outstanding deficiencies.

**TABLE 2: Suicide Prevention Measure Compliance Rate Comparison Table**[12]

|  | Suicide Prevention Measure | Fifth Re-Audit Compliance Rate | Fourth Re-Audit Compliance Rate |
|---|---|---|---|
| **(A)** | Initial health screening and receiving and release unit environment (Page 12) | 78% (18 of 23) | 75% (15 of 20) |
| **(B)** | Psychiatric technician (PT) practices (Page 14) | 86% (19 of 22) | 75% (15 of 20) |
| **(C)** | Suicide-resistant MHCBs (Page 15) | 95% (19 of 20) | 94% (17 of 18) |
| **(D)** | Use of suicide-resistant cells for newly admitted inmates in administrative segregation units (Page 17) | 82% (18 of 22) | 65% (13 of 20) |
| **(E)** | Use of alternative housing for suicidal inmates (Page 19) | 96% (22 of 23) | 85% (17 of 20) |
| **(F)** | Practices for Observing MHCB Patients (Page 20) | 15% (3 of 20) | 33% (6 of 18) |
| **(G)** | MHCB practices for possessions and privileges (Page 26) | 53% (10 of 19) | 67% (12 of 18) |
| **(H)** | 30-minute welfare checks in restrictive housing units (Page 32) | 95% (21 of 22)[3] | 100% (20 of 20) |
| **(I)** | Mental health referrals and suicide risk evaluations (Page 33) | 61% (14 of 23) | 65% (13 of 20) |
| **(I)** | SRE training (Page 33) | 65% (15 of 23) | 45% (9 of 20 – both seven-hour and mentoring training) |
| **(J)** | Safety planning for suicidal inmates (Page 39) | Not reviewed | 11% (2 of 18) |

[1]Of note, Section F (Practices for Observing Suicidal Patients) and Section I (Mental Health Referrals and Suicide Risk Evaluations) requires 100 percent compliance; whereas all other sections require a minimum of 90 percent compliance.

[2]Of note, the denominator in columns may vary depending upon on-site findings, e.g., 20 of 23 audited facilities had MHCBs, with two MHCB units closed and/or not containing patients during the on-site assessment; ASU temporarily closed, etc.

[3]This high rate of compliance was diminished by the fact that three facilities experienced five inmate suicides in administrative segregation during 2020-2022 in which decedents were either found in rigor mortis or irregularities were found in timely Guard One checks at time of death.

| | Suicide Prevention Measure | Fifth Re-Audit Compliance Rate | Fourth Re-Audit Compliance Rate |
|---|---|---|---|
| **(J)** | Safety planning training (Page 39) | 96% (22 of 23) | 45% (9 of 20) |
| **(K)** | MHCB and alternative housing and efficacy of five-day clinical follow-up and custody welfare checks (Page 43) | 9% (2 of 23) | 5% (1 of 20) |
| **(L)** | Quorums at SPRFIT meetings (Page 45) | 26% (6 of 23) | 40% (8 of 20) |
| **(L)** | Local operating procedures for SPRFITs (Page 45) | 87% (20 of 23) | 70% (14 of 20) |
| **(L)** | Local SPRFIT had a Suicide Risk Management Program policy (Page 45) | 61% (14 of 23) | 55% (11 of 20) |
| **(L)** | Local SPRFIT had a policy for identifying inmates who received "bad news." (Page 45) | 70% (16 of 23) | 5% (1 of 20) |
| **(M)** | Suicide prevention training (Page 49) | 70% (16 of 23 – custody) 65% (15 of 23 – medical) 78% (18 of 23 – mental health) | 100% (20 of 20 – custody) 63% (12 of 19 – medical) 79% (15 of 19 – mental health) |
| | Emergency medical response equipment in housing units (see facility assessments in Appendix) | 100% (23 of 23) | 100% (20 of 20) |
| | Cardiopulmonary resuscitation (CPR) training (see facility assessments in Appendix) | 96% (custody) 100% (medical) | 100% (custody) 100% (medical) |
| **(N)** | Continuous Quality Improvement (CQI) (Page 51) | Not all 19 suicide prevention measures included in either CQI Guidebook or facility CQI audit reports. | Not all 19 suicide prevention measures included in either CQI Guidebook or facility CQI audit reports |
| **(O)** | Suicide case reviews (Page 53) | Comprehensive | Comprehensive |
| **(P)** | Reception center suicides (Page 55) | Review of relevant documents remains problematic. | Reasonable access and review of relevant documents remains problematic. |

**A)     Initial Health Screening and Receiving and Release Unit Environment**

**Summary:**

The original recommendations (see previous <u>Recommendations 6-8</u>) focused upon two areas of intake screening in R&R units: (1) the adequacy of the intake screening form and ensuring that all questions were asked during the process, and, (2) the adequacy of inmate privacy and confidentiality during the process. The issue of intake screening form adequacy was related to the presence of certain compound questions on the form, as well as the thoroughness of form completion by nursing staff. The issue of privacy and confidentiality was related to the practice of the door to the nurse's office remaining open during the screening process and/or officers stationed inside the office or at the door. In the preceding (fourth re-audit) assessment, 75 percent (15 of 20) of audited facilities had adequate intake screening practices in their R&R units, with problems found at CCI, CMC, CMF, and SQ.

In addition, based upon a concern that inmates were at higher risk for suicide in close proximity to receiving "bad news" during a recent court hearing, the Initial Health Screening form embedded in the EHRS was slightly revised in January 2021 to include the following additional question: "Did the patient receive any bad and/or unexpected news during a recent court hearing?" This question was required to be asked of <u>all</u> newly admitted inmates during the intake screening process.

**Current Findings:**

Problems associated with accurate completion of the Initial Health Screening form and ensuring reasonable privacy and confidentiality during the process have not been resolved. Although intake screening was consistently conducted inside the nurse's office (Recommendation 6), problems continued to be found with accurate completion of all 15 mental health/suicide risk inquiry questions on the form (Recommendation 7), and not always providing reasonable privacy and confidentiality (Recommendation 8). During the current assessment, issues were resolved at CMC, CMF and SQ, but problems continued to be found at CCI, as well as four other facilities (CSP/Sac, NKSP, PBSP, and WSP). For example, although deficiencies in providing reasonable privacy and confidentiality had been corrected at CCI, the process remained inadequate because the nurse was observed to be not addressing all 15 mental health/suicide risk questions on the Initial Health Screening form, including "Did the patient receive any bad and/or unexpected news during a recent court hearing? and mental status examination ("Disoriented to time, place, or person").

At both NKSP and WSP, the two CDCR RCs for male inmates, additional nursing stations were developed to address the influx of additional new inmates following the closure of two other RCs (at CIM and SQ). At NKSP, due to a current Health Care Facility Improvement Program (HCFIP) "Reception Center Health Care Processing Renovation" project, intake screening had been temporarily relocated to three separate nursing stations in the building. Although each intake nurse at NKSP was observed to be asking all of the questions on the Initial Health Screening form and correctly entered the information into the EHRS, problematic practices in each of these three nursing stations are summarized as follows:

<u>Station 1</u> was an L-shaped room in the back right-hand corner of the building. There were several desks in the room, and this reviewer was informed that it was possible for up to two inmates to be screened in the room at the same time. One of the desks was situated in the back corner of the room, with no line-of-sight to the outer door. There were no custody officers situated in the area of the outer door and, even if posted outside the door, an officer would not have any visibility to the second desk. A mirror situated in the corner of the room provided no assistance in visibility because it was directed toward the outer door, not to the nurse's desk. A cloth partition was situated on one side of the inmate's chair, also obstructing visibility. The purpose of this partition was unclear. In addition, a noise-canceling machine in the room was of little use in providing privacy and/or confidentiality.

<u>Station 2</u> was located in a converted holding cell (No. 17) on the opposite side of the building. The cell contained two desks, one chair for an inmate, and two therapeutic treatment modules (TTMs). This reviewer was informed that only one inmate was screened at a time. In the intake screening observed by this reviewer, the inmate was handcuffed and situated in a chair, with an officer standing behind him. Following the screening, this reviewer interviewed the nurse and asked whether it was common practice for an officer to remain in the cell during the intake screening process. The nurse responded that an officer only remained in the cell when nursing staff were screening a maximum-security inmate. The nurse also stated that custody officers did not consistently provide security presence outside of the cell when non-maximum-security inmates were screened. When asked if the TTMs were ever utilized by nursing staff for the screening of maximum-security inmates, the nurse responded – "No" – TTMs were *only* utilized by mental health clinicians when they responded to the R&R unit for an emergency consultation. It remained unclear why these TTMs could not be utilized by nursing staff and thus provide both privacy and confidentiality while custody officers remained outside the holding cell.

<u>Station 3</u>, commonly referred to by staff as either the "shack" or "hut," was located outside the back of building in the sally port area. This structure resembled a residential shed and had been operational for approximately one week. The room contained a desk and two chairs. During an intake screening observed by this reviewer, the door to the structure was open and no custody officers were in the area. Following the screening, this reviewer asked the nurse if they felt comfortable being alone without any custody officers. The nurse responded by stating she had already informed her supervisors that she would refuse to conduct any intake screening in this area when it was dark outside.

Finally, multiple nurses confided to this reviewer that there were concerns about their safety when custody personnel were not consistently posted in these station areas. The above findings regarding privacy, confidentiality, and staff safety were subsequently presented to both nursing and custody leadership at NKSP.

At WSP, three nursing stations were located in the R&R Unit.  Station 1 was located in the originally designated nurse's office.  That nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering information in the EHRS. The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality.  Subsequent to the fourth re-audit report, two other nurses' stations (referred here as Station 2 and Station 3) had been converted from holding cells adjacent to the nurse's office.  There were concerning practices in both of these converted nursing stations. First, the nurse in Station 2 was observed not asking "Did the patient receive any bad and/or unexpected news during a recent court hearing?" to any newly admitted inmate. When subsequently asked why this question was omitted, the nurse informed this reviewer that they felt the question was repetitive with another "bad news" question on the form, and they only asked this second question if custody personnel presented them with a copy of the "bus schedule" which listed all current inmates returning from court.  Such an explanation was contrary to the directive that all questions on the Initial Health Screening form were required to be asked and staff were not to utilize discretion in asking some questions and not others.  In addition, this nurse's response simply ignored the fact that almost all inmates being admitted into WSP were RC inmates being admitted from county jails and, therefore, conceivably might have received potentially "bad news" from court prior to their arrival.  Second, Station 3 which contained open cell bars, was located adjacent to an existing holding cell containing inmates.  Although there was a cloth privacy partition between Station 3 and the holding cell that obstructed visibility, it was later determined that the nursing screening could be easily heard by an inmate in the adjacent holding cell.

At PBSP, a nurse was observed to only be asking a few of the 15 mental health/suicide risk areas of inquiry.  Instead of completing all areas of inquiry, the nurse simply asked the inmate if they were "currently suicidal?" and "ever attempted suicide?"  With regard to the final line of inquiry on the form that stated, "Did the patient receive any bad and/or unexpected news during a recent court hearing?" the nurse was observed telling the inmate that "you didn't go to court, so no need to ask that question."  This reviewer subsequently spoke with the registered nurse (RN) and corrected the misconception that this question was optional.  Similarly, at CSP/Sac, the intake nurse was also observed failing to ask inmates if they had received any bad and/or unexpected news during a recent court hearing.

In conclusion, only 78 percent (18 of 23) of audited facilities had adequate intake screening practices in their R&R units, a comparable level of compliance that was found during the previous assessment.

**Recommendation**:

CDCR should develop CAPs for the five facilities (CCI, CSP/Sac, NKSP, PBSP, and WSP) referenced above.

B)      **Psych Tech Practices**

**Summary**:

According to the MHSDS *Program Guide* (*Program Guide*), PTs are required to conduct daily rounds in all ASUs and weekly rounds in Security Housing Units (SHUs)/Psychiatric Services Units (PSUs) "to attend to the mental health needs of all inmates, with documentation of their observations for each MHSDS inmate recorded on a Psych Tech Daily Rounds Form" (at page 12-7-5). This reviewer's previous audits found inconsistent and problematic PT rounding in these units, primarily related perfunctory rounds with little interaction with caseload inmates (see previous Recommendation 20). In the preceding (fourth re-audit) assessment, 75 percent (15 of 20) of the audited facilities had adequate PT practices.

**Current Findings**:

The current assessment found that 86 percent (19 of 22) of the audited facilities had adequate PT rounding practices in their restrictive housing units. Three facilities (CIM, CSATF, and SQ) were found to have deficiencies. At both CIM and CSATF, although the observed PTs appeared very personable and spoke with each caseload and non-caseload inmate, they did not ask each caseload inmate if they were currently suicidal. At SQ, although the observed PT was correctly entering information from the Psych Tech Daily Rounds Form into the EHRS for all caseload inmates, as well as offering various handouts (sudoku puzzles, etc.) and books from the unit's book cart to all caseload inmates, they ignored all other (non-caseload) inmates in the unit and only offered a quick "good morning" response to those inmates standing at the cell front.

**Recommendation**:

CDCR should develop CAPs for the three facilities (CIM, CSATF, and SQ) referenced above to correct PT deficiencies in their restrictive housing units.

C)      **Suicide-Resistant MHCBs**

**Summary**:

Previous audits found that, although most MHCBs were suicide-resistant, some were not (see previous Recommendation 32). Problems found in several MHCB units included rooms with square-shaped stainless-steel sinks protruding from the wall which could be used as attachment points for a noose and thus were conducive to suicide attempts by hanging. Other hazards included some rooms containing wall ventilation grates with holes that were larger than the industry standard 3/16-inch diameter, allowing for the possibility of being conducive to suicide attempts by hanging, as well as rooms with small gaps between the wall and window frame. Previous assessments and subsequent court orders accelerated CDCR's efforts to fix non-suicide-resistant MHCB units at both CIM and CSP/Corcoran. Renovation projects in both facilities were successfully completed during 2018. In addition, a previously unidentified deficiency of wall and ceiling ventilation grates in each MHCB room at PBSP was corrected by

CDCR in January 2019 and this reviewer's subsequent inspection of the MHCB unit in December 2019 found that each MHCB room at PBSP was suicide-resistant.

Further, one of the 12 MHCBs at CCWF, the designated observation room, had been inoperable and off-line for repair for several years. Although designated as a licensed MHCB, this large room contained many protrusions including window bars, shower hoses attached to the wall, a blind spot to the shower area, etc. that deemed it to be non-suicide-resistant. A planned renovation project to correct deficiencies in the designated observation room, as well create enhancements to the other MHCBs, had not commenced as of September 2020. In sum, 94 percent (17 of 18) of the audited facilities that had a MHCB unit contained suicide-resistant patient rooms during the preceding (fourth re-audit) assessment.

**Current Findings**:

With the exception of CCWF, 95 percent (19 of 20) of audited facilities that had a MHCB unit continued to contain suicide-resistant patient rooms during the current assessment. In November 2021, the MHCB unit at CCWF was closed for renovation, including repair of the designated observation room. According to the work plan made available to this reviewer, the renovation would include "modification of 10 cells in the B Wing of Building 805 to include epoxy flooring, anti-ligature toilets, ADA [Americans with Disabilities Act] compliant anti-ligature sinks, anti-ligature handrails, modify combi-unit to anti-ligature, updated cell doors, updated security lights, updated electrical cover plates, updated fire sprinkler heads, updated cell window screens, and no-pick caulking." The project was tentatively scheduled to be completed by June 30, 2022.

However, there continued to be other problematic issues within the MHCB unit at CCWF that remained unresolved from previous assessments. For example, MHCB patients on maximum-security/administrative segregation status, including unclassified RC patients, continued to be prohibited from leaving their cell for yard and other program activities, including meeting in a private and confidential setting with clinicians. Yard privileges were not offered to MHCB patients on maximum-security status because it required their escort to the ASU (Building 504). Although this reviewer had historically been informed during previous assessments that a "side yard" attached to the B Wing of Building 805 was being considered, or a "Restart Chair" would be installed in the multi-purpose program room of the building, such promises remained unfulfilled for these such patients. Construction on a small management yard for maximum-security MHCB patients was initiated in July 2021. As observed by this reviewer in October 2021, construction remained in the early stages, and CDCR has revised its Suicide Prevention Activation Schedules on multiple occasions, most recently on May 31, 2022 (ECF 7562), to indicate that the small management yard would be activated on June 30, 2022.

During the October 2021 onsite assessment at CCWF, this reviewer observed that a small TTM had been installed in B Wing's multi-purpose program room to address the deficiency of MHCB patients on maximum-security status not having access to out-of-cell activities in the room. The program room was designed for a variety of activities, including interdisciplinary treatment team (IDTT) meetings, group activities, and opportunity for telephone calls (for both medical and MHCB patients). However, according to several clinicians who were interviewed,

although specifically intended for one-on-one clinical sessions with maximum-security patients, the TTM was rarely utilized because of the other activities cited above.  As a result, this reviewer was informed that *all clinical contacts with maximum-security MHCB patients either occurred cell-front or in a scenario in which the patient's door was opened and the patient was handcuffed and instructed to sit on their bed, with the clinician and officer standing in the open doorway of the cell.*

The above practice was obviously very problematic and this reviewer informed CCWF leadership that such a practice needed immediate correction.  More than eight months later in May 2022, this reviewer was informed that an additional renovation project was in the early stage of development and an architect was tasked with presenting a preliminary plan for renovation by September 15, 2022.

**Recommendation**:

The current CCWF practice of allowing all clinical contacts with maximum-security MHCB patients to either occur cell-front or in a scenario in which the patient's door is opened, the patient is handcuffed and instructed to sit on their bed, with the clinician and officer standing in the open doorway of the cell, remains unacceptable.  CDCR and CCWF should develop an interim solution that could be implemented immediately while awaiting completion of a renovation project that still remains in the preliminary planning stage.  Conversion of the large observation room into a program room for maximum-security MHCB patients, to include a TTM, would be a reasonable solution.


D)      **Use of Suicide-Resistant Cells for Newly-Admitted Inmates in Administrative Segregation Units**

**Summary**:

Pursuant to CDCR policy, all inmates initially placed in administrative segregation in single-cells are required to be placed in cells that have been retrofitted to be suicide-resistant for the first 72 hours.  This reviewer's previous audits found several problems regarding the housing of newly-admitted inmates in administrative segregation.  Original recommendations (see previous Recommendations 12-13) offered to address these deficiencies included ensuring there were a sufficient number of suicide-resistant retrofitted cells to house newly-admitted inmates and enforcing existing policy requirements of only housing newly-admitted inmates in retrofitted cells (and re-housing other inmates into other cells).  In the preceding (fourth re-audit) assessment, only 65 percent (13 of 20) of the audited facilities were found to have adequate practices for placing new intake inmates in suicide-resistant cells.

**Current Findings**:

On January 10, 2020, the Governor's Proposed Budget Summary for 2020-2021 included a "$3.8 million one-time General Fund to retrofit 64 intake cells across the state to provide a

safer environment for inmates entering segregated housing" (at page 139).[4]  CDCR subsequently received funding for the project, entitled "Governance of Compliance with Intake Cell Usage." Construction for the new intake cells began in May 2021 and was delayed for various reasons, including the impact of the COVID-19 pandemic.  According to defendants' May 31, 2022 Suicide Prevention Activation Schedules, the construction and tracking project was completed on April 27, 2022.

Despite the continued reduction in the overall administrative segregation census population statewide, as well as incremental construction of retrofitted new intake cells during 2021-2022, this reviewer continued to find deficient practices in the placement of inmates into new intake cells.  During this current assessment, 82 percent (18 of 22) of the audited facilities were found to have adequate practices, an improvement from 65 percent in the previous assessment.  Problems found in four facilities (CCI, CMF, CSATF, and CSP/LAC) included inmates placed in unsafe cells because all new intake cells were occupied; in other cases, new intake cells were available, but custody staff had not appropriately relocated the inmates.  At CCI, all of the three intake cells were full during the last day of the on-site assessment, and a fourth new intake inmate was scheduled to be placed in the unit in a non-new intake cell later that day.  At CMF, this reviewer was informed by correctional officers in both ASUs that new intake inmates exceeded the capacity for the four currently available new intake cells on a regular basis.

At CSATF, all ten new intake cells in the Short-Term Restricted Housing (STRH) unit were full and, upon inspection, all of the inmates housed in these cells were beyond their initial 72-hour new intake status.  There was one new intake inmate confined to a wheelchair who was not housed in either a new intake cell or an ADA compliant cell.  In addition, this reviewer was informed that new intake inmates who could not be housed in new intake cells within the STRH unit were transferred to the administrative segregation "overflow" cells located in E-Yard, Building 1.  This reviewer subsequently inspected the designated overflow cells in E-1 and found that three new intake inmates were housed in the cells and none of the cells were suicide-resistant.  Although the cells had retrofitted ventilation grates, each cell had gaps between the wall and the bunks, horizontal brackets that attached the stools to the walls, and gaps between the desktops and the walls.  These hazards were easily conducive to suicide attempts by hanging.

At CSP/LAC, there were 12 new intake cells in the STRH unit and seven new intake cells in the Enhanced Outpatient Program (EOP) ASU that had been previously retrofitted to be suicide-resistant.  During inspection of both units, this reviewer observed that two new intake inmates housed in the EOP ASU were not in new intake cells as required.  The supervisor in the unit stated that new intake inmates were placed in unsafe, non-new intake cells on almost a weekly basis.  CSP/LAC had not been scheduled for construction of any new intake cells.  In addition, this reviewer was informed that the STRH unit would be temporarily closed in late April 2022 due to a shortage of custody personnel.

---

[4] See http://www.ebudget.ca.gov/budget/2020-21/#/BudgetSummary

**Recommendation**:

Similar to the previous assessments, CDCR should develop CAPs in CCI, CMF, CSATF, and CSP/LAC to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in suicide-resistant new intake cells for the first 72 hours of administrative segregation confinement. Some of the CAPs will again involve creating additional retrofitted new intake cells, particularly in the EOP ASU at CSP/LAC where new intake inmates were placed in unsafe, non-new intake cells on almost a weekly basis and the facility had not been a recipient of any new intake cells during the current "Governance of Compliance with Intake Cell Usage" project.

### E)    Use of "Alternative Housing" for Suicidal Inmates

**Summary**:

According to the *Program Guide*, an inmate who meets the criteria for MHCB admission is required to be transferred to a crisis bed within 24 hours of referral. In the interim, as well as in those cases in which physical transfer does not occur within that timeframe, the inmate is required to be placed in "Alternative Housing." The most recent policy enacted following issuance of the *Program Guide* relevant to Alternative Housing is Policy 12.05.301 ("Housing of Patients Pending Mental Health Crisis Bed Transfer"), revised February 2020. The policy listed the following preferred locations for housing suicidal inmates pending transfer to an MHCB: Correctional Treatment Center (CTC) licensed medical beds, Outpatient Housing Unit (OHU), OHU overflow cells, large holding cells with toilets, large holding cells without toilets, Triage and Treatment Area (TTA) or other clinic exam room, and other housing where complete and constant visibility can be maintained. Previous assessments found that suicidal inmates placed in alternative housing were often housed in hazardous, unsafe cells, not always observed on a continuous basis, and housed for more than 24 hours without a suicide-resistant bed and mattress (see previous Recommendation 26). During the preceding (fourth re-audit) assessment, 85 percent (17 of 20) of the audited facilities were found to have adequate practices regarding the use of alternative housing for suicidal inmates.

**Current Findings**:

With the exception of problematic provider orders for both observation level and clothing issuance for suicidal inmates in one facility (CTF), all of the other 22 (96 percent) audited facilities had adequate practices in this area. CTF had a 21-bed OHU/Infirmary with four cells designated as Alternative Housing to temporarily house suicidal inmates awaiting MHCB placement. Each of these cells were previously found by this reviewer to be extremely dangerous, with ventilation grates that had not been retrofitted, exposed open-faced cell bars, and in at least one room, a handicap railing that could easily be used in a suicide attempt by hanging. Review of CTF's "Operational Procedure No. 402: Suicide Prevention," revised September 2021, found both confusing and incorrect procedures regarding observation of suicidal inmates on alternative housing status. For example, despite a statewide directive requiring suicidal inmates on alternative housing status to be clothed in a safety smock and receive continuous, direct visual observation, CTF's "Operational Procedure No. 402: Suicide Prevention" contained

19

narrative that allowed for flexibility, stating that "MH Patient Issue order shall be placed to determine what clothing, bedding and personal items, if any, the patient is allowed to have within the AHA (Alternative Housing Area) observation cells" (at page 9).

In addition, the CTF local operating procedure (LOP) contained sections on both Suicide Watch and Suicide Precaution status despite the fact that Suicide Precaution status was prohibited for suicidal inmates in alternative housing.  Further, the CTF LOP allowed for the downgrading of patients from Suicide Watch to Suicide Precaution status, stating "As the patient begins to make progress and is determined to be no longer actively suicidal, Suicide Watch may be discontinued and the patient may be placed on Suicide Precaution; however, direct visual observation of the patient will be continued per AHA policy" (on pages 12-13).  The LOP also allowed for "partial issue" clothing, and several reviewed cases indicated that clinicians allowed patients in alternative housing for suicidal ideation (SI) to "have shorts, shirt…"  Finally, the CTF LOP also allowed for one nursing staff member to observe up to two suicidal patients at a time if the patients are in adjoining cells.  Given the configuration of the four designated cells in the OHU/Infirmary, in which the cells are situated behind a glass wall and nursing staff are stationed outside in the corridor, it would be challenging for one person to consistently maintain continuous, direct visual observation on two suicidal patients (i.e., a 1:2 ratio).

**Recommendation**:

CDCR should develop a CAP at CTF that includes revision of its LOP on suicide prevention to eliminate the option for Suicide Precaution status and, given the physical hazards in the cells, eliminate any clothing option other than a safety smock while inmates are housed on alternative housing status.  In addition, given the configuration of CTF's OHU/Infirmary, only continuous, direct 1:1 observation should be permitted.


F)      **Practices for Observing MHCB Patients**

**Summary**:

Historically, two issues have been encountered regarding the adequate observation of suicidal patients in the MHCB units.  First, previous assessments by this reviewer found inadequate practices in the timely completion of required "Suicide Watch/Suicide Precaution Record" observation forms by nursing staff, including the falsification of observation forms for patients on Suicide Precaution status in the MHCB units (see previous Recommendation 21).  CDCR finalized installation of its EHRS in 2018 and nursing personnel were then required to enter the time into EHRS indicating that they observed each patient on either suicide observation (Suicide Watch or Suicide Precaution) or non-suicide observation status.  Second, despite clear *Program Guide* requirements for only two levels of observation (i.e., Suicide Watch requiring continuous 1:1 observation and Suicide Precaution requiring observation at staggered intervals not to exceed 15-minutes), this reviewer observed some suicidal patients being observed in MHCB units at non-suicidal observation levels (e.g., 30-minute intervals) utilizing such terms as "mental health observation."  As a result, CDCR reissued a memorandum entitled "Reminder: Level of Observation for Patients in Mental Health Crisis Beds" in April 2018 that specified

orders for observation of non-suicidal MHCB patients "shall not be written for a frequency less often than permitted by the program's licensing requirements."

This reviewer has previously stated that observation of suicidal patients must be automatic; therefore, 100 percent compliance is required because failure to observe a suicidal patient can result in death by suicide within CDCR facilities. The preceding (fourth re-audit) assessment found that, although six of 18 (33 percent) facilities (CIM, CSATF, CSP/Sac, PBSP, PVSP, and WSP) had either no or only minor problems, (e.g., a few observation checks of one or two patients that were in excess of required 15-minute intervals) practices at the remaining 12 facilities were very problematic, with violations attributable to multiple nursing personnel during multiple days at each facility. None of the 18 facilities were at 100 percent compliance with this measure.

**Current Findings**:

While on-site at the 20 facilities that contained activated MHCB units during 2021-2022, this reviewer was able to verify the accuracy of observation rounds of patients on Suicide Precaution status (and requiring observation at staggered 15-minute intervals) by reviewing the EHRS charts of several sampled patients. Typically, four patient charts were selected at each facility for nine-hour periods ranging from 12:00 a.m. through 8:59 a.m. The current assessment found that, although three of 20 (15 percent) facilities (CHCF, CSP/Sac, and NKSP) had either no or only minor problems, (e.g., a few observation checks of one or two patients that were in excess of required 15-minute intervals) practices at the remaining 17 facilities were problematic, with multiple violations per patient by multiple nursing personnel assigned to the MHCB units.

In addition, a few facilities had other unique problematic practices. At CSP/Solano, for example, documentation of nursing rounds for two patients on Suicide Precaution status was noteworthy with one patient's observation documented at exact 15-minute intervals for a three-hour period and the second patient's observation documented at exact ten-minute intervals for a nine-hour period. Such practices were contrary to the policy that required patients on Suicide Precaution status to be observed at staggered intervals that did not exceed 15-minutes. At MCSP, review of documentation revealed that many nursing staff notations attempted to provide explanations for late entries, with notations stating a variation of the following: "Late entry, taking shift report, preparing breakfast trays, doing patient care, and answering call lights." Given the unusual nature of these late entry notations, this reviewer spoke with the chief nursing executive at MCSP who confirmed that, absent an emergency, there was no justification for such notations because there were at least two nursing staff always assigned to each shift, and one staff was exclusively responsible for observing patients on Suicide Precaution status.

At other facilities, including SVSP, there were internet connectivity problems. Review of EHRS charts at SVSP found that nursing staff notations in many cases included late entries attributable to connectivity problems (e.g., "laptop frozen, had to reboot," "lost Wi-Fi," etc.). When late entries were found to be attributable to connectivity problems, this reviewer decided to review cases that did not cite problems of connectivity as a reason for late entries. In another reviewed case at SVSP, a nursing note indicated "late entry due to rounding on 8 IPs [inmate patients] (more than maximum 6 allowed at one time)."

Despite the general overall inadequacy of nursing observation of suicidal patients, as well as the other above cited unique problematic practices, there was some overall improvement noted in the observation of suicidal patients in the MHCB units.  Whereas it was not unusual during the preceding (fourth re-audit) assessment to find facilities typically having up to ten observation checks per patient that were in excess of the required 15-minute intervals during a nine-hour period, the current assessment found that violations were reduced to four to five or less per patient during a nine-hour period.

In addition, California Correctional Health Care Services (CCHCS) developed an automated report in February 2022 that was designed to assist nursing supervisors in auditing the observation of suicidal patients in MHCB units.  Entitled the "Mental Health Observations Reporting Tool," the automated program provides 1) a summary of a facility's overall rounding compliance rate of patients on Suicide Watch and Suicide Precaution, 2) easy-to-read documentation of each observation for each patient, and 3) a profile for each patient indicating their current and prior observation orders.  This reviewer sampled the effectiveness of the "Mental Health Observations Reporting Tool" against the time-consuming review of documented observation checks in sampled EHRS charts and concluded that the Tool was very accurate.

With regard to the second concerning issue of some suicidal patients in the MHCB units being observed at 30-minute intervals, this reviewer found troubling practices at six facilities (CMC, CSP/LAC, HDSP, KVSP, PBSP, and SQ), representing 30 percent (six of 20) of the MHCB units.  At CSP/LAC, for example, this reviewer's examination of various medical charts for MHCB patients indicated that most patients were often on Suicide Precaution status for an average of only 24 hours before being moved to 30-minute observation.  The chart review also found that several patients remained on 30-minute observation despite still reporting current SI. For example, a psychiatrist wrote the following progress note on March 12, 2022 regarding a patient on 30-minute observation in the MHCB: "When I went to his cell door I met him laying [sic] in a bed which he had made on the floor by his door and he readily got up to talk to me when I called his name.  He reported doing 'alright' and did not appear to be in any distress, however, as soon as I introduced myself as the weekend psychiatrist, patient said 'I am suicidal. I don't want to talk anymore' and got back into his bed.  Any further attempts to engage him in the interview when successful [sic] as he persistently ignored my prompts."  The progress note indicated that the patient "expressed passive SI," and he remained on 30-minute checks.  The patient met with another psychiatrist two days later on March 14 and the progress note indicated the psychiatrist "saw him at the cell door.  'I am still suicidal.'  And patient said that additional dose of Zyprexa helped him with the voices, they are less frequent now.  But he is still having suicidal thoughts because of 'his situation'."  The patient remained on 30-minute observation.

At HDSP, this reviewer's examination of various medical charts for MHCB patients also indicated that most patients were often only on Suicide Precaution status for an average of just 24 hours before being moved to 30-minute observation.  In addition, the chart review found that several patients remained on 30-minute observation despite still reporting current SI.  In one case, the patient was admitted into the MHCB on December 13, 2021 with current SI and a plan to hang himself with a bedsheet.  He was placed on Suicide Precaution status with partial issue.

The following day (December 14), the patient was downgraded to 30-minute observation despite reporting continuing SI. A progress note dated December 14 indicated that the patient would continue to be clothed in a safety smock and "remain on q 30-min. nursing checks x 24 hrs. w/full safety issue as he is refusing safety issue and stating he will harm himself w/it." This confusing progress note was followed by several daily provider orders which stated that the patient would remain on 30-minute observation and "to have safety issue due to being in ATH (alternative housing) pending MHCB placement."

In a second case at HDSP, the patient continued to report SI on a daily basis from February 11 through February 14, 2022, sometimes on a "conditional" basis, and initiated a hunger strike on February 12. During this time, he remained on 30-minute observation. In a progress note dated February 13, a clinician stated "The Pt. appears to be in distress related to recurrent thoughts of suicide, depression, and irritability but also appears to be seeking a transfer to a prison that is closer to home. Pt. appears to be focused on his hunger strike in order to obtain EOP LOC [level of care] or just to leave HDSP." The clinician also stated that the patient would remain on Suicide Precaution with 15-minute observation not realizing that the patient had been on 30-minute observation for several days. In a third case at HDSP, a patient at EOP LOC was admitted to the MHCB unit for SI and self-injurious behavior (SIB) (cutting) on January 10, 2022. He was initially placed on Suicide Watch, continued to engage in SIB, and allegedly swallowed a paper clip that same day (January 10). Despite such behavior, a clinician completing a SRASHE the following day (January 11) indicated that "The Pt. will be maintained in the MHCB and will be observed for ideation for self-harm and/or SIB as his observation and issue are increased to full and q-30's." The patient remained in the MHCB on 30-minute observation for nine days while awaiting transfer to the EOP LOC, with a provider order on January 12 stating: "Pt. may have less than full issue as he states he cannot be safe w/full issue at this time."

At KVSP, in a case observed by this reviewer during an initial IDTT meeting on November 18, 2021, the patient had been admitted to the MHCB the previous day (November 17) for grave disability, but also self-reported that "I'm suicidal." He was initially placed on Suicide Precaution status with "partial issue" clothing. During the IDTT meeting on November 18, although the patient denied any current SI, the team discussed an incident from the previous evening in which he had started a fire in his MHCB cell. The patient could not provide an explanation as to why he started the fire. The team then proceeded to downgrade his observation level to Q-30-minute observation with "full issue" clothing. In another case observed during an initial IDTT meeting on November 18, 2021, the patient had been admitted into the MHCB unit two days earlier on November 16 for SI. Both his chronic and acute risk for suicide were rated as "high" on the initial SRASHE. He was initially placed on Suicide Precaution status with "partial issue" clothing. Less than 24 hours later on November 17, the patient was downgraded to Q-30-minute observation with "full issue" clothing. During the initial IDTT meeting on November 18, the patient reported being "very depressed" (10 out of 10) and stressed out because he had been housed in the STRH as an EOP patient while attending various court proceedings on a new case, and also felt that he had falsely tested positive for COVID. The patient also stated that "October and November are bad months for me," because both his grandmother and uncle died during those months (with his uncle committing suicide). Other risk factors for suicide included multiple prior MHCB placements, as well as both intermediate care

and acute care placements. During the meeting, the patient expressed passive SI in the form of "not wanting to wake up." Despite these risk factors and concerning behavior, the patient remained on Q-30-minute observation with "full issue" clothing.

At PBSP, this reviewer's examination of various medical charts for MHCB patients also indicated that most patients were often only on Suicide Precaution status for an average of just 24 hours before being moved to 30-minute observation. The chart review found that numerous patients remained on 30-minute observation despite still reporting current SI. For example, the patient in one case was on 30-minute observation and the clinician's progress note dated April 9, 2022 indicated that his "current SI was reduced from 10/10 from previous contact with this writer to 7 or 8 out of 10, with 10=severe. Plan remains the same, to jump off the tier, and Pt. has no access to means of self-harm in restricted MHCB setting." The patient remained on 30-minute observation. In a second case, the patient was admitted to the MHCB unit on October 17, 2021 and, despite being admitted for danger to self (DTS), was immediately placed in "full issue" on 30-minute observation. The SRASHE dated October 17 stated, in part, that: "While Pt's threats of SI seem to be for the purpose of secondary gain at this time, the Pt. is historically impulsive and labile and his acute risk level can change in an instant." A clinician also summarized the initial MHCB referral in a progress note dated October 18, 2021 as follows: "Pt. reported he would become suicidal again if returned to his ASU/STRH cell, as he would 'rather die than live like this,' threatening to jump off the top bunk if returned to his cell. Pt. was admitted to MHCB in which setting was no longer a danger to self. Pt was admitted after hours on 10/17/21 on q30 watch/full issue, due to calm presentation and resolution of conditional SI upon admit to MHCB." In a third PBSP case, an individual plan of care (IPOC) for DTS was completed for an MHCB patient on 30-minute observation on October 9, 2021 which indicated that he thought about suicide "every day," "I am committed to killing myself," "I feel somewhat prepared to die by suicide," "There is nothing to hold me back from killing myself," and "I used to have reasons not to kill myself. Those reasons aren't very strong anymore." The accompanying clinical progress note stated: "No acute issues that require further intervention today. Pt. continues to report SI with high intent on his IPOC, but his attitude and actions don't appear to match." The patient remained on 30-minute observation. A few hours later on October 9, the nurse conducting rounds noted in a progress note that the patient "stated he is suicidal with plan to jump off his upper bunk when he gets back to ASU." The nurse advised a MHCB clinician and 30-minute observation was continued.

Of note, MHCB clinicians at PBSP utilized virtually the exact same narrative to justify both Suicide Precaution status at 15-minute intervals or non-suicide observation at 30-minute intervals. For example, the provider order in one case stated on October 28, 2021: Q-11/safety issue due to + SI, no plan, no SIB, not at high imminent risk;" whereas in another case, the provider order on April 20, 2022 stated: "Q-30/full. Pt. is + SI with no verbalized plan, no SIB, Pt. has utilized issued items appropriately. Not at imminent risk."

At SQ, there were examples of contradictory provider orders and progress notes for MHCB patients. For example, although the provider orders in EHRS for one patient clearly indicated that they would be observed at 30-minute intervals (Behavior Observation) on October 8 and October 9, 2021, the progress notes from those dates indicated that the patient's primary clinician (PC) downgraded the level of observation from Suicide Precaution (15-minute

intervals) to Behavior Observation (at 30-minute intervals) on October 8, whereas the psychiatrist stated in a progress note on October 9 that the patient should remain on Suicide Precaution status. The patient's behavior remained unchanged during both of those days. Adding to the confusion was that six nursing shift progress notes spanning October 8 and October 9 indicated that the patient was on the following levels of observation: <u>October 8</u>: Q-11 at 15:48, Q-30 at 20:48, and Q-11 at 21:05; <u>October 9</u>: Q-30 at 02:58, Q-60 at 15:52, and Q-11 at 17:58. Finally, despite the fact that the patient's behavior remained unchanged, the actual nursing rounds were interchangeably listed as both Suicide Precaution and Behavior Observation statuses during those two days.

Finally, CMC had a unique practice of requiring that all non-suicidal patients in their MHCB unit be observed at regular 15-minute nursing checks. These rounds were not documented in EHRS, rather they were documented in hard copy on a form entitled "Nursing Service Call Light System-Nursing Rounds Checklist." The chart review indicated several MHCB patients who continued to express SI during their placement, but remained on regular 15-minute nursing checks rather than Suicide Precaution status (where checks could be verified through the EHRS). For example, in one case, the patient reported "passing suicidal thoughts to 'not wake up,'" "intermittent suicidal ideation," and "vague SI without a plan" on a daily basis from December 12 through December 15, 2021; while another patient "continues to report interrupted sleep and passive suicidal ideation by strangulation occurring 2 hours daily." This patient was observed during his IDTT meeting on December 8, 2021 and continued to express SI. Review of the PT rounds in EHRS indicated that the patient expressed "constant" SI with "hanging" indicated as the method of suicide on a daily basis from December 11 through December 14. Despite these concerning behaviors, neither of the patients were placed on Suicide Precaution status.

In summary, observation of suicidal patients must be automatic; therefore, 100 percent compliance with this measure is required because failure to observe a suicidal patient can result in death by suicide within CDCR facilities. Although none of the 20 audited facilities were found to be 100 percent compliant during the current assessment, three facilities (CHCF, CSP/Sac, and NKSP) had either no or only minor problems (e.g., a few observation checks of one or two patients that were in excess of required 15-minute intervals). Practices at the remaining 17 facilities continued to be problematic, with violations attributable to multiple violations (e.g., four or five per patient during a nine-hour period) attributable to multiple nursing personnel during multiple days at each facility. These multiple violations were less than what was found during the preceding assessment. The newly developed and automated "Mental Health Observations Reporting Tool" will provide nursing supervisors with a more efficient mechanism to monitor the observation of suicidal patients, which will hopefully result in higher compliance rates in the future. In addition, MHCB clinicians in at least 30 percent of the facilities inappropriately placed suicidal patients at non-suicidal observation levels (e.g., 30-minute intervals).

## <u>Recommendations</u>:

CCHCS's automated "Mental Health Observations Reporting Tool" is an effective instrument to measure compliance with the required observation of suicidal MHCB patients.

Defendants' most recent Suicide Prevention Activation Schedules (ECF 7562, filed May 31, 2022), did not contain a completion date for this issue (Recommendation 21: Observation of Suicidal Patients), simply stating that monitoring was "Ongoing" and "Nursing headquarters continues to meet monthly with the Regional Chief Nurse Executives (CNEs) and/or institutional CNEs and invite the Regional Health Care Executives, as optional attendees, to review the results of the MH Observation Reporting Tool compliance percentage." CDCR needs to revise the CAP to ensure that its "Mental Health Observations Reporting Tool," along with facility-level nursing leadership oversight and responsibility, results in accelerated compliance with this issue.

In addition, as originally recommended in this reviewer's "An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," filed in January 2015, CDCR should create a CAP to enforce its *Program Guide* requirements authorizing only two levels of observation which may be provided for suicide inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch. Quite simply, no other level of observation should be utilized for suicidal patients.

### G)    MHCB Practices for Possessions and Privileges

**Summary**:

Previous assessments by this reviewer found disparate practices with regard to privileges provided to medical versus mental health patients within CTCs. Whereas patients admitted into a CTC for medical purposes were generally eligible for recreation, visits, or telephone calls, such privileges were generally prohibited for MHCB patients. Recommendations were provided for CDCR to develop a directive(s) regarding guidance on clothing and allowable privileges for both suicidal and non-suicidal MHCB patients (see previous <u>Recommendation 32</u>).

CDCR subsequently issued multiple memoranda over the years to address issues of clothing, possessions, and privileges (i.e., out-of-cell activities) for MHCB patients. The first policy, CDCR's "State-Issued Clothing and Bedding for Mental Health Inmate-Patients in the Mental Health Crisis Bed and Outpatient Housing Unit," became effective on October 29, 2013, and required male "inmate-patients not on suicide precautions or watch" to be issued "one pair blue denim jeans or one blue chambray shirt, or one jumpsuit…" Another memorandum, "Level of Observation and Property for Patients in Mental Health Crisis Beds" was issued on March 15, 2016. The directive required that "all orders shall detail what specific items may be issued to a patient. Staff shall ensure all patients are provided with the clothing, bedding and allowable items permitted at the patient's level of observation."

On June 23, 2016, CDCR issued a memorandum on MHCB privileges entitled "Mental Health Crisis Bed Privileges." The directive stated that "IPs admitted to the MHCB may be authorized for out-of-cell activities when specifically approved by the MHCB IDTT." Out-of-cell activities included, but were not limited to, dayroom, recreational activities, and yard. The memorandum also stated that "The recreational therapist [RT] shall be responsible for facilitating

26

all out-of-cell activity, and is expected to remain with the IP during these activities." In addition, the memorandum stated that MHCB patients were entitled to both telephone access and visiting privileges "unless specifically restricted by the MHCB IDTT." On February 14, 2017, a "Mental Health Crisis Bed Privileges Revision" memorandum was issued to reiterate that "The recreational therapist shall be responsible for facilitating all structured out-of-cell activity, and is expected to remain with the IP during these activities. Custody staff may provide supervision for unstructured out-of-cell activity to include yard and dayroom." On April 18, 2018, CDCR issued a one-page "Reminder - Level of Observation for Patients in Mental Health Crisis Beds" memorandum that reiterated the frequency of observation for non-suicidal MHCB patients. Finally, on April 24, 2020, CDCR issued a "Clarification of Allowable Property for Patients on Suicide Watch" memorandum. This one-page directive attempted to clarify "the expectations for allowable property given to patients on Suicide Watch… in all inpatient levels of care." The memorandum authorized licensed clinicians, following documentation of the clinical rationale, to allow patients on Suicide Watch additional items beyond the minimum required property.

Despite issuance of the six memoranda cited above, practices in this area remained inconsistent and the preceding (fourth re-audit) assessment found that only 67 percent (12 of 18) of the audited facilities with active MHCB units had adequate practices regarding possessions and privileges provided to MHCB patients.

**Current Findings**:

The current assessment did not find any improvement in the provision of clothing, possessions, and privileges (i.e., out-of-cell activities) provided to MHCB patients. In fact, compliance has regressed since the previous assessment because only 53 percent (10 of 19) of audited facilities (with active MHCB units and patients during the assessment) were found to have adequate practices. (Of note, because there were not any patients in the MHCB unit at HDSP during the on-site assessment, this reviewer could not assess out-of-cell activities afforded to MHCB patients.) As stated most recently in defendants' Suicide Prevention Activation Schedules (ECF No. 7562, filed May 31, 2022), CDCR created CAPs to address deficiencies in the six facilities cited in the preceding assessment. Yet one facility (CSP/Corcoran) cited in the previous assessment, as well as eight other audited facilities, were found to have inadequate practices during the current assessment.

CSP/Corcoran continued to have a myriad of problems with this issue. The first problem was related to the long-standing problem of MHCB patients not receiving yard privileges due to their maximum-security custody status. Such patients had historically not been offered yard because the yard attached to the MHCB unit had previously been determined to be unsecure for maximum-security patients. The issue was first reported by this reviewer in 2014. Although there had been previous discussions about installing a small management yard within the CTC yard, this reviewer had been most recently advised that MHCB patients on maximum-security/ administrative segregation status would be offered to be escorted to the yard attached to the STRH unit. In fact, in the most recent Suicide Prevention Activation Schedules (ECF No. 7562, filed May 31, 2022), CDCR stated that "As of April 2021, the temporary remediation to escort patients to ASU for yard is underway. The durable solution involving construction of a small management yard to the CTC yard will be requested to be included in the FY 2022/23 budget."

This reviewer, however, could not find any verification during this current assessment that such a protocol was being offered and, as reflected in the monthly SPRFIT minutes, the regional suicide prevention coordinator presented audit findings in both August and October 2021 indicating that such a protocol "was not observed.''

This reviewer routinely reviews CDCR 114-A forms for documentation of all out-of-cell activities offered to current MHCB patients. Excluded from the review are 114-A forms of newly arrived patients who had not yet received their initial IDTT meetings (where decisions regarding out-of-cell privileges are typically discussed). At CIM, this reviewer examined the 114-A forms for 16 MHCB patients who had previously received their initial IDTT meetings and found they were regularly offered both showers and telephone calls. However, although yard was offered to MHCB patients in Station 4, it was not regularly offered to those patients housed in Station 1. It was later determined that Station 1 housed several patients on maximum-security status and, because the CTC yard could not accommodate such patients, they were provided the option (and often refused) to be transported to the yard attached to the ASU on the other side of the facility campus.

At CCWF, the long-standing inadequate out-of-cell practices in the MHCB unit continued during the current assessment and were previously detailed on pages 16-17 of this report. In addition, the facility was in the midst of a construction project to build a small management yard adjacent to the MHCB unit to accommodate maximum-security patients. The small management yard was tentatively scheduled to be completed on May 31, 2022. However, examination of 114-A forms for patients housed in the MHCB unit found other problems with out-of-cell activities, regardless as to whether patients were on maximum-security or non-maximum-security status. For example, in one case, a patient had been housed in the MHCB unit for approximately 20 days and, although showers were offered on a regular basis, only one telephone call and out-of-cell activity had been offered, with most notations in the 114-A form inappropriately marked either "no yard due to construction" or "no group therapy/outside recreation due to yard construction." In another case, a patient had been admitted to the MHCB a week earlier on October 8, 2021, was not on maximum-security status, and only offered one out-of-cell group activity and telephone call by the RT during the seven-day commitment. On other days, the patient's 114-A form simply stated, "no yard due to construction" (despite the fact that such a notation was attributable to the small management yard that would be inappropriate for non-maximum-security patients.)

This reviewer also found problematic practices at other several facilities in which MHCB patients were not receiving out-of-cell activities because of a misunderstanding/misinterpretation of COVID-19 quarantine directives. At CSP/Corcoran, for example, an examination of all applicable patients in the MHCB unit on February 9, 2022 found that, although patients were offered showers, as well as telephone calls through the RT in the program office, most of the patients had not been offered yard privileges. In the comments section of the 114-A forms, custody staff often wrote contradictory comments as to the reasons for a patient not receiving yard, such as "refused/quarantine," "not cleared/ quarantined," or simply "quarantine." This reviewer also received conflicting information as to why MHCB patients were not receiving out-of-cell activities. When a custody officer assigned as the yard officer was asked why patients were not receiving yard, they responded that yard had started again today (February 9) when the

unit was taken off quarantine status. Other custody officers suggested that the quarantine status had been initiated by medical staff. When the nurse supervisor was asked about the quarantine status, they correctly responded that the unit quarantine did not prohibit out-of-cell movement, it simply necessitated physical distancing between patients, use of face masks, and disinfecting certain areas (such as telephones after each patient's use of the program office). A nurse informed this reviewer that a custody officer had informed her that custody did not want to "contaminate the hallway" by escorting patients to the yard.

The review found that certain staff at CSP/Corcoran, primarily custody personnel, were under the incorrect assumption that yard privileges were suspended because the unit was on quarantine status, despite the fact that patients were allowed out of their cells three times a week to shower, attend IDTT meetings, and interact with the RT in the program office. This reviewer then reviewed CDCR's "COVID-19 Mandatory 15-Day Modified Program" memorandum, effective since January 6, 2022, with various CSP/Corcoran personnel. The memorandum outlined the requirements for modified program, periods of quarantine, and out-of-cell activities (including video visiting, telephone calls, showers, recreation, dayroom, etc.). The memorandum not only allowed for these out-of-cell activities, but even created exemptions by specifically stating that the COVID-19 Mandatory 15-Day Modified Program did <u>not</u> apply to "Restrictive Housing Units, Correctional Treatment Centers, and Psychiatric Inpatient Programs, etc." The memorandum was clear and concise.

Similar problems with misinterpretation and misuse of CDCR policy were found at CIW, CSATF, and NKSP. At CIW, this reviewer examined notations on the 114-A forms in the Walker unit (the facility's unlicensed MHCB) in September 2021 that indicated there were "no phone calls/dayroom due to PSR [the daily Program Status Report]." Given the fact that such privileges were afforded to patients in the licensed MHCB unit during the same time period, the withholding of such privileges in the Walker Unit was unexplained by CIW leadership.

At CSATF, there was not only confusion by MHCB clinicians as to whether or not they could allow telephone privileges to patients on quarantine status, but widespread confusion and/or miscommunication regarding the provision of out-of-cell time for patients. This reviewer's examination of 114-A forms for applicable patients in the MHCB unit on February 7, 2022 found that none of the forms had documentation of patients being offered yard privileges and/or access to the telephone. In the comments section of the 114-A forms, custody staff often wrote contradictory comments as to the reasons for a patient not receiving yard, such as "refused/quarantine," "not cleared/quarantined," or simply "quarantine." In addition to the above cited CDCR's "COVID-19 Mandatory 15-Day Modified Program" memorandum, this reviewer examined CSATF "Daily Program Status Report," dated February 7, 2022, that had been effective at the facility since January 9, 2022 and based upon the CDCR 15-Day Modified Program memorandum. The daily PSR also confirmed that out-of-cell activities such as dayroom, recreation, showers, and telephone calls were permitted throughout CSATF. Finally, this reviewer received yet another explanation from custody personnel at CSATF as to why MHCB patients were not allowed yard privileges – the CCTV in the yard had been broken since at least March 2021. Although this equipment had allegedly been broken for almost a year (or even longer), there were no work orders provided to this reviewer to demonstrate a remedy for the problem.

At NKSP, examination of 114-A forms for MHCB patients found that, other than opportunities to shower, patients in the unit did not have opportunities for any out-of-cell activities, including yard, program office, or telephone calls. This reviewer subsequently spoke with both an RT and custody officers assigned to the unit who provided varying explanations as to why patients were not receiving any out-of-cell time. Two RTs provided services to MHCB patients for up to 30 hours per week. According to one of the RTs, MHCB patients were not offered yard on November 15, 2021 because: (1) there was intense fog that day that created a safety issue, and (2) six of the patients were on quarantine status "due to COVID-19 precautions" because they had recently arrived from other facilities and, therefore, were prohibited from leaving their cells. Such as explanations were contradicted by the fact that, despite the presence of intense fog during the morning of November 15, this reviewer observed several inmate workers socializing in the same MHCB yard, and records indicated that patients were permitted to leave their cells for individual sessions with clinicians, IDTT meetings, and showers.

This reviewer also spoke with several custody officers assigned to the MHCB unit. They also had similar explanations as to why MHCB patients did not receive out-of-cell activities. These explanations included quarantine status, as well as purported instructions from NKSP's daily PSRs indicating that the facility was on "modified program" which prohibited any "recreational activities" or "telephone calls," despite the fact that this reviewer observed other NKSP inmates mingling in various yards throughout the facility during the two-day assessment. This reviewer subsequently spoke with NKSP's Associate Warden for Health Care Access who confirmed that the PSR did not apply to MHCB patients and quarantine status due to COVID-19 precautions and did not preclude patients from out-of-cell activities.

In other facilities, although MHCB patients were regularly offered both showers and telephone privileges, other out-of-cell privileges were not offered on a regular basis. For example, this reviewer examined the 114-A forms for approximately 16 MHCB patients at CMF and found that, although ten were offered yard, shower, and telephone privileges consistent with their level of observation and length of stay, there were six patients (or 38 percent) housed in the MHCB for over ten days in which yard privileges were not offered (and there was no clinical justification for withholding the privilege). In fact, the correctional counselor I (CC I) incorrectly stated to several patients during the observed IDTT meetings that they needed to be on "full issue" prior to receiving out-of-cell activities. Similarly, at least one of the CC Is assigned to the MHCB units at CSP/Sac, as well as a CSP/Sac LOP, incorrectly stated that "patients must not be on a Suicide Watch and be in whites to participate in a yard." There are no CDCR polices and/or directives that restrict out-of-cell activities, including yard, based upon a patient's suicide observation status. Out-of-cell activities are allowable based upon a patient's custody designation and only restricted based upon the clinical judgment of the IDTT.

At RJD, this reviewer examined the 114-A forms for 11 patients in the MHCB unit during July and August 2021. These 11 patients accounted for 84 MHCB days. During this time, access to the yard was offered on only 24 occasions. One patient had been in the unit for approximately 21 days and only offered yard on two occasions. Another patient had been in the unit for seven days and had not been offered yard. The review also found that although patients were regularly offered showers, there was no documentation that they received access to the

telephone. This reviewer subsequently spoke with the RT assigned to the MHCB unit on Monday, Wednesday, and Friday. Although the RT stated that yard was offered to six to eight patients per day (which would translate into 18 to 24 times for three days per week), such a statement was inconsistent with the reviewed 114-A forms.

At CSP/Sac, this reviewer examined the 114-A forms for approximately 25 CTC-1, CTC-2, and the unlicensed Mental Health Outpatient Housing Unit (MHOHU) patients who were housed at least seven days (and had at least one IDTT meeting), with many housed for more than three weeks and awaiting transfer to a higher level of care. Although showers and opportunities for telephone calls were offered on multiple occasions to all reviewed patients, the reviewer found that the nine CTC-1 patients were each offered yard on only one occasion, and four CTC-2 patients were each offered yard on only one occasion, with one additional patient offered yard three times. In addition, nine MHOHU patients were not offered any yard, with one additional patient offered yard on one occasion and a second patient offered yard on four occasions. Because the MHOHU yard had historically not been utilized, those two patients were only offered out-of-cell time in a small corridor referred to as the "dining area" located outside the unit. In sum, only two of 25 (eight percent) of MHCB patients were offered yard more than once, and ten of 25 (40 percent) were never offered yard during their several week placements in the MHCB units at CSP/Sac.

Finally, this reviewer observed the inappropriate use of safety smocks in several MHCB units during the current assessment. Safety smocks should only be issued to suicidal patients who are assessed as being at high risk for suicide by hanging. The inappropriate ordering of smocks by clinicians can inadvertently result in patients being prohibited from certain out-of-cell activities. In addition, safety smocks are sometimes issued to patients for reasons other than patient safety, e.g., for those who complain of being cold or due to ill-fitting issued clothing. This reviewer observed that patients clothed in safety smocks were also issued t-shirts which completely undermined patient safety because a t-shirt could be easily utilized as a ligature in a suicide attempt by hanging. At both CMF and SVSP, this reviewer observed patients dressed in both safety smocks and "partial issue" (t-shirt, boxers, and socks) during initial IDTT meetings. Following one IDTT meeting at SVSP, this reviewer inquired as to why the patient had been issued both a safety smock and partial issue clothing, and was informed that the smock had been provided after the patient complained of being cold.

In another observed IDTT meeting in the MHCB unit at SVSP, a patient was approved for telephone privileges, as well as yard, by the treatment team, but inexplicably denied access to the dayroom. Following the meeting, this reviewer inquired as to why the patient had not been approved for dayroom, and was informed the team was concerned that the patient might engage in SIB in the dayroom. Subsequent review of the patient's medical chart did not find a rationale for allowing yard privileges, but denying dayroom privileges, for this patient.

In a third case at SVSP, the patient was observed to be clothed in both a safety smock and "partial issue" (t-shirt, boxers, and socks) during the IDTT meeting. The patient appeared quite upset that he was on Suicide Watch status, clothed in a safety smock, and unable to call his family regarding the health of his mother who had recently been diagnosed with ovarian cancer. He also complained about being locked down in his cell, as well as the bright lighting interfering

with his sleep.  The patient requested that the lights be dimmed.  The patient became increasingly upset as the meeting went on, insisted that he was no longer suicidal, and wanted to be discharged.  Similar to another case discussed by the IDTT that day, the patient had been previously approved for telephone privileges, but there had been miscommunication between IDTT members and custody personnel resulting in the patient not being able to use the telephone. In addition, the psychiatrist incorrectly informed the patient that, pursuant to policy, the lighting in his cell could not be dimmed because he was on Suicide Watch status, but that once he was downgraded to Suicide Precautions status, the lights could be dimmed.  There was no such policy.  Following the meeting, this reviewer inquired as to why the patient had been issued both a safety smock and partial issue clothing, and was informed that the boxers issued to the patient were too small and the smock had been provided to provide adequate covering of his genitals.

In conclusion, whereas the preceding (fourth re-audit) assessment found that only 67 percent (12 of 18) of the audited facilities had adequate practices regarding possessions and privileges provided to MHCB patients, the current assessment found that compliance had further regressed and only 53 percent (ten of 19) of audited facilities had adequate practices. Problematic practices ranged from patients not receiving out-of-cell activities due to their maximum-security custody status, misunderstanding/misinterpretation of COVID-19 quarantine directives, incorrect belief that patients could only receive out-of-cell activities when they were approved for "full issue" clothing, and clinical misuse of safety smocks.  With regard to safety smocks, clinicians appeared to issue smocks as if they were simply an additional layer of clothing, rather than recommend that a patient complaining of being cold be provided with an additional safety blanket or a patient issued ill-fitting clothes be provided with the correct clothing size.

**<u>Recommendation</u>**:

Misuse of CDCR policies, including the "COVID-19 Mandatory 15-Day Modified Program" memorandum and facility daily PSRs, that results in MHCB patients being locked down and prohibited from out-of-cell activities should be remedied through CAPs at each affected facility.

In addition, CDCR should issue a memorandum that specifically sets forth strict criteria for use of safety smocks in MHCB units.  At a minimum, suicidal patients should never be issued both a safety smock and partial issue clothing (e.g., t-shirt and boxers), and patients on non-suicide observation status should never be placed in a safety smock.

Finally, CDCR should provide verification for funding of a small management yard at CSP/Corcoran, as well as any other MHCB unit that needs a small management yard (e.g., CIM) in its FY 2022/23 budget [as stated in defendants' most recent Suicide Prevention Activation Schedules (ECF No. 7562, filed May 31, 2022)].  Verification should include not only the requests, but whether funds were authorized and received, as well as deadlines for project completion.  Such documentation should be forwarded to the Special Master.

**H)**    **30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs, and Condemned Units**

**Summary**:

CDCR's requirement that inmates housed in administrative segregation be observed at 30-minute intervals has been in place since 2006, with inmates housed in SHUs requiring the same level of observation since 2013. Documentation was historically recorded by handwritten housing logs. In 2014, CDCR implemented the Guard One system to electronically verify 30-minute welfare checks of all inmates in administrative segregation during the first 21 days of their stays. Pursuant to a memorandum issued on May 9, 2014, the policy was subsequently revised to extend use of the Guard One system to all inmates in ASUs, SHUs, PSUs, and condemned units at staggered intervals not to exceed 35 minutes for the duration of their stays. This expansion was a significant and commendable policy change. Due to unique architectural features of the SHU at PBSP and complaints of excessive noise generated from Guard One, particularly during First Watch (10:00 p.m. to 6:00 a.m.), the parties agreed to a permanent policy specific to the SHU at PBSP allowing for Guard One observation at 60-minute intervals during First Watch. The permanent stipulation was approved by the *Coleman* court on September 1, 2016 (ECF No. 5487). Finally, due to the unique architectural and program design of the 22-cell condemned unit at CCWF, Guard One rounds are only conducted during the First Watch (pursuant to a CDCR directive issued in 2014). The preceding (fourth re-audit) assessment found that all 20 audited facilities had adequate practices with Guard One compliance rates well above 90 percent in administrative segregation, SHUs, and PSUs.

**Current Findings**:

This reviewer's most recent assessment found that 95 percent (21 of 22) audited facilities with active ASUs had Guard One compliance rates well above 90 percent in administrative segregation, SHUs, and PSUs. One facility (KVSP) had an 89 percent compliance in the STRH (ASU-1) unit and 96 percent compliance in the general population (GP) administrative segregation (ASU-2) unit. This high rate of compliance was diminished by the fact that three facilities (CIM, HDSP, and SVSP) experienced five inmate suicides in administrative segregation during 2020-2022 in which decedents were either found in rigor mortis or irregularities were found in timely Guard One checks at time of death.

**Recommendation**:

No recommendations are offered related to this issue.

**I)**    **Mental Health Referrals and Suicide Risk Evaluations**

**Summary**:

This reviewer's previous assessments found that, although all emergency mental health referrals for reported SI and SIB resulted in an almost immediate response from mental health

clinicians, these emergency referrals did not always result in completion of the required suicide risk assessments. According to the MHSDS *Program Guide*, "Any CDCR employee who becomes aware of an inmate's current SI, threats, gestures, self-injurious behaviors or suicide attempts shall immediately notify a member of the health care staff. The inmate shall be placed under direct observation, per local custody operating procedure, until a clinician trained to perform a suicide risk assessment (psychiatrist, psychologist, clinical social worker, primary care physician, nurse practitioner, or RN) conducts a face-to-face evaluation" (12-10-7). The suicide risk assessment form currently utilized is entitled the Suicide Risk Assessment and Self-Harm Evaluation (SRASHE), which includes the Columbia-Suicide Severity Rating Scale screening form.

Further, because the quality of completed SRASHEs had historically been found to be problematic, previous recommendations included revision of the Suicide Risk Evaluation (SRE) Mentoring Program (12.04.201) and SRE Procedure (12.04.201P), effective January 17, 2013, and better auditing of SRE quality on a monthly basis by local SPRFITs. Specifically, this reviewer's first assessment ("An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation, filed on January 14, 2015, recommended that "CDCR should revise its SRE Mentoring Program to eliminate its "graduation" component after completion of two adequate assessments, conduct ongoing mentoring throughout the year, and audit clinicians' SREs on a regular scheduled basis" (see previous Recommendation 9); and "Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis" (see previous Recommendation 10). The *Coleman* court adopted these recommendations on February 3, 2015 (ECF No. 5271). Defendants previously agreed with this reviewer's assessments that the quality of completed suicide risk assessments throughout CDCR was problematic and agreed to issue the "Revision to the Suicide Risk Evaluation Mentoring Program" memorandum, last revised on March 10, 2016, and the "Clarification of Suicide Risk Evaluation Training Requirements" memorandum, last revised on March 24, 2016. The memoranda included requirements for seven-hour SRE training every two years by clinical staff, annual training for clinicians regularly assigned to a MHCB unit, and auditing of at least one of every clinician's SRASHE every six months.

In addition, this reviewer observed that monthly minutes from various facilities' SPRFIT meetings consistently reported full compliance with timely completion of SRASHEs. Although this reviewer found that SRASHEs were generally completed in a timely manner, much of the data collected and reviewed by SPRFITs simply looked at timeliness and not whether SRASHEs were being completed for mental health referrals related to SI and SIB. In addition, while this reviewer has historically reviewed both emergency mental health referrals, as well as urgent mental health referrals (because such referrals frequently refer to SI and SIB and/or an inmate expressed SI to a clinician during an urgent referral that had been initiated for other reasons), CDCR has historically *only* reviewed emergency mental health referrals to assess timely compliance. See, for example, defendants' most recent Suicide Prevention Activation Schedules (ECF No. 7562, filed May 31, 2022), in which compliance is measured by "Auditing of Emergent Referrals with SRASHEs."

Finally, it was noteworthy that CDCR began to incrementally initiate CITs in its prison facilities beginning in October 2018. Prior to the issuance of a statewide CIT policy, there were

a variety of practices observed in the approximately 21 facilities that had initiated the CIT process. Generally, a CIT encompassed a mental health clinician, nurse, and custody supervisor (often a lieutenant) who responded to, and attempted to de-escalate a mental health crisis. When clinically indicated, the CIT was required to consult with a psychiatrist. CITs normally operated during Third Watch (2:00 p.m. to 10:00 p.m.), with those facilities without a formalized CIT process deploying designated clinicians to respond to mental health emergencies. When the mental health emergency involved an inmate presenting with SI and/or SIB, a SRASHE was required to be completed by the CIT clinician. Following the issuance of this reviewer's preceding (fourth re-audit) assessment, the "Crisis Intervention Teams" policy (12.01.700) became effective on July 8, 2021.

In conclusion, this reviewer has previously stated that completion of SRASHEs for inmates presenting as possible risk for suicide by expressing SI and/or engaging in SIB must be automatic; therefore, 100 percent compliance is required because failure to complete such an assessment can result in death by suicide within CDCR facilities. The preceding (fourth re-audit) assessment found that only 65 percent (13 of 20) of facilities reached over 90 percent compliance with the required completion of SRASHEs, and none of the 20 facilities were at 100 percent compliance.

**Current Findings**:

This reviewer's current assessment found continuing problems with the required completion of SRASHEs following either emergent or urgent mental health referral for SI or SIB. Most of these failures were related to cases involving urgent mental health referrals. There were also cases in which SRASHEs were not completed when SI and/or SIB was identified during routine clinical contacts or following undocumented referrals in which urgent/emergent referrals were not generated. Although 100 percent compliance is required for this issue, the current assessment found that only 61 percent (14 of 23) of audited facilities achieved over 90 percent compliance with the required completion of SRASHEs. The nine facilities under 90 percent compliance were: CIM, CMC, CSATF, CSP/LAC, KVSP, MCSP, NKSP, SVSP, and WSP. Only one (SQ) of the 23 facilities was at 100 percent compliance with this measure. This finding was slightly lower than the preceding assessment, which found 65 percent of facilities were over 90 percent compliance.

One case at MCSP was symbolic of the problem. On January 7, 2022, an inmate was referred to mental health from a housing officer who related that he had received "bad news that his brother was declared brain dead." According to the responding clinician's progress note dated the same day, "Patient reported 'bad thoughts' of 'why him instead of me.' MHPC assessed for DTS. Patient endorsed passive SI but denied plan/intent/means. MHPC and patient discussed safety planning." A SRASHE was not completed. Four days later on January 11, 2022, the inmate was again seen by another clinician for a routine contact and reported a continuing struggle with grieving his brother's medical condition (he reportedly was still in a coma). The clinician's progress note documented his increased depression, as well as "passive SI." The inmate remained tearful throughout the interaction. A SRASHE was not completed. A progress note dated a few weeks later on February 1, 2022 documented that the inmate "endorsed SI" during a routine contact. A SRASHE was not completed. Six days later on February 7, 2022,

the inmate met with a psychiatrist during a routine monthly contact and reported "SI on and off" since his brother's death the previous week. The following day (February 8), as well as on February 15, the inmate was seen by his PC and again during routine contacts and reported "passive SI" on both occasions. SRASHEs were not completed on either occasion. The inmate was at the EOP LOC, had a "high" chronic risk for suicide that included multiple suicide attempts, and had witnessed his father's suicide with a shotgun at age 12. The last SRASHE completed for this inmate occurred one year earlier on February 17, 2021 following his return from CMF-PIP that required four follow-up SRASHEs at 90-day intervals. However, these three subsequent SRASHEs were never completed.

Two other cases involved the failure to complete SRASHEs in close proximity to inmate suicides. In the first case, a SVSP inmate screened positive for suicidal thoughts on the ASU Pre-Placement Screen on March 15, 2021, immediately following his discharge from the MHCB unit. According to the CDCR reviewer in the case, an emergent mental health referral order was generated, but there was no documentation in the EHRS to indicate that the inmate was ever seen by a clinician, nor a progress note or SRASHE completed based on the consult order. He committed suicide the following month.

In the second case, despite finding a 91 percent compliance rate for completed SRASHEs at RJD, the facility experienced an inmate suicide in January 22, 2022 that occurred two days following multiple failed opportunities to complete the required assessment. On January 20, 2022, the inmate met with his PC for a routine contact. The session was held cell front due to "modified programming." According to the progress note, the inmate made statements such as "No end in sight. Angry, anxious, depressed. Everyone else (related to his case) is long gone and I'm still here." The clinician documented that the inmate "denied suicidal ideation, although he presents with increasing depressive symptoms." In addition, his speech was rapid, pressure, and loud, and his mood appeared irritated, angry, anxious, and depressed. He continued to report elevated levels of the stress related to his extended administrative segregation placement." The PC concluded the progress note by stating "IP will remain in CCCMS LOC at this time as he did not present in acute distress, crisis, or is decompensating."

Several hours later on January 20, the inmate met cell front with a practicum student for adjunctive treatment. When asked how he was feeling, the inmate responded, "I've been better" and now endorsed SI. When asked more about his suicidal thinking, he stated "Yes, everyday it comes and goes!" The practicum student also wrote in the progress note that:

> IP presented as frustrated with still being in Ad Seg and not being able to help his mother. He reported feeling frustrated with medical staff, as he stated, 'I was trying to call one of the nurses over and she straight up fuc.... ignored me!' He stated that he's been in the same mood for weeks now and reported that nothing has changed. IP stated he has been frustrated due to his eczema flaring up when he is stressed. IP was asked to rate his current anxiety and stated he was at a '10.' When asked about SI he stated, 'Yeah every freaking day!' IP reported fleeting SI but denied a plan and intent. IP was unable to cultivate goals for future sessions and stated, 'What does it matter anyway? I'm always going to be

depressed.'  He also stated that he does not want help at the door and that there is no point in talking too much.'

The progress note again reiterated that the inmate denied current thoughts, intent, and plan to harm himself.  The inmate simply stated: "I don't need help for anything.  *If I have a crisis, I'm not going to tell anyone.  Just going to deal with it on my own."*

The medical chart indicated that the practicum student consulted with the inmate's PC after the cell front interaction, with the note indicating that the PC stated, "IP has had increasing frustration gradually, and that his biggest protective factor is his mother" and "there are no immediate concerns about the IP."  As noted by the CDCR reviewer in the case, "the inmate was not removed from his cell for a thorough evaluation for a higher level of care, there was no emergent referral generated, and no SRASHE was completed.  The clinical supervisor co-signed this note later that same day.  This contact was the inmate's last contact with mental health" before his suicide less than two days later on January 22, 2022.

In addition, the current assessment found that all 20 audited facilities with MHCB units had over 90 percent compliance with SRASHE completion during admission and discharge from those units.

With regard to SRE training, the preceding (fourth re-audit) assessment found that only 45 percent (nine of 20) of the audited facilities had compliance rates over 90 percent for both the seven-hour SRE training and SRE mentoring training.  The current assessment found that only 65 percent (15 of 23) of audited facilities had compliance rates over 90 percent for both the seven-hour SRE training and SRE mentoring training.  The following eight facilities were under 90 percent compliance: CMF, CCWF, CHCF, CTF, CSP/Solano,  NKSP, RJD, and SVSP.

Finally, CDCR recently presented the Special Master with a final draft to a revised "Suicide Risk Evaluation Mentoring Program" policy (12.04.201) in early May 2022 that would reduce the number of SRASHEs completed by the mentee and observed by the mentor during the initial mentoring process, reduce booster training from annual to biennial for all clinicians whose regular duties include the assessment of suicidal inmates (including those that work in MHCB units), and eliminate the requirement that every clinician would have a SRASHE audited every six months.  Because this draft policy would be inconsistent with this reviewer's previous court-ordered recommendation in this area (Recommendation 9), it was further revised by CDCR in early July.  Following subsequent discussion with the Special Master's team, the revised policy was approved and became effective on July 12, 2022.  The revised policy is now consistent with the requirements of Recommendation 9.

The CITs continued to play a prominent role in the response to emergency mental health crises.  The CIT policy (12.01.700) became effective on July 8, 2021, and 21 CDCR facilities were identified to activate a CIT program.  Of those facilities, California Rehabilitation Center and Valley State Prison were not audited by this reviewer during the current assessment, and Deuel Vocational Institution was deactivated in September 2021.  A CIT was also activated (date unknown) at CSATF.  The current assessment found that 19 audited facilities had active CITs, although the program at SVSP was suspended in April 2022 due to low staffing.  This reviewer

found that 89 percent (17 of 19) of the audited facilities with CITs had LOPs authorizing their use. Almost all of the teams were operational for the entire 2nd Shift (2:00 p.m. through 10:00 p.m.), including CCWF, CIM, CIW, MCSP, NKSP, and SQ. Five other facilities (CSATF, HDSP, RJD, and WSP) had CITs active 14 hours a day from 8:00 a.m. through 10:00 p.m., while the CIT at CMC was active for 12 hours between 8:00 a.m. and 8:00 p.m. Three other facilities had CITs active for five hours, with CSP/Sac from 3:00 p.m. until 8:00 p.m., CCI from 5:00 p.m. until 10:00 p.m., and CSP/LAC also from 5:00 p.m. until 10:00 p.m., with 12-hour a day coverage on the weekends. Both CHCF and KVSP had CITs active between 7:00 a.m. and 4:30 p.m., and the CITs hours for CMF were unknown and for CSP/Corcoran based on staff availability.

Although the majority (13 of 19 or 68 percent) of the CIT programs did not have any observed problems, there were a few noteworthy problematic practices observed in some CIT programs. For example, at CSP/Sac, there were several concerns about the observed CIT response on June 17, 2021, including a lack of sensitivity for providing reasonable privacy and confidentiality during the encounter, as well as the very brief assessment of suicide risk by the clinician who initially did not inquire about the circumstances surrounding the suicide attempt that prompted the CIT referral. In addition, there were problems associated with nursing participation in the CIT process at a few facilities. For example, at NKSP, this reviewer's examination of numerous medical charts indicated that nursing staff never participated in any CIT responses. At CHCF, the nurse who responded late to a CIT referral on July 23, 2021 was observed to be stating "Apparently, I'm supposed to be a part of this, what do you need from me?" At CSATF, auditing of the CIT process was challenged by the fact that the CIT Power Form in EHRS was not always utilized by nursing staff, and mental health clinicians were sometimes inappropriately utilizing the Form for crisis responses that did not involve the full CIT (i.e., nursing and custody were absent). At SVSP, nursing participation was lacking in many CIT responses. In addition, this reviewer observed the CIT responses at SVSP for two inmates who had separately expressed SI to custody personnel in the same housing unit on March 23, 2022. Upon arrival to the unit, one inmate was observed in a TTM outside of the custody office, and the second inmate was observed inside the indoor recreation yard. Neither inmate was observed on continuous observation by custody personnel as required by the CIT policy.

Finally, one of the best examples of CIT effectiveness was found at CMF. The CIT was launched at CMF in December 2018, paused in April 2020 due to COVID-19, and reactivated in April 2021. This reviewer had an opportunity to observe the process on May 25, 2021 following the intake screening (also observed by this reviewer on the same day) of a newly admitted inmate who appeared anxious, paranoid, and expressing SI. The CIT, comprised of a psychologist, nurse, and sergeant, assembled outside the R&R unit following review of the medical chart and the psychologist's clinician-to-clinician contact with a CIT clinician at CMC who had previously assessed the inmate a few days earlier. The inmate apparently had a history of MHCB placements for reasons primarily related to safety, and had no history of either SIB or suicide attempts. The CIT then interviewed the inmate for approximately one hour, with the clinician completing a SRASHE, the nurse inquiring about any medical concerns, and the sergeant inquiring about any custody concerns. The inmate was initially concerned about being housed in a dormitory environment, and was assured by the sergeant that he would initially receive a 14-day COVID-19 quarantine and either housed alone or with one other inmate. The inmate also

expressed some family concerns and the CIT agreed to allow him to call his mother. Following completion of the SRASHE, the clinician determined that inmate was at both low acute and chronic risk for suicide. The inmate was no longer expressing SI and his safety concerns had dissipated. He was not referred to the MHCB, but was placed on a five-day clinical follow-up and referred to a psychiatrist for review of his psychotropic medication. The inmate was seen by the psychiatrist the following day (May 26) and was noted to be stable during each of the five-day clinical follow-ups that were performed from May 26 through May 30, 2021. In short, members of the CIT worked together very collaboratively and effectively diffused the crisis.

In conclusion, the current assessment found that only 61 percent (14 of 23) of audited facilities achieved over 90 percent compliance with the required completion of SRASHEs following emergent/urgent mental health referrals. Most of the failures were related to cases involving urgent mental health referrals. Completion of SRASHEs for inmates presenting as possible risk for suicide by expressing SI and/or engaging in SIB must be automatic; therefore, 100 percent compliance is required because failure to complete such an assessment can result in death by suicide within CDCR facilities. The current assessment found that one (SQ) of the 23 facilities was at 100 percent compliance with this measure. In addition, the current assessment found that all 20 audited facilities with a MHCB units had over 90 percent compliance with SRASHE completion during admission and discharge from those units. The assessment also found only 61 percent (14 of 23) of audited facilities had compliance rates over 90 percent for both the seven-hour SRE training and SRE mentoring training. Finally, the CITs continued to play a prominent role in the response to emergency mental health crises within CDCR facilities, and most observed programs had both adequate policies and practices.

**Recommendations**:

Although all CDCR facilities should be at 100 percent compliance with completion of SRASHEs for emergent/urgent mental health referrals involving SI and SIB, at a minimum, CAPs should be developed for the nine facilities (CIM, CMC, CSATF, CSP/LAC, KVSP, MCSP, NKSP, SVSP, and WSP) that were under 90 percent compliance during this assessment. Develop CAPs for the eight facilities (CMF, CCWF, CHCF, CTF, CSP/Solano, NKSP, RJD, and SVSP) that had completion rates under 90 percent for both the seven-hour SRE training and SRE mentoring program training.

It is also strongly urged that all CDCR facilities with a CIT program ensure that referred inmates receive continuous observation prior to the CIT arrival, reasonable privacy and confidentiality during the encounter, full team participation (by clinician, nurse, and lieutenant or sergeant), adequate assessment by the clinician (including SRASHE completion for cases involving suicidal behavior), and accurate completion of CIT Power Forms in EHRS.

### J)    <u>Safety Planning for Suicidal Inmates</u>

<u>Summary</u>:

Safety planning includes a specific strategy that describes signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient and clinician can take if suicidal thoughts do occur. This reviewer's previous assessments, including the preceding (fourth re-audit) assessment, found that safety planning to reduce a MHCB patient's suicide risk was observed to be inconsistent during IDTT meetings, and the vast majority of safety plans developed by MHCB clinicians for suicidal patients were grossly inadequate and often simply repeated *Program Guide* requirements (e.g., "discharge from MHCB, provide 5-Day Follow-Up by Primary Clinician, provide daily rounds by the PT, and medication management"), rather than a specific plan to reduce the inmate's suicide risk. In addition, there was little concordance between safety planning strategies developed within the SRASHEs that justified the discharge from a MHCB unit and subsequent five-day follow-up check notes written by clinicians to indicate that safety plan objectives were being addressed (see previous <u>Recommendations 17-18</u>).

In an effort to improve the quality of safety planning throughout the prison system, the SMHP subsequently decided to implement a safety plan model entitled Safety Planning Intervention (SPI). The SPI model was intended to provide a prioritized and specific set of coping strategies and sources of support that suicidal patients could utilize should suicidal thoughts reemerge. Comprising seven steps, SPI was originally developed to be utilized in settings where emergency services or acute care services were provided, such as emergency rooms and crisis hotlines. Other than CDCR, this reviewer was not aware of any other state or local correctional agency that currently utilizes SPI.

Members of the Special Master's team were first introduced to SPI during a SMHP presentation in July 2018. The team was initially impressed by the presentation but remained concerned that the SPI model could not sufficiently be adapted to include specific risk reduction strategies for patients in a correctional environment. Ultimately, subsequent support of the SPI model by the Special Master's team was primarily given based upon the need to provide an immediate alternative to woefully inadequate safety planning practices within CDCR. The SPI process was initiated systemwide in August 2019.

Finally, in a separate effort to address inadequacies in safety planning, this reviewer had recommended in 2017 that CDCR develop a process by which each safety plan contained within the SRASHE of a patient released from a MHCB unit was reviewed in real time by an SRE mentor at that facility. Without interfering with the physical and administrative discharge of the patient from the MHCB unit, any safety plan found to be deficient (i.e., not containing a reasonably specific strategy to reduce SI) would immediately be returned to the authoring clinician for revision. Almost three years later on March 10, 2020, CDCR finally released the appropriate policy to address this issue. The "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" (12.05.200.P4) required MHCB unit supervisors or designees to review the safety plan section of SRASHEs for patients discharged from a MHCB unit to ensure that the plans include "specific risk reduction strategies."

In conclusion, the preceding (fourth re-audit) assessment included review of safety plans developed both before and after the SPI model and still found that only 11 percent (two of 18) of the audited facilities had adequate safety planning practices.  In addition, the previous assessment found only 45 percent compliance with safety planning training.  Based upon these poor findings, this reviewer recommended to CDCR that the decision whether to retain the SPI model or return to the original concept of safety planning should be made immediately and well before this reviewer's scheduled fifth re-audit.  In addition, this reviewer informed CDCR that the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy would be audited during the next assessment (the current fifth re-audit).

**Current Findings**:

The current status of safety planning is provided in the following timeline.  CDCR agreed with this reviewer's previous findings that the SPI concept within CDCR was problematic and needed to be replaced, as well as a return to the original concept of safety planning, with revisions, was appropriate.  The revision process was initiated in August 2020, with policy and procedure development originally estimated to be completed by December 2020.  In addition, CDCR estimated that "the EHRS build" would be completed by February 2021, with completion of training and activation of the new safety planning process by the end of May 2021.  As reported in the first "Defendants Updated Activation Schedule for Completion of Court-Ordered Suicide Prevention Recommendations" (ECF No. 7024, filed on January 15, 2021), the "Initial proposal has been developed and OSM (Office of the Special Master) has consulted on factors to consider for the revised safety plan model.  Work is ongoing to refine the model.  Additional modifications will be made based upon procedural decisions regarding when safety plans must be created for patients at risk for suicide."

Although the new safety planning program was estimated to be completed by May 2021, there have been multiple delays in the process.  In order to better ensure that the new safety planning program was successful, this reviewer has generally supported several extensions to the revised safety planning program in the Suicide Prevention Activation Schedules.  For example, when draft safety planning templates and policies and procedures were presented to Special Master's experts in May 2021, this reviewer recommended that the new template be piloted at several facilities to test its effectiveness.  CDCR initially decided to choose only one pilot site (CIM) for testing.  During an on-site assessment of suicide prevention practices at CIM in September 2021, this reviewer examined several safety planning templates and expressed disappointment in the process.  As a result, additional pilot sites were selected at four other facilities (CMC, COR, CSP/LAC, and CSP/Sac).  A revised policy and procedure were presented to the Special Master's experts for comment in October 2021.  During the next several months, CDCR continued to refine the safety planning template and policy/procedure, as well as develop training curricula based upon feedback from the four pilot sites. On March 4, 2022, the Special Master's experts met with SPRU leadership after they expressed disappointment that the piloted safety plan template had not demonstrated significant improvement.  As a result of the meeting, the SPRU decided that additional time was needed to further revise the safety planning training curricula.  Then, according to the most recent Suicide Prevention Activation Schedules (ECF No. 7562, filed on May 31, 2022), CDCR notified the Special Master and the court that

implementation of the new safety planning program was going to be delayed until September 30, 2022, stating that "The delay is caused by the need to incorporate crucial updates to the training materials, COVID-19-related staffing shortages, and the diversion of resources to other court ordered projects, such as the Unmet Beds Need Assessment and the Special Master's 29th Round of Monitoring" (at 2).

Due to the prolonged delay in the implementation of the revised safety planning program, this reviewer decided not to formally review the quality of safety planning during the current assessment. However, the current assessment did include a review of whether safety plans were developed for patients discharged from a MHCB unit (if they had been admitted for suicidal behavior) and compliance with safety plan training. The review found that only 70 percent (14 of 20) of audited facilities with active MHCB units had compliance rates over 90 percent for safety plans developed at MHCB discharge. The six deficient facilities were: CMF, CSATF, CSP/LAC, KVSP, MCSP, and SVSP. In addition, the informal review of safety planning during the current assessment process continued to find problematic practices, including, but not limited to, the following:

- Narrative that indicated the safety plan was not collaborative between the patient and clinician, but rather simply listed, without correction, the patient's exact words;

- At a few facilities, safety plans were often not completed because MHCB clinicians incorrectly assumed that such plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide. Such a rationale ignored the fact that MHCB patients should be at low acute risk for suicide when they are discharged from an MHCB.

- Narrative that suggested that the safety plan was generated as an afterthought during or following the patient's MHCB discharge IDTT meeting (e.g., "we will talk later about safety planning" and "let's talk about safety planning"), rather than starting the discussion within days of inpatient admission (if the patient was stable);

- Narrative that continued to deflect safety planning development to the outpatient clinician;

- Narrative that indicated the patient refused to participate in safety planning; and

- Most importantly, narrative that failed to include a specific strategy that described signs, symptoms, and the circumstances in which the risk for suicide was likely to recur, how recurrence of suicidal thoughts could be avoided, and actions the patient and clinician could take if suicidal thoughts reoccurred.

The current assessment also included review of the implementation of the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy (12.05.200.P4), effective March 10, 2020.  The policy was developed to better ensure that safety plans were written to include "specific strategies patients can employ" to reduce suicide risk.  The policy requires that "Prior to, or during the clinical discharge Interdisciplinary Treatment Team (IDTT) from the MHCB, the supervisor, or designee, shall review the discharge SRASHE…. After reviewing, if the SRASHE needs to be modified, the MHCB supervisor shall notify the clinician prior to, or during, the discharge IDTT of the changes that must be made."

Compliance with supervisory review of safety plans for patients discharged from the MHCB was found to be abysmal during the current assessment, with only five percent (one of 20) of audited facilities with active MHCB units found in compliance.  The lone facility was CSP/Sac.  There were a myriad of reasons for non-compliance, including, but not limited to, non-review because some supervisors were unaware of the policy requirement, inadequate assessment when supervisors incorrectly perceived that safety plans were not required for discharged patients at low acute risk for suicide or when patients refused to participate in process, or reviews were untimely and conducted in anticipation of the chart audit tool (CAT) process rather than prior to or during the discharge IDTT meeting.

Finally, the current assessment found that, although the SPI model was in the process of being replaced, 96 percent (22 of 23) of all audited facilities had compliance rates over 90 percent for SPI training, with only NKSP below the threshold at 83 percent.

In conclusion, with the noted exception of training, problematic safety planning practices continued during the current assessment period.  The review found that only 70 percent (14 of 20) of audited facilities with active MHCB units had compliance rates over 90 percent for safety plans developed at MHCB discharge, and only one facility was in compliance with the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy.

**Recommendations**:

A CAP should be developed for the six facilities (CMF, CSATF, CSP/LAC, KVSP, MCSP, and SVSP) that were under 90 percent compliance with safety planning completion at MHCB discharge.  A CAP should be developed to ensure that all CDCR facilities with MHCB units are in compliance with the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy requiring review and revision (when appropriate) of safety plans prior to, or during, discharge IDTT meetings.  The new safety planning model should no longer be delayed.[5]

---

[5] Subsequent to writing of this report, on October 5, 2022, CDCR notified the Special Master that implementation of the new safety planning program was going to be delayed once again until February 28, 2023.  When this reviewer's previous (fourth re-audit) assessment found significant problems with safety planning and recommended corrective action, CDCR's initial response to the Special Master and Court was that the new safety plan model would be implemented by May 2021.  As noted above, this reviewer has generally supported several extensions to the revised safety planning program in the Suicide Prevention Activation Schedules, but CDCR's recent explanation of implementation delays (on May 31, 2022) being caused by other projects not related to safety planning, as well as the October 5, 2022 notification, without explanation, are no longer reasonable.  No further delays in implementation are warranted.

K)     **MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks**

**Summary**:

Consistent with the need for continued safety planning of patients released from MHCB units and alternative housing to GP, administrative segregation, and other housing units, this reviewer's prior recommendations included strengthening existing procedures for follow-up assessments by mental health clinicians and welfare checks by custody staff (see previous Recommendations 28-29). Defendants developed several memoranda and compliance forms to strengthen the follow-up process. In March 2016, the "Interdisciplinary Progress Note – 5-Day Follow-Up" CDCR MH-7230-B form was released in final format. The accompanying policy, entitled "Release of Revised 5-Day Follow-Up Form," was released on May 31, 2016. On January 27, 2016, CDCR released a joint memorandum from the Director of the Division of Adult Institutions (DAI) and Deputy Director of the SMHP entitled "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy." The policy required custody staff to observe an inmate at 30-minute intervals for a minimum of 24 hours following MHCB discharge. The policy also required that a clinician perform daily mental health assessments to determine whether the 30-minute discharge checks were necessary beyond the minimum 24-hour requirement (up to 72 hours), or whether the inmate required a referral back to a MHCB unit.

In addition, a two-page "Discharge Custody Check Sheet" (CDCR MH-7497) form was required to be completed by both clinical and custody staff. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

On September 1, 2017, CDCR officials released a slightly revised memorandum to include inmates expressing SI and referred to, and discharged from, alternative housing "when clinically indicated." An "Updated Mental Health Crisis Bed - Referral Rescission, and Discharge Policy and Procedures" memorandum and policy were issued on September 18, 2018 and October 15, 2018, respectively.

Finally, CDCR released the "Revision of Mental Health Crisis Bed Discharge Custody Checks Form and Introduction of Audit Requirement" memorandum on October 19, 2021 as a clarifying directive to require that any decision to discontinue custody checks must be made by as clinician following a face-to-face assessment. The memorandum also introduced an audit tool to measure compliance with each component of the "Discharge Custody Check Sheet" (CDCR MH-7497) form process. The preceding (fourth re-audit) assessment found almost 100 percent compliance with the "Interdisciplinary Progress Note-5-Day Follow-Up" (CDCR MH-7230-B) form process by clinical staff; whereas compliance with the "Discharge Custody Check Sheet" (CDCR MH-7497) form process by both clinical and custody staff was at only five percent (one of 20) of audited facilities.

**Current Findings**:

      This reviewer's current assessment continued to include an audit of both the "Interdisciplinary Progress Note-5-Day Follow-Up" (CDCR MH-7230-B) form process by clinical staff, as well as the "Discharge Custody Check Sheet" (CDCR MH-7497) form process by both clinical and custody staff. Overall, this reviewer found that 87 percent (20 of 23) of audited facilities maintained over 90 percent compliance with the "Interdisciplinary Progress Note-5-Day Follow-Up" (CDCR MH-7230-B) form process by clinical staff (and nursing staff in their absence). The three facilities that did not meet the 90 percent threshold were CTF, CSP/LAC, and SVSP. As noted in the preceding section of this report, the current assessment did <u>not</u> include a review of the quality of safety plans found in these five-day follow-up assessments.

      This reviewer's current assessment also found that only two (CCWF and SQ) of 23, or nine percent of the audited facilities, had clinicians and custody personnel correctly complete both pages of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms in 90 percent or more of the cases; virtually no significant improvement from the preceding assessment. During this most recent assessment, problems continued to be found in clinicians not accurately completing the first page; clinicians discontinuing custody checks in less than the required 24 hours; custody checks performed in excess of 30-minute intervals, and gaps in performed checks. The overall compliance rate for the correct completion of Page 1 by clinical staff was 79 percent, whereas the compliance rate for the correct completion of Page 2 by custody staff was 76 percent. Both of these rates of compliance were lower than the preceding assessment. Finally, clinicians ordered discontinuation of 30-minute custody checks after 24 to 48 hours in the vast majority of cases.

      In conclusion, this reviewer continued to find that clinicians (and nursing staff in their absence) consistently completed "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) forms in all 23 audited facilities. In addition, despite the introduction of a clarifying memorandum and audit tool to measure compliance in October 2021, accurate completion of the two-page "Discharge Custody Check Sheet" (CDCR MH-7497) forms continued to be problematic during the current assessment, with only two of 23, or nine percent of the audited facilities, having clinicians and custody personnel correctly complete both pages of the forms in 90 percent or more of the cases.

**Recommendation**:

      Develop CAPs for the 21 facilities that were below 90-percent compliance with Page 1 and/or Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form.

### L)    Local SPRFITs

**Summary**:

Each local SPRFIT is required to meet at least monthly and carry out various responsibilities, to include ensuring compliance with all CDCR suicide prevention policies and procedures, five-day clinical follow-ups, safety plans, etc. Previous assessments by this reviewer found that, although the SPRFIT concept was a valuable tool in CDCR's suicide prevention program, the local process was not functioning as intended and needed to be rebooted. Most importantly, many of the deficiencies identified by this reviewer in each prison were easily observable and should not have been identified for the first time by a Special Master's expert and/or monitor, but rather by the local SPRFIT. Therefore, one of this reviewer's previous recommendations in 2016 was for CDCR, under the guidance of the Special Master, to re-examine and revise its SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool (see previous Recommendation 31).

Because CDCR did not finalize the revised SPRFIT policy, the *Coleman* court ruled on January 25, 2018 that "[g]ood cause appearing, defendants will be directed to provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, not later than thirty days from the date of this order." (ECF No. 5762 at 3.) On February 2, 2018, CDCR issued the "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum that "clarifies, modifies, and establishes requirements and responsibilities." It also reemphasized that a meeting "quorum" included all mandatory members or designees. The revised memorandum became effective on March 1, 2018 and contained 19 responsibilities that included, but were not limited to, monitoring suicide prevention training, safety planning, and five-day follow-up compliance; review the quality of SRASHEs to ensure they are clinically appropriate; conducting semi-annual root cause analyses (RCAs) of serious suicide attempts; providing assistance and coordination for the activities of visiting SMHP and DAI suicide case reviewers following an inmate suicide; and conducting self-assessments related to compliance with suicide prevention items developed by the SMHP's Quality Improvement Unit. In addition, each SPRFIT was required to develop a LOP that was consistent with the CDCR directive of February 2, 2018; as well as policies and procedures regarding establishment of a local "High Risk Management Program" and identifying inmates who received "bad news" following return from court and/or Board of Parole Hearings (BPH).

The preceding (fourth re-audit) assessment found that only 70 percent (14 of 20) of the local SPRFITs had signed and/or dated LOPs that were consistent with the CDCR directive of February 2, 2018. In addition, only 40 percent (eight of 20) of the SPRFITs achieved three consecutive months of meeting quorums. The preceding assessment found only 55 percent (11 of 20) of the SPRFITs had a signed and/or dated policy and procedure for their "High Risk Management Program," and only five percent (one of 20) of the SPRFITs had a signed and/or dated policy and procedure for identifying inmates who received "bad news" following return from court and/or BPH. Recommendations offered during the preceding assessment included a focus on correcting deficiencies identified by this reviewer's assessment reports, as well as sustaining implemented corrective actions, rather than simply reporting out on compliance rates.

Recommendations also included ensuring that local SPRFITs maintained monthly meeting quorums, and had LOPs for their SPRFITs, "High Risk Management Program," and for identifying inmates who received "Bad News" following return from court and/or BPH.  CDCR was also encouraged to initiate the long-delayed, self-imposed "paused" SPRFIT responsibility to conduct RCAs for serious suicide attempts without further delay.

**Current Findings**:

In partial response to this reviewer's preceding assessment recommendations, CDCR's SMHP and the CCHCS Quality Management Program subsequently entered into a partnership with the goal of standardizing operations among all local SPRFITs, increasing access to automated data, increasing the efficiency of SPRFIT meetings, and introducing nationally-recognized improvement techniques.  The partnership became known as the "SPRFIT Reboot." In the first "Defendants Updated Activation Schedule for Completion of Court-Ordered Suicide Prevention Recommendations" (ECF No. 7024, filed on January 15, 2021), CDCR reported that:

> This interdisciplinary team has developed standardized metrics, an automated report for the SPRFIT Committees at the institution, and has begun piloting the training to the field.  Continued work on the finalization of the SPRFIT dashboard is underway.  By the end of March 2021, all initial SPRFIT materials will be completed for test phase, including first version of the automated SPRFIT Report. April 2021-July 2021: the new process will be rolled out to four test institutions to validate data, make refinements to the automated reports and SPRFIT materials, and evaluate new SPRFIT process for efficiency/effectiveness.  August 2021: the workgroup and MH leaders will consider results from the test phase and determine appropriate changes/reports to be rolled out statewide.  December 2021: the full program will be implemented statewide.

According to defendants' most recent Suicide Prevention Activation Schedules (ECF No. 7562, filed on May 31, 2022), the systemwide rollout of the SPRFIT Reboot was pushed back again twice more from December 2021 to February 2022, and then from February 2022 to June 30, 2022.  Most of the delay was based upon refinement of the process following feedback from the four facilities that piloted the new SPRFIT model.  Another delay occurred on May 9, 2022 when CDCR announced through email notification that the SPRFIT Reboot would be tentatively rolled out in facilities at three staggered phases between June and October 2022.  The finalized process would include training on quality improvement committee concepts, standardized committee processes, and improvement techniques and tools including, but not limited to, a standardized SPRFIT agenda and measurement plan, automated SPRFIT report and program assessment tool, and report-out templates for improvement projects.  The following week, on May 16, 2022, CDCR notified the Special Master that the SPRFIT Reboot "is now estimated to be completed by the end of December 30, 2022.  The delay is caused by scheduling difficulties to have all three disciplines attend training sessions over the span of several days.  This difficulty is further exacerbated by the staffing shortages previously mentioned."

The current assessment continued to focus on the following areas: did each SPRFIT have an LOP, did each SPRFIT achieve meeting quorums in consecutive months, did each SPRFIT

conduct either semi-annual RCAs or case summaries of serious suicide attempts, and did each SPRFIT have policies and procedures for both a "High Risk Management Program" (now referred to as the "Suicide Risk Management Program") and identifying inmates who received "bad news" following return from court and/or BPH.

The assessment found that 87 percent (20 of 23) of the SPRFITs had signed and/or dated LOPs that were consistent with the "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum dated February 2, 2018. SPRFITs with either no LOP or LOPs inconsistent with the memorandum, were found at CSP/LAC, KVSP, and SQ. In addition, in applicable facilities that experienced serious suicide attempts, very few SPRFITs were found to have completed either semi-annual RCAs or case summaries of the incidents. Further, only 26 percent (six of 23) of the SPRFITs achieved six consecutive months of meeting quorums for all mandatory members or their designees. As noted in a subsequent section of this report, problems were noted at each of the three CDCR RCs where SPRFITs were required (and failed) to collect data and assess compliance with various RC expectations and report such findings during monthly SPRFIT meetings.

Finally, in addition to the CIT policy that became effective July 2021 and was previously referenced in this report, two other CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021, and the "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. The current assessment found that only 70 percent (16 of 23) of the audited facilities had an LOP that addressed "Inmate-Patients Receiving Bad News," and only 61 percent (14 of 23) of the audited facilities had an LOP that addressed the "Suicide Risk Management Program." Of note, this reviewer found that compliance with both directives increased during the assessment period as more facilities became aware through the SPRU that this reviewer would be requesting the LOPs during the on-site audit.

The current assessment also found that very few local SPRFITs reported the tracking of SRMP patients in monthly meetings minutes, and there appeared to be a misunderstanding as to the role of the local SPRFIT in the SRMP. For example, at CSP/Corcoran, SPRFIT meeting minutes appropriately provided a brief summary of each SMRP patient, whereas other facilities, like CSATF, simply listed the total number of inmates in the SRMP, an unhelpful piece of information. Finally, although local SPRFITs had the responsibility for reviewing the quality of SRASHEs to ensure they were "clinically appropriate," review of monthly SPRFIT meeting minutes indicated that, although a few local SPRFITs included Performance Report data indicating the "timeliness" of completed SRASHEs, few addressed the "quality" and "clinical appropriateness" of completed SRASHEs.

In conclusion, consistent with the above finding that compliance with LOP development increased in anticipation of this reviewer's on-site assessment (with the assistance of the four newly-appointed regional suicide prevention coordinators), many of the overall deficiencies identified by this reviewer during the current assessment continued to be easily observable and should not have been identified for the first time by a Special Master's expert, but rather by the local SPRFIT prior to the on-site audit. There were numerous examples of these easily

observable deficiencies, detailed in other sections of this report and in the facility assessments found in Appendix A, including the following:

- In an intake screening observed by this reviewer at NKSP, the inmate was handcuffed and situated in a chair, with an officer standing behind the inmate. Following the screening, this reviewer asked the nurse whether it was common practice for an officer to remain in the cell during the intake screening process. The nurse responded that an officer only remained in the cell when nursing staff were screening a maximum-security inmate. When asked if the TTMs in the room were ever utilized by nursing staff for the screening of maximum-security inmates, the nurse responded – "No" – TTMs were *only* utilized by mental health clinicians when they responded to the R&R unit for an emergency consultation.

- At CCWF, this reviewer determined that a TTM previously installed in the program room of the MHCB unit was rarely utilized. When several clinicians were asked where they conduct one-on-one clinical sessions with maximum-security patients, they uniformly responded that all clinical contacts with maximum-security MHCB patients either occurred cell-front or with the patient's door opened, the patient handcuffed and sitting on their bed, and the clinician and officer standing in the open doorway of the cell.

- At CSATF, all ten new intake cells in the STRH unit were observed to be full and this reviewer was informed that any new intake inmate who could not be housed in the STRH unit would be transferred to the administrative segregation "overflow" cells located in E-Yard, Building 1. Inspection of these designated overflow cells found that three new intake inmates were housed in the cells and none of the cells were suicide-resistant, with numerous hazards that were easily conducive to suicide attempts by hanging.

- At CIW, CSP/Corcoran, CSATF, and NKSP, numerous staff in the MHCB units were misinterpreting and misusing CDCR quarantine directives (i.e., the "COVID-19 Mandatory 15-Day Modified Program" memorandum and facility daily PSRs) to deny patients the opportunity for out-of-cell activities.

- During an observed crisis response at CSP/LAC, a clinician walked over to an inmate situated in a TTM located in a crowded gymnasium (with other inmate playing basketball) and began to initiate the assessment. The inmate was clothed only in his boxer shorts, with his clothing placed on a chair outside the module. A second inmate was situated in another TTM less than a foot away. This reviewer needed to immediately interrupt and suggest that the inmate be moved to another TTM location for privacy and confidentiality. The clinician then asked the inmate if he desired such privacy and confidentiality, and inmate said "yes" and also requested his t-shirt.

- In all but one facility with a MHCB unit, supervisors and/or SPRFIT coordinators were either unaware of, or simply non-compliant with, the policy requiring timely review of safety plans for patients discharged from a MHCB unit.

**Recommendations**:

CDCR should develop CAPs for the three facilities (CSP/LAC, KVSP, SQ) that had either no SPRFIT LOP or LOPs that were inconsistent with SPRFIT memorandum. CDCR should develop CAPs for the seven facilities (CCWF, CIM, CIW, CMF, CSP/Sac, CSP/Solano, and SQ) that did not have an LOP addressing "Inmate-Patients Receiving Bad News." CDCR should develop CAPs for the nine facilities (CCI, CCWF, CHCF, CIM, CIW, CMF, CSP/Sac, CSATF, and WSP) that did not have an LOP addressing the SRMP, as well as CAPs to ensure that all local SPRFITs track SRMP patients and review the program status of patients during monthly SPRFIT meetings. CDCR should develop CAPs for the 17 facilities that did not achieve six consecutive months of meeting quorums for all mandatory members or their designees. CDCR should immediately initiate the SPRFIT responsibility for conducting semi-annual RCAs for serious suicide attempts or, in the alternative, case summaries to be discussed during monthly meetings. CDCR should create a CAP that addresses the requirement for local SPRFITs to review both the quality and clinical appropriateness of completed SRASHEs, and report findings in meeting minutes. The SPRFIT Reboot should no longer be delayed; it should be implemented no later than December 30, 2022.

## M)  **Suicide Prevention Training**

**Summary**:

Previous assessments of both pre-service and annual suicide prevention in-service training (IST), including the *Mental Health Services Delivery System Instructor Guide*, found some concerns regarding content, length of training, and low completion rates for both health care and non-custody staff (see previous Recommendations 1 and 3). In November 2018, the SMHP received approval from the BCOA to expand the pre-service suicide prevention training from 2.5 hours to four hours based upon this reviewer's previous recommendation. The training curriculum, entitled "Inmate Suicide Prevention" Lesson Plan (Version 1.0), and 155-slide PowerPoint presentation was finalized and approved for instruction in December 2020. This reviewer was scheduled to observe live presentation of the curriculum prior to the COVID-19 pandemic.

In addition, the two-hour annual IST suicide prevention curriculum, entitled "Suicide Prevention," has been revised on several occasions. The most recent version is Version 4.0 which contains 54 PowerPoint slides. This version of the annual suicide prevention training curriculum was initiated in CDCR facilities beginning in January 2020. The curriculum is periodically updated to revise inmate suicide data.

The preceding (fourth re-audit) assessment found that all of the audited facilities had compliance rates for annual suicide prevention IST of custody personnel that were well above 90

percent, with the overall rate of compliance at 98 percent. In addition, there was some improvement in annual suicide prevention IST of both medical and mental health personnel. The prior assessment also found that 63 percent of audited facilities had compliance rates for IST of medical staff that were above 90 percent, the overall rate of compliance at 92 percent. Further, 79 percent of audited facilities had compliance rates for IST of mental health staff that were above 90 percent, with the overall rate of compliance at 94 percent. Eight facilities had compliance rates for either (or both) medical/mental health personnel under 90 percent.

**Current Findings**:

This reviewer observed live presentation of the four-hour "Inmate Suicide Prevention" curriculum at the BCOA via Teams during two separate workshops on July 12 and July 13, 2022. Two different psychologists presented the workshops; the curriculum material was adequately presented during both presentations. Feedback regarding suggested improvements was subsequently provided to the SPRU.

This reviewer's current assessment also found that 73 percent (16 of 23) of the audited facilities had compliance rates for annual suicide prevention IST of custody personnel that were well above 90 percent, with the overall rate of compliance at 90 percent. One facility (CHCF) did not report IST data for custody personnel. In addition, the current assessment found that 65 percent (15 of 23) of audited facilities had IST compliance rates for medical staff that were above 90 percent, with the overall rate of compliance at 89 percent. Further, 78 percent (18 of 23) percent of audited facilities had IST compliance rates for mental health staff that were above 90 percent, with the overall rate of compliance at 93 percent. Finally, four facilities (CCI, CHCF, CIW, and RJD) had IST compliance rates below 90 percent for two or more disciplines.

**Recommendation**:

CDCR should collaborate with the Special Master's suicide prevention expert during the next scheduled review of the four-hour pre-service "Inmate Suicide Prevention" curriculum in order to better enhance the content and presentation. In addition, CDCR should develop CAPs for annual suicide prevention IST in the four facilities (CCI, CHCF, CIW, and RJD) that were below 90-percent compliance for suicide prevention training for two or more disciplines.

## N)    **Continuous Quality Improvement**

**Summary**:

By order of the *Coleman* court (ECF No. 4232, filed August 30, 2012; ECF No. 4561, filed April 23, 2013; ECF No. 5092, filed March 3, 2014), defendants were directed to develop an improved quality improvement process by which CDCR could identify issues and improve its performance levels in the delivery of mental health care. The result was the development of a Continuous Quality Improvement Tool (CQIT). During an earlier portion of the SPMW process,

CDCR agreed to incorporate this reviewer's "Suicide Prevention Audit Checklist" into its overall CQI process (see previous <u>Recommendation 32</u>). The checklist included 19 measures.[6]

A review of CDCR's revised Continuous Quality Improvement On-Site Audit Guidebook, revised multiple times over the years, found it included many, but not all, of this reviewer's 19 "Suicide Prevention Audit Checklist" measures. During SPMW and All-Parties Workgroup meetings in 2019, CDCR repeatedly stated that all 19 measures would be incorporated into either the CQIT or other CQI processes. At a larger *Coleman* policy meeting with the parties on November 22, 2019, this reviewer was presented with a rebranded version of the "Continuous Quality Improvement On-Site Audit Guidebook" entitled "Continuous Quality Improvement Suicide Prevention: Self-Audit Guidebook." This rebranded version was still dated August 16, 2019 and contained most, but not all, of this reviewer's 19 suicide prevention audit measures. During the meeting, CDCR reiterated that the 19 measures would be gathered by a variety of sources, including on-site CQI audits, chart audits by the SMHP, and utilization of "On-Demand" data. It was further explained that the "Continuous Quality Improvement Suicide Prevention: Self-Audit Guidebook" was designed to be utilized by local SPRFITs in auditing of suicide prevention practices in their respective facilities. At that point, it still remained unclear why all 19 suicide prevention audit measures were not included in the Guidebook. Finally, during that November 2019 *Coleman* Policy Meeting, a SMHP administrator interjected by stating "if SPRFITs were going to be responsible for replicating Mr. Hayes's suicide prevention audits in the future, all of the (19) items needed to be included in the Guidebook."

Finally, the first "Defendants Updated Activation Schedule for Completion of Court-Ordered Suicide Prevention Recommendations" (ECF No. 7024, filed on January 15, 2021), stated that "CDCR continues to work to finalize the template of the CQI-Suicide Prevention tool. Work to complete the language to present to the OSM (Office of the Special Master) is underway and we will schedule consultation meetings with the OSM as we move closer to a complete draft." The project was scheduled to be completed, to include staff training, before April 30, 2021.

<u>**Current Findings**</u>:

Nine months later on September 13, 2021, CDCR informed the *Coleman* court and Special Master in the "Defendants Updated Activation Schedule for Completion of Court-

---

[6]The measures were: 1) Observation of R&R intake screening by nursing/RC screening by diagnostic clinicians; 2) Confirming R&R/RC screening completeness and privacy and confidentiality; 3) Administrative segregation new intake inmates housed in retrofitted new intake cells for 72 hours; 4) Psych Tech rounds in administrative segregation, SHU, and PSU; 5) Guard One compliance in administrative segregation, SHU, and PSU; 6) SRASHEs required for emergent/urgent mental health referrals for SI/SIB/SA; 7) Use of Alternative Housing; 8) Suicide-resistant MHCBs; 9) SRASHEs required for admission/discharge in MHCB and alternative housing; 10) Observation of MHCB patients; 11) Clothing/property/privileges orders for MHCB patients; 12) Safety planning for suicidal patients in MHCBs; 13) Five-day clinical follow-ups for MHCB, Alternative Housing, DSH, and Psychiatric Inpatient Program (PIP) returns; 14) Clinical and Custody 30-minute Discharge Checks for non-ASU inmates returning from MHCB, Alternative Housing, DSH, and PIP (Form 7497); 15) Emergency response equipment in housing units; 16) CPR training for custody and medical staff; 17) Annual suicide prevention training for custody, medical, and mental health staff; 18) SRE Mentoring/7-hour SRE training/Safety Planning training for clinicians; and 19) SPRFIT responsibilities.

Ordered Suicide Prevention Recommendations" (ECF No. 7306), that "Upon further review, and in consultation with the OSM, Defendants are revising this item to document that full and final roll out of this item is inextricably tied to the SPRFIT Reboot project…..Given this analysis, the revised completion is being moved to 2/28/2022. It should be noted that the development of the manual self-assessment tool for use at the local level is actively being utilized by the four test institutions in the SPRFIT Reboot trial implementation. The full CQIT contains all 19 suicide prevention indicators, as identified by Mr. Hayes, to be used at the regional/statewide level."

On February 23, 2022, the Special Master received another version of the "Continuous Quality Improvement On-Site Audit Guidebook," dated February 3, 2022. This reviewer was subsequently informed by CDCR that the guidebook contained all of the 19 Suicide Prevention Audit Checklist measures. However, review of this revised version of the CQIT guidebook found that it did not contain all of the 19 Suicide Prevention Checklist measures. Five days later on February 28, 2022, CDCR again reversed course and informed the *Coleman* court and Special Master in the "Defendants Updated Activation Schedule for Completion of Court-Ordered Suicide Prevention Recommendations" (ECF No. 7480) that:

> CDCR recognizes that continuous quality improvement for suicide prevention requires multiple layers of oversight. At the institutional level, as part of the SPRFIT Reboot Project (see recommendation 31) a self-assessment tool is under development and is currently being tested with the four pilot institutions. It is anticipated this self-assessment tool will be finalized simultaneously with the larger SPRFIT Reboot project, by 6/30/2022. At the regional/statewide level, the suicide prevention coordinators for each region regularly complete site visits to all institutions that mimic an official Lindsay Hayes site visit. At the outcome of these tours a report is created with findings and any recommendations or corrective action that the institution must act upon to come into compliance with any deficiencies noted. Given these regional suicide prevention coordinator positions are relatively new, we are continuing to refine the language in these reports and align methodology of audits with those of Mr. Hayes when he conducts his visits. It is anticipated that these reports, as well as a finalized schedule for ongoing visits to institutions, based upon the size and scope of their mental health mission, will be completed by 6/30/2022.

As noted above, CDCR hired four suicide prevention coordinators during 2021 and they are assigned to each of the four regions and report directly to the SPRU at SMHP headquarters. Each of these coordinators provide technical assistance and support to facilities in their region, as well as complete periodic site visits to assess suicide prevention practices. These coordinators also prepare each facility for this reviewer's suicide prevention assessments. In addition, the SMHP hired a permanent chief psychologist for Statewide Suicide Prevention in April 2021 who oversees the suicide prevention coordinators and SPRU. These are promising developments.

On May 10, 2022, this reviewer received the first draft of a "Suicide Prevention On-Site Audit Guidebook. As subsequently related to this reviewer by SPRU leadership, this guidebook, when finalized, would be utilized internally by the four regional suicide prevention coordinators on an interim basis until the larger "Continuous Quality Improvement On-Site Audit Guidebook"

was finalized and approved by the Special Master and *Coleman* court. This reviewer's extensive critique of first draft was returned to SPRU leadership on July 25, 2022.

In conclusion, this reviewer's preceding (fourth re-audit) assessment recommended that "CDCR immediately: (1) incorporate all of this reviewer's 19 "Suicide Prevention Audit Checklist" measures into any CQI Guidebook, and, (2) any CQI audit report of an individual facility's suicide prevention practices should be formatted to contain data on all 19 suicide prevention measures." To date, although a suicide prevention audit guidebook is in a first draft, CDCR has not yet implemented either of these recommendations.

**Recommendation**:

No additional recommendations are offered related to this issue.

**O)**    **Suicide Case Reviews**

**Summary**:

As detailed in previous reports, the MHSDS *Program Guide* provides detailed procedures in the event of an inmate death by suicide. Following a suicide, the Division of Correctional Health Care Services' (DCHCS) SPRFIT coordinator appoints a Suicide Reviewer to begin reviewing the case. The primary purpose of the suicide review is to try to understand how the death occurred, what was the precipitant(s) to the suicide, as well as any system failures that, once corrected, will allow the agency to improve the suicide prevention program. The Suicide Reviewer examines all relevant documentation in the case, including, but not limited to, the decedent's central file, health care record, and all relevant CDCR policies and procedures. The Suicide Reviewer is assisted by both a custody supervisor from the Mental Health Compliance Team (MHCT) and a Nurse Consultant Program Reviewer. The review also includes inspection of the decedent's cell and its contents, as well as interviews with select custody, medical, and mental health personnel, inmates, and family members of the decedent, when appropriate. Within approximately 30 calendar days of the suicide, the Suicide Reviewer is required to complete a preliminary Suicide Report that contains relevant findings and recommendations, if any, for a QIP regarding the suicide. The preliminary report is forwarded to the DCHCS SPRFIT Coordinator and the report is subsequently discussed at a Suicide Case Review Committee meeting. Members of the Committee include SMHP staff, DAI and nursing leadership, MHCT members, and CDCR Office of Legal Affairs representative(s). In addition, leadership from the facility where the suicide occurred is represented at the meeting. Members of the *Coleman* Special Master's team are also invited to observe and participate in the process as necessary. Following the Suicide Case Review Committee meeting, the Suicide Report is finalized, and local facility leadership is required to implement any QIPs pursuant to a defined schedule.

**Current Findings**:

A considerable strength of the CDCR suicide prevention program continues to be the Suicide Case Review process. Since at least June 2015, members of the Special Master's team have reviewed each preliminary Suicide Report and observed, as well as often participated in, the Suicide Case Review Committee meetings. Although members of the Special Master's team have provided critiques of individual preliminary reports that have resulted in some revision of those reports, overall, Suicide Reports authored by the suicide reviewers have not only been very comprehensive but provided thoughtful and targeted QIPs for correcting deficiencies and improving suicide prevention practices.

During the current assessment period, CDCR experienced 43 inmate suicides in audited facilities between January 2020 and April 2022, with Suicide Reports developed in each case. This reviewer examined 42 of those 43 Suicide Reports and they are each summarized in the facility assessment sections of Appendix A.[7] One case did not contain any QIPs, resulting in 41 Suicide Reports generating approximately 219 QIPs. Those QIPs are categorized as follows:

- Missing a variety of mental health documentation/appointments: 53
- Inadequate/lack of SRASHEs and/or Safety Plans: 29
- Level of care errors: 16
- Diagnostic errors: 2
- Delay in emergency medical response - CPR, cut-down kit retrieval, other: 19
- Psychiatry documentation/medication errors: 6
- Psychiatry missed appointments: 11
- Administrative segregation deficiencies - new intake cell, supervisory review, other: 6
- Problems encountered during MHCB/TMHU/PIP placement: 11
- Observation deficiencies in MHCB/TMHU/Guard One: 11
- Nursing documentation (general): 10
- Nursing errors during emergency response: 13
- Delay in 911 activation: 7
- Training (suicide prevention/CPR): 8
- Minor/miscellaneous: 17

Similar to previous assessments, the above listed QIPs continued to document repetitive deficiencies in such areas as missing mental health documentation/appointments, inadequate development/lack of SRASHEs, level of care decisions, delays in emergency medical response, and delays in 911 activation. The strength of the Suicide Case Review process remains the comprehensiveness of each review; a weakness is the repetitive nature of the deficiencies.

**Recommendation**:

No recommendations are offered related to this issue.

---

[7]One case was not reviewed because the Suicide Case Review process was delayed pending receipt of the autopsy report.

P)    **Reception Center Practices**

**Summary**:

This reviewer's previous audits found problematic practices regarding RC intake nursing staff and diagnostic clinicians not always receiving and/or reviewing timely information from local county jail systems, as well as diagnostic clinicians' review of intake nursing screening forms.  The concerns were accentuated by nine RC suicides during 2017.

In this reviewer's third re-audit report released in November 2018, it was recommended that the RC Workgroup (since disbanded) include the following during its deliberations:  (1) CAPs in each RC facility to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, nurse's offices where intake screening is administered, and pill call windows; (2) ensure review and distribution of the HQ SPRFIT memorandum regarding the results of the evaluation of "the process used by clinicians when reviewing jail records" as related to the WSP suicide in July 2017; (3) the necessity to provide direction to clinicians assigned to the RC diagnostic testing areas to ensure that they consistently review both the most recent Initial Health Screening forms and any available county jail records prior to and/or during completion of the Mental Health Screening Interview process; and (4) review Chapter 2 ("Reception Center Mental Health Assessment") of the MHSDS *Program Guide* to determine if unclear language regarding requirements for review of health care information from both county jails and prior CDCR confinements is in need of clarification (see previous Recommendation 32).

The following year in August 2019, CDCR generated a "Clarification of Mental Health Documentation Review Requirements" memorandum which re-emphasized previously established responsibilities of RC diagnostic clinicians to review documents that include, but were not limited to, initial intake screening forms, county jail records, mental health records, and custody records.  The directive also clarified that RC clinicians should request that the inmate sign a "CDCR 7385 Authorization for Release of Protected Health Information (or ROI)" form during the Mental Health Screening Interview process if a prior history of mental health treatment is reported.

In this reviewer's preceding (fourth re-audit) report, although the assessment found that all diagnostic clinicians conducted appropriate screenings in private offices that ensured both privacy and confidentiality, problematic practices regarding consistency in reviewing outside documents remained.  The report recommended that "CDCR should provide verification to the Special Master that all RC facilities (CCWF, CIM, DVI, NKSP, SQ, and WSP) are aware of their suicide prevention responsibilities."

**Current Findings**:

In response to this reviewer's previous recommendations, CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was released on January 27, 2021 and required all RCs to have suicide prevention placards (both Spanish and English versions) displayed in designated areas (including offices of the RC diagnostic clinicians); RC diagnostic

clinicians were required to review the nurses' Initial Health Screening Forms, county jail records, and other pertinent documents within EHRS and the Strategic Offender Management System (SOMS); RC diagnostic clinicians were required to request that inmates sign ROI forms when reporting prior mental health services in the community; and RC diagnostic clinicians were required to complete SRASHEs when inmates presented with possible current risk for suicide. In addition, SPRFIT coordinators or designees at the RCs were required to collect data and assess compliance with these four expectations. The data or other required "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum were required to be included in monthly SPRFIT meeting minutes.

Due to downsizing and other mission change decisions, there are currently three RCs operational within CDCR: CCWF, NKSP, and WSP. This reviewer found a variety of suicide prevention practices within each of these RCs during 2021. At CCWF-RC, although privacy and confidentiality were maintained during the process, as well as thorough assessments observed, it was a common practice during times of large volume intakes for the nurse's Initial Intake Screening and clinicians' Mental Health Diagnostic Testing to occur simultaneously. On such occasions, RC clinicians would be unable to review the nurse's completed Initial Intake Screening form because it was still in process of being completed. In addition, English and Spanish versions of the suicide prevention placard were not observed in the RC clinician offices.

At NKSP-RC, due to a HCFIP renovation project, RC clinicians were temporarily housed in offices within several RC housing units. Although privacy and confidentiality were maintained during the process, and both English and Spanish versions of the suicide prevention placard were observed in each RC clinician's office and dayrooms of each RC housing unit as required, there was a concern regarding one clinician's review of the nursing Initial Health Screening form prior to each assessment. For example, in one observed case, the clinician completed both the "MH Screening Interview Form" and "MHPC Consult Routine Progress Note" as required. However, this reviewer's subsequent examination of the progress note indicated that although the clinician wrote: "The Databases and/or sources of information reviewed included: County records (to date, no records were scanned into EHRS), SOMS, ERMS, EHRS documentation (Initial Health Care screening, additional MH documentation as available), and staff observation unless otherwise noted. The I/P [inmate patient] did not report outside treatment history. A ROI was not completed" -- this information was not entirely accurate. The inmate's county jail records had been scanned into the EHRS prior to the RC clinician's mental health screening and, therefore, available for review. In addition, the inmate had reported previous mental health treatment through the Veterans Administration that had been noted by the clinician on the MH Screening Interview form. An ROI form should have been completed as required. This reviewer found other case examples in which this clinician wrote boilerplate narrative into progress notes suggesting "no records were scanned into EHRS" despite the fact that county jail records had been previously scanned into the EHRS.

At the WSP-RC, diagnostic clinicians were observed to conduct thorough assessments in offices providing both privacy and confidentiality. Clinicians were also observed to have access to (and used) the Patient Health Information Portal during the process, and clinicians confirmed that they had access to SOMS and the county jail transfer sheet, as well as reviewed the nurse's

Initial Health Screening form prior to each assessment. Both English and Spanish versions of the suicide prevention placard were observed in each RC clinician's office.

Finally, required data or other "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum were <u>not</u> reflected in monthly SPRFIT meeting minutes for any of the three RCs. Of note, review of SPRFIT minutes at WSP indicated that, although there was discussion during the March 2021 meeting that "The first quarter was completed and will be the baseline. The date of the audit started after the initial staff received on-the-job training on the new documentation requirements," no data or other required "proof of practice" was contained in either the March meeting minutes or any of the subsequent monthly minutes (through June).

**<u>Recommendation</u>**:

Although no new recommendations are offered, this reviewer's prior recommendation from the fourth re-audit report is reiterated again - "CDCR should provide verification to the Special Master that all RC facilities (CCWF, NKSP, and WSP) are aware of their suicide prevention responsibilities," including (1) placement of suicide prevention posters in the offices utilized for direct patient care by RC nurses and RC diagnostic clinicians, as well as RC housing unit bulletin boards and RC pill call windows; (2) diagnostic clinicians are required to review the nurse's Initial Health Screening form, any county jail records, and other pertinent documents contained within the EHRS and SOMS for each inmate; (3) diagnostic clinicians completing the Mental Health Screening Interview form are to request that the inmate sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form during the screening process if a prior history of mental health treatment is reported; and (4) diagnostic clinicians completing the Mental Health Screening Interview form are required to complete a SRASHE if the screening and/or inmate's behavior suggest a possible current risk for suicide. In addition, as required pursuant to CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum dated January 27, 2021, data or other required "proof of practice" regarding compliance with the memorandum should be reflected in monthly SPRFIT meeting minutes for each of the three RCs.

## V.  **<u>Baseline Assessment of Suicide Prevention Practices in CDCR's Five Psychiatric Inpatient Programs</u>**

**<u>Summary</u>**:

On December 30, 2020, CDCR released its "Psychiatric Inpatient Program Treatment Planning and Procedures: Suicide Prevention and Response," Policy No. 12.11.2104.P1. Developed in conjunction with the Special Master's team, this policy promulgated (for the first time) requirements for the identification and management of suicidal patients in CDCR's PIPs. Such requirements included, but were not limited to, suicide prevention training; assessment of suicide risk upon admission, during placement (whenever a patient making expresses SI and/or engages in SIB) and upon discharge; observation of suicidal patients; placement of suicidal patients in suicide-resistant rooms; provision of clothing commensurate with the level of suicide risk; provision of out-of-cell activities; and safety planning.

This reviewer conducted a baseline assessment of suicide prevention practices within the five PIPs between May and October 2021. The assessment was conducted in conjunction with the Special Master's team overall assessment of the delivery of mental health care in the PIPs. Each facility assessment is found in Appendix B. The following is a summary of the major findings.

A)    <u>**Intake Screening**</u>

There were disparate practices observed at most of the PIPs regarding suicide risk identification for incoming patients during the intake screening process. For example, although nursing staff at CHCF-PIP were completing the Initial Health Screening form for all incoming patients, a nurse was observed to be not asking the patient all of the 15 mental health and suicide risk questions on the form. Nursing staff at both CMF-PIP and SVSP-PIP did not utilize the Initial Health Screening form for incoming patients, rather only the "Admission Assessment and History" and "Acute/ICF Nursing Assessment" forms were completed, and neither form contained any suicide risk questions. The intake screening process at CIW-PIP was very problematic, with the door to the Nurse's Office remaining open, two correctional officers remaining inside the office in close proximity to the patient, and the nurse was not asking all of the required mental health/suicide risk questions on the Initial Intake Screening form (including if the patient was current suicidal). However, CIW-PIP had an excellent practice of a psychiatrist observing the nurse's intake screening for incoming patients and completing the Initial Psychiatric Assessment immediately thereafter (although unfortunately in the same non-confidential location).

B)    <u>**SRASHE Completion**</u>

The aforementioned PIP suicide prevention policy (No. 12.11.2104.P1) required that a SRASHE must be completed for "a patient making statements about suicidal intent or ideation, or the patient is engaging in behaviors that may elevate the risk of suicide," as well as within 72 hours of both admission and discharge from the program. With the exception of SQ-PIP which had a local practice of completing SRASHEs on all patients on a monthly basis regardless of whether or not they presented with SI and/or SIB, low compliance rates for completion of SRASHEs for urgent/emergent mental health referrals, as well as upon admission and discharge from the PIP, were found in the other four programs.[8] At CIW-PIP, total percentages of compliance could not be calculated because required SRASHEs were not always completed on weekends.

---

[8]In close proximity to the completion of this reviewer's onsite PIP suicide prevention assessments, CDCR issued a memorandum entitled "Completion of Suicide Risk Assessments and Self-Harm Evaluations in Psychiatric Inpatient Program Settings," effective October 22, 2021. The memorandum significantly altered the requirement for completion of SRASHEs by stating that instead of completing SRASHEs whenever a patient expresses SI and/or engages in SIB that may elevate the risk for suicide, clinicians now "shall complete a SRASHE whenever it is determined to be *clinically indicated* (emphasis added), such as when a patient's clinical presentation suggests an increased acute risk for suicide (if the patient presentation is clinically ambiguous, consult a colleague or supervisor)."

When completed, SRASHEs were almost always done by psychology and social work staff, not psychiatry, in the PIPs. Psychiatrists were primarily responsible for the daily management of patients on suicide observation, with psychology and social work staff rarely, if ever, assessing the suicide risk of patients.

**C)    Suicide-Resistant Beds**

At CMF-PIP, not all cells designated to house suicidal patients were suicide-resistant. At SVSP-PIP, none of the cells utilized to house suicidal patients at the facility were suicide-resistant. These dangerous cells were first identified following a patient suicide in the program in December 2020.

**D)    Observation of Suicide Patients**

The PIP suicide prevention policy allows for two levels of observation for suicidal patients - Suicide Precaution and Suicide Watch. At most of the PIPs, there were problematic practices regarding the proper levels of observation for both suicidal and non-suicidal patients, as well as proper terminology. For example, at CMF-PIP, progress notes and provider orders regarding levels of observation were often confusing, with clinicians not distinguishing between Suicide Precaution status and non-suicide observation at 15-minute intervals. At CHCF-PIP, the required term of "Suicide Precaution" was not utilized by any staff, rather "stags," "mental health observation," or "Q-11" was written in progress notes. At SVSP-PIP, Suicide Watch was utilized as the preferred observation level for suicidal patients, either because providers were reluctant to place suicidal patients in non-suicide resistant cells without constant observation and/or providers relied on nursing personnel to conduct regular rounds at 15-minute intervals (meant for non-suicidal patients) rather than order Suicide Precaution status which required continued daily assessment.

In addition, patients on suicide observation status at SVSP-PIP were not always assessed on a daily basis, and orders for discharge from Suicide Watch and Suicide Precaution were sometimes received without documentation that the patient was assessed by the provider. At CIW-PIP, patients on suicide observation status were consistently not seen by a provider on weekends and, in several cases, not seen on Fridays. In addition, it was unclear why a 60-minute level of "enhanced observation" was utilized at CIW-PIP when non-suicidal patients were required to be observed during regular nursing rounds at 15-minute intervals, and the practice of utilizing "Behavioral" Suicide Watch at CIW-PIP was not authorized in the PIP suicide prevention policy. Adequate practices were found at SQ-PIP.

Finally, with regard to the observation of suicidal patients, this reviewer verified the accuracy of observation rounds by examining the EHRS charts of four patients at each facility who were required to be observed on Suicide Precaution status at staggered intervals not exceeding 15-minutes during the selected nine-hour period from 12:00 a.m. through 8:59 p.m. With the exception of CIW-PIP where all reviewed patients were found to be observed on Suicide Precaution status as required, each of the other PIPs had multiple violations (ranging from one to seven per case).

E)    **Proper Clothing and Possessions**

The PIP suicide prevention policy states that patients on Suicide Watch should normally be clothed in safety smocks, with patients on Suicide Precaution normally clothed in t-shirts, boxers, and socks, commonly referred to as "partial issue." However, the policy also stated that "Providers need not to default to providing minimal issues. The psychiatrist or licensed psychologist may authorize additional items if clinically indicated. Additional items must be supported by a thorough chart review and documented clinical rationale."

There were problematic practices regarding proper clothing and possessions for patients on suicide observation status at most of the PIPs. At CMF-PIP, it was very problematic that some patients not on suicide observation status were clothed in either a safety smock or partial issue clothing. In one problematic case at CMF-PIP, the patient reported feeling depressed, expressed high anxiety, and was grieving the loss of his brother a few days earlier. He initially told a nurse that he was "having suicidal thoughts going on and off because of his brother's passing away." The patient was seen later that evening by a psychiatrist and stated "he still felt that he was better off dead but was willing to work on his issues…. Patient voluntarily gave up his clothes and chose to go in suicide smock as he did not feel safe." Despite the patient being placed in a safety smock, he was not placed on either Suicide Watch or Suicide Precaution.

At CHCF-PIP, the majority of suicidal patients were dressed in "full issue" of blue shirts and pants, but not issued t-shirts and boxers because psychiatry believed these items could be easily torn and made into a ligature, whereas they incorrectly assumed pants and shirts could not. At CIW-PIP, some clinicians struggled with providing patients on suicide observation status with basic amenities such as books and other reading material. At SQ-PIP, a few patients assessed as not requiring suicide observation were placed on "behavior observation" status with only "partial issue" and not "full issue."

F)    **Out-of-Cell Activities**

According to the PIP suicide prevention policy, "Consistent with clinical rationale and discretion, follow existing local operating procedures (LOPs) for all PIP patients to continue to provide out-of-cell activities (including yard), telephone use, and visiting for both non-Max and Max patients." When this policy was released on December 31, 2020, there was concern expressed by the Special Master and this reviewer with respect to the lack of specificity in the policy regarding staff responsible for the provision of out-of-cell activities for suicidal patients in the PIPs, particularly for maximum security patients, and the lack of LOPs to address the issue in each PIP. When releasing the PIP suicide prevention policy, CDCR's Office of Legal Affairs informed the Special Master on December 28, 2020, that the provision of out-of-cell activities in the PIPs "is a complicated issue that requires an individualized approach at each institution and that the collaboration necessary between nursing, custody, and mental health to develop the details requested could not be completed by the Court's deadline" (of December 28, 2020). Despite this proclamation, CDCR did not release any further clarification, either through directive and/or LOP template regarding out-of-cell activities, to the PIPs during 2021.

The reviewer's assessment found very problematic practices regarding out-of-cell activities for suicidal patients at three of the PIPs.  At CMF-PIP, most patients on suicide observation status were not provided yard or other out-of-cell activities.  At SVSP-PIP, although two housing units had multiple yards (including "walk-alone yards") for patients on maximum-security status, there was unreliable data from the Mental Health NCAT (Non-Clinical Activity Tracking) database regarding patients on suicide observation status receiving dayroom/yard privileges.[9]  At CHCF-PIP, review of NCAT records could not determine whether dayroom/yard privileges were consistently offered to maximum security patients.  In addition, when a CHCF-PIP patient complained about the lack of programming during an IDTT meeting, a nurse incorrectly wrote in a progress note that: "I/P stated that he wanted to program more but was reminded that he is in a MAX unit."  At both CIW-PIP and SQ-PIP, most, but not all, patients were regularly offered out-of-cell activities.

Overall, most NCAT documentation provided was unreliable.  For example, there were multiple examples of both dayroom and yard sessions listed as "cancelled."  Although initial indications were that the yard sessions were cancelled due to excessive heat, according to supervisory custody personnel at several PIPs, the notation of "canceled" meant that individual custody officers did not accurately "close or save" the activity in the patient's NCAT record within ten days, resulting in the activity being listed as cancelled.  However, such an explanation did not explain why the term "cancelled" did not appear for any showers or telephone calls in the reviewed cases.  In sum, it could not be determined through review of the NCAT records whether an activity listed as "canceled" was indeed cancelled or offered, refused, or completed for individual patients.

G)     **IDTT Meetings**

Observed IDTT meetings were very inconsistent within all of the PIPs.  Although there was good treatment team representation, most meetings were problematic, with uneven case presentations and higher level of care discussions (during meetings for intermediate care patients), as well as inadequate discussion regarding suicide risk histories, current suicide risk and observation, clothing/possessions/out-of-cell activities, and safety planning to reduce further recurrence of SI.

One case symbolized the problems in the IDTT meetings.  The patient had arrived at the CMF-PIP in early May 2021 for chronic SI and self-injurious behavior.  He also had a history of seizures and often wore a helmet for protection.  The patient was initially quarantined in the 64-bed unit.  On May 9, the patient attempted to asphyxiate himself with a ligature made out of bedsheets.  He was sent out to a community hospital for evaluation, as well as for treatment of a possible seizure.  On May 12, he was returned to the PIP and placed on Suicide Watch which was discontinued the following day (May 13).  Approximately ten days later on May 24, the patient again tried to asphyxiate himself by tying a bedsheet tightly around his neck.  Officers

---

[9]Requirements regarding the Non-Clinical Activity Tracking (NCAT) database are contained within Volume 12, Mental Health Services, Chapter 11: Correctional Treatment Center, Psychiatric Inpatient Program, No. 12.11.1706, Patient Policies: Non-Clinical Out-of-Cell Time Tracking, March 8, 2021, and state that "The NCAT shall be used to track all out-of-cell non-clinical leisure activities offered to PIP patients.  Scheduled and non-scheduled activities shall be tracked using NCAT."

utilized a cut-down tool to remove the ligature.  He was again sent out to the hospital for examination of his injury, as well as possible seizure activity.  The patient was returned to the PIP the following day (May 25) and reassigned to an intermediate care facility (ICF) unit (post-quarantine). The patient arrived at his initial IDTT meeting on May 26 clothed in a safety smock and wearing a helmet.  Although there was a brief summary of why the patient was referred to ICF LOC, there was no explanation as to why he was in a safety smock nor his level of observation.  When asked, the patient denied current SI.  Following prompting by an ICF supervisor who was monitoring the meeting, the PC briefly discussed the ICF program and stated that the patient would be offered between six and eight hours of group treatment each week.  There was no discussion regarding the patient's two recent serious suicide attempts nor other relevant information regarding his history of suicidal behavior.  The patient self-reported that one of his coping skills was to listen to music, and he requested a radio.  There was some discussion as to whether he would automatically be provided a radio because he was a maximum custody patient or would need to earn the radio as an incentive through the STEP program.

Based upon the lack discussion regarding suicide risk and level of observation during the IDTT meeting, this reviewer briefly spoke with the treatment team psychiatrist following the meeting at CMF-PIP.  This reviewer was informed that the patient would be removed from Suicide Watch and given full issue.  Subsequent review of the chart indicated that the PC met with the patient the following day (May 27) and inserted the following narrative (from the MH Consult Inpatient Referral dated April 29, 2021) into their progress note:

> "IP is being referred to ICF-Single cell as a result of MAX status following battery on a non-inmate.  Treatment goals to include: 1) Reduce passive suicidal ideation to at least a 0/10 for a period of 1 month; 2) Reduce depression to at least a 5/10 for a period of 1 month; 3) IP will not exhibit self-harm behaviors, including cutting, scratching, swallowing FBs, for 1 month; 4) Identify and demonstrate the use of at least 4 coping mechanisms to manage his depression and anxiety for a period of 1 month; 5) Refer IP to EOP once clinically stable."

None of these treatment goals were discussed during the IDTT meeting on May 26.

**H)    Safety Planning**

Safety Planning was problematic within all of the PIPs.  The PIP suicide prevention policy (No. 12.11.2104.P1) required that "supervisory review (of safety plans) shall be completed prior to, or during the Interdisciplinary Treatment Team in which the discharging SRASHE is completed."  This reviewer found that supervisory review of discharging SRASHEs and safety plans were untimely, not occurring at all, or incorrectly determining on occasion that safety plans were not required.  For example, supervisors would incorrectly state that a safety plan was not required due to "low acute risk/not clinically indicated" upon PIP discharge despite the fact "low acute risk" was not an exemption for safety plan completion.  In other cases, supervisors incorrectly concluded that safety plans were not warranted due to a patient's refusal or lack of cooperation.  For example, in one SQ-PIP case in which a required safety plan was not

completed, the clinician inappropriately stated in the discharge SRASHE that "Pt. denied a need to complete safety planning intervention at discharge."

I)      **Contracting for Safety**

Despite the abundance of evidence in the literature indicating that "contracting for safety" has been found to be ineffective in the management of suicidal individuals, including condemnation of the practice in previous CDCR suicide prevention training curricula, "contracting for safety" was found in several psychiatric progress and/or nursing notes at CMF-PIP, SVSP-PIP, and CIW-PIP. For example, a psychiatric progress note in one SVSP-PIP case contained the following rationale for release from Suicide Watch on May 22, 2021: "1:1 suicide watch will be discontinued because patient is contracting for safety, forward thinking, and open to discussing his treatment options." Several days later on May 29, the patient was observed with a piece of glass in his hands and informed a nurse that "I just don't feel well tonight and might cut myself." He was placed on Suicide Watch; the required SRASHE was not completed as required. The patient remained on Suicide Watch and there was no documentation that he was seen by either psychiatry and/or psychology/social work staff on May 30. The following day (May 31), the patient was discharged from Suicide Watch with the following nursing note: "I/P stated he is not suicidal anymore and wants all his properties back. Verbalized coping skills and contracted for safety. MHMD notified. Ordered d/c 1:1. Full issues." There was no indication that any provider assessed the patient or documented an assessment.

At CMF-PIP, the psychiatric progress note in one case contained the following rationale for release from Suicide Watch: "Pt. was seen in dayroom wearing safety smock which was falling over his shoulders; he was entirely cooperative and stated that he does not feel at all suicidal; he appreciated the degree of support he has received from the team and was able to contract for safety and he stated that he is no longer at all impulsive and would ask for assistance if he suddenly felt at risk for self-harm."

J)      **CPR Training**

High rates of compliance with CPR training for both custody and medical staff were found in all of the PIPs.

K)      **Suicide Prevention Training**

With the exception of CMF-PIP and CHCF-PIP, high rates of compliance with annual suicide prevention training for custody, medical, and mental health staff were found in the other three PIPs. In addition, all of the PIPs had high compliance rates for safety plan training. Both CIW-PIP and SQ-PIP had high compliance rates for mental health clinician completion of both SRE mentoring program and the seven-hour SRE training, whereas clinicians at CMF-PIP, CHCF-PIP, and SVSP-PIP had compliance rates under 90 percent for both the SRE mentoring program and the seven-hour SRE training.

**L)**    **SPRFIT**

With the exception of CHCF-PIP which conducted periodic audits of suicide prevention practices by its SPRFIT coordinator, and to a lesser extent at SQ-PIP, monthly SPRFIT meetings at the other programs did not always meet the quorum of all required members.  Many of the above cited deficiencies found by this reviewer were neither identified nor addressed by the SPRFITs in each PIP.

**M)**    **Patient Suicides**

There were four (4) patient suicides in the PIPs during the review period.[10]  CHCF-PIP experienced a patient suicide on September 29, 2020 that resulted in 36 QIPs distributed amongst multiple facilities, with 18 QIPs specific to the CHCF-PIP.  These deficiencies included the incorrect practice of only allowing psychiatry to write observation and clothing issue orders; inadequate programming for maximum-security patients; untimely clinical contacts; under-estimation of suicide risk; use of "contracting for safety;" inadequate IDTT meetings (including meetings held without the patient); failure to complete multiple required SRASHEs; inadequate nursing rounds; and emergency medical response.

SVSP-PIP experienced two patient suicides on December 17, 2020 and January 30, 2021, respectively.  These deaths resulted in 50 QIPs distributed amongst multiple facilities, with 26 QIPs specific to the SVSP-PIP.  These deficiencies included problematic treatment, least restrictive housing, and rules violation report (RVR) decisions; untimely clinical contacts; inadequate IDTT meetings, including decisions regarding transfer to lower levels of care; failure to complete required SRASHEs; deficiencies in observation and clothing issues; and emergency medical response.

CIW-PIP experienced one patient suicide on April 8, 2021, resulting in 15 QIPs distributed amongst multiple facilities, with seven QIPs specific to the CIW-PIP.  These deficiencies included the patient not being seen on a daily basis (including weekends) by providers while on suicide observation status; placement on "enhanced observation" status at 60-minute intervals with limited clothing items; multiple incidents of self-harm that were not adequately documented; violation of the Development Disability Program requirement for reporting victimization; multiple violations of 15-minute regular nursing rounds; and failure to place the patient on suicide observation status following an incident of self-injurious behavior.

**VI.**    **Conclusion and Recommendations**

As stated in all of this reviewer's previous assessments, it continues to be noteworthy that CDCR, its management team (including the SMHP and its SPRU) and legal counsel, as well as local custody, medical, and mental health leadership at each of the prison and PIP facilities assessed during 2021-2022, displayed total cooperation during the assessment process. However, this reviewer's baseline assessment of suicide prevention practices in CDCR prison facilities began in November 2013 and, after more than eight years, CDCR's full implementation

---

[10]Due to the enormity of deficiencies and QIPs identified in these four cases, summarization of the individual Suicide Case Reviews were not provided in this report.

of this reviewer's initial recommendations, as well as the correction of existing and often chronic ongoing deficiencies, continues to progress at varying speeds. In addition, despite the fact that facilities were given several months of advanced notice to prepare for these assessments, this reviewer continued to find deficiencies during the current assessment that were easily observable and should not have been identified for the first time by a Special Master's expert and/or monitor, but rather by the local SPRFIT and/or viable CQI process prior to the on-site audit.

As shown in Table 3 below, there were 15 inmate suicides in CDCR during 2021, representing the lowest number of deaths in well over 20 years. The reason(s) for such a significantly low number is unknown and the impact, if any, arising from the COVID-19 pandemic will need to be analyzed further over time. As of December 29, 2021, CDCR housed 96,522 inmates (in-state within its institutions and camps) and with 15 inmate suicides, the resulting suicide rate was 15.5 deaths per 100,000 inmates. Approximately 67 percent (ten of 15) of the suicide victims were participants in the MHSDS. In contrast, 2020 produced the highest rate (33.6) of inmate suicides within CDCR in recent memory, representing a rate of suicide that remained higher than the suicide rate of 27 per 100,000 in state prison systems throughout the country.[11]

**TABLE 3**
**YEAR-END POPULATION, OVERALL SUICIDES/RESTRICTIVE HOUSING**
**SUICIDES, AND SUICIDE RATES WITHIN THE**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**2017 THROUGH 2021**[12]

| Year | Population | All Suicides/Rate | Suicides in Restrictive Units/Percent |
|------|-----------|-------------------|----------------------------------------|
| 2017 | 118,232 | 30/25.3 | 11/36.6 |
| 2018 | 117,230 | 33/28.1 | 8/24.2 |
| 2019 | 117,506 | 38/32.3 | 12/31.5 |
| 2020 | 92,141 | 31/33.6 | 11/35.4 |
| 2021 | 96,522 | 15/15.5 | 7/46.6 |
| 2017-2021 | 541,631 | 147/27.1 | 49/33.5 |

As stated in previous reports, caution should always be exercised when viewing the above data. Suicide rates are most meaningful when viewed over a sustained period of time and, as stated in all of this reviewer's reports, although the total number of inmate suicides and the corresponding suicide rate in any prison system can be important indicators, they are not the sole barometer by which adequacy of suicide prevention practices should be measured. The best methodology for determining whether a correctional system has fully implemented its suicide prevention program continues to be: (1) the assessment of suicide prevention practices within

---

[11]The suicide rate in state prison systems throughout the country was approximately 27 deaths per 100,000 inmates in 2019. More recent data not available. See Carson, E. (2021), *Suicide in Local Jails and State and Federal Prisons, 2000 - 2019 - Statistical Tables*, Washington DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (BJS).
[12]Source: California Department of Corrections and Rehabilitation.

each prison, and (2) a review of each inmate suicide in relation to practices in the prison and determining its degree of preventability.

In conclusion, it is again recommended that CDCR continue their efforts to fully implement this reviewer's previous recommendations, as well as develop CAPs based upon deficiencies found in this most recent assessment. As shown below, most of these critical corrective actions are not necessarily based upon new recommendations, but rather by CDCR's continuing challenge of implementing and sustaining adequate suicide prevention practices within its prisons. As such, in cooperation with the Special Master and his experts through the SPMW process, CDCR should:

- Develop CAPs for the five facilities (CCI, CSP/Sac, NKSP, PBSP, and WSP) referenced above related to the intake screening process.

- Develop CAPs for the three (CIM, CSATF, and SQ) referenced above to correct PT deficiencies in their restrictive housing units.

- Prohibit the current CCWF practice of allowing all clinical contacts with maximum-security MHCB patients to either occur cell-front or in a scenario in which the patient's door is opened, the patient is handcuffed and instructed to sit on their bed, with the clinician and officer standing in the open doorway of the cell. CDCR and CCWF should develop an interim solution that could be implemented immediately while awaiting completion of a renovation project that still remains in the preliminary planning stage. Conversion of the large observation room into a program room for maximum-security MHCB patients, to include a TTM, would be a reasonable solution.

- Develop CAPs in CCI, CMF, CSATF, and CSP/LAC to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in suicide-resistant new intake cells for the first 72 hours of administrative segregation confinement. Some of the CAPs will again involve creating additional retrofitted new intake cells, particularly in the EOP ASU at CSP/LAC where new intake inmates were placed in unsafe, non-new intake cells on almost a weekly basis and the facility had not been a recipient of any new intake cells during the current "Governance of Compliance with Intake Cell Usage" project.

- Develop a CAP at CTF that includes revision of its LOP on suicide prevention to eliminate the option for Suicide Precaution status and, given the physical hazards in the cells, eliminate any clothing option other than a safety smock while inmates are housed on alternative housing status. In addition, given the configuration of CTF's OHU/Infirmary, only continuous, direct 1:1 observation should be permitted.

- Revise the CAP to ensure that use of CCHCS's automated "Mental Health Observations Reporting Tool," an effective instrument to measure compliance with the required observation of suicidal MHCB patients, results in accelerated compliance with this issue. Defendants' Suicide Prevention Activation Schedules (ECF 7562, filed May 31, 2022),

did not contain a completion date for this issue (Recommendation 21: Observation of Suicidal Patients), simply stating that monitoring was "Ongoing."

- Again, create a CAP to enforce its *Program Guide* requirements authorizing only two levels of observation which may be provided for suicide inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch. Quite simply, no other level of observation should be utilized for suicidal patients.

- Remedy the misuse of CDCR policies, including the "COVID-19 Mandatory 15-Day Modified Program" memorandum and facility daily PSRs, that results in MHCB patients being locked down and prohibited from out-of-cell activities through CAPs at each affected facility.

- Issue a memorandum that specifically sets forth strict criteria for use of safety smocks in MHCB units. At a minimum, suicidal patients should never be issued both a safety smock and partial issue clothing (e.g., t-shirt and boxers), and patients on non-suicide observation status should never be placed in a safety smock.

- Provide verification for funding of a small management yard at CSP/Corcoran, as well as any other MHCB unit that needs a small management yard (e.g., CIM) in its FY 2022/23 budget [as stated in defendants' most recent Suicide Prevention Activation Schedules (ECF No. 7562, filed May 31, 2022)]. Verification should include not only the requests, but whether funds were authorized and received, as well as deadlines for project completion. Such documentation should be forwarded to the Special Master.

- Develop CAPs for the nine facilities (CIM, CMC, CSATF, CSP/LAC, KVSP, MCSP, NKSP, SVSP, and WSP) that were under 90 percent compliance with completion of SRASHEs for emergent/urgent mental health referrals involving SI and SIB, although all CDCR facilities should be at 100 percent compliance.

- Develop CAPs for the eight facilities (CMF, CCWF, CHCF, CTF, CSP/Solano, NKSP, RJD, and SVSP) that had completion rates under 90 percent for both the seven-hour SRE training and SRE mentoring program training.

- Ensure that referred inmates receive continuous observation prior to the CIT arrival, reasonable privacy and confidentiality during the encounter, full team participation (by clinician, nurse, and lieutenant or sergeant), adequate assessment by the clinician (including SRASHE completion for cases involving suicidal behavior), and accurate completion of CIT Power Forms in EHRS.

- Develop CAPs for the six facilities (CMF, CSATF, CSP/LAC, KVSP, MCSP, and SVSP) that were under 90 percent compliance with safety planning completion at MHCB discharge.

- Develop a CAP to ensure that all CDCR facilities with MHCB units are in compliance with the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy requiring review and revision (when appropriate) of safety plans prior to, or during, discharge IDTT meetings.

- No longer delay initiation of the new safety planning model.

- Develop CAPs for the 21 facilities that were below 90-percent compliance with Page 1 and/or Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form.

- Develop CAPs for the three facilities (CSP/LAC, KVSP, SQ) that had either no SPRFIT LOP or LOPs that were inconsistent with the SPRFIT memorandum.

- Develop CAPs for the seven facilities (CCWF, CIM, CIW, CMF, CSP/Sac, CSP/Solano, and SQ) that did not have an LOP addressing "Inmate-Patients Receiving Bad News."

- Develop CAPs for the nine facilities (CCI, CCWF, CHCF, CIM, CIW, CMF, CSP/Sac, CSATF, and WSP) that did not have an LOP addressing the SRMP, as well as CAPs to ensure that all local SPRFITs track SRMP patients and review the program status of patients during monthly SPRFIT meetings.

- Develop CAPs for the 17 facilities that did not achieve six consecutive months of meeting quorums for all mandatory members or their designees.

- Immediately initiate the SPRFIT responsibility for conducting semi-annual RCAs for serious suicide attempts or, in the alternative, case summaries to be discussed during monthly meetings.

- Develop a CAP that addresses the requirement for local SPRFITs to review both the quality and clinical appropriateness of completed SRASHEs, and report findings in meeting minutes.

- No longer delay initiation of the SPRFIT Reboot; it should be implemented no later than December 30, 2022.

- Collaborate with the Special Master's suicide prevention expert during the next scheduled review of the four-hour pre-service "Inmate Suicide Prevention" curriculum in order to better enhance the content and presentation.

- Develop CAPs for annual suicide prevention IST in the four facilities (CCI, CHCF, CIW, and RJD) that were below 90-percent compliance for suicide prevention training for two or more disciplines.

- Again provide verification to the Special Master that all RC facilities (CCWF, NKSP, and WSP) are aware of their suicide prevention responsibilities, including (1) placement of

suicide prevention posters in the offices utilized for direct patient care by RC nurses and RC diagnostic clinicians, as well as RC housing unit bulletin boards and RC pill call windows; (2) diagnostic clinicians are required to review the nurse's Initial Health Screening form, any county jail records, and other pertinent documents contained within the EHRS and the Strategic Offender Management System (SOMS) for each inmate; (3) diagnostic clinicians completing the Mental Health Screening Interview form are to request that the inmate sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form during the screening process if a prior history of mental health treatment is reported; and (4) diagnostic clinicians completing the Mental Health Screening Interview form are required to complete a SRASHE if the screening and/or inmate's behavior suggest a possible current risk for suicide. In addition, as required pursuant to CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum dated January 27, 2021, data or other required "proof of practice" regarding compliance with the memorandum should be reflected in monthly SPRFIT meeting minutes for each of the three RCs.

With regard to the <u>PIPs</u>, in cooperation with the Special Master and his experts, CDCR should:

- Develop a CAP to ensure uniformity during the nursing intake screening process within the PIPs whereby all PIPs utilize the current Initial Health Screening form (which contains adequate mental health and suicide risk questions) or revise either the "Admission Assessment and History" and "Acute/ICF Nursing Assessment" forms to include adequate mental health and suicide risk questions.

- Develop a CAP to ensure that SRASHEs are always completed consistent with the requirements of the PIP suicide prevention policy, including by psychiatry in all programs, as well as by CIW-PIP clinicians on the weekend.

- Develop CAPs at both CMF-PIP and SVSP-PIP to ensure that all cells designated to house suicidal patients are suicide-resistant.

- Develop a CAP to ensure that only Suicide Precaution and Suicide Watch statuses are permitted for the observation for suicidal patients, and that terms such "stags," "mental health observation," "Q-11," "behavioral suicide watch," and "enhanced observation" are prohibited to be used in provider orders and progress notes.

- Develop a CAP to ensure that regular nursing rounds conducted at 15-minute intervals (meant for non-suicidal patients) should never be utilized as a substitute for Suicide Precaution status.

- Develop CAPs at both SVSP-PIP and CIW-PIP to ensure patients on suicide observation status are always assessed on a daily basis, and that orders for discharge from Suicide Watch and Suicide Precaution at SVSP-PIP are only completed following an assessment by a provider.

- Develop CAPs at CMF-PIP, CHCF-PIP, SVSP-PIP, and SQ-PIP to ensure that all patients on suicide observation status are always adequately observed.

- Develop CAPs at CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP to ensure that all provider orders regarding clothing and possessions are clinically justified in medical charts, and that patients not on Suicide Watch or Suicide Precaution are provided all clothing and possessions.

- Develop a CAP for all PIPs to ensure that suicidal patients have access to out-of-cell activities that are clinically justified, including those on maximum-security status.

- Develop a CAP to improve the reliability of data generated from the Mental Health NCAT (Non-Clinical Activity Tracking) database regarding out-of-cell activities.

- Develop a CAP in improve the consistency of IDTT meetings for suicidal patients within all of the PIPs, to include adequate case presentations; higher level of care discussions (during meetings for ICF patients); adequate discussion regarding suicide risk histories; current suicide risk and observation; clothing, possessions, and out-of-cell activities; and safety planning to reduce further recurrence of SI.

- Develop a CAP to improve the adequacy of safety planning within all of the PIPs, as well as a CAP to enforce the PIP suicide prevention policy requirement for supervisory review of a safety plan prior to, or during the IDTT in which the discharging SRASHE is completed.  In addition, both CAPs should include clear guidance that a patient's current low acute risk at discharge and/or refusal or lack of cooperation for safety plan development should never be considered reasons for exemption to both safety plan development and supervisory review.

- Develop a CAP to ensure that "contracting for safety" is not utilized in either the assessment of suicide risk or documentation of decision-making within the PIPs.

- Develop CAPs to increase custody, medical, and mental health staff compliance for annual suicide prevention training at CMF-PIP and CHCF-PIP.

- Develop CAPs to increase mental health clinician compliance rates for both SRE mentoring program and seven-hour SRE training at CMF-PIP, CHCF-PIP, and SVSP-PIP.

- Develop a CAP to ensure that SPRFITs at each PIP meet required monthly meetings quorums, and that deficient suicide prevention practices, including those cited in this reviewer's report, are remedied.

Finally, as the *Coleman* court clearly indicated in its order dated September 3, 2020, (ECF No. 6846), "The twenty-nine recommendations must be completely and durably implemented to allow comprehensive assessment of their efficacy in reducing the ongoing

number of foreseeable and/or preventable inmate suicides in California's prison system" (at 22). With this current assessment, this reviewer is still unable to report that all 29 of these recommendations have been "completely and durably implemented." In fact, this current fifth re-audit found that only three (Recommendation 1, Recommendation 6 and Recommendation 26) of the 18 remaining recommendations have been fully implemented. As stated above, many of the overall deficiencies identified by this reviewer during the current assessment continued to be easily observable and should not have been identified for the first time by a Special Master's expert, but rather by the local SPRFIT and/or viable CQI process to the on-site audit.

As such, and as stated in previous reports by this reviewer, continuing re-inspection of select CDCR facilities (and the PIPs) which chronically struggle with their suicide prevention programs is necessary and would allow for continued provision of technical assistance to CDCR in achieving complete and durable implementation of these recommendations, a measurement of the sustainability of CDCR's corrective actions, and observation of the department's CQI process at individual facilities, leading to decreased future monitoring and hopefully long-term reduction of inmate-patient suicides throughout CDCR.

# APPENDIX A

**Findings and Summaries of CDCR Suicide Case Reviews at 23 Re-Audited Prisons During 2021-2022**

    **1) California Medical Facility (CMF)**

**Inspection**:  May 27-28, 2021 (previous suicide prevention audit was on February 19-20, 2019).  CMF housed approximately 2,003 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a new admission during the **Intake Screening** process in CMF's R&R unit on May 25, 2021 (while onsite for the CMF-PIP assessment).  The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering information in the EHRS.  The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality.

In addition, this reviewer had the opportunity to observe required daily **PT Rounds** in one of the three (Willis Unit for GP, I-3 for EOP and Correctional Clinical Case Management System (3CMS), and M-3 for EOP inmates) ASUs on February 20.  The rounds in M-3 were unremarkable and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  CMF had 50 **MHCBs** located on two wings (A and B) of the CTC that were previously found to be suicide-resistant. Of note, A-Wing was closed due to a low census, and only approximately 20 of 50 (or 40 percent) rooms in B-Wing were occupied during the on-site assessment.

In addition, there were a total of seven **New Intake Cells** in the ASUs, with two in I-3, two in M-3, and three on the first floor of Willis Unit.  However, the new intake cells in Willis were offline because the floor was currently designated as a quarantine unit. Although there were not any new intake inmates in non-intake cells within the I-3 and M-3 units, and the new intake cells were suicide-resistant, this reviewer was informed by correctional officers in both units that new intake inmates exceeded the capacity for the four currently available new intake cells on a regular basis.

Finally, **Alternative Housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in MHCB observation cells.  Alternative housing was utilized a few times a week, and inmates were required to be furnished with beds and observed on a 1:1 basis.  From February 19, 2021 through May 11, 2021, there were 34 inmates placed in alternative housing, and all were discharged in approximately 24 hours.  The majority (56 percent) of inmates were subsequently transferred to a MHCB, with 15 of 34 (44 percent) of the referrals rescinded and inmates returned to their housing units.  This reviewer examined the EHRS files for all these 15 rescinded cases and found that required SRASHEs were completed in 14 of 15 cases.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff with documentation of such checks entered into the EHRS.  Although

observation of all MHCB patients at 15-minute intervals was commendable, review of provider orders in the EHRS found that both PCs and psychiatrists often did not differentiate between Suicide Precaution status which required observation at 15-minute intervals and non-suicide observation at 15-minute intervals. As such, some orders were written as "Q-11, safety," others as "Q-11, behavioral" or simply "Q-11." In addition, the white board in the Nurses' Station, as well as the daily "B-Side Board" list, indicated that patients on Suicide Watch or Suicide Precaution statuses were highlighted in red, whereas patients not on suicide observation status and observed at 15-minute intervals were highlighted in blue.

The only concern with these distinctions was that providers appeared confused by policy requirements, sometimes ordering "SP Q-11, safety checks" when the patient was not on Suicide Precaution status, while other orders appeared as "Q-11, behavioral," an indication the patient was not on suicide observation status, yet they were clothed in only a safety smock (see CMF 1 below). Adding to the confusion were progress notes utilizing terms such as "mental health observation" for both suicidal and non-suicidal patients. During the IDTT meetings in the MHCB unit on both May 27 and May 28, 2021, it was unclear if patients were on Suicide Precaution status or non-suicide observation status at 15-minute checks.

In addition, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of five patients required to be observed at 15-minute intervals in the MHCB facility during the nine-hour period from 12:00 a.m. through 8:59 p.m. on March 12, 2021 (for CMF 2), March 16, 2021 (for CMF 3), March 26, 2021 (for CMF 4), and May 30, 2021 (for CMF 1 and CMF 5). The chart review found one to three observation checks exceeding 15-minute intervals (i.e., one to three per patient) in cases CMF 2, CMF 3, and CMF 1; whereas the remaining two cases (CMF 4 and CMF 5) had no violations. In contrast to previous reviews, the findings from this review showed significant improvement in the nursing observation for MHCB patients.

Finally, a review of **Guard One** data for a recent 24-hour period in the three ASUs found a combined 99 percent compliance rate with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the five-month period of January 2021 through May 2021. A sample EHRS review of 30 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in 90 percent (27 of 30) of the cases, an increase from 78 percent compliance during the previous assessment.

In addition, the **Crisis Intervention Team** was launched at CMF in December 2018, paused in April 2020, and reactivated in April 2021. This reviewer had an opportunity to observe the CIT process on May 25, 2021 following the intake screening (also observed by this reviewer on the same day) of a newly admitted inmate (CMF 6) who appeared anxious, paranoid, and expressing SI. The CIT, comprised of a psychologist, nurse, and sergeant, assembled outside the R&R unit following review of the medical chart and the psychologist's clinician-to-clinician contact with a CIT clinician at CMC who had previously assessed the inmate a few days earlier. The inmate apparently had a history of MHCB placements for reasons primarily related to safety, and had no

history of either self-injurious behavior (SIB) or suicide attempts. The CIT then interviewed the inmate for approximately one hour, with the clinician completing a SRASHE, the nurse inquiring about any medical concerns, and the sergeant inquiring about any custody concerns. The inmate was initially concerned about being housed in a dormitory environment, and was assured by the sergeant that he would initially receive a 14-day COVID-19 quarantine, and either be housed alone or with one other inmate. The inmate also expressed some family concerns and the CIT agreed to allow him to call his mother. Following completion of the SRASHE, the clinician determined that the inmate was at both low acute and chronic risk for suicide. The inmate was no longer expressing SI and his safety concerns had dissipated. He was not referred to the MHCB, but was placed on a five-day clinical follow-up and referred to a psychiatrist for review of his psychotropic medication. The inmate was seen by the psychiatrist the following day (May 26) and was noted to be stable during each of the five-day clinical follow-ups that were performed from May 26 through May 30, 2021. In sum, members of the CIT worked together collaboratively and effectively diffused the crisis.

Seven **IDTT Meetings** in the MHCB unit were observed on May 27-28, 2021, including for two patients being discharged. Overall, although there was good treatment team representation, each of the meetings (involving varying clinical staff) was very problematic, with uneven case presentations and higher level of care discussions, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI.

One case symbolized the problems in the IDTT meetings. The patient (CMF 1) had been admitted into the MHCB unit ten days earlier on May 18, 2021, for grave disability, although the CIT referral also referenced SI without a plan. He was at the EOP LOC with a diagnosis of schizophrenia. A review of his medical chart found that, although the patient's chronic risk for suicide had been rated as "low," he had previously self-reported a suicide attempt at age 16, as well as stating "he cut his arm in a suicide attempt a year ago." County jail records from February 2021 indicated problem areas of "psychiatric disorder" and "suicidal behavior." The patient had several MHCB placements during a prior CDCR term, as well as several 5150 (involuntary hospitalization) commitments in the community. The patient was doubled-celled at the time of the MHCB referral, and the initial CIT referral on May 18 indicated that he was possibly expressing SI secondary to wanting single cell placement in order to continue his drug usage. There were also indications that the patient had housing problems with other inmates related to his poor hygiene and general disorientation. In fact, the referring CIT clinician had previously interviewed the patient's cellmate who stated, "he had been trying to help him, prompting him to shower 'at least every other day,' fill our canteen slips, giving him food, etc." The patient had been seen on a daily basis in the MHCB by either the PC or psychiatrist, and reported to a clinician on May 20 that he "wants help with coping skills, specifically for anxiety. IP believes learning the skills may prevent future MHCB admissions. Reports he currently tries coping with his anxiety through the social socializing, sleeping, staying sober, and staying positive. Writer provided IP with active/ empathic listening skills, as well as MI for establishing rapport." The patient was also recently referred to the developmental disability program (DDP) for evaluation.

During the discharge IDTT meeting on May 28, the patient was dressed in full issue, was not on suicide observation status, and being observed at 15-minute intervals. He had previously been

cleared for all privileges, including showers and yard. However, there was no inquiry during the meeting regarding suicide risk other than the PC making a statement (without inquiry) that "you're not suicidal anymore." There was no discussion regarding estimate of risk and risk formulation based upon the history described above. There was no discussion regarding safety planning other than the PC stating that "we'll talk about safety planning later." Other than the May 20 progress note suggesting assistance with coping skills, there were no other progress notes that addressed the issue, and no team discussion regarding coping skills to reduce his anxiety, nor discussion regarding the clinical perception that he was feigning SI to gain single cell placement. In fact, there was no discussion at all regarding any custody and/or housing issues. Subsequent review of the medical chart following the meeting also found that the PC and patient did <u>not</u> subsequently discuss safety planning. In fact, the discharging SRASHE had been completed the previous day (May 27) and did not even contain a safety plan. The patient was discharged from the MHCB unit several hours later on May 28. Less than 24 hours later, on May 29, he was readmitted to the MHCB after expressing SI with a plan to cut himself. According to the provider order, he was placed on "SP Q-11, behavioral" and, although a "patient issue" order was not found the EHRS, the patient was clothed in both a safety smock and t-shirt. The provider order was subsequently revised on June 1 to "Q-11, safety" and the patient remained in a safety smock with a t-shirt.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for approximately 16 MHCB patients and found that, although many were offered yard, shower, and telephone privileges consistent with their level of observation and length of stay, there were six patients (or 38 percent) housed in the MHCB for over ten days for whom yard privileges were not offered (and there was no clinical justification for withholding the privilege). In fact, the CC I incorrectly stated to several patients during the observed IDTT meetings that they needed to be on "full issue" prior to receiving out-of-cell activities.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the medical charts of 30 patients discharged from the unit between March and May 2021. Although the review found that the required SRASHEs were completed in 97 percent (29 of 30) cases, the required safety plans were found in only 43 percent (13 of 30) of the cases. Subsequent discussion with the MHCB supervisor found that they were unfamiliar with CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020), and, therefore, unaware of their responsibility to review all discharge SRASHEs and safety plans for patients released from the MHCB. This reviewer also found that all of the required five-day clinical follow-ups were completed for the 20 patients discharged from the MHCB who remained at CMF.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 66 cases of patients discharged from a MHCB, alternative housing placement, or other higher levels of care, who remained at CMF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from December 2020 through April 2021. The review found that only 53 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with low compliance percentage mostly related to clinicians discontinuing the checks prior to the minimum 24-hour requirement, forms not being completed, or forms not being completed each day. Most checks were clinically ordered for 24 hours. In a few cases, the inmate remained on discharge custody checks for up to five days because clinical staff never signed Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form. In other cases, clinicians would assess the inmates prior to the minimum 24-hour requirement and set a time for discharge after 24 hours. This issue remained problematic, with only 65 percent compliance found during the previous assessment in February 2019. In contrast, 97 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with only a few errors found related to gaps in documentation during this current assessment.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months (November 2020 through April 2021) of SPRFIT meeting minutes found that a quorum was achieved for four of six meetings (no quorum during December 2020 and April 2021). Other than an indication that a custody audit of the two-page "Discharge Custody Check Sheet" (CDCR MH-7497) process had not occurred since July 2020, as well as no indication that safety plans contained with discharge SRASHEs from the MHCB unit were being reviewed, the meeting minutes were unremarkable. In addition, although four serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") were recorded at CMF from October 2020 through April 2021, case presentations and/or RCAs on any of the cases were not found in any of the SPRFIT meeting minutes. A SPRFIT LOP was in effect. Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. At the time of the May 2021 assessment, CMF had not provided any of these three LOPs to this reviewer.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 82 percent of medical staff, and 91 percent of mental health staff received annual suicide prevention block training during the previous 12 months. Finally, as of May 2021, only approximately 55 percent of mental health clinicians had completed the SRE mentoring program, 93 percent had received the seven-hour SRE training, and 97 percent had completed safety plan training.

**Recent Suicides**:  CMF experienced one suicide during the review period.[13]  In that case (CMF 7), the inmate was found hanging from a pipe by an unidentified ligature in his dormitory bathroom during the early morning of November 27, 2020.  The inmate entered the CDCR system on April 1, 2009 to serve a life sentence with the possibility of parole for first degree murder (of his wife).  He was transferred to CMF on June 24, 2018.  The inmate incurred eight RVRs during his more than two-year confinement, the most recent of which occurred on the day of his death for possession of a cell phone.  He was initially placed on sensitive needs yard (SNY) status due to his previous gang affiliation.  The inmate had regular family support through letter correspondence and telephone calls with his sisters, as well as a daughter and girlfriend.

According to available records, the inmate and three siblings were primarily raised by their father in a physically and emotionally abusive environment.  His mother suffered from substance abuse and was not fully involved in his childhood.  The inmate was a high school graduate and maintained full employment as an adult until the time of the instant offense.  As a teenager, he experienced substance abuse, had a minor arrest record, and was actively involved in a gang.  The inmate self-reported experiencing depressive symptoms as a youth, and met with a psychiatrist periodically from ages 10 to 14.  He was not prescribed psychotropic medication.  Although not reporting a prior history of suicide attempts, he was found with a ligature around his neck during arrest for the instant offense.

Upon entry into CDCR, the inmate initially screened negative for mental health issues, but was placed at the 3CMS LOC shortly thereafter following a diagnosis of adjustment disorder with depressed mood.  He also expressed passive SI, stating he had "thoughts of rather not be living" based upon his life sentence.  He was subsequently placed on psychotropic medication.  The inmate stabilized and was initially discharged from 3CMS in June 2010, but reinstated two years later in February 2013.  He remained at 3CMS until January 2016, when he was removed due to non-compliance with clinical appointments and psychotropic medication.  On August 3, 2017, the inmate was placed back into 3CMS due to anxiety related to his visual impairment (caused by his diabetes).  His diagnosis was changed to anxiety disorder.

On October 1, 2020, the inmate submitted a health care request services request to mental health indicating that "I need to see my clinician as well as my psychologist.  Something has triggered a large increase of my anxiety and is having very negative affect on the overall."  Through an assortment of errors, he was not seen by his PC until three weeks later on October 22.  During that session, the clinician noted that the inmate was feeling anxious about moving to another housing unit, as well as appeared anxious that his daughter might feel he was a burden to her.  He denied any SI and did not want to restart psychotropic medication.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  However, the reviewer opined that the inmate "consistently struggled with depression, anxiety, guilt, and feelings of being a burden to his family.  This in combination with environmental stressors and the confiscation of the cellular phone, may have further exacerbated his symptoms."

---

[13] Consistent with previous reports, in order to include any inmate suicides that occurred subsequent to this reviewer's preceding (fourth re-audit) assessment, the review period was extended from January 2020 through April 2022.

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

1) There were concerns with the inmate's March 18, 2020 treatment plan. Anxiety he reported in routine contacts prior to his IDTT was not noted in his treatment plan. In addition, his diagnosis did not match documented information and there were two conflicting diagnosis listed.

2) On April 30, 2020, the inmate was seen for a mental health routine contact. His primary clinician did not meet with him again until after 90 days had lapsed.

3) In response to a CDCR 7362 request placed by the inmate on October 1, 2020, multiple concerns were identified including the following: triaging/scheduling, placing mental health consult orders, cancellation of a routine consult without accompanying explanation, as well as missed timelines for clinician response to his 7362 (see Mental Health section for more information). According to the MHSDS *Program Guide*, 2009 Revision, Chapter 1 Program Guide Overview, Referrals to Mental Health, "A Routine referral should be seen within five working days."

4) During the review it was noted upon collection of the inmate's clothing for evidential purposes, staff discovered a hand written note in the pocket of his gray shorts. The note contained verbiage stating in part, "police just came saw rope hanging said nothing…"

**Audit Summary**: Improvement was found in completion of required SRASHEs based upon emergent/urgent referrals for SI/behavior, completion of intake screening during the R&R process, and nursing observation of MHCB patients. Adequate practices were also found in PT rounding, alternative housing, and Guard One compliance. The observed CIT encounter on May 25 was very good and the team collaboratively diffused the crisis. The observed IDTT meetings in the MHCB unit were very problematic, with uneven case presentations and higher level of care discussions, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. Discharging SRASHEs and safety plans were not being reviewed as required, and the MHCB supervisor was unaware of their responsibility to review safety plans. Several patients housed in the MHCB for over ten days were not provided yard privileges. Provider orders from both PCs and psychiatrists often did not differentiate between Suicide Precaution status which required observation at 15-minute intervals and non-suicide observation at 15-minute intervals. A sizable percentage (47 percent) of Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms were inadequately completed by mental health clinicians.

### 2)    California State Prison - Sacramento (CSP/Sac)

**Inspection**:  June 16-18, 2021 (previous suicide prevention audit was on November 13-15, 2018).  CSP/Sac housed approximately 2,184 inmates at the time of the most recent on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the **Intake Screening** process in the R&R unit on June 16 and June 18.  The same nurse was observed on both occasions.  The nurse's office was configured with a long counter against the wall and a TTM in the corner of the far wall.  On June 16, the nurse was observed to be conducting the intake screening while sitting at the counter with his back to the inmate during the entire process. In addition, the nurse was observed to be omitting a recently added question to the Initial Health Screening form, i.e., "Did the patient receive any bad and/or unexpected news during a recent court hearing?"  It was later determined that the nurse was under the mistaken impression that the question was only asked when an inmate was known to be returning from court, rather than asking all questions to all incoming inmates.  The nurse was also advised that face-to-face contact during the intake screening inquiry was preferred to ensure that the inmate's responses were consistent with their facial expressions and general demeanor. The nurse's office door was closed during the process, thus ensuring both privacy and confidentiality.  On June 18, the same nurse was conducting the intake screening and observed to be sitting in a chair (with a rolling cart and laptop) facing the inmate who was in the TTM. Unfortunately, the nurse was again observed to be omitting the question –"Did the patient receive any bad and/or unexpected news during a recent court hearing?" – during the inquiry.  The nurse's office door was closed during the process, thus again ensuring both privacy and confidentiality.  Supervisory nursing staff who were stationed outside in the R&R unit were apprised of this reviewer's observations, as well as the need to include a suicide prevention placard inside the nurse's office that was visible to inmates during the intake screening process.

Daily **PT Rounds** were observed in several of the restricted housing units, including PSU A-1 and A-2, PSU B-8, the STRH unit, and EOP ASU (A-5).  Overall, multiple PTs were observed during the on-site assessment, with rounds appropriately performed and Psych Tech Daily Rounds information entered into EHRS for each caseload inmate.

**Housing**:  CSP/Sac had two CTCs; CTC-1 had 15 **MHCBs** and CTC-2 had 12 MHCBs.  This reviewer previously found that all 27 patient rooms within CTC-1 and CTC-2 were suicide-resistant.  Of note, there were a few vacant rooms in the MHCB units during the on-site assessment.

In addition, all cells in the 20-bed MHOHU were previously designated to provide temporary, unlicensed MHCB LOC.  This unlicensed unit was also known as the "Mental Health Crisis Bed Unit (MHCBU)," see CSP/Sac Local Operation Procedure No. 010.  Each cell was suicide-resistant and had solid cement beds, ventilation grates, and light fixtures.  However, as reported in all of this reviewer's previous assessments, the environment of the MHOHU remained sterile. Cells appeared dark and offered limited visibility of their interiors.  Further, although IDTT meetings were conducted in an area outside of the housing unit, there continued to be no clinician offices in the MHOHU.  Therefore, clinical assessments were regularly conducted at

cell-front or in therapeutic modules in the MHOHU. This reviewer was informed that although use of the MHOHU often fluctuated throughout the year, it had generally been activated on a daily basis approximately 90 percent of the time since February 14, 2020. In May 2022, this reviewer was informed by mental health leadership at CSP/Sac that the MHOHU had not been utilized as an unlicensed crisis bed unit since August 5, 2021, and was currently functioning only as alternative housing (up to five cells).

There were 17 designated **New Intake Cells** (106-109, 114-121, 217-221) in the administrative segregation EOP unit (A-5) previously found to be suicide-resistant. In addition, there were 11 designated new intake cells (100-111) in the STRH unit previously found to be suicide-resistant. Of note, this reviewer observed further retrofitting of new intake cells in the STRH unit during the on-site assessment. Overall, this reviewer did not observe any new intake inmates in non-new intake cells in either the administrative segregation EOP or STRH units.

Finally, **Alternative Housing** cells to temporarily house inmates awaiting MHCB placement were used periodically and primarily found in the B-7 Unit. According to the available data, 18 inmates were housed in alternative housing from March 1, 2021 through June 11, 2021, although this reviewer's medical chart review found at least one additional use of alternative housing that was not reported in the data. All inmates were provided beds, required to be observed on a continuous 1:1 basis, and discharged from alternative housing within 24 hours. Slightly more than half (53 percent) of the 19 MHCB referrals were rescinded and inmates returned to their housing units. This reviewer also examined the 19 EHRS charts of inmates discharged from alternative housing and found that the required SRASHEs and five-day clinical follow-ups were completed in each case.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs and MHOHU. In addition, patients not on suicide observation statuses were observed at 15-minute intervals by nursing staff with documentation of such checks entered into the EHRS. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (SAC 1, SAC 2, SAC 3, and SAC 4) on Suicide Precaution status in the MHCBs and MHOHU during a nine-hour period from 12:00 a.m. through 8:59 a.m. on April 16, 2021, June 4, 2021, June 11, 2021, and June 17, 2021, respectively. The chart review found one case (SAC 2) had one violation, another case (SAC 4) had two violations, and the remaining two cases (SAC 1 and SAC 3) had no violations of checks in excess of required 15-minute intervals. Similar positive findings were found during the 2018 assessment.

Although observation of all MHCB patients at 15-minute intervals was commendable, clinicians in all three MHCB units, as well as the MHCB supervisor, were incorrectly under the impression that all MHCB patients, regardless of their suicide risk status, were required to remain at a minimum on Suicide Precaution status until their physical discharge from the inpatient units. As a result, patients who were stable, not assessed as currently suicidal, and awaiting physical discharge back to their unit, remained on Suicide Precaution status and were issued only boxers and a t-shirt. For example, SAC 1 was clinically discharged from CTC-2 on April 16, 2021, but remained in boxers and whites for an additional three days until his physical discharge on April 19, 2021. There were multiple examples of other patients awaiting placement at a higher level of care, assessed as not currently suicidal, but remained on Suicide Precaution status in only boxers

and whites. As such, clinical practices within the MHCBs and MHOHU were contrary to the CDCR's "State-Issued Clothing and Bedding for Mental Health Inmate-Patients in the Mental Health Crisis Bed and Outpatient Housing Unit," effective October 29, 2013, which required male "inmate-patients not on suicide precautions or watch" to be issued "one pair blue denim jeans or one blue chambray shirt, or one jumpsuit…"

In addition, similar to the 2018 assessment, this reviewer examined a medical chart in which the patient (SAC 3) was on Suicide Precaution status and issued "full issue" (boxers and t-shirt) and a safety smock. Review of the provider's order indicated that the patient should have only been issued boxers and a t-shirt. Issuance of a safety smock was not appropriate, and if the patient was cold and requested additional covering, he should have been issued a safety blanket.

Finally, a review of **Guard One** data for a recent 24-hour period found an overall combined 97 percent compliance rate with required checks not exceeding 35 minutes in STRH, administrative segregation EOP, and two PSU units.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of December 1, 2020 through May 31, 2021. A sample EHRS review of 35 emergent/urgent referrals for SI/behavior revealed that clinical staff timely completed the required SRASHEs in 94 percent (33 of 35) of the cases.

In addition, the **Crisis Intervention Team** was launched at CSP/Sac in October 2019, paused during 2020, and reactivated on May 3, 2021. The full CIT was available during the third shift from approximately 3:00 p.m. to 8:00 p.m., with a crisis clinician responding to referrals during the second shift. This reviewer had an opportunity to observe the CIT process on June 17, 2021. The inmate (SAC 5) had recently returned from CMF-PIP on June 10 and was on quarantine status. Several hours earlier, he had swallowed an unknown quantity of Aleve and expressed SI. He was observed in the TTA for several hours and appeared stable, with no adverse reactions to the overdose. The CIT arrived at the TTA and the inmate was sitting on a gurney in an exam room, supervised by two correctional officers. The clinician, nurse, and sergeant entered the room and the clinician began to question the inmate. The door remained open and the two officers remained, adversely impacting privacy and confidentiality. Of note, the TTA was located in a recently activated building that had multiple secure interview rooms that could have been utilized in lieu of these additional security staff. The inmate could also have been secured to the gurney if a security issue had been identified.

The clinician's initial assessment was very brief, with the inmate complaining that he had been frustrated by his placement on quarantine status despite the fact that he was fully vaccinated. The sergeant informed the inmate that he was no longer on quarantine status and would soon be rehoused and his property returned. The inmate seemed to be satisfied with the sergeant's explanation. The CIT began to leave the exam room and this reviewer informed the clinician that it did not appear there had been any inquiry regarding the inmate's overdose and alleged suicide attempt. After a pause, the clinician acknowledged the error, subsequently returning to the exam room and asking the inmate - "You didn't really swallow any pills, right?" The inmate responded that he had swallowed the pills in an attempt to commit suicide, but that he was no

longer suicidal and relieved to be removed from quarantine status. (Nursing progress notes verified that the inmate was observed swallowing an unknown number of pills.) The clinician subsequently decided not to refer the inmate to a higher level of care, and a member of the SPRU who accompanied this reviewer to observe the CIT process suggested that, if clinically indicated, he could be placed on a five-day clinical follow-up. Subsequent review of the medical chart indicated that the clinician completed the required SRASHE, assessed the inmate as having a "high" chronic risk and "moderate" acute risk for suicide. The SRASHE, with much of the information pulled forward from previous SRASHEs, indicated that the inmate's acute risk was moderate "due to the claim, but unsupported, OD today and yesterday, June 16, 2021, making superficial scratches to his neck." A five-day clinical follow-up was also ordered.

In sum, there were several concerns about the observed CIT response on June 17, 2021, including a lack of sensitivity for providing reasonable privacy and confidentiality during the encounter, as well as the very brief assessment of suicide risk by the clinician who initially did not even inquire about the circumstances surrounding the overdose. Of note, a crisis triage referral completed several hours prior to the suicide of inmate (SAC 8) at the facility in December 2020 was also problematic, see below.

This reviewer observed 11 **IDTT Meetings** in the MHCBs and MHOHU on June 16-18, 2021. Overall, although there was good treatment team representation, some of the meetings (involving varying clinical staff) were problematic, with uneven case presentations and higher level of care discussions, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. Although other case presentations were adequate, they often lacked discussion about treatment goals and safety planning. Daily progress notes did not consistently document specific coping strategies and tools to reduce SI. Of note, the IDTTs in CTC-2 were measurably better, with the PC consistently asking patients if they understood their diagnoses, asking patients about their treatment goals, and conversing with patients regarding their observation level, property, and privileges. The PC also consistently solicited input from other team members.

One case symbolized the problems in the IDTT meetings. The patient (SAC 4) had been admitted into the MHOHU approximately two weeks earlier on June 4, 2021 for both SI and homicidal ideation. His symptoms had not improved, and he was referred to the acute LOC on June 11. The patient had vacillated between Suicide Watch and Suicide Precaution status during his two-week MHOHU placement. The patient had an extensive history of suicide attempts and SIB, and was self-injurious during his MHOHU placement. He was consistently assessed as being both a "high" chronic and acute risk for suicide. During the IDTT meeting on June 18, the patient presented as very depressed with a flat affect, appearing both helpless and hopeless. He continued to express SI. In summarizing his treatment during the meeting, the PC attempted to portray progress in the case, stating that the patient had progressed from Suicide Watch in a smock to Suicide Precaution in "whites." When the clinician further stated that "we're working on safety planning and its working," the patient promptly responded "No, it's not!"

The PC subsequently summarized the IDTT meeting on June 18 in the narrative of the MH Master Treatment Plan as follows:

Today, Pt attended his IDTT and presented as cooperative, Ox4, but with some guardedness including being soft spoken, making poor eye contact, discontented mood with restricted affect. Pt's TC was appropriate and Pt did not appear to be responding to any internal stimulus. Pt demonstrated fair insight by noting: 'My anger feels like an addiction.' Pt reported his mood is the 'Same.' When asked to explain, Pt reports he feels worthless, useless and a burden to his family. Treatment team noted (over the past week) Pt has been taken off suicide watch after demonstrating improved cooperation with staff and reporting an ability to keep himself safe. During the meeting, Pt was somewhat slow to acknowledge his improvements, but did report some improvements. Pt reported his SI has reduced and his sleep has improved helping him achieve his current status regarding less restrictions for daily observation and help to move out of a smock and into whites.

The clinician's perception in the MH Master Treatment Plan that "SI has reduced" was contrary to the patient's consistent daily reporting of SI in the MHOHU. The safety plan for this patient also included narrative that was pulled forward from a previous Master Treatment Plan of June 11 that stated:

> - While awaiting acceptance and transfer to Acute LOC: 'While housed in MHCBU, I/P will be seen daily by either a clinician or psychiatrist and will have psychiatric contact at least every 72 hours. He will also have weekly IDTTs. These will be done in an effort to alleviate symptoms of depression, stress, thoughts of suicide, and thoughts of homicide.
> -Medication management. I/P will benefit from continued psychoeducation about the usefulness of psychotropic medications for symptom management, including issues with depression and thoughts of self-harm.
> -MHCBU staff will utilize cognitive behavioral therapy (CBT) to restructure/reframe SI and depressive thoughts. CBT may also be used to restructure and reframe thoughts of harming others.
> -MHCBU staff will consult with psychiatry for ongoing evaluation of psychotropic medications for issues of depression.
> -Distress/frustration tolerance techniques: relaxation, self-soothing, weighing costs and benefits in order to better manage his mood and engaging in self-injurious behaviors.

Not only did most of the above narrative simply repeat MHCB policy requirements (e.g., daily meetings with the PC and psychiatric contact every 72 hours), but there was no documentation in progress notes to suggest that clinicians were utilizing CBT or any other tools to decrease the patient's SI. In fact, progress notes often utilized the term "safety planning" without specifying specific strategies, vaguely stating that the patient "engaged in safety planning discussion for obs/issue change."

Subsequent review of the patient's medical chart indicated that a few days later on June 21, he was observed to be continuously cutting his arm with a piece of glass and, after refusing orders to stop the self-injury, officers were forced to utilize OC spray. As noted by a clinician

completing a SRASHE following the incident, the patient "has few coping skills, little hope for the future, attempted suicide with desire to die recently. He seems acutely depressed, and seems to really want to die. He will continue to remain in a smock and on Watch observation."

Finally, it should be noted that many of the above issues, including a questionable decision not to refer to a higher level of care, were also found in a case (SAC 7) of an inmate discharged from the MHOHU four days prior to his suicide in October 2020, see below.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for approximately 25 CTC-1, CTC-2, and MHOHU patients who were housed for at least seven days (and had at least one IDTT meeting), with many housed for more than three weeks and awaiting transfer to a higher level of care. Although showers and opportunities for telephone calls were offered on multiple occasions to all reviewed patients, the reviewer found that the nine CTC-1 patients were each offered yard on only one occasion, four CTC-2 patients were each offered yard on only one occasion, with one additional patient offered yard three times, and nine MHOHU patients were not offered any yard, with one additional patient offered yard on one occasion and a second patient offered yard on four occasions. Because the MHOHU yard was not utilized (see below), those two patients were offered out-of-cell time in a small corridor referred to as the "dining area" located outside the unit. Examination of the 114-A forms also indicated that there was no record of visits being offered in any of the units. In sum, only two of 25 (eight percent) of MHCB patients were offered yard more than once, and ten of 25 (40 percent) were never offered yard during their several week placements in the MHCB units.

The lack of out-of-cell time for MHCB patients was particularly acute in the MHOHU. The yard attached to the MHOHU had not been utilized in several years, at least since this reviewer's initial assessment in November 2013. There had been various explanations by CDCR over the years as to why this yard was not utilized, including the cement floor had to be cleaned from bird feces, potentially hazardous tables needed to be removed, etc. Most recently, A-Section of the B-1 Building, which was adjacent to the B-Section housing the MHOHU, had been designated as the COVID-19 Unit at CSP/Sac and housed inmates who were COVID-positive and needed to be quarantined. As such, because the only walkway to the yard was in front of A-Section, a decision was made to further delay the activation of the yard. However, this reviewer was informed that the last COVID-positive inmate housed in A-Section was discharged six months earlier on January 17, 2021, whereby the unit was then utilized to house inmates on administrative segregation status from Folsom State Prison. Therefore, although the yard designated for MHOHU patients had the potentially hazardous tables removed and was cleaned (during this reviewer's on-site assessment), it was still not being utilized.

It should be noted that, apart from the non-utilization of the MHOHU yard, another noteworthy reason why most MHCB patients were receiving very limited or no yard privileges was the significant understaffing of RT staff. This reviewer was informed that there was only one RT assigned to the three MHCB units. This RT, responsible for up to 47 patients, was assigned to CTC-1 for 1.5 days, CTC-2 for 1.5 days, and the MHOHU for one day each week. Review of medical charts indicated that the RT was not able to complete the required initial RT assessment on any of the patients and was generally unavailable for most IDTT meetings. This reviewer

was informed that an additional RT was due to be assigned to the MHCB units the following week.

It should also be noted that both the RT and other MHCB unit personnel were unaware that although the RT was primarily responsible for providing patients with structured out-of-cell activities in the MHCB units, custody personnel also had a responsibility for providing unstructured yard privileges.  CDCR "Mental Health Crisis Bed Privileges Revision" memorandum (dated February 14, 2017) stated that although "The recreational therapist shall be responsible for facilitating all structured out-of-cell activity, and is expected to remain with the IP during these activities," the policy also stated that "Custody staff may provide supervision for unstructured out-of-cell activity to include yard and dayroom."  This exact same language was contained in CSP/Sac's own LOP No. 010: "Mental Health Crisis Bed Unit – Custody Operations (March 2020).  As such, the responsibility for providing out-of-cell privileges to MHCB patients as determined by the IDTT, whether it be structured or unstructured activity, was a joint responsibility of the RT and custody personnel assigned to the MHCB units.  In sum, despite clear direction, yard privileges were either very limited or non-existent for MHCB patients at CSP/Sac.

Finally, at least one of the CC Is assigned to the MHCB units, as well as a CSP/Sac local operation procedure ("Crisis Treatment Center Recreation/Rehabilitation Therapy Program," December 2019) incorrectly stated that "patients must not be on a Suicide Watch and be in whites to participate in a yard."  There are no CDCR polices and/or directives that restrict out-of-cell activities, including yard, based upon a patient's suicide observation status.  Out-of-cell activities are allowable based upon a patient's custody designation and only restricted based upon the clinical judgment of the IDTT.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCBs and MHOHU, this reviewer examined the medical charts of ten patients discharged from the units between April and June 2021.  The review found that required SRASHEs and safety plans were completed in each case, as were the five-day clinical follow-ups.  In addition, the MHCB supervisor reported that they were aware of the responsibility to review all discharge SRASHEs and safety plans for patients released from the MHCBs and MHOHU [pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020], and attempted to review the required documentation on a regular basis.  Although the review found that the required SRASHEs, safety plans, and five-day clinical follow-ups were completed in the ten cases, the quality of SPIs remained inadequate and did not consistently include specific strategies to address the recurrence of SI.

Finally, the process by which inmates were provided "**Discharge Custody Checks**" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 137 cases of inmates discharged from a MHCB or alternative housing placement who remained at CSP/Sac and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from December 2020 through May 2021. The review found that only 83 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Most of the errors were attributable to blank forms or custody checks recommended for discontinuation prior to 24 hours by clinicians. Most checks were clinically-ordered for 24 hours. In addition, 97 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with a few errors involving gaps in observation.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (December 2020 through May 2021) found that meetings had quorums of all required mandatory members or designees for all six months. Meeting minutes reflected some discussion regarding case presentations/RCAs on two serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, as well as corrective actions instituted from this reviewer's prior assessment report. In addition, the utility of presenting monthly data on the expenditures for supervising inmates on Suicide Watch status was very questionable. Meeting minutes were otherwise unremarkable. A SPRFIT LOP was in effect. Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. At the time of the June 2021 assessment, CSP/Sac had not provided any of these three LOPs to this reviewer.

**Training**: According to training records, approximately 99 percent of custody and 100 percent of nursing staff were currently certified in CPR. In addition, 94 percent of custody staff, 94 percent of medical staff, and 97 percent of mental health staff received IST suicide prevention training during the previous 12 months. Finally, as of May 2021, 99 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 98 percent had received safety plan training.

**Recent Suicides**: CSP/Sac experienced four (4) inmate suicides during the review period, with three the deaths occurring in late 2020. In the ***first*** case (SAC 6), the inmate was found hanging from the upper bunk by a sheet in his GP cell during the morning of September 21, 2020. The inmate entered CDCR on September 8, 2004 to serve a more than 30-year sentence for robbery, assault and battery, and burglary. He was transferred to and from CSP/Sac on several occasions, with his last transfer to the facility on August 11, 2020. The inmate incurred seven RVRs during his confinement, the most recent of which occurred on February 14, 2020 involving battery on a prisoner. He was not known to be gang-affiliated. It did not appear that he had any family support nor recent visits, however, he did maintain regular letter and telephone correspondence with two friends throughout his term.

Information regarding the inmate's early childhood years was scarce, with records only indicating that he was an only child and initially raised by both parents until his father's incarceration. His parents then divorced and he temporarily lived with his mother until she remarried. The inmate then resided in group homes, foster care, various county juvenile halls, and the California Youth Authority for most of his adolescent and teenage years. He was involved in two long-term relationships which resulted in two children, a son and daughter. The inmate had limited contact with his daughter until 2016. He had an extensive history of substance abuse which impacted his education and employment histories, and led to multiple arrests as a juvenile and young adult. The inmate had four previous CDCR terms.

The inmate had an extensive history of mental health services and suicide attempts as a youth. His mother had reported to the previous probation officer that he displayed severe behavior problems at home, school, and in the community through his adolescence. He received inpatient psychiatric treatment on multiple occasions. Upon entry into CDCR in 2004, the inmate was not initially placed into the MHSDS, but was admitted into a MHCB in March 2005 for depression and SI that was viewed as "secondary to self-reported safety concerns of the yard." He was initially diagnosed with major depressive disorder and subsequently placed at the EOP LOC. He participated in his EOP treatment by attending his weekly clinical contacts, therapeutic groups, adhering to his medication regime, and noted to be responsive to cognitive behavior techniques. In October 2006, the inmate was downgraded to 3CMS and he continued to receive treatment for depression and opiate dependence. Records indicated he continued to experience mild symptoms of depression and paranoia related to safety concerns. The inmate was eventually removed from the MHSDS in June 2011 when his psychotropic medication was discontinued, and his symptoms appeared to be in remission. The inmate's diagnosis at that time was depression NOS, in remission.

During the next several years, the inmate received multiple RVRs, the most serious of which was for the attempted murder of his cellmate in June 2016. Although not prosecuted for the incident, he did receive a SHU term. Upon expiration of his SHU term, he became actively engaged in programming, was assigned a porter job, had positive work performance reviews, began college courses, and remained disciplinary free, all of which resulted in a reduction of his security level. Further, although records indicated that the inmate had a significant history of SI and suicide attempts as a juvenile and young adult, his only suicide attempts within CDCR occurred during a prior term in 1983, as well as early in his current term when he attempted to hang himself while in a temporary holding cell shortly after his discharge from the MHCB in April 2005.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did, however, have significant medical issues, including Crohn's Disease, perianal fissure, and a hernia that caused considerable chronic pain during the last several years of his life. According to the reviewer, the inmate "suffered from a chronic medical illness, exacerbated by physical pain associated with his abdominal hernia and perianal fissure. He also experienced prolonged stress related to COVID-19 pandemic restrictions, marked by subsequent isolation and quarantine status disrupting his prison program, physical activity, and social interaction…. The inmate likely became overwhelmed by his mental, emotional and physical suffering, reached the end of his coping abilities, and as a cumulative result of the factors listed above, ended his life by suicide."

The Suicide Report contained three (3) recommendations for corrective action through a QIP:

> 1) In review of the staff reports, it was noted upon entry into the cell the responding staff placed mechanical restraints on the inmate prior to utilizing the cutdown kit and starting CPR. At the time of the incident, the inmate was housed in a general population setting, and his custody designation was Medium (A). This is in conflict with the annual Suicide Prevention lesson plan, slide 46, which states "For inmates housed in general population found hanging, there is no need to apply restraints prior to utilizing the cut-down kit and starting CPR."

> 2) During the Review of the CDCR Forms 837-A Staff Narratives revealed the following: Medical staff stated in part, "his eyes were fixed and open, his body had stiffness, and his feet were mottled with pink and white signifying patient was beyond the time of any possibility of regaining vital signs." Other medical staff documented they were unable to open the mouth of the inmate, and therefore unable to intubate him. Another report described the inability to obtain a temperature using different methods. These facts suggest the inmate may have been deceased for a period of time.

> 3) During the review, it was discovered the inmate's personal property did not transfer with him to CSP-SAC from Folsom State Prison and the inmate was without his personal property for approximately 40 days. This is in conflict with Folsom State Prison Department Operations Manual Supplement, Inmate Property, Chapter: 50000, Security Operations, Section: 54030, Inmate Property, signed August 26, 2020 which states in part: 'Upon notification from the Records Office that an inmate will be transferred, the R&R Sergeant (or designee) will notify the inmate to report to R&R with all of his property for inventory and packaging. A CDCR 1083 will be prepared and signed by the inmate that all property is accounted for, then forwarded at the time of transfer for the signature of the transporting officer receiving the inmate's property.'

In the **_second_** case (SAC 7), the inmate was found hanging from the ventilation grate by a sheet in his PSU cell during the early evening of October 19, 2020. The inmate entered CDCR on May 17, 2019 to serve a life sentence (with the possibility of parole) for the attempted murder of a jail deputy and assault with a deadly weapon. He was transferred to CSP/Sac on July 30, 2019. The inmate incurred six RVRs during his brief confinement, the most recent of which occurred on October 5, 2020 involving battery on an officer. He was known to be formally gang-affiliated. The inmate did not have any apparent sources of support in the community, both of his parents were deceased, he never married nor had any children, and did not have any visitors or telephone calls during his most recent CDCR term.

According to available records, the inmate had a turbulent childhood and was raised in a blended family comprised of nine half-siblings. He had severe behavioral problems as a child and his first criminal activity began when he was only eight years old. The inmate began his affiliation with gangs at age five and burned down the school gymnasium at age six. At age seven, he shot

a neighborhood child and was subsequently convicted of involuntary manslaughter. He spent several years in state psychiatric hospitals, as well as in group homes, county juvenile hall, and with an extensive adult criminal history, four CDCR terms. Records also indicated that members of the inmate's family had a history of both mental illness and suicidal behavior.

The inmate was first diagnosed with bi-polar disorder as a child, as well as meeting the criteria for conduct disorder. Over the years, he received many other diagnoses, including schizoaffective disorder, schizophrenia, borderline intellectual functioning, malingering, depressive disorder, and anti-social personality disorder. Since 2002 (during his first CDCR term), the inmate had ten MHCB admissions, two Department of State Hospitals (DSH) placements, and was treated at both the 3CMS and EOP levels of care. At the time of his death, the inmate was in EOP with diagnoses of schizoaffective disorder, depressive type, and anti-social personality disorder. During all of his CDCR terms, he received treatment for reported symptoms of auditory hallucinations (AH), delusional beliefs, mood disturbance, impulsivity, paranoia, depression, and agitation. However, his compliance with offered treatment fluctuated, and he generally had improved functioning when he was compliant with his psychotropic medication. Of note, during his final CDCR term which began in May 2019, although placed in EOP, the inmate regularly refused to engage in treatment. Following the occurrence of his six RVRs during 2020, he remained housed in the PSU.

With regard to suicidal behavior, the inmate self-reported multiple suicide attempts as both an adult and child. His first attempted suicide occurred when he was only nine-years-old. According to the records, CDCR clinicians consistently viewed several alleged incidents with skepticism and, as the CDCR reviewer noted in this case, "it was clear from the record that the inmate was viewed by staff as someone who would claim SI for secondary gain motivators, such as trying to manipulate housing or to get to a higher level of mental health care." Four days before his death, he told his PC on October 15, 2020 that "none of his suicide attempts were ever 'near lethal' and it was documented that his treatment team was not clear if he ever had intent to end his life."

During the last few months of his life, the inmate was housed in the MHCB at CSP/Sac on two occasions: in CTC-2 from September 12 through September 23 and in the unlicensed MHOHU from September 24 through October 15, 2020. Both placements were problematic. According to the CDCR reviewer of this case, although the CTC-2's IDTT noted that the inmate was being discharged on September 23 because he had learned sufficient coping skills and had not manifested any objective symptoms of psychosis or a mood disorder, and had "no suicidal history and has not endorsed AH during the course of this day in the MHCB," the reviewer stated "It was unclear….Why the treatment team documented the inmate had not endorsed auditory hallucinations during his stay as this reviewer saw in the clinical documentation that the inmate frequently reported this as a symptom. Additionally, it was well documented that the inmate had a history of suicidal behavior, including multiple prior suicide attempts." The following day (September 24), he was readmitted and housed in the MHOHU. He was marginally cooperative with clinicians and refused most treatment. The inmate continued to report both SI and command auditory hallucinations (CAH). Following ten days of placement, the CDCR reviewer noted that there was not "any documented consideration of referring the inmate to a higher level of care, even though he had been in this setting 10 days at this point." Contrary to policy, the

inmate was not always seen on a daily basis in the MHOHU. Observation orders were also not documented on a daily basis as required. One IDTT meeting did not occur. Nursing rounds in the MHOHU were also problematic. The inmate's final IDTT meeting on October 15, 2020 was held in absentia, and it was decided that he had "denied significant issues with his mood and reported no SI for the past several days, had not been observed responding to internal stimuli, and was able to attend to activities of daily living appropriately, and had not presented with any acute symptoms." The discharge SRASHE documented a "high" chronic risk and "moderate" acute risk for suicide. The inmate committed suicide four days later.

Apart from the lack of documentation regarding consideration for a higher level of care following a 21-day stay in the MHOHU, the CDCR reviewer did not find any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, including any known significant medical issues. The inmate did not leave a suicide note. However, the reviewer did opine that "the inmate's ultimate decision to end his life on October 19, 2020 was related to feelings of hopelessness over his lengthy prison term, chronic psychiatric symptoms and mood instability, feelings of isolation/loneliness, impulsivity, and disinhibition towards violence."

The Suicide Report contained ten (10) recommendations for corrective action through a QIP:

> 1) CSP-SAC: The inmate had four SRASHE's completed within five weeks of his death (September 12, 23, 24, and October 15, 2020). All of these SRASHEs failed to appropriately identify risk and/or protective factors and likely underestimated his risk for suicide. A number of these assessments also had insufficient rationales or formulations of risk; several had missing or no rationales provided related to the inmate's disposition. Finally, despite reporting a third suicide attempt by hanging (in approximately 2014), this information was never added to the Patient History of Suicide/Self Harm Grid in the healthcare record.

> 2) CSP-SAC: The inmate had two MHCB admissions immediately prior to his death - from September 12, 2020 through September 23, he was housed in the CTC-2 and from September 24, 2020 through October 15, 2020, he was housed in the MHCBU. During both of these admissions, observation orders were not appropriately documented on the following days: September 22, 2020, September 26 and 27, 2020, October 2-5, 2020, October 10-11, 2020, and October 13, 2020. Per memo entitled, 'Level of Observation and Property for Patients in Mental Health Crisis Beds,' dated March 15, 2016, 'The rationale for the decision to place a patient at a particular level or frequency of observation shall be documented on a progress note at least every 24 hours.'

> 3) CSP-SAC: On the inmate's second MHCB admission in the MHCBU, lasting 21 days, the inmate had an Initial IDTT within 72 hours of placement; however, did not have a second IDTT until his discharge. Per the 2009 *Program Guide* (pg. 12-5-12), 'The IDTT shall meet within 72 hours of an inmate-patient's admission and at least weekly thereafter.'

4) <u>CSP-SAC</u>: During the inmate's second MHCB admission, there were five days of no documented psychologist or psychiatrist contacts while the inmate was in the MHCBU: October 3, 2020, October 5, 2020, October 10-11, 2020, and October 13, 2020. Per the 2009 *Program Guide* (pg. 12-5-13), 'An inmate-patient's condition shall be assessed and monitored daily by the treating clinician, either a psychiatrist or psychologist.'

5) <u>CSP-SAC</u>: Despite the 21-day stay in the MHCBU (September 24 - October 15, 2020), there is no documentation that his treatment team considered a transfer to a higher level of care for the inmate, except for in the MH Master Treatment Plan completed on Day 21, at the time of discharge. It was noted that on Day 11 of this placement, the inmate received an RVR for Battery on a Peace Officer, his third RVR within a three-month period, and on Day 12, he was documented to be 'out of touch with reality' and 'illogical.' Given his length of stay, and these observed behaviors/concerns, it is unclear why a referral to a higher level of care was not considered in the documentation.

6) <u>CSP-SAC</u>: Per records reviewed in the health care record, psychiatry staff documented the inmate had made 'multiple superficial lacerations on his forearm…' (See note dated September 12, 2020 at 1300 hours). Multiple notes completed by psychology staff did not mention this act of self-harm and in fact, denied it occurred (see SRASHE dated September 12, 2020 and MH Master Treatment Plan dated September 14, 2020). Additionally, a Self-Harm Powerform was not completed. Per policy, all self-harm incidents must be documented on self-harm power-form within 72 hours of the incident. This was reiterated on the memorandum dated October 28, 2019: Clarification of Documenting and Reporting Suicide Attempts and Self-Harm Incidents.

7) <u>HQ</u>: The inmate's treatment teams during his inpatient admissions viewed his reports of psychiatric symptoms and suicidality as motivated by secondary gain factors, such as him being attention-seeking, medication seeking, and/or seeking an inpatient hospitalization at a state hospital, rather than true psychiatric distress. Likely as a result of the inmate's professed dishonesty in the past, the treatment teams did not accurately assess the inmate's current symptomatology which likely resulted in underestimation of suicide risk and impacted treatment planning.

8) <u>CSP-SAC-Psychiatry</u>: Following the last dose of Seroquel administered on October 11, 2020, Seroquel was not subsequently restarted or reordered.

9) During the review of the inmate's treatment plan, it was noted he did not attend his scheduled IDTT on August 26, 2020, due to not having a jumpsuit to wear. At that time, the inmate was housed within Facility A, Building 5, ASU EOP Hub. It was confirmed by the CDCR 114-A, the inmate refused to attend IDTT that day, but no reason for his refusal was documented.

10) During the review of the Suicide Watch staggered 15-minute rounds, there were notable deficiencies from the period from September 12-22, 2020, and September 24-October 15, 2020, which were beyond the staggered 15-minute intervals.

In the *__third__* case (SAC 8), the inmate was found dead in his GP cell from self-inflicted puncture wounds to his neck during the early morning of December 24, 2020. The inmate entered CDCR on January 4, 2013 to serve a 13-year sentence for criminal threat to cause great bodily harm and battery on a non-prisoner. He was transferred to CSP/Sac on June 1, 2020. The inmate incurred 15 RVRs during his confinement, the most recent of which occurred on October 23, 2020 for willfully resisting an officer. He was known to be gang-affiliated while in the community. The inmate had support from his mother and other family members, documented most recently in several distressing telephone calls with her in the days leading up to his death, including December 21 and December 23. Discussion during the calls included the up-coming Board of Parole Hearing (in which he was denied parole), gang violence, and the possibility of getting killed (telling her that "at the end of the day when it's your time, it's your time, you can't run from it or hide.")

According to available records, the inmate was the only child born to unwed parents, with his mother having three additional children from another relationship. His father died at an early age and he was initially raised by his mother who then "left him in the care of his grandfather." He entered the foster care system at age nine and spent the majority of his adolescence and teenage years in county juvenile hall and the CYA. There was a family history of both mental illness and suicidal behavior, with his mother attempting suicide when he was a young child and his aunt committing suicide when he was 13. The inmate dropped out of high school and began to abuse both drugs and alcohol. He was never married and did not have any children. He became involved in the criminal justice system at age 12 and was both unemployed and homeless when not in juvenile hall or CYA. The inmate had at least one inpatient psychiatric hospitalization as a teenager.

Upon entry to CDCR for his second term in January 2013, he denied any history of mental health or suicidal behavior. He had not participated in the MHSDS during his first term and did not receive any mental health care in CDCR until September 2018 when he was placed in a MHCB for substance-induced psychotic disorder. He admitted to regular use of methamphetamines which caused chest pain, paranoia, and visual hallucinations. He was released from the MHCB several days later and not enrolled in the MHSDS. Several weeks later on November 20, 2019, the inmate was brought to the TTA where he reported having "overdosed on spice… and felt like he was going to die." He presented as paranoid, anxious and experiencing physical pain. He was medically cleared and, when subsequently assessed by a mental health clinician, expressed SI. He was again placed in a MHCB. Upon discharge from the MHCB on December 2, 2019, the inmate was placed in the MHSDS at the EOP LOC. A diagnosis of anxiety (associated with depression) was added to his current diagnosis of substance-induced psychotic disorder. The inmate programmed in the EOP for a few months until he was again referred to a MHCB on January 31, 2020 "after he endorsed suicidality and psychosis secondary to the suspected substance usage." He was discharged from the MHCB on February 10, 2020 and continued to receive EOP treatment, including substance abuse groups.

By May 2020, the inmate had shown continued improvement in functioning and was considered for discharge to 3CMS. However, following his transfer to CSP/Sac in June 2020, records indicated that between July and August 2020, the inmate self-reported an "increase in anxiety, paranoia, and irritability related to adjusting to a new program, incarcerated life outside of an ASU and all of the 'unknowns' of COVID-19." In September 2020, the inmate self-reported an increase in depressive symptoms due to multiple deaths in his family. He also began to refuse his psychotropic medication. On October 23, 2020, custody staff requested a mental health assessment after observing the inmate acting "paranoid, bizarre, and asking his family to be checked on." He was seen by a clinician and admitted to frequent methamphetamine use which increased his paranoia, agitation, and energy. The inmate was initially referred to an MHCB and placed overnight in alternative housing. The MHCB referral was rescinded the following morning with the completed SRASHE indicating both a "low" chronic and acute risk for suicide.

Two months later, during the evening of December 23, 2020, a crisis referral was initiated by nursing staff after the inmate was observed by custody personnel to have ingested an unknown liquid (later determined to be cleanser). He refused both a medical evaluation and treatment. According to officers, the inmate had been acting irrationally, stressed out, pacing back and forth, crying, distressed after a series of telephone calls with his family, as well as drinking cleanser. A crisis clinician subsequently met with the inmate cell-side because the inmate refused to exit the cell. A gallon of cleanser was clearly visible inside his cell. The clinician, unaware of the officers' concerns, wrote in a subsequent progress note (a partially completed SRASHE) that he "presented as fully oriented, maintained eye contact, depression reported as 5/10, and absent of any significant indication of the stress, anxiety, or decompensation." The clinician indicated "some paranoia not wanting to come out to be assessed thinking he would be admitted to MHCB which occurred the last time he was assessed." The inmate denied that the ingestion of the cleanser was a suicide attempt and denied any current SI. According to the clinician's progress note, "due to the un-confidential setting this clinician chose not to ask additional questions." The clinician then departed the unit and the inmate committed suicide several hours later during the early morning of December 24, 2020.

Apart from the events occurring several hours earlier on December 23 that resulted in the crisis referral, the CDCR reviewer in this case found other recent stressors in the inmate's life that were possible precipitants to the suicide, including "multiple deaths in the family, COVID-19 restrictions, housing unit quarantine, pending court proceedings for possession of a weapon, and a recent BPH denial. Additionally, he became increasingly distressed by a fixed internal belief that he and his family would be killed by gang members as result of his conduct in prison." The inmate did not have any significant medical issues and a suicide note was not found in his cell.

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

> 1) <u>CHCF and CSP-SAC</u>: The inmate was placed in the MHSDS on December 2, 2019 with a diagnosis of Substance-Induced Psychosis. Additionally, records indicate he appeared to have continued substance use throughout incarceration, and met criteria for SUD (per nursing screening). Despite significant substance use concerns, it did not appear substance use was included as part of his Mental

Health Treatment Plans December 17, 2019, February 2, 2020, or February 10, 2020 (CHCF), June 11, 2020 (CSP-SAC), or September 9, 2020 (CSP-SAC) as there were no substance-related IPOCs initiated.

2) <u>CHCF and CSP-SAC</u>: There were multiple concerns with SRASHEs completed on January 31, 2020, May 9, 2020, August 4, 2020 (all CHCF), October 23, and 24, 2020 (CSP-SAC). Overall, it appeared that the inmate often presented in distress after suspected substance use. His levels of both chronic and acute risk were often assessed as low and did not account for impact of substance use on suicide risk, mental health symptoms of paranoia, agitation, reported safety concerns, interpersonal isolation, anxiety, recklessness, mood lability, and in some evaluations; violent behaviors resulting in RVRs. As a result of these factors, risk was likely underestimated. Additionally, SPI was not completed during the SRASHE on October 24, 2020, despite the evaluation reason being a MHCB rescission after a referral for Danger to Self, thus requiring SPI to be completed. Please see Suicide History for further details regarding each SRASHE.

3) <u>CSP-SAC</u>: On December 23, 2020, a crisis clinician, conducted a non-confidential (housing unit tier) SRASHE. While the SRASHE contained clinical information regarding depression, paranoia, and current distress, it omitted safety concerns, recent substance abuse, increasing interpersonal isolation, current/recent anxiety/panic symptoms, mood lability, recent substance intoxication, current single cell placement, and recent violent/assaultive behavior. Additionally, documentation indicated the assessing clinician did not ask additional questions as a result of the interview occurring on the housing unit tier. The records did not indicate what specific questions were excluded from the assessment. It is unclear whether the absence of the historical and clinical risk factors is related to the questions that were excluded during the assessment or inadequate file review; however, both of these factors likely contributed to the underestimation of suicide risk.

4) <u>CHCF and CSP-SAC</u>: Despite the inmate carrying a diagnosis of Substance-Induced Psychosis and ongoing substance use while incarcerated, it appears mental health clinicians involved in his treatment consistently underestimated the risks of his drug abuse on his mental health. This underestimation of the severity of his substance abuse, and its deleterious impact on his mental health, likely played a significant role in his decision to end his life.

5) <u>CHCF</u>: During the year prior to the inmate's suicide, while he was housed at CHCF ASU EOP HUB from February 10, 2020 to June 1, 2020, the chart reflects that the inmate was seen less than required by ASU EOP HUB psychiatry contact rules. The chart reflects that the inmate was seen by psychiatry on May 18, 2020. Chart review reveals an extreme departure from the norm.

6) <u>CSP-SAC</u>: During the review, it was noted the incident time was identified as 0510 hours, it was not until ten minutes later that 911 was activated at 0520 hours.

7) <u>CSP-SAC</u>: During the review, it was noted, custody staff did not submit a Mental Health Referral Chrono (CDCR 128 MH-5) following potential bizarre behavior observed from the inmate on December 23, 2020. In addition, staff should have identified the need for an urgent or even emergent referral. The referral should have also included information regarding the inmate's unusual behavior, emotional condition, and information received regarding his alleged consumption of cleaning solution.

8) <u>CSP-SAC</u>: During the review it was noted the inmate had received a denial from the Board of Parole Hearing on December 21, 2020, at which time no Mental Health Referral Chrono (CDCR 128 MH-5) was submitted. This type of information is identified as 'Bad News' and can have a negative effect on the inmate.

In the ***fourth*** case (<u>SAC 9</u>), the inmate was found hanging from the shower door by a sheet in his GP cell during the evening of February 7, 2022. The inmate entered CDCR on February 28, 2017 for his second term to serve a life sentence (with the possibility of parole) for second-degree murder and assault of a child with force likely to produce great bodily injury resulting in death. He was transferred to CSP/Sac on September 28, 2018. The inmate incurred 13 RVRs during his confinement, the most recent of which occurred on October 17, 2021 for disobeying an order. He was known to be gang-affiliated. The inmate was unmarried, but had at least four children from prior relationships. Family support appeared limited to regular telephone calls with his mother, as well as letter correspondence with multiple female friends.

According to available records, the inmate and three siblings were initially raised by their parents until their father left the family when the inmate was five-years-old. His mother later remarried. He reported both his father and stepfather had substance abuse problems, and both had previously served prison sentences. An older brother also had a history of criminal behavior. The inmate stated that he was raised in a turbulent home, and felt abandoned by those responsible for caring for him. He said his stepfather repeatedly abused he and his mother both physically and emotionally, and often denied him food. His mother was a nurse who frequently took additional shifts so as to avoid coming home. Although the inmate was expelled from school on multiple occasions due to behavioral issues, he was able to graduate high school. The inmate began using drugs at the age of eight. Although he did not have a juvenile arrest history, the inmate's employment history appeared sparse, most likely due to his involvement with gangs at an early age. He had multiple arrests and convictions as an adult, including a previous CDCR term between 2006 and 2010.

Upon his reentry into CDCR in February 2017, the inmate was placed at the 3CMS LOC. This MHSDS placement was primarily based upon his mental health treatment in the community as a child that included diagnoses of attention deficit hyperactivity disorder (ADHD) and post-traumatic stress disorder (PTSD). The PTSD diagnosis was given in 2011 secondary to experiencing childhood physical abuse and abandonment, as well as the death of a friend who

was shot right in front of him. Prior to CDCR confinement, the inmate was held in the county jail from 2014 through 2017 and was diagnosed with anxiety disorder, and adjustment disorder with anxiety and depression. He was placed on psychotropic medication in the county jail and those medications were continued during his CDCR confinement. His diagnoses within CDCR were updated in March 2017 to major depressive disorder, PTSD, and anxiety disorder. Three months later in June 2017, the inmate was placed in an MHCB for SI, followed several months later by two additional MHCB placements. He was subsequently placed at the EOP LOC in April 2018, and remained at EOP without any further inpatient placements until his death.

With regard to prior suicidal behavior, records indicated that the inmate reported several suicide attempts in the community that included an overdose, cutting his wrist, and driving his car into a tree. Within CDCR, the inmate reported that he attempted suicide in 2018 by swallowing a razor, however, there were no records in the medical chart to confirm the incident. The most recent SRASHE completed in April 2019 assessed the inmate as a moderate chronic and low acute risk for suicide.

During an IDTT meeting in January 2021, it was documented that he reported increased depression associated with the COVID-19 quarantine and family issues. He also reported feeling numb, sad, eating more, problems concentrating, fatigue, and loss of interest in activities. The PC indicated that he had poor coping skills and struggled to manage his emotions, but remained engaged in treatment. His medication was adjusted. The inmate was seen several times by a psychiatrist, and continued to complain about depression, weight gain, anxiety, and poor sleep. His psychotropic medication was adjusted again in April 2021. The inmate continued to program, and regularly attended both group and individual mental health sessions. He was also involved in various educational activities while incarcerated, including self-help groups and programs aimed at gaining a restoration of credits. He most recently worked as a barber in the facility.

During an individual session with his PC on June 16, 2021, the inmate reported that his depression was "10 out of 10" and that he was having suicidal "thoughts sometimes," however, denied any intent, plan, or means. According to the PC's progress note, the inmate stated "I just want to be home. I don't want to be here anymore." The required SRASHE was not completed. During a session with his PC the following week on June 23, 2021, the inmate appeared to be doing a little better, but still presented as depressed. Subsequent sessions initially indicated he had a better mood based upon regular contact with his mother, as well as potentially hopeful news regarding the appeal of his legal case. However, during other sessions from September through early December 2021, the inmate reported to his PC that his mother had been diagnosed with COVID and he was fearful she could die, as well as being concerned that his youngest daughter had been molested by a family member. On December 1, 2021, the inmate confided to his PC that he had had "a rough weekend" because he had broken up with his girlfriend and learned that his daughter was suicidal. During his final PC contact on February 2, 2022, the inmate did not report any urgent mental health concerns and denied any SI. He shared his annoyance with the systemwide COVID-19 quarantine, but informed his PC in a positive tone that he had received endorsement papers to be transferred to CSP/LAC. The inmate committed suicide five days later on February 5.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, including any known significant medical issues. The inmate did not leave a suicide note. However, the reviewer did opine that "information gathered during the course of this review suggests there were some powerful indicators the inmate might be at a higher risk for suicide. Of these, concerns over ongoing separation from family, bad news from home, fears of not being released from prison, and hopelessness appeared to be incredibly significant…. While it remains unclear what caused the inmate to make the decision to end his life, he was known to have struggled with distress tolerance and emotional regulation during moments of heightened stress (as was reported in his previous suicide attempts)."

The Suicide Report contained three (3) recommendations for corrective action through a QIP:

1) During a confidential individual therapy session with his primary clinician on June 16, 2021, the inmate reported his depression was a '10 out of 10' and when assessed for suicidal ideation, reported 'having thoughts sometimes.' Per the MHSDS *Program Guide*, 2009 revision, 'When an inmate expresses current suicidal ideation, or make threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data. Documentation is achieved by utilizing the CDCR standardized Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) (12-10-8).' While the progress note from that date indicates the PC assessed suicide risk, there was no accompanying SRASHE. As the inmate had not explicitly expressed suicidal ideation in recent years, his admission he was having suicidal thoughts should have triggered an updated SRASHE.

2) Between April and July 2021, documentation suggests the inmate was experiencing increased symptoms, including feeling numb, worsening depression, anger, loss of hope, inconsistent sleep patterns and increased eating. His PC documented in progress notes that EOP was the appropriate level of care. However, documentation during the above specified period rarely discussed at what point a higher level of care might be considered since the Plan/Disposition and Estimate Length of Stay of the weekly progress note really changed over several months. Further, the July 7, 2021 MH Master Treatment Plan did not appear to note the inmate's report of passive suicidal ideation on June 16, 2021 in concert with an increase in other relevant depressive symptoms. Documentation from the treatment plan notes: 'IP (inmate-patient) has not reported SI/HI/SIB, continuing to present future and goal oriented.' Given the negative changes to his chronic depression, it is unclear why a higher level of care was not considered at that time.

3) One psychiatric note (that should have documented the individual psychiatric contact that occurred on 8/12/2021) could not be located in the electronic medical record. Furthermore, the individual psychiatry clinical contact that occurred on 1/31/2022 was approximately 6 weeks following the previous psychiatry

appointment on December 14, 2021.  This 6-week interval is longer than that allowed by the *Program Guide*.

**Audit Summary**:  CSP/Sac had nine suicides in 2019.  Since then, the facility experienced four suicides from 2020 through 2022.  Continued improvement was found in completion of required SRASHEs based upon emergent/urgent referrals for SI/behavior, PT rounds in restrictive housing units, nursing observation of MHCB patients, and suicide prevention and CPR training.  The observed intake screening process by nursing staff in the R&R unit, as well as the CIT encounter on June 17, was problematic.  The observed IDTT meetings in the MHCBs and MHOHU were also problematic, with uneven case presentations and higher level of care discussions, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI.  Most patients housed in the MHCBs and MHOHU for more than seven days were either provided no yard privileges or minimal yard.  All MHCB patients remained on Suicide Precaution status regardless of whether they were suicidal or not, and thus were never provided full clothing (i.e., uniforms).  Unfortunately, the unlicensed MHOHU was activated for most of 2020 and 2021 and, as reported in all of this reviewer's previous assessments, the environment remained sterile.  Cells appeared dark and offered limited visibility of their interiors.  The yard remained closed.  Although IDTT meetings were conducted in an area outside of the housing unit, there continued to be no clinician offices in the MHOHU, resulting in clinical assessments regularly conducted at cell-front or in therapeutic modules inside the unit.  Finally, a sizable percentage (17 percent) of Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms were not adequately completed by mental health clinicians.

### 3)  **Wasco State Prison (WSP)**

**Inspection**:  July 6-7, 2021 (previous suicide prevention audit on November 29-30, 2018).  WSP housed approximately 3,296 inmates at the time of the most recent on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during both the medical **Intake Screening** process and the mental health diagnostic testing in the R&R unit.  In regard to the intake screening process, WSP had three nursing stations in the intake area.  Station 1 was located in the originally designated Nurse's Office.  That nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering information in the EHRS.  The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality.

Subsequent to this reviewer's 2018 assessment, two other nurses' stations (referred here as Station 2 and Station 3) had been converted from holding cells adjacent to the nurse's office.  There were concerning practices in both of these converted nursing stations.  First, the nurse in Station 2 was observed by this reviewer to not ask the recently added question to the Initial Health Screening form of "Did the patient receive any bad and/or unexpected news during a recent court hearing?"  When subsequently asked why this question was omitted, the nurse informed this reviewer that they felt the question was repetitive with another "bad news" question on the form, and they only asked this second question if custody personnel presented

them with a copy of the "bus schedule" which listed all current inmates returning from court. Such an explanation was contrary to the directive that all questions on the Initial Health Screening form were required to be asked and staff were not to utilize discretion in asking some questions and not others. In addition, this nurse's response simply ignored the fact that most inmates being admitted into WSP were RC inmates being admitted from county jails and, therefore, conceivably thus might have received potentially "bad news" from court prior to their arrival.

Second, Station 3 contained open cell bars that were located adjacent to an existing holding cell containing inmates. Although there was a cloth privacy barrier between Station 3 and the holding cell that obstructed visibility, it was later determined that the nursing screening could be easily heard by an inmate in the adjacent holding cell. Supervisory nursing staff were apprised of the problems found in Station 2 and Station 3, as well as the need to include a suicide prevention placard (both English and Spanish versions) inside both nurses' stations that would be visible to inmates during the intake screening process.

Further, this reviewer observed the **RC Mental Health Diagnostic Testing** process on July 7. Several intakes by two RC clinicians were observed. The door to both RC diagnostic clinician's offices were closed and both clinicians were observed to be conducting thorough assessments. The clinicians were observed to have access to (and used) the Patient Health Information Portal during the process, and both clinicians confirmed that they had access to SOMS and the county jail transfer sheet, as well as reviewed the nurse's Initial Health Screening form prior to each assessment. Both English and Spanish versions of the suicide prevention placard were observed in each RC clinician's office.

Daily **PT Rounds** in the ASU were observed on July 7. The rounds were unremarkable and the PT was observed to be conversing with all inmates, with Psych Tech Daily Rounds information entered into EHRS for each caseload inmate.

**Housing**: WSP had an 18-bed CTC, with six rooms designated as **MHCBs**. These cells have been previously been found to be suicide-resistant, and all were occupied during the on-site assessment.

The ASU had 14 **New Intake Cells** identified for new intake inmates. A previous issue of two ADA cells (117-118) not being fully suicide-resistant had been corrected. During the on-site assessment, the ASU had a low census, and all new intake inmates were observed to be in new intake cells.

Finally, **Alternative Housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement continued to be utilized on less than a daily basis. Inmates were primarily housed in various GP units, RC housing, or the ASU (D-6). From April through June 2021, there were approximately 123 inmates placed in alternative housing. According to available data, all inmates were provided beds, required to be observed on a continuous 1:1 basis, and were released within 24 hours. The average length of stay in alternative housing was less than seven hours. Approximately 14 percent (17 cases) of the MHCB referrals were rescinded and inmates returned to their housing units. This reviewer examined the 17 EHRS charts of inmates

discharged from alternative housing and found that the required SRASHEs were completed in all cases, with five-day follow-up assessments provided in all appropriate cases.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were required to be observed at 15-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during a nine-hour period from 12:00 a.m. through 8:59 a.m. on January 21, 2021 (for WSP 1), on May 12, 2021 (for WSP 2), July 4, 2021 (for WSP 3), and July 5, 2021 (for WSP 4).  The chart review found two cases (WSP 2 and WSP 3) each had only one violation, whereas WSP 1 had six violations and WSP 4 had eight violations in excess of required 15-minute intervals.  The longest gap between checks was 51 minutes in WSP 1.  Violations in these four cases were committed by multiple nursing staff.

Finally, a review of **Guard One** data for a recent 24-hour period in the ASU found 99 percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of January through June 2021.  A sample EHRS review of 32 emergent/urgent referrals for SI/behavior found that clinical staff completed the required SRASHEs in only 84 percent (27 of 32) of the cases, a decrease from the 95 percent compliance found during the previous assessment.

In addition, the **Crisis Intervention Team** was launched at WSP in May 2019, paused during 2020, and reactivated in February 2021.  The CIT was available seven days from 3:00 p.m. until 10:00 p.m. Monday through Friday, and 8:00 a.m. until 10:00 p.m. on Saturday and Sunday.  The Crisis Response Team (CRT) was available outside of these hours and included a tele-psychiatrist or on-call psychiatrist.  This reviewer had an opportunity to observe the CIT process on July 6, 2021.  The crisis call involved a case (WSP 5) in which the inmate's sister had called the facility and expressed concern that the inmate might be suicidal because of a drug debt that he had incurred.  The team included two clinicians and a nurse, but for reasons that were never explained, did not include a correctional supervisor.  The inmate had recently been admitted into WSP the previous month (on June 10) and was enrolled in the 3CMS LOC.  He did not have a history of suicidal behavior, and did not express any current SI to the clinicians.  The inmate appeared appreciative both for the support from his family, as well as response from the CIT.  Despite having an instant offense of sexual assault on a minor, the inmate did not express any safety concerns and was aware of the process to submit an emergency referral and/or seek protective custody through the administrative segregation process.  He was returned to his housing unit without incident.  The subsequently completed SRASHE assessed both his chronic and acute risk for suicide as "low."

Four **IDTT Meetings** in the MHCB unit were observed during the on-site assessment.  Although the meetings were well attended by team members, there were concerns found in several cases presented on July 6.  For example, adequate discussion of safety planning for a patient (WSP 6) being discharged from the MHCB was problematic, with the PC informing him that "I did safety planning with you yesterday."  The PC then recited the entire safety plan and the patient

appeared to have no understanding of it.  In another case (<u>WSP 7</u>), the patient had been admitted into the MHCB a few days earlier for grave disability (consuming feces to stop his craving for heroin) and SI.  Although the patient denied any current SI, there was no case presentation regarding his prior history of SI and the reasons for his SI upon admission.  In each of the observed cases, patients were clothed consistent with their observation levels.  IDTT meetings improved the following day, but only after intervention of the regional SPRFIT clinician who was auditing the process and made recommendations prior to the second day of IDTT meetings.

With regard to **<u>Out-of-Cell Time</u>** afforded to MHCB patients, this reviewer examined the 114-A forms for seven MHCB patients recently placed on suicide observation status and found that all had been offered yard, shower, and telephone privileges consistent with their level of observation and length of stay.  Of note, WSP had installed a small "walk alone" cage for maximum-security patients in the CTC subsequent to this reviewer's 2016 suicide prevention assessment.

In order to assess **<u>Discharge SRASHEs and Safety Plans</u>** required for patients discharged from the MHCB unit, this reviewer examined the medical charts of ten patients discharged from the unit in May and June 2021.  Although the review found that the required SRASHEs were completed in all cases, as well as the required five-day follow-up assessments, the required safety plans were marginal at best.  Consistent with CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020), the MHCB supervisor informed this reviewer that all discharge SRASHEs and safety plans for patients released from the MHCB were reviewed and that, to date, no safety plans needed to be revised.  However, subsequent review of safety plans for patients discharged from the MHCB found problems in safety planning.  For example, in three cases (<u>WSP 4, WSP 8, and WSP 9</u>), the SPI's "Step 6 Means Safety" were inappropriately listed as "I don't feel suicidal now," "What my clinician tells me," and "I'll go with mental health's recommendation," respectively.

Finally, the process by which inmates were provided **<u>Discharge Custody Checks</u>** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 94 cases of patients discharged from a MHCB or alternative housing placement who remained at WSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January through June 2021.  The review found that only 84 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Most of the clinician errors were attributable to discontinuation of checks prior to 24 hours by clinicians or discontinuation by weekend PTs without face-to-face assessments by clinicians. When completed correctly, custody checks were recommended for 48 hours in the majority of cases.  In addition, 95 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**:  Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**:  A review of six months (January through June 2021) of SPRFIT meeting minutes found that a quorum was achieved for each monthly meeting except March and June.

Because WSP is a RC, the SPRFIT was required pursuant to CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum, effective January 27, 2021, to ensure that: suicide prevention placards were displayed in designated areas (including offices of the RC diagnostic clinicians); diagnostic clinicians were reviewing the nurses' Initial Health Screening Forms, county jail records, and other pertinent documents within EHRS and SOMS; diagnostic clinicians were requesting inmates sign ROI forms when reporting histories of prior mental health services in the community; and diagnostic clinicians complete SRASHEs when inmates present with possible current risk for suicide.  SPRFIT coordinators or designees were required to collect data and assess compliance with these four expectations, as well as report such findings during monthly SPRFIT meetings.  Review of SPRFIT minutes indicated that, although there was discussion during the March 2021 meeting that "The first quarter was completed and will be the baseline.  The date of the audit started after the initial staff received on-the-job training on the new documentation requirements," no data or other required "proof of practice" was contained in either the March meeting minutes or any of the subsequent monthly minutes (through June).

In addition, monthly minutes contained discussion of non-serious and serious suicide attempts during the month, CIT, higher levels of care (APP/ICF) referrals, as well as Guard One and discharge custody check data.  RCAs of serious suicide attempts were not contained in the meeting minutes.  A SPRFIT LOP was in effect.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021.  The required LOPs were provided for both "Inmate-Patients Receiving Bad News" and the CIT program, but not available for the "Suicide Risk Management Program."

**Training**:  According to training records, both custody and nursing staff were at 100 percent compliance with current CPR certification.  In addition, only 78 percent of custody staff, 95 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during the previous 12 months.  Finally, as of July 2021, 100 percent of mental health clinicians had completed the SRE mentoring program, 97 percent had received the seven-hour SRE training, and 95 percent had completed safety plan training.

**Recent Suicides**:  WSP experienced three inmate suicides during the review period, two of which occurred in 2020.  In the ***first*** case (WSP 10), the inmate was found hanging from the ventilation grate by a sheet in his GP cell during the morning of February 1, 2020.  The inmate entered CDCR on July 29, 2019 to serve a three-year sentence for assault with a deadly weapon on a police officer.  He incurred four RVRs during his confinement, the most recent of which occurred on January 22, 2020 involving a fight with another inmate.  Although there was no

documentation that the inmate was gang-affiliated, subsequent investigation indicated some gang involvement during his confinement. Records indicated that he was previously married but did not have any children. The inmate had family support that was demonstrated through letter correspondence with his family and girlfriend, as well as telephone calls (most recently with his sister).

According to available records, the inmate had a chaotic childhood and grew up in the foster care system where he was exposed to various types of abuse. Very little other information was available regarding his childhood and adolescence other than he did not complete high school and had a sparse employment background. The inmate had a limited history of juvenile and adult arrests, but both were related to his substance abuse. He served a brief CDCR term in 2018 for evading a police officer and vandalism. There were no records to indicate that the inmate had a history of either mental health or suicidal behavior in the community.

Upon entry into CDCR in 2019, the inmate screened negative for any mental health issues during the RC process, therefore, he was not placed into the MHSDS. He had only periodic contact with medical and mental health staff, and always denied SI during inquiries. Despite the fact that the inmate screened negative for mental illness and suicidal behavior during both of his brief CDCR terms, and review of county jail records did not suggest any mental health concerns, the CDCR reviewer in this case subsequently interviewed several individuals who stated that he had a significant history of suicidal behavior. For example, an inmate-porter suggested that the inmate had "always been kinda suicidal… his brother killed himself a few years back, so it runs in the family." An interview with the inmate's sister also suggested that he had an extensive prior history of suicidal behavior, including a suicide attempt prior to his incarceration in 2019. It also appeared that the inmate's mother had previously attempted suicide and was subsequently hospitalized shortly before his readmission into CDCR in July 2019.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not leave a suicide note, and did not have any significant medical issues that were thought to be contributory to his suicide. According to the reviewer, the inmate appeared to have a longstanding history of untreated depression, and although he "had a network of various individuals who continued to show their support through his incarceration, the loss of several loved ones throughout the years were on-going triggers of sadness, guilt and hopelessness, as evidenced by the writings of their names posted above his bed where he laid daily. As result, he could have experienced vacillating thoughts toward suicide, which coupled with untreated depression further exacerbated his mental health, contributing to his decision to end his life."

The Suicide Report did not contain any recommendations for corrective action through a QIP.

In the **_second_** case (WSP 11), the inmate was found to have asphyxiated himself with a plastic bag in his RC cell during the afternoon of March 9, 2020. The inmate entered CDCR on June 26, 2019 to serve a two-year sentence for robbery. Of note, the inmate also had an active out-of-state detainer for the alleged murder of his mother in December 2018. Although he had been confined in CDCR for approximately nine months, the inmate remained on RC status because he had been placed in an MHCB and a PIP for approximately seven of those nine months. The

inmate incurred one RVR during his confinement involving a fight with another inmate in July 2019. He was not known to be gang affiliated. The inmate was unmarried and did not have any children. It did not appear that he had any family support as demonstrated by a lack of any visits, letter, or telephone correspondence.

According to available records, the inmate and two sisters were initially raised by his parents. When he was nine-years-old, his parents divorced and he was subsequently raised by his mother. There was no report of abuse, substance use, or mental illness in the family, although he periodically reported that one of his sisters had previously been diagnosed with schizophrenia. The inmate was reported to be a high school graduate and had a sporadic history of employment. Although he initially denied any substance abuse issues, the inmate had several drug-related offenses as an adult and subsequently admitted to use of both drugs and alcohol beginning at the age of 12. He had a limited juvenile arrest history, but an extensive adult criminal history that included confinement in multiple county jails. The inmate also had a history of mental illness and suicidal behavior that included three or four psychiatric hospitalizations between 2012 and 2018. Two of these hospitalizations were reported to be involuntary and involved suicidal and self-injurious behavior.

Upon entry into CDCR in late June 2019, the inmate was placed in the MHSDS at the 3CMS LOC with an initial diagnosis of unspecified schizophrenia and schizoaffective disorder, depressive type. Placement was not voluntary, as he refused to participate in most initial assessments saying "I don't want any program. I am not interested in mental health." The inmate, did, however, accept psychotropic medication. Several weeks later on July 22, 2019, the inmate was involved in a fight with another inmate in which he was accidentally hit with a 44-mm rubber bullet after failing to respond to verbal commands to stop fighting. He experienced a temporary loss of consciousness. Following the injury, the inmate also appeared confused and disoriented and complained of headaches and nausea. He was transferred to an outside hospital and diagnosed with severe injuries that included traumatic intracranial hemorrhage.

When the inmate returned to WSP the following day (July 23), he expressed SI without a plan, stating "I was suicidal before I got my head trauma and I am suicidal now." He was placed in an MHCB from July 24 through August 16, 2019, and then transferred to the CMF-PIP acute care program where he stayed until February 6, 2020. During his placement in the MHCB, the inmate frequently refused to participate in programming, including out-of-cell activities such as confidential contacts, showers, and assessment of vital signs. Throughout his MHCB placement, he continued to consistently report SI with command hallucinations to kill himself and/or others. During his initial CMF-PIP stay, the inmate continued to be non-compliant with programming and other out-of-cell contacts, but generally demonstrated good compliance with IDTT meetings. He continued to endorse chronic and acute symptoms of mental illness, and clinicians began to question possible secondary motives for remaining in the PIP. For example, on September 19, 2019, a clinician wrote that "I/P reported that he has had an increase in HI. He indicated that he has an open detainer in Ohio and does not want to serve time there, and therefore, would prefer to assault someone in CA so he can stay. He stated, 'I'm motivated to stay in California. I have motivation to harm others so I have more time in CA'."

Overall, the inmate demonstrated minimal change in symptom reporting and behavior presentation during the course of his six-month PIP treatment. Although he frequently self-reported depression and SI, he did not attempt suicide nor engage in any self-injurious behavior. The inmate remained compliant with his psychotropic medication. At an IDTT meeting on February 4, 2020, the team concluded that the inmate had reached the maximum program benefit of the PIP and decided to discharge him to EOP. Two days later on February 6, the inmate was returned to WSP and minimally engaged in EOP treatment. A few weeks later on February 21, 2020, the inmate reported to an officer that he "was having command auditory hallucinations telling him to kill himself by hanging." The CIT responded, assessed the inmate, and referred him to the MHCB. While in the MHCB, the inmate was compliant with meals, showers, medications, and engaged in some programming. During his stay, however, he demonstrated aggressive behavior and threatened to harm others. The inmate also reported high levels of both anxiety and depression, as well as ongoing SI.

During an IDTT meeting in the MHCB on March 2, 2020, the team decided to discharge the inmate back to in EOP, stating that his "mental health profile began to stabilize as his 10 days of treatment progressed. He was adhering to treatment methods and was able to safety plan prior to his discharge into the EOP." However, mental health documentation also indicated that the inmate continued to endorse SI with no plan, and CAHs. Of note, the discharge SRASHE indicated that a "moderate" chronic risk for suicide and "low" acute risk for suicide. All other prior SRASHEs had consistently indicated a "high" chronic high risk for suicide.

Upon his return to the EOP yard, the inmate continued to struggle with commingling with other inmates and mental health programming, resulting in continuing threats of suicide. In fact, between the date of his MHCB discharge on March 2 until the day of his death seven days later on March 9, six SRASHEs were completed. Two of these SRASHEs were the result of CIT referrals on March 5 and March 7. According to the CDCR reviewer in this case, all of the SRASHEs were problematic, and "showed acute rate attributions with overreliance on protective factors, which were not demonstrably viable (e.g., promised group attendance when the inmate demonstrated to be a frequent treatment refuser; future orientation as a significantly mitigating factor; and inmate agreement to present to staff in the midst of a suicidal crisis). Moreover, these SRASHEs had misattribution of ratings for chronic and acute risk, including one with a decrease in chronic risk from high to moderate, and another with a reduction of acute risk to low with limited change in the inmate's presentation, while each of the proceeding SRASHEs' acute risk rating was either high or moderate."

According to the CDCR reviewer in this case, the inmate experienced a number of stressors during the last year of his life, most notably his involvement in the murder of his mother in December 2018. In addition, he experienced post-concussive syndrome, substance abuse, perseverating symptoms of mental illness, as well as both chronic and acute suicidality. As stated by the reviewer, "Across his final days, his self-reported determination of suicidality vacillated between complete endorsement and absolute denial. Notably, the inmate's responses to days six and seven of the five-day follow-up and final SRASHE denying all thoughts of suicide stood in stark contrast to his presentation throughout the first five days of discharge from the WSP MHCB throughout which he consistently endorsed high levels of suicidality. This, in

and of itself, is often indicative of the individual who has struggled with psychache and made the ultimate decision to end their life by suicide."

The Suicide Report contained ten (10) recommendations for corrective action through a QIP:

1) <u>WSP</u>: There were six SRASHEs completed prior to the inmate's death. All six showed acute ratings attributions with over-reliance on protective factors, which were not demonstrably viable. Moreover, these SRASHEs had misattribution of ratings for chronic and acute risk (see *Discussions/Conclusions* for more information).

2) <u>WSP</u>: The SPI contents of the initial entry were minimal and did not evolve over the course of the following seven SRASHE contacts. It is also concerning that across each subsequent SRASHE intervention conditions did not provide updated content by working with the inmate to tailor his SPI, and definitively identify additional elements for entry. Moreover, the clinicians cited the minimally developed SPI as a coping tool for the inmate to utilize in times of suicidal crises. There were four SRASHEs completed prior to the inmate's death. All of four showed over-reliance on an underdeveloped SPI.

3) <u>WSP</u>: Three of the SRASHEs prior to the inmate's death used custody 30-minute welfare checks re-issued during the five-day follow-up period or 'imploring of building officers to keep a close watch on the inmate' as safety mechanisms. While not a policy violation, this is a substantial concern, in that these SRASHEs occurred on days 3, 4, and 5 of the five-day follow-up. In consideration, should the inmate have required close watch and/or additional supervision at this time, clinical judgment merited his return to a higher level of care and referral and placement in the MHCB.

4) <u>CMF-PIP</u>: The inmate's EHRS had a paucity of group and progress notes, specifically as related to his treatment in the solo program. It is relevant for non-Max patients on solo programming to have separate group documentation in the EHRS with specific requirements for individualized treatment documentation, to include group and provider contacts (see *Discussions/ Conclusions* for more information).

5) <u>HQ-SPRFIT</u>: In the PIP at CMF-Acute, the IDTT does not appear to complete the issuance and cancellation of restraint chronos on a regular basis. It is unclear as to how the IDTT makes this determination, or if they generate documentation regarding decision-making of this nature (see *Discussions/Conclusions* for more information).

6) <u>CMF-PIP</u>: The inmate was hospitalized at CMF-PIP Acute for approximately six months. His IDTT discharged him on February 6, 2020 to EOP LOC without an SPI, yet per policy, an SPI is required (see *Discussions/Conclusions* for more information).

7) <u>WSP</u>: The inmate returned to WSP-RC without a completed SPI. He was seen twice for SRASHE completion on February 6 and 7, 2020. Neither contact contained SPI documentation. He was also placed on five-day follow-up upon his return from CMF-PIP Acute. During the five- day follow-up, documentation indicates the SPI was neither attempted nor reviewed with the inmate (e.g., February 7 and 10, 2020).

8) <u>HQ SPRFIT</u>: During the time the inmate was at CMF-PIP, there were minimal entries into the NCAT regarding his participation and behavioral observations during out-of-cell non-clinical activities. Per July 19, 2019, Volume 12 Mental Health Services, Correctional Treatment Center, Psychiatric Inpatient Program, Patient Policies Non-Clinical Out-of-Cell Time Tracking 12.11 .1106, 'The NCAT shall be used to track all out-of-cell non-clinical leisure activities offered to PIP patients. Scheduled and unscheduled activity shall be tracked using NCAT.' As this was identified as a statewide concern, this was made a HQ SPRFIT QIP.

9) <u>CMF-PIP</u>: CMF-PIP psychiatry clinical contacts and clinical documentation (reflecting said contacts) were not in keeping with expectations and requirements. The frequency of psychiatry contacts and clinical notations was inadequate.

10) <u>WSP</u>: During the review of this incident, he was identified the activation of the Emergency Medical System (calling 911) did not take place until approximately 16 to 18 minutes after the emergency was observed.

In the ***third*** case (<u>WSP 12</u>), the inmate was found hanging from the top bunk by a sheet in his RC cell during the afternoon of April 30, 2022. The inmate entered CDCR three weeks earlier on April 7, 2022 to serve a ten-year sentence for arson and possession of an explosive device with intent to harm/injure. The inmate did not have any RVRs during his confinement. He was not known to be gang-affiliated. The inmate was unmarried and had one child. With the exception of his mother, it did not appear that he had any family support as they had largely distanced themselves from him following his arrest on the instant offense.

According to very limited available records, the inmate and four siblings were initially raised by their parents. His parents subsequently were separated, with the date unknown. Documentation regarding his early childhood was also unknown and, although he had previously denied any history of abuse, prior state hospital records indicated a history of sexual abuse perpetrated by a family friend. The inmate did not graduate high school, and reported a history of truancy and special education during his school years. As an adult, although he had a long history of employment, there were also large gaps of unemployment. He also had an extensive history of substance abuse, including methamphetamine, heroin, and marijuana. In a subsequent interview with the inmate's mother, she believed that her son's mental health problems began in his early 20s and was primarily attributed to extensive substance abuse. She also believed that he had previously been diagnosed with schizophrenia. The inmate did not have a juvenile arrest history, and had only a minor adult criminal history prior to the instant offense.

According to available county jail records, the inmate received extensive mental health treatment in the county jail and was initially diagnosed with borderline personality disorder and antisocial personality disorder. Additional diagnoses included major depressive disorder, delusional disorder, other stimulant-induced psychotic disorder, and impulse control disorder.  In May 2019, the inmate was found incompetent to stand trial and subsequently transferred to DSH. Hospital records indicated that he presented in an acutely psychotic manner, exhibiting AH, preoccupation with delusional themes (belief that there was a chip in his head, people were trying to rape other people), and an agitated disorganized thought process, notably around his controlling offenses.  Despite treatment, DSH records indicated that the inmate remained frightened, out-of-control, and suicidal.  He was subsequently discharged back to the county jail in September 2020 with diagnoses of schizoaffective disorder, severe methamphetamine use disorder, and other substance-related disorders.  Several psychotropic medications were continued.

The inmate remained an active participant in mental health treatment the county jail.  He participated in multiple groups, individual therapy, and was medication compliant.  According to progress notes from March and April 2022, the inmate appeared stable and engaged in treatment. Although he continued to endorse AH, progress notes from the jail stated that he was able to keep a "distance" from the voices and they were no longer as negative as they used to be.  The inmate continued to deny significant depression or SI in the county jail.

Upon entry into CDCR on April 7, 2022, the inmate was immediately placed in the MHSDS at 3CMS LOC.  He had refused to sign a ROI form during the RC process, therefore, most of the records from the county jail and DSH were not available to RC diagnostic clinicians.  The 27-item Mental Health Screening form was administered on April 13, and the inmate denied most of the questions related to mental health history, with the exception of "hearing things other people couldn't hear."  The RC clinician noted his mental health diagnoses in the chart.  The inmate also denied any SI during this encounter, but did report a history of suicide attempts.  He also met with a psychiatrist on April 13 and reported symptoms of depression, but stated he felt hopeful. The inmate also indicated he had a decreased need for sleep and, although continuing to experience AH that he described as "irritating," the voices from the hallucinations were not telling him "bad things anymore."  He denied any current SI, and was diagnosed with mood disorder NOS, with rule-outs for bipolar disorder with psychotic features, psychotic disorder, methamphetamine-induced psychotic disorder, versus major depressive disorder with psychotic features.  The inmate agreed to continue his psychotropic medication.

The inmate's next and last contact with a mental health clinician was on April 30, 2022, the day of his death. He had been complaining about abdominal pain and vomiting, and had returned from an outside hospital the prior evening, stating that he felt "no one cares."  In the morning (of April 30), he became frustrated and expressed SI.  The CIT process was initiated, and he subsequently disclosed to the CIT clinician that he was fearful of returning to his dorm housing because he felt other inmates were harassing him.  A SRASHE was completed, the inmate denied any active suicidal thoughts or a plan to commit suicide.  He was assessed as a high chronic and moderate acute risk for suicide.  Custody personnel intervened to accommodate a

housing transfer to a cell setting, and medical staff agreed to provide the inmate with additional anti-nausea medication to assist with his pain. The inmate committed suicide several hours later.

According to the CDCR reviewer in this case, in addition to the expression of SI secondary to complaints about severe abdominal pain on the day of his death, "information gathered during the course of this review suggests that the inmate was experiencing increased symptoms of depression, SI, and possible anxiety. It is likely that the recent transition to prison, perceived interpersonal conflicts with inmate-peers, reported medical symptoms further exacerbated these symptoms. This may have resulted in the inmate's decision to end his life within 23 days of arrival to the CDCR."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) In review, one respondent staff member was not in compliance with the required Annual Suicide Prevention Training. A list of the aforementioned staff will be provided to WSP's Executive Management Team who will schedule the officer for this required training.
>
> 2) During the review of the Emergency Medical Response timeline, no MAR documentation was found for IN Narcan administration.

**Audit Summary**: Adequate practices were found in PT rounding, alternative housing, Guard One compliance, and most required training. The intake screening process in two of the three nursing stations in the R&R unit were problematic (both incomplete screening and privacy/confidentiality concerns). There were multiple examples of suicidal MHCB patients not observed at required 15-minute intervals. Compliance rate with required SRASHEs for emergent/urgent mental health referrals was problematic. Observation of IDTT meetings in the MHCB found problems of case presentation and safety planning. A previous problem of maximum-security patients in the MHCB not being offered yard privileges had been corrected by installation of a small "walk alone" cage in the CTC yard. Clinician compliance with discharge custody checks was problematic. Monthly SPRFIT meetings did not always meet quorums and, although this reviewer found adequate suicide prevention practices during the RC screening process, required data or other required "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was not reflected in any monthly SPRFIT meeting minutes.

### 4)    California Correctional Institution (CCI)

**Inspection**: July 8-9, 2021 (previous suicide prevention audit was on November 27-28, 2018). CCI housed approximately 2,957 inmates at the time of the on-site assessment.

**Screening/Assessment**: The facility had nurse's offices located on four yards (A-Yard Clinic, B-Yard Clinic, C-Yard Clinic, and D-Yard Clinic) that were utilized for the R&R **Intake Screening** process. Historically, this reviewer had found that each of the nurse's offices were problematic because either they did not have doors, or the doors were opened during the intake

screening process, thus negating adequate privacy and confidentiality. During the current assessment, these problems had been corrected such that each of the four designated nurse's offices contained doors that were required to be closed during the intake process. However, required suicide prevention placards (both English and Spanish versions) were not observed inside the nurse's offices.

This reviewer observed the intake screening processes in the B-Yard Clinic on July 8, 2021. The process was problematic because the nurse did not accurately complete all 15 mental health/suicide risk questions on the Initial Health Screening form, including "Did the patient receive any bad and/or unexpected news during a recent court hearing?," or conduct a mental status examination ("Disoriented to time, place, or person").

Finally, this reviewer observed daily **PT Rounds** in the ASU (B-8) on July 8. The unit housed GP and 3CMS inmates. The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds forms and entering the information into the EHRS for MHSDS inmates. Of note, because a medical cart did not fit on the stairway, the PT was forced to converse with inmates on the second tier then return to the first tier to enter the required information into the EHRS.

**Housing**: CCI had eight of its 16 OHU cells designated to temporarily house inmates with mental illness and/or requiring suicide observation. These OHU cells were designated as alternative housing. In addition, as observed during previous assessments, inmates awaiting transfer to an MHCB and housed in the OHU on 1:1 observation were not automatically placed in a safety smock. Rather, because they were required to be observed on a continuous 1:1 basis, pursuant to a LOP (Volume 12: Mental Health Services, Chapter 5.1: "Mental Health Crisis Bed Program, Alternative Housing-Mental Health"), each inmate was "provided with a safety mattress, sheets, safety blanket, state issued clothing, including pants, shirt, socks, underclothes, reading materials, hygiene items and a prescribed health care appliance as clinically indicated as per Policy 12.05.301." Such a policy and practice continued to be very commendable.

As noted above, **Alternative Housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily located in the OHU. Alternative housing was rarely utilized at CCI, with only ten cases reported from April through June 2021. A review of the data found that all inmates were housed for less than 24 hours, with the average length of stay being approximately 12 hours. Forty percent (four of ten) of inmates were subsequently transferred to a MHCB, with the remaining 60 percent (six of ten) of cases rescinded and inmates returned to their housing units. This reviewer examined the EHRS charts of all six rescinded cases and found that required SRASHEs were completed in all cases.

Finally, the B-8 ASU still contained only three retrofitted **New Intake Cells** (A103-A105). All of the three intake cells were full during the on-site assessment, and a fourth new inmate was scheduled to be placed in the unit on July 9. The inadequate number of retrofitted new intake cells had been a long-standing problem at CCI, and this reviewer has cited the issue in each of the previous suicide prevention reports. Of note, an inmate (CCI 1) on new intake status and not housed in a new intake cell committed suicide on January 5, 2020 in the B-8 ASU. CDCR had embarked on a "ASU New Intake Cell" construction project that would include the creation of

eight additional retrofitted new intake cells at CCI, the projected time for completion was March 2022. In addition, this reviewer was informed by CCI custody leadership on July 9, 2021 that "The New Cell Conversion project that IWL was scheduled to start on 5/31/21 has been put on hold until a door design issue gets resolved." It remained unclear what impact, if any, this delay would have on the creation of new intake cells at CCI on or before March 2022. However, according to defendants' most recent Suicide Prevention Activation Schedules (ECF 7562, filed on May 31, 2022), the project at CCI was completed in January 2022.

**Observation**: Because CCI did not operate a MHCB unit, all suicidal inmates were required to be supervised on 1:1 observation until they were transferred to a MHCB. No other levels of observation were permitted within the OHU.

Finally, a review of **Guard One** data for a recent 24-hour period found 99 percent compliance with the required checks not exceeding 35-minute intervals in the ASU.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of January through June 2021. This reviewer's sample EHRS review of 30 emergent/urgent referrals for SI/behavior found that clinical staff completed the required SRASHEs in 93 percent (28 of 30) of the cases. This reviewer did not review discharging SRASHEs at CCI because the assessments were conducted by mental health clinicians at other MHCB facilities.

In addition, the **Crisis Intervention Team** was launched at CCI in February 2020, paused during 2020, and reactivated in February 2021. The CIT was available Monday through Friday from 5:00 p.m. until 10:00 p.m. An on-call clinician was required to respond to emergency mental health referrals after hours. This reviewer had an opportunity to observe the CIT process during the early afternoon of July 8 (and prior to the stated initiation of the CIT at 5:00 p.m. The crisis call involved the case (CCI 2) of an inmate who expressed "fleeting thoughts of suicide" to nursing staff. In addition to regular members of the CIT, a psychiatrist also responded to the call. The team adequately addressed the inmate's concerns, most of which were related to his inability to contact family members and regarding his current psychotropic medication. A SRASHE was subsequently completed and assessed the inmate's chronic risk for suicide as "moderate" (based on two recent suicide attempts in the community) and his acute risk for suicide as "low." The inmate was returned to his housing unit without incident. The only concern observed during this CIT case was that, instead of the team assessing the inmate in the privacy of the TTA area of E-Yard, where the inmate was housed, the inmate was escorted through the yard to an empty room in the administration building. The door to the room remained open, and there was heavy and loud traffic in the corridor from other custody personnel.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody

checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was initially presented with documentation of 22 patients discharged from a MHCB or alternative housing placement who were returned or transferred to CCI from January through June 2021. Subsequent review of the documentation found that nine of the cases involved inmates who were placed in the CCI ASU (where observation at 30-minute intervals was required). These nine cases should not have had Discharge Custody Check Sheets completed, and their inclusion in such documentation unnecessarily delayed review of the process. As such, 13 cases were ultimately reviewed, and only 46 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority of the custody checks recommended by clinicians for either 24 or 48 hours. Most of the clinician errors were attributable to incomplete documentation. In addition, only 54 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the custody errors were attributable to gaps in required observation at 30-minute intervals.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (December 2020 through May 2021) found that quorums were achieved for four meetings, with quorums not reached during December 2020 and January 2021. The meeting minutes were otherwise unremarkable. A SPRFIT LOP was in effect. Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. The required LOPs were provided for both "Inmate-Patients Receiving Bad News" and the CIT program, but not available for the "Suicide Risk Management Program."

**Training**: According to training records, 99 percent of custody and 100 percent of nursing staff were currently certified in CPR. In addition, approximately 94 percent of custody, 81 percent of medical, and 86 percent of mental health staff completed the annual suicide prevention block training during the previous 12 months. Finally, as of June 2021, 100 percent of mental health clinicians had completed both the SRE mentoring program and seven-hour SRE training program, and 94 percent had completed safety plan training.

**Recent Suicides**: CCI experienced five (5) inmate suicides during the review period. In the ***first*** case (CCI 1), the inmate was found hanging from a ventilation grate by a sheet in his administrative segregation cell during the late evening of January 5, 2020. The inmate entered the CDCR system on May 10, 1995 for a third term to serve a life sentence without parole for murder. He was transferred to CCI on March 1, 2019. The inmate incurred 21 RVRs during his almost 25 years of confinement, the most recent of which occurred in May 2018 for battery on a peace officer. He had been placed on SNY status in December 2008 due to his previous gang affiliation. The inmate was married, had two adopted children, and had regular family support through visits (until April 2019), letter correspondence, and telephone calls. Following his death,

however, it was reported that recent telephone calls indicated the inmate's wife was planning on ending the marriage.

According to available records, the inmate and five siblings were raised by their parents. His father was reportedly both physically and verbally abusive, and struggled with alcohol dependency. The inmate dropped out of high school during his youth, but obtained his GED during incarceration. The inmate reported a sporadic employment history. He had a significant history of substance abuse beginning as a teenager. He also had an extensive juvenile and adult criminal history, resulting in both confinement in juvenile facilities, as well as two prior CDCR terms. There was no documentation that the inmate had a prior history of mental illness or suicidal behavior, and he consistently denied any prior history of suicide attempts in the community. He did, however, receive prior treatment in the MHSDS, including admission to both an MHCB and PIP during prior terms.

Upon re-entry into CDCR for his third term, the inmate screened negative for any mental health issues and was not initially placed in the MHSDS. However, in December 2009, the inmate reported symptoms of depression based upon his long-term confinement in the PBSP SHU from 2002 through 2008. As a result, he was placed in the MHSDS at the 3CMS LOC. Through medication and programming, the inmate's depressive symptoms were stabilized, and he was removed from the MHSDS in May 2010. A few years later in November 2012, the inmate reported SI, including a plan to cut his wrists upon learning that his first wife was planning to divorce him. He was referred to an MHCB and diagnosed with depressive disorder. The diagnosis was later changed to adjustment disorder, and then to major depressive disorder in January 2013. He remained stable and marginally cooperative in mental health treatment at 3CMS until October 2015 when he was again removed from the MHSDS.

On November 18, 2017, the inmate engaged in self-injurious behavior by cutting his wrist and informing custody staff that he was feeling suicidal. He also reported an increase in depression and hopelessness following a relapse on methamphetamine. The inmate was admitted to an MHCB and subsequently discharged to 3CMS ten days later on November 28 with a diagnosis of amphetamine-induced psychosis with delusions. However, less than ten days later on December 7, 2017, the inmate was returned to an MHCB after again cutting his wrist. He was discharged to EOP on December 16, 2017. The following week on December 25, the inmate returned to an MHCB for the third time after exhibiting bizarre behavior and attempting to set a fire in his cell. Initially, the inmate reported continued paranoia and safety concerns, however, he later admitted to be seeking a bed move and denied any mental health symptoms. He was discharged back to EOP.

On January 10, 2018, the inmate made a superficial cut on his wrist and was subsequently placed in an MHCB. He informed the admitting clinician that "I don't mind dying. I just don't want someone else to do it. I want to die on my terms." Based upon being minimally cooperative with mental health treatment in the MHCB, he was admitted into the APP at CMF-PIP on January 24, 2018. During this placement, the inmate attended most groups, participated in mental health contacts, and was medication compliant. He was discharged back to EOP on April 6, 2018. However, the inmate was sent out to the hospital several weeks later on May 2 after cutting his wrist. He was subsequently placed in an MHCB and later transferred to the ICF at

CHCF.  He was returned to EOP in September 2018.  The inmate was again admitted into an MHCB for the seventh time on November 4, 2018.  He was subsequently discharged to EOP on November 7 with the goal of sustaining recovery from methamphetamine use.  A few weeks later on December 18, 2018, the inmate was seen for an emergency consult after again superficially cutting his wrist.  He denied any SI and requested to be transferred to 3CMS at another facility so he could be closer to his family.  The inmate's IDTT agreed to downgrade his LOC to 3CMS and he was transferred to CCI in March 2019.  Soon thereafter, the inmate began to request removal from the MHSDS.  He continued to deny any mental health symptoms, including SI, and reported abstinence from methamphetamine.  The inmate was removed from the MHSDS on June 26, 2019.  During a follow-up assessment three months later, he continued to deny any mental health symptoms, and reported both sobriety and family support.

There was no documentation of any mental health concerns expressed by the inmate until January 3, 2020, two days before his death, when he engaged in self-injurious behavior by cutting his wrist.  He was placed in alternative housing by the on-call clinician.  The inmate was assessed the following morning (January 4), but was minimally cooperative and, other than to report safety concerns in the yard, provided vague answers to SRASHE questions.  The clinician determined that he was at low acute risk for suicide due to "superficial self-injurious behavior with no intent or plan."  Although the inmate reported that he had "lost his wife in September" and "my wife found another guy," the clinician noted family support as a protective factor during the assessment.  The MHCB referral was rescinded and the inmate was returned to his housing unit.  Several hours later on January 4, the inmate was seen again as an emergency referral after custody staff observed him to be opening the wound and again cutting himself on his wrist.  Another SRASHE was completed, with the clinician noting that the inmate's acute risk for suicide was moderate due to "IP denies SI or intent, but cut himself on two occasions within 24 hours and is refusing to discuss the details.  IP refusing to be returned to his prior cell and is exhibiting impaired reality testing in bizarre and paranoid ideations."  An MHCB referral was initiated and the inmate was placed in the ASU on alternative housing.

On the morning of January 5, 2020, the inmate was assessed in alternative housing.  Another SRASHE was completed, with the clinician concluding that the inmate was at low acute risk for suicide because he "was seen cell front where he appeared calm and presented with no issues…IP was rescinded today as IP did not endorse SI after being placed in Adseg…. IP was satisfied with being placed in Adseg as well as being informed that he will go to committee."  A safety plan was not completed and the inmate was not readmitted into the MHSDS.  He remained in administrative segregation and was not placed in a retrofitted, suicide-resistant, new intake cell.  The inmate committed suicide later that evening.

The CDCR review found numerous examples of self-injurious behavior in the days leading to the inmate's death that were known to various staff indicating he was at high risk for suicide.  A suicide note was found in his property indicating that other inmates were plotting his murder, with possible involvement from his estranged wife.  The inmate did not have any significant medical issues that were felt to be contributory to his death.  The CDCR reviewer concluded that "With continued drug use, the inmate presented with a pattern of behavior that included using methamphetamine, exhibiting bizarre and delusional behavior and minimizing his level of distress to remain housed close to his family….  The inmate consistently engaged in self-harm

behaviors, presumably to facilitate transfers out of his cell when his paranoia was increased....
He may have seen suicide as the only way to prevent his murder by other inmates, which he
believed was imminent, and to keep his wife from receiving money in a wrongful death lawsuit."

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

> 1) <u>CCI</u>:  SRASHEs completed on January 4, 2020 and January 5, 2020 were
> found to be deficient. Please see *Conclusions* section for further details.

> 2) <u>CCI</u>:  The decision to return the inmate to his housing unit and not place him in
> the MHCB nor MHSDS was made on January 5, 2020, despite the inmate's
> reported increase in mental health symptoms such as anxiety and reported SI
> (although he did deny it during this contact), observed bizarre statements and
> increased paranoid delusions, two self-harm events within the past 24 hours,
> increased distress related to relational difficulties, and reported stress related to
> perceived safety concerns.  Consideration of these identified stressors were not
> made in documentation, nor an adequate plan to address these stressors created.
> This is especially concerning as the inmate was found unresponsive the same
> evening.

> 3) <u>HQ SPRFIT</u>:  During the review it was noted the inmate was not celled in a
> retrofitted intake cell at the time of his death and he was within the first 72 hours
> of his initial placement in the administrative segregation unit (ASU).  The
> California Correctional Institution ASU does not have a sufficient number of
> retrofitted ASU intake cells to meet their initial ASU placement needs.

> 4) <u>CCI</u> joint custody and mental health:  During the review it was noted the
> inmate had a clinical contact conducted cell front in ASU and that it was not done
> in a confidential location.  Additionally, the mental health clinician failed to
> document the reason for conducting the interview in a non-confidential setting.

In the ***second*** case (<u>CCI 3</u>), the inmate was found hanging from a ventilation grate by a sheet in
his administrative segregation cell during the early morning of May 1, 2020.  The inmate entered
the CDCR system on November 20, 2014 for a second term to serve a five-year sentence for
robbery.  While incarcerated, he received an additional four years for possession and
manufacture of a weapon.  He was transferred to CCI on April 19, 2019.  The inmate incurred 19
RVRs during his approximate five years of confinement, the most recent of which occurred on
March 11, 2020 for refusing to accept assigned housing.  The majority of the RVRs were related
to fighting and battery.  The inmate was not known to be gang-affiliated within CDCR, but had
been in the community, resulting in safety concerns during his current term.  He was never
married, but had three children from two prior relationships.  Although he did not receive any
visits during his incarceration, the inmate did have family support exemplified by regular
telephone contact his family, primarily with his mother and sister.

According to available records, the inmate was the oldest of four siblings raised in a chaotic
family environment.  His father was murdered when he was only a few months old, and he and

his siblings were removed from the home several years later when his mother became addicted to crack cocaine and unable to care for them. The inmate was subsequently placed in foster care, followed by a series of group home placements. While in these group homes, he experienced both emotional and physical abuse, and was exposed to drugs, violence, and other criminal activity. The inmate did not graduate from high school and had a minimal employment history. He had an extensive juvenile and adult criminal history, resulting in both confinement in juvenile facilities, as well as one previous CDCR term. He had an extensive history of substance abuse. The inmate self-reported experiencing AH at the age of 14, and also prior diagnoses of bipolar disorder, paranoid schizophrenia, depression, and PTSD. He reported a significant history of prior suicidal behavior in the community that included hospitalization for DTS on five occasions. The inmate also had a family history of mental illness.

Upon re-entry into CDCR for his second term, the inmate was immediately placed in the MHSDS at the 3CMS LOC based primarily upon county jail records indicating a serious mental illness and current psychotropic medication. He was initially diagnosed with bipolar disorder. The inmate had also been placed in the MHSDS during his prior CDCR term. He initially programmed adequately at the 3CMS LOC until July 18, 2015, when he was admitted to an MHCB for SI, increased depression, paranoia, and auditory and visual hallucinations. The inmate was subsequently discharged to EOP with a diagnosis of schizoaffective disorder.

In October 2016, the inmate was again admitted to an MHCB for SI. During the course of this placement, he failed to progress sufficiently and was subsequently referred to the APP at CHCF on November 1, 2016. Following this 12-week placement, he was discharged back to EOP on January 10, 2017 with a diagnosis of mood disorder with psychosis. During the next year, the inmate remained at EOP but incurred several behavioral issues, resulting in both RVRs and restrictive housing placements. In addition, he was minimally cooperative with mental health treatment and remained vague when reporting ongoing symptoms.

During an IDTT meeting on January 17, 2019, the inmate was informed that his level of care was being reduced to 3CMS, with antisocial personality disorder added to his existing diagnosis of mood disorder. A clinician noted that he "appears notably higher functioning than most EOP IPs." Upon hearing the decision, the inmate became extremely agitated, flipped his chair in the direction of the team, and left the meeting. Later that day after he was returned to his cell, the inmate expressed SI and allegedly swallowed several pills. He was placed in an MHCB, but was stabilized within a few days and discharged back to 3CMS six days later on January 23, 2019.

During the next several months, the inmate appeared to be adequately programming at the 3CMS LOC. He was transferred to CCI in April 2019 and appeared stable. During this time, he did not express any SI ideation or engage in any SIB. In September 2019, the inmate requested to be moved to EOP, but could not articulate the symptoms being experienced to warrant a higher level of care. He remained at 3CMS. In early February 2020, his psychotropic medication was discontinued due to non-compliance. In February 11, 2020, the inmate expressed SI with a plan to hang himself. He was placed overnight in alternative housing. The following morning (February 12), the inmate was assessed by a clinician and initially stated "I am suicidal. Definitely suicidal. It is hard to keep going. I'm done. I want to die." However, as the clinician documented in the SRASHE, "After processing with inmate's personal issues and ruled out

safety concerns or custody issues, inmate stated 'I'm okay now. I'm not suicidal and not homicidal. I'm not going to hurt nobody. I'm going to program get my GED. My goal now is to go home on time (12/22/2022). I'm ready to go back to my building'." His acute risk for suicide was assessed as low and the MHCB referral was rescinded.

A few weeks later on February 24, 2020, the inmate refused to attend a scheduled PC appointment. Documentation indicated that he had been ducated twice for the assessment, but refused to attend on both occasions. He also failed to attend his IDTT meeting two days later on February 26. At that time, the treatment team decided (in his absence) to remove the inmate from the MHSDS. The rationale for such a decision was that he was no longer on psychotropic medication, had not been admitted into an MHCB in over a year, and did not appear to be benefiting from mental health services. His diagnoses were changed from mood disorder and antisocial personality disorder to simply antisocial personality disorder.

Several days later on March 1, 2020, the inmate was placed in the ASU after alleging he had conflicts with other inmates on the yard, specifically stating that he did not want to comply with orders from gang members to assault other inmates and steal their property. The inmate continued to be seen occasionally by mental health clinicians while housed in the ASU. Such referrals were not the result of a mental health crisis, rather in response to the inmate's desire to restart his psychotropic medication without the need for mental health programming. The inmate was not referred to psychiatry for follow-up assessment. His last encounter with a mental health clinician occurred on April 28, 2020, a few days prior to his death. An ASU officer had apparently asked a clinician to see the inmate because he had been oppositional earlier in the day. The inmate refused to meet the clinician in a confidential setting, therefore, the brief contact occurred cell front, with the inmate not reporting any signs of distress or displaying any observable signs of mental illness. The clinician's progress note did not further elaborate on the interaction between the officer and inmate that day.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property, and he did not have any serious medical issues that were felt contributory to his death. However, the CDCR reviewer noted that the inmate's "recent removal from the MHSDS, in addition to his placement in ASU, may have also led to his perception that he could no longer easily access a support system he had previously relied on in times of crisis. His inability to self-soothe without additional support increased his reactivity and the likelihood of lashing out impulsively without sufficiently considering the potential consequences of his actions. It is also unclear to what degree he may have been psychologically decompensating as he recently requested to continue receiving his medication and had reported suicidal ideation only weeks before his death."

The Suicide Report contained three (3) recommendations for corrective action through a QIP:

> 1) There were multiple problems with the discharge from MHSDS which occurred on February 26, 2020. (See *Discussion/Conclusions* section for specifics).

2) There were concerns with a mental health clinician's response to two 7362s submitted by the inmate.  (See *Discussion/Conclusions* section for specifics).

3) There were issues with five of the SRASHEs completed at CCI in the year before the inmate's death.  (See *Discussion/Conclusions* section for specifics).

In the ***third*** case (<u>CCI 4</u>), the inmate was found hanging from a ventilation grate by a sheet in his SNY cell during the early morning of June 20, 2020.  The inmate entered the CDCR system on January 21, 2020 to serve a 38-year sentence for multiple charges of continuous sexual abuse of children.  He was transferred to CCI on May 19, 2020.  The inmate did not incur any RVRs during his approximate six months of confinement.  The inmate had requested SNY status during the RC process due to his dropout status from gang affiliation and other safety concerns.  He was divorced and had four children, three of whom were the victims of his instant offenses over a period of ten years.  Although he did not receive any visits during his incarceration due to COVID-19 restrictions, the inmate did have family support exemplified by regular letter correspondence and telephone contact with his family, primarily with his mother and sister.

According to limited available records, the inmate was born and raised by his parents in Mexico before immigrating to the United States at the age of 14.  At that point, he was raised by his mother while his father was incarcerated.  Records indicated that he had an unknown number of siblings.  Following his arrest on the instant offenses, the inmate disclosed that he had been sexually abused as a youth by his father.  The inmate dropped out of high school and began working in field labor.  He had a history of substance use beginning at the age of 17 which included daily methamphetamine and alcohol use.  The inmate's involvement with street gangs began at the age of 19 and resulted in various arrests, most of which were minor.  He denied any history of mental health or suicidal behavior in the community.

Upon entry into CDCR, the inmate screened negative for any mental health concerns and was not placed in the MHSDS.  Other than being the victim of a battery by another inmate on June 12, 2020, the inmate's brief six-month incarceration was unremarkable.  During his limited contact with both medical and mental health staff, he consistently denied SI or any mental health concerns.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  A suicide note found in his property indicated that he was individually apologizing to each member of his family for the profound harm he had caused them for the sexual abuse of his children.  Although the inmate was transported to the emergency room on June 12, 2020 for medical treatment following an inmate assault, he did not have any other serious medical issues that were felt contributory to his death.  The reviewer concluded that "this review suggests he was experiencing feelings of shame and guilt.  He may have seen suicide as a way to save his family from experiencing the continued grief of his incarceration."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

1) During the review of the emergency response incident, it was noted nursing staff placed a c-collar on the inmate over a piece of the noose, which was still on his neck.

In the **_fourth_** case (CCI 5), the inmate was found hanging from a ventilation grate by a sheet in his SNY cell during the early morning of December 4, 2020. The inmate entered the CDCR system on May 23, 2006 to serve a life sentence without the possibility of parole for multiple counts of murder. He was transferred to CCI several weeks prior to his death on November 9, 2020. The inmate incurred 11 RVRs during his confinement, the most recent of which occurred on December 30, 2019 for battery with a deadly weapon. The inmate had requested SNY status due to his dropout status from gang affiliation and because his instant offense included the killing of an infant. He was divorced with three children. Although he did not receive any visits or recent telephone calls during his incarceration, the inmate did have limited family support through letter correspondence with a sister. Of note, the inmate's instant offense involved the murder and attempted murder of his brother and several members of his brother's family.

According to limited available records, the inmate was born and raised by his parents in Laos before immigrating to the United States at the age of 11. Records indicated that he had three siblings. His parents separated when he was seven years old and he was primarily raised by his mother. The inmate dropped out of high school, became involved with street gangs, and had a sporadic history of employment. He had a history of substance use that included methamphetamine, cocaine, marijuana, and alcohol. The inmate became involved with street gangs at the age of 19 which resulted in various arrests, most of which were minor. He denied any history of mental health or suicidal behavior in the community.

Upon entry into CDCR, the inmate was placed in the MHSDS at the 3CMS LOC based upon affirmative responses to screening questions and county jail records indicating current psychotropic medication for AH. He also reported one prior incident of SI four years earlier while he was under the influence of drugs. The inmate was given an initial diagnosis of amphetamine dependence, rule-out adjustment disorder with depressed mood. In early March 2007, he was admitted into the MHCB for SI and SIB, secondary to safety concerns after other inmates became aware of his incident offense. The following year in April 2008, the inmate was admitted into an MHCB for SI. His diagnosis was changed to adjustment disorder with depressed mood, mood disorder NOS, and polysubstance dependence. He continued to be treated at the 3CMS LOC. In May 2009, the inmate was admitted to an MHCB for a third time for SI. His diagnosis was revised to depressive disorder NOS, psychotic disorder NOS, and unspecified anxiety disorder.

During the next 11 years, the inmate was able to successfully program at 3CMS without any further MHCB admissions. During this time, the CDCR reviewer noted that "he typically reported AH of familiar voices, feelings of anxiety and situational paranoia when he felt others were picking on him. He was seen at 90-day intervals per policy and remained compliant with mental health treatment. At different times throughout his incarceration it is evident from his treatment notes that the inmate reported some safety concerns to his mental health clinicians, however, he was able to manage the anxiety with psychotropic medications at 3CMS." During all of his interactions with mental health clinicians in 2020, most of which occurred at CSP/LAC,

the inmate consistently denied SI and did not present any observable signs of distress or increased mental health symptoms. His most recent SRASHE, completed on November 23, 2020 during the initial assessment with a new PC, indicated both a low chronic and acute risk for suicide. The assessment, however, was later found to be deficient because it did not account for multiple chronic risk factors in the justification of lowering his chronic suicide risk to low.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property, and he did not have any other serious medical issues that were felt contributory to his death. The reviewer concluded that "this review suggests he suffered from a disturbed thought process as a result of his methamphetamine use and mental illness. He often minimized his mental health symptoms and may have felt an increase in paranoia and distress although he did not report it. Likely, he believed suicide was a way to end his discomfort and distress."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) <u>CSP-LAC</u>: The inmate was placed in STRH the majority of time in 2020. While in STRH, he was offered weekly individual treatment, however, it appeared that he was not offered group treatment for large gaps of time in 2020, nor were modifications to the treatment plan made in lieu of both refusing and not being offered group treatment. Additionally, RT notes dated May 7 and 8, 2020 indicate weekly follow-up, but that did not occur.

> 2) <u>CCI</u>: The SRASHE completed on November 23, 2020 was found to be deficient. It did not account for multiple chronic risk factors in the justification of lowering his chronic risk, nor did the risk justification provide a thorough explanation as to why chronic risk was assessed as low despite a history of a suicide attempt. According to the SPI training, chronic risk should be assessed as at least moderate whenever there is a history of one suicide attempt or multiple significant chronic risk factors.

> 3) <u>CSP-LAC Psychiatry</u>: During the year prior to the inmate's suicide, while he was housed at LAC, the chart reflects that the inmate was seen less than that required by CCCMS psychiatry contact rules. While there was accurate and appropriate documentation that the inmate failed to attend an appointment on May 5, 2020, that 'no show' should have triggered some follow-up or rescheduling or sooner appointments, which seems absent from the chart. While non-compliance at scheduled psychiatry appointments can, at times, produce extreme challenges for both the provider and the system, simple automatic responses (such as rescheduling the patient for another appointment several days later or one week later) can be offered and appear missing in this instance.

> 4) Multiple nursing documents with significantly varying times of events during the emergency response.

5) There was a 16-minute delay in nursing staff arrival to the scene during emergency medical response.

In the ___fifth___ case (CCI 6), the inmate was found hanging from a ventilation grate by a sheet in his SNY cell during the late morning of May 30, 2021. The inmate entered the CDCR system on January 10, 2019 to serve a 16-year sentence for assault with a deadly weapon with an enhancement for use of a firearm. He was transferred to CCI on March 25, 2020. The inmate incurred two RVRs during his short confinement, the most recent of which occurred in August 2020 for possession of a cell phone. He had been placed on SNY status due to his previous gang affiliation. The inmate had regular family support through visits, letter correspondence, and telephone calls with his fiancé (and their children), parents, siblings, and cousins. His last visit with his fiancée was in late December 2020.

According to available records, the inmate was primarily raised by his maternal grandmother, aunt, and uncle. He was the second oldest child and had five sisters and three brothers, some of whom were born to different fathers. His father had spent considerable time in prison, and his mother, previously addicted to methamphetamine, was also involved in the criminal justice system. The inmate reported early sexual abuse by a friend of his mother, as well as physical abuse and neglect by unknown family members. At the time of his death, the inmate had reconciled with both parents who were no longer incarcerated, and his mother had been drug-free for several years. Due to his dysfunctional upbringing, the inmate was frequently truant from school, had sporadic employment as a youth, and became involved in substance abuse (often with his mother) and gangs. He had several juvenile convictions. The inmate served his first CDCR term in 2009, paroled in 2013, violated parole and returned to CDCR in 2014, and subsequently released to the community in January 2017. The instant offense occurred several months later in September 2017. He remained in the county jail until his most recent CDCR commitment in January 2019.

Upon re-entry into CDCR, the inmate was placed at the 3CMS LOC following a diagnosis of adjustment disorder with mixed anxiety and depressed mood. During his prior CDCR confinement, the inmate had one MHCB placement in September 2014 following self-injurious behavior (SIB) of cutting his wrist. Although periodically prescribed psychotropic medication, the inmate's compliance level was low, and he was not on any medication at the time of his death. In addition to MHCB placement in 2014, the inmate was briefly held in alternative housing at COR in February 2020 after expressing SI. The MHCB referral was later rescinded. His most recent SRASHE was completed in April 2020, with the clinician assessing his chronic risk for suicide as "moderate" and his acute risk as "low."

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property, and he did not have any serious medical issues that were felt contributory to his death. However, a series of telephone calls between the inmate and his fiancée during the four-day period of May 25-29, 2021, reviewed following his death, indicated that his fiancée had ended their long-term relationship and he appeared unable to cope with the breakup. Following his last telephone call with his ex-fiancée and their daughter on the night of May 29, the inmate told his

cellmate that his "wife had broken his heart and began crying profusely." He committed suicide the following morning after his cellmate had left the cell for a visit.

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) An appointment was scheduled for the inmate to be seen by psychiatry on July 20, 2020. The patient did not show for, or possibly refused, the appointment. No psychiatric note was added to the electronic medical record following the no-show. No scheduling order was added to the electronic medical record in response to the no-show. A strategy to respond to no-shows appeared lacking. Follow-up strategies in response to no-shows might include rescheduling the patient for an appointment sometime within the next several days, visiting the patient at the cell-side, alerting other members of the treatment team (such as the assigned mental health clinician) of the no-show occurrence, and briefly recording strategies or plans for follow-up in the electronic medical record note on the day of the no-show.

> 2) During the review of the Emergency Medical Response documentation, it was found that the RN did not utilize intraosseous infusion (IO) per the current Emergency Medical Response Program (EMRP).

**Audit Summary**: Adequate practices were found in PT rounding, alternative housing, and Guard One compliance. The previous physical plant problem resulting in privacy and confidentiality concerns in nurse's offices in the four yards had been corrected. An observed intake screening by a nurse in one of the yards was problematic. The long-standing problem of an inadequate number of new intake cells in the B-8 ASU remained unresolved. The suicide case reviews for three inmate suicides found deficiencies in SRASHE completion. Both clinician and custody compliance discharge custody checks were very problematic. Both medical and mental health staff had low compliance rates for annual suicide prevention training.

### 5)    **California Health Care Facility (CHCF)**

**Inspection**: July 22-23, 2021 (previous suicide prevention audit was on February 7-8, 2019). CHCF housed approximately 2,478 inmates at the time of the on-site assessment.

**Screening/Assessment**: Because there were not any inmates admitted into the CHCF during the two-day assessment, the **Intake Screening** process within the R&R unit (referred to as the Patient Management Unit) could not be observed. Daily **PT Rounds** in the ASU were observed on July 23. The rounds were unremarkable and the PT was observed to be entering the Psych Tech Daily Rounds information into EHRS for each caseload inmate.

**Housing**: CHCF had 98 **MHCBs** in housing units A1A, A1B, and A2B that were previously found to be suicide-resistant. At the time of the assessment, the MHCB units had very low censuses with approximately 42 of the 98 beds (or 43 percent) occupied by patients. Of note, A2B was designated as "acute flex beds" and 18 (of 42) patients were being treated at the acute

level of care by MHCB clinicians.  The ASU in E-Facility had five retrofitted **New Intake Cells** designated for new intake inmates, and all new intake inmates were observed to be housed in the five new intake cells.

Finally, **Alternative Housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were used infrequently at CHCF.  From April through June 2021, there were only 13 inmates placed in alternative housing, with all but one case (at 38 hours) discharged within 24 hours.  In addition, 69 percent (nine of 13 cases) of MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined the EHRS charts of these nine sample cases and found that the required SRASHEs were completed and provided adequate justification for the rescissions.  Eight of the nine cases had the required five-day follow-up assessments.  Units D1A and C1A were utilized for alternative housing, and each inmate was required to be provided a stack-a-bunk and observed on a continuous 1:1 basis.  Of note, during the previous assessment, this reviewer found that two of the three inmates in alternative housing were not provided stack-a-bunks.  Although there were not any inmates on alternative housing status during the current assessment, this reviewer examined the stack-a-bunks that were appropriately located in storage rooms adjacent to the D1A and C1A units.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were being used in the MHCB units.  In addition, patients not on suicide observation status were required to be observed at two-hour intervals by nursing staff as part of regular "nursing rounds."  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB units during a nine-hour period from 12:00 a.m. through 8:59 a.m. on May 10, 2021 for CHCF 1, on June 19, 2021 for CHCF 2, on July 17, 2021 for CHCF 3, and on July 18, 2021 for CHCF 4.  The chart review found only a few violations in observation checks (i.e., CHCF 2 and CHCF 3 each had one violation, and CHCF 1 and CHCF 4 each had two violations).  This finding was a significant improvement from the February 2019 assessment when there was a total of 38 violations in four reviewed patient cases.

Finally, a review of **Guard One** data for a recent 24-hour period in the ASU found 100 percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals from for the period of January through June 2021.  A sample EHRS review of 23 emergent/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 91 percent (21 of 23) of the cases.

In addition, the **Crisis Intervention Team** was launched at CHCF in March 2019, briefly paused, and reactivated in February 2020.  The CHCF CIT policy was revised in July 2021, but was unsigned.  According to the policy, the CIT was available seven days from 7:00 a.m. until 4:30 p.m.  During off-hours, a CIT-trained clinician would respond to the crisis.

This reviewer (and members of the headquarters SPRU) had an opportunity to observe and/or review the CIT process on July 23, 2021.  The inmate (CHCF 5) was being referred to the CIT for both suicidal and homicidal ideation.  Upon arrival to E-Facility, the team did not convene for a briefing and/or review of the case.  Rather, the clinician simply indicated the inmate would

be seen in the clinic and, upon arrival at the clinic, the inmate was observed to be alone in a TTM located in a clinic room. The door was closed and the inmate was not under continuous observation as required.

The CIT clinician entered the room and began to assess the inmate. No other members of the team were present at the beginning of the assessment. A few minutes later, a sergeant came into the room and the inmate began to report feeling stressed and suicidal regarding recent housing changes. The team did not initiate any follow-up questions regarding the nature or extent of the concerns. At one point, the clinician asked the sergeant if something could be done about the inmate's concerns and, although the sergeant indicated that changes could be made, there was no further discussion about the issue. Approximately ten to 15 minutes later, a nurse walked into the room and stated: "Apparently, I'm supposed to be a part of this, what do you need from me?" The nurse then asked the inmate if he had any medical concerns, to which he replied "No," whereupon the nurse left the room. (Shortly before the nurse left, a nursing supervisor had briefly entered the room and asked if anyone needed her, and then left the room.) There were no other case factors discussed with the team. The sergeant reminded the inmate to alert staff if he felt uncomfortable with his housing, whereupon the sergeant left the room.

The remainder of the time was spent with the clinician conducting an SRASHE. The inmate reported feeling hopeless with recurrent thoughts of ending his life (by jumping off the housing tier). All questions of the SRASHE were completed and the inmate was informed he would be referred to the MHCB. Upon exiting the room, the clinician informed an officer that the inmate required continuous observation pending MHCB transfer. The officer stated that he would notify nursing staff. The clinician remained with the inmate until the officer returned and informed the clinician that "I told them (nursing) and they said they would come when they can." The clinician asked the officer if he could remain with the inmate so that they could continue processing the MHCB referral. The officer then stated, "That's not my job, but I'll do it for a few minutes." The officer continued with other activities, such as opening clinic doors and getting his lunch, only intermittently glancing into the room. As a result, a member of the headquarters SPRU remained with the inmate until relieved by a PT.

Given the multiple deficiencies found during this CIT response, including grossly inadequate observation of a suicidal inmate, the headquarters SPRU subsequently met with the Chief of Mental Health at CHCF.

Five **IDTT Meetings** were observed in the MHCB units on July 22-23, 2021. Overall, there was uneven discussion during the IDTTs regarding why the patients were admitted to the MHCB for DTS and safety planning to reduce SI. For example, during IDTT meetings in both A1A and A1B on July 22, there was no case summary or discussion regarding patients' admission for DTS, and little discussion regarding safety planning. However, during the two IDTT meetings in A1A on July 23, there was sufficient discussion regarding the specific DTS behavior that prompted the MHCB admissions. In one case (CHCF 6) on July 23, the team patiently listened to a challenging patient who was invoking a hunger strike due to alleged abuse by custody personnel; whereas in the second case (CHCF 4), the team reinstituted Suicide Precaution status (and appropriately discussed both level of observation and privileges) for the patient who was expressing ongoing SI.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for 34 MHCB patients and found that most patients housed on the A1A and A1B units were offered yard/dayroom, shower, and telephone privileges on a regular basis, with some yard sessions cancelled due to excessive heat. MHCB patients on maximum security status were provided yard on the unit, one patient at a time. For reasons that remained unclear, "acute flex bed" patients housed on the A2B MHCB unit were provided with few opportunities for dayroom and telephone privileges during June and July 2021 (although they were provided with amply opportunities for both showers and yard sessions).

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB units, this reviewer examined the EHRS charts of 18 patients who were discharged from the units and remained in CHCF between May and June 2021. The review found that the required SRASHEs and safety plans were completed in all (18 of 18) cases, and the required five-day clinical follow-ups were completed in 94 percent (17 of 18) of cases. However, this reviewer's examination of safety plans found that many were inadequate and/or some deferred safety planning development to the outpatient clinicians. In one case (CHCF 7), for example, the clinician wrote that "While patient did not refuse to answer, he could not identify distractions he could utilize. He was encouraged to work with his clinician on developing helpful distractions/ coping skills."

This reviewer's examination of the MHCB supervisory review of 36 discharge SRASHEs and safety plans for June 2021 based upon the CDCR's required "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans (effective March 10, 2020)" found that 25 percent (nine of 36) of cases had SRASHE scores below 90 percent, as well as inadequate safety planning discussion in 25 percent of cases. Of note, the above referenced case (CHCF 7) that deferred safety planning development to the outpatient clinician received a 100 percent compliance score by the MHCB supervisory review.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 109 cases of patients discharged from a MHCB or alternative housing placement who remained at CHCF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January through June 2021. The review found that 92 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with non-compliance mostly related to clinicians discontinuing the checks prior to the minimum 24-hour requirement or non-completion of the form on a daily basis. In addition, most of the custody checks were recommended for either 24 or 48 hours by clinicians. In addition, only 82 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at

30-minute intervals. Most of the problems were related to gaps in documentation, missing observation sheets, and time intervals pre-printed on the custody check sheets prior to the observation.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (January through June 2021) found that only three meetings (March, April, and May) had quorums of all required mandatory members or designees. Meeting minutes incorrectly reflected that only "50%" of committee members were required for a quorum. In addition, there were not any serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3") during the review period, therefore, case presentations and/or RCAs were not required. A SPRFIT LOP was in effect. Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. At the time of the July 2021 assessment, CHCF had an LOP for "Inmate-Patients Receiving Bad News," as well as an unsigned LOP for the CIT. However, an LOP for the "Suicide Risk Management Program" was not provided to this reviewer.

**Training**: According to training records, 94 percent of custody staff and 99 percent of medical staff were currently certified in CPR. In addition, only 58 percent of medical staff and only 84 percent of mental health staff received annual suicide prevention block training during the preceding 12 months. Custody staff compliance with annual suicide prevention training was not provided. Finally, as of July 2021, only 88 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 98 percent had completed safety plan training.

**Recent Suicides**: CHCF experienced one inmate suicide during the review period. In that case (CHCF 8), the inmate asphyxiated himself with a string tied to both sides of the bed in his OHU cell during the morning of April 6, 2020. The inmate entered the CDCR system on October 23, 1991 to serve a 137-year sentence for multiple counts of lewd and lascivious acts with children under the age of 14. He was transferred to CHCF on August 6, 2013. The inmate incurred only three RVRs during his more than 29 years of confinement, the most recent of which occurred in September 2003 for mutual combat. He was not known to be gang-affiliated. The inmate was unmarried and did not have any children. He had limited family support through letter correspondence with a cousin (that was also referred to in some records as his older brother). He did, however, receive support from a female friend and her husband through telephone calls and letter correspondence. Records indicated that the female friend was listed as his emergency contact and visited with the inmate in 1998 and 2004.

According to available records, the inmate and an older brother were raised by both parents in a chaotic and dramatic family environment. His father emotionally and physically abused him beginning at age six, and an uncle sexually abused him from the ages of 10 to 15. The inmate also reported that he was both sexually and physically abused by his older brother. He struggled

in grade school and eventually dropped out at the age of 16. He joined the military two years later as a Marine, served for approximately three years, and endured combat in Vietnam. The inmate was subsequently diagnosed with PTSD from this military experience. He had a history of substance abuse which began at age 16 and escalated while he was in the military. The inmate subsequently received drug and alcohol treatment through the Veterans Administration (VA), including several residential treatment centers. He had a variety of jobs throughout his life. The inmate did not have a juvenile arrest history, but had numerous arrests as an adult, including out-of-state prior convictions for sexual abuse of minors. In January 1991, the inmate suffered a severe spinal injury in an automobile accident that was reported as a serious suicide attempt. This incident occurred a few months prior to the instant offense in March 1991.

The inmate had an extensive mental health history, and first reported experiencing depression at age six that lasted through his teenage years. He denied ever receiving mental health treatment during his youth. As an adult, the inmate received mental health treatment at the VA for PTSD, major depressive disorder, multiple suicide attempts, and alcohol dependence. His first suicide attempt occurred in the early 1970s by drug overdose, and subsequent attempts included drug overdoses, hanging attempts, and stabbing himself in the stomach, as well as the above described suicide attempt resulting from the automobile accident.

Upon entry into CDCR, the inmate was placed in the MHSDS and treated for major depressive disorder, PTSD, and SI. His chronic back pain resulted in several spinal surgeries and his medical condition often impacted his willingness to comply with mental health treatment at all levels of care, including 3CMS, EOP, MHCB, and multiple DSH admissions (in 2006, 2008, in 2011). The primary driver for the inmate's inpatient placements were depression and SI, exaggerated by safety concerns and custody requirements to accept cell placement with another inmate. In fact, the inmate's adjustment to prison was difficult, and his physical disability, chronic pain, and safety concerns made it challenging to program and care for himself throughout his CDCR confinement. This led to the inmate socially isolating and restricting his involvement in prison activities. Based upon safety concerns related to his instant offense, the inmate spent considerable time in administrative segregation between 1992 and 2000.

During his 27 years in the MHSDS, the inmate was treated with various psychotropic medication and supportive therapy that focused on reducing depression and SI. Records indicated that he was often non-compliant with medication. In September 2011, his treatment team agreed that the inmate's physical condition posed significant barriers to his participation in the MHSDS and recommended that he be placed in the OHU. Prior to his subsequent placement at the CTC and OHU at CHCF, he was housed in various CTC medical beds at three other institutions.

Upon transfer to CHCF in August 2013 at 3CMS level care, he was seen as scheduled by his PC and routinely denied major depressive symptoms, although he expressed some sadness and frustration on occasion, generally related to his medical condition and frustration with nursing and medical staff. He also routinely denied SI, although some records reflected that he would state "If I was suicidal, I wouldn't tell anybody." In 2017, medical documentation indicated that the inmate reported depression secondary to pain. He frequently denied SI and, although clinicians continued to encourage his participation in out-of-cell programming, including group treatment, he rarely left his cell.

On January 9, 2018, the inmate met with two clinicians on separate occasions during the day. Both clinicians noted that he was depressed, with one clinician describing his mental status as "depressed, logical thought process, possible perceptual disturbances with poor appetite, and limited insight." However, during the inmate's IDTT meeting several days later on January 17, the team decided to discharge the inmate from the MHSDS. Other than a reference to a psychiatry note indicating that the inmate had not taken psychotropic medication for several years and had agreed to be removed from the MHSDS, review of the Mental Health Master Treatment Plan found that it did not provide any clinical rationale for the IDTT level of care decision. According to the CDCR reviewer in this case, records also indicated that there was no transition planning for removal from the MHSDS and it was unclear if the inmate met full criteria for removal pursuant to the *Program Guide*. It was unclear why the inmate's removal from the MHSDS without documented clinical rationale did not result in a QIP in this case other than the fact that removal occurred more than two years prior to his death.

Following his removal from the MHSDS, the inmate had a few contacts with mental health staff from 2019 until March 2020. The first contact occurred on August 1, 2019 in response to a nursing staff concern that he was demonstrating "anxious, fearful, nervous behavior." In addition, the inmate was seen by an outside forensic psychologist on October 10, 2019 in preparation of a risk assessment for the BPH. The assessment found that the inmate "met criteria for major depressive disorder, recurrent, severe, without psychotic features, and PTSD, however, he denied any recent symptoms warranting a referral to the CDCR Mental Health Program." Finally, on March 12, 2020, a clinician met with the inmate in response to another nursing staff referral noting that he appeared to be depressed. When seen by the clinician, the inmate acknowledged feeling "sad" after receiving a five-year denial at his BPH hearing, as well as expressing frustration for not being able to contact his correctional counselor for assistance in petitioning for an earlier return to the BPH. The clinician's note indicated that the inmate denied SI and did not present with any symptoms warranting inclusion into the MHSDS. The clinician simply referred him back to medical staff for pain management.

It should be noted that on January 24, 2020, the inmate was provided with a BPH hearing that subsequently recommended a five-year extension until reconsideration of parole. A Classification Committee's Post Board Review hearing to review the BPH's decision and recommendations with the inmate did not occur. According to records, he subsequently received his official BPH transcripts on April 2, 2020, four days prior to his suicide.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. Although a suicide note was not found in his property, the inmate left several letters that complained about his medical treatment, declining physical health, increased pain, and belief that the medical staff were uncaring. He also described frustration with appealing the BPH process. According to the CDCR reviewer, "records indicate a number of stressors occurred in the last week of his life further depleting his ability to tolerate frustration and effectively manages distress…. The inmate likely became overwhelmed by his mental, emotional and physical suffering, reached the end of his coping skills, and as a cumulative result of the factors listed above, ended his life by suicide."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

1) A routine mental health consult was completed on August 1, 2019. At this time, it was documented the inmate was exhibiting symptoms of anxiety and depressed mood primarily regarding his upcoming BPH hearing and request for single cell. The responding clinician documented a plan the inmate 'needs counseling and help with anxiety managing techniques,' however, there did not appear to be follow-up scheduled with mental health, nor was there documentation regarding consideration of inclusion in the MHSDS.

2) During the review of the incident, it was identified the activation of the Emergency Medical System (calling 911) did not take place until approximately six minutes after the emergency was observed.

3) During the review it was noted a Classification Committee (Post Board Review) was not conducted within 15 days of receipt of official notice of a BPH decision regarding the inmate. Official transcripts were scanned into the inmate's file on January 24, 2020. The inmate did not receive his official BPH transcripts until April 2, 2020.

4) During the review it was noted life-saving measures began at approximately 0601 hours and it was not until 0619 hours staff discovered a blue string type material was attached to one side of the bed going across the inmate's neck and attached to the other side of the bed. The presence of the string wrapped around the inmate's neck was allegedly impeding the effectiveness of the CPR.

5) Lack of rise and fall in chest went unnoticed during 17 minutes of CPR with rescue breathing.

**Audit Summary**: Adequate practices were found in PT rounding, alternative housing, and Guard One compliance. There was a significant improvement in the observation of suicidal MHCB patients at required 15-minute intervals. An observed CIT case was found to be very problematic. Observed IDTT meetings in the MHCB units were inconsistent. Safety planning for patients discharged from the MHCB was problematic, as was the process for MHCB supervisory review of safety planning. Custody compliance with discharge custody checks was low. Both medical and mental health staff compliance with annual suicide prevention training was low, and data on custody compliance with such training was not provided.

### 6)    Richard J. Donovan Correctional Facility (RJD)

**Inspection**: August 10-11, 2021 (previous suicide prevention audit was on July 25-26, 2017). RJD housed approximately 3,302 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed the **Intake Screening** process in the R&R unit on August 11, 2021. There were two nurse's offices available for intake screening. During the

previous 2017 assessment, this reviewer observed that when multiple inmates were being processed at the same time, both rooms were utilized and an officer would escort a second inmate through the first office during the screening process, thus interrupting the screening and compromising privacy and confidentiality. This problematic practice had since been corrected by simply requiring the escorting officer to bypass the inner office and walk around to a short outside corridor that connected to the second office. This reviewer was also informed that the intake screening of multiple inmates at the same time was rare at RJD. During the observed intake screening on August 11, the door to the office remained closed, with officers stationed outside, thus ensuring both privacy and confidentiality. The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering information in the EHRS. Finally, it was recommended that required suicide prevention placards (both English and Spanish versions) be placed inside each of the nurse's offices.

Daily **PT Rounds** in the B-6 (EOP Hub) and B-7 (3CMS and GP) ASUs were observed on August 10. The rounds were unremarkable and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms at cell-front on all caseload inmates.

**Housing**: RJD had 12 **MHCBs**, as well as two swing beds. All 14 rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt. All 12 MHCBs were filled during the on-site assessment.

Both ASUs (B-6 and B-7) each contained 12 retrofitted **New Intake Cells**. During inspection of each unit, the censuses were low and all new intake inmates were observed to be housed in new intake cells.

Finally, **Alternative Housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was extensively used at RJD. Inmates on administrative segregation status requiring alternative housing remained in designated cells in either B-6 or B7, whereas non-administrative segregation status inmates were housed in designated cells in Facility C, Housing Unit 15. All inmates were required to be provided bunks and observed on a continuous 1:1 basis. This reviewer was provided data for 216 inmates placed in alternative housing from May through July 2021. The vast majority (98 percent) were housed under 24 hours, with an overall length of stay of ten hours, correcting a problem of excessive length of stay found during the previous assessment. Four inmates were held in alternative housing slightly over 24 hours, with an additional inmate held for approximately 57 hours. The majority (54 percent) of the 216 inmates were subsequently returned to their housing units following rescission of their MHCB referrals. This reviewer examined the EHRS files for ten rescinded cases and found that required SRASHEs and five-day clinical follow-ups were completed in all cases. However, one case was noteworthy. The inmate (RJD 1) was placed in alternative housing on five separate occasions during May 2021 for expressing SI. On each occasion, the required SRASHE was completed and his chronic and acute risk for suicide were assessed a "high and "low," respectively. During completion of the fifth SRASHE on May 10, 2021, the PC consulted with a lieutenant and sergeant and the decision was made to "place IP on sheet restriction" and rescind the MHCB referral. Of course, such a decision should have been contraindicated because if the clinician determined that the inmate's risk for suicide was high enough to warrant restriction of bedding,

then the inmate should have been admitted into a MHCB. Two days later on May 12, 2021, the inmate was again placed in alternative housing and subsequently referred to an MHCB.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status during a nine-hour period from 12:00 a.m. through 8:59 a.m. on May 6, 2021 for RJD 2, July 21, 2021 for RJD 3, August 2, 2021 for RJD 4, and August 9, 2021 for RJD 5. The chart review found only one violation in RJD 5, but six violations each in RJD 2 and RJD 3. Further, RJD 4 had ten observation checks that were in excess of required 15-minute intervals, with the longest gap between checks being 32 minutes. RJD 2 had a 43-minute gap between required checks. Violations in the four cases were committed by multiple nursing staff.

A review of **Guard One** data for a recent 24-hour period found a combined compliance rate of 99 percent in both B-6 and B-7 ASUs with the required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of February through July 2021. A sample EHRS review of 34 cases of emergent/urgent mental health referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 91 percent (31 of 34) of the cases.

In addition, the **Crisis Intervention Team** was initiated at RJD in June 2019. The CIT was operational seven days a week from 8:00 a.m. through 10:00 p.m. This reviewer had an opportunity to observe the CIT during PT rounds in the B-6 ASU on August 10. The team comprised a clinician, RN, and lieutenant. The intervention occurred in a confidential setting. The inmate (RJD 6) had expressed SI during PT rounds, as well as reporting that he engaged in SIB by cutting himself with a razor a few days earlier. When seen by the CIT, the inmate reported that he engaged in SIB as a coping mechanism to relieve emotional distress. He felt that his mental health treatment was inadequate, and he was also requesting a change in psychotropic medication. By the end of the intervention, the inmate was no longer expressing SI and agreed to work with his PC on alternative coping strategies (rather than engaging in SIB). The subsequently completed SRASHE assessed his chronic risk for suicide as "moderate," and his acute risk as "low." The inmate agreed to attend his IDTT meeting later that day. His cell was searched for razor blades and the inmate was placed on a ten-day razor restriction. This reviewer later attended the inmate's IDTT meeting where his history of SIB was extensively discussed.

This reviewer did not have an opportunity to observe any **IDTT Meetings** within the MHCB unit because none were scheduled during the on-site assessment. With regard to **Out-of-Cell Time** offered to MHCB patients, this reviewer examined the 114-A forms for 11 patients in the MHCB unit during July and August 2021. The 114-A forms of two patients were excluded from review because they had only been in the MHCB unit for two days and had not yet been provided with an initial IDTT meeting. These 11 patients accounted for 84 MHCB days. During this time, access to the yard was offered on only 24 occasions. One patient (RJD 7) had been in

the MHCB for approximately 21 days and only offered yard on two occasions. Another patient (RJD 8) had been in the MHCB for seven days and had not been offered yard. The review also found that although patients were regularly offered showers, there was no documentation that they received access to the telephone. This reviewer subsequently conversed with the RT assigned to the MHCB unit on Monday, Wednesday, and Friday. Although the RT stated that yard was offered to six to eight patients per day (which would translate into 18 to 24 times per week), such a statement was inconsistent with the reviewed 114-A forms.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the medical charts of 12 charts discharged during June and July 2021. The review found that the required SRASHEs were completed in each case, as well as the five-day follow-up assessments. In addition, the required safety plans were completed in all appropriate cases, but the quality of such plans was marginal. For example, in one case (RJD 9), the patient was admitted into the MHCB unit on June 16, 2021 and clinically discharged ten days later on June 25, 2021. The safety plan simply stated that "EOP PC is recommended to assist with bolstering this section through brainstorming and Socratic questioning. IP became agitated and did not want to complete SPI despite direct redirects." Such narrative not only was indicative of deferring safety plan development to the outpatient clinician, but also suggestive that safety planning was only attempted on the last day of the patient's MHCB placement. Finally, CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020), required MHCB supervisors or designees to review all discharge SRASHEs and safety plans for patients released from the MHCB. This reviewer was presented with data indicating that approximately 48 patients were discharged from the MHCB unit to a lower level of care from May through August 2021. According to the "Supervisory Review of MHCB Discharge Safety Source CAT Audit," only 38 percent (18 of 48) of the cases resulted in supervisory review of safety planning.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed for each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 160 cases of inmates discharged from a MHCB or alternative housing placement that remained at RJD and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from December 2020 through May 2021. The review found that only 83 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority of cases recommending that custody checks continue for the full 72 hours of observation. In addition, only 76 percent of the "custody checks" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the clinician deficiencies were related to incomplete documentation, whereas most of the custody deficiencies were related to gaps in documentation and/or missing observation sheets.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of six months (January through June 2021) of SPRFIT meeting minutes found that quorums were reached in each meeting.  Meeting minutes and attachments included, but were not limited to, presentation of data regarding suicide prevention training, SIB, as well as Guard One and SRASHE.  The minutes did not reflect any case presentations and/or RCAs of serious suicide attempts.  A SPRFIT LOP was in effect.  Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021.  The reviewer was presented with an LOP for "Notification of Inmate Bad News" dated May 2021, and LOP for the "Crisis Intervention Team" dated March 2020, and a draft LOP for the "Suicide Risk Management Program" dated August 2021.

**Training**:  According to training records, only 69 percent of custody and 100 percent of nursing staff were currently certified in CPR.  In addition, only 37 percent of custody staff, 61 percent of medical staff, and 65 percent of mental health staff received annual suicide prevention block training during the previous 12 months.  Finally, as of August 2021, only 86 percent of mental health clinicians had completed the SRE mentoring program, 100 percent received the seven-hour SRE training, and 93 percent had completed safety plan training.

**Recent Suicides**:  RJD experienced three (3) inmate suicides during the review period.  In the ***first*** case (RJD 10), the inmate was found hanging from the top shelf by a sheet in his EOP cell during the late afternoon of August 26, 2020.  The inmate entered the CDCR system on December 16, 2019 for his second term to serve a four-year sentence for assault with intent to commit a sex offense.  He also received an additional five-year enhancement for a prior felony conviction.  He was transferred to RJD on August 20, 2020, six days before his death.  The inmate incurred four RVRs during his confinement, the most recent of which occurred in March 2020 for threatening staff.  He was not known to be gang-affiliated within CDCR, but was involved in street gangs in the community.  The inmate was unmarried and did not have any children.  He did not have any visits, but received family support through letter correspondence and telephone calls with his grandmother and uncle.

According to available records, the inmate and four siblings were raised by their grandmother following the murder of their mother by their father when he was two-years-old.  He graduated high school, but had only sporadic employment in the construction business and other odd jobs.  The inmate used both alcohol and methamphetamine on a daily basis since the age of 13.  He had both a juvenile and adult arrest history, including a prior CDCR term.  The inmate previously reported a history of intermittent AH since the age of 15.  He also reported suffering from significant depressive symptoms, as well as fleeting thoughts of suicide, following the death of one of his brothers in 2018.  The inmate did not report any prior mental health treatment in the community.

Upon re-entry into CDCR for his second term on December 16, 2019, the inmate was assaulted by two other inmates.  He was placed in administrative segregation for his safety and it was later

determined that he had been assaulted based upon his gang dropout status, as well as his commitment offense. He subsequently requested SNY status. The inmate was placed in the MHSDS at the 3CMS LOC several days later after verbalizing significant depressive symptoms, AH, and anger over his brother's death the previous year. He denied any current SI. The inmate was subsequently placed on psychotropic medication and given a diagnosis of major depressive disorder with psychotic features.

Three months later during March 2020, the inmate incurred three RVRs in the span of five days. During the week of March 16, he appeared both intoxicated and hostile towards staff when refusing a cellmate. It was suspected that the inmate had incurred a drug debt. On March 23, he endorsed SI and threatened to engage in SIB if he was returned to his housing unit. The inmate was subsequently placed in an MHCB, and his diagnosis was changed to adjustment disorder with depressed mood. His medication was also adjusted. The inmate continued to endorse SI throughout his MHCB placement, and the psychiatrist opined that he might have been exaggerating his symptoms in order to remain in the placement. On April 1, 2020, the IDTT decided to discharge the inmate to EOP, with documentation stating that the inmate "had exaggerated his symptoms, but while he may be suffering from grief and depression due to his family loss, his symptoms could be addressed in the outpatient level of care." However, two days later on April 3, the inmate again expressed SI with a plan to hang himself. He was readmitted to the MHCB. The inmate was viewed as both argumentative and uncooperative with treatment, with the treatment team continuing to believe that he was exaggerating his symptoms. The inmate was discharged from the MHCB three days later on April 6, 2020. Documentation contained within the Mental Health Master Treatment Plan was sparse and did not provide sufficient details of what was discussed during the IDTT meeting. In addition, while a nursing note stated that the inmate continued to endorse SI, a clinical progress note stated that he denied SI at discharge.

During subsequent sessions with clinical staff, the inmate continued to report intermittent passive SI and hopelessness. For example, during an appointment with his psychiatrist on May 7, 2020, the inmate reported that he was feeling "kind of depressed," and stated that he felt he would eventually commit suicide although denied any current active thoughts or plans for suicide. His medication was adjusted. On June 3, 2020, he informed his clinician that "he had thoughts of throwing himself off the tier, but did not want to do so because he was afraid he would not die and would only severely hurt himself. He added he viewed suicide as 'being weak' and death as 'scary'." On June 15, the inmate reported to a clinician that he had fleeting thoughts of suicide after being informed that his grandfather had passed away the previous week. On July 5, he informed the psychiatrist that he had "occasional" SI, but no current plans to kill himself. In addition, the inmate informed the psychiatrist for the first time of two previous suicide attempts that had not been previously reported on SRASHEs. On July 9, 2020, the inmate's clinician reported that he would be seen twice a week for individual therapy sessions due to his history of reporting chronic SI and recent placement on quarantine status. On July 26, the sessions reverted back to weekly encounters following his discharge from quarantine status. The inmate's last SRASHE was completed on July 31, 2020 in response to a CIT call for reported SI. He subsequently informed the responding clinician that he was not suicidal, but wanted to see the psychiatrist concerning a medication change. His chronic risk for suicide was rated as moderate,

with his acute risk rated as low. The inmate was seen by a psychiatrist a few days later and his medication was again adjusted.

The inmate was transferred to RJD on August 20, 2020. He was seen by a clinician on August 25 and denied any current SI. He was seen again the following day (August 26), the day of his death. The inmate continued to report significant anxiety and depressive symptoms, stating that he had a "bad feeling and antsy-ness." There was no elaboration for follow-up regarding this statement in the clinician's progress note. He was scheduled for another "wellness check" on August 27.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property, and he did not have any serious medical issues that were felt contributory to his death. According to the CDCR reviewer, the inmate "may have minimized his symptoms and distress as it related to suicidal ideation, or possibly was in denial regarding the severity of his suicide risk. The inmate had a history of ongoing anxiety and depression that appeared to be superficially managed through heavy substance use while in the community, but when incarcerated he did not have the same access to illicit substance and substances so his anxiety and depression worsened. The increase in his anxiety and depression may have led the inmate to feel hopeless, trapped, and looked to suicide as a means to end his internal suffering."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

1) <u>SATF</u>: The MH Treatment Plan completed on February 25, 2020 provided no comprehensive documentation of what was fully discussed during the IDTT. While the documentation stated the inmate attended and participated in his IDTT, the clinical documentation only referenced his response to psychiatric medications. His current symptoms including anxiety and irritability, adapting to the institution, level of care needs and other concerns that merit discussion in an IDTT were not documented. As a result, this likely impacted treatment planning, and ability to document progress and level of care needs in future clinical documentation.

2) <u>SATF</u>: Psychiatry: The inmate was seen for a psychiatrist appointment on December 24, 2019 during which the psychiatrist recommended a follow-up psychiatry appointment in two weeks. On December 27, 2019, the patient was transferred from California Institution for Men to SATF. The next psychiatry appointment did not occur until seven weeks later (on February 13, 2020) due to the patient being transferred to another facility and then being scheduled for a psychiatry appointment within the minimum required interval for his level of care (instead of at two weeks, which was the original psychiatrist recommendation).

3) <u>NKSP</u>: Concerns with SRASHEs completed on March 24, 2020, April 1, 2020, April 4, 2020, April 6, 2020, and June 17, 2020 were identified. Please see *Conclusions* section for further details.

4) <u>NKSP</u>:  On April 6, 2020, the inmate was discharged from the MHCB to EOP level of care.  The MH Master Treatment Plan contained sparse documentation on what was discussed during the IDTT.  In addition, separate notes from nursing and the clinician are contradictory.  The nursing notes stated the inmate endorsed suicidal ideation, homicidal ideation, auditory hallucinations, visual hallucinations, anxiety, and depression.  But the discharge summary from the clinician stated the inmate denied suicidal ideation on the same day.  Having clear documentation on what was discussed during the IDTT and the inmate's presentation would be crucial when there are contradictory statements in the treatment notes because the inmate may have presented differently to different staff members.  This gap in communication between nursing and mental health staff may have impacted treatment planning.

5) <u>RJD</u>:  During review it was noted staff applied restraints to the inmate prior to supporting his body and being cut down.  The inmate's custody designation was Medium (A) and he was housed in a general population housing unit.

In the ***second*** case (<u>RJD 11</u>), the inmate was found hanging from the top bunk by a sheet in his administrative segregation cell during the early afternoon of May 3, 2021.  The inmate entered the CDCR system on March 12, 2020 to serve a ten-year sentence for multiple counts of burglary.  He had been transferred to RJD a few days earlier on April 30, 2021.  The inmate incurred five RVRs during his confinement, the most recent of which occurred in January 2021 for failure to meet work expectations.  The inmate had regular family support through visits, letter correspondence, and telephone calls.

According to available records, the inmate was primarily raised by his parents, both of whom have been involved in the criminal justice system and previously incarcerated within CDCR.  He was involved in gang activity at an early age, as were several other family members.  He reported a good relationship with his family, and denied any physical, sexual, or emotional abuse as a child.  Due to his gang involvement, the inmate never completed high school, had sporadic employment as a youth, and became involved in substance abuse.  He had several juvenile convictions.  The inmate served his first CDCR term from January 2016 to May 2018 for a robbery conviction.

Upon re-entry into CDCR, the inmate denied any history of mental health treatment in the community, but records indicated that he did receive mental health treatment during his first CDCR placement (in 2016-2017).  He was not placed in the MHSDS until April 30, 2021, less than a week prior to his death.  A few days earlier on April 26, 2021 the inmate had been placed in administrative segregation at Calipatria State Prison for safety reasons, less than a week prior to his death.  During the ASU Screening Questionnaire process, the inmate had expressed fleeting thoughts of suicide (i.e., "Wished you were dead or sleep, not wake up" in the past 30 days).  He was referred to mental health and a SRASHE was completed.  Although he denied any current SI during the assessment, he did report "recent SI is being persistent and attributed it primarily due to environmental stressors."  Both his chronic and acute risk for suicide were rated as "low."  Two days later on April 28, the inmate presented a sick call slip to the PT "indicating that he was feeling depressed and anxious and requested to speak with psychiatrist."  Asked by

the PT if he was feeling suicidal, the inmate responded, "I can't answer that right now… well, not right now, depends if I get kicked back out to the yard." The PT informed the inmate that he would see be seen by the psychiatrist the following day (April 29).

The inmate was not seen by the psychiatrist on April 29, but was seen by both a psychologist and psychiatrist on April 30. He was placed in the MHSDS at the 3CMS LOC after reporting "depressive and anxious symptoms (rated at "8" from a scale of 1-10; 10 being the most severe): difficulty sleeping (3-4 hours/night), depressed mood (feels hopeless at times), decreased appetite, recurrent thoughts of death (actively dreaming about being killed; recent SI), excessive worry, rumination about 'enemy concerns' that appears to be heightening anxiety (reason he left Alpha yard approximately 1 week ago and went 'SNY'); onset of symptoms; 2-3 months. Patient denied current SI/HI/SIB/SA….cont. to report the aforementioned symptoms and requested CCCMS as well as meds." He was subsequently diagnosed by the psychiatrist with unspecified depressive disorder, but declined any psychotropic medication because he was scheduled to be transferred to RJD in a few hours.

Upon transfer to RJD on April 30, the inmate responded affirmatively to the Initial Health Screening questions of: "In the past year, have you had thoughts that you would be better off dead? In the past year, have you had thoughts of hurting yourself? and In the past year have you heard thoughts of hurting others." He was subsequently seen by a clinician and, while reporting increased depression and anxiety, denied the current SI. Three days later on May 3, the inmate committed suicide.

Apart from expressing fleeting thoughts of suicide less than a week before his death, the CDCR reviewer did not find any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property, and he did not have any serious medical issues that were felt contributory to his death. However, the review found that the inmate was probably abusing drugs in the weeks prior to his death, and the reviewer noted that his "use of spice coupled with the safety concerns, may have led to increased depression, anxiety and possible psychosis. Furthermore, the rapid progression of his reported mental health symptoms but denial of suicidal plans and intent may have made it difficult for clinical staff to accurately identify the severity of his distress. The inmate's final decision to end his life may have been an impulsive decision after struggling to adequately cope with combination of safety concerns, withdrawing from substances, and ongoing thoughts of death."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) A clinician determined the inmate's acute risk was low on the SRASHE dated April 27, 2021. Several acute risk factors were incorrectly identified leading to a possible underestimation of acute risk. The clinician did not successfully integrate risk factors into the determination of acute risk in the risk justification section of the SRASHE. The clinician evaluated the inmate's chronic risk as low and his acute risk is low, therefore a safety planning intervention was not required. However, the apparent risk factors indicated the inmate's acute risk was at least moderate and he may have benefited from a safety planning intervention, as well as consideration for admission into the MHSDS.

2) Although responding custody staff retrieved the cut-down kit, custody responders separated the cut-down kit and retrieved only the rescue tool followed by the Ambu bag.  Policy requires the retrieval of the complete cut-down kit when responding to a suicide attempt by hanging.

3) During the review it was noted that after the ligature was cut away, custody responders did not support the inmate's body by physically lifting the inmate's weight off of the noose.

4) During the review of the training reports, it was identified four custody officers were out of compliance with the required annual suicide prevention training at the time of the incident.

5) During the review of Emergency Medical Response timeline, documentation was found to be inconsistent and missing information.  No time recorded when the RN responded at the scene and documentation of initial RN assessment.

In the _**third**_ case (RJD 12), the inmate was found hanging from the top bunk by a sheet in his administrative segregation cell during the early morning of January 22, 2022.  The inmate entered the CDCR system on October 21, 2011 for his eighth term to serve a 22-year sentence for multiple charges, including attempted murder, resisting/deterring an officer with threat of violence, assault with a deadly weapon, battery on a peace officer, and removal of a firearm from a peace officer.  He had been transferred to RJD on November 26, 2017.  The inmate incurred seven RVRs during his confinement, the most recent of which occurred on October 14, 2021 for possession of a controlled substance.  There was no documentation of any gang affiliation.  The inmate was divorced and did not have any children.  He had regular family support through visits, letter correspondence, and telephone calls, primarily with his mother and brother, although the most recent family visit occurred in October 2019.

According to available records, the inmate and two siblings were raised by their parents.  His father died in 2014 and his brother became severely disabled following a motorcycle accident in 2020.  The inmate did not appear to have any contact with his other sibling, a sister.  Of note, some records indicated that the inmate also had a half-brother who murdered his wife and then committed suicide, with the date unknown.  He reported a good relationship with his family, despite reporting a history of sexual abuse, primarily by a babysitter, a member of his church, and a Boy Scout leader.  The inmate had difficulty in school at an early age, and exhibited both hyperactivity and difficulty with concentration.  He was later diagnosed with ADHD and briefly prescribed medication.  By age 12, the inmate began getting into trouble at school fueled by his consumption of both alcohol and marijuana.  By age 15, he began using methamphetamine on a daily basis.  It was during this time that the inmate became to be involved in the juvenile justice system, with his first arrest for breaking and entering and receiving stolen property.  He spent time in both the residential treatment facilities and juvenile hall.  The inmate spent the majority of the adult life being incarcerated, including seven prior CDCR terms beginning in 1988 at the age of 22.  He did receive his GED in CDCR.  Due to his long periods of incarceration, he had a

very short history of employment. Apart from a diagnosis of ADHD, the inmate did not have any additional mental health treatment in the community.

Upon re-entry into CDCR for his eighth term in October 2011, the inmate did not meet the criteria for the MHSDS and did not report any mental health symptoms until May 2014 when he was admitted into the 3CMS LOC after reporting depression and difficulty with concentration at school. He was initially diagnosed with mood disorder, not otherwise specified (NOS), with a rule-out for PTSD. In February 2017, his diagnosis was changed to major depressive disorder and ADHD. He was prescribed a variety of psychotropic medication, but often refused. Medication was discontinued was in 2019. In 2020, the inmate appeared to experience increased anxiety, depression, and frustration, most of which was attributable to custodial factors, the length of the sentence, and ongoing medical issues which included chronic left shoulder pain, orthopedic pain, and skin cancer. In August 2021, the inmate met with his PC regarding struggling with the anniversary of his brother's motorcycle accident. During the session, he began to process past trauma from his sexual abuse history. At this time, his PC suggested he may benefit from weekly adjunctive treatment in addition to routine 3CMS contacts. However, the chart review indicated that the inmate did not receive any weekly adjunctive treatment until several months later.

In October 2021, the inmate was transferred to administrative segregation following his most recent RVR for possession of a controlled substance and began to receive weekly mental health contacts. He continued to endorse both depression and anxiety. In November 2021, his diagnoses were revised to ADHD, amphetamine use disorder, major depressive disorder, and PTSD. By December 2021, the inmate began complaining about his prolonged confinement in segregation, obsession about his index offense, and perception that his medical treatment was inadequate. He continued to report high levels of depression and anxiety, both "10 out of 10."

The inmate did not have a history of suicidal behavior, and although he expressed a few instances of SI during CDCR confinement in 2014, 2017 and 2018, his level of acute risk was consistently rated as low and he was never placed in a higher level of care. His most recent SRASHE was completed in January 2018, and resulted in a finding of chronic high risk and low acute risk for suicide.

On December 28, 2021, the inmate submitted a CDCR Form 7362 to both medical and mental health stating that "Okay I've reached my breaking point. My stress levels are maxed out. I'm having anxiety attacks that are accompanied by psychological signs. I'm having extreme itching along with burning skin. This manifestation of my mental decline is happening on a regular basis. I need Prednisone to knock it back and I need it now." Nursing staff collected the form from the housing unit and triaged the request the following day (December 29). However, according to the CDCR reviewer this case, the form was only scanned to mental health, and the inmate never received a medical assessment regarding his medical complaints. He was seen by a mental health clinician on January 5, 2022 and expressed feeling very stressed, worried, and distressed. The inmate was referred to a psychiatrist, but he refused a confidential session on January 10 and declined the need for psychotropic medication during a cell front interaction.

On January 20, 2022, the inmate met with his PC for a routine contact.  The session was held cell front due to "modified programming."  According to the progress note, the inmate made statements such as "No end in sight.  Angry, anxious, depressed.  Everyone else (related to his case) is long gone and I'm still here."  The clinician documented that the inmate "denied suicidal ideation, although he presents with increasing depressive symptoms.  In addition, his speech was rapid, pressured, and loud, and his mood appeared irritated, angry, anxious, and depressed. He continued to report elevated levels of the stress related to his extended administrative segregation placement."  The PC concluded the progress note by stating "IP will remain in CCCMS LOC at this time as he did not present in acute distress, crisis, or is decompensating."

Several hours later on January 20, the inmate met cell front with a practicum student for adjunctive treatment.  When asked how he was feeling, the inmate responded, "I've been better" and endorsed SI.  When asked more about his suicidal thinking, he stated "Yes, everyday it comes and goes!"  The practicum student also wrote in the progress note that:

> IP presented as frustrated with still being in AdSeg and not being able to help his mother.  He reported feeling frustrated with medical staff, as he stated, 'I was trying to call one of the nurses over and she straight up fuc…. ignored me!'  He stated that he's been in the same mood for weeks now and reported that nothing has changed.  IP stated he has been frustrated due to his eczema flaring up when he is stressed.  IP was asked to rate his current anxiety and stated he was at a '10.'  When asked about SI he stated, 'Yeah every freaking day!'  IP reported fleeting SI but denied a plan and intent.  IP was unable to cultivate goals for future sessions and stated, 'What does it matter anyway?  I'm always going to be depressed.  He also stated that he does not want help at the door and that there is no point in talking too much.'

The progress note again reiterated that the inmate denied current thoughts, intent, and plan to harm himself.  The inmate simply stated: "I don't need help for anything.  If I have a crisis, I'm not going to tell anyone.  Just going to deal with it on my own."

The medical chart indicated that the practicum student consulted with the inmate's PC after the cell front interaction, with the note indicating that the PC stated, "IP has had increasing frustration gradually, and that his biggest protective factor is his mother" and "there are no immediate concerns about the IP."  As noted by the CDCR reviewer in the case, "the inmate was not removed from his cell for a thorough evaluation for a higher level of care, there was no emergent referral generated, and no SRASHE was completed.  The clinical supervisor co-signed this note later that same day. This contact was the inmate's last contact with mental health" before his suicide less than two days later on January 22, 2022.

When interviewed by the CDCR reviewer following the inmate's death, the PC was asked why a SRASHE was not completed on January 20, and responded that "there was nothing else that could've been done.  He had no plan or intent, and he had negative thoughts in general, so it did not appear clinically indicated."  The PC also stated that assessing the inmate after he had talked with the practicum student would not have resulted in anything different, and that the inmate had already been seen twice that day.

According to the CDCR reviewer in this case, although the inmate "did not explicitly verbalize to staff a clear intent to kill himself or a specific plan to end his life, in the weeks leading up to his suicide, the inmate began to cry out for help. He rated his depression and anxiety as a 10 out of 10 and he wrote many self-referrals to medical and mental health staff. In the weeks leading up to his suicide he presented with imminent warning signs of suicide including purposelessness, anxiety, feeling trapped, hopelessness, withdrawal, agitation, and mood lability. He expressed frustrations with his medical treatment and refused to consent to psychotropic medications…. Two days prior to the suicide he specified that he was struggling with SIs every day. Overall, the inmate's suicide appears to be the result of an accumulation of stressors outlined above. Additionally, there appeared to have been missed opportunities to better address the inmate's decompensation."

The Suicide Report contained 17 recommendations for corrective action through a QIP:

1) On August 26, 2021, the inmate's MHPC documented he would benefit from weekly adjunctive treatment, in addition to routine contact at CCCMS, to process past trauma. However, those services were not provided while patient was still in ML CCCMS between August 26, 2021 and October 14, 2021. Subsequently, while the inmate was seen weekly by a clinician while in ASU, the proposed adjunctive services were not provided until November 18, 2021 and were focused on anger management only. This concern involves multiple clinical issues, but is separated into parts A and B. A: It is unclear why there was a gap in time in which the recommended services were not provided. B: There was no documented rationale for not considering the inmate for a higher level of care, if the clinician believed the inmate required weekly services.

2) Multiple concerns were found with the MH Master Treatment Plan dated November 2, 2021. Please see *Conclusion Section* for further detail.

3) There are multiple clinical concerns regarding the inmate's increased symptomology following his placement in ASU on October 14, 2021. Please see *Conclusion Section* for further detail.

4) *The incident that occurred on this date involves multiple supervisory concerns*: On January 20, 2022, the inmate expressed suicidal ideation (although denied plan/intent). He was never removed from the cell for a thorough evaluation for a referral to a higher level of care, was no emergent referral generated, in no SRASHE was completed. It is unclear why the supervisors, while aware, did not ensure these items were completed. These items are in violation of statewide suicide prevention policies and trainings.

5) The inmate was seen at cell front on January 20, 2022 as result of a misinterpretation of the COVID guidelines. Not affording inmates an opportunity for confidential clinical contacts is inconsistent with multiple statewide

memorandums and procedures at this time.  It is unclear why there was a departure from statewide guidelines.

6) On December 28, 2021, the inmate submitted a CDCR Form 7362 to both medical and mental health.  He wrote 'Okay I've reached my breaking point.  My stress levels are maxed out.  I'm having anxiety attacks that are accompanied by psychological science.  I'm having extreme itching along with burning skin.  This manifestation of my mental decline is happening on a regular basis.  I need Prednisone to knock it back and I need it now.'  Nursing staff collected the form from the unit and the RN triaged the 7362 on December 29, 2021 for medical and mental health.  It appeared that the form was only scanned to mental health, but not with nursing thus there was no appointment scheduled for the RN to face-to-face and the patient was not seen for the complaint of skin itching and burning. The following day, a mental health supervisor triaged the referral as a MHPC routine consult and the inmate was seen on January 5, 2022.  It is unclear why a more urgent consult was not considered.

7) During the review, it was noted custody staff failed to respond to the incident location in a timely manner.

8) During the review, the CDCR 837s did not identify whether or not responding staff utilized Personal Protective Equipment during the incident.

9) During the review, it was noted responding custody staff did not identify whether a riot helmet was retrieved and donned prior to entering the cell.

10) During the review, it was noted that responding staff failed to retrieve the Cut Down Kit.  It should be noted custody staff did respond with the Cut Down Tool, however, the entire Cut Down Kit shall be transported to the incident location by custody staff.

11) During the review, it was noted responding custody and non-custody staff were not in compliance with the required annual suicide prevention training.

12) During the review of the CDCR 114-A, Inmate Segregation Record, there were deficiencies identified noting the inmate had not been afforded the required showers at least three times per week.

13) In review of the 837 reports regarding 'CPR,' custody staff reported completing one cycle consisting of 30 chest compressions followed by one rescue breath.  Per CPR/First-Aid Refresher and Recertification Training, lay responders will provide 30 compressions followed by two rescue breaths (30:2).

14) A review of the 837 reports regarding the application of AED, custody staff utilized an ASU razor in an attempt to remove chest hairs from the inmate for the

application of the AED pads, however, custody staff were unable to utilize the AED.

15) During the review of the Emergency Medical Response details, no documentation was found whether there was an AED shock was advised not.

16) During the review of the Psychiatric Technician (PT) rounding, there was an incident of missed PT rounds on November 19, 2021 while the patient was in the ASU at RJD.

17) During the review of the Psychiatric Technician (PT) rounding, there was no weekly PT summary completed while the patient was in the ASU.

**Audit Summary**:  Adequate practices were found in PT rounding, alternative housing, and Guard One compliance.  A previous problem of privacy and confidentiality concerns during the intake screening process had been resolved.  There was improvement in the length of stay within alternative housing, however, an inappropriate rescinded MHCB order of "place IP on sheet restriction" rather than MHCB referral, was found.  There were multiple violations of suicidal MHCB patients not observed at required 15-minute intervals.  There were concerns regarding the frequency of yard and telephone calls afforded to MHCB patients.  MHCB supervisory review of discharge SRASHE and safety plans was inconsistent.  Compliance with discharge custody checks was problematic.  Compliance with annual suicide prevention training for custody, medical, and mental health personnel was problematic.

### 7)    California Institution for Women (CIW)

**Inspection**:  September 14-15, 2021 (previous suicide prevention audit was on December 11-12, 2018).  CIW housed approximately 956 inmates at the time of the on-site assessment.

**Screening/Assessment**:  Due to scheduling conflicts, the **Intake Screening** process within the R&R unit could not be observed.  Daily **PT Rounds** in the ASU were observed on September 15.  The rounds were unremarkable and two PTs were observed to be entering the Psych Tech Daily Rounds information into EHRS for each caseload inmate.

**Housing**:  CIW had a CTC with ten designated **MHCBs** previously found to be suicide-resistant. In addition, the Walker Unit, a 19-bed unlicensed MHCB unit was opened in late 2018, with all cells previously found to be suicide-resistant.  Although this reviewer was previously informed that a "special management 'walk-alone' yard" was being planned for maximum-security patients placed in the Walker Unit, funding for the project was never secured.  During the current assessment, this reviewer was informed that maximum-custody patients in need of MHCB LOC were housed in the CTC's licensed MHCB which had a "walk-alone" yard.  Of note, only eight of 29 rooms in the MHCBs (or 28 percent of both the licensed and unlicensed units) were occupied as of September 14, 2021.

The ASU for GP and 3CMS inmates contained seven retrofitted **New Intake Cells** for inmates on new intake status. Due to a low census of only nine inmates during the on-site inspection, this reviewer observed that all of the new intake cells were empty and there were no inmates on 72-hour new intake status. Of note, since the last assessment, the EOP Hub had been relocated to the PSU (due to low numbers in both units), and newly admitted EOP inmates were required to be housed in the ASU new intake cells for the initial 72 hours before being transferred to the PSU.

Finally, **Alternative Housing** cells to temporary house inmates identified as suicidal and awaiting MHCB placement were located in the TTA (Cells 103 and 104). All inmates in alternative housing were required to be observed on a 1:1 basis and were furnished with beds. Alternative housing continued to be used on a regular basis at CIW, but the length of stay was very short. From June through August 2021, there were approximately 41 inmates placed in alternative housing, with all discharged within 24 hours. Most inmates were in alternative housing for only one to three hours, with three inmates housed for approximately ten hours. There were no rescissions during this period, and all 41 inmates were subsequently placed in a MHCB. Such findings were a significant improvement from the 2018 assessment, when 31 percent of inmates were held in alternative housing for over 24 hours and had an average length of stay of 65 hours.

**Observation**: Both Suicide Precaution and Suicide Watch statuses were regularly used in both the MHCB units for patients identified as being suicidal. In addition, patients not on suicide observation status were required to be observed at 15-minute intervals. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status during a nine-hour period from 12:00 a.m. through 8:59 a.m. on August 7 for CIW 1, September 11 for CIW 2, September 14 for CIW 3, and September 15 for CIW 4. The chart review found several observation checks (between two and three per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 34 minutes in one case (CIW 3). Violations in the four cases were committed by multiple nursing staff in both MHCB units.

Finally, a review of **Guard One** data for a recent 24-hour period found a combined 99 percent compliance with required checks not exceeding 35-minute intervals in the ASU and EOP Hub/PSU.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals from March through August 2021. This reviewer's sample EHRS review of 30 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in 97 percent (29 of 30) of the cases, an increase from the previous assessment when 85 percent compliance was found.

In addition, the **Crisis Intervention Team** was initiated at CIW in January 2017. This reviewer did not have an opportunity to observe the CIT process during the on-site assessment, but was informed that the CIT was operational seven days a week from 2:00 p.m. through 10:00 p.m. A LOP for the CIT was also provided to this reviewer.

This reviewer had the opportunity to observe one **IDTT Meeting** during the on-site assessment. It was an initial IDTT meeting, therefore, the opportunity to adequately discuss safety planning was not appropriate. Overall, there was good participation from all team members, as well as an adequate case presentation.

With regard to **Out-of-Cell Time** offered to MHCB patients, this reviewer examined the 114-A forms for seven patients in both the licensed MHCB unit and unlicensed Walker Unit. The review of one patient was excluded because they had arrived in the MHCB on the day of the review. Within the licensed MHCB unit, showers and yard/dayroom were offered to two of three patients; whereas although showers and yard/dayroom appeared to be offered to Walker Unit patients, there were also notations on the 114-A forms of "no phone calls/dayroom due to PSR." Given the fact that such privileges were afforded to MHCB patients during the same time period, the withholding of such privileges in the Walker Unit was unexplained by CIW leadership.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB units, this reviewer examined the medical charts of 12 charts discharged from March through August 2021. The review found that the required SRASHEs were completed in each case, as well as the five-day follow-up assessments. In addition, the required safety plans were completed in all cases, but the quality of such plans was marginal. Subsequent discussion with the MHCB supervisor found that they were familiar with CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" (effective March 10, 2020), and that all discharge SRASHEs and safety plans were reviewed on a regular basis. However, subsequent review of a "MHCB DC SRE Reviews" form found an incorrect notation that supervisory review was unnecessary for a patient being discharged at low acute risk for suicide.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 58 cases of patients discharged from a MHCB or alternative housing placement who remained at CIW and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from March through August 2021. The review found that 93 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the vast majority (88 percent) of custody checks recommended for discontinuation after 24 hours by clinicians. In addition, 83 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the custody deficiencies were related to gaps in documentation and/or missing observation sheets.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months (March through August 2021) of SPRFIT meeting minutes found that quorums were reached in each month except April and June. The SPRFIT continued to be very active, and minutes (with attachments) reflected updated CAPs for continued suicide prevention deficiencies, as well as regular discussion regarding SRASHE review, High-Risk List, alternative housing, training, PT, the Suicide Prevention Outreach Committee (with inmate representation suspended during COVID-19), and summaries of any recent serious suicide attempts, among other issues. A SPRFIT LOP was in effect. Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. As noted above, although CIW had an LOP for the CIT, LOPs for "Inmate-Patients Receiving Bad News" and the "Suicide Risk Management Program" were not provided to the reviewer during the September 2021 assessment.

**Training**: Due to the small size of the CIW-PIP and CIW prison, this reviewer was presented with training records that combined data from both facilities. According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, only 88 percent of custody staff, only 85 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2020. Finally, as of August 2021, approximately 91 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**: CIW did not experience any inmate suicides during the review period.

**Audit Summary:** Adequate practices were found in PT rounding and Guard One compliance. Significant improvement was found in alternative housing lengths of stay. There were multiple examples of suicidal MHCB patients not observed at required 15-minute intervals. There was a discrepancy in privileges afforded to MHCB patients housed in the Walker Unit compared to those housed in the CTC. Custody compliance with discharge custody checks was low. Custody and medical staff compliance with annual suicide prevention training was low.

### 8) California Institution for Men (CIM)

**Inspection**: September 16-17, 2021 (previous suicide prevention audit was on December 13-14, 2018). CIM housed approximately 2,515 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a new admission during the **Intake Screening** process on September 17, 2021. Nurses utilized very small enclosed cubicles in the R&R unit. At this reviewer's request to ensure adequate social distancing during COVID-19, the door to the cubicle remained open, with an officer stationed well outside the area, thus ensuring both privacy and confidentiality. The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering information in the EHRS. Finally, it was

recommended that required suicide prevention placards (both English and Spanish versions) be placed inside each of the nursing station cubicles.

Daily **PT Rounds** in the ASU (Palm Unit) were observed on September 17. Although the PT appeared very personable and conversed with each caseload and non-caseload inmate, he did not ask each caseload inmate if they were currently suicidal. The rounds were otherwise unremarkable and the PT was observed to be completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**: Two units (Stations 1 and 4) of the CTC at CIM contained 34 **MHCBs**. All of the MHCB rooms had previously been found by this reviewer to be suicide-resistant following renovation in 2018. Only 24 of 34 beds (71 percent) were occupied during the current on-site assessment.

In addition, this reviewer found that the Palm Unit still contained 13 retrofitted **New Intake Cells** that were suicide-resistant. All new intake inmates were observed to be in new intake cells for the initial 72 hours.

Finally, **Alternative Housing** cells to temporarily house inmates awaiting MHCB placement were used on a regular basis, with most inmates housed in Cell 175 located in the CTC. All inmates in alternative housing were required to be observed on a 1:1 basis and furnished beds. From June through August 2021, there were 58 inmates placed in alternative housing and all were released within 24 hours. The average length of stay was 3.6 hours, with one inmate housed for approximately 19 hours. Only five percent (three cases) of the MHCB referrals were rescinded and inmates returned to their housing units. This reviewer examined the three EHRS charts of inmates discharged from alternative housing and found that the required SRASHEs and five-day clinical follow-up assessments were completed in each case.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs. In addition, patients not on suicide observation status were required to be observed at 15-minute intervals. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during a nine-hour period from 12:00 a.m. through 8:59 a.m. on June 11, 2021 for CIM 1, on July 22, 2021 for CIM 2, and on September 16, 2021 for both CIM 3 and CIM 4. The chart review found no violations in two cases (CIM 1 and CIM 3), one violation in CIM 2, and four violations in CIM 4. A notation by a PT indicated the rounds were late because of understaffing.

Finally, a review of **Guard One** data for a recent 24-hour period found 99 percent compliance in the administrative segregation (Palm) unit with required checks not exceeding 35 minutes. Such data was negated by the fact that there were two suicides in the Palm Unit in July and August 2021, and both cases involved decedents who were found in rigor mortis, suggesting that the Guard One rounds were not completed as required (i.e., officers looking into each cell).

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of March through August 2021. A sample EHRS review of 42 emergency/urgent referrals for SI/behavior found that clinical staff

subsequently completed the required SRASHEs in only 88 percent (37 of 42) of the cases.  A similar deficiency was found during the previous assessment.

In addition, the **Crisis Intervention Team** was initiated at CIM in 2018.  This reviewer did not have an opportunity to observe the CIT process during the on-site assessment, but was informed that the CIT was operational Monday through Friday from 2:00 p.m. through 10:00 p.m.  A LOP for the CIT was also provided to this reviewer.  Data indicated the CIT was activated 72 times during the six-month period of June through November 2021, or only 12 times per month.

This reviewer observed **IDTT Meetings** for eight patients on September 16-17.  Overall, although there was good treatment team representation, several of the meetings were problematic because they did not contain an adequate case presentation and suicide risk history of the patients.  For example, in one case (CIM 5), the patient was observed in full issue clothing and not on suicide observation status.  According to the daily census sheet, he had been admitted into the MHCB on August 23.  Although the team discussed his current diagnosis (major depressive disorder), psychotropic medication (he refused), and SI (he denied any), there was no discussion as to why the patient had been referred to the MHCB or any other case presentation.  It was subsequently determined that the patient had been referred to acute care.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for approximately 24 patients in MHCBs during the on-site assessment.  Of those patients, eight cases were excluded because the patients had only been in the Unit for a few days.  Of the remaining 16 patients, the 114-A form review indicated that showers and telephone calls were regularly offered.  However, although yard was offered to MHCB patients in Station 4, it was not regularly offered to those patients housed in Station 1.  Part of the problem might have been attributable to the fact that patients on maximum-security/administrative segregation status were prohibited from using the CTC yard and the only option was their transport to the yard attached to the ASU located on the other side of the facility campus.  Such an option continued to be problematic.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of nine patients discharged from the unit between July and August 2021 that remained at CIM.  The required discharge SRASHEs and five-day follow-up assessments were completed in all nine cases.  In addition, seven of the nine cases required safety plans to reduce SI, but only 71 percent (five of seven) had safety plans.  A subsequent discussion with the MHCB supervisor found that they were aware, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), of their responsibility to review all discharge SRASHEs and safety plans for patients released from the MHCB.  This reviewer's examination of the CIM Performance Report indicated that the MHCB supervisory review of 48 cases during July 1 through September 17, 2021 found 100 percent compliance for safety planning.  It was unclear from this data as to whether the supervisory review, consistent with this reviewer's examination, included SRASHEs that did not result in safety plans.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 36 cases of inmates discharged from a MHCB or alternative housing placement who remained at CIM and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from March through August 2021. The review found that only 83 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Of note, the vast majority (86 percent) of the custody checks were recommended for discontinuation by clinicians after the maximum allowable 72 hours. In addition, 92 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months (March through August 2021) of SPRFIT meeting minutes found that all required mandatory members or designees (CIM had not been allotted a correctional health services administrator position) attended each meeting. The meeting minutes consistently reported discussion of such topics as training, CIT, SRASHE completion, 7297 Discharge Custody Check forms, and the recent inmate suicides. A SPRFIT LOP was in effect. Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. Although CIM had an LOP for the CIT (dated March 2020), the LOP for the "Suicide Risk Management Program," dated July 12, 2021, was unsigned, and an updated LOP for "Inmate-Patients Receiving Bad News" based upon the April 2021 directive was not provided to the reviewer during the September 2021 assessment.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, approximately 92 percent of custody staff, 86 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2020. Finally, as of August 2021, 96 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 95 percent had completed safety plan training.

**Recent Suicides**: CIM experienced four (4) inmate suicides during the review period. In the **_first_** case (CIM 6), the inmate was found hanging from the window by a sheet in his OHU cell during the early afternoon of December 17, 2020. He had been placed in the OHU on December 1, 2020 for "acute back pain" and "inability to function on the yard." The inmate entered the CDCR system on July 6, 2012 to serve an 18-year sentence for carjacking, oral copulation, and rape. He had been transferred to CIM in October 2012. The inmate had incurred only one RVR

during his eight years of confinement, involving being under the influence of substances, on December 1, 2020, the day of his OHU placement. He was not known to be gang-affiliated, was not married, and did not have any children. The inmate had regular family support, primarily from his mother, through letter correspondence and telephone calls.

According to available records, the inmate and two brothers were primarily raised their mother. He reported that his mother was frequently absent from the home and left him alone with his older brothers, one of whom sexually abused him at the age of seven. The inmate had behavioral problems in school and never graduated high school. He also had a history of substance abuse, beginning at the age of 12. The inmate had a sporadic work history. He did not have a juvenile history, and had only one prior adult offense for assault and battery.

Upon entry into CDCR, the inmate requested SNY due to the nature of his commitment offense. He adjusted well to the prison environment, maintained numerous jobs, completed several college courses, and did not incur any RVRs until prior to his death. The inmate did not have a history of mental health treatment in the community, but was prescribed various psychotropic medications in the county jail system for a mood disorder. In addition, he did not report a history of suicidal behavior, nor did he express any SI during his CDCR confinement. Although he was initially placed at the 3CMS LOC, the inmate was removed from the MHSDS in October 2012 at his request. Approximately seven months later in July 2019, the inmate was readmitted into 3CMS with a diagnosis of adjustment disorder with depressed mood. This PC saw him every 90 days to discuss "his depression, childhood trauma, grief, and rehabilitative activities." In May 2020, when the inmate was informed that his original PC had retired, he became upset and terminated the session. Documentation regarding that session was viewed as inadequate by the CDCR reviewer in this case, as was documentation regarding the inmate's annual IDTT meeting in July 2020, with the reviewer stating that "there was no meaningful or significant clinical updates to the treatment plan regarding his symptoms or functioning during the review." The inmate was last seen by his PC on October 8, 2020, and he denied any depression, anxiety, or suicidal thoughts.

On an unknown date in early December 2020, the inmate's mother contacted CIM and left a voicemail requesting to speak with his PC about "his mental health status condition." Approximately two weeks later on December 15, 2020, an OHU clinician saw the inmate as a result of an email from a health record technician (HRT) concerning his mother's voicemail. The specific date and content of the voicemail and content were unclear, as was the reason it took almost two weeks for a clinician to make contact with the inmate. In addition, a signed ROI form was not found in the chart, but the OHU clinician apparently obtained verbal consent from the inmate to speak with his mother. According to this clinician, an attempt to contact the mother by telephone occurred twice without success.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property. The inmate had several medical issues, including back and shoulder pain, as well as arthralgia of the knee. He had submitted several health care appeals regarding his perceived inadequate medical treatment. However, the reviewer noted that "the inmate had worked diligently trying to secure an early release from CDCR. He kept himself active by participating

in various programs activities. Injuring his back may have triggered feelings of helplessness which may have been exacerbated by his long-held belief that his medical concerns were not being adequately addressed, which continued when he was placed in OHU. He reached out to mental health but was not seen" in a timely manner. The CDCR reviewer also noted that "the two-month period prior to his death was riddled with numerous stressors and while in OHU, he did not have access to his usual coping skills which may have overwhelmed him and contributed to his decision to end his life on December 17, 2020."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

1) Multiple inadequacies were identified with the treatment provided to the inmate by the new clinician who assumed his care after retirement of his previous PC.

2) On December 11, 2020, the HRT sent an email stating the inmate's mother called the institution and left a voicemail asking to speak with mental health. The HRT emailed mental health informing them of this request rather than submitting a mental health referral chrono and/or initiating a consult order in EHRS. The email was forwarded to the OHU primary clinician and supervisor on December 14, 2020. The email had minimal information regarding the content of the voicemail which would have determined the urgency of this contact.

3) The mental health clinician saw the inmate on December 15, 2020 due to receiving an email that his mother called the institution requesting the status of her son's 'mental health status condition,' and nursing also indicated he would be seen. The clinician only obtained verbal consent during this contact to speak with the inmate's mother even though no Release of Information was on file. It is unclear if the clinician needed to provide information about the inmates 'mental health status condition' to the mother during the phone call or if the intention was solely to receive information from the mother. Documentation of the intention would have indicated the requisite next step. The clinician documented he called the mother twice but no one picked up the phone. During this contact, the inmate indicated he wanted to be released from OHU and off quarantine. The clinician documented in a progress note he would follow up with medical, however, no consult order was initiated in EHRS. I n the institutional suicide report, it was indicated the clinician sent an email to various medical providers but did not receive a response.

4) On December 3, 2020, a CDCR 7362 request for mental health services was received and reviewed by the RN. It was not clear if this request was forwarded and received by mental health as there was no documentation found in EHRS to support that this request was completed. The clinician did not document during the December 15, 2020 contact that this request, which was available for review in EHRS, was reviewed or incorporated into that contact.

5) Per review of RVR dated December 1, 2020, the medical assistant reported an unlawful influence that the patient was attempting to manipulate the extension of his lower bed chrono by purposely injuring himself when the MA notified the patient of chrono expiration. This RVR is not warranted per Title 15 definition of unlawful influence and the medical assistant made an assumption that the patient was being manipulative. The patient was later seen by the provider and admitted in the OHU due to physical limitations secondary to recent acute back injury.

6) In review of the Rules Violation Report dated December 1, 2020, it was noted the Hearing Officers guilty finding was based on preponderance of evidence. Although no due process violations were identified, it appears there may have been a lack of evidence to support this guilty finding.

In the **_second_** case (CIM 7), the inmate was found hanging from the upper bunk by a sheet in his ASU cell during the evening of July 8, 2021. The inmate's body was found with a "rigid jaw," an indication that rigor mortis was present and Guard One rounds were not thoroughly completed as required. The inmate entered the CDCR system on May 21, 2013 to serve a 13-year sentence for mayhem. He had been transferred to CIM on May 15, 2021. The inmate had incurred two RVRs during his confinement, the most recent of which occurred in October 2014 for use of a controlled substance. He was known to be a gang-drop-out, had significant safety concerns, and placed in SNY and administrative segregation. The inmate was married twice and had three children. At the time of his death, he was divorced from his second wife and, based upon a prior sex offense conviction requiring no contact with minors, he was unable to have any ongoing relationship with his children. The inmate had regular family support, primarily from his mother, through letter correspondence and telephone calls. He had also recently renewed contact with his eldest adult daughter.

According to available records, the inmate and four siblings were primarily raised by their mother and stepfather. He was raised in a dysfunctional family environment, with his parents frequently moving and suffering from substance abuse. He and his mother were frequently physically abused by his stepfather. The inmate did not graduate from high school, had a sporadic employment history, and suffered from substance abuse issues. He also had a significant history of juvenile convictions, as well as a prior CDCR term from December 1999 through September 2005. He was returned to CDCR custody on four separate occasions for violating parole, and subsequently discharged in August 2009.

Upon re-entry into CDCR for his second term, the inmate reported safety concerns and initially housed in administrative segregation in various facilities, including an out-of-state contract facility. He did not have a significant history of mental health treatment in the community, but did receive psychotropic medication while confined in the Juvenile Hall system, as well as during the previous CDCR term. The inmate had been briefly admitted into the 3CMS LOC from March 2000 through October 2002 for command hallucinations to harm others. The inmate was not enrolled in the MHSDS during his current term, and he did not report a history of suicidal behavior nor did he express SI during either CDCR term.

The inmate's contact with medical and mental health staff was generally limited to screening when he was admitted into administrative segregation. For example, on May 15, 2021, the nurse completing the Initial Health Screening form asked the inmate if he had recently received any bad news, and he responded that "his grandma died this year." A mental health referral was not generated. The following day (May 16), during interaction with a PT during the ASU Screening Questionnaire process, the inmate apparently answered affirmatively to the question: "In the past 30 days, have you wished you were dead, or could go to sleep and not wake up?" A mental health referral was not generated, but subsequent review by the CDCR reviewer in this case found that the inmate's affirmative response was entered in error and the referral was not necessary.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property. The inmate had several medical issues, but none that were thought to be contributory to his death. The reviewer theorized that "the inmate's sex offender status, STG-II history, chronic substance abuse, and impulsivity, convalesced to overwhelmed his coping ability, and ultimately cause him to end his life by suicide."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

> 1) During the review, it was noted that the respondents failed to don extraction equipment prior to entering the cell in accordance with the DOM.

> 2) A review of the training records revealed two responding staff members were not up-to-date with the annual suicide prevention training. CIM executive management team has been advised of this concern, and will schedule the officers for this training.

> 3) The inmate was discovered hanging in the cell during a Guard One check. Although it was noted the prior Guard One check was in accordance with departmental policy, there was documentation in the patient health care record regarding the condition of the inmate's body upon discovery that would suggest the need for further inquiry.

> 4) During the review of the documentation, it was found that the CDCR 7362s were not triaged and processed timely after they were submitted. At 6/9/21, an RN received a 7362 requesting to see a mental health clinician due to anxiety and depression and did not document nursing actions taken. The 7362 form was completed on 6/3/21 and picked up/received by health care staff six days later (6/9/21). A 7362 form was completed on 7/1/21 and pick up/received by health care staff seven days later (7/8/21). On 7/7/21, an RN received a 7362 stating 'I have been really having bad anxiety and a hard time falling asleep at night.' The patient was scheduled for a routine mental health counselor. Face-to-face RN assessment was not completed to determine the level of risk and appropriate mental health referral timeframe. The patient had the following risk factors: history of substance use, currently in ASU, severe anxiety, and insomnia.

155

5) In reviewing ASU screening documentation, the following concerns were noted:  During ASU screening on 5/16/21, the patient responded 'yes' to question 7 (In the past 30 days, have you wished you were dead or could go to sleep and not wake up?) resulting in a positive screen result.  The patient was not referred for mental health consult.  The screen was marked 'No consult needed'; and on 5/16/21, conflicting statements were noted in the Psych Tech Progress Note and ASU Screen.  The ASU screening was marked 'yes' for the question 'wish you were dead or asleep, not wake up: yes.'  The Psych Tech Progress Note stated, 'I/P… denies any DTO/DTS or SI this time.  No mental health issues or concerns voiced.'

6) On 5/15/21, the inmate answered 'yes' the question of recently receiving bad news.  The RN did not make a referral to mental health.  Per the Department's current policy, any positive responses for bad news related questions require urgent or emergent mental health referrals.

In the **_third_** case (CIM 8), the inmate was found hanging from the lower bunk by a sheet in his ASU cell during the early morning of August 12, 2021.  Responding medical personnel "attempted to insert an oral airway but was unable to due to rigor mortis," an indication that Guard One rounds were not thoroughly completed as required.  The inmate entered the CDCR system on December 18, 2018 to serve a four-year sentence for grand theft. He had been transferred to CIM on July 10, 2021, approximately one month prior to his death. The inmate incurred seven RVRs during his confinement, the most recent of which occurred July 10, 2021 involving "behavior which could lead to violence."  He was not known to be gang- affiliated, but had recently expressed safety concerns due to a canteen debt that resulted in his placement in administrative segregation.  The inmate was never married and did not have any children.  He had family support from his mother and father whom he talked to on the telephone on a regular basis.

According to available records, the inmate was placed in foster care at three months of age due to his parents' drug addiction.  He was later adopted into a supportive family that also consisted of five siblings (he was the second youngest).  The inmate completed high school, as well as some college courses.  He had a long history of employment that was often interrupted by criminal behavior and substance abuse.  The inmate attended both inpatient and outpatient drug treatment programs in the community.  He self-reported a history of both depression and anxiety during childhood, with diagnoses of ADHD, bipolar disorder, and anxiety.  The inmate also reported several psychiatric hospitalizations, as well as psychotropic medications in the community and county jail prior to CDCR confinement.  At the time of the instant offense, which was drug-related, he had not worked and was living homeless for approximately four years.

Upon entry into CDCR, the inmate was diagnosed with dysthymia and anxiety and placed in 3CMS LOC.  The following year in April 2019, he was diagnosed at various times with either adjustment disorder, with depressed mood; adjustment disorder with mixed anxiety and depressed mood; and unspecified anxiety disorder.  During the next several months, the inmate repeatedly requested to be removed from 3CMS, as well as discontinued from his psychotropic

medication. He was subsequently removed from the MHSDS in January 2020. Following his removal, the inmate did not have any further contact with mental health providers, and any subsequent ASU mental health screenings resulted in negative responses to both mental health and suicide risk. He consistently denied any history of SI or suicidal behavior.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property. The inmate had several medical issues, but none were thought to be contributory to his death. It was theorized by the reviewer that the inmate "consistently struggled with drug abuse, debt, and anxiety. It is likely these factors, in combination with safety concerns, may have further exacerbated his anxiety including feelings of despair. These factors may have led to the inmate's decision to end his life on August 12, 2021."

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

> 1) A review of the 837 crime incident report identified the inmate was discovered hanging during a Guard One check. Although it was noted the prior Guard One check was in compliance with departmental policy, there was documentation in the 837 crime incident report regarding the condition of the inmate's body upon discovery that would suggest a need for further inquiry.

> 2) During the review of the CDCR 114-A Inmate Segregation Record for the inmate, it was noted the unit supervisor was not signing the CDCR 114-A as required by departmental memorandum dated May 5, 2015, entitled 'Weekly Supervisory Review of CDCR form 114-A, Inmate Segregation Records.'

> 3) During the review of the CDCR 114-A Inmate Segregation Record for the inmate, it was noted the inmate was not offered the minimum hours of yard each week as required by departmental memorandum dated May 5, 2015, entitled 'Weekly Supervisory Review of CDCR form 114-A, Inmate Segregation Records.'

> 4) During the review of the training it was identified one non-custody responder was out of compliance with required annual CPR/First Aid training at the time of the incident. The name of a staff member will be reported to CIM's executive management team who will schedule the training member for the required training.

The ***fourth*** case (CIM 9) was not examined because, although the suicide occurred on November 17, 2021, CDCR's Suicide Case Review process was delayed pending receipt of the autopsy report.

**Audit Summary**: Adequate practices were found in intake screening, alternative housing, and most required training. Observed PT rounds in administrative segregation were problematic, with caseload inmates not being asked if they were currently suicidal. With one exception, nursing observation of suicidal MHCB patients showed improvement from the previous

assessment. The Guard One high compliance rate in the administrative segregation was negated by the fact that two recent inmate suicides involved decedents who were both found in rigor mortis. Compliance with required completion of SRASHEs for emergent/urgent mental health referrals was problematic. IDTT meetings for MHCB patients were inconsistent because they did not all contain adequate case presentation and suicide risk history. There was inconsistent offering of yard privileges in the MHCB units, including patients on maximum-security/administrative segregation status. Both safety planning and MHCB supervisory review of safety planning was problematic. Clinician compliance with discharge custody checks was problematic.

#### 9)    Central California Women's Facility (CCWF)

**Inspection**: October 13-14, 2021 (previous suicide prevention audit was on January 10-11, 2019). CCWF housed approximately 2,278 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed both the **Intake Screening** process in the R&R Unit and the mental health diagnostic testing in the RC on October 13. The R&R nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS. The door to the nurse's office was closed, with the officer stationed outside, thus ensuring privacy and confidentiality.

With regard to the **RC Mental Health Diagnostic Testing** process, this reviewer observed two clinicians separately conducting assessments. The doors to each psychologist's office were closed and the clinicians were observed to be conducting thorough assessments. However, although the psychologists had access to (and used) the Patient Health Information Portal during the process, as well as SOMS and the county jail transfer sheet, it was a common CCWF practice during times of large volume intakes for the nurse's Initial Intake Screening and clinicians' Mental Health Diagnostic Testing to occur simultaneously. On such occasions, RC clinicians would be unable to review the nurse's completed Initial Intake Screening form because it was still in the process to be completed. Further, although (English and Spanish-version) suicide prevention placards were found in the Nurse's Office, placards were not found in the RC clinicians' offices as required by policy.

In addition, this reviewer had the opportunity to observe daily **PT Rounds** in the restrictive housing unit (Building 504) on October 14. Building 504 contained GP inmates, STRH, administrative segregation EOP, condemned unit, and alternative housing. The rounds were unremarkable and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**: CCWF had a Skilled Nursing Facility (or CTC) in Building 805 with 12 designated **MHCBs** in eight rooms. At the time of the assessment, one room (the large "observation room") continued to be offline for repair (as it was during several previous assessments). Although designated as a licensed MHCB, this room contained many protrusions (including window bars, shower hoses attached to the wall, a blind spot to the shower area, etc.) that deemed it to be non-operable. In addition, this reviewer was informed that beginning on November 1, 2021, the

entire MHCB unit would be temporarily closed for further renovation of cells, including this large observation room. According to the work plan made available to this reviewer, the renovation would include "modification of 10 cells in the B Wing of Building 805 to include epoxy flooring, anti-ligature toilets, ADA compliant anti-ligature sinks, anti-ligature handrails, modify combi-unit to anti-ligature, updated cell doors, updated security lights, updated electrical cover plates, updated fire sprinkler heads, updated cell window screens, and no-pick caulking."

In addition, the ASU (Building 504) contained five retrofitted **New Intake Cells** (127 thru 131) for inmates on new intake status. During this reviewer's tour of the unit, there were not any new intake inmates housed in unsafe, non-new intake cells. Of note, this reviewer observed construction of four additional retrofitted new intake cells during the on-site assessment.

Finally, **Alternative Housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in Building 503 (RC housing), Building 504 (in the administrative segregation section), and A-73 (a holding cell in the CTC). Alternative housing continued to be utilized on almost a daily basis at CCWF, with inmates required to be furnished beds and observed on a 1:1 basis. From July through September 2021, there were 132 inmates placed in alternative housing, with all but one inmate discharged within 24 hours. This was a significant improvement from the previous assessment when 58 percent of inmates were held over 24 hours in alternative housing. In addition, 48 percent (64 of 132) of the MHCB referrals were rescinded and inmates returned to their housing units. This reviewer examined EHRS charts for a sample of ten rescinded cases and found that the required SRASHEs were completed in each case.

**Inspection**: October 13-14, 2021 (previous suicide prevention audit was on January 10-11, 2019). CCWF housed approximately 2,278 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed both the **Intake Screening** process in the R&R Unit and the mental health diagnostic testing in the RC on October 13. The R&R nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS. The door to the nurse's office was closed, with the officer stationed outside, thus ensuring privacy and confidentiality.

With regard to the **RC Mental Health Diagnostic Testing** process, this reviewer observed two clinicians separately conducting assessments. The doors to each psychologist's office were closed and the clinicians were observed to be conducting thorough assessments. However, although the psychologists had access to (and used) the Patient Health Information Portal during the process, as well as SOMS and the county jail transfer sheet, it was a common CCWF practice during times of large volume intakes for the nurse's Initial Intake Screening and clinicians' Mental Health Diagnostic Testing to occur simultaneously. On such occasions, RC clinicians would be unable to review the nurse's completed Initial Intake Screening form because it was still in the process to be completed. Further, although (English and Spanish-version) suicide prevention placards were found in the Nurse's Office, placards were not found in the RC clinicians' offices as required by policy.

In addition, this reviewer had the opportunity to observe daily **PT Rounds** in the restrictive housing unit (Building 504) on October 14. Building 504 contained GP, STRH, administrative

segregation EOP, condemned unit, and alternative housing.  The rounds were unremarkable and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  CCWF had a Skilled Nursing Facility (or CTC) in Building 805 with 12 designated **MHCBs** in eight rooms.  At the time of the assessment, one room (the large "observation room") continued to be offline for repair (as it was during several previous assessments).  Although designated as a licensed MHCB, this room contained many protrusions (including window bars, shower hoses attached to the wall, a blind spot to the shower area, etc.) that deemed it to be non-operable.  In addition, this reviewer was informed that beginning on November 1, 2021, the entire MHCB unit would be temporarily closed for further renovation of cells, including this large observation room.  According to the work plan made available to this reviewer, the renovation would include "modification of 10 cells in the B Wing of Building 805 to include epoxy flooring, anti-ligature toilets, ADA compliant anti-ligature sinks, anti-ligature handrails, modify combi-unit to anti-ligature, updated cell doors, updated security lights, updated electrical cover plates, updated fire sprinkler heads, updated cell window screens, and no-pick caulking."

In addition, the ASU (Building 504) contained five retrofitted **New Intake Cells** (127 thru 131) for inmates on new intake status.  During this reviewer's tour of the unit, there were not any new intake inmates housed in unsafe, non-new intake cells.  Of note, this reviewer observed construction of four additional retrofitted new intake cells during the on-site assessment.

Finally, **Alternative Housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in Building 503 (RC housing), Building 504 (in the administrative segregation section), and A-73 (a holding cell in the CTC).  Alternative housing continued to be utilized on almost a daily basis at CCWF, with inmates required to be in furnished beds and observed on a 1:1 basis.  From July through September 2021, there were 132 inmates placed in alternative housing, with all but one inmate discharged within 24 hours.  This was a significant improvement from the previous assessment when 58 percent of inmates were held over 24 hours in alternative housing.  In addition, 48 percent (64 of 132) of the MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined EHRS charts for a sample of ten rescinded cases and found that the required SRASHEs were completed in each case.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, this reviewer was informed that all MHCB patients remained (at a minimum) on Suicide Prevention status because orders were not generated for regular nursing rounds.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on September 1, 2021 (for CCWF 1), September 28, 2021 (for CCWF 2), October 2, 2021 (for CCWF 3), and on October 9, 2021 (for CCWF 4).  The chart review found observation checks were in excess of required 15-minute intervals in all four cases (one violation for CCWF 1, four violations in CCWF 2, three violations in CCWF 3, and two violations in CCWF 4).  The longest gap between checks was 34 minutes in CCWF 1.  Violations in the four cases were by multiple nursing staff.

Finally, a review of **Guard One** data for a recent 24-hour period within Building 504 found 99 percent compliance with the required checks not exceeding 35 minutes. It should be noted, however, that this level of compliance was not an accurate reflection of the overall level of observation of inmates housed in Building 504. As detailed in all of this reviewer's previous assessments, Building 504 at CCWF was unique in that it housed the condemned unit containing 22 single cells. Seventeen of the cells were located within an enclosed program area on the first floor of the unit, with five cells located outside the enclosed program area. According to CCWF custody officials and staff, because condemned unit inmates had regular access to the enclosed program area outside their cells, but within the chain-link fenced area, Guard One rounds were not conducted except during the First Watch. A May 9, 2014 directive from the DAI Director entitled, "Security/Welfare Check Procedure Utilizing the Guard One System to Supersede Administrative Segregation Unit Welfare Check and Security/Custody Rounds in Specialized Housing Procedures" supported such a practice by citing the "unique design and programs" of the enclosed condemned unit. In addition, five of the condemned unit cells remained outside of the enclosed program area and adjacent to other ASU cells that were subject to Guard One surveillance. There continued to be no practical reasons why these five condemned unit cells should not be subject to Guard One surveillance.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of April through September 2021. A sample EHRS review of 44 emergent/urgent mental health referrals for SI/behavior revealed that clinical staff subsequently completed the required SRASHEs in 93 percent (41 of 44) of the cases.

In addition, the **Crisis Intervention Team** was initiated at CCWF in March 2019. This reviewer did not have an opportunity to observe the CIT process during the on-site assessment, but was informed that the CIT was operational Monday through Friday from 2:00 p.m. through 10:00 p.m., plus some weekend coverage. A LOP for the CIT was also provided to this reviewer.

Four **IDTT Meetings** were observed in the MHCB unit on October 13-14, including two patients being discharged. Although there was good representation from all required team members, the IDTT meetings were inconsistent and problematic. For example, there was inconsistent case presentation in the cases, with this reviewer having to ask the level of care and diagnoses of each patient. There was also inconsistent discussion regarding each patient's level of observation and possessions/privileges. There was no discussion regarding safety planning for one of the patients being discharged until the very end of the meeting when the MHCB supervisor interceded and asked the patient if she was familiar with her safety plan. The patient was not. A subsequent review of the patient's chart did not find any previous discussion regarding safety planning in the progress notes. Finally, there was little, if any, input solicited from, or offered by, the nurse, RT, or correctional counselor who attended the meetings.

With regard to **Out-of-Cell Time** afforded to MCHB patients, this reviewer continued to find problematic issues that remained unresolved from previous assessments. For example, MHCB patients on maximum-security/administrative segregation status, including unclassified RC patients, were prohibited from leaving their cell for yard and other program activities, including meeting in a private and confidential setting with clinicians. Yard privileges were not offered to

161

MHCB patients on maximum-security status because it required their escort to the ASU (Building 504). Although this reviewer had historically been informed during previous assessments that a "side yard" attached to the B Wing of Building 805 was being considered, or a "Restart Chair" would be installed in the multi-purpose program room of the building, such promises remained unfulfilled for these such patients. Construction on a small management yard for maximum-security MHCB patients was finally initiated in July 2021. As observed by this reviewer in October 2021, construction remained in the early stages. CDCR has revised its Suicide Prevention Activation Schedules on multiple occasions, most recently on May 31, 2022, to indicate that the small management yard would be activated on June 30, 2022.

Further, this reviewer observed that a small TTM had been installed in B Wing's multi-purpose program room subsequent to the previous assessment. This room was designed for a variety of activities, including IDTT meetings, group activities, and opportunity for telephone calls (for both medical and MHCB patients). According to several clinicians who were interviewed, although specifically intended for one-on-one clinical sessions with maximum-security patients, the TTM was rarely utilized because of the other activities cited above. As a result, this reviewer was informed that all clinical contacts with maximum-security MHCB patients either occurred cell-front or in a scenario in which the patient's door was opened, the patient was handcuffed and instructed to sit on their bed, with the clinician and officer stationed in the open doorway of the cell. Such a practice was obviously very problematic.

This reviewer examined the 114-A forms for five patients housed in the MHCB unit during the on-site assessment. In one case (CCWF 3), the patient had been housed in the MHCB unit since September 23 and, although showers were offered on a regular basis, and a telephone call was offered on October 12, had only been offered out-of-cell privileges on one occasion, with most notations inappropriately marked either "no yard due to construction" or "no group therapy/ outside recreation due to yard construction." The 114-A forms for the other four patients contained similar notations regarding the lack out-of-cell activities, and there was no explanation as to why any out-of-cell activities by the RT or other staff were not being afforded any of the maximum-security MHCB patients. In general, telephone calls were not offered and/or not documented on the 114-A forms for individual patients. Further, in another case (CCWF 5), the patient had been admitted to the MHCB a week earlier on October 8, was not on maximum-security status, and was only offered one out-of-cell group activity and telephone call by the RT during the seven-day commitment (on October 12). On other days, the patient's 114-A form simply stated, "no yard due to construction" (despite the fact that such a notation was attributable to the small management yard that would be inappropriate for non-maximum-security patients.)

As this reviewer suggested to mental health leadership at CCWF on October 14, the large "observation room" that continued to remain offline with plans to return it to a MHCB bed following the retrofit construction could easily be utilized as a program room (with a TTM) for maximum-security MHCB patients.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of ten patients discharged from the unit during August and September 2021 who remained at CCWF. The required discharge SRASHEs and five-day follow-up assessments were completed in all ten cases, with the required safety

plans completed in all but one case. The quality of the reviewed safety plans was marginal. This reviewer conversed with the MHCB supervisor who was aware, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), of their responsibility to review all discharge SRASHEs and safety plans for patients released from the MHCB. Examination of the MHCB supervisor's "MHCB SRE Audit" found that approximately 66 discharge SRASHEs were reviewed from July 6, 2021 through October 11, 2021. The vast majority of the cases received a grade of "pass" by the MHCB supervisor, who incorrectly noted that eight of the 66 cases (12 percent) involved situations in which safety plans were not developed because the patients "refused to participate." Although patient participation best ensures success of a safety plan, plans were required to be developed for all MHCB patients admitted for DTS, regardless of their degree of participation.

Finally, the process by which inmates were provided **<u>Discharge Custody Checks</u>** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 148 cases of patients discharged from a MHCB or alternative housing placement who remained at CCWF and were not transferred to the ASU (where observation at 30-minute intervals was required) from January through August 2021. The review found that 97 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, an improvement from the previous assessment. The majority (53 percent) of the custody checks were recommended by clinicians for 48 hours. In addition, 92 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of seven months (March through September 2021) of SPRFIT meeting minutes found that quorums were achieved for all of the meetings. Meetings were scheduled for 90 minutes, and meeting minutes were normally between four and eight pages in length. The meetings were otherwise unremarkable except for the fact they did not identify any of the deficiencies found in this reviewer's current assessment (RC clinicians sometimes not able to review Initial Intake Screening forms because the nursing and RC mental health screening processes were occurring simultaneously, inconsistent nursing rounds for MHCB patients on suicide observation status, lack of out-of-cell activities for MHCB patients, lack of privacy during one-on-one clinical contacts for maximum-security MHCB patients, etc.). The facility had a SPRFIT LOP.

Because CCWF is a RC, the SPRFIT was required pursuant to CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum, effective January 27, 2021, to ensure that: suicide prevention placards were displayed in designated areas (including offices of the RC

diagnostic clinicians); diagnostic clinicians were reviewing the nurses' Initial Health Screening Forms, county jail records, and other pertinent documents within EHRS and SOMS; diagnostic clinicians were requesting inmates sign ROI forms when reporting histories of prior mental health services in the community; and diagnostic clinicians complete SRASHEs when inmates present with possible current risk for suicide. SPRFIT coordinators or designees were required to collect data and assess compliance with these four expectations, as well as report such findings during monthly SPRFIT meetings. Review of SPRFIT minutes indicated that such data or other required "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was not reported as required.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. Although CCWF had a LOP (Operational Procedure, MH-019 – Crisis Intervention Team, effective August 2021) that was consistent with CCHCS's "Crisis Intervention Team Policy and Procedure," this reviewer was not presented with required LOPs for either "Inmate-Patients Receiving Bad News" or a "Suicide Risk Management Program."

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 89 percent of custody, 99 percent of medical, and 96 percent of mental health staff had received annual suicide prevention block training during the previous 12 months. Finally, as of September 2021, only 78 percent of mental health clinicians had completed the SRE mentoring program, 96 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**: CCWF did not experience any inmate suicides during the review period.

**Audit Summary**: Although both the Initial Intake Screening by nursing and Mental Health Diagnostic Testing by RC clinicians were adequate, it was a common CCWF practice during times of large volume intakes for both processes to occur simultaneously, therefore RC clinicians would be unable to review the nurse's completed Initial Intake Screening form. Suicide prevention placards (English and Spanish-version) were found in the Nurse's Office, but not in the RC clinicians' office as required by policy. There was a significant improvement in reducing the length of stay for inmates in alternative housing. Observed IDTT meetings were inconsistent and problematic. Out-of-cell time afforded to MCHB patients was very problematic and remained unresolved from previous assessments. The practice of all clinical contacts with maximum-security MHCB patients occurring cell-front or in scenarios in which the patient's door was opened, the patient was handcuffed and instructed to sit on their bed, and the clinician and officer standing in the open doorway of the cell, was very problematic. Nursing observation of suicidal MHCB patients was inconsistent. LOPs for "Inmate-Patients Receiving Bad News" or a "Suicide Risk Management Program" were not presented to the reviewer. Reviewed SPRFIT minutes indicated that data or other required "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was not reported as required.

10)    **San Quentin State Prison (SQ)**

**Inspection**:  November 25-27, 2021 (previous suicide prevention audit was on November 5-6, 2019).  SQ housed approximately 2,954 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical **Intake Screening** process in the R&R unit on both October 25 and October 26.  Two nurses were assigned to the process, and both were observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS.  The doors to both of the nurse's offices were closed during the process, thus ensuring privacy and confidentiality.

In addition, this reviewer had the opportunity to observe required daily **PT Rounds** in the ASU (Carson) on October 26.  The PT was observed to be correctly entering information from the Psych Tech Daily Rounds Form into the EHRS for all caseload inmates.  The PT also offered various handouts (sudoku puzzles, etc.), as well as books from the unit's book cart, to all caseload inmates.  However, the PT was also observed to be ignoring all other (non-caseload) inmates in the unit and only offered a quick "good morning" response to those inmates standing at the cell front. Such an observed practice was contrary to the *Program Guide* which requires PT rounds in the ASUs "to attend to the mental health needs of all inmates" (at page 12-7-5). Of note, the Carson Unit was the only unit housing administrative segregation inmates.  The facility no longer had an STRH program, and the previously practice of STRH inmates on RC status being housed in a section of the Assessment Center was discontinued subsequent to this reviewer's 2019 assessment.

Finally, this reviewer had an opportunity to observe completion of the ASU Screening Questionnaire for a newly admitted inmate (<u>SQ 1</u>) by the PT on October 26.  The screening was conducted in the privacy of the custody office, with the door closed and officers stationed in the hallway.  The PT was observed to be asking all of the questions on the form.  The inmate denied any current SI, but stated that he was a "little" nervous, hopeless, and depressed.  A routine mental health referral was generated.

**Housing**:  The facility had an inpatient bed capacity for 40 patients.  Although initially opened to serve the psychiatric needs of condemned patients at the acute and intermediate levels of care, the program was recently expanded to treat up to 16 non-condemned patients from other CDCR facilities who require acute care.  Finally, the facility could accommodate a small number of condemned patients who require a **MHCB** level of care.  All rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The administrative segregation (Carson) unit contained approximately 30 **New Intake Cells** on the first (108-122) and second (201-215) tiers.  All the new intake cells were retrofitted to be suicide-resistant.  Due to a low census, many of the new intake cells were empty and all new intake inmates were observed to be in new intake cells.

Finally, **<u>Alternative Housing</u>** to temporarily house inmates identified as suicidal and awaiting MHCB placement was found in either six licensed medical beds in the CTC (and referred to as "alternative housing flex beds"), TTA cells, or various large holding cells scattered throughout the Central Health Services Building. Alternative housing continued to be utilized several times a week (but not on a daily basis as found in the previous assessment), and inmates were required to be furnished beds and observed on a 1:1 basis. From July through September 2021, there were approximately 52 inmates placed in alternative housing and all were released within 24 hours. All but one of the MHCB referrals resulted in MHCB placement in the MHCB at SQ for condemned patients or MHCB units at other facilities. This reviewer examined the medical chart for the one rescinded case and found that the required SRASHE was completed, as well as the subsequent five-day clinical follow-up assessments.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were utilized for suicidal patients at the MHCB LOC. In addition, MHCB patients not on suicide observation status were observed on either "behavioral observation" at 30-minute intervals or regular nursing rounds at 60-minute intervals. According to both nursing staff and providers interviewed by this reviewer, "behavioral observation" at 30-minute intervals was most often utilized for patients who were no longer currently suicidal, but were being downgraded from either Suicide Watch or Suicide Precaution statuses. Review of the medical charts for the three patients at MHCB LOC during the on-site assessment found that consistent with policy, all were on "behavioral observation" status at 30-minute intervals and issued "full issue" clothing.

In addition, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status at MHCB LOC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on May 7, 2021 for <u>SQ 2</u>, on September 8, 2021 for <u>SQ 3</u>, on October 3, 2021 for <u>SQ 4</u>, and on October 24, 2021 for <u>SQ 5</u>. The chart review found multiple violations in observation checks in each case, with <u>SQ 3</u>, <u>SQ 4</u>, and <u>SQ 5</u> each having four violations that were in excess of the required 15-minute intervals, and <u>SQ 2</u> having eight violations that were in excess of the required 15-minute intervals. The longest gap between checks was 38 minutes in <u>SQ 2</u>. Violations in the four cases were committed by multiple nursing staff.

Case <u>SQ 4</u> was also noteworthy because, although the provider orders in EHRS clearly indicated that the patient would be observed at 30-minute intervals (Behavior Observation) on October 8 and October 9, 2021, the progress notes from those dates indicated that the patient's PC downgraded the level of observation from Suicide Precaution (15-minute intervals) to Behavior Observation (at 30-minute intervals) on October 8, whereas the psychiatrist stated in a progress note on October 9 that the patient should remain on Suicide Precaution status. The patient's behavior remained unchanged during both of those days. Adding to the confusion was that six nursing shift progress notes spanning October 8 and October 9 indicated that the patient was on the following levels of observation:  October 8: Q-11 at 15:48, Q-30 at 20:48, and Q-11 at 21:05; October 9: Q-30 at 02:58, Q-60 at 15:52, and Q-11 at 17:58. Finally, despite the fact that the patient's behavior remained unchanged, the actual nursing rounds were interchangeably listed as both Suicide Precaution and Behavior Observation statuses during those two days. The issue of inconsistent information and communication amongst nursing staff and providers in this case was problematic.

Finally, a review of **Guard One** data for a recent 24-hour period found 100 percent compliance with required checks that did not exceed 35-minute intervals in the administrative segregation (Carson) unit.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of April through September 2021. A sample EHRS review of 25 emergency/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in all (100 percent) cases, a considerable improvement from the previous assessment.

In addition, the **Crisis Intervention Team** was initiated at SQ in September 2019. There was only one assigned CIT clinician, therefore, the CIT was operational from Monday through Thursday from 2:00 p.m. through 10:00 p.m. Outside those hours, clinicians from the High-Risk Team (HRT) responded to crisis calls. This reviewer had an opportunity to observe an HRT clinician respond to a crisis call on October 26. The clinician met with the inmate (SQ 1), who this reviewer coincidentally observed being interviewed by the PT earlier in the day, in a private room within the TTA area. The inmate was very guarded, expressed vague SI, and was referred to an MHCB. The required SRASHE was completed.

This reviewer observed the **IDTT Meeting** for one MHCB patient on October 27. Overall, there was good treatment team representation and participation, the PC reviewed the patient's safety plan, and the patient was discharged to EOP.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the Mental Health NCAT (Non-Clinical Activity Tracking) Report forms for documentation of out-of-cell activity for 11 PIP and MHCB patients on suicide observation status during August and September 2021. The review found that yard, telephone calls, and showers were regularly offered to eight of the 11 patients or 73 percent.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 14 patients discharged from the unit between April and October 2021 that remained at SQ. The required discharge SRASHEs and five-day follow-up assessments were completed in all 14 cases, as were the required safety plans. The safety plans were found to be marginal. This reviewer was informed that MHCB supervisors were aware, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020) of their responsibility to review all discharge SRASHEs and safety plans for patients released from the MHCB. However, despite the policy becoming effective in March 2020, the supervisory review process at SQ was <u>not</u> initiated and tracked until June 2021.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody

checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 32 cases of inmates discharged from a MHCB or alternative housing placement who remained at SQ and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from May through September 2021. The review found that 100 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Of note, all 32 custody checks were recommended for discontinuation by clinicians after the maximum allowable 72 hours. In addition, 94 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Housing units toured by this reviewer contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: Both the SQ-PIP and SQ prison had an integrated SPRFIT, with one coordinator chairing the committee. A review of six months (May 2021 through October 2021) of SPRFIT meeting minutes found that quorums were not reached during the May and June 2021 meetings. Overall, the meeting minutes were robust and included summaries of active CAPs, some of which related to deficiencies previously identified by this reviewer.

Further, although this reviewer was presented with data to indicate that there were six incidents of self-injurious behavior resulting in outside hospital treatment (i.e., with a medical severity rating of "3"), from January 2021 through August 2021, there was no indication from the SPRFIT minutes that a Root Cause Analysis (RCA) was conducted in any of the cases and/or clinical review or summaries presented during SPRFIT meetings. CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum requires clinical reviews or summaries of serious suicide attempts, as well as semi-annual aggregate RCAs of serious suicide attempts presented during monthly SPRFIT minutes.

Finally, although a SPRFIT LOP, dated November 2019, was in effect, it was inadequate (encompassing less than two pages) and did not address any of the SPRFIT responsibilities contained within CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum. In addition, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. Although SQ had an LOP for the CIT (Volume 24 – Out-Patient Mental Health Services, Chapter 51, dated August 2021), as well as an LOP for the "Suicide Risk Management Program" (Volume 24, Chapter 54, dated September 2021), narrative regarding "Inmate-Patients Receiving Bad News" that was contained within Volume 24, Chapter 11 – Mental Health Referral Process" was inadequate and not consistent with the template contained within the CCHCS "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021.

**Training**: Due to the small size of the SQ-PIP, this reviewer was presented with training records that combined data from both the SQ-PIP and SQ prison. According to training records, 97

percent of custody and 100 percent of nursing staff were currently certified in CPR.  In addition, 95 percent of custody staff, 95 percent of medical staff, and 97 percent of mental health staff received annual suicide prevention block training during the previous 12 months.  Finally, as of October 2021, approximately 98 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**:  SQ experienced two (2) inmate suicides during the review period.  In the ***first*** case (SQ 6), the inmate was found hanging from the door by a sheet in his Condemned Unit cell during the very early morning of December 14, 2020.  He entered the CDCR system in May 1999 to serve a sentence of life with parole for first-degree murder with the use of a firearm, attempted first-degree murder with use of a firearm, and inflicting great bodily injury.  While serving this term, the inmate was convicted of an additional murder dating back to 1995 and was given a death sentence and admitted into SQ's Condemned Unit on August 26, 2008.  The inmate only incurred two RVRs during his 21-year confinement, both occurring in 2016.  He was not married and did not have any children.  The inmate had family support through regular visiting with his mother, stepfather, and sister until 2016 when visitation abruptly stopped.  In 2019, he deleted his mother's name as his next of kin.  There was no explanation why these changes in visitation and next of kin notifications were made.

According to available records, the inmate and two younger siblings were raised by their mother and stepfather.  There were no reports of any dysfunction or abuse within the family.  The inmate graduated high school and attended some community college.  He had periodic employment that was interrupted by substance abuse and criminal involvement.  The inmate had an extensive record of both juvenile and adult convictions, and was gang-affiliated.  He did not have a documented history of mental illness and/or suicidal behavior in the community.  In addition, during his confinement in a county jail from 2001 through 2008 while awaiting his conviction and subsequent death sentence, there was no record of the inmate receiving any mental health services.

Upon entry into CDCR in 1999, as well as when he re-entered the system in August 2008, the inmate screened negative for any mental health and suicide risk factors, and was not included in the MHSDS.  He had minimal contact with mental health staff while in the Condemned Unit, never submitted any Health Care Request forms to mental health, and never voiced any concerns during regular PT rounds.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  A suicide note was not found in his property.  In addition, the inmate did not have any significant medical issues that were thought to be contributory to his death.  The reviewer indicated that "it is difficult to discern what the inmate was thinking when he made the decision to end his life, especially as he was such a private individual who almost never shared his feelings with others, nor journaled about them."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

1) A review of the training records revealed a responding staff member was not up-to-date with the annual Suicide Prevention training. San Quentin Hiring Authority has been advised of this concern, and has remedied the issue. Completed training records have been provided for the staff member.

In the ***second*** case (SQ 7), the inmate was found hanging from the door by a sheet in his Condemned (North Segregation) Unit cell during the late evening of January 23, 2021. He entered the CDCR system through SQ's Condemned Unit in August 2000 to serve a death sentence for multiple counts of first-degree murder, first-degree burglary, second-degree robbery, and receiving stolen property. The inmate incurred only one RVR during his 21-year confinement that involved flooding the tier in 2001. He had very good family support demonstrated by frequent telephone calls and family visits, including a visit with his daughter a few weeks prior to his death.

According to available records, the inmate was born into an alcoholic and dysfunctional family. He had two other siblings. The inmate began experiencing behavioral problems at an early age, as well as physical and emotional abuse from his parents. In addition, after receiving treatment for his behavior problems, the inmate was sexually abused by a mental health clinician. He also had an extensive history of substance abuse that began in grammar school. The inmate completed the 11th grade and subsequently obtained his GED. His employment history was interrupted by the lengthy history of both juvenile and criminal behavior.

Upon entry into CDCR in August 2000, the inmate screened negative for any mental health and suicide risk factors, and was not initially included in the MHSDS. However, he submitted a Health Care Services Request form in April 2007 that complained about sleeping problems and mild panic attacks. A few weeks later on May 10, 2007, the inmate cut both of his forearms. He was assessed by a mental health clinician and stated that the incident was not a suicide attempt but "cut self impulsively in frustration as being sleepless. Now regrets his action. No h/o (history of) suicidality." He was subsequently placed in the MHSDS at the 3CMS LOC. However, the inmate refused all mental health appointments during the next 18 months, reporting that he was feeling well with no mental health symptoms. He was removed from the MHSDS in October 2008.

Over the years, the inmate received a number of routine "wellness checks" by mental health staff. During all of these interventions, he denied any mental health symptoms or need to be readmitted into the MHSDS. However, the inmate's last interaction with mental health staff occurred on January 22, 2021, the day before his suicide, based upon his complaint about insomnia. Although originally classified as routine, the referral was upgraded to urgent after being triaged by the High-Risk Team (HRT) supervisor who found that the inmate had gone "man down" the previous day following a complaint of a "fast heart rate...endorsing on-going anxiety." He was seen by a clinician whose subsequent progress note stated: "IP reports numerous/recent sleepless nights, and presents today with depressed mood. 'The last time I felt like this was 2007, and I ended up – making a cutting wrist gesture.' IP denies current SI/plan/intent." The inmate was referred to the unit psychiatrist for further assessment of the need to place him back into the MHSDS, and the clinician also wrote an email to the HRT Supervisor and psychiatrist which repeated the inmate's statement of "the last time I felt like this

was 2007, and I ended up – making a cutting wrist gesture." The clinician also (incorrectly) added in the email that "This SA does not seem to reflect in his record. Credibly denies SI (suicidal ideation) plan/intent in the moment." Of note, the clinician apparently viewed the inmate's self-reporting of the May 2007 incident of SIB as not credible because they could not find it referenced in his medical chart, but found that he credibly denied any current SI.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property. In addition, the inmate had several medical conditions that included diabetes, degenerative joint disease, hyperlipidemia, hypertension, lower left quadrant pain, ocular hypertension, and pulmonary nodes. The reviewer concluded that the inmate's decision to commit suicide was probably "related to anxiety or concerns for his health, feelings of helplessness and hopelessness, concern for his family, and impaired judgment due to prolonged sleep deprivation."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

1) During review of the CDCR 114-A Inmate Segregation Record for the inmate, it was noted there were identified concerns regarding the documentation of the CDCR 114-A as required by Departmental Memorandum dated May 5, 2015, titled 'Weekly Supervisory Review of CDCR Form 114-A Inmate Segregation Records.'

**Audit Summary**: Adequate practices were found in many areas, including intake screening, alternative housing, Guard One compliance, and required training. Apart from this reviewer's observation of the PT ignoring all other (non-caseload) inmates in the ASU during morning rounds, problematic nursing observation of suicidal MHCB patients, lack of clinical reviews or RCAs contained within monthly SPRFIT minutes, and inadequate LOPs for both the SPRFIT and "Inmate-Patients Receiving Bad News," SQ was found to have made significant improvements from the previous assessment.

## 11)    California State Prison-Solano (CSP/Solano)

**Inspection**: October 28-29, 2021 (previous suicide prevention audit was on February 21-22, 2019). CSP/Solano housed approximately 3,301 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed two new admissions during the **Intake Screening** process in the R&R unit on October 28, 2021. The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS. The door to the nurse's offices was partially closed during the first screening and completely closed during the second screening.

In addition, this reviewer observed daily **PT Rounds** in administrative segregation (Building 10) on October 28, 2021. The rounds were unremarkable and the PT was observed to be correctly

entering Psych Tech Daily Rounds information into the EHRS for the approximately six 3CMS inmates confined to the unit.

**Housing**:  CSP/Solano had nine **MHCBs** that had previously been found to be suicide-resistant. There were approximately four patients in the MHCB unit during the on-site assessment.

The ASU (Building 10) contained a total of ten retrofitted **New Intake Cells**, including an additional cell renovated since the previous assessment.  This reviewer observed that all new intake inmates were housed in new intake cells as required.

Finally, **Alternative Housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement was primarily found in Building 10 or the TTA and continued to be used very infrequently at the facility.  In fact, from July 27, 2021 through October 27, 2021, only five inmates were reported to be placed in alternative housing, with one additional case found by this reviewer.  All six inmates were furnished beds and required to be observed on a 1:1 basis, discharged from alternative housing well under 24 hours, and all were referred to an MHCB.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on a suicide observation status were observed at 30-minute intervals by nursing staff under the term "Mental Health Observation."  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on May 21, 2021 for SOL 1, on July 21, 2021 for SOL 2, on September 7, 2021 for SOL 3, and October 27, 2021 for SOL 4.  The chart review found multiple violations in observation checks in three cases, with SOL 2 and SOL 3 each having two violations that were in excess of the required 15-minute intervals, and SOL 4 having five violations that were in excess of the required 15-minute intervals.  The longest gap between checks was 30 minutes in SOL 4. Violations in these three cases were committed by multiple nursing staff.

Case SOL 1 was noteworthy because, although only one violation was noted on May 21, 2021, nursing rounds were documented at exact 15-minute intervals for the three-hour period of 6:00 a.m. to 9:00 a.m.  Case SOL 2 was also noteworthy because all nursing rounds during the nine-hour period were documented at exact ten-minute intervals.  Such practices were contrary to the policy that required patients on Suicide Precaution status be observed at staggered intervals that did not exceed 15 minutes.  Finally, case SOL 4 was noteworthy not only because of multiple violations, but nursing rounds were also documented that exact 15-minute intervals.  A nursing note within the EHRS observation template noted "late documentation. IP Q-15 not Q-30," an indication that certain nursing staff were unaware that the patient was on Suicide Precaution status.

Finally, a review of **Guard One** data for a recent 24-hour period in administrative segregation found approximately 99 percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of April 2021 through September

172

2021.  A sample EHRS review of 22 emergent/urgent referrals for SI/behavior found that clinical staff completed required SRASHEs in 91 percent (20 of 22) of the cases.

In addition, CSP/Solano did not have a **Crisis Intervention Team** and any emergent or crisis mental health referrals were responded to by clinicians assigned to individual housing units.

Two **IDTT Meetings** were observed on October 28 and 29.  Overall, although there was good treatment team representation, the meetings were problematic for several reasons.  In the first case (SOL 4), although the PC had placed an order into EHRS that the patient would be placed in "partial issue" clothing with boxers and a t-shirt the previous day (October 27), the patient arrived for to the IDTT meeting clothed in a safety smock.  It was subsequently determined that miscommunication existed between the clinician and custody staff regarding the patient's clothing order.  In addition, although the patient was generally indifferent during the meeting, the case presentation by the PC was disjointed, with little discussion regarding suicide risk factors, and no discussion regarding safety planning.  Further, there was little, if any, input solicited from, or offered by, the nurse, RT, or correctional counselor who attended the meeting.  In the second case, a different PC offered a better case presentation, and a different correctional counselor provided more input during the meeting.  The nurse and RT remained virtually silent during the meeting.  In both cases, it appeared that the psychiatrists were unfamiliar with the patients, which was primarily related to the fact that a psychiatrist was not regularly assigned to the MHCB unit.

Further, Adaptive Support Forms (CDCR 128 C-2), which normally summarize provider orders for level of observation, patient issue, and privileges, and are routinely placed outside patients' door while they are on suicide observation status, were found on each door of the four MHCB patients.  However, perhaps explaining the lack of communication in SOL 4 case, the forms had not been updated on a daily basis and did not contain the level of observation for each patient.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for the four patients who were housed in MHCB unit during the on-site assessment.  The review found that, although most of the patients had only been in the unit for a few days, all were offered yard, showers, and telephone calls on a regular basis.  Of note, the MHCB unit did not have a program office and, although an "activity treatment center" was listed in records, the term euphemistically referred to the TTM located in the corridor.  Because there was no television or DVD player to play movies or a radio to play music, RT programming inside the unit was limited to board games either cell-side or in the TTM.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 13 patients discharged from the unit between April and September 2021, had been admitted into the MHCB for DTS, and remained at CSP/Solano.  The required discharge SRASHEs and five-day follow-up assessments were completed in all 13 cases, with safety plans to reduce SI developed in all but one case.  The reviewed safety plans were marginal.  A subsequent discussion with the CMH found that they were aware, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020) of their responsibility to review all discharge SRASHEs and safety plans for patients released from the MHCB.

When data regarding the MHCB supervisory review of these 13 cases was requested, the initial response yielded data for only four cases. A second response yielded data for approximately 40 cases from the same time period. This discrepancy (between four and 40 cases) could not be explained by mental health leadership at CSP/Solano. In addition, the MHCB supervisory review of the 40 cases incorrectly stated that 12 of 40 (30 percent) cases involved situations in which safety plans were not developed because the patients "refused to cooperate" or their acute risk for suicide was low. Although patient participation best ensures success of a safety plan, plans were required to be developed for all MHCB patients admitted for DTS, regardless of their degree of participation or suicide risk level at discharge.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was initially presented with documentation indicating there were only four cases of inmates discharged from a MHCB or alternative housing placement who remained at CSP/Solano and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from April through September 2021. The two-page (CDCR MH-7497) forms were missing in one case. This reviewer then requested that the search criteria be expanded to October 2020 to September 2021. That request resulted in the identification of four additional cases, only one of which was duplicative of the original request. In addition, this reviewer found at least three additional cases during the on-site EHRS chart review that required the two-page (CDCR MH-7497) forms to be included. In sum, there were at least 11 cases of inmates discharged from a MHCB or alternative housing placement who remained at CSP/Solano and were not transferred to administrative segregation from October 2020 through September 2021.

The review found that the required the two-page (CDCR MH-7497) forms were not found in eight of the 11 cases. As such, the review found that only 27 percent (three of 11 cases) had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the low completion percentage attributable to lost forms. Custody check forms in the three completed cases recommended custody checks for 48 hours by clinicians. In addition, only 11 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems attributed to lost forms and checks documented in excess of 30-minute intervals. In conclusion, the Discharge Custody Check Sheet (CDCR MH-7497) form process was very problematic at CSP/Solano.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**:  A review of six months (April through September 2021) of SPRFIT meeting minutes found that a quorum was achieved in only two (August and September) of the meetings.  The meeting minutes were brief and unremarkable.  In addition, the facility had a SPRFIT LOP contained within Volume 20 - Out-Patient Mental Health Services, Chapter 7 - Suicide Prevention Program, dated October 2021.  The LOP was consistent within CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021.  Although CSP/Solano had a LOP (Volume 20 - Out-Patient Mental Health Services, Chapter 7 - Suicide Prevention Program, dated October 2021) that contained a few paragraphs of narrative regarding inmates receiving "bad news," that narrative was inadequate and not consistent with the template contained within the CCHCS "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021.  Because the facility did not have a CIT program, CCHCS's "Crisis Intervention Team Policy and Procedure," effective July 8, 2021, was not applicable.  Finally, the facility had an LOP for their "Suicide Risk Management Program" (Volume 20 - Out-Patient Mental Health Services, Chapter 7 - Suicide Prevention Program, dated October 2021) that was consistent with CCHCS's "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021.

**Training**:  According to training records, 100 percent of both custody and nursing staff were certified in CPR.  In addition, approximately 99 percent of custody staff, 100 percent of medical staff, and 96 percent of mental health staff received annual suicide prevention block training during the previous 12 months.  Finally, as of October 2021, 93 percent of mental health clinicians had completed the SRE mentoring program, only 81 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**:  CSP/Solano did not experience any inmate suicides during the review period.

**Audit Summary**:  Adequate practices found in intake screening, PT rounding, Guard One compliance, and most required training.  Various deficiencies requiring corrective action were noted during the on-site assessment, including problematic IDTT meetings for MHCB patients, problematic nursing rounds for MHCB patients on suicide observation status, the process for MHCB supervisory review of safety planning, low compliance rates and lost data regarding discharge custody check forms, and inconsistent quorums during monthly SPRFIT meetings.


### 12)    North Kern State Prison (NKSP)

**Inspection**:  November 15-16, 2021 (previous suicide prevention audit was on October 29-30, 2019).  NKSP housed approximately 3,638 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the **Intake Screening** process in the R&R Unit on November 15, 2021.  Due to a current HCFIP "Reception Center Health Care Processing Renovation" project, intake screening had been temporarily relocated to three separate nursing stations in the building.  The HCFIP renovation project was tentatively scheduled to be completed by June 2022.  This reviewer found very problematic practices in each of these three nursing stations that are summarized as follows.

Station 1 was an L-shaped room in the back right-hand corner of the building.  There were several desks in the room, and this reviewer was informed that it was possible for up to two inmates to be screened in the room at the same time.  One of the desks was situated in the back corner of the room, with no line-of-sight to the outer door.  There were no custody officers situated in the area of the outer door and, even if posted outside the door, an officer would not have any visibility to the second desk.  A mirror situated in the corner of the room provided no assistance in visibility because it was directed toward the outer door, not to the nurse's desk.  A cloth partition was situated on one side of the inmate's chair, also obstructing visibility.  The purpose of this partition was unclear.  In addition, a noise-canceling machine in the room was of little use in providing privacy and/or confidentiality.

Station 2 was located in a converted holding cell (No. 17) on the opposite side of the building.  The cell contained two desks, one chair for an inmate, and two TTMs.  This reviewer was informed that only one inmate was screened at a time.  In the intake screening observed by this reviewer, the inmate was handcuffed and situated in a chair, with an officer standing behind the inmate.  Following the screening, this reviewer interviewed the nurse and asked whether it was common practice for an officer to remain in the cell during the intake screening process.  The nurse responded that an officer only remained in the cell when nursing staff were screening a maximum-security inmate.  The nurse also stated that custody officers did not consistently provide security presence outside of the cell when non-maximum-security inmates were screened.  When asked if the TTMs were ever utilized by nursing staff for the screening of maximum-security inmates, the nurse responded – "No" – TTMs were only utilized by mental health clinicians when they responded to the R&R unit for an emergency consultation.  It remained unclear why these TTMs could not be utilized by nursing staff and thus provide both privacy and confidentiality while custody officers remained outside the holding cell.

Station 3, commonly referred to by staff as either the "shack" or "hut," was located outside the back of building in the sally port area.  This structure resembled a residential shed and had been operational for approximately one week.  The room contained a desk and two chairs.  During an intake screening observed by this reviewer, the door to the structure was open and no custody officers were in the area.  Following the screening, this reviewer asked the nurse if they felt comfortable being alone without any custody officers.  The nurse responded by stating she had already informed her supervisors that she would refuse to conduct any intake screening in this area when it was dark outside.

Finally, this reviewer observed multiple screenings by three nurses in each of the nursing stations on November 15.  Each nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entered the information into the EHRS.  Each nurse also informed this reviewer that there were concerns about their safety when custody personnel were not

consistently posted in these station areas. Of note, required English and Spanish versions of the suicide prevention placard were not found in any of the three nursing stations. The above problematic findings regarding privacy, confidentiality, and staff safety were subsequently presented to both nursing and custody leadership by this reviewer.

In addition, this reviewer observed the **RC Mental Health Diagnostic Testing** process on November 16. Due to the above cited HCFIP renovation project, RC clinicians were temporarily housed in offices within several RC housing units. The screening process by three RC clinicians were observed in B-4, D-1, and D-2 buildings. Both English and Spanish versions of the suicide prevention placard were observed in each RC clinician's office, as well as the dayrooms of each RC housing unit as required. The door to each RC diagnostic clinician's offices were closed and both clinicians were observed to be conducting thorough assessments during each observed screening. Although each clinician was observed to have access to (and used) the Patient Health Information Portal during the process, and each clinician confirmed that they had access to SOMS and the county jail transfer sheet, as well as reviewed the nurse's Initial Health Screening form prior to each assessment, there were concerns observed by one clinician. In the observed case (NKSP 1), the clinician completed both the "MH Screening Interview Form" and "MHPC Consult Routine Progress Note." Subsequent review of the progress note indicated that although the clinician wrote that "The Databases and/or sources of information reviewed included: County records (to date, no records were scanned into EHRS), SOMS, ERMS, EHRS documentation (Initial Health Care screening, additional MH documentation as available), and staff observation unless otherwise noted. The I/P did not report outside treatment history. A ROI was not completed." This information was not entirely accurate. The inmate's county jail records had been scanned into the EHRS prior to the RC clinician's mental health screening and thus were available for review. In addition, the inmate had reported previous mental health treatment through the Veterans Administration that had been noted by the clinician on the MH Screening Interview form. An ROI form should have been completed as required. This reviewer found other case examples in which this clinician wrote boilerplate narrative into progress notes suggesting "no records were scanned into EHRS" despite the fact that county jail records had been previously scanned into the EHRS.

Finally, daily **PT Rounds** in the ASU were observed on November 15. The rounds were unremarkable and the PT correctly entered the Psych Tech Daily Rounds information into the EHRS for each caseload inmate. The PT was observed to be equally conversing with both caseload and non-caseload inmates on the unit.

**Housing**: NKSP had a 16-bed CTC, with ten designated **MHCBs** that were previously found to be suicide-resistant.

The ASU (D-6) contained 11 retrofitted **New Intake Cells**. This reviewer observed that the unit had a low census and all new intake inmates were housed in new intake cells as required.

Finally, **Alternative Housing** cells continued to be designated in A-4 unit to temporarily house suicidal patients prior to transfer to a MHCB, although some were occasionally held in the ASU (D-6). All inmates were required to be observed on a 1:1 basis and bunks were found in each cell. This reviewer initially received the list of eight inmates who were in alternative housing

from August through October 2021. The MHCB referrals for six of these inmates were subsequently rescinded and they were returned to their housing units. All six cases had SRASHEs completed to justify the decisions.

This reviewer also received a second list, containing approximately 40 inmates who were listed as being in alternative housing for the same time period (August through October 2021). Review of this second list, as well as discussion with the SPRFIT coordinator, indicated that there were approximately 40 additional inmates referred to the MHCB who were temporarily housed in either holding cells or TTMs in various housing units at NKSP. All of these 40 inmates were subsequently transported to the MHCB. The length of stay in the holding cells or TTMs was generally less than two hours. However, there were a few cases in which inmates were held in holding cells or TTMs in excess of two hours and their required continuous observation was not documented in either EHRS or custody logs (see, for example, NKSP 2, in which the inmate was held in a TTM for approximately eight hours with no documentation available that they were on continuous observation.)

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB. In fact, all patients were minimally on Suicide Precaution status throughout their MHCB placement. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB during a nine-hour period from 12:00 a.m. through 8:59 a.m. on July 16, 2011 for NKSP 3, on September 9, 2021 for NKSP 4, October 11, 2021 for NKSP 5, and November 15, 2021 for NKSP 6. The chart review found only a few observation checks were in excess of required 15-minute intervals. Both NKSP 5 and NKSP 6 each had two violations, NKSP 4 had two violations, and NKSP 3 had no violations. The longest gap between checks being 27 minutes in NKSP 6. There were similar findings during the previous assessment.

Of note, during the exit meeting with NKSP leadership on November 16, this reviewer noted that all patients remained on Suicide Precaution status throughout their MHCB placement regardless of suicidality. Following that meeting, this reviewer examined several medical charts of MHCB patients and found contradictory observation orders by psychology and psychiatry within the MHCB. For example, for the two patients (NKSP 7 and NKSP 8) observed during their respective IDTT meetings on November 15, see below, the PC wrote in a progress note three days later on November 18 that "IP is on full issue and Q-30 as a step-down," whereas the psychiatrist wrote in a progress note on November 18 "Suicide Precaution with partial issue."

Finally, a review of **Guard One** data for a recent 24-hour period found 99 percent compliance with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a list of emergent/urgent mental health referrals for the period of April through October 2021. A sample EHRS review of 43 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in only 86 percent (37 of 43) of the cases. Of note, all of the referrals for SI/behavior that did not result in completion of SRASHEs were mislabeled as "urgent referrals." A similarly low level of compliance was found during the previous assessment.

In addition, the **Crisis Intervention Team** was launched at NKSP in February 2019 and said to be available for activation seven days a week during Third Watch (2:00 p.m. to 10:00 p.m.). although this reviewer did not observe any CIT referrals during the on-site assessment, a review of numerous medical charts indicated that nursing staff <u>never</u> participated in any CIT responses. The problem of non-compliance by nursing staff had occurred at least since April 2021, the start date of this reviewer's data request timeframe.  Although both mental health and nursing leadership were said to be aware of this problem and working toward a solution, there was no documentation provided to this reviewer confirming either awareness or corrective action.

Two **IDTT Meetings** were observed on November 15.  All required team members were present and participated in each case.  The psychiatrist was noted to provide a good summary of each patient's diagnoses and psychotropic medications.  There was, however, uneven case presentations in the two cases by the PCs, somewhat impacted by the stability and cooperativeness of each patient.  In the first case (<u>NKSP 7</u>), the patient was quite unstable, and their behavior seemed to negatively impact the clinician's case presentation, review of treatment history, behavior that precipitated the MHCB placement, as well as discussion of level of observation and possessions/privileges in the unit.  In the second case (<u>NKSP 8</u>), the patient was relatively stable, and the PC was able to present an adequate case presentation, review of treatment history, and behavior that behavior that precipitated the MHCB placement.  The PC also encouraged input from other team members.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for the eight patients who were housed in MHCB unit during the on-site assessment.  The review found that, other than opportunities to shower, all patients in the unit did not have opportunities for any out-of-cell time, including yard, program office, or telephone calls.  This reviewer subsequently conversed with both an RT and custody officers assigned to the unit who provided varying explanations as to why patients were not receiving any out-of-cell time.  Two RTs provided services to MHCB patients of up to 30 hours per week.  According to one of the RTs, MHCB patients were not offered yard on November 15 because: 1) there was intense fog that day that created a safety issue, and 2) six of the patients were on quarantine status "due to COVID-19 precautions" because they had recently arrived from other facilities and thus prohibited from leaving their cells.  Such as explanations were contradicted by the fact that, despite the presence of intense fog during the morning of November 15, this reviewer observed several inmate workers socializing in the MHCB yard, and records indicated that patients were permitted to leave their cells for individual sessions with clinicians, IDTT meetings, and showers.

This reviewer also conversed with several custody officers assigned to the MHCB unit.  They also had similar explanations as to why MHCB patients did not receive out-of-cell activities.  These explanations included quarantine status, as well as purported instructions from NKSP's "Daily Program Status Report" indicating that the facility was on "modified program" which prohibited any "recreational activities" or "telephone calls."  This reviewer, who observed NKSP inmates mingling in various yards during the two-day assessment, was subsequently informed that a variety of PSRs may be released on a regular basis and this particular PSR directive (NKSP-INST-21-005) had been issued on November 8, 2021 and pertained to an institutional

search of each housing unit on a scheduled basis. Review of several 114-A forms found inconsistency as to the explanation for the lack of out-of-cell time for MHCB patients. For example, some forms stated that patients were not provided telephone calls "per the PSR," whereas other 114-A forms indicated that patients "refused yard and phone" despite the fact that the PSR was still in effect.

This reviewer's concerns were subsequently conveyed to the Associate Warden for Health Care Access, and it was confirmed that the specific PSR issued on November 8 did not apply to MHCB patients, and that quarantine status due to COVID-19 precautions did not preclude patients from out-of-cell activities. This reviewer was informed that the problem would be immediately corrected. The inconsistent operation of the MHCB unit in which clinical orders authorized out-of-cell activities and clinicians were meeting with patients out-of-cell, whereas custody officers and RTs were not allowing patients out-of-cell for yard, telephone calls, and other RT programming, was very problematic and had remained uncorrected until this reviewer's on-site assessment.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 41 patients discharged from the unit during September and October 2021, had been admitted into the MHCB for DTS, and remained at NKSP. The required discharge SRASHEs were completed in all cases, and safety plans and five-day clinical follow-ups were completed in all but for applicable cases. In addition, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from April through October 2021. This reviewer's examination of the data found problems in timely supervisory review (review of the SRASHE is required to be completed prior to or during the anticipated discharge IDTT meeting), as well as cases in which safety plans were incorrectly not developed because the patients "refused to cooperative." Although patient participation best ensures success of a safety plan, plans were required to be developed for all MHCB patients admitted for DTS, regardless of their degree of participation or suicide risk level at discharge. Other MHCB supervisory reviews of safety plans gave "pass" grades to plans that were clearly inadequate. For example, in one case (NKSP 9), the safety plan received the highest grade of "14" points and stated:

> Step 1 (Warning Signs): IP was disengaged in a process. He was provided examples and encouraged to think of things that help in the past but he continued to demonstrate little effort.
> Step 2 (Independent Coping Skills): music, puzzles.
> Step 3 (Distracting People & Places): my dad, to the park
> Step 4 (People to Ask for Help): my dad, my aunt.
> Step 5 (Professionals to Contact): you guys (mental health).
> Step 6 (Means Safety): just lay down.
> Step 7 (Reasons to Live): family.

These type of inadequate safety plans, as well as plans that simply stated, "unknown at this time as IP refused to participate," were also inappropriately carried over into the narrative sections of five-day clinical follow-up forms.

Finally, the process by which inmates were provided **<u>Discharge Custody Checks</u>** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 87 cases of patients discharged from a MHCB or alternative housing placement who remained at NKSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from May through October 2021. The review found that 99 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 70 percent of the custody checks recommended for 48 hours or more by clinicians. In addition, only 86 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems mostly attributably to checks documented in excess of 30-minute intervals.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months (April through September 2021) of SPRFIT meeting minutes found that a quorum was not achieved in two (June and July) of the meetings. The meeting minutes were very brief and unremarkable. In fact, despite the numerous problems identified in this reviewer's current assessment, meeting minutes consistently stated each month that "all performance report indicators for Suicide Prevention are compliant."

Because NKSP is a RC, the SPRFIT was required pursuant to CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum, effective January 27, 2021, to ensure that: suicide prevention placards were displayed in designated areas (including offices of the RC diagnostic clinicians); diagnostic clinicians were reviewing the nurses' Initial Health Screening Forms, county jail records, and other pertinent documents within EHRS and SOMS; diagnostic clinicians were requesting inmates sign ROI forms when reporting histories of prior mental health services in the community; and diagnostic clinicians completed SRASHEs when inmates present with possible current risk for suicide. SPRFIT coordinators or designees were required to collect data and assess compliance with these four expectations, as well as report such findings during monthly SPRFIT meetings. Review of SPRFIT minutes indicated that such data or other required "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was reported as required, but deficiencies found by this reviewer (as noted above), were not previously identified during the required monthly audits. Of note, the monthly audits consistently found that "No ROIs were completed

this audit" during a six-month time frame, a dubious finding that should have sparked further inquiry.

In addition, the facility had a SPRFIT LOP contained within "Operational Procedure No. 181: Suicide Prevention," last updated in February 2021. The LOP was consistent within CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. NKSP had the following LOPs that were consistent with these CCHCS directives - "Operational Procedure No. 250: Notification of Inmate Bad News," dated June 2021; "Operational Procedure No. 200: Crisis Intervention Team," dated February 2021; and "Operational Procedure No. 181: Suicide Prevention" was amended to contain the "Suicide Risk Management Program" in August 2021.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, custody, medical, and mental health staff each had 98 percent compliance rates for annual suicide prevention block training during the previous 12 months. Finally, as of October 2021, only 83 percent of mental health clinicians had completed the SRE mentoring program, received the seven-hour SRE training, and completed safety plan training.

**Recent Suicides**: NKSP did not experience any inmate suicides during the review period.

**Audit Summary**: Although there were adequate practices found in the observed intake screening by nursing staff and PT rounding, Guard One compliance, IDTT meetings, and annual suicide prevention training, there were numerous deficiencies found that required corrective action. These deficiencies included the systemic lack of privacy, confidentiality, and staff safety during the R&R Unit's intake screening process, inadequate review of county jail records by one of the observed RC diagnostic clinicians, inadequate compliance rates for SRASHEs required for emergent/urgent mental health referrals for suicidal behavior, non-participation by nursing staff in the CIT process, failure to provide MHCB patients with out-of-cell activities (that included faulty explanations as to why such activities were not provided), inadequate MHCB supervisory review of discharge SRASHEs and safety plans, low compliance rates regarding discharge custody check forms by custody personnel, and low compliance rates for SRE and safety plan training. Reviewed SPRFIT minutes indicated that data or other required "proof of practice" regarding compliance with CDCR's "Reception Center Suicide Prevention Reporting Expectations" memorandum was reported as required, but deficiencies found by this reviewer during the current assessment were not previously identified during the required monthly audits.

13)    **Kern Valley State Prison (KVSP)**

**Inspection**:  November 17-18, 2021 (previous suicide prevention audit was on January 8-9, 2019).  KVSP housed approximately 3,383 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer did not have an opportunity to observe the **Intake Screening** process in the R&R unit because there were not any new admissions during the time this reviewer was onsite.  Of note, there were not any concerns observed during the previous assessment.

In addition, this reviewer observed daily **PT Rounds** in both the GP administrative segregation (ASU-2) and STRH (ASU-1) units on November 17.  The rounds in both ASUs were unremarkable and each PT was observed to be adequately conversing with both caseload and non-caseload inmates, as well as entering Psych Tech Daily Rounds information into EHRS for each caseload inmate.

**Housing**:  KVSP had a 20-bed CTC, with 12 designated **MHCBs** previously found to be suicide-resistant.  The census varied between seven and eight patients during the onsite assessment.

In addition, there were a total of ten **New Intake Cells** in the two ASUs.  This reviewer did not observe any new intake inmates in non-intake cells, an improvement from the previous assessment when new intake inmates were housed in unsafe, non-new intake cells in both ASU-1 and ASU-2.

Finally, **Alternative Housing** cells to temporarily house inmates awaiting MHCB placement were primarily located in ASU-1 and C-4 units, as well as occasionally in other designated cells throughout the facility.  Alternative housing was used on a daily basis, and inmates were required to be furnished beds and observed on a 1:1 basis.  From August through October 2021, there were approximately 96 inmates placed in alternative housing, and all were released within 24 hours.  Approximately 68 percent (65 cases) of the MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined the EHRS charts for all of these 68 rescinded cases and found that the required SRASHEs were completed in 90 percent (59 of 65) of the cases.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals.

This reviewer observed concerning practices regarding use of "Q-30 minute" observation within the MHCB unit.  First, almost all patients admitted to the MHCB for DTS were downgraded from Suicide Precaution status (with observation required at 15-minute intervals) to Q-30-minute observation within the first 24 hours of admittance.  In one case observed by this reviewer during an initial IDTT meeting on November 18, the patient (KVSP 1) had been admitted to the MHCB the previous day (November 17) for grave disability, but also self-reported that "I'm suicidal." He was initially placed on Suicide Precaution status with "partial issue" clothing.  During the IDTT meeting the following morning, although the patient denied any current SI, the team

discussed an incident from the previous evening in which he had started a fire in his MHCB cell. The patient could not provide an explanation as to why he started the fire. The team then proceeded to downgrade his observation level to Q-30-minute observation with "full issue" clothing. In a second case observed by this reviewer during an initial IDTT meeting on November 18, the patient (KVSP 2) had been admitted into the MHCB unit two days earlier on November 16 for SI. Both his chronic and acute risk for suicide were rated as "high" on the initial SRASHE. He was initially placed on Suicide Precaution status with "partial issue" clothing. Less than 24 hours later on November 17, the patient was downgraded to Q-30-minute observation with "full issue" clothing. During the initial IDTT meeting on November 18, which was held cell front because the patient had initially tested positive for COVID-19, he self-reported being "very depressed" (10 out of 10) and stressed out because he had been housed in the STRH as an EOP patient while attending various court proceedings on a new case, and also felt that he had falsely tested positive for COVID. The patient also stated that "October and November are bad months for me," because both his grandmother and uncle died during those months (with his uncle committing suicide). Other risk factors for suicide including multiple prior MHCB placements, as well as both intermediate and acute care placements. During the meeting, the patient expressed passive SI in the form of "not wanting to wake up." Despite these risk factors and concerning behavior, the patient remained on Q-30-minute observation with "full issue" clothing.

The second concerning practice regarding use of "Q-30 minute" observation within the MHCB unit was that some patients assessed as not being suicidal and placed on Q-30-minute observation still remained with "partial issue" clothing without a rationale for withholding "full issue" clothing. CDCR policy (see CCHCS' "Level of Observation and Property for Patients in Mental Health Crisis Beds, dated March 15, 2016) generally required that if a clinician is concerned enough about a patient's safety to restrict their possessions and/or privileges, then they should be placed on either Suicide Watch or Suicide Precaution unless there were "unique risk factors" that suggested otherwise. In at least three cases (KVSP 3, KVSP 4, and KVSP 5) examined by this reviewer, the required progress notes did not provide clinical justification that included "unique risk factors." Of note, each of these cases involved the same MHCB clinician.

Further, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB during a nine-hour period from 12:00 a.m. through 8:59 a.m. on September 18, 2021 for KVSP 6, on October 8, 2021 for KVSP 7, on October 21, 2021 for KVSP 8, and on November 18, 2021 for KVSP 1. The chart review found a variety of violations in observation checks (i.e., KVSP 7 had one violation, KVSP 1 and KVSP 8 each had two violations, and KVSP 6 had five violations) that were in excess of required 15-minute intervals. The longest gap between checks was 40 minutes in KVSP 6. Violations in the four cases were by multiple nursing staff. Although multiple violations were found in three of the four reviewed cases, these findings indicated improvement from the previous assessment.

Finally, a review of **Guard One** data for a recent 24-hour period found only 89 percent compliance in the STRH (ASU-1) and 96 percent compliance in the GP administrative segregation (ASU-2) unit with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a list of emergent/urgent mental health referrals for the six period of May through October 2021. A sample EHRS review of 38 emergency/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in only 89 percent (34 of 38) of the cases.

In addition, the **Crisis Intervention Team** was launched at KVSP in October 2018 and available seven days a week from 7:00 a.m. to 5:00 p.m. This reviewer did not have an opportunity to observe the CIT process during the on-site assessment.

Four IDTT meetings were observed in the MHCB unit on November 17-18. Apart from the concern expressed above in <u>KVSP 1</u> and <u>KVSP 2</u> in which each patient was downgraded to Q-30-minute observation despite the presence of continued concerning behavior, there was good treatment team representation and participation from most team members (other than the nurse). In addition, there were adequate case presentations, discussion of diagnoses and medications, as well as suicide risk inquiry and preliminary thoughts regarding treatment planning.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for the eight patients who were housed in MHCB unit during the on-site assessment. The review found that all patients were afforded opportunities to shower, as well as other out-of-cell time such as yard, program office, or telephone calls. Most 114-A forms that were reviewed indicated that yard was offered on a daily basis to MHCB patients.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 19 patients discharged from the unit during September and October 2021, had been admitted into the MHCB for DTS, and remained at KVSP. The required discharge SRASHEs were completed in all cases, and safety plans were completed in 89 percent (17 of 19) of the cases. In one (<u>KVSP 8</u>) of the two cases in which safety plans were not completed, the clinician simply stated that the patient was uncooperative and he "will have additional opportunities to work on his safety plan and SRA once he returns to EOP level of care."

In addition, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from April through November 2021. This reviewer's examination of the data found problems in untimely supervisory review. For example, although discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, the data indicated that all supervisory reviews occurred well after MHCB discharge, and there was no documentation that discharge SRASHEs completed in October and November received any supervisory review.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody

checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 76 cases of inmates discharged from a MHCB or alternative housing placement who remained at KVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from May through October 2021. The review found that only 67 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the low completion percentage almost exclusively related to nursing staff discontinuing the checks on weekends without "face-to-face evaluations" by clinicians. This protocol was established in June 2021 following the statewide distribution of the revised "Discharge Custody Check Sheet" (CDCR MH-7497) form. Almost two-thirds of the custody checks were recommended for 48 hours or more by clinicians. In addition, only 71 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation and/or missing check sheets.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months (May through October 2021) of SPRFIT meeting minutes found that a quorum was not achieved in two (May and October) of the meetings. Apart from some discussion regarding this reviewer's previous assessment and/or regional team audits, the meeting minutes were otherwise unremarkable. Review of various LOPs for suicide prevention found that KVSP did not have an LOP consistent with CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. KVSP had the following LOPs that were consistent with these CCHCS directives - "Operational Procedure No. 1075: Notification of Inmate Bad News," dated June 2021; "Operational Procedure No. 1055: Crisis Intervention Team," dated June 2021; and "Operational Procedure No. 1051: Suicide Prevention" which contained the "Suicide Risk Management Program" in August 2021.

Of note, although the "Suicide Risk Management Program" policy required that inmates placed in the program be tracked by the SPRFIT committee and reviewed during monthly meetings, such a requirement was not reflected in review of the SPRFIT meeting minutes from September and October 2021.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 91 percent of custody staff, 92 percent of medical staff, and only 88 percent of mental health staff, had completed annual suicide prevention block training during the previous 12 months. Finally, as of October 2021, 100 percent of mental health clinicians had completed the SRE mentoring program, received the seven-hour SRE training, and completed safety plan training.

**Recent Suicides**:  KVSP experienced two (2) inmate suicides during the review period, both during 2020.[14]  In the **_first_** case (KVSP 10), the inmate was found hanging from the ventilation grate in his ASU cell during the late evening of February 10, 2020.  The inmate entered the CDCR system on April 6, 2009 to serve a life sentence with the possibility of parole for first degree murder with gang enhancements.  He had been transferred to KVSP on November 17, 2016.  The inmate had incurred eight RVRs during his confinement, the most recent of which occurred on January 12, 2020 for battery on another inmate with a deadly weapon.  He was gang-affiliated during his CDCR confinement, but requested consideration for SNY placement in January 2020 following the self-report of "significant enemy concerns and being the victim of an assault."  He was placed in administrative segregation pending further investigation.  The inmate had regular family support that was demonstrated by letter correspondence with family and friends, as well as regular telephone calls and visits with his wife.  He had one teenage daughter.

According to available records, the inmate and his older brother were raised by their parents. Despite reports that he was physically abused by his father and often felt misunderstood by his family, the inmate maintained a close relationship with his parents.  However, he became involved with street gangs at the age of 13, which also resulted in substance abuse and juvenile behavior.  He earned his GED during a juvenile camp placement.  The inmate had sporadic employment as a young adult.  He did not have any history of mental health treatment in the community, nor any history of suicidal behavior.

Upon entry into CDCR in 2009, the inmate screened negative for any mental health symptoms and was not included into the MHSDS.  In fact, other than periodic screenings for administrative segregation placement, he did not have any contact with mental health clinicians for more than 11 years.  However, following his placement in administrative segregation following an altercation with his cellmate on January 4, 2020, the inmate requested to see mental health because "I am having night terrors and have PTS (sic)."  He met with a clinician several days later on January 10 and complained of anxiety that he had been experiencing "on and off" for several months.  The inmate was reluctant to enter the MHSDS, but accepted mental health treatment workbooks.

Approximately two weeks later on January 15, the inmate reported SI to a nurse and was subsequently placed overnight in alternative housing by the on-call psychiatrist.  He was seen by a CIT clinician the following morning who completed a SRASHE indicating the inmate was at low acute risk and chronic risk for suicide.  The MHCB referral was rescinded, but the inmate was placed in the MHSDS at the 3CMS LOC.  Subsequent review of the SRASHE found that the safety plan section of the form was blank.  He met with his PC on January 21, and the progress note indicated his "mood was flat or indifferent."  A few days later on January 24, the MHPC Initial Assessment indicated that the inmate reported "experiencing frequency of nervousness, unable to control worry, worrying too much, trouble relaxing, restlessness, irritability, and fear 'nearly every day'."  The following week on January 30, the inmate was noted to be acting bizarre by the PC and "guarded, having a hard time processing, and suspected drug use as the reason for his bizarre behavior."  On February 4, the inmate met with his PC and another

---

[14]KVSP experienced an inmate suicide in May 2022 that occurred outside this reviewer's January 2020 to April 2022 review period.

clinician as a result of concern expressed by his wife following a visit the previous weekend. A subsequent progress note indicated the inmate was "semi-cooperative, mood as flat/guarded, slow thought process, and slow speech." The clinicians suspected, and the inmate acknowledged, continued drug use on a regular basis. Despite suspected drug use, the inmate's continued concerning behavior resulted in the PC documenting that "Pt. attending IDTT tomorrow where he will be referred to a higher LOC as Pt. appears to be decompensating since his arrival to STRH." The following day on February 5, the inmate's IDTT meeting was held in absentia, and he was elevated to EOP LOC. Two days later on February 7, when told by his new clinician that he had been elevated to EOP, the inmate refused to participate in the initial assessment.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note was not found in his property and he did not have any medical issues that were thought to be contributory to his death. The reviewer theorized that "the inmate's final decision to end his life may have been due to his inability to adequately cope with the combination of safety concerns, withdrawal from substances, intense anxiety, and bleak view of his future" due to facing a possible two-year SHU term for the recent assault on his cellmate with a weapon.

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

> 1) Multiple concerns were found with the SRASHE completed on January 15, 2020. Please see Conclusions section for further details.
>
> 2) There were multiple concerns identified with the IDTT completed on February 5, 2020. Please see Conclusions section for further details.
>
> 3) The inmate was seen by a mental health clinician for five-day follow-up evaluations on January 16, 17, January 21, 2020. The documentation was found to be deficient per chart audit criteria. Please see Conclusions section for further details.
>
> 4) The MHMD progress note for medication non-adherence authored by the psychiatric nurse practitioner on February 7, 2020 was insufficient and lacked adequate detail and plan.

In the ***second*** case (KVSP 11), the inmate was found hanging from the cell door of his EOP cell during the afternoon of October 17, 2020. Upon further investigation and subsequent determination by the medical examiner, the inmate had also lacerated his upper arm with a nail clipper and his suicide was caused by "exsanguination of incised wound of the upper left extremity." The inmate entered the CDCR system for the third time on March 8, 2016 to serve a four-year term for indecent exposure with a one-year enhancement for a prior felony conviction. He had been transferred to KVSP on March 10, 2020. Of note, the inmate had been moved 39 times within nine CDCR facilities during his current term. The moves were primarily caused by changes in his custody status and level of care. The inmate had incurred 16 RVRs during his confinement, the most recent of which occurred on March 19, 2020 involving behavior which

could lead to violence.  Although he had not had a visit since 2018, the inmate had other family support as evidenced by letter correspondence with several family members, as well as regular telephone calls with his mother.  He was unmarried and did not have any children.

According to available records, the inmate was primarily raised by his mother, with his father absent from most of his life.  He previously reported history of both sexual and physical abuse by his mother's boyfriend or step-father, as well as a mentor at a Big Brother program.  There were also reports that he might have been sexually molested by his brother.  The inmate began to use illegal drugs, including methamphetamine, at an early age and his continued use resulted in both hospitalizations and criminal behavior.  He primarily worked as a carpenter until his chronic back ailments, which were reportedly caused by the earlier physical abuse by his step-father, resulted in unemployment and homelessness.  The inmate had an extensive history of mental health treatment in the community, including several hospitalizations for suicide attempts and self-injurious behavior that began when he was a teenager.  In addition, one out-of-state hospitalization was related to "odd and sexually inappropriate behavior."  The inmate had a history of consistently being diagnosed with bipolar disorder, but clinical documentation also indicated that his frequent use of illegal substances may have impacted his clinical presentation and lead to inaccurate diagnoses.

During his first two CDCR terms, the inmate was placed in the MHSDS and provided services at all levels of care, including 3CMS, EOP, MHCB, ICF, and APP.  Upon his return to CDCR in March 2016, the inmate was initially placed at the EOP LOC, but was subsequently placed at either DSH or APP within CDCR on several occasions during 2016 through 2019.  Beginning in early 2020, he was provided services at both the EOP and MHCB levels of care for treatment for PTSD, anger issues, delusions, sexual behavior, and his history of suicidal behavior.  From October 2016 through August 2020, there were 44 SRASHEs completed for the inmate.  During this time, the inmate's diagnoses included, but were not limited to, bipolar disorder, mood disorder, NOS, PTSD, borderline personality disorder, and amphetamine use disorder.  His compliance with psychotropic medication was inconsistent throughout his CDCR confinement.  According to the psychiatric reviewer in this case, "Although the inmate was, at times, severely symptomatic and dysfunctional, this dysfunction and dangerousness were often brief, making involuntary medication options difficult to secure.  Treatment was also complicated by the fact that he often refused to attend scheduled psychiatric appointments."  During this time, the inmate's mother contacted CDCR on several occasions and conversed with his PC regarding her concerns for his mental health.

Following multiple MHCB placements, the inmate was referred to ICF LOC on June 10, 2020 based upon his continued SIB and lack of insight on the severity of this behavior.  His IDTT determined that he did not present as imminently suicidal at the time of the referral, thus ICF was clinically indicated to provide him "with comprehensive skill building so he can better manage his distress."  It was also determined that the inmate did not meet the emergency transfer criteria to ICF as outlined in the April 10, 2020 memorandum entitled "COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow." He remained at KVSP and was seen by his PC on a regular basis.  Although often appearing to be delusional, the inmate did not engage in any SIB and consistently denied any SI. The inmate was assessed as a high chronic and low acute risk for suicide on his final SRASHE dated August 27,

189

2020. He continued to refuse most mental health programming and was often seen "bird-bathing" in his cell. Custody staff viewed him as quiet and respectful, commenting that the inmate "consistently stayed in his cell, refused yard, programming, day room dining, and showers." During the final individual session with his PC on October 12, five days before his suicide, the inmate denied any significant mental health issues or the need for psychotropic medication. Although denying any SI, the inmate did make a statement that "he engages in self-harm when he wants to 'feel something'."

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide. A suicide note was not found in his property. Although the inmate had several medical issues, including chronic lower back pain, and had several surgical procedures performed as a result of his SIB, these medical issues were not thought to be contributory to his death. The reviewer theorized that, in addition to a pending criminal proceeding that would in all likelihood prolong his incarceration,

> the inmate's paranoia and possible hopelessness contributed to his decision to end his life. The inmate had a long history of mental health treatment prior to the CDCR commitment where the predominant diagnosis was bipolar disorder with possible psychotic features. During the last few months of his life, multiple accounts stated the inmate refused to leave the cell and interact with peers or staff. He reported safety concerns related to a drug debt, but refused to comply with the investigation. His safety concerns due to a drug debt could be reality-based or could have been a result of a paranoid decision (or a combination of both), but regardless of the reason it significantly impacted his ability to function in the outpatient setting which is why the treatment team referred him to ICF approximately four months before his death. It is possible his paranoia significantly increased, as evidenced by reports his delusions were increasing the preceding weeks before his suicide, and he felt trapped and suicide was his only option.

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

> 1) CHCF: On March 8, 2020, the inmate was discharged from the CHCF-MHCB to EOP level of care, but it was documented that 'continued support in EOP w/strong recommendation that he be referred to ICF.' If the treatment team opined the inmate required ICF level of care, then they could have referred him to ICF level at the IDTT and also discharged him to the EOP environment (to wait for the ICF admission). There was no clinical justification for delaying and ICF referral at that time.

> 2) CSP/Sac and KVSP: On February 19, 2020 in March 29, 2020, the inmate engaged in self-harm behavior, but there was no self-harm power form completed to document these incidents within 72 hours as required in the October 28, 2019 policy entitled 'Clarification of Documenting and Reporting Suicide Attempts in Self-Harm Incidents.'

3) <u>KVSP</u>: On May 22, 2020, the inmate was sent out to hospital due to self-harm behavior of cutting. His acute risk and chronic risk were rated as moderate in the SRASHE. The rationale provided for the ratings was insufficient and was a direct 'copy and paste' from the reason for assessment section. The rationale was not sufficient and did not justify a moderate rating for acute or chronic risk.

4) <u>KVSP</u>: On May 22, 2020, the inmate was referred to the MHCB, but the 'Consult Inpatient' power form referring the inmate to the MHCB was not completed. This power form is part of the referral packet as outlined in Volume 12: Mental Health Services, Chapter 5: Inpatient Services, Procedure 12.05.200.P.1: Mental Health Crisis Bed: Referral Procedure memorandum.

**Audit Summary**:  Although there were adequate practices found in PT rounding of the ASUs, new intake cell placement, alternative housing, CPR and suicide prevention training for both custody and medical staff, there were several deficiencies found during the assessment that required corrective action. These deficiencies included patients admitted to the MHCB for DTS being downgraded to Q-30 minute observation within the first 24 hours of admittance despite still being at risk for suicide, MHCB non-suicidal patients placed on "Q-30 minute" observation with "partial issue" clothing, inadequate compliance rates for SRASHEs required for emergent/urgent mental health referrals for suicidal behavior, inadequate MHCB supervisory review of discharge SRASHEs and safety plans, and low compliance rates regarding discharge custody check forms by clinical and custody personnel.


### 14)    **California Men's Colony (CMC)**

**Inspection**:  December 7-8, 2021 (previous suicide prevention audit on May 15-16, 2019). CMC housed approximately 3,200 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a new admission during the **Intake Screening** process in the East Facility R&R unit on December 7. Lack of privacy and confidentiality during intake screening had been a chronic problem at CMC, with doors to the nurses' offices remaining open during the process when maximum security/administrative segregation inmates were screened. Other CDCR facilities remedied the issue by installing TTMs in the nurse's office, thus allowing the door to be closed during the intake screening process. Since this reviewer's previous assessment at CMC in May 2019, a TTM was installed in the vestibule adjacent to the nurse's office in the East Facility R&R unit, and the West Facility R&R unit was closed because a TTM could not be accommodated in or around the nurse's office. During the current assessment, the reviewer observed the nurse to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS. The observed screening was of a maximum security/administrative segregation inmate, thus the TTM in the adjacent vestibule was utilized. Although the nurse did not have direct line of sight of the inmate and needed to walk from her desk to the TTM on several occasions to ask follow-up questions and answer the inmate's inquiries, the vestibule's outer doors were closed and an officer stationed outside, thus ensuring privacy and confidentiality during the process.

191

In addition, this reviewer observed daily **PT Rounds** in the ASU (Building 4) on December 7. The rounds were unremarkable and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for all caseload inmates.

**Housing**:  CMC had 50 **MHCBs** located in two wings (A and B) of the CTC that were previously found to be suicide-resistant.  Of note, beginning in late April 2021, 12 beds in Section B (cells 1 through 12) were designated as "flex" beds to accommodate patients placed at the acute level of care.[15]  On December 8, 2021, approximately 28 MHCB patients and ten acute care patients were housed in the CTC.

In addition, there were 16 **New Intake Cells** in the ASU, and all had been previously retrofitted to be suicide-resistant.  This reviewer observed that all new intake inmates were correctly housed in new intake cells.

Finally, **Alternative Housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were found in Building 7, a location formally utilized as an interim unlicensed MHCB unit.  Alternative housing was used on a daily basis, and inmates were all furnished beds and required to be observed at staggered 15-minute intervals (because all of the cells were previously found to be suicide-resistant when it was utilized as an unlicensed MHCB unit).  From September through November 2021, there were approximately 110 inmates placed in alternative housing, and all were discharged within 24 hours.  The vast majority (85 percent) were transferred to a MHCB, with 16 of 110 (15 percent) of the referrals rescinded and inmates returned to their respective housing units.  This reviewer examined the EHRS charts for all 16 rescinded cases and found that the required SRASHEs and five-day clinical follow-ups were completed in all of the cases.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were required to be observed at 15-minute intervals by nursing staff, with documentation hand-written on individual "Nursing Service Call Light System-Nursing Rounds Checklist" forms.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (CMC 1, CMC 2, CMC 3, and CMC 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on September 17, 2021 (for CMC 1), October 24, 2021 (for CMC 2), and December 1, 2021 for both CMC 3 and CMC 4.  CMC 2 was at the acute level of care.  The chart review found three violations each (i.e., checks in excess of required 15-minute intervals) in CMC 1 and CMC 2, whereas there were five violations each in cases CMC 3 and CMC 4.  The longest gap between checks was 33 minutes in CMC 1 and CMC 3.  Violations in these four cases were committed by multiple nursing staff.

In addition, it should also be noted that this reviewer examined the medical charts of several MHCB patients who continued to express SI during their placement, but remained on regular 15-minute nursing checks rather than Suicide Precaution status.  For example, in one case (CMC 5),

---

[15]Because acute care patients assigned to these flex beds are provided services from existing mental health, medical, and custody personnel assigned to the MHCB unit, assessment of suicide prevention practices for these patients were combined together within this assessment.  Distinctions in suicide prevention practices between MHCB and acute care patients are made where appropriate.

the patient reported "passing suicidal thoughts to 'not wake up,'" "intermittent suicidal ideation," and "vague SI without a plan" on a daily basis from December 12 through December 15; while another patient (CMC 6) "continues to report interrupted sleep and passive suicidal ideation by strangulation occurring 2 hours daily." This patient was observed during his IDTT meeting on December 8 and continued to express SI. Review of the Psych Tech Rounds data in EHRS indicated that the patient expressed "constant" SI with "hanging" indicated as the method of suicide on a daily basis from December 11 through December 14. Despite these concerning behaviors, both patients were not placed on Suicide Precaution status during this time.

Finally, a review of **Guard One** data for a recent 24-hour period in the ASU found 98 percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the five-month period of July through November 2021. A sample EHRS review of 44 emergent/urgent mental health referrals for SI/behavior revealed that clinicians completed the required SRASHEs in only 86 percent (38 of 44) of the cases. Most of the deficiencies were noted in urgent referrals.

In addition, the **Crisis Intervention Team** was launched at CMC in April 2019 and operational from approximately 8:00 a.m. to 8:00 p.m. each day. Two clinicians each worked three 12-hour days, and other CIT-trained clinicians were assigned for Saturday, vacations, and holidays. The CIT was very active and responded to multiple calls per day. This reviewer had an opportunity to observe the CIT process on December 8. The crisis call involved an inmate (CMC 5) who had expressed SI to custody staff after receiving notice of an investigation and pending RVR for conspiracy to distribute drugs. He had been successfully programing at the EOP LOC, as well as participating in the ISUDT program. When interviewed by the CIT, the inmate appeared depressed that a potential RVR would jeopardize his programming. He continued to express SI. Each member of the CIT (psychologist, PT, and lieutenant) was interactive with the inmate who was subsequently referred to the MHCB. A SRASHE was completed as required.

Five **IDTT Meetings** in the MHCB unit were observed on December 7-8, including two patients being discharged. Overall, although there was good treatment team representation, each of the four meetings (involving varying clinical staff) held on December 8 was very problematic, with uneven case presentations and higher level of care discussions, as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI in two of the cases. The MHCB supervisor attended all of the observed IDTT meetings and attempted to resuscitate the case presentations on December 8. The nursing staff represented at each meeting was not asked, nor offered, any input during any of the meetings.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for all 28 MHCB patients and ten acute care patients housed in the CTC during the on-site assessment. The review found that all patients were afforded opportunities to shower, as well as other out-of-cell time such as yard and telephone calls.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of ten patients discharged from the unit

during October and November 2021, had been admitted into the MHCB for DTS, and remained at CMC. The required discharge SRASHEs and five-day follow-ups were completed in all cases, and safety plans were completed in 90 percent (9 of 10) of the cases. In the case (CMC 7) in which a safety plan was not completed, the clinician incorrectly stated that the patient "declined to complete safety plan at this time."

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from April through November 2021. This reviewer's examination of the data found problems with untimely supervisory review. For example, discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, and the examination found that all of the supervisory reviews from April through September were occurring well after the IDTT meetings, and there was no documentation of any supervisory review of discharge SRASHEs completed in October and November 2021.

In addition, pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), a SRASHE was required to be completed within 72 hours of admission, as well as completed upon discharge from the PIP. This reviewer examined a sample of medical charts for patients admitted to, and discharged from, the APP at CMC from July through November 2021. The review found that all nine reviewed admission cases had admission SRASHEs, and 14 of 15 (93 percent) of reviewed discharge cases had discharge SRASHEs completed in a timely manner. In addition, nine of the 15 discharge cases required a safety plan and the review found that safety plans were developed in seven of nine (78 percent) of the cases.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was required to be completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 111 cases of patients discharged from a MHCB or alternative housing placement who remained at CMC and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from June through November 2021. Five cases were subsequently excluded from review because the patients were returned to the MHCB or alternative housing. The review found that only 86 percent (of the 106 cases) had Page 1 "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first day of the form. When completed correctly, a vast majority of the custody checks were recommended for 24 hours by clinicians. In addition, only 88 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation.

**Intervention**:  Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**: A review of six months (May through October 2021) of SPRFIT meeting minutes found that all required mandatory members or designees attended all but one meeting (July 2021).  Meetings were 90 minutes in length, and meeting minutes were very robust, averaging 12 to 18 pages per month.  The minutes consistently reported discussion of such topics as training, CIT, SRASHE completion, 7297 Discharge Custody Check forms, inmates in the Suicide Risk Management Program, and self-harm summaries.  A SPRFIT LOP was in effect.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021.  CMC had the following LOPs that were consistent with these CCHCS directives - "Operational Procedure No. 3053: Mental Health Access for Inmates/Patients Receiving Bad News," dated August 2021; "Operational Procedure No. 3043: Crisis Intervention Team," dated September 2021; and "Operational Procedure No. 10-0016: Suicide Risk Management Program" dated July 2021.

**Training**:  According to training records, 100 percent of custody and nursing personnel were currently certified in CPR.  In addition, 94 percent of custody staff, 90 percent of medical staff, and 94 percent of mental health staff received annual suicide prevention block training during the previous 12 months.  Finally, as of November 2021, 100 percent of mental health clinicians had completed the SRE mentoring program, 95 percent had received the seven-hour SRE training, and 99 percent had completed safety plan training.

**Recent Suicides**:  CMC experienced one (1) inmate suicide during the review period.  In that case (CMC 8), the inmate was found with a large laceration to the trachea in his EOP cell during the afternoon of March 7, 2022.  The inmate entered the CDCR system on November 12, 2022 serve an 11-year sentence for arson, burglary, and cruelty to animals.  He had been transferred to CMC on May 12, 2021.  The inmate incurred three RVRs during his confinement, the most recent of which occurred on October 12, 2021 for absence from a work assignment.  He was not known to be gang-affiliated.  The inmate was unmarried and had one child.  He appeared to have strong family support, primarily from his mother and at least one sister through letter correspondence and telephone calls.

According to very limited available records, the inmate and four other siblings (two sisters and two stepbrothers) were raised by his mother and stepfather in a dysfunctional environment that included physical abuse by the stepfather.  The inmate indicated that he "started getting in trouble with the law at an early age," but limited records did not indicate any history of juvenile arrests.  Documentation regarding his educational history was inconsistent, with some records indicating that he graduated high school and took some college courses, while other records indicated that he dropped out of high school without graduating.  Records also indicated that the inmate had a history of fire setting behavior in high school.  He had a limited employment history.  The inmate had a long history of substance abuse that began at least at the age of 18.  An interview with a sister conducted following his death indicated that the inmate had been

psychiatrically hospitalized in 2014-2015 for demonstrating paranoia related to substance abuse. There was also some other documentation indicating the inmate had been involuntarily hospitalized on other occasions in the community, however, the reasons were not documented. It did not appear that he had a prior history of suicidal behavior in the community, and that any prior hospitalizations were likely related to grave disability.

Upon entry into CDCR, the inmate was placed in the MHSDS at the 3CMS LOC after an assessment found that he was endorsing AH, a history of mental health treatment, and a suicide attempt four years earlier by overdose of pain medication. The inmate later clarified to a clinician that the overdose was not a suicide attempt, but rather an attempt to get high. He was subsequently diagnosed with unspecified schizophrenia and other psychotic spectrum disorder. The inmate appeared to function well for the first several months of his incarceration and then began to decompensate in February 2021. He became inconsistent with taking his psychotropic medication and endorsed persecutory AH of somebody coming through the television and calling him names. Other symptoms observed during this time included a disheveled appearance and cognitive disorientation. A short time later, the inmate was placed in administrative segregation for battery on staff (i.e., throwing an unknown liquid substance at a nurse). Although a subsequent RVR mental health assessment found that his psychotic thought process influenced behavior that resulted in the RVR, the hearing officer disagreed and found the inmate guilty.

In March 2021, the inmate's level of care was elevated to EOP, with his diagnoses remaining at unspecified schizophrenia and other psychotic spectrum disorder. Despite his placement at EOP, subsequent progress notes for at least three weeks indicated that he was still 3CMS. During the next several months, although he did not endorse any significant symptoms, he continued to present to clinical staff as disheveled and malodorous, with ill-fitting clothing. The inmate did not consistently take a psychotropic medication nor always attend group EOP treatment. He also received another RVR during the month, destruction of the state issued radio, which he complained had been "sending me subliminal messages." A subsequent RVR mental health assessment found that his behavior had been influenced by his mental illness, and the hearing officer subsequently agreed.

In May 2021, the inmate was transferred to CMC and over the course of the next few months it appeared that both his presentation and cleanliness were improving. In June, he was screened for placement in the medication assisted therapy (MAT) program after he reported using intravenous heroin for the past month. However, on August 5, 2021, he was observed to be again demonstrating bizarre behaviors, including urinating on the ground in the game room and not recognizing this behavior to be a problem. A subsequent progress note indicated that the inmate was "experiencing the real thought process and restricted range of affect with limited insight and judgment and that he also seemed to be minimizing his problems." A few days later on August 9, a MAT physician assessing his possible admittance into the program "was concerned that mental health symptoms not only made assessment difficult, but may place him at risk for continued substance abuse." Beginning on September 1, although a PC progress note summarized a plan that would involve the "provision of psychoeducation in the teaching of grounding techniques in order to decreased solutions and magical thinking," subsequent progress notes indicated that such interventions were not utilized. During this time, several psychiatric appointments or other contacts were not timely. A few weeks later on September 17, the inmate

was seen by a DDP psychologist for possible inclusion into the program.  Although the note indicated that a more comprehensive assessment, referred to as the California Adaptive Support Evaluation (CASE) would follow at a later date, the CASE was never completed.  By December 2021, the inmate began complaining about a possible fractured relationship with his mother and other ongoing family stressors.

By January 2022, PC progress notes began to reflect that the relationship with his mother appeared to be repaired and that his mood was improving, although his affect consistently remained flat.  The inmate continued to attend his EOP programs and his education classes during the month.  Progress notes, however, indicated that the inmate was not offered any confidential contacts due to misinterpretation of the COVID-19 protocol.  In addition, according to the CDCR reviewer in this case, the inmate was able to attend his final IDTT meeting on February 16, 2022 and "documentation still supported that the inmate may have had adaptive support needs and continued to regularly demonstrate confusion."

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide.  He did not leave a suicide note and did not have any medical issues that were thought to be contributory to his death.  However, the CDCR reviewer learned during the review that the inmate had a distressing telephone call with his mother on March 2, 2022 and, on the morning of his death (March 7), was allegedly informed by an inmate-peer with whom he was having a romantic liaison with, that the relationship was over.  The CDCR reviewer theorized that the inmate's increasing level of distress was challenged by the fact that he "was offered psychiatry contacts outside the *Program Guide* required time frames, was not properly assessed for inclusion into the DDP program, and for approximately the last month of his life, he was offered only cell-front mental health check ins and in-cell activities, rather than confidential out-cell individual contacts.  These missed and modified contacts may have represented missed opportunities for mental health staff to assess the inmate more accurately and thus, provide more appropriate treatment interventions and level of care decisions."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

1) NKSP:  The inmate was placed at the EOP level of care beginning on March 3, 2021, however, subsequent MHPC contact notes for the next three weeks (March 11, March 18, and March 24, 2021), all discussed the inmate as being at the CCCMS level of care.  It was not until his April 1, 2021 contact that the note acknowledged him as being in the EOP level of care.  Additionally, there were seven MHPC routine contact between March 11 and May 7, 2021, all by the same clinician, and all clinical notes contained the exact same language in the 'plan' section of the note, save for the notes from April 1, 2021 on that acknowledged the correct level of care.

2) CMC:  In August 2021, the inmate was seen for a MHPC consult in response to a staff referral that was submitted in response to his urinating on the floor in the game room and not seeming to understand why such behavior was inappropriate.  This behavior occurred only two days prior and during the session, Mental Status

Exam indicators suggested a possible thought disorder episode. This note acknowledged the inmate's own tendency to minimize his problems. Yet despite the totality of this clinical picture, there was no documentation of an adequate follow-up plan targeting concerns identified in the referral.

3) <u>CMC</u>: MHPC progress notes indicate that between January 20 and February 22, 2022, the inmate was seen only at cell-front and was not offered any confidential contacts because of COVID-19 protocol. However, there was no statewide mandate during that time that required contacts to be completed at cell-front and while the institution did provide Program Status Reports (PSRs), those PSRs indicated that priority dockets would be honored. Additionally, there were no notes in the chart indicating that there was any consultation completed with a supervisor regarding the inmate's care, which the institution also reported was designed to be part of the process.

4) <u>CMC</u>: The inmate was seen on September 17, 2021 and December 21, 2021 by the DDP psychologist to assess his cognitive functioning and adaptive support needs. Documentation from both contacts indicated the inmate would receive follow-up appointments to complete the CASE in order to determine inclusionary criteria for the DDP. However, it appears the inmate did not receive follow-up appointments and a CASE was not completed.

5) <u>CMC</u>: Between September 2021 and March 2022, psychiatry individual appointments or contacts were not timely. The intervals between one-on-one psychiatry appointments were considerably longer than that allowed by the *Program Guide*. Even though remedies have been fully implemented, full documentation of discovered deficits and crafted remedies is required.

6) <u>CMC</u>: During the review of the Emergency Medical Response timeline, there was a 13-minute delay in TTA staff arrival after the activation of the alarm.

**Audit Summary**: Although there were adequate practices found in intake screening, PT rounding of the ASUs, new intake cell placement, alternative housing, CIT, out-of-cell time for MHCB patients, CPR and suicide prevention training for both custody and medical staff, and robust SPRFIT meeting minutes, there were several deficiencies found during the assessment that required corrective action. These deficiencies included inadequate compliance rates for SRASHEs required for emergent/urgent mental health referrals for suicidal behavior, several examples of MHCB patients continuing to express SI and not placed on Suicide Precaution status, problematic IDTT meetings for MHCB patients, inadequate MHCB supervisory review of discharge SRASHEs and safety plans, and low compliance rates regarding discharge custody check forms by clinical and custody personnel.

**15)      California Substance Abuse Treatment Facility (CSATF)**

**Inspection**: February 7-8, 2022 (previous suicide prevention audit on January 24-25, 2019). CSATF housed approximately 4,826 inmates at the time of the on-site assessment.

**Screening/Assessment**: Because there were not any inmates admitted into CSATF during the two-day assessment, the **Intake Screening** process within the R&R unit could not be observed. Daily **PT Rounds** in the STRH unit were observed on February 7. The rounds were inconsistent and the PT, although entering the Psych Tech Daily Rounds information into EHRS for each caseload inmate, was not always inquiring about SI.

**Housing**: CSATF had 20 **MHCBs** that were previously found to be suicide-resistant. During the inspection, four of the rooms had been "redlined" for repairs, and approximately 14 of the available rooms were occupied with patients.

The facility had one administrative segregation STRH unit with 3CMS inmates, with GP inmates requiring administrative segregation often transferred to CSP/Corcoran. The STRH unit contained ten **New Intake Cells** (100-109) that had been previously retrofitted to be suicide-resistant. Upon inspection, all of the new intake cells were full on February 7, but <u>all</u> of the inmates housed in these cells were beyond their initial 72-hour new intake status. There was one new intake inmate confined in a wheelchair who was not housed in either a new intake cell or an ADA compliant cell. During PT rounds, this reviewer observed the inmate voice his displeasure to the PT that he was having difficulty positioning his wheelchair next to the toilet in order to transfer his body to the toilet without falling.

In addition, this reviewer was informed that new intake inmates who could not be housed in new intake cells within the STRH unit were transferred to the administrative segregation "overflow" cells located in E-Yard, Building 1. This reviewer subsequently inspected the designated overflow cells in E-1 and found that three new intake inmates were housed in the cells and <u>none</u> of the cells were suicide-resistant. Although the cells had retrofitted ventilation grates, each cell had gaps between the wall and the bunks, horizontal brackets that attached the stools to the walls, and gaps between the desktops and the walls. These hazards were easily conducive to suicide attempts by hanging.

Finally, this reviewer determined that the STRH unit had a capacity for approximately 200 inmates and housed 105 inmates on February 7. There were 56 empty single cells. The very problematic practice of housing new intake inmates in non-new intake cells, which was also found during this reviewer's previous assessment in January 2019, could have been easily corrected if the ten non-72-hour inmates housed in the STRH's new intake cells were properly housed in one of the 56 non-occupied single cells. Of note, several inmates in both the STRH and E-1 units complained that they had not received any entertainment devices (i.e., radios or tablets).

Finally, **Alternative Housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement continued to be used on a daily basis. Two wet (i.e., running water in sink and toilet) holding cells in the CTC and designated cells in E-1 unit (formally administrative

segregation) were primarily utilized for alternative housing. All inmates had beds, with those housed in the CTC holding cells provided stack-a-bunks. Inmates housed in the CTC holding cells were required to be observed on a 1:1 basis. Of note, similar to the previous assessment, this reviewer was initially provided data indicating that two TTA examination rooms (No. 166 and No. 167) in the CTC were also utilized for alternative housing. These rooms had been identified by this reviewer in the 2016 assessment as extremely problematic because inmates were being shackled to hospital beds in these rooms while on alternative housing status. Upon closer examination, this reviewer was again able to verify that although clinical assessments could occasionally occur in these TTA exam rooms, inmates were actually housed in the CTC holding cells. This reviewer would again strongly recommend to CSATF leadership that these TTA exam rooms not be listed in the "Location and Cell Type" column of alternative housing data reports. In fact, the current CSATF policy on alternative housing (OP-464) entitled "Alternative/ Temporary Housing," dated June 2021, incorrectly states that "Triage and Treatment Area (TTA) or other clinic exam room" could be utilized for housing. Such a policy is flawed and needs to be revised. Although a TTA exam room could be utilized for assessment, it should never be authorized for the housing of inmates on alternative housing status.

From November 2021 through January 2021, there were approximately 151 inmates placed in alternative housing, with all discharged within 24 hours. Approximately 62 percent (93 cases) of the MHCB referrals were rescinded and inmates returned to their housing units. This reviewer examined the EHRS charts of ten rescinded cases and found that the required SRASHEs and five-day clinical follow-ups were completed in all cases.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In fact, all patients remained on Suicide Precaution status (at a minimum) throughout their MHCB placement. The arbitrary practice of continuing suicide precautions status for all patients, including those who were not at risk for suicide, would only be problematic if such non-suicidal patients were not afforded full clothing and privileges. This reviewer's observation of several IDTT meetings, as well as review of medical charts, indicated that patients were appropriately clothed and authorized for possessions/privileges consistent with their suicide risk or lack thereof.

This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (CSATF 1, CSATF 2, CSATF 3, and CSATF 4) on Suicide Precaution status for a nine-hour period from 12:00 a.m. through 8:59 a.m. on November 29, 2021 for CSATF 1, January 1, 2022 for CSATF 2, January 26, 2022 for CSATF 3, and January 31, 2022 for CSATF 4. The observation rounds for three patients (CSATF 1, CSATF 3, and CSATF 4) each had two violations (i.e., checks in excess of the required 15-minute intervals); whereas CSATF 2 had five violations, with the longest gap of 43 minutes between checks. Violations were by multiple nursing staff.

Finally, a review of **Guard One** data for a recent 24-hour period found 99 percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently reviewed a listing of emergent/urgent mental health referrals for the six-month period of August 2021

through January 2022.  A sample EHRS review of 32 emergent/urgent mental health referrals for SI/behavior (in December 2021 and January 2022) found that mental health clinicians subsequently completed the required SRASHEs in only 84 percent (27 of 32) of the cases.  Most of the deficiencies were noted in urgent referrals.  A low level of compliance was also found during the previous assessment.

In addition, the **Crisis Intervention Team** was normally operational from approximately 9:00 a.m. to 10:00 p.m. seven days per week.  This reviewer was unable to observe the CIT process because all three designated CIT clinicians were unavailable (two were on vacation and one was on long-term leave).  In addition, auditing of CIT was challenged by the fact that the CIT Power Form in EHRS was not always utilized by nursing staff and mental health clinicians were sometimes inappropriately utilizing the Form for crisis responses that did not involve the full CIT (i.e., nursing and custody were absent).  The non-use of the CIT Power Form by nursing was only identified and reported in the SPRFIT meeting minutes in December 2021, and clinicians' inappropriate use of the CIT Power Form was first identified by this reviewer during the on-site assessment.

Six **IDTT Meetings** were observed in the MHCB unit on February 7-8, including two patients being discharged.  All team members were active participants, and different PCs were observed during the two days.  The two IDTT meetings involving patients being discharged from the MHCB were particularly problematic.  There were uneven case presentations, inadequate discussion regarding suicide risk, and no discussion regarding safety planning.  In fact, both patients had the same clinician and the clinician informed each patient during the meeting that "we will talk later about safety planning."  Of course, safety planning discussion should be initiated upon a patient's admittance into the MHCB (if stable enough to discuss), and not following a treatment team decision to discharge the patient.

In other IDTT meetings observed by this reviewer, although there was discussion by psychiatry regarding each patient's diagnoses and medication, there were uneven case presentations to include suicide risk history and prior in-patient placements.  In addition, although PCs would ask each patient about their meals and showers, there was no inquiry regarding other out-of-cell activities (e.g., access to program room, yard, and telephone calls).  When one patient (CSATF 5), who had been admitted into the MHCB unit three days earlier on February 4, inquired about access to a telephone on multiple occasions during their IDTT meeting, the PC appeared uncertain and incorrectly stated that the unit was on quarantine status and telephone calls were not permissible.  Of note, the patient had been placed on full issue status the previous day (February 6) and cleared for all out-of-cell activities.

In addition to staff uncertainty regarding allowance of telephone calls for MHCB patients, there seem to be widespread confusion and/or miscommunication regarding the provision of all **Out-of-Cell Time** for MHCB patients.  This reviewer's examination of 114-A forms for all 14 patients in the MHCB unit on February 7 found that none of the patients had documentation of receiving yard privileges and/or access to the telephone.  In the comments section of the 114-A forms, custody staff often wrote contradictory comments as to the reasons for a patient not receiving yard, such as "refused/quarantine," "not cleared/quarantined," or simply "quarantine." It appeared that both custody staff, as well as members of the IDTT in the MHCB unit, were

under the incorrect assumption that out-of-cell activity was prohibited because the unit was on quarantine status, despite the fact that patients were allowed out of their cells three times a week to shower, as well as permitted to attend IDTT meetings.

This reviewer reviewed the CDCR's "COVID-19 Mandatory 15-Day Modified Program" memorandum, effective since January 6, 2022.  The memorandum outlines the requirements for modified program and out-of-cell activities (including visiting, telephone calls, shower, recreation, etc.).  The memorandum not only allows for these out-of-cell activities, but also creates exemptions for restrictive housing units, CTCs (including MHCB units), and PIPs.  In addition, this reviewer examined the CSATF "Daily Program Status Report," dated February 7, 2022 and based upon the above CDCR memorandum.  The daily PSR also confirmed that out-of-cell activities such as dayroom, recreation, showers, and telephone calls were permitted throughout the facility.  There was no indication from this Report that MHCB patients were prohibited from engaging in any out-of-cell activities.  Finally, this reviewer received yet another explanation from custody personnel as to why MHCB patients were not allowed yard privileges – the CCTV in the yard had been broken since at least March 2021.  Although this equipment had purportedly been broken for almost a year (or even longer), there were no work orders provided to this reviewer to demonstrate a remedy for the problem.

In conclusion, the current practice of placing MHCB patients on lockdown status and inappropriately using the term "quarantine" as the rationale for prohibiting all out-of-cell activities (except for showers and IDTT attendance) was very problematic and should be immediately remedied.

In order to assess **<u>Discharge SRASHEs and Safety Plans</u>** required for patients discharged from the MHCB unit, the EHRS charts of 71 patients discharged from the unit between November 2021 and January 2022 were examined.  The review found that discharge SRASHEs and five-day clinical follow-ups were completed in all cases.  Although safety plans were required in 49 cases of patients admitted into the MHCB unit for DTS, the review found that safety plans were completed in only 31 percent (15 of 49) of the cases.  Safety plans were not completed in 69 percent of the cases because clinicians incorrectly assumed that such plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide.  Such a rationale ignores the fact that MHCB patients should be at low acute risk for suicide when they are discharged from an MHCB.  As exemplified by the following case (<u>CSATF 5</u>), even when completed, the quality of safety planning at CSATF was marginal:

> <u>Step 1</u> (Warning Signs):  Really stressed out, really depressed.
> <u>Step 2</u> (Independent Coping Skills):  Try to think of something else, something good, like family.
> <u>Step 3</u> (Distracting People & Places):  Yeah, some other inmates. Move to another unit.
> <u>Step 4</u> (People to Ask for Help):  Not really anyone.
> <u>Step 5</u> (Professionals to Contact): No one.
> <u>Step 6</u> (Means Safety):  That new unit.
> <u>Step 7</u> (Reasons to Live):  Family. Work.

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from August 2021 through January 2022. This reviewer's examination of the data found problems in untimely supervisory review. For example, discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, and the examination found that several supervisory reviews were occurring well after the IDTT meetings. In addition, the MHCB supervisory review did not identify the very problematic practice identified above in which MHCB clinicians (and perhaps the MHCB supervisor) incorrectly assumed that safety plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide.

The process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 141 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSATF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from July 2021 through December 2021. The review found that only 77 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing one or more days of the form, as well as discharges occurring on the weekends without a face-to-face assessment by a clinician. The majority of custody checks were recommended for 48 hours. In addition, only 78 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to time gaps for correctional officers consistently conducting checks at 30-minute intervals.

Finally, in this reviewer's general review of EHRS charts, there were several problematic practices found, including a CIT-trained clinician who included the following narrative in progress notes for several patients: "Patient may be given a 115 in the future if Pt. reports SI to influence housing." In addition, review of daily progress for MHCB patients found that several clinicians (both psychology and psychiatry) utilized "contracting for safety" to justify the rationale for issuing orders for observation and possessions.

**Intervention**: Housing units toured by this reviewer contained an Ambu-bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months (July 2021 through December 2021) of SPRFIT meeting minutes found that quorums were achieved for all of the meetings. Meetings were scheduled for 60 minutes, and meeting minutes were normally only four to five pages in length. Meeting topics consistently included, but were not limited to, training, CIT, SRASHE

completion, self-harm data, and five-day follow-up assessments. Of note, although three serious suicide attempts (i.e., medical severity rating of "3") and one suicide were reported in October and November 2021, the meeting minutes did not contain any discussion, case summaries, and/or RCAs of these incidents. In addition, although the minutes indicated the number of inmates in the SRMP, there was no review or discussion of SRMP inmates. Most importantly, none of the deficiencies found during this reviewer's current assessment were previously identified by the SPRFIT.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. CSATF had the following LOPs that were consistent with these CCHCS directives - "Operational Procedure No. 515: Notification of Inmate Bad News," dated July 6, 2021; "Operational Procedure No. 484: Crisis Intervention Team," dated November 24, 2021; and "Operational Procedure No. 230: Suicide Risk Management Program," which was undated and unsigned. A SPRFIT LOP was in effect.

**Training**: According to training records, 100 percent of both custody and nursing personnel were currently certified in CPR. In addition, 94 percent of custody staff, 85 percent of medical staff, and 90 percent of mental health staff received annual suicide prevention block training during the previous 12 months. Finally, as of February 2022, 100 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 96 percent had completed safety plan training.

**Recent Suicides**: CSATF experienced one (1) inmate suicide during the review period. In that case (CSATF 6), the inmate was found hanging from an unknown device by a sheet in his STRH unit cell during the evening of November 24, 2021. The inmate entered the CDCR system on December 14, 2010 to serve a 16-year to life sentence for murder. He had been transferred to CSATF on July 18, 2017. The inmate had incurred six RVRs during his confinement, the most recent of which occurred on September 11, 2021 for battery on a peace officer. He was known to be gang-affiliated. The inmate was unmarried, but had a significant other/girlfriend, and did not have any children. Other than some mention of support from his significant other/girlfriend, there was no indication that the inmate had any family support through letter correspondence, telephone calls, or visits during his confinement.

According to very limited available records, the inmate was raised by his parents in a dysfunctional environment and was subjected to sexual abuse by his uncle, as well as physical abuse by both parents. Both parents were said to have substance abuse issues. There was conflicting information regarding the number of siblings in the family. The inmate did not graduate from high school, and began using illegal substances at the age of 13. It was approximately at this time that he became homeless and eventually found his way from Mexico to the United States. The inmate did not have any history of juvenile arrests and his first adult criminal arrest occurred at the age of 23 for possession of drugs. He had a limited history of mental health treatment in the community, including prescribed medication for a thought disorder as a teenager.

Upon entry into CDCR, the inmate was placed in the MHSDS at the 3CMS LOC. He was diagnosed with depressive disorder with a rule out for major depressive disorder. Records indicated that he had been diagnosed with adjustment disorder and prescribed psychotropic medications in the county jail. The inmate had also previously attempted suicide by hanging in jail. He was initially prescribed psychotropic medication within CDCR, but was not always compliant. By January 2012, the inmate had decompensated to the point where he began reporting AH telling him that others were trying to kill him. He also disclosed that he had been gang-affiliated. The inmate was subsequently placed in administrative segregation for his own safety and his level of care was increased to EOP. On January 20, 2012, he began to engage in SIB by cutting himself. The inmate was admitted into an MHCB and subsequently discharged back to EOP on February 7, 2012 with diagnoses of major depressive disorder, PTSD, and polysubstance dependence.

Several months later in June 2012, the inmate reportedly made a noose and expressed SI following receipt of an RVR for overfamiliarity with staff. He was assessed, but not admitted into an MHCB. In November 2012, the inmate reported that his command hallucinations had returned, and he began to again engage in SIB by cutting. He was readmitted into an MHCB and later returned to EOP. However, on December 25, 2012, the inmate was transferred to an outside hospital following a drug overdose. Upon return, he denied that the overdose was a suicide attempt and he remained in EOP. The inmate was again admitted into an MHCB on November 20, 2013 following the reoccurrence of SIB by cutting after receiving news that his mother had died. He was subsequently discharged and programmed relatively well in EOP until July 2016 when he was readmitted into an MHCB for SI. The inmate's diagnoses were revised to schizoaffective disorder and PTSD. He was readmitted to an MHCB for the fourth and final time on November 27, 2017 following further SIB by lacerating his arm. The inmate was discharged from the MHCB the following day (November 28), with his chronic and acute risk for suicide both assessed as moderate.

The inmate appeared to function well in EOP during most of 2018 and his level of care was scheduled to be lowered to 3CMS on December 18, 2018. However, he engaged in SIB that same day. A SRASHE was completed, with the inmate denying SI and he was not admitted into an MHCB. His level of care was lowered to 3CMS the following week on December 26, 2018. During an IDTT meeting in January 2019, the treatment team discussed the inmate's tendency to cut himself as a means of stress relief and one of his treatment goals became decreasing his SIB to less than two times per week. In March 2020, the inmate began requesting a variety of groups with the hope that attendance in these groups would make a positive impression on the BPH. However, in July 2020, the inmate began cutting himself again as a result of anxiety related to COVID-19, as well as allegedly being assaulted by his cellmate. He was subsequently transferred to a different yard and his level of anxiety lessened. During a routine contact with his PC on September 8, 2020, the progress note indicated that the inmate continued to function well and was denying most mental health symptoms, including any thoughts of SIB. The note documented that he would be offered bi-weekly contact, which did not subsequently occur and the rationale for these increased contacts was unclear. In addition, no order was placed in the EHRS to see the inmate on a more frequent basis and, in fact, he was not seen again until several months later on January 19, 2021.

On January 19, 2021, the inmate met with his PC and reported a desire to get into the MAT program, stating "I cannot live like this anymore, I want to be off drugs." He was subsequently evaluated, and a determination was made that he did not qualify for the MAT program. The inmate was seen again by for a PC contact on March 25, 2021 at which time he did not report any significant symptoms of distress. His July 2021 PC contact also indicated that the inmate was relatively distress-free. On September 11, 2021, the inmate verbalized SI and the resulting SRASHE determined that his acute risk for suicide was low because the reported SI was secondary to safety concerns arising from a drug debt. He was not admitted into an MHCB but, while being escorted back his housing unit, the inmate assaulted an officer and stated "I'm sorry…. I prefer…. that you guys (custody) kill me then the inmates." The inmate was placed in the STRH unit.

During his confinement in the STRH unit, although the inmate was regularly seen by mental health staff, the interactions were not always weekly as required. In addition, records indicated that he was rarely offered confidential, out-of-cell appointments with his PC. The inmate's final contact with his PC occurred on November 16, 2021. The progress note indicated that he denied any SI and was otherwise unremarkable. In addition, the medical chart also contained a progress note suggesting that the inmate was seen by his PC on November 24, 2021, the day of his death. However, subsequent investigation indicated that such a contact never occurred, therefore, the progress note was falsified by the clinician. Finally, subsequent interviews with two STRH clinicians indicated that they had reportedly been directed by their supervisor not to offer confidential, out-of-cell contacts to inmates, rather, only cell front contacts were necessary.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide. He did not leave a suicide note and did not have any medical issues that were thought to be contributory to his death. The CDCR reviewer theorized "that a combination of external stressors and psychiatric symptomology influence his decision" to end his life.

The Suicide Report contained seven (7) recommendations for corrective action through a QIP:

> 1) The inmate's annual IDTT was held on January 19, 2021 and the documentation in the clinical summary portion of the Master Treatment Plan is exactly the same verbiage that was used in the December 26, 2018 Master Treatment Plan. This includes details such as the statement '(patient) recently cut on his arm' which by January 19, 2021, was no longer true. Per MHSDS *Program Guide*, 2009 Revision (12-3-11), 'Treatment Plans are updated at least annually, whenever a change in level of care occurs, or when clinical judgment indicates the need for an update.'

> 2) There is a concerning pattern in this case of mental health providers documenting that interventions would be offered to this patient which weren't ultimately provided. As indicated in the body of this report, the patient was seen for an MHPC routine contact on September 8, 2020 and the clinician specifically documented that the patient would be offered bi-weekly sessions after that. The patient was not offered biweekly sessions. On September 17, 2021, a different

clinician documented that the safety plan would be reviewed and updated during the week and it was not.

3) During an MHPC routine contact on September 8, 2020, the clinician indicated that the inmate continued to function well and was denying symptoms, including any thoughts of self-harm, but documented that the inmate would be offered contacts bi-weekly. However, the inmate was not seen for another PC contact until January 19, 2021, which was outside of *Program Guide* timeframes. According to the closed appointments report, there were a total of four MHPC contacts that were scheduled but canceled for reasons that are not clear in the mental health documentation, between the dates of September 8, 2020 and January 19, 2021.

4) There is a note in the chart reflecting a clinical contact for the inmate on the date of his death, November 24, 2021. However, this note raises several concerns. Specifically, the note says 'patient seen in housing unit due to staff shortage by supervisor's direct order. No issues of clinical concern noted. Check in and out times are not accurate due to supervisor directive.' Additionally, when interviewed, the clinician who wrote the note stated that he did not engage verbally with the patient that day and did not offer him a confidential contact. Although the note is timestamped at 0925, the patient was checked in for his appointment at 1400. Upon interviewing this clinician, he stated that he did not recall seeing the inmate that day and did not actually offer him a clinical contact, as he was under the impression he was directed not to do so.

5) During the onsite portion of this review, two different clinicians working in the STRH reported they were often directed by a supervisor to not offer out-of-cell contacts, but rather to see inmate-patients at cell front only.

6) Psychiatry: Psychiatric nurse practitioner (PNP) clinical note on September 28, 2021 includes a written plan to see the patient again in four weeks (four weeks from the September 28th appointment). Review of the electronic medical record did not reveal a scheduling order for a four-week appointment with PNP/ psychiatrist and did not reveal a PNP or psychiatry clinical contact four weeks following the September 28th appointment, as was planned in the September 28th note.

7) During the review of staff reports it was noted the responding officers failed to support the inmate's body as the ResQhook was being utilized, allowing him to 'fall to the floor' as instructed in the January 22, 2018 Memorandum entitled 'Response to Suicide Attempts by Hanging or Asphyxiation, Introduction of the Replacement Cut-Down Tool, and Standardization of the Cut-Down Tool Kit.'

**Audit Summary**: Although there were adequate practices found in alternative housing, Guard One compliance, and CPR and suicide prevention training, there were multiple deficiencies found during this assessment that require corrective action. These deficiencies included

observation of a PT conducting daily rounds in the STRH unit and not consistently inquiring about SI, new intake inmates not properly housed in new intake cells because other inmates who were no longer on 72-hour new intake status continued to be inappropriately housed in those cells, inadequate compliance rates for SRASHEs required for emergent/urgent mental health referrals for suicidal behavior, inadequate documentation of CIT referrals, inappropriately using the term "quarantine" as the rationale for prohibiting all out-of-cell activities (except for showers and IDTT attendance) for MHCB patients, yard privileges not provided to MHCB patients because CCTV equipment had purportedly been broken since at least March 2021, problematic IDTT meetings for MHCB patients, inadequate safety plans and inadequate MHCB supervisory review of those safety plans, and low compliance rates regarding discharge custody check forms by clinical and custody personnel.  Progress notes from multiple MHCB clinicians indicating their patients were "contracting for safety," as well as a CIT clinician threatening disciplinary action on inmates who were perceived to be expressing SI for secondary gain, was also very problematic.  Most importantly, almost all of the above deficiencies had not been previously identified by the facility's SPRFIT.

### 16)    California State Prison - Corcoran (CSP/Corcoran)

**Inspection**:  February 9-10, 2022 (previous suicide prevention audit was October 2-3, 2019).  CSP/Corcoran housed approximately 3,471 inmates at the time of the on-site assessment.

**Screening/Assessment**:  Because there were not any inmates admitted into CSP/Corcoran during the two-day assessment, the **Intake Screening** process within the R&R unit could not be observed.  Daily **PT Rounds** were observed in three ASUs (EOP Hub, STRH, and LTRH) on February 9 and 10.  Overall, the rounds were generally unremarkable, and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Form and entering the information into the EHRS.  In one of the long-term restrictive housing (LTRH) units, however, the PT was observed to be struggling with both the interaction with inmates, as well as entering information into the EHRS.  For example, despite an uneventful encounter, it took approximately 15 minutes for the PT to both interact with the first inmate and complete the EHRS entry.  This reviewer was subsequently informed by a PT supervisor that the observed PT was a seasoned employee, and perhaps this individual was simply uncomfortable being observed by an outside reviewer.

**Housing**:  CSP/Corcoran had 24 **MHCBs** that were previously found to be suicide-resistant.  During the inspection, one of the rooms had been "redlined" for repairs, and approximately 14 of the available rooms were occupied with patients.

In addition, there were five **New Intake Cells** (101-105) located in the STRH unit and five new intake cells (124 through 128) located in the EOP ASU (or Hub).  During inspection of both of these units, all new intake inmates were observed to be in new intake cells.  This reviewer was informed that although the STRH unit periodically exceeded its capacity for new intake cells, the EOP Hub rarely exceeded its capacity for new intake cells. When additional cells were needed for STRH new intake inmates, the inmates were transferred to the EOP Hub.  This reviewer was also informed that four additional new intake cells were scheduled to be retrofitted within the EOP Hub.

Finally, **<u>Alternative Housing</u>** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in nine designated cells within the EOP Hub. All cells used for alternative housing had beds, and inmates were required to be observed on a continuous 1:1 basis. Alternative housing was used on a daily basis at CSP/Corcoran. During the three-month period of November 2021 through January 2022, there were approximately 155 inmates placed in alternative housing, with all but six (four percent) released within 24 hours. The longest length of stay in alternative housing was 38 hours. In addition, approximately 41 percent (64 cases) of the MHCB referrals were rescinded and inmates returned to their housing units. Examination of the EHRS charts for all of these rescinded cases found that required SRASHEs were completed in all cases.

**Observation**: Both Suicide Precaution and Suicide Watch statuses were being used in the MHCB unit. Patients not on suicide observation status were required to be observed at 30-minute intervals. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on September 17, 2021 for <u>COR 1</u>, on February 4, 2022 for <u>COR 2</u>, on February 5, 2022 for <u>COR 3</u>, and February 9, 2022 for <u>COR 4</u>. The chart review found multiple violations (i.e., checks in excess of required 15-minute intervals) in all four cases. For example, <u>COR 1</u> and <u>COR 3</u> each had ten violations, <u>COR 4</u> had eight violations, and <u>COR 2</u> had four violations. Violations in the four cases were by multiple nursing staff.

Finally, a review of **<u>Guard One</u>** data for a recent 24-hour period found a combined 98 percent compliance rate in the STRH, EOP Hub, and LTRH ASUs with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of from August 2021 through January 2022. A sample EHRS review of 23 cases of emergent/urgent mental health referrals for SI/behavior found that clinicians completed the required SRASHEs in 91 percent (21 of 23) of the cases.

In addition, a **<u>Crisis Intervention Team</u>** was launched at CSP/Corcoran in October 2018 and operational seven days a week. Although the local CIT policy did not specify a coverage hour range, this reviewer was informed that CIT activation was dependent upon clinician availability each day. The CIT program was very active, and this reviewer was presented with data which indicated that CIT referrals ranged from 54 to 78 per month during June through November 2021.

This reviewer observed one CIT activation on February 9. The inmate (<u>COR 5</u>) presented with a challenging case. He had recently been discharged from the MHCB at RJD and arrived at CSP/Corcoran that morning in order to attend a court hearing the following day (February 10). The inmate was being temporarily housed in the EOP Hub. The CIT had been activated because "RJD contacted COR regarding a 7362 IP submitted on February 8, 2022 while housed at RJD MHCB indicating that he was discharged from MHCB LOC 'despite reporting continued

thoughts of self-harm'." The CIT, comprised of a clinician, nurse, and sergeant (from the EOP Hub), huddled and discussed the case prior to meeting with the inmate. The team then met with the inmate in a semi-private area of the dayroom. The inmate had an extensive history of suicide attempts and self-injurious behavior, and had previously been assessed as being at high chronic risk for suicide. Although he denied any current SI on February 9, the inmate openly admitted that he had urges to cut himself as a way to self soothe and reduce anxiety in anticipation of his court hearing. He wanted to attend his court hearing the next day, while at the same time expressed a need to engage in SIB. The inmate was concerned that if he was again admitted into an MHCB, his court hearing would be postponed, and the judge would be angry. Following a lengthy assessment that took almost an hour and included initial development of a safety plan, the clinician decided to refer the inmate to the MHCB. The required SRASHE was completed and the inmate was subsequently placed in the MHCB later that afternoon. The CIT response was timely, team members worked well together, and documentation subsequently entered into the EHRS was comprehensive.

Three **IDTT Meetings** in the MHCB unit were observed on February 9-10, including one patient being discharged. There was good treatment team representation in each of the cases. The meeting involving the patient being discharged was presented by the MHCB supervisor who was filling in for a clinician that was on leave. The supervisor provided a good case presentation that included case formulation, diagnoses, and safety planning. The patient was provided a copy of his safety plan. The two remaining meetings were held in absentia because the patients refused to participate. Both cases involved initial IDTT meetings and were uneventful, with clinicians simply reading their initial assessments verbatim to team members.

With regard to **Out-of-Cell Time** afforded to MHCB patients, a previous finding from this reviewer's fourth re-audit assessment regarding numerous deficiencies in authorization of both possessions and privileges for MHCB patients had apparently been resolved (with the exception of yard, see below). All MHCB patients appeared to be clothed and authorized to receive possessions/ privileges that were consistent with their level of suicide risk or lack thereof. Further, this reviewer spoke with the RT who was assigned to the MHCB unit on a full-time basis. The RT reported that he encouraged each patient to come out of their cell and into the program office on a regular basis where they were able to make telephone calls (when authorized) and participate in unstructured activities, such as puzzles, watching a movie, etc. The RT informed this reviewer that access to the yard was the responsibility of custody officers.

This reviewer's examination of 114-A forms for all 14 patients in the MHCB unit on February 9 found that, although patients were receiving showers, as well as telephone calls through the RT in the program office, most of the patients had not been offered yard privileges. In the comments section of the 114-A forms, custody staff often wrote contradictory comments as to the reasons for a patient not receiving yard, such as "refused/quarantine," "not cleared/ quarantine," or simply "quarantine." This reviewer also received conflicting information as to why MHCB patients were not receiving out-of-cell activities. When a custody officer assigned as the yard officer was asked why patients were not receiving yard, they responded that yard had started again today (February 9) when the unit was taken off quarantine status. Other custody officers suggested that the quarantine status had been initiated by medical staff. When the nurse supervisor was asked about the quarantine status, they correctly responded that the unit

210

quarantine did not prohibit out-of-cell movement, it simply necessitated physical distancing between patients, use of face masks, and disinfecting certain areas (such as telephones after each patient use of the program office). A nurse informed this reviewer that a custody officer had informed her that custody did not want to "contaminate the hallway" by escorting patients to the yard.

In sum, certain staff, primarily custody personnel, were under the incorrect assumption that yard privileges were suspended because the unit has on quarantine status, despite the fact that patients were allowed out of their cells three times a week to shower, attend IDTT meetings, and interact with the RT in the program office. This reviewer reviewed the CDCR's "COVID-19 Mandatory 15-Day Modified Program" memorandum, effective since January 6, 2022, with various CSP/Corcoran personnel. The memorandum outlines the requirements for modified program and out-of-cell activities (including visiting, telephone calls, shower, recreation, etc.). The memorandum not only allows for these out-of-cell activities, but even creates exemptions for restrictive housing units, CTCs (including MHCB units), and PIPs.

Finally, the previously identified issue of MHCB patients on maximum-security/administrative segregation status receiving yard privileges still appeared to be unresolved. Such patients had historically not been offered yard privileges within the CTC because the yard attached to the MHCB unit had previously been determined to be unsecure for maximum-security patients. The issue was first reported by this reviewer in 2014. Although there had been previous discussions about installing a small management yard within the CTC yard, this reviewer had been most recently advised that MHCB patients on maximum-security/administrative segregation status would be offered to be escorted to the yard attached to the STRH unit. This reviewer, however, could find no verification during this current assessment that such a protocol was being offered. (Of note, as reflected in the monthly SPRFIT minutes, the regional suicide prevention coordinator presented audit findings in both August and October 2021 and also reported that such a protocol "was not observed'' during the tour.)

In conclusion, the current practice of inappropriately using the term "quarantine" as the rationale for prohibiting yard activities should be immediately remedied.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined a sample of EHRS charts of ten patients discharged from the unit during December 2021 and January 2022, who had been admitted into the MHCB for DTS, and remained at CSP/Corcoran. The required discharge SRASHEs and five-day clinical follow-ups were completed in all cases, and safety plans were completed in 90 percent (nine of ten) of the cases. In the case (COR 6) in which a safety plan was not completed, the clinician incorrectly pulled forward a prior inadequate safety plan because the patient refused to participate in the process following his discharge IDTT meeting. Of note, in an effort to increase the quality of safety planning within CDCR, CSP/Corcoran was participating in a headquarters-initiated pilot project during November and December 2021. Despite the pilot project introducing a new template that attempted to both improve the quality of plans and avoid the practice of MHCB clinicians deferring safety planning to outpatient clinicians, review of several safety plans indicated continued problems with the development of specific strategies and coping skills to reduce suicide risk. For example, in one reviewed case (COR 7), the clinician simply

deferred safety planning to the outpatient clinicians by stating "MHPC will work with IP on identifying ways to get his perceived needs met in appropriate manner" and "MHMD will work with IP to address psychotropic medication needs…MHPC will work with IP to learn coping skills to address SI and AH."

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from August 2021 through January 2022. This reviewer's examination of the data found problems in untimely supervisory review. For example, discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, and the examination found that several supervisory reviews were occurring well after the IDTT meetings. In addition, there was no data provided to indicate that MHCB supervisory review of safety plans occurred during January 2022.

Finally, the process by which inmates were provided **<u>Discharge Custody Checks</u>** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 85 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSP/Corcoran and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from August 2021 through January 2022. The review found that only 84 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing one or more days of the form, as well as discharges occurring on the weekends without a face-to-face assessment by a clinician. The majority of custody checks were recommended for 48 hours. In addition, only 70 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to time gaps for correctional officers consistently conducting checks at 30-minute intervals, as well as missing custody check forms.

**Intervention**: Housing units toured by this reviewer contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months (July through December 2021) of SPRFIT meeting minutes found that a quorum was not achieved during any month except for November 2021. Overall, however, meeting attendance was very strong and normally included over 20 participants. Meetings were scheduled for 60 minutes, and meeting minutes were robust and between 15 and 20 pages in length. Minutes consistently included, but were not limited to, presentation of data and graphs for discharge custody checks, CIT, training, and nursing audits. Minutes also listed inmates placed in the SRMP, as well as appropriately provided brief information regarding each case. Various corrective action items and recent regional SPRFIT

audits were also contained within meeting minutes. Of note, although four serious suicide attempts (i.e., medical severity rating of "3") were reported in July, September, and December 2021, the meeting minutes did not contain any discussion, case summaries, and/or RCAs of these incidents. A SPRFIT LOP was in effect.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. CSP/Corcoran had the following LOPs that were consistent with these CCHCS directives - "Operational Procedure No. 1101: Notification of Inmate Bad News," dated June 2021; "Operational Procedure No. 1031: Crisis Intervention Team," dated February 2021; and "Operational Procedure No. 1018: Suicide Prevention" which contained the "Suicide Risk Management Program" in August 2021.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 90 percent of custody staff, 96 percent of medical staff, and 96 percent of mental health staff completed annual suicide prevention block training during the previous 12 months. Finally, as of February 2021, 98 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training. These compliance rates for SRE and safety planning training were significantly improved since this reviewer's prior assessment.

**Recent Suicides**: CSP/Corcoran experienced two (2) inmate suicides during the review period, both occurring in 2020. In the **_first_** case (COR 8), the inmate was found hanging from the top bunk by a sheet in his GP cell during the late afternoon of January 4, 2020. The inmate entered the CDCR system on October 12, 2017 to serve a six-year sentence for a variety of offenses, including robbery, vehicle theft, and evading a peace officer. He had been transferred to CSP/Corcoran on November 25, 2019. The inmate incurred 12 RVRs during his confinement, the most recent of which occurred on September 14, 2019 for fighting. He was known to be gang-affiliated. The inmate was unmarried and did not have any children. Records indicated that he had some family support through letter correspondence and telephone calls with his fiancée of three years, as well as occasional visits.

According to available records, the inmate and five siblings were raised by his mother until the age of six. There was little documentation regarding his father, but records indicated that the inmate's father was incarcerated for most of his formative years. The inmate and his siblings were removed from his mother's care due to her addiction to drugs, and placed in foster care. He reported both physical and sexual abuse as a child by a variety of individuals, including an older brother's friend, foster parents, and his mother's boyfriend. The inmate also reported a history of mental illness, including depression and psychosis. He had a family history of drug abuse, and his drug use began at the age of 11 and involved a variety of illegal substances. Although it was reported that he was formally adopted by his grandmother at age 14, other records indicated that he spent much of his youth in juvenile detention facilities. The inmate was able to attain his GED during juvenile hall confinement. He had a very limited employment history. The inmate became gang-affiliated at the age of 14 and had an extensive history of juvenile and adult arrests and convictions.

Upon entry into CDCR, the inmate screened positive for mental health issues, including depression, mania, and anxiety beginning during his childhood. He was placed in the MHSDS at the 3CMS LOC with a diagnosis of bipolar disorder. The inmate chose not to start psychotropic medication. Less than a month later on November 2, 2017, the inmate was placed in administrative segregation for his participation in a gang riot. He later told a clinician that he was "disinterested in attending treatment groups and plans to continue his refusals." As such, during an IDTT meeting on November 14, 2017, the treatment team agreed to remove the inmate from 3CMS, with the rationale for removal being that he denied any mental health issues and had not been taking medication for more than six months.

The inmate's placement in administrative segregation approximately three weeks following his admission exemplified his struggles during CDCR confinement. In fact, he had multiple placements in administrative segregation during 2017 through 2019, most of which were the result of RVRs and assaults by members of his own gang. The inmate was offered SNY consideration on multiple occasions, but he consistently denied safety or enemy concerns, and claimed he wanted to remain in GP.

In late January 2018, he was again placed in administrative segregation after being the victim of a battery. The inmate was seen a few days later by a clinician and reported auditory and visual hallucinations almost daily, as well as paranoia and anxiety. Despite pressures from his gang, he agreed to be placed back into 3CMS during an IDTT meeting on February 7, 2018. The inmate was diagnosed with bipolar disorder and schizophrenia, and started on psychotropic medication. He continued to struggle with mental health symptoms, and continued to be victimized by assaults. During most of 2018, the inmate was transferred to different institutions, and was in and out of administrative segregation for safety reasons.

The inmate continued to struggle with self-esteem, depression, paranoia, and anger during the next year. In January 2019, he filed a PREA allegation against a staff member claiming that they had made inappropriate remarks about his sexuality during work. He resigned from the job and a subsequent investigation found that the allegations were unfounded. In May 2019, the inmate told both his PC and psychiatrist that he wanted to be removed from 3CMS, stating "I can't be on it no more.... My race doesn't want me on it." During an IDTT meeting on July 24, 2019, the team decided to discharge the inmate from 3CMS, with the rationale that he "agreed to let the clinician or staff know if he has any concerns/safety issues. He has met all his treatment goals and built up his self-esteem." The treatment team also indicated that he had been taken off psychotropic medication and was programming at a "high level." Review of the same documentation by the CDCR reviewer in this case indicated that the inmate was neither stable nor ready for discharge from the MHSDS.

The inmate never reported any history of suicidal behavior, and consistently denied SI throughout his CDCR confinement. His last SRASHE, completed on July 23, 2019, indicated both a low chronic and acute risk for suicide.

On two separate occasions in September 2019, the inmate was again assaulted by gang members and placed back into administrative segregation for safety concerns. Despite the assaults, he

continued to deny any safety concerns or mental health issues, including suicidality. During an assessment by a clinician on October 14, 2019, the inmate acknowledged that he had problems on the yard and although endorsing some mental health symptoms, he declined wanting to receive mental health services again because of gang pressure. Despite his refusal, the clinician noted that his insight and judgment were poor and recommended reinstatement into 3CMS. He was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood, and unspecified bipolar disorder.

The inmate was released from administrative segregation on October 24, 2019 and was immediately assaulted that day on the yard, suffering bite wounds to his left arm and losing part of his left ear. Following treatment at an outside hospital, he was transferred to CSP/Corcoran on November 25, 2019. During the initial mental health assessment, the inmate refused to meet with the clinician and insisted that he was no longer in 3CMS. The clinician later reported that the inmate "was terrified to be seen talking to mental health." He subsequently refused all out-of-cell appointments and only saw clinicians briefly at cell front. Documentation contained within the MH Master Treatment Plan from the last IDTT meeting held in absentia on December 10, 2019 provided minimal information regarding the inmate's current circumstances. For example, there was no information regarding his recent assaults and safety concerns, and the treatment plan simply quoted his attestations that he had no such concerns. Much of the documentation from the IDTT meeting was pulled forward from previous treatment plans. The documentation was also inaccurate, suggesting that he would continue to be seen weekly in administrative segregation and offered weekly STRH groups, whereas the inmate had actually been previously discharged from administrative segregation and housed in GP since October 24, 2019.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide. A brief suicide note addressed to his fiancée, with whom he had a turbulent relationship with during the past several months, simply stated "Goodbye. He's moving on now! Forever." The inmate did not have any medical issues that were thought to be contributory to his death. The CDCR reviewer theorized the inmate:

> had been the victim of at least six different gang-affiliated batteries within a two-year period. He has a mental illness which was not well-controlled due to his inability to simultaneously receive appropriate care for his mental illness while also remaining a (gang member) in good standing. He additionally had an up-and-down relationship with his fiancée, which appeared to be very significant to him and caused him added stress when he could not lean on her for support. Two weeks prior to his death, she indicated she sent him another breakup letter, but he wrote back saying he did not believe her and they would be fine. Whether he actually was fine or the stress of thinking she may have actually abandoned him this time, coupled with the pressure to assimilate in the new yard at COR while dealing with an untreated mental illness, may have exceeded his abilities to cope. The fact he ended his life two days before his building was to come off lockdown (which may have forced him to further engage in inmate politics) may also have played a role in the timing of his decision.

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

1) <u>WSP</u>:  The inmate's IDTT/MH Master Treatment Plan documentation from May 15, 2019 was confusing and contained a variety of inconsistencies (including information that was pulled forward which was no longer current or accurate, contained more than one case conceptualization, and was unclear about diagnosis and treatment interventions to address his symptoms).  See Discussions/ Conclusions section for more information.

2) <u>WSP</u>:  The inmate was prematurely discharged from CCCMS on July 24, 2019. (See Discussions/Conclusions section for more information.)  He was neither stable nor ready for discharge, and had not been medication-free for a period of six months.  Per Program Guide (12-3-13): 'Inmate-patients may be clinically discharged from CCCMS if they have been in continuous remission and are functioning adequately in the mainline without treatment (including medication) for six months.  Inmates shall be seen for 90-day clinical contacts throughout the six-month period.'

3) <u>COR</u>:  Initial IDTT/MH Master Treatment Plan documentation from December 10, 2019 was largely pulled forward (due to the inmate's refusal to engage with mental health clinicians) without checking for documentation accuracy or consistency.  Additionally, minimal consideration was given to the inmate's victimization by his own fellow gang members just prior to his transfer to COR.

4) <u>WSP</u>:  The July 23, 2019 SRASHE was insufficient as it underestimated both chronic and acute suicide risk levels and missed some ISPATHWARM indicators. Safety planning was completed but did not acknowledge the inmate's most significant issues which put him at higher risk for suicide. (See Discussions/ Conclusions section for more information.)

5) <u>WSP</u>:  A psychiatry note crafted on June 6, 2019 did not contain the necessary elements or did not clearly document that the patient was unwilling to answer questions posed.

6) <u>COR</u>:  During the review of staff reports it was noted the responding officers did not immediately relieve pressure from the inmate's airway by using a stable object for support of the inmate's body or by physically lifting the inmate's weight off the noose as instructed in the January 2018 Memorandum titled 'Response to Suicide Attempts by Hanging or Asphyxiation, Introduction of the Replacement Cut-Down Tool and Standardization of the Cut-Down Tool.'

7) <u>COR</u>:  Resuscitation was initiated to a patient with rigor mortis (stiff jaw and upper extremities) contrary to HC DOM 3.7.1, Emergency Medical Response System, p.4 section (D) 1.

8) <u>HQ-SPRFIT</u>:  Between December 22, 2017 and November 14, 2019, the inmate (who had on-going mental health issues) was a victim of gang-related batteries by members of his own race.  When these batteries were investigated by custody staff, the inmate consistently denied safety concerns and refused to go SNY.  However, he continued to be transferred to different prisons and eventually back on GP yards, where he remained a target for on-going assault by his on race since he would not disaffiliate from gang membership.  This dilemma of requiring mental health services but lack of willingness to debrief from the gang may have contributed to the inmate's choice to end his life.

In the ***second*** case (<u>COR 9</u>), the inmate was found hanging from the plumbing chase access port by a sheet in his LTRH unit cell during the early evening of May 26, 2020.  The inmate entered the CDCR system on June 1, 2017 to serve a three-year sentence for burglary and assault.  He had most recently been transferred to CSP/Corcoran on February 9, 2020.  The inmate incurred 11 RVRs during his confinement, the most recent of which occurred on October 30, 2019 for battery on a peace officer.  He was not known to be gang-affiliated.  The inmate was unmarried and did not have any children.  Records indicated that he had some family support through letter correspondence with his sister, a girlfriend, and uncle.

According to available records, the inmate and five siblings were initially raised by their mother.  He had a chaotic early childhood which included exposure to substance abuse, familial mental health problems, and placement in foster care as the result of physical and emotional abuse and neglect.  The inmate also had behavioral problems, including truancy and other acting out behaviors in school.  He did not complete high school and had a sporadic employment history.  The inmate began consuming alcohol and other illicit drugs at age 13.  At age 16, he began using methamphetamine.  The inmate had an extensive history of juvenile offenses that included several juvenile hall placements.  He was released from juvenile hall when he turned 18 and was "unsuccessfully terminated from juvenile probation."  The instant offense occurred approximately six months later in March 2016.  At the time, he was unemployed and transient.  Available records did not indicate any treatment for mental health issues in the community, however, records did indicate escalating anger issues.

Upon entry into CDCR, the inmate screened negative for mental health issues and was not initially placed in the MHSDS.  However, six months later in December 2017, he requested psychotropic medication for ongoing depression and anxiety.  The inmate was diagnosed with adjustment disorder, oppositional defiant disorder, and polysubstance dependence.  He was placed at the 3CMS LOC.  During the next three years, the inmate had 24 level of care changes between 3CMS, EOP, and MHCB.  He was placed in the MHCB on ten occasions, the most recent of which occurred from February 28, 2020 through March 5, 2020.  In addition, the inmate was placed in 28 CDCR facilities during his confinement, including multiple placements at several facilities.  Records indicated that he was unable to function in GP and lived mostly in either administrative segregation or the MHCB.  During his confinement, the inmate demonstrated low frustration tolerance, difficulty adapting to undesirable environments, and was easily overwhelmed.  In response to these challenges, clinicians opined that he often reported SI to change housing and/or his level of care.

In early 2020, the inmate was at the 3CMS LOC and his housing alternated between LTRH and two MHCB placements.  On January 29, 2020, he was seen by the CIT due to SI and AH, and reported to be not eating or drinking.  The inmate stated that he had planned to attempt suicide earlier in the month by shredding his sheets and making a ligature.  He also reported prior attempts by hanging in May 2019 and an overdose in October 2019.  Although he was placed in an MHCB, clinicians noted in documentation that the inmate had a history of claiming suicidality to affect his housing.  And during a subsequent clinical session in the MHCB, he admitted to feigning AH symptoms in the past to get into an inpatient program.  On February 16, 2020, the inmate was seen again by the CIT for SI.  He was not referred to an MHCB following an assessment that determined his acute risk for suicide was low. The inmate also revealed that he often sought MHSDS placements for sentence leniency in pending court cases.  A few weeks later on February 28, the inmate again expressed SI and was referred to the CIT after informing his clinician that he had planned to hang himself with a sheet. He was admitted into an MHCB, but later recanted the suicide threat and admitted he simply wanted a new cellmate upon his return to LTRH.  He was assessed as malingering and discharged from the MHCB on March 5, 2020.  The inmate was returned to 3CMS in the LTRH unit.  In April 2020, he met briefly with his PC on two occasions and denied any mental health problems, including SI, stating on April 14 that "I haven't had any thoughts of harming myself in the past week."

On May 5, 2020, the inmate expressed SI to his clinician who noted in a progress note that he had a history of claiming suicidality then recanting it.  The clinician also stated that the inmate had only one "questionable" suicide attempt two years ago, and concluded that he was not currently suicidal.  A SRASHE was not completed.  A few weeks later on May 19, the inmate met with his clinician for completion of a required quarterly SRASHE.  He was assessed as both a low chronic and acute risk for suicide.  Several sections of the document were not updated and contained information that was pulled forward from previous SRASHEs, and the assessed low chronic risk was contrary to previous SRASHEs which consistently assessed the inmate's chronic risk for suicide as moderate.

During the afternoon of May 26, 2020, the inmate met with his clinician and reported that he "has been taking life 'day by day.' 'I'm hearing voices.'  Says sister blessed him with some money on his books and he is looking forward to getting some hygiene and coffee next week. 'I'm suicidal.  I'm depressed.  I'm hopeless.'  Says AH telling him to do things that he doesn't want to do.'  They're far out'."  The clinician concluded that the inmate's presentation "is not congruent with his verbalized concern about AH, hopelessness and suicidality."  The required SRASHE was not completed.  The inmate committed suicide three hours later.

Apart from the fact that the inmate expressed SI a few hours prior to his death, the CDCR reviewer did not find any other precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide.  He did not leave a suicide note and did not have any medical issues that were thought to be contributory to his death.  The CDCR reviewer suggested that there were two possibilities for the suicide: "The first possibility is the inmate unintentionally ended his life.  It is probable the inmate wanted to change his housing and/or level of care…. The other possibility which may have led to the inmate's suicide is an increase of command auditory hallucinations, suicidal thoughts, and feeling helpless and hopeless due to the

218

possibility of extended time.  In addition, the stress of safety concerns further exacerbated his symptoms."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

1) <u>CSP-SAC</u>:  There were concerns with safety planning in SRASHEs completed on October 21, 26, and 28 2019.  (See Discussion/Conclusions section for further details.)

2) <u>CSP-SAC</u>:  Concerns were identified regarding the decision to lower the inmate's level of care on November 6, 2019.  (See Discussion/Conclusions section for further details.)

3) <u>HQ-SPRFIT</u>:  On February 19, 2020, the inmate made comments about a possible PREA violation.  However, the MHPC did not report the incident to his supervisor.  The CDCR Department Operations Manual (DOM), Chapter 5, Article 44 - Prison Rape Elimination Act Policy, Section 54040.7:  Detection, Notification and Reporting states the following:  'All staff are responsible for reporting immediately and confidentially to the appropriate supervisor any information that indicates an offender is being, or has been the victim of sexual violence, staff sexual misconduct, or sexual harassment.'  In addition, 'Staff shall ensure the reporting of information is done as soon as possible and in a confidential manner.'

4) <u>CSP-COR</u>:  On May 5, 2020 and May 26, 2020, the inmate reported suicidal ideation.  A SRASHE was not completed on either of these dates.  Per the MHSDS Program Guide, Suicide Prevention and Response, (12-10-8), 'When an inmate expresses current suicidal ideation, or make threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data.'

5) <u>CSP-COR</u>:  There were concerns with the SRASHE completed on May 19, 2020.  (See Discussion/Conclusions section for further details.)

6) <u>HQ-SPRFIT</u>:  The inmate's reported symptoms as 'impression management' was documented by multiple clinicians throughout different treatment plans, progress notes, and SRASHEs; however, the documentation lacked treatment interventions to address this concern or how to obtain understanding as to what was driving the described 'impression management.'  Documentation noted the inmate did not have appropriate coping skills when stressed and claimed suicidal ideation instead to change level of care and/or housing.  Based on the documentation, it is unclear how the symptoms were being addressed within treatment.

**Audit Summary**:  Adequate practices were found in PT rounding of the ASUs, new intake cell placement, Guard One, CIT, IDTT meetings, CPR and suicide prevention training, and SPRFIT. There were several deficiencies found during the assessment that required corrective action,

including a few inmates that were housed in alternative housing beyond the maximum allowable time period, inadequate nursing rounds of suicidal MHCB patients, inappropriately using the term "quarantine" as the rationale for prohibiting MHCB yard access and no yard access for maximum-security MHCB patients, inadequate safety plans and inadequate MHCB supervisory review of those safety plans, and low compliance rates regarding discharge custody check forms by clinical and custody personnel.

### 17)    **Mule Creek State Prison (MCSP)**

**Inspection**:  February 24-25, 2022 (previous suicide prevention audit was on June 5-6, 2019). MCSP housed approximately 3,759 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed one new admission during the **Intake Screening** process in the R&R unit on February 24, 2022.  The nurse was observed to be asking all of the questions on the Initial Health Screening form and correctly entering the information into the EHRS.  The door to the nurse's office was closed during the screening, thus ensuring privacy and confidentiality during the process.

In addition, this reviewer observed daily **PT Rounds** in the ASU (C-Yard, Building 12) on February 24.  The building housed the EOP Hub, 3CMS, and GP inmates on segregation status. The rounds were unremarkable, and the two PTs were observed to be correctly completing the Psych Tech Daily Rounds Form and entering the information into the EHRS for all caseload inmates.

**Housing**:  MCSP had a ten-bed CTC with eight designated MHCBs that were previously found to be suicide-resistant.  Approximately five to seven patients were housed in the unit during the two-day assessment.

In addition, there were 13 **New Intake Cells** in the ASU (C-Yard, Building 12) and all new intake inmates were observed to be appropriately housed in the new intake cells.  All inmates on new intake status were also observed to have both radios and tablets.

Finally, **Alternative Housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in Building 13 (C-Yard), Building 12 (C-Yard), and wet holding cells within the TTA.  Alternative housing was used on a daily basis, and inmates were all furnished beds and required to be observed on a 1:1 basis.  From November 2021 through January 2022, there were approximately 116 inmates placed in alternative housing, and all were released within 24 hours.  The vast majority (83 percent) of inmates were transferred to an MHCB, with 17 percent (20 cases) of the MHCB referrals rescinded and inmates returned to their respective housing units.  The EHRS charts for all the rescinded cases were reviewed and the required SRASHEs were completed in 19 of 20 (95 percent) cases.  Five-day clinical follow-ups were completed in all reviewed cases.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were required to be observed at

30-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status during a nine-hour period from 12:00 a.m. through 8:59 a.m. on January 14, 2022 (for <u>MCSP 1</u>), January 23, 2022 (for <u>MCSP 2</u>), January 24, 2022 (for <u>MCSP 3</u>), and February 24, 2022 (for <u>MCSP 4</u>).  The chart review found several violations in each case, with observation checks (i.e., between three and four per patient) that were in excess of required 15-minute intervals.  The longest gaps between checks were 51 and 58 minutes in one case (<u>MCSP 3</u>).  Violations in the four cases were by multiple nursing staff.  In addition, this reviewer observed that many nursing staff notations attempted to provide explanations for late entries, with notations stating a variation of the following: "Late entry, taking shift report, preparing breakfast trays, doing patient care, and answering call lights."

Given the unusual nature of these late entry notations, this reviewer spoke with the chief nursing executive at MCSP who confirmed that, absent an emergency, there was no justification for such notations because there were at least two nursing staff always assigned to each shift, and one staff was exclusively responsible for observation of patients on Suicide Precaution status.

Finally, a review of **<u>Guard One</u>** data for a recent 24-hour period in the ASU found 98 percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of November 1, 2021 through February 15, 2022.  A sample EHRS review of 30 cases of emergent/urgent mental health referrals for SI/behavior found that clinicians completed the required SRASHEs in only 87 percent (26 of 30) of cases.  All of the cases in which incidents of SI/behavior did not result in SRASHE completion were labeled as urgent referrals.

One of these cases (<u>MCSP 5</u>) was very problematic.  On January 7, 2022, the inmate was referred to mental health by a housing officer who related that he had received "bad news that his brother was declared brain dead."  According to the responding clinician's progress note dated the same day, "Patient reported 'bad thoughts' of 'why him instead of me.'  MHPC assessed for DTS.  Patient endorsed passive SI but denied plan/intent/means.  MHPC and patient discussed safety planning."  A SRASHE was not completed.  Four days later on January 11, 2022, the inmate was again seen by another clinician and reported a continuing struggle with grieving his brother's medical condition (he reportedly was still in a coma).  The clinician's progress note documented his increased depression, as well as "passive SI."  The inmate remained tearful throughout the interaction.  A SRASHE was not completed.  A progress note dated a few weeks later on February 1, 2022 documented that the inmate "endorsed SI."  A SRASHE was not completed.  Six days later on February 7, 2022, the inmate met with a psychiatrist and reported "SI on and off" since his brother's death the previous week.  The following day (February 8), as well as on February 15, the inmate was seen by his PC and again reported "passive SI" on both occasions.  SRASHEs were not completed on either occasion.  This inmate was at the EOP level of care, had a "high" chronic risk for suicide that included multiple suicide attempts, and had witnessed his father's suicide with a shotgun at age 12.  The last SRASHE completed for this inmate occurred one year earlier on February 17, 2021 following his return from CMF-PIP that

221

required four follow-up SRASHEs at 90-day intervals.  The three subsequent required SRASHEs were never completed.

In addition, the **Crisis Intervention Team** was launched at MCSP in May 2019 and was operational seven days a week from 2:00 p.m. until 10:00 p.m., with other clinicians responding to emergency mental health referrals during other hours.  This reviewer observed the CIT respond to an emergency mental health referral during the late afternoon of February 24, 2022.  The inmate (MCSP 6) was at the EOP LOC and housed in a DDP dorm within MCSP's Level 2 facility (D-Yard).  He had expressed SI to his PC earlier in the day and wanted to return to the CHCF-PIP, where he had previously received treatment (for grave disability) until September 2021.  The CIT assembled and met with the inmate in privacy.  He appeared very distressed, had lost contact with his family, and repeatedly requested a direct transfer to the CHCF-PIP.  The inmate could not articulate how the loss of his family was related to his fixation for a PIP transfer.  He repeatedly stated that he could not take care of himself and needed to be surrounded by doctors and nurses.  The inmate appeared very guarded, but did not disclose any custody or safety concerns.  The CIT clinician attempted to engage the inmate in a plan to receive increased support and treatment by remaining in D-Yard, with negative results. Following prolonged discussion with the CIT, the inmate appeared to become frustrated and then threatened suicide with a plan to cut himself with a razor.  At that point, the CIT clinician decided to refer him to the MHCB.  A SRASHE and CIT Power forms were completed as required.

Two **IDTT Meetings** were observed in the MHCB unit on February 24-25.  Overall, although there was good treatment team representation during both meetings, the meetings were uneven.  During the first IDTT meeting on February 24, the MHCB supervisor provided an adequate case presentation that included the patient's prior history of suicide, current level of observation and possessions/privileges, and acknowledgment that safety planning had been initiated the previous week.  The patient had been in the MHCB since February 16, 2022 and, due to on-going SI, was referred to the acute level of care.  During the second IDTT meeting on February 25, the MHCB supervisor was not in attendance and the case presentation of the patient (MHCB 6), who had been seen by the CIT the previous day (see above), was inadequate.  There was little discussion about the patient's prior history of suicide, inquiry regarding the reason(s) for current SI, or introduction to safety planning.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for all patients housed in the MHCB during the on-site assessment.  The review found that all patients were afforded opportunities to shower, as well as other out-of-cell activities such as yard and telephone calls.  A full-time RT was assigned to the CTC and provided both in-cell and out-of-cell opportunities for MHCB patients.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, the EHRS charts of 16 sampled patients discharged from the unit between December 2021 and February 2022 were examined.  The review found that, although discharge SRASHEs and five-day clinical follow-ups were completed in all cases, the required safety plans were completed in only 75 percent (12 of 16) of the cases.  Safety plans were not completed in these cases because clinicians incorrectly assumed that such plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide.  Such a rationale

ignored the fact that MHCB patients should be at low acute risk for suicide when they were discharged from an MHCB.  In other cases, the quality of safety planning was either marginal or non-existent.  For example, in one case (MCSP 7), the safety plan stated the following:

> Step 1 (Warning Signs):  IP refused.
> Step 2 (Independent Coping Skills):  IP reported that once he has had time to troubleshoot issues with his tablet, he will utilize it frequently to stay in contact with family.
> Step 3 (Distracting People & Places):  IP reported he talks to his daughter at least 1x/week.
> Step 4 (People to Ask for Help):  IP refused.
> Step 5 (Professionals to Contact):  IP refused.
> Step 6 (Means Safety):  IP refused.
> Step 7 (Reasons to Live):  'My grandchildren,' IP also identified his upcoming parole (<3 years).

The above safety plan was carried forth into all of the clinical five-day follow-up assessment forms.

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from August 2021 through January 2022.  This reviewer's examination of the data found problems in untimely supervisory review.  For example, discharge SRASHEs are required to be completed prior to or during the anticipated discharge IDTT meeting, and the examination found that most supervisory reviews were occurring several weeks (and even a few months) after the IDTT meetings.  The MHCB supervisor informed this reviewer that, until recently, the reviews were occurring on a quarterly basis.  In addition, there was no protocol in place for the supervisory review of safety plans when the MHCB supervisor was unavailable (on days off, leave time, etc.).  Finally, the MHCB supervisory review did not identify the very problematic practice identified above in which MHCB clinicians (and perhaps the MHCB supervisor) incorrectly assumed that safety plans were not required because the patients had been discharged from the MHCB unit at low acute risk for suicide.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 198 cases of inmates discharged from a MHCB or alternative housing placement who remained at MCSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from August 2021 through January 2022.  The review found that only 56 percent had Page 1 of the "Discharge

Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first and/or second day on the form. When completed correctly, the majority of the custody checks were recommended for 24 or 48 hours by clinicians. In addition, only 85 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (August 2021 through January 2022) found that quorums were achieved by all required mandatory members or designees attending all of the meetings. Meetings appeared to be scheduled for 60 minutes, and meeting minutes were generally between eight and ten pages in length. Minutes consistently included, but were not limited to, presentation of basic data on discharge custody checks, CIT, training, the number of inmates in the suicide risk management program, self-harm data, and nursing audits. Various corrective action items from this reviewer's previous assessment, as well as a recent regional SPRFIT audit, were also contained within meeting minutes. Of note, although three serious suicide attempts (i.e., medical severity rating of "3") were reported in July 2021, September 2021, and January 2022, respectively, the meeting minutes did not contain any discussion, case summaries, and/or RCAs of these incidents. A SPRFIT LOP was in effect.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. MCSP had the following LOPs that were consistent with these CCHCS directives - "Operational Procedure No. 59: Suicide Prevention" which contained the "Notification of Inmate Bad News," dated May 2021; "Operational Procedure No. 24: Crisis Intervention Team," dated July 2021; and "Operational Procedure No. 59: Suicide Risk Management Program," dated July 2021.

**Training**: According to training records, 98 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, only 86 percent of custody staff, 93 percent of medical staff, and 99 percent of mental health staff received annual suicide prevention block training during 2021. Finally, as of February 2022, 98 percent of mental health clinicians had completed the SRE mentoring program, 99 percent had received the seven-hour SRE training, and 99 percent had completed the safety plan training.

**Recent Suicides**: MCSP experienced four (4) inmate suicides during the review period. In the _**first**_ case (MCSP 8), the inmate was found hanging from the ventilation grate bunk by a sheet in his GP cell during the morning of March 14, 2020. He had entered the CDCR system on August 28, 2008 to serve a life sentence with the possibility of parole for torture and multiple counts of corporal punishment or injury to a child, and aggravated mayhem (on his children). The inmate was transferred to MCSP on March 6, 2020, a week prior to his death. He incurred 18 RVRs during his confinement, the most recent of which occurred on November 15, 2019 for fighting. The inmate was not known to be gang-affiliated. He was divorced and had three children.

Although the inmate appeared to have a close relationship with his family (parents, siblings, and children), other records described the family relationship as "unstable." Records indicated that he did not receive any letter correspondence or telephone calls during 2020, but did receive regular family visits until November 2019 when he was placed in an MHCB and then a PIP.

According to available records, the inmate and seven siblings were raised by their parents and immigrated to the United States from Syria when he was 15-years-old. Although he initially described significant domestic violence within his family, most notably physical abuse by his father, he subsequently denied these allegations and stated he had initially reported the alleged abuse in order to receive leniency during his legal case. The inmate graduated from high school and reported to have completed some community college courses. He had a sparse employment history. The inmate did not have a juvenile arrest history, and only a minor minimal adult criminal history prior to the instant offense in September 2007. He did not have a history of substance use nor prior mental health treatment in the community. The inmate was married in 1983 and subsequently divorced in 2001. It had been documented that he was physically abusive toward his wife, and some records indicated that he retained full custody of his children after the divorce. Although his ex-wife purportedly returned to Syria, she was subsequently listed as a missing person and the inmate was later suspected in her disappearance.

Upon entry into CDCR, the inmate was not initially placed in the MHSDS because he denied any mental health symptoms. While denying a history of mental health treatment in the community, it appeared that the inmate's pre-existing mental health symptoms, including delusions, increased once he was incarcerated. In October 2008, the inmate was placed at the 3CMS LOC. Records indicated his initial diagnoses were mood disorder and psychosis, with rule-outs for delusional disorder and personality disorder. The inmate displayed poor activities for daily living (ADLs), was argumentative, minimized symptoms, displayed poor insight, and appeared fixated on a belief of perceived mistreatment from "the system." His level of care was increased to EOP in September 2009 following his first MHCB placement when he attempted suicide by hanging. He was subsequently transferred to DSH in December 2009. Over the next eight years, the inmate had nine MHCB and DSH admissions, with his level of care alternating between EOP, APP, and ICF. He was often referred to DSH following his MHCB placements. Many of these placements were lengthy, including almost a one-year stay at DSH-ICF in 2011.

Mental health records from 2010 through 2018 described the inmate's recurrent delusional thought patterns (e.g., report of vibrations coming through the walls causing physical symptoms, other grandiose beliefs, etc.), observed negative symptoms of schizophrenia, poor attendance to ADLs, aggressive and assaultive behaviors, and suicide attempts. He often denied the suicide attempts were actual attempts to kill himself, and continued to minimize most of his mental health symptoms. The inmate also continued to report the belief that he was being held against his will and persecuted by the government. Documentation from one of his DSH admissions noted that the inmate reported mental illness was a stigma in Syrian culture, and many individuals who required hospitalization for mental illness were unable to return to their families as the family may perceive they are dead rather than admit that they have a family member with mental illness. Such a cultural belief was thought to be the primary factor why the inmate did not actively engage in mental health treatment and often minimized or denied his symptoms. In

January 2019, his diagnosis was changed to schizoaffective disorder, bipolar type, and later to delusional disorder in March 2020.

Because the inmate was viewed as an unreliable historian, his history of suicidal behavior was inconsistently reported. Although there were no records to indicate he had a history of suicidal behavior in the community, records indicated at least seven suicide attempts during confinement. The most lethal suicide attempt occurred on March 2, 2016 when he was found to have severely lacerated both his neck and wrist. The injuries were so severe that he was airlifted to an outside hospital for surgery. Documentation regarding the suicide attempts indicated that most of the incidents appeared to have been triggered by fears regarding acquiring a single cell, shame and guilt regarding his family, cultural factors, and a perception that he was being tortured and held against his will. All of these incidents resulted in MHCB placement, the most recent placement occurring in November 2019. There were 11 SRASHEs completed on the inmate during 2019-2020, all of which consistently assessed his chronic risk for suicide as high.

On November 15, 2019, the inmate received two RVRs following a fight with another inmate in the cafeteria. In the weeks leading up to the incident, he had been observed to be acting bizarrely, as evidenced by banging on his cell door in the middle the night, having verbal altercations with custody staff, exhibiting rapid mood swings, responding to internal stimuli, and other acting out behaviors toward other inmates. The inmate was said to be very upset regarding these recent RVRs because he was hoping to receive upcoming family visits, as well as a BPH date in 2023. Despite this behavior, he was initially retained in EOP. However, less than a week later on November 21, 2019, the inmate was referred to an MHCB after his primary psychiatrist observed that he had decompensated after removal of his Clozaril medication. The referral was based upon grave disability "because he was seen as high chronic risk for suicide as a result of the observed decompensation." The inmate was seen daily while in the MHCB, remained opposed to any psychotropic medication, and viewed as both uncooperative and argumentative during treatment contacts. On November 30, 2019, he was referred to the PIP for grave disability and was transferred to the CMF-APP on December 19, 2019. He continued to initially deny all mental health symptoms, including SI, but appeared to become more cooperative the following month. For example, although he continued to refuse group treatment, the inmate was compliant with psychotropic medication and appeared to stabilize. He did not engage in any incidents of SIB during the placement.

The inmate was discharged from CMF-PIP on March 3, 2020. Discharge documentation described him as continuing to deny all mental health symptoms or need for medication. He also denied SI and appeared to have adequate sleep and appetite patterns. Although the inmate's insight and judgment were documented to be poor, the treatment team believed that he was stable enough for discharge to EOP. He was returned to MCSP on March 6, 2020. Although the required five-day clinical follow-ups were completed, documentation was said to be minimal and the SPI was not updated. The inmate was seen for an initial mental health assessment on March 12, 2020 and conditionally denied SI stating that "because I have a single cell. I won't take my life, but if I am made double cell, I will take my life in a heartbeat." Although the inmate remained in a single cell, he committed suicide two days later on March 14.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did leave a suicide note for his three children that stated, in part, that "They tortured me, so I chose to take myself to a better place." The inmate did not have any medical issues that were thought to be contributory to his suicide. According to the CDCR reviewer, the inmate "had a long-standing history of delusional beliefs and depression, which caused significant distress for him. The day prior to his suicide, he received paperwork for two RVRs he received prior to his last inpatient placement. As he previously expressed hope regarding going before the parole board and receiving family visits, this likely resulted in the perception that he would never be released. The combination of the aforementioned factors likely contributed to his decision to end his life at this time."

The Suicide Report contained nine (9) recommendations for corrective action through a QIP:

1) <u>CMF-PIP</u>: During the time the inmate was at CMF-PIP, there was multiple documentation in EHRS regarding delayed IDTTs. Specifically, the inmate arrived on December 10, 2019, but his initial IDTT did not take place until December 26, 2019. There were multiple inpatient progress notes dated December 17-19, 23-24, 2019, all of which attributed the delay in the initial IDTT primarily due to staffing concerns. Per CMF-PIP Local Operating Procedure: Chapter 11 Psychiatric Inpatient Program, Section 2.13: Treatment Planning, 'the full treatment planning conference shall be held within 10 calendar days of the patient's admission to the psychiatric inpatient program.'

2) <u>CMF-PIP</u>: The inmate remained at CMF-PIP for 85 days (December 10, 2019 - March 6, 2020). During this time, he refused to attend all group treatment. He appeared to have received approximately six individual contacts with his primary clinician, but there did not appear to be additional modifications to his treatment plan or progress notes in response to his refusal rate (e.g., more treatment contacts, in cell treatment materials).

3) <u>CMF-PIP</u>: During the time the inmate remained at CMF-PIP, it was noted that there were minimal treatment contacts offered. Over the 85 days he was in the PIP, it appeared he received approximately six individual contacts, and refused all group contacts. At the time of this review, there was not a policy identified which specified minimum treatment contacts in CMF-PIP.

4) <u>MCSP</u> and <u>CMF-PIP</u>: Multiple concerns were identified with SRASHEs completed on November 15, 2019 (MHSP), March 4, 2020 (CMF-PIP), and March 6, 2020 (MCSP). Please see Conclusions section for further details.

5) <u>MCSP</u>: Five-day follow-up power-forms were completed by mental health on March 9, March 10, and March 11, 2020. Overall, the documentation was minimal and did not meet CAT audit requirements. The SPI section was allowed to pull forward without change from December 18, 2019. There was no documentation regarding whether SPI was attempted, and why it was not completed.

6) <u>HQ</u>:  Concerns were found with multiple RVR MHAs completed on November 26, 2019 while the inmate was at CMF.  Please see Conclusions section for further details.

7) <u>CMF-PIP</u>:  CMF-PIP psychiatry clinical contacts and clinical documentation (reflecting said contacts) were not in keeping with expectations and requirements. The frequency of psychiatry contacts and clinical notations was inadequate.

8) <u>HQ-SPRFIT</u>:  During the time the inmate was at CMF-PIP, there were minimal entries into the NCAT regarding his participation and behavioral observations during out-of-cell non-clinical activities.  Per July 19, 2019, Volume 12 Mental Health Services, Correctional Treatment Center, Psychiatric Inpatient Program, Patient Policies Non-Clinical Out of Cell Time Tracking 12.11.1706, 'The NCAT shall be used to track all out-of-cell non-clinical leisure activities offered to PIP patients.  Scheduled and non-scheduled activities shall be tracked using NCAT.' As this was identified as a state-wide concern, this was made a HQ SPRFIT QIP.

9) <u>HQ</u> and <u>MCSP</u>:  Upon entry into the cell, the responding staff placed mechanical restraints on the inmate prior to utilizing the cut-down kit and starting CPR.  At the time of the incident, the inmate was housed in a general population setting within the Enhanced Outpatient Program housing unit.  This is in conflict with the annual Suicide Prevention lesson plan, slide 46, which states 'for inmates housed in general population found hanging, there is no need to apply restraints prior to utilizing the cut-down kit starting CPR.'

In the ***second*** case (<u>MCSP 9</u>), the inmate was found hanging from the upper bunk by a sheet in his ASU cell during the early morning of October 12, 2020.  He had entered the CDCR system on May 18, 2011 to serve a life sentence with the possibility of parole for first-degree murder, attempted murder, and possession of a firearm by an ex-felon.  The inmate was transferred to MCSP on March 1, 2019.  He incurred 19 RVRs during his confinement, the most recent of which occurred several hours before his death when he assaulted his cellmate.  The inmate was known to be gang-affiliated.  He was unmarried, but had one child from a previous relationship. The inmate had regular family support through regular visits and telephone calls from various family members, including his mother and three sisters.

According to available records, the inmate and three sisters were raised by their mother and stepfather.  He described his childhood as growing up "around violence and drugs all my life." The inmate began using drugs at age 13 which adversely affected his grades and behavior.  He subsequently dropped out of high school, but later received his GED in 2006.  As a young adult, the inmate began to attend community college, but dropped out and worked at a local fast food restaurant.  He also became gang-affiliated, but had a relatively brief history of both juvenile and adult arrests and convictions prior to the incident offense.  The inmate's gang involvement continued during his initial confinement in CDCR.  He did not have a documented history of mental illness or suicidal behavior in the community.

Upon entry into CDCR, the inmate screened negative for any mental health issues and was not initially enrolled in the MHSDS. Between 2011 and 2018, he had periodic contact with mental health staff regarding sleep disturbances and stress regarding his legal case. The inmate had an extensive history of restrictive housing that included 17 placements in administrative segregation for disciplinary infractions and safety concerns. Most of these placements and infractions were based upon his gang affiliation. The inmate's assault of a high-ranking gang member resulted in himself being the victim of several subsequent assaults by multiple inmates during his confinement. Although he had historically denied the need for SNY placement, he reluctantly agreed to SNY status in July 2019 after becoming disaffiliated with his gang.

On February 11, 2020, the inmate met with a clinician and asked to be admitted into 3CMS because he was bored with the lack of programming. Upon further assessment, he reported being anxious and depressed, but became frustrated when asked to describe his symptoms. The clinician determined that he did not meet inclusion criteria for the MHSDS, but scheduled a two-week follow-up. The inmate met again with the clinician on February 26 and complained about a sleep disturbance, decreased appetite, as well as lack of motivation to exercise and socialize. He also reported for the first time that he had a history of ADHD. The inmate denied any prior history of mental health treatment, and denied any current SI. A SRASHE was completed and the inmate was assessed as being both a low chronic and acute risk for suicide. The clinician diagnosed the inmate with unspecified anxiety disorder and placed him in the MHSDS at 3CMS LOC. The inmate also met with psychiatry multiple times between April and September 2020, and although varying low dose psychotropic medications were tried to treat mild anxiety, he was often non-compliant and the medication was subsequently discontinued. In July 2020, the inmate was placed in administrative segregation following an incident involving battery on another inmate and officer. He denied any SI during the ASU pre-screening process.

On September 24, 2020, the inmate met with a newly assigned clinician in administrative segregation and requested that they meet for individual sessions in a confidential setting bi-weekly and cell front on alternating weeks. Although the reason for this schedule was unclear, the inmate continued to consistently deny SI and did not display any observable signs of depression. During the last contact with his clinician on October 5, 2020, the inmate again denied SI and reported that he was doing well. During the evening of October 11, 2020, several hours prior to his death, the inmate called an officer to his door and then began punching his newly arrived cellmate. Use of force was utilized to dispel the fight, and the inmates were separated into different cells. It was subsequently determined that the new cellmate had played a significant role in the inmate's reluctant decision to seek SNY placement the previous year.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not leave a suicide note and he did not have any medical issues that were thought to be contributory to his suicide. According to the CDCR reviewer, the inmate's "was struggling with a number of serious problems. As time went on, the inmate appeared to exhaust all of his internal and external coping strategies…. At the time of his death, the inmate was likely facing a future filled with severe peer conflicts and additional criminal charges. It could be speculated that the last fight with his cellmate may have contributed to the ultimate decision to end his life the following morning."

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

1) The inmate was taken to IDTT on April 9, 2020 and August 5, 2020. In the Mental Health Master Treatment Plans completed on these dates, there was inadequate documentation regarding new symptoms/problems, collateral information, or goal setting with the inmate. Additionally, the August 5, 2020 treatment plan was not updated to address the inmate's functioning at that time nor was mental health treatment progress documented. The diagnosis on his treatment plan was unspecified anxiety disorder, however, much of the treatment while in MHSDS appeared to focus on the inmate's reports of ADHD. According to the chart audit tool for treatment plans, clinical staff are required to document a meaningful discharge plan for future treatment needs or description of why extended care will likely be required and provide a rationale for the current level of care that is consistent with the clinical presentation.

2) Responding staff did not don the Personal Protective Equipment (PPE) prior to performing an immediate extraction. Upon review of the Incident Package, it was discovered responding staff failed to don the appropriate PPE, pursuant to Department Operations Manual Section 51020.12.2, Extractions, prior to making entry into the inmate's cell.

3) Upon review of the CDCR 114-A Inmate Segregation Record for the inmate, it was noted the unit supervisor was not signing off indicating he/she was conducting a weekly review of the CDCR 114-A as required by Departmental Memorandum dated May 5, 2015, titled 'Weekly Supervisor Review of Form CDCR 114-A Inmate Segregation Records.' However, upon review of the CDCR 114-A, staff did offer the minimum required yard and shower consistent with ASU.

4) A report received by staff following the incident indicated that there might have been a policy violation regarding the presence of a window covering on the inmate's cell during the last Guard One check.

In the ***third*** case (MCSP 10), the inmate was found hanging from a bunk by a sheet in the B-Yard gymnasium during the early morning of March 30, 2021. His body was found in rigor mortis. The inmate entered the CDCR system on December 9, 2002 to serve a 56-year-to-life sentence for first degree murder (of his former girlfriend) with enhancements for use of a deadly weapon and a prior felony conviction. He was transferred to MCSP on December 21, 2018. The inmate incurred 20 RVRs during his confinement, the most recent of which occurred on March 21, 2021 for destruction of state property. Most of the RVRs with drug-related. He was not known to be gang-affiliated. The inmate was unmarried, but had one child from a previous relationship. He had regular family support through letter correspondence, telephone calls, and visits from various family members and friends, including a girlfriend.

According to limited available records, the inmate and two older brothers were raised by their parents. Although he struggled with behavioral issues in school, including the possibility of an

undiagnosed attention deficit-hyperactivity disorder, he was able to graduate high school and complete an apprenticeship program as a tile fitter. The inmate was initially employed by his father in the family construction business. He began a history of substance abuse at the age of 21 that included both cannabis and methamphetamine use. The inmate did not have a history of juvenile activity, but had multiple arrests as an adult that included reckless driving, residential burglary and receiving stolen property. Most of these arrests were related to his drug use. He did not report having a history of drug or alcohol treatment, mental health services, or suicidal behavior in the community.

Upon entry into CDCR, the inmate reported that he had difficulty managing anger impulses and had a history of attention deficit-hyperactivity disorder. Records indicated that he was on psychotropic medication in the county jail. The inmate was placed in the MHSDS at the 3CMS LOC with a diagnosis of substance abuse and a rule out of bipolar disorder. In fact, the psychiatrist who later assessed the inmate opined that he had been high on methamphetamine upon arrival to CDCR. During 2003, the inmate's medication compliance was inconsistent, and he requested removal from 3CMS. He also requested to be transferred to CSP/Solano to be closer to his family and believed that not being in the MHSDS would increases his chances of transfer. He was subsequently transferred to CSP/Solano and removed from the MHSDS in September 2005.

Approximately one year later in August 2006, the inmate complained of "racing thoughts, depression, irritability, and sleeplessness." He requested psychotropic medication and wanted to re-enter the MHSDS. He was seen by psychiatry, restarted on medication, and again placed in 3CMS in October 2006 with diagnoses of depressive disorder NOS and antisocial personality disorder. During 2007-2008, the inmate continued to struggle with mental health symptoms and stopped taking his medication by August 2008. He was suspected of continued methamphetamine use. The inmate was removed from the MHSDS in March 2009 with diagnoses of polysubstance dependence and personality disorder. He remained out of the MHSDS for the next two years.

In May 2012, the inmate again reported depressive symptoms and asked to be placed back into the MHSDS for a third time. He re-entered 3CMS with the diagnosis of rule out adjustment disorder with mixed anxiety and depressed mood. The psychotropic medication was changed several times during the next few years following complaints of panic attacks, depression, inability to control his anger, and sleep disturbance.

Throughout his CDCR confinement, when not housed in administrative segregation, the inmate was actively involved in various work assignments, as well as involved in a variety of non-mental health programming and community college. However, he continued to struggle with substance abuse. As noted by the CDCR reviewer in this case, the inmate's PC met with him on December 10, 2018 and noted that the inmate "had been using drugs regularly for approximately 30 years and had only been clean two days. She suggested his anxiety and other mental health symptoms were likely due to substance use (intoxication or withdrawal). 'I suspect that his mental health condition will significantly improve if he can abstain for a significant period of time.' The inmate appeared interested in medications to help curb his cravings, however, did not appear interested in enrolling in a substance abuse program."

The inmate continued to receive 3CMS treatment for panic attacks, high levels of anxiety, and sleep disturbance throughout 2019-2020.  In June 2020, he agreed to enter the MAT program.  But the inmate continued to struggle with substance abuse, and received an RVR for possession of drug paraphernalia on February 25, 2021.  He last met with mental health staff two days earlier on February 23, 2021, and complained to the psychiatrist of increased anxiety because of the "constant" cell moves.  He felt that he and his cellmate "are always getting jerked around."  This complaint might have coincided with he and other inmates in the housing unit being rehoused in the B-Yard gymnasium due to a COVID-19 outbreak.

Other than reporting for the first time a prior suicide attempt (whereby he tried to shoot himself) and psychiatric hospitalization in 1996 during the ASU pre-screening process in April 2015, the inmate consistently denied any SI, and did not engage in any suicide attempts or SIB during his CDCR confinement.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  He did not leave a suicide note and although he had several medical issues, none were thought to be contributory to his suicide.  According to the CDCR reviewer, because of the inmate's "increased emotional distress associated with restrictions as a result of the COVID-19 precautions and RVRs, he may have felt he would not be able to tolerate his emotional stress without drugs….  Based on personal phone calls and letters, he may have felt trapped in the struggle to refrain from substance use and his desire to improve his life, and not to disappoint his family and girlfriend….  He may have felt overwhelmed by his stress and unable to see options.  He determined his best course of action was to end his own life."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) A review of the training records revealed not all responding staff were up-to-date with the annual Suicide Prevention training.  The Mule Creek State Prison Hiring Authority has been advised of this concern and has remedied the issue.  Completed training records have been provided for the staff member.

> 2) After review of the incident, MCSP Hiring Authority identified concerns with staff actions prior to the actual suicide.  These concerns will be addressed by the Hiring Authority (through a CDCR 989 investigation).

In the ***fourth*** case (MCSP 11), a transgender inmate who identified as female was found hanging from the upper bunk by a sheet in her administrative segregation cell during the evening of November 22, 2021.  The inmate entered the CDCR system for the third time on August 12, 2015 to serve a 17-year sentence for carjacking and assault.  She had most recently been transferred to MCSP on October 15, 2021.  The inmate had incurred two RVRs during her confinement, the most recent of which occurred on June 12, 2021 for battery on an inmate.  She was not known to be gang-affiliated.  The inmate was previously married and had two children.  She had very limited family support, primarily from an older brother, as well as several pen pals,

through letter correspondence. There was no record of any telephone calls or visits during her confinement.

According to available records, the inmate and her two siblings were primarily raised by their parents. She reported that her father was an alcoholic and her mother suffered from mental illness. At the age of 12, her father reportedly strangled her mother to death. After the trauma of her mother's death, the inmate lived with an uncle who physically abused her, and later an older brother. She later became homeless, did not graduate high school, and had only sporadic employment as a young adult caused in part by her confinement in both jails and prisons. The inmate had a history of substance use, primarily methamphetamine. One of the two children given up for adoption because of dysfunction and substance abuse within the family, a son, reportedly later committed suicide. The inmate had both a juvenile and adult arrest history, and had two previous terms in CDCR in 1995 and 2005. She reported numerous psychiatric hospitalizations in the community, including a four-month stay at Atascadero State Hospital for "incompetent to proceed" prior to her conviction for the instant offense. The inmate had prior diagnoses of schizoaffective disorder, bipolar type, and amphetamine dependence.

The inmate also reported a significant history of both SIB and suicide attempts. Her history of SIB began at age 12, and usually involved cutting herself to relieve stress and racing thoughts. Some of her self-reported suicide attempts occurred during prior CDCR terms, including two suicide attempts by overdose 2005, laceration to her neck in 2006, and a suicide attempt by hanging in June 2013.

Upon entry into CDCR for the third term, the inmate screened positive for both mental health issues and an extensive history of SIB and suicide attempts. She was placed in the MHSDS at the 3CMS LOC. Although initially started on psychotropic medication, the inmate asked that they be discontinued and, due to her non-compliance with medication and programming, she was removed from the MHSDS in December 2015.

On June 26, 2016, the inmate engaged in a serious incident of SIB by cutting that required sutures. She was placed in an MHCB and subsequently discharged to EOP. She remained at the EOP LOC until October 5, 2016 when she engaged in another serious incident of SIB by cutting. This incident was classified as a suicide attempt and resulted in transfer to a hospital for medical treatment, including sutures. Upon return, she was initially placed in an MHCB and subsequently treated at both the acute and intermediate levels of care for the next 18 months. Her diagnoses were primarily bipolar disorder, amphetamine dependence, and borderline personality disorder. During this time, the inmate also had significant dental problems resulting from her chronic methamphetamine use. She was in a great deal of both physical pain and mental anguish regarding her teeth, most of which were subsequently removed. Concerns such as having adequate adhesive for her dentures became chronic irritants for the inmate "which appeared to contribute to her waxing and waning levels of distress."

In May 2018, the inmate's behavior at the PIPs had stabilized enough to warrant discharge back to EOP. She remained compliant with her psychotropic medication and the diagnoses remained intact. In November 2018, following notification that her son had died by suicide, she received additional grief counseling. Her son's death continued to be a major theme in her treatment

sessions during the next few years, particularly around the anniversary of his death.  During the next few years from 2019 through September 2021, the inmate continued to program at EOP without the need for a higher level of care.  She did, however, continue to struggle with sleeping problems, perceived weight loss, and substance abuse.

On September 10, 2021, the inmate was placed in an MHCB at CSP/Corcoran due to SI.  She had recently filed a PREA compliant that alleged she was raped and/or groped by two inmates.  She informed the CIT that the distress from the experience had caused her "increased depression, hopelessness, increased anxiety, and thought of getting a razor to cut herself."  She subsequently informed the IDTT that correctional staff were not taking her allegations seriously and told her to "shut up" and not file a PREA petition.  During her MHCB placement, she continued to endorse depression, hopelessness, anxiety, distressing memories of the abuse, and racing thoughts.  During an IDTT meeting on September 13, she told the team that "she hasn't eaten in three days and explained she is on a hunger strike because she 'wants to shine light on sexual abuse at MCSP.  I think you should be able to call PREA anytime you want'."  The inmate continued to report safety concerns and fear of returning to MCSP.  The IDTT retained her in the MHCB unit beyond the ten-day guideline because of a newly enacted CDCR policy that required resolution of safety concerns prior to MHCB discharge.  The inmate remained on Suicide Precaution status from September 10 through October 6 because of continued SI with thoughts of cutting herself.  The team did not believe a higher level of care was clinically indicated.

On October 14, 2021, the inmate was discharged from the MHCB at CSP/Corcoran and returned to MCSP at the EOP LOC.  She denied any current SI and her safety issues were apparently resolved following assurances that she would not be placed in the same EOP yard that housed her alleged attackers.  The discharging SRASHE documented a high chronic risk and moderate acute risk for suicide.  As part of the MHCB discharge, and as documented in the MH Master Treatment Plan, the IDTT placed the inmate in the SRMP, a program designed to provide individualized services and support to patients in an outpatient setting who have an elevated risk for suicide.

Upon the inmate's return to MCSP, various mental health clinicians met with her on a regular basis and, although consistently denying SI, there was no documentation to indicate that she was ever considered and/or placed in the SRMP or any indication that the above interventions were contained in clinical progress notes.  In fact, the MH Master Treatment Plan dated October 28, 2021 by a MCSP clinician stated that "SRMP Patient Status" was "not applicable (the patient is not being placed or currently in the SRMP)."  Following completion of a 14-day COVID-19 quarantine period on October 28, the inmate was placed in administrative segregation for continued safety concerns.  During the next few weeks, she was seen on a weekly basis by mental health staff, endorsed depression while consistently denying SI, and attended a few groups (i.e., five to nine hours per week).

During the afternoon of November 22, 2021, the day of her death, nursing notes indicated that the inmate had declared a hunger strike.  There was no other documentation indicating the reason for such a decision.  A few hours later, the inmate was interviewed by a custody supervisor after she filed a grievance about her previous accusations of staff misconduct during the PREA incident in September 2021.  During the interview, the inmate repeated her allegation about staff

misconduct and was asked a series of questions about the details of the alleged incident.  Near the end of the interview, she questioned why she was being interviewed and stated, "Oh my God, why'd you bring me in here."  The interview abruptly ended.  The inmate committed suicide a few hours later.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide.  Although the inmate had several medical issues, including dental pain that caused considerable distress and perceived weight loss, these medical issues were not thought to be contributory to her death.  The inmate did not leave a traditional suicide note but, in two letters found in her property, she complained about the perceived lack of staff responsiveness to the PREA allegations and property not provided while housed in administrative segregation.  The CDCR reviewer theorized that the suicide "was the result of a series of incidents in the prior six months along with high chronic risk (vulnerability) that led to a suicidal crisis in an individual with high capability to make a suicide attempt."

The Suicide Report contained nine (9) recommendations for corrective action through a QIP:

> 1) <u>CSP-COR</u>:  There were multiple concerns related to issue and observation while the inmate was in the MHCB.  Please see *Conclusions* section for further information.

> 2) <u>MCSP</u>:  On October 28, 2021, an initial IDTT was convened following the inmate's arrival back to MCSP.  The IDTT was held in absentia as the inmate was on quarantine per COVID-19 protocols.  The MH Master Treatment Plan was not updated from the last time the inmate was taken to IDTT, thus her presentation was unclear.  The inmate also had recently been returned from a MHCB.  Per MHSDS *Program Guide*, 2009 Revision (12-3-11), 'Treatment Plans are updated at least annually, whenever a change in level of care occurs, or when clinical judgment indicates the need for an update.'

> 3) <u>CSP-COR</u> and <u>MCSP</u>:  The inmate was placed in the SRMP at the time of discharge on October 14, 2021 while in the CSP-COR MHCB.  Although the rationale for placement was well documented, this is a violation of the SRMP training which specifies that placement in the program occurs during out-patient IDTTs.  Additionally, the receiving treatment team at MCSP, in their IDTT documentation, noted that the inmate was not in the SRMP.  The documentation did not indicate that the team considered the COR MHCB's SRMP documentation and goals for the inmate.

> 4) <u>MCSP</u>:  On November 3, 2011 the ASU mental health clinician at MCSP activated the MH Anxiety IPOC but left the Indications and Orders section in a Planned state, which would not allow documentation of the IPOC.

> 5) <u>HQ</u>:  The inmate declared her transgender status and identified as female, which was documented in mental health documentations in July 2021.  However, a number of medical documents continued to use a mix of both male and female

pronouns across multiple institutions. Per the State Senate Bill 132: 'The Transgender Respect, Agency, and Dignity Act' that went into effect on January 1, 2021: 'staff, contractors, and volunteers of the department shall not consistently fail to use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding the individual that involves use of a pronoun and honorific.' Two memorandums were released to the field via the Learning Management System that outlined the expectations in this Senate Bill. As this concern occurred across multiple institutions, a need to provide further training to the field was identified. As such, this concern was given to HQ.

6) <u>CSP-COR</u> Psychiatry: CSP-Corcoran psychiatrist entered clinical notes into the chart on September 17, 2021, September 21, 2021, September 24, 2021, and October 1, 2021 that were nearly identical. Clinical notes were not individualized to reflect the inmate's clinical specifics on the given day of the clinical contacts.

7) <u>MCSP</u>: During the review, it was discovered the responding staff failed to don the appropriate Personal Protective Equipment prior to making cell entry into the cell of the inmate, pursuant to the Department Operations Manual, Section 51020.12.2, Extractions.

8) <u>MCSP</u>: During the review of the Isolation Log Book located in the unit, it was found that Mental Health huddles were not documented on a consistent basis during the Second and Third Watches.

9) <u>CSP-COR</u>: The patient was admitted to MHCB in CSP-COR on September 11, 2021 to October 14, 2021. Review of Suicide Precaution documentation showed several instances in which time between observations exceeded over 15 minutes (in some entries as much as 40 minutes between observations).

**Audit Summary:** Adequate practices were found in intake screening, PT rounding of the ASUs, new intake cell placement, Guard One, alternative housing, CIT, MHCB patients receiving out-of-cell activities, CPR and suicide prevention training, and SPRFIT. There were several deficiencies found during the assessment that required corrective action, including an inadequate compliance rate with required SRASHEs for emergent/urgent mental health referrals, inadequate nursing rounds of suicidal MHCB patients, uneven IDTT meetings, inadequate safety plans and inadequate MHCB supervisory review of those safety plans, and low compliance rates regarding discharge custody check forms by clinical and custody personnel.

### 18)    <u>Salinas Valley State Prison (SVSP)</u>

**Inspection**: March 22-24, 2022 (previous suicide prevention audit was on February 8-9, 2018). SVSP housed approximately 2,911 inmates during the on-site assessment.

**Screening/Assessment**:  This reviewer observed a new admission during the **Intake Screening** process in the R&R unit on March 23, 2022.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was closed during the process, an officer was stationed in the hallway, and privacy and confidentiality were maintained.

In addition, **PT Rounds** were observed in the STRH (Z-9) unit on March 22.  The rounds were unremarkable and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  SVSP had a 22-bed CTC, with ten designated **MHCBs**.  All of the MHCB rooms were found to be suicide-resistant.  In addition, there were 12 **New Intake Cells** (100-111) in the STRH (Z-9) unit, including three additional cells retrofitted since the previous assessment; and six (6) new intake cells (116-118, 216-218) in D-1(for non-MHSDS inmates), including three additional cells retrofitted since the previous assessment.  During inspection of both the STRH and D-1 units, this reviewer observed that all new intake inmates were appropriately housed in new intake cells, an improvement from the previous assessment which found several new intake inmates housed in unsafe, non-new intake cells in the STRH.

Finally, **Alternative Housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in D-2 Unit and TTA cells (114-115).  Alternative housing was used multiple times on a daily basis, and inmates were all furnished beds and required to be observed on a 1:1 basis.  In fact, this reviewer observed three inmates on alternative housing status in D-2 Unit on March 23, 2022.  For the approximate three-month period of November 26, 2021 through March 3, 2022, there were approximately 123 inmates placed in alternative housing, and the vast majority (89 percent) were released within 24 hours.  Of the 11 percent (13 of 123) of inmates held over 24 hours, most were held under 28 hours, with one inmate held for 37 hours.  In addition, only 42 percent of inmates on alternative housing status were subsequently transferred to a MHCB, with the majority (58 percent) of cases rescinded and inmates returned to their respective housing units.  This reviewer examined the EHRS charts for 20 cases and found that, although SRASHEs were completed as required in all cases, only 70 percent (14 of 20) of the cases had timely five-day clinical follow-ups performed.  Problems included missed follow-ups or follow-ups not occurring during a consecutive five-day period.  One case was indicative of the problem.  The inmate (SVSP 1) expressed SI on January 7, 2022 and was placed overnight in alternative housing.  The following morning (January 8), a clinician assessed the inmate at low acute risk for suicide, the required SRASHE was completed, and the inmate was returned to their housing unit.  The first of the required five-day clinical follow-ups did not occur until three days later on January 11.  A second follow-up by another clinician inexplicably occurred on the same day (January 11).  Two other follow-ups incurred on January 12 and January 13, but the fifth-day follow-up never occurred.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs.  All other patients not on a level of suicide observation were required to be observed at staggered 30-minute intervals.  This reviewer subsequently reviewed the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on October 3, 2021 (for SVSP 2),

February 12, 2022 (for <u>SVSP 3</u>), February 22, 2022 (for <u>SVSP 4</u>), and March 7, 2022 (for <u>SVSP 5</u>). The chart review found numerous observation checks (i.e., between five and ten per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 56 minutes in one case (<u>SVSP 3</u>). Violations in the four cases were by multiple nursing staff.

In addition, this reviewer found during the EHRS chart review that nursing staff notations in many cases included late entries attributable to connectivity problems (e.g., "laptop frozen, had to reboot," "lost Wi-Fi,", etc.). When late entries were found to be attributable to connectivity problems, this reviewer decided to review the four cases cited above that did not cite problems of connectivity as a reason for late entries. In one case (<u>SVSP 5</u>), however, a nursing note indicated "late entry due to rounding on 8 IPs (more than maximum 6 allowed at one time)."

Finally, a review of **<u>Guard One</u>** data for a recent 24-hour period found a combined 99 percent compliance with required checks not exceeding 35 minutes in both the STRH and D-1 Units. Of note, the high compliance rate for Guard One was offset by the fact that the inmate (<u>SVSP 8</u>) who committed suicide in the STRH in April 2021 was found in rigor mortis, an indication that the rounds in that case were not thorough.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the five-month period of October 2021 through February 2022. A sample EHRS review of 50 emergent/urgent mental health referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in only 88 percent (44 of 50) of the cases. All of the cases in which incidents of SI/behavior did not result in SRASHE completion were labelled as urgent referrals. Of note, deficiencies in the completion of SRASHEs following emergent/urgent mental health referrals was cited in the case of the inmate (<u>SVSP 8</u>) who committed suicide in the STRH in April 2021.

In addition, the **<u>Crisis Intervention Team</u>** was launched at SVSP in May 2019 and, pursuant to policy, was operational seven days a week from 8:00 a.m. until 10:00 p.m., with other clinicians responding to emergency mental health referrals during other hours. Prior to April 1, 2022, the CIT included two CIT-trained clinicians who were assigned to cover the seven-day schedule. However, due to significant understaffing of mental health clinicians at SVSP, the two CIT-trained clinicians will no longer be assigned to the CIT, and all emergency crisis calls will be handled by outpatient clinicians.

There were other problems associated with the CIT. This reviewer examined the random selection of 18 "MH Crisis Intervention Team (CIT) Mental Health Forms" completed by mental health clinicians between October 2021 and March 2022. These forms are intended to document the mental health, nursing, and custody personnel who responded when the CIT was activated. The review found that nursing staff responded to only 11 percent (two of 18) of the CIT calls during that time. In addition, data presented by the SPRFIT coordinator during the SPRFIT monthly meeting on February 15, 2022 indicated that "Of the 60 noted CIT activations (in January 2022), only 30 have data regarding any CIT intervention or outcome. Staffing issues have been a large issue in January which led to some difficulties with CIT coverage. These problems have only worsened since the end of November. Mental Health and Nursing staffing are at critical levels, leading to few opportunities for a complete CIT."

This reviewer had an opportunity to observe the CIT process on March 23. The CIT was activated in the D-3 Unit for two inmates who had separately expressed SI to custody personnel. The two cases were unrelated. Upon arrival to the D-3 Unit, one inmate (SVSP 6) was observed in a TTM outside of the custody office, and the second inmate (SVSP 7) was observed inside the indoor recreation yard. Neither inmate was observed on continuous observation by custody personnel as required by the CIT policy. This reviewer observed that the full CIT, including a clinician, nurse, and lieutenant, responded to the first case (SVSP 6) and met with the inmate in the privacy of the custody office. The inmate quickly recanted any SI and stated that he had only threatened suicide because he was frustrated in not being able to meet with his EOP clinician on a consistent basis. In the second case (SVSP 7), interaction with the inmate was postponed for a short time so that the clinician could have an opportunity to review the chart. Subsequent review of the "MH Crisis Intervention Team (CIT) Mental Health Form" indicated that the lieutenant (or designee) was not in attendance when the CIT reconvened in the case. Similar to the first case, the second case also involved an inmate who expressed SI due to frustration in not seeing their EOP clinician since March 10, a period of two weeks. Subsequent review of both charts indicated that the required SRASHEs were completed in each case, both inmates were assessed as being at low acute risk for suicide, and both inmates were returned to their cells in the D-3 unit. The CIT clinician scheduled PC appointments for each inmate.

Three **IDTT Meetings** were observed in the MHCB unit on March 24. Overall, although there was good treatment team representation during each meeting, the meetings were problematic. During the first IDTT meeting, the patient was observed to be clothed in both a safety smock and "partial issue" (t-shirt, boxers, and socks). As this was the patient's initial IDTT meeting, the clinician summarized several demographic characteristics of the patient, including age, race, offense, and sentence, but neglected to address the patient's level of care, any previous MHCB placements, as well as mental health and suicide behavior histories. There was appropriate preliminary discussion regarding coping skills and treatment goals to reduce SI. During the meeting, the patient requested a telephone call with his attorney because he was very concerned about an upcoming appeal. Although the custody officer who had escorted the patient to the meeting (and remained in the room) informed the patient that he had not been approved for telephone privileges, other members of the IDTT indicated that the patient had previously been granted all privileges, including telephone use. The patient was subsequently provided a telephone call. Following the meeting, this reviewer inquired as to why the patient had been issued both a safety smock and partial issue clothing, and was informed that the smock had been provided after the patient complained of being cold.

In the second case, there was inadequate case presentation similar to the first case. The patient had been in the MHCB unit since March 9 for self-injurious behavior. The clinician initiated a discussion about safety planning and it was evident that such a discussion had not previously taken place during the patient's approximate 15-day MHCB stay. There was also an acknowledgment that the patient had not engaged in any SIB for at least seven days. Although approved for telephone privileges, as well as yard, the patient was inexplicably not approved for dayroom. Following the meeting, this reviewer inquired as to why the patient had not been approved for dayroom, and was informed that the treatment team was concerned that the patient

might engage in SIB in the dayroom. Subsequent review of the patient's medical chart did not find a rationale for allowing yard privileges, but denying dayroom privileges for this patient.

In the third case, the patient was observed to be clothed in both a safety smock and "partial issue" (t-shirt, boxers, and socks). Inadequate case presentation was again observed during this patient's initial IDTT meeting. The patient appeared quite upset that he was on the Suicide Watch status, clothed in a safety smock, and unable to call his family regarding the health of his mother who had recently been diagnosed with ovarian cancer. He also complained about being locked down in his cell, as well as the bright lighting interfering with his sleep. The patient requested that the lights be dimmed. The patient became increasingly upset as the meeting went on, insisted that he was no longer suicidal, and wanted to be discharged. Similar to the first case, the patient had been previously approved for telephone privileges, but there had been miscommunication between IDTT members and custody personnel. In addition, the psychiatrist incorrectly informed the patient that, pursuant to policy, the lighting in his cell could not be dimmed because he was on Suicide Watch status, but that once he was downgraded to Suicide Precautions status, the lights could be dimmed. There was no such policy. Following the meeting, this reviewer inquired as to why the patient had been issued both a safety smock and partial issue clothing, and was informed that the boxers issued to the patient were too small and the smock had been provided to provide adequate covering of his genitals.

Of note, safety smocks should only be issued to suicidal patients who are assessed as being at high risk for suicide by hanging. If the patient complains about being cold, they should be issued an additional safety blanket. In addition, instead of providing a patient with a safety smock because their boxers are too small, the patient should be issued boxers of the appropriate size.

With regard to **Out-of-Cell Time** afforded to MHCB patients, this reviewer examined the 114-A forms for all patients housed in the MHCB during the on-site assessment. The review found a significant amount of inconsistency, with patients not always being afforded opportunities to shower within three days of MHCB admittance; and one patient being approved for dayroom, but not yard, whereas another patient was approved for yard, but not dayroom. As cited above, not all patients approved for privileges were always notified of such approval.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 23 patients discharged from the unit during January 2022 and February 2022, who had been admitted into the MHCB for DTS, and remained at SVSP. The review found that, although discharge SRASHEs were completed in all cases, the required safety plans and/or five-day clinical follow-ups were completed in only 87 percent (20 of 23) of the cases.

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from September 2021 through February 2022. This reviewer's examination of the data found problems in untimely supervisory review. First, the SRASHEs and safety plans of only 17 patients were reviewed by the MHCB supervisor despite acknowledgment from mental health leadership at SVSP that a significantly larger number of patients were discharged from the

MHCB during this six-month time period.  In addition, discharge SRASHEs were required to be completed prior to or during the anticipated discharge IDTT meeting, and the examination found that all supervisory reviews were untimely and occurring months after the IDTT meetings, and on the specific dates of October 28, 2021, January 20, 2022, and January 27, 2022.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 212 cases of inmates discharged from either the MHCB unit or alternative housing who remained at SVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from September 2021 through February 2022.  The review found that only 73 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first page of the form or discharging the custody checks in less than the 24-hour minimum.  When completed correctly, the majority of custody checks were recommended for 48 hours by clinicians.  In addition, only 67 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation (particularly between 12:00 a.m. and 6:00 a.m.).

**Intervention**:  Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**:  A review of six months (September 2021 through February 2022) of SPRFIT meeting minutes found that all required mandatory members or designees were not in attendance for any of the meetings.  Although the meeting minutes stated that quorums were achieved in all the meetings, the same unit supervisor was incorrectly listed as both SRN and Senior PT, and a sergeant was incorrectly listed as a designee for the associate warden of health care access when the designee cannot have a classification lower than a captain.

Meetings were scheduled for 90 minutes, and meeting minutes were generally between ten and 11 pages in length without attachments.  Minutes consistently included, but were not limited to, presentation of basic data on timely SRASHE compliance, 7497 Discharge Custody Check forms, CIT, training, and alternative housing.  Of note, discussion of the SRMP was limited to staff training, rather than the required monthly tracking of patients in the SRMP.  A SPRFIT LOP was in effect.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021.  SVSP had the following

LOPs that were consistent with these CCHCS directives - "Operational Procedure No. 407: Inmate-Patients Receiving Bad News," dated December 21, 2021; "Operational Procedure No. 402: Crisis Intervention Team," dated July 2021; and "Operational Procedure No. 401: Suicide Risk Management Program," dated July 2021.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 96 percent of custody staff, 96 percent of medical staff, and only 82 percent of mental health staff received annual suicide prevention block training during the previous 12 months.  Finally, as of March 2022, only 70 percent of mental health clinicians had completed the SRE mentoring program, 92 percent had received the seven-hour SRE training, and 90 percent had completed safety plan training.

**Recent Suicides**:  SVSP experienced two (2) inmate suicides during the review period.  In the **_first_** case (SVSP 8), the inmate was found hanging from the ventilation grate by a sheet in his STRH unit cell during the late afternoon of April 22, 2021.  His body was found in rigor mortis.  The inmate entered the CDCR system on March 29, 2006 to serve a life sentence with the possibility of parole for multiple counts of burglary and one count of lewd and lascivious acts on a child under 14.  While incarcerated, he was also charged with indecent exposure which added more time to his sentence.  He had most recently been transferred to SVSP on May 11, 2020.  The inmate incurred at least 17 RVRs during his confinement, the most recent of which occurred on December 19, 2020 for indecent exposure.  He was not known to be gang-affiliated.  The inmate was divorced and did not have any children.  Records indicated that he had not received any visits and/or telephone calls from family members or friends since 2016.  The inmate's last letter from a family member occurred in 2019 when he asked for money from an aunt.  It appeared that he no longer had any viable support system.

According to very limited available records, the inmate was raised in Mexico by his parents and later immigrated to the United States.  He reported experiencing severe trauma as an adolescent as a result of being held captive, experiencing sexual abuse, and witnessing his grandmother's suicide.  He did not graduate high school and was employed in the construction business for seven years at the time of his arrest.  The inmate did not have a juvenile offense history.  He reported a history of substance abuse, including methamphetamine.  Any history of mental illness, including suicidal behavior, in the community was unknown.

Upon entry into CDCR, the inmate screened positive for mental health issues and was initially placed in the MHSDS at 3CMS LOC.  He reported symptoms of depression and was diagnosed with depressive disorder and amphetamine abuse.  However, several months later on September 14, 2006, the inmate was removed from the MHSDS for reasons that were unclear from available records.  Three years later on April 1, 2009, the inmate attempted suicide and was placed in an MHCB.  He was subsequently discharged to the 3CMS LOC.  At that point, the inmate's adjustment to confinement appeared to be unremarkable until January 2013 when he requested SNY status due to safety concerns.  The inmate was placed in 18 CDCR facilities during his more than 15-year confinement and incurred at least 17 RVRs.  On July 10, 2015, the inmate was again admitted into an MHCB after expressing SI upon entry into administrative segregation.  A SRASHE was completed and both his chronic and acute risk for suicide were assessed as moderate.  He was subsequently discharged to 3CMS.

On April 17, 2016, the inmate was charged with indecent exposure.  A few days later on April 21, he attempted to hang himself and was placed in an MHCB.  According to a progress note, the inmate "endorsed continued SI, depression as 8/10, command auditory hallucinations telling him to hurt himself, anxiety related to his placement in ASU, anger, mood lability, hopelessness, recent change in housing, negative custody staff interactions, and a pending 115 for IEX acts with prior convictions."  His diagnosis was changed to major depressive disorder. He remained in the MHCB for four weeks and was subsequently discharged to EOP on May 18, 2016.  The following year on June 10, 2017, the inmate was involved in a riot and charged with battery on a peace officer.  On August 16, 2018, the inmate engaged in a serious suicide attempt by hanging which "resulted in a moderate compression fracture" in his neck.  He was placed in an MHCB and his diagnoses were revised to affective disorder and schizoaffective disorder.  He was discharged back to EOP on February 24, 2018.  Of note, the inmate had a well-documented history of suicide attempts within CDCR on at least seven occasions beginning in 2008.  Of these seven attempts, four were by hanging, including the near fatal attempt on August 16, 2018.

One year later on March 5, 2019, the inmate was placed at the ICF LOC following an MHCB placement for SI.  During the initial assessment, the inmate told the ICF clinician that he "heard voices intermittently, visual hallucinations describing a vision of an 'angel' and saw 'spiders' often, and there were times when he would become physically paralyzed and unable to move. He doesn't know why the symptoms were triggered at this particular time, but the combination of everything overwhelms him to the point that Pt became depressed and anxious that the thought of suicide entered his mind."  Two months later on June 6, 2019, the inmate cut his wrists with a razor and reported that "staff is trying to kill him."  He refused to leave his cell and the treatment team opined that he was experiencing CAH and paranoia.  The inmate's level of care was then elevated to APP.  Although the inmate's behavior became somewhat stabilized and he did not engage in further self-harm, he was not always compliant with psychotropic medication and incurred two RVRs during his acute care placement.  The inmate was discharged to intermediate care on September 9, 2019.

The inmate's ICF placement continued until May 7, 2020 when the discharge summary indicated that he was "stable, not reporting any SIB/SI, he denies HI at this time, but continues to state, 'I need to get out here' and 'they (peers) don't want me here.'  No reported depression and is not observed with symptoms of depression including changes in sleeping/appetite/mood.  He is pleasant/calm with writer and team members."  The inmate was discharged back to EOP and the subsequent initial assessment on May 13, 2020 indicated that "The patient was discharged from ICF/Acute where he was an inpatient for 429 days.  During this time placement alternated a number of times between Acute and ICF.  Patient presented with SIs and delusions that he is an angel.  He also reports AH."

During the evening of May 16, 2020, the inmate expressed SI and was placed in alternative housing.  He reported feeling suicidal and depressed due to not hearing from his family.  The inmate was assessed by a clinician the following morning, and the completed SRASHE indicated that his acute risk for suicide was low "due to the absence of genuine SI."  The MHCB referral was rescinded and he was returned to his housing unit.  Of note, the inmate did not participate in the assessment and the safety plan contained information from a prior SRASHE that was pulled

forward.  Records also indicated that, despite being in EOP, the inmate was not provided with weekly one-on-one interactions with clinicians during most of November and December 2020.  In addition, several required IPOCs were missing from MH Master Treatment Plans from May, August, and October 2020, as well as January 2021.

On March 5, 2021, the inmate was referred to the CIT after expressing SI to his housing officer.  When assessed by a clinician, the inmate "endorsed SI with a plan to either hang himself or cut his throat with a razor.  He also endorsed AH voices telling him to hang himself."  He was admitted into an MHCB and remained there until his discharge ten days later on March 15, 2021.  However, on March 14, the day before his discharge, the MHPC in-patient progress note stated that the "IP was seen cell front as he refused to come out of cell….  IP was observed to be pacing in cell, affect was blunted with constricted range and reporting depressed mood with continued SI to hang himself.  IP endorsed AV/AH 3-4 hours/day still and reported he was cold, only having one blanket.  Author offered him to have a second blanket."  Despite his presentation, continued SI, and lack of clinical progress, the inmate was discharged from the MHCB to EOP.  His diagnoses were revised to PTSD and major depressive disorder.  Both the MHPC and MHMD opined in their respective discharge summaries that the inmate appeared to be exaggerating his symptoms for secondary gain and did not appear to have any overt signs of responding to perceptual disturbances.  The MHMD discharge summary stated that "IP presented today with significant depression and anxiety, poor sleep, no appetite, and difficulty with concentration.  He endorsed command auditory hallucinations of voices telling him to hang himself."  The discharging SRASHE completed by the MHPC indicated a high chronic and low acute risk for suicide, and the SPI was again not updated, with a previous plan simply pulled forward from a prior assessment.

The inmate was subsequently placed in STRH later that day (March 15) and an ASU Pre-Placement screening form indicated that he was currently experiencing suicidal thoughts.  An emergent mental health referral was initiated, but there was no indication that he was seen by a clinician as required, including completion of another SRASHE.  During the next few weeks, the inmate was seen by both his PC and psychiatry and expressed concern that his psychotropic medications had expired.  He was observed to be in distress and complained about a lack of sleep, perpetual disturbances, and according to the PC, "appeared to be more animated and agitated than he normally does" on March 29, 2021.  The inmate was seen by the psychiatrist on April 5 and some of his medication was restarted.  On April 20, 2021, he had his final PC contact and the progress note indicated that the inmate was still experiencing perpetual disturbances that were of a paranoid nature.  As a result of this contact, the PC initiated a routine referral to psychiatry.  A psychiatric appointment was scheduled for April 22, but the inmate either refused the appointment or was listed as a "no-show" to the appointment (as he was housed in STRH).  He committed suicide later that day.

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide.  He did not leave a suicide note and did not have any medical issues that were thought to be contributory to his death.  The CDCR reviewer opined that the inmate was in distress and "lacked protective factors as he had no contact with family, his controlling offense was sensitive in nature resulting in safety concerns, he was isolative, and was frustrated with his inability to obtain his psychotropic medication. Given the

severity of the self-reported paranoia and perpetual disturbances, it is likely the inmate felt exasperated and hopeless resulting in his decision to take his own life."

The Suicide Report contained thirteen (13) recommendations for corrective action through a QIP:

1) While the patient was receiving EOP level of care at SVSP, he did not receive MHPC and/or MHMD contacts from November 9, 2020 through December 22, 2020.  There was a ML EOP continuing primary clinician contact check in/out in his chart, but no corresponding documentation is noted (November 17, 2020).

2) The MH Master Treatment Plans during his placement in EOP level of care did not include clinically indicated treatment goals (also known as IPOCs).  There were no IPOCs for MH Master Treatment Plans on May 21, 2020, August 13, 2020, and March 8, 2021.  MH Master Treatment Plans on October 29, 2020 and January 27, 2021 contained only a MH Anxiety IPOC, despite the inmate being referred to MHCB for self-harm, suicide attempts, and suicidal ideation.  The Discharge MH Master Treatment Plan dated March 15, 2020 contained only a MH Hallucinations IPOC even though the inmate was admitted to MHCB for suicidal ideation and plan to self-harm.

3) Several SRASHEs completed in the last year prior to the inmate's death did not include SPIs that were updated (May 7, 12, 17, November 3, 2020, and March 15, 2021).  Rather, the SPIs were pulled forward from prior dates.  Of note, the SPI conducted on May 17, 2020 pulled forward information and despite indicating the patient refused to participate, the SPI questions were answered as if the patient participated in the development of the plan.  Per statewide policies and procedures, suicide risk assessments shall reflect current patient information.  If patient refuses to engage in the assessment, this shall be documented, along with what efforts were taken in effort to establish participation.

4) The inmate was placed on suicide watch for self-harm behavior and suicidal statements on March 5, 2021 through March 6, 2021, and the issue orders were consistent with this as he was ordered safety issue.  However, his observation orders changed to suicide precaution on March 7, 2021 through his discharge on March 15, 2021.  Despite his observation orders changing, the inmate was still ordered safety issue throughout his entire stay at this level of care; no documentation substantiated this.

5) The inmate screened positive for suicidal thoughts on the ASU Pre-Placement Screen on March 15, 2021 at 1238.  An emergent MH referral order was generated and the appointment was checked out on March 16, 2021 at 1201.  However, there was no documentation in the EHRs to support the inmate being seen and assessed, there is no progress note or SRASHE associated with this consult order.

6) Two weeks following the inmate's discharge from SVSP MHCB to SVSP EOP LOC, five psychiatric medications were not reordered. This resulted in the discontinuation of the five medications, which was first noticed on March 29, 2021. There were some attempts to remedy this omission which included a possible email to the psychiatrist (noted in the psychologist's documentation on March 29), a message (regarding one of the medications) sent from psych tech to the pharmacy on March 29 stating that there were 'none in cart for todays (sic) dose,' and three 7362 requests from the patient to meet with the psychiatrist. Two of the five medications were eventually restarted on April 4, following an appointment with the psychiatrist.

7) While the patient was receiving EOP level of care at SVSP, the inmate refused or no-showed for his scheduled psychiatry appointments on April 16, 2021 and April 22, 2021. Psychologist notes around the same time suggest that the patient was symptomatic. An efficient approach to no-shows or refusals from symptomatic patient appeared lacking.

8) A review of the training records revealed a responding staff member was not up-to-date with annual Suicide Prevention training. Salinas Valley State Prison Hiring Authority have been advised of this concern, and has remedied the issue. Completed training records have been provided for the staff member.

9) During the review of the incident, it was identified the activation of the Emergency Medical System (calling 911) did not take place until approximately eight minutes after the emergency was observed.

10) During the review it was identified responding officers did not provide immediate life support. Specifically, from the initial time of discovery until the inmate's removal from the cell and the initiation of CPR, it appears there was a delay of eight minutes.

11) Upon further review of the inmate's Administrative Segregation Unit status and subsequent SVSP Institution Classification Committee (ICC) actions, additional concerns were identified regarding the following items: a. Pre-MERD Hearing pursuant to California Code of Regulations (CCR) 3341.8(b), b. Aggravating and mitigating factor considerations pursuant to CCR 3341.9(a)(1), c. The total period of confinement shall be no less than nor greater than the lowest or highest months listed for the offense in subsection 3341.9(e), the SHU Term Assessment Chart, pursuant to CCR 3341.9(a)(2).

12) Upon review of the inmate's housing placement, it appears SVSP was not in compliance with protocol defined in the Mental Health Services Delivery System *Program Guide*. Specifically, the referral process for ASU EOP HUB placement.

13) After review of the incident, SVSP Hiring Authority identified concerns with staff actions prior to the actual suicide. These concerns will be addressed by the Hiring Authority.

In the **_second_** case (SVSP 9), the inmate was found hanging from the light fixture by a sheet in his SNY cell during the morning of March 17, 2022. The inmate entered the CDCR system on February 26, 2002 for his fourth term to serve multiple sentences totaling 44 years for carjacking, robbery, use of a firearm, and assault with a deadly weapon. He had been transferred to SVSP on June 24, 2021. The inmate incurred 17 RVRs during his confinement, the most recent of which occurred on August 11, 2020 for battery with a deadly weapon. He had been gang-affiliated until February 2000 and classified to an SNY during his last CDCR term. The inmate had been married since 2017 and did not have any children. Records indicated that he received regular visits and had telephone calls with his wife and other family members, with the last visit and telephone call with his wife occurring shortly before his death.

According to available records, the inmate was raised by his mother until the age of seven but, based upon her regular substance use, he was abandoned and subsequently lived with his grandmother, and later with his father. The inmate had nine half-brothers and sisters. While living with his father, he developed several behavioral issues and was placed in a juvenile hall and later the CYA. The inmate reported a very dysfunctional upbringing that was surrounded by substance use, as well as verbal and physical abuse. He dropped out of high school, but later completed his GED during confinement in the CYA. Apart from an approximate 11-month period in 1989, the inmate reported he had been incarcerated for most of his life, including three previous CDCR terms. He was treated for attention-deficit hyperactivity disorder at age 10 and began using illegal substances at the age of 12. The inmate did not have a history of mental health treatment in the community, but reported experiencing periods of depression, paranoia, and anger while confined in the CYA.

Upon entry into CDCR for his fourth term, the inmate screened positive for mental health issues and was initially placed in the MHSDS at 3CMS LOC. He had numerous levels of care changes during his final term, including non-MHSDS, 3CMS, EOP, and MHCB. He was admitted to the MHCB five times in 2003, 2004 (twice), 2010, and 2011. All admissions were for SI and/or suicidal behavior. From September 2013 through February 2020, the inmate programmed at 3CMS with diagnoses of major depressive disorder, recurrent, mild adjustment disorder with anxiety, adjustment disorder with depressed mood, and intermittent explosive disorder. In February 2020, the inmate was discharged from the MHSDS "due to having no functional impairments, being without psychotropic medication for six months and limited participation in mental health services."

In August 2020, the inmate was placed in administrative segregation and subsequently requested to be included in the MAT program, as well as placed back into the MHSDS for ongoing depression and anxiety. Although initially denied reentry into the MHSDS, he was placed back at the 3CMS LOC in October 2020 without a diagnosis documented in his medical chart. The inmate reported various symptoms, including irritability, a desire to use illicit substances, anger, and anxiety. However, he began refusing out-of-cell contacts, as well as psychotropic medication. Medication was subsequently discontinued in April 2021. The CDCR reviewer in

this case found that various treatment plans developed during this time were inadequate, and specifically noted that treatment plans developed in October 2020, January 2021, and April 2021 were nearly identical with information in the clinical summary sections pulling forward information about the inmate's eligibility for MHSDS removal from February 2020.

The inmate reported a long history of engaging in self-injurious behavior and during an initial mental health assessment in 2011, reported at least six prior suicide attempts in juvenile hall and during prior CDCR terms.  The inmate's last confirmed suicide attempt occurred in April 2010 and resulted in a MHCB placement.  The last SRASRE was completed in October 2020 and the inmate was assessed as being a high chronic and moderate acute risk for suicide.

In June 2021, the inmate was seen by psychiatry following a request to restart his psychotropic medication due to a depressed mood, inconsistent sleep, decreased appetite, and excessive worry. His medication was restarted.  The inmate was transferred to SVSP June 24, 2021 and met with his PC on July 9, followed by his initial IDTT meeting on July 14.  Several days later on July 19, he was seen by his psychiatrist.  This July 19, 2021 appointment was his last contact with mental health staff until his death eight months later in March 2022.  In addition, the inmate's psychotropic medication was discontinued without a face-to-face evaluation.

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide.  He left an undated letter in his cell that the CDCR reviewer interpreted as a suicide note.  The letter simply conveyed an apology to his aunt, his closest family member apart from his wife.  Other letters found in the cell indicated that the inmate perceived himself to be a burden on his family and, according to the CDCR reviewer's conversation with his wife following the suicide, the inmate continued to struggle with depression and consistently spoke about "being better off dead."  He also complained of being threatened by other inmates, but did not want to resort to violence that would result in additional RVRs and prolong his release date.  The inmate did not have any medical issues that were thought to be contributory to his death.  According to the CDCR reviewer:

> Due to the lack of mental health contact and documentation, it is unclear if he had the skills and/or resources to adequately cope with these interpersonal stressors and mental health symptoms.  His previous interaction with mental health would indicate that he was more than capable of advocating for himself to ensure his mental health needs are being met, but it is unclear why he elected not to reach out.  Nonetheless, the combination of his perceived burdensomeness with his family, a desire to avoid inflicting more pain upon his family, the threat against his life, and the spiritual conflict he was experiencing likely overwhelmed him and caused such despair and hopelessness that he utilized his longstanding coping skill of self-harm and made the decision to end his life on March 17, 2022.

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) <u>CCI</u>:  The treatment plan dated April 7, 2021 was nearly identical to treatment plans dated January 6, 2021 and October 21, 2020.  There was no meaningful clinical update regarding the inmate's functioning or presentation during the

review period and information in the clinical summary section carried over information about his eligibility for removal from the mental health program from the February 5, 2020 discharge treatment plan. Per MHSDS *Program Guide*, 2009 revision (12-7-12): 'The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care.'

2) <u>SVSP</u>: The inmate transferred to SVSP on June 24, 2021. He had his initial PC contact on July 9, 2021 and subsequently was not assessed by clinician again prior to his death. Additionally, the initial treatment team meeting was held on July 14, 2021, which was outside of *Program Guide* requirements.

3) <u>SVSP and Tele-psychiatry</u>: Review of the previous year's documentation revealed that there were several instances (on 4/22/2021, 5/20/2021, 6/10/2021, 7/7/2021, and 8/31/2021) when the assigned tele-psychiatrist inadequately responded to the patient's failure to attend scheduled psychiatry appointments. Additionally, there were at least two instances (on 7/6/2021 and 8/11/2021) when the assigned tele-psychiatrist discontinued medication without evaluating the patient at the time of the discontinuation or shortly thereafter or establishing an adequate plan for follow-up by on-site staff.

4) Upon further review of the inmate's recent Classification Committee, one concern was identified. Although the classification committee conducted single/double cell housing review, the reason to continue single cell status was not clearly articulated.

5) During the review of the Emergency Medical Response timeline, there was a 17-minute documentation gap from 0627 to 0644. No documentation related to attempted IV/IO, shocks advised or not, and monitor readings were found.

**Audit Summary**: Adequate practices were found for intake screening, PT rounding of the ASUs, new intake cell placement, Guard One (negated by the fact that the inmate committing suicide in April 2021 was found in rigor mortis) and CPR and suicide prevention training for custody and nursing staff. There were multiple deficiencies found in other areas that required corrective action, including an inadequate compliance rate with required SRASHEs for emergent/urgent mental health referrals, CIT activation that frequently did not include all required team members, observed crisis response in which two inmates were not on continuous 1:1 observation prior to the CIT's arrival, inconsistent timelines for five-day clinical follow-ups after discharge from alternative housing, inadequate nursing rounds of suicidal MHCB patients, uneven case presentations during IDTT meetings, inconsistent authorization of possessions and privileges for MHCB patients, untimely and/or no MHCB supervisory review of those safety plans, and low compliance rates regarding discharge custody check forms by clinical and custody personnel. Finally, it was noteworthy that SPRFIT minutes consistently noted since at least September 2021 that the "Chiefs of Mental Health have reached out to Headquarters regarding

the ongoing staffing issue for SVSP's Mental Health Department and how it is impacting programming and coverage."

### 19)   Correctional Treatment Facility (CTF)

**Inspection**:  March 24-25, 2022 (previous suicide prevention audit was on April 24-25, 2014). CTF housed approximately 4,052 inmates during the on-site assessment.

**Screening/Assessment**:  Two new admissions were observed during the **Intake Screening** process in the R&R Unit on March 24, 2022.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS in each case.  The nurse's office door was closed during the process, an officer was stationed in the hallway, and privacy and confidentiality were maintained.

**PT Rounds** were not observed during the on-site assessment because the ASU (located in O-Wing of the Central Facility) was closed for renovation.

**Housing**:  CTF had a 21-bed OHU/Infirmary with four cells (230-233) designated as **Alternative Housing** to temporarily house suicidal inmates awaiting MHCB placement.  Each of these cells were previously found by this reviewer to be extremely dangerous during the 2014 assessment, with ventilation grates that had not been retrofitted, exposed open-faced cell bars, and in at least one room, a handicap railing that could easily be used in a SA by hanging.

For the 13-month period of January 2021 through February 2022, there were approximately 74 inmates placed in alternative housing, and all released within 24 hours. [Of note, this number excludes several inmates who were held in these cells on Temporary Mental Health Unit (TMHU) status from January through March 2021.]  In addition, approximately 86 percent (64 of 74) of inmates on alternative housing status were subsequently transferred to a MHCB, with only 14 percent (ten of 74) of cases rescinded and inmates returned to their respective housing units. This reviewer examined the EHRS charts for all ten of these rescinded cases and found that the required SRASHEs were completed in all cases, and 80 percent (eight of ten) of the cases had timely five-day clinical follow-ups performed.

In addition, although the ASU had been closed since January 2022 for renovation, it was tentatively scheduled for re-opening in May 2022.  As such, this reviewer had an opportunity to inspect the renovation project and **New Intake Cells**.  The inspection found that the cell doors were replaced throughout the unit, and 12 new intake cells (101-106; 143-148) remained in the unit.  With one exception (i.e., push-button faucets needed to replace current faucet handles in Cell No. 145), the remaining new intake cells were suicide-resistant.

**Observation**:  Because CTF does not have a MHCB unit, all inmates identified as suicidal are required to be temporarily housed on alternative housing status awaiting MHCB placement. Once placed on alternative housing status, these inmates are required to be clothed in a safety smock and receive continuous, direct visual observation (i.e., Suicide Watch) until they are

transferred to a MHCB or the MHCB referral is rescinded following assessment by a mental health clinician and they are returned to their housing unit.

Review of CTF's "Operational Procedure No. 402: Suicide Prevention," revised September 2021, found both confusing and incorrect procedures regarding observation of suicidal inmates on alternative housing status. For example, despite a statewide directive requiring suicidal inmates on alternative housing status to be clothed in a safety smock and receive continuous, direct visual observation, the CTF LOP contained narrative that allowed for flexibility, stating that "MH Patient Issue order shall be placed to determine what clothing, bedding and personal items, if any, the patient is allowed to have within the AHA (Alternative Housing Area) observation cells" (at page 9). In addition, the CTF LOP contained sections on both Suicide Watch and Suicide Precaution status despite the fact that Suicide Precaution status was prohibited for suicidal inmates in alternative housing. Further, the CTF LOP allowed for the downgrading of patients from Suicide Watch to Suicide Precaution status, stating "As the patient begins to make progress and is determined to be no longer actively suicidal, Suicide Watch may be discontinued and the patient may be placed on Suicide Precaution; however, direct visual observation of the patient will be continued per AHA policy" (on pages 12-13). Finally, the CTF LOP also allowed for one nursing staff member to observe up to two suicidal patients at a time if the patients were in adjoining cells. Given the configuration of the four designated cells (230-233) in the OHU/Infirmary, in which the cells are situated behind a glass wall and nursing staff are stationed outside in the corridor, it would be challenging for one person to consistently maintain continuous, direct visual observation on two suicidal patients (i.e., a 1:2 ratio).

In addition, given the fact that the four designated cells (230-233) in the OHU/Infirmary were extremely dangerous and not suicide-resistant, with ventilation grates that had not been retrofitted and exposed open-faced cell bars, it was very problematic that the CTF LOP allowed for clothing issue other than a safety smock, allowed for downgrading suicidal inmates to Suicide Precaution status (i.e., with observation at staggered intervals that did not exceed 15-minute intervals), and allowed for a 1:2 staff to inmate observation ratio.

This reviewer examined the EHRS charts for the 17 inmates placed on alternative housing status in the OHU/Infirmary from October 10, 2021 through March 10, 2022. Consistent with statewide directives, all of the inmates had provider orders for Suicide Watch. In addition, 82 percent (14 of 17) of the inmates had provider orders for issuance of safety smocks, with the remaining 18 percent (three inmates) having provider orders for either full issue or partial issue. Although this reviewer was initially informed that these cases involved inmates who were not suicidal and referred to an MHCB for grave disability, review of their charts indicated that each inmate also expressed SI. In one case (CTF 1), for example, the inmate was placed in alternative housing during the evening of January 27, 2022 after he was observed to be paranoid and expressing increased anxiety regarding safety concerns and family issues. The rationale for the MHCB was listed as both grave disability and SI. The SRASHE completed the following day (January 28) indicated that the inmate's "acute risk is considered to be high…. He reports experiencing recent passive suicidal ideation with a plan to defensively confront others on the yard he believes are targeting him." The inmate was housed in Cell 231 of the OHU/Infirmary, and a nursing note indicated that the inmate "Per PCP, can have shorts, shirt…" He was subsequently transferred to an MHCB several hours later. Of note, the September 2021 SPRFIT

meeting minutes listed at least one case in which a clinician incorrectly ordered Suicide Precaution status for an inmate housed in alternative housing.

In sum, given the fact that the four designated cells (230-233) in the OHU/Infirmary were extremely dangerous and not suicide-resistant, and there were no pending work orders to retrofit any of these designated cells to be suicide-resistant, CTF's "Operational Procedure No. 402: Suicide Prevention," should be revised to eliminate the option for Suicide Precaution status, as well as eliminate any clothing option other than a safety smock while inmates are housed on alternative housing status.  In addition, only continuous, direct 1:1 observation should be permitted.

Finally, review of **Guard One** data was not applicable because the ASU was closed for renovation at the time of the on-site assessment.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of September 2021 through February 2022.  A sample EHRS review of 25 emergent/urgent mental health referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in 96 percent (24 of 25) of the cases.

In addition, review of the **Crisis Intervention Team** process was not applicable because CTF did not have a CIT.  All emergency mental health referrals were responded to by outpatient mental health clinicians.  Review of **IDTT Meetings** for MHCB patients, **Out-of-Cell Time** for MHCB patients, and **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit were not applicable because CTF did not have a MHCB unit.

Finally, the process by which inmates were provided Discharge Custody Checks at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 40 cases of inmates discharged from either a MHCB unit or alternative housing who returned to CTF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 2021 through January 2022.  The review found that only 68 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first page of the form or discharging the custody checks in less than the 24-hour minimum.  When completed correctly, the majority of custody checks were recommended for either 48 or 72 hours by clinicians.  In addition, only 53 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation.

**Intervention**:  Due to time constraints, this reviewer did not have an opportunity to tour any housing units to verify whether an Ambu bag and cut-down tool were contained in the same emergency response bag.

**SPRFIT Meetings**:  A review of six months (September 2021 through February 2022) of SPRFIT meeting minutes found that all required mandatory members or designees attended all but one meeting (November 2021).  Meetings were scheduled for 90 minutes, and meeting minutes were generally between four and six pages in length without attachments.  Minutes consistently included, but were not limited to, presentation of basic data on timely SRASHE compliance, 7497 Discharge Custody Check forms, training, and alternative housing.  A SPRFIT LOP was in effect.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021.  Because CTF did not have a CIT process, an LOP was not required.  CTF had the following LOPs that were consistent with the other CCHCS directives - "Operational Procedure No. 1687: Notification of Inmate Bad News," dated May 2021; and "Operational Procedure No. 413: Suicide Risk Management Program," dated September 2021.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 98 percent of custody staff, 94 percent of medical staff, and 96 percent of mental health staff received annual suicide prevention block training during the previous 12 months.  Finally, as of March 2022, only 88 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**:  CTF experienced three (3) inmate suicides during the review period, all occurring in 2020.  In the ***first*** case (CTF 2), the inmate was found hanging from the window by a sheet in his GP cell during the early morning of January 16, 2020.  He had also exsanguinated himself from both arms and neck.  The inmate entered the CDCR system on May 26, 1993 to serve a 25-year to life sentence for murder (of his ex-fiancé).  He had been transferred to CTF on September 12, 2017.  The inmate incurred 11 RVRs during his confinement, the most recent of which occurred on February 1, 2019 for fighting.  He was not known to be gang-affiliated.  The inmate was unmarried and did not have any children.  He had good family support from his siblings and mother (until her death in 2000).  Although one of the sisters passed away in 2013, he continued to have support through telephone calls, or correspondence, and visits from his two other siblings and friends.

According to available records, the inmate and three older siblings were raised by their mother.  His father died when he was eight-years-old.  The inmate experienced both physical and verbal abuse by his mother who struggled as a single parent and often threatened to put her children up for adoption.  He graduated high school, attended junior college and acquired an associate's degree, but dropped out of college before obtaining a bachelor's degree.  The inmate was always able to maintain full-time employment, including working in construction and having a real

estate license.  Although he occasionally used illegal drugs, records did not indicate that the inmate had a history of substance abuse.  He did not have a prior juvenile criminal history, and his adult criminal history was minor until the instant offense in September 1992.  Although the inmate did not have a history of mental illness in the community, records indicated that it had been his original intent to commit suicide prior to the murder of his fiancée.

Upon entry into CDCR, the inmate screened negative for mental health issues and was not initially placed in the MHSDS.  However, in September 1993, the inmate was referred to mental health for depression, low energy, crying spells and feelings of hopelessness.  He was included in mental health services as a "Category J," with initial diagnoses of major depression, alcohol abuse, cocaine abuse, and methamphetamine abuse.  In March 1995, the inmate reported that he had been struggling with depression since the age of 21, had experienced SI when a friend killed himself and when his fiancée broke up with him.  He was placed at the 3CMS LOC and remained at that level of care for approximately nine years with revised diagnoses of major depression and polysubstance abuse.

In December 2005, the inmate's level of care was elevated to EOP and his diagnosis changed to major depression.  Three months later on March 16, 2006, he was admitted into an MHCB after expressing SI and refusing to remain in a dormitory setting.  He also began complaining of chronic back and neck pain, as well as stomach issues.  He was subsequently returned to EOP and received treatment for paranoia, depression, and intermittent SI.  Records indicated that he was frequently agitated, hostile, and resistant to treatment.  The inmate gradually reduced his agitation and increased organization, lowered his risk of suicide, and started to participate in programming.

The inmate remained at EOP for approximately eight years and was generally engaged in treatment.  Records indicated continuing medical complaints regarding pain (back, pancreatitis, arthritis, and abdominal pain).  He also had two MHCB admissions during this time.  The first occurred in May 2012 for SI following his initial denial of parole with a five-year extension.  The second occurred one year later in May 2013 when he placed a ligature around his neck following an altercation with custody staff, as well as grieving the recent death of his sister.  He was returned to EOP following each MHCB discharge.

By October 2014, the inmate began to demonstrate increased mental health stability, and continued to engage in treatment related to the loss of her sister.  He continued to deny any SI and suicide risk assessments identified him as a moderate chronic risk and low acute risk for suicide.  His level of care was lowered to 3CMS and his diagnoses were changed to mood disorder, antisocial personality disorder, and narcissistic personality disorder.  During the next three years, the inmate remained stable, continued to deny SI, and did not have any MHCB admissions.

On January 4, 2017, the inmate was discharged from the MHSDS.  With one exception, he continued to function well within the mainline GP and did not have any further contact with mental health staff.  The exception occurred on December 23, 2019 when custody staff referred him to mental health after he appeared "confused/disorientated withdrawn" and "hearing/saying/imagining things."  When seen by a clinician, the inmate appeared frustrated that

he was seeing a mental health clinician, and not medical staff for his persistent medical issues. He denied any mental health issues, including SI, but continued to complain about his untreated physical pain.

Although the inmate had 11 RVRs during his over 25-year CDCR confinement, five of which involved violence, he also achieved multiple certificates for completion of treatment programs such as celebrate recovery, long-term offender program, anger management, and 12 steps. He had a job as a dining room worker. The inmate had two parole hearings during his confinement, both resulting in extensions. The inmate petitioned to advance his next hearing and, on October 3, 2019, the BPH granted the advance and scheduled his next hearing for April 9, 2020.

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide. He did leave a brief suicide note that spoke to the excruciating pain he was suffering from, as well as his frustration with medical staff regarding the lack of treatment to resolve the issue. The inmate had a history of hyperlipidemia, diverticulitis, pancreatic insufficiency, and chronic lower back and abdominal pain. He was treated with various medications with limited success. The CDCR reviewer opined that the inmate "reached an endpoint in coping. Following his colonoscopy in November 2019, the inmate developed pain, and over the next three months his actions would suggest he had reached the point where he was done with everything. He was tired of the guilt for what he had done, he was tired of his chronic pain, he felt no one would find a solution to his pain, and he did not feel heard regarding what he believed needed to be done."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

> 1) In the EHRS, the emergency response was lacking, more specific documentation of wounds (length/depth, etc.) and hemostasis attempted.

In the **_second_** case (CTF 3), the inmate was found hanging from the locker by a sheet in his SNY cell during the morning of August 19, 2020. He had entered the CDCR system on November 14, 1996 for his second term to serve a 35-year to life sentence for assault with a deadly weapon on a peace officer, with an enhancement for personal use of a dangerous or deadly weapon. He had been transferred to CTF on April 4, 2019. The inmate incurred 16 RVRs during his confinement, the most recent of which occurred on June 5, 2019 for refusing to accept assigned housing. He was not known to be gang-affiliated. The inmate was divorced and had three children. Records indicated that he did not have any strong family support through either visits or telephone calls during the previous three years, however, he did have some letter correspondence with a sister and friend.

According to available records, the inmate and two siblings were raised by their mother. His father died when he was nine-years-old. The inmate reported that his father physically abused his mother. He reported one incident of sexual abuse when he was seven-years-old, although he denied the abuse in subsequent clinical interviews. There was also a family history of both depression and alcohol abuse. The inmate reported a previous diagnosis of attention-deficit hyperactivity disorder as a child, and subsequently dropped out of high school. He later received his GED during confinement in an out-of-state prison. The inmate had a sporadic employment

history. He was married and divorced three times. In addition to alcohol abuse, the inmate began using illegal drugs at the age of 13. He had both a juvenile and adult criminal history, including a prior CDCR term from 1991 through 1994.

Upon entry into CDCR, the inmate screened positive for mental health issues and was placed in the MHSDS at the 3CMS LOC with diagnoses of bipolar disorder, anti-social personality disorder, and amphetamine abuse. He reported prior mental health issues with attention-deficit hyperactivity disorder, depression, and AH. The inmate also reported a suicide attempt while housed in the county jail prior to his conviction, as well as previous 5150 holds in the community. While in CDCR, he was initially started on psychotropic medication, but he became non-compliant. Because the inmate was also assessed as being non-symptomatic, he was discharged from the MHSDS in October 1997.

The inmate remained relatively stable until March 2000 when he was placed back in 3CMS following complaints of depression, irritability, and sleeping problems. The following year in May 2001, the inmate's only MHCB placement occurred following a serious suicide attempt in which he lacerated his left forearm. The attempt was precipitated by housing issues, as well as loss of a legal appeal. He remained in 3CMS with a diagnosis of adjustment disorder and bipolar disorder until November 2003 when he was briefly elevated to EOP and his diagnosis changed to psychotic disorder versus substance-induced psychosis. This elevation was a result of possible delusional behavior and his claim of experiencing AH for several months following the death of his mother.

In December 2003, his treatment team found that he did not display any psychiatric symptoms that would require EOP LOC and he was presenting with "only mild anxiety with no reported mood symptoms." The inmate was returned to 3CMS and his subsequent diagnoses varied between adjustment disorder, mood disorder, and attention-deficit hyperactivity disorder for the next several years. From 2010 through 2015, the inmate was typically diagnosed with either mood disorder or adjustment disorder with depressed mood. He was briefly discharged from 3CMS in June 2015 after his symptoms stabilized without consistent compliance with medication. In August 2015, the inmate was assaulted and placed in administrative segregation for safety. He subsequently complained of depression then was reinstated into 3CMS in September 2015.

In July 2016, records indicated that the inmate appeared hyperverbal and tangential, speaking on topics of religiosity. His PC suspected that he was using methamphetamine. In subsequent sessions, however, the inmate's mood appeared more stable. The following year on July 19, 2017, he tied a shoelace around his neck, but his cellmate intervened and notified custody staff. In a subsequent interview with a clinician, he denied any SI, simply stating that he had a "moment." He was not placed in an MHCB. In October 2017, the inmate told his PC that he was feeling irritable, had insomnia, and wanted to get back on a mood stabilizer to help him "calm down." His psychotropic medication was adjusted. The following year in October 2018, the inmate informed his PC that "I'm good, I'm just waiting for the parole board," and also disclosed that he became eligible for parole beginning in January 2019 due to proposition 57 and had a BPH suitability hearing scheduled for November 4, 2020. In April 2019, the inmate began to endorse auditory and visual hallucinations, as well as delusional behavior. He met with

psychiatry and his medications were again adjusted. However, due to non-compliance, his medications were discontinued in August 2019. The inmate met with his PC the following month and denied any psychotic symptoms, paranoia, or depression.

In February 2020, he told his PC that "I'm doing well" and denied any immediate mental health concerns. In April 2020, the inmate was placed on a single low dose medication for insomnia and irritability. As part of his annual review, the inmate's PC also completed a SRASHE on April 9, 2020 that found a moderate chronic risk and low acute risk for suicide. The last contact with his PC occurred on July 14, 2020, with the progress note indicating that the inmate was "looking forward to the BPH hearing in November…. wants to explain to the Board his changes in his thinking since he was incarcerated." The PC described the inmate as "very calm and stable," with a "good" mood and full affect. Similar behavior was described by a psychiatrist during an appointment on August 4, 2020. The inmate committed suicide two weeks later.

During his almost 24-year CDCR confinement, the inmate was placed in 19 facilities, several of which were for purposes of layover. Many of the RVRs were related to violence and drugs, resulting in several administrative segregation placements. He was placed on SNY status in April 2011. The inmate had numerous work assignments during his confinement that were often interrupted by either administrative segregation placements or prison transfers. In addition, the inmate was in chronic pain throughout his CDCR confinement as a result of being shot twice (in his left arm and spine area) during his instant offense in 1995. The inmate was placed on CTF's medical high-risk list and periodically treated with pain medication.

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide. Several inmates who were interviewed following the suicide indicated that he had been acting bizarrely in the days leading up to his death and they suspected he was using drugs. The inmate did not leave a suicide note. In addition to his chronic pain, he experienced other less serious medical problems. The CDCR reviewer opined that the likely factors leading to the inmate's suicide "involved current drug abuse which triggered a psychotic episode and/or intensified chronic pain which may have distorted the inmate's thinking to the point he could no longer tolerate his physical pain. His behavior in the days just before his death suggest he was not completely in touch with reality…. It is quite likely the inmate ended his life in a moment of pain where death seemed to be a better option than a life where he cannot see a way to end his physical and mental anguish."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) The IDTT documentation from April 6, 2020 was insufficient in guiding further treatment and intervention (see Discussion/Conclusions section for specifics).

> 2) Despite the inmate being on the institution's medical high-risk list due to his chronic pain, it appeared there was poor communication between medical and mental health staff about both his chronic pain issues and his recurrent substance abuse in the form of diverting his morphine, in addition to his lengthy history of methamphetamine abuse.

In the ***third*** case (CTF 4), the inmate was found hanging from the ventilation grate by a sheet in his SNY cell during the morning of September 14, 2020. He had entered the CDCR system on March 24, 1999 for his fifth term to serve a 35-year to life sentence for burglary as his third strike. He had been transferred to CTF on June 20, 2020. The inmate incurred nine RVRs during his confinement, the most recent of which occurred on November 18, 2019 for unauthorized possession of drug paraphernalia. Most of his infractions were for possession of inmate manufactured alcohol. He was not known to be gang-affiliated within CDCR. The inmate was divorced and had one child. Records indicated that he received family support through letter correspondence and telephone calls, primarily from a sister.

According to very limited available records, the inmate and three siblings were raised by their parents. The family had a history of alcohol abuse, including his father, a brother, and himself. The inmate did not graduate high school, nor did he obtain a GED. He had an extensive juvenile and adult criminal history, including four previous CDCR commitments. He was gang-affiliated in the community, and had a sporadic employment history when not incarcerated. His criminality was directly related to a significant history of substance abuse, including alcohol, heroin, and cocaine. Records indicated he underwent some methadone treatment while in the community, but did not appear to have any history of mental illness and/or suicidal behavior.

Upon entry into CDCR, the inmate screened negative for mental health issues and was not placed in the MHSDS. He also did not receive mental health services during any prior CDCR confinement. During his more than 20 years of CDCR confinement, the inmate was placed in only seven facilities and all of his nine RVRs were related to his substance abuse. Although gang-affiliated in the community, he was an inactive gang member when he was admitted back into CDCR in 1999. However, he continued to be pressured to rejoin gang membership throughout this confinement, and was frequently threatened with assault. Finally, he requested SNY status in July 2007. Prior to 2020, the inmate only had periodic contact with mental health staff. However, on July 7, 2020, the inmate reported SI to nursing staff and was referred to mental health for an assessment. During the assessment, he reported a suicide attempt by placing a plastic bag over his head while his cellmate was out of the cell. The inmate also reported ongoing thoughts of "cutting my wrists in bed and just bleeding out," as well as feeling hopeless, helpless, anxious, and depressed as a result of his medical care condition, ulcerative colitis. He was admitted to MHCB LOC in the facility's TMHU. During his placement in the TMHU, the inmate was not seen on a daily basis by mental health staff as required. In addition, there were problems regarding provider orders for suicide observation and patient issue during the entirety of his TMHU placement. The inmate's initial IDTT meeting occurred on July 14, well outside the requirement of 72 hours following admission. At this point, the inmate denied SI, but continued to report ongoing chronic pain and difficulties adjusting to his medical symptoms. The IDTT meeting was held in absentia due to COVID-19 restrictions caused by the lack of office space. In addition, a correctional counselor did not attend the meeting as required. The inmate was discharged to 3CMS. Not all of the required five-day follow-up assessments were provided.

A few weeks later on August 4, 2020, custody staff initiated an emergency mental health referral indicating that the inmate was "feeling stressed" and reporting SI. The inmate also reported a

similar mental health referral the same day and complained that he was having trouble sleeping, could not get comfortable as a result of his ongoing pain, and could not cope with persistent ringing in his ears.  He was seen by a clinician and the completed SRASHE documented feelings of hopelessness and helplessness, with the inmate stating that he was constantly thinking about suicide but "just hadn't work up the nerve to do it."  He was again returned to the TMHU at the MHCB LOC.  During the inmate's placement in the TMHU from August 4 through August 11, 2020, there were again concerns regarding inconsistent provider orders for suicide observation and patient issue.  For example, the inmate was issued both a safety smock and white undershirt and socks on August 6.  His diagnosis varied between adjustment disorder and major depressive disorder and anxiety disorder.  The inmate was also not seen on a daily basis as required during his TMHU placement.  The subsequent investigation determined that the physical location of the TMHU did not include a bed, and the inmate was forced to lie on a mattress on the floor.

The inmate was discharged from the TMHU on August 11, 2020 and returned to 3CMS.  The clinician completing the discharging SRASHE assessed both his chronic and acute risk for suicide as moderate.  The five-day follow-up assessments were completed as required, and the inmate continued to deny SI.  According to clinicians, he appeared future oriented and discussed a future parole hearing scheduled for December 2021 (although his earliest release date was February 2028).  On September 10, 2020, the inmate attended his initial 3CMS IDTT meeting.  He again denied any SI, but continued to report ongoing medical symptoms of ringing in his ears and chronic pain.  The documentation was otherwise unremarkable.  The inmate committed suicide three days later.  A few inmates interviewed following his death indicated that he had been very frustrated regarding his ongoing medical issues.  According to these inmates, in the week prior to his death, the inmate reportedly had not slept "for several days, and it was driving him crazy."

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide.  He did not leave a suicide note.  The inmate had several medical issues during his CDCR confinement, the most serious of which was ulcerative colitis.  This condition resulted in several short-term hospitalizations and medical procedures, including permanent use of a colostomy bag.  Use of a colostomy bag and adult diapers were said to be extremely stressful for the inmate when he was assigned a cellmate.  Medical records also indicated that his primary care physician appeared unaware of these stressors and his overall mental health treatment, including treatment at the MHCB LOC in July and August 2020.  The CDCR reviewer opined that the inmate's "medical pain increased over the past year, which resulted in his first and only reported suicide attempt in July 2020 and inclusion in the MHSDS.  Within a two-month period, he was admitted into the MHCB/TMHU twice, reported increased medical pain including new symptoms of tinnitus, and made multiple statements during phone calls to his sister that he was feeling hopeless and alluded to suicidality."

The Suicide Report contained nine (9) recommendations for corrective action through a QIP:

> 1) The inmate was placed on a five-day follow-up following his TMHU discharge in July 2020.  It appeared the fifth day of this five-day follow-up did not occur on July 20, 2020.

2) The inmate was placed in the TMHU in July and August 2020. During these admissions, it did not appear he received a daily contact on July 11, 2020 and August 8, 2020. Per the COVID Emergency Mental Health Treatment Guidance memorandum dated April 10, 2020, 'individual treatment out-of-cell shall occur daily and will be conducted by either the primary clinician or the psychiatrist.'

3) The inmate was placed in the TMHU at the MHCB level of care on July 7, 2020. His initial IDTT did not occur until July 14, 2020 and he was ultimately discharged on July 15, 2020. It is unclear how treatment planning and progress of treatment was monitored throughout the duration of his admission. Per the COVID Emergency Mental Health Treatment Guidance memorandum dated April 10, 2020, 'The initial IDTT shall occur within 72 hours of patient's placement in the TMHU.'

4) Multiple concerns regarding placing issue/observation orders daily, justifying issue/observation orders in daily documentation, and appropriate levels of issue were identified. Please see Conclusions section for further details.

5) During staff interviews it was reported that the inmate was given a mattress on the floor during his July TMHU admission while on medical quarantine. As referenced in MHCB memorandums dated October 29, 2013, March 15, 2016, and June 1, 2018, regarding bedding provisions, the bed (cement bed with mattress on top is acceptable) is to be provided for all MHCB patients.

6) HQ Psychiatry: With the recent addition of the ISUDT program and MAT to CDCR, and given ongoing ISUDT expansions and improvements, many mental health staff are unfamiliar with the referral process. Review of the medical record of the inmate reveals that he expressed an interest in the ISUDT program on July 28, 2020, but a referral was not submitted.

7) The inmate had an extensive history of medical concerns which ultimately resulted in his inclusion in mental health in July 2020. These medical concerns also appear to have precipitated his multiple MHCB/TMHU admissions in the months preceding his death. Despite these concerns being identified as a primary factor in his mental health symptoms and suicide risk, there did not appear to be any collaboration between his assigned PCP and mental health staff. It appeared that this lack of communication may have impacted treatment and safety planning.

8) During the review, it was identified that the IDTT held in July 2020 commenced without the presence of a correctional counselor, which is a required member of IDTT due to the inmate's level of care.

9) During the review of the incident, it was identified the activation of the Emergency Medical System (calling 911) did not take place until approximately six minutes after the emergency was observed.

**Audit Summary**:  Adequate practices were found in almost all reviewed areas, including intake screening, completion of SRASHEs upon emergent/urgent mental health referrals for SI/behavior and when inmates are placed in alternative housing, and CPR and suicide prevention training for custody, medical, and mental health personnel.  Deficiencies found included occasional provider orders allowing for full issue or partial issue clothing for suicidal inmates housed in designated cells in the OHU/Infirmary that remained dangerous and not suicide-resistant, confusing and incorrect procedures regarding observation of suicidal inmates on alternative housing status contained within "Operational Procedure No. 402: Suicide Prevention," and low compliance rates regarding 7497 discharge custody check forms by clinical and custody personnel.

### 20)    <u>California State Prison – Los Angeles County (CSP/LAC)</u>

**Inspection**:  April 4-5, 2022 (previous suicide prevention audit was on August 6-7, 2019).  CSP/LAC housed approximately 2,733 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a new admission during the **<u>Intake Screening</u>** process in the R&R unit on April 4.  The nurse was observed to be asking all of the questions and correctly entering information into the EHRS.  The door to the nurse's office remained closed, with an officer stationed outside, thus ensuring both privacy and confidentiality.

In addition, this reviewer observed daily **<u>PT Rounds</u>** in both the EOP administrative segregation (D-5) and STRH units on April 4-5.  The rounds were unremarkable, and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS for all caseload inmates.

**Housing**:  CSP/LAC had a 16-bed CTC, with 12 rooms designated as **<u>MHCBs</u>** that were previously found to be suicide-resistant.  Of note, only six of 12 rooms (or 50 percent) of the MHCB unit were occupied during the on-site assessment.

In addition, there were 12 **<u>New Intake Cells</u>** in the STRH unit and seven new intake cells in the EOP ASU (D-5) that had been previously retrofitted to be suicide- resistant.  During inspection of both units, this reviewer observed that two new intake inmates housed in the EOP ASU were not in new intake cells as required.  The supervisor in the unit informed this reviewer that new intake inmates were placed in unsafe, non-new intake cells on almost a weekly basis.  CSP/LAC had <u>not</u> been scheduled for construction of any new intake cells.  In addition, this reviewer was informed that the STRH unit would be temporarily closed in late April 2022 due to a shortage of custody personnel.

Finally, **<u>Alternative Housing</u>** cells to temporarily house inmates awaiting MHCB placement were found in a variety of designated locations in most yards, as well as the STRH and EOP administrative segregation (D-5) units.  All inmates were furnished beds and required to be observed on a 1:1 basis.  Alternative housing was used extensively at CSP/LAC, and there were frequently four to five inmates in alternative housing on a daily basis.  During February and

March 2022, there were approximately 281 inmates placed alternative housing, and all were discharged within 24 hours. The overwhelming majority (81 percent) of the MHCB referrals were rescinded and inmates were returned to their respective housing units. A sample review of 103 (of 228) rescinded cases indicated that required SRASHEs were found in all cases. However, approximately 52 percent (54 of 103) of the reviewed cases did not include safety plans, with clinicians often incorrectly stating that safety plans were not required because the inmate was assessed as being at low risk for suicide.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB. In addition, patients assessed as not being suicidal were required to be observed at 30-minute intervals. This reviewer's examination of various medical charts for MHCB patients indicated that most patients were often on Suicide Precaution status for an average of only 24 hours before being moved to 30-minute observation. In addition, the chart review found that several patients remained on 30-minute observation despite still reporting current SI. For example, a psychiatrist wrote the following progress note on March 12, 2022 regarding a patient (LAC 1) on 30-minute observation in the MHCB: "When I went to his cell door I met him laying in a bed which he had made on the floor by his door and he readily got up to talk to me when I called his name. He reported doing 'alright' and did not appear to be in any distress, however, as soon as I introduced myself as the weekend psychiatrist, patient said 'I am suicidal. I don't want to talk anymore' and got back into his bed. Any further attempts to engage him in the interview when successful [sic] as he persistently ignored my prompts." The progress note indicated that the patient "expressed passive SI," and he remained on 30-minute checks. The patient met with another psychiatrist two days later on March 14 and the progress note indicated the psychiatrist "saw him at the cell door. 'I am still suicidal.' And patient said that additional dose of Zyprexa helped him with the voices, they are less frequent now. But he is still having suicidal thoughts because of 'his situation'." The patient remained on 30-minute observation.

In another case (LAC 2), the patient was on 30-minute checks in the MHCB and clothed in a safety smock for unknown reasons, and the psychiatrist wrote the following progress note on April 8: "Continues to express vague suicidal ideas." The patient remained on 30-minute checks.

During this reviewer's 2019 assessment, it was recommended that mental health leadership at CSP/LAC conduct an in-depth review of observation orders in the MHCB unit to ensure that patients were not prematurely discharged from suicide observation status.

Further, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on March 5, 2022 (for LAC 3), March 9, 2022 (for LAC 4), March 31, 2022 (for LAC 5), and March 31 2022 (for LAC 6). The chart review found numerous observation checks (i.e., between four and eight per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 57 minutes in one case (LAC 6). Violations in the four cases were by multiple nursing staff.

Finally, a review of **Guard One** data for a recent 24-hour period found a combined 98 percent compliance rate with required checks not exceeding 35 minutes in both the STRH and EOP ASUs.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of September 2021 through February 2022.  A sample EHRS review of 32 emergent/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in only 88 percent (28 of 32) of the cases.  All of the deficiencies were noted in urgent referrals.

In addition, a **Crisis Intervention Team** was initiated in May 2018 and was fully activated until November 2021, when one of the assigned CIT-trained clinicians left state service.  Since that time, the CIT had been operational for only three hours (5:00 p.m. to 8:00 p.m.) on Monday and Friday, and for 12 hours (8:00 a.m. to 8:00 p.m.) on Saturday and Sunday.  This reviewer was informed that it was anticipated that additional CIT coverage for three hours (5:00 p.m. to 8:00 p.m.) on Tuesday, Wednesday, and Thursday would begin in late April 2022.  At other times, emergency mental health referrals were normally handled by outpatient clinicians during the second shift.  This reviewer observed a crisis response by an outpatient clinician during the afternoon of April 4.  The clinician was scheduled to meet with the inmate (<u>LAC 7</u>) in the D-Yard gymnasium.  Prior to the clinician's arrival, this reviewer observed the inmate being placed into the TTM clothed only in his boxer shorts, with his clothing placed on a chair outside the module.  Officers were providing observation from the podium located approximately 20 yards from the TTM.  Several minutes later, another inmate was escorted to the gymnasium and placed in the TTM next to the inmate awaiting the crisis clinician.  During this time, several inmates were also observed playing basketball in the gymnasium.  Shortly thereafter, the clinician arrived and walked over to the inmate and began to initiate the assessment.  This reviewer immediately interrupted and suggested that the inmate be moved to another TTM location for privacy and confidentiality.  The clinician then asked the inmate if he desired such privacy and confidentiality, the inmate said "yes" and also requested a t-shirt.  The inmate was subsequently moved to another TTM several feet away from the other inmate in the gymnasium, and provided a t-shirt.

During the assessment, the inmate was observed to be acting bizarrely, accusing the clinician and others in the vicinity of making annoying noises.  He also appeared paranoid, and vaguely described problems with officers and other inmates in his housing unit.  Although the clinician initially appeared to be leaning toward allowing the inmate to return to his housing unit, when asked about current SI, the inmate responded that he was suicidal and had a plan to cut himself with a razor in his cell.  The clinician appeared very concerned about this response and further inquired about the plan.  The inmate was subsequently referred to an MHCB. Subsequent review of the medical chart found that, although the clinician appropriately completed a SRASHE as required, the reason for the MHCB referral was labeled as "significant mental impairment due to mental impairment" (or grave disability).  There was no mention whatsoever of the inmate's current SI and plan to cut himself with a razor.  It was further problematic that, without intervention from this reviewer, the clinician would have conducted the assessment without providing the inmate a minimum amount of privacy and confidentiality during the assessment.

This case was similar to a case observed by this reviewer during the 2019 assessment whereby the CIT met with the inmate in the D-Yard gymnasium. The inmate was kept in a TTM and, although not in the vicinity of any inmates, an officer was unnecessarily standing next to the TTM.

Finally, it should also be noted that, while walking to the exit debriefing during the late afternoon of April 5, this reviewer observed an inmate (LAC 8) clothed only in a safety smock being escorted across the D-Yard into the gymnasium. This reviewer was subsequently informed that an emergency referral had been initiated in the case and the inmate was clothed in a smock because his clothing had not been returned to him following his discharge from alternative housing earlier that morning (April 5). Subsequent review of the medical chart indicated that the inmate had been housed in alternative housing eight times on a daily basis from April 1, 2022 through April 8, 2022. Approximately 12 SRASHEs were completed during this eight-day period, and the same safety plan was utilized for each assessment. Documentation within the SRASHEs indicated that the inmate had been feigning SI in order to change his housing. Of note, a new safety plan template had been used at CSP/LAC as a pilot project and a clinician had the opportunity to compete the new template during an assessment with the inmate on April 5. The template allowed the clinician to address perceived manipulative behavior with the following inquiry: "If this patient has a history of threatening suicide/self-harm for secondary gain, what interventions are being used to specifically address these concerns?" In response, instead of listing specific interventions, the clinician wrote "Denied."

Five **IDTT Meetings** in the MHCB unit were observed on April 4-5, including one patient being discharged. Overall, although there was good treatment team representation, the IDTT meetings included uneven case presentations, inadequate summaries of suicide risk history and inquiry regarding current SI, uneven explanations of privileges within the MHCB unit, and little, if any, discussion regarding safety planning to reduce further recurrence of SI. The meetings would have been more problematic if not for the participation of the MHCB supervisor. Ironically, the best presentation involved the case of a patient who was not brought into the IDTT room due to inappropriate sexual behavior earlier that morning. He was subsequently seen cell-side by the IDTT. In another case, during a discussion of MHCB privileges, a clinician informed the patient that he was cleared for both shower and telephone use, but misinterpreted policy and told the patient that, because he was still clothed in a safety smock, he was prohibited from either dayroom or yard privileges. With regard to the patient (LAC 9) being discharged, there was no discussion regarding why he had been admitted into the MHCB and, although the patient was provided a copy of his safety plan, there was no discussion of the plan during the IDTT meeting.

With regard to **Out-of-Cell Time** afforded to MHCB patients, there was a full-time RT assigned to the CTC and available on a daily basis from Tuesday through Friday. This reviewer examined the 114-A forms of six patients and, although the forms for three patients were started two days after their arrival onto the unit, it appeared that, with the exception of the case cited above, most patients were receiving opportunities for shower and other out-of-cell activities commensurate with their level of suicide risk.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 20 patients discharged from the unit

during February and March 2022,who had been admitted into the MHCB for DTS, and remained at CSP/LAC. Required discharged SRASHEs were completed in all cases, but safety plans were completed in only 70 percent (14 of 20) of the cases. In addition, only 70 percent of the clinical five-day follow-ups were timely.

Further, this reviewer examined one case which was not only problematic for the lack of adequate safety planning, but in the use of alternative housing and lack of adequately documented rationale for consideration of a higher level of care. During a 58-day period of February 14, 2022 through April 12, 2022, the inmate (LAC-10) engaged in at least 23 SIB incidents. Although most of the SIB was superficial in nature and involved minor lacerations, several incidents were serious enough to warrant outside medical treatment, including two suicide attempts by hanging, an overdose, and ingestion of a foreign object. During this 58-day period, the inmate was housed in alternative housing on at least 26 occasions, including daily from February 14 through February 21, 2022, and April 3 through April 11, 2022. In all but three incidents, the inmate's MHCB referrals were rescinded and he was returned to his housing unit. The three MHCB placements occurred in February and March 2022. During this 58-day period, at least 37 SRASHEs were completed, with his risk of suicide typically rated as high chronic and moderate acute. As indicated below, despite the inmate's continuous SIB, almost daily use of alternative housing and three MHCB placements, the inmate's safety plan remained virtually unchanged in numerous SRASHEs completed from February 15 through April 11, 2022 (with very subtle changes shown in italics):

<u>Safety Plan Intervention on February 15, 2022</u>

<u>Step 1</u> (Warning Signs): Frustrated and angry, When I stop talking, When I stop caring about anything, Anxious and frustrated.
<u>Step 2</u> (Independent Coping Skills): Radio – football, Reading – anything, TV – football, puzzles.
<u>Step 3</u> (Distracting People & Places): Talking with neighbors, attending groups.
<u>Step 4</u> (People to Ask for Help): My mom and grandmother.
<u>Step 5</u> (Professionals to Contact): Clinician, any staff member.
<u>Step 6</u> (Means Safety): Nothing sharp to cut myself, something I could strangle myself with, or hoarding pills/drugs to OD.
<u>Step 7</u> (Reasons to Live): *I love my mother and grandmother and do not want to upset them.*

<u>Safety Plan Intervention on April 11, 2022</u>

<u>Step 1</u> (Warning Signs): Frustrated and angry, When I stop talking, When I stop caring about anything, Anxious and frustrated.
<u>Step 2</u> (Independent Coping Skills): Radio – football, Reading – anything, TV – football, puzzles.
<u>Step 3</u> (Distracting People & Places): Talking with neighbors, attending groups.
<u>Step 4</u> (People to Ask for Help): My mom and grandmother, *my brother on A. Yard.*
<u>Step 5</u> (Professionals to Contact): 1. Clinician, any staff member.

> <u>Step 6</u> (Means Safety):  Nothing sharp to cut myself, something I could strangle myself with, or hoarding pills/drugs to OD.
> <u>Step 7</u> (Reasons to Live):  *My mother and my brother*.

On April 1, 2022, the MHCB's IDTT recommended that the inmate be referred to ICF LOC, stating in the MH Master Treatment Plan that:

> "IP was admitted to MHCB for DTS.  While IP's behavior continues to trend in terms of SIB incidents during his stay in MHCB, the constant supervision and temptation to have a female 1:1 is counter therapeutic for IP.  IP's behavior; although not considered lethal in nature so far, is not controlled at the lower level of care.  The most significant common factor across the level of care spectrum that contributes to IP's SIB continues to be the presence of custody and his conflicts with authority.  A change in environment and specialized treatment such as DBT and IEX tx are suggested as an alternative to try to contain IP's SIB.  For this reason, IP is being recommended for ICF LOC with a request for expedited transfer."

The inmate was discharged back to his housing unit (the EOP ASU) awaiting a decision regarding the ICF referral.  Similar to a case cited above (<u>LAC 8</u>), the clinician who developed the MH Master Treatment Plan also utilized the new safety plan pilot template that allowed clinicians to address perceived manipulative behavior with the following inquiry:  "If this patient has a history of threatening suicide/self-harm for secondary gain, what interventions are being used to specifically address these concerns?"  In response, instead of listing specific interventions, the clinician wrote on April 1 that "IP is being referred to ICF."

Two days later on April 3, the inmate began to engage in SIB, including a suicide attempt by hanging, and was housed continuously in alternative housing until April 11.  A few days earlier on April 6, the IRU accepted the inmate into ICF.  However, the following week on April 12, the EOP IDTT not only rescinded the ICF referral, but decreased his level of care from EOP to 3CMS, and documented the decision in the inmate's MH Master Treatment Plan as follows:

> Based on the totality of objective evidence as presented he does not appear to benefit from the EOP LOC as bx pattern established by IP and heavily influenced by cluster B of characterological traits and not due to decompensation/severe mental health disorder or a qualifying MH Diagnosis that would warrant such placement.  Further, reinforcing a HLOC such as ICF or EOP wherein Mr. _____ will only continue to engage in threatening, acting out and or victimizing others only serves to his detriment as it will provide with zero need to change his bx, and engage in meaningful engagement with any mental health provider- regardless of gender or personal preference…..  Therefore, IPs ICF referral will be rescinded and he may return transfer to a CCCMS STRP MH Program to maintain stability within the least restrictive environment.

Later that same evening (April 12), the inmate again attempted suicide by overdose and asphyxiation, and was transported to an outside hospital for treatment.  The inmate returned to

LAC three days later on April 15 and was again placed in alternative housing. A SRASHE was subsequently completed, the MHCB referral was rescinded on April 16, and he subsequently again engaged in SIB which resulted in him being sent out to the hospital on at least two separate occasions on April 17 and April 18. Although a SRASHE completed on April 17 again rescinded the MHCB referral, another SRASHE completed following additional SIB on April 18 resulted in a MHCB referral. The inmate was finally sent to an MHCB unit at CIM during the early evening of April 18.

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from October 2021 through March 2022. This reviewer's examination of the data found problems in untimely supervisory review specifically, the reviews were typically done consistent with the CAT audit schedule and not prior to or during the anticipated discharge IDTT meeting for each patient. In fact, supervisory review of discharge SRASHEs and safety plans had not been completed since January 2022.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 337 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSP/LAC and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from October 2021 through March 2022. The review found that only 88 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first page of the form. When completed correctly, the majority of custody checks were recommended for 72 hours by clinicians. In addition, only 40 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation and/or entire observation checks omitted.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (September 2021 through February 2022) found that all required mandatory members or designees attended only three (November 2021, January 2022, and February 2022) of the meetings. Meetings were scheduled for an unspecified length, and meeting minutes were generally 12 pages in length. Meeting minutes reported discussion of such topics as training, CIT, SRASHE completion, self-harm data and the SRMP. The meeting minutes were otherwise unremarkable, and did not include identification of most of the deficiencies found within this reviewer's current assessment.

Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was <u>not</u> contained within any CSP/LAC LOP. This deficiency was previously identified in the 2019 assessment.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. CSP/LAC had the following LOPs that were consistent with these CCHCS directives - "Operational Procedure No. 33: IPs Receiving Bad News," dated March 2021; "Operational Procedure No. 30: Crisis Intervention Team," revised December 2021; and "Operational Procedure No. 34: Suicide Risk Management Program," dated July 2021.

**Training**: According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, only 82 percent of custody, 92 percent of medical, and 91 percent of mental health staff received annual suicide prevention block training during the previous 12 months. Finally, as of March 2022, 92 percent of mental health clinicians had completed the SRE mentoring program, 99 percent had received the seven-hour SRE training, and 94 percent had completed safety plan training.

**Recent Suicides**: CSP/LAC experienced two (2) inmate suicides during the review period, both occurring in 2020. In the ***first*** case (LAC 11), the inmate was found to have inserted a pen into his nasal cavity, puncturing his cranium, while housed in his STRH cell during the afternoon of January 11, 2020. Custody staff observed bodily fluids from his mouth and bleeding from his nose. It was subsequently determined that he had also ingested various illegal substances. He was transported to an outside hospital, but returned to the facility the following morning and placed in alternative housing on suicide watch. The inmate's health deteriorated, and he was later returned to the hospital the following day (January 12). He remained in the care of several medical facilities during the next six months, and later succumbed to his original injuries and was pronounced dead on July 17, 2020. He had entered the CDCR system on November 5, 2015 for his third term to serve a life sentence with the possibility of parole for murder (of his wife). He had been transferred to CSP/LAC on March 15, 2017. The inmate incurred seven RVRs during his confinement, the most recent of which occurred on October 2, 2019 for possession of a deadly weapon. In fact, all of his RVRs were violence-related, and he had a pending legal case for the murder of his cellmate on November 9, 2018. He was known to be gang-affiliated. The inmate was widowed and had one child. Records indicated that he received only limited family support through occasional letter correspondence with his stepfather.

According to available records, the inmate and two younger half-brothers were raised by their mother and stepfather. Records indicated that there was family dysfunction that included parental substance abuse, depression, and conflicts between his siblings. The inmate reported later in life that he had been sexually abused at the age of six. His parents also enrolled him in counseling regarding early behavioral and emotional problems. The inmate began a history of substance abuse at age 12, and was suspended from school on multiple occasions. He was removed from the home at age 13 and placed in a juvenile detention center for molesting a

neighborhood girl.  Following his release from juvenile detention, the inmate resided with his great grandmother, but later became involved in gang activity.  The inmate spent the remainder of his adolescence in group homes, juvenile detention, and the CYA.  He did not graduate high school, nor did he have an employment history.  The inmate also had an extensive adult criminal history, including two prior CDCR terms.  As an adult, he received mental health treatment in the community for depression, anxiety, and substance abuse.  The inmate was also reported to have been involuntarily hospitalized in the community for bizarre behavior, substance use, and being a danger to others.

Upon re-entry into CDCR, the inmate screened positive for mental health issues and was placed in the MHSDS at the 3CMS LOC.  He also received mental health services during his two previous CDCR terms.  From November 2015 through February 2017, the inmate remained at the 3CMS LOC with diagnoses that included schizoaffective disorder, polysubstance dependence, psychotic disorder, and possible bipolar disorder.  He was often housed in administrative segregation due to the seriousness of his RVRs.  The inmate often refused to attend dayroom activities due to paranoia and, in the beginning of 2017, began to report command and persecutory AH.  In February 2017, the inmate was placed in an MHCB for 17 days due to SI and increased paranoia.  He was released to EOP with a diagnosis of psychotic disorder.  During the next year in EOP, the inmate refused a majority of his groups and individual contacts with clinicians due to paranoia and hallucinations.  Due to poor treatment compliance, the treatment team placed the inmate on modified treatment.

In May 2018, the inmate's IDTT determined that he had reached the maximum benefit from the EOP program, primarily because he had refused most mental health services.  He was diagnosed with antisocial personality disorder, generalized anxiety disorder, and paranoid personality disorder.  He was lowered to 3CMS.  During the next year and a half, the inmate remained housed mostly in administrative segregation, refused the majority of his yard privileges, and often agreed to only meet cell front with mental health staff.  He demonstrated continued increased thoughts of paranoia, exemplified by his belief that he was being watched through his television, and concerns that officers would enter his cell and tamper with this food.  In fact, the inmate was often observed to be selecting his food trays and washing his food in his cell.  He was inconsistent with medication compliance and refused to speak to psychiatry.

The inmate also often refused IDTT team meetings.  As stated in his MH Master Treatment Plan completed on January 8, 2020, "It was agreed that I/P's non-adherence to his program was volitional, and not the result of mental health decomposition.  The team agreed that since his non-adherence had been initiated in August of last year, I/P should be allowed a full year of time to continue to work on his goals."  Three days later on January 11, 2020, the STRH sergeant asked a clinician to meet after the inmate was observed to be acting "bizarre and unusual" that morning.  According to a subsequent progress note, the inmate was observed to be pacing his cell and making references to wanting to assault others.  He presented as annoyed, irate, and upset about the messy condition of his cell (which the clinician observed to be very organized).  The clinician also noted that the inmate "denied SI but made vague references to HI, did not appear to respond to internal stimuli nor be internally preoccupied, no overt delusions or ideations were elicited.  He was pacing in the cell, but it appeared volitional and not due to distress….no evidence of acute distress or psychosis at this time."  Several hours later, the inmate engaged in

the serious self-injurious behavior that resulted in his hospitalization and subsequent death by suicide.

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide. He did not leave a suicide note and, although he had several medical issues, none were thought to be contributory to his death. Although it appeared to be unclear if the inmate intended to die by suicide, the CDCR reviewer opined that "As his propensity for violence increased, violence towards himself appeared to become a more viable option for solving problems. The inmate expressed paranoid thoughts as the main reason for consistently refusing to leave his cell; he appeared to continue to use illegal substances while in custody; he maintained beliefs that staff were out to harm him by poisoning his food; and consistently refused to receive mental health treatment in confidential settings despite efforts by his treatment team."

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

1) Mental Health Master Treatment Plans beginning in June 2018 through January 2020 did not provide adequate rationales for changes to mental health diagnoses. Additionally, treatment interventions and goals did not appear to address the inmate's level of paranoia or violence. According to the IDTT chart audit tool, diagnoses and problems should be consistent with the clinical summary. The changes to the inmate's diagnoses may have influenced level of care placement, treatment planning and suicide risk.

2) On January 11, 2020, the inmate was referred to mental health for an urgent mental health consult. Despite evidence of homicidal ideation, non-compliance with medications, paranoia, possible substance intoxication and bizarre and unusual behavior, there were no documented interventions provided to mitigate risk, develop an adequate plan for follow-up care, or document a thorough risk evaluation with a rationale for why a higher level of care referral was not considered. The inmate was found unresponsive later that evening.

3) HQ: There appeared to be some lapses in communication with the inmate's next of kin during the period of time when he was placed in an outside hospital. Although there were no policy violations as a result of this concern, there is a HQ Next of Kin policy currently under development which addresses the workflow of communication with next of kin following a serious self-harm incident. As such, this QIP will be assigned to HQ.

4) On January 11, 2020, the inmate engaged in a serious self-harm incident which was determined to be a suicide attempt by mental health staff. It was not clear if this was communicated to custody staff as there was no mental health or custody documentation regarding this determination. This may have contributed to an 837 incident package not being completed as required per Memorandum dated October 28, 2019: 'Clarification of Documenting and Reporting Suicide Attempts and Self-Harm Incidents.'

In the **_second_** case (LAC 12), the inmate was found hanging from the cell door by a sheet in his STRH cell during the morning of February 14, 2020.  He had entered the CDCR system on February 6, 2008 to serve a 40-years to life sentence for murder and use of a firearm.  He had been transferred to CSP/LAC on December 13, 2017.  The inmate incurred multiple RVRs during his confinement, seven within the last 12 months, the most recent of which occurred on December 22, 2019 for possession of a cell phone.  He was known to be gang-affiliated.  The inmate was unmarried and had two children.  Records indicated that he had some family support through visits, telephone calls, and letter correspondence with a girlfriend, sister, brother-in-law, and various friends.

According to available records, the inmate and nine siblings were raised by their parents and immigrated from Mexico to the United States when he was five-years-old.  He had a dysfunctional childhood that included both physical and sexual abuse by older siblings.  In addition, the inmate sustained a head injury from an automobile accident at age four.  His family history was also significant for prostitution (by his sisters), gang involvement (himself and older brothers), a brother's mental illness, his mother's depression, and family violence.  The inmate did not graduate high school and had only periodic employment.  He had a significant history of substance abuse which began at age 12 and predominantly involved methamphetamine.  His history of juvenile arrest was unknown, but he had a significant history of adult criminal behavior.  The inmate reported that he began suffering from depression at the age of six following his father's death and dysfunction within the family.  His symptoms of depression worsened at age 18 after he witnessed the gang-related death of an older brother.  The inmate also reported experiencing anxiety, nightmares, and both auditory and visual hallucinations.  There was no record of the inmate receiving any mental health treatment in the community for these issues.

Upon entry into CDCR, the inmate screened positive for mental health issues and was placed in the MHSDS at the 3CMS LOC.  His initial diagnosis was depression, mood disorder, and rule-out adjustment disorder.  The inmate was started on psychotropic medication.  However, by March 2009, the inmate was not actively participating in any mental health services and not taking his medication.  He was removed from the MHSDS.

On April 27, 2011, the inmate was placed in an MHCB following possible drug-induced psychosis.  He was treated for AH, disorganized behavior, insomnia, and grandiosity.  However, the inmate chose to discontinue his medication following pressure from gang members and, based upon ongoing safety concerns, requested to be placed into SNY.  On May 2, 2011, he was discharged to 3CMS, but the following day (May 3) was found to have tried to hang himself from the upper bunk in his cell.  He was transported to an outdoor hospital, medically cleared, and returned to the facility the following day (May 4), and again placed in an MHCB.  From May 13, 2011 through September 21, 2011, the inmate was treated in the DSH-APP for SI, CAH, and delusions of persecution.  Upon discharge, the inmate was placed at the EOP LOC and continued to be treated for auditory and visual hallucinations, depression, and delusional thinking.

On February 28, 2012, the inmate reported SI with a plan to hang himself and ongoing hallucinations. He was initially placed in an MHCB and then treated in DSH-APP from March 30 through July 27, 2012, followed by DSH-ICF until October 9, 2013. From October 2013 through January 2016, the inmate was consistently treated at the EOP and presented as generally stable, but reporting ongoing depression and hallucinations that fluctuated over time. On January 16, 2016, the inmate was referred to an MHCB for SI with a plan to hang himself due to poor family support and receiving news that a niece was dying. He was subsequently referred to DSH-APP. The inmate was at both APP and ICF through May 2017, and he attempted suicide by hanging at ICF in March 2017.

Upon his return to EOP on May 22, 2017, the inmate continued to exhibit poor treatment compliance with groups and medication. He continued to report hallucinations and poor sleep. On June 26, 2017, the inmate was observed to have multiple self-inflicted lacerations on his left arm and was again placed in an MHCB. He was subsequently returned to EOP, but by September 2017, was again engaging in SIB because he felt there was a "chip" under his skin. The inmate was placed in an MHCB in early December 2017. He was subsequently discharged and able to program at the EOP LOC until May 20, 2018, when he was again referred to an MHCB for SI and SIB.

During 2019, the inmate continued to program in EOP, but was inconsistent with his treatment participation and medication adherence. He also incurred several RVRs during the year. The inmate continued to engage in SIB and a psychiatrist advised him during an IDTT meeting on February 27, 2019 that he may have reached the maximum benefit from his placement in EOP and that there was "no reason to not work toward the CCCMS discharge." The inmate's diagnoses were revised to PTSD and major depressive disorder. On March 20, 2019, the inmate was placed overnight in alternative housing for SI, but the MHCB referral was rescinded the following morning following an assessment in which the inmate denied any ongoing SI. During his quarterly EOP IDTT team meeting held on May 28, 2019, the team surprisingly determined that the inmate had been stable for the past year despite being a high treatment refuser and exhibiting inconsistent medication compliance. Although he had received several RVRs during the previous three months, the team determined that mental health factors did not play a role in these behaviors and his mental health symptoms did not necessitate treatment at the EOP LOC. The inmate was discharged to 3CMS "in order to prepare for his parole board hearing and participate in vocational training, which could provide IP with a sense of purpose and meaning."

On June 17, 2019, the inmate was again placed overnight in alternative housing for SI, but the MHCB referral was again rescinded the following morning following an assessment in which the inmate denied the ongoing SI. During the next several months, he denied most mental health symptoms and was not interested in restarting psychotropic medication because he thought it was both ineffective and unnecessary. His last SRASHE, completed on December 3, 2019 as a required quarterly follow-up assessment, identified his chronic risk for suicide as moderate and acute risk as low. Based upon the inmate's significant history of SI and SIB that resulted in numerous MHCB and DSH placements, this assessment of his chronic risk of suicide was subsequently viewed by the CDCR reviewer as being inadequate. The clinician also noted that the inmate no longer appeared to meet criteria for inclusion in the MHSDS and would likely be discharged at his next IDTT team meeting.

Two months later on February 13, 2020, a confidential memorandum from a facility captain at CSP-LAC indicated that they had received a telephone call from the inmate's brother indicating that the inmate needed to be transferred from the facility due to a confirmed threat on his life. The inmate was referred to STRH until custody officials could arrange a transfer. He denied any SI during the pre-screening process, but committed suicide the following day.

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide. He did not leave a suicide note and, although he had several medical issues, none were thought to be contributory to his death. The CDCR reviewer opined that "a combination of depression, drug addiction, and reported safety concerns led the inmate to take his life. Throughout his incarceration, the inmate reported difficulty being housed in a single cell without anyone to talk to. More specifically, in the past he reported intense command auditory hallucinations to hang himself while housed in isolative settings. In a segregated setting, with the aforementioned factors, he was likely overwhelmed by his current situation and acted impulsively."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

   1) There were multiple concerns with the completion of the MH Master Treatment Plan on February 27, 2019. Please see Conclusions section for further details.

   2) The inmate did not attend the discharge IDTT meeting on May 28, 2019 because 'he was not in the master pass list and was unable to be brought to IDTT in person.' Per the MHSDS *Program Guide*, Chapter 4, 12.4.6, 'The IDTT is comprised of, at a minimum: assigned primary clinician, assigned psychiatrist, correctional counselor, and inmate-patient.'

   3) There was clinical documentation noting self-harm incidents, but no self-harm power-forms were completed nor was an assessment of suicide risk made (i.e., a SRASHE), which made it difficult to corroborate and track many of the inmate's reports of self-harm, and likely lead to underestimation of risk. Per policy, all self-harm incidents must be documented on self-harm power-forms within 72 hours of the incident. This was reiterated on the memorandum dated October 28, 2019, 'Clarification of Documenting and Reporting Suicide Attempts and Self-Harm Incidents.'

   4) Concerns that were identified regarding the decision to decrease the inmate's level of care on May 28, 2019. Please see Conclusions section for further details.

   5) Multiple concerns were found with SRASHEs completed on September 11 and December 3, 2019. Please see Conclusions section for further details.

   6) Nursing: Delay of calling 911. 911 called after medical on scene and after custody had initiated CPR.

**Audit Summary**:  Adequate practices were found for intake screening, PT rounding of the ASUs, Guard One compliance, and CPR and suicide prevention training for custody and nursing staff.  There were multiple deficiencies found in other areas that required corrective action, including placement of new intake inmates in unsafe, non-new intake cells in the EOP ASU, inadequate compliance rate with required SRASHEs for emergent/urgent mental health referrals, CIT activation on a limited weekly schedule, problematic crisis responses involving compromised privacy/confidentiality in the D-Yard gymnasium (including an inmate escorted through D-Yard in a safety smock), inadequate nursing rounds of suicidal MHCB patients, downgrading of currently suicidal patients to 30-minute observation (with at least one example of a patient clothed in a safety smock on non-suicide observation status), uneven case presentations during MHCB IDTT meetings, incorrect interpretation of policy regarding privileges for MHCB patients, inadequate safety plans and untimely five-day clinical follow-ups for patients discharged from MHCB and alternative housing, untimely and/or no MHCB supervisory review of those safety plans, low compliance rates regarding discharge custody check forms by clinical and custody personnel, and chronic failure to implement a local SPRFIT LOP.


### 21)    Pleasant Valley State Prison (PVSP)

**Inspection**:  April 6-7, 2022 (previous suicide prevention audit was on November 19-20, 2019).  PVSP housed approximately 2,616 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a new admission during the intake screening process in the R&R unit on April 6, 2022.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The door to the nurse's office remained closed during the screening process, with an officer stationed in the hallway, correcting a problem observed during the previous assessment.

In addition, this reviewer observed daily **PT Rounds** in STRH unit on April 6.  The rounds were unremarkable, and the PT was observed to be consistently asking about inmates' mental health status and correctly entering the Psych Tech Daily Rounds information into the EHRS for all caseload inmates, correcting a problem observed during the previous assessment.

**Housing**:  PVSP had six **MHCBs** previously found to be suicide-resistant.  The MHCB unit had been closed since November 30, 2018 due to renovation.  PVSP leadership was unable to confirm a specific date for reopening, but remained optimistic that it would occur sometime during 2022.  In addition, there were ten **New Intake Cells** (100-109) in the STRH unit, including four cells retrofitted earlier this year.  This reviewer observed that all new intake inmates were correctly housed in new intake cells.  An observed problem of new intake inmates not receiving radios was corrected on-site.

Finally, **Alternative Housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement was located in the D-4 Unit.  Alternative housing was infrequently utilized at PVSP.  During the approximate 15-month period of January 2021 through March

274

2022, there were only 61 inmates placed in alternative housing. During this time, all inmates were held under 24 hours. Inmates were provided bunks and required to be observed on a 1:1 basis. The vast majority (79 percent) were transferred to a MHCB unit, with 13 of 61 (21 percent) of the referrals rescinded and inmates returned to their respective housing units. This reviewer examined the EHRS charts for all 13 rescinded cases and found that the required SRASHEs were completed in 12 of 13 cases. Of note, seven of these cases were ruled to be accidental overdoses and not suicide attempts, and the required five-day clinical follow-ups were completed in five of six cases.

**Observation**: Because the MHCB unit had been closed since late November 2018, this reviewer was unable to assess the accuracy of nursing rounds of MHCB patients on suicide observation status.

Finally, a review of **Guard One** data for a recent 24-hour period in the STRH unit found 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of January 2021 through March 2022. A sample EHRS review of 44 emergent/urgent mental health referrals for SI/ behavior revealed that clinicians completed the required SRASHEs in 91 percent (40 of 44) of the cases.

In addition, although PVSP did not have a **Crisis Intervention Team**, this reviewer had an opportunity to observe the crisis response to an emergency mental health referral for SI on April 7. The inmate (PVSP 1) had expressed SI and engaged in SIB (by swallowing a piece of metal). The responding clinician assessed the inmate in a private area and completed the required SRASHE. The assessment determined that the inmate was at high acute risk for suicide and he was referred to an MHCB.

Because the MHCB unit has been closed for a significant amount of time, this reviewer could not assess **IDTT Meetings**, **Out-of-Cell Time**, and **Discharge SRASHEs and Safety Plans**.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 26 cases of patients discharged from a MHCB unit or alternative housing placement who remained at, or returned to, PVSP and were not transferred to the STRH unit (where observation at 30-minute intervals was required) from January 2021 through March 2022. The review found that 100 percent of the cases had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) completed correctly by mental health clinicians, with most of the custody checks recommended for 48 hours by clinicians. In

addition, only 69 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation.

**Intervention**:  Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**:  A review of five months (September 2021 through February 2022) of SPRFIT meeting minutes found that all required mandatory members or designees did not attend three (October 2021, November 2021, and January 2022) of the meetings.  Meetings were only approximately 30 minutes long, and meeting minutes were generally eight to nine pages in length.  Meeting minutes reported discussion of such topics as training, self-harm data, and discharge custody checks.  The meeting minutes were otherwise unremarkable.  A SPRFIT LOP was in effect.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021.  Although PVSP did not have a CIT and, was therefore, not required to have an LOP on CIT, the facility had the following LOPs that were consistent with the other CCHCS directives - "Operational Procedure No. 265: Notification of Inmate Bad News," dated May 2021; and "Operational Procedure No. 250: "Suicide Risk Management Program," pages 8-11 of "Suicide Prevention Plan," dated September 2021.

**Training**:  According to training records, 100 percent of custody staff and 97 percent of nursing staff were currently certified in CPR.  In addition, 100 percent of custody, medical, and mental health personnel received annual suicide prevention block training during the previous 12 months.  Finally, as of April 2022, 100 percent of mental health clinicians had completed the SRE mentoring program, received the seven-hour SRE training, and had completed safety plan training.

**Recent Suicides**:  PVSP did not experience any inmate suicides during the review period.

**Audit Summary**:  Although the MHCB unit had been closed for a significant amount of time and IDTT meetings, out-of-cell time, and discharge SRASHEs/safety plans could not be assessed, adequate practices were found in almost all reviewed areas, including intake screening, PT rounds, completion of SRASHEs upon emergent/urgent mental health referrals for SI/behavior and when inmates are discharged from alternative housing, and CPR and suicide prevention training for custody, medical, and mental health personnel.  Deficiencies were found in low compliance rates regarding 7497 discharge custody check forms by custody personnel, and the lack of quorums for three monthly SPRFIT meetings.

22)    **High Desert State Prison (HDSP)**

**Inspection**:  April 18-19, 2022 (previous suicide prevention audit was on November 2-3, 2017).  HDSP housed approximately 2,340 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a new admission during the **Intake Screening** process within the R&R unit on April 18.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The door to the nurse's office remained closed during the screening process, with an officer stationed in the hallway.  In addition, this reviewer observed daily **PT Rounds** in STRH unit on April 18.  The rounds were unremarkable, and the PT was observed to be consistently asking about inmates' mental health status and correctly entering the Psych Tech Daily Rounds information into the EHRS for all caseload inmates, correcting a problem observed during the previous assessment.  Approximately 27 of the 84 STRH unit inmates were at the 3CMS LOC.

**Housing**:  HDSP had ten **MHCBs** that were previously found to be suicide-resistant.  There were not any patients in the MHCB unit during the on-site assessment.  In fact, the most recent MHCB patient had been discharged the previous week on April 13.  Of note, this reviewer was informed that B-Yard, comprising Level 4 SNY inmates at 3CMS LOC, had been closed since December 2021, resulting in a dramatic decrease in emergency mental health referrals, use of alternative housing, and MHCB admissions.  This reviewer was also informed that the MHCB unit would be closed for at least eight months beginning in July 2022 for renovation (i.e., installation of new flooring within the entire CTC).

In addition, there were 15 **New Intake Cells** (100-111; 196-199) in the STRH unit.  This reviewer observed that all new intake inmates were correctly housed in new intake cells.

Finally, **Alternative Housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were found in either the observation room (Room 11) in the MHCB unit or designated medical cells in the CTC.  Room 11 had a suicide-resistant MHCB bed, whereas inmates housed in the CTC medical cells were provided with stack-a-bunks.  All inmates in alternative housing were required to be observed on a continuous 1:1 basis.  Alternative housing was infrequently used at HDSP.  For the 15-month period from January 2021 through March 2022, only 45 inmates were housed in alternative housing.  All were released within 24 hours, and the vast majority (84 percent) were referred to an MHCB.  Of the 16 percent (seven of 45) of cases that resulted in rescissions, all had the required SRASHEs and clinical five-day follow-up assessments.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer's examination of various medical charts for MHCB patients indicated that most patients were often only on Suicide Precaution status for an average of 24 hours before being moved to 30-minute observation.  In addition, the chart review found that several patients remained on 30-minute observation despite still reporting current SI.  For example, in one case (HDSP 1), the patient was admitted into the MHCB on December 13, 2021 with current SI and a plan to hang himself with a bedsheet.  He was placed on Suicide Precaution

status with partial issue. The following day (December 14), the patient was downgraded to 30-minute observation despite reporting SI. A progress note dated December 14 indicated that the patient would continue to be clothed in a safety smock and "remain on q 30-min. nursing checks x 24 hrs. w/full safety issue as he is refusing safety issue and stating he will harm himself w/it." Several daily provider orders stated that the patient would remain on 30-minute observation and "to have safety issue due to being in ATH (alternative housing) pending MHCB placement."

In a second case (HDSP 2), the patient continued to report SI on a daily basis from February 11 through February 14, sometimes on a "conditional" basis, and initiated a hunger strike on February 12. During this time, he remained on 30-minute observation. In a progress note dated February 13, a clinician stated, "The Pt. appears to be in distress related to recurrent thoughts of suicide, depression, and irritability but also appears to be seeking a transfer to a prison that is closer to home. Pt. appears to be focused on his hunger strike in order to obtain EOP LOC or just to leave HDSP." The clinician also stated that the patient would remain on Suicide Precaution with 15-minute observation not realizing that the patient had been on 30-minute observation for several days. In a third case (HDSP 3), the inmate attempted suicide in the STRH unit during the evening of February 8, 2022. He was sent out to the hospital, assessed with superficial abrasions around his neck, and subsequently returned to the facility and admitted into the MHCB unit. Less than 24 hours later on February 9, the patient was downgraded to 30-minute observation. On February 11, a psychiatric note indicated that "His SA was significant. That coupled with intermittently odd affect and his abject denial of any issues makes this a concerning situation." The patient remained on 30-minute observation. Two days later on February 13, a clinician wrote in a progress note that the patient would remain on Suicide Precaution with 15-minute observation, again not realizing that he had been on 30-minute observation for several days. (Of note, this reviewer found multiple cases in which MHCB clinicians wrote contradictory progress notes indicating the same patients were on 30-minute observation and Suicide Precaution with 15-minute observation.)

In a fourth case (HDSP 4), a patient at the EOP LOC was admitted in the MHCB unit for SI and SIB (cutting) on January 10. He was initially placed on Suicide Watch, continued to engage in SIB, and allegedly swallowed a paper clip that same day (January 10). Despite such behavior, a clinician completing a SRASHE the following day (January 11) indicated that "The Pt. will be maintained in the MHCB and will be observed for ideation for self-harm and/or SIB as his observation and issue are increased to full and q-30's." The patient remained in the MHCB on 30-minute observation for nine days while awaiting transfer to EOP level care, with a provider order on January 12 stating: "Pt. may have less than full issue as he states he cannot be safe w/full issue at this time."

Further, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on February 26, 2022 (for HDSP 5), March 6, 2022 (for HDSP 6), March 23, 2022 (for HDSP 7), and April 8, 2022 (for HDSP 8). The chart review found that two cases (HDSP 5 and HDSP 6) had four violations each that were in excess of required 15-minute intervals. The longest gap between checks was 36 minutes in HDSP 6, and

violations in these two cases were by multiple nursing staff.  The remaining two cases (<u>HDSP 7</u> and <u>HDSP 8</u>) had no violations.

Finally, a review of **<u>Guard One</u>** data for a recent 24-hour period in the STRH unit found 100 percent compliance with the required checks that did not exceed 35-minute intervals.  This high rate of compliance was offset by the fact that two of the inmate suicides in the STRH unit during 2020 involved inadequate Guard One checks.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals for the six-month period of October 2021 through March 2022.  A sample EHRS review of 41 emergent/urgent mental health referrals for SI/behavior revealed that clinicians completed the required SRASHEs in 98 percent (40 of 41) of the cases.

In addition, a **<u>Crisis Intervention Team</u>** was initiated in December 2019 and operational between 7:00 a.m. to 10:00 p.m. seven days per week.  All clinicians at HDSP were CIT-trained. This reviewer had an opportunity to observe the CIT process on two separate occasions on April 18.  In the first case, the inmate expressed SI secondary to several medical complaints and frustration regarding lost property.  The CIT was able to address most of his concerns, and a SRASHE was subsequently completed and indicated a low acute risk for suicide.  The inmate was not referred to the MHCB.  In the second case, the inmate expressed SI secondary to safety concerns on the yard.  A separate CIT met with the inmate and the subsequent decision by the lieutenant to place the inmate in administrative segregation, with a referral to an SNY, appeared to resolve the inmate's safety concerns.  A SRASHE was subsequently completed and indicated a moderate acute risk for suicide.  The inmate was not referred to the MHCB.

Because there were not any patients in the MHCB unit during the on-site assessment, this reviewer could not assess the quality of **<u>IDTT Meetings</u>** or **<u>Out-of-Cell Time</u>** afforded to MHCB patients.

In order to assess **<u>Discharge SRASHEs and Safety Plans</u>** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of 24 patients discharged from the unit during January through March 2022, who had been admitted into the MHCB for DTS, and remained at HDSP.  The review found that required discharged SRASHEs, safety plans, and five-day clinical follow-ups were completed in all cases.

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from October 2021 through March 2022.  This reviewer's examination of the data found problems in untimely supervisory review specifically, many reviews were typically done several days after completion of the SRASHE and not prior to or during the anticipated discharge IDTT meeting for each patient.

Finally, the process by which inmates were provided **<u>Discharge Custody Checks</u>** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 26 cases of inmates discharged from either the MHCB unit or alternative housing who remained at HDSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from October 2021 through February 2022. The review found that 100 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, and the majority of custody checks were recommended for 48 hours. In addition, only 69 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with most errors attributable to gaps in observation.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**: A review of six months (September 2021 through February 2022) of SPRFIT meeting minutes found that quorums were not achieved in any of the meetings. This was attributable to the lack of psychiatry attendance. Although HDSP did not have a chief psychiatrist or senior psychiatrist, and relied exclusively on telepsychiatry, the CCHCS SPRFIT policy allowed for psychiatry designees. For reasons that were unclear, HDSP did not designate any of the tele-psychiatrists to attend the monthly SPRFIT meetings.[16] Monthly meetings were scheduled for one hour and meeting minutes were normally ten to 12 pages in length. Meeting minutes included, but were not limited to, discussion of such topics as CAPs (including those to address this reviewer's prior assessment findings), training, CIT, SRASHE and five-day clinical follow-up compliance, self-harm data, inmates in the SRMP, and discharge custody checks. A SPRFIT LOP was in effect (and included the requirement for psychiatry attendance at monthly meetings).

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021. HDSP had the following LOPs that were consistent with these CCHCS directives - "Operational Procedure No. 847: Notification of Inmate Bad News," dated May 2021; "Operational Procedure No. 838: Crisis

---

[16]In their response to the draft of this fifth re-audit report, defendants incorrectly suggested that CDCR policy "explicitly permits the Chief of Mental Health (CMH) to act in the absence of Chief Psychiatrist" and cited a footnote on page 8 of the "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum dated February 2, 2018. That footnote (No. 2) stated: "Attendance by the Chief of Mental Health shall satisfy the requirement for the Chief Psychologist or Chief Psychiatrist attendance, *depending on classification of the CMH at the institution*" (emphasis added)." The term "classification" means that if the CMH is a psychologist, then they can be the designee for the chief psychologist; if the CMH is a psychiatrist, then they can be the designee for the chief psychiatrist. The Chief of Mental Health at HDSP was a psychologist, therefore, they could *not* be the psychiatry designee at SPRFIT meetings.

Intervention Team," revised July 2021; and "Operational Procedure No. 810: Suicide Prevention and Response Program," containing the Suicide Risk Management Program on pages 11-12, dated June 2021.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 90 percent of custody staff, 93 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during the previous 12 months.  Finally, as of March 2022, 100 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 96 percent had completed safety plan training.

**Recent Suicides**:  HDSP experienced three (3) inmate suicides during the review period, all occurring in 2020.  In the ***first*** case (HDSP 9), the inmate was found hanging from the shelving unit by a sheet in his SNY cell during the early morning of January 4, 2020.  He had entered the CDCR system for his third term on March 6, 1995 to serve a 27-year sentence for various offenses, including robbery.  While incarcerated, he was also convicted of holding a correctional officer hostage and possession of a deadly weapon in 2010 and subsequently sentenced to life with the possibility of parole.  He had been transferred to HDSP on October 28, 2014.  The inmate incurred 14 RVRs during his confinement, the most recent of which occurred on January 22, 2019 for willfully resisting a peace officer.  He was not known to be gang-affiliated within CDCR.  The inmate was divorced and had two children.  Records indicated that, other than his sister whom he called on a regular basis, he did not have any other family support through visits, telephone calls, or letter correspondence since 2015.

According to available records, the inmate and six siblings were raised by their parents.  He reported being physically abused by his father when he was a child.  The inmate graduated high school and had a sporadic employment history.  He was affiliated with a street gang from ages 15 through 22.  The inmate had a significant juvenile criminal behavior that included two separate CYA placements.  As an adult, his criminal history included two prior CDCR terms in 1985 and 1988.  He reported a substance abuse history that included marijuana alcohol and cocaine.  Although he denied any history of mental illness or mental health treatment in the community, records indicated that he was placed on a 72-hour hold after being observed "running around with a bat, fearful someone was going to kill him" when he was 22 years old.

Upon re-entry into CDCR, the inmate screened negative for mental health issues and was initially placed in the MHSDS.  Several years later on July 26, 2002, he reported increased symptoms of both depression and paranoia.  The inmate was assessed by psychiatry and initially diagnosed with a mood disorder, started on psychotropic medication, and enrolled in 3CMS.  He also had a few MHCB placements for SI prior to 2004, but records were not available regarding the specific duration of treatment.  In 2004, the inmate's diagnosis was changed to schizoaffective disorder.  From 2004 through 2006, he appeared obsessed with classification issues that incorrectly labeled him as SNY, as well as a sex offender.  These labels were causing problems with other inmates, and his escalating frustration led to the offense of taking a custody officer hostage in 2006.  Between 2007 and 2011, his behavior was unremarkable and did not necessitate any changes in levels of care.  He did, however, continue to have classification issues, and often refused to be housed with inmates.  Clinical notes indicated that he was

"organized and linear with his thought process, but his thought content perseverated with paranoid delusions. He also appeared anxious, but did not appear to be responding to internal stimuli."

By 2013, the inmate began to consistently refuse medication, and his diagnoses were changed to depressive disorder and antisocial personality disorder in 2014. He continued to struggle with maintaining compliance with MHSDS programming. On August 31, 2016, the inmate was discharged from 3CMS following repeated requests for removal and after six months of not taking any psychotropic medication.

On January 11, 2017, the inmate was referred back to 3CMS after he endorsed an increase of depressive symptoms, poor appetite with a loss of approximately 20 pounds, difficulty sleeping, and increased anger leading to violent outbursts. He also reported stressors, including multiple family losses and being far away from his family. He was restarted on psychotropic medication, with a diagnosis of bereavement, depressive disorder, and antisocial personality disorder. By 2018, the inmate was continuing to report depressive symptoms due to separation from his family, as well as hypervigilance in the yard with other peers. He did not endorse any SI or HI during this time. The inmate's medications were adjusted, but his compliance was inconsistent. By July 2019, he began refusing psychotropic medication and they were subsequently discontinued. The inmate was seen for a follow-up appointment with the psychiatrist in October 2019 and presented as "asymptomatic, calm, and good spirits, offering no complaints." He did not report any difficulties with sleep or appetite. In subsequent mental health contacts, the inmate continued to consistently deny any SI and requested to be removed from the MHSDS.

On January 1, 2020, the inmate informed a nurse that he was having chest pain and subsequently told a provider that he had "swallowed a bindle of drugs, wrapped in cellophane" and was worried that "the drug package had opened inside him." He was sent to an outside hospital for examination and, while there, informed hospital staff that he had been sexually assaulted two days earlier by custody staff. He also appeared to be paranoid and, upon further inquiry, the inmate stated he had not swallowed a "bindle" of drugs, but "started feeling funny and thought someone had drugged him." He also reported that he had been previously sexually assaulted in November 2019, but later revised the statement to indicate that he felt he was drugged and assumed that custody staff had also sexually assaulted him. The inmate was viewed as inconsistent with the date(s) of the alleged abuse. The inmate received a rectal examination at the hospital and the results were pending at the time of his death. On January 2, he returned to HDSP and a routine mental health referral was generated and required an assessment within 14 days. The inmate committed suicide two days later on January 4, 2020.

During his more than 35 years of CDCR confinement, the inmate was transferred over 50 times to numerous facilities, including 36 separate placements at both MCSP and CSP/Corcoran. These transfers were primarily caused by changes in custody status and mental health levels of care. The inmate was placed on SNY status in 2010. He consistently denied SI throughout his CDCR confinement and, although the inmate previously reported suicide attempts in 2006 and 2007 while confined in restrictive housing, there were no records of such incidents. As previously indicated, the inmate had a few MHCB placements for SI prior to 2004, but records were not available regarding the specific duration of treatment. He was consistently assessed as

being both a low chronic and acute risk for suicide on SRASHEs. Finally, although the inmate alleged that he was sexually assaulted in January 2020, a SRASHE was not completed as required by PREA policy.

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide. He did not leave a suicide note and, although he had several medical issues, including neuropathic pain on his feet and knees, as well as a history of Crohn's disease and irritable bowel syndrome, none were thought to be contributory to his death. The CDCR reviewer opined that "his paranoid and persecutory ideations significantly increased the last two months before his death, and most likely contributed to him making the decision to take his own life…. The methamphetamine use, if confirmed, only exacerbated his mental illness and most likely led to increased anxiety, paranoia and sleep deprivation which probably contributed to his hopelessness and decision to take his own life."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

1) On January 2, 2019, the inmate was seen for IDTT, but the IDTT documentation was not written on a Master Treatment Plan as mandated by policy. While the progress note documenting the IDTT was reasonably thorough, the Master Treatment Plan is more comprehensive and provides treatment teams with a tool to examine multiple facets of the patient's treatment and progress.

2) On February 15, 2019, the rule-out diagnoses for MDD and PTSD were discontinued/canceled in his chart. These rule-out diagnoses were placed by the treatment team and were discontinued by a clinician during an urgent/emergent contact with the inmate. The clinician who saw the inmate on this date was not his primary clinician. Any change in diagnoses, even rule-out or provisional diagnoses, should be a treatment team decision and should not be completed by one clinical practitioner.

3) During the review it was noted staff applied waist restraints to the inmate prior to transporting him to the Treatment and Triage Area. The inmate's custody destination was Medium (A) and he was housed in a general population housing unit.

4) During the review a prior PREA allegation was noted. Upon further review of the documentation, specifically the Mental Health Referral chrono (CDCR 128-MH5) completed by custody staff and dated January 2, 2020 noted the following checkboxes marked: PREA Routine (14 days), as well as New Allegation/Post 72 hours. Although staff indicated the allegations were identified as post 72 hours, it is a violation of policy to not refer the inmate-patient for an emergency mental health evaluation based on his return back to the institution following a SART/ SANE examination (DOM54040.10).

5) When the inmate went out to hospital on January 1, 2020, outside hospital records indicated the inmate reported he was sexually assaulted two or five days

prior depending on his story. Records indicated a rectal medical examination occurred in lieu of a forensic SART examination. When the inmate returned to HDSP from the outside hospital, his records were not available to the triage nurse. The triage nurse did note 'possible PREA' on January 1, 2020.

In the **_second_** case (HDSP 10), the inmate was found hanging from the ventilation grate by a sheet in his STRH unit cell during the late evening of August 7, 2020. He had entered the CDCR system on January 13, 2012 to serve a 26-year sentence for various offenses, including assault, inflicting great bodily harm, and robbery. While incarcerated, the inmate received another four-year sentence for assault with a deadly weapon on another inmate. He had been transferred to HDSP on May 15, 2019. The inmate incurred 23 RVRs during his confinement, the most recent of which was for fighting and occurred on August 3, 2020, a few days before his death. He was known to be gang-affiliated. The inmate was unmarried and did not have any children. With the exception of a female friend and occasional letter correspondence with his mother, it did not appear that the inmate had any other family support through visits, telephone calls, or letter correspondence during his incarceration.

According to very limited available records, the inmate and ten siblings were initially raised by their parents. He reportedly did not know all his siblings and could not remember much of his early childhood other than to state that his family was "very broken." His parents separated when he was young, and he alternated between living with each separately for several years. At the age of nine, the inmate was placed in child protective services due to violence and narcotics found in the home. At age 11, his father drowned trying to save his life during a water accident. This incident continued to be a significant event in the inmate's life as he "went off the rails" after the accident and engaged in fights and physical altercations with peers. In addition, following the loss of his father, the inmate spent the remainder of his adolescence in foster care, group homes, and juvenile detention. The inmate did have a high school diploma, but did not have a significant history of employment. His juvenile criminal history began at the age of 11 and he spent a significant time in juvenile detention, as well as county jail facilities as a young adult. The inmate's substance abuse history began at age 15 and included alcohol and marijuana. He had a limited history of mental illness that included treatment for depression and ADHD.

Upon entry into CDCR, the inmate screened negative for mental health issues, but was seen by a psychiatrist because he had been prescribed psychotropic medication for a mood disorder during county jail confinement. Although he reported a prior suicide attempt at age 12, the inmate had no current mental health complaints and refused medication or any mental health treatment. He was not placed in the MHSDS. On January 14, 2020, he was seen by a mental health clinician following an acute drug overdose. A SRASHE was completed, the incident was not viewed as a suicide attempt, and he was assessed as being both a low chronic and acute risk for suicide. The inmate consistently denied any SI during the screening processes for multiple admissions into restrictive housing, including upon placement in STRH on August 7, 2020, the day of his death. He did, however, express safety concerns to a custody supervisor that day after being identified as a witness in a homicide investigation from May 2020. During the conversation, the inmate requested to "go SNY" and "roll up for safety." He committed suicide a few hours later.

The CDCR reviewer did not find any precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide.  He did not leave a suicide note and he did not have any significant medical issues that were thought to be contributory to his death.  The CDCR reviewer opined that the inmate "was likely feeling alone and isolated.  His friend was gone, he was in conflict with long-term cellmate, and he had just made a big decision to further separate and isolate from the life he once knew.  This dark realization likely became too overwhelming for him.  His vision for the future became narrow and it can be speculated that the only way he knew how to cope was to escape the reality of his circumstances."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) During the review, it was noted the inmate was within the first 72 hours of his initial placement in ASU, but was not housed in an appropriate intake cell nor assigned a compatible cellmate.

> 2) The inmate was discovered hanging in his cell during a Guard 1 check. During the review, it was noted the time of the Guard 1 check exceeded the 35-minute maximum time from the prior Guard 1 check.

In the ***third*** case (HDSP 11), the inmate was found hanging from the door by a sheet in his STRH unit cell during the early morning of December 17, 2020.  His body was found in rigor mortis.  He had entered the CDCR system on June 12, 2014 to serve a 58-year sentence for various offenses, including robbery, assault, and burglary.  While incarcerated, the inmate received another three-year sentence for manufacturing a deadly weapon.  He had been transferred to HDSP on May 27, 2020.  The inmate incurred 20 RVRs during his confinement, the most recent of which was on December 6, 2020 for possession of a deadly weapon.  He was known to be gang-affiliated.  The inmate was married and there were inconsistent reports that he might have had a daughter.  Records indicated that he had strong family support through visits, telephone calls, or letter correspondence with his father and several siblings during his incarceration.

According to available records, the inmate and three siblings were initially raised by their parents until their divorce when he was five years old.  His father subsequently remarried, and the inmate had an additional four step-siblings.  Records were unclear as to who raised the inmate during his adolescence, but there appeared to be some indication that he was raised by his father and stepmother.  He dropped out of high school to help financially support his family, but subsequently received his GED.  Although the inmate did not have a juvenile criminal history, he was involved in a street gang as a teenager and his first arrest occurred at the age of 18.  The inmate's substance abuse history began at age 15 and included alcohol and marijuana.  He denied any history of mental illness or mental health treatment in the community.

Upon entry into CDCR, the inmate screened negative for mental health issues and was not initially placed in the MHSDS.  He had a difficult adjustment to confinement, and most of his RVRs were for fighting and battery on other inmates.  He had multiple restrictive housing placements during his more than six years of CDCR confinement.  During the pre-screening

process for these administrative housing placements, the inmate consistently denied SI. Of note, he was a victim of attempted murder when stabbed by several other inmates in October 2018. Despite the incident, he denied any safety concerns and remained in GP yards when he was not in restrictive housing for disciplinary infractions. The inmate was known to have a significant history of substance abuse within CDCR which not only affected his mood, but resulted in volatile relationships with other inmates.

In April 2019, a custody officer submitted a routine mental health referral noting that the inmate appeared hostile, aggressive, and had poor self-control. He was subsequently seen by a mental health clinician, but was reluctant to enter the MHSDS due to gang politics. However, several weeks later on May 1, 2019, the inmate renounced his gang membership and was placed on SNY status due to safety concerns. He continued to be apprehensive about receiving mental health services. However, several months later on November 13, 2019, the inmate was placed in the MHSDS at the 3CMS LOC after reporting paranoia, anxiety, and AH. His initial diagnosis was adjustment disorder with anxiety.

The inmate continued to program at the 3CMS LOC until May 17, 2020 when he informed nursing staff that he had ingested approximately 20 pills due to family problems. He was transferred to an outside hospital and was placed in an MHCB upon his return. Three days later on May 20, 2020, the inmate was discharged back to 3CMS after claiming that he was not suicidal and simply ingested the pills "to get out of SHU." His diagnosis was revised to major depressive disorder and unspecified anxiety disorder. A few months later on June 23, 2020, the inmate reported to a mental health clinician during an emergency consult that he was feeling depressed and was "very mentally unstable." He expressed SI and reported using illicit substances to "escape things." He was placed in an MHCB. During the placement, the inmate experienced drug withdrawal symptoms that included insomnia, body pains, and abdominal cramps. He also reported experiencing some paranoia and occasional AH, as well as feeling like he was a burden to his family. On July 24, a shredded safety blanket and sheet were found in his MHCB cell. Two days later on July 26, he denied any current SI and his mood was described as "stable" in progress notes. Despite the fact that the inmate had engaged in high-risk behavior a few days earlier and remained non-compliant with psychotropic medication, the IDTT determined that he was no longer at an elevated risk for self-harm and appeared motivated to work on his drug addiction. He was discharged back to 3CMS. Subsequent review of the inmate's MH Master Treatment Plan and other documentation found that the inmate did not have an adequate safety plan or any treatment goals, and there was an inadequate rationale regarding the decision not to refer him to a higher level of care.

In both June and October 2020, the inmate submitted two Health Care Services Request Forms noting that he had been struggling with his sobriety and requested be placed into the MAT program. He was subsequently screened and reported using a number of illicit substances on a daily basis during the last three months, including methamphetamine, sedatives, and alcohol. Although a follow-up appointment was intended, it was never scheduled. In addition, although the inmate received an initial ISUDT screen, he never received an ISUDT appointment.

On November 7, 2020, the inmate reported SI and expressed concern that his parents might have COVID-19. A SRASHE was completed and he was assessed as being both a moderate chronic

and acute risk for suicide. The clinician's progress note stated that the inmate became uncooperative during the process, as well as "evasive" and "spoke in a sarcastic tone." The inmate abruptly walked out of the office and reported to the officer that he was going back to a cell. He was not placed in an MHCB. However, a few days later on November 11, the inmate again expressed SI, was assessed by mental health staff, and placed in an MHCB. He later informed the psychiatrist that he was "coming off heroin" and wanted to be in a place "where he could kick the addiction." During his MHCB placement, he continued to report SI, but refused most treatment. On November 17, the inmate was notified that his father had died from COVID-19 and that his stepmother was hospitalized and in critical condition with COVID-19. On November 20, 2020, the inmate continued to report a "very" depressed mood and SI. He was discharged back to 3CMS, with the SRASHE stating that his chronic risk for suicide was low and his acute risk was moderate. Subsequent review of the inmate's MH Master Treatment Plan and other documentation found that the inmate did not have an adequate safety plan or any treatment goals, and there was an inadequate rationale regarding the decision not to refer him to a higher level of care.

On November 25, 2020, the inmate reported SI with a plan to hang himself or overdose because he lost his family support system. He was again placed in an MHCB. He subsequently reported to a psychiatrist that he was also experiencing possible paranoia towards custody officers and inmates which led to homicidal ideation. He continued to experience intermittent SI throughout his placement. Five days later on November 30, he was again discharged to 3CMS despite the fact that he was still experiencing an "extremely" depressed mood and often thought of suicide. The discharging SRASHE again stated that the inmate's chronic risk for suicide was low and his acute risk was moderate. Subsequent review of the inmate's MH Master Treatment Plan and other documentation found that the inmate did not have an adequate safety plan or any treatment goals, and there was an inadequate rationale regarding the decision not to refer him to a higher level of care.

On December 6, 2020, the inmate was seen in the TTA after experiencing breathing problems due to a Suboxone overdose. He reported injecting the Suboxone and other illegal substances in an attempt to commit suicide. The inmate also had superficial cuts on his left hand. He was sent out to the hospital for medical treatment and was placed in an MHCB upon return the following day (December 7). According to the treatment team, the inmate presented with a lack of motivation, loss of interest, hopelessness, and depressed mood. He continued to be depressed regarding the death of his father, and recent death of his stepmother, also to COVID-19. Although he continued to experience intermittent SI during the next few days, the inmate requested to be discharged back to his regular housing unit. On December 14, 2020, the inmate described his mood as "moderately" depressed and denied SI. He was discharged to EOP, and the clinician completing the SRASHE estimated that both his chronic and acute risk for suicide were "high." Subsequent review of the decision to discharge the inmate to a lower level of care found multiple problems, including the fact that he had recently received an RVR for possession of a deadly weapon, his father was being buried on the day of the discharge, he had numerous and frequent MHCB readmissions for similar issues, and he was clearly experiencing significant impairments impacting his ability to function in a lower level of care. Finally, this subsequent review also found that the rationale for the discharge did not adequately address the inmate's presenting concerns and it remained unclear why a PIP referral was not considered. The safety

plan was also inadequate and appeared to have simply been pulled forward from previous MHCB discharges.

The inmate was discharged from the MHCB and transferred to STRH for the pending RVR. He denied SI during the pre-placement screen and appeared stable to the clinicians conducting follow-up assessments on December 15 and December 16. The inmate committed suicide early the following morning (December 17).

Other than the fact that the inmate was discharged from the MHCB unit three days earlier at a high acute risk for suicide, the CDCR reviewer did not find any other precipitating factors that were known to staff indicating that the inmate was at imminent risk for suicide. He did not leave a suicide note and he did not have any significant medical issues that were thought to be contributory to his death. The CDCR reviewer opined that "the loss of the inmate's father played a significant role in his decision to end his life. His father appeared to be his rock through thick and thin, and there to pick up every telephone call from prison, and the constant he could always count on no matter what the inmate was faced with. The idea that the inmate had to face his life alone within the prison walls likely became too unbearable."

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

    1) <u>CSP-COR</u>: The inmate was evaluated for suicidal ideation on May 18, 2020. In the accompanying SRASHE, the suicide risk formulation risk levels were not comprehensive or individualized based on each risk factor. See Discussions/ Conclusion section for more information.

    2) <u>HDSP</u>: The inmate was discharged from the MHCB on July 27, 2020. The accompanying treatment plan indicated he was no longer an elevated risk for self-harm, he demonstrated adequate progress in treatment with improved mood and motivation to work on his addiction. However, the inmate was found with a ripped safety blanket and sheet three days prior to discharge and was only on full issue one day. Although it was documented he demonstrated adequate progress in treatment, it was also noted he was not medication compliant. Additionally, he was discharged back to CCCMS level care where he would receive much less mental health support in order to continue to address his stressors, substance abuse, and suicidal ideation. Based on these factors, it is unclear why the inmate did not remain in the MHCB longer and why EOP level of care was not considered at the time of discharge.

    3) <u>HDSP</u>: Multiple concerns were found with the MHCB discharge SRASHEs dated July 27, 2020, November 20, 2020, November 30, 2020, and December 14, 2020. There were additional concerns with a SRASHE dated November 7, 2020. See Suicide and Mental Health sections for specific concerns identified in each SRASHE.

    4) <u>HDSP</u>: Multiple concerns in MHCB discharge treatment planning were found following treatment plans: November 20, 2020, November 30, 2020, and

December 14, 2020. There were additional treatment planning issues in the MH Master Treatment Plan dated August 5, 2020. See Mental Health section for specific concerns identified in each treatment plan.

5) <u>HDSP</u>: During the review it was noted that the incident time was identified as 0145 hours, it was not until nine minutes later that 911 was activated at 0154 hours.

6) <u>HDSP</u>: Incomplete documentation of EMR record in time discrepancies in the documentation of assessment.

7) <u>HDSP</u>: MHCB admissions November 25-November 30, 2020 and December 7- December 14, 2020, the staggered suicide records and documentation were not done consistently.

8) <u>HDSP</u>: The inmate was seen by an ISUDT clinician on October 6, 2020 for SUD screening after submitting two requests requesting help for his substance abuse. The ISUDT clinician recommended intensive outpatient level of care and consult to addiction medicine champion. These recommendations were not completed.

**Audit Summary**: Although there were no patients in the MHCB during the on-site assessment and IDTT meetings and out-of-cell time could not be assessed, adequate practices were found in almost all reviewed areas, including intake screening, PT rounds, completion of SRASHEs upon emergent/urgent mental health referrals for SI/behavior and when inmates are discharged from the MHCB and alternative housing, and CPR and suicide prevention training for custody, medical, and mental health personnel. Deficiencies were found in downgrading of currently suicidal patients to 30-minute observation (with some patients clothed in partial issue or safety smocks, and other cases involving contradictory progress notes for levels of observation), low compliance rates regarding 7497 discharge custody check forms by custody personnel, and the lack of psychiatry representation during monthly SPRFIT meetings.

## 23) <u>Pelican Bay State Prison (PBSP)</u>

**Inspection**: April 21-22, 2022 (previous suicide prevention audit was on December 17-18, 2019). PBSP housed approximately 1,840 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the **Intake Screening** process in the R&R unit on April 21, 2022. Two different RNs were observed. During observation of the first RN, this reviewer found that very few of the 15 mental health/suicide risk areas of inquiry were accurately completed. Instead of completing these 15 areas of inquiry, the nurse simply asked the inmate if they were "currently suicidal?" and "ever attempted suicide?" With regard to the final line of inquiry on the form that stated, "Receive bad and/or unexpected news?" this reviewer observed the RN telling the inmate that "you didn't go to court, so no need to ask that question." This reviewer subsequently spoke with the RN and

corrected the misconception that this question was optional.  An SRN who was coincidentally in the R&R unit training a new employee was subsequently advised of this reviewer's observations.  During observation of the second RN, this reviewer found that the screening process was accurately completed.  The doors to both nurse's offices remained closed during the process, with custody personnel stationed in the hallway.

Of note, during the evening of April 20, 2022, six new admissions arrived to the PBSP R&R unit from CSP/LAC.  Five of these inmates reported current SI when they arrived.  In order to determine what might have precipitated these five newly arriving inmates to be expressing SI at the same time, this reviewer attempted to review the intake screening forms in the EHRS during the morning of April 21.  The review found that although the five inmates were placed in the MHCB unit during the evening of April 20, the intake screening forms for four of these inmates were <u>not</u> in the EHRS.

In addition, this reviewer observed **<u>Daily PT Rounds</u>** in the STRH unit on April 21.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.  Due to a scheduling conflict, this reviewer was unable to observe weekly rounds by a psychologist assigned to the SHU.  Of note, the SHU program at PBSP continued to be dramatically reduced at PBSP, and only one housing unit (C-12) was occupied during the on-site assessment.

**Housing**:  PBSP had ten MHCBs that were previously found to be suicide-resistant.  Apart from the influx of five new patients from CSP/LAC on April 20, the MHCB unit continued to have a very low census.  The STRH unit had 24 retrofitted suicide-resistant cells (112-123; 188-199) designated for new intake inmates, with 12 new intake cells designated in both the STRH and GP administrative segregation sections of the unit.  During inspection, this reviewer did not observe any new intake inmates housed in non-new intake cells.  In addition, this reviewer was informed that three additional ASUs for GP inmates were located in C-2, C-3, and C-12 units (formally utilized as SHUs).  GP inmates on 72-hour new intake status were required to be initially housed in the new intake cells of the STRH unit.

Finally, **<u>Alternative Housing</u>** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were found in either the observation room (Room 184) of the MHCB unit or in other CTC medical rooms.  In addition, alternative housing was used infrequently, and the length of stay was normally very short because inmates were almost immediately admitted into the MHCB unit.  For example, during the 15-month period from January 2021 through March 2022, only 87 inmates were housed on alternative housing status, and only 17 percent (15 of 87) remained on that status for more than one hour.  All of the remaining inmates were released well within 24 hours.  There were also no MHCB rescissions, and all inmates initially placed in alternative housing were subsequently admitted into the MHCB unit.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer's examination of various medical charts for MHCB patients indicated that most patients were often only on Suicide Precaution status for an average of 24 hours before being moved to 30-minute observation.  In addition, the chart review found

that numerous patients remained on 30-minute observation despite still reporting current SI. For example, in one case (PBSP 1), the patient was on 30-minute observation and the clinician's progress note dated April 9, 2022 indicated that his "current SI was reduced from 10/10 from previous contact with this writer to 7 or 8 out of 10, with 10=severe. Plan remains the same, to jump off the tier, and Pt. has no access to means of self-harm in restricted MHCB setting." The patient remained on 30-minute observation. In a second case (PBSP 2), the patient was admitted to the MHCB unit on October 17, 2021 and, despite being admitted for DTS, was immediately placed in "full issue" on 30-minute observation. The SRASHE dated October 17 stated, in part, that: "While Pt's threats of SI seem to be for the purpose of secondary gain at this time, the Pt. is historically impulsive and labile, and his acute risk level can change in an instant." A clinician also summarized the initial MHCB referral in a progress note dated October 18, 2021 as follows: "Pt. reported he would become suicidal again if returned to his ASU/STRH cell, as he would 'rather die than live like this,' threatening to jump off the top bunk if returned to his cell. Pt. was admitted to MHCB in which setting was no longer a danger to self. Pt was admitted after hours on 10/17/21 on q30 watch/full issue, due to calm presentation and resolution of conditional SI upon admit to MHCB."

In a third case (PBSP 3), an IPOC for DTS was completed for an MHCB patient on 30-minute observation on October 9, 2021 which indicated that he thought about suicide "every day," "I am committed to killing myself," "I feel somewhat prepared to die by suicide," "There is nothing to hold me back from killing myself," and "I used to have reasons not to kill myself. Those reasons aren't very strong anymore." The accompanying clinical progress note stated: "No acute issues that require further intervention today. Pt. continues to report SI with high intent on his IPOC, but his attitude and actions don't appear to match." The clinician also noted on October 9 that:

> Pt. reported he was doing ok and that he just needed a change of scenery from ASU, but also reported that the ASU environment was really getting to him and that he was really suicidal. Discussed ways of coping once he gets back to STRH to get through the couple of months he has left there. With questioning, he admitted that he was also really having to rethink his life and his way of dealing with his incarceration. Pt. reports that he was optimistic coming to prison, thinking that he would be able to stay out of politics and just 'be cool' and that nobody would bother him (and he would be able to do a little hustling). Pt. has been discouraged by the immaturity and short-sightedness of many of his fellow inmates and this has been preventing him from going out to yard and groups. Pt. reported that he has been thinking about his whole life and that is a big part of what is driving his SI.

The patient remained on 30-minute observation. A few hours later on October 9, the nurse conducting rounds noted in a progress note that the patient "stated he is suicidal with plan to jump off his upper bunk when he gets back to ASU." The nurse advised the MHCB clinician who had met with the patient earlier, and 30-minute observation was continued.

In several of the cases, clinicians utilized virtually the exact same narrative to justify both Suicide Precaution status at 15-minute intervals or non-suicide observation at 30-minute intervals. For example, in one case (PBSP 4), the provider order on October 28, 2021 stated: Q-

11/safety issue due to + SI, no plan, no SIB, not at high imminent risk;" whereas in another case (PBSP 5), the provider order on April 20, 2022 stated: "Q-30/full. Pt. is + SI with no verbalized plan, no SIB, Pt. has utilized issued items appropriately.  Not at imminent risk."

Further, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on March 4, 2022 (for PBSP 6), April 3, 2022 (for PBSP 1), April 8, 2022 (for PBSP 7), and April 16, 2022 (for PBSP 8).  The chart review found that two cases (PBSP 7 and PBSP 8) had one violation each that were in excess of required 15-minute intervals, one case (PBSP 6) had two violations, and the last case (PBSP 1) had four violations.  The longest gap between checks was 23 minutes in PBSP 6, and violations in these four cases were by multiple nursing staff.

Finally, a review of **Guard One** data for a recent 24-hour period in the STRH unit found 99 percent compliance with the required checks that did not exceed 35-minute intervals, whereas the SHU and the three ASUs had a combined 98 percent compliance rate.  Of note, pursuant to a previous court order, Guard One checks were required at 60-minute intervals during First Watch in the SHU and non-STRH ASUs.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals for the six-month period of October 2021 through March 2022.  A sample EHRS review of 26 emergent/urgent mental health referrals for SI/behavior revealed that clinicians completed the required SRASHEs in 96 percent (25 of 26) of the cases.

In addition, although PBSP did not have a **Crisis Intervention Team**, this reviewer had an opportunity to observe the crisis response to an emergency mental health referral for SI on April 21.  The inmate (PBSP 9) had expressed SI secondary to frustration regarding appeal of his conviction.  The responding clinician assessed the inmate in a private office within the STRH unit and completed the required SRASHE.  The assessment determined that the inmate was at low acute risk for suicide and a MHCB referral was not warranted.

Five **IDTT Meetings** in the MHCB unit were observed on April 22, including two cases held in absentia because the patients refused to attend their initial treatment team meetings.  Overall, there was good treatment team representation, and most IDTT meetings included adequate case presentations, adequate summaries of suicide risk history and inquiry regarding current SI, and some explanations regarding privileges within the MHCB unit.  Because most of the cases involved initial IDTT meetings and patients were generally unstable, it was appropriate that discussion regarding safety planning was limited.

With regard to **Out-of-Cell Time** afforded to MHCB patients, there was a full-time RT that was assigned to the entire facility, but said to prioritize MHCB patients.  EHRS review of several patients indicated that the RT was completing RT initial assessments, and providing opportunities for yard and telephone calls upon IDTT approval.  This reviewer examined the 114-A forms of three patients who had been in the MHCB unit for at least seven days and, absent opportunities to shower, there was no documentation of other out-of-cell activities.  Subsequent

review of another log, referred to as the "RT Log," indicated that MHCB patients were being given opportunities for yard and telephone calls by the RT.

In order to assess **Discharge SRASHEs and Safety Plans** required for patients discharged from the MHCB unit, this reviewer examined the EHRS charts of ten patients discharged from the unit from October 2021 through March 2022, who had been admitted into the MHCB for DTS, and remained at PBSP. Required discharged SRASHEs were completed in all cases, and safety plans were completed in 90 percent (nine of ten) of the cases. In addition, all clinical five-day follow-ups were timely.

Further, pursuant to CDCR's "Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans" directive (effective March 10, 2020), this reviewer requested data regarding MHCB supervisory review of all discharge SRASHEs and safety plans for patients released from the MHCB from October 2021 through March 2022. This reviewer's examination of the data found problems in untimely supervisory review, specifically, all reviews were typically done a few days or several weeks after completion of the SRASHE and not prior to or during the anticipated discharge IDTT meeting for each patient.

Finally, the process by which inmates were provided **Discharge Custody Checks** at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 44 cases of inmates discharged from either the MHCB unit or alternative housing who remained at PBSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 2021 through March 2022. The review found that only 89 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians not completing the first page of the form. When completed correctly, the majority of custody checks were recommended for 24 hours by clinicians. In addition, 98 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with most of the few errors attributable to gaps in observation.

**Intervention**: Housing units toured by this reviewer had an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of six months of SPRFIT meeting minutes (October 2021 through March 2022) found that all required mandatory members or designees attended all but one (October 2021) of the meetings. Meetings were scheduled for 60 minutes and meeting minutes were generally between eight to ten pages in length. Meeting minutes included, but were not limited to, discussion of such topics as training, discharge custody checks, and self-harm data. The meeting minutes were otherwise unremarkable. A SPRFIT LOP was in effect.

Finally, three CCHCS polices were created during 2021 that required LOPs – "Local Operating Procedure for Inmate-Patients Receiving Bad News," effective April 28, 2021; "Crisis Intervention Team Policy and Procedure," effective July 8, 2021; and "Suicide Risk Management Program Policy and Procedure," effective July 12, 2021.  PBSP did not have a CIT, therefore, a LOP for that process was not applicable.  The facility had the following LOPs that were consistent with the other CCHCS directives - "Operational Procedure MH.01.101: Bad News Screening and Notification of Inmate Bad News," dated July 2021; and "Operational Procedure MHV1.02A: Suicide Risk Management Program," dated August 2021.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 96 percent of custody, only 82 percent of medical, and 100 percent of mental health staff received annual suicide prevention block training during the previous 12 months.  Finally, as of March 2022, 100 percent of mental health clinicians had completed the SRE mentoring program, seven-hour SRE training, and safety plan training.

**Recent Suicides**:  PBSP did not experience any inmate suicides during the review period.

**Audit Summary**:  Adequate practices were found in almost all reviewed areas, including PT rounds, Guard One compliance, completion of SRASHEs upon emergent/urgent mental health referrals for SI/behavior and when inmates are discharged from the MHCB unit, completion of 7497 discharge custody check forms, and CPR and suicide prevention training for custody, medical, and mental health personnel.  Deficiencies were found in intake screening and downgrading of currently suicidal patients to 30-minute observation in the MHCB unit.

# APPENDIX B

**California Medical Facility - Psychiatric Inpatient Program (CMF-PIP)**

**Inspection**: May 24-26, 2021. The facility had a bed capacity for 466 patients. The ICF (including L-1) was at 62 percent capacity with 154 of 248 beds filled, whereas the APP was at 79 percent capacity with 172 of 218 beds filled.

**Screening/Assessment**: A new patient admission was observed on May 28. Pursuant to practice, nursing assessments, utilizing an Acute/ICF Nursing Assessment Form, were completed on the patient's assigned housing unit. Although the form does not contain any specific suicide risk inquiry, the nurse was observed soliciting information regarding current and prior history of SI/behavior. The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality. Of note, subsequent review of 30 charts for newly admitted patients during February through May 2021 found that current suicide risk inquiry by nurses were documented in only nine of 30 (30 percent) of the cases. This finding was offset by the fact that a psychiatrist (or psychologist) completed initial assessments of patients on the day of admission in 97 percent (29 of 30) of the cases.

**Housing**: The CMF-PIP had five housing units including the unlicensed L-1, the 64-bed High Custody Intermediate Treatment Center (HCITC) for ICF, and seven units for APP. Pursuant to CMF-PIP practice, almost all patients on suicide observation status remain housed in their assigned cells. The exception was L-1 where suicidal patients were generally housed in two observation cells (136-137), although this reviewer subsequently determined that two other cells (134-135) were also utilized for suicidal patients in L-1.

Overall, although some cells utilized for suicidal patients were mostly suicide-resistant, there were concerns. For example, there were gaps between the sink and wall in all cells (with the exception of the HCITC) that could be dangerous because the sinks could be utilized as anchors in suicide attempts by hanging. The warden was made aware of this finding and quickly moved to remedy the hazards in the L-1 Unit. A determination as to whether to correct the hazards in other cells or to designate a smaller number of cells to house suicidal patients in the other housing units and retrofit those cells was pending.

Finally, the cells in the 64-bed HCITC were not suicide-resistant and contained several hazards, including metal-frame beds, shelves, and sinks with anti-squirt slit faucets. This reviewer was advised that a work order had been approved to retrofit 32 patient rooms in A and B Units to include "ligature resistant beds, mirrors, and bubblers." These retrofits were tentatively scheduled to be completed between September and December 2021.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were utilized in the PIP units. In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff with documentation of such checks entered into the EHRS. Although observation of all PIP patients at 15-minute intervals was commendable, review of provider orders in the EHRS found that both PCs and psychiatrists often did not differentiate between Suicide Precaution status, which required daily assessment by clinicians and observation at 15-minute intervals and non-suicide observation at 15-minute intervals. As such, some orders were written as "Q-11, safety," and others as "Q-11, behavioral" or simply "Q-11." Adding to the confusion,

multiple provider orders (to include level of observation, patient issue, and privileges) placed outside each suicidal patient's door on Adaptive Support Forms (CDCR 128 C-2) were not current.

A significant concern with these differing observation orders was that providers appeared confused by policy requirements. They sometimes ordered "SP Q-11, safety checks" when the patient was not on Suicide Precaution status, while other orders appeared as "Q-11, behavioral," an indication the patient was not on suicide observation status, yet they were clothed in only a safety smock (see CMF-PIP 1). Adding to the confusion were progress notes utilizing terms such as "mental health observation" for both suicidal and non-suicidal patients. During the IDTT meetings in the PIP units on May 26, 2021, it was unclear if patients were on Suicide Precaution status or non-suicide observation status at 15-minute checks. In another problematic case, the patient (CMF-PIP 2) reported feeling depressed, expressed high anxiety, and was grieving the loss of his brother a few days earlier. He initially told a nurse, on the evening of April 28, 2021, that he was "having suicidal thoughts going on and off because of his brother's passing away." The patient was seen later that evening by a psychiatrist and stated that, "he still felt that he was better off dead but was willing to work on his issues….Patient voluntarily gave up his clothes and chose to go in suicide smock as he did not feel safe." Despite the patient being placed in a safety smock, he was not placed on either Suicide Watch or Suicide Precaution. His clothes were returned the following day (April 29).

Further, the chart review indicated that clinicians rarely utilized Suicide Precaution status, but instead, ordered either Suicide Watch or observation at 15-minute intervals. Suicide Precaution required daily assessment, whereas observation at 15-minute intervals did not. Of the six patients on suicide observation status (Suicide Watch or Suicide Precaution) on May 26 and May 27, 2021, four patients went from Suicide Watch to non-suicide observation status without being placed on Suicide Precaution status. In one case (CMF-PIP 3), there was an order by the psychiatrist to discontinue Suicide Watch on May 25, yet there was no indication or progress note that the psychiatrist saw the patient on that date to assess his level of suicide risk. In another case, the patient (CMF-PIP 4) was on Suicide Watch on May 25 and May 26, 2021 for expressing SI and engaging in self-injurious behavior (superficial cutting and an alleged overdose of Tylenol). He was later observed smearing feces on the window of the observation cell. When seen by the psychiatrist on May 26, the patient denied any SI and "admitted to secondary gain as his reason for wanting to go to the hospital." He was discharged from Suicide Watch without a downgrade to Suicide Precaution.

In a third case, the patient (CMF-PIP 5) was discharged from Suicide Watch on May 26 and not placed on Suicide Precaution. Therefore, the patient was no longer on suicide observation status. The provider's order stated a "partial" issue for "pants/shirt/shoes... He is being given 'blues' (partial issue) and may have two books in the cell at this time." However, according to CDCR policy, if a patient was not on suicide observation status, they were required to be provided their uniform or full clothing (often referred to as "blues"). It was unclear why the psychiatrist ordered "partial issue" (which referred to a t-shirt, boxer shorts, and socks) for a patient removed from suicide observation status. Ironically, the patient attended his IDTT the meeting the following day (May 27) and he was still clothed in a safety smock. There was no indication that his observation status and clothing issue were addressed during the meeting. He was not seen

daily for the next several days by any mental health clinicians because he was not on suicide observation status. Finally, on June 1, the patient was seen by the psychiatrist and complained "that he could not understand why he remains in 'blues only' when he has been denying SI for several days. Patient shared that he was told by officers that he would have to wait until this writer returned to have the issue orders clarified." The subsequent June 1 psychiatric note, as well as a provider order, indicated that the patient was "given full issue with packages/property/canteen." The patient was later changed into full clothing. In conclusion, it remained unclear as to whether clinical and custody staff, as well as the patient, believed that "blues" referred to either the color of the safety smock or full clothing. It also remained unclear as to why a patient who was not on suicide observation status was denied other possessions and privileges for several days.

Finally, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients required to be observed on Suicide Precaution status at 15-minute intervals in the PIP during the nine-hour period from 12:00 a.m. through 8:59 p.m. on March 1, 2021 (for <u>CMF-PIP 1</u>), March 2, 2021 (for <u>CMF-PIP 6</u>), May 21, 2021 (for <u>CMF-PIP 7</u>), and May 28, 2021 (for <u>CMF-PIP 8</u>). The chart review found that <u>CMF-PIP 1</u> had five violations of observation checks exceeding 15-minute intervals, <u>CMF-PIP 6</u> had one violation, and the remaining two cases (<u>CMF-PIP 7</u> and <u>CMF-PIP 8</u>) had no violations.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the three-month period of March through May 2021. A sample EHRS review of 20 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in only 20 percent (four of 20) of the cases. Although the "Psychiatric In-Patient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy (No. 12.11.2104.P1) only became effective on December 31, 2020, with the requirement that a SRASHE must be completed for "a patient making statements about suicidal intent or ideation, or the patient is engaging in behaviors that may elevate the risk of suicide," these findings were very problematic. In fact, a CMF-PIP supervisor told this reviewer that, although clinical staff were agreeable to complete an initial and discharge SRASHE for patients, many viewed completion of a SRASHE during other times of a PIP placement to be "discretionary based upon change of behavior." Of course, such an interpretation of the Policy 12.11.2104.P1 was incorrect. Further, although it might be arguable that completion of multiple SRASHEs for individual patients who continually engaged in suicidal and/or self-injurious behaviors during their PIP placement was clinically unnecessary and/or excessive, in 80 percent (16 of 20) of cases in which the required SRASHEs were not completed, patients had not had SRASHEs completed for at least a month in all but four cases. Six patients had not had a SRASHE completed for several months.

Finally, in several cases, psychiatric progress notes utilized to document the clinical decision in lieu of completion of a SRASHE contained the term "contracting for safety," a practice that had been strongly condemned in previous CDCR suicide prevention training curricula. Such "contracting for safety" was utilized, in part, as the rationale for discharging a patient from suicide observation. For example, the psychiatric progress note in one case (<u>CMF-PIP 5</u>) contained the following rationale for release from Suicide Watch: "Pt. was seen in dayroom wearing safety smock which was falling over his shoulders; he was entirely cooperative and

stated that he does not feel at all suicidal; he appreciated the degree of support he has received from the team and was able to contract for safety and he stated that he is no longer at all impulsive and would ask for assistance if he suddenly felt at risk for self-harm."

Five IDTT meetings in the PIP units were observed on May 25-26, 2021. Overall, although there was good treatment team representation, each of the meetings (involving varying clinical staff) was very problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. Several meetings included participation from ICF supervisors, who continually redirected the PCs when necessary.

One case symbolized the problems in the IDTT meetings. The patient (CMF-PIP 9) had arrived at the CMF-PIP in early May 2021 for chronic SI and SIB. He also had a history of seizures and often wore a helmet for protection. The patient was initially quarantined in the 64-bed HCITC. On May 9, the patient attempted to asphyxiate himself with a ligature made out of bedsheets. He was sent out to the hospital for evaluation, as well as for treatment of a possible seizure. On May 12, he was returned to the facility was and placed on Suicide Watch, which was discontinued the following day (May 13). Approximately ten days later on May 24, the patient again tried to asphyxiate himself by tying a bedsheet tightly around his neck. Officers utilized a cut-down tool to remove the ligature. He was again sent out to the hospital for examination of his injury and possible seizure activity. The patient was returned to the facility the following day (May 25) and reassigned to an ICF unit (post-quarantine). The patient arrived at his initial IDTT meeting on May 26 clothed in a safety smock and wearing a helmet. Although there was a brief summary of why the patient was referred to ICF LOC, there was no explanation as to why he was in a safety smock, nor his level of observation. When asked, the patient denied current SI. Following prompting by an ICF supervisor who was monitoring the meeting, the PC briefly discussed the ICF program and stated that the patient would be offered between six and eight hours of group treatment each week. There was no discussion regarding the patient's two recent serious suicide attempts nor other relevant information regarding his history of suicidal behavior. The patient self-reported that one of his coping skills was to listen to music and he requested a radio. There was some discussion as to whether he would automatically be provided a radio because he was a maximum custody patient or if he would need to earn the radio as an incentive through the STEP program.

Based upon the lack of discussion regarding suicide risk and level of observation during the IDTT meeting, this reviewer briefly conversed with the treatment team psychiatrist following the meeting. This reviewer was informed that the patient would be removed from Suicide Watch and given full issue. Subsequent review of the chart indicated that the PC met with the patient the following day (May 27) and inserted the following narrative (from the MH Consult Inpatient Referral dated April 29, 2021) into their progress note:

> IP is being referred to ICF-Single cell as a result of MAX status following battery on a non-inmate. Treatment goals to include: 1. Reduce passive suicidal ideation to at least a 0/10 for a period of 1 month; 2. Reduce depression to at least a 5/10 for a period of 1 month; 3. IP will not exhibit self-harm behaviors, including cutting, scratching, swallowing FBs, for 1 month; 4. Identify and demonstrate the

use of at least 4 coping mechanisms to manage his depression and anxiety for a period of 1 month; 5. Refer IP to EOP once clinically stable.

None of these treatment goals were discussed during the IDTT meeting on May 26.

In addition, this reviewer examined the Mental Health NCAT (Non-Clinical Activity Tracking) Report forms for documentation of out-of-cell activity for PIP patients on suicide observation status from February through May 2021. Only cases in which patients were on suicide observation status for more than seven (7) days were reviewed. Of the 16 reviewed cases, most of the patients were offered showers and at least one telephone call. Yard was not offered to 50 percent (eight of 16) of the patients. Dayroom was only offered to 38 percent (six of 16) of the patients.

Finally, pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), a SRASHE was required to be completed within 72 hours of admission and upon discharge from the PIP. This reviewer examined the medical charts of 30 patients admitted to and discharged from the CMF-PIP to a lower level of care from February through May 2021. The review found that only 70 percent (11 of 30) of admission SRASHEs were completed in a timely manner, and 87 percent (26 of 30) discharge SRASHEs were completed. In addition, 53 percent (16 of 30) of the cases did not contain the required safety plans, either because the discharge SRASHEs were not completed (in four cases) or the assessments incorrectly stated that a safety plan was not required due to "low acute risk/not clinically indicated" (in 12 cases). A CMF-PIP supervisor informed this reviewer that the required supervisory review of safety plans contained in discharging SRASHEs was not being completed due to shortages in supervisory staff.

**Intervention**: PIP housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit located in nursing stations.

**SPRFIT Meetings**: A review of six months (November 2020 through April 2021) of SPRFIT meeting minutes found that a quorum was not achieved for any of the meetings. The SPRFIT had been without a full-time coordinator since April 2021 and two psychologist specialists were acting as interim coordinators. Other than acknowledgement that "no auditing of SRASHE quality has been conducted since April 2020 due to work caused by the pandemic," the meeting minutes were very brief and unremarkable. In addition, meeting minutes did not identify any of the deficiencies in PIP suicide prevention practices as found above in this reviewer's assessment.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 86 percent of medical staff, and 83 percent of mental health staff received annual suicide prevention block training during the previous 12 months. Finally, as of May 2021, approximately 54 percent of mental health clinicians had completed the SRE mentoring program, 84 percent had received the seven-hour SRE training, and 95 percent had completed safety plan training.

**Recent Suicides**: Although CMF-PIP did not experience any suicides during the review period, a patient committed suicide at Valley State Prison on May 2, 2021, three days following his discharge from CMF-PIP-APP. Ten recommendations for corrective action through a QIP were

generated in that case, five of which were specific to CMF-PIP and involved problems of provider orders for possessions and observation level while on suicide observation status, inadequate master treatment plans, inconsistent offering of group treatment, and frequency of psychiatric contact.

**Audit Summary**: Apart from the fact that most patients on suicide observation status were adequately observed at 15-minute intervals, as well as both custody and medical staff having 100 percent compliance with CPR training, this review found multiple problems in all other areas. There were low compliance rates for completion of SRASHEs for urgent/emergent mental health referrals, as well as upon admission and discharge from the PIP. Not all cells designated to house suicidal patients were suicide-resistant. Progress notes and provider orders regarding levels of observation were often confusing, with clinicians not distinguishing between Suicide Precaution and non-suicide observation at 15-minute intervals. Contracting for safety was found in several psychiatric progress notes. It was very problematic that some patients not on suicide observation status were clothed in either a safety smock or partial issue clothing. Most patients on suicide observation status were not provided yard or other out-of-cell activities. IDTT meetings were problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. Training compliance was below 90 percent for annual suicide prevention block training for both medical and mental health staff, as well as SRE mentoring and seven-hour SRE training for mental health clinicians.

## California Health Care Facility (CHCF) - PIP

**Inspection**: July 19-21, 2021. The facility had a bed capacity for approximately 542 patients. The ICF was at 95 percent capacity with approximately 336 of 355 beds filled whereas the APP was at 89 percent capacity with approximately 162 of 177 beds filled. These numbers were approximations because the facility had an unknown number of "flex beds," as well as up to 43 beds designated for patient admissions.

**Screening/Assessment**: The intake screening by nursing staff was observed in the Patient Management Unit (PMU) on both July 20 and July 22. The door to the nurse's office was closed on both occasions with officers stationed outside, thus ensuring both privacy and confidentiality. The same Initial Health Screening form was utilized for both PIP and outpatient incarcerated persons entering CHCF. Both observed intake screenings were for patients being admitted into the PIP. Although the nurse was observed to be asking all of the intake screening questions and correctly entering information in the EHRS for the patient on July 22, a second nurse conducting the screening on July 20 failed to ask the patient all 15 of the mental health and suicide risk questions on the Initial Health Screening form.

**Housing**: The CHCF-PIP had five housing units designated for acute care patients and approximately 16 housing units designated for ICF patients. Patients on suicide observation status could be housed in any of the APP and ICF beds. The review found all patient rooms were suicide-resistant.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were utilized in the PIP units.  In addition, patients not on suicide observation status were observed at regular 15-minute intervals by nursing staff.  In addition, for reasons that were unexplainable, the term "Suicide Precaution" was not utilized by any CHCF-PIP staff, including psychiatry, who routinely referred to the observation level as "stags" and wrote "mental health observation" or "Q-11" in progress notes.

Finally, this reviewer subsequently verified the accuracy of observation rounds by examining the EHRS charts of four patients required to be observed on Suicide Precaution status at 15-minute intervals in the PIP during the nine-hour period from 12:00 a.m. through 8:59 p.m. on February 8, 2021 (for <u>CHCF-PIP 1</u>), April 26, 2021 (for <u>CHCF-PIP 2</u>), July 13, 2021 (for <u>CHCF-PIP 3</u>), and July 20, 2021 (for <u>CHCF-PIP 4</u>).  The chart review found several observation checks exceeding 15-minute intervals (i.e., four or five per patient) in three cases and two violations in one case (<u>CHCF-PIP 4</u>), with one exceeding 75 minutes.  The violations in these four cases were by multiple nursing staff.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of January through June 2021.  Of note, the document review was made more challenging by the fact that many of the emergent referrals involved patients already on suicide observation status (because an emergent referral was inexplicably automatically generated whenever a patient was placed on suicide observation status) and/or in need of a psychotropic medication assessment.  The subsequent sample EHRS review of 75 emergent/urgent referrals (of patients not on suicide observation status) revealed that the required SRASHEs were completed in only 35 percent (26 of 75) of the cases.  Of note, none of the SRASHEs were completed by psychiatry staff.

Finally, there were concerns regarding the issuance of clothing and property for patients on suicide observation status.  There were very few patients observed in "partial issue" of t-shirt and shorts, with the majority of suicidal patients dressed in "full issue" of blue shirts and pants regardless of whether they were on Suicide Watch or Suicide Precaution status.  A handful of patients were in safety smocks.  Pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), patients on Suicide Watch should normally be clothed in safety smocks, with patients on Suicide Precautions normally clothed in t-shirts and boxers.  However, the policy also stated that "Providers need not to default to providing minimal issues.  The psychiatrist or licensed psychologist may authorize additional items if clinically indicated.  Additional items must be supported by a thorough chart review and documented clinical rationale."

The issuance of clothing for suicidal patients at CHCF-PIP revealed two concerns.  First, review of various patient records found that there was no documentation of any clinical judgement utilized to justify exceptions to clothing and property issuance.  Second, many of the patients who were issued "blues" were not issued either a t-shirt or boxers, with one psychiatrist informing this reviewer that patients get "blues before whites."  When asked to explain this decision, the psychiatrist stated that t-shirts and boxers were potentially dangerous because they easily could be torn and made into a ligature, whereas blue uniform pants and shirts could not.  Such a rationale was dubious at best.

Thirteen IDTT meetings were observed on July 19-21, 2021. Overall, although treatment team representation was good, each of the meetings (involving varying clinical staff) was problematic, with uneven case presentations and higher level of care discussions (during meetings for ICF patients), as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI. Subsequent chart review found repeated reference to the following generic treatment goals in progress notes of patients on suicide observation status: "1) Patient will be free of self-harm behavior for 30 days, and 2) Patient will learn approximately 2 or more coping methods of getting needs met other than cutting/SIB within 30 days."

In addition, this reviewer examined 63 Mental Health NCAT (Non-Clinical Activity Tracking) Report forms for documentation of out-of-cell activity for PIP patients on suicide observation status on July 20, 2021. Of the 63 reviewed cases, most of the patients were consistently offered showers, telephone calls, and opportunities for yard and/or dayroom. There was no documentation of any patient receiving the opportunity for a visit.

Of note, there was inconsistent information provided to this reviewer regarding practices of providing yard to patients on maximum custody status. PIP leadership stated that patients on maximum custody status were offered to be escorted to the ASU yard on E-Facility, a considerable distance from the PIP units, because walk-alone cages were not available in the PIP units; whereas several custody staff indicated that the yards in the PIP units were available for patients one at a time. Of note, NCAT records indicated that most maximum custody and non-maximum custody status PIP patients refused yard sessions when offered. In addition, the NCAT documentation indicated that approximately 80 dayroom and 254 yard sessions were listed as "cancelled." Although initial indications were that the yard sessions were cancelled due to excessive heat, according to supervisory custody personnel, the notation of "canceled" meant that individual custody officers did not accurately "close or save" the activity in the patient's NCAT record within ten days. This resulted in the activity being listed as cancelled. However, such an explanation did not explain why the term "cancelled" did not appear for any showers or telephone calls in the reviewed cases. In sum, it could not be determined through review of the NCAT records whether an activity listed as "canceled" was indeed cancelled or offered, refused, or completed for individual patients.

Finally, pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), a SRASHE was required to be completed within 72 hours of admission, as well upon discharge from the PIP. This reviewer examined the medical charts of 51 patients admitted to the CHCF-PIP from January through June 2021. The review found that only 29 percent (15 of 51) of admission SRASHEs were completed in a timely manner. In addition, this reviewer examined the medical charts of 32 patients discharged from the CHCF-PIP to a lower level of care from January through June 2021. The review found that the required discharge SRASHEs were completed in only 78 percent (25 of 32) cases. In addition, 56 percent (18 of 32) of the cases did not contain the required safety plans, either because the discharge SRASHEs were not completed (in seven cases) or the assessments incorrectly stated that a safety plan was not required due to "low acute risk/not clinically indicated" (in 11 cases). These findings would indicate that the required supervisory review of discharging SRASHEs and safety plans was not being completed.

303

The following case (<u>CHCF-PIP 5</u>) was illustrative of the problem regarding management of suicidal patients at the facility. The patient was admitted into the CHCF-PIP on June 9, 2021 for DTS. He was placed on Suicide Watch clothed in a safety smock. The following day (June 10), a SRASHE was completed and indicated both a high chronic and acute risk for suicide. The patient attended his initial IDTT meeting and was generally viewed as uncooperative. He remained on Suicide Watch and seen daily by psychiatry from June 11 through June 14. The patient was seen by a psychologist on June 15 and, although denying any SI and requesting his clothing, the Suicide Watch and safety smock orders were renewed. The following day (June 16), the patient attended another IDTT meeting and, again, was generally uncooperative. Although a subsequent RT note suggested that the patient had been downgraded to Suicide Precaution status, there was no such documentation contained in either progress notes or master treatment plans authored that day by either psychiatry or psychology to justify lowering the observation level. However, the frequency of nursing rounds was changed from Suicide Watch to Suicide Precaution following the IDTT meeting.

The patient was seen by a psychologist on June 17 regarding completion of a mental health evaluation for a pending RVR. The following day (June 18), the patient was seen by a psychiatrist who noted in a progress note that "Pt is currently on staggered 10 minute obs... Continue staggered 10 minute obs. for safety now. Pt. has his clothes but restricted on sharps and plastics."

Despite being on Suicide Precaution status, the patient was not seen by either psychiatry or psychology/social work for the next three days - June 19, June 20, and June 21. In addition, not all required observation at staggered 15-minute intervals was performed during this time period. On June 22, a psychiatrist wrote in a progress note that the patient "will remain on q11 staggs as we get to know patient more." (The patient had been transferred from another unit the previous day.) The following day (June 23), a psychiatrist wrote in a progress note and order that Suicide Precaution status was discontinued. Despite the new order, the patient remained on Suicide Precaution throughout June 23 and into the morning of June 24. He attended IDTT meetings on both June 25 and July 1. The following treatment goals were inserted into his master treatment plan documents: "Patient will be free of self-harm bx for 30 days - Ongoing as patient has not engaged in SIB for 2 weeks. IP will learn 2 more appropriate methods of getting needs met other than cutting SIB within 30 days - Ongoing as patient has been able to voice his concerns at this time and identify reading as a coping skill." Of note, when the patient complained about the lack of programming during another IDTT meeting on July 20, a nurse incorrectly wrote in progress note that: "I/P stated that he wanted to program more but was reminded that he is in a MAX unit."

On July 13, the patient informed an RT that "he would cut himself if not pulled out" of his cell. He was subsequently seen by a psychiatrist who restarted his Suicide Precaution status. A SRASHE was not completed. On July 14, the patient was seen by a psychiatrist and remained on Suicide Precaution. During the morning of July 15, the psychiatrist again saw the patient and continued Suicide Precaution status, stating in a progress note that the patient was at "low moderate risk for completed suicide. Has been agitated, irritable past few days. Risk mitigated by q11 checks. Denies SI…. Continue q11 staggered grounds, will follow up tomorrow and can take off paper restriction possibly." Several hours later during the afternoon of July 15, the

psychiatrist wrote another order to discontinue the patient's Suicide Precaution status, documenting the reason for discontinuation as "duplicate order." There was no other documentation to indicate that the psychiatrist saw the patient again prior to writing the second order. When this reviewer arrived at CHCF-PIP on July 19 and viewed the facility list, the patient's name was still listed as being on Suicide Precaution status, as well as on the Adaptive Support Form (CDCR 128 C-2) attached to his cell door, but he was only being observed on regular 15-minute nursing rounds.

**Intervention**: PIP housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit located in nursing stations.

**SPRFIT Meetings**: CHCF-PIP did not initiate a stand-alone SPRFIT meeting process until February 2021. A review of five months (February 2021 through June 2021) of SPRFIT meeting minutes found that a quorum was achieved for all meetings. Other than data from monthly audits indicating that required SRASHEs were not being completed in a timely manner, the meeting minutes were brief and unremarkable and did not previously identify most of this reviewer's above findings, with one exception. The exception was an "Enhanced Observation Documentation Audit" completed by the SPRFIT coordinator in both April and May 2021. The May audit, specific to provider progress notes for patients on suicide observation status in April 2021, found the following:

- Contact completed by POD/PC or primary clinician: 80%
- Was patient seen in a confidential setting? 50%
- Did the clinician indicate reason for the Suicide Watch? 80%
- Was the most recent SRASHE reviewed? 25%
- Mental Status Examination included: 70%
- Assessment of patient's current suicide risk: 45%
- Rationale for continued observation: 90%
- Rationale for issue restriction if patient was provided partial/full issue: 80%
- Determination of contact frequency and tx plan modifications: 55%
- Safety/risk management plan referenced in note: 35%

The above audit was very helpful and should result in corrective action to address deficiencies.

Finally, although the monthly SPRFIT minutes referenced four cases in which a Root Cause Analysis (RCA) was completed for serious suicide attempts involving outside hospital treatment (i.e., with a medical severity rating of "3"), neither the minutes nor attachments contained any documentation (including, but not limited to, case summaries) that clinical reviews of the RCAs were presented during any of the monthly meetings.

**Training**: According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 94 percent of custody staff, 61 percent of medical staff, and 60 percent of mental health staff received annual suicide prevention block training during the previous 12 months. Finally, as of July 2021, only approximately 40 percent of mental health clinicians had completed the SRE mentoring program, 77 percent had received the seven-hour SRE training, and 94 percent had completed safety plan training.

**Recent Suicides**:  The CHCF-PIP experienced one suicide (CHCF-PIP 6) on September 29, 2020, resulting in 36 QIPs distributed amongst multiple facilities with 18 QIPs specific to the CHCF-PIP.  These deficiencies included incorrect practice of only allowing psychiatry to write observation and clothing issue orders; inadequate programming for maximum security patients; untimely clinical contacts; under-estimation of suicide risk; use of "contracting for safety;" inadequate IDTT meetings (including meets held without patient); failure to complete multiple required SRASHEs; inadequate nursing rounds; and emergency medical response.

**Audit Summary**:  Apart from the fact that patients on suicide observation status were housed in suicide-resistant cells, as well as both custody and medical staff having high compliance rates for CPR training, multiple problems were found in most other areas.  The term "Suicide Precaution" was not utilized by any CHCF-PIP staff, rather "stags," "mental health observation," or "Q-11" was written in progress notes.  Patients on Suicide Precaution status were not always adequately observed at 15-minute intervals.  There were low compliance rates for completion of SRASHEs for urgent/emergent mental health referrals, as well as upon admission and discharge from the PIP.  The majority of suicidal patients were dressed in "full issue" of blue shirts and pants, but not issued t-shirts and boxers because psychiatry incorrectly assumed they could be easily torn and made into a ligature, whereas pants and shirts could not.  IDTT meetings included uneven case presentations and higher level of care discussions (during meetings for ICF patients), as well as inadequate discussion regarding both suicide risk and safety planning to reduce further recurrence of SI.  Safety planning was inadequate.  Supervisory review of discharging SRASHEs and safety plans was not being completed as required.  Review of NCAT records could not determine whether dayroom/yard privileges were consistently offered to maximum security patients.

## Salinas Valley State Prison (SVSP)-PIP

**Inspection**: August 23-25, 2021.  The facility had a bed capacity for 246 ICF patients and was at 88 percent capacity with 217 patients confined in the four housing units.  There were 202 single cells and 44 multiple-occupancy cells.

**Screening/Assessment**: A new patient (SVSP-PIP 1) admission was observed on August 24.  Pursuant to SVSP-PIP practices, nursing assessments were completed on the patient's assigned housing unit.  The door to the nurse's office was closed with the officer stationed outside thus ensuring both privacy and confidentiality.  The observed assessment was very disjointed, with the nurse observed with their back to the patient and disengaged for the majority of the assessment.  The nurse initially took approximately ten minutes to find the correct form in EHRS, and then eventually began completing a "Admission Assessment and History" form.  The nurse then spent well over 20 minutes filling out the form without any interaction with the patient.  The assessment ended with the nurse asking the following three questions: "Do you have suicidal ideation?  Do you have auditory or visual hallucinations?  Do you want to hurt anyone?"  The patient answered "no" to all these questions.  Subsequent review of the patient's chart indicated that both an "Admission Assessment and History" and "Acute/ICF Nursing

Assessment" form had been completed on the patient, and the above three questions and answers were not found on either form.

Of note, review of five (5) other recent admissions at SVSP-PIP during June and July 2021 found that nursing staff utilized only the "Admission Assessment and History" form, and not the "Acute/ICF Nursing Assessment" form. Neither form contained any suicide risk inquiry.

**Housing**: The SVSP-PIP had four housing units, including TC1, TC2, C-5, and C-6. Pursuant to practice, almost all patients on suicide observation status remain housed in their assigned cells. The exception was in both TC1 and TC2 where suicidal patients could be housed in either assigned cells or two observation cells on the units.

Overall, none of the cells at SVSP-PIP were suicide-resistant. In TC1, the cells contained metal framed bunks, wall ventilation grates with holes in excess of 3/16 inch diameter, sprinkler heads without caps, perforated communication holes on interior side of cell door, and light fixtures without security caulking to close gaps between the fixture and ceiling. Of note, clothesline string attached to light fixtures and ventilation grates were found in numerous cells. All of these protrusions could easily be used as anchors in suicide attempts by hanging. In fact, the perforated communication holes in the cell door were utilized as the anchor to a patient's suicide (SVSP-PIP 2) in TC2 on December 17, 2020.

In TC2, the same protrusions were found with the exception that wall ventilation grates appeared to be 3/16 inch and some security caulking was found on light fixtures. Further, the observation cells in TC1 and TC2 contained square-shaped sinks and grab bars contained gaps between the bar and wall. The C-5 and C-6 units had similar dangerous protrusions that were conducive to suicide attempts by hanging including gaps between the bunk and wall, ventilation grates with diameters in excess of 3/16 inches, and lack of security caulking on ceiling light fixtures. Finally, C-5 and C-6 were two-tiered housing units and there was no fencing or netting on second tier railings to eliminate the possibility of suicidal patients jumping from the second tier. This hazard was previously identified by the reviewer in "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" (ECF No. 5994, filed November 5, 2018), regarding discussion of a proposed unlicensed MHCB unit at RJD.

This reviewer was advised that, following the patient suicide in December 2020, a CDCR headquarters review team was dispatched to SVSP-PIP on March 12, 2021 to inspect all patient cells. Based upon that review, there were preliminary plans to renovate the four housing units, including retrofitting designated "observation cells" in TC2, C-5 and C-6, as well as several regular cells in TC1 and TC2. *These preliminary plans did not address the hazardous two-tiered C-5 and C-6 units.* To date, approval status and timeline for completion were not available.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were utilized in the PIP units. In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff with documentation of such checks entered into the EHRS. Practices regarding the observation of suicidal patients at SVSP-PIP were found to be quite different than other PIPs and CDCR prisons. Whereas most suicidal patients in other facilities were placed on Suicide

Precaution, and Suicide Watch only utilized when patients were deemed at imminent risk for suicide, suicidal patients at SVSP-PIP were far more likely to only be placed on Suicide Watch, and Suicide Precaution (if utilized) was only used as a step-down from Suicide Watch for a short period of time (e.g., 24 hours or less).  For example, there were 110 orders for suicide observation status during June and July 2021, with 73 orders (66 percent) for Suicide Watch and 37 (34 percent) for Suicide Precaution.  Of note, during the investigation of the patient suicide (SVSP-PIP 2) on December 17, 2020, the CDCR reviewer found that "there were concerns with appropriate transitions through levels of observation (as there appeared to be a practice of transitioning from Suicide Watch to no watch)…." (at page 34 of Suicide Report).

There were two possibilities as to why Suicide Watch was utilized as the preferred observation level for suicidal patients at SVSP-PIP.  First, providers were reluctant to place suicidal patients in non-suicide resistant cells without constant observation.  Second, as noted in the SPRFIT meeting minutes of May 27, 2021, "some providers have historically reported relying on rounding instead of issuing MH observation SP Q11 orders."  In other words, providers were relying on nursing personnel to conduct regular rounds at 15-minute intervals (meant for non-suicidal patients), rather than ordering Suicide Precaution status for a suicidal patient at 11-minute intervals.  In addition, Suicide Precaution status required daily assessment, whereas regular nursing rounds at 15-minute intervals did not require daily assessment.

This reviewer's examination of multiple charts for patients under suicide observation status found extensive problems.  For example, as detailed in other sections of this report, SRASHEs were not always completed for patients expressing SI and/or engaging in self-injurious behavior.  Psychiatrists were primarily responsible for the daily management of patients on suicide observation, with psychology and social work staff rarely, if ever, providing daily assessments of patients.  Patients on suicide observation status were not always assessed on a daily basis, and orders for discharge from Suicide Watch and Suicide Precaution were sometimes received without documentation that the patient was assessed by the provider.

The following case (SVSP-PIP 3) was illustrative of the problem.  The patient was admitted into the SVSP-PIP on July 20, 2021.  A SRASHE completed the following day (July 21) found that the patient was assessed as a high chronic and low acute risk for suicide.  Several weeks later on August 12, the patient swallowed a pen filler that was tied to a piece of string.  He was transferred to a local hospital for examination and returned to the facility and placed on Suicide Watch the following morning (August 13).  Several hours later at 11:37am, a nursing note indicated that "I/P seen & evaluated by MHMD @ cell front after being evaluated by psychologist for SRASHE.  I/P A & O x 4.  Respiration even & unlabored.  No c/o pain/discomfort.  No SIB demonstrated since return from HOC.  With order to D/C 1:1 observation & start Suicide Precaution w/partial issue & noted."  The SRASHE completed by a psychologist indicated that the patient remained at high chronic and low acute risk for suicide.  A subsequent psychiatry note on August 13 indicated that, although the patient had been downgraded to Suicide Precaution, the patient later informed nursing staff that he had swallowed pills, therefore, Suicide Watch was restarted.

On August 14, the patient remained on Suicide Watch.  There was no documentation that he was seen by either psychiatry or psychology/social work staff.  He was briefly transferred to a local

hospital for another possible drug overdose and returned the same day. The following day (August 15), the patient again claimed to have swallowed pills, was escorted to the TTA for examination, and later returned to a cell. There was again no documentation that he was seen by either psychiatry or psychology/social work staff.

On August 16, while on Suicide Watch, the patient inserted a piece of metal into his penis and was subsequently transferred to the local hospital. He returned the same day. There was again no documentation that he was seen by either psychiatry or psychology/social work staff. The following day (August 17), another SRASHE completed by a psychologist that indicated the patient was at high chronic and moderate acute risk for suicide. On August 18, the patient was seen by a psychiatrist who wrote the following insightful note:

> The patient remains on a SW without seclusion. The patient's housing domain has been adapted in an effort to promote the safest, yet humane and dignified, living conditions. The foreseeable risks of self-harm continue and the matter was explained to the patient. There are modest changes to the current psychotropic medication regimen including returning to the previously prescribed agents. Ultimately, because of persistent foreseeable risk the 1:1 order was renewed. We have reviewed the patient's coping skills, including reflecting, outlook strategies, and reading. At this time, the patient is not yet able to competently & adaptively utilize these coping strategies with consistency. The patient's statements regarding aggressive behavior and self-harm behavior included 'I'm not suicidal and I think I'm ready to come off...but, I understand that the focus is on the long-term.' Thus, his SW status will continue, because the risks of impulsive self-harm trump the patient's current perception that he is free of active or intended self-harm.

At approximately 12:56 p.m. on August 19, a nursing note indicated that "I/P seen & evaluated 1:1 by MHMD at the interview room, A & O x 4, appropriate during interview. No SOB, no c/o pain/discomfort. Will order to D/C 1:1 observation & start Suicide Precaution w/partial safety & noted. SRN aware of above orders." Although the nursing note indicated that the patient had been assessed by a psychiatrist, there was no documentation of such assessment in the chart. Approximately two hours later at 3:04 p.m., another nursing note indicated the following: "Received order from Dr. _____ to D/C Suicide Precaution & partial safety. Full issue & noted." There was again no indication that the provider assessed the patient or documented an assessment.

Finally, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients required to be observed on Suicide Precaution status at 15-minute intervals in the PIP during the nine-hour period from 12:00 a.m. through 8:59 p.m. on June 26, 2021 (for SVSP-PIP 4), July 3, 2021 (for SVSP-PIP 5), July 6, 2021 (for SVSP-PIP 6), and August 10, 2021 (for SVSP-PIP 7). The chart review found multiple observation checks exceeding 15-minute intervals (i.e., four to six per patient) in all cases, with SVSP-PIP 5 and SVSP-PIP 7 each having four violations, whereas SVSP-PIP 4 and SVSP-PIP 6 each had six violations. The longest time between required 15-minute checks was 34 minutes in SVSP-PIP 4. The violations in these four cases were by multiple nursing staff.

**Management/Treatment Planning**: CDCR's "Psychiatric In-Patient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy (No. 12.11.2104.P1), effective on December 31, 2020, requires that a SRASHE must be completed for "a patient making statements about suicidal intent or ideation, or the patient is engaging in behaviors that may elevate the risk of suicide." This reviewer requested and received a listing of emergent/urgent mental health referrals for the six-month period of February through July 2021. The list totaled 34 referrals comprised of two emergent MHMD referrals, 20 emergent MHPC referrals, and 12 urgent MHPC referrals. Given that this reviewer also examined SPRFIT meeting minutes from the same time period indicating approximately 300 incidents of self-injurious behavior, it would appear that emergent/urgent mental health referrals for suicidal behavior were significantly under-reported. For example, in one reviewed case (SVSP-PIP 8), the patient was admitted to the facility on May 13, 2021 for DTS. The required SRASHE was not completed (either within 72 hours or anytime thereafter). Three days later on May 16, the patient complained of insomnia to the psychiatrist, who also noted in a brief progress note that "I/P reported passive SI with no intent or plan." A SRASHE was not completed as required, nor was an emergency referral generated in EHRS.

Of note, there were four patients on suicide observation status at SVSP-PIP during the on-site assessment. All four patients (SVSP-PIP 9, SVSP-PIP 10, SVSP-PIP 11, and SVSP-PIP 12) were on Suicide Watch and none had SRASHEs completed prior to initiation of their suicide observation. As such, due to numerous incidents of SI and SIB not resulting in emergent referrals, the compliance rate for completed SRASHEs could not be calculated.

Further, when SRASHEs were initiated, they were completed by psychology/social work clinicians and not psychiatry. Unless they were completed as part of the PIP admissions process (see below), most reviewed SRASHEs were completed following initiation of suicide observation status and did not appear to inform clinical decisions. For example, in case SVSP-PIP 11, the patient claimed to have swallowed up to 30 psychotropic medication pills during the late evening of August 20, 2021. He was subsequently sent out to the local hospital, became uncooperative and was returned to the facility during the early morning of August 21 and placed on Suicide Watch. He was seen by psychiatry on a daily basis (except for August 25) from August 23 through August 29. All assessments occurred at cell front and the patient continued to endorse SI with a plan to either cut or hang himself. He also declared a hunger strike, which was retracted on August 25. On August 23, two days following the patient's return from the hospital, a social worker completed a SRASHE which started, in part, that, although his chronic risk for suicide was high and included at least nine (9) SIB incidents since 2018:

> Mr. _____'s Acute Suicide Risk is rated as Low in that this writer assesses that death is an unlikely result for Mr._____ in the immediate future. That being said, given his established history of engaging in said behavior strategically, there is high risk that Mr. _____ will engage in self-harm (or report self-harm) behavior which could result in minor-moderate injury (emphasize differing risk between injury vs. death). That is to say Mr. _____ will likely engage in some type of behavior with the intent to obtain a desired outcome or avoid an undesirable outcome (in this case it is likely Mr. ____ wants to avoid discharging) …. Mr.

_____ was recently assigned to this writer's caseload.  Per all reports Mr. _____ was on a trajectory to discharge in the near future and that will remain the plan baring any significant issues in the interim.

Despite the patient's placement on Suicide Watch from August 20 through at least August 29, the social worker's plan was to see the patient on a weekly basis.  No SPI was completed because the clinician determined that "Low Acute Risk/Not Clinically Indicated."

In addition, both psychiatric and nursing progress notes utilized to document the clinical decision to discharge a patient from suicide observation status contained the term "contracting for safety" in several cases, a practice that had been strongly condemned in previous CDCR suicide prevention training curricula.  For example, the psychiatric progress note in one case (SVSP-PIP 13) contained the following rationale for release from Suicide Watch on May 22, 2021: "1:1 suicide watch will be discontinued because patient is contracting the safety, forward thinking, and open to discussing his treatment options."  Several days later on May 29, the patient was observed with a piece of glass in his hands and informed a nurse that "I just don't feel well tonight and may cut myself."  He was placed on Suicide Watch; the required SRASHE was not completed as required.  The patient remained on Suicide Watch and there was no documentation that he was seen by either psychiatry and/or psychology/social work staff on May 30.  The following day (May 31), the patient was discharged from Suicide Watch with the following nursing note: "I/P stated he is not suicidal anymore and wants all his properties back.  Verbalized coping skills and contracted for safety.  MHMD notified.  Ordered d/c 1:1.  Full issues."  There was no indication that the provider assessed the patient or documented an assessment.

The reviewer did not have an opportunity to observe any IDTT meetings during the on-site assessment.  However, this reviewer examined the Mental Health NCAT Report forms for documentation of out-of-cell activity for PIP patients on suicide observation status for multiple days during July 2021.  Of the 32 reviewed cases, most of the patients were offered multiple opportunities for showers and at least one telephone call.  In addition, this reviewer observed that TC1 and TC2 each had multiple yards, including "walk-alone yards" for patients on maximum-security status, whereas C-5 and C-6 did not have "walk-alone yards."  However, review of the NCAT Reports indicated that 41 percent (13 of 32) of the patients did not receive dayroom/yard privileges, with the term "cancelled" appearing on patient forms.  The writer was previously informed that "cancelled" appeared on a patient's NCAT form when custody personnel opened, but did not close and/or save the activity within ten days.  As such, it was unclear from these NCAT forms whether yard/dayroom were offered, completed, refused, or simply canceled in these cases.  However, such an explanation did not explain why the term "cancelled" was limited to yard/day room and did not appear for any showers and telephone calls in the 32 reviewed cases.  This reviewer was also informed that the SVSP-PIP policy on "out-of-cell activity" for patients on suicide observation status had not been finalized to date.

Further, Adaptive Support Forms (CDCR 128 C-2), which summarized provider orders for level of observation, patient issue, and privileges, and were routinely placed outside suicidal patients' doors in other PIP facilities, were not found on any of the doors of the four patients on Suicide Watch during the on-site assessment.

Finally, pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), a SRASHE was required to be completed within 72 hours of admission, as well as completed upon discharge from the PIP. This reviewer examined the medical charts of 27 patients admitted to, and discharged from, the SVSP-PIP to a lower level of care from January through August 2021. The review found that only 67 percent (18 of 27) of admission SRASHEs were completed in a timely manner, and 96 percent (26 of 27) of discharge SRASHEs cases were completed. In addition, 19 percent (six of 27) of the cases not contain the required safety plans either because the discharge SRASHEs were not completed (in one case) or the assessments incorrectly stated that a safety plan was not required due to "low acute risk/not clinically indicated" (in five cases). SVSP-PIP supervisors freely admitted to this reviewer that the required supervisory review of safety plans contained in discharging SRASHEs was not being completed.

**Intervention**: PIP housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit located in nursing stations.

**SPRFIT Meetings**: A review of seven months (January 2021 through July 2021) of SPRFIT meeting minutes found that quorums were achieved in all but two (February and March) of the meetings. Other than discussion of monthly staff training and patient self-harm data, as well as some discussion on numerous QIPs arising out of the two patient suicides during in December 2020 and January 2021, meeting minutes were very brief and unremarkable. More importantly, most of the deficiencies found in this assessment had not been previously addressed in SPRFIT meeting minutes.

**Training**: According to training records, 100 percent of custody and 99 percent of nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 99 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during the previous 12 months. Finally, as of August 2021, only approximately 89 percent of mental health clinicians had completed the SRE mentoring program, only 57 percent (and no psychiatry) had received the seven-hour SRE training, and 96 percent had completed safety plan training.

**Recent Suicides**: SVSP-PIP experienced two patient suicides in December 2020 (SVSP-PIP 2) and January 2021 (SVSP-PIP 14). These deaths resulted in 50 QIPs distributed amongst multiple facilities, with 26 QIPs specific to the SVSP-PIP. These deficiencies included treatment, least restrictive housing, and RVR decisions; untimely clinical contacts; inadequate IDTT meetings, including decisions regarding transfer to lower levels of care; failure to complete required SRASHEs; deficiencies in observation and clothing issues; and emergency medical response.

**Audit Summary**: Apart from the fact that staff at SVSP-PIP had high compliance rates for annual suicide prevention training and CPR certification, as well as two housing units having multiple yards (including "walk-alone yards" for patients on maximum-security status), the facility had profound problems in its suicide prevention program. None of the cells utilized to house suicidal patients at SVSP-PIP were suicide-resistant. Dangerous cells were first identified following the patient suicide in December 2020, and a work plan detailing the renovation of cells and timeline for completion was not available.

Suicide Watch was utilized as the preferred observation level for suicidal patients at SVSP-PIP, either because providers were be reluctant to place suicidal patients in non-suicide resistant cells without constant observation and/or providers relied on nursing personnel to conduct regular rounds at 15-minute intervals (meant for non-suicidal patients) rather than order Suicide Precaution status which required continued daily assessment. When utilized, patients on Suicide Precaution status were as always adequately observed at 15-minute intervals.

SRASHEs were not always completed for patients expressing SI and/or engaging in self-injurious behavior, and were inconsistently completed for newly admitted patients. SRASHEs were completed by psychology and social work staff, but not psychiatry. Psychiatrists were primarily responsible for the daily management of patients on suicide observation, with psychology and social work staff rarely, if ever, providing daily assessments of patients. Patients on suicide observation status were not always assessed daily and orders for discharge from Suicide Watch and Suicide Precaution were sometimes received without documentation that the patient was assessed by the provider. "Contracting for safety" was found in several psychiatric and nursing progress notes. The data regarding patients on suicide observation status receiving dayroom/yard privileges was unreliable, and the required policy for out-of-cell activities had not been finalized. Safety plans were not consistently developed for patients discharged from the SVSP-PIP, and supervisory review of discharging SRASHEs and safety plans was not occurring as required.


## California Institution for Women (CIW) - PIP

**Inspection**: September 13-14, 2021. The facility had a bed capacity for 45 patients; 20 beds were filled during the on-site assessment.

**Screening/Assessment**: A new patient admission (CIW-PIP 1) was observed on September 13. Pursuant to stated practice, nursing assessments, utilizing an Acute/ICF Nursing Assessment Form, were completed in the nurse's office. The form did not include any suicide risk inquiry. However, the nurse was observed to also be utilizing the Initial Health Screening form normally completed in non-PIP facilities. The observed screening process was very problematic. The door to the nurse's office remained open, and two correctional officers remained inside the office in close proximity to the patient. One of the officer's radios remained on and was a distraction during the process. The patient was sitting on a medical gurney facing the door and with her back to the nurse who was positioned in front of a desktop computer against the opposite wall. It remained unclear why the patient was not re-positioned on the gurney to face the nurse. As such, the nurse either asked questions facing the patient's back or periodically walked toward the patient to solicit questions. At one point, a sergeant disrupted the process by walking into the room and asking one of the officers how much longer the screening process would take. The sergeant subsequently replaced one of the officers in the room.

Most importantly, the nurse did not ask all of the 15 mental health/suicide risk questions on the Initial Health Screening form, including whether the patient was currently suicidal. In addition, although the patient answered "no" to receiving any bad news, the nurse neglected to ask the

patient the second required "bad news" question of whether or not the patient had recently received "any bad and/or unexpected news during a recent court hearing."  In fact, this patient was returning to the PIP from a county jail where she had recently attended a court hearing and, in fact, had received bad news.  She appeared very upset when subsequently being assessed by the psychiatrist.  The nurse took more time (approximately ten minutes) reciting the PIP rules and regulations to the patient then conducting the mental health/suicide risk inquiry.

A subsequent review of medical charts for patients admitted into the CIW-PIP from March through August 2021 found that nursing staff completed Initial Health Screening forms in only four of 14 (29 percent) of cases.

Finally, this reviewer observed one of the PIP psychiatrists attend and observe the above nursing screening process, and then subsequently completing the "MHMD Initial Assessment" with the patient in the nurse's office.  Despite the fact that the door to the office remained open and the officers remained in close proximity to the patient, the practice by this psychiatrist to observe the nursing screening, attempt to avoid repetitive questions during the psychiatric assessment, and conduct a suicide risk inquiry, was excellent.  It was unclear if all CIW-PIP psychiatrists completing the "MHMD Initial Assessment" followed this same protocol.

**Housing**: The CIW-PIP had four housing wings (A thru D).  Pursuant to practice, almost all patients on suicide observation status remained housed in their assigned cells.  Each wing also had seclusion and observation rooms (which had capabilities for restraint).  All cells utilized for suicidal patients were suicide-resistant.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were utilized in the CIW-PIP. In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff with documentation of such checks entered into the EHRS.  In addition, the facility had two other observation levels: "Enhanced Observation" at 60-minute intervals and "Behavioral" Suicide Watch.  Although an LOP stated that "Enhanced Observation" should not be utilized for suicidal patients, it was unclear why a 60-minute level of observation was necessary when non-suicidal patients were required to be observed during regular nursing rounds at 15-minute intervals.  CIW-PIP did not have an LOP regarding "Behavioral" Suicide Watch and such a level of observation was not authorized in the "Psychiatric In-Patient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy (No. 12.11.2104.P1), effective on December 31, 2020.  CIW-PIP leadership informed this reviewer that "Behavioral" Suicide Watch required one-on-one continuous observation and allowed providers to authorize possessions and privileges while on suicide observation status.  Such a level of observation was unnecessary because the current PIP suicide prevention policy already allowed providers to provide possessions and privileges based upon documented clinical judgment, for example:

> The ordering provider shall…Ensure the issuance of property is individualized based upon the patient's clinical needs.  Providers need not default to providing minimal issues… The psychiatrist or licensed psychologist may authorize additional items if clinically indicated.  Additional items must be supported by a thorough chart review and documented clinical rationale…. Clearly state on the

order which items the patient may have or which specific items the patient may
not have. (at page 6)

In fact, several PIP clinicians appeared to be confused and/or misinformed by the PIP suicide
prevention policy related to possessions and privileges afforded to patients on suicide
observation status.  For example, in one case (CIW-PIP 2), the clinician was providing a daily
assessment of the patient on Suicide Watch status on July 2, 2021 and:

> reminded IP that if she does well over the weekend and can remain free of self-
> harm thoughts or bxs then tx team will plan to see her for a special IDTT on
> Tuesday to discuss and assess being able to step her down to SP and then she can
> work towards being off any type of watch or precaution so she can start
> programming and going to groups and yard, etc. IP asked about having a book or
> coloring marks and paper and was educated that when she is off SW the team can
> talk about approving possibly a book or some pieces of paper and once she was
> off SW/SP then she could request her additional property.  IP demonstrating her
> understanding of this through repeating back what was told to her.  IP educated to
> let staff know if any additional needs arise to the tx team can be notified as
> needed.

In yet another example, this reviewer attended an IDTT meeting on September 14, 2021 in which
the treatment team decided to retain the patient (CIW-PIP 3) on Suicide Watch "to learn coping
skills."  The patient was also allowed out-of-cell activities such as groups and yard, but was
prohibited from having a book and other reading materials in her cell.  When the patient asked
how she could learn better coping skills without reading materials and mentioned access to a
specific workbook, a team member suggested that the staff providing 1:1 observation could hold
up the workbook pages from outside the cell door for the patient to read through the window.
Such a solution seemed unhelpful for several reasons including the fact the patient did not have a
history of misusing and/or self-harming with reading materials.

As noted above, the PIP suicide prevention policy allows patients on suicide observation status
to participate in programming and have other out-of-cell activities such as group and
yard/dayroom.  Patients on suicide observation status can also be provided with a book and other
paper materials based upon the provider's clinical judgment that is appropriately documented in
EHRS.

In addition, the chart review indicated that, despite assurances from CIW-PIP leadership that all
patients discharged from Suicide Watch were initially downgraded to Suicide Precaution status,
several patients were discharged from Suicide Watch directly to non-suicide observation status.
This reviewer also found a few cases in which providers placed patients on Suicide Watch,
ordered the removal of all clothing and possessions, yet correctional staff were reluctant to enter
the cell when the patient refused to change into a safety smock and/or turnover their possessions
(see, for example, CIW-PIP 4).

Finally, this reviewer subsequently verified the accuracy of observation rounds by reviewing the
EHRS charts of four patients required to be observed on Suicide Precaution status at 15-minute

intervals in the PIP during the nine-hour period from 12:00 a.m. through 8:59 p.m. on May 5, 2021 (for <u>CIW-PIP 5</u>), July 7, 2021 (for <u>CIW-PIP 2</u>), August 15, 2021 (for <u>CIW-PIP 6</u>), and August 20, 2021 (for <u>CIW-PIP 4</u>).  The chart review found that there were no violations in any of the four cases.

**Management/Treatment Planning**: The "Psychiatric In-Patient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy (No. 12.11.2104.P1), effective on December 31, 2020, required that a SRASHE must be completed for "a patient making statements about suicidal intent or ideation, or the patient is engaging in behaviors that may elevate the risk of suicide."  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of March through August 2021. The list totaled only 21 referrals (19 emergent and two urgent).  These 21 referrals involved four patients.  Given that this reviewer also examined SPRFIT meeting minutes indicating that approximately 48 incidents of self-injurious behavior occurred between March and August 2021, as well as data indicating that at least five patients engaged in serious suicide attempts requiring outside medical treatment and did not result in emergent mental health referrals, it would appear that emergent/urgent mental health referrals for suicidal behavior were significantly under-reported.  In fact, during the June 2021 SPRFIT meeting, it was reported that required SRASHEs for incidents of SI and SIB were not being completed on weekends due to lack of staffing.  As such, due to numerous incidents of SI, SIB, and serious suicide attempts not resulting in emergent referrals, as well as SRASHEs not completed on the weekends, the compliance rate for completed SRASHEs could not be calculated.

Three IDTT meetings were observed on September 14, 2021.  Overall, although there was good treatment team representation, with one "special" IDTT meeting not requiring CC I representation, the meetings (involving varying clinical staff) were inconsistent.  There were uneven case presentations, suicide risk histories, or even identification as to whether patients were at the acute or intermediate LOC.  As noted above, in at least one case (<u>CIW-PIP 3</u>), IDTT members appeared confused and/or misinformed by the PIP suicide prevention policy related to possessions and privileges afforded to patients on suicide observation status.

Further, the chart review indicated that patients on suicide observation status were consistently not seen by a provider on weekends and, in several cases, not seen on Fridays.  According to CIW-PIP leadership, this problem was first identified following a patient suicide (<u>CIW-PIP 7</u>) in April 2021.  This reviewer was informed that the problem was seemingly corrected when weekend MHCB providers were instructed to also conduct daily assessments of PIP patients on suicide observation status.  However, medical chart review of PIP patients on suicide observation status in August 2021 found that they were still not being consistently assessed on the weekend.

In addition, this reviewer continued to review cases in which nursing staff referred to "contracting for safety" in progress notes, a practice that had been strongly condemned in previous CDCR suicide prevention training curricula.  There were also reviewed cases in which there was no documentation that providers assessed a patient prior to discharging them from Suicide Watch, and cases in which SRASHEs were unnecessarily completed on patients currently on suicide observation status (despite the fact there was no such requirement in the PIP suicide prevention policy).

One case symbolized the problematic management of suicidal patients in the CIW-PIP. In that case (CIW-PIP 5), the patient was admitted to the APP on April 27, 2021 for SI and SIB. She was immediately put on Suicide Watch and temporarily placed in seclusion the following day (April 28), for SIB. The patient was then sent out to the hospital for medical treatment, returning the same day. A SRASHE was completed without her participation and she remained on Suicide Watch. Although seen by mental health clinicians on April 30, the patient was not seen as required on either May 1 or May 2 (Saturday and Sunday). She was seen again on May 3 and at an IDTT meeting on May 4. Although documentation regarding the IDTT meeting did not include any information regarding observation status, nursing logs indicated that the patient was downgraded to Suicide Precaution status at 1:00 p.m. on May 4. The following day (May 5), the patient engaged in head-banging, was temporarily placed in seclusion, and upgraded to Suicide Watch. Another SRASHE was completed following the patient's return from the hospital on May 6 following ingestion of a paperclip. Although seen by mental health clinicians on May 7, the patient was not seen as required on either May 8 or May 9. She continued to be seen on a daily basis by clinicians during the week of May 10, and was again temporarily placed in seclusion, as well as four-point restraints, for SIB. On May 14, another SRASHE was completed. The patient was not seen as required by a clinician on either May 15 or May 16. She remained on Suicide Watch and continued to be seen by clinicians daily during the week of May 17. On Saturday, May 22, a provider assessed the patient in restraints after she engaged in SIB. She was not seen by a clinician the following day (May 23).

On May 24, another SRASHE was completed after the patient engaged in head-banging and needed to be restrained. She remained on Suicide Watch and was seen daily by mental health clinicians during the week. From May 29 through May 31, the patient was not seen as required by any mental health clinicians. On June 1, the patient's observation status was downgraded to Suicide Precaution and remained at this level until her next IDTT meeting on June 3, when suicide observation status was discontinued. She was then placed on 60-minute "Enhanced Observation" even though nurses conducted regular checks at 15-minute intervals. A Positive Behavior Support Plan (PBSP) was initiated, and she was subsequently seen by clinicians several times during the next few weeks.

During the early evening of June 22, an RN note indicated that the patient "was hearing voices and they were getting intense. IP already has a bump on the middle of the forehead." She was given medication, provided the helmet, and "able to contract for safety." The patient was continued on 60-minute checks and there was no documentation that she was either seen by, or referred to, a provider. The following day (June 23), she was observed to be "tapping her head" on the wall and responded to staff by stating "I need to bang my head." The patient refused to put on her helmet, and 60-minute checks continued. During the morning of June 24, a special IDTT meeting was held as a result of the patient's head-banging. The team decided to maintain her on "Enhanced Observation" at 60-minute intervals. However, several hours later, the patient was observed to be engaging in severe head-banging necessitating transfer to an outside hospital. Upon return, she was placed on "Behavioral Suicide Watch." Another SRASHE was completed, but without her participation.

From June 24 through July 8, the patient was seen by clinicians daily (except for June 26, June 27, July 3, July 4, and July 5), and maintained on either Suicide Watch or "Behavioral" Suicide Watch (with certain possessions). During an IDTT meeting on July 8, the patient's "Behavioral" Suicide Watch was discontinued and she continued to be seen on at least a weekly basis by clinicians. On July 29, the patient was placed back on "Behavioral" Suicide Watch. Although seen by a clinician on July 30, she was not seen as required by mental health clinicians on either July 31 or August 1. "Behavioral" Suicide Watch was discontinued on August 2, but reinstated on August 5 following a special IDTT team meeting in which she expressed thoughts of suicide and SIB. The patient was not seen as required by a clinician for the next three days (August 6, August 7, and August 8). She remained on "Behavioral" Suicide Watch and seen on a daily basis by clinicians from August 9 through August 12. The patient was again not seen as required by a clinician for the next three days (August 13, August 14, and August 15).

On August 16, a special IDTT meeting was held and the patient was discharged from "Behavioral" Suicide Watch. However, the following day (August 17), the patient reported to staff that she had swallowed a paperclip four days earlier. She was initially placed on Suicide Precaution, but the order was upgraded to Suicide Watch after she began threatening SIB (head-banging). On August 18, the patient attended a special IDTT meeting in the morning but was subsequently sent out to the emergency room after an x-ray confirmed ingestion of the paperclip. The patient returned to the PIP two days later during the late evening of August 20 and remained on Suicide Watch. She was seen by a provider on August 21 and, although subsequent daily psychiatric progress notes (and another SRASHE) did not address the observation level, the patient orders indicated that she was downgraded to Suicide Precaution on August 23, and to "enhanced observation" at 60-minute intervals on August 24. Enhanced observation was discontinued on August 26.

In addition, this reviewer examined the Mental Health NCAT (Non-Clinical Activity Tracking) Report forms for documentation of out-of-cell activity for PIP patients on suicide observation status from May through August 2021. During this period, 31 NCATs were initially reviewed. Three cases did not have enough data to evaluate whether out-of-cell time was sufficient, leaving 28 cases to review. Of those, yard was regularly offered to 24 of 28 (86 percent) patients, with dayroom offered to 22 of 28 (79 percent) patients. Showers were offered regularly to 27 of 28 (96 percent) patients, with telephone calls offered to 19 of 28 (68 percent) patients. Of note, this reviewer's on-site assessment found there were multiple yard areas and "walk-alone" cages in the housing units.

Finally, pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), a SRASHE was required to be completed within 72 hours of admission, as well as completed upon discharge from the PIP. This reviewer examined the medical charts of 14 patients admitted to the CIW-PIP from March through August 2021. The review found that 86 percent (12 of 14) of admission SRASHEs were completed in a timely manner. In addition, the medical charts of 19 patients discharged from the CIW-PIP to a lower level of care (or paroled) from February through August 2021 were reviewed. The review found that 89 percent (17 of 19) of discharge SRASHEs were completed. In addition, three of 19 discharge SRASHEs did not require safety plans because the patients were not admitted into the PIP for DTS and did not express any SI or engage in SIB during their placement. Of the remaining 16 cases, only 63 percent (ten of 16) contained the

required safety plans, either because the discharge SRASHEs were not completed (in two cases) or the assessments incorrectly stated that a safety plan was not required due to "low acute risk/not clinically indicated" (in four cases). This reviewer was also informed that CIW-PIP supervisors did not begin the required supervisory review of safety plans contained in discharging SRASHEs until August 2021.

**Intervention**: PIP housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit located in nursing stations.

**SPRFIT Meetings**: A review of six months (March 2021 through July 2021) of SPRFIT meeting minutes found that quorums were only reached in the March, May, and August meetings. The March 2021 SPRFIT meeting encompassed both the CIW-PIP and CIW programs. A separate SPRFIT meeting for the PIP was initiated in April 2021. The SPRFIT coordinator remained the chairperson for both programs. The meeting minutes were very brief, encompassing only two pages. Agenda topics were limited to the announcements, timely SRASHE review, SIB trend reports, and a patient suicide (CIW-PIP 7) in April 2021. Although there was narrative suggesting that incidents of SIB were discussed, there was no documentation verifying such discussion. Meetings were typically between only 30 and 45 minutes in length. Most importantly, meeting minutes did not previously identify nor address any of the deficiencies in PIP suicide prevention practices as found above in this reviewer's assessment.

**Training**: Due to the small size of the CIW-PIP, this reviewer was presented with training records that combined data from both the CIW-PIP and CIW prison. According to training records, 100 percent of both custody and medical staff were currently certified in CPR. In addition, only 88 percent of custody staff, only 85 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2020. Finally, as of August 2021, approximately 91 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**: The CIW-PIP experienced one suicide (CIW-PIP 7) on April 8, 2021, resulting in 15 QIPs distributed amongst multiple facilities, with seven (7) QIPs specific to the CIW-PIP. These deficiencies included the patient not being seen on a daily basis (including weekends) by providers while on suicide observation status; placement on "enhanced observation" status at 60-minute intervals with limited clothing items; multiple incidents of self-harm that were not adequately documented; violation of the DDP requirement for reporting victimization; multiple violations of 15-minute regular nursing rounds; and failure to place the patient on Suicide Watch following an incident of self-injurious behavior.

**Audit Summary**: Patients on suicide observation status were adequately observed at 15-minute intervals in all reviewed cases, CPR training compliance rates for both custody and medical staff were 100 percent, and mental health clinicians had high compliance rates for annual suicide prevention training. However, this review found multiple problems in all other areas. The observed intake screening process was very problematic, with the door to the nurse's office remaining open, two correctional officers remaining inside the office in close proximity to the patient, and the nurse not asking all of the 15 required mental health/suicide risk questions on the

form (including if the patient was currently suicidal). Fortunately, this reviewer observed an excellent practice of a PIP psychiatrist observing the nurse's intake screening and completing the initial psychiatric assessment immediately thereafter.

In addition, it was unclear why a 60-minute level of "Enhanced Observation" was necessary when non-suicidal patients were required to be observed during regular nursing rounds at 15-minute intervals, and the practice of utilizing "Behavioral" Suicide Watch was not authorized in the PIP suicide prevention policy. Due to numerous incidents of SI, SIB, and serious suicide attempts not resulting in emergent referrals, and required SRASHEs not being completed on weekends, the compliance rate for completed SRASHEs could not be calculated. The observed IDTT meetings were inconsistent, with uneven case presentations, suicide risk histories, or even identification as to whether patients were at the acute or intermediate LOC. Although patients on suicide observation status were provided regular opportunities for yard/dayroom, telephone calls, and showers, some clinicians struggled with providing these patients with basic amenities such as books and other reading material. Completion rates for both admission and discharge SRASHEs were below 90 percent, and safety plans were not always completed for patients discharged from the PIP with histories of suicidal behavior. Supervisory review of safety plans contained in discharging SRASHEs did not begin until August 2021. As noted above, these deficiencies were neither identified nor addressed by the SPRFIT.

## San Quentin State Prison (SQ) - PIP

**Inspection**: October 25-26, 2021. The facility had a bed capacity for 40 patients, and approximately 33 beds were filled during the on-site assessment. Although initially opened to serve the psychiatric needs of condemned patients at the acute and intermediate levels of care, the program was recently expanded to treat up to 16 non-condemned patients from other CDCR facilities who required acute care. Finally, the facility could accommodate a small number of condemned patients who required a MHCB LOC.

**Screening/Assessment**: Due to a scheduling conflict, this reviewer was not able to observe any new admissions during the on-site assessment. Pursuant to stated practice, nursing assessments, utilizing an Acute/ICF Nursing Assessment Form, were completed in the nurse's office for all internal transfers of condemned patients. The form did not include any suicide risk inquiry. For external transfers of non-condemned patients from other CDCR facilities who require an acute level of care, nursing staff complete both the Acute/ICF Nursing Assessment Form and the Initial Health Screening form. The Initial Health Screening does contain appropriate mental health and suicide risk questions. Finally, a subsequent review of ten medical charts for patients currently in the PIP during the onsite assessment found that that a psychiatrist assessed each patient on the day of arrival and completed the "MHMD Initial Assessment."

**Housing**: The SQ-PIP had 40 beds. All rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were utilized in the SQ-PIP. In addition, patients not on suicide observation status were observed on either "behavioral

observation" at 30-minute intervals or regular nursing rounds at 60-minute intervals. According to both nursing staff and providers interviewed by this reviewer, "behavioral observation" at 30-minute intervals was most often utilized for patients who were no longer currently suicidal, but were being downgraded from either Suicide Watch or Suicide Precaution statuses.

This reviewer examined the medical charts of 29 patients admitted and discharged from the SQ-PIP during April through September 2021. All of these patients were placed on "behavioral observation" at 30-minute intervals at some point during their PIP stay, including during the MHCB portion of the placement. The review found that two of the 29 patients (seven percent) were placed on "behavioral observation" with only "partial issue" clothing, with no "documented clinical rationale" for withholding full issue from a non-suicidal patient, a violation of the "Psychiatric In-Patient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy (No. 12.11.2104.P1), effective on December 31, 2020. In fact, in one of the cases (SQ-PIP 1), the patient informed the provider on April 18, 2021 that "I am still depressed and a little bit suicidal," but remained on "behavioral observation" status at 30-minute intervals.

Finally, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients required to be observed on Suicide Precaution status at 15-minute intervals in the PIP during the nine-hour period from 12:00 a.m. through 8:59 p.m. on February 15, 2021 (for SQ-PIP 2), April 18, 2021 (for SQ-PIP 3), September 6, 2021 (for SQ-PIP 4), and October 3, 2021 (for SQ-PIP 5). The chart review found multiple observation checks exceeding 15-minute intervals (i.e., four to seven per patient) in all cases with SQ-PIP 2 and SQ-PIP 5 each having four violations, whereas SQ-PIP 4 had five violations and SQ-PIP 5 had seven violations. The longest time between required 15-minute checks was 43 minutes in SQ-PIP 2. The violations in these four cases were by multiple nursing staff.

**Management/Treatment Planning**: The "Psychiatric In-Patient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy (No. 12.11.2104.P1), effective on December 31, 2020, required that a SRASHE must be completed for "a patient making statements about suicidal intent or ideation, or the patient is engaging in behaviors that may elevate the risk of suicide." This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the six-month period of April through September 2021. The list subsequently received totaled only three (3) referrals (two emergent and one urgent). Two of these referrals involved patients that were already on suicide observation status. Upon further review and discussion with PIP leadership, the low number of documented emergent/urgent mental health referrals could best be explained by the program's low census, lack of serious suicide attempts/self-injurious behavior incidents during the reporting period, and a practice of clinicians regularly completing SRASHEs regardless of whether or not emergent/urgent mental health referrals were initiated.

In fact, this reviewer found that there was not a paucity of SRASHEs completed at SQ-PIP, rather PIP leadership instructed clinicians to generate SRASHEs for patients with histories of suicidal behavior on a weekly and/or monthly basis prior to their IDTT meetings. The chart review seemed to indicate that conversion to monthly SRASHEs occurred sometime after April 2021. Such a practice is arguably excessive and far exceeds the requirements of the "Psychiatric

In-Patient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy.

With that said, this reviewer did examine one case (SQ-PIP 2) that was concerning. The patient was admitted into the PIP on 2021 at the acute level of care, transferred to ICF on April 21, and discharged from the PIP on September 1, 2021. He had an extensive history of suicidal behavior and had consistently been assessed as a "high" chronic risk and "moderate" acute risk for suicide on regular SRASHEs. On May 18, the patient was seen by his PC and the resulting progress note quoted the patient as stating "It was a rough weekend…Saturday was really bad…I had my shoelaces ready and even wrote a note…It was still…I'll throw away the note…I'm doing better now." The PC did not complete a SRASHE or change his 60-minute observation level. The patient was seen again by the PC two days later on May 20, and "appeared more goal-directed and was smiling toward the end of the session," but again was admitted to SI the previous evening. A SRASHE was not completed.

The patient's PC continued to complete SRASHEs on a scheduled monthly basis prior to IDTT meetings. The patient continued to periodically express SI at varying levels of intensity, but not necessarily in close proximity to IDTT meetings. For example, during a session on August 3, the patient told his PC that "Yard was rough... I'm stressed... I've had a lot of suicidal ideation... I thought about how I could do it... jamming my door so no one could come in... I was going to write some letters to send to my family and attorneys... I decided against all that... I'm going to keep doing what works... stay in the moment and using my tools." A SRASHE was not completed.

This case (SQ-PIP 2) exemplifies the concern that, rather than completing a SRASHE on a regularly scheduled basis, the assessment should be completed when the patient presents as a current risk for suicide.

Five IDTT meetings were observed during the on-site assessment. Overall, there was very good treatment team representation, each team member was familiar with the patients, with each providing individual insight into the patients. In addition, there were consistent case presentations, review of suicide risk histories (where appropriate), and discussion of both treatment and safety planning (for suicidal patients). Although three patients refused to attend their IDTTs, the remaining two patients were dressed consistent with their level of observation.

Further, the chart review indicated that patients on suicide observation status were consistently seen by a provider on a daily basis.

In addition, this reviewer examined the Mental Health NCAT (Non-Clinical Activity Tracking) Report forms for documentation of out-of-cell activity for 11 PIP/MHCB patients on suicide observation status during August and September 2021. The review found that yard, telephone calls, and showers were regularly offered to eight of the 11 patients or 73 percent.

Finally, pursuant to the PIP suicide prevention policy (No. 12.11.2104.P1), a SRASHE was required to be completed within 72 hours of admission and upon discharge from the PIP. This reviewer examined a sample of 16 medical charts for patients admitted to, and discharged from,

the SQ-PIP from January through September 2021. The review found that all admission and discharge SRASHEs were completed in a timely manner. In addition, all 16 reviewed cases required a safety plan at discharge and the review found that safety plans were developed in 15 of 16 cases. In the only case (SQ-PIP 6) in which a required safety plan was not completed, the clinician inappropriately stated in the SRASHE dated April 1, 2021 that "Pt. denied a need to complete safety planning intervention at discharge."

Consistent with the "Psychiatric In-Patient Program Treatment Planning and Procedures: Suicide Prevention and Response" policy, this reviewer also verified that PIP supervisors were currently reviewing the safety plans contained in the SRASHEs of all patients discharging from the program who presented with SI/SIB. However, contrary to the policy, the supervisory reviews were not timely. For example, this reviewer was provided with a list of approximately 41 patients discharged from either acute care or intermediate care from late January 2021 through August 2021 in which supervisory reviews of discharging SRASHEs were completed. Although the policy required that the supervisory review "be completed prior to, or during the Interdisciplinary Treatment Team in which the discharging SRASHE is completed," the review found that almost all reviews occurred on either July 28 or July 30, 2021. In addition, the supervisory reviewer incorrectly concluded in a few cases (including SQ-PIP 6) that a safety plan was not required.

**Intervention**: The PIP unit contained an Ambu bag and cut-down tool in the same emergency response kit located in nursing stations.

**SPRFIT Meetings**: Both the SQ-PIP and SQ prison had an integrated SPRFIT, with one coordinator chairing the committee. A review of six months (May 2021 through October 2021) of SPRFIT meeting minutes found that quorums were not reached in the May and June 2021 meetings. Overall, the meeting minutes were robust and included summaries of active CAPs, some of which related to deficiencies previously identified by this reviewer.

**Training**: Due to the small size of the SQ-PIP, this reviewer was presented with training records that combined data from both the SQ-PIP and SQ prison. According to training records, 97 percent of custody and 100 percent of nursing staff were currently certified in CPR. In addition, 95 percent of custody staff, 95 percent of medical staff, and 97 percent of mental health staff received annual suicide prevention block training during the previous 12 months. Finally, as of October 2021, approximately 98 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**: The SQ-PIP did not experience any patient suicides during the review period.

**Audit Summary**: The SQ-PIP had a local practice of completing SRASHEs on all patients on a regular monthly basis regardless of whether they presented with SI and/or SIB. With three exceptions, all suicide prevention practices were in compliance with policy. The exceptions were that a few patients assessed as not requiring suicide observation were placed on "behavior observation" status with only "partial issue" and not "full issue;" patients on Suicide Precaution

status were not always adequately observed at 15-minute intervals; and supervisory review of discharging SRASHEs and safety plans were untimely and occasionally incorrect.

## ACRONYMS and ABBREVIATIONS

3CMS:            Correctional Clinical Case Management System

ADA:             Americans with Disabilities Act

ADHD:            Attention Deficit Hyperactivity Disorder

AED:             Automated External Defibrillator

AH:              Auditory Hallucinations

AHA:             Alternative Housing Area

Ambu bag:        Ambulatory Bag Used for CPR

APP:             Acute Psychiatric Program

ASU:             Administrative Segregation Unit

BCOA:            Basic Correctional Officers Academy

BPH:             Board of Parole Hearings

CAP:             Corrective Action Plan

CAT:             Chart Audit Tool

CBT:             Cognitive Behavioral Therapy

CCCMS:           Correctional Clinical Case Management System

CCHCS:           California Correctional Health Care Services

CC I:            Correctional Counselor I

CCI:             California Correctional Institution

CCWF:            Central California Women's Facility

CDCR:            California Department of Corrections and Rehabilitation

CHCF:            California Health Care Facility

CIM:             California Institution for Men

CIT:                    Crisis Intervention Team

CIW:                    California Institution for Women

CMC:                    California Men's Colony

CMF:                    California Medical Facility

CNE:                    Chief Nurse Executive

CPR:                    Cardiopulmonary Resuscitation

CQI:                    Continuous Quality Improvement

CQIT:                   Continuous Quality Improvement Tool

CSATF:                  California Substance Abuse Treatment Facility

CSP/Corcoran:           California State Prison/Corcoran

CSP/LAC:                California State Prison/Los Angeles County

CSP/Sac:                California State Prison/Sacramento

CSP/Solano:             California State Prison/Solano

CTC:                    Correctional Treatment Center

DAI:                    Division of Adult Institutions

D/C:                    Discharge

DCHCS:                  Division of Correctional Health Care Services

DDP:                    Developmental Disability Program

DSH:                    Department of State Hospitals

DTS:                    Danger to Self

EHRS:                   Electronic Health Record System

EOP:                    Enhanced Outpatient Program

GP:                     General Population

HCFIP:              Health Care Facility Improvement Program

HCITC:              High Custody Intermediate Treatment Center

ICF:                Intermediate Care Facility

IDTT:               Interdisciplinary Treatment Team

IP or I/P:          Inmate Patient or Inmate/Patient

IPOC:               Individual Plan of Care

IRU:                Inpatient Referral Unit

IST:                In-Service Training

KVSP:               Kern Valley State Prison

LOC:                Level of Care

LOP:                Local Operating Procedure

MCSP:               Mule Creek State Prison

MD:                 Medical Doctor

MH:                 Mental Health

MHA:                Mental Health Assessment

MHCB:               Mental Health Crisis Bed

MHCT:               Mental Health Compliance Team

MHOHU:              Mental Health Outpatient Housing Unit

MHPC:               Mental Health Primary Clinician

MHSDS:              Mental Health Services Delivery System

NKSP:               North Kern State Prison

NOS:                Not Otherwise Specified

NP:                 Nurse Practitioner

OCA:                    Out-of-Cell Activity

OHU:                    Outpatient Housing Unit

PBSP:                   Pelican Bay State Prison

PC:                     Primary Clinician

PIP:                    Psychiatric Inpatient Program

PSR:                    Program Status Report

PSU:                    Psychiatric Services Unit

PT:                     Psychiatric Technician or Psych Tech

PTSD:                   Post-Traumatic Stress Disorder

PVSP:                   Pleasant Valley State Prison

QIP:                    Quality Improvement Plan

R&R:                    Receiving and Release

RC:                     Reception Center

RCA:                    Root Cause Analysis

RJD:                    Richard J. Donovan Correctional Facility

RN:                     Registered Nurse

ROI:                    Release of Information

RT:                     Recreational Therapist

RVR:                    Rules Violation Report

SHU:                    Security Housing Unit

SI:                     Suicidal Ideation

SIB:                    Self-Injurious Behavior

SMHP:                   Statewide Mental Health Program

SNY:                  Sensitive Needs Yard

SOMS:                 Strategic Offender Management System

SPI:                  Safety Planning Intervention

SPMW:                 Suicide Prevention Management Workgroup

SPRFIT:               Suicide Prevention and Response Focused Improvement Team

SPRU:                 Suicide Prevention and Response Unit

SQ:                   San Quentin State Prison

SRASHE:               Suicide Risk Assessment and Self-Harm Evaluation

SRE:                  Suicide Risk Evaluation

SRMP:                 Suicide Risk Management Program

STRH:                 Short-Term Restricted Housing

SVSP:                 Salinas Valley State Prison

TTA:                  Triage and Treatment Area

TTM:                  Therapeutic Treatment Module

Tx:                   Treatment

WSP:                  Wasco State Prison