ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
　455 Golden Gate Avenue, Suite 11000
　San Francisco, CA  94102-7004
　Telephone:  (415) 510-4431
　Fax:  (415) 703-5843
　E-mail:  Namrata.Kotwani@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
　1676 N. CALIFORNIA BLVD., SUITE 620
　WALNUT CREEK, CALIFORNIA 94596
　TELEPHONE: 925-746-8460
　FACSIMILE:  925-746-8490
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>　　　　　　　　　　　　Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' OBJECTIONS TO PART B OF THE SPECIAL MASTER'S TWENTY-NINTH ROUND MONITORING REPORT ON THE INPATIENT MENTAL HEALTH CARE PROGRAMS AT THE CALIFORNIA DEPARTMENT OF STATE HOSPITALS (ECF NO. 7625)**<br><br>Judge: Hon. Kimberly J. Mueller |

1

Defs.' Objections to Part B of Special Master's 29th Round Monitoring Report (2:90-cv-00520 KJM-DB (PC))

I. INTRODUCTION

On October 14, 2022, the Special Master filed his Twenty-Ninth Round Monitoring Report, Part B, on the inpatient mental health care programs at the Department of State Hospitals (DSH) ("Report"). (ECF No. 7625.) The Special Master provided Defendants a draft of the Report on July 28, 2022 ("Draft Report"), and Defendants submitted objections to the Draft Report on August 29, 2022. (See Exhibit B to the Report, ECF No. 7625-1.) Although the Report addresses some of the issues and objections raised in Defendants' August 29 letter, it does not address all of the issues and Defendants now reassert their objections to those remaining issues that were not adequately addressed in the Report.

II. THE REPORT INCLUDES OUTDATED CHARACTERIZATIONS OF ACCESS TO INPATIENT CARE.

At the outset of the Report, the introductory section on "DSH-Related Policy Developments and Milestones," includes a description of past issues with access to inpatient care, citing to old orders and conditions that existed before implementation of several significant remedial actions that resulted in the elimination of the waitlist for access to DSH beds. (*See* Report, at 19-20.)[1] This section ignores the improvements made in the access to inpatient care at DSH over the past five years. Rather than stating that improvements in the past five years have ameliorated long-standing access issues, the Report creates the impression that inadequate access persists to this day. Although the Special Master avers that "the Draft Report appropriately reserved judgment regarding the adequacy of defendants' referral process in light of the ongoing court-ordered unidentified needs assessment," ("UNA"), this sentence suggests that inadequate access to inpatient care is a foregone conclusion. (*See* Report at 15.)

In fact, DSH has admitted almost all referred patients within 30 days since the lift-and-shift in 2017. This success is well-documented in the monthly inpatient reports filed since 2017.[2]

---

[1] All citations to page numbers in the Report correspond to the pagination on the header of ECF No. 7625.

[2] ECF Nos. 5684; 5715; 5731; 5751; 5757; 5789; 5804; 5819; 5827; 5837; 5858; 5882; 5923; 5960; 6004; 6046; 6072; 6090; 6110; 6128; 6152; 6198; 6222; 6245; 6286; 6342; 6394; 6423; ;6446; 6470; 6505; 6611; 6670; 6719; 6762; 6823; 6867; 6912; 6959; 6990; 7028; 7060; 7085; 7123; 7171; 7201; 7234; 7274; 7316; 7349; 7373; 7399; 7422; 7463; 7499; 7529; 7552; 7572; 7590; 7604; 7612; and 7628.

2

Defs.' Objections to Part B of Special Master's 29th Round Monitoring Report (2:90-cv-00520 KJM-DB (PC))

Except for COVID-related delays, DSH has an almost 100% rate of timely transfers to inpatient care for patients accepted for referral. (*Id.*) The Report states that the Special Master has added language to footnote 9 of the Report to "highlight defendants' progress in improving transfer timeline compliance prior to the onset of the COVID-19 pandemic." (Report at 15.) Footnote 9 acknowledges that in 2021, the Special Master commended Defendants for "maintain[ing] their 'substantial strides in timely transferring referred patients to acute and intermediate care'" since 2018. (Report at 22.) Defendants are concerned that the most significant achievements of the past five years are relegated to a footnote in the section of the Report purporting to describe the "Impact of COVID-19 on the Provision of Inpatient Mental Health Care at DSH Hospitals" (Report at 22), while creating the impression that patients have inadequate access to DSH even though the UNA is ongoing and a data-driven conclusion on this matter is not available. In addition to minimizing significant achievements, the treatment the Report gives to this topic fails to credit the good work done by numerous clinicians who have served *Coleman* patients to the best of their abilities in adverse pandemic conditions.

