| | |
|---|---|
| ROB BONTA, SBN 202668<br>Attorney General of California<br>MONICA N. ANDERSON, SBN 182970<br>DAMON MCCLAIN, SBN 209508<br>Supervising Deputy Attorney General<br>ELISE OWENS THORN, SBN 145931<br>NAMRATA KOTWANI, SBN 308741<br>Deputy Attorneys General<br>  1300 I Street, Suite 125<br>  P.O. Box 944255<br>  Sacramento, CA 94244-2550<br>  Telephone: (916) 210-7318<br>  Fax: (916) 324-5205<br>  E-mail: Elise.Thorn@doj.ca.gov<br>*Attorneys for Defendants* | HANSON BRIDGETT LLP<br>PAUL B. MELLO, SBN 179755<br>SAMANTHA D. WOLFF, SBN 240280<br>KAYLEN KADOTANI, SBN 294114<br>DAVID C. CASARRUBIAS, SBN 321994<br>CARSON R. NIELLO, SBN 329970<br>  1676 N. CALIFORNIA BLVD., SUITE 620<br>  WALNUT CREEK, CALIFORNIA 94596<br>  TELEPHONE: 925-746-8460<br>  FACSIMILE: 925-746-8490<br>*Attorneys for Defendants* |

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.<br><br>    Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S REPORT ON HIS EXPERT'S FIFTH RE-AUDIT AND UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION AND BASELINE AUDIT OF SUICIDE PREVENTION PRACTICES IN THE PSYCHIATRIC INPATIENT PROGRAMS**<br><br>Judge: Hon. Kimberly J. Mueller |

**INTRODUCTION**

On October 24, 2022, the Special Master submitted "Special Master's Report on his Expert's Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation (CDCR) and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs." (ECF No. 7636 [Fifth Re-Audit].)  In the report, the Special Master found that, following the Fifth Re-Audit, CDCR successfully implemented three of the remaining eighteen recommendations outlined in the Court's December 24, 2020 Order. (*Id*. at 22) (providing that CDCR successfully implemented recommendations 1, 6, and 26.)  The Special Master recommended that the Court order Defendants to complete implementation of the remaining fifteen recommendations—*i.e.*, 3, 7, 8, 9, 10, 12, 13, 17, 18, 20, 21, 28, 29, 31, and the remaining part of 32.  (*Id*.)  The Special Master outlined the recommendations that require further work in the section of his report titled, "Roadmap to Full Implementation of the Remaining Recommendations."  (*Id*.)

Since the Court's December 3, 2020 Order (ECF No. 6973), CDCR has continued to dedicate countless hours and extensive resources, to improving its suicide prevention practices in order to save inmate lives.  (*See* Defendants' June 30, 2022 Updated Activation Schedules for Completion of Court-Ordered Suicide Prevention Recommendations, ECF No. 7578 at 5-14.)  CDCR has completed construction projects, issued memoranda and policy, developed trainings, and hired additional leadership staff to further improve and institutionalize its suicide prevention program.  (Williams Decl. at ¶ 4.)  In addition to those measures, CDCR has developed automated and manual tools that continually self-monitor and immediately alert CDCR to mistakes to facilitate correction when noncompliance occurs.  (*Id*.)  These mechanisms are consistent with the Continuous Quality Improvement Tool (CQIT) that CDCR began developing in 2012, with input from the Special Master and Plaintiffs.  (ECF No. 4693 at 5-6.)  And, consistent with the Court's December 24, 2020 Order, CDCR has prepared and filed several activation schedules[1] to include "interim deadlines toward completion of the recommendations and identification of all persons

---

[1] *See* ECF Nos. 7160, 7281, 7444, 7523, and 7562.

responsible for completing each step." (ECF No. 7004 at 2.)

The Special Master does not dispute the above actions. Rather, he and Mr. Hayes focus on whether CDCR has implemented certain recommendations with perfect or near perfect levels of compliance. That Defendants have not achieved the Mr. Hayes' desired compliance threshold with every recommendation does not equate to noncompliance with the Court's December 3, 2020 Order. Accordingly, the Special Master's concept of compliance is misguided and based on an unworkable, all but impossible standard.

