# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
    **Plaintiffs**

        **v.**                          **No. CIV S-90-0520 KJM DB P**

**GAVIN NEWSOM, et al.,**
    **Defendants**

## SPECIAL MASTER'S REPORT AND RECOMMENDATION
## ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

Matthew A. Lopes, Jr., Esq.

Special Master

PANNONE LOPES DEVEREAUX & O'GARA LLC

Northwoods Office Park, Suite 215-N

1301 Atwood Avenue

Johnston, RI 02908

(401) 824-5100

Fax: (401) 824-5123

December 15, 2022

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Management System |
| ASU: | Administrative Segregation Unit |
| CC I: | Correctional Counselor I |
| CCCMS: | Correctional Clinical Case Management System |
| CCI: | California Correctional Institution |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| CHCF: | California Health Care Facility |
| CIT: | Crisis Intervention Team |
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMHPP: | Custody and Mental Health Partnership Plan |
| CNA: | Certified Nursing Assistant |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| EHRS: | Electronic Health Records System |
| EOP: | Enhanced Outpatient Program |
| FTE: | Full-Time Equivalent |
| HDSP: | High Desert State Prison |
| HQ: | Headquarters |

| | |
|---|---|
| IDTT: | Interdisciplinary Treatment Team |
| KVSP: | Kern Valley State Prison |
| LTRH: | Long-Term Restricted Housing |
| MA: | Medical Assistant |
| MCSP: | Mule Creek State Prison |
| MHCB: | Mental Health Crisis Bed |
| MHSDS: | Mental Health Services Delivery System |
| PIP: | Psychiatric Inpatient Program |
| PC: | Primary Clinician |
| PC: | California Penal Code |
| PNP: | Psychiatric Nurse Practitioner |
| PY: | Personnel Year |
| RDO: | Regular Day Off |
| RJD: | Richard J. Donovan Correctional Facility |
| SQ: | San Quentin State Prison |
| STRH: | Short-Term Restricted Housing |
| SVSP: | Salinas Valley State Prison |
| TTM: | Therapeutic Treatment Modules |
| VSP: | Valley State Prison |
| WSP: | Wasco State Prison |

## <u>TABLE OF CONTENTS</u>

ACRONYMS AND ABBREVIATIONS ........................................................................... ii

SPECIAL MASTER'S REPORT AND RECOMMENDATION ON A FINAL
PROPOSED TELEPSYCHIATRY POLICY ................................................................. 1

    I.      Introduction ................................................................................................. 1

    II.     Background and Relevant History ............................................................... 4

    III.    CDCR's Provisionally Approved Telepsychiatry Policy ....................... 16

    IV.   Parties' Final Positions on Modifications to CDCR's Provisionally
         Approved Telepsychiatry Policy ............................................................... 21

    V.     The Special Master's Telepsychiatry-Related Findings from the
         Provisional Approval Period ...................................................................... 31

    VI.    Special Master's Expert's Analysis of Scholarly Articles Cited by
         Defendants ................................................................................................. 38

    VII.   Analysis ..................................................................................................... 42

    VIII.  Conclusion and Recommendation ............................................................ 62

RECOMMENDATION ............................................................................................... 66

APPENDIX A1  Special Master's Telepsychiatry-Related Findings from the  [DRAFT]
29th Round Monitoring Report – Part C .................................................................... 67

APPENDIX A2  Special Master's Monitoring Tours of CDCR's Telepsychiatry Hubs ............. 79

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

    **Plaintiffs,**

    **vs.**                                             **No. 2:90-cv-0520 KJM DB**

**GAVIN NEWSOM, et al.,**

    **Defendants.**


**SPECIAL MASTER'S REPORT AND RECOMMENDATION
ON A FINAL PROPOSED TELEPSYCHIATRY POLICY**

I. **Introduction**

    For years, the Special Master and his expert have recognized that, when utilized within reasonable parameters, telepsychiatry can be an effective means of delivering psychiatric care to many *Coleman* class members. After a lengthy negotiation and settlement process, the parties reached an agreement on the terms of the telepsychiatry policy in 2020. The Court thereafter provisionally approved the negotiated policy, settling a number of longstanding disputes about the appropriate scope of the California Department of Corrections and Rehabilitation's (CDCR) use of telepsychiatry. Consequently, CDCR is able to provide psychiatry via telehealth for Correctional Clinical Case Management System (3CMS) patients, who comprise the vast majority of *Coleman* class members, without limitation.[1] The Provisionally Approved Telepsychiatry Policy also permits CDCR to supplement on-site psychiatry at the Enhanced

---

[1] According to MHSDS population data uploaded to CDCR's secure website, as of September 26, 2022, 3CMS patients comprised 76 percent of CDCR's MHSDS population, while mainline EOP patients comprised 18 percent, MHCB patients comprised less than one percent, and PIP patients comprised 3 percent. CDCR categorized two percent of MHSDS participants as either "EOP-ASU/NDS/STRH" or "EOP-PSU/LTRH/SHU."

Outpatient Program (EOP) level of care and use telepsychiatry in the mental health crisis beds

(MHCBs) and Psychiatric Inpatient Programs (PIPs) in emergencies.  *See infra* Part III(A).

Subsequent to the Court's provisional approval of the telepsychiatry policy, CDCR, for

the first time in the long history of this case, reported filling 90 percent or more of allocated

psychiatry positions as required by the Court's 2002 staffing vacancy order.  ECF No. 1383 at 4.

After an 18-month provisional approval period, wherein the Special Master monitored CDCR's

use of telepsychiatry, plaintiffs were prepared to accept final approval of the provisionally

approved policy with minimal changes.  *See* Letter from Ms. Amy Xu, Esq., Plaintiffs' Counsel,

to Special Master Lopes (June 30, 2022), attached hereto as Exhibit A, at 1 ("The Special Master

should instead recommend a final telepsychiatry policy that closely resembles the one carefully

negotiated by the parties, overseen by the Special Master, and approved by the Court.").  And

yet, here we are on the precipice of litigating the appropriate use of telepsychiatry in California

prisons.

The Special Master had expected to be in a position to recommend the Court's adoption

of a final telepsychiatry policy that had the support of the parties.  Instead, defendants' proposed

a revised version of the Provisionally Approved Telepsychiatry Policy and related discussions

reached an impasse.  As a result, the Special Master submits this Report and Recommendation in

the absence of consensus.

As will be demonstrated below, the substantive disputes between the parties on the

appropriate use of telepsychiatry remain largely unchanged since the time preceding the Court's

provisional approval of CDCR's telepsychiatry policy in 2020.  This Report provides a brief

overview of historic developments and relevant law of the case related to telepsychiatry

generally and the Provisionally Approved Telepsychiatry Policy specifically.  This Report also

discusses the parties' respective final positions on the telepsychiatry policy, as reflected in correspondence to the Special Master.

Because of the centrality of the dispute over the permissibility of the removal of any required on-site psychiatry staff in EOP programs, the Special Master also provides findings specific to the provision of telepsychiatry in EOP institutions during the 29th monitoring round, which have been incorporated into the Special Master's Draft Twenty-Ninth Round Monitoring Report – Part C, distributed to the parties on December 8, 2022. In addition, this Report includes the Special Master's expert's analysis of the scholarly literature defendants cited in support of their proposed expansion of telepsychiatry in EOP programs. After analyzing the parties' respective positions, recent psychiatry staffing data, and findings from the 29th monitoring round, the Report concludes with the Special Master's recommendation.

As noted below, the Provisionally Approved Telepsychiatry Policy afforded CDCR extensive utilization of telepsychiatry in a manner consistent with the Court's prior orders. ECF No. 5711 at 21, 30. While the Special Master's findings from on-site monitoring during the provisional approval period were varied, the Special Master found that the terms of the Provisionally Approved Telepsychiatry Policy adequately addressed many of his expert's historic concerns with utilizing telepsychiatry. During the provisional approval period, the Special Master's expert did, however, find evidence of telepsychiatrists' disconnection from the treatment team and milieu, one of the foundational concerns underlying the Special Master's 2017 recommendations related to telepsychiatry. ECF No. 5564 at 16-17. This is especially concerning in the context of the ongoing staffing crisis in many CDCR institutions, including the EOP programs, where defendants have proposed removing the requirement for on-site psychiatry. A review of the literature concerning telepsychiatry provided by defendants

confirmed that the use of telepsychiatry in correctional settings, particularly for higher acuity

patients, is indeed still a "nascent science." *See infra* note 40. Because the field of

telepsychiatry in general, and its application to residential and inpatient correctional settings in

particular is still evolving, new scientific literature or professional standards may justify focused

modifications of the Provisionally Approved Telepsychiatry Policy in the future. However, on

this record and in consideration of the Court's prior controlling orders, it is clear that the

Provisionally Approved Telepsychiatry policy appropriately calibrates the utilization of

telepsychiatry across CDCR's MHSDS levels of care and should be adopted as final.

## II.  <u>Background and Relevant History</u>

Vacancies in mental health clinical staff have plagued CDCR's Mental Health Services

Delivery System (MHSDS) for the duration of this case. *See Coleman v. Wilson*, 912 F. Supp.

1282, 1307 (E.D. Cal. 1995) ("The overwhelming weight of the evidence before this court

demonstrates that the California Department of Corrections is significantly and chronically

understaffed in the area of mental health care.");[2] *see also* Special Master's Report on the Status

---

[2] As noted in the Special Master's Twenty-Sixth Round Monitoring Report:

> The findings and recommendations of the Magistrate Judge which were later
> adopted by the court in its 1995 remedial order, included the following which relate
> specifically to staffing:
>
> > Within (90) days of the order of the district court, defendants shall
> > develop and implement a formula for mental health care staffing
> > ratios at all institutions within the class. Said formula shall be
> > developed in consultation with an expert to be designated by the
> > court in consultation with the Special Master, with defendants to pay
> > the cost of the expert
> >
> > Within (90) days of the order of the district court, defendants shall
> > develop and implement a recruitment program, including but not
> > limited to provision of adequate compensation, for the recruitment
> > of mental health staff at every institution in the class. Said program

of Mental Health Staffing and the Implementation of Defendants' Staffing Plan, filed February 6, 2017 [hereinafter Special Master's 2017 Staffing Report], ECF No. 5564 at 6 (comparing clinical vacancy rates observed during the Twenty-Sixth Monitoring Round to those observed in 1998 and discussing "how static the vacancy rates for psychiatrists and psychologists have remained over time"). The Special Master conducted assessments of CDCR's clinical staffing vacancies and clinician-to-patient ratios early in the remedial phase of this case. *See* Special Master's 2017 Staffing Report, ECF No. 5564 at 2. By the time of the filing of the Special Master's 2017 Staffing Report, the Special Master had filed "18 reports that directly or indirectly addressed staffing deficiencies, in addition to addressing staffing vacancies in all 26 of his monitoring reports." *Id.*; *see also id.* at 2 n. 1.

In a February 26, 2002 report, the Special Master recommended that defendants "be directed to maintain the vacancy rate among psychiatrists and case managers at a maximum rate of ten percent, including contracted services." Special Master's Second Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, ECF No. 1351 at 11. The Court adopted the Special Master's recommendation in a June 12, 2002 order. ECF No. 1383 at 4.

---

> shall be developed in consultation with an expert to be designated by the court after consultation with the Special Master, with defendants to pay the cost of the expert.
>
> Within (90) days of the order of the district court, defendants shall fill those positions presently authorized for the provision of mental health care services. Within (180) days of the order of the district court, defendants shall fill those positions determined to be necessary under the formula developed in paragraph 7, supra.

ECF No. 5439 at 23 (quoting Findings and Recommendations, filed June 6, 1994, ECF No. 547 at 80).

A. <u>Defendants' 2009 Staffing Plan and Subsequent Revisions</u>

On June 17, 2009, the Court issued an order directing defendants to "complete a staffing plan by the end of August 2009…under the guidance of the Special Master." ECF No. 3613 at 2-3. After receiving a 30-day extension, defendants filed their staffing plan on September 30, 2009. ECF No. 3693. On March 4, 2010, the Special Master endorsed defendants' September 30, 2009 staffing plan. *See* Special Master's 2017 Staffing Report, ECF No. 5564 at 4.

By the time of the Court's April 5, 2013 order denying defendants' motion to terminate this case, the Court found that "chronic understaffing continue[d] to hamper the delivery of constitutionally adequate [mental health] care and [was] a central part of the ongoing constitutional violation in this action." ECF No. 4539 at 62. On June 18, 2014, the Court ordered defendants to "revisit and, as appropriate, revise their existing mental health staffing plan in order to resolve the ongoing problem of mental health staffing shortages and come into compliance with the requirements of this court's June 12, 2002 order (ECF No. 1383) concerning maximum mental health staff vacancy." ECF No. 5171 at 4.[3]

Defendants filed their "Report on Review of Mental Health Staffing" on February 2, 2015. ECF No. 5269. At that time, CDCR proposed a "four-prong approach" to address clinical staffing vacancies, one of which was the "continuance of a statewide tele-psychiatry program." *Id.* at 6. At that time, CDCR reported that it had "28 staff psychiatrists working out of three satellite offices." *Id.* at 9. Significantly, CDCR indicated the following: "As *it is CDCR's preference to use on-site psychiatry wherever possible*, when an institution is able to fill a

---

[3] *See also id.* at 2 ("[I]t also appears, and the Special Master confirms, that defendants continue to struggle with the task of hiring sufficient mental health staff, particularly psychiatrists. A sufficient number of beds without adequate staff to meet the treatment needs of the identified population would leave defendants short of meeting their constitutional obligations to the plaintiff class.").

position for an on-site psychiatrist, the tele-psychiatrist is moved elsewhere in favor of the on-site doctor." *Id.* at 9-10 (emphasis added). Further, CDCR stated "tele-psychiatrists are able to treat patients at all levels of care *at institutions where recruitment is more difficult or temporary staffing shortages require relief.*" *Id.* at 10 (emphasis added).

On May 15, 2015, the Court issued an order directing defendants to "move forward with the proposals contained in the report on review of mental health staffing filed February 2, 2015." ECF No. 5307 at 6. While acknowledging "defendants must be given an opportunity to test the efficacy of their current" staffing proposals, the Court highlighted "at least two potential areas of concern in the proposals currently before the court. *Id.* at 5. "First, defendants apparently are broadening their reliance on telepsychiatry while the development of positions and procedures for this method of care, and assessment of its adequacy, is ongoing. This is troubling, particularly because there may be class members not susceptible to this method of care." *Id.* Based on the need for "ongoing focused monitoring by the Special Master of staffing issues," the Court directed the Special Master "to report to the court in 180 days on the status of defendants' implementation" of CDCR's February 2, 2015 update to its staffing plan. *Id.*[4]

In his Twenty-Sixth Round Monitoring Report, the Special Master noted the following:

> One area of concern that emerged from the monitor's findings was mental health staff. Chronic understaffing of CDCR mental health positions had not improved, while CDCR's implementation of its most recent mental health staffing plan, which was filed over a year ago…seems to have stagnated, leaving CDCR somewhat adrift with mental health staffing.

---

[4] On November 10, 2015, the court issued an order granting the Special Master's request to include the status update required by the May 15, 2015 order in his Twenty-Sixth Round Monitoring Report. *See* ECF No. 5377 at 1 ("It is hereby ordered that in lieu of a separate report as contemplated by the court's May 18, 2015 order, the Special Master shall include in his Twenty-Sixth Round Monitoring Report the report and recommendations on staffing required by that order.").

ECF No. 5439 at 16.  The Special Master identified defendants' struggles maintaining adequate

clinical staffing levels as a "problem that pervades the remedial effort, standing in the way of full

realization of the benefits of the many improvements in mental health care that have been made

in *Coleman*." *Id.* at 128.  Because of the delays in implementing CDCR's February 2, 2015

update to its staffing plan, the Special Master recommended the Court order him to write a stand-

alone report on staffing at a later time. *Id.*; *id.* at 141.

     B.  Special Master's 2017 Staffing Report

     Following the submission of the Special Master's Twenty-Sixth Monitoring Round

Report, the Special Master and parties engaged in a series of all-parties workgroup meetings to

discuss the status of defendants' February 2, 2015 update to CDCR's staffing plan.  *See* Special

Master's 2017 Staffing Report, ECF No. 5564 at 7.  Based on these discussions, defendants

submitted further updates to their staffing plan on January 10, 2017.  *Id.* at 8.[5]  In his 2017

Staffing Report, the Special Master described CDCR's January 10, 2017 update as "promising"

and recommended the proposals contained therein be adopted in part and rejected in part.  *Id.*

Regarding telepsychiatry, the Special Master noted the following:

> The inability to hire and retain on-site psychiatrists has plagued CDCR for the last
> 19 years and defendants have been unable to remedy this chronic problem.  Unless
> and until defendants can increase the rate of recruitment and retention of on-site
> psychiatrists and reduce the vacancy rate to ten percent or less, all options must be
> explored without sacrificing the ability to provide adequate psychiatric treatment
> to inmates participating in the MHSDS.

*Id.* at 14.

