# EXHIBIT A



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Amy Xu
Email: AXu@rbgg.com

June 30, 2022

VIA ELECTRONIC MAIL ONLY
Matthew A. Lopes
*Coleman* Special Master
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park
1301 Atwood Ave.
Suite 215 N
Johnston, RI 02919
mlopes@pldolaw.com

      Re:    *Coleman v. Newsom*: Plaintiffs' Position on Final Telepsychiatry Policy
             Our File No. 0489-03

Dear Special Master Lopes:

      This letter memorializes Plaintiffs' positions and proposed language for the final telepsychiatry policy for the Special Master to review. Defendants' proposed changes to the telepsychiatry policy would degrade the quality of care provided in EOP, MHCB, and PIPs. Defendants propose removing the requirement for on-site psychiatry in EOP programs, loosening requirements for when telepsychiatry is permissible in inpatient programs, gutting the requirement for telepsychiatrists to visit institutions where they provide care, and permitting cell-front telepsychiatry contacts to count as Program Guide required clinical contacts. These changes isolate psychiatrists from other members of the interdisciplinary treatment team and relegate them to the role of medication management, all to the detriment of *Coleman* class members.

      The Special Master should instead recommend a final telepsychiatry policy that closely resembles the one carefully negotiated by the parties, overseen by the Special Master, and approved by the Court. The final policy should be supplemented with additional information about the new EHRS identifier that CDCR has developed to study telehealth outcomes and additional reporting requirements for Defendants. The Special Master should not adopt Defendants' substantial changes without further opportunities to

**SUBJECT TO PROTECTIVE ORDERS**

Matthew A. Lopes
June 30, 2022
Page 2

monitor telepsychiatry implementation, with a focus on institutions that are unable to meet on-site psychiatry staffing requirements

## I.    Background

After substantial negotiations, including a settlement conference before District Judge Dale A. Drozd on January 17, 2020, the parties reached an agreement on the terms of CDCR's provisional telepsychiatry policy on February 12, 2020.  *See* ECF No. 6539 at 5-12[1] (hereinafter referred to as "provisional policy").  The Court approved the provisional policy on March 27, 2020 by granting a stipulation from the parties.  *See id.* at 1-3.  The stipulation provided for a 120-day delay in the implementation of the provisional policy to allow Defendants time to "complete the internal monitoring process" that will allow them to "provide notice to Plaintiffs and the Special Master, as required by the provisional policy."  *Id.* at 2.  Despite Defendants' request for an extension of time, *see* ECF No. 6833, the Court ordered that the eighteen month period for monitoring the provisional policy would begin on October 1, 2020.  *See* ECF No. 6874.

The eighteen month provisional period ran through April 1, 2022.  During that period, Defendants provided the Special Master and Plaintiffs' counsel with notice as required by the provisional policy if an EOP program did not have any on-site psychiatry for 30 consecutive calendar days, if a telepsychiatrist was required to serve in an MHCB for greater than 14 consecutive calendar days, and/or if a telepsychiatrist was required to serve in a psychiatric inpatient program for more than thirty days.  ECF No. 6539 at 7-8.  On numerous occasions, Defendants provided notice that its EOP, MHCB, and PIPs were unable to satisfy the on-site psychiatry staffing required by the provisional policy.  Meanwhile, the Special Master's 29th Monitoring Round overlapped with the provisional monitoring period.  The Special Master's tours, however, did not often overlap with the periods during which the particular EOP, MHCB, and PIP being toured did not have the on-site psychiatrists needed under the provisional policy.

After the end of the eighteen month provisional period, Defendants circulated a version of the provisional telepsychiatry policy with their proposed changes in redline, attached hereto as **Exhibit A**.  The parties discussed Defendants' proposed changes to the provisional telepsychiatry policy with the Special Master and his team on several occasions, including during the May 10, May 19, and June 21, 2022 Data Meetings, but were unable to come to an agreement.  Because the parties were unable to resolve this

---

[1]  Page references for e-filed documents are to the ECF numbers at the top right-hand corner of the page.

**SUBJECT TO PROTECTIVE ORDERS**
Matthew A. Lopes
June 30, 2022
Page 3

issue, the Stipulation and Order approving the provisional policy directs each side to submit "their positions and proposed language for the final telepsychiatry policy to the Special Master for review" by June 30. ECF No. 6539 at 3. Plaintiffs' proposed changes to the provisional policy are attached hereto as **Exhibit B**.

## II.    The Special Master should not adopt Defendants' changes to the provisional policy, which would substantially damage the quality of treatment in EOP and inpatient facilities.

Defendants proposed several major changes to the carefully negotiated provisional telepsychiatry policy that was approved by the Court. *See* **Exhibit A.** These proposed changes include removing the on-site psychiatrist requirement for all EOP programs; removing statements that telepsychiatry is a "last resort in emergency situations" at the MHCB and inpatient levels of care; decreasing the frequency of site visits to annually across all levels of care; removing provisions that indicate that non-confidential telepsychiatry contacts, including cell front contacts, do not count as Program Guide required clinical contacts; and removing language intended to ensure informed consent from patients. *See also* **Exhibit C** (Plaintiffs' May 18, 2022 Letter).

Adopting Defendants' proposed changes would allow on-site psychiatry to be replaced with telepsychiatry in all EOP programs and expand the use of telepsychiatry in inpatient settings. At some points Defendants stated that they do not intend to expand the use of telepsychiatry to the full limits of any new policy. At the same time, however, Defendants declined to discuss including any guarantee of any on-site psychiatry presence in the EOP. Current performance under the existing policy points to a future in which all psychiatry in the EOP is remote, and in which most inpatient psychiatry is remote.

For example, SVSP D yard and VSP A yard currently do not have any on-site psychiatrists, despite the current requirement that telepsychiatry may only supplement rather than replace on-site psychiatry in EOP programs. *See* **Exhibit D** (June 20, 2022 email). Plaintiffs were first informed that VSP A yard did not have any on-site psychiatrists on October 9, 2020—only nine days after the beginning of the monitoring period—meaning that this issue persisted throughout the entire eighteen month monitoring period. *See* **Exhibit E** (October 9, 2020 email stating no on-site psychiatry at VSP A yard); **Exhibit F** (December 9, 2020 email stating no on-site psychiatry at VSP A yard); **Exhibit G** (June 10, 2021 email stating no on-site psychiatry at VSP A yard). SVSP D yard has not had an on-site psychiatrist since April 13, 2022. *See* **Exhibit H** (May 13, 2022 email). Similarly, Defendants have used telepsychiatry at the SVSP PIP since at least April 5, 2022, as well as in numerous other PIPs and MHCBs throughout

**SUBJECT TO PROTECTIVE ORDERS**
Matthew A. Lopes
June 30, 2022
Page 4

the provisional period, despite agreeing in the operative policy that "[t]elepsychiatry may not be used . . . except as a last resort in emergency situations when an on site psychiatrist is not assigned to the program." *See* **Exhibit I** (May 5 and June 6, 2022 emails re SVSP PIP); ECF No. 6539 at 7-8. There is no reason to believe that Defendants would rely less, rather than more, on telepsychiatry if the policy were to expand as they propose, especially given their chronic problem of high overall psychiatry vacancy rates.

    A.    **Telepsychiatry should supplement rather than replace on-site psychiatry in EOPs, which are intensive residential treatment programs for seriously mentally ill patients.**

The Special Master must reject Defendants' proposal which would permit them to replace on-site psychiatry with telepsychiatry in EOP programs. *See* **Exhibit A** at 3-4. In line with the Special Master's recommendations, the Court clearly stated that "telepsychiatry should not replace on-site psychiatry at any level of care above CCCMS." ECF No. 5850 at 5. Despite being labeled an "outpatient" program, EOP is meant to be an intensive residential program "synonymous with an inpatient setting," which provides "housing, treatment and programming for seriously mentally ill inmates 'whose mental illness precludes their placement and participation in the' general population." *Id.* at 5-6 (citing the Program Guide at 12-4-1).

Telepsychiatry is most appropriately and safely used in routine, low-risk appointments for stable rather than high needs patients, and therefore should never replace on-site psychiatry in EOP programs, which treat patients with serious mental disorders such as schizophrenia, schizoaffective disorder, psychotic disorders, bipolar disorders, and substance-induced psychotic disorders. *See* Program Guide at 12-4-2. Some patients have treatment needs or diagnoses that are contraindications for telepsychiatry, or are averse to the use of telepsychiatry.[2] For instance, researchers have found that psychotic disorders are the least appropriate diagnosis to make via telehealth.[3] Other studies indicate that telepsychiatry is an inappropriate modality for treating psychotic patients who have ideas of reference that incorporate technology (*e.g.*,

---

[2] Richard O'Reilly et al., *Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results from a Randomized Controlled Trial*, Psychiatric Servs., 58 (6) 836-843 (2007) (noting that "there appears to be a group of individuals who are averse to the use of telepsychiatry"), https://ps.psychiatryonline.org/doi/full/10.1176/ps.2007.58.6.836.

[3] Guinart et al., *Mental Health Care Providers' Attitudes Toward Telepsychiatry: A Systemwide, Multisite Survey During the COVID-19 Pandemic*, Psychiatric Servs. 72:704-707 (2021) ("Psychotic disorders were considered the least appropriate diagnosis to conduct telehealth."), https://ps.psychiatryonline.org/doi/10.1176/appi.ps.202000441.

**SUBJECT TO PROTECTIVE ORDERS**
Matthew A. Lopes
June 30, 2022
Page 5

psychotic delusions in which the patient believes he receives messages from the television).[4]  Telepsychiatry interventions are also known to be inferior to in-person psychiatry for patients with substance abuse problems.[5]  Though Defendants did not revise the requirement to provide an on-site psychiatrist if patients are contraindicated for telepsychiatry, this becomes an empty promise if EOP programs cease to have on-site psychiatry, as would be permitted by Defendants' proposal.

On-site psychiatrists are better equipped to provide care to EOP patients because of their closeness to the intensive residential program and increased ability to assess patient symptoms.  Providers who treat patients in correctional settings must relate to the profound and overwhelming stressors found in that environment, an understanding that cannot be obtained through annual visits to an institution.  On-site psychiatrists can gain better context about a patient by walking through the housing unit and connecting with patients within their everyday environment.[6]  The modality of telepsychiatry also decreases a provider's ability to observe the signs and symptoms of mental illness.  A recent study found that nearly half of surveyed health care providers did not feel as connected or comfortable providing care via telepsychiatry as in person, and more than a third were concerned about missing relevant patient information.[7]  A telepsychiatrist is limited to their two-dimensional observations, whereas on-site psychiatrists are more capable of identifying the signs of medical disorders with psychiatry implications.  Further, a psychiatrist providing treatment in person can observe the patient's interactions

---

[4] Philip R Magaletta & Thomas J. Fagan, *Telehealth in the Federal Bureau of Prisons: Inmates' Perceptions*, Professional Psychology: Research & Practice 31(5) 497-502 (2000), https://psycnet.apa.org/doi/10.1037/0735-7028.31.5.497.

[5] Subho Chakrabarti, *Usefulness of Telepsychiatry: A Critical Evaluation of Videoconferencing-Based Approaches*, World J. of Psychiatry 5 (3) 286-304 (2015) (noting that telepsychiatric interventions are inferior to in-person psychiatry for populations with substance abuse problems), https://dx.doi.org/10.5498%2Fwjp.v5.i3.286; *see also* Jay H. Shore et al., *Diagnostic Reliability of Telepsychiatry in American Indian Veterans*, Am. J. of Psychiatry Volume 164 (No. 1): 115-118 (2007) (noting use of telepsychiatry resulted in diminished rates of reliability in diagnosing outpatients with long-term substance or alcohol abuse issues), https://ajp.psychiatryonline.org/doi/10.1176/ajp.2007.164.1.115.

[6] David Farabee et al., *An Experimental Comparison of Telepsychiatry and Conventional Psychiatry for Parolees*, Psychiatric Servs. 67(5) 562-565 (2016) (highlighting poorer therapeutic alliances in patients treated through telepsychiatry in study involving California parolees), https://doi.org/10.1176/appi.ps.201500025.

[7] *See also* Guinart et al., *supra* n. 3.

**SUBJECT TO PROTECTIVE ORDERS**

Matthew A. Lopes
June 30, 2022
Page 6

with other people, making them more capable of identifying the signs and symptoms of mental illness.

Compared to on-site psychiatrists, telepsychiatrists are limited in the ways that they can integrate into and contribute to the efforts of the treatment team, meaning that their roles may be distilled to simply medication management. During the recent Special Master monitoring tour at SATF in April 2022, clinicians reported to Plaintiffs' counsel and the Special Master's experts that they preferred working with on-site psychiatrists because they were more easily accessible. Telepsychiatrists at SATF do not attend huddles with other treatment team members. Because telepsychiatrists are difficult to schedule for consults, they are usually only consulted for decisions such as a change in medication or referral to a higher level of care. As a result, telepsychiatrists are less involved in overall treatment planning compared to on-site psychiatrists.

**B.    Telepsychiatry in inpatient facilities should not expand beyond emergency situations.**

Defendants also propose loosening restrictions on using telepsychiatry in MHCB and inpatient settings. The redlined draft that Defendants circulated proposes removing language which states that telepsychiatry "may not be used at the [MHCB and PIP] level of care except as a last resort in emergency situations when an on site psychiatrist is not assigned to the program." **Exhibit A** at 4-5. As a replacement, Defendants inserted language stating that telepsychiatry may be used in inpatient facilities "when in-person psychiatric care is not available, and only as long as necessary." *Id.* Defendants also removed language which required them to make good faith efforts to recruit and retain on-site psychiatrists for inpatient facilities. *Id.*

The Special Master should not endorse efforts to expand the use of telepsychiatry in inpatient facilities, especially after such a limited monitoring period. Defendants readily admit that the relevant research identifies "concerns or uncertainty" about using telepsychiatry for higher acuity patients. *See Lessons Learned During the COVID-19 Pandemic* Report, ECF No. 7196 at 17. The limitations that telepsychiatrists face in treating patients in EOP programs, such as contraindications for treating certain diagnoses, limited ability to observe signs of patient illness, and difficulty integrating into and contributing to the treatment team, are even more profound in MHCBs and PIPs, where patients are likely to have acute symptoms of a serious mental disorder or may be suffering from a significant or life threatening disability. Telepsychiatry is not an appropriate modality for conducting emergency assessments or for treating patients in crisis.

[4113157.6]

**SUBJECT TO PROTECTIVE ORDERS**

Matthew A. Lopes
June 30, 2022
Page 7

The proposed changes would permit Defendants to use telepsychiatry in inpatient settings simply because they deem that on-site psychiatrists are not "available." As of April 2022, Defendants reported significant psychiatry vacancies at CHCF PIP (23%), CMF PIP (34%), and SVSP PIP (51%). *See* Defs' Monthly Psychiatry Vacancy Report, ECF No. 7561 at 5 (May 31, 2022). Adopting Defendants' proposed changes concedes that these substantial vacancies may be filled by telepsychiatrists, without imposing any affirmative duty to retain or recruit on-site providers. *See* **Exhibit A** at 4-5.

> **C.     The Special Master should reject Defendants' other proposed changes.**

Defendants make a number of other proposed changes to the provisional policy which must all be rejected.

> **1.     Frequency of Site Visits**

Defendants want to remove the requirement of biannual on-site visits for CCCMS programs and quarterly on-site visits for EOP, MHCB, and PIP programs. Instead, they propose that all telepsychiatrists make annual visits, regardless of the level of care. *Id.* at 5-6. Annual visits are not adequate for any level of care. The purpose of this requirement is to ensure that telepsychiatrists understand the institution and program where they provide treatment and have ample time to collaborate with on-site colleagues and members of their treatment team. Defendants have not provided any justification for this change, which would seriously limit the telepsychiatrists' ability to integrate into the care team.

Additionally, Defendants seek to eliminate the requirement that telepsychiatrists spend a full working day at their institution when they visit. Defendants have even included a statement in the new policy that telepsychiatrists need not see any patients in person during their visit. *Id.* These requirements are necessary to ensure telepsychiatrists gain sufficient familiarity with the conditions at the institution, with other members of the treatment team and staff, and to build rapport with patients.

> **2.     Non-confidential cell front telepsychiatry is not a Program Guide required clinical contact.**

Defendants' new policy green-lights non-confidential cell-front telepsychiatry as equivalent to a confidential clinical contact. *Id.* at 3. Even in-person cell-front psychiatry is fundamentally clinically inappropriate, with very limited exceptions. This is because cell-front interactions are nearly always non-confidential and heighten the risk of custody interference with treatment. Telepsychiatry further exacerbates the deficiencies of in-person cell-front psychiatry and makes it even more difficult for

SUBJECT TO PROTECTIVE ORDERS

Matthew A. Lopes
June 30, 2022
Page 8

providers to assess risk, identify medical and mental illness, and develop a relationship with the patient.

### 3.    Removal of Language Intended to Ensure Informed Consent

Under the heading "Professional and Patient Identity," Defendants removed the provision that requires the telepsychiatrist to explain in the first session the "conditions under which a referral is made for in-person care." *Id.* at 2. This language was the result of a compromise between the parties in 2018 to address our concerns about the need for informed consent, and the Special Master team's recommendation for upfront patient education. It remains necessary and appropriate, and the phrase should be reinserted.

## III.    Plaintiffs' Proposed Changes to the Telepsychiatry Policy

Plaintiffs propose a revised telepsychiatry policy, attached hereto as **Exhibit B**. This revision does not change the originally negotiated telepsychiatry policy regarding how telepsychiatry staffing may be used in CCCMS, EOP, MHCB, and PIP programs. Plaintiffs' version also references the new EHRS identifier that CDCR has developed, and requires that Defendants continue to notify Plaintiffs and the Special Master if staffing issues continue to persist. *Id.* at 5, 8. Finally, Plaintiffs request that the Special Master extend the provisional monitoring period before adopting any of Defendants' other proposals.

### A.    Telepsychiatry Indicator in EHRS and Other Data

In their *Lessons Learned During the COVID-19 Pandemic* Report filed on June 14, 2021, Defendants stated that they would develop an identifier in EHRS to track whether care is provided via telehealth and/or by temporarily teleworking psychiatrists and clinicians. *See* ECF No. 7196 at 27. On May 9, 2022, Defendants reported that the telepsychiatry indicator in EHRS was recently installed, tested, and rolled out statewide, though no data is currently available to analyze. Defendants must ensure that this EHRS identifier is functional and that it maps to CDCR dashboards where it can be analyzed. Further, Defendants should also ensure that there is a way to document in EHRS if the telepsychiatry contact was cell-front or in a non-confidential setting, if the patient refused a telepsychiatry contact, if the patient was contraindicated for telepsychiatry, if an IDTT included a telepsychiatrist, and the identity and discipline of the telepresenter. Plaintiffs have inserted their proposed changes in a section of the policy titled "Documenting Telepsychiatry in EHRS." *See* **Exhibit B** at 8.

/////

[4113157.6]

SUBJECT TO PROTECTIVE ORDERS

Matthew A. Lopes
June 30, 2022
Page 9

### B.    Telepsychiatry Reporting

Plaintiffs propose changes to the telepsychiatry policy regarding how Defendants report deficient on-site psychiatry staffing.  Currently the telepsychiatry policy requires Defendants to notify Plaintiffs' counsel and the Special Master when 1) EOP programs do not have any on-site psychiatry for 30 consecutive calendar days; 2) a telepsychiatrist serves in a MHCB program for greater than 14 consecutive days; and 3) a telepsychiatrist serves in a PIP for greater than 30 consecutive calendar days.  Defendants must also provide Plaintiffs' counsel and the Special Master with a plan to address the staffing issue if the issue is not resolved in 1) 60 calendar days from the provision of notice for EOP programs; 2) 16 days from the provision of notice for MHCBs; and 3) 30 days from the provision of notice for PIPs.  *See* ECF No. 6539 at 7-8.

Defendants should also continue to notify Plaintiffs' counsel and the Special Master on a monthly basis if the staffing issue persists beyond the second notice.  For example, Defendants recently confirmed that VSP A yard (EOP) does not have an on-site psychiatrist, but the last notice that Plaintiffs received about this yard was on June 10, 2021—more than a year ago.  Plaintiffs have added these proposed changes to their draft of the final policy.  *See* **Exhibit B** at 5.

### C.    Monitoring Telepsychiatry Implementation

Plaintiffs' counsel, Defendants' counsel, and the Special Master's experts gathered information about telepsychiatry implementation during the current round of tours, at times observing unreliable connectivity during IDTTs, exceedingly heavy caseloads, patients reporting difficulty building rapport with telepsychiatrists, and telepsychiatrists that were not integrated with treatment teams.  More time is needed for the Special Master to monitor telepsychiatry implementation and eventually, analyze telehealth outcomes, including in programs where Defendants do not have sufficient on-site psychiatrists in accordance with the telepsychiatry policy.  This is especially true if the Special Master is considering adopting any of the substantive changes proposed by Defendants, such as removing the requirement that telepsychiatry may only supplement on-site psychiatrists in EOP programs.

#### 1.    MCSP – February 10-11, 2022

During the exit call, the Special Master's team reported on several issues with telepsychiatry use at MCSP related to the absence of medical assistants, which resulted in cancellation of telepsychiatry appointments for the entire day.  There were also

**SUBJECT TO PROTECTIVE ORDERS**
Matthew A. Lopes
June 30, 2022
Page 10

connectivity problems on A and C-yards. The Special Master's team was unable to observe IDTTs using telepsychiatry due to quarantine or isolation status.

During the provisional period, Defendants first reported that MCSP's A and B yard EOP mainline were entirely staffed by telepsychiatry on October 9, 2020. *See* **Exhibit E**. However, these issues may have been resolved at the time of the tour, meaning that the Special Master's experts did not get to observe how those units functioned without on-site psychiatry.

2.    **KVSP – April 5-7, 2022**

During the KVSP tour in April 2022, an observed telepsychiatrist did not participate in IDTTs on the stated grounds of not considering himself part of the treatment team for patients not prescribed medication.

3.    **SATF – April 26-28, 2022**

Plaintiffs' counsel attended the Special Master's tour at SATF on April 26-28, 2022, and observed that telepsychiatry connections in SATF's EOP programs were unreliable and went in and out during IDTTs. Two of the three telepsychiatrists at SATF had caseloads well in excess of the 1:120 ratio. Patients reported difficulty building rapport with their telepsychiatrists. Telepsychiatrists were not well integrated with the treatment teams and did not attend huddles. During an IDTT observed on the tour, the screen kept going blank, and the on-site participants did not engage with the telepsychiatrist. One of the observed IDTTs involved a patient recently placed back on anti-psychotic medication who was exhibiting significant signs of akathisia. The telepsychiatrist did not respond, and the Special Master's expert had to intervene to refer the patient for medical evaluation.

During the provisional period, Defendants first reported that SATF's F and G Yard EOP Mainline were entirely staffed by telepsychiatry on October 9, 2020. *See* **Exhibit E**. By the time of the tour, however, it appeared that these units had a least one on-site psychiatrist. The Special Master's expert therefore did not get to observe how those units functioned without on-site psychiatry.

4.    **Other Institutions**

Additional monitoring by the Special Master's experts is needed to understand the impact and efficacy of the telepsychiatry policy, especially in programs where Defendants did not comply with the on-site psychiatry staffing requirements of the current policy. For example, CMF PIP, CHCF PIP, and SVSP PIP all used

[4113157.6]

**SUBJECT TO PROTECTIVE ORDERS**

Matthew A. Lopes
June 30, 2022
Page 11


telepsychiatrists for more than 30 days during the provisional period, beginning in at least September 2020.  *See* **Exhibit E**.  It is unclear whether that period overlapped with the Special Master's tours, and whether the Special Master's experts were able to observe telepsychiatry in PIPs or MHCBs.

    Please let us know if you have any questions.  We look forward to further discussions with Defendants and the Special Master about the final telepsychiatry policy.

                                Sincerely,

                                ROSEN BIEN
                                GALVAN & GRUNFELD LLP

                                */s/ Amy Xu*

                        By:  Amy Xu

AX:ax


cc:  *Coleman* Co-counsel          Adriano Hrvatin          Carrie Stafford
     *Coleman* Special Master Team  Paul Mello              Sundeep Thind
     Elise Thorn                    Samantha Wolff          Antonina Raddatz
     Namrata Kotwani                Nick Weber              Christine Ciccotti
     Damon McClain                  Dillon Hockerson        Kristopher Kent

[4113157.6]

# Exhibit A
# Defendants' policy redline (April 2022)

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER 8:**<br>PSYCHIATRY SERVICES | Revision Date(s): | |
| | Supersedes: | |
| **12.08.100**<br>TELEPSYCHIATRY | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | |

**Policy**

The Telepsychiatry Program enables psychiatrists to provide real-time psychiatric evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the telepsychiatrist, the patient, and the patient's treatment team. Telepsychiatry is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telepsychiatric services, as stated in this policy and procedure, ~~can be~~are a safe and efficient vehicle to provide psychiatric care to CDCR's mental health population.

The Telepsychiatry Program provides mental health services to the Correctional Clinical Case Management System (CCCMS) level of care and may, under specified circumstances outlined in this policy and procedure, be used for higher levels of mental health care. On-site psychiatrists shall remain the preferred method of psychiatric care for ~~Enhanced Outpatient Program (EOP),~~ Mental Health Crisis Bed (MHCB)~~,~~ and Psychiatric Inpatient Program (PIP)[1] programs. To ensure continuity of care for patients within the program, telepsychiatrists will work from ~~CDCR operated~~ California ~~hubs~~ supervised by local civil service psychiatry supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychiatrists may not be assigned to caseloads and may instead be used as short term coverage for times when the assigned on-site psychiatrist or telepsychiatrist is unavailable to provide treatment to his or her assigned caseload. For purposes of this assignment, registry telepsychiatrists who have less than five years of experience working for CDCR or the Department of State Hospitals will not be assigned. Night Shift Telepsychiatrists also do not carry caseloads but are available for comprehensive after-hours services.

~~**Definitions**~~

~~The following term is defined for use in this policy only:~~

- ~~Supplement means at least 1.0 personnel year (PY) equivalent on-site psychiatrist shall be assigned to each EOP program (e.g., EOP General Population, EOP Administrative Segregation Unit Hub, or Psychiatric Services Unit) per yard at each institution. For each program on a yard that is allocated less than 1.0 PY equivalent for psychiatry per the current approved Staffing Plan, the position shall be filled by on-site psychiatrists. Whenever possible, the assigned on-site psychiatrist shall be full-time, as opposed to assigning several part-time psychiatrists to provide EOP care.~~

**Equipment**

The telepsychiatrist shall be given the following equipment and resources:

---

[1] PIP units provide Acute Psychiatric Program (APP) and Intermediate Care Facility (ICF) levels of care.

- Computer, monitor, speaker, microphone, camera~~, scanner/printer (can be individual and/or shared)~~, and state cell phone ~~phone with access to an outside line~~
- ~~A single, enclosed, and confidential office space with a door, desk, and chair. This office space will be sound-proofed, where possible.~~
- Computer access to Electronic Health Records System (EHRS) and to all resources, or equivalent resources utilized by on-site psychiatrists.
- Internet access of sufficient speed and stability to allow a videoconference where patient and telepsychiatrist can be seen and heard clearly. Telepsychiatrists working from home must provide the same standard of internet access.
- ~~Access to the Electronic Health Records System (EHRS).~~

Telepsychiatrists working from home must provide a confidential space with their own office furniture. Telepsychiatrists will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the telepsychiatrist's and patient's identities shall be verified verbally and/or by showing their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telepsychiatry contact, the telepsychiatrist shall explain the treatment modality, including a description of the role of the tele-presenter (an institutional staff member in an approved clinical classification who facilitates patient encounters with the telepsychiatrist)~~,~~ and a plan for a response to interruption in services~~, and conditions under which a referral is made for in person care~~.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telepsychiatrist participation in the Interdisciplinary Treatment Teams (IDTT) is required. As such, telepsychiatrists shall participate in the receiving institution's IDTT meetings. To facilitate telepsychiatrists' participation in IDTTs, IDTT meetings that include a telepsychiatrist shall be held in a location that is appropriately wired to allow for the telepsychiatrist's full participation when their patients are being reviewed.

In addition to IDTT meetings, telepsychiatrists shall participate to the same extent as on-site psychiatrists in all meetings and huddles relevant to the clinical care of their patients.

Night Shift Telepsychiatrists will not be able participate in IDTT, since they do not carry caseloads and IDTTs are held in the daytime.

**Refusals**

If a patient refuses treatment via telepsychiatry, the patient's telepsychiatrist may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient. The treatment team may work toward resolving any issues contributing to the patient's refusal of telepsychiatry services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals.

If the patient requires a psychiatric contact, the telepsychiatrist may request a consultation from an on-site provider or conduct a cell-front telepsychiatry contact, as clinically required. Telepsychiatry may be used cell front when it is necessary for the telepsychiatrist to speak with the patient and the patient does not attend the scheduled appointment.

If the treatment team has not been successful in resolving the patient's refusal of telepsychiatry visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals and contingency plans shall also be made to provide in-person psychiatric care to the patient.

If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the patient because of refusals, the team shall report this finding to the Mental Health Leadership (Chief and/or Senior Psychiatrist and Chief of Mental Health) of the institution receiving telepsychiatry services as well as the Chief of Telepsychiatry. If it is determined that the patient is not appropriate for telepsychiatry, the Chief of Telepsychiatry will work with the Mental Health Leadership at the institution to ensure the patient has access to appropriate on-site psychiatric treatment.

**Cell Front Telepsychiatry**

Telepsychiatry may be used cell front when it is necessary for the telepsychiatrist to speak with the patient and the patient does not attend the scheduled appointment. However, non-confidential telepsychiatry contacts, including cell front contacts, shall not be considered a Program Guide required clinical contact under any circumstance.

**Contraindications for Telepsychiatry**

Patients shall not be entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis. If the telepsychiatrist and Chief of Telepsychiatry determine that the patient needs to be seen by an on-site psychiatrist, he or she will work with the Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) to make sure the patient has an appropriate on-site psychiatrist assigned. Similarly, if the treatment team thinks that telepsychiatry is not appropriate for a patient, the team will work with Mental Health Leadership to make sure that the patient is assigned to an on-site psychiatrist.

**Telepsychiatry and Levels of Care**

Telepsychiatrists will be assigned to CCCMS and EOP. Whenever possible, CDCR seeks to employ psychiatrists who can deliver in-person psychiatric evaluation and care to patients in all inpatient facilities. The use of telepsychiatry is restricted to only when in-person psychiatric care is not available, and only as long as necessary. CDCR will not use telepsychiatry in lieu of in-person psychiatrists at the inpatient level of care for any reason other than a lack of availability of in-person psychiatrists, unless they are needed to supplement in the EOP program or there is an emergency situation as determined by Mental Health headquarters. If an institution requires telepsychiatry services, on-site psychiatrists shall be assigned to the higher levels of care.

Night Shift tTelepsychiatrists cover all levels of care except for PIP, similar to on-site on-call services.

**Correctional Clinical Case Management Services and Enhanced Outpatient Program**

Telepsychiatry may ~~replace on-site psychiatry at the~~ serve patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are adhered to ~~and good faith efforts to recruit on-site psychiatrists continue~~.

~~Enhanced Outpatient Program~~

~~Telepsychiatry may supplement on-site psychiatry at the EOP level of care, but it should not replace on-site psychiatry. On-site psychiatrists shall remain the preferred method of psychiatric care for each program providing EOP level of care, consistent with the requirements of the current approved Staffing Plan. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry, consistent with the requirements described in other sections of this policy and procedure. If an EOP program does not have the on-site psychiatry required by this policy for 30 consecutive calendar days that would not be consistent with this policy's objectives. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 60 calendar days from the provision of notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how that issue has been resolved.~~

**Mental Health Crisis Bed**

Whenever possible, CDCR seeks to employ psychiatrists who can deliver in-person psychiatric evaluation and care to patients in all inpatient facilities. The use of telepsychiatry is restricted to only when in-person psychiatric care is not available, and only as long as necessary. CDCR will not use telepsychiatry in lieu of in-person psychiatrists at the inpatient level of care for any reason other than a lack of availability of in-person psychiatrists ~~and as a last resort in emergency situations~~ Telepsychiatry ~~may not be used at the MHCB level of care except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the MHCB level of care. If these good faith efforts are unsuccessful, psychiatric services may be provided via telepsychiatry.~~ If a telepsychiatrist is required to serve in an MHCB for greater than 14 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 16 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved.

**Psychiatric Inpatient Program**

Whenever possible, CDCR seeks to employ psychiatrists who can deliver in-person psychiatric evaluation and care to patients in all inpatient facilities. The use of telepsychiatry is restricted to only when in-person psychiatric care is not available, and only as long as necessary. CDCR will not use telepsychiatry in lieu of in-person psychiatrists at the inpatient level of care for any reason other than a lack of availability of in-person psychiatrists ~~and as a last resort in emergency situations~~ Telepsychiatry ~~may not be used at the PIP level of care except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program. Good faith efforts shall be~~

~~made to recruit and retain on-site psychiatrists to provide services at the PIP level of care. If these good faith efforts to recruit and retain on-site psychiatrists to provide services at the PIP level are unsuccessful, psychiatric services may be provided via telepsychiatry.~~ If a telepsychiatrist is required to serve in a PIP for greater than 30 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel.  Within 30 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved.

**Clinical Emergency Management**

If a clinical emergency arises during a telepsychiatry session (for example, a suicidal, violent or homicidal patient), the telepsychiatrist shall immediately notify the appropriate institution staff as identified by the institution's LOP. The telepsychiatrist shall coordinate with institutional Mental Health Leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, arrangements for the patient to be seen by an on-site psychiatrist, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders for medications, etc.

**~~EOP,~~ MHCB and Psychiatric Inpatient Programs**

In the event that a telepsychiatrist is needed in an ~~EOP,~~ MHCB or inpatient setting, the telepsychiatrist shall, to facilitate familiarity with the program and patients, participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telepsychiatrist has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychiatrists, telepsychiatrists shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse shall notify the telepsychiatrist, who may place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. Emergency medications may be ordered by telepsychiatrists, as clinically appropriate.

To ensure continuity of care, telepsychiatrists shall provide relevant clinical information during the hand off to the on-call psychiatrist to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns.

Telepsychiatrists and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telepsychiatrists are responsible for maintaining relationships with members of the on-site treatment team through regular communication and by visiting institutions. Telepsychiatrists shall visit their assigned institution within 30 days of assignment and no less than annually thereafter ~~ with follow up visits annually~~. The frequency of follow-up visits shall be determined by the telepsychiatrist's assigned level of care. The

telepsychiatrist will spend at least one ~~full working~~ day~~, consisting of the regular number of hours they would normally be scheduled to work,~~ during each site visit at the facility~~, and attend meetings as described below:~~

| ~~Level of Care~~ | ~~Frequency of Site Visit~~ |
|---|---|
| ~~CCCMS~~ | ~~Biannually~~ |
| ~~EOP, MHCB, PIP~~ | ~~Quarterly~~ |

During each visit, the telepsychiatrist shall participate in the IDTT, meet with necessary health care staff, and <u>may</u> see patients face-to-face.

<u>Night Shift T</u>telepsychiatrists will not be required to perform site visits as they cover several institutions at once and are not assigned to specific treatment teams.

**Physical Environment**

The patients' interview room/environment shall allow for both the telepsychiatrist and the patient to be seen and heard clearly. The patient's and telepsychiatrist's camera shall be positioned with their faces clearly visible to each other. The telepsychiatrist shall also be able to clearly see the patient's body to assess for any signs of movement disorders. When indicated, the telepsychiatrist can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telepsychiatry administration and the institution receiving services shall ensure privacy so that others are not able to enter the telepsychiatrist's or patient's room accidently or overhear conversations from inside or outside the rooms. Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telepsychiatrist and the patient will be appropriately sound-proofed, when possible, or alternative mechanisms will be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Organizational Structure**

All telepsychiatry staff report within the Telepsychiatry Program supervisory chain.

Psychiatric Nurse Practitioners shall not be permitted to provide care through telepsychiatry.

**Workflow Interruptions**

In the event of technology or equipment failure, telepsychiatrists shall immediately notify their direct telepsychiatry supervisor and Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telepsychiatrist shall also make arrangements with institutional Mental Health Leadership to ensure appropriate patient coverage based on patient need (for example, coverage by on-site provider or rescheduling of appointments). Telepsychiatrists may also be redirected to another telepsychiatry assignment when this occurs.

<u>If telepsychiatrists working from home have a</u>n sustained interruption in technology or <u>significant equipment malfunction, or there are other supervisory concerns that interfere</u>~~s~~ <u>with their ability to see patients, they may be required to come in</u>~~to~~ <u>an office space in the hub.</u>

**On-Call Coverage by Telepsychiatry**

The telepsychiatry team shall contribute to on-call coverage as assigned, and their provision of services shall be in accordance with California Correctional HealthCare System (CCHCS) Health Care Department Operations Manual (HCDOM), Headquarters' Mental Health Policy, and applicable bargaining unit Memorandums of Understanding.

Telepsychiatrists are not required to travel to the institution where they are providing on-call coverage. Therefore, institutions receiving on-call coverage from the Telepsychiatry Program shall provide a backup physician (psychiatrist or medical provider). This backup physician shall be within one hour of travel time to the facility in order to physically examine a patient if needed (for example, in the case of a patient who requires placement into seclusion or restraints).

Night Shift Telepsychiatrists will supplement the existing "physician on-call" services, currently managed by phone, with comprehensive after-hours coverage to all institutions. They have access to a full technological setup and are able to provide face-to-face encounters as needed for urgent issues overnight. They are also available to integrate with the Crisis Intervention Teams (CIT) as a psychiatrist consultant.

Similar to telepsychiatrists on-call, Night Shift Telepsychiatrists~~they~~ are not required to travel to the institutions where they are providing services. Therefore, institutions receiving this service must provide a backup on-call physician (psychiatrist or medical provider) that is available to physically examine a patient if needed.

**Responsibilities**  The receiving facility shall be responsible for providing the following:

- Timely access for patients to the telepsychiatrist.
- A dedicated and appropriately clinically trained tele-presenter who presents the patient from the originating site to the telepsychiatrist, and is responsible for providing clinical support and coordination. The tele-presenter shall be required to introduce themselves and explain that they are subject to the same confidentiality requirements as the telepsychiatrist and other medical providers. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment and remaining with the patient during the appointment. Tele-presenters shall be assigned from position classifications in the following order of priority: medical assistant[2], certified nursing assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other classifications, such as office technicians, may be used~~, such as office technicians~~.
- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Institutions receiving telepsychiatry services shall have appropriate clinical staff available, including Nursing when needed.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.

---

[2] Medical Assistants cannot act as a tele-presenter for patients housed in inpatient units licensed as Correctional Treatment Centers

- A contact list of important names and numbers for the institution. This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Primary Clinician(s)
    6. Medical Provider(s)
    7. Mental Health Supervisor(s)
    8. Chief of Mental Health
    9. Chief Psychiatrist or Senior Psychiatrist Supervisor
    10. IT Department
    11. Scheduler
    12. Medical Records Supervisor

- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telepsychiatry encounter, including a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telepsychiatrist.
- The maintenance of telemedicine connectivity between institutions and telepsychiatrists.
- Ensuring that telepsychiatrists are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance of items such as, but not limited to, Medication Administration Process Improvement Project (MAPIP) criteria and Effective Communication requirements.
- Organized tours for the telepsychiatrists during their initial visits to the institution.
- Developing on-site clinical contingency plans and patient prioritization strategies to manage absences of telepsychiatrists.
- A Local Operating Procedure (LOP) for Telepsychiatry shall be submitted to the Chief of Telepsychiatry, or designee, for review and approval prior to local distribution or implementation. Telepsychiatry services at an institution will not commence until an LOP for Telepsychiatry has been submitted and approved. Current and active LOPs shall be revised as necessary by the institution and submitted to the Chief of Telepsychiatry or designee. Any revisions of the LOP for Telepsychiatry shall be reviewed and approved by the Chief of Telepsychiatry or designee prior to implementation at the institution.
- Routine system tests to ensure that equipment is safe, operational, and secure.

**Purpose**

This policy ensures services provided by the Telepsychiatry Program comply with CDCR's MHSDS Program Guidelines.  Telepsychiatrists shall conduct care consistent with CDCR rules, regulations, policies, and local operating policies and procedures of the institution(s) to which they provide services.  This policy is intended to reflect best practices in a correctional setting (not constitutional requirements), and should be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telepsychiatry Program and the institution receiving services:

1. Telepsychiatrists are provided with the appropriate equipment and resources.
2. Telepsychiatrists participate in the same manner as on-site psychiatrists in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their patients. – (This requirement does not apply to Night Shift Telepsychiatrists.)
3. On-site staff and members of the treatment team communicate with the telepsychiatrist any important patient issues and concerns related to patient care.
4. Telepsychiatrists have access to all necessary clinical information via the health record.
5. Telepsychiatrists will communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are not entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis.
7. Telepsychiatrists complete all documentation in the health record by the close of each business day.
8. Telepsychiatrist and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telepsychiatrists visit their receiving institutions as directed by policy.
10. Ongoing mandatory trainings for all telepsychiatrists.
11. Telepsychiatrists are privileged at each licensed or inpatient unit they serve.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution… | then… |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. Ensure the LOP is reviewed annually. |
| does not have an LOP | ensure that one is completed within 30 days of the effective date and create an LOP to meet the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

CDCR Mental Health Services Delivery System (MHSDS) Program Guide, 2009 Revision

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# Exhibit B
# Plaintiffs' policy redline

| **VOLUME 12:** MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER 8:** PSYCHIATRY SERVICES | Revision Date(s): | |
| | Supersedes: | |
| **12.08.100** TELEPSYCHIATRY | Attachments: | Yes    No ☒ |
| | Director Approval: | |

**Policy**

The Telepsychiatry Program enables psychiatrists to provide real-time psychiatric evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the telepsychiatrist, the patient, and the patient's treatment team.  Telepsychiatry is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services.  Telepsychiatric services, as stated in this policy and procedure, can be a safe and efficient vehicle to provide psychiatric care to CDCR's mental health population.

The Telepsychiatry Program provides mental health services to the Correctional Clinical Case Management System (CCCMS) level of care and may, under specified circumstances outlined in this policy and procedure, be used for higher levels of mental health care.  On-site psychiatrists shall remain the preferred method of psychiatric care for Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB), and Psychiatric Inpatient Program (PIP)[1] programs.  To ensure continuity of care for patients within the program, telepsychiatrists will work from ~~CDCR operated~~ California ~~hubs~~ supervised by local civil service psychiatry supervisors and will be assigned to caseloads at the institution(s) they serve.  As appropriate, some telepsychiatrists may not be assigned to caseloads and may instead be used as short term coverage for times when the assigned on-site psychiatrist or telepsychiatrist is unavailable to provide treatment to his or her assigned caseload.  For purposes of this assignment, registry telepsychiatrists who have less than five years of experience working for CDCR or the Department of State Hospitals will not be assigned.  Night Shift Telepsychiatrists also do not carry caseloads but are available for comprehensive after-hours services.

**Definitions**

The following term is defined for use in this policy only:

- Supplement means at least 1.0 personnel year (PY) equivalent on-site psychiatrist shall be assigned to each EOP program (e.g., EOP General Population, EOP Administrative Segregation Unit Hub, or Psychiatric

---

[1] PIP units provide Acute Psychiatric Program (APP) and Intermediate Care Facility (ICF) levels of care.

Services Unit) per yard at each institution.  For each program on a yard that is allocated less than 1.0 PY equivalent for psychiatry per the current approved Staffing Plan, the position shall be filled by on-site psychiatrists. Whenever possible, the assigned on-site psychiatrist shall be full-time, as opposed to assigning several part-time psychiatrists to provide EOP care.

**Equipment**

The telepsychiatrist shall be given the following equipment and resources:

- Computer, monitor, speaker, microphone, camera, ~~scanner/printer (can be individual and/or shared),~~ and state cell~~phone with access to an outside line~~.

- ~~A single, enclosed, and confidential office space with a door, desk, and chair. This office space will be sound proofed, where possible.~~

- Computer access to Electronic Health Records System (EHRS) and to all resources, or equivalent resources utilized by on-site psychiatrists.

- Internet access of sufficient speed and stability to allow a videoconference where patient and telepsychiatrist can be seen and heard clearly.  Telepsychiatrists working from home must provide the same standard of internet access.

- ~~Access to the Electronic Health Records System (EHRS).~~

Telepsychiatrists working from home must provide a confidential space with their own office furniture.  Telepsychiatrists will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up.  This office space will be sound-proofed, where possible.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the telepsychiatrist's and patient's identities shall be verified verbally and/or by showing their CDCR-issued photo identification card on the video screen.  At the beginning of the patient's first telepsychiatry contact, the telepsychiatrist shall explain the treatment modality, including a description of the role of the tele-presenter (an institutional staff member in an approved clinical classification who facilitates patient encounters with the telepsychiatrist), a plan for a response to interruption in services, and conditions under which a referral is made to in person care.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telepsychiatrist participation in the Interdisciplinary Treatment Teams (IDTT) is required.  As such, telepsychiatrists shall participate in the receiving institution's IDTT meetings.  To facilitate telepsychiatrists' participation in IDTTs, IDTT meetings that include a telepsychiatrist shall be held in a location that is appropriately wired to allow for the telepsychiatrist's full participation when their patients are being reviewed.

In addition to IDTT meetings, telepsychiatrists shall participate to the same extent as on- site psychiatrists in all meetings and huddles relevant to the clinical care of their patients.

Night Shift Telepsychiatrists will not be able to participate in IDTT, since they do not carry caseloads and IDTTs are held in the daytime.

**Refusals**

If a patient refuses treatment via telepsychiatry, the patient's telepsychiatrist may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient.  The treatment team may work toward resolving any issues contributing to the patient's refusal of telepsychiatry services.  A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals.  If the patient requires a psychiatric contact, the telepsychiatrist may request a consultation from an on-site provider or conduct a cell-front telepsychiatry contact, as clinically required.

If the treatment team has not been successful in resolving the patient's refusal of telepsychiatric visits, a formal IDTT meeting shall be convened.  During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals and contingency plans shall also be made to provide in-person psychiatric care to the patient.

If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the patient because of refusals, the team shall report this finding to the Mental Health Leadership (Chief and/or Senior Psychiatrist and Chief of Mental Health) of the institution receiving telepsychiatry services as well as the Chief of Telepsychiatry.  If it is determined that the patient is not appropriate for telepsychiatry, the Chief of Telepsychiatry will work with the Mental Health Leadership at the institution to ensure the patient has access to appropriate on-site psychiatric treatment.

**Cell Front Telepsychiatry**

Telepsychiatry may be used cell front when it is necessary for the telepsychiatrist to speak with the patient and the patient does not attend the

scheduled appointment.  However, non-confidential telepsychiatry contacts, including cell-front contacts, shall not be considered a Program Guide required clinical contact under any circumstance.

**Contraindications for Telepsychiatry**

Patients shall not be entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis.  If the telepsychiatrist and Chief of Telepsychiatry determine that the patient needs to be seen by an on-site psychiatrist, he or she will work with the Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) to make sure the patient has an appropriate on-site psychiatrist assigned.  Similarly, if the treatment team thinks that telepsychiatry is not appropriate for a patient, the team will work with Mental Health Leadership to make sure that the patient is assigned to an on-site psychiatrist.

**Telepsychiatry and Levels of Care**

Telepsychiatrists will be assigned to CCCMS, unless they are needed to supplement in the EOP program or there is an emergency situation as determined by Mental Health headquarters.  If an institution requires telepsychiatry services, on-site psychiatrists shall be assigned to the higher levels of care.

Night Shift Telepsychiatrists cover all levels of care except for PIP and MHCB, similar to on-site on-call services.

**Correctional Clinical Case Management Services**

Telepsychiatry may ~~replace on-site psychiatry~~serve patients at the CCCMS level of care provided all other conditions pertaining to the CCCMS level of care contained within this policy are adhered to and good faith efforts to recruit on-site psychiatrists continue.

**Enhanced Outpatient Program**

Telepsychiatry may supplement on-site psychiatry at the EOP level of care, but it should not replace on-site psychiatry.  On-site psychiatrists shall remain the preferred method of psychiatric care for each program providing EOP level of care, consistent with the requirements of the current approved Staffing Plan.  Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care.  If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure.  If an EOP program does not have the on-site psychiatry required by this policy for 30 consecutive calendar days that would not be consistent with this policy's objectives.  In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel.  Within 60 calendar days from the provision of notice, CDCR

headquarters shall also provide a plan to address the staffing issue or provide information regarding how that issue has been resolved.  CDCR headquarters must continue to notify the Special Master and Plaintiffs 'counsel on a monthly basis if the staffing issue persists.

### Mental Health Crisis Bed

Telepsychiatry may not be used at the MHCB level of care except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program.  Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the MHCB level of care.  If these good faith efforts are unsuccessful, psychiatric services may be provided via telepsychiatry.  If a telepsychiatrist is required to serve in an MHCB for greater than 14 consecutive calendar days, this would not be consistent with this policy's objective.  In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel.  Within 16 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved.  CDCR headquarters must continue to notify the Special Master and Plaintiffs 'counsel on a monthly basis if the staffing issue persists.

### Psychiatric Inpatient Program

Telepsychiatry may not be used at the PIP level of care except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program.  Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the PIP level of care.  If these good faith efforts are unsuccessful, psychiatric services may be provided via telepsychiatry.  If a telepsychiatrist is required to serve in a PIP for greater than 30 consecutive calendar days, this would not be consistent with this policy's objective.  In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel.  Within 30 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved.  CDCR headquarters must continue to notify the Special Master and Plaintiffs 'counsel on a monthly basis if the staffing issue persists.

### Clinical Emergency Management

If a clinical emergency arises during a telepsychiatry session (for example, a suicidal, violent or homicidal patient), the telepsychiatrist shall immediately notify the appropriate institution staff as identified by the institution's LOP.  The telepsychiatrist shall coordinate with institutional Mental Health Leadership and follow local institutional protocol for managing such emergencies.  This may include, but is not limited to, arrangements for the patient to be seen by an on-site psychiatrist, arrangements for safe holding, transport to an emergency

triage area, communication with local emergency team members, and placing emergency orders for medications, etc.

**EOP, MHCB and Psychiatric Inpatient Programs**

In the event that a telepsychiatrist is needed in an EOP, MHCB or inpatient setting, the telepsychiatrist shall, to facilitate familiarity with the program and patients, participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telepsychiatrist has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychiatrists, telepsychiatrists shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse shall notify the telepsychiatrist, who may place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. Emergency medications may be ordered by telepsychiatrists, as clinically appropriate.

To ensure continuity of care, telepsychiatrists shall provide relevant clinical information during the hand off to the on-call psychiatrist to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns.

Telepsychiatrists and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telepsychiatrists are responsible for maintaining relationships with members of the on-site treatment team through regular communication and by visiting institutions. Telepsychiatrists shall visit their assigned institution within 30 days of assignment. The frequency of follow-up visits shall be determined by the telepsychiatrist's assigned level of care. The telepsychiatrist will spend at least one full working day, consisting of the regular number of hours they would normally be scheduled to work, during each site visit at the facility, and attend meetings as described below:

| *Level of Care* | **Frequency of Site Visit** |
|---|---|
| CCCMS | Biannually |
| EOP, MHCB, PIP | Quarterly |

During each visit, the telepsychiatrist shall participate in the IDTT, meet with necessary health care staff, and see patients face-to-face.

Night Shift Telepsychiatrists will not be required to perform site visits as they cover several institutions at once and are not assigned to specific treatment teams.

**Physical Environment**

The patients' interview room/environment shall allow for both the telepsychiatrist and the patient to be seen and heard clearly. The patient's and telepsychiatrist's camera shall be positioned with their faces clearly visible to each other. The telepsychiatrist shall also be able to clearly see the patient's body to assess for any signs of movement disorders. When indicated, the telepsychiatrist can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telepsychiatry administration and the institution receiving services shall ensure privacy so that others are not able to enter the telepsychiatrist's or patient's room accidently or overhear conversations from inside or outside the rooms. Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telepsychiatrist and the patient will be appropriately sound-proofed, when possible, or alternative mechanisms will be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele- presenter should be seated closest to the door.

**Organizational Structure**

All telepsychiatry staff report within the Telepsychiatry Program supervisory chain.

Psychiatric Nurse Practitioners shall not be permitted to provide care through telepsychiatry.

**Workflow Interruptions**

In the event of technology or equipment failure, telepsychiatrists shall immediately notify their direct telepsychiatry supervisor and Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telepsychiatrist shall also make arrangements with institutional Mental Health Leadership to ensure appropriate patient coverage based on patient need (for example, coverage by on-site provider or rescheduling of appointments). Telepsychiatrists may also be redirected to another telepsychiatry assignment when this occurs.

If telepsychiatrists working from home have a sustained interruption in technology or significant equipment malfunction, or there are other supervisory

concerns that interfere with their ability to see patients, they may be required to come in to an office space in the hub.

**On-Call Coverage by Telepsychiatry**

The telepsychiatry team shall contribute to on-call coverage as assigned, and their provision of services shall be in accordance with California Correctional HealthCare System (CCHCS) Health Care Department Operations Manual (HCDOM), Headquarters' Mental Health Policy, and applicable bargaining unit Memorandums of Understanding.

Telepsychiatrists are not required to travel to the institution where they are providing on- call coverage.  Therefore, institutions receiving on-call coverage from the Telepsychiatry Program shall provide a backup physician (psychiatrist or medical provider).  This backup physician shall be within one hour of travel time to the facility in order to physically examine a patient if needed (for example, in the case of a patient who requires placement into seclusion or restraints).

Night Shift Telepsychiatrists will supplement the existing "physician on-call" services, currently managed by phone, with comprehensive after-hours coverage to all institutions.  They have access to a full technological setup and are able to provide face-to-face encounters as needed for urgent issues overnight.  They are also available to integrate with the Crisis Intervention Teams (CIT) as a psychiatrist consultant.

Similar to telepsychiatrists on-call, Night Shift Telepsychiatrists are not required to travel to the institution where they are providing services.  Therefore, institutions receiving this service must provide a backup on-call physician (psychiatrist or medical provider) that is available to physically examine a patient if needed.

**Documenting Telepsychiatry in EHRS**

Telepsychiatrists are required document on EHRS if they provide treatment to a patient via telepsychiatry.  Additionally, telepsychiatrists must document in EHRS if the telepsychiatry contact was cell-front or in a non-confidential setting, if the patient refused a telepsychiatry contact, if the patient was contraindicated for telepsychiatry, if an IDTT included a telepsychiatrist, and the identity and discipline of the telepresenter.

**Responsibilities**     The receiving facility shall be responsible for providing the following:

- Timely access for patients to the telepsychiatrist.

- A dedicated and appropriately clinically trained tele-presenter who presents the patient from the originating site to the telepsychiatrist, and is responsible for providing clinical support and coordination.  The tele-

presenter shall be required to introduce themselves and explain that they are subject to the same confidentiality requirements as the telepsychiatrist and other medical providers.  Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment and remaining with the patient during the appointment. Tele-presenters shall be assigned from position classifications in the following order of priority: medical assistant[2], certified nursing assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians.  When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment.  In emergency circumstances, other classifications, such as office technicians, may be used.

- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.

- Institutions receiving telepsychiatry services shall have appropriate clinical staff available, including Nursing when needed.

- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.

- A contact list of important names and numbers for the institution.  This includes, but is not limited, to the following:
    1. Laboratory
    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Primary Clinician(s)
    6. Medical Provider(s)
    7. Mental Health Supervisor(s)
    8. Chief of Mental Health
    9. Chief Psychiatrist or Senior Psychiatrist Supervisor
    10. IT Department
    11. Scheduler
    12. Medical Records Supervisor

- A confidential treatment space to facilitate patient encounters.  This space shall include all equipment needed to facilitate the telepsychiatry encounter, including a computer, phone, scanner, printer, desk, and chair.

---

[2] Medical Assistants cannot act as a tele-presenter for patients housed in inpatient units licensed as Correctional Treatment Centers

- Caseload assignments and scheduled appointments for the telepsychiatrist.

- The maintenance of telemedicine connectivity between institutions and telepsychiatrists.

- Ensuring that telepsychiatrists are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.

- Audit reports for local compliance of items such as, but not limited to, Medication Administration Process Improvement Project (MAPIP) criteria and Effective Communication requirements.

- Organized tours for the telepsychiatrists during their initial visits to the institution.

- Developing on-site clinical contingency plans and patient prioritization strategies to manage absences of telepsychiatrists.

- A Local Operating Procedure (LOP) for Telepsychiatry shall be submitted to the Chief of Telepsychiatry, or designee, for review and approval prior to local distribution or implementation. Telepsychiatry services at an institution will not commence until an LOP for Telepsychiatry has been submitted and approved. Current and active LOPs shall be revised as necessary by the institution and submitted to the Chief of Telepsychiatry or designee. Any revisions of the LOP for Telepsychiatry shall be reviewed and approved by the Chief of Telepsychiatry or designee prior to implementation at the institution.

- Routine system tests to ensure that equipment is safe, operational, and secure.

**Purpose**

This policy ensures services provided by the Telepsychiatry Program comply with CDCR's MHSDS Program Guidelines. Telepsychiatrists shall conduct care consistent with CDCR rules, regulations, policies, and local operating policies and procedures of the institution(s) to which they provide services.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telepsychiatry Program and the institution receiving services:

1. Telepsychiatrists are provided with the appropriate equipment and resources.
2. Telepsychiatrists participate in the same manner as on-site psychiatrists in the receiving institutions' IDTTs and all meetings and huddles relevant to the

clinical care of their patients.  (This requirement does not apply to Night Shift Telepsychiatrists.)

3. On-site staff and members of the treatment team communicate with the telepsychiatrist any important patient issues and concerns related to patient care.
4. Telepsychiatrists have access to all necessary clinical information via the health record.
5. Telepsychiatrists will communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are not entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis.
7. Telepsychiatrists complete all documentation in the health record by the close of each business day.
8. Telepsychiatrist and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telepsychiatrists visit their receiving institutions as directed by policy.
10. Ongoing mandatory trainings for all telepsychiatrists.
11. Telepsychiatrists are privileged at each licensed or inpatient unit they serve.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution… | then… |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. Ensure the LOP is reviewed annually. |
| does not have an LOP | ensure that one is completed within 30 days of the effective date and create an LOP to meet the new policy requirements.  Ensure the LOP is reviewed annually. |

**References**

CDCR Mental Health Services Delivery System (MHSDS) Program Guide, 2009 Revision

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# Exhibit C
# Plaintiffs' May 18, 2022 letter



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Ernest Galvan
Email: egalvan@rbgg.com

May 18, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>

Melissa Bentz
Office of Legal Affairs
California Department of Corrections and
Rehabilitation
melissa.bentz@cdcr.ca.gov

   Re: *Coleman v. Newsom*: Telepsychiatry Draft
     <u>Our File No. 0489-03</u>

Dear Melissa:

  This is to follow-up on the all-parties conference call of May 10, 2022, during which we discussed the draft telepsychiatry policy that Plaintiffs' counsel received by email from the Special Master on April 25, 2022.

1.  Fix and Evaluate Existing Implementation Before Expanding.

  Before continuing the current level of telepsychiatry, and certainly before any expansion, CDCR should fix the existing implementation, and should complete the outcome study promised to the Court in the "lessons learned" document on June 14, 2021 (ECF No. 7196 at 27) ("and in the future CDCR will be able to more comprehensively assess outcomes in relation to telehealth.").

  Plaintiffs' counsel, Defendants' counsel, and the Special Master's experts gathered important information about the current telepsychiatry implementation during the current round of Special Master tours. For example, during the tour at SATF on April 26-28, 2022, telepsychiatry connections in SATF's EOP programs were unreliable and went in and out during IDTTs. Two of the three telepsychiatrists at SATF had caseloads well in excess of the 1:120 ratio. Patients reported difficulty building rapport with their telepsychiatrists. Telepsychiatrists were not well integrated with the treatment teams, and did not attend huddles. During an IDTT observed on the tour, the screen kept going blank, and the on-site participants did not engage with the telepsychiatrist. One of the

[3917221.1]

Telepsychiatry Response
May 18, 2022
Page 2

observed IDTTs involved a patient recently placed back on anti-psychotic medication who was exhibiting significant signs of akathisia. The telepsychiatrist did not respond and the Special Master's expert had to intervene to refer the patient for medical evaluation.

Connectivity problems were also reported during the MCSP tour in April 2022. During the KVSP tour in April 2022, an observed telepsychiatrist did not participate in IDTTs on the grounds of not considering himself part of the treatment team for patients not prescribed medication.

By contrast, the telepsychiatry equipment in use during the VSP tour in April 2022 was reported to be very good, and patients reported good rapport with the telepsychiatrists. CDCR could study what is going right at VSP, and implement these things at the other institutions before implementing any of the expansions contemplated in the current draft.

2.      Removal of Language Intended to Ensure Informed Consent

Under the heading "Professional and Patient Identity," you have removed the provision that requires the telepsychiatrist to explain in the first session the "conditions under which a referral is made for in-person care." This language was the result of a compromise between the parties in 2018 to address our concerns about the need for informed consent, and the Special Master team's recommendation for upfront patient education. It remains necessary and appropriate, and the phrase should be reinserted.

3.      Non-Confidential Cell Front Telepsychiatry is Not a Program Guide Required Clinical Contact.

The deletion on page 3 should be reversed, to continue the policy that "non-confidential telepsychiatry contacts, including cell front contacts, shall not be considered a Program Guide required clinical contact under any circumstance."

4.      EOP Care

During our meeting on May 10, Dr. Mehta said that the intent of the draft is not to expand telepsychiatry in EOP and inpatient care. If that is the intent, then the section titled "Enhanced Outpatient Treatment" on page 4 should be restored. Restoring this section would ensure that telepsychiatry remains a supplement to on-site psychiatry in EOP programs.

If there are concerns about the difficulty tracking 30-day periods with no on-site psychiatrist for reporting purposes under the current policy, that can be addressed without

Telepsychiatry Response
May 18, 2022
Page 3

throwing out the entire supplementation concept.  We are open to discussing other reporting methods, such as relying on existing staffing reports to include on-site versus remote information.

5.    MHCB and Inpatient Care

The draft removes statements that telepsychiatry is "a last resort in emergency situations" at the MHCB and Inpatient levels of care.  These statements should be restored, consistent with Dr. Mehta's statement at the May 10 meeting that CDCR's intention is not to expand telepsychiatry in inpatient settings.

Inpatient and MHCB programs should have on-site psychiatrists assigned, and should not devolve into full reliance on telepsychiatry, as some EOP programs now have. Language should be added to the policy to require a report to the Special Master and counsel whenever any inpatient or MHCB program lacks an on-site psychiatrist for 30 consecutive calendar days.

6.    Frequency of Site Visits.

The draft removes the requirement of on-site visits biannually for CCCMS programs, and quarterly visits  for  EOP.  Instead, it requires an annual site visit.  Annual visits are not adequate at EOP and higher levels of care where the telepsychiatrist must form part of a treatment team and huddles. We also object to the reduction in frequency for CCCMS visits.

Additionally, we object to the elimination of the requirement that telepsychiatrists spend a full working day at their institution when they visit, as well as the language making it optional for the telepsychiatrist to see patients in person while on site.  These requirements are necessary to ensure telepsychiatrists gain sufficient familiarity with the conditions at the institution, with other members of the treatment team and staff, and to build rapport with patients.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

/s/ Ernest Galvan

By:   Ernest Galvan

EG:eg

Telepsychiatry Response
May 18, 2022
Page 4

cc:  *Coleman* Co-counsel         Adriano Hrvatin        Carrie Stafford
     *Coleman* Special Master Team  Paul Mello             Sundeep Thind
     Elise Thorn                   Samantha Wolff         Antonina Raddatz
     Namrata Kotwani               Nick Weber             Christine Ciccotti
     Damon McClain                 Dillon Hockerson       Kristopher Kent

# Exhibit D

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Amy Xu; Matt Lopes; Mohamedu Jones; Kerry F. Walsh; Sofia Millham; Coleman Team - RBG Only; Steve Fama Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; Nick Weber; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Mehta, Amar@CDCR; Martello, Toni@CDCR; Genetin, Arianna@CDCR |
| **Cc:** | |
| **Subject:** | RE: Coleman: Notice of the Use of Telepsychiatry on SVSP D Yard [IWOV-DMS.FID12440] |
| **Date:** | Monday, June 20, 2022 11:57:33 AM |
| **Attachments:** | image001.jpg |

---

**[EXTERNAL MESSAGE NOTICE]**

Amy,

Currently the EOP programs on SVSP D Yard and VSP A Yard are the only EOP programs that do not have the number of on-site psychiatrists required per the provisional telepsychiatry policy.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Amy Xu <AXu@rbgg.com>
**Sent:** Wednesday, June 15, 2022 4:21 PM
**To:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Matt Lopes <mlopes@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Sofia Millham <smillham@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Martello, Toni@CDCR <Toni.Martello@cdcr.ca.gov>; Genetin, Arianna@CDCR <Arianna.Genetin@cdcr.ca.gov>
**Subject:** RE: Coleman: Notice of the Use of Telepsychiatry on SVSP D Yard [IWOV-DMS.FID12440]

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Dear Melissa,

Thank you for this notification about SVSP D yard. Please provide us a list of all programs at the EOP level of care that do not currently have an on-site psychiatrist and are only relying on telepsychiatry. Previously you have also informed us that other EOP programs, such as CHCF E yard and VSP A yard, also do not have an on-site psychiatrist, but it is not clear to us whether that is still the case. Please let us know if you can provide this information before the next data meeting on June 21.

Thanks,

Amy Xu
(She/her)



101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
axu@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at axu@rbgg.com.

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Friday, May 13, 2022 3:33 PM
**To:** Matt Lopes <mlopes@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Sofia Millham <smillham@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>
**Cc:** Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Martello, Toni@CDCR <Toni.Martello@cdcr.ca.gov>; Genetin, Arianna@CDCR <Arianna.Genetin@cdcr.ca.gov>
**Subject:** Coleman: Notice of the Use of Telepsychiatry on SVSP D Yard

[EXTERNAL MESSAGE NOTICE]

All,

Per the provisional Telepsychiatry Policy, CDCR shall provide notice to the Special Master and Plaintiffs' counsel if an EOP program does not have an on-site psychiatrist as required by the policy for 30 consecutive calendar days. As of today, SVSP D yard has not had an on-site psychiatrist for 30 consecutive calendar days. Consistent with the provisional Telepsychiatry Policy, CDCR will provide a plan to address the use of telepsychiatry at SVSP D yard within 60 calendar days from the provision of notice.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO
NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE
AUTHOR.

# Exhibit E

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Matt Lopes; Mohamedu Jones; Kerry F. Walsh; Lisa Ells; Michael W. Bien; Coleman Team - RBG Only |
| Cc: | Stafford, Carrie@CDCR; Nick Weber; Hockerson, Dillon@CDCR; Ryan, Amanda@CDCR; Elise Thorn; Tyler Heath; Lucas Hennes; Kyle Lewis; Adriano Hrvatin; Mehta, Amar@CDCR; Ponciano, Angela@CDCR |
| Subject: | Coleman: Notification of Use of Telepsychiatry in PIPs and EOPs |
| Date: | Friday, October 9, 2020 11:04:21 AM |

All,

Per the provisional Telepsychiatry Policy, CDCR shall provide notice to the Special Master and Plaintiffs' counsel if an EOP program does not have an on-site psychiatrist as required by the policy for 30 consecutive calendar days. CDCR shall also provide notice if a telepsychiatrist is required to serve in a PIP for more than 30 consecutive calendar days. Below is notification regarding the utilization of telepsychiatry in EOP programs without an on-site psychiatrists and in the PIPs for more than 30 consecutive calendar days since the implementation of the Telepsychiatry Resource Management Tool.

PIPs Where Telepsychiatrists Provided Care for More than 30 Days:

- CHCF PIP currently has five telepsychiatrists who have provided care for more than 30 days.
- CMF PIP currently has two telepsychiatrists who have provided care for more than 30 days.
- SVSP PIP currently has one telepsychiatrist who have provided care for more than 30 days.

Consistent with the provisional telepsychiatry policy, CDCR will provide a plan to address the use of telepsychiatry in these programs within 30 calendar days from the provision of notice.

EOP Programs Without At Least One On-Site Psychiatrists:

- CHCF- E Yard EOP Mainline
- CMF- A Yard ASU EOP
- MCSP- A Yard and B Yard EOP Mainline
- SATF- F Yard and G Yard EOP Mainline
- SVSP- A Yard Mainline
- VSP- A Yard Mainline

Consistent with the provisional telepsychiatry policy, CDCR will provide a plan to address the use of telepsychiatry in these programs within 60 calendar days from the provision of notice.

Use of Telepsychiatry at HDSP MHCB:

On September 17, 2020, Plaintiffs and the Special Master were provided notice of the use of telepsychiatry at the HDSP MHCB for more than 14 consecutive calendar days with a plan regarding how CDCR will try to address the use of telepsychiatry in that program. CDCR continues to recruit for both civil service and registry on-site psychiatrists and HDSP has been prioritized in this effort.

Respectfully,

**Melissa C. Bentz**

Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Office Phone: (916) 324-7177
Cell Phone: (916) 628-5385
Fax: (916) 327-5306

ATTORNEY CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

# Exhibit F

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Matt Lopes; Mohamedu Jones; Kerry F. Walsh; Lisa Ells; Michael W. Bien; Coleman Team - RBG Only |
| **Cc:** | Stafford, Carrie@CDCR; Nick Weber; Hockerson, Dillon@CDCR; Ryan, Amanda@CDCR; Elise Thorn; Tyler Heath; Lucas Hennes; Kyle Lewis; Adriano Hrvatin; Mehta, Amar@CDCR; Martello, Toni@CDCR; Le, Sophia@CDCR; Steven Cartwright; Genetin, Arianna@CDCR |
| **Subject:** | RE: Coleman: Notification of Use of Telepsychiatry in PIPs and EOPs |
| **Date:** | Wednesday, December 9, 2020 4:42:31 PM |

All,

On October 9, 2020, CDCR provided notice of EOP programs at 5 institutions that did not have the equivalent of 1.0 PY on-site psychiatrist. Below is the current status of the use of telepsychiatry in those programs as well as a plan to assign the equivalent of 1.0 PY on-site psychiatrist to each program where possible.

CHCF E Yard EOP Mainline

As of December 8, 2020, all telepsychiatrists have been unassigned from CHCF E Yard.

CMF A Yard ASU EOP Hub

The CMF ASU EOP hub now has an on-site psychiatrist assigned to the unit.

MCSP A Yard EOP Mainline

Currently, there is less than 1.0 PY of an on-site psychiatrists assigned to the A Yard EOP program,. However, there is one registry psychiatrist that is anticipated to start at MCSP at the end of the month. MCSP anticipates assigning the new psychiatrist to the ASU EOP hub and reassigning the psychiatrist currently in that unit to A Yard EOP mainline. This will bring the on-site psychiatry presence in the A Yard EOP program to more than 1.0 PY.

MCSP B Yard EOP Mainline

MCSP B Yard has the equivalent of 1.5 PY on-site psychiatrists who provide care to the EOP patients in the mainline program. The on-site psychiatrists have been assigned to the B Yard EOP program since before the initial notice went out on October 9, 2020. Therefore, a notice should not have been sent.

SATF F and G Yard EOP Mainline

SATF anticipates they will have two on-site registry psychiatrists begin this month. These psychiatrists will be assigned to the EOP programs on F and G yard. Therefore, CDCR anticipates that SATF will have the requisite on-site coverage soon.

SVSP A Yard EOP Mainline and VSP A Yard EOP Mainline

CDCR continues to recruit for both on-site civil service and registry for these institutions. The civil service efforts include a continuous presence in various print and digital advertising media sources and platforms. Interested candidates are automatically directed to focused recruitment for these institutions.

COR 3B Yard EOP Mainline and ASU EOP Hub

In the prior notification email, COR 3B EOP mainline and ASU EOP hub were inadvertently left off

of the list of programs that did not have the equivalent of 1.0 PY on-site psychiatrist. COR has confirmed the telepsychiatrist on 3B will swap with an onsite psychiatrist to CCCMS effective January 4, 2021. In addition, a new on-site psychiatrist is scheduled to take over the caseload in the ASU EOP hub this week and the telepsychiatrist will be moved to the CCCMS level of care. Accordingly, CDCR anticipates that both programs will have the requisite on-site coverage soon.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Bentz, Melissa@CDCR
**Sent:** Friday, October 9, 2020 11:04 AM
**To:** Matty Lopes (mlopes@pldolaw.com) <mlopes@pldolaw.com>; Jones Mohamedu <mjones@pldolaw.com>; Kerry Walsh (kwalsh@pldolaw.com) <kwalsh@pldolaw.com>; 'Lisa Ells (LElls@rbgg.com)' <LElls@rbgg.com>; Michael W. Bien <MBien@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>
**Cc:** Carrie Stafford (Carrie.Stafford@cdcr.ca.gov) <Carrie.Stafford@cdcr.ca.gov>; Weber, Nicholas <Nicholas.Weber@cdcr.ca.gov>; Hockerson, Dillon <Dillon.Hockerson@cdcr.ca.gov>; Amanda Ryan (AMANDA.RYAN@cdcr.ca.gov) <AMANDA.RYAN@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Amar Mehta (Amar.Mehta@cdcr.ca.gov) <Amar.Mehta@cdcr.ca.gov>; Ponciano, Angela <Angela.Ponciano@cdcr.ca.gov>
**Subject:** Coleman: Notification of Use of Telepsychiatry in PIPs and EOPs

All,

Per the provisional Telepsychiatry Policy, CDCR shall provide notice to the Special Master and Plaintiffs' counsel if an EOP program does not have an on-site psychiatrist as required by the policy for 30 consecutive calendar days. CDCR shall also provide notice if a telepsychiatrist is required to serve in a PIP for more than 30 consecutive calendar days. Below is notification regarding the utilization of telepsychiatry in EOP programs without an on-site psychiatrists and in the PIPs for more than 30 consecutive calendar days since the implementation of the Telepsychiatry Resource Management Tool.

PIPs Where Telepsychiatrists Provided Care for More than 30 Days:

- CHCF PIP currently has five telepsychiatrists who have provided care for more than 30 days.
- CMF PIP currently has two telepsychiatrists who have provided care for more than 30 days.
- SVSP PIP currently has one telepsychiatrist who has provided care for more than 30 days.

Consistent with the provisional telepsychiatry policy, CDCR will provide a plan to address the use of telepsychiatry in these programs within 30 calendar days from the provision of notice.

EOP Programs Without At Least One On-Site Psychiatrists:

- CHCF- E Yard EOP Mainline
- CMF- A Yard ASU EOP
- MCSP- A Yard and B Yard EOP Mainline
- SATF- F Yard and G Yard EOP Mainline
- SVSP- A Yard Mainline
- VSP- A Yard Mainline

Consistent with the provisional telepsychiatry policy, CDCR will provide a plan to address the use of telepsychiatry in these programs within 60 calendar days from the provision of notice.

Use of Telepsychiatry at HDSP MHCB:

On September 17, 2020, Plaintiffs and the Special Master were provided notice of the use of telepsychiatry at the HDSP MHCB for more than 14 consecutive calendar days with a plan regarding how CDCR will try to address the use of telepsychiatry in that program. CDCR continues to recruit for both civil service and registry on-site psychiatrists and HDSP has been prioritized in this effort.

Respectfully,

**Melissa C. Bentz**
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email:   Melissa.Bentz@cdcr.ca.gov
Office Phone: (916) 324-7177
Cell Phone: (916) 628-5385
Fax: (916) 327-5306

ATTORNEY CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

# Exhibit G

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR |
| **To:** | Matt Lopes; Mohamedu Jones; Kerry F. Walsh; Coleman Team - RBG Only; Steve Fama |
| **Cc:** | Stafford, Carrie@CDCR; Nick Weber; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Elise Thorn; Lucas Hennes; Damon McClain; Namrata Kotwani; Paul B. Mello; Samantha Wolff (swolff@hansonbridgett.com); David Casarrubias; Laurel O"Connor; Mehta, Amar@CDCR; Genetin, Arianna@CDCR; Martello, Toni@CDCR; Le, Sophia@CDCR |
| **Subject:** | Coleman: Notification of Use of Telepsychiatry on SVSP D Yard |
| **Date:** | Thursday, June 10, 2021 11:45:34 AM |

All,

Per the provisional Telepsychiatry Policy, CDCR shall provide notice to the Special Master and Plaintiffs' counsel if an EOP program does not have an on-site psychiatrist as required by the policy for 30 consecutive calendar days.

As of yesterday, SVSP D yard has not had an on-site psychiatrist for 30 consecutive calendar days. Consistent with the provisional Telepsychiatry Policy, CDCR will provide a plan to address the use of telepsychiatry at SVSP D yard within 60 calendar days from the provision of notice.

As a reminder, the EOP programs on CHCF E yard and VSP A yard also do not have an on-site psychiatrist. Further, one telepsychiatrist is assigned to each the HDSP MHCB and CMF PIP. Notices and plans were previously sent out for these programs and CDCR continues to work to hire on-site psychiatrists for these locations. All other programs are assigned telepsychiatrists consistent with the provisional Telepsychiatry Policy.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

# Exhibit H

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Matt Lopes; Mohamedu Jones; Kerry F. Walsh; Sofia Millham; Coleman Team - RBG Only; Steve Fama |
| Cc: | Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; Nick Weber; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Mehta, Amar@CDCR; Martello, Toni@CDCR; Genetin, Arianna@CDCR |
| Subject: | Coleman: Notice of the Use of Telepsychiatry on SVSP D Yard |
| Date: | Friday, May 13, 2022 3:32:59 PM |

[EXTERNAL MESSAGE NOTICE]

All,

Per the provisional Telepsychiatry Policy, CDCR shall provide notice to the Special Master and Plaintiffs' counsel if an EOP program does not have an on-site psychiatrist as required by the policy for 30 consecutive calendar days. As of today, SVSP D yard has not had an on-site psychiatrist for 30 consecutive calendar days. Consistent with the provisional Telepsychiatry Policy, CDCR will provide a plan to address the use of telepsychiatry at SVSP D yard within 60 calendar days from the provision of notice.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

# Exhibit I

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Matt Lopes; Mohamedu Jones; Kerry F. Walsh; Sofia Millham; Coleman Team - RBG Only; Steve Fama |
| Cc: | Nick Weber; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR; Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com); Elise Thorn; Damon McClain; Namrata Kotwani; Martello, Toni@CDCR; Mehta, Amar@CDCR; Genetin, Arianna@CDCR |
| Subject: | RE: Coleman: Notice of the Use of Telepsychiatry in the SVSP PIP |
| Date: | Monday, June 6, 2022 5:00:09 PM |

[EXTERNAL MESSAGE NOTICE]

All,

Since the below notice was provided, telepsychiatry has continued to be used at the SVSP PIP. SVSP recently gained additional on-site psychiatrists, but there is an on-site psychiatrist who will be on extended leave for some time. SVSP anticipates that the psychiatrist will return from leave in August. At that time, they believe they will be able to discontinue the use of telepsychiatry in the PIP. Use of telepsychiatry may also be discontinued before August if additional on-site psychiatrists are hired at the SVSP PIP. As always, CDCR will continue to recruit to fill on-site psychiatry positions at the SVSP PIP.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Bentz, Melissa@CDCR
**Sent:** Thursday, May 5, 2022 2:08 PM
**To:** Matt Lopes <mlopes@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Sofia Millham <smillham@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>
**Cc:** Weber, Nicholas <Nicholas.Weber@cdcr.ca.gov>; Sundeep Thind (SUNDEEP.THIND@cdcr.ca.gov) <SUNDEEP.THIND@cdcr.ca.gov>; Hockerson, Dillon <Dillon.Hockerson@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Martello, Toni@CDCR <Toni.Martello@cdcr.ca.gov>; Amar Mehta (Amar.Mehta@cdcr.ca.gov) <Amar.Mehta@cdcr.ca.gov>; Genetin, Arianna@CDCR <Arianna.Genetin@cdcr.ca.gov>
**Subject:** Coleman: Notice of the Use of Telepsychiatry in the SVSP PIP

All,

Per the provisional Telepsychiatry Policy, CDCR shall provide notice to the Special Master and

Plaintiffs' counsel if a telepsychiatrist is required to serve in a PIP for more than 30 consecutive calendar days. As of today, a telepsychiatrist has been assigned to the SVSP PIP for 30 consecutive calendar days. Consistent with the provisional telepsychiatry policy, CDCR will provide a plan to address the use of telepsychiatry in the SVSP PIP within 30 calendar days from the provision of notice.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

# EXHIBIT B

**XAVIER BECERRA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 210-7318
Facsimile: (916) 324-5205
E-Mail: Elise.Thorn@doj.ca.gov

June 30, 2022

*Via Electronic Mail*

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes Devereaux & O'Gara, LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215 N
Johnston, RI 02919

RE:    *Coleman*, et al. *v. Newsom*, et al.,
       U.S. District Court, Eastern District of California, Case No. 2:90-cv-00520 KJM-DB

Dear Special Master Lopes:

Defendants seek to implement a telepsychiatry policy that appropriately allows the broad use of telepsychiatry based on current standards of care, and that respects the role of the psychiatrist as part of the treatment team, is clinically indicated for each patient, and includes safeguards for patient confidentiality. CDCR's proposed revisions to the provisional policy are attached as Exhibit 1 to the Declaration of Dr. Mehta (Revised Policy).

CDCR's more than two decades of experience successfully using telepsychiatry in prisons demonstrates that telepsychiatry is a safe and effective modality for the delivery of mental health care services in correctional settings, including for Enhanced Outpatient Program (EOP) patients. Indeed, there is a substantial body of evidence that supports telepsychiatry's wide use in correctional settings across the country and beyond, consistent with the Revised Policy. Thus, CDCR has updated its telepsychiatry policy to eliminate unnecessary restrictions and facilitate the delivery of care to a broader group of patients. Moreover, the imposition of any limitations on telepsychiatry's use by the Court would violate the strictures of the PLRA and would unnecessarily limit *Coleman* class members' access to care, working against the joint goals of all parties in this case. Accordingly, Defendants request that you recommend that CDCR implement its Revised Policy.

The eighteen-month period for the provisional telepsychiatry policy elapsed on April 1, 2022. On April 14, 2022, CDCR provided the Special Master with its proposed revisions to the provisional telepsychiatry policy. The proposed revisions were sent to Plaintiffs on April 25, 2022. On May 18, 2022, Plaintiffs submitted their response to CDCR's proposed revisions, after which time the parties met and conferred concerning CDCR's revisions. The Special Master's

18687331.1

Matthew A. Lopes, Jr.
June 30, 2022
Page 2

team and Plaintiffs have rejected the Revised Policy.  Because no resolution has been reached, Defendants now submit their position and proposed language for a revised telepsychiatry policy to the Special Master, pursuant to the March 27, 2020 Stipulation and Order Approving the California Department of Corrections and Rehabilitation's Telepsychiatry Policy (ECF No. 6539).

The revisions to the policy that are in dispute include the ability to treat EOP patients under the same conditions that are applied to the Correctional Clinical Case Management Services (CCCMS) patients, to treat patients from a clinically appropriate and properly equipped home office, and to reduce the number of visits telepsychiatrists are required to make to institutions each year.

The Revised Policy expands CDCR's ability to use telepsychiatry in a safe and effective manner.  In particular, the Revised Policy makes the following changes:

- Telepsychiatrists may be assigned to the EOP level of care without having to first meet burdensome and unnecessary restrictions requiring the exhaustion of efforts to recruit and retain on-site psychiatrists or the assignment of on-site psychiatrists to each EOP program.

- Telepsychiatrists may work from telepsychiatry hubs or their homes provided they have appropriate computer equipment, network access, and confidential space to conduct business.  The Revised Policy ensures that telepsychiatrists who work from home may be required to come into an office in the event technology issues or supervisory concerns.

- Clarifies the role and duties of night shift telepsychiatrists, including their participation in crisis intervention teams, and ensures that telepsychiatry may be used in crisis bed and inpatient facilities only when on-site psychiatrists are not available and only as long as necessary.

- Expands the pool of telepresenters that may be used to include rec/rehab therapists and allows office technicians and other classifications to be telepresenters in an emergency.

- Directs that telepsychiatrists, except those assigned to night-shift, shall visit their assigned institution annually and spend at least one day at their assigned institution.

These changes are consistent with evidence-based best practices for telepsychiatry use, including in a correctional setting, and will allow CDCR to more fully utilize telepsychiatry for EOP and other patients.  They are supported by the expert declarations of Dr. Mehta, CDCR Chief of Telepsychiatry Dr. Toni Martello, Dr. Joseph Penn, professional and community standards, and a significant body of literature, as explained in detail below.

Matthew A. Lopes, Jr.
June 30, 2022
Page 3

## I.    Overview of Defendants' Position on Telepsychiatry.

To meet their constitutional obligations, Defendants must "employ mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" *Coleman v. Wilson*, 912 F. Supp. 1282, 1306 (E.D. Cal. 1995) (internal citation omitted).  The "constitutional requirement that Defendants provide inmates with 'a system of ready access to adequate medical care,' means simply either ready access to physicians at each prison or 'reasonably speedy access' to outside physicians or facilities." *Id*. at 1308 (internal citation omitted).

By making it easier to recruit and retain psychiatrists at CDCR, telepsychiatry is a valuable tool to help CDCR deliver care to patients and meet or exceed constitutional requirements.  This is especially true at a time when staffing shortages in the mental health profession are widespread across the country.  *See Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Psychiatrists, 9/18/18,* Economists Incorporated.  (ECF No. 6695 at 97-100.)  As Defendants' experts reported in 2018, "the supply of psychiatrists in California has neither kept pace with demand, nor has it been sufficient to replace a diminishing workforce."  (*Id.* at 105.)[1]  To meet this serious challenge, Defendants need flexibility to hire licensed psychiatrists wherever they may be and utilize  new technologies that expand options for delivering patient care.

There is no basis in fact or law that justifies placing restrictions on CDCR's ability to use telepsychiatry to deliver care that go beyond what is required under the standard of care.  The continued imposition of the restrictions on CDCR's use of telepsychiatry is inconsistent with applicable American Psychiatry Association standards and the standard of care.  Telepsychiatry is widely accepted as meeting the standard of care for providing mental health treatment in diverse treatment settings, including correctional settings, emergency settings, inpatient psychiatric facilities, residential care homes, and rural locations.  CDCR's Revised Policy meets or exceeds the standard of care for telepsychiatry. *See* Declaration of Joseph Penn, ¶ 65. Telepsychiatrists fulfill the same role as on-site psychiatrists and follow the same ethical and professional standards.  And there is no legal precedent that supports the view that CDCR's use of telepsychiatry as part of its mental health staffing plan constitutes deliberate indifference or otherwise violates the Eighth Amendment.  To the contrary, CDCR's proactive implementation of modern modalities for delivering care to patients is the exact "antithesis of the callous

---

[1] The report also cited a finding from an academic study by researchers at the University of California, San Francisco, "that 45% of psychiatrists in California are over age 60 and likely to retire or reduce their hours in the near future.  As a consequence of these retirements, the study projects that the overall number of psychiatrists will decline by 34% between 2016 and 2028." (*Id*.)  The results of the study indicated that California's psychiatrist shortage will get significantly worse, expanding to almost 2,700 by 2028 under current utilization rates and to almost 3,900 to relieve unmet need.

Matthew A. Lopes, Jr.
June 30, 2022
Page 4

disregard required to make out an Eighth Amendment claim." *Rasho v. Jeffries,* 22 F.4th 703, 710 (7th Cir. 2022).

CDCR has used telepsychiatry to deliver mental health treatment for over two decades without evidence of negative patient outcomes tied to telepsychiatry. Monitoring reports dating back to 1998 endorse the use of telepsychiatry without the excessive and unwarranted requirements in the provisional policy and without any findings that telepsychiatry is an improper modality for the delivery of mental health care to the *Coleman* class. (ECF No. 5872 at 2.) CDCR telepsychiatrists provide mental health services consistent with the role and duties required of psychiatrists under all of CDCR's mental health policies. Further, CDCR's use of telepsychiatry to deliver mental health treatment is consistent with expert literature, which shows without exception that there is no distinction in terms of outcomes for patients treated via telepsychiatry versus in-person.

Advances in technology, the end of the provisional period, and the widespread successful use of telepsychiatry support CDCR's request that the Special Master re-evaluate his expert's position calling for the placement of unnecessary and unsupported restrictions on CDCR's use of telepsychiatry.

**II.    CDCR Is Entitled to Continue Its Longstanding Use of Telepsychiatry, Free of Limitations That Are Not Permitted by Law or Supported by Psychiatric Practice Standards.**

The Special Master has monitored CDCR's use of telepsychiatry for years with positive findings. (Twenty-Sixth Round Monitoring Report, ECF No. 5439.) The 2015 report described successful use of telepsychiatry at seven institutions at the EOP and crisis bed levels of care. The report also confirmed that the *Coleman* experts' opinions regarding the potentially positive uses of telepsychiatry had not changed since 1999. (*Id.* at 20.)

The Special Master's observations are not surprising. Telepsychiatrists follow the same professional and ethical standards and carry out the same duties and functions as on-site psychiatrists. The Program Guide sets forth the expected duties of psychiatrists when treating *Coleman* class members at each level of care. For both CCCMS and EOP levels of care, psychiatrists are required members of the interdisciplinary treatment teams (Program Guide at 12-3-9 and 12-4-6) and psychiatrists are assigned to handle the patients' medication evaluation and management. (Program Guide at 12-3-9 and 12-4-9.) The Program Guide also makes no distinction between on-site psychiatrists and telepsychiatrists for credentialing requirements. (12-1-10 to 12-1-12.) This is consistent with California licensing standards. Nothing in the Program Guide supports the theory that telepsychiatrists cannot provide the same mental health care as on-site psychiatrists.

Matthew A. Lopes, Jr.
June 30, 2022
Page 5


A.    **Psychiatric Organizations Support the Use of Telepsychiatry in Corrections and the Broader Psychiatric Community.**

In 2018, Defendants submitted the report of Joseph Penn, M.D.—a nationally recognized mental health expert—on the standard of care for telepsychiatry. Dr. Penn reaffirms those opinions that: (1) telepsychiatry is a standard, widely accepted, and effective method of providing psychiatric evaluation and treatment for all mentally ill patients and is generally no less effective or therapeutic than face-to-face treatment; and (2) telepsychiatry is a standard, widely accepted, and effective method of psychiatric evaluation and treatment for individuals in residential treatment, both within correctional and non-correctional patient populations. *See* Report of Joseph Penn, M.D., ECF No. 5873-5 at 44 and the attached Declaration of Joseph Penn. Dr. Penn's declaration serves as an authoritative resource supporting CDCR's implementation of the Revised Policy, including his professional opinion that implementation of the Revised Policy would exceed the standard of care. Penn Decl. ¶ 65.

Dr. Penn further provides the following pronouncements on the use of telepsychiatry:

- Telepsychiatry continues to be a standard, widely accepted, and effective method of effective method of providing psychiatric evaluation and treatment for all mentally ill patients and is generally no less effective or therapeutic than face-to-face treatment. Penn Decl. ¶ 41.
- Telepsychiatry continues to be a standard, widely accepted, and effective method of psychiatric evaluation and treatment delivery system for individuals in residential treatment, both within correctional and non-correctional patient populations. Penn Decl. ¶ 42.
- There are no contraindications to the routine use of telepsychiatry for EOP inmate patient populations and other similar levels of care, subject to individual patient's evaluation and treatment needs. Penn Decl. ¶ 44.
- Telepsychiatry is generally an effective treatment to supplement on-site psychiatric services for incarcerated individuals in inpatient psychiatric prison units. Penn Decl. ¶ 45.
- Telepsychiatry has been successfully utilized as a primary method of delivering psychiatric care to incarcerated individuals across a variety of levels of care: inmate patients housed in "step-down" (previously inpatient level of care, but were recently transitioned to a "step-down" unit setting) mental health units, residential programs, other specialized mental health unit non-inpatient treatment programs, designated mental health sheltered housing settings, chronic mentally ill programs (CMI), and other specialized treatment programs and housing setting for individuals with serious mental illness (SMI)], and for incarcerated individuals with intellectual disabilities and other special needs. Penn Decl. ¶ 46.

18687331.1

Matthew A. Lopes, Jr.
June 30, 2022
Page 6

- The COVID-19 pandemic further drives the vital need for the continued growth, implementation, and expansion of telepsychiatry and other types of telehealth for incarcerated individuals regardless of their housing setting/classifications. Penn Decl. ¶ 46.
- Nationally, there has been an increased use and acceptance of telepsychiatric, telemental health for emergency, crisis/urgent and non-urgent telehealth care, and specialty care delivered through telemedicine throughout the United States. Penn Decl. ¶ 47.
- Dr. Penn is unaware of any adverse patient outcomes, patient safety risks, or adverse outcomes that are solely attributable to the use of telepsychiatry or telehealth. Penn Decl. ¶¶ 49 and 52.
- Telepsychiatry, telepsychology, and other forms of telehealth have clearly improved access to care and greatly improved continuity of care, particularly in remote/rural psychiatric physician manpower/shortage settings where many state prisons are located, and moreover due to the existing and well described national shortage of psychiatrists and the lack of any clear solution to an anticipated further national shortage of psychiatrists. Penn Decl. ¶ 57.

Dr. Penn's pronouncements are consistent with those of the California Medical Board – the governing agency that licenses and regulates medical doctors, including psychiatrists – which recognizes that: (1) telehealth is "a tool in medical practice, not a separate form of medicine;" (2) there "are no legal prohibitions to using technology in the practice of medicine, as long as the practice is done by a California licensed physician and complies with state and federal privacy laws;" and (3) the standard of care is the same whether the patient is seen in-person, through telehealth or other methods of electronically enabled health care."[2]

As previously reported by Defendants, the American Psychiatric Association (APA) endorses the use of telepsychiatry as a successful evidence-based treatment modality, with high satisfaction rates among patients and psychiatrists. *See* Report of Joseph Penn, M.D. (ECF No. 5873-5 at 47.) The APA also describes telepsychiatry as comparable to in-person care in terms of "therapeutic engagement, quality of care, validity/reliability of assessment, and clinical outcomes." (*Id.*) In 2018, the APA collaborated with the American Telepsychiatry Association (ATA) "to create a consolidated update of the previous APA and ATA official documents and resources in telemental health to provide a single guide on best practices in clinical videoconferencing in mental health." Penn Decl. ¶ 54. As that document reflects, the APA is the main professional organization of psychiatrists and trainee psychiatrists in the United States, and the largest psychiatric organization in the world, and the ATA is the principal organization bringing together telemedicine practitioners, healthcare institutions, government agencies, vendors and others involved in providing remote healthcare using telecommunications. (*Id.*) According to the American Telemedicine Practice Guidelines for Video-Based Online Mental

---

[2] https://www.mbc.ca.gov/Resources/Medical-Resources/telehealth.aspx, last accessed on 6/21/22.

Matthew A. Lopes, Jr.
June 30, 2022
Page 7

Health Services, "no studies have identified any patient subgroup that does not benefit, or is harmed by, mental health care provided through remote videoconferencing." And like the APA, the National Commission on Correctional Health Care (NCCHC)—whose accreditation of correctional facilities constitutes substantial evidence of adequate medical care—also supports the use of telepsychiatry in correctional settings. (*Id.*; *see Balla v. Idaho*, 29 F.4th at 1026.) Indeed, the new chair of NCCHC's Governance Board included among his top four priorities for 2022 the use of telemedicine and telepsychiatry for incarcerated patients to provide a viable option for specialty services.[3]

Considering the APA and ATA's support of telepsychiatry, it's not surprising that telepsychiatry is widely used by a majority of state correctional facilities in the United States. As part of their analysis of telepsychiatry and to confirm their belief that it is widely accepted as a modality to deliver mental health care to incarcerated persons, the CDCR mental health leadership surveyed their counterparts in other correctional systems to see whether and how they use telepsychiatry. Of the thirty-five correctional systems that responded, all but one confirmed they used telepsychiatry. And the one not currently using telepsychiatry, said it was making plans for its future use. *See* Martello Decl. at ¶ 9. Survey responses confirmed that telepsychiatry is used in correctional settings to deliver mental health treatment to incarcerated persons.

**B.      CDCR successfully used telepsychiatry and telehealth to deliver mental health care to patients at every level of care during the COVID-19 pandemic.**

On June 14, 2021, Defendants filed a report on the lessons CDCR learned during the COVID-19 pandemic, referred to as the "Lessons Learned report." (ECF No. 7196.) CDCR's response to the contagiousness and lethality of the virus lead to changes in the way it delivered mental health care services to *Coleman* class members, including the expanded use of telehealth to provide mental health care. (*Id.* at 9.) Using the established infrastructure and experience of the telepsychiatry department, CDCR implemented telehealth solutions to respond to a rapidly evolving pandemic. (*Id.* at 9 and 15.) The Lessons Learned report demonstrates that CDCR successfully used telehealth to bring mental health care to patients notwithstanding social distancing requirements and staff's inability to provide treatment on-site. (*Id.* at 10.)

The 2021 report identified the following broad lessons learned:

- The expansion of telehealth was an effective way to provide treatment during the COVID-19 pandemic.[4]

---

[3] https://www.ncchc.org/priorities-for-2022-and-beyond/, last accessed on 6/29/22.

[4] CDCR was not alone in determining that the use of telehealth was critical to ensuring access to mental health treatment during the COVID-19 pandemic. For instance, the Centers for

Matthew A. Lopes, Jr.
June 30, 2022
Page 8

- Telehealth coverage provided by psychologist and social workers helped deliver mental health care to patients in institutions without mental health programs to prevent mental health crises and stress related to the COVID-19.

- By allowing onsite and hub providers the ability to work from home, CDCR ultimately retained more civil service psychiatrists and telepsychiatrists during the COVID-19 pandemic.

---

Medicare and Medicaid Services (CMS) permanently implemented measures enacted during the COVID-19 public health emergency (PHE) to expand telehealth access for mental health patients. (*See* https://www.cms.gov/newsroom/press-releases/cms-physician-payment-rule-promotes-greater-access-telehealth-services-diabetes-prevention-programs). Under the Consolidated Appropriations Act of 2021, Medicare beneficiaries will be able to permanently utilize telehealth for receiving mental health treatment even after the COVID-19 public health emergency ends—including at their homes, homeless shelters, and hotels. (*See* https://www.cms.gov/files/document/mm12549-cy2022-telehealth-update-medicare-physician-fee-schedule.pdf.) Beneficiaries may receive telehealth services such as counseling, psychotherapy, and psychiatric evaluations from their home for diagnosis, treatment or evaluation. (*Id.*) After the pandemic ends, CMS will require an in-person visit with the physician or practitioner within six months of the initial telehealth service. For established patients using telehealth during the pandemic, this in-person visit must occur no later than six months after the end of the public health emergency. (*Id.*) A subsequent in-person visit must occur within 12 months of the initial visit, to be repeated at least every 12 months. (*Id.*) Medicare will also reimburse audio-only services for established patients with mental illness/substance abuse disorders who are unable or unwilling to use video technology. (*Id.*) The rule would require providers to note that the patient wasn't able to or didn't want to use a video call. (*Id.*) CMS's rationale for this exception was "the generalized shortage of mental health care professionals" and patients with "limited access to broadband due to geographic or socioeconomic challenges" who relied on audio communications to receive treatment, such that a "discontinuation of this flexibility at the end of the [public health emergency] could have a negative impact on access to care." (*See* ).

On March 15, 2022, the OIG issued a report which concluded that telehealth was critical for providing services to Medicare beneficiaries. (*See* https://oig.hhs.gov/oei/reports/OEI-02-20-00520.pdf.) In particular, the report found that "beneficiaries' use of telehealth for behavioral health services relative to their use of [other medical] services in-person shows that beneficiaries benefited from the ability to use telehealth for these services." (*Id.* at 9.) The OIG noted that medical "literature prior to the pandemic that suggests the use of telehealth for behavioral health may improve access, especially for beneficiaries facing barriers to care." (*Id.*)

Matthew A. Lopes, Jr.
June 30, 2022
Page 9

- Staff and patients appear to be generally satisfied with telehealth, which aligns with trends reported in the community. Telework contributed to the quality of life, job satisfaction, recruitment, and retention of providers in CDCR's system.

- Antidepressant, mood stabilizer, and antipsychotic medications can be successfully monitored via telehealth.

- By targeting telehealth services toward more routine, non-urgent services, onsite staff were able to focus on more acute and intensive needs at the institutions.

- Competing demands on identified telepresenter classifications should be considered to ensure onsite availability to support service delivery. Having a diversity of classifications trained as telepresenters can be invaluable during critical incidents.

- There are a wide variety of available options for telework, including CDCR offices located at different units within the institutions or in remote hubs. In addition, services from home can also be provided safely and effectively when clear standards are enforced, and secure, functional equipment is deployed.

(*Id.* at 10-11.)

According to the report, telepsychiatry dramatically increased as a result of the COVID-19 pandemic, and had a positive impact on the delivery of care. (*Id.* at 16-17.) These findings are also consistent with those of the APA. The APA conducted a survey that demonstrated the following: (1) after COVID-19 struck, an overwhelming majority of psychiatrists began seeing all or most of their patients via telehealth; (2) telehealth can be adopted quickly to treat psychiatric and substance use disorders; (3) there was a significant increase in patients keeping appointments when those appointments had the added convenience of a telehealth option; and (4) of patients who were seen for the first time via telehealth, a large majority (85%) were either somewhat satisfied or satisfied with their treatment experience. (*Id.* at 16.) The APA also issued a guidance publication on the impacts of COVID-19 on incarcerated persons with mental illness. The guidance included a recommendation for the treatment of incarcerated people with mental illness, to "coordinate care within facilities and *significantly expand telehealth wherever possible and clinically appropriate.*" (*Id.* at 17) (emphasis added.)

The report also identified the positive impact of teleworking on the hiring and retention of psychiatrists between 2020 and 2021 (*id.* at 15) and discussed issues that arose as a result of having to provide care under COVID-19 conditions. The conditions impacting CDCR programs and the delivery of mental health during COVID are unprecedented. Telehealth provided the flexibility needed for CDCR to operate the mental health programs, including through the use of various treatment modalities, to achieve the best access to care for its patients during the pandemic.

Matthew A. Lopes, Jr.
June 30, 2022
Page 10

C.    **Telepsychiatry improves CDCR's ability to deliver quality mental health care to patients at every level of care.**

Notwithstanding the limitations imposed by the provisional policy on the use of telepsychiatry, between April 2020 and June 2022, CDCR telepsychiatrists had more than 158,000 clinical encounters with their patients. Mehta Decl. at ¶ 16. As previously reported, from 2015 through August of 2018, CDCR provided over 70,000 telepsychiatry contacts to inmates assigned to the EOP level of care. (ECF No. 5879-2 at 2.) The Lessons Learned report demonstrates that expanded use of telepsychiatry, even by formerly on-site providers working from home, did not result in any negative outcomes associated with this modality. Mehta Decl. ¶ 21. There is no indication that the use of telepsychiatry during these periods was responsible for any negative patient outcomes. Mehta Decl. at ¶¶ 7 and 21.

The use of telepsychiatry during the provisional period also assisted CDCR in filling allocated staffing positions. Telepsychiatry has been increasing as a means of overcoming geographic limitations to clinician availability and in particular increasing access to treatment for remote and underserved populations, including those in correctional settings. Mehta Decl. ¶ 22. Utilizing telepsychiatry has allowed many organizations, including CDCR, to provide quality psychiatric care to patients who need it most. (*Id.*) The monthly psychiatry vacancy reports filed for the months April 2020 through May 2022, show that telepsychiatry significantly increased CDCR's staffing fill rates in each of those months. The most recent fill rate for allocated telepsychiatrist positions was 90%.[5]

D.    **CDCR's revised telepsychiatry policy safeguards patients' interests.**

Under the Revised Policy, telepsychiatrists will provide patients with the treatment outlined in the Program Guide in the same manner as on-site psychiatrists. Mehta Decl. at ¶ 19. The Revised Policy respects and ensures the psychiatrist is part of the treatment team, thereby preserving the treatment milieu. (*Id.*) As Dr. Mehta has stated in a number of meetings, the telepsychiatrists engage with their on-site counterparts as part of the interdisciplinary teams for their patients. But their interaction is certainly not limited to the IDTT context.

The available evidence indicates that telepsychiatrists participate in multi-disciplinary interaction in the same manner as on-site psychiatrists. Mehta Decl. at ¶ 19. Telepsychiatrists engage with their on-site team members as part of the interdisciplinary treatment teams for their patients. (*Id.*) Telepsychiatrists are also readily available by video, phone, or chat. (*Id.*) They regularly speak with other team members outside of interdisciplinary treatment team meetings for curbside consults, to express a concern or recommendation about a patient, or to discuss other matters relevant to the provision of care on their shared yard. (*Id.*) Additionally, telepsychiatrists regularly speak with other staff members such as escort officers, gather crucial

---

[5] ECF Nos. 6694, 6745, 6803, 6842, 6892, 6929, 6970, 7011, 7042, 7069, 7115, 7148, 7188, 7253, 7291, 7335, 7361, 7383, 7408, 7441, 7481, 7518, 7542, 7561, and 7579.

Matthew A. Lopes, Jr.
June 30, 2022
Page 11

information on the patient and the environment from their telepresenters, and can be taken cell front through telepresence where they can observe the common areas and the cells of their patients. (*Id.*) When taken into the building, it is common for other inmates in the day room to recognize their doctor and address them in an impromptu fashion. (*Id.*) The extent of their interaction is comparable with the expectations of on-site psychiatrists, who have patients brought to their office by escort officers throughout the day. (*Id.*) Engagement with other aspects of the institution are largely dependent on the individual physician, rather than whether they are on-site or telepsychiatrists. (*Id.*)

The elements of the Revised Policy, many of which were included in the provisional policy, are based on the APA standards for telepsychiatry. Mehta Decl. ¶ 10. The Revised Policy also clearly requires that telepsychiatrists adhere to the Program Guide requirements when treating *Coleman* class members. Mehta Decl. ¶ 20.

E.     **Neither the Eighth Amendment nor the PLRA permits continuing limitations on telepsychiatry.**

Defendants negotiated the terms of the March 2020 stipulation in good faith and agreed to the provisional period so that the Special Master and Plaintiffs could observe that telepsychiatry is an effective and safe modality for all levels of care. Even in the face of overwhelming evidence demonstrating the uncontroverted benefits of telepsychiatry, the Special Master's team and Plaintiffs insist on restricting CDCR's use. But the continued imposition of limitations on CDCR's use of telepsychiatry that are not clinically warranted or based in evidence violates the PLRA. There are no factual findings of constitutional harm from CDCR's use of telepsychiatry or evidence that limitations on the use of telepsychiatry are necessary to correct a current and ongoing constitutional violation. *Graves v. Arpaio*, 623 F.3d 1043, 1047–48 (9th Cir. 2010); *see also United States v. State of Mich.*, 940 F.2d 143, 159–60 (6th Cir. 1991) (district court lacked authority to impose additional requirements on remedial plan proposed by prison officials; state was entitled to develop and implement its own procedures "until it appears from affirmative proof that the plan and procedures result in a constitutional infringement.") Telepsychiatry is a widely-accepted and well-established modality to deliver mental health services – not just in correctional settings, but in the community as well. Penn Decl. ¶¶ 41, 42. In fact, one federal appellate court recognized that telepsychiatry was a valuable tool to address staffing needs reduced backlogs in mental-health treatment and substantially increased the number of psychiatric providers. *Rasho*, 22 F.4th at 11. And any disagreement on the suitability of telepsychiatry, or isolated examples of technical difficulties, do not establish systemic deliberate indifference constituting cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) (a disagreement among experts concerning medical judgment is insufficient to support a deliberate-indifference claim); *Armstrong v. Davis*, 275 F.3d 849, 870 (9th Cir. 2001, *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 507 (2005) ("isolated violations affecting a narrow range of plaintiffs" cannot justify systemwide relief; *see also Lewis v. Casey*, 518 U.S. 343, 359 (1996) (two instances of inadequacies "were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief.").

Matthew A. Lopes, Jr.
June 30, 2022
Page 12

In addition, limits on CDCR's use of telepsychiatry would violate the PLRA's mandate that prospective relief must be limited to the least intrusive, most narrowly tailored means of remedying any purported constitutional violation. 18 U.S.C. § 3626(a)(1)(A). Indeed, a broad limitation on CDCR's use of telepsychiatry at the EOP level of care is not a narrowly-tailored means of achieving systemically constitutional access to care, and improperly limits Defendants' ability to treat patients or meet its mental-health staffing goals. *Brown v. Plata*, 563 U.S. 493, 531 (2011) (the scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation). Disregarding the industry-wide consensus of mental-health care professionals and imposing substantial constraints on a clinically validated method to deliver constitutionally adequate psychiatric care to CDCR's patients is not the least intrusive means to remedy any purported deliberate indifference to inmates' serious mental-health needs.

## III. Defendants Request that the Special Master Recommend that the Court Permit CDCR to Implement the Revised Telepsychiatry Policy.

Defendants have developed a telepsychiatry program and policy that is consistent with national standards and furthers CDCR delivery of constitutionally adequate mental health treatment to the *Coleman* class. Telepsychiatry brings needed flexibility to CDCR's mental health program, which experiences periodic fluctuations in its inmate population and staff. The lessons learned during COVID-19, as well as uncontroverted scientific literature, demonstrate that telepsychiatry is a safe and effective modality to deliver mental health treatment to patients at every level of care.

While the Special Master's reports on telepsychiatry in *Coleman* have acknowledge the positive impacts of telepsychiatry, CDCR is confused by the Special Master's generalized statements that telepsychiatry is not appropriate to treat a certain class of patients or that limits placed on CDCR's ability to expand the use of telepsychiatry are justified. That is just not the case.

CDCR's Revised Policy represents best practices under the APA guidelines and the industry-wide consensus of mental-health care professionals.

/ /

/ /

Matthew A. Lopes, Jr.
June 30, 2022
Page 13


      Defendants must be given the deference to implement a telepsychiatry policy that meets the national standards described above and gives it the best opportunity to provide mental health treatment to the *Coleman* class.

                                 Sincerely,

                                 */s/ Elise Owens Thorn*

                                 ELISE OWENS THORN
                                 Deputy Attorney General

                 For    ROB BONTA
                        Attorney General

Enclosures

cc:  Coleman Plaintiffs' Counsel

<table>
<tr><td>1</td><td>TO ROB BONTA, State Bar No. 202668<br>Attorney General of California</td><td>PAUL B. MELLO, State Bar No. 179755<br>SAMANTHA D. WOLFF, State Bar No. 240280</td></tr>
</table>

1   TO ROB BONTA, State Bar No. 202668
    Attorney General of California
2   MONICA N. ANDERSON, State Bar No. 182970
    Senior Assistant Attorney General
3   DAMON MCCLAIN, State Bar No. 209508
    Supervising Deputy Attorney General
4   ELISE OWENS THORN, State Bar No. 145931
    NAMRATA KOTWANI, State Bar No. 308741
5   Deputy Attorneys General
      1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone:  (916) 210-7318
     Fax:  (916) 324-5205
8    E-mail:  Elise.Thorn@doj.ca.gov
    *Attorneys for Defendants*
9

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
DAVID C. CASARRUBIAS, State Bar No. 321994
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone:  (925) 746-8460
  Fax:  (925) 746-8490
  E-mail:  PMello@hansonbridgett.com
*Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14  **RALPH COLEMAN, et al.,**                2:90-cv-00520 KJM-DB (PC)

15                            Plaintiffs,    **DECLARATION OF AMAR MEHTA**
                                             **REGARDING DEFENDANTS'**
16          v.                               **POSITION ON TELEPSYCHIATRY**

17

18  **GAVIN NEWSOM, et al.,**

19                            Defendants.

20

21      I, Amar Mehta, declare:

22      1.  I am the Deputy Director of the Statewide Mental Health Program for the California

23  Department of Corrections and Rehabilitation (CDCR).  I previously held this position in an

24  acting capacity from July to September 2020, and prior to that I was the Statewide Chief of

25  Telepsychiatry.  I have worked at CDCR since July 2013, during which time I have also served as

26  a staff telepsychiatrist, site director for residency training, institution clinical lead, and acting

27  statewide Chief of Psychiatry.  I attended residency in general Psychiatry, and completed

28  fellowships in both Child & Adolescent Psychiatry and Forensic Psychiatry.  I am Board-certified

                                              1

1    in Adult, Child & Adolescent, and Forensic Psychiatry, as well as Addiction Medicine.  I submit

2    this declaration in support of Defendants' position on telepsychiatry as required under the March

3    27, 2020 Stipulation and Order Approving the California Department of Corrections and

4    Rehabilitation's Telepsychiatry Policy (ECF No. 6539).  I have personal knowledge of the

5    statements in this declaration and could testify to them if called to do so.

6        2.  I am familiar with the *Coleman* court's prior orders on the use of telepsychiatry,

7    specifically the October 10, 2017 order, the July 3, 2018 order (ECF No. 5711), and the

8    September 20, 2018 order (ECF No. 5928).

9        3.  CDCR began to implement most the provisional telepsychiatry policy, Exhibit A to

10   the March 27 order, on August 25, 2020.  (ECF No. 6833-1.)  Under the September 21, 2020

11   order, the eighteen-month provisional period commenced on October 1, 2020.  (ECF No. 6874.)

12   CDCR followed the provisional telepsychiatry policy during the provisional period and continues

13   to follow the policy pending further revisions to the policy as outlined in the dispute resolution

14   process under the March 27 order.

15       4.  As a result of CDCR's successful use of telepsychiatry under the provisional policy,

16   including the delivery of mental health care to patients at the Enhanced Outpatient Program

17   (EOP) level of care, and lessons learned regarding the use of telehealth and telepsychiatry

18   throughout the institutions and the larger community during the COVID-19 pandemic, it was

19   clear that CDCR needed to propose revisions to the provisional telepsychiatry policy.

20       5.  On April 14, 2022, following the end of the provisional period, CDCR submitted

21   revisions to the provisional policy to the Special Master and his experts for input.  Attached as

22   Exhibit 1 is a true and correct copy of Defendants' proposed revisions to the provisional

23   telepsychiatry policy (Revised Policy).

24       6.  The Special Master shared the Revised Policy with Plaintiffs and the parties met and

25   conferred on May 10 to discuss the proposed revisions.  On May 18, 2022, Plaintiffs sent CDCR

26   a letter setting forth their response to the Revised Policy.  A true and correct copy of Plaintiffs'

27   letter is attached as Exhibit 2.   The parties met and conferred again on May 19, 2022, and it was

28

Mehta Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18682354.1

1    clear that the Special Master and his experts and Plaintiffs would not agree to CDCR's proposed

2    revisions to the provisional telepsychiatry policy and that we were at an impasse.

3        7.    As reflected in Plaintiffs' May 18 letter, Plaintiffs object to CDCR's proposed

4    revisions to the provisional policy on the following grounds:

5        a.  Plaintiffs suggested that CDCR needed to fix and evaluate implementation of the

6            provisional policy before expanding telepsychiatry, ignoring the fact that

7            telepsychiatry has been used for over 10 years in CDCR.  This suggestion is based

8            on their attendance at IDTTs during 3 recent monitoring tours.  Over the course of

9            3 days at the Substance Abuse Treatment Facility (SATF), Plaintiffs noted the

10           connection during some IDTTs "went in and out," then alleged vague quality of

11           care issues that could equally have applied to an on-site psychiatrist.  A non-

12           specific comment on connectivity was made about Mule Creek State Prison

13           (MCSP), and at Kern Valley State Prison (KVSP), as well as a vague quality of

14           care issue that again could equally have applied to an on-site psychiatrist.  On rare

15           occasions there are technical issues during individual calls, but plaintiffs have

16           given no indication of more widespread issues, and CDCR addresses any technical

17           issues promptly as they arise.  There have been hundreds of thousands of

18           individual telepsychiatry appointments since the program started over a decade

19           ago, and no allegation of widespread connectivity issues from patients, CDCR

20           telepsychiatrists, the Special Master's team, or Plaintiffs, despite regular reviews.

21       b.  Plaintiffs object that the Revised Policy does not preserve the need to provide

22           informed consent.  This objection is meritless.  Informed consent continues to be

23           provided in full, and patients are constantly evaluated for their appropriateness to

24           remain in telepsychiatry as described in the policy.  Concerns leading to the

25           revision include "doctor shopping" and other potential misuses of the system.

26       c.  Plaintiffs object that "Non-Confidential Cell Front Telepsychiatry is Not a

27           Program Guide Required Clinical Contact."  There is no justification or

28           explanation for this objection.  Since the release of the provisional policy, CDCR

3

1   patients have significantly benefitted from on-site providers' ability to utilize tele-

2   health appropriately during the COVID-19 pandemic.  During that time, cell-front

3   visits that would have been carried out in person were carried out through video

4   conferencing equipment brought into the housing unit.  In these situations, on-site

5   providers "tele-working" could count their cell-front visit for a Program Guide

6   required clinical contact in specific circumstances such as quarantines.  A

7   telepsychiatrist, however, could conduct an identical cell-front visit, but it would

8   not count under this clause in the policy.  This is logically inconsistent. It is not

9   being proposed that every cell front contact count as a Program Guide required

10  clinical contact, only that the same rules that apply to on-site providers apply

11  equally to telepsychiatrists.  A prior demonstration carried out for the Special

12  Master's team and Plaintiffs showed that the video and audio experience was

13  adequate for these visits to occur (separate from the issue of whether they were

14  counted), and in some ways the audio was superior to being in person, because the

15  directionality of the microphone and speakers limited sound travelling to adjacent

16  cells.

17  d.  Plaintiffs suggest that I said at the May 10 meeting that "the intent of the draft is

18      not to expand telepsychiatry in EOP and inpatient care."  Plaintiffs may have

19      misunderstood the discussion, as CDCR has been using telepsychiatry to

20      successfully treat patients at the EOP level of care for many years. The previous

21      telepsychiatry policy, implemented in 2015, stated, "IPs shall not be excluded from

22      participation in the Telepsychiatry Program based solely on their level of care or

23      their diagnosis." CDCR proposes to continue delivering care in EOP, without the

24      limitations imposed by the provisional second policy.

25  e.  CDCR has been clear that the Revised Policy is not intended to expand

26      telepsychiatry use in inpatient beds (PIP and MHCB).  The Revised Policy retains

27      all limitations from the provisional draft.  The language has been updated, but

28      continues to clearly state: "Whenever possible, CDCR seeks to employ

4

Mehta Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18682354.1

psychiatrists who can deliver on-site psychiatric evaluation and care to patients in all inpatient facilities.  The use of telepsychiatry is restricted to only when on-site psychiatric care is not available, and only as long as necessary.  CDCR will not use telepsychiatry in lieu of on-site psychiatrists at the inpatient level of care for any reason other than a lack of availability of on-site psychiatrists.  If a telepsychiatrist is required to serve in an [inpatient bed for more than 2 to 4 weeks], this would not be consistent with this policy's objective," and all prior reporting requirements are unchanged.

    f.   Plaintiffs object to the revision that allows an annual visit to institutions by telepsychiatrists as opposed to bi-annual or quarterly visits, and removes the requirement that telepsychiatrists "spend a full day working" when they visit the institutions.  The original 2015 policy that was in effect for years did not require quarterly visits for any providers, nor prescribed exactly how long such a visit must last, as homes, hubs, and institutions vary between providers.  During the provisional period,  site visits were suspended during much of the COVID-19 pandemic, and were resumed entirely as a result of an internal initiative of the telepsychiatry department.  There has been no allegation of any negative outcomes, let alone outcomes worse than on-site psychiatry, due to either of those policies.  There is no evidence-based guideline that Plaintiffs are using to inform their insistence on a particular frequency of visits, and many community telepsychiatry organizations do not require any site visits, even when treating incarcerated populations.  In CDCR, telepsychiatry participation in the treatment environment is achieved through other means.  *See* Paragraph 19 below.

    8.  During the May 10 and May 19 all parties meetings, we responded to the Plaintiffs and the Special Master's criticisms of telepsychiatry, pointing out the many years of successful treatment using telepsychiatry within CDCR.  As Deputy Director of the Statewide Mental Health Program, I meet regularly with the Assistant Deputy Director (acting), Toni Martello, M.D., who was previously Chief of the Telepsychiatry Program, and with Sophia Le, D.O., the other Chief of

5

Mehta Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18682354.1

1   the Telepsychiatry Program.  We routinely discuss the quality of care provisioned through

2   telepsychiatry, we respond to any concerns raised by the institutions or our own providers, and we

3   plan on ways to continue improving the program at all times. I also closely monitor the provision

4   of care through on-site psychiatry, and am ideally situated to be able to compare them against

5   each other.

6       9.   Individual practitioners may prefer treatment styles that suit them individually, and

7   such providers can choose to apply to work on-site at an institution, or to work in the separate

8   department of telepsychiatry.  Professional preferences do not outweigh the overwhelming

9   evidence in the psychiatric community that telepsychiatry can be effectively used to treat patients

10  at every level of care.  Such professional preferences likewise do not outweigh the overwhelming

11  evidence that telepsychiatry is successfully used in CDCR to treat *Coleman* class members at

12  every level of care.

13      10. CDCR follows, and the revised telepsychiatry policy reflects, the guidance provided

14  by the American Psychiatric Association, the American Telepsychiatric Association, and the

15  National Commission on Correctional Health Care on telepsychiatry.

16      11. As part of CDCR's analysis of telepsychiatry and to confirm that telepsychiatry is

17  widely accepted as a modality to deliver mental health care to incarcerated persons, Dr. Martello

18  and I developed a survey to find out whether and how our mental health colleagues in other

19  correctional systems use telepsychiatry.  Through the responses, we learned that the vast majority

20  of our colleagues rely on telepsychiatry, and the one respondent that did not indicated it would

21  soon be implementing a telepsychiatry program.  In short, the survey results confirmed that

22  telepsychiatry is widely used, not just in the community, but also within other correctional

23  systems.

24      12. Under the revised telepsychiatry policy, CDCR telepsychiatrists follow the same

25  professional and ethical standards and carry out the same duties and functions as on-site

26  psychiatrists.

27      13. The Program Guide sets forth the expected duties of psychiatrists when treating

28  *Coleman* class members at each level of care.  For both the CCCMS and the EOP levels of care,

6

Mehta Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18682354.1

1    psychiatrists are required members of the interdisciplinary treatment teams (Program Guide at 12-

2    3-9 and 12-4-6) and psychiatrists are assigned to handle the patients' medication evaluation and

3    management. (Program guide at 12-3-9 and 12-4-9.)  There is no distinction or difference in the

4    licensing, credentialing, or training of telepsychiatrists as compared to on-site psychiatrists, either

5    inside or outside CDCR.

6        14. Following a March 25 status conference, Defendants were ordered to file a report on

7    lessons learned from management of mental health care during the COVID-19 pandemic,

8    including the use of telehealth, decreased movement and continuity of care.  I, along with my

9    team, including Assistant Deputy Director Steven Cartwright, Ph.D., drafted a report on the

10    lessons learned.  The filed report is attached as Exhibit 3.

11        15. Despite the court-approved expansion of tele-work during the COVID-19 pandemic

12    described in that report, there continues to be no significant evidence or substantive allegation

13    presented by Plaintiffs that telepsychiatry has been harmful to our patients, let alone more

14    harmful than standard on-site psychiatry, in the circumstances where it was used. They have not

15    provided any published studies demonstrating negative outcomes, while CDCR has provided an

16    entire bank of studies that did not find a significant difference in the quality of care across a

17    variety of settings.  See Exhibit 1 to the Martello Declaration.  They have also not credibly

18    indicated any systemic problem with telepsychiatry in over hundreds of thousands of sessions, let

19    alone shown it to be worse than standard on-site psychiatry, despite clearly indicating their biases

20    in this regard.

21        16. CDCR began to implement the provisional telepsychiatry policy on August 25, 2020,

22    and has been using telepsychiatry under that policy since that time.  The provisional policy

23    enabled CDCR to use telepsychiatry successfully at all levels of care, subject to strict limitations.

24        17. Notwithstanding the limitations imposed by the provisional telepsychiatry policy,

25    CDCR has used telepsychiatry for more than two decades.  Between April 2020 and June 2022

26    alone, CDCR telepsychiatrists engaged with their patients in more than 158,000 clinical

27    encounters.  I am not aware of any empirical evidence that demonstrates that the telepsychiatry

28    modality is connected to worse outcomes than on-site psychiatry for patients at any psychiatric

7

Mehta Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18682354.1

1    level of care.  Instead, CDCR leadership provides an over-arching structure for the practice of

2    telepsychiatry, and individual mental health professionals employ their collective clinical

3    judgment as a team to assess whether treatment via this modality for a specific, individual is

4    appropriate.

5    18. The use of telepsychiatry over more than a decade has assisted CDCR in filling

6    allocated staffing positions as reflected in the monthly psychiatry vacancy reports.  Many articles

7    and studies regarding the use of telepsychiatry note the increased access to psychiatric services

8    that are the result of its use, especially within underserved populations throughout the community.

9    19. Under the Revised Policy, telepsychiatrists will provide patients with the treatment

10    outlined in the Program Guide in the same manner as on-site psychiatrists.  The Revised Policy

11    respects and ensures the telepsychiatrist is part of the treatment team, thereby preserving the

12    treatment milieu.  There is no systemic evidence to support Plaintiffs' counsel's and the Special

13    Master's contention that multi-disciplinary interaction is hindered by telepsychiatry specifically,

14    compared to on-site psychiatry.  Telepsychiatrists engage with their on-site team members as part

15    of the interdisciplinary treatment teams for their patients.  Telepsychiatrists are also readily

16    available by video, phone, or chat.  They regularly speak with other team members outside of

17    interdisciplinary treatment team meetings for curbside consults, to express a concern or

18    recommendation about a patient, or to discuss other matters relevant to the provision of care on

19    their shared yard.  Additionally, telepsychiatrists regularly speak with other staff members such as

20    escort officers, gather crucial information on the patient and the environment from their

21    telepresenters, and can be taken cell front through telepresence where they can observe the

22    common areas and the cells of their patients.  When taken into the building, it is not uncommon

23    for other inmates in the day room to recognize their doctor and address them in an impromptu

24    fashion.  The extent of their interaction is comparable with the expectations of on-site

25    psychiatrists, who have patients brought to their office by escort officers throughout the day.

26    Engagement with other aspects of the institution are largely dependent on the individual

27    physician, rather than whether they are on-site or telepsychiatrists.

28

8

Mehta Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18682354.1

20. The Revised Policy clearly requires that telepsychiatrists continue to adhere to the Program Guide requirements when treating Coleman class members in any setting, as they have for over a decade.

21. In my professional opinion, and as the Deputy Director of the Statewide Mental Health Program, telepsychiatry is an appropriate modality to deliver mental health treatment to the *Coleman* class and brings efficiency to the delivery of mental health care in a prison environment. The Lessons Learned report demonstrates that expanded use, even by traditionally on-site providers, did not result in an increase in negative outcomes associated with this modality. Indeed, without this modality, the provision of psychiatric care would have been impossible to guarantee, as was evident in the community at large during COVID.

22. A thorough literature review overwhelmingly shows that telepsychiatry is considered an effective and efficient means of providing psychiatric care to many populations, including incarcerated persons. While there may be special considerations for specific patient populations, there is no evidence of absolute contraindications for the use of telepsychiatry. In particular, telepsychiatry has been increasing as a means of overcoming geographic limitations to clinician availability and in particular increasing access to treatment for remote and underserved populations, including those in correctional settings.

23. The bottom line is that utilizing telepsychiatry has allowed many organizations in the country to provide quality psychiatric care to patients who need it most. CDCR has followed in this tradition, using proven and widely accepted methods. This is not an experimental form of therapy that is only provided to patients with no alternative; it is a major form of treatment in the community, including training programs and emergency departments. There is no justification for Plaintiffs' counsel's continued resistance to this well-proven modality of treatment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in San Quentin, California on June 30, 2022.

*/s/ A. Mehta* 
A. MEHTA, M.D. 
*(original signature retained by attorney)*

9

Mehta Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18682354.1

# Exhibit 1

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER 8:**<br>PSYCHIATRY SERVICES | Revision Date(s): | |
| | Supersedes: | |
| **12.08.100**<br>TELEPSYCHIATRY | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | |

**Policy**

The Telepsychiatry Program enables psychiatrists to provide real-time psychiatric evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the telepsychiatrist, the patient, and the patient's treatment team. Telepsychiatry is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telepsychiatry services, as stated in this policy and procedure, ~~can be~~are a safe and efficient vehicle to provide psychiatric care to CDCR's mental health population.

The Telepsychiatry Program provides mental health services to the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient Program (EOP) levels of care and may, under specified circumstances outlined in this policy and procedure, be used for higher levels of mental health care. On-site psychiatrists shall remain the preferred method of psychiatric care for ~~Enhanced Outpatient Program (EOP),~~ Mental Health Crisis Bed (MHCB)~~,~~ and Psychiatric Inpatient Program (PIP)[1] programs. To ensure continuity of care for patients within the program, telepsychiatrists will work from ~~CDCR operated~~ California ~~hubs~~ supervised by local civil service psychiatry supervisors and will be assigned to caseloads at the institution(s) they serve. As appropriate, some telepsychiatrists may not be assigned to caseloads and may instead be used as short term coverage for times when the assigned on-site psychiatrist or telepsychiatrist is unavailable to provide treatment to his or her assigned caseload. For purposes of this assignment, registry telepsychiatrists who have less than five years of experience working for CDCR or the Department of State Hospitals will not be assigned. Night Shift Telepsychiatrists also do not carry caseloads but are available for comprehensive after-hours services.

~~Definitions~~

~~The following term is defined for use in this policy only:~~

- ~~Supplement means at least 1.0 personnel year (PY) equivalent on-site psychiatrist shall be assigned to each EOP program (e.g., EOP General Population, EOP Administrative Segregation Unit Hub, or Psychiatric Services Unit) per yard at each institution. For each program on a yard that is allocated less than 1.0 PY equivalent for psychiatry per the current approved Staffing Plan, the position shall be filled by on-site psychiatrists. Whenever possible, the assigned on-site psychiatrist shall be full-time, as opposed to assigning several part-time psychiatrists to provide EOP care.~~

**Equipment**

The telepsychiatrist shall be given the following equipment and resources:

---

[1] PIP units provide Acute Psychiatric Program (APP) and Intermediate Care Facility (ICF) levels of care.

- Computer, monitor, speaker, microphone, camera~~, scanner/printer (can be individual and/or shared)~~, and state cell phone ~~phone with access to an outside line~~.
- ~~A single, enclosed, and confidential office space with a door, desk, and chair. This office space will be sound-proofed, where possible.~~
- Computer access to Electronic Health Records System (EHRS) and to all resources, or equivalent resources utilized by on-site psychiatrists.
- Internet access of sufficient speed and stability to allow a videoconference where patient and telepsychiatrist can be seen and heard clearly. Telepsychiatrists working from home must provide the same standard of internet access.
- ~~Access to the Electronic Health Records System (EHRS).~~

Telepsychiatrists working from home must provide a confidential space with their own office furniture. Telepsychiatrists will also have access to office space at a CDCR-operated hub should they prefer or need to work from the office. Each hub office will be a single, enclosed, and confidential space with a door, desk, and chair, as well as a full technological set-up. This office space will be sound-proofed, where possible.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the telepsychiatrist's and patient's identities shall be verified verbally and/or by showing their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telepsychiatry contact, the telepsychiatrist shall explain the treatment modality, including a description of the role of the tele-presenter (an institutional staff member in an approved clinical classification who facilitates patient encounters with the telepsychiatrist); and a plan for a response to interruption in services~~, and conditions under which a referral is made for in-person care~~.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telepsychiatrist participation in the Interdisciplinary Treatment Teams (IDTT) is required. As such, telepsychiatrists shall participate in the receiving institution's IDTT meetings. To facilitate telepsychiatrists' participation in IDTTs, IDTT meetings that include a telepsychiatrist shall be held in a location that is appropriately wired to allow for the telepsychiatrist's full participation when their patients are being reviewed.

In addition to IDTT meetings, telepsychiatrists shall participate to the same extent as on-site psychiatrists in all meetings and huddles relevant to the clinical care of their patients.

Night Shift Telepsychiatrists will not be able participate in IDTT, since they do not carry caseloads and IDTTs are held in the daytime.

**Refusals**

If a patient refuses treatment via telepsychiatry, the patient's telepsychiatrist may meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient. The treatment team may work toward resolving any issues contributing to the patient's refusal of telepsychiatry services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. If the patient requires a psychiatric contact, the telepsychiatrist may request a

consultation from an on-site provider or conduct a cell-front telepsychiatry contact, as clinically required.  Telepsychiatry may be used cell front when it is necessary for the telepsychiatrist to speak with the patient and the patient does not attend the scheduled appointment.

If the treatment team has not been successful in resolving the patient's refusal of telepsychiatry visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals and contingency plans shall also be made to provide in-person on-site psychiatric care to the patient.

If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the patient because of refusals, the team shall report this finding to the Mental Health Leadership (Chief and/or Senior Psychiatrist and Chief of Mental Health) of the institution receiving telepsychiatry services as well as the Chief of Telepsychiatry. If it is determined that the patient is not appropriate for telepsychiatry, the Chief of Telepsychiatry will work with the Mental Health Leadership at the institution to ensure the patient has access to appropriate on-site psychiatric treatment.

**Cell Front Telepsychiatry**

Telepsychiatry may be used cell front when it is necessary for the telepsychiatrist to speak with the patient and the patient does not attend the scheduled appointment. However, non-confidential telepsychiatry contacts, including cell-front contacts, shall not be considered a Program Guide required clinical contact under any circumstance.

**Contraindications for Telepsychiatry**

Patients shall not be entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis. If the telepsychiatrist and Chief of Telepsychiatry determine that the patient needs to be seen by an on-site psychiatrist, he or she will work with the Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) to make sure the patient has an appropriate on-site psychiatrist assigned. Similarly, if the treatment team thinks that telepsychiatry is not appropriate for a patient, the team will work with Mental Health Leadership to make sure that the patient is assigned to an on-site psychiatrist.

**Telepsychiatry and Levels of Care**

Telepsychiatrists will be assigned to CCCMS and EOP. Whenever possible, CDCR seeks to employ psychiatrists who can deliver in-person on-site psychiatric evaluation and care to patients in all inpatient facilities. The use of telepsychiatry is restricted to only when in-person psychiatric care is not available, and only as long as necessary. CDCR will not use telepsychiatry in lieu of on-site in-person psychiatrists at the inpatient level of care for any reason other than a lack of availability of on-site in-person psychiatrists, unless they are needed to supplement in the EOP program or there is an emergency situation as determined by Mental Health headquarters. If an institution requires telepsychiatry services, on-site psychiatrists shall be assigned to the higher levels of care.

Night Shift tTelepsychiatrists cover all levels of care except for PIP, similar to on-site on-call services.

**Correctional Clinical Case Management Services  and Enhanced Outpatient Program**

Telepsychiatry may ~~replace on-site psychiatry at the~~ serve patients at the CCCMS and EOP levels of care provided all other conditions pertaining to the CCCMS and EOP levels of care contained within this policy are adhered to ~~and good faith efforts to recruit on-site psychiatrists continue~~.

~~Enhanced Outpatient Program~~

~~Telepsychiatry may supplement on-site psychiatry at the EOP level of care, but it should not replace on-site psychiatry. On-site psychiatrists shall remain the preferred method of psychiatric care for each program providing EOP level of care, consistent with the requirements of the current approved Staffing Plan. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry, consistent with the requirements described in other sections of this policy and procedure. If an EOP program does not have the on-site psychiatry required by this policy for 30 consecutive calendar days that would not be consistent with this policy's objectives. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 60 calendar days from the provision of notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how that issue has been resolved.~~

**Mental Health Crisis Bed**

Whenever possible, CDCR seeks to employ psychiatrists who can deliver ~~in-person~~on-site psychiatric evaluation and care to patients in all inpatient facilities. The use of telepsychiatry is restricted to only when ~~in-person~~on-site psychiatric care is not available, and only as long as necessary. CDCR will not use telepsychiatry in lieu of ~~in-person~~on-site psychiatrists at the inpatient level of care for any reason other than a lack of availability of ~~in-person~~on-site psychiatrists— and as a last resort in emergency situations.~~Telepsychiatry may not be used at the MHCB level of care except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the MHCB level of care. If these good faith efforts are unsuccessful, psychiatric services may be provided via telepsychiatry.~~ If a telepsychiatrist is required to serve in an MHCB for greater than 14 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 16 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved.

**Psychiatric Inpatient Program**

Whenever possible, CDCR seeks to employ psychiatrists who can deliver ~~in-person~~on-site psychiatric evaluation and care to patients in all inpatient facilities. The use of telepsychiatry is restricted to only when ~~in-person~~on-site psychiatric care is not available, and only as long as necessary. CDCR will not use telepsychiatry in lieu of ~~in-person~~on-site psychiatrists at the inpatient level of care for any reason other than a lack of availability of ~~in-person~~on-site psychiatrists— and as a last resort in emergency situations.~~Telepsychiatry may not be used at the PIP level of care except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the PIP level of care. If these good faith efforts to recruit and retain on-site~~

psychiatrists to provide services at the PIP level are unsuccessful, psychiatric services may be provided via telepsychiatry. If a telepsychiatrist is required to serve in a PIP for greater than 30 consecutive calendar days, this would not be consistent with this policy's objective. In such a case, CDCR headquarters shall immediately provide notice via electronic mail to the Special Master and Coleman Plaintiffs' counsel. Within 30 calendar days from the provision of the notice, CDCR headquarters shall also provide a plan to address the staffing issue or provide information regarding how the staffing issue was resolved.

**Clinical Emergency Management**

If a clinical emergency arises during a telepsychiatry session (for example, a suicidal, violent or homicidal patient), the telepsychiatrist shall immediately notify the appropriate institution staff as identified by the institution's LOP. The telepsychiatrist shall coordinate with institutional Mental Health Leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, arrangements for the patient to be seen by an on-site psychiatrist, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders for medications, etc.

**EOP, MHCB and Psychiatric Inpatient Programs**

In the event that a telepsychiatrist is needed in an EOP, MHCB or inpatient setting, the telepsychiatrist shall, to facilitate familiarity with the program and patients, participate in clinical staff meetings and case conferences, and coordinate patient care. On-site staff shall ensure that the telepsychiatrist has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychiatrists, telepsychiatrists shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse shall notify the telepsychiatrist, who may place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. Emergency medications may be ordered by telepsychiatrists, as clinically appropriate.

To ensure continuity of care, telepsychiatrists shall provide relevant clinical information during the hand off to the on-call psychiatrist to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns.

Telepsychiatrists and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telepsychiatrists are responsible for maintaining relationships with members of the on-site treatment team through regular communication and by visiting institutions. Telepsychiatrists shall visit their assigned institution within 30 days of assignment and no less than annually thereafter, with follow-up visits annually. The frequency of follow-up visits shall be determined by the telepsychiatrist's assigned level of care. The telepsychiatrist will spend at least one full working day, consisting of the regular number

~~of hours they would normally be scheduled to work,~~ during each site visit at the facility~~,~~ ~~and attend meetings as described below:~~

| *Level of Care* | *Frequency of Site Visit* |
|---|---|
| ~~CCCMS~~ | ~~Biannually~~ |
| ~~EOP, MHCB, PIP~~ | ~~Quarterly~~ |

During each visit, the telepsychiatrist shall participate in the IDTT, meet with necessary health care staff, and may see patients face-to-face.

Night Shift Ttelepsychiatrists will not be required to perform site visits as they cover several institutions at once and are not assigned to specific treatment teams.

**Physical Environment**

The patients' interview room/environment shall allow for both the telepsychiatrist and the patient to be seen and heard clearly. The patient's and telepsychiatrist's camera shall be positioned with their faces clearly visible to each other. The telepsychiatrist shall also be able to clearly see the patient's body to assess for any signs of movement disorders. When indicated, the telepsychiatrist can request assistance from the tele-presenter, who shall receive appropriate training on how to assess for such physical signs. The telepsychiatry administration and the institution receiving services shall ensure privacy so that others are not able to enter the telepsychiatrist's or patient's room accidently or overhear conversations from inside or outside the rooms. Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telepsychiatrist and the patient will be appropriately sound-proofed, when possible, or alternative mechanisms will be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Organizational Structure**

All telepsychiatry staff report within the Telepsychiatry Program supervisory chain.

Psychiatric Nurse Practitioners shall not be permitted to provide care through telepsychiatry.

**Workflow Interruptions**

In the event of technology or equipment failure, telepsychiatrists shall immediately notify their direct telepsychiatry supervisor and Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telepsychiatrist shall also make arrangements with institutional Mental Health Leadership to ensure appropriate patient coverage based on patient need (for example, coverage by on-site provider or rescheduling of appointments). Telepsychiatrists may also be redirected to another telepsychiatry assignment when this occurs.

If telepsychiatrists working from home have an sustained interruption in technology or significant equipment malfunction, or there are other supervisory concerns that interferes with their ability to see patients, they may be required to come in-to an office space in the hub.

**On-Call Coverage by Telepsychiatry**

The telepsychiatry team shall contribute to on-call coverage as assigned, and their provision of services shall be in accordance with California Correctional HealthCare System (CCHCS) Health Care Department Operations Manual (HCDOM), Headquarters' Mental Health Policy, and applicable bargaining unit Memorandums of Understanding.

Telepsychiatrists are not required to travel to the institution where they are providing on-call coverage. Therefore, institutions receiving on-call coverage from the Telepsychiatry Program shall provide a backup physician (psychiatrist or medical provider). This backup physician shall be within one hour of travel time to the facility in order to physically examine a patient if needed (for example, in the case of a patient who requires placement into seclusion or restraints).

Night Shift Telepsychiatrists will supplement the existing "physician on-call" services, currently managed by phone, with comprehensive after-hours coverage to all institutions. They have access to a full technological setup and are able to provide face-to-face encounters as needed for urgent issues overnight. They are also available to integrate with the Crisis Intervention Teams (CIT) as a psychiatrist consultant.

Similar to telepsychiatrists on-call, Night Shift Telepsychiatrists~~they~~ are not required to travel to the institutions where they are providing services. Therefore, institutions receiving this service must provide a backup on-call physician (psychiatrist or medical provider) that is available to physically examine a patient if needed.

**Responsibilities**

The receiving facility shall be responsible for providing the following:

- Timely access for patients to the telepsychiatrist.
- A dedicated and appropriately clinically trained tele-presenter who presents the patient from the originating site to the telepsychiatrist, and is responsible for providing clinical support and coordination. The tele-presenter shall be required to introduce themselves and explain that they are subject to the same confidentiality requirements as the telepsychiatrist and other medical provider. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment and remaining with the patient during the appointment. Tele-presenters shall be assigned from position classifications in the following order of priority: medical assistant[2], certified nursing assistant, psychiatric technician, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, rec/rehab therapist, social worker, psychologist, psychiatrist, or other physicians. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment. In emergency circumstances, other non-custody classifications, such as office technicians, may be used~~such as office technicians.~~
- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.
- Institutions receiving telepsychiatry services shall have appropriate clinical staff available, including Nursing when needed.
- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.
- A contact list of important names and numbers for the institution. This includes, but is not limited, to the following:
    1. Laboratory

---

[2] Medical Assistants cannot act as a tele-presenter for patients housed in inpatient units licensed as Correctional Treatment Centers

    2. Pharmacy
    3. Nursing station(s)
    4. Housing unit(s)
    5. Primary Clinician(s)
    6. Medical Provider(s)
    7. Mental Health Supervisor(s)
    8. Chief of Mental Health
    9. Chief Psychiatrist or Senior Psychiatrist Supervisor
    10. IT Department
    11. Scheduler
    12. Medical Records Supervisor

- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telepsychiatry encounter, including a computer, phone, scanner, printer, desk, and chair.
- Caseload assignments and scheduled appointments for the telepsychiatrist.
- The maintenance of telemedicine connectivity between institutions and telepsychiatrists.
- Ensuring that telepsychiatrists are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.
- Audit reports for local compliance of items such as, but not limited to, Medication Administration Process Improvement Project (MAPIP) criteria and Effective Communication requirements.
- Organized tours for the telepsychiatrists during their initial visits to the institution.
- Developing on-site clinical contingency plans and patient prioritization strategies to manage absences of telepsychiatrists.
- A Local Operating Procedure (LOP) for Telepsychiatry shall be submitted to the Chief of Telepsychiatry, or designee, for review and approval prior to local distribution or implementation. Telepsychiatry services at an institution will not commence until an LOP for Telepsychiatry has been submitted and approved. Current and active LOPs shall be revised as necessary by the institution and submitted to the Chief of Telepsychiatry or designee. Any revisions of the LOP for Telepsychiatry shall be reviewed and approved by the Chief of Telepsychiatry or designee prior to implementation at the institution.
- Routine system tests to ensure that equipment is safe, operational, and secure.

**Purpose**

This policy ensures services provided by the Telepsychiatry Program comply with CDCR's MHSDS Program Guidelines. Telepsychiatrists shall conduct care consistent with CDCR rules, regulations, policies, and local operating policies and procedures of the institution(s) to which they provide services. This policy is intended to reflect best practices in a correctional setting (not constitutional requirements), and should be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telepsychiatry Program and the institution receiving services:

1. Telepsychiatrists are provided with the appropriate equipment and resources.
2. Telepsychiatrists participate in the same manner as on-site psychiatrists in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their patients. (This requirement does not apply to Night Shift

Telepsychiatrists.)

3. On-site staff and members of the treatment team communicate with the telepsychiatrist any important patient issues and concerns related to patient care.
4. Telepsychiatrists have access to all necessary clinical information via the health record.
5. Telepsychiatrists will communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are not entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis.
7. Telepsychiatrists complete all documentation in the health record by the close of each business day.
8. Telepsychiatrist and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telepsychiatrists visit their receiving institutions as directed by policy.
10. Ongoing mandatory trainings for all telepsychiatrists.
11. Telepsychiatrists are privileged at each licensed or inpatient unit they serve.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution… | then… |
| --- | --- |
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. Ensure the LOP is reviewed annually. |
| does not have an LOP | ensure that one is completed within 30 days of the effective date and create an LOP to meet the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

CDCR Mental Health Services Delivery System (MHSDS) Program Guide, 2009 Revision

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

# Exhibit 2



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Ernest Galvan
Email:  egalvan@rbgg.com

May 18, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>

Melissa Bentz
Office of Legal Affairs
California Department of Corrections and
Rehabilitation
melissa.bentz@cdcr.ca.gov

 Re:  *Coleman v. Newsom*: Telepsychiatry Draft
  <u>Our File No. 0489-03</u>

Dear Melissa:

 This is to follow-up on the all-parties conference call of May 10, 2022, during which we discussed the draft telepsychiatry policy that Plaintiffs' counsel received by email from the Special Master on April 25, 2022.

1. Fix and Evaluate Existing Implementation Before Expanding.

 Before continuing the current level of telepsychiatry, and certainly before any expansion, CDCR should fix the existing implementation, and should complete the outcome study promised to the Court in the "lessons learned" document on June 14, 2021 (ECF No. 7196 at 27) ("and in the future CDCR will be able to more comprehensively assess outcomes in relation to telehealth.").

 Plaintiffs' counsel, Defendants' counsel, and the Special Master's experts gathered important information about the current telepsychiatry implementation during the current round of Special Master tours.  For example, during the tour at SATF on April 26-28, 2022, telepsychiatry connections in SATF's EOP programs were unreliable and went in and out during IDTTs.  Two of the three telepsychiatrists at SATF had caseloads well in excess of the 1:120 ratio.  Patients reported difficulty building rapport with their telepsychiatrists.  Telepsychiatrists were not well integrated with the treatment teams, and did not attend huddles.  During an IDTT observed on the tour, the screen kept going blank, and the on-site participants did not engage with the telepsychiatrist.  One of the

Telepsychiatry Response
May 18, 2022
Page 2

observed IDTTs involved a patient recently placed back on anti-psychotic medication who was exhibiting significant signs of akathisia. The telepsychiatrist did not respond and the Special Master's expert had to intervene to refer the patient for medical evaluation.

Connectivity problems were also reported during the MCSP tour in April 2022. During the KVSP tour in April 2022, an observed telepsychiatrist did not participate in IDTTs on the grounds of not considering himself part of the treatment team for patients not prescribed medication.

By contrast, the telepsychiatry equipment in use during the VSP tour in April 2022 was reported to be very good, and patients reported good rapport with the telepsychiatrists. CDCR could study what is going right at VSP, and implement these things at the other institutions before implementing any of the expansions contemplated in the current draft.

2.      Removal of Language Intended to Ensure Informed Consent

Under the heading "Professional and Patient Identity," you have removed the provision that requires the telepsychiatrist to explain in the first session the "conditions under which a referral is made for in-person care." This language was the result of a compromise between the parties in 2018 to address our concerns about the need for informed consent, and the Special Master team's recommendation for upfront patient education. It remains necessary and appropriate, and the phrase should be reinserted.

3.      Non-Confidential Cell Front Telepsychiatry is Not a Program Guide Required Clinical Contact.

The deletion on page 3 should be reversed, to continue the policy that "non-confidential telepsychiatry contacts, including cell front contacts, shall not be considered a Program Guide required clinical contact under any circumstance."

4.      EOP Care

During our meeting on May 10, Dr. Mehta said that the intent of the draft is not to expand telepsychiatry in EOP and inpatient care. If that is the intent, then the section titled "Enhanced Outpatient Treatment" on page 4 should be restored. Restoring this section would ensure that telepsychiatry remains a supplement to on-site psychiatry in EOP programs.

If there are concerns about the difficulty tracking 30-day periods with no on-site psychiatrist for reporting purposes under the current policy, that can be addressed without

Telepsychiatry Response
May 18, 2022
Page 3

throwing out the entire supplementation concept. We are open to discussing other reporting methods, such as relying on existing staffing reports to include on-site versus remote information.

5.      MHCB and Inpatient Care

        The draft removes statements that telepsychiatry is "a last resort in emergency situations" at the MHCB and Inpatient levels of care. These statements should be restored, consistent with Dr. Mehta's statement at the May 10 meeting that CDCR's intention is not to expand telepsychiatry in inpatient settings.

        Inpatient and MHCB programs should have on-site psychiatrists assigned, and should not devolve into full reliance on telepsychiatry, as some EOP programs now have. Language should be added to the policy to require a report to the Special Master and counsel whenever any inpatient or MHCB program lacks an on-site psychiatrist for 30 consecutive calendar days.

6.      Frequency of Site Visits.

        The draft removes the requirement of on-site visits biannually for CCCMS programs, and quarterly visits for EOP. Instead, it requires an annual site visit. Annual visits are not adequate at EOP and higher levels of care where the telepsychiatrist must form part of a treatment team and huddles. We also object to the reduction in frequency for CCCMS visits.

        Additionally, we object to the elimination of the requirement that telepsychiatrists spend a full working day at their institution when they visit, as well as the language making it optional for the telepsychiatrist to see patients in person while on site. These requirements are necessary to ensure telepsychiatrists gain sufficient familiarity with the conditions at the institution, with other members of the treatment team and staff, and to build rapport with patients.

                                        Sincerely,

                                        ROSEN BIEN
                                        GALVAN & GRUNFELD LLP

                                        /s/ Ernest Galvan

                                By:     Ernest Galvan

EG:eg

Telepsychiatry Response
May 18, 2022
Page 4


cc: *Coleman* Co-counsel           Adriano Hrvatin          Carrie Stafford
    *Coleman* Special Master Team   Paul Mello               Sundeep Thind
    Elise Thorn                     Samantha Wolff           Antonina Raddatz
    Namrata Kotwani                 Nick Weber               Christine Ciccotti
    Damon McClain                   Dillon Hockerson         Kristopher Kent

# Exhibit 3

1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   MONICA N. ANDERSON, State Bar No. 182970
    Senior Assistant Attorney General
3   DAMON MCCLAIN, State Bar No. 209508
    Supervising Deputy Attorney General
4   ELISE OWENS THORN, State Bar No. 145931
    LUCAS HENNES, State Bar No. 278361
5   NAMRATA KOTWANI, State Bar No.308741
    Deputy Attorneys General
6     1300 I Street, Suite 125
      P.O. Box 944255
7     Sacramento, CA 94244-2550
      Telephone:  (916) 210-7318
8     Fax:  (916) 324-5205
      E-mail:  Elise.Thorn@doj.ca.gov
9   Attorneys for Defendants

10  HANSON BRIDGETT LLP
    PAUL B. MELLO, SBN 179755
11  SAMANTHA D. WOLFF, SBN 240280
    LAUREL E. O'CONNOR, SBN 305478
12  DAVID C. CASARRUBIAS, SBN 321994
    1676 N. CALIFORNIA BLVD., SUITE 620
13  WALNUT CREEK, CALIFORNIA 94596
    TELEPHONE:  925-746-8460
14  FACSIMILE:  925-746-8490

15  Attorneys for Defendants

    ROMAN M. SILBERFELD, State Bar No. 62783
    GLENN A. DANAS, State Bar No. 270317
    ROBINS KAPLAN LLP
      2049 Century Park East, Suite 3400
      Los Angeles, CA 90067-3208
      Telephone:  (310) 552-0130
      Fax:  (310) 229-5800
      E-mail:  RSilberfeld@RobinsKaplan.com
    Special Counsel for Defendants

16

17              IN THE UNITED STATES DISTRICT COURT

18            FOR THE EASTERN DISTRICT OF CALIFORNIA

19                       SACRAMENTO DIVISION

20

| | |
|---|---|
| 21  **RALPH COLEMAN, et al.,** | Case No. 2:90-cv-00520 KJM-DB (PC) |
| 22                              Plaintiffs, | **DEFENDANTS' RESPONSE TO MARCH 29, 2021 ORDER REQUIRING DEFENDANTS FILE REPORT ON THE LESSONS LEARNED FROM THE COVID-19 PANDEMIC** |
| 23      v. | |
| 24  **GAVIN NEWSOM, et al.,** | |
| 25                              Defendants. | |
| 26 | Judge:    Hon. Kimberly J. Mueller |

27

28

1

1    On March 29, 2021, the Court ordered Defendants to file "a report on lessons learned from

2  management of mental health care during the COVID-19 pandemic, including the use of

3  telehealth, decreased movement and continuity of care[.]" (ECF No. 7112.)  On May 12, 2021,

4  the Court approved the parties' stipulated request to extend the filing deadline to June 14, 2021.

5  (ECF No. 7159.)

6    Attached as Exhibit A is the California Department of Corrections and Rehabilitation,

7  Statewide Mental Health Program's report *Lessons Learned During the COVID-19 Pandemic.*

8                                   **CERTIFICATION**

9    Defendants' counsel certifies that they reviewed the following orders relevant to this filing:

10  ECF Nos. 7112 and 7159.

11  Dated: June 14, 2021                         Respectfully submitted,

12                                               ROB BONTA
                                                Attorney General of California
13                                               DAMON MCCLAIN
                                                Supervising Deputy Attorney General
14

15                                      By:  */s/ Elise Owens Thorn*

16                                           ELISE OWENS THORN
                                            DEPUTY ATTORNEY GENERAL
17                                           ATTORNEYS FOR DEFENDANT

18  DATED:  June 14, 2021                         HANSON BRIDGETT LLP

19

20                                      By:  */s/ Samantha Wolff*

21                                           PAUL B. MELLO
                                            SAMANTHA D. WOLFF
22                                           LAUREL E. O'CONNOR
                                            DAVID C. CASARRUBIAS
23                                           Attorneys for Defendants

24

25

26

27

28

                                              2

# Exhibit A

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 14, 2021


Damon McClain, Esq.
Elise Owens Thorn, Esq.
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-5500


*VIA EMAIL ONLY*

RE:    Lessons Learned During the COVID-19 Pandemic

Dear Mr. McClain and Ms. Thorn:

Attached please find CDCR's report entitled "Lessons Learned During the COVID-19 Pandemic: Management of Mental Health Care through Expanded Use of Telehealth Services, Decreased Movement, and Continuity of Care."

Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney
Office of Legal Affairs
California Department of Corrections and Rehabilitation

**Amar Mehta, M.D.**, Deputy Director

**Steven Cartwright, Psy.D.**, Assistant Deputy Director



# STATEWIDE MENTAL HEALTH PROGRAM

California Department of Corrections and Rehabilitation

Division of Health Care Services

# Lessons Learned During the COVID-19 Pandemic

Management of Mental Health Care through Expanded Use of Telehealth Services, Decreased Movement, and Continuity of Care

*June 2021*

California Department of Corrections and Rehabilitation    Statewide Mental Health Program

| Selected Abbreviations Used in This Report | |
|---|---|
| CCCMS | Correctional Clinical Case Management System |
| CCHCS | California Correctional Health Care Services |
| CDC | Center for Disease Control |
| CDCR | California Department of Corrections and Rehabilitation |
| CDPH | California Department of Public Health |
| CI | Confidence Interval |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| HIPAA | Health Insurance Portability and Accountability Act |
| HLOC | Higher Level of Care |
| HQ | Headquarters |
| IDTT | Interdisciplinary Treatment Team |
| IEX | Incident Exposure |
| ISUDT | Integrated Substance Use Disorder Treatment program |
| LOC | Level of Care |
| MH | Mental Health |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| OSM | Office of the Special Master |
| PHQ9 | Patient Health Questionnaire 9 |
| PIP | Psychiatric Inpatient Program |
| PPE | Personal Protective Equipment |
| PTSD | Post-Traumatic Stress Disorder |
| RMHA | Regional Mental Health Administrator |
| RVR | Rules Violation Reports |
| SUD | Substance Use Disorder |
| TMHU | Temporary Mental Health Units |
| UOF | Use of Force |

California Department of Corrections and Rehabilitation          Statewide Mental Health Program

# CONTENTS

I.  **EXECUTIVE SUMMARY** ................................................................. 5

  1.  Telehealth Expanded to Provide Access to MH Services during COVID-19 ...................... 5

  2.  Effects of Decreased Movement on Maintaining Continuity of Care ................................ 7

  3.  Effects of Decreased Demand for Mental Health Services During COVID-19 .................. 8

  4.  Next Steps ................................................................................................. 10

II.  **CDCR'S EXPANSION OF TELEHEALTH TO PROVIDE CARE DURING COVID-19** ................... 11

  1.  Research Related to the Expansion of Telehealth Utilized by Health Care Systems Outside of CDCR ...................................................................... 11

  2.  CDCR's Successful Expansion of Telemental Health ........................................ 13

    A.  Existing Information Technology Infrastructure Expanded and Telework from Home 14

    B.  Expansion of Telepresenter Pool ............................................................ 15

    C.  Adaptations to Services During COVID-19 ................................................ 15

    D.  Telehealth Services Expanded to Psychologists and Social Workers ...................... 16

    E.  Other Remote Technology Solutions ........................................................ 18

  3.  Lessons Learned in the Expansion of Telemental Health ................................... 19

    A.  CDCR's Providers Share Their Experiences on the Expansion of Telepsychiatry .......... 20

    B.  The Effect of Telepsychiatry on Patient Care ............................................. 21

    C.  Telehealth Services by Psychologists and Social Workers ................................ 23

III.  **DEMAND FOR MENTAL HEALTH SERVICES DECREASED DURING COVID-19** ..................... 24

  1.  Related Research ................................................................................... 25

    A.  Mental Health Visits Decreased in Many Settings during COVID-19 ....................... 25

    B.  Anxiety and Depression Symptoms Have a Higher Prevalence After Mass Traumatic Events ........................................................................................ 26

    C.  Increased Resilience is More Common than Pathological Outcomes After Mass Traumatic Events ................................................................................ 26

    D.  Developing Coping and Resilience Strategies are Effective Approaches to Mental Health Treatment During Mass Traumatic Events .......................................... 27

    E.  The Relationship Between Suicide Rates and Mass Traumatic Events is Unclear ........ 27

    F.  Suicidal Ideation, Plans, and Attempts Initially Decrease, but Subsequently Increase After Mass Traumatic Events ................................................................ 28

  2.  Sustainable Process ............................................................................... 29

    A.  Methodology ..................................................................................... 29

    B.   Findings From Sustainable Process Audits .......................................................... 30

  3.   Regional Review of Level of Care Decisions ............................................................ 31

  4.   Lessons Learned From Delivering Mental Health Services During a Pandemic .............. 32

**IV.  DECREASED MOVEMENT AND MAINTAINING CONTINUITY OF CARE ............................. 35**

  1.   Research Related to the Continuity of Care ............................................................ 35

  2.   Methodology ..................................................................................................... 36

  3.   Plain Language Summary of Methodology and Plot Graphs ........................................ 37

  4.   CDCR Findings .................................................................................................. 41

    A.   Treatment Continuity and Access to Care During the COVID-19 Pandemic ................ 42

    B.   Change in Behavioral Outcomes during COVID-19 ..................................................... 43

  5.   Lessons Learned from Decreased Movement and Maintaining Continuity of Care ........ 45

**V.  NEXT STEPS ................................................................................................ 47**

  1.   Telehealth ....................................................................................................... 47

  2.   Continuity of Care Within Mental Health Services .................................................. 48

  3.   Effecting Change ............................................................................................... 49

**VI.  REPORT CONTRIBUTORS ............................................................................... 50**

# I.   EXECUTIVE SUMMARY

On January 21, 2020, the first case of COVID-19 was identified in the United States,[1] and the first confirmed COVID-19 death in California occurred just 38 days later.[2] That same day, February 28, 2020, a statewide emergency was declared,[3] sparking a series of public health measures to prevent and reduce the spread of COVID-19 within the California Department of Corrections and Rehabilitation (CDCR). The contagiousness and lethality of the virus required significant changes to the delivery of mental health (MH) services. Traditional approaches to services like group treatment were redesigned to mitigate the spread of the virus and meet then current and evolving public health guidance. Plaintiffs in *Coleman v. Newsom*, the ongoing class action related to the provision of prison MH care services in California, CDCR and California Correctional Health Care Services (CCHCS) were required to think differently about delivering treatment services. The pandemic, and subsequent collaborative measures to abate the spread of COVID-19 with the Special Master's team and the *Coleman* Plaintiffs' counsel, challenged assumptions about telehealth services, the impact of reduced movement, and the importance of continuity of care.

## 1.   Telehealth Expanded to Provide Access to MH Services during COVID-19

With the established infrastructure and experience of the telepsychiatry department, CDCR quickly and effectively rolled out widespread telehealth solutions in line with community and public health standards to respond to a rapidly evolving pandemic. Telehealth proved to be an effective way of maintaining quality patient care while protecting both staff and patients and preserving limited quantities of essential Personal Protective Equipment (PPE). Patients could be treated in place at multiple levels of care, including at desert institutions that do not have MH missions, when public health restrictions prevented patient movement.

Response to the COVID-19 pandemic forced innovation to treat patients safely despite environmental and staffing challenges, and some regulatory barriers were removed to facilitate the use of telehealth. Innovative use of digital technologies present continued opportunities for augmentation of onsite treatment and recreation for MH patients and will be beneficial to solve staffing and space challenges that may arise in the future.

In addition to expanding CDCR's telepsychiatry services, telehealth options for psychologists and social workers were initiated. Psychologists and social workers were authorized to provide telehealth services on an emergency basis on May 22, 2020. Quarantine and transfer restrictions increased demand for MH services as patients were "treated in place" while

---

[1] Taylor, D. B. (2021, March 17). A Timeline of the Coronavirus Pandemic. The New York Times. https://www.nytimes.com/article/coronavirus-timeline.html.
[2] Johns Hopkins University & Medicine. (2021, May 2). Coronavirus Resource Center. Johns Hopkins Coronavirus Resource Center. https://coronavirus.jhu.edu/.
[3] California, S. of. (2020, March 5). Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19. California Governor. https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/.

awaiting transfer to a facility with an MH mission for their assigned level of care (LOC). On-site staffing was further impacted by social distancing requirements and high-risk criteria that applied to certain staff, making telework safer in many circumstances. Telehealth was well received with very few patient appointment refusals. CDCR's analysis shows that, excluding unavoidable restrictions on groups provided for Enhanced Outpatient Program (EOP) patients necessitated by public health mitigation efforts, telehealth has allowed many institutions broadly to maintain Program Guide-equivalent care with no known major deficiencies.

*Lessons Learned*

- Expansion of Telehealth is an Effective Response to the COVID-19 Pandemic: Based on CDCR's and other health care organizations' experiences and preliminary outcome measures discussed in more detail in the "Decreased Movement and Maintaining Continuity of Care" section, expansion of telehealth was an effective way to provide treatment during the COVID-19 pandemic.

- Cross-Coverage Between Institutions Increased Treatment Services: Psychologists and social workers from other institutions successfully provided telehealth services to desert institutions, which were experiencing significant staffing shortages and increased patient need resulting from transfer restrictions. This allowed more MH care to be delivered to patients in need to prevent MH crises and stress related to the COVID-19 pandemic.

- Telework from Home Increased Provider Retention: By allowing onsite and hub providers the ability to work from home, CDCR ultimately retained more civil service psychiatrists and telepsychiatrists during the COVID-19 pandemic.

- Telehealth Did Not Reduce Patient Satisfaction while Enhancing Staff Satisfaction, Recruitment, and Retention: Staff and patients appear to be generally satisfied with telehealth, which aligns with trends reported in the community. Telework contributed to the quality of life, job satisfaction, recruitment, and retention of providers in CDCR's system.

- Antidepressant, Mood Stabilizer, and Antipsychotic Medications Can Be Successfully Monitored via Telehealth: Preliminary data shows that CDCR MH Services Delivery System (MHSDS) patients on neuroleptic medications received appropriate diagnostic monitoring consistent with clinical guidelines and that psychiatrists effectively monitored their patients while teleworking.

- Strategic Deployment of Telehealth is Key: By targeting telehealth services toward more routine, non-urgent services, onsite staff were able to focus on more acute and intensive needs at the institutions.

- Diverse Telepresenter Classifications Should be Considered for Resource Allocation: COVID-19 created unique demands for nursing, who were tasked with monitoring quarantined and isolated patients and coordinating testing. This critically strained typically available resources. Competing demands on identified telepresenter classifications should be considered to ensure onsite availability to support service

California Department of Corrections and Rehabilitation          Statewide Mental Health Program

delivery. Having a diversity of classifications trained to telepresent can be invaluable during critical incidents.

- <u>Provider Location Is an Important Consideration</u>: There are a wide variety of available options for telework, including CDCR offices located at different units within the institutions or in remote hubs. However, services from home can also be provided safely and effectively when clear standards are enforced, and secure, functional equipment is deployed.

### 2. Effects of Decreased Movement on Maintaining Continuity of Care

While CDCR's population decreased significantly in 2020, the composition of the population (age, gender, race, custody level, MH LOC, and proportion of patients identified with developmental disabilities) remained consistent with pre-pandemic levels (± 2%). During this same time, intakes from other prisons or the community decreased by 65%, and transfers within programs at the same prison decreased by 51%.

Movement was considerably restricted due to transfer restrictions adopted to slow the spread of COVID-19. However, this in no way changed the need to deliver treatment services to CDCR's MH population. Continuity of care is largely focused on the quality of care over time. While there is general agreement that continuity of care is a complex concept, it is considered by patients and clinicians alike as an essential feature of good quality care in long-term disorders. During a time of significant changes to the delivery of MH services, emerging research on continuity of care was reviewed. The goal was to better understand this important component of treatment. Additionally, by pairing significant research findings with CDCR's experience and internal data analysis, a deeper understanding of the MH program was achieved.

The significant reduction in movement (both within CDCR and from county jails or returning parolees) afforded an opportunity to evaluate various outcomes in more stable populations. With that in mind, CDCR gathered internal data to examine psychiatric and behavioral health outcomes during the COVID-19 pandemic including data related to demand for MH services, rules violations, overdoses, self-injury, and suicide. The analysis controlled for the significant changes in CDCR's population (size and composition).

Peer reviewed research has found statistically significant relationships between continuity of care and successful inpatient discharge to outpatient LOC, quality of life, service satisfaction, symptom severity, social and community functioning, and hospitalization.. However, due to research limitations, it is inherently difficult to draw definitive conclusions about which aspects of such relationships are the most beneficial to patients because there are so many relevant factors. Limitations may also result from inherent difficulties in comparing care continuity and patient care outcomes utilizing studies that use different definitions and measure care continuity and patient outcomes differently.

Our findings suggest that with increased treatment and environmental stability, there was a co-occurring decrease in negative outcomes including less crime, depression, illegal drug use, self-harm, and suicide.

Lessons Learned During the COVID-19 Pandemic                                                    7

California Department of Corrections and Rehabilitation          Statewide Mental Health Program

*Lessons Learned*

- <u>Referrals to Change Levels of Care Decreased During COVID-19</u>: This is consistent with other internal findings and research.

- <u>Length of Time Between Individual Contacts</u>: This increased for psychiatrists, psychologists, and social workers, highlighting a reduced ability to deliver some MH contacts on time. However, the percentage of patient contacts with the most frequent provider over six months (at the EOP level of care) increased, a measure of continuity of care.

- <u>Treatment Hours Offered and Refused Both Decreased During COVID-19</u>: Patients attended a higher percentage of the treatment offered during COVID-19, though less hours of treatment were offered overall. This was after CDCR adjusted to new public health guidelines, which allowed treatment of fewer patients in large spaces.

- <u>Violent and Drug-Related Rules Violation Reports Decreased</u>: This unexpected shift may be related to decreased means and opportunity to commit such offenses during COVID-19, which may explain why Indecent Exposure (IEX) behavior remained essentially unchanged.

- <u>Emergent, Urgent, and Routine Mental Health Referrals Decreased During COVID-19</u>: Emergent, Urgent, and Routine MH referrals all decreased during COVID-19, which is consistent with other research and findings. Parallel trends in community settings are discussed below.

- <u>Symptoms of Depression and Hospitalization for Overdose Decreased During COVID-19</u>: Hospitalizations due to overdose and patients' self-reported symptoms of depression both decreased. Movement restrictions likely played a role in this decrease, but so did the lack of drugs in the prisons; the main vector of drugs being brought into the prisons—visitation—paused in March 2020.

- <u>Suicide and Self-Injury (Serious, Lethal, and with Intent to Die) Decreased During COVID-19</u>: Suicides decreased significantly during COVID-19 (35%). Most other types of self-injury (severe, lethal method used, with intent to die) also decreased during COVID-19. While a reduction of suicide and self-injurious behavior is a positive sign, the reason for the decline is not fully understood. These findings echo other research and findings that demonstrate a reduced need for MH services in other settings during COVID-19.

### 3. Effects of Decreased Demand for Mental Health Services During COVID-19

Despite the increased stress and social disruption caused by the pandemic, various community settings including the Veterans Health Administration documented a decrease in utilization of MH services. Within CDCR, there was also an unexpected decrease in referrals to inpatient levels of care shortly after movement restrictions were implemented. While necessary steps were taken to augment the delivery of treatment services under public health guidelines, it was

equally important to monitor how those changes influenced the MHSDS and the patients it served. Traditional efforts aimed at establishing and reinforcing referral expectations, such as new policies, monitoring, and direct communication, were utilized, but the unexpected decrease in referrals continued. In response, in order to assess whether referrals were being made appropriately, CDCR compared Sustainable Process Audit results, systematically reviewed recent LOC decisions, and consulted emerging research to better understand any changes observed during COVID-19.

The primary objective of the Sustainable Self-Monitoring Process is to ensure that patients are at the right LOC, receiving the MH treatment they need and are being evaluated for and referred to higher levels of care when clinically indicated. An additional objective is to maintain a sustainable, internally monitored quality improvement process. The quality improvement objective is designed to support the primary objective, while simultaneously providing feedback to refine existing policies and procedures, improve data management systems, enhance ongoing training of institutional staff, and take appropriate corrective action when warranted. While comprehensive, the Sustainable Process is not perfect. It is possible that external forces, variables, issues, and factors prevalent in 2020 were not considered in earlier analyses. For example, clinicians also knew that it was often more difficult to have patients transferred to be treated at the Mental Health Crisis Bed (MHCB) LOC due to quarantines and thus they could have chosen to refer more sparingly.

All four Regional MH teams reviewed a sample of recent Master Treatment Plans and Self-Harm forms and the LOC decisions that followed to evaluate whether referral considerations were appropriate.

*Lessons Learned*

- Mental Health Visits Also Decreased in Many Other Settings During COVID-19: Several studies have observed a similar decrease in community MH visits during the COVID-19 pandemic. None identified reliable causes for the decrease.

- Increased Resilience is Common After Mass Traumatic Events: Research indicates that resilience (the ability to recover from and adapt to adversity) is more common than pathological outcomes. However, for some populations, it is not uncommon for anxiety and depression symptoms to have a higher prevalence after mass traumatic events. Keeping these somewhat differing findings in mind, the MH program must continue to be responsive to the changing needs of our population.

- The Relationship Between Suicide Rates and Mass Traumatic Events is Unclear in the Literature: According to relevant research, suicidal ideation, plans, and attempts may decrease and then later increase after mass traumatic events. As such, initial signs of reduced self-harm and suicide may be temporary.

- The Need for Higher Levels of Care Decreased During COVID-19: Patients' clinical teams, using approved clinical factors to detect patients' need for higher level of care (HLOC) consideration, identified fewer patients needing HLOC during COVID-19. This suggests fewer patients displayed known indicators for inpatient services (as measured by the

Sustainable Process audits). Additionally, audits indicated that when known indicators were present, clinical teams referred patients to HLOC more often, and referrals were more accurate with higher quality documentation than before COVID-19.

- <u>Level of Care Decisions Followed Established Policies, Standards, and Expectations of Due Diligence</u>: The Regional review found 95% of the reviews resulted in an agreement with the treatment team's LOC decision. No systematic or significant deviation from referral procedures were detected.

## 4. Next Steps

Telemental health must continue to be taken more seriously as a safe, effective, and viable alternative to more traditional methods for delivery of care. There was never a clear data-focused justification for the imposed limitations, and now the case for harm by lack of acceptance is stronger. The relative priority of "continuity of care" has been elevated as a greater benefit to patients than previously considered. The classification of providers in the Electronic Healthcare Records System (EHRS) needs fundamental changes to be able to automatically parse and provide data on outcomes for different types of care delivery. Consideration should be given to the more creative use of telemental health, such as by MH classifications other than psychiatry, the creation of telemental health critical response teams, and the delivery of speciality services statewide by telemental health alone, similar to the Integrated Substance Use Disorder Treatment (ISUDT) program (e.g., Dialectical Behavioral Therapy, cognitive processing therapies for trauma, etc.). The effectiveness of high quality telemental health delivered from the providers' homes has also been demonstrated.

Video visits for inmates and their families has a long history of political difficulties, but it has now been shown that it is possible to implement. Audio only or text only options are also possible. If the functionality is made available to a wider range of hardware, the use of tablets can be expanded greatly with even greater benefits to the patients. Other treatment options could piggy-back on this success, such as MH treatment modules, direct messaging between patients and their doctors, and complementary services like education and skill-building courses. Use of such tablets also decrease the space needs in an institution, with multiple obvious benefits.

Many questions remain, and further research and analysis of collected data is critical. Causative links must be established between the independent variables and the dependent outcome measures. Measurement must continue into the recovery phase in order to track whether gains are lost by returning to older methods, and if so, when. Non-emergency changes to policies are much slower and more difficult, but it is critically important to carry these lessons forward nonetheless. Factors that must be considered include broader availability of EOP programs at more facilities, reduced institutional movement when changing LOCs, and transitional groups or other ways to create continuity on both sides of a change in LOC. Questioning the assumptions underlying past delivery of care is an important lesson from the experience of the COVID-19 pandemic.

## II.   CDCR'S EXPANSION OF TELEHEALTH TO PROVIDE CARE DURING COVID-19

CDCR started the telepsychiatry program in 2013 to improve access to psychiatric care and to help reach the court-mandated 90 percent fill rate among the allocated psychiatry positions statewide. Over the span of 7 years, CDCR telepsychiatry has offered remote services to 29 out of 35 institutions. It has grown to approximately 90 individual telepsychiatrists.

Before 2020, the use of telehealth within CDCR was limited to the official telepsychiatry and telemedicine programs. On March 19, 2020, the Governor ordered Californians to stay at home to reduce transmission of COVID-19, resulting in state workers immediately and unexpectedly transitioning to telework from home.[4] Overall MH staffing was severely impacted across the system during the COVID-19 pandemic due to staff infections, public health-mandated quarantine and isolation, and providers in high-risk populations unable to enter the institutions to deliver care safely. Even in the case of essential workers, limiting the number of people coming into prisons and particular units was crucial to reduce the risk of introducing or spreading COVID-19.

As a result, CDCR created COVID-19 policies to expand the use of telehealth. At the discretion of the Chief Executive Officers (CEOs), institutions were able to transition onsite psychiatrists who were in a high-risk category to telework from home, independent from the telepsychiatry program or structure. Many institutions, such as San Quentin, also instituted intra-institutional telehealth programs to limit the number of individuals going in and out of affected units and to preserve PPE resources. The CDCR telepsychiatry department transitioned telepsychiatrists who met certain criteria to work from home instead of coming into the hub buildings and risking exposure. As the COVID-19 pandemic progressed, telehealth was expanded to include limited telepsychology and telesocial-work. This was a decentralized use of telehealth that was assisted —but in no way managed, by—the telepsychiatry department.

### 1.   Research Related to the Expansion of Telehealth Utilized by Health Care Systems Outside of CDCR

A rapid global expansion of the use of telehealth occurred at the beginning of the COVID-19 pandemic. Many healthcare systems moved quickly to implement remote conferencing technologies to facilitate the continuation of care while observing social distancing, isolation, and other risk mitigation strategies. These technologies spanned the continuum from phone calls to video encounters with both the patient and provider in their respective homes, along with administrative services also becoming partially or fully remote.

---

[4] Executive Department, State of California, Executive Order N-33-20. https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf

Telepsychiatry had already been established as an effective and reliable method of treatment.[5] [6] [7] [8] [9] [10] [11] [12] [13] [14] Numerous articles were published about best practices and guidelines for the implementation and expansion of telepsychiatry services.[15] [16] [17] [18] [19] Telepsychiatry was also a focus at many professional conferences and webinars this past year, sharing the benefits of delivering care through this modality.[20]

The American Psychiatric Association (APA) published a survey showing that after COVID-19 struck, an overwhelming majority of psychiatrists began seeing all or most of their patients via telehealth, whereas most had not used telehealth at all previously.[21] The APA notes that telehealth can be adopted quickly to treat psychiatric and substance use disorders and that most barriers to doing so in the first place may have been regulatory in nature. The survey also noted a significant increase in patients keeping appointments when those appointments had the added convenience of a telehealth option. Additionally, the survey found that of the patients who were seen for the first time via telehealth, a large majority (85%) were either somewhat satisfied or satisfied with their treatment experience. The APA made several policy recommendations in support of the permanent expansion of telehealth regulations after COVID-19, and later released several guidance publications. One, titled "The Impact of COVID-

[5] American Psychiatric Association. American Psychiatric Association telepsychiatry toolkit. Accessed April 25, 2021. https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit

[6] Myers, K., Valentine, J., Morganthaler, R., & Melzer, S. (2006). Telepsychiatry with incarcerated youth. *Journal of Adolescent Health*, *38*(6), 643-648.

[7] Lexcen, F. J., Hawk, G. L., Herrick, S., & Blank, M. B. (2006). Use of video conferencing for psychiatric and forensic evaluations. *Psychiatric Services*, *57*(5), 713-715.

[8] Brodey, B. B., Claypoole, K. H., Motto, J., Arias, R. G., & Goss, R. (2000). Satisfaction of forensic psychiatric patients with remote telepsychiatry evaluation. *Psychiatric Services*, *51*(10), 1305-1307.

[9] Hubley, S., Lynch, S. B., Schneck, C., Thomas, M., & Shore, J. (2016). Review of key telepsychiatry outcomes. *World journal of psychiatry*, *6*(2), 269.

[10] Shore, J. H., Yellowlees, P., Caudill, R., Johnston, B., Turvey, C., Mishkind, M., ... & Hilty, D. (2018). Best practices in videoconferencing-based telemental health April 2018. *Telemedicine and e-Health*, *24*(11), 827-832.

[11] Bashshur, R. L., Shannon, G. W., Bashshur, N., & Yellowlees, P. M. (2016). The empirical evidence for telemedicine in mental disorders. *Telemedicine and e-Health*, *22*(2), 87-113.

[12] Morland, L. A., Mackintosh, M. A., Greene, C. J., Rosen, C. S., Chard, K. M., Resick, P., & Frueh, B. C. (2014). Cognitive processing therapy for posttraumatic stress disorder delivered to rural veterans via telemental health: A randomized noninferiority clinical trial. The Journal of Clinical Psychiatry, 75(5), 470–476. https://doi.org/10.4088/JCP.13m08842

[13] Aboujaoude, E., Salame, W., & Naim, L. (2015). Telemental health: a status update. *World psychiatry*, *14*(2), 223-230.

[14] Yellowlees P, Shore JH. Telepsychiatry and Health Technologies: A Guide for Mental Health Professionals. Washington, DC: American Psychiatric Assoc Pub; 2018.

[15] Shore, J. H., Schneck, C. D., & Mishkind, M. C. (2020). Telepsychiatry and the coronavirus disease 2019 pandemic—current and future outcomes of the rapid virtualization of psychiatric care. *JAMA psychiatry*, *77*(12), 1211-1212.

[16] Smith, A. C., Thomas, E., Snoswell, C. L., Haydon, H., Mehrotra, A., Clemensen, J., & Caffery, L. J. (2020). Telehealth for global emergencies: Implications for coronavirus disease 2019 (COVID-19). *Journal of telemedicine and telecare*, *26*(5), 309-313.

[17] Smith, K., Ostinelli, E., Macdonald, O., & Cipriani, A. (2020). Covid-19 and telepsychiatry: development of evidence-based guidance for clinicians. *JMIR mental health*, *7*(8), e21108.

[18] Shore, J. H. (2020). Managing virtual hybrid psychiatrist-patient relationships in a digital world. *JAMA psychiatry*, *77*(5), 541-542.

[19] Torous, J., & Wykes, T. (2020). Opportunities from the coronavirus disease 2019 pandemic for transforming psychiatric care with telehealth. *JAMA psychiatry*, *77*(12), 1205-1206.

[20] American Psychiatric Association (APA) Annual Meeting 2020 and upcoming 2021; American Telehealth Association (ATA) Annual Meeting 2020 and upcoming 2021; Psych Congress 2020; The Joint Commission – Demonstrating Quality Care in Tele-Behavioral Health webinar; Advancing the Use of Telehealth Through Education and Advocacy – APA webinar; Telepsychiatry in the Era of COVID-19 – APA webinar

[21] "Support for Permanent Expansion of Telehealth Regulations after COVID-19," American Psychiatric Association, 2020.

19 on Incarcerated Persons with Mental Illness," included a recommendation for the treatment of incarcerated people with mental illness, to "coordinate care within facilities and significantly expand telehealth wherever possible and clinically appropriate" and "allow visitation via video visits, including professional visits for court-ordered psychiatric evaluations."[22]

Previous barriers to widespread implementation and acceptance of telepsychiatry, such as federal and state regulatory barriers, system inertia, and resistance to change associated with new technology or healthcare practice have diminished during COVID-19. Many early adopters of telepsychiatry, such as the federal Veterans Health Administration system, were in a unique position to scale up telemental health treatment rapidly. Within weeks of the start of the pandemic, telemental health became the primary means by which psychiatry, therapy, and groups were delivered to maintain continuity of care.[23] Traditionally Before the pandemic, full establishment of telemental health, especially in large organizations, could take months to years. Patients, providers, and the health care system quickly adapted to telemental health as rapid virtualization spread across organizations by way of people realizing the full potential of telemental health[24] [25]

All articles reviewed demonstrated positive or no change to outcomes associated with the rapid expansion of telehealth services during COVID-19, though some did note concerns or uncertainty regarding the use of telepsychiatry with special patient populations, such as those at higher levels of care. Use of telepsychiatry in inpatient settings within CDCR is already limited to situations when there is no onsite psychiatrist available to be assigned to the program.

One article, a meta-analysis of English-language guidelines for telemental health from many countries and systems, suggested a hybrid system combined with in-person services and other digital technologies may be the best solution post-COVID-19. This is in line with CDCR's use of telepsychiatry, and targeted use of telepsychology and tele-social work in combination with onsite MH services, augmented by other emerging digital services.

## 2. CDCR's Successful Expansion of Telemental Health

CDCR's experience with the expansion of telemental health echoes the broader practices discussed above. While other organizations were determining and sharing best practices and guidance for setting up de novo telehealth systems, CDCR was able to capitalize on the structure it already had in place before the COVID-19 pandemic, modeled on established best practices and already set in statewide and local policy. Given the CDCR telepsychiatry department's experience with remotely providing care within CDCR, the unit's leadership staff were well positioned to assist with the rapid expansion of providing remote MH care via

---

[22] COVID-19 Pandemic Guidance Document, "The Impact of COVID-19 on Incarcerated Persons with Mental Illness," American Psychiatric Association, 2020.
[23] Myers, U. S., Birks, A., Grubaugh, A. L., & Axon, R. N. (2020). Flattening the curve by getting ahead of it: How the VA healthcare system is leveraging telehealth to provide continued access to care for rural veterans. *The Journal of Rural Health*.
[24] Madigan, S., Racine, N., Cooke, J. E., & Korczak, D. J. (2020). COVID-19 and telemental health: Benefits, challenges, and future directions. *Canadian Psychology/Psychologie canadienne*.
[25] Torous, J., Myrick, K. J., Rauseo-Ricupero, N., & Firth, J. (2020). Digital mental health and COVID-19: using technology today to accelerate the curve on access and quality tomorrow. *JMIR mental health*, *7*(3), e18848.

telework across the institutions. The IT infrastructure already in place could be scaled up rapidly to adapt to work from home without a need to scramble for resources. Similarly, CDCR already had a framework for telepresenters and standards for how to conduct remote visits and manage difficult situations encountered in telepsychiatry. Remote services were expanded to include targeted use of telepsychology and telesocial-work, as well as other remote services to complement one-on-one treatment. CDCR's expansion of telemental health is discussed in the following section.

A.   Existing Information Technology Infrastructure Expanded and Telework from Home

Prior to the COVID-19 pandemic, telepsychiatry utilized a secure platform that was only accessible from internal CDCR networks. After the COVID-19 pandemic struck, the IT department worked quickly to implement a new Health Insurance Portability and Accountability Act (HIPAA) compliant platform that could be securely accessed from both CDCR's internal network and external networks at home. Several options were considered, including industry standards such as WebEx, Zoom, Teams, FaceTime, and Skype. IT worked closely with telepsychiatry and telemedicine to examine the pros and cons of each. Once a platform was selected, tutorials and trainings were created and disseminated to providers and institutions. IT was also able to internally manage the chosen platform, WebEx, allowing them to internally test levels of encryption to ensure proper security and to monitor and swiftly respond to issues as they arose without needing to rely on external assistance.

CDCR confronted several technological challenges while attempting to expand telework. Establishing priority on the network allowed for the significantly increased load of video applications without crowding out other critical bandwidth uses. Virtual Private Network (VPN) use from home, necessary to facilitate secure connection to medical charts and other essential applications, also added unplanned burdens to the system and had to be accommodated by recommending providers use two separate devices, one exclusively for video and one for accessing the electronic medical chart via VPN.

The Chief of Telepsychiatry worked with IT to set up telework resources on the intranet with training about HIPAA-compliant videoconferencing software, provided orientation to new telepresenters, including appropriate PPE procedures, and assisted institutional leadership in demystifying this method of treatment. Telepsychiatry was also familiar with and able to provide guidance about preparing the environment, integration with the onsite team, contingencies for emergency situations, and how to address concerns such as patients who may not be appropriate for telehealth, those who repeatedly refuse remote encounters, or those who may need in-person follow-up. These protocols were already in place in local operating procedures with many of the institutions.

To maintain a high standard of audiovisual quality, the telepsychiatry department sent the same audiovisual equipment utilized in the hubs, Cisco DX80 monitors, to telepsychiatrists teleworking from home. The telepsychiatry program continued to make efforts to improve the quality of connection with institutions via purchases of new teleconferencing equipment. Cisco

Room Kits were deployed to several institutions, enabling telepsychiatrists to better integrate with onsite Interdisciplinary Treatment Teams (IDTT). Additional monitors and mobile carts equipped with monitors were also shipped to institutions to facilitate telepsychiatric encounters. Onsite, webcams and video-capable laptops with both built-in and external speakers were quality-tested and used extensively for teleworking providers.

### B. Expansion of Telepresenter Pool

The availability of telepresenters is often a challenge faced by CDCR telepsychiatry, and was even more so with the staff shortages caused by the COVID-19 pandemic at the same time as the expansion of telehealth. The telepsychiatry policy outlines a number of clinical designations that can serve as telepresenters under normal circumstances. Those designations were temporarily expanded during the COVID-19 pandemic, to make use of staff who could not continue their typical work during the COVID-19 pandemic, such as dental assistants due to the closure of dental clinics, recreational therapists whose groups were canceled, and office technicians whose programs were temporarily impaired during the COVID-19 pandemic. Given the increased need for telepresenters, the pool of possible telepresenters was allowed to expand temporarily to utilize the staff who would otherwise not have any work to perform. The aforementioned telepresenter orientation and policy specifically highlighted several facets of safety precautions, considering that many new telepresenters may not have worked with MH patients before. This included detailed instructions for donning and doffing PPE and other infection control measures, precautions for physical safety while working with acutely mentally ill patients, and guidance and support to maintain emotional safety given potential exposure to extreme behavior and unstable patients.

### C. Adaptations to Services During COVID-19

As outbreaks spread through facilities, prompting quarantines, and staffing levels were reduced by illness and mandatory self-isolation protocols, regular clinic daily attendance schedules were impacted. Patients were visited by their teams daily at cell-side to ensure that they had continued access to providers and could have their MH needs addressed on time. Routine appointments and referrals were seen in confidential settings when possible, with sanitation measures taken between patients, and at cell-side when a confidential setting was not feasible. Patients reported they were seen even more frequently than they would have requested and had no new issues to raise. Group time offered was significantly impacted, and when possible, patients were provided with in-cell activities. In some cases tablets were provided, and in many other cases patients were provided packet-based programming to mitigate the reduction of in-person groups being offered. Nursing-led therapeutic groups were also implemented to supplement in-person and remote treatment modalities.

Legal proceedings that had previously been held in person, such as involuntary medication hearings or Offenders with MH Disorder evaluations, quickly transitioned to being held via

teleconference technology. Other proceedings that had in part been held remotely before COVID-19, such as parole hearings and other court cases, did so to an even greater degree.

### D. Telehealth Services Expanded to Psychologists and Social Workers

Recruitment and retention of clinical staff at desert institutions (Calipatria State Prison (CAL), Centinela State Prison (CEN), Chuckawalla Valley State Prison (CVSP), and Ironwood State Prison (ISP)) has historically been challenging. Psychologist and social worker positions have been the most difficult to sustain. With a relatively small staff, any absences due to illness or disability can significantly impact care provision and crisis response. In the lead-up to the COVID-19 crisis, the desert institutions were already struggling to maintain adequate staffing levels. The staffing problem was notable at CAL. The additional strains placed upon the desert institutions by the COVID-19 pandemic imposed a critical need for alternative modes of service delivery.

| Staffing at Calipatria on 3/25/2020 | | |
|---|---|---|
| **Position** | **Status** | **Percent Filled/Covered** |
| 1.0 Psychiatrist | 20 hours (2x 10 hour days) per week | 0.5/1.0 |
| 1.0 Sr. Psychologist | Vacant | 0.0/1.0 |
| 1.0 Psychologist | Vacant | 0.0/1.0 |
| 1.0 Psychologist (Registry) | 20 hours (2x 10 hour days) per week | 0.5/1.0 |
| 1.0 Psychologist | Filled for 2 more weeks (pending transfer to ISP) | 1.0/1.0 |
| 1.0 Psychologist | Functionally vacant (extended medical leave) | 0.0/1.0 |
| 1.0 Licensed Clinical Social Worker | Functionally vacant (COVID-19 related medical leave) | 0.0/1.0 |

When transfer restrictions were imposed due to COVID-19, these institutions were required to treat many patients in place, including providing acute care in Temporary Mental Health Units (TMHUs). Routine and urgent requests for MH services that would have typically resulted in expedient transfers to institutions with MH programs, instead required the institutions to mobilize commensurate programming. Pent up demand for MH services began to build, with limitations on space, social distancing requirements and quarantines critically affecting access to care. Treatment programming was rapidly mobilized to serve an increasing population at the desert institutions. Where there was no previous programming, Correctional Clinical Case Management System (CCCMS), EOP and MHCB LOCs were required for an expanding population. This expansion of services provided critical access to outpatient services, crisis intervention and acute psychiatric care. TMHU provided a means to safely provide care for acute patients while triaging emergent transfers for the most at risk patients with full COVID-19 protection and quarantine protocols. Many patients were able to resolve their crises in the TMHUs at the desert institutions and safely transferred to a lower level of care.



To reduce exposure risks and due to individual health vulnerabilities, many staff members began to telework. Emergency approval for psychologists and social workers to provide telehealth services was authorized in late March 2020. Statewide approval was issued on May 22, 2020. This rapid deployment of services prevented serious delays in access to care and mitigated associated risks to this vulnerable population.

Provision of telehealth by psychologists and social workers was modeled upon existing telepsychiatry service delivery. The approach to the provision of telehealth services by psychologists and social workers was conservative, emphasizing routine outpatient services and consults. This allowed onsite resources to be directed toward more acute care. Onsite services provided for increased continuity of care and interdisciplinary coordination to manage acute care needs. Increased continuity of care and interdisciplinary coordination promote better patient outcomes and improved risk management.

The program was applied with strict adherence to community standards and current ethical guidelines for the provision of telehealth services. Providers were trained on guidelines and expectations. Documentation was monitored by the Region IV [26] team consisting of a Regional Mental Health Administrator (RMHA), Senior Psychologist, Specialists, and Health Care Analysts. Informed consent was provided at each encounter providing benefits and limitations of telehealth services. All patients were afforded the ability to request a face-to-face encounter within a reasonable timeframe. The Region IV team provided consultation and guidance throughout the implementation of the program.

---

[26] Region IV includes CAL, CEN, CVSP, ISP, California Institution for Men (CIM), California Institution for Women (CIW), California Rehabilitation Center (CRC), and Richard J. Donovan Correctional Facility (RJD)

California Department of Corrections and Rehabilitation                    Statewide Mental Health Program

Initially, providers from neighboring desert institutions provided the bulk of telehealth support. In October 2020, telehealth resources expanded to a non-desert institution where there were no staffing shortages. Services peaked early in implementation and began to diminish as staffing issues improved to include more onsite staff availability, outbreaks were contained, and COVID-19 protocols became less restrictive.

Approximately 800 telehealth appointments were provided by psychologists and social workers from April 2020 through April 2021 at Region IV desert institutions.[27] In addition to providing support for patients enrolled in the MHSDS, telehealth providers provided a significant amount of care and consultation to patients in General Population (GP). CDCR believes that care to the GP likely prevented MH crises and assisted the population in coping with the isolation and stress created by the COVID-19 crisis. Roughly 20% of telehealth appointments were provided to patients in restricted housing, providing critical access to those patients. Restricted housing is generally seen as a higher risk environment. Telehealth support in restricted housing undoubtedly helped mitigate risk and provided timely MH response in this difficult area.



### E.  Other Remote Technology Solutions

Division of Rehabilitative Programs provided tablets to inmates at pilot institutions. While they were not network capable, they provided static content designed by MH, such as anger management modules, which inmates could do in their cells and review with their clinicians at

---

[27] Given the rapid need to expand telehealth services, CDCR did not have a validated data metric to distinguish telehealth appointment from face to face encounters. Consequently, the data extracted was based on provider names known to be providing services to the desert institutions, and it does not include canceled appointments.

Lessons Learned During the COVID-19 Pandemic                                                    18

their next appointment. CDCR discussed future versions of this program that could include network-capable devices for inter-institutional groups, in-cell MH appointments, and a token economy-like system that provided direct rewards, including access to games, email time, video messaging, and so forth.

Visiting was shut down during the COVID-19 pandemic. CDCR adapted to the lack of visitation by creating a system to provide video visits to inmates and their families when in-person visits would have been an unacceptable public health risk.[28] As testing has improved and vaccines have become available, visits are being transitioned back to in-person. However, video visits served a key purpose for critical portions of CDCR's patient population by allowing patients to remain connected to their loved ones when in-person visits were not possible, and will continue to be considered in the future.

Innovative usages of digital technologies, combined with removing regulatory barriers to their use, present continued opportunities for augmentation of treatment and recreation for MH patients through the phases of the COVID-19 pandemic and into the "new normal."

### 3. Lessons Learned in the Expansion of Telemental Health

Expansion of telehealth is an effective response to the COVID-19 pandemic based on CDCR's and other health care organizations' experiences and preliminary outcome measures as discussed in more detail in the "Decreased Movement and Continuity of Care" section of this report. CDCR's success depended on using best practice guidelines, the rapid expansion of an already established telepsychiatry framework and expertise, enlargement of the telepresenter pool, and novel adaptation of telemental health to deliver care as well as to continue with legal proceedings and visitation. Psychologists and social workers from other institutions successfully provided telehealth services to desert institutions with significant staffing shortages and increased patient need related to transfer restrictions. This allowed more MH care to be delivered in order to prevent MH crises and stress related to the COVID-19 pandemic.

While some of the common barriers to the use of telepsychiatry in the community, such as insurance reimbursement and geographic restrictions related to licensure and prescribing, were not directly applicable to CDCR, other challenges unique to this environment were faced. Approval by court monitors was required for every incremental policy change. The physical realities of the institutions made social distancing difficult, as were hygiene and sanitizing efforts among the prison population. This led to fewer staff being able to use the space, while also complicating telepresenting. Many of CDCR's patients have psychiatric and medical comorbidities, substance use disorders, and carry socioeconomic risk factors such as poverty and housing insecurity that can confer a greater risk of morbidity and mortality during a pandemic.[29] [30] While early release, compassionate release, and expedited release were all used

---

[28] For more information on video visits: https://www.cdcr.ca.gov/visitors/visitation-faqs/#video
[29] Akiyama, M. J., Spaulding, A. C., & Rich, J. D. (2020). Flattening the curve for incarcerated populations—Covid-19 in jails and prisons. *New England Journal of Medicine*, *382*(22), 2075-2077.
[30] Hawks, L., Woolhandler, S., & McCormick, D. (2020). COVID-19 in prisons and jails in the United States. *JAMA internal medicine*, *180*(8), 1041-1042.

to manage the population, minimize crowding, and reduce the spread of disease, delivering services to patients that were notified of their release on very short time frames created more difficulties. Releasing patients to an uncertain community with strained resources and active shelter-in-place orders presented its own set of difficulties and complications.

CDCR's flexibility and willingness to accommodate the ability to work from home ultimately resulted in a retention of onsite providers while effectively recruiting more civil telepsychiatrists during the COVID-19 pandemic. Staff and patients appear to be generally satisfied with telehealth, which aligns with trends reported in other health care systems. Telework contributed to quality of life, job satisfaction, recruitment, and retention of providers in CDCR's system.

### A. CDCR's Providers Share Their Experiences on the Expansion of Telepsychiatry

The established infrastructure and experience of the telepsychiatry department allowed CDCR to adopt new practices early in the COVID-19 pandemic, and several clinicians published open forum articles about their experiences, including in partnership with prestigious academic institutions such as University of California, San Francisco. Psychiatrists at San Quentin described their experience managing MH care during the COVID-19 pandemic in an article titled "Mental health services in a US prison during the COVID-19 pandemic." They noted that expanding access to telepsychiatry became a key feature of San Quentin's response to the pandemic and found that:

> "informal feedback from staff and patients has reflected relatively high overall satisfaction with telepsychiatry so far; staff have noted that they are often able to provide similar quality of services to patients over video as they are in person, and patients appreciate being able to meet with clinicians without coming into close contact with others. Clinics seem to run efficiently, as telepsychiatry reduces the time required for custody staff to escort patients from housing units to treatment areas. Waiting rooms appear less congested than before. Telepsychiatry methods have conserved the prison's PPE supply. In addition, trainees continue to participate in mental health services remotely; for instance, forensic psychiatry fellows evaluate patients and testify as expert witnesses in administrative court for involuntary medication hearings via video." [31]

The telepsychiatry program saw an increase in applicant interest during the COVID-19 pandemic. Telepsychiatry was opened to registry providers in 2019 to help meet the staffing needs of the state. An increase in hiring of both registry and civil service providers in late 2019 continued into the COVID-19 pandemic, with an increase in interest from civil service candidates. CDCR is in the process of replacing all registry telepsychiatry providers and will be

---

[31] Burton, P. R., Morris, N. P., & Hirschtritt, M. E. (2021). Mental health services in a US prison during the CoViD-19 pandemic. *Psychiatric services*.

fully staffed by civil service providers by summer 2021. Many applicants reported that they were not able to telework in their previous employment during the COVID-19 pandemic and worried about their personal health and that of their family, which is in part why they sought out telepsychiatry. The telepsychiatry department worked with institutional leadership to implement onsite teleworking whenever possible, and through these efforts, were able to retain several psychiatrists who may otherwise have left CDCR service. Supervisors sought ways to support and care for their providers as they continued to provide treatment to patients throughout the COVID-19 pandemic.

Despite the difficulties health care workers have faced during the COVID-19 pandemic, there was a slight decrease in the number of separations, defined as retirements or resignations, for civil service psychiatrists between 2019 and 2020, with an increase in the number of total hires. Telepsychiatry had a particularly strong year, growing by 52 providers in 2020, 25 of which were civil service hires. In combination with the reduced patient population and related allocation adjustments, CDCR has reached over 90% psychiatry staffing for the first time in decades.

Providers have expressed overall satisfaction with teleworking. Telepsychiatrists and administrative staff have overwhelmingly expressed a desire to continue teleworking, at least part-time, on a permanent basis. Teleworking telepsychiatrists have noted high audiovisual quality achieved from home, especially with the Cisco DX80s monitors.

### B. The Effect of Telepsychiatry on Patient Care

In general, telepsychiatrists have continued their work much as before the COVID-19 pandemic, despite some working from home. Newly teleworking psychiatrists quickly adapted to the medium with the aid of the provided instructional materials. Interruptions to patient clinics were typically driven by onsite quarantines or staffing limitations that similarly impacted onsite providers. Technological disruptions have been rare and short-lived, though when psychiatrists faced prolonged outages at home, they would come back into the office as an alternative.

The percentage of MHSDS patients prescribed antidepressant, mood stabilizer and antipsychotic medications who received appropriate diagnostic monitoring consistent with clinical guidelines also held relatively stable during COVID-19 and statewide increase in psychiatrist teleworking. From March 1, 2019 through February 28, 2020, the average statewide compliance for this measure was 92%. By comparison, from March 2, 2020 through March 31, 2021, the average was 90%. Upon drilling down during the COVID-19 period, it appears there were focused dips in the months of July, September, and November through January, which correlate with upticks in COVID-19 cases within the CDCR population and may represent staffing shortages or reduced movement that impacted patients' ability to complete the testing in a timely manner. Overall, the measure was relatively stable, suggesting that psychiatrists can effectively monitor their patients while teleworking.

Telepsychiatrists serving the desert institutions reported that, despite the fact that these institutions do not have a MH mission and were not intended to maintain caseloads of patients, MH staff including telepsychiatry were able to manage sizeable outpatient caseloads, along

with numerous in-patient TMHU placements during the COVID-19 surge, when movement between institutions was restricted.

Telepsychiatry coordination between institutional staff, regional teams, and headquarters also enabled emergency exceptions to transfer patients to more appropriate treatment settings when clinically indicated. Similarly, when patients could be stabilized quickly in the TMHU, they could be discharged back to their previous yards at CCCMS or EOP LOC. Continuity of care was maintained, and patients received care consistent with that at institutions within the MHSDS. The data, as discussed in the decreased movement section below, demonstrates that telepsychiatry did not worsen patient outcomes and that there was a decrease in referrals to higher levels of care.

One prominent contrasting voice was that of the a single telepsychiatry "floater," who does not maintain a stable caseload of patients at one institution but instead fills in as needed behind provider absences or where there is otherwise an acute need. He reported that he felt the patients he saw while filling in during the COVID-19 pandemic were more psychiatrically acute and faring worse in terms of their MH. He attributed this to various reasons, including that patients were worried both about their own health, the well-being of their loved ones, and interruptions in normal services caused by the response to COVID-19. He noted that patients made it "crystal clear" that they were appreciative of the effort expended to continue to provide them psychiatric services. This telepsychiatrist's conflicting personal experience may be a function of his unique role, as he primarily sees urgent cases and referrals rather than routine follow-ups while filling in for primary psychiatrists and assumed this role during the course of the COVID-19 pandemic. However, it may also reflect a subset of patients who did fare worse for unknown reasons related to the COVID-19 pandemic. To determine this would require further research and analysis.

Many patients reported COVID-19-related concerns shared by the general population – concern for their own health and safety, worry about loved ones, and frustration and boredom from decreased recreational opportunities. Many of these same patients also refused to leave their cell due to fear of infection. However, CDCR's data suggest that MH patient outcomes did not suffer, as evidenced by observations discussed in more detail below such as a decrease in self-reported symptoms of depression, decreased hospitalizations for overdose, and decreased suicide and self-injury during COVID-19, which aligns with patterns seen in other systems.[32] [33] [34] These findings are discussed in more detail in the continuity of care section of this report. CDCR has also begun discussions with the authors of "Mental Health Treatment and the Role of Tele-Mental Health at the Veterans Health Administration During the COVID-19 Pandemic" to see if we can model our methodology to their study to see if we come up with similar results. They found decreases in counts of patients receiving MH treatment early in the pandemic ranged from 7% to 20% for on-going treatment, and 28% to 37% for new treatment. Telemental health rapidly expanded across VHA (Veterans Health Administration) becoming the primary means by

---

[32] Zhang, J., Boden, M., & Trafton, J. (2021). Mental health treatment and the role of tele-mental health at the veterans health administration during the COVID-19 pandemic. *Psychological Services*.

[33] Faust, J. S., Shah, S. B., Du, C., Li, S. X., Lin, Z., & Krumholz, H. M. (2021). Suicide deaths during the COVID-19 stay-at-home advisory in Massachusetts, March to May 2020. *JAMA network open*, *4*(1), e2034273-e2034273.

[34] Ahmad, F. B., & Anderson, R. N. (2021). The Leading Causes of Death in the US for 2020. *JAMA*.

California Department of Corrections and Rehabilitation          Statewide Mental Health Program

which encounters were delivered. Counts of patients receiving on-going care for suicide attempts were stable, and for overdoses, decreased by 17%. Counts of patients initiating care for suicide attempts and overdoses decreased by 30% and 38%, respectively. Weekly prescriptions and medication on-hand for psychotropics ranged from a 2% decrease to a 4% increase. New patient prescribing decreased 21%–50%." Data specific to outcomes of care provided exclusively via telehealth are currently difficult to obtain in the EHRS tracking system. Telepsychiatrists have not had a separate identifier to distinguish them from onsite psychiatrists in EHRS, though this is currently in progress. Additionally, last year new check-out categories for patient appointments were added to reflect temporarily teleworking psychiatrists and clinicians. However, this information is not yet mapped to CDCR dashboards where it can be readily analyzed. This change is also in progress, and in the future CDCR will be able to more comprehensively assess outcomes in relation to telehealth.

It should be noted that face-to-face care was still used appropriately for specialized services such as responding to emergent patient issues such as suicidal behavior, aggression/assaultive behavior, Use of Force (UOF) incidents, and so forth.

### C.  Telehealth Services by Psychologists and Social Workers

The emergent activation of telehealth services by psychologists and social workers provided valuable lessons as to how this model of service delivery can be delivered at CDCR. This emergency activation revealed that CDCR can safely provide telehealth services with good acceptance by the patient population. Critical access to care was available during an acute staffing crisis at the desert institutions. The patients adapted well to this service delivery modality, with few refusals attributed to the telehealth format. CDCR has demonstrated that, with proper administration, telehealth can provide increased access to care for patients in difficult-to-staff locations.

As CDCR expanded telehealth options, determining which services to offer under this new program contributed to a strategic deployment. By targeting telehealth services toward routine, non-urgent services, onsite staff were able to focus on more acute and intensive services needs at the institution. However, telehealth cannot fully replace face-to-face care; onsite staff are still required to respond to emergent patient issues, such as suicidal behavior, aggression/assaultive behavior, UOF incidents, and other similar services.

CDCR found that the provider location is an important consideration. Telepsychology and tele-social work services from home can be provided safely and effectively when clear standards are enforced and secure, and functional equipment is deployed. CDCR found that telehealth can aid in staff retention. Telehealth can provide an important alternative retention tool for staff who might otherwise be required to take a leave of absence due to health or caregiving responsibilities.

California Department of Corrections and Rehabilitation                    Statewide Mental Health Program

## III.   DEMAND FOR MENTAL HEALTH SERVICES DECREASED DURING COVID-19

Efforts to mitigate the spread of COVID-19 required major adjustments to the delivery of MH services. Decreased movement was one of the most significant changes, since the traditional approach to changes in LOC relied on transporting the patient to new treatment locations. While necessary steps were taken to deliver treatment under public health guidelines, it was equally important to monitor how those changes may affect the MH program and the patients it serves.

Shortly after CDCR implemented a series of public health recommendations to reduce the spread of COVID-19, the number of inpatient referrals began to noticeably decrease. In response, CDCR took several steps to ensure patients requiring inpatient services were properly referred. In addition to confirming in writing the HLOC referral expectations required in the MHSDS Program Guide, 2018 revisions, CDCR did the following:

- Continued discussing the importance of referrals with regional and institutional leadership.

- Afforded opportunities for institutions to review new policies directly with HQ, ask questions, and voice concerns.

- Sent periodic statewide reminders that referrals must continue despite any transportation delays.

- Tracked referrals over time and reviewed the methodology, limits, and opportunities for improving dashboard indicators with the Special Master's Data Expert.


CDCR also reviewed four cases highlighted by *Coleman* Plaintiffs and the Special Master's team, which appeared to show clinical staff's hesitation to refer patients, instead taking action as needed to ensure patient safety, timely MH services, and adherence to policies and procedures. While three of the four cases were unsubstantiated, remedial training and increased supervision were immediately deployed to correct any misunderstandings related to inpatient referral expectations in the fourth case.

Despite these actions, a lowered rate of referrals to inpatient care for MHCB and Psychiatric Inpatient Program (PIP) continued compared to pre-COVID-19 pandemic referral rates. CDCR's commitment to providing ethical, professional, and effective MH services, requires an openness to continuously improve and demonstrate an ability to be a self-monitoring and self-correcting program. Accordingly, on October 13, 2020, CDCR began an in-depth review to assess whether there were MH referral barriers to inpatient care among the CDCR inmate population. CDCR has the authority, resources, and obligation to deliver MH services to patients. As a result, concurrent actions, both ongoing (Sustainable Process Review) and newly implemented and enhanced (Regional Review of LOC Decisions and a review of emerging research), were required to ensure MH services were available to meet the needs of patients.

California Department of Corrections and Rehabilitation                Statewide Mental Health Program

## 1. Related Research

As part of CDCR's work to understand the impact of COVID-19 on the MH program, CDCR conducted a focused review of published articles, research, and other scholarly analysis to ensure a thorough understanding of potential factors affecting referrals to MH services. Additionally, CDCR recognized that related research could identify potential areas for exploratory analysis and identify knowledge gaps within the MH Program, leading to further investigation and program improvement. While COVID-19 is relatively new, every day in biomedicine, approximately 4,000 scientific papers are published[35] - and some already focus on researching the impacts of COVID-19 on MH. CDCR also recognized the opportunity to gain insights from similar research investigating other pandemics, natural disasters, and mass traumatic events.

### A. Mental Health Visits Decreased in Many Settings during COVID-19

A handful of retrospective pre- and post-test studies researched decreasing MH visits during COVID-19. Individuals with a primary diagnosis of Mood Disorders appeared to represent the largest portion of patients utilize emergency MH services.[36] Additionally, researchers noticed a correlation between lower service utilization rates and decreased movement, suggesting increased social distancing requirements impacted patients' willingness to seek help for MH problems through in-person consultations.[37] However, many patients repeatedly emphasized that social distancing measures and isolation positively impacted them because all other people in the community are in the same position, which helps with the burden of social isolation due to mental illness.[38] While some findings underscored the threat to MH posed by the COVID-19 pandemic[39], others concluded mental illness and the personality characteristic of resilience are not directly linked, particularly if there is a good balance of protective factors and risk factors[40].

In an editorial-style article, some researchers opined that fear of contracting COVID-19 and feelings that their problems were not severe enough, in comparison to those needing treatment for COVID-19, might also play a role in reduced referrals and admissions to inpatient psychiatric services.[39] Most studies agreed that more research was necessary and that tracking psychiatric visits may not directly correlate to a lower prevalence of MH distress.

---

[35] C. (Ed.). (2021, January 11). Meta.org. Retrieved January 11, 2021, from http://www.meta.org/

[36] Gonçalves-Pinho, M., Mota, P., Ribeiro, J., Macedo, S., & Freitas, A. (2020). The impact of COVID-19 pandemic on psychiatric emergency department visits – a descriptive study. Psychiatric Quarterly, 1–11. https://doi.org/10.1007/s11126-020-09837-z

[37] Hoyer, C., Ebert, A., Szabo, K., Platten, M., Meyer-Lindenberg, A., & Kranaster, L. (2020). Decreased utilization of mental health emergency service during the COVID-19 pandemic. European Archives of Psychiatry and Clinical Neuroscience, 1–3. https://doi.org/10.1007/s00406-020-01151-w

[38] Kolar, D. (2020). Psychiatric emergency services and non-acute psychiatric services utilization during COVID-19 pandemic. European Archives of Psychiatry and Clinical Neuroscience, 1–2. https://doi.org/10.1007/s00406-020-01182-3

[39] Goldenberg, M. N., & Parwani, V. (2020). Psychiatric emergency department volume during Covid-19 pandemic. The American Journal of Emergency Medicine. https://doi.org/10.1016/j.ajem.2020.05.088

California Department of Corrections and Rehabilitation    Statewide Mental Health Program

### B. Anxiety and Depression Symptoms Have a Higher Prevalence After Mass Traumatic Events

In addition to studies aimed at researching the impact of COVID-19 on MH symptoms, other studies investigated MH symptoms following hurricanes, earthquakes, other pandemics, and mass traumatic events. In a systematic review of the potential impact of natural disasters, researchers concluded there is a clear need to continue monitoring MH and suicidal behaviors for several years after the traumatic events.[40]

A research article based on cohort studies found depression symptoms in the US increased three times more during COVID-19, than pre-COVID-19.[41] Moreover, in a study comparing pre- and post-Katrina surveys, authors concluded that the prevalence rate of severe mental illness in respondents post-Katrina was almost double – 11.3%, versus 6.1% for respondents pre-Katrina.[42] Other survey studies found similar increases in Post-Traumatic Stress Disorder (PTSD) after Hurricane Ike,[43] anxiety after the H1N1 pandemic,[44] and symptoms of PTSD and anxiety-depression after the 2014 – 2016 Ebola epidemic.[45]

### C. Increased Resilience is More Common than Pathological Outcomes After Mass Traumatic Events

Resilience is the ability to recover from and adapt to adversity. A wide range of MH outcomes following mass traumatic events have been observed. Research finds that some factors, characteristics, and conditions may increase psychopathology risk, while others may promote adaptive adjustment and resilience. Chen and colleagues (2020) conducted a meta-analysis to examine the theoretical prevalence of individuals developing resilience versus psychopathology following natural disasters.[46] Their findings suggest that, overall, resilience is more common

---

[40] Kõlves, K., Kõlves, K. E., & De Leo, D. (2013). Natural disasters and suicidal behaviors: A systematic literature review. Journal of Affective Disorders, 146, 1–14. http://dx.doi.org/10.1016/j.jad.2012.07.037

[41] Ettman C.K., Abdalla S.M., Cohen G.H., Sampson L., Vivier P.M., & Galea S. (2020). Prevalence of Depression Symptoms in US Adults Before and During the COVID-19 Pandemic. JAMA Network Open. https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2770146

[42] Kessler, R. C., Galea, S., Jones, R. T., & Parker, H. A., on behalf of the Hurricane Katrina Community Advisory Group. (2006). Mental illness and suicidality after Hurricane Katrina. Bulletin of the World Health Organization, 84(12), 930–939.

[43] Pietrzak, R. H., Tracy, M. Galea, S., Kilpatrick, D. G., Ruggiero, K. J., Hamblen, J. L., Southwick, S. M., & Norris, F. H. (2012). Resilience in the face of disaster: Prevalence and longitudinal course of mental disorders following Hurricane Ike. PLOS One, 7(6), e38964, 1–14. http://10.1371/journal.pone.0038964

[44] Liao, Q., Cowling B.J., Lam W.T., Ng D. M.W., & Fielding, R. (2014). Anxiety, worry, and cognitive risk estimate in relation to protective behaviors during the 2009 influenza A/H1N1 pandemic in Hong Kong: ten cross-sectional surveys. BCM Infectious Diseases. https://link.springer.com/article/10.1186/1471-2334-14-169#citeas

[45] Jalloh M.F., Li W., Bunnell R.E., O'Leary, A., Hageman K.M., Sengeh P., Jalloh M.B., Morgan O., Hersey S., Marston B.J., Dafae F., & Redd J.T. (2017). Impact of Ebola experiences and risk perceptions on mental health in Sierra Leone, July 2015. BMJ Global Health. https://gh.bmj.com/content/bmjgh/3/2/e000471.full.pdf

[46] Chen, S., Bagrodia, R., Pfeffer, C. C., Meli, L., & Bonanno, G. A. (2020). Anxiety and resilience in the face of natural disasters associated with climate change: A review and methodological critique. Journal of Anxiety Disorders, 76, 1-16. https://doi.org/10.1016/j.janxdis.2020.102297

than pathological outcomes. Greater resilience was associated with a decrease in self-reported incidents of experiencing stressors, older adults, education, economic resources, employment, and social support.

Similarly, a recent cross-sectional study concluded that resilience is associated with having greater support systems, positive role models, and a sense of stability and community. Individual-level resilience may improve as resources are allocated towards building support systems, friend relationships, and role models.[47] The same study found that individuals with higher Adverse Childhood Experiences have lower resilience scores.

### D. Developing Coping and Resilience Strategies are Effective Approaches to Mental Health Treatment During Mass Traumatic Events

In a case controlled study relying on retrospective data collection, researchers found that a treatment approach based on caring, empathy, generosity, sharing of experiences, and humanism can help develop coping and resilience strategies.[48] Another similarly designed study concluded that participants who engaged in action-based activities in their community immediately following the traumatic event reported more significant posttraumatic growth.[49] The same study encouraged public policy to create supportive spaces that allow interested patients opportunities to contribute to meaningful change following mass traumatic events.

Another article discussing the theory and literature on psychological distress, morbidity, and risk of suicide following the COVID-19 pandemic, noted that despite psychological distress increasing, resilience, grief recovery, posttraumatic growth, hope, and self-compassion were identified as strategies for navigating the negative impact of the COVID-19 crisis.[50] That same article suggested utilizing self-help resources based on psychological principles to help patients focus their behaviors towards those within their control (i.e., using good sleep hygiene, healthy eating, exercise, meditation, and outdoor activities). To mitigate the psychological impact of quarantine, researchers found the following to be beneficial: disease education, the reason for quarantine, adequate supplies, reduced boredom, and increased communication.

### E. The Relationship Between Suicide Rates and Mass Traumatic Events is Unclear

Kõlves et al. (2013) found that suicide rates sometimes decreased, remained constant, or increased after natural disasters in a study of observational studies on suicidal activity after

---

[47] Daniel, R., Ring, K., Husbands, T., Marshall, H., Wang, J., Shah, A., & Chan, R. Y. (2020). Resilience in the setting of adverse childhood experiences: A cross-sectional study. Clinical Pediatrics, 59(4), 1296-1300. http://doi.org/10.1177/0009922820941633

[48] Cénat, J. M. Noorishad, P., Blais-Rochette, C., McIntee, S., Mukunzi, J. N., Darius, W. P., Broussard, C., Morse, C., Ukwu, G., Auguste, E., & Menelas, K. (2020). Together for hope and resilience: A humanistic experience by the Vulnerability, Trauma, Resilience, and Culture Lab members during the COVID-19 pandemic. Journal of Loss and Trauma, 25(8), 643-648. https://doi.org/10.1080/15325024.2020.1774704

[49] Jaramillo, N., & Felix, E. D. (2020). Psychosocial influences on posttraumatic growth among university students following a mass murder. American Journal of Orthopsychiatry, 1-9. http://dx.doi.org/10.1037/ort0000512

[50] Shakespeare-Finch, J., Bowen-Salter, H., Cashin, M., Badawi, A., Wells, R., Rosenbaum, S., & Steel, Z. (2020). COVID-19: An Australian perspective. Journal of Loss and Trauma, 25(8), 662-672. https://doi.org/10.1080/15325024.2020.1780748

natural disasters across the globe. However, increases in suicide rates were usually confined to population subgroups (men after the 1999 Nantou earthquake in Taiwan, and youth in the United States, though not to a statistically significant extent, after Hurricane Andrew in 1992). Nevertheless, in the initial post-disaster timeframe, referred to as the honeymoon phase, there seems to be a decrease in non-fatal suicidal behaviors. In some studies, a delayed rise in suicidal conduct has been identified. However, other causes, such as previous and current MH conditions, have been reported to raise the likelihood of suicidal behavior following natural disasters. Contributing variables, such as economic conditions, should also be considered. In total, 19 papers analyzed suicide mortality and 23 non-fatal suicidal behaviors. The effects of earthquakes on suicidal behaviors are the most frequently studied among natural disasters (n = 20), followed by hurricanes (n = 11). Further, there were four papers about tsunamis, three about floods, three about heatwaves and drought, and one investigating the effects of multiple natural disasters.

F.  Suicidal Ideation, Plans, and Attempts Initially Decrease, but Subsequently Increase After Mass Traumatic Events

Kessler et al. (2006) tested for anxiety and mood problems in their research, including some extreme psychiatric conditions and mild-moderate mental illnesses. While their research cited lower suicidal ideation prevalence between 5 and 8 months after Hurricane Katrina, subsequent research conducted as part of the same initiative found a substantial rise in suicidal ideation among approximately the same population, after the 8-month mark.

In three waves of interviews following Hurricane Ike, Pietrzak et al. (2012) measured the incidence of suicidality and psychiatric illness of people who had lived in the region impacted by the catastrophe for at least one month prior to the hurricane. Researchers found a prevalence of PTSD associated with trauma other than Hurricane Ike, but depression, panic disorder, and suicidality remained reasonably consistent throughout the evaluations. Later, Hurricane Ike-related PTSD and generalized anxiety disorder decreased in the second-wave review and stabilized in the third, while suicidality frequency rose from the second wave of assessment to the third.

The traditional stages of psychological responses to disasters may help explain patterns in suicidality in research. Zunin and Myers initially identified these stages. Emotions improve in a heroic phase, in which individuals are inclined to try to contribute to the disaster response, followed by a honeymoon phase when community cohesion peaks. However, after the honeymoon, is disillusionment, sometimes spurred by disappointment in the slower-than-expected pace of disaster recovery. Disillusionment typically occurs in the second half of the year after the disaster. After the disaster's first anniversary, it is generally followed by reconstruction, as survivors come to terms with their "new normal" after the disaster.



*(Adapted from Zunin & Myers as cited in DeWolfe, 2000[51])*

## 2. Sustainable Process

The Sustainable Self-Monitoring Process's primary objective is to ensure that patients are treated at the appropriate LOC, and deemed clinically necessary, are timely referred and transferred to a psychiatric inpatient program. An additional objective is to develop a sustainable, internally monitored quality improvement process by providing feedback to refine existing policies and procedures, improve data management systems, enhance ongoing training of institutional staff, and take appropriate corrective action when warranted.

The Sustainable Process includes an assessment of clinicians' documentation of their higher LOC considerations on the MH referral form, as well as extensive patient record reviews each quarter. The HLOC considerations documentation is subjective and objective, meant to be a catchall for all areas of concern. The combined efforts from the institution, Regional teams, and Headquarters, demonstrate CDCR's collective commitment to and success in ensuring patients are placed in the appropriate LOC, and CDCR's ability to self-monitor.

### A. Methodology

CDCR uses multiple procedures to self-monitor the referral process. These procedures consist of three broad categories of review: monthly procedures, quarterly procedures, and semi-

---

[51] DeWolfe, D. J. (2000). Training manual for mental health and human service workers in major disasters (2nd ed., HHS Publication No. ADM 90-538). Rockville, MD: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Mental Health Services.

annual procedures. Headquarters, RMHAs, and the local Inpatient Coordinators utilize multiple tools to track and monitor referrals and non-referrals, most central being the On Demand Referral and Non-Referral Logs. The institutional, Regional, and HQ actions related to the Sustainable Self-Monitoring Process have continued throughout the COVID-19 pandemic.

Institutions complete monthly audits using the HLOC Document audit tool (formerly CDCR Form 7388-MH-B). The HLOC document is used to guide the IDTT in determining a patient's LOC based on assessing the patient's behaviors and symptoms and the potential benefit to the patient of a different LOC. The HLOC document is completed electronically at a frequency consistent with the MHSDS Program Guide requirements. Before completing the form, clinicians must answer seven yes/no questions and enter an explanation as necessary. The seven questions include three subjective questions and four objective questions, summarized below.

| Subjective Questions | Objective Questions |
|---|---|
| 1. Unable to function at current LOC | 4. MHCB for at least 10 days |
| 2. Patient requires highly structured inpatient | 5. Three or more MHCB Referrals in the last 180 days |
| 3. Unresponsive psychiatric symptoms in the last 6 months | 6. Three or more RVRs in the last 90 days |
|  | 7. Participating in less than 50% Treatment |

Data from the Sustainable Process results were collected and compared for two periods of review. "Pre-COVID-19" data was collected from April 2019 – December 2019, and "COVID-19" data was collected from April 2020 – December 2020.

### B.  Findings From Sustainable Process Audits

Findings indicate that the referrals stemming from Sustainable Process considerations were more accurate with higher quality documentation during COVID-19. After controlling for changes in population size, the average monthly number of patients with one or more "yes" to the seven questions above decreased approximately 25% during COVID-19 (M = 1,639), compared to pre-COVID-19 (M = 2,199). In general, the decrease in patients identified for referral consideration can be accounted for by decreased movement, decreased opportunity for programming and assessment, and related distress. This is particularly evident in the reduced potential for answering "yes" to question #7 (participating in less than 50% of structured treatment hours), which corresponds with reduced opportunity for refusal due to reduced programming offered and participation parameters that allow for easier compliance (in-cell programming). Similarly, question #6 (three or more Rules Violation Reports (RVRs) in the last 90 days) may correlate with reduced distress or opportunity for altercations or rules

violations. With a reduction in patients identified for referral questions (both subjective and objective) during IDTT, it is reasonable to conclude that there would also be a reduction in referrals made during IDTT.

The Sustainable Process also reviews the list of patients who were considered for referral to a higher level of care but ultimately were not referred. These "non-referrals" also decreased during COVID-19. Controlling for population changes, the average monthly number of non-referrals decreased by approximately 14% during COVID-19 (M = 1,263), compared to pre-COVID-19 (M = 1,468). This finding indicates that while the Sustainable Process did find fewer patients for HLOC, identified patients were more likely to be referred during COVID-19.

The Sustainable Process audit also includes measures of quality and accuracy. The quarterly review measures the percentage of HLOC consideration documentation identified as "good." The process involves selecting a sample of cases for review, and determining if the documentation is accurate and meets quality standards. Comparing the quarterly reviews measured during the pre-COVID-19 and COVID-19 timeframes, the portion of "good" cases identified increased approximately 15% during COVID-19.

### 3. Regional Review of Level of Care Decisions

CDCR is committed to demonstrating its ability to monitor and improve the MH program independently. On October 19, 2020, all four Regional teams, consisting of MH clinicians with extensive experience in treating inmates with mental illness, were directed by the MH Administrators to review a sample of recent Master Treatment Plans (MTPs) and Self-Harm forms and the LOC decisions that followed. No systematic deviation in referral procedures was detected. IDTTs appeared to follow established policies, standards, and expectations of due diligence. While this review was somewhat similar to the Sustainable Process audits and aimed to achieve similar insights, there were some key differences:

- 100 MTPs were randomly chosen from all 8,297 MTPs issued between September 18 and October 18, 2020 (from all non-PIP LOC), including ones that were referred to HLOC.

  - The Sustainable Process only reviews MTPs generated for patients at an EOP LOC. This review included MTPs from MHCB, EOP, and CCCMS.

  - Randomness was achieved by assigning a random number greater than or equal to zero and less than one, evenly distributed using the Microsoft Excel 2016 RAND function. Since Excel 2010, Excel uses the Mersenne Twister algorithm (MT19937)[52] to generate random numbers. All 8,297 MTP were rank-ordered by an assigned random number (smallest to largest), and the first 100 MTPs were selected for review.

---

[52] The Mersenne Twister is a pseudorandom number generator (PRNG). It is by far the most widely used general-purpose PRNG. Its name derives from the fact that its period length is chosen to be a Mersenne prime. The most commonly used version of the Mersenne Twister algorithm is based on the Mersenne prime 219937−1. The standard implementation of that, MT19937, uses a 32-bit word length.

California Department of Corrections and Rehabilitation          Statewide Mental Health Program

- 50 Self-Harm forms were randomly selected from all 610 forms issued during the same time period (from all LOC).
  - The Sustainable Process does not include a review of Self-Harm forms.
  - Randomness was achieved by assigning a random number greater than or equal to zero and less than one, evenly distributed using the Microsoft Excel 2016 RAND function. Since Excel 2010, Excel uses the Mersenne Twister algorithm (MT19937) to generate random numbers. All 610 Self-Harm forms were rank-ordered by an assigned random number (smallest to largest), and the first 50 Self-Harm forms were selected for review.

A list of 145 unique patients were assigned by region for review (5 patients appeared on both lists but were only counted on the Self-Harm group). Regional teams were directed to review each patient's chart and report if they agreed with the subsequent decision to refer (or not refer) to a HLOC.

| Region | MTP | Self-Harm Forms | Regional Agreement with Subsequent LOC decision |
|:---:|:---:|:---:|:---:|
| I | 40 | 23 | 92% (58/63) |
| II | 16 | 17 | 94% (31/33) |
| III | 26 | 1 | 100% (27/27) |
| IV | 13 | 9 | 96% (21/22) |
| Total | 95 | 50 | 95% (137/145) |

The results of the Regional review identified eight instances of LOC disagreement. Five out of the eight disagreements were related to CCCMS or EOP LOC – the Regional team determined four LOC decisions should have been EOP instead of CCCMS, and one LOC decision should have been CCCMS instead of GP. The other three were associated with MCHB and Acute LOC – the Regional team determined two LOC decisions should have been Acute Psychiatric Program instead of Intermediate Care Facility, and one LOC decision should have continued to be MHCB instead of an MHCB rescission. The Regional teams took steps to resolve any LOC concerns with the institutions and IDTTs. While 95% of the reviews resulted in an agreement with the treatment teams' LOC decision, these results do not appear to help explain observations of fewer inpatient referrals during COVID-19.

### 4.  Lessons Learned From Delivering Mental Health Services During a Pandemic

During the COVID-19 pandemic, there was an unexpected decrease in referrals to inpatient levels of care. Traditional efforts aimed at establishing and reinforcing referral expectations, such as new policies, monitoring, and direct communication, were utilized, but the unexpected

decrease in referrals continued. In order to better understand this phenomenon, CDCR independently took steps to review emerging research, investigate the effectiveness of established monitoring tools during COVID-19, and expand the scope of quality assurance to ensure adherence to policies, standards, and expectations of due diligence. Clinicians may also have understood that due to limitations on patient movement due to COVID-19 pandemic restrictions, quarantines, and institutional lockdowns, their patients would be less likely to have been moved and hence they chose to treat the patient in place.

Several research studies have observed a decrease in MH visits during the COVID-19 pandemic across different settings. This was consistent with CDCR data indicating lower than expected inpatient referrals. Regrettably, none of the reviewed articles identified reliable causes for the decrease, instead offering survey results (e.g., fear of infection or a sense of community), observed correlations (e.g., social distancing practices and patients with mood disorders most likely to decrease MH services), and theories from experts on resilience as a personality factor. Most studies agree that more research is necessary and that tracking psychiatric visits may not directly correlate to a reduction in MH distress, which could explain the disconnect between CDCR's decreasing referral numbers despite audits demonstrating a high quality Sustainable Process.

The Sustainable Process includes a robust scope of review, and there is significant overlap between its objectives and CDCR's concerns related to the frequency of inpatient referrals. The comprehensive nature of the Sustainable Process was likely to reveal important information related to referral trends. Accordingly, reviewing recent Sustainable Process audit results to understand why there may be lower than expected referrals was a logical step. However, recent results did not reveal any apparent patterns or issues indicating a sudden drop in Sustainable Process compliance. Instead, the results indicate that the Sustainable Process identified fewer patients in need of HLOC consideration, and the patients that were identified were more likely to be referred during COVID-19, with increased accuracy and quality documentation. This may reflect that the clinicians knew the patients better because of less patient movement. Despite clinicians knowing that many patients would not have been as likely to be moved to higher levels of care, o, observational reports from CDCR's MH regional teams indicated that staff continued to complete reviews and audits, and there was no evidence of an increased number of cases that should have been referred to HLOC, but were not.

Taking a broader view of research related to MH symptoms following mass traumatic events revealed several key insights. The prevalence of depression, anxiety, and PTSD tends to increase in the months following mass traumatic events – though most individuals develop coping and resilience strategies naturally. Treatment activities targeting action-based activities, improving patient education, and focusing behaviors towards those within their control (i.e., utilizing good sleep hygiene, healthy eating, exercise, meditation, and outdoor activities) are found to be most beneficial. The role of resilience repeatedly appeared in research, indicating mental illness does not necessarily affect resilience as a personality characteristic, particularly if there is a good balance of protective factors and risk factors. Overall, resilience is more common than pathological outcomes following a mass traumatic event. Increased resilience is associated with lower self-reported stressors, older adults, education, economic resources, employment, and social support. Moreover, resilience is linked to having greater support systems, positive role

models, and a sense of stability and community. An encouraging finding is that individual-level resilience may improve as resources are allocated towards building support systems, friend relationships, and role models.

The relationship between suicide rates and mass traumatic events is unreliable. Increases in suicide rates, however, were usually confined to specific population subgroups. In the initial post-disaster timeframe, there seems to be a decrease in non-fatal suicidal behaviors. The traditional stages of psychological responses to disasters may help explain shifting patterns of suicidal ideation, plans, and attempts in research. In this model, improved MH and community cohesion is followed by discouragement over the slower-than-expected pace of disaster recovery.

# IV.    DECREASED MOVEMENT AND MAINTAINING CONTINUITY OF CARE

The movement of patients both within CDCR institutions and between them, as well as the total amount of time individuals spent outside of their cells, was restricted based on recommendations from the Center for Disease Control (CDC) and California Department of Public Health (CDPH). CDCR's goal was to maximize staff and patient safety by restricting the spread of COVID-19 within CDCR institutions, while simultaneously ensuring that CDCR's MH patient population continued to receive appropriate care.

To achieve these goals, CDCR developed alternative housing and treatment options for *Coleman* class members. CDCR's efforts included increasing in-cell rounding/monitoring and access to in-cell reading and writing therapeutic materials. TMHUs were activated and used for patients who required inpatient MH care services while awaiting transfers to PIPs and MHCBs.

In response to the necessary changes to the delivery of MH services, CDCR reviewed the emerging body of research related to continuity of care to gain a better understanding of this critical component of treatment. This research was then paired with CDCR's experience and internal data to better understand impacts from COVID-19 on the MH program. CDCR analyzed how restricted movement restriction of movement in light of the COVID-19 pandemic impacted programming changes, the prevalence of various types of events (i.e., incidents of self-harm, suicide, RVRs, inter- and intra-facility moves), and the amount of out-of-cell treatment provided.

## 1.   Research Related to the Continuity of Care

Continuity of care is largely focused on the quality of care over time. While there is general agreement that it is a complex concept, it is considered by patients and clinicians alike as an essential feature of good quality care for long-term disorders.[53] Within integrated systems of care where patients' health care needs can rarely be met by a single professional, the goal is often a combination of two ideal conditions: a continuous caring relationship with an identified health care professional, and the delivery of a "seamless service" through integration, coordination and the sharing of information between different providers.[54]

Peer reviewed research has found statistically significant relationships between care continuity, successful inpatient discharge to outpatient care, quality of life, service satisfaction, symptom

---

[53] Burns, T., Catty, J., White, S., Clement, S., Ellis, G., Jones, I., ... Wykes, T. (2009). Continuity of care in mental health: Understanding and measuring a complex phenomenon. Psychological Medicine, 39(2), 313-323. doi:10.1017/S0033291708003747

[54] Gulliford, M., Naithani, S., & Morgan, M. (2006). What is 'continuity of care'? Journal of Health Services Research &amp; Policy, 11(4), 248–250. https://doi.org/10.1258/135581906778476490

severity, social and community functioning, and hospitalization trends. [55] [56] [57] [58] However, a common issue many researchers find is that there is no accepted definition or measure against which to test policies or interventions designed to improve continuity. Consequently, research on this topic has had many limitations, including low sample sizes, differences in the definition and measurement of the involved variables, sampling bias, difficulty with generalizing the outcomes across treatment settings, and the challenge of teasing out differences in impact (on patient outcomes) of visit frequency versus visit continuity. CDCR agrees with the broad consensus that continuity of care is an important component in MH treatment, but also recognizes it is inherently difficult to draw definitive conclusions about the comparative value because there are so many relevant factors. Regardless, CDCR found positive relationships between continuity of care and outcomes after gathering the following types of internal data and examining behavioral health outcomes during the COVID-19 pandemic: the demand for MH services, rule violations, overdoses, self-injury, and suicide. This also included data to control for the significant changes in CDCR's population size and composition. CDCR defines Continuity of Care as the percentage of Primary Clinician (MHPC) and Psychiatrist (MHMD) contacts seen by the most frequent provider during a six-month period for any EOP patient who has remained in the same housing program at the same institution without interruption for the entirety of the past six months. CDCR's review of patients who remained in an EOP for a full six months found that the same provider saw those patients more often during COVID-19 than the same period prior to COVID-19, which indicates that CDCR increased continuity of care through the COVID-19 pandemic.

## 2. Methodology

The observation period for this analysis was split into equal and consecutive timeframes: "Pre-COVID-19", spanning from May 3, 2019 through March 30, 2020; and "COVID-19", spanning from April 1, 2020 through February 28, 2021. The frequency of various events both before and during the COVID-19 period will be presented here. These events were analyzed using both descriptive and inferential statistics to arrive at a set of general conclusions and hypotheses regarding the lessons learned about the population, the response to the emergence of COVID-19, and how changes in movement and access to care interacted during this period. However, this analysis was not designed to determine which factors caused which changes.

CDCR calculated the impact of the COVID-19 pandemic on each behavioral outcome as the observed rate of each outcome divided by its expected rate minus 1. Similarly, CDCR calculated

[55] Adair, C.E, McDougal, G.M., Mitton, C.R., Joyce, A.S., Wild, T.C., Gordon, A., Costigan, N., Kowalsky, N., Pasmeny, G., and Beckie, A. Continuity of Care and Health Outcomes Among Persons with Severe Mental Illness. Psychiatry Services 56: 1061-1069, 2005.

[56] Puntis, S., Rugkasa, J., Polit, C., Forrest, A., Mitchell, A., and Burns, T. Associations Between Continuity of Care and Patient Outcomes in Mental Health Care: A Systematic Review. Psychiatric Services 66: 354-363, 2015.

[57] Greenberg, G.A., Rosenheck, R.A. Continuity of Care and Clinical Outcomes in a National Health System. Psychiatric Services 56: 427-433, 2005

[58] Brekke, J.S., Ansel, M., Long, J., Slade, E., and Weinstein, M. Intensity and Continuity of Services and Functional Outcomes in the Rehabilitation of Persons with Schizophrenia. Psychiatric Services 50: 248-256, 1999).

changes in all continuity measures as the COVID-19 pandemic rate divided by the pre- COVID-19 pandemic rate minus 1. For example, the per capita prison arrival rate was 0.74 pre-COVID-19 and 0.26 during the COVID-19 pandemic, yielding a change in this rate of (0.26/0.74) - 1 = -0.65, or a decrease of 65%. Expected rates were calculated using a technique called indirect standardization based on age group and MH LOC.[59] These expected rates reflect what CDCR would have observed if nothing had changed during the COVID-19 pandemic other than the population size, proportions of age groups, and MH LOC.

### 3.  Plain Language Summary of Methodology and Plot Graphs

During the pandemic, CDCR made several changes to the MH program and the broader operations within CDCR. The "Changes in Treatment Continuity during Pandemic" graph plots the various changes. Each item is plotted on a range (-100% to 100%). The red boxes (■) within that range indicate the degree to which these changes differ from pre-COVID-19 data and each other. The data to the right of each red box indicates the percent difference. For example, internal and external movement restrictions were significant and widespread during most of the pandemic. These changes to CDCR operations are plotted (Prison and Program Arrivals), and visualize the extent to which this change differs from before COVID-19 (-65% and -51% respectively). The 0% line indicates no measureable difference.



[59] Wildeman, C., Goldman, A. W., & Wang, E. A. (2019). Age-Standardized Mortality of Persons on Probation, in Jail, or in State Prison and the General Population, 2001-2012. Public health reports (Washington, D.C.: 1974), 134(6), 660–666. https://doi.org/10.1177/0033354919879732

| Treatment Continuity during Pandemic Definitions | |
|---|---|
| Prison Arrivals | Inmates' movement into the prison system either from county jails or from those being returned from parole |
| Program Arrivals | Movement within an institution |
| Psychiatrist Continuity | Percentage of psychiatrist contacts seen by the most frequent provider (psychiatrists) |
| Primary Clinician Continuity | Percentage of primary clinician contacts seen by the most frequent provider (primary clinicians) |
| Treatment Offered | Percentage of patient-weeks during which offered treatment met or exceeded benchmarks |
| Timely MHPC Patient-Weeks | Percentage of time routine primary clinician contacts and initial primary clinician contact completed on time |
| Timely MHMD Patient Weeks | Percentage of time routine Psychiatrist Contacts and initial Psychiatrist Contact completed on time |
| PHQ9 Administered | Number of PHQ9s administered to patients in a given placement and institution. (The PHQ9 is a multipurpose instrument for screening, diagnosing, monitoring, and measuring the severity of depression) |

In addition to the deliberate changes discussed above, there were population changes (size and demographics) that were outside of CDCRs control. Before analyzing how our patients reacted (outcomes) to the various changes during COVID-19, we analyzed various demographic changes (Age, Race, Gender, Custody Level, MH LOC, and Developmental Disability). This step highlights variables CDCR may need to control for in the outcome analysis. For example, while General Population (GP) comprised 70% of the total population in before the COVID-19 pandemic, they comprised 68% of the total population during the COVID-19 pandemic. While the population size reduced substantially during COVID-19, the demographics changes appear to be minor (1% - 2% differences). Consequently, we decided the outcome data should control for differences in population size, age, and MH LOC.

| | Variables | PreCovid | Covid | Delta |
|---|---|---|---|---|
| **Age** | Under 30 | 23% | 21% | -2% |
| | 30 to 49 | 52% | 52% | 0% |
| | 50 to 69 | 23% | 25% | 2% |
| | 70 plus | 2% | 2% | 0% |
| **Race** | Black | 28% | 29% | 1% |
| | Hispanic | 44% | 45% | 1% |
| | Other | 7% | 7% | 0% |
| | White | 21% | 20% | -1% |
| **Gender** | Female | 4% | 4% | 0% |
| | Male | 96% | 96% | 0% |
| **Custody Level** | Custody Level I | 12% | 10% | -2% |
| | Custody Level II | 48% | 49% | 1% |
| | Custody Level III | 16% | 16% | 0% |
| | Custody Level IV | 23% | 25% | 2% |
| **MH Level of Care** | CCCMS | 22% | 22% | 0% |
| | EOP | 5% | 6% | 1% |
| | GP | 70% | 68% | -2% |
| | Inpatient | 1% | 2% | 1% |
| | Developmental Disability | 1% | 1% | 0% |

Given the variety of changes to the MH program during COVID-19, CDCR wanted to understand how these changes were impacting our patients. After analyzing the various changes patients experienced during COVID-19, CDCR compared behavioral outcome data before and during COVID-19. The method used (indirect standardization) is more precise than trend analysis, because allows us to control for more variables (e.g., population size and demographic changes).

Similar to the "Changes in Treatment Continuity during Pandemic" graph, each behavioral outcome is plotted on a range (-100% to 100%). The red box (■) within that range indicate the difference between the expected rate (based on pre-COVID-19 data) and the observed rate (based on the data during COVID-19). The information to the right of each red box indicates the percent difference and the 95% Confidence Interval (CI) [60]. CDCR can assign a statistical probability to COVID-19 pandemic impact estimates in the form of 95% CI. These confidence intervals indicate the range of values between which CDCR can be 95% confident as to where the actual impact lies.[61] The CI range is visualized by the bars extending left and right of each

---

[60] Pan American Health Association. (2002). Standardization: a classic epidemiological method for the comparison of rates. Epidemiol Bull, 23(3), 9-12.

[61] Confidence Intervals (CI): A 95% confidence level indicates that, if you took 100 random samples from the population, the confidence intervals for approximately 95 of the samples would contain the mean response. CDCRs analysis uses a two-sided confidence interval to estimate both likely upper and lower values for the mean response.

red box). The 0% line indicates there were no differences between the two timeframes (e.g., RVR: IEX).

If a given outcome such as the rate of RVRs per capita differed between GPs and non-GPs, CDCR would expect that the change in the proportion of GPs would by itself lead to a change in the rate of RVRs. By calculating an expected RVR rate that adjusts for the change in the proportion of age groups and levels of care, and then comparing it to the RVR rate actually observed, CDCR can estimate how the COVID-19 pandemic impacted the RVR rate above and beyond the change in the proportion of GPs.



**Estimated change in behavioral outcomes due to pandemic**

| | |
|---|---|
| MH Outpatient Up | -43% [-44, -41] |
| MH Outpatient Down | -45% [-47, -44] |
| MH Inpatient Up | -37% [-38, -36] |
| MH Referrals: Emergent | -29% [-30, -28] |
| MH Referrals: Urgent | -11% [-13, -10] |
| MH Referrals: Routine | -8% [-9, -8] |
| All Serious RVRs | -32% [-34, -30] |
| RVRs: Violent | -39% [-42, -37] |
| RVRs: Drug-related | -23% [-27, -20] |
| RVRs: IEX | 0% [-10, 11] |
| Treatment refusal weeks | -31% [-32, -31] |
| PHQ9 = Depressed | -31% [-34, -28] |
| Hospitalization for Overdose | -33% [-38, -28] |
| Self-Injury with Intent to Die | -20% [-27, -13] |
| Self-Injury without Intent to Die | 14% [10, 17] |
| Severe Self-Injury | -22% [-35, -9] |
| Self-Injury with Lethal Method | -14% [-23, -6] |
| Suicide | -35% [-61, -8] |

-100                0                100

Observed rate during pandemic as a percentage of the expected rate, with 95% confidence interval

| Behavioral Outcome Definitions | |
|---|---|
| MH Outpatient Up | Change from any lower outpatient level of care to any higher outpatient level of care |
| MH Outpatient Down | Change from any higher outpatient level of care to any lower outpatient level of care |
| MH Inpatient Up | Change from any outpatient level of care to any inpatient LOC, from MHCB to Acute/ICF, or from Acute to ICF |
| MH Referrals: Emergent | Percentage of Emergent MH Referrals resolved on time |
| MH Referrals: Urgent | Percentage of Urgent MH Referrals resolved on time |
| MH Referrals: Routine | Percentage of Routine MH Referrals resolved on time |
| All Serious RVRs | Combines RVR data for Violent, Drug-Related, and IEX behavior |
| RVRs: Violent | Assault, Attempted Murder, Murder, and Battery |
| RVRs: Drug-Related | Charges associated with various types of use, possession, and trafficking of drugs |
| RVRs: IEX | Specific charges associated with indecent exposure behavior |
| Treatment Refusal Weeks | Percentage of patient-weeks during which hours of treatment refused met or exceeded benchmarks (over 50% of all offered treatment was refused or no showed) |
| PHQ9 = Depressed | Average change in PHQ-9 scores per day in a given placement |
| Hospitalization for Overdose | Percentage hospitalizations due to overdose |
| Self-Injury without Intent to Die | Percentage of Self-Harm Forms indicating the patient did not intend to die as a result of the self-harm event |
| Self-Injury with Intent to Die | Percentage of Self-Harm Forms indicating the patient did intend to die as a result of the self-harm event |
| Severe Self-Injury | Percentage of Self-Harm Forms indicating the injuries required significant medical services |
| Self-Injury with Lethal Method | Percentage of Self-Harm Forms indicating the patient used a lethal method to inflict self-harm |
| Suicide | Percentage of Self-Harm Forms indicating the self-harm event resulted in death |

Overall it appears that despite several changes CDCR made to programing and operations, after controlling for changes in population size, age, and MH LOC, most negative outcomes (e.g., Suicide, Self-Injury, RVRs) occurred less frequently than we expected. Each outcome is discussed in more detail below.

## 4. CDCR Findings

The demographic information about the population during the two observation periods provides some key insights. After adjusting for the overall decrease in incarcerated individuals during COVID-19, the demographic composition of the population did not markedly change. Only slight shifts were noted when comparing the two timeframes (pre-COVID-19 and COVID-19).

The proportion of 50 to 69 year-olds increased by 2%, the proportion of Black and Hispanic inmates increased by 1%, the proportion of Custody level II and IV inmates increased by 1% and

2%, respectively, and the proportion of EOPs and Inpatients both grew by 1%. Conversely, the proportion of under 30 year-olds fell by 2%, the proportion of inmates classified as White reduced by 1%, the proportion of Custody level I inmates decreased by 2%, and the GP population proportion fell 2%. Overall, however, the two groups (Pre-COVID-19 and COVID-19) appeared demographically similar from one period to the next.

### A.  Treatment Continuity and Access to Care During the COVID-19 Pandemic

The following information pertains to patient movement and different aspects associated with access to care, as well as continuity of care for patients at the mainline EOP LOC, compared across the two periods of time. These issues are grouped together because they represent factors associated with treatment and the stability of both the patient's living and treatment settings.

There was a 65% reduction in Prison arrivals (inmates' movement into the prison system either from county jails or from those being returned from parole). Similarly, there was a 51% total reduction in Program arrivals (movement within an institution). This is significant because it afforded an opportunity to evaluate various outcomes in a more stable population.

During this time, patient referrals higher levels of outpatient MH care (CCCMS and EOP) were 43% less than expected. Likewise, the referral and movement of patients from outpatient to inpatient MH care were 37% less than expected. Looking at the rate of movement to lower levels of outpatient care, a 45% fewer patients were referred than expected. While reduced referrals to higher levels of care may be a positive indicator of patients' MH (suggesting a reduced need for HLOC), that inference would need to explain a similar reduction found in reduced referrals to lower levels of care.

Timely access to MH appointments with Primary Clinicians and Psychiatrists decreased during COVID-19 (Timely MHPC patient-weeks -11% and Timely MHMD patient-weeks -3%). While this is concerning, as it suggests patients were being seen past the timeframes more often than they had been seen during the pre-COVID-19 period, it is not surprising considering the unusual circumstances created by COVID-19. This finding highlights a reduced ability to deliver some MH contacts on time. Additionally, an encouraging finding indicates continuity of MH care to the same population (mainline EOP) increased (Primary clinician continuity +12% and Psychiatrist continuity +46%).

Another concerning but not surprising finding was a 25% decrease in MH treatment hours offered to patients during COVID-19. During this time, several efforts to ensure staff and patient safety associated with slowing the COVID-19 pandemic spread within the institutions were implemented. Notably, CDCR halted all visiting, retained patients at their current institution regardless of changes in the MH LOC (except in emergency circumstances), and most out-of-cell activities were either halted or were severely restricted. While total hours of MH treatment being offered decreased, the total amount of treatment refused by patients was 31% less than expected.

Case 2:90-cv-00520-KJM-SCR  Document 7632  Filed 06/14/22  Page 471 of 625
Case 2:90-cv-00520-KJM-DB  Document 7681-6  Filed 06/14/22  Page 142 of 228
California Department of Corrections and Rehabilitation          Statewide Mental Health Program

B. Change in Behavioral Outcomes during COVID-19

CDCR reports changes in rates of MH outcomes during the COVID-19 pandemic as a percentage of the expected rate. Rates of MH outcomes are organized by category type: RVRs, MH Referrals, Depression, Hospitalization for Overdose, and Self-Injury and Suicide.

*Rules Violation Reports (RVRs)*

The rates of Serious RVRs were 32% less than expected CI [-34%, 30%]. The Serious RVRs analyzed fell into three sub-categories: Violent RVRs, Drug-Related RVRs, and Indecent Exposure (IEX). Violent RVRs include: Assault, Attempted Murder, Murder, and Battery. Drug-Related RVRs include 19 types of RVRs specific to drug-related charges associated with various types of use, possession, and trafficking. IEX RVRs are exclusive to the specific charges associated with IEX behavior. Two of the three RVR sub-categories showed lower than expected rates during the COVID-19 timeframe.

The largest difference was observed with Violent RVRs, which was 39% less than expected CI [-42%, -37%], while Drug-Related RVRs were 23% less than expected CI [-27%, -20%]. The only category of RVRs that essentially showed no difference between observed and expected was for IEXs (0% CI [-10%, +11%]). In general, this suggests a reduction in maladaptive behavior during COVID-19. However, the extent to which this is attributable to a shift towards pro-social behavior, positive decision-making, and other healthy or adaptive outcomes is unclear. The unexpected shift may be related to decreased means and opportunity during COVID-19, which may explain why IEX behavior remained essentially unchanged. Additionally, there may be a more complicated relationship between reduced patient movement, fewer RVRs, and the significant changes made to the delivery of MH services (e.g., expansion of telehealth and increased continuity of care). More analysis is needed to clarify the relationship, if any, between these variables.

*Mental Health Referrals*

Any inmate (including GP) can be referred for MH services at any time. All staff are encouraged to refer a patient if they have concerns about a patient's mental stability. A MH referral triggers an evaluation by a qualified MH clinician. The referrals fall within three categories: Emergent, Urgent, or Routine. The frequency of referrals during COVID-19 reduced significantly. Emergent MH Referrals were 29% less than expected CI [-30%, -28%], Urgent MH Referrals 11% less than expected CI [-13%, -10%], and Routine MH Referrals 8% less than expected CI [-9%, -8%].

Lower than expected MH referrals during COVID-19 appears to be consistent with other findings. Related research indicates MH visits decreased in many settings during COVID-19. While the cause is unclear, this finding is also consistent with related results found in the Sustainable Process audit and the Regional Review of LOC decisions analyzed during COVID-19. (Hoyer, C. et al., 2020, and Gonçalves-Pinho, M. et al., 2020). As discussed previously, daily rounding was initiated at several institutions during COVID-19 to ensure that patients had

continued access to providers and had their MH needs addressed. The increased frequency of patient contacts through daily rounding may have contributed to the reduced number of referrals, as symptoms could have been recognized and addressed earlier in the process.

### *Depression*

The behavior outcome "PHQ9 = depressed" was measured by the Patient Health Questionnaire 9 (PHQ9). The PHQ9 is a multipurpose instrument for screening, diagnosing, monitoring, and measuring the severity of depression. The PHQ9 is used first as a baseline measure, typically at the start of MH treatment. Then the PHQ9 is periodically completed again by the patient and compared to the baseline measure, to measure treatment progress. During COVID-19, the frequency of PHQ9s completed by patients increased 7%, yet the number of patients assessed as "Depressed" by this instrument was 31% less than expected CI [-34%, -28%]. This finding is inconsistent with some research showing depression symptoms in the US increased 3-fold during COVID-19.[41] However, it is consistent with related research indicating resilience is more common than pathological outcomes during mass traumatic events. While this report can offer analysis showing self-reported symptoms of depression decreased during COVID-19, it cannot offer conclusive data to explain why it decreased.

### *Hospitalization for Overdose*

Drug overdoses, as measured by hospitalization for overdose, were 33% less than expected CI [-38%, -28%] during COVID-19. Like other findings indicating a decrease in many negative outcomes during COVID-19, fewer hospitalizations for overdose may be related to decreased movement, reduced demand for MH services, cancelled in-person visitation (which had served as a primary entry point for illicit substances), and increased resilience during the COVID-19 pandemic. An additional variable to consider is the impact of the ISUDT program.

In the summer of 2019, CDCR and CCHCS implemented comprehensive enhancements to better treat substance use disorder (SUD) among the state's prison population. This program, which officially kicked off January 21, 2020, with the screening of eligible individuals, quickly exceeded first quarter goals. Accomplishments included providing quick-screen assessments to an established percentage of the population, increasing the number of participants receiving Medication Assisted Treatment (MAT), training counselors for revised Cognitive Behavioral Interventions (CBI) and bringing Methadone treatment in-house at certain qualifying institutions.

However, ISUDT was extremely impacted in early March due to the COVID-19 pandemic, as were all CDCR and CCHCS operations. Regardless, CDCR continued to roll out critical SUD treatment as safely as possible. Given the treatment population ISUDT aims to serve, additional research is needed to determine the relationship between this treatment program and reduced hospitalizations for overdose during COVID-19.

*Suicide and Self-Injury*

The frequency of suicide pre-COVID-19 versus COVID-19 was 35% less than expected CI [-61%, -8%]. The annual suicide rate in CDCR in 2020 was 27.3 deaths per 100,000 incarcerated individuals, based on 31 suicides. The 2020 rate was the first decrease after five straight years of increase. The rate reached 30.3 in 2019, the highest since 1985.

The category of self-injury encompasses four different types of self-injurious behavior, which include self-injury *with* intent to die, self-injury *without* intent to die, severe self-injury, and self-injury with lethal method.[62] Three self-injury categories had lower than expected rates during COVID-19 (Self-injury with intent to die -20% CI [-27%, -13%], Severe self-injury -22% CI [-35%, -9%], and Self-injury with a lethal method which -14% CI [-23%, -6%]). Of concern, the final category of self-injurious behavior without intent to die was 14% higher than expected CI [+10%, +17%] during COVID-19.

While a reduction of suicide and self-injurious behavior is a positive sign, the reason for the decline is not fully understood. Most of these findings echo other research and findings that suggest a reduced need for services during COVID-19. However, the increase in self-injurious behavior *without* intent to die raises questions. Is this increase measuring the patients that did not intend to die, but used self-injury to affect a change in physical environment? While reduced movement may be ideal for treatment, for some patients, being isolated or in an environment they dislike is a negative, and they could use self-injurious behaviors to try and get out of the environment. Alternatively, this increase could be highlighting another variable. Some patients are known to use self-injury (*without* intent to die) as a maladaptive tactic to control and provide relief from profound emotional distress. There is likely a complex correlation between decreased movement, types of self-injury, and suicide. A more specific analysis is needed to help CDCR understand why the most serious forms of self-injury and suicide decreased during COVID-19, while self-injury *without* intent to die increased.

## 5. Lessons Learned from Decreased Movement and Maintaining Continuity of Care

Decreases in patient movements of all types were noted during the COVID-19 pandemic. This resulted in a vastly more stable population, as individuals were not constantly being introduced to, or moved within, the system. In other words, individuals did not have to personally adjust to changes in their environments, and environments did not have to adjust to movements of individuals. The impact on the prison culture appears to have been significant.

Continuity of care increased for a small subset of the total prison population. However, there was a decrease in the actual amount of treatment hours offered and the timeliness with which providers saw their patients. At the same time, the subjective level of distress observed within the populations as reflected by patients being referred for MH emergencies, referrals to higher

---

[62] These categories are not mutually exclusive, since some acts of self-harm may include multiple categories. Accordingly, this is a known limitation of the current analysis, whereby substantial overlap may have skewed the results. Based on these findings, subsequent analysis should examine the extent of overlap for each variable.

California Department of Corrections and Rehabilitation                    Statewide Mental Health Program

levels of care, and measured levels of depression, observed occurrences of self-harm with intent to die, and suicide was less than expected.

As individuals and their environments remained stable, a co-occurring decrease in expected negative outcomes associated with crime, depression, drugs, self-harm, and suicide was also observed. The connection between a stable environment with consistent healthcare staff and positive outcomes seems logical. The outcome data from this report shows a number of promising findings to support that logic, but cannot conclusively prove a connection between reduced movement, continuity of care, and positive outcomes.

In short, a more stable population marked by less movement occurred during the same time that the population was less distressed in terms of both emotion and behavior. Perhaps the most promising indicator of this was that suicide was 35% less than expected.

Multiple factors may be relevant including that because of decreased visitation, there were likely decreased amounts of illicit drugs circulating in the prison. Perhaps there was also decreased opportunity for patients to exchange drugs with each other in the yard, and decreased opportunities for fighting because of less movement and reduced time outside of their cells. It is also possible that existential life-threats focused patients' attention on staying alive (rather than on their MH symptoms) given the literature about psychological changes following a mass traumatic event. No doubt there are multiple other possible factors, but it is also true that decreased movement created opportunities for beneficial continuity of care and the COVID-19 pandemic created opportunities to utilize telepsychiatry more efficiently.

California Department of Corrections and Rehabilitation                    Statewide Mental Health Program

# V.    NEXT STEPS

### 1.  Telehealth

CDCR's recommendation to continue telework as appropriate is broadly supported by ongoing efforts to analyze the data collected during the COVID-19 pandemic, to define and examine patient outcome measures, to survey patient and staff satisfaction, and to measure potential limitations of the telehealth delivery of care. Fundamental changes in the identification of telepsychiatrists versus onsite psychiatrists are being built into the EHRS to help analyze outcome measures. Various data measures captured during the COVID-19 pandemic are currently in the lengthy process of being mapped and validated so they can be easily accessed and studied.

The overall success of the expansion of telehealth services to psychologists and social workers naturally leads CDCR and many other health care organizations to think about ways to expand telemental health services as appropriate and in areas that are needed. Perhaps a small telemental health response team can be coalesced for deployment to hot spots with critically low staffing. A response team can help avoid potential burn out of the remaining institutional staff by helping onsite recruitment and overall efficacy of patient care. Telemental health can expand to areas where CDCR does not currently provide these services, such as Fire Camps, which will allow stable MH patients the opportunity to participate in skill-building programs instead of being excluded as they currently are. Specialized treatments like Dialectical Behavioral Therapy and PTSD treatment have the potential to expand via telemental health services much like the Integrated Substance Use Disorder Treatment program.

The COVID-19 pandemic offered the opportunity to introduce video visits to inmates and their families and the development of anger management modules for a tablet pilot program. Beyond the COVID-19 pandemic, persistent staffing and space challenges may benefit from technological innovations to increase inmates' family involvement and inmate patients' access to MH care services such as inter-institutional groups and in-cell MH appointments for patients with limited mobility. Other innovative solutions such as tablet devices that enable direct messaging from patients to their doctors, completion of self-assessments and scales, and complementary services like learning materials, skill-building courses, and relaxation techniques may be beneficial additions to overall MH treatment.

Moving forward, CDCR, along with other health care systems, will have emergency plan for another pandemic, plan for what happens if the pandemic becomes controlled as well as what happens if it becomes episodic, resulting in a series of sporadic and regional quarantines. Health care systems are working on capturing data now to understand current lessons learned to be prepared for similar future situations. Telehealth services should not replace traditional in-person treatment. However, telehealth can provide quality access to care in locations that are typically difficult to staff. Continuity of care can be maintained as resources are less strained, and patients can access programming in areas that they would typically be unable to

California Department of Corrections and Rehabilitation                    Statewide Mental Health Program

participate in because of the lack of services at those locations. Therefore, the following are recommendations for CDCR's future use of telehealth:

- CDCR should allow telework from home for telepsychiatrists indefinitely.

- CDCR should develop an operating procedure for telehealth services provided by psychologists and social workers, which incorporates materials developed for implementation during the COVID-19 crisis.

- CDCR should assess other potential areas that could benefit from telehealth services (i.e., Fire Camps where trauma services and brief interventions are not currently offered, understaffed or inconsistently staffed institutions, and any future institutions suffering from an outbreak or other crisis).

- CDCR should consider tablets with built in skill building courses and relaxation programs that can augment the provision of one-on-one care by telehealth and onsite providers.

- Further outcome measures to gauge the efficacy of telehealth services could be beneficial to improving and providing quality care.


## 2. Continuity of Care Within Mental Health Services


While the current findings offer some promising insights, it also generates more questions for research. Benefitting from the current analysis, CDCR is now positioned to ask better questions. For example, this analysis was not designed to measure causative factors that could explain why MH outcomes did not seem to worsen. Some hypotheses may include possible decreased drug availability and drug use changes, decreased violence, decreased gang activity and patients less exposed to threat, patients maintaining in a stable peer group, and/or frequency of visits with the same psychiatrist, psychologist, custodial officer, nurse, and many others. Over time, relevant issues need to be researched, such as changes in drug use or availability, violence, or continuity of care in the prison setting. Many of these are difficult to measure, but may be relevant.

Moving forward, it will be important to compare data on relevant factors as movement opens and restrictions associated with COVID-19 ease. With the Roadmap to Reopening, CDCR will gradually return to pre-COVID-19 pandemic operations. Carefully monitoring this transition and replicating CDCR's analysis with a post-COVID-19 timeframe will offer important insights. Additionally, there is enough evidence to begin discussing ways to maintain stable environments within CDCR's systems. These discussions must reflect CDCR's emerging understanding of how movement within the system may be an inherently destabilizing force. To that end, it will be important to identify ways to facilitate therapeutic and rehabilitative efforts, while simultaneously maintaining the stability of the environments within which they occur. This is critical, not just for the individuals within those environments, but also for the environments themselves.

There are several possibile options to facilitate therapeutic and rehabilitative efforts, while maintaining the stability of patient environment. One would be to house EOP patients who

California Department of Corrections and Rehabilitation                    Statewide Mental Health Program

have demonstrated a pattern of positive programming behavior together. Another would be reducing the movement associated with changes in outpatient LOC (for example, when they are transferred to CCCMS). This should result in better outcomes for those patients. This may result in more facilities offering more LOCs, so that EOP patients could transition back and forth without total disruption of the non-MH aspects of their lives. Keeping EOP patients on the same yard as much as possible can provide stability for job assignments, peer groups, etc., but would require a potential increase in the number of EOP programs to accommodate the various housing requirements. A benefit of this would be to have transitional groups which carry the patient through a LOC change, creating continuity on both sides of the treatment programs. Since the goal is to improve overall individual stability and rehabilitation, it is incumbent upon CDCR to consider new ways such as these to achieve these goals.

### 3. Effecting Change

As with most large organizations, over the years CDCR has incorporated a series of assumptions into the best practices and improvement goals that they try to achieve. These assumptions are even more difficult to challenge or re-evaluate due to the involvement in the court system, where any change must be submitted through an extensive review process and multiple parties must come to a compromise. This often leads to existing beliefs becoming even more firmly cemented, as the standard for change is higher than the standard for setting the conjectures in the first instance. CDCR and the court system as a whole have assumed that all of the treatment choices made in the last few decades are responsible for any positive outcomes in the patient population. When CDCR was forced to make drastic changes to many operations and policies due to COVID-19, the expectation following that assumption would be that patient outcomes would drop precipitously; that did not occur. There are many specific changes to consider such as prioritizing continuity of care over other transfers to different facilities, a wider acceptance and use of telehealth services, and a more flexible approach to policy changes in general. This may require a fundamental re-think in the organization's approach, but the benefits to the patient population could be comparably immense.

California Department of Corrections and Rehabilitation            Statewide Mental Health Program

# VI.    REPORT CONTRIBUTORS

Dr. Amar Mehta
Deputy Director

Dr. Steven Cartwright
Assistant Deputy Director

Ms. Laurie Ball
Associate Director (A)

Dr. Chris Cornell
Mental Health Administrator

Dr. Michael Hewitt
Mental Health Administrator

Dr. Travis Williams
Mental Health Administrator

Dr. Michael Golding
Chief Psychiatrist

Dr. Toni Martello
Chief Psychiatrist

Dr. Sophia Le
Chief Psychiatrist

Dr. Andrew Stoner
Chief Psychologist

Dr. Yanira Servin
Chief Psychologist

Dr. Allen Nodine
Senior Psychologist, Specialist

Dr. Andrea Ames
Senior Psychologist, Specialist

Dr. Ann Nicholas
Senior Psychologist, Specialist

Dr. Brian Gotterer
Senior Psychologist, Specialist

Dr. Brittany Sawyer
Senior Psychologist, Specialist

Dr. Caitlin Chinn
Senior Psychologist, Specialist

Dr. David Leidner
Senior Psychologist, Specialist

Dr. Diana Couto da Silva
Senior Psychologist, Specialist

Dr. Dina Khoury
Senior Psychologist, Specialist

Dr. Dominique Bressi
Senior Psychologist, Specialist

Dr. Kenneth Olsen
Senior Psychologist, Specialist

Dr. Mandip Grewal
Senior Psychologist, Specialist

Dr. Melissa Griffith
Senior Psychologist, Specialist

Dr. Robin Farrell
Senior Psychologist, Specialist

Dr. Shalila Douglas
Senior Psychologist, Specialist

Mr. Daniel Stebbins
Associate Health Program Advisor

Ms. Gloria Perez
Associate Health Program Advisor

Ms. Garnica, RJD Doctoral
Practicum Student

Ms. Griggs, RJD MSW Practicum
Student

Ms. Leal, RJD MSW Practicum
Student

Ms. Navin, RJD MSW Practicum
Student

Ms. Villalobos, RJD MSW
Practicum Student

1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MONICA N. ANDERSON, State Bar No. 182970
   Senior Assistant Attorney General
3  DAMON MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   NAMRATA KOTWANI, State Bar No. 308741
5  Deputy Attorneys General
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone:  (916) 210-7318
     Fax:  (916) 324-5205
8    E-mail:  Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
DAVID C. CASARRUBIAS, State Bar No. 321994
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone:  (925) 746-8460
  Fax:  (925) 746-8490
  E-mail:  PMello@hansonbridgett.com
*Attorneys for Defendants*

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14  **RALPH COLEMAN, et al.,**                    2:90-cv-00520 KJM-DB (PC)

15                              Plaintiffs,      **DECLARATION OF T. MARTELLO**
                                                 **REGARDING DEFENDANTS'**
16         v.                                    **POSITION ON TELEPSYCHIATRY**

17

18  **GAVIN NEWSOM, et al.,**

19                              Defendants.

20

21         I, T. Martello, declare:

22         1.   I am the acting Assistant Deputy Director, Psychiatric Services, for the California

23  Department of Corrections and Rehabilitation (CDCR).  I have worked for CDCR since 2017,

24  during which time I have also served as a staff telepsychiatrist, Senior Supervising Psychiatrist

25  within the Telepsychiatry Program, and Chief Psychiatrist.  I attended residency in general

26  psychiatry at New York University and am board-certified in general psychiatry and licensed to

27  practice in the state of California.  Prior to my time in CDCR, I provided care as a consult-liaison

28  psychiatrist in outpatient medical clinics and as the psychiatrist in an Intensive Outpatient/Partial

Martello Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18684149.1

1  Hospitalization Program.  I also served as the Medical Director of a Substance Use Disorder

2  treatment program.  I submit this declaration in support of Defendants' position on telepsychiatry

3  as required under the March 27, 2020 Stipulation and Order Approving the California Department

4  of Corrections and Rehabilitation's Telepsychiatry Policy (ECF No. 6539).  I have personal

5  knowledge of the statements in this declaration and could testify to them if called to do so.

6      2.  As a staff telepsychiatrist at CDCR, I was assigned to California Health Care Facility,

7  Stockton, Psychiatric Inpatient Program and later Salinas Valley State Prison Enhanced

8  Outpatient Program, and briefly served as the acting Chief Psychiatrist of the Salinas Valley State

9  Prison – Psychiatric Inpatient Unit.  I have also worked at headquarters as Chief Psychiatrist of

10  the Telepsychiatry Program.  As Chief of Telepsychiatry, my duties include managing over 101

11  staff members at six telepsychiatry hubs and ensuring that all aspects of telepsychiatry are

12  properly implemented.  I also provide psychiatric input to committees and projects under the

13  auspices of the larger mental health program.

14      3.  I am familiar with the *Coleman* court's prior orders on the use of telepsychiatry,

15  specifically the October 10, 2017 order, the  July 3, 2018 order (ECF No. 5711), and the

16  September 20, 2018 order (ECF No. 5928).

17      4.  CDCR began to implement the provisional telepsychiatry policy, Exhibit A to the

18  March 27 order, on August 25, 2020.  (ECF No. 6833-1.)   CDCR followed the provisional

19  telepsychiatry policy for the eighteen-month provisional period and continues to follow the policy

20  pending further revisions to the policy as outlined in the dispute resolution process under the

21  March 27 order.

22      5.  As a result of CDCR's successful use of telepsychiatry under the provisional policy,

23  including the delivery of mental health care to patients at the Enhanced Outpatient Program

24  (EOP) level of care, and lessons learned regarding the use of telehealth and telepsychiatry as a

25  result of conditions in institutions during the COVID-19 pandemic, it was clear that CDCR

26  needed to propose revisions to the provisional telepsychiatry policy.

27      6.  I have met regularly with Deputy Director Amar Mehta since I became Chief of the

28  Telepsychiatry program in July 2020. I have worked closely with Dr. Mehta, discussing the

2

Martello Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18684149.1

1    overall quality of care provided by telepsychiatry, reviewing staffing such as the hiring and

2    placement of telepsychiatrists, addressing any issues that arise such as concerns raised by

3    institutions and providers, coordinating special efforts such as telework from home, and

4    continually planning and implementing quality improvement initiatives.

5         7.   Individual practitioners may prefer treatment styles that suit them individually, and

6    such providers can choose to apply to work on-site at an institution, or to work in the separate

7    department of telepsychiatry.  But professional preferences do not outweigh the overwhelming

8    and uncontroverted evidence in the psychiatric community that telepsychiatry can be effectively

9    used to treat patients at every level of care.  Such professional preferences likewise do not

10   outweigh the overwhelming evidence that telepsychiatry is successfully used in CDCR to treat

11   *Coleman* class members at every level of care.

12        8.   CDCR follows, and the revised telepsychiatry policy reflects, the guidance provided

13   by the American Psychiatric Association, the American Telepsychiatric Association, and the

14   National Commission on Correctional Health Care on telepsychiatry.

15        9.   As part of CDCR's analysis of telepsychiatry and to confirm that telepsychiatry is

16   widely accepted as a modality to deliver mental health care to incarcerated persons, Dr. Mehta

17   and I developed a survey to find out whether and how our mental health colleagues in other

18   correctional systems use telepsychiatry.  We had respondents from 35 state department of

19   corrections, operating 31 prisons, 6 jail systems, and 3 detention facilities.  All but one of the

20   departments use telepsychiatry, and the one that answered "no" is planning to implement the use

21   of telepsychiatry.  The responses confirmed that telepsychiatry is used in correctional settings to

22   deliver mental health treatment to incarcerated persons and that it has been a modality they have

23   used for many years:  7 have used telepsychiatry for over ten years; 11 have used telepsychiatry

24   for five to ten years; 8have used telepsychiatry for three to five years; and 7 have used it for less

25   than three years.    The respondents indicated they use telepsychiatry to treat the following patient

26   populations:

27        •    27 provide outpatient treatment

28        •    20 provide partial hospitalization and day treatment

3

Martello Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18684149.1

1    •     14 provide short term inpatient treatment

2    •     12 provide long term inpatient treatment

3    •     4 provide emergency treatment and after-hours and weekend coverage for suicide risk

4    assessments and assessment for transfer to crisis management

5           10. Under the revised telepsychiatry policy, CDCR telepsychiatrists follow the same

6    professional and ethical standards and carry out the same duties and functions as on-site

7    psychiatrists.

8           11. I am familiar with CDCR's Lessons Learned report from management of mental

9    health care during the COVID-19 pandemic, and participated in drafting the sections on the use of

10    telehealth.  The Lessons Learned report confirmed what we already know about the benefits to be

11    gained from telepsychiatry, including that: telepsychiatry is an effective way to provide treatment

12    to patients at all levels of care and to increase access to care in the midst of staff shortages;

13    psychiatric medications can be effectively monitored via telepsychiatry; and both patients and

14    providers are generally satisfied with telepsychiatry. In fact, the opportunity to provide services

15    via telepsychiatry during the COVID-19 pandemic contributed to quality of life and job

16    satisfaction and ultimately led to increased recruitment and retention of psychiatrists in CDCR.

17    The Lessons Learned report demonstrates that expanded use, even by traditionally on-site

18    providers, did not result in an increase in negative outcomes associated with this modality.

19    Indeed, without this modality, the provision of psychiatric care would have been impossible to

20    guarantee, as was evident in the community at large during COVID.

21           12. The use of telepsychiatry for more than a decade has assisted CDCR in filling

22    allocated staffing positions, as reflected in the monthly psychiatry vacancy reports.  Many articles

23    and studies regarding the use of telepsychiatry note the increased access to psychiatric services

24    that result from its use, especially within underserved populations throughout the community.

25           13.  In a number of telepsychiatry guideline publications, rapport building is recognized as

26    a potential challenge of telepsychiatry, though not considered a contraindication.  Knowing this,

27    the telepsychiatry program has been deliberate in selecting for telepsychiatrists who acknowledge

28    the importance of teamwork and demonstrate an ability to work well with others.

4

Martello Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18684149.1

14.  Telepsychiatrists engage with their on-site team members as part of the interdisciplinary treatment teams (IDTT) for their patients.  Telepsychiatrists are also readily available by video, phone, or chat.  They regularly speak with other team members outside of interdisciplinary treatment team meetings for curbside consults, to express a concern or recommendation about a patient, or to discuss other matters relevant to the provision of care on their shared yard. Additionally, telepsychiatrists regularly speak with other staff members such as escort officers, gather crucial information on the patient and the environment from their telepresenters, and can be taken cell front through telepresence where they can observe the common areas and the cells of their patients.  When taken into the building, it is not uncommon for other inmates in the day room to recognize their doctor and address them in an impromptu fashion.  The extent of their interaction is comparable with the expectations of on-site psychiatrists, who have patients brought to their office by escort officers throughout the day. Engagement with other aspects of the institution are largely dependent on the individual physician, rather than whether they are on-site or telepsychiatrists.  There is no systemic evidence to support that multi-disciplinary interaction is hindered by telepsychiatry specifically, as compared to on-site psychiatrists.

15. In my professional opinion, and as the Chief of Telepsychiatry, telepsychiatry is an appropriate modality to deliver mental health treatment to the *Coleman* class and telepsychiatry brings efficiency to delivery of mental health care in a prison environment.

16. As part of my analysis of the continued merits and justification for the use of telepsychiatry in CDCR, my team and I conducted a thorough literature review that overwhelmingly shows that telepsychiatry is considered an effective and efficient means of providing psychiatric care to many populations, including incarcerated persons.  Attached as Exhibit 1 is a true and correct copy of the spreadsheet we prepared summarizing the literature review.  While there may be special considerations for specific patient populations, there is no evidence of absolute contraindications for the use of telepsychiatry.  In particular, telepsychiatry has been increasing as a means of overcoming geographic limitations to clinician availability, and

5

18684149.1

1   in particular, telepsychiatry has increased access to treatment for remote and underserved

2   populations, including correctional settings.

3        I declare under penalty of perjury under the laws of the United States of America that the

4   foregoing is true and correct.  Executed in Sacramento, California on June 30, 2022.

5                                        /s/ T. Martello
6                                        T. MARTELLO, M.D.
                                          *(original signature retained by attorney)*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        6

Martello Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18684149.1

# Exhibit 1

| Citation (APA) | Year | Telepsychiatry Setting | Summary | Conclusion |
|---|---|---|---|---|
| Brodey, Benjamin B., et al. "Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation." Psychiatric Services 51.10 (2000): 1305-1307. | 2000 | Corrections | 43 forensic psychiatric inpatient inmates in large urban jail seperated into two groups: Forensic psychiatric interview in person and via interactive video. Same psychiatrist evaluated in person and remote. Used Brief Symptom Inventory and GSI. Evaluated comparison of forensic patients' satisfaction with remote psychiatry services. **Result**: no difference in overall patient satisfaction between in person and remote psychiatry services (less than 0.5 difference on 1 to 5 scale) | No overall difference in patient satisfaction. |
| Zaylor, Charles, Pamela Whitten, and Charles Kingsley. "Telemedicine services to a county jail." Journal of Telemedicine and Telecare 6.1_suppl (2000): 93-95. | 2000 | Corrections | "Local and county jails rarely offer telepsychiatry services to their inmates. We have established a telepsychiatry pilot project between the Kansas University Medical Center and the Lyon County Jail in Emporia, Kansas. A total of 264 telepsychiatry consultations were conducted with jail inmates. Of these, 70 were initial evaluations and 194 were follow-up visits; only one inmate refused to be seen . Approximately one-third of all inmates were seen for psychiatric consultation within one week of their incarceration and 68% were seen within one month of incarceration. In conclusion, telepsychiatry appears to be a reasonable solution to the problem of limited access to psychiatric care that some rural jails experience." | "Moderately to severely ill inmates with a broad range of psychiatric illness can be seen and treated effectively using videoconferencing; and the technology was accepted by the jail personnel and the inmates alike and integrated into the jail's routine in terms of the delivery of psychiatric care." |
| Zaylor, C., Nelson, E. L., & Cook, D. J. (2001). Clinical outcomes in a prison telepsychiatry clinic. Journal of Telemedicine and Telecare, 7(1_suppl), 47-49. | 2001 | Corrections | The effectiveness of a prison telepsychiatry service was evaluated from a user perspective. Forty-five inmates (41 male, 4 female) completed the Symptom Rating Checklist-90-Revised (SCL-90-R) on three occasions, once before the teleconsultation and twice during treatment. The psychiatrist completed the Clinical Global Impression Scale—Severity Index (CGI) after each teleconsultation. | Telepsychiatry is an effective means of delivering mental health services to the prison population. |
| Larsen, Debra, et al. "Prison telemedicine and telehealth utilization in the United States: state and federal perceptions of benefits and barriers." Telemedicine Journal & e-Health 10.Supplement 2 (2004): S-81. | 2004 | Corrections | "The purpose of the present study was to fill the void of limited information on telemedicine and telehealth utilization in corrections by reporting the utilization patterns in telemedicine programs in state and federal correctional facilities throughout the United States by interviewing administrative staff from different federal and state correctional settings." **Results**: "52% of states correctional institutions and 39% of federal institutions are using some sort of telehealth or telemedicine programs. Of the remaining 24 states, 20 were offering some form of non medical video conferencing. Data at the county level was not available. The most common barriers cited were costs of technology, resistance from medical personnel, lack of staff technical expertise, and difficulties coordinating services." | Telepsychiatry is increasingly used nationwide in correctional settings |
| Leonard, S. (2004). The development and evaluation of a telepsychiatry service for prisoners. Journal of Psychiatric and Mental Health Nursing, 11(4), 461-468. | 2004 | Corrections | "Telepsychiatry is one strategy to improve the accessibility and quality of mental health care in the prison setting. This paper firstly reviews the current prison health care system and then describes a research study which is focused on the development and evaluation of a telepsychiatry service for prisoners. This study has investigated what is lost or gained in a psychiatric assessment when it is conducted via telepsychiatry. The researcher compared the inter-rater reliability between two raters interviewing 80 participants in an observer/interviewer split configuration in telepsychiatry and same room settings. The measure used was the Comprehensive Psychopathology Rating Scale. Prisoners and prison staff also took part in semi-structured interviews which focused on their satisfaction and acceptability of the telepsychiatry service. A cost comparison of the telepsychiatry service with the existing visiting service was conducted." | Telepsychiatry decreased wait times and improve follow-ups. |
| Leonard, Sarah. "The successes and challenges of developing a prison telepsychiatry service." Journal of telemedicine and telecare 10.1_suppl (2004): 69-71. | 2004 | UK Prisons | "The successes and challenges of developing a prison telepsychiatry service (UK). In adopting a collaborative approach to health-care delivery in prisons in UK, it is clear that there are barriers which will need to be overcome. Prisons have highly restrictive regimes and staff are often faced with time constraints. The present period of prison health reform offers challenges to an already overburdened and poorly resourced NHS. In recent years the NHS has been looking at new ways of delivering health services to those who require them. The increasing adoption of information and communications technology has been instrumental in forming new kinds of services. This is evident in the development of services such as NHS Direct. In other countries such as Australia and the United States, the use of technology to support health-care delivery has been much more extensive. This has partly been prompted by the large distances that separate patients from health services. In the United States, telehealth has been used within the correctional system to deliver equitable health-care to prisoners. Many US prison systems have well developed prison telehealth services which operate regular clinics. Telehealth may provide the only regular access to specialist health-care." | "Despite some initial challenges the telepsychiatry service was successfully established and underpinned by a research study, which has produced favorable outcomes. The results of the service evaluation suggest that videoconferencing can provide a reliable assessment of a wide range of psychiatric signs and symptoms, and that this method of health-care delivery is both feasible and acceptable in a prison setting." |
| Myers, Kathleen, et al. "Telepsychiatry with incarcerated youth." Journal of Adolescent Health 38.6 (2006): 643-648. | 2006 | Corrections | "Incarcerated adolescents have a high prevalence of psychiatric disorders but lack psychiatrists to provide ongoing care. Telepsychiatry may provide one solution to treating this underserved population. **METHODS:** "Interactive video conferencing was used to connect a minimum security correctional facility with a regional telemedicine program. Clinical records were reviewed to examine utilization, demographics, diagnoses, pharmacotherapy, and patient satisfaction." **RESULTS:** "During the 29-month study period, 115 youth were treated using 275 telepsychiatry visits. Substance-use, behavioral, and emotional disorders were highly prevalent. Eighty percent (80%) of the youth were successfully prescribed medications. Youth expressed confidence with the psychiatrist's recommendations but expressed concerns about privacy." | "Telepsychiatry can successfully deliver services to incarcerated adolescents with a wide range of psychiatric needs. A patient-centered approach that directly assesses adolescents' satisfaction is recommended to ensure youths' optimal involvement in needed services.' |

| | | | | |
|---|---|---|---|---|
| Ax, R. K., Fagan, T. J., Magaletta, P. R., Morgan, R. D., Nussbaum, D., & White, T. W. (2007). Innovations in correctional assessment and treatment. Criminal Justice and Behavior, 34(7), 893-905. | 2007 | Corrections | "This article considers innovations in the assessment and treatment of incarcerated individuals. Scarce resources, new scientific knowledge and technology, organizational barriers, and role transformations for psychologists will guide improvements and future research in correctional mental health care, as reflected in specific areas: dimensional assessment, suicide risk assessment, neuropsychological correlates of chronic maladaptive behavior, prescriptive authority for psychologists, and telehealth." | Use of telepsychiatry improved the safety and security of the institution and staff due to decreased inmate movement and increased the availability of specialized providers familiar with the setting. |
| O'Reilly, Richard, et al. "Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial." Psychiatric Services 58.6 (2007): 836-843. | 2007 | Community    Randomized control study | **Method:** *Randomized 495 patients referred for psychiatric evaluation to telepsychiatry (N=241) vs. Face to face evaluation (N = 254). Administered Brief Psychiatric Inventory.* **Results:** "Psychiatric consultation and follow-up delivered by telepsychiatry produced clinical outcomes that were equivalent to those achieved when the service was provided face to face. Patients in the two groups expressed similar levels of satisfaction with service". | Use of telepsychiatry has been found to be efficacious, without negative impact on clinician–patient communication, rapport, or satisfaction with treatment. |
| Shore, Jay H., Donald M. Hilty, and Peter Yellowlees. "Emergency management guidelines for telepsychiatry." General hospital psychiatry 29.3 (2007): 199-206. | 2007 | Telepsychiatry Guideline Emergency Psychiatry | "Telepsychiatry is an emerging application for emergency psychiatric assessment and treatment and can improve the quality and quantity of health services, particularly for rural, remote and isolated populations... In our experience, emergency telepsychiatry can be undertaken effectively, efficiently and safely... Guidelines and protocols are suggested. Techniques of emergency telepsychiatry are relatively new and require further examination, modification and refinement so that they may be fully utilized within comprehensive mental health service systems." | "A benefit of emergency telepsychiatry is that it increases provider safety when assessing potentially dangerous patients. On several occasions, the physical distance afforded by telepsychiatry has allowed patients to express extremely strong affects that may have led the authors to terminate an encounter if in the room with the patient. Often, in these cases, once the affect has been discharged, the assessment can continue." |
| Frueh, B. Christopher, et al. "A randomized trial of telepsychiatry for post-traumatic stress disorder." Journal of telemedicine and telecare 13.3 (2007): 142-147. | 2007 | Veterans Administration Telepsychiatry and Cognitive Behavioral Therapy | **Method:** "We compared the efficacy of telepsychiatry and same-room treatment of combat-related post-traumatic stress disorder (PTSD) using cognitive behavioural therapy in 14 weekly, 90-min treatment sessions. Of 97 patients referred for study participation, 38 were randomized (17 into telepsychiatry, 21 into same-room), and approximately 25 (the number differed by instrument) had at least one post-baseline assessment. Measures of clinical and process outcomes were examined."**Results:** "No group differences were found on clinical outcomes at three month follow-up. Satisfaction with treatment ratings was similar in both groups, with 'strong satisfaction' indicated by veterans in both modalities. Attendance and drop-out were similar in the two groups. The same room group reported more comfort in talking with their therapist and had better treatment adherence." | The results provide preliminary support for the use of telepsychiatry in the treatment of PTSD to improve access to care. |
| Sullivan, D. H., Chapman, M., & Mullen, P. E. (2008). Videoconferencing and forensic mental health in Australia. Behavioral sciences & the law, 26(3), 323-331. | 2008 | Corrections Australia | "Videoconferencing is in common use in Australian forensic mental health services. It provides opportunities to link remote prisons, courts, and psychiatric clinics with distant specialist services, and enables a range of activities including assessment, treatment and feedback, expert testimony, education, and inter-service planning. These functions are acceptable to patients and clinicians, and in Australia videoconferencing minimizes disruption to small services and their patients, who might otherwise face lengthy journeys. In particular, marginalized patient groups, including indigenous people and prisoners, may receive better services. The evidence base supports use of videoconferencing despite a number of practical, legal, and clinical issues that may reduce its effectiveness compared with face-to-face assessments. Videoconferencing technologies are critical to effective forensic mental health services in Australia." | Telepsychiatry is accepted and common in Australia |
| Antonacci, Diana J., et al. "Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: implications for forensic and correctional psychiatry." Behavioral sciences & the law 26.3 (2008): 253-269. | 2008 | Corrections and others Literature Review | "This article reviews empirical evidence on the use and effectiveness of videoconferencing in providing diagnostic and treatment services in mental health settings that serve child, adolescent, and adult populations. Descriptive reports, case studies, research articles, and randomized controlled trials related to clinical outcomes were identified and reviewed independently by two authors. Articles related to cost-effectiveness, technological issues, or legal or ethical aspects of telepsychiatry were excluded. The review of the evidence broadly covers mental health service provision in all settings, including forensic settings." | Telepsychiatry has steadily been increasing as a means of overcoming geographic limitations to clinician availability. |
| Morgan, Robert D., Amber R. Patrick, and Philip R. Magaletta. "Does the use of telemental health alter the treatment experience? Inmates' perceptions of telemental health versus face-to-face treatment modalities." Journal of Consulting and Clinical Psychology 76.1 (2008): 158. | 2008 | Corrections | "Although telemental health presents an efficient treatment modality for a spectrum of mental health services, it is imperative to study how this modality influences key elements of the treatment experience. **Method:** Participants consisted of 186 inmates who received mental health services (36 via telepsychology, 50 via face-to-face psychology, 50 via telepsychiatry, and 50 via face-to-face psychiatry). **Results:** There were no significant differences between telemental health and face-to-face delivery modalities for perceptions of the therapeutic relationship, post session mood, or general satisfaction with services." | Telemental health appears to offer an efficient means of service delivery without a loss in the quality of the therapeutic relationship. |
| Yellowlees, Peter, et al. "Emergency telepsychiatry." Journal of telemedicine and telecare 14.6 (2008): 277-281. | 2008 | Emergency | "Telemental health services (similar to telepsychiatry where mental health services are provided by a licensed mental health professional rather than a psychiatrist) were successful in alleviating overcrowding due to excessive lengths of stay, and reduced unnecessary admissions for psychiatric patients. Psychiatric patient stay in the ED was reduced from an average of 4.2 days to less than one day for more than 80% of the participants screened via telemental health." | "Emergency telepsychiatry delivered by videoconferencing has the potential to improve patient care in many settings. Although experience is limited, it has been found to be safe and effective, as well as satisfactory to both emergency department (ED) staff and psychiatric patients treated." |
| Khalifa, N., Saleem, Y., & Stankard, P. (2008). The use of telepsychiatry within forensic practice: A literature review on the use of videolink. The Journal of Forensic Psychiatry & Psychology, 19(1), 2-13. | 2008 | Corrections | Literature search of several relevant databases for reports published between 1998 and 2006 of forensic applications of telepsychiatry. | Telepsychiatry is a feasible mode of health care delivery in areas relevant to the practice of forensic psychiatry. |

| | | | | |
|---|---|---|---|---|
| Scott, C. L. (Ed.) (2009). Handbook of correctional mental health. American Psychiatric Pub. | 2009 | Corrections Textbook | **Telepsychiatry in correctional settings (page 139-140)**: "Over the past decade, the use of telepsychiatry has played a significant role in psychiatric assessments and treatment in correctional settings...Telepsychiatry in a correctional setting involves the use of adequate policy and procedures. When endorsing telepsychiatry, the institution must consider issues such as model of care (i.e., consultative vs. ongoing and single-provider treatment vs. collaborative or multidisciplinary team treatment), role and responsibilities of the telepsychiatrist and mental health staff, provision of services after hours, and inclusion of information in the medical record (Shore et al. 2007). Although the benefits of telepsychiatry appear clear, the importance of having a clinician on site should not be disregarded. The vast majority of research in telepsychiatry indicates that it is well accepted, but that does not rule out the possibility of individuals refusing the evaluation, leaving or attempting to leave the office, or making threats of self-harm or harm to others. In those cases, the presence of an on-site clinician becomes paramount because hospitalization or other changes in level of care might be required. Finally, should the inmate require involuntary hospitalization, administrative issues may become evident if the telepsychiatry provider is located in a different state and does not have the appropriate license to mandate inpatient admission. In those cases, an on-site clinician must become involved to minimize delays and ensure prompt transfer of the inmate to the appropriate site." **Page 368**: Telepsychiatry (the use of videoconferencing techniques for the provision of health-related services) has been growing in popularity in recent years, due in part to limited access to health care. This technique is particularly useful in rural counties, where limited numbers of health care professionals provide treatment to individuals over wide geographic areas. Correctional systems have started to recognize the benefits of using technology to provide health-related services, especially mental health services, to individuals who are incarcerated. A number of benefits accompany the use of videoconferencing for psychological or psychiatric consultation, including reduction in the need to transport inmates, improved overall cost, and improved access to mental health care. Ax et al. (2007) found that incarcerated individuals who used telepsychiatry did not report a difference between in-person versus videoconferenced mental health treatment sessions. Morgan et al. (2008) reported that satisfaction with telepsychiatric services depended on diagnosis, with persons with psychotic disorders reporting higher levels of satisfaction than those with affective disorders. Although use of the technology is minimal at this point, it holds some promise for the provision of services to individuals in situations where adequate care is difficult to access." | CDCR has make provisions for the possible limitations of telepsychiatry with its current policy.  There are many benefits to use of telepsychiatry. |
| Porcari, Carole E., et al. "Assessment of post-traumatic stress disorder in veterans by videoconferencing and by face-to-face methods." Journal of Telemedicine and Telecare 15.2 (2009): 89-94. | 2009 | Veterans Administration | **Methods/Results:** "Compared videoconferencing and face-to-face (FTF) assessments for veterans seeking a mental health evaluation for post-traumatic stress disorder (PTSD). The Clinician-Administered PTSD Scale (CAPS) interview was used in 20 male veterans. There were significant correlations (ranging from 0.74 to 0.92) between the CAPS administered FTF and by videoconferencing on all three subscales, as well as on the total severity score." "The patients indicated general satisfaction with the videoconferencing method. Most of them indicated that they would prefer to see a clinician FTF, but would utilize videoconferencing if there were distance barriers to services." | Overall, the results of the present study support the use of videoconferencing in the assessment of PTSD. |
| Burke Center Mental Health Emergency Center, Lufkin, Texas. "2011 APA Gold Award: A Telepsychiatry Solution for Rural Eastern Texas." Psychiatric Services 62.11 (2011): 1384-1386. | 2011 | Community/Rural | "Treated over 3000 patients from 2008-2011. 1st free standing, rural comprehensive psychiatric emergency program providing 100% psychiatric emergency care in nonhospital setting via telemedicine. Serves population of 370,000 and 11,000 square miles in 12 counties of Eastern Texas. Only 15% of patients transitioned to higher level of care.  Reduced utilization of state hospital resources by 32%. The center provides psychiatric care that would have previously resulted in an inpatient referral."After nearly three years, telemedicine has been proven to work in an emergency treatment setting with no significant shortcomings and no 'sentinel events.' Prompt access to psychiatric care via telemedicine 24/7 has proven very efficacious. Such prompt psychiatric service is rarely seen in most inpatient treatment programs." | Telepsychiatry is a viable solution to many locales around the country that face shortages in psychiatrists. |
| Kramer, Greg M., et al. "A standard telemental health evaluation model: The time is now." Telemedicine and e-Health 18.4 (2012): 309-313. | 2012 | Commentary | "This article focuses on the process and feasibility of developing a standard evaluation model to help advance the science and acceptance of the field of telemental health (TMH)." "It can be argued that the TMH field is at an evolutionary scientific phase requiring an agreed-upon standard evaluation model to drive its continued growth and acceptance. A standard evaluation model could provide several benefits. First and foremost, acceptance of a standard evaluation model is a step towards greater perception of TMH as an established field" | "Evaluation in the telemental health field largely consists of descriptive and small pilot studies, is often defined by the individual goals of the specific programs, and is typically focused on only one outcome. The field should adopt new evaluation methods that consider the co-adaptive interaction between users (patients and providers), healthcare costs and savings, and the rapid evolution in communication technologies." |
| Godleski, L., Darkins, A., & Peters, J. (2012). Outcomes of 98,609 US Department of Veterans Affairs patients enrolled in telemental health services, 2006–2010. Psychiatric services, 63(4), 383-385. | 2012 | Veterans Administration | "**Methods:** The study compared number of inpatient psychiatric admissions and days of psychiatric hospitalization among patients who participated in remote clinical videoconferencing during an average period of six months before and after their enrollment in the telemental health services.**Results:** Between 2006 and 2010, psychiatric admissions of telemental health patients decreased by an average of 24.2% (annual range 16.3%–38.7%), and the patients' days of hospitalization decreased by an average of 26.6% (annual range 16.5%–43.5%). The number of admissions and the days of hospitalization decreased for both men and women and in 83.3% of the age groups. This four-year study, the first large-scale assessment of telemental health services, found that after initiation of such services, patients' hospitalization utilization decreased by an average of approximately 25%." | Telemental health services at the VA is linked to a 1/4 decrease in hospitalization utilization. |

| Citation | Year | Setting | Details | Findings |
|---|---|---|---|---|
| Smucker Barnwell, Sara V., et al. "VA Puget Sound Telemental Health Service to rural veterans: a growing program." Psychological Services 9.2 (2012): 209. | 2012 | Veterans Administration/Rural | **Service:** Providers offer evidence-based individual and group psychotherapy and medication management. Providers at the patient care site remain available to deliver in-person assistance in case of emergency. In-home session emergencies require the provider to contact mental health authorities or police from the patient's community. Veterans are located in rural communities in Washington, Oregon, and Alaska. **Technology:** Providers possess individual CVT equipment that often consists of an inexpensive (e.g., $50–$100) Web camera with integrated microphone attached to an Internet connected computer. Software applications (e.g., Tandberg Movi™) provide the necessary security and connection for CVT calls and are relatively inexpensive. Each CBOC possesses private TMH rooms equipped with desktop CVT equipment that provides superior picture quality at higher cost (e.g., Tandberg Ex90™, $10,000). To ensure information privacy, all communication between clients and providers uses a secure transmission protocol that encrypts the data. Internet bandwidth can be as low as 350 Kb/sec for an individual CVT call or 750 Kb/sec for a group call (i.e., provider at one site; patients at another site). In-home TMH requires the Veteran to have high-speed Internet3 (e.g., broadband, LAN) and a computer with adequate memory (e.g., 512MB RAM) and processing speed. The TMH service provides the Veteran with a Web camera." | **"Biggest challenges:** Greeting telemental health patients, establishing teleconferencing connections with telemental health providers, and maintaining provider/equipment schedules. **Biggest Successes:** In FY2010, Puget Sound TMH delivered over 570 episodes of care to VA medical centers and CBOCs, and Veteran homes, saving over 30,000 miles traveled/ $13,000 in costs. Over 95% of TMH participants report satisfaction with service convenience and quality." |
| Deslich, Stacie Anne, Timothy Thistlethwaite, and Alberto Coustasse. "Telepsychiatry in correctional facilities: using technology to improve access and decrease costs of mental health care in underserved populations." The Permanente Journal 17.3 (2013): 80. | 2013 | Corrections | **Method:** Conducted a literature review, which they paired with a structured interview. **Results:** There was overall satisfaction with the use of telepsychiatry. They acknowledged the use of telepsychiatry services within CDCR and indicated "This program has increased public safety by preventing inmate transports, decreased costs associated with those transports, and increased inmate access to effective psychiatric treatment in the form of psychiatric evaluations, medication management, and crisis intervention." They found that one limitation with the use of telepsychiatry was at times related to technological challenges. **Additional Information:** Noted the use of telepsychiatry in providing services to patients in correctional settings has been expanding, and is currently in use in Arizona, California, George, Kansas, Ohio, Texas, West Virginia, New Mexico and Michigan. Also noted significant cost savings with telepsychiatry." | "The results of this review suggest that telepsychiatry has had a positive impact on mental health care in prisons by increasing access for inmates to effective psychiatric treatment and by maintaining continuity of care." |
| Hilty, Donald M., et al. "The effectiveness of telemental health: a 2013 review." Telemedicine and e-Health 19.6 (2013): 444-454. | 2013 | Various Settings<br>Literature Review | **"Method:** Literature review of telepsychiatry and psychological services and on what is and what is not effective related to telemental health. **Results:** Telemental health is effective for diagnosis and assessment across many populations (adult, child, geriatric, and ethnic) and for disorders in many settings (emergency, home health) and appears to be comparable to in-person care." | Telemental health is effective and increases access to care. |
| Southard, Erik P., Jonathan D. Neufeld, and Stephanie Laws. "Telemental health evaluations enhance access and efficiency in a critical access hospital emergency department." Telemedicine and e-Health 20.7 (2014): 664-668. | 2014 | Emergency Department | "Mentally ill patients in crisis presenting to critical access hospital emergency rooms often face exorbitant wait times to be evaluated by a trained mental health provider. Patients may be discharged from the hospital before receiving an evaluation or boarded in a hospital bed for observation, reducing quality and in creasing costs." **Materials and Methods:** "Retrospective data collection was implemented to consider patients presenting to the emergency room for 212 days prior to telemedicine interventions and for 184 days after. The study compared measures of time to treatment, length of stay (regardless of inpatient or outpatient status), and door-to-consult time." **Results:** "There were 24 patients seen before telemedicine was implemented and 38 seen using tele medicine. Significant reductions in all three time measures were observed." | Telemedicine appears to be an effective intervention for mentally ill patients by providing more timely access to mental health evaluations in rural hospital emergency departments. |
| Seidel, R. W., & Kilgus, M. D. (2014). Agreement between telepsychiatry assessment and face-to-face assessment for emergency department psychiatry patients. Journal of telemedicine and telecare, 20(2), 59-62. | 2014 | Emergency Department | **Method:** Compared psychiatrists' evaluations of Emergency Department (ED) mental health patients, assigning patients to either face-to-face in the ED or telepsychiatric evaluations. Enrolled 73 patients over 39 months. **Results:** They found no significant difference in disposition or diagnosis between the two groups. | Quality of Care Equal between in-person and telepsychiatry in ED setting |
| Kaskow, J., Felmet, K., Appelt, C., Thompson, R., Rotondi, A., & Haas, G. (2014). Telepsychiatry in the assessment and treatment of schizophrenia. Clinical schizophrenia & related psychoses, 8 (1), 21-27A. | 2014 | Literature review | "The purpose of this article is to review the studies which have examined telepsychiatric approaches in treating people with schizophrenia. **AIM:** To assess the types and nature of distant interventions for patients with schizophrenia, either telephone-based, internet-based or video-based telehealth systems. **Methods:** Search in the following databases—MEDLINE, PsycINFO, CINAHL, the Cochrane Library, the Cochrane Database of Systematic Reviews, the Database of Abstracts of Reviews of Effects, and EMBASE." | "Based on the limited data available, the use of modalities involving the telephone, internet and videoconferencing appears to be feasible in patients with schizophrenia. In addition, preliminary evidence suggests these modalities appear to improve patient outcomes." |
| Salmoiraghi, Alberto, and Shahid Hussain. "A systematic review of the use of telepsychiatry in acute settings." Journal of Psychiatric Practice® 21.5 (2015): 389-393. | 2015 | Acute Care/Community    Literature Review | **Method:** Literature review of 23 papers from inception up to 2013 for the use of telepsychiatry in the acute setting. **Results:** (1) that patients have a positive attitude toward the technology and show a high level of satisfaction with telepsychiatry, (2) that the use of telepsychiatry is correlated with decreased admissions to psychiatric inpatient units, (3) that the quality of clinical interaction in telepsychiatry is similar to that in face-to-face care, and (4) that telepsychiatry seems to be cost effective. | Quality of care comparable |

| Citation | Year | Setting | Description | Summary |
|---|---|---|---|---|
| American Psychiatric Association. Psychiatric services in correctional facilities. American Psychiatric Pub, 2015. | 2015 | Corrections Textbook | **Page 68-69:** "Telepsychiatry supplements onsite psychiatry services in many correctional settings".... "Correctional settings lend themselves well to telepsychiatry use... Studies have shown that patients who receive psychiatric services via videoconferencing have had no negative consequences and quickly adapt to the technology... Another use of telepsychiatry is observation of a patient during afterhours crises or for suspected medication side effects." "Psychiatrists and other mental health staff need selection criteria to ensure the appropriateness of patients for videoconference services. Patients who are acutely psychotic or paranoid may have difficulty being seen remotely and may be unable to give consent to participate in this treatment modality." | "Telepsychiatry is becoming a more accepted practice in correctional settings and in the community as the shortage of psychiatrists increases. Greater comfort by correctional mental health professionals with this technology increases accessibility of expeditious services for patients." |
| Trestman, Robert, Kenneth Appelbaum, and Jeffrey Metzner, eds. Oxford textbook of correctional psychiatry. Oxford University Press, 2015. | 2015 | Corrections Textbook | **Page 65:** "The use of live two-way videoconferencing to provide correctional mental health services has steadily been increasing as a means of overcoming geographic limitations to clinician availability (Antonacci, Bloch, Saeed, Yildirim, & Talley, 2008), which is a frequent problem in correctional settings. Use of telepsychiatry has been found to be efficacious, without negative impact on clinician–patient communication, rapport, or satisfaction with treatment, at least with assessment and short-term treatment (O'Reilly et al., 2003)." "An additional consideration is on-site mental health staffing. While some mental health services can be delivered effectively by video, telepsychiatry is not a substitute for on-site staff, particularly in responding to emergencies or to deliver other modalities of assessment and treatment." | Use of telepsychiatry is efficacious and supplements on site psychiatry |
| Saurman, Emily, Sue E. Kirby, and David Lyle. "No longer 'flying blind': how access has changed emergency mental health care in rural and remote emergency departments, a qualitative study." BMC health services research 15.1 (2015): 1-11. | 2015 | Emergency Department | **Background:** The Mental Health Emergency Care-Rural Access Program (MHEC-RAP) is a telepsychiatry program that was established to improve access to specialist emergency mental health care across rural and remote western NSW, Australia. **Method:** This study uses interviews with ED providers to understand their experience of managing emergency mental health patients and their use of The Mental Health Emergency Care-Rural Access Program MHEC-RAP. The lens of access was applied to assess program impact and inform continuing program development **Conclusion:** MHEC-RAP not only provided access to specialist mental health care for local ED providers, but it has changed their practice and perspective. MHEC-RAP could be adapted for implementation elsewhere. Provider experience confirms that the program is accessible and offers insights to those considering how to establish an emergency telepsychiatry service in other settings." | Telepsychiatry MHEC-RAP has not only provided access to specialist mental health care for local ED providers, but it has changed their practice and perspective. |
| Narasimhan, Meera, et al. "Impact of a telepsychiatry program at emergency departments statewide on the quality, utilization, and costs of mental health services." Psychiatric Services 66.11 (2015): 1167-1172. | 2015 | Emergency department | Between March 2009 and June 2013, there were 9,066 patients with at least one telepsychiatry visit. Of these, 7,261 had index telepsychiatry visits that the authors were able to successfully match. **Method:** Individuals treated via telepsychiatry were compared with a matched control group of individuals with mental health diagnoses who were treated in nonparticipating hospitals. Bivariate and two-part and generalized linear regression models were used to assess differences between the two groups in outpatient follow-up, hospital admission following the ED visit, length of hospital stay if admitted, and inpatient and total costs." **Results:** found that patients seen via telepsychiatry were more likely (p <0.001) to receive 30-day outpatient follow-up and less likely admitted to the hospital during the index ED visit. The combined effect of having a telepsychiatry consult during the index ED visit was a reduction of .86 days in inpatient length of stay. | "Telepsychiatry delivered in the ED through a centralized coordinated program has great promise for improving linkage with outpatient mental health services while reducing inpatient utilization and hospital costs." |
| Batastini, A. B., King, C. M., Morgan, R. D., & McDaniel, B. (2016). Telepsychological services with criminal justice and substance abuse clients: A systematic review and meta-analysis. Psychological Services, 13(1), 20. | 2016 | Corrections | "Recent years have seen the incorporation of telepsychology into poorly accessed, rural, and underserved settings, including criminal justice and substance abuse treatment. A systematic search of the literature on telepsychological and related services with justice-involved and substance abuse clients revealed numerous descriptive reports, but few empirical studies. The results of 3 studies of criminal justice participants and 2 studies of substance-abuse participants were subjected to a series of 5 outcome-specific meta-analyses (mental health symptoms, therapeutic processes, program engagement, program performance, and service satisfaction). These 5 studies, all of which utilized a comparison group, contributed a total of 342 participants and 14 total effect sizes. Summary data on 3 additional uncontrolled studies are also presented." | Results indicated that telepsychological outcomes were at least comparable with in-person outcomes. |
| Bashshur, Rashid L., et al. "The empirical evidence for telemedicine interventions in mental disorders." Telemedicine and e-health 22.2 (2016): 87-113. | 2016 | Literature Review Various Settings | "This article is the fourth in a series of in-depth literature reviews aimed at assessing the empirical evidence regarding the impact of telemedicine interventions on access, quality, and cost of care. In order to arrive at definitive conclusions, each of these reviews is focused on a set of disease manifestations as the basis for organizing and presenting the empirical evidence, which is limited to studies with sufficient statistical power (defined as samples of = or >150), robust research designs (RCT or other appropriate methodology that enables hypothesis testing), and published between 2005 and 2015. This article is focused on TMH (Telemental health). The review process consisted of an initial screening of relevant abstracts and a subsequent reading of research articles that met the inclusion criteria for final review and analysis." | "There is substantial empirical evidence for supporting the use of telemedicine interventions in patients with mental disorders." |

| Citation | Year | Setting | Details | Notes |
|---|---|---|---|---|
| Farabee, David, Stacy Calhoun, and Robert Veliz. "An experimental comparison of telepsychiatry and conventional psychiatry for parolees." Psychiatric Services 67.5 (2016): 562-565. | 2016 | Parolees | **Method:** Collected data from 71 parolees over a 6 month period. Examined *"satisfaction with treatment, therapeutic alliance, medication adherence, and psychological functioning were measured"*. Ended with 20 in telepsychiatry and 40 face to face. Offered $25 per interview. **Results:** overall satisfaction and no difference between psychological functioning or medication adherence as compared with in person telepsychiatry. They did note that patients receiving services via telepsychiatry did note a lower therapeutic alliance. | Parolees noted a lower therapeutic alliance with Telepsychiatry |
| Hubley, Sam, et al. "Review of key telepsychiatry outcomes." World journal of psychiatry 6.2 (2016): 269. | 2016 | Various Settings Literature Review | **Method:** Reviewed 452 studies of the 1976 identified and categorized them into 6 categories (satisfaction, reliability, treatment outcomes, implementation outcomes, cost effectiveness, legal issues). **Results:** "Overall, patients and providers are generally satisfied with telepsychiatry services. Providers, however, tend to express more concerns about the potentially adverse of effects of telepsychiatry on their provider rapport. Patients are less likely to endorse such concerns about impaired rapport with their provider. Although few studies appropriately employ non-inferiority designs, the evidence taken together suggests that telepsychiatry is comparable to face-to-face services in terms of reliability of clinical assessments and treatment outcomes. When non-inferiority designs were appropriately used, telepsychiatry performed as well as, if not better than face-to-face delivery of mental health services. Notwithstanding legal concerns about loss of confidentiality and limited capacity to respond to psychiatric emergencies, we uncovered no published reports of these adverse events in the use of telepsychiatry." | A large evidence base supports telepsychiatry as a delivery method for mental health services. |
| Young, Jeremy D., and Melissa E. Badowski. "Telehealth: increasing access to high quality care by expanding the role of technology in correctional medicine." Journal of clinical medicine 6.2 (2017): 20. | 2017 | Corrections | **Method:** Literature review through Jan 12, 2017. **Results:** Noted correctional establishments are located in rural, less populated areas, and lack medical specialty providers available for hire. They report "....despite the growing body of literature in support the use of telemedicine in the correctional setting, and the call for increasing the use of telehealth technologies to improve access to care for inmates ... too few centers are implementing technology-based medical care." | Need for increased use of telepsychiatry in corrections. |
| Dham, Pallavi, et al. "Community based telepsychiatry service for older adults residing in a rural and remote region-utilization pattern and satisfaction among stakeholders." BMC psychiatry 18.1 (2018): 1-13. | 2018 | Community Telepsychiatry | **Method:** "The utilization pattern was studied using retrospective chart review of telepsychiatry assessments over 24 months (2010–2011). Satisfaction was evaluated through prospective post-consultation feedback (using a 5-point Likert scale), from patients, community based clinicians and psychiatrist participating in consecutive assessments from April–November 2012." **Results:** "On retrospective review of 134 consults, mean age was 75.89 years (SD 7.55), 60.4% (81) were females, and 71.6% (96) lived independently. Patients had a broad range of psychiatric disorders, from mood disorders to delirium and dementia, with co-morbid medical illness in 83.5% (112). On feedback evaluation (N = 98), mean scores ranged from 3.88–4.41 for patients, 4.36–4.73 for clinicians and 3.67–4.45 for psychiatrists. Feedback from inpatients (14 out of 37) was significantly lower compared to outpatients (37 out of 61) (chi sq. = 0.808, p < 0.05), and they were significantly less satisfied with the wait time (U = 163.0, p < 0.05) and visual clarity (U = 160.5, p < 0.05). Audio clarity was the most common aspect of dissatisfaction (mean score less than 3) among patients (6, 11%). Psychiatrists reported a preference for telepsychiatry over face to face in 55.4% (46) assessments. However, they expressed discomfort in situations of cognitive or sensory disabilities in patients." | "Audio clarity is important for satisfactory telepsychiatry encounter. Cognitive or sensory disabilities in older adults can be a challenge in telepsychiatry." |
| Shore, Jay H., et al. "Best practices in videoconferencing-based telemental health April 2018." Telemedicine and e-Health 24.11 (2018): 827-832. | 2018 | Guidelines from ATA and APA | "This article updates and consolidates previous guidance developed by The American Telemedicine Association (ATA) and The American Psychiatric Association (APA) on the development, implementation, administration, and provision of telemental health services." | "The guidance included in this article is intended to assist in the development and delivery of effective and safe telemental health services founded on expert consensus, research evidence, available resources, and patient needs." |
| Kaftarian, E. (2019). Lessons learned in prison and jail-based telepsychia | 2019 | Corrections | This article reviews the unique benefits and challenges of implementing telepsychiatry in correctional facilities. | Telepsychiatry increased access to mental health care. |
| Smith, Katharine, et al. "COVID-19 and telepsychiatry: development of evidence-based guidance for clinicians." JMIR mental health 7.8 (2020): e21108. | 2020 | Community | **Method:** searched websites/guidelines for information on telepsychiatry. **Results:** Developed a guide for clinical use of telepsychiatry. **Additional information:** In their article, they highlighted that, while some clinicians may be hesitant to use telepsychiatry, believing it be not as effective, literature they reviewed indicated quite the opposite. "Telepsychiatry is equivalent to in-person care in diagnostic accuracy, treatment effectiveness, and patient satisfaction. Patient privacy and confidentiality issues parallel in-person care. It usesspecialty expertise effectively, facilitating patient-centered and integrated care." | Equivalent to in person care |
| O'Brien, M., & McNicholas, F. (2020). The use of telepsychiatry during COVID-19 and beyond. Irish journal of psychological medicine, 37(4), 250-255. | 2020 | COVID & Telepsychiatry | "The COVID-19 pandemic has disrupted the traditional practice of psychiatric assessment and treatment via face-to-face interaction. Telepsychiatry, the delivery of psychiatric care remotely through telecommunications technology, is an existing and under-utilised tool that may help to minimise disruption to patient care. Technological advancement is at a stage where it can facilitate widespread use of this practice; however, concerns that limited its expansion previously were not unfounded. This article discusses the use of telepsychiatry in the context of the COVID-19 pandemic." | "While telepsychiatry is a particularly apt solution to the problems posed by physical distancing measures during this pandemic, its scope for benefit existed before the current crisis and will continue long after it. The adoption of its use has been dramatically accelerated due to unprecedented need, though the move towards technology-mediated medical intervention is long established." |

| Citation | Year | Type | Quote | Summary |
|---|---|---|---|---|
| American Psychiatric Association. "The Impact of COVID-19 on Incarcerated Persons with Mental Illness." (2020). | 2020 | COVID-19 Pandemic Guidance Document | "The presence of mental illness leads to more frequent incarceration, on average, as well as longer periods of incarceration when compared to those without mental illness. The opportunities for system improvement suggested in this document, while focused on the impact of COVID-19, may have more generalized application beyond the pandemic. Issues- PwMI (Persons with mental illness) have fewer access to resources; PwMI remain incarcerated at higher rates relative to other prison populations; therapeutic groups have been canceled; access to routine care is reduced or eliminated; greatly needed admissions to psychiatric inpatient facilities are even more limited than prior to the advent of COVID-19; crowding and movement restrictions in jails and prisons may exacerbate mental illness leading to symptomatic exacerbation; access to reliable technology/wi-fi/cell phone service has been limited, affecting all who are incarcerated and work in these settings; Rapid turnover of inmates and generally reduced access to stable care in jails have been currently exacerbated; Prejudice and discrimination related to COVID-19 contagion is especially directed towards PwMI and jail and prison staff, exacerbating preexisting stigma associated with religious, ethnic, gender, and racial minority status." | Evidence to support coordinating care within facilities and significantly expanding telehealth wherever possible and clinically appropriate. |
| Spivak, Stanislav, et al. "Telepsychiatry use in US mental health facilities, 2010–2017." Psychiatric services 71.2 (2020): 121-127. | 2020 | Inpatient Mental Health | **Results:** "The proportion of state facilities that self-reported offering telepsychiatry increased significantly from 15.2% in 2010 to 29.2% in 2017, with wide variability among states. The published scientific literature on telemental health reveals strong and consistent evidence of the feasibility of this modality of care and its acceptance by its intended users, as well as uniform indication of improvement in symptomology and quality of life among patients across a broad range of demographic and diagnostic groups. Similarly, positive trends are shown in terms of cost savings." | Increased use of telehealth in inpatient facilities |
| Shore, Jay H. "Managing virtual hybrid psychiatrist-patient relationships in a digital world." JAMA psychiatry 77.5 (2020): 541-542. | 2020 | Opinion | "Certain technologies, such as telepsychiatry, are long-standing, have a robust evidence base with numerous published clinical guidelines, and have been widely deployed in practice. This virtual space is a key component of modern physician-patient relationships.  An important component of this is virtual disinhibition, the loosening of social restraints in online vs face-to-face communication. The concept of virtual disinhibition, arising from the literature examining online communication, arguably applies to all technologies. By facilitating more unfiltered communication, virtual disinhibition can enhance treatment through providing richer information on a patient's underlying state." | "Telepsychiatry is a longstanding technology with a robust evidence base and widely deployed in practice. Virtual disinhibition is a useful component which can enhance treatment." |
| Stoll, Julia, John Z. Sadler, and Manuel Trachsel. "The ethical use of telepsychiatry in the Covid-19 pandemic." Frontiers in Psychiatry (2020): 665. | 2020 | Opinion | Discussed ethical considerations of telepsychiatry: "We have identified six areas of ethical challenges in delivering telepsychiatry/psychotherapy: (1) data security, privacy, and confidentiality; (2) clinical safety of telepsychiatry recipients; (3) competency and preparedness for telepsychiatric clinicians; (4) legal, regulatory, and financial concerns; (5) informed consent for services; and (6) social justice concerns." | Telepsychiatry offered a means of providing service to "preventing service undersupply" but that consideration towards individual patients must be considered. |
| Kaftarian, E. (2020). Telemental health in rural correctional institutions. Mhealth, 6. | 2020 | Corrections | There is a shortage of providers for the desperate need of mental health treatments in corrections. | Telemental health is an effect solution to staffing shortages. |
| Haque, Saira Naim. "Telehealth beyond COVID-19." Psychiatric Services 72.1 (2021): 100-103. | 2021 | Government Agencies: Center for Medicare and Medicaid Services (CMS), U.S. Drug Enforcement Administration (DEA), Office of Civil Rights (OCR) | "In their efforts to promote physical distancing during the COVID-19 pandemic, agencies such as the CMS, DEA and OCR have revised rules governing reimbursement procedures, Internet connectivity and security, and prescriptions to enhance telehealth uptake. " **Results:** "The COVID-19 pandemic has changed the landscape of health care delivery. " "Telehealth…the electronic exchange of information required for accurate diagnosis, efficient treatment, and ongoing care, can improve treatment access and efficacy.""…telehealth can expand access to care, improve treatment engagement and retention, enhance the clinical efficacy of evidence-based services, and reduce costs while achieving outcomes comparable to those of face-to-face care." "When looking to the future, organizations may need to revisit their telehealth strategies. Decision making should include what services to retain or expand and how to measure success, ensure financing, and engage patients and staff when telehealth technologies are used." | "Policy changes in response to the COVID-19 pandemic have reduced barriers to telehealth uptake by expanding reimbursement, allowing use of additional technologies, providing support for technical infrastructure, and permitting prescribing for medication-assisted treatment via telehealth services." |
| Justice Center The Council of State Governments. Telehealth and Telecommunication Opportunities in the Criminal Justice System  Telehealth and Telecommunication Opportunities in the Criminal Justice System (sharepoint.com) | 2021 | Opinion | "Technology is fundamentally changing the way that behavioral health care and services are delivered across the country. In the criminal justice system, telehealth is expanding access to assessments, case management, connections to treatment providers, and more—critical services that can improve outcomes for people with behavioral health needs. Shown to be as effective as in-person services, telehealth can also support continuity of care and reduce barriers to participation among people who live in remote areas. More broadly, local leaders are also leveraging telecommunication, such as conducting court proceedings via video and connecting people to diversion and reentry programs, to support criminal justice efforts." | "Telehealth Approaches That Can Support Criminal Justice Efforts- Screening and assessment for behavioral health needs; Collaborative comprehensive case management; Counseling and group programming; Medication management.  Telecommunication Approaches That Can Support Criminal Justice Efforts- Case and court processing; Virtual peer and family support communication; Virtual 12-step programs" |
| Burton, Paul RS, Nathaniel P. Morris, and Matthew E. Hirschtritt. "Mental health services in a US prison during the COVID-19 pandemic." Psychiatric services 72.4 (2021): 458-460. | 2021 | San Quentin State Prison | "Expanding access to telepsychiatry became a key feature of SQSP's response to the pandemic." "By late March 2020, approximately 60% of all psychiatric encounters in SQSP had moved to telehealth." "Informal feedback from staff and patients has reflected relatively high overall satisfaction with telepsychiatry so far; staff have noted that they are often able to provide similar quality of services to patients over video as they are in person, and patients appreciate being able to meet with clinicians without coming into close contact with others." "Clinics seem to run efficiently…telepsychiatry reduces the time required for custody staff to escort patients from housing units to treatment areas. Waiting rooms appear less congested than before." "Telepsychiatry methods have conserved the prison's PPE supply." | SQSP successfully implemented its own telepsychiatry service outside of CDCR's telepsychiatry program to effectively respond to the pandemic. |

| | | | | |
|---|---|---|---|---|
| Zhang, Jonathan, Matt Boden, and Jodie Trafton. "Mental health treatment and the role of tele-mental health at the veterans health administration during the COVID-19 pandemic." Psychological services (2021). | 2021 | Veterans Administration | **Method:** Longitudinal study including veterans receiving mental health treatment from 1/1/2017 6/16/2020 (pre-COVID vs. early part of COVID). **Results:** "Percent change between actual and expected counts in the early months of the COVID pandemic (March 1B–May 5, 2020) shows a decreases in counts of patients receiving mental health treatment early in the pandemic ranged from 7% to 20% for on-going treatment, and 28% to 37% for new treatment. Telemental health rapidly expanded, becoming the primary means by which encounters were delivered. Counts of patients receiving on-going care for suicide attempts were stable, and for overdoses, decreased by 17%. Counts of patients initiating care for suicide attempts and overdoses decreased by 30% and 38%, respectively. Weekly prescriptions and medication on-hand for psychotropics ranged from a 2% decrease to a 4% increase. New patient prescribing decreased 21%–50%." | Veterans Administration rapidly expanded use of Telemental health because of COVID to be the primary method of delivering care across all the VA. They saw a decline people needing mental health treatment during early months of COVID as compared to years prior. |
| https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/toolkit/practice-guidelines | 2022 | American Psychiatric Association: Telepsychiatry Practice Guidelines and Toolkit | "Highlight effective and liberalizing changes to telehealth regulations that enabled healthcare to continue during the COVID-19 pandemic; and second to provide the basis for the American Psychiatric Association's (APA's) advocacy on behalf of continuing and, in some cases, expanding further the changes made during the pandemic." "The American Psychiatric Association supports the use of telemedicine as a legitimate component of a mental health delivery system to the extent that this use is for the benefit of the patient, protects patient autonomy, confidentiality, and privacy; and when used consistent with APA policies on medical ethics and applicable governing law." | Telemedicine in psychiatry, using video conferencing, is a validated and effective practice of medicine that increases access to care. |
| Verma, Shikha, et al. "Incorporation of Telepsychiatry for Patients with Developmental Disorders into Routine Clinical Practice—A Survey of Specialty Clinics Adapting to Telepsychiatry During the COVID-19 Pandemic." Journal of Autism and Developmental Disorders (2022): 1-5. | 2022 | Community | **Method:** surveyed clinics from 5 locations, looking at in person vs telepsychiatry. **Results:** "In a survey of five ASD/DD clinics across the country, we show that telepsychiatry appointments rapidly became the predominant care model after the COVID-19 lockdown, a remarkably swift transition that yielded unexpected but clear benefit." | Shift to telepsychiatry during COVID pandemic, with increased acceptance |
| Amartey, Michelle. "Deinstitutionalizing the "New Asylums": Telepsychiatry in the United States Correctional System." (2022). | 2022 | Corrections | "The successful use of telemedicine throughout the medical field is a signal that telepsychiatry is a viable option capable of expanding mental health access and care. The standardized use of telepsychiatry in the U.S. correctional system could be the breakthrough needed to combat the mental health crisis within this system. Telepsychiatry could fill gaps by providing much needed mental health care at a reduced cost and redistributing correctional facility staff inappropriately used for mental health treatment. Providing telepsychiatry in jails and prisons would be a step towards turning the U.S. correctional system from the "new asylum" that it has become to the rehabilitative system it was always supposed to be." | Telepsychiatry reduced health care disparity in CDCR. |
| Adiukwu, Frances, et al. "Scaling up global mental health services during the COVID-19 pandemic and beyond." Psychiatric Services 73.2 (2022): 231-234. | 2022 | Low-and-middle income countries | "Every health care system requires an adequate health care workforce, service delivery, financial support, and information technology. During the COVID-19 pandemic, global health systems were ill prepared to address the rising prevalence of mental health problems, especially in low- and middle-income countries (LMICs), thereby increasing treatment gaps. To close these gaps globally, task shifting and telepsychiatry should be made available and maximized, particularly in LMICs. Task shifting to non-specialist health workers to improve essential mental health coverage and encourage efficient use of the available resources and technology has become the most viable strategy." | Telepsychiatry is important to decrease health care disparity especially in low-and-middle income countries. |
| Psychiatrists use of telepsychiatry during COVID-19 public health emergency: Survey Results. American Psychiatric Association. (2020). | 2022 | Various Settings Survey Results | 600 APA psychiatrists responded in June 2020 and 20% of original partipants responded in follow up survey in January 2021. "As was revealed in the first survey, the follow-up results continued to reflect trends in national research on telehealth that shows improved access to care, reduced no-show rates, and a high rate of patient satisfaction. 90% of respondents reporting that patients who were seen for the first time via telehealth remain either "somewhat satisfied" or "Satisfied" withtheir care. This trends with nearly a decade of research in telepsychiatry highlighting patient satisfaction with using telehealth for treatment." | Telepsychiatry has good patient satisfaction. |

1  ROB BONTA, State Bar No. 202668
Attorney General of California
2  MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
3  DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
5  Deputy Attorneys General
1300 I Street, Suite 125
6  P.O. Box 944255
Sacramento, CA 94244-2550
7  Telephone: (916) 210-7318
Fax: (916) 324-5205
8  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

9

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
DAVID C. CASARRUBIAS, State Bar No. 321994
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14

**RALPH COLEMAN, et al.,**

15                                    Plaintiffs,

16        v.

17

18  **GAVIN NEWSOM, et al.,**

19                                    Defendants.

20

2:90-cv-00520 KJM-DB (PC)

**DECLARATION OF JOSEPH PENN MD
IN SUPPORT OF DEFENDANTS'
POSITION ON THE USE OF
TELEPSYCHIATRY**

21        I, Joseph V. Penn, MD, CCHP, FAPA, declare:

22        1.    I am the Director of Mental Health Services of the University of Texas Medical Branch

23  (UTMB) Correctional Managed Care (CMC), a university-based correctional health care system

24  since February 2008. In this capacity, I oversee the provision of psychiatric, psychological, and

25  mental health services to approximately 80% (approximately 110,000 adult inmates) of the entire

26  Texas state jail and state adult prison population housed within the Texas Department of Criminal

27  Justice (TDCJ) facilities statewide. Prior to and subsequent to the COVID-19 pandemic, Texas has

28  maintained the largest state prison population nationally. I also manage the psychiatric services to

1

18686938.1

1   approximately 800 youths housed statewide within secure state school residential facilities and

2   halfway houses in the Texas Juvenile Justice Department (TJJD).  I oversee the delivery of

3   supplemental telepsychiatry services to jail inmates detained in the Bexar County jail, San Antonio,

4   Texas. I previously oversaw telepsychiatry service delivery to county jails in Brazoria, Galveston,

5   and Victoria, Texas.  I also had clinical and administrative oversight of on-site psychiatric services

6   that UTMB CMC previously provided at four Federal Bureau of Prison (BOP) units in Beaumont,

7   Texas.

8   2.   My training and qualifications are detailed in my C.V. and will not be repeated here.  I

9   have dedicated my thirty-year career to the psychiatric and mental health care of incarcerated

10   individuals across correctional settings.  By way of brief review, subsequent to medical school, I

11   pursued specialty training in general, child and adolescent, and forensic psychiatry. I achieved

12   board certification and maintenance of certification in all three specialties.  I completed my

13   certification and annual recertification as a Certified Correctional Health Professional (CCHP)

14   since 2004.

15   3.   Although my attached Curriculum Vitae (Appendix A) includes additional details of

16   my education and experience, as well as a list of all my publications, a summary of my most

17   relevant qualifications follows.

18   4.   I am a psychiatric physician based in Conroe, Texas. I attended medical school at the

19   University of Texas Medical Branch (UTMB), Galveston, Texas, graduating in 1992. I completed

20   seven years of specialty/subspecialty residency training – four years of general psychiatry in 1996

21   at Brown University, Providence, Rhode Island, two years of child and adolescent psychiatry in

22   1998 at Brown University, Providence, Rhode Island, and one year of forensic psychiatry, at Yale

23   University, New Haven, Connecticut, in 1999.

24   5.   I am triple board-certified in forensic psychiatry, general psychiatry, and child and

25   adolescent psychiatry. All these boards are under the American Board of Psychiatry and Neurology

26   (ABPN); this is a member board of the American Board of Medical Specialties (ABMS) that grants

27   board certification for psychiatrists and neurologists in the United States. I am fully licensed as a

28   health care professional, specifically as a medical doctor (M.D.), to practice medicine in Texas. I

2

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1  specialize in correctional medicine, specifically, correctional psychiatry. I have devoted most of

2  my professional time in the past 30 years in both the practice and in the teaching of general adult,

3  child and adolescent, and forensic and correctional psychiatry.

4      6.    I have served in a variety of capacities as a forensic psychiatrist expert witness, in civil

5  matters involving jails, prisons and other correctional and forensic psychiatry and community

6  settings. I have been retained in civil matters as a court appointed expert, plaintiff's expert, and

7  defense expert; and in criminal matters as a prosecution expert, defense expert, and a court

8  appointed expert. I am committed to honesty and to strive for objectivity throughout my

9  correctional and forensic psychiatric work.

10      7.    Since 1999 I have focused my clinical, administrative, and forensic work within

11  correctional settings including adult and juvenile detention facilities, jails, and prisons, and non-

12  correctional civil detention such as ICE (Immigration and Customs Enforcement) facilities.

13  Additionally, I have achieved and maintained specialized certification as a Certified Correctional

14  Health Professional-Mental Health (CCHP-MH) since 2004, approximately 18 years, by the

15  National Commission on Correctional Health Care (NCCHC). This requires passing of a written

16  national examination, demonstration of proficiency in national correctional health standards,

17  annual attestation of continuing medical education credits, full medical licensure without

18  restrictions, and annual re-certification.

19      8.    I remain current in the evaluation, diagnosis, and treatment of individuals within both

20  correctional, forensic, and non-correctional non-forensic settings as demonstrated by my national

21  board re-certification and maintenance of certification within general, child and adolescent, and

22  forensic psychiatry. I remain knowledgeable in clinical and administrative psychiatry and systems

23  of care issues within non-correctional settings through my leadership work at the national and state

24  level within the American Academy of Psychiatry and the Law (AAPL), American Psychiatric

25  Association (APA), Texas Society of Psychiatric Physicians (TSPP) the state district branch of the

26  APA, the American College of Psychiatrists, and through other medical and psychiatric

27  organizations.

28

3

18686938.1

9.    I provided direct patient care and forensic psychiatry consultation in Rhode Island for approximately 15 years and in Connecticut for 1 year, a total of 16 years. I have continued to provide direct patient care and "on-call" after hours coverage to incarcerated adults and youths since returning to Texas in 2008. Throughout my 15 years of experience as the UTMB CMC mental health services director, I oversee approximately 320 mental health staff including psychiatrists, psychologists, mental health managers and clinicians, case managers, psychiatric nurse practitioners, psychiatric physician assistants, and other mental health professionals and student trainees across the state. I provide both clinical and administrative support, oversight, quality assurance, supervision, and leadership. I review and co-sign at least 10 percent of charts of psychiatric nurse practitioners and physician assistants that I directly supervise. Also, I conduct peer reviews of psychiatrists and midlevel psychiatric providers.

10.    Frequently, I provide clinical support, prescribe, order, reorder or adjust patients' psychotropic medications and provide other consultation and behavioral treatment recommendations to mental health, nursing, and medical treatment staff and to TDCJ custody leadership. Periodically, I evaluate TDCJ and TJJD patients in person or via telepsychiatry at a variety of locations. Also, I participate in systemwide on-call duties for both TDCJ and TJJD. Further, I assist with direct patient care as needed.

11.    As detailed in my CV, in addition to my Director of Mental Health Services role, during separate time periods due to clinical director vacancies, I previously served as the acting clinical director (lead psychiatrist) and oversaw the care of more than 500 inmate patients admitted to crisis management, diagnostic and evaluation and other specialized treatment tracks admitted to two dedicated inpatient psychiatric prison units. These inmates were housed at two of three TDCJ dedicated psychiatric inpatient/behavioral health units located in Texas. The crisis management inmate patients for whom I oversaw care, had been determined by an outpatient unit based Qualified Mental Health Professional ("QMHP") to be at imminent risk of significant self-injury or suicide, or their mental health needs could not be managed at their assigned outpatient unit. I now supervise the two current clinical directors (lead psychiatrists). I am routinely involved in the referral,

4

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1  acceptance, and admission and transfers or discharges of inmate patients within the state's three

2  dedicated TDCJ inpatient psychiatric prison units.

3      12.    When needed, I also consult and oversee the evaluation and management of particularly

4  complicated patients across TDCJ outpatient units, TDCJ inpatient/behavioral health prison units,

5  stepdown [chronic mentally ill (CMI) programs], and medical/psychiatric inpatients housed in

6  TDCJ medical infirmary prison units or within our specialty medical surgical hospital, a maximum

7  security prison unit, Hospital Galveston (HG), on the grounds of the UTMB academic medical

8  center, medical school and other UTMB complex hospitals in Galveston, Texas (HG is the only

9  one of its type in the United States). I obtained hospital privileges at a local community hospital

10 where we transferred nursing home level of care state prison patients to this non-correctional "free

11 world" hospital. This facility lacked a consulting psychiatrist; accordingly, I stepped in and oversaw

12 the patients' psychotropic medication treatment and provided both onsite and telephonic

13 consultation to the patient's treatment hospitalists and other medical teams when patients

14 demonstrated agitation, confusion, or other changes in mental status.

15     13.    I have approximately 15 years of clinical and administrative experience in the provision

16 of psychiatric services and psychotropic medication treatment within state jails and state prisons,

17 county jails, short-term Substance Abuse Felony Punishment treatment programs (SAFP's) and

18 short-term Intermediate Sanction Facilities (ISF's) across Texas. I also have expertise in the

19 evaluation and treatment services that are provided to adult state inmates who are identified as

20 requiring substance abuse treatment, determination of which sedative, hypnotic and anxiolytic

21 medications needed to be discontinued in county jail prior to acceptance to a SAFP regular or

22 special needs unit. I have been directly involved in the acceptance or deferral of county jail

23 detainees being referred to TDCJ, specifically detainees with comorbid mental disorders and

24 substance use disorders into the SAFP programs.

25     14.    I have also been directly involved in the review and acceptance or deferral of female

26 TDCJ inmates who are currently pregnant, with mental disorders and substance use disorders, in

27 their third trimester, and determining their clinical appropriateness for acceptance or deferral into

28

5

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1   the TDCJ Baby and Mother Bonding Initiative Program. I oversee the telepsychiatry and
2   telepsychology services that are readily available to these women.

3       15.   Some examples of additional special populations and programs that I directly oversee
4   include the provision of telepsychiatry services to Youthful Offender Programs [(YOP) for youths
5   who have been sentenced as adults to TDCJ) and housed at two different programs, the TDCJ Ellis
6   Unit for males, and the TDCJ Hilltop Unit for females]. Another program that I oversee involves
7   the provision of mental health and psychiatric evaluation and treatment services to males and
8   females housed on Death Row. I also oversee two state prison developmental disabilities sheltered
9   housing programs, the Hodge DDP program which houses approximately 600 male and the Valley
10  Crain satellite DDP program which houses approximately 100 female state prisoners identified with
11  possible intellectual developmental disorders and/or adaptive functioning impairments. I also saw
12  the development and implementation of three mental health therapeutic diversion treatment
13  programs (MHTDP) for male and female inmates on the mental health caseload who were
14  previously housed in restrictive housing settings (previously referred to as "Ad Seg, administrative
15  segregation").

16      16.   I have additional recent experience in the provision of telepsychiatry delivery and
17  short-term mental health and psychiatric treatment and management for undocumented migrant
18  detainees with pending state charges (referred to as confinees by TDCJ) at several state jail units.
19  I have been directly involved in the evaluation, clinical management, and psychopharmacological
20  treatment of several confinee migrant detainees and in clinical decision-making and management
21  of confinees presenting with psychosis, PTSD (post-traumatic/stress disorder), self-injurious
22  behaviors and suicide attempts, identifying as transgendered or on hormonal treatment for gender
23  dysphoria, other mental disorders, and substance use disorders such as acute alcohol,
24  benzodiazepine, and opioid withdrawal, or alternatively at risk for acute or subacute substance
25  withdrawal. I have been directly involved in the clinical oversight of their detoxification and
26  clinical management.

27      17.   With regard to my direct clinical and administrative experience within jail settings, I
28  supervise telepsychiatry services that UTMB CMC provides to jail inmates at the Bexar County

6

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    Jail, San Antonio, Texas through a contract with University Health Services [(UHS) is the

2    contracted medical and mental health care provider]. I am credentialed as a UHS psychiatrist and

3    remain available to provide telepsychiatry services and psychiatric consultation to Bexar County

4    Jail inmates. I regularly tour the Bexar County Jail and meet with other mental health, psychiatric,

5    medical, nursing, and pharmacy staff and the UHS clinical and administrative leadership. I also had

6    previous direct involvement and administrative oversight of mental health and psychiatric services

7    that UTMB CMC provided to three county jails, specifically the Victoria County Jail, Victoria,

8    Texas, Galveston County Jail, Galveston, Texas and Brazoria County Jail in Angleton, Texas.

9        18.    I have extensive experience in examining access to care and continuity of care within

10   correctional settings. I perform psychiatric evaluations and suggest treatment approaches to

11   mitigate possible mental health sequelae for certain juveniles and adult inmates in restrictive

12   housing settings or those with recent disciplinary infractions who have pending pre-hearing

13   detention (PHD) status, or inmates who have filed requests due to personal safety concerns via

14   inmate protection investigations [(IPI's) formerly known as offender protection investigations

15   (OPI's)]. I am familiar with mental health and psychiatry best practices to include suicide

16   prevention policies and practices within juvenile and adult correctional settings nationally. I have

17   also published and presented in the areas of correctional mental health care and suicide prevention

18   at state, national, and international meetings (this is detailed in my CV).

19       19.    I have extensive experience in the evaluation, treatment, and clinical management of

20   incarcerated individuals with primary versus co-occurring substance-related and addictive

21   disorders, substance/medication-induced psychotic disorder, anxiety and depressive disorders,

22   schizophrenia spectrum and other psychotic disorders, personality disorders, substance intoxication

23   delirium and substance withdrawal delirium, and withdrawal from substances such as alcohol,

24   opioids, benzodiazepine, other sedative, hypnotic, or anxiolytic agents, nicotine, cannabis, and

25   other substances, and primary versus comorbid chronic "medical" diseases such as hypertension

26   (high blood pressure) within correctional settings. I also have additional extensive clinical

27   experience in the evaluation and management of incarcerated individuals with ADHD, disruptive

28   behavior disorders, impulse control disorders, severe self-harming and self-mutilating behaviors,

7

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    intellectual developmental disorders, and neurocognitive disorders (including head injuries,
2    dementia, and other neurocognitive disorders).

3    20.    I have served on several national task forces and committees and have published on the
4    use of psychotropic medications within correctional settings. I am involved in the oversight of state
5    prison, county jail, and juvenile correctional disease management guidelines (DMG's), clinical
6    protocols, decision-making regarding psychotropic medications and treatment protocols, formulary
7    and non-formulary approval of psychotropic medications and psychiatric evaluation and treatment
8    of individuals with serious mental illness (such as schizophrenia and other psychotic disorders) and
9    also depressive disorders, ADHD, disruptive behavior disorders, and PTSD and anxiety disorders.
10   As a result, I maintain a current clinical knowledge of the unique mental health needs individuals
11   with serious mental illness (SMI) such as psychotic disorders (e.g., schizophrenia, schizoaffective
12   disorder, and other psychotic disorders), bipolar disorders, severe depressive disorders, and
13   personality disorders, and those with co-occurring substance disorders across a variety of
14   correctional settings. In my clinical role, I perform both on-site and telepsychiatric evaluations and
15   treatment management of high profile and more complicated patient inmates and student residents
16   within our state adult and juvenile correctional systems, respectively, statewide.

17   21.    I currently serve on the Executive Operations Council of UTMB CMC, the Pharmacy
18   and Therapeutics Committee (I am a past Chair), other Joint UTMB CMC and TDCJ Health
19   Services and other Joint UTMB CMC and TJJD committees, and various other local, state, and
20   national committees that are detailed in my CV. I was recently re-appointed as the Chair of the
21   Joint Mental Health Work Group, and Co-Chair of the Gender Dysphoria Work Group. This
22   demonstrates my knowledge and direct interaction regarding the provision of psychiatric and
23   mental health care to incarcerated state inmate patient and various special populations.

24   22.    I have published extensively in scientific journals and other peer reviewed publications
25   in the areas of correctional patient care, mental health needs of geriatric inmates, and other
26   correctional mental health, recidivism, and continuity of care of incarcerated individuals with
27   mental health and substance abuse, and suicide prevention topics. I have been appointed to councils,
28   committees, work groups, task forces, and made numerous national and international contributions

8

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1   for example the American Psychiatric Association (APA), American Academy of Child and
2   Adolescent Psychiatry (AACAP), American Academy of Psychiatry and the Law (AAPL), and
3   even within two non-psychiatrist led organizations, for example, the International Association for
4   Correctional and Forensic Psychology (IACFP), and the American College of Correctional
5   Physicians (AACP) [formerly known as the Society of Correctional Physicians (SCP)]. I served as
6   an appointed member of the APA Council on Psychiatry and Law, which reviews law and
7   psychiatry issues pertaining to correctional and community settings, and as past chair of the APA
8   Council on Children, Adolescents and Their Families. Although I am no longer a member of the
9   APA Council on Psychiatry and Law, I was recently invited to consult on a draft APA position
10  statement on the use of telepsychiatry within correctional settings.

11      23.    I have provided guidance and consultation to other jail and prison systems in the USA
12  and the United Kingdom (England and Ireland, most recently). I have published and presented on
13  numerous topics regarding incarcerated individuals with mental health and substance abuse, special
14  populations, and suicide prevention. Some recent publications specifically in correctional
15  psychiatry and mental health include Psychiatric Services in Correctional Facilities: A Work Group
16  Report of the American Psychiatric Association, the chapter, "Standards and Accreditation for Jails,
17  Prisons, and Juvenile Facilities," in the Oxford Textbook of Correctional Psychiatry, and the
18  chapter, "Correctional Psychiatry" in the most current edition of the Kaplan and Sadock's
19  Comprehensive Textbook on Psychiatry (now in its 50th anniversary edition). I was a lead author
20  in the American Academy of Psychiatry and the Law (AAPL) "Resource Document for Prescribing
21  in Corrections," and also a subsequent revision (which is in press), and a separate "Resource
22  Document for Prescribing in Juvenile Justice/Correctional Settings," (which is also in press).

23      24.    I have presented nationally and internationally and have consulted nationally (and as
24  noted above, internationally) on correctional and non-correctional mental health care delivery and
25  standards of care. Some recent examples include: the Office of the California Attorney General
26  regarding the California Department of Corrections and Rehabilitations (CDCR); Office of the
27  Nevada Attorney General regarding the Nevada Department of Corrections; Sacramento County
28  Jail, Rio Cosumnes Correctional Center (RCCC) and Yolo County Jail, and other surrounding

9

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    county jails; Technical Assistance Project Consultant, U.S. Department of Justice in several states

2    regarding jails, prisons, ICE facilities, and tribal nation correctional facilities, National Institute of

3    Corrections (NIC); Technical Assistance to New York County Jails, Valhalla, New York;

4    Consultant to the State of Vermont Department of Corrections; and Consultant, National Institute

5    of Mental Health (NIMH) regarding ICE detainees (other examples are listed in my CV).

6          25.    I have undergone specialized initial and ongoing training and served as a physician

7    surveyor for the National Commission on Correctional Health Care (NCCHC), a national

8    organization that provides health care accreditation of jails and short-term detention facilities,

9    prisons, juvenile facilities, and opioid treatment programs in correctional facilities. I have surveyed

10   several major metropolitan county jails, short term detention facilities [e.g., US Immigration and

11   Customs Enforcement (ICE) facilities] nationally (these are listed in my CV). I am the past chair

12   of the NCCHC accreditation committee and continue to serve as a committee member. I have

13   served on several NCCHC standards revision task force groups to revise the NCCHC health care

14   standards: NCCHC Standards for Health Services in Jails and Prisons, NCCHC Standards for

15   Mental Health Services in Correctional Facilities, and the NCCHC Juvenile Health Standards (I

16   serve as the current chair of the juvenile standards revision work group). This further demonstrates

17   my current knowledge and direct involvement in the provision of psychiatric and mental health

18   care to sentenced juveniles and adult inmate populations.

19         26.    I am actively involved at a national level in a leadership role within several psychiatric

20   organizations. I recently served on the Council of the American Academy of Psychiatry and the

21   Law (AAPL) and am also the AAPL representative to the NCCHC Board of Directors. I was

22   recently appointed co-chair of the AAPL Corrections Committee. I am also a past chair of the

23   AAPL Suicidology committee, a committee focused on suicide phenomenology and suicide

24   assessment and prevention and remain an active committee member. I also serve on the AAPL

25   Government Action Committee and the AAPL Media and Public Relations, and the AAPL

26   Rappeport Fellowship Committee. I also serve on the American Academy of Child and Adolescent

27   Psychiatry (Children and the Law committee, formerly known as the Rights and Legal Matters

28   committee). I was previously the AACAP's representative to the NCCHC Board of Directors and

10

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1  am now the AAPL representative. I am the immediate past chair of the NCCHC Board of Directors,

2  I have served as the NCCHC Board Chair for two different terms over three-year cycles (e.g., chair

3  elect, chair, and immediate past chair).

4      27.    I have guided the development of correctional psychiatry resource documents,

5  publications, policy, best practices, and position statements within the American Psychiatric

6  Association, the American Academy of Psychiatry and the Law, the American Academy of Child

7  and Adolescent Psychiatry, and the Texas Society of Psychiatric Physicians. I am a past president

8  of the Texas Society of Psychiatric Physicians, the Texas statewide branch of the American

9  Psychiatric Association. I am also involved at a state level and have testified at the Texas State

10 Capital on a variety of psychiatric, correctional, and forensic psychiatry and mental health issues.

11     28.    In addition to those leadership roles, I previously served on the behavioral health

12 committee and the health care committee of the American Correctional Association (ACA), (the

13 ACA also provides accreditation of correctional facilities nationally). I am a past board member of

14 the American College of Correctional Physicians (formerly known as the Society of Correctional

15 Physicians).

16     29.    I have extensive experience in examining access to care, continuity of care, mental

17 health and psychiatric evaluation and treatment approaches to mitigate possible mental health

18 sequelae for certain inmates in restrictive housing settings and other mental health and psychiatry

19 best practices to include suicide prevention policies and practices within juvenile and adult

20 correctional settings nationally. I have also published and presented in the areas of correctional

21 mental health care and suicide prevention at state, national, and international meetings.

22     30.    I maintain ongoing communication with other correctional professionals who provide

23 direct clinical, administrative, and/or consultative work within correctional settings across the

24 United States (and several other countries). I frequently attend and present at correctional health

25 and other correctional related conferences and serve on several committees, as described earlier,

26 including those conferences organized by the National Commission on Correctional Health Care

27 (NCCHC), and the American Correctional Association (ACA). I served on the two most recent

28 NCCHC task forces/work groups that were responsible for revising the separate NCCHC standards

11

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1  for jails and prisons in 2014 and 2018. I have participated in various American Psychiatric

2  Association (APA), American Academy of Psychiatry and the Law (AAPL), and American

3  Academy of Child and Adolescent Psychiatry (AACAP) committees and task force/work groups

4  with relevance to adult and juvenile correctional health, suicide prevention policies and best

5  practices, and the development of correctional standards and position statements. I am frequently

6  contacted/consulted regarding policies, procedures, best practices, challenging patient cases or

7  clinical situations, regarding my professional recommendations re: how to provide access to care,

8  continuity of care, and implement efficient psychiatric and mental health care to jails, prisons, and

9  other correctional settings, and have been qualified and rendered testimony at depositions and trials

10  as an expert witness in several state and federal courts.

11      31.   Through these various experiences and my ongoing continuing medical education, I

12  remain current in best practices for correctional mental health care services. Further, I continually

13  review emerging correctional health research and evidence-based practices and quality

14  improvement initiatives. For example, in my role as a reviewer for several scientific journals and

15  through my work on the editorial board of the Journal of Correctional Health Care, I have

16  knowledge and experience in reviewing the scientific merit and methodology of correctional health

17  manuscripts/reviews.

18      32.   I am also particularly knowledgeable and maintain daily direct clinical and

19  administrative involvement in establishing access to mental health and psychiatric care and

20  continuity of care in the Texas state prison system regardless of the medical and/or mental health

21  need and acuity, across a variety of custody levels. This includes restrictive housing settings,

22  suicide prevention, psychiatry evaluation, and treatment practices and modalities within state prison

23  correctional settings. Due to my direct work experience and career focus on correctional psychiatry,

24  and my work within organized psychiatry, correctional and forensic psychiatry at a state and

25  national level, I believe that I am uniquely qualified to render opinions regarding the provision of

26  on-site versus telepsychiatric versus a blended model of services within correctional settings. In

27  summary, I have dedicated my entire career to direct patient care, other clinical and administrative

28  work, and forensic psychiatry consultative services within juvenile and adult correctional settings.

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1     33.     With regard to my academic work and clinical teaching roles, I am a Clinical Professor,

2 Department of Psychiatry and Behavioral Sciences, UTMB, Galveston, Texas. I was previously

3 Clinical Associate Professor in the Department of Psychiatry and Human Behavior, at Brown

4 University and the Warren Alpert Medical School, Providence, Rhode Island. I provide clinical

5 supervision to several psychiatrists, psychiatric nurse practitioners, physician assistants, and

6 student trainees. I provide grand rounds, lectures, and trainings on a variety of correctional

7 psychiatry topics at several medical schools and residency/fellowship training programs, to clinical

8 faculty, psychiatry residents, medical students, physician assistant students and other trainees,

9 treatment program staff, other professional organizations and am frequently invited to lecture in

10 state, nationally, and internationally.

11     34.     I attend state, national, and international meetings and have completed continuing

12 medical education (CME) and maintenance of certification requirements to become and maintain

13 my status as a triple board-certified psychiatrist – board certified in forensic psychiatry, general

14 adult psychiatry, and child and adolescent psychiatry. I previously served as a board examiner for

15 the American Board of Psychiatry and Neurology (ABPN) in the areas of general adult psychiatry

16 and child and adolescent psychiatry, on the general psychiatry recertification committee, and on

17 the forensic psychiatry committee (for individuals who had completed a forensic psychiatry

18 fellowship training program and are now sitting for their initial ABPN board certification exam in

19 forensic psychiatry, or alternatively sitting for their 10 year recertification exams. I currently serve

20 on the ABPN Forensic Psychiatry Maintenance of Certification (MOC) committee.

21     35.     I have been qualified as an Expert Witness in various State and Federal Courts, in the

22 field of forensic, child and adolescent, and correctional Psychiatry (1998-present), and have given

23 expert opinion in the several areas, for example, standards of care in jails, prisons, juvenile

24 correctional facilities and other settings. I have also provided expert opinion regarding the use of

25 psychotropic medications, psychic harm, PTSD, suicide, suicide prevention, suicide risk

26 assessment, seclusion and restraint and other mental health and psychiatry content areas.

27     36.     From 2013-2014, I was a correctional psychiatric consultant to the Special Master,

28 *Coleman v. Brown, Governor of California, et al.*, United States District Court for the Eastern

13

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    District of California. From 2017–2019 I served as a consultant to the State of California's Office

2    of the Attorney General regarding psychiatrists, psychologists, and other mental health professional

3    staffing, use of telepsychiatry, and increasing level of efficiencies within the health care service

4    delivery within the California Department of Corrections and Rehabilitation (CDCR) state prison

5    units statewide. I have previously toured several CDCR prison facilities, interviewed CDCR

6    psychiatry, psychology, social work, and other health care staff, including unit-based, regional, and

7    senior leadership staff, and focused my onsite evaluations and tours of restrictive housing units and

8    specialty programs for different classifications of CDCR inmates with various medical and mental

9    health needs with respect to access to care and continuity of care concerns.

10    37.    Since 1998, I have conducted numerous evaluations and site tours of various state

11    prisons in Rhode Island, Vermont, Texas, California, and Arizona, and several county jails, juvenile

12    detention facilities in Florida, and ICE facilities across various jurisdictions. I have toured

13    numerous high security restrictive housing settings (formerly known as ad seg/administrative

14    segregation) to include male and female Death Row units in Texas and Arizona. Based upon my

15    experience, I am familiar with different custody and housing levels, inmate movement for various

16    activities (custody escorts to medical clinics for medical, mental health or specialty clinic

17    appointments, inmate movement for recreation, dining, work assignments, commissary, showers,

18    visitation) and other operational issues. While I do not suggest that I am an expert regarding general

19    correctional custody issues, I have a fundamental appreciation of the impact and interplay between

20    correctional custody and mental health delivery in custodial situations.

21    38.    Regarding my work as a correctional and forensic psychiatrist, I am not solely a

22    plaintiff or defense expert nor a monitor or a member of a monitor team. When possible, I attempt

23    to balance my consulting work as a court appointed expert, plaintiff's expert, and defense expert.

24    A list of my depositions and trial testimony is attached (see Appendix B). My fee schedule is

25    attached (see Appendix C).

26    39.    Due to my direct clinical and administrative work experience within correctional

27    systems in Rhode Island and Texas and my career focus on correctional psychiatry, I am uniquely

28    qualified to render opinions regarding the provision of psychiatric and mental health services in

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1  correctional settings, including opinions concerning the effectiveness of telepsychiatry when
2  compared to in-person psychiatric services.

3      40.   All opinions stated in this document are based upon my years of training and
4  experience, my review of the records and a reasonable degree of medical and psychiatric
5  certainty/probability. It is my opinion to a reasonable degree of medical and psychiatric and mental
6  health certainty that the use of telepsychiatry and telepsychology (and other types of correctional
7  medical and mental health services delivered via videoconferencing) comport with or exceed the
8  correctional and community standard of care and are necessary, integral, and instrumental in order
9  to ensure the timely provision of quality psychiatric and mental health care and therefore meet the
10 requisite constitutionally determined access to care and continuity of care to CDCR inmates
11 statewide in California.

12     41.   Based on my personal knowledge of, and 15 year experience providing and overseeing
13 the provision of telepsychiatry and telepsychology and other telehealth services (herein collectively
14 referred to as telepsychiatry) to Texas state jail and state prison inmates and Texas youth housed in
15 state school residential programs, telepsychiatry is a standard, widely accepted, and effective
16 method of providing psychiatric evaluation and treatment for all mentally ill patients and is
17 generally no less effective or therapeutic than face-to-face treatment.

18     42.   Telepsychiatry is a standard, widely accepted, and effective method of psychiatric
19 evaluation and treatment delivery system for individuals in residential treatment, within both
20 correctional and non-correctional patient populations.

21     43.   Based on my past review of documents, policies, proposed policy revisions, and tours
22 of CDCR facilities, interviews with CDCR health care leadership and psychiatric, psychology,
23 social worker and other health care staff, and based on my experience of working in two state
24 correctional systems, as well as my experience working as a correctional and forensic psychiatric
25 consultant to numerous jails, prisons, ICE facilities, and other correctional systems, CDCR's
26 Enhanced Outpatient Program (EOP) level of care is not an inpatient program.  I have reviewed
27 CDCR's proposed telepsychiatry policy as it relates to the EOP setting and CDCR's proposed
28 policy would exceed the standard of care.

15

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1      44.    Based on my 15 year experience of directly providing telepsychiatric care and also

2   overseeing the delivery of telepsychiatry services to incarcerated youths and adults across the State

3   of Texas, my review of existing telepsychiatry literature, and observation of the use of

4   telepsychiatry delivery across county jails, ICE facilities, and state prison systems in Texas and

5   other correctional settings nationally, it is my professional opinion that there are no

6   contraindications to the routine use of telepsychiatry for EOP inmate patient populations and other

7   similar levels of care. Obviously if an individual patient's evaluation and treatment needs could

8   not be met utilizing telepsychiatry, an individualized clinical evaluation should ensue with further

9   treatment planning to determine that individual patient's clinical needs and if the patient warranted

10   a higher level of mental or medical care and correctional health care services and

11   monitoring/follow-up.

12      45.    Based on my personal knowledge of, and experience working in (as an acting Clinical

13   Director at two different state prison psychiatric inpatient units, each housing over 500 inpatients),

14   and also overseeing these two large inpatient psychiatric prison unit settings for 15 years, and

15   having toured and personal knowledge of psychiatric service delivery to a third inpatient psychiatric

16   state prison unit in West Texas, telepsychiatry is generally an effective treatment supplement to on-

17   site psychiatric services for incarcerated individuals in inpatient psychiatric prison units.

18      46.    Based on my personal knowledge of, and 15 years of experience working in the largest

19   state prison system in the USA, telepsychiatry has been successfully utilized as a primary method

20   of delivering psychiatric care to incarcerated individuals across a variety of levels of care: inmate

21   patients housed in "step-down" (previously inpatient level of care, but were recently transitioned

22   to a "step-down" unit setting) mental health units, residential programs, other specialized mental

23   health unit non-inpatient treatment programs, designated mental health sheltered housing settings,

24   chronic mentally ill programs (CMI), and other specialized treatment programs and housing setting

25   for individuals with serious mental illness (SMI)], and for incarcerated individuals with intellectual

26   disabilities and other special needs.

27      47.    Based on my personal knowledge of, and 15 years of experience working in the largest

28   state prison system in the USA, and also with youth in TJJD state schools (the majority of these

16

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    youths with significant psychopathology and on a variety of psychotropic medications and thus the

2    equivalent of a high end residential level of care) the COVID-19 pandemic further drives the vital

3    need for the continued growth, implementation, and expansion of telepsychiatry and other types of

4    telehealth for incarcerated individuals regardless of their housing setting/classifications.

5         48.    Based on my personal knowledge of, and 15 years of experience working in the largest

6    state prison system in the USA, in Texas and my other experiences across correctional systems

7    nationally there has been an increased use and acceptance of telepsychiatric, telemental health for

8    emergency, crisis/urgent and non-urgent telehealth care, and specialty care delivered through

9    telemedicine throughout the USA.

10        49.    Based on my personal knowledge of, and 15 years of experience working in the largest

11   state prison system in the USA, in Texas and my other experiences across correctional systems

12   nationally, I am unaware of any adverse patient outcomes, patient safety risks, or adverse outcomes

13   that are solely attributable to the use of telepsychiatry or telehealth.

14        50.    There is substantial evidence supporting the use, acceptance, satisfaction, validity and

15   reliability and clinical outcomes of telepsychiatry.  The American Psychiatric Association (APA)

16   is the main professional organization of psychiatrists and trainee psychiatrists in the United States,

17   and the largest psychiatric organization in the world.  The APA describes the use and robust

18   evidence of telepsychiatry on its website:

19              "The use of video-based telepsychiatry helps meet patients' needs for

20              convenient, affordable, and readily accessible mental health services.

21              With a robust evidence base that shows telepsychiatry leading to

22              improved outcomes and higher patient satisfaction ratings, policy

23              makers, payers and providers are increasingly considering ways to

24              implement and use telepsychiatry."

25   In February 2018, the APA updated its Policy on Telepsychiatry:

26              "Telemedicine in psychiatry, using video conferencing, is a validated

27              and effective practice of medicine that increases access to care. The

28              American Psychiatric Association supports the use of telemedicine

17

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    as a legitimate component of a mental health delivery system to the

2    extent that its use is for the benefit of the patient, protects patient

3    autonomy, confidentiality, and privacy; and when used consistent

4    with APA policies on medical ethics and applicable governing law."

5    51.    The American Psychiatric Association has clearly demarcated telepsychiatry as having

6    a robust evidence base supporting its use and has promulgated the use of telepsychiatry as a means

7    to conduct the practice of psychiatry.    The APA website contains a separate section of

8    "Telepsychiatry" [under the larger heading of "Practice" (Psychiatric Practice)]. The APA website

9    contains the APA's Telepsychiatry Toolkit — developed by the APA Work Group on

10   Telepsychiatry —as "an evolving resource for (APA) members who want to learn about the various

11   aspects of telepsychiatry, including clinical, training, and policy considerations..." The following

12   is listed directly from the section on "Evidence Base": "The Evidence Base in Telepsychiatry,"

13   written by Donald M. Hilty, MD, on their current website:

14   • "Telepsychiatry's evidence base is substantial, and satisfaction is extremely high

15   among patients, psychiatrists and other professionals."

16   • "Its effectiveness is comparable to in-person care in terms of therapeutic engagement,

17   quality of care, validity/reliability of assessment, and clinical outcomes. There are two

18   types of study design: head-to-head comparison or non-inferiority (i.e., as good as)."

19   • "The evidence base is formidable for children, adolescents, and adults regarding

20   assessment (diagnostic, cognitive, other) and treatment (medication, therapy)."

21   • "Preliminary studies in geriatric patients and across cultures are positive. Indeed, it may

22   facilitate cultural, ethnic and language matching between patients and providers."

23   • "The experience other mental health clinicians using telemedicine (i.e., telemental

24   health), is consistent with, and further substantiates the diagnostic, therapeutic and

25   outcome evidence base."

26   • "Care models that have good evidence include direct care, consultation to primary care

27   and collaborative care. It is being studied specifically, now, as a way to leverage

28   psychiatric expertise in stepped and integrated care models, too."

18

18686938.1

1      • "There are a few populations in which it may be preferable to in-person care (e.g.,

2        autism spectrum, severe anxiety disorders, geriatric patients with physical limitations,

3        those with significant geographical obstacles)."

4      • "Telepsychiatrists adjust clinical care in a few ways to make it as personal as in-person

5        care. First, they may project a little more in terms of gestures, just as if one is giving

6        a presentation to a large group. Second, it helps to check-in to see how the patient is

7        experiencing it. Third, verbal communication may replace handshakes, handing a

8        tissue box and such. Finally, if a particular examination item is less facile at a distance,

9        another staff or accompanying person can help."

10  https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/evidence-base, last visited

11  6/28/2022.

12      52.  The following were impressive outcome findings from a variety of studies examining

13  the safety and efficacy of telepsychiatry. I was unable to identify any articles demonstrating patient

14  harm, risk of harm, or adverse outcomes. Instead, Dr. Hilton is quoted in the APA Telepsychiatry

15  Clinical Outcomes section, with the following "Outcome areas (rated from: extremely poor;

16  somewhat acceptable; similar to in-person care; good; outstanding)":

17      • Feasibility rating: outstanding. The TMH evidence-base related to feasibility is related

18        to satisfaction and usability and there are now only rare technical issues (e.g., poor

19        visual images, pixilation, "drops" of conversations, turn taking in discussion) – those

20        were all due to low bandwidth.

21      • Validity rating: outstanding. The TMH evidence-base related to validity has largely

22        focused on TMH in comparison to in-person. You can do everything as you do in

23        person with only minor exceptions (e.g., smell alcohol on a patient, check for

24        extrapyramidal side effects or tremor – need to train a nurse on the other end).

25      • Reliability rating: outstanding. Diagnoses have been made reliably, with good inter-

26        rater reliability, for a wide range of psychiatric disorders in all ages of patients. TMH

27        overcomes limitations in hearing and appears to facilitate language and cultural

28        matching by accessing others.

19

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

- Satisfaction rating: outstanding. It is extremely high among patients, psychiatrists, and other professionals. This extends to all clinical services, populations, and contexts.
- Cost and cost-effectiveness rating: similar to good. Robust studies have not been completed, but descriptive studies clearly indicate savings in time, travel, and money to patients and providers
- Clinical measures rating: individually assessed below.
- Interviewing, assessment, cognitive testing, and others: outstanding. Dozens of clinician scales have been shown as reliable and valid.
- Disorders include depression, anxiety, psychosis (counters myth that patients would get paranoid), substance, cognitive/attentional/behavioral (assistance for those with mental retardation or dementia), personality/behavioral, and many others: outstanding.
- Settings well studied include outpatient, primary care/medical: outstanding. Settings less well studied include emergency rooms, jails, inpatient units, and schools: somewhat acceptable – similar to in-person care.

Interesting and preliminary findings:

- For children and adolescents on the autism spectrum, it may be preferable to in-person.
- For adults with disabling anxiety (e.g., panic or posttraumatic stress disorder; veterans), it is preferred (and often coupled with telephone and e-mail options)
- Preliminary studies in geriatric patients and across cultures are positive. Indeed, it may facilitate cultural, ethnic and language matching between patients and providers.
- The experience with therapies is trending very positively, with surprisingly few problems.
- Care models that have good evidence include direct care, consultation to primary care and collaborative care.

This last point regarding telepsychiatry consultation "care models" and "consultation to primary care and collaborative care" is particularly timely and relevant to the current dispute regarding the asserted need to have a psychiatrist "on site" for CDCR treatment team meetings.

20

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    There is another section written in the APA Telepsychiatry Toolkit that actually suggests or

2    promulgates an expansion of telepsychiatry to include "team based integrated care" with additional

3    guidance regarding how to conduct a "treatment plan," via telepsychiatry written by Jeffrey

4    Bennett, MD:

5        • "Integrated care often makes use of Telepsychiatric services. When team members are

6            involved in a session, it is important to incorporate each member in the process."

7        • "Some essentials for the use of telepsychiatry in integrated care:

8            o  Ask that each member of the team present at the originating site and remote

9                site introduce themselves including their name, title, and function related to

10               the patient

11           o  Be sure the patient understands the nature of the encounter

12           o  After interviewing and examining the patient, check in with each team member

13               present for their input

14           o  Clarifying the diagnostic impression and feasibility of a treatment plan should

15               briefly occur with each team member present."

16   53.   As I understand it, there is an assertion that a telepsychiatrist would not be able to effectively

17   participate in or contribute in an effective manner due to an asserted or purported theoretical risk

18   of not being able to identify or understand real time or ongoing changes within the therapeutic or

19   treatment team and unit "milieu." I also understand that concerns have been raised regarding an

20   inability to effectively communicate or actively participate due to missing subtle nuances and in

21   summary, to not be able to be effective in the role of a treating or consulting psychiatrist or to

22   provide timely and useful clinical input and feedback and leadership during treatment team

23   meetings. Based on my actual 15 years of direct clinical and administrative experience utilizing

24   telepsychiatry and videoconferencing technology utilizing a variety of in-person/on-site and remote

25   treating or consulting telepsychiatrists (to include myself) and other telehealth staff, I have actually

26   noted the exact opposite. In my experience, psychiatrists, and other multidisciplinary treatment

27   team members (to include medical and nursing staff in additional to non-psychiatric mental health

28   staff) can very effectively conduct videoconference/telepsychiatry meetings versus in person/on-

21

1  site versus a blended version of both. In my experience, the treating psychiatrist can effectively

2  contribute to and communicated with, and when indicated, lead multidisciplinary treatment team

3  meetings and other treatment planning and admission, transfer and discharge planning for routine

4  and more complicated youth and adult patients within a variety of custody/correctional settings

5  statewide in Texas. I am unaware of any adverse outcomes or that any patients were harmed by

6  not having psychiatrists onsite/in person for treatment team meetings. I am similarly unaware of

7  any published studies to date with these findings/concerns/results.

8      54.    By way of additional example of this existing strong evidence base, growth and

9  widespread expansion of telepsychiatry throughout the USA, the American Psychiatric Association

10  (APA) and the American Telemedicine Association (ATA) The APA and the ATA recognized the

11  importance of telemental health with each individual association undertaking efforts to educate and

12  provide guidance to their members in the development, implementation, administration and

13  provision   of   telemental   health   services.   The   APA   and   the   ATA   formed   a

14  collaboration/collaboration to create a consolidated update of the previous APA and ATA official

15  documents and resources in telemental health to provide a single guide on best practices in clinical

16  videoconferencing in mental health. The ATA, with members from throughout the United States

17  and the world, is the principal organization bringing together telemedicine practitioners, healthcare

18  institutions, government agencies, vendors and others involved in providing remote healthcare

19  using telecommunications. Telemental health in the form of interactive videoconferencing has

20  become a critical tool in the delivery of mental health care. It has demonstrated its ability to increase

21  access and quality of care, and in some settings to do so more effectively than treatment delivered

22  in-person.   This collaborative publication further cements the evidence base and widespread

23  implementation of telepsychiatry across a variety of settings for different patient groups and

24  populations, last visited 6/28/2022.

25      55.    Based on my personal knowledge and clinical and administrative experiences, I am

26  knowledgeable regarding a variety of individual, unit based, and patient related issues or a myriad

27  of other reasons why an inmate patient might refuse to comply with a psychiatric (or other mental

28  health) evaluation or follow-up visit via telepsychiatry. I readily acknowledge the point that some

22

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    patients on certain antipsychotic medication might have some very subtle findings such as motor

2    or vocal tics, extra-pyramidal symptoms, or alternatively might engage in some non-verbal

3    behaviors such as distraction, inattention, eye rolling, and other non-verbal interactions that might

4    be difficult to appreciate during some telepsychiatric encounters.  With appropriate effort and

5    training and based on my 15 years of direct and administrative experience in Texas, our UTMB

6    CMC psychiatric staff can effectively provide high quality psychiatry via telemedicine and are able

7    to discern extra-pyramidal (EPS) abnormal movements and tardive dyskinesia, conduct AIMS

8    (abnormal involuntary movement scale testing) and are able to identify, document, and address and

9    intervene in a clinically appropriate manner, even with very subtle findings.  There have been

10   sustained improvements in audio and video technology and resolution and zoom features of

11   remote/onsite cameras which could be used to better capture EPS and other abnormal movements

12   or slowing or increased or abnormal body or extremity movements.  With an appropriately trained

13   on-site tele-presenter, based on my past 15 years or direct and administrative experience, it is my

14   professional opinion that these types of subtle visual and non-verbal aspects of a telepsychiatry

15   encounter can be identified by the telepresenter and shared with/communicated with the

16   telepsychiatrist prior to, during, or after the evaluation (verbally or via email), thereby facilitating

17   data collection and observation prior to, during, and subsequent to the interview and exam.  As an

18   added safeguard, should the patient report or complain of EPS or other possible medication side

19   effects that are not immediately visualized during the telepsychiatry encounter, the psychiatrist

20   could readily refer the patient to nursing/the medical clinic or to have unit based mental health staff

21   follow-up with the patient for further monitoring and evaluation, or alternatively, the patient could

22   be rescheduled for a follow-up appointment as clinically indicated with the treating telepsychiatrist.

23   I also understand that there is an assertion that were a patient to be malodorous, unkempt or to

24   demonstrate poor grooming or hygiene that there is concern that the remote telepsychiatrist would

25   not be able to appreciate this (being malodorous, in particular) or identify this via

26   telepsychiatry/videoconferencing.  Similar to the above, it is my professional opinion that were a

27   patient to be malodorous or demonstrate other subtle or gross evidence of impairments in their

28   grooming and hygiene and ADL's (Activities of daily living) would be readily identified by the

23

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    telepresenter and promptly shared with/communicated with the telepsychiatrist prior to, during, or

2    after the evaluation (verbally or via email), thereby facilitating data collection and observation prior

3    to, during, and subsequent to the interview and exam.

4        56.    Although I have not had the opportunity to observe CDCR's use of the mobile cell front

5    telepsychiatry equipment, it is my professional opinion, that attempting to increase access to care

6    through the proposed use of this technology and equipment  is a correctional psychiatry/mental

7    health best practice and that this type of evaluation and treatment modality could be used effectively

8    to perform cell front evaluations of state inmates who might be acutely psychotic, paranoid, or

9    alternatively, non-psychotic and not paranoid, but simply, volitionally, refuse to leave their cell, for

10   a variety of reasons, to attend a psychiatric or other mental health appointment in a clinic area

11   (either in person or via telepsychiatry).

12       57.    Based on my personal knowledge of, and 15 years of experience working in the largest

13   state prison system in the USA, in Texas and my other experiences across correctional systems

14   nationally, telepsychiatry, telepsychology, and other forms of telehealth have clearly improved

15   access to care and greatly improved continuity of care, particularly in remote/rural psychiatric

16   physician manpower/shortage settings where many state prisons are located, and moreover due to

17   the existing and well described national shortage of psychiatrists and the lack of any clear solution

18   to an anticipated further national shortage of psychiatrists.

19       58.    I am unaware of any current NCCHC or ACA or any other correctional or non-

20   correctional health care standards (such as the Joint Commission), community standards, position

21   statements, practice guidelines, or other treatises that have determined a particular benchmark,

22   mandate, or outcome measures or metrics such as HEDIS (Healthcare Effectiveness Data and

23   Information Set) standardized performance measures or even a "best practice" that a telepsychiatrist

24   must or shall travel onsite to see a particular patient or set of new or established patients in person

25   and/or to attend in person treatment team meetings via a pre-defined frequency, such as twice a

26   year, on a quarterly basis, or any other set or prescriptive frequency. In my professional opinion,

27   there are no established national standards that set this on-site/travel expectation for the treating

28

24

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    telepsychiatrist. In summary there are no national community or correctional standards that

2    mandate a frequency of onsite clinical evaluations or treatment team meetings for telepsychiatrists.

3    59.    Based on my personal knowledge, writings, and presentations, and conducting

4    additional literature reviews, there are published scientific journals in peer reviewed accepted

5    journals and other literature and resounding support from the American Psychiatry Association that

6    provides clear evidence in the need, use of, and patient acceptance/patient acceptability/tolerability

7    and the generally accepted practice/use of community/free world regarding of telepsychiatry and

8    telemental health services, and furthermore, during the COVID-19 pandemic and subsequently,

9    how psychiatric professionals' work satisfaction, recruitment, and retention has improved.

10    60.    There is no question that the use of telepsychiatry, telepsychology, and other types of

11    telehealth have increased exponentially in the "free world" community during the COVID-19

12    pandemic. Swift legislation and other executive orders sped up the implementation and funding of

13    telehealth within the US. The current pandemic hastened the utilization and implementation of

14    telehealth for primary care, urgent care, specialty care, and telepsychiatry and for a variety of

15    mental health professionals. During the pandemic many community psychiatrists changed from an

16    in-person practice to a solely telepsychiatry or a blended practice. I have 15 years of direct firsthand

17    experience in the challenges and nuances of the recruitment and retention of psychiatrists – a

18    particular costly and scarce resource. Through my work, attendance at CME meetings, reading of

19    literature, discussion with human resource leaders, other correctional mental health directors and

20    leaders, various general psychiatry and child and adolescent residency and forensic psychiatry

21    fellowship training directors, and through my direct experience of trials and failures, in order to

22    successfully recruit a retain a complement of psychiatrists, whether in person or via telepsychiatry,

23    the field has moved to a need to be flexible with respect to the changing workforce. It is also my

24    direct knowledge and 15-year experience that telepsychiatry can be safely delivered with no patient

25    safety risks or adverse patient outcomes from a variety of locations.    These include a

26    telepsychiatrist's home/home office, an office building, or additionally from one state prison unit

27    to another state prison unit again with no adverse effects, safety risks, or compromise to quality

28    psychiatric care. Prior to and during our current COVID-19 pandemic, I have an improved

25

Penn Decl. Re Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

18686938.1

1    knowledge base and direct administrative experiences regarding numerous psychiatry and other

2    mental health care staff recruiting and staffing challenges in our field.  I have increased knowledge

3    of the career decision-making and job search and career goals, objectives, and priorities and how

4    they may differ by early career psychiatrists, mid-career, and late career/senior psychiatrists.  As a

5    result, there is a pressing need to be flexible to attract high caliber and qualified psychiatrists to

6    work with correctional patient populations.  I have recruited and retained staff who have worked in

7    different capacities across their period of employment, such as on-site, telepsychiatry from home

8    office, and then from an office building.  Some may have worked part-time, and then moved to

9    full-time or vice versa depending on a variety of personal and family issues/needs.  This is where

10   the field is going, and there is a clear and critical need for correctional systems, budgetary/funding

11   sources, and leaders to be flexible and attuned to these recruitment and staffing challenges, as

12   opposed to utilizing a rigid boilerplate and regimented approach.

13       61.    In summary, telepsychiatry and telepsychology and other forms of telehealth continues

14   to be an essential tool and modality to afford community and incarcerated populations with timely

15   access and continuity of care to mental health professionals and other health care staff and

16   specialists.  Even in non-health care settings, for example the courts, it is now routine for

17   depositions and hearings to be conducted via videoconferencing while still affording criminal

18   defendants and civil litigants due process protections and access and availability to legal counsel.

19       61.    With regard to the expansion of correctional telepsychiatry during the COVID

20   pandemic, I can speak from my direct clinical and administrative experience in the state of Texas.

21   Thanks to our existing robust telepsychiatry system where we utilize a combination of on-site

22   psychiatrists at our inpatient psychiatry units and telepsychiatrists for non-inpatient outpatient and

23   residential units in addition to on-site qualified mental health professionals at non-inpatient units

24   UTMB CMC was able to provide timely access to care and continuity of care throughout the

25   pandemic and to date.

26       62.    In my professional opinion the COVID-19 pandemic has further cemented the need for

27   telepsychiatry in community "free world" settings in addition to its well established and lengthy

28   pattern of use across a variety of correctional and forensic settings such as state hospitals.  If we

26

1   would have relied solely on unit-based psychiatrists for our residential treatment programs this
2   would have proved disastrous should the unit-based psychiatrist or other psychiatric provider have
3   had a COVID exposure, infection, been required to quarantine at home and be unable to travel to
4   and work onsite (performing their usual job functions/tasks at a state prison unit). Similarly, during
5   the pandemic, many of our health care staff were unable to report to work due to a variety of
6   COVID-health and family issues (e.g., COVID exposures, caring for family members hospitalized
7   or recovering from COVID infection/complications or other health care issues), child care needs
8   (day care closures, other parent/spouse/partner unable to take care of children) and school closures,
9   many of which lasted indefinitely and were unpredictable in nature.

10   63.   There continues to be great potential for using telepsychiatry to expand access to mental
11   health services across correctional populations. Correctional telepsychiatry is a distinctly more
     attractive practice opportunity than working behind prison walls. It provides correctional systems
12   the opportunity to hire the best and the brightest psychiatrists, rather than struggle with vacancies
13   and the use of agency providers. It is the psychiatrist who creates the quality proposition for care
14   delivery rather than the location of the provider and patient. Without the use of this technology,
15   UTMB CMC would not be able to recruit and retain qualified psychiatrists to deliver the requisite
16   psychiatric services to the mental health populations of TDCJ, TJJD, and the county jails it serves.

17   64.   I have served in my role as the Director of Mental Health Services for UTMB CMC for
18   over 15 years. I have personally overseen the growth and expansion of telepsychiatry within the
19   TDCJ   and   TJJD   and   county   jail   healthcare   system,   particularly   in   rural   and
20   physician/psychiatrist/and other health care underserved areas across our large state. I have
21   personally utilized this modality to evaluate, diagnose, and treat the complex mental health
22   pathology of adult TDCJ state jail and state prison inmates as well as juveniles housed within TJJD
23   residential facilities statewide. It is my professional opinion that telepsychiatry is a highly effective,
24   reliable, and established mode of care delivery. Telepsychiatry is comparable if not superior to
25   face-to-face psychiatric encounters.

26   65.   Telepsychiatry has been demonstrated to have a high degree of both patient and
27   provider satisfaction. The use of telepsychiatry has been critical to UTMB CMC maintaining its
28   contractual requirements in providing timely access to high quality psychiatric and mental health

27

18686938.1

1 | care. In conclusion, based on my administrative acumen and clinical experiences in providing direct
2 | patient care, it is my professional opinion that telepsychiatry is, at a minimum, equivalent to onsite
3 | psychiatric care, if not a significant improvement over the traditional face-to-face methodology by
4 | affording staff safety protections with potentially impulsive, threatening, violent or assaultive
5 | individuals; and it can be used effectively during treatment team meetings and to implement
6 | effective treatment planning for incarcerated individuals. I have carefully reviewed CDCR's
7 | proposed telepsychiatry policy, and in my professional opinion it would exceed the standard of
8 | care.

9 |     I declare under penalty of perjury under the laws of the United States of America that the
10 | foregoing is true and correct. Executed in Conroe, Texas on June 30, 2022.

Joseph V. Penn, MD, CCHP FAPA
*(Original signature retained by attorney)*

28

18686938.1

# APPENDIX A

March 5, 2022

CURRICULUM VITAE
**JOSEPH V. PENN, MD CCHP FAPA**

| | |
|---|---|
| Business Address: | University of Texas Medical Branch (UTMB) |
| | Correctional Managed Care (CMC) |
| | Mental Health Services |
| | 200 River Pointe Drive, Suite 200 |
| | Conroe, Texas 77304 |
| Business Telephone: | (936) 494-4183 |
| Business Fax: | (936) 494-4194 |
| E-mail: | jopenn@utmb.edu |

## EDUCATION

| | |
|---|---|
| Undergraduate | 1987 B.S. in Biology |
| | University of the Incarnate Word (formerly Incarnate Word College), San Antonio, Texas |
| | <u>Honors</u>: Alpha Chi, Academic All-American, Who's Who in American Universities & Colleges, Graduated Summa Cum Laude |
| Medical School | 1992 M.D. |
| | University of Texas Medical Branch, Galveston, Texas |
| | <u>Honors</u>: Who's Who in American Colleges/Universities, Junior Marshal |

## POSTGRADUATE EDUCATION

2014 Management Certificate
Physician Leadership Academy
University of Houston Clear Lake &
University of Texas Medical Branch, Galveston, Texas

## POSTGRADUATE TRAINING

| | | |
|---|---|---|
| Residency | 1992-1996 | General Psychiatry |
| | 1995-1996 | Chief Resident |
| | Department of Psychiatry and Human Behavior, | |
| | Brown University, Providence, Rhode Island | |
| Residency | 1996-1998 | Child and Adolescent Psychiatry |
| | Department of Psychiatry and Human Behavior, | |
| | Brown University, Providence, Rhode Island | |
| Fellowship | 1998-1999 | Forensic Psychiatry |
| | Department of Psychiatry | |
| | Yale University, New Haven, Connecticut | |

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

## POSTGRADUATE HONORS AND AWARDS

1994   ACNP Program for Minority Research Training in Psychiatry
1994   Center for Mental Health Services Scholarship
1995   Mead Johnson Fellow, Association for Academic Psychiatry
1995   Laughlin Fellow, American College of Psychiatrists
1996   Outstanding Young Men of America
1996   Chester M. Pierce, M.D., Sc.D. Resident Research Award
1997   Lebensohn Award, American Association of General Hospital Psychiatrists
1997   Rappeport Fellow, American Academy of Psychiatry & the Law
1999   Presidential Scholar, American Academy of Child & Adolescent Psychiatry
2000   Pilot Research Award, American Academy of Child & Adolescent Psychiatry
2001   America's Registry of Outstanding Professionals
2002   Who's Who in Medicine and Healthcare
2003   Who's Who in America
2003   Who's Who in Science and Engineering
2003   Junior Faculty Development Award, Association for Academic Psychiatry
2004   Brown Medical School Teaching Recognition Award
2004   Distinguished Alumnus, University of the Incarnate Word
2004   Strathmore's Professional Honor Society
2005-  Best Doctors in America
2006   Madison Who's Who
2006   Fellow, American Psychiatric Association
2007   Who's Who Among Executives and Professionals
2007   Fellow, The Lloyd Society
2008   Member, American College of Psychiatrists
2011   Cambridge Who's Who Registry among Executives and Professionals in the Field of Research, Medicine, and Healthcare

## MILITARY SERVICE        None

## PROFESSIONAL LICENSES AND BOARD CERTIFICATION

1993   Rhode Island Medical License # 8849
1997   Diplomate, American Board of Psychiatry & Neurology # 43847
1998   Additional Certification, Child and Adolescent Psychiatry # 4583
1998   Connecticut Medical License # 36678
1999   Texas Medical License # K7081
1999   Massachusetts Medical License # 161086
2003   Additional Certification, Forensic Psychiatry # 1438
2004   Certified Correctional Health Care Professional (CCHP), National Commission on Correctional Health Care
2007   Re-Certification, American Board of Psychiatry & Neurology # 43847
2013   Re-Certification, Forensic Psychiatry, American Board of Psychiatry & Neurology #1438
2017   Re-Certification, General Psychiatry, American Board of Psychiatry & Neurology #43847
2017   Re-Certification, Child and Adolescent Psychiatry, American Board of Psychiatry & Neurology #4583

2

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 1995-1996 | Assistant Instructor in Psychiatry |
| 1998-2007 | Clinical Assistant Professor of Psychiatry, Department of Psychiatry and Human Behavior, Brown University School of Medicine, Providence, Rhode Island |
| 2007-2012 | Clinical Associate Professor of Psychiatry, Department of Psychiatry and Human Behavior, Warren Alpert Medical School of Brown University, Providence, Rhode Island |
| 2009-2013 | Clinical Associate Professor of Psychiatry, Department of Psychiatry and Behavioral Sciences, UTMB Medical School, Galveston, Texas |
| 2014- | Clinical Professor of Psychiatry, Department of Psychiatry and Behavioral Sciences, UTMB Medical School, Galveston, Texas |
| 2017- | Clinical Professor, Physician Assistant Studies, UTMB Medical School, Galveston, Texas |

## HOSPITAL APPOINTMENTS

| | |
|---|---|
| 1994-1997 | Psychiatric House Officer, Landmark Medical Center, Woonsocket, RI |
| 1994-1998 | Psychiatric House Officer, St. Joseph Center for Psychiatric Services, Providence, RI |
| 1999-2008 | Medical Staff, Rhode Island Hospital, Providence, RI |
| 1999-2008 | Medical Staff, Emma Pendleton Bradley Hospital, East Providence, RI |
| 1999-2008 | Director, Child and Adolescent Forensic Psychiatry, Rhode Island Hospital, Providence, RI |
| 2008- | Director, Mental Health Services, University of Texas Medical Branch (UTMB), Correctional Managed Care (CMC), Conroe, Texas |
| 2013-2014 | Acting Clinical Director, Texas Department of Criminal Justice (TDCJ), TDCJ Skyview/Hodge Units, Rusk, Texas |
| 2017- | Staff Psychiatrist, University Medicine Associates, Bexar County Hospital District d/b/a University Health, in conjunction with Detention Health Care Services ("University Health"), Bexar County Jail, San Antonio, Texas |
| 2018-2020 | Consulting Psychiatrist, River Oaks Hospital and Clinics, Houston, Texas |
| 2019-2020 | Acting Clinical Director, TDCJ, Jester IV Unit, Richmond, Texas |

## OTHER APPOINTMENTS

| | |
|---|---|
| 1995- | Reviewer, Hospital Physician |
| 1996 | Reviewer, Academic Psychiatry |
| 1996 | Reviewer, Journal of Nervous and Mental Disease |
| 1997 | Reviewer, Journal of Clinical Psychiatry |
| 1997 | Staff Psychiatrist, Kent County Mental Health Center, Warwick, RI |

3

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

| | |
|---|---|
| 1998-2001 | Consultant, New Haven State's Attorney Office, New Haven, CT |
| 1998-2000 | Consultant, Capital Defense and Trial Services Unit, Office of the Chief Public Defender, Hartford, CT |
| 1998-2001 | Consultant, Office of the Public Defender, Bridgeport, CT |
| 1998-1999 | Psychiatrist, New Haven Court Clinic, New Haven, CT |
| 1998-1999 | Consultant, Disabilities Clinic, Yale Law School, New Haven, CT |
| 1998-1999 | Psychiatric Expert Witness, Trial Practice Course, Yale Law School, New Haven, CT |
| 1998-1999 | Consultant, Special Populations Unit, CT Department of Mental Health and Addictions Services, Hartford, CT |
| 1998-1999 | Genesis Group Co-leader and Individual Therapist, Whiting Forensic Institute, Middletown, CT |
| 1998-1999 | Child Custody and Placement Clinic, Yale Child Study Center, New Haven, CT |
| 1998-2001 | Consultant, Superior Court, Juvenile Matters, Stamford, CT |
| 1999 | Consultant, Psychiatric Security Review Board, Middletown, CT |
| 1999 | Consultant, United States Department of State, Washington, DC |
| 1999-2001 | Staff Child Psychiatrist, The Family Health Center at SSTAR Program, Fall River, MA |
| 1999-2008 | Director of Psychiatric Services, Rhode Island Training School, Cranston, RI |
| 1999-2008 | Consultant, Rhode Island Family Court |
| 1999-2008 | Consultant, Rhode Island Department of Children, Youth, and Families |
| 1999-2008 | Consultant, RI Department of Disability Determination Services, Providence, RI |
| 1999-2000 | Consultant, Providence Police Department, Kid's INC. Program, Providence, RI |
| 1999-2001 | Consultant, Office of the Attorney General, Providence, RI |
| 2000-2001 | Consultant, Superior Court, Juvenile Matters, Hartford, CT |
| 2000-2001 | Consultant, United States Attorney, District of Rhode Island, Providence, RI |
| 2001 | Consultant, Butler Hospital, Providence, RI |
| 2001 | Consultant, Northwest Special Education Region, Scituate, RI |
| 2001 | Consultant, Qualidigm, Middletown, CT |
| 2001-2003 | Consultant, Town of Narragansett, Narragansett, RI |
| 2001-2002 | Consultant, Office of the Public Defender, Enfield, CT |
| 2001-2002 | Consultant, Medical Consultants Network, Seattle, WA |
| 2001-2002 | Advisory Board, HELP Mental Health and Wellness Initiative, Providence, RI |
| 2002 | Consultant, Yarmouth Police Department, Yarmouth, MA |
| 2002-2003 | Consultant, Office of the Mental Health Advocate, Cranston, RI |
| 2002 | Consultant, Commonwealth of Massachusetts, Committee for Public Council, Boston, MA |
| 2002- | Editorial Board, Hospital Physician |
| 2002- | Reviewer, Journal of Correctional Health Care |
| 2003- | Consultant, Bradley Hospital, East Providence, RI |
| 2003- | Representative, American Academy of Child & Adolescent Psychiatry to the National Commission on Correctional Health Care, Chicago, Illinois |
| 2003- | Board of Directors, National Commission on Correctional Health Care, Chicago, Illinois |
| 2003 | Advisory Panel, ADHD in Correctional Institutions, National Commission on Correctional Health Care, Chicago, Illinois |
| 2004 | Consultant, Town of West Warwick, RI, Pension Board |
| 2004 | Consultant, Rhode Island Department of Corrections |

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

| | |
|---|---|
| 2004 | Reviewer, Journal of the American Medical Women's Association |
| 2004- | Editorial Board, Psychiatry |
| 2005 | Consultant, Florida Department of Juvenile Justice |
| 2005-2008 | Consultant, Office of the Public Defender, Providence, RI |
| 2005 | Consultant, Bradley School, Portsmouth, RI |
| 2005-2006 | Consultant, Office of the Attorney General, Hartford, CT |
| 2006-2007 | Consultant, Phoenix House, New York, NY |
| 2006- | Editorial Board, Correctional Health Report |
| 2006-2008 | Consultant, Physicians and Lawyers for National Drug Policy |
| 2006-2008 | Board of Directors, Academy of Correctional Health Care Professionals |
| 2007-2009 | Consultant, Town of East Providence, RI, Police Department |
| 2007-2009 | Technical Assistance Project Consultant, National Commission on Correctional Health Care, Various Correctional Facilities, Valhalla, New York |
| 2007-2010 | Chair (Chair-Elect, Chair, Immediate Past), Board of Directors, National Commission on Correctional Health Care, Chicago, Illinois |
| 2008 | Consultant, National Institute of Mental Health (NIMH), Bethesda, MD |
| 2009 | Consultant, Kansas Department of Juvenile Corrections |
| 2009 | Consultant, Philadelphia Department of Behavioral Health and Mental Retardation Services |
| 2009 | Reviewer, Ambulatory Pediatrics |
| 2009- | Board of Directors, Society of Correctional Physicians (SCP) |
| 2011- | Editorial Board, Journal of Correctional Health Care |
| 2011 | Technical Assistance Project Consultant, U.S. Department of Justice, National Institute of Corrections (NIC) |
| 2011 | Consultant, Rhode Island Department of Corrections |
| 2011- | Consultant, Agency for Health Research and Quality's (AHRQ) Effective Health Care (EHC) Program |
| 2011 | Consultant, Office of the Attorney General, Providence, Rhode Island |
| 2011 | Consultant, Vermont Department of Corrections |
| 2012 | Technical Assistance Project Consultant, National Commission on Correctional Health Care, Idaho Department of Corrections |
| 2012 | Consultant, National Commission on Correctional Health Care, US Immigration and Customs Enforcement (ICE) San Diego Contract Detention Facility, San Diego, California |
| 2012 | Surveyor, National Commission on Correctional Health Care, Orleans Parish Criminal Sheriff's Office, New Orleans, Louisiana |
| 2012 | Surveyor, National Commission on Correctional Health Care, Hudson County Correctional Center, Kearny, New Jersey |
| 2012 | Reviewer, Academic Pediatrics |
| 2012-2013 | Consultant, Office of the Attorney General, Providence, Rhode Island |
| 2013- | Consultant, Polk County Juvenile Detention Center/Polk County Jail, Bartow, Florida |
| 2013-2016 | Member, Council on Psychiatry and Law, American Psychiatric Association, Arlington, Virginia |
| 2013 | Surveyor, National Commission on Correctional Health Care, Harris County Jail, Houston, Texas |
| 2013 | Surveyor, National Commission on Correctional Health Care, Rio Grande Detention Center, Laredo, Texas |

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

| | |
|---|---|
| 2013-2014 | Consultant, Juvenile Justice Commission (JJC) State of New Jersey, and the University of Medicine and Dentistry of New Jersey (UMDNJ)-University Behavioral HealthCare/University Correctional HealthCare, Trenton, New Jersey |
| 2013- | Consultant, J Allen and Associates of Texas, Friendswood, Texas |
| 2013- | Reviewer, Suicide and Life-Threatening Behavior |
| 2013- | Consultant, Division of Health Services, Arizona Department of Corrections, Phoenix, Arizona |
| 2013 | Surveyor, National Commission on Correctional Health Care, El Paso Service Processing Center, El Paso, Texas |
| 2013-2014 | Consultant to Special Master, *Coleman v. Brown*, *Governor of California, et al.,* United States Court of Appeals, Ninth Circuit, Pasadena, California. |
| 2015-2017 | Chair, Council on Children, Adolescents and Their Families, American Psychiatric Association, Arlington, Virginia |

## ADDITIONAL INFORMATION

| | |
|---|---|
| 2007-2011 | Contributor and Consultant to the American Academy of Child and Adolescent Psychiatry (AACAP) Work Group on Quality Issues. Practice Parameter for Child and Adolescent Forensic Evaluations. J Am Acad Child Adolesc Psychiatry 2011; 50:1299-1312 |

## HOSPITAL COMMITTEES

| | |
|---|---|
| 1994-96 | Pharmacy and Therapeutics Committee, Butler Hospital, Providence, RI |
| 1995-96 | Outpatient Specialty Program Directors Group, Butler Hospital, Providence, RI |

## UNIVERSITY COMMITTEES

Brown University Department of Psychiatry and Human Behavior

| | |
|---|---|
| 1992-96 | Policy Committee, Residency Training Program |
| 1992-96 | Selection Committee, Residency Training Program |
| 1994 | Residency Recruitment Coordination Committee |
| 1994-96 | SDDS/Primary Care Psychiatry Research Committee |
| 1994 | Search Committee, Director of General Psychiatry Residency Training Program |
| 1998 | Selection Committee, Child and Adolescent Psychiatry Residency Program |

Brown University School of Medicine

| | |
|---|---|
| 2000-2002 | Search Committee, Department of Pediatrics |
| 2003-2007 | Search Committee, Post-Doctoral Training Program in Juvenile Forensic Psychology |

University of Texas Medical Branch Correctional Managed Care

| | |
|---|---|
| 2008- | Continuing Medical Education (CME) Committee |
| 2008-2010 | County Jail Pharmacy and Therapeutics Committee |
| 2008- | Mental Health Services Policy Committee |
| 2008- | Quality Council |
| 2008- | Mental Health Inpatient Leadership Group (Chair) |
| 2009-2011 | Medical Executive Committee (Chair) |
| 2009- | Executive Council |

6

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

## NATIONAL COMMITTEES

Academy of Correctional Health Care Professionals
2003-2004    Education Committee
2005-2008    Membership Committee
2006-2008    Board of Directors
2007-2008    Education Committee

American Academy of Child and Adolescent Psychiatry
1997-2000    Television and the Media Committee
1999-       Rights and Legal Matters Committee
1999-2002    Task Force on Juvenile Justice Reform
2002-2006    Committee on Juvenile Justice Reform
2016-       Children and the Law Committee

American Board of Psychiatry and Neurology
1998-       2001Psychiatry Re-Certification Committee
2001-2004    Re-appointed, Psychiatry Re-Certification Committee
2006        Examiner, Part II General Psychiatry Examination Committee
2001-2006    Examiner, Child and Adolescent Psychiatry Examination Committee
2007-2014    Forensic Psychiatry Examination Committee

American Academy of Psychiatry and the Law
1998-       Rappeport Fellowship Committee
2006-       Suicidology Committee
2010-12      Institutional and Correctional Psychiatry
2011-       (Chair) Suicidology Committee

American College of Psychiatrists
2014-2017    Committee on the Education Award

American Correctional Association
2013-2021    Health Care Committee
2013-2021    Mental Health Committee

American Psychiatric Association
2012-2014    Workgroup on Persons with Mental Illness in the Criminal Justice System
2014-       Workgroup on Mental Illness and Criminal Justice

Association for Academic Psychiatry
2003-2004    Program Committee

Coalition for Juvenile Justice
2001-2002    Membership Committee

National Commission on Correctional Health Care
2003-       Juvenile Health Committee
2003-2004    Standards Revision Task Force, Standards for Health Services in Juvenile
            Detention and Confinement Facilities
2005        Program Committee
2005        (Chair) Clinical Guidelines Monitoring Subcommittee
2006-2007    (Vice-Chair) Clinical Guidelines Monitoring Subcommittee
2006-2010    Executive Committee, Member At-Large
2007-2008    (Chair) Juvenile Health Committee

7

| | |
|---|---|
| 2007-2008 | Clinical Guidelines Monitoring Subcommittee |
| 2008-2010 | Finance Committee |
| 2011-2014 | (Chair) Juvenile Health Committee |
| 2011- | Executive Committee |
| 2011- | Accreditation Committee |
| 2012-2014 | (Vice Chair) Accreditation Committee |
| 2013 | Standards Revision Task Force, Standards for Health Services in Jails and Prisons |
| 2014- | (Chair) Accreditation Committee |
| 2014- | Certified Correctional Health Professional-Mental Health (CCHP-MH) Committee |
| 2014- | Mental Health Standards Revision Task Force, Standards for Mental Health Services in Correctional Facilities |
| 2016 | Standards Revision Task Force, Standards for Health Services in Jails and Prisons |

## STATE AND LOCAL COMMITTEES

Rhode Island Psychiatric Society

| | |
|---|---|
| 1995-1996 | Executive Committee |
| 2006-2008 | (Chair) Public Affairs Committee |

Rhode Island Training School

| | |
|---|---|
| 2000-2001 | Health, Mental Health, and Suicide Prevention Work Group |
| 2002 | Resocialization Steering Committee |
| 2003-2008 | Pharmacy and Therapeutics Committee |
| 2004-2008 | Risk Management Committee |
| 2004-2008 | Suicide Prevention Work Group |

Rhode Island Department of Children, Youth, and Families

| | |
|---|---|
| 2003 | Article 23 Committee and Subcommittee |
| 2004 | Psychotropic Medications and Chemical Restraints |

Rhode Island Department of Health

| | |
|---|---|
| 2006-2008 | Suicide Prevention Subcommittee |

Texas Department of Criminal Justice

| | |
|---|---|
| 2008- | Correctional Managed Care Pharmacy and Therapeutics Committee |
| 2008- | Psychiatry Subcommittee |
| 2008-2009 | Drug Withdrawal/Benzodiazepine Discontinuation Subcommittee |
| 2008- | Joint Suicide Prevention Operational Workgroup |
| 2008- | Joint Mental Health Committee |
| 2008- | Suicide Prevention Working Group |
| 2008- | System Leadership Council |
| 2009-2011 | Joint Mental Health Work Group (Chair) |
| 2012-2017 | Joint Gender Identity Disorder Committee |
| 2012- | Integrated Mental Health Procedure Committee |
| 2014-2016 | Joint Mental Health Work Group (Chair) |
| 2017- | Joint Gender Identity Disorder Committee (Co-Chair) |
| 2017- | Correctional Managed Care Pharmacy and Therapeutics Committee (Chair) |

Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI)

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

2009-2014    Advisory Committee

Texas Juvenile Justice Department (formerly known as the Texas Youth Commission)

2008-        Youth Health Services Leadership Council
2008-        Youth Services Pharmacy and Therapeutics Committee
2008-        Mental Health Subcommittee
2008-        Psychiatry Subcommittee
2016-2018    (Chair) Youth Services Pharmacy and Therapeutics Committee

Texas Society of Psychiatric Physicians

2009-        Government Affairs Committee
2009-2012    Public Mental Health Services Committee
2009-2010    Strategic Planning and Coordinating Committee
2012-2013    (Vice-Chair) Forensic Psychiatry Committee
2013-2015    Continuing Medical Education Committee
2013-        (Chair) Forensic Psychiatry Committee
2013-        Executive Council
2018-2019    President

## MEMBERSHIP IN SOCIETIES

1987-99      American Medical Association
2002-2003    American Medical Association
1992-        Theta Kappa Psi Medical Fraternity Alumni
1992-        American Psychiatric Association
1993-2008    Rhode Island Psychiatric Society
1995-        American Academy of Child and Adolescent Psychiatry
1996-2004    Association for Academic Psychiatry
1996-98      Rhode Island Medical Society
1997-98      American Association of General Hospital Psychiatrists
1997-98      Brown University Housestaff Association
1999-2008    Rhode Island Council of Child and Adolescent Psychiatry
1997-        American Academy of Psychiatry and the Law
1998-99      Connecticut Psychiatric Society
2002-        Academy of Correctional Health Professionals
2008-        Texas Society of Psychiatric Physicians
2008-        Texas Society of Child and Adolescent Psychiatry
2009-        American College of Psychiatrists
2011-        American College of Physician Executives

## PUBLICATIONS

1. Jenkins M, Malloy P, Cohen R, Salloway S, Neeper R, **Penn JV**, Chang K. Attentional and Learning Dysfunction Among Adults with History of Childhood ADHD <u>Journal of the International Neuropsychological Society</u> 1996;2:209.

2. **Penn JV**, Boland RJ, McCartney JR, Kohn R, Mulvey T. Recognition and Treatment of Depressive Disorders by Internal Medicine Residents and Attendings <u>General Hospital Psychiatry</u> 1997;19:179-184.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

3. Jenkins M, Cohen R, Malloy P, Salloway S, Gillard E, **Penn JV**, Marcotte A. Neuropsychological Measures which Discriminate Among Adults with Residual Attention Deficit Disorder and Other Attentional Complaints <u>Clin Neuropsychologist</u> 1998;12:74-83.

4. **Penn JV**, Esposito CL, Schaeffer LE, Fritz GK, Spirito A. Suicide Attempts and Self-Mutilative Behavior in a Juvenile Correctional Facility <u>J Am Acad Child Adolesc Psychiatry</u> 2003; 7:762-769.

5. Zonfrillo MR, **Penn JV**, Leonard HL. Pediatric Psychotropic Polypharmacy. <u>Psychiatry 2005</u> 2005; 8:14-19.

6. Stein, LAR, Lebeau-Craven, R, Martin R, Colby SM, Barnett, NP, Golembeske, C, **Penn, JV**. Use of the Adolescent SASSI in a Juvenile Correctional Setting. <u>Assessment</u> 2005, 12:384-394.

7. **Penn JV**, Thomas CR. AACAP Work Group on Quality Issues. Practice Parameter for the Assessment and Treatment of Youth in Juvenile Detention and Correctional Facilities. <u>J Am Acad Child Adolesc Psychiatry</u> 2005; 10:1085-1098.

8. **Penn JV**, Esposito CL, Stein LAR, Lacher-Katz M, Spirito A. Juvenile Correctional Workers' Perceptions of Suicide Risk Factors and Mental Health Issues of Incarcerated Juveniles. <u>J Correctional Health Care</u> 2006; Volume 11, Issue 4: 333-346.

9. Cascade EF, Kalali AH, **Penn JV**, Feifel D. Recent Changes in Prescriptions for Antipsychotics in Children and Adolescents. <u>Psychiatry</u> (Edgmont). 2006 Volume 3, Issue 9:18-20.

10. Esposito-Smythers CL, **Penn JV**, Stein LAR, Lacher-Katz M, Spirito A. A Test of Problem Behavior and Self-Medication Theories in Incarcerated Adolescent Males. <u>J Child Adol Substance Abuse</u> 2008; Volume 17, Issue 4: 41-56.

11. Baillargeon J, Binswanger IA, **Penn JV**, Williams BA, Murray OJ. Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door. <u>The American Journal of Psychiatry</u> 2009; Volume 166, Issue 1:103-109.

12. Baillargeon J, **Penn JV**, Thomas CR, Temple JR, Baillargeon G, Murray OJ. Suicide in America's Largest Prison System. <u>Journal of the American Academy of Psychiatry and the Law</u> 2009; Volume 37, Number 2: 188-193.

13. Garvey KA, **Penn JV,** Campbell AL, Esposito-Smythers CL, Spirito A. Contracting For Safety with Patients: Clinical Practice and Forensic Implications. <u>Journal of the American Academy of Psychiatry and the Law</u> 2009; Volume 37, Number 3: 363-370.

14. Ochoa KC, Pleasants GL, **Penn JV**, Stone DC. Disparities in Justice and Care: Persons With Severe Mental Illnesses in the U.S. Immigration Detention System. <u>Journal of the American Academy of Psychiatry and the Law</u> 2010; Volume 38, Number 3: 392-399.

15. Baillargeon J, Hoge SK, **Penn JV**. Addressing the Challenge of Community Reentry among Released Inmates with Serious Mental Illness. <u>American Journal of Community Psychology</u> 2010; Volume 46, Number 3-4: 361-375.

16. Baillargeon J, **Penn JV**, Knight K, Harzke AJ, Baillargeon G, Becker EA. Risk of Reincarceration among Prisoners with Co-occurring Severe Mental Illness and Substance Use Disorders. <u>Adm Policy Ment Health</u> 2010; Volume 37, Number 4:367-74.

17. Harzke, AJ, Baillargeon J, Baillargeon G, Henry J, Olvera R, Torrealday O., **Penn, JV**, Parikh, R. Prevalence of Psychiatric Disorders in the Texas Juvenile Correctional System. Journal of Correctional Health Care 2012; Volume 18, Number 2: 143-157.

18. Harzke AJ, Baillargeon J, Baillargeon G, Olvera R, Torrealday O, **Penn JV**, Parikh R. Co-occurrence of Substance Use Disorders with Other Psychiatric Disorders in the Texas Juvenile Correctional system. International Journal of Prisoner Health 2011; 7, 4-16.

19. Hilliard WT, Barloon L, Farley P, **Penn JV,** Koranek A. Bupropion Diversion and Misuse in the Correctional Facility. Journal of Correctional Health Care 2013; Volume 19, Number 3: 211-217.

20. McKee J, **Penn JV**, Koranek A. Psychoactive Medication Use and Misadventuring Issues in Correctional Healthcare – What all Clinicians Should Know. Journal of Correctional Health Care 2014; 20(3):249-260.

21. Trestman, RL (Chair), **Penn JV**, et al. Psychiatric Services in Correctional Facilities: Third Edition A Work Group Report of the American Psychiatric Association. American Psychiatric Publishing 2015.

22. Tamburello A, Metzner J, Ferguson E, Champion M, Ford E, Glancy G, Appelbaum K, **Penn J,** Burns K, Ourada J. The American Academy of Psychiatry and the Law Practice Resource for Prescribing in Corrections. Journal of the American Academy of Psychiatry and Law 46:242-43, 2018. DOI:10.29158/JAAPL.003762-18

23. Tamburello A, **Penn J,** Ford E, Champion M, Glancy G, Metzner J, Ferguson E, Tomita T, Ourada J. The American Academy of Psychiatry and the Law Practice Resource for Prescribing in Corrections. Journal of the American Academy of Psychiatry and Law (in press)

24. Tamburello A, **Penn JV,** Negron-Muñoz R, Kaliebe K. Prescribing Psychotropic Medications for Justice-Involved Juveniles. Journal of Correctional Health Care (under editorial review)

## OTHER PEER-REVIEWED PUBLICATIONS

1. Chang K, Neeper R, Jenkins M, **Penn JV**, Bollivar L, Israeli L, Malloy P, Salloway SP. Clinical Profile of Patients Referred for Evaluation of Adult Attention-Deficit Hyperactivity Disorder (Abstract) Journal of Neuropsychiatry and Clinical Neurosciences 1995;7:400-1.

2. **Penn JV**, Salloway SP. Development of Multiple Sclerosis in a Patient with Attention-Deficit Hyperactivity Disorder (Abstract) Journal of Neuropsychiatry and Clinical Neurosciences 1995;7:406-7.

3. **Penn JV**, Child and Adolescent Forensic Psychiatry, Medicine and Health Rhode Island 2005;9:310-317.

## OTHER NON-PEER REVIEWED PUBLICATIONS

1. **Penn JV**, Martini J, Radka D. Weight Gain Associated with Risperidone (Letter to Editor) Journal of Clinical Psychopharmacology 1996;16:259-260.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

2. **Penn JV**, Leonard HL, March J: OCD in Children and Adolescents. In M.T. Pato, G Steketee (eds.), OCD Across the Life Cycle, <u>Annual Review of Psychiatry</u>, Volume 16. Washington, DC: American Psychiatric Press, 1997, pp 7-53.

3. **Penn JV**, Hagino 0: Child and Adolescent Psychiatry. In R.J. Goldberg, <u>Practical Guide to the Care of the Psychiatric Patient</u>, 2nd Edition. St. Louis: Mosby, 1998, pp 340-374.

4. **Penn, JV**, Casoli-Reardon M. <u>Antisocial and Violent Youth</u> (Book Review) Shamsie Lugus et al., Journal of the American Academy of Child and Adolescent Psychiatry 2001;12:1483-1484.

5. **Penn, JV**, Casoli-Reardon M. <u>Antisocial and Violent Youth</u> (Book Review) Shamsie Lugus et al., Journal of Developmental and Behavioral Pediatrics 2001; 22: 258-259.

6. **Penn JV**. Attention-Deficit/Hyperactivity Disorder: Review Questions. <u>Hospital Physician</u> 2001; 6:27-28.

7. **Penn JV**. Quick to Cry? <u>Parenting</u> 2001; 4:185.

8. **Penn JV**, Leonard HL: Diagnosis and Treatment of Obsessive-Compulsive Disorder in Children and Adolescents. In M.T. Pato, J. Zohar (eds.), <u>Current Treatments of Obsessive-Compulsive Disorder</u>, 2nd Edition. Washington, DC: American Psychiatric Press, 2001, pp. 109-132.

9. **Penn JV**. Justice for Youth? A History of the Juvenile and Family Court. <u>The Brown University Child and Adolescent Behavior Letter</u> 2001; 9:1-4.

10. **Penn JV**. Child and Adolescent Depression: Review Questions. <u>Hospital Physician</u> 2002; 1:39-40.

11. Thomas CR, **Penn JV**: Juvenile Justice Mental Health Services, In <u>Child and Adolescent Psychiatric Clinics of North America</u>. Edited by Haller L. Philadelphia: WB Saunders, 2002, pp 731-748.

12. **Penn JV**: Use of Psychotropic Medications with Incarcerated Youth. <u>Standards for Health Services in Juvenile Detention and Confinement Facilities</u> National Commission on Correctional Health Care, 2004, 263-265.

13. Carlsen AB, **Penn JV** <u>Kids Who Commit Adult Crimes: Serious Criminality by Juvenile Offenders</u> (Book Review) Flowers RB, Journal of Developmental & Behavioral Pediatrics 2005; 26:390-391.

14. Kraus LJ, **Penn JV**: Standards for Juvenile Detention and Confinement Facilities. <u>In Recommendations for Juvenile Justice Reform</u>. (Monograph) 2nd Edition. American Academy of Child and Adolescent Psychiatry Committee on Juvenile Justice Reform, 2005, p.40-47.

15. Masters KJ, **Penn JV**: Seclusion and Restraint: Juvenile Justice Plus Restrictive Interventions Equals Fragmentation. <u>AACAP News</u>, 2005, p. 164, 172.

16. **Penn JV**: Safe Use of Psychotropic Medications with Confined Youth. <u>Correct Care</u>, 2005, Volume 19, Issue 2, p. 12.

17. Murakami S, Rappaport N, **Penn JV**: An Overview of Juveniles and School Violence. In <u>Psychiatric Clinics of North America</u>. Edited by Scott C. Philadelphia: Elsevier, 2006, pp. 725-741.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

18. **Penn JV**: Expert Commentary: Antipsychotic Use Among Children and Adolescents. Psychiatry 2006. 2006; 9:19.

19. **Penn JV**: Child and Adolescent Psychiatry.  In R.J. Goldberg, Practical Guide to the Care of the Psychiatric Patient, 3rd Edition. Elsevier: Philadelphia, PA, 2007, pp 389-441.

20. Romero L, **Penn JV**. Ethical Issues of Youthful Offenders: Confidentiality, Right to and Right to Refuse Treatment, Seclusion and Restraint.  In C. Kessler and L. Kraus, The Mental Health Needs of Young Offenders, Cambridge University Press, Cambridge, UK, 2007, pp. 401-422.

21. **Penn JV**, Thomas CR. Mental Health Care in Juvenile Detention Facilities: A Review (Letter to Editor) Journal of the American Academy of Psychiatry and the Law. 2006; 34:570-571.

22. Faille L, Clair M, **Penn JV**.  Special Risk Management Issues in Child and Adolescent Psychiatry. Psychiatric Times. 2007; 7:64-67.

23. **Penn JV**. Invited Editorial: "Psychotropic Medications in Incarcerated Juveniles: Over versus Under-Prescribed?" Arch Pediatr Adolesc Med. 2008 Mar;162(3):281-3.

24. Baillargeon J, Paar DP, **Penn JV** Psychiatric Disorders and HIV/Hepatitis Coinfection CorrDocs. Volume 11, Issue 3:12.

25. Baillargeon J, **Penn JV**, (Letter to Editor) The American Journal of Psychiatry 2009; 166:490.

26. **Penn JV**. Suicide Prevention Strategies for Juveniles in Correctional Settings. In Condotte Suicidarie: Un'analisi Nel Sistema Degli Istituti Penali Minorili (Suicide Behavior: An Analysis of the Juvenile Justice/Correctional System). Numeri Pensati: Gangemi Editore, Rome, Italy, 2010, pp 66-76.

27. Clair M, Faille L, **Penn JV.**  Prevention and Treatment of Violent Offending/Offenders. In Ferguson CJ, Violent Crime: Clinical and Social Implications, Sage Publications, Thousand Oaks, CA, 2010, 351-372.

28. **Penn JV**. Standards and Accreditation for Jails, Prisons, and Juvenile Facilities, In Oxford Textbook of Correctional Psychiatry. Edited by Trestman R, Appelbaum K, and Metzner J. Oxford University Press, New York, NY, 2015, pp 359-365.

29. McGlasson T, Champion MK, **Penn JV**. Geriatric Offenders: Evaluation and Treatment within Correctional Settings, In Oxford Textbook of Geriatric Forensic Psychiatry. Edited by Holzer J, Kohn R, Recupero P, and Ellison, J. Oxford University Press, New York, NY (in press).

30. **Penn JV**, Weinstein HC. Correctional Psychiatry, In Kaplan & Sadock's Comprehensive Textbook of Psychiatry 10th edition.  Edited by Sadock BJ, Sadock VA and Ruiz P, Lippincott Williams & Wilkins, Philadelphia, PA (in press).

## **ABSTRACTS**

1. Penn JV, Phillips KA. (1995). *Body Dysmorphic Disorder and Social Phobia, Young Investigator's Poster Session, American Psychiatric Association Annual Meeting, Miami, Florida.*

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

2. Penn JV, Boland RJ, McCartney JR. (1995). Recognition and Treatment of Depressive Disorders Among Internists, Young Investigator's Poster Session, American Psychiatric Association Annual Meeting. Miami, Florida.

3. Penn JV, Salloway SP. (1995). Development of Multiple Sclerosis in a Patient with Attention-Deficit Hyperactivity Disorder, Poster Session, American Neuropsychiatric Association Annual Meeting. Pittsburgh, Pennsylvania.

4. Chang K, Neeper R, Jenkins M, Penn JV, Bollivar L, Israeli L, Malloy P, Salloway SP. (1995). Clinical Profile of Patients Referred for Evaluation of Adult Attention-Deficit Hyperactivity Disorder, Poster Session, American Neuropsychiatric Association Annual Meeting. Pittsburgh, Pennsylvania.

5. Penn JV, Zimmerman M, Mattia J. (1996). Screening for Psychiatric Disorders in Medical Outpatients: A Patient Acceptance Study, Young Investigator's Poster Session, American Psychiatric Association Annual Meeting. New York, New York.

6. Jenkins M, Malloy P, Cohen R, Salloway SP, Neeper R, Penn JV, Chang K. (1996). Attentional and Learning Dysfunction among Adults with History of Childhood ADHD, Poster Session, International Neuropsychological Society Annual Mid-Year Meeting. Veldhoven, The Netherlands.

7. Penn JV, Boland RJ, McCartney JR. (1996). Recognition and Treatment of Depressive Disorders by Internal Medicine Attendings and Housestaff, Annual Chester M. Pierce, M.D., Sc.D., Resident and Medical Student Research Symposium, National Medical Association 101st Scientific Assembly, Chicago, Illinois.

8. Penn JV, Boland RJ, McCartney JR. (1996). Recognition and Treatment of Depressive Disorders by Internal Medicine Attendings and Housestaff, Poster Session, Annual Lifespan Hospitals Research Celebration, Providence, Rhode Island.

9. Penn JV, Holden P, Hendren RL. (1997). Can You Teach Child and Adolescent Psychopharmacology from Somebody Else's Lecture Notes? Workshop Presentation and Poster Session, Annual Meeting Association for Academic Psychiatry, Albuquerque, New Mexico.

10. Leonard HL, Penn JV, March J. (1997). OCD in Children and Adolescents, Review of Psychiatry, Obsessive-Compulsive Disorder Across the Life Cycle, American Psychiatric Association Annual Meeting. San Diego, California.

11. Penn JV, Esposito C, Spirito A. (2001). Incidence of Suicide Attempts and Self-Injurious Behavior in a Juvenile Correctional Facility, Poster Session, American Academy of Child and Adolescent Psychiatry Annual Meeting. Honolulu, Hawaii.

12. Penn JV, Esposito CL, Stein LAR, Lacher-Katz M, Spirito A. (2003) Juvenile Correctional Workers' Perceptions of Suicide Risk Factors and Mental Health Issues of Incarcerated Juveniles, Poster Session, American Academy of Psychiatry and the Law Annual Meeting, San Antonio, Texas.

13. Penn JV. (2005) AACAP Practice Parameter for the Assessment and Treatment of Youth in Juvenile Detention and Correctional Facilities, Symposium, Emerging Frontier of Psychiatry: Juvenile Justice, American Psychiatric Association Annual Meeting, Atlanta, Georgia.

14. Penn JV. (2005) Surviving the Challenges of Juvenile Corrections: Suicide Prevention Strategies, Symposium, Juvenile Justice and Mental Health, International Academy of Law and Mental Health, International Congress on Law and Mental Health, Paris, France.

15. Merideth P, Janofsky J, Penn JV. Phillips RTM, Recupero P. (2005) Difficult Case? Consult Your Colleagues, Workshop, American Academy of Psychiatry and the Law Annual Meeting, Montreal, Canada.

16. Chen JT, Hunt J, Penn JV, Spirito A. (2006) Psychiatric Differences Among Adolescents in a Psychiatric Hospital Versus a Juvenile Correctional Facility, Poster Session, American Psychiatric Association, Institute on Psychiatric Services, New York, New York.

17. Penn JV. (2006) Suicide Attempts and Self-Mutilative Behavior in a Juvenile Correctional Facility, Symposium, Recent Developments in the Research of Juvenile Offenders, American Academy of Child and Adolescent Psychiatry Annual Meeting. San Diego, California.

18. Penn JV. (2007) Acting Out: How to Manage Difficult Adolescents in Correctional Settings, Symposium (Chair), Novel Approaches to the Evaluation and Treatment of Juvenile Offenders, International Academy of Law and Mental Health, International Congress on Law and Mental Health, Padua, Italy.

19. Garvey KA, Penn JV. (2007) Contracting for Safety with Adolescents: Is This an Empirically-Based Practice? Poster Session, American Academy of Psychiatry and the Law Annual Meeting, Miami, Florida.

20. Ryan E, Penn JV. (2007) Juvenile Sexual Offenders: Update on Clinical and Forensic Evaluation Strategies, Workshop Presentation, American Academy of Child and Adolescent Psychiatry Annual Meeting. Boston, Massachusetts.

21. Baillargeon J, Penn JV. (2008) The Prevalence and Treatment of Psychiatric Disorders in a State Prison System, Academic and Health Policy Conference on Correctional Health, Quincy, Massachusetts.

22. Garvey KA, Penn JV, Campbell AL, Esposito-Smythers CL, Spirito A. (2008) Contracting for Safety: Clinical Practice and Forensic Implications, Paper Session, American Academy of Psychiatry and the Law Annual Meeting, Seattle, Washington.

23. Baillargeon J, Penn JV, (2009) Psychiatric Disorders and Repeat Incarcerations: The Revolving Prison Door, Symposium, International Academy of Law and Mental Health, International Congress on Law and Mental Health, New York, New York.

24. Baillargeon J, Penn JV, (2009) Psychiatric Disorder and Parole Revocation Among Texas Prison Inmates, Academic and Health Policy Conference on Correctional Health, Fort Lauderdale, Florida.

25. Dingle AD, Zito JM, Sharma S, Zima BT, Varley CK, Carlson GA, Penn JV. (2010) Psychotropic Medication Use in Vulnerable Child and Adolescent Populations, Symposium, American Academy of Child and Adolescent Psychiatry Annual Meeting, New York, New York.

26. Penn JV, (2011) Framework of Correctional Managed Care Models: Formulary Development and Implementation, Symposium, International Academy of Law and Mental Health, International Congress on Law and Mental Health, Berlin, Germany.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

27. Ochoa K, Penn JV, Venters H, Hustings E, Mehta S, Belous L. (2011) Seriously Mentally Ill Persons in U.S. Immigration Detention, Panel, American Academy of Psychiatry and the Law Annual Meeting, Boston, Massachusetts.

28. Penn JV, Harzke AJ, Baillargeon J, (2012) Risk of Reincarceration among Prisoners with Co-Occurring Serious Mental Illness and Substance Use Disorders, Academic and Health Policy Conference on Correctional Health, Atlanta, Georgia.

29. Penn JV, (2012) Practicing Behind Bars: Challenges and Opportunities Within Correctional Psychiatry, Symposium, Forensic Psychiatry: Informing Clinical Practice, American Psychiatric Association Annual Meeting, Philadelphia, Pennsylvania.

30. Torrealday O, Penn JV, (2013) Juveniles Behind Bars: Meeting Treatment Needs Through a Statewide Academic and Correctional Managed Care Partnership, Academic and Health Policy Conference on Correctional Health, Chicago, Illinois.

31. Penn JV, (2013) Psychiatric Services in Jails and Prisons: An Update on the APA Guidelines, American Psychiatric Association Annual Meeting, San Francisco, California.

32. Penn JV, (2013) Psychiatric Comorbidity in Secure Juvenile Settings: How Complex an Issue is It Really? International Academy of Law and Mental Health, International Congress on Law and Mental Health, Amsterdam, The Netherlands.

33. Torrealday O. Penn JV, Parikh R, (2014) Meeting Complex Mental Health Needs of Youthful Offenders, Academic and Health Policy Conference on Correctional Health, Houston, Texas.

34. Parikh R, Torrealday O, Penn JV, (2014) Save Money and Get Better Care? Cost Effective Health Care Delivery in Juvenile Corrections, Academic and Health Policy Conference on Correctional Health, Chicago, Illinois.

35. Torrealday O, Penn JV, (2015) Grievances: Strategies to Reduce Grief and Grievances While Improving Patient Care, Academic and Health Policy Conference on Correctional Health, Boston, Massachusetts.

36. Appelbaum K, Ford E, Metzner J, Penn JV, Trestman R, (2015) The New APA Guidelines on Correctional Psychiatry, Panel Presentation, American Academy of Psychiatry and the Law Annual Meeting, Fort Lauderdale, Florida.

## INVITED PRESENTATIONS

1. "Cognitive Behavioral Treatment of Panic Disorder," Rhode Island Hospital, Department of Psychiatry, General Hospital Psychiatry Continuing Education Series, Providence, Rhode Island, 1993.

2. "Social Phobia: An Overview of Treatment Strategies," Rhode Island Hospital, Department of Psychiatry, General Hospital Psychiatry Continuing Education Series, Providence, Rhode Island, 1994.

3. "Paraphilias and Sexual Deviations," Butler Hospital, Outpatient Department Case Conference, Providence, Rhode Island, 1995.

4. "Cultural Competence in the Delivery of Mental Health Services," Rhode Island Psychological Association 1995 Annual Convention, Providence, Rhode Island, 1995.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

5. "Can You Teach Child and Adolescent Psychopharmacology from Somebody Else's Lecture Notes?" Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 1997.

6. "Consulting to the Community: A Challenge for the Child and Adolescent Psychiatrist," Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 1997.

7. "A School-Based Approach to Selective Mutism," Elmhurst Elementary School, Portsmouth, Rhode Island, 1977.

8. "Moodiness and Depression in Children and Adolescents," WLNE ABC Channel 6, Providence, Rhode Island, 1997.

9. "Moodiness and Depression in Adolescents," Mount Hope High School, Bristol, Rhode Island, 1997.

10. "Moodiness and Depression in Children and Adolescents," Lifespan Health Connection, Speaking of Kids, Parenting Education Series, Bradley Hospital, East Providence, Rhode Island, 1997.

11. "Career Opportunities in Child and Family Psychiatry," Junior Explorers, Miriam Hospital, Providence, Rhode Island, 1998.

12. "The Crisis of School Violence: How Do We Help Our Children," Testimony before the Congressional Children's Caucus, Washington, District of Columbia, 1999.

13. "Assessment of Violent Behavior in Adolescents," Department of Pediatrics, Division of Adolescent Medicine, Hasbro/Rhode Island Hospital, Providence, Rhode Island, 1999.

14. "Overview of Child Psychiatric Consultation at the Rhode Island Training School to the Rhode Island Family Court," Annual Rhode Island Family Court Judges' Conference, Narragansett, Rhode Island, 1999.

15. "The New Law and Psychiatry Service at Brown," Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 1999.

16. "Violent Threats Made by Adolescents: An Approach to Assessment and Treatment," The Family Health Center at SSTAR Program, Fall River, Massachusetts, 1999.

17. "Introduction to Child and Adolescent Psychopharmacology," Miriam Hospital, Rhode Island Nursing Association, Clinical Nurse Specialists Continuing Education Seminar, Providence, Rhode Island, 2000.

18. "What We Don't Want to Happen to Our Youth," Adolescent Mental Health and School Success Conference, Rhode Island Department of Health, Providence, Rhode Island, 2000.

19. "Psychiatric and Abuse Issues Affecting Incarcerated Youth," Justice for All Youth Conference, Rhode Island Office of the Child Advocate, Warwick, Rhode Island, 2000.

20. "Juvenile Violence," Grand Rounds, Newport Hospital, Newport, Rhode Island, 2000.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

21. "Demystifying the Courts and the Legal Process for Juveniles," Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 2000.

22. "Warning Signs in Adolescents: A Practical Guide for Families and Educators," Lifespan Health Connection, Parenting Matters, Parenting Education Series, Tollgate High School, Warwick, Rhode Island, 2000.

23. "Mood Dysregulation and Mood Disorders in Incarcerated Youth," Grand Rounds, Judge Baker Children's Center, Boston, Massachusetts, 2001.

24. "The Crisis of School Violence: How Do We Help Our Children," Grand Rounds, Department of Psychiatry, State University of New York, Buffalo, New York, 2001.

25. "Mental Health Evaluation and Treatment of Incarcerated Youth," Child Psychiatry Fellowship Seminar Series, New England Medical Center, Boston, Massachusetts, 2001.

26. "Mood, Substance Abuse, and Other Mental Disorders in Violent Youth," St. Anne's Hospital, Fall River, Massachusetts, 2001.

27. "Teen Violence: Risk Management and Malpractice Issues" Annual Conference, National Organization of Forensic Social Workers, Philadelphia, Pennsylvania, 2001.

28. "Mental Health Needs of Incarcerated Youth" Annual Conference, National Organization of Forensic Social Workers, Philadelphia, Pennsylvania, 2001.

29. "Children's Mental Health Issues in Rhode Island: Problems and Solutions" Testimony before Congressional Committee Hearing, Rhode Island State House, Providence, Rhode Island, 2001.

30. "Mental Health Evaluation and Treatment of Incarcerated Youth," Sixth New England Correctional Health Conference, Sturbridge, Massachusetts, 2001.

31. "When Psychotherapies Are Not Enough: Medical Management of Aggression," Pediatric Psychopharmacology: An Update for Primary Care Practitioners, Providence, Rhode Island, 2001.

32. "Mental Health Evaluation and Treatment of Incarcerated Juveniles," The Providence Center, Providence, Rhode Island, 2001.

33. "School Shootings and Youth Violence," Truman Taylor Show, WLNE ABC, Channel 6, Providence, Rhode Island, 2001.

34. "Juveniles Presenting with Violent or Threatening Behaviors" Greater Fall River Child Protection Council and St. Anne's Hospital Lecture Series, Fall River, Massachusetts, 2001.

35. "School Shootings and Youth Violence," Healthwatch, NBC, WJAR Channel 10, Providence, Rhode Island, 2001.

36. "Youth Violence," Bradley/Hasbro Hospitals: Parenting Matters 2001, Toll Gate High School, Warwick, Rhode Island, 2001.

37. "School Violence: Strategies for Schools and Families," N.A. Ferry Middle School, Johnston, Rhode Island, 2001.

38. "School Violence: Strategies for Schools and Families" CBS, WPRI, Channel 12, Providence, Rhode Island, 2001.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

39. "Re-Defining the Use of Psychotropic Medications in Children and Adolescents," Annual Rhode Island Family Court Judges' Conference, Narragansett, Rhode Island, 2001.

40. "Bullying, Beatings & Beyond: Assessment and Treatment of Youth Violence," Rhode Island Psychological Society, Pawtucket, Rhode Island, 2001.

41. "Psychiatric Services for Incarcerated Juveniles," Annual Meeting, National Commission on Correctional Health Care (NCCHC), Albuquerque, New Mexico, 2001.

42. "Assessment and Treatment of Juvenile Sexual Offenders," (Discussant) Grand Rounds, Rhode Island Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, Providence, Rhode Island, 2001.

43. "Re-Defining the Use of Psychotropic Medications in Children and Adolescents," Rhode Island Training School, Clinical Staff In-Service, Cranston, Rhode Island, 2002.

44. "Youth Violence: Evaluation and Treatment Approaches," University of Texas Medical Branch, Department of Psychiatry, Psychiatry Resident's Journal Club, Galveston, Texas, 2002.

45. "Youth Violence: Practical Strategies for Clinicians," St. Luke's Hospital, Department of Psychiatry, Grand Rounds, New Bedford, Massachusetts, 2002.

46. "Redefining the Use of Psychotropic Medications in Juvenile Justice Populations," 7th Northeast Correctional Health Care Conference, Sturbridge, Massachusetts, 2002.

47. "Profile of a Columbine Type Perpetrator: What to Look for and What to do About it," Annual Juvenile Probation and Justice Management Conference (Juvenile Probation Track): National Council of Juvenile and Family Court Judges Conference, Tucson, Arizona, 2002.

48. "Conduct Disorder: Evaluation and Treatment Approaches," Plymouth, Massachusetts, 2002.

49. "Conduct Disorder: Evaluation and Treatment Approaches," Child and Adolescent Psychiatry Grand Rounds, Taunton State Hospital, Taunton, Massachusetts, 2002.

50. "Redefining the Use of Psychotropic Medications in Children and Adolescents," Kent County Mental Health Center, Warwick, Rhode Island, 2002.

51. "The Project Hope Experience: Evaluation and Treatment of Mental Health Issues in Incarcerated Juveniles," Children's Mental Health - A System of Care Approach, American Academy of Child and Adolescent Psychiatry, Boston, Massachusetts, 2002.

52. "Clinical Challenges in Child and Adolescent Psychiatry," Beaumont, Texas, 2002.

53. "Recognizing Other Psychiatric Disorders" American Academy of Pediatrics: DB:PREP An Intensive Review Course of Developmental and Behavioral Pediatrics, Providence, Rhode Island, 2002.

54. "Youth Violence: Practical Strategies for Clinicians," Family Service Association of Greater Fall River, Inc., Fall River, Massachusetts, 2002.

55. "Bullying, Beatings, and Beyond: Assessment and Treatment of Youth Violence," Grand Rounds, Department of Pediatrics, Hasbro/Rhode Island Hospital, Providence, Rhode Island, 2002.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

56. "Psychotropic Medications:  What They Do, What They Don't Do," Annual Rhode Island Family Court Judges' Conference, Narragansett, Rhode Island, 2002.

57. "Recognition and Management Strategies of Youth Violence for Mental Health Professionals," Child and Adolescent Psychiatry Grand Rounds, Taunton State Hospital, Taunton, Massachusetts, 2002.

58. "Suicide Prevention in Juvenile Correctional Facilities," Staff Training Program, Rhode Island Training School, Cranston, Rhode Island, 2002.

59. "The Elephant in the Room: How the Legal System Can Impact Therapy," (Discussant) Grand Rounds, Bradley Hospital, Brown University Department of Psychiatry, Division of Child and Adolescent Psychiatry, East Providence, Rhode Island, 2003.

60. "Youth Violence," Bradley/Hasbro Hospitals: Parenting Matters 2003, Toll Gate High School, Warwick, Rhode Island, 2003.

61. "Identification and Treatment of Mental Health Issues in Incarcerated Youth," 8th Northeast Correctional Health Care Conference, Sturbridge, Massachusetts, 2003.

62. "Missed Opportunities and Challenges: Identifying Mental Health and Substance Abuse Issues in Today's Youth," Physician Leadership on National Drug Policy Conference: Adolescent Substance Abuse and Mental Health: A Public Health Priority, Providence, Rhode Island, 2003.

63. "Evaluation and Treatment of Incarcerated Juveniles with Mental Health Issues: Challenges, Frustrations, and Solutions," Butler Hospital, Child and Adolescent Services Program Lecture Series, Providence, Rhode Island, 2003.

64. "Surviving the Challenges of Juvenile Corrections: Suicide Prevention Strategies," National Conference on Correctional Health Care, Austin, Texas, 2003.

65. "Redefining the Use of Psychotropic Medications in Children," Annual Meeting of the RI Chapter of the American Academy of Pediatrics, Providence, Rhode Island, 2003.

66. "How Young People Become Criminals: Their Developmental Trajectories Before and After," Brown University, Behavioral Misadventures Symposium, Providence, Rhode Island, 2003.

67. "Understanding and Defusing Explosive Kids," Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Nashville, Tennessee, 2004.

68. "Mixing Legal and Street Drugs: A Cocktail for Disaster," Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Nashville, Tennessee, 2004.

69. "Promising Programs: Suicide Prevention/Good Practices," 23 rd Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Nashville, Tennessee, 2004.

70. "Challenging Youths, Families & Systems: Implementing Psychiatric Strategies and Risk Management Principles," Problems in Pediatrics Conference, Colby College, Waterville, Maine, 2004.

71. "Acting Out Youths: Practical Evaluation & Treatment Strategies," Problems in Pediatrics Conference, Colby College, Waterville, Maine, 2004.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

72. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics PREP Course: Costa Mesa, California, 2004.

73. "Risky Behavior: How to Keep Youth Safe in Inpatient and Community Settings," Grand Rounds, Department of Pediatrics, Hasbro/Rhode Island Hospital, Providence, Rhode Island, 2004.

74. "ADHD Co-Morbidity: Practical Evaluation and Treatment Approaches," 2004 Fall CME Conference, New York State Society of Physician Assistants, Albany, New York, 2004.

75. "Behavioral Health Issues for Juvenile Offenders," 3rd Annual Behavioral Health in Corrections Conference, University of Rhode Island, Kingston, Rhode Island, 2004.

76. "Redefining the Use of Psychotropic Medications for Incarcerated Juveniles," National Conference on Correctional Health Care, New Orleans, Louisiana, 2004.

77. "Surviving Juvenile Corrections: Timely Suicide Prevention Strategies," National Conference on Correctional Health Care, New Orleans, Louisiana, 2004.

78. "How Young People Become Criminals: Their Developmental Trajectories Before and After," Contemporary Social Work Practice, Bradley Hospital Educational Series, Bradley Hospital, East Providence, Rhode Island, 2004.

79. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics: PREP Course: Miami, Florida, 2005.

80. "Forensic Mental Health Evaluations," Continuing Legal Education Program, Office of the Public Defender, Providence, Rhode Island, 2005.

81. "Juvenile Suicide Risk in Congregate Care Settings, "Suicide Prevention Promises and Practices – Focus on Youth Conference, Rocky Hill, Connecticut, 2005.

82. "Profile of a Columbine-Type Juvenile: What to Look for and What to Do About It," Juvenile Courts Association of Georgia 2005 Annual Seminar, Pineisle Resort at Lake Lanier, Georgia, 2005.

83. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics: PREP Course: Portland, Oregon, 2005.

84. Various Presentations in Developmental/Behavioral Pediatrics, American Academy of Pediatrics: Practical Pediatrics Course: Beaver Creek, Colorado, 2005.

85. "Strategies for Resident Advocacy at the State Legislature," 2nd Northeast Pediatric Resident Advocacy Conference, Hasbro Children's Hospital, Brown Medical School, Providence, Rhode Island, 2005.

86. Various Presentations in Forensic Psychiatry, Forensic Science Course, Law School, Universidad Francisco Marroquin, Guatemala City, Guatemala, 2005.

87. "Suicide Prevention/Intervention Training," Staff Training Seminar Series, Rhode Island Training School, Cranston, Rhode Island, 2006.

88. "ADHD and Juvenile Delinquency," Annual Meeting, American Society for Adolescent Psychiatry, Miami, Florida, 2006.

89. "Forensic Mental Health Evaluations," Continuing Legal Education Program, Criminal Division, Office of the Attorney General, Providence, Rhode Island, 2006.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

90. "Assessment and Treatment of Adolescent Substance Use Disorders in Correctional Settings," National Conference on Correctional Health Care, San Diego, California, 2006.

91. "Berber v. Mellott, MD: Lessons from a Medical Malpractice Mock Trial," Continuing Medical Education Program, Professional Risk Management Services, Inc., Providence, Rhode Island, 2006.

92. "How to Respond to Mentally Ill and Substance-Abusing Youth in the Juvenile Justice System," 25th Annual Juvenile Probation and Justice Management Conference, National Council of Juvenile and Family Court Judges, Providence, Rhode Island, 2006.

93. "Acting Out: How To Manage Difficult Adolescents," National Conference on Correctional Health Care, Atlanta, Georgia, 2006.

94. "You Be the Judge: A Mock Trial Involving an Inmate's Claim," National Conference on Correctional Health Care, Atlanta, Georgia, 2006.

95. "Assessment and Treatment of Court-Involved Youth in Juvenile Corrections and Other Settings: Challenges, Frustrations, and Solutions," Contemporary Social Work Practice, Bradley Hospital Educational Series, Bradley Hospital, East Providence, Rhode Island, 2006.

96. "Mental Health Services for Juvenile Offenders," Grand Rounds, Department of Psychiatry, Maine Medical Center, Portland, Maine, 2007.

97. "Strategies to Avoid the Courtroom – The Case for Thorough Medical Documentation," UNAP/Rhode Island Health Care Education Trust Seminar Series, Rhode Island Hospital, Providence, Rhode Island, 2007.

98. "Suicide Prevention Strategies for Juveniles in Correctional Settings," Congress: Prevention of Suicidal Conduct in Incarcerated Minors, Campidoglio, Sala Della Protomoteca, Rome, Italy, 2007.

99. "Assessment and Treatment of Adolescent Substance Use Disorders in Correctional Settings," National Conference on Correctional Health Care, Las Vegas, Nevada, 2007.

100. "Civil Commitment of Adolescents," Rhode Island/Hasbro Hospitals Department of Pediatric Emergency Medicine, Case Conference, Providence, Rhode Island, 2007.

101. "Emerging Issues in Forensic Psychiatry," St. Luke's Hospital, Department of Psychiatry, Grand Rounds, New Bedford, Massachusetts, 2007.

102. Various Presentations in Forensic Psychiatry, Forensic Science Course, Law School, Universidad Francisco Marroquin, Guatemala City, Guatemala, 2007.

103. "Redefining the Use of Psychotropic Medications for Incarcerated Juveniles," National Conference on Correctional Health Care, Nashville, Tennessee, 2007.

104. "Lessons Learned from Inside the Fence: Juvenile Offenders, the RI Training School and Family Court Systems," Rhode Island Psychiatric Society, Providence, Rhode Island, 2007.

105. "Use of Psychotropic Medications for Incarcerated Youth," Updates in Correctional Health Care, National Conference on Correctional Health Care, San Antonio, Texas, 2008.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

106. "Mentally Ill Juveniles," American Correctional Association, New Orleans, Louisiana, 2008.

107. "Identification and Management of Juvenile Mental Disorders," National Conference on Correctional Health Care, Chicago, Illinois, 2008.

108. "Identification and Management of Juvenile and Adult Mental Disorders," Texas Corrections Association, Austin, Texas, 2008.

109. "Use of Psychotropic Medications Within Correctional Settings," Mental Health Managers Conference, UTMB CMC Mental Health Services, Huntsville, Texas, 2008.

110. Various Presentations in Forensic Psychiatry, Forensic Science Course, Law School, Universidad Francisco Marroquin, Guatemala City, Guatemala, 2008.

111. "Mental Health Services within the Texas Correctional System," National Institute of Mental Health (NIMH) and UTMB: Mental Illness, Incarceration and Community Re-Entry: Telepsychiatry and Continuity of Mental Health Care, Austin, Texas, 2008.

112. "Essentials of Correctional Juvenile Health Care," Updates in Correctional Health Care: Transforming Principles to Practice, Las Vegas, NV.

113. "Preventing Suicide in Corrections: Timely Collaboration Between Administration, Custody, and Clinical Staff," UTMB CMC Annual Conference, Galveston, Texas, 2009.

114. "Psychotropic Medication Education for Non-Psychiatrists," UTMB CMC Mental Health Services Conference, Huntsville, Texas, 2009.

115. "Malingering: Practical Evaluation and Management Approaches," UTMB CMC Mental Health Services Conference, Huntsville, Texas, 2009.

116. "Assessment and Treatment of Adolescent Substance Use Disorders in Correctional Settings," Academy of Correctional Health Professionals Regional Seminar, Austin, Texas, 2009.

117. "Rational Approach to Psychotropic Medications in Correctional Settings," Academy of Correctional Health Professionals Regional Seminar, Austin, Texas, 2009.

118. "Behind the Bars and Razor Wire: Mental Health Disorders Within Correctional Settings," Texas Department of Criminal Justice (TDCJ) Community Justice Assistance Division (CJAD) Skills Conference, Austin, Texas, 2009.

119. "Essentials of Correctional Juvenile Health Care," National Conference on Correctional Health Care, Orlando, Florida, 2009.

120. "Evaluation and Treatment of Personality Disorders," Mental Health Managers Conference, UTMB CMC Mental Health Services, Huntsville, Texas, 2009.

121. "Mental Health Issues of the Female Offender," Texas Corrections Association Annual Conference, Galveston, Texas, 2010.

122. "Identification and Management of Adult and Juvenile Mental Health Disorders in Correctional Settings, National Conference on Correctional Health Care, Boston, Massachusetts, 2010.

123. "An In-Depth Look at NCCHC's New Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Las Vegas, Nevada, 2010.

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

124. "Essentials of Correctional Juvenile Health Care," National Conference on Correctional Health Care, Las Vegas, Nevada, 2010.

125. "Mental Health Formulary and Disease Management Guidelines Development and Utilization with the Texas Department of Criminal Justice," Mental Health Conference, United States Bureau of Prisons-Health Services Division, Oklahoma City, Oklahoma, 2010.

126. "Competency to Assist in Immigration/Deportation Hearings: Application of Existing Competency Evaluation Models to Immigration Context (Non-Citizens with Mental Disabilities)," United States Immigration and Customs Enforcement (ICE)/Office for Civil Rights and Civil Liberties (CRCL) Mental Health Roundtable, Washington, D.C., 2010.

127. "Mental Health Systems of Care, Formulary and Disease Management Guidelines Development and Utilization within the Texas Department of Criminal Justice," Forensic Best Practices Conference, Houston, Texas, 2010.

128. "Juvenile Waiver and Transfer to Criminal Court," Conference Update on Juvenile Forensic Evaluations, Capacity for Justice, Austin, Texas, 2010.

129. "Practicing Behind Bars: Challenges and Opportunities Within Correctional Psychiatry" Grand Rounds, UTMB Department of Psychiatry and Behavioral Sciences, Galveston, Texas, 2010.

130. "Behind the Bars and Razor Wire: Mental Health Disorders within Correctional Settings" University of Texas Arlington, Annual Psychiatric Nursing Symposium, Arlington, Texas, 2011.

131. "An In-Depth Look at NCCHC's New Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Phoenix, Arizona, 2011.

132. "Medical Conditions That Can Present as 'Psychiatric' in Nature," National Conference on Correctional Health Care, Baltimore, Maryland, 2011.

133. "An In-Depth Look at NCCHC's New Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Baltimore, Maryland, 2011.

134. "Containing Your Psychotropic Medication Expenses: Strategies for Formulary Development and Implementation," American Correctional Association, Phoenix, Arizona, 2012.

135. "Child and Adolescent Forensic Psychiatry," International Conference on Forensic Psychiatry, Santiago, Chile, 2012.

136. "An In-Depth Look at NCCHC's 2008 Standards for Health Services in Prisons and Jails, National Conference on Correctional Health Care, San Antonio, Texas, 2012.

137. "Acting Out" Offenders: Implementing Mental Health/Psychiatric Strategies and Risk Management Principles, National Conference on Correctional Health Care, San Antonio, Texas, 2012.

138. "Save Pharmacy Dollars: Contain Your Psychotropic Medication Use and Expenses" American Correctional Association, Denver, Colorado, 2012.

139. "Practicing Behind Bars: Challenges and Opportunities within Correctional Psychiatry" Grand Rounds, Keck School of Medicine of the University of Southern California, Department of Psychiatry, Los Angeles, California, 2012.

140. "Review of NCCHC's Standards for Health Services in Juvenile Facilities," National Conference on Correctional Health Care, Las Vegas, Nevada, 2012.

141. "Medical Conditions That Present as 'Psychiatric' in Nature," National Conference on Correctional Health Care, Las Vegas, Nevada, 2012.

142. "Mad Versus Bad Offenders: Implementing Mental Health Strategies and Risk Management Principles," National Conference on Correctional Health Care, Las Vegas, Nevada, 2012.

143. "Contain Your Psychotropic Medication Use and Expenses," American Correctional Association, Houston, Texas, 2013.

144. "Evaluation and Management of Juvenile Offenders," American Correctional Association, Houston, Texas, 2013.

145. "Integrating Mental Health and Medical Issues in the Complex Environment of Corrections," Society of Correctional Physicians, Denver, Colorado, 2013.

146. "Update on NCCHC Standards," National Institute on Corrections (NIC), U.S. Department of Justice, State Directors of Mental Health Network meeting, National Advocacy Center, Columbia, South Carolina, 2013.

147. "Identification and Prevention of Suicide and Self Injurious Behaviors in Correctional Settings," American Association of Suicidology, Austin, Texas 2013.

148. "'Acting Out' Adolescents: Pearls for Effective Evaluation and Management," American Correctional Association, National Harbor, Maryland, 2013.

149. "Preventing Suicide Behind Bars: Real World Approaches," American Correctional Association, National Harbor, Maryland, 2013.

150. "DSM-5: An Overview and Its Impact on Correctional Mental Health," UTMB CMC Annual Conference, Galveston, Texas, 2013.

151. "Overview of UTMB CMC Mental Health Services," Texas Correctional Office on Offenders with Medical or Mental Impairments (TCOOMMI) Advisory Committee, Austin, Texas, 2013.

152. "An In-Depth Look at NCCHC's 2014 Standards for Health Services in Prisons," National Conference on Correctional Health Care, Nashville, Tennessee, 2013.

153. "Institutional Self-Injury: Managing the Self-Destructive Juvenile," National Conference on Correctional Health Care, Nashville, Tennessee, 2013.

154. "Medical Conditions That Present as Psychiatric in Nature," National Conference on Correctional Health Care, Atlanta, Georgia, 2014.

155. "Guidelines for Treatment of Adolescents with ADHD," National Conference on Correctional Health Care, Atlanta, Georgia, 2014.

156. "Correctional Psychiatry: The Final Frontier of Psychiatry," Psychiatry Grand Rounds, John Peter Smith (JPS) Health Network, Fort Worth, Texas, 2014.

157. "DSM 5: What Pediatricians Need to Know," "Psychopharmacology in Primary Care: Practical Strategies," "Adolescent Substance Abuse," and "Adolescent Suicide and Self-Injurious Behaviors," American Academy of Pediatrics: Practical Pediatrics CME Course, Hilton Head, South Carolina, 2014.

158. "Mental Health Issues of Female Offenders," and "Update on NCCHC Standards," National Institute on Corrections (NIC), U.S. Department of Justice, State Directors of Mental Health Network meeting, National Corrections Academy, Aurora, Colorado, 2014.

159. "Correctional Psychiatry: The Final Frontier of Psychiatry?" Grand Rounds, UTMB Department of Psychiatry and Behavioral Sciences, Galveston, Texas, 2014.

160. "Mental Health Issues of the Female Offender," American Correctional Association, Salt Lake City, 2014.

161. "Strategies to Improve Patient Safety and Professional Satisfaction," National Conference On Correctional Health Care, Las Vegas, Nevada, 2014.

162. "Risk Management: How is Your Jail Liable?" National Conference on Correctional Health Care, Las Vegas, Nevada, 2014.

163. Various Topics in Child and Adolescent Psychiatry, 25th Annual Pediatric Symposium, Joe DiMaggio Children's Hospital at Memorial, Fort Lauderdale, Florida, 2014.

164. "Breaking Bad: Timely Strategies for Offenders with Mental Illness," Mid-Winter Workshop, Texas Corrections Association, Austin, Texas, 2014.

165. "Assessment & Prevention of Suicide and Self-Injurious Behaviors: Correctional Best Practices," American Correctional Association, Long Beach, California, 2015.

166. "Diagnosing Mental Illness Using DSM-5," American Correctional Association, Indianapolis, Indiana, 2015.

167. "An In-Depth Look at NCCHC's 2015 Standards for Health Services in Juvenile Detention and Confinement Facilities," National Conference on Correctional Health Care, Dallas, Texas, 2015.

168. "Medical Conditions That Present as Psychiatric in Nature." National Conference on Correctional Health Care, Dallas, Texas, 2015.

169. "Demystifying Mental Illness: It's Not All in Your Head." Texas Department of Criminal Justice (TDCJ) Health Services Division Annual Conference, Huntsville, Texas, 2015.

170. "PTSD in Corrections, Diagnostic and Treatment Issues." American Correctional Association, New Orleans, Louisiana, 2016.

171. "The Development of a University-Based Specialty Program for State Prisoners with Gender Dysphoria." American Correctional Association, New Orleans, Louisiana, 2016.

172. "Acting Out Youths: Timely Forensic and Correctional Approaches." Presidential Symposia, "Issues for Child and Adolescent Psychiatry in the 21st Century." American Psychiatric Association, Atlanta, Georgia, 2016.

173. "Use of Telepsychiatry Within Correctional Settings." American Correctional Association, Boston, Massachusetts, 2016.

174. "LGBT Offenders: Critical Issues in Gender Dysphoria." Coalition of Correctional Health Authorities, All Health Authority Training, National Institute of Corrections, Washington, D.C., 2016.

175. "Guidelines for Treating ADHD in Adolescents," NCCHC, Las Vegas, Nevada, October 2018.

176. "Epidemiology of Suicide." Texas Society of Psychiatric Physicians Conference, Austin, Texas. 2018.

177. "The Assessment and Management of Suicide Risk, Tex Med Conference, San Antonio, Texas May 2018.

178. "The Assessment and Management of Violence Risk, Tex Med Conference, San Antonio, Texas May 2018.

179. "Guidelines for Treating ADHD in Adolescents," NCCHC, Las Vegas, Nevada, October 2018.

180. "Practicing Correctional Psychiatry Behind the Bars and Razor Wire: Challenges and Opportunities," McMaster University: International Forensic Psychiatry Lecture Series. Virtual CME Program, December 2020.

181. "Mental Health: Finding a Way Past Trauma and Violence," UTMB Health Virtual Winter Series, Galveston, Texas, March 2021.

182. "Seclusion and Restraint in Correctional Settings," Texas Society of Child and Adolescent Psychiatry: Child Psychiatry at the Crossroads: Focus on At Risk Populations and Social Change. Virtual CME Program, July 2021

183. "Diagnosis and Treatment of Individuals with Gender Dysphoria (GD) Within Correctional Settings," Developments in Correctional Psychiatry Course, American Academy of Psychiatry and the Law (AAPL), Virtual CME Program, December 2021.

## GRANTS

1. Penn (PI)                                          01/01/2002-01/01/2003
   "Incidence of Suicide Attempts and Self-Injurious Behavior in a Juvenile Correctional Facility." Source: American Academy of Child and Adolescent Psychiatry, Eli Lilly and Company. $ 9,000.
   Role: Principal Investigator

2. Penn (PI)                                          01/01/2003-05/31/2004
   "Correlates of Suicidal Behavior in Incarcerated Juveniles." Source: Lifespan Developmental Grant, Lifespan. $ 29,451.
   Role: Principal Investigator

3. Penn (PI)                                          06/30/2004-12/31/2005
   "Liability Prevention for Hasbro Hospital Staff: Practical Strategies for Youths with Mental Health and Substance Abuse Issues." Source: Lifespan Risk Management, Lifespan. $12,200.
   Role: Principal Investigator

4. 5K23DA021532 (PI: Tolou-Shams, Ph.D.)              02/01/2008-01/13/2013

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

"HIV Prevention in the Family Drug Court."  Source: National Institute of Drug Abuse (NIDA)
Role: Consultant

## UNIVERSITY TEACHING ROLES

Brown University, Residency in Psychiatry, 1995: "Effective Documentation and Medical Record Strategies for Psychiatrists," New Residents' Seminar Series (single seminar).

Brown University, Residency in Psychiatry, 1995: "Antipsychotics: An Introduction and Rational Clinical Approach," New Residents' Seminar Series (single seminar).

Brown University, Residency in Psychiatry, 1995: "Cultural Psychiatry," PG-3 Seminar Series, Seminar Leader (weekly seminars).

Brown Medical School, 1997: "Biomed 278: Introduction to Clinical Psychiatry," Small Group Leader, (weekly meetings).

Brown University, Residency in Psychiatry, 1997: " PG-2 Seminar: Mood Disorders in Children and Adolescents" (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1998: "Children's Testimony in Court: Roles of the Expert Witness and Videotaped Interviews," Child and Adolescent Forensic Psychiatry Seminar Series, (single seminar).

Yale University Law School, Disabilities Clinic, 1999: "Introduction to Child and Adolescent Psychopharmacology," (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1999-2008: "Risk Assessment of Youth Violence," Child Psychiatry Boot Camp Seminar Series, (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1999-2008: "Rhode Island Mental Health Law," Child Psychiatry Boot Camp Seminar Series, (single seminar).

Brown University Residency in Psychiatry, 1999: "Introduction to Child and Adolescent Forensic Psychiatry," PG-3 Resident Seminar, (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 1999: Community Mental Health Center Rotation, Family Health Center at SSTAR, Fall River, Massachusetts, Clinical Supervisor, (weekly clinic and supervision).

Brown University, Residency in Child and Adolescent Psychiatry, 1999-2008: Clinical Supervisor, Brown University Child Psychiatry Forensic Psychiatry Elective, (weekly supervision).

Brown University Residency in Psychiatry, 2000-2001: "Disruptive Disorders, Antisocial Behaviors, and Legal Issues," PG-2 Resident Seminar, (single seminar).

Brown University, Residency in Child and Adolescent Psychiatry, 2000-2008: "Child and Adolescent Forensic Psychiatry" Seminar Leader, (four seminars).

Brown University, Residency in Child and Adolescent Psychiatry, 2001-2002: Clinical Supervisor, Community Mental Health Center Rotation, Kent County Mental Health Center, Warwick, Rhode Island, (weekly clinic and supervision).

Joseph V. Penn, MD CCHP FAPA Curriculum Vitae

Brown University, Residency in Child and Adolescent Psychiatry, 2001-2008: Clinical Supervisor, Forensic/Juvenile Justice Rotation, Rhode Island Training School, Cranston, Rhode Island, (daily and weekly clinics and supervision).

Brown Medical School, 2002-2008: Clinical Supervisor for 3rd and 4th year medical students, Longitudinal elective, 4th year elective, and psychiatry rotation, Rhode Island Training School, Cranston, Rhode Island, (daily and weekly clinics and supervision).

Brown University Residency in Psychiatry, 2002-2003: Tutor-Advisor to Nada Milosavljevic, M.D., J.D., PG-2 Psychiatry Resident.

Brown University Residency in Psychiatry, 2003: "Bullying, Beatings, and Beyond: Assessment and Treatment of Youth Violence," Noon Seminar, (single seminar).

Brown University Post-Doctoral Juvenile Forensic Psychology Training Program, 2003-2008: Core Supervisor and Seminar Leader.

Brown University Psychology Intern and Post-Doctoral Fellowship Training Program, Child Track Seminar Series Presenter, 2004-2008: "The Law and Psychiatry/Psychology" (single seminar).

Brown University Residency in Psychiatry, 2004-2008: "Risk Assessment of Potentially Violent Juveniles," PG-3 Resident Seminar, (single seminar).

Brown University Residency in Psychiatry, 2004-2008: "Divorce, Custody and Visitation Issues: The Psychiatrist Facing Court Systems," PG-2 Resident Seminar, (single seminar).

Brown University Residency in Child and Adolescent Psychiatry, 2005-2008: "Evaluation and Treatment of Conduct Disorder," Child and Adolescent Psychiatry Developmental Psychopathology Seminar Series, (single seminar).

UTMB Department of Psychiatry and Behavioral Sciences, Residency in Psychiatry, 2008-present: "Opportunities and Challenges within Correctional and Forensic Psychiatry," (single seminar).

UT Health Science Center at Houston, Department of Psychiatry and Behavioral Sciences, Residency in Child Psychiatry, 2008-present: "Juvenile Correctional Mental Health Services in Texas," (single seminar).

UTMB Department of Psychiatry and Behavioral Sciences, Residency in Psychiatry, 2010-present: "Suicide Prevention and Litigation: Timely Risk Management Approaches," Forensic Psychiatry Seminar Series, (single seminar).

## HOSPITAL TEACHING ROLES

Butler Hospital, 1993-1996: Seminar Leader, Various Psychiatry Topics, Brown University Medical Students' Psychiatry Clerkship, (multiple seminars).

Rhode Island Hospital, 1995: Psychiatry Preceptor and Consultant to Internal Medicine Housestaff Clinic, (twice weekly clinic).

E. P. Bradley Hospital, 1997: Adolescent Program Training, "The Use of Antipsychotics in Adolescents," (one seminar).

# APPENDIX B

**Joseph V. Penn, MD CCHP FAPA**
**Testimony**

Revised 3/9/2022

**2022**

Wilhen Hill Barrientos, et al. v. CoreCivic, Inc. United States District Court, Middle District of Georgia, Mental Risk of Harm to U.S. Immigration and Customs Enforcement (ICE) Detainees Confined, with a Focus on ICE Detainees' Participation, Housing Assignments, and Privileges (or Loss Thereof) While Housed at the Stewart Detention Center, Lumpkin Georgia

**2021**

Victor Parsons; et al., on behalf of themselves and all others similarly situated, and Arizona Center for Disability Law v. David Shinn, Director, Arizona Department of Corrections Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract, Monitoring Bureau, Arizona Department of Corrections Rehabilitation and Reentry, in their official capacities: U.S. District Court, District of Arizona, Phoenix, Arizona. Arizona Department of Corrections State Prisoners: Unconstitutional Conditions of Confinement, Access to and Provision of Clinically Appropriate and Individually Determined Mental Health Evaluation and Treatment Services, Mental Health Intake Health Screening and Procedures, Mental Health and Psychiatric Evaluation and Treatment Services, Other Mental Health Policies and Procedures, Mental Health and Psychiatric Staffing, Suicide Prevention Policy and Procedures, Audits and Compliance Reports, Access to Mental Health and Psychiatric Care

Stephen Knox v. Rob Jeffreys, Dr. Kelly Renzi, Dr. Andrew Tilden and Wexford Health Sources, Inc., et al, United States District Court, Central District of Illinois, Mental Health Conditions and Treatments of Mr. Stephen Knox While Housed in Restrictive Housing

Bryan P. Bonham v. State of Nevada, Nevada Department of Corrections, et al, United States District Court, District of Nevada, Is Restriction of a State Prison Inmate's Out of Cell Activities Due to COVID Precautions Reasonable or Does This Pose Risk Of Mental Harm or Mental Disorder(s)

**2020**

William A. Ruda, MD and Sandra L. Ruda v. State of New Jersey Department of Human Services; Ann Klein Forensic Center; State of New Jersey Department of Corrections; Moises Polanco; Carrier Clinic, Inc. et al. Superior Court of New Jersey, Somerset County, Forensic Patient on Physician Assault Resulting in Injuries

Debra P. Vought and Eric Vought as the Permanent Guardians Acting on Behalf of Jared R. West v. San Juan County Regional Medical Center, Inc., Presbyterian Medical Services, Inc., et al; Aztec District Court, Aztec, New Mexico, Jail Mental Health Services

Medical Malpractice Screening Panel Testimony (confidential by state statute) – I am unable to reference the name, issue, city, or state as it would identify the case

## 2019

State of Texas v. Pontrey Jones, Judicial District Court 403rd District Court, Travis County, Austin, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Offenders

Luis Alberto Mendez v. County of Sacramento; The Regents of the University of California; Gregory Sokolov, MD; Danielle Dass, LCSW; Charlene Williams, NP; Andrea Javist; Deputy Sheriff Tineley Sietz; Deputy Sheriff Alexander Egenberger; Deputy Sheriff Jordan Lee, United States District Court for the Eastern District of California Sacramento Division, Sacramento California, Jail Self Harm

Connie McMillin, as Independent Executrix of the Estate of Lee B. Albin, Deceased, and Heather Albin and Claire McMillin-Albin v. Oceans Behavioral Hospital Lufkin; Oceans Behavioral Hospital of Lufkin, LLC; Oceans Healthcare, LLC; Vernon Johnson, MD; and Vernon Charles Johnson, MD, PA, Angelina County, Texas, Medical Malpractice

## 2018

State of Texas v. Anthony Paz Torres, Judicial District Court 203rd, Dallas County, Dallas, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Offenders

State of Florida v. Anthony Carter, Third Judicial Circuit of Florida, Columbia County, Lake City, Florida, Deposition to Perpetuate Testimony, Death Penalty

Ferreira, et al. v. Penzone, et al., United States District Court, District of Arizona, Phoenix, Arizona, Jail Inmate on Jail Inmate Assault Resulting in Death

## 2017

Jacqueline Smith (Estate of Danarian Hawkins) v. Harris County, Houston, Texas,  Jail Suicide and Suicide Prevention

US v. Graff, Court Martial/Sentencing Hearing, United States Army Base, Fort Hood, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Offenders

State of Texas v Randall Mays, Henderson County, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Death Row Offenders

Civil Action No. BC494030; Dianne Jordan v. Los Angeles County Sheriffs' Department, Los Angeles Police Department (LAPD), Superior Court of California, County of Los Angeles, Central District, et al., Jail Suicide and Suicide Prevention

Civil Action No. 2:15-cv-01845-JAT; Ferreira, et al. v Arpaio, et al., Maricopa County Jail, Phoenix, Arizona United States District Court, District of Arizona, Mental Health Services and a Jail Inmate on Inmate Assault Resulting in Death

Civil Action No. 4:14-cv-03326; Ashley Adams, et al v. Brad Livingston, et al; In the United States District Court for the Southern District of Texas, Houston Division, Houston, Texas, Extreme Heat and Offenders with Mental Disorders

Civil Action No. 4:14-cv-03302; Edna Webb, et al v. Brad Livingston, et al; In the United States District Court for the Southern District of Texas, Houston Division, Houston, Texas, Developmental Disabilities Program (DDP) Evaluation and Treatment Services and Mental Health Services

# APPENDIX C

RE:

_____

I.  Fee schedule for providing expert services to your firm with reference to the
     above name matter:

(A)  Review of depositions, records, report, or other data..........500.00 pr/hr
(B)  Conference with attorney or others as required................500.00 pr/hr
(C)  Psychiatric consultation with written report....................500.00 pr/hr
(D)  Research...............................................................500.00 pr/hr
(E)  Deposition – testimony.......................................  1,000.00 pr/hr
(F)  Testimony in court.......................................... 1,000.00 pr/hr

II.  Billing for out-of-town cases will be $4,000.00 for a minimum of 4 hours and
      $8,000.00 for 8 hours per day, and will include any/all travel time.  Any
      additional time will be billed at $1000.00 per hour.  Travel expenses, meals and
      accommodations will be computed at actual rate.

III.  It is hereby specifically agreed that payment of all fees and expenses as outlined
       herein are the full responsibility of the undersigned attorney and firm of which
       he/she may be a member, and payment is not contingent on any verdict or
       settlement of the above captioned matter.

IV.  It is also specifically agreed that the undersigned attorney and firm will be
       responsible for securing funds in advance for depositions (and not subsequent to
       the deposition).

V.  A retainer amount of $5,000.00 payable to "*Joseph Penn MD and Forensic
      Associates, LLC*" is due before starting any work in this matter.  Dr. Penn will
      submit invoices periodically and will notify the undersigned attorney/firm if an
      additional retainer amount is necessary.

VI.  Please sign one copy of this agreement and return to this office.  The original is
       for your records.

Joseph Penn MD and Forensic Associates, LLC
206 A S. Loop 336 W. #158
Conroe, Texas 77304


Agreed & Accepted by


_____        _____

Attorney for firm                                  Name of law firm

Date_____