1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MONICA N. ANDERSON, State Bar No. 182970
   Senior Assistant Attorney General
3  DAMON MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   NAMRATA KOTWANI, State Bar No. 308741
5  Deputy Attorneys General
    1300 I Street, Suite 125
6  P.O. Box 944255
   Sacramento, CA 94244-2550
7  Telephone: (916) 210-7318
   Fax: (916) 324-5205
8  E-mail: Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

   Hanson Bridgett LLP
   Paul B. Mello, SBN 179755
   Samantha D. Wolff, SSBN 240280
   Kaylen Kadotani, SBN 294114
   David C. Casarrubias, SBN 321994
   Carson R. Niello, SBN 329970
   1676 N. California Blvd., Suite 620
   Walnut Creek, California 94596
   Telephone:   925-746-8460
   Facsimile:   925-746-8490
   Attorneys for Defendants

9

10                IN THE UNITED STATES DISTRICT COURT

11             FOR THE EASTERN DISTRICT OF CALIFORNIA

12                     SACRAMENTO DIVISION

13

14

15  **RALPH COLEMAN, et al.,**

                                    2:90-cv-00520 KJM-DB (PC)
16                       Plaintiffs,

                                    **DEFENDANTS' RESPONSE TO THE**
17                                  **SPECIAL MASTER'S REPORT AND**
        v.                          **RECOMMENDATION ON A FINAL**
                                    **PROPOSED TELEPSYCHIATRY**
18                                  **POLICY (ECF NO. 7682)**
    **GAVIN NEWSOM, et al.,**

19                       Defendants.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................... 1

I.    Telepsychiatry Ensures Access to Mental Health Care by Helping CDCR Meet Staffing Requirements and Deliver Care. .................................................. 2

II.   CDCR's Revised Policy Is Consistent with the National Standard of Care and Emerging Scientific Literature. .................................................................. 4

III.  The Overwhelming Evidence Supports CDCR's Modifications to the Provisional Policy and the Special Master's and Plaintiffs' Concerns Are Easily Addressed. ........ 8

    A.    The Revised Policy Removes the Unnecessary Requirement of One On-Site Psychiatrist for Each EOP Program. ........................................................ 10

       1.    The Special Master's Concerns About Telepsychiatrists' Participation in the Treatment Milieu Are Unfounded. ................................................ 11

       2.    The Special Master's Reporting of Internet Connectivity Issues Does Not Provide a Sufficient Basis to Reject the Revised Policy. .................... 16

       3.    CDCR's Revised Policy Is Contemplated Under Prior Court Orders. ................... 17

    B.    Removing "Last Resort in Emergency Situations" Standard for Use of Telepsychiatry in MHCBs and PIPs. ...................................................... 18

    C.    Decreased Frequency of Site Visits. ...................................................... 19

    D.    Status of Cell-Front Telepsychiatry Contacts. ....................................... 19

    E.    Modified Language Regarding Informed Consent. ................................. 20

    F.    Telepsychiatry from Home. ................................................................... 21

    G.    Night-Time Telepsychiatry. .................................................................. 21

    H.    Continued Good Faith Recruitment and Retention of On-site Psychiatrists. ........ 21

Conclusion ...................................................................................................... 23

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Armstrong v. Davis*
    275 F.3d 849 (9th Cir. 2001)................................................................................ 14

*Balla v. Idaho*
    29 F.4th 1019 (9th Cir. 2022)............................................................................... 8

*Brown v. Plata*
    563 U.S. 493 (2011) ............................................................................................ 12

*Coleman v. Wilson*
    912 F. Supp. 1282 (E.D. Cal. 1995)...........................................................*passim*

*Graves v. Arpaio*
    623 F.3d 1043 (9th Cir. 2010).............................................................................. 9

*Johnson v. California*
    543 U.S. 499 (2005) ............................................................................................ 14

*Lewis v. Casey*
    518 U.S. 343 (1996) ............................................................................................ 14

*Turner v. Safley*
    482 U.S. 78 (1987) ........................................................................... 2, 3, 13, 18

*United States v. State of Mich*.
    940 F.2d 143 (6th Cir. 1991)................................................................................ 9

**STATUTES**

18 U.S.C.
    § 3626 (a)(1)(A) ............................................................................................ 2, 10

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Eighth Amendment ............................................................................ 1, 12, 13, 17

**OTHER AUTHORITIES**

*Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on
    the Employment of Psychiatrists, 9/18/18, Economists Incorporated*, ECF No.
    6695................................................................................................................... 3

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

https://mhealthintelligence.com/news/the-history-of-remote-monitoring-
    telemedicine-technology ............................................................................ 16

4

5

https://www.aamc.org/news-insights/growing-psychiatrist-shortage-enormous-
    demand-mental-health-services.................................................................... 3

6

https://www.mbc.ca.gov/Resources/Medical-Resources/telehealth.aspx ...................................... 6

7

https://www.ncchc.org/priorities-for-2022-and-beyond/ ............................................... 8

8

https://www.samhsa.gov/about-us ................................................................ 7

9

https://www.samhsa.gov/resource/ebp/telehealth-treatment-serious-mental-illness-
    substance-use-disorders............................................................................. 7

10

11

Stacy Weiner, *A growing psychiatrist shortage and an enormous demand for
    mental health services* ............................................................................ 3

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Defendants' proposed modifications to the provisional telepsychiatry policy (Provisional Policy) will enable them to provide the *Coleman* class *greater* access to mental health care and further the great progress made over the last three years. As this Court has recognized (ECF No. 7699 at 2:13-16), recruiting and retaining mental health clinicians has been an ongoing, challenging issue for CDCR despite many efforts to increase staffing. And CDCR is not alone; other institutions, private or otherwise, have had issues recruiting and retaining mental health professionals. There is a nationwide shortage of mental health professionals, and the shortage acutely affects prison systems like CDCR because of additional challenges professionals face in treating patients in remote areas or under dangerous or difficult conditions. Rather than ignoring this reality and maintaining the status quo, CDCR seeks to remove superficial or outdated restrictions on telepsychiatry to ensure that class members receive effective and regular psychiatric care from mental health professionals, whether remotely or in person.

The overwhelming evidence shows that telepsychiatry is a nationally accepted method of providing psychiatric treatment, particularly where on-site psychiatry is unavailable, and is well within the standard of care for providing psychiatric services to mental health patients. As Deputy Director Amar Mehta has declared, "utilizing telepsychiatry has allowed many organizations in the country to provide quality psychiatric care to patients who need it most. CDCR has followed in this tradition, using proven and widely accepted methods. This is not an experimental form of therapy that is only provided to patients with no alternative; it is a major form of treatment in the community, including training programs and emergency departments. There is no justification for Plaintiffs' continued resistance to this well-proven modality of treatment." (ECF No. 7682-1 at 79.) Following this Court's October 10, 2017 Order, the parties were invited to provide additional briefing "on the role telepsychiatry plays, consistent with the Eighth Amendment, to aid in resolving the psychiatrist staffing shortage." (ECF No. 5786 at 3-4.) Neither the Plaintiffs nor the Special Master could demonstrate that telepsychiatry is an insufficient modality or that its use results in negative patient outcomes. Yet, even after focused monitoring during a lengthy provisional period, the Special Master and Plaintiffs continue to

1

1    oppose CDCR's proposed use of telepsychiatry, even though its Revised Proposal aligns with

2    widely-accepted national standards and is richly supported by expert opinions and empirical data.

