Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Paul B. Mello, State Bar No. 179755
Samantha D. Wolff, State Bar No. 240280
David C. Casarrubias, State Bar No. 321994
Hanson Bridgett LLP
 1676 N. California Boulevard, Suite 620
 Walnut Creek, CA 94596
 Telephone: (925) 746-8460
 Fax: (925) 746-8490
 E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF JOSEPH PENN MD IN SUPPORT OF DEFENDANTS' POSITION ON THE USE OF TELEPSYCHIATRY** |

I, Joseph V. Penn, MD, CCHP, FAPA, declare:

1. I am the Director of Mental Health Services of the University of Texas Medical Branch (UTMB) Correctional Managed Care (CMC), a university-based correctional health care system. I have held this position since February 2008. In this capacity, I oversee the provision of psychiatric, psychological, and mental health services, including telepsychiatry services, to approximately 80% (approximately 110,000 adult inmates) of the entire Texas state jail and state adult prison population housed within the Texas Department of Criminal Justice facilities statewide. Prior to and subsequent to the COVID-19 pandemic, Texas has maintained the largest

1

Penn Decl. Supp. Defs.' Position On Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

19277147.1

1  state prison population nationally. I also manage the psychiatric services to approximately 600 youths housed statewide within secure state school residential facilities in the Texas Juvenile Justice Department. Seventy-seven percent of the youth offenders are on psychotropic medications and the state successfully delivers all psychiatric treatment to this population of patients via telepsychiatry. I also oversee the delivery of supplemental telepsychiatry services to jail inmates detained in the Bexar County jail, San Antonio, Texas. I previously oversaw telepsychiatry service delivery to county jails in Angleton, Galveston, and Victoria, Texas. I also had clinical and administrative oversight of on-site psychiatric services that UTMB CMC previously provided at four Federal Bureau of Prison units in Beaumont, Texas.

2.  My training, qualifications, as well as my relevant experience and publications are described in detail in my C.V. and earlier declaration submitted to the Special Master on June 30, 2022. *See* ECF 7682-1 at 165-222.

3.  I have reviewed Special Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy (ECF No. 7682). That report does not cause me to revise my opinions that were included with Defendants' June 30, 2022 submission to the Special Master, and which conclude that telepsychiatry is a safe and effective modality for the delivery of mental healthcare services in correctional settings, including for Enhanced Outpatient Program (EOP) patients. Nor does the Special Master's Report cause me to revise my opinion that CDCR's proposed telepsychiatry policy, as it relates to the EOP setting, would exceed the standard of care. The Special Master's Report does not refute that telepsychiatry is a standard, widely accepted, and effective method of psychiatric evaluation and treatment delivery for individuals in residential treatment, within both correctional and non-correctional patient populations. Nor does the report describe harm or adverse clinical outcomes to any *Coleman* patients that can be attributed to telepsychiatry. I am similarly unaware of any published studies to date that reach such conclusions regarding telepsychiatry.

4.  There is substantial evidence and literature supporting the use and effectiveness, of telepsychiatry, which is not contradicted by the Special Master's Report and Recommendation. Telepsychiatry, telepsychology, and other forms of telehealth have improved access to care and

2

Penn Decl. Supp. Defs.' Position On Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

19277147.1

1  continuity of care during the current national shortage of psychiatrists and other mental health
2  practitioners. This is based on my personal knowledge, my 15 years of direct patient care
3  providing evaluation and treatment via telepsychiatry and in person, overseeing other
4  telepsychiatry services in the largest state prison system in the United States, and my other
5  experiences across correctional systems nationally. My direct observations of CDCR's
6  telepsychiatry program have only strengthened my opinions in this regard.

