ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE:   925-746-8460
FACSIMILE:   925-746-8490
Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                Plaintiffs,<br><br>        v.<br><br>GAVIN NEWSOM, et al.<br><br>                Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**SUPPLEMENTAL DECLARATION OF AMAR MEHTA REGARDING DEFENDANTS' POSITION ON TELEPSYCHIATRY**<br><br>Judge:    Hon. Kimberly J. Mueller |

I, Amar Mehta, declare:

1.    I am the Deputy Director of the Statewide Mental Health Program for the California Department of Corrections and Rehabilitation (CDCR). I previously held this position in an acting capacity from July to September 2020, and prior to that I was the Statewide Chief of Telepsychiatry. I have worked at CDCR since July 2013, during which time I have also served as a staff telepsychiatrist, site director for residency training, institutional clinical lead, and acting statewide Chief of Psychiatry. I attended residency in general Psychiatry, and completed fellowships in both Child & Adolescent Psychiatry and Forensic Psychiatry. I am Board-certified in Adult, Child & Adolescent, and Forensic Psychiatry, as well as Addiction Medicine. I submit

1 this supplemental declaration in support of Defendants' Response to the Special Master's Report

2 and Recommendation on a Final Proposed Telepsychiatry Policy.  I have personal knowledge of

3 the statements in this declaration and could testify to them if called to do so.

4       2.     I have reviewed and am familiar with the parties' June 30, 2022 letter submissions

5 to the Special Master on telepsychiatry and the Special Master's Report and Recommendation on a

6 Final Proposed Telepsychiatry Policy.  (ECF No. 7682 and 7682-1.)

7       3.     I am aware that one of the reasons the Special Master does not support CDCR's

8 Revised Policy on telepsychiatry is based upon his misunderstanding that CDCR intends to use

9 telepsychiatry to replace on-site psychiatry, particularly for higher acuity patients.  But this is not

10 Defendants' intent, nor has it ever been.  Instead, CDCR has clearly stated the intent to use

11 telepsychiatry only in the specific circumstance set forth in the Revised Policy.  The Revised

12 Policy indicates that telepsychiatry shall be used only when on-site psychiatric care is not

13 available, and that CDCR will not use telepsychiatry in lieu of on-site psychiatrists at the inpatient

14 level of care for any reason other than a lack of availability of on-site psychiatrists. This is actually

15 more specific than the language in the provisional policy.

16       4.     Because CDCR only intends to use telepsychiatry in that specific case, CDCR has

17 never and does not intend to scale back its efforts to recruit and retain on-site psychiatrists.

18 Indeed, CDCR will continue to focus and expand its efforts on recruiting and retaining

19 psychiatrists to work on-site, and has even re-directed some telepsychiatry applicants to work on-

20 site at nearby institutions.  However, given the very real, and very serious nationwide mental

21 health staffing shortage, CDCR seeks to remove superficial and outdated restrictions on

22 telepsychiatry by implementing its Revised Policy.  This will ensure that class members receive

23 effective and regular psychiatric care from mental health professionals, whether remotely or in-

24 person.

25       5.     In the six months from July 2022 to December 2022, CDCR telepsychiatrists had

26 close to 39,000 clinical encounters with their patients, including over 10,000 encounters with EOP

27 patients.

28 / / /

SUPP. DECL. AMAR MEHTA RE DEFS.' POSITION ON TELEPSYCHIATRY

6.      In late 2019 and early 2020, CDCR demonstrated its cell-front telepsychiatry technology for the Special Master experts and Plaintiffs at Salinas Valley State Prison and at the California Medical Facility.  We received no complaints or concerns, and the audio quality was noted to be more confidential than in person because the speakers and microphones on the new equipment offered more narrow directional communication.

7.      The Special Master's dismissive criticism of Defendants' literature review of 56 articles, guidelines, studies, analyses, and opinions supporting the use of telepsychiatry rests primarily upon a single out of context quote from a page and a half opinion, whose primary author is an expert on the epidemiology of addiction.  It suggests that telepsychiatry is a "nascent science," but that quote itself references a paper that does not mention any form of telemedicine. The opinion piece cited by the Special Master's expert also notes "[a] 2022 study of 126 million patients across all 50 states found that 39% of mental health visits were virtual."  This is not "nascent"; telepsychiatry has been used since at least 1959 at the Nebraska Psychiatric Institute. A copy of the opinion piece is attached hereto as Exhibit A.  The article concludes: "[d]elaying policy making because of limited evidence can constrain policy frameworks later, once the technology has been diffused and adopted (the Collingridge dilemma), and restrict access to mental health care for those who might need it most."

8.      CDCR found during the Provisional Period that applying the undefined terms "last resort" and "emergency situations" in the Provisional Policy led to some ambiguity for institutions in applying this exception to use of telepsychiatry for inpatient levels of care.  CDCR modified the section to eliminate the undefined terms in favor of a more concrete standard, similar to the language used in the Department of State Hospital's telepsychiatry policy.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed in San Quentin, California on January 17, 2023.


*/s/ A. Mehta, M.D.*
A. Mehta, M.D.

