| | |
|---|---|
| ROB BONTA, SBN 202668<br>Attorney General of California<br>MONICA N. ANDERSON, SBN 182970<br>DAMON MCCLAIN, SBN 209508<br>Supervising Deputy Attorney General<br>ELISE OWENS THORN, SBN 145931<br>NAMRATA KOTWANI, SBN 308741<br>Deputy Attorneys General<br>  1300 I Street, Suite 125<br>  P.O. Box 944255<br>  Sacramento, CA 94244-2550<br>  Telephone:  (916) 210-7318<br>  Fax:  (916) 324-5205<br>  E-mail:  Elise.Thorn@doj.ca.gov<br>*Attorneys for Defendants* | HANSON BRIDGETT LLP<br>PAUL B. MELLO, SBN 179755<br>SAMANTHA D. WOLFF, SBN 240280<br>KAYLEN KADOTANI, SBN 294114<br>DAVID C. CASARRUBIAS, SBN 321994<br>CARSON R. NIELLO, SBN 329970<br>  1676 N. CALIFORNIA BLVD., SUITE 620<br>  WALNUT CREEK, CALIFORNIA 94596<br>  TELEPHONE: 925-746-8460<br>  FACSIMILE:  925-746-8490<br>*Attorneys for Defendants* |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.<br><br>Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DECLARATION OF DEVIN M. STROMAN, M.D.**<br><br>Judge:   Hon. Kimberly J. Mueller |

I, Devin M. Stroman, M.D., declare as follows:

1. I am the acting Chief of Telepsychiatry for the Statewide Mental Health Program of the California Department of Corrections and Rehabilitation ("CDCR"). I submit this declaration in response to the Special Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy (ECF No. 7682). I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

2. I started work for CDCR in 2015 as a staff telepsychiatrist at the Telepsychiatry Program out of the telepsychiatry hub at San Quentin State Prison. In January 2019 I was promoted to a Senior Supervising Psychiatrist the Telepsychiatry Program.  On September 12,

1  2022 I was appointed as the acting Chief of Telepsychiatry.  I attended residency in California at
2  the University of Southern California, I am board certified in Adult Psychiatry, Consult-Liaison
3  Psychiatry and in Addiction Medicine and fully licensed to practice in the state of California. Prior
4  to my time in CDCR I completed additional fellowship training which a provided sub-
5  specialization in treating medically complex patients. In addition to this work I also worked part-
6  time on both an inpatient psychiatric unit and in outpatient, residential treatment program for the
7  severely mentally ill.

8        3.      As Chief of Telepsychiatry, my duties include managing our seven Senior
9  Supervising Psychiatrists, five administrative staff members and, ultimately, overseeing our six
10 telepsychiatry hubs in order to ensure that all aspects of telepsychiatry are properly implemented. I
11 also provide psychiatric input to committees and projects under the auspices of the larger mental
12 health program.

13       4.      In my roles as a staff telepsychiatrist, Senior Supervising Psychiatrist, and as Chief
14 of Telepychiatry, I work on the Coleman Class Action and I am familiar and the Coleman court's
15 prior orders on the use of telepsychiatry, specifically the October 10, 2017 order (ECF No. 5711),
16 the July 3, 2018 order (ECF No. 5850), the September 20, 2018 order (ECF No. 5928), and the
17 March 27, 2020 order (ECF No. 6833) that sets forth the provisional telepsychiatry policy at
18 Exhibit A.

19       5.      I have reviewed and am familiar with the parties' June 30, 2022 letter submissions
20 to the Special Master on telepsychiatry and the Special Master's Report and Recommendation on a
21 Final Proposed Telepsychiatry Policy.  (ECF No. 7682.)

22       6.      Both the Special Master and Plaintiffs object to the use of telepsychiatry due to
23 their observation of internet connectivity issues or the reports from staff concerning connectivity
24 issues.  The report notes that telepsychiatrists indicated poorer internet connectivity when working
25 from home compared with work at the hub.  (ECF No. 7682-1 at 41, 53, and 61.)  No names of
26 individual doctors were provided to confirm or refute this statement.  The telepsychiatrists
27 referenced here appear to be working from the hubs.  The poorer internet connection from their
28 homes is likely what led them to work from the hubs, creating a selection bias. Also, it is possible

1 that these doctors may have had poor home internet identified during preliminary testing (prior to
2 being allowed to work remotely), which required them to work from a hub. The report also states
3 that the staff interviewed were those doctors working out of the hubs, and who were working out
4 of the hub due to poorer internet connectivity.  But the report does not state whether
5 telepsychiatrists working from home were asked the same question and gave the same response, if
6 other staff were interviewed but not included in the report, and/or if institutional staff were
7 interviewed.  The report also does not indicate whether the Special Master's experts observed poor
8 connectivity when observing doctors working from home.  The reporting of connectivity issues for
9 doctors working from home is not representative of all telepsychiatrists, as the majority of
10 telepsychiatrists working from home do not have connectivity issues and are teleworking
11 successfully.

       7.     CDCR has vastly improved its telepsychiatry equipment over the last 5 years.  All telepsychiatrists, whether working from a designated hub or from a home office, are provided with the Cisco DX80, state-of-the-art audio-video equipment, which is designed especially for providing the highest-quality video-teleconferencing.  The DX80 is a dedicated, always-on HD video communication system with a high-quality audio system and oversized, 23-inch screen that provides an engaging experience for video calls.  The following is a picture of the DX80 monitor in use by CDCR telepsychiatrists.



