DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
BRENDA MUÑOZ – 328813
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | Judge:  Hon. Kimberly J. Mueller |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

I.      PROCEDURAL HISTORY ................................................................. 1

II.     STANDARD OF REVIEW ................................................................. 3

III.    THE SPECIAL MASTER'S MONITORING REVEALED SIGNIFICANT PROBLEMS AND DOES NOT SUPPORT ADOPTING DEFENDANTS' PROPOSED MODIFICATIONS TO ELIMINATE ON-SITE PSYCHIATRY IN THE ENHANCED OUTPATIENT PROGRAM, NOR TO EXPAND THE REACH OF TELEPSYCHIATRY BEYOND THE PROVISIONAL POLICY. ................................................................. 4

IV.     THE COURT SHOULD ADOPT THE PROVISIONALLY APPROVED TELEPSYCHIATRY POLICY AS FINAL. ........................................ 6

        A.    The Court Should Maintain Some On-Site Psychiatrist Presence in EOP Programs ................................................................. 7

        B.    Telepsychiatry In Inpatient Units Should Only Be Used As a Last Resort in Emergency Situations. ................................... 8

        C.    The Court Should Maintain Current Requirements Regarding Site Visits for Telepsychiatrists ................................................ 10

        D.    The Court Should Maintain Current Restrictions Regarding Cell-Front Telepsychiatry Contacts. .................................. 11

        E.    The Court Should Maintain Current Requirements Regarding Informed Consent. .............................................................. 12

        F.    The Court Should Not Eliminate the Telepsychiatry Hub Requirement From the Provisional Telepsychiatry Policy. ..................... 13

        G.    The Court Should Not Adopt Defendants' Proposed Modification Regarding Night Shift Telepsychiatry. ........................ 15

        H.    The Court Should Not Adopt Defendants' Proposed Modification Regarding Good Faith Recruitment of On-Site Psychiatrists. ..... 15

V.      CONTRARY TO THEIR ASSERTIONS, DEFENDANTS' PROPOSED MODIFICATIONS ARE NOT SUPPORTED BY THE RELEVANT SCIENTIFIC LITERATURE. ........................................................... 16

VI.     THE COURT SHOULD NOT RELY ON THE OPINIONS OF DR. JOSEPH PENN WHICH HAVE BEEN REJECTED BY OTHER COURTS. ............................................................................................. 18

VII.    ADOPTING THE FINAL TELEPSYCHIATRY POLICY WOULD NOT VIOLATE THE PRISON LEGAL REFORM ACT. ........................... 20

CONCLUSION................................................................................................................ 21

CERTIFICATION .......................................................................................................... 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF AUTHORITIES

2                                                                          **Page**

3  <u>**CASES**</u>

4  *Armstrong v. Brown,*
    768 F.3d 975 (9th Cir. 2014) ................................................................... 21

5

6  *Coleman v. Brown,*
    756 F. App'x 677 (9th Cir. 2018) .............................................................. 21

7  *Coleman v. Newsom,*
    789 F. App'x. 38 (9th Cir. Dec. 24, 2019) ................................................... 2

8

9  *In re U.S.A. Motel Corp.,*
    450 F.2d 499 (9th Cir. 1971) ..................................................................... 3

10 *Jensen v. Shinn,*
    No. CV-12-00601-PHX-ROS, 2022 WL 2911496 (D. Ariz. June 30, 2022) ... 19, 20

11

12 *McCormack v. Hiedeman,*
    694 F.3d 1004 (9th Cir. 2012) .................................................................... 3

13 *Oil, Chemical and Atomic Workers Int'l Union, AFL-CIO v. N.L.R.B.,*
    547 F.2d 575 (D.C. Cir. 1976).................................................................... 4

14

15 *Parsons v. Ryan,*
    912 F.3d 486 (9th Cir. 2018) ................................................................... 20

16

17 <u>**STATUTES**</u>

18 18 U.S.C. § 3626............................................................................................ 20

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT AND RECOMMENDATION ON A FINAL
PROPOSED TELEPSYCHIATRY POLICY

**INTRODUCTION**

1

2      Plaintiffs request that the Court adopt the Special Master's recommendation to

3   adopt the provisional telepsychiatry policy as final.  The recommendation is well

4   supported by the Special Master's findings during the provisional monitoring period after

5   his team monitored telepsychiatry in action at Defendants' institutions and telepsychiatry

6   hubs.  California's prison mental health services include systems of care that cannot

7   operate without appropriate access to on-site psychiatrists for high-acuity and

8   psychiatrically complex patients.  The Defendants' proposed new policy amounts to a

9   dangerous experiment in which EOP patients would never see an in-person psychiatrist at

10  all.  The Special Master's recommendation draws a balance between live and remote

11  psychiatry that is consistent with patient safety.

12  **I.    PROCEDURAL HISTORY**

13     The Special Master's Report describes the background and extensive history

14  relevant to telepsychiatry.  Special Master's Report and Recommendation on a Final

15  Proposed Telepsychiatry Policy ("Telepsychiatry Report"), Dec. 15, 2022, ECF No. 7682

16  at 8-20.  Defendants have presented telepsychiatry as a solution to their psychiatry staffing

17  problem, which the Special Master and the Court have accepted within reasonable limits.

18  *See id.* at 10.  The Special Master's 2017 findings stated that "[t]elepsychiatry is not

19  clinically desirable as a frontline approach to providing psychiatric services for inmates

20  with the most intensive or emergent needs."  Special Master's Report on the Status of

21  Mental Health Staffing and the Implementation of Defendants' Staffing Plan, Feb. 6, 2017,

22  ECF No. 5564 at 15.  The Court adopted this finding.  Order, Oct. 10, 2017, ECF No. 5711

23  at 30 (incorporating substance of Special Master's telepsychiatry-related recommendations

24  in 2017 Staffing Report and ordering Defendants to develop a telepsychiatry policy);

25  Order, July 3, 2018, ECF No. 5850 at 4-7 (confirming that requirements of Oct. 17, 2017

26  order should form the basis of any telepsychiatry policy).  Defendants have tried to

27  relitigate the finding that telepsychiatry should supplement, not replace onsite psychiatry at

28  the higher levels of care.  This Court as well as the Ninth Circuit, however, have stated that

PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT AND RECOMMENDATION ON A FINAL
PROPOSED TELEPSYCHIATRY POLICY

1   the prior orders setting limitations on telepsychiatry are law of the case. *See Coleman v.*

