1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
BRENDA MUÑOZ – 328813
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

11

12                    UNITED STATES DISTRICT COURT

13                    EASTERN DISTRICT OF CALIFORNIA

14

15  RALPH COLEMAN, et al.,                  Case No. 2:90-CV-00520-KJM-DB

16              Plaintiffs,                 **DECLARATION OF PABLO
                                            STEWART, M.D. IN SUPPORT OF
17       v.                                 PLAINTIFFS' RESPONSE TO
                                            SPECIAL MASTER'S REPORT AND
18  GAVIN NEWSOM, et al.,                   RECOMMENDATION ON A FINAL
                                            PROPOSED TELEPSYCHIATRY
19              Defendants.                 POLICY**

20                                          Judge:  Hon. Kimberly J. Mueller

21

22

23

24

25

26

27

28

[4204976.9]

Case No. 2:90-CV-00520-KJM-DB

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

**INTRODUCTION**

1. I am a board-certified psychiatrist and Clinical Professor at the John A. Burns School of Medicine, University of Hawaii Department of Psychiatry. My curriculum vitae is attached hereto as **Exhibit A**.

2. I have over 30 years of experience in correctional mental health care, including serving as the court's expert in class action cases challenging the provision of mental health care to incarcerated persons. After medical school, I completed my psychiatric residency at the University of California, San Francisco ("UCSF") in part as a Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and the San Francisco Veterans Affairs Medical Center, including service at the VA's Substance Abuse Inpatient Unit. During my residency, I also practiced at several community health programs. Between 1986 and 1990, I was the Senior Attending Psychiatrist for the Forensic Unit of UCSF, which was located at San Francisco General Hospital. In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco. Between August 1988 and December 1989, I was the Director of Forensic Psychiatric Services for the City and County of San Francisco. In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the incarcerated person population in San Francisco at both the county jails and in the locked inpatient treatment unit at San Francisco General Hospital.

3. From September 2006 to the present, I have served as a Clinical Professor at the University of California, San Francisco, School of Medicine. From 1990 through 1996, I served in various medical leadership posts at the Department of Veterans Affairs Medical Center, San Francisco, including as Chief of the Substance Abuse Inpatient Unit, Chief of the Intensive Psychiatric Community Care Program, focusing on services for homeless veterans, and Medical Director of the VA's Comprehensive Homeless Center.

4. From 1996 to the present, I have served as a psychiatric consultant to

1   governmental and private agencies on a variety of psychiatric, forensic, substance abuse

2   and organizational issues, with a focus on correctional psychiatry.  I have served as a

3   psychiatric expert or consultant to various federal courts, the United States Department of

4   Justice, and other organizations evaluating the provision of mental health treatment and

5   implementing remedial decrees covering the provision of mental health care in correctional

6   institutions.  From May 2016 to the present, I have served as the court-appointed monitor

7   in *Rasho v. Baldwin*, No. 1:07-CV-1298 (C.D. Ill.).

8          5.      I estimate that I have observed over 100 telepsychiatry sessions in

9   correctional intuitions, primarily at jails and prisons in California, Arizona, and Illinois.

10   On December 19, 2017, I testified at an evidentiary hearing in *Rasho* as to my opinion of

11   the use of telepsychiatry in correctional institutions.

12          6.      I have submitted a number of declarations in connection with *Coleman v.*

13   *Newsom* on the adequacy of mental health care in the California Department of

14   Corrections and Rehabilitation ("CDCR").  I have conducted numerous tours of CDCR

15   prisons in the last 25 years.  My first experience with CDCR was in the mid-1990s, when I

16   spent several years monitoring mental health care at the California Medical Facility

17   ("CMF"), a CDCR prison in Vacaville, California, as a court expert in the *Gates v.*

18   *Deukmejian* case.  In 2013, I toured six prisons as Plaintiffs' expert witness in opposing

19   the termination motion filed by Defendants in this matter.  I also provided several

20   declarations and gave testimony in several live hearings before Judge Karlton in support of

21   subsequent enforcement motions filed by Plaintiffs later in 2013, after the termination

22   motion was denied.  I also testified on behalf of Plaintiffs in the overcrowding proceedings

23   that took place in this case starting in around 2007.  In the overcrowding and termination

24   phases of this case alone, I have spoken with well over 150 CDCR patients, toured

25   numerous prisons, and reviewed scores of patient medical and custody records in CDCR.

26          6.      In August 2018, I provided declaration regarding CDCR's telepsychiatry

27   policy at the time, which was filed with the Court as part of ongoing negotiations between

28   the parties on the issue.  *See* Expert Report of Pablo Stewart, M.D., ECF No. 5873 at 8–46.

My publications and presentations address a broad range of treatment and assessment problems for mentally ill patients in both community and institutional settings.  In compliance with Rule 26(a)(2)(B), my CV at Exhibit A lists my publications authored at pages 24 through 25.

7.      Attached hereto as **Exhibit B** is a list of cases in which I have testified at trial or deposition during the previous 4 years.

8.      My compensation to be paid for study and testimony in this case is $350 per hour.

9.      In preparing this report I have reviewed the documents listed in **Exhibit C**. In addition to the long list of scholarly articles on telepsychiatry listed in Exhibit C, I reviewed the following (also listed in Exhibit C):

- CDCR's provisionally-approved telepsychiatry policy, which was filed with the Court on March 27, 2020.  *See* March 27, 2020 Stipulation and Order, ECF No. 6539 at 5-12.

- Letters dated June 30, 2022 from Plaintiffs and from Defendants setting forth their final positions and proposed modifications to the telepsychiatry policy after negotiations on this issue, filed with the Court by the Special Master on December 15, 2022.  *See* ECF No. 7682-1.

- The Special Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy ("Telepsychiatry Report"), filed December 15, 2022, which included his telepsychiatry-related findings from the [DRAFT] 29th Round Monitoring Report – Part C and the monitoring tours of CDCR's Telepsychiatry Hubs.  *See* ECF No. 7682.

My findings and conclusions regarding these documents are discussed below.

### SUMMARY OF KEY OPINIONS IN THIS MATTER

10.     I have been asked to give my opinion regarding the changes that CDCR proposes to make in the provisional telepsychiatry policy.  My opinions are summarized below:

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

- Academic studies and scholarly articles on the use of telepsychiatry suggest caution in using telepsychiatry within correctional settings and at higher levels of care.

- Appropriate cautions include severely limiting the use of telepsychiatry at higher levels of care, limiting cell-front telepsychiatry, maintaining close ties between telepsychiatrists and the institutions where their patients reside, ensuring that telepsychiatrists have full access to patient records, and ensuring that patients can give informed consent to treatment by telepsychiatry.

- CDCR's Enhanced Outpatient Program ("EOP") is a residential treatment program. Telepsychiatry should supplement on-site psychiatric staff at the EOP level of care. The quality of psychiatric care in EOP programs would substantially deteriorate if Defendants removed the requirement in the policy for at least one on-site psychiatrist in each program.

- On-site care should predominate in the Mental Health Crisis Bed ("MHCB") and Acute and Intermediate Psychiatric Inpatient Program ("PIP") levels of care, with telepsychiatry used only as a last resort in emergency situations. Shifting to telepsychiatry in these high-level programs is clinically risky.

- Defendants' proposal to reduce the number and quality of site visits is clinically inappropriate. CDCR telepsychiatrists should conduct frequent site visits to their assigned institutions, in order to visit patients face-to-face, and the current requirements in the provisional policy (twice a year for Correctional Clinical Case Management System ("CCCMS"), and quarterly for telepsychiatrists at all other Mental Health Services Delivery System ("MHSDS") levels of care) are clinically appropriate.

- Cell-front telepsychiatry contacts should not count as Program Guide-compliant clinical contacts under "any circumstances." ECF No. 6539 at 7. Defendants' proposal that this language be stricken from the policy, and that

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

1    "the same rules that apply to on-site providers apply equally to

2    telepsychiatrists," (ECF No. 7682-1, Ex. B, June 30, 2022 Mehta Declaration

3    at 4), ignores the clinical reality that telepsychiatrists cannot perform

4    medically-adequate evaluations at a patient's cell.

5    • Defendants' proposal to remove the protections with respect to informed

6    consent in the provisional telepsychiatry policy is medically unsound.

7    Telepsychiatrists have the same clinical and ethical obligations to their

8    patients as any other psychiatrist, and they should preserve patient autonomy

9    and dignity by fully disclosing the conditions under which a referral to in-

10    person psychiatric care is clinically indicated.  It is widely accepted in the

11    field of psychiatry that informed consent "facilitates physician-patient

12    collaboration in treatment and may permit more knowledgeable participation

13    in and adherence to treatment by the patient."  *See* American Psychiatric

14    Association ("APA") Resource Document on Principles of Informed Consent

15    in Psychiatry (1997) at 123[1].

16    • Defendants should take careful precautions to guarantee that telepsychiatrists

17    working from home, as opposed to CDCR-operated telepsychiatry hubs,

18    have the tools and space necessary to provide optimal psychiatric care so that

19    they are not further separated from the environments where their patients

20    live.

21    • CDCR also proposes to exempt "Night Shift" telepsychiatrists from on-site

22    visits.  Like any other telepsychiatrist, Night Shift telepsychiatrists should be

23    required to visit the institutions they serve as part of their professional

24    obligation to familiarize themselves with the setting(s) in which they practice

25    medicine.

26

27    ─────────────────────

28    [1] Pincites to academic studies and articles are included throughout this declaration when
pagination is provided by their authors and/or publishers.

[4204976.9]                                                    6                         Case No. 2:90-CV-00520-KJM-DB

**I.    THE PROVISIONAL TELEPSYCHIATRY POLICY PLACES CLINICALLY APPROPRIATE LIMITATIONS ON THE USE OF TELEPSYCHIATRY AT HIGHER LEVELS OF CARE IN A CORRECTIONAL SETTING LIKE CDCR**

11.    In general, there is not sufficient evidence to support the use of telepsychiatry without limitation in populations with serious mental illness.  During the process of compiling evidence-based telepsychiatry guidance for clinicians during the height of the COVID-19 pandemic, Smith, Ostinelli, Macdonald, & Cipriani (2020) found that several important populations were missing from the literature, including those with psychosis and personality disorders, and that settings less well-studied by scholars included prisons and inpatient units.

12.    As the Special Master highlights in his Telepsychiatry Report, "Defendants have not provided any literature or published studies demonstrating that telepsychiatry is recommended as a replacement for on-site psychiatry for higher acuity patients."  ECF No. 7682 at 45.  In fact, the literature appears to suggest the exact opposite.  Verma et al. (2022) found in their recent survey of telepsychiatry at specialty clinics for patients with developmental disorders that "[m]anagement of acute behavioral dysregulation or suicidality were especially challenging when patients were not in-person, therefore confirming the location of the patient and accessible care providers was essential at every appointment."  (5283).

13.    Particularly relevant to CDCR's EOP, MHCB, and PIP programs, the literature is sparse as to the use of telepsychiatry at higher levels of care in correctional settings.  As far as I am aware, Defendants have not cited to any academic studies of acutely mentally ill patients in a residential treatment or inpatient setting being treated with telepsychiatry within a prison or jail facility.  And the literature on telepsychiatry in correctional settings in general is limited.  *See* Smith, Ostinelli, Macdonald, & Cipriani (2020).

14.    Therefore, it is my professional opinion that the restrictions and protective measures set forth in the provisional policy on the use of telepsychiatry in CDCR as to

1  patients in EOP, MHCB, and PIP programs are appropriate limitations given the risks of

2  this form of treatment.

3        A.      **Telepsychiatry Should Not Be The Only Treatment Modality Available To Patients in an Intensive, Residential Treatment Program Like EOP**

4

5        15.    Defendants have proposed removing the requirement in the final

6  telepsychiatry policy that each EOP program have at least 1.0 personnel year equivalent

7  on-site psychiatrist.

8        16.    I have toured many EOP units within CDCR and am very familiar with these

9  programs and the incarcerated persons in them, who are very acutely ill.  I can state

10  confidently and without reservation that, based on my experience, it is clinically indicated

11  that these programs have on-site psychiatric care available at all times.

