ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
    1300 I Street, Suite 125
    P.O. Box 944255
    Sacramento, CA 94244-2550
    Telephone: (916) 210-7318
    Fax: (916) 324-5205
    E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
SAMANTHA D. WOLFF, State Bar No. 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
HANSON BRIDGETT LLP
    1676 N. California Boulevard, Suite 620
    Walnut Creek, CA 94596
    Telephone: (925) 746-8460
    Fax: (925) 746-8490
    E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**NOTICE OF SUBMISSION OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S 2021 ANNUAL SUICIDE REPORT** |

Pursuant to its proposal, and the court's order adopting that proposal (ECF Nos. 7574 and 7592), on September 29, 2022, the California Department of Corrections and Rehabilitation (CDCR) filed its 2021 Annual Suicide Report. (ECF No. 7615.) Thereafter, Plaintiffs filed objections to the report (ECF No. 7621) and Defendants responded to those objections. (ECF No. 7659.) On December 15, 2022, the court issued its order resolving Plaintiffs' objections, and directed Defendants to amend their annual suicide report and refile it within forty-five days. (ECF No. 7681.)

1

1    Attached is a letter from CDCR dated January 30, 2023, enclosing: (1) CDCR's overview

2  report that describes the amendments to the 2021 Annual Suicide Report; (2) an email from

3  Plaintiffs' counsel in response to CDCR's draft revisions to the Annual Suicide Report; and (3)

4  the amended 2021 Annual Suicide Report.

5  Dated: January 30, 2023                          Respectfully submitted,

6                                                   ROB BONTA
                                                     Attorney General of California
7                                                    DAMON MCCLAIN
                                                     Supervising Deputy Attorney General
8

9                                                    /s/ *Elise Owens Thorn*
                                                     Elise Owens Thorn
10                                                   Deputy Attorney General
                                                     *Attorneys for Defendants*
11

12

13  Dated:  January 30, 2023                         HANSON BRIDGETT LLP

14                                                   */s/ Samantha D. Wolff*
                                                     PAUL MELLO
15                                                   SAMANTHA D. WOLFF
                                                     *Attorneys for Defendants*
16

17

18

19

20

21

22

23

24

25

26

27

28

2

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 30, 2023

Damon McClain, Esq.
Elise Thorn, Esq.
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-550

VIA EMAIL

RE: Amended 2021 Annual Suicide Report

Dear Mr. McClain and Ms. Thorn:

On December 15, 2022 the court ordered the California Department of Corrections and Rehabilitations (CDCR) to make a number of amendments to its 2021 Annual Suicide Report. (See ECF Nos. 7615 and 7681.)  CDCR has completed revisions in response to that order and has met and conferred with Plaintiffs and the Special Master.  Enclosed for filing with the *Coleman* court are:  (1) CDCR's overview report describing the revisions to the Annual Suicide Report; (2) an email from Plaintiffs' counsel in response to CDCR's draft revisions to the Annual Suicide Report; and (3) CDCR's 2021 Amended Annual Suicide Report.

Sincerely,


*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs

### California Department of Corrections and Rehabilitation's
### Overview Report on its 2021 Annual Suicide Report – Amended

On September 29, 2022, Defendants filed their Annual Report to the Legislature on Suicides in CDCR and 2021 Annual Suicide Report.  (ECF No. 7615, 2021 Annual Suicide Report.) Plaintiffs filed objections to the report on October 11, 2022.  (ECF No. 7621.)  CDCR responded on November 10, 2022.  (ECF No. 7659.)  On December 15, 2022 the court issued its order resolving Plaintiffs' October 11 objections and ordered Defendants to amend their annual suicide report and refile it within forty-five days.  (ECF No. 7681.)  Specifically, the court ordered:

> 1.  The parties to meet and confer under the supervision of the Special Master to determine whether the issues listed in Tables 18 and 19 of the 2021 Annual Suicide Report can be described with greater specificity when read in conjunction with the issues identified in Appendix B4 of the Special Master's Expert's Annual Suicide Reports for Calendar Years 2017 through 2020; and

> 2. Defendants to file an amended 2021 Annual Suicide Report that includes: (a) Tables 18 and 19 as amended under the order; (b) an additional explanation and analysis of the emergency response issues referred to on page 96 of the original report; and (c) a clear statement of whether deficiencies in any of the several mental health assessments required by the Program Guide played a role in any of the 2021 inmate suicides.

(*Id.* at 10-11.)

On December 28, 2022, CDCR provided the Special Master and Plaintiffs with a draft of the proposed amendments to the 2021 Annual Suicide Report.  On January 6, 2023, Plaintiffs provided written feedback to CDCR's proposed amendments, and the parties met to discuss the proposed amendments.  (*See* January 6, 2023 emails from Plaintiffs' counsel Michael Nunez, Attachment A.)  CDCR provided a redlined draft of the amended 2021 Annual Suicide Report to the Special Master and Plaintiffs on January 26, 2023.

The amended 2021 Annual Suicide Report (Attachment B) revised the September 29, 2022 report in accordance with the court's December 15, 2022 order, taking into account the comments and revisions suggested by the Special Master and Plaintiffs.  Specifically, responsive changes were made to the second-to-last full paragraph at page 29, beginning at the second-to-last paragraph at pages 52 and ending at Table 18 on page 56, and the last full paragraph on page 56.  Minor grammatical and non-substantive edits were made to pages 35, 36, 39, 41, and 48.

# ATTACHMENT  A

**Weber, Nicholas@CDCR**

| | |
|---|---|
| **From:** | Michael Nunez <MNunez@rbgg.com> |
| **Sent:** | Friday, January 6, 2023 5:29 PM |
| **To:** | Coleman Special Master Team |
| **Cc:** | Matt Lopes; Weber, Nicholas@CDCR; Elise Thorn; Coleman Team - RBG Only; Steve Fama; Mehta, Amar@CDCR; Williams, Travis@CDCR; Toche, Diana@CDCR; Kerry F. Walsh; Michael Ryan |
| **Subject:** | RE: 2021 Annual Suicide Report Order |
| **Attachments:** | DRAFT Defendants' proposed revisions to 2021 Suicide Report rec'd 12-28-22, 0489-3.DOCX; JSY+MSN-Lopes and Defs, Re 2021 Suicide Review, 03-01-2022, 0489-03.PDF |

---

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

All,

I write to summarize the concern regarding cuffing patients that I raised during our meet and confer about the 2021 suicide report earlier today.

Defendants' proposed amended section regarding emergency response issues needs, but is missing, a discussion of 2021 suicides that involved patients who were cuffed before and/or during provision of emergency medical care.  Plaintiffs' March 1, 2022 letter regarding the 2021 suicides (attached) identified three 2021 suicides that involved patients who were cuffed before or during provision of emergency medical care: ███████████████████████████; and ████████████.  *Id.* at 11-12.  Plaintiffs' objection to the emergency response section of Defendants' 2021 report specifically noted that, to be consistent with prior Special Master annual suicide reports, Defendants' Report needed to include a discussion of 2021 suicides that involved patients who were cuffed before and/or during provision of emergency medical care.  Plaintiffs' Objections, ECF No. 7621 at 6 ("To track the content and analysis found in the Special Master's prior reports as required by the Suicide Reporting Plan, the Report must specifically [. . . ] *discuss how many cases involved application of cuffs or restraints to patients before or during administration of emergency medical care as well as the trend over years in the number of such cases*. *See* Special Master's 2020 Suicide Report at 27-28; Special Master's 2019 Suicide Report (Jul. 16, 2021), ECF No. 7239 at 33-34" (emphasis added)).  The Court sustained this objection.  Order (Dec. 15, 2021), ECF No. 7681 at 7.

For your reference, I have attached an updated copy of Plaintiffs' comments that includes a comment addressing the patient cuffing issue and a copy of Plaintiffs' March 1, 2022 2021 suicide review letter.

Mike

---

**From:** Michael Nunez
**Sent:** Friday, January 6, 2023 10:37 AM
**To:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>
**Cc:** Matt Lopes <mlopes@pldolaw.com>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Travis Williams <Travis.Williams@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Kerry F. Walsh

<kwalsh@pldolaw.com>; Michael Ryan <mryan@pldolaw.com>
**Subject:** FW: 2021 Annual Suicide Report Order

All,

I noticed that I did not copy the entire SM team on my email below. I'm resending it to copy the entire SM team.

Mike

---

**From:** Michael Nunez
**Sent:** Friday, January 6, 2023 10:18 AM
**To:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Kerry F. Walsh <kwalsh@pldolaw.com>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Travis Williams <Travis.Williams@cdcr.ca.gov>; Lisa Ells <LElls@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Thomas Nolan <TNolan@rbgg.com>
**Cc:** Matt Lopes <mlopes@pldolaw.com>; Jenny Yelin <JYelin@rbgg.com>; Michael Ryan <mryan@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>
**Subject:** RE: 2021 Annual Suicide Report Order

Dear OLA and Special Master lopes,

Thank you, Nick, for sharing Defendants' proposed revisions to their 2021 Suicide Report. Upon our initial review, it appears the new and revised content help address Plaintiffs' objections that the Court sustained. However, we have a few remaining concerns. We have flagged them in the attached version of the document, and I summarize them below.

1. The QIP issue described as "Level of care issues: improper level of supervision" is vague. We do not know what it means, and we request that Defendants revise the description of the issue identified to clarify what the deficiency is.
2. Table 19 is missing several common QIP issues that occurred more commonly than the 911 activation issue listed at the bottom of Table 19. These other more common QIP issues include inadequate nursing documentation, which reportedly arose in five different instances, out-of-date custody training, which reportedly arose in 7 instances, custody improper documentation of ASU yard time, which reportedly arose in four instances, and level of care issues, issue and observation, and PIP contacts, which each reportedly arose in four instances. We request that Defendants add these other common QIP issues into Table 19.
3. The draft section regarding mental health assessments does not include a discussion of RVR MHAs. In sustaining Plaintiffs' objection that Defendants' 2021 suicide Report must be amended to include a discussion of inadequate MHAs related to 2021 suicides, the Court specifically recognized that Plaintiffs' objection included the absence of a discussion of RVR MHAs. Order (Dec. 15, 2022), ECF No. 7681 at 8. Defendants must add a discussion of RVR MHAs into the amended Report to satisfy the Court's December 15 Order.
4. One portion of the draft section regarding mental health assessments opens by referring to transfer delays, but the content that follows instead discusses patients that received untimely clinical contacts. For clarity, Defendants should either revise this portion of the draft section to clarify how transfer delays also impacted these patients, or Defendants should revise the beginning of this section to clarify that it is about untimely clinical contacts and not about transfer delays.
5. There are what appear to be a couple of minor typographical errors – missing words – in the section regarding mental health assessments. We have proposed corrections in redline in the attached version of the amended content.

We look forward to discussing these issues, and any others the Special Master team may have, later today.

Mike

**From:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Wednesday, December 28, 2022 3:40 PM
**To:** Elise Thorn <Elise.Thorn@doj.ca.gov>; Kerry F. Walsh <kwalsh@pldolaw.com>; Mehta, Amar@CDCR
<Amar.Mehta@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Travis Williams
<Travis.Williams@cdcr.ca.gov>; Lisa Ells <LElls@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Thomas Nolan
<TNolan@rbgg.com>
**Cc:** Matt Lopes <mlopes@pldolaw.com>; Michael Ryan <mryan@pldolaw.com>
**Subject:** RE: 2021 Annual Suicide Report Order

[EXTERNAL MESSAGE NOTICE]

All,

We haven't heard anything further on a meet and confer.  I have attached CDCR's proposed revisions to the annual report to hopefully streamline any conversation.  The attachment includes revisions to Tables 18 and 19, additional information on emergency response issues, and discussion on mental health assessments and the impact of COVID 19 on 2021 suicides.


Nick Weber
Attorney
Department of Corrections & Rehabilitation
(916) 217-1949
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


**From:** Elise Thorn <Elise.Thorn@doj.ca.gov>
**Sent:** Friday, December 16, 2022 8:54 AM
**To:** Walsh Kerry F. <kwalsh@pldolaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Mehta,
Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Williams, Travis@CDCR
<Travis.Williams@cdcr.ca.gov>; LElls@rbgg.com; Steve Fama <sfama@prisonlaw.com>; Thomas Nolan
<TNolan@rbgg.com>
**Cc:** Lopes Matthew <mlopes@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>
**Subject:** RE: 2021 Annual Suicide Report Order

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.


Kerry,

# ATTACHMENT B

# 2021 Annual Report on Suicides in the CDCR – (Amended)

## Table of Contents

EXECUTIVE SUMMARY ................................................................................................................................... 3

INTRODUCTION .......................................................................................................................................... 5

PROGRESS TOWARD COMPLETING ADEQUATE SUICIDE RISK EVALUATIONS. ........................................... 8

PROGRESS TOWARD COMPLETING 72-HOUR TREATMENT PLANS IN A SUFFICIENT MANNER .................. 9

PROGRESS TOWARD ENSURING THAT ALL REQUIRED STAFF RECEIVE TRAINING RELATED TO SUICIDE PREVENTION AND RESPONSE .................................................................................................................... 11

THE DEPARTMENT'S PROGRESS IN IMPLEMENTING THE RECOMMENDATIONS MADE BY THE SPECIAL MASTER REGARDING INMATE SUICIDES AND ATTEMPTS, TO INCLUDE THE RESULTS OF ANY AUDITS THE DEPARTMENT CONDUCTS, AT THE HEADQUARTERS OR REGIONAL LEVEL, AS PART OF ITS PLANNED AUDIT PROCESS TO MEASURE THE SUCCESS OF CHANGES THE DEPARTMENT IMPLEMENTS AS A RESULT OF THESE RECOMMENDATIONS .......... 13

PROGRESS IN IDENTIFYING AND IMPLEMENTING INITIATIVES DESIGNED TO REDUCE RISK FACTORS ASSOCIATED WITH SUICIDE ........................................................................................................................................ 20

DESCRIPTION OF THE DEPARTMENT'S EFFORTS AND PROGRESS TO EXPAND UPON ITS PROCESS OF NOTIFICATION PURSUANT TO PENAL CODE SECTION 5022, INCLUDING EXPANSION OF THOSE NOTIFICATIONS IN CASES OF SUICIDE ATTEMPTS WHEN DEEMED APPROPRIATE BY THE DEPARTMENT, AND WHEN INMATES HAVE CONSENTED TO ALLOW RELEASE OF THAT INFORMATION ................................................................................. 25

STATISTICAL SUMMARY OF 2021 SUICIDES ............................................................................................. 26

SUICIDE DEFINITIONS AND TERMS USED .................................................................................................. 26

REVIEW OF FINDINGS ............................................................................................................................... 27

SOCIODEMOGRAPHIC FACTORS ............................................................................................................... 27

CUSTODIAL AND CORRECTIONAL FACTORS .............................................................................................. 31

MENTAL HEALTH FACTORS ....................................................................................................................... 39

SUICIDE ATTEMPT HISTORY ...................................................................................................................... 42

DETERMINATION OF UNKNOWN CAUSES OF DEATH ............................................................................... 43

SELF-INJURY INCIDENTS, INCLUDING SUICIDE ATTEMPTS ....................................................................... 45

SUICIDE RESPONSE PROCEDURES ............................................................................................................. 46

DETERMINATION AND TRACKING OF QUALITY IMPROVEMENT PLANS .................................................... 49

COMMONALITIES IN INDIVIDUAL CASE REVIEWS ..................................................................................... 57

AUDITS OF SUICIDE REVIEW QUALITY ...................................................................................................... 58

TIMELINESS OF SUICIDE CASE REVIEWS AND SUICIDE REPORTS .............................................................. 60

SUMMARY ................................................................................................................................................ 61

Appendix A ............................................................................................................................................... 62

Appendix B ............................................................................................................................................... 66

## EXECUTIVE SUMMARY

In 2021, 125,737 individuals spent at least one night confined in the California Department of Corrections and Rehabilitation (CDCR). Out of that population, 15 individuals died by suicide, the lowest number in decades. This was a significant decrease from the previous year of 31 deaths by suicide. The 2021 rate of 15.2 suicides per 100,000 inmates was the lowest rate since 2002.

This report, submitted pursuant to Penal Code Section 2064.1, provides information about suicide prevention initiatives and improvements in suicide prevention efforts made during calendar year 2021. This report describes CDCR's efforts, identifies successes in preventing suicides over the prior calendar year, and includes a section that provides a more in-depth look at notable key trends from the suicide-related deaths that occurred that same year.

Ten of the 15 suicide decedents were patients in the statewide mental health program, and eight of these decedents had a previous suicide attempt in the community or in CDCR. In 2020, Caucasians were the highest percentage of deaths by suicide; however, in 2021, Hispanics had the highest percentage of deaths by suicide with six, followed by Caucasians with five, and African Americans with four. The frequency of suicides by age group for 2021 was evenly distributed between age groups 25-34, 35-44, and 45-54 with four in each of those groups. The age group with the highest number of deaths by suicide was 25-34 in 2020 and 35-44 in 2019. Suicides clustered more frequently at institutions with higher security levels (Level III or Level IV) than institutions with lower security levels (Level I or Level II), consistent with previous years. Additionally, the vast majority of self-harm incidents were non-suicidal, consistent with prior years.

Each suicide in prison is a devastating tragedy that takes a profound toll on family and friends separated from their loved ones by distance and incarceration. Each suicide also significantly impacts staff and other inmates within CDCR. Each and every suicide within CDCR is one too many, and must be carefully examined for lessons and insights on how to prevent similar tragedies in the future. For over thirty years, CDCR has dedicated tens of millions of dollars to developing a robust suicide prevention program employing nationally established best practices and a comprehensive system of quality mental health care for patients that few other state correctional systems can match. CDCR provides *all* CDCR staff members suicide prevention training every year, ensures all potential first responders to suicides in progress are trained in emergency procedures and lifesaving skills, such as cardiopulmonary resuscitation and basic life support. CDCR provides extensive training to the talented and dedicated mental health clinicians in suicide risk assessment and risk management, and has systems in place for identifying individuals at risk of suicide and referring them to proper care. CDCR provides special care for individuals who are placed in higher-risk administrative segregation settings, and regularly offers individuals suicide prevention information through videos, posters and pamphlets, and institutional suicide prevention events.

Since 1995, the *Coleman* Special Master has monitored CDCR's mental health care system and reports his findings and recommendations to the *Coleman* court. The *Coleman* Special Master's team, referred to as the Office of Special Master (OSM), includes dozens of experts, consultants, and attorneys. Of that team, the Special Master has a subset of experts who provide oversight and support to CDCR's suicide prevention program. CDCR has implemented numerous recommendations from five separate audit reports by the OSM's suicide prevention expert. CDCR has a comprehensive system of suicide risk evaluations, treatment plans, and suicide prevention programs in place. Many of the policies and procedures aimed at suicide prevention and response are compiled in the court-ordered Mental Health Services Delivery System (MHSDS) Program Guide.

The COVID-19 pandemic affected all aspects of medical and mental health care in CDCR. Despite changes necessitated by the COVID-19 emergency, which continued throughout the 2021 calendar year, CDCR's mental health program was able to continue providing services to patients in need of mental health treatment, including by expanding tele-psychiatry. CDCR worked closely with the *Coleman* parties and the federal Receiver, who oversees the medical operations of CDCR, and is appointed under *Plata v. Newsom*, to develop and implement appropriate policies and procedures related to providing treatment. Within these guidelines, modifications to treatment were made, which prioritized the assessment and treatment of suicidal patients in times of significant staffing shortages and quarantining of patients due to the COVID-19 pandemic.

Progress in implementing each of the Penal Code requirements is discussed at length in this report. The following is a summary of the findings:

*Suicide Risk Evaluations*: In 2021, Department clinicians conducted more than 4,750 suicide risk evaluations per month on average, totaling over 57,000 suicide risk evaluations over the course of the year. The monthly average includes 4,000 evaluations completed in compliance with the Program Guide requirements plus over 750 evaluations completed by clinicians based on clinical judgment and patient's clinical need. Eighty-four percent of suicide risk evaluations during the year were required by policy (e.g., admissions and discharges from inpatient psychiatric settings, required follow-up evaluations, and others), and the remainder were completed based on clinicians' judgment of clinical need.

Each risk evaluation is a complex clinical task that requires clinicians to make important clinical decisions. According to CDCR's policy, risk evaluations occur whenever an individual expresses suicidal ideation, makes a statement regarding self-harm, or makes a suicide attempt; at a number of key evaluation points; and during known higher risk times for the patient. To improve the quality of the risk evaluations, CDCR is revising the Suicide Risk Evaluation Mentoring policy and training and has implemented regional oversight to assist in auditing suicide risk evaluations and to provide direct feedback to clinical teams at the institutions.

*Treatment Plans*: In 2021, clinicians completed initial treatment plans for patients within 72 hours of admission to a Mental Health Crisis Bed (MHCB) unit in 96% of the cases. CDCR continues to improve the quality of these plans by ensuring clinical factors associated with individual suicidal risk are incorporated into the patients' treatment, and when indicated, that there are treatment goals specifically targeted towards reducing the patient's suicidal risk. CDCR continues its efforts to ensure that the treatment plans meet quality standards set by the Statewide Mental Health Program (SMHP) through improved training and the use of quality improvement tools and audits. Compliance with the Chart Audit Tool (CAT) pass rate fluctuated between 66% and 73%, which is an improvement from the prior year's range of 50% and 74%.

*Training*: CDCR conducts a broad range of suicide prevention and response trainings. By the end of 2021, 90% of employees had completed their annual training. This average reflects high rates of compliance among custody, health care, and mental health staff.

*Court Recommendations Agreed to and Adopted by the Department*: The OSM's initial suicide audit from 2015 included 32 recommendations, three of which have been withdrawn, and 29 of which have been addressed and implemented or which are the subject of current policy development and physical plant improvements. The OSM's suicide prevention expert has conducted five subsequent re-audits. Each re-audit has raised new issues or concerns that CDCR continues to address, and those are described more fully in this report. As of December 3, 2020, the *Coleman* court found CDCR to be in

compliance with 11 of the initial 29 recommendations and partial compliance with one recommendation. CDCR is currently working with the OSM and the parties to implement the remaining 18 recommendations.

***Next-of-Kin (NOK) Notification***: During 2020, CDCR and the California Correctional Health Care Services (CCHCS) designed a NOK notification system for inmates who engage in suicide attempts, and the system was implemented in April 2021. The Health Care Department Operating Manual (HCDOM) is in the final process of being updated to reflect the changes to the NOK notification workflow.

***Departmental Initiatives***: In addition to initiatives developed to address Coleman recommendations, CDCR has undertaken numerous suicide prevention projects. On project identifies specific points in time when incarcerated individuals are at increased risk, including: arrival at a reception center, the 90 days after discharge from inpatient psychiatric settings, and when facing new charges or civil commitment. CDCR continues to examine serious suicide attempts for ways to improve prevention.

Many of CDCR's suicide prevention projects continued to see progress in 2021. CDCR continued its construction activities for MHCB unit improvements and the addition of more suicide-resistant intake cells in Administrative Segregation Units (ASU); the development and implementation of policies essential to improve CDCR's suicide prevention mission, including the Suicide Risk Management Program (SRMP), the suicide prevention policies for the Psychiatric Inpatient Programs (PIPs), the NOK notification plan, and the implementation of the Transitional Help Rehabilitation in a Violence-Free Environment (THRIVE) program in CDCR's two large reception center institutions. Development of initiatives that began in prior years, such as the revision of the safety planning intervention, and the update for local suicide prevention programs, continued during the year. Unlike in previous years, there were no significant recommendations for changes or updates to policies or procedures flowing from the suicide case review process during 2021.