The Report also creates the impression that DSH is in violation of *Coleman* requirements, noting that "the 2016 Inpatient Care Report emphasized that '(t)he *Coleman* court has repeatedly ordered DSH to utilize the intermediate care beds at DSH-Atascadero to treat *Coleman* class members.'" (Report at 32.) This statement is misleading because DSH accepts all appropriate *Coleman* referrals for treatment at its facilities and did so during the monitoring period.

Another issue that was not clarified despite Defendants' request involves findings that were influenced by COVID-19 conditions. The Report states that "[n]ot all DSH referrals to DSH-Atascadero transferred timely" and that 87 percent of patients were timely transferred within 30 days, but left out the undisputed fact that almost all delays in transfers occurred during pandemic surges when patients were quarantined, subject to an agreed-upon exception. (Report at 34; *see also* Report at 23; 65; 87; and 96.) The Report should have been clarified to emphasize that almost all delays in transfers occurred during pandemic surges, as a result of patient quarantines.

///

3

Defs.' Objections to Part B of Special Master's 29th Round Monitoring Report (2:90-cv-00520 KJM-DB (PC))

Defendants request that that the Special Master be instructed to amend the Report to include the finding that DSH accepted all appropriate referrals during the monitoring period and ensured timely transfers.

### III. THE REPORT MISCONSTRUES DSH'S CLINICAL POSITION ON INDIVIDUAL THERAPY.

The Report criticizes DSH for not providing individual treatment on a routine basis: "DSH-Atascadero did not typically provide individual treatment based on an institutional culture that appeared to view individual treatment as not essential to providing adequate care," (Report at 40) and "DSH-Atascadero only regularly provided individual treatment to between five and ten percent of patients, reflecting a hospital culture that did not believe that this treatment was necessary." (Report at 53.) There is no support for these statements or the criticism that DSH's "institutional culture" devalues individual treatment. In addition, the criticism is not consistent with evidence-based psychiatric or psychological treatment standards. DSH practitioners utilize individual treatment when clinically indicated. Patients receive group therapy only when clinicians believe treatment objectives will be met through group therapy. The Report does not provide any psychiatric or scientific support that individual therapy is t the default standard of care. Utilizing group therapy over individual therapy after the application of sound clinical judgment is not a violation of Eighth Amendment or evidence of inadequate care.

Defendants request that that any order adopting the findings set forth in the Report include the fact that there is no recognized standard that requires the use of individual therapy as essential to providing adequate inpatient care in the DSH programs.

### IV. THE REPORT IMPROPERLY CONCLUDES THAT TWO CASE PATIENTS RECEIVED INADEQUATE CARE.

#### A. Patient A (DSH-Coalinga)

Patient A's treatment at DSH-Coalinga was found to be inadequate because a psychologist's initial assessment recommended biweekly individual therapy that was not provided. (Report at 167.) The Report also states that the care provided was inadequate because of the "failure to modify the patient's treatment plan in response to ineffectiveness and the lack of

4

group treatment provided." (Report at 17.) These conclusions are not supported by the medical record. As presented in the objections to the draft report, DSH's records refute this assertion and show that DSH provided more than adequate treatment, including EMDR (Eye Movement Desensitization and Reprocessing) therapy, numerous biweekly individual therapy sessions, group therapy (where the patient demonstrated 100 percent attendance for various treatment groups), and biofeedback therapy. (*See* ECF No. 7625-1, at 12-13.) Accordingly, this finding is not warranted and should be addressed in the Court's final order.