As set forth in the August 1, 2022 letter to the Special Master, Defendants maintain that they have fully implemented thirteen of the remaining fifteen recommendations outlined by the Special Master, even if they have not met Mr. Hayes' desired compliance threshold—*i.e.*, 3, 7, 8, 9, 10, 12, 13, 18, 20, 21, 28, 29, and portions of 32.[2] Defendants seek to achieve full implementation of the remaining recommendations—17 and 31—and look forward to working with Mr. Hayes to improve CDCR's suicide prevention program. Defendants, however, raise the following objections to the Special Master's report:

First, Defendants object to Mr. Hayes' concept of implementation, which applies the 90-percent and 100-percent compliance standards for establishing full compliance with his recommendations. Defendants' activation schedules decouple implementation from compliance. This makes sense. Implementation should focus on the actual development and application of a policy, plan, or audit that make up CDCR's durable suicide prevention program. As discussed in detail below, Mr. Hayes' requirement of 100-percent compliance as to recommendations 10 and 21 to establish systemic constitutional compliance is virtually unachievable in a system operated by humans. But more importantly, it is inconsistent with the Prison Litigation Reform Act's needs-narrowness-intrusiveness requirements and Ninth Circuit jurisprudence. *See* 18 U.S.C. § 3626(a)(1)(A); *Rouser v. White*, 825 F.3d 1076, 1082 (9th Cir. 2016) (holding that the term "substantial compliance" in the context of a prison-reform consent decree "doesn't require perfection."). Despite Mr. Hayes' 90 or 100-percent compliance standard for monitoring

---

[2] *See* Letter from Melissa Bentz, Attorney, CDCR Office of Legal Affairs to Special Master Lopes (August 1, 2022). (ECF No. 7636 at 38-59.)

implementation, this Court will ultimately determine whether defendants have adequately implemented all reasonable steps to remedy deficiencies in their suicide prevention program. (*See* ECF No. 6973 at 9-10.)

Second, Defendants object to the Special Master's and Mr. Hayes' findings that noncompliance at a small number of institutions constitutes systemic noncompliance.

Finally, Defendants object to Mr. Hayes' characterization of CDCR's Suicide Case Review process included in his report, which does not accurately reflect Defendants' compliance.

I. **MR. HAYES' CONCEPT OF IMPLEMENTATION CREATES AN UNWORKABLE STANDARD FOR COMPLIANCE WITH INDIVIDUAL RECOMMENDATIONS**

After completing his fifth re-audit tour, Mr. Hayes found that "15 of the 18 remaining recommendations have not been fully implemented," primarily because CDCR did not meet a 90 or 100-percent compliance rate. (ECF No. 7636-1 at 5.) The Special Master and Mr. Hayes fixate on numerical compliance measures of 90 and 100-percent to such an extent that they overlook the robust self-monitoring mechanisms and policies that have already been implemented by CDCR. While the Special Master may be "puzzled" by Defendants' uncertainty as to the definition of "implementation," "it will be for the court to decide whether defendants have 'take[n] and adequately implement[ed] all *reasonable* steps to remedy' the 'pattern of identifiable and describable inadequacies in suicide prevention in the CDCR.'"  (ECF No. 6973 at 9-10, emphasis added.) And critically, this Court has clarified that Mr. Hayes' recommendations—*i.e.*, the 90 and 100-percent compliance standards—"provide guidance for defendants regarding when [the Special Master] will report to the court that, in his view, they have sufficiently implemented [a recommendation]." (*Id.* at 9.) The Court did not, however, address whether meeting the 90 and 100-percent compliance thresholds is *required* to demonstrate constitutional compliance. (*Id.*) Moreover, while the term "substantial compliance" "is not amenable to a 'mathematically precise definition,'" the Ninth Circuit has held that "[t]his standard doesn't require perfection." *Rouser*, 825 F.3d at 1082. Further, full implementation of recommendations that require a 100-percent compliance standard is impracticable and impossible for several reasons, discussed *infra*.

### A. Defendants Disagree That Meeting a 100-percent Compliance Threshold Is Appropriate or Necessary to Establish Systemic Compliance