---

[5] CDCR's January 10, 2017 update to their staffing plan included the following proposals: Use of
medical assistants to assist psychiatrists; internship and fellowship programs; increased pay rates
for contract psychiatrists; telepsychiatry; cash for on-call compensation for all clinicians; dual
appointments at additional institutions; psychiatric nurse practitioners; utilization management;
Proposition 57; establishment of a mental health academy; salary increases for psychiatrists; bed
planning (clustering).  ECF No. 5564 at 8.

While the Special Master embraced telepsychiatry as "a viable method for the delivery of mental health services," CDCR's continued use of telepsychiatry "[did] not come without admonitions and parameters." *Id.* at 15. The Special Master discussed these "admonitions and parameters" as follows:

> Telepsychiatry should serve as a supplement for on-site psychiatry, not as a substitute and should only be utilized when institutions are unable to recruit psychiatrists to work on-site. In no circumstances should this method of delivering mental health treatment relieve CDCR of their obligations to continue their efforts of recruiting full-time psychiatrists to work on-site at the facilities. The convenience of telepsychiatry should also not serve as a reason to allow on-site psychiatrists to migrate to the comfort of remote off-site offices. It cannot be emphasized enough that telepsychiatry should not replace on-site psychiatry, a concern shared by plaintiffs' counsel. …
>
> Telepsychiatry is not clinically desirable as a frontline approach to providing psychiatric services for inmates with the most intensive or emergent needs. The higher the acuity of mental illness, the less telepsychiatry should be relied on as a permissible method of treatment. For 3CMS level of care inmates, it is an appropriate option with the requirement that the telepsychiatrist work on-site at least twice per year at the designated institutions and more frequently if feasible. Although the efficacy of telepsychiatry for EOP inmates is not clear or recommended as a permanent solution at this time, it would be recommended that a psychiatrist be on-site at least quarterly to treat EOP inmates, given the frequency of psychiatric contacts required by the Program Guide. The Special Master's experts observed EOP inmates receiving treatment using telepsychiatry and it appeared to function properly, but additional data would need to be examined before further expansion for EOP inmates could be endorsed. …
>
> For inmates at the MHCB level of care, telepsychiatry is not an appropriate method of treatment to be used on a regular basis. Telepsychiatry for these higher acuity inmates should only be used as a last resort or in emergency situations when an on-site psychiatrist is not available. On-site psychiatrists are able to more positively impact the therapeutic milieu by regularly interacting with correctional, nursing and other mental health staff. This is just not possible with telepsychiatrists. In addition, on-site psychiatrists are better able to discern nonverbal behavior demonstrated by inmates which often has an important impact on diagnoses and treatment planning. The ease of multidisciplinary interaction on-site is especially important in regards to emergency consultation, which is essential at the higher levels of care and much better accomplished with on-site psychiatrists.

*Id.* at 15-17.

In their response to the Special Master's 2017 Staffing Report, defendants acknowledged their historical difficulties retaining sufficient psychiatry staff: "After more than a decade of trying, unsuccessfully, to hire psychiatrists in sufficient numbers to meet the court-ordered benchmark, it is time to reevaluate the need and feasibility of the outdated staffing ratios from the 2009 staffing plans as a means of delivering constitutional care to the *Coleman* class." ECF No. 5591 at 4. Regarding telepsychiatry, defendants stated "the best available evidence does not support the Special Master's concerns" with the expansion of telepsychiatry to all MHSDS levels of care. *Id.* at 5. Moreover,

> Telepsychiatry is especially helpful in locations where on-site staff have been difficult to recruit or where staffing levels shift. CDCR is far more effective at hiring and retaining telepsychiatrists to work from its Rancho Cucamonga office than to persuade psychiatrists to move to Salinas Valley or to work out of certain correctional environments. Telepsychiatry can successfully serve patients with intensive and urgent mental health needs. In addition to CDCR's use of telepsychiatrists to provide crisis bed treatment, DSH uses telepsychiatry to provide inpatient care at Coalinga….

*Id.* at 9. Defendants further indicated there was "little risk, as the Special Master cautions, that telepsychiatry could replace on-site psychiatric services." *Id.*

C.  <u>October 10, 2017 Staffing Order</u>

On October 10, 2017, the Court issued an order adopting in full the findings contained in the Special Master's 2017 Staffing Report, ECF No. 5711 at 29, and announced its intent "to move the staffing component of compliance from its present posture to full and complete remediation, including, if necessary, through issuance of an enforcement order." *Id.* at 2. The Court set a one-year deadline for CDCR to "take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." *Id.* at 30.

Regarding telepsychiatry, the Court reviewed the Special Master's recommendations and the parties' objections thereto. Among the evidence cited by defendants in support of their objections to the Special Master's recommendation, defendants cited more than 20 scholarly articles, though they acknowledged they were "unable to locate any well-controlled studies evaluating telepsychiatry vs. onsite psychiatry within a prison setting." *Id.* at 22 (quoting ECF No. 5591-1, Golding Decl. ¶ 2.). Therefore, defendants indicated they relied on "findings published from studies on telepsychiatry in other settings,' which [defendants] describe[d] as 'informative and corroborat[ing] its usefulness in providing mental health treatment patients who need it.'" ECF No. 5711 at 22 (quoting ECF No. 5591-1, Golding Decl. ¶ 2.).

Giving "little weight" to the evidence cited by defendants, "the court conclude[d] the evidence tendered by defendants is insufficient to demonstrate that use of telepsychiatry is appropriate for all *Coleman* class members at every level of care in the MHSDS." ECF No. 5711 at 22. The Court indicated it was "persuaded that the Special Master's monitoring of CDCR's use of telepsychiatry and the conclusions of his experts concerning its efficacy for class members based on that monitoring is more relevant to a determination of the appropriate use of telepsychiatry for members of the plaintiff class than are the studies cited by" defendants. *Id.* at 22-23.[6] Therefore, the Court directed defendants to, under the guidance of the Special Master, "develop an addendum to the Revised Program Guide to govern the use of telepsychiatry and the extent to which telepsychiatrists may provide mental health services in place of on-site

---

[6] In its July 3, 2018 Order, the Court noted the following: "In issuing the October 10, 2017 order, the court specifically rejected as insufficient evidence tendered by defendants in an effort to demonstrate that telepsychiatry can and should be widely used at all levels of the MHSDS. Defendants would be well advised to cease their reliance here on evidence the court has rejected." ECF No. 5850 at 6.

11

psychiatrists." The Court thereafter incorporated the substance of the Special Master's

telepsychiatry-related recommendations contained in his 2017 Staffing Report in its order:

> Telepsychiatry should serve as a *supplement, rather than a substitute, for on-site psychiatry* and should *only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists*. The Special Master's recommendations concerning the use of telepsychiatry, as clarified by this order, shall form the basis of that addendum, subject to modification as appropriate as a result of ongoing monitoring of defendants' telepsychiatry program. The addendum shall be developed and finalized with the guidance of the Special Master and his experts, and with input from plaintiffs' counsel at the discretion of the Special Master.

*Id.* at 30 (emphasis added).

Following the October 10, 2017 Order, the Court held further staffing-related status

conferences and invited the parties to provide additional briefing "on the role telepsychiatry

plays, consistent with the Eighth Amendment, to aid in resolving the psychiatrist staffing

shortage." Special Master's Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 81

(citing February 15, 2018 Order, ECF No. 5786 at 3-4). In their response to the Court's

February 15, 2018 Order, the parties filed a joint status report on June 21, 2018, wherein they

identified four remaining disputes related to the appropriate use of telepsychiatry:

> (1) whether the policy required specific language stating that telepsychiatry was not appropriate at the MHCB and PIP levels of care, (2) whether the policy required specific language stating that telepsychiatry should serve as a supplement for on-site psychiatry and should only be utilized when institutions were unable to recruit on-site psychiatrists, (3) whether cell-front telepsychiatry should be used, and (4) whether psychiatric nurse practitioners should be able to provide telepsychiatry services. ECF No. 5872 at 4-5 (citing ECF No. 5841 at 7-8).

ECF No. 7074 at 81-82.

In a July 3, 2018 Order, the Court identified defendants' telepsychiatry policy as "[t]he

area of work … closest to completion" among the outstanding staffing related remedial projects.

ECF No. 5850 at 4. The Court confirmed and reiterated the requirements of its October 10, 2017

order related to telepsychiatry and ordered that those requirements "shall—or should, in the

obligatory sense – form the basis of the telepsychiatry addendum to the Revised Program

Guide."  *Id.* at 4-5.[7]  Specifically, the Court that "[t]elepsychiatry may supplement on-site

psychiatry at the Enhanced Outpatient (EOP) level of care but it should not replace on-site

psychiatry."  The Court clarified the distinction between the EOP and 3CMS (outpatient) levels

of care as follows:

> Although EOP is labeled as an "outpatient" program, outpatient is contextual and
> relative to inpatient programs within the MHSDS; moreover, the Revised Program
> Guide makes clear EOP is a residential program, synonymous with an inpatient
> setting.  All inmates at this level of care are housed in separate specifically
> designated EOP housing units, which provide housing, treatment and programming
> for seriously mentally ill inmates "whose mental illness precludes their placement
> and participation in the" general population.

*Id.* at 5-6 (quoting Program Guide at 12-4-1).

The Court directed the Special Master "to finalize a proposed telepsychiatry policy that is

in his view consistent with the provisions of the October 10, 2017 order and the

recommendations of his experts," including resolution to the two outstanding disputes about cell-

front telepsychiatry and psychiatric nurse practitioners.  *Id.* at 6.

D.  Special Master's 2018 Telepsychiatry Report

On August 2, 2018, the Special Master filed his report on the proposed telepsychiatry

policy.  Special Master's Report on the Proposed Telepsychiatry Policy Addendum to the CDCR

MHSDS Program Guide, ECF No. 5872 [hereinafter Special Master's 2018 Telepsychiatry

---

[7] The Court also rejected defendants' effort to relitigate certain objections that the court had
previously overruled: "The first two disputes arise from a disagreement over interpretation of the
relevant requirements of the court's October 10, 2017 order.  Defendants' reading of the court's
order, or any purported misunderstanding regarding the order's meaning, borders on the
frivolous, given that the position defendants take now is substantially similar to the position they
took in objections that have been effectively overruled by the court."  ECF No. 5850 at 4.

Report].  The Special Master described proposed revisions to the telepsychiatry policy in order to

align its terms with the requirements of the Court's October 10, 2017 order, *id.* at 8-10, and those

revisions which addressed two specific issues identified by the Court in its July 3, 2018 order

(cell-front telepsychiatry and use of psychiatric nurse practitioners (PNPs) to provide

telepsychiatry).  *Id.* at 10.[8]

      In their response to the Special Master's 2018 Telepsychiatry Report, defendants

provided lengthy objections, attempted to relitigate a number of settled issues with respect to the

use of telepsychiatry, and indicated they "intend[ed] to appeal the July 3[, 2018] Order."  ECF

No. 5873-5 at 13.[9]

---

[8] Additional revisions to the Special Master's August 2, 2018 telepsychiatry policy included:

- Added language to ensure access to the Electronic Health Records System (EHRS) for telepsychiatrists.
- Added language to ensure treating telepsychiatrists participate in IDTTs.
- Added language to clarify that patients are not entirely excluded from receiving telepsychiatry services based upon their level of care.
- Removed additional language regarding the cell-front provision of telepsychiatry.
- Added language to clarify the role of telepsychiatrists in an EOP setting.
- Added language to clarify the role of telepsychiatrists in treatment and discharge decisions.
- Added language to clarify the role of telepsychiatrists in communicating patient issues to on-site staff and treatment team members.

ECF No. 5872 at 10-11.

[9] Defendants did in fact appeal the Court's July 3, 2018 Order.  Defendants' appeal was dismissed for lack of jurisdiction.  The Ninth Circuit noted the effect of defendants' failure to appeal the court's earlier staffing order (October 10, 2017 order, ECF No. 5711):

      The telepsychiatry limitations articulated in the [July 2018] order merely reiterate the same limitations enumerated in the district's court's October 10, 2017 order, which Appellants chose not to appeal.  Appellants argue that the language of the telepsychiatry limitations in the October 2017 order were permissive, so the mandatory language used in the July 2018 order imposed a new injunction.  We

E. <u>Judge Drozd Settlement Conference</u>

After additional opportunities to meet and confer following the Special Master's

submission of his 2018 Telepsychiatry Report, the parties remained at an impasse regarding the

policy's language requiring EOPs to have some on-site psychiatry staff.  *See* Special Master's

28th Round Monitoring Report, ECF No. 7074 at 82-83.  As noted in the Twenty-Eighth Round

Monitoring Report, the Golding Report and subsequent proceedings effectively postponed

further substantive consideration of the parties' dispute regarding the telepsychiatry policy,[10]

until the Court referred several issues, including staffing-related disputes, to settlement

conference in a December 18, 2018 order.  *See* ECF No. 7074 at 83 (citing December 18, 2018

Order, ECF No. 6050).[11]

Through the settlement conference process, the parties reached an agreement in principle

regarding the telepsychiatry policy on January 17, 2020.  Special Master's Twenty-Eighth Round

Monitoring Report, ECF No. 7074 at 83.  On March 25, 2020, the parties filed a stipulation and

proposed order requesting the Court's provisional approval of the negotiated, agreed-upon

telepsychiatry policy.  ECF No. 6517.  On March 27, 2020, the Court approved the parties'

---

find this argument unpersuasive.  The October 2017 order was sufficiently clear
that the telepsychiatry limitations were mandatory.

*Coleman v. Newsom*, 789 F. App'x. 38, 40 (9th Cir. Dec. 24, 2019).  Accordingly, the limitations
on telepsychiatry imposed on defendants in the October 10, 2017 order remain controlling over
defendants' telepsychiatry policy.  These limitations are indeed law of the case.

[10] *See, e.g.*, ECF No. 5980 ("The court VACATED the evidentiary hearing re: telepsychiatry,
which had been continued to next Monday, 10/29/2018; this hearing will be reset as soon as
reasonably practical.").

[11] The Court's December 18, 2018 Minute Order set a one-day Settlement Conference focused
on "whether mentally ill inmates can be located in fewer total institutions to address persistent
impediments to Program Guide compliance in the areas of staffing, bed transfers and cultural
compliance training."  ECF No. 6050.

telepsychiatry stipulation, including the provisional approval of the telepsychiatry policy.  March

27, 2020 Stipulation and Order, ECF No. 6539 at 3.

**III.** **CDCR's Provisionally Approved Telepsychiatry Policy**

A.  Substantive Provisions of the Provisionally Approved Telepsychiatry Policy

Consistent with CDCR's 2015 Staffing Plan Update and the Court's prior orders,

CDCR's Provisionally Approved Telepsychiatry Policy included several material provisions

based on the general principle that telepsychiatry should "supplement" rather than "replace" on-

site psychiatry services in MHSDS levels of care other than 3CMS: "The Telepsychiatry

Program provides mental health services to the Correctional Clinical Case Management System

(CCCMS) level of care and may, under specified circumstances outlined in this policy and

procedure, be used for higher levels of mental health care."  ECF No. 6539 at 5; *see id.* at 7

("Telepsychiatrists will be assigned to CCCMS, unless they are needed to supplement in the

EOP program or there is an emergency situation as determined by Mental Health headquarters.

If an institution requires telepsychiatry services, on-site psychiatrists shall be assigned to the

higher levels of care.").  Further, the policy explicitly permitted the replacement of on-site

psychiatry with telepsychiatry for 3CMS patients "provided all other conditions pertaining to the

CCCMS level of care contained within this policy are adhered to and good faith efforts to recruit

on-site psychiatrists continue."  *Id.* at 7.

Regarding the other MHSDS levels of care, the Provisionally Approved Telepsychiatry

Policy provided the following: "On-site psychiatrists shall remain the preferred method of

psychiatric care for Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB),

and Psychiatric Inpatient Program (PIP) programs." *Id.* at 5.[12]  Moreover: "Telepsychiatry may *supplement*[13] on-site psychiatry at the EOP level of care, but it *should not replace* on-site psychiatry.  On-site psychiatrists shall remain the preferred method of psychiatric care for each program providing EOP level of care, consistent with the requirements of the current approved Staffing Plan."  *Id.* at 7 (emphasis added); *see also* October 10, 2017 Order, ECF No. 5711 at 30 ("Telepsychiatry should serve as a supplement, rather than a substitute, for on-site psychiatry and should only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists.").  Accordingly, the policy required each EOP program to have at least "1.0 personnel year equivalent on-site psychiatrist" on staff.  Provisionally Approved Telepsychiatry Policy at 5; *see supra* note 13.

Similar to the policy's 3CMS requirements and consistent with the requirements of the Court's October 10, 2017 order, ECF No. 5711 at 21, 30, the policy required CDCR to continue making "good faith efforts…to recruit and retain on-site psychiatrists to provide services at the EOP level of care."  Provisionally Approved Telepsychiatry Policy at 7.  "If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent

---

[12] This language is consistent with defendants' stated policy preference regarding the scope of appropriate use of telepsychiatry contained in CDCR's February 2, 2015 update to its staffing plan: "As it is CDCR's preference to use on-site psychiatry whenever possible, when an institution is able to fill a position for an on-site psychiatrist, the tele-psychiatrist is moved elsewhere in favor of the on-site doctor."  ECF No. 5269 at 9-10.