3        Unable to identify any way in which CDCR's proposed modifications are inconsistent with

4    national treatment standards, the Special Master cautions that such modifications would conflict

5    with prior court orders.  This is a curious argument.  This Court has expressly contemplated that

6    modifications to any prior limitations on CDCR's telepsychiatry policy may be necessary.  (ECF

7    No. 5711 at 30 and ECF No. 5850 at 7.)  Indeed, the March 27, 2020 stipulation and order

8    expressly envisions a process for modifications.  (ECF No. 6539.)

9        Defendants' evidence and the scientific literature from the relevant medical field—

10   telepsychiatry — strongly support the targeted modifications that Defendants propose, whereas

11   Plaintiffs' and the Special Master's evidence—including experts who have no experience in

12   telepsychiatry—fails to show why the proposed modifications should be rejected.  Defendants'

13   requested modifications are demonstrably consistent with best practices and the standard of care,

14   and will expand access to psychiatric care during a nationwide shortage of mental health

15   professionals.  Thus, an injunction that limits Defendants' implementation of their Revised Policy

16   would not comport with legal standards under either the PLRA or Supreme Court jurisprudence.

17   18 U.S.C. § 3626 (a)(1)(A) (the court must evaluate what relief would hew most closely to

18   address the violation to ensure it is narrowly tailored and the least intrusive means necessary to

19   correct that violation); *Turner v. Safley*, 482 U.S. 78, 85 (1987) (requiring deference to prison

20   officials' policy-making preferences).  Judicial restraints on Defendants' ability to use

21   telepsychiatry under their proposed modifications should therefore be lifted.

22   **I.    TELEPSYCHIATRY ENSURES ACCESS TO MENTAL HEALTH CARE BY HELPING
         CDCR MEET STAFFING REQUIREMENTS AND DELIVER CARE.**

23

24       To meet their constitutional obligations, Defendants must "employ mental health staff in

25   'sufficient numbers to identify and treat in an individualized manner those treatable inmates

26   suffering from serious mental disorders.'"  *Coleman v. Wilson*, 912 F. Supp. 1282, 1306 (E.D.

27   Cal. 1995) (internal citation omitted).  The "constitutional requirement that Defendants provide

28   inmates with 'a system of ready access to adequate medical care,' means simply either ready

2

Defs.' Resp.to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))

19106178.1   19285212.1

1   access to physicians at each prison or 'reasonably speedy access' to outside physicians or

2   facilities." *Id*. at 1308 (internal citation omitted).

3         At a time when serious staffing shortages in the mental health profession are widespread

4   across the country,[1] the Special Master's report makes clear that telepsychiatry has been

5   successful in helping CDCR achieve the court-ordered staffing vacancy rates under the 2009

6   staffing plan ratios.  (ECF No. 7682 at 47-51.)  The monthly psychiatry vacancy reports filed for

7   the months April 2020 through November 2022 show that telepsychiatry significantly increased

8   CDCR's staffing fill rates in each of those months, and notably did so by increasing the number

9   of civil service psychiatrists (since all telepsychiatrists are civil servants).[2]  Over the same period,

10  CDCR's psychologist staffing fill rates have fallen dramatically, in part because there is no

11  telepsychology program to offset increasing vacancies among on-site psychologists.

12        The use of telepsychiatry during the provisional period also enabled CDCR to overcome

13  geographic limitations to clinician availability, thereby increasing access to treatment for remote

14  and underserved populations.  (Mehta Decl. ¶ 22, ECF No. 7682-1 at 79.)  Furthermore, the

15  Lessons Learned report demonstrates that expanded telepsychiatry use, even by formerly on-site

16  providers working from home, did not result in any negative outcomes and was effective in

17  delivering psychiatric services to patients.  (Mehta Decl. ¶ 21-23, ECF No. 7682-1 at 79.)  By

18  making it easier to recruit and retain psychiatrists at CDCR, and expanding the field of available

19  providers, telepsychiatry is an invaluable tool enabling the delivery of care to patients that meets

20  or exceeds constitutional requirements.[3]

21        [1] *See Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on
    the Employment of Psychiatrists, 9/18/18, Economists Incorporated*, ECF No. 6695 at 97-100; *id.*
22  at 105 (noting "the supply of psychiatrists in California has neither kept pace with demand, nor
    has it been sufficient to replace a diminishing workforce"); Stacy Weiner, *A growing psychiatrist
23  shortage and an enormous demand for mental health services*, Association of American Medical
    Colleges, 9/9/2022, https://www.aamc.org/news-insights/growing-psychiatrist-shortage-
24  enormous-demand-mental-health-services.
        [2] ECF Nos. 6694, 6745, 6803, 6842, 6892, 6929, 6970, 7011, 7042, 7069, 7115, 7148,
25  7188, 7253, 7291, 7335, 7361, 7383, 7408, 7441, 7481, 7518, 7542, 7561, 7579, 7595, 7610,
    7617, 7645, 7674, and 7691.
26      [3] Between April 2020 and June 2022, CDCR telepsychiatrists had more than 158,000
    clinical encounters with their patients.  (See Mehta Decl. at ¶ 16, ECF No. 7682-1 at 71-79.)  In
27  the six months from July 2022 to December 2022, CDCR telepsychiatrists had close to 39,000
    clinical encounters with their patients, including over 10,000 encounters with EOP patients.

28

19106178.1   19285212.1

## II.  CDCR's Revised Policy Is Consistent with the National Standard of Care and Emerging Scientific Literature.

Defendants have proposed removing unnecessary restrictions on the use of telepsychiatry, especially in EOP programs, in order to provide relief to on-site staff and mitigate the continuing national shortage of clinical psychiatrists.  The Special Master resists such change, not because telepsychiatry does not work well at the EOP level, but because of vague concerns that have not materialized in over a decade of successful utilization in EOP and other levels of care.  His fears are unfounded and should not prevent increased patient access to psychiatrists.  CDCR's Revised Policy, which was crafted based on CDCR's years of experience delivering care to CCCMS and EOP patients through telepsychiatry, expert testimony, and literature from the relevant medical community, should be adopted.

In support of the Revised Policy, Defendants rely on the expertise of Deputy Director Mehta (formerly a Chief of Telepsychiatry), Chief of Telepsychiatry Toni Martello, and expert witness Joseph Penn, M.D.[4]  All three declarations are in the Special Master's report.  (ECF No. 7682-1.)  Defendants also submit with this filing the supplemental declarations for Drs. Mehta and Penn and a declaration of the acting Chief of Telepsychiatry, Devin Stroman, in response to the Special Master's December 15 report.  Defendants also presented Dr. Penn's opinions on telepsychiatry as the standard of care in 2018.  (ECF No. 5873-5 at 44.)  Dr. Penn is imminently qualified to provide opinions on psychiatry and telepsychiatry.  Dr. Penn oversees the mental health care delivered to approximately 80% of the residents within the nation's largest state correctional system as the Director of Mental Health Services of the University of Texas Medical Branch (UTMB) Correctional Managed Care (CMC).  He is well-regarded by his peers, presents nationally and internationally on correctional and non-correctional mental health care delivery and standards of care, is actively involved at a national level in a leadership role within several psychiatric organizations, and regularly authors and is invited to present on a range of mental

---

(Suppl. Mehta Decl. at ¶ 5.)  As previously reported, from January 2015 through August 2018, CDCR provided over 70,000 telepsychiatry contacts to inmates assigned to the EOP level of care. (ECF No. 5879-2 at 2.)