7      5.    I am aware that the Special Master's Report included references to challenges with
8  connectivity, but it did not describe the frequency or nature of those issues. I have personally
9  observed the provision of telepsychiatry services to *Coleman* patients and found that the
10 connectivity and technology being used were excellent. The clinical sessions I observed did not
11 encounter any challenges with connectivity from the telepsychiatry hub or from the
12 telepsychiatrists' home offices. Regardless, in my opinion, occasional connectivity challenges
13 would not justify unnecessary limits on the use of telepsychiatry because these types of problems,
14 if they arise, can usually be readily addressed. Moreover, the benefits that are gained through the
15 use of telepsychiatry – including the ability to expand the reach of mental health care to patients
16 in need – far outweigh any occasional technical glitches that may occur. A true and correct copy
17 of a short report that I prepared, immediately following my observations of telepsychiatric
18 clinical sessions, is attached as **Exhibit A**.

19     I declare under penalty of perjury under the laws of the United States of America that the
20 foregoing is true and correct. Executed in Conroe, Texas on January 17, 2023.

Joseph V. Penn, M.D., CCHP FAPA
*(original signature retained by attorney)*

3

Penn Decl. Supp. Defs.' Position On Telepsychiatry (2:90-cv-00520 KJM-DB (PC))

19277147.1

# Exhibit A

**Observation of CDCR Telepsychiatry Encounters**

Joseph V Penn MD CCHP-MH LFAPA

12/20/2022

Telepsychiatry Encounters: I observed individual telepsychiatry encounters of a convenience/random sample of CDCR EOP inmate patients with various CDCR telepsychiatry staff. A plaintiff attorney was present for the entirety of these evaluations:

December 1, 2022   California Medical Facility (CMF), Vacaville, CA Dr. Stephanie Bolton (Telepsychiatrist)

December 2, 2022   San Quentin State Prison, San Quentin, CA Dr. Rafael Perez Espejo (Telepsychiatrist)

Observations:

The telepsychiatry audio/video link between the clinic room and the offsite telepsychiatrist had already been established. There was also a pre-established patient clinic schedule. The medical assistant had also previously arranged for each inmate patient to be transported to the clinic area waiting room area. When ready to begin, the designated medical assistant escorted each patient into the confidential exam room. There were no custody staff in the room or immediately outside, thus affording the patient full privacy and confidentiality. The medical assistant remained seated behind a desk with several computer screens. The medical assistant was readily available to facilitate and assist the telepsychiatrist throughout the encounter, and then upon completion, escorted each patient outside. Both the telepsychiatrist and the medical assistant had immediate access to the individual inmate patient's CDCR electronic health records.

Each medical assistant/proctor was engaged and immediately available to facilitate the telepsychiatrist prior to, during, and subsequent to the evaluation. I found their immediate presence and ready availability to the psychiatrist to exceed the standard of care of medical assistants in similar community outpatient or other jail or prison psychiatry settings. For example, during one patient encounter, one patient who was in wheelchair and had a hearing impairment identified, was complained of a particular complaint related to his lower extremity. Without the telepsychiatrist requesting anything, the medical assistant/proctor immediately adjusted the camera to allow the telepsychiatrist to better visualize the lower extremity. This clearly demonstrated the fluidity and proactive and immediate availability of the medical assistant to facilitate the telepsychiatric encounter and any identified needs in real time.

Each psychiatrist greeted each patient in a professional and engaging manner and confirmed their name (and that they were meeting with the correctly identified patient). Prior to beginning the psychiatric encounter an explanation was given re: my role (and that of the plaintiff attorney). There was an opportunity for questions. Permission was obtained from each CDCR inmate patient for myself and the plaintiff attorney attending these tours to observe the evaluation. Each inmate patient had an opportunity to decline having myself and the plaintiff attorney present for the encounter. No inmate patient declined to allow myself and the plaintiff attorney to observe the telepsychiatry encounter.

I did not engage or interview any patient. Similarly, I did not direct or prompt the psychiatrist in any manner. Instead, I observed the telepsychiatry clinical evaluation in its entirety. The screen that displayed the telepsychiatrist or the inmate patient was large, easily visible with excellent resolution and clarity. There was no video or audio lag. The screen that displayed the telepsychiatrist was within a few feet of the patient.