Case No. 2:90-CV-00520- KJM-DB

19279507.2

SUPP. DECL. AMAR MEHTA RE DEFS.' POSITION ON TELEPSYCHIATRY

# Exhibit A

Opinion



VIEWPOINT

# Implications of Telepsychiatry for Cost, Quality, and Equity of Mental Health Care

**Carlos Blanco, MD, PhD**
Division of Epidemiology, Services and Prevention Research, National Institute on Drug Abuse, Bethesda, Maryland.

**Melanie M. Wall, PhD**
Department of Psychiatry, New York State Psychiatric Institute/Columbia University, New York.

**Mark Olfson, MD, MPH**
Department of Psychiatry, New York State Psychiatric Institute/Columbia University, New York.

**The COVID-19 pandemic** has triggered a rapid expansion of telepsychiatry. A 2022 study of 126 million patients across all 50 states found that 39% of mental health visits were virtual.[1] It is expected that telepsychiatry will continue to expand after the COVID-19 pandemic subsides.[2] Advantages of telepsychiatry include greater access, flexibility, convenience of routine care, and potential for increased privacy. However, in contrast to the decades of accumulated knowledge concerning cost, quality, and equity of in-person care, our understanding of telepsychiatry is still a nascent science.[3] We outline some of the choices that will have to be made as telepsychiatry continues to expand and will have far-reaching implications for multiple stakeholders including, among others, regulators, payers, clinicians, health care systems, and patients.

In the US, the practice of psychiatry and related disciplines is primarily regulated by the states. State licensure requirements, in addition to pre–COVID-19 expectations of in-person care, have contributed to the development of multiple, separate markets for mental health care. In each market, prices are based, at least in part, on demand for services, clinician availability, and cost of living within each geographical area. Expansion of telepsychiatry has challenged the expectation of in-person care and softened the boundaries of those compartmentalized markets.

Telepsychiatry expansion could help decrease the cost of mental health care. Relaxation of licensing regulations could increase availability of clinicians, stimulate market competition, and lead to lower prices as a way to compete for patients.[4] Eliminating commuting times for patients and clinicians along with greater flexibility in scheduling virtual rather than in-person care could further increase the functional supply and reach of clinicians including in underserved areas. Greater office sharing could lower overhead costs. Fewer missed appointments could increase treatment adherence, which, combined with broader access to experts, may improve clinical outcomes resulting in fewer failed treatments and decreased need for hospitalization and emergency care.

Although these forces should lower per-unit service costs, they might not lower aggregate treatment costs. For example, greater access could lead to increased provision of discretionary care that could offset per-unit service savings.[2] Furthermore, savings might not be passed along to patients, particularly if expansion of telepsychiatry leads to highly consolidated treatment markets. Consolidation could occur because larger systems may have advantages over smaller ones in marketing their services, navigating telepsychiatry regulations, or engaging in arbitrage, the practice of buying a product in one market (in this case clinicians' time) and selling it at a higher price elsewhere.[5] Consolidation could also limit patients' ability to choose their clinicians.

Expansion of telepsychiatry can also influence quality of care. Some studies suggest that outcomes are similar in virtual and in-person care, but whether that holds across disorders, levels of symptom severity, and populations is unknown.[6] For example, in accord with the Ryan-Haight Act, prescription of controlled substances requires an initial in-person visit. This requirement has been suspended during the COVID-19 public health emergency. However, if there are concerns about greater medication diversion or lower quality in virtual care than in-person care, it may be reactivated once the COVID-19 pandemic emergency is declared over. More broadly, because it is easier to monitor cost than quality,[7] crude implementation and scaling up of telepsychiatry care could lead to worse overall quality of care and patient outcomes. Fortunately, small amounts of monitoring can lead to substantial increases in quality of care.[7,8] Thus, even modest advances in the assessment of the quality of telepsychiatry could lead to large increases in its value. Expansions of telepsychiatry could also help generalize standards of care, reduce unjustified practice variation, and moderate legal liability risks associated with deviations from standards of care. Nevertheless, tensions may arise in balancing broadly applied care standards with justifiable and desirable experimentation and local variation in practice.

To ensure patient centeredness, patient preferences in delivery modality (virtual vs in person) should be carefully assessed without constraints imposed by clinicians, health care systems, or payers. Optimal hybrid models may vary by disorder type and chronicity, stage of care, and prevailing barriers to accessing high-quality care.[2]

Equity is also a key consideration. Lower costs could reduce inequities, as financial barriers to care have greater influence on those with fewer economic resources. To ensure that expansion of telepsychiatry reduces rather than exacerbates inequities by expanding access primarily for those with greater resources, it will be important to address the digital divide (ie, the gap between those with and without knowledge and easy online access).[9] Investing in information infrastructures necessary to provide telepsychiatry will be central to improving care across populations and achieving equity.

Expansion of telepsychiatry will have implications for multiple stakeholders through a complex interplay that will involve resetting treatment costs, challenges to assessing quality of care, embracing patient centeredness, and achieving equity. For patients, telepsychiatry is likely, at least in the short term, to increase access to

**Corresponding Author:** Carlos Blanco, MD, PhD, Division of Epidemiology, Services and Prevention Research, National Institute on Drug Abuse, 11601 Landsdown St, Rockville, MD 20852 (carlos.blanco2@nih.gov).