The DX80 provides a multitouch capacitive touchscreen that provides a powerful user interface. With a large 23-inch screen and best-in-class video and audio capabilities, the Webex DX80

1  allows for life-like experiences.  The monitor has a high-contrast LED panel with a wide viewing
2  angle and a full touch surface.  The DX80's camera located on the top of the monitor allows
3  telepresenters to adjust the camera in order to show the telepsychiatrists' patients' physical
4  movements and attributes.

5       8.      The IDTT's are outfitted with large monitors so that the patient and the treatment
6  team are able to communicate with the telepsychiatrists.  The monitor and equipment are mobile
7  and able to track each speaker and zoom in and out providing improved integration of
8  telepsychiatrists into IDTT meetings.  The equipment has a 43'' TV and a sound bar and camera
9  (top) and a panel control (bottom).



18       9.      Every telepsychiatrist maintains the ability to work from a telepsychiatry hub,
19  whether due to technical issues or just a preference to work from the hub.

20       10.     In addition to state-of-the-art equipment, telepsychiatrists have on demand access
21  to an Internet Technology (IT) department to assist with internet connectivity and equipment
22  issues that may arise.

23       11.     The Special Master reports an incident where a telepsychiatrist did not comment on
24  a patient's akathisia during an IDTT at SATF.  (ECF No. 7682 at 42.)  Akathisia relates to an
25  internal feeling of restlessness which can present on a spectrum.  The report lacks details that
26  would indicate whether the Special Master's monitor discussed the incident with the
27  telepsychiatrist, who could have already been aware of the issue and was working on it with the
28  patient during the individual clinical appointments.  Whether missed or not addressed during this

clinical encounter or for other reasons (the details of which are unclear as no clinical information was provided in the report), this one vague reference to a single physician's response during an IDTT does not translate to telepsychiatry as being an inferior modality.

12. The Special Master's report expresses a concern about the use of telepsychiatry in programs with high vacancy rates in other mental health staff positions and large numbers of unlicensed on-site clinicians who would benefit from ongoing consultation with psychiatry, which is difficult to facilitate when psychiatrists are not on-site. (ECF No. 7682 at 63.) This concern is easily addressed as CDCR telepsychiatrists are available for on-demand video consultations, instant message via Microsoft Teams, email and phone consultations at all times throughout the regular working hours. The COVID-19 pandemic restrictions enhanced the awareness and facilitation of use of these modalities for consultation.

13. Currently, more than 90% of the telepsychiatrists work from their home offices, but each also maintains an office and has the freedom to work from one of the telepsychiatry hubs.

14. The Special Master's Report includes several factual findings that are erroneous:

    a. At page 72, the Special Master reports that telepsychiatry was used in the crisis bed unit at CHCF for some acute and intermediate care patients. CDCR does not currently have any telepsychiatrists assigned to the MCHB at CHCF.

    b. At page 73, the Special Master reports that "patients knew the telepsychiatrist, who had worked at CMC for over 12 years. However, it was unclear how long the telepsychiatrist had been utilized in this capacity, and whether this clinician had previously worked on-site." But the telepsychiatrist currently assigned to CMC (who was assigned at the time of rounding also), has not previously worked on-site at CMC and was first assigned to CMC on April 5, 2021.

    c. At page 74, the Special Master reports that the "West facility telepsychiatrist worked from home and not from a hub. The telepsychiatrist reported directly to the headquarters' psychiatrist specialist with a dotted line to CMC's chief psychiatrist." This statement is incorrect as telepsychiatrists report to telepsychiatry senior psychiatrist supervisors, not headquarters psychiatry specialists (who are specialists and not supervisors).

        d.      At page 75, the Special Master reports that at the California State Prison at Los Angeles County (LAC), during the review period, due to COVID-19, his experts reviewed appointment logs that indicated that some telepsychiatrists provided some services for several programs, including the MHCB and mainline EOP and CCCMS programs, utilizing telepsychiatry. This is incorrect as CDCR only has one telepsychiatrist assigned to LAC who only attends to the PC2602s in the outpatient setting. We do not have any telepsychiatrists assigned to LAC who are providing regular clinical care in EOP or the MHCB.

        e.      At page 80, the Special Master reports that San Quentin did not normally utilize telepsychiatry, but between March 30, 2020, and June 30, 2021, in response to COVID-19, San Quentin primarily utilized telepsychiatry at all levels of care and that staff reported that San Quentin used telepsychiatry in one of the H-Units for ten days between July and August 2021, after a staff member tested positive for COVID-19. This is a reference to San Quentin's onsite psychiatrists who were teleworking during COVID and not to CDCRs Telepsychiatry program or Telepsychiatry doctors. There is a telepsychiatry hub located at San Quentin but none of the telepsychiatry doctors who work in that hub provide clinical care at San Quentin.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this seventeenth day of January, 2023, at San Quentin, California.

/s/ *Devin M. Stroman*
Devin M. Stroman, M.D.

-6-
DECLARATION OF DEVIN M. STROMAN, M.D.

19046896.1