2   *Newsom*, 789 F. App'x. 38, 40 (9th Cir. Dec. 24, 2019); Order, July 3, 2018, ECF

3   No. 5850 at 5 ("The recommendations of the Special Master concerning the use of

4   telepsychiatry, as clarified by the October 11, 2017 order, shall – or should, in the

5   obligatory sense – form the basis of the telepsychiatry addendum to the Revised Program

6   Guide.").

7       CDCR developed its current "provisional" telepsychiatry policy in late 2019 and

8   early 2020. *See* March 27, 2020 Order, Ex. A, ECF No. 6539 at 5-12 (hereinafter referred

9   to as "provisional telepsychiatry policy"). Under the provisional telepsychiatry policy,

10  remote practice supplements but does not replace on-site psychiatry services in the

11  Enhanced Outpatient Program (EOP). *Id.* In the Mental Health Crisis Beds (MHCB) and

12  Psychiatric Inpatient Programs (PIP), telepsychiatry is only available as a last resort in

13  emergency situations. *Id.* at 7-8. In all levels of care, remote psychiatrists make periodic

14  site visits. *Id.* at 9. The provisional telepsychiatry policy, like the Program Guide itself,

15  disfavors cell-side contacts, and does not permit any such cell-front telepsychiatry

16  encounters to be considered a Program-Guide required clinical contact. *Id.* at 7. The

17  provisional telepsychiatry policy also preserves informed consent by requiring that

18  telepsychiatrists inform their patients that services are to be provided remotely, and the

19  conditions under which they may be referred to onsite psychiatry if necessary. *Id.* at 6.

20      The Court's March 27, 2020 order provided for an eighteen month provisional

21  period that ran through April 1, 2022. *See* ECF No. 6539 at 2-3; Sept. 21, 2020 Order,

22  ECF No. 6874 (stating that eighteen month period for monitoring the provisional policy

23  would begin on October 1, 2020). On June 30, 2022, the Special Master received

24  simultaneous submissions from the party on potential changes to the policy. *See*

25  Telepsychiatry Report, ECF No. 7682 at 25-35; ECF No. 7382-1, Exs. A-B (Plaintiffs' and

26  Defendants' submissions to the Special Master). The Special Master filed his Report and

27  Recommendation on a Final Proposed Telepsychiatry Policy ("Telepsychiatry Report") on

28  December 15, 2022. *See* ECF No. 7682.

1    **II.    STANDARD OF REVIEW**

2        The Special Master's Telepsychiatry Report includes telepsychiatry-related findings

3    to support his recommendation to adopt the provisional telepsychiatry policy as final and is

4    therefore a compliance report within the meaning of the Order of Reference.  *See*

5    March 27, 2020 Order, ECF No. 6539 at 3 ("If the parties are unable to reach an agreement

6    after receipt of the Special Master's input, the Special Master will file a recommendation

7    with the Court within 45 days, after which the parties will have 30 days to respond

8    consistent with the Order of Reference (ECF No. 640).");  Order of Reference at 4 (Special

9    Master's duties are to "make interim reports to the court on the progress of the remedial

10   plan" and to "prepare and file with the court periodic reports assessing defendants'

11   compliance with such remedial plan as the court may order.").  The Order of Reference

12   provides that the Court shall adopt the findings of fact in the Special Master's reports

13   "unless they are clearly erroneous."  *Id.* at 8; *see also* Nov. 23, 2009 Order at 2 n.1, ECF

14   No. 3731 (affirming that "clearly erroneous" is the applicable standard of review for

15   Special Master's reports).  The 2019 modification of the Order of Reference provided for a

16   30-day deadline for reports not previously circulated to the parties while modifying "[n]o

17   other aspect of the Order of Reference."  July 29, 2019 Order, ECF No. 6230 at 2.

18       A finding is "clearly erroneous" when "on review of the entire evidence, the

19   reviewing court arrives at the firm conviction that the finding is mistaken."  *In re U.S.A.*

20   *Motel Corp.*, 450 F.2d 499, 503 (9th Cir. 1971); *see also McCormack v. Hiedeman*, 694

21   F.3d 1004, 1019 (9th Cir. 2012) ("To be clearly erroneous, a decision must strike the court

22   as more than just maybe or probably wrong; it must … strike [the court] as wrong with the

23   force of a five-week-old, unrefrigerated dead fish.") (internal case citation omitted).  The

24   party objecting to the Special Master's findings has the burden of proving that they are

25   clearly erroneous.  *Oil, Chemical and Atomic Workers Int'l Union, AFL-CIO v. N.L.R.B.*,

26   547 F.2d 575, 580 (D.C. Cir. 1976).

27

28

III. **THE SPECIAL MASTER'S MONITORING REVEALED SIGNIFICANT PROBLEMS AND DOES NOT SUPPORT ADOPTING DEFENDANTS' PROPOSED MODIFICATIONS TO ELIMINATE ON-SITE PSYCHIATRY IN THE ENHANCED OUTPATIENT PROGRAM, NOR TO EXPAND THE REACH OF TELEPSYCHIATRY BEYOND THE PROVISIONAL POLICY.**

In support of his recommendation to adopt the provisional telepsychiatry policy, the Special Master provided telepsychiatry-specific findings from EOP institutions during the 29th Monitoring Round, which were based on touring institutions, interviewing staff and patients, reviewing records, and observing IDTTs and mental health huddles where telepsychiatry attendance would have been required under the terms of the provisional telepsychiatry policy. Telepsychiatry Report, ECF No. 7682 at 7, 35. The Special Master focused on findings from EOP institutions because of "the centrality of the dispute over … removal of any required on-site psychiatry staff in EOP programs…." *Id.* at 7. In total, the Special Master provided findings about telepsychiatry at fifteen institutions, eleven of which used telepsychiatry in CCCMS, seven which used telepsychiatry in EOP, one which used telepsychiatry in the MHCB, and three which used telepsychiatry in a PIP. *Id.* at 35-36 (summary chart of CDCR's telepsychiatry use in EOP institutions). Additionally, the Special Master also toured five out of the six telepsychiatry hubs to observe and evaluate individual clinical encounters conducted via telepsychiatry. *Id.* at 35, 39-42.