12        17.    EOP programs are intensive residential treatment programs that are

13  synonymous with an inpatient setting.  EOP programs are much more similar to inpatient

14  care programs than to CCCMS, which is the level of care at which CDCR is currently

15  permitted to use telepsychiatry without limitations under the provisional policy.  EOP

16  patients are a high risk, acutely ill group with serious mental disorders such as

17  schizophrenia, schizoaffective disorder, psychotic disorders, bipolar disorders, and

18  substance-induced psychotic disorders.  Many patients in the EOP program decompensate

19  even with the EOP level of care treatment and go back and forth to Acute and Intermediate

20  PIP programs.  Given the high level of care and the high acuity of mental illness among the

21  EOP patients I have observed in CDCR, I would not recommend relying solely on

22  telepsychiatry in this setting.

23        18.    On-site psychiatrists are necessary for a residential treatment program.

24  Because EOP is a residential treatment program, EOP units house patients with chronic

25  and serious mental illness who do not require acute care but do need enhanced services.  It

26  is for this reason that, under the Program Guide, EOP patients are required to receive 10

27  hours a week of structured therapeutic activities and more frequent case manager contacts.

28  Yet when it comes to telepsychiatry, scholars have identified significant gaps in the

1   literature regarding its utility in providing enhanced patient services.  For example,

2   Batastini, King, Morgan & McDaniel (2016) highlighted in their systematic literature

3   review of telepsychological services to criminal justice and substance abuse clients the fact

4   that unanswered questions remained as to "whether *intensive intervention services* could

5   be successfully provided through audio-video equipment, especially for justice-involved

6   clients."  (28) (emphasis added).

7        19.    Dr. Joseph Penn, Defendants' expert, writes in his June 30, 2022 declaration

8   that EOP is not an inpatient program.  *See* ECF No. 7682-1, Ex. B, Penn Declaration at 15.

9   This statement ignores the unique nature of EOP as an intensive, residential treatment

10  program in prison.  My understanding is that throughout CDCR, EOP patients live and

11  receive treatment in separate, specifically-designated EOP housing units because their

12  mental illness precludes their placement and participation in the general population.  The

13  purpose of such segregation is to separate EOP patients from non-mentally ill incarcerated

14  persons for safety and to provide enhanced treatment.  In my experience, EOP patients

15  generally also have had their own yard and eat in their own dining halls in many or most

16  CDCR prisons.  These are key characteristics that EOP shares with CDCR's inpatient

17  programs.

18       20.    Given all of the above, it is therefore no surprise that other facilities

19  providing similar intensive mental health treatment have been slow in adopting

20  telepsychiatry.  In a study using national data regarding the use of telepsychiatry in U.S.

21  mental health facilities, Spivak et al. (2020) found that in 2017, of the mental health

22  facilities that offered telepsychiatry, 90.5% were outpatient, as compared to 11.6% of

23  residential-type treatment settings.

24       21.    Because many EOP patients are at high risk of decompensating, and many

25  such patients go back and forth to Acute and Intermediate PIP level of care, it is especially

26  important to have on-site psychiatrists that can easily identify signs and symptoms of

27  mental illness.  During each psychiatric evaluation of a patient, the psychiatrist seeks to

28  obtain an accurate assessment as well as engage the patient's cooperation in treatment.

1   Doing so requires a working therapeutic relationship—a therapeutic alliance—between the

2   patient and provider.  In a therapeutic alliance, the patient trusts the provider such that he is

3   willing to open up and honestly describe the symptoms of his mental illness.  It can be

4   difficult to establish a therapeutic alliance for any given patient, but it is especially hard to

5   do so in a prison setting, and it is especially hard for patients in the throes of severe mental

6   health decompensation.  Psychiatric symptoms are the type of thing that people are

7   reluctant to talk about even on a good day.  People in general are exceedingly unwilling to

8   talk about deeply personal issues such as suicide, depression, trauma, and psychosis.  For

9   those EOP patients who are decompensating, or at a high risk of decompensating, on-site

10  psychiatrists are in a better position to identify symptoms, immediately intervene, and

11  recommend a higher level of care when necessary.

12          22.     In addition, on-site psychiatrists are more capable of identifying the signs of

13  medical disorders with psychiatric implications.  Medical illnesses can cause and

14  exacerbate psychiatric symptoms.  For example, there is a strong association between

15  major depressive disorder and medical conditions such as myocardial infarction, stroke,

16  type 2 diabetes, and endocrine disorders.  Anxiety and panic attacks are associated with

17  many medical conditions, including hyperthyroidism, asthma, congestive heart failure,

18  traumatic brain injury, and Parkinson's disease.  Hallucinations are associated with

19  diseases often found among elder patients, including Alzheimer's and Huntington's

20  diseases.  Metabolic and endocrine abnormalities at times present with mania and

21  psychosis.  HIV and pneumonia can present as agitation, cognitive impairment, and

22  psychosis.  Medication side effects can also present as mental illness; for example,

23  dopamine agonists used to treat Parkinson's disease can lead to hallucinations and

24  paranoia.

25          23.     Psychiatrists are trained to identify signs of medical illness that may be

26  causing or exacerbating a patient's psychiatric symptoms, and are obligated to conduct a

27  focused medical evaluation to rule out medical illness in a psychiatric presentation.

28  Psychiatrists use their senses of sight, hearing, smell, and touch to identify these signs.  For

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

1   example, during in-person evaluations, psychiatrists use their sense of smell to gather

2   information about the patient.  A patient presenting with major depression may actually be

3   suffering from diabetic ketoacidosis, which is associated with a sweet, fruity odor on one's

4   breath.  Similarly, the smell of alcohol on a patient's breath may be an indication of

5   intoxication or withdrawal, which can be associated with somnolence.  Pungent body odors

6   including the smell of urine and/or feces signal that a medical or mental illness is

7   interfering with the patient's Activities of Daily Living ("ADLs").  It is particularly

8   imperative that psychiatrists in EOP programs be able to perform these type of physical

9   evaluations given the strong prevalence of EOP patients with acute mental illness.

10       24.     In his June 30, 2022 declaration, Dr. Penn suggests that telepsychiatrists can

11  rely on telepresenters to identify "subtle visual and non-verbal aspects of a telepsychiatry

12  encounter" and communicate those to the telepsychiatrist.  ECF No. 7682-1, Ex. B, Penn

13  Declaration at 23.  But telepresenters are not psychiatrists and are not medically trained to

14  conduct such evaluations.  They may not be able to identify which aspects of the

15  telepsychiatry encounter should be communicated to the telepsychiatrist in the first place.

16  In cases of severe psychiatric decompensation, it is important to "cut out the middleman"

17  and have on-site psychiatrists available to perform their clinical assessments in person.

18       25.     My opinion is not unique in the field of psychiatry.  In advising providers on

19  how to manage virtual psychiatrist-patient relationships in a digital world, Shore (2020)

20  opined that all psychiatrists need to "understand a technology's effect on clinical

21  processes," specifically "rapport, communication, and treatment outcomes."  For some

22  patients, telepsychiatry "can create a sense of emotional or virtual distance," which is why

23  it is important to continuously assess "the best adaption of a technology to a patient's

24  clinical circumstances in the context of administrative and operational considerations."

25  (*Id*.)  This is why it is imperative for a team of both on-site psychiatrists and

26  telepsychiatrists in EOP programs to constantly evaluate all EOP patients for any potential

27  contraindications to telepsychiatry.

28       26.     Many EOP patients may have treatment needs or diagnoses that are adverse

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

1    to the use of telepsychiatry.  For example, scholars have found that patients who are

2    acutely psychotic or paranoid may present difficulties in being treated remotely through

3    telepsychiatry, and may be unable to give consent to participate in this treatment modality.

4    *See* APA, Psychiatric Services in Correctional Facilities, Third Edition (2016).  In a cohort

5    study evaluating the use of telepsychiatry for older adults in Southern Australia, Dham et

6    al. (2018) received concrete feedback from treating psychiatrists that had difficulty

7    engaging with patients with behavioral symptoms and/or cognitive difficulties, and

8    expressed doubts regarding telepsychiatry over an in-person consultation for these types of

9    patients.  And in a qualitative study of telepsychiatry in emergency departments across

10   Western Australia conducted by Saurman, Kirby, & Lyle (2015), telepsychiatry was

11   considered for "almost every mental health presentation except those particularly violent

12   or under the influence of substances."  (6).

13       27.    My opinion on this issue is also supported by the Special Master's

14   telepsychiatry-related excerpts and findings in the draft 29th Round Monitoring Report.

15   *See* ECF No. 7682, Appx. A1.  The Special Master's team of experts interviewed EOP

16   patients at CDCR's Substance Abuse Treatment Facility ("SATF") who reported problems

17   with telepsychiatry, including difficulty with building rapport with providers on the

18   computer screens and concerns about the presence of medical assistants in the room during

19   individual sessions.  *Id*. at 76

20       28.    In his June 30, 2022 declaration, Dr. Penn acknowledges the possibility that

21   "an individual patient's evaluation and treatment needs could not be met utilizing

22   telepsychiatry," and in such situations "an individualized patient's clinical evaluation

23   should ensue with further treatment planning to determine that individual patient's clinical

24   needs and if the patient warrant[s] a higher level of mental or medical care and correctional

25   health care services and monitoring/follow-up."  ECF No. 7682-1, Ex. B, Penn Declaration

26   at 16.  But how can further clinical evaluation and treatment planning occur in EOP units if

27   there are no on-site psychiatrists immediately available?  Dr. Penn appears to suggest that

28   the solution would be a higher level of care referral.  However, just because an EOP

[4204976.9]                                    12                    Case No. 2:90-CV-00520-KJM-DB

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

1  patient is clinically contraindicated for telepsychiatry does not necessarily mean they need

2  crisis or inpatient psychiatric care.

3       29.     The on-site psychiatrist requirement for EOP units should also be maintained

4  given staffing vacancies in CDCR across multiple mental health disciplines.  The need for

5  on-site psychiatry presence and leadership in EOP units becomes even more dire if there

6  are significant vacancies for other mental health disciplines, such as psychologists, social

7  workers, recreational therapists, and medical assistants.  My understanding is that, as of

8  September 2022, around a third or more of psychologist and social worker positions

9  statewide are vacant.  Psychiatrists often have the most training out of all interdisciplinary

10  mental health treatment team members and, therefore, are the most qualified to lead

11  interdisciplinary treatment teams.  Under these circumstances, it is even more important

12  for EOP units to maintain some level of on-site psychiatry presence to serve as accessible

13  resources for other disciplines.  I agree with the Special Master that "removing on-site

14  psychiatry from these woefully understaffed EOP programs could compound an already

15  dire situation."  ECF No. 7682 at 68.

16       30.     Because of the unique nature of EOP as an intensive residential treatment

17  program, the acute mental illness of many EOP patients, the very real possibility that many

18  EOP patients will have clinical contraindications for the use of telepsychiatry, the

19  advantages that on-site psychiatrists have in identifying signs and symptoms of mental

20  health decompensation, and the significant statewide staffing vacancies for other mental

21  health disciplines, CDCR should continue to be required to have at least one-site

22  psychiatrist in all EOP programs.

23      **B.**     **Telepsychiatry Is Not Clinically Appropriate In Inpatient Units At The**
   **MHCB And PIP Levels Of Care, And Its Use Should Be Limited To**

24            **Being A Last Resort In Emergency Situations**

25       31.     On-site psychiatry should always predominate at the MHCB and PIP levels

26  of care.  Telepsychiatry in these settings should be reserved only as a "last resort in

27  emergency situations."

28       32.     The literature around telepsychiatry in inpatient settings is sparse.  The APA

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

notes in the organization's online Telepsychiatry Practice Guidelines and Toolkit that "the development of inpatient [t]elepsychiatry programs has lagged behind that of outpatient programs." *See* https://www.psychiatry.org/psychiatrists/practice/ telepsychiatry/toolkit/inpatient-settings. Because of this, the APA cautions that "more research is needed on implementation, outcomes, and guidelines for inpatient…settings." *See* https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/evidence-base.

33.    It is therefore not surprising that Spivak et al.'s (2020) study using national data found that, in 2017, of the U.S. mental health facilities that offered telepsychiatry, only 15.6% were inpatient compared to 90.5% being outpatient programs. And that the APA has instead focused its guidance on telepsychiatry's utility "in situations where short-term coverage is needed," such as when providers are unavailable due to vacation or illness. *See* https://www.psychiatry.org/psychiatrists/practice/telepsychiatry /toolkit/inpatient-settings.