CDCR continues to focus on improving and expanding its suicide prevention practices, including by assessing the effectiveness of its initiatives and monitoring their quality and sustainability. The lessons learned from the suicides that occurred in 2021 are invaluable, and the analyses of these deaths is an essential part of a robust suicide prevention system.

Previous reports in this series proved helpful to CDCR and the State of California in identifying areas of improvement and areas that require more innovative thinking to address the unique needs of those who are most vulnerable.

## INTRODUCTION

In the United States (U.S.), 1.4 million suicide attempts were reported in 2019.[1] The number of adult suicides in the U.S. increased by more than 50% between 2000 and 2019, from fewer than 30,000 per year to over 45,000 per year, while the overall U.S. population grew by only 22%. Prior to 2020, the rate of suicides in the U.S. was the highest rate in the country since the 1930s, during the Great Depression.[2] However, in 2020, there was a slight decrease in all adult suicides in the U.S.

Figure 1. U.S. Adult Suicide Rates by Sex, 2001-2020*

---

[1] National Institutes of Mental Health: https://nimh.nih.gov/health/statistics/suicide, accessed on 04/04/2022

[2] Drapeau, C. W., & McIntosh, J. L. (for the American Association of Suicidology). (2020). *U.S.A. suicide: 2018 Official final data.* Washington, DC: American Association of Suicidology, dated February 12, 2020, downloaded from http://www.suicidology.org.



Data accessed April 4, 2022 from CDC Web-based Injury Statistics Query and Reporting System (WISQARS), https://www.cdc.gov/injury/wisqars/fatal.html

Suicide prevention is a societal and complex public health problem that has frustrated the efforts of federal, state, and local agencies alike. In the U.S., suicide has long been more prevalent in jails than in prisons, and there have been significant increases in the number of suicides in jails in recent years. Among those detained in U.S. jails, the rate of suicide increased from 39 per 100,000 in 2005 to 42 per 100,000 in 2010. It reached 52 per 100,000 in 2015 before dropping in 2018 to 46 per 100,000, but climbed to 49 per 100,000 in 2019.[3]  The rate of suicide for those incarcerated in all state prisons nationwide ranged from 14 per 100,000 to 27 per 100,000 from 2001 to 2019.[4] The rates of suicide among adult males in the U.S. and those in jails and prisons are shown in Figure 2.

Figure 2. Comparison of Suicide Rates



* Most recent data from Bureau of Justice Statistics, CDCR, and WISQARS.

In prison systems, suicide deaths have multiple contributing factors that can include longstanding medical and mental health issues, court and sentencing issues, issues involving family, lack of purposeful activity, conditions of the specific prison environment, and the stress of adjusting to incarceration.[5] In

---

[3] *Mortality in Local Jails, 2000-2019 – Statistical Tables* (NCJ 256002, Bureau of Justice Statistics, October 2021)

[4] *Mortality in State and Federal Prisons, 2000-2019 – Statistical Tables* (NCJ 255970, Bureau of Justice Statistics, October 2021)

[5] https://www.psychiatryadvisor.com/home/topics/suicide-and-self-harm/preventing-suicide-in-prison-inmates/

6 The CDCR suicide rate uses the mid-year June 30 CDCR population.

1990, CDCR began tracking the annual suicide frequency and rate. The annual rate of suicide for each year is shown below in Figure 3. The highest rate of suicide occurred in 2019 with a rate of 30.3 per 100,000 and 38 suicides in total. In 2021, CDCR's rate of suicide declined to 15.2 per 100,000 with 15 suicides total.[6]

Figure 3. Rate of Suicide in CDCR, 1990-2021



Over the last thirty years, CDCR has expended significant resources to develop and fully implement policies to improve CDCR's suicide prevention program. Federal court oversight of those efforts continues with the Coleman Special Master's expert conducting six comprehensive audits of the suicide prevention efforts at individual prisons and reporting his findings to the federal court following each audit. The most recent audit was conducted from 2021 into 2022. At the time of the writing of this report, the findings from the fifth re-audit had not been finalized and reported to the Coleman court. CDCR has a comprehensive suicide prevention system in place for suicide risk screening, risk evaluation, and treatment planning, and remains committed to continuing to work and improve this system.  CDCR has made significant improvements in the development of its Statewide MHSDS. With respect to suicide prevention and response, these improvements include new and enhanced suicide prevention training for all staff, specialized emergency procedures training for all potential first responders to suicide attempts in progress, and training for mental health clinicians on suicide risk assessment, safety planning and treatment planning. Taking a public health approach to suicide prevention, the program targets both those inmates who receive mental health treatment and those who do not. Additionally, CDCR provides patients with a range of mental health services and has created a referral procedure for mental health evaluations, including procedures for protecting individuals during particularly vulnerable periods. CDCR has implemented suicide screening procedures and provides the prison population with suicide prevention information through videos, posters/pamphlets, and institutional suicide prevention events.

In 2021, 15 inmates died by suicide in CDCR. This was a decrease from 2020, when there were 31 deaths by suicide. During the nineteen years spanning 2002 through 2020, CDCR averaged 31 suicides per year. The rate of suicide in CDCR during 2021 was 15.2 suicide deaths per 100,000 incarcerated individuals.

The U.S. Bureau of Justice Statistics estimates the suicide rate among state prison inmates nationally was 27 per 100,000 in 2019, the most recent data available.[6]

*Summary of 2021 Suicides:* Suicides occurred in 11 CDCR institutions in 2021. Nine (60%) suicides occurred among incarcerated persons with violent offense histories. Seven (47%) individuals were in segregated housing units,[7] and eight (53%) suicides occurred in high-custody programs (Level III and Level IV). Twelve (80%) incarcerated individuals who died by suicide were sentenced to eleven years or more. Ten (67%) of the suicides occurred among those participating in mental health treatment, including three (20%) suicides among Enhanced Outpatient Program (EOP) participants, five (33%) in the Correctional Clinical Case Management System (CCCMS) population, and two (13%) individuals receiving inpatient psychiatric care. Three (20%) individuals had been psychiatrically hospitalized during the year prior to their deaths. Eight (53%) individuals had at least one prior suicide attempt. One of those had only one attempt (13%) while the majority of the eight individuals (88%) had more suicide attempts during their lives.

*Annual Progress:* The following sections describe, in detail, the ongoing work to enhance suicide prevention practices within CDCR institutions. CDCR has worked to improve the completion of suicide risk evaluations, 72-hour treatment plans, proper training specific to suicide prevention and response, implementing the recommendations made by the Special Master's expert regarding inmate suicides and attempts, and identifying and implementing initiatives to help reduce risk factors associated with suicide.

## PROGRESS TOWARD COMPLETING ADEQUATE SUICIDE RISK EVALUATIONS.

It is CDCR's goal to ensure that adequate and appropriate suicide risk evaluations are completed accurately and timely. The Suicide Risk Assessment and Self-Harm Evaluation (SRASHE), a set of electronic forms in the Electronic Healthcare Record System (EHRS), is the primary way that suicide risk evaluations are documented. The SRASHE is composed of 1) a standardized set of questions about suicide-related ideation and behavior – the Columbia-Suicide Severity Rating Scale;[8] 2) a review of the individual's history of self-injury; 3) a checklist of risk and protective factors and warning signs; 4) a risk formulation and its justification; and 5) a safety plan,[9] when clinically indicated. Under CDCR's policies, a suicide risk evaluation is conducted whenever any individual expresses suicidal ideation, makes suicidal threats, or makes a suicide attempt at a number of key evaluation points and during known high risk times.

*Risk Evaluation Audits Using the Chart Audit Tool:* The SMHP uses a standardized audit method — the Chart Audit Tool (CAT) — for evaluating the quality of key mental health documents (Appendix A). Audits are conducted on a quarterly basis, with results available to the mental health leadership at institutions, regional mental health administrators, and headquarters. A sample of risk evaluation forms are audited quarterly for quality. In addition, each mental health clinician's risk evaluation form is audited twice per year for completion and quality, using criteria first proffered by the California State Auditor in its 2017 report.[10] The pass rate is 85%.  In 2021, institutional compliance rates show that the pass rate fluctuated between 66% and 73%, which is an improvement over last year's range of 50% and 74%. Common reasons for a risk evaluation form to fail an audit include poor justification of suicide risk,

---

[6] Carson, E A. (2020). Mortality in State and Federal Prisons, 2001-2018 – Statistical Tables, Report NCJ 256002. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC.

[7] These include Administrative Segregation, Security Housing Units, Short-Term Restricted Housing, Long-Term Restricted Housing, Psychiatric Services Unites, and Condemned Housing.

[8] See: https://cssrs.columbia.edu/

[9] A suicide "safety plan" is a series of individualized and concrete statements that are developed in collaboration with a patient to lower the risk of suicide attempt in the near-term.

[10] See: https://www.auditor.ca.gov/pdfs/reports/2016-131.pdf page 23

under-estimation of suicide risk, and non-individualized treatment planning. While 2021 showed improvement, statewide figures still fall below the pass rate. CDCR will continue to focus on improving the quality of suicide risk evaluations.

*Suicide Risk Assessment Training*: By the end of 2019, 94% of all mental health clinical staff had received comprehensive training to address the key factors in completing suicide risk assessments. In 2020, despite suspension of live training for some time due to the COVID-19 pandemic, the rate of compliance system-wide remained over 95%. In 2021, the rate of compliance was 94%. In 2021, CDCR began considering possible revisions to the suicide risk evaluation. A workgroup was created and comprised of CDCR Headquarters staff, institution leadership, and experts from the OSM to review alternatives to the form. The workgroup's purpose is to refine the risk evaluation's utility and to enhance its efficacy for patients who are in crisis. CDCR is currently revising suicide risk evaluation training to incorporate new research and focus on the skills staff need to understand the unique factors associated with suicide risk in a correctional setting.

## PROGRESS TOWARD COMPLETING 72-HOUR TREATMENT PLANS IN A SUFFICIENT MANNER

CDCR recognizes that patients in acute crisis require timely treatment to address their mental health symptoms. The treatment plan is an individualized plan that identifies patient-specific treatment and individualized treatment goals to address the patient's clinical needs. To ensure the inpatient treatment is appropriately targeting the patient's risk factors and symptoms the treatment team will develop an initial treatment plan that maps out the interventions that will be employed to reduce the most distressing symptoms. It is CDCR's goal to ensure that a full treatment plan in MHCB units is completed for all patients within 72 hours of admission.[11] Treatment plans establish the goals and interventions patients receive at all levels of need for mental health services. Patients in crisis are transferred to a MHCB unit, where an evaluation and initial treatment plan is developed within 24 hours of admission.[13] The 72-hour treatment plan is discussed in the patient's Interdisciplinary Treatment Team (IDTT) meeting in the MHCB unit, which the patient attends. Treatment teams are composed of, at a minimum, the patient's assigned psychiatrist and primary clinician (typically a psychologist), a member of the MHCB unit nursing staff, and a correctional counselor. The team members are responsible for ensuring that the treatment plan created is within timelines and meets the quality standards set by CDCR.

In 2017, the State Auditor's Report cited the completion and quality of the 72-hour treatment plans in MHCB units as a chief concern. The State Auditor noted several incidents where sections of the 72-hour treatment plans were left blank and reported several other deficiencies. Those deficiencies included: inadequate treatment methods, including a lack of information on the frequency of interventions and who was responsible for the intervention; poor post-discharge follow-up plans; poor treatment goals or goals without measurable outcomes; and missing documentation of medication dosage and frequency.

To remedy the deficiencies, CDCR undertook the following efforts:

- Training to Improve the Quality of 72-hour Treatment Plans: CDCR expends considerable resources on training for staff to apply appropriate treatment team

---

[11] MHSDS Program Guide page 12-5-12 17
MHSDS Program Guide page 12-5-11

processes and quality treatment planning. Quarterly audits are conducted both in person by Regional Mental Health teams and in quarterly chart documentation audits. Training [12] designed to improve the quality of 72-hour treatment planning was developed and delivered during 2019 and 2020 in all institutions that have MHCB units. The training emphasizes the importance of the treatment plan to MHCB supervisors and clinicians. The training focuses on the role of the 72-hour treatment planning conference in suicide prevention and crisis resolution and reinforces good treatment team practice and high-quality documentation. The training complements existing treatment team process training.

- <u>Audits of Treatment Plans</u>: MHCB treatment plan audits are required for both 72-hour treatment plans and discharge treatment plans. Results of chart audits are monitored by regional and institutional mental health supervisors and managers. Audits review and assess whether a summary of mental health symptoms and treatment is present; whether the diagnosis and clinical summary are consistent with the problems found; whether medications are listed that target symptoms; if the goals and interventions include individualized, measurable objectives; if progress was discussed among team members and with the patient; if there is a meaningful discussion of a discharge plan or future treatment needs; if the rationale for the level of care is sound; and whether the plan is updated to reflect current functioning. Audits are conducted by clinical supervisors or senior psychologists who oversee the programs. Auditors use findings to provide feedback to staff and to develop plans to improve documentation. Audit items can be revised periodically based on departmental priorities or due to changes to treatment planning forms. Revisions to the MHCB treatment team audit are currently in process and under review by the *Coleman* Special Master and plaintiffs' counsel.

  o The audit results related to quality of MHCB treatment planning documentation fluctuated during 2021, ranging from 67% to 73% of MHCB treatment plans complying with all audit criteria.[13] In 2021, there were 3,081 audits conducted in the first half of the year with a 67% pass rate and 3,034 audits in the second half of the year with a 73% pass rate.

  o CDCR has set a pass rate of 85% for audited treatment planning documents. Institutions with pass rates under 85% are required to develop and implement corrective action plans to remedy the quality of their documentation for all audits that are included in the statewide performance improvement priorities. Currently, quality of suicide risk evaluations is included as one of the priorities, and corrective action plans are sent to Regional Mental Health leadership each month. Institutions may also set Performance Improvement Work Plans to prioritize treatment plan quality through the site's Quality Management Committee. In 2021, several initiatives were implemented to improve the CAT audit process. Specifically, webinars for the field have been streamlined to focus on how to conduct a CAT audit and how to achieve inter-rater reliability. Methodology and traceability are both being further defined

---

[12] Other IDTT Trainings currently exist, such as "IDTT: An overview of the clinical thinking and process," a seven-hour training for treatment planning for all levels of care.
[13] Due to the COVID-19 emergency, CAT audits were halted in Q2 2020

through a larger data remediation effort, in collaboration with the *Coleman* Special Master.

•   <u>Timeliness of MHCB Treatment Plans</u>: The timeliness of MHCB treatment plans is tracked by CDCR's Performance Report, a tool used for quality management purposes. Timeliness is defined by policy as whether a treatment planning session occurred within 72 hours of admission for initial treatment plans, and then within seven days following the initial treatment planning session for routine treatment plans. In 2021, the overall timeliness of treatment plans completed by MHCB treatment teams was 95%. Over 18,000 MHCB treatment team sessions were conducted, with 7,089 Initial or 72-hour, and 11,223 Routine treatment plans completed. Timeliness of routine treatment plans in MCHBs, including discharge treatment plans ranged from 97% to 98% in each half of 2021. The compliance for initial treatment plans ranged from 93% to 94% in each half of 2021. [14] This was a slight increase from 2020 where the timeliness of routine treatment plans in MCHBs, including discharge treatment plans ranged from 89% to 95% in each quarter of 2020 and the compliance for initial treatment plans ranged from 91% to 93% in each quarter of 2020.

## PROGRESS TOWARD ENSURING THAT ALL REQUIRED STAFF RECEIVE TRAINING RELATED TO SUICIDE PREVENTION AND RESPONSE

CDCR has a number of suicide prevention and response trainings, some of which are required for all staff members and others that are customized for specific disciplines. Some suicide prevention training is meant to be provided over a brief period, such as training on a new procedure or an updated form. Other suicide prevention training is meant to be ongoing, used both as a way for new employees to learn suicide prevention and response practices and to update staff members about their responsibilities in these areas.

CDCR has efforts underway to improve how staff training is tracked. These efforts range from granular, institution-specific generation of compliance data and tracking, with supervisors expected to ensure staff's compliance in completing training, to broad efforts to adopt sophisticated training compliance tools using the intra-departmental Learning Management System (LMS). The LMS is a computer-based teaching and tracking tool that provides online training with options for offering recorded video and for requiring embedded knowledge checks. Each staff member is notified via email of the need to complete required trainings. The email includes a link to the LMS site. The LMS automatically records information about training completion status, which is accessible to the SMHP and CDCR's Division of Adult Institutions for compliance tracking.

Revisions to existing In-Service Training (IST) curricula were completed and adopted by CDCR's Office of Training and Professional Development (OTPD) in late 2019. Subsequently, live training for new IST facilitators was conducted in all regions in May and July 2021. The mental health and suicide prevention training for the correctional officer academy courses was revised during 2020 and was first delivered to cadets in June 2021.

CDCR has a system in place several steps are available to identify and remedy the lack of compliance. When individual employees are non-compliant with required training, Non-compliance is identified by IST offices at institutions via the use of compliance tracking logs. Lists of non-compliant staff

---

[14] Performance Report "Timely IDTTs" data extracted on 4/16/2022

are sent to the supervisors of each discipline. For CCHCS employees, compliance is tracked with the LMS. The CCHCS Staff Development Unit reports this data directly to the SMHP, which then sends the information to the institutional Chief Executive Officers (CEOs). This information is also given to the regional Suicide Prevention and Response Focused Improvement Team (SPRFIT) coordinators who can follow up with the local institutions.

In addition to the annual training delivered to all disciplines and new employees, custodial officers and nursing staff receive additional suicide prevention and response trainings. Compliance with required cardiopulmonary resuscitation and Basic Life Support classes is also tracked for potential first responders (custody and nursing), psychiatrists, and psychiatric nurse practitioners.[15]

In 2015, the SMHP created a specialized training unit for the purposes of tracking training compliance, developing new clinical training when needed, and revising existing training as needed. The training unit keeps record of institutional compliance with mandatory suicide risk assessment and evaluation training and all suicide prevention and response training. For non-in-service training, such as classes specific to mental health suicide risk evaluation training, compliance lists are maintained at the institution and information is entered into a local tracking log. Copies of tracking logs are sent to and maintained by the training unit, which reviews institutional compliance and alerts regional and institutional staff to follow up on compliance. For training held within the LMS system, compliance data is automatically tabulated and both individual staff members and their managers are alerted to any non-compliance issues. Compliance with mandatory training is also an issue reviewed at an employee's probationary and/or annual evaluations.

CDCR provides broad training in suicide prevention and response to all employees upon their initial hiring and annually thereafter. Suicide prevention training is provided through the IST departments at all institutions. In its 2017 report, the State Auditor identified variable attendance[16] at this training between disciplines, with custodial attendance percentages often above those of mental health and other health care personnel. Improved compliance with this training is noted within all staff disciplines. In 2021, 43,963 staff members were required to take this training: of these, 20,804 custody staff and 12,319 health care staff completed the training, with an overall compliance rate of 85% for custody and 90% compliance rate for health care staff.[17]  Specific to mental health, 1,828 of the 1,928 active mental health staff completed the training, a 95% compliance rate.

In an effort to ensure that medical and mental health program staff comply with annual training requirements, Headquarters and Regional Mental Health staff track compliance and send updates and reminders to CEOs, Wardens, Chief Nursing Executives, and Chiefs of Mental Health. These institutional leaders are responsible for ensuring that their staff are attending required training. Compliance data about suicide prevention-specific trainings is reviewed by the statewide SPRFIT Committee and non-compliance results in the regional Suicide Prevention Coordinator working with the institution to establish corrective action. While data is not yet available to analyze the impact that the regional Suicide Prevention Coordinators' CAPs for institutions have had on compliance for 2022 annual suicide prevention training, CDCR is hopeful this approach will prove successful.

Mental health clinicians receive a significant number of additional tailored suicide risk evaluation and risk management classes as a requirement of employment. For mental health staff, the training

---

[15] Memorandum dated 12/3/18, *Psychiatry and Psychiatric Nurse Practitioners Basic Life Support Certification,* tracking occurs through the Credentialing and Privileging Support Unit.

[16] www.auditor ca.gov'/pdfs/reports/2016-131 pdf pages 43-45; 55-57.

[17] Data on custodial staff is from Division of Adult Institutions and Clinical Support. Data for CCHCS and SMHP staff are from Clinical Support. Health care staff include mental health, medical, nursing, ancillary, and administrative staff and does not include staff on long-term leave.

related to suicide prevention is mandatory and tracked for compliance. Several additional training courses are available to CDCR clinicians as optional trainings. These courses provide mental health clinicians with opportunities to enhance skills when evaluating or working with suicidal patients. Several of these courses have Continuing Education Units (CEUs) available as well.

In 2019, CDCR introduced a comprehensive Safety Planning Initiative training to address ongoing concerns related to deficient safety planning found in both internal and external audits of suicide risk assessments. Additionally, CDCR updated and delivered the seven-hour Suicide Risk Evaluation course in 2019. Institutions are required to train newly hired mental health clinicians within 90 days on the topic of suicide prevention and institutional mental health leadership is responsible for tracking completion of required training within this period.

## THE DEPARTMENT'S PROGRESS IN IMPLEMENTING THE RECOMMENDATIONS MADE BY THE SPECIAL MASTER REGARDING INMATE SUICIDES AND ATTEMPTS, TO INCLUDE THE RESULTS OF ANY AUDITS THE DEPARTMENT CONDUCTS, AT THE HEADQUARTERS OR REGIONAL LEVEL, AS PART OF ITS PLANNED AUDIT PROCESS TO MEASURE THE SUCCESS OF CHANGES THE DEPARTMENT IMPLEMENTS AS A RESULT OF THESE RECOMMENDATIONS

On July 12, 2013, the *Coleman* court ordered CDCR, the *Coleman* Plaintiffs, and the Special Master to convene a Suicide Prevention Management Workgroup. In 2015, the Special Master's expert, Lindsay Hayes, made 32 recommendations related to suicide prevention practices, which were ordered to be implemented by the court that same year. [18] Since 2015, CDCR has worked to implement the recommendations made by the workgroup and continues to meet with the OSM's experts to discuss progress on those recommendations. In 2018, three of those recommendations were withdrawn.[19]

The OSM's expert has completed five audits since the first in 2013 and has issued five reports on these audits. Mr. Hayes' fourth re-audit covered 20 prisons visited between November 2018 and December 2019 and the report was filed in September 2020. Mr. Hayes' fifth re-audit started in May 2021 and continued through April 2022. CDCR is awaiting the final report associated with this audit.

As noted in the State Auditor's report (page 51), CDCR has "addressed the majority of the suicide expert's January 2015 report." CDCR continues to work with the OSM's suicide prevention expert to improve compliance with outstanding recommendations. CDCR has made significant strides in implementing sustainable responses to the expert's recommendations and that work is ongoing.

For issues developed as part of the Hayes audits, Corrective Action Plans (CAPs) were written and then monitored. The report of the Fourth Re-Audit along with recommendations by the Special Master's expert was filed on September 23, 2020. [20] One significant finding of the Special Master's Report on his expert's Fourth Re-Audit is that CDCR has fully or partially implemented 12 of the 29 remaining

---

recommendations. The status of CAPs related to Mr. Hayes' findings are categorized and described below.[21]

- Initial Health Screening and Receiving and Release (R&R) Environment: CAPs related to the clarity of questions on the intake screening form were completed by the end of 2018. The most recent audit found continued problems with issues related to confidentiality and privacy in the screening environment. Mr. Hayes found that 15 of 20 institutions audited had adequate screening practices in their R&R areas, similar to his previous findings.

    o   Five institutions have open CAP items related to confidentiality and physical plant issues in R&R areas. California Correctional Institution (CCI) has identified an interim solution to its physical plant issues and the Region III suicide prevention coordinator is monitoring their progress toward a permanent solution. PVSP has completed its physical plant modifications and all R&R screenings are occurring in a confidential setting.