### B.   Patient E (DSH-Patton)

Patient E's treatment at DSH-Patton was found to be inadequate because of "the contradictory information regarding the patient's level of risk for suicide and for self-injurious behavior was of particular concern." (Report at 178.) In addition, the Report states that record demonstrates a lack of "evidence-based interventions such as Dialectical Behavioral Therapy or a behavioral plan to reduce engaging in self-harm and dealing with frequent suicidal ideation." (Report at 18; 178.) The conclusion of inadequate care is not warranted due to the patient's fluctuating suicide risk, nor does the medical record evince a paucity of evidence-based interventions. The fact that the records reflect Patient E's suicide risk fluctuating due to changes in her life circumstances is not an indication of inadequate care or cause for concern, and those assertions should therefore be addressed in the Court's final order. As presented in the objections to the draft report, DSH's records show a number of evidence-based therapeutic interventions including various group therapy programs, increased individual contact, and medication changes to reduce risk of self-harm. *See* ECF No. 7625-1, at 13-14.)

## V.   THE REPORT FAILED TO INCLUDE ALL RELEVANT DATA ON CERTAIN GROUP THERAPY METRICS.

The Report includes the monitor's independent calculation that *Coleman* patients attended a weekly average of 5.38 hours of core groups at DSH-Atascadero. (Report at 16.) Defendants requested the Special Master include the treatment hours offered and scheduled in his Report. As a patient cannot be compelled to attend treatment, consideration of the hours offered and scheduled should be part of the report. The Special Master declined to focus on that metric, even

5

though Defendants pointed out that the average scheduled group treatment hours were 9.28 hours, and the average hours offered were 8.16 hours. The Report should have acknowledged that additional group therapy was offered and in several instances, patients declined to attend groups.

Defendants request that the Court order the Special Master to revise the Report to include the missing data on the scheduled and offered group treatment hours.

## VI.  THE REPORT SHOULD INCLUDE ADDITIONAL INFORMATION ON STAFFING.

The Report states that "DSH-Atascadero's Program V . . . reported functional vacancy rates above ten percent for the four major disciplines of psychiatry, psychology, social work, and rehabilitation therapy, including 22 percent vacancy rates for psychology and rehabilitation therapy." (Report at 31; *see also id.* at 47; 48; 85; 89.) However, the Report should have also reflected that the vacancy rate for psychiatrist positions when including contract psychiatrists was ten percent during the Special Master's tour.

Defendants request that that any order adopting the findings set forth in the Report include and address their position on the vacancy rate for psychiatrists at DSH-Atascadero.

## VII.  CONCLUSION

Defendants acknowledge that the Special Master noted their objections to the Draft Report and corrected several issues Defendants raised in their August 29 objections. However, the final Report fails to address several important objections and, as a result, is not a comprehensive and wholly accurate report of the DSH programs.

Accordingly, Defendants respectfully request that the Court:

1. Instruct the Special Master to amend the Report to include the finding that DSH accepted all appropriate referrals during the monitoring period and ensured timely transfers;

2. Find that no recognized standard categorically requires the use of individual therapy to provide adequate inpatient care in the DSH programs;

3. Instruct the Special Master to either revise or amend the Report in response to DSH clinicians' explanations of the treatment provided to Patient A at DSH-Coalinga and DSH-Patton;

6

Defs.' Objections to Part B of Special Master's 29th Round Monitoring Report (2:90-cv-00520 KJM-DB (PC))

4.  Instruct the Special Master to revise the Report to include the missing data on the scheduled and offered group treatment hours; and

5.  Instruct the Special Master to revise the Report to reflect that DSH-Atascadero's vacancy rate for psychiatrists (when including contract psychiatrists) at DSH-Atascadero was 10 percent during the monitoring tour.

Defendants will diligently work with the Special Master to address the outstanding issues noted herein in the next monitoring round, and request that any order adopting the findings set forth in the final Report include and address Defendants' objections.

## CERTIFICATION

Defendants' counsel certifies that she reviewed the following orders relevant to this filing: ECF Nos. 640; 7108; and 7608.

Dated: October 24, 2022

Respectfully submitted,

ROB BONTA
Attorney General of California
DAMON MCCLAIN
Supervising Deputy Attorney General


/s/ *Namrata Kotwani*
Namrata Kotwani
Deputy Attorney General
*Attorneys for Defendants*

7

Defs.' Objections to Part B of Special Master's 29th Round Monitoring Report (2:90-cv-00520 KJM-DB (PC))