Recommendation 10 requires that the quality of completed Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) be audited monthly at a 100-percent compliance standard. (ECF No. 7636-1 at 6.) The Special Master and Mr. Hayes found that full implementation had not been achieved because only one of the facilities was at 100-percent compliance. (*Id.*) But there are two oversight mechanisms built into the system to ensure compliance is as close to 100-percent as is reasonably practicable. (Williams Decl. at ¶ 7.) First, Mr. Hayes suggests that CDCR reviews only emergent mental health referrals—but not urgent referrals—to assess timely compliance. (ECF No. 7636-1 at 6.) However, this suggestion is plainly inaccurate. CDCR analyzes every urgent referral that may indicate the individual is potentially suicidal to determine the clinical reason it was not classified as emergent and what, if any, error occurred during the classification process. (Williams Decl. at ¶ 7.) Second, in an effort to improve compliance and patient safety, CDCR has developed mechanisms for the Electronic Health Record System (EHRS) to prevent staff from erroneously classifying a referral as urgent. (*Id.*) Whenever a patient reports danger to self or suicidal ideation, staff are required to classify the mental health referral as emergent, absent a clinical override by a supervisor due to a valid reason why it should have been classified as urgent. (*Id.*) CDCR's mechanisms, therefore, account for potential—and inevitable[3]—noncompliance by individual clinicians. The Special Master and Mr. Hayes seemingly ignore these suicide prevention measures that account for and correct noncompliance, and instead assess implementation solely on an uncompromising, unrealistic 100-percent standard. (*Id.*) Full implementation under Mr. Hayes' perfection standard may never be achieved given the inevitability of human error.

### B. CDCR Disagrees That Failure to Achieve 100-percent Compliance at An Institution or System-wide Represents Systemic Noncompliance

Recommendation 21 requires CDCR to authorize only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15

---

[3] *See* https://www.who.int/news-room/fact-sheets/detail/patient-safety. Last accessed on November 1, 2022.

minutes on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch. (ECF No. 7636-1 at 7.) CDCR and the California Correctional Health Care System (CCHCS) developed an automated Mental Health Observations Reporting Tool (Reporting Tool) to record compliance with these levels of observation and assist institutional staff. (*Id*.)

The Special Master and Mr. Hayes found that full implementation had not been achieved because none of the audited facilities achieved the 100-percent compliance with this measure. (*Id*.) However, the Reporting Tool that was developed shows every single observation conducted at 15-minute intervals of suicidal patients housed in the Mental Health Crisis Bed (MHCB) units, and indicates whether the observation was compliant or not. (Williams Decl. at ¶ 9.) Significantly, there are hundreds of thousands of observations each month throughout CDCR's institutions, all of which are captured by the Reporting Tool. (*Id*.) Humans are not infallible, and given the sheer number of observations that staff conduct each month across all institutions, it is understandable that CDCR has not achieved 100-percent compliance. (*Id*.) But perfect compliance by staff using the Reporting Tool does not inform the Court whether or not the Reporting Tool is in fact in place at all institutions. Even if the Court accepts Mr. Hayes' view that every nurse or clinician conducting suicide watch observations must have used the Reporting Tool at the required time, perfection is not the legal standard, nor is it reasonable to require perfection across hundreds of thousands of encounters in order to establish 100-percent compliance with this measure. *See Rouser*, 825 F.3d at 1082 ("This [substantial compliance] standard doesn't require perfection."). Moreover, the Reporting Tool was developed in order to assist institutions with identifying staff who need to improve performance, which further demonstrates CDCR's robust self-monitoring system and durable suicide prevention program. (*Id*.) Again, the system is in place, but implementation was found inadequate because staff compliance was not perfect.

With respect to recommendations 10 and 21, Mr. Hayes and the Special Master appear unwilling to acknowledge that there are situations in which perfect, 100-percent compliance is unattainable, nor do they appear willing to recognize reasonable explanations for minimal "noncompliance." This, however, runs afoul of applicable legal standards which do not require perfection. *See* 18 U.S.C. § 3626(a)(1)(A); *Rouser*, 825 F.3d at 1082.

## II.   INSTITUTIONAL NONCOMPLIANCE IS SEPARATE FROM SYSTEMIC NONCOMPLIANCE

As to the remaining recommendations, the Special Master found that Defendants were noncompliant system-wide as they failed to fully implement those recommendations (*i.e.*, 3, 7, 8, 9, 12, 13, 17, 18, 20, 21, 28, 29, 31, and 32). In some cases, the Special Master's findings of system-wide noncompliance were predicated on limited incidents of noncompliance that do not indicate a systemic deficiency. (ECF No. 7636 at 22-28.) Recommendation 7, by way of example, provides the following: "[t]he nurse's office should be of sufficient size to conduct adequate intake screening and the door to the office (which should contain a large viewing window) should remain closed during the screening process." (ECF No. 7636-1 at 5.) Mr. Hayes evidently concluded that the California Correctional Institution (CCI), as a whole, was noncompliant based on his observation of *one* nurse who failed to adequately address all fifteen mental health/suicide risk questions on the Initial Health Screening Form during *one* encounter. (*Id.* at 12.) Such an alleged, isolated and de minimus occurrence cannot equate to institutional noncompliance, much less systemic noncompliance.