[13] The provisionally approved policy included the following definition of "supplement" for purposes of telepsychiatry in EOPs: "Supplement means at least 1.0 personnel year (PY) equivalent on-site psychiatrist shall be assigned to each EOP program (e.g., EOP General Population, EOP Administrative Segregation Unit Hub, or Psychiatric Services Unit) per yard at each institution.  For each program on a yard that is allocated less than 1.0 PY equivalent for psychiatry per the current approved Staffing Plan, the position shall be filled by on-site psychiatrists.  Whenever possible, the assigned on-site psychiatrist shall be full-time, as opposed to assigned several part-time psychiatrists to provide EOP care."  Provisionally Approved Telepsychiatry Policy, ECF No. 6539 at 5.

with the requirements described in other sections of this policy and procedure." *Id.* The

provisionally approved policy was clear that an EOP program operating without on-site

psychiatry for 30 consecutive days "would not be consistent with this policy's objectives." *Id.*

As such, in the event an EOP program operated without on-site psychiatrists for 30 consecutive

days, the policy required CDCR to provide notice to the Special Master and plaintiffs, along with

a plan to address the lack of on-site psychiatry staff. *Id.*

The provisionally approved policy's restrictions on the use of telepsychiatry in MHCBs

and PIPs were more stringent: "Telepsychiatry may not be used at the MHCB level of care

*except as a last resort in emergency situations* when an on-site psychiatrist is not assigned to the

program." *Id*. (emphasis added)*.* An MHCB program operating without an on-site psychiatrist

for 14 or more consecutive days "would not be consistent with this policy's objective" and

would trigger notice requirements to the Special Master and plaintiffs. *Id.* at 8.

Like the restrictions on the use of telepsychiatry in MHCBs, the policy included identical

language regarding the PIPs: "Telepsychiatry may not be used at the PIP level of care *except as a*

*last resort in emergency situations* when an on-site psychiatrist is not assigned to the program."

*Id.* (emphasis added). Utilizing telepsychiatry in a PIP for more than 30 consecutive calendar

days "would not be consistent with this policy's objective" and would trigger notice

requirements to the Special Master and plaintiffs. *Id.*

The Provisionally Approved Telepsychiatry Policy required telepsychiatrists to work

from "CDCR-operated telepsychiatry hubs," *id.* at 5, and visit the institutions they serve within

30 days of assignment. *Id.* at 9. Thereafter, the policy required 3CMS telepsychiatrists to visit

their institutions biannually, while telepsychiatrists for all other MHSDS levels of care were

required to visit their institutions quarterly. *Id.*

18

The Provisionally Approved Telepsychiatry Policy addressed several other important topics including provisions regarding informed consent, contraindications for telepsychiatry, telepsychiatrist participation in interdisciplinary treatment teams (IDTTs), meetings, and huddles, technical standards, and physical environment requirements.  ECF No. 6539 at 5-6 (discussing telepsychiatry equipment); *id.* at 6 (discussing informed consent, participation in IDTTs, meetings, and huddles); *id.* at 7 (discussing contraindications for telepsychiatry); *id.* at 9 (discussing physical environment).  Regarding cell-front telepsychiatry, the policy permitted its use "when necessary," though "non-confidential telepsychiatry contacts, including cell-front contacts shall not be considered a Program Guide required clinical contact under any circumstance."  *Id.* at 7.

B.  Process Outlined in March 27, 2020 Stipulation and Order for Finalizing Telepsychiatry Policy

The March 27, 2020 Stipulation and Order indicated "[t]he parties agree that this is a provisional policy that will not be part of the MHSDS Program Guide, and that the provisional period will last eighteen months from the date of the policy's full implementation throughout CDCR, which will occur within 120 days of the date of the Court's approval of this stipulation." *Id.* at 2.[14]  The parties indicated their agreement that the negotiated telepsychiatry policy "replaces all previous policies concerning CDCR's use of telepsychiatry, and that it will be CDCR's operative telepsychiatry policy during the provisional period, unless and until otherwise modified upon the agreement of the parties and the Special Master."  *Id.*

---

[14] Defendants required a 120-day period to "complete the internal monitoring process which will allow Defendants to provide notice to Plaintiffs and the Special Master, as required by the provisional policy."  *Id.* at 2.  Further, "[i]f Defendants believe[d] that the 120-day period may need to be extended due to the COVID-19 pandemic impacts on CDCR, they will meet and confer with Plaintiffs' counsel and the Special Master concerning an extension."  *Id.*

Following the Special Master's monitoring of the use of telepsychiatry during the eighteen-month provisional approval period, the March 27, 2020 Stipulation and Order afforded the parties "30 days…to determine whether any alterations to the provisional policy [were] necessary." *Id.* The stipulation further specified a process for proposing changes to the provisionally approved policy:

> If a party proposes to alter the provisional policy, the parties, under the guidance of the Special Master, will have a total of 60 days from the end of the provisional period to agree on a modified final policy. If no resolution is reached, the parties ha[d] 90 days from the end of the provisional period to submit their positions and proposed language for the final telepsychiatry policy to the Special Master for review. The Special Master will, within 30 days of receiving the parties' positions, provide the parties with his guidance and recommendation. If the parties [were] unable to reach agreement after receipt of the Special Master's input the Special Master will file a recommendation with the court within 45 days, after which the parties will have 30 days to respond consistent with the Order of Reference.

*Id.* at 2-3.

Upon the expiration of the 18-month provisional approval period on April 1, 2022, the Special Master and parties followed the process outlined in the March 27, 2020 Stipulation and Order, including the exhaustion of the meet and confer process outlined therein. Specifically, the Special Master and parties discussed the telepsychiatry policy – and proposed changes to the policy defendants initially distributed to the Special Master and plaintiffs on April 14, 2022[15] – during all-parties meetings on April 26, May 10, May 19, and June 21, 2022. Thereafter, as required by the March 27, 2020 stipulation and order, the parties each sent the Special Master

---

[15] Defendants timely submitted their initial proposed modifications to the telepsychiatry policy on April 14, 2022. *See* ECF No. 6539 at 2-3 ("The parties will have *30 days from the end of the provisional period to determine whether any alterations to the provisional policy are necessary*… If a party proposes to alter the provisional policy, the parties under the guidance of the Special Master will have a total of 60 days from the end of the provisional period to agree on a modified final policy.") (emphasis added).

their respective final positions and proposed modifications to the telepsychiatry policy on June 30, 2022. *See infra* Part IV.

On September 14, 2022, the Court issued a minute order granting an extension of time to December 15, 2022 to file a report and recommendation on a final proposed telepsychiatry policy. ECF No. 7611. The Special Master requested the extension of time to allow "additional time for discussions with the parties" in order to resolve "ongoing questions concerning possible expansion of CDCR's use of telepsychiatry." *Id.* In addition to meetings with the parties, the Special Master engaged in direct discussions with CDCR Secretary Kathleen Allison in an effort to move forward without litigation. It was clear after these discussions that the parties had once again reached an impasse regarding the telepsychiatry policy.

IV. **Parties' Final Positions on Modifications to CDCR's Provisionally Approved Telepsychiatry Policy**

    A. <u>Plaintiffs' Final Position on Telepsychiatry</u>

        (1) <u>Plaintiffs' June 30, 2022 Letter</u>

In their June 30, 2022 letter to the Special Master, plaintiffs' counsel reiterated their steadfast opposition to expanding the use of telepsychiatry in the EOP, MHCB, and PIP levels of care as permitted in defendants' proposal: "Defendants' proposed changes to the telepsychiatry policy would degrade the quality of care provided in EOP, MHCB, and PIPs." Exhibit A, at 1. Plaintiffs argued the defendants' proposed changes would "isolate psychiatrists from other members of the interdisciplinary treatment team and relegate them to the role of medication management, all to the detriment of *Coleman* class members." *Id.* Among the revisions plaintiffs opposed were the following:

> [R]emoving the on-site psychiatrist requirement for all EOP programs; removing statements that telepsychiatry is a "last resort in emergency situations" at the MHCB and inpatient levels of care; decreasing the frequency of site visits to

21

annually across all levels of care; removing provisions that indicate that non-confidential telepsychiatry contacts, including cell front contacts, do not count as Program Guide required clinical contacts; and removing language intended to ensure informed consent from patients.

*Id.* at 3.  Based in part on these concerns, plaintiffs urged the Special Master to "recommend a final telepsychiatry policy that closely resembles the one carefully negotiated by the parties, overseen by the Special Master, and approved by the court."  *Id.* at 1.

Plaintiffs requested that the Special Master reject defendants' proposal to permit telepsychiatry to effectively replace on-site psychiatry in EOP programs.  Exhibit A at 4. Plaintiffs reviewed their concerns with the expansion of telepsychiatry into EOPs and cited scholarly articles in support of their position.  *Id.* at 4-5 nn. 2-7.  Plaintiffs argued "telepsychiatrists are limited in the ways that they can integrate into and contribute to the efforts of the treatment team, meaning that their roles may be distilled to simply medication management," and cited examples from the Special Master's recent monitoring tours in support of their contention.  *Id.* at 6.  Regarding the removal of the requirement for each EOP program to have an on-site psychiatrist, plaintiffs wrote: "Though Defendants did not revise the requirement to provide an on-site psychiatrist if patients are contraindicated for telepsychiatry, this becomes an empty promise if EOP programs cease to have on-site psychiatry, as would be permitted by Defendants' proposal."  *Id.* at 5.

Plaintiffs also objected to defendants' proposal to "loosen" restrictions on the use of telepsychiatry in MHCBs and PIPs, including removing policy language limiting the use of telepsychiatry in MHCBs and PIPs "except as a last resort in emergency situations" and striking the requirement to continue good faith efforts to recruit on-site psychiatry staff in these programs.  *Id.* at 6.  Citing to defendants' Lessons Learned During the COVID-19 Pandemic

Report, plaintiffs argued "[d]efendants readily admit that the relevant research identifies 'concerns or uncertainty' about using telepsychiatry for higher acuity patients." *Id.*[16]

Regarding the reduced frequency of site visits by telepsychiatrists to the institutions they serve, plaintiffs objected and noted "[d]efendants have not provided any justification for this change, which would seriously limit the telepsychiatrists' ability to integrate into the care team." *Id.* at 7. As noted, plaintiffs also objected to defendants' proposed modification to policy language governing cell-front telepsychiatry, *id.* at 7-8, and informed consent. *Id.* at 8.

(2) Plaintiffs' Proposed Changes to Provisionally Approved Policy

While plaintiffs urged the Special Master to "recommend a final telepsychiatry policy that closely resembles" the Provisionally Approved Telepsychiatry Policy, *id.* at 1, they offered several revisions for the Special Master's consideration. First, plaintiffs proposed new language referencing an "identifier in EHRS" to track telepsychiatry appointments, which CDCR had previously reported was under development. *Id.* at 8 (citing Defendants' COVID-19 Lessons Learned Report, ECF No. 7196 at 27).[17] Plaintiffs also requested enhanced reporting requirements when EOP, MHCB, and PIP programs are without on-site psychiatry for extended

---

[16] *See* Defendants' Response to March 29, 2021 Order Requiring Defendants File Report on the Lessons Learned from the COVID-19 Pandemic [hereinafter Defendants' COVID-19 Lessons Learned Report], ECF No. 7196 at 17. ("All articles reviewed demonstrated positive or no change to outcomes associated with the rapid expansion of telehealth services during COVID-19, though some did note concerns or uncertainty regarding the use of telepsychiatry with special patient populations, such as those at higher levels of care. Use of telepsychiatry in inpatient settings within CDCR is already limited to situations when there is no onsite psychiatrist available to be assigned to the program.").

[17] "Defendants must ensure that this EHRS identifier is functional and that it maps to CDCR dashboards where it can be analyzed. Further, Defendants should also ensure that there is a way to document in EHRS if the telepsychiatry contact was cell-front or in a non-confidential setting, if the patient refused a telepsychiatry contact, if the patient was contraindicated for telepsychiatry, if an IDTT included a telepsychiatrist, and the identity and discipline of the telepresenter." Exhibit A at 8.

periods. *Id.* at 9.[18]  Finally, plaintiffs requested the Special Master to conduct additional monitoring of CDCR's use of telepsychiatry, especially "if the Special Master is considering adopting any of the substantive changes proposed by Defendants, such as removing the requirement that telepsychiatry may only supplement on-site psychiatrists in EOP programs." *Id.*

    B.  Defendants' Final Position on Telepsychiatry

      (1)  Defendants' June 30, 2022 Letter

In their June 30, 2022 letter, defendants indicated they sought to "implement a telepsychiatry policy that appropriately allows the broad use of telepsychiatry based on current standards of care, and that respects the role of the psychiatrist as part of the treatment team, is clinically indicated for each patient, and includes safeguards for patient confidentiality."  Letter from Ms. Elise Thorn, Esq., Deputy Attorney General, to Special Master Lopes (June 30, 2022), attached hereto as Exhibit B at 1.[19]  Defendants characterized the provisionally approved policy's requirements as "unnecessary restrictions" and reiterated their argument that "the imposition of any limitations on telepsychiatry's use by the Court would violate the strictures of the" Prison Litigation Reform Act. *Id.*

Defendants contended "[t]elepsychiatry is widely accepted as meeting the standard of care for providing mental health treatment in diverse treatment settings, including correctional settings, emergency settings, inpatient psychiatric facilities, residential care homes, and rural locations." *Id.* at 3.  Defendants identified telepsychiatry as "a valuable tool" in part because it

---

[18] "Defendants should also continue to notify Plaintiffs' counsel and the Special Master on a monthly basis if the staffing issues persists beyond the second notice [required by the Provisionally Approved Telepsychiatry Policy]."  Exhibit A at 9.

[19] Defendants' proposed revisions to the Provisionally Approved Telepsychiatry Policy, Exhibit B at 24-32, are hereinafter referred to as "Defendants' Revised Policy" or "Revised Policy."

enhanced CDCR's ability to recruit and retain psychiatrists. *See id.* ("By making it easier to recruit and retain psychiatrists at CDCR, telepsychiatry is a valuable tool to help CDCR deliver care to patients and meet or exceed constitutional requirements."); *see also id.* ("…Defendants need flexibility to hire licensed psychiatrists wherever they may be and utilize new technologies that expand options for delivering patient care."). Defendants reported the use of telepsychiatry had bolstered CDCR's psychiatry fill rates and argued "the available evidence indicates that telepsychiatrists participate in the multi-disciplinary interaction in the same manner as on-site psychiatrists." *Id.* at 10.

Defendants pointed to a purported lack of "evidence of negative patient outcomes tied to telepsychiatry" and a bevy of scholarly articles to support their proposed re-write of the telepsychiatry policy. *Id.* at 4. Finally, defendants argued "[a]dvances in technology, the end of the provisional period, and the widespread successful use of telepsychiatry support CDCR's request that the Special Master re-evaluate his expert's position calling for the placement of unnecessary and unsupported restrictions on CDCR's use of telepsychiatry." *Id.*

In support of their proposed expansion of telepsychiatry, defendants attached declarations from Dr. Amar Mehta (CDCR Deputy Director of the Statewide Mental Health Program), Dr. Toni Martello (CDCR HQ Chief of Telepsychiatry), [20] and Dr. Joseph Penn. [21] Regarding the Penn Declaration, defendants indicated "Dr. Penn reaffirms" the opinions he expressed in a 2018 declaration, ECF No. 5878-5, including:

---

[20] Attached to Dr. Martello's declaration was a document summarizing 56 scholarly articles defendants identified as supporting their position on the expanded use of telepsychiatry. *See infra* Part VI.

[21] As noted in defendants' June 30, 2022 letter, "In 2018, Defendants submitted the report of Joseph Penn, M.D. – a nationally recognized mental health expert –on the standard of care for telepsychiatry." Exhibit B at 5 (citing Report of Joseph Penn, M.D., ECF No. 5873-5).

(1) telepsychiatry is a standard, widely accepted, and effective method of providing psychiatric evaluation and treatment for all mentally ill patients and is generally no less effective or therapeutic than face-to-face treatment; and (2) telepsychiatry is a standard, widely accepted, and effective method of psychiatric evaluation and treatment for individuals in residential treatment, both within correctional and non-correctional patient populations.

Exhibit B at 5. In addition to Dr. Penn's declaration, defendants cited to resources from the California Medical Board, American Psychiatric Association, American Telepsychiatry Association, and the National Commission on Correctional Health Care as generally supporting the use of telepsychiatry in a variety of settings, including corrections. *Id.* at 5-7.

Defendants reviewed the observations contained in their COVID-19 Lessons Learned Report, ECF No. 7196, which they argued "demonstrate[d] that CDCR successfully used telehealth to bring mental health care to patients notwithstanding social distancing requirements and staff's inability to provide treatment on-site." *Id.* at 7. Defendants identified the following "lessons learned" based on their experience expanding the use of telepsychiatry (and telehealth more generally) during the COVID-19 pandemic:

- The expansion of telehealth was an effective way to provide treatment during the COVID-19 pandemic.
- Telehealth coverage provided by psychologist[s] and social workers helped deliver mental health care to patients in institutions without mental health programs to prevent mental health crises and stress related to the COVID-19 [pandemic].
- By allowing onsite and hub providers the ability to work from home, CDCR ultimately retained more civil service psychiatrists and telepsychiatrists during the COVID-19 pandemic.
- Staff and patients appear to be generally satisfied with telehealth, which aligns with trends reported in the community. Telework contributed to the quality of life, job satisfaction, recruitment, and retention of providers in CDCR's system.