[4] Dr. Penn's declaration is presented as an attachment to the Special Master's report and recommendation at ECF No. 7682-1, pages 165-228.

4

health care topics.  (*See*, *e.g.*, Penn Decl. ¶¶ 23, 24, 26 & App'x A at 9-27.)  His qualifications are detailed in his declaration at paragraphs 1 through 40 (ECF No. 7682 at 165-179) and establish his years of experience in the field of forensic psychiatry, treating patients—including incarcerated patients, using both on-site psychiatry and telepsychiatry.  (Penn Decl. ¶ 20.)  Dr. Penn has been providing mental health treatment to incarcerated patients continuously since 1999.  (Penn Decl. ¶ 7.)

In 2018, Dr. Penn presented opinions on telepsychiatry, including that: (1) telepsychiatry is a standard, widely accepted, and effective method of providing psychiatric evaluation and treatment for all mentally ill patients and is generally no less effective or therapeutic than face-to-face treatment; and (2) telepsychiatry is a standard, widely accepted, and effective method of psychiatric evaluation and treatment for individuals in residential treatment, both within correctional and non-correctional patient populations.  (ECF No. 5873-5 at 44.)  Dr. Penn has not only reaffirmed his opinions tendered in 2018, but also affirms in his professional opinion that implementation of the Revised Policy would exceed the standard of care.  (Penn Decl. ¶ 65, ECF No. 7682 at 191-192.)

Dr. Penn affirms the following:

1.  Telepsychiatry continues to be a standard, widely accepted, and effective method of providing psychiatric evaluation and treatment for all mentally ill patients and is generally no less effective or therapeutic than face-to-face treatment.  Penn Decl. ¶ 41.

2.  Telepsychiatry continues to be a standard, widely accepted, and effective method of psychiatric evaluation and treatment delivery system for individuals in residential treatment, both within correctional and non-correctional patient populations.  Penn Decl. ¶ 42.

3.  There are no contraindications to the routine use of telepsychiatry for EOP inmate patient populations and other similar levels of care, subject to individual patient's evaluation and treatment needs.  Penn Decl. ¶ 44.

4.  Telepsychiatry has been successfully utilized as a primary method of delivering psychiatric care to incarcerated individuals across a variety of levels of care, including residential programs.  Penn Decl. ¶ 46.

5.  The COVID-19 pandemic further drives the vital need for the continued growth, implementation, and expansion of telepsychiatry and other types of telehealth for

incarcerated individuals regardless of their housing setting/classifications. Penn Decl. ¶ 46.

6. Nationally, there has been an increased use and acceptance of telepsychiatric, telemental health for emergency, crisis/urgent and non-urgent telehealth care, and specialty care delivered through telemedicine. Penn Decl. ¶ 47.

7. Dr. Penn is unaware of any adverse patient outcomes, patient safety risks, or adverse outcomes that are solely attributable to the use of telepsychiatry or telehealth. Penn Decl. ¶¶ 49 and 52.

8. Telepsychiatry, telepsychology, and other forms of telehealth have clearly improved access to care and greatly improved continuity of care, particularly in remote/rural psychiatric physician manpower/shortage settings where many state prisons are located. Penn Decl. ¶ 57.

9. Due to the existing and well described national shortage of psychiatrists and the lack of any clear solution to an anticipated further national shortage of psychiatrists, telepsychiatry, telepsychology, and other forms of telehealth have also clearly improved access to care and greatly improved continuity of care. Penn Decl. ¶ 57.

Deputy Director Mehta and Dr. Martello have also attested that, in their professional opinions, including based on their extensive work as telepsychiatrists within CDCR and their monitoring of CDCR's Telepsychiatry Program, telepsychiatry is an appropriate modality to deliver mental health treatment to the *Coleman* class. (ECF No. 7682-1 at 79 and 154.) Drs. Mehta and Martello further testified that telepsychiatry brings efficiency to the delivery of mental health care in a prison environment and has helped offset staffing challenges. (*Id.*)

Drs. Penn, Mehta, and Martello's opinions are consistent with those of the California Medical Board—the governing agency that licenses and regulates medical doctors, including psychiatrists—which recognizes that: (1) telehealth is "a tool in medical practice, not a separate form of medicine"; (2) there "are no legal prohibitions to using technology in the practice of medicine, as long as the practice is done by a California licensed physician and complies with state and federal privacy laws"; and (3) the standard of care is the same whether the patient is seen in-person, through telehealth or other methods of electronically enabled health care."[5]

---

[5] https://www.mbc.ca.gov/Resources/Medical-Resources/telehealth.aspx, last accessed on 6/21/22.

6

Drs. Penn, Mehta, and Martello's opinions are supported by the Substance Abuse and Mental Health Services Administration (SAMHSA), the agency within the U.S. Department of Health and Human Services that leads public health efforts to advance the behavioral health of the nation.[6]  SAMHSA was established by Congress in 1992 to make substance use and mental disorder information, services, and research more accessible.  SAMHSA's extensively referenced guide on Telehealth for the Treatment of Serious Mental Illness and Substance Use Disorders[7] specifically evaluates the *quality* of the evidence for telehealth and rates it as "strong evidence" for various forms of treatment, ultimately stating:

- Telehealth is effective across the continuum of care for s)erious mental illness (SMI and substance abuse disorders (SUD), including screening and assessment, treatments, including pharmacotherapy, medication management, and behavioral therapies, case management, recovery supports, and crisis services.
- Evidence-based treatments for SMI and SUD, traditionally provided face-to-face, are also effective when delivered using telehealth and have outcomes comparable to in-person service delivery.
- Use of telehealth modalities increases individuals' and communities' access to trained providers and evidence-based practices that may otherwise be unavailable to them.

Drs. Penn, Mehta, and Martello's opinions are also supported by leading national medical associations.  The American Psychiatric Association (APA) – the largest professional psychiatric organization in the world—endorses the use of telepsychiatry as a successful evidence-based treatment modality, with high satisfaction rates among patients and psychiatrists.  (ECF No. 5873-5 at 47.)  The APA describes telepsychiatry as comparable to in-person care in terms of "therapeutic engagement, quality of care, validity/reliability of assessment, and clinical outcomes." (*Id.*)  According to the American Telemedicine Practice Guidelines for Video-Based Online Mental Health Services, "no studies have identified any patient subgroup that does not benefit, or is harmed by, mental health care provided through remote videoconferencing." (*Id.*) And like the APA, the National Commission on Correctional Health Care (NCCHC)—whose accreditation of correctional facilities constitutes substantial evidence of adequate medical care—

---

[6] https://www.samhsa.gov/about-us, last accessed on 1/16/23.

[7] https://www.samhsa.gov/resource/ebp/telehealth-treatment-serious-mental-illness-substance-use-disorders, last accessed on 1/16/23.