Every telepsychiatrist was able to establish rapport and demonstrated a caring, compassionate, and empathic treatment approach. Each telepsychiatrist employed a clinically appropriate open ended diagnostic interviewing approach at the beginning of the encounter, and then moved to a more focused emphasis on specific individual subjective complaints, target symptoms, impairments, recent stressors/conflicts/psychosocial issues, review of systems, and an assessment of the inmate patient's overall functioning and activities of daily living (ADL's) within the CDCR unit/housing setting. I noted that the telepsychiatrists were explicit in their efforts to establish and contribute to continuity of care. For example, the telepsychiatrist attempted to educate the patient regarding their past, current and future treating psychiatrist particularly if/when an inmate patient were to be transferred from one CDCR facility to another facility.

Not a single telepsychiatry encounter appeared hurried or rushed. No encounter was solely focused on psychotropic medications and medication issues as is often the case in outpatient community practice, sometimes referred to as "med checks" or "five minute med checks." Instead each telepsychiatrist took a patient centered holistic approach to better understand the patient's past, recent and current life experiences and mental health issues. Patients were queried regarding their current live experiences, interactions with cell mates, other inmates, family contacts, use of tablets, participation in psychotherapies (individual and group), and the like, perception of medication efficacy, side effects, and medication compliance. In summary, each telepsychiatrist was able to effectively "connect" with each patient, establish a therapeutic alliance, rapport, and "meet the patient" where they were with respect to their desired treatment needs.

Each patient received immediate psychoeducation regarding their diagnoses, medications, and treatment plans. Each inmate patient was appropriately informed

regarding their current DSM-5 diagnoses/psychiatric condition, individual treatment plans with an emphasis on the intended effects and benefits of a respective psychotropic medication and non-psychotropic treatment recommendations in an intelligible manner. Patients were given options of adjusting or continuing their current psychotropic medication regimens. Patients were educated regarding the possible short and long term risks and side effects and intended beneficial effects of their psychotropic medications. The rational for any recommended medication dose adjustment or medication change was carefully explained in basic terms. The patients were able to ask questions. Near the wrap up or conclusion of each evaluation, the telepsychiatrist provided an additional prompt, and queried each patient to identify any other issues or concerns that the patient may have forgotten to bring up previously.

No inmate patients asked any questions or expressed any concern regarding the use of telepsychiatry consultation. No inmate patients expressed any concerns or dissatisfaction with being seen via telepsychiatry, issues with the audio/video signal, difficulty understanding or communicating effectively with the telepsychiatrist. None expressed any dissatisfaction, stopped or requested to end the encounter prematurely, or made a request to see an in person psychiatrist as opposed to a telepsychiatrist.

Additional impressions/observations:

1) The telepsychiatry encounters were properly implemented, well structured, organized, and efficient.
2) The telepsychiatrist, medical assistant and the inmate patient engaged appropriately and interacted in a professional and therapeutic manner.
3) The telepsychiatry session length of duration were more than adequate to assess and render timely psychiatric treatment to each patient.
4) The telepsychiatry encounters that I observed clearly demonstrated that CDCR provided immediate "real time" access to specialty psychiatric care and consultation within this large correctional system.
5) In my professional opinion the telepsychiatry encounters that I observed were equivalent or exceeded in person psychiatry encounters for a similar level of acuity of incarcerated or community patient.
6) The use of telepsychiatry augmented and improved access to care and continuity of care.
7) There was no lag, interruption or disconnection of the audio/video link at any time. There were no technological issues that impeded the encounters.
8) The picture of the telepsychiatrist (my vantage point from being near the patient) and inmate patient (my vantage point from being near the telepsychiatrist) was extremely clear.
9) The telepsychiatrists maintained excellent eye contact with the patient and were attentive to verbal and non-verbal signs.

10) The telepsychiatrists were familiar with each patient and had obviously previously reviewed the patient's chart and history and medications. They demonstrated familiarity with the patient's clinical history, diagnoses, medications, and treatment plans. They did not spend excessive amounts of time looking through a patient's chart to locate information.