© 2022 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by a Kaiser Permanente User  on 12/28/2022

care and lower costs.[1,2] As choices expand, a challenge for patients will be to evaluate the quality of care offered by different clinicians and health care systems[7] and to appropriately balance ease of access, costs, and quality of care.

For clinicians, access to larger patient populations through virtual care could offer opportunities to better match their skills to patients' needs, which may lead to increased productivity and income.[2] A challenge and opportunity for clinicians will be to reduce clinically unjustified practice variation and to converge toward delivery of evidence-based care.

Health care systems may be compelled to accelerate adoption of global standards and protocol-driven care. The flexibilities afforded by virtual care may stimulate development of hybrid models of care in which experts are more accessible to consult with generalists. An important decision for health care systems will be the selection of geographical and population markets for their services.[2]

Increased access to clinicians and systems of care should help payers lower costs and honor patient preferences while improving the quality of care, patient centeredness, and equity. A challenge for payers will be to determine whether treatment reimbursement will vary by delivery modality (virtual vs in person).[2] An additional challenge for state-based payers, such as Medicaid, will be to decide when to contract services to out-of-state providers (including clinicians,

hospitals, and health care systems) that may offer lower costs, high-quality care, or value than in-state providers.

Lastly, regulators will have to balance the amount of evidence necessary to ensure the safety and efficacy of telepsychiatry with societal needs to make mental health care more accessible, patient centered, and equitable. Delaying policy making because of limited evidence can constrain policy frameworks later, once the technology has been diffused and adopted (the Collingridge dilemma),[3] and restrict access to mental health care for those who might need it most. Establishing explicit standards regarding which data will be used to inform decisions could help stimulate data collection and ensure that policy decisions are evidence-based. These standards may include data on patient preferences for virtual vs in-person care, treatment initiation, treatment adherence and retention, and selected patient outcomes (eg, emergency department visits or hospitalizations).

In summary, expansion of telepsychiatry creates new opportunities to increase treatment access, while it poses overlapping challenges to multiple stakeholders, as outlined above. Aligning the incentives of the key stakeholders offers a rare and important opportunity with far-reaching implications to lower the cost, increase the quality, advance equity of psychiatric care, and improve patients' outcomes and satisfaction.

ARTICLE INFORMATION

**Published Online:** October 19, 2022.
doi:10.1001/jamapsychiatry.2022.3330

**Conflict of Interest Disclosures:** None reported.

**Disclaimer:** The views and opinions expressed in this report are those of the authors and should not be construed to represent the views of any of the National Institute on Drug Abuse, the National Institutes of Health, or any US government agency.

REFERENCES

1. Lo J, Rae M, Krutika A, Cox C, Panchal N, Miller BF. Telehealth has played an outsized role meeting mental health needs during the COVID-19 pandemic. KFF. Published March 15, 2022. Accessed September 17, 2022. https://www.kff.org/coronavirus-covid-19/issue-brief/telehealth-has-played-an-outsized-role-meeting-mental-health-needs-during-the-covid-19-pandemic

2. Bestsennyy O, Gilbert G, Harris A, Roast A. Telehealth: a quarter-trillion-dollar post-COVID-19 reality? Published July 9, 2021. Accessed April 13, 2022. https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/telehealth-a-quarter-trillion-dollar-post-covid-19-reality

3. Mathews DJH, Balatbat CA, Dzau VJ. Governance of emerging technologies in health and medicine: creating a new framework. N Engl J Med. 2022;386(23):2239-2242. doi:10.1056/NEJMms2200907

4. Mullangi S, Agrawal M, Schulman K. The COVID-19 pandemic-an opportune time to update medical licensing. JAMA Intern Med. 2021;181(3):307-308. doi:10.1001/jamainternmed.2020.8710

5. Glied S, D'Aunno T. Efficiency and arbitrage in health services innovation. JAMA Health Forum. 2022;3(3):e220619. doi:10.1001/jamahealthforum.2022.0619

6. Jones CM, Shoff C, Hodges K, et al. Receipt of telehealth services, receipt and retention of medications for opioid use disorder, and medically treated overdose among Medicare beneficiaries before and during the COVID-19 pandemic. JAMA Psychiatry. Published online August 31, 2022. doi:10.1001/jamapsychiatry.2022.2284

7. Rochaix L. Information asymmetry and search in the market for physicians' services. J Health Econ. 1989;8(1):53-84. doi:10.1016/0167-6296(89)90009-X

8. Blanco C, Olfson M, Blanco-Jerez C. Managed care market share, fee-for-service Medicare, and information theory. JAMA. 1999;282(3):235-236. doi:10.1001/jama.282.3.235

9. Blanco C, Kato EU, Aklin WM, et al. Research to move policy: using evidence to advance health equity for substance use disorders. N Engl J Med. 2022;386(24):2253-2255. doi:10.1056/NEJMp2202740

© 2022 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by a Kaiser Permanente User on 12/28/2022