The Special Master described significant problems regarding the use of telepsychiatry during the 29th Monitoring Round under the provisional telepsychiatry policy. Telepsychiatry Report, ECF No. 7682 at 39. While at the institutions, the Special Master's experts observed that some telepsychiatrists did not actively participate in treatment team meetings, limited their participation to medication issues, and were unfamiliar with their patients. *See, e.g., id.* at 75 (describing the LTRH telepsychiatrist at CSP-Corcoran); *id.* at 78 (CCCMS telepsychiatrist at KVSP "did not speak during IDTTs for patients who were not prescribed psychiatric medication"). Some institutions had connectivity and technological problems, which impeded the reliable use of telepsychiatry. *Id.* at 75 (technological issues at CSP-Corcoran and delayed IDTTs "due to equipment issues"); *id.* at 76 ("significant connectivity problems when using a laptop for

1  telepsychiatry" at SATF); *id.* at 77 (CCCMS staff at SATF "reported connectivity issues

2  due to internet issues for telepsychiatrists working from home.").  Additionally, the Special

3  Master interviewed numerous EOP patients who "reported difficulty building a rapport

4  with a clinician on a screen and concerns about lack of confidentiality with a telepresenter

5  in the room during individual telepsychiatry sessions." *Id.* at 39; *see also id.* at 77

6  (CCCMS patients reported difficulty building rapport with telepsychiatrists).  On-site

7  mental health staff "noted challenges with telepsychiatry" because the telepsychiatrist

8  "only got a 'small snapshot' of the patient," which would then lead to "differing diagnostic

9  and clinical assessments" between the telepsychiatrist and on-site staff.  *Id.* at 39.

10          While monitoring the telepsychiatry hubs, the Special Master found that

11  telepsychiatrists were disconnected from their patients' environment of care, reinforcing

12  "one of the bedrock concerns regarding utilization of telepsychiatry for higher acuity

13  patients, including patients at the EOP and higher levels of care." *Id.*  Few

14  telepsychiatrists working from the hubs participated in huddles, *id.* at 41, even though the

15  provisional telepsychiatry policy requires that they "participate in the same manner as on-

16  site psychiatrists in the receiving institutions' IDTTs and all meetings and huddles relevant

17  to the clinical care of their patients."  Provisional Telepsychiatry Policy, ECF No. 6539 at

18  11.  From monitoring the hubs, the Special Master also found that telepsychiatrists lacked

19  an understanding of the treatment milieu which could impede close coordination and

20  integration of the treatment team, especially for complex patients at the EOP level of care

21  or higher.  Telepsychiatry Report, ECF No. 7682 at 41 (noting that telepsychiatrists were

22  "unfamiliar with the Program Guide," did not understand their required participation in the

23  Custody and Mental Health Partnership Plan, and could not "name any correctional officer

24  at the institution" where they provided care).  Telepsychiatrists working from home as

25  opposed to the hubs experienced problems with internet connectivity.  *Id.* at 41.  All of

26  these observations occurred while Defendants were supposed to be using telepsychiatry

27  pursuant to the limits of the provisional telepsychiatry policy.

28          In light of the above findings, the Court would be well justified to reject any use of

1    telepsychiatry in the EOP.  Recognizing CDCR's long-standing recruiting problems with

2    on-site psychiatrists, it is reasonable to adopt the Special Master's recommendation, and

3    allow EOP telepsychiatry as long as an onsite psychiatric presence is maintained in these

4    programs.

5    **IV.    THE COURT SHOULD ADOPT THE PROVISIONALLY APPROVED**
     **TELEPSYCHIATRY POLICY AS FINAL.**

6

7            The Court should adopt the Special Master's findings and recommendation and

8    approve the provisional telepsychiatry policy as final.  Despite numerous serious problems

9    that emerged during the eighteen-month provisional period, Defendants continue to push

10   for further expansions of telepsychiatry beyond what can be considered safe.  Defendants

11   now propose to eliminate all on-site psychiatry in EOP, expand it in the higher levels of

12   care, erase the distinction between a cell-front session and a private session, remove the

13   requirement for informed consent, and water down the safeguards necessary to ensure that

14   remote psychiatrists have some connection to the settings where their patients receive

15   treatment.  *See* Ex. B to Telepsychiatry Report, ECF No. 7682-1 at 57-228 (Defendants'

16   proposed revisions to telepsychiatry policy).  To support their position, Defendants proffer

17   generalized research about the benefits of telepsychiatry, *see infra* § V, and an expert

18   declaration from Dr. Joseph Penn, whom other courts have found unreliable, *see infra*

19   § VI.  Defendants assert that there have been no adverse outcomes associated with

20   telepsychiatry but have no basis for that assertion when they have failed to track when and

21   how telepsychiatry is being used.  *See Lessons Learned During the COVID-19 Pandemic*

22   Report, June 14, 2021, ECF No. 7196 at 27 (stating that "telepsychiatrists do not have an

23   identifier to distinguish them from on-site psychiatrists in EHRS," and therefore, it is

24   difficult to obtain data specific to outcomes of care provided through telepsychiatry).  All

25   of Defendants' proposals to expand telepsychiatry beyond the limits set by the Court's

26   prior orders should be rejected as unsupported and dangerous to patient safety.  *See* Order,

27   Oct. 10, 2017, ECF No. 5711 at 23; Order, July 3, 2018, ECF No. 5850 at 4-7.

28

1

2

**A.    The Court Should Maintain Some On-Site Psychiatrist Presence in EOP Programs**

3    Based on the Special Master's earlier recommendations, the Court previously

4  ordered that "telepsychiatry should not replace on-site psychiatry at any level of care

5  above CCCMS."  *Id.* at 5.  Defendants now seek to remove the requirement that the EOP

6  programs maintain at least one on-site psychiatrist, among other changes.  ECF No. 7682-1

7  at 14-17; *see also* Telepsychiatry Report, ECF No. 7682 at 31.  These positions have been

8  rejected by the Special Master at every turn and directly contradict the Court's prior

9  orders.  *See* ECF No. 5564 at 16; ECF No. 5711 at 21; ECF No. 5850 at 5-6; ECF

10  No. 5872 at 9.  The Special Master stated that his "expert's concerns with the expansion of

11  telepsychiatry into EOPs and inpatient settings have not abated and were in fact bolstered

12  by some of the findings from the provisional approval period."  Telepsychiatry Report,

13  ECF No. 7682 at 67.

14    The provisional telepsychiatry policy places clinically appropriate limitations on the

15  use of telepsychiatry.  EOP is an intensive residential program "synonymous with an

16  inpatient setting," which provides "housing, treatment and programming for seriously

17  mentally ill inmates 'whose mental illness precludes their placement and participation in

18  the' general population."  July 3, 2018 Order, ECF No. 5850 at 5-6 (citing the Program