34.    The standard of care in the psychiatric community is that if a patient is in crisis, they are seen in-person by a psychiatrist to evaluate their need for medication or medication adjustments, and to identify and treat any underlying or contributing medical conditions. Any increased acute risk to self or others is a "clinical red flag" that triggers the need for an urgent, in-person consultation. *See* Smith, Ostinelli, Macdonald, & Cipriani (2020).

35.    Patients in crisis are generally less likely to be capable of being evaluated or agreeing to a treatment recommendation. Most often, the nature of the crisis is due to an underlying condition that has resulted in symptoms that prevent the patient from cooperating and being amenable to treatment intervention. The underlying condition has not yet been adequately addressed and has resulted in a crisis that requires a more aggressive type of intervention because of the severity of the condition that led to the crisis in the first place.

36.    I have seen thousands of patients in psychiatric crisis. Behaviors consistent with crisis include thrashing and yelling, sobbing, crying, self-injurious behaviors (cutting,

banging, slapping, hitting selves), lack of cooperation, and extreme behavior ranging from catatonia to excessive agitation. The expression of such behaviors makes it very difficult to perform an adequate evaluation to identify the underlying reasons for the patient's presentation. When a patient experiences a psychiatric crisis, the provider must deescalate the situation in order to conduct a thorough evaluation and facilitate assessment of the condition. Where a patient finds himself in a situation where taking his own life seems like a reasonable action, human intervention is required. Placing that individual in front of a computer screen and telling him to talk to the doctor is clinically inadequate. In their article discussing the ethical use of telepsychiatry during the COVID-19 pandemic, Stoll, Sadler, and Trachsel (2020) opined that providers needed to "ensure that telepsychotherapy is appropriate for the patient in question. For example, this approach may not be suitable for patients with concrete suicidal ideation because rapid reaction to emergency situations may be hindered by physical distance."

37.     Because of my experience, and given my understanding of the literature with respect to the use of telepsychiatry with patients in crisis, I recommended against implementation of telepsychiatry in crisis care during my tenure as a court-appointed monitor for the Illinois Department of Corrections in *Rasho v. Jeffreys*. They ultimately decided not to use telepsychiatry in crisis settings while I was the court-appointed monitor.

38.     My experiences are echoed by the cohort study conducted by Dham et al. (2018), where they found that individuals in inpatient settings receiving psychiatric treatment via telepsychiatry "were significantly less satisfied with wait times and visual clarity compared to outpatients," which the authors believed "could be because of *subjective differences in needs/expectations or illness severity*." (10) (emphasis added). Another study on an acute inpatient unit by Singleton (2011) also showed lower satisfaction across all clinical domains in patients with a psychotic illness compared to those without psychosis.

39.     Once the patient is calm, an evaluation can be performed. In order to evaluate the patient undergoing crisis and effectively assess the underlying condition, the

1   provider must be physically present to properly observe all aspects of their presentation.

2   In doing so, the provider has access to all of her senses of seeing, hearing, smelling, and

3   touching.  The use of telepsychiatry is inadequate for the task, as it does not allow the

4   provider the full use of her hearing or sight, and necessarily prohibits the use of her smell

5   and touch.

6   **C.    My Review Of _Coleman_ Class Members' Records Supports My Opinion Regarding The Clinical Propriety Of The Current Restrictions In The Provisional Policy On The Use Of Telepsychiatry At Higher Levels Of Care**

7

8

9   40.    The need for treatment limitations when it comes to the use of telepsychiatry

10  at higher levels of care is supported by the CDCR-specific evidence I reviewed.  In

11  particular, medical records for three _Coleman_ class members housed in units that either

12  now provide or recently provided only telepsychiatry care raise questions and concerns

13  about telepsychiatry, highlighting the risks of this method of treatment for acutely ill

14  patients.  It is my professional opinion that these records illustrate the need for the current

15  restrictions on telepsychiatry in the provisional policy.

16  **1.    Patient A's and Patient B's Medical Records From SATF G Yard Demonstrate The Importance of Having On-Site Psychiatry Care in EOP Units**

17

18  41.    Patient A is an EOP patient at SATF.  Patient A is a 30-year old Hispanic

19  male who is deaf and communicates through American Sign Language.  His diagnoses

20  include Bipolar disorder and history of depression.  Patient A has had multiple CDCR

21  terms at various MHSDS levels of care, including EOP, MHCB, and at the Acute PIP.  He

22  was also admitted to Coalinga State Hospital in 2017 after a suicidal attempt by cutting his

23  throat.  He arrived at SATF, G yard on August 31, 2022.

24  42.    I am informed by Plaintiffs' counsel that Defendants notified the parties in

25  _Coleman_, as required by the provisional telepsychiatry policy, on August 17, 2022 that

26  SATF G yard, an EOP yard, had not had any on-site psychiatrists for at least 30 days.  On

27  October 18, 2022, Defendants reported that SATF G yard still had no on-site psychiatrists,

28  and CDCR had initiated a registry order for an on-site psychiatrist to fill the position.

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

43.     Patient A's recent records show that his initial psychiatric evaluation at SATF, on September 2, 2022, was done via telepsychiatry.  I have serious concerns about a patient's initial psychiatric evaluation being conducted through telepsychiatry.  As I explained above in Paragraph 21, an on-site psychiatrist is in a better position to evaluate a patient for signs and symptoms of serious mental illness.

44.     Because of Patient A's disability, both a medical assistant and a sign-language interpreter were also present for the appointment.  Patient A reported being depressed and anxious and in a lot of physical pain.  However, he denied feeling hopeless, or having suicidal and/or homicidal ideations.  Notably, he had tried to hang himself just two months earlier in July 2022.

45.     On October 20, 2022, Patient A had an appointment scheduled with his telepsychiatrist, but he refused to be seen, stating that "he is tiered [sic] and wants to be seen next week."  The telepsychiatrist's progress note, dated October 25, 2022, indicated that he was missing his medications every other day.  After testing positive for COVID-19, he was noted to have made suicidal statements to custody staff on November 15, 2022.  On December 3, 2022, Patient A was placed on suicide watch and eventually transferred to the MHCB after writing a note to custody stating that he was suicidal and wanted to hurt himself.

46.     After his admission to the MHCB, Patient A reported needing "help" and "support" and alluded to having safety concerns due to problems with three other incarcerated persons on his yard.  Notably, when he arrived at NKSP, he spoke with his primary clinician on June 24, 2022 about prison politics.  His PC wrote at the time, "[i]t is unknown at this time how much politics will play a role in his EOP programming" and "[a]ssigned EOP clinician stressed the concern about his safety and what to do if he is not allowed to talk to mental health."

47.     During a telepsychiatry session on January 5, 2023, Patient A continued to deny any significant symptoms of depression or anxiety, or any psychotic symptoms.  But his list of recent medications included Ripseridone, Remeron, and Vistaril, psychiatric

1  medications meant to target depression, anxiety, and psychosis.  There appears to be a

2  concerning disconnect between the psychiatric assessment of the patient and the

3  recommended treatment plan for Patient A.

4        48.    Because SATF G yard has had no on-site psychiatrists in the recent past, it is

5  unclear if an assessment of Patient A's suitability for telepsychiatry was completed, given

6  that there were no on-site psychiatrists to refer him to.  It is my opinion that had such an

7  assessment been completed, Patient A's psychiatric history, including self-harm, suicide

8  attempt(s), and diagnoses, combined with his deafness that requires the use of a sign

9  language interpreter cautions against the use of telepsychiatry.  O'Brien & McNicholas

10  (2020) opined in a recent article on telepsychiatry during the COVID-19 pandemic that

11  telepsychiatry "may be less suitable for certain cohorts of patients," such as "those with

12  hearing difficulties, visual impairment or poor manual dexterity."

13        49.    There is also a disconnect as to the way the on-site non-psychiatric providers

14  document his safety concerns due to prison politics.  No such historical record can be

15  found in the telepsychiatry clinical notes.  It is Patient A's safety concerns that fueled his

16  MHCB admission in December 2022.  An on-site psychiatrist is more likely to be familiar

17  with such prison politics.  They know how A-yard dorm is different than a C-yard cell

18  block.  They understand prison culture, through their own observations of and interactions

19  with specific individuals.

20        50.    Patient B is EOP and has been at SATF, G yard since October 14, 2019.

21  Patient B is a 37 year old Mexican male with a history of schizophrenia, amphetamine, and

22  opiate dependence.  His primary language is Spanish, although he has some English

23  proficiency and will at times communicate directly with his treatment team in English.

24        51.    As explained in Paragraph 42 above, Defendants notified the parties in

25  *Coleman* as required by the provisional telepsychiatry policy that SATF G yard has had

26  issues in the last 5 months with having at least one on-site psychiatrist on the yard.

27        52.    Patient B has a history of admissions to higher levels of care within MHSDS,

28  including MHCB and at the Acute PIP.  He was recently admitted to the MHCB on

August 25, 2022 for suicidal ideation and danger to self.  Patient B was observed with multiple red bruises on his head and his knuckles.  During his MHCB initial assessment, through a Spanish interpreter, Patient B stated that he had banged his head and punched the wall with his fist.  Patient B said that he had safety concerns and was depressed and anxious because his cell mates had been harassing him to have him provide documentation for his crime.  Patient B reported that he was overwhelmed and felt he was not being taken seriously.  Patient B was eventually released from MHCB to EOP on September 1, 2022.

53.     Patient B was seen by a telepsychiatrist on August 3, 2022.  There is no indication in the telepsychiatrist's notes whether a Spanish interpreter was used.  Patient B told the telepsychiatrist that he was staying up at night, going to sleep around 4:00 or 5:00 A.M. and sleeping deep into the day.  He also said he was having "difficult interactions" with a particular cell mate.  In the telepsychiatrist's opinion, Patient B's anxiety and low mood "is a chronic issue for him, that is difficult to tackle given that he feels that his current environment chronically contributes to his anxiety and depressive symptoms."

54.     In addition, the telepsychiatrist described Patient B as having a "significantly avoidant approach."  Patient B told the telepsychiatrist that he did not have a positive therapeutic relationship with his mental health primary clinician, but when the telepsychiatrist suggested he request another clinician, he stated that he was afraid he could be "punished" for making such a request.

55.     In the telepsychiatrist's clinical note from a December 15, 2022 session with Patient B, she wrote that Patient B was refusing any psychiatric medication.  In addition to the August 2022 MHCB admission, Patient B has a serious history of suicidality and self-harm, including two prior psychiatric hospitalizations and two suicidal attempts and/or self-harm incidents.  And Patient B has been on psychiatric medications in the past.  From my chart review, I have serious concerns about the telepsychiatrist's ability to encourage Patient B to consider medication to treat his significant psychiatric symptoms.

56.     As with Patient A, there is no indication that Patient B's suitability for telepsychiatry was adequately assessed, especially given SATF G yard's issues with

1   staffing on-site psychiatrists.  In addition, Patient B has similar factors that could make

2   him clinically adverse to telepsychiatry, including a language barrier and safety concerns

3   due to prison politics.

4        57.    Patient B's telepsychiatrist acknowledged that he had a "significantly

5   avoidant approach."  This was not just with his peers, but also with prison staff, given

6   Patient B's fear of requesting another primary clinician.  Yet the telepsychiatrist's

7   August 3, 2022 progress note did not discuss obtaining informed consent from Patient B to

8   proceed with telepsychiatry.  During this appointment, Patient B did not express a desire to

9   die or intent to harm himself.  Yet he engaged in self-harm and was admitted to the MHCB

10  just 22 days later, for the same exact issues he was able to articulate during his

11  telepsychiatry appointment.

12       58.    Because of Patient B's language difficulties and his tendency to avoid

13  conflict with staff, it is my professional opinion that he should have been substantively

14  evaluated for suitability for telepsychiatry, including obtaining his informed consent to

15  proceed with telepsychiatry.  Yet EOP programs like SATF, G yard cannot realistically

16  complete such an evaluation if there are no on-site psychiatrists available to take over

17  patient care in situations where telepsychiatry is clinically contraindicated.

18       **2.    Patient C's Records From CMF A Yard Demonstrate The**
            **Importance of Having On-Site Psychiatry Care in EOP Units**
19

20       59.    Patient C is in EOP at CMF, A yard.  He is a 65-year old African-American

21  male serving life with parole and has been incarcerated since July 2002.  In the last several

22  years, Patient C has been at the EOP, MHCB, Acute and Intermediate PIP levels of care.