    The changes at CMF, CMC, and San Quentin (SQ) have been completed through training and local observation, however, confirmation of compliance has not been completed through observation by the regional suicide prevention coordinator. Improvement at these institutions has been demonstrated through consistent findings during onsite observations, which began in June 2021, and continue on a regular basis.

- Psychiatric Technician Practices: In 2017, Mr. Hayes' report of his Second Re-Audit found that Psychiatric Technicians (PT) at three institutions did not meet standards for administrative segregation rounds. CAPs were developed and in his 2018 Third Re-Audit report he found that all 35 institutions had adequate PT rounding practices. A process of ongoing fidelity checks of rounding was in place at each site under the supervision of the Chief Nursing Executives. The expert's 2020 Fourth Re-Audit report recommended that CAPs be developed for five institutions to address deficiencies in PT practices.

    Work is ongoing on improving PT practices in the five institutions. During 2013, an audit system was implemented requiring Nursing supervisors to complete quarterly audits of PT rounds to ensure that rounds were completed consistent with policy. These audits have been reported to the institutional suicide prevention coordinators. Starting in 2021, the Regional Chief Nursing Executives have been reporting the results of fidelity checks to the statewide SPRFIT committee.

- Retrofitted Cells in MHCB Units: In 2018, Mr. Hayes reported that three institutions did not meet all specifications for retrofitted cells in the MHCB units. Retrofitting was completed at all three institutions by January 31, 2019. The Fourth Re-Audit report notes that 17 of 18 audited institutions were compliant with this requirement. As of the spring of 2021, the renovations of the MHCB at CCWF has not been completed, although it is scheduled for construction. Pending completion of the retrofitted cells, individuals on suicide watch are on one-to-one observation.

- Use of Suicide Resistant Cells for Those Newly Admitted to Administrative Segregation: Individuals placed in administrative segregation are to be housed in single-occupancy

---

[21] Order of items corresponds to Mr. Hayes' most recent re-audit.

suicide resistant intake cells for the first 72 hours of their placement. They may occasionally need to be placed in non-intake cells, which is permissible, if housed with another individual.

Mr. Hayes' Fourth Re-Audit report noted problems with seven institutions related to either retaining inmates in intake cells for longer than 72 hours or placing some new arrivals in administrative segregation in non-intake cells. Mr. Hayes recommends CAPs be developed for the seven institutions to create "additional retrofitted cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available."

The 2020 Budget Act included funds to convert 64 existing ASU cells in 14 institutions to ASU intake cells. Design efforts for these conversions were underway in late 2020. Design and construction continued through the entirety of 2021. As of March 30, 2022, all new intake cell conversions have been completed.

Secondarily, the Division of Adult Institutions (DAI) created an automated report in its Strategic Offender Management System (SOMS) to track the usage of the intake cells at each institution. When utilized, this report allows DAI to recognize when institutions are using the intake cells appropriately, transferring inmates out of intake cells timely, and when they are in need of additional intake cells. A formal announcement of activation of this report was released to all institutions in April, 2022.

- <u>MHCB Practices for Observation Status, Clothing, and Privileges</u>: Three issues related to MHCB practices were identified: Problems with nursing documentation of observation of suicidal patients, errors in allowable property for patients, and the provision of out-of-cell activities and other privileges (e.g., access to a telephone).

The Fourth Re-Audit found improvements in a number of institutions. Regional teams continue to audit the suicide observation practices in MHCBs across the state and the court's expert recommends that each of the dozen "chronically deficient" institutions complete a review of observation orders and engage the local nursing leadership in this effort.

CCHCS Nursing Services has begun an aggressive audit program to improve the documentation of suicide precaution rounding in the MHCB units. Audits directed from Headquarters occur monthly. In addition, as of May 2021 and as part of the "reboot" of institutional SPRFIT committees, four institutions have been designated to test a new electronic system to automate suicide precaution rounding.

In collaboration with CCHCS Quality Management, Nursing Services developed an automated reporting tool that allows institutional leadership and regional/headquarters staff to look at real-time compliance with suicide precaution rounding orders. This report provides patient-level data to look at how many of the rounds were missed and the length of time between each rounding. Information in this reporting tool is used to develop focused improvement projects at the institutional level to improve compliance.

As of June 2021, physical plant renovations at COR, CCWF, and WSP to allow out-of-cell time for MHCB patients are either completed (WSP), in the design phase (CCWF), or are

being monitored by the regional suicide prevention coordinator. CDCR's Facility Planning, Construction and Management (FPCM) is finalizing a proposal for renovations at a fourth institution (COR).

In addition, several institutions (SOL, LAC, and SATF) have made changes to local procedures to ensure that observation schedules, out-of-cell privileges, and proper patient issue are in compliance with statewide policy. Regional suicide prevention coordinators actively monitor these institutions.

- <u>30-Minute Welfare Checks in Segregated Housing</u>: Mr. Hayes recommended CAPs for any institution with a compliance rate of less than 90% for 30-minute checks within segregated housing facilities. All institutions were found to meet or surpass this compliance rate in 2019. In his Fourth Re-Audit, Mr. Hayes found greater than 90% compliance and made no recommendations. CDCR continues to audit this indicator in all institutions. In 2021, CDCR's overall average compliance with the 30-minute checks was 96%.

- <u>Mental Health Referrals and Suicide Risk Evaluations</u>: In the previous audit of institutions (2018), Mr. Hayes found a compliance rate of 74% for the 23 institutions audited. In his 2020 report, he notes that seven of 20 institutions remain below 90% compliance with completion of suicide risk evaluations when required, such as for emergency mental health referrals or upon discharge from Alternative Housing. There is also a sub-component of ensuring that referrals with suicidality are appropriately classified as emergent.

  Changes were made to the EHRS to ensure that when orders for Urgent Mental Health Consults are placed by a clinician, the clinician may not include self-injurious behavior or suicidal ideation as a reason for the consult. This change in the EHRS was completed in the winter of 2021 and was available to users in February 2021. In addition, weekly audits of Emergent and Urgent consults are being completed by the regional suicide prevention coordinators and then reported to the statewide SPRFIT committee.

- <u>Suicide Risk Evaluation Trainings</u>: In 2021, compliance with required suicide risk evaluation trainings was 94% statewide.

- <u>Safety Planning for Suicidal Individuals</u>: In both 2017 and 2018, Mr. Hayes noted difficulties with the quality of safety plans written within suicide risk evaluations. During discussions, CDCR and Mr. Hayes agreed to supervisory[22] monitoring of all safety plans written in suicide risk evaluations at the time of discharge from MHCB. The supervisory reviews are designed to ensure that MHCB discharge safety plans were of good quality, reflected consultation with receiving treatment teams when indicated, and helped to ensure risk management efforts were described effectively.

  In his most recent audit of 20 institutions, Mr. Hayes found deficiencies in the safety planning process at a majority of the institutions visited. In collaboration with Mr. Hayes and other members of the OSM, CDCR began a process in the fall of 2020 to re-design the safety plan intervention. Currently, CDCR is reviewing policy language and building the

---

[22] While MHCB program supervisors are the most likely reviewers of discharge safety plans, at times a qualified designee, such as a SPRFIT coordinator or covering Sr. Psychologist, Supervisor or Specialist may act as a reviewer.

necessary forms in the EHRS. CDCR also tested the new format at several institutions to test its utility and determine if outcomes improved. It is anticipated that the plan will be finalized, approved, and implemented in late December 2022.

• <u>MHCB and Alternative Housing Discharge - Efficacy of Custody Welfare Checks and Five-Day Follow-Up</u>: When patients are discharged from Alternative Housing, inpatient beds in CDCR's PIPs and DSH, or an MHCB, custody officers in housing units must make welfare checks every 30 minutes for at least 24 hours. After the first 24 hours, a mental health clinician must evaluate the patient and notify the housing officers about the patient's adjustment to the unit. This process can re-occur at 24-hour intervals for up to 72-hours. Additionally, when a patient is discharged from either Alternative Housing or an MHCB, mental health clinicians must re-evaluate the patient daily, recording their assessment on a Five-Day Follow-Up form. The form requires clinicians to ask about suicidal thoughts, signs of distress, while instructing the clinician to review MHCB discharge documents, and to review and/or revise the patient's safety plan.

In early 2020, discussions began about modifications to the Inpatient and Alternative Housing Custody Check Sheet, CDCR 7497 form and the necessary training. By late 2020, the form had been finalized and was approved pending labor notifications and approval. The new form was released to the field in the spring of 2021. A standardized audit tool and guide was also released to the field in summer 2021, which requires institutional mental health and custody staff to review the CDCR 7497 forms for compliance on barriers to full compliance with policy. Any deficiencies found in this auditing process will be reviewed and approved by the regional Suicide Prevention Coordinators. The process of auditing is ongoing.

In his most recent audit, Mr. Hayes found that most audited institutions complete at least one of two pages in the CDCR 7497 form correctly more than 80% of the time, but overall, only one of 20 audited institutions completed the full two-page report satisfactorily. He recommended that CAPs be developed for the non-compliant institutions. In 2021, 1,115 patients had discharge custody checks completed after being discharged from an inpatient setting. Of those individuals, 21% were re-referred to an inpatient setting within the first 72 hours of discharge. CDCR continues to strive for improvement in this area.

• <u>Local Suicide Prevention Programs</u>: In February 2018 and in response to a court order, the SMHP issued a memorandum outlining enhancements for local SPRFITs. Mr. Hayes' Fourth Re-Audit report recommended prioritizing the completion of local operating procedures and High-Risk Management Programs. In addition, he recommends further work with the local institutions on "bad news" policies and implementing the Root Cause Analysis (RCA) policy, which is currently being reviewed for possible changes. While the RCA policy is being reviewed for possible changes, institutions continue to be required to complete thorough reviews of all serious suicide attempts.

In 2020, the SMHP designed and wrote a new, comprehensive high-risk policy. This new policy, known as the Suicide Risk Management Program standardizes inclusionary and exclusionary criteria for patients to be placed into the program. Additionally, the policy outlines specific expectations for modifications, or enhancements, to treatment that are required for patients in the program. The master treatment plan was modified to allow

for documentation of the specific treatment goals for patients in the program. The policy was released to the field during the summer of 2021 and training was provided to all clinical staff.

A Bad News Notification policy was developed by the SMHP in 2020. It was approved by the OSM and has been implemented as of the spring of 2021. LOPs for institutional SPRFIT committees are reviewed for compliance with policy on an ongoing basis by the new Regional Suicide Prevention Coordinators during their regular site visits. In 2020, an agreement was reached with the Special Master that CDCR's Mental Health Quality Improvement Unit would work more closely with CCHCS Quality Management. This agreement has produced a pilot program for local SPRFIT committees to use a specialized suicide prevention dashboard and engage in a more structured and quality-based approach to the committee's work regarding suicide prevention initiatives. Included in the rebooted pilot are new agenda templates, self-assessments, and training related to the quality management mission of the local committees. The pilot program underwent a thorough pilot phase that concluded at the end of 2021. Nursing has worked with OSM to add an additional question on the Initial Health Screening form. CDCR expects the new SPRFIT Committee initiative to be released to all institutions by the end of 2022.

- Continuous Quality Improvement (CQI): CDCR, in consultation with Mr. Hayes and the OSM, has agreed to monitor 19 suicide prevention audit items through a CQI process. In 2018, CDCR worked with the OSM on a final CQI report format. This format integrates suicide prevention audit findings with other CQI assessments, with the comprehensive group of findings detailed in a written report. The CQI Tool (CQIT) involves reviewers from multiple disciplines within each institution (e.g., custody, nursing, and mental health disciplines) to ensure that the audit is done comprehensively. A self-audit guidebook containing these items was distributed to institutions. The CQIT is currently under discussion with the *Coleman* Special Master and plaintiffs' counsel.

In the Fourth Re-Audit report, Mr. Hayes reiterated the necessity of including all 19 audit items in any tool or report used to evaluate an institution's suicide prevention program. As part of the collaboration between CCHCS quality management and SMHP quality management, a manual self-assessment tool has been developed for institutions to conduct their own reviews of the health of their suicide prevention programs and identify areas for improvement. Simultaneously, the SMHP has created suicide prevention onsite guidebook to allow the regional Suicide Prevention Coordinators to complete reviews of the suicide prevention programs across the state. This onsite guidebook utilizes approved CQIT indicators and also incorporates additional qualitative assessments related to various aspects of suicide prevention policies and procedures.

- Suicide Prevention Training: Mr. Hayes attended selected in-service training (IST) annual suicide prevention classes held within audited institutions. He opined that the course content was too large for a two-hour class, yet still did not include important topics. Mr. Hayes made recommendations for course content that has been since integrated into a revised training. The revised training was reviewed by Mr. Hayes and sent to the OTPD in the spring of 2020 for review. It was approved in August 2020 and the new revision was released to the field in January 2021.

In his Fourth Re-Audit report, Mr. Hayes recommended that eight institutions develop CAPs to improve training compliance.

The mental health program's training unit, which tracks training compliance for all suicide prevention trainings, reports that in 2021 the overall compliance with the seven-hour suicide risk evaluation training was over 94%. The overall rate for IST suicide prevention training was also over 90% for the entire system in 2021. Training for suicide risk assessment mentoring was 84% for the year and compliance with safety planning intervention training was 96%. The regional Suicide Prevention Coordinators work with institutional SPRFIT Coordinators to establish corrective action for deficiencies. In the SPRFIT Committee Meeting held on January 24, 2022, it was reported that the training compliance at the 8 institutions referenced in the Fourth re-audit were: CCI at 96%, CHCF at 84%, CMF at 99%, MCSP at 99%, LAC at 97%, Corcoran at 100%, SQ at 100%, and PVSP at 100%.

- Reception Center Suicides: This item was raised in 2018; specifically, there was a cluster of suicides in Reception Center institutions during the year. Reception Centers are prisons where individuals committed to CDCR are received from county jails for initial processing. Some of the issues identified as impacting suicide prevention in reception included inconsistent posting of suicide prevention posters and difficulties receiving jail mental health records in a timely manner. Regional Mental Health Compliance Teams are directed to inspect reception center institutions for suicide prevention posters on a routine basis. The SMHP released a memorandum to the field in January 2021 providing direction to reception center mental health clinicians regarding expectations for obtaining and reviewing jail records for newly received individuals.

The THRIVE program, developed to assist individuals adjusting to living in an institution, is underway at WSP and NKSP. CDCR's Division of Rehabilitative Programs (DRP) has been working with subject matter experts within CDCR to develop an orientation for offenders in Reception Centers. DRP's goal is to place modules and video content on eReader tablets that will be checked out to offenders. The modules provide an overview of credit earning, rehabilitative programs, basic institutional rules, appeals process, disability policies and procedures, financial responsibilities, and family visiting. DRP has been working with SMHP to develop a module specifically informing offenders how to take care of their physical and mental health while in prison. The development of this module for the THRIVE program was initially halted in 2020 due to the COVID-19 pandemic, but work on the program has resumed. The program continues to be offered at the reception centers via the eReader tablets. Additionally, at NKSP, Peer Mentor Literacy mentors assist with the instruction.

A number of initiatives have been developed and implemented to reduce the time needed to move patients in crisis from their current location to a MHCB.

*Use of Alternative Housing for Suicidal Individuals*: Patients placed in Alternative Housing are to be transferred to MHCB units within 24 hours unless their referrals to MHCBs are rescinded. In 2021, compliance with transfers from Alternative Housing was 97%.[23]

---

[23] Data from Performance Report

***MHCB Transfer Timelines***: CDCR has initiated several statewide initiatives for oversight and improvement of timelines for transfer from Alternative Housing to MHCB. A specific quality management report was developed in 2018 to help ensure timely transfers. Assigned headquarters staff members in the Inpatient Referral Unit send out alerts, review missed transfer timelines, and ensure institutional action plans are developed to prevent future missed timelines. Barriers to timely transfers were identified and addressed through a number of actions impacting CDCR transportation staff practices, medical clearance procedures, and improved communication between centralized population management staff members and local classification representatives at institutions. CDCR maintained an overall timeline compliance rate of 96% for the year.[24]

***Improving Transfer Timelines for Female Patients***: In 2019, CDCR established an additional unlicensed MHCB unit for female patients that has dramatically decreased the number of female patients waiting over 24 hours for transfer. The unit was established at California Institution for Women and provides additional beds which allows for compliance with mandated transfer timelines.

***Flex Units***: Flex units are designed to adjust as needed between different levels of inpatient care. Three levels of inpatient care are available to meet patient needs: Intermediate Care Facility (ICF), Acute Psychiatric Program (APP), and MHCB. The use of flex units ensures no single inpatient program has on-going problems with delays in admissions. Thus, these units adjust to patient needs in order to address any possible wait time issues for MHCBs. A more detailed plan and draft policy and procedure were shared with the Special Master in April 2022. Discussions continue as CDCR works on implementation.

The OSM suicide expert's Fourth Re-Audit report was filed in September 2020. In addition, the OSM filed a report in January 2021 on suicides that occurred in CDCR in 2015. During 2020, the court held a series of status conferences which were primarily focused on COVID-related issues such as transfer timelines, coordination with the Receiver's health care services, quarantine measures, and admissions to higher levels of mental health care. The *Coleman* court's fourth quarterly status conference was held on December 18, 2020, and focused on staffing and suicide prevention. The court issued orders in December 2020, adopting Mr. Hayes' Fourth Re-Audit Report and recommendations in full. In order to ensure that CDCR remains on task for implementing the recommendations, CDCR developed an activation schedule to track all components related to the outstanding recommendations from Mr. Hayes' report. Updates to this schedule are filed with the *Coleman* court on a monthly basis, and any deviations from the anticipated completion dates are shared with the parties upon discovery.

## PROGRESS IN IDENTIFYING AND IMPLEMENTING INITIATIVES DESIGNED TO REDUCE RISK FACTORS ASSOCIATED WITH SUICIDE

There are many potential sources of information to consider in identifying initiatives for suicide prevention: input and innovation of institutional staff and leadership, input from the incarcerated population and their family or loved ones, information from the field of suicidology, the results of suicide reviews and reviews of serious incidents of self-injury, quality management reviews, the findings of CDCR's informatics system and healthcare data warehouse, the dissemination of best practices at institutions, the practices of other agencies or states, the review of community or agency suicides or suicide attempts, insights from formal research on correctional populations, and the adoption and implementation of Crisis Intervention Teams.

All incarcerated persons in CDCR, patients and non-patients alike, are important sources of information about the issues affecting them individually and as a group, what external stressors may be

---

[24] Data from Performance Report, Timely MHCB Admissions indicator.

contributing to the development of suicidal thoughts and behaviors in some individuals, and what they find helpful to reduce the risk for suicide. Individuals incarcerated in CDCR may tell custody officers, nurses, or other staff members about certain stressors, such as peers who are in danger from other peers. Men and women living in CDCR may divulge personal issues or stressors contributing to their thoughts of suicide and identify those unique risk factors that may have application beyond the individual case.

The field of suicidology is represented nationally by the American Association of Suicidology (AAS). Most major suicide prevention agencies are members or affiliates of the AAS. CDCR is a corporate member of AAS, meaning any staff member employed by CDCR may join the AAS without cost, which allows the staff member to gain access to the association's journal *Suicide and Life-Threatening Behavior*, informational webinars, libraries, and discounted attendance fees to AAS events. CDCR staff are reminded how to join and access AAS materials routinely via videoconferences, with documents regarding how to join the AAS posted on the suicide prevention SharePoint site. SMHP staff attend the annual AAS conference and have given presentations and trainings for correctional staff from across the country.

Reviews of suicide deaths and attempts inform the practice of suicide prevention. The pace of efforts derived from findings from suicide reviews continued in 2021. Below are three continually important projects that emerged from suicide case reviews:

- PIP and MHCB unit discharge workgroup.

- PIP suicide prevention program coordinator positions were filled in all PIP programs.

- Release of the PIP suicide prevention policy.

There are many quality management processes occurring at institutions as well as Patient Safety and Quality Management Committees at institutions. These institutional efforts are supported by regional healthcare, mental health, nursing, and custody staff members. The various quality management activities monitor many institutional functions, highlighting when programs are underperforming, and leading to innovation in determining how quality can be improved. In 2020, CDCR began hiring a Suicide Prevention Coordinator for each of CDCR's four regions. These new positions are an extension of the Suicide Response and Prevention unit at CCHCS Headquarters but based in their respective regions. While not directly reporting to the Regional Mental Health Administrators, all regionally-based Suicide Prevention Coordinators work directly with their respective multidisciplinary regional teams. Two positions were filled in late 2020 and the remaining two in 2021. These positions afford CDCR's suicide prevention efforts an extended reach to provide assistance to the local institutions on improving and sustaining compliance, and developing institution-specific suicide prevention approaches that are consistent with statewide policy. The Suicide Prevention Coordinators are actively involved in all statewide suicide prevention processes; including suicide case reviews and at suicide prevention quality management activities.

Currently, CCHCS Quality Management provides comprehensive management and executive reports, operational tools, resources for local committees and subcommittees, leadership tools and training, and best practice information to institutions. The Quality Management portal contains, for example, information on conducting Performance Improvement Work Plans and Lean Six Sigma projects. They are also assisting in suicide prevention initiatives with the CIT Reporting Tool and the Nursing Observation Reporting Tool. Institutional leadership can review performance on a variety of metrics across units, programs, and facilities over periods of time, allowing leaders to adjust staffing, identify and address problems, and manage compliance issues.

The Mental Health Performance Report, an automated computerized quality management tool, among other indicators, supplies metrics to mental health leadership regarding quality and compliance,

including timeliness of transfers and required evaluations, the number of treatment hours received by patients at different levels of care, and so forth. The timeliness of suicide risk evaluations, five-day follow-ups, treatment plans, inpatient discharges, outpatient appointments, and amount of treatment scheduled and completed is updated and reported daily. Compliance rates can be compared between institutions and can be addressed by regional resources, as well as institutional leadership. The Performance Report is updated regularly to reflect changes in program requirements.

This robust mental health quality management structure and reporting capability has led to a natural process of information and best practices sharing. Institutional programs that are not meeting standards often reach out to institutions that are meeting standards. Alternatively, regional staff members export what is working in one institution to other institutions in their region as best practices and as ways to improve on specific indicators. For example, institutions which were not meeting compliance standards regarding the completion of MHCB Discharge Custody Checks were assisted by regional staff by identifying methods used by high-performing institutions. In addition, CEOs at institutions meet with institutional quality management staff members and with other executives regularly, allowing for information to be shared from high-performing institutions with other sites. Best practices (discussed further below) can be highlighted in discussions within and between institutions.

The SMHP and the Receiver's medical staff jointly administer a healthcare data warehouse to house information and analyze system-wide data. The warehouse is a repository for data from the EHRS and other health care databases. The warehouse links to CDCR's custodial data system, Strategic Offender Management System (SOMS). This wealth of data is then aggregated and disseminated for quality improvement purposes. This shared data warehouse allows CDCR to analyze variables found in self-harm and death by suicide to inform policy decisions. The use of informatics allows mental health leadership to look at "big picture" items, sharing this information with other stakeholders (e.g., custody leadership).