Mr. Hayes also found that full implementation of recommendation 8 had not been achieved because "there continue to be a few audited facilities in which intake nurses did not feel comfortable conducting screening without the presence of custody personnel . . . ." (*Id.* at 5.) Defendants object to the notion that noncompliance in even a handful of cases represents systemic noncompliance. The preceding findings are examples of Mr. Hayes' unwillingness to recognize that perfect compliance is not legally required, and is entirely unrealistic in any healthcare system, let alone one as large as CDCR. *See* 18 U.S.C. § 3626(a)(1)(A); *Rouser*, 825 F.3d at 1082.

## III.   DEFENDANTS DISAGREE WITH MR. HAYES' AND THE SPECIAL MASTER'S FINDINGS REGARDING SUICIDE CASE REVIEWS

The Special Master's and Mr. Hayes' findings concerning Defendants' Suicide Case Reviews are largely positive, describing the process as "very comprehensive" and "[a] considerable strength of the CDCR suicide prevention program." (ECF No. 7636-1 at 9, 56.) That said, in his report, Mr. Hayes states that "a weakness [of the Suicide Case Review process] is the repetitive nature of the deficiencies," including missing mental health documentation/appointments, inadequate

development or lack of SRASHEs, and delays in emergency medical response (*Id*. at 55.) But Mr. Hayes conflates the Suicide Case Review process with Defendants' adherence to policy or clinical practice. The two are not synonymous. Indeed, the Suicide Case Review process involves analyzing deaths in the event that they occur within a CDCR institution, identifying any problems that are revealed during that review, and implementing corrective action in the form of Quality Improvement Plans. (Williams Decl. at ¶ 11.) The "repetitive deficiencies," on the other hand, concern CDCR institutions not following policy or failing to adhere to clinical practice. (*Id*.) Thus, to the extent that Mr. Hayes observes any deficiencies with respect to individual clinical practice that does not reflect a systemic deficiency in CDCR's Suicide Case Review process as a whole. At best, the deficiencies demonstrate isolated individual practitioner shortcomings or individual failures to strictly comply with policies. (*Id*.) Therefore, the following clause regarding Suicide Case Reviews is not accurate: "[t]he strength of the Suicide Case Review process remains the comprehensiveness of each review; a weakness is the repetitive nature of the deficiencies." (*Id*.) Defendants request that this statement either be stricken from the report or revised as follows: "The strength of the Suicide Case Review process remains the comprehensiveness of each review, which reveal deficiencies at an individual clinician level."

## CONCLUSION

This Court should not accept the Special Master's 100-percent compliance standard concerning recommendations 10 and 21, which runs afoul of the PLRA and Ninth Circuit precedent. Nor should this Court adopt Mr. Hayes' concept of implementation because it creates an unworkable standard for compliance with individual recommendations. Finally, this Court should not equate isolated incidences of human error with systemic noncompliance. Defendants have built a robust, durable suicide prevention system, evidenced by the oversight and self-monitoring mechanisms that address noncompliance—which is inevitable in any healthcare system. Defendants will continue their efforts to further implement Mr. Hayes' recommendations.

## CERTIFICATION

In preparing these objections, the undersigned counsel for the Defendants reviewed the following Court orders relevant to the issues in this filing, ECF Nos. 640, 4693, 6973, and 7004.

| | | |
|---|---|---|
| DATED: November 3, 2022 | | Respectfully submitted, |
| | | HANSON BRIDGETT LLP |
| | | By: */s/ Paul B. Mello* |
| | | PAUL B. MELLO |
| | | SAMANTHA D. WOLFF |
| | | KAYLEN KADOTANI |
| | | DAVID C. CASARRUBIAS |
| | | CARSON R. NIELLO |
| | | Attorneys for Defendants |
| | | |
| DATED: November 3, 2022 | | ROB BONTA |
| | | Attorney General of California |
| | | Damon McClain |
| | | Supervising Deputy Attorney General |
| | | By: */s/ Elise Owens Thorn* |
| | | ELISE OWENS THORN |
| | | Deputy Attorney General |
| | | Attorneys for Defendants |