- Antidepressant, mood stabilizer, and antipsychotic medications can be successfully monitored via telehealth.
- By targeting telehealth services toward more routine, non-urgent services, onsite staff were able to focus on more acute and intensive needs at the institution.
- Competing demands on identified telepresenter classifications should be considered to ensure onsite availability to support service delivery. Having a diversity of classifications trained as telepresenters can be invaluable during critical incidents.
- There are a wide variety of available options for telework, including CDCR offices located at different units within the institutions or in remote hubs. In addition, services from home can also be provided safely and effectively when clear standards are enforced, and secure, functional equipment is deployed.

*Id.* at 7-9.

After reiterating their legal arguments against limiting CDCR's use of telepsychiatry, *id.* at 12, defendants concluded: "Defendants must be given the deference to implement a telepsychiatry policy that meets the national standards described above and gives [CDCR] the best opportunity to provide mental health treatment to the *Coleman* class." *Id.* at 13.

    (2)  <u>Defendants' Proposed Changes to the Provisionally Approved Telepsychiatry Policy</u>

Defendants proposed the following substantive modifications to the Provisionally Approved Telepsychiatry Policy:

- Amended language to align policy requirements for 3CMS and EOP programs.

    *See* Defendants' Revised Policy at 1, 3, 4, 5.[22]

---

[22] *Compare* Defendants' Revised Policy at 3 ("Telepsychiatrists will be assigned to CCCMS *and EOP*.") (emphasis added), *with* Provisionally Approved Policy, ECF No. 6539 at 3 ("Telepsychiatrists will be assigned to CCCMS, unless they are needed to supplement in the EOP program or there is an emergency situation as determined by Mental Health headquarters."); *compare* Defendants' Revised Policy at 3-4 ("Telepsychiatry may serve patients *at the CCCMS and EOP levels of care* provided all other conditions to the CCCMS and EOP levels of care contained within this policy are adhered to."), *with* Provisionally Approved Policy,

- Eliminated the requirement that EOP programs have at least 1.0 personnel year equivalent on-site psychiatry coverage. *See* Defendants' Revised Policy at 1 (removing definition of "supplement"); *see also supra* note 13.

- Removed the requirement that telepsychiatrists work from CDCR's designated telepsychiatry hubs and amended the language regarding the conditions under which telepsychiatrists could work from home. *See* Defendants' Revised Policy at 1 (removing requirement that telepsychiatrists work from CDCR designated telepsychiatry hubs); *see id.* at 2 ("Telepsychiatrists working from home must provide the same standard of internet access… Telepsychiatrists working from home must provide a confidential space with their own office furniture. Telepsychiatrists will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible."); *see id.* at 6 ("If telepsychiatrists working from home have a sustained interruption in technology or significant equipment malfunction, or there are other supervisory concerns that interfere with their ability to see patients, they may be required to come into an office space in the hub.").

---

ECF No. 6539 at 3 ("Telepsychiatry may replace on-site psychiatry at the CCCMS level of care provided all other conditions pertaining to the CCCMS level of care contained within this policy are adhered to and good faith efforts to recruit on-site psychiatrists continue….Telepsychiatry may supplement on-site psychiatry at the EOP level of care, but it should not replace on-site psychiatry. On-site psychiatrists shall remain the preferred method of psychiatric care for each program providing EOP level of care, consistent with the requirements of the current approved Staffing Plan.").

- Added language clarifying the role of night-time telepsychiatrists. *See* Defendants' Revised Policy at 1 ("Night Shift Telepsychiatrists also do not carry caseloads but are available for comprehensive after-hours services."); *see id.* at 2 ("Night Shift Telepsychiatrists will not be able to participate in IDTT, since they do not carry caseloads and IDTTs are held in the daytime."); *see id.* at 3 ("Night Shift Telepsychiatrists cover all levels of care except for PIP, similar to on-site on-call services."); *see id.* at 6 ("Night Shift Telepsychiatrists will not be required to perform site visits as they cover several institutions at once and are not assigned to specific treatment teams."); *see id.* at 7 ("Night Shift Telepsychiatrists will supplement the existing 'physician on-call' services currently managed by phone, with comprehensive after-hours coverage to all institutions. They have access to a full technological setup and are able to provide face-to-face encounters as needed for urgent issues overnight. They are also available to integrate with the Crisis Intervention Teams (CIT) as a psychiatric consultant. Similar to telepsychiatrists on-call, Night Shift Telepsychiatrists are not required to travel to the institutions where they are providing services. Therefore, institutions receiving this service must provide a backup on-call physician (psychiatrist or medical provider) that is available to physically examine a patient if needed."); *see id.* at 8-9 (excluding Night-Shift Telepsychiatrists from requirement to participate in IDTTs and huddles).

- Modified language regarding the provision of cell-front telepsychiatry. *See* Defendants' Revised Policy at 3 (striking language from the Provisionally Approved Policy clarifying that "non-confidential telepsychiatry contacts,

including cell front contacts, shall not be considered a Program Guide required clinical contacts under any circumstances.").

- Modified language regarding informed consent. *See* Defendants' Revised Policy at 2 (striking language from the Provisionally Approved Policy requiring the telepsychiatrist to discuss the "conditions under which a referral is made for in-person care" with the patient).

- Removed the requirement that CDCR maintain good-faith efforts to recruit on-site psychiatrists at all MHSDS levels of care without on-site coverage. *See* Defendants' Revised Policy at 4-5 (striking language from the Provisionally Approved Policy requiring continued "good faith efforts to recruit on-site psychiatrists" for CCMS, EOP, MHCB, and PIP programs).

- Modified language defining conditions under which telepsychiatry may be provided in MHCBs and PIPs, including the removal of language only permitting telepsychiatry to be used in MHCBs and PIPs "as a last resort in emergency situations." *See* Defendants' Revised Policy at 3, 4-5.[23]

- Reduced the required frequency of telepsychiatrists' on-site visits to the institutions they serve. *See* Defendants' Revised Policy at 5-6 (requiring annual telepsychiatrist visits to the institutions they serve, and striking requirement that

_____

[23] Rather than reserving telepsychiatry use in MHCBs and PIPs as a last resort in emergency situations, defendants' Revised Policy provides as follows: "Whenever possible, CDCR seeks to employ psychiatrists who can deliver on-site psychiatric evaluation and care to patients in all inpatient facilities. The use of telepsychiatry is restricted to only when on-site psychiatric care is not available and only as long as necessary. CDCR will not use telepsychiatry in lieu of on-site psychiatrists at the inpatient level of care for any reason other than a lack of availability of on-site psychiatrists." Revised Policy at 4. Identical language is included regarding the PIP level of care. *Id.* at 4-5.

telepsychiatrists serving CCCMS programs visit the institutions they serve twice

per year, and the requirement that telepsychiatrists serving EOP, MHCB, and PIP

programs quarterly).

## V.  **The Special Master's Telepsychiatry-Related Findings from the Provisional Approval Period**

During the provisional approval period, which largely overlapped with the Special

Master's 29th Monitoring Round, the Special Master and his team toured institutions, interviewed

staff and patients regarding the use of telepsychiatry, and conducted record reviews (including

reviews of patients treated via telepsychiatry).  During the monitoring tours, the monitor's expert

observed IDTTs with telepsychiatry representation and attended mental health huddles where

telepsychiatry attendance would have been required under the terms of the Provisionally

Approved Telepsychiatry Policy.  The monitor and monitor's expert also toured five of CDCR's

six telepsychiatry hubs, where the monitor's expert observed and evaluated individual clinical

encounters conducted via telepsychiatry.

During the monitoring tours, interviewed staff and patients reported both positive and

negative experiences regarding their respective experience with telepsychiatry.  Likewise, the

monitor's expert's observations revealed variability in the quality of care provided to *Coleman*

class members via telepsychiatry.

The table below displays use of telepsychiatry by level of care at each of the 15 CDCR

institutions with EOP programs covered in the [DRAFT] 29th Round Monitoring Report – Part

C.[24]

---

[24] This table reports usage of telepsychiatry observed during the 29th monitoring round at CDCR
institutions with EOP programs for mainline MHSDS programs.  For 3CMS and EOP programs,
this table depicts those institutions where telepsychiatrists regularly provided services and
carried patient caseloads, as observed during the Special Master's monitoring tours and as

**FIGURE 1**

**CDCR's Use of Telepsychiatry in EOP Institutions by MHSDS Level of Care**

|  | **3CMS** | **EOP** | **MHCB** | **PIP (Acute or Intermediate)** |
|---|---|---|---|---|
| **CHCF** | Y | Y | Y | Y |
| **CIW** | N | N | N | N |
| **CMF** | Y | Y | N | Y |
| **CMC** | Y | N | N | NA |
| **CSP/Corcoran** | Y | Y | N | NA |
| **CSP/LAC** | N | N | N | NA |
| **CSP/Sac** | N | N | N | NA |
| **CSATF** | Y | Y | N | NA |
| **CCWF** | Y | N | N | NA |
| **KVSP** | Y | N | N | NA |
| **MCSP** | Y | Y | N | NA |
| **RJD** | Y | N | N | NA |
| **SVSP** | Y | Y | N | Y |
| **SQ** | N | N | NA | N |
| **VSP** | Y | Y | NA | NA |

Eleven EOP institutions utilized telepsychiatry at the 3CMS level of care and seven utilized telepsychiatry at the EOP level of care. One MHCB program utilized telepsychiatry, and three of CDCR's PIPs utilized telepsychiatry.

Telepsychiatry-related excerpts from the Special Master's DRAFT Twenty-Ninth Round Monitoring Report – Part C are attached as Appendix A1. In addition, a summary of the monitor's expert's findings from telepsychiatry hub monitoring tours is attached as Appendix A2. These findings are briefly summarized below.

---

reflected in CDCR's periodic notices to the Special Master and plaintiffs regarding the use of telepsychiatry in EOPs, MHCBs, and PIPs.

A. <u>The Special Master's Telepsychiatry-Related Findings Included in the DRAFT Twenty-Ninth Round Monitoring Report – Part C</u>

The monitor's expert's observations revealed variability in the quality of care provided to *Coleman* class members via telepsychiatry.  Connectivity and equipment issues were noted in some institutions, though other programs utilized excellent equipment and rarely encountered challenges with connectivity.

1. <u>Telepsychiatry Participation in IDTT and Quality of Care</u>

At the California Men's Colony (CMC), the monitor's expert observed well-conducted IDTTs with adequate telepsychiatry participation and no evidence of differing diagnoses or clinical assessments between on-site clinicians and the telepsychiatrist.  At VSP, the monitor's expert observed an engaged telepsychiatrist participating in EOP IDTTs, who was well-prepared even to discuss patients not on her caseload.  The monitor's expert's also observed adequate telepsychiatrist participation in IDTTs for 3CMS patients and MHSDS participants in administrative segregation at VSP.

At Kern Valley State Prison (KVSP), the monitor's expert found variable quality of telepsychiatrists' participation in IDTTs, as there were no problems observed in one facility, but evidence of lack of telepsychiatry participation in IDTTs in another facility.  The monitor's expert also noted evidence of telepsychiatrists' minimal contributions to IDTTs and lack of engagement at the California State Prison/Corcoran (CSP/Corcoran) and KVSP.  Specifically, at CSP/Corcoran, the monitor's expert observed the telepsychiatrist providing inaccurate patient information during a Long-Term Restricted Housing (LTRH) IDTT.

The relatively limited view into CDCR's use of telepsychiatry provided by the monitor's expert's assessment of IDTTs during monitoring tours revealed some significant concerns related to patient care.  At the California Substance Abuse Treatment Facility (CSATF), for instance, the

33

placement of telepsychiatry equipment during an EOP IDTT prevented the telepsychiatrist from having a full view of the patient, who was exhibiting signs of akathisia with involuntary movements.[25]  The telepsychiatrist failed to appropriately intervene, requiring the monitor's expert to recommend an urgent medical evaluation of the patient's condition.  During another EOP IDTT at CSATF, the telepsychiatrist did not have access to the EHRS.

2.  <u>Connectivity and Technology</u>

As noted, problems with connectivity persisted across multiple institutions.  The monitor's expert observed good connectivity during IDTTs at CMC.  In some cases, connectivity quality was variable between programs within the same institution.  For instance, at CSP/Corcoran, there were no technology or connectivity problems observed in the Short-Term Restricted Housing (STRH), but the monitor's expert noted significant technology-related disruptions to patient care in the LTRH.  At CSATF, significant connectivity problems were noted to be related to the use of laptops to provide telepsychiatry and on-site staff reported frequent connectivity problems related to telepsychiatrists working from home.  Likewise, at Mule Creek State Prison (MCSP), interviewed staff reported connectivity issues in some facilities.  At CSP/Corcoran, problems with telepsychiatry equipment were noted to delay the start of IDTTs by as much as 20 minutes.

3.  <u>Patient and Mental Health Staff Interviews</u>

Patient satisfaction with telepsychiatry was variable.  At CMC, interviewed West Facility patients reported satisfaction with telepsychiatry, as did Facility A 3CMS patients at CSATF.

---

[25] Notably, in his 2017 Staffing Report, the Special Master noted on-site psychiatrists were "better able to discern nonverbal behavior demonstrated by inmates which often has an important impact on diagnoses and treatment planning" compared to telepsychiatrists.  ECF No. 5564 at 17.

However, interviewed EOP patients at CSATF reported difficulty building a rapport with a clinician on a screen and concerns about lack of confidentiality with a telepresenter in the room during individual telepsychiatry sessions. Likewise, interviewed EOP patients at Valley State Prison (VSP) reported dissatisfaction with telepsychiatry and expressed concern that their treatment teams did not make changes in response to their dissatisfaction.

At CSATF, multiple interviewed on-site mental health staff noted challenges with telepsychiatry, indicating the telepsychiatrist only got a "small snapshot" of the patient. These on-site clinicians attributed specific examples of differing diagnostic and clinical assessments between the telepsychiatrist and on-site mental health staff. Interviewed staff at MCSP indicated telepresenter absences led to cancelled telepsychiatry appointments.

B.  The Special Master's Monitoring Tours of CDCR's Telepsychiatry Hubs

In addition to the monitoring of telepsychiatry conducted during 29th Monitoring Round site visits, the monitor and monitor's expert toured five of CDCR's telepsychiatry hubs in August 2022. While on-site observations of telepsychiatry during monitoring tours are typically limited to telepsychiatrists' participation in IDTTs and huddles, the telepsychiatry hub monitoring tours also included observations of individual telepsychiatry clinical encounters.

During the telepsychiatry hub monitoring tours, the monitor's expert found engaged telepsychiatrists providing adequate clinical care. However, as will be demonstrated below, there was also evidence of telepsychiatrists' disconnection from their patients' environment of care, reflecting one of the bedrock concerns regarding utilization of telepsychiatry for higher acuity patients, including those patients at the EOP[26] and higher levels of care.

---

[26] *See infra* notes 32-34.

The monitor's expert observed the use of telepsychiatry at the following telepsychiatry hubs:[27] Fresno; Elk Grove; San Quentin; Diamond Bar; and Santa Ana.[28] A total of ten psychiatrists at these hubs provided telepsychiatry services to ten institutions. Four of these (VSP, the California Health Care Facility (CHCF), CSATF, and MCSP) were mainline EOP programs. Six of these (the California Correctional Institution (CCI), High Desert State Prison (HDSP), Wasco State Prison (WSP), the Central California Women's Facility (CCWF), CSP/Corcoran, and KVSP) were 3CMS programs. Of the 3CMS programs, all were mainline, except for CSP/Corcoran where the psychiatrist treated patients within the LTRH, and HDSP where the psychiatrist saw patients in the STRH.

A total of 53 patients were observed. Of these, 24 were EOP and 29 were 3CMS. CDCR reported there were a total of 89 telepsychiatrist positions filled.[29] Of the 89 filled telepsychiatrist positions, seven provided night coverage. The monitor's expert was able to observe ten telepsychiatrists at five of the six hubs over the course of two weeks. A total of 13 telepsychiatrists worked in the telepsychiatry hubs, with the remainder working from home. Of the three telepsychiatrists who were not observed, two were due to the psychiatrist having a regular day off (RDO) during the site visit, or in one case, being out sick at the time of site visit.

---

[27] The monthly Mission Change letter sent out by CDCR on August 23, 2022, indicates that there is a total of 103 telepsychiatry offices located in the six hubs: 16 in Elk Grove, 15 in San Quentin, 29 in Rancho Cucamonga, 16 in Diamond Bar, 22 in Santa Ana and 5 in Fresno.

[28] Rancho Cucamonga was not monitored, as no telepsychiatrists were working from the hub at the time of the site visit.

[29] The monthly psychiatry vacancy report filed with the court on August 31, 2022, indicates that there are 98.50 allocated telepsychiatry positions, with 82.51 filled. *See* ECF No. 7610 at 5. As noted, at the time of the Special Master's telepsychiatry hub monitoring tours, there were only ten telepsychiatrists working from CDCR's telepsychiatry hubs.