19106178.1   19285212.1

1    also supports the use of telepsychiatry in correctional settings.  (*Id.*; *see Balla v. Idaho*, 29 F.4th

2    1019, 1026 (9th Cir. 2022).)  Indeed, the new chair of NCCHC's Governance Board included

3    among his top four priorities for 2022 the use of telemedicine and telepsychiatry for incarcerated

4    patients to provide a viable option for specialty services.[8]

5        By contrast, the Special Master has not presented the opinions of any experts in

6    telepsychiatry.  While this Court observed in its July 3, 2018 order that the Special Master's

7    opinions are informed and guided by a team of nationally recognized experts in correctional

8    mental health, many of whom have served in an expert capacity for most of the duration of this

9    case (ECF No. 5850 at 6-7), none of these experts' credentials indicate *any* level of experience or

10   expertise regarding telepsychiatry.  (ECF Nos. 669 at 2-3 & attached curriculum vitae ("CV"),

11   920 at 1-2 & attached CV, 2161-1 at 3, 2162-1, 2211-1 at 3-4 & attached CV [CVs of the Special

12   Master's psychiatry experts, none of which indicate any expertise in the areas of telepsychiatry,

13   telehealth, or telemedicine, specifically or generally].)  Indeed, the Special Master acknowledges

14   that Defendants support their Revised Policy with reference to the national standard of care and

15   the Declarations of Drs. Mehta and Penn (ECF No. 7682 at 28-30), but proffers no alternative

16   standard of care.  Nor does the Special Master suggest that Defendants' proffered standard of care

17   is wrong.  In short, Defendants' overwhelming and uncontroverted evidence establishes that

18   telepsychiatry is a nationally accepted modality that can help offset staffing challenges and ensure

19   the delivery of mental health care to *Coleman* class members.

20   **III.   THE OVERWHELMING EVIDENCE SUPPORTS CDCR'S MODIFICATIONS TO THE
21       PROVISIONAL POLICY AND THE SPECIAL MASTER'S AND PLAINTIFFS' CONCERNS
         ARE EASILY ADDRESSED.**

22       CDCR's proposed modifications would further the great progress made over the last three

23   years, allow CDCR to continue providing safe and effective care into the future, and increase the

24   number of available psychiatrists in CDCR's mental health programs, especially where

25   geographical limitations restrict available services during this critical shortage of mental health

26   professionals nationwide.  Specifically, removing the restriction of having an on-site psychiatrist

27   will increase access to care for patients at programs that cannot hire an on-site psychiatrist,

28   ---

[8] https://www.ncchc.org/priorities-for-2022-and-beyond/, last accessed on 6/29/22.

Defs.' Resp.to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))

19106178.1  19285212.1

1  despite extensive efforts to do so.  The monitoring during the operation of the Provisional Policy

2  demonstrated that removing this restriction will successfully provide psychiatric care to EOP

3  patients without causing them harm.

4          Notably, CDCR does not intend to reduce its efforts to recruit and retain onsite

5  psychiatrists.  (Supp. Mehta Decl. ¶ 3.)  Instead, given the current staffing climate, CDCR seeks

6  to utilize telepsychiatry to augment these efforts.  (*Id.*)  There is no evidence of harm to patients

7  attributed to the use of telepsychiatry, and instead, an abundance of evidence demonstrates that

8  telepsychiatry is an effective and widely-accepted treatment modality used by numerous

9  institutions across the country.  In short, telepsychiatry improves access to care instead of

10  hindering it.  And because there are no factual findings that CDCR's use of telepsychiatry has

11  ever violated patients' Eight Amendment rights, nor evidence that limitations on the use of

12  telepsychiatry are necessary to correct a current and ongoing constitutional violation, judicial

13  imposition of restrictions on the use of telepsychiatry beyond what CDCR proposes would violate

14  the PLRA.  *See Graves v. Arpaio*, 623 F.3d 1043, 1047–48 (9th Cir. 2010); *see also United States*

15  *v. State of Mich.*, 940 F.2d 143, 159–60 (6th Cir. 1991) (district court lacked authority to impose

16  additional requirements on remedial plan proposed by prison officials; state was entitled to

17  develop and implement its own procedures "until it appears from affirmative proof that the plan

18  and procedures result in a constitutional infringement.").

19          In response to Defendants' June 30, 2022 submission, the Special Master and Plaintiffs

20  raise general concerns and a handful of anecdotes against telepsychiatry.  However, the Special

21  Master does not provide any actual data from his monitoring tours or detailed observations of the

22  work at the telepsychiatry hubs, and instead, the report's recommendations against adoption of

23  the Revised Policy are largely based on a few isolated anecdotes and lack supporting empirical

24  evidence, and they are not reasonably. *See* Stroman Decl. ¶¶ 11, 12, and 14.  In addition, many of

25  Plaintiffs' and the Special Masters' concerns improperly blame telepsychiatry for issues that are

26  not properly attributable to telepsychiatry as a modality. (*Id.*) More importantly, nothing

27  presented by the Special Master and Plaintiffs indicates that telepsychiatry, as a modality, fails to

28  deliver effective psychiatric care to patients or that its use harms patients.

9

Defs.' Resp.to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))

19106178.1   19285212.1

1    The Special Master also claims that Defendants' modifications are improper because they

2    are inconsistent with prior court orders.  But Defendants' proposed modifications to the Provional

3    Policy are expressly contemplated under the 2017, 2018 and 2020 orders.  In short, with the end

4    of the provisional period, Plaintiffs' and the Special Master's concerns do not present an

5    acceptable basis under the PLRA for blocking CDCR from implementing its Revised Policy,

6    particularly in light of the overwhelming evidence presented by Defendants.  Contrary to the

7    PLRA, the Special Master's recommended restrictions on the use of telepsychiatry—particularly

8    at the EOP level of care—are not a narrowly-tailored means of achieving systemically

9    constitutional access to care, and improperly limit Defendants' ability to treat patients and meet

10   CDCR's mental-health staffing goals.  *See* 18 U.S.C. § 3626(a)(1)(A) (prospective relief must be

11   limited to the least intrusive, most narrowly tailored means of remedying any purported

12   constitutional violation).  Given the nationwide shortage of mental health professionals and

13   CDCR's difficulty in recruiting and retaining mental health staff, maintaining the status quo (i.e.,

14   arbitrarily limiting telepsychiatry) would inevitably result in less or inconsistent care for the

15   *Coleman* class.

16           A.      **The Revised Policy Removes the Unnecessary Requirement of One
                     On-Site Psychiatrist for Each EOP Program.**
17

18           Under the Provisional Policy, no telepsychiatrists may be assigned to an EOP program

19   unless there is at least one on-site psychiatrist assigned to that program.  The Revised Policy

20   eliminates this burdensome and unwarranted restriction for delivering appropriate mental health

21   services at the EOP level.  (ECF No. 7682-1 at 81, 84.)  Defendants have shown that there is no

22   reason to place this limit on the use of telepsychiatry at the EOP level of care because: (1) there is

23   a broad and deep clinical consensus that the modality of telepsychiatry is a safe and effective way

24   to deliver treatment; (2) CDCR successfully used telepsychiatry at the EOP level of care for over

25   a decade without any limitations prior to the Provisional Policy; (3) there are robust safety

26   measures in place under the Revised Policy (*id.* at 82-83, 85 [processes are in place to handle

27   connectivity isuses, patient refusals, contraindications for telepsychiatry, and clinical emergencies

28   that may arise]); (4) telepsychiatrists' treatment follows the Program Guide (*id.* at 78; ); and

10

1    (5) telepsychiatrists have demonstrated commitment to providing excellent care to their patients

2    (*id.* at 78, 153-154).   By contrast, the Special Master rejects the proposed modification largely on

3    three unpersuasive bases.