19  Guide at 12-4-1); Declaration of Pablo Stewart, M.D. in support of Plaintiffs' Response to

20  Special Master's Report and Recommendations on a Final Proposed Telepsychiatry Policy

21  ("Stewart Decl.") at ¶¶ 16-19.  On-site psychiatrists are necessary for a residential

22  program.  *Id.* at ¶ 18.  Without being on-site, psychiatrists have difficulty assessing patient

23  symptoms, including the signs of medical disorders with psychiatric implications.  *See,*

24  *e.g.*, Telepsychiatry Report, ECF No. 7682 at 76 (EOP telepsychiatrist could not see

25  patient's signs of akathisia with severe involuntary movements and failed to intervene or

26  recommend follow-up); *see also* Stewart Decl. at ¶¶ 21-24.  Telepsychiatry is most

27  appropriately and safely used in routine, low-risk appointments for stable rather than high

28  needs patients, and therefore cannot completely replace on-site psychiatry in EOP

1  programs, which treat patients with serious mental disorders such as schizophrenia,

2  schizoaffective disorder, psychotic disorders, bipolar disorders, and substance-induced

3  psychotic disorders, who are often at risk for decompensation.  *Id.* at ¶¶ 17, 21.  EOP

4  patients are also more likely to have treatment needs or diagnoses that are

5  contraindications for telepsychiatry, or are adverse to the use of telepsychiatry.  *Id.* at

6  ¶¶ 26-27; *see also id.* at ¶¶ 59-68 (describing the clinical risks of using telepsychiatry to

7  treat acutely ill EOP patients, including ones who suffer from paranoid delusions).  But

8  those patients cannot receive a meaningful evaluation for whether they are suitable to be

9  treated via telepsychiatry if their EOP program is only staffed with telepsychiatrists.  *See*

10 *id.* at ¶¶ 28; 41-58 (describing patients A and B and the importance of assessing patient

11 suitability for telepsychiatry).

12      Removing all on-site psychiatry presence from EOP units, as Defendants propose,

13 is also inappropriate and dangerous given the ongoing staffing crisis for other mental

14 health disciplines, and the high numbers of unlicensed staff.  Around 38% of line staff

15 psychology positions and more than a third of line staff social work positions statewide are

16 vacant as of September 2022.  *See* Response of Special Master to Court Order of Dec. 1,

17 2022 to File Staffing Vacancy Charts, Dec. 9, 2022, ECF No. 7677 at 1.  The Special

18 Master observed that "most on-site PCs [at CSATF] were unlicensed, inexperienced, and

19 had very high caseloads" and therefore, "would benefit from ongoing consultations with

20 psychiatry about patient care and risk management, which was more difficult to

21 accomplish with off-site psychiatrists …"  Telepsychiatry Report, ECF No. 7682 at 76-77.

22 More than ever, EOP and inpatient units, which treat high acuity and complex patients,

23 need the leadership of on-site psychiatry staff to cope with significant vacancies in other

24 on-site mental health disciplines.  *See* Stewart Decl. at ¶ 29; Telepsychiatry Report, ECF

25 No. 7682 at 67-68.

26      **B.    Telepsychiatry In Inpatient Units Should Only Be Used As a Last Resort in Emergency Situations.**

27

28      The Special Master rejected Defendants' efforts to loosen restrictions on using

1   telepsychiatry in MHCB and inpatient settings.  In their proposed revisions, Defendants

2   removed language which states that telepsychiatry "may not be used at the [MHCB and

3   PIP] level of care except as a last resort in emergency situations when an on site

4   psychiatrist is not assigned to the program."  ECF No. 7682-1 at 17-18; *see also*

5   Telepsychiatry Report, ECF No. 7682 at 34.  Instead, Defendants proposed using

6   telepsychiatry at the inpatient level of care when "on-site psychiatric care is not available,"

7   while also removing language which required them to make good faith efforts to recruit

8   and retain on-site psychiatrists for inpatient facilities.  ECF No. 7682-1 at 17-18; *see also*

9   Telepsychiatry Report, ECF No. 7682 at 55-56; 63-64.  This proposal directly contradicts

10  the Special Master's prior 2017 recommendation, which was adopted by the Court, that

11  "[t]elepsychiatry is not appropriate for the MHCB level of care except as a last resort or in

12  emergency situations when an on-site psychiatrist is not available."  Oct. 10, 2017 Order,

13  ECF No. 5711 at 21.

14        Telepsychiatry in inpatient facilities should not expand beyond emergency

15  situations.  The limitations that telepsychiatrists face in treating patients in EOP programs,

16  such as contraindications for treating certain diagnoses, limited ability to observe signs of

17  patient illness, and difficulty integrating into and contributing to the treatment team, are

18  even more profound in MHCBs and PIPs, where patients are likely to have acute

19  symptoms of a serious mental disorder or may be suffering from a significant or life

20  threatening disability.  Stewart Decl. at ¶¶ 31-39.  Patients in MHCBs and PIPs are more

21  likely to experience psychiatric crisis and require an urgent, in-person assessment to

22  determine appropriate next steps for their treatment.  An in-person psychiatrist is not

23  hindered by the barrier of a computer screen and is therefore better equipped to assess and

24  treat patients in psychiatric crisis or in need of inpatient treatment.  *Id.* at ¶¶ 34-36.

25        Further, there is limited research on the efficacy of telepsychiatry for incarcerated

26  populations receiving inpatient mental health treatment.  *Id.* at ¶¶ 32-33.  Defendants

27  readily admit that the relevant research identifies "concerns or uncertainty" about using

28  telepsychiatry for "special patient populations, such as those at higher levels of care."  *See*

1  *Lessons Learned During the COVID-19 Pandemic Report*, June 14, 2021, ECF No. 7196

2  at 17.  None of the recent research that Defendants have identified indicate that it is

3  clinically appropriate to use telepsychiatry as a modality in inpatient facilities.  Stewart

4  Decl. at ¶¶ 69-73.  Nor have Defendants been able to track or measure the impact of

5  telepsychiatry in their own inpatient units.  *See* ECF No. 7196 at 27.