23  His main diagnosis is schizophrenia and he has been under psychiatric care on and off

24  since 1980.

25       60.    I am informed by Plaintiffs' counsel that Defendants notified the *Coleman*

26  parties, as required by the provisional telepsychiatry policy, on July 7, 2022 that CMF A

27  yard, an EOP yard, had not had any on-site psychiatrists for at least 30 days.  On

28  September 6, 2022, Defendants reported that CMF A yard still had no on-site psychiatrists,

1  and CDCR was in the process of completing clearance for a Psychiatric Nurse Practitioner

2  and Psychiatrist.  On November 10, 2022, Defendants again informed the parties that CMF

3  A yard had not had any on-site psychiatrists for at least 30 days.  On January 10, 2023,

4  Defendants also informed the parties that CMF A yard EOP ASU had no on-site

5  psychiatrist as of December 29, 2022.

6      61.    Patient C is currently on a PC 2602 for grave disability, which was granted

7  on January 18, 2022.  According to his records, Patient C began to decompensate in the

8  last part of 2021.  He refused medications and was "having hallucinations, agitation,

9  disorganized thought, easily aggressive, poor insight, hostility, disturbance of mood and

10  poor treatment compliance."

11      62.    Records show that Patient C has been receiving psychiatric treatment via

12  telepsychiatry since at least August 20, 2018, when he was assessed after being discharged

13  from the MHCB to EOP.  His last inpatient admission was to the MHCB on August 23,

14  2022.  Patient C was referred by a custody officer for aggressive and bizarre behavior.

15  Patient C stated, "I will get the mafia on you (officer)," and at the clinical interview, he

16  stated, "I lost a lot of weight. It's the raincoats."  The primary clinician conducting the

17  assessment went on to write, "Review of documents indicate ongoing decline in

18  functioning, increased paranoid and threatening statements, for the last few months.

19  [Patient C] is referred to MHCB for grave disability. He is disorganized, tangential,

20  bizarre, poor ADLS, and paranoid."  Patient C was discharged from the MHCB on

21  September 2, 2022.

22      63.    During a July 26, 2022 telepsychiatry appointment, Patient C was described

23  as "disorganized and paranoid throughout interview," "easily agitated," and "internally

24  preoccupied."  During a September 27, 2022 telepsychiatry appointment, a few weeks after

25  his MHCB discharge, Patient C was described as knowing "he has schizophrenia but

26  continues to have minimal insight into necessity of treatment."

27      64.    During a December 21, 2022 telepsychiatry appointment, the telepsychiatrist

28  noted that Patient C began talking about "his beliefs about a man who killed a police

officer at San Quentin," and then became "disorganized and slightly paranoid." In addition, the telepsychiatrist's clinical note indicated that at one point Patient C was taking Haldol and it was working for him, but the medication was discontinued in April 2021 per patient request because he did not like injections.

65.     It is my professional opinion that Patient C is exactly the kind of acutely ill patient that the literature warns about when it comes to treatment via telepsychiatry. In fact, Defendants themselves identified at least one scholarly article which conducted a literature review focused on 18 studies covering the use of telephone-based, internet-based, or video-based telehealth systems for assessing and treating patients with schizophrenia. Kasckow et al. (2014). Although the authors opined that "preliminary evidence suggests these modalities appear to improve patient outcomes," the authors also acknowledged that more research is needed into the influence of other key factors, including "*symptom severity*." (emphasis added).

66.     Patient C is schizophrenic, paranoid, easily agitated, and has demonstrated minimal insight into the necessity of treatment. The evidence during my chart review of severe decompensation was overwhelming. In my experience, patients who suffer from schizophrenia and/or paranoid delusions could decompensate even further through treatment via telepsychiatry, for example, some patients could incorporate the disembodied telepsychiatrist into their paranoid delusions, thereby amplifying their psychosis. This could be a real danger with Patient C, especially since he has been documented as focusing his paranoia on prison staff that he interacts with.

67.     There is no indication that Patient C's suitability for telepsychiatry has been adequately assessed, especially given CMF A yard's issues with retaining on-site psychiatrists. Records show that Patient C has been decompensating since late 2021, with multiple admissions to and from the MHCB and Acute levels of care. The telepsychiatrist during his December 21, 2022 appointment wrote in the progress note for Patient C, "Strongly recommend ongoing LAI + oral meds and likely will require continuation of PC2602 as patient has little motivation to comply with medication." Yet as far as I could

1  tell during my chart review, there has been no serious consideration of on-site psychiatry

2  to assist with motivating Patient C to comply with medication, and restart Haldol, given its

3  effectiveness for Patient C in the past.

4      68.    Given the severity of Patient C's mental illness and symptoms, he is the type

5  of patient that could potentially be contraindicated for telepsychiatry.

6  **D.**    **Current Academic Literature Likewise Supports My Opinion**

7  **Regarding the Clinical Propriety of the Current Restrictions In The**
**Provisional Policy On The Use Of Telepsychiatry At Higher Levels of**

8  **Care**

9      69.    Defendants cite to 56 scholarly articles, practice guidelines, studies, and

10  textbook excerpts that allegedly support their key contention that there are no significant

11  differences between telepsychiatry and on-site psychiatry as a treatment modality.  *See*

12  ECF No. 7682-1, Ex. B, Martello Declaration, Ex. 1.  This idea is echoed by their expert,

13  Dr. Penn, who opines based on his experience and his review of the clinical evidence that

14  he is "unaware of any adverse patient outcomes, patient safety risks, or adverse outcomes

15  that are solely attributable to the use of telepsychiatry or telehealth."  *Id*., Ex. B, Penn

16  Declaration at 17.

17      70.    I disagree with their analysis of the current state of the literature.  It is true

18  that there is no evidence of any significant differences between telepsychiatry and in-

19  person psychiatric care.  But the absence of evidence is not the same as having "evidence

20  of nonexistent differences."  Batastini, King, Morgan, & McDaniel (2016) at 27-28.  For

21  example, Santesteban-Echarri, Piskulic, & Addington (2020) reviewed a set of 14 original

22  research studies which involved individuals with a schizophrenia-spectrum disorder

23  receiving treatment via videoconferencing technology in the community, inpatient units,

24  and at least one prison facility.  They found no study reporting on videoconferencing

25  interventions for individuals at clinical high risk.

26      71.    The truth is we do not know that telepsychiatry and on-site psychiatry lead to

27  equivalent treatment outcomes, especially for individuals at higher levels of care with

28  severe psychiatric symptoms within correctional settings like CDCR.  Defendants have not

1   identified any research about residential or inpatient mental health treatment for acutely ill

2   patients via telepsychiatry in prisons.  The current literature also has serious

3   methodological limitations, including small sample sizes and a lack of randomized control

4   trials.  As Hewson et al. (2021) note in their article on remote consultations in prison

5   mental healthcare in England during the COVID-19 pandemic, most of the data we do

6   have in the context of forensic psychiatry comes from case reports, descriptive studies, and

7   uncontrolled trials.  It is far too soon in the development of telepsychiatry as a treatment

8   modality to make any definitive assertions about its utility for all patients.

9       72.    Moreover, much of the literature cited by Defendants is not specific to

10  correctional and residential treatment settings similar to EOP units.  Out of the 56 sources

11  cited by Defendants in Exhibit 1 of Dr. Martello's declaration, only 22 pertain to

12  telepsychiatry in correctional settings.  And another 5 studies offered by Defendants

13  involved outpatient mental health care provided by the Veterans' Administration to

14  veterans.  This is such a different patient population than the incarcerated person patient

15  population within CDCR that any results from these studies cannot be confidently applied

16  here.  *See* Zhang, Boden, & Trafton (2021) at 383 ("[G]eneralization of results may be

17  limited by our veteran patient population, which varies from the American population

18  more broadly.")

19      73.    The existing clinical evidence does not support what Defendants are doing

20  by removing all limitations on telepsychiatry for patients at higher levels of care, patients

21  who are acutely ill, patients with severe psychotic symptoms, patients who are in the throes

22  of mental health decompensation, and patients at grave risk for self-harm or harm to

23  others.

24  **II.    IT IS CLINICALLY INDICATED FOR CDCR TELEPSYCHIATRISTS TO
        CONDUCT FREQUENT SITE VISITS AT THEIR ASSIGNED**

25  **INSTITUTION, AS CURRENTLY REQUIRED BY THE PROVISIONAL
        TELEPSYCHIATRY POLICY**

26

27      74.    The proposal to cut back on-site visits from twice (CCCMS) or four times a

28  year (all other MHSDS levels of care) to one time per year—and to turn this visit into a

1  "fly-by" where the doctor sees no patients—is irresponsible.  Telepsychiatrists, just as all

2  other psychiatrists, have certain clinical obligations to their patients, which include being

3  knowledgeable about the culture and environments in which they are providing care.  This

4  is why the APA, in its online Telepsychiatry Practice Guidelines and Toolkit, recommends

5  that telepsychiatrists practicing in any type of cross-cultural setting consider conducting

6  "periodic site visits" and ensure they are "informed of events occurring in the communities

7  in which patients are located."  *See* https://www.psychiatry.org/psychiatrists/practice/

8  telepsychiatry/use-of-telepsychiatry-in-cross-cultural-settings.  That is, telepsychiatrists

9  need to be aware of "resources, cultural issues, and environmental factors affecting

10  patients in remote environments with which clinicians may not have familiarity" in order

11  to properly manage the psychiatrist-patient relationship.  (Shore 2020).  This appears to be

12  in tension with Dr. Amar Mehta's, the Deputy Director of the Statewide Mental Health

13  Program for CDCR, claim in his June 30, 2022 declaration that "many community

14  telepsychiatry organizations do not require any site visits…"  ECF No. 7682-1, Ex. B,

15  Mehta Declaration at 5.

16      75.    This advice is certainly applicable and especially crucial when it comes to

17  telepsychiatrists seeing patients in correctional settings.  Patients in such settings are

18  simply not comparable to community-based patients.  Not only do incarcerated patients

19  have substantially higher acuity of medical and mental illness, they are also subjected to

20  non-comparable conditions and objective stressors that are profound and singular.

21      76.    Many incarcerated persons have recently entered prison and are coping with

22  adjustment to a harsh and frightening environment.  Their movements are restricted, their

23  choices are limited, and incarceration itself leads to further psychiatric decompensation.

24  This unique reality is one that most psychiatrists are not familiar with, and it will

25  undoubtedly take more than just one visit a year to build up such familiarity.

26      77.    Experts in the field of correctional mental health services echo my concerns.

27  As Kaftarian (2020) explains in his article on telemental health in rural correctional

28  institutions, remote providers such as telepsychiatrists "should be cognizant of some of the

limitations to being located remotely.  This includes potential challenges to accessing information that may be more readily available to onsite staff about activities of the facility.  Events such as riots, racial tension, or suicides may adversely affect the mental and emotional condition of patients.  Without the knowledge of these events and familiarity of the dynamics of the facility, telemental health staff may potentially be at a disadvantage…."

78.     This means not just frequent site visits, but also requiring telepsychiatrists to interact with their patients face-to-face during these site visits.  Given the unique setting of a prison, there is no way a telepsychiatrist can truly understand how her patient's state of mind is affected without seeing it in person herself.  Moreover, as I previously explained in Paragraph 21, psychiatrists performing psychiatric assessments on-site are in a much better clinical position to identify subtle signs and symptoms of severe mental illness.

79.     Finally, even scholars who have fully embraced telepsychiatry emphasize the importance of integrating the remote psychiatrist into a patient's treatment team.  That is, "the telepsychiatrist must feel that (s)he belongs to the community and has an equal voice, despite being in a different geographical location." *See* Kaftarian (2019) at 6.  Although such integration can be done through constant communication via emails, telephone calls, or videoconferences, frequent site visits only serve to further facilitate a culture of teamwork, which in turn will be a tremendous benefit to the patient under the care of the interdisciplinary treatment team.

## III.    THE USE OF TELEPSYCHIATRY FOR CELL-FRONT EVALUATIONS IS NOT APPROPRIATE AND IT IS MY OPINION THAT CELL-FRONT TELEPSYCHIATRY CONTACTS ARE NOT COMPLIANT WITH THE PROGRAM GUIDE IN *COLEMAN*

80.     As a clinical matter, a patient's refusal to leave their cell for an in-person evaluation in a confidential setting can be for a variety of reasons, but almost all of them tend to reflect some type of clinical deterioration—some worsening of existing mental health issues or the development of new, more serious mental health concerns that increase the risks of using telepsychiatry.