CDCR, in collaboration with the Receiver's medical staff, has implemented numerous ways in which staff members and institutions can inform others or review best practices. Staff members at all levels are able to become involved in learning and using tools for performance improvement, with opportunities to inform institutional leadership and statewide leadership on specific projects or issues. Several methods are available to train staff in leadership skills, focused improvement projects, and projects that promote efficiency. In turn, each of these methods result in identifying best practices, which are then available for dissemination.

In early 2020, CDCR established a workgroup to redesign institution SPRFIT processes, incorporating the most current quality improvement techniques and best practices – a project referred to as the SPRFIT Reboot.  Among other changes, the SPRFIT Reboot:

- Standardizes the set of metrics (automated, as well as audit-based) assigned to local SPRFITs.
- Provides an automated SPRFIT Report that draws from the Enterprise Data Warehouse to monitor performance of critical processes and identify emerging risks to patients.
- Assigns a risk score to identified quality problems, assisting institutions in prioritizing improvement projects.
- Offers a structured approach to problem analysis and development and testing of interventions, using Lean Six Sigma tools and techniques.
- Streamlines and standardizes SPRFIT agenda, minutes, and report-out documentation.

Four institutions (SQ, CCWF, ASP, and CIM) began testing the SPRFIT Reboot processes and tools in April 2021; the test phase concluded at the end of 2021. Feedback was provided by the sites to further

inform the workgroup on ways to enhance the tools and resources developed as part of the project and next steps for a statewide rollout.

*Inpatient Discharge Work Group*: Recognizing that the risk of suicide is elevated in the period after a patient discharges from a PIP unit, the SMHP has been working to improve outcomes in this group. This is especially important since 14 suicide deaths in 2019 were among this population. The workgroup began work in the fall of 2018 and since mid-2020 has met over 40 times with representatives of the SMHP, DAI, and the OSM. Among the recommendations are:  1)  A streamlined workflow for safety concerns to be reported by mental health staff and reviewed by custody, while patients are in an inpatient mental health setting. 2)  In conjunction with the prior recommendation, patients in a PIP cannot be discharged to a lower level of care until reported safety concerns are resolved by custody staff. Patients endorsing safety concerns in a MHCB setting can be clinically discharged to a lower level of care prior to resolution of the safety concerns, but an enhanced review by mental health leadership shall occur prior to discharge. The memo related to this new process in recommendations 1 and 2 continues to be reviewed by the workgroup to prepare for release to the field. 3) Improvements to the Master Treatment Plan/Acute ICF Master Treatment Plan that enables mental health staff to document conversation and coordination with custody related to safety concerns, and prompts to identify clinical interventions should safety concerns be assessed to contribute to increased suicide risk. The changes to the Master Treatment Plan were implemented on September 30, 2021. 4) Creation of a policy that requires patients with a mental health single cell designation to be reviewed prior to EOP discharge from the PIP to determine if a single cell remains clinically indicated. This policy was released to the field on July 26, 2021 and training was also released at the same time. 5) Streamline the high-risk list, which was accomplished by the Suicide Risk Management Policy rolled out in June 2021.

*Suicide Prevention SharePoint Site:* Like most SharePoint sites, the Suicide Prevention SharePoint allows users to share documents, post articles of interests, and share training materials. The site currently contains over 320 research or clinical articles, archived suicide prevention slide shows from monthly instructional video conference presentations (2011 to present), instructions on joining the AAS, groups of presentations made at the CDCR's Suicide Summits, contact lists for institutional suicide prevention program coordinators and headquarters suicide prevention staff, resources for staff suicide prevention, and resources for the entire CDCR population (videos, pamphlets, and posters). The information sharing occurring on SharePoint sites is another way of disseminating best practice information.

The SMHP has started to revise its intranet site with a best practices library. The library is available to all CDCR intranet users. Once created, existing documents from other sites that are not readily available to all users will be added to the library in archival fashion, such as best practice information from the Suicide Prevention SharePoint site.

*Statewide Suicide Prevention Coordinator Conference Calls*: In addition to monthly suicide prevention video conferences that can be viewed by all staff, Suicide Prevention Program coordinators from headquarters and from all institutions have held quarterly conference calls since 2014 to discuss issues impacting suicide prevention efforts statewide. These calls continued during 2021.

*Leadership Meetings Related to Suicide Prevention*: In past years, the SMHP has held three Mental Health Leadership conferences and one three-day Suicide Prevention Summit conference annually. Mental Health Leadership conferences are meant to disseminate best practice information in a variety of areas, including suicide prevention. The Suicide Summit is focused more specifically on advancements within CDCR as to policy, procedure, best practices, innovations, and interventions to

improve suicide prevention and response. Leadership meetings were held on September 27th and 28th, virtually, because of the COVID-19 pandemic.

In 2021, topics presented at the Suicide Prevention Summit included: "What I Wish Someone Told Me About Suicide Watch 12 Years Ago", "Medication and Suicide Prevention", "Cell Extraction-Through an Officer's Lens", "Therapeutic Risk Management", "Mental Health Nursing Suicide Prevention Initiatives", "The DSH Suicide Risk Assessment Study in Retrospect: Our Most Important Findings" and "Dialectical Behavioral Therapy Approaches". All presentations from the 2021 Suicide Summit are found on the Suicide Prevention SharePoint site.

*Psychiatry Trainings and Consultants*: Psychiatrists and other interested staff are able to attend weekly Grand Rounds and earn Continuing Medical Education credits. Grand Rounds offer presentations from academic and forensic psychiatrists, and are broadcast throughout the state using video-conferencing technology. Much of the content of the series is related to psychopharmacology and psychiatric illness, but there is also a lecture series on forensics and the assessment of suicidality. These educational sessions encourage the use of evidence-based best practices in forensic settings. On August 24, 2020, the CDCR implemented a tele-psychiatry policy, which enabled psychiatrists to utilize videoconferencing to facilitate real-time evaluations and treatment for the patient.

The statewide psychiatry program's psychopharmacological consultant continues to be available for consultation statewide. She also has access to additional consultation services with CDCR of State Hospital's experts. Psychopharmacological approaches are important as some psychiatric medications, for example, Clozapine [25] and Lithium, [26] are associated with lower suicide rates among vulnerable patients with particular diagnoses. In addition, psychopharmacological treatment itself lowers all causes of death (including suicidality) among patients with serious mental illness. [27] The expertise of the consulting psychiatrist, and her relationship with and ability to consult with nationally renowned experts, supported CDCR psychiatrists in 2021, helped patients to improve, and ultimately helped to decrease suicidality and deaths from other causes.

Beginning in 2018, CDCR implemented the U.S. Substance Abuse and Mental Health Services Administration's evidenced-based *Illness Management and Recovery*[28] group curriculum to address co-occurring disorders in CDCR's EOP population. In addition, at the end of 2019, Medication-Assisted Treatment (MAT) became available in all CDCR institutions, with medications such as buprenorphine, methadone, and naloxone available as treatment options. As of the end of 2021, the Integrated Substance Use Disorder Treatment (ISUDT) program was providing MAT to over 14,000 patients in CDCR.[29]

In addition to expanding CDCR's tele-psychiatry services during the COVID-19 emergency period, telehealth services were proposed for psychologists and social workers. Emergency authorization for psychologists and social workers to provide telehealth services was given at the end of March 2020. Quarantines and transfer restrictions increased the demand for mental health services as patients were "treated in place" while awaiting transfer to a facility with a mental health program for their assigned level of care. Staffing was further impacted by social distancing requirements and personal vulnerabilities that

---

[25] Meltzer, H., et al. (2003) Clozapine Treatment for Suicidality in Schizophrenia, Archives of General Psychiatry, 60(1):82-91. doi:10.1001/archpsyc.60.1.82

[26] Lewitzka, U., et al. (2015). The suicide prevention effect of lithium: more than 20 years of evidence. International Journal of Bipolar Disorders, 3: 15. https://doi.org/10.1186/s40345-015-0032-2

[27] Tiihonen, J., et al. (2009). 11-year follow-up of mortality in patients with schizophrenia: a population-based cohort study. The Lancet, 374, 620-627. DOI:10.1016/S0140- 6736(09)60742-X

[28] https://store.samhsa gov/product/Illness-Management-and-Recovery-Evidence-Based-Practices-EBP-KIT/SMA09-4463

[29] Data accessed on April 27, 2022 from the ISUDT dashboard. Public data is available at: ISUDT Dashboard | CCHCS (ca.gov).

required some staff to telework. Telehealth was well received by patients and few appointment refusals have been noted. Telehealth has allowed the desert institutions (CEN, CVSP, ISP, and CAL) to broadly maintain required care with no major deficiencies. As staffing steadied, the use of telehealth provided by psychologists or social workers was reduced.

*Crisis Intervention Teams*: Previous reports to the Legislature noted the establishment of Crisis Intervention Teams in CDCR institutions. These teams have been adapted through a partnership between mental health, nursing and custodial personnel to provide an interdisciplinary team to intervene in crisis situations. If an individual reports a desire to kill themself, the team will evaluate the situation, identify sources of distress, attempt to resolve or mitigate the sources of distress at the point of service, and arrange follow-up (which may or may not include placement in an inpatient unit). For example, if an individual is distressed by a perceived lack of medical attention, the presence of a nurse may help to clear any misunderstanding. A relatively common example of the value of a Crisis Intervention Team is suicidal thoughts associated with interpersonal conflicts. These conflicts can create significant distress and can quickly develop into significant fears for one's safety. Whereas mental health clinicians may not be able to address safety concerns directly, they can work collaboratively with custody personnel who may be able to work out a reasonable solution, thus relieving the distress. The Crisis Intervention Teams help to problem-solve issues related to prison life that may not be directly related to a mental health issue.

The initial Crisis Intervention Teams were established at 22 institutions between late 2018 and early 2020. In 2021, the teams had 4,531 contacts with individuals, an average of 375 each month. Twenty-eight percent (N = 1,250) of the contacts resulted in admission to a MHCB unit. Forty-six percent (N = 2,083) were returned to their housing, four percent (N = 174) were provided conflict resolution skills and returned to their housing unit, and two percent (N = 109) were educated regarding a custody process. The resolution of an additional 563 contacts were a mix of referrals to Mental Health, housing changes, referrals to volunteer groups, and custody consultations. Prior to the inception of CITs, it was most likely that a much higher proportion of individuals with crisis issues would have been admitted to costly inpatient psychiatric beds around the state. CDCR cannot definitively state that the use of the CIT was able to prevent specific individuals from attempting, or dying by, suicide. However, the data does suggest the CITs have been effective at identifying root causes of patient crises and providing the most effective intervention for the individuals' crises, which includes inpatient hospitalization for acutely suicidal individuals

## DESCRIPTION OF THE DEPARTMENT'S EFFORTS AND PROGRESS TO EXPAND UPON ITS PROCESS OF NOTIFICATION PURSUANT TO PENAL CODE SECTION 5022, INCLUDING EXPANSION OF THOSE NOTIFICATIONS IN CASES OF SUICIDE ATTEMPTS WHEN DEEMED APPROPRIATE BY THE DEPARTMENT, AND WHEN INMATES HAVE CONSENTED TO ALLOW RELEASE OF THAT INFORMATION

CDCR is committed to expanding the process for notifying next of kin, to include events involving an individual who commits an act of self-injury with the intent to die, while ensuring that it complies with federal laws designed to protect patients' medical records and other health information.

CDCR collects and maintains notification lists, commonly referred to as Next of Kin Designations. A CDCR Next-of-Kin form is completed regularly and is renewed at least annually with all individuals who agree to do so. However, in order to ensure protected personal healthcare information is appropriately provided only to a Next-of-Kin designee, the patient must also complete a Health Care Release of Information form, which allows a patient to designate an individual to receive protected health information for medical and mental health purpos*es*.

During 2020, CDCR assembled a workgroup involving DAI, the SMHP, and CCHCS to develop uniform guidance on Next of Kin designations and the Health Care Release of Information process. A policy was written and delivered to the field in the spring of 2021. A tracking process is part of the new Health Care Department Operations Manual (HCDOM) requirements.

## STATISTICAL SUMMARY OF 2021 SUICIDES

This section of the report focuses primarily on the 15 deaths by suicide that occurred in CDCR during 2021, identifying key findings and comparing these trends with CDCR's historical data. In addition, given that prison suicides occur in larger national and state contexts, CDCR's 2021 data are compared with national figures for state prison suicides and with community suicide rates in California.

The primary sources of data for this section are the suicide case reviews completed by highly trained staff of the SMHP with input from the OSM's experts. Additional data is obtained from CDCR's Office of Research (OOR), the CCHCS's Death Review Committee (DRC) reports, information from prior CDCR annual suicide reports, and publicly available information regarding suicide rates in community and incarcerated settings. Suicide case review reports were independently reviewed by senior clinical staff of the SMHP to assess trends in data or in qualitative findings.

## SUICIDE DEFINITIONS AND TERMS USED

The MHSDS Program Guide, 2021 Revision, provides definitions of suicide and suicide attempts. Several terms used in the last 2009 revision of the PG are now considered obsolete within the field of suicidology and will not be used in this report. Specifically, the terms "self-mutilation" and "suicide gesture" are found in the MHSDS PG, 2021 Revision; however, a less-pejorative term, "non-suicidal self-injury" or NSSI, is used in this report and refers to self-injury for reasons other than death by suicide.

- Suicide: An intentional self-injurious behavior that causes or leads to death.
- Suicide Attempt: An intentional self-injurious behavior which is apparently designed to deliberately end one's life and may require medical and/or custody intervention to reduce the likelihood of death or serious injury.
- Suicidal Ideation: Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing[30] (that is, dying by) suicide or the passive desire to be dead.
- Suicidal Intent: The intention to deliberately end one's own life.
- Self-injurious Behavior: A behavior that causes, or is likely to cause, physical self-injury.

---

[30] The term" 'committing" is not used by current suicidal experts, as the term implies some sort of success in carrying out a pledge or obligation. The favored term is straightforward —" died by suicide."

## REVIEW OF FINDINGS

The total population in CDCR in 2021 was 98,472. The annual suicide rate in CDCR in 2021 was 15.2 deaths per 100,000 incarcerated individuals, based on 15 suicides, representing the lowest rate of suicides since 2002. The 2021 rate was a significant decrease from 2020's rate of 27.3. The rate reached 30.3 in 2019, the highest since 1985. The rate of suicide in CDCR institutions and contract facilities has been at least 20 per 100,000 in 13 of the last 20 years. Figure 4 shows the annual rate, frequency, and population of CDCR since 2001.[31]

Figure 4. CDCR Suicide Rate, Frequency, and Population, 2001-2021



The rate of suicide averaged almost 40 per 100,000 in the 1980s, dropping to an average of 16 per 100,000 in the 1990s as the incarcerated population grew by 72%. In the 2000s, the rate averaged 18 per 100,000 as the population peaked in 2007 and then began to decline. From 2010 through 2019, the rate averaged 23 per 100,000 even though CDCR's incarcerated population fell by 29% due to litigation, decreasing crime rates, criminal justice reform, and the passage of Assembly Bill (AB) 109 (Public Safety Realignment) in 2011. The average annual number of suicides rose from 16 in the 1980s, to 20 in the 1990s, to 33 per year in the 2000s, and to 31 in the 2010s. This year saw a significant decrease with 15 suicides.

## SOCIODEMOGRAPHIC FACTORS

Sociodemographic characteristics do not directly cause suicide but are important risk factors with indirect effects. Table 1 below presents the male, female, and overall frequency and rates of suicide in CDCR since the end of 2000.

***Gender:*** In 2021, CDCR suicides were 13 males, 1 female, and 1 transgender female at a rate of 15.2 per 100,000.

---

[31] CDCR population counts are from the Office of Research June 30th Monthly Report of Population. Suicide counts are from the CDCR Statewide Mental Health Program (SMHP).

Table 1. Annual Frequency, Population, and Rate of Suicide, by Gender and Total, 2002-2021*

| Year | Male Frequency | Male Pop. | Male Rate | Female Frequency | Female Pop. | Female Rate | Total Frequency | Total Pop. | Total Rate |
|------|------|------|------|------|------|------|------|------|------|
| 2002 | 22 | 148,153 | 14.8 | 0 | 9,826 | 0.0 | 22 | 157,979 | 13.9 |
| 2003 | 37 | 150,851 | 24.5 | 0 | 10,080 | 0.0 | 37 | 160,931 | 23.0 |
| 2004 | 23 | 152,859 | 15.0 | 3 | 10,641 | 28.2 | 26 | 163,500 | 15.9 |
| 2005 | 37 | 153,323 | 24.1 | 0 | 10,856 | 0.0 | 37 | 164,179 | 22.5 |
| 2006 | 39 | 160,812 | 24.3 | 4 | 11,749 | 34.0 | 43 | 172,561 | 24.9 |
| 2007 | 33 | 161,424 | 20.4 | 1 | 11,888 | 8.4 | 34 | 173,312 | 19.6 |
| 2008 | 36 | 159,581 | 22.6 | 0 | 11,392 | 0.0 | 36 | 170,973 | 21.1 |
| 2009 | 25 | 156,805 | 15.9 | 0 | 11,027 | 0.0 | 25 | 167,832 | 14.9 |
| 2010 | 34 | 155,721 | 21.8 | 1 | 10,096 | 9.9 | 35 | 165,817 | 21.1 |
| 2011 | 33 | 152,803 | 21.6 | 0 | 9,565 | 0.0 | 33 | 162,368 | 20.3 |
| 2012 | 32 | 128,829 | 24.8 | 1 | 6,409 | 15.6 | 33 | 135,238 | 24.4 |
| 2013 | 29 | 126,992 | 22.8 | 1 | 5,919 | 16.9 | 30 | 132,911 | 22.6 |
| 2014 | 21 | 129,268 | 16.2 | 2 | 6,216 | 32.2 | 23 | 135,484 | 17.0 |
| 2015 | 22 | 123,268 | 17.8 | 2 | 5,632 | 35.5 | 24 | 128,900 | 18.6 |
| 2016 | 24 | 122,874 | 19.5 | 3 | 5,769 | 52.0 | 27 | 128,643 | 21.0 |
| 2017 | 28 | 125,289 | 22.3 | 2 | 5,971 | 33.5 | 30 | 131,260 | 22.9 |
| 2018 | 33 | 123,511 | 26.7 | 1 | 5,906 | 16.9 | 34 | 129,417 | 26.3 |
| 2019 | 37 | 119,781 | 30.9 | 1 | 5,691 | 17.6 | 38 | 125,472 | 30.3 |
| 2020 | 31 | 108,682 | 28.5 | 0 | 4,721 | 0.0 | 31 | 113,403 | 27.3 |
| 2021 | 13 | 94,562 | 13.7 | 2 | 3,910 | 51.2 | 15 | 98,472 | 15.2 |

*All populations are mid-year monthly as of June 30th of each year. Total population includes camps, institutions, in-state and out-of-state contract beds.

*Race/Ethnicity:* Of the 15 suicide deaths in 2021, five were by Caucasian individuals, six were by Hispanic individuals, and four were by African American individuals. Table 2 breaks down the last five years of death by suicide based on race.

Table 2. Frequency & Percent of CDCR Suicide Decedents by Race/Ethnicity Group, 2017-2021

| Racial/Ethnic Group | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|
| African American | 5 (17%) | 1 (3%) | 8 (21%) | 5 (16%) | **4 (27%)** |
| Hispanic | 15 (50%) | 17 (50%) | 11 (29%) | 9 (29%) | **6 (40%)** |
| Caucasian | 7 (23%) | 9 (26%) | 13 (34%) | 12 (39%) | **5 (33%)** |
| Other | 3 (10%) | 7 (21%) | 6 (16%) | 5 (16%) | **0 (0%)** |

*Age:* Table 3 shows annual age group suicides for the five-year period 2017 through 2021 and the percentage of suicides in each group. In 2021, the number of total suicides between three of the age groups were identical. The average age of a suicide decedent in 2021 was 42 years. The average age of all CDCR inmates in 2021 was 42 years.

Table 3. Frequency & Percent of CDCR Suicide Decedents by Age Group, 2017-2021

| Age Group | 2017 | 2018 | 2019 | 2020 | 2021 |
|-----------|------|------|------|------|------|
| 18-24 | 5 (17%) | 3 (9%) | 1 (3%) | 4 (13%) | 1 (7%) |
| 25-34 | 11 (37%) | 11 (32%) | 10 (26%) | 9 (29%) | 4 (27%) |
| 35-44 | 11 (37%) | 9 (27%) | 15 (40%) | 5 (16%) | 4 (27%) |
| 45-54 | 2 (7%) | 8 (24%) | 9 (24%) | 6 (19%) | 4 (27%) |
| 55+ | 1 (3%) | 3 (9%) | 3 (8%) | 7 (23%) | 2 (13%) |

*Marital Status*: Of the 15 individuals who died by suicide in CDCR during 2021, one (7%) was married at the time of their death, three (20%) were divorced, eleven (73%) were single, and none were widowed.

*Education, Juvenile Criminal History, and Work History*: In 2021, 7 (47%) of the 15 had less than a high school education. Two decedents (13%) finished 12 years of schooling and six (40%) had a GED certificate. None of the decedents had a college degree.

Among the 15 individuals in CDCR custody who died by suicide in 2021, nine (60%) had a history of crime as juveniles with an average age at first arrest of 15 years. Of these nine individuals, three (33%) had some level of gang involvement either inside or outside of prison.

Twelve (80%) of the 2021 suicide decedents had information about employment outside CDCR. Of these, all were unskilled workers. Three (20%) of the decedents had job placements while incarcerated.

*Languages Spoken*: For 12 (80%) of 2021's suicide decedents, English was their primary spoken language. Three individuals (20%) spoke Spanish.

*Health Factors:* Incarcerated populations have higher rates of both chronic medical conditions and infectious diseases than members of the community at large[32] and medical conditions increase the risk of suicide related thinking and behavior[33].

Thirteen (87%) of the 15 individuals who died by suicide in 2021 had both past and current medical conditions at the time of their death. Four individuals had a past COVID-19 diagnosis with one of these individuals being diagnosed with COVID-19 long hauler's syndrome. In all of the COVID-19 cases, there was no evidence or indication that COVID-19 impacted the decision to end their lives.

Other medical conditions present in the decedents included AIDS, kidney disease, type 2 diabetes, degenerative joint disease, hyperlipidemia, hypertension, seizure disorder, heart murmur, scoliosis,

---

[32] Maruschak, L.M. & Berzofsky, M. (2016). "Medical Problems of State and Federal Prisoners and Jail Individuals, 2011-12." Report NCJ 251920. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC. Available at: https://www.bjs.gov/pub/pdf/mpsfpji1112.pdf.

[33] Ahmedani, B. K., Peterson, E. L., Hu, Y., Rossom, R. C., Lynch, F., Lu, C. Y., et al. (2017). Major Physical Health Conditions and Risk of Suicide. *American Journal of Preventive Medicine*, *53*(3), 308–315. https://doi.org/10.1016/j.amepre.2017.04.001

asthma, gastroesophageal reflux disease (GERD), and hepatitis C. One individual had a gunshot wound prior to his incarceration however had no medical or health issues due to the wound, at the time of death.

***Temporal Factors***: Over the years, annual reports have inspected the distribution of suicides by custody watches (1st, 2nd, 3rd), day of week, quarter of year, and month to see if it was more likely that suicide deaths occurred during one temporal domain rather than another.