The monitor's expert noted the telepsychiatry hub offices to be conducive to their purpose, featuring telepsychiatry equipment which interviewed telepsychiatrists praised as clinically useful and user-friendly. While telepsychiatrists indicated experiencing poorer internet connectivity when working from home, problems with connectivity were minimal when working from the hub offices.

As noted, while the monitor's expert observed telepsychiatrists to be engaging, empathetic, and providing adequate clinical care, there was evidence of telepsychiatrists' disconnection from the treatment milieu. For instance, only one of ten telepsychiatrists working from the hubs participated in a huddle during the Special Master's telepsychiatry hub tour. Another telepsychiatrist for an EOP program reported not attending huddles unless she had a topic she wished to raise. In addition, no interviewed telepsychiatrists were familiar with the requirements of the Custody and Mental Health Partnership Plan (CMHPP), which was a concern due to psychiatrists required participation in several activities. Other interviewed telepsychiatrists were unfamiliar with the Program Guide and several could not name any correctional officer at the institution. This was concerning, as the close coordination and integration of the treatment team, with collateral information from custody officers and knowledge of the milieu and environment of care are essential, especially for treatment of complex patients at the EOP level of care or higher.

In sum, the findings from the provisionally approval period indicated variability in CDCR's implementation of the Provisionally Approved Telepsychiatry Policy. There were some bright spots, as some institutions utilized excellent telepsychiatry equipment and experienced few connectivity challenges. However, technological challenges persisted across and sometimes within institutions. Indeed, technological and implementation challenges were not limited to

37

internet connectivity. As the monitor's observed at CSATF, the placement of telepsychiatry equipment limited the telepsychiatrist's view of the patient's involuntary movements during IDTT. This required the monitor's expert's intervention to prompt the assessment of a potentially serious medical concern that would have likely been apparent had the psychiatrist been on-site. Moreover, in some institutions, there was evidence of telepsychiatrists' disconnection from the treatment team and environment of care.

These variable findings, which in some instances aligned with the Special Master's expert's historic concerns about the expansion of telepsychiatry, indicate a properly calibrated telepsychiatry policy rooted in the Court's prior orders continues to be warranted.

## VI. Special Master's Expert's Analysis of Scholarly Articles Cited by Defendants

In their June 30, 2022 letter, defendants indicated that their proposed changes were supported by "a significant body of literature." Exhibit B at 2. The declarations of Dr. Mehta and Dr. Martello, attached to defendants' response, assert that their review of the literature "overwhelmingly shows that telepsychiatry is considered an effective and efficient means of providing psychiatric care to many populations, including incarcerated persons." *Id*. at 22 (Dr. Mehta declaration at page 9). As previously stated, this particular point is generally not in dispute, as evidenced by the Special Master's endorsement of the provisional telepsychiatry policy. In further support of defendants' proposal, Drs. Mehta and Martello assert that "there is no evidence of absolute contraindications for the use of telepsychiatry," however both do concede that "there may be special considerations for specific patient populations." *Id.*; *id.* at 97 (Dr. Martello declaration at page 9)

Attached to the declaration of Dr. Martello, defendants provided a spreadsheet that included a list and summary of each piece of literature they rely upon in support of their proposal

for expansion of the telepsychiatry policy. *Id.* at 100. The literature consisted of 56 documents, including scholarly articles, practice guidelines, textbook excerpts, and studies on the use of telepsychiatry in different settings. The spreadsheet also contained a column indicating the telepsychiatry setting that was the focus of each piece of literature and a column labeled "conclusion." A review of the literature proved unpersuasive, as it did not provide enough data to support a recommendation to adopt defendants' proposed changes to the telepsychiatry policy. The conclusions documented on defendants' spreadsheet in some cases did not take into account other relevant findings and thus only represented a portion of the conclusions to be drawn from the respective documents. Further, many of the documented conclusions were of accepted findings that are not in dispute.

Of the 56 documents relied upon by defendants, they identified 22 as relating specifically to corrections, with two of those focused on corrections in the United Kingdom and Australia, respectively. Two others focused on jail instead of prison, one focused on incarcerated youth, and another contained limited discussion of corrections. One article was authored by a law student. *See id.* at 107 (citing Amartey, Michelle, "Deinstitutionalizing the "New Asylum": Telepsychiatry in the United States Correctional System," an article published on Seton Hall School of Law's Law School Student Scholarship eRepository).

The review found that some of the literature referenced studies with limitations that prevented a useful comparison to CDCR's proposed revised telepsychiatry policy. There were studies solely based on patient satisfaction that did not consider other outcomes, studies that did not consider higher acuity patients, and studies with small sample sizes. One of the jail-based studies noted that the results "may not be generalizable to other psychiatric inmate patient populations or to those who exhibit more severe psychiatric disturbances." Brodey, Benjamin

39

B., et al, *Satisfaction of forensic psychiatric patients with remote telepsychiatry evaluation*, PSYCHIATRIC SERVICES 51.10 (2000) at 1306.

There were some limitations outlined in the literature directly related to defendants' proposed changes which made clear that, without additional data, caution must continue to be exercised in consideration of defendants' proposed expansion of the policy. Two noted challenges associated with working off-site included the potential for difficulty in accessing information readily available to on-site staff and the perception of telepsychiatrists as "outsiders" by on-site prison staff. There were multiple references in the literature citing concerns about confidentiality and the ability to develop the patient-provider relationship as limitations. Other noted limitations in the relied upon literature included poor continuity of care created by the lack of interaction between telepsychiatrists and other staff and telepsychiatrists' lack of access to "collateral information" (information about the patient from a secondary source, such as another on-site clinician or correctional staff, regarding the patient's status). Additional limitations outlined in the literature not directly related to defendants' proposed changes but still worth mentioning included the potential cost of technology, resistance from medical staff, difficulties coordinating services, and the prison culture, in which security issues may take priority over health care provisions.

Despite defendants' indications to the contrary, some of the literature they cited spoke directly against telepsychiatry being used as the default practice for high acuity patients. One article found that videoconferencing was unable to "replace direct assessment in a number of situations, particularly complex evaluations or those with potential complicating factors such as physical illness." Sullivan, D. H., Chapman, M., and Mullen, P. E., *Videoconferencing and forensic mental health in Australia*, BEHAVIORAL SCIENCES AND THE LAW, 26(3) at 326-27

(2008). That same article went on to state that "negative aspects of videoconferencing clearly prevent it from becoming the default practice." *Id.* at 329.

Another source made clear that telepsychiatry should not be used as a replacement for on-site psychiatry, stating that "telepsychiatry is still not a substitute for on-site staff, particularly when it comes to emergencies or delivery of treatment beyond consultation and short-term care." Exhibit B at 104.

Defendants acknowledged that there may be special considerations for specific populations and the literature speaks to that. According to an American Psychiatric Association publication, "patients who are acutely psychotic or paranoid may have difficulty being seen remotely and may be unable to give consent to participate in this treatment modality." *Id.*

Defendants have not provided any literature or published studies demonstrating that telepsychiatry is recommended as a replacement for on-site psychiatry for higher acuity patients such as EOP patients. As evidence-based data on the use of correctional telepsychiatry is limited and still evolving at this stage, particularly with respect to its use for higher acuity patients, it is premature to rely on the premise that there is currently no absolute evidence of contraindications for telepsychiatry in order to justify the expansion of the policy that defendants advocate for.

The Special Master does not dispute that under the correct circumstances telepsychiatry can be an effective means of providing psychiatric care to *Coleman* class members. The Special Master's expert's evaluation of telepsychiatry under the Provisionally Approved Telepsychiatry Policy showed mixed results which included the significant concerns noted above. Still, the expert's assessment did not reveal that the use of telepsychiatry should be limited beyond the terms of the Provisionally Approved Telepsychiatry Policy which already allows for significant

use of this modality.  The concern lies in relaxing limitations further as defendants propose prior to gathering additional information that might support defendants' proposed policy rewrite.

## VII.  <u>Analysis</u>

### A.    <u>Preliminary Observations</u>

Defendants have opted to use the process outlined in the March 27, 2020 Stipulation and Order for finalizing the telepsychiatry policy to attempt to relitigate the law of this case.  The Special Master's monitoring during the provisional approval period was intended to determine the appropriateness of the Provisionally Approved Telepsychiatry Policy's terms.  However, the defendants' proposal presents the Court, Special Master, and parties with an entirely different question: Whether the experience of the provisional approval period justifies adoption of defendants' substantially rewritten policy – which has not been subject to any monitoring.

The renewed conflict over the appropriate scope of telepsychiatry in the context of this remedy must not obfuscate the fact that the Provisionally Approved Telepsychiatry Policy did exactly what it was intended to do: The expansion of telepsychiatry during the provisional approval period permitted the replacement of on-site psychiatry for 3CMS patients, who comprise the vast majority of *Coleman* class members, *see supra* note 1, and allowed CDCR the flexibility to appropriately utilize telepsychiatry at other levels of care in the face of psychiatric staffing shortages.  *See, e.g.*, Exhibit B at 20 (Mehta Declaration at 7) ("Between April 2020 and June 2022 alone, CDCR telepsychiatrists engaged with their patients in more than 158,000 clinical encounters.").  As will be demonstrated below, this expansion enabled CDCR, for the first time, to fill a sufficient number of psychiatry positions statewide to satisfy the Court's 2002 mental health staffing vacancy order.  June 12, 2002 Order, ECF No. 1383 at 4.  In doing so, the

Provisionally Approved Telepsychiatry Policy provided defendants the opportunity to begin demonstrating the durability of their psychiatry staffing remedy.

Moreover, defendants' argument that the terms of the Provisionally Approved Telepsychiatry Policy – which defendants negotiated and agreed to – "strictly" and inappropriately limited CDCR's utilization of telepsychiatry rings hollow. Indeed, defendants' correspondence actually demonstrates the flexibility of the Provisionally Approved Telepsychiatry Policy and its facilitation of the significant expansion of the number of telepsychiatry clinical encounters during the provisional approval period. *See* Exhibit B at 10 (reporting a significant increase in telepsychiatry encounters between 2015 – August 2018 (70,000 encounters) and April 2020 – June 2022 (158,000 encounters)).

A review of defendants' monthly psychiatry vacancy reports demonstrates CDCR's recent success filling psychiatry positions. Between February 2018, when defendants filed their first monthly psychiatry vacancy report, *see* February 15, 2018 Order, ECF No. 5786 at 5, and May 2020, CDCR's psychiatry statewide psychiatry vacancy rate remained substantially above the court-ordered ten percent maximum, as displayed below in Figure 2.

**Figure 2**[30]



During this time, the psychiatry fill rate – including all positions reflected in CDCR's monthly reports (on-site civil servants, on-site registry, telepsychiatry, and psychiatric nurse practitioners) – ranged from 71 to 77 percent, as reflected in Figure 3 below.

---

[30] Data included in Figures 2 and 3 are taken from defendants' monthly psychiatry vacancy reports from February 2018 – May 2020.  ECF Nos. 5813 (February 2018), 5820 (March 2018), 5828 (April 2018), 5839 (May 2018), 5899 (June 2018), 5900 (July 2018), 5934 (August 2018), 5991 (September 2018), 6019 (October 2018), 6059 (November 2018), 6080 (December 2018), 6102 (January 2019), 6117 (February 2019), 6137 (March 2019), 6174 (April 2019), 6209 (May 2019), 6232 (June 2019), 6260 (July 2019), 6299 (August 2019), 6375 (September 2019), 6400 (October 2019), 6437 (November 2019), 6453 (December 2019), 6491 (January 2020), 6563 (February 2020), 6649 (March 2020), 6694 (April 2020), 6745 (May 2020).

**Figure 3**



In the months after the Court's March 27, 2020 Stipulation and Order, CDCR's monthly reports reflected increases in the number of telepsychiatry positions filled, with statewide fill rates approaching 90 percent. This trend continued through the entirety of the provisional approval period (October 1, 2020 – April 1, 2022).

**Figure 4**[31]



Data included in Figures 4 and 5 are taken from defendants' monthly psychiatry vacancy reports from June 2020 – March 2022. ECF Nos. 6803 (June 2020), 6842 (July 2020), 6892 (August 2020), 6929 (September 2020), 6970 (October 2020), 7011 (November 2020), 7042 (December 2020), 7069 (January 2021), 7115 (February 2021), 7148 (March 2021), 7188 (April 2021), 7214 (May 2021), 7253 (June 2021), 7291 (July 2021), 7335 (August 2021), 7361 (September 2021), 7383 (October 2021), 7408 (November 2021), 7441 (December 2021), 7481 (January 2022), 7518 (February 2022), 7542 (March 2022), 7561 (April 2022), and 7579 (May 2022). As reflected in Figure 4, the Special Master notes that CDCR reduced allocations for psychiatry positions in response to the decline in population secondary to the COVID-19 pandemic, which also impacted fill rates.

**Figure 5**



| | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | June-21 | July-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fill Rate | 75% | 80% | 85% | 87% | 88% | 85% | 89% | 87% | 87% | 92% | 96% | 94% | 95% | 91% | 93% | 92% | 91% | 91% | 92% | 88% | 87% | 92% |

As displayed in Figure 5, throughout the provisional approval period (October 1, 2020 – April 1, 2022), CDCR reported compliant or nearly compliant statewide psychiatry fill rates for most months.  Including on-site civil service and registry providers, telepsychiatrists, and PNPs, CDCR reported its psychiatry fill rate exceeded 90 percent for the first time in March 2021; the fill rate remained above 90 percent through December 2021.  The psychiatry fill rate dipped below 90 percent in January and February 2022 and exceeded 90 percent again in March 2022 (92 percent).

As will be demonstrated below, the Special Master carefully reviewed the parties' June 30, 2022 submissions.  Throughout the process, the Special Master has been open to reasonable modifications to the Provisionally Approved Telepsychiatry Policy, especially those grounded in any emerging scientific literature or professional standards.  However, the Special Master must also be mindful of the extensive record in this case – including controlling orders that defendants either did not appeal or unsuccessfully appealed.

B.    Overview of Parties' Proposed Revisions to Provisionally Approved
      Telepsychiatry Policy

Upon review of the parties' respective submissions, it is apparent there are at least ten

proposed substantive changes to the provisionally approved policy requiring the Special Master's

attention:

(1) Removing on-site psychiatrist requirement for EOP programs;

(2) Removing "last resort in emergency situations" standard for use of telepsychiatry in

MHCBs and PIPs;

(3) Decreased frequency of site visits;

(4) Status of cell-front telepsychiatry contacts;

(5) Modified language regarding informed consent;

(6) Telepsychiatry from home / status of the telepsychiatry hubs;

(7) Night-Time Telepsychiatry;

(8) Continued good faith recruitment and retention of on-site psychiatrists;

(9) Status of CDCR's telepsychiatry EHRS identifier; and

(10) Plaintiffs' request for enhanced reporting of lack of on-site psychiatry coverage.

Each of these issues is discussed below.

(1) Removing on-site psychiatrist requirement for EOP programs

As noted, defendants' Revised Policy removes the Provisionally Approved

Telepsychiatry Policy's requirements related to the provision of telepsychiatry in EOPs,

including the requirement that each EOP program have 1.0 personnel year equivalent on-site

psychiatry staff.  The plaintiffs oppose this substantial change, as does the Special Master's

expert.  Significantly, this proposal conflicts with existing court orders in this case.  *See* ECF

Nos. 5711, 5850.

Throughout the meet and confer process, it became clear that defendants' proposed changes related to EOP programs were among the most controversial under consideration. On the one hand, plaintiffs correctly noted the long, intensive negotiations that ultimately led to the compromise language contained in the Provisionally Approved Telepsychiatry Policy. For their part, defendants – as they have in prior filings – acknowledged their decades-long unsuccessful efforts to recruit and retain sufficient on-site psychiatry staff to meet their obligations to the *Coleman* class. Defendants pointed to their monthly psychiatry vacancy report as evidence of the benefit of utilizing telepsychiatry on their psychiatry staffing fill rates.

Notably, the findings from the provisional approval period did not materially alter the monitor's expert's historic concerns with the unfettered expansion of telepsychiatry into EOP programs. Indeed, the monitoring tours reflected variable quality of care. Some institutions utilized high-quality equipment, experienced few connectivity problems, and telepsychiatrists were noted to be active, engaged members of the treatment team. However, connectivity problems were noted in multiple institutions, particularly where laptops were used. Interviewed staff noted that telepsychiatrists working from home were more likely to experience internet connectivity issues, a particular concern considering the majority of telepsychiatrists worked from home during the provisional approval period. *See supra* note 29. In other institutions, the monitor's expert's observations reflected telepsychiatrists' disconnection from the milieu, as evidenced by telepsychiatrists' minimal participation in IDTTs and huddles and, in one case, providing inaccurate patient information during an IDTT. The monitor's expert also noted concerns about the use of telepsychiatry in programs with high vacancy rates in other mental health staff positions and large numbers of unlicensed on-site clinicians who would benefit from ongoing consultation with psychiatry, which is difficult to facilitate when psychiatrists are not

on-site.  In one case, the position of telepsychiatry equipment during an IDTT prevented the

telepsychiatrists from being able to observe signs of akathisia with severe involuntary

movements, requiring the monitor's expert's intervention.