#### 1.    The Special Master's Concerns About Telepsychiatrists' Participation in the Treatment Milieu Are Unfounded.

6        The Special Master's expert rejects eliminating the Provisional Policy's requirement that

7    there be at least one on-site psychiatrist assigned per EOP program, per yard, because he believes

8    that "in a residential treatment unit, the psychiatrist's role includes attention to the treatment

9    milieu, team building, and other functions, which cannot adequately be accomplished by remote

10   psychiatrists." (ECF No. 7682 at 54, n. 2.)  His expert's opinion is unsupported by evidence and

11   is demonstrably wrong.

12       As a threshold matter, CDCR's experience delivering patient care at the EOP level through

13   telepsychiatry directly undermines the expert's position.  Telepsychiatrists at the EOP level

14   already provide patients with the treatment outlined in the Program Guide in the same manner as

15   on-site psychiatrists.  (Mehta Decl. ¶¶ 19, 20, ECF No. 7682-1 at 78; Martello Decl. ¶¶ 10 and 14,

16   ECF No. 7682-1 at 153-154.)  Just like the Provisional Policy, the Revised Policy ensures the

17   psychiatrist is part of the treatment team, thereby preserving the treatment milieu.  (*Id.*)  Indeed,

18   telepsychiatrists engage with their on-site counterparts as part of the interdisciplinary teams for

19   their patients just as any on-site psychiatrist would.  (Mehta Decl. ¶¶ 19 & 20, ECF No. 7682-1 at

20   78; Martello Decl. ¶¶ 10 & 14, ECF No. 7682-1 at 153-154.)  Telepsychiatrists are also readily

21   available by video, phone, or chat.  (*Id.*)  They regularly speak with other team members outside

22   of interdisciplinary treatment team meetings for curbside consults, to express a concern or

23   recommendation about a patient, or to discuss other matters concerning the mental health

24   treatment provided to patients on their shared yard.  (*Id.*)  Additionally, telepsychiatrists regularly

25   speak with other staff members, such as escort officers and telepresenters, to gather crucial

26   information about their patients and the environment.  (*Id.*)  Telepsychiatrists can also be taken

27   cell front through telepresence, where they can observe their patients' common areas and cell

28   living conditions.  (*Id.*)  When virtually taken into the building, it is common for other inmates in

11

Defs.' Resp.to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))

19106178.1   19285212.1

1   the day room to recognize their doctor and address them in an impromptu fashion.  (*Id.*)  The

2   extent of their interactions is comparable to those of on-site psychiatrists who have patients

3   brought to their offices by escort officers throughout the day.  (*Id.*)

4         Disregarding all of this, the Special Master claims that some telepsychiatrists are

5   "disconnected from the treatment team and milieu" and references telepsychiatrists who allegedly

6   do not participate in IDTTs, do not know correctional officer's names, and are unfamiliar with

7   *Coleman* terminology such as the "Program Guide" and the "Custody and Mental Health

8   Partnership Plan."  These specific criticisms do not create doubt as to the benefit and

9   effectiveness of telepsychiatry.  Escort officers often rotate, which can result in mental health

10  staff not always knowing their names.  This is not the fault of telepsychiatry or a deficiency that

11  makes telepsychiatry worse than the on-site equivalent.  Moreover, none of CDCR's clinicians,

12  on-site or off-site, are required to know the names of negotiated plans within the *Coleman* legal

13  framework.  Clinicians are only responsible for incorporating the substance of those plans into

14  their provision of treatment.

15        The Special Master's analysis suffers from a basic attribution error—his concerns are not

16  properly attributed to telepsychiatry as a modality.  Indeed, these or similar criticisms could have

17  been lodged against on-site clinicians and there is no evidence that they apply disproportionally to

18  telepsychiatry clinicians.  Thus, it cannot be said that these concerns represent issues unique to

19  telepsychiatry.  The relevant question should be whether telepsychiatry works to deliver care at

20  the EOP level, and the obvious answer—supported by years of telepsychiatry's use within CDCR,

21  expert testimony, medical literature, and the Provisional Policy to date—is yes.

22        Furthermore, contrary to the PLRA, neither the Special Master nor Plaintiffs present any

23  evidence that the requirement that there be at least one on-site psychiatrist assigned per EOP

24  program, per yard, is necessary to avoid or remedy an Eighth Amendment violation.  *Cf. Brown v.*

25  *Plata*, 563 U.S. 493, 531 (2011) (the scope of the remedy must be proportional to the scope of the

26  violation, and the order must extend no further than necessary to remedy the violation).  Indeed,

27  the Provisional Policy itself carves out an exception to the on-site psychiatrist requirement at the

28  EOP level, demonstrating that even the Provisional Policy recognizes that always having an on-

12

Defs.' Resp.to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))

19106178.1   19285212.1

1    site psychiatrist at the EOP level is not necessary to provide constitutionally adequate care.  This

2    exception has been used multiple times over the provisional period, *see* ECF No. 7682-1 at 40-56,

3    with no negative effects identified by any monitor at any time. (Mehta Decl. ⁋⁋ 4, 15-17.)[9]  In

4    utilizing this exception, CDCR has diligently satisfied the Provisional Policy's three conditions

5    by: (1) demonstrating that good faith efforts to recruit on-site psychiatrists have been exhausted;

6    (2) notifying the Special Master and Plaintiffs' counsel whenever the on-site assignment

7    requirement has not been satisfied for 30 days; and (3) presenting a plan to address the staffing

8    issue within 60 days.  While these conditions may reflect the Special Master's policy preferences,

9    none are clinically warranted, let alone necessary to avoid or remedy a violation of the Eighth

10   Amendment.  Judicially imposing them would violate the PLRA and improperly impede

11   Defendants' policy-making discretion.  *Turner v. Safley*, 482 U.S. 78, 85.

12        The Special Master also raises concerns that telepsychiatry results in variability in the

13   quality of care, noting one telepsychiatrist who reported some incorrect information (ECF No.

14   7682 at 37), observing telepsychiatrists generally as only providing "minimal contributions to

15   IDTTs and lack of engagement" (*id.* at 37-38), and complaining that placement of telepsychiatry

16   equipment during one EOP IDTT prevented a telepsychiatrist from having a full view of the

17   patient who was exhibiting signs of akathisia with involuntary movements (*id.* at 37-38, and

18   42).[10]  But the small handful of observations and concerns reported by the Special Master do not

19   fairly or accurately represent the overwhelming care taken by CDCR telepsychiatrists when

20   treating their patients.  *See* Supplemental Declaration of Joseph Penn, M.D. filed herewith.  And

21   one poorly-placed camera should not prevent the adoption of a statewide policy that will improve

22   the delivery of care for thousands of class members.[11]  Indeed, as CDCR has already reported,

---

23        [9] The fact that the Provisional Policy actually allows in some cases telepsychiatry at the

24   EOP level where no on-site psychiatrist has been assigned belies any assertion that CDCR's
     proposed modification represents "a substantial deviation" (ECF No. 7682-1 at 55).

25        [10] Akathisia relates to an internal feeling of restlessness which can present on a spectrum.
     (Stroman Decl. ⁋ 11.)