6      **C.    The Court Should Maintain Current Requirements Regarding Site
            Visits for Telepsychiatrists**
7

8          Defendants proposed dramatically reducing the frequency of on-site visits so that

9  telepsychiatrists, regardless of what level of care they serve, are only required to visit the

10  institutions they serve once every year.  ECF No. 7682-1 at 18-19; *see also* Telepsychiatry

11  Report, ECF No. 7682 at 56-57.  Defendants also seek to eliminate the requirement that

12  telepsychiatrists spend a full working day at their institution when they visit, and even

13  included a statement in their revision that telepsychiatrists do not need to see any patients

14  in person during their visit.  ECF No. 7682-1 at 19.  The Special Master rejected this

15  revision, stating that the on-site visit requirements "were intended to foster collaboration

16  and relationship-building between telepsychiatrists and their on-site colleagues and

17  mitigate against the possibility of telepsychiatrists being isolated from the rest of the onsite

18  treatment team."  Telepsychiatry Report, ECF No. 7682 at 57.  Neither the Special

19  Master's findings from the provisional monitoring period nor recent telepsychiatry

20  research raised by Defendants support this drastic watering down of the site visit

21  requirement.

22          The Special Master's position on maintaining current on-site visiting requirements

23  is justified.  The Special Master found that, even under the provisional telepsychiatry

24  policy, treatment teams that included telepsychiatrists lacked close coordination and

25  integration with on-site treatment team members and other institution staff.  *Id.* at 37-42.

26  At CSP-Corcoran and KVSP, the Special Master's experts found that telepsychiatrists

27  made "minimal contributions to IDTTs" and only spoke up in treatment team meetings

28  about issues pertaining to medications.  *Id.* at 37, 75.  Telepsychiatrists also lacked

1   "familiarity with fundamental CDCR concepts," such as the Program Guide, therapeutic

2   treatment modules (TTMs), and "the difference between STRH and ASU."  *Id.* at 87.

3   Telepsychiatrists were disconnected from custody officers, thereby preventing them from

4   obtaining important collateral information regarding their patients.  *See id.* (Special

5   Master's findings that "[s]everal telepsychiatrists queried could not name any correctional

6   officer in the institution").

7         Defendants have argued that decreasing the frequency of on-site visits is

8   appropriate because telepsychiatrists are available to communicate with members of the

9   on-site treatment team through other means, and that failure to do so is a reflection of the

10  individual psychiatrist rather than a shortcoming of their proposal.  June 30, 2022 Mehta

11  Decl., ECF No. 7682-1 at 78.  It is illogical to loosen the site visit requirements—a tool

12  that is meant to facilitate collaboration and relationship-building—and then blame

13  inevitable failures on individual psychiatrists.  Psychiatrists cannot understand the complex

14  environment of a correctional institution unless they are required to visit and see patients at

15  the institutions on a regular basis.  Stewart Decl. at ¶¶ 74-79.  The Court should adopt the

16  final telepsychiatry policy as recommended by the Special Master, which maintains the

17  requirement of biannual on-site visits for CCCMS programs, and quarterly visits for EOP,

18  MHCB, and PIP.

19        **D.    The Court Should Maintain Current Restrictions Regarding Cell-Front
              Telepsychiatry Contacts.**
20

21        Defendants proposed changing the provisional telepsychiatry policy so that cell-

22  front telepsychiatry contacts may be considered Program Guide compliant contacts.  Non-

23  confidential cell-side contacts are only considered Program Guide compliant contacts in

24  response to a patient's refusal or due to medical isolation.  *See* Telepsychiatry Report, ECF

25  No. 7682 at 58-59 at n.36 (citing ECF No. 7333-1 at 636).  The Special Master rejected

26  this revision, citing connectivity issues at several institutions that would negatively affect

27  cell-side telepsychiatry encounters.  Telepsychiatry Report, ECF No. 7682 at 59; *see also*

28  *supra* § III (describing the Special Master's description of connectivity and technological

1  problems, which impeded the reliable use of telepsychiatry).

2      In addition to the Special Master's concerns about connectivity, telepsychiatry

3  further exacerbates the deficiencies of in-person cell-front psychiatry and makes it even

4  more difficult for providers to assess risk, identify medical and mental illness, and develop

5  a relationship with the patient.  Stewart Decl. at ¶¶ 80-86.  Remote cell-front evaluations

6  are not substantive clinical contacts.  *Id.* at ¶ 82.  Patients who refuse to leave their cell for

7  an in-person evaluation in a confidential setting likely do so based on some worsening of

8  existing mental health issues or the development of new, more serious mental health

9  concerns that increase the risks of using telepsychiatry.  *Id.*  Cell-front clinical contacts

10  with such patients are critical to attempt to convince the patient to leave the cell, to assess

11  the patient's danger to self or others, and in some instances, to determine if a cell

12  extraction is appropriate.  *Id.* at ¶ 81.  The remote nature of telepsychiatry inhibits effective

13  cell-side assessments because telepsychiatrists cannot sufficiently identify the signs of

14  medical and mental illness.  *Id.* at 83-85.  This provision is also premature because

15  Defendants have indicated that they do not yet have the capability to track information

16  about telepsychiatry appointments, including information about confidentiality.

17  Telepsychiatry Report, ECF No. 7682 at 59 (citing ECF No. 7196 at 27, 51).

18      **E.      The Court Should Maintain Current Requirements Regarding Informed
          Consent.**

19

20      Defendants also proposed removing the provision in the provisional telepsychiatry

21  policy that requires the telepsychiatrist to explain in the first session the "conditions under

22  which a referral is made for in-person care," arguing that providing this information to

23  patients will result in "doctor-shopping" and other misuses of the system.  ECF No. 7682-1

24  at 15, 73.  The Special Master rejected this proposal and maintained that this provision

25  should be included, especially in light of Defendants' obligation to provide on-site

26  psychiatry to patients who are deemed inappropriate for telepsychiatry.  Telepsychiatry

27  Report, ECF No. 7682 at 60.

28      Informed consent is a foundational tenet in the field of psychiatry, as all patients

1  have a right to be informed and make decisions about their mental health care.  Stewart

2  Decl. at ¶ 88.  Accordingly, telepsychiatrists must inform patients of their obligation to

3  provide on-site psychiatry to those patients determined unsuitable for telepsychiatry as a

4  treatment modality.  *Id.* at ¶¶ 89-93.  Patients cannot give informed consent to proceed

5  with telepsychiatry versus in-person psychiatric care if their psychiatrist does not

6  communicate the limitations of telepsychiatry and the conditions for referral to in person

7  care.  *Id*.  Defendants have provided no research or evidence to demonstrate why this

8  proposed change is appropriate.  *Id.* at ¶ 93.  The Court should adopt the Special Master's

9  recommendation and maintain the informed consent requirement in the final telepsychiatry

10  policy.