81.    Not infrequently, for example, vulnerable mentally ill individuals will decompensate under the stress of living in a locked-down, punitive administrative segregation setting.  When these individuals decompensate, they often become "cell dwellers" who refuse to leave their cells to go to yard, showers, or mental health appointments.  Cell-front clinical contacts with such patients are critical to attempt to convince the patient to leave the cell, or to assess the degree to which the patient is a danger to him or herself or to others, or gravely disabled.  Such cell-front interactions may be needed to assess whether a patient's situation is so dire that he or she needs to be cell-extracted by custody staff in order to be provided urgent mental health treatment, assuming the patient cannot be convinced by the clinician to voluntarily leave the cell for treatment.

82.    While I do not agree that conducting clinical treatment is ever appropriate cell-front due to the lack of confidentiality and the difficulty of communicating effectively with the patient in this setting, cell-front assessments may sometimes be necessary to ensure that mentally ill individuals do not harm themselves, staff, or other incarcerated persons; suffer harm from an undiagnosed medical illness; become victimized; or engage in problematic behavior that causes or exacerbates operational difficulties.  The remote nature of telepsychiatry inhibits such assessments.  In my opinion, remote cell-front evaluations are not substantive clinical contacts.

83.    Because they are not physically present in the prison with the patient, telepsychiatrists, by themselves, cannot sufficiently identify the signs of medical and mental illness during cell-front interactions.

84.    I would also be concerned about the efficacy of any cell-front telepsychiatry technology.  Many housing units in CDCR are extremely noisy, and even with a microphone inserted into the cell, my belief is that a human being present at the doorway, able to look at the patient and speak through the door, would be better able to communicate and certainly more able to engage in a therapeutic conversation about what problems the patient is experiencing.

85.    My belief is also that a mental health provider who is physically present will

1  be better able to connect to and treat the patient in this setting.  Even in the best of

2  conditions, my experience with telepsychiatry is that the connection quality can often be a

3  problem and detract from the quality of the clinical interaction.  I would be even more

4  concerned about any mobile technology that would be dependent on wireless internet

5  coverage in old CDCR prisons.  Moreover, even when there is good connectivity, the

6  quality of the clinical connection between the doctor and patient is significantly impaired

7  by the technology.  I also have serious concerns about confidentiality in using cell-front

8  technology.  That is also a problem with in-person cell-front visits, but in-person clinicians

9  may be able to minimize any privacy problems.

10        86.    Accordingly, cell-front meetings and evaluations with mental health patients

11  should be done in-person rather than by a remotely-based provider.  Cell-front

12  telepsychiatry contacts should not count as Program Guide-compliant clinical contacts.

13  **IV.    TELEPSYCHIATRISTS HAVE A CLINICAL OBLIGATION TO THEIR
       PATIENTS TO OBTAIN INFORMED CONSENT WHICH INCLUDES**

14  **EXPLAINING THE CONDITIONS UNDER WHICH A REFERRAL IS
       MADE FOR IN PERSON CARE**

15

16        87.    Defendants also propose to remove the requirement that telepsychiatrists

17  explain "the conditions under which a referral is made for in person care."  ECF No. 6539

18  at 6.  That is, under the current provisional policy, telepsychiatrists must inform patients of

19  their obligation to provide on-site psychiatry to those patients determined unsuitable for

20  telepsychiatry.  If adopted, CDCR patients' ability to provide informed consent will be

21  severely compromised.

22        88.    Informed consent is a foundational tenet in the field of psychiatry.  Patients

23  have a right to be informed and actively involved in their medical and mental health care.

24  Informed consent protects a person's dignity and autonomy by ensuring that patients have

25  the right to make decisions about their psychiatric treatment, "including their right to

26  refuse unwanted treatments."  *See* Neilson & Chaimowitz (2015) at 11.  Defendants have

27  not identified any scholars that believe informed consent does not apply in equal force to

28  telepsychiatry.

89.     In his June 30, 2022 declaration, Dr. Mehta claims that despite Defendants' proposed modification to the policy, "[i]nformed consent continues to be provided in full, and patients are constantly evaluated for their appropriateness to remain in telepsychiatry…"  ECF No. 7682-1, Ex. B, Mehta Declaration at 3.  But what Dr. Mehta fails to acknowledge is that it is not simply necessary to have informed consent to participate in psychiatric treatment, but a provider needs informed consent to proceed with telepsychiatry versus in-person psychiatric care.  This involves engaging in dialogue with the patient in addition to a psychiatrist's evaluation of a patient's appropriateness for telepsychiatry.  In praising the use of telepsychiatry during the COVID-19 pandemic, O'Brien and McNicholas (2020) nevertheless emphasize the clinical importance of psychiatrists obtaining informed consent by explaining "the nature and purpose of the interaction…together with the known limitations such as inability to perform a physical examination or to identify other cues that might be relevant to making a diagnosis." Psychiatrists who conduct in-person initial evaluations have access to more information— and more opportunities to observe signs of mental illness—than telepsychiatrists.  Patients should be aware of this and other key differences between telepsychiatrists and on-site psychiatrists so they can make a fully-informed decision about whether to proceed with telepsychiatry.

90.     In addition, O'Brien and McNicholas astutely observe that the "failure to object or refuse in itself does not constitute consent…"  The fact that patients are aware they are proceeding with treatment via telepsychiatry—given that they are speaking with their psychiatrist through videoconferencing technology—does not mean they have provided informed consent.  They must also be given the information necessary to "allow the patient to make a careful decision about the advantages and disadvantages of telepsychiatry."  *See* Stoll, Sadler, & Trachsel (2020).  This includes an explanation by the telepsychiatrist of the conditions under which a patient may be clinically contraindicated for telepsychiatry and instead need in-person psychiatric care.

91.     Not all patients will want to use telepsychiatry to receive treatment, nor will

1   all patients equally benefit from and engage with a telepsychiatrist.  Freuh et al. (2007)

2   conducted a small study comparing the efficacy of telepsychiatry and same-room treatment

3   of combat-related post-traumatic stress disorder using cognitive, behavioral therapy in 14

4   weekly sessions.  The same-room group reported more comfort in talking with their

5   provider, and they were more likely to have completed homework assignments, which as

6   the study's authors noted, is perhaps evidence of higher treatment engagement.

7        92.    In support of the proposal to revise the provisional telepsychiatry policy as to

8   informed consent, Dr. Mehta claims that Defendants' concerns lie with " 'doctor shopping'

9   and other potential misuses of the system."  ECF No. 7682-1, Ex. B, Mehta Declaration at

10  3.  I agree with the Special Master that such concerns are vague and frankly troubling.

11  ECF No. 7682 at 60.

12       93.    If Defendants' concerns are with "potential misuses" by patients within the

13  correctional system, their views are unsupported by the literature.  Khalifa, Saleem, &

14  Stankard (2008) conducted a literature review of reports of forensic applications of

15  telepsychiatry published between 1998 and 2006.  Notably, the forensic psychiatry

16  literature emphasizes "the importance of obtaining consent from patients and informing

17  them of the risks and benefits of telepsychiatry." (8).  The fact that patients are

18  incarcerated and limited to receiving psychiatric care provided by the facility where they

19  are located does not remove their right to provide informed consent to the psychiatric

20  treatment they receive, through whatever modality it is provided.

21  **V.    CDCR SHOULD EXERCISE EXTREME CAUTION IN**

22  **DISCONTINUING THE REQUIREMENT THAT ITS**
    **TELEPSYCHIATRISTS WORK FROM CDCR-OPERATED HUBS**

23       94.    I am informed that CDCR operates telepsychiatry hubs for its

24  telepsychiatrists to work from but adopted a "Telepsychiatry From Home" policy during

25  the COVID-19 pandemic.  Now, Defendants propose eliminating the requirement that

26  CDCR telepsychiatrists work from their hubs.

27       95.    Telepsychiatry within correctional settings can only be successful if both the

28  telepsychiatrist and the patient have access to reliable technology to facilitate their

1  interactions and sessions.  Young and Badowski (2017) provided a comprehensive list in

2  their scholarly article of "every component vital to a successful telemedicine clinic" in

3  correctional health care.  Not surprisingly, this includes "purchasing and installing the

4  correct equipment and technology" and "ensuring reliable connectivity."  (3).  This could

5  be incredibly difficult for Defendants to guarantee if CDCR telepsychiatrists are allowed to

6  work from home.

7        96.    The Special Master's team of experts witnessed this concern first-hand.  In

8  his telepsychiatry-related findings, the Special Master noted the fact that "[i]n some cases,

9  connectivity quality was variable between programs within the same institution. For

10  instance, at CSP/Corcoran, there were no technology or connectivity problems observed in

11  the Short-Term Restricted Housing (STRH), but the monitor's expert noted significant

12  technology-related disruptions to patient care in the [Long-Term Restricted Housing]."

13  ECF No. 7862 at 38.

14        97.    In addition to reliable internet connectivity, a successful telepsychiatrist must

15  have complete access to all of her patient's medical records to ensure she is able to make

16  an informed assessment as to the patient's mental status and necessary psychiatric

17  treatment.  In my experience, accessing medical records remotely can bring with it

18  significant technical difficulties that are not easily resolved when telepsychiatrists work

19  from home.  My understanding is that this is not just a theoretical concern.  The Special

20  Master's telepsychiatry monitoring at SATF revealed at least one instance where an "EOP

21  telepsychiatrist was unable to access EHRS [during an IDTT] and could not rely on the PC

22  for relevant information because the PC had neither a laptop nor computer access."  ECF

23  No. 7682 at 76.

24        98.    Finally, patient confidentiality is at risk in a work-from-home environment.

25  It is important that telepsychiatrists who work from home have a dedicated private home

26  office where they can meet with patients and discuss patient care.  The therapeutic alliance

27  between psychiatrist and patient is severely damaged when patients do not have guaranteed

28  confidentiality, so that they can freely speak about their mental health without

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

1    interruptions or fear of unknown third-parties overhearing.  If CDCR plans on allowing

2    telepsychiatrists to work from home, then it must take affirmative steps to ensure that

3    patient confidentiality is safeguarded at all times.

4        99.    Ultimately, I agree with the Special Master that this issue needs to be

5    "monitored closely and addressed to minimize any disruptions in mental health service

6    delivery."  ECF No. 7682 at 62.

7  **VI.    CDCR SHOULD HAVE THE SAME CLINICAL REQUIREMENTS AND
        OBLIGATIONS FOR ALL OF ITS TELEPSYCHIATRISTS, INCLUDING
8        NIGHT SHIFT TELEPSYCHIATRISTS**

9        100.    The proposal to exempt Night Shift telepsychiatrists from any on-site

10   visitation is unsound.

11        101.    As I previously discussed in Paragraphs 74-79, the importance of

12   telepsychiatrists being integrated into the treatment settings where their patients are located

13   and fully informed about the cultural environment where they practice is practically

14   undisputed.  I believe every telepsychiatrist interacting with patients has such obligations,

15   no matter their specific role within a mental health services system and even if they do not

16   carry patient caseloads.

17        102.    My understanding is that Night Shift telepsychiatrists are still expected to

18   provide substantive patient care in crisis and emergency situations.  It is important that all

19   telepsychiatrists have an adequate understanding of the local facility where the patient in

20   crisis is presenting to be able to provide psychiatric care.  My concerns were shared by

21   participating providers in a qualitative study conducted by Saurman, Kirby, & Lyle (2015),

22   who found that "[a] note of caution was expressed if the [telepsychiatrists] appeared to not

23   fully understand the local context or situation, and concern was raised when the advice

24   given was dissonant to local clinical judgement."  (7).

25   / / /

26   / / /

27   / / /

28   / / /

1    103.    Therefore, I believe that, at a minimum, it is clinically indicated that Night

2  Shift  telepsychiatrists have the same frequent site visit requirements as telepsychiatrists

3  working with patients at higher levels of care.

4

5  DATED:  January 17, 2023                        Respectfully submitted,

6

7                                                  _____

8                                                  Pablo Stewart, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL
MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

# Exhibit A

<u>CURRICULUM VITAE</u>

***PABLO STEWART, M.D.***
**3021 La Pietra Circle**
**Honolulu, HI 96815**
**(808) 352-8074**
**(415) 264-0237**
**e-mail: <span style="color:red">pablo.stewart.md@gmail.com</span>**
**(Updated July 2022)**

<u>Personal Statement:</u>    As evidenced in my CV, my psychiatric career is based on several guiding principles. These include but are not limited to a commitment to diversity at all levels of medical education, including medical students, residents and faculty members. Also, I have always believed that health care is a right and not a privilege. I have demonstrated this fact by my passion for social justice and health equity for everyone.