The distribution of 2021 suicides by day of week, time of day (watch), day of week, month, quarter, and time of year were tested against the hypothesis that all things being equal, suicides would be distributed evenly across these temporal sequences. The analyses found that, in 2021, no day of week, time of day, month, quarter, or the holiday season was statistically more likely to have more suicide deaths than any other.

It is commonly believed suicide increases around the winter holidays of Thanksgiving and Christmas.[34] Data from the Centers for Disease Control shows that spring and early summer typically have a higher number of suicides, and CDCR's data over the long-term mirrors this finding. In 2021, death by suicide dropped to less than half of that from the previous year making a comparison to the previous ten-year averages in appropriate. Figure 5 shows the 2021 number of suicides by month.

In 2021, Thursday had five suicides, three on a Monday, two on a Wednesday, two on a Saturday, two on a Sunday, and one on a Tuesday. First watch (10 PM to 6 AM) had five suicides, 2nd watch (6 AM to 2 PM) had two suicides, and 3rd watch (2 PM to 10 PM) had eight suicides.

Rigor mortis[35] is a condition of the body after death that involves stiffening of the musculature due to post-mortem chemical reactions and indicates a person has been deceased for a period ranging from two to six hours. In 2021, two (13%) of the 15 decedents were found in rigor mortis. In 2020, two of the 31 decedents (6%) were found in rigor mortis. Five (33%) of the 15 decedents were under custody discharge checks/guard 1 checks/nursing observations at the time of their death. In 2020, one individual (3.2%) included a concern about inadequate custody/welfare checks related to the death by suicide whereas in 2019, there were 5 (13.2%) cases with custody/welfare checks concerns.

Rules violation reports (RVRs) received by the 15 decedents ranged from of 0 – 23 RVRs with an average of 5.5. The decedents averaged 9.1 years served of their sentence. In 2020, the range of the 31 decedents were from 0 – 24 RVRs similar to this year.

In 2021, there was also a range of 0 – 25 inter-facility transfers for the 15 decedents with a total average of 0.9 transfers. In 2020, that range was from 0 – 57 inter-facility transfers for the 31 decedents. In 2019, the average was 1.4 transfers per year, identical to 2018.

---

[34] See: Suicide Rate is Lower During Holidays  But Holiday-Suicide Myth Persists | The Annenberg Public Policy Center of the University of Pennsylvania
[35] Rigor mortis is "the state of postmortem stiffening." It "starts developing within 1 to 2 hours after death," "becomes apparent in the small muscle groups first" including "eyelids, lower jaw, face," "but on an average it may be said to commence 2-4 hours after death…" Kori (2018). Time since death from rigor mortis: Forensic perspective," *Journal of Forensic Sciences and Criminal Investigation, 9 (5), 1-9.*

Figure 5. Monthly Suicides: 2019, 2020 and 2021 and 10 Year Average



## CUSTODIAL AND CORRECTIONAL FACTORS

***Institution at Time of Death***: In 2021, suicides occurred in 11 CDCR institutions (Table 4). Institutions vary in the number of patients in the institution's mental health program, the mental health mission of the facility, the predominance of violent offenders at the site, and the total number of individuals at the institution. Fluctuations in the number of suicides occurring at an institution can be attributed to cluster effects,[36] changes in the use or mental health mission of the institution, and other factors. There are also subsets of suicides that occur during, or upon, transfer of an individual from one institution to another, further complicating the interpretation of *why* suicides occur at certain institutions more frequently.

Suicides are more frequent in institutions with intensive mental health programming (e.g., EOP institutions). Suicides are also more frequent in higher security (Level III or Level IV) institutions than in lower security settings. The institutions that have the highest average annual suicides, such as Salinas Valley State Prison (SVSP), are those where high security Level IV incarcerated individuals are housed and being treated for severe and chronic mental health and behavior problems.

Table 4. 2021 CDCR Suicides by Institution, Security Level and Available Mental Health Programs[37]

| Institution | Level I and II | Level III | Level IV | Mental Health Programs Available |
|---|---|---|---|---|
| California Correctional Institution | 0 | 0 | 1 | CCCMS |
| Ironwood State Prison | 0 | 0 | 1 | No Mental Health |

---

[36] Clusters of suicides can occur temporally or by location. See: Hawton, K., Linsell, L., Adeniji, T., Sariaslan, A., and Fazel, S. (2014). "Self-harm in prisons in England and Wales: An epidemiological study of prevalence, risk factors, clustering, and subsequent suicide." *Lancet, 383*.

[37] Levels of mental health care are: Correctional Clinical Case Management System (CCCMS); Enhanced Outpatient Program (EOP); Mental Health Crisis Bed (MHCB); and Psychiatric Inpatient Program (PIP)

| Institution | Level I and II | Level III | Level IV | Mental Health Programs Available |
|---|---|---|---|---|
| California Institution for Women | 0 | 0 | 1 | CCCMS, EOP, EOP-ASU, PSU, MHCB, LTRH, STRH, PIP, DDP |
| Valley State Prison | 1 | 0 | 0 | CCCMS, EOP |
| Calipatria State Prison | 0 | 0 | 1 | No Mental Health |
| Mule Creek State Prison | 1 | 1 | 0 | CCCMS, EOP, EOP-ASU, MHCB |
| Richard J. Donovan Correctional Facility | 0 | 0 | 1 | CCCMS, EOP, EOP-ASU, MHCB |
| San Quentin State Prison | 0 | 0 | 1 | CCCMS, EOP, MHCB, Condemned PIP |
| Salinas Valley State Prison | 0 | 0 | 2 | CCCMS, EOP, MHCB, PIP |
| Substance Abuse Treatment Facility | 1 | 0 | 0 | CCCMS, EOP, MHCB, DDP |
| California Institution for Men | 3 | 0 | 0 | CCCMS, MHCB |
| Total (percent) | 6 (40%) | 1 (7%) | 8 (53%) | |

Table 5 presents the data on suicides in each institution over the ten-year period 2012-2021 along with the average number per year per institution. Two institutions had, on average, at least two suicides per year while ten institutions had at least one suicide per year. These twelve institutions accounted for 192 of the 284 (68%) of all suicides over the 10 years, with an average of 16 per year.

Table 5. Frequency of Suicide by CDCR Institution, 2012 thru 2021 and 10-Year Annual Average[38]

| Institution | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | **2021** | Annual Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CSP Sacramento | 1 | 1 | 2 | 3 | 3 | 1 | 2 | 9 | 3 | **0** | 2.5 |
| CSP LA County | 1 | 1 | 0 | 0 | 2 | 4 | 2 | 2 | 2 | **0** | 1.4 |
| Corcoran SP | 1 | 2 | 0 | 2 | 0 | 2 | 3 | 4 | 2 | **0** | 1.6 |
| Deuel Vocational Institute* | 2 | 0 | 0 | 3 | 0 | 4 | 1 | 3 | 0 | **0** | 1.3 |
| Kern Valley SP | 0 | 1 | 1 | 0 | 3 | 1 | 5 | 2 | 2 | **0** | 1.5 |

---

[38] Chuckawalla Valley SP and California City CF had no suicides during the ten years 2012-2021.

| Institution | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | **2021** | Annual Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| California Medical Facility | 1 | 2 | 1 | 2 | 0 | 2 | 0 | 3 | 1 | **0** | 1.2 |
| Sierra Conservation Center | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0.1 |
| California Men's Colony | 0 | 0 | 0 | 3 | 3 | 0 | 1 | 0 | 0 | **0** | 0.7 |
| High Desert SP | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 1 | 3 | **0** | 0.8 |
| Correctional Training Facility | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 1 | 3 | **0** | 0.8 |
| Pleasant Valley SP | 2 | 1 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | **0** | 0.6 |
| Wasco SP | 1 | 1 | 0 | 0 | 0 | 4 | 0 | 0 | 2 | **0** | 0.8 |
| Folsom SP | 3 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | **0** | 0.7 |
| California Health Care Facility | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 2 | **0** | 0.5 |
| Pelican Bay SP | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | **0** | 0.3 |
| California Correctional Center | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | **0** | 0.4 |
| Out-of-State Institutions | 1 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | **0** | 0.4 |
| North Kern SP | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | **0** | 0.4 |
| CSP Solano | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | **0** | 0.4 |
| Centinela SP | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0.1 |
| Central California Women's Facility | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | **0** | 0.3 |
| Avenal SP | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | 0.1 |
| Calipatria SP | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1** | 0.2 |
| California Institute for Women | 1 | 1 | 2 | 2 | 2 | 1 | 0 | 1 | 0 | **1** | 1.1 |
| Substance Abuse & Training Facility | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | **1** | 0.5 |
| California Correctional Institute | 1 | 1 | 3 | 1 | 2 | 0 | 2 | 2 | 4 | **1** | 1.7 |
| San Quentin SP | 3 | 3 | 2 | 3 | 0 | 2 | 2 | 1 | 1 | **1** | 1.8 |
| RJ Donovan | 2 | 3 | 1 | 2 | 0 | 1 | 4 | 0 | 1 | **1** | 1.4 |
| Ironwood SP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1** | 0.1 |
| Valley SP | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **1** | 0.2 |
| Salinas Valley State Prison (SP) | 6 | 2 | 2 | 0 | 4 | 2 | 2 | 1 | 1 | **2** | 2.2 |
| Mule Creek SP | 1 | 2 | 2 | 0 | 0 | 2 | 2 | 2 | 2 | **2** | 1.5 |
| California Institute for Men | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | **3** | 0.8 |
| Total | 33 | 30 | 23 | 25 | 26 | 30 | 34 | 38 | 31 | **15** | 28.5 |

\* Deuel Vocational Institute closed in 2021

***Housing Type***: Incarcerated individuals in CDCR are housed in a variety of physical settings, from dormitory settings with up to 200 people, to the most common type, celled housing, which house one or

two persons. Table 6 presents the number and percentage of suicides in each type of CDCR housing for 2020 and 2021.

The types of housing where an incarcerated person lives can be associated with prison-related difficulties. For instance, individuals entering CDCR with a new prison term or whose parole has been revoked are initially housed in Reception Center institutions. During 2021, no one died by suicide in a Reception Center institution. This is decrease from last year where one individual died in 2020 in a Reception Center institution. Starting in late 2020, reception center services were consolidated to two male institutions (WSP and NKSP) and one female (CCWF).

Table 6. Frequency and Percent of Housing Placements of CDCR Suicide Decedents, 2020 and 2021

| Housing Type | 2020 | **2021** |
|---|---|---|
| Administrative Segregation (including EOP Hub units) | 3 (10%) | **4 (27%)** |
| Condemned Housing | 1 (3%) | **1 (7%)** |
| Psychiatric Services Units | 1 (3%) | **0 (0%)** |
| Short-Term Restricted Housing | 5 (16%) | **2 (13%)** |
| Long-Term Restricted Housing | 1 (3%) | **0 (0%)** |
| Security Housing Units | 0 (0%) | **0 (0%)** |
| Special Needs Yard | 0 (0%) | **2 (13%)** |
| Psychiatric Inpatient Program (PIP) | 2 (6%) | **2 (13%)** |
| Reception Centers | 1 (3%) | **0 (0%)** |
| Outpatient Housing Unit (Medical) | 2 (6%) | **0 (0%)** |
| Correctional Treatment Center/MHCB | 0 (0%) | **0 (0%)** |
| General Population | 15 (48%) | **4 (27%)** |

***Segregated Housing***: Individuals alleged to be, or found guilty of committing disciplinary infractions are typically placed in segregated housing. If found guilty, sanctions can include loss of time credits, loss of privileges, or other consequences. Incarcerated individuals can also be placed in segregated housing at their own request for protection due to perceived interpersonal safety risk.[39] At the end of 2021, 3,052 individuals or 3.1% of the total CDCR population, were housed in segregated housing.

The units and cells in these units are often physically similar to other housing units. But the regulations and routines of segregated housing restrict an individual's movements and privileges, which can affect their mental status and functioning. The conditions of confinement in segregated housing may result in significant distress for some people, and for some, placement in segregated housing increases the risk of self-injury.

---

[39] For this report, segregated housing includes Administrative Segregation (ASU), Short-Term Restricted Housing, Long-Term Restrictive Housing, ASU Hubs, Security Housing Units, Psychiatric Services Units, and Condemned housing.

Over the last twenty years, CDCR has implemented policies and programs to increase mental health services and to reduce the risk of suicide in segregated housing. In the early 2000s, CDCR created specialized ASU "Hub" units and Psychiatric Services Units (PSU) for EOP patients. In 2015, CDCR developed the Short-Term and Long-Term Restricted Housing (STRH/LTRH) units for incarcerated persons at the Correctional Clinical Case Management System (CCCMS) level. These units correspond to the ASU and Security Housing Units, respectively.

During 2021, 7 suicide decedents were housed in CDCR segregated housing units. Of these, four were participants in the MHSDS – two at the CCCMS level of care and two at the EOP level of care. One condemned individual died by suicide and was not a participant in the MHSDS at the time of their death. Six individuals were housed in either ASU or STRH.

Because of the small number of individuals and the number of suicides in these units, suicide rates for segregated housing are higher than the rest of CDCR (183 per 100,000 in ASU/STRH by the end of 2021). For reference, the rate of suicide in 2020 was 236 per 100,000 and between 2015 and 2019 the rate was 218 per 100,000. In the past few years, the annual total of suicides and the percentage of total CDCR suicides that occurred in ASU/STRH has trended downward. However, in 2021, while the annual total of suicides in restricted housing units has significantly decreased, the percentage has increased. This is due to the small number of deaths by suicide in 2021. For instance, in 2020, there were more individuals who died by suicide in ASU/STRH than in 2021 but due to the much larger number of deaths by suicide in 2020 than in 2021 (31 v. 15), the percentage in 2021 is greater. Figure 6 shows the number and percentage of total CDCR suicides that occurred in ASU and STRH from 2012 through 2021. Condemned individuals are excluded from the table below.

Figure 6. Percentage of Suicides in ASU, STRH LTRH, SHU and PSU, 2012-2021



|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Frequency | 15 | 15 | 16 | 15 | 8 | 8 | 11 | 10 | 13 | 8 | 6 |
| Percentage | 45% | 45% | 43% | 65% | 29% | 30% | 37% | 29% | 34% | 26% | 40% |

— Frequency   — Percentage   - - - Frequency Trend   - - - Percentage Trend

***Time in ASU/STRH Housing***: The initial few days in ASU or STRH can be very stressful for some individuals, especially those who are in mental health treatment. Similarly, extended stays (greater than 30 days) can also lead to a deterioration of an individual's mental well-being.[40] In 2007, CDCR began a

---

[40] Haney, C. (2018). Restricting the use of solitary confinement. *Annual Review of Criminology, 1*. 285-310. https://doi.org/10.1146/annurev-criminol-032317-092326

program to retrofit a number of ASU cells as "intake" cells. These cells have physical modifications, which include removing ligature attachment sites to increase the safety of the cells. Incarcerated people who are moved to either ASU or STRH are assigned to these cells for their initial 72 hours in the unit before transitioning to regular ASU or STRH housing. If an individual is double-celled upon placement in ASU, they are not required to be placed in an ASU intake cell. In 2021, six individuals were in ASU or STRH at the time of their death. The average time from ASU/STRH entry to suicide was 39 days with a range from 7 days to 75 days.

*Offense Type:* A common finding in state prisons is the high proportion of suicides among individuals whose commitment offenses were crimes against persons.[41] Individuals incarcerated for a violent crime have a rate of suicide death more than twice the rate for those committed for non-violent crimes.[42] Table 7 shows the number and proportion types of crimes committed by CDCR suicide decedents in 2020, 2021, and the overall proportion of these crimes of the CDCR population.

Table 7. Frequency and Percent of Commitment Offenses of CDCR Suicide Decedents, 2020, 2021, and CDCR Proportions for 2021

| Type of Offense | 2020 | **2021** | CDCR Population Proportions in 2021 |
|---|---|---|---|
| Violent Crimes | 24 (77%) | **9 (60%)** | 71% |
| Property Crimes | 2 (7%) | **3 (20%)** | 7% |
| Sex Crimes | 5 (16%) | **3 (20%)** | 12% |
| Other Crimes | 0 (0%) | **0 (0%)** | 7% |

*Security Level:* In 2021, 8 of 15 suicide decedents had Level IV classification points, the highest security level (Table 8). One decedent was at Level III. The remaining six suicide decedents were at Levels I and II. None of the 15 decedents were unclassified, as happens when they are housed in reception center institutions in the first weeks of incarceration or for other reasons.  As can be seen in Table 8, the pattern of classification levels in 2021 was similar to that of the previous year.

Table 8. Frequency and Percent of Security Levels of CDCR Suicide Decedents 2020, 2021, and CDCR Proportions in 2021

| Security Level | 2020 | **2021** | CDCR Population Proportions in 2021 |
|---|---|---|---|
| Level IV | 18 (58%) | **8 (53%)** | 25% |

[41] Most inmates are charged and found guilty of multiple charges. The charges in Table 7 are the primary charges. The CDCR and the California Department of Justice define crimes against persons as violent offenses and make a distinction between those crimes and property and other crimes. Although sex crimes are considered crimes against persons, they are separated out in this report. See https://openjustice.doj.ca.gov/resources/glossary

[42] Mumola, C. (2005), Bureau of Justice Statistics, located at: http://www.bjs.gov/content/pub/pdf/ardus05.pdf

| Security Level | 2020 | **2021** | CDCR Population Proportions in 2021 |
|---|---|---|---|
| Level III | 3 (10%) | **1 (7%)** | 15% |
| Level II | 8 (26%) | **5 (33%)** | 47% |
| Level I | 2 (7%) | **1 (7%)** | 9% |
| Unclassified | 0 (0%) | **0 (0%)** | 4% |

*Sentence Length:* Another variable unique to suicides in correctional settings is sentence length: total length of sentence; how much time an incarcerated person has served prior to their suicide death; and how much time they have left to serve in prison at the time of their death. These variables are captured in Tables 9, 10, and 11. Length of sentence can have implications for the mental state of incarcerated individuals at the beginning of their prison term. Table 9 presents the sentence lengths of suicide decedents during 2020 and 2021. In 2021, almost half of the decedents were serving sentences between 11-20 years, three of which were sentenced to over 20 years. This differs from previous years, including 2020, in which over 60% of individuals who died by suicide in CDCR had either a long-term sentences (20+ years) or a life sentence without the possibility of parole (LWOP).

Table 9. Frequency and Percent of Sentence Length of CDCR Suicide Decedents, 2020 and 2021

| Sentence Length | 2020 | **2021** |
|---|---|---|
| 1-5 years | 5 (16%) | **2 (13%)** |
| 6-10 years | 4 (13%) | **1 (7%)** |
| 11-20 years | 1 (3%) | **7 (47%)** |
| 21+ years | 6 (19%) | **3 (20%)** |
| Life w/ Possible Parole | 12 (39%) | **1 (7%)** |
| Life w/out Parole | 2 (7%) | **0 (0%)** |
| Condemned | 1 (3%) | **1 (7%)** |

Table 10 shows time spent in CDCR during the current admission by individuals who died by suicide in 2020 and 2021. 2020. During 2021, the amount of time served at the time of death ranged from just under 14 months to almost 21 years. In 2021, nine decedents had served more than 6 years in CDCR custody.

Table 10. Frequency and Percent of Time Served at Time of Death of CDCR Suicide Decedents, 2020 and 2021

| Time Served | 2020 | **2021** |
|---|---|---|
| 0-1 year | 4 (13%) | **0 (0%)** |
| 1-5 years | 8 (19%) | **6 (40%)** |
| 6-10 years | 6 (23%) | **4 (27%)** |
| 11-20 years | 5 (39%) | **5 (33%)** |

| Time Served | 2020 | **2021** |
|---|---|---|
| 21+ years | 8 (26%) | **0 (0%)** |

Table 11 shows the length of time remaining in sentences for those who died by suicide in 2020 and 2021. One individual had no release date because he was condemned.

Table 11. Frequency and Percent of Time Left to Serve of CDCR Suicide Decedents, 2020 and 2021

| Time Left to Serve | 2020 | **2021** |
|---|---|---|
| 0-1 year | 4 (13%) | **2 (13%)** |
| 1-5 years | 8 (26%) | **5 (33%)** |
| 6-10 years | 2 (7%) | **3 (20%)** |
| 11-15 years | 1 (3%) | **3 (20%)** |
| 16+ years | 16 (52%) | **2 (13%)** |

**Cell Occupancy:** It is typical for individuals to attempt suicide when they are alone in their assigned housing. They may be alone because they have not been assigned a cellmate, are assigned a single cell, they are housed in single cell-designated housing (CTC, MHCB, or ASU/STRH intake cells), or their cellmate is away from the cell. In 2021, nine (60%) suicide decedents were either housed on single-cell status (N = 5, 33%) or were housed alone although eligible for a cellmate (N = 4, 27%) at the time of their death. Four individuals died while being housed in a double cell. All of the four individuals were alone at the time. The remaining two decedents died in a dormitory setting by hanging.

**Job/School Assignment**: In 2021, of the 15 individuals, six had a job or school assignment during their incarceration, eight did not have a job or school assignment and one was unknown based on records available.

**Method of Suicide**: As in most years, ligature hanging predominated as the method of suicide with 13 individuals (87%) using it in 2021. For the 13 deaths by suicide this year, the noose was tied to the top bunk (38%; 5 individuals), air vent (31%; 4 individuals), cell door (8%; 1 individual), toilet bar (8%; 1 individual), top of the holding cell (8%; 1 individual), and bed frame (8%; 1 individual). In 2021, the remaining two individuals (13%) died by asphyxiation. Figure 7 shows the proportions of the different methods of suicide from 2020 and 2021.

Figure 7. Method of Suicide: 2017 - 2021



## MENTAL HEALTH FACTORS

*Mental Health Level of Care*. CDCR's MHSDS is divided into levels of care corresponding to increasing intensity of treatment. CCCMS and EOP are outpatient programs. The MHCB units and the Acute and Intermediate PIPs are licensed inpatient programs with 24-hour nursing care provided.

In both the community and correctional settings, individuals suffering from mental illness are overrepresented in the number of suicide deaths. In 2021, 67% (N = 10) of incarcerated persons who died by suicide in CDCR were participants in the MHSDS. Of those individuals not in the MHSDS at the time of their death, one had been discharged from the MHSDS one and a half years prior to their death and two had not been at the CCCMS level of care in over ten years prior to their deaths. Two suicide decedents had never received mental health treatment in CDCR. Table 12 shows the frequency of suicides among the levels of care for 2012 through 2021 and the percent of total annual suicides for each year.

Table 12. Frequency of Suicide by MHSDS Level of Care and Percent of Total Annual Suicides, 2012-2021

| Year | CCCMS | EOP | Inpatient | Percent of Total Annual Suicide Deaths in MHSDS |
|------|-------|-----|-----------|------------------------------------------------|
| 2012 | 12 | 5 | 1 | 55% |
| 2013 | 9 | 6 | 1 | 53% |
| 2014 | 12 | 9 | 1 | 96% |
| 2015 | 9 | 5 | 0 | 58% |
| 2016 | 7 | 15 | 0 | 82% |
| 2017 | 8 | 10 | 2 | 67% |
| 2018 | 12 | 10 | 1 | 68% |
| 2019 | 11 | 16 | 0 | 71% |
| 2020 | 11 | 7 | 3 | 68% |

| Year | CCCMS | EOP | Inpatient | Percent of Total Annual Suicide Deaths in MHSDS |
|------|-------|-----|-----------|--------------------------------------------------|
| 2021 | 5 | 3 | 2 | 67% |

Table 13 shows the annual suicide rates of those incarcerated persons receiving mental health treatment in CDCR, those not receiving treatment, and the total CDCR populations from 2012 through 2021.[43]

***Mental Health Treatment Prior to Incarceration:*** Eleven (73%) of suicide decedents in 2021 had indications in their records that they had treatment for mental health problems in the community. Most of these individuals reported treatment as children or adolescents. This proportion is comparable to the 67% of individuals who died by suicide in 2020 and reported some history of mental health treatment in the community.