Considering the Special Master's expert's historic[32] and ongoing concerns with the

expansion of telepsychiatry into correctional residential treatment programs, like CDCR's

EOP,[33] and the requirements of the Court's prior orders (and appellate decisions affirming the

court's prior orders), the Special Master cannot recommend approval of defendants' requested

changes at this time.  Indeed, based on the record in this case and the findings from the

provisional approval period, the Special Master's observation from his 2017 Staffing Report

remains valid: "The higher the acuity of mental illness, the less telepsychiatry should be relied on

as a permissible method of treatment."  ECF No. 5564 at 16.  Given the level of acuity of

---

[32] *See, e.g.*, Special Master's 2017 Staffing Report, ECF No. 5564 at 16.  ("Telepsychiatry is not
clinically desirable as a frontline approach to providing psychiatric services for [patients] with
the most intensive or emergent needs.  The higher the acuity of mental illness, the less
telepsychiatry should be relied on as a permissible method of treatment. …Although the efficacy
of telepsychiatry for EOP [patients] is not clear or recommended as a permanent solution at this
time, it would be recommended that a psychiatrist be on-site at least quarterly to treat EOP
[patients], given the frequency of psychiatric contacts required by the Program Guide.");  Special
Master's 2018 Telepsychiatry Report, ECF No. 5872 at 9 ("On-site psychiatrists are required for
each program providing EOP level of care consistent with the staffing ratios delineated in the
2009 Staffing Plan.  The rationale for this requirement was that in a residential treatment unit, the
psychiatrist's role includes attention to the treatment milieu, team building, and other functions,
which cannot adequately be accomplished by remote psychiatrists.").

[33] *See* July 3, 2018 Order, ECF No. 5850 at 5-6 ("Although EOP is labeled an 'outpatient'
program, outpatient is contextual and relative to inpatient programs within the MHSDS;
moreover, the Revised Program Guide makes clear EOP is a residential program, synonymous
with an inpatient setting.  All inmates at this level of care are housed in separate specifically
designated EOP housing units, which provide housing, treatment and programming for seriously
mentally ill inmates 'whose mental illness precludes their placement and participation in the"
general population." (citing Revised Program Guide at 12-4-1)).

*Coleman* class members at the EOP level of care,[34] on-site psychiatry should remain the

preferred modality for these patients. *See supra* note 32. At a minimum, these findings indicate

it is premature to recommend such a substantial deviation from the requirements of the Court's

prior orders as is contemplated in defendants' proposed policy re-write.

    (2) <u>Removing "last resort in emergency situations" standard for use of telepsychiatry in MHCBs and PIPs</u>

Defendants' Revised Policy strikes language that originated from the Special Master's

2017 Staffing Report regarding telepsychiatry in MHCBs and PIPs. Specifically, defendants

proposed removing language from the policy prohibiting the use of telepsychiatry in MHCBs

---

[34] *See* Program Guide at 12-4-1 ("The [EOP] is characterized by a separate housing unit and structured activities for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care."); *see id.* at 12-4-3 ("In addition to the overall treatment criteria above, an inmate must meet the following specific treatment criteria to receive treatment at the EOP level of care:

    Acute Onset or Significant Decompensation of a serious mental disorder characterized by symptoms such as increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment; and/or

    Inability to Function in General Population Based Upon:

        A demonstrated inability to program in work or educational assignments, or other correctional activities such as religious services, self-help programming, canteen, recreational activities, visiting, etc. as a consequence of a serious mental disorder; or

        The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, extreme argumentativeness, inability to respond to staff directions, provocative behavior toward others, inappropriate sexual behavior, etc., as a consequence of a serious mental disorder; or

        An impairment in the activities of daily living including eating, grooming, and personal hygiene, maintenance of housing area, and ambulation, as a consequence of a serious mental disorder.

and PIPs "except as a last resort in emergency situations." In addition to being the subject of one of the Special Master's recommendations, this requirement was also incorporated in subsequent court orders related to telepsychiatry. ECF No. 5711 at 21, 23, 30; ECF No. 5850 at 6.

The Provisionally Approved Policy was unambiguous about the use of telepsychiatry in MHCBs and PIPs:

> Telepsychiatry may not be used at the MHCB level of care except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the MHCB level of care. If these good faith efforts are unsuccessful, psychiatric services may be provided via telepsychiatry.

ECF No. 6539 at 7-8; *see also id.* at 8 (applying identical language to PIPs). Defendants proposed the following significant re-write of these sections of the policy:

> Whenever possible, CDCR seeks to employ psychiatrists who can deliver on-site psychiatric evaluation and care to patients in all inpatient facilities. The use of telepsychiatry is restricted to only when on-site psychiatric care is not available and only as long as necessary. CDCR will not use telepsychiatry in lieu of on-site psychiatrists at the inpatient level of care for any reason other than a lack of availability of on-site psychiatrists.

Defendants' Revised Policy at 4, 27.

Upon review, the Special Master is deeply troubled by defendants' efforts to deviate from the carefully negotiated language regarding the use of telepsychiatry in inpatient levels of care, which is rooted in the Court's prior orders and consistent with defendants' representations about their intent to utilize telepsychiatry in inpatient programs.

(3) Decreased frequency of site visits

The Provisionally Approved Policy required telepsychiatrists to visit their institutions within 30 days of assignment. ECF No. 6539 at 9. Thereafter, 3CMS telepsychiatrists were required to visit their institutions twice per year, while quarterly site visits were required for all other MHSDS levels of care. *Id.* Further, the Provisionally Approved Policy required the

52

telepsychiatrist to "spend at least one full working day, consisting of the regular number of hours they would normally be scheduled to work, during each site visit" and "participate in the IDTT, meet with necessary health care staff, and see patients face-to-face." *Id.*

In contrast, defendants' Revised Policy would require telepsychiatrists to visit the institutions they serve annually, regardless of the level of care they serve. Defendants also propose striking the requirement that the telepsychiatrist spend one "full working day consisting of the regular number of hours they would normally be scheduled to work." *Compare* ECF No. 6539 at 9 ("The telepsychiatrist will spend at least one full working day, consisting of the regular number of hours they would normally be scheduled to work, during each site visit at the facility…."), *with* Defendants Revised Policy at 5-6 ("The telepsychiatrist will spend at least one day during each site visit at the facility."). Moreover, face-to-face visits with patients would be optional under the terms of defendants' Revised Policy. *Id.* at 6.

The Provisionally Approved Policy's site visit requirements were intended to foster collaboration and relationship-building between telepsychiatrists and their on-site colleagues and mitigate against the possibility of telepsychiatrists being isolated from the rest of the onsite treatment team: "Telepsychiatrists are responsible for maintaining relationships with members of the on-site treatment team through regular communication and by visiting institutions." ECF No. 6539 at 9. Moreover, site visits enable the telepsychiatrist to assess patients in-person who may be clinically contraindicated for telepsychiatry.

Given the Special Master's expert's concerns about the potential for telepsychiatrists to be isolated from the treatment team – concerns which were reinforced by some of the monitor's expert's findings during the provisional approval period – the Special Master is not convinced that reducing the number of required site visits is indicated at this time.

(4) Cell-front Telepsychiatry

As noted, the Provisionally Approved Policy did not allow cell-front telepsychiatry contacts to count as a Program Guide-compliant clinical contact "under any circumstance." ECF No. 6539 at 7. Defendants proposed striking this language and propose "that the same rules that apply to on-site providers apply equally to telepsychiatrists." Exhibit B at 17 (Mehta Declaration at 4).[35]

Plaintiffs opposed defendants' proposed revisions regarding cell-front telepsychiatry, arguing that "[t]elepsychiatry further exacerbates the deficiencies of in-person cell-front psychiatry and makes it even more difficult for providers to assess risk, identify medical and mental illness, and develop a relationship with a patient." Exhibit A at 7-8.

While plaintiffs' observations about the inferiority of in-person non-confidential cell-front clinical contacts are beyond the scope of this report, the Program Guide and CDCR's related policies are clear that non-confidential contacts are Program Guide-compliant only in very limited circumstances. *See* ECF No. 7333-1 at 15, 65, 203, 636.[36]

---

[35] Discussing on-site, teleworking clinician's use of cell-front video-conferencing during the COVID-19 pandemic, Dr. Mehta wrote: "During that time, cell-front visits that would have been carried out in person were carried out through video conferencing equipment brought into the housing unit. In these situations, on-site providers "tele-working" could count their cell-front visit for a Program Guide required clinical contact in specific circumstances such as quarantines. A telepsychiatrist, however, could conduct an identical cell-front visit, but it would not count under this clause in the policy. This is logically inconsistent. It is not being proposed that every cell front contact count as a Program Guide required clinical contact, only that the same rules that apply to on-site providers apply equally to telepsychiatrists." Exhibit B at 17 (Mehta Declaration at 4).

[36] A February 7, 2020 Memorandum entitled "Clinical Contacts and Documentation," attached to the 2021 Program Guide Update provides the following:

Each patient shall be offered individual treatment in a confidential setting. To be considered a clinical contact that meets Mental Health Services Delivery System (MHSDS) Program Guide requirements, the patient must be seen:

In his 2018 Telepsychiatry Report, the Special Master discussed his recommendation related to cell-front telepsychiatry as follows:

> Consistent with the Special Master's team's assessment of the potential efficacy of cell-front telepsychiatry…the telepsychiatry policy was modified to prohibit, at the present time, the use of cell-front telepsychiatry. The qualifying terminology "at present" was added to the policy to indicate that this provision may change based upon subsequent improvements in technology.

ECF No. 5872 at 10.

During the provisional approval period, several institutions were noted to utilize excellent monitors and equipment, but the use of laptops and tablets to provide telepsychiatry was noted to present connectivity issues. Moreover, CDCR's COVID-19 Lessons Learned Report revealed the department's ability to track telepsychiatry appointments, including information about confidentiality, was still under development. ECF No. 7196 at 27, 51.

Final approval of this policy revision, which has not been monitored, is not indicated at this time.

---

1.  In a confidential setting, OR

2.  In a non-confidential setting in response to:

    a.  The patient's refusal, as defined below, OR

    b.  Temporary Medical Isolation that requires confinement to quarters or isolation in a medical setting per the Health Care Department Operations Manual 1.2.14, Medical Classification System (Attached).

    A non-confidential contact for reasons other than in response to a refusal or medical isolation due to medical illness shall not be considered a Program Guide required clinical contact.

ECF No. 7333-1 at 636.

(5) Modified language regarding informed consent

Defendants proposed revising the "Professional and Patient Identity" section of the Provisionally Approved Telepsychiatry Policy as follows: "At the beginning of the patient's first telepsychiatry contact, the telepsychiatrist shall explain the treatment modality, including a description of the role of the tele-presenter…, and a plan for a response to interruption in services, and conditions under which a referral is made for in person care." Defendants' Revised Telepsychiatry Policy at 2, 25. In support of this revision, defendants cited vague concerns about "'doctor shopping' and other potential misuses of the system." Exhibit B at 16 (Mehta Declaration at 3).

Plaintiffs opposed this revision: "This language was the result of a compromise between the parties in 2018 to address our concerns about the need for informed consent, and the Special Master['s] team's recommendation for upfront patient education. It remains necessary and appropriate, and the phrase should be reinserted." Exhibit A at 8.

Defendants have appropriately maintained the Provisionally Approved Telepsychiatry Policy's requirement to provide on-site psychiatry to those patients determined inappropriate for telepsychiatry as a modality. Their proposal to strike the requirement to inform the patient of this fact upfront is, thus, troubling.

(6) Telepsychiatry from home / status of the telepsychiatry hubs

Defendants' proposal to remove the Provisionally Approved Telepsychiatry Policy's requirement that telepsychiatrists work from CDCR operated telepsychiatry hubs is based in part on a temporary policy implemented during the COVID-19 pandemic. CDCR's "Telepsychiatry

from Home" policy was one of the four modifications to CDCR's 2009 Staffing Plan[37]

defendants' proposed in December 2020. Defendants identified "these modifications, and in

particular the formalized policies for use of PNPs and *telepsychiatry from home*, [as] critical to

eliminating barriers to Defendants' ability to deliver constitutionally adequate care, and will

improve access to care." Defendants' Response to November 4, 2020 Order, ECF No. 6978 at 2.

Defendants indicated CDCR first permitted telepsychiatrists to work from home in response to

the COVID-19 pandemic and continued to do so throughout the duration of the provisional

approval period for CDCR's telepsychiatry policy. *See* ECF No. 6978-1 at 4 ("To facilitate the

delivery of care to patients, while also protecting both patients and staff during the COVID-19

pandemic, many telepsychiatrists are now providing services from their homes[.]"). The Court

ordered that defendants' December 11, 2020 proposed revisions to CDCR's staffing plan be

approved and "implemented forthwith." ECF No. 7035 at 2.

By eliminating the Provisionally Approved Policy's telepsychiatry hub requirement,

defendants are in essence proposing to make the Telepsychiatry from Home policy a permanent

fixture of CDCR's telepsychiatry policy. Plaintiffs expressed no opposition to this revision and

incorporated defendants' proposed language into their Revised Policy.

As noted, CDCR cited the telepsychiatry from home policy as a critical tool for

"eliminating barriers" to its ability to "deliver constitutionally adequate care." Moreover,

defendants allude to the positive impact "allowing onsite and hub providers the ability to work

---

[37] Defendants proposed the following four modifications to CDCR's 2009 Staffing Plan:
"(1) establishing a new psychiatrist staffing ratio for CCCMS patients not on medications for six
months or more; (2) redirecting psychiatry positions allocated for crisis intervention on
weekends and holidays to night shift telepsychiatry; (3) adopting a formal policy for Psychiatric
Nurse Practitioners (PNPs) to provide psychiatry services and recognizing PNPs in the
psychiatry position allocation fill rate; and (4) creating a telepsychiatry from home policy." ECF
No. 6978 at 2.

from home" had on recruitment and retention.  *See* Exhibit B at 8; *see also id.* at 9 ("Telework

contributed to the quality of life, job satisfaction, recruitment, and retention of providers in

CDCR's system."); *see also* Defendants' Lesson Learned Report, ECF No. 7196 at 24 ("CDCR's

flexibility and willingness to accommodate the ability to work from home ultimately resulted in a

retention of onsite providers while effectively recruiting more civil [service] telepsychiatrists

during the COVID-19 pandemic…Telework contributed to quality of life, job satisfaction,

recruitment, and retention of providers in CDCR's system.").

     The Special Master's recent monitoring tours of the telepsychiatry hubs confirmed that

these telepsychiatry hub offices are essentially empty.  *See supra* Part V.B (noting only ten of

82.51 telepsychiatrists were working from the telepsychiatry hubs at the time of the Special

Master's telepsychiatry hub monitoring tours).

     As noted, plaintiffs did not object to defendants' revised language regarding

telepsychiatry from home.  At a minimum, defendants' revisions present practical challenges

from a monitoring perspective as experienced during the Telepsychiatry Hub monitoring tours.

*See supra* Part V.B. (noting limitations of the findings derived from the Special Master's

telepsychiatry hub monitoring tours due to the low number of telepsychiatrists working from the

hubs.).  In addition, reports from staff at multiple institutions that telepsychiatrists working from

home tended to experience more connectivity problems is concerning.  If CDCR intends to allow

the overwhelming majority of telepsychiatrists to work from home indefinitely, this should be

monitored closely and addressed to minimize any disruptions in mental health service delivery.

     (7) Telepsychiatry at Night

     Defendants propose clarifying language regarding the role of Night Shift

telepsychiatrists.  *See* Defendants' Revised Policy at 1, 2, 3, 6, 7.  These revisions clarify that

Night Shift telepsychiatrists provide "comprehensive after-hours services" but "do not carry [MHSDS] caseloads." *Id.* at 1; *see also id.* at 7. Accordingly, Night Shift telepsychiatrists are not required to participate in IDTTs, *id.* at 2, nor are they required to visit the institutions they service. *Id.* at 6, 7. Finally, defendants' revisions clarify that Night Shift telepsychiatrists do not service the PIP level of care. *Id.* at 3.

Plaintiffs did not express concerns regarding defendants' proposed Telepsychiatry at Night modifications.

(8) Good faith recruitment of on-site psychiatrists

As noted, defendants proposed removing language from the Provisionally Approved Policy requiring continued good-faith efforts to recruit on-site psychiatry staff. CDCR's obligation to recruit sufficient clinical staff, including psychiatrists, to provide adequate mental health services to the plaintiff class is firmly rooted in the law of this case. *See supra* note 2 and accompanying text; *see also Coleman v. Wilson*, 912 F.Supp. 1282, 1307 ("The overwhelming evidence before this court demonstrates that the California Department of Corrections is significantly and chronically understaffed in the area of mental health care services. The Department does not have sufficient staff to treat large numbers of mentally ill inmates in its custody."). As noted above, in its October 10, 2017 and July 3, 2018 orders, the Court reiterated defendants' obligation to continue recruiting on-site psychiatry staff even while CDCR was expanding its use of telepsychiatry. ECF No. 5711 at 30; ECF No. 5850 at 8.