26        [11] The Special Master's reference to this IDTT incident is not supported by any details or
     clinical information in the report that would indicate whether the Special Master's monitor

27   discussed the incident with the telepsychiatrist, who could have already been aware of the issue
     and addressing it with the patient during the individual clinical appointments.  (Stroman Decl. ⁋

28   11.)  Whether missed or simply not addressed during this particular clinical encounter, this one

---

1   between April 2020 and June 2022, CDCR telepsychiatrists had more than 158,000 clinical

2   encounters with their patients (Mehta Decl. at ¶ 16, ECF No. 7682-1 at 71-79) and in the six

3   months from July 2022 to December 2022, CDCR telepsychiatrists had close to 39,000 clinical

4   encounters with their patients, including over 10,000 encounters with EOP patients.  (Suppl.

5   Mehta Decl. ⁋ 5.)  The handful of incidents reported by the Special Master and Plaintiffs

6   represent a tiny fraction of those encounters and do not justify blocking CDCR from

7   implementing the Revised Policy when the overwhelming majority of contacts using

8   telepsychiatry are clearly successful and without issues.  *See Armstrong v. Davis*, 275 F.3d 849,

9   870 (9th Cir. 2001, *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 507

10  (2005) ("isolated violations affecting a narrow range of plaintiffs" cannot justify systemwide

11  relief; *see also Lewis v. Casey*, 518 U.S. 343, 359 (1996) (two instances of inadequacies "were a

12  patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide

13  relief.").

14       The Special Master also faults Defendants for not presenting "published studies

15  demonstrating that telepsychiatry is recommended as a replacement for on-site psychiatry for

16  higher acuity patients such as EOP patients."  (ECF No. 7682 at 45.)  As a threshold matter, the

17  Special Master's basic premise is incorrect.  Entirely replacing on-site care has never been

18  Defendants' intent.  (Suppl. Mehta Decl. ⁋ 3.)  In fact, even at the CCCMS level, where

19  Defendants are free to use telepsychiatrists and on-site psychiatrists interchangeably,

20  telepsychiatry has not entirely supplanted on-site psychiatry.  Rather, the intent of Defendants'

21  Revised Policy is to eliminate the burdensome and unnecessary requirement that there be at least

22  one on-site psychiatrist assigned per EOP program, per yard.

23       But Defendants provided articles supporting the use of telepsychiatry for higher acuity

24  patients in community settings, correctional settings, and in acute, inpatient, and emergency

25  settings.  Faced with a mountain of literature overwhelmingly supportive of the use of

---

26  vague reference to a single misplacement of equipment during an IDTT does not demonstrate that
    telepsychiatry is an inferior or unconstitutional modality.  (*Id*.)  CDCR's telepsychiatry

27  equipment is, in fact, especially designed to allow telepresenters to adjust cameras so that the
    telepsychiatrists are able to observe their patients' physical characteristics, and is routinely used

28  for this purpose .  (*Id*.; Suppl. Penn Decl. ⁋ 5, Exhibit A.)

1  telepsychiatry for higher acuity patients in a number of settings, the Special Master's current

2  criticism seems to be that Defendants have not provided studies or articles specific to the EOP

3  level of care.  But the EOP level of care is unique to CDCR.  No perfect equivalent exists

4  anywhere else.  Thus, the lack of studies or articles specifically concerning EOP is not a

5  reasonable basis for prohibiting the use of telepsychiatry in that setting.  This is especially true

6  given that EOP is highly comparable to levels of care that are studied in the existing literature,

7  and the Lessons Learned report directly addresses this point.  (ECF  (Mehta Decl. ¶ 21-23, ECF

8  No. 7682-1 at 79.)

9         Further, the Special Master concludes that because "evidence-based data on the use of

10  correctional telepsychiatry is limited and still evolving at this stage, particularly with respect to its

11  use for higher acuity patients, it is premature to rely on the premise that there is currently no

12  absolute evidence of contraindications for telepsychiatry in order to justify the expansion of the

13  policy that defendants advocate for."  (ECF No. 7682 at  45.)  But this misses the point of

14  Defendants' literature review.  This is not a clinical dispute because the Special Master has made

15  no clinical argument.  Defendants put forth 56 articles, guidelines, studies, analyses, and opinions

16  supporting the use of telepsychiatry, which represent a significant clinical consensus in the field

17  of medicine.  (ECF No. 7682-1 at 150-164.)  In response, the Special Master's expert offered one

18  quote from a commentary opinion written by an epidemiologist who primarily studies nicotine,

19  suggesting that telepsychiatry is a "nascent science."  (Suppl. Mehta Decl. ⁋ 7, Exhibit A.)

20  Notably, telepsychiatry is not a "nascent science" and has been in use since at least 1959. (Suppl.

21  Mehta Decl. ⁋ 7.)  Further, and the same commentary opinion cited by the Special Master's

22  expert concludes that "[d]elaying policy making because of limited evidence can constrain policy

23  frameworks later, once the technology has been diffused and adopted (the Collingridge dilemma),

24  and restrict access to mental health care for those who might need it most."  (Suppl. Mehta Decl.

25  Exhibit A.)

26         The Special Master also cautions against the use of telepsychiatry as a "default practice for

27  high acuity patients."  (ECF No; 7682 at 44.)  But this is another red herring.  Using

28  telepsychiatry as the default for high acuity patients is not CDCR's practice nor a part of the

15

1   Revised Policy.  The Revised Policy provides for clinical input to determine the appropriateness

2   for use of telepsychiatry.  (ECF No; 7682-1 at 83.)  And while Defendants' literature review did

3   show some contraindications in the use of telepsychiatry, those are expressly accounted for in the

4   Revised Policy, consistent with the Program Guide.  (ECF No; 7682-1 at 83.)  Thus, the

5   cautionary lessons in the scientific articles cited by Plaintiffs and the Special Master are already

6   addressed by CDCR's policy.[12]

7            **2.      The Special Master's Reporting of Internet Connectivity Issues
                       Does Not Provide a Sufficient Basis to Reject the Revised
8                      Policy.**

9            The Special Master reports "connectivity issues that persisted across multiple institutions."

10  (ECF No. 7682 at 38.)  Specifically, it appears the Special Master is referencing a handful of

11  connectivity events reported at several institutions, including CSP-Corcoran, SATF, and MCSP.

12  (*Id.*)  While internet issues are a common occurrence in today's telework environment, most are

13  readily resolved by an employer's internet technology or IT department.  CDCR has an IT

14  department that can resolve connectivity issues (Stroman Decl. ¶ 10), and its telepsychiatry

15  program uses sophisticated, state-of-the-art video equipment that is reliable and provides a clear

16  line of sight and communication between the doctor, patient, and treatment team.  (Stroman Decl.

17  ¶¶ 6-10.)  Moreover, the answer to purported internet connectivity concerns is not to insist on

18  CDCR's use of an outdated policy.

19  _____

    [12] In support of the Revised Policy, Defendants presented the Special Master with a
20  literature review conducted by the Assistant Deputy Director, Psychiatric Services, Toni Martello,
    M.D. (ECF No. 7682-1 at 150-164.)  Dr. Martello relied on the literature search as part of her
21  analysis of the merits and justification for using telepsychiatry in CDCR.  (Martello Decl. ¶ 16,
    *Id.* at 155-156.)
22          For the most part, the Special Master's report does not refute Dr. Martello's opinions or call
    into question the accuracy or validity of the literature review.  Instead, the Special Master
23  attempts to distinguish some of the methodologies and applications described in the articles, but
    in doing so, ignores the basic conclusion reached from the literature review.  (ECF No. 7682 at
24  42-44.)  For example, the Special Master referenced a study included in Defendants' literature
    review, stating that it confirmed that telepsychiatry is still a "nascent science," particularly for
25  higher acuity patients.  (ECF No. 7682 at 7-8; *but cf.* Vera Gruessner, *The History of Remote
    Monitoring, Telemedicine Technology*, 11/09/2015, https://mhealthintelligence.com/news/the-
26  history-of-remote-monitoring-telemedicine-technology (observing that telemedicine technology
    first began as a form of healthcare delivery in the late 1960s due to the needs of NASA and the
27  Nebraska Psychology Institute).  Notably, this particular reference is to an *opinion* piece, not
    independent research.  More importantly, this same opinion notes that the "[a]dvantages of
28  telepsychiatry include greater access, flexibility, convenience of routine care, and potential for
    increased privacy."