11  **F.    The Court Should Not Eliminate the Telepsychiatry Hub Requirement**
       **From the Provisional Telepsychiatry Policy.**

12

13         Since the onset of the Covid pandemic, telepsychiatrists have had the option to

14  work from home rather than reporting to one of the CDCR's telepsychiatry hubs.  *See*

15  Telepsychiatry Report, ECF No. 7682 at 60; ECF No. 6978 at 22-27 (Telepsychiatry from

16  Home plan).  The provisional telepsychiatry policy, however, maintains a default

17  requirement for the providers to work from the hubs.  Defendants propose removing the

18  telepsychiatry hub requirement from the provisional telepsychiatry policy, making the

19  pandemic Telepsychiatry from Home plan permanent.  *See* Telepsychiatry Report, ECF

20  No. 7682 at 61.  The Special Master correctly recommends rejecting this change.  *See id.* at

21  62.

22         The Special Master expressed several concerns about this revision, including

23  greater connectivity issues when telepsychiatrists worked from home as opposed to from

24  hubs.  *Id.*  The Special Master also indicated that eliminating the telepsychiatry hub

25  requirement would make it more difficult to monitor telepsychiatry.  *Id.*  If

26  telepsychiatrists are permitted to work from their homes, it will be crucial for the Special

27  Master to closely monitor whether telepsychiatrists have complete access to all medical

28  records while working from home, and whether telepsychiatrists are able to preserve

1   patient confidentiality without working in the hub environment.  Stewart Decl. at ¶¶ 94-99.

2           Further, the proposal to permanently remove any telepsychiatry hub requirement to

3   facilitate expansion of telepsychiatry will backfire in the long-term unless some sort of

4   course correction is made to encourage psychiatrists to continue treating patients on-site.

5   Defendants must continue to place sufficient emphasis on ensuring that adequate numbers

6   of on-site psychiatrists exist to treat class members at the EOP and higher levels of care, in

7   accord with the provisional telepsychiatry policy.  The exodus from in-person to remote

8   psychiatry that the Special Master and this Court warned Defendants to prevent is already

9   occurring.  *See* Order, Oct. 10, 2017, ECF No. 5711 at 21, 30 (adopting Special Master

10  findings and recommendations regarding telepsychiatry, including quoting Special Master

11  finding that "[t]he convenience of telepsychiatry should … not serve as a reason to allow

12  on-site psychiatrists to migrate to the comfort of remote off-site offices.  *It cannot be*

13  *emphasized enough that telepsychiatry should not replace on-site psychiatry.*").  During

14  the 18-month provisional period, Defendants lost nearly 12 (or around 9%) on-site civil

15  service staff psychiatrists while gaining more than 24 (or around 40%) civil service staff

16  telepsychiatrists.  *Compare* Oct. 2020 Psychiatry Vacancy Report, ECF No. 6970 at 5 with

17  April 2022 Psychiatry Vacancy Report, ECF No. 7561 at 5.  Additionally, Defendants'

18  reliance on on-site registry psychiatrists increased by over 15 (or nearly 19%) during that

19  period.  *Id.*

20          It is not surprising that, all else being equal, psychiatrists prefer to work remotely or

21  at home rather than treating patients in the prisons.  And if given a choice, telepsychiatrists

22  would rather work from their homes rather than from telepsychiatry hubs.  *See*

23  Telepsychiatry Report, ECF No. 7682 at 62 (finding that "telepsychiatry hub offices are

24  essentially empty" and that only ten out of 82.51 telepsychiatrists worked from the hubs at

25  the time of the Special Master's telepsychiatry hub monitoring tour).  Defendants must

26  develop ways to mitigate or forestall this side-effect of allowing telepsychiatrists to work

27  from home.  Defendants could consider, for instance, a differential pay scale to combat this

28  slide and move them closer to a durable staffing remedy.  The scale should pay most for

1  on-site care in higher levels of care: PIPs, MHCBs and EOP programs, less for

2  telepsychiatry care from a hub, and the least for telepsychiatry from home.  This proposal

3  is supported by the findings of the Special Master's Labor Economist expert that targeted

4  pay differentials can successfully incentivize clinicians to work in positions they otherwise

5  find undesirable.  *See* Special Master Labor Economist Report, ECF No. 6695 at 250-51.

6  **G.    The Court Should Not Adopt Defendants' Proposed Modification
         Regarding Night Shift Telepsychiatry.**

7

8       Defendants proposed adding language about the role of Night Shift

9  telepsychiatrists, which would clarify that Night Shift telepsychiatrists provide

10  comprehensive after-hours services, do not carry patient caseloads, are not required to

11  participate in IDTTs, are not required to visit the institutions where they see patients, and

12  that they do not work in PIPs.  The Special Master did not recommend adopting

13  Defendants' proposed changes regarding night shift telepsychiatry.  Telepsychiatry Report,

14  ECF No. 7682 at 62-63.

15       In particular, Plaintiffs oppose the language that Defendants proposed stating that

16  night shift telepsychiatrists do not need to visit the facility where they see patients.  *See*

17  ECF No. 7682-1 at 19-20.  Because night-shift telepsychiatrists provide comprehensive

18  after-hours services and do not just serve in a crisis-management role, they must still visit

19  the institutions to be familiar with the facility and the setting.  Stewart Decl. at ¶¶ 100-103.

20  These changes should not be incorporated into the final telepsychiatry policy at this time.

21  **H.    The Court Should Not Adopt Defendants' Proposed Modification
         Regarding Good Faith Recruitment of On-Site Psychiatrists.**

22

23       Defendants proposed removing language from the provisional telepsychiatry policy

24  which requires them to continue good-faith efforts to recruit on-site psychiatry staff.  The

25  Special Master opposed this change.  Telepsychiatry Report, ECF No. 7682 at 63-64.

26  However, this proposed revision contradicts the Court's prior orders which require

27  Defendants to use good-faith efforts to recruit on-site psychiatry staff—including at the

28  CCCMS level—simultaneous with their implementation of telepsychiatry.  *See* Order,

1   July 3, 2018, ECF No. 5850 at 8.  Removing this requirement would also eviscerate the

2   intent of other aspects of the policy that limit telepsychiatry at levels of care above

3   CCCMS.  For example, if Defendants fail to use good-faith efforts to recruit on-site

4   psychiatry staff for PIPs, they have to resort to relying on telepsychiatrists, regardless of

5   whether it is truly a emergency situation.  The Court should adopt the Special Master's

6   recommendation and reject this proposed change.