<u>Language Competency:</u>    Fluent in both Spanish and English.

<u>EDUCATION:</u>    University of California, San Francisco, Teaching Certificate in General Medical Education, 2017

University of California, San Francisco, School of Medicine, Department of Psychiatry, Psychiatric Residency Program, 1986

University of California, San Francisco, School of Medicine, M.D., 1982

United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry

<u>LICENSURE:</u>    California Medical License #GO50899
Hawai'i Medical License #MD-11784
Federal Drug Enforcement Administration #BS0546981
Hawaii Controlled Substances Certificate of Registration #E14341
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

<u>ACADEMIC APPOINTMENTS:</u>

July 1, 2019-
Present    <u>Academic Appointment:</u> Clinical Professor/Psychiatrist, University Health Partners (UHP), University of Hawaii, John A. Burns School of Medicine.

February 22, 2018-
February 22, 2019    <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of Hawaii, John A. Burns School of Medicine.

1

| | |
|---|---|
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco.<br>School of Medicine. |
| July 1995 -<br>August 2006 | <u>Academic Appointment:</u> Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u> Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u> Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| July 2019-<br>Present | Attending Psychiatrist John A. Burns School of Medicine, Department of Psychiatry, University of Hawaii. Current duties include supervising psychiatric residents in their provision of acute and chronic care to the mentally ill inmate population housed at the Oahu Community Correctional Center. In this capacity I was also involved with local agencies in formulating the jail's response to Covid-19. I present a lecture series to the psychiatric residents regarding Forensic Psychiatry. I also serve as an Attending Psychiatrist in the Emergency Department, the Psychiatric Inpatient Unit and the Medical and Surgical Units at the Queens Medical Center. |
| December 1996-<br>Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues, extensive experience in all phases of capital litigation and correctional psychiatry. |
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities Project.</u> Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court  Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San Francisco.</u> Overall clinical/administrative responsibility for the |

|  | IPCC, a community-based case management program. Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center. This is a social work managed program that provides comprehensive social services to homeless veterans. |
|---|---|
| April 1991 - February 1995 | Chief, Substance Abuse Inpatient Unit, (SAIU), Department of Veterans Affairs Medical Center, San Francisco. Overall clinical/administrative responsibility for SAIU. |
| September 1990 - March 1991 | Psychiatrist, Substance Abuse Inpatient Unit, Veterans Affairs Medical Center, San Francisco. Clinical responsibility for patients admitted to SAIU. Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 - December 1989 | Director, Forensic Psychiatric Services, City and County of San Francisco. Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco. Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 - August 1990 | Senior Attending Psychiatrist, Forensic Unit, University of California, San Francisco General Hospital. Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward. Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco. Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |
| July 1985 June 1986 | Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital. Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 - March 1987 | Physician Specialist, Westside Crisis Center, San Francisco, CA. Responsibility for Crisis Center operations during assigned shifts, admitting privileges at Mount Zion Hospital. Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 - July 1985 | Psychiatric Consultant, Marin Alternative Treatment, (ACT). Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |

| August 1983 -<br>November 1984 | Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA. Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
|---|---|
| July 1982-<br>July 1985 | Psychiatric Resident, University of California, San Francisco. Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | Infantry Officer - United States Marine Corps. Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Officer in Charge of a Vietnamese Refugee Camp. Received an Honorable Discharge. Highest rank attained was Captain. |

HONORS AND AWARDS:

| June 2020 | Recognized by the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii as the recipient ot the 2019-2020 Excellence in Teaching Award-Psychiatry. |
|---|---|
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |

| | |
|---|---|
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 - January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000- April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001- September 2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002- June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003- April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003- January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004- June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004- January 2006; February 2017- October 2018 | Member of Human Services Commission, City and County of San Francisco. |
| February 2006- January 2007; April 2013- January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007- March 2013; February 2015- 2017 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| June 2020- Present | Member of the John A. Burns School of Medicine, University of Hawaii Scholarship Committee. |
| June 2020- Present | Member of the resident selection committee for the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii. |
| October 1999- October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |

| | |
|---|---|
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing. Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine. Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine. Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2019-<br>present | Present a lecture series to the psychiatric residents of the Department of Psychiatriy, JABSOM, University of Hawaii on forensic psychiatry. Psychotherapy supervisor Department of Psychiatriy, JABSOM, University of Hawaii. |
| December 2018-<br>May 2019 | Lecturer, Department of Psychiatry, JABSOM, University of Hawaii. |

| | |
|---|---|
| September 2016-<br>June 2018 | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014-<br>June 2018 | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003-<br>June 2018 | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| September 1990-<br>December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

8

| | |
|---|---|
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 - February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |

| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

## COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| May 2016-Present | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |

| June 2015-May 2017 | Senior Fellow, University of California, Criminal Justice & Health Consortium. |

| April 2014-Ocotber 2018 | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |

| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |

| August 2012-present | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |

| October 2007-Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners. My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata,* __ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011). |

| July/August 2008-July 2016 | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.) This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |

10

| | |
|---|---|
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific<br>Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii,<br>Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement,"<br>New Mexico Corrections Department (NMCD). This is a<br>settlement arrived at between plaintiffs and the NMCD regarding<br>the provision of constitutionally mandated psychiatric services for<br>inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United<br>States Department of Justice, Civil Rights Division, Special<br>Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training<br>Alliance's Alcohol and Drug Disability Technical Assistance<br>Project. This Project provides assistance to programs and<br>communities that will have long lasting impact and permanently<br>improve the quality of alcohol and other drug services available to<br>individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and<br>Delinquency (NCCD) in its monitoring of the State of Georgia's<br>secure juvenile detention and treatment facilities. NCCD is acting<br>as the monitor of the agreement between the United States and<br>Georgia to improve the quality of the juvenile justice facilities,<br>critical mental health, medical and educational services, and<br>treatment programs. NCCD ceased to be the monitoring agency<br>for this project in June 1999. At that time, the Institute of Crime,<br>Justice and Corrections at the George Washington University<br>became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign<br>Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance<br>Abuse Treatment, Substance Abuse and Mental Health Services<br>Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer<br>Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc.<br>Review all research protocols for the clinic per Department of<br>Health and Human Services guidelines. |

| | |
|---|---|
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic.<br>Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services,<br>Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>June 2002 | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.    San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1.   (10/12/1990).   "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.    Grand Rounds.   Department of Psychiatry, University of California, San Francisco, School of Medicine.  (12/5/1990).  "Advances in the Field of Dual Diagnosis."

3.    Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California.   (3/3/1991).   "Planning a Satisfying Life in Medicine."

4.    24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991).  "The Chronically Ill Substance Abuser."

5.    Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics.  (11/26/91).  "Mentoring as an Art."

6.    Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine.  (4/25/1992).  "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.    First International Conference of Mental Health and Leisure.   University of Utah. (7/9/1992).  "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.    American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993).  "Inpatient Groups in Initial-Stage Addiction Treatment."

9.    Grand Rounds.  Department of Child Psychiatry, Stanford University School of Medicine.  (3/17/93, 9/11/96).  "Issues in Adolescent Substance Abuse."

10.   University of California, Extension.   Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97).  "Dual Diagnosis."

11.   American Psychiatric Association Annual Meeting.   (5/26/1993).   "Issues in the Treatment of the Dual Diagnosis Patient."

12.   Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis.  (6/23/1993).  "Dual Diagnosis Treatment Issues."

13.   Utah Medical Association Annual Meeting, Salt Lake City, Utah.  (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14.   Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993).  "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15.   Haight Ashbury Free Clinic's 27th Anniversary Conference.   (6/10/94).   "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.   University of California, San Diego.   Addiction Technology Transfer Center Annual Summer Clinical Institute:  (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98).  "Treating Multiple Disorders."

17.   National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists.  (9/10/94).  "Psychiatry, Homelessness, and Serious Mental Illness."

18.   Value Behavioral Health/American Psychiatry Management Seminar.   (12/1/1994).  "Substance Abuse/Dual Diagnosis in the Work Setting."

19.   Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry.  (1/24/1995).  "Models of Addiction."

20.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.   (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01).  "Demystifying Dual Diagnosis."

21.   First Annual Conference on the Dually Disordered.  (3/10/1995).  "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.   Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995).  "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.   Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.   (11/23/95).  "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.   The Labor and Employment Section of the State Bar of California.   (1/19/96).  "Understanding Alcoholism and its Impact on the Legal Profession."   MCCE Conference, San Francisco, CA.

25.   American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26.   American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27.   Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.   International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.   Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30.   Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.    Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.    Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.    DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34.    The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35.    The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children."  Newport Beach, California. (2/12/98)

36.    American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.    "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis.  San Francisco, California.  (3/6-3/8/1998)

38.    "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference.  (6/4/1998)

39.    Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women."  (6/11/1998)

40.    Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient."  (6/17/1998)

41.    Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems."  (6/19/1998)

42.    "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer."  The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference.  San Rafael, California.  (6/20/1998)

43.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.     Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.     "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.     9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.     Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.     Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.     California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.     California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53.     Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54.     1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55.     "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56.     Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57.     "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58.     Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender." (2/17/99)

59. American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999). Entry Level Process Group Leader.

60. "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61. "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62. "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63. "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64. Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66. "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67. California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68. "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69. State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71. 11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72. The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.     "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.     15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho.  (5/25/99)

76.     "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.     "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.     "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.     "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.     "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83.     "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.     1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California.  (8/3/99)

85.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui.  (8/23/99)

86.     "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.     "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.  "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.  "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.  "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.  "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.  "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.  "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.  "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.  "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.  "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.  "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.  "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.  "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101. "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102. National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103. "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.	"The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California.  (6/29 & 7/27/00)

105.	"Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.	 "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.	Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.  "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.	"Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (11/1/00, 3/13/01)

109.	"Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.	"Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.	"Wasn't One Problem Enough?"  Mental Health and Substance Abuse Issues.  2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California.  (3/2/01)

112.	"The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.	"Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114.	"Dual Diagnosis-Assessment and Treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115.	Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

116.	National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."  I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA.  (6/1-6/2/01)

117.	Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California.  (6/15/01)

118.	Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington.  (11/15/01)

119.	San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135.   "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.   Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.   Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.   "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.   "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.   "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.   "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.   "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.   "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.    Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.    2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.    Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.    Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.    2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.    2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.    Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.    Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.    "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.    San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161.    Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162.    "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.

163.    Mental Health & Death Penalty Training, Community Legal Aid Institute (LBH Masyarakat), Jakarta, Indonesia, February 12 -16, 2019.

PUBLICATIONS:

1) Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients.* Hospital and Community Psychiatry, 39, 437-439.

2) Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3) Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4) Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal.* Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5) Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6) Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7) Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8) Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9) Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10) Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11) James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12) Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13) Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, <u>*Uppers, Downers, All Arounders, Sixth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

14) Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, <u>*Uppers, Downers, All Arounders, Seventh Edition,*</u> CNS Publications, Inc., Ashland, Oregon.

15) Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16) Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17) Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)* Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

*19)* Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Plaintiff-Appellant Edgar Quintanilla v. Homer Bryson, Commissioner, State of Georgia's Department of Corrections, et al., On appeal from the United States District Court for the Southern District of Georgia, Case No. 6:17-cv-00004-JRH-RSB in the United States Court of Appeals for the Eleventh Circuit, No. 17-14141.