Table 13. Suicide Rate (per 100,000) of Mental Health, Non-Mental Health, & Total CDCR Populations, 2012-2021

| Year | Mental Health Population | Non-Mental Health Population | Total Population Rate |
|------|--------------------------|------------------------------|------------------------|
| 2012 | 53.6 | 16.0 | 25.9 |
| 2013 | 46.4 | 15.5 | 24.1 |
| 2014 | 56.3 | 2.2 | 18.2 |
| 2015 | 40.4 | 9.8 | 18.6 |
| 2016 | 58.3 | 5.5 | 21.0 |
| 2017 | 51.9 | 10.8 | 23.0 |
| 2018 | 60.9 | 12.0 | 26.3 |
| 2019 | 74.7 | 12.5 | 30.3 |
| 2020 | 70.7 | 13.2 | 17.3 |
| 2021 | 30.7 | 12.3 | 15.2 |
| 10-Year Average | 54.4 | 11.0 | 22.0 |

***Screening on Initial Arrival to CDCR***: All newly arrived individuals are administered an initial health screening questionnaire that contains some mental health questions. Within seven days upon arrival, a brief mental health screening questionnaire will also be administered. The questionnaires cast a relatively wide net to identify individuals who need in-depth evaluation. Those who screen positive on the health screening are referred to the mental health program. Those who screen positive on the mental health screening are provided a fuller mental health evaluation within 18 days of arrival. Of the 15 individuals who died by suicide during 2021, none had arrived within one year of their death.

---

[43] This information was obtained from the CCHCS Health Care Placement Oversight Programs (HCPOP) monthly trends reports and the CDCR Office of Research Data Points series. The population totals vary slightly from other referenced population totals within this report, as the data from HCPOP is collected at different points of time and utilizes total population average.

*Psychiatric Medication:* Of the ten suicide decedents receiving mental health treatment at the time of their deaths, all were prescribed psychiatric medications as part of their treatment. Suicide case reviewers noted that medication compliance (either outright refusal or intermittent adherence) was an issue in only one case of those who were prescribed psychiatric medications. A small number of MHSDS patients are subject to involuntary psychiatric medication orders per Penal Code Section 2602 due to severe mental illness and poor compliance with prescribed medications.[44] In 2021, one mental health patient was subject to an involuntary medication order at the time of their death.

*History of Admissions to CDCR Psychiatric Inpatient Programs:* Both in the community[52] and in correctional settings, one of the highest risk periods for suicide is after discharge from inpatient psychiatric hospitalization. Ten of the 15 decedents in 2021 were in the MHSDS at the time of their death, and seven had been hospitalized in a CDCR inpatient psychiatric facility at some time during their CDCR tenure.

Three (38%) of the 8 individuals who were at the CCCMS or EOP (i.e., outpatient) levels of care at the time of their death had been discharged from a CDCR inpatient psychiatric program within 12 months of their death. One individual died within two days after being discharged from a PIP.  Historically the number of suicides that occurred shortly after an individual was discharged from an inpatient psychiatric program has proven concerning. As such, in 2021, CDCR finalized an overhaul to its High Risk Management Program. CDCR changed the program's title to the Suicide Risk Management Program to reflect the focused attention on patients at increased risk for suicide. Additionally, specific parameters were placed around inclusionary criteria, expectations for providing treatment for individuals within the program, and guidance on when to consider a patient for removal of the program. CDCR built an automated report to aid treatment teams in identifying patients for the program, based upon the inclusionary criteria.

*Psychiatric Diagnoses:* The mental health diagnoses of individuals who died by suicide during 2021 and the previous year are summarized in Table 14. Although many individuals use and abuse alcohol and illegal substances while incarcerated, substance-related and alcohol use diagnoses in Table 14 are included *only* when formally reported as a diagnosis in the medical record. All diagnoses are based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5). As comorbidity is the rule rather than the exception among mental health patients, six of 2021 suicide decedents had two diagnoses recorded and two had more than two diagnoses.

Of the ten individuals with DSM-5 mental health disorders in 2021, the most common category of disorder was psychotic disorders (Schizophrenia, Schizoaffective Disorder, Delusional Disorder, and Psychotic Disorder Not-Otherwise-Specified) at five, followed by personality disorders at four, and then Substance Use Disorder at three. Mood disorders, which include Major Depressive Disorder, Depressive Disorder Not-Otherwise-Specified, and Bipolar Disorder, accounted for four diagnoses.

Table 14*. Frequency of Mental Health Diagnoses of Suicide Decedents, 2020 and 2021*

| Diagnosis | 2020 | 2021 |
|---|---|---|
| Major Depressive Disorder | 7 | 2 |

---

[44] Penal Code § 2602 provides for the involuntary administration of psychiatric medication if a psychiatrist determines that an inmate suffers from a "serious mental disorder" and "as a result of that disorder, the inmate is gravely disabled and does not have the capacity to refuse treatment with psychiatric medications or is a danger to self or others." Inmates are entitled to a hearing and the psychiatrist must certify that alternative methods of treatment "are unlikely to meet the needs of the patient." 52 Chung, D. T., Ryan, C. J., Hadzi-Pavlovic, D., Singh, S. P., Stanton, C., & Large, M. M. (2017). Suicide Rates after Discharge from Psychiatric Facilities. JAMA Psychiatry, 74(7), 694 9. doi.org/10.1001/jamapsychiatry.2017.1044

| Diagnosis | 2020 | 2021 |
|---|---|---|
| Depressive Disorder Not-Otherwise-Specified | 4 | 0 |
| Bipolar Disorder | 1 | 2 |
| Schizophrenia and Schizoaffective Disorder | 2 | 5 |
| Psychotic Disorder Not-Otherwise-Specified | 2 | 0 |
| Delusional Disorder | 1 | 0 |
| Anxiety Disorder | 4 | 3 |
| Adjustment Disorder | 4 | 1 |
| Post-Traumatic Stress Disorder | 2 | 2 |
| Personality Disorders | 7 | 4 |
| Alcohol Abuse or Dependence | 1 | 0 |
| Any Substance Use-related Disorder | 5 | 3 |
| Other Diagnoses | 4 | 1 |

## SUICIDE ATTEMPT HISTORY

In 2021, nine of the suicide decedents had a history of suicide attempts in the community and/or while in CDCR custody. Of these, two had evidence in the records of community suicide attempts but no attempts in CDCR custody. There was evidence by self-report or documentation that seven had multiple suicide attempts in the past.

***Suicide Precipitants and Behavior:*** Individuals who kill themselves often experience significant interpersonal or life events in the weeks or months prior to death. These events are often identified as "precipitating" events that play a role in triggering an individual's decision to make a suicide attempt. Additionally, individuals can be "driven" to suicidal thinking and behavior by mental processes, such as the symptoms of a mental disorder, negative life events, or a collection of psychosocial stressors.[45] The frequency and percentage of total precipitants or drivers of suicides listed or suspected by CDCR suicide reviewers are presented in Table 15. In many cases, the precipitants or drivers were not entirely clear or definitively established. Rather, those identified by suicide case reviewers should be considered clinically presumptive about each individual's idiosyncratic reasons for ending their life, based on available records and information reviewed posthumously.

Rarely can one precipitant or driver be identified as the sole reason someone killed themselves. More often, there are multiple precursors that accumulate on top of pre-existing vulnerabilities. Reviewers identified 45 separate precipitants and drivers among the 15 suicides. The frequency of precipitants and drivers is greater than the total number of suicides, as nearly all suicide case reviews identified more than one precursor.

In 2021, mental health symptoms were identified by reviewers as significant in 10 (67%) of suicide decedents, the most frequent precipitant or driver found, and similar to previous years. Seven individuals had what might be termed crises of despair, isolation, loss, and hopelessness which appeared to drive

---

[45] Tucker, R.P., Crowley, K.J., Davidson, C.L. & Gutierrez, P.M. (2015). Risk factors, warning signs, and drivers of suicide: What are they, how do they differ, and why does it matter? *Suicide Life-Threatening Behavior 45*, 679-689.

them to attempt suicide. This category accounted for 16% of all the precipitants or drivers. Eight individuals had substance use issues, while seven had an extensive history of childhood trauma.

The interpersonal culture of prison may include coercion and threats of outright violence. [46] Thus, the general category of "safety concerns" figured prominently in multiple suicides during 2021. These concerns can center on prison gang issues, threats based on a commitment offense (particularly sex crimes), gambling or drug debts, intellectual disability status, or medical vulnerabilities (perceived or real). Reviewers identified 7 instances where the record suggested that safety concerns were a precipitant or driver to an individual's suicide death. This category accounted for 16% of all precipitants or drivers.

Table 15. Suspected Precipitants/Drivers of Suicide in CDCR, 2021

| Precipitant and Drivers Category | Frequency | Percentage of All Precipitants and Drivers Identified |
|---|---|---|
| Mental health symptoms, e.g., anxiety, psychosis, depression | 10 | 22% |
| Safety concerns, drug debts, fears of victimization | 7 | 16% |
| Crises of despair and hopelessness, interpersonal losses, isolation, loneliness, | 7 | 16% |
| Medical illness and/or pain issues; medical disability | 1 | 2% |
| Substance-related issues (use, withdrawal, etc.) | 8 | 18% |
| Custodial issues (adverse transfer, long sentence, poor adjustment to prison, new charges, new court proceedings, etc.) | 2 | 4% |
| COVID-19 issues (fears about illness; loss of support through illness) | 1 | 2% |
| Board of Prison Hearings issues | 2 | 4% |
| History of childhood trauma | 7 | 16% |

Of the 15 individuals who died by suicide during 2021, two (13%) left suicide notes. This percentage is roughly the same that (one in six) found in community samples,[47] but lower than the 37% in the previous five years of CDCR suicide deaths.

## DETERMINATION OF UNKNOWN CAUSES OF DEATH

When a death occurs in CDCR for which there is no obvious cause, it is classified as an "Unknown Death." These cases receive special attention until the cause and manner of death is determined, particularly when suicidal intent needs to be determined in a timely fashion or is unclear. If a death notification lists the cause of death as unknown or undetermined, the SMHP tracks the case until the death is classified. In some instances, the cause and manner of death is quickly classified during an institutional medical review.

---

[46] See e.g., Toch, H. & Adams, K. (2002). *Acting Out: Maladaptive Behavior in Confinement*. American Psychological Association, Washington, DC.
[47] See Gelder, Mayou, and Geddes (2005). "Incidence of note-leaving remains constant despite increasing suicide rates." *Psychiatry and Clinical Neurosciences, 4*(1). And also: Cerel, J., Moore, M., Brown, et al. (2014). "Who leaves suicide notes? A six year population-based study." *Suicide and Life-Threatening Behavior 45*(3), 326-334. https://dx.doi.org/10.1111/sltb.12131 57 The *Plata* Three-Judge panel recognized in 2011 that state-by-state comparisons are of "limited value" when they fail to "control for demographics of each state's inmate population." ECF No. 3641 at 88.

In other cases, the cause of death remains undetermined pending the receipt of autopsy or toxicology results. In such cases, the CCHCS DRC will investigate the death and produce an initial cause of death as well as a final cause and manner of death determination. In the meantime, the SMHP communicates with the institution and with the DRC about these cases until the cause and manner of death is finalized. A member of the SMHP also sits on the DRC to ensure all unknown deaths are reviewed and, when applicable, that the possibility of suicide has been closely and objectively considered. The SMHP member of the DRC may discuss unknown or undetermined death with the headquarters SPRFIT committee, particularly when a history of suicide attempts is present or if there's some suspicion an overdose was intentional, rather than accidental.

The following guidelines for suicide reviewers are used to determine unknown deaths:

Reviewer Guidelines for Determination of Unknown Deaths

1. Review the method of death to determine if there may have been an alternative reason (other than suicide) for the behavior (e.g., autoerotic asphyxiation, confusion, inability to form intent, purposeful intoxication, etc.).

2. If an overdose on substances, is it reasonable that the substance (illicit or prescribed) may have been used to become intoxicated? (e.g., Tylenol is not likely to be used to become intoxicated; Klonopin may be.)

3. Review recent mental health history and any past history of suicide attempts/self-injury behavior (check self-harm log). Did the individual:
   - Voice suicidal ideation (including conditional suicidal ideation)?

   - Have admissions to a MHCB unit?
   - Engage in self-injury behavior?
   - Have a history of depression or mood disturbance?
   - Have a history of psychosis?

4. Review substance abuse history.
   - What substances were used?
   - Have there been any past overdoses?
   - If yes, what did the individual say about them at the time?
   - What substance abuse treatment was offered?
   - How recent are reports of current use?

5. Review recent custodial information.
   - Was the individual facing criminal charges?
   - Did the individual lose an appeal?
   - Did the individual have any recent losses?
   - Was there any "bad news" readily apparent?

6. Review medical information for the presence of:
   - Chronic pain
   - Terminal illness

7. Was there a suicide note or a note that could be construed as such?

## SELF-INJURY INCIDENTS, INCLUDING SUICIDE ATTEMPTS

Self-injury among incarcerated persons is a serious problem. A 2011 national survey collected data from 39 state and federal prison systems in the United States. The study's authors found that "in the average prison system less than 2% of individuals per year engaged in self-injurious behavior...."[48] Most systems surveyed reported that these types of incidents are at least somewhat disruptive to facility operations and consumed significant mental health resources.[49]

In 2017, CDCR established an electronic system to track incidents of self-injury. Suicide prevention coordinators in each institution enter data about intent, medical severity, method, and disposition into the electronic health record system. The On-Demand reporting system generates a real-time report available statewide that can be used to track individuals and injuries across all settings.

In 2021, the system reported 5,348 separate incidents of self-injury by 1,869 unique individuals.[50] The majority of these incidents (N = 3,984) resulted in no or minor injury. Most incidents of self-injury during 2021 (4,573 or 86% of all reported self-injury where the intent was known) were non-suicidal (Table 16). However, 493 (9%) were considered suicide attempts (self-injury with intent to die), of which 15 (0.3% of total incidents and 3% of all incidents with intent) resulted in death by suicide (Table 17). There were also 282 incidents where intent could not be determined. For reference, in 2020, the system reported 5,472 separate incidents of self-injury by 2,088 unique individuals. The majority of these incidents (N = 4,285) resulted in no or minor injury. Most incidents of self-injury during 2020 (4,539, or 88% of all reported self-injury where the intent was known) were non-suicidal. However, 616 (12%) were considered suicide attempts (self-injury with intent to die), of which 31 (0.6% of total incidents and 5% of all incidents with intent) resulted in death by suicide. There were also 317 incidents where intent could not be determined. Of these, 13 had severe injuries and 79 had moderate injuries.

Table 16. Non-Suicidal Self-injury Incidents in CDCR by Mental Health Level of Care and Injury Severity, 2021 (excluding incidents with unknown intent)

| Level of Care | No Injury | Minor | Moderate | Severe |
|---|---|---|---|---|
| GP | 31 | 47 | 14 | 0 |
| CCCMS | 122 | 292 | 70 | 8 |
| EOP | 235 | 732 | 145 | 10 |
| MHCB | 157 | 436 | 36 | 5 |
| ICF | 173 | 974 | 193 | 11 |
| ACUTE | 140 | 645 | 86 | 4 |
| Total | 858 | 3126 | 544 | 38 |

Of the 476 non-lethal incidents with intent to die, 156 (33%) had moderate or severe injuries ("serious" attempts). The majority of self-injury incidents with intent to die resulted in no or minor injury. Table 17 gives a breakdown of these incidents, including the ones resulted in death in 2021. For reference, in 2020, of the 585 non-lethal incidents with intent to die, 219 (37%) had moderate or severe injuries

---

[48] Although two percent may appear small, across a national state prison population of more than 1.3 million individuals, two percent is more than 25,000 individuals who have self-harmed themselves

[49] Appelbaum, K., Savageau, J., Trestman, R., Metzner, J., & Baillargeon, J. (2011). A national survey of self- injurious behavior in American prisons. *Psychiatric Services* 62(3), 285. https://dx.doi.org/10.1176/ps.62.3.pss6203_0285

[50] Seven incidents had no data about intent and/or injury severity and were excluded from this analysis.

("serious" attempts) and comprised 4% of all self-injury incidents with or without intent to die. Of the incidents considered serious non-lethal suicide attempts, 74 (34%) were by individuals at the EOP level of care, 53 (24%) were at the CCCMS level of care, 75 (34%) were among psychiatric inpatients, and the remaining 17 (8%) were either not in the MHSDS or were in a Reception Center. During 2020, ten individuals made two serious suicide attempts and 16 individuals made three or more serious suicide attempts. The most common methods used in serious attempts were laceration (N = 85), poisoning (N = 41), hanging (N = 24), and insertion/ingestion (N = 19). Jumping (N = 4), asphyxiation (N = 5), and combinations (N = 41) made up the remaining incidents.

Table 17. Self-Injury Incidents in CDCR with Intent to Die, by Mental Health Level of Care and Injury Severity, 2021 (excluding incidents with unknown intent)

| Level of Care | No Injury | Minor | Moderate | Severe | Death |
|---|---|---|---|---|---|
| GP | 12 | 15 | 12 | 2 | 5 |
| CCCMS | 27 | 43 | 33 | 9 | 4 |
| EOP | 30 | 55 | 33 | 15 | 3 |
| MHCB | 25 | 45 | 13 | 0 | 0 |
| ICF | 12 | 27 | 15 | 6 | 2 |
| Acute | 15 | 14 | 12 | 6 | 0 |
| Total | 121 | 199 | 118 | 38 | 14 |

Of the 4,573 incidents of non-suicidal self-injury, 582 (13%) were classified as moderate or severe in medical severity. The most common methods of NSSI were laceration and ingestion or insertion. More than 87% of the NSSI lacerations were classified as No Apparent or Minor Injury. For reference, in 2020, of the 4,539 incidents of non-suicidal self-injury, 620 (14%) were classified as moderate or severe in medical severity. The most common methods of NSSI were laceration and ingestion or insertion. More than 95% of the NSSI lacerations were classified as No Apparent or Minor Injury. Of the ingestion or insertion injuries, 77% were classed as "No Apparent or Minor Injury." Overall, 92% of unique individuals with non-suicidal self-injury were participants in the MHSDS, with 63% at the CCCMS and EOP levels of care.

## SUICIDE RESPONSE PROCEDURES

The process of responding to and reviewing suicide deaths is governed by the MHSDS Program Guide, 2019 Revision, Chapter Ten: Suicide Prevention and Response (12-10-23 to 12-10-28), and internal timelines of the Suicide Prevention Program of the Mental Health Program.

**Reporting of a suicide to stakeholders:** When an incarcerated individual dies by suicide, members of the SMHP complete two formal notification processes. First, a death notification is written and sent to the OSM and contains basic and preliminary details of the suicide. Second, a summary of the suicide is composed and sent to the Deputy Director of the SMHP and the Undersecretary of Health Care Services as well as the Governor's office. The Public Information Officer at the institution is assigned with any local notifications or reports regarding the death, including notifying the next of kin of the suicide.

**Institutional internal review process**: The internal process for reviewing suicides at CDCR institutions includes reviews by mental health, custody, and nursing/medical personnel employed at that

site. The reviews are conducted first within disciplines and then within joint institutional reviews, such as during SPRFIT and emergency medical response committee meetings.

Each CDCR institution has a SPRFIT committee, chaired by a Senior Psychologist Specialist assigned to coordinate local prevention and response efforts. The institution's SPRFIT is established and maintained by the Mental Health Program subcommittee, with both committees being part of local Quality Management Committee. Each institutional SPRFIT is responsible for monitoring and tracking all self-harm events, ensuring that appropriate treatment and follow- up interventions occur. When deaths by suicide occur, the local SPRFIT coordinator is required to notify the SMHP, to provide assistance to mental health, custody, and nursing suicide reviewers, and to ensure the implementation of QIPs resulting from the suicide review.

**External review processes**: CDCR's response to any patient suicide includes external reviews by Nursing, Medical, Custody, and Mental Health staff. Within three days of the suicide, Headquarters reviewers from each discipline are assigned to review the case. The role of each discipline's review is discussed separately below, but these disciplines collaborate with each other during the suicide review process, sharing initial findings, conducting reviews together, etc.

Trained custody and mental health reviewers conduct an on-site visit together within seven days of a suicide. Reviewers inspect the deceased's property, listen to recorded phone calls, check trust account records, and talk with the institutional Investigative Services Unit (ISU). Reviewers evaluate emergency response actions and review the medical and mental health services rendered in the case, if applicable. Reviewers will also talk with officers, clinicians, work or school supervisors, and cellmates who may have known the patient. Reviewers may gather information from other sources as well, e.g., interviews of family members. After thorough chart review, reports are generated by each discipline, with a combined report, the Suicide Report, distributed and discussed in the SCR.

SCR meetings review findings in the case within and across disciplines while sharing information with institutional leadership. The preliminary Suicide Report contains QIPs that are presented at the SCR; these plans cross disciplines as well. Nursing, medical, and mental health disciplines additionally have peer review bodies that are able to review staff performance when indicated. The external review process is completed when all QIPs have been successfully implemented or resolved in the case.

**DAI Mental Health Compliance Team (MHCT) reviews:** The reviews completed by DAI's MHCT focus on the performance of custody staff members related to the suicide. The MHCT member reviews custody documentation and institutional records (i.e., SOMS). The MHCT member's role is to determine whether departmental suicide prevention practices and policies were followed by custody staff involved in the case. The MHCT reviewer, for example, evaluates whether custody officers followed procedure during the emergency response, how quickly the response was called once the suicide attempt was discovered, and whether all custody staff responding to the incident had received required training (e.g., in CPR) within set timelines (e.g., annually). The context of the suicide may necessitate additional review items. Most notably, if the individual was in a segregated housing unit at the time of the suicide, the MHCT reviewer will evaluate performance on tasks such as timeliness and quality of welfare checks, as specified by policy, whether inmates new to an ASU were placed in intake cells, and so forth. The MHCT reviewer also constructs a timeline for the emergency response and for significant events leading up to the suicide. Finally, the MHCT reviewer will document any concerns noted and will recommend corrective action/QIPs.

**Nursing reviews:** At the same time as a suicide is reviewed by DAI's MHCT, a Nurse Consultant Program Reviewer (NCPR) is assigned by a Headquarters Chief Nurse Executive. The NCPR does not make

an on-site visit but reviews all health care record documentation as to the quality of nursing care in the case. LPT practice is also covered within the nursing review. The NCPR and mental health case reviewer frequently consult on cases during the review period.

The NCPR generates a Nursing Death Review Summary (NDRS). The NDRS lists the primary cause of death, notes whether coexisting conditions were present prior to the death, summarizes medical history, reports what medications and medical treatment the patient was receiving, and documents significant events that occurred medically for the patient prior to and at the time of discovery. The NCPR determines if nursing standards of care were met within the emergency response to the suicide and whether nursing standards of care were met in the overall medical care of the patient prior to the time of death.