Significantly, defendants conceded their Eighth Amendment obligation to continue their good faith efforts to recruit on-site psychiatrists during a status conference on September 10, 2018. There, defense counsel (Jay Russell, California Office of the Attorney General) used the requirements of the October 10, 2017 order to support defendants' argument that requiring good-

faith recruitment of on-site psychiatrists within the four corners of the Telepsychiatry Policy was

unnecessary:

> **MR. RUSSELL**: We submit that the staffing plan that was essentially approved by the October 10, 2017, order has within it a requirement of good faith in seeking to hire and retain staff, and that's what we're working on here with regard to the telepsychiatry policy is actually a policy that dictates to the field how telepsychiatry services should be rendered and—or provided. And so the concern is if there is a directive to the hiring authorities of using good faith in order to try to obtain and retain psychiatrists, that might somehow – you know, it could just simply lead to confusion. … *So all of that leads us to believe that the requirement of good faith should not actually be within this policy. It's already been addressed.* …

> **THE COURT**:    So not even a separate order required –

> **MR. RUSSELL**: We would submit not.

> **THE COURT**:    --because you're saying it would be redundant?

> **MR. RUSSELL**: That's correct, your Honor. And *it would be redundant*, I think, of the defendants' overall obligations in any event. I mean, the defendants are required to act in good faith, and so the question arises that it would probably be one of fact as to whether or not they have done so when they're trying to recruit and retain psychiatrists.

September 7, 2018 RT, ECF No. 5915 at 4:8-5:14.[38]

Defendants' obligations to recruit on-site mental health staff are law of the case and the

Special Master is not aware of any change in defendants' interpretation of relevant court orders

from the time of the September 7, 2018 status conference.

(9) <u>Plaintiffs' Recommendation Regarding CDCR's Telepsychiatry EHRS Identifier</u>

Citing defendants' COVID-19 Lessons Learned Report's discussion of CDCR's plan to

"develop an identifier in EHRS to track whether care is provided via telehealth," plaintiffs

recommend inserting a new section to the Provisionally Approved Telepsychiatry Policy entitled

---

[38] Plaintiffs' counsel agreed with defendants' interpretation of the October 10, 2017 order, though they argued for a separate court order for clarity. *See* September 7, 2018 RT, ECF No. 5915 at 6:24-7:24.

"Documenting Telepsychiatry in EHRS."  Exhibit A at 8.  Plaintiffs proposed the following language be inserted into the policy:

> Telepsychiatrists are required to document on EHRS if they provide treatment to a patient via telepsychiatry.  Additionally, telepsychiatrists must document in EHRS if the telepsychiatry contact was cell-front or in a non-confidential setting, if the patient refused a telepsychiatry contact, if the patient was contraindicated for telepsychiatry, if an IDTT included a telepsychiatrist, and the identity and discipline of the telepresenter.

Plaintiffs' Revised Policy at 8, 30.

> A review of CDCR's COVID-19 Lessons Learned Report is instructive:

> Data specific to outcomes of care provided exclusively via telehealth are currently difficult to obtain in the EHRS tracking system.  Telepsychiatrists have not had a separate identifier to distinguish them from onsite psychiatrists in EHRS, though this is currently in progress.  Additionally, last year new check-out categories for patient appointments were added to reflect temporarily teleworking psychiatrists and clinicians.  *However, this information is not yet mapped to CDCR dashboards where it can be readily analyzed.  This change is also in progress, and in the future CDCR will be able to more comprehensively assess outcomes in relation to telehealth.*

ECF No. 7196 at 27 (emphasis added).  Later in the report, defendants similarly acknowledged their preliminary efforts to enhance tracking and reporting of telepsychiatry outcomes:

> CDCR's recommendation to continue telework as appropriate is broadly supported by *ongoing efforts* to analyze the data collected during the COVID-19 pandemic, *to define and examine patient outcome measures*, to survey patient and staff satisfaction, *and to measure potential limitations of the telehealth delivery of care*. Fundamental changes in the identification of telepsychiatrists versus onsite psychiatrists are being built into the EHRS to help analyze outcome measures. *Various data measures captured during the COVID-19 pandemic are currently in the lengthy process of being mapped and validated so they can be easily accessed and studied.*

*Id.* at 51 (emphasis added).

While the Special Master generally concurs with the rationale underlying plaintiffs' recommendation, it is premature to recommend specific policy language in light of the ongoing

nature of CDCR's efforts to enhance its telepsychiatry tracking and reporting capabilities.  *See* Defendants' COVID-19 Lessons Learned Report, ECF No. 7196 at 27, 51.

        (10)    <u>Plaintiffs' request for enhanced reporting of lack of on-site psychiatry coverage</u>

        The Provisionally Approved Telepsychiatry Policy requires CDCR to report to the Special Master and plaintiffs when EOP, MHCB, and PIP programs are without on-site psychiatry coverage for extended periods of time.  ECF No. 6539 at 7-8; *see supra* Part III(A). In addition to these existing reporting requirements, plaintiffs requested ongoing monthly reports "if the staffing issue persists beyond the second notice" required by the Provisionally Approved Telepsychiatry Policy.  Exhibit A at 9.

        The Special Master is satisfied that the Provisionally Approved Telepsychiatry Policy's notice requirements remain sufficient.  Notably, defendants did not propose rolling back the Provisionally Approved Telepsychiatry Policy's notice requirements.  While the Special Master will not recommend revising the policy to include additional reporting requirements, the Special Master expects defendants to remain responsive to all reasonable requests for staffing-related data and information.

## VIII.   <u>Conclusion and Recommendation</u>

        As demonstrated above, for years the Court, Special Master, and parties have worked to develop and fine-tune CDCR's telepsychiatry policy, balancing the constitutional rights of *Coleman* class members to mental health care not violative of the Eighth Amendment with CDCR's need for flexibility in staffing and operating its mental health program.  Through that process, CDCR developed a telepsychiatry policy that allowed unlimited use of telepsychiatry for *Coleman* class receiving outpatient treatment at the 3CMS level of care, who comprise a majority of the *Coleman* class.  In addition, the Provisionally Approved Telepsychiatry Policy

permits CDCR to utilize telepsychiatry in residential (EOP), crisis bed, and inpatient settings in the event of vacancies in on-site psychiatry positions as long as certain conditions are met. Moreover, during the provisional approval period, CDCR, for the first time, established compliant or nearly-compliant fill rates for psychiatry staff.  Defendants' desire to discard a negotiated policy that is essentially achieving its goals is, thus, perplexing.

CDCR's implementation of the Provisionally Approved Telepsychiatry Policy remains a work in progress.  Indeed, the Special Master's expert's findings during the provisional approval period were mixed.  The Special Master's expert's concerns with the expansion of telepsychiatry into EOPs and inpatient settings have not abated and were in fact bolstered by some of the findings from the provisional approval period.  However, the Provisionally Approved Telepsychiatry Policy appropriately accounts for these concerns and, significantly, complies with controlling Court orders in this case.

The Special Master is also mindful of the ongoing staffing crisis in other mental health classifications, particularly among primary clinicians.  *See, e.g.*, Special Master's Response to December 1, 2022 Court Order, ECF No. 7677.[39]  As the Special Master's expert noted in a prior

---

[39] On December 1, 2022, the Court "direct[ed] the Special Master to file charts completed with the most recent data provided by defendants that show staffing vacancy rates, by institution and systemwide, for all psychologist classifications, all clinical social worker classifications, all recreational therapist classifications, and all medical assistant classifications." ECF No. 7675 at 1.  the Special Master filed charts displaying mental health staffing vacancy rates required by the Court's December 1, 2022 order on December 9, 2022.  ECF No. 7677.  The charts included in the Special Master's response included data submitted by defendants to the secure website for the month of September 2022.  Statewide vacancy rates were as follows:

- Psychology – line staff:  38.2 percent.
- Psychology – all classifications: 33.1 percent.
- Social Work – line staff: 33.5 percent.
- Social Work – all classifications: 30 percent.
- Recreation Therapist: 26.3 percent.

report, compared to telepsychiatrists, "[o]n-site psychiatrists are able to more positively impact the therapeutic milieu by regularly interacting with correctional, nursing and other mental health staff." Special Master's 2017 Staffing Report, ECF No. 5564 at 17. Given on-site psychiatrists' ability to "positively impact the therapeutic milieu," *id.*, the staffing crisis in other mental health classifications in many EOP institutions underscores the importance of maintaining the minimal on-site psychiatry requirement included in the Provisionally Approved Telepsychiatry Policy. This is especially true when considering the number of unlicensed staff working in these programs and vacancies among mental health supervisor positions. The Special Master remains concerned that removing on-site psychiatry from these woefully understaffed EOP programs could compound an already dire situation. Simply put, now is not the time to permit the removal of all on-site psychiatry from CDCR's EOP programs.

While the Special Master's expert's and plaintiffs' concerns about the proposed expansion of telepsychiatry in the EOP programs are critical, many of defendants' other proposed modifications are likewise subject to prior controlling court orders, as noted above. Moreover, in addition to being rooted in the law of the case, the terms of the Provisionally Approved Telepsychiatry Policy in large part remain consistent with defendants' representations about their intended use of telepsychiatry going forward.

However, the Special Master recognizes that the scientific literature regarding the efficacy of telepsychiatry[40] and, in particular, the efficacy of its use in correctional settings is

---

- Medical Assistant: 47.9 percent.

*Id.* at 2-5.

[40] *See* Blanco et al, Implications of Telepsychiatry for Cost, Quality and Equity of Mental Health Care, Journal of the American Medical Association – Psychiatry (December 2022) at 1 ("Expansion of telepsychiatry can also influence quality of care. Some studies suggest that

still evolving.  As defendants acknowledged in the documents submitted in support of their expanded use of telepsychiatry, even CDCR's ability to track and monitor the efficacy of its own use of telepsychiatry is in a nascent state.  *See* ECF No. 7196 at 27, 51.

As the literature and professional standards evolve and defendants' ability to evaluate the efficacy of its use of telepsychiatry matures, it is entirely possible that adjustments to the Provisionally Approved Telepsychiatry Policy may be warranted.  However, the record thus far, including the Special Master's findings from the provisional approval period, does not support defendants' proposed rewrite of the policy.  Acknowledging the evolving state of the field, the Special Master and his experts remain willing to consider future policy adjustments as the scientific literature develops and professional standards in the correctional setting, particularly for patients with higher degrees of symptoms severity treated at higher levels of care, emerge.

Significant work remains to remedy defendants' staffing-related deficiencies.  However, as demonstrated, the Provisionally Approved Telepsychiatry Policy has facilitated a significant expansion of telepsychiatry within CDCR and enabled CDCR to substantially improve its psychiatry staffing levels.  The record supports the proposition that despite some concerns around implementation, the Provisionally Approved Policy properly calibrates the use of telepsychiatry across CDCR's various levels of care.

---

outcomes are similar in virtual and in-person care, but whether that holds across disorders, levels of symptom severity, and populations is unknown."); *see also id.* ("[I]n contrast to the decades of accumulated knowledge concerning cost, quality, and equity of in-person care, our understanding of telepsychiatry is still a nascent science.").

## **<u>RECOMMENDATION</u>**

In view of the findings contained herein, the Special Master recommends that the

*Coleman* court enter an order directing the following:

1. That the Provisionally Approved Telepsychiatry Policy, ECF No. 6539 at 5-12, be

   adopted as final.

Respectfully submitted,

*Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

December 15, 2022

# APPENDIX A1

## Special Master's Telepsychiatry-Related Findings from the

## [DRAFT] 29th Round Monitoring Report – Part C

Included below are excerpts from the Special Master's [DRAFT] 29th Round Monitoring Report – Part C regarding the use of telepsychiatry during the monitoring round.[41]

<u>CHCF</u>

CHCF used telepsychiatry for individual clinical contacts and IDTTs but not after-hours or as the psychiatrist on duty.  Telepsychiatry was also used in the MHCB and for some acute and intermediate care patients housed at CHCF.

Four telepsychiatrists provided services for the E yard EOP program, which lacked an on-site psychiatrist during the review period.  These E yard telepsychiatrists participated in 2,356 individual clinical contacts and 758 IDTT meetings.

Three telepsychiatrists provided services for EOP and 3CMS patients on C and D yards and participated in IDTTs for acute and intermediate care, and MHCB patients.  These telepsychiatrists participated in 1,247 individual clinical contacts and 642 IDTTs.  CHCF was unable to break down the telepsychiatry individual clinical contacts among EOP and 3CMS patients.  Of the 642 IDTTs, telepsychiatry provided services for 373 EOP patients, 223 3CMS patients, five GP patients, 15 MHCB patients, 20 acute care patients, and six intermediate care patients.

CHCF reported that telepsychiatrists had visited the institution; however, the institution did not maintain documentation that reported the dates of these visits.  CHCF also could not report on whether telepsychiatrists' attended clinical staff meetings or case conferences for EOP patients.

---

[41] As noted above, the Special Master's DRAFT 29th Round Monitoring Report – Part C was distributed to the parties on December 8, 2022.

CIW

CIW did not use telepsychiatry during the review period.

CMC

The 1.0 telepsychiatrist who provided services to 3CMS patients on West Facility had a 330-patient caseload, exceeding the established ratio. The 0.5 telepsychiatrist completed PC 2602 involuntary medication evaluations and testified at those hearings. One medical assistant assisted one telepsychiatrist; the other medical assistant was a medication court assistant supporting the PC 2602 telepsychiatrist. Headquarters' telepsychiatrists provided on-call coverage.

The supervising senior psychologist specialist, PC, telepsychiatrist, medical assistant, and the CC I attended well-conducted IDTTs on West Facility. The treatment team was familiar with patients, and the IDTTs reflected supportive treatment team interaction and appropriate engagement with other team members and patients. The IDTTs did not reflect any issues with differing diagnoses between the PC and telepsychiatrist or agreement on patients' level of care. The PC also clarified diagnoses, interventions, and goals, which were appropriately changed after discussions of coping skills, medication compliance, and custody input.

There was good connectivity for these West facility IDTTs utilizing telepsychiatry. Further, patients knew the telepsychiatrist, who had worked at CMC for over 12 years. However, it was unclear how long the telepsychiatrist had been utilized in this capacity, and whether this clinician had previously worked on-site. The telepsychiatrist also had a long-standing relationship with the medical assistant.

The West facility telepsychiatrist worked from home and not from a hub. The telepsychiatrist reported directly to the headquarters' psychiatrist specialist with a dotted line to CMC's chief psychiatrist.

CMF

For approximately six months ending in November 2020, the administrative segregation EOP hub used telepsychiatry facilitated by an on-site psychiatric nurse practitioner. The PNP sat with the patient to facilitate the telepsychiatrist's assessment and also conducted cell-side assessments for patients who refused to attend telepsychiatry sessions. CMF's 3CMS program had two telepsychiatrists and an on-site PNP. The MHCB did not use telepsychiatry. CMF reported that beginning in June 2021, telepsychiatry would assist with after-hours coverage, with on-site psychiatrists working as a backup.

CSP/Corcoran

All five allocated telepsychiatrist positions were filled.

CSP/Corcoran used telepsychiatry for 3CMS IDTTs, individual clinical contacts, and PC 2602 involuntary medication hearings. Two of the four telepsychiatrists in the 3CMS mainline program carried caseloads in excess of the established ratio, with caseloads of 306 and 310.

Telepsychiatry was used intermittently for initial and routine EOP contacts during the reporting period, with a total of 455 contacts during the review period. There were 314 initial contacts and 141 routine contacts.

The one telepsychiatrist assigned to STRH had a caseload within the established ratio for 3CMS, but the telepsychiatrist assigned to the LTRH had a caseload of 147, exceeding the established ratio.

Telepsychiatry in the STRH consisted of a laptop with a speaker.  Staff reported no issues with the technology and indicated only positive experiences with the telepsychiatrists.

In the LTRH, although technology issues were observed, the fourth quarter sustainable process report also indicated that observed IDTTs started 20 minutes late due to equipment issues.  Observed IDTTs revealed that the telepsychiatrist was not an active member of the treatment team and only spoke about medication issues.  In one observed IDTT, the telepsychiatrist mixed up the identities of patients on the list and provided inaccurate information for two patients.

The institution reported that the telepsychiatrists conducted biannual visits.

<u>CSP/LAC</u>

At the time of the site visit, CSP/LAC's one telepsychiatrist did not have a caseload but handled the institution's PC 2602 involuntary medication renewals.  During the review period, due to COVID-19, reviewed appointment logs indicated that some telepsychiatrists provided some services for several programs, including the MHCB and mainline EOP and 3CMS programs, utilizing telepsychiatry.

<u>CSP/Sac</u>

CSP/Sac only used telepsychiatry for after-hours on-call coverage between 6:00 p.m. and 7:00 a.m.

<u>CSATF</u>

CSATF's ten telepsychiatry positions were filled.

In the EOP program, telepsychiatry was provided by three full-time telepsychiatrists and another telepsychiatrist who split time between the EOP and 3CMS programs.  Two of the EOP program's three full-time telepsychiatrists had caseloads that exceeded the established ratio.