1
        **3.    CDCR's Revised Policy Is Contemplated Under Prior Court**
             **Orders.**

2

3        Finally, the Special Master argues that it is "premature to recommend such a substantial

4    deviation from the requirements of the Court's prior orders." (ECF No. 7682 at 55.)  First, CDCR

5    disagrees that removing superficial and outdated requirements constitutes a "substantial

6    deviation."  Second,  both the 2017 and 2018 orders contemplated the possibility that ongoing

7    monitoring may lead to modification of the telepsychiatry policy.  The 2017 order states, "[t]he

8    Special Master's recommendations concerning the use of telepsychiatry, as clarified by this order,

9    shall form the basis of that addendum, **subject to modification as appropriate as a result of**

10   **ongoing monitoring** of defendants' telepsychiatry program."  (ECF No. 5711 at 30, emphasis

11   added.)  The 2018 order states, "nothing in this order precludes such modifications as may be

12   required, including as a result of the completion of the work required by the October 10, 2017

13   order."  (ECF No. 5850 at 7.)  The Court's subsequent orders implicitly recognize that the issue

14   of the limits on telepsychiatry are not settled.  For instance, on September 20, 2018, the Court

15   ordered that "defendants must be given an opportunity in the first instance to demonstrate why the

16   expansion of telepsychiatry they seek to implement will satisfy their Eighth Amendment

17   obligations."  (ECF No. 5928 at 4.)

18       The parties' March 2020 stipulation also anticipates that further modifications to the

19   Provisional Policy may be appropriate.  (ECF No. 6539.)  The Court approved the Provisional

20   Policy, the parties' agreed upon process to implement and monitor the Provisional Policy, and the

21   process to seek modifications of the Provisional Policy following the provisional period.  (ECF

22   No. 6539 at 2:22-3:27.)  Defendants have invoked their right to seek reasonable modifications of

23   the Provisional Policy consistent with the March 27, 2020 order, and those modifications are

24   properly before the Court.

25       Notwithstanding the Court's prior order permitting Defendants to request reasonable

26   modifications, the Special Master contends that Defendants are "attempt[ing] to relitigate the law

27   of this case." (ECF No. 7682 at 46.)  This is not Defendants' intention nor an accurate

28   characterization of their efforts.  Defendants seek to further improve their telepsychiatry policy

17

Defs.' Resp.to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))
19106178.1  19285212.1

1    and the delivery of psychiatric care in light of lessons learned during the provisional period and to

2    comport with current standards.  (Mehta Decl. ⁋ 4, ECF No. 7682-1 at 72.)  Much has changed

3    since the Provisional Policy was first approved—indeed, a global pandemic forced the world to

4    rethink how medical and mental health care could be delivered, particularly in congregate

5    settings.  The Court should not hamstring prison administrators' efforts to update policy to

6    comport with national standards of care, particularly where, as here, the Court anticipated that

7    changes may be necessary.  *Turner v. Safley*, 482 U.S. at 85; ECF Nos. 5711 at 30, 5850 at 7.

8            **B.    Removing "Last Resort in Emergency Situations" Standard for Use**
             **of Telepsychiatry in MHCBs and PIPs.**
9

10           The Special Master objects to the proposed modification to the limits on the use of

11   telepsychiatry to treat patients in MHCBs and PIPs on the basis that the modification "deviate[s]

12   from the carefully negotiated language regarding the use of telepsychiatry in inpatient levels of

13   care, which is rooted in the Court's prior orders and consistent with defendants' representations

14   about their intent to utilize telepsychiatry in inpatient programs."  (*Id*. at 55-56.)  CDCR found

15   during the Provisional Period that applying the undefined terms "last resort" and "emergency

16   situations" led to some confusion for institutions.  (Suppl. Mehta Decl. ⁋ 8.)  The modification

17   that the Special Master opposes was made to eliminate the undefined terms in favor of a more

18   concrete standard, similar to the language from the Department of State Hospital's telepsychiatry

19   policy. (ECF No. 5591-4 at 4.)

20           The modification provides a more precise limitation for the use of telepsychiatry in

21   inpatient settings by making the availability of on-site staff the standard.  If a patient is in need of

22   immediate treatment and no on-site provider is available, this modification allows that patient to

23   receive telepsychiatric care.  It maintains the requirement for use of on-site psychiatrists except

24   when no other psychiatrists are available to provide treatment in the MHCBs and PIPs.  It also

25   maintains the requirement for recruitment of on-site psychiatrists.  As Dr. Mehta explained,

26   "[w]henever possible, CDCR seeks to employ psychiatrists who can deliver on-site psychiatric

27   evaluation and care to patients in all inpatient facilities.  The use of telepsychiatry is restricted to

28   only when on-site psychiatric care is not available, and only as long as necessary.  CDCR will not

18

1  use telepsychiatry in lieu of on-site psychiatrists at the inpatient level of care for any reason other

2  than a lack of availability of on-site psychiatrists." (ECF No. 7682-1 at 74-75, Mehta Decl. ℙ 6.)

3          **C.      Decreased Frequency of Site Visits.**

4          The Revised Policy reduces the frequency with which telepsychiatrists must visit

5  institutions to no less than annually and requires at least one day on-site where they "may" but are

6  not required to see patients face-to-face.  The Special Master recommends against reducing the

7  required number of site visits "at this time," based on his concerns about the potential for

8  telepsychiatrists to be isolated from the treatment team.  As explained above, this concern is

9  unwarranted because telepsychiatrists do participate in interactions with the treatment team and

10 the team building and collaboration with telepsychiatry more than satisfies those concerns.  (*Id.* at

11 153-154.)  Also, Defendants' telepsychiatry expert agrees with the Revised Policy (Penn Decl. ℙ

12 3) and specifically that the requirement for an annual visit is within the standard of care and that

13 reducing the number of required on-site visits would not have a negative impact on or interfering

14 with the telepsychiatrists' ability to provide mental health treatment.  (Suppl. Penn Decl. ℙ 6 .)

15 Neither the Special Master nor Plaintiffs have referenced another tele-mental health system with

16 similar on-site requirements.