7   **V.    CONTRARY TO THEIR ASSERTIONS, DEFENDANTS' PROPOSED**
    **MODIFICATIONS ARE NOT SUPPORTED BY THE RELEVANT**
8   **SCIENTIFIC LITERATURE.**

9       In support of their June 30, 2022 letter providing the Special Master with their

10  position on the final telepsychiatry policy, Defendants submitted a declaration from

11  Dr. Toni Martello, who opined that the relevant literature "overwhelmingly shows that

12  telepsychiatry is considered an effective and efficient means of providing psychiatric care

13  to many populations, including incarcerated persons."  ECF No. 7682-1 at 154; *id.* at 157-

14  164 (chart summarizing Defendants' literature review).  That non-controversial statement

15  does not justify the radical change that Defendants propose here: to eliminate on-site

16  psychiatry entirely from their largest residential mental health program, and to

17  substantially increase the reliance on telepsychiatry in crisis and inpatient settings.  The

18  Special Master also concluded that the literature did not support adopting Defendants'

19  proposed changes.  *See* Telepsychiatry Report, ECF No. 7682 at 42-46.

20      The new research that Defendants identify does not change the state of the

21  academic landscape, which is that there is insufficient research to conclude that

22  telepsychiatry is an appropriate modality for treating patients with severe psychiatric

23  symptoms, much less those in correctional settings.  Stewart Decl. at ¶¶ 69-73.  There is

24  limited research about the effectiveness of telepsychiatry in residential-type treatment

25  settings like EOP and in inpatient units.  *Id.* at ¶¶ 18; 20; 32; 38.  Further, the studies that

26  do exist have serious methodological limitations, including small sample sizes and a lack

27  of randomized control trials.  Stewart Decl. at ¶ 71 (Hewson et al. (2021) found that the

28  majority of telepsychiatry data in the context of forensic psychiatry comes from "case

1   reports, descriptive studies, and uncontrolled trials."). Defendants cannot rely on existing

2   research to support their proposal to expand telepsychiatry use, as it is far too soon in the

3   development of telepsychiatry as a treatment modality to make any definitive assertions

4   about its utility for all patients. *See id.*

5        The limited research that does exist indicates that telepsychiatry may not be an

6   effective modality for acutely mentally ill or psychiatrically complex patients, among other

7   patient populations in the *Coleman* class. Indeed, Drs. Mehta and Martello acknowledge

8   that there are special considerations for using telepsychiatry with specific patient

9   populations. *See* ECF No. 7682-1 at 22 (Mehta declaration); 97 (Martello declaration).

10  The literature states that telepsychiatry is not indicated for emergency assessments or

11  regular treatment of patients in need of inpatient care. Stewart Decl. at ¶¶ 34, 38. Other

12  studies found that patients who are acutely psychotic or paranoid may present difficulties

13  in being treated remotely through telepsychiatry, and may be unable to give consent to

14  participate in this treatment modality. *Id.* at ¶ 26. Patient populations, such as individuals

15  with psychosis and personality disorders, especially in correctional settings, are not well-

16  studied. *Id.* at ¶ 11.

17       Much of the telepsychiatry literature that Defendants cite to is not specific to

18  correctional environments, or residential treatment settings similar to EOP units. Stewart

19  Decl. at ¶¶ 13, 72. Out of the 56 sources of purported authority that Defendants identify,

20  only 22 pertain to telepsychiatry in correctional environments. *Id.* at ¶ 72. In addition,

21  five of Defendants' cited articles are in the context of outpatient mental health care

22  provided by the Veterans' Administration to veterans. *Id.* As the Court and the Special

23  Master have recognized, these populations are significantly different from the *Coleman*

24  class, and therefore, findings from those populations do not counsel towards expanding the

25  reach of telepsychiatry in CDCR. *See* Special Master's Inpatient Monitoring Report,

26  Jan. 28, 2021, ECF No. 7039 at 36 (Special Master's team determined that the Psychiatric

27  Intensive Care Unit (PICU), a 12-bed locked inpatient psychiatric unit at the Veterans

28  Administration Medical Center in San Francisco, was not comparable to the CDCR PIPs).

1    The current telepsychiatry research supports continued reliance on on-site mental

2 health professionals to handle serious cases, such as threats of self-harm or harm to others.

3 Stewart Decl. at ¶¶ 12 (Verma et al. (2022) found in their recent clinical survey of

4 telepsychiatry at specialty clinics for patients with developmental disorders that

5 "[m]anagement of acute behavioral dysregulation or suicidality were especially

6 challenging when patients were not in-person, therefore confirming the location of the

7 patient and accessible care providers was essential at every appointment." (5283)); 34.

8 Studies indicate that telepsychiatry or tele-mental health may not be appropriate for certain

9 patients in acute distress (i.e., patients with concrete suicidal intent). *Id.* at ¶ 36 (Stoll,

10 Sadler, & Trachsel (2020) opined that "clinicians should ensure that telepsychotherapy is

11 appropriate for the patient in question.  For example, this approach may not be suitable for

12 patients with concrete suicidal ideation because rapid reaction to emergency situations may

13 be hindered by physical distance.")).  Similarly, other studies have noted feedback from

14 crisis care providers that telepsychiatry is not appropriate for violent individuals or people

15 under the influence of substances.  *Id.* at ¶ 26.

16    Finally, the telepsychiatry literature stresses the importance of obtaining informed

17 consent from patients.  Research indicates that telepsychiatrists should take time to explain

18 the benefits and drawbacks of telepsychiatry to their patients.  Stewart Decl. at ¶ 93.

19 Moreover, telepsychiatrists should constantly re-assess consent, in addition to the clinical

20 propriety of telepsychiatry for each patient.  Stewart Decl. at ¶¶ 89-90.

21 **VI.    THE COURT SHOULD NOT RELY ON THE OPINIONS OF DR. JOSEPH**
   **PENN WHICH HAVE BEEN REJECTED BY OTHER COURTS.**

22

23    In their June 30, 2022 letter providing the Special Master with their position on the

24 final telepsychiatry policy, Defendants included a declaration from their expert, Dr. Joseph

25 Penn.  *See* ECF No. 7682-1 at 165-228.  Dr. Penn opined that telepsychiatry and other

26 forms of telehealth are "an essential tool and modality" for providing timely mental health

27 care in correctional settings.  *Id.* at 190.  Additionally, Dr. Penn provided several opinions

28 that Defendants' proposed changes to the provisional telepsychiatry policy are warranted.