25

# Exhibit B

*PABLO STEWART, M.D.*
**Psychiatric Consultant**
**3021 La Pietra Circle**
**Honolulu, HI 96815**
**808-352-8074**
**pablo.stewart.md@gmail.com**

---

## TESTIMONY/DEPOSITIONS January 2000-Present

1. People versus Juan Duarte Gonzales (Lincoln County, Washington, January 2000)
2. People versus Jerry Lane Davis (Stanislaus County, California, September 2000)
3. James Andrew Melton versus Arthur Calderon, et al. (United States District Court, Los Angeles, California, December 2000)
4. Fremont Unified School District versus James Parks (Deposition taken in San Francisco, California, April 2001)
5. People versus Pablo Lomeli (Douglas County, Arizona, August 2001)
6. Dunlap versus County of Mendocino (Deposition taken in Oakland California, September 2001)
7. Maxwell Hoffman versus A.J. Arave, Warden, et al. (Deposition taken in San Francisco, October 2001)
8. People versus Michelle Michaud (Alameda County, California, April 2002)
9. People versus David Attias (Santa Barbara County, California, May/June 2002)
10. People versus Larry Christopher Graham (Contra Costa County, California, October 2002)
11. People versus Miguel Enrique Diaz (San Mateo County, California, November/December 2002)
12. United States versus Eugene Frederick Boyce, III (District Court, Honolulu, Hawai'i December 2002)
13. People versus Robert Daniel Weston (Stanislaus County, California, April/July 2003)
14. People versus Vincent Sanchez (Ventura County, California, August 2003)
15. Armstrong Petition JW01-6450 (San Francisco Juvenile Court, December 2003)
16. People versus Daniel Mugnolo (San Francisco City and County, December 2003)
17. Brandon Astor Jones versus Frederick Head, Warden (Deposition taken in San Francisco, January 2004)
18. David Perkins versus Frederick Head, Warden (Deposition taken in San Francisco, March 2004)
19. People versus Marino Hernandez (San Mateo County, California, June 2004)
20. Raphael Camargo versus Larry Norris, Director, Arkansas Department of Correction (Deposition taken in San Francisco, July 2004)
21. People versus Ronald Mathews (King County, Washington, August 2004)
22. People versus Huberto Mendoza (Stanislaus County, California, December 2004)
23. People versus James Essick (San Diego County, California, June 2005)

24. People versus Jesse Ignacio Sanchez Gomez (Ada County, Idaho, July/August 2005)
25. People versus Adrian Camacho (San Diego County, California, October 2005)
26. People versus Huberto Mendoza (Stanislaus County, California, November 2005)
27. People versus Paul Speer (Maricopa County, Arizona, January 2006)
28. People versus Mark Thigpen (San Mateo County, California, January 2006)
29. United States versus Tommy Ray Elam (District Court, Los Angeles, California, February 2006)
30. Enrique Arevalo versus Frederick Head, Warden (Deposition taken in San Francisco, March 2006)
31. United States versus Danny Lee Jones (District Court, Phoenix, Arizona, March 2006)
32. People versus Omar Dent, III (Los Angeles County, California, May 2006)
33. People versus Delaney Marks (Alameda County, California, May 2006)
34. People versus Angel Maturino Resendiz (Harris County, Texas, June 2006)
35. People versus Antonio Nicolosi (San Mateo County, California, July 2006)
36. Gregory Paul Lawler versus Frederick Head, Warden (Deposition taken in San Francisco, July 2006)
37. United States versus Todd Sarver (District Court, San Francisco, California, August 2006)
38. United States versus Eugene Frederick Boyce, III (United States District Court, Honolulu, Hawaii, October 2006)
39. Arthur Torlucci versus W.A. Duncan, (District Court, Santa Ana, California, November 2006)
40. Joaquin Enrique Arevalo versus William Terry, Warden, (Butts County, Georgia, December 2006)
41. People versus Jerry Cabonce, (San Mateo County, California, January 2007)
42. People versus Rodrigo Paniagua, (Santa Clara County, California, February 2007)
43. Gregory Paul Lawler versus William Terry, Warden, (Butts County, Georgia, February 2007)
44. United States versus Francisco Rodriguez, (District Court, Santa Ana, California, April 2007)
45. People versus O'Neal Durgin, (San Mateo County, California, June 2007)
46. Sepulveda versus Beard et al., (Bartonsville, Pennsylvania, June 2007)
47. Webster versus Ayers et al., (District Court, Sacramento, California, September 2007)
48. Ronald Deere versus Jeanne Woodford, et al., (District Court, Los Angeles, California, October 2007)
49. People versus Eric V. Hall (Ada County, Idaho, October 2007)
50. Rickey Dale Newman versus Larry Norris, Director, Arkansas Department of Correction (District Court, Fort Smith, Arkansas, November 2007
51. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, December 2007)
52. People versus Matthew Cunningham (Maricopa County, Arizona, January & February 2008)
53. People versus Alfredo Prieto (Fairfax County, Virginia, February 2008)

54. People versus Edward Gutierrez (Santa Clara County, California, May 2008)
55. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants. (Deposition taken in Phoenix, Arizona, July 2008). A supplemental deposition was also taken in July 2008 approximately 2 weeks after the initial deposition.
56. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, August 2008)
57. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, California, September 2008)
58. United States versus Naeem Williams (District Court, Honolulu, Hawaii, November 2008)
59. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Three Judge Panel, District Court, San Francisco, California, December 2008)
60. United States versus Michael Behenna (United States Army Court Marshall, Fort Campbell, Kentucky, February 2009)
61. United States versus Steven Green (District Court, Paducah, Kentucky, May 2009)
62. People versus Francisco Merino (San Mateo County, California, July 2009)
63. Milton Lewis versus State of California (District Court, Sacramento, California, October 2009)
64. People versus Adrian Sedano (San Mateo County, California, November 2009)
65. United States versus Noshir S. Gowadia (District Court, Honolulu, Hawaii, November 2009)
66. Johnny A. Johnson versus State of Missouri (St. Louis, Missouri, December 2009)
67. Martin Kipp versus State of California (District Court, Los Angeles, California, December 2009)
68. David Welch versus State of California (Martinez, California, September 2010)
69. State of Arizona versus Eddy Rose (Phoenix, Arizona, September 2010)
70. State of Delaware versus Gary Ploof (Dover, Delaware, October 2010)
71. State of Arizona versus Steven Ray Newell (Phoenix, Arizona, March 2011)
72. State of Arkansas versus Ricky Lee Newman (Fort Smith, Arkansas, March 2011)
73. People versus Kerri Livingston (San Mateo County, California, March 2011)
74. People versus Alexander Youshock (San Mateo County, California, April 2011)
75. United States versus Francisco Rodriguez (District Court, Santa Ana, California, May 2011)
76. State of Connecticut versus Robert Breton (Hartford, Connecticut, July 2011)
77. United States versus Billie Allen (St. Louis, Missouri, December 2011)
78. People versus Mohammed Ali (San Mateo County, California, February 2012)
79. Clemency Hearing re: Robert Towery (Florence, Arizona, March 2012)
80. United States versus Danny John, Jr. (Prescott, Arizona, March 2012)
81. State of Ohio versus Abdul H. Awkal (Cleveland, Ohio, June 2012)
82. People versus Monica McCarrick (Solano County, California, June 2012)
83. People versus Robert Hall (Ada County, Idaho, October 2012)
84. People versus Alamoti Finau (San Mateo County, California, November 2012)
85. United States versus Merrell Hobbs (District Court, Philadelphia, Pennsylvania, November 2012)

86. Ex Parte Juan Lizcano, W05-59563-S(A) (Dallas, Texas, November 2012)
87. People versus David Vanalstine (San Mateo County, California, December 2012)
88. Sinisterra versus the United States (District Court, Kansas City, Missouri, January 2013)
89. People versus Jing Hua Wu (San Jose, California, February & March 2013)
90. Coleman versus Brown (Deposition taken in San Francisco, California, March 2013)
91. Coleman versus Brown (District Court, Sacramento, CA, June 2013)
92. Tate versus Humphrey (Deposition taken in San Francisco, California, June 2013)
93. Coleman versus Brown (District Court, Sacramento, CA, October 2013)
94. People versus Alegria (Tucson, Arizona, October 2013)
95. Commonwealth v. Michael Pruitt (Reading, PA, November 2013)
96. Coleman versus Brown (District Court, Sacramento, CA, December 2013)
97. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, March 2014)
98. Deposition taken in Parsons, et al v. Ryan. March 28, 2014, San Francisco, CA.
99. Evidentiary hearing in State of Arizona v. Albert Martinez Carreon. Phoenix Arizona, April 21 & 22, 2014.
100. United States v. Naeem Williams, (District Court, Honolulu, HI, April 29 & 30, and June 3, 2014
101. Deposition taken in Hernandez v. County of Monterey, San Francisco, CA, July 8, 2014
102. United States v. Thomas Steven Sanders, (District Court, Alexandria, LA, September 22 & 23, 2014)
103. Deposition taken in Kurian David, et al., plaintiffs v. Signal International, LLC, defendant, San Francisco, California, October 2014)
104. People v. Dennis McGraw (Vallejo, California, November 2014)
105. People v. Leticia Serna (San Jose, California, December 2014)
106. Wilridge v. Marshall, (District Court, San Francisco, California, February 2015)
107. People v. Hugo Munguia-Hernandez (Redwood City, California, July 2015)
108. Deposition taken in Goddard v. State of California, et al., San Mateo, California, September 2015.
109. People v. Bryan Thomas (Redwood City, California, October 2015)
110. Carlos Gutierrez v. E.K. McDaniel, Warden, et al. (Reno, Nevada, January 2016)
111. State of Arkansas v. Rickey Dale Newman (Fort Smith, Arkansas, January 2016)
112. Deposition taken in Roscoe Walker v. Ford Motor Company, et al., San Mateo, California, February 2016.
113. People v. Philip Law (Boise, Idaho, May 2016)
114. United States v. Joel Manuel Taylor, (District Court, San Francisco, CA, March 18, April 25 & May 25, 2016)
115. United States v. Henry Cervantes, et al, (District Court, Oakland, CA, June 28, 2016)

116. Manual Camacho v. State of Arkansas, (District Court, Fort Smith, Arkansas, November 8, 2016)

117. The People of Guam vs. Mark Anthony Torre, Jr. (Superior Court of Guam, Agana, Guam, February 22, 2017)

118. Kevin Webb, et. al., v. Brad Livingston, et. al. (civil action no. 4:14-cv-03302). Deposition taken in San Francisco, California, June 2, 2017)

119. State of Missouri v. Marvin Rice (11DE-CR00590-2), video deposition taken in Honolulu, HI, July 20, 2017.

120. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, December 18 & 19, 2017)

121. United States v. Nna Alpha Onuoha, (District Court, Riverside, California, January 24, 2018)

122. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, February 27 & 28, March 1, and August 27-30, 2018)

123. United States v. Alfonso Rodriguez, Jr. Deposition taken in Honolulu, HI, September 6, 2018.

124. People v. Omar Pettigen (Superior Court, Alameda County, CA, July 22, 2019)

125. United States v. Roger Trent Skaggs (District Court, Cincinnati, Ohio, July 25, 2019)

126. Parsons, et al v. Shin (District Court, Phoenix, AZ, November 3, 2021)

127. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, February 1, 2022)

128. Joseph O'Malley v. Hawaii Department of Safety (Superior Court, Honolulu, HI, February 3, 2022)

129. State of Missouri v. Marvin Rice (11DE-CR00590-2), (Superior Court, Clark County, MO, March 31, 2022)

# Exhibit C

<u>**Documents Reviewed in Preparation of Expert Report**</u>

*Coleman v. Newsom* **Case Filings and Documents**

1.    CDCR's provisionally-approved telepsychiatry policy, which was filed with the Court on March 27, 2020.  *See* March 27, 2020 Stipulation and Order, ECF No. 6539 at 5-12.

2.    Letters dated June 30, 2022 from Plaintiffs and from Defendants setting forth their final positions and proposed modifications to the telepsychiatry policy after negotiations on this issue, filed with the Court by the Special Master on December 15, 2022.  *See* ECF No. 7682-1.

3.    The Special Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy, filed December 15, 2022, which included his telepsychiatry-related findings from the [DRAFT] 29th Round Monitoring Report – Part C and the monitoring tours of CDCR's Telepsychiatry Hubs.  *See* ECF No. 7682.

**Scholarly Articles**

1.    American Psychiatric Association, Resource Document on Principles of Informed Consent in Psychiatry, J Am Acad Psychiatry Law, Vol. 25, No. 1, 1997.

2.    Brodey, Benjamin B., et al. "Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation." Psychiatric Services 51.10 (2000): 1305- 1307.

3.    Zaylor, Charles, Pamela Whitten, and Charles Kingsley. "Telemedicine services to a county jail." Journal of Telemedicine and Telecare 6.1_suppl (2000): 93- 95.

4.    Zaylor, C., Nelson, E. L., & Cook, D. J. (2001). Clinical outcomes in a prison telepsychiatry clinic. Journal of Telemedicine and Telecare, 7(1_suppl), 47-49.