**CCHCS Death Review Committee:** The CCHCS Death Review Committee reviews all causes of inmate mortality within CDCR. When a suicide occurs, the Death Review Committee assigns a physician to serve as the medical reviewer. This physician works with the NCPR to examine all aspects of health care received by the patient and will yield an opinion as to the cause of death. As needed, the SMHP reviewer may also consult with the CCHCS physician reviewer. The physician and NCPR produce a Combined Death Review Summary (CDRS) on each case. The CDRS contains both an administrative review and a clinical mortality review of the case. In cases of suicide, the suicide report (discussed below) is reviewed by the Death Review Committee and addends or is integrated with the CDRS. The findings of the NDRS and CDRS are then considered by the CCHCS Death Review Committee for corrective actions on either an institutional or individual basis.[51]

**Statewide Mental Health Program (SMHP) reviews:** Simultaneously with Custody, Medical, and Nursing reviews, a trained member of the SMHP is assigned to review each suicide. The assigned Mental Health Suicide Reviewer, typically a Senior Psychologist Specialist, is tasked with completing a SCR. The Mental Health Suicide Reviewer schedules an on-site visit with the institution and is accompanied by the custody reviewer. The site-visit is conducted within seven calendar days of the death. The site review consists of an inspection of the location of the suicide and of the means used in the death, an inspection of the deceased's personal property, and interviews of inmates, Custody, Medical, or Mental Health staff who knew, interacted with, and/or treated the deceased. The deceased's property is inspected to see if there is any information present related to the suicide, such as a suicide note, letters to the inmate informing them of bad news, and other information associated the death. Interviews focus on behavior and statements made in the days prior to the suicide, with questions about anything the deceased may have said about being distressed or suicidal in past days, weeks, or months. Photographs of the scene at the time of death and photographs of the autopsy are made available, as are phone records, trust accounts, toxicology reports, and other information. The Mental Health Suicide Reviewer may contact family members of the deceased to gain additional information about the individual's state of mind, any statements made prior to the suicide, etc.

In addition to the on-site review, the Mental Health Suicide Reviewer reviews extensive documentation from medical and custodial files. The focus of the Mental Health Suicide Reviewer will vary based on the factors in the case, though all relevant information is reviewed in each case. In some cases, the review will concentrate on mental health treatment received while at CDCR; in others, on the quality of suicide risk assessment; in yet others, on the presence or absence of distress when an inmate is placed in administrative segregation, and so on. SMHP psychiatry staff review the psychiatric care and consult with the Mental Health Suicide Reviewer. The Mental Health Suicide Reviewer will review information

---

[51] CCHCS Health Care Department Operating Manual (HCDOM), Sec.1.2.10

from each of the institutions where the deceased resided and will look at whether mental health policy and procedure was followed at each setting.

**Determination and tracking of QIPs**: Each SCR report may include formal QIPs as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing, medical, or mental health case reviewers. QIPs may represent areas of deviation from policy or procedure, departures from standards of care, or systemic issues that require examination, modification, or innovation. QIPs may be written for any discipline and can focus on the specific institution where the suicide occurred. Occasionally a QIP will request that an institution's warden determine whether a formal investigation take place involving one or more aspects of a death. If systemic issues are identified, the QIP can be directed to the SMHP SPRFIT, a team that can address statewide policies and practices. The Division of Corrective Health Care Services (DCHS) SPRFIT team includes representatives from nursing, custody, legal, mental health, and mental health quality management. This representation allows the team to review issues and find solutions in a manner that is inclusive of disciplines and effective in addressing problems.

SCR meetings are held by teleconference so that staff from the institution can attend. During the meeting, the case reviewer will read sections of the Suicide Report. The Suicide Case Review Committee (SCRC) is made up of members of the CDCR SMHP, DAI MHCT, Nursing Executives, CDCR's Office of Legal Affairs, and medical personnel (as needed). The SCRC also discusses the QIPs raised within the Suicide Case Review with the institution. Institutional staff can respond to or clarify concerns raised in the report, can raise additional concerns, or can discuss ways of meeting the requirements of QIPs. Since late 2015, experts from the *Coleman* OSM have participated in the SCR process and provided critiques of the preliminary draft report that have resulted in some revisions, including additional QIPs, of those reports. QIPs can also be written as pending concerns that need to be addressed if a fact or finding awaits further information, such as awaiting the results of a coroner's report to determine the time of death.

**Audits of Suicide Case Review Quality:** Mental Health Quality Management audits all SCRs for fifteen items. The SCRs are scored with required elements marked present or absent.

## DETERMINATION AND TRACKING OF QUALITY IMPROVEMENT PLANS

Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case. QIPs are developed based on concerns or departures from policies and procedures identified by custody, nursing, medical, and mental health case reviewers regardless of whether the concern or departure led to the suicide. The plans are designed to remedy specific issues raised within each review, though in some cases the plans developed address statewide policy or prevention initiatives. Once a QIP has been assigned to an institution, the assigned party, has 60 days from the receipt of the final report to determine the action that will resolve the identified problem and provide proof of practice that remediation was completed. Historically, this is where the process ended. The Suicide Prevention and Response Unit at Mental Health Headquarters would review the documentation and determine if it was resolved, assuming all relevant information was provided. Figure 8 shows the proportion of QIPs assigned by discipline for both 2020 and 2021.

Figure 8. Proportion of Suicide Case Review QIPs by Domain, 2020 and 2021



However, CDCR has recognized that this process does not allow for a full determination that the remediation was effective at reducing future incidences of similar non-compliance and/or policy violations. With the allocation and hiring of the Suicide Prevention Coordinators in each region, which was finalized in June 2021, CDCR was able to begin developing the process of monitoring QIP efficacy. However, given that the Coordinators were not all fully onboard with the suicide prevention and response unit until mid-2021, their full oversight capabilities remained limited throughout 2021. As such, in 2021, a more robust feedback loop to track the ongoing efficacy of the interventions employed by an institution was in its infancy. Moving forward, the Suicide Prevention Coordinators in each of the regions will track all QIPs after they have been completed by the institutions in their regions. During their regular onsite monitoring, the coordinators will report on the ongoing status of the originally identified deficiency and discuss with the institutional SPRFIT Coordinator any concerns. An institution is determined to be compliant if, after two consecutive onsite visits, the issue appears to no longer be an issue. Compliance may be demonstrated through direct observation or review of documentation, by the Suicide Prevention Coordinator, of the noted concern noted in the QIP. It can also be demonstrated through improved rates of compliance on automated metrics, if applicable. If an institution continues to demonstrate non-compliance with an issue that was identified as a QIP, a formal CAP will be assigned, and the institution will be required to establish a new intervention to improve performance in a sustained manner. A specific issue at CHCF-PIP was that only psychiatrists are provisioned and placing issue/observation orders. Training was provided in February 2021 to all clinical staff. During the on-site review, the coordinator reviewed the EHRS which indicated that psychiatrists continue to be the only provider placing issue/observation orders. CHCF-PIP reported they will be providing small group hands-on training by the end of May 2021 to clinical staff and an implementation date for psychologists to place orders was not determined. In an update on May 2022, CHCF-PIP reported psychologists are now placing observation/issue orders. However, the coordinator's review of observation/issue orders indicated that this is a very infrequent event. As a result, this will be incorporated into a new CAP. For example, if there was a documentation issue within a treatment plan, the coordinators would audit a random sample of approximately 5-10 charts. While this process is still in its infancy and ongoing modifications to methodology may be needed, the Suicide Prevention Coordinators were able to give feedback to a few QIP outcomes in their respective institutions for 2021.

As the statewide Suicide Prevention and Response Unit reviews issues that arise in Suicide Case Reviews, it also identifies issues across institutions that appear to be systemic and necessitate intervention at an agency level, rather than relying on institutions to resolve the concerns locally. When these issues emerge, the statewide SPRFIT Committee will take on the onus of remediation and the development of

statewide solutions. This can come in the form of policy language revisions, introduction of new policies or procedures, or development of new programs or interventions.

In 2021, of the 110 QIPs assigned, 61 were MH-related, 31 were Custody-related, 17 were Nursing-related and 1 was Multidisciplinary. For the majority of the QIPs, the expectation was for the institutional leadership to identify remediation and resolve the concerns within their respective institution. Two of the QIPs were assigned to headquarters to address, as they were systemic concerns. One HQ QIP was completed by the regional coordinator who went out to the institution to train on documentation and determination of clinically appropriate issue and observation levels for patients in inpatient settings. The second HQ QIP involved the HQ tele-psychiatry unit, which is working on a policy to help with concerns about no-show appointments. As previously stated, tablets have begun to be utilized and psychiatrists in the field found this to be helpful in reducing refusals for psychiatry appointments. This should continue to be monitored to establish sustained progress. There was a third HQ QIP that was not a systemic concern. This QIP resulted in a training developed by HQ to specifically address the clinical significance of appropriately documenting the correct gender identified by a transgender individual. The training was implemented and no further issues were identified. The Suicide Prevention Coordinators will continue to monitor in this as well as other institutions.

Many QIPs were issues that were handled by their respective institutions. These QIPs involved training and mentoring that was needed to help prevent issues with documentation, knowledge of policy, etc. This continues to be a problem within the institutions and is in need of improvement. The addition of the Suicide Prevention Coordinators in 2021 will help address these ongoing issues. The coordinators will also follow up to see if there are trends within the institution on reported deficiencies. Additionally, they will assess for any delays and barriers to the implementations of the QIP. Some concerns which arose in more than one suicide case review or at more than one institution are considered at the statewide level to explore whether there are systemic issues that need to be addressed.

An in-depth review was conducted to determine if there were any pervasive issues within an institution that had more than one death by suicide in 2021. CIM had three individuals who died by suicide. CIM had a total of 10 Custody QIPs, 3 Nursing QIPs, and no MH QIPs. In two of the cases, the condition of the body was a QIP for custody. The institution is waiting on the autopsy report to determine whether further action is needed to address potential violations of policy. Guard 1 checks were found to be in compliance with departmental policy.

MCSP and SVSP had two individuals each who died by suicide. MCSP had a total of 6 MH QIPs, 4 Custody QIPs, and 1 Nursing QIP. There were no commonalities among the two cases pertaining to institutional issues. Of significance, all 6 MH QIPs were from one individual case.

SVSP had 27 MH QIPs, 9 Custody QIPs, and 6 Nursing QIPs. One individual case had more than one institution involved. Specific to MH concerns at SVSP, the commonalities found in these cases are no weekly clinical contact provided when required, problems with issue and observation, issues with SRASHEs, and no follow up in psychiatry no shows. Randomly selected cases were audited and training was provided for the issues listed above. Mentoring with a supervisor was also provided for the issues relating to SRASHE completion. Due to a continued pattern of SRASHE issues, in one case, a specialized one-hour training was provided using the current SPI training as well as the individual's SCR. This training was presented to every single Mental Health Clinician at SVSP. As a result of an identified issue pertaining to inadequate tele-psychiatry appointments, tele-psychiatry provided their staff with tablets equipped with a camera in case a patient is a no show for their appointment. This solution provides for a tele-

presenter to go to the cell and allow the psychiatrist a chance to engage with the patient in order to provide care. Concerns related to custody training compliance were also noted as an issue at SVSP and was resolved through ensuring all staff received the requisite trainings. A follow up would be needed to ensure efficacy of the implementation of these QIPs.

In contrast, in 2020, 9 institutions had more than one person die from suicide. One of the institutions, WSP, had two deaths by suicide however only one of the individuals had QIPs assigned. The remaining institutions - HDSP, COR, CCI, CTF, KVSP, LAC, MCSP, SAC – all had between 2 to 4 deaths by suicides each in 2020. HDSP had 3 deaths with a total of 15 QIPs from all three disciplines. A commonality with this institution was 2 instances of treatment planning concerns. COR had 2 deaths with a total of 14 QIPs but had no commonalities in any of the disciplines between the two cases.  CCI had the most deaths at 4 with a total of 13 QIPs. The commonalities with this institution involved SRE justification issues from MH and emergency response concerns from Nursing. CTF had 3 deaths by suicide with a total of 14 QIPs with one commonality related to continuity of care issues from MH. KVSP had 2 deaths by suicide with a total of 8 QIPs, all MH, with no commonalties between the two cases. LAC had 2 deaths by suicide with a total of 10 QIPs. There were two commonalties, both for MH, which consisted of treatment planning issues and self-harm reporting concerns. MCSP had 2 deaths by suicide with a total of 13 QIPs but there were no commonalities between the two cases. SAC had 3 deaths by suicide with a total of 21 QIPs; there was one commonality - SRE justification of risk issues from MH.

Once an institution has been assigned a QIP, the local leadership is tasked with developing the remediation necessary to ensure sustained correction has been achieved for the identified concern. Table 18 summarizes the actions taken by either individual institutions or Headquarters. The table below shows the breakdown by discipline to issues that were documented more than twice, which could be viewed as a pattern of concern. Of importance, the number of issues represents the number of instances in which the concern was present, not different individual decedents. The issues identified are generated from the QIP descriptors (Appendix B). For example, there are 8 instances of issues with MH Treatment Planning; however, these issues came from only three of the 15 decedents. In 2021, 2 cases were referred to OIA for concerns due to staff misconduct, whereas in 2020 in 5 cases were referred. In subsequent reports, a column for efficacy of the actions taken will be included in this table.

There were no QIPs related to Mental Health Assessments associated with Rules Violation Reports in 2021. There were eight instances with Treatment Planning concerns for three individuals.

For the first individual, treatment planning concerns were found in the treatment plan documentation from three institutions. At one institution, the patient's treatment plan did not have treatment goals aimed at addressing their symptoms of psychosis or mental health diagnosis, so it is unclear how progress toward addressing these symptoms was acknowledged. At a second institution, the treatment plan did not include any identified treatment interventions. Subsequent progress notes revealed there were no interventions aimed at addressing the patient's psychiatric symptoms or diagnosis included as part of their treatment plan.  Another treatment plan at this institution did not contain any other treatment goals targeting symptoms of mental health, diagnosis, or reason for the MHCB admission included as part of their treatment plan. In a third instance at this institution, it was unclear why there were no treatment goals targeting suicide included as part of the treatment plan. At a third institution, the MH Treatment Plan was only minimally updated from the prior IDTT, as the majority of information appeared to have pulled forward without change.

The second individual had one instance where the MH Master Treatment Plan during their placement in EOP level of care did not include clinically indicated treatment goals.

The third individual had concerns with the MH Master Treatment Plans from two different institutions.  In the first institution, the MHCB MH Master Treatment Plans did not include IPOCs or PLOs addressing the patient's symptomology and reason for MHCB placement. Also, the documentation did not include updates with treatment progress, nor were significant mental health symptoms and behaviors addressed as part of treatment planning in the IDTT documentation.  In the second institution, concerns identified in the Acute ICF Master Treatment Plans included missing IPOCs and PLOs addressing the reason for PIP placement and mental health symptoms, so it is unclear what treatment interventions were utilized in this PIP placement. Some Acute ICF Master Treatment Plans documented that the patient no longer met criteria for acute hospitalization and was referred for discharge, but did not include the status of what the patient's discharge was or that they remained at the PIP-Acute level of care for subsequent weeks. Additionally, the PIP-Acute discharge Acute ICF Master Treatment plan did not specify why the patient was not retained at the PIP-Acute level of care or discharged to another inpatient setting given their recent shifts in presentation with behavioral changes and substance abuse.

There were seven instances wherein five individuals who died by suicide in 2021 were not provided with treatment within specific Program Guide timelines for the level of care in which they were enrolled.

The first individual began receiving bi-monthly MHPC EOP contacts starting several months before their death. Four months prior to their death, the inmate refused their MHPC contact, and was not scheduled or seen again until a month later, when they were approached at cell front. The patient's mental health record does not indicate why they were not seen every 30 days, as required under the Program Guide.  They were seen every month during the three months prior to this death.

The second individual was admitted to the MHCB for six weeks. Although the patient received the required daily visits for 11 days, there was one day where they were not seen, as required under the Program Guide. This instance occurred one year prior to the death by suicide.

The third individual in the EOP level of care went six weeks (instead of four weeks) without receiving Program Guide required MHPC and/or MHMD contacts. This instance occurred five months prior to the death by suicide.

The fourth individual was not offered the Program Guide-required weekly contact for four weeks. This instance occurred approximately 10 months prior to the death by suicide. At a second institution, while at the MHCB level of care, a mental health clinician did not provide the patient with one of their required daily contacts. This instance occurred two months prior to the death by suicide.

The fifth individual did not receive interventions that providers had documented would be offered to this patient. Also, during an MHPC routine contact, the clinician indicated that the patient continued to function well and was denying symptoms, including any thoughts of self-harm, but documented that the patient would be offered bi-weekly contacts which did not happen for a few weeks as required under the Program Guide. This instance occurred 10 months prior to the death by suicide.

There were three instances where emergency response was improper. In one instance, responding officers did not provide immediate life support from the initial time of discovery until the

patient's removal from the cell and the initiation of CPR, a delay of eight minutes. A second instance involved custody responders conducting an immediate cell extraction without donning extraction equipment prior to entering the cell. The third instance, according to documentation, involved staff lowering the patient to the floor and first checking for vitals. Checking for vital signs before initiation of CPR, however, is not aligned with the proper protocol of administering CPR, based upon training.

There were 3 instances of 911 activation that were not handled in a timely manner. In the first instance, the activation of the Emergency Medical System (calling 911) did not take place until approximately 5 minutes after the emergency was observed. Although staff noted initial activation three minutes after discovery, it did not appear that the radio transmission was captured by Central Control. In the second instance the activation of EMS did not take place until approximately 8 minutes after the emergency was first observed and reported. In the third instance, the activation of the EMS did not take place until approximately 12 minutes after the emergency was observed.

There were three issues with the cut down tool kit. In the first instance, custody responders separated the cut-down kit and retrieved only the RESQHOOK followed by the AMBU-BAG. In the second instance, Custody staff failed to retrieve the cut-down kit as instructed in the January 22, 2018, Memorandum titled, "RESPONSE TO SUICIDE ATTEMPTS BY HANGING OR ASPHYXIATION, INTRODUCTION OF THE REPLACEMENT CUT-DOWN TOOL, AND STANDARDIZATION OF THE CUT-DOWN KIT." In the third instance, the responding officers failed to support the patient's body as the ResQhook was being utilized.

There were three instances of individuals being handcuffed at the time they were found. These incidents all occurred in a restricted housing setting, where individuals are placed in restraints upon entering a cell during an emergency. This ensures safety for both the staff and individuals when in a maximum-security setting. If medical personnel deem that the restraints impede lifesaving measures, they may be removed immediately.

Table 18: Common Issues, by Discipline, in the 2021 QIPs

| Discipline | Number of Issues | Issue Identified | Assigned Party | Action Taken |
|---|---|---|---|---|
| Mental Health | 3 (5%)* | Missing MH Documentation <br> *Missing Progress Notes* <br> *Missing Master Treatment Plan* | Institution | Audit completed; training provided; PIP added full time PIP SPRFIT to ensure compliance |
| | 3 (5%)* | Psychiatry No Referral for Non-Compliance | Institution | Training provided; tele-psychiatrists started utilizing tablets with cameras |
| | | | HQ | Adjustments to "refusal policy" |
| | 3 (5%)* | PIP Issue and Observation <br> *Improper Clothing Assigned* <br> *Improper Level of Supervision* | Institution | Audit completed; training provided; HC OP 212 being updated to reflect |

| Discipline | Number of Issues | Issue Identified | Assigned Party | Action Taken |
|---|---|---|---|---|
| | | | | language for use of Enhanced Observations |
| | 4 (7%)* | Level of Care Issues *Insufficient Level of Treatment for Symptom Presentation* | Institution | Audit completed; training provided |
| | 4 (7%)* | Issue and Observation *Improper Clothing Assigned Improper Level of Supervision* | Institution | Audit completed; training provided; orders renewed daily |
| | | | HQ | Regional SPRFIT provided training |
| | 4 (7%)* | PIP Frequency of Contacts *Insufficient Contact with Clinician* | Institution | Audit completed; training provided; tool to track patients by unit created |
| | 5 (8%)* | SRE/Justification of Risk *Underestimation of Level of Risk* | Institution | Audit completed; training and mentoring provided |
| | 7 (11%)* | Program Guide Timelines *Insufficient Client Contact Patient Not Seen in Timely Manner* | Institution | Audit completed; training provided |
| | 8 (13%)* | Treatment Planning *Treatment Plan Minimally Updated No Identified Treatment Interventions* | Institution | Audit completed; training provided; psychiatrist will review MH plans for inclusion of IPOCS |
| Custody | 3 (10%)* | 911 Activation (joint w/nursing) *Delay in calling 911* | Institution | Addendum to post orders completed; training provided |
| | 3 (10%)* | Emergency Response *Delay in initiating CPR Delay in opening cell door* | Institution | PPE was relocated; simulated emergency response drill conducted; training provided |
| | 4 (13%)* | ASU Policy/CDCR 114 issues *Improper Documentation of Form 114 Min. hours of Yard not offered* | Institution | Training provided |

| Discipline | Number of Issues | Issue Identified | Assigned Party | Action Taken |
|---|---|---|---|---|
| | 7 (23%)* | **Custody Training** *Training not current* | Institution | Training provided |
| | | | Institution | Audit completed; Training provided; MH Observation Report Tool created by QM |
| Nursing | 5 (29%)* | **Nursing Documentation** *Incomplete Documentation Inadequate Documentation Noncompliance of Rounding Documentation* | Institution | Training provided |

*The percentages are based on the respective disciplines: MH at 61 instances, Custody at 31 instances and Nursing at 17 instances

In comparison to the 110 QIPs in 2021, there were 202 QIPs at issue in the 31 deaths by suicide in 2020. Similar to 2021, the majority were MH related. There were 124 MH QIPs or 61% of total QIPs, 35 Custody QIPs or 17% of total QIPs, 24 Nursing QIPs or 12% of total QIPs, and 19 Multidisciplinary QIPs or 9% of all QIPs. In 2021, compared to 2020, the percentages of MH (57% vs. 61%) QIPs was lower, Custody (26% vs. 17%) and Nursing (16% vs. 12%) QIPs were higher, and Multidisciplinary QIPs were the same (9% vs. 9%). Even though MH QIPs continue to be the highest percentages of QIPs, it's an encouraging sign that the percentages of QIPs have decreased for 2021. Although not many, there are still commonalities seen in 2020 that have not been remedied in 2021. Table 19 provides a breakdown of the commonalities in QIPs of the most challenging issues in 2021. Prior years are broken down by the raw data as well as the percentages of their respective QIPs by discipline. As shown below, every category except Program Guide Timelines decreased in percentages from 2020 to 2021.

Table 19: Most Frequent QIPs for 2021, Comparison to Prior Years, Frequency and Percentages

| QIP Issues | Discipline | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Treatment Planning | MH | 7 | 8% | 18 | 17% | 14 | 8% | 18 | 15% | 8 | 13% |
| SRE/Justification of Risk | MH | 7 | 8% | 3 | 3% | 22 | 12% | 11 | 9% | 5 | 8% |
| Program Guide Timelines | MH | 6 | 7% | 11 | 11% | 11 | 6% | 8 | 6% | 7 | 11% |
| 911 Activation | Custody | 11 | 22% | 4 | 13% | 5 | 11% | 7 | 20% | 3 | 10% |

Table 19 only includes issues that trended over the past five years.   The following issues CDCR found and reported on for suicides that occurred in 2021 were not included in Table 19 for that reason: nursing documentation, Custody Training, ASU Policy Issues, LOC Issues, PIP Frequency of Contacts, and Issue and Observation. If any of these issues continue to be problematic, they will be added to the table in subsequent years of annual reporting.