Reported problems with telepsychiatry's use in the EOP program included patients' complaints that it was difficult to build rapport with providers on computer screens and with medical assistants in the room during individual sessions. There were also significant connectivity problems when using a laptop for telepsychiatry; however, these connectivity issues were minimal with the use of higher quality and larger videoconferencing screens and cameras. The monitor's expert was also concerned that, despite observing connectivity issues, EOP telepsychiatrists did not mention them to treatment teams or ask teams to repeat missed information. One EOP telepsychiatrist was unable to access EHRS and could not rely on the PC for relevant information because the PC had neither a laptop nor computer access. The placement of the telepsychiatry equipment resulted in only the patient seeing the telepsychiatrist.

During an EOP patient IDTT, a patient prescribed antipsychotic medication exhibited signs of akathisia with severe involuntary movements. However, the telepsychiatrist could not fully capture the patient's presentation from the small laptop screen and failed to appropriately intervene or recommend follow-up. The monitor's expert intervened and recommended an urgent medical evaluation of the patient's condition, as his involuntary movements were so severe that they likely caused sleeplessness, profuse sweating, fatigue, and interpersonal difficulties with other incarcerated persons. This patient was also at a high risk for self-harm and suicide. A subsequent review of the patient's medical records revealed that although the IDTT documented the monitor's expert's recommendation, there was no documentation located that an evaluation or other follow-up regarding the patient had occurred.

CSATF's use of telepsychiatry in the EOP program was also very concerning, given that most on-site PCs were unlicensed, inexperienced, and had very high caseloads. These EOP primary clinicians would benefit from ongoing consultations with psychiatry about patient care

and risk management, which was more difficult to accomplish with off-site telepsychiatrists and the reported lack of time for consultations due to current workloads.

Facility A 3CMS patients generally reported satisfaction with telepsychiatry. Some nonetheless also reported difficulty building rapport "with a screen," as well as not being able to speak with the doctor one-on-one due to the medical assistant's presence during sessions.

A telepsychiatrist attended an observed Facility B 3CMS patient IDTT. The screen resolution was good, and the telepsychiatrist could be clearly seen. There were rare, brief issues with connectivity, with the equipment intermittently making loud noises, which mildly disrupted the IDTT's flow.

Multiple 3CMS clinical staff members reported challenges with telepsychiatry when compared with on-site psychiatry. Staff reported that the telepsychiatrist only got "a small snapshot" of the patient, compared to the more robust picture that was possible with an on-site psychiatrist. One clinician indicated that, on occasion, this had led to different diagnostic and clinical assessments between the PC and telepsychiatrist. In one instance of a patient reporting the onset of auditory hallucinations, the PC and telepsychiatrist arrived at differing diagnostic conclusions; the PC believed that such a difference would have been much less likely if the telepsychiatrist was an on-site psychiatrist.

3CMS staff reported frequent connectivity issues due to internet issues for telepsychiatrists working from home. Clinicians nonetheless typically reported being able to access the telepsychiatrists using email or telephone.

The MHCB did not utilize telepsychiatry.

CCWF

73

During the review period and at the time of the site visit, CCWF had two full-time telepsychiatrists who exclusively provided services for 3CMS patients on all four yards. These telepsychiatrists had respective caseloads of 237 and 208 patients, which were within ratios.

The two telepsychiatrists had a total of 2,112 contacts with 3CMS patients during the reporting period. There were 1,756 individual clinical contacts and 356 contacts for IDTTs. Of the 1,756 individual psychiatry clinical contacts, 227 were for initial patient contacts, 1,132 were for routine patient contacts, two were for urgent referrals, and 309 were for routine referrals. There was one psychiatry contact for medication noncompliance and 38 for medication consents, either in connection with the prescription of new medications or for medication changes. Forty-seven psychiatry contacts were for AIMS evaluations. Of the 356 psychiatry contacts for IDTTs, 225 were for initial IDTTs and 131 were for continuing IDTTs.

KVSP

Telepsychiatry was used in all 3CMS IDTTs. On Facility C, the telepsychiatrist did not speak during IDTTs for patients who were not prescribed psychiatric medication. There were no observed problems with telepsychiatry on Facility B. Telepsychiatry was at times used for alternative housing patients.

MCSP

MCSP utilized telepsychiatry for IDTTs, individual clinical contacts for EOP and 3CMS patients, and for PC 2602 involuntary medication hearings. Telepsychiatry was not used in the MHCB.

All telepsychiatrists that carried caseloads were within established ratios for the EOP and 3CMS levels of care. One 0.5 full-time (FTE) telepsychiatrist did not have a caseload but performed PC 2602 involuntary medication hearings. MCSP reported that telepsychiatry was

distributed across levels of care to prevent burnout of on-site psychiatrists from managing only EOP or higher levels of care.

Mental health leadership reported some issues with telepsychiatry's use related to the absence of medical assistants, which resulted in the cancellation of all but one telepsychiatrist's appointments for an entire day.  It was also reported that there were connectivity issues on some facilities.

Mental health leadership reported that telepsychiatrists assigned to the EOP program visited MCSP every three months; those assigned to the 3CMS program visited every six months.

RJD

Two telepsychiatrists provided services for the 3CMS program.  During evening hours, telepsychiatry also provided coverage for all levels of care.  No telepsychiatry IDTTs were scheduled during the site visit.

SVSP

One telepsychiatrist provided services in the mainline EOP program, another provided them in STRH and administrative segregation, three others provided services for mainline 3CMS patients, and a part-time telepsychiatrist covered some after hours on-call functions.  A telepsychiatrist previously assigned to SVSP was transferred to the SVSP-PIP shortly before the site visit.

The chief psychiatrist reported that the primary clinician checked on patients who refused telepsychiatry.  The patient was subsequently rescheduled for telepsychiatry, and, if he again refused, another IDTT was held to address any barriers to the patient attending the appointment.

If the patient continued to refuse telepsychiatry appointments, the telepsychiatrist would see the patient when on-site.  Telepsychiatrists visited SVSP every three months.

SQ

SQ did not normally utilize telepsychiatry.  However, between March 30, 2020, and June 30, 2021, in response to COVID-19, SQ primarily utilized telepsychiatry at all levels of care. Staff also reported that SQ used telepsychiatry in one of the H-Units for ten days between July and August 2021 after a staff member tested positive for COVID-19.

VSP

VSP had seven telepsychiatrists filling six positions.  Telepsychiatry services for VSP were provided by statewide service from designated telepsychiatry offices.  One telepsychiatrist had provided services to VSP patients since 2016 and another since 2019.  The remaining five had provided services to VSP over a range of ten to 20 months.

All four telepsychiatrists who provided services solely in the EOP had caseloads within the established ratio.  Another telepsychiatrist who provided services to both EOP and 3CMS patients had a caseload that exceeded established ratios.

Five observed EOP patient IDTTs all used telepsychiatry.  The telepsychiatrist was often the patients' assigned psychiatrist, and fully explained medication issues.  However, she was also adequately prepared for patients who were not on her caseload.

Interviewed EOP patients nonetheless indicated dissatisfaction with telepsychiatry.  They further reported that despite expressing these concerns to IDTT teams, no changes had been made.

In the 3CMS program, psychiatry services were almost exclusively provided by way of telepsychiatry. However, a registry psychiatrist was available one day weekly for patients for whom telepsychiatry was inappropriate.

The caseloads for the telepsychiatrists who provided services solely to 3CMS patients were within the established ratio; however, as noted above, the caseload of a telepsychiatrist who provided services to both the 3CMS and EOP programs exceeded established ratios.

All observed 3CMS IDTTs used telepsychiatry. The telehealth equipment facilitated good auditory and visual communication to enable communication between the telepsychiatrist and patients. Telepsychiatrists' participation varied from team to team, but overall, was generally adequate.

Observed IDTTs for MHSDS patients housed in administrative segregation found the telepsychiatrist making useful treatment planning contributions.

Each telepsychiatrist who provided services to EOP patients was required to conduct in-person visits to VSP at least every three months. For 3CMS patients, telepsychiatrists were expected to conduct in-person visits to VSP at least every six months. Staff indicated that these visits were to occur on a day the telepsychiatrist could attend their patients' IDTTs. In addition, as time permitted, the telepsychiatrist was expected to conduct in-person one-to-one visits with some patients. VSP's chief of mental health tracked telepsychiatrist on-site visits.

Telepsychiatry equipment in treatment team meeting rooms at VSP included 43-inch video screens with voice-activated rotating cameras. The monitor's experts who observed IDTTs during the site visit indicated that the camera rotated to the member of the team speaking, enabling the telepsychiatrist to see them. Video and audio qualities were adequate. There was a 23-inch video screen located in each room used for one-to-one telepsychiatry contacts. Staff

reported that a medical assistant was physically present in the room during telepsychiatry individual sessions to facilitate the contacts.  VSP had two audio-video carts with 24-inch video screens that were used in the administrative segregation unit and the medical OHU for treatment team meetings and individual contacts.  A laptop computer was used for cell-front contacts.

# APPENDIX A2

# Special Master's Monitoring Tours of CDCR's Telepsychiatry Hubs

In addition to the monitoring of telepsychiatry conducted during 29th Monitoring Round site visits, the monitor and monitor's expert toured five of CDCR's telepsychiatry hubs in August 2022.  While on-site observations of telepsychiatry during monitoring tours are typically limited to telepsychiatrists' participation in IDTTs and huddles, the telepsychiatry hub monitoring tours also included observations of individual telepsychiatry clinical encounters.

The monitor's expert observed the use of telepsychiatry at the following telepsychiatry hubs:[42] Fresno; Elk Grove; San Quentin; Diamond Bar; and Santa Ana.  Rancho Cucamonga was not monitored, as no telepsychiatrists were working from the hub at the time of the site visit.  A total of ten psychiatrists at these hubs provided telepsychiatry services to ten institutions.  Four of these (VSP, CHCF, CSATF, and MCSP) were mainline EOP programs.  Six of these (CCI, HDSP, WSP, CCWF, CSP/Corcoran, and KVSP) were 3CMS programs.  Of the 3CMS programs, all were mainline, except for CSP/Corcoran where the psychiatrist treated patients within the LTRH, and HDSP where the psychiatrist saw patients in the STRH.

The telepsychiatrists reported they were rarely required to provide coverage at institutions other than their assigned institution.  Examples of why the telepsychiatrist saw patients at another institution included an institution that did not have a mental health program, or if their appointments at their primary institution were canceled due to institutional issues.

A total of 53 patients were observed.  Of these, 24 were EOP and 29 were 3CMS.

---

[42] The monthly Mission Change letter sent out by CDCR on August 23, 2022, indicates that there is a total of 103 telepsychiatry offices located in the six hubs: 16 in Elk Grove, 15 in San Quentin, 29 in Rancho Cucamonga, 16 in Diamond Bar, 22 in Santa Ana and 5 in Fresno.

CDCR reported there were a total of 89 telepsychiatrist positions filled.[43]  Of these, seven provided night coverage.  The monitor's expert was able to observe ten telepsychiatrists at five of the six hubs over the course of two weeks.  A total of 13 telepsychiatrists worked in the telepsychiatry hubs, with the remainder working from home.  Of the three telepsychiatrists who were not observed, two were due to the psychiatrist having an RDO during the site visit, or in one case, being out sick at the time of site visit.

Telepsychiatrists were given the choice of working in the hub or working from home.  Some utilized a hybrid model, seeing patients at the hub, while doing documentation at home.  Reasons for working from the hub were usually personal or logistical issues.

The schedule for the telepsychiatrists varied, but most had between nine to 13 patients scheduled.  Add-on cases were rare, generally once per week.  Telepsychiatrists reported carrying a regular caseload and having good continuity of care.

The telepsychiatry offices were conducive to their purpose, with adequate size and light.  The telepsychiatrists reported only minor issues with connectivity from the hub.  Some psychiatrists did report poorer connectivity from their internet at home.  All sites observed had two monitors as well as the Cisco DX-80 screen with microphone and camera.  Many psychiatrists praised the technology as both clinically useful and easy to use.  Most technological issues observed by the monitor's expert were simple, minor, did not translate to meaningful clinical impact, and were easily rectified.  Only one institution, CHCF, had more substantial technology issues.  These were deemed to have a mild clinical impact for most individual

---

[43] The monthly psychiatry vacancy report filed with the court on August 31, 2022, indicates that there are 98.50 allocated telepsychiatry positions, with 82.51 filled. *See* ECF No. 7610 at 5.  As noted, at the time of the Special Master's telepsychiatry hub monitoring tours, there were only ten telepsychiatrists working from CDCR's telepsychiatry hubs.

patients.  The technological challenges involving one patient requiring a telephonic interpreter were more substantial and deemed to have a moderate deleterious clinical impact.

The degree of familiarity with on-site functioning in CDCR varied from psychiatrist to psychiatrist.  The majority of psychiatrists had not worked on site, other than the required visits to the facility pursuant to the provisional policy.

Psychiatrists knew the required frequency of visits to the institution, namely quarterly visits for EOP programs and every six months for 3CMS programs.  Several site visits had been delayed, due to COVID-19 related factors.  Several psychiatrists had recently visited or had plans to visit their assigned institutions in the near future.  Most psychiatrists found value in visiting the institution, but some felt the frequency of on-site visits was excessive.  While on-site, the telepsychiatrists generally saw patients or attended IDTT meetings.

Of all psychiatrists interviewed, only one stated that he would be willing to work on-site in the institution.  However, this doctor was retiring in the near future, and reported that he would like to return as a contractor.  Contractors were reportedly unable to work via telepsychiatry.  Reported reasons for not wanting to work on site included distance from the institution, less work-life balance, and safety concerns.  Several psychiatrists raised the issue of safety, and voiced discomfort working on-site with patients.

All caseloads were within 2009 staffing plan requirements.

The psychiatrists generally reported that should a patient refuse, the telepresenter would go cellside to the patient to check-in.  The patient would then be rescheduled.  Several psychiatrists reported that should a patient refuse multiple times, the patient would return to IDTT.  Having the patient seen by an on-site psychiatrist was an option at most institutions. While general guidance was given to the telepsychiatrists, there was no cohesive policy

governing how to address repeated refusals.  The telepsychiatrists universally reported that they were able to go cellside via tablet or laptop, should they deem this clinically necessary.  Barriers to this included lack of confidentiality, difficulty hearing through doors, and background noise.

There were several positive aspects observed during the telepsychiatry hub tour.  The telepsychiatrists observed were engaging and empathetic.  While the purpose of the tour was to evaluate the process of telepsychiatry, and generally not the clinical care provided to individual patients, it should be noted that clinical care provided to patients was adequate.  The telepresenters were helpful and efficient.  The telepsychiatrists reported that they generally worked with the same telepresenter.  The majority of telepsychiatrists stated that it was important for the telepresenter to have a medical background, such as MA or CNA.

The familiarity with fundamental CDCR concepts was lacking with some telepsychiatrists.  One telepsychiatrist did not understand the term Program Guide, which had to be explained.  Despite covering a restricted housing unit, one telepsychiatrist did not understand the monitor's use of the term TTM.  Another telepsychiatrist who covered cases in restricted housing did not understand the difference between STRH and ASU.  Several telepsychiatrists queried could not name any correctional officer in the institution.  The close coordination and integration of the treatment team, with collateral information from custody officers, was lacking. This raised sizeable concerns with the monitor's expert, especially in the treatment of complex patients at the EOP or higher levels of care, for whom knowledge of the milieu and environment of care is essential.

Telepsychiatrists reported being available to primary clinicians and other CDCR staff. They reported this contact was generally by email or the chat feature in Microsoft Teams.

Should a more detailed conversation be required, options included a video meeting via Microsoft Teams or a telephone call.

Of concern was that two telepsychiatrists who were either leaving CDCR or changing to another program did not discuss termination with their patients. Such a discussion was clinically indicated.

The marginalization of the telepsychiatrist was further reflected by only one telepsychiatrist attending any huddle at all during the Special Master's telepsychiatry hub monitoring tours. This was an EOP morning huddle which lasted approximately five minutes and was with mental health staff only. Another telepsychiatrist covering an EOP program knew of the morning huddles, but only attended if she had a topic she wished to raise. No telepsychiatrists queried knew of the Custody and Mental Health Partnership Plan (CMHPP), which is relevant due to required attendance by psychiatrists in several activities.

In summary, these concerns painted a picture of telepsychiatrists who were isolated from the clinical and custodial staff due to the obvious differences between providing services on-site versus via telepsychiatry. The use of telepsychiatry provided adequate medication management services but was generally lacking in the context of milieu management and developing working relationships with housing correctional officers and/or escort officers. Observations were concerning due to the minimization of the telepsychiatrist's role, relegated mostly to medication management. Evidence of telepsychiatrists' acting as a central member and leader of the treatment team was lacking. A robust understanding of the therapeutic milieu and the environment of care was inadequate. In total, these limitations were particularly concerning given the severity and complexity of patients being treated at EOP and higher levels of care.

A limitation of this monitoring tour was that only telepsychiatrists working in the hubs were observed. This accounted for only a small portion of the total telepsychiatrists working within CDCR. In many monitoring tours, difficulties were noted primarily with telepsychiatrists working from home. Thus, the observations in this report may have underestimated challenges with the use of telepsychiatry within CDCR.