17          **D.      Status of Cell-Front Telepsychiatry Contacts.**

18         Based on CDCR's experience that patients have significantly benefitted from on-site

19 providers' ability to utilize telehealth appropriately during the COVID-19 pandemic, the Revised

20 Policy removes the section in the Provisional Policy discussing cell-front contacts.  (Mehta Decl.

21 ℙ 7, ECF No. 7682-1 at 73-74.)  The Provisional Policy included a section that approved cell-

22 front contacts when a patient did not attend a scheduled appointment and the psychiatrist needed

23 to speak with the patient, and excluded all cell-front contacts by telepsychiatrists from counting as

24 Program Guide-required clinical contacts under any circumstance.  (ECF No. 6539 at 7.)  As

25 CDCR has discovered in practice, this section in the Provisional Policy leads to logically

26 inconsistent results.  For example, on-site providers "tele-working" could count their cell-front

27 visit for a Program Guide-required clinical contact in specific circumstances such as quarantines,

28 but a telepsychiatrist's same contact would not count under this clause in the policy.  (Mehta

Defs.' Resp.to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))

19106178.1  19285212.1

1  Decl. ⁋ 7, ECF No. 7682-1 at 73-74.)  Defendants are not proposing that every cell front contact

2  count as a Program Guide-required clinical contact, only that the same rules apply equally to tele-

3  working and on-site providers.  (*Id.*)  Also, although the Special Master agrees that the

4  technology used for cell-front contacts has improved, he recommends against approving the

5  modification allowing for cell-front contacts because he has not yet monitored the technology.

6  (ECF No. 7682 at 59.)

7       But CDCR provided a formal demonstration of cell-ftront technology at Salinas Valley

8  State Prison and the California Medical Facility with the Special Master and Plaintiffs present and

9  not only were there no complaints, but audio quality was noted to be more confidential than in-

10  person encounters because speakers and microphones offered more narrow directional

11  communication.  (Suppl. Mehta Decl. ⁋ 6.)  More importantly, a need for further monitoring is

12  not a basis to reject a reasonable modification.  The modification should be approved and the

13  Special Master can proceed to monitor and report on the provision going forward.

14                 **E.**    **Modified Language Regarding Informed Consent.**

15       CDCR proposed a minor revision to this section of the Provisional Policy.  The

16  modification removes the requirement that the telepsychiatrist explain the conditions under which

17  the patient may be referred for in-person care, as shown in the stricken language:

18  
19            At the beginning of the patient's first telepsychiatry contact, the
          telepsychiatrist shall explain the treatment modality, including a

20            description of the role of the tele-presenter (an institutional staff
          member in an approved clinical classification who facilitates patient
          encounters with the telepsychiatrist), and a plan for a response to

21            interruption in services. ~~, and conditions under which a referral is~~

22            ~~made for in person care~~.

23  Plaintiffs did not agree with this revision, citing a compromise between the parties in 2018 to

24  address their concerns about the need for informed consent, and the Special Master's team's

25  recommendation for upfront patient education.  ((ECF No. 7682 at 60.)  But as modified, the

26  section continues to provide for informed consent, explicitly provides for patient education, and

27  requires patients to be constantly evaluated for their appropriateness to remain in telepsychiatry as

28  described in the policy.  (Mehta Decl. ⁋ 7, ECF No. 7682-1 at 73.)  The only edit concerns the

20

Defs.' Resp.to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))

19106178.1  19285212.1

clinical decision-making process underlying the patient's referral to an on-site clinician. The patient is not deprived of any information concerning telepsychiatry, only the doctor's internal thought processes are not shared with the patient. Defendants have a legitimate reason for this modification—to prevent doctor shopping. The Special Master and Plaintiffs do not address this very real concern.

### F.    Telepsychiatry from Home.

Under the Provisional Policy, telepsychiatrists are required to work from designated telepsychiatry hubs. Currently, more than 90% of the telepsychiatrists work from their home offices—a fact well-known to the Special Master and Plaintiffs. (Stroman Decl. ¶ 13 and ECF No. 7682 at 4.) If the Court agrees with the Special Master's recommendation on maintaining the Provisional Policy, all telepsychiatrists will be required to return to working in hub offices, with distastrous implications for psychiatrist recruitment and retention. An important aspect of the Revised Policy is allowing doctors the option to work from home, provided they have appropriate computer equipment, network access, and confidential space to conduct business. The Special Master notes that Plaintiffs do not oppose this modification. And the Special Master also appears to approve this modification with future monitoring to address any connectivity issues. (*Id*. at 60-82.)

### G.    Night-Time Telepsychiatry.

There are no stated objections to CDCR's proposed modifications clarifying the role of nighttime telepsychiatrists.

### H.    Continued Good Faith Recruitment and Retention of On-site Psychiatrists.

CDCR's modifications remove the statements from the Provisional Policy that require CDCR to make good faith efforts to recruit and retain on-site psychiatrists for the MHCBs and PIPs. The reasons for these modifications are that such good faith efforts are already part of CDCR's staffing plan and actions continuously taken and reported independently of this language in the telepsychiatry policy. Staffing is a large component of the remedial plan under the 1995 judgment as confirmed under countless Court orders and CDCR's 2009 staffing plan. Dr. Mehta

21

Defs.' Resp. to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))

19106178.1  19285212.1

1    has repeatedly confirmed CDCR's commitment to continue to recruit and retain onsite

2    psychiatrists, most recently in his June 30, 2022 declaration and supplemental declaration filed

3    concurrently herewith.  As of Novemember 2022, CDCR employed 261 on-site psychiatrists and

4    79 telepsychiatrists.  (ECF No. 7691 at 5.)  These numbers alone support Defendants' position

5    that the policy does not need to include both the commitment to use on-site staffing and the good

6    faith to continue efforts to recruit such on-site staffing.

7        Plaintiffs have requested two additional modifications to the Provisional Policy.  The first

8    modification seeks an EHRS identifier for telepsychiatry.  CDCR has agreed to this modification

9    and has developed the requested identifier within the EHRS.

10       Plaintiffs' second requested modification seeks enhanced reporting on programs that lack

11   on-site psychiatric coverage.  The Special Master reports that Defendants are in compliance with

12   this reporting requirement and that no further obligation is required.  Defendants agree that there

13   is no need for a further order in response to Plaintiffs' request.

14   / / /

15   / / /

16

17

18

19

20

21

22

23

24

25

26

27

28

19106178.1  19285212.1

1

**CONCLUSION**

2      The targeted modifications that Defendants propose in the Revised Policy are supported by

3   current standards of care, national psychiatric organizations, expert opinions, and CDCR's years

4   of successfully using telepsychiatry to deliver mental health treatment and expand access to care

5   for patients.  They are designed to ensure that mental health services extend to all who need them

6   within CDCR's MHSDS, notwithstanding staffing, geographical, or other challenges.  The

7   Special Master and Plaintiffs have not offered persuasive reasons supported by empirical

8   evidence to reject the proposed modifications.  Judicial imposition of limitations on the use of

9   telepsychiatry beyond what Defendants propose are not supported by the record on this issue.

10   Accordingly, Defendants respectfully request that they no longer be blocked from implementing

11   their Revised Policy.

12      Dated: January 17, 2023                 Respectfully submitted,

13                                              ROB BONTA
                                               Attorney General of California
14                                              DAMON MCCLAIN
                                               Supervising Deputy Attorney General
15

16                                              **/s/ *Elise Owens Thorn***
                                               Elise Owens Thorn
17                                              Deputy Attorney General
                                               *Attorneys for Defendants*
18

19                                              *HANSON BRIDGETT LLP*

20                                              */s/ **Samantha D. Wolff***
                                               *PAUL B. MELLO*
21                                              *SAMANTHA D. WOLFF*
                                               *DAVID C. CASARRUBIAS*
22                                              *Attorneys for Defendants*

23

24

25

26

27

28

Defs.' Resp.to Report on Final Proposed Telepsychiatry Policy (2:90-cv-00520 KJM-DB (PC))

19106178.1  19285212.1