1        Dr. Penn's opinion about telepsychiatry in EOP units does not support rejecting the

2  Special Master's recommendation to adopt the provisional telepsychiatry policy as final.

3  In his June 30, 2022 declaration, Dr. Penn opines:  "[I]t is my professional opinion that

4  there are no contraindications to the *routine use of telepsychiatry for EOP inmate patient*

5  *populations* and other similar levels of care."  ECF No. 7682-1 at 180 (emphasis added).

6  But the "routine" use of telepsychiatry is already permissible under the provisional policy.

7  Defendants' proposal to remove the on-site psychiatrist requirement for EOP units would

8  not just lead to routine uses of telepsychiatry for EOP patients—it would also remove the

9  possibility that EOP patients could be treated by anyone other than a telepsychiatrist.

10  Dr. Penn also asserts that patients who are contraindicated for telepsychiatry should be

11  evaluated for on-site or a higher level of care, *see id.*, but this becomes an empty promise if

12  EOP units cease to have any on-site psychiatry, and PIPs are increasingly staffed by

13  telepsychiatrists, as would be permitted by Defendants' proposal.  *See* ECF No. 7682-1 at

14  14-22.

15        Further, other courts have identified significant credibility concerns pertaining to

16  Dr. Penn's testimony.  Dr. Penn recently provided testimony in *Jensen v. Shinn*, Case

17  No. CV-12-00601-PHX-ROS (D. Ariz.) in support of defendant Arizona prison officials

18  during a 15-day bench trial.  On June 30 2022, Judge Silver issued an order in favor of the

19  plaintiffs and found that the defendants failed, among other things, to provide medically

20  necessary mental health treatment and basic mental health care.  *Jensen v. Shinn*, No. CV-

21  12-00601-PHX-ROS, 2022 WL 2911496 (D. Ariz. June 30, 2022).  In the order, Judge

22  Silver found Dr. Penn's opinion to lack credibility and merit.  *See, e.g., id.* at 49 ("In short,

23  Dr. Penn's opinion has no merit."); *id.* (Dr. Penn's opinion on short mental health

24  encounters were "not credible"); *id.* at 51, n.28 ("It is difficult to overstate Dr. Penn's lack

25  of credibility.  He was evasive when asked direct, simple questions.  He failed to take a

26  single note during his medical records review."); *id.* at 52, n.32 (Dr. Penn had a "callous

27  indifference" to plaintiffs who received inadequate mental health treatment); *id.* at 53

28  (Dr. Penn's "obstinance—and indifference—was devastating to his credibility and renders

PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT AND RECOMMENDATION ON A FINAL
PROPOSED TELEPSYCHIATRY POLICY

1  his opinions unworthy of any weight."); *id.* at 56 ("Dr. Penn's testimony was so flawed on

2  this topic that the Court cannot credit any of his opinions.  At the outset, Dr. Penn began

3  by misidentifying the issue."); *id.* at 57 ("Dr. Penn's testimony is nonsensical…"); *id.* at 57

4  ("When pressed on this point at trial, Dr. Penn's testimony became absurd."); *id.* at 58 ("In

5  general, Dr. Penn's testimony on the topic of language interpretation was unreliable and

6  incredible.  Dr. Penn's opinion—the status quo of interpretation services is sufficient—is

7  rejected.").  Defendants will likely submit an additional declaration from Dr. Penn in

8  support of their response to the Special Master's telepsychiatry report and

9  recommendation.  If that occurs, Plaintiffs may seek leave from the Court to respond to

10  Dr. Penn's opinion.

11  **VII.    ADOPTING THE FINAL TELEPSYCHIATRY POLICY WOULD NOT VIOLATE
        THE PRISON LEGAL REFORM ACT.**

12

13       An order adopting the Special Master's report and recommendation for the final

14  telepsychiatry policy is fully consistent with the Prison Litigation Reform Act (PLRA).

15  Because an order adopting a final telepsychiatry policy would simply enforce compliance

16  with preexisting orders to provide a minimally adequate prison mental health care delivery

17  system under the Eighth Amendment, it does not constitute prospective relief under the

18  PLRA.  *See Parsons v. Ryan*, 912 F.3d 486, 501 (9th Cir. 2018).  For that reason, the Court

19  is not required to make the findings set forth in 18 U.S.C. § 3626(a)(1).

20       Even if the Court finds that the PLRA applies, an order adopting the Special

21  Master's report is necessary and appropriate.  The provisional telepsychiatry policy allows

22  for "extensive utilization of telepsychiatry in a manner consistent with the Court's prior

23  orders."  Telepsychiatry Report, ECF No. 7682 at 7.  This includes using telepsychiatry

24  without limitation for CCCMS patients, who make up the majority of the *Coleman* class,

25  and permitting telepsychiatry to supplement on-site psychiatry for EOP, MHCB, and PIPs.

26  *See supra* § IV(A)-(B).  The few limitations in the provisional telepsychiatry policy are

27  supported by the Special Master's findings from monitoring and prevent harm to *Coleman*

28  class members.  *See Coleman v. Brown*, 756 F. App'x 677, 679 (9th Cir. 2018) (finding

1    relief ordered did not violate PLRA where there was "substantial risk of serious harm" and

2    the "factual findings [were] well supported and not clearly erroneous").  Defendants have

3    failed to show that there is any basis for their proposals, which include eliminating all on-

4    site psychiatry presence from EOP units, loosening when telepsychiatry may be used in

5    units treating patients in crisis and in need of psychiatric hospitalization, and removing

6    other safeguards that balance telepsychiatry with patient safety.  *See supra* § IV(A)-(H).

7    An order requiring Defendants to adopt the provisional telepsychiatry policy therefore

8    satisfies the type of narrow tailoring the PLRA requires.  *See Armstrong v. Brown*, 768

9    F.3d 975, 985 (9th Cir. 2014).

10    **CONCLUSION**

11    Plaintiffs respectfully request that the Court adopt the Special Master's

12    recommendation and enter an order adopting the Provisionally Approved Telepsychiatry

13    Policy, ECF No. 6539 at 5-12 as final.

14    **CERTIFICATION**

15    The undersigned counsel for Plaintiffs certifies that she reviewed the following

16    relevant court orders:  ECF Nos. 3731, 5711, 5850, 6230, 6539, 6874.

17

18    DATED:  January 17, 2023                Respectfully submitted,

19                                            ROSEN BIEN GALVAN & GRUNFELD LLP

20

21                                            By: */s/ Amy Xu*

22                                            Amy Xu

23                                            Attorneys for Plaintiffs

24

25

26

27

28