5.    Larsen, Debra, et al. "Prison telemedicine and telehealth utilization in the United States: state and federal perceptions of benefits and barriers." Telemedicine Journal & e-Health 10.Supplement 2 (2004): S-81.

6.    Leonard, S. (2004). The development and evaluation of a telepsychiatry service for prisoners. Journal of Psychiatric and Mental Health Nursing, 11(4), 461- 468.

7.    Leonard, Sarah. "The successes and challenges of developing a prison telepsychiatry service." Journal of telemedicine and telecare 10.1_suppl (2004): 69-71.

8.    Myers, Kathleen, et al. "Telepsychiatry with incarcerated youth." Journal of Adolescent Health 38.6 (2006): 643-648.

9.    Ax, R. K., Fagan, T. J., Magaletta, P. R., Morgan, R. D., Nussbaum, D., & White, T. W. (2007). Innovations in correctional assessment and treatment. Criminal Justice and Behavior, 34(7), 893-905.

10.   O'Reilly, Richard, et al. "Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial." Psychiatric Services 58.6 (2007): 836-843.

11.   Shore, Jay H., Donald M. Hilty, and Peter Yellowlees. "Emergency management guidelines for telepsychiatry." General hospital psychiatry 29.3 (2007): 199- 206.

12.   Frueh, B. Christopher, et al. "A randomized trial of telepsychiatry for post-traumatic stress disorder." Journal of telemedicine and telecare 13.3 (2007): 142-147.

13.   Sullivan, D. H., Chapman, M., & Mullen, P. E. (2008). Videoconferencing and forensic mental health in Australia. Behavioral sciences & the law, 26(3), 323-331.

14.   Antonacci, Diana J., et al. "Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: implications for forensic and correctional psychiatry." Behavioral sciences & the law 26.3 (2008): 253-269.

15.   Morgan, Robert D., Amber R. Patrick, and Philip R. Magaletta. "Does the use of telemental health alter the treatment experience? Inmates' perceptions of telemental health versus face-to-face treatment modalities." Journal of Consulting and Clinical Psychology 76.1 (2008): 158.

16.   Yellowlees, Peter, et al. "Emergency telepsychiatry." Journal of telemedicine and telecare 14.6 (2008): 277-281.

17.   Khalifa, N., Saleem, Y., & Stankard, P. (2008). The use of telepsychiatry within forensic practice: A literature review on the use of videolink. The Journal of Forensic Psychiatry & Psychology, 19(1), 2-13.

18.   Scott, C. L. (Ed.). (2009). Handbook of correctional mental health. American Psychiatric Pub.

19.   Porcari, Carole E., et al. "Assessment of post-traumatic stress disorder in veterans by videoconferencing and by face-to-face methods." Journal of Telemedicine and Telecare 15.2 (2009): 89-94.

[4212499.1]

20.    Burke Center Mental Health Emergency Center, Lufkin, Texas. "2011 APA Gold Award: A Telepsychiatry Solution for Rural Eastern Texas." Psychiatric Services 62.11 (2011): 1384-1386.

21.    Kramer, Greg M., et al. "A standard telemental health evaluation model: The time is now." Telemedicine and e-Health 18.4 (2012): 309-313.

22.    Godleski, L., Darkins, A., & Peters, J. (2012). Outcomes of 98,609 US Department of Veterans Affairs patients enrolled in telemental health services, 2006–2010. Psychiatric services, 63(4), 383-385.

23.    Smucker Barnwell, Sara V., et al. "VA Puget Sound Telemental Health Service to rural veterans: a growing program." Psychological Services 9.2 (2012): 209.

24.    Deslich, Stacie Anne, Timothy Thistlethwaite, and Alberto Coustasse. "Telepsychiatry in correctional facilities: using technology to improve access and decrease costs of mental health care in underserved populations." The Permanente Journal 17.3 (2013): 80.

25.    Hilty, Donald M., et al. "The effectiveness of telemental health: a 2013 review." Telemedicine and e-Health 19.6 (2013): 444-454.

26.    Southard, Erik P., Jonathan D. Neufeld, and Stephanie Laws. "Telemental health evaluations enhance access and efficiency in a critical access hospital emergency department." Telemedicine and e-Health 20.7 (2014): 664-668.

27.    Seidel, R. W., & Kilgus, M. D. (2014). Agreement between telepsychiatry assessment and face-to-face assessment for emergency department psychiatry patients. Journal of telemedicine and telecare, 20(2), 59-62.

28.    Kasckow, J., Felmet, K., Appelt, C., Thompson, R., Rotondi, A., & Haas, G. (2014). Telepsychiatry in the assessment and treatment of schizophrenia. Clinical schizophrenia & related psychoses, 8 (1), 21-27A.

29.    Salmoiraghi, Alberto, and Shahid Hussain. "A systematic review of the use of telepsychiatry in acute settings." Journal of Psychiatric Practice® 21.5 (2015): 389-393.

30.    American Psychiatric Association. Psychiatric services in correctional facilities. American Psychiatric Pub, 2015.

31.    Trestman, Robert, Kenneth Appelbaum, and Jeffrey Metzner, eds. Oxford textbook of correctional psychiatry. Oxford University Press, 2015.

32. Saurman, Emily, Sue E. Kirby, and David Lyle. "No longer 'flying blind': how access has changed emergency mental health care in rural and remote emergency departments, a qualitative study." BMC health services research 15.1 (2015): 1-11.

33. Narasimhan, Meera, et al. "Impact of a telepsychiatry program at emergency departments statewide on the quality, utilization, and costs of mental health services." Psychiatric Services 66.11 (2015): 1167-1172.

34. Neilson G, Chaimowitz G. Informed Consent to Treatment in Psychiatry. Can J Psychiatry. 2015 Apr;60(4):1–11. PMCID: PMC4459249.

35. Batastini, A. B., King, C. M., Morgan, R. D., & McDaniel, B. (2016). Telepsychological services with criminal justice and substance abuse clients: A systematic review and meta-analysis. Psychological Services, 13(1), 20.

36. Bashshur, Rashid L., et al. "The empirical evidence for telemedicine interventions in mental disorders." Telemedicine and e-Health 22.2 (2016): 87- 113.

37. Farabee, David, Stacy Calhoun, and Robert Veliz. "An experimental comparison of telepsychiatry and conventional psychiatry for parolees." Psychiatric Services 67.5 (2016): 562-565.

38. Hubley, Sam, et al. "Review of key telepsychiatry outcomes." World journal of psychiatry 6.2 (2016): 269.

39. Young, Jeremy D., and Melissa E. Badowski. "Telehealth: increasing access to high quality care by expanding the role of technology in correctional medicine." Journal of clinical medicine 6.2 (2017): 20.

40. Dham, Pallavi, et al. "Community based telepsychiatry service for older adults residing in a rural and remote region-utilization pattern and satisfaction among stakeholders." BMC psychiatry 18.1 (2018): 1-13.

41. KM Cheng, Bonnie WM Siu, Cherie CY Au Yeung, TP Chiang, MH So, Mick CW Yeung, Telepsychiatry for stable Chinese psychiatric outpatients in custody in Hong Kong: a case-control pilot study, Hong Kong Med J 2018;24:378–83.

42. Shore, Jay H., et al. "Best practices in videoconferencing-based telemental health April 2018." Telemedicine and e-Health 24.11 (2018): 827-832.

43. Edward Kaftarian, MD, Lessons Learned in Prison and Jail-Based Telepsychiatry, Current Psychiatry Reports (2019) 21: 15, https://doi.org/10.1007/s11920-019-1004-5.

44.  Santesteban-Echarri O, Piskulic D, Nyman RK, Addington J. "Telehealth interventions for schizophrenia-spectrum disorders and clinical high-risk for psychosis individuals: A scoping review." J Telemed Telecare. 2020 Jan-Feb;26(1-2):14-20. doi: 10.1177/1357633X18794100. Epub 2018 Aug 22. PMID: 30134781.

45.  Smith, Katharine, et al. "COVID-19 and telepsychiatry: development of evidence-based guidance for clinicians." JMIR mental health 7.8 (2020): e21108.

46.  O'Brien, M., & McNicholas, F. (2020). The use of telepsychiatry during COVID-19 and beyond. Irish journal of psychological medicine, 37(4), 250-255.

47.  American Psychiatric Association. "The Impact of COVID-19 on Incarcerated Persons with Mental Illness." (2020).

48.  Spivak, Stanislav, et al. "Telepsychiatry use in US mental health facilities, 2010–2017." Psychiatric services 71.2 (2020): 121-127.

49.  Shore, Jay H. "Managing virtual hybrid psychiatrist-patient relationships in a digital world." JAMA psychiatry 77.5 (2020): 541-542.

50.  Gunn, John, Taylor, Pamela J., Forrester, Andrew, Parrott , Janet and Grounds, Adrian 2020 Telemedicine in prisons: A Crime in Mind perspective. Criminal Behaviour and Mental Health 30 (2-3) , p. 6 5-6 7. 1 0.1 0 0 2/cbm.2160 file.

51.  Stoll, Julia, John Z. Sadler, and Manuel Trachsel. "The ethical use of telepsychiatry in the Covid-19 pandemic." Frontiers in Psychiatry (2020): 665.

52.  Edward Kaftarian, MD. (2020). Telemental health in rural correctional institutions. Mhealth, 6.

53.  Haque, Saira Naim. "Telehealth beyond COVID-19." Psychiatric Services 72.1 (2021): 100-103.

54.  Oncu F, Balcioglu YH. Virtualization of mental health care in the midst of chaos: is telepsychiatry a silver lining? Dusunen Adam The Journal of Psychiatry and Neurological Sciences 2021;34:219-222.

55.  Tian EJ, Venugopalan S, Kumar S, Beard M (2021) The impacts of and outcomes from telehealth delivered in prisons: A systematic review. PLoS ONE 16(5): e0251840. https://doi.org/ 10.1371/journal.pone.0251840.

56.  Justice Center The Council of State Governments. Telehealth and Telecommunication Opportunities in the Criminal Justice System Telehealth and Telecommunication Opportunities in the Criminal Justice System (2021).

57. Burton, Paul RS, Nathaniel P. Morris, and Matthew E. Hirschtritt. "Mental health services in a US prison during the COVID-19 pandemic." Psychiatric services 72.4 (2021): 458-460.

58. Donna M. Norris, MD, Harold J. Bursztajn, MD, Thomas G. Gutheil, MD, Archie Brodsky (2021). "Telepsychiatry: Practical Pointers and Potential Pitfalls." Psychiatric Times.

59. Zhang, Jonathan, Matt Boden, and Jodie Trafton. "Mental health treatment and the role of tele-mental health at the veterans health administration during the COVID-19 pandemic." Psychological services (2021).

60. Hewson T, Robinson L, Khalifa N, Hard J, Shaw J. Remote consultations in prison mental healthcare in England: impacts of COVID-19. BJPsych Open. 2021 Feb 8;7(2):e49. doi: 10.1192/bjo.2021.13. PMID: 33551008; PMCID: PMC7870917.

61. Mark Zimmerman, MD; Douglas Terrill, BA; Catherine D'Avanzato, PhD; and Julianne Wilner Tirpak, MA, Telehealth Treatment of Patients in an Intensive Acute Care Psychiatric Setting During the COVID-19 Pandemic: Comparative Safety and Effectiveness to In-Person Treatment, J. Clin. Psychiatry 82:2 March/April 2021.

62. American Psychiatric Association, Telepsychiatry Toolkit, https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/telepsychiatry-toolkit-home (2022).

63. Verma, Shikha, et al. "Incorporation of Telepsychiatry for Patients with Developmental Disorders into Routine Clinical Practice—A Survey of Specialty Clinics Adapting to Telepsychiatry During the COVID-19 Pandemic." Journal of Autism and Developmental Disorders (2022): 1-5.

64. Amartey, Michelle. "Deinstitutionalizing the 'New Asylums': Telepsychiatry in the United States Correctional System." (2022).

65. Adiukwu, Frances, et al. "Scaling up global mental health services during the COVID-19 pandemic and beyond." Psychiatric Services 73.2 (2022): 231-234.

66. Kinoshita, S., & Kishimoto, T. (2022). Advantages and disadvantages of the long-term use of telepsychiatry. Irish Journal of Psychological Medicine, 1-2. doi:10.1017/ipm.2022.21.

67. Psychiatrists use of telepsychiatry during COVID-19 public health emergency: Survey Results. American Psychiatric Association. (2020).