The Statewide Suicide Prevention and Response Unit reviews these trends regularly to determine if intervention is required. It is clear that work remains to refine the various concerns identified above and

specific work is underway to address these concerns. For example, an ongoing concern that has been found across many suicide case reviews at nearly all institutions is adequate suicide risk justification. The current suicide risk evaluation has been an item under consideration for revision to assist clinicians in making more accurate risk justifications and streamlining the process of gathering critical information to aid in this decision making. As a result, in 2022, a workgroup convened with the *Coleman* OSM, representatives from CDCR Statewide Mental Health Program, and field leadership to review the current SRASHE form and make recommendations on how to improve the form. Work continues to develop a new suicide risk evaluation for the field to use that addresses correctional-specific suicide risk factors and enhances clinicians' ability to assess and act upon suicide risk.

In two instances, one in Region II and one in Region IV, after trainings, institutions continued to have concerns which resulted in Corrective Action Plans (CAP). For Region II, self-harm powerforms were not consistency being completed for all self-harm incidents. In Region IV, level of observation/issue justified in the documentation was not present. Due to these two continuing issues, both will be a formal CAP that the regional specialist will monitor closely during subsequent visits. In Region III, one institution continued to demonstrate deficits in maintaining compliance with timely completion of the 5-day follow-up process after a patient is discharged from an inpatient setting. The regional coordinator suggested a change in practice to increase oversight of daily 5-day follow-up completion. This proved productive and yielded high compliance rates of 96% in February 2022 and 100% compliance rates in March 2022.

## COMMONALITIES IN INDIVIDUAL CASE REVIEWS

Case reviewers found a number of commonalities among the 15 suicides in 2021. Most of these variables are systemic issues that cross disciplinary and professional lines. Case reviews assess elements such as an individual's care, functioning, and behavior in the year leading up to their death and evaluate the institutional response to the suicide attempt.

When an element is found to be lacking or of poor quality, the reviewer will almost always recommend implementation of a QIP. Risk assessments are scrutinized closely to make sure they capture the essential elements and are accurate reflections of the individual's risk state. Other elements of cases may or may not result in QIPs, depending on the severity of deviation from policy and procedure, how directly the element is related to the suicide death, and other issues tangential to the suicide. In SCR reports, reviewers *may* comment on what was done well within an institution and *may* state areas where policy was correctly followed. However, these comments are not required, as the expectation is that staff members follow policy and will act professionally in their work with individuals. In contrast, reviewers *must* identify departures from policy or from standards of care by creating formal QIPs applicable to each identified issue. Reviewers may also point to clinical, medical, or custodial practices that could be improved either at an institutional level or throughout all institutions; these practice suggestions can be addressed through QIP processes as well. Institutional responses to QIPs are sent to the SMHP and DAI leadership for review. If a QIP response is inadequate, the SMHP and DAI will request clarification, additional development, or implementation of the QIP. QIPs are not considered final until approved at the Headquarters level.

Poor quality mental health treatment planning can affect an individual's ability to adequately program in the prison environment. Suicide risk assessment and formulation of risk is an important aspect of treatment planning. Additionally, if suicide risk is not recognized by clinicians and their team, then adequate management of that risk is not possible. Of the 15 suicide cases in 2021, 71% were subsequently judged by case reviewers to have had inadequate treatment planning. Issues identified by the reviewers

included poor discharge planning from inpatient settings, insufficient efforts in dealing with the patient's poor treatment participation, and inadequate recognition of and efforts to deal with chronic suicidal ideation. Specific to Mental Health, 6 had issues with the SRASHE and/or Self-Harm assessments, 4 had concerns with a higher level of care referral being warranted, and 6 had questions about their level of issue and observation.

The quality of contacts with mental health staff can make a difference in outcomes for an individual. Good quality interactions have the ability to model positive and prosocial interactions and increase the probability of changing behavior. On the other hand, poor quality or simply the lack of contacts can alienate an individual from mental health treatment and lead to distrust of and distancing from mental health staff. In 2021, reviewers found that seven individuals who died by suicide had poor quality mental health contacts at some time in the year prior to their deaths.

Across the board with Mental Health, Nursing and Custody were issues with documentation. Mental Health had 9 instances of improper documentation from 2 decedents, Nursing had 8 instances from 3 decedents, and Custody had 3 instances from 1 decedent. Additionally, Custody had 7 instances of not being up to date on their training, either Suicide Prevention training or CPR/First Aid.

A prompt, vigorous, and timely emergency response can save a life. The response of custody, nursing, and health care staff is considered in CDCR's ratings of emergency response. Reviewers had concerns focused on emergency response in 3 of the 15 suicide death cases during 2021 to include cut-down tool issues, donning Personal Protective Equipment, and delay to call 911.

## AUDITS OF SUICIDE REVIEW QUALITY

SCRs are audited for the presence or absence of 15 elements considered necessary for an adequate review. The 15 elements can be found in Table 18. Of the SCRs completed in 2021, only one audit item fell below 90%.

The compliance rate in 2021 was 99%. One category fell below 90% compliance. There were two categories that were not at 100% compliant: The quality of the past-year's suicide risk assessments and the Quality Improvement Plans recommendations being adequate to address the concerns. Not all cases have all audit items, and so the number of applicable cases is often less than the number of total cases over the three years. The audit was completed by SMHP senior staff who do not write SCRs but do participate in the review of cases. Audit results are presented in Table 20.

Table 20. Results of Quality Audits, 2021 Suicide Case Review Reports

| Audit Item | Applicable Cases | Compliance |
|---|---|---|
| 1. Does the Executive Summary describe the means of death, the emergency response taken, and the Mental Health (MH) LOC of the patient? | 15 | 100% |
| 2. Are the sources for the Suicide Case Review (SCR) identified? | 15 | 100% |
| 3. Are substance abuse issues reported, if applicable? | 15 | 100% |

| Audit Item | Applicable Cases | Compliance |
|---|---|---|
| 4. Does the Institutional Functioning section include information on institutional behavior, including disciplinary history? | 15 | 100% |
| 5. Does the Mental Health History review the adequacy of mental health care and screening? | 14 | 100% |
| 6. Are medical concerns discussed (e.g., chronic pain, terminal illness) or is the absence of medical conditions noted? | 15 | 100% |
| 7. Is the quality of the most recent suicide risk evaluations (past year) reviewed, with comment on risk level, safety planning, and risk and protective factors? | 9 | 96% |
| 8. Does the Suicide History section review all prior attempts, as applicable? | 12 | 100% |
| 9. Are significant pre-suicide events discussed (e.g., receipt of bad news or existence of a safety concern)? | 15 | 100% |
| 10. Was a risk formulation offered specific as to why the person was vulnerable to suicide? | 15 | 100% |
| 11. Does the review comment on the adequacy of the emergency response? | 15 | 100% |
| 12. Are all violations of policy and breaches of standards of care in mental health, medical, and nursing addressed in the reviewer's concerns, if applicable? | 14 | 100% |
| 13. Were custody policies followed? If not, were violations noted in the report? | 15 | 100% |
| 14. Were all concerns raised by reviewers (custody, nursing, and mental health) represented in Quality Improvement Plan recommendations? | 14 | 100% |
| 15. Were the Quality Improvement Plan recommendations adequate to address the concerns? (e.g., QIP should not simply say conduct an inquiry and report findings). | 12 | 86% |
| Compliant Items/Total Items | 210 | 99% |

## TIMELINESS OF SUICIDE CASE REVIEWS AND SUICIDE REPORTS

The process of responding to suicides, completing reviews, writing and editing reports, and tracking QIP compliance involves a variety of interdependent steps. Timelines for each step of suicide response are specified in the MHSDS PG, 2021 Revision. Internal deadlines have also been developed to ensure timelines for each step of the suicide response process are met. The number of days for each step of the response to a suicide as specified in the MHSDS PG are shown in Table 21.

Table 21. Suicide Case Review Tasks and Timelines as Specified by the MHSDS Program Guide

| Case Review Actions | Number of Days after the DOD within which the action must be completed |
|---|---|
| Suicide reviewer assigned | 2 |
| Site visit | 7 |
| Institutional Internal Review submitted to the SMHP* | 10 |
| Custody & Nursing Report due to MH reviewer* | 22 |
| Suicide report received by the SMHP* | 25 |
| Suicide Case Review conference | 45 |
| Final suicide report to institution approved and signed by MH/DAI | 60 |
| QIPs completed at the Institution and submitted to the SMHP | 90 days from the receipt of the final report |
| Final QIP Report reviewed and approved/signed by MH and DAI leadership | 120 |
| Final QIP report electronically transmitted to the OSM | 180 |

*These are internally-established deadlines to ensure compliance with the PG timelines.

The suicide prevention and response team endured some initial delays in the assignment of a suicide case reviewer, particularly during unfortunate clusters of deaths by suicide. For instance, assignment of the suicide reviewer was completed within two days in 10 (67%) of 15 cases, within three days in 2 cases, within four days in 2 cases, and within five days in 1 case. As such, it was quickly identified that there was a need to promptly expand the number of available suicide case reviewers. Such initial delays further impacted subsequent timelines for some of these cases. Of the review team (mental health and custody) site visits, only one was completed within seven days of the date of the individual's death. The remaining were completed within 8 to 17 of the date of death, with the 6 of the remaining 14 cases within 10 days of the date of death. Additionally, (53%) reports were completed within 25 days of death and the remaining seven (47%) within 37 days. The average time for a draft report to be transmitted to the OSM was 30 days from the date of death. One report was sent 58 days after the date of death. The suicide response team has continued to expand the number of trained suicide case reviewers to address this identified deficiency.  There were other factors that contributed to deficient timelines such as additional, or unexpected information provided to the suicide case review team that warranted extra time to appropriately incorporate the findings into the suicide case review report. Eight SCR meetings (53%) were held on time. Two (13%) additional meetings were held within one week of the required timeframe. The remaining four late meetings ranged from 12 to 36 days late due to the complexity of the cases.

After suicide reports are reviewed at the SCR meeting, final edits are completed, and a finished report is sent to the institutions within 60 days after the date of death. In 2021, ten reports (67%) were sent to institutions within 60 days. One report was sent at 61 days, one was sent at 62 days, two were sent at 76 and 78 days, and one was sent at 83 days. QIPs are required to be reported back to Mental Health Headquarters, where they are reviewed and subsequently transmitted to the OSM. The timeframe for return of completed QIPs to Headquarters is 120 days post death. In 2021, 14 (93%) reports were returned by the 120-day mark. One report was returned after the 120-day mark.

## SUMMARY

Of the more than 125,000 individuals who spent a night in CDCR custody in 2021, 15 of them died by suicide. This was a significant decrease from the prior year, which reported 31 suicides. The vast majority of decedents died by hanging, similar to previous years. The decedents consisted of mostly men, one female and one transgender female. Race was not a significant factor, as Caucasians, African Americans, and Hispanics were equally represented. The ages of the decedents ranged from 23 to 61 years, with the largest represented equally amongst 25-34, 35-44, and 45-54 age groups. Most of the decedents were Level IV custody level, similar to previous years. Half of the decedents were in outpatient level of care, while two were inpatient and the rest receiving no mental health services. While the 15 suicides seen in 2021 is a welcome departure from the average of 30+ suicides seen in previous years, it should not be viewed as a prediction or a trend for years to come. CDCR continues to strive for improvement and will continue to assess effectiveness and monitor for quality and timeliness of suicide risk evaluations, treatment plans, and suicide prevention plans. CDCR continues to follow policies and procedures provided in the MHSDS Program Guide and will continue to utilize its resources to improve upon and expand its initiatives to help reduce the number of suicides in any given year.

## Appendix A

Chart Audit Tool



CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

# Mental Health Survey - Suicide Evaluation/Prevention - Suicide Risk Evaluations That Meet Audit Criteria (Quarterly)

Institution: ⌄   Area: ⌄   MHI: ⌄

CDCR#:   Form Author:

Document Date:

**1. If patient refused SRASHE, did the clinician document the steps taken to encourage participation or increase the patient's ability to participate in the SRASHE?**

☐ Yes
☐ No
☐ N/A

**2. If History of Suicide Attempts was endorsed are details of previous attempt(s) provided? (If patient does not have history of Suicide Attempts, mark N/A.)**

☐ Yes
☐ No
☐ N/A

**3. Does the narrative of risk justification address the following? (check all that apply)**

☐ Chronic Risk
☐ Acute Risk
☐ IS PATH WARM warning signs
☐ Protective factor

**4. If the safety plan is required per policy, is a plan documented?**

☐ Yes
☐ No
☐ N/A

**5. Safety Plan audit:**

   **Step 1: Which of the following is true for step 1:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized

☐ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs

☐ Not documented but reason noted

☐ None of the above

**Step 2: Which of the following is true for step 2:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized

☐ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs

☐ Not documented but reason noted

☐ None of the above

**Step 3: Which of the following is true for step 3:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized

☐ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs

☐ Not documented but reason noted

☐ None of the above

**Step 4: Which of the following is true for step 4:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized

☐ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs

☐ Not documented but reason noted

☐ None of the above

**Step 5: Which of the following is true for step 5:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized

☐ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs

☐ Not documented but reason noted

☐ None of the above

**Step 6: Which of the following is true for step 6:**

6/12/2020                                    CAT7 - New Form

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized

◯ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs

◯ Not documented but reason noted

◯ None of the above

**Step 7: Which of the following is true for step 7:**

☐ Collaboratively written to address modifiable risk, protective factors, and warning signs, specific and personalized

◯ Documented but not collaboratively written to address modifiable risk, protective factors, and warning signs

◯ Not documented but reason noted

◯ None of the above

Comment:

Submit

## Appendix B
QIP Descriptors

| MH QIPs |
|---|
| Clinical Care |
| **5 Day Follow/Up (e.g., not completed as required; not of adequate quality; failure to tie to safety plan)** |
| **Clinical Decision Making Concerns - Multiple clinical components going on within a QIP (e.g., discharging diagnoses outside of IDTT, not addressing the clinical issues in 7362s, no consideration of LOC change or no rationale for LOC change, lack of interventions to mitigate risk, no rationale for clinical decisions, no plan for follow-up care)** |
| **Confidential Setting (e.g., lack of use, lack of availability; seen cell-front by MHPC without documentation of reason why in progress note)** |
| **Continuity of Care/Clinician to Clinician Contacts** |
| **DDP Issues (e.g., failure to complete required assessments, lack of timely assessments, lack of inclusion of adaptive supports, failure to adequate provide adaptive supports; victimization issues)** |
| **Diagnosis Issues (e.g., lack of diagnosis, conflicting diagnoses, diagnostic disagreement not addressed)** |
| **IDTT Issues (e.g., lack of required membership;; not adequately updated)** |
| **Issue and Observation – including Alternative Housing, TMHU (2020), MHCB, and PIP (e.g., failure to order properly, failure to complete orders daily, failure to provide what was ordered; poor rationale)** |
| **MHCB: Issue and Observation (e.g., failure to order properly, failure to complete orders daily, failure to provide what was ordered; poor rationale)** |
| **MHCB: Other** |
| **Policy Issues/ Violations (includes lack of policy, inadequate policy) (Catchall for Policy Violations not otherwise categorized)** |
| **Program Guide Timelines (includes contacts and)** |
| **Records Review/** **Requests/Missing Records (e.g., failure to request records, failure to review available records)** |
| **ROI Issues -- (e.g., ROI not on file, verbal consent instead of written as required, no follow-up with family, family required to speak to clinician not properly forwarded to Mental Health)** |
| **Self-Harm Reporting (e.g., failure to track,)** |
| **Treatment Planning (e.g., failure to do a treatment plan, treatment and treatment plan disconnect; inadequate treatment plan, failure to update treatment plan)** |
| **RVR MHA issues (e.g., not completed, inadequate, poor rationale)** |
| **Failure to address patient victimization issues (e.g., safety concerns, PREA evaluation/referrals)** |
| **Not offered required programming/lack of access to out of cell programming** |
| **Other** |
| Documentation |
| **MH Documentation (e.g., includes failure to document adequately, copied documentation, incomplete documentation; inaccurate documentation)** |
| **MH Referrals (e.g., failure to refer, failure to document response to referral adequately, failures in communication between disciplines)** |
| **Missing MH Documentation/Chrono** |
| Suicide Risk Assessment |
| **Missing SRE/No SRE** |
| **Poor SRE Documentation** |
| **Safety Planning (e.g., lack of safety plan, inadequate safety plan)** |

| MH QIPs |
|---|
| **SRE/Justification of Risk (e.g., poor justification of risk; inadequate justification of risk; failure to include identified risk factors)** |
| **Over reliance on patient self-report** |
| Psychiatry |
| **2602 Issues (e.g., not sought when indicated, not renewed, not followed)** |
| **Psychiatry Clinical Care (e.g., not provided, inadequate)** |
| **Psychiatry Documentation (e.g., copy and paste issues, inadequate, inconsistent, not present, not timely)** |
| **Program Guide Timelines not met** |
| **Psychiatry No Referral for Non-Compliance, No show** |
| **Psychiatry Policy Violations** |
| **Medication discontinued without face-to-face** |
| **Other** |
| Psychiatric Inpatient Program (PIP) |
| **Frequency of Contacts – (e.g., MHMD/MHPC/RT contacts and group treatment)** |
| **Housing Review Recommendation** |
| **Issue and Observation (e.g., failure to order properly, failure to complete orders daily, failure to provide what was ordered; poor rationale)** |
| **Missing PIP Documentation – (e.g., MHMD/MHPC/RT missing progress notes for individual contacts, group treatment, and assessments; RT documentation re: in-cell treatment materials provided)** |
| **PIP Policy Violation** |
| **Program Guide Timelines** |
| **Programming Issues** |
| **Quality of PIP Documentation – (e.g., copy and paste/pulled-forward without change from a previous assessment at same or different facility)** |

| CUSTODY QIPs |
|---|
| **911 Activation (e.g., failure to activate, delayed activation)** |
| **ASU Policy/CDCR 114 issues** |
| **BPH Issues** |
| **Confidential Setting -  (e.g., joint QIP with mental health in which lack of confidential setting utilized)** |
| **Crime Scene Preservation** |
| **Custody Documentation (e.g., poor documentation, conflicting documentation)** |
| **Custody Training (e.g., not timely, not done, inadequate)** |
| **Cut Down Tool/Kit** |
| **Emergency Response (e.g., CPR issues, failure to activate personal alarm, delayed cell entry, failure to don proper PPE)** |
| **ICC Issues** |
| **IDTT Issues – (e.g., no correctional counselor present in IDTT; custody failed to bring patient to IDTT)** |
| **Inappropriate GP Inmate Restraint** |
| **Policy Violation** |
| **PREA Issues** |
| **Referrals (e.g., failure to make referral when indicated)** |
| **Rigor – should this be under security/guard one checks?** |
| **R & R Issues – (e.g., property did not transfer with patient to a new institution as required per policy)** |
| **RVR Issues – (e.g., lack of evidence to support guilty finding on RVR by hearing officer)** |

| CUSTODY QIPs |
|---|
| **Security/Guard 1 Checks (e.g., not completed, not timely)** |
| **Self-Harm Issues – (e.g., joint issues with Mental Health- poor communication and documentation of suicide attempts; 837 incident package not completed as required by policy; post suicide hand-written note in patient's clothing stated in part "police just came, saw rope hanging, said nothing"; joint QIP with Nursing-tried to strangle self under the blanket with a blue shirt while on suicide watch)** |
| **Staff Actions Concern** |
| **Universal Precautions** |
| **Visibility of the Cell** |
| **Failure to provide property/privileges** |
| **Failure to adequately address safety concerns/victimization issues (not PREA)** |

| NURSING QIPs |
|---|
| **5 Day Follow/Up (e.g., not completed as required; not of adequate quality; failure to tie to safety plan)** |
| **911 Activation (e.g., failure to activate, delayed activation)** |
| **7362 Processing Issues** |
| **Administration of Narcan** |
| **Emergency Response (e.g., CPR/AED issues, delayed treatment, inadequate treatment, improper treatment)** |
| **Hunger Strike Issue** |
| **ISUDT Issues** |
| **Medication Issue (e.g., failure to follow 2602 order, failure to provide medication, failure to notify psych of med misses)** |
| **Nursing Checks/Rounds** |
| **Nursing Documentation (e.g., failure to document, inadequate documentation, conflicting documentation)** |
| **Patient Care/Continuity of Care** |
| **Policy Violation** |
| **PREA Issues** |
| **Referrals (e.g., failure to refer, delayed referral, communication issues between disciplines)** |
| **Self-Harm Issues** |
| **Universal Precautions** |
| **Other** |

| SPRFIT-Multisystem QIPs |
|---|
| **911 Activation (e.g., failure to activate, delayed activation)** |
| **Bad News Issues** |
| **DDP Issues – (e.g., assessment and treatment of DDP patients in PIP; victimization concerns; custody responsibility for moving inmates with victimization concerns)** |
| **HQ Psychiatry Issues** |
| **Impression Management** |
| **Inappropriate GP Inmate Restraint** |
| **ISUDT Issues** |
| **Missing Documentation – This refers to policy required documentation (e.g., Mental Health 5 Day Follow-up combined with Custody Check form; self-harm attempts must be documented on specific forms when there is a suicide attempt, which may then generate a 837) versus records that might be unable to be located for some reason (Records Review/Request/Missing Records category)** |
| **NCAT** |

| SPRFIT-Multisystem QIPs |
|---|
| **Next of Kin issues** |
| **Physical Plant (e.g., cell/structural safety issues)** |
| **PIP Policy (includes lack of policy)** |
| **Policy Issues/Violation (includes lack of policy, inadequate policy)** |
| **Poor SRE Documentation (e.g., not done when required, inadequate, incomplete, not updated, failed to incorporate prior information)** |
| **PREA Issues** |
| **Program Guide Timelines** |
| **Records Review/Request/Missing Records** |
| **Referrals (e.g., making referrals, responding to referrals, documenting referrals)** |
| **RVR MHA Issues (e.g., not done, inadequate, poor rationale)** |
| **Safety Concerns not addressed** |

I understand Plaintiffs have proposed a meeting the first week in January. Defendants are available to meet and confer the first week in January concerning proposed amendments to Table 18 (Common Issues in the 2021 QIPs) and Table 19 (Results of Quality Audits in the 2021 Suicide Case Reviews) of the 2021 report. Please propose some days and times.

Thank you,

Elise

**Elise Owens Thorn | Deputy Attorney General | California Department of Justice**
Correctional Law Section | 1300 I Street | Sacramento, CA 95814
*t* (916) 210-7318 | *e* elise.thorn@doj.ca.gov

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Walsh Kerry F. <kwalsh@pldolaw.com>
**Sent:** Friday, December 16, 2022 8:04 AM
**To:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Toche, Diana@CDCR <diana.toche@cdcr.ca.gov>; travis.williams@cdcr.ca.gov; LElls@rbgg.com; Steve Fama <sfama@prisonlaw.com>; Thomas Nolan <TNolan@rbgg.com>
**Cc:** Lopes Matthew <mlopes@pldolaw.com>; Walsh Kerry F. <kwalsh@pldolaw.com>; Ryan, Jr., Michael F. <mryan@pldolaw.com>
**Subject:** 2021 Annual Suicide Report Order

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Good morning – in response to the court order that was issued yesterday, we would like to set up a meeting for next week to begin the meet and confer process as directed by the court. Can you please provide me with some days and times that you are available next week to commence this process. Thank you.

**Kerry F. Walsh, Partner**
kwalsh@pldolaw.com
P 401.824.5118 • F 401.824.5123

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com • Legal Disclaimer

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.