# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
    Plaintiffs,

v.                          No. CIV S-90-0520 KJM DB P

GAVIN NEWSOM, et al.,
    Defendants.

**TWENTY-NINTH ROUND MONITORING REPORT – PART C: SPECIAL MASTER'S MONITORING REPORT ON THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S INSTITUTIONS WITH ENHANCED OUTPATIENT PROGRAMS COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS**

Matthew A. Lopes, Jr., Esq.

Special Master

PANNONE LOPES DEVEREAUX & O'GARA LLC

Northwoods Office Park, Suite 215-N

1301 Atwood Avenue

Johnston, RI 02908

(401) 824-5100

Fax: (401) 824-5123

February 7, 2023

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1:1: | One-to-One |
| 3CMS: | Correctional Clinical Case Management System |
| AA: | Alcoholics Anonymous |
| ADA: | Americans with Disabilities Act |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| ADL: | Activities of Daily Living |
| AGPA: | Associate Governmental Program Analyst/(Assistant) |
| AIMS: | Abnormal Involuntary Movement Scale |
| APA: | American Psychological Association |
| ASH: | Atascadero State Hospital |
| ASU: | Administrative Segregation Unit |
| BLS: | Basic Life Support |
| BPH: | Board of Parole Hearing |
| BUN: | Blood Urea Nitrogen |
| C&PR: | Classification and Parole Representative |
| Calipatria: | Calipatria State Prison |
| CAMS: | Collaborative Assessment and Management of Suicidality |
| CAP: | Corrective Action Plan |
| CAT: | Chart Audit Tool |
| CBC: | Complete Blood Count |
| CBT: | Cognitive Behavioral Therapy |
| CC I: | Correctional Counselor I |

CC II:              Correctional Counselor II

CCAT:             Correctional Clinical Assessment Team

CCHCS:           California Correctional Health Care Services

CCI:               California Correctional Institution

CCWF:            Central California Women's Facility

CDCR:            California Department of Corrections and Rehabilitation

CEO:              Chief Executive Officer

CHCF:            California Health Care Facility

CHSA:            Correctional Health Services Administrator

CIM:              California Institution for Men

CIT:               Crisis Intervention Team

CITPP:           Condemned Inmate Transfer Pilot Program

CIW:              California Institution for Women

CMC:             California Men's Colony

CME:             Chief Medical Executive

CMF:             California Medical Facility

CMHPP:          Custody and Mental Health Partnership Plan

CMP:             Comprehensive Metabolic Panel

CNA:             Certified Nursing Assistant

CPR:             Cardiopulmonary Resuscitation

CQI:             Continuous Quality Improvement

CQIT:            Continuous Quality Improvement Tool

CSATF:          California Substance Abuse Treatment Facility

| | |
|---|---|
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CSR: | Classification Staff Representative |
| CTC: | Correctional Treatment Center |
| CTQ: | Confined to Quarters |
| DAI: | Division of Adult Institutions |
| DAR: | Daily Activity Report |
| DBT: | Dialectical Behavior Therapy |
| DD1: | Developmental Disability 1 |
| DDP: | Developmental Disability Program |
| DDP2: | Developmental Disability Program 2 |
| DRP: | Division of Rehabilitative Programs |
| DSH: | Department of State Hospitals |
| DOT: | Direct Observation Therapy |
| DVI: | Deuel Vocational Institution |
| EHRS: | Electronic Health Records System |
| EKG: | Electrocardiogram |
| EMR: | Emergency Medical Response |
| EMRRC: | Emergency Medical Response Review Committee |
| EOP: | Enhanced Outpatient Program |
| EPRD: | Estimated Parole/Release Date |

FIT:             Focused Improvement Team

FLSA:            Fair Labor Standards Act

FTE:             Full-Time Equivalent

GED:             General Education Development

GP:              General Population

HCFIP:           Health Care Facilities Improvement Program

HCPOP:           Health Care Placement Oversight Program

HEPA:            High Efficiency Particulate Air

HLOC:            Higher Level of Care

HPS I:           Health Program Specialist I

HPS II:          Health Program Specialist II

HS:              *Hora Somni*/Hour of Sleep

IAC:             Inmate Advisory Counsel

ICC:             Institutional Classification Committee

ICF:             Intermediate Care Facility

IDTT:            Interdisciplinary Treatment Team

IEX:             Indecent Exposure

IP:              Inmate Patient

IPOC:            Interdisciplinary Plan of Care

IRU:             Inpatient Referral Unit

IST:             In-Service Training

ISUDT:           Integrated Substance Use Disorder Treatment

KOP:             Keep on Person

KVSP:          Kern Valley State Prison

LMS:           Learning Management System

LOP:           Local Operating Procedure

LOC:           Level of Care

LRH:           Least Restrictive Housing

LTRH:          Long-Term Restricted Housing

LVN:           Licensed Vocational Nurse

MA:            Medical Assistant

MAPIP:         Medication Administration Process Improvement Program

MAT:           Medication-Assisted Treatment

MCRP:          Male Community Reentry Program

MCSP:          Mule Creek State Prison

MDO:           Mentally Disordered Offender

MERD:          Minimum Eligible Release Date

MHA:           Mental Health Assessment

MHCB:          Mental Health Crisis Bed

MHPS:          Mental Health Program Subcommittee

MHSDS:         Mental Health Services Delivery System

ML:            Mainline

MRI:           Magnetic Resonance Imaging

MSF:           Minimum Support Facility

MTP:           Master Treatment Plan

NA:            Nurse-Administered

NAR:             Narcotics Anonymous

NDS:             Non-Disciplinary Segregation

NKSP:            North Kern State Prison

OHU:             Outpatient Housing Unit

OIG:             Office of the Inspector General

OMD:             Offender with Mental Disorder

OSS:             Office Services Supervisor

PBSP:            Positive Behavioral Support Plan

PC               Primary Clinician

PIA:             Prison Industries Authority

PIP:             Psychiatric Inpatient Program

PIWP:            Performance Improvement Work Plan

PNP:             Psychiatric Nurse Practitioner

PRCS:            Post Release Community Supervision

PREA:            Prison Rape Elimination Act

PRN:             Pro Re Nata – Take prescription as Needed

PRPA:            Pre-Release Program Assessment

PSR:             Program Status Report

PSU:             Psychiatric Services Unit

PTSD:            Post-Traumatic Stress Disorder

QIP:             Quality Improvement Plan

QIT:             Quality Improvement Team

QMC:             Quality Management Committee

| | |
|---|---|
| R&R: | Receiving and Release |
| RAC: | Rehabilitative Activity Credit |
| REMS: | Risk Evaluation and Mitigation Strategies |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| ROI: | Release of Information |
| RT: | Recreation Therapist |
| RVR: | Rules Violation Report |
| SAP: | Substance Abuse Program |
| SCC: | Sierra Conservation Center |
| SCU: | Support Care Unit |
| SHO: | Senior Hearing Officer |
| SHU: | Security Housing Unit |
| SNF: | Skilled Nursing Facility |
| SNY: | Sensitive Needs Yard |
| SOMS: | Strategic Offender Management System |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |
| SRASHE: | Suicide Risk and Self-Harm Evaluation |
| SRMP: | Suicide Risk Management Program |
| SRN: | Supervising Registered Nurse |
| SSI: | Supplemental Security Income |
| SSRI: | Selective Serotonin Reuptake Inhibitor |

STEP:           System to Encourage Progress

STOP:           Specialized Treatment for Optimized Programming

STRH:           Short-Term Restricted Housing

SVSP:           Salinas Valley State Prison

TBI:            Traumatic Brain Injury

TCMP:           Transitional Case Management Program

TMHU:           Temporary Mental Health Housing Unit

TTM:            Therapeutic Treatment Module

TTA:            Triage and Treatment Area

UCC:            Unit Classification Committee

VSP:            Valley State Prison

WSP:            Wasco State Prison

## TABLE OF CONTENTS

ACRONYMS AND ABBREVIATIONS ............................................................................... i

THE *COLEMAN* SPECIAL MASTER'S  TWENTY-NINTH ROUND MONITORING
REPORT – PART C ............................................................................................................ 1

I.       INTRODUCTION ............................................................................................... 1

   A.      STAFFING CRISIS: PRIMARY CLINICIAN STAFFING VACANCIES ............. 20

   B.      UPDATE ON RECENT SEMINAL EVENTS IN *COLEMAN*: THE
           GOLDING REPORT AND SUBSEQUENT DATA REMEDIATION
           PROCESS AND THE CONTINUING IMPACT OF THE COVID-19
           PANDEMIC ON THE PROVISION OF MENTAL HEALTH CARE TO
           *COLEMAN* CLASS MEMBERS ................................................................. 24

   C.      2021 UPDATE TO PROGRAM GUIDE ................................................. 42

   D.      MODIFICATIONS TO CDCR'S STAFFING PLAN ............................... 47

   E.      UNIDENTIFIED NEEDS ASSESSMENT (UNA) ................................. 55

   F.      UPDATE ON POLICY DEVELOPMENT ............................................. 58

   G.      SUICIDE PREVENTION ..................................................................... 61

II.      MENTAL HEALTH VACANCY RATES .................................................. 62

III.     SUMMARY OF THE SPECIAL MASTER'S FINDINGS ......................... 68

CONCLUSION ...................................................................................................... 159

APPENDIX A SPECIAL MASTER'S ACTIVITIES .............................................. 164

APPENDIX B INSTITUTIONAL SUMMARIES .................................................. 167

APPENDIX C CLINICAL CASE REVIEWS ........................................................ 712

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

  **Plaintiffs,**

  **vs.**                                     **No. 2:90-cv-0520 KJM DB**

**GAVIN NEWSOM, et al.,**

  **Defendants.**


**THE _COLEMAN_ SPECIAL MASTER'S
TWENTY-NINTH ROUND MONITORING REPORT – PART C**


I.       **INTRODUCTION**

The Special Master's Twenty-Ninth Monitoring Round commenced simultaneously with

his monitoring tours of California Department of Corrections and Rehabilitation (CDCR)

institutions with Psychiatric Inpatient Programs (PIPs) in May-June 2021.  As directed by the

Court, _see_ ECF No. 7462, the Special Master accelerated his report on the CDCR PIPs and filed

his Twenty-Ninth Round Monitoring Report Part A on May 17, 2022.  ECF No. 7555.  The

Court adopted the Special Master's findings contained in the Twenty-Ninth Round Monitoring

Report Part A in full in an August 29, 2022 order.  ECF No. 7608 at 6.[1]  The Court referred "the

issues presented by the Special Master's first and second recommendations … to the Special

Master and [CDCR] Secretary [Kathleen] Allison for focused discussions."  _Id._[2]  Thereafter, the

---

[1] References to page numbers for documents filed in the Court's Electronic Case Filings (ECF)
system are to page numbers assigned by the ECF system.  References to page numbers in the
Special Master's Twenty-Ninth Round Monitoring Report – Parts C and D are to the page
numbers noted at the bottom of each page.

[2] The Court referred the following recommendations to focused discussions between the Special
Master and Secretary Allison:

Special Master filed his Twenty-Ninth Round Monitoring Report B, covering the Department of

State Hospitals' (DSH) inpatient mental health programs, on October 14, 2022.  ECF No. 7625.[3]

Beginning in May 2021, the monitor and monitor's expert conducted two-week

monitoring tours of the five CDCR institutions with PIPs: California Medical Facility (CMF),

California Health Care Facility (CHCF), Salinas Valley State Prison (SVSP), California

Institution for Women (CIW), and San Quentin State Prison (SQ), with the first week of

monitoring dedicated to the PIPs and the second week dedicated to the prisons' respective

outpatient mental health programs.  The monitor and monitor's expert toured Central California

Women's Facility (CCWF) between December 13-16, 2021.  In January 2022, full-scale

---

1. That CDCR be ordered to develop a comprehensive plan within 30 days, under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, to remedy the seriously deficient staffing levels at the Lift and Shift PIPs identified in this report.

2. Consistent with the recommendations contained in the Special Master's 2021 Inpatient Care Report, to the extent necessary to remedy any deficiencies identified in this report, within 90 days CDCR, under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, shall develop minimum standards for the provision of structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, consistent with a psychiatric inpatient level of care, and shall develop plans to provide such structured activities, unstructured out-of-cell activities, treatment planning, and individual treatment, consistent with the established minimum standards.  CDCR shall also develop and implement a system for tracking and reporting adherence to the standards developed.

ECF No. 7555 at 164-65.  In a January 5, 2023 order, the Court vacated paragraph two of its August 29, 2022 order and instead ordered the parties to meet and confer and file a "joint status report outlining the results of the meet and confer required by this order and, as appropriate, either a stipulated resolution or a schedule for motion practice if one or both issues remains unresolved."  ECF No. 7697 at 3.

[3] On December 19, 2022, the Court issued an order adopting the Special Master's Twenty-Ninth Round Monitoring Report – Part B in full and approving DSH's staffing plan.  ECF No. 7688 at 9-10.

monitoring tours at two institutions were postponed due to the significant increase in COVID-19 cases among CDCR's incarcerated persons and staff and the associated statewide modified program. *See* Emails and attachments from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel, (January 7, 2022, January 24, 2022, and February 4, 2022), attached hereto as Exhibit A. The Special Master's team conducted abbreviated tours at California State Prison Los Angeles County (CSP/LAC) and Mule Creek State Prison (MCSP) with a focus on monitoring the impact of COVID-19-related restrictions on mental health programming between February 9-11, 2022. Full scale tours of CDCR institutions resumed on March 22, 2022 with the Special Master's monitoring tour of Valley State Prison (VSP) and concluded with the monitoring tour at the California State Prison at Sacramento (CSP/Sac) on May 9-12, 2022.

In all, this report includes the monitor's and monitor's expert's findings from monitoring tours of 15 CDCR institutions: CHCF, CIW, CMF, California Men's Colony (CMC), California State Prison, Corcoran (CSP/Corcoran), CSP/LAC, CSP/Sac, California Substance Abuse Treatment Facility (CSATF), CCWF, Kern Valley State Prison (KVSP), MCSP, Richard J. Donovan Correctional Facility (RJD), SVSP, SQ, and VSP.

In his Twenty-Eighth Round Monitoring Report, the Special Master identified both the whistleblower report authored by Dr. Michael Golding, M.D. ("Golding Report") and the onset of the COVID-19 pandemic as contributing factors to what he described as "the most unpredictable monitoring round in the history of this case." Special Master's Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 19. As discussed below, these events continued to impact this case during the monitoring round. The amount of work required to remediate CDCR's mental health data systems as a result of the Golding Report and proceedings related

thereto has been daunting for all stakeholders.  Likewise, as will be demonstrated below,

COVID-19 and CDCR's response to the pandemic continued to impact mental health care

delivery in CDCR institutions throughout this monitoring round.

That being said, there is still reason for optimism that progress toward a durable remedy

remains on track, despite these disruptive events.  At defendants' request, the Court has approved

numerous significant revisions to CDCR's mental health staffing plan, which defendants believe

will significantly enhance their ability to provide constitutionally adequate mental health care.

*See infra* Section I.D.  The data remediation process continues to progress – though sometimes in

fits and starts – and remains defendants' most direct route to positioning themselves to

demonstrate compliance with a durable remedy in this case and eventual exit from federal court

oversight.  As the Court recently noted, the fog of COVID-19 continues to lift, as partially

demonstrated by CDCR's updated COVID-19 policies, rules, and guidelines, which permit, for

instance, larger groups to gather for group treatment.  The Special Master's optimism is

tempered, however, by the staffing crisis that continues to hinder defendants' ability to provide

Program Guide-compliant mental health care to the plaintiff class.  *See infra* Section I.A.

The Special Master's Twenty-Ninth Monitoring Round Report covers defendants'

compliance with the plans, policies, and protocols provisionally approved by this Court in mid-

1997, known as the Mental Health Services Delivery System (MHSDS) Program Guide.  The

Program Guide has been subsequently revised, updated, and re-approved by the Court several

times, the most recent update occurring during this monitoring round.  *See infra* Section I.C.

Due to the unique nature of the Special Master's Twenty-Eighth Round Monitoring

Report, *see* ECF No. 7074 at 21-23, the format of this report more closely resembles that of the

Special Master's Twenty-Seventh Round Monitoring Report.  As such, the monitoring focus

areas included mental health staffing vacancies, quality management, quality of care in CDCR's

mental health programs, medication management, access to higher levels of care, Custody and

Mental Health Partnership Plan (CMHPP), review of the rules violation report (RVR) process,

use of force, program access, treatment space, and MHSDS patients in segregated housing.

The summaries of the focus areas appear below in Part II Sections A through I.

Appendix A is a list of the Special Master's activities since the filing of the Special Master's

Twenty-Ninth Round Monitoring Report Part B. Appendix B is comprised of institution-by-

institution summaries of the monitor's findings during the monitoring round. Finally, Appendix

C is comprised of the Special Master's expert's clinical reviews of individual patient cases.

**Parties Responses to Draft Reports**

On December 8, 2022, the Special Master provided the *Coleman* parties with a draft

version of the Twenty-Ninth Round Monitoring Report – Part C, covering CDCR institutions

with EOP programs. On December 16, 2022, the Special Master provided the *Coleman* parties

with a draft version of the Twenty-Ninth Round Monitoring Report – Part D (together with the

Twenty-Ninth Round Monitoring Report – Part C referred to as the "Draft Reports"), covering

CDCR institutions with 3CMS programs. On December 16, 2022, the Special Master granted

defendants' request to extend the respective deadlines for responding to the Draft Reports to

January 25, 2023. The parties each sent their responses and objections to the Draft Reports to

the Special Master on January 25, 2023. *See* Letter from Thomas Nolan, Esq. and Marc Shinn-

Krantz, Esq., plaintiffs' counsel, to Special Master Lopes (January 25, 2023), attached hereto as

Exhibit B; *see* Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special

Master Lopes (January 25, 2023), attached hereto as Exhibit C.

The Special Master carefully reviewed the parties' comments and objections and made revisions to the final version of the Reports as warranted.  The parties each responded to both of the Draft Reports in one letter.  As such, this section responds to the parties' correspondence as a whole.  As noted below, corresponding revisions and clarifications have been made to each Report.

**Plaintiffs' Response to the Draft Reports**

In their response to the Draft Reports, plaintiffs noted their "primary concern as to both reports…is to the lack of additional recommendations to remedy the snowballing staffing crisis and the long-standing deficiencies in quality of care."  Exhibit B at 1.  After reviewing the Draft Reports' findings regarding mental health staffing and quality of care, *see id.* at 1-9, plaintiffs requested the Draft Reports be revised to include recommendations requiring defendants to address deficiencies in staffing and quality of care.  *Id.* at 13.[4]

For the reasons explained herein, the Special Master declines to make recommendations for additional remedial orders.  *See infra* note 30 and accompanying text.  In addition, the Special Master notes that at least one of the topics raised in plaintiffs' preliminary comments, staffing, will be discussed at a status conference on February 10, 2023.  *See* January 6, 2023 Order, ECF No. 7699 at 5.

Plaintiffs provided additional comments to the Draft Report's discussion of staff misconduct, RVRs, lengths of stay in segregated housing, overflow housing, pill line length, and document review timeframes.  Each of these issues is discussed below.

---

[4] Regarding the specific request made in footnote two of plaintiffs' letter, the Special Master will incorporate the requested summary in future monitoring reports and notes that the underlying data plaintiffs seek is included in the Special Master's expert's clinical case reviews appended to the Report.  *See* Appendix C.

**Reporting on Staff Misconduct**

Plaintiffs stated that the Draft Report's discussion of staff misconduct and patient complaints was "unclear…whether the institutions are reporting only complaints against mental health clinicians or against all staff, whether they are reporting complaints by MHSDS participants or by all incarcerated people, and whether certain institutions are reporting complaints raised through the grievance process or through other avenues such as 989s." Exhibit B at 9-10. Plaintiffs, therefore, requested clarification on the scope of reported data regarding staff misconduct and patient complaints. *Id.* at 10. As plaintiffs alluded to, institutions do not report data regarding allegations of staff misconduct and patient complaints consistently. The Special Master will consider clarifying his pre-site document request in the upcoming monitoring round to ensure it captures sufficient information on this issue.

**Disproportionate Use of RVRs**

Plaintiffs noted that "it appears EOP patients are drastically disproportionately impacted by RVRs" and requested "that the final report update these findings to break out what percentage of the overall population was at each level of care at the fifteen institutions." Exhibit B at 10. In response, the Special Master notes that the information plaintiffs seek can be found in the "Census" sections of each institutional summary. The Special Master did not revise the Report in response to this request.

**Proportions and Lengths of Stay of Class Members in Segregation**

Plaintiffs requested "that the Draft Reports be updated to include findings on the extent to which class members, and particularly EOP class members, are disproportionately held in segregated housing as compared to non-class members." Exhibit B at 10. The Special Master

does not have this information to include in the current Report but will consider revising his pre-site document request to ensure it captures sufficient information on this issue going forward.

Plaintiffs also requested that information regarding class members' lengths of stay in segregation "be summarized at a high level and be compared to prior reporting periods to ascertain whether the 2014 remedial plans issued in response to the Court's April 10, 2014 segregation order are decreasing class members' lengths of stay in dangerous segregation units." *Id.* at 10. The Special Master did not revise the Report in response to this request and notes plaintiffs are free to conduct their own comparisons to prior monitoring round reports.

### Overflow Housing Issues

Plaintiffs requested additional information regarding the use of overflow housing during the monitoring round. Exhibit B at 11-12. The Special Master notes the overflow housing data provided in plaintiffs' letter was from November 21, 2022, after the review period of the current Report. Further, findings regarding the use of overflow housing are included in the CIW, CSP/Sac, and KVSP institutional summaries. *See infra* pp. 293, 545, 675, 685-86, 688. The Special Master did not revise the Report based on this request but will consider revising his pre-site document request to ensure sufficient information about the use of overflow housing is captured going forward.

### Clarification Regarding Reporting on Pill Line Lengths

Plaintiffs requested clarification regarding two pill-line-related timeframes discussed in the Draft Report. Exhibit B at 12. As plaintiffs alluded to, the 30-minute timeframe refers to a patient's individual wait time, while the two-hour timeframe is for the entire pill line to be completed for all patients. Institutions do not report both data points consistently, but the Special

Master will consider clarifying his pre-site document request to ensure sufficient information on this issue is captured going forward.

### Document Review Timeframe

The Special Master added the data of the review period in each institutional summary in response to plaintiffs' request.  Exhibit B at 12.

### Defendants' Response to the Draft Reports

The first page of defendants' response includes a mischaracterization of the Draft Report's discussion of the significance of remedying longstanding – and indeed worsening – staffing vacancies and completing data remediation.  *See* Exhibit C at 1 ("The conclusion of the Draft Report – Part C states that addressing staffing vacancies and completing data remediation are CDCR's two major outstanding remedial obligations.").  This is misleading.  The Court has made clear what defendants' remaining remedial obligations are, and they are not limited only to staffing and data remediation.  *See, e.g.*, September 2, 2020 Order, ECF No. 6846 at 2-15, 20-28.  The conclusion to the Twenty-Ninth Round Monitoring Report – Part C states: "But much work remains.  Aside from addressing the staffing emergency, data remediation continues to be of paramount importance."  *See infra* p. 162.  Indeed, both of these projects are of "paramount importance" for the reasons the Court has repeatedly identified.  However, they are hardly defendants' only outstanding major remedial obligations.  *See, e.g.*, ECF No. 6846 at 2-15, 20-28.

On page two of their letter, defendants stated, "As the Special Master himself acknowledges, CDCR has committed adequate numbers of dedicated and qualified staff to data remediation."  Exhibit C at 2.  This is also misleading.  The Draft Report referenced former CDCR Secretary Kathleen Allison's statements regarding the adequacy of data remediation staff

made in a sworn declaration to this Court. *See infra* p. 32 (citing Declaration of Kathleen Allison in Response to Minute Order, ECF No. 7541, ECF No. 7556 at 3). The Special Master did not express an opinion about whether CDCR in fact has adequate numbers of staff to complete data remediation by December 2023.

I.    **"The Draft Report Should Remove Conclusory Statements on the Constitutionality of Care Provided to the Coleman Class"**

Defendants objected to a statement in the conclusion of the Draft Report that "defendants are presently unable to provide constitutionally adequate mental health care to the number of seriously mentally ill persons now incarcerated in California," arguing this statement amounted to a legal judgment outside the Special Master's authority. Exhibit C at 2. Upon review, the Special Master revised this statement, replacing the phrase "constitutionally adequate" with "Program Guide-compliant" mental health care.[5] Of course, the Court has made clear that defendants' remedial plan, the Program Guide, constitutes the constitutional floor in this case. *See, e.g.,* August 1, 2020 Order, ECF No. 6806 at 14 ("[T]he Program Guide is based in Eighth Amendment requirements and, although the court has yet to issue an opinion on whether and if so for how long the pandemic might justify emergency departures from Eighth Amendment requirements, the Program Guide and other court-approved remedies provide the Eighth Amendment floor."); *see also Coleman v. Brown*, 756 Fed. Appx. 677, 678-79 (9th Cir. 2018) ("Appellants contend that the district court erred by treating the requirements of the Program Guide as a constitutional minimum and by failing to evaluate the 'deliberate indifference'

---

[5] In objecting to the use of the phrase "constitutionally adequate" mental health care on page 36 of the Draft Report, defendants objected to a quotation of their own use of the phrase in a filing related to their updated staffing plan. *See infra* p. 52 ("Defendants identified 'these modifications, and in particular the formalized policies for use of PNPs and telepsychiatry from home" as "critical to eliminating barriers to Defendants' ability to deliver constitutionally adequate care, and will improve access to care.'") (quoting ECF No. 6978 at 2).

element of an Eighth Amendment violation.  But the district court was entitled to rely on its

previous ruling in these areas, which had become final, as the law of the case.  It was therefore

established that the Program Guide sets out the objective standards that the Constitution requires

in this context, and that the persistence of objectively unconstitutional conditions satisfies the

subjective "deliberate indifference" inquiry.") (internal citations omitted).

## II.    "The Draft Report Relies Upon an Inaccurately Calculated Psychiatry Vacancy Rate"

Defendants objected to the Draft Twenty-Ninth Monitoring Round Report – Part C's

calculation and reporting of a "'shocking' vacancy rate of 51 percent for psychiatrists at the 15

EOP institutions visited by the Special Master's team during the 29th Round."  Exhibit C at 3.

Defendants allege that this reported psychiatry vacancy rate calculation was "erroneous" and

"[did] not comport with the monthly psychiatry vacancy reports defendants had filed during the

monitoring period."  *Id.*  Defendants then surmised how the Special Master may have calculated

the psychiatry vacancy rates at the 15 institutions with EOP programs and offered data regarding

vacancy rates for December 2022.  *Id.*

First, defendants' provided data for December 2022 is irrelevant because it covers a

period subsequent to the review period.  Moreover, as of the time of defendants' writing, they

had neither uploaded December 2022 vacancy rate data to the CDCR Secure Website for

Monthly Reports, nor had they filed their monthly psychiatry vacancy filing with the Court.

Further, as clearly indicated in the Draft Report, the Special Master's source for the

psychiatry data was the CDCR Secure Website for Monthly Reports, posted October 2022 and

covering August 2022.  *See infra* note 22.  For psychiatry positions, this website data was limited

to the psychiatry positions of chief psychiatrist, senior psychiatrist, and staff psychiatrist, and did

not also include telepsychiatry.  Adding the secure website data for the 15 EOP institutions

revealed a total of 149.8 authorized staff psychiatry positions, of which 73 were filled and 76.8 were vacant, for a 51 percent psychiatry vacancy rate. This website data also reported 40.32 registry staff psychiatrists, for a total of 113.32 staff and registry psychiatrists, for a 24 percent functional vacancy rate. The Special Master did not revise the final Report in response to this preliminary objection.

III.    **"The Draft Report Should Acknowledge That Vacancy Rates Are Heavily Influenced by the Broader Labor Market"**

Defendants requested the Draft Report be revised to acknowledge that there is a "nationwide and state-level shortage of mental health professionals" impacting CDCR's ability to recruit and retain sufficient numbers of mental health professionals. Exhibit C at 3. In response, the Special Master added a footnote to the Report acknowledging defendants' statements. *See infra* note 9.

IV.    **"The Draft Report Should Clarify Certain Assertions Regarding Telepsychiatry and Telehealth"**

Defendants objected to the Draft Report's discussion of observed connectivity problems at several institutions. Exhibit C at 4-5. Defendants argued that the Special Master's reports of "connectivity issues appear[ed] anecdotal in nature and lack[ed] specificity." *Id.* at 4. Defendants requested that the Special Master revise the Report to "quantify the extent of these connectivity problems." *Id.*

With respect to observed connectivity-related problems at CMC, CSP/Corcoran, CSATF, and SVSP, additional specificity regarding observed connectivity problems and any observed impact on patient care can be found in the respective institution's institutional summaries. *See infra* pp. 264, 570, 619-20, 644-45, 660, 662. Accordingly, the Special Master did not revise the Report in response to defendants' preliminary objections.

In other instances, defendants objected to the inclusion of the accounts of interviewed CDCR staff members and *Coleman* class members regarding the use of telepsychiatry in their respective institution or program.  Exhibit C at 4 (objecting to a statement in the Draft Report that "MCSP mental health leadership reported connectivity problems on some facilities…."); *id.* (objecting to a statement in the Draft Report that "CSATF 3CMS staff also reported frequent connectivity issues for telepsychiatrists working from home."); *see also id.* (objecting to statements of interviewed class members at the EOP level of care who expressed "discomfort" with telepsychiatry).  Staff and patient interviews are integral parts of the Special Master's monitoring tours, providing key insight into the operations of CDCR's institutions and revealing information that may not come to light from reviewing documents.  The Special Master did not revise the Report in response to this objection.

While the Report was not revised in response to defendants' preliminary objections, the Special Master generally agrees that more granular reporting on CDCR's use of telepsychiatry is warranted.  The Special Master will take defendants' comments into consideration in preparation for the 30th round monitoring tours in the coming months.  As CDCR's ability to track telepsychiatry-related data matures, *see* Special Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy, ECF No. 7682 at 64-66, 69, the Special Master will review his pre-site document request to ensure it captures as much relevant information as CDCR can provide regarding its use of telepsychiatry and telehealth.

## V.    <u>Data Remediation</u>

In sections V, VI, and VII of their letter, defendants made several objections to the Draft Report's discussion of ongoing data remediation efforts.  Exhibit C at 5-7.  Specifically, defendants argued: "The Draft Report Contains Contradictory Assertions Regarding Data

Remediation and Selectively Quotes Defendants' Prior Filings," *id.* at 5, "The Draft Report Conflates Remediation and Certification with Data Validation and Verification, and Avoids Providing Clarity on What Is Necessary to Achieve Data Remediation, Hamstringing Defendants," *id.* at 6, and "The Draft Report Includes Outdated Characterizations of the Post-Certification Process." *Id.* at 7.

First, defendants misconstrued a quotation from the Draft Report. Defendants attributed the following to the Draft Report: "The Draft Report states that data remediation is 'intended to align the scope of a given indicator with the Special Master's current scope of monitoring.'"[6] In fact, the Draft Report quoted language included in one of defendants' data remediation activation schedules, *see infra* pp. 30-31 (quoting ECF No. 7523-1 at 4), and noted that defendants nonetheless regularly resisted efforts to modify CDCR's existing indicators "to align the scope of a given indicator with the Special Master's current scope of monitoring and with the requirements of the Program Guide…." *Infra* p. 31.

Contrary to their assertions otherwise, defendants are well aware of the scope of the Special Master's monitoring. Currently, through the data remediation process, the Special Master's team of monitors and experts provide painstakingly detailed feedback to the parties

---

[6] The Special Master's monitoring reports assess defendants' compliance with the Program Guide, Compendium, and related court-ordered remedial tasks. As the Court noted in its September 2, 2020 order, "[T]he Program Guide 'is defendants' plan, approved by this court, to remedy the Eighth Amendment violations identified in this court's 1995 order….Because the … Program Guide is the operative remedial plan in this action, the degree to which defendants have implemented the requirements of the …Program Guide is extremely relevant and useful to assessment of whether they are meeting their constitution obligations." ECF No. 6846 at 19 (citing February 27, 2013 Order, ECF No. 4361 at 6, 9). Thus, efforts to align the scope of key indicators with the Special Master's long-established (and relied-upon) monitoring practices are intended to assist CDCR achieve its ultimate end-goal through data remediation, "allowing the defendants, ultimately, when they truly can, to accurately demonstrate to the court that the Constitution is finally satisfied." December 17, 2019 Order, ECF No. 6427 at 49.

regarding the design of indicators, including relevant information regarding the scope of the Special Master's monitoring.[7]

Defendants also argued that the Special Master selectively quoted defendants' filings by omitting a sentence which made clear their position that data remediation is "intended to assess whether CDCR's indicators measure what they purport to measure." Exhibit C at 5. Defendants position on this point is a matter of record and the Draft Report accurately reflected the state of the record. In fact, the Draft Report quoted multiple of defendants' filings where this exact point was made, verbatim. *See infra* p. 30 ("Defendants repeated their arguments that 'the process for completing data remediation remains unclear' and that the data remediation process is '*primarily meant to ensure that each indicator is measuring what it purports to measure*.'") (emphasis added); *see also infra* p. 30 ("Once again, CDCR lamented the lack of 'clarity on what exactly is needed to achieve certification' and *repeated its argument that the data remediation process is only 'intended to assess whether CDCR's indicators measure what they purport to measure*.'")

---

[7] Relatedly, defendants requested that the Report "acknowledge that [d]efendants have requested but been denied access to the Special Master's guidebook, business rules, sample size methodology and other necessary documents to properly replicate" the Special Master's "monitoring process." Exhibit C at 5. In 2022, for the first time the Special Master can recall in his 15-year tenure (and after 29 rounds of monitoring over more than a quarter century), defendants formally requested a copy of the Special Master's monitoring tools, a request they repeated in their response to the Draft Reports. *Id.* The Special Master stands by his decision not to share his internal monitoring tools with the parties. These are internal documents and checklists used by the Special Master's team of monitors and experts to ensure consistent monitoring practices across monitoring teams and reports. Defendants newfound interest in conducting a fishing expedition to scrutinize the Special Master's internal documents is perhaps related to what the Court recently described as defendants' "distracting and costly scorched-earth litigation strategy." January 6, 2023 Order, ECF No. 7699 at 3. As noted above, the Special Master's team regularly provides detailed feedback to the parties during the course of various meetings, including data remediation-related meetings, and will continue to do so.

(emphasis added).  Accordingly, the Special Master did not revise the final Report based on this preliminary objection.

Defendants also requested that a footnote in the Draft Report (which includes definitions of "data validation" and "data verification" contained in defendants' September 29, 2021 data remediation activation schedule) be removed from the Report because it "conflates validation and verification with remediation and certification…."  Exhibit C at 7.  The Draft Report included this footnote, *see infra* note 15, to provide context to defendants' repeated argument that they know not what is required of them to complete data remediation.  The text accompanying this footnote is followed by a update on the Special Master's efforts to "endeavor[] once more to establish clear definitions of remediation and certification."  *Infra* p. 36.  As reported herein, defendants rejected the Special Master's proposed definitions.  *See infra* p. 36; *see also* Exhibit E.  Rather than attempt to force the Special Master's preferred definitions on defendants through a formal recommendation in this Report when discussions among the stakeholders remained unresolved, the Special Master instead provided the court with a status update.

Regarding the post certification review process, the Special Master revised the Report by specifying the "post-certification review process" as one of the topics Drs. Potter and Cartwright are addressing in their regular discussions.  *See infra* p. 37.

## VI.    "The Draft Report Requires Certain Clarifications."

Defendants requested numerous clarifications to the Draft Report, as discussed below.

Regarding patient attendance at IDTTs, defendants requested the Draft Report be revised to note that patients may refuse to attend IDTTs.  Exhibit C at 7.  A clarifying footnote was added to the final Report (Part C) in response to this concern.  *See infra* note 23.  Neither of the pages of the Draft Part D Report cited by defendants referred to patients attending less than 90

percent of IDTTs, so no revisions were made to the final Part D Report. Regarding supervisor attendance at IDTTs, the Draft Report did not suggest supervisors were required to attend IDTTs. Therefore, the Special Master did not revise the Report based on this concern.

Regarding the Draft Report's discussion of rejected referrals to inpatient care, defendants noted "that the IRU cannot reject a referral" and that "[o]nly a PIP may reject a referral." Exhibit C at 8. The Report was revised to change the phrase "IRU rejections" to "IRU 'kickbacks,'" as this was the term used by CDCR staff during the relevant monitoring tour. *See infra* pp. 115, 682. The Special Master further notes the referral data for CIM included in defendants' letter is not from the review period for that institution and, accordingly, made no additional revisions to the Report.

Regarding a section in the Draft Report discussing "institutional compliance with transfers to acute or intermediate inpatient care," defendants noted "[i]nstitutions are not responsible for bed identification." Exhibit C at 8. Defendants requested that the "Draft Report be revised to reflect that transfers to inpatient care are not an institutional-level issue after a referral is made." *Id.* The Draft Report's findings regarding compliance with inpatient transfer timelines were reported consistently with prior monitoring reports. As such, the Special Master did not revise the Report based on this preliminary objection.

Defendants requested clarification regarding the Draft Report's discussion of restricted housing transfers at CMC and requested a sentence be removed from the final Report. *Id.* at 8. The Special Master revised the Report by removing the word "mistaken" from the sentence defendants found objectionable. *See infra* pp. 120-21.

Defendants erroneously argued that the Draft Report Part D reported noncompliance with the "ten-day requirement" for MHCB lengths of stay at CIM, NKSP, PBSP, and WSP. Upon

review, it appears defendants were referring to a section of the Draft Report discussing

compliance with acute care transfer timelines.  *See* Special Master's Twenty-Ninth Round

Monitoring Report – Part D at 65.[8]  Accordingly, the Special Master did not revise the Report in

response to this objection.

      Defendants requested clarification to the Draft Report's discussion of staff complaints at

eight institutions where these complaints did not result in staff members being "moved to another

post as a result."  *See* Exhibit C at 8-9.  Defendants opined that this finding "implies wrongdoing

on behalf of CDCR for not removing staff from their posts following a staff complaint" and

further stated that the Draft Report did not "cite to any policy or procedure that would require

removal of staff from a post solely because of an unsubstantiated staff complaint."  *Id.* at 9.  In

response to defendants' concerns, the Special Master added a footnote indicating that there is no

CDCR policy or procedure that removes staff from a post solely due to an unsubstantiated staff

complaint.  *Infra* note 26.  The Special Master also rephrased its staff misconduct subsection in

the Report's custody and mental health partnership plan summary of summaries to eliminate any

implication of CDCR noncompliance for not removing staff from their posts following a staff

complaint.  *See infra* p. 131.

      Defendants noted that the Draft Report stated "that there were 'no RVR mental health

assessments wherein the mental health clinician recommended alternative disciplinary measures

at nine institutions,'" and inquired whether this conclusion was based upon a representative

sample.  Exhibit C at 9.  In response to this concern, the Special Master refers defendants to the

---

[8] "CIM, HDSP, NKSP, PBSP, and WSP referred patients to acute inpatient care during the review period; only HDSP was compliant with the timely transfer of their only acute patient. The remaining four institutions – CIM, NKSP, PBSP, and WSP – were noncompliant with the ten-day requirement."  Special Master's Twenty-Ninth Round Monitoring Report – Part D at 65.

discussion of his RVR review methodology included in Part A of the Twenty-Ninth Monitoring Round Report. *See* ECF No. 7555 at 20-21. The Special Master further acknowledges four cases at two institutions reported in Part D of the Draft Report where the mental health clinician recommended alternative disciplinary measures.

Pursuant to defendants' request, Exhibit C at 9, the Special Master clarified the Draft Report to remove statements that a CSATF custody officer's spraying of a patient with pepper spray in connection with an immediate use of force from approximately two feet away violated "applicable policy" and revised the reported number of institutions found to be compliant with use of force policy accordingly. *See infra* pp. 139, 142.

In response to the Special Master's general comments that "(t)he 15 institutions with EOP programs continued to fail to satisfy the requirements for MHSDS patients for program access,'" and "(t)he 15 institutions with EOP programs did not satisfy the requirements for MHSDS patients for program access," defendants stated that "(t)he Draft Report does not state which requirements govern program access, nor does it establish the policies that were violated." Exhibit C at 9. As the Draft Report's program access summary of summary thoroughly addressed EOP and 3CMS patients', and non-MHSDS inmates', job and academic assignments, vocational and voluntary education, substance abuse treatment, earning of milestone credits, and other components of program access, the Special Master deleted these two general statements. *See infra* pp. 143, 150. As far as the Draft Report's assertion that EOP patients were "less likely to access jobs than 3CMS patients and general population inmates", no further response from the Special Master is warranted as the data speaks for itself.

Defendants pointed out that Part D of the Draft Report "summarizes the overall assessment of the quality of treatment into three categories: 'adequate quality,' 'marginally

adequate quality,' 'and inadequate quality.'" Exhibit C at 9. Defendants further opined that "(t)hese definitions are not well defined—notably, 'marginally adequate quality.'" *Id*. The Special Master declined to recategorize these cases in response to defendants' assertion that they were "vague" as the categorizations speak for themselves.

Defendants noted that the Draft Report "includes a discussion of CCCMS patients who were housed out-of-level" and "request that the Special Master provide more details on the reasons these patients were housed out-of-level." *See* Exhibit C at 9. The Special Master is unable to provide Defendants with more details as defendants only provided the Special Master with the number of patients who were housed out-of-level, and not the reasons for this out-of-level housing.

## A. **STAFFING CRISIS: PRIMARY CLINICIAN STAFFING VACANCIES**

Far and away the most disturbing development since the filing of the Twenty-Eighth Round Monitoring Report has been the vacancy rate explosion among primary clinicians (psychologists and social workers).[9] With the vacancy rates observed at some institutions, it was virtually impossible to provide anything close to Program Guide-compliant mental health care. What the Court observed in its September 2, 2020 order remained true through the course of the Twenty-Ninth Monitoring Round:

> [T]he record over the past two years gives rise to a strong inference that while the October 10, 2017 order focused minds on the woeful shortages in staffing, defendants have not been able to identify meaningful ways of achieving compliance with the remedial staffing requirements, which have been clear for more than a decade.

---

[9] In their response to the Draft Report, defendants noted that "there is a nationwide and state-level shortage of mental health professionals, and the shortage acutely affects prison systems like CDCR because of additional challenges professional face in treating patients in remote areas or under dangerous or difficult conditions." Exhibit C at 3-4.

ECF No. 6846 at 21.  Between the time of the monitor's site visits and the writing of this report, there has been no improvement.

As displayed in the figure below, during the monitoring round, 13 of 15 institutions with enhanced outpatient programs (EOP) failed to fill 90 percent of allocated psychology positions; 11 of 15 were unable to fill 90 percent of allocated social worker positions.  Of the institutions that failed to satisfy the Court's June 13, 2002 order regarding mental health staffing fill rates, functional vacancy rates for psychology positions ranged from 11 to 76 percent, while social worker functional vacancy rates ranged from 16 to 64 percent.  At five of the 15 institutions, more than half of allocated psychology positions were vacant; two of 15 institutions had social worker vacancies at or in excess of 50 percent.

**Figure 1**[10]



Moreover, several institutions with EOPs often had to rely on unlicensed staff to fill primary clinician positions. Time spent training and supervising unlicensed clinicians further strained licensed staff members' ability to focus on delivery of care to patients. *See, e.g.*, *infra* pp. 428-29, 644, 659.

As displayed in Figure 2 below, these excessive functional vacancy rates among psychologists and social workers are a recent development. In the Twenty-Seventh and Twenty-Eighth monitoring rounds, functional vacancy rates were at or below 20 percent. *See* ECF No. 7074 at 94-95. In the Twenty-Ninth Round, functional vacancy rates for both primary clinician classifications were at or above 30 percent.

---

[10] The primary clinician fill rate data included in Figure 1 is taken from CDCR's Secure Website for Monthly *Coleman* Reports, posted October 2022, covering the period of August 2022.

**<u>Figure 2</u>**



As revealed at CDCR's Mental Health Leadership Conference on November 16, 2022, the dire state of CDCR's mental health staffing levels has led Mental Health leadership to authorize a "patient triaging" process at twelve institutions. While the details of any statewide triaging process or any institutional triaging plans have not been shared with the Special Master, the Special Master's expert observes that this development most likely means CDCR is using its limited staff to attend to only the most critical patient needs. By pivoting to triaging patients, CDCR is tacitly acknowledging that many institutions' mental health staffing vacancies make it impossible to provide Program Guide-compliant mental health care to the entire MHSDS population. Without dramatic intervention, defendants will remain noncompliant with the Court's June 13, 2002 staffing order, and patients will suffer.

Interviewed staff at several institutions reported that colleagues were leaving CDCR for employment opportunities offering higher compensation and better working conditions. *See*

*infra* pp. 203-04 (CHCF), 428-29 (CSP/LAC), 608-09, 611 (SVSP), 642-43 (CSATF); *see also*

*infra* pp. 570-71 (CSP/Corcoran) (reporting lack of applicants for vacant psychology positions at

the time of the monitoring tour).  The impact on those mental health staff members who

remained employed in CDCR institutions was evident during the monitoring tours: many carried

excessively high patient caseloads and reported experiencing burnout.  *See infra* pp. 251 (CMC),

443, 446 (CSP/LAC), 460 (MCSP), 505, 512-13 (RJD), 570 (CSP/Corcoran), 608 (SVSP).

  As will be demonstrated in the findings reported herein, the staffing crisis within CDCR

is untenable and requires immediate attention and intervention.  Indeed, these grossly inadequate

staffing levels "must be finally and fully remedied."  May 18, 2015 Order, ECF No. 5307 at 5.

## B. UPDATE ON RECENT SEMINAL EVENTS IN *COLEMAN*: THE GOLDING REPORT AND SUBSEQUENT DATA REMEDIATION PROCESS AND THE CONTINUING IMPACT OF THE COVID-19 PANDEMIC ON THE PROVISION OF MENTAL HEALTH CARE TO *COLEMAN* CLASS MEMBERS

  As alluded to, in some respects, the story of the Special Master's Twenty-Ninth round of

monitoring CDCR's mental health delivery system cannot be fully understood without reference

to the two seminal events discussed below:  The Golding Report (and subsequent data

remediation efforts) and the onset of the COVID-19 pandemic.

  1. Update on Data Remediation

   i. Background

  The record regarding the Golding Report, the Neutral Investigator's Report, and the four-

day evidentiary hearing which culminated in the Court's December 17, 2019 order is extensive

and need not be repeated in full here.  *See generally* December 17, 2019 Order, ECF No. 6427 at

6-19; Special Master's Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 43-55.

  As noted in the Twenty-Eighth Round Monitoring, the Golding Report (October 4, 2018)

"set off a chain of events that led to the appointment of a neutral expert and an evidentiary

hearing to determine whether the defendants intentionally provided misleading information to the Court and the Special Master." ECF No. 7074 at 43 (citing ECF No. 6064 at 2). Following the submission of the Neutral Expert's Report, the Court scheduled an evidentiary hearing for October 15, 2019. September 17, 2019 Order, ECF No. 6288 at 1. After a four-day hearing, "[o]n October 23, 2019, the court pronounced oral findings and conclusions in open court" and thereafter memorialized those findings and conclusions in its December 17, 2019 Order. ECF No. 6427 at 13.

In his Twenty-Eighth Round Monitoring Report, the Special Master noted the "impact of the Golding Report, and the evidentiary hearing" as follows:

> Unsurprisingly, the allegations in the Golding Report led to feelings of mistrust and created tension not only between the parties, but between CDCR mental health staff as well. Consequently, by agreement with CDCR's Mental Health Program, the Special Master assigned a team of experts and monitors to conduct in-person monitoring of CDCR's Mental Health Headquarters ("Central Office") operations....
>
> Additionally, given the allegations of fraud and the Court's ultimate finding of defendants' knowing presentation of misleading information, the Special Master and his team were required to perform their own data analysis, through a random sampling of information located in the Electronic Health Records System (EHRS).

ECF No. 7074 at 49.

Following a December 13, 2019 status conference, the Court issued an order noting the Special Master's need to hire a data expert:

> At hearing, all parties agreed the Special Master should be authorized to hire his own data expert as part of the ongoing remedial process that follows the court's proceedings on the Golding Report and the proposed coordination of data management with the *Plata* Receiver. The court agrees, and will authorize the Special Master to submit a request to approve this hiring when he has identified an appropriate expert.

January 7, 2020 Order, ECF No. 6441 at 4.  The Special Master submitted his request to appoint

Dr. Daniel F. Potter, Ph.D., CAIA, as data expert on April 3, 2020, ECF No. 6604, which the

Court approved on April 29, 2020.  ECF No. 6646.

Needless to say, significant remedial work growing out of the Golding Report-related

proceedings continued during the Twenty-Ninth Monitoring Round as the Special Master, his

clinical experts and data expert, and parties worked toward the December 31, 2023 deadline for

completion of data remediation.  *See* Reporter's Transcript of Proceedings (April 22, 2022 Status

Conference), ECF No. 7540 at 10:20-11:4.  A concise update on developments since the time of

the Special Master's Twenty-Eighth Round Monitoring Report is provided below.

Appended to the Twenty-Eighth Round Monitoring Report was a separate status update

from the Special Master's data expert, Dr. Daniel Potter.  Special Master's Data Expert Report,

Special Master's Twenty-Eighth Round Monitoring Report, Appendix A, ECF No. 7074 at 217-

242.  There, the Special Master's data expert reported the following:

> The current [quality assurance] data system, including its *lack of documentation, testing framework support, and change management processes*, is insufficient for the task at hand.  Work must also continue on validating the indicators and their individual business rules which are used in the ASU EOP Hub certification and [Continuous Quality Improvement Tool] CQIT processes and software testing must occur to verify that the indicator's actual operations are correct.  At present, these processes are not sufficiently transparent.  CDCR could address these issues more quickly and more effectively if they had additional personnel devoted to these tasks.
>
> The time has come to move the system to the next level and for the parties, working under the guidance of the Special Master to devise a plan for CDCR to develop a data system to address the deficiencies described in this report.  CDCR would then have a data system capable of producing data in which the parties, the Special Master and the Court could have confidence accurately reflected defendants' compliance for the indicators reported and which had the controls in place to maintain the integrity of the data over time.  That system would also be sufficiently transparent

which would help restore trust in the data defendants produce and rely upon.

ECF No. 7074 at 241 (emphasis added).

Since the filing of the Special Master's Twenty-Eighth Monitoring Round Report, the Special Master and parties have continued to tackle the arduous task of remediating CDCR's mental health data systems, including the remediation of each of CDCR's provisionally approved key indicators. The centrality of this work to the defendants' eventual exit from federal court oversight in this matter cannot be overstated. As the Special Master's data expert reported,

> In CDCR, indicators designed to measure Program Guide compliance rely on a series of business rules to describe and implement their operation. To be considered accurate, *the business rules must be designed with fidelity to the dictates of the Program Guide* and rely on data that is appropriate to achieve its intended purpose. The actual operation of the indicator must then match its intended operation.

> In order to determine whether an indicator is accurate requires both careful review of its design to determine if it will indeed correctly measure its business requirement, and comparison of its intended operation with its actual operation. *In other words, the system must not only give a technically precise correct answer to a query, but it must also ask the right question and have access to information appropriate to answer that question.*

> The watchwords for an acceptable data system are accuracy, transparency, and sustainability. Unfortunately, defendants' mental health data systems are not currently sufficient on any of these fronts. Remediation is required so that trust in defendants' data can be established. This can only be accomplished through meticulous assessment of what the system currently does, what it needs to do in order to be sufficient to the task at hand, and what it needs to maintain sufficiently over time.

ECF No. 7074 at 218-219 (emphasis added).

ii.    <u>Data Remediation-Related Meetings Held During the Twenty-Ninth Round</u>

Since the filing of the Special Master's Twenty-Eighth Round Monitoring Report on March 5, 2021, the Special Master and parties have participated in the following data-remediation-related meetings:

- All-Parties Data Meetings: 39 meetings

- Business Rules and Methodology Review (BRMR) Meetings: 83 meetings

In addition, the CAPC and QAC continued to meet weekly throughout the monitoring round.

As of the time of this writing, the Special Master and parties are discussing a number of strategies to ensure the efficient completion of data remediation by December 2023. The Special Master and parties have agreed to combine the regularly scheduled all-parties data meeting with an additional BRMR meeting, resulting in three BRMR meetings occurring every two weeks, which is expected to accelerate the completion of stakeholder review of the indicators. As the Special Master has informed the parties, his team is ready, willing, and able to add as many additional meetings as necessary to timely meet Court-required deadlines.

iii.    <u>Data Remediation Activation Schedules</u>

Following an August 4, 2021 Special Status Conference, the Court issued an order discussing, among other items, CDCR's CQIT indicators and data remediation. There, the Court noted the following:

> [T]he court recognizes the urgency that must attend satisfactory completion of data remediation, as CQIT cannot be implemented until the data on which it depends can be validated and verified. Accordingly, recognizing the parties are meeting and conferring on this topic, defendants also will be directed to work under the guidance of the Special Master to develop preliminary activation schedules for completion of data remediation and to file those preliminary activation schedules by September 29, 2021. To the extent feasible, defendants shall include with the preliminary activation schedules a review of all contingencies that at

> this time preclude development of final activation schedules for
> completion of data remediation.

August 25, 2021 Order, ECF No. 7283 at 6.

In their Preliminary Activation Schedule for Completion of Court-Ordered Data

Remediation, defendants projected "the preliminary activation schedule is estimated to

successfully process CDCR's key indicators in February 2023, and all provisionally approved

indicators by December 2023." ECF No. 7334 at 8.[11] Defendants "included a review of all

known contingencies that preclude the development of a final activation schedule for completion

of data remediation." *Id.* at 7. Defendants also attached "an overview of the data validation and

verification process to provide more context for the preliminary activation schedule." *Id*. at 4.

Included in the attached overview of the data validation and verification process, CDCR

provided a detailed overview of its data remediation plan, including a "Post-Certification Annual

Review Cycle."[12]

On January 7, 2022, defendants filed an updated data activation schedule and reported

that "incremental progress on CDCR key indicators increased from 27% to 43% and incremental

progress on all provisionally approved key indicators increased from 8% to 18%." ECF No.

7415 at 6. Defendants credited "the dedicated efforts of CDCR staff to mitigate any delays" for

data remediation progress achieved since the filing of the preliminary activation schedule and

---

[11] Defendants disputed that each of the provisionally approved indicator was in fact a "key"
indicator. ECF No. 7334 at 7 ("Defendants maintain that almost half of the indicators on the list
presented by the Special Master do not measure material provisions of the Program Guide,
Compendium, or court orders."). Accordingly, defendants' Preliminary Activation Schedule for
Completion of Court-Ordered Data Remediation provided separate timeline projections for
CDCR's "key indicators" and the provisionally approved indicators.

[12] CDCR described the Post-Certification Annual Review Cycle as follows: "At least annually,
all Key Indicators will be reviewed through the data remediation process. If at any point,
anything impacting the Key Indicator, such as a policy or workflow changes, the indicator must
again undergo the data remediation process." ECF No. 7334 at 36.

laid the foundation to blame any future delays on the Special Master or plaintiffs' counsel.  *See, e.g.*, *id.* ("CDCR remained on track with its original activation schedule, with some components currently ahead of schedule.  But continued progress depends on other stakeholders, including Plaintiffs and the Special Master, to fully participate in the process laid out in Defendants' remediation plan.").

Defendants repeated their arguments that "the process for completing data remediation remains unclear," *id.* at 6, and that the data remediation process is "primarily meant to ensure that each indicator is measuring what it purports to measure."  *Id*. at 7.  Regarding policy disputes, CDCR reported its concern "that potential disputes on policy interpretations or on what some of the parties would like an indicator to measure (as opposed to what the indicator needs to measure) could prevent data remediation of all indicators."  *Id*.

In defendants' most recently filed update to the data remediation activation schedule, CDCR reported progress had "significantly slowed," that "the parties are 2.8 month [sic] behind schedule for verifying indicators," and that "incremental pre-certification progress for all of the provisionally approved key indicators continues to be ahead of schedule" but to a lesser extent than previously reported.  Updated CDCR Data Activation Schedule (April 7, 2022), ECF 7523-1 at 3.  Once again, CDCR lamented the lack of "clarity on what exactly is needed to achieve certification" and repeated its argument that the data remediation process is only "intended to assess whether CDCR's indicators measure what they purport to measure."  *Id*. at 4.  Notably, in expressing their "concerns about the scope of the Data Remediation process," defendants appeared to acknowledge that part of the process is to assess "what is currently being done by the

Special Master during his monitoring." ECF No. 7523-1 at 4.[13]  Modifications intended to align

the scope of a given indicator with the Special Master's current scope of monitoring and with the

requirements of the Program Guide are the types of modifications that CDCR regularly resists

during the remediation process.

As alluded to, there have been a number of disputes about the appropriate scope of

CDCR's CQIT indicators and whether they appropriately measure compliance with defendants'

remedial plan in this matter, the Program Guide.  During an April 22, 2022 status conference

following defendants' filing their April 7, 2022 updated data remediation activation schedule, the

Court and parties discussed the status of defendants' data remediation efforts and strategies for

streamlining the process and resolving disputes about indicators.  *See generally* Reporter's

Transcript of Proceedings (April 22, 2022 Status Conference), ECF No. 7540.  In a minute order

following the April 22, 2022 status conference, the Court noted:

> As discussed at the status conference, certain matters relevant to ongoing
> data remediation require clarification, which the court anticipates will be
> achieved in discussions involving Special Master Lopes, Secretary
> Allison, Undersecretary Toche, Dr. Daniel Potter, and Dr. David Leidner.
> First, methods need to be identified to streamline the data remediation
> process so the process can be completed well before December 2023,
> including the time during the process for court resolution as needed of any
> disputes. Second, tools need to be adopted to monitor deadlines for
> complete remediation of each CQIT indicator as part of completion of the
> entire project globally; to this end the Special Master will provide a
> template to Secretary Allison for discussion. Third, a focused process
> needs to be adopted to identify disputes or gaps arising during the data
> remediation process, provide for efficient exhaustion of dispute resolution
> and to the extent needed prompt presentation to the court for resolution.
> Finally, the court expects confirmation from the Secretary and the
> Undersecretary, in consultation with the Special Master, that the staff
> assigned to the data remediation project is sufficient in number and

---

[13] The full quotation in context reads as follows: "The Data Remediation process is not meant to
be an overhaul of CDCR's data system, or the forum to wordsmith indicators, expand the scope,
or add requirements above and beyond what is currently being done by the Special Master during
his monitoring."  ECF No. 7523-1 at 4.

qualifications to complete the project well in advance of December 2023. By subsequent minute order this matter will be SET for further in-person status conference during the week of 5/9/2022 for the court to hear from Secretary Allison and the Special Master about the results of their discussions. In the alternative, if the Special Master and Secretary Allison are able to agree on resolution of all the issues identified in this minute order, the court will accept a declaration from Secretary Allison setting out that resolution, which shall include confirmation that the Special Master has advised the plaintiffs of the resolution and obtained their agreement to it.

ECF No. 7541.

### iv.  Secretary Allison's May 19, 2022 Declaration

On May 19, 2022, Secretary Allison filed a declaration outlining the "plan to streamline data remediation" and resolve data-remediation-related disputes.  ECF No. 7556 at 2.  Attached to Secretary Allison's declaration were: (1) data-remediation activation schedule templates, ECF No. 7556-1, and (2) a document outlining the agreed-upon data remediation dispute resolution process.  ECF No. 7556-2.

In her declaration, Secretary Allison confirmed that the staff assigned to work on data remediation were sufficient in number and qualifications to complete the data remediation before December 2023.  ECF No. 7556 at 3.   Further, Secretary Allison indicated she was "committed to ensuring additional staff, as may be necessary, will be assigned to the project."  *Id.*  Secretary Allison also requested that the Court direct the Special Master to adopt an agreed upon definition of the term "remediation" and emphasized the importance of agreeing on what it means to remediate and to certify CDCR's data system.

The dispute resolution process outlined in Secretary Allison's declaration and agreed to by the Special Master and plaintiffs envisioned a three-step process for resolving disputes over the scope of CDCR's CQIT indicators.  Disputes regarding methodological issues were to be "addressed in the BRMR/QAC process and only move through dispute resolution as a last

resort." ECF No. 7556-2 at 2. Where the Special Master and parties agreed on an indicator "but also agree[d] that the policy measured by the indicator" required modification "to align with the indicator," CDCR would pursue the policy modification in a manner so as not to "delay the data remediation process." *Id.* Further, "[a]ny request by the parties for a new indicator (*not including a reasonable modification to an existing one*) shall be sent to the Special Master for his consideration" in advance of his forthcoming 29th Round Monitoring Report on CQIT indicators. *Id.* (emphasis added).

Disputes regarding indicators left unresolved after two weeks of BRMR/QAC consideration are referred to the "First Level Review Team," consisting of "[CDCR's] Mental Health Program Deputy Director, Undersecretary of Health Care Services, the Special Master and/or the Special Master's designated experts, defendants' counsel, plaintiffs' counsel, and the minimal number of subject matter experts necessary." *Id.* First Level Reviews left unresolved after two weeks of consideration in BRMR were referred to the "Second Level Review Team," consisting of the CDCR Secretary, Special Master, and "whomever else either deems necessary." *Id.* at 3. Step three of the process consisted of the Special Master making a recommendation to the Court to resolve those disputes left unresolved after two weeks of "Second Level" review. *Id.*

On May 20, 2022, the Court issued a minute order acknowledging Secretary Allison's declaration and confirming that the four issues identified in the Court's prior order had been resolved. ECF No. 7557. As will be discussed below, concerns raised in Secretary Allison's declaration that did not address the four issues identified in the Court's prior order were referred to the Special Master and Secretary Allison for further discussions and clarifications as necessary. *Id.*

In recent months, the parties' disagreement over the need to create new CQIT indicators as opposed to making reasonable modifications to existing indicators has slowed down the remediation process for certain indicators.  Defendants have repeatedly resisted plaintiffs' proposed modifications to existing key indicators, arguing that the scope of the requested revisions required a new indicator.

For their part, defendants seek the Special Master's rubber stamp on any indicator which *accurately* measures what it purports to measure without any regard for whether it is measuring what it is *supposed to measure* in the context of this case.  Defendants base this contention, in part, on their misguided argument that the Special Master was aware of and has previously agreed to the scope of CDCR's CQIT indicators and associated business rules that put them into practice.[14]  The need to do this was not evident until the Golding Report proceedings had run their course; and, in any event, would not have been possible given the mental health data system's lack of precise documentation concerning how it operated.  Plaintiffs, on the other hand, use the data remediation process to, in some cases, relitigate issues and broaden the scope of monitoring in the case beyond what the Special Master has deemed necessary over several decades.

---

[14] Defendants' contention that the Special Master was aware of and previously agreed to the specifics of the key indicators' business rules does not comport with the record in this case.  In its December 23, 2019 order, the Court noted: "[D]efendants must arrange for the Special Master … forthwith be given access to all of the business rules defendants are currently using to process mental health data and generate informational reports related to delivery of constitutionally adequate mental health care to members of the plaintiff class.  This access must include, but not be limited to, access to business rules in use by the CCHCS Quality Management Section if that section is processing any data or generating any reports related to the delivery of constitutionally adequate mental health care to members of the plaintiff class."  ECF No. 6435 at 2-3.  The Court thereafter ordered defendants to "file a list of all steps they have taken to ensure that the Special Master has access" to the business rules. *See id.* at 4.

While the parties' tactics are understandable given the importance of the task at hand, it is past time to sharpen our collective focus and finish this project.  The Special Master has directed his team to proceed with steadfast focus on the remedial requirements of this case; he expects and hopes the parties will do the same.

v.    <u>Definitions of Remediation and Certification</u>

As noted, defendants have also repeatedly expressed confusion as to what is required of them for the Special Master to report to the Court that CDCR's mental health data systems have been remediated.  *See, e.g.*, Declaration of Kathleen Allison In Response to April 29, 2022 Order (ECF No. 7541) Requiring Clarification of Data Remediation Issues, ECF No. 7556 at 3-4 ("…CDCR continues to lack clarity on the end goal of this process. … I request that the court direct the Special Master to adopt an agreed upon definition of the term 'remediation.' It is important that the Special Master and the parties agree on what it means to remediate and to certify CDCR's data.  I am concerned that without greater clarity on what is required to remediate an indicator and to certify CDCR's data system, the end goal of this project and how to achieve that goal remain undefined.").[15]  In a May 20, 2022 minute order, the Court

---

[15] *But see* Defendants' Preliminary Activation Schedule for Completion of Court-Ordered Data Remediation, ECF No. 7334 at 9 ("Data validation asks: is the system designed to correctly measure Program Guide requirements? Software validation is the process of ensuring a program's design satisfies its business requirements.  In the context of data remediation, this consists of a careful review of each indicator's design (including the design of all of its business rules) to ensure that it accurately measures Program Guide Requirements within a reasonable margin of error.  Indicators that rely on the (EHRS) workflows require the workflows to also comport (i.e. be validated) against Program Guide Requirements and other CDCR business requirements.  Similar comments apply to indicators that depend on data derived from other systems within CDCR, such as the Strategic Offender Management System (SOMS)."); *id.* at 10 ("Data verification asks: have the measurements been coded correctly?  The detailed specification on how exactly an indicator and its business rules are intended to work is used to create a set of 'software tests' (that can be run as needed).  These tests help verify the indicator and business rules operate as intended within a reasonable margin of error.  For example, such tests can check that the numerator and denominator in a percentage score have not overlooked

35

acknowledged CDCR's concerns about the definition of remediation, but noted those concerns were "focused on a separate issue not covered by the April 29, 2022 minute order."  ECF No. 7557.  The Court further noted it was "confident that further direct discussions between the Secretary and the Special Master will lead to such additional clarification of the issue described in paragraphs seven through nine of Secretary's Allison's declaration as may be necessary."  *Id.*

While, contrary to defendants' assertions otherwise, the "end goal" of data remediation in this case is clear from a review of the record, the Special Master nonetheless endeavored once more to establish clear definitions of remediation and certification.  Beginning in July 2022, the Special Master and parties renewed discussions on the definitions of remediation and certification in the regularly scheduled all-parties data meetings.  On July 20, 2022, the Special Master provided proposed Data Remediation and Data System Certification Definitions to the parties and requested their comments.  *See* Email and attachment from Mr. Kerry Walsh, Deputy Special Master, to plaintiffs' and defendants' counsel (July 20, 2022), attached hereto as Exhibit D.  Defendants provided their comments on the Special Master's proposed definitions on August 5, 2022.  *See* Letter from Ms. Sundeep Thind, Esq. (CDCR Office of Legal Affairs), to Special Master Lopes (August 5, 2022), attached as Exhibit E.  Plaintiffs sent a reply to defendants' August 5, 2022 letter on September 11, 2022.  *See* Letter from Ms. Cara Trapani, Esq. to Special Master Lopes (September 11, 2022), attached hereto as Exhibit F.  The Special Master and

---

any patients.  Currently, the verification process has not benefitted from standardization and must be completed by individuals familiar with test writing best practices.  Consequently, the current preliminary timeline cannot offer a more precise estimate of the time needed to accomplish this test writing…. Ultimately, data verification will evaluate the entire indicator through an in-depth process to confirm the indicator is operating as intended by the approved documentation.").

parties discussed the proposed definitions at several all-parties data meetings between July – October 2022.  As of the time of this writing, the outcome of these discussions is pending.

The Special Master and his data team have spent considerable time and effort over the last two years explaining precisely and in plain language what is required of defendants to remediate CDCR's mental health data systems.  Most recently, the Special Master directed his data expert, Dr. Potter, to meet regularly with Dr. Steven Cartwright, Psy.D., CDCR's data remediation project manager, to resolve any remaining differences, including but not limited to the development of an adequate post-certification review process, and continue to identify strategies to accelerate completion of this project.  Successful completion of data remediation, with fidelity to the dictates of the remedy in this case remains defendants' most direct path to ending this case.  As the Court stated in its December 17, 2019 order following the Golding Report proceedings: "…*Coleman* data collection and reporting must be fixed, and it must be fixed to serve the policies and orders in this case, not the other way around.  The policies and orders must not be drained of meaning in an effort to squeeze a square peg into a round hole." ECF No. 6427 at 49.

> 2.   The Continuing Impact of the COVID-19 Pandemic on the Provision of Mental Health Care to *Coleman* Class Members

The COVID-19 pandemic and related restrictions on programming and patient movement impacted the provision of mental health care to *Coleman* class members throughout the monitoring round.  This section provides a brief overview of COVID-19 related developments in the case, including the parties COVID-19-Related Program Guide Departures filings.  This section also includes a summary of relevant findings from the Special Master's 29th Round monitoring tours of CDCR institutions with EOPs, including COVID-19-related deficiencies that were common across institutions.

i.  COVID-19-Related Program Guide Departures

On April 17, 2020, the Court ordered the parties, working under the Special Master's supervision, to file a stipulation "that identifies with specificity" those "temporary departures from certain Program Guide requirements" resulting from CDCR's efforts to manage the spread of COVID-19.  ECF No. 6622 at 2-3.  On May 20, 2020, the parties filed a Stipulation and Proposed Order in response to the Court's April 17, 2020 order.  ECF No. 6679.  The parties subsequently filed nineteen joint reports on COVID-19-related Program Guide departures between June 15, 2020 and February 15, 2022. *See* ECF Nos. 6718, 6761, 6831, 6866, 6915, 6952, 6988, 7025, 7059, 7086, 7129, 7176, 7203, 7237, 7273, 7314, 7351,7376, 7401.

In a July 28, 2020 order, the Court noted that "departures from the Program Guide that provide less access to mental health care than required by the Program Guide likely fall below constitutional minima."  ECF No. 6791 at 4-5.  Consequently, the Court ordered the parties to file a joint report, by August 18, 2020, regarding their respective "positions on the path to full resumption of Program Guide level mental health care assuming the COVID-19 pandemic has not abated and will not abate for some time." *Id.* at 3.  The parties filed their joint response to the Court's July 28, 2020 order on August 21, 2020. *See* ECF No. 6831.  On May 14, 2021, the Court ordered the parties to include deactivation schedules for each COVID-19 Program Guide departure in their monthly joint reports addressing COVID-19 related Program Guide departure filing.  ECF No. 7162.

The Court suspended the requirement for the monthly joint report on COVID-19-related Program Guide departures in a January 20, 2022 order.  ECF No. 7426.  The Court discussed the COVID-19 Program Guide departures during a February 11, 2020 status conference:

> It appears to the Court that the need for further reporting on COVID-19 departures is obviated by the upcoming 29th round report.  And, you know, clearly

38

the backdrop of COVID is here to stay, and so we're just all learning how to live with it....So to the extent the Special Master finds deficiencies in any areas that he's monitoring as measured by the proposed CQIT indicators and identifies the deficiencies as tied to COVID, then I would be made aware of that through his report, and then we could address deficiencies.

Reporter's Transcript of Proceedings (February 11, 2022 Status Conference), ECF No. 7461 at 7:8-18.

Following the February 11, 2022 status conference, the Court ordered the following: "In accordance with the agreement of the parties the requirement for the parties to file a monthly joint report addressing COVID-19 departures from the Program Guide is DISCONTINUED." ECF No. 7462.

ii.   29th Round Findings Regarding COVID-19-Related Impact on the Provision of Mental Health Care to *Coleman* Patients

The COVID-19 pandemic and defendants' related restrictions on programming and patient movement negatively impacted mental health treatment across CDCR institutions during the 29th Monitoring Round.  Staffing vacancies and shortages due to illness and the inability to fill positions limited patients' movement which in turn delayed transfers and admissions to inpatient and outpatient mental health programs.  In addition, there was an increase in the number of patients who remained in housing inconsistent with their housing classification (i.e., single cell, locked dorms, etc.,) due to COVID-19 outbreaks, quarantine, and isolation requirements.

Additional barriers to treatment included frequent modified programs or lockdowns, including a statewide modified program between January 9, 2022 – February 13, 2022; limitations on the use of treatment space and size of groups due to social distancing requirements; and the widespread utilization of nonconfidential, cell-front clinical encounters due to COVID-19 precautions, modified programs, and staffing shortages.  Cell-front psychiatry

and primary clinician contacts, as well as the use of in-cell activities in place of structured

therapeutic activities (STA) continued to be commonplace due to COVID-19 restrictions.

Patient participation in yard and day room, along with access to showers and phone calls, were

modified to ensure social distancing requirements during outbreaks, quarantine, or isolation. In-

person patient visitation was generally replaced with virtual visitation throughout the pandemic.

In some instances, the interruptions to mental health treatment were shared equally by all

CDCR institutions, while other treatment disruptions were specific to individual institutions. For

example, the ability to provide confidential mental health treatment was challenging throughout

the monitoring round across CDCR institutions. Non-confidential psychiatry appointments were

reported across varied MHSDS levels of care at CIW, CHCF, CCWF, CMC, CMF,

CSP/Corcoran, CSP/Sac, CSATF, KVSP, MCSP, RJD, SQ and VSP. Non-confidential, cell-

front primary clinician contacts were also prominent across mental health levels of care at CIW,

CHCF, CCWF, CMC, CMF, CSP/Corcoran, CSP/Sac, CSATF, KVSP, MCSP, RJD, SVSP, SQ,

and VSP and were frequently attributed to COVID-19 precautions or patient refusals during the

monitoring round. Also, Interdisciplinary Treatment Teams (IDTTs) at CIW, CSP/Corcoran,

CSP/Sac, KVSP, MCSP, RJD, SQ and SVSP were often held without the patient present due to

patient refusals, COVID-19 outbreaks, quarantines, and isolation. COVID-19 restrictions

resulted in limitations and/or cancellations of groups and structured therapeutic activities at CIW,

CHCF, CCWF, CMF, CSP/Corcoran, CSP/Sac, MCSP, RJD, SQ and VSP.

Limitations on movement during the monitoring round due to COVID-19 restrictions

impeded inpatient transfers at CHCF, MCSP, and RJD during the monitoring round. Data from

CHCF's site visit indicated that just 38 percent of acute patients and 46 percent of intermediate

care patients transferred timely to DSH. CMF completed referral packets for intermediate care

referrals, though 43 percent took longer than 72 hours to transfer once accepted due to COVID-19 movement restrictions.

Transfers between CDCR institutions were also delayed due to COVID-19 limitations on movement. Delays in transfers were noted for non-disciplinary segregation (NDS) patients at CSP/Corcoran, CSP/Sac, and CSATF. Transfer delays were reported for all MHSDS patients at CMF, while transfers out of the Short-Term Restricted Housing (STRH) at CSP/Corcoran, KVSP and SQ, and admissions into the STRH at RJD and KVSP were delayed due to COVID-19 restrictions.

Administrative segregation EOP Hubs at CHCF, CIW, CMC, CMF, CSP/Sac, and RJD all reported inconsistent compliance with certification and specifically confidential treatment and the provision of structured therapeutic treatment due to COVID-19 and staffing shortages. The Psychiatric Services Unit (PSU) at CSP/Sac was unable to achieve certification in November 2021 and was closed to intake due to the lack of structured therapeutic activities resulting from COVID-19 restrictions. CCWF, CSP/Sac, CSP/Corcoran, CHCF, CIW, CMF, KVSP, MCSP and RJD reported the inability to consistently provide the required number of structured therapeutic activities (STA) throughout the reporting period due to COVID-19 restrictions.

During the monitoring round, mental health crisis bed (MHCB) patients at CHCF were confined to quarters (CTQ) after exposure to staff who had tested positive for COVID-19. The MHCB at CCWF was reduced from 12 to seven beds during the review period as the institution converted four double cells to single cells. In the MHCB at CMC, extended lengths of stay were attributed to the lack of availability of intermediate care beds and COVID-19 quarantine.

CCWF, CMC, CSP/Sac, SVSP, and MCSP all reported that pre-release groups were cancelled or operated intermittently during the period under review due to COVID-19

modifications.  Similarly, compliance with the various components of the CMHPP were erratic.

EOP orientation groups at CMF, CSATF, and VSP were often cancelled and the quarterly

partnership training did not occur at CMC.  At SVSP, the monthly joint supervisory program

area tours occurred on one facility during one of the six months reviewed and the inmate

advisory committee met only one month on Facility A due to COVID-19 restrictions.  Further, at

CMF, there was inadequate space within the housing units to conduct in-person huddles given

social distancing requirements; therefore, staff members attended virtually.

During the reporting period, lockdowns or modified programs were reported at CCWF,

CHCF, CMC, CMF, CIW, CSP/Corcoran, CSP/Sac, CSATF, KVSP, MCSP, RJD, SVSP, SQ,

and VSP; most were due to COVID-19 outbreaks and staffing shortages.

### C.  <u>2021 UPDATE TO PROGRAM GUIDE</u>

In his Twenty-Eighth Round Monitoring Report, the Special Master provided a thorough

overview of the history of the Program Guide updating process as well as the 2018 update to the

Program Guide.  ECF No. 7074 at 39-42.  In its September 2, 2020 order, the Court reiterated

law of the case related to the *Coleman* remedy: "The Program Guide is defendants' plan,

approved by the court, to remedy identified violations in the delivery of mental health care to the

plaintiff class."  ECF No. 6846 at 4 (citing ECF No. 4361 at 2-6; *Coleman v. Brown*, 756 Fed.

Appx. 677, 679 (9th Cir. 2018)).  As noted in the Twenty-Eighth Round Monitoring Report:

"After 30 years, 27 monitoring rounds, and two revisions, the Court's adoption of the 2018

Program Guide Revision 'clarifi[ed] for the record that remedial planning for this action [wa]s

substantially complete' and that 'the time to materially alter its provisions ha[d] passed."  ECF

No. 7074 at 40 (quoting ECF No. 6214 at 4, 14).

As required by the Court's July 9, 2019 order, the Special Master filed a "report on the

proposed process for updating the 2018 Program Guide Revision on February 20, 2020."  ECF

No. 7074 at 42 (citing ECF No. 6476).  In an August 1, 2020 order, the Court adopted "The

Special Master's Amended Report on Proposed Processes for Updating the 2018 Program Guide

Revision, Related State Regulations, and Related Additions or Changes to the CDCR Operations

Manual, and the recommendations contained therein…to the extent consistent with this order."

ECF No. 6806 at 15.

 For a period of one year, the Court provisionally approved the following process for

updating the Program Guide and Compendium of Custody Related Remedial Measures:

> All proposed new regulations or policies, and all proposed regulatory or policy changes that may affect the court-approved remedy in this action shall be presented to the Special Master. In the case of proposed regulatory changes or enactments, this presentation shall be made not less than ninety days' notice prior to the public comment period. In the case of other proposed changes not subject to a public comment period, defendants shall give the Special Master not less than ninety days' notice prior to implementation of any proposed rule-making or policy action that would affect one or more of the remedial measures the court has approved and ordered implemented. The notice shall be accompanied by a statement of the proposing party's view of whether the proposed rule, regulation or policy, or amendment thereto, would, if adopted, be a material modification of the court-approved remedy in this action, and, if so, and which part or parts of the remedy would be affected. Within ten days, the Special Master shall make a determination whether the proposal would make a material modification of the court-approved remedy in this action and shall notify the proposing of his decision with a statement of reasons therefor.

> The Special Master's decision that a proposed change would not make a material modification of the remedy in this case shall be final and binding on all parties, and any such proposed change may proceed without further vetting through the updating process described in this order. Any proposed change the Special Master determines would make a material modification of the remedy in this case shall proceed through the updating process below.

> Any party may seek reconsideration of the Special Master's decision that a proposed change would make a material modification of the remedy in this case by submitting a request for reconsideration to this court within five days of that decision, accompanied by the proposed policy change, the Special Master's decision and statement of reasons, and a short statement presenting the basis on which reconsideration is sought. The proposed change may be submitted to the update process below at any time after the Special Master's decision is made, including while a request for reconsideration is pending before this court, at the

election of the party proposing the change. Any proposed change the Special Master or the court after reconsideration determines would be a material modification of the remedy in this case must proceed through the update process below before incorporation into the Annual Update to the Program Guide and the Compendium of Custody Related Remedial Measures and must be noted as a substantive change affecting the remedy at the time the Annual Update is filed.

In order to be included in an Annual Update, all proposed changes that the Special Master or the court after reconsideration determine would be a material modification of the remedy in this case must proceed through the following update process. To commence the update process, the proposed change shall be presented to the other party. The presenting party shall: (1) indicate whether the proposed policy would revise the operative version of the Program Guide or the Compendium of Custody Related Measures, (2) provide a written rationale for the proposed change and any other relevant context necessary to understand the proposed policy, and (3) include the Special Master's short statement of reasons why the change is substantive.

The responding party will have 30 days to provide written comments, which shall include, but not be limited to, the party's position regarding how the proposed policy would affect either the Program Guide or the Compendium of Custody-Related Measures and which part or parts thereof; as well as proposed alternative language. The responding party may request an extension if required, that will not exceed 21 days. Within 21 days of receipt of the responding party's comments, the parties, along with the Special Master, shall meet and confer to determine if agreement can be reached on the substance of the policy as well as its inclusion in the Program Guide or the Compendium of Custody Related Measures.
If an agreement is not reached during the first meet and confer, the party that presented the proposed policy has 45 days to request, in writing, another meet and confer session. The responding party will submit its final position in writing within 21 days of the request for a second meet and confer. If the parties believe that a second meet and confer is warranted, that further session will be scheduled within 21 days of receipt of the responding party's final position.

If the parties cannot reach an agreement following the second meet and-confer session, they will submit their positions and proposed language to the Special Master for review within 30 days. The Special Master will, within 30 days of receiving the parties' positions, provide the parties with his guidance and recommendation. If the parties are unable to reach agreement after receipt of the Special Master's input, the Special Master will file a recommendation with the Court within 45 days.

If an agreement is reached through the above-outlined process, the parties will submit the agreed-upon modification to the Court for approval through a filing capturing all agreed-upon policy revisions reached in the prior 12 months.

By mutual agreement, any deadlines in this process may be extended by a reasonable amount of time to ensure that complex and meaningful negotiations are not arbitrarily truncated. If one party requests an extension of time, but the other party does not agree that one is warranted, the parties will submit the dispute to the Special Master for resolution.

ECF No. 6806 at 15-17.[16]

During the one-year provisional approval for the Program Guide updating process, the Special Master and parties discussed numerous policy revisions and included these updated policies in the 2021 Program Guide Revision. *See* ECF No. 7333-2 ("Negotiated or Court-Ordered Remedial Measures Related to Custodial Issues Not Included in the 2021 Program Guide Revision", Appendix B to 2021 Program Guide Update).  As the parties noted in their Joint Response to the Court's August 1, 2020 Order, they were "ultimately able to reach agreement as to whether many of the policies at issue constituted a material modification to the Program Guide or Compendium, and in the process, refined their dispute about the definition of the term."  ECF No. 7332 at 2.  However, the parties reported "that they will be unable to fully implement the annual updating process contemplated in [the parties' proposed revised Program Guide updating process] until the dispute as to the definition of 'material modification' is resolved."  *Id.* at 3.  The parties further requested that the Court "set the issue of 'material modification' for briefing without delay."  *Id.*  As a result of the lingering dispute over the term "material modification," five policies were not included in the 2021 Program Guide Revision: (1) Mental Health Crisis Bed: Supervisory Review of Suicide Risk Assessment and Self-Harm

---

[16] On September 2, 2020, defendants filed a Notice of Appeal of the Court's August 3, 2020 order regarding the Program Guide updating process.  ECF No. 6844.  On September 21, 2022, the Court of Appeals for the Ninth Circuit held oral arguments on defendants' appeal.  On October 5, 2022, the Court of Appeals for the Ninth Circuit granted Plaintiff-Appellees' motion to dismiss defendants' appeal for lack of jurisdiction.  *Coleman v. Newsom*, No. 20-16734, 2022 U.S. App. LEXIS 27802, at *5 (9th Cir. October 5, 2022).

Evaluations; (2) Psychiatric Inpatient Programs: Treatment Planning and Procedures: Suicide

Prevention and Response; (3) Psychiatric Nurse Practitioner (PNP) Policy; (4) Use of Force

Procedures during Medical Emergencies and for Court Ordered Involuntary Treatment; and (5)

Crisis Intervention Teams (CITs).  Defendants' Annual Update to Program Guide and

Compendium of Custody-Related Remedial Measures, ECF No. 7333 at 2 n.1.

On February 7, 2022, the Court issued an order regarding the 2021 Program Guide

update.  ECF No. 7456.  The Court reiterated that it was not clear to the Court that the

"provisionally approved updating process was ever followed and, in any event, it became

apparent some time ago the process was unworkable."  *Id.* at 1 (citing Reporter's Transcript of

Proceedings, October 7, 2021 Status Conference and Hearing on Motion to Strike, ECF No. 7345

at 13:19-22).  The Court reviewed its September 2, 2020 order, which "identifie[d] CQIT's 'key

indicators' as the functional equivalent of 'benchmarks' that…signify the material provisions of

the Program Guide and the Compendium that must be durably implemented at a degree of

compliance the court will confirm in a subsequent order."  ECF No. 7456 at 2-3 (quoting ECF

No. 6846 at 28).  The Court concluded its order with the following:

> As the foregoing demonstrates, the impending completion of the list of key CQIT
> indicators will pave the way for full implementation of the material provisions of
> the court-ordered remedy in this case as necessary to meet the requirements of the
> Eighth Amendment.  Maintaining the focus on these indicators also will achieve
> judicial and case management efficiencies.

ECF No. 7456 at 3.  Accordingly, the Court approved the 2021 Program Guide Update

and Compendium Update.  *Id.*

In addition, the Court referred "[t]he parties' dispute over the five policies omitted

from the 2021 Program Guide Update…to the Special Master for consideration as to

whether the substantive provisions of those policies are, or should be, reflected in the list

of CQIT indicators currently under review as part of the Twenty-Ninth Monitoring Round." *Id.* Finally, the Court indicated it "anticipate[d] that final approval of a list of CQIT indicators will replace the need for annual updates to the Program Guide and the Compendium and, therefore, the parties' obligation to file further annual updates to the Program Guide and the Compendium is DISCONTINUED unless or until further order of the court." *Id.* at 4.

Because data remediation and development of the CQIT indicators remains ongoing as of the time of this writing, the Special Master will provide a substantive update on the status of these five disputed policies in his forthcoming Report on CQIT Indicators.[17]

### D. **MODIFICATIONS TO CDCR'S STAFFING PLAN**

Since late 2020, the Special Master and parties have extensively discussed and negotiated several modifications to CDCR's 2009 Staffing Plan. These modifications are discussed below.

1. Defendants' December 2020 Proposed Modifications to CDCR's Staffing Plan

On July 30, 2020, the Court issued an order following the second quarterly status conference for 2020, inviting the parties to brief five specific staffing related questions[18] and

---

[17] In a January 3, 2023 order, the Court granted the Special Master's request for an extension of time, ECF No. 7693, and directed the Special Master to "file a brief report on the status of data remediation generally and as it pertains to finalization of the list of CQIT indicators in particular." ECF No. 7695 at 2.

[18] The five specific staffing-related questions were as follows:
1. Within thirty days from the date of this order the parties shall file briefs that address the following:

   a. With specificity, the size of the reduction in the population of seriously mentally ill inmates in California's prison system at each level of care that would be required for defendants to come into compliance with the ratios in the 2009 Staffing Plan.

scheduled further proceedings to enforce the Court's October 10, 2017 order for September 10, 2020.[19]  ECF No. 6794 at 3, 8.  As the Court noted, two previously scheduled hearings on enforcement of the staffing remedy in this case were postponed: the October 11, 2018 hearing was continued due to the submission of the Golding Report, and the April 23, 2020 hearing was postponed due to the onset of the COVID-19 pandemic.  *Id.* at 2; *see also* November 3, 2020 Order, ECF No. 6938 at 3 ("On October 5, 2018, five days before the deadline for defendants to come into compliance with the October 10, 2017 order, the court received notice from both parties of a whistleblower report on staffing issues prepared by CDCR's Chief Psychiatrist, Dr. Michael Golding.").

On September 24, 2020, the Court held a status conference to "consider enforcement of its October 10, 2017 order…requiring compliance with the 2009 staffing plan and the June 13,

---

b.  Whether defendants can, within thirty days of any court order directing them to do so or sooner if the task if promptly undertaken, develop a plan in consultation with the Special Master and, as necessary, plaintiffs' counsel that they will implement voluntarily and that will not later than the end of one year, permanently reduce the number of seriously mentally ill inmates to the number that will bring defendants into compliance with the requirements of the October 10, 2017 order.

c.  If the answer to question 1.b. is yes, a description of the general contours of such a plan.

d.  As an alternative to a voluntary plan from defendants, what remedies are available to the court to enforce its October 10, 2017 order with respect to defendants' 2009 Staffing Plan.

e.  What remedies are available for the shortfall required for the psychiatric inpatient programs operated by the California Department of Corrections and Rehabilitation.

July 30, 2020 Order, ECF No. 6794 at 8.

[19] In an August 25, 2020 order, the Court denied defendants' motion to continue "the dates set in the July 30, 2020 order and direct[] the parties instead to provide briefing in January 2021…." ECF No. 6838 at 2.  The Court instead continued the date for filing briefs set forth in the July 30, 2020 order to September 14, 2020, and continued the hearing date from September 10, 2020 to September 24, 2020.  *Id.* at 5.

2002, order requiring the maximum 10 percent vacancy rate." Reporter's Transcript of Proceedings (September 24, 2020 Status Conference), ECF No. 6889 at 6:18-22. During the status conference, the Court and parties discussed the parties' responses to the Court's specific questions[20] and discussed several of defendants' proposed modifications to their 2009 Staffing Plan, including the use of psychiatric nurse practitioners and modified staff-to-clinician ratios for certain MHSDS participants. *Id.* at 26:10-12 (noting several of defendants' proposals to address staffing deficiencies, including "a new point in time workload study, the [use of] PNPs, increased use of telepsychiatry."). The Court also queried the parties regarding the possibility of sanctioning defendants for their longstanding non-compliance with the Court's prior orders related to mental health staffing. *Id.* at 30:8-39:22.

As the Court noted in an order following the September 24, 2020 status conference, "[a]t hearing, counsel for defendants represented that defendants could use the number of mental health positions actually filled, including telepsychiatrists, contractors, psychiatric nurse practitioners (PNPs) and all providers who work under the supervision of a psychiatrist, to determine the size of the mental health population that can be served under the ratios required by the 2009 Staffing Plan." September 25, 2020 Order, ECF No. 6886 at 1-2. The Court directed defendants to "file a report within seven days, prepared under the Special Master's supervision, that describes with specificity and including charts as necessary the number of class members at each level of the MHSDS that can be served by the current filled mental health staffing positions using the positions and the ratios set out in the 2009 Staffing Plan, including telepsychiatrists…as well as contractors, and allowing for a ten percent vacancy rate." *Id.* at 2.

---

[20] *See supra* note 18; *see also* ECF Nos. 6853 (Defendants' Response to July 30, 2020 Order), 6854 (Plaintiffs' Response to July 30, 2020 Order).

Defendants timely filed their response to the Court's September 25, 2020 order on October 2, 2020.  ECF No. 6896.

In a November 3, 2020 order, the Court reviewed its efforts to "refocus attention" on defendants' compliance with the Court's prior staffing orders.  ECF No. 6938 at 4 ("[A]s defendants' management of the COVID-19 pandemic in the prison system moved from the initial emergency stage to development and implementation of ongoing management strategies consistent with public health requirements, the court issued a series of orders designed ultimately to refocus attention on compliance with the October 10, 2017 order, among other considerations."); *see id.* at 5 (discussing the Court's July 2, 2020 order, ECF No. 6750, July 30, 2020 order, ECF No. 6794, September 21, 2020 order, ECF No. 6874, and September 25, 2020 order, ECF No. 6886).  After review of the materials submitted by the parties in response to its prior orders, the Court concluded "the record supports a finding that some discrete adjustments to the 2009 Staffing Plan may be appropriate before the court moves finally to full enforcement of the October 10, 2017 order."  ECF No. 6938 at 6.  The Court specifically identified the following proposals, contained in a September 8, 2020 letter from defense counsel ("Bentz Letter"), as those that "may well warrant consideration":

> (1)      Review of the assumptions underlying frequency of psychiatric contacts for Correctional Clinical Case Management System (CCCMS) and EOP patients that inform the psychiatrist staffing ratios for these distinct levels of care and potential adjustment of those ratios based on the review;

> (2)      Review of psychiatrist ratios for the 3CMS caseload and relevant data in light of the fact that the existing ratios are based on psychiatrist contact with every 3CMS patient a minimum of once every ninety days, exceeding the Program Guide requirement that applies this minimum review period only to 3CMS patients on psychiatric medication;

> (3)      Redirecting psychiatry positions designated for crisis intervention on weekend and holidays to on-call telepsychiatry positions;

(4)    Including psychiatric nurse practitioners (PNPs) in the psychiatrist fill rate; and

(5)    Calculating staffing ratios based on actual number of patients, rather than numbers of inpatient beds.

*Id.*

As the Court noted, these proposals were "not new ideas." *Id.* They were in fact "substantially similar to proposals the parties discussed in 2018" prior to the submission of the Golding Report. *Id.* Therefore, the Court directed "defendants…to propose modifications to the Staffing Plan in accordance with the foregoing provisions of the Bentz Letter, to work with the Special Master and the COVID-19 Task Force … to achieve consensus on the proposed modifications to the extent possible, and to file a proposed revised Staffing Plan on or before December 11, 2020. *Id.* at 7. Recognizing the "basic agreement among the parties that PNPs have a role to play" in CDCR's MHSDS, the Court further directed defendants to "file a proposed final PNP policy on or before December 11, 2020, together with the proposed revised staffing plan." *Id.*

After a series of rigorous meet and confers among the Special Master and parties, defendants timely submitted their proposed modifications to CDCR's 2009 Staffing Plan on December 11, 2020. Defendants' Response to November 4, 2020 Order, ECF No. 6978. The collaboration among the Special Master and parties resulted in four discrete agreed-upon proposals: "(1) establishing a new psychiatrist staffing ratio for 3CMS patients not on medications for six months or more; (2) redirecting psychiatry positions allocated for crisis intervention on weekends and holidays to night shift telepsychiatry; (3) adopting a formal policy for Psychiatric Nurse Practitioners (PNPs) to provide psychiatry services and recognizing PNPs in the psychiatry position allocation fill rate; and (4) creating a telepsychiatry from home

policy." *Id.* at 2.  Defendants identified "these modifications, and in particular the formalized policies for use of PNPs and telepsychiatry from home" as "critical to eliminating barriers to Defendants' ability to deliver constitutionally adequate care, and will improve access to care." *Id.*

Regarding psychiatrist staffing ratios for Correctional Clinical Case Management System (3CMS) patients not on medications for six months or more, defendants' proposal adjusted these staff-to-patient ratios as follows:  3CMS general population (GP):  from 1:225, to 1:675; 3CMS administrative segregation unit (ASU)/Condemned: from 1:101, to 1:303; 3CMS Secure Housing Unit (SHU): from 1:161, to 1:483.  ECF No. 6978-1 at 3.

Regarding night shift telepsychiatry, CDCR indicated it would be removing the existing 0.52 psychiatry positions allocated to each institution for crisis intervention on weekends and holidays and replacing that coverage with assignment of "a telepsychiatry pool for night-shift coverage," offering "after-hours coverage seven days a week at all CDCR institutions." *Id.* at 4.

Defendants also requested approval of their proposed PNP policy, *see id.* at 7-20, which "outline[d] the appropriate scope of practice and supervisory requirements for PNPs providing psychiatric services…[and] limit[ed] PNPs to the 3CMS level of care." *Id.*

Finally, regarding CDCR's proposed telepsychiatry from home policy, *see id.* at 22-27, defendants indicated it first permitted telepsychiatrists to work from home in response to the COVID-19 pandemic and planned to continue to do so throughout the duration of the provisional approval period for CDCR's policy. *See id.* at 4 ("To facilitate the delivery of care to patients, while also protecting both patients and staff during the COVID-19 pandemic, many telepsychiatrists are now providing services from their homes[.]").

Plaintiffs filed objections to and comments on defendants' proposed revisions to CDCR's 2009 Staffing Plan on December 15, 2020.  ECF No. 6994.  In a January 26, 2021 order, the Court disregarded plaintiffs' objections as they "focus[ed] on issues beyond the scope of the proposed revisions or the proposed PNP policy."  ECF No. 7035 at 2.  The Court ordered that defendants' December 11, 2020 proposed revisions to CDCR's staffing plan and defendants proposed PNP policy be approved and "implemented forthwith."  *Id.*

### 2.    Parties' Proposals Related to Psychiatric Supervisors

Plaintiffs resurfaced issues raised in their December 15, 2020 objections to and comments on defendants' proposed revisions to CDCR's 2009 Staffing Plan in an April 9, 2021 motion to clarify the scope of the application of the 10 percent maximum staff vacancy rate required by the Court's June 13, 2002 order.  Plaintiffs' Notice of Motion and Motion to Clarify Order of June 13, 2022, ECF No. 7118.  Specifically, plaintiffs sought "an order clarifying that the maximum vacancy rate in the 2002 Order applies to all Defendants' psychiatry positions, including but not limited to chief psychiatrists and senior psychiatrist supervisors."  *Id.* at 3.  Defendants filed their opposition to plaintiffs' motion to clarify on April 23, 2021.  ECF No. 7137.  On the same date, the Court set a May 14, 2021 hearing on plaintiffs' motion.  April 23, 2021 Minute Order, ECF No. 7136.  Following the May 14, 2021 status conference, the Court scheduled an In Camera Midlitigation Status (Scheduling) Conference for July 20, 2021.  *See* ECF Nos. 7162, 7192, 7193, 7228, 7240, 7243.

On July 9, 2021, defendants requested leave to file a motion further modifying their Staffing Plan as related to on-site psychiatric supervisors.  ECF No. 7223.  The Court granted defendants motion in a July 13, 2021 minute order.  ECF No. 7226.  On July 27, 2021, defendants filed their motion to modify CDCR's staffing plan as it relates to on-site psychiatric

supervisors.  ECF No. 7250.  Plaintiffs filed their opposition to defendants' motion on August 10, 2021.  ECF No. 7268.

In a July 26, 2021 order following the July 20, 2021 In Camera Midlitigation Status Conference, the Court referred a number of disputed issues between the parties to a series of settlement conferences.  ECF No. 7246 at 1-3.  Among the issues the Court planned to discuss referring to a future settlement conference was "patient care, including treatment delivery, access to higher levels of care, and staffing, including issues related to telepsychiatry and vacancies." *Id.* at 3.

In an October 12, 2021 minute order, the Court referred the subject matter of both plaintiffs' April 9, 2021 motion to clarify the scope of the Court's June 13, 2002 order, ECF No. 7118, and defendants' motion to modify CDCR's staffing plan as it relates to on-site psychiatric supervisors, ECF No. 7250, "to the settlement judge for inclusion in the settlement discussions focused on staffing."  ECF No. 7343.

Following a February 11, 2022 status conference, ECF No. 7458, the Court issued an order directing the parties to file "a joint notice informing the court whether they have resolved one or both motions or, instead are requesting ruling on one or both" of the parties outstanding motions related to staffing (ECF Nos. 7118, 7250).  ECF No. 7462.  The parties requested two additional weeks to resolve the issues raised in defendants' motion (ECF No. 7250) and further requested that Court "decide the issues raised in the [plaintiffs' motion, ECF No. 7118] following the parties' submission of short, focused supplemental briefs."  ECF No. 7470 at 1-2.

In accordance with the Court's February 23, 2022 order, ECF No. 7472, the parties filed a Stipulation and Proposed Order Approving the CDCR's On-Site Psychiatric Supervisor

Proposal as a Modification to Defendants' 2009 Staffing Plan. ECF No. 7486. The parties later

withdrew their Stipulation and Proposed Order and instead agreed to the following:

> For a period of 18 months, Defendants intend to continue implementing the
> criteria for allocating Chief Psychiatrist and Senior Psychiatrist Supervisor
> positions contained in the Proposal, and Plaintiffs do not intend to seek
> enforcement of the 1:50 ratio for Senior Psychiatrist Supervisors from the 2009
> Staffing Plan at issue in Defendants' July 27, 2021 Motion. The purpose of this
> period is to engage in information sharing and to evaluate the effects of the
> implementation of the allocations identified in the Proposal. At the end of the 18-
> month period, the parties intend to submit either a stipulation or proposed briefing
> schedule to address any disagreements regarding the allocations for psychiatric
> supervisors.

ECF No. 7526 at 2.

Regarding plaintiffs' motion to clarify the Court's June 13, 2002 order, the parties filed

their "focused supplemental briefing." ECF Nos. 7482, 7488. On March 17, 2022, the Court

issued an order directing the following:

1.    Plaintiffs' April 9, 2021 motion for clarification is GRANTED;

2.    The June 13, 2002 orders as issued at that time applied to all allocated
      psychiatrist positions and continues to so apply. …

ECF No. 7504 at 6; *see also id.* at 4 ("[T]he record as relevant to the court's 2002 order shows

conclusively that the Special Master's reference to 'psychiatrists' in his reports on staffing

vacancies was to all allocated psychiatrist positions, including chief psychiatrists, senior

psychiatrists, and staff psychiatrists.").


**E.  UNIDENTIFIED NEEDS ASSESSMENT (UNA)**

Simultaneously with the commencement of full-scale on-site monitoring tours of

CDCR's institutions, the Special Master and parties were actively engaged in a number of

significant, Court-ordered projects, including the Unidentified Needs Assessment. A brief

review of the background of the UNA study and a status update are included below.

In its March 17, 2020 order regarding the first quarterly status conference of 2020, the Court indicated it had "reached the tentative conclusion that at least one additional unmet bed needs study will be required in order for defendants to demonstrate (a) that they have a sufficient number of licensed inpatient mental health beds, including mental health crisis beds; and (b) that all class members in need of inpatient mental health care are in fact being timely identified, referred, and transferred to such care." ECF No. 6509 at 3. Shortly after the Court's March 17, 2020 order, the onset of the COVID-19 pandemic effectively postponed further consideration of the unmet needs assessment. *See* September 10, 2021 Order, ECF No. 7305 at 4 ("As a consequence [of the onset of the COVID-19 pandemic], as well as the significant limitations placed on access to California's prisons, it became clear an unmet bed needs study could not be conducted until the Special Master's team could regain access to the state prison facilities, safely and consistent with public health requirements.").

On September 10, 2021, the Court again considered the "question of whether defendants should be required to conduct a study to determine whether there is an unmet need for higher levels of mental health care among members of the plaintiff class." ECF No. 7305 at 1. The Court reviewed recent history of the consideration of this question, *see id.* at 2-12, and noted the following regarding the need for a further unmet needs assessment:

> As the history of remediation in this area described in preceding sections of this order makes clear, defendants need both accurate mental health population projections and a fully sustainable process for continuous identification, referral, and placement of class members at the appropriate level of mental health care in order to accurately determine and plan for the number of inpatient beds, including MHCBs, required to meet the needs of the plaintiff class. Defendants' suggestion that population projections plus actual bed usage is necessarily an accurate measure of bed needs misses the mark and ignores substantial history in this case. Actual inpatient bed usage is only an accurate measure of bed need if it is otherwise clear that bed usage is the result of a robust and thorough process of identification and referral of class members in need of inpatient care.

*Id.* at 13.  Moreover, the Court observed that certain "red flags…suggest[ed] a less than robust

identification or referral process," including declining referral and admissions of *Coleman* class

members to beds at DSH-Atascadero.  *Id.* at 14.  The Court rejected defendants' preference for

being permitted to "refine" and fix CDCR's "sustainable process" in lieu of conducting an unmet

needs assessment:

> This history of this litigation shows that the absence of a robust sustainable process for identification and referral of inmates to inpatient care has inevitably led to large numbers of inmates in need of inpatient care remaining unidentified and unreferred to such care. …
>
> Defendants must, under the supervision of the Special Master, undertake an unmet bed needs study to assess whether there are class members in need of inpatient or crisis bed care who have not been identified or referred for necessary care.  This unmet bed needs study must be sufficiently broad in scope and focused in methodology to ensure that it results in a clear and comprehensive assessment of whether there is any unmet need for access to necessary inpatient care, whether unmet need is the result of an insufficient number of beds in one or more inpatient programs or whether it is the result of an absence of necessary treatment programs.

*Id.* at 14-15.

After protracted negotiations over the UNA study's methodology (despite the clear,

unambiguous language of the Court's September 13, 2021 order), the Court convened two status

conferences on February 11, 2022, *see* February 11, 2022 Status Conference RT, ECF No. 7461

at 21-33, and February 23, 2022, *see* February 23 Status Conference RT, ECF No. 7476 at 1-31,

regarding the UNA study.  Following the February 23, 2022 status conference, the Court issued a

minute order as follows:

> Having considered the discussion with the parties on February 23, 2022, reviewed the record, and good cause appearing, the court clarifies the schedule for implementation of the unmet bed needs assessment the court ordered on September 13, 2021 as follows: (1) The deadline for completion of planning of the unmet bed needs assessment is EXTENDED to March 18, 2022. The Special Master may, under the authority granted to him by the court in its September 13, 2021 Order: convene at least one more planning session with the parties for the purpose of such

additional discussion as he deems necessary to finalize the methodology to be followed in conducting the unmet bed needs assessment; provide to Defendants a written statement of the final methodology to be followed in conducting the unmet bed needs assessment and obtain from Defendants a written statement setting out an operational plan for that final methodology. (2) The parties shall cooperate fully in the schedule set by the Special Master to complete tasks as needed by the March 18, 2022 deadline. (3) On or before December 31, 2022, Defendants shall file with the court a written report on the results of the unmet bed needs assessment. It is SO ORDERED.

ECF No. 7477.

As reported in the Special Master's Twenty-Ninth Round Monitoring Report— Part B: "The UNA [study] commenced on April 4, 2022 with the start of the Phase I review at the Richard J. Donovan Correctional Facility (RJD)." ECF No. 7625 at 21.

On December 2, 2022, the parties filed a stipulation and proposed order requesting an extension of the December 31, 2022 deadline to file the UNA study to June 30, 2023. ECF No. 7676 at 4. On December 15, 2022, the Court issued a stipulation and order granting the requested extension for completion of the UNA study. ECF No. 7680 at 4-5.

## F.  UPDATE ON POLICY DEVELOPMENT

During the Twenty-Ninth Monitoring Round, defendants distributed draft revisions to dozens of CDCR's mental health policies, memoranda, and procedures. The Special Master and parties have discussed defendants' proposed revisions in various all-parties settings and the Special Master and plaintiffs' have provided written comments and questions on many of these policy revisions.

The following policies, memoranda, and/or procedures were either revised or considered for revision during the Twenty-Ninth Monitoring Round. In some instances, CDCR's proposed changes remain pending as of the time of this writing.

- Policy and Procedure re: Pre-Release Program

- Safety Planning Policy and Procedure

- Change Management Policy

- Inmate Patient Property in the Psychiatric Inpatient Program

- Psychiatry Peer Review Policy and Procedure

- 3CMS LOC and MSF Memo, Policy, and Procedure

- Use of Mechanical Restraints in MHCB Policy

- Telepsychiatry Policy[21]

- Change to Higher Level of Care Form Proposal

- Proposed Changes to IDTT Chart Audit

- Memo re: Completion of Suicide Risk Assessments and Self-Harm Evaluations in Psychiatric Inpatient Program Settings

- PIP Policy – Housing Review/Least Restrictive Housing

- Medication Non-Adherence Policy

- Flex Bed Policy

- PIP Policy – Treatment Strategies and Interventions

- On-Site Psychiatric Supervisor Proposal

- DOM Section 51020.15.7 re: the Use of Chemical Agents in Immediate Use of Force Situations

- Single Cell PIP Discharge Memo

- Reception Center Suicide Prevention Reporting Expectations

- Suicide Risk Management Program – Suicide Prevention Policy

---

[21] The Telepsychiatry Policy and the parties' proposed revisions thereto are the subject of a separate report of the Special Master.  ECF No. 7682.

- Update to Suicide Precaution and Suicide Watch Orders

- MHCB Discharge Custody Check Memorandum and Form

- Update to After Hours Phone Call for Consults Tracking

- Notification of Bad News – Suicide Prevention Policy

- Psychological Testing Policy and Procedures

- PIP Policy – Referral and Admission

- Clinical Care for Temporary Departure Returns Policy

- PIP Policy – Patient Allowable Items

- PIP Policy – Out of Cell Time Tracking

- PIP System to Encourage Progress (STEP) Policy

- Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants

- Psychiatry Contact Requirements for Patients in the MHSDS Prior to IDTT Memorandum

- CIT Policy and Procedure

- Suicide Risk Evaluation Mentoring Policy

- Mental Health Custody Staff Reporting Safety Concerns

As the Special Master has informed the parties, going forward the Special Master will resume his prior practice of convening quarterly all-parties policy meetings to discuss and negotiate policy revisions impacting the *Coleman* class. During the early part of the COVID-19 pandemic, policy discussions were often held in both the small workgroup settings and the broader all-parties COVID-19 Task Force. Thereafter, due to the frequency of all-parties meetings related to data remediation, policy discussions were included in these meetings. Having a separate process in place for all-parties policy discussions has benefited the remedy in

this case historically and the Special Master believes data remediation-related discussions should remain focused on the task at hand: completely remediating CDCR's mental health data systems by December 2023.

### G. **SUICIDE PREVENTION**

As noted in the Special Master's Twenty-Ninth Monitoring Round Report – Part B, during the monitoring round the Special Master and parties concluded discussions regarding the use of foreseeability and preventability in the *Coleman* annual suicide report. The Special Master recommended the provisional delegation of his responsibility to draft and file the annual suicide report to CDCR on June 28, 2022. ECF No. 7574 at 11. On July 22, 2022, the Court issued an order adopting the Special Master's June 28, 2022 recommendation and CDCR's Annual Suicide Report Proposal "subject to the provisional approval process outlined therein." ECF No. 7592 at 2.

On September 29, 2022, CDCR filed its 2021 Annual Suicide Report. ECF No. 7615. Plaintiffs filed their response to CDCR's 2021 Annual Suicide Report on October 11, 2022. ECF No. 7621. The Court granted defendants' request to file a response to plaintiffs' response, ECF No. 7633, on October 26, 2022. ECF No. 7643. Defendants filed their response to plaintiffs' response to the 2021 Annual Suicide Report on November 10, 2022. ECF No. 7659. As of the time of this writing, the Special Master remains optimistic at the prospects of the provisional delegation of the Annual Suicide Report at providing "the court, parties, and Special Master with a sufficient record to evaluate the constitutional adequacy of CDCR's suicide prevention program." ECF No. 7574 at 10-11.

During the Twenty-Ninth Round, the Special Master's suicide prevention expert, Mr. Lindsay Hayes, completed and filed his Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the CDCR. ECF No. 7636-1. In his report on Mr. Hayes' Fifth Re-

Audit Report, the Special Master recommended the Court "find defendants in compliance with the implementation" of three of Mr. Hayes' recommendations and that the Court "order defendants to implement the 16 initial recommendations and develop corrective action plans (CAPs) based upon deficiencies found during Mr. Hayes' baseline assessment of suicide prevention practices in CDCR's PIPs."  ECF No. 7636 at 32.  On November 3, 2022, defendants filed objections to the Fifth Re-Audit Report.  The Court granted plaintiffs' November 4, 2022 request for leave to file a response to defendants' objections, ECF No. 7655, on November 7, 2022.  ECF No. 7656.  Plaintiffs filed their response to defendants' objections on November 23, 2022.  ECF No. 7672.

The Special Master's suicide prevention expert plans to begin his next re-audit of CDCR's suicide prevention practices simultaneously with the Special Master's 30th round of monitoring in January 2023.

## II.    MENTAL HEALTH VACANCY RATES

### Mental Health Vacancy Rates Overall and by Discipline During the Twenty-Ninth Monitoring Round[22]

During the Twenty-Ninth Monitoring Round, the 15 institutions with EOPs continued to report unacceptably high vacancy rates.  Except for telepsychiatry, all such vacancy rates exceeded ten percent.  There was an overall 13 percent vacancy rate for chief psychiatrists and

---

[22] Sources (excluding psych techs and telepsychiatrists):  CDCR Secure Website for Monthly Reports, posted October 2022, covering the period of August 2022.  Because psych tech staffing data was not included in the monthly posting, the reported psych tech staffing data was obtained from the individual institutional reports for the Twenty-Ninth Monitoring Round.  Further, telepsychiatry data for August 2022 was taken from Defendants' Monthly Psychiatry Vacancy Report (ECF No. 7617 at page 5).

an alarming 55 percent vacancy rate for senior psychiatrists. The 51 percent staff psychiatry vacancy rate was reduced to a still unacceptable 24 percent functional vacancy rate through the use of registry staff. Three institutions nonetheless indicated staff psychiatry functional vacancy rates exceeding 50 percent, with SVSP reporting a startling 64 percent. On a positive note, the overall telepsychiatry vacancy rate was seven percent.

All institutional psychology vacancy rates also exceeded ten percent, with institutions' reporting respective vacancy rates of 17 and 13 percent for chief and senior psychologists. Further, there was an overall 45 percent staff psychology vacancy rate, which registry staff reduced to a still shocking 37 percent. Five institutions reported functional vacancy rates for staff psychologists above 50 percent; CHCF indicated the highest such vacancy rate at 76 percent.

Further, there were overall functional vacancy rates of 30 percent for social workers, with two institutions noting social worker functional vacancy rates of 50 percent or higher; SVSP reported a 64 percent functional vacancy rate for social workers. There were also respective functional vacancy rates of 11 and 17 percent for recreation therapists and psych techs. The office tech vacancy rate was 26 percent.

Chief Psychiatrists

At the 15 CDCR institutions with EOPs, 13 of 15 chief psychiatrist positions were filled, reflecting a 13 percent vacancy rate; chief psychiatry positions at CSP/Corcoran and VSP were vacant. CSP/Corcoran's chief psychiatrist position was also vacant during the Twenty-Eighth Monitoring Round. No registry staff were used to fill any vacancies.

Senior Psychiatrists

Ten of 15 institutions with EOPs reported having a total of 11 senior psychiatrist positions, of which only five were filled, for a 55 percent vacancy rate. Regrettably, both of CHCF's senior psychiatry positions were vacant, as they were during the prior review period. CSP/Corcoran's senior psychiatry position was also vacant during the prior and current monitoring rounds. During this monitoring round, CSP/Lac, MCSP, and SVSP also reported senior psychiatry vacancies.

Staff Psychiatrists

Overall, at the 15 institutions with EOPs, 73 of 149.8 authorized staff psychiatry positions were filled, for a 51 percent vacancy rate. The use of 40.32 registry staff reduced the number of staff psychiatry vacancies to 36.48, lowering the overall functional vacancy rate to a still unacceptable and noncompliant 24 percent.

For individual institutions, and including registry staff, the following vacancy rates were reported. CIW, MCSP, and VSP reported having more psychiatrists than authorized. CSP/Sac indicated a staff psychiatry functional vacancy rate of less than ten percent. However, psychiatry functional vacancy rates at the remaining 11 institutions all exceeded ten percent. Eight of the 15 institutions -- CMF, CMC, CSP/Corcoran, CSP/LAC, CSATF, CCWF, RJD and SQ, reported functional vacancy rates ranging from 11 to 50 percent. Staff psychiatry functional vacancy rates at CHCF, KVSP, and SVSP were exceptionally high, and all exceeded 50 percent. SVSP reported the highest staff psychiatry functional vacancy rate at a staggering 64 percent.

Telepsychiatrists

The 15 institutions with EOPs had a total of 63 telepsychiatry positions, of which 58.53 were filled, reflecting a seven percent vacancy rate. There were no registry telepsychiatrists. CMF, CSP/Corcoran, and CSATF had more telepsychiatrists than they were authorized. Six

other institutions – CMC, CSP/LAC, CCWF, KVSP, RJD, and VSP, reported no telepsychiatry vacancies, while SVSP reported a seven percent telepsychiatry vacancy rate. CHCF and MCSP reported respective telepsychiatry vacancy rates of 17 and 48 percent. CSP/Sac, CIW, and SQ were not allocated telepsychiatrists.

Chief Psychologists

Each of the 15 institutions with EOPs reported having two authorized chief psychologist positions, for a total of 30 positions. Twenty-five of these positions were filled, for an overall 17 percent vacancy rate. No positions were filled by registry staff. Ten institutions – CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, RJD, and SVSP, reported filling both of their chief psychology positions. The remaining five institutions – CCWF, CSATF, KVSP, SQ, and VSP, reported filling only one of two of their chief psychologist positions, reflecting 50 percent vacancy rates. During the Twenty-Eighth Monitoring Round, CCWF, KVSP, and VSP also reported 50 percent vacancy rates for chief psychologists.

Senior Psychologists

Of the 152.3 authorized senior psychologist specialist and supervisor positions, 133 were filled, for a 13 percent vacancy rate. No registry staff provided additional coverage. RJD and VSP had more senior psychologists than authorized. Four other institutions – CIW, CSP/Corcoran, CSP/Sac, and KVSP, indicated senior psychologist vacancy rates of zero, while CSP/LAC reported a four percent vacancy rate. Otherwise, the eight remaining institutions – CHCF, CMF, CMC, CSATF, CCWF, MCSP, SVSP, and SQ, all reported vacancy rates above ten percent ranging from 15 to 52 percent. SVSP noted the highest vacancy rate for senior psychologists at 52 percent.

Staff Psychologists

The 15 institutions with EOPs had a total of 536.3 staff psychologist positions, of which 296 were filled, representing an abysmal vacancy rate of 45 percent. Registry staff covered an additional 40.95 staff psychology positions, reducing the functional vacancy rate to 37 percent. CIW had more staff psychologists than authorized and VSP had a staff psychology vacancy rate of five percent. Otherwise, the remaining 13 institutions all had functional vacancy rates exceeding ten percent that ranged from 11 to 76 percent. Moreover, five institutions had psychology functional vacancy rates exceeding 50 percent, as follows: CSATF 51 percent, CSP/Corcoran 54 percent, MCSP 57 percent, SVSP 58 percent, and CHCF 76 percent.

Social Workers

Of 238.4 authorized social worker positions, 159 were filled, reflecting a 33 percent vacancy rate. Additionally, registry staff provided coverage for 6.82 positions, minimally lowering the functional vacancy rate to 30 percent. Four institutions reported social worker vacancy rates of ten percent or less, as follows: VSP zero percent, CSP/Corcoran two percent, and CIW and CSP/Sac each reported five percent. The remaining institutions all reported social worker vacancies exceeding ten percent that ranged from 16 to 64 percent. Two institutions reported social worker functional vacancy rates of 50 percent or higher, with RJD and SVSP respectively reporting such functional vacancy rates of 50 and 64 percent.

Psych Techs

The psych tech data reported by ten of the 15 institutions with EOPs indicated a total of 592.8 psych tech positions, of which 487.5 were filled, reflecting an 18 percent vacancy rate. Contractors also filled six positions, reducing the psych tech functional vacancy rate to 17 percent. SVSP did not have any psych tech positions. Including contractors, five of the institutions – CSP/Corcoran, CHCF, CIW, KVSP, and VSP, reported psych tech vacancies of

less than ten percent.  The remaining five institutions – CMF, CSP/Sac, CCWF, RJD, and SQ, reported vacancy rates between 17 and 33 percent.

### Recreation Therapists

Of 248.6 authorized recreation therapist positions, 208 were filled, for a 16 percent vacancy rate.  Registry provided coverage for an additional 12.11 positions, reducing the functional vacancy rate to 11 percent.  Three institutions – CSP/Sac, CCWF and VSP, reported having more recreation therapists than authorized.  Four other institutions – CSP/Corcoran, CHCF, RJD, and SQ, indicated recreation therapist vacancies of less than ten percent.  The remaining eight institutions all reported recreation therapy vacancy rates exceeding ten percent that ranged from 12 to 31 percent.  Both CSP/LAC and MCSP reported the highest recreation therapist functional vacancy rates at 31 percent.

### Office Techs

Of 285.2 authorized office tech positions, 212 were filled, for a 26 percent vacancy rate. No registry staff provided additional services.  Three institutions – CIW, CSATF, and KVSP, indicated office tech vacancy rates of less than ten percent.  The remaining 12 institutions all reported office tech vacancies of between 14 and 54 percent.  SVSP had the highest percentage of office tech vacancies at 54 percent.

## **Summary – Staffing**

The institutions continued to report extremely high staff vacancy rates for virtually all disciplines.  Except for telepsychiatry, all such vacancy rates exceeded ten percent.  These vacancy rates included a shocking 55 percent vacancy rate for senior psychiatrists, and a 51

percent staff psychiatry vacancy rate, which registry staff reduced to 24 percent. There were also respective functional vacancy rates of 37 and 30 percent for staff psychologists and social workers, as well as functional vacancy rates above ten percent for recreation therapists and psych techs. It is axiomatic that defendants' failure to satisfy the established staffing requirements significantly contributed to its inability to provide the *Coleman* class with Program Guide-compliant mental health treatment.

## III.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS

### A.  Quality Management

In his Twenty-Eighth Monitoring Round Report, the Special Master noted that the obstacles faced by CDCR defendants during the Twenty-Seventh Monitoring Round had continued during the Twenty-Eighth Monitoring Round. Notably, the Special Master reported in the Twenty-Seventh Round Monitoring Report that:

> None of the institutions reviewed had a quality management structure in place in the nature of a system that monitored mental health activities, analyzed the results, identified areas that needed improvement, and developed and implemented remedies with the objective of preventing future adverse outcomes.

ECF No. 5779 at 55. As the Special Master reported in the Twenty-Eighth Monitoring Round, these were the issues that a CQI system was designed to address. *Id.*

Nonetheless, CDCR institutions with EOPs have made considerable progress in the development and implementation of quality management programs. During the Twenty-Ninth Monitoring Round, quality management bodies regularly met and addressed pertinent mental health matters. Institutions typically reported holding regular meetings of the local governing body, quality management committee (QMC), and mental health subcommittee, and achieving quorums. However, institutions' demonstrated variability in the chartering of Quality

Improvement Teams (QITs) and Focused Improvement Teams (FITs), implementing CAPS and audits to address mental health concerns, and utilizing the Emergency Medical Response Review Committee (EMRRC). Peer review was also limited. Some institutions reported on the process to disseminate quality management information to line staff.

CSP/Sac and RJD continued to have robust quality management programs. CIW continued to have an active quality management program. VSP had a reasonable quality management program. Regional and leadership staff reported that CMC's quality management program had steadily improved and was more streamlined after acquiring a quality management specialist.

The local governing bodies at CIW, CSATF, SVSP, and SQ met monthly. CSP/Sac's local governing body met five times; CHCF's met four times. Local governing bodies at CSP/Corcoran, CCWF, KVSP, and MCSP met quarterly; those at CMF and CSP/LAC met twice. RJD's local governing body met once. CMC's local governing body met with appropriate frequency.

Twelve institutions, namely CHCF, CMF, CMC, CSP/Corcoran, CSP/Sac, CSATF, CIW, CCWF, KVSP, MCSP, SVSP, and SQ, reported achieving quorums for all local governing body meetings.

Quality management committees regularly met. CHCF typically conducted quality management committee meetings two to three times monthly. Eleven institutions -- CSP/Corcoran, CSP/LAC, CSP/Sac, CIW, CSATF, CCWF, MCSP, RJD, SVSP, SQ, and VSP, conducted monthly QMC meetings. CMF's quality management committee met during five months of the review period. CMC and KVSP's QMC met with appropriate frequency.

Eleven institutions -- CHCF, CMF, CMC, CSP/Sac, CSATF, CIW, CCWF, KVSP, SVSP, SQ, and VSP, reported quorums for all quality management committee meetings. MCSP reported adequate attendance at QMC meetings.

Most institutions' mental health subcommittees also regularly met and achieved quorums. CSATF's mental health subcommittee met every two weeks. CHCF, CSP/LAC, CSP/Sac, CIW, CCWF, RJD, SVSP, and SQ's mental health subcommittees met monthly. The mental health subcommittees at CMF and VSP respectively met five and three times; MCSP provided subcommittee meeting minutes for five months. CMC and KVSP's subcommittee convened with appropriate frequency.

Ten institutions, namely CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CIW, CCWF, KVSP, SVSP, and VSP, reported attaining quorums at all mental health subcommittee meetings. However, CSP/LAC's chief of mental health was not present at four of six meetings. SQ reported quorums for five months. MCSP reported adequate attendance at subcommittee meetings.

Some institutions utilized QIT/FITs and CAPs during the review period and conducted audits. CMC had an ongoing EOP hub QIT that addressed potential problem areas. CCWF's QIT addressed multiple areas of its administrative segregation EOP program. CSP/LAC leadership reported that a QIT for contraband in the Correctional Treatment Center (CTC) effectively reduced contraband in the unit. CSP/Sac also conducted a QIT/FIT. MCSP had no active QITs but two active FITs; one monitored the mainline EOP program's treatment hours while another for the EOP hub monitored treatment hours and staffing vacancies, among other issues. Due to COVID-19, CMF had temporarily discontinued QITs/FITs. CHCF, CSP/Corcoran, CIW, KVSP, RJD, SVSP, SQ, and VSP did not conduct QIT/FITs.

As for CAPs, CHCF's robust CAP process regularly audited Prison Rape Elimination Act (PREA) referrals, suicide prevention, Suicide Risk and Self-Harm Evaluation (SRASHE) quality and mentoring, RVR mental health assessments, individual plans of care, and safety planning. CSP/Sac implemented several CAPs in response to a suicide case review, audits, and dashboard and performance report data. CSATF implemented CAPs related to sustainable process reviews, DSH and PIP referral and return processes, documentation reflecting higher level of care (HLOC) referral considerations, and the quality of EOP patient IDTTs. CCWF implemented five CAPs. MCSP's CAPs included training on CAT audit criteria, nursing prescreens, EOP treatment, diagnostic monitoring, and timely administrative segregation transfers.

Regarding audits, CSP/Corcoran assessed issues related to MHCB readmissions. CSP/Sac audited treatment plans. MCSP completed several audits; institutional mental health leadership often identified focus areas based on completed audits' findings and routine monitoring. Other than a performance improvement work plan for suicide precaution and suicide watch, SVSP did not conduct audits. CMF had temporarily discontinued audits due to COVID-19.

As for EMRRCs, CHCF's met once to twice monthly, CSP/Corcoran and CSATF's met biweekly, and CCWF and RJD's met monthly. SQ provided finalized minutes from three EMRRC meetings and draft minutes from another.

There was limited peer review during the review period. CSP/Corcoran conducted three months of peer review but did not include psychiatry. SQ psychiatrists from different clinical teams reviewed one another. CSP/LAC's peer review was restricted to the MHCB and emphasized evaluating safety issues. Peer review at CSP/Sac and CIW remained on hold; nonetheless, CSP/Sac conducted internal peer review for CTC psychologists while CIW

clinicians who provided services to the psychiatry and psychology programs were subject to their respective peer review committees.  Peer review at CSATF and MCSP was also on hold except for MHCB safety plans at the former and reviews for two MHCB psychologists and the assigned psychiatrist at the latter.  CHCF and CMF had suspended peer review.  CCWF, KVSP, RJD, and VSP did not conduct peer review.  CMC did not conduct peer review in the MHCB.  SVSP was revising its peer review process and did not have a peer review policy in effect.

CMF and CSP/Sac disseminated quality management information to line staff during MHSDS program meetings while performance reports were discussed at weekly supervisors' meetings.  CMC supervisors disseminated quality management findings, audits, and proposed changes to line staff.  SVSP emailed mental health subcommittee information to line staff. MCSP reported that local governing body information was disseminated to staff through staff meetings with supervisors.  KVSP line staff received direct feedback and directives from supervisors when quality management procedures and audits revealed problem areas.  A large cross section of VSP mental health staff reported a lack of awareness of quality management activities.  CSP/LAC lacked a clear process to disseminate QMC and mental health subcommittee information to staff.

## Summary – Quality Management

During the Twenty-Ninth Monitoring Round, CDCR institutions with EOPs continued to progress with the development and implementation of quality management programs.  Tellingly, quality management entities regularly met, typically attained quorums, and addressed pertinent issues related to mental health.  Some institutions also initiated QITs/FITs, CAPs, and audits to address mental health-related matters and also utilized the EMRRC.  Some institutions also had

processes in place to disseminate quality management information to staff. However, peer review was limited.

**B.  Quality of Care in CDCR's Mental Health Programs**

**1.  The IDTT Process**

In his Twenty-Eighth Monitoring Round Report, the Special Master found that IDTT meeting quality varied across and within institutions. This trend continued during the Twenty-Ninth Monitoring Round. Most observed IDTTs for institutions with EOP programs reflected some degree of collaboration among attending disciplines and typically also addressed diagnoses and symptoms. However, observed IDTTs reflected variability regarding the various components of treatment planning, including meaningful case conceptualizations, measurable treatment goals, and adequate clinical interventions, among other aspects of treatment; reviewed treatment plans revealed similar inadequacies in the quality of treatment planning. Site visit observation and contact compliance overwhelmingly indicated that patients typically attended less than 90 percent of IDTTs, but most observed IDTTs appropriately engaged patients. Observed IDTTs and contact compliance usually found most required disciplines in attendance, but in all cases the attending staff members were not the assigned clinicians. Further, some supervisors also attended observed IDTTs, where they provided useful guidance. IDTT observation and staff and patient reports indicated both positive and negative experiences with telepsychiatry, including both effective telepsychiatry operations and connectivity issues. Some institutions had inadequate IDTT treatment space.

IDTT Collaboration

Treatment team member collaboration, which was necessary for an IDTT's adequate functioning, varied among institutions and in programs within institutions. Nonetheless, most, but not all, observed IDTTs reflected collaboration. IDTTs for CHCF's 3CMS program, CMC's

EOP, West facility, and C Quad 3CMS programs, CSP/LAC's D1 and D2 EOPs, CSP/Sac's EOP hub, CCWF's 3CMS program, MCSP's EOP hub, MHCB, and EOPs, RJD's EOP hub, and VSP's MHSDS administrative segregation patients all demonstrated collaboration. IDTTs for CSP/LAC's EOP hub and KVSP's STRH programs indicated collaborative engagement and relevant participant input. MHCB IDTTs at CHCF found treatment team members collaboratively engaging with patients but less with one another. IDTTs for CIW's MHCB, CSATF's STRH, and SQ's 3CMS programs demonstrated good interdisciplinary discussions.

Further, IDTTs for CSP/LAC's MHCB and CSP/Sac's 3CMS program revealed active participation by the psychiatrist and correctional counselor. All disciplines contributed to IDTTs for RJD's EOP hub. At several institutions, including CMF and CSP/Sac's EOP hubs, and CSATF's 3CMS program, the psychiatrist and primary clinician (PC) typically met with patients before IDTTs.

Other observed IDTTs lacked collaboration. IDTTs for CMF's EOP program, CMC's MHCB, CSP/Corcoran's EOP hub and STRH, CSP/LAC's D4 EOP program, and KVSP's 3CMS program revealed a lack of collaboration. KVSP's EOP and MHCB IDTTs lacked interdisciplinary discussions. SVSP's MHCB IDTTs lacked effective interdisciplinary discussions and interactions, as well as an integrated treatment planning process. IDTTs for CSP/Sac's EOP and CSATF's 3CMS programs indicated discussions that were largely siloed rather than robust interdisciplinary discussions. VSP treatment team members' participation in IDTTs for the 3CMS program would have benefited from more team discussion rather than staff members' sequential presentations. There was a need for more interactive discussion by the CMC EOP hub IDTT.

Diagnoses and Symptoms

Another treatment team objective was addressing diagnoses and symptoms, which most observed IDTTs did to some degree.  CSP/Sac's STRH program IDTTs agreed on diagnoses and symptoms.  IDTTs for KVSP's EOP program concurred on diagnoses, and symptoms appeared consistent with diagnoses.  KVSP's STRH program IDTTs explained patients' diagnoses and symptoms.  IDTTs for CSP/LAC's EOP hub and D4 EOP and CCWF's STRH programs addressed diagnoses.  IDTTs at CMC's 3CMS West facility did not address differing diagnoses.  CCWF's 3CMS IDTTs typically identified patients' diagnoses and functional impairments and noted discussions of patients' symptoms supporting diagnoses.  CHCF's 3CMS and MCSP's EOP IDTTs typically reflected diagnostic agreement.  The PC provided reasonable diagnostic case formulation for IDTTs at CMF's EOP hub.

Two of three observed CIW 3CMS program IDTTs resolved diagnostic clarification issues.  IDTTs for CSP/LAC's MHCB addressed symptoms and diagnoses but did not discuss diagnoses in patients' presence.  CSP/LAC's IDTTs for the D1 and D2 EOPs identified diagnoses but did not indicate supporting criteria such as symptoms and functional impairment.  IDTTs for CSP/Sac's 3CMS program discussed diagnoses and symptoms; however, discussion regarding the severity of symptomatology was vague.  CHCF's MHCB IDTTs routinely discussed symptoms and patient behaviors but did not consistently mention diagnoses.

IDTTs for RJD's MHCB and MCSP's 3CMS program reflected sparse discussion of patients' diagnoses.  CMC's MHCB IDTTs neglected to address symptoms supporting diagnostic decisions.  IDTTs for CSATF's EOP program did not review diagnostic justifications.

Regrettably, some institutions' observed IDTTs indicated concerning diagnoses and/or responses to diagnoses.  An IDTT for CSP/Sac's EOP/hub revealed a patient who had been

75

diagnosed with adjustment disorder since 2018 despite this condition normally being a time-limited response to a stressful event.  A CSATF STRH IDTT reported mutually exclusive patient diagnoses.  An IDTT for a CSATF 3CMS patient with a difficult-to-control seizure disorder revealed the telepsychiatrist's minimal participation.  Despite a patient being prescribed a medication that was frequently used to treat anxiety, the PC at a SVSP STRH IDTT was unaware of this anxiety disorder diagnosis.

<u>Treatment Planning</u>

Adequate and effective treatment planning was the IDTT's central function and was critical to the provision of sufficient care to MHSDS patients.  Like other components of the IDTT process, treatment planning quality varied across institutions and programs.

Many observed IDTTs reflected adequate treatment planning.  IDTTs for CMC's "acute care" MHCB patients, MHCBs at CSP/LAC and MCSP, CSP/Sac's STRH, and CCWF's STRH and 3CMS programs typically addressed appropriate case conceptualizations and treatment planning.  CHCF's 3CMS program IDTTs reviewed case conceptualizations and functional impairments.  The PC provided comprehensive case reviews during CMF's EOP hub IDTTs.  At CMC, EOP IDTTs revealed generally appropriate and measurable treatment goals and interventions while most C Quad IDTTs revealed meaningful case conceptualizations.  CSP/LAC EOP hub IDTTs addressed patients' relevant treatment.  KVSP STRH program IDTTs reflected relevant clinical and psychosocial histories, appropriate case conceptualizations, and clearly stated treatment goals.  CHCF EOP hub IDTTs revealed individualized treatment planning.

However, other observed IDTTs revealed concerns with treatment planning.  IDTTs for MCSP's EOP program indicated mostly adequate case conceptualizations but did not

consistently discuss treatment goals. CSP/Sac EOP program IDTTs revealed individualized treatment plans that addressed functional impairments, but case conceptualization quality was variable. CSP/Sac's 3CMS program IDTTs discussed treatment goals, but specifics were often vague. IDTTs for VSP's 3CMS program were generally adequate, but case presentations' comprehensiveness and the connection between treatment goals and diagnoses varied. CSP/Corcoran STRH IDTTs were generally adequate but indicated concerns with case conceptualizations. IDTTs for SQ's condemned program for EOP patients reflected variable case conceptualization and treatment plan quality but did not discuss interventions. Most CSATF EOP program IDTTs reviewed patients' treatment progress, but routinely failed to review case conceptualizations and patient-specific treatment interventions. For CSP/LAC's D4 EOP program, IDTTs identified treatment goals but lacked discussion of treatment progress and functional impairment.

Further, most observed CHCF MHCB IDTTs lacked discussion of clinical conceptualization, clear treatment goals and clinical interventions, and typically did not discuss treatment plans. CMC's MHCB IDTTs routinely neglected to address case conceptualizations and treatment goals and interventions. CSP/Sac's EOP hub and EOPs' IDTTs revealed frequently vague and unmeasurable treatment goal discussions. CSP/Sac's PSU IDTTs revealed treatment plans requiring greater utilization of objective treatment goals, while some clinicians had difficulty conceptualizing cases. CMF's EOP program IDTT discussions routinely lacked case conceptualizations and planned treatment interventions and typically did not provide measurable treatment objectives. CSP/LAC's D1 and D2 EOP did not consistently address treatment goals. RJD's MHCB IDTTs indicated limited treatment plan discussions. IDTTs for CSATF's MHCB and KVSP and MCSP's 3CMS programs failed to address case

conceptualizations and measurable treatment goals. SVSP's MHCB IDTTs did not address treatment planning and case conceptualizations. SVSP's STRH IDTTs revealed limited case conceptualizations and impracticable treatment goals. CSP/Corcoran's Long-Term Restricted Housing (LTRH) IDTTs did not address case conceptualizations. CSP/Corcoran's EOP hub IDTTs lacked discussions of treatment goals and necessary treatment plan modifications.

A sample of reviewed treatment plans also revealed inadequacies. CMC's MHCB documentation demonstrated treatment planning inadequacies. CMF's EOP treatment plans routinely indicated problems with clinical summary updates, and treatment interventions and goals, and did not consistently address treatment and medication nonadherence. KVSP's EOP treatment plans revealed inadequate clinical summaries and lacked realistic goals. SVSP's MHCB patient healthcare records indicated a lack of individualized treatment plans. Only 60 percent of CHCF's EOP treatment plans contained satisfactory documentation, and problems were routinely identified in clinical summaries and the development of realistic goals.

Patients' IDTT Attendance

The Program Guide identified each patient as a required member of the IDTT team. However, patients' IDTT attendance and efforts to engage patients during IDTTs varied.[23]

Site visit observations revealed that patients attended less than 90 percent of IDTTs for CSP/Sac's MHCB and EOP hub programs, CSATF's STRH program, CCWF's 3CMS program, MCSP's EOP hub, and RJD's Facility C EOP program. Regrettably, CMF EOP program IDTTs did not invite patients on quarantine or isolation status to attend, while the provided rationale for not inviting them was inadequate.

---

[23] In their response to the Draft Report, defendants noted that "patients may refuse to attend IDTTs." Exhibit C at 7.

Further, although contact compliance reported patients' attendance at all VSP 3CMS program IDTTs and 90 percent of CCWF's MHCB IDTTs, it overwhelmingly indicated that less than 90 percent of patients attended IDTTs, as reported for the following institutions and programs: CIW's STRH, LTRH, and initial IDTTs in the EOP hub, CMF's MHCB, CMC's EOP, CSP/Corcoran's EOP and STRH, CSP/LAC's EOP hub, STRH, EOP, and 3CMS, CSP/Sac's PSU and initial IDTTs in the STRH, CSATF's STRH and EOP, KVSP's MHCB and 3CMS, MCSP's EOP hub, EOP, and 3CMS, RJD's EOP hub and 3CMS, and SVSP's STRH and routine EOP IDTTs.

Observed IDTTs typically revealed staff's appropriate engagement of patients. CSATF's STRH IDTTs requested patient input, which treatment planning incorporated. Patients contributed to CMC EOP hub IDTT discussions. CMF 3CMS patients reported IDTT participation and identified their diagnoses and treatment goals. IDTTs for CHCF and CCWF's EOPs, and CIW's MHCB, properly interacted with patients. IDTTs for CMF's EOP hub, CHCF's EOP program, CSP/LAC's EOP hub, RJD's Facility C EOP program, and SQ's condemned program for EOP patients demonstrated appropriate patient engagement. CHCF's MHCB IDTTs used appropriate language to establish effective communication. IDTTs for CMC's EOP program exhibited participant consensus, including patients. CSATF's MHCB staff were familiar with patients. KVSP's EOP treatment team generally discussed the IDTT's purpose with patients. CHCF 3CMS program IDTT staff appropriately responded to patient questions.

However, at other institutions, staff's patient engagement was less effective. CMC's MHCB IDTTs consistently failed to explain their purpose to patients to ensure that they understood their treatment plans. IDTTs at CSP/LAC's MHCB did not discuss diagnoses in

patients' presence. RJD's Facility A and C EOP patients reported not regularly attending and/or not having the option to attend IDTTs.

### Supervisors' IDTT Attendance

Some supervisors attended observed IDTTs, where they provided guidance. SVSP's EOP supervisor provided very good clinical insight. The supervising psychologist offered useful guidance at IDTTs for CSATF's STRH. Supervising psychologists facilitated IDTTs for CHCF's 3CMS and MHCB programs, summarizing IDTT discussions at the latter. The supervising psychologist attended KVSP's MHCB and EOP program IDTTs and, at the latter, facilitated the treatment team in a clinically useful way. The EOP hub supervisor attended IDTTs at CHCF, intervening when IDTTs' lost focus. Supervisors also attended IDTTs for CSATF's MHCB and EOP programs, MCSP's MHCB, and for EOP hubs at CMF, CMC, and RJD. The senior psychiatrist attended CSP/Sac's MHCB IDTTs.

Further, for CSP/Sac's EOP program, the chief psychologist reported daily intervention by mental health leadership and program supervisors to cover IDTTs. Overall, IDTT treatment teams for SQ's condemned program for EOP patients would benefit from clinical supervision.

### Required Staff's IDTT Attendance[24]

The Program Guide required attendance by the assigned psychiatrist, primary clinician, and correctional counselor at IDTT meetings. Notably, observed IDTTs typically found required disciplines in attendance for the following institutions and programs: CHCF's MHCB, EOP and 3CMS, CIW's MHCB, CMF's EOP, CMC's MHCB "acute care," EOP and C Quad 3CMS, CSP/Corcoran's MHCB and EOP, CSP/LAC's EOP and 3CMS, CSP/Sac's MHCB and 3CMS,

---

[24]The data for required staff's attendance at IDTTs does not include staff IDTT attendance for the PSU, EOP hub or STRH, which is reported at pp. 154-160.

CCWF's EOP and 3CMS, CSATF's MHCB and EOP, KVSP's MHCB, EOP and 3CMS, MCSP's EOP and 3CMS, RJD's MHCB, SVSP's EOP, SQ's mainline EOP, mainline 3CMS and condemned MHCB, and VSP's 3CMS.  It was not possible to discern from the medical records whether the IDTT participants were assigned clinicians.

Similarly, contact compliance indicated all required disciplines' attendance at IDTTs for the following institutions and programs:  CHCF's EOP and 3CMS, CIW's MHCB, EOP and 3CMS, CMF's EOP and 3CMS, CMC's EOP and 3CMS, CSP/Corcoran's EOP and 3CMS, CSP/LAC's EOP and 3CMS, CCWF's EOP and 3CMS, CSATF's 3CMS, KVSP's MHCB, EOP and 3CMS, MCSP's EOP and 3CMS, SVSP's 3CMS, SQ's mainline and condemned EOP and condemned 3CMS, and VSP's 3CMS, as well as for initial IDTTs for CSP/LAC's MHCB, CSP/Sac's MHCB and EOP, RJD's EOP, SQ's MHCB and mainline 3CMS and VSP's EOP, and for routine IDTTs for CSP/Corcoran's MHCB and CSATF's EOP.

Contact compliance further reported that 90 percent of required staff or more attended IDTTs for CHCF's MHCB, CMF's MHCB, CSP/Sac's 3CMS, CSATF's MHCB, CCWF's MHCB, RJD's routine EOP IDTTs, SVSP's routine EOP IDTTs, SQ's initial MHCB IDTTs and VSP's routine EOP IDTTs.  It was not possible to discern from the medical records whether the IDTT participants were assigned clinicians.

For other institutions and programs, contact compliance reported noncompliance for required staff's IDTT attendance.  There was noncompliance for required staff's attendance at IDTTs for RJD's 3CMS, as well as for initial IDTTs for CMC, CSP/Corcoran, MCSP, RJD and SVSP's EOP, and for routine IDTTs for CSP/Sac and CSATF's EOP, and CSATF's MHCB, and SQ's 3CMS condemned program.

Frequency of Required Contacts and Required IDTTs[25]

There was variability among institutions and in programs within institutions for the timeliness of required clinical contacts and IDTT meetings.  As for initial psychiatry contacts, contact compliance revealed both compliance and noncompliance, with the following institutions and programs reporting compliance: CHCF's MHCB, CIW's MHCB and EOPs, CMF's MHCB, CMC's MHCB, CSP/Corcoran's MHCB and 3CMS programs, CSP/Sac's MHCB and 3CMS programs, CCWF's MHCB and EOPs, KVSP's MHCB, RJD's MHCB, and SQ's EOP condemned and EOP mainline programs.  However, contact compliance for the following institutions and programs demonstrated noncompliance for timely initial psychiatry contacts: CHCF's EOP and 3CMS programs, CIW's 3CMS, CMF's EOP and 3CMS programs, CMC's EOP and 3CMS programs, CSP/Corcoran's EOP program, CSP/LAC's MHCB, EOP and 3CMS programs, CSP/Sac's EOP program, CSATF's MHCB, EOP and 3CMS programs, CCWF's 3CMS program, KVSP's EOP and 3CMS programs, MCSP's MHCB, EOP and 3CMS programs, RJD's EOP and 3CMS programs, SVSP's MHCB, EOP and 3CMS programs, SQ's MHCB, 3CMS condemned and mainline programs, and VSP's EOP and 3CMS programs.

For routine psychiatry contacts, contact compliance similarly indicated both compliance and noncompliance.  The following institutions and programs reported compliance for timely routine psychiatry contacts: CHCF's MHCB, CIW's MHCB and 3CMS programs, CMF's MHCB and 3CMS, CMC's MHCB, CSP/LAC's MHCB and 3CMS programs, CSP/Sac's MHCB, CCWF's MHCB, KVSP's MHCB and 3CMS programs, MCSP's MHCB, EOP and 3CMS programs, RJD's MHCB, SVSP's MHCB, and SQ's MHCB, EOP condemned, 3CMS

_____

[25] The data for the timeliness of required clinical contacts and IDTT meetings for the PSU, EOP hub, STRH, and LTRH is reported at pp. 154-160.

condemned and EOP mainline programs.  However, contact compliance for the following

institutions and programs indicated  noncompliance for routine psychiatry contacts:  CHCF's

EOP and 3CMS, CIW's EOP, CMF's EOP, CMC's EOP and 3CMS programs, CSP/Corcoran's

MHCB, EOP and 3CMS programs, CSP/LAC's EOP program, CSP/Sac's EOP and 3CMS

programs, CSATF's MHCB, EOP and 3CMS programs, CCWF's EOP and 3CMS programs,

KVSP's EOP program, RJD's EOP and 3CMS programs, SVSP's EOP and 3CMS programs,

SQ's 3CMS program, and VSP's EOP and 3CMS programs.

     Contact compliance also demonstrated both compliance and noncompliance for initial

primary clinician contacts, reflecting compliance for the following institutions and programs:

CHCF's MHCB, CIW's MHCB, EOP and 3CMS programs, CMC's MHCB, CSP/Corcoran's

MHCB, EOP and 3CMS programs, CSP/LAC's EOP program, CSATF's MHCB, CCWF's

MHCB, EOP and 3CMS programs, KVSP's MHCB, EOP and 3CMS programs, MCSP's EOP

program, RJD's MHCB and EOPs, SVSP's MHCB, and SQ's EOP condemned, 3CMS

condemned and EOP mainline programs.  However, contact compliance also revealed

noncompliance for initial primary clinician contacts for the following institutions and programs:

CHCF's EOP and 3CMS programs, CMF's MHCB, EOP and 3CMS programs, CMC's EOP and

3CMS, CSP/LAC's MHCB and 3CMS programs, CSP/Sac's MHCB, EOP and 3CMS programs,

CSATF's EOP and 3CMS programs, MCSP's MHCB and 3CMS, RJD's 3CMS, SVSP's EOP

and 3CMS programs, SQ's MHCB and 3CMS, and VSP's EOP and 3CMS programs.

     For timely routine primary clinician contacts, contact compliance demonstrated

compliance for the following institutions and programs: CHCF's MHCB, CIW's MHCB and

3CMS, CMC's MHCB, CSP/Corcoran's MHCB, CSP/LAC's MHCB and 3CMS programs,

CSP/Sac's MHCB, CCWF's MHCB, KVSP's MHCB, MCSP's MHCB and 3CMS, RJD's

MHCB, SVSP's MHCB, and SQ's MHCB and 3CMS mainline program.  For considerably more institutions and programs, however, contact compliance reported noncompliance for timely routine primary clinician contacts: CHCF's EOP and 3CMS, CIW's EOP, CMF's MHCB, EOP and 3CMS programs, CMC's EOP and 3CMS programs, CSP/Corcoran's EOP and 3CMS programs, CSP/LAC's EOP program, CSP/Sac's EOP and 3CMS programs, CSATF's MHCB, EOP and 3CMS programs, CCWF's EOP and 3CMS programs, and KVSP's EOP and 3CMS programs, MCSP's EOP program, RJD's EOP and 3CMS programs, SVSP's EOP and 3CMS programs, SQ's EOP condemned, 3CMS condemned and EOP mainline programs, and VSP's EOP and 3CMS programs.

Further, contact compliance reported compliance for timely initial IDTTs for the following institutions and programs: CHCF's MHCB and EOP, CIW's MHCB, EOP and 3CMS programs, CMF's MHCB, CMC's MHCB, CSP/Corcoran's MHCB and EOPs, CSP/LAC's MHCB and EOPs, CSP/Sac's MHCB, CCWF's MHCB and EOPs, KVSP's MHCB, MCSP's MHCB and EOPs, RJD's MHCB, SVSP's MHCB, and SQ's MHCB.  However, contact compliance indicated noncompliance for timely initial IDTTs for the following institutions and programs:  CHCF's 3CMS program, CMF's EOP and 3CMS programs, CMC's EOP and 3CMS programs, CSP/Corcoran's 3CMS, CSP/LAC's 3CMS program, CSP/Sac's EOP and 3CMS programs, CSATF's MHCB, EOP and 3CMS programs, CCWF's 3CMS, KVSP's EOP and 3CMS programs, MCSP's 3CMS, RJD's EOP and 3CMS programs, SVSP's EOP and 3CMS programs, SQ's EOP condemned, 3CMS condemned, EOP mainline and 3CMS mainline programs, and VSP's EOP and 3CMS programs.

For routine IDTTs, contact compliance indicated that the following institutions and programs reported compliance for timely routine IDTTs: CHCF's MHCB and EOP, CIW's

MHCB, EOP and 3CMS programs, CMF's EOP and 3CMS, CSP/Corcoran's MHCB and EOPs, CSP/LAC's MHCB, EOP and 3CMS programs, CSP/Sac's MHCB and 3CMS programs, CSATF's MHCB, CCWF's MHCB and EOPs, KVSP's MHCB and 3CMS programs, MCSP's EOP and 3CMS programs, RJD's MHCB and 3CMS programs, SVSP's MHCB, and SQ's MHCB and 3CMS mainline programs. Further, contact compliance indicated noncompliance for timely routine IDTTs for the following institutions and programs: CHCF's 3CMS, CMF's MHCB, CMC's MHCB, EOP and 3CMS programs, CSP/Corcoran's 3CMS, CSP/Sac's EOP program, CSATF's EOP and 3CMS programs, CCWF's 3CMS, KVSP's EOP program, MCSP's MHCB, RJD's EOP, SVSP's EOP and 3CMS programs, SQ's EOP condemned, 3CMS condemned and EOP mainline programs, and VSP's EOP and 3CMS programs.

Telepsychiatry Use during IDTTs

IDTT observation and staff and patient reports indicated both positive and negative experiences with telepsychiatry, including connectivity issues. CSP/Corcoran STRH staff only reported positive telepsychiatry experiences. CMC's 3CMS and CSATF's Facility A 3CMS patients reported satisfaction with telepsychiatry. The VSP telepsychiatrist for MHSDS administrative segregation patients made meaningful treatment planning contributions during IDTTs. The VSP EOP telepsychiatrist was adequately prepared including when seeing patients who were not on her caseload. SVSP's telepsychiatrist for Facility D's EOP program saw all patients prior to IDTTs and had rapport with engaged patients.

Other institutions' experiences reflected difficulties with telepsychiatry. CSATF's 3CMS clinicians reported telepsychiatry challenges which occasionally led to different diagnostic assessments between the PC and telepsychiatrist. MCSP mental health leadership noted issues

related to medical assistants' absences resulting in cancelled telepsychiatry appointments. CSATF's EOP and 3CMS patients complained of difficulty building rapport with telepsychiatrists on computer screens.  VSP's EOP patients expressed discomfort with telepsychiatry's use.

Notably, observed IDTTs revealed both effective telepsychiatry operations and problems with connectivity.  IDTTs for CMC's 3CMS program on West facility indicated good telepsychiatry connectivity.  VSP's EOP program IDTTs demonstrated adequate visual contact with the telepsychiatrist.  IDTTs for CHCF's EOP program were generally adequate, and the video equipment did not significantly impact team members' interactions with each other or with patients.  There were no technical issues for observed IDTTs using telepsychiatry in KVSP's 3CMS or SVSP's EOPs.

Regrettably, connectivity issues negatively impacted IDTTs for CMC's 3CMS program on A Quad, CSP/Corcoran's LTRH, CSATF's EOP and 3CMS programs, and SVSP's STRH. MCSP mental health leadership reported connectivity problems on some facilities as well. CSATF 3CMS staff also reported frequent connectivity issues for telepsychiatrists working from home.  Further, CSP/Corcoran's fourth quarter 2021 sustainable process reported that IDTTs that relied on telepsychiatry started late due to equipment issues.

IDTT Treatment Space

Although most, but not all, institutions had adequate space for IDTTs, several facilities' observed IDTT treatment space was limited.  Observed IDTTs for CSP/Sac's PSU A unit occurred in an open area outside of several offices that had multiple purposes, including IDTTs, storage, and photocopying.  Individuals who accessed these offices regularly interrupted IDTTs, compromising confidentiality.  CSP/Corcoran's MHCB IDTT room was small, making it

difficult to accommodate all required attendees.  Only two of four CHCF 3CMS IDTT rooms could comfortably accommodate all participants.  SVSP had limited IDTT treatment space in the CTC/MHCB.  MHCB treatment space at CSATF was inadequate.

## 2. **Treatment Planning Concerns**

Similar to what was reported during the Twenty-Eighth Monitoring Round, the Twenty-Ninth Monitoring Round revealed numerous concerns with the adequacy of treatment plans' clinical documentation across institutions and programs.  Among them, there were concerns with the adequacy of provided documentation, which included sparse, overly brief, incomplete, and/or inadequate documentation.  Treatment plan inadequacies also included plans that failed to target symptoms and/or other treatment needs, and that lacked measurable goals, among other shortcomings.  Some IDTTs also failed to sufficiently modify treatment plans in response to changes in patients' symptoms, mental health condition, or lack of treatment progress, and/or where the treatment plan did not address the patient's current treatment needs.  There were also many instances of treatment plans that were not individualized to patients' specific needs, that contained ineffective case conceptualizations and/or treatment formulations, that necessitated diagnostic clarification, and/or that contained inadequate goals.

Documentation Issues

Reviewed healthcare records for CCWF patients indicated extensive documentation deficiencies.  Among them, overall documentation was sparse, and psychiatric documentation was overly brief, for [CCWF Patient B].  Multiple sections of the primary clinician's assessment for [CCWF Patient C], including the mental status, were incomplete.  Documentation for [CCWF Patient F] did not sufficiently summarize his symptoms, functioning, treatment participation and progress/lack of progress since his initial IDTT.  Further, documentation for [CCWF Patient G] revealed an overly brief primary clinician assessment that included outdated documentation

87

instead of more clinically relevant information. Historical functioning for [CCWF Patient H] focused on documentation from 2019 and lacked a mental status summary of her functioning since then. Accurate documentation of [CCWF Patient I's] group participation was lacking. Psychiatric progress notes for [CCWF Patient M] included substantial amounts of copied text, resulting in difficult to follow notes that included contradictory and inaccurate information.

Reviewed patient healthcare records from many other institutions similarly revealed numerous documentation inadequacies. Psychiatric documentation for [CSP/LAC Patient H], which a nurse practitioner completed, was insufficient, and there was a need for documentation that addressed continuation at the 3CMS level of care. Documentation for [CIW Patient Q] was generic and included many phrases that appeared to be for liability purposes and unrelated to the patient's mental health needs. Annual IDTT documentation for [SQ Patient E] was deficient as a summary of symptoms, functioning, and treatment over the previous year was not documented. For [RJD Patient F], the quality of MHCB, alternative housing, and SRASHE documentation was very poor, with clinicians' failing to document sufficient justifications for their clinical decisions. Although [CSP/Sac Patient Q] displayed concerning, disorganized behaviors, such as pouring toilet water on his head, documentation of a clear rationale why the treatment team did not evaluate the patient for immediate MHCB placement was absent.

Some noted issues with CSATF patients' documentation included a lack of documentation for primary clinician contacts and IDTT meetings for [CSATF Patient B], inadequate documentation of IDTT meetings and treatment plans for [CSATF Patient D], inadequate IDTT documentation for [CSATF Patient G] that did not include patient progress, the rationale for the patient's EOP placement, and a functional assessment of the patient's needs, and

no documentation regarding the use of emergency interventions, including emergency involuntary medication administration and the use of five-point restraints for [CSATF Patient N].

Treatment planning for [CSP/Sac Patient B] had not been updated for two years while the lack of a useful clinical summary was disruptive to continuity of care. Psychiatric documentation for [CSP/Sac Patient V] was overly terse and minimally useful for continuity of care. A summary of [CMF Patient B's] course of treatment and an overview of symptoms and functioning while in the MHCB was not documented on the treatment plan or psychiatric discharge summary, hindering continuity of care. Initial treatment planning documentation for [CMF Patient C] needed improvement as most of the information was pulled forward and the documentation failed to provide a useful narrative of the patient's functioning and mental health status over time.

Further, document discrepancies for [CHCF Patient O] indicated some clinical documentation describing the patient as stable and at baseline, while other notes from the same period suggested that the patient had difficulty managing moderate to high levels of anxiety, depression, and auditory hallucinations. IDTT documentation for [CHCF Patient Q] included inaccurate and misleading patient information, including suggesting there were no HLOC referral indicators or barriers to treatment progress. There were documentation concerns for [MCSP Patient I], which included inadequate completion of sections of the treatment plan and conflicting information about the patient's upcoming release date. Psychiatric documentation for [MCSP Patient L] was inadequate due to its lack of evidence of healthcare record review and similarity in content from note to note.

<u>Treatment Planning Inadequacies</u>

Patient healthcare record reviews indicated that, similar to the findings from the three most recent Monitoring Round Reports, there were widespread problems with treatment plans.

89

Among them, numerous treatment planning concerns at CCWF included treatment planning for [CCWF Patient A] being impacted by a combination of insufficient initial assessments and a lack of provider care coordination. Further, despite identification of specific post-traumatic stress disorder (PTSD) symptoms for [CCWF Patient B] during initial assessments, treatment failed to address these symptoms, while the content of PC sessions for [CCWF Patient J] reflected neither treatment plan interventions nor treatment goals. IDTT meetings for [CCWF Patient L] did not review patient progress toward treatment goals.

Healthcare record reviews also indicated many treatment planning issues at CSP/LAC. Among them, the lack of collaboration between treatment providers impacted treatment planning for [CSP/LAC Patient A], while treatment planning for [CSP/LAC Patient E] was not updated according to his treatment needs. There were no interdisciplinary plans of care (IPOCs) for treatment nonadherence nor targeted interventions to address [CSP/LAC Patient G's] pattern of treatment refusals, while treatment for [CSP/LAC Patient N] did not properly address his self-harm ideation and behaviors.

At SQ, there was a need for treatment planning with measurable goals and clear objectives for [SQ Patient F]. Further, treatment planning for [SQ Patient G] was inadequate as identified symptoms were not targeted, and there was no clear documentation of the rationale for treatment goals, stated goals were not measurable, and interventions to address them were not included in the treatment plan. The EOP treatment of [SQ Patient O] was inadequate due to the lack of treatment provided in accordance with the treatment plan to target the patient's identified needs.

Further, EOP treatment plans for [RJD Patient I] did not target treatment and medication nonadherence. The pattern of passive suicidal ideation of [VSP Patient G] was not appropriately

assessed or treated.  At KVSP, treatment plans for [KVSP Patient B] did not address the

underlying contributing factors to the patient's frequent self-harming behaviors, psychotic

symptoms, or out-of-cell treatment refusals, while [KVSP Patient F]'s identified treatment needs

for suicide ideation, low group attendance, and anxiety were not added as IPOCs.  Treatment

planning and assessment documentation for [SVSP Patient E] failed to provide an updated,

individualized assessment of his treatment needs or progress, while treatment plans for [SVSP

Patient J] were inadequate due to the lack of measurable, concrete, and realistic goals.  The

treatment team for [CMC Patient G] failed to sufficiently focus treatment efforts on prominent

symptoms, self-harming behaviors, and acute suicide risk factors during admission.  The

treatment plan for [RJD Patient U] generally relied on historic rather than current clinical

information.

At CMF, treatment planning for [CMF Patient F] did not target the primary treatment

needs of poor distress tolerance, mood lability, impulsivity, and threatening behaviors.

Treatment planning for [CMF Patient H] did not address identified treatment needs, including

clear goals for self-harm behavior.  None of the treatment planning documents for [CMF Patient

L] contained an actual treatment plan with targets, interventions, and goals.

Moreover, treatment planning at CHCF also reflected numerous inadequacies.  Treatment

planning for [CHCF Patient F] lacked IPOCs for recent symptoms of auditory hallucinations,

self-harm behavior, and adjustment to and management of segregation.  Treatment planning for

[CHCF Patient I] was overly narrow and did not address pertinent treatment needs.  The

treatment plans of [CHCF Patient N] failed to appropriately address current treatment needs,

including depression, anxiety, pain management, and Board of Parole Hearing (BPH)

preparation.  Further, treatment plans for [CHCF Patient P] and [CHCF Patient Q] remained
unchanged despite an apparent lack of effectiveness.

<u>Necessary Treatment Plan Modifications and Updates in Response to Patients' Current
Health Needs Did Not Occur</u>

Similar to prior monitoring rounds, reviewed patient healthcare records revealed
numerous instances of IDTTs failing to appropriately modify patients' treatment plans in
response to changes in patients' symptoms, mental health condition, or lack of treatment
progress, and/or where the treatment plan did not address the patient's current treatment needs.
Specifically, at CCWF, the routine IDTT did not update IPOCs for [CCWF Patient F] despite the
patient's lack of progress, while a pattern of PC, group, and yard refusals were not addressed.
Further, treatment modifications provided to support [CCWF Patient M] given her number of
MHCB referrals did not reflect treatment enhancements, but only listed the minimal services that
EOP patients required.  The healthcare record noted that [CCWF Patient N] was on a modified
treatment plan, but there was no evidence of a modified plan.

Further, although documentation for [CSP/LAC Patient A] indicated his attendance at
less than 50 percent of treatment, there was no documentation of active interventions to increase
treatment adherence or to understand the reasons for the lack of participation.  Similarly, despite
the frequent treatment refusals of [CSATF Patient S], the treatment team did not update the
treatment plan to address this treatment barrier.  IPOCs for [CSP/LAC Patient G] were not
updated according to his current treatment needs.  Treatment goals for [CIW Patient I] were not
appropriately updated to address her lack of programming.  Despite placement at the EOP level
of care, the treatment team for [SVSP Patient N] did not alter the treatment plan to incorporate
necessary additional treatment.  EOP level of care treatment for [SQ Patient N] was inadequate

because the IDTT neglected to recognize or provide treatment modifications after the patient consistently refused treatment groups.

Additionally, [RJD Patient H] was overdue for an IDTT to address new treatment concerns, including increased depressive symptoms, recent substance use relapse, anxiety related to BPH, and treatment nonadherence.  Treatment goals for [CSP/Sac Patient A] were focused on anxiety and were not appropriately updated to account for a lack of progress and new symptomology.  Despite providers documenting ongoing symptoms of depression and anxiety at moderate to high levels, treatment plans for [CMF Patient I] were not modified to address these concerns.  Treatment plans for [CMF Patient K] were outdated and not revised to address current symptoms, treatment and medication nonadherence, and transition to a lower level of care.  Despite ongoing and distressing nightmares reported by [CSP/Sac Patient R], the psychiatrist prescribed the lowest available dose of medications for his nightmares.

Treatment was not individualized

Patient healthcare record review indicated numerous instances of non-individualized patient treatment.  At CCWF, documentation for [CCWF Patient B] neglected to convey individualized initial and ongoing assessments of the patient's unique treatment needs.  Further, the initial assessment for [CCWF Patient E] lacked individualization, which impacted treatment planning.  Initial assessments for [CCWF Patient F] were also not individualized as the majority of clinical information was copied from previous documentation, impacting treatment planning.

Treatment planning for [CSP/LAC Patient A] was not individualized to target treatment needs.  Documentation was not individualized for [CSP/LAC Patient I] as it failed to provide a summary of treatment needs, including symptoms, functional impairments, and treatment progress.  At KVSP, treatment planning for [KVSP Patient E] was not sufficiently

individualized, treatment interventions for [KVSP Patient F] were not clearly individualized, and treatment planning for [KVSP Patient H] was neither individualized nor appropriately updated.

Further, IPOCs and treatment interventions were not clearly individualized for [SVSP Patient A]. The lack of updated and individualized treatment planning for [CSP/Sac Patient F] was disruptive to continuity of care, while the care for [CSP/Sac Patient L] was inadequate because it lacked individualized treatment planning. The majority of [CMC Patient B's] primary clinician assessment was not individualized as much of the content was copied from a previous provider almost one year before. [CMF Patient D's] initial treatment plan lacked an individualized approach as documentation was primarily pulled forward without consideration of the patient's current status and treatment needs. The treatment plan for [SVSP Patient L] was not individualized to address this EOP patient's treatment needs.

Deficient Case Conceptualizations and/or Treatment Formulations

Reviewed healthcare records also revealed concerns with case conceptualizations and/or treatment formulations. Although treatment goals addressed most identified symptoms for [CIW Patient L], no specified interventions addressed these goals. Case formulation was inadequately documented for [SQ Patient I], while protective factors were not documented. The diagnosis for [CCWF Patient O] needed updating to reflect clinical formulations developed after initial contacts. [CCWF Patient E] was not provided with sufficient treatment interventions to assist her in managing her symptoms. Risk assessments for [SVSP Patient A] lacked a sufficient case formulation despite a prompt to complete one. The primary clinician evaluation for [SVSP Patient L] displayed an inadequate conceptualization of the case.

Further, there was a lack of individualization in case conceptualization and treatment planning for [CSP/Sac Patient N]. The failure to complete a primary clinician assessment for

[CMF Patient B] and [CMF Patient C] were significant deficiencies as this comprehensive assessment was pertinent to case conceptualization and collaborative treatment planning. The assessment and plans section of the psychiatric evaluation for [KVSP Patient J] did not demonstrate an adequate clinical conceptualization for this patient. As for the MHCB treatment of [KVSP Patient M], the psychiatric notes contained insufficient information to formulate a robust clinical conceptualization. There was unresolved diagnostic uncertainty based on discrepant opinions documented by mental health providers, and the IDTT did not develop an adequate case conceptualization to demonstrate sufficient understanding of [CSP/Corcoran Patient P's] presentation. Clinical formulations primarily relied on historic information for [RJD Patient S] and [RJD Patient V].

> Diagnoses in Patients' Healthcare Records Required Clarification and/or Conflicting or Multiple Diagnoses Required Resolution

Patient healthcare record review also indicated numerous records needing diagnostic clarification and/or resolution of conflicting or multiple diagnoses. At CCWF, psychiatric diagnoses for [CCWF Patient E] lacked a clinical rationale, warranting clarification, clinical criteria to support psychiatric diagnoses was lacking for [CCWF patient F], and diagnostic discrepancies for [CCWF Patient M] were neither acknowledged nor addressed.

Further, there was a lack of collaborative treatment between providers and a need for diagnostic clarification for [CSP/LAC Patient M]. Psychiatric diagnoses for [CIW Patient H] contrasted with diagnoses on IDTT documentation. The diagnoses provided in the healthcare record of [CSATF Patient T] were inconsistent, while the medications prescribed by the PNP did not clearly relate to the diagnoses in the healthcare record. Diagnostic discrepancies were neither noted nor discussed for [CIW Patient L]. The EOP providers for [RJD Patient H] clearly had diagnostic uncertainties that were neither resolved nor discussed during IDTT meetings.

Diagnostic clarification was needed for [KVSP Patient H] as criteria to support current diagnoses was not specified and behaviors suggestive of borderline traits were not considered.

Additionally, clinicians offered discrepant opinions about [CMC Patient H's] symptoms and underlying reasons for frequently endorsing suicidal ideation, suggesting unresolved diagnostic uncertainties. [CMF Patient D] had various diagnoses without any documented clinical rationale by multiple providers. The healthcare record of [KVSP Patient K] contained contradictory diagnoses, such as major depressive disorder and bipolar disorder, which should not be provided to a patient concurrently, and there was no documentation of an adequate plan to address these diagnostic discrepancies. There was a need for clinical justification for diagnoses for [CMF Patient G], while there was no documentation that efforts were made for diagnostic clarification for [KVSP Patient J].

There was also a need for diagnostic clarification for [CHCF Patient A], [CHCF Patient D], [CHCF Patient F], [CMF Patient C], [CMF Patient H], [CMC Patient A], [CMC Patient B], [CMC Patient D], [CSP/Sac Patient G], [CSP/Sac Patient N], [CSP/Sac Patient V], [MCSP Patient B], [MCSP Patient F], [SQ Patient B], [SQ Patient F], [SQ Patient G], and [VSP Patient F].

<u>Treatment Plans had Inadequate Goals</u>

Reviewed health records revealed many treatment plans with inadequate goals. Among them, the treatment goal rationale for [CIW Patient H] was unclear and not aligned with documented treatment needs. Treatment goals for [CSP/Sac Patient R] were not clearly aligned with treatment needs identified during initial assessments, or updated to address changes in the patient's treatment needs. [CIW Patient I] lacked a treatment goal that addressed her unwillingness to engage in a confidential treatment contact. Many treatment goals for [CSP/Sac

Patient P] were vague, had limited patient input, and were frequently carried over from prior IDTTs. Similarly, the treatment plan for [KVSP Patient K] displayed vague goals, such as continuing to build rapport with the patient, despite the clinician's treatment of the patient for a protracted period.

Further, the initial treatment plan for [RJD Patient S] repeated many goals from prior treatment plans, without documenting how interventions would change to achieve treatment goals. Treatment goals were not identified for [SQ Patient M], and did not target each of the treatment needs of [VSP Patient G]. IDTT documentation noted that [CSATF Patient A's] PC contacts were focused on interpersonal and trauma issues, but there was no mention of them in the patient's treatment goals.

Treatment plans for [SVSP Patient I] lacked treatment goals. The initial treatment plan for [RJD Patient U] did not include treatment goals. Treatment goals were not individualized for the treatment needs of [CSP/Sac Patient L]. There was no rationale for changes to treatment goals for [CMC Patient A]. Treatment goals were not individualized and failed to address the reason for [CMF Patient D]'s referral or the underlying reasons leading to his decompensation. Treatment goals were insufficient for [CMF Patient F], unclear for [CSP/Corcoran Patient I] and [CMF Patient G], and needed improvement for [CMF Patient C]. IDTTs for [MCSP Patient F] failed to update treatment goals to address recent patient self-injury. [CSP/Corcoran Patient M's] treatment goals with expected expectations and interventions were not clearly defined in the treatment plan. Treatment goals for [SVSP Patient N] were often vague and unrealistic.

<u>Issues with the Consideration of Higher Level of Care Referrals</u>

The Program Guide identified the IDTT as the clinical setting for consideration and decisions concerning HLOC referrals. Further, MHSDS policies delineated a particular process

for considering a patient's HLOC referral, with certain specific objective and subjective indicators triggering HLOC referral consideration. In those instances where the IDTT did not refer a patient to a HLOC, it was required to provide sufficient clinical rationale to support its decision and develop and implement a modified treatment plan to address the criteria that led to the referral consideration.

During the Twenty-Ninth Monitoring Round, healthcare record review indicated many instances where the IDTT did not properly consider and refer patients to higher levels of care. Further, in those cases where patients were considered but not referred, there were many cases of insufficient clinical nonreferral rationales and inadequate treatment interventions and goals for non-referred patients.

Specifically, there were serious concerns about the lack of an assessment for [CCWF Patient I's] need for a HLOC. The rationale for not referring [CSP/LAC Patient G] to a HLOC was not fully consistent with clinical documentation. The failure to timely identify [CSP/LAC Patient M's] decompensation resulted in a delayed HLOC referral. Although [CIW Patient G] showed signs of decompensation, she was not timely referred to a HLOC. The IDTT was invested in supporting [CIW Patient M] at the lowest level of care; however, there was insufficient evidence to support the decision to reduce her level of care given her medication nonadherence, failure to attend programming, and increased psychosis. An IDTT was clinically needed for [SQ Patient E] so that treatment team members could discuss the patient's increase in symptoms and lack of treatment participation, and discuss a HLOC referral.

Further, although [RJD Patient F] required treatment at a HLOC, there was no indication that mental health providers were considering an acute or intermediate care referral. The MHCB IDTT should have considered an intermediate care referral for [RJD Patient G] based on the

patient's inability to remain stable in an outpatient setting.  Treatment teams did not refer [RJD Patient I] to a HLOC despite the patient's multiple MHCB referrals, continued refusal of psychiatric medications, and clear demonstration of an inability to remain stable without an inpatient setting's structure while non-referral rationales were also insufficient.  The level of care rationale for [VSP Patient G] was insufficient and lacked HLOC referral consideration.

Moreover, at KVSP, [KVSP Patient B] should have been referred to a HLOC but the IDTT failed to consider all HLOC referral considerations, underestimated the patient's acute suicide risk, and minimized the patient's safety concerns.  HLOC non-referral rationales were inadequate for [KVSP Patient C] and suggested that the MHCB IDTT only considered acute care referrals.  The majority of documentation did not provide sufficient rationale for the EOP non-referral of [KVSP Patient H] despite the patient's repeated requests for EOP level of care.  At SVSP, there was insufficient documentation of the IDTTs justification of its decision to not refer [SVSP Patient F] to a HLOC, while the treatment team also did not adequately address the clinical reason for non-referral.  [SVSP Patient H] was not timely referred to a HLOC despite needing one, as the IDTT failed to recognize the patient's multitude of high-risk factors and lack of substantive protective factors.  The HLOC form for [SVSP Patient I] used cut and paste with inadequate clinical justifications for HLOC non-referral, and inadequate enhanced treatment modifications.  [CMC Patient F] required a HLOC, while documented non-referral rationales were inadequate, and the verbal rationale from psychiatry during IDTT was inappropriate.

Additionally, despite [CMC Patient G's] worsening presentation during the first 30 days of MHCB admission, the IDTT did not refer the patient to a HLOC and the non-referral rationale was inappropriate and inaccurate.  The rationale for [CMF Patient B's] HLOC non-referral was not provided.  HLOC consideration documentation for delusional [MCSP Patient B] in a high-

risk environment was insufficient.  Despite [CSP/Corcoran Patient P] having numerous RVR and

MHCB referrals during a three-month period, at least 12 CIT evaluations, refusing more than 50

percent of offered treatment, and demonstrating a lack of progress at the EOP level of care,

IDTTs did not refer the patient to a HLOC, document sufficient non-referral rationales, or

develop and implement effective treatment plans in lieu of HLOC referral.

      C.      **Medication Management**

The court's original decision in *Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal

1995) determined that CDCR's medication management process violated the Eighth

Amendment.  Thereafter, the combined efforts of the *Coleman* Special Master and the *Plata*

Receiver to ameliorate mental health's medication management needs resulted in the

establishment of the Medication Administration Process Improvement Program (MAPIP) audit

tool.  As of the Twenty-Eighth Monitoring Round, all institutions utilized MAPIP.  Further, as

the Twenty-Eighth Round Monitoring Report previously reported, MAPIP's mental health

medication management components "focuses on specific medication compliance measures that

report performance in each area, and identifies problematic medication management

administration issues requiring attention by an institution."  ECF No. 7074 at 125 (citing ECF

No. 5779 at 78).

During the Twenty-Ninth Monitoring Round, the 15 CDCR institutions with EOPs used

MAPIP to assess medication management compliance.  Notably, institutions' MAPIP results

reflected variability for mental health's medication management compliance.  Regrettably, not

one of the 15 institutions reported compliance for all psychiatry measures during all months of

the review period; compliance was especially dismal for atypical antipsychotics, Depakote, and

lithium measures.  Institutions also typically did not report compliance for all required months of

the reporting period for the medication continuity measures.  Most institutions also reported

noncompliance for the administration of AM/PM and HS medications but typically reported compliance for administering HS medications at or after 8:00 p.m.  For administering psychiatric-prescribed medications, there was often compliance for chronic care medications but noncompliance for outpatient provider new medication orders.  Institutions also generally reported noncompliance with PC 2602 involuntary medication orders and variability for pill line lengths and the amount of time that patients waited in pill lines.

1.    **Psychiatry Measures**

Psychiatry measures assessed compliance with laboratory tests and other matters for patients who were prescribed psychotropic medications.  Monthly institutional data addressed compliance for diagnostic monitoring for antidepressants, atypical antipsychotics, carbamazepine, Depakote, lamotrigine, and lithium, as well as for clozapine for institutions that were authorized to initiate or maintain clozapine.  There was compliance where MAPIP reported 90 percent or more for a psychiatry measure.  Significantly, not one of the 15 institutions with EOPs indicated compliance with all applicable psychiatry measures during every month of the reporting period.

As for the specific measures, only three institutions indicated compliance for diagnostic measures for antidepressants during the review period.  MCSP was compliant for all four measures for all six months.  CSATF reported compliance for three required measures.  CMF reported 90 percent or greater compliance for most, if not all, antidepressant medication requirements.  However, five institutions -- CIW, CCWF, KVSP, SQ, and VSP, were only compliant for three of four measures, while CSP/Sac was compliant for two of three required measures.  Five other institutions -- CHCF, CMC, CSP/Corcoran, CSP/LAC and SVSP, reported compliance for two of four measures.

Regrettably, no institution reported compliance for all 11 diagnostic measures for atypical antipsychotics for all months of the review period. MCSP was compliant for nine measures, CHCF and VSP were compliant for six measures, CIW, CCWF, and KVSP were compliant for five measures, and CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, and SVSP were compliant for four measures during each month of the review period. SQ indicated compliance for four of ten measures. CMF MAPIP scores for psychotropic medication diagnostic monitoring reflected greater than 85 percent compliance except for lipid monitoring and obtaining an electrocardiogram (EKG) due to QT prolongation. RJD reported compliance ranging from 71 to 95 percent for obtaining timely laboratory studies for antipsychotic medications and mood stabilizers.

As for patients who were prescribed carbamazepine, only CCWF and MCSP reported compliance for all four of its diagnostic measures for all required months. CHCF reported compliance for two of three required measures. KVSP reported compliance for two of three measures. Five institutions -- CMC, CIW, CSATF, SVSP and VSP, reported compliance for one of four measures. CMF and CSP/LAC reported noncompliance for three measures. CSP/Sac reported noncompliance for all four measures. No SQ patients were prescribed carbamazepine.

Reported compliance for the four psychiatric measures for patients who were prescribed Depakote was also very concerning. In fact, not one institution indicated compliance for all four measures during every month of the review period. CCWF reported compliance for two of four measures. Four other institutions -- CIW, MCSP, SQ, and VSP, reported compliance for only one measure during every review period month. KVSP reported compliance for one of three measures. Seven other institutions -- CMC, CHCF, CSP/Corcoran, CSP/LAC, CSP/Sac,

CSATF, and SVSP, did not report compliance for any of the four measures during every month of the reporting period.

Nine institutions provided medication management information for clozapine. CCWF reported compliance for ten of 11 clozapine measures for all required months. CIW and VSP indicated compliance for nine measures for all required months. SQ noted compliance for nine of 11 measures. CSP/Corcoran indicated compliance for seven of 11 measures. MCSP reported compliance for six of ten measures. CHCF reported compliance for five measures for all required months. CSP/Sac reported compliance for three of 11 measures. CMF reported noncompliance for three measures.

As for obtaining medication consents for lamotrigine, three institutions -- KVSP, MCSP, and SQ, reported compliance for all six months of the review period. CSP/Corcoran reported compliance for required months. VSP was compliant for five months and CIW indicated compliance for four of five required months. Five other institutions -- CMC, CSP/LAC, CSATF, CCWF, and SVSP, reported compliance for four months. CHCF was compliant for three of four months that reported data. CSP/Sac indicated compliance for two months.

There were five psychiatric measures for patients who were prescribed lithium. Regrettably, only SQ achieved compliance for all five measures for all required months. MCSP reported compliance for two measures during every month of the reporting period. CCWF and VSP reported compliance for only one measure; KVSP reported compliance for one measure for all required months. Seven institutions -- CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, and SVSP, did not achieve compliance for any of the five measures for all required months. CHCF did not indicate compliance for four measures during any month. CMF's

MAPIP data, which combined the prison and the PIP, indicated noncompliance for April 2021 for obtaining lithium levels, and thyroid monitoring and obtaining an EKG for lithium.

As for performance improvement plans (PIP) and CAPs to remedy deficient psychiatry measures, CIW implemented a PIP to improve medication management processes through improved EHRS notifications and staff training. However, CIW did not provide either CAPs or performance improvement data for measures scoring below 90 percent. CSP/Sac master treatment plan (MTP) audits indicated deficiencies including missing MTP medication reviews and updates. MCSP's formal CAPs included training on CAT audit criteria, and diagnostic monitoring.

CHCF psychiatrists did not conduct any CAPS for psychiatric matters due to a lack of support staff and time. However, CHCF conducted nursing CAPs for measures that scored below 90 percent. RJD implemented a nursing CAP to address compliance issues with PC 2602 involuntary medication orders.

## 2. Clozapine/Clozaril Institutions

On August 8, 2020, CDCR's statewide mental health program issued a memorandum indicating that clozapine could only be initiated in a mental health inpatient bed. The memorandum further ordered staff to refer all patients who required clozapine to a PIP at CHCF, CIW, CMF, SVSP, or SQ at the acute or intermediate levels of care. However, the memorandum also permitted the statewide chief psychiatrist to authorize the initiation of clozapine when clinically indicated at MHCBs at CIW, CMF, CSP/Sac, or CCWF. It further identified CIW, CMF, CSP/Corcoran, CSP/Sac, CCWF, MCSP, North Kern State Prison (NKSP), SQ, and VSP as approved clozapine maintenance facilities to which reasonably stable patients could be discharged from mental health inpatient beds.

During site visits, patients prescribed clozapine included 19 housed at CSP/Sac, three at CCWF, 20 at SQ, and one at VSP.  CIW did not report the number of patients who were prescribed clozapine.

Although CHCF had not been identified as a clozapine initiation facility, the statewide chief psychiatrist had authorized clozapine initiation at CHCF if needed.  Notably, five CHCF EOP patients were prescribed clozapine.  CSATF and SVSP also were not clozapine initiating or maintenance institutions.  Nonetheless, one CSATF patient was prescribed clozapine while housed in the MHCB in October 2021 and one SVSP patient was prescribed clozapine during the review period.  During the site visit, VSP was not receiving patients who were prescribed clozapine because the institution did not have a full-time on-site psychiatrist.

### 3.  Continuity, Compliance, Observation, and Administration Matters

MAPIP also assessed medication continuity for numerous other measures.  These measures addressed medication continuity following arrival at reception centers, for inter-institutional transfers at Receiving and Release (R&R), for Nurse-Administered (NA)/Direct Observation Therapy (DOT) medications with intra-institutional transfers excluding ASU/SHU/PSU and to ASU/SHU/PSU, for MHCB transfers, upon discharge/transfer from a community hospital and/or DSH or a CDCR PIP, and following parole/transfer to the community.  There were also measures for observation of the preparation and administration of *hora somni*/hour of sleep (HS) and AM/PM medications, for psychiatrist-prescribed chronic care medications and outpatient provider new medication orders, and for compliance with PC 2602 involuntary medications.  There was compliance when an institution achieved 90 percent or above for a measure.  Further, this report also addresses PC 2602 petitions and pill lines.

Institutions typically did not report compliance for all required months of the review period for the above-referenced medication continuity measures.  Most facilities also reported

noncompliance for observation of the preparation and administration of AM/PM and HS medications but typically reported compliance for HS medication administration at or after 8:00 p.m.  Most reporting institutions also indicated compliance for psychiatric-prescribed chronic care medications during all six months of the review period, but noncompliance for outpatient provider new medication orders.  There also was often noncompliance for PC 2602 involuntary medication orders and variability for pill line lengths and the amount of time that patients waited in pill lines.

a.  **Continuity of Medication Upon Arrival at Reception Center**

CCWF reported noncompliance for medication continuity upon arrival at R&R at the reception center for five of six months.

b.  **Continuity of Medication for Inter-Institutional Transfers at R&R**

Institutions' typically did not report medication continuity compliance for inter-institutional transfers at R&R for all six months of the review period.  Nonetheless, SQ and VSP reported compliance for this measure for all six months.  Otherwise, CSP/Sac and CCWF reported compliance for four months.  CMC, CIW, and CSATF reported compliance for three months.  CHCF reported compliance for three of four required months.  CSP/Corcoran, KVSP, MCSP, and SVSP reported compliance for two months.  CSP/LAC was noncompliant for all six months.  RJD reported 80 percent compliance.

c.  **Continuity of Medication with Intra-Institutional Transfers**

Institutions' also typically did not report compliance for all six months of the review period for continuity of NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU and to the ASU/SHU/PSU.  However, CMC, CIW, SQ, and VSP reported compliance with NA/DOT medication continuity following intra-institutional transfers excluding ASU/SHU/PSU for all six months.  Otherwise, CHCF indicated compliance for five months,

CSP/Sac reported compliance for three months, and MCSP noted compliance for two months. CSP/Corcoran, CSATF, and CCWF reported compliance for only one month.  CSP/LAC, KVSP, and SVSP reported noncompliance for all six months.

Relatedly, for medication continuity upon intra-institutional transfers to ASU/SHU/PSU, CCWF, CIW, and SQ reported compliance for five of six months.  KVSP and VSP reported compliance for four months.  CSP/Corcoran, CSP/LAC, CMC, MCSP, and SVSP reported compliance for three months.  CSP/Sac reported compliance for one month.

### d.  Continuity of Medication following MHCB, Community Hospital, or DSH Transfer, or Parole or Community Transfer

Institutions also generally did not report compliance for medication continuity following transfers from the MHCB for all months of the review period.  However, VSP reported compliance for this measure for all six months of the review period.  Otherwise, CIW, CSATF and SQ indicated compliance for four months.  CHCF reported compliance for three of five required months.  CMC and MCSP were compliant for three months, while CSP/Sac and CCWF were compliant for two months.  CSP/Corcoran noted compliance for one month.  CSP/LAC, KVSP, and SVSP did not achieve compliance for any month.  RJD reported monthly compliance ranging from 71 to 85 percent.

Similarly, most institutions did not indicate compliance for medication continuity for all six months of the review period following discharge/transfer from a community hospital and/or DSH or a CDCR PIP.  Nonetheless, CIW, SQ, and VSP reported compliance for this measure for all six months.  On the other hand, CMC and MCSP noted compliance for four months, and CSP/Sac, CCWF and KVSP reported compliance for three months.  CSP/Corcoran and CSP/LAC reported compliance for two months, while CSATF reported compliance for one

month.  CHCF reported compliance for one of five required months.  SVSP reported noncompliance for all six months.

Most institutions also did not report compliance during all six months of the reporting period for medication continuity upon parole or release/transfer to the community.  However, CSP/Sac, CCWF, KVSP, and VSP reported compliance for all six months for this measure. CHCF, CIW, CSP/Corcoran, CSP/LAC, CSATF, and SQ were compliant for five months.  CMC and MCSP were compliant for four months.  SVSP indicated compliance for two months.

   **e.  *Hora Somni*/Hour of Sleep (HS) Medications**

Most institutions did not report compliance for observation of the preparation and administration of HS medications for all six months of the reporting period.  However, CHCF, CMC, CIW, and SQ reported compliance for this measure for all six months.  VSP also reported compliance.  Otherwise, SVSP reported compliance for two months.  CSP/Corcoran, CSP/Sac, CSATF, CCWF, KVSP, and MCSP were not compliant with this measure during any month of the review period.

Notably, institutions were typically compliant with the administration of HS medications on or after 8:00 p.m.  CCWF audits reflected consistent compliance with this measure.  SQ and VSP consistently administered HS medications at or after 8:00 p.m., while CMC, CSP/Corcoran, CSP/LAC, and SVSP administered them after 8:00 p.m.  KVSP reported being timely in the administration of HS medications.  MCSP reported that 89 percent of HS medications were administered at or after 8:00 p.m.  CSP/Sac did not report how frequently HS medications were administered prior to 8:00 p.m.  CSATF did not report whether HS medications were timely administered.

CMC, CSP/LAC, CCWF, MCSP, SVSP, SQ, and VSP reported the number of patients who were prescribed HS medications.  At CSP/Sac, the monitor's expert could not ascertain the

number of patients who were prescribed HS medications.  CHCF did not report the number of patients who were prescribed HS medications.

    **f.**   **AM/PM Medications**

Institutions were typically noncompliant for the observation of the preparation and administration of AM/PM medications for all six months of the review period.  Nonetheless, CSATF, CIW, and SQ reported compliance for this measure for all six months.  CMC and VSP reported compliance for five months.  CHCF reported compliance for three months. CSP/Corcoran, CSP/Sac, CCWF, KVSP, MCSP, and SVSP were noncompliant with this measure during all six months of the review period.

    **g.**   **Psychiatric-Prescribed Chronic Care Medications**

Most institutions reported compliance with psychiatrist-prescribed chronic care medication orders during all six months of the review period.  Specifically, CHCF, CMC, CIW, CSATF, MCSP, SVSP, SQ, and VSP indicated compliance with this measure for all six months. CSP/Corcoran and CCWF were compliant for four months.  CSP/LAC, CSP/Sac, and KVSP were noncompliant for all six months of the review period.

    **h.**   **Psychiatric-Prescribed Outpatient Provider New Medication Orders**

Institutions' typically reported noncompliance with psychiatrist-prescribed outpatient new medication orders during all six months of the review period.  However, four institutions -- CIW, CMC, SQ, and VSP, were compliant with this measure for all six months.  Otherwise, CSATF and CHCF respectively reported compliance for five and four months.  SVSP and CCWF reported compliance for three and two months, respectively.  MCSP reported compliance for one month.  CSP/LAC, CSP/Sac, and KVSP reported six months of noncompliance.

    **i.**   **Medication Compliance for PC 2602 Involuntary Medication Orders**

There was general noncompliance with PC 2602 involuntary medication orders for all six months of the reporting period.  Nonetheless, CSP/LAC noted compliance for this measure for six months, while SQ indicated consistent compliance with PC 2602 orders.  Otherwise, CMC, CCWF, KVSP, and SVSP reported compliance for five of six months.  CSATF was compliant for four of five required months.  RJD's monthly compliance ranged from 67 to 100 percent.  CSP/Corcoran reported compliance for three of five months.  MCSP reported compliance for two of five required months.  CSP/Sac reported compliance for two months.  VSP reported compliance for one of four required months.  CIW indicated that MAPIP erroneously reported that medication continuity for involuntary medications was noncompliant due to an error in EHRS; however, CIW further reported that a manual audit documented 100 percent compliance.  CHCF did not report compliance data.

RJD reported five uses of force to administer PC 2602 involuntary medications during the review period.  CCWF reported using controlled use of force with one patient for medication administration for PC 2602 medications.  SQ reported rarely using force to administer involuntary medications.  CSP/Corcoran, CSP/LAC, MCSP, SVSP, and VSP reported that no use of force was required to administer PC 2602 medications.

During site visits, many institutions reported the actual number of patients who received medications pursuant to PC 2602 involuntary medication orders.  CSP/LAC and CSP/Sac respectively noted that 109 and 156 patients received such medications.  CSATF, CCWF, and MCSP respectively indicated that 22, 14, and 92 patients received these medications.  RJD reported that as of February 28, 2022, there were 119 EOP and two 3CMS patients with these orders.  SQ, SVSP, and VSP respectively noted that 23, 59, and 14 patients received medications through the PC 2602 process.

### j.   PC 2602 Involuntary Medication Order Petitions

The CDCR institutions with EOPs reported the following information for the review period, or for another specified time period, regarding PC 2602 involuntary medication orders and petitions. CHCF indicated that of 46 PC 2602 involuntary medication orders, 39 were granted, three were renewed, and four were withdrawn. CIW reported having 40 PC 2602 orders between November 5, 2018, and October 22, 2019, of which 23 were emergent and 17 were non-emergent orders. CIW further reported that 13 petitions were denied, expired, rescinded, or were not renewed.

CMF reported that 43 review period patients had active PC 2602 orders, including two MHCB patients, eight patients housed in the EOP hub, and 33 EOP patients. CMC reported 46 petitions for PC 2602 orders, including seven initial emergency and four initial non-emergency petitions, 27 renewals, six petitions pending renewal, and two denied petitions.

CSP/Corcoran submitted nine initial involuntary medication petitions, including six emergent petitions, during the reporting period. All nine petitions were granted, while ten PC 2602 petitions were renewed. CSP/LAC granted two emergency and two non-emergency initial petitions, while 57 PC 2602 medication renewals were granted and there was one non-renewal. CSP/Sac filed 82 PC 2602 petitions, including 75 renewals, and five emergent and two non-emergent initial petitions. All were granted.

CSATF granted 14 initial PC 2602 applications and 22 renewals, while five PC 2602 orders were not renewed. CCWF initiated 11 PC 2602 involuntary medication petitions, including six emergency and five non-emergency petitions, and renewed ten PC 2602 petitions. At CCWF, no PC 2602 petitions were denied or withdrawn. MCSP initiated 60 PC 2602 petitions, denied four, and did not initiate any emergency petitions.

RJD renewed 49 patients' PC 2602 orders, four were allowed to expire, 12 were initiated on an emergent basis, 11 were initiated on a non-emergent basis, two were withdrawn, and three were denied. SVSP granted all 17 initial involuntary medication petitions; six were emergent. SVSP also renewed 54 PC 2602 petitions and withdrew three.

Of 23 SQ patients who received PC 2602 medications, three were initial petitions, 15 renewals, three were recommended for non-renewal, and two were pending court action. VSP initiated three PC 2602 petitions and renewed five petitions; none were emergency petitions. One VSP petition was withdrawn during the review period.

### k. **Pill Lines**

Institutions' reported variability for pill line lengths and the amount of time that patients waited in pill lines. CSP/LAC pill line lengths and individual patients' average wait times were compliant for all six months of the review period. KVSP patients generally reported ten to 20-minute pill line waits. At SVSP, there was compliance for pill line lengths, except for some Facility C medication passes.

However, pill lines at KVSP and CMC's West Facility and Facility C frequently exceeded two hours, largely due to some patients being prescribed Suboxone, which took additional time to dispense. CSATF pill lines also often exceeded two hours, which was attributed to delays in letting patients out timely. CCWF audits found pill lines on Facilities C and D exceeding two hours; however, patients' medications were administered within 30 minutes. VSP pill lines did not last longer than one hour, but there were occasions when patients' medication administration took approximately 45 minutes. SQ psychiatrists reported pill lines of up to 45 minutes, which were described as concerning for some patients. CSATF and RJD EOP patients on Facility A reported lengthy pill lines. VSP 3CMS patients' concerns included pill line lengths.

112

Further, VSP patients prescribed heat risk medications waited in shaded areas to receive medications. CSATF and KVSP reported challenges with the lack of protected places from the elements for patients to wait while in pill lines.

**Summary – Medication Management**

Although all 15 CDCR institutions with EOPs used MAPIP to assess and report about medication management during the Twenty-Ninth Monitoring Round, reported results reflected variability, and notable noncompliance, for the review period. Not one of the 15 institutions reported compliance for all psychiatry measures during all months of the review period. Institutions also typically did not report compliance for all required months for the various medication continuity measures. Similarly, most institutions reported noncompliance for observation of the preparation and administration of AM/PM and HS medications, for administering psychiatric-prescribed outpatient new medication orders, and for PC 2602 involuntary medication orders. Tellingly, institutions were more likely to report compliance for the administration of HS medications on or after 8:00 p.m. and for psychiatric-prescribed chronic care medications. There was also variability for pill line lengths and the amount of time that patients waited in pill lines.

**D. Access to Higher Levels of Care**

The appropriate identification, referral, and transfer of patients to higher levels of inpatient mental health care is a requirement to end court supervision of the *Coleman* defendants. In this regard, in his Twenty-Second Monitoring Round Report (ECF No. 3990), the Special Master identified "(e)nsuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive higher levels of mental health care" as one of "seven general goals for the defendants." ECF No. 4124 at 85. The Court has similarly affirmed that this objective is a critical element of the "road map to the end of federal court oversight." ECF No. 5477 at 2.

Nonetheless, as was also reported during the last three review periods, *see*, ECF No. 5439, ECF No. 5779, and ECF No. 7074, during the Twenty-Ninth Monitoring Round HLOC referral considerations also continued to be challenging for defendants.

During the Twenty-Ninth Monitoring Round, observed IDTTs demonstrated variability in considering whether patients' satisfied the criteria for inpatient care referrals, and, if so, were referred. Regrettably, observed IDTTs, and treatment plan and sustainability process reviews, overwhelmingly demonstrated a lack of quality in the referral process by failing to address pertinent factors in considering patients for higher levels of care. Most institutions also did not properly document clinical rationales for patients who were considered but not referred to a HLOC, and also did not develop appropriate treatment interventions that addressed positive inpatient care referral indicators.

Furthermore, defendants failed to meet Program Guide timeframes for transfers to acute and intermediate inpatient care during the Twenty-Ninth Monitoring Round. The conflict between local institutional logs and headquarters' generated On-Demand logs persisted. And while the COVID-19 pandemic had a significant impact on defendant's ability to meet Program Guide timeframes, CDCR failed to provide specific, adequate delay reasons for individual class members. In fact, little to no reasons for delays were provided during the reporting period other than "COVID-19" and/or "court-approved exceptions," though most often, CDCR provided no corresponding documentation of the exceptions.

Apart from two institutions, CDCR met the requirement of referring patients to the Inpatient Referral Unit (IRU) within Program Guide timeframes for both acute and intermediate inpatient care after IDTT referral. However, once uploaded to SharePoint, referrals stalled in IRU and took well beyond the ten and 30-day timeframe requirements for acute and intermediate

transfers, respectively.  Moreover, some institutions reported pressure from IRU to rescind referrals in an effort to avoid rejections.  Additionally, institutional staff reported numerous "kickbacks" of referrals from IRU due to poor completion.  These kickbacks resulted in further delay in the transfer of patients to indispensable inpatient care.

Compliance with transfers to MHCBs within 24 hours of referral remained consistent across the reviewed institutions; all 15 institutions with EOPs satisfied the compliance standard. Further, lengths of stay in the reviewed MHCBs improved during the Twenty-Ninth Monitoring Round.  Ten institutions' MHCB stays averaged ten days or less.  Four remaining institutions were shy of compliance by one to four days.

IDTT Consideration of Higher Level of Care Referrals

There was variability in institutions' consideration and referral of patients to inpatient care during the Twenty-Ninth Monitoring Round.  Some observed IDTTs, including those for CMC's EOP hub, and CSP/Corcoran's and CSP/LAC's MHCBs, addressed HLOC considerations.  CSATF's MHCB referred patients to higher levels of care.  IDTTs for CSATF's EOP program regularly reviewed HLOC indicators.  SQ's IDTTs for the 3CMS program discussed criteria for HLOC transfers.  CSP/Sac's EOP program IDTTs typically addressed HLOC indicators, but very few did so in a structured and systemic way.

However, observed IDTTs for other institutions and programs did not adequately consider HLOC referrals.  IDTTs for CSP/LAC's EOP and 3CMS programs, and CCWF's and KVSP's EOPs, did not discuss HLOC indicators.  SVSP's MHCB IDTTs did not address positive HLOC referral considerations.  IDTTs for CIW's MHCB did not expressly evaluate the need for a HLOC.  IDTTs for CSP/LAC's EOP program did not consistently address level of care rationales.  At CSP/Sac's EOP hub, IDTTs typically did not discuss HLOC indicators in a

comprehensive and structured manner. IDTTs for SVSP's STRH only partially discussed HLOC referral indicators. MCSP's 2021 sustainability review process reported 29 patients needing further follow-up to determine whether they required a HLOC referral.

The Quality of the Higher Level of Care Consideration Process

Across institutions and programs within institutions, observed IDTTs, reviewed treatment plans, and sustainability process reviews typically indicated inadequate quality by failing to consider relevant factors with HLOC considerations. IDTTs for CSP/LAC's EOP hub identified factors influencing patients' HLOC consideration but further discussion was required. A CCWF EOP hub IDTT addressed the objective factors of the need for a HLOC but did not discuss the subjective ones. IDTTs at CMC's and CSATF's MHCB did not justify HLOC referrals. CMF EOP program IDTTs revealed deficiencies in most HLOC discussions.

The monitor's expert's review of treatment plans also revealed problems with the quality of level of care rationales. Treatment plans for CMF's EOP program often indicated vague and inadequate level of care justifications. Reviewed CMC MHCB documentation demonstrated inadequacies with level of care rationales. Reviewed KVSP EOP documentation indicated that the quality of HLOC non-referral rationales was clinician dependent.

Sustainability reviews also indicated concerns with the quality of HLOC considerations. CMF's sustainability review findings were consistent with the monitor's expert's on-site findings, which found that all programs' treatment teams consistently failed to properly review HLOC criteria and address possible referrals. CSATF's sustainability review for the mainline EOP program indicated the need for supervisory oversight to ensure that patients who might need higher levels of care were identified and appropriately referred. KVSP's sustainability review identified problems with HLOC discussions during EOP IDTTs. Sustainability reviews

116

at SQ determined that the institution's HLOC referral process had significant problems and required intervention. CIW's sustainability reviews indicated difficulties documenting HLOC consideration and failed to indicate when a patient met multiple indicators for HLOC referral. The monitor's expert's review also found that CIW's mental health treatment teams continued to underutilize subjective considerations in the HLOC referral process.

### IDTTs' Documentation of Clinical Rationales for Non-Referred Patients and Development of Appropriate Treatment Interventions to Address Positive Inpatient Care Referral Indicators

IDTTs were required to document a clinical rationale for patients who were considered but not referred to a HLOC, and develop appropriate treatment interventions to address the positive inpatient care referral indicators. Most institutions were unable to satisfy this requirement.

On the positive side, CHCF 2021 audits found that 96 percent of HLOC non-referral rationales and modified treatment plans were adequate. Reviewed healthcare records for CHCF's EOP program found that, when completed, HLOC non-referral rationales were an area of strength. Reviewed CHCF EOP patient healthcare records further revealed that 90 percent had adequate non-referral rationales but only 80 percent of modified treatment plans appropriately addressed patients' specific treatment needs. A KVSP sustainable process report noted improvements in HLOC non-referral rationales.

However, significantly more institutions demonstrated concerns with documenting clinical rationales for non-referred patients and developing adequate treatment interventions to address positive referral indicators. CMC's MHCB IDTTs demonstrated inadequate non-referral rationales, while alternatives to HLOC referrals were not discussed when indicated. CSP/LAC's sustainability review revealed inadequate non-referral documentation and inadequate treatment

interventions.  CIW's sustainability reviews indicated that the institution had difficulty with alternative treatment modalities for patients who were not referred.

Further, the monitor's expert's review of several CSP/Sac cases from the non-referral log and CMF and SVSP healthcare records noted inadequate non-referral rationales and treatment modifications, and that CSP/Sac did not refer all patients when inpatient treatment was indicated. The monitor's review of non-referred SQ cases revealed multiple errors on the HLOC form including overreliance on objective criteria when there was evidence that subjective indicators were positive and inadequate clinical rationales for non-referral treatment modifications.

At VSP, regional staff's review of HLOC forms revealed that approximately half had inadequate non-referral rationales and inadequate treatment modifications, which was consistent with the monitor's expert's findings.  Additional problems with VSP HLOC non-referral forms remained throughout the review period.  Lastly, for CSATF's MHCB patients who were referred to higher levels of care and were awaiting transfers, IDTTs did not discuss enhanced treatment interventions.

<u>Transfers to Inpatient Care</u>

<u>Timely Referral to Inpatient Referral Unit</u>

Pursuant to the Program Guide, institutional staff must submit acute inpatient care referrals within two business days of IDTT referral or five days of IDTT referral if a *Vitek* hearing was required.  For intermediate inpatient care, institutional staff must refer patients within five business days of IDTT referral or ten days if a *Vitek* hearing was required.

Thirteen institutions -- CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/Sac, CCWF, KVSP, MCSP, RJD, SVSP, SQ, and SVSP, were compliant with the timely submission of both acute and intermediate care referrals to IRU within timeframe guidelines.  CSP/LAC was

compliant with the timely submission of intermediate inpatient care referrals but noncompliant for the timely submission of acute inpatient care referrals. CSATF was not compliant with the timely submission of referrals to either acute or intermediate inpatient care.

### Transfers to Acute Inpatient Care

Only CIW and CCWF were compliant with the Program Guide requirement to transfer patients to acute inpatient care within ten days of referral. Eleven other institutions – CHCF, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, KVSP, MCSP, RJD, and SVSP, were noncompliant with the ten-day requirement. For these institutions, the average compliance rate was 15 percent; CMF achieved the greatest compliance at 39 percent. MCSP timely transferred only six percent of acute care patient referrals. Four institutions – CSP/Corcoran, CSP/LAC, CSATF, and KVSP, noted zero compliance. SQ and VSP did not refer any patients to acute inpatient care during the Twenty-Ninth Monitoring Round.

### Transfers to Intermediate Inpatient Care

CIW, CMF, CSP/Corcoran, and CCWF were compliant with patient transfers to intermediate care within 30 days of referral as required by the Program Guide. The 11 other institutions -- CHCF, CMC, CSP/LAC, CSP/Sac, CSATF, KVSP, MCSP, RJD, SVSP, SQ, and VSP, were noncompliant with the 30-day timeframe; these institutions averaged 52 percent compliance. Notably, SQ and VSP achieved the highest compliance rates at 83 percent and 75 percent, respectively.

### Transfers Following Inpatient Program Acceptance

Six institutions -- CIW, CSP/Corcoran, CCWF, MCSP, RJD, and VSP, were compliant with transfers to inpatient programs within 72 hours of acceptance pursuant to Program Guide requirements. Four institutions – CHCF, CMF, CSP/LAC, and SQ, were noncompliant;

CSP/LAC reported 35 percent compliance. The remaining institutions – CMC, CSATF, CSP/Sac, KVSP, and SVSP, did not provide compliance data.

MHCBs

Transfers to MHCBs and Bed Availability

Pursuant to the Program Guide, transfers to MHCBs must occur within 24 hours of referral. All 15 institutions met this compliance standard.

MHCB Clinical Lengths of Stay

The Program Guide provided for a length of stay of up to ten days in the MHCB. Ten institutions – CIW, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, MCSP, SVSP, and SQ, had average lengths of stay of ten days or less. Four institutions – CHCF, CMF, CMC, and RJD, had average lengths of stay exceeding ten days; their stays averaged 12 days, with a range of 11 to 14 days. VSP did not have an MHCB.

Restricted Housing

Restricted housing transfers were profoundly impacted by the COVID-19 pandemic during the Twenty-Ninth Monitoring Round. Specifically, COVID-19 outbreaks precluded all nonessential movement from January 9 through February 28, 2022. Because restricted housing transfers were deemed *nonessential*, many took far longer than the requisite Program Guide timeframes. Moreover, as a result of the movement suspension, CDCR experienced a significant transportation backlog. Consequently, many patients remained in inappropriate restricted housing settings until bus seats became available for transport. Patients' refusal to submit to COVID-19 testing and positive COVID-19 test results further delayed their transfer to appropriate housing. However, while these explanatory circumstances existed, CDCR failed to appropriately track and report such delays for each patient. Further, CMC failed to timely

transfer patients due to an erroneous practice of maintaining patients under the belief that it could provide a better level of care.

Transfers to Psychiatric Services Unit (PSU)

Transfer to a PSU must occur within 60 days of endorsement. Five institutions -- CHCF, CMC, CSP/Corcoran, CCWF, and VSP, were compliant with transferring patients to PSU within the timeframe requirements. CIW and CSP/Sac were PSU institutions; thus, there were no delays in patient placement. CSP/LAC and KVSP did not track PSU transfers throughout the reporting period; however, during site visits, current patients waiting for transfer exceeded the Program Guide timeframe guidelines. At CSP/LAC, 13 of 18 patients waiting for PSU transfer exceeded the timeframe guideline, as did two of three KVSP patients. CMF did not transfer any patients to PSU. CSATF, MCSP, RJD, SVSP, and SQ did not provide PSU transfer data.

Transfers to Administrative Segregation EOP Hubs

EOP patients in administrative segregation must transfer to administrative segregation EOP hubs within 30 days of placement. Nine institutions – CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CCWF, MCSP, and RJD, were EOP hub institutions and were not required to transfer patients to other EOP hub institutions. CSP/Sac's EOP hub was closed during the review period due to certification failure. Nonetheless, though closed to external placements, CSP/Sac continued to place internal patients in the unit rather than transferring them to certified hubs as required. KVSP was 86 percent compliant, and further reported a pending district attorney referral and RVR as the reason for the one delayed transfer; however, both were inappropriate justifications pursuant to the Program Guide. CSATF and VSP were not compliant with transferring patients to an EOP hub within 30 days, with compliance rates of 71 and 80 percent, respectively. SQ and SVSP did not provide data for EOP hub transfers.

<u>Transfers to Short-Term Restricted Housing</u>

The Program Guide required the transfer of 3CMS patients to STRH within 30 days of administrative segregation placement.  Seven institutions – CIW, CSP/Sac, CSP/Corcoran, CCWF, CSATF, KVSP, and SVSP, had STRHs and thus experienced no placement delays.

CMF reported no transfers to STRH during the review period.  However, during the site visit, four of five, or 80 percent, of CMF 3CMS patients in administrative segregation were waiting more than 30 days to transfer.

CMC did not transfer 3CMS patients to STRHs and instead inappropriately placed them in its EOP hub.  MCSP, RJD, and VSP reported noncompliance.  VSP reported 81 percent compliance, which dropped to 67 percent compliance by the time of the site visit; RJD indicated zero percent compliance.

CHCF made no transfers to STRH; one patient was waiting longer than 30 days at the time of the site visit.  CSP/LAC and SQ did not provide STRH transfer data.

<u>Transfers to Long-Term Restricted Housing (LTRH)</u>

Transfers to LTRH were required within 30 days of endorsement.  CIW and CSP/Corcoran were LTRH institutions, and there were no delays in LTRH placements.  CSP/Sac closed its LTRH in December 2021 and failed to provide data for post-closure transfers.

CMC, CCWF, and MCSP were noncompliant.  CMC did not transfer patients but instead inappropriately placed them in its administrative segregation EOP hub.  CCWF was 62 percent compliant, and MCSP failed to transfer the one LTRH patient within 30 days.

CHCF, CMF, CSATF, KVSP, and VSP did not transfer any patients to LTRH.

CSP/LAC, RJD, SVSP, and SQ did not provide LTRH transfer data.

## Summary – Access to Higher Levels of Care

Overall, institutions' IDTTs reflected variability for considering whether patients satisfied the criteria for inpatient care referrals, and, if so, were referred.  Moreover, observed IDTTs, reviewed treatment plans, and sustainability process reviews typically revealed insufficient quality in the referral process by neglecting to address relevant factors in considering patients for higher levels of care.  Most institutions also failed to adequately document clinical rationales for patients who were considered but not referred to a HLOC, as well as failing to develop appropriate treatment interventions for positive inpatient care referral indicators.

During the Twenty-Ninth Monitoring Round, defendants failed to meet Program Guide timeframes for transfers to acute and intermediate inpatient care.  Only two institutions timely transferred patients to acute care, and four institutions met the Program Guide timeframes for intermediate care transfers.  While institutions were timely with referrals to IRU, referrals languished in IRU for periods exceeding ten and 30 days, and some institutions reported pressure from IRU to rescind the referrals.  Additionally, CDCR failed to provide patient-specific reasons for delays.  For MHCB transfers, CDCR continued to achieve compliance for transfers within 24 hours.  Further, MHCB lengths of stay decreased during the Twenty-Ninth Monitoring Round.

Restricted housing transfers were significantly slowed due to the COVID-19 pandemic and intermittent outbreaks.  However, again, the defendants failed to report patient-specific reasons for delays throughout the review period.  Transfers to PSUs, EOP hubs, STRH and LTRH remained noncompliant throughout the Twenty-Ninth Monitoring Round at institutions that did not have said programs on-site.

E. **Custody and Mental Health Partnership Plan**

During the Twenty-Ninth Monitoring Round, the Special Master's assessment of the CMHPP indicated that the majority of CMHPP components were implemented with varying degrees of compliance and quality and, at times, impacted by staffing deficiencies. Across institutions, CMHPP activities, intended to improve relationships between institutional custody and mental health staff and their impact on patients' mental health treatment, continued to need attention and improvement from leadership staff. Strengths and areas in need of improvement for each CMHPP activity are discussed below.

Alignment of Institutional CMHPP LOPs with the Headquarters' Partnership Plan

An improvement from the Twenty-Eighth Monitoring Round was the alignment of institutional local operating procedure LOPs with the headquarters' partnership plan. Twelve institutions with EOPs, namely, CHCF, CMF, CMC, CSP/Corcoran, CSP/Sac, CSATF, CCWF, MCSP, RJD, SVSP, SQ, and VSP, reported such general alignment. However, LOPs for CIW and CSP/LAC were not consistent with headquarters' partnership plan.

Executive Leadership Joint Rounding

Institutions typically reported conducting executive leadership joint rounding, although all did not indicate monthly rounding as required. Eight institutions -- CIW, CCWF, KVSP, MCSP, RJD, SVSP, SQ, and VSP, conducted rounding during all six months of the review period. CMC rounded on seven occasions. CSATF rounded seven facilities. CSP/LAC conducted five months of executive rounding. CMF conducted four months. CSP/Sac performed rounding. CHCF and CSP/Corcoran did not provide rounding documentation.

CMF, CSATF, CCWF, MCSP, SVSP, SQ, and VSP reported required staff's participation in executive rounding for all six months of the review period. CSP/LAC reported

such participation for five months.  CSP/Sac did not indicate whether required staff participated in rounding.

Many institutions, including CIW, CMC, CSP/LAC, CSATF, CCWF, KVSP, MCSP, RJD, SVSP, SQ, and VSP, reported that executive leadership joint rounding demonstrated positive relationships between mental health and custody staff.  Rounding documentation from CMC, CSP/LAC, CCWF, MCSP, RJD, and SVSP referenced staff and patient interviews.  CSATF documentation noted staff interviews.  However, CSP/Sac rounding documentation did not reflect staff or patient interviews, a necessary component of executive rounding.  During rounding, CSP/LAC patients typically reported a helpful mental health program.  CCWF patients reported respectful treatment by healthcare and custody staff.  CMC patients reported timely mental health appointments.  VSP patients noted adequate access to mental health.

Dissemination of information to staff regarding executive leadership joint rounding needed improvement in the three required forums.  First, institutions demonstrated variability for referencing executive rounding in the warden's executive staff meeting minutes.  Minutes from CMC, CSP/Sac, CCWF, KVSP, and SVSP referenced the rounding.  SQ shared rounding's outcomes with executive leadership.  Although MCSP's executive staff meeting agendas did not reference rounding, the institution reported discussion of rounding results at executive staff meetings.  However, during the review period, executive staff meeting minutes from CIW, CSP/Corcoran, CSP/LAC and CSATF did not reference executive rounding.  VSP did not produce executive staff meetings' agendas.

Quality management committee meeting minutes were the second forum for disseminating information and there was also variability in referencing executive leadership joint rounding at institutions' QMC meetings.  SVSP's quality management committee meeting

minutes summarized executive rounding. QMC meeting minutes from CCWF, KVSP, MCSP, RJD, and VSP referenced rounding, as did five months of CMC minutes. However, only one SQ QMC meeting addressed rounding outcomes. CIW, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, and CSATF's review period quality management committee meeting minutes did not address rounding.

The third dissemination of information forum was the mental health subcommittee. Most institutions' mental health subcommittee meeting minutes addressed executive leadership joint rounding, but not for all six months as required. Subcommittee meeting minutes from CSP/Sac, CSATF, CCWF, KVSP, RJD, and MCSP referenced rounding, as did five months of CMC's, and three months of VSP's. Most SVSP subcommittee minutes did not address rounding. SQ only addressed rounding outcomes at one subcommittee meeting. Only one of three months of CMF's provided subcommittee minutes addressed rounding. Mental health subcommittee meeting minutes from the reporting period from CIW, CSP/Corcoran, and CSP/LAC did not address executive rounding.

Huddles

Review of a sample of huddle forms reflected the conduct of required mental health huddles at only four institutions. CMC, CCWF, and MCSP conducted required huddles. All three institutions' huddle forms addressed relevant issues and reported required staff's attendance. CSP/Corcoran reported compliance for more than 90 percent of STRH and LTRH huddles, with required staff attending 99 percent.

CSP/Sac conducted required huddles but did not indicate required staff's attendance. KVSP's STRH and EOP huddle reports noted required staff's attendance at 98 percent; however, KVSP did not provide MHCB huddle reports. RJD's huddle reports appropriately addressed

relevant issues; however, some huddle reports did not identify attending staff. RJD also did not produce huddle reports for all EOPs.

Reviewed CIW administrative segregation huddle reports indicated required staff's attendance at 89 percent. Reviewed huddle sheets for several CSATF programs revealed adequate completion of only 59 percent. SVSP huddles were typically noncompliant; MHCB huddle reports were largely blank, those for the EOP did not reflect custody staff's attendance, and those for STRH revealed that custody did not consistently attend. SQ only provided huddle reports for administrative segregation for 21 percent of required huddles. Huddle sheets from CMF did not indicate required staff's attendance. Further, some CMF EOP huddle reports indicated staff's attendance from multiple housing units; however, combining different housing units' staff in one huddle seemed to defeat the huddle's purpose. CSP/LAC did not provide huddle sheets. CHCF did not conduct required huddles.

Notably, observed huddles were typically sufficient and attended by required staff. All required disciplines typically attended adequate observed huddles at CMC, CSP/Corcoran, CSP/LAC, CSATF, KVSP, and RJD. A CSP/Sac STRH huddle addressed pertinent matters. CMF huddles were interactive. SQ huddles exhibited good relations between custody and mental health staff.

An observed MCSP huddle for administrative segregation revealed collaboration and staff who were knowledgeable about patients. However, an observed MCSP EOP huddle largely consisted of the psychologist reviewing patient names and correctional staff providing input. At SVSP, all disciplines attended and actively participated in a STRH huddle; however, a SVSP EOP huddle demonstrated limited patient discussion and minimal custody input. Several

observed VSP huddles appropriately addressed relevant issues, but all required staff did not attend.

### Weekly 3CMS Program Supervisory Meetings

Eight institutions indicated compliance for weekly 3CMS program supervisory meetings between the 3CMS program supervisor and the custody sergeant. Reviewed CMF 3CMS program supervisory reports of weekly meetings reflected required staff's attendance and relevant discussions. CMC and CCWF documentation of these meetings typically demonstrated their conduct by all required facilities. CSP/LAC and MCSP also conducted the weekly 3CMS supervisory meetings; MCSP documentation reflected discussion of relevant issues. SQ reported these meetings' weekly occurrence. VSP reports reflected required staff's attendance. RJD 3CMS supervisory meeting reports noted attending staff and reflected relevant discussions; however, due to COVID-19, these meetings did not occur for several weeks.

CHCF conducted the weekly 3CMS program supervisory meetings for 15 weeks between March 2021 and the site visit. CSP/Sac conducted these meetings for 69 percent of weeks. Only one of four SVSP facilities conducted the meetings.

Observed CCWF and MCSP 3CMS program supervisory meetings found the mental health supervisor and sergeants knowledgeable of their units' patients. An observed CIW 3CMS supervisory meeting revealed the custody sergeant and supervising social worker partnering well. Several CSP/Sac 3CMS supervisory meetings were adequate with well-prepared clinicians discussing pertinent information with housing unit sergeants. However, a SQ supervisory meeting revealed custody staff not appearing to understand the meeting's purpose.

<u>Monthly Joint Supervisory 3CMS Program Area Tours</u>

Six institutions indicated compliance for required monthly joint supervisory 3CMS program area tours.  CMC and VSP conducted these tours, which reflected staff and patient interviews.  CCWF conducted these tours on each of its four yards, which found staff discussing patients who typically reported being treated well by custody and healthcare.  MCSP conducted the monthly 3CMS supervisory tours on all required facilities, including the Minimum Support Facility (MSF).  RJD documentation of the monthly tours reported the staff who attended them, and the issues raised by interviewed patients during the tours.  CSP/Sac's tours usually occurred monthly in required housing units, except during COVID-19 outbreaks.

CSP/LAC conducted the monthly tours on two of three facilities but did not report them for the third facility.  CSP/LAC patients reported satisfaction with the mental health program.  CHCF and CMF conducted the tours for four months.  CSATF provided documentation for three months, which indicated custody and patient interviews.  KVSP only provided 3CMS supervisory tour documentation for one or two months for each of its four facilities.  Due to COVID-19 and staffing shortages, SVSP only performed the tours on one facility for one month.

<u>3CMS Orientation Brochure</u>

Six institutions, namely, CHCF, CMC, CSP/Sac, CSATF, CCWF, and MCSP, distributed the 3CMS orientation brochure to new 3CMS patients.  Five more -- CIW, CSP/LAC, RJD, SQ, and VSP, reported that they had copies of the 3CMS orientation brochure.

<u>EOP Orientation Groups</u>

Although most institutions conducted EOP orientation groups, there was a need for greater collaboration between mental health and custody in their implementation.  SVSP offered EOP orientation groups to 157 patients.  CCWF and MCSP offered four-session EOP orientation

groups; 60 MCSP patients attended.  VSP regularly held EOP orientation groups.  CSP/LAC

scheduled these groups.  KVSP scheduled 57 patients for EOP orientation groups but did not

indicate the dates of patients' attendance.  CSP/Corcoran scheduled nine patients for the groups

but did not identify the participating custody staff member.  CSP/Sac offered two-session EOP

orientation groups following patients' complaints that they were too basic.  Only 54 percent of

76 CSP/Sac patients who were offered the groups attended the first session; 16 percent attended

both sessions.  Custody did not attend an observed SQ EOP orientation group and it was further

reported that custody sporadically attended them.  RJD did not provide information on EOP

orientation groups.  CHCF, CMF, CMC, and CSATF did not provide these groups.

Inmate Advisory Council

There was also a need for more collaboration between the disciplines to implement

monthly inmate advisory council (IAC) meetings.  CIW and MCSP held monthly IAC meetings.

The CIW mental health representative attended five meetings; required MCSP staff generally

attended all IAC meetings.  KVSP held five IAC meetings attended by mental health staff.  VSP

held five of these monthly meetings.  RJD demonstrated general compliance with the monthly

meeting requirement for IACs.  A 3CMS patient led an observed IAC meeting at SQ.

However, only three of four CCWF facilities conducted monthly IAC meetings.

CSP/Sac reported that 63 percent of these meetings occurred, addressed pertinent issues, and

were attended by the warden and mental health staff.  CMC held IAC meetings for three of six

months; however, CMC meeting minutes did not indicate mental health agenda items.  CSP/LAC

conducted 44 percent of these required meetings but only one quarter addressed issues related to

3CMS patients.  SVSP conducted one IAC meeting.  The only information that CHCF provided

about these meetings were minutes from the warden's meeting.  CSATF did not provide IAC meeting minutes.

Staff Misconduct

Institutions reported numerous staff misconduct complaints.   There were three staff complaints at CMF, 12 at CMC, 11 at CSP/LAC, 14 at CCWF, two each at KVSP and RJD, one at VSP, and 120 MHSDS complaints at CSP/Corcoran.  However, no staff members were moved to another post as a result of these complaints.[26]  Further, five institutions reassigned staff due to misconduct complaints.

CHCF's staff misconduct data reported 134 substandard performance claims and 58 use of force allegations, resulting in nine staff moving to other posts.  CSP/Sac patients filed 19 staff misconduct complaints and there were three additional complaints that were not initiated through the appeals process that led to ten staff members' reassignment.  CSATF's 35 staff misconduct complaints resulted in the reassignment of two staff members.  CIW reported 84 staff misconduct complaints, resulting in five staff members' redirection due to PREA or staff sexual misconduct complaints.  At MCSP, 48 staff complaints, and 93 OIA complaints about staff misconduct led to one staff member's reassignment.  SVSP reported 51 staff complaints but did not indicate staff reassignment.

Off-Post Training

CMF and CMC reported that 90 percent or more of custody and mental health staff attended annual off-post training.  Otherwise, institutions mostly reported noncompliance for attendance at off-post training.  CSP/Sac indicated that required mental health staff attended the

---

[26] There is no CDCR policy or procedure that requires removal of staff from a post solely due to an unsubstantiated staff complaint.

training but reported noncompliance for custody staff. RJD and SQ indicated noncompliance for correctional staff's attendance. Further, RJD did not report mental health staff's attendance; SQ did not provide data to determine mental health staff's compliance. CSP/Corcoran, CIW, CCWF, and VSP reported noncompliance for custody and mental health staff's attendance at off-post training. CSP/LAC, CSATF, and MCSP reported staff attendance at the training but did not indicate staff who were required to attend and compliance could not be determined. SVSP documentation did not allow for verification that required staff received the training. CHCF did not report attendance at off-post training.

<u>Quarterly Partnership Round Table Training</u>

Although CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, and MCSP provided sign-in sheets and/or other information demonstrating attendance at quarterly partnership round table training, required mental health and custody staff attendance could not be determined for these seven institutions. Such training compliance also could not be determined for KVSP's MHCB and EOPs; training for the STRH was noncompliant. CHCF and RJD did not report staff round table training attendance. CMC and SVSP did not provide this training.

## <u>Summary – Custody and Mental Health Partnership Plan</u>

Most institutional CMHPP LOPs were aligned with headquarters' partnership plan. Most institutions also reported conducting executive leadership joint rounding and indicated that rounding revealed positive relationships between mental health and custody staff. However, there was variability with institutions' referencing of executive rounding in the meeting minutes of the warden's executive staff meetings, the quality management committee meetings, and the mental health subcommittee meetings.

Review of a sample of huddle forms reflected the conduct of required mental health huddles at only four institutions.  However, observed huddles during the site visit were typically adequate and attended by required disciplines.

Eight institutions noted compliance for weekly 3CMS program supervisory meetings. Six institutions indicated compliance for required monthly joint supervisory 3CMS program area tours.

Most institutions had copies of the 3CMS brochure and typically distributed it to new 3CMS patients.  However, there was a need for greater collaboration between mental health and custody in implementing EOP orientation groups and monthly inmate advisory council meetings. Although institutions typically reported staff misconduct complaints, only five reassigned staff as a result.

Most institutions reported noncompliance for staff's attendance at off-post training. Required staff's attendance at quarterly partnership round table training could not be determined.

**F. <u>Review of the RVR Process</u>**

While CDCR made improvements in some areas of the RVR mental health assessment process, it continued to struggle to achieve compliance with many of the basic requirements.  Of notable improvement during the Twenty-Ninth Monitoring Round was the consideration of mental health factors by institutional classification committees (ICCs).  However, mental health staff training compliance remained woefully low, as did timely requests for mental health assessments.  Institutions remained noncompliant for timely completing and returning mental health assessments, and used boilerplate language in them, and untrained clinicians to complete them.  Similarly, senior hearing officers documenting consideration of mental health assessments and mitigation remained noncompliant.  Also, senior hearing officers used canned language at

several institutions.   Recommendations and utilization of alternative disciplinary measures were scarcely used.

Regarding custody staff training on the RVR mental health assessment process, 11, or 73 percent, of reviewed institutions were in compliance.  These institutions were CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, MCSP, SVSP, and VSP.  Four institutions -- CHCF, CIW, RJD, and SQ, were not compliant.  SQ was close to compliance at 84 percent, while CIW demonstrated only four percent compliance.  CHCF and RJD were 54 and 62 percent compliant, respectively.

Seven institutions – CMC, CSP/Corcoran, CSP/Sac, CCWF, KVSP, MCSP, and VSP, were compliant with completing mental health clinician training for the RVR mental health assessment process.  SQ did not supply data for mental health clinician training.  The remaining seven institutions -- CHCF, CIW, CMF, CSP/LAC, CSATF, RJD, and SVSP, were not compliant.

There were 22,512 RVRS issued at the 15 reviewed institutions during the reporting period.  Of these, 14,729, or 65 percent, were issued to MHSDS patients.  During that same period, MHSDS patients accounted for 50 percent of the total population.  There were 9,419 RVRs issued to 3CMS patients, 4,726 RVRs issued to EOP patients, 461 RVRs issued to MHCB patients, 74 RVRs issued to patients at the intermediate level of care, and 49 RVRs issued to acute level of care patients.  Thirty-five percent, or 7,783 RVRs, were issued to non-MHSDS patients.

Only one institution, CMF, complied with timely requests for mental health assessments.  The average compliance rate for the remaining institutions was 48 percent.  Six institutions -- CHCF, CIW, CSP/LAC, CSP/Sac, SQ, and VSP, demonstrated 50 to 71 percent compliance.

Compliance at CSP/Corcoran, CCWF, MCSP, and RJD ranged from 43 to 47 percent. CSATF reported 38 percent compliance, and CMC attained only 27 percent compliance with the timely request for assessments. SVSP achieved the lowest compliance with requests for assessments at 13 percent.

At 11 institutions -- CIW, CMF, CMC, CSP/Corcoran, CSP/Sac, CCWF, KVSP, MCSP, RJD, SQ, and VSP, mental health clinicians completed and returned assessments to custody staff within timeframe guidelines. CSP/LAC demonstrated 70 percent compliance, and CHCF and SVSP achieved 50 and 33 percent compliance, respectively. CSATF was compliant 67 percent of the time; however, mental health clinicians used identical, boilerplate responses in 19 percent of reviewed cases. Additionally, CSATF staff reported that mental health assessments were completed by clinicians who were not trained in the RVR mental health assessment process. They further reported that the supervisor overseeing the RVR mental health assessment process also lacked sufficient training.

Nine institutions -- CHCF, CMC, CSP/Corcoran, CSP/Sac, CSATF, KVSP, SVSP, SQ, and VSP, were compliant with conducting mental health assessments in a confidential setting and documenting patient refusals. RJD was 83 percent compliant. RJD completed one assessment at the cell front of an MHCB patient because he had disruptive out-of-cell behavior and lost the MHCB privilege to exit his cell, which was an inappropriate justification for the lack of confidentiality. CIW and MCSP were between 70 and 80 percent compliant with the completion of mental health assessments in confidential settings. CMF and CCWF were only 63 percent compliant each.

A reviewed sample of adjudicated RVRs included documentation of consideration of the mental health assessment by the senior hearing officers at seven institutions, namely, CIW,

CMF, CMC, CSATF, CCWF, KVSP, and VSP.  Four institutions -- CSP/LAC, MCSP, RJD, and SVSP, revealed documentation of consideration by senior hearing officers; however, the officers used canned language that was not specific to individual patients' mental health assessments. Further, at MCSP, one senior hearing officer indicated that he agreed with the clinician's assessment, though the clinician's assessment stated the opposite of what the senior hearing officer documented.  CSP/Sac demonstrated 76 percent compliance, and CHCF achieved only 50 percent compliance with mitigation documentation.  CSP/Corcoran and SQ reached 40 and 30 percent compliance, respectively.

Nine institutions -- CIW, CMC, CSP/LAC, CSATF, CCWF, KVSP, MCSP, SQ, and SVSP, were compliant with mitigation documentation by the senior hearing officer.  At CSP/Corcoran, the senior hearing officer was compliant with documenting mitigation of penalties in all reviewed cases; however, one clinician inappropriately recommended continued access to mental health programming as a factor to consider for mitigation.  This demonstrated the clinician's lack of understanding of mitigation of penalties, as access to mental health programming cannot be denied or restricted.  At CHCF, the senior hearing officer based mitigation on recommendations that were not included in the mental health assessment in 64 percent of reviewed cases.  In 50 percent of CMF reviewed cases, the senior hearing officer did not document mitigation when recommended in the mental health assessment.  At CSP/Sac, mitigation was documented in 76 percent of reviewed RVRs, and at VSP, it was documented in 74 percent of reviewed RVRs.  RJD recorded mitigation in only 46 percent of cases where the mental health clinician recommended it.

The reviewed sample of adjudicated RVRs indicated that there were 11 cases at four institutions – CMF, CMC, CSATF, and MCSP, where the mental health clinician recommended

alternative disciplinary measures as the patients' behavior was strongly influenced by their mental illness.  The one case at MCSP resulted in a reduction to a counseling chrono by the captain.  The one CMF case and four CMC cases proceeded to the senior hearing officer for adjudication; all five patients were found guilty and assessed credit and privilege losses.  At CSATF, the five cases proceeded to the senior hearing officer for adjudication; the senior hearing officer documented mitigation in all five cases.  RJD and VSP each reported six RVRs during the review period for which the mental health clinician recommended alternative discipline, though they did not provide further information about adjudication.  At nine institutions -- CHCF, CIW, CSP/Corcoran, CSP/LAC, CSP/Sac, CCWF, KVSP, SVSP, and SQ, there were no RVR mental health assessments wherein the mental health clinician recommended alternative disciplinary measures.

Classification committee consideration of mental health factors when assessing SHU terms improved from 30 percent during the Twenty-Eighth Monitoring Round to 88 percent during this review period.  Twenty-two of 25 reviewed classification committee actions included consideration of mental health factors.

At CSP/Corcoran, two patients were issued two RVRs from the same incidents resulting in the stacking of RVRs against both patients.  According to the CDCR senior hearing officer handbook, stacking referred to the practice of breaking a single act of misconduct into several offenses and assessing separate penalties for each offense.  The handbook further cautioned that stacking might violate due process because it penalized some incarcerated persons more than others.

**Summary -- RVR Process**

*Coleman* class members continued to receive a disproportionate number of RVRs compared to non-class members.  While MHSDS patients comprised 50 percent of CDCR's census at the reviewed institutions, 65 percent of RVRs were issued to MHSDS patients.  While improved, training for custody staff remained noncompliant, and mental health staff training was seriously deficient.  Equally deficient, only one institution achieved compliance with timely requests for mental health assessments by custody staff.  Mental health clinicians' completion and timely return of assessments to custody remained noncompliant during the Twenty-Ninth Monitoring Round, and only 64 percent of reviewed institutions completed the assessments in confidential settings.  Senior hearing officers failed to adequately document consideration of mental health assessments in over half of the reviewed institutions and some senior hearing officers continued to utilize canned language to document their consideration.  Similarly, senior hearing officer documentation of mitigation remained noncompliant and alternative discipline was recommended and used minimally.  On a positive note, ICC documentation of consideration of mental health factors improved significantly during the review period.

### G. Use of Force

Following the Court's April 10, 2014, order directing defendants to revise their use of force procedures under the Special Master's supervision, ECF No. 5131 at 72, defendants filed their revised use of force policies on August 1, 2014.  ECF No. 5190.  The Court approved defendants' revised plan on August 11, 2014.  ECF No. 5196.

During the Twenty-Ninth Monitoring Round, 14 of 15 institutions housing EOPs reported compliance for custody staff's attendance at mandatory use of force training; only eight of 15 indicated that required mental health staff attended the training.  Review of controlled use of force incidents at the nine institutions that reported them revealed compliance with applicable

policy at seven institutions, and concerns at the remaining two.  Further, review of a sample of immediate use of force incidents for compliance with applicable policy did not indicate any violations at eleven institutions, but revealed concerns at three other facilities.

<u>Training</u>

The use of force policy required training on the controlled and general uses of force for certain custody, mental health, and nursing executive, managerial, supervisory, and line staff. Notably, 14 of 15, or 93 percent, of institutions with EOPs appeared compliant with training custody staff about these policies.  CHCF and CCWF reported training 100 percent, MCSP trained nearly 100 percent, CIW and CSATF trained 98 percent, and CSP/Corcoran and CSP/LAC each trained 97 percent.  KVSP reported training nearly all custody officers within the past year.  CMC trained 96 percent but did not provide data for correctional administrators. CSP/Sac trained 91 percent but did not train the warden, chief deputy warden, and all six captains.

Further, CMF's data, combining the prison and the PIP, reflected training the warden, chief deputy warden, all correctional administrators, captains, lieutenants,  sergeants, and 93 percent of custody officers.  SVSP reported training the warden, chief deputy warden, and all correctional administrators and captains, and 96 percent of lieutenants, 93 percent of sergeants, and 89 percent of correctional officers.  VSP noted that the chief deputy warden, all assistant wardens, and three of four captains attended the training, and reported compliance for lieutenants, sergeants, and line custody staff; however, the captain did not attend the training. SQ also appeared compliant, indicating compliance for executive, managerial, and line custody staff, but only for 26 of 34 lieutenants, and 57 of 77 sergeants.  RJD just missed compliance, reporting 89 percent training attendance by custody.

Similar to the Twenty-Eighth Monitoring Round, institutions were less likely to report compliance for training mental health staff about the use of force. Only eight of 15, or 53 percent, of facilities housing EOP patients noted compliance. CMC and CSP/Sac reported training 98 percent, MCSP trained 93 percent, CSATF trained 91 percent, and CSP/LAC trained 90 percent. CCWF reported training completion by the chief of mental health, supervising psychiatrists, psychologists, and social workers, psychologists, 94 percent of social workers, and five of six psychiatrists. KVSP indicated that all chief psychologists, psychiatrists, psychologists, and social workers attended the training. VSP reported that the chief of mental health, psychologist, psychiatrist, and social worker supervisors, all psychiatrists, 18 of 21 psychologists, 14 of 15 social workers, and 99 percent of nurses received training.

Seven other institutions with EOPs indicated noncompliance for training required mental health staff on the use of force policies. CSP/Corcoran, CIW, and SVSP respectively trained only 85, 54, and 40 percent of mental health staff. CMF reported training the chief of mental health and chief psychologists, 41 percent of psychiatry, psychology, and social worker supervisors, 16 percent of psychiatrists, 57 percent of psychologists, neither PNP, and 43 percent of social workers. SQ reported training the chiefs of psychiatry, psychology, and mental health, psychiatrist, psychologist, and social worker supervisors, and psychiatrists, and 77 percent of psychologists, 87 percent of social workers, and 84 percent of nurses. CHCF and RJD did not provide data on mental health staff's attendance at use of force training.

<u>Controlled Use of Force</u>

Nine institutions reported a total of 42 controlled use of force incidents, as follows: CMF (three), CSP/Corcoran (six), CSP/LAC (six), CSP/Sac (14), CSATF (three) CCWF (one), RJD (seven), SQ (one), and VSP (one). CHCF, CIW, CMC, KVSP, MCSP, and SVSP did not report any controlled uses of force.

Review of all controlled uses of force at CSP/LAC, CSATF, CCWF, RJD, SQ, and VSP, and both of CMF's controlled uses of force involving an MHSDS patient, indicated compliance with applicable policy. However, all three reviewed CSP/Corcoran controlled uses of force, and nine of 13 reviewed incidents at CSP/Sac, indicated concerns.

At CSP/Corcoran, administrative review did not address an incident where OC spray was used on a patient, who was then ordered to submit to an unclothed body search. In another CSP/Corcoran incident, the only justification for the controlled use of force was the patient's creation of a safety and security issue, without further details, which the administrative review failed to address. The third CSP/Corcoran incident found a patient's bizarre behavior resulting in his cell extraction and MHCB placement, and he was issued a RVR. However, Title 15 prohibited RVR issuance following a patient's cell extraction for HLOC placement. Further, the administrative review also did not address this issue.

Review of nine CSP/Sac controlled uses of force also revealed concerns. In one instance, the patient being extracted from his cell for MHCB transfer was issued a RVR for obstructing a peace officer, violating applicable policy. Four other CSP/Sac incidents found mental health staff trying to convince patients to comply with custodial orders only once during the cool down period, which was insufficient. Four more CSP/Sac incidents revealed custody staff conducting unclothed body searches following pepper spray use and prior to patients' restraint and removal from their cells, violating policy that required custody to first conduct visual searches.

Immediate Use of Force

All 15 institutions with EOPs reported a total of 1,805 immediate use of force incidents, as follows: CHCF (19), CIW (23), CMF (70), CMC (55), CSP/Corcoran (154), CSP/LAC (289),

CSP/Sac (260), CSATF (140), CCWF (160), KVSP (140), MCSP (89), RJD (125), SVSP (260), SQ (nine), and VSP (12).

The monitor's review of a sample of immediate use of force incidents for compliance with applicable policy did not reveal any use of force violations at the following eleven institutions:  CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, KVSP, MCSP, RJD, SQ, and VSP.  However, other reviewed instances of the immediate use of force were concerning.

Specifically, one CHCF immediate use of force reported a patient striking an officer, resulting in the officer's use of force.  However, reports from medical staff and another custody officer noted that the patient may have fell after losing his balance and did not report the patient striking the officer.

Further, two CCWF incidents demonstrated concerns about the need for immediate force as the institution's executive reviews noted that they should have been documented in an alternative manner.  At SVSP, the rationale for the immediate use of force in response to the patient "gassing" custody staff was unclear because the patient was in his locked cell.

### Summary – Use of Force

There was compliance by 14 of 15, or 93 percent, of facilities with EOPs with custody training requirements for the revised use of force policy.  However, only eight of 15, or 53 percent, complied with the mental health training requirement, which was concerning.

Six institutions did not report controlled use of force episodes.  Of the nine institutions reporting controlled uses of force, reviewed incidents from seven noted compliance with applicable policy, while reviewed incidents at the other two indicated policy violations, which was worrisome.

All 15 institutions reported immediate use of force incidents. Reviewed incidents at 14 indicated ten facilities' compliance with relevant policies. However, some reviewed immediate use of force incidents at four other facilities reflected concerns and reflected policy violations.

**H.** **Program Access**

The 15 institutions with EOPs did not satisfy the requirements for MHSDS patients for program access. Similar to prior review periods, non-MHSDS incarcerated persons held more job assignments than mental health caseload patients, with 3CMS patients holding more assignments than EOP patients. EOP patients were also less likely than 3CMS patients and non-MHSDS incarcerated persons to hold academic assignments.

As for education assignments, all institutions with EOPs reported enrolling a small percentage of patients and other incarcerated persons in vocational education assignments. Further, a lower percentage of EOP patients than 3CMS patients and non-MHSDS incarcerated persons were enrolled in vocational education programs, but 3CMS patients' participation in them was also low. EOP patients also accounted for the lowest percentage of the incarcerated who held voluntary education assignments. No institution enrolled more than ten percent of EOP patients in voluntary education, and enrolled significantly higher percentages of 3CMS than EOP patients in voluntary education assignments.

Overall, milestone credits were earned by approximately two-thirds of eligible EOP patients, and one-fifth of eligible 3CMS patients and non-MHSDS incarcerated persons.

Further, EOP patients were less likely than 3CMS patients to be housed out-of-level.

Job Assignments

Similar to prior monitoring rounds, non-MHSDS incarcerated persons held more job assignments than mental health caseload patients, with 3CMS patients holding more assignments than EOP patients.

None of the 15 institutions with EOPs employed more than half of their EOP patients. Job assignments were held by 48 percent of CCWF's EOP patients, and by 42 percent of CMC's EOP patients. Three institutions – CSP/LAC, RJD, and SVSP, employed between 30 and 39 percent of EOP patients. Five institutions – CHCF, CIW, CMF, KVSP, and SQ, employed between 20 and 29 percent of EOP patients. Five other institutions – CSP/Corcoran, CSP/Sac, CSATF, MCSP, and VSP, reported that between ten and 19 percent of EOP patients had job assignments.

The percentage of employed 3CMS patients exceeded the percentage of EOP patients with employment positions. Nonetheless, 3CMS patients were less likely to be employed than non-MHSDS incarcerated persons. Sixty-one percent of RJD's 3CMS patients were gainfully employed. CMF and CCWF reported that between 50 and 59 percent of their 3CMS patients were employed, while six institutions – CIW, CMC, CSP/LAC, CSATF, MCSP, and SVSP, reported employing between 40 and 49 percent of 3CMS patients. Four more institutions – CSP/Corcoran, KVSP, SQ, and VSP, employed between 30 and 39 percent of 3CMS patients. At CHCF and CSP/Sac, between 20 and 29 percent of 3CMS patients were employed.

Typically, non-MHSDS incarcerated persons were more likely to have jobs than MHSDS patients. RJD employed 62 percent of non-MHSDS incarcerated persons. Five institutions – CMC, CSP/LAC, CCWF, CSATF, and MCSP, employed between 50 and 59 percent of non-mental health caseload incarcerated persons. Six other institutions – CIW, CSP/Corcoran, CSP/Sac, KVSP, SVSP, and VSP, reported employing between 40 and 49 percent of non-MHSDS incarcerated persons. CHCF, CMF, and SQ employed between 30 and 39 percent of non-mental health caseload incarcerated persons.

<u>Academic Assignments</u>

Academic assignments included adult basic education, adult high school, and other educational programs.  Patients with grade level scores of 6.0 or below were assigned to them.

EOP patients were less likely than 3CMS patients and non-MHSDS incarcerated persons to hold academic assignments.  Thirty-five percent of RJD's EOP patients held academic assignments.  Seven institutions – CIW, CMC, CSP/Corcoran, CCWF, MCSP, SVSP, and VSP, indicated that 20 to 29 percent of EOP patients held academic assignments.  CMF, CSP/Sac, and CSATF reported that between ten and 19 percent of EOP patients held these assignments.  At CSP/LAC, CHCF, and SQ, from one to ten percent of EOP patients held academic assignments.  No KVSP EOP patients had these assignments.

Further, 44 percent of RJD's 3CMS patients held academic assignments.  Six institutions – CIW, CMC, CSP/Corcoran, CSP/Sac, CCWF, and SVSP, reported that between 30 and 39 percent of 3CMS patients held academic assignments.  At CSATF, KVSP, MCSP, and VSP, between 20 and 29 percent of 3CMS patients had academic assignments, while between ten and 19 percent of 3CMS patients maintained academic assignments at CMF, CSP/LAC, CHCF, and SQ.

Moreover, RJD and CSP/Corcoran respectively reported that 47 and 42 percent of non-MHSDS incarcerated persons had academic assignments.  At CSP/Sac, 35 percent of non-MHSDS patients held them.  Seven institutions – CIW, CMC, CSATF, CCWF, KVSP, SVSP and VSP, reported that such assignments were held by between 20 and 29 percent of non-MHSDS incarcerated persons.  CMF, CSP/LAC, MCSP, and SQ noted that between ten and 19 percent of non-MHSDS incarcerated persons held academic assignments.  Between one and nine percent of CHCF non-MHSDS incarcerated persons held them.

Education Assignments

145

A. <u>Vocational Education</u>

Vocational education assignments included carpentry, computer repair, electrical, painting, plumbing, heating, ventilation, and air conditioning, and welding.

All institutions with EOPs reported enrolling a small percentage of patients and other incarcerated persons in vocational education assignments. Further, a lower percentage of EOP patients were enrolled in vocational education programs as compared to 3CMS patients and non-MHSDS incarcerated persons.

CSP/Sac enrolled only six percent of EOP patients in vocational education. Seven other institutions – CMC, CMF, CSP/LAC, CHCF, CSATF, KVSP, and MCSP, enrolled less than six percent of EOP patients in vocational education. Less than one percent of SVSP and VSP EOP patients held vocational education assignments. No EOP patients at CIW, CSP/Corcoran, CCWF, RJD, and SQ were enrolled in vocational education.

Although 3CMS patients were more likely to be enrolled in vocational education than EOP patients, 3CMS patients' participation in these programs was also low. CIW, CMC, and CSP/Sac enrolled between 12 and 13 percent of 3CMS patients in vocational education. Eleven institutions – CHCF, CMF, CSP/Corcoran, CSP/LAC, CSATF, CCWF, KVSP, MCSP, SVSP, SQ, and VSP, enrolled between one and ten percent of 3CMS patients in vocational education. Less than one percent of RJD 3CMS patients held these assignments.

The enrollment of non-MHSDS incarcerated persons in vocational education was also low. CMC, CSP/Corcoran, CSP/Sac, and CCWF enrolled between 10 and 11 percent of non-MHSDS incarcerated persons in vocational education. At 11 institutions – CHCF, CIW, CMF, CSP/LAC, CSATF, KVSP, MCSP, RJD, SQ, SVSP, and VSP, between one and ten percent of non-MHSDS incarcerated persons had vocational education assignments.

B. Voluntary Education

Patients who participated in college courses held voluntary education assignments.

EOP patients accounted for the lowest percentage of the incarcerated who were enrolled in voluntary education assignments. Regrettably, no institution enrolled more than ten percent of EOP patients in voluntary education. CMC enrolled eight percent of EOP patients in voluntary education, while CMF, MCSP, SQ, and VSP enrolled between one and four percent of EOP patients in this assignment. Less than one percent of SVSP EOP patients held voluntary education assignments. CHCF, CIW, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, CCWF, KVSP, and RJD did not enroll any EOP patients in this assignment.

Institutions enrolled significantly higher percentages of 3CMS patients in voluntary education than EOP patients. MSCP and VSP reported that 28 percent of 3CMS patients held voluntary education assignments. CCWF enrolled 22 percent of 3CMS patients in these programs; CMF and CMC enrolled between ten and 19 percent. Five institutions – CIW, CSP/LAC, KVSP, SQ, and SVSP, enrolled between one and nine percent of 3CMS patients in these assignments. No 3CMS patients had voluntary education assignments at CHCF, CSP/Corcoran, CSP/Sac, CSATF, and RJD.

As for non-MHSDS incarcerated persons, CCWF and VSP respectively enrolled 43 and 30 percent of non-MHSDS incarcerated persons in voluntary education assignments. CMC and MCSP enrolled between 20 and 29 percent of non-MHSDS incarcerated persons in these assignments. At KVSP and SQ, between ten and 19 percent of non-MHSDS incarcerated persons held voluntary education positions, while CIW, CMF, and SVSP indicated enrolling between one and nine percent of non-MHSDS incarcerated persons in these assignments.

CSP/Corcoran, CSP/LAC, CSP/Sac, CHCF, CSATF, and RJD did not enroll non-MHSDS incarcerated persons in voluntary education assignments.

Milestone Credits

Patients' completion of in-person rehabilitation programs permitted them to reduce their incarceration stays.  Specifically, patients earned milestone credits by completing various academic, vocational education, and substance abuse programs.  Overall, milestone credits were earned by 66 percent of eligible EOP patients, 19 percent of eligible 3CMS patients, and 21 percent of non-MHSDS incarcerated persons.

For EOP patients, CIW reported that 87 percent of eligible EOP patients earned milestone credits.  CSP/Corcoran and RJD indicated that 81 percent of eligible EOP patients earned milestone credits.  Five institutions – CHCF, CSATF, MCSP, SQ and VSP, reported that between 70 and 79 percent of eligible EOP patients earned the credits.  Four other institutions, CMC, CSP/LAC, CCWF, and KVSP, reported that between 60 and 69 percent of eligible EOP patients earned milestone credits; SVSP noted that 58 percent of eligible EOP patients earned them.  CSP/Sac reported that 47 percent of eligible EOP patients earned milestone credits.  At CMF, 11 percent of eligible EOP patients earned the credits.

Eligible 3CMS patients were less likely than EOP patients to earn milestone credits. CMF and CIW respectively reported that 47 and 34 percent of eligible 3CMS patients earned these credits.  Four institutions – CCWF, MCSP, RJD, and VSP, indicated that from 20 to 29 of eligible 3CMS patients earned milestone credits.  Eight other institutions – CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, KVSP, SQ, and SVSP, reported that ten to 19 percent of eligible 3CMS patients earned the credits.  Five percent of eligible patients earned milestone credits at CHCF.

CIW and CCWF respectively reported that 33 and 32 percent of eligible non-MHSDS patients earned milestone credits.  Seven institutions – CHCF, CMF, CMC, MCSP, RJD, SVSP, and VSP, reported that between 20 and 29 percent of eligible non-MHSDS incarcerated persons earned milestone credits.  Six more institutions – CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, KVSP, and SQ, indicated that ten to 19 percent of eligible non-MHSDS incarcerated persons earned the credit.

Out-of-Level Housing

Across institutions, many patients were housed out-of-level, namely, they were housed at a custody security level that was inconsistent with their housing classification score.

During the review period, EOP patients were less likely than 3CMS patients to be housed out-of-level.  RJD reported that 27 percent of EOP patients were housed out-of-level.  CMC and SVSP reported housing 25 percent of EOP patients out-of-level.  CSP/LAC housed 21 percent of EOP patients out-of-level; CSATF housed 20 percent out-of-level.  Four institutions – CSP/Corcoran, MCSP, SQ, and VSP, housed between ten and 19 percent of EOP patients out-of-level.  CHCF, CMF, and CSP/Sac housed between one and nine percent of EOP patients out-of-level.  No KVSP EOP patients were housed out-of-level.  CHCF and CIW did not house patients according to levels.

3CMS patients were more likely than EOP patients to be housed out-of-level.  CMF reported that 48 percent of 3CMS patients were housed out-of-level.  At CSP/LAC, 45 percent of 3CMS patients were housed out-of-level.  RJD reported housing 37 percent of 3CMS patients out-of-level.  Further, CMC and MCSP housed between 20 to 29 percent of 3CMS patients out-of-level.  Three institutions -- CSP/Corcoran, CSATF, and SVSP, housed between ten and 19 percent of 3CMS patients out-of-level.  Five other institutions – CSP/Sac, CHCF, KVSP, SQ,

and VSP, housed from one to nine percent of 3CMS patients out-of-level.  CIW and CCWF did not house patients according to levels.

### ADA Reasonable Accommodation and Grievance Procedures

All 15 institutions indicated implementation of the Americans with Disabilities Act (ADA) reasonable accommodation and grievance procedures.

### Periodic Classification Score Reductions: EOP Patients

The monitor's expert's review of CDCR 840s from seven institutions, namely, CMF, CSP/Corcoran, CIW, MCSP, RJD, SQ and SVSP, revealed that EOP patients were granted classification score reductions for successful programming.

## Summary – Program Access

Like previous monitoring rounds, non-mental health incarcerated persons held more job assignments than MHSDS patients, with 3CMS patients holding more of these assignments than EOP patients.  Further, EOP patients were less likely than 3CMS patients and non-MHSDS incarcerated persons to hold academic assignments.

All institutions enrolled a small percentage of patients and other incarcerated persons in vocational education assignments, with a lower percentage of EOP patients enrolled in these assignments in comparison with 3CMS patients and non-MHSDS incarcerated persons.  EOP patients also accounted for the lowest percentage of the incarcerated who participated in voluntary education assignments.

However, milestone credits were earned by 66 percent of eligible EOP patients, 19 percent of eligible 3CMS patients, and 21 percent of non-MHSDS incarcerated persons.  Further, EOP patients were less likely than 3CMS patients to be housed out-of-level.

All 15 institutions indicated implementation of the ADA reasonable accommodation and grievance procedures.  Review of CDCR 840s from seven institutions found that EOP patients were granted classification score reductions for successful programming.

## I. <u>Construction and Renovation of Mental Health Treatment Space at Various Levels of Care</u>

Thirteen institutions – CHCF, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, KVSP, MCSP, RJD, SVSP, SQ, and VSP, reported no ongoing or anticipated construction or renovation of mental health treatment space.[27]  CIW reported ongoing construction which limited Outpatient Housing Unit (OHU) shower access.  CCWF reported a pending construction project.

Similar to previous round reports, various institutions indicated a lack of mental health treatment space.  CHCF, CSP/Corcoran, CSP/Sac, CSATF, CCWF, and RJD all reported insufficient MHCB treatment space.  KVSP and SVSP reported insufficient treatment space in their MHCBs' CTCs.  CSATF's MHCB's insufficient treatment space consisted of one room that

---

[27] It should be noted, however, that CDCR has worked toward adhering to various court orders pertaining to treatment space construction and/or renovation.  On June 15, 2012, defendants filed their revised long-range mental health bed plan to address bed and treatment space deficiencies in CDCR institutions.  ECF No. 4196.  The plan was approved by the court on June 15, 2012, with slight modifications. ECF No. 4199.  In his monitoring reports, the Special Master has reported on the progress and successful completion of these court-ordered construction projects, which have resulted in an increase of EOP bed capacity and treatment space.  ECF No. 4205 at 20-24; ECF No. 4298 at 38-44; ECF No. 5439 at 75-83.

More recently, defendants converted an additional 200 beds in a GP yard (H-yard) at SQ to Level I EOP dorm beds, along with treatment space for that population.

Separate from the completion of the above-referenced court-ordered bed and treatment space projects, the *Plata* Receiver's Health Care Facility Improvement Program (HCFIP) resulted in the construction of 264 dorm beds and treatment space at MCSP for Level II EOP patients and 264 dorm beds and treatment space at RJD for Level II EOP patients.

Plans are also currently underway for the construction of 50 MHCB beds at CIM with a projected completion date at the end of 2025.

was used for individual contacts, assessments, IDTTs, and workspace for up to five mental health staff. Further, CSATF's inadequate MHCB yard could only be used for one patient at a time despite being the only available yard for up to 40 CTC patients. KVSP's MHCB treatment space was unnecessarily limited to one shared confidential interview room within the CTC; however, the unit had other space which lacked Therapeutic Treatment Modules (TTMs). Although CCWF executive leadership joint rounding meeting minutes reflected inadequate MHCB treatment space, CCWF's MHCB closed to intake on October 20, 2021, in preparation for a pending construction project.

Moreover, CHCF psychiatrists resorted to cell-front contacts instead of waiting for available MHCB treatment space. Most CSP/Sac MHCB treatment occurred in cell or at cell front due to space limitations. Relatedly, CSP/LAC alternative housing patients were typically seen for treatment non-confidentially at cell front in part due to space limitations.

CMF, CCWF, and VSP reported insufficient treatment space for EOP patients. CCWF had insufficient treatment space to accommodate EOP patient groups in both the mainline EOP and ASU.

CMF and CSP/Corcoran reported insufficient 3CMS patient treatment space. CMF's 3CMS treatment space, which was largely located in R-Wing, was insufficient and inadequate; individual treatment offices also lacked air conditioning and were extremely hot during summer months.

Observed treatment space for CIW STRH and LTRH patients was nonconfidential and located in the dayroom with restart chairs arranged in a semicircle; it was unknown whether any initial evaluations were held in confidential space. SVSP STRH primary clinicians reported difficulty locating space for individual clinical contacts. CSATF STRH clinicians reported

having limited treatment space and difficulties scheduling space for treatment but denied that this resulted in patients not being seen.

Further, at CSP/LAC, insufficient treatment space and COVID-19 restrictions, among other issues, contributed to the inability to provide patients with adequate structured treatment. Initial psychiatry evaluations at CSP/Sac either occurred in non-confidential treatment space or the space where the evaluation occurred was unknown.  RJD reported underutilizing its treatment space due to COVID-19 social distancing requirements, but staff reported privacy and confidentiality concerns and inadequate heating/cooling and data connectivity issues.

Notably, SQ had created more treatment space for condemned patients since the prior site visit.

### Summary – Mental Health Treatment Space

Most institutions with EOPs did not report any ongoing or anticipated construction or renovation of mental health treatment space.  However, many institutions had insufficient mental health treatment space, particularly in their MHCBs but also for their EOP, 3CMS, STRH, and LTRH programs.  Consequently, clinicians frequently resorted to non-confidential or cell-front contacts.

**J.  MHSDS Patients in Segregated Housing**

Defendants must achieve compliance with the requirements for the treatment of MHSDS patients in administrative segregation.  ECF No. 5779 at 133.

Across all reviewed institutions for restricted housing, psychiatry and PC contacts were nonconfidential for a myriad of reasons, including COVID-19 restrictions, quarantine, and the lack of staff.  Similarly, the confidentiality of IDTTs was compromised at the one male PSU located at CSP/Sac.  Relatedly, the timeliness of psychiatry and clinical contacts was inconsistent

and often noncompliant.  While IDTTs in restricted housing were attended by required disciplines, documentation was unclear whether they were attended by the patient-assigned clinicians as required by the Program Guide.  As for structured therapeutic treatment hours, 30 percent of administrative segregation EOP hubs failed to offer clinician-led groups.

Fifty percent of administrative segregation EOP hubs failed certification from one to five months, some resulting in closure to intake.  Although closed, institutions continued to place EOP patients from their institutions in the uncertified hubs.  Additionally, 60 percent of administrative segregation EOP hubs passed certification "with explanation" from one to three consecutive months during the review period.

**Psychiatric Services Unit**

The CSP/Sac PSU failed to achieve certification in November 2021 primarily due to, among other things, the lack of offered structured therapeutic activities and was closed to intake. CIW's PSU was consistently certified.  Both programs were intermittently affected by COVID-19 quarantine status during the review period.

At CSP/Sac, the three psychiatrists in the PSU met psychiatry staffing ratios; however, the facility did not meet the required ratio for PCs.  CIW remained within staffing ratios for psychiatrists and PCs.

CIW and CSP/Sac were noncompliant with initial psychiatry contacts; both were compliant with routine psychiatry contacts.  CIW was not compliant with initial PC contacts, and although CSP/Sac was compliant for initial PC contacts, only 18 percent occurred in confidential settings.  CIW was compliant with routine PC contact, while CSP/Sac was not compliant.

For IDTTs, CIW and CSP/Sac were compliant with the timely completion of both initial and routine IDTTs.  All required disciplines attended 100 percent of initial and routine IDTTs.

However, the Program Guide required attendance of the *assigned* psychiatrist and PC at IDTTs, which was not clearly discernable in the documentation for both CIW and CSP/Sac.

With the exception of COVID-19 quarantine status, CIW was compliant with providing the required number of structured therapeutic hours to patients.  CSP/Sac was not compliant.

**<u>Administrative Segregation EOP Hubs</u>**

Three institutions -- CHCF, CIW, and CCWF, achieved compliance with meeting staffing ratios for both psychiatry and PC caseloads.  CMC and MCSP reported caseloads that exceeded staffing ratios for both psychiatry and PCs.  MCSP indicated that caseloads would increase further due to impending staff departures.  CMF was also noncompliant with both; however, only marginally.  CSP/Corcoran and CSP/Sac psychiatrists were within caseload ratios, and CSP/LAC and RJD PCs were also within caseload ratios.  CSP/LAC and RJD psychiatrists exceeded ratios, as did PCs at CSP/Corcoran and CSP/Sac.

CIW, CSP/Corcoran, CSP/LAC, and MCSP were compliant with the timely completion of initial and routine psychiatry contacts.  CSP/Sac neared compliance at 89 percent for initial psychiatric contacts and achieved compliance with timely routine psychiatry contacts.  CMC and CCWF were compliant with initial psychiatric contacts.  CHCF, CMF, and RJD were noncompliant with initial psychiatric contacts.  Five institutions -- CHCF, CMF, CMC, CCWF, and RJD, were not compliant with routine psychiatry contacts.

Only CIW was compliant with initial and routine PC contacts.  CSP/Corcoran was compliant with initial PC contacts and just shy of compliance with routine contacts at 88 percent.  Seven institutions -- CHCF, CMC, CSP/LAC, CSP/Sac, CCWF, MCSP, and RJD, were compliant with timely initial PC contacts.  Seven institutions -- CHCF, CMC, CSP/LAC,

CSP/Sac, CCWF, MCSP, and RJD, were not compliant with routine PC contacts.  CMF was not compliant with initial or routine PC contacts.

Seven institutions -- CIW, CMC, CSP/Corcoran, CSP/LAC, CCWF, MCSP, and RJD, were compliant with initial IDTTs.  Three institutions -- CHCF, CSP/Sac, and CMF, neared compliance at 85, 89, and 86 percent, respectively.  Ninety percent of the EOP hubs, including CHCF, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CCWF, MCSP, and RJD, were compliant with routine IDTTs.

Nine institutions -- CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CCWF, MCSP, and RJD, were compliant with the attendance of all required disciplines at initial and routine IDTTs.  While all disciplines attended, documentation was unclear whether it was the patients' assigned clinicians as required by the Program Guide.  CSP/Sac was not compliant with required disciplines' attendance at initial or routine IDTTs.

Patients at CHCF, CIW, CMC, CSP/Corcoran, CSP/LAC, CCWF, and MCSP were offered a weekly average of ten hours or more of structured therapeutic activities.  However, at CHCF, CCWF, and MCSP, none of the offered groups were clinician-led.  CMF, CSP/Sac, and RJD did not offer a weekly average of ten hours of structured therapeutic activities.

**Long-Term Restricted Housing**

CIW met all Program Guide requirements for the provision of care to patients in the LTRH.  Psychiatry and PC caseloads were within the required ratios.  CIW was compliant with initial and routine contacts by psychiatry and PCs, as well as initial and routine IDTTs.   CIW offered 90 minutes of weekly structured therapeutic activity and provided the required yard and showers.

CSP/Corcoran struggled to achieve compliance with most LTRH requirements. Both psychiatry and PC caseloads exceeded the established ratios. CSP/Corcoran was also noncompliant with initial and routine psychiatry contacts. All psychiatry contacts in the LTRH were provided by telepsychiatry. For PCs, CSP/Corcoran was compliant with initial contacts, though noncompliant for routine contacts. CSP/Corcoran was compliant with the offering of 90 minutes of weekly structured therapeutic activities. CSP/Corcoran was noncompliant with the offering of sufficient yard time and weekly showers to LTRH patients.

### **Short-Term Restricted Housing**

At CIW, CSP/Sac, CSATF, CCWF, KVSP and SVSP, psychiatry and PCs caseloads were within required staffing ratios. CSP/Corcoran was compliant for psychiatry ratios. At CSATF, the psychiatric nurse practitioner provided treatment to EOP patients placed in segregation in violation of applicable policy. All psychiatric contacts at CSP/Corcoran and SVSP were provided by telepsychiatry. CSP/LAC psychiatry caseloads exceeded the ratio. CSP/LAC PCs met caseload ratios; however, CSP/Corcoran did not.

CIW was compliant with initial and routine psychiatry contacts. CSP/LAC was compliant with initial psychiatric contacts and just shy of compliance with routine contacts at 89 percent. CCWF was compliant with initial psychiatric contacts but only neared compliance with routine contacts at 86 percent. CSP/Corcoran and KVSP were noncompliant with initial psychiatric contacts but were compliant with routine contacts. CSP/Sac, CSP/SATF, and SVSP were noncompliant with initial and routine psychiatric contacts.

For initial PC contacts, four institutions -- CSP/Corcoran, CIW, CCWF, and KVSP, achieved compliance. CSP/LAC, CSP/Sac, CSATF, and SVSP were noncompliant with initial PC contacts. No institution was compliant with routine PC contacts. The average rate of

compliance for routine PC contacts was 66 percent, with a range from two percent at SVSP to 81 percent at CCWF.

CSP/Corcoran was compliant for initial and routine IDTTs. CIW was also compliant with initial IDTTs; none of the patients at CIW were in the STRH long enough to require a routine IDTT. CSP/Sac was compliant with initial IDTTs and close to compliance for routine IDTTs at 86 percent. SVSP was noncompliant with initial and routine IDTTs. CSP/LAC, CSP/SATF, CCWF, and KVSP were noncompliant with initial IDTTs, though all were compliant with routine IDTTs.

While required disciplines were in attendance at initial and routine IDTTs, documentation was unclear whether the attending participants were the patients' treating clinicians as required.

CIW, CSP/LAC, CSP/Sac, CCWF, and KVSP offered 90 minutes of weekly structured group therapeutic activity. CSP/Corcoran reported compliance with structured group therapeutic activity; however, in-cell therapeutic activities were included in compliance data. SVSP was not compliant.

CIW, CSP/Corcoran, CSP/LAC, CSATF, KVSP, and SVSP were compliant with the weekly offering of 18.5 hours of out-of-cell activities, including yard. CCWF was not compliant, and CSP/Sac missed compliance due to three weeks during which it offered only 18 hours.

**Non-Disciplinary Segregation (NDS)**

CMF reported timely transfers for patients placed on NDS status; CMC reported 87 percent compliance. CHCF, CSP/Corcoran, CSP/Sac, CSATF, KVSP, MCSP, RJD, SQ, and

158

VSP were noncompliant, largely due to the impact of COVID-19.  CIW and CCWF did not track transfers, and there were no patients on non-disciplinary segregation status at the time of the site visits.  Appropriate property and privileges were provided to non-disciplinary segregation status patients at CHCF, CMF, CMC, CSP/Corcoran, CSP/Sac, CSATF, KVSP, MCSP, RJD, SQ, and VSP.

### Summary—MHSDS Patients in Segregated Housing

Compliance with the requirements for treatment of MHSDS patients in restricted housing was significantly impeded by the defendants' inability to secure adequate staffing to satisfy Program Guide ratios.  Coupled with the continued and lingering impact of the COVID-19 pandemic, defendants were unable to meet basic requirements, including timely clinical contacts, IDTTs, structured therapeutic activities, and access to yard in the restricted housing setting.

### CONCLUSION

As demonstrated above, there is a bona fide mental health staffing emergency within CDCR, particularly among psychologists and social workers.  Indeed, the dramatic increase in functional vacancies among psychologists and social workers in CDCR is a recent development, as demonstrated in Figure 2, above.  *See supra* p. 23.  While defendants have significant flexibility to remedy CDCR's staffing crisis,[28] continuing to operate with the high vacancy rates reported herein is unsustainable and risks patient harm.  The psychology and social worker vacancies documented in this Report once again "raise[] a question about whether defendants will ever be able to hire sufficient staff to meet their constitutional obligations to members of the

---

[28] *See* October 10, 2017 Order, ECF No. 5711 ("As with transfers to inpatient care, which the court is addressing separately, defendants have a wide range of options available to meet their constitutional obligations to hire sufficient numbers of prison psychiatrists.  These include, but are not limited to, raising salaries and clustering programs in locations where psychiatrists can be more easily recruited.").

plaintiff class, as long as the size of the seriously mentally ill inmate population in California's prison system remains at current levels or continues to grow." October 11, 2017 Order, ECF No. 5711 at 28. Indeed, the monitor's findings suggest it may be time for defendants to again consider patient clustering and targeted mental health population reduction measures. Given the persistence of defendants' inability to recruit and retain sufficient mental health staff over many years, "transformational" solutions may need to be considered, as it is clear defendants are presently unable to provide Program Guide-compliant mental health care to the number of seriously mentally ill persons now incarcerated in California.[29]

During the monitoring tours, interviewed staff shed light on some of the reasons staff are exiting CDCR, reporting their departing colleagues were leaving for higher paying jobs with better working conditions. With vacancy rates significantly in excess of 50 percent in some institutions, CDCR clearly has not been able to recruit sufficient numbers of psychologists and social workers to make up for the large numbers of mental health staff exiting CDCR. The more mental health clinicians who leave CDCR, the more unfair the burden is on the dedicated though often beleaguered clinical staff who remain and are left with excessively high caseloads. And, most importantly, without sufficient staff, seriously mentally ill members of the plaintiff class go without clinically indicated mental health care, resulting in patient decompensation. Defendants must not allow this to continue.

---

[29] *See* December 17, 2019 Order, ECF No. 6427 at 48-49 ("[T]he court repeats its observation from the bench, that nothing prevents the defendants coming forward with a more transformational options. In 2014, Judge Karlton observed, 'California is not alone in criminalizing mental illness'… If there is a transformational and pragmatic alternative to the prison as de facto mental health hospital, as a way to address a root contributor to the constitutional violation in this case, this court would entertain such a proposal. Unless or until such a constructive reform is possible, the staffing remedy in this case calls for defendants' staffing plan in the context of the Program Guide to chart the way forward and be put front and center.").

Moreover, the woeful state of CDCR's mental health staffing stands in the way of defendants' advancing toward an eventual exit from federal oversight. Indeed, given his experience working on the remedy in this case for more than two decades, the Special Master recognizes that CDCR's MHSDS has improved in significant ways since the Court's remedial order in 1995. For instance, CDCR has spent significant resources constructing housing and treatment space for MHSDS patients and office space for their mental health clinicians. CDCR's suicide prevention program advanced to a point where the Special Master recommended the provisional delegation of one of the most critical of the Court's tools to evaluate CDCR's suicide prevention program, the annual suicide report, to CDCR.

In addition, at various times, the Special Master has recognized the positive impact that certain of defendants' inpatient mental health programs –namely the DSH hospitals (DSH-Atascadero, DSH-Coalinga, and DSH-Patton), CIW-PIP, and SQ-PIP – have had on *Coleman* class members despite identified shortcomings in the amount of treatment delivered in those programs. In the 30th monitoring round, as previously reported, the Special Master will be monitoring these programs via paper review, an indication of the Special Master's determination that these programs are ready for reduced-scope monitoring.

Further, while disputes about the proper scope of the use of telepsychiatry have resurfaced, the record in this case clearly demonstrates the Special Master's support for the broad use of telepsychiatry for most *Coleman* class members. Utilizing the flexibility afforded by the CDCR's provisionally approved telepsychiatry policy, CDCR appeared within striking distance of demonstrating systemwide compliance with the Court's 2002 staffing order regarding psychiatry staffing during the monitoring round.

These recent successes indicate defendants are indeed aware of their remedial obligations in this case and, further, that collaboration among the stakeholders remains the most effective strategy to advance this case forward.

But much work remains.  Aside from addressing the staffing emergency, data remediation continues to be of paramount importance.  Consistent with the 1995 Order of Reference in this case, it is beyond the scope of the Special Master's authority to determine whether and to what extent the Court's oversight of CDCR's data system should abate.  However, a fundamental tenet of data remediation in this matter bears repeating here: development of a reliable, transparent data system – and the CQIT reporting process derived therefrom – that accurately measures defendants' compliance with their remedial plan is defendants' most direct pathway to an exit from this case.  *See, e.g.*, December 17, 2019 Order, ECF No. 6427 at 47 ("The remediation called for by [the Golding-Report] proceedings will allow a long-delayed return to the big picture and the proper laser focus on quality of care for California's seriously mentally ill prison inmates….[I]t must be abundantly clear that focus on the quality of care for this class of prisoners is what will guide defendants' true relief from court oversight."); *id.* at 17 ("The CQIT is the measurement tool identified in this case as key to demonstrating defendants' progress toward and ultimate compliance with a durable remedy." (citing ECF No. 5477 at 3-4)).

As indicated, the Special Master and his team are prepared to move forward on data remediation, focusing on the remedial requirements in this case.  The Court's observations from its December 17, 2019 Order bear repeating here: "*Coleman* data collection and reporting must be fixed, and it must be fixed to serve the policies and orders in this case, not the other way

around.  The policies and orders must not be drained of meaning in an effort to squeeze a square peg into a round hole."  ECF No. 6427 at 49.

Given the amount of remedial work facing the Special Master and parties in the coming months and the clarity of the Court's prior orders,[30] the Special Master offers no formal recommendations and makes no request for any additional orders.

Respectfully submitted,


*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr.
Special Master

February 7, 2023

---

[30] As the Court noted in its October 10, 2017 order: "At this juncture, further orders requiring specific remedial measures would in a number of instances be redundant and, more importantly, would tip the balance unacceptably toward micromanagement and substitute this court's judgment for that of prison administrators.  The court has repeatedly identified the constitutional deficiencies in staffing and has issued several orders aimed at remedying the deficiencies."  ECF No. 5711 at 27.

# **APPENDIX A**

# **SPECIAL MASTER'S ACTIVITIES**

**ACTIVITIES OF THE SPECIAL MASTER <u>SINCE</u> THE SUBMISSION OF THE TWENTY-NINTH MONITORING ROUND REPORT - PART B: SPECIAL MASTER'S MONITORING REPORT ON THE INPATIENT MENTAL HEALTH CARE PROGRAMS AT THE CALIFORNIA DEPARTMENT OF STATE HOSPITALS ON OCTOBER 14, 2022**

**DATA REMEDIATION ACTIVITIES**

- Data and CQI Meetings – Two meetings

- Business Rules and Methodology Review Workgroup – 20 meetings

- Quality Assurance Certification Workgroup – Meets weekly

- Level 1 Data Dispute Meetings – Nine meetings

- Level 2 Data Dispute Meetings – Four meetings

- Indicator Status (based on MH Verification Team Status Tracking System on 2023-02-07)

  Remediated (Validated and Verified):                          26

  Partially Remediated (Validated, but not verified):          1

  Verified, but tagged as having a dispute:                      11

  Verified, awaiting final validation by stakeholders:         4

  Additional indicators undergoing verification software test development:   17

**UNA MEETINGS**

- Case Presentations – 85 meetings

- Dispute Resolutions – 12 meetings

- Trainings – 12 trainings

- Patient Interviews – Four patient interviews

- All Parties Meetings – Two meetings

**POLICIES**

- Change Management Policy – Issued to the field December 5, 2022
- Flex Bed Policy – Issued to the field, January 4, 2023

**SPECIAL MASTER REPORTS ISSUED IN 2022**

- Special Master's Report on his Expert's Summary of Findings: Deaths by Suicide in the California Department of Corrections and Rehabilitation from January 1, 2013 through December 31, 2020, Filed March 23, 2022, ECF No. 7511

- Twenty-Ninth Monitoring Round Report – Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for Mental Health Patients of the California Department of Corrections and Rehabilitation, Filed May 17, 2022, ECF No. 7555

- Special Master's Report and Recommendation Regarding the California Department of Corrections and Rehabilitation's Proposal for Assuming the Annual Suicide Monitoring Report, Filed June 28, 2022, ECF No. 7574

- Twenty-Ninth Monitoring Round Report – Part B: Special Master's Monitoring Report on the Inpatient Mental Health Care Programs at the California Department of State Hospitals, Filed October 14, 2022, ECF No. 7625

- Special Master's Report on His Expert's Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs, Filed October 24, 2022, ECF No. 7636

- Special Master's Report and Recommendation on a Final Proposal Telepsychiatry Policy, Filed December 15, 2022, ECF No. 7682

# **APPENDIX B**

# **INSTITUTIONAL SUMMARIES**

**APPENDIX B-1**
**CALIFORNIA MEDICAL FACILITY (CMF)**
**(June 2, 2021 – June 4, 2021)**
**Review Period: (November 1, 2020 – April 30, 2021)**

Census:

On June 1, 2021, CMF's total patient population was 2,008, which was a 21 percent decrease since the preceding site visit. The mental health caseload population of 931 patients decreased by 12 percent since the prior review period and comprised 46 percent of CMF's population.

The MHCB housed 23 patients.

There were 567 mainline EOP patients and 37 EOP patients in the administrative segregation EOP hub.

The 3CMS mainline population was 290. There were 14 3CMS patients housed in administrative segregation.

Staffing:

The chief of mental health and chief medical executive (CME) positions were filled.

The chief psychiatrist position was filled. The position of senior psychiatrist was filled in an acting capacity. Six of 14.5 staff psychiatrist positions were filled, for a 59 percent vacancy rate. Contractors or dual appointments covered 5.87 positions, reducing the functional vacancy rate to 18 percent. Three of four telepsychiatry positions were filled. Including telepsychiatry, the overall staff psychiatry functional vacancy rate was 20 percent.

Three of four psychiatric nurse practitioner positions were filled, for a vacancy rate of 25 percent.

Both chief psychologist positions were filled. Six civil service psychologists covered 5.5 senior psychologist positions. Of 40.5 staff psychologist positions, 30.75 were filled, for a 24

percent vacancy rate. Contractors or dual appointments covered an additional 3.82 vacancies, resulting in a 15 percent functional vacancy rate.

The supervising social worker position was filled. Fourteen of 15.5 social worker positions were filled, for a nine percent vacancy rate. Contractors or dual appointments covered an additional 0.47 positions, reducing the functional vacancy rate to seven percent.

All six MHSDS registered nurse positions were filled.

Six senior psych tech positions were filled. Of 77.9 psych tech positions, 60.9 were filled, for a 22 percent vacancy rate.

Twenty-one of 23.5 recreation therapist positions were filled, for an 11 percent vacancy rate.

Seventeen of 21 MHSDS clerical positions were filled for a vacancy rate of 19 percent.

Both Health Program Specialist I (HPS I) positions were filled. Two civil servants filled the 1.5 Associate Governmental Program Assistant (AGPA) position.

Telepsychiatry:

For approximately six months ending in November 2020, the administrative segregation EOP hub used telepsychiatry facilitated by an on-site psychiatric nurse practitioner. The PNP sat with the patient to facilitate the telepsychiatrist's assessment and also conducted cell-side assessments for patients who refused to attend telepsychiatry sessions. CMF's 3CMS program had two telepsychiatrists and an on-site PNP. The MHCB did not use telepsychiatry. CMF reported that beginning in June 2021, telepsychiatry would assist with after-hours coverage, with on-site psychiatrists working as a backup.

Quality Management:

The local governing body met twice and achieved quorums for both meetings. Meeting minutes from January 2021 reflected the discontinuation of mental health groups due to COVID-19. April 2021's meeting minutes reported the resumption of programming and increased treatment hours on all mental health units.

The quality management committee met for five months during the review period; the December 2020 meeting was canceled due to a COVID-19 outbreak, staffing shortages, and competing priorities. All meetings achieved quorums. Reviewed QMC minutes reflected COVID-19 updates, performance improvement work plans, and findings of the mental health subcommittee.

The mental health subcommittee met five times. Meeting minutes addressed access to care, compliance measures, staffing, the MHCB, the CIT, the administrative segregation EOP hub, mainline 3CMS programming, and treatment hours, which indicated an increase in offered groups beginning in February 2021 due to nursing-led Rehabilitative Activity Credit (RAC) groups.

Audits, QITS, and FITS were temporarily discontinued due to COVID-19.

CMF disseminated quality management information to line staff during MHSDS program meetings. Performance reports were discussed at weekly supervisors' meetings. Line staff had access to meeting minutes from the local governing body, QMC, and the mental health subcommittee.

CMF suspended peer review following EHRS implementation in 2017.

Medication Management:

CMF's MAPIP data combined the prison and the PIP. MAPIP generally reported dashboard scores for psychotropic medication diagnostic monitoring that exceeded 85 percent.

During April 2021, measures demonstrating 90 percent or greater compliance included most, if not all, for antipsychotic and antidepressant medication requirements, polypharmacy medication reviews, inter-system transfers, and refills/renewals.  The non-compliant areas reporting less than 90 percent compliance were lipid monitoring and obtaining an EKG due to QT prolongation for antipsychotics, and lipid monitoring, obtaining an EKG, and abnormal involuntary movement scale (AIMS) testing for clozapine.  There was also non-compliance for obtaining carbamazepine levels, a complete metabolic panel, and medication consent for mood stabilizers.  Also non-compliant were obtaining lithium levels, and thyroid monitoring and obtaining an EKG for lithium, and obtaining an EKG for tricyclics for antidepressants.  However, many of the identified non-compliant areas had very small sample sizes of between two and four.

Review of the monthly quality council management meeting minutes reflected review of the relevant MAPIP measures twice during a five-month period.

EHRS was in the process of adding a psychiatric workflow section.  This section's addition was intended to facilitate increased compliance with the MAPIP indicators because it would facilitate monitoring by the prescribing psychiatrist of required diagnostic testing for psychotropic medications.

Forty-three CMF patients, including two housed in the MHCB, eight housed in the EOP hub, and 33 in the EOP program, were on active PC-2602 orders during the review period.

Transfers:

CMF had two inpatient coordinator positions; however, at the time of the site visit, one position had been vacant for approximately six months.

During the reporting period, CMF had two sustainability reviews, namely, a 2020 minor review, and a 2021 major review.  One component of the sustainability reviews involved audits

of HLOC consideration forms, which were reviewed by CMF's inpatient coordinator and a headquarters' reviewer. This assessment measured the quality of HLOC consideration forms completed by CMF staff to assess whether they were thoroughly completed and provided adequate justification for patient non-referral when there were positive referral indicators. The review also analyzed the interrater reliability between the judgment of the headquarters' reviewer and CMF's inpatient coordinator as to the acceptability of the HLOC forms.

Third quarter 2020 minor review findings indicated that CMF's inpatient coordinator found 67 percent of the HLOC forms to be acceptable, reflecting poor document quality. However, this minor review also found poor interrater reliability between CMF staff and the headquarters' reviewer, who assessed 88 percent of HLOC documentation to be acceptable.

Findings from the fourth quarter 2020 minor review and the first quarter 2021 major review both indicated good interrater agreement as both the inpatient coordinator and the headquarters' reviewer similarly found approximately two-thirds of reviewed cases to be acceptable; however, they also both determined that approximately one-third of the documentation was of poor quality. HLOC forms were deemed unacceptable due to insufficient non-referral narratives, failing to address indicator-specific issues, insufficient documentation of treatment intervention, and clinical inconsistency.

These sustainability review findings were consistent with the Special Master's expert's on-site findings, which revealed that all programs' treatment teams consistently failed to properly review HLOC criteria and address possible referrals. The Special Master's expert's review of individual cases also revealed inaccurate documentation, documentation errors, and inadequate non-referral clinical rationales and/or treatment modifications. CMF's HLOC referral process was clearly broken.

CMF has repeatedly failed to achieve compliance with the sustainable processes' data review and documentation component. In fact, since 2013, not one of CMF's quarterly data reviews achieved compliance. Moreover, although CMF experienced significant staffing changes during the review period, the sustainability reviews noted that poor clinical compliance was the largest contributor to the lack of improvement in the data review results.

COVID-19 significantly impacted transfers at all levels of care due to patient movement stoppages and restrictions, which included frequent internal quarantines of CMF units. In fact, COVID-19 stopped all non-essential patient movement from July 2020 through March 2021.

During the review period, there were 259 cases involving 98 patients where criteria for a HLOC consideration were met, but the patient was not referred. The only reason provided for each non-referral was "not clinically indicated," which was not a clinically sufficient rationale for non-referral.

There were 32 acute care referrals, all of which were generated by the MHCB. Fourteen acute care referrals were rescinded, but none were rejected.

CMF timely completed all acute care referral packets. Of the 18 acute care patient referrals who transferred, seven patients or 39 percent transferred within ten days of referral. For the remaining 11 acute care transfers, transfer times averaged 25 days and ranged from 11 to 44 days. Seven patients transferred more than 72 hours after a bed assignment. Staff attributed these delays to quarantine issues at both the PIP and the prison that impacted movement.

During the site visit, one patient was awaiting transfer to acute care.

CMF made 33 referrals to intermediate care, of which 26 or 79 percent were rescinded. None were rejected. CMF timely completed all intermediate care referral packets. Six of seven

intermediate care transfers were timely, but three occurred more than 72 hours after a bed assignment.  Transfer delays were attributed to COVID-19 movement restrictions.

During the site visit, no patients were awaiting transfer to intermediate care.

No inpatient care transfers were delayed due to pending paroles, disciplinary proceedings, or pending PC-2602 involuntary medication hearings.  Due to COVID-19, however, there were delays due to classification factors such as the unavailability of single-celled beds or locked dorms.

No patients with complex medical needs were referred to acute or intermediate care.

The institution conducted 21 *Vitek* hearings during the review period; 11 were for acute care patients, and ten were for intermediate care patients.  Two acute care and two intermediate care patients prevailed at their *Vitek* hearings.

CMF's inpatient coordinator reported emailing the receiving institution's inpatient coordinator about referred patients.  CMF also used protocols to expedite DSH referrals when clinically indicated.

CMF reported poor communication from external PIPs and DSH about impending discharges back to CMF; communication from the CMF-PIP was reportedly improving.  Treating clinicians were informed of returning patients through Suicide Prevention and Response Focused Improvement Team (SPRFIT) coordinators, who also notified mental health and custody staff.  CMF supervisors encouraged clinicians to engage in clinician-to-clinician contacts with discharging PIPS and DSH, but did not monitor compliance.

Of 225 referrals to CMF's MHCB, 187 or 83 percent were admitted.  Thirteen patients or seven percent were not admitted within 24 hours of referral.  No CMF patients were transferred to another institution's MHCB.

CMF's MHCB admissions data contained inconsistencies and, though requested by the monitor, the institution did not provide reconciled data. The provided data reported an average clinical length of stay of 12 days for the 187 MHCB admissions; 70 exceeded ten days. Ten patients had three or more MHCB admissions.

At the time of the site visit, the MHCB housed 29 patients. Stays averaged 7.3 days and ranged from one to 28 days. Six stays exceeded ten days.

No patients transferred to the PSU during the review period. At the time of the site visit, four CMF patients awaited transfer to the PSU.

CMF patients requiring placement in an administrative segregation EOP hub were transferred to CMF's EOP hub.

CMF did not provide data on transfers to EOPs.

During the review period, CMF reported reducing 25 patients' level of care from EOP to 3CMS and increasing another 22 patients' levels from 3CMS to EOP. The institution did not provide information as to enhanced services provided to patients pending EOP transfer.

CMF did not transfer any patients to STRH or LTRH during the review period. At the time of the site visit, five patients were pending STRH transfer from 20 to 97 days. No patients were pending LTRH transfer.

CMF did not place any patients in MSF during the review period.

Programming:

>MHSDS Inmates in Administrative Segregation:

>>EOP Hub:

CMF's provided information did not accurately reflect the institution's staff-to-patient ratios. During the site visit, EOP hub leadership reported that staff-to-patient caseloads exceeded established ratios only minimally.

Primarily due to restrictions related to COVID-19, the administrative segregation EOP hub had limited programming during the review period; both mental health leadership and staff reported many obstacles which impeded their ability to provide sufficient programming to these patients. These restrictions ranged from complete isolation of entire units to individual patients being quarantined. Although not required to cohort for all activities, patients could only attend groups in pre-determined cohorts. Moreover, a COVID-19 outbreak from mid-December 2020 through February 2021 eliminated all group activity. Thereafter, when unit isolation was lifted, patients remained quarantined on a case-by-case basis.

Despite the pandemic, EOP hub leadership reported that mental health staffing had remained relatively stable during the review period; caseloads only marginally exceeded requirements, if at all.

During the review period, the EOP hub's monthly intake ranged from 20 to 49 patients. The percentage of new EOP hub admissions who received a brief intake assessment within five working days of placement ranged from 86 to 95 percent. CMF reported that initial mental health evaluations were routinely completed prior to initial IDTTs, which IDTT observation confirmed.

The EOP hub struggled to provide patients with the required minimum of ten hours of weekly out-of-cell structured therapeutic treatment.  CMF data reflected the offering of an average of two hours of weekly structured treatment, of which patients attended a weekly average of 1.54 hours.

IDTT observation was limited during the site visit; only two initial IDTTs and one routine IDTT were scheduled in the EOP hub during the site visit.  All three IDTTs occurred within required timeframes and were attended by required disciplines, who had access to EHRS and SOMS.

Observed IDTTs were well-conducted.  The primary clinician provided a comprehensive case review and reasonable diagnostic case formulation aided by the EOP hub supervisor; it was reported that the supervisor generally attended IDTTs and was typically an active participant. The treatment team considered relevant factors when addressing level of care decisions and demonstrated good rapport with patients.  Both the psychiatrist and the primary clinician had evaluated the patients prior to the initial IDTTs.  A misconception that the treatment team could not directly refer patients to acute care surfaced during the IDTTs, and was clarified by the chief of mental health.

COVID-19 led to a reduction in group treatment, resulting in patients receiving less than ten hours of weekly treatment.  Moreover, during the first two weeks of November 2021, the entire M-3 EOP hub unit was quarantined and there were no groups.  Group treatment was subsequently canceled in mid-December 2020 following a significant COVID-19 outbreak and did not resume until February 2021.

Group offerings primarily consisted of recreation therapist (RT)-led groups scheduled in three-hour blocks.  However, three-hour periods were not conducive for clinically-oriented

177

groups, while the offered groups were not sufficiently varied.  Mental health leadership was aware of these concerns, but reported utilizing these types of groups because of its need to prioritize primary clinicians for individual clinical contacts when COVID-19 restrictions were in place.

An observed clinician-led group had five patients and was facilitated by an unlicensed psychologist.  The group leader had a good rapport with the patients and made efforts to generate group discussion about substance use and other clinically-relevant topics.  However, the group's meaningfulness was hampered by the clinician's unfamiliarity with most group members and by the group's excessive length.

Observed psych tech rounds were adequately conducted.  The psych tech communicated well with patients, took notes during the rounds, provided patients with forms to request services, and reported plans to refer patients who requested or required clinical contacts.

Eighteen EOP hub patients were placed on modified programming during the review period.  CMF data reflected the offering of a weekly average of 0.72 hours of structured treatment, of which patients attended 0.53 hours and refused 0.19 hours.  Facility leadership reported that modified programming patients received daily clinical contacts and cell-front recreation therapy contacts.  All but two patients had monthly IDTTs.

Four interviewed EOP hub patients all reported being offered confidential monthly psychiatry contacts and weekly PC contacts.  They reported that psych tech rounds regularly occurred but indicated significant variations in psych techs' receptiveness to their concerns.  The patients reported receiving prescribed medications, but offered mixed reports about custody; some stated that custody assisted with the provision of mental health care, while others complained about custody's aggressive behavior.

Mental health leadership reported that staff felt a sense of futility in referring patients to inpatient programs due to the perception that the EOP hub could provide equivalent or more intensive treatment as compared to the treatment patients received in the PIPs. Furthermore, COVID-related movement restrictions meant that even referred and accepted patients remained in the hub for extended periods.

CMF provided administrative segregation EOP hub certification letters from November 2020 through February 2021. The hub was certified with explanation in November 2020 but was not certified in December 2020 or January 2021 and was closed to new intake in February 2021. In accordance with CMF's standing practice, however, the hub continued with internal intake from CMF mainline units during February 2021. The hub subsequently passed certification with explanation in February 2021 and was reopened to external intake.

CAPs related to the low number of provided treatment hours identified COVID-19-related restrictions as the primary drivers of low compliance, including the lack of treatment space due to social distancing requirements, restricted custodial movement, and quarantine requirements. CAPs also addressed patient movement discrepancies, which caused late mental health screens.

EOP hub cells were not wired for electricity; a small number of cells that had electricity were reserved for patients who required medical devices. As such, there were no televisions in the hub, but observation revealed numerous crank radios; however, a crank radio spot check found two patients without one. Patients also reported having recreational puzzles.

Review of 114-A logs revealed 94 percent compliance for the offering of ten hours of weekly yard and 100 percent compliance for the offering of three weekly showers. Review also revealed that hub patients were allowed to make a weekly phone call 70 percent of the time.

Twenty patients were randomly selected to have their records reviewed for their administrative segregation EOP stays. Certain factors led to the removal of some cases from the assessment.

In 11 of 14 cases, the initial psychiatry contact occurred before the IDTT and was timely. Twelve of 14 required routine psychiatry contacts occurred every 30 days. Fifteen of 28 psychiatry contacts were confidential.

Eleven of 14 patients had initial primary clinician evaluations before the IDTT and were compliant. Eleven of 19 required weekly PC contacts occurred every seven days. Although patient refusals resulted in the cancellation of many appointments, records reflected diligence on clinicians' part to attempt to reschedule them. Twenty-four of 33 primary clinician contacts were confidential.

Twelve of 14 patients had initial IDTTs within 14 calendar days of arrival. All seven routine IDTTs occurred within 90 days. Required staff attended all 21 IDTT meetings. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this was not clearly documented.

Non-Disciplinary Segregation:

During the review period, six NDS patients transferred from administrative segregation to mainline programs. Timeframes from NDS designation to physical transfer averaged 49 days and ranged from 15 to 86 days. None of the eight patients reviewed for expedited transfer were approved, but all eight were timely provided with property and privileges. There were 16 patients on NDS status during the site visit.

MHCB:

The MHCB had 50 beds in units A and B.  In January 2021, at the height of the pandemic at CMF, the MHCB's census had increased to 54 patients; four were housed in the seclusion and restraint rooms and/or alternative/outpatient housing.  This high MHCB census resulted from CMF being closed to movement and being unable to physically transfer approximately one-half of the clinically-discharged patients due to COVID-19.  Given this situation, CMF received permission to treat patients who had been clinically discharged from the MHCB at the EOP level of care.  By March 2021, when patient movement resumed, CMF's MHCB census had significantly decreased, and the MHCB's B side was deactivated.  By the time of the site visit, the B side had re-opened.

Interviewed MHCB patients typically reported being seen confidentially by psychiatry and PCs.  Reviewed documentation and observed IDTT meetings also revealed that psychiatrists generally saw patients prior to IDTTs and completed the history and physical.  However, primary clinicians did not consistently see patients prior to IDTTs; this was especially apparent during initial IDTT meetings when the PC did not know the patient but facilitated the IDTT meeting.  In many of these cases, initial treatment plan documentation was not adequately completed.

The MHCB had a culture of deference to custody and unfamiliarity with operational procedures.  For example, a patient was kept in handcuffs during an observed IDTT despite mental health staff believing it was not necessary.  Moreover, the IDTT did not address the cuffing issue.  Queried nursing staff did not appear concerned about the policy, responding that "whatever custody wants, that's what happens."

Thirteen patients were randomly selected to have their records reviewed for their MHCB stays. All 13 patients had a timely initial psychiatry evaluation. Five of 13 had an initial primary clinician evaluation within 24 hours of admission.

CMF conducted all 59 required twice-weekly psychiatry contacts; however, 31 of 59 appointments took place at cell front, in the yard, or it otherwise was not noted whether the appointments were confidential.

Forty-four of 136 required daily primary clinician contacts in the MHCB occurred. However, these clinical contacts occurred at cell front, in the yard, or their venue was not identified in 18 of 44 cases.

All 13 patients had a timely initial IDTT within 72 hours of MHCB admission. Ten of 13 patients had required subsequent IDTTs within seven days of their initial IDTT. Discharge IDTTs were conducted for both patients who required one. Required IDTT members attended 23 of 25 IDTTs; in both instances, the correctional counselor I (CC I) was missing. Patients attended 19 of 25 IDTTs.

CIT:

The CIT provided on-call coverage. There were two and one-half positions allocated to the CIT; however, one provider was on extended leave and was not expected back until the fall of 2021. The CIT's weekday coverage was by way of a rotation of clinical staff. A psychiatrist was assigned to the CIT on a consulting basis.

A review of the (LOP) and document review indicated that CMF used the "scout" CIT model. As such, the CIT clinician initially assessed the patient and subsequently included the lieutenant and registered nurse. While the CMF LOP indicated that the sole clinician was "triaging" the case, this was not compliant with the statewide CIT model.

There were no referrals to the CIT during the review period, as it had been suspended due to COVID-19. CMF reinstated the CIT in April 2021, but it was still not fully operational. Mental health leadership reported not knowing when the CIT would resume full operations.

Alternative Housing:

During the review period, 62 patients, including 53 EOP, eight 3CMS, and one GP, were admitted to alternative housing. However, CMF provided incomplete data that lacked information for 23 patients. As such, the average lengths of stay of alternative housing patients, the number of patients who were housed in the unit for more than 24 hours, and the number of alternative housing patients who transferred to the MHCB could not be calculated. Data provided for 39 patients indicated an average alternative housing length of stay of 15.9 hours; two patient outliers were in alternative housing for 73.6 and 65.2 hours.

CMF housed alternative housing patients in three areas, namely, the MHCB, the CTC medical beds, and the triage and treatment area (TTA). Observed alternative housing cells in the MHCB and TTA were found to be clean; cleaning logs were hung and on display outside of the cells.

EOP:

During the site visit, 16 primary clinicians were assigned to the mainline EOP program. Clinicians' caseloads ranged from 20 to 25 patients. Three psychologist supervisors were also assigned to the mainline EOP program.

CMF failed to meet Program Guide requirements for EOP structured treatment. In fact, reported treatment hours were non-compliant since the prior site visit. For the review period, CMF reported that 2.14 hours were offered.

The Special Master's expert randomly selected ten mainline EOP patients from CMF's IDTT roster for compliance reviews. This review revealed that all ten patients were consistently offered confidential treatment contacts with adequate continuity of care. However, only 60 percent of initial and 70 percent of routine psychiatry contacts, and 70 percent of initial and 40 percent of routine PC contacts, were timely. The review further revealed only 60 percent compliance for initial IDTTs and 100 percent for routine IDTTs; required members attended IDTTs 100 percent of the time.

The Special Master's expert's analysis further indicated that a majority of reviewed IDTT treatment plans were deficient; satisfactory documentation was found in 30 percent of cases. Problems were routinely identified in level of care rationales, clinical summary updates, and treatment targets, interventions, and goals. Treatment plans did not consistently address treatment and medication non-adherence. Treatment plans were also not consistently updated when patients presented with new symptoms, worsening functional impairments, or a lack of treatment progress. Level of care justifications were often vague and inadequate. Treatment plans and IPOCs were absent in two reviewed cases. One patient's treatment plan failed to address suicidal ideation and self-injurious behavior despite recent repeated acts of self-harm noted in the record.

During the site visit, 13 mainline EOP IDTT meetings were observed, with presentations by two different psychiatrists and six different PCs. The IDTT space was adequate and all required members attended and participated. However, EOP patients on quarantine or isolation status were not invited to attend; the provided rationale for not inviting them, namely, insufficient IDTT space due to social distancing requirements and a lack of personnel to escort patients back and forth to the O-wing, was inadequate.

IDTT quality varied across treatment teams, with only three of 13 meeting all audit criteria. There were deficiencies in most level of care justifications and/or HLOC discussions. Level of care decisions were also often based on arbitrary observation timeframes rather than progress toward measurable treatment objectives. Routinely missing from IDTT discussions were case conceptualizations, primary clinicians' planned treatment interventions, and patients' group participation. Although all IDTT members shared information relative to their disciplines, treatment planning was non-collaborative. Only one of the six primary clinicians provided clear and measurable treatment objectives for all three of his patients.

At the time of the site visit, patients were assigned to treatment groups by cohorts due to COVID-19 precautions. Notably, the quality and quantity of EOP treatment groups were inadequate. Primary clinicians did not offer core treatment groups. EOP patients expressed frustration with the lack of structured clinical groups; the only clinician-led groups available to EOP patients were biweekly case management groups. However, the case management groups were poorly attended due to a scheduling conflict with medication pass and yard. Patients enrolled in the nursing-led RAC groups spoke highly of their quality and structure, but space limitations restricted enrollment. Offered recreation therapy groups were limited to videos, games, and leisure activities.

Two observed clinician-led case management groups were both inadequate. Each observed group had only two to three patients in attendance. During one of the groups, the clinician attempted to play a game that involved guessing symptoms of different psychiatric diagnoses. The group activity was poorly organized with an unclear purpose.

The second group, with two very low-functioning patients, focused on structures of the brain; however, the facilitator did not consider the patients' limitations, and both patients

appeared bored and confused during the brief psychoeducation portion.  Ultimately, the group became a coloring group.

Overall, group activities appeared to be a way to fill allotted time instead of offering clinically relevant interventions tailored to EOP patients' functional level.  Considering case management groups were the only clinician-led groups offered to EOP patients, it was concerning that they were so poorly structured and meaningless.

There were no mainline EOP patients on isolation status during the site visit.  One primary clinician was assigned to mainline EOP patients on quarantine status in unit W-1.  Quarantined patients were offered out-of-cell individual assessments and treatment contacts.  All quarantined patients were participating in yard when the Special Master's expert toured the unit, and their observed opened cells were clean, with hand crank radios inside.  CMF also reported that quarantined patients received a minimum of one in-cell clinical assignment packet per week, which was reviewed with patients and tracked for milestone credits.

Treatment space in O-wing was generally adequate and confidential.  However, unit N-1's "chow hall" was also used for EOP treatment groups, despite extremely hot temperatures due to a broken fan and visual and auditory distractions due to dayroom windows.

Twenty patients were randomly selected to have their healthcare records reviewed for their EOP stays.  Certain factors led to the removal of several cases from the assessment.

Six of ten patients who required an initial psychiatric contact had one before the IDTT and within 14 calendar days of arrival.  Twenty of 29 routine psychiatry contacts timely occurred within 30 days.

Seven of ten patients had an initial primary clinician contact within 14 calendar days of arrival.  Thirteen of 50 routine PC contacts were timely.

Six of 10 initial IDTTs were timely.  Required staff was present at all ten initial IDTTs; however, attendance of the assigned psychiatrist and PC was not clearly documented for all cases.

All four patients who required quarterly IDTTs had one.  Required staff attended all IDTTs; however, attendance of the required assigned psychiatrist and primary clinician was not clearly documented for all cases.

3CMS:

The 3CMS program's clinician-to-patient ratios were adequate; the program had two telepsychiatrists, one on-site psychiatric nurse practitioner, and six primary clinicians.  The program no longer utilized psych techs for medication passes and to facilitate groups.

Record review and reports from clinicians and patients indicated that individual clinical contacts occurred in confidential settings, except during severe COVID-19 outbreaks.  Neither clinicians nor patients reported access to care problems.

Mental health leadership and clinicians reported that 3CMS treatment and IDTT meeting refusal rates had not significantly changed during the COVID-19 outbreak; refusal rate estimates varied from five to twenty percent.  The chief psychologist reported that clinicians were responsible for follow-up after missed appointments.  Five interviewed patients reported participating in IDTTs and were able to identify their diagnoses, problems, and treatment goals.  Review of three 3CMS patient records revealed timely IDTTs and measurable treatment goals.

There were no 3CMS treatment groups during the review period.  The chief psychologist and several patients reported that discontinuation of 3CMS treatment groups had negatively impacted the treatment program.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays. Certain factors led to the removal of several cases from the assessment.

There was an initial psychiatric evaluation prior to the initial IDTT for two of three patients who required one. All 14 required 90-day psychiatry contacts were completed.

One of three patients had a timely initial primary clinician contact within ten working days of arrival. Twelve of 14 required quarterly PC contacts timely occurred.

Two of three patients had required initial IDTTs. One patient had a timely annual IDTT. Required staff attended all IDTTs.

Other Issues:

Pre-Release Planning:

CMF had one full-time pre-release coordinator for all outpatient and inpatient programs. The coordinator kept a detailed, well-organized log that monitored patient release dates, and tracked patient service needs. She emailed her log to mental health and Integrated Substance Use Disorder Treatment (ISUDT) staff on a weekly basis. There were no pre-release groups for MHSDS patients during the review period; however, the pre-release coordinator offered individual pre-release contacts to all eligible patients.

Nonetheless, the monitor's expert found a general disconnect between pre-release planning and mental health treatment planning, which included those instances when patients expressed anxiety and fear prior to release dates. Tellingly, CMF mental health leadership was aware of this issue based on prior chart audit tool (CAT) results.

Program Access:

a.    Job and Program Assignments:

On May 3, 2021, CMF's 767 job assignments were held by 112 EOP patients, representing 24 percent of EOP patients, as well as by 237 or 53 percent of 3CMS patients, and 418 or 39 percent of non-MHSDS patients.  Many patients worked as porters and kitchen workers; however, the program assignment officer stated that MHSDS patients were eligible for all job assignments, including the more sought-after Prison Industry Authority (PIA) positions, providing they met the necessary qualifications.

The 242 academic assignments included many levels of education ranging from basic through post-secondary education, and programs specifically designed for EOP patients.  CMF's academic assignments were held by 61 EOP patients, representing 13 percent of EOP patients, as well as by 72 or 16 percent of 3CMS patients, and 109 or ten percent of non-MHSDS patients.

The 74 vocational assignments included computer-related programming.  They were held by 11 or two percent of EOP patients, 26 or six percent of 3CMS patients, and 37 or three percent of non-MHSDS patients.  CMF did not offer vocational assignments in plumbing, welding, or similar trades.

The 175 voluntary education assignments included post-secondary and college education.  They were held by 19 or four percent of EOP patients, 56 or 12 percent of 3CMS patients, and 100 or nine percent of non-MHSDS patients.

Reportedly due to COVID-19, only one non-MHSDS patient received substance abuse treatment.

The institution provided sign-in sheets, course evaluation forms, and training materials for a PowerPoint program entitled "Program Assignment for EOP Patients: An IDTT Review Process."  Attendance at this training was a one-time requirement for mental health psychologists and social workers to provide information on the functional evaluation of EOP patients for

program assignments. There was compliance for 46 of 56 or 82 percent of psychologists and social workers who were required to complete it.

CMF produced copies of completed CDCR 128-C chronos that evaluated EOP patients' ability to participate in program assignments.

      b.   <u>Milestone Credits</u>:

CMF had implemented the milestone completion credit program. Since the prior site visit, the institution had not implemented any new policies as to the completion of milestone credits for MHSDS patients.

For the review period, 422 of 450 or 94 percent of CMF's EOP patients were eligible to earn milestone credits, with 11 percent earning the credit. For 3CMS patients, 448 of 473 or 95 percent of 3CMS patients were eligible to earn milestones; 47 percent earned the credit. Of the 1,057 non-MHSDS patients, 987 or 93 percent were eligible to earn the credit, with 25 percent earning it.

      c.   <u>Out-of-Level Housing</u>:

On May 17, 2021, there were 22 EOP and 11 3CMS custody Level I patients in Level II housing and four 3CMS custody Level I patients in Level III housing. There were also 85 3CMS custody Level II patients in Level III housing and 20 EOP and two 3CMS custody Level III patients in Level II housing. Additionally, there were nine EOP custody Level IV patients in Level II housing and 36 3CMS custody Level IV patients in Level III housing.

CMF reported that some out-of-level housing was due to medical overrides in instances where the institution was able to provide required medical treatment for patients but not the correct housing level. COVID-19 also resulted in considerably less patient movement, which reportedly negatively impacted out-of-level housing.

d.    ADA Reasonable Accommodation and Grievance Procedures:

CMF had previously implemented the revised ADA accommodation and grievance procedures, including appeals for accommodations for psychiatric disabilities.  The institution also provided a copy of the CDCR Form 1824 Desk Reference Manual, which explained the ADA reasonable accommodation process.

e.    Periodic Classification Score Reductions/EOP patients:

CMF provided completed CDC 840s reflecting the provision of classification score reductions for EOP patients.

f.    Re-entry for Patients with Psychiatric Disabilities:

EOP patient programming included academic and vocational programming that assisted patients with community re-entry.  This programming included adult basic, middle, and secondary school education, and general education development (GED) and high school diploma programs, among others.

Case-by-Case Reviews:

There were eight MHSDS patients who had their 150-day case reviews who were not released from segregation and/or their cases were not resolved.  Case notes provided for four patients indicated required staff's attendance at the case reviews.  The monitor requested, but was not provided with, additional information to determine whether the reviews were timely, and whether the reasons for patient retention were sufficient.  CMF also did not provide requested information about the 120-day pre-minimum eligible release date (MERD) review.

"C" Status:

At the time of the site visit, five patients, including three at the 3CMS level of care, were on "C" Status.  Review of the classification committee chronos for the three 3CMS patients

revealed that all had multiple serious RVRs within 180 days and were deemed to be program failures.  They were placed on "C" Status for 60, 120 and 180 days, respectively.

Mental Health Referrals:

During the reporting period, CMF reported a total of 1,520 mental health referrals; there were 576 referrals to psychiatry and 944 primary clinician referrals.  CMF reported compliance at 90 percent or above with psychiatry and PC responses to emergent and urgent referrals. Psychiatry and primary clinician responses to routine referrals were 86 and 88 percent, respectively.  CMF did not report data for timely responses to medical non-compliance referrals.

Interviewed custody officers in all visited housing units were aware of the purpose of the CDCR MH5-128 form and were able to locate copies of it in their housing units.

Treatment Space:

Clinicians reported that there was adequate treatment space for individual contacts, group treatment, and IDTT meetings for EOP patients, and for patients in the MHCB and in administrative segregation.  Current 3CMS treatment space was insufficient.

O-wing contained three floors of clean and spacious, air-conditioned treatment space that had adequate lighting and sound confidentiality for EOP and administrative segregation patients. For the mainline EOP program, there were numerous clinical offices for individual treatment, eight group treatment rooms, and two rooms for IDTT meetings.  For administrative segregation EOP patients, there were specifically-designed adjacent rooms for individual clinical contacts; a window partition between the rooms allowed for communication.  O-wing also contained three group treatment rooms, each with eight treatment modules, and an IDTT room with a treatment module for administrative segregation EOP patients.

Each side of the 50-bed air-conditioned MHCB contained an adequate, private room with a treatment module for individual clinical contacts and/or IDTT meetings, as well as a group treatment room with four treatment modules. Yet another confidential, private room could be used for private meetings; it contained a clear window partition that separated the patient from the other individual.

Treatment space for 3CMS patients was largely located in R-wing and was generally inadequate. Some of this space lacked air conditioning and, as CMF had similarly reported during the prior site visit, individual treatment offices were extremely hot during the summer. The R-wing 3CMS treatment space also contained a supervisor's office and an IDTT/group treatment room, which were also reported to be very hot in the summer. CMF further reported that connectivity for the IDTT telepsychiatrist in R-wing could be poor, negatively impacting treatment. Although 3CMS group treatment space had been relocated to the air-conditioned and spacious O-wing, there were no 3CMS groups at the time of the site visit.

Mental health leadership further reported that most 3CMS clinical offices and treatment space would soon be relocated to the air-conditioned, newly renovated V-wing. This space contained four clinical offices for individual treatment, a supervisor's office, and an IDTT/group treatment room. During the site visit, it was reported that this relocation was pending final space completion and resolution of a custody staffing issue. Even with this relocation, however, some 3CMS clinicians would have offices in R-wing.

There was less desirable treatment space on all three floors of the CTC, in the air-conditioned G-wing, which also housed EOP and 3CMS patients. Each G-wing floor had a private room for individual clinical contacts, and a larger room that could be used for IDTTs.

Custody and Mental Health Partnership Plan:

CMF's CMHPP Procedures LOP, which was dated March 2020, was not current, but was in general alignment with headquarters' Partnership Plan. However, the LOP included programs that did not exist at CMF, including the reception center, STRH, and LTRH.

CMF provided executive leadership joint rounding documentation for four months; this rounding had been cancelled for one month due to COVID-19 and no information was provided for another. Document review indicated required staff's participation in the rounding. However, CMF's quality management committee executive reports did not reflect executive leadership joint rounding. Only one of three months of provided mental health subcommittee meeting minutes discussed joint rounding.

Documentation for second watch huddles on O-Wing for several EOP housing units reported staff attendance from multiple housing units. For example, one unit O-1 huddle included staff from units L-2, L-3, M-1, and M-2. Combining staff from different housing units in one huddle seemed to defeat the huddles' purpose.

Review of numerous huddle reports noted attendance by custody and mental health staff at 43 and 88 percent of huddles, respectively. However, because the huddle sign-in sheets did not report the actual work location of attending staff, it could not be determined whether all required staff were present.

Review of MHCB huddle reports revealed that a CC I represented custody at 36 percent of huddles. Because the huddle's purpose was to allow custody and mental health staff to regularly communicate about patients, substituting a CC I for the housing units' correctional officer was problematic. No huddles occurred on third watch.

During the site visit, observed huddles on units O-wing indicated the presence of a sergeant, and mental health and nursing staff. Observed huddles were interactive with staff discussing new arrivals, expiring and new medications, problematic patients, physical plant issues, and program changes.

Reviewed 3CMS supervisory meeting reports indicated attendance by required supervisors and reflected discussions of new arrivals, patients receiving bad news, level of care changes, and patient concerns. Reviewed documentation of monthly joint supervisory 3CMS tours for four months indicated various discussions between staff and patients; due to COVID-19, these rounds were not performed for two months.

Due to COVID-19, EOP orientation groups did not occur at CMF.

Patients filed three staff complaints during the reporting period; however, no staff were moved to a different post due to a patient complaint.

CMF data on quarterly partnership training reported staff attendance for the fourth quarter of 2020, and the first and second quarters of 2021, but combined information for all CMF and CMF-PIP staff. For these three quarters, 200 custody and 342 non-custody staff attended the quarterly partnership training. However, it could not be determined whether required staff attended the training.

CMF reported that 98 percent of custody officers attended the annual off-post partnership training, as well as 90 percent of mental health staff.

<u>Heat Plan</u>:

The heat plan was not in operation at CMF during the review period, but was in effect at the time of the site visit. There were eight Stage I heat alerts in May 2021.

During the heat season, the grill gate officer was responsible for obtaining and recording indoor and outdoor temperatures.  The monitor's review of the logs maintained by the grill gate officer indicated the logging of temperatures in accordance with policy.

Interviewed custody officers typically knew when the heat plan was in effect and that it applied to patients prescribed heat-sensitive medications.  They were aware of the respective temperatures that activated the heat plan's three stages and each stage's requirements.  Most, but not all, had the current daily list of patients who were prescribed heat-sensitive medications.

All toured housing units had thermometers on the walls, as well as hand-held thermometers.  Some wall thermometers were located near large fans.  Officers demonstrated use of the hand-held thermometer but were unable to explain how they knew it was accurate.

CMF's Daily Activity Reports (DARs) reflected all eight Stage I heat alerts during May 2021, but only one reported the offering of dayroom as an accommodation.  Custody officers reported offering patients more dayroom for cancelled yard due to a heat alert; however, only three reviewed housing unit logbooks contained some written entries reflecting this accommodation.

Review of the CMF Institutional Heat Protocols LOP 49 dated April 2021 indicated compliance with the California Correctional Health Care Services (CCHCS) 2021 "Heat Plans and Updates" directive.

Except for several custody officers on extended leaves, all CMF custodial administrators and officers had completed the heat-related pathologies on the job training for 2020.

RVRs:

Ninety-eight percent of custody officers and 73 percent of designated clinical staff who were required to receive RVR training received the training.

During the review period, CMF issued 611 RVRs, of which 382 or 63 percent were issued to MHSDS patients.  Of those RVRs, 26 were issued to MHCB patients, 182 to EOP patients, and 174 to 3CMS patients.

The monitor reviewed 16 RVRs where clinicians completed mental health assessments to assess compliance with applicable CDCR policy; reviewed RVRs included three issued to MHCB patients, ten issued to EOP patients, and three issued to 3CMS patients.  A staff assistant was assigned for all MHCB and EOP patients and for one of the 3CMS patients.

The review found that all 16 RVRs were timely referred to mental health for completion of the mental health assessment; in 15 of the 16 RVRs, mental health staff timely completed the assessment and returned it to custody.

One reviewed RVR was issued in connection with an emergency use of force cell entry for a patient expressing suicidal ideation after the patient committed battery on a custody officer. The mental health assessment found that the patient's behavior was strongly influenced by his mental illness and recommended alternative disciplinary measures; however, the hearing officer disregarded the recommendation and assessed the patient with a loss of credits and privileges.

In five other reviewed RVRs, the mental health assessment determined that the patients' mental illness contributed to the behavior that led to the RVR and recommended penalty mitigation.  One hearing officer reduced the RVR to a counseling chrono, and in two others, the hearing officer mitigated penalties but did not reduce credit loss; there was no penalty mitigation in the two other cases.

Use of Force:

CMF's use of force training data combined the prison and the PIP.  As for custody, the training was attended by the warden, chief deputy warden, and all correctional administrators,

captains, lieutenants, and sergeants, as well as by 93 percent of correctional officers.  For mental health, the chief of mental health and chief psychologists attended the training, as did 41 percent of psychiatry, psychology, and social work supervisors, 16 percent of psychiatrists, 57 percent of psychologists, zero of two psychiatric nurse practitioners, and 43 percent of social workers.

Sixty-three of 73 or 86 percent of use of force incidents involved MHSDS patients; however, CMF did not further break down this data between EOP and 3CMS patients.  Two of three controlled and 61 of 70 immediate use of force incidents involved mental health caseload patients.

Review of both controlled use of force incidents, which involved the same patient while he was housed in the MHCB, indicated compliance with applicable policy.

Lockdowns/Modified Programs:

Prior to the review period, there were restrictions on normal patient treatment and movement as a result of enhanced prevention efforts due to COVID-19.  Thereafter, on November 26, 2010, CMF implemented a modified patient program, which it subsequently extended.  This modified patient programming included custody staff escorting all patient movement, no inner mixing of patients' housing units, feeding patients in their cells, no regular or family visiting, and various restrictions on patient employment, dayroom, yard, and phone calls, among others.  This modified program's restrictions also changed over the course of the review period; for example, in December 2020, video visiting was allowed for patients in non-quarantine units.

This COVID-19 modified programming ended on February 8, 2021, when it was re-classified as a social distancing program; however, numerous restrictions still remained in effect.  Among them, patients continued to have in-cell feeding, dayroom was limited to between four

and eight patients, yard was limited to one housing unit at a time, and patient workers were required to wear N95 masks.

Access to Care:

A review of CMF's monthly Health Care Access Quality Reports from November 2020 through April 2021 revealed that 25 percent of mental health ducats and add-on appointments were completed, while 75 percent were not completed. Of the non-completed appointments, zero percent were not completed due to custody factors, while 100 percent were not completed for non-custodial reasons, excluding patient refusals.

Due to COVID-19, patient access to care was especially bleak in January 2021. During this month, only 0.30 percent of mental health ducats and add-on appointments were completed. All non-completed appointments were due to non-custodial reasons, excluding patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

CMF did not place any 3CMS patients in Minimum Support Facilities during the review period.

*Coleman* Postings:

CMF did not have a written LOP for *Coleman* postings. There were no audits, reports, or logs as to the presence of *Coleman* postings.

During the site visit, the monitor observed the revised 2019 Prison Industries issue *Coleman* posting in English and Spanish in all toured housing units, where it was displayed in areas accessible to patients.

Document Production Issues:

There were numerous issues with CMF-provided documentation. Though requested by the monitor on-site, CMF did not provide accurate data reflecting staff-to-patient ratios. CMF

also did not provide requested information on patient transfers to EOPs, or on the 120-day pre-MERD review.  The monitor also requested, but was not provided with, certain additional information about case reviews, as well as requested reconciled data on MHCB admissions.  The institution's data on alternative housing stays was incomplete.

CMF data on EOP patients' treatment refusals did not permit a determination of the number of patients who had modified treatment plans or were enrolled in special programs due to treatment refusal.  CMF EOP hub data was of limited utility for calculating the timeliness of many clinical contacts.

**APPENDIX B-2**
**CALIFORNIA HEALTH CARE FACILITY (CHCF)**
**(July 26, 2021 – July 29, 2021)**
**Review Period: (January 1, 2021 – June 30, 2021)**

Census:

On July 29, 2021, CHCF housed 2,035 patients, which was a 26 percent decrease from the preceding site visit. The mental health caseload population of 1,088 patients had decreased by 12 percent since the prior review period and constituted 53 percent of CHCF's population.

The MHCB housed 40 patients, including 14 acute and ten intermediate care patients awaiting transfer. Since April 2021, the MHCB had flexed 18 beds to accommodate acute care patients.

There were 479 mainline EOP patients and 559 mainline 3CMS patients.

The administrative segregation EOP hub housed 17 patients including seven EOP, three 3CMS, and seven non-MHSDS patients.

Staffing:

The chief psychiatrist position was filled. Both senior psychiatrist positions were vacant. Two of six civil service psychiatry positions were filled; however, six contractors eliminated the psychiatry vacancy rate. Seven of 18 telepsychiatry positions were filled for a 61 percent vacancy rate.

A psychiatric nurse practitioner (PNP) worked in the 3CMS program, even though CHCF did not have an established PNP position. However, the PNP had been on an extended several-month leave since mid-May 2021.

Positions for both chief psychologists were filled, but one chief psychologist served as the chief of mental health. A senior psychologist supervisor filled the other chief psychologist

position on a limited-term basis.  Accordingly, the chief psychologist vacancy rate was 50 percent.

Five of six senior psychologist supervisor positions were filled but two were filled limited term.  One senior psychologist supervisor filled the position for the CHCF-PIP executive director out of class; as noted above, another filled one of the chief psychologist positions.  Two civil service psychologists, one of whom acted out of class, filled in for these two senior psychologist supervisors.  Four of six senior psychologist specialist positions were also filled.

Four of 46 civil service psychologist positions were filled for a startling 91 percent vacancy rate.  The use of 8.5 contractors reduced the functional vacancy rate to an alarming 73 percent.

Six of seven medical assistant positions were filled for a 14 percent vacancy rate.  Three registry medical assistants provided additional service.  The medical assistants assisted telepsychiatry and were a new CHCF allocation.

The 0.5 supervising social worker position was vacant.  Seven of 15 social worker positions were filled for a 53 percent vacancy rate.  One social worker was unlicensed.

Of 27 established recreation therapist positions, 27.5 were filled.

Of 365.7 registered nurse positions, 344 were filled.  One registered nurse (RN) contractor provided additional service.

One of 1.8 senior psych tech positions was filled, as were 47 of 53 psych tech positions. Three psych tech contractors provided additional services.

Positions for two HPS I and three AGPAs were filled.  Positions for the Office Services Supervisor (OSS) II and the Correctional Health Services Administrator CHSA were vacant.

Eighteen of 27.5 office technician positions were filled.  Mental health leadership reported a lack of supervision for the office technicians, which was concerning.

Telepsychiatry:

CHCF used telepsychiatry for individual clinical contacts and IDTTs but not after-hours or as the psychiatrist on duty.  Telepsychiatry was also used in the MHCB and for some acute and intermediate care patients housed at CHCF.

Four telepsychiatrists provided services for the E yard EOP program, which lacked an on-site psychiatrist during the review period.  These E yard telepsychiatrists participated in 2,356 individual clinical contacts and 758 IDTT meetings.

Three telepsychiatrists provided services for EOP and 3CMS patients on C and D yards and participated in IDTTs for acute and intermediate care, and MHCB patients.  These telepsychiatrists participated in 1,247 individual clinical contacts and 642 IDTTs.  CHCF was unable to break down the telepsychiatry individual clinical contacts among EOP and 3CMS patients.  Of the 642 IDTTs, telepsychiatry provided services for 373 EOP patients, 223 3CMS patients, five (GP) patients, 15 MHCB patients, 20 acute care patients, and six intermediate care patients.

CHCF reported that telepsychiatrists had visited the institution; however, the institution did not maintain documentation that reported the dates of these visits.  CHCF also could not report on whether telepsychiatrists' attended clinical staff meetings or case conferences for EOP patients.

Staffing Shortages and Recruitment Efforts:

CHCF reported that staffing was its most significant challenge during 2020 and 2021, during which the institution's very consequential staff turnover had a horrific impact on patient

care and staff morale. Since the pandemic's start in early 2020, CHCF reported it had a gradual decline in staffing resulting in the loss of 29 mental health staff, including five supervisors and one specialist. CHCF did not delineate the classifications of the other mental health staff it had lost. In March 2020, CHCF had an overall mental health functional vacancy rate of 18 percent. By the site visit in July 2021, CHCF reported an overall 38 percent functional vacancy rate.

Mental health leadership reported many reasons why CHCF had lost so much staff. Among them, additional pandemic-related stress led staff to leave CHCF for employers that offered either telework or significantly higher compensation. Other mental health staff transferred to headquarters or other CDCR institutions; still others retired.

Despite undertaking efforts to try to improve staffing, CHCF was unable to hire *any* new mental health staff during the review period. This resulted in CHCF's implementation of a "harm reduction" strategy by the time of the site visit. Working with regional leadership, CHCF was in the process of transferring approximately 200 EOP patients to other facilities with more staffing.

Quality Management:

The local governing body met four times and always attained quorums. Reviewed meeting minutes addressed LOPs, privileging for CHCF providers, and licensing updates as regular agenda items.

Reviewed QMC minutes reflected meetings that typically occurred two to three times monthly and attained quorums. Program subcommittees, including mental health, presented reports at QMC meetings. Agenda items varied but included performance improvement work plans, root cause analyses, and the health care services dashboard.

The mental health program subcommittee (MHPS) met monthly..  Typical agenda items included staffing and training issues, self-injury/suicide tracking, level of care referrals, and RVR mental health assessments.

CHCF had a robust CAP process and regularly audited numerous CAPs, including PREA referrals, suicide prevention, SRASHE quality and mentoring, RVR mental health assessments, individual plans of care, and safety planning.  There were no QITs or FITs during the reporting period.

Reviewed MRRC committee minutes indicated meetings that occurred once or twice monthly.  Agenda items included EMR case reviews and drills, and improvement projects.

Following EHRS implementation in 2017, CHCF had suspended peer review.

Medication Management:

CHCF MAPIP medication management data for January through June 2021 reported compliance for two of six months for patients prescribed antidepressants for EKGs conducted for patients who were also prescribed tricyclics.  There was compliance for four of six months for informed consents.  For thyroid monitoring and for blood pressure monitoring for patients who were prescribed venlafaxine, there was compliance for all six months.

For patients prescribed antipsychotics, CHCF reported compliance for all six months for medication consent, blood pressure and blood sugar checks, height and weight measurements, and thyroid monitoring; however, there was noncompliance for all six months for lipid panel monitoring.  Compliance for complete blood count (CBC) with platelets and comprehensive metabolic panel (CMP) was achieved for three of six months; compliance for EKGs was achieved for one of six months.  CHCF was not compliant for AIMS testing.

As for psychiatric diagnostic monitoring for patients prescribed carbamazepine, levels were noncompliant for three of six months and not required for three months, while CBC and CMP were compliant for three months and not required for the other three months. Medication consent for carbamazepine was not required during the six months of the review period.

CHCF reported data for clozapine that demonstrated compliance with measures for AIMS, blood pressure, blood sugar, and CBC. There was compliance for three of six months for CMP labs and EKGs and for two months for height measurements, medication consents, and thyroid testing. Thyroid testing was not required for the remaining four months. CHCF was not compliant for lipid panel monitoring for the review period.

Psychiatric measures for patients prescribed Depakote showed compliance for Depakote levels and CMP for three of six months. There was compliance for medication consent for two of six months and for four of six months for CBC compliance with platelet orders.

Medication consent for lamotrigine was compliant for three months; no data was reported for two months.

For patients prescribed lithium, CHCF reported compliance for medication consent and lithium levels for two of six months and for three of six months for thyroid monitoring. Compliance with creatinine and blood, urea, and nitrogen (BUN) were compliant for four of six months.

The following compliance rates were reported for MAPIP nursing measures for medication orders. For medication continuity upon inter-institutional transfer at R&R, there was compliance for three of six months and was not required for two months. There was also compliance for five of six months for continuity of N/A DOT medications with intra-institutional transfers excluding ASU/SHU/PSU. Medication continuity following discharge from MHCB

206

transfers was compliant for three of five months and not required for one month. Medication continuity with discharge/transfer from community hospital or DSH was compliant for one of five months and not required for one month. There was also compliance for five of six months for medication continuity upon parole/transfer to the community.

There was compliance for all six months for observation of medication preparation and administration of HS medications; observation of medication preparation and administration of AM and PM medications reported compliance for three of six months. There was compliance for all six months for medication administration of psychiatrist-prescribed chronic care medications and, for new outpatient psychiatric medications, CHCF was compliant for four of six months.

There were no CAPS for psychiatric matters which psychiatry attributed to a lack of support staff and time. Nursing CAPs for measures that scored below 90 percent addressed continuous monitoring by supervising registered nurses (SRNs) and collaboration with prescribers and pharmacy.

CHCF reported a 180-day limit for psychotropic medications. Bridge orders were limited to 30 days.

Non-formulary psychotropic medications were no longer reported to the chief psychiatrist for the purpose of approving or denying the request. Polypharmacy meetings were either nonexistent or not attended by the psychiatrist due to the lack of a senior psychiatrist and time constraints.

CHCF was not an initiating facility for Clozaril; however, the statewide chief psychiatrist had authorized the initiation of Clozaril at CHCF if needed. Five EOP patients were prescribed

Clozaril. There were no patients in the Clozaril initiation phase during the review period or at the time of the site visit.

During the review period, of 46 PC 2602 orders 39 had been granted, three were renewed, and four were withdrawn. CHCF did not report data regarding compliance with administration of PC 2602 medications.

CHCF documentation did not report patients on psychotropic DOT, psychotropic "Keep On Person" (KOP), or HS medications, and CHCF staff was unable to provide such data during the site visit.

Transfers:

Headquarters conducted a major sustainability review in March 2021. The review audited HLOC documentation for non-referred patients to determine the adequacy of HLOC non-referral rationales and accompanying modified treatment plans and assessed HLOC referral timeliness and documentation quality. The review also analyzed the interrater reliability between the headquarters' reviewer's findings and CHCF's internal audit findings.

Results from the March 2021 review revealed an overall decline in interrater reliability and HLOC non-referral document quality in comparison to the prior sustainability review conducted during the fourth quarter of 2020. Examination of eight sample cases by the headquarters reviewer also found pronounced clinical documentation inconsistencies that were attributed to continuity of care issues resulting from high staff turnover and holiday coverage; only one of eight reviewed cases demonstrated appropriate and consistent documentation.

CHCF audits from January through June 2021 found that 96 percent of HLOC non-referral rationales and modified treatment plans were adequate.

The monitor's expert selected a sample of ten EOP patients from CHCF's HLOC non-referral rosters to review the accuracy of referral indicators and the quality of non-referral rationales and modified treatment plans. Three HLOC forms contained inaccurate or incomplete referral indicator information. While 90 percent of non-referral rationales were adequate, reviewed modified treatment plans demonstrated that only 80 percent appropriately addressed patients' specific treatment needs.

Overall, CHCF inpatient transfer data was confusing due to the institution's attempt to filter headquarters generated On-Demand Reports to exclude non-CHCF referrals. Some data was also inconsistent. For example, some patients were not listed on the alternative housing log although other documentation showed them housed in those cells. Regional staff also explained several problems with duplicate and/or erroneous entries on the headquarters' On-Demand Acute-ICF referrals report. These problems were reportedly systemic, applied to all institutions, and had been raised to headquarters staff.

During the review period, there were 197 non-referrals for 123 patients; the sole non-referral rationale provided for these patients was "not clinically indicated."

CHCF made 50 acute care referrals, which was a decrease from the prior review period's 78 referrals. Five referrals were rescinded. None were rejected. All acute care referral packets were timely completed within two working days of identification. Forty-two acute care patients transferred during the review period; there were 36 transfers to the CHCF-PIP and six to the CMF-PIP. Sixteen patients or 38 percent timely transferred within ten days. Thirty-four patients or 81 percent took longer than 72 hours to transfer following a bed assignment. Reported reasons for delays included COVID-19 and patient medical issues.

During the site visit, six patients who had been referred to acute care were pending acceptance. One was a CTC medical patient and three were awaiting *Vitek* hearings; the only information providing for the other two patients awaiting transfer was "pending."

CHCF made 45 intermediate care referrals; two referrals were subsequently referred to the MHCB and 16 were rescinded. There were no rejections. Twenty-seven patients transferred to intermediate care programs during the review period. With one exception, CHCF referrals to IRU were completed timely. Twelve patients, or 44 percent, transferred timely. Only one patient transferred within 72 hours of a bed assignment. CHCF reported that COVID-19 and patient medical issues impacted timely patient transfers.

During the site visit, six intermediate care referrals were pending acceptance. No patients were waiting more than 30 days to transfer.

There were no delays in inpatient care transfers due to pending paroles, disciplinary proceedings, or PC-2602 involuntary medication hearings; however, there were delays related to COVID-19.

Fourteen patients with complex medical needs were referred to acute or intermediate care.

CHCF did not have a *Vitek* LOP and did not provide *Vitek* data for inpatient care referrals during the review period.

CHCF had two inpatient coordinators. They reported providing notice to receiving institutions of referred waitlisted patients who were pending transfer. CHCF also used protocols to expedite DSH referrals when clinically indicated; however, COVID-19 restrictions significantly impeded movement.

CHCF reported being given several days' notice of patients who returned to the institution from outside PIPs and holding Correctional Clinical Assessment Teams (CCATs) for them.  SOMS was checked daily for patients returning from the CHCF-PIP; the Classification and Parole Representative (C&PR) sent an email that typically provided 24 hours' notice and notified staff of these patients' return.  As for clinician-to-clinician contact, the inpatient coordinator contacted sending institutions to coordinate this contact within five business days of patients' arrival.

CHCF's MHCB had two units and 98 beds.  CHCF did not report the total number of MHCB referrals during the review period but indicated that no CHCF patients were transferred to outside MHCBs.  There were 189 admissions to CHCF's MHCB, of which 186 or 98 percent were timely admitted within 24 hours.  Thirteen MHCB referrals were rescinded.  MHCB clinical stays averaged 11.5 days; physical stays averaged 22.7 days.  The maximum MHCB stay was 87 days.  CHCF reported that CTQ protocols secondary to exposure to staff testing positive for COVID-19 and discharge delays due to medical holds had resulted in extended MHCB stays. With limited exceptions, COVID-19 resulted in all external referrals to the CHCF MHCB being halted from 2020 through May 8, 2021.

Due to a consistently low census during the reporting period, on April 7, 2021, headquarters notified CHCF that 18 MHCBs in unit A2B would be "flexed" to acute care beds; the first acute care patients arrived the following week.  There was no LOP for this "flex" bed unit.  Moreover, MHCB staff provided services in A2B and training had not been provided to clinicians on the provision of care to acute patients in "flex" beds since 2019.  Recent training other than an informational memorandum on issue and property also had not been provided to custody staff.

During the review period, there were typically 11 acute care patients in the "flex" beds. Clinical stays averaged 35 days; extended physical stays, which were primarily due to COVID-19, averaged 63 days.  At the time of the site visit, the 18 patients housed in A2B had an average clinical length of stay of 33.5 days; 12 clinically discharged patients who remained in the unit averaged an additional physical length of stay of 14 days due to the unit's placement on CTQ status.

CHCF was an ASU EOP hub; CHCF patients requiring hub placement were transferred to the hub without delay.  There were also no reported delays in CHCF's transfer of patients requiring an EOP level of care to CHCF's EOP program.

CHCF timely transferred three patients to the CSP/Sac PSU.  No patients transferred to STRH or LTRH during the reporting period.

During the site visit, three administrative segregation patients were awaiting transfer to STRH.  One patient had been waiting more than 30 days to transfer; no reason was provided for the delay.  At the time of the site visit, no patients were pending LTRH transfer.

Programming:

 MHSDS Patients in Administrative Segregation:

  EOP Hub:

Based on the EOP hub's low MHSDS census during the site visit, caseloads for the EOP hub's psychiatrist and psychologist were within mandated ratios.

During the site visit, the EOP hub housed seven EOP and three 3CMS patients, with stays averaging 52 days and ranging from six to 117 days.  During the review period, the hub's census averaged 11 MHSDS patients and a total of 17 patients, with stays averaging 37 days and ranging from 0.1 to 175 days.  Leadership reported continually requesting that headquarters limit

the EOP hub's caseload census because the hub could not provide required services with a significantly higher census.

Mental health leadership reported an undefined period during the review period when staffing shortages had led to the conduct of cell-side "wellness" checks instead of required one-to-one clinical contacts; however, this was not occurring during the site visit.  COVID-19 restrictions also markedly contributed to a lack of programming and confidential contacts.  During quarantine periods, patients were given packets, puzzles, and similar activities to complete in their cells.

CHCF's EOP hub passed certification with explanation in November and December 2020 but failed from January through March 2021, resulting in its closure to intake from other institutions during February and March 2021.  The EOP hub subsequently passed certification in April 2021 and reopened to external intake.  The hub again passed certification in May 2021.

Overall, for EOP hub certification, there was reasonable congruence among certification reports, provided information, and leadership and staff interviews.  Certification letters and supporting documents noted COVID-19 restrictions as the reason for insufficient offered treatment hours.  However, leadership also reported that low staffing levels and staff turnover contributed to the problem.

Provided data indicated that, except for one month, nursing mental health screens were generally completed timely.  During January 2021, however, due to a lack of coverage, there was 57 percent compliance for these screens.

Data for December 2020 through June 2021 reported the timely completion of brief intake assessments within five working days of patient administrative segregation placement for all 32 required initial psychiatry and PC appointments.  Initial psychiatry and PC assessments

213

occurred prior to initial IDTTs in all but one case.  Observed IDTTs similarly revealed assessments occurring prior to initial IDTTs; however, the psychiatrist in attendance was not the assigned psychiatrist.

Thirteen patients were randomly selected to have their healthcare records reviewed for their administrative segregation EOP hub stays.

Nine of 13 patients had timely initial psychiatry evaluations before the initial IDTT. Nineteen of 22 or 86 percent of required routine psychiatry contacts occurred every 30 days. Sixty-five percent of psychiatry contacts were confidential.  Non-confidential contacts were due to patient refusals and quarantine status.

Nine of 12 patients required initial primary clinician evaluations before the IDTT.  Seven of ten required weekly routine PC contacts occurred every seven days.  Seventy-one percent of primary clinician contacts were confidential.  Non-confidential contacts were due to patient refusals and quarantine status.

Eleven of 13 or 85 percent of patients had timely initial IDTTs within 14 calendar days of arrival.  All required nine routine IDTTs timely occurred within 90 days.  Required participants attended 69 percent of initial and 80 percent of routine IDTTs.  Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this was not clearly documented.

Observed IDTTs found all required disciplines in attendance.  However, the attending psychiatrist was not the assigned psychiatrist.  The primary clinician demonstrated appropriate patient rapport and good knowledge of patients' histories and concerns.  Treatment planning was individualized.  However, at times, IDTTs lost focus, requiring the supervisor's intervention.

Level of care assessments also were not discussed.  They were not discussed for a patient who had five MHCB admissions during the preceding three months.

CHCF offered EOP hub patients a weekly average of 11.4 hours of structured treatment, with patients attending 7.7 hours.  Leadership confirmed that, due to COVID-19 restrictions and staffing issues, the hub struggled to consistently provide patients with the required amount of out-of-cell structured therapeutic activities. Due to staffing shortages, the EOP hub did not offer any clinician-led groups.  Two observed groups conducted by the same RT varied significantly in quality.  For one observed group, the RT had filled in for a reassigned colleague, which staff reported as a regular occurrence.  The RT was unfamiliar with the group's usual contents.  The second group was the RT's regularly scheduled activity; it was exceptionally well-conducted and reflected good planning and excellent patient engagement.

The EOP hub had ten individual exercise yards.  Yard was continuously offered to patients five days weekly throughout the day for two hours at a time beginning at 7 a.m.  Patients were also consistently offered three weekly showers.  Unclothed body searches occurred in private settings.

Reviewed patient records for the timely completion of ICCs within ten days revealed 40 percent compliance.  All required participants, including the staff assistant and the patient, were present at an observed ICC.  All participants appeared familiar with the patient and his history. The primary clinician had good patient rapport and the team educated the patient about the ICC's outcomes.  Patients were typically offered property following ICCs.

Non-Disciplinary Segregation:

There were two EOP and one 3CMS patients on NDS status during the site visit.  All three patients received property and privileges.  One of the EOP NDS status patients remained in administrative segregation beyond transfer timelines without an explanation.

MHCB:

Seven psychiatrists, two psychology supervisors, seven psychologists, and eight recreation therapists were assigned to the MHCB during the review period.  Due to the low MHCB census of 40 patients at the time of the site visit, psychiatry and psychology caseloads were all within established ratios.  However, psychiatrists' schedules resulted in the availability of only two psychiatrists to cover both the MHCB and the "flex" acute care program on unit A2B on Wednesdays; five psychiatrists were on-site on Mondays and Fridays.  This staffing pattern resulted in patients seeing a different psychiatrist every two days.  Because many individuals provided unit services, access to rooms for confidential individual clinical contacts was a challenge.  It was also reported that psychiatrists resorted to cell-front contacts instead of waiting for available treatment space.

Ten patients who had been admitted to the CHCF MHCB during the review period were randomly selected to have their electronic health records reviewed for compliance with Program Guide requirements during their crisis bed admissions.  All ten received a primary clinician evaluation within 24 hours of admission.  In addition, all psychiatry initial evaluations were timely completed.  However, from the documentation it could not be determined whether any initial evaluations were confidential.

As for twice weekly psychiatry contacts, the institution was compliant 98 percent of the time; however, only one psychiatric contact was documented as a confidential appointment.  Daily primary clinician contacts were compliant 92 percent of the time.

CHCF was 100 percent compliant for initial IDTTs within 72 hours of admission and was also 100 percent compliant for routine IDTTs within seven days of their initial IDTT while in the MHCB. Ninety five percent of all MHCB IDTTs had the required attendees present. All ten patients had a timely discharge IDTT.

Interviewed psychiatrists complained about a lack of continuity of care and an inability to schedule their own patients based on assessed needs and acuity. Rather, a scheduler provided psychiatrists with lists of patients who they had to see; psychiatrists reported that it was not clear how these determinations were made. Non-psychiatry staff reported MHCB psychiatrists arriving two hours late and leaving two hours early. Non-psychiatry staff reported spending too much time completing redundant paperwork instead of providing patient care.

The monitor's expert could not accurately determine how much recreation therapy MHCB patients received due to conflicting data. During January and February 2021, six percent of recreation therapy contacts were reported to last five minutes or less. Furthermore, record reviews indicated that RTs were entering a 60-minute group encounter with patients for the "unit book pass." This occurred when the RT went to individual cell doors and asked patients if they wanted books. Shockingly, patients were documented as having attended a 60-minute group for these brief cell-front contacts even when patients refused a book or were noted to be sleeping.

As for the acute care patients housed in the MHCB's "flex" beds, staff reported that recreation therapists conducted five daily groups, five days weekly, when the unit was not on quarantine status. When the unit was quarantined, there was no group programming. A clinician also saw patients daily during the week in a confidential space. One consistent psychiatrist provided services in the unit until about one and one-half months prior to the site visit. However, during the site visit, there was no consistent psychiatric coverage. Moreover, at the

time of the site visit, 12 of the 18 "flex" bed patients were on maximum custody status and only received solo programming.

A senior psychologist supervisor facilitated ten observed, confidential MHCB IDTTs. IDTT observation found all required disciplines in attendance, with treatment teams engaging collaboratively with patients but less so with one another.

IDTT quality was inconsistent and varied by team and, at times, within the team. Due to staffing deficiencies, all but one IDTT included psychiatrists and/or PCs who were not the patients' assigned providers. At some IDTTs the correctional counselor was not the patient's assigned counselor; the attending counselor was nonetheless knowledgeable. In two of ten observed IDTTs, custody staff's involvement was concerning and did not reflect proper patient treatment; in one case, the correctional counselor was resistant to seeing the patient's mental health needs as relevant to his assigned housing.

Most observed IDTTs lacked discussion of clinical conceptualization, clear treatment goals, or clinical interventions; typically, treatment plans also were not discussed. However, most IDTTs covered medication adherence, group participation, yard access, allowable items and privileges, RVR histories, safety planning, and other relevant custodial matters. Nursing staff reviewed patients' medical conditions. While symptoms and patient behaviors which precipitated MHCB placement were routinely discussed, diagnoses were not consistently mentioned; therefore, treatment team agreement on diagnoses could not be assessed. The supervisor summarized IDTT discussions and used language that patients understood to establish effective communication. For discharging patients, the treatment team summarized patients' treatment progress and provided MHCB care. Patients appeared to agree with the discharge levels of care.

Observed initial IDTTs also revealed concerns about mechanical restraint use. Four patients arrived to IDTTs in mechanical restraints. However, CHCF's LOP stated that mechanical restraints should not be routinely used for MHCB patients. Rather, a lieutenant was to review patients' case factors prior to MHCB housing to make an initial decision about mechanical restraint use. The LOP further required the treatment team to review the patient's need for mechanical restraints within 24 hours but no later than the initial IDTT.

At one observed initial IDTT at which one of the four patients arrived in mechanical restraints, the treatment team did not address mechanical restraint use until the monitor's expert inquired as to the reason for maintaining them. The clinical team provided several inadequate justifications for maintaining the patient in mechanical restraints; the CC II reported that there were no custodial reasons for maintaining the patient in mechanical restraints. For another new arrival patient, the CC II again stated that there were no custodial reasons for continued mechanical restraints; in response, the treatment team was unable to effectively discuss the need for their continued use. The third patient was noted to be in mechanical restraints secondary to security concerns. However, the senior psychologist supervisor stated that there was no mental health reason to keep the patient in restraints. In the fourth case, although the IDTT determined that the patient no longer clinically required restraints, the patient remained in them throughout the IDTT. Sadly, IDTT observation revealed the treatment teams' lack of attention to the issue of mechanical restraints, as well as insufficient clinical rationales for maintaining patients in them.

The monitor's expert also reviewed treatment plans to further assess clinical justification for the continued use of mechanical restraints following IDTTs. The first patient was described as unpredictable, impulsive, and a danger to self. However, this behavior had not been

previously documented beyond the patient's recent decompensation with increased auditory and visual hallucinations and disorganization.  There was no treatment goal related to the underlying behavior of impulsiveness and unpredictable behavior.  For the second patient, neither the treatment plan nor reviewed documentation provided any clinical justification for the continued use of mechanical restraints.

Four observed MHCB groups revealed three single-patient groups conducted in the day room with patients listening to music and casually conversing with the RT about challenges to accessing appropriate care and issues related to their life histories.  The remaining group consisted of two patients also listening to music in the day room with an RT; one patient actively chose songs, but the other patient was minimally engaged.  During the session, the RT maintained a relaxed tone and steered the conversation into mostly relevant topics such as coping mechanisms and encouraging exercise.  The RT reported that groups were routinely scheduled for more patients, but there were many refusals and groups were held in the non-confidential day room.  As each MHCB unit had two group rooms, it was unclear why groups were held in the non-confidential day room.

Three interviewed "music" group patients expressed frustration with the lack of programming and treatment due to insufficient staffing.  Additional patient interviews revealed similar concerns about limited programming and limited clinical staff time.  Patients reported feeling cared for when psychiatrists and PCs saw them, but also reported that such contacts were limited.  Some patients stated that, at times, they had to escalate their behavior to see their psychiatrists and PCs.  Three interviewed patients reported looking forward to being discharged to another level of care where they could access more treatment services.  Patients reported ready yard access.

Seclusion and Restraint:

Neither seclusion nor clinical restraints were used during the review period.

Crisis Intervention Team:

Beginning in 2020, staffing shortages and a lack of mental health staff who were willing to serve on the Crisis Intervention Team (CIT) resulted in CHCF restructuring the CIT.  In so acting, mental health leadership reported that, due to the pandemic, the institution also sought to limit the risk of cross-contamination that undoubtedly resulted from one or two CIT clinicians handling all CIT referrals across all institutional yards.

CHCF restructured the CIT by training all clinical staff to respond to emergent referrals as part of the CIT.  This practice continued throughout 2020 and into 2021.  The restructured CIT was not assigned a specific mental health staff member.  Instead, during the day, a patient's primary clinician was the clinical member of his CIT.  In those instances when the patient's PC was unavailable, other yard clinicians served as the mental health CIT member.

A psychiatrist was assigned to address any medication-related components.  The psychiatrist on call handled all after-hour crisis calls.

Alternative Housing:

CHCF housed alternative housing patients, in order of priority, in licensed CTC beds on D yard, vacant OHU cells on C yard, and in the patient management unit.  Due to COVID-19, available MHCBs were also used for alternative housing to maintain staff and patient safety and prevent cross-contamination between yards.

During the reporting period, CHCF admitted 34 patients to alternative housing.  Although CHCF maintained a log of alternative housing placements, the log did not include patients' level of care.  All but three patients in alternative housing were housed there for less than 24 hours; the

average time for these three patients' alternative housing placements was 188.7 hours, or just under eight days.  No patients were in alternative housing during the site visit.

Although patients were seen daily by either a psychiatrist, psychologist, or both while in alternative housing, many contacts were cell front.  Patients in alternative housing were not offered recreation therapy.

EOP:

Four telepsychiatrists assigned to the E yard EOP program, and one telepsychiatrist assigned to the EOPs on C and D yards, all had caseloads within the established staffing ratio of 1:120.  Of two telepsychiatrists assigned to the EOP and 3CMS programs on C and D yards, one's caseloads was within the established ratios, but the others slightly exceeded it.  CHCF was unable to report the caseload of a newly hired on-site registry psychiatrist assigned to C and D yards' EOPs.

As for psychology, a civil service psychologist assigned to the E yard EOP program had a 44-patient caseload, which exceeded the mandated 1:26 staffing ratio.  Two civil service and one registry psychologist assigned to the C and D yard EOPs had caseloads of between 54 and 56 patients, exceeding the established ratio.  Another registry psychologist had a 0.25 position in the EOP program on C and D yards with eight patients and, again, over the ratio.

Five civil service social workers assigned to the E yard EOP program had caseloads ranging from 31 to 50 patients; all exceeded the mandated ratio of 1:26. A civil service social worker assigned to 16 EOP patients on E yard, and the 3CMS programs on C and D yards had a caseload of 382 patients which also exceeded mandated ratios.

Two yards at CHCF, C and D, operated with outpatient mental health staffing ratios, though these yards housed medically acute and subacute patients with complex needs which

added additional challenges to the provision of services.  C and D yards also housed some PIP and MHCB patients who were unable to transfer due to medical acuity.

While available programming increased after the resolution of CHCF's May 7, 2021, COVID-19 outbreak, the mainline EOP program was unable to offer structured treatment activity hours or PC contacts in accordance with Program Guide minimum requirements through July 2021.

Recognizing that due to CHCF's critically low staffing the institution was unable to provide adequate care to EOP patients, CHCF and regional leadership developed and implemented a "harm reduction strategy" which included a plan to transfer 200 EOP patients to other institutions.  These transfers were commencing around the time of the site visit in July 2021 when E yard EOP patients were being endorsed at a rate of 15 patients weekly.  Due to insufficient staffing, CHCF leadership also reported exploring the possibility of transferring some medically compromised CTC and OHU EOP patients.

Seven patients were randomly selected to have their healthcare records reviewed for their EOP stays.  Three of seven patients who required an initial psychiatry contact had one before the initial IDTT and within 14 calendar days of arrival.  However, one of these patients had an initial contact that was clearly described as cell front, yet the psychiatrist marked it as confidential. Sixty-seven of 79 required routine psychiatry contacts timely occurred within 30 days; 79 percent were also confidential.  Telepsychiatry was used for all reviewed routine psychiatry contacts.

Six of seven patients had an initial primary clinician contact within 14 calendar days of arrival.  Twenty-five of 85 routine PC contacts were timely; 47 percent were confidential. Reasons cited for non-confidential appointments included patient refusals and quarantine status.

All seven patients had timely initial IDTTs within 14 calendar days of arrival; required staff members attended all seven initial IDTTs.  The Program Guide required attendance by the assigned psychiatrist and primary clinician; however, assignment was not clearly discernable for all cases.

Twenty-five of 26 required quarterly IDTTs were timely; required attendees were present for all quarterly IDTTs.  Although some IDTTs addressed the effect of COVID-19 on patients' symptoms, they did not describe mitigating activities to help patients deal with the related decompensation.  Though the Program Guide required attendance by the assigned psychiatrist and primary clinician, assignment was not clearly discernable for all cases.

Reviewed healthcare records for an additional 17 EOP patients revealed that for only 25 of 85 or 29 percent were routine primary clinician contacts completed in accordance with Program Guide timeframes.  Reviewed healthcare records for EOP patients housed in the OHU and CTC found that patients were often seen every 14 days.  The assigned medical unit primary clinician routinely wrote progress notes indicating patients could not be seen due to limited staffing; however, there was no indication that patients with worsening symptoms and increased risk were more closely monitored.  One patient on a modified EOP programming plan and PC 2602 medications was not offered a routine primary clinician contact for 42 days between May 27 and July 8, 2021; due to refusals, this patient also had limited psychiatry contacts.

CHCF leadership and EOP patients identified PC continuity of care as a problem.  EOP leadership further reported that poor continuity among providers often resulted in increased patient refusals, as well as contacts being completed as cell-front wellness checks.  The monitor's expert determined that 47 percent of PC contacts were completed at cell front or in another non-confidential setting, most often due to patients' refusals or quarantine status.

Reviewed primary clinician progress notes revealed adequate documentation in only 30 percent of cases and adequate implementation of treatment plans in only 50 percent. Primary clinicians documented effective communication in five of ten reviewed cases; however, effective communication was consistently documented when patients required language interpreters or had an identified physical or developmental disability. EOP patients were not offered routine PC contacts in accordance with Program Guide requirements during the review period or at the time of the site visit, which was very concerning. While several patients who were not identified on the high-risk list were offered routine contacts every other week, no groups occurred during the interim. CHCF leadership also reported that staff were unable to offer services in lieu of missed PC contacts, such as increased recreation therapy hours. The limited frequency of primary clinician contacts clearly impacted clinicians' ability to implement treatment plans to meet patients' needs.

Several interviewed EOP patients reported that they had not met with their primary clinician in three to five weeks; the EOP supervisor responded that he was "not surprised" when the monitor's expert shared this concern.

Review of a random sample of healthcare records for another ten EOP patients to evaluate the quality of care and clinical documentation demonstrated that IDTT diagnostic decisions were appropriately justified in 70 percent of reviewed records. Treatment plans were deficient in several areas and only 60 percent contained satisfactory documentation; problems were routinely identified in clinical summaries, development of patient specific and realistic goals, and attention to treatment obstacles. There was also an overreliance on copied and pasted generic statements. When completed, HLOC non-referral rationales were an area of strength; however, some clinicians failed to identify patients with positive referral indicators and did not

225

provide non-referral rationales or develop accompanying modified treatment plans.  Safety planning was appropriately documented in 80 percent of reviewed cases.

Seven of nine reviewed treatment plans for EOP patients on modified programming for high refusal rates were found to be adequate.  However, there was inadequate implementation even when treatment plans were appropriately modified or enhanced as PCs were often unable to offer weekly contacts or provide psychotherapy during clinical encounters.  No additional services were offered in lieu of missed contacts.

Five observed IDTTs were all held in adequate space.  All required treatment team members attended, typically provided relevant information, and appropriately interacted with patients.  However, the attending nurse in observed CTC IDTTs was unfamiliar with the patients, did not access a laptop for patient information, and was unable to respond to patients' specific medical concerns.

All observed IDTTs utilized telepsychiatry; counselors for IDTTs held in the OHU and CTC also used videoconferencing to attend.  The IDTTs attempted to ensure that patients were comfortable with being on camera.  The use of video equipment did not significantly impact team members' interactions with patients or the rest of the treatment team.  Except for medication compliance information, which was not consistently reviewed in the OHU and CTC units, the EOP IDTTs were generally adequate.

Mainline (ML) EOP patients were offered less than five weekly hours of structured treatment activity during the review period; during July, they were offered an average of 4.69 weekly hours.

EOP treatment groups were limited to recreation therapy activities, such as listening to music, games, and therapeutic exercises.  Clinicians were unable to facilitate groups as staffing

limitations had resulted in larger clinical caseloads and coverage needs for higher priority tasks. Numerous EOP patients complained about the lack of core clinical groups, as well as being discouraged by the high number of group cancellations.

Three observed EOP recreation therapy groups were adequate but were an insufficient substitute for core treatment groups. Group treatment rooms for EOP patients were sufficient and confidential.

EOP leadership reported that CTQ status patients were offered confidential IDTTs and individual psychiatry and primary clinician contacts. In-cell recreation therapy packets limited to recreation therapy or leisure activities were provided to CTQ status patients; however, individual RT contacts were no longer offered due to staffing limitations. EOP leadership further reported that RTs and patients often complained about the lack of available clinical packets.

EOP patients who were not housed in the dormitory setting complained about being denied access to the larger yard since the onset of the pandemic; these patients only had access to the "small patio" attached to their units.

CHCF leadership reported the offering of EOP education through independent study; the pandemic had resulted in the suspension of in-person classes.

3CMS:

Of two telepsychiatrists assigned to the 3CMS and EOPs on C and D yards, one's caseloads were within established ratios but the others slightly exceeded it.

The psychiatric nurse practitioner assigned to the 3CMS program had a 163-patient caseload. However, during the site visit, she had been on an extended leave that began in mid-

May 2021 and would reportedly end in early August 2021.  During this extended leave another PNP or psychiatrist had not been assigned her caseload for regular individual clinical contacts.

As for psychology, the 0.75 registry psychologist assigned to the E yard 3CMS program and administrative segregation had a 163-patient caseload on E yard which exceeded the established ratio.  A civil service social worker assigned to the 3CMS programs on C and D yards had a caseload of 382 patients and 16 EOP patients on E yard, which also exceeded mandated ratios.

Six patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

There was an initial psychiatric evaluation prior to the initial IDTT for five of six patients who required one.  Twenty of 23 required routine psychiatry contacts timely occurred within 90 days.  Telepsychiatry conducted 47 percent of routine psychiatry contacts.

Four of six patients had a timely initial primary clinician evaluation within ten working days of arrival.  Six of 19 required routine primary clinician contacts timely occurred.

Five of six patients had timely initial IDTTs.  Two of three patients that required one had a timely annual IDTT.  Required staff attended all initial and routine contacts.

Five observed 3CMS patient IDTTs revealed that only two of four IDTT rooms could comfortably accommodate all participants, especially with COVID-19 restrictions.  However, IDTT meeting space was confidential and staff had access to computers and patient records.  All IDTTs included the supervising psychologist, primary clinician, telepsychiatrist, medical assistant, correctional counselor, and a nurse.  A psych tech attended two IDTTs.

Observed IDTTs were comprehensive and collaborative, facilitated by the supervising psychologist, and included active patient participation.  All began with the PC's review of the

patient's psychiatric history and case conceptualization; four of five conceptualizations were appropriate. The IDTTs reviewed patients' diagnoses and supporting symptoms; there was diagnostic agreement among the team in four of five cases. All IDTTs also reviewed functional impairments and improvements in patient functioning. All but one discussed treatment goals.

All five IDTTs' discussed interventions were appropriate to patients' needs and identified goals. The IDTTs briefly reviewed safety planning with three patients whose histories included suicidal ideation/behavior; however, no formal planning was completed. All IDTTs reviewed patients' level of care and explicitly stated the decision to retain the patient at the current level of care.

At observed IDTTs, all staff responded appropriately to patient questions. Custody and nursing participation was relevant and appropriate; however, a psych tech present for two IDTTs failed to provide relevant input.

Five interviewed 3CMS patients all reported rarely seeing their primary clinicians and seeing their psychiatrist more frequently; three patients reported not remembering seeing the same PC more than once. All five further stated that they had not seen their PC for a clinical contact during the previous 90 days.

An interviewed telepsychiatrist and two PCs who provided 3CMS patient care typically reported neither barriers to accessing patients nor challenges locating confidential treatment space for patient clinical contacts. Staff indicated that patient refusals were infrequent as patients were eager to be seen.

The telepsychiatrist further reported bringing the telepsychiatry equipment to the cells of patients who refused contacts to encourage patient attendance. Three consecutive patient telepsychiatry refusals led to the scheduling of an on-site provider to see the patient. The

telepsychiatrist further reported the expectation that telepsychiatrists would be on-site every six months, during which "high refuser" patients were seen along with other routinely scheduled patients and IDTTs.

During the review period, groups were not offered to 3CMS patients.

Other Issues:

Pre-Release Planning:

CHCF's staffing limitations and need to prioritize direct patient care resulted in its inability to maintain a full-time pre-release planner or offer pre-release groups to MHSDS patients. Tracking logs indicated that the institution provided pre-release services to only 77 percent of 69 eligible patients prior to release.

Program Access:

a.    Job and Program Assignments

On July 7, 2021, CHCF reported that of the 706 job assignments, 101 or 20 percent of EOP patients held them, as did 160 or 29 percent of 3CMS patients, and 445 or 31 percent of non-MHSDS incarcerated persons.

For the 211 academic assignments, 28 or six percent of EOP patients held this assignment, as did 55 or 10 percent of 3CMS patients, and 128 or nine percent of non-caseload incarcerated persons.

Of the 28 vocational education assignments, six or one percent of EOP patients held this assignment, as did seven or one percent of 3CMS patients, and 15 or one percent of non-MHSDS incarcerated persons.

No patients held voluntary education assignments.

Of the 124 substance abuse treatment assignments, 39 or eight percent of EOP patients held this assignment, as did 31 or six percent of 3CMS patients, and 54 or four percent of non-MHSDS incarcerated persons.

b.    Milestone Credits

On July 7, 2021, CHCF reported that 472 of 501 or 94 percent of EOP patients were eligible for milestone credits; 77 percent earned the credit.  Of the 556 3CMS patients, 515 or 93 percent were eligible for milestone credits; five percent earned them.  For non-MHSDS patients, 1,278 of 1,452 or 88 percent of patients were eligible for milestone credits; 28 percent earned them.

c.    Out-of-Level Housing

On July 1, 2021, there were 26 EOP and 10 3CMS custody Level I patients in Level II housing.  There were also five EOP and three 3CMS custody Level III patients in Level II housing and one EOP custody Level IV patient in Level II housing.  CHCF further reported that there were also 185 EOP, 347 3CMS, and 506 other patients who were housed in programs that did not categorize incarcerated persons by levels.

d.    ADA Reasonable Accommodation and Grievance Procedures

CHCF had previously implemented the revised ADA accommodation and grievance procedures.  The institution also provided a copy of the CDCR Form 1824 Desk Reference Manual, which explained the ADA reasonable accommodation process.

Case-by-Case Reviews:

Eight of 11 patients who met the requirement for a case-by-case review during the reporting period had the long-term case conference.  Reviewed notes from the case conferences indicated compliance with CDCR policy.

Three of four MHSDS patients housed in administrative segregation for more than 90 days were awaiting transfer to another institution.  The warden, captain, and a mental health clinician reviewed these patients' cases every 30 days.  Further information about the remaining patients was not provided.

"C" Status:

No patients were on "C" Status during the site visit.

Mental Health Referrals:

CHCF reported a total of 1,711 mental health referrals during the review period.  There were timely responses to 89 percent of the 454 emergent referrals, 95 percent of the 280 urgent referrals, and 60 percent of the 977 routine referrals; the large number of untimely responses to routine referrals were due to staff shortages.

Treatment Space:

All observed individual and group treatment space was clean and air-conditioned with adequate lighting and provided for privacy and sound confidentiality.  There were treatment rooms for individual clinical contacts and more spacious, larger rooms that could be used for IDTT meetings and groups.

Custody and Mental Health Partnership Plan:

CHCF's CMHPP LOP had been updated in January 2021 and was generally aligned with headquarters' Partnership Plan.  Due to their designation for medical beds, CHCF's C and D yards did not have to comply with the CMHPP's requirements.  Leadership on E yard reported good relations between mental health and custody staff but further reported being hindered by coordination challenges related to staffing shortages.

CHCF initiated executive leadership joint rounding in June 2021 but did not provide documentation of the rounding.  The institution also conducted monthly joint supervisory 3CMS tours during four of six months of the review period.  During 15 weeks between March 2021 and the site visit, CHCF conducted weekly 3CMS supervisory meetings.  The institution reported distributing 3CMS brochures to patients.

CHCF did not conduct required second and third watch huddles during the review period but reported huddles' recent initiation following the lifting of COVID-19 restrictions; however, as of the site visit, CMHPP huddles were not yet occurring on EOP yards.

CHCF had yet to begin EOP orientation groups.  The only information that CHCF provided reflecting monthly inmate advisory meetings were minutes from the warden's meeting.

CHCF's staff misconduct data reported substandard performance and use of force allegations.  The substandard performance data reflected 134 claims, of which six were approved or granted, and 74 were rejected or disapproved; the remaining claims were being evaluated.  Of 58 use of force claims, one was approved, 47 were denied or otherwise disapproved, and ten were under investigation.  Nine staff moved to other posts due to staff misconduct.

CHCF did not provide data that reported mental health and custody staff attendance at the quarterly partnership round table training or the annual partnership off-post training.

Heat Plan:

The heat plan was in effect for two months of the review period and at the time of the site visit.

CHCF's heat plan was dated February 2021 and was in compliance with the CCHCS 2021 "Heat Plans and Updates" directive.  Reviewed records demonstrated that CHCF did not always log the outside air temperature on an hourly basis as required when the heat plan was

operational.  Because all CHCF housing units were air-conditioned, housing unit officers were only required to record inside temperatures when the air conditioning malfunctioned.

The monitor visited numerous housing units and interviewed custody officers about the heat plan.  Interviewed officers' knowledge of the heat plan varied.  Officers who had primarily or exclusively worked at CHCF were the least knowledgeable, which was presumably because CHCF was air-conditioned.  However, custody officers could typically identify some signs of patient heat stress symptoms.

Most toured housing units had an updated list of patients who were prescribed heat sensitive medications.  All units also had inside thermometers though approximately one quarter had missing or broken thermometers.

There were six Stage I heat alerts during May and 17 during June.  Reviewed DARs indicated heat alert activation and deactivation for most May and all June heat alerts.  The DARs did not document accommodations provided to patients due to the heat alerts.

CHCF reported that 17 custody officers completed the heat-related pathologies on the job training.

RVRs:

During the review period, CHCF issued 387 RVRS.  Of those, 239 were issued to MHSDS patients, including 133 3CMS patients, 91 EOP patients, and 15 patients in the MHCB.

The monitor reviewed ten RVRs where clinicians completed mental health assessments to assess compliance with applicable CDCR policy.  The review found that custody staff timely referred 70 percent of RVRs to mental health staff for completion of the mental health assessment; in 50 percent of RVRs, mental health staff timely completed the assessment and

returned it to custody.  All ten mental health assessments were conducted in a confidential setting.

None of the mental health assessments indicated that the patient's behavior "strongly influenced" the RVR behavior.  The senior hearing officer correctly documented consideration of mental health assessment information in only 50 percent of reviewed cases.  In five reviewed RVRs, the senior hearing officer (SHO) incorrectly relied on the response to mental health assessment question number four as to specific factors to consider when assessing penalties instead of the response to assessment question number three; the latter specifically inquired whether patients' mental illness contributed to the behavior that the RVR documented.

Furthermore, the SHOs documented penalty mitigation as a result of the mental health assessment responses for 80 percent of cases reviewed.  However, in five of the eight cases, the SHOs incorrectly documented penalty mitigation based on alleged mental health assessment recommendations that were not documented in the clinician's assessment.

The monitor reviewed three ICC classification chronos where there was consideration of assessing a SHU term due to a RVR.  In two of the three cases, the ICC chrono noted consideration of the mental health assessment information.  In the third ICC chrono, the clinician stated that the patient would have a "high risk of decompensation if retained in administrative segregation housing."  The ICC failed to address this statement.

Custody staff attendance at required RVR training was noncompliant for all classifications.  Specifically, 83 percent of correctional administrators attended this training, as did 60 percent of captains, 47 percent of lieutenants, and 60 percent of sergeants.  As for mental health staff, this training was not attended by the chief of mental health, chief psychiatrist, nor by any chief psychologists or social workers.  However, three of ten senior psychiatrists, senior

psychologists, and senior social worker supervisors attended the training, as did five of 11 psychologists and one of nine psychiatrists.

Use of Force:

During the review period, CHCF reported 19 immediate uses of force but no controlled use of force incidents.

One of two reviewed immediate use of force incidents was concerning. This case involved a patient's alleged assault of a correctional officer and the officer's subsequent use of physical force to subdue the patient. When medical staff entered the patient's room to transfer him from a medical bed to a wheelchair, the patient attempted to leave the room, allegedly striking the officer with his wheelchair and then striking the officer's chest. The officer allegedly then used physical force to push the patient away; the patient fell to the floor but continued to resist staff. Responding staff applied handcuffs to the patient.

Reviewed reports from other staff present identified areas requiring further clarification. For example, reports from a medical staff member and another officer indicated that the patient may have lost his balance and fell on the floor and did not report the patient striking the officer.

CHCF reported that 100 percent of custody staff completed the use of force training; however, the institution was unable to report the percentage of mental health staff who attended the training.

Lockdowns/Modified Programs:

During the review period, there were various periods when either the entire institution, certain yards, or particular housing units were placed on modified programming due to the COVID-19 pandemic. This modified programming resulted in limited programming and other patient restrictions that included controlled patient movement, cell feeding, sack meal lunches,

no general visiting, patient employment being limited to critical workers, and/or modified dayroom, canteen, phone calls, and packages. Program Status Reports (PSRs) indicated the nature of the modified programming.

Access to Care:

Review of CHCF's monthly Health Care Access Quality Reports from December 2020 through May 2021 indicated that, from December through March, none of the issued mental health ducats and add-on appointments were not completed due to custody factors. However, during April and May, 4.5 percent of appointments were not completed due to custody factors. Notably, 69 percent were not completed due to non-custodial reasons, excluding patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

CHCF did not have a MSF and did not otherwise transfer any patients to MSF's during the review period.

*Coleman* Postings:

All visited housing units contained the current *Coleman* posters in English and Spanish.

Document Production Issues:

CHCF's inpatient transfer data was generally confusing due to the institution's attempt to filter headquarters generated On-Demand Reports to exclude non-CHCF referrals. Some data was also inconsistent. Regional staff also identified problems with duplicate and/or erroneous entries on the headquarters' On-Demand Acute-ICF referrals report.

Other documentation production issues included the monitor's inability to review CDC 840s because the institution was unable to provide them. As for the CMHPP, CHCF did not provide data that reported mental health and custody staff attendance at the quarterly partnership

round table training or the annual off-post training.  CHCF also did not provide inmate advisory

meeting minutes.

**APPENDIX B-3**
**CALIFORNIA MEN'S COLONY (CMC)**
**(April 19, 2022 – April 22, 2022)**
**Review Period: (October 1, 2021 – March 31, 2022)**

Census:

On April 18, 2022, CMC housed 3,225 inmates, which was a 15 percent decrease from the prior reporting period. The mental health caseload population of 1,416 patients comprised 44 percent of the population and was a six percent increase since the preceding review period.

The MHCB housed 36 patients, including 11 receiving care in the MHCB "Acute Care" unit.

There were 517 mainline EOP patients and 676 mainline 3CMS patients.

The administrative segregation population included 55 EOP and 22 3CMS patients in the EOP hub, and 121 patients in STRH.

Staffing:

The position for the chief psychiatrist was vacant since December 2021 but filled by an acting out of class senior psychiatrist. A psychiatrist acting out of class filled the senior psychiatrist's position.

Eight of 15 psychiatry positions were filled, for a 53 percent psychiatry vacancy rate. As noted above, one psychiatrist was acting as the senior psychiatrist. The use of 5.25 registry psychiatrists reduced this vacancy rate to 18 percent. The 1.5 allocated telepsychiatry positions were filled.

One of two chief psychologist positions was vacant. Three senior psychologists acting out of class covered this vacancy on a monthly rotating basis. Six of 6.5 senior psychologist specialist positions were filled for an eight percent vacancy rate. Five of six filled senior psychologist supervisor positions reflected a 17 percent vacancy rate.

Thirty-three of 40.5 psychology positions were filled, for a 19 percent vacancy rate.  Four psychologists were unlicensed.  CMC had two psychology interns.

The supervising social worker position was filled.  Fourteen of 15 filled social worker positions reflected a seven percent vacancy rate.  Four social workers were unlicensed.

Of 23 recreation therapist positions, 19.25 were filled, for a 16 percent vacancy rate.

Both medical assistant positions were filled.

There was a 24 percent office technician vacancy rate; 17.5 of 23 positions were filled.

Custody staffing reflected a 14 percent vacancy rate for lieutenants, with 31 of 36 positions filled, a six percent vacancy rate for sergeants, with 92 of 98 positions filled, and a four percent correctional officer vacancy rate, with 731 of 759 positions filled.  There were position vacancies for one of seven correctional counselor II (CC II) supervisors, one of three CC II specialists, and for the CC II.  Seventeen percent of CC I positions were also vacant.

Telepsychiatry:

The 1.0 telepsychiatrist who provided services to 3CMS patients on West yard had a 330-patient caseload, exceeding the established ratio.  The 0.5 telepsychiatrist completed PC 2602 involuntary medication evaluations and testified at those hearings.  One medical assistant assisted one telepsychiatrist; the other medical assistant was a medication court assistant supporting the PC 2602 telepsychiatrist.  Headquarters' telepsychiatrists provided on-call coverage.

Quality Management:

Regional and leadership staff reported that CMC's quality management/quality improvement program had steadily improved following the acquisition of a quality management specialist.  As a result, CMC reported having more streamlined quality management processes,

including templates for clinicians, which had improved document quality and compliance rates. Supervisors disseminated quality management findings, audits, proposed changes, and suggestions to line staff.

During the review period, meetings of the local governing body, quality management committee, and mental health subcommittee occurred with appropriate frequency, attaining required quorums. No meetings were canceled. Meeting minutes for all three reflected thorough and appropriate analysis of relevant data and issues, action plans with specific goals and benchmarks, and referenced initiatives from previous meetings with updates on action plans.

The mental health subcommittee reported on three Performance Improvement Work Plans (PIWPs) that occurred during the review period. These PIWPs reviewed the HLOC form regarding the non-referral of MHCB and EOP patients based on document completion and positive referral indicators, audited compliance with treatment planning guidelines for administrative segregation, the MHCB, and the mainline EOP and 3CMS programs, and analyzed 30-day MHCB readmissions. The PIWP on the HLOC form reported meeting its goal for the last three months. The treatment planning guidelines PIWP found that the administrative segregation, and mainline EOP and 3CMS programs, satisfied headquarters' 85 percent benchmark for the fourth quarter of 2021; however, MHCB compliance was a dismal 47 percent. The MHCB 30-day readmission PIWP found that CMC did not achieve its objective of reducing MHCB admissions to less than 15 percent for a one-year period.

CMC did not initiate any QITs or FITs during the review period. An ongoing EOP hub QIT addressed potential problem areas, including the unit's census and patients' treatment hours. The SPRFIT was also active and met monthly.

CMC did not conduct peer review in its MHCB during the review period.

Medication Management:

CMC provided MAPIP results for the review period for psychiatric diagnostic monitoring and medication management metrics.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated CMC's compliance for obtaining height, weight, blood pressure, and thyroid tests for all six months of the review period. There was compliance for required glucose monitoring for four of six months. CMC reported compliance for three months when a medication required an EKG, for CMPs, and medication consents. There was compliance for only one month for AIMS tests, and CBC with platelets. Lipid monitoring was noncompliant for all six months.

For monitoring antidepressants, CMC reported compliance for all six months for obtaining thyroid tests, and for checking blood pressure for patients prescribed venlafaxine. For obtaining EKGs, CMC reported compliance for one of two required months. The institution was compliant for two months for obtaining medication consents.

For patients prescribed carbamazepine, CMC indicated compliance for two of three required months for checking blood levels, CBC, and CMP. Both documented months indicated compliance for obtaining medication consents.

As for monitoring Depakote, there was compliance for medication consents for five of six months. CMC also indicated compliance for two months for CBC with platelets, and for three months for CMP. There was compliance for five months for checking therapeutic monitoring of blood levels.

For lamotrigine, CMC was compliant for four months for obtaining medication consents.

For lithium, CMC reported compliance for medication consents and kidney function tests for five months.  There was only one month of compliance for monitoring thyroid and lithium levels, and for EKGs.

Medication management metrics indicated  that CMC was consistently compliant for all six months for the following measures: chronic care medications historical administration prescribed by a psychiatrist, continuity of nurse administered (N/A)/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), observation of medication preparation and administration for HS medications, and medication administration: outpatient provider new medications orders (psychiatry).  CMC was compliant for five months for observation of preparation and administration for a.m. and p.m. medications, and for four months for medication continuity following discharge/transfer from a community hospital and/or DSH, and at parole/release to the community.  There was compliance for three months for medication continuity upon inter-institutional transfer at R&R), continuity of medications for MHCB transfers, and medication continuity with intra-institutional transfers to ASU/SHU/PSU.

CMC was not an authorized clozapine initiation or maintenance facility.

Psychiatrists could prescribe psychotropic medications for a maximum of 180 days. Bridge orders were allowed for 30 days.

Population management meetings conducted monthly polypharmacy reviews.

CMC psychiatrists were permitted to prescribe non-formulary medications without obtaining a secondary reviewer's approval.  The prescriber was required to appropriately document the non-formulary prescription in EHRS.

Psychiatrists typically prescribed psychotropic medications DOT.  A total of 907 patients were prescribed medications DOT.  Twenty-six patients were prescribed

psychotropic prescriptions KOP.  No patients were prescribed selective serotonin reuptake inhibitors (SSRIs) KOP.

Nursing leadership reported that pill lines exceeded two hours on the West Facility and Facility C due to the increased number of patients who were prescribed Suboxone.  Nurses were required to observe patients for one to two minutes after they received the medication to prevent patients "cheeking" or diverting Suboxone by other means, causing longer than usual pill lines. Nursing shortages further exacerbated the problem.

Nursing used EHRS to document and track telephone and verbal orders.  Providers issuing authorized telephone/verbal orders were required to sign the orders in EHRS.

CMC reported prescribing 142 patients HS medications, which were administered after 8:00 p.m., as policy required.

There was compliance for five months for PC 2602 involuntary medication court orders. CMC reported 46 petitions for PC 2602 involuntary medication orders during the review period, including seven initial emergency and four initial non-emergency petitions.  Twenty-seven PC 2602 orders were renewed, six were pending renewal, and two were denied.

Transfers:

CMC had one major sustainability review in November 2021 and one minor sustainability review in February 2022.  The February 2022 sustainable process review found the headquarters' reviewer reporting unacceptable documentation in 33 percent of EOP hub cases, and 12 percent of MHCB and mainline EOP cases.  The headquarters' reviewer also found inconsistent interrater reliability when comparing its findings with CMC's audits of treatment planning documentation.  CMC's resulting CAPs from the sustainable process review targeted

IDTTs' measurable treatment goals, review of treatment progress, safety planning, and interventions to address treatment resistance.

The headquarters' reviewer's February 2022 review also found documentation concerns for patients who were referred to higher levels of care.  Specifically, the reviewer found that only one of eight reviewed patients had the requisite enhanced treatment interventions, that IDTTs' expected treatment outcomes for the receiving inpatient facility were not patient-specific, and that, for some patients, treatment interventions were missing entirely.

Notably, for a gravely disabled patient, the reviewer found that MHCB staff failed to document an adequate rationale for not pursuing an involuntary medication order, despite documenting ongoing medication nonadherence and the patient saving urine and feces in the MHCB cell.  The headquarters' reviewer also found that an EOP patient recommended for a HLOC referral during the preceding sustainable process review was not referred for inpatient care until six months later. At that time, the CMC clinician merely copied and pasted the headquarters' reviewer's language without updating the patient's current level of functioning and symptoms.

While CMC submitted proof of training for CAPs recommended during the February 2022 review, the monitor's expert found that MHCB IDTTs continued to struggle with treatment interventions, level of care determinations, and measurable treatment goals.

During the review period, there were 837 instances of 301 patients who were considered but not referred to a HLOC.

CMC timely referred all acute and intermediate care patients to IRU.  CMC referred 13 patients to acute care; five referrals were rescinded.  For the eight acute care transfers, six took

more than ten days to transfer following IRU referral.  Transfer times ranged from one to 45 days.

CMC made 42 referrals to intermediate care; seven referrals were rescinded.  Seventeen of 35 or 49 percent took more than 30 days to transfer after IRU referral.  Intermediate care transfer times ranged from six to 62 days.

CMC made nine referrals from the institution's MHCB" Acute Care" unit to intermediate care.  Four were rescinded.  Three of five transfers exceeded 30 days, with ranges of 35 to 42 days.

During the site visit on April 18, 2022, one patient was awaiting transfer to intermediate care; this patient was not beyond the 30-day transfer timeframe.

No patients with complex medical needs transferred to inpatient programs.

CMC's two inpatient coordinators had their positions for two and four years, respectively.  Notifications were emailed about patient returns from DSH.  CMC staff did not report any problems with the notification process.  Once received, they forwarded discharge summaries to the EOP supervisor and treating clinicians for follow-up.  For PIP returns, there were three ways to inform the mental health AGPA of patient returns: the daily movement report, an email from the receiving and release custody officers, and the statewide email of movement.  The AGPA notified clinical staff and tracked follow-up, including completion of clinician-to-clinician contacts and five-day follow-ups.

There were 233 referrals to the MHCB; 201 patients were admitted, and 32 referrals were rescinded.  All admissions timely occurred within 24 hours, including six patients who transferred to outside MHCBs.  Clinical lengths of stay averaged 14.3 days and ranged from one to 89 days; physical stays averaged 18.7 and ranged from one to 95 days.  Between October

1, 2021, and March 31, 2022, the MHCB reported an average daily census of 31 patients. MHCB lengths of stay were impacted by the COVID-19 pandemic and subsequent outbreaks.

During the site visit, MHCB patients' stays averaged 12.4 days and ranged from two to 36 days. Nineteen MHCB patients were on maximum custody status.

Twenty-six patients had more than three MHCB admissions, including one patient with 14 admissions, another with seven admissions, two patients with six admissions, seven patients with four admissions, and 15 patients with three admissions.

CMC transferred 20 patients to a PSU in the review period. Two transfers exceeded 60 days; one patient was out to court, and the other transfer was affected by COVID-19 movement restrictions.

There were no transfers to STRH or LTRH during the review period. CMC provided unclear information, which included COVD-19 movement restrictions, as to why none of the 3CMS patients housed in administrative segregation transferred to STRH. CMC also reported that 3CMS patients were placed in the EOP hub where they received "adequate care."

During the review period, CMC reduced 11 patients' level of care from EOP to 3CMS. One patient returned to EOP, and one was admitted to the MHCB within three months of discharge from EOP.

During the site visit, the ASU housed 22 3CMS patients. Three of these 3CMS patients had been housed there for longer than 30 days, including two patients who were in the unit for 132 and 184 days. No patients were awaiting transfer to LTRH at the time of the site visit.

Programming:

    MHSDS Patients in Administrative Segregation:

        EOP Hub:

There were 524 placements in administrative segregation during the review period. Overall, administrative segregation stays averaged 50 days and ranged from one to 189 days. The average length of stay for all EOP patients in administrative segregation was 51 days, with a range of one to 290 days.

The patient caseload of the administrative segregation psychiatrist exceeded the established ratio. The unit's seven primary clinicians included one on an extended leave, a part-time clinician, and one who was unlicensed. Except for the part-time clinician, all PC caseloads exceeded the established ratio.

CMC's EOP hub passed certification for three of five reported months and passed with explanation for the two remaining months.

CMC offered EOP hub patients an average of 12.8 weekly hours of structured treatment activity, with patients attending 7.96 hours. Leadership and staff further reported redirecting staff from other areas, and especially from the mainline EOP, to maintain this level of offered treatment.

Sixteen patients were randomly selected to have their healthcare records reviewed to assess their EOP hub stays.

All 16 patients had timely initial psychiatry evaluations before the initial IDTT. Sixty-three percent were confidential. Eighteen of 21 or 86 percent of routine psychiatry contacts timely occurred every 30 days; 25 percent were confidential. None of the psychiatry evaluations utilized telepsychiatry.

All 16 of the required initial primary clinician evaluations timely occurred before the initial IDTT; eight or 50 percent were confidential. Twenty-four of 32 or 62 percent of required routine PC contacts timely occurred every seven days; 44 percent were confidential.

Twelve of 16 patients had timely initial IDTTs within 14 calendar days of admission. All four routine IDTTs timely occurred within 90 days. Required staff attended 100 percent of initial and routine IDTTs. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this was not clearly documented.

Observed IDTTs for EOP hub patients found all required disciplines in attendance with access to medical records and SOMS. However, the psychiatrist's familiarity with patients varied. In some instances, the psychiatrist had previously interviewed the patient and was familiar with him; in others, this was not the case. All disciplines and patients contributed to IDTT discussions, and the treatment team addressed HLOC considerations. However, instead of giving serial presentations, moving from team member to the other, the IDTT team could have been more interactive.

Three of six scheduled patients attended an observed EOP hub recreation therapy group. The RT was well-prepared and actively engaged patients with multiple group activities, including an activity game, creative writing, face mask wearing, and movie watching.

Interviewed EOP hub patients reported being offered the required number of treatment hours, and regular individual psychiatry and primary clinician contacts. However, patients offered divergent views about EOP hub treatment. Some reported that the mental health program was beneficial, expressed appreciation for clinician-led groups, and stated that custody responded to their mental health emergencies. Others expressed concern that clinical groups could not address more pressing issues related to property and the attitude of custody staff. They

also indicated frustration about an unclean physical plant, a poorly regulated heating and cooling system, the lack of blankets, limited entertainment appliances, and damaged mattresses that needed replacement. They further complained about the EOP hub's "dehumanizing" environment, custody staff's pervasive lack of respect, and human excrement and blood in unattended areas, which the monitor also observed. A CIT clinician reported responding to multiple crisis calls about difficulties related to such patient complaints.

Patients also reported that, except for a small number of cells that were prioritized for patients requiring medical devices, many of the EOP hub unit's lacked electrical outlets for televisions or other electrical devices. Patients reported having crank radios. Leadership was unaware of any imminent plans to rectify this situation.

Custody staff reported conducting unclothed body searches in patients' cells before they left for an activity outside of the housing unit. Upon return, the searches occurred in a housing unit TTM.

Review of ten CDCR 114As for EOP hub patients indicated the offering of three weekly showers and ten or more weekly hours of yard. There was 100 percent compliance for timely ICCs.

Non-Disciplinary Segregation:

During the site visit, CMC reported 76 MHSDS patients on non-disciplinary segregation, including two awaiting intermediate care placement, 12 MHCB patients, 47 EOP patients, and 15 3CMS patients. Thirty-eight NDS status patients were awaiting accelerated transfer; the remaining 38 had access to privileges and property. During the site visit, five patients awaiting expedited transfer were beyond transfer timelines.

MHCB:

The MHCB's 50 beds included 12 reserved for acute care patients.  Four psychiatrists and nine primary clinicians all had caseloads within established ratios.  The PCs included one unlicensed intern.  The MHCB and acute care patients shared four RTs.

The MHCB supervisor reported that the supervisor and line staff clinicians regularly covered caseloads for absent providers while also managing their own caseloads and other daily assignments.  As such, it was reported that staff were "burning out," adversely affecting both continuity of care and clinical documentation.

Ten patients were randomly selected to have their records reviewed for their MHCB stays.  All ten patients received an initial primary clinician evaluation within 24 hours of admission.  All initial psychiatry evaluations were also timely.  However, it was not specified whether the evaluations occurred in a confidential setting.

Fifty-four of 55 or 98 percent of daily clinical contacts occurred; six percent were confidential.  Ninety-four percent of required twice weekly psychiatry contacts were timely; however, only ten percent were identified as confidential.

All ten patients had timely initial IDTTs within 72 hours of admission.  Required staff attended 40 percent of initial IDTTs.  Seven of nine or 78 percent of patients had timely routine IDTTs.

Reviewed MHCB documentation demonstrated inadequacies regarding treatment planning and level of care rationales, which observed IDTTs confirmed.  Multiple reviewed progress notes were also inadequate.

Four observed MHCB IDTTs began timely.  All required disciplines attended a except for nursing, whose lack of attendance was attributed to staffing shortages.  Attending IDTT staff

had computer access.  However, providers covering for assigned clinicians at several IDTTs had not reviewed relevant treatment records prior to and did not during IDTTs, which was apparent during the IDTTs.

Observed IDTTs were not collaborative and demonstrated poor quality.  Treatment teams consistently failed to explain the purpose of the IDTTs and ensure that patients understood their treatment plans before the meetings ended.  IDTTs also routinely neglected to address case conceptualizations, justifications for level of care decisions, symptoms to support diagnostic decisions, measurable treatment goals, treatment progress, psychiatric medications, safety planning, and patient-specific treatment interventions.  Custody participation in IDTTs was minimal.

Further, when IDTTs correctly identified patients with HLOC indicators, non-referral rationales were inadequate.  For example, one clinician stated a HLOC referral would have been inappropriate merely because the patient previously had an intermediate care admission five months prior.  For another patient with multiple referral indicators, the psychiatrist stated that a referral would motivate other patients to self-harm to obtain an inpatient referral.  Alternatives to HLOC referrals were not discussed when indicated.

Two of the IDTTs retained patients in the unit beyond ten days due to the treatment teams' admitted uncertainties about the next treatment steps.  Despite the supervisor's presence and expressing concern about the lack of a treatment plan, the patients were retained without addressing potential discharge obstacles or providing an adequate HLOC non-referral rationale.

Other observed MHCB IDTTs revealed the covering psychiatrist lacked access to patient records.  This psychiatrist nonetheless routinely made inappropriate and baseless comments about patients.  For example, in response to a patient complaint about a negative reaction to a

medication prior to admission, the psychiatrist told the patient that he suffered from bipolar disorder and should refuse a medication that his assigned psychiatrist recommended.  Although other IDTT members, including the MHCB supervisor, responded that the patient's healthcare records did not support the psychiatrist's claims, they neither explained the correct way to resolve discrepant recommendations to patients nor attempted to resolve the discrepancies with the covering psychiatrist.

While in the MHCB, the monitor's expert observed a patient sleeping on the floor with a custody observer and a shattered window in his cell door.  The custody observer reported that the patient had been on contraband watch with waist, leg, and wrist restraints for three days due to repeatedly ingesting razors to self-harm.  The patient had cut on himself twice while in the MHCB and at least once required transport to an outside hospital.  CMC leadership explained that custody staff planned to keep the patient on contraband watch and requested an extension for restraints beyond 72 hours pursuant to policy.  MHCB nursing staff confirmed that they had reported custody's use of restraints in the MHCB to licensing and were awaiting a response. Nursing was reportedly conducting rounds on the patient every 15 minutes.  Mental health clinicians were only offering brief non-confidential cell-front "check-ins" with the custody observer present.

Review of this contraband watch patient's healthcare record revealed inadequate care planning and interventions, and an appropriate case for a HLOC consideration and referral.  At the monitor's expert's request, MHCB staff held an IDTT for this high-risk patient.  The supervisor organized the IDTT one day after its recommendation to enable IDTT staff to have adequate time to review the case; however, neither the covering psychiatrist nor clinician had reviewed the patient's recent records prior to the IDTT.  Due to safety concerns, the treatment

team did not invite the patient to the IDTT.  Although the attending psychiatrist did not have access to the patient's records during the IDTT, she provided strong recommendations based on her brief cell-front interactions with the patient during the prior week.  The psychiatrist also made several inappropriate comments about the patient, which included reporting a prior RVR for disrespect that she had issued to him and arguing that the patient's HLOC referral would lead other patients to self-harm to obtain inpatient care.

After observing IDTT members report outdated and inaccurate patient information, the monitor's expert presented an overview of the healthcare record.  The monitor's expert explained that the patient met at least three HLOC consideration indicators, cut on himself twice during the current 11-day MHCB admission, required outside hospitalization at least once for self-harm, and remained on contraband watch in restraints under constant custody observation due to ongoing concerns he might again self-harm.

The covering clinician responded being unaware that the patient had been in custody restraints for nearly 72 hours while in the MHCB and expressed general concern about this practice with MHCB patients.  Although the patient's IDTT ended without resolution, leadership subsequently reported that the patient would be referred to acute care, assigned to the MHCB supervisor for care continuity and closer monitoring, and the psychiatrist who issued the RVR and made inappropriate comments during IDTT would no longer treat him.

Regarding MHCB therapeutic groups, recreation therapists facilitated all MHCB therapeutic groups, which occurred in confidential rooms.  These groups included skill-building exercises and leisure activities.  Observed recreation therapy groups were adequate for patients' functional levels and included playing music for patients in the walk-alone yards.  Patients expressed satisfaction with the RT groups and reported generally sufficient out-of-cell time.

Site visit observation revealed that the MHCB adhered to the statewide mechanical restraints or "cuffing" policy.  During escorts, only maximum custody patients were observed with handcuffs, which were promptly removed following patients' placement in TTMs.  The IDTT also confirmed that custody staff considered the IDTT's input about mechanical restraint use for non-maximum custody patients presenting as violent or unpredictable due to mental illness.

Review of Form 114As for ten MHCB patients indicated the offering of at least one shower.  Only one of ten reviewed Form 114As indicated the offering of yard to patients.

MHCB "Acute Care":

CMC operated a temporary acute care unit on the MHCB's B side.  Beds B1 through B12 constituted the acute care unit, while beds B13 through B25 were used as MHCBs.  During the site visit, 11 of the 12 CMC MHCB "Acute Care" beds were occupied.

The acute care unit was largely unchanged since the prior targeted site inspection in July 2021.  Overall, the unit continued to function on an ad hoc basis, providing minimally adequate care to an increasingly challenging patient population.  CMC leadership was not aware of any planned end for this temporary unit.  Leadership and staff reported that a statewide plan to increase salaries for PIP clinical staff did not apply to this acute care unit due to its temporary status.

Staff reported, and the monitor's expert observed, a significantly increased acuity in the acute care patient population, which further taxed staff's ability to stay abreast of the workload, which at times required them to work on scheduled days off.  The unit's clinical staff also continued to be redirected to other treatment areas, especially the MHCB, which staff reported

occurred more frequently in comparison to July 2021.  Staff's dedication was notable, but it appeared that the model was sustainable long-term.

The CMC MHCB "Acute Care" unit received 40 referrals from 13 different referring institutions during the review period.  All referrals, except one from SVSP's intermediate care unit, were from MHCBs. None of the referrals were maximum custody patients; one patient who became maximum custody while in unit was promptly transferred.

CMC offered the acute unit's patients out-of-cell structured treatment activity that ranged from a low average of 16.7 weekly hours in January 2022 to a high average of 22.1 weekly hours in October 2021.

Four acute care patients engaged in 18 self-harm incidents during the review period; one was considered severe, seven were moderate, and ten were minor.  These incidents resulted in the transfer of two patients to an outside hospital and five to an MHCB.

During the site visit, all required staff attended four observed IDTTS.  The IDTTs demonstrated meaningful discussion among team members and with patients and reflected the high-risk, acute nature of the unit's population.  The IDTTs also demonstrated comprehensive case presentations and sufficient treatment planning given that the unit did not use behavioral plans.  Although leadership and staff agreed that behavioral plans could be constructive and clinically appropriate for some of the unit's highly challenging patients, they also believed that a clinician dedicated to developing and implementing behavioral plans was required.

Another observed IDTT for an acute care patient was inadequate due to the lack of collaborative decision making and the treatment team's failure to discuss critical aspects of care, including case conceptualization, diagnosis, and measurable treatment/discharge goals.  The

psychiatrist also did not review all psychiatric medications or provide information regarding medication indications, potential side effects, and adherence.

Four patients attended an observed MHCB acute care treatment group that a recreation therapist facilitated. The group was appropriately run, clinically appropriate, and tailored to patients' ranges of functional levels. All patients actively engaged. One group member on suicide watch was able to attend under the constant supervision of an assigned observer. The group process included the facilitator engaging patients to complete a worksheet titled "Living Our Values." The facilitator spent time with each patient so that they understood the assignment and further supported patients by keeping them focused on the activity.

Interviewed CMC MHCB "Acute Care" patients reported satisfaction with the quality of provided mental health services. They reported helpful daily primary clinician contacts and every other day psychiatry contacts and reported that providers spent adequate time with them. They noted the good group quality but further stated that the program could be enhanced by providing more clinician-led and leisure groups.

Seclusion and Restraint:

CMC reported three restraint incidents involving one patient in the unit. All three incidents lasted less than four hours and complied with Program Guide requirements. There were no seclusion incidents.

CMC's restraint room was a large clean space with a toilet. The seclusion room was also clean. Staff reported that both rooms were rarely used.

CIT:

CMC's CIT LOP was updated annually and was consistent with the statewide CIT policy.

There were 293 referrals to the CIT between October 2021 and February 2022, of which 126 or 43 percent resulted in patients' referrals to the MHCB.

The CIT was composed of two dedicated mental health clinicians, nursing, and custody staff. Each CIT mental health clinician worked three days weekly from 8:00 a.m. to 9:00 p.m.; one clinician worked Sunday through Tuesday and the other worked Wednesday through Friday. MHCB clinicians covered the CIT on Saturday from 7:00 a.m. to 5:00 p.m. On-call psychiatry staff covered after-hours crises. Notably, the regional telepsychiatrist was called first; if this clinician could not be reached, the on-call CMC psychiatrist was utilized.

When a crisis occurred during coverage hours, the CIT was activated by way of radio. Specifically, central control contacted the CIT mental health clinician and duty nurse to provide the location of the emergency. The CIT clinician then called the unit's sergeant or lieutenant to identify the patient in crisis and researched the patient's chart. The CIT clinician, nursing, and custody then met as a team unit and reviewed the referral. The clinical team then confidentially assessed the patient and referred the patient to the appropriate setting.

The monitor's expert interviewed a CIT supervisor and mental health clinician. The clinician reported spending a significant amount of time in administrative segregation deescalating situations that were often unrelated to acute mental health symptoms. She elaborated that patients used the CIT as a tool to bring attention to their concerns when they felt they were not being heard by custody, and that property concerns were an overwhelming factor influencing CIT activation. The CIT clinician nonetheless reported that the CIT had helped to reduce MHCB admissions. Overall, mental health clinicians and staff reported that the CIT had been a significant benefit to all CMC staff. However, despite policy requiring that a supervising psych tech or other nursing supervisor perform CIT contacts, reviewed healthcare records

revealed that CMC repeatedly used line staff psych techs for CIT contacts.  Reviewed CIT notes also repeatedly failed to include the custody representative's title, making it difficult to determine compliance with CIT policy.

Alternative Housing:

CMC's alternative housing LOP was current, consistent with the institution's practice, and correctly identified the cells used for alternative housing.  Six single, suicide-resistant cells in Facility D, building 7 were primarily utilized for alternative housing.  If all six cells were full, the unit's remaining 38 cells were used for alternative housing.

CMC reported 472 alternative housing placements during the review period.  Stays averaged 4.3 hours.

EOP:

CMC operated 550 mainline EOP beds on Facility D in buildings 7 and 8.  The mainline EOP patients were primarily Level II and III.

Two of four EOP psychiatrists had 130 and 132 patient caseloads, exceeding the established ratio.  Fifteen EOP primary clinicians also exceeded the established ratio with caseloads between 27 and 31 patients.

Nineteen EOP patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

Three of five or 60 percent of patients had required initial psychiatry evaluations prior to the initial IDTT and within 14 calendar days of arrival.  One patient did not receive an initial psychiatric contact.  Telepsychiatry did not conduct any initial psychiatry contacts.  Seventy-five percent were conducted confidentially.  Fifty-six of 77 or 73 percent of routine psychiatry contacts timely occurred within 30 days.  None were conducted by telepsychiatry.

Four of five initial primary clinician contacts timely occurred within 14 calendar days of arrival. Eighty percent were confidential. Fifty-four of 61 or 89 percent of routine primary clinician contacts were timely; 86 percent were conducted confidentially.

Three of five initial IDTTs timely occurred within 14 calendar days. Required staff attended 100 percent; patients attended 80 percent. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this assignment was not clearly discernable for all cases.

Seven of 18 or 39 percent of routine IDTTs timely occurred within 90 days. Required staff attended 100 percent; patients attended 73 percent. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this assignment was not clearly discernable for all cases.

During the review period, CMC offered EOP patients an average of 4.5 weekly hours of structured therapeutic activity. Patients attended 3.5 hours and refused one hour.

Eight observed IDTTs were attended by the EOP supervisor, psychiatrist, PC, nursing, and correctional counselor. The attending psychiatrist was the patient's assigned provider. All IDTT members used laptops. The IDTTs demonstrated collaborative discussions and treatment planning processes. All IDTT members actively participated, except for the correctional counselor, whose participation was limited to the patient's disciplinary review status. The IDTTs exhibited consistent agreement among the EOP supervisor, psychiatrist, primary clinician, and patient on case conceptualization, diagnoses, level of care, and medication considerations. Goals, objectives, and interventions were generally appropriate, measurable, and clearly stated.

CMC leadership reported that, although the facility had adequate EOP group treatment space, social distancing requirements resulted in smaller group sizes, while staffing limitations prevented CMC from offering adequate group hours.  Inadequate staffing also resulted in limitations in CMC's ability to cover group facilitators' absences, often resulting in the cancellation of treatment groups.  CMC offered overtime on weekends and holidays to attempt to increase group hours.

Three patients attended an observed cognitive behavioral therapy (CBT) skills group focusing on depression management.  The group was well-run and clinically appropriate, with active patient engagement.

An observed managing mental illness group co-facilitated by the primary facilitator and a psychiatrist provided psychoeducation on psychotropic medications, including how medications worked, as well as symptoms and side effects.  The group was well-run and clinically appropriate, with active engagement by the group's ten participants.

Three interviewed patients who had participated in the managing mental illness group reported seeing their primary clinician weekly and that another clinician saw them if their PC was unavailable.  They reported monthly psychiatry contacts, confidential individual contacts, and timely quarterly IDTTs.  However, patients also reported that groups had been "nonexistent since May 2020;" one patient stated that the managing mental illness group was the first group he had attended in two years.  Patients further reported receiving very few treatment hours.  They elaborated that the strengths of the mental health program were the timely and good quality psychiatry and PC contacts, and IDTTs.  They believed that most clinicians were caring and tried very hard to provide good treatment.  They nonetheless added that custody ran mental health and often retaliated against patients when they complained, or mental health provided treatment that

custody staff disagreed with.  All three patients expressed fear that they would face some level of custody retaliation for agreeing to be interviewed by the monitor's expert.

Other individually interviewed EOP patients all reported timely psychiatry and PC contacts and timely IDTTs.  They indicated benefitting from CMC's mental health programming and offered positive feedback about mental health clinicians and staff.  However, these patients also reported difficulties with custody, including retaliation against patients who reported abuses, attempting to influence patients' level of care, interference with group access, and physical and mental patient abuse.  All patients who openly participated in these individual interviews expressed fears of custody reprisals.

Custody and clinical staff facilitated ten observed EOP patient Unit Classification Committee (UCC) meetings.  Each UCC was approximately three to five minutes in duration.  During the UCCs, the captain, correctional counselors, psychiatrist, and mental health supervisor typically participated and engaged with patients.  All patients were queried about conversations that had occurred during the week prior to the UCC in preparation for the current meeting and whether they had been provided information about PREA, and had met their PC, among other matters.  None of the patients appeared surprised by the UCC's presentations or outcomes.

CMC leadership reported that EOP patients on quarantine status were offered timely out-of-cell contacts with psychiatry and primary clinicians, but the contacts were not always confidential.  Quarantined patients were also provided with daily in-cell materials, including magazines, books, and activity packets.

CMC used extension cords to provide power for electrical appliances for 50 Facility D EOP cells that lacked electricity.  Although leadership reported submitting work orders and written requests on multiple occasions to headquarters to install electrical outlets in these cells,

as well as for EOP hub cells, headquarters repeatedly denied them.  Leadership further reported that when they had attempted to rewire the unit using local staff, they had been instructed to stop.

    <u>3CMS</u>:

In the 3CMS program, three on-site psychiatrists had caseloads within the established ratio.  All five 3CMS primary clinicians had caseloads ranging from 106 to 183 patients, which exceeded the established ratio.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Four of six or 67 percent of patients had timely initial psychiatric evaluations prior to the initial IDTT; all four were confidential.  Two initial psychiatry evaluations did not occur.  Telepsychiatry conducted one initial psychiatry contact.

Twenty of 25 routine psychiatry contacts timely occurred within 90 days; 97 percent were confidential.  Telepsychiatry conducted 50 percent of routine psychiatry contacts.

Two of six or 33 percent of patients had timely initial primary clinician evaluations.  Both were confidential.  Thirteen of 23 of 57 percent of routine primary clinician contacts timely occurred within 90 days; 94 percent were confidential.

One of six or 17 percent of initial IDTTs timely occurred within 14 working days.  One of nine or 11 percent of routine IDTTs occurred annually.  Required staff attended 100 percent of initial and routine IDTTs.  Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this assignment was not always clearly discernable.

Staff and patients reported that, since the beginning of 2020, groups had not been provided for 3CMS patients.

Observed IDTTs on A Quad were negatively impacted by computer connectivity issues. As a result, the psychiatrist could not look up medications, and the primary clinician and CC I could not access patients' treatment plans and SOMS, respectively. The IDTTs were nonetheless adequate. The treatment team was aware of patients' goals, medications, and custody status, and sufficiently discussed next steps and patients' progress or lack thereof.

Three different clinicians conducted observed IDTTs on C Quad. All required assigned staff personally attended and exhibited professional, informative, and collaborative interaction. PCs introduced team members to patients. Two of the PCs adequately conducted the IDTTs, providing meaningful case conceptualizations that reflected relevant biopsychosocial history, maladaptive behaviors, treatment plans, goals, and interventions. The third PC presenter was difficult to follow and failed to engage patients.

The supervising senior psychologist specialist, PC, telepsychiatrist, medical assistant, and the CC I attended well-conducted IDTTs on West Facility. The treatment team was familiar with patients, and the IDTTs reflected supportive treatment team interaction and appropriate engagement with other team members and patients. The IDTTs did not reflect any issues with differing diagnoses between the PC and telepsychiatrist or agreement on patients' level of care. The PC also clarified diagnoses, interventions, and goals, which were appropriately changed after discussions of coping skills, medication compliance, and custody input.

There was good connectivity for these West facility IDTTs utilizing telepsychiatry. Further, patients knew the telepsychiatrist, who had worked at CMC for over 12 years. However, it was unclear how long the telepsychiatrist had been utilized in this capacity, and whether this clinician had previously worked on-site. The telepsychiatrist also had a long-standing relationship with the medical assistant.

The West facility telepsychiatrist worked from home and not from a hub. The telepsychiatrist reported directly to the headquarters' psychiatrist specialist with a dotted line to CMC's chief psychiatrist.

Interviewed patients on A and C Quads, and the West Facility, reported good mental health treatment. A Quad patients indicated timely psychiatry and PC contacts. West facility patients reported satisfaction with telepsychiatry. C Quad patients reported wanting more groups and other activities. West facility patients complained about long pill lines and the lack of groups. A and C Quad patients further reported that custody officers were rude and disrespectful; West facility patients did not report any custody complaints.

Other Issues:

Pre-Release Planning:

There were 1.5 clinical social workers who were assigned to pre-release planning. The 0.5 position also provided support services for clinicians conducting PC 2602 involuntary medication orders.

CMC described several challenges with pre-release services due to staffing vacancies and the pandemic. The full-time pre-release coordinator had been on extended leave for most of the review period but had returned to the institution in January 2022. The Transitional Case Management Program (TCMP) caseworker positions were vacant and remained so through the site visit. As such, TCMP staff from KVSP assisted with CMC's pre-release responsibilities. The CMC pre-release coordinator reported limited contact and collaboration with TCMP staff about patients. Information about benefits applications for patients scheduled for release was thus unavailable to CMC staff.

CMC restarted EOP pre-release groups in April 2022. Previously, the last such group had occurred pre-COVID. There were no pre-release groups for 3CMS patients.

During the site visit, CMC staff reported there were 55 patients scheduled for release, of whom the pre-release coordinator or PC had completed pre-release planning assessments for 53. Twelve of 14 patients pending release to probation had completed release of information (ROI).

The pre-release coordinators participated in several meetings and activities, including weekly ISUDT pre-release meetings and monthly headquarters' pre-release meetings. The pre-release coordinator also worked with the parole services administrator to identify appropriate housing for parolees.

Program Access:

a. Jobs and Program Assignments

On March 4, 2022, CMC's 1,655 job assignments were held by 246 EOP patients, representing 42 percent of the EOP population, 330 3CMS patients, representing 49 percent of the 3CMS population, and 1,079 non-MHSDS inmates, reflecting 55 percent of the non-mental health caseload population.

The 896 academic assignments were held by 152 or 26 percent of EOP patients, 226 or 33 percent of 3CMS patients, and 518 or 26 percent of the non-MHSDS population.

The 570 voluntary education assignments were held by 49 or eight percent of EOP patients, 108 or 16 percent of 3CMS patients, and 413 or 21 percent of non-MHSDS inmates.

Of the 334 vocational education assignments, 32, or five percent, were held by EOP patients, 91, or 13 percent, were held by 3CMS patients, and 211, or 11 percent, were held by non-MHSDS inmates.

CMC did not report any substance abuse treatment assignments.

b. Milestone Credits

Reports for October 1, 2021, through March 31, 2022, indicated that 560 of 587 or 95 percent of EOP patients were eligible to earn milestone credits; 60 percent earned the credit. Of the 676 3CMS patients, 662, or 98 percent, were eligible to earn milestone credits; 17 percent earned the credit. For non-MHSDS patients, 1,928 of 1,957, or 99 percent, were eligible to earn milestone credits, with 23 percent earning the credit.

c. Out-of-Level Housing

On March 28, 2022, 12 EOP and 17 3CMS custody Level I patients were in Level II housing. There were four EOP and six 3CMS custody Level I patients in Level III housing. Eighty-two EOP and 100 3CMS custody Level II patients were in Level III housing. There were also 34 EOP and 42 3CMS custody Level IV patients in Level III housing.

d. ADA Reasonable Accommodations and Grievance Procedure

CMC provided training rosters and attendance sheets reflecting compliance with implementation of ADA accommodations and grievance procedures to accommodate psychiatric disabilities.

Case-by-Case Reviews:

CMC provided reports for all months of the review period reflecting patients who were reviewed pursuant to the long-term case conference requirement. These monthly reports revealed that the number of such patients ranged from six to 15 with lengths of stay ranging from 150 to more than 300 days. Justifications for retaining patients in administrative segregation housing were typically due to pending RVRs, decisions from the district attorney, or pending patient transfers. Reviewed ICC actions were determined to be in compliance as patients were referred for transfer or released from administrative segregation pursuant to CDCR policy.

"C" Status:

At the time of the site visit, CMC reported that there were three EOP and nine 3CMS patients on "C" status after it was determined that they were program failures.

Mental Health Referrals:

During the review period, CMC reported 1,902 mental health referrals; there were 345 psychiatry referrals and 1,557 referrals to primary clinicians. For the 353 emergent referrals, there was 100 percent compliance for timely responding to all 14 psychiatry referrals and 96 percent compliance for timely responding to 326 of 339 primary clinician referrals. For the 228 urgent referrals, there was 94 percent compliance for timely responding to 17 of 18 psychiatry referrals and 96 percent compliance for timely responding to 201 of 210 primary clinician referrals. For the 1,321 routine referrals, there was 96 percent compliance for responding to both 301 of 313 psychiatry referrals and 965 of 1,008 primary clinician contacts.

Further, housing unit custody officers were generally familiar with the mental health referral process for reporting patient mental health concerns. All toured units had current copies of the CDCR 128 MH-5 referral form.

Treatment Space:

CMC's CTC had adequate confidential treatment space for MHCB and MHCB "Acute Care" patients. Many clinicians nonetheless expressed concern with the non-contact interview rooms intended for individual contacts. Leadership explained that MHCB and "Acute Care" clinicians preferred group rooms over non-contact rooms for individual contacts due to ongoing microphone issues and the plexiglass barrier that compromised effective therapeutic interaction.

The CTC had four group treatment rooms with TTMs that were used for both maximum and non-maximum custody patients. Leadership reported placing non-maximum custody patients in TTMs at the onset of the pandemic to "prevent the spread of germs."

The CTC had eight outdoor walk alone yards. Staff further reported that the unit's lack of a dayroom was a significant obstacle to establishing both an acute care inpatient therapeutic milieu and an incentive program for patients.

MLEOP treatment space included 31 offices for confidential individual contacts. There were also ten small group treatment rooms; four had dividers that could be opened to create two large group rooms.

Custody and Mental Health Partnership Plan:

CMC's CMHPP LOP was current and in compliance with headquarters' Partnership Plan.

Seven reviewed executive leadership joint rounding forms reflected discussions with staff and patients. Issues raised by staff included security concerns, occasional conflicts between patients' mental health appointments and school and work, staffing shortages, and programming impacts due to COVID-19 lockdowns. Staff also reported a good working relationship between mental health and custody. Patients reported long medication lines, and program impacts due to COVID-19 lockdowns, but indicated receiving ducats and timely mental health appointments.

Executive staff meetings addressed the findings from executive leadership joint rounding. Five months of meeting minutes from the quality management committee and mental health subcommittee revealed references to executive joint rounding.

The monitor reviewed second and third watch huddle reports from April 2022 for the MHCB, EOP hub, and mainline EOP. All huddle reports documented attendance by required staff and reflected pertinent notations about patients. During huddles, staff discussed new

arrivals, patients refusing medications, groups and other mental health appointments, and patients receiving bad news, among other matters.

All required disciplines attended an observed huddle for MHCB and "Acute Care" patients. The huddle was adequate and collaborative and included a meaningful exchange of information about patients, programming, and staffing.

All required staff attended an observed MHCB huddle. However, custody staff only participated when questioned. The huddle addressed relevant patient information and significant physical plant concerns, including the lack of hot water and broken cell windows.

Nine participants, including two custody officers and seven mental health and medical clinicians, attended an observed EOP huddle. The mental health supervisor facilitated the huddle, which addressed new arrivals, transfers, other significant updates, treatment planning, and patient interventions.

Reviewed documentation of weekly 3CMS supervisory meetings between the 3CMS program supervisor and the custody sergeant demonstrated all required facilities' conduct of such meetings, except for Facility A during October, November, and three of four weeks during December 2021.

Documentation of monthly joint supervisory 3CMS program area tours was thorough, and noted discussions with staff and patients. During the monthly tours, staff reported a good mental health/custody working relationship but also reported that COVID-19 lockdowns had impacted program access. Patients reported helpful mental health and custody staff but also indicated a long walk to attend mental health appointments.

CMC provided a copy of the 3CMS orientation brochure in English.

Reportedly due to COVID-19 precautions, CMC did not provide EOP orientation groups.

As for IAC meetings, CMC provided either meeting minutes or a memorandum that explained why the meetings were not held. They were held for three months each on East and West facilities. However, the IAC meeting minutes did not report mental health agenda items even though mental health staff attended all IAC meetings.

Patients filed 12 staff complaints against five RNs, four licensed vocational nurses (LVNs), and three psych techs. There were nine allegations of unprofessional behavior, one alleging PREA concerns, a medication distribution concern, and discrimination. As of the site visit, two complaints had found policy violations by staff, one was referred for further investigation, three were pending resolution, and six were determined not to involve policy violations. The complaint referred for investigation involved PREA. No staff was reassigned due to staff complaints.

Due to COVID-19 precautions, CMC did not provide quarterly round table training during the fourth quarter of 2021 or the first quarter of 2022.

CMC reported 100 percent attendance by the chief deputy warden, correctional administrators, captains, and lieutenants at the annual off-post partnership training and 99 percent attendance by sergeants and correctional officers. For mental health staff, there was 100 percent attendance by the chief psychologist, CEO, and staff psychiatrists. Ninety-seven percent of psychologists attended the training, as did 93 percent of social workers.

Heat Plan:

CMC's heat plan LOP complied with headquarters' heat plan directive.

Except for October 2021, the reporting period fell outside of the heat season. There were no reported heat alerts during the review period.

Interviewed housing unit correctional officers had general knowledge of the heat plan and its respective stages.

The monitor was concerned about the location of thermometers that recorded the temperatures in the housing units. Each housing unit contained several floors, and the thermometers were placed at the custody officers' station at the top of the staircase at each level and not in the residential areas. In administrative segregation, the thermometer was only located at the officer's station on the housing unit's third floor and not on any other levels. However, all mental health patients were housed on the first and second floors of administrative segregation. The thermometers were also antiquated mercury thermometers.

RVRs:

The required RVR training was attended by the five correctional administrators, seven captains, 30 of 31 or 97 percent of lieutenants, and 78 of 84 or 93 percent of sergeants. The training was also attended by both mental health chiefs, 13 mental health supervisors, and 33 psychologists.

CMC issued 1,031 RVRs during the review period. Ten RVRs were issued to acute care patients, 13 to intermediate care patients, 49 to MHCB patients, 202 to EOP patients, and 307 to 3CMS patients. The remaining 450 RVRs were issued to non-MHSDS patients.

Of 22 RVRs that the monitor reviewed, custody staff timely referred the RVR to mental health staff in six or 27 percent of cases. Mental health staff completed the mental health assessment and timely returned it to custody in 21 or 95 percent of cases. Mental health clinicians confidentially conducted the assessment interview in 12 or 55 percent of cases; the patient refused the assessment interview or declined a confidential setting in the ten remaining

cases. In accordance with policy, CMC assigned a staff assistant for patients for all 22 reviewed RVRs.

The SHO documented consideration of the mental health assessment for all 22 reviewed RVRs. The mental health assessment recommended penalty mitigation in 12 cases, which the SHO documented.

In four reviewed RVR mental health assessments, the clinician recommended documenting the patients' behaviors in an alternative manner due to mental illness strongly influencing the behavior. Nonetheless, for all four RVRs, the captain held a disciplinary hearing. The justifications for proceeding to hearings included the infraction's serious nature, the need to hold the patient accountable, the patient's admission of wrongdoing, and the patient's history of violent acts. All four hearings found the patients guilty and assessed respective credit losses of 31 days, 90 days, and in two incidents, 121 days. The monitor noted that in all four cases, the patients' mental illness strongly influenced their behaviors and could have been documented in an alternative manner.

The monitor also reviewed two ICC actions for SHU term assessments and the ICCs' consideration of mental health assessments. Both reviewed ICC actions were part of the monitor's RVR review discussed above, where mental health assessments recommended alternative discipline and mitigation of time spent in segregation due to mental illness strongly influencing the patients' behavior. In both RVRs, the ICC mitigated the SHU terms in part due to patients' mental health. Both patients had been in segregated housing for months by the time of the ICC and would be retained in segregation and sent to the LTRH or PSU to serve the SHU term.

<u>Use of Force</u>:

CMC reported completion of use of force training by the warden and chief deputy warden, by five of seven or 72 percent of captains, 30 of 31 or 97 percent of lieutenants, 83 of 84 or 99 percent of sergeants, and 679 of 711 or 95 percent of correctional counselors.  CMC did not provide training data for correctional administrators.  As for mental health staff's attendance at use of force training, CMC reported that it was attended by both chiefs, 13 supervisors, 33 psychologists, 38 psychiatrist nurse practitioners, 14 social workers, 12 nurses, and by eight of ten psychiatrists.

There was no reported controlled use of force incidents.  Forty-two of 55 or 76 percent of immediate use of force incidents involved MHSDS patients.  There was also 109 non-use of force incidents, of which 78 or 72 percent involved mental health caseload patients.

The monitor's review of five immediate use of force incidents found all to be in compliance with applicable policy.

No use of force was required to administer involuntary medications.

<u>Lockdowns/Modified Programs</u>:

All four PSRs during the review period were due to COVID-19 mitigation efforts.  Despite the PSRs, mental health ducats were honored, with patients being escorted to their appointments.  The first PSR occurred on November 5, 2021, lasted three days and only applied to Facility A's housing unit 2.  The second PSR dated December 6, 2021, was also for three days and only affected Facility E's dormitory 1.  CDCR headquarters ordered the third PSR, which was in effect from January 9 through February 13, 2022.  The fourth PSR, due to local COVID-19 mitigation efforts, was in effect from February 14 through April 2022.

<u>Access to Care</u>:

A review of CMC's monthly Health Care Access Quality Reports from October 2021 through March 2022 indicated that five percent of non-completed mental health ducats and add-on appointments were not completed due to custody factors.  Further, 29 percent of the non-completed appointments were due to patient refusals; 66 percent were due to non-custody factors.

<u>Placement of 3CMS Patients into Minimum Support Facilities</u>:

During the review period, CMC placed six 3CMS patients in Minimum Support Facilities.  None returned to a non-MSF facility, and none had a HLOC change; one patient's level of care changed from 3CMS to non-MHSDS.

<u>*Coleman* Postings</u>:

*Coleman* postings were observed in English and Spanish in locations visible to patients in all toured housing units, including administrative segregation and the MHCB.

**APPENDIX B-4**
**CALIFORNIA INSTITUTION FOR WOMEN (CIW)**
**(September 15, 2021 – September 15, 2021)**
**Review Period: (February 1, 2021 – July 31, 2021)**

**Census:**

On September 15, 2021, CIW housed 957 incarcerated persons, which was 37 percent less than what was reported during the prior site visit in November 2019. Notably, CIW's significant decrease in its patient population was the result of early patient releases and a complete stoppage of patient transfers to the institution for approximately one year due to COVID-19; patient transfers to CIW had only recently resumed.

The mental health caseload population of 515 patients was 54 percent of CIW's total patient population. Eight patients were in the MHCB. There were 44 EOP patients, including 34 in the mainline, four in the EOP administrative segregation hub, and six in the PSU. There were 454 mainline 3CMS patients, three in STRH, and six in LTRH.

Staffing:

The chief psychiatrist position was filled. The 0.5 senior psychiatrist position was vacant. Three of seven civil service psychiatry positions were filled, for a 57 percent vacancy rate. Three psychiatrists were limited-term. The use of 3.76 contractors reduced the psychiatry functional vacancy rate to three percent.

Both chief psychologist positions were filled; one chief psychologist was designated as the chief of mental health. Two senior psychologist supervisors covered 1.5 established positions, but a 0.5 position was filled limited-term. Three of 3.5 senior psychologist specialist positions were filled for a 14 percent vacancy rate; two of these positions were filled limited-term. The use of 1.5 registry senior psychologist specialists provided additional staff. All 16.5

psychology positions were filled; one registry psychologist provided additional coverage. One civil service psychologist was unlicensed; two were limited-term.

One supervising social worker covered the 0.5 established position. Eight civil service social workers covered the seven allocated social worker positions. All social workers were licensed; one was limited-term.

Seven civil service recreation therapists filled the 6.5 allocated positions; one was filled limited-term.

All 20 registered nurse positions were filled.

All 12 senior psych tech positions were filled. Seventy-one of 76 psych tech positions were filled, for a seven percent vacancy rate.

The CHSA II position was vacant. The institution had one registry Health Program Specialist II (HPS II) and one registry staff services analyst general. The 0.5 OSS II position was vacant. The HPS I position was filled.

All nine office technician positions were filled.

Telepsychiatry:

CIW did not use telepsychiatry during the review period.

Quality Management:

Consistent with the preceding monitoring round, CIW had an active quality management program in place during the review period.

The local governing body met monthly during the review period and achieved a quorum at each meeting. During meetings, the local governing body considered and granted privileges to health care practitioners and discussed proposed updates and amendments to policies and procedures.

The QMC met monthly and achieved quorums at 100 percent of meetings. During the review period, the MHPS was included on the QMC agendas in February and May 2021. During QMC meetings, the MHPS provided updates regarding several quality improvement projects. Mental health performance reports were also reviewed, and updates regarding the institution-wide PIWP and SPRFIT activities were presented.

The MHPS met monthly and achieved a quorum at each meeting. Each meeting agenda included three broad categories of discussion: systems surveillance, PIWP projects, and review of surveys/audits.

Aside from launching the PIP's SPRFIT, the institution did not charter any quality improvement teams (QITs) or FITs during the reporting period.

Peer review for outpatient providers was reportedly on hold throughout the review period. Clinicians who provided services to the inpatient programs (psychiatry and psychology) were subject to their respective peer review committees. During the review period, eight psychologists were peer reviewed. Overall scores for each area reviewed reportedly exceeded 90 percent compliance. None of the reviews indicated a need for follow-up training or intervention.

Psychiatry peer review for the inpatient program consisted of 14 psychiatry providers. Initial psychiatry assessments, routine psychiatry progress notes, and psychiatry consult documentation was reviewed. Overall compliance for psychiatry peer review was reported to be 93 percent.

Medication Management:

CIW provided MAPIP results for February through July 2021 regarding compliance for psychiatric diagnostic monitoring and medication management.

278

The medication management dashboard for the period showed that for patients prescribed antidepressants, venlafaxine blood pressure and thyroid monitoring measurements were compliant for all six months of the review period.  EKGs were compliant for the one required month.  Medication consent was compliant for two of six months.

Diagnostic data for patients prescribed atypical antipsychotics showed that measurements for blood pressure, blood sugar, height and weight, and thyroid monitoring were compliant for all six months.  EKG measurements were compliant for three months during the review period. Medication consent was compliant for three months and AIMS tests were compliant for one of the six months.  Diagnostic monitoring of CBC with platelets and CMP were compliant for two of the six months of the review period.  Lipid monitoring was noncompliant throughout the review period.

Psychiatric measures for CIW patients who were prescribed carbamazepine indicated that level monitoring and CBC diagnostic monitoring were compliant for three of six months.  CMP indicated compliance for four of six months.  Medication consent was compliant for four months; none was required during the other two months.

Data presented for clozapine diagnostic measures indicated that blood pressure, blood sugar, CBC, height, and weight were compliant for all six months of the review period.  CMP was compliant for four of five required months.  Lipid monitoring was compliant for all five required months.  EKGs were compliant for five months; no EKGs regarding clozapine were required for one month.  Medication consent was compliant for four months and no consents for clozapine were required for two months.  Thyroid monitoring was compliant for all three required months.

Psychiatric diagnostic measures for patients prescribed Depakote were compliant for medication consent for all six months of the review period. CBC with platelets was compliant for four of six months. Depakote levels measurements were compliant for three months and noncompliant for three months. CMP measurements were also compliant for three months and noncompliant for three months.

For lamotrigine, CIW was compliant with medication consent for four of five required months.

Regarding data for diagnostic measures for patients prescribed lithium, CIW indicated that medication consent was compliant for five of six months; thyroid monitoring was compliant for four of six months. Testing of lithium levels was compliant for two months and noncompliant for four months; testing for Creatine and BUN (kidney function tests) were compliant for four of six months; and EKG tests were compliant for three of four required months.

Multiple MAPIP mental health medication measures indicated that CIW compliance had improved since the prior review period. Observation of the preparation and administration of HS and AM/PM medications, new psychiatric medication orders, continuity of nurse-administered (N/A)/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity following discharge from the community hospital or acute or intermediate care, and psychiatric-prescribed chronic care medications were compliant for all six months of the review period. CIW reported that MAPIP erroneously reported that medication continuity for court-ordered involuntary medications was not compliant during the review period due to an EHRS error; however, a manual audit documented 100 percent compliance with this measure.

Medication continuity upon inter-institutional transfer at R&R was compliant for three of six months.  Medication continuity for MHCB transfers was compliant for four months.  CIW reported that medication continuity for parole or release to the community and intra-institutional transfers to ASU/SHU/PSU was compliant for five of six months.

CIW submitted a performance improvement plan to improve medication management processes through improved EHRS notifications, staff training, and additional leadership efforts. CIW did not provide either CAPs or performance improvement plans for each measure that scored below 90 percent as requested.

There was a 30-day order limit for psychotropic medications in the MHCB and PIP.  In all other outpatient areas, psychotropic medications were ordered for 60 to 90 days.  Bridge orders were prescribed for a maximum of 30 days.  Nursing conducted telephone and verbal orders only after regular business hours.  Psychiatry signature was required for telephone and verbal orders on the following business day.

Pursuant to a September 5, 2019, memorandum from headquarters, the chief and senior psychiatrists were no longer required to approve non-formulary psychotropic medication requests.  Non-formulary medications were reviewed during the monthly pharmacy and therapeutics (P&T) meetings.  From August 2018 to August 2019, CIW non-formulary medication prescriptions dropped from 13.9 to 7.7 percent.

Of the 210 patients who required a polypharmacy review during the reporting period, 180 were *Coleman* class members.

CIW's clozapine policy was comprehensive.  CIW did not provide the number of patients who were prescribed clozapine.

Over 100 CIW patients were prescribed DOT SSRIs by psychiatrists. Additionally, three patients were prescribed KOP SSRIs, and 46 patients were prescribed DOT SSRIs by medical providers.

From November 5, 2018 through October 22, 2019, there were 40 PC 2602 involuntary medication orders, including 23 emergent and 17 non-emergent orders. Thirteen petitions were denied, not renewed, expired, or rescinded during the review period. The PC 2602 involuntary medication tracking was conducted weekly.

CIW did not track whether psychiatrists scheduled and met with all medication nonadherent patients pursuant to policy during the review period. The change of location for the administration of long-acting injectable medications from the medical clinic to a room at the pill window resulted in poor adherence as the patients were not ducated for the pill line. In response, CIW authorized patients with passes for work, school, etc. to use the same passes to receive their injectable medications during pill lines.

Transfers:

CIW had two sustainability reviews during the review period; there was one major review during the first quarter and one minor review during the second quarter. The first quarter review was completed as a hybrid review with remote and on-site components due to COVID-19 (March 1 - 5, 2021), while the minor review conducted during the second quarter included only on-site review (June 8 - 10, 2021). The major review covered the period of October 1 through December 31, 2020. The *review* occurred during the first quarter of 2021, but the *data* was from the fourth quarter of 2020. The minor review covered the period of January 1 through March 31, 2021.

As for documentation quality, both the major and minor reviews found CIW to be compliant but continued to have some difficulty with documentation of consideration for higher levels of care and alternative treatment modalities for non-referred patients. This was consistent with the monitor's expert's review of patient records. While the numbers demonstrated increased accuracy and sufficient clinical detail, there remained several staff who continued to complete the HLOC form inaccurately or incompletely. The sustainable process reviews identified that CIW also failed to indicate when a patient met multiple indicators for referral to a HLOC. Based on the findings of a small sample reviewed by the monitor's expert, CIW mental health treatment teams also continued to underutilize subjective considerations in the HLOC process.

There were 13 referrals to acute care during the review period; one was rescinded, and one was rejected and re-referred to intermediate care. Three *Vitek* hearings were completed; no patients prevailed. All patients transferred within ten days of referral. All patients were admitted on the same day as accepted and well within 72 hours of acceptance.

For intermediate care, CIW referred four patients; one was rejected for not meeting the minimum criteria for intermediate care admission. Two *Vitek* hearings were completed; no patients prevailed. All patients transferred within 30 days of referral. All patients were transferred within 72 hours of endorsement; patients moved the same day.

As of September 13, 2021, one patient was accepted and waiting transfer to DSH-Patton. She had been waiting 20 days.

There were 76 non-referrals for 46 patients during the review period.

CIW had an EOP; consequently, there were no delays in transferring EOP patients.

During the review period, CIW changed 21 patients' level of care from EOP to 3CMS. Of those, two patients returned to a HLOC.

During the reporting period, there were 15 PSU placements for eight patients. All placements occurred within 60 days, except one who had an MHCB admission prior to placement. The total average length of stay in the PSU was 25 days, with a range of 3.9 to 376.8 days.

CIW operated an EOP hub and placed 14 patients in the EOP hub during the review period with no placement delays. No patients were pending transfer to the EOP hub during the site visit.

There were 15 patients placed in LTRH at CIW during the review period. There were no delays in placement. The average length of stay for these patients was 28 days, with a range of 5.8 to 105.1 days.

There were 44 patients placed in STRH during the review period. There were no placement delays. The average length of stay for these patients at the time of reporting was 32.7 days, with a range of one to 137.6 days.

CIW made 61 MHCB referrals during the reporting period. All except one patient were admitted to CIW's MHCB; one patient was admitted to the MHCB at CCWF. Three patients' referrals were rescinded. There were no rejections. All patients were admitted to the MHCB within 24 hours of referral, except for one patient who was transferred to an outside hospital for medical treatment. Three patients were admitted to the MHCB three times during the review period.

During the reporting period, there were 100 admissions to the MHCB. The average clinical length of stay was 7.6 days. Two patients had clinical stays longer than ten days, with

one patient staying 12 days and the other patient staying 16 days.  An additional patient had a length of stay of 35 days; however, she was sent to a community hospital during that time.  Nine patients or nine percent took longer than 72 hours to physically discharge from the MHCB during the review period.  These patients took an average of 140 hours (six days) with a range of 73 to 192 hours (eight days) to physically discharge.

The average daily census during the review period was reported as 1.36 patients for February, 3.77 patients for March, 7.05 patients for April, 4.67 patients for May, 6.07 patients for July, and 3.13 patients for July.

CIW's inpatient coordinator was notified approximately one week prior to the patients' discharge from DSH-Patton.  Locally, the PIP treatment team directly communicated with the outpatient treatment team at CIW prior to discharge.  There were no problems identified with communication at the time of discharge.

Programming:

MHSDS Patients in Administrative Segregation:

Psychiatric Services Unit (PSU) and EOP Hub:

CIW's PSU and EOP hub patients were housed together in the PSU unit throughout the review period.  CIW explained that housing the PSU and EOP hub patients together in one unit allowed for combined EOP level of care programming while the census remained low for both populations.

Based on the census during the site visit, psychiatrists and psychologists assigned to the administrative segregation EOP hub and PSU all had caseloads within established staffing ratios.

There were four patients in the EOP Hub at the start of the site visit; all patient records were reviewed to assess compliance with Program Guide requirements for clinical contacts.

All four EOP Hub patients required initial psychiatric assessments and 100 percent were timely as they occurred before the initial IDTT.  None of the four patients were in the EOP hub long enough to be seen for a routine contact during the review dates.  However, one patient was seen for a routine contact by psychiatry, after the initial assessment.  The contact was compliant for timeliness but was held at cell front and was not confidential

All four cases required initial primary clinician contacts; all or 100 percent occurred before the IDTT and were assessed as compliant.  All four patients were in the EOP hub long enough to be seen for a routine contact during the review dates.  For these patients, all required routine contacts occurred every seven days and were deemed compliant.  However, of the twelve PC contacts reviewed only two, or 17 percent, were noted to have occurred in a confidential setting.

All patients required an initial IDTT, and all four, or 100 percent, occurred within 14 calendar days and were timely.  The patients attended two of the four IDTTs reviewed, and for the remaining two IDTTs, the patients were either not in attendance or their attendance was not recorded, resulting in a 50 percent compliance rate.  As all patients were new to the EOP Hub at the time of the review, routine IDTTs were not yet due.

Required attendees were present 100 percent of the time for initial IDTTs.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician; however, assignment was not clearly documented nor consistently discernable.

Six PSU patients from the PSU roster were assessed for compliance with timeliness of initial and routine psychiatric contacts.  Regarding initial psychiatrist contacts, 83 percent were timely as they occurred before the IDTT.  The six patients in the sample were in PSU long enough to be seen for a routine psychiatry contact during the review dates and 100 percent

occurred every 30 days and were deemed compliant. For initial PC contacts, 83 percent occurred before the initial IDTT and were assessed as compliant. All six patients in the sample were in the PSU long enough to be seen for a routine contact during the review dates; 92 percent occurred every seven days and were deemed compliant.

All six patients required an initial IDTT; 100 percent occurred within 14 calendar days and were timely. Similarly, all six patients in the sample required routine IDTTs, all of which occurred timely. Required attendees were present for 100 percent of initial and routine IDTTs. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician; however, assignment was not clearly documented nor consistently discernable.

There were no EOP hub or PSU IDTTs held during the site visit.

CIW offered an average of 13.27 hours of structured treatment activities (STAs) to EOP hub and PSU patients during the review period in both confidential and non-confidential settings, of which 10.97 hours were attended and 2.30 hours were refused.

EOP hub and PSU treatment groups were suspended due to quarantine status until the last day of on-site monitoring. The monitor's expert attempted to observe one treatment group; however, only one of three scheduled patients attended.

PSU and EOP hub patients on COVID-19 quarantine status during the reporting period received daily rounds by mental health clinicians, in cell packets, and routine primary clinician and psychiatry contacts at cell front. Leadership indicated all urgent and emergent referrals were interviewed in a confidential setting. Leadership also confirmed that non-confidential treatment groups in the PSU corridor were offered in lieu of confidential out-of-cell treatment groups during quarantine periods.

Interviewed EOP hub and PSU patients confirmed they were offered timely IDTTs, timely contacts with their primary clinicians and psychiatrists, in-cell packets, one to two hours of daily yard, and 12 hours of weekly treatment groups.  Patients reported no significant concerns with mental health treatment or staff on the unit.  However, a few patients described the treatment groups as "redundant" and expressed a desire for "more variety," and two patients reported they did not have access to the law library.

Defendants certified CIW's EOP hub every month from January through July 2021.  The EOP hub certification documents indicated 100 percent compliance throughout the review period for out-of-cell time, showers, and treatment hours.  However, the monitor's expert noted a few concerns with the EOP hub audits.

The EOP hub certifications suggested that non-confidential cell-front treatment groups conducted in the corridor of the PSU were counted toward treatment group hours.  For example, the February 2021 certification audit tool indicated, "Due to COVID-19 quarantine, all groups are cell front."  The comments section for cell-front group observation audits did not reference any limitations on treatment group quality or participation or note that the space was non-confidential.  The observed IDTTs for certification were also conducted in absentia "due to COVID guidelines" during February 2021; however, the reviewer did not document the IDTTs' attempts to share information between the patients and treatment teams.  The March 2021 EOP hub certification attachments were missing the proof of practice for group treatment observation audits.  The EOP hub certification for June 2021 indicated that during group observation "a movie or music was used consistently throughout the group without any pause to apply the contents to treatment;" however, this issue also was not addressed in the certification letter or elsewhere in the documents.  The July 2021 certification audit worksheets indicated there were

no treatment groups to observe during the week of June 7, 2021, which did not appear consistent with group hours counted toward compliance during that week.

During the reporting period, the PSU was also certified each month. At various times there were no mental health referrals from the PSU, and there were no IDTTs and/or ICCs to view; however, the CIW PSU was consistently certified for the review period where data was available through May 2021.

<u>Long-Term Restricted Housing and Short-Term Restricted Housing</u>:

LTRH and STRH patients were housed together throughout the review period, as this allowed for combined programming and 3CMS treatment while the census remained low. During the site visit, CIW had six LTRH and three STRH patients located in cells on opposite sides of the unit.

Based on the census during the site visit, psychiatrists and psychologists assigned to the LTRH and STRH had caseloads within established staffing ratios.

During the review period, LTRH and STRH patients were offered an average of 1.92 hours of weekly structured treatment activities, of which 1.25 hours were attended, and 0.67 were refused. Leadership indicated that treatment groups were canceled when the units were on quarantine status during the review period.

While there were no scheduled STRH or LTRH IDTTs during the site visit, the monitor's expert encouraged staff to review a patient discussed in the morning huddle. Subsequently, staff held a well-attended clinical case conference for the LTRH patient and determined an IDTT was indicated the following day. Both the clinical case conference and IDTT discussions were collaborative and effective for meeting the needs of the patient and addressing staff's concerns regarding the patient's safety. The IDTT for this patient was conducted via videoconference

with all required members in attendance. The treatment team reviewed all relevant aspects of the patient's care, including diagnostic considerations, obstacles to treatment, risk, behavioral issues, and level of care.  The IDTT appropriately increased the patient's level of care, referred the patient for positive behavior support treatment and diagnostic clarification evaluations, and discussed behavioral interventions to address medication cheeking and hoarding.

A sample of four of the six LTRH patients was selected to assess contact compliance. Initial psychiatric assessments were completed for all four patients prior to the IDTT, although one of those assessments occurred on the same day as the IDTT, and another was held at cell front due to a COVID-19 quarantine.  All required subsequent routine psychiatric contacts were timely, with 40 percent of the follow-up contacts reported to have occurred in a confidential setting.

Records of five of the six LTRH patients were used to assess for compliance with timeliness of initial and routine primary clinician contacts in EHRS medical records.  All five patients were seen timely for initial contacts. Regarding routine contacts, 90 percent of the routine contacts occurred within seven days and were compliant.

For the patients reviewed, all five patients' initial IDTTs occurred before ICC and were assessed as compliant.  For all patients in the LTRH, initial PC and psychiatry assessments were completed prior to the IDTT and IDTTs were completed timely.  Of note, patients attended only two of five, or 40 percent, of the IDTTs held.  Four of the five cases reviewed required routine IDTTs and all four were timely with patients attending three of the four routine IDTTs.

A sample of four STRH patients were selected to assess compliance with required contacts.  Each of the four patients required initial evaluations and all received them.  Of note, two of the four initial psychiatric assessments were completed on the same day as the IDTT.

All four patients in the STRH sample required initial primary clinician contacts; 100 percent were timely completed. Of concern, none of the completed assessments were recorded as a confidential meeting and in only one instance was it noted that the patient refused a confidential setting.

Of the four patients expected to be seen for routine primary clinician contacts, 81 percent were compliant and occurred every seven days or more frequently. Of concern, only six appointments, or 37 percent, occurred in a confidential setting, while ten, or 63 percent, of the appointments were reported to have occurred at cell front or the setting was not recorded at all. When the appointments were held at cell front, 44 percent of the time, it was due to a patient's refusal or because of quarantine due to COVID-19.

Regarding the four STRH patients required to be seen for routine psychiatry contacts, all were timely, while just 50 percent were reported as confidential appointments. Still, psychiatrists were meeting with their patients an average of twice per month, which was significantly more than required.

All reviewed patients required initial IDTTs and 100 percent of them were compliant. There were no patients that required quarterly IDTTs during the review period.

Regarding staff attendance, required staff were in attendance at all four initial IDTTs; however, the patients were present at the initial IDTT just 50 percent of the time, with one of the four patients reported to have refused to attend. Of note, while a primary clinician and psychiatrist were in attendance at the IDTTs, it was indeterminable for every case if the assigned treatment providers were in attendance as required by the Program Guide.

The monitor's expert toured the SHU and noted the unit was generally calm and quiet. Custody and healthcare staff were knowledgeable about patients on the unit and were observed

interacting with patients at cell front in a respectful manner.  The monitor's expert also observed psych tech rounds in the SHU, and noted the psych tech spent sufficient time at each cell, appropriately interacted with patients, documented patient observations and responses to brief assessment questions, and distributed and collected forms, packets, and supplies.

The LTRH/STRH group schedule revealed six treatment groups had been scheduled during the week of the site visit; one of which was a core clinical group facilitated by a psychology intern.

Interviewed LTRH and STRH patients indicated they were offered timely IDTTs and individual contacts with their primary clinicians and psychiatrists, two hours of daily yard, and clinical packets and recreation materials either weekly or sooner by request.  The monitor's expert noted that LTRH and STRH patients were unable to describe their treatment plans or goals beyond "working on anger."  A few patients complained about the quality of services provided by the same primary clinician in the unit; leadership indicated they were in the process of addressing this clinician's practice concerns.

During the reporting period, the STRH and LTRH were 100 percent compliant for providing patients with not less than ten hours of weekly yard, which they typically received three days weekly.  In many instances, patients received as much as 14 hours of weekly yard and received yard four to five days per week.  Yard was documented in the reviewed 114As.

Additionally, the review of 114As indicated 100 percent compliance for patients being offered a minimum of three weekly showers.

Non-Disciplinary Segregation:

No incarcerated persons were designated NDS status at the time of the site visit.

MHCB:

CIW operated a ten-bed licensed MHCB located in the CTC.  This MHCB had stand-alone yards which allowed yard time for maximum custody patients.  Additionally, CIW operated a 19-bed unlicensed MHCB located in the Walker unit.  Staff reported that although they had vacant beds in the CTC, they held them for potential maximum custody patients or for patients who, based on the circumstances, they believed might require restraints.  The MHCB supervisor and chief psychologist did not provide any clear rationale for placing patients in an unlicensed unit when there were available beds in the licensed MHCB.

According to the census during the site visit, psychiatrists and psychologists assigned to the MHCB had caseloads within established staffing ratios.

Staff reported that CIW's MHCB was excluded from some Phase I restrictions because it was a self-contained unit, which was confirmed during the site visit.

The census was low during the site visit.  In the licensed MHCB, there were four patients with one discharge bringing the census down to three on the first day.  There were also four patients maintained in the Walker unit, an unlicensed "overflow" MHCB.

Ten patients who had been admitted to the CIW MHCB during the review period were randomly selected to have their electronic health records reviewed for compliance with Program Guide requirements during their crisis bed admissions; all ten received a primary clinician evaluation within 24 hours of admission.  In addition, all psychiatry initial evaluations were timely completed for 100 percent compliance.  However, from the documentation, it was unknown whether any initial evaluations were held in a confidential treatment space.

Regarding twice weekly psychiatry contacts in the MHCB, the institution was compliant 97 percent of the time with this sample of patients; however, only one psychiatric contact was

documented as a confidential appointment. The others indicated that due to patient refusals, they were seen cell front. Routine primary clinician contacts were completed timely 100 percent of the time. Forty-five percent of these contacts were documented as confidential.

CIW was 100 percent compliant for initial IDTTs within 72 hours of admission for the sample and was also 100 percent compliant with IDTTs within seven days of their initial IDTT while in the MHCB. All IDTTs for the sample of patients had the required attendees present. All nine patients were discharged prior to the need for subsequent IDTTs.

During the site visit, because capacity in the IDTT room was limited, the IDTTs were attended via videoconference. There were three IDTTs observed via Microsoft Teams for those at the MHCB level of care. One initial, one weekly, and one discharge IDTT were observed. Treatment teams were generally adequate, and all required disciplines were present. However, the patient's treatment provider was not always present. In one case, a patient who had been admitted with delirium due to lithium toxicity was going to be discharged back to the sending institution with no clinician-to-clinician contact despite the medication toxicity and rapid level of care change when the patient previously arrived at that facility. After the patient left, the monitor's expert asked the treatment team why there was no plan for a psychiatry-to-psychiatry contact pending the patient's physical discharge, which would provide the receiving treatment team psychiatrist with a "heads up" about monitoring this patient and the need for an elevated level of care for a while, only if just for monitoring purposes. The treatment team eventually agreed that it would be prudent to make the psychiatry-to-psychiatry contact.

In general, the team worked well together, reflecting good interdisciplinary discussions and interactions, with the facilitator providing a comprehensive clinical summary of each case with pertinent details. The team also interacted well with the patients and patients clearly felt

safe with the treatment team and disclosed valuable information. Treatment goals were identified though the team leaned toward subjective criteria rather than objective, behaviorally based criteria. IDTTs for CIW's MHCB did not expressly evaluate the need for a HLOC.

While there were groups occurring in the MHCB at the time of the site visit, they were recreation therapist and psych tech groups where the rooms were at maximum capacity. No groups were able to be observed via Microsoft Teams, but one was observed briefly from outside the group room and appeared consistent with typical psych tech groups.

Seclusion and Restraint:

CIW reported one incident of restraint lasting approximately four hours and 35 minutes. There was an order for the initiation of restraints, but when the restraint period exceeded four hours, another order was not completed. The initial order did not include express release criteria. While the need to intervene was justified from documentation, documentation was inadequate regarding the decision to place the patient in restraints, the most restrictive option, over seclusion. Required documentation while the patient remained in restraints was completed adequately. It was not clear from documentation that the patient required restraints for the length of time she remained in them.

CIT:

CIW reported that two psychologists were permanently assigned as the mental health clinicians for the CIT. They covered seven days a week from 2:00 p.m. to midnight. Custody and nursing representatives were assigned by their respective disciplines. Local policy required a lieutenant or sergeant to be assigned by custody but noted that when a sergeant physically responded to a CIT event, the sergeant must consult with a lieutenant to obtain authorization for

any custody related action.  Local policy also required that a nursing supervisor, senior psychiatric technician, or unit supervisor respond as the nursing representative.

CIT-assigned staff did not receive headquarters-approved, standardized CIT training conducted by local Training-for-Trainers staff as required by statewide policy.  It was reported that the statewide training was not yet created and instead, staff were trained through a curriculum on the learning management system (LMS), through shadowing the process and reviewing current policy and documentation requirements.  Evidence of training via LMS was provided.

Alternative Housing:

During the review period, there were 61 placements in alternative housing.  All patients transferred within 24 hours of placement.  The average length of stay in alternative housing was 4.03 hours, with a range of 0.10 to 14.48 hours.  One hundred percent of patients were placed in alterative housing located in the TTA pursuant to local policy and the headquarters' memorandum.  Confidential space for clinical interviews was available in this area.  All patients were placed in alternative housing awaiting Health Care Placement Oversight Program (HCPOP) endorsement to an MHCB.

EOP:

EOP patients were housed in the Support Care Unit ('SCU") which was comprised of two halls, West Hall and North Hall.  The SCU had consisted primarily of double cells with one ADA single-cell.

The 34-patient caseload of the psychiatrist assigned to the mainline EOP program was within the established staffing ratio.  Primary clinicians assigned to the mainline EOP program had caseloads of between six and eight patients, which were also within the established ratio.

A total of ten patients in the mainline EOP program were randomly selected to assess compliance with Program Guide timeframes for psychiatric contacts.  Of the ten randomly selected patients, five required initial psychiatric contacts during the review period.  All five occurred within 14 calendar days of arrival, and each occurred prior to the initial IDTT. Additionally, all required initial primary clinician contacts were 100 percent timely.

Five of the reviewed patients required an initial IDTT during the review period, of which 100 percent occurred within 14 calendar days of arrival.  All ten of the reviewed patients who required routine IDTTs received them within 90 days in compliance with Program Guide timeframes.  Additionally, required staff members were present at all reviewed initial and routine IDTTs.

Regarding routine psychiatric contacts, 68 percent occurred within 30 days and were compliant with Program Guide timeframes. For routine primary clinician contacts, 83 percent were completed with seven days and were timely.

At the time of the site review, there were 34 patients present on the unit.

During the site visit, the facility was on Phase I status from Monday through Thursday, which limited contacts to essential clinical contacts only.  Random record reviews during the site visit revealed that while on Phase I status during the site visit, all patients in the sample of six had documented cell-front wellness checks.  No IDTT meetings were scheduled during the site review, so no meetings were observed.

EOP staff reported that they regularly communicated with PIP, MHCB, and 3CMS staff to discuss patients transferring to and from these programs to the EOP program.  Staff expressed concerns that for patients who transferred to the EOP level of care from 3CMS, information about the reasons for some patient referrals lacked clear indications for a HLOC.

It was reported that there were 25 work assignments/job opportunities for patients receiving EOP treatment; patients without a formal high school/GED diploma were eligible for enrollment in education programming at the time of the site review.

Priority for group placement was determined by participation levels during the previous group cycle, with patients having the highest levels of attendance being prioritized for their preferred groups over those with lower attendance levels. This system was enacted as an incentive to increase group attendance. Regardless of identified preferences, patients were scheduled for at least two hours of clinical core groups each week, and for those on modified programming, the minimum was at least one hour each week of clinical core groups. Other incentives were implemented to encourage group attendance and participation in the EOP, including assigning a peer helper to encourage patients who were not in their assigned groups within five minutes of the group start time to come to group and establishing an incentive store where patients could spend "points" earned for attendance and for the quality of their group participation.

Additionally, a "Purr" group was offered to patients who attended at least 80 percent of their offered groups on Fridays. This group consisted of patients being allowed to interact with cats and kittens. An incentive movie with popcorn was provided to patients who attended at least 80 percent of groups every five weeks during the cycle. Finally, an incentive group, which consisted of two hours of "Home Arts" could be attended for a full ten-week cycle by patients who achieved 80 percent attendance during the previous cycle. "Home Arts" offered patients creative opportunities.

The senior psychologist supervisor reported that the EOP also recently instituted a process by which custody staff was consulted about patient incentive points to include patient behavior on the unit as a mitigating factor in the incentive points earned weekly.

It was reported that 30 of 34 patients, or 88 percent, were eligible for full programming in the EOP and all of them were offered ten or more hours of structured treatment in the EOP. In the week prior to the site visit, these patients were offered between 11 and 24 hours of programming, or an average of 17.1 hours of programming. It was reported that all eligible patients on the EOP were offered at least ten hours of weekly group, with two exceptions. Patients who were formally enrolled in the substance abuse program (SAP) or were employed off the unit were scheduled for eight hours of weekly group and up to four hours of their off-the-unit programs could be counted in their structured treatment hours. At the time of the site review, six patients were enrolled in the SAP.

Two patients (six percent) were on modified programming and offered less than ten hours of treatment secondary to treatment team recommendations.

During the site visit, patients consistently attempted to wear masks during groups, yet in most cases, patients' masks were noted to be old, dirty and loose, to the point where they no longer properly fit on patients' faces.

Over the review period, it was reported that scheduling conflicts and COVID-19 protocols affected patients' ability to attend structured treatment. Corrective action was enacted in April 2021, which included training staff about avoiding scheduling conflicts.

Collaboration with custody staff on the EOP was noted to be excellent.

Four patients were interviewed about the care provided to them within the EOP. All patients reported seeing their PCs weekly and their psychiatrists every three to four weeks. They

reported seeing their PCs and psychiatrists in confidential settings and that they were rarely seen by clinicians other than those assigned.  Patients reported attending IDTTs and reported finding the process to be collaborative.  Three of the four patients reported being aware of the reasons for their placement in EOP and understood their diagnoses and treatment goals.  Patients reported no challenges in accessing their treatment team members outside of scheduled appointment times.

Some challenges were noted in addressing treatment refusals secondary to symptoms associated with personality disorders.  It was not clear that staff were aware of how best to support behavioral change with these patients (e.g., not consistently using incentive-based, behaviorally sound techniques).

It was noted that EOP staff provided variable explanations for cell-front contacts in many of the records reviewed.  Specifically, it was noted that some clinicians and psychiatrists documented that patients were seen cell front secondary to COVID-19 quarantine status, while others documented that the patient refused to be seen out of cell and others noted security concerns.  These several reasons were noted to be in the records of the same patients, sometimes on the same day.  This variability caused concern about the accuracy of documentation.

Staff appeared to struggle with documentation of personal pronouns for patients who were transgender.  In any case, proper use of a patient's preferred gender is necessary and was not consistently being reflected in EOP documentation.

3CMS:

Psychiatrists assigned to the mainline 3CMS program had caseloads of 105, 106, 121, and 121, which were all within the established staffing ratio of 1:280.  Primary clinicians assigned to the mainline 3CMS program typically had caseloads of between 63 and 84 patients,

which were also within the established staffing ratio of 1:97. Several primary clinicians with other responsibilities, such as pre-release coordinator duties, had smaller caseloads.

A total of 18 3CMS patients were randomly selected to assess compliance with timely psychiatric contacts. Six patients in the sample required initial psychiatric evaluations during the review period; 33 percent occurred prior to the initial IDTT. Regarding routine psychiatric contacts, 94 percent of required routine IDTTs occurred within 90 days and were compliant. Notably, many patients were seen more frequently than was required by the Program Guide. Six patients in the sample required initial primary clinician evaluations; all occurred within ten working days as required.

All 18 patients in the sample required routine primary clinician contacts, and 100 percent occurred within 90 days and were compliant. Similar to psychiatry contacts, patients were often seen more frequently by PCs than the Program Guide requirements. The data showed that 85 percent of primary clinician contacts were conducted confidentially. Reasons for contacts not being done in a confidential space included custody reasons and refusals by the patient.

Seven patients in the sample required initial IDTTs. All seven or 100 percent occurred within 14 working days and were compliant. Some IDTTs were held in absentia due to COVID-19 restrictions. Eight patients in the sample required routine IDTTs; 100 percent occurred at least annually and were compliant with Program Guide requirements. Required staff members attended all initial and routine IDTTs in the sample.

Staff reported that groups had not been held in 3CMS for some time but were scheduled to begin on September 13, 2021. As the facility was on Phase I status beginning on that date, groups did not occur. It was reported that they would be starting the following week.

Three IDTT meetings were observed. Patients were present for two of the meetings and one was held in absentia. The quality of the meetings was variable and was determined by the PC conducting the meeting. One PC focused on the computer screen and completion of the IDTT documentation rather than the patient and the patient's treatment. That meeting was not adequate as there was little conversation with the patient and discussion was limited to filling out the form. The other PC integrated the required documentation into discussions with the patient and the other IDTT members. The two meetings held by that PC were adequate. The psychiatrist was the same for all three meetings and was engaged with the patients during the meetings. For two of the three patients, the only interventions discussed were psychotropic medications with no discussion related to other therapeutic interventions. For the third patient, who was not present for the IDTT meeting, only the content of verbal therapy was discussed. In two of the cases, issues related to diagnostic clarification were raised and resolved through discussion.

Six clinicians and one psychiatrist working in 3CMS were interviewed. They reported having no problems with accessing confidential space for clinical sessions and for IDTT meetings but there was concern about the limited space and available custody staff to support adequate group programming. It was reported that patients did not frequently refuse treatment contacts but that recently some PCs had been reassigned to another location within the facility, and patients were refusing to meet with newly assigned PCs, as they preferred their previous PCs.

3CMS primary clinicians also expressed concerns about being inadequately trained to complete evaluations for gender-affirming surgery, despite being asked to complete these evaluations and also noted that the evaluations took between 20 and 26 hours to complete.

Clinical leadership at CIW reported that all staff completing these evaluations had received the required training.  It was evident from these discussions that PCs were in need of training beyond conducting evaluations.  Further training was needed on the concepts of gender and transgender issues.

Social workers expressed concerns that there were no social worker supervisors.

Other Issues:

Pre-Release Planning:

The institution's pre-release unit consisted of two social workers and a supervisor.  One of the two pre-release social workers assisted EOP patients pending release from prison, while the other assisted 3CMS patients pending release.  Both institutional pre-release coordinators were assigned to the positions full time.  In addition to the CDCR pre-release coordinators, patients received the assistance of the TCMP social workers, which was an independent contractor service.

It was noted that in the treatment plans for some patients nearing parole that pre-release goals replaced any other treatment needs on the patients' treatment plans.  In other words, treatment goals and interventions related to patients' mental illness were no longer included in IPOCs for these patients.  While release planning should be of primary concern when a patient was nearing release, it should not replace all clinical needs of the patient on the treatment plan.

Of significance, pre-release groups were suspended at the onset of the pandemic in March 2020.  They resumed for a short two-week period in November of 2020; however, they were again discontinued and had not yet resumed at the time of the visit.  When operational, the state-wide curriculum was utilized for the groups which consisted of 18 modules.

Concerns noted were challenges related to patients who were discharged prior to the completion of important benefit applications, and particularly their California identification card. Patients without a California identification card were unable to complete applications for Supplemental Security Income (SSI), veterans benefits, and/or Medi-Cal. Of the 44 patients released from CIW during the reporting period, 18, or 41 percent, left with their California identification card. Completion of the work associated with obtaining a patients' California identification card and benefits upon release were the primary responsibility of the TCMP contract social workers.

Program Access:

a.    Job and Program Assignments

Institutional data indicated that of the 417 available jobs, 12 EOP patients, or 25 percent of the EOP population, held job assignments. For 3CMS patients, 209, or 43 percent of the 3CMS population, held job assignments, and for non-MHSDS incarcerated persons, 196, or 42 percent of the non-MHSDS population, held job assignments.

Of the 324 academic assignments, 11 EOP patients, or 23 percent of the EOP population, held assignments. For 3CMS patients, 176, or 36 percent of the 3CMS population, held assignments and for non-MHSDS incarcerated persons, 137, or 29 percent of the non-MHSDS population, held assignments.

There were 214 substance abuse treatment assignments; ten EOP patients or 21 percent of the EOP population, held assignments. Of the 3CMS population, 123 patients, or 25 percent, held assignments. For non-MHSDS incarcerated persons, 81 incarcerated persons, or 17 percent of the population, held assignments.

Of the available 95 vocational education positions, no EOP patients held assignments. For 3CMS patients, 57, or 12 percent of the population, held assignments. For non-MHSDS incarcerated persons, 38 or eight percent of the population held assignments.

Of the 25 available voluntary education positions, no EOP patients held assignments. For 3CMS patients, 11, or two percent of the population, held assignments. For non-MHSDS incarcerated persons, 14 or three percent of the population, held assignments.

A review of the assignments data provided showed that amongst the total population of 1,003, there were 1,075 assignments distributed. Interviewed staff reported that the number of assigned program assignments outnumbered the total population because some patients were holding dual program assignments. Staff reasoned that the most likely explanation was that patients were enrolled in substance abuse treatment and also had a job and/or school programming at the same time. There were a substantial number of 3CMS patients, 123, or 25 percent of the population, receiving substance abuse treatment programming, while 36 percent of 3CMS patients had academic assignments and 43 percent had job assignments.

    b.    <u>Milestone Credits</u>

A report dated August 2, 2021, showed that of 48 EOP patients, 46 or 96 percent were eligible to earn milestone credits, and 87 percent earned credits. For 3CMS patients, 478 of 491 or 97 percent, were eligible to earn milestone credits. Of the eligible 3CMS patients, 34 percent actually earned milestone credits.

The data indicated that of the 466 non-MHSDS incarcerated persons, 447 or 96 percent, were eligible to earn milestone credits; 33 percent earned credits.

    c.    <u>Out-of-Level Housing</u>

The institution reported that no patients were housed out of level during the review period.

       d.      <u>ADA Reasonable Accommodation and Grievance Procedures</u>

CIW provided confirmation of implementation of revised ADA accommodation and grievance procedures in the form of training materials and staff training rosters, and a copy of the institution's LOP, dated November 2016.

       e.      <u>Periodic Classification Score Reductions:  EOP Patients:</u>

The institution provided the CDCR 840s of three EOP patients for review during the site visit.  Classification scores were reduced where appropriate.  Two patients received score reductions.  The remaining patient received credit for favorable behavior; however, points for unfavorable behavior resulted in an increase in the patient's classification score.

       f.      <u>Compliance with In-Cell/Private Unclothed Body Search Policy</u>

At CIW, custody staff reported that unclothed body searches were conducted in private areas in the housing units, such as cells, holding cells, bathrooms, and showers.  Privacy screens were used if needed for additional privacy.  A tour of (a sampling of) those areas during the site visit revealed they were adequately private.  Interviewed custody staff indicated that transgender incarcerated persons were provided with a card indicating their search preference.  Staff was trained on body searches in the academy.  Interviewed custody staff demonstrated knowledge of the unclothed body search policy, including the August 19, 2021, memorandum regarding shutting off body cameras during a search.  One issue mentioned by both staff and patients during the site visit was that body cameras were not shut off during a urinalysis.

g.    Re-entry for Patients with Psychiatric Disabilities

CIW was not a designated re-entry hub.  Staff reported that the women's prisons provided pre-release planning services to patients with upcoming parole.  As evidenced by the data provided, EOP patients were receiving academic, job, and substance abuse treatment programming.

Case-by-Case Reviews:

The institution reported there were 13 case-by-case reviews during the reporting period, and no patients were held beyond their minimum eligibility release date (MERD).  There were no long-term case conferences reported during the review period.

"C" Status:

At the time of the site visit, the institution reported that there were three 3CMS patients on "C" Status for multiple RVRs.

Mental Health Referrals:

CIW provided data regarding mental health referrals from March 1, 2021 – August 31, 2021.  During this time period, there were 1,571 mental health referrals.  There were 159 emergent referrals, 210 urgent referrals, and 1,202 routine referrals.  The institution achieved more than 90 percent compliance with Program Guide established timelines for responding to each referral category as follows: emergent referrals were 94 percent compliant (within four hours of initiation); urgent referrals were 99 percent compliant (within 24 hours of initiation); and routine referrals were 98 percent compliant (within five working days of initiation).

Treatment Space:

During the site visit, treatment groups were suspended due to COVID-19 quarantine status.  EOP hub and PSU patients were seen cell front and non-confidential groups were

conducted in the corridor of the PSU building. During non-quarantine periods, patients were escorted to a neighboring building with confidential offices and therapeutic treatment modules. The observed treatment space for STRH and LTRH patients was non-confidential and located in the dayroom with restart chairs arranged in a semicircle. The designated IDTT space within the SHU building was confidential.

Custody and Mental Health Partnership Plan:

The institution provided a copy of the LOP, which was not consistent with statewide requirements. Statewide requirements indicated that huddles were to be completed in the MHCB and the PIP housing units on second and third watch based upon requirements. The LOP provided by CIW only required huddles on second and third watch in the MHCB.

A report was provided as to the number of custody staff institution-wide who attended the annual CMHPP training. As for custody staff, the required training was completed by five of six correctional administrators, none of the four captains, three of 22 lieutenants, 11 of 56 sergeants, and ten of 20 correctional counselors. In addition, 44 of 383 correctional officers completed the training. Of 491 custody staff, 73 completed the partnership training for a compliance rate of 15 percent. The CMHPP coordinator reported that the institution was unable to pull custody staff from program areas during the pandemic for training due to coverage issues. The monitor's expert was informed that the plan moving forward was to institute modified programming once or twice a month between now and the end of the year to allow staff to attend required trainings.

The institution reported 84 staff misconduct complaints were filed during the review period, which included four PREA complaints. The list of complaints included allegations of sexual misconduct, use of force, discrimination, substandard care, staff misconduct, and improper use of restraint.

All four PREA complaints on the log provided were unsubstantiated, however, there were a total of five staff members redirected because of additional PREA or staff sexual misconduct complaints identified as occurring during the reporting period. Of those five cases, two were unsubstantiated, while the investigations in three remained ongoing.

While on site the monitor was able to observe several aspects of the partnership plan. The partnership plan activities observed included executive leadership joint rounding in the administrative segregation housing unit, an IAC meeting, and a weekly 3CMS custody mental health supervisory meeting.

Executive leadership joint rounding occurred monthly as required; specific housing units were visited during the reporting period. The standard questions were asked, and the appropriate rounding documentation was provided. Concerns shared during rounding included some tension between staff members during the COVID-19 pandemic, often the result of poor communication about frequent policy changes that were occurring. Additional complaints were related to operational matters such as difficulties getting supplies, poor wi-fi, and internet connections.

The monitor's expert attended executive leadership joint rounding in restricted housing. All members required to attend the rounding were in attendance, in addition to several other members of the institution's leadership team. The chief of mental health led the group and asked the scripted questions. A single patient in a restart chair in the dayroom awaiting a recreation therapy group was interviewed. Her responses to the questions were limited and no significant concerns were expressed. Many staff members were interviewed during a lunch break. Included in the staff interviewed were custody, clinical, and medical staff. Again, no significant concerns were expressed to the leadership team. The group reported good working relationships between the disciplines.

While executive leadership joint rounding occurred monthly, the institution's leadership acknowledged that the information gleaned during the rounding was not properly disseminated to the required committees for distribution to staff.  The chief of mental health reported this oversight was corrected in August of 2021, and the information was now shared at the weekly warden's meeting, at quality management committee meetings, and with the mental health subcommittee as required in the plan.  The monitor's experts were able to observe the weekly 3CMS meeting between the custody sergeant and the social worker supervisor.  During the meeting, an issue with a patient's medication was addressed, which was referred to the psychiatrist.  The two appeared to partner well during the meeting.  They were also able to provide information about the 3CMS orientation process and handily provided a copy of the 3CMS orientation brochure.

IAC meetings were held monthly.  A representative from mental health was present for five of the six meetings held.  Some of the topics raised at the IAC meetings included COVID-19 vaccinations, testing, quarantine, and isolation, as well as the resumption of all programming, medical, mental health and dental.  In addition, the group addressed issues related to visitation, medication-assisted treatment (MAT), pill lines, ADA guidelines, extraordinary conduct credit, fire camp, transgender concerns, and limited access to showers in the OHU due to a construction project.

The monitor observed an IAC meeting during the site visit.  The meeting's primary focus was COVID-19 protocols that had been put in place overnight when CIW was placed under a quarantine and isolation order due to an outbreak.  A particular concern raised by the IAC was the inability to do laundry while quarantined, specifically the inability of critical need porters to launder their often soiled clothing.  Critical need porters were going back to their cells and

washing their clothes in the sink. In addition, the patients requested from mental health more substantive activity packages that contained more than coloring pages. Custody staff reported back that they were still reviewing the IAC's concern regarding the use of body-worn cameras while a patient was providing a urine sample.

The monitor reviewed a total of 210 huddle reports which occurred on second and third watch in administrative segregation. A total of 187 or 89 percent had the required attendees present.

The institution reported 69 percent of mental health staff had attended annual partnership training, including three of six supervising psychiatrists, psychologists, or social workers, nine of 12 psychiatrists, 17 of 23 psychologists, seven of 12 social workers, and nine of 11 recreation therapists. Regarding the chief of mental health, psychiatry, and psychology, only one of the three had attended. The institution reported that all mental health staff who had not attended were scheduled to attend partnership training prior to the end of December 2021.

Heat Plan:

During the review period, the heat plan was in effect beginning in May 2021 through the time of the site visit. Review of the CIW Operational Procedure 06-002 Facility Heat Plan dated February 2021 indicated compliance with the CCHCS 2021 "Heat Plans and Updates" directive.

There were four stage I heat alerts during the review period, but no stage II or stage III heat alerts. Review of DARs for 2021 indicated the activation and deactivation of stage I heat alerts on all four days there was a heat alert. Iced water and showers were offered to patients during the reporting period. None of the DARs reported the offering of additional dayroom to patients due to a heat alert. No heat-related illnesses were reported.

Custody officers were aware of the list of patients who were prescribed heat-sensitive medications, which they reported was produced weekly; they also knew that this list was also available online. Some officers had highlighted the names of patients on their housing units who were prescribed heat-sensitive medications.

All housing units had handheld thermometers that recorded the housing units' temperatures.

RVRs:

The institution reported a total of 440 custody staff were required to attend annual mental health assessment training. Of this number, none of the four correctional administrators attended, two of four captains attended, three of 19 lieutenants attended, as did nine of 55 sergeants, and two of 366 correctional officers, for four percent compliance. As for mental health staff, the institution reported none of the executive leadership staff attended the mental health training, including the chiefs of mental health, psychiatry, or psychology. Of the remaining 49 mental health staff members, including the senior psychiatrist, senior psychologist, and senior social work supervisor, as well as the staff psychiatrists and psychologists, only one attended the mental health training for an overall compliance rate of two percent.

CIW issued 762 RVRs, of which 569 or 75 percent were issued to MHSDS patients. Of those, CIW issued 516 RVRs to 3CMS patients, 44 RVRs to EOP patients, and nine RVRs to MHCB patients. A random selection of 23 RVRs issued to MHSDS patients was reviewed.

Of the 23 RVRs reviewed, one was issued in the MHCB, two were issued to EOP patients, and 20 were issued to 3CMS patients. Mental health assessments were requested in seven of the 23 RVRS or 30 percent of the RVRs reviewed. Of those, five or 71 percent were requested within timeframe guidelines. Mental health staff completed and returned 100 percent

within timeframe requirements.  Three of seven, or 43 percent, of the mental health assessments were completed in a confidential space.  One assessment was completed in the dayroom because the patient was quarantined, and another patient refused.  A staff assistant was assigned in four RVRs, including the three RVRs involving the patients in the MHCB and at the EOP levels of care.  The remaining 19 RVRs indicated that the patients refused the appointment of the staff assistant.

None of the seven reviewed mental health assessments indicated that the patient's mental health influenced her behavior, such that it required documentation in an alternative manner.  Two assessments indicated that the patients' mental health contributed to the behavior.  Of the 23 RVRs reviewed, three were reduced to a counseling chrono, and in 18 of the remaining 20, as well as in all seven instances when a mental health assessment was completed, the credit loss and/or penalties were mitigated by the senior hearing officer.  The senior hearing officer did not mitigate the sentence or penalties in two of the 23 RVRs reviewed; both were 3CMS patients, and neither required a mental health assessment.  Hearings were held timely in 20 of 23, or in 87 percent of the RVRs reviewed.  RVRs were most frequently issued for fighting, possession of alcohol, contraband, or a controlled substance, as well as for assault and battery.

Use of Force:

The institution provided the following data regarding use of force staff training.  The warden, chief deputy warden, and all four correctional administrators had completed use of force training.  In addition, three of four captains, all 19 lieutenants, all 55 sergeants, and 358 of 366 correctional officers completed use of force training for a compliance rate of 98 percent.

Regarding mental health staff, one of the three chiefs of mental health, psychiatry and psychology had completed use of force training, while all six of the psychiatrist, psychologist and

social worker supervisors had completed use of force training. Additionally, four of nine

psychiatrists, 37 of 77 psychiatric nurse practitioners, and 11 of 15 social workers had completed

use of force training, for total compliance by 54 percent of mental health staff.

During the reporting period, CIW reported no controlled use of force incidents, 23

immediate use of force incidents, of which 21, or 91 percent, involved MHSDS patients, with 17

of the 21 incidents involving Level IV MHSDS patients. There was an immediate use of force

incident involving a patient in the MHCB, an immediate use of force incident involving a patient

in administrative segregation, and one involving a patient in the SHU, as well as six immediate

use of force incidents involving mental health patients in the PIP. There were 53 non-use of force

incidents of which 47 involved MHSDS patients. There was one non-use of force incident in the

MHCB, three non-use of force incidents in the EOP, and 13 non-use of force incidents in the PIP,

as well as 28 non-use of force incidents involving Level IV patients.

Regarding the use of force incident in the MHCB, all documentation requested was

provided. The incident involved a patient who was under a one-to-one supervision order when the

staff observing her expressed concern about the patient having difficulty standing after taking her

medications. As a result, custody staff entered the patient's cell, which subsequently resulted in

the immediate use of force that was reported to be responsive to the patient's agitation and

spitting. The patient was viewed cell front shortly after the incident, and no injuries were noted.

The patient reported only that her "stomach still hurts."

The institution provided appropriate documentation of review of the incident, and it was

determined that the incident was not an excessive use of force by a staff member. The patient was

issued a RVR for assault on a peace officer and custody chronos for leg restraints and a spit hood.

Lockdowns/Modified Programs:

At the start of the review period, CIW implemented a modified program in response to COVID-19. This modified program was replaced by Phase 1 when patients were required to wear facial coverings and comply with other COVID-19 prevention measures. CIW subsequently entered Phase 3 on June 1, 2021. Phase 3 included the regular provision of all mental health services while adhering to social distancing, masking, and cleaning protocols. Phase 3 remained in effect for the remainder of the review period. However, the facility was back on Phase I COVID-19 precautions for the entire site visit.

Access to Care:

A review of CIW's monthly Health Care Access Quality reports from February through July 2021 indicated that an average of 0.3 percent of issued mental health ducats and add-on appointments were not completed due to custody factors during that time period.

Placement of 3CMS Patients into Minimum Support Facilities:

CDCR did not have an MSF for female incarcerated persons.

*Coleman* Postings:

*Coleman* posters were observed in all units except the Walker building, where it was posted after the monitor noted its absence.

**APPENDIX B-5**
**SAN QUENTIN (SQ)**
**(October 25, 2021 – October 29, 2021)**
**Review Period: (April 1, 2021 – September 30, 2021)**

Census:

On October 25, 2021, SQ's total population was 2,925, which was a 22 percent decrease from the preceding reporting period. The mental health caseload population was 1,190, or 41 percent of the population, and had increased by nine percent since the prior review period.

There were 212 mainline EOP and 965 mainline 3CMS patients, including 73 condemned EOP and 114 condemned 3CMS patients.

Three patients were in the MHCB, one patient was in the medical unit, and two patients were awaiting transfers to intermediate care.

Twenty-six patients were housed in administrative segregation, including seven 3CMS patients.

Staffing:

The chief of mental health position was filled. At the time of the site visit, the chief of mental health also served as the acting CEO.

The chief psychiatrist position was filled, as was the senior psychiatrist supervisor position. Eleven civil service psychiatrists and one contractor filled 10.5 psychiatry positions.

SQ did not have an established telepsychiatry position; however, SQ utilized telepsychiatry for brief periods as discussed below.

SQ did not use psychiatric nurse practitioners.

Both chief psychologist positions were filled. Three of 4.5 senior psychologist supervisor positions were filled for a vacancy rate of 33 percent. Of the four senior psychologist specialist positions, two were filled. Twenty-five of 28 staff psychologist positions were filled, for an 11

316

percent vacancy rate. Contractors covered 1.5 vacancies for a five percent functional vacancy rate.

The supervising social worker position was filled. Fifteen of 16.5 social worker positions were filled, for a nine percent vacancy rate.

Eleven of 11.3 mental health RN positions were filled for a three percent vacancy rate.

The one senior psych tech position was vacant. Of 66.9 psych tech positions, 51 were filled for a 24 percent vacancy rate.

All 12 recreation therapist positions were filled.

One of 1.5 OSS II positions was filled.

Twelve of 13.5 mental health clerical positions were filled for an 11 percent vacancy rate.

The HPS II position and the AGPA position were filled.

Telepsychiatry:

SQ did not normally utilize telepsychiatry. However, between March 30, 2020, and June 30, 2021, in response to COVID-19, SQ primarily utilized telepsychiatry at all levels of care. Staff also reported that SQ used telepsychiatry in one of the H-Units for ten days between July and August 2021 after a staff member tested positive for COVID-19.

Quality Management:

The local governing body exceeded the quarterly meeting requirement by meeting monthly. It always achieved a quorum. Agenda items included action on proposed LOPs, attention to unusual occurrences, and approvals and denials of privileges for mental health clinicians.

The quality management committee met monthly and always achieved a quorum. The QMC attended to reports from mental health and other health care subcommittees, as well as the

resource management, institutional utilization management, patient safety, and EMRRCs.  The QMC also attended to ongoing performance improvement work plans, medication management matters, SQ environmental care, and Joint Commission accreditation renewal.

The mental health subcommittee met monthly and provided approved minutes for April through August 2021, and draft minutes for September 2021.  Five meetings reported quorums. The subcommittee attended to matters for each mental health program, and received status reports, including compliance and referrals to higher levels of care data.  The subcommittee authorized audits and received reports on daily clinical rounding in administrative segregation and the condemned units, suicide prevention, and reduction in alternative housing use.

During the review period, no QITs/FITs were charted, and headquarters did not require any ongoing QITs/FITs.

In 2021, SQ only conducted psychiatry peer review.  Two staff psychiatrists served as peer review chairs and were aided by supervisors.  They used the peer review forms that headquarters supplied.  The process consisted of SQ psychiatrists reviewing other SQ psychiatrists from different clinical teams.  Peer review chairs provided feedback to reviewed clinicians with supervisory involvement.  The 2021 peer review process assessed all reviewed psychiatrists as either "satisfactory" or "superior."

Finalized EMRRC minutes were supplied for the April, May, and July 2021 meetings; draft minutes were supplied for the September 2021 meeting.  The EMRRC addressed transports outside the facility, all emergent and urgent cases where there were discrepancies, EMRs, and unscheduled transport events, with a goal of identifying system and process errors or departures from standards of care or policies.  The EMRRC reported its findings and offered remediation actions.

<u>Medication Management</u>:

SQ provided MAPIP results for April through September 2021 for psychiatric diagnostic monitoring and medication management compliance.

Diagnostic monitoring data for patients prescribed atypical antipsychotics showed that measurements for blood pressure, height, weight, and thyroid monitoring were compliant for all six months of the review period. EKG measurements and AIMS tests were compliant for four months. Medication consent was compliant for three months. Diagnostic monitoring of CBC with platelets and CMP were compliant for two months, and lipid monitoring was compliant for one month.

Data presented for clozapine diagnostic measures showed that blood pressure, blood sugar, CBC, height, weight, EKG, and AIMs were compliant for all six months of the review period. CMP and lipid monitoring were compliant for four months. Medication consent was compliant for all five required months. Thyroid monitoring was compliant for both required months.

The medication management dashboard for the period showed that patients prescribed antidepressants, venlafaxine blood pressure, and thyroid monitoring were compliant for the review period. EKGs were compliant for both required months. Medication consent was compliant for four months.

No SQ patients were prescribed carbamazepine during the review period.

Psychiatric diagnostic measures for SQ patients prescribed Depakote were compliant for medication consent throughout the review period. CBC with platelets and CMP were compliant for three of five required months. Depakote levels were compliant for one of five required months.

SQ reported compliance for all six months for medication consents for lamotrigine.

Regarding data for diagnostic measures for patients prescribed lithium, SQ indicated compliance for the required months for medication consent, thyroid monitoring, lithium levels, creatine, BUN tests, and EKGs.

MAPIP data showed that SQ was consistently compliant with medication continuity, PC 2602 orders, and observation of medication preparation and medication administration during the review period. Observation of medication preparation and administration for HS and AM/PM, new psychiatric medications, continuity of NA/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity following discharge from community hospital or acute or intermediate care, inter-institutional transfer at R&R, and psychiatric-prescribed chronic care medications were compliant for all six months of the review period.

Medication continuity for MHCB transfers was compliant for four months and medication continuity for patients paroled or released to the community and intra-institutional transfers to ASU/SHU/PSU were compliant for five months.

Psychiatrists could prescribe medications for a maximum of 180 days. Bridge orders were generally shorter in duration and often dictated by the mental health level of care.

Telephone and verbal orders were tracked through EHRS. Each provider who authorized a telephone/verbal order was notified of the order requiring co-signature through the EHRS' message center. The Health Information Management division tracked outstanding institution-wide telephone/verbal orders and notified providers and supervisors of orders requiring co-signatures.

During the site visit, SQ had implemented the statewide non-formulary medication request process.  The majority of non-formulary requests were approved; 18 percent of prescribed medications were non-formulary.

SQ's institutional polypharmacy reports were generated through a pharmacy protocol that was sent to the prescribing providers.  A supervising psychiatrist also regularly reviewed a sample of polypharmacy reports to confirm that the prescribing practice was clinically appropriate.

All prescriptions within the MHCB and medical CTC had to be prescribed as either NA or DOT, except rescue inhalers and sublingual nitroglycerin, which could be prescribed as KOP.

Psychotropic medications prescribed by a psychiatrist to mental health outpatients were administered either NA or DOT, except for the six formulary SSRI medications and duloxetine for patients at a 3CMS level of care.  For these specific antidepressant medications, the treating psychiatrist had the option to prescribe them as KOP to 3CMS patients on a case-by-case basis, with the patient's consent, if the benefits of doing so outweighed the risks.  There were 120 SSRI prescriptions, and no duloxetine prescriptions were ordered as KOP by SQ psychiatrists at the time of the site visit.

Medication was prescribed as DOT through the parameters outlined in policy.  These parameters included, but were not limited to, prescriptions that fell under PC 2602, mandatory crush and float medications, controlled substances, and whenever specified by the provider based upon individualized concern regarding patient non-adherence, hoarding, exploitation, and/or diversion of the specific medication.  During the site visit, 399 patients received psychotropic medications DOT.

SQ was authorized to both initiate and continue patients on clozapine. Twenty patients were prescribed clozapine during the site visit. The clozapine registry, found within the CCHCS Quality Management Portal, was an effective tool used by SQ to track not only the number of patients prescribed clozapine, but also the MAPIP requirements associated with ongoing clozapine treatment. The federal clozapine Risk Evaluation and Mitigation Strategies (REMS) program was followed for treatment with clozapine, in addition to CDCR's outpatient clozapine maintenance and mental health services policies and procedures.

The number of patients prescribed HS psychiatric medications was 455. HS psychiatric medications were consistently administered on or after 2000 hours.

During the review period, the pre-site information reported the absence of systemic problems with long pill lines or with the timing of medication administration interfering with mental health programs. However, at the time of the site visit, psychiatrists reported pill lines of up to 45 minutes, which were described as concerning for some patients.

During the site visit, 23 patients were receiving medications through the PC 2602 process. Of the 23 patients, three were initial petitions, 15 were renewals, three were recommended for non-renewal, and two were pending court action. SQ reported that it rarely used force to administer PC 2602 medications.

Transfers:

SQ had one inpatient coordinator assigned to referrals to higher levels of care. The coordinator supplied referral and non-referral logs that were not correct, as they included cases referred by other facilities and had inaccurate dates for multiple IDTTs. The inpatient coordinator explained that the logs were produced per directions from headquarters, but supplied corrected versions upon request. It was unclear whether the data provided to the mental health

subcommittee was correct since the reports used for that purpose would have been the same as the incorrect ones produced initially for the Special Master.

There was one major and one minor sustainable review during the reporting period. The minor sustainable tour was conducted in April 2021, and the major sustainable tour occurred in August 2021. Both reviews consisted of a headquarters specialist reviewing the quality of the completed HLOC forms and figuring out interrater reliability by comparing headquarters ratings to the SQ inpatient coordinator. The interrater reliability figure provided an idea of how well the inpatient coordinator understood headquarters' expectations for the HLOC form. The reviews also examined tier walks and IDTTs. SQ's referral to HLOC process had significant problems and required intervention.

The minor sustainability review found that 21 of 23 cases, or 91 percent of cases reviewed by headquarters, were considered adequate, while the inpatient coordinator found all cases adequate. Two cases were considered inadequate due to insufficient treatment interventions. This was an increase in quality and interrater reliability from the previous review when headquarters found 81 percent adequate and a 15 percent difference between headquarters' and the inpatient coordinator rates.

The major review data audits found a decrease in SQ's HLOC form quality and interrater reliability with the inpatient coordinator. The headquarters review showed that 21 of 26 forms or 81 percent of non-referral HLOC forms were adequate, while the inpatient coordinator considered all forms adequate. Of the five disputed cases, headquarters considered three cases unacceptable due to inadequate clinical justification for non-referral, one unacceptable due to insufficient treatment interventions, and one unacceptable due to missing documentation. The

monitor's expert reviewed the audit results of the SQ inpatient coordinator and generally agreed with headquarters' findings.

Since 2013, SQ had not been able to achieve consistent interrater reliability. While some of the variable performance had been due to changes in the inpatient coordinator, it was concerning that a coordinator in place for at least 12 months had not fully grasped CDCR's standard for adequacy of HLOC rationales for non-referral and treatment modifications to achieve compliance in internal audits. Because the inpatient coordinator supplied training to staff on HLOC form completion and referrals, it was critical that this person accurately understood the expectations and documentation requirements. While regional mental health staff provided a reasonable action plan for these concerns, it was the same ineffective action plan recommended during prior reviews. It was unclear whether SQ had fully implemented all recommendations from that action plan or if there were other reasons why performance did not improve.

The monitor's expert conducted a limited review of non-referred cases due to inaccuracies in the non-referral log. Multiple errors on the HLOC form were found, including failure to note a positive criterion, over-reliance on objective criteria when there was evidence that subjective indicators were positive, inadequate clinical rationales for non-referral treatment modifications, and a failure to update treatment modifications in cases where the patient met criteria over multiple IDTTs. Medical record review also showed that patients were not timely referred to higher levels of care. While most cases reviewed were eventually referred if they met criteria, there was insufficient clinical justification for non-referral when they first met criteria.

Both the minor and major sustainable reviews found numerous problems with IDTTs. During the minor review, the ASU treatment team did not complete initial evaluations on the

proper documentation.  MHCB treatment teams lacked leadership, did not properly implement the mechanical restraint memorandum, and failed to consider HLOC while not meeting most IDTT criteria.  Psychiatric initial evaluations were not consistently documented for condemned patients.  Issues found during the sustainability reviews were reported to have been resolved with a full-time psychologist being hired for the MHCB in September 2021.

IDTT concerns found during the major review included MHCB staff over engaging an extremely ill patient, which prevented meaningful treatment discussion.  ML EOP IDTTs did not include a full case conceptualization and did not adequately plan for safety when indicated.  The condemned program lacked a clear IDTT leader/facilitator, clear measurable treatment goals, and safety planning when indicated.

Some of the concerns found during the sustainable process reviews were seen during the site visit.  The psychiatrist supplied structure when serving as IDTT leader in the condemned program, while the PC supplied no structure at all when serving as the IDTT leader.  It would be beneficial to have the program supervisor attend the IDTTs to supply structure, clinical supervision, and accountability for covering all required elements of treatment planning.

Tier walks did not occur during the minor reviews, due to COVID-19 protocols. Regional staff instead used the OnDemand report for objective criteria, selecting five cases for review.  Eight additional cases were found during tier walks in the major review.  Six of 13 or 46 percent of patients required follow-up by institution staff; it was not noted whether any of these patients required HLOC referrals.  The utility of the sustainable process could be improved if SQ stated the number of cases, if any, found for referral to higher levels of care.  This would aid managers in identifying the need for training and other possible unmet needs.

Many of the HLOC problems were found, often repeatedly, by the regional mental health staff during sustainable reviews but were corrected by facility staff. The inpatient coordinator should receive comprehensive training. Supervisors should review the inpatient coordinator's audit results and all non-referrals to quickly find when a patient required referral to inpatient care.

SQ did not refer any patients to the acute level of care during the review period. At the time of the site visit, no patients were listed as awaiting an acute care bed at SQ.

There were 18 patients referred to the intermediate level of care during the reporting period. None of the intermediate care referrals generated from SQ were rejected or rescinded. SQ timely completed all intermediate care referral packets, and 15 of 18 or 83 percent of referral packets were reviewed within three working days of receipt as required. Each of the 18 referrals to intermediate care resulted in transfer. Fifteen of 18 transfers, or 83 percent, were timely transferred, and 10 or 56 percent were transferred within 72 hours of bed assignment.

No patients with complex medical needs were referred to acute or intermediate care during the review period.

SQ did not conduct any *Vitek* hearings during the review period.

SQ generated 91 MHCB referrals during the review period. Eighty-eight, or 97 percent of these referrals, resulted in MHCB admission, and three, or three percent, of referrals were rescinded. Of the MHCB referrals generated at SQ, 24 were admitted to SQ's MHCB, and 64 were transferred to MHCBs at outside institutions. Of the 88 MHCB referrals that resulted in transfer, 87, or 99 percent, were transferred within 24 hours as required. In the one non-compliant case, the transfer exceeded the 24-hour timeframe by 31 minutes, which was attributed

to the patient's initial refusal to transfer. Eight patients had three or more MHCB admissions during the six-month review period.

SQ reported that one of 24, or four percent, of MHCB admissions had a clinical length of stay that exceeded ten days. Five, or 21 percent, had physical lengths of stay beyond ten days. The average clinical length of stay for all admissions during the review period was 6.6 days, with a range of two to 11 days; the average physical length of stay was 7.4 days, with a range of two to 14 days.

Of the 23 discharges from the MHCB during the review period, 19, or 83 percent, were physically discharged within 72 hours of clinical discharge. The average time between clinical and physical discharge was 20.6 hours, with a range of zero to 98 hours. In the four cases where patients' physical discharge was greater than 72 hours from clinical discharge, the patients were discharged to SQ-PIP beds.

On a particular day during the site visit, the two patients in SQ's MHCB had respective lengths of stay of three and seven days.

SQ did not supply data on transfers to EOP, PSU, or ASU EOP hubs that occurred during the review period.

SQ reported that no patients were reduced from the EOP to 3CMS level of care during the reporting period.

The institution reported that three 3CMS patients were transferred to STRH during the review period. Two patients were timely transferred from ASU to STRH. One of the three patients transferred to STRH was in ASU for 172 days, which exceeded the required transfer timeline. This transfer was reportedly delayed due to "toxicology results" and COVID-19 related movement restrictions.

There were no transfers to LTRH during the reporting period.

There was one patient placed in an MSF during the review period.

Programming:

MHSDS Patients in Administrative Segregation:

Since SQ no longer had a reception center, they also no longer had a reception center short-term restricted housing program. Instead, caseload patients were placed into the existing administrative segregation and transferred to appropriate housing at another facility. While awaiting transfer, they received weekly PC clinical contacts in administrative segregation and were seen by psychiatry as needed. PCs and psychiatrists providing care in administrative segregation were part of the EOP and 3CMS treatment teams; all carried caseloads within approved ratios.

At the time of the site visit, there were no EOP patients in administrative segregation. The 3CMS patients were provided one weekly group and two therapeutic yards in addition to their custody program. A small sample of ASU cases were reviewed. Each patient transferred within their 30-day transfer timeline, and psychiatric rounds occurred even though documentation was variable.

Because of the low census of mental health caseload patients in ASU, SQ chose to prioritize treatment continuity rather than assigning clinical specific staff to ASU. For EOP patients, the logistics of continuity were found by management to be too difficult; thus, EOP patients were reassigned to 3CMS PCs. Staff reported during interviews that this made their caseloads challenging at times due to the logistical issues. 3CMS PCs followed their patients to ASU and continued to see them as per ASU Program Guide requirements.

Because of the low administrative segregation caseload, only one IDTT could be seen. This was an initial IDTT for a patient who was previously a MHSDS participant and who needed to be readmitted at the 3CMS level of care.  All required participants were present in the room or by phone, though the CC I was not the patient's assigned correctional counselor.  Despite that, the CC I utilized information about the patient in providing feedback.  The CC I, however, seemed unfamiliar with the STRH transfer process and repeatedly referred the patient to his ICC without supplying concrete information that would have reduced the patient's anxiety. Otherwise, the IDTT was well-facilitated, with thoughtful input from all participants.

During the review period, there were 62 MHSDS patients in ASU; 24 were EOP patients, and 38 were 3CMS patients.  EOP patients' lengths of stay ranged from ten to 781 days and averaged 129 days, indicating that multiple EOP patients were held beyond transfer timelines. The lengths of stay for 3CMS patients ranged from five to 177 days and averaged 44 days; this similarly indicated that multiple 3CMS patients were not transferred timely.

On a particular day during the site visit, there were four 3CMS patients in ASU.  The monitor reviewed 114As for the four 3CMS patients.  They showed that all four were timely offered showers and yard.  Three of four had timely initial ICCs; the monitor was unable to assess whether the remaining ICC was timely, as the patient was in ASU for longer term.

Non-Disciplinary Segregation:

During the review period, eight patients were on non-disciplinary segregation status; two were EOP, and six were 3CMS patients.  Both EOP patients were endorsed, but only one was endorsed timely.  Of the six 3CMS patients on NDS, three were endorsed.  Only one of three patients was timely endorsed.  At the time of the site visit, there were no patients on NDS status.

During the site visit, the monitor saw three ICCs.  Only one incarcerated person was a member of the MHSDS.  Mental health was present at all three ICCs; however, the clinician did not adequately inquire into the patient's understanding of the proceedings.  There was a robust discussion with one incarcerated person on his understanding of the proceeding, but it was prompted by the incarcerated person.  This incarcerated person was not a member of the MHSDS.

MHCB:

Staff interviews and a small sample of reviewed records showed that within 24 hours of admission, patients were given a history and physical, and an updated or new mental health assessment was conducted in a confidential setting.

Clinical staff assigned to the MHCB carried caseloads within approved ratios.  Staff reported that patients were seen daily by a psychiatrist or psychologist and at least twice weekly by a psychiatrist.  Confidential individual contacts were offered to the patients.  This information was generally consistent with EHRS reviews.

Staff reported that IDTTs were conducted at least weekly.  During the site visit, the monitor's expert saw an IDTT of a condemned patient who was being discharged from the MHCB.  The required staff were present, and there was good interdisciplinary discussion during the IDTT with the patient.

Ten patient charts were randomly selected for review for compliance with Program Guide timeframes in the MHCB.  All ten patients required both initial psychiatric and PC evaluations.  Eight, or 80 percent, of initial psychiatric evaluations occurred within 24 hours of admission.  Seven, or 70 percent, of PC initial evaluations occurred within 24 hours of admission.

All, except one, of the required daily clinical contacts occurred.  Of the daily clinical contacts, 48 percent took place in confidential settings, and 52 percent occurred at cell front.  In 67 percent of these cases, the progress note showed the patient refused an out-of-cell confidential contact.

Only one of the required twice weekly psychiatry contacts did not occur.  For the sample, 52 percent of the contacts were conducted confidentially.  Of the contacts that occurred cell front, 64 percent were due to the patient refusing a confidential contact.  For three cases, the progress note showed that the contact occurred cell front while the EHRS order showed the contact was conducted in a confidential setting.  In these cases, the monitor relied on the clinician's progress note to assess the confidentiality of the contact.

All ten patients in the sample had timely initial IDTTs attended by all required staff members.  For the ten patients requiring routine IDTTs, the required staff attended 91 percent of them.  All ten discharge IDTTs were timely.

Staff reported that MHCB patients were offered daily recreation yard, which was confirmed by a patient seen during IDTT.  Recreation therapist logs also confirmed that recreation therapy was offered three times weekly in a small multipurpose room on the unit.

The MHCB clinical supervisor reported that a suicide risk assessment checklist was completed upon discharge for patients admitted for suicidal thoughts/behavior.  Review of a small sample of records by the monitor's expert during the site visit was consistent with this report.

All MHCB cells were ADA-compliant.

Alternative housing cells were used in lieu of licensed MHCBs when MHCBs were not available.

Seclusion and Restraint:

During the review period, there were no clinical restraint or seclusion occurrences in the MHCB.

CIT:

The institution provided an updated crisis intervention operation procedure dated August 2021 that was consistent with headquarters policy. SQ's CIT coordinator was a psychologist who also served as the DDP coordinator. The CIT/DDP coordinator also responded to urgent and emergent mental health referrals at SQ. The CIT was operational from 2:00 p.m. to 10 p.m. from Monday through Thursday. High-risk clinical team members were used for emergency calls between 7:00 a.m. and 4:00 p.m. from Friday through Sunday.

SQ's CIT had two permanent members, the CIT coordinator and the SRN III, who were accompanied by the lieutenant from the patient's housing unit. In April 2021, the two CITs resulted in MHCB referrals. In May 2021, four of ten CITs resulted in MHCB referrals. In June 2021, two of four CITs resulted in MHCB referrals. The three CITs in July 2021 did not result in MHCB referrals. Both August 2021 CITs resulted in MHCB referrals. One of three September 2021 CITs resulted in an MHCB referral.

Alternative Housing:

There were 90 alternative housing placements during the review period. Of these placements, there were 15 condemned EOP, 27 mainline EOP, eight ASU EOP, two condemned 3CMS, 28 mainline 3CMS, five ASU 3CMS, and five non-MHSDS incarcerated persons.

SQ supplied documentation on patients placed in alternative housing during the review period, but information on length of stay for some patients was incomplete. For patients identified as being "directly admitted to [SQ's] MHCB," information on the date of the patient's

removal from alternative housing was not provided.  Of the 70 cases where complete data was provided, one transfer to MHCB, or one percent, exceeded 24 hours, partly due to the patient's refusal to transfer.

SQ utilized 18 alternative housing cells in lieu of licensed crisis beds for patients awaiting MHCB placement.  Patients were placed in alternative housing on one-to-one observation status.  SQ identified its alternative housing areas in order of priority as follows: CTC licensed medical beds; then, large holding cells in the central health services building with a toilet and sink.  Observed cells were wet cells and relatively large.  Patients had constant observation and were issued suicide smocks.

Care for the Condemned:

EOP:

PCs and psychiatrists providing care to condemned MHSDS patients were part of the condemned clinical team and provided services at both the EOP and 3CMS levels of care; all carried caseloads within approved ratios.

Record reviews were conducted for 20 patients to assess timely psychiatric and PC contacts and IDTTs in the condemned EOP program.

All seven of the patients who required an initial psychiatric contact had timely contacts; 86 percent occurred in a confidential setting.  For 20 patients, 97 percent of routine psychiatric contacts occurred within 30 days and were compliant.  Regarding psychiatry contacts, 61 percent were conducted confidentially.  All non-confidential psychiatry appointments were due to patient refusals.  Many patients were seen by their psychiatrists more frequently than required by the Program Guide; however, many patients' psychiatry appointments were conducted simultaneously with their PC contacts.

All seven patients who required initial PC contacts had timely contacts; 71 percent occurred in a confidential setting.  For 20 patients, 83 percent of routine PC contacts were timely.  Of the required contacts, 66 percent were conducted confidentially.  The reasons provided for appointments not being confidential included patient refusals and patients being on flu or COVID-19 quarantine status.

Seven patients in the sample required initial IDTTs during the review period, of which 86 percent occurred within 14 calendar days.  Required staff members were present at all seven initial IDTTs.  Four of seven initial IDTTs were conducted in absentia due to COVID-19 precautions and patient refusals.

For 17 patients, 70 percent of routine IDTTs occurred within 90 days and were compliant with Program Guide timelines.  Required staff attendees were present for all routine IDTTs reviewed.  Patients were present at 18 percent of the IDTTs.  IDTTs were held in absentia due to COVID-19 precautions and patient refusals.

Mental health management reported that the condemned program had insufficient group treatment space during most of the review period.  Condemned EOP patients were offered an average of 8.67 hours of structured treatment, ranging from 5.9 to 12.2 hours, during the reporting period.  An additional room was allocated for condemned EOP patients in August 2021, which increased offered structured treatment to 9.8 hours in August 2021, and to over ten hours in September 2021.  Patients attended an average of three weekly hours of structured treatment.  During the site visit, six daily groups were offered.  Approximately half of the groups were clinical, and half were recreational.

Patients reported several challenges related to group treatment.  They noted problems with escorts to the central health services building, group facilitators were sometimes late or

changed, and they believed that groups were not valuable to them clinically. Patients reported a desire to have more clinically oriented groups and treatment that would rehabilitate them. Some examples given were coping with mental illness, understanding one's diagnosis, and substance abuse. Further, patients reported treatment groups were not discussed with them during their IDTT meetings. The interviewed patients did not understand why they were assigned to certain groups, or how their treatment was helped by some of the treatment groups.

IDTTs were seen during the site visit for the condemned program. The treatment teams were quite knowledgeable about their patients and established a good rapport. While the psychiatric component of the treatment teams was of high quality and consistent across cases, the treatment teams were of variable quality due primarily to the efforts of the clinicians. Two observed clinicians had adequate case conceptualizations, with one clinician supplying a comprehensive conceptualization of a complicated case that had only recently been assigned to the clinician. One clinician was particularly concerning in that they not only did not appear to have conceptualized the case, but also reinforced negative and inappropriate behaviors on the part of the patient during IDTT. The patient made several inappropriate comments to the PC that the PC did not address. This was discussed later with mental health management.

During observed IDTTs, treatment teams did not discuss specific interventions beyond medication nor assignment of patients to particular treatment groups. Treatment goals were often subjective, and interventions were not discussed. Treatment plans were of variable quality, with some adequate and others inadequate. Patients' treatment was reduced without patients being formally placed into a modified program. A limited record review showed that those who were or should have been identified as EOPs on modified programming were not seen monthly

by the IDTT as required.  Reduced participation was not consistently addressed in treatment planning, and patients were not routinely considered for referral to a HLOC.

Overall, treatment teams would benefit from clinical supervision and updated training on treatment planning, modified programming, and HLOC review and documentation.

3CMS:

Mental health treatment in the 3CMS condemned program was concerning.  Patients were not scheduled for any treatment groups, reported increased symptoms, and spent significant amounts of time locked down in their cells.  Despite this, clinicians had not increased their presence on the unit to aid the patients in coping with less treatment and increased cell time.  According to patients and verified by staff, there was virtually no program due to lack of access (including no offered programs), frequent quarantines, and social distancing rules.

Record reviews were conducted for 18 condemned 3CMS patients to assess timely psychiatry and PC contacts, and timely IDTTs.

Only two patients required initial psychiatric evaluations during the review period; one occurred prior to the initial IDTT and was compliant.  For 18 patients, 94 percent of routine psychiatric contacts occurred within 90 days.  Regarding psychiatry contacts, 24 percent occurred confidentially.  The remaining contacts were not in a confidential setting due to patient refusals.  A common excuse was mobility issues that discouraged patients from going up and down the tiers to their appointments.

Two patients required initial PC evaluations during the review period; both occurred within ten working days and were compliant.  For 18 patients, 85 percent of routine PC contacts occurred within 90 days.  For the required contacts, 53 percent were conducted in a confidential setting.  Non-confidential appointments were due to refusals, with mobility as a common excuse.

Two patients required initial IDTTs during the review period; one was timely. Required staff attended both initial IDTTs.

Seven patients in the sample required routine IDTTs during the review period; 71 percent occurred at least annually and were compliant. Required staff members attended five of six of the routine IDTTs that occurred during the review period. All IDTTs were held in absentia due to COVID-19 restrictions or modified program.

Access to yard and showers was also troubling. Patients reported that the strict rules on social distancing for outside yard seemed excessive and reduced their recreation opportunities. Patients complained that the inability to shower on the yard caused them to have hygiene concerns because of reduced shower time in the units. They also reported not being offered showers three times weekly. In July 2021, the warden distributed a bulletin that said yard showers would end due to drought conditions and unit showers would only occur three times weekly and last no more than five minutes.

Mainline EOP:

The mainline EOP, in H-Unit on Facility B, had a joint bed capacity of 200 in two 100-person dorms. Due to the pandemic, dormitory capacity for most of the review period was 64 patients per dorm, for a total capacity of 128 patients. As of September 13, 2021, dormitory capacity returned to pre-pandemic capacity, but due to staffing allocation issues, the return to capacity was being slowed.

The average monthly patient census during the review period ranged from 86 to 118 patients, with the overall average being 101 patients. Each month there was an average of two patients on an EOP modified program.

Clinical staff providing care to EOP mainline patients were assigned to the EOP team and carried caseloads within approved ratios.

A sample of 12 EOP patients was selected to assess compliance with timely psychiatry and PC contacts. All three patients in the sample who required initial psychiatric contacts received timely contacts; two occurred in a confidential setting.

For all 12 patients, 98 percent of the routine psychiatric contacts were timely. As for psychiatry contacts, 84 percent were conducted in a confidential setting. Non-confidential psychiatry appointments were due to patient refusals and COVID-19 restrictions. Of note, many patients in the sample were seen by their psychiatrists more often than required by the Program Guide.

All three patients in the sample who required initial PC contacts during the review period received timely contacts within 14 calendar days; two of three occurred in a confidential setting.

For all 12 patients, 80 percent of routine PC contacts were compliant. For PC contacts, 72 percent were conducted confidentially. The reasons provided for appointments not being confidential included patient refusals and custody modified program.

A sample of ten EOP patients was selected to assess compliance with IDTT requirements. Two of the 10 patients required an initial IDTT during the review period; one occurred within 14 calendar days and was compliant. Required staff members attended both initial IDTTs, but it was not clearly discernable whether the assigned psychiatrist and clinician attended. One of two initial IDTTs was conducted in absentia due to COVID-19 precautions.

For routine IDTTs, seven of ten occurred within 90 days. Required staff attendees were present for all routine IDTTs reviewed. Like initial IDTTs for EOP patients, attendance by the assigned psychiatrist and PC was not clearly discernable for all cases. Patients were present at

eight of ten routine IDTTs.  IDTTs held in absentia were attributed to COVID-19 precautions, conflicting appointments, and patient refusals.

All EOP patients in need of quarantine or isolation but not in need of higher level of medical care were housed in the Adjustment Center.

Patients reported meeting with their PCs on a weekly basis and as needed.  A minority of patients reported having several different PCs during the past six months due to staff changes.

For appointments occurring in the administration building, there was a problem with confidentiality.  Patients sitting in the lobby waiting area overheard conversations in closed offices.  Similarly, clinicians and patients in the offices heard conversations in the lobby waiting area.  Prior to the site visit, SQ ordered white noise machines to resolve this issue.  They arrived on the third day of the site visit.

Staff reported that all clinicians were not assigned to a specific office, which contributed to space issues, especially since nursing staff was allotted office space that previously was assigned to mental health staff.

Significant issues with the number of hours of structured therapy and the quality of the structured treatment were present.  During the review period when H-Unit was not on quarantine, SQ reported that EOP patients were offered an average of 10.5 to 12.7 weekly hours of structured treatment; 6.1 to 7.6 hours on average were used by individual patients.  For August 2021, SQ was reported to be 66 percent compliant with treatment offered.  Specifically, EOP patients received, on average, 10.3 weekly hours of treatment.  During September 2021, EOP compliance for treatment offered was reported to be at 90 percent.

Core mental health groups were a minority of the structured therapy offered, due to the redirection of nurses caused by staffing vacancies.  Until the latter part of September 2021, about

half of the structured treatment was provided by nursing staff.  Given the frequent redirection of

nursing staff, recreation therapists supplied additional recreation therapies for patients assigned

to the canceled groups, and/or various groups were combined.  Patients reported that it was

common for such recreation therapy groups not to be very structured.  Recreation therapists were

scheduled to supply three yard groups each week for a total of six hours, which did not include

the above-referenced coverage for canceled groups.  Scheduled structured treatment activities

also included a weekly community meeting in each dorm.  EOP patients reported a frequent lack

of continuity in group treatment due to different clinicians directing a specific group as a result

of coverage or other issues.  Since the end of September 2021, mainline EOP clinicians increased

the number of groups provided per week, and nursing staff no longer supplied structured

treatment.

Staff placed patients refusing 50 percent or more of their offered structured treatment on

a high refusal list to flag them for interventions designed to increase their participation in

structured treatment.

IDTTs observed were limited to two patients due to COVID-19 cancellations.  All the

required IDTT members were present, either in person or via the phone.  Although a correctional

counselor was present, they were only available by phone and were not the assigned correctional

counselor.  There was no explanation for their lack of attendance.  Treatment plans were

discussed during the IDTTs, while attendance and group assignments were not discussed.

Mental health staff and custody were present at morning huddles.  The monitor's expert

saw the custody officer presenting information about concerning behaviors being shown by

several patients.

In August 2021, the mainline EOP program began implementing the ADA EOP Worker Program with two ADA worker supervisors who held weekly meetings to review responsibilities and address any concerns. These five participants played an active role in orienting new patients to the program and aiding with access to care.

Group treatment was not observed due to COVID-19 cancellations.

During a community meeting, patients reported good access to their clinicians and psychiatrists. They verified that appointments with PCs occurred at least weekly in an office setting. Although patients understood the IDTT process, some patients reported a lack of familiarity with their treatment plans. Patients generally did not experience issues specific to continuity of medications.

There was an average of three patients per day on a modified program due to clinical reasons. These patients received an IDTT at least monthly to address such clinical concerns. There were, however, several areas of concern regarding the EOP modified program at SQ. Patients were told that they were in a modified EOP program, but they were not always found in on-demand reports. Patients in the modified program were not scheduled for any groups or very limited groups and individual contacts. It was not clear from treatment plans that the amount of treatment offered was based on a clinical rationale rather than patient preference.

A sample of records of EOP modified program patients was reviewed, and those patients were not flagged in the HLOC on-demand report. They seemingly only appeared on the on-demand report if they were scheduled for groups but did not attend 50 percent. It was concerning that patients at the EOP level of care who were assigned no group treatment or profoundly limited group treatment were not routinely considered for referral to a HLOC considering that the treatment team made the reduced-treatment decisions. Those same patients

did not have the behavior underlying their lack of participation targeted as a focus of treatment, even when it appeared to be directly connected to their mental condition.  Poor participation was not consistently part of the treatment plan for those patients, and even when indicated, interventions were inadequate or vague.

Concerns about the use of EOP modified programming were discussed with SQ staff and mental health management, and they appeared unaware of Program Guide requirements for modified programming.  SQ was encouraged to supply training to the condemned EOP staff on Program Guide requirements.

Patients reported that they did not attend groups because they were being stripped out in dirty holding cells, and because of COVID-19 concerns.  This was seen, and staff was informed. Custody staff reported that those cells were cleaned "as needed" rather than being disinfected and cleaned on a regular basis.  Since the unit had the equivalent of incarcerated porters, it was unclear why a cleaning schedule had not been set up, particularly considering COVID-19. Mental health management was unaware and committed to addressing the problem with custody management.  The high refusal rate was also discussed with mental health staff, but they had limited insight into the cause and any possible remedies.  SQ should consider a QIT to address the refusal rate.  Mental health staff was receptive to feedback on these concerns.

Mainline 3CMS:

On August 14, 2021, all mainline 3CMS patients and the hospital building returned to Phase I programming due to three related positive COVID-19 cases within a 14-day period. Newly endorsed patients had to first stay in the Adjustment Center for seven days if vaccinated and 14 days if not vaccinated.

Both PCs and psychiatrists providing care to 3CMS patients were part of the 3CMS clinical team and carried caseloads within approved ratios.

Record reviews were conducted for 19 cases to assess timely psychiatric and PC contacts and IDTTs.

Seven patients required initial psychiatric evaluations during the review period; 71 percent occurred prior to the initial IDTT.

Regarding routine psychiatry contacts, all 19 patients required routine contacts; 86 percent occurred within 90 days and were compliant.  The data showed that 83 percent of psychiatry contacts were in a confidential setting.  Contacts not held in a confidential setting were due to COVID-19 restrictions or refusals.

Seven patients in the sample required initial PC evaluations during the review period; 71 percent occurred within ten working days and were compliant.

For routine PC contacts, all 19 patients required routine contacts, and 92 percent occurred within 90 days.  Most patients were seen more often than Program Guide requirements.  The data showed that 96 percent were conducted in a confidential setting.  Reasons for contacts not conducted in a confidential setting included COVID-19 restrictions.

Seven patients required initial IDTTs during the review period; 86 percent occurred within 14 working days and were compliant.  Some were held in absentia due to COVID-19 restrictions.

Five patients required routine IDTTs during the review period.  All five had IDTTs at least annually and were compliant.  Required staff members attended all initial and routine IDTTs that occurred during the review period.  Some IDTTs were held in absentia due to COVID-19 restrictions.

Staff and patients said that patients were seen at least quarterly by their PC.  Mental health staff reported that it was becoming increasingly difficult, if not impossible, to see caseload patients more often if clinically indicated due to the size of the current caseloads.

Staff and patients reported patients were seen for medication reviews by the psychiatrist at least quarterly.

Psychiatrist and PC interviews occurred in private settings based on information obtained from staff and patients.

During the recent review period, 3CMS groups were greatly reduced due to ongoing COVID-19 issues.  A planning group was offered in August 2021.  In October 2021, group treatment was expanded to seven scheduled groups.  About 80 3CMS patients took part in these groups, which were provided by recreation therapists.

Five IDTTs were seen during the site visit.  Three were conducted in absentia due to apparent patient refusal.  All required members of the IDTT were present and there was good interdisciplinary discussion.  Treatment plans and criteria for transfer to higher levels of care were discussed.

Staff reported that they were able to meet with their caseload patients as clinically indicated until fairly recently when their caseload numbers began significantly increasing.  This information was consistent with EHRS reviews.

Additional services were not routinely offered to patients recently discharged from EOP to 3CMS.  Staff reported that this increased the difficulty patients had adjusting to changes in their level of care.

Ducats were intermittently not received.  More concerning was the receiving of ducats without an explanation of the nature of the ducated appointment.

During group interviews, patients described good access to their psychiatrist and PC. They also said that clinical contacts were confidential. Patients were aware of the IDTT process and reported an ability to describe their treatment plans.

Other Issues:

Condemned Inmate Transfer Pilot Program:

Since the last review period, the CDCR and SQ implemented the condemned inmate transfer pilot program (CITPP). This allowed condemned incarcerated persons who met certain criteria to transfer from condemned housing to GP housing in various prisons in CDCR.

This program was important to note for a variety of reasons. Its full implementation could significantly reduce the condemned population at SQ, including members of the *Coleman* class.

Pre-Release Planning:

San Quentin had two pre-release coordinators who tracked release dates for patients using the on-demand and 60-day pre-parole reports provided by the statewide mental health pre-release coordinator.

For mainline EOP patients, a pre-release/re-entry planning group was offered weekly. EOP patients in the Gold Coat Program, an honors program, were also allowed to aid patients in the mainline EOP with acquiring job readiness skills.

Due to the pandemic, the pre-release coordinator reported that they had not run the statewide pre-release curriculum during the reporting period. EOP programming included some groups related to pre-release; however, these alternative groups were not part of the regular statewide pre-release group curriculum. There were no pre-release groups offered to 3CMS patients.

For EOP patients released, the PC documented meeting with 28 of 29 patients. TCMP documented completed Medi-Cal applications for 24 of 29 patients, Social Security and SSI applications for 23 of 29 patients, and veterans' benefits applications for two of 29 patients. There were 67 3CMS patients scheduled for release during the review period. The patients' PCs met with them in all but four instances prior to release. TCMP caseworkers reported the submission of Medi-Cal applications for 63 patients, applications for Social Security or SSI for 24 patients, and veteran benefits for two patients.

Program Access:

a.        Job and Program Assignments

As of October 1, 2021, SQ's 949 job assignments were held by 40 or 20 percent of EOP patients, 285 or 30 percent of 3CMS patients, and 624 or 36 percent of non-MHSDS incarcerated persons.

The 396 academic assignments were held by 15 or eight percent of EOP patients, 128 or 14 percent of 3CMS patients, and 253 or 15 percent of non-MHSDS incarcerated persons.

No EOP patients held vocational assignments. The 77 vocational assignments were held by 26 or three percent of 3CMS patients and 51 or three percent of non-MHSDS incarcerated persons.

The 276 voluntary education assignments were held by five or three percent of EOP patients, 87 or nine percent of 3CMS patients, and 184 or 11 percent of non-MHSDS incarcerated persons.

The 194 substance abuse treatment assignments were held by 11 or six percent of EOP patients, 100 or 11 percent of 3CMS patients, and 83 or five percent of non-MHSDS incarcerated persons.

The institution also supplied documentation of trainings on program assignments for EOP patients that occurred during calendar year 2021. These trainings took place in February, March, and June 2021.

b.     <u>Milestone Credits</u>

During the review period, 131 of 198, or 66 percent, of SQ's EOP patients were eligible to earn milestone credits, with 78 percent of eligible patients earning the credits. For 3CMS patients, 820 of 940, or 87 percent, were eligible to earn milestone credits, and 15 percent earned the credits. Regarding non-MHSDS incarcerated persons, 1,306 of 1,714, or 76 percent, were eligible to earn milestone credits; 17 percent earned them during the review period.

The institution provided a memorandum with additional information on milestone credit implementation at SQ. At the time of the site visit, SQ did not have any mental health staff trained to provide milestone courses but requested to be included in the next round of trainings. SQ patients were eligible to receive 60 hours of milestone credits upon completion of 60 mental health treatment hours.

c.     <u>Out-of-Level Housing</u>

As of September 30, 2021, there were 22 EOP and 53 3CMS custody Level I patients in Level II housing. There were no EOP or 3CMS custody Level II patients housed out of their assigned housing level. There was one EOP and six 3CMS custody Level III patients in Level II housing. There was one 3CMS custody Level IV patient in Level II housing.

d.     <u>ADA Reasonable Accommodation and Grievance Procedures</u>

The institution provided in-service training (IST) materials entitled "Offender Grievance and Appeal Process," last revised in July 2020. The training materials discussed the need to provide reasonable accommodations for offenders with disabilities and included a copy of CDCR

Form 1824 ("Reasonable Accommodation Request"). The institution also supplied documentation showing 754 staff members received the Offender Grievance and Appeal Process IST.

       e.     <u>Periodic Classification Score Reductions: EOP Patients</u>

SQ completed CDCR 840s reflecting the provision of classification score reductions for EOP patients available for review.

       f.     <u>Re-entry for Patients with Psychiatric Disabilities</u>

SQ provided documentation that 11 EOP patients were provided substance abuse programming to help with community re-entry.

<u>Case-by-Case Reviews</u>:

During the review period, four patients were eligible for and received long-term segregation case conferences. All four patients were retained and released prior to their re-review dates. Case notes showed that all required disciplines attended case conferences except for the senior psychologist.

The monitor reviewed four ICC chronos for condemned patients with projected or active SHU terms. All four had timely pre-MERD reviews.

<u>"C" Status</u>:

There were 19 patients on "C" status at the time of the site visit. Of the 19 patients, two were EOP, six were 3CMS, and 11 were non-MHSDS patients. Reasons for "C" status included refusing to accept housing; use, possession, and distribution of controlled substances; possession of alcohol; possession of cell phones; disobeying orders; and fighting.

<u>Mental Health Referrals</u>:

During the review period, SQ reported a total of 1,354 mental health referrals; there were 211 psychiatry referrals and 1,143 PC referrals. The institution reported compliance for psychiatry and PC emergent and urgent referrals for the review period, except for July and September 2021 psychiatry urgent referrals. All psychiatry routine referrals were compliant. PC routine referrals were compliant for all months except April and August 2021.

Treatment Space:

Since the last site visit, SQ created more treatment space for condemned patients. As a result of having to convert downstairs offices to ADA-acceptable cells, mental health was moved to a trailer area between East Block and North Seg. This was where individual contacts and IDTTs occurred for patients from East Block. The space was bright, sufficiently large even with treatment modules, and appeared to be appropriately ventilated. The challenge the new space presented was that it required patients to leave their unit, and some patients were reluctant to do that, preferring to be seen in the building as they had been for years.

During interviews, patients reported that they had greater access to staff and felt as though their mental health needs were more quickly addressed when they could stop mental health staff on the tier. Since mental health staff was moved to the new treatment space, patients reported that they had less access to clinicians and felt that was a disadvantage of the new space.

North Seg also converted a storage/break room to a treatment space for individual contacts. The treatment space had two modules, and the room appeared cluttered and somewhat dirty. Staff was questioned as to why patients had to be seen in modules. Staff reported that this was due to their condemned status and that there was still a makeshift sallyport at the end of each tier.

EOP groups were provided in condemned visiting at the start of the review period, but were moved back to the central health services building on the second floor.  One room was used for these groups.  Only EOP groups were provided.

Custody and Mental Health Partnership Plan:

SQ's CMHPP LOP dated December 2020 was consistent with the statewide operating procedure.

Executive leadership joint rounding documentation was supplied for April through September 2021.  The documentation showed that all required custody and mental health leadership staff were in attendance.  In addition to required staff, CDCR's undersecretary attended in September 2021, a headquarters representative attended in May 2021, and the warden attended four of six months.

Most staff reported positive relationships between mental health and custody, with the caveat that relations were frustrated during COVID-19 outbreaks because patients arrived late to mental health appointments.

Although SQ shared the outcomes of executive rounding with executive leadership staff, the institution did not discuss the outcomes in the quality management committee meeting or in the mental health subcommittee until September 2021.  Prior to September 2021, the institution did not realize that these were requirements of the partnership plan.

The Special Master's monitors and experts saw multiple huddles on second and third watch in the condemned unit and in the H-Unit EOP dorms.  All required staff attended the huddles and participants were present in-person or by teleconference.

In both the condemned and H-Unit EOP dorms, custody and mental health staff were seen to have good relations.  Custody staff were knowledgeable of patient issues, and, in one

instance, the custody sergeant described how he was able to de-escalate a challenging situation with a transgender patient.  In the condemned unit's huddle, custody staff described their interactions with high-risk patients and patients on a hunger strike.

For ASU, huddle reports were requested for 117 days; thus, there should have been 234 reports between second and third watch huddles.   Of the 234 huddle sheets expected, 175 or 75 percent were provided.  Regarding the 175 huddle sheets provided, 125 reports were blank. Notes about patients were present on 50 reports, or 29 percent.

During the site visit, the Special Master's monitor observed an EOP orientation program group.  Two Gold Coat EOP patients ran the group with the aid of a staff psychologist.  The required custody staff was not in attendance.  The patients used a script, handouts, and an audiovisual presentation on visitation.  The exchange between the orientation group and the peer facilitators, with the aid of the mental health staff, was powerful.  As for the absence of custody staff, the chief of mental health learned that custody sporadically attended the group and noted their intent to follow-up on custody attendance.

During the site visit, the weekly 3CMS supervisory meeting was observed.  One of the two supervising staff psychologists reported attending the weekly meeting with the housing unit sergeants.  Although SQ reported that the meetings occurred weekly at the same time and in the same location, it took time and effort to gather custody, and observed custody staff did not appear to understand the meeting's purpose.  The institution reported this was unusual and was likely due to officers covering other areas or being new to the housing unit.  From April through June 23, 2021, documentation showed that the only issue of concern was COVID-19.  Beginning June 30, 2019, documentation included a custody attendance list, and discussions of issues and

concerns about patients were routinely noted.  The 3CMS orientation brochure was provided in the audit materials.

The  IAC met during the site visit.  The IAC consisted of approximately 27 members, and each housing unit could send six or seven members to the council.  Prior to the warden's meeting, the patients' issues and concerns were addressed by housing unit leadership and then elevated to the associate warden's level.  If the issues or concerns remained unresolved after the first two levels of meetings, they were elevated to the warden's level.  The meeting was led by the president of the IAC, who was a 3CMS patient.  Also seen during the meeting was the presence of a sign language interpreter for one member of the IAC who was hearing impaired.  A significant issue raised by the IAC related to a serious suicide attempt by a patient.  The patient was never referred to mental health, and the following morning he was found bleeding from significant self-inflicted lacerations to his neck.  The IAC said that the incident was traumatic for the patient and all witnesses.

Only 715 of 958, or 75 percent of correctional staff attended annual partnership training.  The institution did not supply the specific data needed to determine the number or percentage of mental health staff that attended annual partnership training.

Heat Plan:

There was an updated LOP for the heat plan issued in May 2021 and an addendum issued in August 2021.  There was no Stage I, II, or III heat alerts during the review period.  The monthly summary reports were completed and submitted as required by policy.

The monitor observed the daily heat medication lists and working and appropriately placed thermometers in units.  Staff were familiar with the heat plan and were able to explain the process for each stage.

SQ had housing units with five tiers.  Notably, their LOP required the temperature to be taken at the highest point of the unit.  The heat plan coordinator conducted daily checks to ensure there were no patients on heat alert medications housed above the third tier.

RVRs:

Regarding training on mental health input into the RVR process, the institution reported that the warden, chief deputy warden, associate wardens, and captains attended the mandatory training.  For lieutenants, 31 of 34 attended, or 91 percent, and for sergeants, 52 of 77 attended, or 68 percent.  For mental health staff, SQ reported holding training on mental health input into the RVR process via WebEx; but no training sign-in sheets were completed.

During the review period, SQ issued 735 RVRs; 49 percent were issued to MHSDS patients.  Of those, eight RVRs were issued to MHCB patients, 83 were issued to EOP patients, and 270 were issued to 3CMS patients.

The monitor reviewed 20 RVRs issued to MHSDS patients.  Custody staff timely requested mental health assessments for ten, or 50 percent, of RVRs.  The late referrals ranged from one to 13 days late.  For all 20 cases, mental health timely completed and returned the mental health assessment to custody staff.

The clinicians completing mental health assessments supplied relevant information in layman's terms for the senior hearing officer to consider during RVR adjudication, as well as appropriate mitigation of privileges, including phone calls and visits.  However, it was noted that 16 of 20, or 80 percent, of mental health assessments did not recommend any mitigation of penalties.

The senior hearing officer did not adequately document their consideration of the mental health assessment information during RVR adjudication.  Only six, or 30 percent, of RVRs

documented consideration of the mental health assessment.  Senior hearing officers consistently quoted the clinicians' responses from the mental health assessment and did not include any statement of their consideration of the same.  Clinicians recommended mitigation, and the senior hearing officers agreed to mitigation in four of the reviewed RVRs.

The monitor reviewed two chronos where the ICC assessed a SHU term.  For the two ICC chronos where a SHU term was assessed and imposed, one ICC chrono documented their consideration of the mental health assessment information, and one did not.

Use of Force:

Staff attendance at the mandatory use of force training was compliant for executive, managerial, and line custody staff.  However, training for lieutenants and sergeants was not compliant.  For lieutenants, 26 of 34, or 76 percent, attended the training and for sergeants, 57 of 77, or 74 percent, attended the training.

For mental health staff, the institution reported that the chief psychologist, chief of mental health, chief psychiatrist, psychologist supervisor, psychiatrist supervisor, social worker supervisor, and psychiatrists all attended the training.  For social workers, 13 of 15, or 87 percent, attended the training, and 23 of 30, or 77 percent of psychologists, attended the training.  For nurses, 158 of 187, or 84 percent, attended the training.

SQ staff demonstrated compliance with the use of force policy.  The institution reported ten use of force incidents, including one controlled and nine immediate use of force incidents.

The controlled use of force was a physical cell extraction of a patient from a CTC bed to his endorsed outpatient housing at SQ.  All policy requirements were met including video of the cell extraction, a cool down period, multiple attempts by mental health and custody staff to gain the patient's compliance with the bed move, and nursing review of the patient's EHRS for

oleoresin capsicum contraindications.  Oleoresin capsicum was not approved by the incident commander.

Of the four immediate use of force incidents reviewed, two involved fighting where staff used force to break up the fights, one involved resisting staff during a clothed body search, and one involved a patient battering staff when told of a cell move.  The immediate uses of force were reasonable, and staff responded within policy requirements in all four incidents.

The institution reported no change to the use of force policy since the previous reporting period.

Lockdowns/Modified Programs:

SQ reported four modified programs during the reporting period with no interruption to mental health programming.  Each lockdown was in response to managing COVID-19 exposure.

Access to Care:

A review of SQ's monthly Health Care Access Quality Reports from April to September 2021 showed that 1.2 percent of issued ducats were reported as incomplete due to custody reasons while 37 percent were not completed for non-custodial reasons, excluding patient refusals.

*Coleman* Postings:

There were current *Coleman* posters posted in both English and Spanish on every unit in patient accessible areas.

**APPENDIX B-6**
**CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF)**
**(December 13, 2021 – December 16, 2021)**
**Review Period: (May 1, 2021 – October 31, 2021)**

Census:

On December 10, 2021, CCWF housed 2,264 incarcerated persons, which was a 14 percent decrease since the previous site visit in May 2020. The mental health caseload population of 1,311 represented 58 percent of the total incarcerated population and was four percent less than during the prior review period. This decrease in the incarcerated person population was attributed to the close of CCWF's reception center for most of 2020 and part of 2021 due to the COVID-19 pandemic.

At the time of the site visit, the MHCB had been closed for construction since November 2021 and did not house any patients.

There were 83 mainline EOP patients and 1,041 mainline 3CMS patients.

The administrative segregation population was 93, including ten patients in the EOP hub.

The reception center population of 168 included 108 3CMS patients and one patient in the reception center STRH.

The STRH housed 58 patients.

The SHU population of 13 included one EOP and nine 3CMS patients.

Staffing:

The chief psychiatrist's position was filled.

One of two chief psychologist positions was filled by a senior psychologist supervisor acting out of class. CCWF was not permitted to fill the second position, as a savings action.

All three senior psychologist supervisor positions were filled. However, as noted above, one senior psychologist supervisor was acting as the chief psychologist and another psychologist

acting out of class filled one of the senior psychologist supervisor positions. Three of 3.5 positions for senior psychologist specialists were filled.

Five of 7.5 psychiatry positions were filled for a 33 percent vacancy rate; two of the filled positions were telepsychiatry. Two psychiatric nurse practitioners, one civil service and one registry, reduced the psychiatry vacancy rate to seven percent.

Eighteen of 26.5 psychology positions were filled, for a 32 percent vacancy rate. Three psychologists were unlicensed.

The supervising social worker position was filled. Fifteen of 16.5 social worker positions were filled, for a nine percent vacancy rate. Three social workers were unlicensed.

All six MHSDS registered nurse positions were filled. All three senior psych tech positions were also filled, as were 21 of 26 psych tech positions, for a vacancy rate of 19 percent.

Eight recreation therapists covered 6.5 positions.

Eleven of 15 MHSDS clerical positions were filled, for a 27 percent vacancy rate.

The OSS II position was vacant. One of 2.5 HPS I positions was filled. Two out of class civil service AGPAs, one of whom was from VSP and another from CCWF, provided additional coverage and filled the 1.5 vacant HPS I position. The Correctional Health Services Administrator (CHSA) position was vacant, and the unit supervisor position was filled.

Telepsychiatry:

During the review period and at the time of the site visit, CCWF had two full-time telepsychiatrists who exclusively provided services for 3CMS patients on all four yards. These telepsychiatrists had respective caseloads of 237 and 208 patients, which were within ratios.

The two telepsychiatrists had a total of 2,112 contacts with 3CMS patients during the reporting period. There were 1,756 individual clinical contacts and 356 contacts for IDTTs. Of

the 1,756 individual psychiatry clinical contacts, 227 were for initial patient contacts, 1,132 were

for routine patient contacts, two were for urgent referrals, and 309 were for routine referrals.

There was one psychiatry contact for medication noncompliance and 38 for medication consents,

either in connection with the prescription of new medications or for medication changes. Forty-

seven psychiatry contacts were for AIMS evaluations. Of the 356 psychiatry contacts for IDTTs,

225 were for initial IDTTs and 131 were for continuing IDTTs.

Staff Training:

CCWF conducted numerous staff trainings during the review period for mental health

staff and some for custody. Among them was an online training on the revision of the CDCR

Form 7497, the inpatient and alternative housing discharge custody check sheet. Required

attendees included psychiatrists, psychologists, social workers, and psych techs, and various

custody officers. The institution reported that 34 of 66, or 52 percent of required mental health

staff completed this training; custody attendance was not reported.

Relatedly, all 47, or 100 percent, of required mental health staff completed an online

training on mental health and custody staff reporting and documentation of patient safety

concerns, while 59 of 60, or 98 percent, of required mental health staff completed an online

training on mental health policy and procedure; custody attendance at the latter training was not

reported. Another training on complex cases in correctional mental health that addressed

improving diagnostic accuracy with enhanced case studies was completed by 23 of 36, or 64

percent, of required mental health staff. Furthermore, a training on mental health suicide risk

management program policy and procedure was taken by 213 of 228, or 93 percent, of required

mental health staff.

Quality Management:

CCWF implemented five CAPs during the review period in the following areas: (1) clinical staff not checking appointments "in" and "out" correctly based on when the consult order was received; (2) mainline 3CMS initial IDTTs not meeting Program Guide compliance over a three-month period; (3) reception center and mainline 3CMS routine PC consults not meeting Program Guide compliance requirements during three of six months; (4) 3CMS patients not being seen timely for initial and routine PC contacts; and (5) STRH and mainline (ML) EOP patients not being offered the minimum number of treatment hours required. At the time of the site visit, CAPs were ongoing regarding 3CMS patients not being seen timely for initial and routine PC contacts and STRH and ML EOP patients not being offered the minimum number of treatment hours required.

CCWF's local governing body met quarterly during the review period, achieved quorums, and maintained meeting minutes. The local governing body attended to LOPs, and matters regarding credentials verification, licensing, surveys, audits, and inspections.

The quality management committee met monthly, with a quorum reported at all meetings. Meeting minutes documented attention to mental health matters including the CDCR CMHPP, mental health programs' performance, suicide prevention, EHRS, and training issues that affected mental health care and programming.

The mental health subcommittee met monthly, attained quorums, and maintained meeting minutes. Issues addressed included system surveillance and quality of care issues, suicide prevention and response, CMHPP, PIWP, institutional mental health programs status, crisis intervention, and mental health LOPs.

The EMRRC also met monthly, achieved quorums, and maintained minutes. The committee addressed EMR bag inventories and crash cart inspections; EMR reviews; quarterly

EMR drill; providers and nursing staff maintenance of valid Cardiopulmonary Resuscitation (CPR), Basic Life Support (BLS), and/or Advance Cardiac Life Support (ACLS) certifications; and emergency response training requirements.

There was an active QIT during the review period that addressed multiple areas of CCWF's administrative segregation EOP program, including sustainability and quality improvement, out-of-cell structured treatment hours, ASU-EOP performance reports, small management yards and therapeutic treatment modules, showers, and clinical cell-front contacts.

CCWF did not conduct peer review during the review period per the direction of mental health headquarters.

Medication Management:

CCWF provided MAPIP results for May 2021 through October 2021 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring data for patients prescribed atypical antipsychotics showed that measurements for medication consent, blood pressure, height, weight, and thyroid monitoring were compliant for all six months of the review period. Data also showed that EKG measurements were not compliant during any month of the review period. AIMS tests and blood sugar measures were compliant for five of six months. Diagnostic monitoring of CBC with platelets and CMP were compliant for three of six months. Lipid monitoring was compliant for only two months.

Data presented for clozapine diagnostic measures indicated that blood pressure, blood sugar, CBC, height, and weight were compliant for all six months of the review period. CMP measures were compliant for the five months they were required; lipid monitoring was compliant for the required three months. Medication consent was compliant for each of the five months it

was required.  Thyroid monitoring was compliant for one month and not required for five months for patients prescribed clozapine.  EKG measures were compliant for both required months.  AIMS tests were compliant for three of four required months.

The medication management dashboard for the period showed that for patients prescribed antidepressants, medication consent, venlafaxine blood pressure, and thyroid monitoring were compliant for all six months of the review period.  EKG measures were compliant for one of three required months.

Regarding patients prescribed carbamazepine during the review period, measures for carbamazepine level, CBC, and CMP were compliant during each month of the review period.  Medication consent was compliant during the four months it was required.

Psychiatric diagnostic measures for CCWF patients prescribed Depakote were compliant for CBC with platelets measures and medication consent for all six months of the review period.  CMP was compliant for five of six months.  Depakote levels were compliant for four months, and not compliant for two months.

For lamotrigine, CCWF was compliant with medication consent during four of six months of the review period.

Regarding data for diagnostic measures for patients prescribed lithium, CCWF indicated that medication consent for patients prescribed lithium was compliant for all six months of the review period; thyroid monitoring and Creatine and BUN (kidney function tests) were compliant for five months.  Lithium levels and EKGs for patients prescribed lithium were compliant for three months.

CCWF reported that it was addressing several "barriers" to compliance with psychiatric diagnostic measures, some related to the information system issues including system update

problems, duplicate entries, errors regarding dates of last completed EKGs, and requiring EKGs for patients no longer in CDCR's custody.  The institution reported several remedial actions taken including directing medical assistants (MAs) and mental health nursing staff to assist in tracking, facilitating psychiatrists' orders, and completing ordered EKGs.  Additional remedial actions taken included hiring an MA to focus on EKGs, obtaining an assigned space TTA of the CTC to conduct EKGs, and assigning CCWF quality management staff to work with headquarters' QM to resolve inaccurate reports.  Additional measures included not placing diagnostic orders until a patient was housed following arrival at CCWF.

MAPIP data showed that CCWF was consistently compliant during each month of the review period with medication continuity for patients paroled or released to the community. Regarding medication continuity upon arrival at the reception center, CCWF was not compliant for five months.  For inter-institutional transfer at R&R, compliance was achieved for four of six months.  For continuity of nurse administered (N/A)/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), CCWF was compliant for only one month.

Medication continuity for MHCB transfers was compliant for two months and noncompliant for four months.  CCWF reported that for medication continuity for intra-institutional transfers to ASU/SHU/PSU and compliance with PC 2602 orders, it was compliant for five months.  Regarding medication continuity following discharge from community hospital or acute or intermediate care, there was compliance for three months.  Compliance regarding new psychiatric medications was attained for two months.  For psychiatric-prescribed chronic care medications, CCWF was compliant for four of six months of the review period.

CCWF staff reported that starting in mid-February 2021, when the reception center reopened to intake from the county jails until it was again closed due to a surge in COVID-19

cases, it received up to 100 incarcerated people weekly due to the backlog. According to staff, this level of intake impacted medication continuity throughout the institution, which had started to remediate in October 2021 as intake tapered off to pre-pandemic levels. Leadership expected CCWF to remain compliant with medication continuity requirements going forward.

CCWF was not compliant with observation of medication preparation and administration for HS and AM/PM during any month of the review period.

The maximum length of medications ordered by a psychiatrist at CCWF was 180 days; bridge orders were for 30 days.

Telephone and verbal orders were tracked via EHRS. Providers issuing authorized telephone/verbal orders were notified electronically that the orders needed to be signed. CCWF had access to reports that tracked physician orders, including medication orders that needed to be signed.

CCWF psychiatrists were permitted to prescribe non-formulary medications as needed.

Staff reported that polypharmacy reviews occurred during weekly population health meetings. The reviews addressed patient-specific polypharmacy issues and medication reduction as clinically indicated.

CCWF was authorized to both initiate and continue patients on clozapine. Three patients were prescribed clozapine during the site visit. Clozapine patients were tracked through the clozapine registry, located within the CCHCS Quality Management Portal, as an effective tool to track the number of patients prescribed clozapine, and the MAPIP requirements associated with ongoing clozapine treatment, including mandatory laboratory monitoring. The federal clozapine REMS program, in which the pharmacist and prescribers were certified, was followed for

treatment with clozapine, in addition to CDCR's outpatient clozapine maintenance and mental health services policies and procedures.

The institution reported that at the time of the site visit, there were 2,084 NA/DOT psychotropic medications prescribed to 954 patients. Thirty-four patients were prescribed KOP SSRIs by psychiatrists; medical providers generally did not prescribe SSRIs.

The number of patients prescribed HS psychiatric medications was 320. HS psychiatric medications were consistently administered on or after 8:00 p.m., according to audits provided.

During the review period, CCWF reported that audits showed that pill lines in Yard C and Yard D lasted longer than two hours; however, patients' medications were administered within 30 minutes of arrival at pill lines.

Twenty-one patients received medications via the PC 2602 process during the review period. Regarding these 21 patients, 11 PC 2602 petitions were initiated at CCWF during the review period, of which six were emergency initial petitions and five were non-emergency petitions. Ten PC 2602 petitions were renewed during the review period. No PC 2602 petition was denied or withdrawn during the review period. At the time of the site visit, 14 patients were receiving medications under PC 2602 orders.

CCWF reported that it was very rare to require use of force for medication administration purposes for patients receiving PC 2602 medications. Controlled use of force was utilized in the case of one patient during the reporting period.

Transfers:

The regional mental health team conducted two major sustainability reviews at CCWF during the review period. The initial sustainability review identified specific actions to be taken by supervisors regarding IDTT meetings in the MHCB, administrative segregation and EOP that

the institution needed to address.  A subsequent major sustainability review also addressed issues regarding IDTTs in the MHCB and administrative segregation.  As a result of both reviews, program supervisors were asked to provide training, guidance, and monitoring to specified clinical staff.

CCWF referred two patients to acute care and six patients to intermediate care during the review period.  Both patients referred to acute care transferred within ten days.  For intermediate care, two referrals were rejected.  CCWF pursued a CCAT for one patient who was subsequently accepted.  For the other patient, CCWF did not pursue a CCAT and rescinded the referral.  All intermediate care transfers were completed within the 30-day timeframe requirement.

No acute or intermediate care transfers were delayed or canceled due to pending paroles, PC 2602 hearings, or disciplinary proceedings.  One *Vitek* hearing was completed during the review period; the patient did not prevail.

The inpatient coordinator at CCWF reported adequate notification and communication of patient returns from both the CIW-PIP and DSH-Patton.  Once notified of the pending return, the CCWF inpatient coordinator notified the patient's on-site treatment team.  Additionally, the CCWF C&PR notified custody staff of the returning patient and transportation was arranged.

There were 267 non-referrals for 125 patients during the review period.  On December 13, 2021, no patients were waiting for acceptance or transfer to acute or intermediate care.

During the review period, CCWF transferred eight patients to the PSU.  None of the transfers took longer than 60 days.  The average time to transfer was 18 days.  On December 14, 2021, one patient was pending transfer to the PSU at CIW; she was pending a classification staff representative (CSR) review and had been waiting 12 days.

There were 76 placements of 42 patients in the EOP hub during the review period. CCWF operated an EOP hub; therefore, there were no delays in placement. The average length of stay in the EOP hub was 26 days. One placement exceeded 90 days.

During the review period, CCWF transferred 13 patients to the LTRH at CIW. Transfers following SHU assessment took an average of 28 days with a range of seven to 67 days. Five patients, or 38 percent, took longer than 30 days to transfer to LTRH after assessment. Though requested, reasons for delays were not provided.

On December 14, 2021, three 3CMS patients with active SHU terms were within 30 days of their MERD. Two 3CMS patients were assessed SHU terms and were waiting for CSR review; both had been waiting for five days. Another three 3CMS patients were endorsed and pending transfer to LTRH; two patients had been waiting ten days, and one patient was waiting three days.

There were 261 placements into CCWF's STRH during the review period. The average length of stay was 43.5 days with a range of less than one to 179 days. On December 14, 2021, there were 62 patients housed in STRH, including one reception center patient. Their average length of stay in STRH was 59 days, with a range of one to 167 days.

During the review period, CCWF operated a 12-bed licensed MHCB; four were double cell rooms. Due to COVID-19 precautions, CCWF did not double cell patients. Additionally, one cell was redlined throughout the review period due to unsafe ligature points, thus reducing the number of operational MHCBs to seven. Two beds would be offline due to ADA retrofits during May 2022, reducing the number of operational beds for patients to five during that month. The average daily census during the review period was 5.6 patients.

In preparation of a pending construction project, CCWF's MHCB closed to intake on October 20, 2021.  The final patient transferred out on November 3, 2021.

CCWF made 281 referrals to MHCBs during the review period.  Of those, there were 104 admissions to CCWF's MHCB and 33 admissions to CIW's MHCB.  Further, 132 patients, or 47 percent, were rescinded.  Data provided regarding 12 additional patients was not useful. Patients transferred timely except for one patient that refused transfer and took 43 hours to admit.

Since the closing of CCWF's MCHB, on November 1, 2021, CCWF referred 58 patients to the MHCB level of care.  Of those, 41 patients or 69 percent were admitted, and 17 patients or 28 percent were rescinded.  Four patients were not admitted within 24 hours; one patient took an extra 18 hours due to refusal to transfer.

During the review period, there were 104 admissions to the CCWF MHCB.  The average length of clinical stay was eight days with a range of two to 42 days.  Fifteen patients, or 14 percent, had clinical lengths of stay over ten days.  The average physical length of stay was also eight days; one patient took longer than 72 hours to transfer after discharge.  No reason was provided for the delay.

At the time of the site visit, one patient was awaiting transfer to the MCHB at CIW; she was transported to CIW within 24 hours.

During the review period, eight patients had three or more admissions to MHCBs (four patients with four admissions and four patients with three admissions).

During the review period, 1,471 incarcerated persons were processed through the reception center at CCWF.  Of those, 14 patients were EOP level of care, and 974 patients or 66 percent were 3CMS level of care.  At the time of the site visit, the reception center housed zero EOP patients and 108 3CMS patients; none were there longer than 90 days.  The institution could

not provide a list of reception center STRH patients.  Reception center patients at the 3CMS level of care housed in the administrative segregation housing unit were included in the total number of STRH patients in administrative segregation.

All reception center EOP patients were transferred to mainline programs within 60 days. The average length of stay for EOP patients in CCWF's reception center was 4.6 days, with a range of zero to 14 days.

CCWF had an EOP; consequently, there were no delays in transferring EOP patients.

During the review period, CCWF changed 35 patients' level of care from EOP to 3CMS. Of those, nine patients, or 26 percent, returned to EOP level of care.  One patient's data was incomplete.  The remaining eight patients returned to the EOP level of care within an average of 124 days, with a range of 36 to 214 days.

For 3CMS patients, 942 or 97 percent transferred to mainline programs within 90 days. Transfers beyond 90 days took 91 to 165 days; reasons for delays were not provided.

Programming:

Reception Center:

In the reception center, the timeliness of initial mental health screenings could not be determined from the data that CCWF provided.  Separate files were provided which included the date of arrival and date of completed mental health screenings.  Efforts to reconcile the data were not successful.  Staff reported that initial mental health screenings were completed on the day of arrival, and this was substantiated by on-site observations.

Patients held in reception center housing were assigned a primary clinician.  The patient would be seen by their primary clinician when housed on the unit for more than 30 days.

Caseloads for psychiatrists and primary clinicians assigned to the reception center were all within established staffing ratios.

Once identified as requiring an EOP level of care, reception center EOP patients moved to mainline EOP housing at CCWF and were provided mainline EOP services.  Patients assigned to the EOP level of care during the reception process were immediately transferred to mainline EOP housing after they completed their COVID-19 quarantine period.  Any reception center requirements that were not completed for EOP patients prior to transfer were reportedly completed in their subsequent housing locations.

For the four patients at the EOP level of care who remained in the reception center beyond one week, none were offered more than two weekly hours of out-of-cell structured treatment.  A summary of treatment provided to EOP patients in the reception center over the review period revealed that on average they were offered 2.4 weekly hours of structured therapeutic activities.  Patients were noted to rarely refuse treatment offered.  Average refusals across the review period were 0.19 hours or 11 minutes.

MHSDS Patients in Administrative Segregation:

EOP Hub:

During the review period, one to ten patients were housed in the administrative segregation EOP hub during any given week.  At the time of the site visit, there were nine EOP hub patients, of which one was a patient with SHU status pending transfer to the PSU.  The data provided indicated that all EOP hub patients were in the ASU for fewer than 90 days and only one patient exceeded 90 days during the review period.  Caseloads for psychiatrists and primary clinicians assigned to the administrative segregation EOP hub were within established staffing ratios.

369

Fourteen EOP patients from the hub census were randomly selected to assess compliance with timeliness of initial and routine psychiatric contacts in EHRS medical records.

Fourteen patients required initial psychiatric contacts; 100 percent were timely as they occurred before the IDTT. Of those 14 initial contacts, 79 percent were conducted in a confidential setting.

Nine of the 14 patients were in the EOP hub long enough to be seen for a routine psychiatric contact during the review dates. For these nine patients, 42 percent occurred every 30 days and were deemed compliant. For seven of the nine contacts reviewed, 86 percent were conducted confidentially. Appointments were not confidential due to patient refusals and patients being on quarantine status.

Fourteen of the patients were in the EOP hub long enough to be seen for a routine primary clinician contact during the review dates. For these 14 patients, 67 percent occurred every seven days and were deemed compliant. Thirty-nine percent were conducted in a confidential setting. Appointments were not confidential due to patient refusals and patients being on quarantine status.

Fourteen patients required an initial IDTT; 93 percent occurred within 14 calendar days and were timely. One patient was timely seen for a routine IDTT during the dates reviewed. Required attendees were present for 100 percent of initial and routine IDTTs. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician; however, this assignment was not consistently discernable.

The data provided indicated that ten hours of structured treatment were consistently offered to patients over the course of the review period. However, without explanation, treatment data was only provided for 30 patients, not all 35 patients who were in the

administrative segregation EOP hub for more than ten days.  Given the limited mental health staffing in the EOP hub, clinical groups were not provided for patients in the EOP hub.

One administrative segregation EOP hub group session was observed.  This group was a nursing-led treatment group and was held in a room with adequate space that was appropriate and confidential.  The group included a nurse who provided two patients with materials to color pictures and offered to show a movie.  No therapeutic, psychoeducational, or clinical material was provided to the patients.

One IDTT meeting for an administrative segregation EOP patient was observed.  It was the initial treatment planning meeting for the patient.  The patient refused to attend the IDTT; however, all other required members were present.  The psychiatrist and the correctional counselor were not the staff assigned to the patient.  The meeting space was adequate, confidential, and appropriate for the meeting.  The discussion included most required elements including patient history, case conceptualization, diagnosis, measurable treatment goals, and treatment interventions.  The objective factors were considered regarding the need for a HLOC, but the subjective factors were not discussed in depth as there was very little information available about the patient from the treatment team assembled to ascertain her ability to function at her current level of care.

Psych tech rounds were observed in the ASU.  Rounds were completed with all patients enrolled in the MHSDS and the psych tech reported checking in with non-MHSDS individuals as well.  The psych tech appeared familiar with the patients and their needs.  Required questions were broadly covered, although not every question was asked of every patient.  Health care records for a sample of patients were checked for the presence of psych tech rounding documentation.  All patients had evidence of daily rounds being completed with adequate

documentation.  Weekly summary notes were variable in quality; some included a detailed description of the patient's functioning and others included similar generic and not specific language each week.

The administrative segregation EOP hub certification information was provided for May through September 2021.  The site passed certification each month, except for August 2021.  The reason for not passing certification was related to the fact that during IDTTs the presenting clinician did not discuss treatment goals with the patient.  Compliance was noted as 80 percent.  The omissions were limited to one clinician who was subsequently educated on the need to discuss treatment goals and the EOP hub remained open to intake.

Short-Term Restricted Housing:

Psychiatry and primary clinician caseloads met Program Guide staffing ratio requirements for STRH.  Program Guide timeliness of IDTT, psychiatric and primary clinician contacts and attendance at IDTT was assessed by reviewing a random selection of ten patients' healthcare records taken from the STRH census during the review period.  Of the ten patients reviewed, nine, or 90 percent received timely initial psychiatric evaluations, and 70 percent occurred in a confidential setting.  Of the five patients seen for routine contacts, 86 percent occurred timely, indicating noncompliance.  However, all occurred in confidential settings.  Non-confidential psychiatry appointments were due to patient refusal.

All patients in the sample required initial primary clinician contacts; the compliance rate was 90 percent.  An initial primary clinician assessment was not found for one patient.  Of the ten initial primary clinician contacts reviewed, 70 percent were held in a confidential setting.  Reasons for non-confidential primary clinician appointments were either unknown or due to patient refusals.

For the ten patients required to be seen for routine contacts, 25 or 68 percent occurred timely.  Of the routine primary clinician contacts reviewed, 31 percent were conducted in confidential settings.  Reasons for non-confidential primary clinician appointments were either unknown or due to patient refusals.

All ten reviewed patients required initial IDTTs; 70 percent were compliant.  Four patients in the sample required quarterly IDTTs during the review period; 100 percent were timely and attended by required staff.  Of note, while a primary clinician and psychiatrist were in attendance, it was not easily discernable if the assigned treatment providers were present as required by the Program Guide

IDTT meetings were observed for ten patients being treated in the STRH program.  All meetings were held with the required staff in attendance.  While required team members were present, it was noted that the CC I who attended the meeting remotely was not the assigned counselor.  Of the ten patients scheduled for an IDTT meeting, only one chose to attend the meeting.  The IDTTs were held in a confidential setting that was of adequate space and included a TTM for the patient.  All clinical staff had access to computers and patient records, as did the CC I, as evidenced by communications during the meeting.  In eight of the ten cases, there was discussion of patients' psychiatric history, an appropriate case conceptualization, and identification of patients' diagnosis during the meeting.  In six cases, the diagnosis was discussed among the team members, and in one case diagnostic agreement was not reached but the team decided to continue assessment of the patient.  Patient functioning and functional impairments were discussed for each patient.  Of the nine patients prescribed psychotropic medications, seven, or 78 percent, included identification of the medications during the meeting.

Treatment goals were explicitly discussed in nine of the ten meetings, and the goals were determined to be objective, measurable, and realistic in eight of those cases. Interventions were only mentioned in four of the ten meetings, and in only three of those cases were the interventions appropriate to the patients' needs and treatment goals. The focus of the IDTT meetings appeared to be on day-to-day patient functioning and not patient mental health needs.

Per policy, CCWF reported that STRH patients continued to receive clinical group as required given the limited mental health staff.

Three interviewed STRH patients reported that the majority of contacts with their primary clinicians were conducted at cell front. All patients reported that meetings with the psychiatric provider were provided in a confidential space on the ASU; however, the provider generally left the door open, and the patients expressed that they often felt "rushed" during their appointments. Patients reported being unaware of their diagnoses and treatment goals, although they acknowledged routine IDTT meetings being offered. Patients expressed concern that daily opportunities for yard were not expressly offered or announced on the unit.

MHCB:

At the time of the visit, there were no patients in the MHCB at CCWF. The MHCB was closed to intake on October 20, 2021, in preparation for a pending construction project. The estimated completion date for CCWF's MHCB construction project was May 2022.

Twenty patients from the reporting period were randomly selected to have their EHRS reviewed for compliance during their CCWF MHCB admission. All 20 MHCB patients in the sample received a timely initial psychiatry evaluation and an initial primary clinician evaluation within a 24-hour period. However, from the review it was unknown whether any psychiatry or primary care clinician initial evaluations were held in a confidential treatment space.

Regarding the required twice weekly psychiatry contacts, the MHCB was 98 percent compliant; however, no psychiatric contacts were documented as confidential appointments. Primary clinicians completed 99 percent of the required daily contacts during the review period. One confidential contact was noted.

Of the 20 MHCB patients reviewed, 90 percent were compliant for having their initial IDTT within 72 hours of arrival and 93 percent were compliant for having a subsequent IDTT within seven days of their initial IDTT. Additionally, all 20 patients had a timely second or discharge IDTT and all but one IDTT held in the MHCB, or 98 percent, had all required attendees present. The patients were present at all but two of the IDTTs held in the MHCB.

Seclusion and Restraint:

CCWF reported no incidents involving seclusion or restraints during the review period.

Alternative Housing:

From November 1 through December 14, 2021, there were 59 placements into alternative housing pending MHCB referral. All but one left alternative housing within 24 hours; 41 transferred to MHCBs; 17 were rescinded. One patient was pending referral at the time of the site visit and was timely placed in the MHCB. The one delay was due to a patient's refusal to transfer; her placement lasted 36 hours.

EOP:

At the time of the site visit, CCWF had 83 mainline EOP patients. CCWF's reception center EOP patients were combined with mainline EOP patients for housing and programming once identified as requiring EOP level of care. Caseloads for psychiatrists and primary clinicians assigned to the mainline EOP were within established staffing ratios.

A total of 12 patients in the mainline EOP program were randomly selected to assess compliance with Program Guide requirements.  Regarding timely psychiatric contacts, five patients were admitted to the EOP during the dates reviewed and all five contacts were timely as they occurred prior to the IDTT and within 14 days of admission.  All initial psychiatry contacts occurred in a confidential setting.

Nine patients required routine psychiatry contacts; 84 percent were compliant and occurred within 30 days.  For the psychiatry contacts, 86 percent were conducted in a confidential setting.  Non-confidential psychiatry appointments were all due to patient refusals.

Five patients transferred to EOP during the dates reviewed and required initial primary clinician contacts; 100 percent were compliant.  One hundred percent of initial primary clinician contacts were confidential.

Nine patients were included in the assessment of routine primary clinician contacts, of which 74 percent occurred within required timeframes and 86 percent were held in a confidential setting.  The reasons for non-confidential primary clinician appointments were either unknown, or due to patient refusals or custody staff issues.

Twelve patients in the mainline EOP program were selected to assess compliance with timely IDTT contacts.  Five patients required an initial IDTT, all of which were timely.

Seven patients were expected to be seen for routine IDTTs during the dates reviewed.  All required routine IDTTs for these patients were timely.  Required attendees were present for all the IDTTs.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician; however, assignment was not clearly discernable for all cases.

OnDemand data for CCWF between April 26 and November 30, 2021 indicated that mainline EOP patients were offered a weekly average of 13.5 hours of structured treatment activities, of which nine were attended and 4.5 were refused.

The monitor's expert learned that CCWF's data for mainline EOP included cell-front groups involving in-cell packets. However, while leadership provided the expert with the total number of group hours offered at cell front during the review period, they were unable to separate in-cell activities from out-of-cell activities offered during this timeframe.

According to CCWF leadership, patients with movement restrictions related to COVID-19 were offered daily in-cell packets and confidential individual contacts with psychiatric providers and primary clinicians while pending clearance for regular programming.

Each mainline EOP patient was assigned to only one clinical group per week. ML EOP patients were also scheduled for one or two nursing-led therapeutic groups per week. The remaining group hours were offered in the form of recreation therapy and in-cell packets.

Interviewed mainline EOP patients expressed dissatisfaction with the quality of treatment groups, and specifically, that pre-release planning groups were not available.

One observed mainline EOP clinical group was well attended and focused on various mindfulness exercises which the patients appeared to find meaningful. However, the monitor's expert noted concerns with other groups observed during the site visit. First, during a recreation therapy yard group, the expert observed many patients scattered across a wide-open space while the recreation therapists conversed with one another. Second, the expert attempted to observe six scheduled non-recreation therapy groups; however, three of these groups had only one attendee, one had zero attendees, and one group was cancelled by the provider after attendees arrived at the treatment building. Third, the group facilitators and patients did not arrive on time for any of

the scheduled groups.  Lastly, the monitor's expert learned that the provider for the one cancelled group failed to arrange for coverage while she was in IDTT, and inaccurately cancelled the group, documenting that this was due to patient refusal.

The monitor's expert observed 12 mainline EOP IDTTs during the site visit.  All required disciplines were present, although the attending PNP was not the assigned psychiatric provider.  Each IDTT member utilized available computers to access relevant patient information as needed.  All IDTT members appropriately participated and interacted with patients.  Absent during all 12 observed IDTT reviews were level of care justifications, HLOC considerations, and medication compliance information.  Case formulations and treatment plans were only mentioned in three, or 25 percent, of observed cases.

Despite CCWF leadership and mainline EOP staff reporting a significant increase in severe mental illness among EOP patients during the past year, the institution's HLOC referral practice was inadequate.  The acting chief of mental health informed the monitor's expert that CCWF would address the HLOC concerns with staff to ensure patients requiring higher levels of care were identified and timely referred.

The monitor's expert attempted to observe one mainline EOP morning huddle but could not enter the room due to space limitations.  All required attendees were present for the brief meeting.

3CMS:

For the 3CMS program, the caseloads for two of three psychiatrists, and five of ten primary clinicians, were within established ratios.  Two primary clinicians exceeded the established ratio by three patients each; the remaining three primary clinicians exceeded the ratio by 23, 25, and 28 patients, respectively.

378

Compliance with Program Guide timeframes for IDTT, psychiatry, and primary clinician contacts were assessed by reviewing a random selection of 14 healthcare records for 3CMS patients. Five patients in the sample required initial psychiatric evaluations during the review period; 40 percent occurred prior to the initial IDTT. One patient did not receive an initial evaluation.

For routine psychiatric contacts, 82 percent occurred within 90 days. Ninety-six percent of routine psychiatry contacts were in confidential settings.

Five patients required initial primary clinician evaluations during the review period; 100 percent occurred within ten working days and were compliant with Program Guide requirements. All were conducted confidentially.

For routine primary clinician contacts, 79 percent occurred within 90 days. There were a total of 29 primary clinician contacts reviewed, of which 97 percent were conducted confidentially.

Five patients required initial IDTTs during the review period. Four of five or 80 percent occurred within 14 working days and were compliant. Nine patients required routine IDTTs during the review period. Five of nine or 56 percent occurred at least annually and were compliant with Program Guide requirements. Required staff members attended 100 percent of the initial and routine IDTTs that occurred during the review period.

During the site review, seven 3CMS IDTT meetings were observed. All IDTT meetings were held in confidential and adequate space. It appeared that all team members had access to the patients' records during IDTTs, given the feedback provided. All IDTT meetings were collaborative and included quality participation from the CC I. Patients were present for four of the seven meetings. It was reported that three patients refused to attend.

379

The IDTTs were largely compliant with expectations and consistently included appropriate case conceptualization, discussions of psychiatric history and psychotropic medications, safety planning when appropriate, and clearly stated, individualized treatment goals which were objective, measurable, realistic and met patients' identified needs, with clearly stated treatment interventions that corresponded appropriately to the patients' treatment goals. All IDTT meetings included a discussion of patients' progress toward treatment goals and current barriers to achieving them. Patients' diagnoses and functional impairments were clearly identified in six of seven, or 86 percent of the meetings. Clear discussion of patients' symptoms which supported the diagnoses were included in five of the six cases. One IDTT included a review of the patient's need to be transitioned to the EOP level of care and following the meeting, the patient was appropriately transitioned to the HLOC.

Patients at the 3CMS level of care were offered recreation therapy groups. Six groups were offered across three days. All groups were reported to focus on the use of art, music, and media to support social skills and reinforce coping strategies. One group session per week targeted patients transitioning from the EOP to 3CMS level of care.

Other Issues:

Pre-Release Planning:

CCWF's mental health department had two social workers dedicated full time to pre-release planning during the review period. The two social workers were responsible for tracking upcoming patient releases and the status of relevant pre-release processes and data, including completion of ROI forms for Post Release Community Supervision (PRCS) and pre-parole planning assessments. The staff also coordinated and tracked the status of transportation, housing, government identification cards, government aid, and contacts with outside agencies.

Additionally, CCWF pre-release coordinators attended weekly meetings with staff from the TCMP, ISUDT, and parole services to share and receive relevant pre-release information, including changes to release dates.

While CCWF patients had access to transitions groups through the education department for parole planning, there were no pre-release groups offered by the mental health department during the review period.  CCWF reported that pre-release groups were not offered "due to COVID."  However, several interviewed patients requested pre-release planning groups.

Program Access:

a.      Jobs and Program Assignments

As of October 31, 2021, CCWF reported that of the 1,221 available employment positions, 42, or 48 percent, of EOP patients, 629, or 52 percent of 3CMS patients, and 550, or 56 percent of non-MHSDS incarcerated persons, held positions.

Of the 704 academic assignments, 19, or 22 percent of EOP patients held assignments, 410, or 34 percent of 3CMS patients held assignments, and 275, or 28 percent of non-MHSDS incarcerated persons held assignments.

Regarding the 143 substance abuse treatment placements available, three, or three percent of the EOP patients, 90, or seven percent of 3CMS patients, and 50, or five percent of non-MHSDS incarcerated persons held placements.

Of the 691 voluntary education assignments, none were held by EOP patients, 271, or 22 percent of the 3CMS population held voluntary education assignments, and 420, or 43 percent of the non-MHSDS incarcerated persons held assignments.

For the 206 vocational education assignments, zero EOP patients held assignments, 102, or eight percent of 3CMS patients held assignments, and 104, or eleven percent of non-MHSDS incarcerated persons held assignments.

b.      Milestone Credits

On October 31, 2021, 85 of 88 EOP patients were eligible to earn milestone credits and 69 percent of those eligible earned them.  Of the 1,213 3CMS patients, 1,134 were eligible for milestone credits and 21 percent of those eligible earned them.  For the 975 non-MHSDS incarcerated persons, 890 were eligible to earn milestone credits; and 32 percent of those eligible earned them.

c.      Out-of-Level Housing

CCWF did not house incarcerated persons by level.

d.      ADA Reasonable Accommodation and Grievance Procedures

Regarding ADA reasonable accommodation and grievance procedures, designated mental health, custody, and clerical staff were trained regarding the "Enhanced Outpatient Program (EOP) IDTT review of Suitability for Program Assignments and Functional Evaluation Procedure" and "CDCR Form 1824 Reasonable Accommodation Request Process: Desk Reference Manual."

e.      Compliance with In-Cell/Private Unclothed Body Search Policy

CCWF was compliant with conducting private, unclothed body searches.  Staff reported that such searches typically occurred in cell in the housing units.  Unclothed body searches were reported to be conducted in the shower in administrative segregation.  The work change area at CCWF had a dedicated private area for such searches.  Both areas were inspected by the monitor.

Case-by-Case Reviews:

382

The institution reported a total of 80 case-by-case reviews during the review period. During the review period, ICC elected to release seven patients from administrative segregation at the patient's pre-MERD.  CCWF achieved 100 percent compliance with conducting timely reviews of pre-MERDs for all MHSDS patients.  Zero patients were retained in administrative segregation past their MERD.

"C" Status:

CCWF did not provide information regarding patients placed on "C" status.

Mental Health Referrals:

CCWF reported a total of 4,416 mental health referrals during the review period; 879 were to psychiatrists and 3,537 were to primary clinicians.  Of the 879 mental health psychiatry referrals, there were timely responses to all 69 emergent referrals, to 16 of 17 or 94 percent of urgent referrals, and to 745 of 793 or 94 percent of routine referrals.

Of the 3,537 mental health referrals to primary clinicians, there were timely responses to 419 of 428 or 98 percent of emergent referrals, and 160 of 167 or 96 percent of urgent referrals. Notably, there were timely responses to only 2,118 of 2,942 or 72 percent of routine referrals.

For patients on quarantine or isolation status, mental health leadership reported that CCWF had prioritized timely responses to emergent and urgent referrals.  Routine referrals for patients on quarantine or in isolation were addressed when the patient was no longer in quarantine or isolation.

The institution reported that all 51 or 100 percent of required mental health staff completed an online training on urgent referral responses.

There were no direct referrals to the CIT.  Mental health reported having difficulty with the increased workload associated with the CIT as CCWF did not receive additional clinical staff allocations to account for the increased workload.

Treatment Space:

Treatment space appeared adequate across levels of care; however, treatment space was insufficient to accommodate groups for all patients at the EOP level of care in both the mainline EOP and the ASU.

Most group treatment and IDTTs for patients in the EOP hub and STRH was provided in building 705 as was some of the group treatment for patients receiving services in the mainline EOP.  The rooms were able to accommodate staff and a patient in a TTM for ASU patients.  As the usual air conditioning unit was not operational in building 705, all treatment rooms had portable air conditioners with large hoses running into the ceilings.  Furthermore, in some of the rooms, even the portable air conditioners did not work.

On the ASU, there were two rooms available for confidential individual sessions with patients, although patients reported that the psychiatric nurse practitioner often left the door open during their meetings.  The space appeared adequate if the doors were closed.

In the R&R building, there was adequate space for four individual primary clinicians to conduct initial mental health screenings, and the spaces were confidential and did not negatively impact access to care.

Outpatient mental health services provided to patients at the 3CMS level of care were primarily provided in buildings which included adequate confidential space for individual sessions, IDTT meetings, and groups.

Custody and Mental Health Partnership Plan:

CCWF's CMHPP LOP was dated December 2020 and was aligned with headquarters' Partnership Plan. The LOP defined the plan to consist of monthly executive leadership joint rounding, mental health huddles, quarterly partnership round tables, jointly led EOP orientation programs, annual partnership off-post training, weekly 3CMS supervisory meetings, monthly inmate advisory council meetings, monthly joint 3CMS supervisory program area tours, and 3CMS orientation brochures.

Reviewed meeting minutes reflected six months of reporting period executive leadership joint rounding. Programs included in executive rounding were the MHCB, EOP and 3CMS programs, and administrative segregation. Institutional executive leadership who participated in joint rounding consisted of the warden, CEO, and the chief of mental health.

Reviewed executive leadership joint rounding meeting minutes reflected the discussion of numerous issues with mental health and custody staff and patients. The questions and staffs' responses noted concerns with certain patients, mental health, and custody staffing shortages, which were sometimes related to COVID-19, a positive relationship between mental health and custody, inadequate MHCB treatment space, and concerns about the impact of modified programming due to the pandemic on patients' treatment programming and access to care. Interviewed patients spoke positively about the mental health program, as well as being treated respectfully by both healthcare and custody staff; however, they also expressed concerns about insufficient programming.

Notably, two of the six executive leadership joint rounding tours did not include patient interviews. Specifically, patients were not interviewed in the MHCB due to patient unavailability; they also were not interviewed in administrative segregation due to quarantine/isolation issues.

Review of the warden's monthly executive staff meeting minutes for the six months of the review period revealed references to the executive leadership joint rounding. Similarly, reviewed quality management committee and mental health subcommittee meeting minutes for all six months of the review period referenced the monthly executive leadership joint rounding.

CCWF conducted twice daily weekday huddles during second and third watch in the mainline EOP and administrative segregation. Huddles were conducted seven days a week in the MHCB. Reviewed forms revealed attendance by required staff at huddles that addressed various issues, including new patients to the units, staff concerns about patients who were returning from higher levels of care, medication changes that that could produce behavioral effects, and patients who exhibited odd, unusual, bizarre, or aggressive behavior, among other issues. The monitor's attendance at a huddle in the mainline EOP program during the site visit found a psychologist, psych tech, sergeant, and custody officer in attendance. The custody officer in attendance was especially knowledgeable about the patients on the unit.

The CMHPP LOP further required the institution to conduct weekly 3CMS supervisory meetings between the mental health program supervisor and custody sergeants on each of the institution's four facilities. Reviewed documentation reflecting these weekly meetings indicated that numerous issues were addressed. These issues included any new patients on the units, barriers to patient treatment, and particular patients as to whom there were concerns, among other matters. The monitor's attendance at a weekly 3CMS supervisory meeting on Facility A revealed adherence to the provided script. Both the mental health program supervisor and the custody sergeant were very knowledgeable about the patients on the unit.

In accordance with the LOP, the 3CMS mental health program supervisor and a sergeant also conducted monthly joint 3CMS supervisory program area tours on each of CCWF's four

yards.  On several occasions staff expressed concerns regarding specific patients, and the reasons for such concerns.  Staff further reported various instances during the review period when patients had felt greater overall distress due to COVID-19 and the resulting program restrictions. Interviewed custody officers reported knowing what to do and who to contact in the mental health program when they had concerns about patients.  Staff also reported a good working relationship between custody and mental health staff.

During the monthly joint 3CMS supervisory program area tours, many interviewed patients reported that custody staff was often slow to respond to patient requests for mental health assistance and other matters.  However, patients typically did not report difficulties obtaining ducats or getting scheduled appointments.  Patients generally reported feeling comfortable reaching out to staff if they were in crisis; though not all.  Overall, patients reported being treated well by custody and healthcare staff.

As for jointly led EOP orientation programs, CCWF reported offering a four-week group entitled "Introduction to EOP" for the period of October through December 2021.  The institution elaborated that the group co-facilitators were the EOP sergeant, mental health clinician, and an EOP patient peer.  The main objectives of this EOP orientation program were to provide new EOP patients with an overview of the EOP program.

The LOP further required that two-hour custody and mental health quarterly partnership round tables occur on second and third watch in the EOP, reception center EOP, administrative segregation EOP hub, condemned units, MHCB, and STRH programs.  The LOP delineated a 2021 quarterly round table training schedule and stated that the facilitators would be each program's sergeants and mental health program supervisors.  CCWF provided sign-in sheets for 2021 which reflected attendance at all four quarterly trainings by mental health and custody staff.

However, the documents provided could not provide a tally of the number of mental health and custody staff who had or had not attended.

CCWF produced a copy of the 3CMS orientation brochure, in English and Spanish, to patients upon admission.

There were 18 IAC meetings during the review period. Specifically, Facilities B, C, and D each had monthly inmate advisory council meetings. Conversely, Facility A did not conduct such meetings. Reviewed IAC meeting minutes indicated that the meetings addressed numerous issues related to patient care and treatment. Among them, they addressed patient housing issues, the receipt of patient property, replacement identification cards, ducats, mail, packages, medication, supplies, issues related to phone calls, visitation, canteen, dayroom, yard access, and honor dorm applications.

During the reporting period, there were a total of 1,068 general grievances filed by patients and 14 staff complaints. Of the 1,068 general grievances, 24 or two percent were approved, 63 or six percent were redirected to the appropriate authority, 156 or 15 percent were under investigation or pending, 784 or 73 percent were disapproved or otherwise rejected, and 41 or four percent had another disposition. No policy violations were found in any of the 14 staff complaints. No CCWF staff were directed to move to another post due to a patient grievance or staff complaint.

Overall, CCWF reported that 1,065 of 1,246 or 85 percent, of required staff attended the annual off-post partnership training entitled "Partnership in the Correctional Environment." For non-custody staff, 663 of 717 or 92 percent, of required staff attended this training; for custody staff, 402 of 529 or 76 percent of required staff attended the training.

Heat Plan:

The institution provided data on heat alerts for the six-month period of May 1 through October 31, 2021. During the review period, there were 105 Stage I heat alerts, one Stage II heat alert, and no Stage III heat alerts. No patients suffered a heat-related illness due to these heat alerts.

Review of the CCWF LOP Patient Safety Program: Heat Alert Medications (or "Heat Plan") dated February 2021 indicated compliance with the CCHCS 2021 "Heat Plans and Updates" directive. The heat plan required the central control sergeant to monitor daily and record hourly the outside air temperature, from May 1 through October 31, on a CDCR Form 2030.

Review of the daily CDCR Forms 2030 in the possession of the heat plan coordinator reflected the hourly logging of the outside air temperature according to policy for all months during the review period. Review of CDCR Forms 2031 also indicated the recording of housing units inside temperatures every three hours as required by policy.

The monitor visited six housing units, including the two reception center units, the mainline EOP unit, and three GP 3CMS units, to interview custody officers about the heat plan. All interviewed custody staff were knowledgeable of the heat plan and its various requirements at its three stages. The officers also demonstrated the ability to access the institution's shared drive to obtain the daily list of patients prescribed heat sensitive medications. In each housing unit, inside temperatures were monitored from five different locations. Five of six interviewed officers reported recording the highest temperature reading of the five thermometers on the inside temperature log; the remaining officer reported recording the temperature at the officer's station on the housing unit temperature log.

The institution reported that, excluding custody staff on long-term sick leave, 410 of 532, or 77 percent, of CCWF custody officers completed the Heat-Related Pathologies on the job training for the period of December 2020 through December 2021.

RVRs:

During the review period, there were 2,169 total RVRs issued at CCWF. Of that total, 1,510, or 70 percent of the RVRs were issued to 3CMS patients, and 184, or eight percent, were issued to EOP patients. Non-MHSDS incarcerated persons were issued 458 RVRs or 21 percent of the total. CCWF issued 13 RVRs to patients in the MHCB and one RVR to a patient at the intermediate level of care. Three RVRs were issued to patients without an identified mental health level of care.

The monitor reviewed a randomly selected sample of 29 RVRs. Of those, custody staff timely referred the RVRs to mental health staff for completion of a mental health assessment in in 13, or 45 percent of the cases. The late referrals ranged from one to 13 days overdue.

Mental health staff timely completed and returned the mental health assessment in 27, or 93 percent of cases. The late mental health assessments were eight and ten days late; CCWF did not provide reasons for the delays.

The senior hearing officer documented consideration of the mental health assessment 100 percent of the time in the RVRs reviewed. Regarding mitigation, the reviewing clinician recommended mitigation of penalties in 14 of 29 cases, or 48 percent of the RVRs reviewed. Clinicians conducted the mental health assessment interview in a confidential setting in 14 of 29, or 48 percent of the reviewed cases. Senior hearing officer documentation of mitigation of penalties was not present in all RVRs reviewed.

A staff assistant was assigned to assist the patient in the RVR process in 26 of 29 instances, or 90 percent of the RVRs reviewed. The patient refused the confidential interview in 11 of 29 or 38 percent of the mental health assessments.

CCWF was 100 percent compliant with custody attendance at the RVR process training, including the warden, chief deputy warden, captains, lieutenants, and sergeants. The institution reported the mental health staff RVR training was provided to six clinicians who were assigned to complete the mental health assessments.

Use of Force:

During the review period the institution reported one controlled use of force (UOF) incident. In addition, there were 160 immediate UOF incidents involving 152 MHSDS patients. Of that total, 20 immediate UOF incidents occurred in administrative segregation involving 20 MHSDS patients. There were 13 EOP level of care patients involved in 13 immediate UOF incidents and three MHCB level of care patients involved in three immediate UOF incidents.

The monitor reviewed a total of 15 immediate UOF incidents and the one controlled UOF incident. No issues were identified in review of the controlled UOF incident.

One immediate UOF incident involved a MHCB patient who refused their medication and the mental health staff ordered an immediate injection. Custody staff entered the patient's MHCB room using physical force to restrain the patient. Once restrained, medical staff administered two injections. The patient was issued a RVR for resisting staff, which was in violation of Title 15 section 3317.2. However, during the adjudication of the RVR, the senior hearing office reduced the RVR to a counseling chrono in compliance with CDCR policy.

Two additional UOF incidents raised concern with the monitor regarding the need for immediate use of force. The institution's executive reviews addressed the monitor's concerns

indicating the incidents should have been documented in an alternative manner by staff either prior to or during the incident.

The institution reported 100 percent compliance with custody staff attending use of force training.  For mental health staff, the chief of mental health, supervising psychologist, supervising psychiatrists, supervising social workers, and psychologists all attended the training.   For social workers, 16 of 17, or 94 percent, attended the mandatory training, and for psychiatrists, five of six, or 83 percent, attended.

Lockdowns/Modified Programs:

Throughout the review period, during the pandemic, CCWF placed multiple housing units on modified programming for various time periods to prevent the further spread of COVID-19.  Such modified programming typically resulted in all movement requiring escorts, cell feeding, limited visitation, patient employment being restricted to porters, only priority ducats for health care services, modified dayroom, canteen, and package delivery, and no recreational facilities.

Access to Care:

Review of CCWF 's monthly Health Care Access Quality Reports from May to October 2021 indicated that less than one percent of issued mental health ducats and add-on appointments were not completed due to custody factors; 52 percent were not completed due to non-custodial reasons, excluding patient refusals.

A training on provider roles and responsibilities for access to care was completed by 156 of 254, or 61 percent, of required mental health staff.

Placement of 3CMS into Minimum Support Facilities:

CCWF's MSF was deactivated on September 30, 2020.

_Coleman_ Postings:

The monitor visited six housing units to assess compliance with the requirement of displaying _Coleman_ posters. _Coleman_ posters, in English and Spanish, were observed in all housing units.

**APPENDIX B-7**
**VALLEY STATE PRISON (VSP)**
**(March 22, 2022 – March 25, 2022)**
**Review Period: (August 1, 2021 – January 31, 2022)**

Census:

On March 22, 2022, VSP's total population was 2,911, which was a five percent decrease from the preceding site visit. The mental health caseload population was 1,341 patients or 46 percent of the population, and had decreased by six percent since the preceding review period.

There were 295 mainline EOP and 1,018 mainline 3CMS patients.

Four EOP and eight 3CMS patients were in the OHU for medical treatment.

There were four EOP patients in administrative segregation, including three pending transfer to an EOP administration segregation hub and one EOP patient pending transfer to a PSU. There were 12 3CMS patients housed in administrative segregation.

Staffing:

The chief psychiatrist position was vacant, and there was no senior psychiatrist position at VSP. At the time of the site visit, VSP indicated that it was actively recruiting a chief psychiatrist.

The 0.5 civil service onsite psychiatry position was vacant though the use of 0.25 contractors reduced the onsite psychiatry functional vacancy rate to 50 percent. Seven civil servant telepsychiatrists covered six telepsychiatry positions.

VSP did not have a psychiatric nurse practitioner established or on staff during the review period or at the time of the site visit.

One of two chief psychologist positions was filled and designated as the chief of mental health. The other chief psychologist position was not filled as a salary savings measure. Three senior psychologist supervisors covered 2.5 positions, and four senior psychologist specialists

covered 3.5 positions.  Sixteen licensed civil service psychologists and two unlicensed psychologists covered 17.5 psychology positions.  VSP also had three psychology interns providing services at the time of the site visit.  Additionally, VSP was part of a CDCR-CCHCS consortium that was approved by the American Psychological Association (APA) and was actively engaged in recruiting staff.

The one supervising social worker position was filled.  Fourteen licensed social workers and one unlicensed social worker covered 13 positions.

Ten civil service recreation therapists filled seven established positions.

All three registered nurse positions were filled.

The one senior psych tech position was filled.  Nineteen of 22.2 psych tech positions were filled for a 14 percent vacancy rate.  The use of two contractors reduced the on-site psych tech functional vacancy rate to five percent.

Five of seven medical assistant positions were filled for a 29 percent vacancy rate.  Two specially trained certified nursing assistants (CNAs) were assigned to provide medical assistant services, reducing the functional vacancy rate to zero.

The one CHSA position was vacant.  One of the 2.5 HPS I positions was filled for a functional vacancy rate of 60 percent.  The one OSS II position was filled and the 0.5 AGPA position was filled.

Ten of 12 office technician positions were filled for a vacancy rate of 17 percent.

Telepsychiatry:

VSP had seven telepsychiatrists filling six positions.  Telepsychiatry services for VSP were provided by statewide service from designated telepsychiatry offices.  One telepsychiatrist

had provided services to VSP patients since 2016 and another since 2019. The remaining five had provided services to VSP over a range of ten to 20 months.

All four telepsychiatrists who provided services solely in the EOP had caseloads within the established ratio. Another telepsychiatrist who provided services to both EOP and 3CMS patients had a caseload that exceeded established ratios.

Five observed EOP patient IDTTs all used telepsychiatry. The telepsychiatrist was often the patients' assigned psychiatrist, and fully explained medication issues. However, she was also adequately prepared for patients who were not on her caseload.

Interviewed EOP patients nonetheless indicated dissatisfaction with telepsychiatry. They further reported that despite expressing these concerns to IDTT teams, no changes had been made.

In the 3CMS program, psychiatry services were almost exclusively provided by way of telepsychiatry. However, a registry psychiatrist was available one day weekly for patients for whom telepsychiatry was inappropriate.

The caseloads for the telepsychiatrists who provided services solely to 3CMS patients were within the established ratio; however, as noted above, the caseload of a telepsychiatrist who provided services to both the 3CMS and EOPs exceeded established ratios.

All observed 3CMS IDTTs used telepsychiatry. The telehealth equipment facilitated good auditory and visual communication to enable communication between the telepsychiatrist and patients. Telepsychiatrists' participation varied from team to team, but overall, was generally adequate.

Observed IDTTs for MHSDS patients housed in administrative segregation found the telepsychiatrist making useful treatment planning contributions.

Each telepsychiatrist who provided services to EOP patients was required to conduct in-person visits to VSP at least every three months.  For 3CMS patients, telepsychiatrists were expected to conduct in-person visits to VSP at least every six months.  Staff indicated that these visits were to occur on a day the telepsychiatrist could attend their patients' IDTTs.  In addition, as time permitted, the telepsychiatrist was expected to conduct in-person one-to-one visits with some patients.  VSP's chief of mental health tracked telepsychiatrist on-site visits.

Telepsychiatry equipment in treatment team meeting rooms at VSP included 43-inch video screens with voice-activated rotating cameras.  The monitor's experts who observed IDTTs during the site visit indicated that the camera rotated to the member of the team speaking, enabling the telepsychiatrist to see them.  Video and audio qualities were adequate.  There was a 23-inch video screen located in each room used for one-to-one telepsychiatry contacts.  Staff reported that a medical assistant was physically present in the room during telepsychiatry individual sessions to facilitate the contacts.  VSP had two audio-video carts with 24-inch video screens that were used in the ASU and the medical OHU for treatment team meetings and individual contacts.  A laptop computer was used for cell-front contacts.

On-Call Coverage/CIT:

A telepsychiatrist provided on-call after-hours services seven days a week from 1700 hours until 0700 hours the following day.  VSP also provided extended on-call psychology coverage until 2000 hours on Monday, Tuesday, Friday, Saturday, and Sunday.

VSP's CIT included four psychologists who provided services to EOP and 3CMS patients; one social worker was assigned to administrative segregation.  Other members included nursing staff and a lieutenant or sergeant.  The CIT was on site for extended hours of coverage (until 2000 hours) on Monday, Tuesday, Friday, Saturday, and Sunday.

The VSP LOP was consistent with the statewide CIT policy. However, it appeared that VSP did not always adhere to its own LOP.  For example, the CIT LOP indicated that the facility lieutenant was the custody representative; however, VSP provided documentation indicating that a facility lieutenant *or* sergeant would be part of the CIT.  Further, VSP's CIT LOP required all three members to respond together; however, VSP reported utilizing a "scout" model where the psychologist responded alone to evaluate the problem.  The scout psychologist met with the patient, conferred with nursing, and ultimately conferred with custody.  It would be beneficial for VSP to adhere to its LOP.

During the review period, 76 patients were referred to VSP's CIT.  Of those, 34 patients returned to housing, and 42 patients were referred to MHCBs.  An average of 45 percent of CIT referrals related to mental health issues; 13.5 percent were due to custody issues; 3.8 percent were due to medical issues; and 39 percent were due to a combination of issues.

Quality Management:

VSP had a reasonable quality management program.  The quality management committee met monthly during the reporting period and attained a quorum for all meetings.  Ongoing areas of focus included primary clinician continuity of care, and treatment offered, attended, and canceled.  The quality management committee also reviewed incidents of self-harm, the CIT, and implementation of the CMHPP.  Responses to the COVID-19 pandemic and the attendant public health restrictions were other regular topics of discussion as functions of quality management.

The mental health subcommittee met three times during the reporting period, and a quorum was attained on each occasion.  Specific areas of concern included timeliness of initial psychiatry and primary clinician contacts as well as initial IDTTs.  The committee also addressed the timely completion of administrative segregation screens as compliance fell to 82 percent and

30 percent during November 2021 and January 2022, respectively. Additionally, in August 2021, the mental health subcommittee addressed the results of a workgroup that examined a healthcare incident report wherein approximately 30 mental health referrals were found on a desk unprocessed and unscheduled. These mental health referrals ranged in date from February to July 2021 and resulted in delayed patient care as well as workload issues for clinicians and schedulers addressing the issue once it was discovered.

VSP did not conduct any additional studies, QIT, FITs, or peer review activities during the reporting period.

Although staff generally reported good communication with leadership, a large cross-section of mental health staff indicated a lack of awareness of quality management activities.

Medication Management:

VSP provided MAPIP results for the review period regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring data for patients prescribed atypical antipsychotics showed that measurements of AIMS tests, blood pressure, height, and weight measures, thyroid monitoring, and documentation of medication consent were compliant for all six months of the review period. Diagnostic monitoring of CBC with platelets and CMP were noncompliant for all six months of the review period. Measures for blood sugar for patients prescribed atypical antipsychotics were compliant for five months. EKG measurements were compliant for four of five required months. VSP was noncompliant with lipid monitoring for atypical antipsychotics patients during all six months of the review period.

Although VSP was an authorized clozapine maintenance facility, at the time of the site visit it was no longer receiving patients prescribed clozapine because it did not have a full-time

on-site psychiatrist. Staff reported that there was one clozapine patient at VSP during the site visit. Data presented for clozapine diagnostic measures indicated that blood pressure, blood sugar, CBC, height, and weight measures were compliant for all six months of the review period. CMP measure, lipid monitoring, and medication consent were each compliant for the one month they were required. Thyroid monitoring was compliant for three months and not required for three months for the patient prescribed clozapine. There were no clozapine related EKG measures required during the review period.

The medication management dashboard for the period showed that for patients prescribed antidepressants, venlafaxine blood pressure, thyroid monitoring, and documentation of medication consent were compliant for all six months of the review period. The one EKG measure related to antidepressant medication that was required did not occur.

As for patients prescribed carbamazepine, measures for carbamazepine levels were not compliant for the one required month, and CBC and CMP were each compliant during one of the two months of the review period that these measures were required. Medication consent documentation was compliant during both required months.

Psychiatric diagnostic measures for VSP patients prescribed Depakote were compliant for CBC with platelet measures for four of six months. CMP was noncompliant for five of six months. Measures of Depakote levels were noncompliant for all six months. Documentation of medication consent was compliant for all six months of the review period.

For patients prescribed lamotrigine, VSP was compliant with documentation of medication consent for five of six months that it was required.

Regarding data for diagnostic measures for patients prescribed lithium, VSP indicated that medication consent for patients prescribed lithium was compliant for all six months of the

review period; Creatine and BUN (kidney function tests) were compliant for five of six months. EKGs for patients prescribed lithium were compliant for five months and not compliant for one month; measures of lithium levels were noncompliant for four months and compliant for two months.  Regarding thyroid monitoring, VSP was compliant for three of five required months.

MAPIP data showed that VSP was consistently compliant during each month of the review period for medication continuity for inter-institutional transfer at R&R, for NA/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), for MHCB transfers, following discharge from community hospital or acute or intermediate care, and at parole or release to the community.  Compliance for new psychiatric medications and psychiatric-prescribed chronic care medications was attained during all six months of the review period. VSP was also compliant with observation of medication preparation and administration for HS medications.

VSP was compliant with observation of medication preparation and administration of AM/PM medications for five months of the review period.  VSP reported that for medication continuity for intra-institutional transfers to ASU/SHU/PSU, it was compliant for four of six months.  As for compliance with involuntary medication court orders, VSP was compliant for one of four required months.

The maximum length of medications ordered by a psychiatrist at VSP was 180 days; bridge orders were for 30 days.

Nursing staff documented and tracked telephone and verbal orders in the EHRS. Providers issuing authorized telephone/verbal orders were required to sign the orders in EHRS.

Polypharmacy reviews occurred during the twice monthly Population Management Meetings. Feedback and suggestions from the reviews were provided to prescribing psychiatrists.

Psychiatrists at VSP were permitted to prescribe non-formulary medications without approval from a secondary reviewer. The prescriber was required to appropriately document the non-formulary prescription in the EHRS.

As a general practice, VSP psychiatrists prescribed psychotropic medications DOT, but did not differentiate the number of patients prescribed medications DOT from those prescribed NA. On March 22, 2022, there were 1,961 active NA/DOT psychotropic medications prescribed to 895 patients. There were 119 patients prescribed KOP SSRI by psychiatry.

The number of patients prescribed HS psychiatric medications was 291 at the time of the site visit. VSP consistently administered HS psychiatric medications at or after 2000 hours.

VSP reported that while no pill lines lasted longer than one hour, there were occasions when patients' medication administration took from 40 to 45 minutes from arrival at pill lines. Patients prescribed heat risk medications waited in shaded areas to receive their medications. VSP staff reported ongoing steps to remediate the pill line issues, including staggering housing releases. Staff also indicated that the number of Omnicell medication dispensing units had been increased on Yard D (3CMS program) and that more nursing staff had been assigned to the yards with higher medication volumes. Further, as a means of improving pill lines, staff stated that VSP consistently evaluated patients with the goal of appropriately increasing the number of patients prescribed KOP medications.

Fourteen patients received medications via the PC 2602 process at the time of the site visit, including 13 EOP patients and one 3CMS patient. Three PC 2602 petitions were initiated

at VSP during the review period, none of which was an emergency petition.  Five PC 2602

petitions were renewed during the review period.  No PC 2602 petition was denied during the

review period or was pending referral at the time of the site visit.  One petition was withdrawn

during the review period.

VSP reported that there was no use of force for medication administration purposes for

patients receiving PC 2602 medications during the review period.

Transfers:

Regional staff conducted a "major" sustainable process visit on September 23-24, 2021,

and a "minor" visit on December 8-9, 2021.  Primary areas reviewed included the results of case

reviews by regional staff, MHPS minutes, patients meeting criteria for consideration for referral

to a HLOC who were not referred, data error rates in the relevant logs attendant to this process,

and IDTTs across levels of care.

During the major sustainability report, interrater reliability with the headquarters

reviewer improved from 67 percent previously to 91 percent of "good cases," which required no

CAP or follow-up.  There were no discrepant reviews between the headquarters reviewer and the

VSP inpatient coordinator.  Three "unacceptable" cases involving mainline EOP cases were

identified.  Those cases were due to missing documentation, insufficient narrative, and HLOC

documentation not completed properly.  Improvement was noted due to no inpatient coordinator

errors in documentation this quarter and 100 percent consistency between headquarter's review

and VSP review.

The inpatient coordinator attended all mental health subcommittee meetings and

presented accurate referral information for the quarter.  Minutes reflected that the inpatient

coordinator addressed transfer timeliness and all aspects of discharge requirements.  The minutes

documented no acute care referrals for the quarter but five referrals to intermediate inpatient care, which was consistent with headquarters tracking.

Non-referral logs were reviewed for the quarter by regional staff.  There were nine non-referrals for April, nine for May, and 15 for June.  Five entries contained incorrect IDTT dates, but there were minor error rates for the non-referral logs overall.  Supervisors provided training to staff regarding these errors.

Multiple HLOC forms were also reviewed by regional staff for the quality of rationale for non-referral and treatment modifications.  Of those, approximately 50 percent had an inadequate rationale for non-referral or inadequate treatment modifications.  This was consistent with the monitor's expert's finding.  While the findings of the quarterly sustainable reviews improved during the minor review (December 2021), the same was not found by the monitor's expert.  Problems with documentation on the HLOC form for non-referrals remained throughout the round and up to the time of the site visit.

Due to VSP's 91 percent agreement with the headquarters reviewer, such a review was not needed for the minor visit.  Several action plans from the Q3 major review were not expected to show until following the Q4 review, though documentation of the CAP was noted in October 2021, confirming that action was implemented.  This was particularly relevant for the mental health subcommittee minutes, wherein it was documented that the inpatient coordinator thoroughly reported on transfer timelines and DSH/PIP return paperwork timeframes.  The monitor's expert noted improvement by the inpatient coordinator in areas in the major and minor sustained reviews that required attention and improvement.

The quality of clinical rationales for non-referral and treatment modifications remained deficient, and it was unclear if the CAP for the sustainable reviews would satisfactorily address

these deficiencies.  Supervisor review of deficient HLOC forms with clinicians had not resulted in sufficient improvement by the time of the site visit.  Additional efforts might be required, such as the presence of the inpatient coordinator at the IDTT and/or supervisor review of all treatment plan HLOC forms.

VSP's one inpatient coordinator had held that position for seven years.  There was a backup coordinator who was in the position for five months.

During the review period, VSP referred eight patients to intermediate care; there were no referrals to the acute level of care.  VSP timely submitted all referrals to IRU.  Three patients transferred to intermediate care facilities within 30 days of referral as required.  One patient's referral was changed to MHCB, and that patient timely transferred.  Of the four patients that did not transfer within 30 days, one patient had a complex medical case.  For the remaining three patients, IRU took over 30 days to make the referrals to the intermediate care facilities after receipt from VSP.  One of those patients was placed in administrative segregation after assaulting a member of the *Vitek* hearing.  The patient reportedly "calmed down" in the administrative segregation setting but also had a PC 2602 hearing scheduled.  VSP failed to provide an appropriate reason for delay.  The inpatient coordinator reported that IRU was "waiting for the PC 2602 hearing before referring the patient since the waitlist was so long already."

There were no rejections or rescissions regarding referrals to acute or intermediate care during the review period.

On March 22, 2022, no patients were awaiting acceptance or transfer to an inpatient program.

VSP completed five *Vitek* hearings during the review period; no patients prevailed.

Two patients referred to intermediate care during the review period had complex medical needs.

VSP's non-referral log identified 69 individual patients who were reviewed at 91 IDTTs.

Regarding patients returning to VSP upon discharge from inpatient settings, VSP reported significantly improved communications with sending institutions since the preceding review period. Though rare, there were instances of patient returns to VSP without notification.

For patients transferred to another institution during the referral process, VSP's inpatient coordinator contacted the receiving institution's inpatient coordinator to inform them of the transfer.

VSP expedited two transfers to inpatient care over the past year.

VSP made 97 referrals to MHCBs during the review period. Of those, 84 patients were admitted, and 13 referrals were rescinded. Three referrals took longer than 24 hours to transfer, though two were less than 90 minutes beyond timeframes. MHCB transfers included 37 patients to CHCF, 31 to SVSP, eight to CSP/Corcoran, four to CMF, three to KVSP, and one to MCSP.

Three patients had three MHCB referrals and three admissions during the review period.

VSP referred and transferred one patient to a PSU. The transfer was completed within the 60-day timeframe requirement. At the time of the review, one patient was waiting to transfer to a PSU and had not exceeded the 60-day requirement.

VSP transferred 19 EOP patients from administrative segregation during the review period. Of those, 15 patients moved within 30 days, and four or 21 percent took longer than 30 days to transfer. Two delays were due to patient refusals to comply with COVID-19 testing protocols. A third patient was referred to intermediate care; however, remained in administrative segregation at VSP for 50 days before transferring to a PIP. The patient was never put up for

transfer to an EOP hub while awaiting acceptance to the PIP.  The fourth patient took 40 days to transfer to an EOP hub.  Staff indicated that this was due to the reclassification of his RVR offense, even though this should not delay the transfer to a hub as policy required patients to appropriately transfer during the RVR process.

On March 22, 2022, four EOP patients were housed in administrative segregation waiting for transfer; three patients were awaiting transfer to an EOP hub, and one patient to a PSU.  Of those, one EOP hub patient exceeded the 30-day timeframe guideline and had been waiting 48 days.  Reasons for the delay included the closure of the endorsed institution's EOP hub and the lack of bus seats.

There were no transfers to LTRH during the review period.  VSP transferred 27 patients to STRH.  Of those, five or 18 percent took longer than 30 days to transfer.  Reasons for delays included lack of bus seats and COVID-19 testing refusals.

On March 22, 2022, 12 3CMS patients were housed in administrative segregation waiting for transfer to STRH.  Of those, four or 33 percent had stays longer than 30 days.

During the review period, VSP changed 93 patients' level of care from EOP to 3CMS. Of those, ten patients went to MHCBs, and eight patients returned to the EOP level of care by the time of the site visit.

Programming:

MHSDS Patients in Administrative Segregation:

On March 22, 2022, all psychiatrists and primary clinicians providing services in administrative segregation met caseload ratios.  VSP used cells 108 through 111 for intake cells. On March 24, 2022, one non-MHSDS new intake was housed in cell 109; the patient had a crank radio.  VSP custody staff reported that when intake cells were filled, double celling options were

explored.  If double celling was not an option, incarcerated individuals were placed in cells close to the intake cells.  Interviewed patients and staff reported adequate access to crank radios on intake.

Staff reported daily morning meetings with the administrative segregation sergeant, mental health clinician, and psych tech.  However, a review of the morning meeting log revealed periods of three to five days during the month of March 2022 when no meetings occurred.

The administrative segregation log reflected that psych tech rounds were performed and documented daily.

A review of 20 incarcerated individuals' 114A's indicated that showers were offered three times per week.  Additionally, at least ten hours of yard was offered to incarcerated individuals once they were cleared by ICC.  Patients reported no issues with the receipt of their property.  VSP completed initial ICCs within ten days of placement during the review period, and IDTTs occurred prior to the ICCs.

On March 24, 2022, the monitor attended ICCs in administrative segregation.  The committee was chaired by the warden and members included the unit social worker, C&PR, facility captain, and correctional counselor.  Staff assistants were present and mental health input was comprehensive and germane.  STRH and EOP hub transfers were explained to MHSDS patients.

VSP conducted 41 IDTTs for caseload patients in administrative segregation during the reporting period.  Of those, 23 or 56 percent were for 3CMS patients, 13 or 34 percent were for EOP patients, and four or ten percent were for patients at the intermediate inpatient level of care.  Of the 41 IDTTs, 26 or 63 percent were attended by all required disciplines.  The monitor's expert observed IDTTs for EOP and 3CMS patients.  All psychiatry was conducted utilizing

telehealth equipment, which included two audio-video carts with 24-inch video screens that were used for IDTTs, and for individual contacts. This telehealth equipment provided adequate audio and visual communication. The telepsychiatrist made meaningful contributions to the treatment planning, and meetings were adequately collaborative among team members.

Non-Disciplinary Segregation:

On March 23, 2022, there were three NDS incarcerated individuals housed in administrative segregation; none were on the MHSDS caseload. All received their property the day after arrival, and telephone privileges were documented in reviewed 114As. At VSP, there was no separate logging or tracking of property and privileges other than the 114As.

There were three accelerated NDS transfers during the review period. Two transferred within 72 hours. One transfer took five days due to a lack of bed availability at three different institutions.

Alternative Housing:

VSP utilized unit A3 (celled housing) for alternative housing placements. Patients housed in administrative segregation or the OHU remained housed in those locations. While in alternative housing, all patients were placed on 1:1 suicide watch until transfer to an MHCB or the referral was rescinded. All alternative housing locations had confidential treatment spaces. The current VSP LOP for alternative housing was signed in February 2022.

One patient was placed in alternative housing on March 22, 2022. The patient transferred from alternative housing within 24 hours.

EOP:

VSP operated a 372-bed Level II EOP on A Yard in units A1 and A2. The average patient census for the review period was 294, though the census dropped during the statewide

modified program. On March 22, 2022, there were 295 EOP patients at VSP. Staff reported a steady increase in the EOP population since the removal of statewide modified program restrictions around February 20, 2022.

VSP's EOP staffing included two senior psychologist supervisors, four psychiatrists, nine psychologists, ten recreation therapists, and three social workers. Custody staffing included four housing officers assigned to each building during second watch, with two yard officers and four escort officers assigned to the program.

VSP maintained an APA-accredited internship for up to three interns who were primarily assigned to the EOP. There were also two practicum students at the time of the site visit. The intern and practicum positions were supervised by the EOP program supervisors.

The VSP mental health supervisory staff reported no issues related to staffing, and compliance was best when the EOP census did not exceed 320 patients.

On March 22, 2022, caseloads for four telepsychiatrists and all primary clinicians were within mandated patient ratios. The caseload of an additional telepsychiatrist who provided services to EOP and 3CMS patients exceeded the required ratios.

Treatment space remained challenging in VSP's EOP, and issues were exacerbated by COVID-19 pandemic restrictions. As of March 22, 2022, VSP returned to pre-COVID-19 treatment room capacities so long as High Efficiency Particulate Air (HEPA) filters were utilized. VSP staff noted that this was the first time since the beginning of the COVID-19 pandemic that they could schedule patients for ten hours of structured therapeutic activity (STA).

Further, during the January/February 2022 statewide modified program, VSP staff reported that it was "virtually impossible" to see patients out of cell for routine clinical encounters, including IDTT meetings. Mental health management reported that during that time,

VSP discontinued all routine IDTTs until patients could attend. IDTTs were, however, convened for decompensating patients to address their acute mental health needs. During the modified program, VSP supervisors expected clinicians to see patients at cell front. Consequently, contacts during that time were generally non-confidential due to the difficulties in movement.

The monitor randomly selected and reviewed the healthcare records of 18 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. Of the five patients in the sample who required initial psychiatric contacts, four or 80 percent had an initial psychiatric contact prior to the initial IDTT and within 14 days of arrival. Fifty-three of 79, or 67 percent of required routine psychiatry contacts, occurred within 30 days and were compliant. Of the reviewed psychiatric contacts sample, 86 of 91 or 95 percent of routine psychiatric contacts were conducted via telepsychiatry. One hundred percent of reviewed psychiatric contacts were completed in a confidential setting.

Five of the 18 reviewed patients required initial primary clinician contacts during the review period. Four or 80 percent were completed within 14 calendar days and were compliant with Program Guide requirements. Sixty of 84, or 71 percent of routine primary clinician contacts, were timely. Eighty percent of initial and routine primary clinician contacts were completed in confidential settings. Reasons for the lack of confidentiality included COVID-19 precautions, modified program, lack of treatment space, and fog.

Five of the sampled patients required an initial IDTT during the review period, of which two or 40 percent occurred within 14 calendar days. Required staff attended 100 percent of initial IDTTs, though attendance of the assigned psychiatrist and primary clinician was not clearly discernable for all cases.

For the 16 patients in the sample that required routine IDTTs, 22 of 30 or 73 percent

occurred within 90 days.  Required attendees attended 98 percent; however, it was unclear

whether it was the assigned psychiatrist and primary clinician in all cases.

The monitor's expert observed five EOP IDTTs during the site visit.  Due to the lack of

on-site psychiatrists, all IDTTs utilized telepsychiatry.  A large 43-inch video screen with voice-

activating rotating cameras provided both the patient and treatment team with adequate visual

contact with the telepsychiatrist.  There were no technical problems in any of the observed

IDTTs.

The telepsychiatrist was frequently the assigned psychiatrist for the case under review.

Though even when seeing patients who were not on her caseload, the telepsychiatrist was

adequately prepared and, during introductions, explained that she was covering for the treating

psychiatrist.  The telepsychiatrist fully explained all medication initiations and discontinuances

when applicable.

Further, each room that was used for one-to-one telepsychiatry contacts contained a 23-

inch video screen.  Staff reported a medical assistant's physical presence in the room to facilitate

these telepsychiatry contacts.

Interviewed EOP patients expressed discomfort with the use of telemedicine.  One patient

reported that the registry psychiatrist was angry at him for refusing to see the telepsychiatrist,

threatening the patient with a transfer to the state hospital.  Other patients reported that despite

reporting their discomfort and concerns regarding telepsychiatry to their treatment teams, no

changes were made.

Telepsychiatrists who provided EOP patient services at VSP were required to conduct in-

person visits to the institution every three months.  Such visits were to occur on a day when the

telepsychiatrist could also attend to their patients' IDTTs.  During their VSP site visits, the telepsychiatrist was also expected to conduct one-on-one visits with some caseload patients.

VSP was unable to provide the required ten hours of structured therapeutic activity during the review period.

Since at least May 2020, VSP had a specific CAP to address this deficiency.  The end date set for the CAP was October 18, 2022.  VSP provided the highest amount of treatment during October 2021, with 36 percent of EOP patients scheduled for ten hours of structured therapeutic activities.  The least amount of treatment during the review period was provided in January and February 2022 due to the statewide modified program, with two percent and five percent of EOP patients, respectively, scheduled for ten hours of treatment.  Staff and data analyses indicated that social distancing severely reduced the capacity of existing group rooms, though it was unclear if altering the treatment schedule may have had a positive impact.

3CMS:

At VSP, 3CMS mainline patients were housed across facilities A, B, C, and D. Psychiatry was provided almost exclusively by telepsychiatrists, although a registry psychiatrist was available one day each week to see patients for whom telepsychiatry was deemed inappropriate.  While staff and patients reported that primary clinician and psychiatry contacts took place in confidential settings, VSP leadership reported that during quarantine periods, staff conducted cell-to-cell "welfare checks" and provided workbooks for patients in lieu of one-to-one confidential clinical contacts.

On March 22, 2022, three of the four telepsychiatrists in 3CMS met staffing ratios; the fourth telepsychiatrist, who provided services in EOP and 3CMS, exceeded mandated ratios.

Five of the eight, or 62.5 percent of primary clinicians in 3CMS, carried caseloads within the required ratios.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.  Of the five patients who required initial psychiatric evaluations during the review period, one or 20 percent occurred prior to the initial IDTT and was compliant with Program Guide requirements.  One initial psychiatric evaluation did not occur until three months after the patient's arrival at VSP.  For routine 90-day psychiatry contacts, 17 of 27, or 63 percent, were timely conducted.  One hundred percent of reviewed psychiatry contacts were conducted in a confidential setting.  The majority of routine psychiatric contacts occurred via telepsychiatry.

Three of five, or 60 percent of patients in the sample, had an initial primary clinician contact within ten working days.  For routine primary contacts of the sample 3CMS patients, 35 of 45, or 78 percent, occurred within 90 days.  Of the 54 primary clinician contacts reviewed, 51 or 94 percent were conducted in a confidential setting.  VSP acknowledged enduring problems with timely initial contacts in its 3CMS programs for both primary clinicians and psychiatry. Mental health staff and leadership attributed the difficulty to quarantine and other public health restrictions related to COVID-19.

Of the five 3CMS patients who required initial IDTTs, two or 40 percent occurred within 14 working days.  Regarding routine IDTTs, three of five or 60 percent occurred at least annually.  Required staff members attended 100 percent of the initial and routine IDTTs reviewed; patients attended 100 percent as well.

IDTTs on all 3CMS yards were observed by the monitor's expert.  All were conducted in a confidential space and were attended by a full complement of staff, all of whom had access to computers as needed.  Psychiatry was performed by a telepsychiatrist for all IDTTs observed.

While generally adequate overall, the comprehensiveness of case presentations and the connection between treatment goals and diagnosis and assessment varied across primary clinicians. All team members participated in all IDTTs observed, although some of the teams would have benefited from having more of a team discussion rather than sequential presentations by staff members. The psychiatrist's familiarity with the patient was variable.

For 3CMS telepsychiatry participation in IDTTs, the equipment included a large 43-inch screen with voice-activating rotating cameras that provided good auditory and visual communication. The telepsychiatrist appeared able to hear and comprehend the patient even when the patient was wearing a mask and/or spoke less than clearly. The psychiatrists' participation was generally adequate. Although their degree of participation varied from team to team, there was no indication that this was related to the use of the telepsychiatry equipment but rather the individual styles of the psychiatrist and whether they had assessed the patient prior to the IDTT.

Telepsychiatrists who provided 3CMS patient services at VSP had to personally visit the institution every six months. These visits were expected to take place on a day when the telepsychiatrist could also attend their patients' IDTTs and conduct some one-on-one visits with caseload patients.

Due to COVID-19 public health restrictions, no groups were conducted for 3CMS patients during the reporting period or at the time of the site visit. VSP's efforts to resume groups in January 2022 were thwarted by a COVID-19 outbreak. Leadership reported plans to resume group treatment for 3CMS patients in April 2022.

Reliable access to an adequate amount of confidential space was a significant limitation on the provision of groups to the 3CMS population. This limitation existed prior to the COVID-

19 pandemic and was expected to continue once groups resumed.  Staff reported competition for space with other programming, including education and ISUDT, which disrupted the efficient scheduling and completion of groups.

A group of eight 3CMS patients who had transitioned from the EOP level of care was interviewed by the monitor's expert.  Overall, the patients expressed that mental health staff were generally available to them when needed, and they offered few complaints about 3CMS clinicians and custody staff.  Their areas of concern were mostly limited to the length of pill lines and the lack of transition planning associated with their move from EOP to 3CMS.  In relation to the move from EOP to 3CMS, they reported that they were not adequately prepared regarding the reduction in clinical contacts, especially the lack of 3CMS groups, which they particularly found challenging.

Other Issues:

Pre-Release Planning:

VSP had two pre-release coordinators who integrated their pre-release planning efforts with the IDTTs, ISUDT, TCMP, and the CC I.  VSP held weekly meetings among the pre-release planners, ISUDT, and TCMP.  The monitor's expert observed one meeting, which was constructive; however, relevant information was not reliably communicated to the treatment team for patients with imminent discharge dates.

VSP provided limited data related to pre-release planning.  VSP responded to the monitor's pre-site data request that "TCMP is unable to provide a spreadsheet of patients that they have seen during the reporting period. They do assist patients with SSI benefits, VA benefits, Medi-Cal."  VSP indicated that the month prior to the site visit, the pre-release

coordinators began collecting relevant data from pertinent databases to make this information more readily available to mental health staff.

During the reporting period, VSP pre-release coordinators conducted 191 appointments for 173 patients. Of those, 103 were with 3CMS patients, and 88 were with patients at the EOP level of care.

The monitor's expert observed an EOP pre-release group. The group was facilitated by the two pre-release coordinators and dealt with practical issues such as how to obtain identification. The eight patients participating appeared engaged with the material, and the group facilitators demonstrated a good rapport with the participants.

Program Access:

a.    Job Program and Assignments

As of February 1, 2022, there was a total of 1,126 job assignments at VSP. Of those, 58 or 19 percent of the EOP population and 359 or 35 percent of 3CMS patients held job assignments. Non-MHSDS incarcerated individuals held 709 job assignments, which represented 45 percent of the non-MHSDS population.

Of 790 total academic assignments, EOP patients held 81, which represented 27 percent of the EOP population. Additionally, 3CMS patients held 277 assignments, which represented 27 percent of the 3CMS population. Non-MHSDS incarcerated individuals held 469 academic assignments, which represented 29 percent of the non-MHSDS population.

There was a total of 248 vocational education assignments. One EOP patient held an assignment, and 47 3CMS patients held assignments, which represented five percent of the 3CMS population. Non-MHSDS incarcerated individuals held 86 vocational education assignments, representing five percent of the non-MHSDS population.

Of 877 voluntary education assignments, EOP patients held 12, which represented four percent of the EOP population. Patients at the 3CMS level of care held 290 assignments, which represented 28 percent of the 3CMS population. Non-MHSDS incarcerated individuals held 484 voluntary education assignments, which represented 30 percent of the non-MHSDS population.

VSP had 149 substance abuse treatment assignments, of which EOP patients held one, and 3CMS patients held 83, which represented eight percent of the 3CMS population. Non-MHSDS incarcerated individuals held 113 substance abuse treatment assignments which represented seven percent of the non-MHSDS population.

     b.   <u>Milestone Credits</u>

VSP's LOP regarding milestone completion credits was revised in January 2022. During the review period, 292 of 304 or 96 percent of EOP patients were eligible for, and 73 percent earned milestone credits. For 3CMS patients, 948 of 1,023 or 93 percent were eligible for, and 26 percent earned milestone credits. For non-MHSDS incarcerated individuals, 1,497 of 1,592 or 94 percent were eligible for, and 26 percent earned milestone credits.

Four VSP staff members were trained to enter and approve incarcerated individuals' milestone credits.

VSP staff reported that 3CMS patients complained of the inability to earn milestone credits for group participation at VSP. Similarly, 3CMS patients were not afforded the ability to earn Rehabilitative Achievement Credits (RAC) credits for group treatment. EOP patients earned both milestone and RAC credits for participation in different types of group treatment. As a result, staff noted that some 3CMS patients asked to return to EOP in order to earn the credits.

c.    Out-Of-Level Housing

VSP reported that on March 4, 2022, 27 EOP and 40 3CMS custody Level I patients were in Level II housing, and one custody Level I non-MHSDS incarcerated person was in Level II housing.  There were three EOP and 44 3CMS custody Level III patients in Level II housing.  Further, one 3CMS custody Level IV patient was in Level II housing.

d.    ADA Reasonable Accommodation and Grievance Procedures

VSP confirmed implementation of the revised ADA accommodation and grievance procedures which were updated in March 2022.

Case-by-Case Reviews:

VSP did not complete any case-by-case reviews during the review period.

"C" Status:

At the time of the site visit, two incarcerated individuals were on "C" status.  Review of ICC documentation indicated that the "C" status of the two incarcerated individuals was reviewed in January 2022 and February 2022, respectively.  In each case, the ICC determined to continue their "C" status.

Mental Health Referrals:

During the review period, VSP responded to 1,502 routine referrals, 146 urgent referrals, and 130 emergent referrals.  Follow-up was timely for 97 percent of routine referrals, 87 percent of urgent referrals (January compliance was only 47 percent), and 99 percent of emergent referrals.  For provider compliance, psychiatry was 100 percent compliant with follow-up to emergent referrals, 95 percent complaint for urgent referrals, and 87 percent compliant with timely follow-up of routine referrals.  Primary clinicians were 99 percent complaint with timely

follow-up to emergent referrals, 96 percent complaint with urgent referrals, and 97 percent complaint with timely follow-up to routine referrals.

All interviewed housing unit officers were knowledgeable about initiating mental health referrals and produced MH-5 referral forms upon request.

Custody and Mental Health Partnership Plan:

VSP's CMHPP LOP, which was revised in February 2022, was consistent with the statewide operating procedure.

Executive leadership joint rounding documentation was supplied for August 2021 through January 2022.  The documentation showed that the warden or chief deputy warden and the chief of mental health attended all executive leadership joint roundings during the reporting period.

Staff reported positive relationships between mental health and custody, and patients consistently reported adequate access to mental health.

VSP did not produce the agenda of its executive staff meetings.  Review of QMC meeting minutes indicated that executive joint roundings were covered during the meetings held from August 2021 through January 2022.   The minutes in each case stated that executive rounding and the partnership plan "continue to do well with great collaboration."  VSP provided minutes from meetings of the MHPS for August and November 2021 and January 2022 that stated in each case that mental health supervisors in the 3CMS program continued "to collaborate with custody on their weekly huddles and monthly rounding in the selected housing units."  The documentation in the minutes of both the QMC and the mental health subcommittee suggested proforma reporting rather than discussions of outcomes from the huddles and rounding.

The Special Master's monitors and experts observed several huddles during the site visit, and all required staff did not attend the observed huddles.  Attending staff appropriately addressed patients arriving from higher levels of care, patients new to the unit, and patients exhibiting concerning behaviors and/or poor activities of daily living (ADL).

On March 24, 2022, the monitor observed the morning huddle in administrative segregation.  The huddle was attended by the mental health clinician, administrative segregation sergeant, psych tech, and floor officer.  New intakes and "kick outs" were reviewed as well as medication issues or unusual behaviors.  The meeting was comprehensive and collaborative.

In general, from the monitor's observations and VSP's huddle reports, the primary clinician and housing officers were the only attendees in EOP units.  Weekly 3CMS supervisor huddle reports indicated that the mental health program supervisor and custody program sergeant conducted the huddles.

EOP orientation groups were held regularly during the review period, although several were canceled due to COVID-19 measures.  The orientation group leaders included a mental health clinician, custody staff, and a patient peer.

Documentation of the monthly joint supervisory program area tours in the 3CMS program indicated that they occurred monthly.  The documentation recorded general responses that resulted from questioning staff and patients.

VSP reported that its men's advisory council held meetings monthly from October 2021 through February 2022.  Meeting minutes were provided for October and November 2021.  The minutes indicated that patient representatives from each facility attended the meeting along with custody and health care representatives, including the chief of mental health.  The meetings addressed a variety of subject matters, including COVID-19 measures and access to care.

VSP provided a current brochure available to 3CMS patients that was appropriate.

One staff misconduct allegation was filed during the review period. VSP reported that the complaint was not confirmed and was closed in November 2021.

No staff was removed to another area as a result of patients' complaints.

A total of 900 of the 1,039 required staff, or 87 percent, had completed the required mental health partnership training at the time of the site visit.

Heat Plan:

Indoor and outdoor temperatures were logged and forwarded to the litigation coordinator during August, September, and October of the monitoring period and VSP forwarded a monthly heat report to CDCR headquarters during those months. During the review period, there were 34 Stage I heat alerts and one Stage II heat alert. There were no Stage III alerts or any patients with heat-related illnesses. Officers were familiar with the stages of the heat plan; thermometers were in place and working in toured units; and housing units had daily heat risk medication lists available. Patients were allowed dayroom access when recalled from the yard during Stage I heat alerts.

Incarcerated individuals were provided with iced water and access to showers during the Stage II heat alert.

RVRs:

VSP did not meet RVR training requirements, timeliness of requesting mental health assessments, timeliness of completing mental health assessments and returning them to custody staff, and senior hearing officer documentation of mitigation of penalties as a result of clinician recommendations. Further, the monitor found that clinical staff used inappropriate canned language when completing mental health assessments.

Training data revealed that 76 of 84 or 90 percent of required custody staff received the RVR mental health assessment training.  For mental health clinicians, 12 of 38.5 or 31 percent of clinicians received the required training.  In 2021, VSP prioritized training for those clinicians who regularly completed mental health assessments.

VSP issued 721 RVRs during the review period.  Of those, 409 or 57 percent were issued to MHSDS patients, including 295 issued to 3CMS patients, 108 issued to EOP patients, four issued to MHCB patients, and two issued to patients at the intermediate level of care.  VSP did not issue any RVRs for self-injurious or suicidal behaviors or in connection with a cell extraction to administer involuntary medication or medical treatment.  Further, VSP did not issue any RVRs for behavior related to patients being placed in restraint or seclusion.

A total of 28 RVRs were reviewed for compliance with CDCR policy and procedure.  Custody staff referred the RVR to mental health staff within policy timelines in 15 of 28 cases or 54 percent of the time.  Mental health staff completed and returned the assessment to custody staff timely in 26 of 28 cases or 93 percent of the time.  The senior hearing officer documented consideration of the mental health assessment in 100 percent of reviewed RVRs.  The reviewing clinician recommended mitigation of penalties in 27 or 96 percent of the RVRs reviewed.  Of the 27 cases where mitigation was recommended, the senior hearing officer mitigated the penalty in 20 or 74 percent of the RVRs.

In seven of the 28 mental health assessments or 25 percent of the time, the mental health clinician used canned responses when answering question number four regarding mitigation of penalties.

VSP reported that during the review period, there were six occasions when the clinician recommended alternative discipline due to the patient's behavior being strongly influenced by his mental illness.

Use of Force:

As of March 22, 2022, VSP's warden had not completed the mandatory use of force training. Staff attendance at mandatory use of force training was compliant for the chief deputy and all four assistant wardens. Training for captains was not compliant as three of four captains or 75 percent completed the training. Use of force training for lieutenants, sergeants and line custody staff was compliant.

For mental health staff, the chief of mental health, psychologist, psychiatrist and social worker supervisors, and all psychiatrists, attended the training. Of psychologists, 18 of 21 or 86 percent had completed the training. Two unlicensed psychologists and a newly employed psychologist had not been trained. All 14 licensed social workers were trained; one unlicensed social worker had not been trained. Nursing staff was 99 percent compliant with use of force training.

VSP reported 13 use of force incidents, including one controlled and 12 immediate use of force incidents. The controlled use of force involved a cell extraction of a patient from his cell for MHCB placement. All policy requirements were met, including video of the cell extraction, a cool-down period, multiple attempts by mental health and custody staff to gain the patient's compliance with the bed move, and nursing review of the patient's EHR for oleoresin capsicum contraindications. Oleoresin capsicum was approved by the incident commander.

Six of the nine immediate use of force incidents were reviewed, and the use of force in all reviewed incidents appeared reasonable.

Three immediate use of force incidents had not completed the executive review process at the time of the site visit.

VSP reported no change to the use of force policy since the previous *Coleman* visit.

Program Lockdowns/Modified Programs:

During the monitoring period, there were three program lockdowns/modified programming instituted at VSP.

The documentation provided indicated that during a 13-day institution-wide lockdown from September 18 through October 1, 2021, access to mental health services was not affected by the program modification.

During January 3 through February 18, 2022, the institution was placed on modified program as part of COVID-19 measures. During the 46-day period, mental health services were provided on an urgent/emergent care basis only; priority ducats were available as determined by the mental health program.

Access to Care:

A review of VSP's monthly Health Care Access Quality Reports from August 2021 through January 2022 indicated that 0.36 percent of issued mental health ducats and add-on appointments were not completed due to custody factors. Twenty-five percent were not completed due to non-custodial reasons, excluding incarcerated individual refusals.

Placement of 3CMS in Minimum Support Facility:

During the monitoring period, VSP did not place any MHSDS patients in an MSF.

*Coleman* Postings:

The monitor toured all 16 housing units at VSP; English and Spanish versions of the correct *Coleman* poster were appropriately displayed in areas accessible to incarcerated individuals in all housing units.

**APPENDIX B-8**
**CALIFORNIA STATE PRISON/LOS ANGELES COUNTY (CSP/LAC)**
**(March 28, 2022 – March 30, 2022)**
**Review Period: (June 1, 2021 – November 30, 2021)**

Census:

On March 26, 2022, CSP/LAC housed 2,753 patients, which was a 17 percent decrease from the prior review period. The mental health caseload population of 1,404 patients had decreased by three percent since the preceding review period and comprised 51 percent of CSP/LAC's population.

The MHCB housed nine patients.

There were 557 mainline EOP patients and 669 mainline 3CMS patients.

The administrative segregation population of 202 included 93 patients in the administrative segregation EOP hub and 73 patients housed in STRH.

Two MHSDS patients were in alternative housing, and one was in the CTC.

Staffing:

The chief psychiatrist position was filled. The position of the senior psychiatrist was vacant. Six of ten civil service psychiatry positions were filled, for a 40 percent vacancy rate. One psychiatric nurse practitioner and 2.67 registry psychiatrists reduced the psychiatry functional vacancy rate to three percent. The telepsychiatry position was filled.

Both chief psychologist positions were filled. Of 11.5 senior psychologist positions, 10.5 were filled, for a nine percent vacancy rate. Twenty-nine of 38 staff psychologist positions were filled, for a 24 percent vacancy rate. Contractors covered 0.85 vacancies, reducing the functional vacancy rate to 21 percent.

The supervising social worker position was filled.  Twelve of 14.5 social worker positions were filled, for a 17 percent vacancy rate.  Registry filled 1.16 positions, leaving a nine percent functional vacancy rate.

Of 19 recreation therapist positions, 12.5 were filled, for a 34 percent vacancy rate.

SVSP did not provide filled and vacancy data regarding its mental health nursing positions.

Both senior psych tech positions were filled.  SVSP did not provide filled and vacancy data regarding its psych tech positions.

The CHSA position was vacant.  The OSS II position was filled.  The HPS position was filled, as was one of 1.5 AGPA positions.  Thirteen of 17.5 MHSDS clerical positions were filled, leaving a 26 percent vacancy rate.

Telepsychiatry:

At the time of the site visit, CSP/LAC's one telepsychiatrist did not have a caseload but handled the institution's PC 2602 involuntary medication renewals.  During the review period, due to COVID-19, reviewed appointment logs indicated that some psychiatrists provided some services for several programs, including the MHCB and mainline EOP and 3CMS programs, utilizing telepsychiatry.

Staffing Shortages and Unlicensed Clinical Staff:

CSP/LAC lost 39 clinical staff since the onset of the COVID-19 pandemic.  Further, most newly hired mental health clinicians were unlicensed.  During the site visit, unlicensed CSP/LAC staff included 11 psychologists and nine social workers.  Moreover, despite the institution's relative success in hiring new clinical staff, its inability to retain clinical staff was evident during

the site visit.  In fact, staff vacancies had increased between October 2021 and the March 2022 site visit.

Mental health leadership and line staff attributed the institution's staff retention challenges to non-competitive compensation in comparison with non-correctional employment opportunities and challenges associated with the correctional work environment.   Notably, the institution attributed its inability to conduct 8:00 a.m. groups in the mainline EOP program during the site visit and the review period to significant custody staffing shortages.

Quality Management:

The local governing body met twice during the review period.  Mental health was represented at both meetings.  Reviewed meeting minutes reflected the discussion of pertinent issues.

The quality management committee also addressed relevant topics and included representation from mental health at its monthly meetings.  The mental health subcommittee also met monthly and always achieved a quorum; however, the chief of mental health was not present at four of six meetings.  The subcommittee addressed relevant topics, including patient safety and suicidality.

Although the quality management committee and mental health subcommittee addressed appropriate issues, there was no clear process to disseminate information to staff.  Staff also reported not being actively involved in the dissemination of quality management information from leadership to line staff and that mental health leadership did not actively integrate their recommendations.  Staff further stated that when they received information from the respective committees, it was typically a request to perform additional services.  Staff reported already feeling overburdened and unable to assume additional tasks.

A QIT for contraband in the CTC that included a comprehensive plan involving mental health and custody staff was open for part of the review period.  Leadership reported that the QIT had effectively reduced contraband in the CTC.  Nonetheless, during the site visit, two MHCB patients self-injured by cutting themselves with razors.

CSP/LAC peer review was limited to the MHCB.  Reviewed peer review forms reflected appropriate topics, with a strong emphasis on evaluating safety issues.  Mental health leadership further reported that provider charts were audited on a monthly basis.

Medication Management:

Mental health headquarters provided MAPIP results for the review period for compliance for psychiatric diagnostic monitoring and medication management.

For patients who were prescribed antipsychotic medications, diagnostic monitoring was noncompliant for all six months for lipid monitoring.  For blood sugar monitoring, CSP/LAC reported compliance for three of six months.  EKG monitoring was compliant for one of five required months.  For AIMS tests, compliance was reported for four of six months.  Medication consents were compliant for two of six months.  CBCs with platelets and CMPs monitoring were both noncompliant for all six months.  There was compliance for all six months for monitoring thyroid tests, blood pressure, and height and weight.

For carbamazepine, there was compliance for checking blood levels for two of four required months.  Checking CBC was compliant for five of six required months.  Medication consents were compliant for two of three required months.

As for monitoring Depakote (divalproex, valproic acid) levels, there was noncompliance for all six months.  For monitoring CBC and CMP, and medication consents, the facility was compliant for two of six months.

For lithium level monitoring, CSP/LAC was compliant for three of six months. Thyroid monitoring was compliant for four months. There was compliance for checking renal functioning for five of six months. For EKG monitoring, three of four required months reported compliance. Medication consents were compliant for five of six months.

For lamotrigine, there was compliance for four of six months for medication consent.

For antidepressant monitoring, thyroid function monitoring and monitoring venlafaxine blood pressure were compliant for all six months. Medication consents were compliant for one month. EKG monitoring was noncompliant for the one required month.

CSP/LAC was not a clozapine initiating or maintenance institution. No patients housed at the institution were prescribed this medication.

For medication management metrics reported by headquarters, during the reporting period CSP/LAC was noncompliant with the following measures for all six months: continuity of medications upon inter-institutional transfer at R&R; continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU); continuity of medications for MHCB transfers; chronic care medications historical administration; and outpatient provider new medication orders.

For continuity of medications with intra-institutional transfer to ASU/SHU/PSU, CSP/LAC reported compliance for three of six months. For continuity of medications following discharge/transfer from a community hospital and/or DSH, there was compliance for two of six months. For continuity of medications upon parole/transfer to the community, five of six months reported compliance. For medication compliance with an involuntary medications court order, CSP/LAC was compliant for one of six months. There was compliance with involuntary medication orders by psychiatrists for all six months of the review period.

Pill line lengths and individual patients' average wait times were compliant for all six months of the review period.

Psychiatrists could prescribe medications for a maximum of 180 days; bridge orders were permitted for 14 days.

CSP/LAC pharmacists performed monthly polypharmacy reviews and reported compliance for all such reviews.

The chief psychiatrist reported no longer being required to approve non-formulary psychotropic medication requests; however, he stated that all considerations for the use of non-formulary medications were discussed with him for clinical appropriateness.

Only psychiatrist-approved 3CMS patients on SSRIs were eligible for KOP medications. Fifty-six patients had KOP prescriptions at the time of the site visit. This accounted for approximately two percent of all psychiatric medication prescriptions; the remaining 98 percent were NA/DOT.

During the site visit, 553 patients were prescribed HS medications. CSP/LAC reported 100 percent adherence with providing HS medications after 8:00 p.m.

CSP/LAC reported that 109 patients received PC 2602 involuntary medication orders at the time of the site visit. During the reporting period, two emergency and two non-emergency initial petitions were granted. All 57 PC 2602 medication renewals were granted and there was one non-renewal. Patients' primary psychiatrist completed the initial petition. The telepsychiatrist performed all renewal petitions. No use of force was required to administer PC 2602 medications.

Transfers:

During the review period, CSP/LAC had one remotely conducted major sustainability review that covered the fourth quarter of 2021.  Although institutional staff reported that 84 percent of reviewed documentation for 55 cases satisfied quality standards, region III staff found that only 71 percent of documentation was adequate.  The most common identified reasons for failing to satisfy quality standards were inadequate treatment interventions and non-referral documentation, which the monitor's expert's chart review generally confirmed.  Curiously, the major sustainability report referenced an 85 percent compliance threshold, instead of 90 percent.

CSP/LAC had one inpatient coordinator; during the prior review period, there were two.  The inpatient coordinator indicated prior difficulties with transfers to inpatient care due to COVID-19.  She further reported timely transfers to DSH-Atascadero but more challenges with admissions to the CDCR PIPs.  Specifically, due to changes in the review process for PIP admissions, more referrals were returned to CSP/LAC for additional justification of the need for a HLOC.  Often, they were due to the lack of consistent clinical documentation showing the patient's level of impairment.  She further reported that staff shortages had caused challenges with the quality of documentation supporting the need for a HLOC.

The inpatient coordinator explained that in October 2021 inpatient care referrals began receiving additional scrutiny from the IRU with recommendations that CSP/LAC rescind the referral or otherwise provide additional documentation to support it.  In some cases, during this process, patients' mental health conditions subsequently improved and inpatient placement was no longer justified, resulting in the referral's rescission.  The inpatient coordinator confirmed that this more rigorous referral process led to more rescissions.  She added that inpatient care referrals from the EOP hub were often rescinded.

As for any challenges with inpatient care discharges to CSP/LAC, the inpatient coordinator explained that there had been some issues connecting with PIP primary clinicians during the early stages of the pandemic, but that the coordination process with PIP clinicians for discharged CSP/LAC patients was going smoothly by the time of the site visit. The inpatient coordinator further reported that the biggest challenge for returning patients was their housing in quarantined units for extended periods of time, which delayed return to their housing units; this was a particular concern for patients discharged to the EOP level of care.

CSP/LAC's non-referral log identified 466 individual patients who were reviewed at 1,012 IDTTs. The non-referral rationales were uniformly clinically insufficient.

During the review period, CSP/LAC made 19 acute care referrals. The institution timely completed 16 of 19 or 84 percent of referral packets. Nine of 19 or 47 percent were rescinded. Seven of nine or 78 percent of rescinded referrals were pending for more than ten days when they were rescinded; three of nine were pending for more than 30 days.

The remaining ten or 53 percent of acute care referrals resulted in transfer. None timely transferred within ten days. Acute care transfers averaged 28.9 days and ranged from 23 to 35 days. Six of ten acute care patients transferred within 72 hours of a bed assignment. Six patients transferred to CHCF-PIP; four transferred to CMF-PIP.

During the site visit, three patients were awaiting transfer to acute care. Two of these patients were in MHCB. The other patient had complex medical needs and was at the acute level of care in the CTC but was not medically stable to transfer. All three patients were awaiting transfer for more than ten days.

CSP/LAC made 48 intermediate care referrals. The institution timely completed referral packets for 45 or 94 percent of referrals. All three referrals that took longer than five working

days required a *Vitek* hearing.  Referral packets for these three referrals were submitted within ten working days.  As such, all intermediate care referrals were timely submitted to headquarters. Thirteen or 29 percent of referrals were rescinded.  Four of the rescinded referrals had been pending for more than 30 days at the time of rescission.

Thirty-five of 48 or 73 percent of intermediate care referrals resulted in transfer. Nineteen of 35 or 54 percent of accepted referrals timely transferred within 30 days.  Ten of 35 or 29 percent transferred within 72 hours of a bed assignment.

During the site visit, of nine patients awaiting transfer to intermediate care, seven were housed in the EOP hub.  None had been waiting more than 30 days to transfer.

CSP/LAC reported that it did not track patients with complex medical needs who were referred to acute or intermediate care.

The institution conducted eight *Vitek* hearings during the review period; two were for acute care patients and six were for intermediate care patients.  CSP/LAC prevailed at all eight *Vitek* hearings.

CSP/LAC reported 454 MHCB referrals, of which 301 were rescinded; 153 patients were placed in MHCBs.  The 153 transfers resulted in 117 admissions to CSP/LAC's MHCB; another 36 patients were admitted to MHCBs at other institutions.  More than 99 percent of MHCB transfers were timely admitted within 24 hours.

There were 138 admissions to CSP/LAC's MHCB during the review period; CSP/LAC generated 117 of the referrals, and other institutions generated the remaining 21.  Clinical lengths of stay averaged 10.1 days for patients admitted to CSP/LAC's MHCB; physical stays averaged 10.5 days.  Nineteen patients or 14 percent had clinical stays exceeding ten days; 27 patients or

20 percent had physical lengths of stay longer than ten days. Five patients or four percent remained in the MHCB for more than 72 hours following clinical discharge.

During the site visit, CSP/LAC's MHCB housed nine patients. Stays averaged 7.4 days. The three patients whose MHCB stays exceeded ten days were awaiting transfer to acute care.

Review of provided rescission data supported the inpatient coordinator's report of higher levels of rescinded referrals during the latter part of the reporting period. From June through August 2021, CSP/LAC rescinded three acute and one intermediate level of care referrals. However, from September through November 2021, five acute and ten intermediate care referrals were rescinded.

CSP/LAC did not report the number of patients who transferred to the PSU during the review period. During the site visit, 18 patients housed in CSP/LAC's EOP hub were awaiting transfer to the PSU. Thirteen of 18 or 72 percent had been awaiting PSU transfer for more than 60 days.

The institution reported that it did not track patients whose mental health level of care changed from EOP to 3CMS.

CSP/LAC reported that it did not track data on the number of patients who transferred to STRH or LTRH during the review period. During the site visit, three 3CMS patients were awaiting transfer to STRH. None had been waiting more than 30 days.

The institution reported that its MSF did not accept 3CMS patients.

Programming:

MHSDS Patients in Administrative Segregation:

CSP/LAC admitted 335 mental health caseload patients, and 101 non-MHSDS patients, to administrative segregation during the reporting period.  MHSDS patient stays averaged 56 days and ranged from one to 540 days.

CSP/LAC's administrative segregation EOP hub did not satisfy the established staff-to-patient ratio for psychiatry but complied with the ratio for primary clinicians.

The EOP hub passed certification with explanation in June and July of 2021 and passed certification from August through November 2021.

CSP/LAC did not report on the timeliness of brief intake assessments.

Twenty patients were randomly selected to have their healthcare records reviewed for their administrative segregation EOP hub stays.  Certain factors led to the removal of several cases from the assessment.

For the 15 cases that were reviewed, all initial psychiatry evaluations timely occurred before the initial IDTT, of which 73 percent were conducted confidentially.  All 25 of the required routine psychiatry contacts timely occurred every 30 days; 68 percent occurred in a confidential setting.  None of the psychiatry evaluations utilized telepsychiatry.

All 15 of the required initial primary clinician evaluations timely occurred before the IDTT.  Forty-seven percent were confidential.  Twenty-one of 26 or 81 percent of the required routine PC contacts occurred timely; 42 percent were confidential.

All 15 patients had timely initial IDTTs within 14 calendar days of admission.  Ninety-three percent of required staff, and 67 percent of patients, attended initial IDTTs.  All ten routine IDTTs timely occurred within 90 days.  Required staff attended 100 percent of routine IDTTs; patients attended 50 percent.  Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this was not clearly documented.

Three initial and two routine observed IDTTs were confidentially conducted and attended by all required staff.  Overall, the IDTTs demonstrated clinicians' active participation and collaborative engagement in treatment discussions, and meaningful patient engagement.  A sign language interpreter for a hearing-impaired patient was excellent.  However, the psych tech provided very limited input; the custody officer did not participate.

The primary clinician facilitated the IDTTs.  Two clinicians addressed the IDTT's purpose, patients' relevant mental health history and treatment, and diagnoses.  Although IDTTs identified the factors influencing patients' consideration for a HLOC, further discussion was required.  Among other considerations, rationales for treatment refusals and levels of care were not routinely discussed, targeted clinical interventions were not implemented, and group referrals for new patients and treatment goal progress were rarely addressed.  IPOCs also needed to be expanded.

During the review period, CSP/LAC offered patients a weekly average of 13.11 hours of structured treatment.  Patients attended a weekly average of 5.97 hours and refused 7.14 hours.

There were concerns with aspects of the EOP hub's programming.  As an example, on March 29, 2022, during the site visit, the rooms for four of five groups scheduled for 10:30 a.m. were empty after their scheduled start times.  Two patients were watching a video in the remaining group room.  As such, only two of 28 or seven percent of patients scheduled for group at that time were in attendance, reflecting a 93 percent refusal rate.  Custody staff reported that patients had overwhelmingly refused to attend group.  However, further review revealed that some patients had been scheduled for groups at both 8:30 a.m. and 10:30 a.m.  Although custody officers claimed to have asked patients to attend both groups, patients reported that custody officers did not ask them to attend the 10:30 a.m. group if they had declined to attend the earlier

group.  Group attendance also remained poor on the following day, when only six patients attended three of five scheduled groups.

A psychologist, psych tech, and custody sergeant attended an observed mental health huddle.  Discussions addressed 15 patients recently admitted to the EOP hub from a HLOC who required five-day custody checks, and the housing of six new patients in new intake cells.

Examination of a sample of eight EOP hub patients' 114s confirmed the offering of sufficient yard and showers.  Reviewed files also revealed timely ICCs in five of eight cases.

Interviewed patients expressed concerns about requests for housing changes and a new primary clinician, staff misconduct, and medical care.

STRH:

The STRH did not satisfy established staff-to-patient ratios for psychiatry but was in compliance for primary clinicians.

During the review period, the STRH admitted 282 mental health caseload patients and 98 non-MHSDS patients.  STRH stays averaged 60 days for MHSDS patients.

Twenty patients were randomly selected to have their healthcare records reviewed for their STRH stays.  Certain factors led to the removal of several patients from the assessment.

Fourteen of 15 or 93 percent of patients who required an initial psychiatry evaluation had one.  Seventy-three percent were conducted confidentially.  None utilized telepsychiatry. Seventeen of 19 or 89 percent of routine psychiatry contacts timely occurred within 90 days; 32 percent were confidential.  None were performed by telepsychiatry.

All 15 patients had timely initial PC contacts.  Fifty-three were conducted confidentially. Forty-six of 60 or 77 percent of routine primary clinician contacts timely occurred within seven days.  Thirty-three percent occurred in a confidential setting.

Twelve of 15 or 80 percent of initial IDTTs were timely.  Patients attended 73 percent of initial IDTTs.  All 13 routine IDTTs timely occurred every 90 days, with patients attending 46 percent of routine IDTTs. Required staff attended 93 percent of initial IDTTs and 92 percent of routine IDTTs.  Although the Program Guide required attendance of the assigned psychiatrist and PC, it could not be determined if the required assigned clinician was in attendance for every case.

Because the STRH was on quarantine during the site visit, an attempt to virtually observe IDTTs was unsuccessful due to poor sound quality.

During the review period, patients were offered a weekly average of 1.8 hours of structured therapeutic treatment, which was compliant; patients attended a weekly average of 0.5 hours.

The STRH supervisor reported that individual contacts, in-person IDTTs, and yard had continued during the period since mid-March until the site visit when the STRH was on quarantine.  However, weekly treatment groups did not occur.  Review of the group treatment schedule revealed groups that were clinical in nature.  It was also reported that primary clinicians provided individualized in-cell therapeutic activities.

The STRH supervisor further reported that the only access to care barriers were due to COVID-19 restrictions.  She further indicated a good relationship between custody and mental health, as well as observed positive interactions between custody staff and patients.

Several observed ICCs found all required disciplines to be present. PCs completed mental health status exams for patients prior to each ICC. Patients were also allowed to participate in ICCs, with staff sufficiently explaining ICC decisions to patients.

The monitor's review of a sample of 114s for STRH patients revealed that patients were regularly offered three weekly showers and 18.5 hours of weekly yard. Reviewed records also revealed that ICCs were timely 100 percent of the time.

At the time of the site visit, 15 NDS STRH patients were awaiting transfer. Two interviewed patients both reported having televisions in their cells. One patient further reported having received all his property and that he was attending group once weekly and seeing his PC. The other patient reported that he had not received some of his personal letters. He also stated that he had not been offered group and refused to see his PC because he did not find the individual sessions helpful. He reported participating in yard.

    Non-Disciplinary Segregation:

During the review period, five EOP and 16 3CMS patients were assigned to NDS.

MHCB:

CSP/LAC operated a 12-bed MHCB with competent staff and strong leadership. Two psychiatrists, a senior psychologist supervisor, and five psychologists provided services. Staff-to-patient ratios for psychiatry and primary clinicians satisfied established ratios. All MHCB staff were licensed. Leadership and line staff nonetheless reported ongoing staffing challenges, including clinical staffing vacancies and the need for credentialed staff to work in the MHCB. Clinicians also reported having to frequently educate rotating custody officers assigned to the unit about pertinent policies.

Nine patients were randomly selected to have their records reviewed for their MHCB stays.  Eight of nine or 89 percent received an initial psychiatry evaluation within 24 hours of admission.  Seven of nine or 78 percent received an initial PC evaluation within 24 hours of admission.  However, it could not be determined whether the contacts were confidential.

All 55 of the required daily clinical contacts occurred.  However, due to patient refusals, 27 of 55 or 49 percent occurred at cell front.  Otherwise, notations did not indicate whether contacts were confidential.  All 36 of the required twice weekly psychiatry contacts timely occurred; however, only 14 percent were confidential.

All nine patients had timely initial IDTTs within 72 hours of admission and were attended by required staff.  One hundred percent of patients who required routine IDTTs had them within seven days.  All patients had a discharge IDTT.

Four observed IDTTs revealed adequate treatment space and staff's active use of computers.  The psychiatrist and CC I actively participated and provided useful information.  IDTTs were clinically relevant and adequately addressed clinical reasons for admission, treatment goals, psychosocial histories, case conceptualizations, symptoms, and functional impairments.  Higher levels of care, safety concerns, and property were also appropriately discussed.  Although IDTTs discussed diagnoses and ensured that the psychiatrist and PC agreed upon them, diagnoses were not discussed in the patients' presence.

During IDTT, an alarm was sounded after an MHCB patient engaged in self-injury with a razor blade.  Thereafter, another patient who asked to speak to the monitor's expert following IDTT began cutting his arm with a razor blade while talking to the monitor's expert.  Staff was alerted and promptly arrived.

The MHCB did not offer groups.  However, when cleared by the IDTT, MHCB patients were allowed to use the patio, which contained a TTM for use by administrative segregation patients.  Due to COVID-19 safeguards, all patients were placed in the TTM when on the patio, although the TTM was only locked when required by custody status.  Leadership and line staff reported prioritizing mental health patients over medical patients for yard time.  A recreation therapist was also assigned to the MHCB, while patients were provided with leisure activities when yard was unavailable.

Crisis Intervention Team:

CSP/LAC's CIT was governed by an LOP that was created in 2018.  The institution was also noncompliant with the LOP based on the CIT's hours of operation.  Further, the CIT was also understaffed, which frequently resulted in primary clinicians having to cover patient crises, which contributed to additional workload stress and staff burnout.  Mental health leadership reported that a new CIT member would be trained within a few weeks of the site visit; it was hoped that this would allow more coverage by the CIT team.

Alternative Housing:

CSP/LAC's LOP was up-to-date and identified appropriate cells for use as alternative housing.

During the review period, 454 patients were place in alternative housing.  Stays averaged 10.9 hours.

Patients in alternative housing were typically seen non-confidentially at cell front for mental health treatment due to space limitations and custody staff unavailability.  Otherwise, confidential sessions were offered in the program offices on yards housing patients in alternative housing.

443

EOP:

CSP/LAC reported noncompliance with established staff-to-patient caseload ratios for psychiatry and for three of four mainline EOP units for primary clinicians.

Nineteen patients in the mainline EOP program were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

Of the 13 patients in the sample who required initial contacts, nine or 69 percent had an initial psychiatric contact prior to the initial IDTT and within 14 calendar days of arrival; none utilized telepsychiatry. Four of 13 or 31 percent were conducted confidentially. Forty-six of 61 or 75 percent of the required routine psychiatry contacts timely occurred within 30 days. Four percent of routine psychiatry contacts used telepsychiatry. Seventy-four percent of routine psychiatric contacts were performed confidentially.

All 13 patients received required initial primary clinician contacts within 14 calendar days of arrival; 31 percent were conducted in a confidential setting. Sixty-five of 85 or 76 percent of routine PC contacts were also timely. Forty-seven percent were conducted confidentially.

All 13 initial IDTTs timely occurred within 14 calendar days. Required staff attended 100 percent of the time, but patients were present only 31 percent of the time. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this was not clearly discernable.

All 22 routine IDTTs timely occurred within 90 days. Required staff attended 100 percent; patients attended 32 percent. The Program Guide required attendance of the assigned

psychiatrist and primary clinician; however, this assignment was not clearly discernable for all cases.

Observed IDTTs on Facility D4 were conducted confidentially with required staff in attendance. PCs facilitated the IDTTs, which began by identifying their purpose and addressing patients' diagnoses. However, the IDTTs lacked collaborative discussion as treatment team members waited for the PC's prompt before participating. Even the psychiatrist was not actively engaged until asked for input, and then, psychiatry input was limited to medication identification and adherence. Notably, treatment team members did not assess the reasons for patients who were nonadherent with medications. Correctional counselor input was minimal.

The IDTTs identified treatment goals but there was no summary of the course of treatment or discussion of treatment progress. Moreover, treatment interventions, level of care rationales, HLOC indicators, functional impairment, and group participation were not discussed, including how group assignments pertained to treatment goals. On the positive side, the IDTTs noted treatment refusals, identified barriers, and asked patients about current symptoms.

Assigned PCs also typically led the observed routine IDTTs on Facilities D1 and D2. Required staff attended and were knowledgeable about patients. Correctional counselors provided useful input. Notably, IDTT quality varied by provider. Overall, these observed IDTTs demonstrated a collaborative process, but at times the flow of information was disorganized. Although IDTTs identified diagnoses, they did not discuss the criteria to support them, such as symptoms and functional impairment. The IDTTs also did not consistently address treatment goals, while level of care rationale and group participation were not discussed, including group assignment's relation to treatment goals. Discussed clinical interventions were

limited to medications.  Although patients identified on the HLOC report were noted, IPOCs were not added.

The site visit also revealed multiple barriers to care in the EOP program.  Interviewed patients attributed group treatment refusals to custodial barriers including not receiving a ducat and/or custody staff not opening the door to release them for group.  Staff confirmed that this had been an issue for the past few months.

Another barrier to care was the unavailability of EOP beds.  Specifically, patients discharged from the EOP to 3CMS program often remained on the EOP yard pending transfer. This created a bottleneck both for patients in the EOP hub who completed their segregation time and for patients initially housed on B yard for quarantine.  As for patients on quarantine, once they completed their quarantine, they were moved to another housing unit on B yard (a 3CMS or non-MHSDS yard) pending bed availability.  However, these patients were not permitted to attend group.  Mental health staffing shortages caused by staff who left CSP/LAC due to non-competitive salaries, callouts due to burn-out, and the challenge of working with a maximum custody population created yet another treatment barrier.

Staff further reported that CSP/Sac's closure of a 180-housing unit led to CSP/LAC housing a higher number of "behavioral" patients who engaged in self-injurious or aggressive behavior that disrupted EOP programming.  As an example, during the site visit, on March 30, 2022, by 9:15 a.m., there had been six alarms on the yard.

During the review period, CSP/LAC offered patients a weekly average of 9.11 hours of structured therapeutic activities, which was noncompliant, of which they attended an average of 4.37 hours.  The inability to provide patients with adequate structured treatment was attributed to

mental health and custody staffing shortages, insufficient treatment space, physical plant issues, and COVID-19 restrictions.

CSP/LAC had a busy group schedule that included various appropriate clinical and recreational groups between 9 a.m. and 3:30 p.m. daily. However, inadequate group space was a challenge. Review of the group schedule revealed the frequent scheduling of multiple groups at the same time in the visiting room. Although the groups were situated in different areas of the visiting room, there were no barriers between them. Room availability was yet another barrier. During the site visit, two morning groups were canceled as the electronic equipment used to facilitate visitation had not been removed.

An observed mood management group for 20 patients was only attended by six patients. A capable clinician who knew each patient by name and had good patient rapport facilitated the group. The group addressed anger management and the consequences of aggressive behavior. While all group members participated, there was little interaction between them.

Interviewed group participants complained about being locked in their cells for approximately 21 hours daily. Patients typically reported timely IDTTs and routine provider contacts and stated liking their treatment providers. However, patients further noted that provider inconsistency was disruptive. They also expressed an interest in more clinically focused groups; many offered groups were recreational in nature.

3CMS:

Staff-to-patient ratios were not within the established ratio for primary clinicians for the 3CMS mainline program. However, they satisfied the ratio for psychiatry.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Seven patients required initial psychiatric evaluations. Six of seven or 86 percent of patients who required an initial psychiatry evaluation timely had one prior to the initial IDTT. All six initial psychiatry contacts were completed confidentially.  None of the contacts used telepsychiatry.  Fourteen of 15 or 93 percent of required 90-day psychiatry contacts were timely conducted in a confidential setting.  None utilized telepsychiatry.

Seven of eight or 88 percent of patients had a timely initial primary clinician contact within ten working days.  Thirty-eight percent were conducted confidentially.

Thirty-three of 35 or 94 percent of routine primary clinician contacts timely occurred within 90 days, with 59 percent occurring confidentially.

Five of seven or 71 percent of patients had timely initial IDTTs.  Patients attended 43 percent of initial IDTTs.  Nine of ten patients had timely routine IDTTs, but patients only attended 40 percent of the routine IDTTs.  Required staff attended 100 percent of initial and routine IDTTs.

Observed IDTTs for 3CMS patients took place in an adequate room with good lighting and comfortable air temperature.  All treatment team members attended and actively used computers.  However, IDTT quality was variable and clinician dependent; one IDTT was adequate, but the other was of very limited quality.  Nonetheless, the psychiatrist actively participated in both IDTTs.  The IDTTs also addressed functional impairments; however, indicators for a possible HLOC were not formally discussed.

Other Issues:

Pre-Release Planning:

A clinical social worker served as the institution's mental health pre-release coordinator since 2018, with responsibilities that also included completion of DDP and PC 2602 evaluations.

The pre-release coordinator prepared a monthly report that identified patients who were scheduled for release to probation or parole. Due to restricted patient movement, pre-release groups did not occur during the review period. However, at the time of the site visit, the pre-release coordinator conducted one weekly group for all patients who were scheduled for release within six months. The coordinator reported that the pre-release group's agenda was consistent with patients' individual needs and not headquarters provided 12-week curriculum. Notably, there was limited patient group participation.

The pre-release coordinator reported completing the pre-release program assessment (PRPA) for patients and the ROI required for probation. The CC I completed patient applications for a California identification card. The pre-release coordinator, the TCMP caseworker, and parole services worked collaboratively to assist patients with discharge. The TCMP caseworker assisted patients with applying for benefits, including MediCal, veterans' benefits, and social security. The pre-release coordinator further acknowledged limited engagement with probation staff.

CSP/LAC released 48 patients during the review period; 18 were released to probation and 30 to parole. The PRPA was completed for 37 patients.

<u>Program Access</u>:

a.  <u>Job and Program Assignments</u>

On December 30, 2021, CSP/LAC's 1,348 job assignments were held by 214 EOP patients, representing 36 percent of EOP patients, and by 310 or 41 percent of 3CMS patients, and 824 or 56 percent of the non-MHSDS population.

The 373 academic assignments were held by seven or one percent of EOP patients, 112 or 15 percent of 3CMS patients, and 254 or 17 percent of non-MHSDS patients.

The 104 vocational educational assignments were held by eight or one percent of the EOP population, by 37 or five percent of 3CMS patients, and by 59 or four percent of the non-MHSDS population.

The 63 voluntary education assignments were held by 63 or eight percent of 3CMS patients. No EOP or non-MHSDS patients held voluntary education assignments.

The 89 substance abuse treatment assignments were held by zero EOP patients, by 19 or three percent of 3CMS patients, and by 70 or five percent of non-MHSDS patients.

b.      Milestone Credits

On December 20, 2021, CSP/LAC reported that 561 of 597 or 94 percent of EOP patients were eligible to earn milestone credits; 69 percent earned the credit. Of the 732 3CMS patients, 667 or 91 percent were eligible for milestone credits; 14 percent earned them. For non-MHSDS patients, 1,291 of 1,469 or 88 percent were eligible for milestone credits; 16 percent earned them. The institution further reported having temporarily placed milestone credit groups on hold due to COVID-19.

c.      Out-of-Level Housing

On December 21, 2021, there was one EOP and three 3CMS custody Level I patients in Level IV housing. There were 19 EOP and 56 3CMS custody Level II patients in Level IV housing. Further, there were 97 EOP and 245 3CMS custody Level III patients in Level IV housing.

d.      ADA Reasonable Accommodation and Grievance Procedures

CSP/LAC provided training rosters and attendance sheets reflecting implementation of the ADA accommodations and grievance procedure for psychiatric disabilities.

Case-by-Case Reviews:

Forty-three patients met the requirement for a 150-day case review, which were completed as required.  Three of the four patients retained beyond the pre-MERD were granted NDS status.

"C" Status:

On March 30, 2022, ten EOP, 20 3CMS, and 20 GP non-MHSDS patients were on "C" Status.  The institution did not report lengths of stay.

Mental Health Referrals:

During the review period, CSP/LAC reported a total of 2,677 mental health referrals; there were 509 psychiatry referrals and 2,168 primary clinician referrals.  The 794 emergent referrals included 23 to psychiatry and 771 to primary clinicians.  Of the 319 urgent referrals, two were to psychiatry, and 317 were to PCs.  The 1,564 routine referrals included 484 to psychiatry and 1,080 to primary clinicians.  CSP/LAC reported timely responses to 95 percent of emergent referrals and 97 percent of urgent and routine referrals.

Custody and Mental Health Partnership Plan:

CSP/LAC's CMHPP LOP was dated December 2017, and thus outdated and was not aligned with headquarters' Partnership Plan.  Among other shortcomings, it did not reference the CMHPP for 3CMS patients, nor the required attendees for executive leadership joint rounding.

Reviewed documentation reflected the conduct of executive leadership joint rounding during the review period in the EOP hub, mainline EOP, STRH, and Facilities A, B and D4, as well as required participants' attendance at the rounding for five of six months.  Patients typically reported that the mental health program was helpful.  Custody and mental health staff, and patients, reported good custody and mental health relations, and good morale; however, some staff added that custody and mental health staff vacancies diminished morale.  Executive

leadership joint rounding also revealed concerns about the timely delivery of patient property, and physical plant issues that included malfunctioning air conditioning and poorly draining showers.  Documentation from the warden's executive staff meetings, the quality management committee, and the mental health subcommittee did not reference executive leadership joint rounding.

All required participants attended an observed MHCB huddle, which revealed informative discussions about all MHCB patients, including two patients who were placed on suicide watch; however, custody staff did not provide input.  CSP/LAC neglected to provide second watch huddle sheets, so huddle compliance could not be assessed.

Weekly 3CMS supervisory meetings between the 3CMS program supervisor and the custody sergeant occurred during the review period.

CSP/LAC conducted monthly joint supervisory 3CMS program area tours for Facilities A and B during the review period; however, tours of Facility C were not reported.  Interviewed patients reported satisfaction with the mental health program but also indicated that they would have benefitted from additional mental health programming during the pandemic.  Custody staff indicated frustration with custody vacancies, which they reported limited mental health programming.

CSP/LAC scheduled EOP orientation groups and had copies of the 3CMS orientation brochure.

Although IAC meetings were expected to be held monthly on Facilities A, B, and C, Facility A only conducted IAC meetings for two of six months, Facility B conducted them for five of six months, and Facility C conducted them for only one month.  A captain and mental health professional were present at all five IAC meetings held on Facility B, but a mental health

professional did not attend the three IAC meetings on Facilities A and C.  Only two IAC meetings addressed issues related to 3CMS patients.

CSP/LAC reported 11 allegations of staff misconduct, including three patients making allegations of unprofessional behavior against the same clinician.  The institution investigated all of these allegations and closed them.  Additional misconduct allegations included unprofessional behavior, harassment, and intimidation.  Investigations for three of the 11 staff misconduct allegations remained open as of the site visit.  No staff were moved to another position due to patient complaints.

Staff attendance at quarterly partnership round table training could not be properly assessed based on the documentation provided by the institution.  Data for annual off-post partnership training consisted of a list of 247 custody, mental health, and healthcare staff who attended the training; however, it did not indicate the custody and mental health staff who were required to attend.  Accordingly, compliance could not be determined.

Heat Plan:

CSP/LAC's LOP heat plan was entitled "Heat Illness and Prevention" and was dated July 2021.  Between June 1 and September 30, 2021, the institution reported 106 Stage I heat alerts but no Stage II or Stage III heat alerts.  There were no heat alerts during October 2021.

Interviewed custody staff were typically knowledgeable of the heat plan's three stages; however, many were unfamiliar with the patient requirements at each stage, and particularly with the need to provide medical rounds during Stage III.  Custody officers reported receiving a list from nursing of patients who were prescribed heat-sensitive medications.  Some observed housing units placed placards on the cell doors of heat-sensitive patients.

Most housing unit officers reported ongoing issues with cooling and heating systems that often resulted in housing units that were either too cold or too hot.  Custody officers did not have access to handheld thermometers or another method to record in-cell temperatures.

RVRs:

Ninety-six percent, or 751 of 782 custody staff, and 30 percent, or 20.5 of 69 mental health staff, who were required to receive RVR training received the required training.

During the review period, CSP/LAC issued 2,722 RVRs, of which 1,676 or 66 percent were issued to MHSDS patients.  Specifically, 693 RVRs were issued to EOP patients, 907 were issued to 3CMS patients, five to acute care patients, 14 to intermediate care patients, and 57 to MHCB patients.

CSP/LAC reported completing mental health assessments for all MHCB and EOP patients who were issued RVRs, as well as for all 3CMS patients who received a Division A, B, C or any SHU-able offense, or those where the behavior was deemed bizarre, unusual, or uncharacteristic.

Review of a sample of 20 RVRs included seven issued to MHCB patients, two to acute care patients, six to intermediate care patients, four to EOP patients, and one to a 3CMS patient. Custody staff timely requested a mental health assessment in 12 of 20 or 60 percent of cases; mental health staff timely completed and returned the assessment to custody in 14 of 20 cases or 70 percent of the time.

None of the 20 reviewed assessments were marked "yes" in response to question two, which asked the assessing clinician to determine whether the patient's behavior was strongly influenced by mental health symptoms.  Two of the 20 assessments positively responded to question three as to whether mental illness influenced the patient's behavior.  These two patients

were not assessed any penalties due to mental health factors. The SHO documented consideration of mental health information in all 20 reviewed RVRs. However, in 15 of 20 or 75 percent, the hearing officer used the same generic statement or copied the assessment language rather than state their consideration. All 20 mental health assessments provided recommendations for penalty mitigation, which the SHO considered in assessing the RVR.

None of the reviewed RVRs/mental health assessments recommended alternative discipline.

Use of Force:

CSP/LAC reported that 90 percent of required mental health staff, and 97 percent of custody staff, received the mandatory use of force training.

During the reporting period, there were six controlled use of force incidents, of which five involved MHSDS patients. There were also 289 immediate use of force incidents involving 222 MHSDS and 67 non-MHSDS patients; many incidents involved more than one patient.

Review of the six controlled use of force incidents and three randomly selected immediate use of force episodes indicated compliance with CDCR policy.

Lockdowns/Modified Programs:

On November 12, 2021, Facilities D1, D2, and D3 were placed on modified programming to complete a threat assessment following the attempted murder of a peace officer; a patient stabbed a custody officer with an inmate-manufactured stabbing instrument. The modified programming did not impact urgent mental health treatment or medical, dental, or specialty services; however, there were no mental health groups during the lockdown. Upon completion of all searches and interviews, programming returned to normal on November 23, 2021.

Access to Care:

A review of CSP/LAC's monthly Health Care Access Quality Reports from June through November 2021 indicated that 3.7 percent of issued mental health ducats and add-on appointments were not completed due to custody reasons, while 23.2 percent were not completed due to non-custodial reasons, excluding patient refusals.  Patients refused 39.4 percent of ducats.

Placement of 3CMS into Minimum Support Facilities:

Regional staff provided documentation that reported that CSP/LAC's MSF was not one of the MSFs that accepted 3CMS patients.

*Coleman* Postings:

There were *Coleman* posters in English and Spanish located in areas accessible to patients in all visited housing units.

Documentation Production Issues:

CSP/LAC's staffing report indicated that telepsychiatry was not used during the review period, but this was inaccurate as the institution had one filled telepsychiatry position at the time of the site visit and during the review period.  This telepsychiatrist handled PC2602 cases and did not carry a treatment caseload.

The institution's 72-hour census omitted ten patients, nine of whom were either acute or intermediate care patients.  The other omitted patient was a mainline 3CMS patient who was incorrectly coded as residing in a reception center.

In response to the document request's request for the MHCB's average daily census, the institution reported 23 patients, which was the average number of monthly MHCB admissions during the review period.  CSP/LAC's MHCB only had 12 beds, so an average daily census of 23 was impossible.

Despite being requested in the document request and twice while on site, CSP/LAC failed to report those patients whose level of care was lowered from EOP to 3CMS.

**APPENDIX B-9**
**MULE CREEK STATE PRISON (MCSP)**
**(March 28 – March 30, 2022)**
**Review Period: (June 1, 2021 – November 30, 2021)**

Census:

On March 28, 2022, MCSP housed 3,753 inmates, which was five percent less than the previous reporting period. The mental health caseload population of 2,277 patients represented 61 percent of the total population, which was an increase of eight percent from the prior review period.

The MHCB housed six patients. There were no patients in alternative housing.

There were 742 mainline EOP patients, and 44 patients housed in the administrative segregation EOP hub.

The 3CMS mainline population was 1,451, and there were 34 3CMS patients housed in administrative segregation.

Staffing:

The chief psychiatrist position was filled, as were both chief psychologist positions, with one serving as the chief of mental health.

Six of 6.5 established senior psychologist supervisor positions were filled, but one of the senior psychologists was acting out of class in a position at CHCF, for a 23 percent vacancy rate.

Five of seven positions for senior psychologist specialists were filled, for a 29 percent vacancy rate.

There were 7.5 staff psychiatrist positions, of which 5.9 were filled, for a 21 percent vacancy rate. Registry provided 2.5 positions, eliminating the psychiatry functional vacancy rate.

Of seven telepsychiatry positions, 5.5 were filled, for a 21 percent vacancy rate.

Twenty-eight of 43.5 staff psychology positions were filled. However, of these 28 "filled" psychology positions, two psychologists were acting out of class and had positions at CMF, another psychologist was acting out of class as a supervisor and was not providing clinical care, while three others were on long-term leaves, for a 49 percent vacancy rate. Registry staff filled one additional position for a 47 percent functional vacancy rate. Five psychologists were unlicensed.

The supervising social worker position was filled. Fifteen of 22 social worker positions were filled, but two social workers were on long-term leaves, for a vacancy rate of 41 percent. Registry filled an additional position, reducing the social worker functional vacancy rate to 36 percent. Five social workers were unlicensed.

Of 22.5 recreation therapist positions, four were vacant, and one recreation therapist was on long-term leave, resulting in 17.5 filled positions and a 22 percent vacancy rate.

The CHSA II position was vacant and could not be filled as a salary savings. The AGPA position was filled. Three of four HPS I positions were filled. The 1.5 position for the office services specialist II was vacant.

Sixteen of 25.5 office tech positions were filled, but one staff member was on a leave of absence, for a 41 percent vacancy rate.

Six of seven medical assistant positions were filled for a 14 percent vacancy rate.

Telepsychiatry:

MCSP utilized telepsychiatry for IDTTs, individual clinical contacts for EOP and 3CMS patients, and for PC 2602 involuntary medication hearings. Telepsychiatry was not used in the MHCB.

All telepsychiatrists that carried caseloads were within established ratios for the EOP and 3CMS levels of care. One 0.5 full-time equivalent (FTE) telepsychiatrist did not have a caseload but performed PC 2602 involuntary medication hearings. MCSP reported that telepsychiatry was distributed across levels of care to prevent burnout of on-site psychiatrists from managing only EOP or higher levels of care.

Mental health leadership reported some issues with telepsychiatry's use related to the absence of medical assistants, which resulted in the cancellation of all but one telepsychiatrist's appointments for an entire day. It was also reported that there were connectivity issues on some facilities.

Mental health leadership reported that telepsychiatrists assigned to the EOP program visited MCSP every three months; those assigned to the 3CMS program visited every six months.

Quality Management:

During the review period, the local governing body held two quarterly meetings in July and October 2021. A quorum was met for both meetings. The minutes were adequate and noted mental health trends such as MHCB and PIP readmission rates and timely HLOC transfers. Other discussion topics included staff privileging, policy and procedure review, operating budgets, performance improvement work plans, peer review, construction maintenance, licensing updates, inmate-patient bulletin board updates, reports of unusual occurrences, and health care access. Information was reportedly disseminated to staff through staff meetings with supervisors, but no evidence of the communication of information was provided.

Monthly QMC minutes were reviewed from June through November 2021. All meetings had adequate attendance. Topics discussed included health facilities maintenance, COVID-19

updates, improvement projects, mental health and medical services, substance use treatment, staffing, patient safety, EMRs, access to care, audits and surveys, action items, and program management.  Each month, concerns were noted with the number of EOP treatment hours scheduled, offered, and attended being lower than required.  Minutes indicated that mainline EOP patients were not being offered adequate hours but that the EOP hub was running "regular programming."  There were also consistent concerns regarding continuity of care delivered by PCs and psychiatry staff, as well as the quality of suicide risk assessments and safety planning in July and October 2021.

Mental health subcommittee meeting minutes were provided for July through November 2021.  Attendance was adequate.  Topics discussed included access to care, COVID-19, executive rounding, the CMHPP, health information management, CTC issues related to mental health, quality management, psychiatry, FIT and QIT workgroups, suicide prevention, nursing issues related to mental health, inpatient referrals, EOP, DDP, operational procedures, training, and the physical plant.

There was variability in the development of action plans to address identified issues. While challenges and deficiencies were documented along with occasional actions taken in the past, measurable action plans to address these deficiencies going forward were not consistently noted.  Formal CAPs during the reporting period included training on CAT audit criteria, nursing prescreens, EOP treatment offered, diagnostic monitoring, and timely transfers to administrative segregation.

A number of routine audits were completed at MCSP.  Mental health leadership reported often identifying focus areas based on findings from completed audits and routine monitoring, including CAT audits and recreation therapist rounding in administrative segregation.  MCSP

leadership provided a list of routine "audits," some of which appeared to be formal auditing, while others were reviews of available tracking data. Areas targeted for action appeared to follow from data reviews and audits and were appropriate.

There were no active QITs during the reporting period. There were two active FITs. An EOP group scheduling and standardization FIT monitored treatment hours scheduled, offered, attended, and refused in the mainline EOPs. The FIT met monthly to discuss how to provide at least ten hours of weekly treatment to all patients despite COVID-19 and staffing challenges. The FIT appeared to be functioning well, but the challenge of providing required treatment hours was unresolved secondary to staffing issues and ongoing unit quarantines.

An EOP hub FIT met weekly and appeared to engage in routine monitoring of scheduled treatment hours, staffing vacancies, documentation, performance metrics, and multidisciplinary concerns. Reviewed minutes revealed that this did not appear to be a formal FIT but instead a multidisciplinary meeting to discuss routine issues on the unit.

Of concern, in weekly minutes from June through mid-October 2021, it was documented that typically over 90 percent of patients were offered ten hours of structured treatment; however, the data indicated that 50 percent or more of treatment was being canceled each week and at no point did it appear that patients were attending more than 30 percent of offered treatment. These discrepancies were not identified in the minutes nor addressed through any action plans.

The MHCB peer review committee met twice during the reporting period, in July and September 2021. Peer reviews were completed for the two MHCB psychologists and the assigned psychiatrist. It was reported that an issue was identified with one psychologist and was

addressed through feedback.  No issues were identified for psychiatry.  MCSP reported that the

outpatient peer review process "remained on hold" during the reporting period.

MCSP reported making regular use of dashboard data and reviewing the information

routinely in quality management committee meetings.  Improvement projects were the

responsibility of the identified subcommittee.

Medication Management:

MCSP provided MAPIP psychiatric diagnostic and nursing measure compliance results

for June through November 2021.

The medication management dashboard for the review period showed that for patients

prescribed antidepressants, measurements for venlafaxine blood pressure and thyroid monitoring

were compliant for all six months of the review period.  Medication consent documentation was

also compliant.  Required EKG measures were compliant for both required months.

Diagnostic monitoring data for patients prescribed atypical antipsychotics showed that

AIMS tests, blood pressure, height, weight, thyroid monitoring, medication consents, CBC with

platelets, CMP, and blood sugar were compliant for all six months of the review period.  EKG

measures were compliant for only one month and lipid monitoring was compliant for four of six

months.  Psychiatry leadership reported that EKG noncompliance was due to patients being on

isolation and quarantine status.  The CME agreed to allow patients to come and receive an EKG

from isolation and quarantined buildings if they were on clozapine or had a PC 2602 order.

As for patients prescribed carbamazepine, measures for carbamazepine levels, CBC,

CMP, and medication consent were compliant for all required months.

MCSP was an authorized clozapine maintenance facility.  Data presented for clozapine

diagnostic measures indicated that AIMS, CMP, and lipid monitoring were compliant for five of

six months.  EKG measures were compliant for four months and blood pressure, blood sugar,

CBC, height, and weight measures, and medication consent, were compliant for all six months.

Psychiatric diagnostic measures for patients prescribed Depakote were compliant for

medication consents for all six months.  The CBC with platelets measure was compliant for five

months, the CMP measure was compliant for three months, and measures of Depakote levels

were compliant for four months.

For lamotrigine, MCSP was compliant with medication consent for all six months.

Regarding data for diagnostic measures for patients prescribed lithium, MCSP indicated

that medication consents and Creatine and BUN were compliant for all six months of the review

period.  EKGs for patients prescribed lithium were compliant for three months.  Both lithium

levels and thyroid monitoring were compliant for five of six months.

MCSP was compliant during each month of the review period for medication

administration for chronic care medications prescribed by a psychiatrist.  The institution reported

compliance for two of six months for continuity of medications upon inter-institutional transfer

at R&R, and for N/A DOT medications with intra-institutional transfers (excluding

ASU/SHU/PSU).  For medication continuity for MHCB transfers and intra-institutional transfers

to ASU/SHU/PSU, there was compliance for three of six months.  Medication continuity

following discharge from community hospital or acute or intermediate care/DSH and at parole or

release to the community was compliant for four months.

For PC 2602 court orders, MCSP was compliant for four of six months, and for PC 2602

medication orders, MCSP was compliant for two of five required months.  MCSP was

noncompliant all six months for observation of the preparation and administration of HS and

AM/PM medications due to staffing shortages. Compliance for new psychiatric medications was achieved for only one of six months.

The maximum length of medications ordered by a MCSP psychiatrist was 180 days; bridge orders were for 30 days.

Telephone and verbal orders were documented and tracked in EHRS by nursing. Providers issuing authorized telephone/verbal orders were required to sign the orders in EHRS.

Polypharmacy reviews occurred monthly through population management meetings.

Psychiatrists were permitted to prescribe non-formulary medications without approval from a secondary reviewer. The prescriber was required to appropriately document the non-formulary prescription in EHRS.

MCSP reported that there were 257 patients on DOT medications and seven patients on KOP medications. There were no patients prescribed KOP SSRI.

HS psychiatric medications were prescribed to 484 patients and were administered at or after 8:00 p.m. 89 percent of the time. The main reasons for noncompliance were refusals, no shows, and the high number of HS medications.

MCSP did not report whether any patients remained in pill lines for longer than 30 minutes.

At the time of the site visit, PC 2602 orders were active for 92 patients. Sixty PC 2602 cases were initiated during the report period and four were denied. In one case, it was unclear if the petition was granted or denied. No emergency petitions were initiated during the review period.

No force was utilized to administer PC 2602 medications.

Transfers:

MCSP had one inpatient coordinator.  The inpatient coordinator reported that no inpatient care transfers were delayed or canceled due to impending paroles, disciplinary proceedings, or classification factors (such as the unavailability of single-cell beds or locked dorms) or pending PC 2602 hearings; however, there were patient transfer delays related to COVID-19.

The inpatient coordinator indicated using protocols to expedite DSH referrals when clinically indicated and reported three instances when she attempted to expedite referrals; however, COVID-19 restrictions impeded such expedited movement.

The inpatient coordinator also reported that she had no direct communications with the inpatient programs and that headquarters handled all communications.  Nonetheless, she reported that in those instances where she felt that a patient was waiting too long for inpatient care transfer, she emailed headquarters about such patients.

As for impending discharges from inpatient care programs, the inpatient coordinator reported being contacted by the C&PR about patients' returns to MCSP.  In approximately 50 percent of cases, she was informed of a patient's return on his actual return date; in some instances, she only received several hours' notice.  As soon as she learned about a returning patient, she provided notification to treating clinicians.

The inpatient coordinator reported that because there was no direct clinician-to-clinician contact between MCSP and the inpatient care programs, there were no routine discussions about patients discharged from the inpatient programs, or other issues.

A major sustainable process review was conducted remotely in June 2021.  Findings included a decrease in patients who were refusing more than 50 percent of treatment offered, which appeared to be due to the lack of programming offered secondary to COVID-19 rather than an increase in treatment participation.  Of concern was a finding that in five of eight cases,

466

HLOC considerations and related clinical documentation were noted to be internally inconsistent, with no follow-up action required. Review of these cases was to be completed by the inpatient coordinator with the respective clinicians and supervisors. The audit also found 21 patients who needed further follow-up to determine whether or not they required a HLOC referral.

A minor sustainable process on-site review was conducted in July 2021. Only minor improvements were noted with regard to internal consistency with HLOC considerations (six of eight cases), but no follow-up action was required. During the review, eight patients were identified as requiring further follow-up to determine whether they required a referral for a HLOC. In all, the sustainable process reviews appeared thorough.

During the review period, 707 patients were considered but not referred to a HLOC. Eighty-six percent of the placement considerations for these non-referrals were because patients refused more than 50 percent of treatment. In this regard, mental health leadership opined that some patients were overscheduled, resulting in patient treatment refusals.

There were 23 referrals to acute care, of which five were rescinded, one patient paroled, and 17 patients transferred. All acute care referrals were from the MHCB. MCSP was compliant with completing acute care referral packets within two working days of identification. One of 17 or six percent of patient transfers were timely. However, all 17 patients transferred within 72 hours of acceptance from the inpatient program.

There were 30 referrals to intermediate care, of which five were rescinded, four patients were referred to MHCBs, and 21 patients transferred. All intermediate care referral packets were timely completed within five working days of identification. Twelve of 21 patients, or 57 percent, timely transferred to intermediate care within 30 days. Nineteen of 21 patients, or 90

percent, transferred within 72 hours of acceptance. Reasons for untimely transfers were the lack of bed space and the COVID-19 pandemic restrictions.

*Vitek* hearings were held for seven patients; the outcome for all was to continue with the referral.

MCSP referred 220 patients to MHCBs during the review period; 180, or 82 percent, were admitted. Forty MHCB referrals were rescinded.

Of the 180 MHCB patients who were admitted to the MHCB, 94 patients were admitted to the MCSP MHCB. The remaining 86 patients were placed at either CHCF or CMF. All but two of the MHCB referrals timely transferred within 24 hours of referral.

During the review period, 89 of 94 MCSP MHCB stays were for ten days or less; five stays exceeded ten days. The average daily MHCB census was seven.

MCSP discharged 99 patients from its MHCB during the review period. MCSP's MHCB patients' clinical lengths of stay averaged 9.9 days; 13 patients' clinical stays exceeded ten days. The physical lengths of stay of MCSP's MHCB patients averaged 14.5 days; 29 patients exceeded ten days. It was reported that the primary reason for such extended physical lengths of stay was due to patients on medical holds refusing to transfer.

During the site visit on March 28, 2022, the MHCB housed six patients. Two of four MHCB patients awaiting acute care transfer were beyond transfer timelines.

MCSP was an EOP hub. Mental health leadership reported that MCSP patients were immediately placed in the EOP hub without delay.

MCSP had an EOP program, therefore, were no EOP transfer delays during the review period.

During the review period, the level of care of 143 EOP patients was changed to 3CMS, and 17 3CMS patients were changed to EOP.

MCSP transferred 17 patients to STRH and one patient to LTRH. Six of 17 STRH transfers occurred within 30 days; the range of the remaining untimely transfers was from 31 to 118 days. The one LTRH transfer was untimely and took 74 days.

During the site visit, there were 31 3CMS patients housed in administrative segregation. Of these, 23 patients had been housed in administrative segregation for more than 30 days, with ranges in stays from 31 to 151 days. As for the reasons why patients with lengths of stay of more than 30 days had not been transferred, four patients' administrative segregation placement reasons were reported to be "investigation;" MCSP reported wanting to keep these patients at the institution while the investigations continued. For four other patients, it was reported that there were no available STRH beds. For the remaining patients, although the reasons for most of their administrative segregation placements were provided, there was a lack of identification why these patients remained in ASU for more than 30 days and had yet to be transferred to STRH or LTRH.

Due to an issue with SOMS, MCSP reported being unable to report transfer timelines for patients who transferred to the PSU during the review period. On March 28, 2022, two MCSP patients transferred to the CSP/Sac PSU. The institution was unable to report the length of time that these patients had been awaiting transfer.

Programming:

MHSDS Patients in Administrative Segregation:

There were 184 patients treated in the EOP hub during the reporting period. The average length of stay was 57 days and ranged from one to 339 days. Sixteen patients were retained in

the EOP hub from 90 to120 days, and an additional 27 patients were retained for over 120 days. The capacity of the EOP hub was 50 patients and the average census during the reporting period was 46 patients.

The psychiatrist assigned to administrative segregation provided care to both EOP and 3CMS patients and carried a caseload exceeding the applicable ratio. The four PCs in administrative segregation provided services to both EOP and 3CMS patients. The caseloads of three PCs exceeded established ratios.

A review of 114As showed that patients had appropriate access to ten hours of yard during the review period. The monitor randomly reviewed ten patients' files over a four-week period for shower access and found 100 percent compliance.

MCSP's EOP hub passed monthly certification from July to September 2021 and "met expectation with explanation" in October and November 2021. In October, ASU prescreens were deficient with 80 percent compliance secondary to three missed prescreens and two late prescreens. In November 2021, treatment offered was reported at 78 percent secondary to two power outages and individually quarantined patients.

Record reviews were conducted for 16 patients to assess timely psychiatric and PC contacts, and IDTTs in the EOP hub.

All 16 patients required initial psychiatric contacts, which were timely. For nine patients who required routine psychiatric contacts, all routine contacts occurred every 30 days and were deemed compliant. As for psychiatry contacts, 50 percent were conducted confidentially. The reasons provided for appointments not being confidential included patient refusals, no shows, lack of space, and patients' being on quarantine status. Telepsychiatrists conducted 11 percent of psychiatry contacts.

All 16 patients required initial PC contacts, which were timely.  For 16 patients, 31 percent of initial PC contacts were conducted in a confidential setting.  Reasons for appointments not being confidential included COVID-19 precautions, refusals, and staffing issues.  For 12 patients, 81 percent of routine PC contacts occurred every seven days and were deemed compliant.  Forty-four percent of routine PC contacts were confidential.  The reasons provided for non-confidential contacts included patient refusals, staffing issues, no shows, and COVID-19 precautions.

All 16 patients required an initial IDTT, which were timely.  Of the reviewed initial IDTTs, 50 percent were attended by patients.  Reasons for patients' absence included COVID-19 precautions.  For four patients, required routine IDTTs were timely.  Required attendees were present for all initial and routine IDTTs.

EOP hub patients, excluding patients on modified programming, were offered an average of 10.28 hours of weekly structured therapeutic activities; patients attended an average of 5.6 weekly hours of structured programming.  Across the reporting period, patients refused an average of 45 percent of offered programming.  There was no evidence of any focus on increasing patient participation in programming in quality management minutes, FIT minutes or during discussions with mental health leadership on-site.  It was reported that patients who refused programming for eight weeks were seen during joint rounding, in keeping with policy, but no other program-wide actions were undertaken.  Individual patient encouragement was reported.

Groups were offered daily to EOP hub patients.  However, it was reported that no core clinical groups facilitated by PCs nor PC caseload groups were offered to EOP hub patients.  During the site visit, an anger management group facilitated by a recreation therapist was

observed.  Three of four scheduled patients attended.  Each patient was secured in a TTM, and there was a HEPA filter in the room.  There was adequate space, and the area was confidential. The content of the group was engaging and appropriate.  Patients actively participated.

Patient interviews revealed that the utility of group sessions was variable, based on the recreation therapist facilitating the groups.  It was noted that some recreation therapy staff played movies or engaged in activities with limited therapeutic value.  Discussions with EOP hub leadership revealed that patients were surveyed regularly about their group preferences, and there was variability among patients about their preference for leisure versus clinical groups.

Based on the data provided, ten patients were assigned to modified programming during the reporting period; one of these patients appeared to return to regular EOP programming based on the IDTT data provided.  All ten patients had monthly IDTTs while on modified programming.  At the time of the site visit, there were no EOP hub patients on modified programming.  MCSP reported that the ASU EOP treatment teams worked to keep patients engaged in treatment and preferred to see patients weekly and encourage them to attend treatment rather than using modified programming, whenever possible.

Patients who refused a high percentage of their programming over a period of eight weeks were seen during a joint interview process to identify any barriers to accessing treatment. Twenty-six patients were jointly interviewed about high refusal rates during the reporting period. None of the interviewed patients reported refusing groups secondary to security procedures. Overall, the interventions documented to address patients' reported reasons for not attending groups were variable, ranging from adequate responses using motivational interviewing to providing no interventions to increase participation.  Given the high overall refusal rates noted

among ASU EOP hub patients, it appeared that focused problem-solving to increase attendance was warranted.

Eight IDTTs for ASU EOP hub patients were observed.  Patients were cuffed behind the back during the meetings but not placed in TTMs.  A custody officer was present in the room during the meetings when patients were present.  Of the eight IDTTs, three included patient participation.  The other five were held in absentia; four due to COVID-19 quarantine and one due to patient refusal.  The IDTTs were of adequate quality and included collaborative discussions among participants.  Clinical staff members were thoughtful in their discussions about diagnoses and case formulation.  In two of the IDTTs, treatment interventions were not clearly discussed, and psychotropic medications were not specifically identified in three of the eight IDTTs.  For two of the patients, release dates were identified to be potentially occurring within the next 90 days; however, release planning was not discussed.  When patients were present for the meetings, it was clear that their assigned PC and psychiatrist were familiar with the patients and had a good rapport.  Level of care discussions were adequate.

IDTTs ran efficiently, with custody officers readily available to escort patients.  During the observed IDTT, an officer asked whether a patient should be held to wait for his IDTT or if he should be taken to his group while waiting.  This demonstrated positive collaboration as well as dedication on the part of the correctional officer to ensure that the patient was receiving treatment in the ASU EOP hub.

A review of healthcare records indicated that daily psych tech rounds were consistently documented, however, weekly summaries were cursory and contained minimal information.

During the reporting period, there were 144 patients treated at the 3CMS level of care in administrative segregation.  The average length of stay for those patients was 46 days, and

ranged from one to 357 days. Seventy patients were identified as remaining in administrative segregation for over 30 days. Fifty of those patients, or 71 percent, were noted as having an endorsement to another facility prior to their removal from administrative segregation at MCSP.

Rationales for patients remaining in administrative segregation at the 3CMS level of care beyond 30 days were variable in their adequacy. Such reasons were only provided for 11 patients and included protecting the integrity of an ongoing investigation in four cases, pending the resolution of RVR/district attorney action in three cases, retain pending transfer in one case, and three listed rationales as "other."

No groups were available to 3CMS patients housed in administrative segregation, but patients were seen weekly by their PCs. Of concern were delays in the transfer of 3CMS patients in administrative segregation to STRH within required timeframes. Delays in transfers were noted, and patients who were housed in administrative segregation beyond 30 days were not provided with STRH-equivalent programming. Local mental health leadership noted that no action had been taken to address this issue to date, but efforts could be made to include 3CMS patients in administrative segregation beyond 30 days in ASU EOP groups.

Two initial and one routine IDTT for 3CMS patients housed in administrative segregation were observed during the site visit. The room was adequate and provided for confidentiality. Each was held in absentia. Two of the patients were on quarantine status, and one refused to attend. All required staff members were present and provided input during the meetings. There was a collaborative discussion about diagnoses, treatment needs, and plans for follow-up. All audit criteria were met. Level of care discussions were adequate.

Psych tech rounds were observed in administrative segregation. All documentation and interviews were done well.

<u>Non-Disciplinary Segregation</u>:

During the review period, there were 16 patients on NDS status; 11 or 69 percent were timely endorsed. MCSP reported that the patients were cleared for property and privileges. At the time of the site visit, there were 13 patients on NDS status, and 12 patients had received their eligible issue of property. The remaining patient had received an initial issue of property.

<u>MHCB</u>:

The CTC/MHCB/TTA building consisted of two CTC beds, eight MHCBs, one TTA bay, and two observation rooms.

Staffing consisted of one supervising psychologist, two psychologists (with one working Sunday through Wednesday and the other working Wednesday through Saturday), and two psychiatrists (one worked on Monday and one worked Tuesday through Friday). Nursing staff on second watch consisted of two RNs, one LVN, and one recreation therapist, and on first and third watch, there was one RN and one psych tech. The MHCB treating clinicians were within the established ratios for psychiatry and psychology.

Seven patient charts were selected for review for compliance with Program Guide timelines in the MHCB. Six of seven, or 86 percent, received a PC evaluation within a 24-hour period of admission. Of the seven psychiatry initial evaluations, four, or 57 percent were timely completed. In some instances, it was noted that the contacts were held cell side due to COVID-19 restrictions. Otherwise, it was not specified if they were held in a confidential setting.

Of the seven patients reviewed, all received an initial IDTT within 72 hours of admission, but two meetings did not have required staff present. Six of seven patients, or 86 percent, received IDTTs within seven days of their initial IDTT while in the MHCB. None of the patients were discharged without a discharge IDTT.

For seven patients, twice weekly psychiatry contacts were timely, but only 14 percent of the appointments were identified as confidential.

All necessary daily contacts in the MHCB occurred for the seven patients reviewed. Only 28 percent were noted to be confidential, and 40 percent were held cell side due to patient refusal.

On March 28, 2022, the monitor's expert observed IDTTs of five patients in the MHCB and two MHSDS medical patients in the CTC. Two IDTTs were held and attended by all required members and the MHCB supervisor. There was appropriate case conceptualization, defined treatment goals, collaborative discussion with each discipline, and all disciplines had knowledge of the patients.

The first IDTT was presented in absentia. After each IDTT discipline presented, it was agreed that the patient required acute care to manage the patient's delusions and medication. The treatment team went to the patient's cell to request the patient's consent to transfer to a HLOC, but the patient refused.

The second IDTT was in-person. The patient was brought to the IDTT room by two custody officers, uncuffed, and in a safety smock, socks, and slippers. The IDTT consisted of introduction of the team members, the purpose of the IDTT, and permission to discuss the patient's biopsychosocial history, and what brought the patient to the MHCB, and the patient responded with bird squawks. The team attempted to engage the patient to speak but again to no avail. The team continued the IDTT with each member giving information and asking questions and the patient either did not respond at all or squawked.

In both IDTTs, the psychiatrist discussed the patients' medications, purpose of the medications, asked about side effects, and asked about other medications that worked in the past.

The CC I gave historical information about the patients' points, custody level, and RVRs, and asked if the patient had any questions.  Nursing discussed the patients' compliance or lack thereof, rounding observations, and asked if there were any questions.  The MHCB supervisor interjected to enhance the support of the team to the patient and was engaged.

During the review period, there were no seclusion or restraint occurrences.  There were no patients on one-to-one suicide watch.  Telepsychiatry was not used in MHCBs.

CIT:

The CIT responded to all third watch emergency referrals seven days per week.  Two licensed psychologists were assigned to the CIT; one was scheduled from Sunday through Wednesday, and the other was assigned from Thursday through Saturday.  The other CIT members were a nursing staff member and a representative from custody supervisory staff.  MCSP also had a backup coverage plan to provide coverage if the assigned CIT members were unavailable.

During regular work hours, a patient's assigned PC managed their patients' crisis calls.  Otherwise, during second watch, and weekends and holidays, triage clinicians also managed crisis care calls for alternative housing, RVRs, and for institution-wide coverage, as needed.  One psychologist was assigned as the triage clinician from Sunday through Wednesday, while a social worker was the triage clinician from Wednesday through Saturday.

Alternative Housing:

During the review period, 220 patients were sent to alternative housing.  Of these patients, 180, or 82 percent, were admitted to MHCBs, and 40, or 18 percent, were rescinded.  One alternative housing placement lasted longer than 24 hours.

At the time of the site visit, there were two patients in alternative housing. One patient's MHCB referral was rescinded, and one patient was transferred to the MHCB within 24 hours of referral. During their alternative housing stays, staff reported that both patients were on a one-to-one suicide watch until the rescission and admission.

MCSP had eight designated alternative housing cells; Facility C-12, cells 147-150, and Facility C-13, cells 118-121. All cells were wet cells and contained suicide resistant mattresses. Seven of the eight cells had up-to-date cleaning logs.

EOP:

During the reporting period, 428 patients were admitted to the mainline EOP program. The average length of stay was 65.7 days and ranged from zero to 195 days.

Except for one, psychiatrists assigned to the EOP program, including those that also provided care to 3CMS patients, carried caseloads within established ratios. Each PC assigned to the EOP program had caseloads that exceeded the established ratio.

Record reviews were conducted for 20 patients to assess timely psychiatric and PC contacts, and IDTTs in the EOP program.

Ten patients required initial psychiatric contacts during the review period. Six or 60 percent of required initial psychiatric contacts were compliant as the contacts occurred before the IDTT and within 14 calendar days of arrival. Fifty percent of initial psychiatric contacts were conducted via telepsychiatry. Five of ten, or 50 percent, were not conducted in a confidential setting due to COVID-19.

For 19 patients, 98 percent of routine psychiatric contacts occurred within 30 days and were compliant. Of the routine psychiatric contacts, 59 percent were conducted using telepsychiatry, and 91 percent were performed confidentially.

Nine of ten patients who required initial PC contacts during the review period had timely reviews. Four of nine, or 44 percent of initial PC contacts, were conducted confidentially, and those not performed in a confidential setting were due to COVID-19 precautions or modified programming.

For 19 patients, 72 percent of routine PC contacts were timely, and 42 percent were conducted confidentially. The reasons provided for appointments not being confidential included COVID-19 precautions, modified programming, lack of staff, no shows, and refusals.

All ten patients who required an initial IDTT had timely IDTTs, and all required staff attended. For the 15 patients seen for routine IDTTs during the dates reviewed, all were timely, and required staff attended. Patients attended 48 percent of routine IDTTs. Reasons for their absences included COVID-19 and refusals.

EOP patients placed on COVID-19 quarantine or isolation were typically housed in their originally identified housing locations when buildings were placed on quarantine. Positive patients and patients who were cellmates of positive patients were placed in Facility A-Building 2. Unvaccinated patients who were transferred into MCSP were placed in Facility A-Building 2 upon arrival for ten to 21 days depending on testing results and patient refusal of testing. Isolated positive patients were placed in R&R, and large outbreaks were moved to the Facility C gym.

Schedules for EOP mainline programming were provided. Core groups included anger management, life/coping skills, mood management, stress management, social skills, and other therapeutic activities provided in an open topic group. For all three facilities, it was reported that groups were facilitated by recreation therapists and nursing staff. Caseload groups offered by PCs and EOP orientation groups were also listed on weekly schedules. Facility A EOP did not

offer any groups during the site review as the unit was on quarantine status secondary to COVID-19 and had been under quarantine for a number of months.  Patients on Facility A received in-cell treatment packets, which were reviewed with clinical staff to ensure that the packets were completed meaningfully.  Tracking of in-cell packets for milestone credits was completed by an office technician and monitored by the chief of mental health.  It was reported that the use of packets was consistently implemented on any facility under quarantine.

Data indicated that across the reporting period, patients were offered an average of 6.13 weekly hours of structured treatment, with an average attendance of 3.55 weekly hours.  On average, 2.45 hours of weekly structured treatment were canceled.  While individual patient offerings could not be determined from the data provided, of 15,443 patient weeks reported, 1,478, or 10 percent, were offered at least ten hours of weekly structured treatment during the reporting period.

The EOP focused improvement team provided a written report and plan to increase the provision of structured treatment within the EOP program.  The report indicated that large COVID-19 outbreaks occurred from December 2020 through February 2021.  Socially distanced groups were initiated in March 2021, but given low participation rates, minimum group size was expanded in June 2021.  This allowed the provision of five hours of weekly treatment to be offered to all mainline EOP patients.  While improvements had been made in recent months, there continued to be challenges related to the provision of required treatment hours, mostly due to staffing limitations.  At the time of review, two EOP program units were on quarantine.

Facility B's EOP orientation group was observed during the site visit.  Three patients participated in the group along with the EOP supervisor, a sergeant, a correctional officer, and an

ADA worker who served as a peer facilitator. The group was positive and appeared to achieve its goal.

Twelve EOP IDTTs were observed on Facility A, and all were held without patients present due to the unit being on quarantine. The meetings included required participants. The psychiatrist was not assigned to any of the patients but was a registry psychiatrist covering the IDTTs. The IDTTs were collaborative and included discussions among the clinicians. The room was of sufficient size and allowed for confidentiality. All staff had access to computers and the patients' healthcare records. There was variability in the meetings, mostly depending on the PC. All meetings included discussions of patient functioning, psychiatric history, psychotropic medications, education/work assignments, diagnostic agreement, and barriers to treatment progress. Case conceptualizations were mostly adequate. Appropriate rationale for the patient's level of care was discussed in all but two cases. Specific and measurable treatment goals which met patients' needs and interventions to target patient needs were not consistently discussed. In half of the cases, the goals stated during the meeting did not meet the identified mental health needs of the patients and were simply carried over from prior treatment plans. Safety planning was not explicitly discussed in three cases where a history of self-harm or suicidal ideation was present. Considerations of the patient's ability to attend work or educational programming once the unit was off quarantine was appropriate.

While no groups were being offered due to quarantine, it was reported that the EOP program on Facility A routinely held EOP orientation and transition groups for patients who were being reduced to the 3CMS level of care. Both groups included a peer facilitator.

3CMS:

One PC was assigned to each of the 3CMS facilities, despite the staffing allocation indicating that three PCs should be assigned to each facility. Each PC carried caseloads that significantly exceeded the established ratio. PCs in 3CMS programs were also reallocated to EOP units to cover treatment needs in those locations. To accommodate for staffing reallocation, psychiatrists assigned to 3CMS were acting as PCs for patients who were prescribed psychotropic medications, responding to consults, and completing initial evaluations. PCs were only assigned to patients without medications and reportedly could see patients for individual therapy upon request.

Record reviews were conducted for 19 patients to assess compliance with psychiatry and PC contacts, and timely IDTTs. All expected routine PC contacts occurred for the 19 patients; 69 percent were conducted in a confidential setting. Reasons for contacts not being confidential included COVID-19 precautions, staffing, and modified programming.

Six patients required initial psychiatric evaluations during the review period. Five of six or 83 percent occurred prior to the initial IDTT. For 19 patients, 90 percent of the routine psychiatric contacts were compliant with Program Guide timeliness requirements; 93 percent were confidential.

Five of six, or 83 percent, of patients who required initial PC evaluations during the review period were compliant with Program Guide requirements.

Six patients required initial IDTTs. Three of six, or 50 percent, were timely. Eight patients required routine IDTTs. All were timely. Required staff members attended all initial and routine IDTTs. Patients attended 70 percent of IDTTs; reasons for IDTTs being held in absentia included COVID-19 precautions and refusals.

MCSP reported only offering 3CMS groups to DDP patients in mainline once per week. The reasons for not offering more groups were staff vacancies and the allocation of recreation therapists to the EOPs.

During the reporting period, 143 patients had their level of care changed from EOP to 3CMS and 18 patients had their level of care changed from 3CMS to EOP. One EOP patient who was lowered to 3CMS during the reporting period was returned to EOP within just over two months. There were 34 admissions of 3CMS patients to the MHCB during the reporting period.

Six IDTTs were observed on Facility C; one was not attended by the patient due to refusal. There was confidential and adequate space. All required participants were present. The quality of the meetings was clinically relevant and revealed familiarity with the patients and their needs, yet the content did not meet required criteria. Discussion of objective and measurable treatment goals was absent in all meetings, as were specific interventions to target patient needs beyond medications and generic discussions of therapy. Safety planning was not discussed in two cases where it appeared necessary. Diagnosis, case conceptualization, and psychiatric history were not discussed in one case.

Interviews with PCs revealed concerns related to high caseloads and frustrations with the lack of continuity of patient care given staff reallocation.

Other Issues:

Pre-Release Planning:

The pre-release coordinator reported that, during the review period, the institution had developed protocols and had trained PCs on completing the pre-release assessment tool in CERNER and that MCSP's pre-release planning process included completion of the patient pre-release needs assessment. The pre-release coordinator did not indicate any difficulties receiving

the needs assessment back from clinicians and also reported that some PCs were proactive in assisting patients with re-entry preparation.  She reported utilizing the completed needs assessment to obtain necessary pre-release services for patients.

Notably, due to COVID-19, MCSP had ceased offering pre-release groups in October 2021 and had not reinstituted these groups as of the site visit.  However, reporting period data reflected that 26 patients attended pre-release groups during the review period prior to their suspension.

All post-release community supervision patients signed a release of information to permit community mental health to obtain information about their care.

TCMP did not provide MCSP with a report of patients whom they saw during the review period nor information on the outcomes for benefit applications.  MCSP was unable to report the percentage of class members who were released with a CAL-ID card.

Program Access:

a.  Job and Program Assignments
As of December 2, 2021, MCSP's 1,562 total job assignments were held by 85, or 12 percent of EOP patients, 633 or 43 percent of 3CMS patients, and 844 or 53 percent of non-MHSDS inmates.

Of 790 total academic assignments, EOP patients held 187 or 26 percent of them.  3CMS patients held 323, or 22 percent of assignments, and non-MHSDS inmates held 280, or 17 percent of academic assignments.

There were 248 vocational education assignments.  EOP patients held seven, or one percent, 3CMS patients held 121, or eight percent, and non-MHSDS inmates held 120, or seven percent of vocational assignments.

Of 877 voluntary education assignments, EOP patients held 32, which represented four percent of the EOP population and 3CMS patients held 409, which represented 28 percent of the 3CMS population.  Non-MHSDS inmates held 436 voluntary education assignments, which represented 27 percent of the non-MHSDS population.

The 149 substance abuse treatment assignments were held by 28 or four percent of EOP patients, 61 or four percent of 3CMS patients, and 60 or four percent of non-MHSDS inmates.

b.  <u>Milestone Credits</u>

During the review period, 693 of 725, or 96 percent, of EOP patients were eligible for milestone credits; 77 percent earned credits.  For 3CMS patients, 1,357 of 1,463, or 93 percent, were eligible to earn milestone credits, with 23 percent earning credits.  For non-MHSDS inmates, 1,402 of 1,605, or 87 percent, were eligible for milestone credits, and 22 percent earned credits.

MCSP's mental health leadership reported that eligible EOP patients were provided in-cell packets and subsequently awarded milestone credits in the amount equal to what they would have received had groups been conducted.

c.  <u>Out-of-Level Housing</u>

MCSP reported that 13 EOP and 16 3CMS custody Level I patients were in Level II housing.  One 3CMS custody Level I patient was in Level III housing.  Three 3CMS custody Level II patients were in Level I housing, 56 EOP and 165 3CMS custody Level II patients were in Level III housing, and four custody Level II EOP patients were in Level IV housing.  There were two EOP and two 3CMS custody Level III patients in Level II housing and seven EOP and 12 3CMS custody Level III patients in Level IV housing.  Finally, 48 EOP and 89 3CMS custody Level IV patients were in Level III housing.

d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>

MCSP confirmed implementation of the revised ADA accommodation and grievance procedures and provided a copy of the updated 1824 Desk Reference Manual.

e. <u>Periodic Classification Score Reductions: EOP Patients</u>

MCSP provided completed CDCR 840 forms indicating that the institution was providing classification score reductions for EOP patients.

<u>Case-by-Case Reviews</u>:

MCSP was unable to identify all MHSDS patients who had their 150-day case review or subsequent case review and were not released or whose cases were not resolved during the review period. Nonetheless, review of case-by-case review information for five MHSDS patients who had 150-day mental health long-term case conferences revealed that two were released from segregation. For three others who were retained in segregation, the reasons for their continued retention beyond 150 days were sufficient.

<u>"C" Status</u>:

MCSP was unable to report the number of patients on "C" Status during the review period. On March 28, 2022, during the site visit, 12 EOP patients, eight 3CMS patients, and one non-MHSDS inmate were on "C" Status. The 12 EOP patients had been on "C" Status for an average of 73 days, with ranges of five to 173 days. The eight 3CMS patients had been on "C" Status for an average of 58 days, with ranges of 12 to 125 days. The non-MHSDS inmate was on "C" Status for 88 days.

<u>Mental Health Referrals</u>:

During the reporting period, MCSP reported 4,910 mental health referrals; 1,140 referrals were made to psychiatrists, and 3,745 were made to PCs. MCSP reported compliance for psychiatry and PC emergent and routine referrals and PC urgent referrals. Urgent psychiatry referrals were noncompliant at 67 percent.

<u>Treatment Space</u>:

ASU EOP structured treatment was provided in a separate building connected to administrative segregation through a walkway.  Rooms were of adequate size and included TTMs.  ASU IDTTs were held in a moderate-sized room within the ASU building that allowed for confidentiality.  It was reported that individual sessions with patients in the ASU were held in offices on the unit ground floor, but these spaces were not observed.

The IDTTs for mainline EOP in Facility A were held in a building which housed staff offices and a large meeting room.  The space was adequate and provided for confidentiality.  Other treatment space for Facility A EOP was not toured due to the unit being on quarantine status.  Facility B and Facility C 3CMS IDTTs and individual contacts were provided in separate modular buildings on the facilities.  The spaces were adequate and provided for confidentiality.

<u>Custody and Mental Health Partnership Plan</u>:

MCSP's CMHPP LOP was dated March 2021 and was aligned with headquarters' partnership plan.

Reviewed meeting minutes reflected six months of executive leadership joint rounding for the review period.  Rounded programs included the MHCB, EOP and 3CMS programs, ASU, and the MSF 3CMS program.  Institutional executive leadership, consisting of the chief deputy warden and chief of mental health, were the usual executive leadership joint rounding participants, but program captains and sergeants were also at times in attendance.

Reviewed executive leadership joint rounding meeting minutes reflected discussion of numerous issues with mental health and custody staff and patients.  Patients were not interviewed during the MHCB's executive rounding.

The rounding of the MSF did not reveal any access to care issues or patient concerns. During the rounding of the EOP ASU hub, no patient access to care concerns were reported, and mental health indicated a good working relationship with custody. During the rounding of the EOP and 3CMS programs, a positive working relationship between mental health and custody was also noted. However, staff noted some access to care issues as there had been some delays getting patients to groups, which appeared to have been a result of non-regular custody staff. However, interviewed patients did not report access to care issues and reported attending groups and feeling comfortable approaching staff when in crisis.

MCSP reported that the warden's executive meeting occurred every Monday through Friday. The institution did not provide executive staff meeting agendas that included joint rounding topics, programs rounded, and/or identified staff who completed the rounds. However, it was reported that the executive rounding results were always discussed by the chief of mental health and the chief deputy warden on the following business day after the rounding was conducted. It was further reported that the chief of mental health sent a copy of the executive rounding minutes to the warden's office upon completion.

Notably, reviewed QMC meeting minutes for all six months of the review period contained detailed reports on executive leadership joint rounding. Reviewed QMC minutes also reflected patient interviews. All reviewed mental health subcommittee program meeting minutes from the review period also addressed the CMHPP in great detail, noting the executive leadership rounding participants, huddle compliance, monthly joint supervisory program tours, escort issues, and physical plant issues. The subcommittee meeting minutes also noted that patients were interviewed.

MCSP also provided documentation reflecting the conduct of twice daily weekday huddles during second and third watch for the EOP and EOP ASU hub programs, as well as for twice daily huddles during second and third watch for the MHCB. Reviewed huddle forms revealed attendance by required staff and addressed pertinent issues.

An afternoon huddle was observed in the ASU. A PC, sergeant, and psych tech were in attendance. The meeting was collaborative and included necessary elements. All suicide risk management program (SRMP) patients were reviewed along with new arrivals, recent releases, recent incidents, intake cell usage, patients who received or were expected to receive bad news, and physical plant concerns. The sergeant and the psych tech appeared to be familiar with the patients and their mental health needs.

The monitor also attended a huddle for the administrative segregation EOP program during the site visit. Required disciplines were in attendance, were knowledgeable about patients, and relevant issues were discussed.

An afternoon huddle was observed on the Facility A EOP unit, which was under quarantine. Nursing staff did not appear familiar with the patients being discussed. The huddle largely consisted of the psychologist reviewing patient names and correctional staff providing input. Of concern, a nurse did not wear appropriate personal protective equipment upon leaving the nursing station to enter the unit despite the unit being on quarantine. Patients were observed walking around in the day room, many unmasked, and some were standing at the doors of other patient cells. Patient interviews revealed complaints about correctional officers using excessive force with patients on the unit. These issues were discussed with facility leadership on site.

MCSP's CMHPP LOP further required the conduct of weekly 3CMS supervisory meetings between the mental health program supervisor and custody sergeants on each of the

institution's facilities housing 3CMS patients.  Reviewed documentation reflected the conduct on these weekly meetings on Facilities A, B, C, D, and E, as well as the MSF.  Documentation addressing these weekly meetings was often detailed and reflected discussion of numerous and relevant issues.

The monitor observed weekly 3CMS supervisory meetings held between the mental health 3CMS program supervisor and the sergeants on Facility C and in the MSF.  Both meetings revealed that the mental health supervisor and sergeants were knowledgeable about the patients on their units and had discussions about relevant and appropriate issues.

Pursuant to the LOP, MCSP also conducted monthly joint 3CMS supervisory program area tours.  These tours occurred on each of the five facilities and in the MSF every month.  A review of reports from these area tours revealed that they typically addressed COVID-19, decreased consistency in mental health assessments, lack of mental health staff, and lack of programming as causing patient distress.

As for jointly led EOP orientation programs, the chief of mental health reported that patients were scheduled for EOP orientation groups.  However, she noted some scheduling issues with these groups as EOP patients who had been in the EOP program for many years but were new to MCSP were required to attend orientation groups; however, some patients expressed a lack of interest in them.

MCSP further reported offering four, two-hour group sessions for EOP patients, including currently housed EOP patients who were functioning poorly in the EOP program.  The groups were jointly led by a mental health clinician, a custody representative, and an EOP patient peer.

MCSP documentation reflected that EOP orientation groups were provided throughout the review period. Provided documentation reported that 60 patients attended these groups, although there were also many group cancellations and patient refusals.

MCSP provided sign-in sheets for 2021 reflecting attendance by mental health and custody staff assigned to the EOP, ASU EOP hub, and MHCB at joint partnership round table trainings for second and third watch. Notably, based on how the information was provided, the monitor was unable to determine whether mandated staff attended required trainings.

MCSP produced a copy of the 3CMS orientation brochure in English and Spanish, which the institution reported was provided to patients upon admission.

The inmate advisory council met monthly during the reporting period in Facilities A through E. The IAC meetings were generally attended by the facility captain, senior psychologist supervisor, correctional lieutenant, office tech, community resources manager, AGPA, IAC chairman, IAC vice chair, IAC secretary, IAC sergeant-at-arms, and the IAC parliamentarian.

During a meeting with line staff, they reported that staff resignations were due to mistreatment of patients by officers and lack of support by management. They also reported that morale was decreased by the name calling and mistreatment of mentally ill and developmentally delayed patients by custody staff.

Patients filed 48 staff allegations/complaints regarding health care during the reporting period. Many of the filings contained multiple allegations against staff.

Patients filed 93 OIA staff allegations/complaints regarding staff misconduct during the reporting period. Many of these filings also contained multiple allegations against staff. One

MCSP staff member was moved to another post due to a staff misconduct complaint; this staff member was reassigned from a housing unit to the mailroom.

Overall, MCSP reported that 1,343 required custody and mental health staff attended the annual off-post partnership training entitled "Partnership in the Correctional Environment" (BET Code 11060827) during 2021.  However, the institution did not report those required staff who did not attend the training.

Heat Plan:

MCSP data on heat alerts for the six-month review period of June 1 through November 30, 2021, indicated a total of 94 Stage I heat alerts, but no Stage II or Stage III heat alerts.  No patients suffered a heat-related illness.

Review of the MCSP LOP for the heat plan dated May 2021 indicated compliance with the CCHCS 2021 "Heat Plans and Updates" directive.

Review of a sample of the heat log forms reflected the hourly logging of the outside ambient air temperatures according to policy and also indicated the recording of housing units inside ambient air temperatures every three hours according to policy.

The monitor visited several housing units to interview custody officers about the heat plan.  Custody officers were typically knowledgeable of the heat plan and its various requirements at its three respective stages and were aware that a daily list provided by MCSP identified those patients who were prescribed heat-sensitive medications.

Each toured housing unit's control booth contained a thermometer with a remote temperature probe located in the housing unit's dayroom and that recorded the temperature.

Review of institutional DARs for dates when there was a heat alert revealed the activation and deactivation of heat alerts.  However, reviewed DARs only generically reported

that patients' "HAVE ACCESS TO DAYROOM AND INDOOR ACTIVITIES" without more specific details.

The institution reported that, excluding custody staff on long-term sick leave, 767 of 883, or 87 percent, of MCSP custody officers completed the heat-related pathologies on the job training for 2021.

RVRs:

Of the custody staff required to complete RVR mental health assessment training, 94 percent completed the required training.  Mental health leadership reported that all required mental health staff were trained.

Of the 1,677 RVRs issued by MCSP during the review period, 1,276 or 76 percent were issued to MHSDS patients.  Sixteen were issued to MHCB patients, 496 to EOP patients, and 764 to 3CMS patients.  There were 401 RVRs issued to non-MHSDS inmates.

The monitor reviewed a random sample of nine adjudicated RVRs.  Four of nine, or 44 percent, were timely referred to mental health staff for mental health assessments.  All mental health assessments were timely returned to custody.  Regarding the consideration of mental health assessments in the RVR, there were six patients whose mental illness or developmental disability/cognitive or adaptive functioning deficits contributed to the RVR.  In five of these cases, the senior hearing officer cut and pasted language from the mental health assessment.  In one case, the senior hearing officer indicated that he agreed with the clinician's assessment that the subject's adaptive functioning did not influence behavior, but the clinician's assessment said the opposite.

One mental health assessment recommended that the RVR be documented in an alternative manner, but the senior hearing officer disagreed.  This RVR was reviewed by the captain and reduced to a counseling chrono.

Use of Force:

MCSP reported that nearly 100 percent of custody staff and 93 percent of required mental health staff attended use of force training.

The institution reported there were no controlled use of force incidents during the review period.  There were 89 immediate use of force incidents, of which 83 involved MHSDS patients and six were non-MHSDS inmates.

The monitor reviewed 11 immediate use of force incidents.  All were compliant with CDCR policy and procedure.

Lockdown/Modified Programs:

Due to COVID-19, throughout the review period MCSP was impacted by periodic quarantines.  As a result, various facilities/housing units were placed on modified programming for various time periods in an effort to prevent the further spread of COVID-19.  Such modified programming typically resulted in all movement being escorted, cell feeding, limited visitation, patient employment being limited to critical workers, priority ducats for health care services, no physical access to the law library, modified dayroom, canteen, and package delivery, and no recreational facilities.

The institution also reported being impacted by custody staff shortages during the review period, which included strike teams being sent to CSP/Sac for 120 days and to the department of juvenile justice for 60 days; this also resulted in modified programming, including yard and dayroom closures to allow for custody staff redirection.

Moreover, there were other dates during the review period when MCSP was subject to modified programming due to other matters.

Access to Care:

MCSP provided monthly Health Care Access Quality reports from June through November 2021, showing that 36 percent of the total issued ducats and add-on appointments were not completed.  For those mental health ducats and add-on appointments not completed, 64 percent were due to patient refusals, two percent were due to custody reasons, and 34 percent were due to non-custody reasons.

Placement of 3CMS Patients into Minimum Support Facilities:

During the review period, MCSP placed ten 3CMS patients in the institution's MSF and none were returned to a non-MSF facility.

At the time of the site visit, the MSF's current census of 62 inmates included seven 3CMS patients, of whom two patients were prescribed psychotropic medications.

*Coleman* Postings:

Review of selected MHSDS housing units showed that postings were current and in English and Spanish.

**APPENDIX B-10**
**RICHARD J. DONOVAN CORRECTIONAL FACILITY (RJD)**
**(March 28, 2022 – March 30, 2022)**
**Review Period: (September 1, 2021 – February 28, 2022)**

Census:

On March 28, 2022, RJD housed 3,354 incarcerated persons, which was less than a one percent decrease from the prior review period. The mental health caseload population of 2,190 patients was 65 percent of the institution's population and represented a two percent increase since the preceding site visit.

There were 15 patients in the MHCB and five patients in alternative housing.

Five EOP and five 3CMS patients were in the CTC for medical treatment.

The 817 mainline EOP patients reflected a 19 percent increase since the prior review period; the 1,243 mainline 3CMS patients represented a seven percent decrease since the preceding reporting period.

The 139 incarcerated persons in administrative segregation included 64 EOP patients, which was one patient more than the mandated 63 patient cap placed on RJD's EOP hub population, and 36 3CMS patients.

Staffing:

The position for the chief psychiatrist was filled. The senior psychiatrist position was vacant. Of 14 staff psychiatry positions, civil service psychiatrists filled 7.50 positions, for a 46 percent vacancy rate. RJD used 5.75 contractors. However, during the site visit, one civil service psychiatrist was on long-term leave, and two civil service psychiatrists each provided 0.75 FTE of psychiatry services, and not 1.0 FTE, for a psychiatry functional vacancy rate of 16 percent.

Both telepsychiatry positions were filled.

RJD did not have an established position for a psychiatric nurse practitioner or one on staff.

One of two chief psychologist positions was filled; the chief psychologist was designated as the chief of mental health. All eight senior psychologist supervisor positions were filled. Seven of eight senior psychologist specialist positions were filled for a 13 percent vacancy rate.

The 49.5 psychology positions were filled by 37.5 civil service psychologists, leaving a 24 percent vacancy rate. Staff reported that one psychologist had resigned effective April 2022, which would further increase the psychology functional vacancy rate. Nine psychologists were not licensed. There were eight pre-doc psychology interns during the site visit.

The supervising social worker position was filled. Eleven civil service social workers, including four who were unlicensed, filled 23 positions, for a 52 percent vacancy rate. One contractor reduced the social worker functional vacancy rate to 48 percent. Staff reported that a licensed social worker had resigned as of April 2022, which would further increase the social worker functional vacancy rate.

Twenty-four recreation therapists filled 27 positions, for an 11 percent vacancy rate.

Both senior psych tech positions were filled. Of 64.6 psych tech positions, 53.6 were filled, for a 17 percent vacancy rate.

Eight of nine filled registered nurse positions reflected an 11 percent vacancy rate.

All three medical assistant positions were filled; two were filled by two specially trained CNAs who provided tele-presenting services in the 3CMS program.

The CHSA position was vacant. Three of the four HPS I position were filled. Two OSS IIs covered 1.5 positions. The AGPA position was filled.

A total of 20.5 office technicians filled 27.5 positions, leaving a 25 percent vacancy rate.

As for custody staffing, one vacant lieutenant position reflected a two percent vacancy rate.  Further, 19 unfilled sergeant positions indicated an 18 percent vacancy rate; 128 correctional officer vacancies left a 14 percent vacancy rate.

Telepsychiatry:

Two telepsychiatrists provided services for the 3CMS program.  During evening hours, telepsychiatry also provided coverage for all levels of care.  No telepsychiatry IDTTs were scheduled during the site visit.

Staff Recruitment:

During the site visit, RJD reported being actively engaged in staff recruitment and having submitted a proposed clinical recruitment plan to headquarters that was under review.  The institution's APA internship program was another potential source for hiring permanent staff.  Further, RJD also hired some unlicensed staff who had the potential of becoming permanent employees, and also actively recruited registry staff.

Quality Management:

RJD's quality management program continued to be robust and very useful.

The local governing body met in October 2021.  Reviewed meeting minutes addressed relevant policies and procedures, and issues related to COVID-19, among other matters.

The health care quality management committee met monthly.  Required members attended.  Meeting minutes were comprehensive and reported mental health subcommittee matters as frequent agenda items.  Typical agenda items included reports from numerous subcommittees, review of the dashboard and CAPs, PIWPs, patient safety, and COVID-19 issues.  Relevant performance improvement projects addressed psychiatry routine EOP contacts, custody EMR time, and CTC suicide precautions.

The quality management committee met monthly.  Agenda items included LOPs, audits, COVID-19 issues, the CMHPP, the CIT, dashboard issues, the ISUDT, CAPs, and patient treatment hours.  Meeting minutes summarized relevant findings, assessments, and action plans.

The chief of mental health and chief psychiatrist co-chaired the mental health subcommittee, which met monthly and maintained very comprehensive meeting minutes.  The mental health subcommittee was actively engaged, implementing and monitoring corrective actions related to numerous quality management/quality improvement processes.  The mental health subcommittee's quality improvement studies and audits addressed the timeliness of psychiatry contacts, psychiatrists' IDTT attendance, suicide prevention as it related to the MHCB, including MHCB/PIP discharge safety plans, suicide precaution rounds, custody discharge checks, treatment hours, continuity of care following MHCB discharge, and EOP and 3CMS patients' psychiatric medication nonadherence.

RJD did not conduct QIT/FITs during the review period.

There was no peer review.  The institution reported that it was awaiting a headquarters' directive on peer review training and instruction.

The EMRRC met monthly.  Minutes effectively summarized discussion of the various agenda items.  Identified issues included emergency transport by custody staff, which resulted in the initiation of corrective actions.

Medication Management:

RJD reported that medication management metrics had recently declined due to COVID-19 and the curtailment of patient movement, except in cases of emergent/urgent care.  Notably, laboratory draws and other diagnostic testing, such as EKGs, had been suspended, while patients

were not escorted to routine appointments where MAPIP surveillance was performed.  Other barriers included patients' decreased access to psychiatry due to quarantines.

MAPIP audits reported that compliance for obtaining timely laboratory studies for antipsychotic medication and mood stabilizers, when the sample size was adequate, ranged from 71 to 95 percent.  Staff reported that the low compliance was due to COVID-19-related restrictions.

There were monthly compliance issues, ranging from 71 to 85 percent, for medication continuity on the receiving yard following intra-institutional moves from non-locked units and for MHCB patient discharges.  Eighty percent compliance was reported for medication continuity following inter-institutional transfers at R&R.  Ninety percent or higher compliance was reported for intra-institutional moves to locked units for four of six months.

Compliance with PC 2602 involuntary medication orders ranged from 67 to 100 percent on a monthly basis.  Observation further revealed compliance issues, for both morning and evening medications, for nursing staff's preparation and administration of PC 2602 medications. This resulted in RJD's initiation of a nursing CAP.

Psychiatrists could prescribe medications for a maximum of 180 days.  However, patients were more regularly assessed at 30-to-90-day intervals depending on their level of care and clinical needs.  The minimum length of psychiatry medication orders was 30 days for EOP patients, 90 days for 3CMS patients, or less, when the frequency of patient appointments was greater than the minimums set by their programs.  Bridge orders were typically entered for 30 days when medication orders were reconciled during the transfer process.

Mental health pharmacists used the medication registry to track polypharmacy prescriptions. The pharmacist conducted an electronic record review and provided recommendations in a progress note.

The chief psychiatrist monthly monitored all non-formulary medications. Mental health pharmacists performed quarterly audits for each psychiatrist to ensure there was chart justification for non-formulary medications' use.

RJD was not a Clozaril initiating or maintenance institution.

RJD required the patient to either be in the MHCB or at the EOP level of care to order SSRI medications DOT. Psychiatrists were encouraged to order 3CMS patients' medications KOP but could order them DOT.

As of February 28, 2022, there were 119 EOP and two 3CMS patients with PC 2602 involuntary medication orders. During the review period, 49 patients had their PC 2602s renewed, four were allowed to expire, 12 were initiated on an emergent basis, 11 were initiated on a non-emergent basis, two were withdrawn, and three were denied. There were five uses of force during the review period to administer PC 2602 medications.

Medication refusals data was neither automated nor reported.

<u>Transfers</u>:

RJD's impatient coordinator had held the position for four months and had served as the backup inpatient coordinator for the prior five years.

During the review period, RJD referred 20 patients to acute care. Of these referrals, 14 were accepted, five were rescinded, and one was rejected. Two of 14 or 14 percent timely transferred within ten days. RJD met timeframe guidelines for the timely submission of the remaining 12 referrals to IRU, where they stalled. Once received, IRU took an average of 18

days to refer patients to acute care. Moreover, on average, it took 24 days from the date IRU received the referral until the patient's transfer to acute care. Most transfer delays were identified as "waitlist." All but one patient, who had a medical hold, transferred to a bed assignment within 72 hours of acceptance.

RJD referred 26 patients to intermediate care. Three referrals were rescinded, two were rejected, and one patient paroled. Two RJD intermediate care referrals were submitted late to IRU. As for the 20 transfers to intermediate care, 12 or 60 percent were untimely as they took more than 30 days to transfer after IRU's receipt of the referral. Most reasons for transfer delays were listed as "waitlist."

The institution conducted 26 *Vitek* hearings during the review period; 15 were for acute care patients, and 11 were for intermediate care patients. All but one of the hearings were completed within applicable timeframes. No patients prevailed.

There were 736 instances involving 399 patients when patients were considered, but not referred to inpatient care.

RJD transferred 11 patients with complex medical needs to inpatient care programs. There were no expedited transfers.

RJD's inpatient coordinator reported contacting receiving institutions' inpatient coordinator to alert the coordinator of RJD patients who were being transferred. Relatedly, the inpatient coordinator reported receiving adequate email notification between 24 and 48 hours prior to patients' pending returns from inpatient care from the RJD C&PR. She also reviewed the returning patient's discharge documentation and notified mental health treatment staff, nursing, and pharmacy of patients' return.

RJD made 582 MHCB referrals, of which 339 were rescinded.  The 243 MHCB admissions included 135 to RJD and 108 to MHCBs at other institutions.  Seven referrals took longer than 24 hours to transfer.  Two patients each had three MHCB referrals during the review period.

The MHCB's daily census averaged 12.8 patients.  MHCB clinical lengths of stay averaged 10.9 days, with 47 patients, or approximately one-third, having clinical stays exceeding ten days.  Physical lengths of stay averaged 16 days; 66 patients, or approximately one-half, had physical stays longer than ten days.  The majority of these excessive stays were due to medical holds.

RJD did not provide PSU transfer data for the reporting period.  During the site visit, one patient was endorsed to the CSP/Sac PSU; however, the PSU was closed to intake.

Because RJD was an EOP hub institution, patients requiring EOP hub placement were moved to RJD's on-site unit.  During the site visit, EOP hub patients had stays averaging 34 days, with ranges from one to 149 days.

Patients whose level of care changed to EOP were moved to RJD's EOP program.

During the review period, RJD reported reducing 44 patients' level of care from EOP to 3CMS.  Two of these patients returned to the EOP level of care within 27 and 48 days, respectively.

During the reporting period, none of the 91 3CMS patients housed in RJD's ASU transferred to STRH within 30 days.  Significantly, 42 patients' transfers were delayed by the department-wide suspension of non-essential movement from January 9 through February 28, 2022.  Other reasons for delays included 17 medical holds, eight patient refusals, four patients'

COVID-19 testing refusal and required isolation, four patients' placement in outside hospitals, and one patient being out to court.

At the time of the site visit, the ASU housed 36 3CMS patients, of whom 19 or 53 percent had stays exceeding 30 days, with a range of six to 157 days. RJD reported that all but three of these patients' transfers were delayed due to COVID-19 movement restrictions. Although the restrictions were lifted on February 28, 2022, efforts to expedite transfer to STRHs had been hindered by patients' refusals to submit to COVID-19 PCR testing.

No patients transferred to an MSF during the review period.

<u>Programming</u>:

<u>MHSDS Patients in Administrative Segregation</u>:

RJD's administrative segregation EOP hub was located on Facility B6. 3CMS patients housed in administrative segregation awaiting transfer to STRH were housed in B7. EOP and 3CMS patients housed in administrative segregation received mental health services in a mental health treatment center that was located behind both housing units. The clinic was specifically built in 2017 for administrative segregation patients and contained adequate confidential office space for individual contacts, groups, and IDTTs. The clinic's group treatment rooms had HEPA filters, and either restart chairs or TTMs arranged in a semi-circle.

One psychiatrist provided services to all administrative segregation patients. During the site visit, the psychiatrist's caseloads exceeded the established staff-to-patient ratio. Nine primary clinicians who provided services to both EOP and 3CMS patients housed in segregation all had caseloads within established ratios.

Staff and patients reported that during the review period and at the time of the site visit, the EOP hub did not provide adequate structured treatment activity hours; most treatment also

consisted of recreational therapy groups and not core clinical groups. Staff further reported that staff turnover and recruiting difficulties created significant problems for existing staff, including unrealistic workloads, burnout, excessive callouts, and difficulty meeting deadlines, negatively impacting staff's ability to provide appropriate programming. A scheduler reported that there were more appointment requests for mental health services than staff to handle them. Staff identified the most significant problem as patients being unable to obtain necessary groups and programming due to clinical staffing problems. Custody staffing shortages also impacted the delivery of services, including the slowing or halting of patient movement and transfers, delaying the start of groups, and trained officers being reassigned to cover other areas, leaving less qualified officers to cover mental health units.

The interviewed administrative segregation mental health supervisor confirmed that the unit had numerous staffing issues, including insufficient staffing to consistently satisfy staff-to-patient ratios, only two licensed clinicians assigned to the unit, and some staff who only carried half caseloads. The unit also received all newly hired clinicians, many of whom were required to work weekends, leaving coverage issues during the week. There was also limited office space on some weekdays due to the high number of half-time clinicians assigned to the unit. The supervisor admitted that these issues affected continuity of care.

During September, October, and December 2021, RJD's EOP administrative segregation hub was certified with explanation. For the month of January 2022, only 48 percent of EOP administrative segregation hub patients were offered the requisite minimum hours of STAs, and, although RJD self-certified at the local level, mental health headquarters notified the Special Master that the hub did not pass certification that month.

During the review period, EOP hub patients were offered an average of 11 weekly hours of structured therapeutic activities, of which an average of five were attended and six were refused. However, as less than 90 percent of EOP hub patients were offered ten weekly hours of structured therapeutic activity during September, October, and December 2021, for those months, the EOP hub was certified with explanation. For January 2022, because only 48 percent of EOP hub patients were offered sufficient structured treatment activity hours, the EOP hub was not certified.

The EOP hub offered an array of core treatment groups, including anger management, addictive criminal thinking, stress and symptom management, and substance abuse. It also offered pre-release planning, RT yard groups, and groups on current events and mindfulness. Interviewed EOP hub patients described mental health groups as helpful and relevant to their treatment goals. However, they also wanted more groups and activities for increased out-of-cell time. Treatment groups were not offered to 3CMS patients in segregation pending STRH transfer.

Interviewed EOP hub patients reported timely contacts with psychiatry and primary clinicians. They had generally positive comments about their mental health providers and reported confidential routine contacts that often lasted at least 45 minutes and included interventions that helped them to achieve treatment goals. Patients denied problems accessing mental health, and with custody staff interfering with their mental health treatment. 3CMS patients in segregation were offered weekly PC contacts.

Sixteen patients were randomly selected to have their healthcare records reviewed to assess their administrative segregation hub stays.

Fifteen patients had initial psychiatry evaluations.  Ten of the 15 or 67 percent of these patients had timely initial psychiatry evaluations before the initial IDTT.  Fourteen of 22 or 64 percent of routine psychiatry contacts timely occurred every 30 days.  Twenty-six percent of psychiatry contacts were confidential; confidentiality was impacted by the COVID-19 pandemic.  Telepsychiatry did not conduct any of the initial or routine psychiatry contacts.

Sixteen patients required initial primary clinician evaluations before the IDTT.  Fifteen of 16 or 94 percent timely occurred before the IDTT; 31 percent were conducted confidentially.  Eighteen of 27 or 67 percent of required routine PC contacts timely occurred every seven days; 60 percent were confidential.  Confidentiality was limited by the COVID-19 pandemic during the review period.

All 16 patients had timely initial IDTTs within 14 calendar days of admission.  All six routine IDTTs timely occurred within 90 days.  Initial and routine IDTTs were attended by 37 percent of patients and 100 percent of staff.  Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this was not clearly documented.

Seven observed IDTTs for both EOP hub and 3CMS patients awaiting STRH transfer found the administrative segregation supervisor and all required attendees present with computer access.  All disciplines contributed to the discussions; however, in some cases, the correctional counselor minimally contributed.  Treatment team decisions, including level of care determinations, were collaborative and appropriately justified.  Nonetheless, while the IDTTs addressed most aspects of care, improvements were needed.  Among them, prescribed medications were not consistently reviewed, treatment plans were not modified to address medication and treatment refusals when indicated, and effective communication efforts were generally absent.  Pre-release planning was not discussed for patients due to release.

Observed psych tech rounds were adequate.  The psych tech was familiar with most patients and worked to establish positive rapport with them.  Relevant assessment questions were weaved into casual conversations with patients portraying genuine interest, as opposed to the appearance of checking off boxes on a form.  Forms and in cell materials were offered to patients.  Patients confirmed that psych tech rounds were conducted daily and described psych techs as helpful and respectful.

The administrative segregation mental health supervisor facilitated morning meetings.  An observed morning meeting was well attended with all expected disciplines represented.  All attendees were engaged.  The facilitator provided necessary updates about patients, staffing, programming, and other relevant matters.  Addressed topics included new arrivals, departures, five-day follow-ups, bad news, changes in patients' presentation, and specific behavioral concerns.

The administrative segregation supervisor described positive and supportive relations between mental health and custody.  However, the supervisor further reported problems with administrative segregation healthcare access officers being redirected to other areas in the afternoon hours, which resulted in treatment groups starting late.  RJD's chief of mental health further reported that the prior warden had regularly permitted such redirection of healthcare access officers, resulting in increased group cancellations.  The chief of mental health further explained that the current warden attempted to address this issue.

The administrative segregation housing units contained alternative housing cells that were used for patients awaiting MHCB placement.  Leadership indicated RJD attempted to avoid using these alternative housing cells for non-segregation patients.  Nonetheless, it was reported that RJD recently began using these cells more frequently for non-segregation class members as

the designated alternative housing cells in mainline housing were often occupied by *Armstrong* class members with ADA accommodations.

Interviewed EOP hub patients confirmed that they were regularly offered showers and a minimum of three hours of daily yard.

The reviewed CDCR Form 114s documented offering all EOP hub patients a loaner radio.

Four observed ICCs revealed attendance by a mental health clinician; however, the attending clinician was not the patient's assigned clinician. The clinician nonetheless provided relevant clinical information, professionally spoke to patients, and made recommendations about any impact that retaining the patient in administrative segregation would have on patients' mental health. The ICC chairperson was engaged, discussed recommendations with patients, and attempted to ensure that patients' understood the ICC's action.

The EOP hub sergeant reported that all unclothed body searches were conducted inside patients' cells. However, the sergeant was unaware whether there was an alternate location to conduct them. The sergeant was also unaware that CDCR policy provided that patients did not have to have to undergo an unclothed body search if they remained in the building and were under constant supervision.

During the review period, the number of patients retained in the EOP hub monthly for more than 90 days was as follows: there were four patients in September 2021, nine in October, 11 in November, five in December, 11 in January 2022, and 14 in February. The reasons for retention beyond 90 days included pending RVRs, patient postponed RVR hearings, safety concerns, and transfer endorsement.

<u>Non-Disciplinary Segregation</u>:

RJD identified 69 patients as NDS during the review period, including 36 EOP patients, 21 3CMS patients, and 12 non-MHSDS incarcerated persons.  Thirty-four of the 69 NDS patients were approved for accelerated transfer, of which 22 or 65 percent transferred within policy timeframes.

Prior to the site visit, on March 25, 2022, 14 RJD patients were assigned to NDS.  Six of these patients had been approved for accelerated transfer, of whom four were within transfer timelines and two were overdue for transfer by three weeks.

The monitor's review of the issuance of property to NDS patients while housed in segregation found compliance with applicable policy.  However, because administrative segregation cells lacked electricity, NDS patients did not have televisions but were issued loaner radios.

MHCB:

RJD operated a 14-bed MHCB, which included two swing beds and four that were ADA compliant.  The unit's various cells had approved beds and mattresses.

One civil service psychiatrist provided weekday services; a registry psychiatrist provided services on Saturdays.  Four psychologists were also assigned to the MHCB.  During the site visit, both psychiatry and psychology staff-to-clinician ratios were within established ratios.

The MHCB's psychologist supervisor reported that her daily checks indicated that a history and physical was given to new MHCB admissions within 24 hours, and an updated or new mental health assessment was performed upon admission; however, due to physical plant limitations, they were not always confidential.

Ten patients were randomly selected to have their records reviewed for their MHCB stays.  All ten patients received an initial primary clinician evaluation within 24 hours of

admission. All ten initial psychiatry evaluations were also timely. Some contacts were noted to be held at cell front due to COVID-19 restrictions. Otherwise, it was not specified whether contacts were confidential.

All 50 of the required twice weekly psychiatry contacts timely occurred; only six percent were confidential. All 94 or 100 percent of required daily clinical contacts occurred; however, only seven percent were noted to be confidential.

All ten patients had timely initial IDTTs within 72 hours of admission. Required staff attended 70 percent. One hundred percent of patients who required routine IDTTs had them within seven days of their initial IDTT. All patients had a discharge IDTT.

Staff confirmed that, due to physical plant limitations, clinical contacts typically did not occur in a confidential setting, which was reported to have been an issue for many years.

Due to custody staffing shortages, the MHCB did not offer dayroom or yard to MHCB patients. However, staff reported that MHCB patients had access to recreation therapy in the walk alone yard at least several times weekly. Although, from a clinical perspective, MHCB patients' insufficient out-of-cell time was very concerning, it was understandable due to the unit's significant custody shortages.

Three observed IDTTs revealed all relevant disciplines in attendance. Significantly, the IDTTs reflected sparse discussion of patients' diagnoses and treatment plans. They also did not solicit input from custody staff, while custody did not receive treatment team input about the patients.

In general, and especially during the earlier months of the review period, RJD audits reported greater than 90 percent compliance for completion of all suicide risk evaluations. However, during the latter months of the reporting period, there was noncompliance with some

of these measures.  For example, during February 2022, there was 82 percent overall compliance for suicide risk evaluations, including 71 percent compliance for their completion following MHCB discharge when the patient was admitted to the MHCB due to suicide risk, and 72 percent for their completion following emergent consultations.  Leadership opined that such reported noncompliance was often due to data entry issues.

Seclusion and Restraint:

RJD utilized neither seclusion nor restraint during the review period.

Crisis Intervention Team:

During regular business hours, Monday through Friday, from 8:00 a.m. until 6:00 p.m., a specifically assigned clinician triaged incoming consultations and referrals.  This clinician also coordinated activation of the CIT.  The required CIT included a licensed clinician, a lieutenant or sergeant in collaboration with a lieutenant, and a registered nurse or supervising psych tech.  The actual CIT that was deployed varied by yard and staff availability.  When required members were not available, a team would be assembled, but this would not be counted as a CIT for reporting purposes.

After hours, there was a designated CIT telephone number that was accessible to any staff member seeking to activate the CIT; the evening clinician was responsible for triaging and attending to the patient in crisis.  On weekends and holidays, from 8:00 a.m. until 4:00 p.m., the mental health specialist who was the lead was responsible for responding to crises and coordinating the CIT to provide assistance.

RJD had a multi-tiered psychiatry on-call system.  A "night shift" telepsychiatrist providing coverage from 6:00 p.m. until 7:00 a.m. the following day covered first call.  A second call was covered by one of the civil service psychiatrists.  With only three civil service

psychiatrists working full time, each psychiatrist provided second call coverage for "a disproportionate amount of time," contributing to lowered morale and "burnout." Further, when the telepsychiatrist was off, civil service psychiatrists also provided first call coverage. The chief psychiatrist provided third call coverage, as well as consultancy to other psychiatrists.

Alternative Housing:

RJD reported 610 alternative housing placements during the review period. Eighteen or three percent exceeded 24 hours, averaging 34 hours. Reasons for extended alternative housing stays included transportation delays and staffing shortages that resulted in delayed mental health evaluations.

RJD used alternative housing cells when MHCBs were unavailable. Such cells were located in the Facility C EOP program and in administrative segregation. Staff reported that nursing or custody staff continually observed alternative housing patients. Although patients placed in alternative housing in administrative segregation were supposed to be seen confidentially, space limitations resulted in instances of nonconfidential assessments, which especially occurred for EOP patients. The alternative housing cells in the EOP unit were not suicide resistant.

Prior to December 2021, RJD had assigned one clinician for alternative housing coverage. In those instances when the primary clinician could not see all patients, RJD assigned other clinicians to provide services. In December 2021, the clinician assigned to alternative housing went out on leave. RJD subsequently implemented a plan that assigned four clinicians to alternative housing. However, due to increased mental health staffing shortages, fewer clinicians were available to cover alternative housing, which resulted in PCs from the facilities seeing most alternative housing patients.

EOP:

Three of four psychiatrists who exclusively provided services to the mainline EOP program had caseloads exceeding the established staff-to-patient ratio. Three other psychiatrists who provided services in both the mainline EOP and 3CMS programs carried caseloads within the established ratios. Only six of 24 EOP primary clinicians had caseloads of 26 patients or less that were within the established ratio.

RJD did not offer the requisite minimum of ten hours of weekly structured therapeutic activities to EOP patients. The institution reported offering EOP patients a weekly average of 7.97 hours of structured therapeutic activity, with patients attending 4.6 hours. However, this information was not consistent with reports from EOP patients.

Notably, on December 20, 2021, RJD was experiencing such significant custody staffing shortages that it implemented a program status report (PSR) that reduced services, including those provided to mental health patients. Thereafter, as positive COVID-19 cases continued to rise, CDCR enacted a statewide PSR from January 9 through February 13, 2022, for all institutions, which continued to negatively impact mental health services.

During the reporting period, the pandemic, staffing shortages, and the need to prioritize other tasks resulted in RJD not providing routine IDTTs for EOP patients housed on Facilities A and C unless they were "clinically indicated." The EOPs on Facilities A and C continued to provide initial IDTTs, but patients were only allowed to attend when it was "clinically indicated." However, the "clinically indicated" criteria was undefined. Staff admitted that it was a subjective standard that usually meant that the treatment team was considering a level of care change, the patient posed a significant safety risk, or the patient had specifically requested to

attend the initial IDTT.  Staff further reported that the standard was inconsistently applied across yards.

Eighteen patients in the mainline EOP program were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

Of the seven patients who required initial contacts, one or 14 percent had an initial psychiatry evaluation prior to the initial IDTT and within 14 calendar days of arrival.  Eighteen patients required routine psychiatric contacts.  Twenty of 67 or 30 percent of required routine psychiatry contacts timely occurred within 30 days.  Telepsychiatry was not used to conduct routine psychiatry contacts.  Seventy-one percent of initial and routine psychiatry contacts were confidential.

All seven patients had required initial primary clinician contacts within 14 calendar days of arrival.  Eighteen patients required routine PC contacts.  Forty-five of 87 or 52 percent of required routine primary clinician contacts were timely.   Forty percent of initial and routine primary clinician contacts were confidential.

Six of seven or 86 percent of initial IDTTs timely occurred within 14 calendar days.  Required staff attended all initial IDTTs.  Although the Program Guide required attendance by the assigned psychiatrist and primary clinician, this was not always clearly discernable.

Fifteen patients required routine IDTTs.  Five of 22 or 23 percent of required routine IDTTs timely occurred within 90 days.  Required staff attended 93 percent of routine IDTTs.  Attendance of the required assigned psychiatrist and primary clinician was not always clearly discernable.

<u>Facility A</u>

Facility A, which was a non-designated EOP program, did not distinguish between Level III mainline and sensitive needs yard (SNY) patients who required EOP services.  During the review period, Facility A's census averaged 290 patients; the program's capacity was 300 EOP patients.

Fifteen to 20 Facility A patients interviewed in a group setting reported receiving weekly individual clinical contacts and monthly psychiatry contacts, which mostly occurred at cell front. Patients reported being offered two to three weekly mental health groups, which they described as often not being relevant to their mental health needs.  They further reported being offered approximately four weekly hours of outdoor recreational therapy, which typically consisted of two to three recreation therapists being on the yard during what was essentially unstructured recreational time.  Many patients reported not having the option to attend IDTTs.  They also reported long pill lines and stated that it was not uncommon to not receive prescribed medications two to three times monthly.  They indicated being locked in their cells more often than being out of them.  Many complained about their interactions with correctional officers; some reported being the victims of excessive use of force.

<u>Facility C</u>

The Facility C EOP Program was located on a Level IV 3CMS SNY Yard.  It had a 300-patient capacity and an average census of 257 patients during the review period.  The program did not distinguish between Level IV mainline and SNY patients who required an EOP level of care.  However, some custody staff and EOP patients reported that this was an SNY EOP.

Due to a COVID-19-related decrease in clinical staffing, Facility C allowed cell-front clinical contacts.  Groups were provided, and group treatment rooms with HEPA filters operated

at full capacity. However, due to COVID-19 and custody and mental health staffing shortages, Facility C was unable to offer ten hours of weekly structured treatment activities. Recreational therapy was provided.

Approximately 20 Facility C EOP patients interviewed in a group setting reported weekly primary clinician contacts and monthly psychiatry contacts, which frequently were not confidential. They reported that individual PC contacts typically lasted from five to 20 minutes. Most patients reported being offered two weekly hours of group, and up to four weekly hours of recreation therapy, which primarily consisted of games, watching movies, exercising, or listening to music. Patients further reported that IDTTs did not always occur within 90 days and that they did not regularly attend them. Patients also reported fearing retaliation, including being downgraded to the 3CMS level of care, if they requested to change clinicians or treatment, such as requesting to no longer take medication. Medication continuity issues were reported to be common. Due to custody staffing shortages, patients reported being locked in their cells most of the time.

Three observed Facility C routine IDTTs included two attended by patients related to the "clinically indicated" criteria. As for the IDTT that the patient did not attend, the attending psychiatrist was not the patient's assigned psychiatrist, while a CC II attended due to the absence of the regularly assigned CC I.

The observed IDTTs attended by patients were well-organized. The primary clinician presented case conceptualizations and there was active discussion between the PC and psychiatrist about level of care. The psychiatrist discussed medications and was receptive to patients' feedback concerning effectiveness and side effects. Patients were engaged and the treatment team actively discussed patients' care and treatment. The correctional counselor was

actively engaged and was familiar with both patients, providing feedback and encouragement as appropriate.  Both patients were provided with updated goals and interventions based on their current mental health status.

The patient whose IDTT was held in absentia had recently arrived at RJD from a MHCB and had been housed on Facility C for approximately two to three days before the IDTT.  Two weeks since arriving at RJD, neither a psychiatrist nor a PC had seen him, and the correctional counselor had yet to complete an initial assessment.

Facility E

Facility E housed Level II EOP, 3CMS, and non-MHSDS incarcerated persons.  The mainline EOP and non-EOP patients were housed separately, but were integrated during education, work, yard, and other programming activities.  Facility E's mental health clinic had sufficient confidential treatment space for individual and group contacts, and IDTTs.  Group and IDTT rooms contained HEPA filters.

The Facility E supervisor reported that initial IDTTs continued to occur on the yard, and that patients were invited to them.  However, routine IDTTs had been suspended for two to three months due to limited staffing and the need to prioritize other tasks.

Likely due to the suspension of routine IDTTs, there was only one scheduled EOP IDTT on Facility E during the site visit.  The observed IDTT was inadequate.  While all required disciplines participated, the psychiatrist was reportedly unwilling to walk from the medical clinic to the mental health clinic to personally participate; staff indicated this was unrelated to COVID-19.  As such, the psychiatrist, as well as the correctional counselor, attended with only audio capabilities; however, there was poor sound and microphone quality.  Only the primary clinician, lead clinician, and patient were in the IDTT room with the monitor's expert.

The IDTT also reviewed a high-risk patient who was designated Developmental Disability 1 (DD1), had recently returned from an inpatient facility and had subsequently been admitted to RJD's MHCB for danger to self before discharging to the EOP level of care. The IDTT was unprepared, disorganized, and failed to intervene appropriately. During the IDTT, a significant amount of time was spent repeating information that the psychiatrist had missed, including complaints about the side effects and false beliefs about antipsychotic medications. Clinicians did not reference the patient's recent inpatient or MHCB records, and they inaccurately reported that the patient had been placed in the MHCB as a step down from inpatient care. The monitor's expert's subsequent review of the healthcare record found that the patient's inpatient admission was for decompensation following medication non-adherence and that the recent MHCB admission was for auditory hallucinations and suicidality. As such, safety planning was indicated but not covered by the IDTT. The IDTT's treatment planning discussion was also inadequate as it failed to address recommendations from the inpatient and MHCB discharge summaries.

During the IDTT, the primary clinician offered to submit a psychiatry referral in response to the patient's complaints of negative side effects from his antipsychotic medication. However, the psychiatrist inappropriately rebutted the primary clinician and stated that the patient should submit a request form on his own. The monitor's expert ultimately intervened and recommended that the IDTT schedule the patient for a psychiatry appointment to avoid referral processing delays. The monitor's expert noted that this referral issue was consistent with complaints from mainline EOP clinicians' reports that psychiatry referrals were not well-received.

Facility E EOP groups included life skills, Dialectical Behavioral Treatment (DBT), introduction to EOP, primary clinician check-in groups, health and wellness, and pre-release

519

planning.  However, group facilitators confirmed that staffing limitations had resulted in a lack of group treatment.  They further reported not having the time to meet with EOP patients who refused their check-in groups, resulting in a lack of weekly contacts for those patients.

Two observed Facility E groups included an EOP case management group and a group attended by both EOP and 3CMS patients.  Both were process-oriented and loosely structured but nonetheless tailored to patients' level of functioning.  Although only approximately half of the scheduled patients attended, patients were effectively engaged.

While interviewed Facility E EOP patients appreciated that the number of groups had recently increased, they expressed interest in both more group hours and more core groups such as anger management and criminal thinking.  Patients also expressed frustration that groups were often canceled due the unavailability of providers.  Two patients reported typically expecting their groups to be canceled and were pleasantly surprised when they actually occurred.  Patients also expressed surprise that RTs counted their yard time toward group hours as they reported minimal RT interaction during groups.

Interviewed Facility E EOP patients were also aware of RJD's current staffing problems. Several patients reported that although they desired more treatment, they believed that mental health staff were "doing the best they can."  Patients perceived that mental health staff were "overwhelmed and burning out," and expressed concern that more staff would resign as a result. Interviewed patients also stated that the amount of yard and other out-of-cell time helped to mitigate the effects of limited mental health programming.  Facility E EOP patients reported typically having access to daily yard from 9:00 a.m. to 4:00 p.m.

Interviewed EOP clinicians reported attempting to meet weekly with patients.  However, when patients refused to attend caseload check-in groups that were scheduled every other week,

clinicians often lacked the time to follow up with them in the housing units. Clinicians further reported that clinical staff was often not available to cover check-in groups during unplanned absences, resulting in a lack of routine contacts for the week.

Facility E EOP patients denied problems with accessing the law library, phone calls, cleaning supplies, or clean laundry.

3CMS:

Three psychiatrists who provided services in both the mainline 3CMS and EOPs carried caseloads within the established staff-to-clinician ratios. Two telepsychiatrists assigned to the mainline 3CMS had caseloads of 327 and 367 patients, exceeding the established ratio. Caseloads for all mainline 3CMS primary clinicians meaningfully exceeded the established staffing ratio; several PCs had caseloads between 152 and 196 patients.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Two of five or 40 percent of patients who required an initial psychiatry evaluation timely had one prior to the initial IDTT. Seventeen patients required routine psychiatry contacts. Sixteen of 18 or 89 percent of required routine psychiatry contacts occurred within 90 days. Forty-four percent of psychiatry contacts were confidential. Two reviewed psychiatry contacts utilized telepsychiatry.

Two of five or 40 percent of patients had timely initial primary clinician evaluations within ten working days. Seventeen patients required routine PC contacts. Thirteen of 25 or 46 percent of required routine primary clinician contacts timely occurred within 90 days. Fifty-six percent of primary clinician contacts were confidential.

Three of five or 60 percent of initial IDTTs were timely.  All four or 100 percent of required routine IDTTs at least occurred annually.  Required staff attended 88 percent of initial and routine IDTTs; patients attended 55 percent.

Until shortly before the site visit, on Facility C, COVID-19 restrictions had resulted in the suspension of 3CMS groups and the conduct of routine IDTTs without patients; patients were only allowed to attend initial IDTTs.

The monitor's expert separately met with 3CMS patients from Facilities A and C.  Both groups of patients reported numerous issues with the 3CMS program.  On Facility C, many patients reported not seeing a mental health clinician during the past 90 days.  Patients from both yards reported that many clinical contacts were brief, lasting approximately 15 minutes, and were not confidential.  Patients further reported continuity of care issues due to changing primary clinicians and limited access to dayroom, group, and yard.  Facility C patients estimated being locked in their cells 16 hours daily.  Several Facility C patients raised the issue of the use of excessive force and further reported that the timing of medication pill call lines frequently varied.  Facility A patients reported not attending IDTTs but did not indicate medication management issues.  These patient interview findings were consistent with reviews of medical records.  Staff did not voice disagreement when these findings were summarized during a staff meeting.

Interviewed Facility E mainline 3CMS patients reported general satisfaction with mental health services and confidential routine individual clinical contacts.  They further reported satisfaction with the amount of out-of-cell time and denied problems accessing the law library, phone calls, cleaning supplies, or clean laundry.  They also denied problems with housing unit custody staff.

The Facility E supervisor reported that RJD no longer offered routine IDTTs for 3CMS patients. Despite Facility E's staffing limitations, some 3CMS patients were offered treatment groups.

Interviewed Facility E primary clinicians reported problems with interdisciplinary communication and collaboration. They further reported not having been allowed to submit psychiatry referrals for several years. Although leadership no longer prohibited this practice, PCs were reluctant to make such referrals due to psychiatrists' negative reactions when staff made them. The clinicians' reports were consistent with the monitor's expert's IDTT observation when the psychiatrist argued against the PC submitting a referral. Primary clinicians further reported being reluctant to consult with medical providers as some had been reprimanded for doing so.

Other Issues:

Pre-Release Planning:

RJD had a full-time pre-release coordinator, and a social worker trained as a back-up coordinator. The monitor's expert found that RJD had an organized system for identifying patients needing pre-release services, as well as tracking patients' pre-release dates, provided services, and cross-agency communications.

The interviewed backup pre-release coordinator reported that SOMS pre-release reports identified incarcerated persons who would be released within 60 days, upon which a pre-release planning assessment was completed. The pre-release coordinator then notified the assigned psychiatrist, primary clinician, program supervisor, TCMP, and pre-release planning group facilitator of the patient's pending release date. The pre-release coordinator also maintained

tracking logs that monitored the completion of important documentation and communications, such as ROI and community calls.

Pre-release groups were offered to all eligible patients.  Group facilitators assigned patients to these groups or otherwise provided relevant materials within 30 to 45 days of a patient's release.  RJD had also implemented a clinical pre-release student program where student interns offered adjunctive clinical pre-release services through group and individual contacts.

The pre-release coordinator maintained regular communication with TCMP workers through weekly or biweekly pre-release meetings, in which ISUDT staff also participated.

Program Access:

a.  Job and Program Assignments
On March 4, 2022, RJD's 1,880 full and part-time job assignments were held by 335 EOP patients, or 37 percent of the EOP population, by 780 3CMS patients, representing 61 percent of the 3CMS patient population, and by 765 non-MHSDS incarcerated persons, reflecting 62 percent of the non-mental health caseload population.

The 1,453 full and part-time academic assignments were held by 315 or 35 percent of EOP patients, by 562 or 44 percent of 3CMS patients, and by 576 or 47 percent of non-MHSDS incarcerated persons.

Of the 48 vocational education assignments, none were held by EOP patients.  Six 3CMS patients, representing zero percent of the 3CMS population, held such assignments, as did 42 or two percent of non-mental health caseload incarcerated persons.

There were no voluntary education assignments at RJD.

The 208 substance abuse treatment assignments were held by 63 EOP patients, representing seven percent of the EOP population, 86 or seven percent of the 3CMS population, and 59 or five percent of non-MHSDS incarcerated persons.

b.  Milestone Credits

During the review period, RJD reported that 838 of 898 EOP patients were eligible to earn milestone credits; 81 percent earned the credit.  Of the 1,279 3CMS patients, 1,142 or 23 percent earned the credit.  For non-MHSDS incarcerated persons, 1,087 of 1,226 individuals were eligible to earn the credit, with 23 percent earning the credit.  Notably, RJD provided milestone credit packages to EOP patients in both English and Spanish.

c.  Out-of-Level Housing

RJD reported that on March 4, 2022, 25 EOP and 12 3CMS custody Level I patients were placed in Level II housing, and seven EOP and three 3CMS custody Level I patients were in Level III housing.  There were 82 EOP and 263 3CMS custody Level II patients in Level III housing, and two EOP and two 3CMS custody Level II patients in Level IV housing.  Further, five EOP and seven 3CMS custody Level III patients were in Level II housing, and 19 EOP and 32 3CMS custody Level III patients were in Level IV housing.  There were also one EOP and one 3CMS custody Level IV patients in Level II housing, and 80 EOP and 135 3CMS custody Level IV patients in Level III housing.

d.  ADA Reasonable Accommodation and Grievance Procedures

RJD provided training rosters and attendance sheets that demonstrated compliance with the implementation of ADA accommodations and grievance procedures to accommodate psychiatric disabilities.

e.  Periodic Classification Score Reduction: EOP Patients

During the reporting period, RJD provided CDCR Form 840s demonstrating that RJD was providing periodic classification score reductions for EOP patients.

<u>"C" Status</u>:

During the site visit, three EOP, eight 3CMS, and one non-MHSDS incarcerated person were on "C" status. The stated reasons for these patients' "C" status included multiple RVRs within a 180-day period. The patients were assigned to "C" status for periods of three to six months.

<u>Mental Health Referrals</u>:

During the review period, RJD reported a total of 6,388 mental health referrals, excluding PREA referrals. There were 1,626 psychiatry referrals and 4,762 referrals to primary clinicians. The 1,088 emergent referrals included 191 to psychiatry and 897 to primary clinicians. Of the 654 urgent referrals, 35 were to psychiatry and 619 were to PCs. The 4,646 routine referrals included 1,400 to psychiatry and 3,246 to primary clinicians.

RJD reported timely responses to 99 percent of the emergent referrals to psychiatry and 93 percent of the emergent referrals to primary clinicians. Of the urgent referrals, 80 percent of psychiatry referrals had timely responses, as did 96 percent of PC referrals. Ninety-two percent of all routine referrals had timely responses.

All interviewed housing unit officers were knowledgeable about the mental health referral process and produced a CDCR 128 MH-5 referral form upon request.

<u>Treatment Space</u>:

Due to COVID-19 social distancing requirements, RJD's treatment space was not utilized to its fullest capacity. There were also several issues regarding the space needs for mental health services and staff, as a January 2022 space survey had identified. This space survey reported concerns with privacy and confidentiality in Facility C's PIA/health care annex and in buildings C1 and C3. Facility C's mental health treatment space also had inadequate heating/cooling and

data connectivity. Further, during the site visit, staff raised concerns about the lack of MHCB treatment space.

Custody and Mental Health Partnership Plan:

RJD's CMHPP LOP was in compliance with headquarters' Partnership Plan.

RJD conducted executive leadership joint rounding for all months of the review period. Joint rounding interviews with staff revealed staffing shortages, canceled appointments, and high patient refusals. However, staff also reported a good collaborative relationship between mental health and custody. Interviewed patients discussed power outages in the housing units, limited shower time, and the inability to control water temperature as concerns. Although the quality management committee and mental health subcommittee referenced the executive leadership joint rounding, their meeting minutes lacked details of actions taken in response to the issues raised during rounding.

As for daily huddles in the EOP units, RJD only provided IST sign-in sheets for second watch for the EOP hub for October through December 2021, and January 2022. The huddle reports addressed patients' returning from higher levels of care, five-day follow-ups after MHCB discharge, new patients, and any patients known to have received bad news, among other matters. RJD failed to use the approved daily huddle report as required by CDCR policy. RJD also provided several second and third watch Facility A huddle reports, which indicated staff in attendance and included adequate notations. No huddle reports were provided for EOPs on Facilities C or E.

The institution also provided the second watch combined CTC medical/mental health huddle reports for several months of the review period; third watch reports were not provided. Because most reports did not identify attending staff, it could not be determined whether

required mental health and custody staff attended.  The reports were nonetheless very detailed about CTC patients and included information on admissions, discharges, medication continuity, specialty appointments, medical holds, PC 2602 involuntary medication orders, and staffing shortages.

Observation of a third watch EOP huddle on Facility A revealed required staff in attendance.  Staff followed the huddle report format and appropriately discussed patients.

Reviewed weekly reports for 3CMS supervisory meetings for all facilities indicated attending staff, and noted discussions about staffing shortages, limited shower time, power outages, and inquiries about COVID-19 restrictions.  Due to COVID-19 restrictions, the 3CMS supervisory meetings did not occur for several weeks of the review period.

As for monthly joint supervisory 3CMS program area tours, RJD provided documentation reflecting these area tours, attending staff, and issues raised by patients.

RJD had a copy of the 3CMS orientation brochure.  The institution did not provide information on EOP orientation groups.

RJD provided IAC monthly meeting minutes for Facilities A, B, C, and D for nearly all months of the review period.  Meeting minutes were not provided for Facility E.  The meeting minutes generally identified attending mental health staff.  Reviewed meeting minutes and staff discussions found general compliance with the CMHPP requirement that the IAC meet monthly.

The same patient filed two staff complaints against the same mental health clinician during the review period.  No interventions were required due to the complaints, and the staff member was not reassigned.

As for attendance at the mandatory CMHPP off-post training, RJD reported that the warden and chief deputy warden attended the training, as did four of six correctional

administrators, two of seven captains, 22 of 34 lieutenants, 58 of 100 sergeants, and 252 of 878 correctional officers.  RJD did not report attendance by mental health staff at the off-post training.

RJD did not provide information on quarterly round table training.

Heat Plan:

RJD's LOP 54 "Heat Plan and & Heat Risk Medications" was updated in May 2021 and complied with the statewide Heat Plan.  Indoor and outdoor temperatures were logged and forwarded to the litigation coordinator during September and October of 2021, which were the two months of the review period when the heat plan was in effect.  The litigation coordinator forwarded the monthly heat report to CDCR headquarters.  RJD reported four Stage I heat alerts but no Stage II or Stage III heat alerts.

Interviewed officers were generally familiar with the heat plan and its respective stages.  The monitor observed working thermometers in appropriate areas of the housing units.  Custody officers had the daily list of patients who were prescribed heat sensitive medications.  Upon recall from the yard during Stage I heat alerts, patients were allowed dayroom access.

RVRs:

RJD reported that 85 of 158 or 54 percent of required custody staff received the mental health assessment training, as did seven of 68 or ten percent of mental health clinicians.

RJD issued 2,100 RVRs during the review period, including 1,655 or 79 percent issued to MHSDS patients and 445 issued to non-MHSDS incarcerated persons.  There were 689 RVRs issued to EOP patients, 889 issued to 3CMS patients, 67 issued to MHCB patients, six issued to patients at the acute level of care, and four issued to intermediate level of care patients.

The monitor reviewed 23 RVRs to assess compliance with CDCR policy. Custody staff timely referred the mental health assessment to mental health staff in ten of 23 or 43 percent of cases. Mental health staff timely completed and returned the assessment to custody in 22 of 23 or 96 percent of cases. The SHO documented consideration of the mental health assessment in all 23 reviewed cases. However, in 14 of 23 or 61 percent of reviewed mental health assessments, the clinician used canned language in response to question number four regarding penalty mitigation. The clinician recommended penalty mitigation in 11 of 23 or 48 percent of reviewed RVRs; the SHO mitigated the penalty in five of 11 or 46 percent of cases.

Use of Force:

RJD reported seven controlled and 125 immediate use of force incidents during the review period. Five of the seven controlled use of force incidents were for the administration of PC 2602 involuntary medications; the remaining two were to affect a patient transfer to another institution. Six of the patients were in the MHCB and one patient was at the 3CMS level of care.

The 125 immediate use of force incidents involved 62 EOP patients, 49 3CMS patients, 16 patients in the MHCB, one acute care patient, two intermediate level of care patients, and 12 non-MHSDS patients. Some immediate use of force episodes involved more than one patient.

Review of all seven controlled use of force incidents revealed compliance with CDCR policy, including a cool down period, attempts by mental health staff to gain the patient's compliance, and review of the patient's EHRS for contraindications. All controlled use of force incidents were video recorded. Review of the video recording for one incident found the institution's response to be compliant with CDCR use of force policy.

The monitor's review of three immediate use of force incidents also determined that they complied with applicable policy.

The required use of force training was completed by the warden and chief deputy warden, four of six correctional administrators, five of seven captains, 32 of 34 lieutenants, 90 of 100 sergeants, and 784 of 878 correctional officers.  RJD did not provide data for mental health staff's attendance at use of force training.

Lockdowns/Modified Programs:

From December 31, 2021, through January 8, 2022, RJD implemented an institution-wide modified program due to massive staff shortages and a recent increase in COVID-19 cases. During this modified program, ducats were only issued for emergent and urgent referrals, patients were escorted to treatment, and there was healthcare rounding in the housing units. There was also controlled medication distribution, general movement, and feeding, while visiting was limited to weekend video visitation.  Dayroom access, recreation, canteen, and receipt of packages were also modified.  Normal programming resumed on January 9, 2022.

Access to Care:

A review of RJD's monthly Health Care Access Quality Reports from September 2021 to February 2022 indicated that less than two percent of issued mental health ducats and add-on appointments were not completed due to custody factors.  Fifty-three percent were not completed due to non-custodial reasons, excluding patient refusals.

Minimum Support Facility:

At the time of the site visit, RJD no longer had an MSF.

*Coleman* Postings:

There were *Coleman* posters in English and Spanish in appropriate areas of all toured housing units, as well as in IDTT meeting spaces.

Non-Designated EOP/Non-Designated Facility:

531

RJD reported not having converted any facility from an SNY to a non-designated facility during the review period.  The 2017 CDCR memorandum stated that all EOPs were to convert to non-designated units by January 8, 2018.  However, Facility C's mental health staff and MHSDS patients referred to all of Facility C as an "SNY yard."  Facility C had a fence separating the Level IV EOP patients from the non-EOP patients who were classified as SNY.  On Facility A, housing units 1 and 2 housed EOP patients while housing units 3, 4, and 5 housed non-EOP patients classified as SNY.  However, there was no fence on Facility A separating the EOP and non-EOP SNY patients.  Facility A staff nonetheless tried to maintain physical separation between the respective patients; however, this was not always possible.

**APPENDIX B-11**
**KERN VALLEY STATE PRISON (KVSP)**
**(April 5, 2022 – April 7, 2022)**
**Review Period: (September 1, 2021 – February 28, 2022)**

<u>Census</u>:

On April 5, 2022, KVSP housed 3,259 incarcerated persons, which was a 12 percent decrease since the preceding reporting period.  The mental health population of 1,160 patients, which was 36 percent of KVSP's total incarcerated population, was an increase of four percent since the previous monitoring round.

The mental health caseload included four MHCB patients, 135 EOPs, 932 3CMS patients, and 89 patients in STRH, including three patients pending transfer to an administrative segregation EOP hub and two EOP patients pending transfer to a PSU.

<u>Staffing</u>:

There were two established chief psychologist positions, of which one was filled and designated as the chief of mental health.  The remaining position was not filled as a cost-saving measure.  There were no current plans to fill the second chief psychologist position.

The chief psychiatrist position was filled.  Of the four staff psychiatrist positions, one was filled by civil service, and 1.24 positions were filled by registry staff, resulting in a 44 percent functional vacancy rate.

One of 2.5 psychologist supervisor positions was filled for a vacancy rate of 60 percent. All three senior psychologist specialist positions were filled.

Of the 21.5 staff psychologist positions, 14 positions were filled for a vacancy rate of 35 percent.  Contractors covered 0.92 vacancies resulting in a functional vacancy rate of 31 percent. Six or 40 percent of staff psychologists were unlicensed.

KVSP had one registry psychiatric nurse practitioner providing services at the time of the site visit.

All five telepsychiatrist positions were filled.

The supervising clinical social worker position was filled. Nine of 10.5 clinical social worker positions were filled for a 14 percent vacancy rate, and 0.87 registry staff reduced the functional vacancy rate to six percent. One clinical social worker was unlicensed.

The MHSDS registered nurse position was filled.

The senior psych tech position was filled. Of 31 psych tech positions, 28 were filled for a vacancy rate of ten percent.

Six recreation therapists filled 5.5 established recreation therapist positions.

Eleven of 11.5 MHSDS clerical staff positions were filled, for a vacancy rate of four percent.

The OSS II position was filled, while the CHSA position was vacant.

There were 833.2 established custody officer positions, of which 779 were filled, and 71 were on extended leave, resulting in 708 filled positions and a vacancy rate of 15 percent.

Telepsychiatry:

Telepsychiatry was used in all 3CMS IDTTs. On Facility C, the telepsychiatrist did not speak during IDTTs for patients who were not prescribed psychiatric medication. There were no observed problems with telepsychiatry on Facility B. Telepsychiatry was at times used for alternative housing patients.

Quality Management:

Local governing body, quality management committee, and mental health subcommittee meetings occurred with appropriate frequency and attendance throughout the review period. No

meetings were canceled. Appropriate staff was present at each meeting, and quorums were met. Review of meeting minutes for each entity revealed thorough and appropriate data analysis and action plans based upon specific goals and benchmarks. Meeting minutes referenced agenda items and initiatives from previous meetings as appropriate and provided proper updates and feedback on action plans. Leadership reported close involvement in quality management matters, including review of lower-level subcommittee meeting minutes and agendas. Line staff reportedly received direct feedback and directives from supervisors when quality management procedures and audits revealed problem areas and needs for improvement.

Local governing body meetings were held quarterly. Meetings during the review period were held in September and December of 2021. Per meeting minutes, both meetings opened with the approval of the previous meeting minutes and review of pending action items from the previous meetings. In the September 2021 meeting, the members reviewed three CTC policies for approval. The local governing body also discussed licensed areas' incident report audits, and there were no California Department of Public Health deficiencies to report at the time of the meeting. The body discussed credentialing and decided that the CHSA II would assume credentialing responsibilities until a new credentialing coordinator was established.

At the December 2021 meeting, pending action items involved laundry and personal alarms. The body also discussed its purpose and whether it should be revamped. The Chief Executive Officer (CEO) and warden requested further review prior to any changes. There was also discussion of CTC policies and procedures. Regarding licensed areas incident report audits and credentialing, there were no issues reported for the last quarter. The local governing body decided the CHSA II was to implement a credentialing meeting to include the CME, Chief Physician & Surgeon, Supervising Dentist, and chief of mental health.

QMC meetings discussed and reviewed multiple departments and subcommittee initiatives at each meeting, including the MHPS, ISUDT, PIA, plant operations, the patient safety committee, the EMRRC, the medication management subcommittee, CMHPP, the Office of the Inspector General (OIG) Cycle 6 draft report, the Employee Health and Safety visit, quality management report changes, and the status of various green belt projects.

QMC meeting minutes indicated that the committee closely tracked and monitored several significant and ongoing issues related to the delivery of mental health services. The QMC utilized CDCR's rate of 85 percent to assess compliance. Throughout the review period, timely transfer of MHSDS patients out of stand-alone administrative segregation did not meet compliance and was consistently an area of concern and discussion for the committee. The QMC tracked several green belt projects across several departments, including a green belt project focused on improving EOP treatment hours. This project was tracked through its various phases and EOP treatment hours offered were able to meet the committee's compliance goal during the reporting period. HLOC documentation compliance was not consistently achieved, with varying compliance from month to month, and remained a high priority throughout the monitoring period. During the review period, HLOC documentation varied widely, from a low of 59 percent compliance in September 2021 to a high of 94 percent compliance in December 2021 and decreasing to 74 percent in January 2022 (latest reported). At the end of the review period, KVSP had not met compliance for three consecutive months as required.

Reviewed MHPS meeting minutes indicated that the MHPS consistently addressed several focus areas; agenda items included green belt projects and mental health performance metrics. The MHPS closely tracked and monitored several priorities identified by ongoing regional sustainable process CAPs and regional SPRFIT tour CAPs: custody suicide prevention

check sheets (CDCR 7497) documentation, HLOC documentation, and EOP treatment hours offered. The committee addressed HLOC documentation at each meeting.  The subcommittee also discussed a treatment cancellation plan and staffing vacancies.

There were no QITs or FITs during the review period despite documentation deficiencies; however, several PWIPs were developed to address noncompliant areas.

There was no peer review during the review period per statewide directive.

Medication Management:

KVSP provided MAPIP results for September 2021 through February 2022 regarding compliance for psychiatric diagnostic monitoring and nursing measure compliance results.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that KVSP was compliant with obtaining medication consent, and checking blood pressure, height, weight, and thyroid tests for all six months of the review period.  AIMS was compliant for four months, and noncompliant for two.  EKG monitoring was compliant for three of four required months. For glucose (blood sugar) monitoring, KVSP was compliant for two months and noncompliant for four months.  For both CBC with platelets and CMP, the facility was compliant for one of six required months.   Finally, for measuring lipids, the facility was noncompliant for the entire review period.

KVSP was not an authorized clozapine initiation or maintenance facility.

For required monitoring of antidepressants, the institution was compliant for all six months in obtaining medication consents and thyroid tests, and for checking blood pressure for patients taking venlafaxine.  For checking EKGs where required, KVSP was compliant for two of three required months.

For patients prescribed carbamazepine, the facility was compliant with checking CBC for all five required months. Complete metabolic panels were compliant for four of five required months. Regarding medication consent, KVSP was compliant for all four required months.

Medication consent documentation for patients prescribed Depakote were compliant for all six months during the review period. For both CBC and CMP, KVSP was compliant for two of six months.

For lamotrigine, the facility was compliant in obtaining medication consent for all six months of the review period.

As for lithium, KVSP was compliant with medication consent for the five required months. KVSP's monitoring of lithium levels was compliant for three of six months and noncompliant for the remaining three. Both checking kidney function tests and checking thyroid tests were compliant for two of six months, and noncompliant for four months. Finally, KVSP was compliant with checking EKG for only one of four required months.

For medication management metrics reported by mental health headquarters, KVSP was noncompliant with the following measures for all months during the reporting period: continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU); continuity of medications for MHCB transfers; observation of medication preparation of HS medications; observation of medication preparation for AM and PM medications; chronic care medications historical administration; and psychiatric outpatient provider new medication orders. For continuity of medications upon inter-institutional transfer at R&R, the facility was compliant for only two months. For continuity of medications with intra-institutional transfer to ASU/SHU/PSU, the facility was compliant for four months. For continuity of medications from discharge/transfer from a community hospital and/or DSH, KVSP was compliant for three of six

months.  For continuity of medications upon parole/transfer to the community, KVSP was compliant for all six months.  For both medication compliance with involuntary medications court orders, and compliance with psychiatrists' involuntary medication orders, the institution was compliant for five of six months.

KVSP was timely in the administration of HS medications.

Of the 857 total patients on psychiatric medications, 23 had KOP medications prescribed.  All of these prescriptions were for SSRIs written for patients at the 3CMS level of care.  There were 853 patients prescribed at least one DOT medication.

Pill lines frequently ran over two hours.  Institutional leadership reported that the major cause of this was the number of patients prescribed Suboxone (buprenorphine/naloxone).  Used for MAT for patients with opiate use disorder, the medication reportedly took additional time to dispense, and the patient must be monitored after administration.  The medication management committee raised this issue to the QMC.  Institutional leadership reported that they had asked for guidance from both the Division of Adult Institutions (DAI) and CCHCS.

KVSP reported ongoing challenges with not having a place protected from the elements for patients to wait while in pill lines.  Data for wait times for individual patients was not provided.  Patients generally reported ten to 20 minute waits.

Transfers:

During the November 2021 minor sustainability review, KVSP had not "met expectations" for sustainable process reviews since the third quarter of 2019.  Problems identified during the November 2021 review pertained to level of care documentation, HLOC discussions during EOP IDTTs, and MHCB discharge decisions.  At that time, multiple CAPs were recommended, including additional audits, supervisory oversight, and training.

The November 2021 minor sustainability review also referenced specific MHCB patient discharges that were concerning.  One patient was referred to intermediate care and discharged to await transfer on the yard; however, the reviewer noted the IDTT did not document an adequate discharge rationale.  A few hours after MHCB discharge, this patient engaged in self-harm, was readmitted to the MHCB, and ultimately required a referral to acute care.  A second patient of concern was removed from MHSDS at the time of the MHCB discharge, despite being 3CMS at the time of admission.  The reviewer found clinical documentation did not support the decision to remove this patient from MHSDS.  A third patient referenced in the sustainability report was discharged from the MHCB without documented evidence of stabilization and completion of a SRASHE, despite being admitted for self-harm and suicidal ideation.

During the site visit, the monitor's expert was provided the March 2022 sustainable process report.  This report noted KVSP received a passing score for the first time in three years, with compliance for HLOC consideration documentation "above threshold" at 88 percent. Improvements were reportedly observed in HLOC non-referral rationales, documentation quality, and interrater reliability between the headquarters' reviewer and KVSP's inpatient coordinator.  Despite some improvements noted in the most recent sustainable process report, the headquarters' reviewer recommended KVSP address ongoing problems with timely and accurate entry of acute and intermediate care referrals, rationales for lower level of care decisions, and measurable treatment goals for EOP level of care patients.

During the review period, KVSP considered but did not refer patients to a HLOC in 286 instances.  Some of the reasons for non-referral included that the patient was not in an MHCB, no MHCB admission within the past ten days, no mental health evaluation completed within the past three months, or no previous multiple referrals to the MHCB.

All ten acute care referrals from KVSP were generated by the MHCB.  Two of ten acute care referrals were rescinded.  None of the remaining eight patients transferred within ten days, as required by the Program Guide.

KVSP made 13 referrals to the intermediate level of care during the review period.  Three patients were transferred timely; five referrals were rescinded.

There were no patients pending transfer to acute care or intermediate level of care at the time of the site visit.

KVSP held *Vitek* hearings for three patients referred to an acute level of care; one patient prevailed.

None of the KVSP patients who required transfer to a PIP or DSH had complex medical needs that impacted their transfer during the reporting period.

KVSP referred 154 patients to the MHCB; 56, or 36 percent were admitted; 98, or 64 percent were rescinded.

As KVSP had its own MHCB, internal transfers were immediate.  Most referrals to the MHCB at KVSP were from other institutions.

During the review period, the clinical length of stay in the MHCB averaged 5.5 days, and physical length of stay averaged 7.2 days.  Eleven patients had physical discharge dates beyond ten days.  The average daily census in the MHCB during the reporting period was 12 patients, while the census at the time of the site visit was four patients.

Three EOP patients were pending transfer to PSU; two were waiting longer than 60 days.  No explanations were provided for the late PSU transfers.

During the review period, seven patients were transferred to an EOP administrative segregation hub.  One patient's transfer took 77 days due to a pending district attorney referral and completion of the RVR.

Programming:

Short-Term Restricted Housing:

In a report dated March 16, 2022, KVSP reported there were 91 MHSDS patients in the STRH with a total length of stay of 49 days.

Nineteen STRH patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

Of the 15 patients requiring initial psychiatric evaluations, 12, or 80 percent, were compliant, and 27 percent were conducted in a confidential setting.  Nonconfidential evaluations were due to patient refusals.

All 12 patients expected to be seen for routine psychiatric contacts had timely contacts; 45 percent were done in a confidential setting.  All non-confidential contacts were due to patient refusals.  Almost all contacts were completed by a psychiatric nurse practitioner.  Generally, the patients reviewed were seen for routine psychiatric contacts more frequently than the minimum required by the Program Guide.

All 15 patients that required initial PC contacts had timely contacts; 27 percent were conducted in a confidential setting.  The nonconfidential contacts were due to patient refusals.  For the 18 patients expected to be seen for PC routine contacts, 68 percent occurred within seven days and were compliant; 22 percent were done in a confidential setting.  Nonconfidential contacts were due to patient refusals.

Fifteen reviewed patients required initial IDTTs; 80 percent were compliant.

542

All 13 patients who required routine IDTTs had timely IDTTs.  Required staff attended all initial and routine IDTTs.  Of note, while a PC and psychiatrist were in attendance, it was unable to be determined for every case if the assigned treatment providers were in attendance as required by the Program Guide.

The monitor's expert observed four IDTTs in STRH.  Three were initial IDTTs, and one was a routine IDTT.  The IDTTs were appropriately staffed.  The process was collaborative, and the monitor's expert observed relevant input from each participant.  The correctional counselor participated actively, using a computer to access the patient's information.  The correctional counselor appeared familiar with and knowledgeable about each patient and where each patient was with regard to custody status and process.  For each IDTT, the PCs provided the patient's relevant clinical and psychosocial history, which was described thoroughly and extensively.  Case conceptualizations were appropriate.  The PCs presented their patients appropriately and included early life experiences, psychosocial factors, and cultural factors which were impacting the patients' presentation and treatment.  The diagnoses and symptoms were clearly stated and explained for each patient, with in-depth discussion of how the patients' symptoms impacted functioning and may have contributed to RVRs or behaviors.  The PC and psychiatrist consistently agreed on diagnoses.  For each patient, the psychiatrist identified the name and purpose of each prescribed medication and discussed effectiveness and side effects with the patient who was present for his IDTT.

For the routine IDTTs, the team discussed the patients' progress and response to treatment since the last IDTT.  There was also discussion of current mental status, requirements for a reduction in the level of care, and requirements for discharge from the MHSDS for each

patient.  The correctional counselor discussed custody levels, placement options related to level of care concerns, and ICC scheduling/status for each patient.

Regarding treatment planning, treatment goals were clearly stated for each patient. Appropriate group referrals were made in the initial IDTT meetings held in absentia.  For the patient who was present for his IDTT meeting, the team engaged with the patient in the goals discussion, asking him about his own goals and whether he wanted to add any goals to the treatment plan.  He was also asked to restate his treatment goals in his own words to ensure understanding.  The goals for each patient were clearly identified, measurable with realistic timelines, individualized for each patient based on the case formulation, and gave consideration to relevant clinical and psychosocial factors.  Goals varied between patients, but primarily focused on reducing symptoms and related impairments and increasing patient stability and functioning.  Interventions for each patient were also clearly stated, with clear identification of clinician responsibilities and timelines for implementation and completion.  Interventions were also individualized, appropriate, and flexible based on symptom severity and level of engagement with treatment.

Safety concerns and substance abuse concerns were discussed in the IDTTs as appropriate.  For example, the team discussed safety for a patient with a hanging attempt last year and discussed substance use disorder history and effectiveness of substance use disorder programming for a patient who currently received MAT.  For each patient, there was a thorough discussion of justification for current level of care using the case conceptualization and clinical data.

The monitor's expert observed three ICCs in STRH.  Overall, the ICCs were properly staffed, questions and information provided by staff were relevant and appropriate, and patients

were involved and contributed to their ICC. Each meeting consisted of an introduction of the patient and the attendees, review of the patient's current status, and the purpose of the meeting. The mental health supervisor actively participated in each ICC by providing a review of the patients' current mental health status, a brief mental health history, and current treatment summary for each patient presented. The mental health supervisor also engaged directly with each patient. Both the mental health supervisor and deputy warden appeared to be intentional in their efforts to ensure each patient understood the purpose and process of the ICC.

During the review period, KVSP offered 16 groups in STRH, including four groups designated as EOP overflow groups. There were nine coping skills groups, one anger management group, one depression management group, one leisure group, and four EOP overflow groups. EOP overflow groups were utilized when one of the scheduled groups was full. Groups were held Monday through Thursday with group times scheduled throughout the day.

Patients reported that psych techs provided in-cell activity packets. Documents reviewed showed that STRH patients were offered therapeutic workbooks and interactive journals. These workbooks and journals were intended to be completed in cell between sessions with the PC and targeted specific mental health symptoms and presentations including self-esteem, coping skills, managing emotions, healthy thinking, victim awareness, anger management, grief and loss, substance abuse, and distress tolerance skills.

Review of CDCR Form 114As for patients typically reflected the offering of a minimum of 18.5 hours of weekly yard, three weekly showers, and phone calls every two weeks, which interviewed patients confirmed. Staff reported that custody staff shortages impacted yard daily.

The cells had electricity access outside the cells and patients who received their property after ICC were able to plug in their personal televisions and radio.

The monitor could not conduct a complete review of timely initial ICCs as the 114A records were sent to the records department for scanning into SOMS at the end of each month.

When interviewing STRH custody staff, the information provided describing the procedure for unclothed body searches was consistent with KVSP's LOP.  The STRH contained private areas to conduct unclothed body searches, namely, single holding cells and patients' cells.

Non-Disciplinary Segregation:

During the review period, there were a total 68 patients identified as NDS.  Of the 68, one was an MHCB patient, 17 were EOP patients, and 50 were 3CMS patients.  KVSP approved 62 patients for accelerated transfer, of whom five were transferred within policy timelines.  Patients approved for accelerated transfer who were transferred late ranged from one to 188 days late. Staff reported movement had recently started again per the Roadmap to Reopening.

The issuance of property to NDS patients was reviewed by the monitor.  The monitor found that staff were compliant with policy.

MHCB:

KVSP's licensed CTC included 12 MHCBs, four of which were occupied at the start of the site visit.  One patient was placed in restraints during the review period.

There were eight patients with three or more MHCB stays during the review period reported by KVSP.  Of the eight patients, one patient had five stays, three patients had four stays, and four patients had three stays.

The MHCB was staffed by one licensed senior psychologist, two licensed and one unlicensed psychologist, one registry psychiatrist, and one registry clinical psychologist.

Although psychiatrists and psychologists were within the established ratios, there were coverage and continuity of care concerns. For instance, the assigned psychiatrist reported they were often pulled from the MHCB to cover EOP caseloads and MHCB staff reported that the chief psychiatrist often provided MHCB coverage during weekends and backup coverage throughout the week.

Per the MHCB supervisor, PCs were not assigned to patients in the unit; thus, PCs could cover different patients on any given day and "switch off" when they needed a break from certain patients. The monitor's expert noted that this practice raised continuity of care concerns. PCs assigned to the MHCB also managed patients in alternative housing cells, responded to CIT referrals during normal business hours, and carried caseloads of CTC medical patients included in the MHSDS.

KVSP's MHCB did not have an assigned recreation therapist. Recreation therapy services were only offered when recreation therapists from other programs volunteered for overtime hours on weekends. Staff reported that indoor treatment groups were not available as the MHCB had only one TTM. When recreation therapy services were offered, they typically occurred on the three CTC solo yards or indoors with one patient placed in a TTM. The solo yards did not offer ideal space for recreation therapy services, and patients reportedly refused yard during extreme temperatures.

Telepsychiatry was not utilized in the MHCB during the review period.

Ten charts were selected for review for compliance with Program Guide timeframes in the MHCB. All ten initial psychiatry and PC evaluations were timely completed. For the psychiatry initial evaluations, three were completed in a confidential space or were completed at cell front due to the patients' refusal; the remaining seven were either held in a non-confidential

space or the space where the evaluation took place was unknown.  For PC evaluations, one was reported as held in a confidential treatment space, one was completed by telehealth, and one was held at cell front due to the patient's refusal.  The remaining seven were seen in a non-confidential treatment space or the place for the assessment was unknown.

For required initial and weekly IDTTs, 17 of 18, or 94 percent were compliant.  Additionally, all ten patients had timely discharge IDTTs; all the IDTTs had the required attendees present.  Patients were present for 14 of 18 IDTTs held in the MHCB.

All twice weekly psychiatry contacts were timely, but only 52 percent were confidential.

All, except one, of the daily PC contacts did not occur, or 98 percent.  Of the PC daily contacts, 44 percent were held in a confidential setting.

The LOP provided by the institution for the MHCB was current.

Observed IDTTs were inadequate.  All required attendees were present with computer access; however, the meetings were disorganized and lacked interdisciplinary collaboration.  Diagnostic and treatment planning decisions were determined by the PC and psychologist supervisor without input from the assigned psychiatrist.  Psychiatry waited for their turn to speak during the meeting and limited their contributions to naming the prescribed medications and asking patients about side effects.  Psychiatry did not mention diagnosis or whether they agreed with level of care decisions and other non-medication treatment recommendations.

One patient endorsed current thoughts of suicide during the IDTT; however, clinicians did not assess for intent, discuss safety planning, or provide a rationale for maintaining this patient on 15-minute checks instead of 1:1 suicide watch observation.  Another patient's PC inappropriately used the IDTT to complete an initial assessment with very detailed and personal questions in the presence of nine staff members, including two custody officers and two

correctional counselors.  The monitor's expert also noted this PC's assessment questions were leading, instead of open-ended, and that the patient struggled to keep up with the rapid pace of questioning.  At times, the clinician was also unwilling to wait for the patient to respond to her questions, and would blurt out her own assumptions, which were often inaccurate.

MHCB staff reported and were observed to adhere to the policy for mechanical restraints in the MHCB.  Staff indicated handcuffs were used during escort only when staff was concerned about the potential for violence or when patients were maximum custody.

Nursing staff facilitated an observed shift change meeting.  The facilitator provided relevant patient updates and other useful information for the incoming shift.  The meeting was collaborative and covered necessary topics, including new arrivals, discharges, medication compliance, patient complaints, observation levels, and behavior concerns.  A few staff members added meaningful input during the meeting.

Although staff reported there was a sergeant in the unit who managed de-escalation appropriately, the monitor's expert noted KVSP's MHCB operated like an ASU.  For example, all patients, regardless of custody status, were placed in locked TTMs for mental health assessments and individual contacts.  During IDTTs, the only instance when TTMs were not used was when an officer stood next to the patient.  All mental health clinicians in KVSP's MHCB were required to wear protective vests.  Interviewed MHCB clinicians reported that the use of locked TTMs for all mental health contacts was a custody decision.

Interviewed MHCB staff reported that patients were afforded full issue of clothing and allowable items unless clinically contraindicated and documented.  The MHCB supervisor explained that MHCB staff followed policy regarding reviewing and updating orders for allowable items, level of observation, and mechanical restraints.

CIT:

During the reporting period, KVSP reported 209 patients were seen by the CIT.  Of the 209 patients seen, nine were MHCB, 77 were EOP, and 109 were 3CMS.  The remaining 14 incarcerated persons were non-MHSDS.  For those patients seen by the CIT, the most significant concern was suicide ideation.  The institution reported less than eight percent of the patients seen by the CIT were admitted to the MHCB.  However, KVSP reported that usually when a patient was seen by the CIT, the outcome was to return the patient back to his housing.

Alternative Housing:

KVSP reported a total of 154 referrals to alternative housing, with 56, or 36 percent, admitted to MHCBs and 98, or 64 percent, rescinded.  Of the 56, 55 or 98 percent were transferred within the 24-hour timeline.  The noncompliant transfer was 33 minutes over the 24-hour timeline.

There were no patients in alternative housing during the site visit.  The 16 designated alternative housing cells were wet cells with a sink and toilets.  Cleaning logs were completed and current.

KVSP reported that telepsychiatry was used for alternative housing patients "on occasion" during the review period; however, the frequency was unknown.

EOP:

KVSP admitted 240 EOP patients during the reporting period and the average length of stay was 108 days.

The EOP psychiatrist exceeded the caseload ratio by 35 patients, but PCs were within the ratio.  KVSP had one civil service psychiatrist; thus, the chief psychiatrist took nightly calls and initial PC 2602 applications.

Nineteen records were reviewed to assess timely psychiatric and PC contacts and IDTTs in the EOP program.

Thirteen patients required initial psychiatric contacts during the review period. Ten or 77 percent of required initial psychiatric contacts were assessed as compliant as the contact occurred before IDTT and within 14 calendar days of arrival. No initial psychiatric contacts were conducted via telepsychiatry. Eight of 13, or 62 percent, were not conducted in a confidential setting, due to patient refusals.

For 17 patients, 28 percent of routine psychiatric contacts occurred within 30 days and were compliant; 56 percent were done in a confidential setting. Reasons for appointments not being conducted confidentially were primarily related to patient refusals. One reviewed routine psychiatric contact was conducted via telepsychiatry.

All 13 patients who required initial PC contacts during the review period had timely contacts. Eight of 13, or 62 percent of initial PC contacts were conducted in a confidential setting; those not performed confidentially were due to COVID-19 precautions, mental health or custody modified programs, or patient refusals.

For all 19 patients, 85 percent of routine PC contacts were compliant, and 56 percent were conducted confidentially. The reasons provided for appointments not being confidential included COVID-19 precautions, mental health or custody modified programs, and patient refusals.

Fourteen patients required an initial IDTT during the review period, of which 12 or 86 percent occurred within 14 calendar days and were compliant. All required staff members were present at IDTTs; however, it could not always be determined whether the assigned treatment provider attended.

For ten patients, 87 percent of routine IDTTs occurred within 90 days.  All required staff members were present at IDTTs.  Patients were present for 56 percent of routine IDTTs.  Reasons for their absence included COVID-19, custody modified programs, and refusals.

For the reporting period, KVSP offered an average of 12.24 hours of structured treatment activities per week, ranging from 7.64 to 15.9 hours.  All weeks were above ten hours, with the exceptions of one week in October 2021 (7.76) and November 2021 (7.64).  KVSP reported that 93 percent of patients were offered at least ten hours of structured treatment activities per week.  Leadership confirmed that in-cell activities were counted toward offered structured therapeutic activity hours during COVID-19 related modified programming

The monitor's expert observed a clinician led, mainline EOP group.  The location was confidential and adequate in terms of space, light, temperature, and limited background noise.  The group started seven minutes late due to patients arriving late.  The group leader was active, engaged, and presented clinically relevant information.  The majority of patients participated on their own.  One participant who did not was encouraged to participate.  The clinician established good rapport and translated therapy ideas into real-life situations the patients might face during incarceration.

EOP staff reported that groups frequently started 15 minutes late due to custody releasing patients at the time of the scheduled group, which did not allow patients to arrive on time.  Also, challenges such as breakfast and pill lines running late caused delays in starting groups.

The monitor's expert observed the IDTTs for five EOP patients.  The IDTTs started on time.  The space was a confidential location which was adequate in terms of space, light, and temperature.  All required team members were present, along with the recreation therapist and

supervising psychologist.  Computers were present and actively used by all disciplines during the meetings.  The CC I was active, engaged, and contributed useful information.

The purpose of the IDTT was generally discussed with the patient.  For the two initial IDTTs, the PC and the psychiatrist had both met with the patient prior to the IDTT.  Clinical and psychosocial histories were variable but, in general, contained germane information.  Case conceptualization was clinician dependent.  The PC and the psychiatrist agreed on diagnoses. The degree of progress since the prior IDTT was discussed, with patient input.  In each case, the symptoms presented appeared consistent with the diagnosis.  The psychiatrist routinely reviewed psychiatric medications, including names, indications, side effects, and medication adherence. For initial IDTTs, referral to groups was not formally discussed; however, both patients had already begun attending groups.  Group attendance was discussed in general terms, without percentages given.  The treatment team discussed the degree of participation in groups in one case.  Functional impairments were generally discussed, including ADL, leaving cell, and going to yard.

The treatment team did not formally discuss indicators for HLOC.  In one case, the supervisor brought up the possible need to consider a HLOC, due to the patient engaging in self-injurious behavior.

While all disciplines participated, the interactions were not robust interdisciplinary discussions.  The supervising psychologist facilitated the team in an effective and clinically useful manner.  However, without guidance from the supervising psychologist, the discussion would have had much less clinical utility.

Regarding individualized treatment plans, many of the IPOC goals were vague and broad, such as reducing depression to a certain level by the time of the next IDTT.  Safety planning was

limited.  While prior dangerousness to self and others, as well as present ratings, were discussed, formal safety planning besides requesting to see the PC or psychiatrist was limited.  Substance use was discussed in relevant cases.  The option of MAT was not discussed.

While estimated parole/release dates (EPRDs) and BPHs were discussed with the patients, transition/pre-release planning was not discussed in appropriate cases.

The monitor's expert randomly selected ten patients from KVSP's EOP patient rosters in order to evaluate the quality of care and clinical documentation.  Treatment plans were inadequate, most notably for the quality of clinical summaries and setting specific and realistic goals appropriate to the prison setting.  Justification for continued treatment in EOP was usually clear.  The quality of HLOC non-referral rationales was clinician-dependent.  The rationale for patients receiving modified EOP treatment was often unclear.  Safety planning was appropriately documented in 90 percent of reviewed cases.

The monitor's expert interviewed a group of seven mainline EOP patients.  The EOP patients reported challenges with custody.  They stated that there was inconsistency with third watch officers, with the result being that some officers were not familiar with dealing with patients with mental health concerns.  They stated that custody was engaged in leisurely activities during times in which patients should be being escorted.  Patients reported concerns for boundaries between custody and both mental health and nursing.

3CMS:

Interviewed 3CMS patients reported timely contacts with PCs and psychiatrists.  However, they were not aware of required minimums until the monitor's expert provided this information.  None of the interviewed patients met with providers more frequently than required minimums.  The patients did, however, report that mental health staff responded timely to their

requests for as-needed contacts.  The 3CMS patients were not aware of any problems with custody staff interfering with mental health treatment or issues with accessing mental health care in general.

3CMS telepsychiatrists were within caseload ratios.  PCs exceeded caseloads with a range of four to 49 patients.

EHRS reviews were completed on 18 cases to assess compliance with psychiatric and PC contacts, and IDTTs.

Six patients required initial psychiatric evaluations during the review period.  Five of six or 83 percent were compliant with Program Guide requirements.

For routine psychiatric contacts, 90 percent occurred within 90 days and were compliant. All routine psychiatric contacts were conducted in a confidential setting and 94 percent were conducted via telepsychiatry.

All six patients who required initial PC evaluations during the review period had timely evaluations; four of six, or 67 percent, were conducted in a confidential setting.

For routine PC contacts, 89 percent occurred within 90 days and were compliant; 31 percent were conducted in a confidential setting.  Reasons for contacts not being confidential included mental health staffing shortages and patient refusals.

Six patients required initial IDTTs during the review period.  Four of six or 67 percent occurred within 14 working days and were compliant.  Patients were present at 67 percent of initial IDTTs.

All four patients who required routine IDTTs had timely annual IDTTs.  Both initial and routine IDTTs were attended by required staff.  Patients were in attendance at their IDTTs 25 percent of the time, with reasons for IDTTs being held in absentia including COVID-19

precautions and refusals.  Required staff members attended all or 100 percent of the initial and routine IDTTs.

During the review period, KVSP's 3CMS treatment groups were limited to two transgender groups.  All other groups were suspended, including step-down groups for EOP patients transitioning to the 3CMS level of care.  Interviewed 3CMS patients requested the resumption of mental health treatment groups, especially core groups that might be beneficial for BPHs.

3CMS IDTTs were observed on Facilities B and C.  All required attendees were present with computer access.  Telepsychiatry was used during all 3CMS IDTTs.  The observed 3CMS IDTTs were non-collaborative, missing critical information for adequate treatment planning and risk management, and lacked useful interventions to address concerns raised during the meetings. The IDTTs failed to discuss case conceptualizations, measurable treatment goals, necessary treatment plan modifications, and level of care rationales.  For several patients, level of care was not discussed at all.

IDTTs on Facility C appeared rushed for no apparent reason.  When the monitor's expert arrived at Facility C for IDTT observation, one custody officer indicated mental health staff had assured him the current patient's IDTT would be completed "in no more than two minutes."  One PC on Facility C did not reference treatment planning at all and instead used the IDTT to briefly "check-in" with patients.  The telepsychiatrist on Facility C generally did not speak during IDTTs for patients who were not prescribed psychiatric medication.

During IDTT observation on Facility B, two patients presented with objective signs of depression and endorsed worsening symptoms.  One of these patients was new to the MHSDS and expressed disappointment that he had not met with mental health staff since his inclusion in the program, adding that he felt regular contacts might help him get through a difficult time.

While the PC indicated both depressed patients would benefit from more frequent contacts, the clinician failed to determine clinically indicated frequencies during IDTT, modify the treatment plan, and schedule the appointments accordingly.  Instead, the clinician inappropriately informed the patients they would need to regularly fill out and submit healthcare request forms "every other week, but not weekly" and include "a detailed explanation" to trigger the clinician's memory regarding the rationale for additional contacts.

The monitor's expert noted that clinicians should be scheduling mental health contacts in accordance with treatment recommendations, as this practice allowed for better tracking of 3CMS patients with elevated risk, required much less time and effort for the clinician than the patient, and might prevent further decompensation resulting in referrals to a HLOC.

Another 3CMS IDTT for Male Community Reentry Program (MCRP) clearance was very concerning.  The IDTT informed the patient they would be cleared for MCRP on this date, celebrated the patient's accomplishment, and allowed the patient to share their excitement about the program.  Subsequently, the supervisor interjected and asked whether the IDTT had checked the patient's records for a pending offender with a mental disorder (OMD) evaluation, adding that other patients had been unable to participate in MCRP when the OMD evaluations were required.  After the IDTT confirmed the pending OMD evaluation in the record, they informed the patient that MCRP was unlikely as the OMD evaluations were occurring very close to patients' actual release dates.  At this point, the PC informed the patient she had "heard" removal from MHSDS might speed up the process and asked whether the patient would consider removal.  However, removal from MHSDS was not discussed with the IDTT, and the PC did not know whether it would help this patient achieve his goal of participating in MCRP.  The patient did not agree to the MHSDS removal.

The monitor's expert noted that this patient was clearly saddened by the outcome of this IDTT; however, the meeting ended, and the patient returned to their housing unit without mental health staff appropriately intervening or mentioning a plan to follow up on this date. The monitor's expert discussed this case with leadership, noting that the 3CMS supervisor described the MCRP issue as an increasingly common occurrence and that staff should be informed and reminded to review relevant records prior to each IDTT. The expert also recommended leadership provide training on the appropriate delivery of bad news and follow up interventions.

Other Issues:

Pre-Release Planning:

KVSP had one institutional mental health pre-release coordinator, who was a licensed clinical social worker. In addition to duties as the pre-release coordinator, she had a caseload of 18 patients in the STRH and covered patient mental health evaluations when needed.

KVSP reported that 44 patients were scheduled for release during the reporting period. The pre-release coordinator reported that she initiated the PRPA and the Request for Information (ROI) within 30 to 45 days prior to patients' scheduled release. However, no records of meetings with the patient or any service providers were kept by the pre-release coordinator.

Although the institution reported that groups were scheduled for several days during each week, pre-release groups did not consistently occur over the previous two years due to the pandemic. The pre-release coordinator reported that 3CMS groups were not occurring due to staffing challenges and the lack of available group space.

The pre-release coordinator initiated required documentation, which was forwarded to the patient's PC for completion. Once completed, it was forwarded to the appropriate county probation office. The pre-release coordinator reported good communications with probation

offices in the community and that they coordinated with the parole services analyst for patients who were released to parole, particularly regarding patient referrals to the Specialized Treatment for Optimized Programming (STOP) Housing Program.

The pre-release coordinator and the TCMP workers attended a bi-weekly ISUDT pre-release group which was reported to be helpful for collaboration on patient releases. A good rapport with TCMP workers was reported by the pre-release coordinator. The pre-release coordinator also attended a monthly meeting with headquarters and all other institutional pre-release mental health coordinators.

Program Access:

a.   Job and Program Assignments:
On March 4, 2022, KVSP reported that of 1,327 available jobs, 28 EOP patients, or 21 percent of the EOP population, held job assignments. For 3CMS patients, 356 or 34 percent of the 3CMS population held job assignments, and for non-MHSDS incarcerated persons, 943 or 42 percent of the non-MHSDS population held job assignments.

For the 756 academic assignments, KVSP reported that no EOP patients held assignments. For 3CMS patients, 240 or 23 percent of the 3CMS population held these assignments and for non-MHSDS, 516 or 23 percent of the non-MHSDS population held assignments.

Of 256 vocational education assignments, one or one percent of EOP patients held assignments, as did 84 or eight percent of 3CMS patients and 171 or eight percent of non-MHSDS incarcerated persons.

Of 406 voluntary education assignments, no EOP patients held assignments, 83 or eight percent of 3CMS patients, and 323 or 14 percent of non-MHSDS incarcerated persons held them.

The nine substance abuse treatment assignments were held by non-MHSDS incarcerated persons.

b.  Milestone Credits:

During the reporting period, 126 of 134, or 94 percent, of EOP patients were eligible to earn milestone credits and 63 percent earned credits.  For 3CMS patients, 961 of 1,039, or 92 percent, were eligible to earn milestone credits, with 14 percent earning credits.  For non-MHSDS incarcerated persons, 2,034 of 2228, or 91 percent were eligible to earn milestone credits, with 17 percent earning credits.

Out-of-Level Housing:

KVSP reported that 18 non-MHSDS Level I incarcerated persons were placed in Level IV housing.  There were 29 non-MHSDS Level II incarcerated persons placed in Level I housing.  Two 3CMS Level II patients and 22 non-MHSDS Level II incarcerated persons were placed in Level IV housing.  There were 24 3CMS patients and 88 non-MHSDS Level III incarcerated persons placed in Level IV housing.

c.  ADA Reasonable Accommodations and Grievance Procedures

KVSP provided training rosters and attendance sheets that demonstrated compliance with the implementation of ADA accommodations and grievance procedures to accommodate psychiatric disabilities.

Case-by-Case Reviews:

The institution conducted 66 ICC long-term segregated case reviews during the review period.  The monitor reviewed 19 ICC chronos, including 17 patients at the 3CMS level of care, and two patients at the EOP level of care.  One patient was released from segregation at the ICC, and the remaining 16 patients were retained in segregation pending a decision by the district attorney to prosecute the patient or pending completion of a RVR.  The ICCs documented

completion of projected MERDs in the event the patient was found guilty of the RVR and conducted pre-MERDs based on the projected MERDs. The monitor noted lengthy decision delays by the district attorney. ICC documentation reported multiple contacts with the district attorney's office to try and obtain a decision.

"C" Status:

During the site visit, staff reported that there were a total of 42 incarcerated persons on "C" Status. Of the 42, 22, or 52 percent, were 3CMS patients. The remaining 20, or 48 percent, were non-MHSDS incarcerated persons. The average length of stay on "C" Status was 165.2 days, ranging from 90 to 180 days.

Mental Health Referrals:

KVSP reported a total of 2,721 mental health referrals during the review period; 992 were to psychiatrists and 1,729 were to PCs. Psychiatry and PC emergent and psychiatry routine referrals were compliant, while psychiatry and PC urgent referrals were noncompliant at 81 and 89 percent, respectively. Routine PC referrals were noncompliant at 84 percent.

Treatment Space:

In the STRH, treatment space consisted of the group room or small treatment rooms. There were six smaller treatment rooms, two were near the front of the building near the mental health offices, and four were in the rear of the building. Each consisted of a TTM and a small area where the clinician could stand. The rooms had doors that could be closed for increased privacy.

As MHCB staff were required to meet with patients in a TTM, treatment space was unnecessarily limited to one shared confidential interview room within the CTC. Although other space was observed in the unit, these offices did not have TTMs. The treatment room was small

and allowed for confidentiality; however, the space was also used as "dayroom" space for one patient at a time.

Confidential individual interview space was available on all 3CMS facilities, although one housing unit used for quarantining new arrivals was limited to one shared office utilized by both nursing and mental health.  3CMS IDTT rooms also offered confidentiality and sufficient space for required attendees.

Custody and Mental Health Partnership Plan:

During the review period, the institution's documentation demonstrated compliance with monthly executive leadership joint rounding, and executive staff meeting, quality management committee, and mental health subcommittee discussion of executive rounding.  Issues raised during the rounding and subsequent meetings included the impact of COVID-19 lockdowns, the installation of cameras impacting yard program, and staff shortages.  Executive joint rounding generally indicated the mental health program was running well, staff was responsive, and custody and mental health staff had a collaborative relationship.  The inmate advisory council had mental health staff present and discuss mental health issues during five of six months.

The institution only provided documentation of 3CMS joint rounding on Facilities A, B, and C for one month and Facility D for two months, and 3CMS weekly huddle reports for

January and February 2022 for Facilities A, B, C, and D.  KVSP utilized the required forms, and notations were made regarding the information obtained during the rounding and huddles.

Regarding the EOP orientation group, the institution provided a list of 57 patients scheduled for the EOP orientation group; however, the report did not include the date that patients attended the group.

Regarding EOP huddles, the institution's LOP was in compliance with statewide policy. The monitor reviewed second and third watch huddle reports in Facility C-8, where EOP patients were housed, and in the STRH.  The huddles utilized the required form, and required staff were in attendance for 98 percent of huddle reports reviewed.  Patient discussions included new arrivals, medication refusals, bad news, and individual patient concerns.  For STRH, the monitor reviewed 12 huddle reports from March 2022 and found all reports to be in compliance with policy.  The monitor observed the third watch huddle on April 7, 2022, and found all required staff were in attendance, the required huddle form was used, and staff discussed patients as needed.

No huddle reports were provided for the MHCB, and the monitor did not observe any MHCB huddles.

Two staff complaints were filed by patients during the review period; both were closed with a finding of "no policy violation."  The complaints alleged staff were dismissive of the patient's pain and were racist.  No staff was reassigned as a result of the complaints.

Regarding quarterly round table training, the institution provided CDCR Form 844, IST sign-in sheets for MHCB 2021 quarter four training for second and third watches with a total six custody and 17 mental health/medical staff attending.  Documentation was not provided for the monitor to determine if the staff working that day in the MHCB attended.  For EOP housing,

three CDCR Form 844s were provided for the 2021 third quarter and 2022 first quarter. The monitor was unable to determine whether the staff working that day attended the training because Fair Labor Standards Act (FLSA) sheets were not provided.

Quarterly round table training in the STRH for the 2021 fourth quarter was offered on October 12, October 13, December 17, and December 23, 2021. The STRH FLSA sign-in sheets reported that on October 12 and December 17 second watch, 46 and 44 percent of custody staff working that day attended quarterly round training, respectively. On December 23, 78 percent of custody staff attended the training.

Heat Plan:

Interviewed custody officers were typically knowledgeable of the heat plan and its requirements at the various stages. They reported that they followed the heat plan documentation year-round, including getting a daily list of patients on heat medications and logging temperatures, which was confirmed by sergeants and captains on each facility. Most officers had small cards with the heat plan requirements in their uniform pocket. To mitigate a reduction in yard time during stage I heat alerts, staff reported they provided extra dayroom for MHSDS patients. When questioned about following up on signs and symptoms after patients had ice and showers to cool down, they reported most patients wanted to just lie down.

RVRs:

The institution reported that a total of 2,194 RVRs were issued during the review period, including 1,085, or 49 percent, issued to MHSDS patients. Sixteen RVRs were issued to MHCB patients, 84 RVRs were issued to EOP patients, and 985 RVRs were issued to 3CMS patients. KVSP issued 1,109 RVRs to non-MHSDS incarcerated persons.

The monitor reviewed 13 RVRs issued to MHSDS patients during the review period. Custody referred RVRs to mental health staff for a mental health assessment in a timely manner in five of 13 cases. For the eight RVRs that were submitted late, the referrals were late by a range of two to eight days. Mental health returned the completed mental health assessment in a timely manner in all 13 cases.

The senior hearing officer documented their consideration of the mental health assessment information in 12 of 13 cases reviewed. Five mental health assessments recommended mitigation of penalties if the patient was found guilty of the RVR. The senior hearing officer adhered to the mental health assessment recommendations and did not impose a penalty.

Regarding training, one of three correctional administrators attended the inmate disciplinary process mental health assessment training. All custody staff attended the training. For mental health staff, four of 16 psychologists and one of eight psychiatrists attended the training. The institution reported a practice of assigning mental health assessments only to staff who had received the training.

Use of Force:

Regarding use of force training, nearly all custody officers attended mandatory use of force training within the past year. For mental health staff, all chief psychologists, psychologists, psychiatrists, and social workers attended the mandatory use of force training.

KVSP reported that there were no controlled use of force incidents. However, while reviewing immediate use of force incidents, the monitor discovered an incident that should have been classified as a controlled use of force. Staff was preparing for a cell extraction, and they failed to obtain a camera to record the incident. Because this controlled use of force incident was

565

not properly recorded using a video camera, it was noncompliant with CDCR policy and procedure.

There were reportedly 140 immediate use of force incidents during the review period; 103 involved MHSDS patients, and 37 involved non-MHSDS incarcerated persons.

The monitor reviewed 11 immediate use of force incidents; each was in compliance with CDCR policy and procedure.

Lockdowns/Modified Programs:

During the review period, the institution reported there were five modified programming events and one lockdown. Of the five modified programs, three were due to COVID-19 outbreaks and two were due to inmate-on-inmate violence. One was due to dangerous contraband being found on a facility and a facility-wide search was conducted. The lockdown was institution-wide due to a COVID-19 outbreak. During modified programming and the lockdown, the institution directed that mental health ducats would be honored, and patients would be escorted to their appointments.

Access to Care:

KVSP provided monthly Health Care Access Quality reports from September 2021 through February 2022. Fifty-one percent of the total issued mental health ducats and add-on appointments were not completed. Of the incomplete mental health ducats and add-on appointments, 69 percent were due to patient refusals, four percent were due to custody reasons, and 28 percent were due to non-custody reasons.

Non-Designated EOP:

KVSP reported that it was a non-designated institution; however, the documentation provided labeled Facility C-8 as "SNY."  Additionally, patients in C-8 did not mix with the rest of Facility C for yard.

Placement of 3CMS into Minimum Support Facilities:

The institution did not provide any information regarding transferring 3CMS patients to the MSF.

*Coleman* Postings:

*Coleman* postings were present on every unit in both English and Spanish.

**APPENDIX B-12**
**CALIFORNIA STATE PRISON/CORCORAN (CSP/Corcoran)**
**(April 11 – April 14, 2022)**
**Review Period: (September 1, 2021 – February 28, 2022)**

<u>Census:</u>

On April 11, 2022, CSP/Corcoran housed 3,341 incarcerated individuals, which was 11 less than the preceding review period. The mental health caseload population of 1,446 patients had decreased by 13 percent since the prior review period and constituted 44 percent of CSP/Corcoran's population.

The MHCB housed 16 patients, and there were no patients in alternative housing.

There were 174 mainline EOP patients and 1,007 mainline 3CMS patients.

The administrative segregation EOP hub housed 50 patients; seven of these EOP patients were awaiting transfer to a PSU.

There were 116 3CMS patients in LTRH and 83 3CMS patients in STRH.

One EOP patient and 13 3CMS patients were in non-designated segregation.

<u>Staffing</u>:

The one chief psychiatrist and one senior psychiatrist positions were both vacant. Two of seven psychiatrist positions were filled for a vacancy rate of 71 percent. The addition of 2.24 registry positions reduced the functional vacancy rate to 39 percent.

CSP/Corcoran did not employ PNPs.

Both chief psychologist positions were filled. Eight of nine senior psychologist positions were filled for a vacancy rate of 11 percent.

Of 35 allocated staff psychologist positions, 16 were filled for a vacancy rate of 54 percent. Contractors filled four positions leaving a functional vacancy rate of 43 percent.

Four of five medical assistant positions were filled for a 20 percent vacancy rate. One registry medical assistant reduced the functional vacancy rate to zero.

The one supervising social worker position was filled. Fourteen of the 15.5 social worker positions were filled, and the use of registry eliminated the functional vacancy rate.

Of 12.5 allocated recreation therapist positions, five were filled for a vacancy rate of 60 percent. Seven contractors reduced the functional vacancy rate to four percent.

All five registered nurse positions were filled.

All four of the senior psych tech positions were filled, as were 63 of the 65.5 psych tech positions, for a vacancy rate of four percent. One contractor reduced the functional vacancy rate to two percent.

The 0.5 APGA position was filled, as was the one office services supervisor II position. The CHSA position was vacant. Two of the 2.5 HPS I positions were filled for a vacancy rate of 20 percent.

Of the five allocated medical assistant positions, four were filled for a vacancy rate of 20 percent; a contractor filled the remaining position leaving no vacancies.

Of 17 mental health clerical positions, 13.5 were filled, leaving a vacancy rate of 21 percent.

As for custody staffing, CSP/Corcoran reported that of 976 correctional officer positions, 192 were either vacant or on long-term sick leaves, for a vacancy rate of 20 percent. Of the 110 sergeant positions, 30 were vacant or on long-term sick leaves, resulting in a vacancy rate of 27 percent. Of the 36 lieutenant positions, nine were vacant or on long-term sick leaves for a vacancy rate of 25 percent.

Telepsychiatry:

All five allocated telepsychiatrist positions were filled.

CSP/Corcoran used telepsychiatry for 3CMS IDTTs, individual clinical contacts, and PC 2602 involuntary medication hearings.  Two of the four telepsychiatrists in the 3CMS mainline program carried caseloads in excess of the established ratio, with caseloads of 306 and 310.

Telepsychiatry was used intermittently for initial and routine EOP contacts during the reporting period, with a total of 455 contacts during the review period.  There were 314 initial contacts and 141 routine contacts.

The one telepsychiatrist assigned to STRH had a caseload within the established ratio for 3CMS, but the telepsychiatrist assigned to the LTRH had a caseload of 147, exceeding the established ratio.

Telepsychiatry in the STRH consisted of a laptop with a speaker.  Staff reported no issues with the technology and indicated only positive experiences with the telepsychiatrists.

In the LTRH, although technology issues were observed, the fourth quarter sustainable process report also indicated that observed IDTTs started 20 minutes late due to equipment issues.  Observed IDTTs revealed that the telepsychiatrist was not an active member of the treatment team and only spoke about medication issues.  In one observed IDTT, the telepsychiatrist mixed up the identities of patients on the list and provided inaccurate information for two patients.

The institution reported that the telepsychiatrists were making their biannual visits.

Staffing Shortages and Recruitment Efforts:

CSP/Corcoran reported challenges in recruiting and retaining staff.  At the time of the site visit, CSP/Corcoran reported that there were 18 psychologist vacancies and 2.5 social worker vacancies, contributing to staff burnout and high caseloads.  The institution indicated that there

were no psychiatrist candidates to be interviewed as well as no applicants for the vacant

psychologist positions. There were four social worker candidates scheduled for interviews.

Oversight was also an issue with the lack of a chief psychiatrist and chief psychologist.

Quality Management:

The local governing body continued to meet quarterly during the review period, and

quorums were met for the meetings. Agenda topics included peer review, review of policies and

procedures, statewide memoranda, credentialling, licensing reports, and other relevant topics

with minutes adequately reporting on the issues.

The QMC met monthly, and minutes provided useful summaries of each meeting. Topics

discussed included status of PIWP projects, subcommittee chair reports, health care quality

access reports, LOPs, audit and survey findings, and COVID-19 information.

Mental health subcommittee meeting minutes were provided for the reporting period and

showed that quorums were met. Topics discussed during the meetings included PIWP, system

surveillance and quality concerns, program management issues, on-demand mental health

reports, and MHCB readmissions.

No formal QITs or FITs were chartered, completed, or continued during the reporting

period but an audit was undertaken to assess issues related to MHCB readmissions.

CSP/Corcoran initiated a peer review project in November 2021 and conducted monthly

reviews through January 2022 which were set to resume in April 2022 due to COVID-19 related

staffing issues. The project was intended to be an instructional tool rather than a disciplinary

measure but did not include psychiatrists. The forms for these peer reviews were in the process

of being revised at the time of the site visit.

The EMRRC met bi-weekly and reviewed numerous cases with covered topics including death reviews and daily required checks.

Medication Management:

CSP/Corcoran provided MAPIP results for the six months of the review period for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed antipsychotics indicated CSP/Corcoran's compliance for thyroid monitoring, blood pressure, and measuring height and weight. There was noncompliance for all six months for AIMS tests, CBCs with platelets, CMPs, lipid monitoring, blood sugar monitoring, and obtaining medical consent. When medication required an EKG, CSP/Corcoran was compliant for two of four months.

For monitoring antidepressants, CSP/Corcoran reported compliance for all six months for venlafaxine blood pressure and thyroid monitoring. The institution reported noncompliance for all months for obtaining EKGs and medical consents.

As for monitoring Depakote (divalproex, valproic acid) levels, there was noncompliance for monitoring blood levels and CBC with platelets. CSP/Corcoran was compliant for two of six months for obtaining medical consents and one of six months for CMP.

For lamotrigine, there was compliance for obtaining medication consents for the required months.

For lithium, the institution reported noncompliance for three of six months for lithium level monitoring, and two of six months for obtaining medication consents. There was noncompliance for all six months for checking renal functioning. CSP/Corcoran also reported noncompliance for two of three reported months for obtaining EKGs and three of five reported months for thyroid monitoring.

CSP/Corcoran was compliant for four of six months for medication administration for chronic care medications prescribed by a psychiatrist.

For medication management metrics reported by mental health headquarters, CSP/Corcoran was noncompliant for five of six months for the continuity of (NA) and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU) and continuity of medications for MHCB transfer.  The institution was noncompliant for four of six months for continuity of medications from discharge/transfer from a community hospital and/or DSH, and/or continuity of medications upon inter-institutional transfer at R&R.  For continuity of medications with intra-institutional transfer to ASU/SHU/PSU, CSP/Corcoran was noncompliant for three of six months and one of six months for continuity of medications upon parole/transfer to the community.  For the observation of medication preparation and administration at HS, the institution was noncompliant for all six months.  For the observation of preparation of medication for AM/PM, the institution was noncompliant for all six months.

For PC 2602 court orders, CSP/Corcoran was compliant for two of the five reported months and for PC medication orders, there was compliance for three of the five reported months.

Data presented for clozapine diagnostic measures indicated that the institution was compliant for AIMS testing, blood pressure monitoring, CBC measures, lipid and thyroid monitoring, and height and weight measuring.  CSP/Corcoran was compliant for five of six months for measuring blood sugar, three of four reported months for CMP measures, two of four reported months for EKG measures, and one of two reported months for obtaining medical consent.

Psychiatrists could prescribe psychotropic medications for a maximum of 180 days; bridge orders were allowed for 30 days.

A process for reviewing polypharmacy had been implemented.

Medications were ordered pursuant to the formulary with the option to prescribe non-formulary medications when clinically indicated.  The maximum length of medications ordered by a psychiatrist was 90 - 180 days; bridge orders were for 30 days.  All psychotropic medications were administered DOT except SSRIs which were administered KOP by the provider as deemed appropriate in their clinical judgement.

Pill lines and the DOT process were periodically audited through observation by nursing supervisors, but formal reports of such audits were not completed.

CSP/Corcoran was compliant with administering prescribed HS medications after 8:00 p.m.

During the review period, the institution submitted nine initial involuntary medication petitions.  Six were emergent and all petitions were granted.  Ten PC 2602 petitions were renewed.  No use of force was required to administer involuntary medications.

Transfers:

CSP/Corcoran had one impatient coordinator who had been in that position intermittently since 2017.  Two clinicians were trained as backup inpatient coordinators.

CSP/Corcoran referred 56 patients to inpatient care during the review period.  Of those, 41 patients were referred to acute care, which was a slight increase from the 39 referrals during the preceding review period.  For intermediate care, CSP/Corcoran referred 15 patients for a 114 percent increase since the prior reporting period during which there were seven referrals to intermediate care.  One acute and one intermediate care referral were rejected.  Four acute care

referrals were rescinded; three were referred to intermediate care and one patient improved and no longer required inpatient level of care. One acute care patient paroled during the referral process. Three intermediate care referrals were rescinded; two were referred to acute care, and one patient's symptoms improved and no longer required inpatient care. One acute care patient and one intermediate care patient were placed in the MHCB during the referral process.

While CSP/Corcoran submitted referrals to CDCR IRU timely, patients did not transfer within timeframe guidelines to either acute or intermediate care programs during the review period. No acute patients transferred within ten days. For those patients, the average time to transfer after referral to IRU was 34 days, with a range of 14 to 63 days. On April 14, 2022, two patients were awaiting acceptance to acute care programs; neither patient exceeded the required timeframe guidelines.

For intermediate care patients, one patient transferred in seven days; however, the remaining patients took longer than 30 days, with a range of 35 to 52 days. A total of eight delays were due to approved timeline exceptions.

Once accepted, all inpatient transfers moved within 72 hours.

On April 14, 2022, two patients were waiting acceptance to acute care programs. They were endorsed on April 7 and April 8, 2022. Another patient completed his *Vitek* hearing on April 13, 2022 and was not yet endorsed to an acute program.

CSP/Corcoran completed nine *Vitek* hearings during the review period; seven for patients referred to acute care and two for patients referred to intermediate care. *Vitek* hearings were completed within timeframes and no patients prevailed.

During the review period, CSP/Corcoran transferred one patient with complex medical needs to an acute care program.

There were 590 instances of nonreferral for 281 patients during the review period.

The inpatient coordinator reported that she did not receive advance notification of returning patients. Typically, notification was through a daily report that listed patients on the day of their scheduled return to the institution. Once aware of a returning patient, the inpatient coordinator emailed clinical supervisors, treatment teams, and office technicians about the pending return. Clinician-to-clinician contact by CSP/Corcoran was tracked by the inpatient coordinator, and there were no reported issues with the process.

When CSP/Corcoran transferred patients who were already in the referral process, the CSP/Corcoran inpatient coordinator contacted the receiving institution inpatient coordinator and alerted them of the patient's referral.

There were no expedited transfer requests during the review period or at the time of the site visit.

CSP/Corcoran made 260 referrals to MHCBs during the review period. Of those, 142 patients or 55 percent were admitted for a 133 percent increase since the preceding monitoring round. Forty-five percent or 118 referrals were rescinded, representing a 51 percent decrease in recissions since the prior review. Two referrals took longer than 24 hours to transfer, though both were less than one hour overdue. Twelve patients transferred to outside MHCBs, including four to CSP/Sac, three to SATF, two to KVSP, and one each to CHCF, CMC, and NKSP.

The average number of patients in the MHCB during the reporting period was 19, and there were 19 patients in crisis beds during the site visit. The average clinical length of stay in the MHCB was 10.4 days, with a range of one to 51 days. The average physical length of stay was 16.5 days, with a maximum stay of 75 days. There were 56 patients with clinical lengths of stay over ten days during the reporting period.

There were 18 patients who had three or more admissions to the MHCB during the review period; one was admitted six times, two were admitted five times, four were admitted four times, and the remaining patients had three admissions.

During the reporting period, a total of 185 patients were admitted to alternative housing. The average length of stay was 9.6 hours. There were five patients who remained in alternative housing beyond 24 hours, with an average length of stay of 30.2 hours.

Observing that CSP/Corcoran was an EOP institution, there were no EOP transfer delays during the reporting period.

CSP/Corcoran did not track patients transferred from EOP to 3CMS; no data was provided.

Two 3CMS patients transferred to the MSF at CSP/Corcoran during the review period.

CSP/Corcoran referred 20 patients to PSU. Of the ten patients who transferred, one took longer than 60 days; the one noncompliant transfer took 72 days.

CSP/Corcoran was an EOP hub institution; CSP/Corcoran patients requiring EOP administrative hub placement were moved to the on-site unit without delay.

During the review period, 51 patients transferred to the STRH with no delays in placement. All were placed in CSP/Corcoran's STRH. The average length of stay was 253 days, with stays ranging from 25 to 871 days.

During the review period, 131 patients transferred to LTRH with no delays in placement in CSP/Corcoran's LTRH. The average length of stay was 472 days, with stays ranging from 141 to 472 days.

There were 844 transfers to administrative segregation during the reporting period. Stays averaged 34 days and ranged from one to 399 days.

Programming:

MHSDS Patients in Administrative Segregation:

EOP Hub

There were 173 patients treated in the EOP administrative segregation hub during the reporting period. The average length of stay was 37 days and ranged from one to 299 days. The capacity of the EOP hub was 100.

The one psychiatrist assigned to the EOP hub had a caseload of 52 patients, which was within the established ratio. All four psychologists exceeded the established caseload ratio.

A review of CDCR Form 114As showed the institution was compliant with showers being offered to patients three times weekly, but ten hours of weekly yard time was offered only 47 percent of the time.

It was reported that CSP/Corcoran's EOP hub passed monthly certification from October 2021 to February 2022, with all required measures remaining above the 90 percent threshold. However, during January and February, the hub was on modified programming with IDTTs completed in absentia, individual contacts completed at cell front, out-of-cell time-limited, and treatment groups suspended. Although the institution consistently reported that IDTTs were 100 percent compliant during the review period, audits conducted during the sustainable process, as well as the monitor's expert's observations on-site, found similar concerns with measurable treatment goals, requiring a CAP to address certain deficiencies.

Twenty patient charts were selected for review for compliance with Program Guide timelines in the EOP hub. All 20 patients required initial psychiatric contacts, and 90 percent were timely as they occurred before the initial IDTT. Of those initial contacts reviewed, 60

percent were conducted in a confidential setting. Reasons for appointments not being confidential were patient refusals, custody modified programming, and COVID-19 restrictions.

Nine of the 20 patients were in the EOP hub long enough to be seen for routine psychiatry contacts during the review dates. For these nine patients, 94 percent of the routine contacts occurred every 30 days and were deemed compliant. Of the routine contacts reviewed, 24 percent were conducted in a confidential setting. The reasons provided for appointments not being confidential included patient refusals, COVID-19 restrictions, and custody modified programming.

No initial or routine psychiatry contacts reviewed were conducted via telepsychiatry.

All 20 reviewed cases required initial PC contacts; 100 percent occurred before the initial IDTT and were compliant. As for the initial primary clinician contacts reviewed, 45 percent were conducted in a confidential setting. Reasons for appointments not being confidential were patient refusals, custody modified programming, COVID-19 restrictions, or no reason being provided.

Fifteen of the patients were in the EOP hub long enough to be seen for routine PC contacts during the review dates. For these 15 patients, 88 percent of routine PC contacts occurred every seven days and were compliant. Of the reviewed routine PC contacts, 43 percent were conducted in a confidential setting. Reasons stated for appointments not being confidential were patient refusals, COVID-19 restrictions, custody modified programming, or no reason being provided.

All 20 reviewed patients required an initial IDTT, and 100 percent occurred within 14 calendar days and were timely.

Two patients were expected to be seen for a routine IDTT during the dates reviewed and both occurred within 90 days and were timely.

Required attendees were present for 100 percent of initial and routine IDTTs.  Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician, however, assignment was not clearly documented or consistently able to discern in the records.

Data indicated that EOP hub patients were offered an average of 12.06 hours of weekly structured therapeutic activities; patients attended an average of 6.03 hours per week.  Across the reporting period, patients refused an average of 6.03 hours of structured therapeutic activities per week.  Of note, however, was that the institution credited in-cell packets provided to patients as one to two hours of offered treatment when movement was restricted due to quarantine issues.

The EOP hub treatment groups were primarily facilitated by recreation therapists, although there were also three clinician-led groups scheduled on the same day each week.  CSP/Corcoran's nursing-led groups were reportedly suspended since the onset of the pandemic.  At the time of the site visit, the institution appeared to be scheduling a sufficient number of groups to meet required minimums for each patient.

The monitor's expert observed three two-hour EOP hub recreation therapy groups during the monitoring visit.  Although six to eight patients were scheduled, only two or three patients attended.  All three EOP hub groups were anger management groups facilitated by different recreation therapists.  The group facilitators presented and discussed an anger management topic before showing a movie or movie clips.  Some movie clips were relevant to the group topic, while others were not.

The monitor's expert also observed one clinician-led DBT group for EOP hub patients. This group was well-structured, engaging, and utilized both in-group and in-cell exercises for skill building.

Interviewed EOP hub patients complained about recreation therapy groups relying too heavily on movies and not enough on treatment. However, interviewed patients in the clinician-led DBT group found the groups useful for learning new skills and noted that these groups were generally at capacity.

Interviewed EOP hub staff expressed the need for additional custody officers to start appointments on time. CSP/Corcoran staff explained that treatment groups started especially late when custody staffing was limited and patients required two officers for escort.

Observed EOP hub IDTTs started on time, and all required members were present with computers to access patient information. Nearly all observed IDTTs were initial meetings, and the PC and psychiatrist confirmed they completed each patient's initial assessment prior to the IDTT. The counselors were exceptional during these IDTTs, appeared knowledgeable, provided valuable input, and repeatedly summarized information to ensure effective communication. However, often missing from these IDTT discussions were medication adherence information, measurable treatment goals, collaborative discussions between the primary clinician and psychiatrist, and necessary treatment plan modifications to address new problems presented during the IDTTs.

Observed psych tech rounds in the EOP hub were generally adequate and the psych tech appeared to have good rapport with each patient.

Fifteen weeks of 114As were reviewed documenting that ten hours of yard was offered in seven weeks, or 47 percent. Three showers were offered during 14 of the 15 weeks reviewed for 93 percent compliance.

### Short-Term Restricted Housing

There were 51 patients treated in STRH during the review period. The average length of stay was 253 days and ranged from 25 to 871 days.

The one telepsychiatrist position for STRH had a caseload within the established ratio but two of four psychologists exceeded the established ratio.

Fifteen patient charts were reviewed for compliance with Program Guide timelines in the STRH.

All 15 patients required initial psychiatric evaluations, and ten of 15 or 67 percent were compliant. Two did not occur during the review period. Of the 13 initial psychiatry contacts reviewed, 100 percent were conducted in a confidential setting, and 100 percent were done via telepsychiatry.

Six patients were required to be seen for routine psychiatry contacts, and 100 percent occurred within 90 days and were compliant. Of the routine psychiatry contacts reviewed, 38 percent were conducted confidentially. Nonconfidential contacts were attributed to patient refusals or COVID-19 precautions. Ninety-two percent of routine psychiatry contacts were conducted via telepsychiatry. Generally, the patients reviewed were seen for routine psychiatry contacts more frequently than required by Program Guide timelines.

Of the 15 patients who required initial PC contacts, 100 percent were compliant, and 33 percent were conducted in a confidential setting. Those that were not confidential were due to patient refusals, modified programming, and COVID-19 restrictions.

For the 15 patients who required routine PC contacts, 75 percent occurred within seven days and were compliant.  Of the routine primary clinician contacts reviewed, 18 percent were performed in a confidential setting.  Reasons for non-confidential PC contacts were due to patient refusals, COVID-19 precautions, modified programming, or staffing schedule issues.  Of note, and not counted as part of this data set, there were several instances where the primary clinician counted time spent speaking to a patient during an IDTT as a PC contact.

Fifteen reviewed patients required initial IDTTs, of which 93 percent were compliant.  Of the initial IDTTs reviewed, patients were present 47 percent of the time.  Reasons for non-attendance were due to patient refusals, COVID-19 precautions, and modified programming.

For those patients who required quarterly IDTTs during the review period, 100 percent occurred within 90 days and were timely.  Of those IDTTs reviewed, patients were present 50 percent of the time.  The reason for non-attendance was patient refusals.

Required staff was in attendance at 100 percent of initial and routine IDTTs.  Of note, while a primary clinician and psychiatrist were in attendance, it could not be determined in every case if the assigned treatment providers were in attendance as required by the Program Guide.

 Data indicated that patients in STRH were offered an average of 1.71 hours of weekly structured therapeutic activities; patients attended an average of 1.08 hours per week.  During the reporting period, patients refused an average of 0.63 hours of weekly structured therapeutic treatment activities.

Ninety-six percent of patients in STRH were offered at least 90-minutes of treatment groups per week.  However, in-cell packets provided to these patients were also credited toward structured therapeutic activities.

There were no clinician-led groups at CSP/Corcoran at the time of the site visit.

The monitor's expert observed two 90-minute recreation therapy treatment groups in STRH.  The first 30 minutes of the 90-minute groups were good, as the facilitator engaged patients in a relevant workbook activity and discussion.  However, after 30 minutes, the facilitator showed an hour of television that was not relevant to the group topic.

During one of the STRH groups, a patient was pulled for an individual mental health appointment.  The monitor's expert was informed that it was not uncommon for providers to pull patients from groups for individual contacts.

The monitor's expert observed seven STRH IDTTs during the site visit.  Telepsychiatry was used for all IDTTs, and all other required disciplines were present in the room with sufficient computer access.  Each team member contributed to the discussion.  The IDTTs were facilitated by assigned primary clinicians.  For seven of the observed IDTTs, five were completed in absentia due to patient refusals.  The monitor's expert noted that while IDTTs were generally adequate, there were concerns regarding case conceptualizations, collaborative planning, and attention to the underlying safety concerns contributing to STRH patients' anxiety.

The monitor's expert observed psych tech rounds in STRH.  The psych tech interviewed patients at cell front, conducted brief mental status examinations, offered in-cell materials, and documented on each patient prior to moving on to the next.  The STRH psych tech rounds were generally adequate.

Seven weeks of STRH Form 114As were reviewed, and indicated that 18.5 hours of yard time was offered for four of the weeks, or 57 percent.  Showers were offered in all seven weeks reviewed.

Long-Term Restricted Housing (LTRH)

There were 131 patients treated in LTRH during the reporting period. The average length of stay was 472 days and ranged from 141 to 2,473 days.

The one telepsychiatrist for the LTRH exceeded the established ratio. Two of six social workers were within the established ratio, and the other four exceeded the ratio slightly.

Eleven patient charts were reviewed for compliance with Program Guide timelines in the LTRH.

Ten patients required initial psychiatric evaluations during the review dates, of which five or 50 percent occurred prior to the initial IDTT, as required. Of the ten initial psychiatric evaluations, five or 50 percent occurred in confidential settings. Reasons for the lack of confidentiality included patient refusal and COVID-19 restrictions. All initial psychiatric evaluations were conducted via telepsychiatry.

Five patients required routine psychiatric contacts during the review period, of which 75 percent were compliant. Of seven reviewed routine psychiatric contacts, four or 57 percent occurred in confidential settings. Reasons for the lack of confidentiality included patient refusal and staffing shortages. All routine psychiatric contacts were conducted via telepsychiatry.

Ten patients required initial primary clinician evaluations during the review period, all of which occurred within ten working days of arrival, as required. One of ten, or 10 percent of initial primary clinician evaluations, was conducted confidentially. Reasons for the lack of confidentiality included modified programming, COVID-19 restrictions, or otherwise were not documented.

Across 11 patients, 58 percent of routine PC contacts occurred at least every seven days as required, and 27 percent occurred in confidential settings. Reasons for the lack of

confidentiality included patient refusal, COVID-19 restrictions, modified programming, and staffing shortages.

Ten patients required initial IDTTs during the review period, all of which were completed within 14 working days of arrival, as required. Required staff attended all initial IDTTs, although five or 50 percent of initial IDTTs were held in absentia. As for routine IDTTs during the review period, six or 60 percent occurred at least every 90 days, as required. Required staff attended nine or 90 percent of routine IDTTs during the review period, and six or 60 percent of routine IDTTs were held in absentia.

Data indicated that patients in the LTRH were offered an average of 1.70 hours of weekly structured therapeutic activities; patients attended an average of 0.79 hours per week. During the reporting period, patients refused an average of 0.91 hours of weekly structured therapeutic treatment activities.

Ninety-six percent of patients in LTRH were offered at least 90 minutes of weekly treatment groups. However, in-cell packets provided to these patients were also credited toward structured therapeutic activities.

All LTRH treatment groups were facilitated by recreation therapists. Leadership indicated that clinicians had not led groups in LTRH since 2020. Recreation therapy group topics in LTRH included coping skills, socialization, and conflict management.

The monitor's expert observed an LTRH recreation therapy group with a total of four patients in attendance. The facilitator showed participants brief video documentary clips to prompt discussion and social interaction. All patients were fully engaged, and later reported enjoying the group activity. Overall, it was an adequate recreation therapy group.

A total of seven LTRH IDTTs were observed during the site visit. Psychiatry attended via telepsychiatry. All other required attendees were present in the room with the tele-psychiatrist's assigned MA. Representatives from each discipline had computers to access patient information. The IDTTs started on time, and escorting officers removed patients' handcuffs upon TTM placement.

The monitor's expert found that LTRH IDTTs were inadequate. Some critical areas were missed during IDTTs, including case conceptualizations, measurable and realistic treatment objectives, and treatment plan modifications to address RVR behaviors and new symptoms mentioned during IDTTs. The telepsychiatrist awaited their turn to speak directly to patients about medications but did not participate in treatment team discussions or non-medication treatment decisions. Even when the PC informed the treatment team that she was struggling with an accurate diagnosis for one patient, the telepsychiatrist remained silent, and the issue was left unresolved. The telepsychiatrist discovered at the end of the IDTT meetings that he had mixed up at least two patients on the list and provided inaccurate information during their IDTTs as a result. As the IDTT did not attempt to address this concern before ending the meeting, the monitor's expert intervened before staff left the room and asked whether the telepsychiatrist wanted to provide accurate patient information for the team. However, when responding to the expert, the telepsychiatrist continued to mix up patients on the list, and other members of the IDTT were clearly disinterested as they continued to pack up their belongings and did not engage in the discussion. Lastly, while the senior psychologist specialist/HLOC coordinator attended this IDTT and repeatedly prompted staff to discuss HLOC considerations and risk, the IDTTs were still inadequate, and the specialist later confirmed she did not regularly attend IDTTs.

The psych tech in the LTRH engaged each patient at cell front and assessed mental health status with open-ended questions, visually inspected cells, provided daily leisure activities, and asked patients whether they needed additional forms or materials.  The psych tech documented on each patient prior to moving on to the next and reported to the expert that any changes in mental health status were communicated to mental health clinicians in writing and to other healthcare staff during huddles.

One interviewed psych tech in the LTRH requested that CDCR provide more specific policy information regarding expectations for conducting psych tech rounds in ASUs, as the current language was reportedly interpreted differently by nursing staff. The psych tech further indicated that, with more demands placed on psych techs, many felt forced to spend less time with each patient during psych tech rounding.

CSP/Corcoran reported that all restricted housing programs (LTRH, STRH, EOP hub) were canvassed by staff each morning for treatment groups to ask whether patients were going to attend groups that day, which allowed staff to potentially fill morning groups and cancel afternoon groups when they had few expected attendees.

The monitor observed ICCs for four patients in LTRH.  The mental health input into the ICC was not adequate, and no mental health information was provided to the ICC chairperson for consideration.  The ICC failed to ensure effective communication as staff only asked if the patient understood the ICC action without obtaining any statement from patients as to what they actually understood.

Fourteen weeks of 114-As were reviewed for patients in LTRH.  Nine of 14 weeks or 64 percent had documentation of ten hours of yard being offered.  Three weekly showers were offered during 12 of 14 weeks for an 86 percent compliance rate.

The monitor reviewed monthly reports of patients retained LTRH for more than 90 days and found that adequate reasons were provided to justify the retention of those patients in segregated housing.

Non-Disciplinary Segregation

During the review period, there were 24 patients identified as NDS and 11 required expedited transfers. Of the 11 identified for expedited transfer, none were transferred within 72 hours with the reason for delay reported as COVID-19 testing.

MHCB:

CSP/Corcoran maintained 24 beds in the MHCB, but at various times some cells were redlined and awaiting repair. One cell could not be retrofitted therefore one-to-one supervision was required if the cell was used. The MHCB also had a restraint room, an observation room, and an ADA-compliant cell.

There was one psychologist supervisor assigned to the MHCB, four full-time psychologists, and three part-time psychologists. Two psychiatrists were assigned to oversee the MHCB; one was assigned full-time, while the other was assigned as needed.

Ten patient charts were selected for review for compliance with Program Guide timelines in the MHCB. All ten patients required initial PC evaluations, and all were completed within 24 hours of admission. Nine of ten, or 90 percent, of initial psychiatric evaluations were completed within 24 hours as required.

Of the ten patients reviewed, all received an initial IDTT within 72 hours of admission; required staff attended eight of ten, or 80 percent of initial IDTTs during the review period. Nine patients required ongoing IDTTs, and all were timely and included required staff members.

Regarding the required twice-weekly psychiatry contacts in the MHCB, 72 percent occurred as required, and notably, five of 21 contacts were conducted through telepsychiatry. Of those 21 contacts, 11 or 52 percent occurred in confidential settings. Reasons for non-confidential contacts included staffing, modified programming, patient refusal, and lack of treatment space.

For the required daily contacts in the MHCB for the patients reviewed, 94 percent of daily contacts occurred as required. Of the daily contacts reviewed, 57 percent were conducted in a confidential setting. As with psychiatry contacts, reasons for non-confidential contacts included staffing, modified programming, patient refusal, and lack of treatment space.

Clinical contacts occurred in a confidential setting in one of two treatment rooms unless the patient refused, which resulted in cell-front contacts.

The monitor's expert observed an IDTT meeting which was attended by all required disciplines. There was appropriate multidisciplinary discussion, which included a discussion of the treatment plan with the patient and consideration of higher levels of care. Property and bedding were reviewed and revised as clinically appropriate.

Another IDTT was observed without the patient present due to the patient being in isolation due to COVID-19 symptoms. All required team members were present and clinical discussion of the case was appropriate.

Staff reported that discharge summaries were completed timely, but no audits were available to confirm those reports.

The monitor's expert reviewed four random discharge summaries of MHCB patients, which revealed inadequacies. One discharge summary listed medications as the patient's course of treatment with a discharge plan of five-day follow-up. The discharge summary of another

patient made specific references to only the summaries regarding the patient's course of treatment, which was insufficient.  For one patient, a discharge summary from the psychiatrist could not be found in the record.

The MHCB had one yard, and only one patient could be on the yard at a time.

The monitor reviewed four weeks of 114As in the MHCB and found no record of ten hours of yard being offered to patients in any of the four weeks.  The 114As failed to note the hours that yard was offered by staff.  In three of the four weeks reviewed, the patients in the MHCB were not offered three weekly showers.  The 114As did document the offering of phone calls for three of the four weeks reviewed.

The IDTT room utilized by CSP/Corcoran in the MHCB was small and made it difficult to fit all required attendees for the meetings.  The inadequate space had been previously reported by both the monitor's expert and CDCR regional staff.  A larger room had been identified but was not ready for use at the time of the site visit.

Seclusion and Restraint:

There were no clinical restraints or seclusion initiated in the MHCB during the reporting period.

Crisis Intervention Team:

CIT staff was assigned to cover calls during regular business hours.  CSP/Corcoran used volunteer staff for on-call coverage on nights and weekends for the CIT.  If no volunteer staff was available, the patient was taken to the TTA to meet with the registered nurse, who contacted the on-call mental health clinician for disposition and orders.

CSP/Corcoran reported that the CIT was challenged by a loss of staff due to attrition, lack of interest in working on weekends, and the need to reallocate positions.  The CIT, which

previously had seven primary clinicians assigned to it, was covered by three clinicians at the time of the site visit. Despite the reduced staff, the CIT continued to provide coverage for all yards from 7:00 a.m. until 10:00 p.m. The institution reported that it found the CIT to be successful in preventing inappropriate MHCB referrals.

CSP/Corcoran reported that there were 395 referrals to the CIT during the review period. For five of six months, the patient's level of care was identified. Of the patients whose level of care was identified, 216 were EOP, 101 were 3CMS patients, and the remaining levels of care were something other than EOP or 3CMS. The CIT data provided indicated that of the 395 referrals to the CIT, 123 or 31 percent were referred to the MHCB, while 68 percent were returned to their housing. The primary reason noted for referral to the CIT was patient suicidality.

The CIT process at CSP/Corcoran operated consistent with statewide policy during those times when adequate staffing was available.

Alternative Housing:

Alternative housing was in housing unit 4A3L cells 41 - 64. There were no alternative housing cells available in the CTC or OHU as was indicated in CSP/Corcoran's LOP.

Alternative housing staff included a psychologist supervisor, psychologist, and clinical social worker. CSP/Corcoran reported that alternative housing patients were typically seen at cell front, particularly when there was one patient in alternative housing, as the unit would then be confidential. A patient not seen at cell front was placed in a TTM located on the dayroom floor for any interviews that occurred.

EOP:

Both psychologists assigned to the mainline EOP program maintained caseloads within the established ratio. The one on-site psychiatrist had a caseload that exceeded the established ratio. Three of five social workers had caseloads within established ratios and the other two exceeded the ratio by one patient each.

Nineteen patients' charts were selected for review for compliance with Program Guide timelines for the provision of treatment.

Twelve patients required initial psychiatric contacts during the review period. Seven or 58 percent of required initial psychiatric contacts were assessed as compliant as the contact occurred before the initial IDTT and within 14 calendar days of arrival. One initial psychiatric contact was conducted via telepsychiatry. Seven of 12, or 58 percent, were conducted in a confidential setting due to COVID-19 precautions.

For 15 patients who required routine psychiatric contacts, 70 percent occurred within 30 days and were compliant. Fifteen percent of the psychiatric contacts reviewed were conducted via telepsychiatry. Of the reviewed psychiatric contacts, 52 percent were performed in a confidential setting. Reasons for appointments not being conducted confidentially were due to COVID-19 precautions, modified programming, patient refusals, or not noted.

Twelve patients required initial primary clinician contacts during the review period. All contacts were completed within 14 calendar days and were compliant with Program Guide requirements. Forty-two percent of initial primary clinician contacts were conducted in a confidential setting and those not performed confidentially were due to COVID-19 precautions.

For 17 patients who required routine primary clinician contacts, 69 percent were compliant with Program Guide timelines. Of those primary clinician contacts that were reviewed, 43 percent were performed in a confidential setting. The reasons provided for

appointments not being confidential included COVID-19 precautions, mental health or custody modified programming, a power outage, and patient refusals.

Of the 19 patient charts reviewed, 12 required an initial IDTT and all occurred within 14 days and were compliant.  All required disciplines attended the IDTTs and patients were present at five of the reviewed IDTTs.

Of the 19 patient charts reviewed, 14 required routine IDTTs, and 96 percent occurred within 90 days and were compliant with Program Guide timelines.  Required staff were present at 100 percent of routine IDTTs.  Patients were present at 46 percent of the routine IDTTs, with reasons for non-attendance reported as COVID-19 and refusals.

The monitor's expert attended five EOP mainline IDTTs, including one initial IDTT.  All required members were present.  The IDTTs frequently did not adequately address the patient's current presentation, groups assigned to patients were not discussed, and it was unclear how many treatment hours should be assigned to in-cell packets.

Interviewed patients reported that they were offered approximately 12 hours of weekly structured therapeutic activities but that all groups were provided by recreation therapists.

The monitor's expert observed an outdoor recreation group activity with patients walking alone or in small groups but not engaged by the recreation therapist, who was in the yard.  However, EOP patients reported having access to all the same recreational activities as GP inmates, in addition to individualized activities provided by recreation therapists.

3CMS:

Of the four telepsychiatrists assigned to the 3CMS program, two had caseloads within the established ratio and two had caseloads exceeding the established ratio.  All five psychologists

exceeded the established clinician-to-patient ratio.  Three social workers had caseloads that exceeded the established clinician-to-patient ratio.

Of the 17 patient charts reviewed, five patients required initial psychiatric evaluations during the review period.  One hundred percent occurred prior to the initial IDTT and were compliant with Program Guide requirements.  Three of five, or 60 percent, of initial contacts were conducted confidentially with reasons for lack of confidentiality attributed to medical restrictions and modified programming.  Eighty percent of initial psychiatry contacts were conducted by telepsychiatry.

For routine psychiatric contacts, 80 percent of required contacts occurred within 90 days and were compliant with Program Guide requirements.  Eighty percent of required routine psychiatry contacts were conducted confidentially.  Reasons for appointments not being confidential were medical restrictions and modified programming.  Ninety-six percent of routine psychiatry contacts were conducted via telepsychiatry.

Of the 17 patient charts reviewed, four patients required initial primary clinician evaluations.  All evaluations occurred within ten working days and were compliant with Program Guide requirements.  One of four, or 25 percent, of initial contacts were conducted in a confidential setting.  The reason indicated for the lack of confidentiality was modified programming.

For routine primary clinician contacts, 86 percent occurred within 90 days and were compliant with Program Guide requirements; 51 percent were conducted confidentially.  Records indicated that reasons appointments were not confidential included patient refusals, modified programming, COVID-19 restrictions, staff shortages, and unplanned contact by the provider.

Of the 17 cases reviewed, six patients required initial IDTTs during the review period. Four of six occurred within 14 working days and were compliant with Program Guide requirements.

Of the nine patients who required routine IDTTs, 89 percent occurred at least annually and were compliant with Program Guide requirements. Required staff members attended 100 percent of initial and routine IDTTs that occurred during the review period. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician, however, this was not clearly discernable for all cases.

Five IDTTs for 3CMS patients were observed by the expert's monitor, with two held in absentia. The quality of the IDTTs was variable, with the majority not clearly defining measurable problems, setting achievable and measurable goals, or identifying specific evidenced-based interventions.

The most serious challenges reported by PCs were large caseloads, limited treatment space, and an inability to provide adequate treatment to those 3CMS patients who did not meet criteria for EOP placement but required more group therapy.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

CSP/Corcoran's pre-release coordinator was a licensed clinical social worker who maintained a spreadsheet that included patients who were scheduled for release within six months. The pre-release coordinator kept a record of the assessments sent out and returned, along with follow-up efforts when an assessment was not returned. For the 70 patients reported as released to probation, 67 release of information forms were signed and forwarded to CCHCS for the release of records to community providers.

Housing for patients often could not be secured until the patient had left the institution, so the coordinator provided each patient with a packet of information upon release, which included multiple housing options that were available to them.

The coordinator facilitated pre-release groups and utilized the CDCR headquarters curriculum. Groups were offered and scheduled weekly for both EOP and 3CMS patients, though typically, 3CMS patients were not allowed to attend them.

TCMP caseworkers reported assisting 161 MHSDS patients with benefit applications during the review period. Of these, 26 were EOP, and 135 were 3CMS patients. Benefit applications for 142 patients were submitted to Medi-Cal, seven applications were submitted to other medical insurance providers, 12 were either late referrals, out-to-court or refused TCMP assistance. TCMP caseworkers did not report any significant challenges completing their work, but the supervisor acknowledged difficulties scheduling confidential appointments as a result of COVID-19, particularly with expedited releases and lockdowns due to isolation and quarantine.

The pre-release coordinator and TCMP caseworker collaborated well on behalf of mental health patients.

CC Is were responsible for assisting patients with Cal ID applications. In instances when patients were unable to obtain identification, the coordinator attempted to release them with their CDCR ID, and to provide them with information on how they could obtain important documents, such as their birth certificate and social security card.

Program Access:

    a.  Jobs and Program Assignments
On March 4, 2022, CSP/Corcoran reported that of 1,339 available jobs, 36 EOP patients, or 17 percent of the EOP population, held job assignments. For 3CMS patients, 403 or 34

percent of the 3CMS population held job assignments, and for non-MHSDS incarcerated persons, 900 or 44 percent of the non-MHSDS population held job assignments.

For the 1,361 academic assignments, CSP/Corcoran reported that 44 EOP patients, or 20 percent of the EOP population, held assignments.  For 3CMS patients, 453 or 38 percent of the 3CMS population held assignments, and for non-MHSDS incarcerated persons, 864 or 42 percent of the non-MHSDS population held assignments.

Of 296 vocational education assignments, no EOP patients held assignments, 87 or seven percent of 3CMS patients held assignments, and 209 or ten percent of non-MHSDS incarcerated persons held assignments.

No voluntary education assignments were reported.

Of 135 substance abuse treatment assignments, it was reported that six EOP patients or three percent of EOP patients held assignments, as did 53 3CMS patients or four percent of 3CMS patients, and 76 or four percent of non-MHSDS incarcerated persons.

b.  Milestone Credits
A report for September 1, 2021, to February 28, 2022, indicated that of 218 EOP patients, 208 or 95 percent were eligible to earn milestone credits, with 81 percent earning the credit.  For 3CMS patients, 1,107 of 1,200 or 92 percent were eligible to earn milestone credits, with 14 percent earning the credit.  The data further reflected that of non-MHSDS incarcerated persons, 1,911 of 2,054 or 93 percent were eligible to earn milestone credits, with 16 percent earning the credit.

c.  Out-of-Level Housing
For the out-of-level housing of MHSDS patients, provided data reported that on March 17, 2022, 13 EOP and 31 3CMS Level I patients were placed in Level II housing, and 79 non-MHSDS Level I incarcerated persons were placed in Level II housing.  Thirty-seven non-

598

MHSDS Level II incarcerated persons were placed in Level I housing; one EOP and 18 3CMS Level II patients were placed in Level III housing, and 28 non-MHSDS Level II incarcerated persons were placed in Level III housing.  Four EOP and 11 3CMS Level III patients were placed in Level II housing, and 12 non-MHSDS Level III incarcerated persons were placed in Level II housing.  Twenty-two 3CMS Level III patients were placed in Level IV housing and 75 non-MHSDS Level III incarcerated persons were placed in Level IV housing.  Thirty 3CMS Level IV patients were placed in Level II housing, and 14 non-MHSDS Level IV incarcerated persons were placed in Level II housing.  Two EOP and 58 3CMS Level IV patients were placed in Level III housing, and 81 non-MHSDS Level IV incarcerated persons were placed in Level III housing.

    d.   <u>ADA Reasonable Accommodation and Grievance Procedures</u>
The institution provided a draft copy of the "CDCR Form 1824 – Request for Accommodation Process – Desk Reference Manual" and a roster indicating that 224 staff had attended training.

    e.   <u>Periodic Classification Score Reductions: EOP Patients</u>
CSP/Corcoran provided completed 840 forms which indicated that the institution was providing classification score reductions for EOP patients.

<u>Case-by-Case Reviews</u>:

CSP/Corcoran reported 62 patients were scheduled for 150-day case-by-case reviews.  A determination regarding whether the required members were present at the case-by-case reviews could not be made as the composition of the committee was not identified in the documents provided by the institution.  Of the 62 patients identified, two patients were transferred to other institutions prior to their scheduled review.  There were 16 patients awaiting resolution of a RVR

and/or district attorney referral, and an additional 19 patients elected to be retained pending transfer to their endorsed institution.

Classification hearing documents were requested and reviewed for ten MHSDS patients in administrative segregation. Five of the ten patients were transferred to other institutions prior to the site visit. The five remaining patients reviewed had been in administrative segregation for an average of 864 days, including two outliers who had been there for 1,196 days, with a controlling MERD of May 27, 2037, and 2,383 days, with a controlling MERD of November 29, 2031, at the time of the site visit.

The next hearing dates for all patients except one were scheduled appropriately. The ICC outcome for the remaining patient was for transfer. Information was not available for previously scheduled classification reviews.

As for MHSDS patients who required a 120-day pre-MERD review, CSP/Corcoran reported not being able to provide this information for the reporting period. Instead, the institution provided a snapshot of the information available on March 22, 2022. Of the 35 patients identified pending a pre-MERD review, 24 had active SHU terms. There were six patients held in administrative segregation, 21 patients in LTRH, seven patients in STRH, and one in the CTC. The average length of time that all patients were on maximum custody status was 185 days, with a range of 30 to 615 days.

"C" Status:

There were two EOP patients, five 3CMS patients, and two non-MHSDS inmates on "C" status during the site visit. The 3CMS patients were placed on "C" status due to program failure.

<u>Mental Health Referrals</u>:

During the reporting period, CSP/Corcoran reported a total of 3,055 mental health referrals; 692 referrals were made to psychiatrists, and 2,363 were made to PCs. The institution reported compliance for emergent and routine referrals for both disciplines but non-compliance for urgent referrals for both psychiatry and PCs.

<u>Treatment Space</u>:

The EOP clinic had adequate space for confidential interviews, although related to various COVID-19 outbreaks, such space was intermittently not utilized. There were three group treatment rooms in the 3B EOP clinic to conduct group therapy sessions.

The ASU EOP Hub treatment building included five group rooms with eight TTMs in each, one designated IDTT room, and nine interview rooms with plexy-glass separating patients from clinicians. All treatment space in the ASU EOP Hub allowed for confidentiality.

The STRH had one large group room, one IDTT room, and four interview rooms for individual mental health appointments. All mental health treatment space was adequate and allowed for confidentiality. The one group room had eight restart chairs arranged in a semi-circle.

The LTRH housing units had two rooms for groups, two rooms for IDTTs, and a total of eight rooms (five in one building and three in another) for individual contacts. All treatment space offered confidentiality; however, one observed group room required custody staff to leave the adjacent break room for confidentiality. While most mental health treatment areas had TTMs, two areas in the front of the housing units placed patients in cells, previously used for staging, during confidential individual interviews.

<u>Custody and Mental Health Partnership Plan</u>:

CSP/Corcoran's CMHPP LOP was dated January 2022 and was compliant with statewide policy.

The institution reported that 596 of 1,028 custody staff, or 58 percent, attended the annual off-post training, and 18 of 44 clinical staff, or 41 percent, also attended the training.

CSP/Corcoran did not document discussing executive joint leadership rounding at executive staff meetings, quality management committee meetings, or mental health subcommittee meetings. The institution did not provide executive leadership joint rounding documentation.

As for quarterly round table trainings, the institution provided IST sign-in logs for the third and fourth quarters of 2021. However, no documentation was provided to determine the total number of staff who were required to attend the training, therefore compliance could not be determined.

The monitor reviewed the huddle reports for February 2022 for LTRH and STRH. In LTRH, there were eight reports missing from a total of 78 reports for February 2022. In STRH, two huddle reports were missing from a total of 39 reports for February 2022 on second and third watch. All huddle reports, except one for third watch for LTRH, which did not have a custody staff member present, included required staff in attendance. The monitor observed a second watch huddle in LTRH, which was found to be compliant with policy.

The monitor attended a second watch huddle in the MHCB, and all required participants were in attendance. The huddle form was used, and each MHCB patient was reviewed.

The EOP administrative segregation Hub morning huddle occurred in the sergeant's office on April 13, 2022. There was one psych tech, one mental health clinician, and one

custody officer.  CSP/Corcoran staff informed the monitor's expert that a sergeant was not available for the huddle on this date.  A mental health clinician facilitated the meeting and reviewed high risk patients, five-day follow-ups, new arrivals, departures, broken equipment, medication compliance, and other relevant matters.  The morning huddle was generally adequate, as all relevant topics were covered, and all attendees contributed useful information.

The monitor's expert observed the STRH morning meeting on April 13, 2022.  This meeting took place in the housing unit sergeant's office and was facilitated by a mental health clinician.  All expected disciplines were present and contributed to the discussion, which included relevant patient and housing unit updates, medication issues, behavioral concerns, and other relevant topics.  The monitor's expert found the STRH morning huddle was generally adequate.

The monitor's expert observed one LTRH morning meeting.  All expected disciplines were present.  Custody and healthcare staff shared pertinent patient information, including high risk patients, new arrivals, behavior issues, and specific patient concerns requiring follow up.  The morning meeting was well attended, organized, and covered all relevant topics.

The institution reported nine patients were scheduled to attend EOP orientation groups during the review period.  The report included three patients who were scheduled multiple times to attend these groups.  The institution identified the mental health instructor and patient peer participant, but no custody staff was identified to be part of the team.

CSP/Corcoran reported a total of 120 staff complaints filed by MHSDS patients, with 40 pending OIA or AIMS review.  There were also 112 staff complaints filed by non-MHSDS patients.  No staff was reassigned due to a staff complaint being filed.

Heat Plan:

CSP/Corcoran provided the current operating procedure for the heat plan, as well as a current copy of the heat plan memorandum dated May 3, 2021, received from CDCR headquarters. The heat plan was active for two months during the reporting period. There were 23 Stage I heat alerts in September, and no Stage II or Stage III heat alerts. There was one Stage I heat alert in October and no Stage II or Stage III heat alerts. No patient heat-related illnesses were reported.

Custody staff in the ASU EOP hub, the MHCB, and housing units 3A02, 3A01, 3B01, 3B05, and 3C03 were interviewed regarding their knowledge of the heat plan. The staff were predominantly familiar with the stages and requirements of the heat plan, received heat lists as required, and knew where to obtain a copy of the heat list if needed.

Review of the heat logs reflected the hourly logging of the outside ambient air temperatures according to policy.

RVRs:

Of the custody staff required to complete RVR mental health assessment training, 97 percent completed the required training. The institution reported that 91 percent of the mental health staff were also trained.

Of the 1,158 RVRs issued during the review period, 665, or 57 percent, were issued to MHSDS patients. Of those RVRs issued to MHSDS patients, 417 were issued to 3CMS patients, 162 were issued to EOP patients, 55 were issued to patients in the MHCB, 27 were issued to patients at the intermediate level of care, and four were issued to acute care patients.

The monitor reviewed a random sample of 15 RVRs that all included mental health assessments. Seven of 15, or 47 percent of RVRs, were timely referred to mental health for

mental health assessments.  The assessments were timely returned to custody 93 percent of the time.

Ten of the mental health assessments recommended penalty mitigation.  However, one of the clinical recommendations was that the patient continue to have access to mental health programming, which cannot be imposed as a penalty by custody and showed a lack of knowledge by the clinician about penalty mitigation.  The senior hearing officer documented penalty mitigation in nine of ten cases when the clinician recommended mitigation.

The senior hearing officer documented consideration of the mental health assessment in six of 15 cases or 40 percent of the time.

The monitor noted concerns in two cases where patients were issued two RVRs that stemmed from the same interactions; in one case, two RVRs were issued to a patient one minute apart and in another case, two RVRs were issued to a patient 11 minutes apart, resulting in the stacking of RVRs against both patients.

The monitor reviewed documentation from four ICC meetings to examine the consideration of mental health input during the meetings.  The ICC complied with the policy by considering mental health input but did not take any action to mitigate any SHU terms as a result of the RVR.

Use of Force:

CSP/Corcoran reported that 97 percent of custody staff and 85 percent of required mental health staff attended use of force training.

The institution reported that there were six controlled use of force incidents involving MHSDS patients during the review period and 154 immediate use of force incidents, of which 115, or 75 percent, involved mental health caseload patients.

The monitor reviewed the three controlled use of force incidents that had completed the administrative review process and had concerns with all three incidents.  In one incident, OC spray was used on the patient, and then he was ordered to submit to an unclothed body search.  This action was not addressed at any stage of the administrative review.

In another incident, the only language used in the report to justify the use of force stated that the patient was creating a safety and security issue and provided no further details.  This blanket statement was not addressed during the administrative review process.

In the third incident, the patient was extracted from his cell and immediately placed in the MHCB due to his bizarre behavior.  However, Title 15 prohibited the issuance of a RVR when a patient was extracted from a cell in order to be placed into a HLOC.  This was not addressed during the administrative review of the incident.

Eleven immediate use of force incidents were reviewed by the monitor, and all were compliant with CDCR policy and procedure.

<u>Lockdowns/Modified Programs</u>:

During the reporting period, there were 619 program status reports (PSRs).  C Yard had remained on a modified programming status for approximately four years due to tension between two gangs.  To address this issue, the institution assigned three programming days to each group every week.  All patients received ducats for their designated days, and emergency requests were addressed by the building managers.

Positive COVID-19 outbreaks in the various housing units accounted for most of the other modified programming, with certain sections within the housing units being quarantined or isolated.  Often, modified programming allowed for continued access to medical care, mental

health care, dental care, and specialty care, although at least half of the visits occurred at cell front.

Access to Care:

A review of CSP/Corcoran's monthly Health Care Access Quality Reports from September 2021 through February 2022 indicated that zero mental health ducats and add-on appointments were not completed due to custody factors. Further, 25 percent of the non-completed appointments were due to patient refusals; 75 percent were due to non-custody factors.

Placement of 3CMS Patients into Minimum Support Facilities:

CSP/Corcoran housed two 3CMS patients in the MSF during the review period.

*Coleman* Postings:

There were *Coleman* postings in all housing units and program areas visited, including the ASU EOP hub, the MHCB, housing units 3A01, 3A02, 3B01, 3B05, and 3C03, and the mental health office buildings.

**APPENDIX B-13**
**SALINAS VALLEY STATE PRISON (SVSP)**
**(April 11, 2022 – April 14, 2022)**
**Review Period: (September 1, 2021 – February 28, 2022)**

Census:

On April 11, 2022, SVSP housed 2,898 incarcerated persons, which was a ten percent decrease from the prior reporting period.  The mental health caseload population of 1,279 patients was 44 percent of the institution's population and represented a 14 percent decrease since the prior review period.

There were nine patients in the MHCB and one in alternative housing.

The CTC housed two MHSDS patients for medical treatment.

The 234 mainline EOP and 942 mainline 3CMS patients represented respective 32 percent and 10 percent population decreases since the preceding review period.

The administrative segregation population included 16 EOP patients pending transfer to an EOP hub, four 3CMS patients pending transfer to STRH, and 71 3CMS patients housed in STRH.

Staffing:

SVSP staff described the institution's mental health staffing as being in a state of crisis, with low morale and high "burnout," and the inability to satisfy treatment requirements. Between January 2021 and the site visit, SVSP lost 2.5 senior psychologist supervisors, two senior psychologist specialists, nine psychologists, and five social workers.  The functional vacancy rates for psychology and social work were 39 and 50 percent respectively.  Primary clinicians who provided services in the mainline EOP and 3CMS programs had caseloads that meaningfully exceeded established staffing ratios.

At the time of the site visit, SVSP had prioritized staffing assignments by acuity by program and within programs. SVSP's leadership team highlighted the institution's chronic staffing shortages, high mental health staff turnover, and the inherent limitations of primarily relying on registry staff as impediments to providing appropriate care to MHSDS patients. Staff further reported that custody staffing shortages resulted in frequent mental health program interruptions, including cell-front contacts and canceled groups.

The position of chief psychiatrist was filled. The senior psychiatrist position was vacant. Both civil service psychiatry positions were vacant. SVSP used 3.4 contractors, reducing the psychiatry functional vacancy rate to zero. There was a 13 percent vacancy rate for telepsychiatry, with 5.68 of 6.5 positions filled.

Both chief psychologist positions were filled. One chief psychologist was designated as the chief of mental health.

Although 2.5 of four senior psychologist supervisor positions were filled, two senior psychologist supervisors were on long-term leaves, reflecting an 88 percent vacancy rate. The out-of-class assignment of a senior psychologist specialist as a senior psychologist supervisor reduced the functional vacancy rate to 63 percent.

Two of five senior psychologist specialist positions were filled. However, one senior psychologist specialist was assigned to quality management institution-wide and reported to the CEO, and the other, as reported above, was assigned as a senior psychologist supervisor. As such, the senior psychologist supervisor vacancy rate was 100 percent.

Of the 29 psychologist positions, five were filled for an 83 percent vacancy rate. A total of 12.7 registry psychologists provided services resulting in a functional vacancy of 39 percent.

The supervising social worker position was filled.  Although six of 13 social worker positions were filled, one social worker was on a long-term leave, reflecting a 62 percent vacancy rate.  One social worker was unlicensed.

All 12 recreation therapist positions were filled.

SVSP did not have any psych tech positions.

Two of seven medical assistant positions were filled for a 71 percent vacancy rate.  The two medical assistants and two specially trained CNAs provided tele-presenting services.

The CHSA position was vacant.  The OSS II position and two of 2.5 HPS I positions were filled.  The 0.5 AGPA position was vacant.

Ten of 15 office technician positions were filled, for a 33 percent vacancy rate.

<u>Telepsychiatry</u>:

One telepsychiatrist provided services in the mainline EOP program, another provided them in STRH and administrative segregation, three others provided services for mainline 3CMS patients, and a part-time telepsychiatrist covered some after hours on-call functions.  A telepsychiatrist previously assigned to SVSP was transferred to the SVSP-PIP shortly before the site visit.

The chief psychiatrist reported that the primary clinician checked on patients who refused telepsychiatry.  The patient was subsequently rescheduled for telepsychiatry, and, if he again refused, another IDTT was held to address any barriers to the patient attending the appointment.  If the patient continued to refuse telepsychiatry appointments, the telepsychiatrist would see the patient when on-site.  Telepsychiatrists visited SVSP every three months.

<u>Staff Recruitment</u>:

For recruiting clinical staff, SVSP relied on central hiring and also participated in local employment fairs. Similar to other CDCR mental health programs, the registry contracting agent hired SVSP registry staff.

Some SVSP staff reported feeling demoralized about the upcoming increase in the pay differential for mental health staff working in the PIPs, including the SVSP-PIP. Mental health leadership further reported being aware of several civil service staff who were in the process of transferring to the SVSP-PIP.

<u>Quality Management</u>:

The local governing body met monthly and achieved quorums during the reporting period. Regular agenda items included policies and procedures, privileging and credentialing, PIWPs, and audit preparation.

The quality management committee met monthly and always attained quorums. Regular agenda items included PIWPs, reports from the various subcommittees, including mental health, the health care dashboard, LOPs, CTC policies and procedures, and patient safety, among others.

The mental health subcommittee met monthly and achieved quorums. Regular agenda items included reports on health care access quality, nursing, a health information management, system surveillance and quality concerns, patient safety, the CIT, alternative housing, MHCB, psychiatry mental health registries, PIWPs, SPRFIT, and the inpatient coordinator's report. However, reviewed minutes did not reflect action items. Mental health subcommittee information was emailed to line staff.

There were no QITs or FITs. SVSP completed a PIWP for suicide precaution and suicide watch. Otherwise, audits were not performed.

Pursuant to directions from mental health headquarters, the peer review process was being revised. As such, SVSP did not have a peer review policy in effect during the review period.

Medication Management:

SVSP provided MAPIP results for the six months of the review period for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated SVSP's compliance for obtaining height, weight, blood pressure, and thyroid tests for all six months of the review period. However, SVSP reported six months of noncompliance for the following measures: AIMS tests, CBCs with platelets, CMPs, and lipid monitoring. There was compliance for obtaining medication consent for four of six months. When a medication required an EKG, SVSP reported compliance for three months. SVSP was compliant with required glucose (blood sugar) monitoring for only two months.

For monitoring antidepressants, SVSP reported compliance for all six months for obtaining thyroid tests, and for checking blood pressure for patients who were prescribed venlafaxine. For obtaining EKGs, SVSP reported compliance for two of four required months. SVSP was also compliant for two months for obtaining medication consents.

For patients prescribed carbamazepine, for the one required month, SVSP was noncompliant with checking CBC, CMP, and blood levels, but compliant for obtaining medication consents.

As for monitoring Depakote (divalproex, valproic acid) levels, there was compliance for medication consents for four months. SVSP also reported compliance for three months for CBC

with platelets, and for two months for CMP. There was noncompliance for checking therapeutic monitoring of blood levels for all six months.

For lamotrigine, there was compliance for four months for obtaining medication consents.

For lithium, SVSP reported compliance for one of six required months for lithium level monitoring and medication consents. There was noncompliance for checking renal functioning and EKG monitoring for all six months. Thyroid monitoring was compliant for two months.

For medication management metrics reported by mental health headquarters, SVSP was noncompliant for all months for the following measures: continuity of (NA) and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), continuity of medications for MHCB transfers, continuity of medications from discharge/transfer from a community hospital and/or DSH, and observation of medication preparation a.m. and p.m. For both continuity of medications with intra-institutional transfer to ASU/SHU/PSU, and outpatient provider new medication orders, SVSP was compliant for three months. For continuity of medications upon inter-institutional transfer at R&R, continuity of medications upon parole/transfer to the community, and observation of medication preparation and administration at HS, SVSP reported compliance for two months.

SVSP reported compliance for psychiatrist-prescribed chronic care medication orders for all six months of the reporting period.

SVSP was not an authorized clozapine initiation or maintenance facility. However, during the review period, one SVSP patient was prescribed clozapine. The SVSP-PIP had previously treated this patient, who had been discharged to SVSP. However, the discharge had

occurred without consulting SVSP mental health leadership; leadership was in the process of transferring the patient to an authorized clozapine institution at the time of the site visit.

Psychiatrists could prescribe psychotropic medications for a maximum of 180 days. Bridge orders were allowed for 14 days.

There were monthly polypharmacy reviews, which the chief psychiatrist reviewed with prescribing psychiatrists.

The chief psychiatrist reviewed all non-formulary medications with the prescribing psychiatrist. While policy no longer required this review, the chief psychiatrist felt it was useful to review non-formulary medications with the prescribing psychiatrist. During the site visit, 166 patients received 276 non-formulary psychiatric medications.

SVSP reported that 761 patients received a total of 1,571 psychotropic DOT medications.

There was compliance for pill line lengths, except for the Facility C morning and noon medication passes, which averaged 2.5 hours. SVSP did not report problems with medication passes interfering with programming. From September through November 2021, the per person pill line wait times averaged several minutes. Reviewed documentation indicated that staffing shortages resulted in medications being given at cell front from December 2021 through February 2022.

SVSP was compliant with administering prescribed HS medications after 8:00 p.m. Notably, 438 patients received 668 HS medications. Patient refusal was the most common reason identified for a patient not receiving HS medications.

SVSP reported compliance for five of six months for PC 2602 involuntary medication orders.

During the review period, SVSP submitted 17 initial involuntary medication petitions. Six were emergent. All petitions were granted. SVSP renewed 54 PC 2602 petitions and withdrew three. At the time of the site visit, 59 patients received involuntary medications. No use of force was required to administer involuntary medications.

Transfers:

SVSP's inpatient coordinator had only held the position for six months at the time of the site visit. She was nonetheless very knowledgeable and would be a strong support to IDTT teams. The institution did not have a backup inpatient coordinator.

During the review period, SVSP had one minor sustainability review in November 2021 and one major sustainability review in March 2022, which occurred remotely due to COVID-19-related restrictions. The minor review observed IDTTs and other operational activities within the MHCB, administrative segregation, STRH, and EOPs and conducted tier walks.

The sustainable process reviews included a headquarters' audit that evaluated the accuracy and quality of a sample of HLOC forms. The audit included whether the HLOCs were thoroughly completed and provided adequate clinical justification for patient non-referral to a HLOC when there were positive referral indicators. The sustainable process reviews also analyzed the soundness of clinical interventions in instances of patient non-referral, as well as the interrater reliability between the headquarters' reviewer's judgment and that of SVSP's inpatient coordinator as to the acceptability of the HLOC forms.

The reviewed sustainability reports reflected moderate, acceptable correlations of between 75 and 80 percent between headquarters and the inpatient coordinator.

The monitor's expert's review of patient records indicated several areas of continued concern and were generally consistent with the findings from the sustainable process. Among

them, clinical rationales were inadequate to justify patient non-referral, did not address positive referral criteria, and/or were simply cut and paste from prior HLOC forms.  Treatment modifications were also typically inadequate as they often merely restated Program Guide standards, did not include clinically appropriate interventions for the positive indicator(s), and/or were simply inappropriate, such as recommending more group therapy for a paranoid patient who refused to attend group.

During the review period, there were 307 instances of 186 patients who were considered for but not referred to a HLOC.

SVSP referred 30 patients to inpatient care, including seven to acute care and 23 to intermediate care.

The MHCB generated all seven acute care referrals.  None were rejected.  SVSP was compliant for the timely submission of all acute care referral packets to IRU.

Six of seven referred acute care patients transferred; the remaining referral remained at SVSP due to a medical hold.  Only one of six patients timely transferred to acute care within ten days.  The average transfer time after IRU's receipt of the referral was 25 days, with a range of eight to 59 days.  The SVSP inpatient coordinator reported that the closure of acute care beds at CHCF impacted these transfers.

Of the 23 intermediate care referrals, the EOP program generated 18 and the MHCB generated five.  Four intermediate care referrals were rejected; all four referrals were ultimately rescinded due to patient stabilization.  SVSP timely submitted all intermediate care referrals packets to IRU.

Of the 19 patients who transferred to intermediate care, only six or 32 percent timely transferred within 30 days of IRU's receipt of the referral.  Intermediate care transfers averaged

36.5 days and ranged from six to 91 days. One transfer delay was due to the patient's refusal to transfer.

During the site visit, on April 13, 2022, one patient was awaiting an inpatient care acceptance decision; the referral was submitted to IRU on April 12, 2022.

The institution requested expedited transfers for three acute care and four intermediate care referrals. Two of the requests for intermediate care patients were denied.

SVSP did not report any patients with complex medical needs who transferred to inpatient programs during the review period.

The institution conducted 12 *Vitek* hearings for two acute care patients and ten intermediate care patients. All hearings were scheduled within the required five business days. No patients prevailed at *Vitek* hearings.

The inpatient coordinator reported that the transport log, which was completed by the CC II and updated and emailed several times daily, provided notification of patients' return to SVSP. Notice of patients' return ranged from 24 hours to one month. The inpatient coordinator also maintained an internal log of returning patients that included the date of patients' expected return, and dates of required follow-ups upon return. Following notification of a patient's anticipated return, the inpatient coordinator reviewed the EHR and discharge summary, contacted the sending institution for additional information, if necessary, and forwarded an email to the IDTT team. The inpatient coordinator also emailed the treating clinician about the need to complete the required continuity of care contact with the sending institution. Once the continuity of care contact was completed, a communication note was recorded in the patient's records and in the transport log. The monitor reviewed the log, which reflected that continuity of care contacts occurred as required.

For SVSP patient referrals to inpatient care, the inpatient coordinator contacted the receiving institution's inpatient coordinator to ensure that the referral was not dropped. Documentation of these contacts was included in the inpatient coordinator's internal log.

SVSP referred 283 patients to the MHCB, of which 142 referrals were rescinded and 141 resulted in admission.  Fifteen referrals or five percent took longer than 24 hours to transfer or rescind.  Forty-eight patients transferred to outside MHCBs, including 32 to CMC, six each to CHCF and CSP/Corcoran, and four to CSATF.

SVSP did not track transfers to the PSU or to EOP hubs during the review period.

SVSP patients requiring the EOP level of care were transferred to the institution's EOP program.

During the review period, SVSP reported reducing 55 patients' level of care from EOP to 3CMS.  Eleven patients, or 20 percent, returned to a HLOC within six months.

The institution did not provide data on patient transfers to STRH.

No 3CMS patients transferred to SVSP's MSF during the review period.

Programming:

STRH:

A telepsychiatrist who provided services to all STRH and administrative segregation patients had caseloads within the established staffing ratios.  One full-time and two half-time primary clinicians who provided services in STRH and administrative segregation, including treatment to EOP patients awaiting transfer to an EOP hub, carried caseloads within the established staffing ratios.

STRH staff expressed concern with the unit's lack of adequate staffing, which included losing staff to large healthcare organizations.  STRH staffing was reportedly prioritized over

staffing for other programs, including the EOP and 3CMS programs. The monitor's expert was thus concerned that STRH staff felt understaffed.

The STRH housed 428 patients during the review period. Patients' stays averaged 44 days and ranged from one to 259 days.

Thirteen patients were randomly selected to have their healthcare records reviewed for their STRH stays.

Six of 11 or 55 percent of patients had a timely initial psychiatry evaluation, while two patients did not have initial psychiatry contacts. Five of seven or 71 percent of routine psychiatry contacts timely occurred within 90 days. The telepsychiatrist confidentially conducted all initial and routine psychiatry evaluations.

Seven of 13 or 54 percent of required initial primary clinician contacts timely occurred; 85 percent were confidential. One of 41 or two percent of routine primary clinician contacts timely occurred within seven days; 38 percent were confidential.

Five of 12 or 42 percent of initial IDTTs were timely. Required staff attended 100 percent of initial IDTTs; patients attended 75 percent. Five of eight or 63 percent of routine IDTTs timely occurred every 90 days. Required staff attended 100 percent of routine IDTTs; patients attended 25 percent. Although a psychiatrist and primary clinician always attended the IDTTs, it could not always be determined whether the assigned treatment provider attended the IDTTs.

Three observed STRH IDTTs started 90 minutes late due to the absence of the regular office technician. The IDTTs took place in an area that was adequate in terms of space, light, and temperature. All required disciplines attended. The CC I actively participated and contributed meaningful information. A telepsychiatrist covered for the regular psychiatrist.

Because the telepsychiatry equipment did not work, the telepsychiatrist joined by way of an audio-only cell phone. The monitor's expert's concern that a required treatment team member was unable to see patients during IDTTs was amplified by the telepsychiatrist covering for the assigned psychiatrist.

Observed IDTTs reflected numerous concerns. Among them, a lack of custody officers resulted in one patient not being able to attend the IDTT. Further, case conceptualizations were frequently limited in their attempted presentation of a salient clinical picture. Although the primary clinician attempted to set measurable, time-limited goals, the goals were plagued by impracticality, lack of clarity, and limited patient input. For example, one goal sought to reduce the patient's number of RVRs to "two out of ten." For another example, the stated goal for a patient who had recently been treated in the MHCB was to reduce his level of depression to "zero out of ten" for three months. While ideal, the goal was not realistic. In some cases, the PC did not discuss issues surrounding suicidality until prompted by the supervisor.

The treatment team only partially discussed HLOC referral indicators and did not discuss them in an organized and succinct manner. Despite a patient being on a medication that was frequently used to treat anxiety, the PC did not know that an anxiety disorder diagnosis was listed in the chart until the supervisor's prompting. One reviewed patient did not have a treatment plan. Another patient stated that he had been requesting appointments with his PC because he wanted to be raised to the EOP level of care. Notably, the supervisor decided to place the patient in the EOP program, which appeared clinically appropriate.

Despite significant staffing challenges, the chiefs of mental health reported that group treatment remained a top priority. The STRH offered 20 90-minute weekly groups, which the

same RT facilitated. Group topics included anger management, coping skills, meditation, life skills, positive thinking, symptom management, recreation, and self-esteem.

An observed coping skills group started timely and contained three participants. Despite the monitor's expert's multiple efforts explaining that his presence was for group observation, the patients and the facilitator frequently directed comments and questions to the monitor's expert. Group participants complained about both mental health and custody staff. Concerns included confidential information they had discussed with mental health staff being shared with custody, custody staff reading complaint forms, and medical staff administering medications at cell front instead of in the nursing office. Significantly, group content was not related to the stated group topic and was of limited therapeutic utility.

Five observed ICC hearings all found a mental health representative in attendance. However, the psychologist did not engage or interact with patients beyond asking baseline, preliminary questions. The questions included whether the patients had mental health problems and needed help or a mental health referral, and/or were thinking of hurting themselves or others. One of two CC IIs in attendance introduced the ICC members to each patient. She concluded by asking each patient whether they understood and agreed to what was happening, and to relay the information back in their own words.

A review of 22 weeks of STRH 114s demonstrated the conduct of all ICCs within ten days. Showers were properly offered three times weekly for 19 of 22 or 86 percent of the weeks reviewed. Notably, 18.5 weekly hours of yard time were only offered for 16 of 22 or 73 percent of the weeks.

Custody staff reported that STRH unclothed body searches were generally conducted in patients' cells but were occasionally conducted in holding cells. Custody staff asserted that they

used a mesh-like covering to maintain privacy when using holding cells for unclothed body searches; however, the mesh-like covering was broken and inoperable for two weeks prior to and during the site visit because a work order had yet to be made.  Consequently, as necessary, unclothed body searches were conducted in a wet cell with partially covered glass.  Staff reported not receiving any training for unclothed body searches.

> Non-Disciplinary Segregation:

There were nine STRH patients on NDS status during the reporting period.  During the site visit, three 3CMS STRH patients were on NDS status.

MHCB:

SVSP's ten-bed MHCB reopened in July 2020 following closure by the *Plata* Receiver.

During the site visit, one on-site psychiatrist and two psychologists who provided MHCB treatment had caseloads that were within established staffing ratios.  The psychiatrist generally worked a regular schedule while the two PCs covered all seven days of the week.  The MHCB had regular custody staff.  The MHCB has provided dayroom to patients since the recreation therapist was moved from the unit in November 2021.

Most patients reported that initial evaluations typically occurred in a confidential space or during IDTT.  They further reported daily clinical contacts which frequently occurred at cell front or in other non-confidential areas, which record review confirmed.  Ongoing treatment more commonly also occurred at cell front.  However, patients expressed an interest in more confidential encounters.

Nine patients were randomly selected to have their records reviewed for their MHCB stays.  All nine patients received an initial primary clinician evaluation within 24 hours of

admission.  Six of nine received timely initial psychiatry evaluations.  It was not specified whether the evaluations were held in a confidential setting.

All 23 of the required twice-weekly psychiatry contacts occurred timely; 22 percent were confidential.  Fifty-four of 55 or 98 percent of required daily clinical contacts occurred; five percent were confidential.

All nine patients had timely initial IDTTs within 72 hours of admission.  Required staff attended eight of nine initial IDTTs.  One hundred percent of patients who required routine IDTTs had them within seven days of their initial IDTT.  All patients had a discharge IDTT.

During the site visit, the MHCB's nine patients included two "dual" MHCB/medical patients, one of whom had been housed in the MHCB for one year.  SVSP had twice referred him to acute care, and he was currently documented at the acute level of care pending placement to an inpatient care facility.  Staff reported a recent CCAT where the IRU committed to assisting with the patient's placement.  He was a "complex medical case," and his treatment team had been told that the system had few beds for such patients, and none were currently available.

Review of this patient's record indicated multiple deficiencies in treatment planning, ongoing treatment, and utilized behavioral interventions, as well as failing to timely transfer him to appropriate inpatient acute care treatment.  The treatment team also had concerns about rewarding the patient's positive behavior, which demonstrated their lack of knowledge about behaviorism and behavioral interventions.  It was also concerning that MHCB clinical supervisors were not more actively involved in helping the treatment team identify empirically based interventions for the patient.

Observed MHCB IDTTs revealed a treatment team that was not cohesive and lacked an integrated treatment planning process.  Treatment team members had to be prompted to discuss

their observations and patient concerns.  The treatment team failed to discuss discharge decisions, which the PC had made prior to the IDTT.  The team also failed to properly address positive HLOC referral considerations, and there was a lack of discussion about treatment planning, patient retention and discharge, case conceptualization, and each discipline's specific interventions.

Review of MHCB patients' records revealed that the IDTT team typically used cut-and-paste functions for treatment planning, resulting in a lack of individualized treatment plans. This was particularly concerning for MHCB patients because the treatment team did not cohesively work together during IDTTs to identify treatment targets and effective interventions. Reviewed treatment plans often were not updated in a clinically relevant manner.

<u>Seclusion and Restraint</u>:

There were no episodes of restraint during the review period.  Seven seclusion incidents involved four patients.  One patient was placed in seclusion three times during a 28-hour period. Although the seclusion log was not thoroughly completed for all incidents, medical record documentation of the incidents was consistent with the Program Guide.  There was a need for the treatment team to update treatment plans following seclusion episodes.

<u>Crisis Intervention Team</u>:

SVSP's LOP was consistent with the statewide CIT policy.  However, due to insufficient mental health staffing, leadership reported that the CIT had completely ceased operations on April 1, 2022, when staff resignations resulted in both clinicians who were assigned to the CIT being reassigned to STRH.  In reality, as staff confirmed, mental health and nursing staffing deficits resulted in the CIT not being fully functional during the review period.  Staff reported instances of having to cover for the CIT that led to decreased care for their caseload patients.

Just prior to the site visit, SVSP assigned two primary clinicians to the CIT from 7:00 a.m. to 7:00 p.m.  At the time of the site visit, SVSP reported that line staff primarily from the facility where the crisis originated covered crisis calls during weekdays; however, alternate facilities also provided CIT services when there was a lack of staff.  On weekends and holidays, SVSP reported that it attempted to have a CIT clinician on-site but due to staffing limitations this was not always possible.

A part-time telepsychiatrist provided coverage for some after-hours calls.  Two on-site psychiatrists provided on-call services on weekends and during after-hours on weekdays that were not covered by telepsychiatrists.

Staff reported that CIT activations in March 2022 had doubled since February from 46 to 105 activations.

Alternative Housing:

At the time of the site visit, SVSP was revising its alternative housing LOP.  The draft LOP was consistent with approved CDCR operating procedures and appropriately reflected priority of housing locations for patients awaiting MHCB placement.

EOP:

Two on-site psychiatrists and one telepsychiatrist provided services to the mainline EOP program and carried caseloads within the established staffing ratio.  Except for one PC who was assigned to the EOP quarantine unit, all EOP primary clinicians carried caseloads that exceeded the established staffing ratio.  A half-time primary clinician carried a caseload of 27 patients and a 0.75 PC had a caseload of 39 patients.  The remaining clinicians carried caseloads between 43 and 52 patients.

Staff reported that SVSP was unable to offer mainline EOP patients the required ten weekly hours of structured treatment.

During the site visit, five EOP patients were on modified programming. Staff estimated that this number was lower than anticipated given IDTT delays.

Leadership reported that patient refusal data included mainline EOP patients who did not attend groups, despite not officially or clearly refusing the group. Notably, refusal data could be artificially elevated and impacted the sustainability data.

Nineteen EOP patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

Seven of 13 or 54 percent of patients had required initial psychiatry evaluations prior to the initial IDTT and within 14 calendar days of arrival. Two patients did not receive an initial psychiatry contact. Telepsychiatry conducted 55 percent of initial psychiatry contacts. Eighty-nine percent were conducted confidentially. Thirty-three of 59 or 56 percent of routine psychiatric contacts timely occurred within 30 days; the telepsychiatrist conducted 26 percent. Eighty-eight percent of routine psychiatry contacts were confidential.

Ten of 13 or 77 percent of initial primary clinician contacts timely occurred within 14 calendar days of arrival. Fifty-eight percent were confidential. One patient did not have an initial primary clinician contact. Thirty of 79 or 38 percent of routine primary clinician contacts were timely; 69 percent were conducted confidentially.

Eight of 13 or 62 percent of initial IDTTs timely occurred within 14 calendar days. Required staff attended 83 percent of initial IDTTs. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this assignment was not clearly discernable for all cases.

Four of 14 or 29 percent of routine IDTTs timely occurred within 90 days. Required staff attended 94 percent of routine IDTTs; patients attended 61 percent. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, such an assignment was not clearly discernable for all cases.

Facility A

The monitor's expert observed six initial and one routine IDTT. Five of the six initial IDTTs addressed patient discharges from either the MHCB or the PIP; four were overdue by an average of 15 days. The one routine IDTT was 35 days overdue.

Primary clinicians facilitated the IDTTs, which all required staff attended. The correctional counselor provided relevant input. An on-site psychiatrist attended all but one IDTT, which an on-site psychiatrist attended using telepsychiatry equipment because he did not want to walk to the IDTT from the other side of the facility. The telepsychiatry equipment had a large screen for viewing patients, with clear sound, and there were no connectivity issues.

One of two observed clinicians was very good; the other clinician's presentation needed improvement with level of care rationales and HLOC indicators. The supervisor provided very good clinical insight but at times provided premature prompts to clinicians to discuss required IDTT criteria. Neither clinician discussed group referrals or group progress related to patients' treatment goals.

Group treatment and education were scheduled in one-hour blocks between 8:45 a.m. and 2:00 p.m. RTs primarily facilitated groups, although there were also hourly nurse-led groups and a few clinical caseload groups.

Two observed groups that RTs conducted were effective. The RTs knew patients' names and had a good rapport with them. Eight patients attended a social skills communication group

627

that showed a movie. At pertinent points, the RT paused the movie for group discussion. Although only two of eight scheduled patients attended the other RT group, the attending patients were attentive and engaged.

An observed nurse-led life skills group that two patients attended was psychoeducational in nature, with the nurse providing information relating to coping skills. However, only one of two patients was actively engaged. The group began 15 minutes late and ended ten minutes early. The nurse informed patients multiple times during the group that they could leave at any time or not attend if they had competing activities.

Interviewed patients reported that, due to staffing shortages and lockdowns, they were locked in their cells most of the time. They further reported having recently been locked in their cells for ten days due to patient drug overdoses and believed that during this period, they should have at least received regular mental health check-ins. Supervisory staff added that rounds could not be conducted due to housing unit searches. Patients further reported that custody staff needed further training to work with mental health patients; it was reported that they used vulgar language and were disrespectful and easily frustrated. Patients also reported that custody staff did not allow them to attend group if they had "words" with custody staff.

<u>Facility D</u>

Observed EOP patient IDTTs were attended by an on-site psychiatrist and a telepsychiatrist. The telepsychiatrist had seen all the patients prior to the IDTTs. He conveyed clinically useful information and reviewed medications, indications for each medication, and screened for side effects. He had rapport with the patients who were engaged in the discussion with him. There were no technical issues with telepsychiatry.

An observed PC-led group that three patients attended was very good.  The primary clinician checked in with each patient and then conducted a semi-structured discussion on stress management.  The group reflected the group process with patients interacting with the clinician and with each other.  Patients provided support to one another and engaged in problem solving.  An observed RT leisure skills group included active discussion and activities on coping skills.

Overall, interviewed patients reported finding the EOP program helpful and liking their providers.  However, they also reported access to care issues that included canceled groups and not being released from their cells or housing units.  They expressed an interest in more yard and group treatment and indicated concern that other patients' suicidal statements were not taken seriously.  Patients further reported that their laundered clothes were often either not returned or were returned dirty.  Some patients reported cleaning their clothes themselves and, at times, in the toilet.

3CMS:

Caseloads for three telepsychiatrists assigned to the mainline 3CMS program ranged from 301 to 332 patients, exceeding the established staffing ratio.  3CMS primary clinicians carried caseloads of 101, 200, 309, and 329 patients, which all also exceeded the established staffing ratio.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Three of eight or 38 percent of patients who required initial psychiatric evaluations timely had them prior to the initial IDTT.  Three initial psychiatry contacts did not occur.  Telepsychiatry conducted all initial psychiatry evaluations.  Seven of 18 or 39 percent of

required routine psychiatry contacts timely occurred within 90 days. All psychiatry contacts were confidential.

Two of eight or 25 percent of patients had timely initial primary clinician evaluations within ten working days. Three patients did not receive an initial PC contact. Two of 19 or 11 percent of routine primary clinician contacts timely occurred within 90 days; 56 percent were confidential. Confidentiality was impacted by the COVID-19 pandemic during the review period.

Four of eight initial IDTTs timely occurred within 14 working days. Two patients did not receive an initial IDTT. Two of ten or 20 percent of routine IDTTs occurred annually. Required staff attended 100 percent of initial and routine IDTTs. Six patients had not had a routine IDTT since 2020, and others were overdue by over 100 days.

Six 3CMS patients interviewed in a group setting all reported not meeting with their assigned PC according to Program Guide requirements. One patient stated not knowing his PC. The patients also reported frequent changes in assigned PCs, which negatively impacted the ability to form a therapeutic relationship. The patients similarly reported challenges in their abilities to meet with their psychiatrist and reported that psychiatry contacts did not occur within timeframes. One patient indicated a lapse in medications, despite submitting multiple requests to have them refilled. Patients also raised concerns with infrequent yard time, showers, and phone time, which they stated contributed to worsening mental health. Due to staffing shortages, 3CMS patients were not offered group treatment.

Other Issues:

Pre-Release Planning:

SVSP primarily assigned a part-time licensed social worker to conduct pre-release planning activities for 86 EOP and 3CMS patients during the review period. Documentation indicated that pre-release activities included individual contacts, headquarters' pre-release conference calls, and obtaining additional patient resources as needed. The institution briefly offered pre-release groups early in the review period before COVID-19 modifications disrupted group treatment. TCMP data was not available for review.

Program Access:

a. Job and Program Assignments

During the reporting period, of 1,343 job assignments, 86 were held by EOP patients, representing 33 percent of this population; this was a 13 percent decrease from the prior review period. 3CMS patients held 453 job assignments, representing 42 percent of the 3CMS population, as did 804 or 48 percent of non-MHSDS incarcerated persons.

The 885 academic assignments were held by 62 or 24 percent of EOP patients, 368 or 34 percent of 3CMS patients, and 455 or 27 percent of non-MHSDS incarcerated persons.

The 53 vocational education assignments were held by one EOP patient, representing less than one percent of the EOP population, 21 or two percent of 3CMS patients, and 31 or two percent of non-MHSDS incarcerated persons.

The 106 voluntary education assignments were held by one or less than one percent of the EOP population, 22 or two percent of 3CMS patients, and 83 of five percent of non-MHSDS incarcerated persons.

The 15 substance abuse treatment assignments were held by one or less than one percent of EOP patients, seven or one percent of 3CMS patients, and seven or less than one percent of non-MHSDS incarcerated persons.

b.  Milestone Credits

On March 4, 2022, SVSP reported that 245 of 260 or 94 percent of EOP patients were eligible to earn milestone credits; 58 percent earned the credit.  Further, 983 of 1,083 or 91 percent of 3CMS patients were eligible for milestone credits; 13 percent earned the credit.  For non-MHSDS incarcerated persons, 1,528 of 1,678 or 91 percent were eligible to earn milestone credits, with 22 percent earning them.  Mental health leadership reported that milestone credits were only earned through one-to-one clinical sessions and review of in-cell packets, and not through group meetings.

c.  Out-of-Level Housing

SVSP reported that one custody Level I 3CMS patient was in Level III housing.  There were 87 custody Level II 3CMS and 21 custody Level II EOP patients in Level III housing, and three custody Level II 3CMS patients in Level IV housing.  Further, there were 31 custody Level III 3CMS and four custody Level III EOP patients in Level IV housing, and 47 custody Level IV 3CMS and 34 custody Level IV EOP patients in Level III housing.

d.  ADA Reasonable Accommodation and Grievance Procedures

SVSP confirmed implementation of the revised ADA accommodation and grievance procedures and provided a copy of the updated CDCR Form 1824 Desk Reference Manual.

e.  Periodic Classification Score Reductions: EOP Patients

SVSP provided completed CDC Form 840s reflecting the provision of classification score reductions for EOP patients.

<u>"C" Status</u>:

There were no MHSDS patients on "C" Status during review period or at the time of the site visit.

<u>Mental Health Referrals</u>:

SVSP had a comprehensive process to track responses to mental health referrals. Interviewed custody officers knew the circumstances that might require a mental health referral and how to submit one.

During the review period, SVSP reported 4,043 mental health referrals; there were 590 psychiatry referrals and 3,453 referrals to primary clinicians. Of the 551 emergent referrals, there was a 96 percent compliance rate for timely responding to the 27 psychiatry referrals and a 95 percent compliance rate for responding to the 524 primary clinician referrals. For the 306 urgent referrals, there was 35 percent compliance for timely responding to the 20 psychiatry referrals and 76 percent compliance for timely responding to the 286 urgent referrals. For the 3,186 routine referrals, there was a 70 percent compliance rate for timely responses to 543 psychiatry referrals and a 24 percent compliance rate for timely responses to 2,643 primary clinician referrals.

Mental health leadership reported that the lack of staffing was SVSP's primary obstacle to timely responding to urgent and routine referrals.

<u>Treatment Space</u>:

SVSP had limited available treatment space in the CTC/MHCB, which was restricted to one "multipurpose" room for individual and group treatment, and IDTTs. The only other treatment area was the outside yard.

The Facility C EOP program had four group rooms that mental health staff utilized as treatment space and six clinical offices for individual contacts. Staff did not report any challenges with the space for conducting groups. However, nursing groups often conflicted with the use of the treatment rooms for group.

The STRH's sole treatment space for groups was large, with adequate lighting. However, when multiple HEPA filters were in operation, it was often difficult to hear patients. STRH primary clinicians reported difficulty locating space for individual contacts.

<u>Custody and Mental Health Partnership Plan</u>:

Mental health leadership reported that mental health and custody staffing shortages necessitated both disciplines working closely together and that their relationship was the most collaborative it had ever been, which was particularly true for leadership staff. Patient reports of custody officer disrespect were not as pervasive as they were during prior site visits.

SVSP's CMHPP LOP was aligned with headquarters' template except for 3CMS executive leadership joint rounding. Specifically, the institutional LOP allowed for annual rounding while the required frequency in the headquarters' template indicated that 3CMS executive leadership rounding should occur monthly.

Reviewed documentation of executive leadership joint rounding indicated required staff's conduct of monthly rounds and interview of staff and patients. However, the rounding reports did not convey outcomes or follow-up plans for identified issues. Consistent with leadership reports, the rounding reports revealed positive mental health and custody relationships.

The warden's meeting minutes referenced executive leadership joint rounding but did not provide further details.  Quality management committee minutes summarized the rounding.  In contrast, most mental health subcommittee minutes did not address executive rounding.

Overall, huddles were noncompliant.  Review of MHCB huddle reports for February 2022 revealed largely blank reports containing staff signatures.  There were huddle reports for second watch but none for third watch.  Review of a sample of second and third watch huddle reports for the Facility D EOP program indicated thorough discussion of patient care and needs but did not reflect custody staff's attendance.  Similarly, a reviewed sample of Facility A EOP huddle reports indicated useful information but did report custody's attendance and did not indicate whether the reports were for second or third watch.  Review of a sample of STRH huddle reports revealed that custody staff did not always attend them and that huddles did not consistently occur on both shifts.  Although reviewed STRH huddle reports addressed all pertinent areas, more detailed discussion would be useful for continuity of care.

An observed STRH morning huddle started timely.  All required disciplines attended and actively participated, with mental health and custody working well together.

An observed Facility D EOP third watch huddle utilized the approved form and found all required staff in attendance.  However, the huddle occurred in the treatment area and not the housing unit, as the LOP required.  Huddle participants addressed all required areas but patient discussion was limited to whether patients were seen without further clinical detail.  Custody input was also minimal and only in response to specific mental health questions.  Staff reported that custody officers did not consistently attend huddles.

Reviewed reports of weekly 3CMS supervisory meetings used the appropriate template to document relevant information.  The 3CMS supervisory meetings occurred throughout the

reporting period on Facility A but had not occurred since the fourth quarter of 2021 on Facilities B, C, and D.

Due to COVID-19 and staffing shortages, monthly joint supervisory program area tours only occurred on Facility A during September 2021 and did not take place on Facilities B, C, or D. Reviewed documentation reported required staff's attendance and the interviewing of staff and patients, with much of the focus being on the negative impact of staffing shortages. Mental health staff reported that most Facility A patients were non-MHSDS. For unclear reasons, these individuals were interviewed instead of 3CMS patients.

Observation of a monthly joint supervisory 3CMS program area tour on Facility A found the mental health supervisor asking relevant questions to custody staff and mental health patients. Three mental health patients were interviewed. The sergeant was attentive but not actively engaged. Overall, patients reported good relationships with custody staff. However, patients reported access to mental health care as an area of concern. Consistent with leadership reports of delays for timely 3CMS clinical contacts, one patient reported not seeing his mental health clinician for approximately six months; the patient further reported having submitted a request to be seen six weeks prior but was still awaiting the appointment. It was also reported that initial primary clinician assessments, including those for patients discharged from the EOP level of care, were delayed by four to five months.

Both of the institution's EOP facilities scheduled introduction to EOP orientation groups on Tuesdays, which were offered to 157 patients during the review period. The monitor's expert attempted to attend an EOP orientation group, but the group was canceled.

Monthly inmate advisory council IAC meetings did not take place on Facilities B, C, or D during the review period due to COVID-19 and staffing shortages. On Facility A, an IAC

meeting only occurred during February 2022.  The IAC documentation also indicated that due to modified programming, mental health contacts occurred at cell front.

There were 51 staff complaints.  SVSP did not report whether any staff was reassigned due to a staff complaint.

Due to custody and mental health staffing shortages, quarterly partnership round table training was not held during the third and fourth quarters of 2021.  When the training was provided, leadership reported that it was inconsistently co-taught by custody and mental health.  Reviewed documentation of annual off-post training did not allow for verification that required staff received the training.

Heat Plan:

Review of SVSP's heat plan LOP revealed compliance with headquarters' heat plan directive.  The heat plan was in operation during September and October of the review period, when there were nine Stage I heat alerts.  There were no Stage II or Stage III heat alerts.

Review of a sample of temperature logs from each of the housing units revealed the appropriate recording of temperatures.  The litigation coordinator maintained all heat plan-related records, reports, and logs.

A tour of the housing units indicated the central location of thermometers.  Housing unit staff had lists of patients who were prescribed heat sensitive medications.  All interviewed custody officers were familiar with heat plan policy and procedure.  One custody supervisor in particular had taken the initiative to prepare wallet-sized laminated cards for each of his officers that included information about the heat medications list, dates that the heat plan was in effect, and the three stages of the heat plan and the actions they triggered.

SVSP reported that 91 percent of custody staff had completed the annual heat plan training.

RVRs:

Ninety-four percent or 118 of 125 correctional staff received the required mental health assessment training, as did seven of 37 or 19 percent of mental health staff.

SVSP issued 2,183 RVRs during the review period. There were 1,202 RVRs issued to mental health caseload patients, including 43 to MHCB patients, 239 to EOP patients, and 920 to 3CMS patients. The institution issued 981 RVRs to non-MHSDS incarcerated persons.

Review of a sample of 15 RVRs for compliance with applicable CDCR procedure revealed that custody staff timely requested mental health assessments in two or 13 percent. Mental health staff timely completed and returned the assessment to custody in five or 33 percent of cases. None of the mental health assessments indicated that patients' behavior was so strongly influenced by mental illness that the RVR should be documented in an alternative manner.

In four of five reviewed mental health assessments where clinicians' reported that mental health factors contributed to patients' behavior, the senior hearing officer appropriately considered the mental health assessment. In the fifth case, the SHO did not consider the clinician's recommendation but merely cut and paste information from the assessment.

The senior hearing officer mitigated penalties in all 14 cases where the mental health assessment recommended penalty mitigation. In the remaining case, the SHO mitigated penalties that the assessment did not recommend.

Use of Force:

SVSP reported completion of use of force training by the warden, chief deputy warden, and all correctional administrators and captains.  Ninety-six percent of lieutenants, 93 percent of sergeants, and 89 percent of correctional officers also attended the training.  Only 40 percent of mental health staff were trained.  None of the psychiatrists or mental health supervisors received the training.

There were no controlled use of force incidents during the review period.  There were 260 immediate use of force incidents, of which 226 involved mental health caseload patients and 34 involved non-MHSDS incarcerated persons.

Review of four immediate use of force incidents for compliance with applicable CDCR policy revealed three involving the use of pepper spray and the fourth involving the physical use of force.  Two of the pepper spray incidents complied with applicable policy as pepper spray was used to prevent self-mutilation and physical harm to staff.  In the remaining incident, pepper spray was used in response to the patient "gassing" custody staff.  It was unclear why immediate force was necessary to quell the incident when the patient was in his locked cell and the officer had closed the food port.  The immediate use of physical force was reasonable when the patient became resistant during MHCB admission, resulting in the patient being held down for the administration of his medication.

Lockdowns/Modified Programs:

SVSP reported that there were no program lockdowns, however, there were 11 periods of modified programming during the review period through to the site visit.  The modified programming followed yard riots, patients' fights, staff assaults, an attempted homicide, and searches related to missing chain-link fencing.  One period of modified programming, from December 24, 2021, through March 9, 2022, was due to staffing shortages and COVID-19

restrictions.  SVSP also placed Facility A on modified programming from March 29 through April 7, 2022, following 19 patient drug overdoses.  Staff reported that a drone delivered the drugs that caused the overdoses; the resulting searches discovered significant drug contraband in the housing units.  Otherwise, modified programming had typical durations of up to several days or several weeks.

Access to Care:

A review of SVSP's monthly Health Care Access Quality Reports from September 2021 through February 2022 indicated that nine percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 28 were not completed for non-custodial reasons.

Placement of 3CMS into Minimum Support Facilities:

No 3CMS patients were placed in MSFs during the reporting period.

*Coleman* Postings:

At the time of the site visit, most, but not all housing units that housed class members contained *Coleman* postings in both English and Spanish.

**APPENDIX B-14**
**CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY (CSATF)**
**(April 26, 2022 – April 28, 2022)**
**Review Period: (October 1, 2021 – March 31, 2022)**

Census:

On April 27, 2022, CSATF housed 4,459 incarcerated persons, which was a 19 percent decrease from the prior review period. The mental health caseload population of 2,226 comprised 50 percent of the incarcerated population and was a 14 percent decrease from the preceding review period.

The MHCB housed 11 patients.

There were 480 mainline EOP patients and 1,691 mainline 3CMS patients.

The administrative segregation population of 88 included six EOP patients pending transfer to the EOP hub, 38 3CMS patients in STRH, and 44 non-MHSDS incarcerated persons.

Staffing:

The position of chief psychiatrist was filled. The senior psychiatrist position was vacant. Of 5.5 on-site psychiatry positions, 1.25 were filled, for a 77 percent vacancy rate. The use of 2.5 registry psychiatrists reduced the on-site psychiatry functional vacancy rate to 32 percent.

All ten telepsychiatry positions were filled.

CSATF did not have established positions for psychiatric nurse practitioners but had two civil service PNPs.

One of two chief psychologist positions was filled; however, a senior psychologist supervisor acting out of class filled the vacant position. Four of 5.5 senior psychologist supervisor positions were filled, for a 27 percent vacancy rate; however, as noted above, one senior psychologist supervisor filled the vacant chief psychologist's position, reflecting a senior psychologist supervisor functional vacancy rate of 45 percent. Of six senior psychologist

641

specialist positions, 3.5 were filled and a 0.5 position was on long-term sick leave, resulting in a 50 percent vacancy rate.

The 41 staff psychology positions were filled by 20.5 civil service psychologists; however, two psychologists were on long-term sick leaves, for a 55 percent vacancy rate. One registry psychologist reduced the functional vacancy rate to 52 percent. Fifteen psychologists were unlicensed.

One of 1.5 supervising social worker positions was filled. Twenty-five of 38 social worker positions were filled, but one social worker was on administrative leave, for a 37 percent vacancy rate. Registry staff covered 0.98 positions for a 34 percent functional vacancy rate. Three social workers were unlicensed.

Fifteen of 18 recreation therapist positions were filled, but one recreation therapist was on long-term leave, for a 22 percent vacancy rate. Registry filled an 0.28 position, reducing the functional vacancy rate to 21 percent.

All ten medical assistant positions were filled.

Of 25.5 mental health clerical positions, 18.5 were filled, but two staff were on long-term leaves, for a 35 percent functional vacancy rate.

Two OSS Is covered 1.5 positions, and one AGPA covered the 0.5 position. Four HPS IIs filled 3.5 positions. The CHSA position was vacant.

CSATF reported a 45 percent overall mental health staff functional vacancy rate during the review period due to COVID-19, long-term sick leaves, daily call-outs, terminations, and resignations. Staff reported that recruitment and retention were also negatively impacted by the unavailability of telework, which private sector employers offered, non-competitive salaries, lack of recruitment/retention bonuses and monetary incentives to work in remote locations, and long

daily commutes. Staff also reported custody staffing shortages due to vacancies and call-outs, virtually eliminating yard access. Specifically, 39 of 42.8 lieutenant positions were filled, for a nine percent vacancy rate, as were 102 of 113.4 sergeant positions, for a ten percent vacancy rate. Further, 797 of 847.2 custody officer positions were filled, for a six percent vacancy rate. Although all correctional counselor positions were filled, two CC Is were on leave.

Telepsychiatry:

CSATF's ten telepsychiatry positions were filled.

In the EOP program, telepsychiatry was provided by three full-time telepsychiatrists and another telepsychiatrist who split time between the EOP and 3CMS programs. Two of the EOP program's three full-time telepsychiatrists had caseloads that exceeded the established ratio.

Reported problems with telepsychiatry's use in the EOP program included patients' complaints that it was difficult to build rapport with providers on computer screens and with medical assistants in the room during individual sessions. There were also significant connectivity problems when using a laptop for telepsychiatry; however, these connectivity issues were minimal with the use of higher quality and larger videoconferencing screens and cameras. The monitor's expert was also concerned that, despite observing connectivity issues, EOP telepsychiatrists did not mention them to treatment teams or ask teams to repeat missed information. One EOP telepsychiatrist was unable to access EHRS and could not rely on the PC for relevant information because the PC had neither a laptop nor computer access. The placement of the telepsychiatry equipment resulted in only the patient seeing the telepsychiatrist.

During an EOP patient IDTT, a patient prescribed antipsychotic medication exhibited signs of akathisia with fairly severe involuntary movements. However, the telepsychiatrist could not fully capture the patient's presentation from the small laptop screen and failed to

appropriately intervene or recommend follow-up.  The monitor's expert intervened and recommended an urgent medical evaluation of the patient's condition, as his involuntary movements were so severe that they likely caused sleeplessness, profuse sweating, fatigue, and interpersonal difficulties with other incarcerated persons.  This patient was also at a high risk for self-harm and suicide.  A subsequent review of the patient's medical records revealed that although the IDTT documented the monitor's expert's recommendation, there was no documentation located that an evaluation or other follow-up regarding the patient had occurred.

CSATF's use of telepsychiatry in the EOP program was also very concerning, given that most on-site PCs were unlicensed, inexperienced, and had very high caseloads.  These EOP primary clinicians would benefit from ongoing consultations with psychiatry about patient care and risk management, which was less likely with off-site psychiatrists and the reported lack of time for consultations due to current workloads.

Facility A 3CMS patients generally reported being satisfied with telepsychiatry.  Some nonetheless also reported difficulty building rapport "with a screen," as well as not being able to speak with the doctor one-on-one due to the medical assistant's presence during sessions.

A telepsychiatrist attended an observed Facility B 3CMS patient IDTT.  The screen resolution was good, and the psychiatrist could be clearly seen.  There were rare, brief issues with connectivity, with the equipment intermittently making loud noises, which mildly disrupted the IDTT's flow.

Multiple 3CMS clinical staff members reported challenges with telepsychiatry when compared with on-site psychiatry.  Staff reported that the telepsychiatrist only got "a small snapshot" of the patient, compared to the more robust picture that was possible with an on-site psychiatrist.  One clinician indicated that, on occasion, this had led to different diagnostic and

clinical assessments between the PC and telepsychiatrist.  In one instance of a patient reporting the onset of auditory hallucinations, the PC and telepsychiatrist arrived at differing diagnostic conclusions; the PC believed that such a difference would have been much less likely if the telepsychiatrist was an on-site psychiatrist.

3CMS staff reported frequent connectivity issues due to internet issues for telepsychiatrists working from home.  Clinicians nonetheless typically reported being able to access the telepsychiatrists using email or telephone.

The MHCB did not utilize telepsychiatry.

Quality Management:

The local governing body met monthly, always achieved quorums, and approved minutes from previous meetings, CTC policies, LOPs, and staff credentials.  Meetings typically only lasted between four and eight minutes.

The quality management committee also met monthly and attained quorums.  The mental health subcommittee reported to the quality management committee on topics pertinent to mental health, including suicide prevention efforts, MHCB treatment, administrative segregation prescreens, and MAPIP metrics.

Concerningly, both the local governing body and quality management committee approved LOP 242 on psychiatry involuntary medication management and legal obligations and LOP 474 on telepsychiatry, without the chief psychiatrist's presence.

The mental health subcommittee met every two weeks and consistently achieved quorums.  The subcommittee regularly addressed treatment hours, transfers to higher levels of care, MAPIP measures, suicide prevention, and staffing issues, and reviewed relevant LOPs. The psychologist supervisor who oversaw DDP regularly reported to the mental health

subcommittee, which was particularly important given CSATF's large DDP population. Reviewed minutes indicated that supervisors were provided with relevant information.

CSATF implemented CAPs related to sustainable process reviews, DSH and PIP referral and return processes, documentation reflecting HLOC referral considerations, and the quality of EOP patient IDTTs.

The EMRRC met every other week and achieved quorums. The chief psychiatrist or his designee typically represented mental health; the SPRFIT coordinator also attended most meetings. Addressed mental health-related topics included suicide attempts, substance use, and the treatment of suspected opiate overdoses with naloxone.

All peer review was on hold except for MHCB safety plans; however, CSATF did not provide data on safety plan audits.

Medication Management:

CSATF provided MAPIP results for the review period for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics revealed that CSATF was compliant for obtaining height, weight, blood pressure, and thyroid tests for all six months of the review period. CSATF reported compliance for five months for obtaining medication consents. There was only one month of compliance for AIMS tests and EKGs. There was noncompliance for all six months for glucose (blood sugar) monitoring, CBCs with platelets, CMPs, and lipid panel monitoring.

CSATF was not an authorized clozapine initiation or maintenance facility. One patient was nonetheless prescribed clozapine while housed in the MHCB in October 2021. The chief

psychiatrist reported the initiation of clozapine in close coordination with mental health headquarters and included a CCAT meeting.

For monitoring antidepressants, there was compliance for all six months for obtaining thyroid tests and medication consents, and for checking blood pressure for patients prescribed venlafaxine. CSATF was not required to check EKGs during the reporting period.

For patients prescribed carbamazepine, CSATF indicated compliance for all four required months for checking CBC. There was compliance for three of four required months for monitoring CMP and therapeutic medication levels, and for three of six months for obtaining medication consents.

For patients prescribed Depakote (divalproex, valproic acid), there was compliance for three months for medication consent documentation, for two months for obtaining CMP, and for one month for monitoring medication levels. CSATF reported noncompliance for all six months for CBC with platelets.

For lamotrigine, CSATF was compliant for medication consents for four months.

For lithium, there was compliance for three months for medication consents, and kidney function and thyroid tests. CSATF reported one month compliance for monitoring lithium levels and noncompliance for all six months for checking EKGs.

For MAPIP medication management metrics, CSATF was compliant for all six months for observation of medication preparation a.m. and p.m., and for chronic care medications historical administration. There was compliance for five months for outpatient provider new medication orders and medication continuity upon parole/transfer to the community. CSATF reported compliance for four months for medication continuity for MHCB transfers, and for three months for medication continuity upon inter-institutional transfer from R&R. There was

compliance for one month for continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU) and for medication continuity from discharge/transfer from a community hospital and/or inpatient care. CSATF reported noncompliance for all six months for observation of medication preparation at HS.

CSATF reported that no data was required for the review period's six months for medication continuity with intra-institutional transfers to ASU/SHU/PSU; however, this appeared erroneous as CSATF housed many patients in restricted housing. The monitor's expert sought clarification, but CSATF did not provide clarifying information.

CSATF did not report the maximum lengths of time that psychiatry could prescribe medications or bridge orders.

Nursing documented and tracked telephone and verbal orders in EHRS. Providers giving authorized telephone/verbal orders were required to sign them in EHRS.

Monthly polypharmacy reviews were discussed with the chief psychiatrist.

Psychiatrists prescribed non-formulary medications without secondary review. The chief psychiatrist and the mental health subcommittee monitored the percentage of medications that were prescribed non-formulary, which was approximately eight percent.

It could not be determined how many patients were prescribed medications KOP. Nevertheless, in accordance with CDCR policy, all KOP prescriptions were for SSRIs and were only prescribed for 3CMS patients.

Pill lines often exceeded two hours, which leadership attributed to custody staff, including delays in letting patients out timely. Custody further indicated that safety and security needs, which staffing shortages exacerbated, resulted in their only being able to release a certain number of patients at a time.

CSATF reported ongoing challenges on all yards with the lack of protected places from the elements for patients to wait while in pill lines.

CSATF did not report whether HS medications were timely administered.

At the time of the site visit, 22 patients received medications pursuant to PC 2602 involuntary medication orders; during the review period, between 22 and 30 patients received such medications. During the reporting period, there were 14 initial PC 2602 applications and 22 renewals. All were granted. Five PC 2602 orders were not renewed.

CSATF was compliant for three of five required months for PC 2602 involuntary medication court orders being in patients' charts, and for four of five required months for compliance with involuntary medication orders.

Transfers:

CSATF had a major sustainability review in November 2021 that covered the third quarter of 2021. The assigned mental health headquarters' reviewer found 74 percent compliance for CSATF's HLOC documentation, noting that the institution's compliance scores had remained below the required threshold since the first quarter of 2019. The headquarters' reviewer further opined that the institution's failure to pass the HLOC review for numerous consecutive quarters reflected a breakdown in the preparation of accurate and clinically appropriate documentation.

The headquarters' reviewer recommended multiple CAPs to improve inadequate IDTTs, HLOC discussions and documentation, and timely contacts for mainline EOP patients. Further, for the mainline EOP program, the headquarters' reviewer noted the need for "great supervisory oversight" to ensure that patients who may need higher levels of care were identified and appropriately referred.

The monitor's expert reviewed CSATF's responses to the sustainable review report's recommended CAPs.  All items on the April 2022 spreadsheet were listed as ongoing; nonetheless, most of the recommended supervisory audits had yet to be implemented based on language suggesting they would occur in the future.

Unfortunately, CSATF continued to demonstrate problems with IDTTs and HLOC documentation and referrals throughout the review period and at the time of the site visit.  While leadership reported that most identified issues were due to critically low staffing levels during the pandemic, the headquarters' reviewer's report noted that CSATF had struggled to achieve compliance with HLOC documentation and referrals prior to COVID-19.

There were also significant internal referral problems that led to delayed access to clinically indicated inpatient care.  During the review period, IDTTs submitted several referral packets that were either late, incomplete, or inaccurate.  The inpatient coordinator admitted that many inpatient referrals were returned to treatment teams several times for revisions.  Inpatient transfers were also delayed further by CSATF's clinicians' failure to timely respond to IRU's requests for corrections or missing information.

During the review period, 251 patients were considered, but not referred, to higher levels of care on 372 occasions.

CSATF referred 27 patients to acute care, with the MHCB generating all referrals; three referrals were rescinded, and one was rejected.  CSATF submitted ten referrals late to IRU, with a range of one to eight days late.  Twenty-three patients transferred.  However, no patients timely transferred within ten days; transfer times averaged 33 days and ranged from 13 to 71 days.

Twenty patients were referred to intermediate care, of which there was incomplete data for four referrals, and there were four recissions and one rejection.  Five referrals were not

submitted to IRU timely, with a range of one to nine days late. Of 11 patients who transferred, six or 54 percent timely transferred within 30 days. The remaining five patients took between 42 and 91 days to transfer.

There were 24 *Vitek* hearings for 18 acute and six intermediate care patients. No patients prevailed.

During the site visit, nine patients were awaiting transfer to inpatient care. Of the five patients awaiting acute care transfer, three were beyond the ten-day transfer timeframe. One delay was due to IRU concerns over whether the patient needed acute or intermediate level of care, another was due to necessary revisions to the referral which had been completed and submitted, and no reason was provided for the remaining patient.

Of the four patients awaiting intermediate care transfer, CSATF had not timely referred two patients to IRU; one was four days late, and the other was 11 days late. None of the four patients were beyond the 30-day transfer timeframe.

CSATF made 258 MHCB referrals, of whom 119 patients were admitted and 139 were rescinded. Thirty patients transferred to outside MHCBs, including 24 to CSP/Corcoran, five to KVSP, and one to CMC. Five patients took longer than 24 hours to transfer to an MHCB.

CSATF's MHCB had a review period average daily census of 14 patients. Clinical lengths of stay averaged 9.4 days, with a maximum clinical stay of 87 days. Physical stays averaged 16.7 days, with a maximum stay of 96 days.

Thirteen patients had three or more MHCB admissions; one patient had six admissions, another had five admissions, three patients had four admissions, and eight patients had three admissions.

During the site visit, MHCB stays averaged 13.9 days and ranged from one to 33 days.

CSATF did not track transfers to the PSU during the review period. No patients were pending PSU transfer at the time of the site visit.

During the site visit, two patients were pending transfer to an EOP hub; neither were beyond the 30-day transfer timeframe.

During the review period, CSATF reduced 50 EOP patients' level of care from EOP to 3CMS. The institution did not provide data on any patients who subsequently returned to a HLOC.

Of the 69 patients housed in STRH during the review period, 20 patients' stays exceeded 30 days, with a range from 32 to 175 days.

No patients transferred to LTRH during the review period or were awaiting LTRH transfer at the time of the site visit.

Programming:

MHSDS Patients in Administrative Segregation:

STRH

The psychiatric nurse practitioner who provided services in STRH had a caseload within the established staffing ratio. Notably, a psychiatrist was not assigned to provide treatment in STRH, and the PNP also treated EOP patients housed in STRH, which violated applicable policy. PC and recreation therapist caseloads were within mandated ratios.

During the review period, 264 individual patients had 334 stays in STRH. Including time periods before and after the review period, 3CMS patient stays in STRH averaged 38.3 days; the maximum length of stay was 411 days.

Fourteen patients were randomly selected to have their healthcare records reviewed for their STRH stays.

Twelve of 14 or 86 percent of patients had timely initial psychiatry evaluations. One patient did not have an initial psychiatry contact. Thirty-eight percent of initial psychiatry contacts were confidential. Fifteen of 17 or 88 percent of routine psychiatry contacts timely occurred within 90 days; 54 percent were confidential. Patients who were reviewed for their routine psychiatry contacts were generally seen more frequently than the Program Guide required. Telepsychiatry was not utilized for initial or routine psychiatry contacts.

Ten of 14 or 71 percent of patients had initial primary clinician contacts. Two patients did not have initial PC contacts. Three of 12 were confidential. Thirty-nine of 52 or 75 percent of patients had timely routine primary clinician contacts within seven days; 18 percent were confidential.

Ten of 14 or 71 percent of initial IDTTs occurred timely. Two patients did not have an initial IDTT. Patients attended two or 17 percent of initial IDTTs. All four patients had timely routine IDTTs within 90 days. Patients did not attend any routine IDTTs. Required staff attended all initial and routine IDTTs. Although a PNP and PC attended all IDTTs, it could not always be determined whether the assigned treatment provider attended.

Required staff attended all five observed IDTTs; patients attended four IDTTS. The IDTTs started timely, and occurred in adequate space with the PNP, primary clinician, psych tech, and CC I all actively using computers.

Observed IDTT treatment teams reflected good interdisciplinary discussions and interactions. The supervising psychologist provided useful guidance, while PCs and the PNP had seen all patients prior to the IDTTs. The PNP had worked in the STRH for approximately three years, which aided continuity of care. The treatment team asked patients for their input, which was incorporated into treatment planning.

The IDTTs nonetheless also revealed significant concerns.  Among them, the PNP participated in all IDTTs, including those for EOP patients, in violation of CDCR policy that PNPs only treat patients at the 3CMS level of care.

Multiple clinicians asked questions throughout the IDTTs.  While such input could be useful, here it was disruptive as clinicians pursued different lines of questioning.  When asked to clarify their approach, the treatment team responded that PCs wanted to be familiar with all STRH cases in case they had to cover them in the future.  Notably, the assigned PC for one patient introduced himself by stating, "I'm one of your clinicians."  The monitor's expert had concerns that this could lead to patient confusion as to the identity of their assigned PC.

In several cases, listed diagnoses were mutually exclusive.  In another case, the patient's diagnosis of gender dysphoria was erroneous; the patient denied any gender identity challenges and identified as male.

Two observed IDTTs were especially concerning.  In one case, the clinician used troublesome language, describing behaviors as "odd" in front of the patient.  Therapeutic interventions were also frequently vague, unrealistic, and did not conform to generally accepted treatment guidelines.  Further, many treatment goals were unlikely to be obtained.  For example, one stated goal was for the patient to be free of psychotic symptoms for a three-month period. While this would be ideal, the goal was unlikely to be reached.

The PC also frequently interrupted the patient.  The patient had refused medications and had had his last dose in July 2020.  Previously, he had received medications through the PC 2602 involuntary medication process.  Despite the severity of the case, the PC suggested retaining the patient at the 3CMS level of care, with a reevaluation in three months.

After the patient left the room, the monitor's expert discussed the case with the treatment team. The patient's last suicide risk evaluation was in 2017. The team stated this would be updated. After further consideration, the treatment team planned to have the patient return to IDTT the following week, for reconsideration whether the patient would merit placement at the EOP level of care.

In the second case, the patient was diagnosed with both schizoaffective disorder and depression. However, these diagnoses were mutually exclusive per standard diagnostic definitions. The patient had difficulty following the conversation and was often observed looking around the room, which strongly suggested that he was hallucinating. Multiple clinicians asking questions worsened his ability to follow the conversation.

The patient refused medications. The treatment team also reported that he had recently been lowered from EOP to 3CMS, but the reasons for lowering his level of care were unclear. Further, his last treatment plan retained him at the EOP level of care. The patient reported not having his property, despite being housed in STRH for over two weeks. The IDTT raised the patient to the EOP level of care.

Reviewed CDCR Form 114As for a total of 40 weeks for 20 patients indicated timely ICCs and the offering of phone calls. Eighty percent of reviewed weeks reflected the offering of 18.5 weekly hours of yard. Ninety-three percent of reviewed weeks reflected the offering of three weekly showers; 90 percent indicated weekly linen exchanges.

<u>Non-Disciplinary Segregation</u>:

During the review period, the ASU housed 14 MHSDS patients on NDS status, of whom one EOP and ten 3CMS were awaiting accelerated transfer; three other patients were entitled to NDS for property and privileges only. Stays for the NDS patients awaiting accelerated transfer

averaged 35 days; however, one 3CMS patient was awaiting transfer for 224 days.  CSATF

reported that due to COVID-19 transfer restrictions, no patients transferred within 72 hours.

MHCB:

CSATF's 20-bed MHCB was staffed by three psychiatrists, one senior psychologist

supervisor, who also acted as the clinical director, four psychologists, and one recreation

therapist.  All were licensed.  Two psychiatrists were contractors, and one psychologist was

primarily assigned to the CTC for MHSDS medical patients.  The MHCB supervisor reported

that the unit was understaffed with PCs and that this supervisor routinely covered caseloads

during PCs' regular days off and other absences.  Telepsychiatry was not used in the MHCB.

All psychiatrists' caseloads were within the established ratio.  Primary clinicians'

caseloads exceeded the ratio.

Ten patients were randomly selected to have their records reviewed for their MHCB

stays.  Nine of ten patients timely received an initial primary clinician evaluation within 24 hours

of admission.  Seven of ten initial psychiatry evaluations were timely.

Twenty-one of 28 or 75 percent of required twice weekly psychiatry contacts timely

occurred.  Fifty-seven percent were confidential; however, in five cases documentation of

confidentiality could not be located in the record.  Sixty-seven of 82 or 82 percent of required

daily clinical contacts timely occurred; 36 percent were confidential.

Eight of ten initial IDTTs timely occurred with 72 hours of admission; required staff attended 90

percent.  All 12 or 100 percent of patients had required routine IDTTs; requisite staff attended 67

percent.  All discharge IDTTs were conducted within 24 hours of discharge.

All required team members attended observed IDTTs and had computer access.  The

MHCB supervisor also attended and presented cases she was covering.  All staff participated in

the IDTTs, were familiar with patients, spent sufficient time establishing effective communication, and generally erred on the side of caution in terms of treatment decisions. The IDTTs were nonetheless deficient in multiple areas, which led the monitor's expert to intervene on several occasions to inquire about missing critical information and to request clarity regarding clinical rationales presented for some treatment decisions. Routinely missing from IDTT discussions were case conceptualizations, diagnostic justifications, measurable treatment goals, HLOC referral indicators, lengths of stay, discharge objectives, and rationales for safety observation and level of care decisions. While patients were regularly referred to higher levels of care, the IDTT did not justify the referral or explain why they chose one level of care over another.

The monitor's expert noted that for MHCB patients who were referred to higher levels of care and awaiting transfers, IDTTs did not discuss enhanced treatment interventions; this was especially concerning given that several MHCB patients experienced inpatient care transfer delays due to incomplete or inadequate referral packets, and even further delays resulting from MHCB staff's failure to timely respond to IRU's follow-up requests for additional information.

The monitor's expert separately interviewed a group of MHCB psychiatrists and primary clinicians. The clinicians confirmed that out-of-cell clinical contacts occurred with up to four other clinicians in the room and with patients in locked TTMs. MHCB clinicians estimated that insufficient staffing resulted in 50 percent of routine patient contacts occurring at cell front.

The monitor's expert had concern with CSATF's practice of placing non-maximum custody MHCB patients in locked TTMs during individual treatment contacts, psychological assessments, and dayroom. Further, because non-maximum custody MHCB patients were

treated similarly to maximum custody patients, only one patient could participate in yard and dayroom at any given time.

Nine reviewed CDCR Form 114As did not report linen exchanges and provided phone calls; offered showers were not reported for four of nine reviewed patients.  Leadership attributed these deficiencies to poor reporting and stated that linen exchanges, phone calls, and showers were provided much more frequently.

<u>Seclusion and Restraint</u>:

There were nine restraint incidents for nine different patients during the review period. All but one patient was in restraints for less than four hours; the remaining patient exceeded the four-hour timeframe by two minutes.  Observation and seclusion rooms were clean and appropriately furnished.

<u>Alternative Housing</u>:

CSATF reported 258 alternative housing admissions, of which 119 patients were admitted to the MHCB.  Stays averaged 8.65 hours.  Five patients who remained in alternative housing for more than 24 hours had stays averaging 2.5 days; the maximum stay was 4.4 days. MHCB staff treated alternative housing patients.

In accordance with policy, CSATF's up-to-date alternative housing LOP appropriately identified alternative housing cells.  The cells that were utilized first were in the CTC, followed by the use of cells in the TTA.

<u>EOP</u>:

Two of four telepsychiatrists and three of six primary clinicians had caseloads exceeding established ratios.  Of the four telepsychiatrists, three worked full-time in EOP and one was assigned half-time each to the EOP and 3CMS programs.

EOP primary clinicians reported that the quality of patient care had suffered due to larger caseloads and being regularly pulled to cover other staff's duties during absences.  The EOP program also had a very high number of unlicensed clinicians; some complained about a lack of onboarding training and adequate supervision

Twenty EOP patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

Five of seven or 71 percent of patients had required initial psychiatry evaluations; telepsychiatry conducted 86 percent.  Thirty-nine of 87 or 45 percent of routine psychiatry contacts were timely; 95 percent were confidential.  Telepsychiatry conducted 75 percent of routine psychiatry contacts.

Five of seven initial primary clinician contacts timely occurred within 14 calendar days of arrival; all were conducted confidentially.  Fifty-nine of 107 or 55 percent of routine primary clinician contacts were timely; 91 percent were confidential.

Two of seven initial IDTTs were timely conducted; required staff attended 86 percent and patients attended 57 percent.  Nineteen of 23 or 83 percent of routine IDTTs timely occurred within 90 days.  Required staff attended all routine IDTTs; patients attended 66 percent.

Observed IDTTs on two different dates included all required disciplines, with psychiatric providers attending through telepsychiatry.  The EOP program supervisor also attended.  Some PCs' lack of computer access led to the inability to assist one of the telepsychiatrists who experienced difficulties accessing patient records from home.  While both telepsychiatrists experienced connectivity issues, the telepsychiatrist observed on the second day had significant technical difficulties that led to repeated disruptions in audio and visual capabilities.  However, due to the location of the laptop in the room, the medical assistant and other IDTT members did

not notice the repeated loss of connectivity until the telepsychiatrist shared his patient observations and medication-related information.

Overall, the observed IDTTs were inadequate. While most treatment teams reviewed HLOC indicators, treatment progress, and relevant custody information, clinicians routinely failed to review case conceptualizations, diagnostic justifications, level of care rationales, obstacles to treatment progress, patient specific treatment interventions, education, jobs, and effective communication. PCs also rarely spoke directly to the telepsychiatrists when clinically indicated for diagnostic clarification and treatment planning. Instead, telepsychiatrists awaited their turn to speak. One telepsychiatrist clearly had difficulty determining when it was their turn to speak as they could not see other IDTT members in the room and was repeatedly interrupted. Further, the telepsychiatrist observed on the first day of IDTTs would not schedule patients recommended for psychiatric follow-ups based on medication complaints. Instead, patients were asked to submit request forms, which would result in unnecessary delays.

CSATF did not offer EOP patients adequate structured therapeutic activities. The institution reported that between September 27, 2021, and March 31, 2022, it offered EOP patients an average of nine weekly hours of structured therapeutic activities; patients attended 5.8 weekly hours and refused 3.2 hours.

Leadership further reported that, due to social distancing requirements, CSATF would have had to offer twice as many groups to achieve the minimum requirements for structured therapeutic activities. However, due to staffing shortages, treatment space limitations, and the unavailability of adequate custody staff during weekends and after normal business hours, CSATF was unable to increase provided group hours.

During the site visit, Facilities G-1 and F-3 offered recreation therapy groups and two clinician-led groups. Facility G-3 EOP patients were only offered recreation therapy groups. Two observed recreation therapy groups both started timely. Although the first observed group's topic was mindfulness, only about five to eight minutes of the group included a mindfulness-related activity. The recreation therapist spent the remainder of the group discussing other loosely related topics, with occasional participation by only one of five attending patients. The other patients were unstimulated and unengaged.

Approximately 22 patients attended the second observed RT group. The group's large size compromised the group's effectiveness and made it difficult to actively engage all participants.

Interviewed EOP patients complained about program staff's high rate of turnover, and that PC contacts were limited to five to ten minutes with the same set of five or six questions. They complained that PC contacts did not feel therapeutic or in line with their treatment goals. As for telepsychiatry appointments, patients reported that, despite occasional connectivity issues, providers spent sufficient time answering their medication-related questions. Two patients reported being reluctant to discuss some topics with telepsychiatrists due to medical assistants' presence in the room.

Multiple interviewed EOP patients reported spending too much time in locked cells. Several patients described the EOP units as operating more like a Level III or IV facility than a Level II facility. CSATF leadership attributed the limited out-of-cell time to custody staff shortages and the mixing of non-EOP patients in other wings of the housing units.

3CMS:

Two 3CMS telepsychiatrists exceeded the established ratio. All six PCs' caseloads were alarmingly high and significantly exceeded the established ratio.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Three of four patients had timely initial confidential psychiatry evaluations conducted by telepsychiatry. Fourteen of 17 or 82 percent of routine psychiatry evaluations timely occurred within 90 days and were confidential; telepsychiatry conducted all evaluations.

Two of four patients had timely initial primary clinician evaluations; both were confidential. Eleven of 23 or 48 percent of routine PC contacts timely occurred within 90 days; 57 percent were confidential.

One of four initial IDTTs timely occurred within 14 working days. Six of seven or 86 percent of routine IDTTs occurred annually. Required staff attended all initial and routine IDTTs. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this assignment was not always clearly discernable.

An observed Facility B IDTT occurred in an adequate room in terms of space, temperature, and lighting. The IDTT room also contained sufficient computers, which the team actively used. However, the psychologist, medical assistant, and CC I arrived late from covering IDTTs on other yards. For telepsychiatry use, there was adequate screen resolution and lighting; however, there were brief connectivity issues, and the equipment intermittently made loud noises. Overall, these technological issues were mildly disruptive to the flow of the IDTT.

The telepsychiatrist and primary clinician met with the patient prior to the IDTT. The CC I actively participated, contributing useful custodial information but the telepsychiatrist's input was very limited. Further, while all required treatment team members attended, IDTT discussions were siloed rather than robust interdisciplinary discussions.

The observed IDTT involved a complex case involving multiple pressing mental health and medical concerns.  The treatment team appropriately spent a longer than usual amount of time with the patient.  The patient used a wheelchair, wore a helmet due to his severe seizure disorder, and was incontinent.  He reported that he was not provided with enough adult diapers and wipes to clean himself and that his cellmate cleaned him.  He was prescribed three anticonvulsants for a difficult to control seizure disorder.  However, he had stopped one and was considering stopping the other two so he would have a seizure, which he thought would facilitate a wanted transfer to a unit that could better address his medical needs.

Despite such imperative medication issues, the telepsychiatrist minimally contributed to the IDTT.  Further, due to the impact of these medical issues on his mental health, the patient alluded that he might become suicidal.  The PC responded with, "you've threatened a psych emergency" and "what you choose to do is your decision."

The psychologist and telepsychiatrist responded that they would respectively follow-up with the patient after the IDTT and next week.  The CC I stated that he would alert the housing unit about possible mental health and medical concerns.  Notably, regional mental health leadership, who attended the IDTT, followed up with the monitor's expert the following day and reported that the patient had been evaluated for safety, would receive adequate hygiene supplies, and had been endorsed for transfer.

The monitor's expert met with a group of 12 Facility B 3CMS patients.  Patients reported that Facility B was a Level II yard that felt like Level IV.  They reported feeling that mental health was not taken seriously.  Most stated that their psychiatrist or primary clinicians did not see them every 90 days; most also did not know their psychiatrist's name.  They further reported a lack of PC continuity.  Several patients felt that group treatment would be beneficial.

Two Facility A 3CMS patients who were individually interviewed in the presence of the supervising psychologist both reported being pleased with mental health services.  One patient nonetheless reported challenges with telepsychiatry because it was hard to build rapport "with a screen."  Patients' concerns included insufficient yard time, reportedly due to custody staffing shortages, and limited space on the housing unit floor, which was reportedly due to COVID-19 restrictions.  One patient reported that the only box to submit healthcare request forms was on the yard, and not in the housing unit.  The patients reported good relationships with Facility A's custody officers.

Overall, Facility A custody staff reported a good relationship with mental health.  The officers understood that staffing shortages affected both custody and mental health.  One correctional officer reported that some patients were reduced from the EOP to 3CMS level of care before they were ready.  These patients reportedly caused challenges in the housing units, and sometimes had to be raised back to the EOP level of care.

Other Issues:

Pre-Release Planning:

CSATF's pre-release coordinator had filled this position two days per week since early February 2022.  Previously, the position had even fewer hours dedicated to pre-release planning.  The coordinator's pre-release efforts included obtaining the Release of Information (ROI), which were forwarded to community providers, initiating patients' pre-release planning assessments, which PCs completed, and facilitating patient referrals to local mental health community and housing programs.  The pre-release coordinator also attended the bi-weekly ISUDT and monthly headquarters' pre-release meetings; other non-pre-release duties included a 3CMS caseload, completing mental health assessments for RVRs, and participating in institutional trainings.

The pre-release coordinator reported that CSATF's staffing shortages resulted in challenges to pre-release planning.  Further, the pre-release coordinator acknowledged that CSATF lacked data on patients who were preparing for release and also did not conduct pre-release groups.

Between October 2021 and April 2022, TCMP caseworkers assisted 168 EOP and 156 3CMS patients complete five applications for veterans' benefits, which represented 28 percent of patients who were eligible for them, 245 Medi-Cal applications, representing 77 percent of eligible patients, and 115 applications for SSI benefits, representing 86 percent of eligible patients.  TCMP caseworkers further reported being unable to see some patients prior to release.

Program Access:

a.     Job and Program Assignments

On March 4, 2022, CSATF's 2,155 job assignments were held by 85 EOP patients, representing 18 percent of the EOP population, 769 3CMS patients, representing 43 percent of 3CMS patients, and 1,301 non-MHSDS incarcerated persons, reflecting 50 percent of the non-mental health caseload population.

The 1,161 academic assignments were held by 70 or 15 percent of EOP patients, 396 or 22 percent of 3CMS patients, and 695 or 27 percent of the non-MHSDS population. Of the 294 vocational education assignments, 21 or four percent were held by EOP patients, 120 or seven percent were held by 3CMS patients, and 153 or six percent were held by non-MHSDS incarcerated persons.

The 213 substance abuse treatment assignments were held by seven or one percent of EOP patients, 103 or six percent of 3CMS patients, and 103 or four percent of non-mental health caseload incarcerated persons. CSATF did not have any voluntary education assignments.

b.     Milestone Credits

Reports for October 1, 2021, through March 4, 2022, indicated that 464 of 482 or 96 percent of EOP patients were eligible to earn milestone credits; 79 percent earned the credit. Of the 1,805 3CMS patients, 1,660 or 92 percent were eligible to earn milestone credits; 12 percent earned the credit. For non-MHSDS patients, 2,280 of 2,579 or 88 percent, were eligible to earn milestone credits, with 13 percent earning the credit.

c.     Out-of-Level Housing

On March 28, 2022, 72 EOP, 32 3CMS, and 28 non-MHSDS custody Level I patients were in Level II housing, and one EOP, three 3CMS, and one non-MHSDS custody Level I patients were in Level III housing. There were 18 EOP, 89 3CMS, and 65 non-MHSDS custody Level II patients in Level III housing, and five 3CMS and ten non-MHSDS custody Level II patients in Level IV housing. One EOP, 21 3CMS, and 13 non-MHSDS custody Level III patients were in Level II housing, while 46 3CMS and 72 non-MHSDS custody Level III patients were in Level IV housing. Lastly, there were two EOP custody Level IV patients in Level II housing, and one EOP, 89 3CMS, and 54 non-MHSDS Level IV patients in Level III housing.

d.     ADA Reasonable Accommodations and Grievance Procedures

CSATF provided copies of the CDCR Form 1824 Request for Accommodation Process Desk Reference Manual, the Interim Accommodation Procedure Interview Worksheet, the Memorandum on Reasonable Accommodation Request Process Implementation, the Reasonable Accommodation Panel Response, and the Disability Verification Process Worksheet.

Case-by-Case Reviews:

Two CSATF patients were retained beyond their 150-day long-term case conferences pending transfer.  Both patients had timely ICCs; however, ICC hearing information was unavailable for review.

During the review period, 46 STRH patients were eligible for 120-day ICC pre-MERD reviews, of which 36 were released and the remaining ten patients were retained pending disposition of a RVR, resolution of enemy concerns, or transfer.

"C" Status:

CSATF reported that as of April 8, 2022, the institution's 11 "C" status patients included three 3CMS patients who had been found to be program failures, and eight non-MHSDS incarcerated persons.

Mental Health Referrals:

CSATF reported 4,265 mental health referrals, including 391 emergent, 327 urgent, and 3,541 routine referrals.  There were also six routine PREA primary clinician consultations. Including the PREA referrals, there were 1,238 referrals to psychiatry and 3,027 to primary clinicians.  For emergent referrals, there were timely responses to all seven or 100 percent of psychiatry referrals and to 347 of 384 or 90 percent of PC referrals.  For urgent referrals, there were timely responses to 73 of 86 or 84 percent of psychiatry referrals and to 215 of 241 or 88 percent of primary clinician referrals.  For routine referrals, there were timely responses to 998 of 1,145 or 87 percent of psychiatry referrals, as well as to 2,094 of 2,396 or 87 percent of primary clinician referrals.  There were timely responses to all six routine PREA PC referrals.

Treatment Space:

The CTC's MHCB cells and treatment areas were generally clean.  However, the MHCB had inadequate confidential treatment space that was limited to one room with five computer

workstations that was used for individual contacts, assessments, IDTTs, and workspace for up to five mental health staff. The MHCB supervisor reported that the shared mental health office was not vacated to allow for confidentiality, adding that up to four other staff members could be working on documentation during clinical encounters with patients in TTMs.

Patients were placed in the MHCB's TTM for dayroom, clinical contacts, and assessments, and after arrival from administrative segregation and/or if assessed to be a risk of harming themselves or others. The MHCB yard was inadequate and could only be used for one patient at a time, despite serving as the only available yard for up to 40 CTC patients. It featured two cement benches, a water fountain, and a sink. Although the monitor's expert observed other CTC rooms that could be used for confidential MHCB contacts, nursing staff believed that MHCB patients required TTM placement when out of cell and, as a result, some CTC rooms were not used by MHCB patients. CSATF's recently appointed MHCB supervisor reported that TTMs had been used for non-maximum custody patients since before she started.

STRH clinicians reported limited treatment space and difficulties scheduling space for treatment. However, they denied that this resulted in patients not being seen.

ML EOP treatment space was located within housing units and was confidential. However, because primary clinicians' offices were very small and lacked HEPA filters, most clinicians used small group rooms for routine individual appointments. The EOP program's G-3 contained two group rooms and F-3 and G-1 contained four group rooms.

3CMS patients did not report challenges related to treatment space.

Custody and Mental Health Partnership Plan:

CSATF's CMHPP LOP was current and in compliance with headquarters' policy.

Reviewed executive leadership joint rounding documentation indicated that it occurred on Facilities A, C, D, F, and G, the STRH, and the MHCB. The warden and chief of mental health participated in the rounding; they were at times joined by the CEO and other executive leadership team members. Although staff in three facilities reported good working relationships between custody and mental health, most housing unit staff expressed concerns about challenges related to staffing shortages. Staff reported some poor morale due to increased patient caseloads and other work responsibilities. Reviewed executive leadership joint rounding documentation also indicated staff assisting with making a referral to the pre-release coordinator to obtain a patient's medication in preparation for his release.

Reviewed mental health subcommittee meeting minutes addressed executive leadership joint rounding; however, neither the warden's meeting minutes nor those from the quality management committee addressed the rounding.

Although CSATF was not selected to pilot specialized bed huddles, the institution submitted the specialized bed huddle form as proof of practice for Facility F for the months of October 2021 through February 2022. No huddle sheets for Facility F were provided for March 2022. The monitor also reviewed three months of STRH huddle sheets and two months of sheets for the EOP program's G-1. For these months, 59 percent of first and second watch huddle sheets were properly completed.

All required participants attended an observed STRH huddle. The huddle started timely and demonstrated good collaboration between mental health and custody. The psych tech knew the patients and reported meaningful information; she had resolved a medication issue raised in IDTT the preceding day. Discussed topics were relevant and clinically useful.

CSATF only provided documentation of monthly joint supervisory 3CMS program area tours for three of six months.  Custody staff's reporting during the tours was typically limited to staffing shortages and quarantine restrictions, which distressed patients.  Patient concerns included frequent moves, which resulted in the loss of property, the need for more dayroom, out-of-cell time, group treatment, and a veterans' group, significant clinician turnover, and lengthy pill lines.

Due to staffing shortages that were in part related to COVID-19, CSATF did not offer EOP orientation groups during the review period.

CSATF did not provide meeting minutes for inmate advisory council meetings.

The institution provided a copy of the 3CMS orientation brochure that was distributed to new 3CMS patients.

All 35 staff misconduct complaints had either been closed or were pending approval and closure.  Two staff members were reassigned due to a single staff misconduct complaint.

CSATF identified 171 staff who attended the annual 2022 off-post partnership training but did not report the total number of staff who were required to attend the training.  CSATF also reported that quarterly round table partnership training occurred in December 2021 and March 2022 on Facilities F and G, and in the MHCB, STRH, and CTC for psychiatrists, psychologists, and custody staff.  The institution reported staff who attended the training but did not identify staff who were required to attend.

<u>Heat Plan</u>:

CSATF's heat plan LOP complied with headquarters' heat plan directive.  Except for October 2021, the reporting period fell outside of the heat season.

Pursuant to policy, CSATF prepared and submitted monthly heat reports to CDCR. There were no reported heat alerts during the review period.

The monitors interviewed custody staff from two different housing units each on Facilities A, B, C, D, E, F, and G, and from administrative segregation, about heat plan protocols. Only officers in administrative segregation and one other housing unit had satisfactory knowledge of heat plan practices. Custody staff in seven housing units incorrectly reported that the list of patients who were prescribed heat sensitive medications was updated weekly; another custody officer stated that it was updated monthly. Custody staff in five housing units were unaware of the months that the heat plan was in effect, the heat plan's three stages, or both. Most custody officers incorrectly identified the heat plan stage when nursing/medical rounds were conducted. Additionally, one or multiple thermometers in five toured housing units were not working.

These deficiencies were particularly concerning because the monitors expressly allowed, and sometimes instructed, all interviewed custody officers to reference any available documentation containing heat plan information before answering questions; unfortunately, custody staff were not only generally unaware of the various aspects of the heat plan but were also unaware of where to find the information. However, most interviewed custody officers were aware of the signs of heat-related distress and confirmed monitoring patients for it.

RVRs:

CSATF reported that all 167 or 100 percent of custody correctional administrators, captains, lieutenants, and sergeants received the required RVR training. Further, 31 of 57 or 54 percent of mental health staff received the required training. Specifically, none of the three chief psychologists, six psychiatrists, or six senior psychologists received the training. However, 23 of

27 or 85 percent of psychologists, and eight of 15 or 53 percent of social workers, received the training.

CSATF issued 1,975 RVRs during the review period. Of those, 1,228 were issued to MHSDS patients, including eight to patients waiting for transfer to acute care, one to a patient waiting for transfer to the intermediate level of care, 35 to MHCB patients, 150 to EOP patients, and 1,034 to 3CMS patients. Further, 747 RVRs were issued to non-MHSDS incarcerated persons.

Review of a sample of 21 RVRs for compliance with CDCR policy indicated that custody staff timely referred RVRs to mental health for completion of a mental health assessment in eight of 21 or 38 percent of cases. Mental health timely completed and returned the assessment to custody in 14 of 21 or 67 percent of cases.

In four of 21 or 19 percent of assessments, the mental health clinician used an identical, boilerplate response when answering question number three as to whether evidence suggested that mental illness and/or developmental disability/cognitive or adaptive functioning deficits contributed to the patients' behavior that led to the RVR, and question number four regarding penalty mitigation.

The SHO documented consideration of the mental health assessment in all 21 or 100 percent of cases. Mental health assessments recommended penalty mitigation in five or 24 percent of the reviewed RVRs; the SHO actually mitigated penalties in all five or 100 percent of the cases where it was recommended by clinicians recommended.

Some staff reported that unlicensed clinicians were tasked with completing mental health assessments for RVRs without adequate training and further reported that the supervisor overseeing RVR assessments lacked sufficient training to provide adequate guidance.

Use of Force:

CSATF reported that the warden and chief deputy warden attended use of force training, as did six of eight correctional administrators, all six captains, all 43 lieutenants, 107 of 110 or 97 percent of sergeants, and 776 of 791 or 98 percent of correctional officers. For mental health staff, the chief of mental health attended the training, as did four of six supervisors, 25 of 27 or 93 percent of psychologists, all four psychiatrists, and 14 of 15 social workers. Regarding nursing, 126 of 135 or 93 percent of nurses attended the training. One of four physician's assistants attended the training. However, neither of the two psychiatric nurse practitioners and none of the 15 doctors attended the training.

CSATF reported three controlled use of force incidents involving three MHSDS patients and 140 immediate use of force incidents involving 110 mental health caseload patients and 30 non-MHSDS incarcerated persons.

The monitor reviewed three controlled and eight immediate use of force incidents. The three controlled use of force episodes and eight immediate use of force incidents complied with CDCR policy.

There was one controlled use of force to administer PC 2602 medications during the review period.

Lockdowns/Modified Programs:

CSATF reported nine program lockdowns during the review period, of which two were active at the time of the site visit, having commenced on March 30, 2022, in response to a COVID-19 quarantine. Of the remaining seven lockdowns, five led to modified programming due to COVID-19 quarantines; the remaining two were the result of a battery, riot, and/or disturbance.

Access to Care:

A review of CSATF's monthly Health Care Access Quality Reports from October 2021 through March 2022 reflected the issuance of 184,918 mental health ducats and add-on appointments, of which 55 percent were completed.  Of the non-completed appointments, three percent were not completed due to custody reasons, 58 percent were not completed due to non-custody factors, and 39 percent were not completed due to patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

CSATF did not have a MSF but reported sending two 3CMS patients to an MSF during the review period.

*Coleman* Postings:

Thirteen of 14 toured housing units, and the STRH and ASU all contained prominently displayed *Coleman* posters in English and Spanish.  Housing unit G-3 only posted the *Coleman* poster in Spanish.

**APPENDIX B-15**
**CALIFORNIA STATE PRISON/SACRAMENTO (CSP/Sac)**
**(May 9, 2022 – May 12, 2022)**
**Review Period: (October 1, 2021 – March 31, 2022)**

Census:

On May 9, 2022, CSP/Sac housed 1,943 inmates, which was an eight percent decrease from the prior review period.  The mental health caseload population of 1,035 comprised 53 percent of the total incarcerated population and was a 15 percent decrease from the previous reporting period.

The MHCB unit housed 20 patients.

There were 58 patients in the administrative segregation EOP hub, 20 in the EOP hub overflow, and 524 mainline EOP patients.

The PSU housed 121 patients, which was a 62 percent decrease from the prior review period.

The 3CMS population included 238 mainline patients and 54 patients housed in STRH.

Staffing:

Positions for the chief psychiatrist and senior psychiatrist were filled.  Fifteen of 19 psychiatry positions were filled, for a 21 percent vacancy rate.  Two registry psychiatrists reduced the psychiatry functional vacancy rate to 11 percent.

CSP/Sac did not have an established telepsychiatry position but utilized telepsychiatry for on-call coverage.

Both chief psychologist positions were filled.  Eight of 8.5 senior psychologist supervisor positions were filled.  Eight senior psychologist specialists covered 7.5 positions.  Thirty-eight of 58 psychology positions were filled, but two psychologists were on long-term sick leaves, for a 38 percent psychology vacancy rate.  Three registry psychologists reduced the functional

675

vacancy rate to 33 percent. Fourteen psychologists were unlicensed. There were also two psychology interns.

One supervising social worker covered the 0.5 established position. Fifteen of 19.5 social worker positions were filled, but one social worker was on long-term sick leave, reflecting a 28 percent vacancy rate. One contractor reduced the social worker functional vacancy rate to 23 percent. Two social workers were unlicensed.

Twenty-nine of 29.5 recreation therapist positions were filled, but one RT was on long-term sick, for a five percent vacancy rate.

Sixty-eight of 76.53 registered nursing positions were filled, for an 11 percent vacancy rate. All four senior psych tech positions were filled. Seventy-three of 109.7 psych tech positions were filled, reflecting a 33 percent vacancy rate.

Positions for the OSS II and AGPA, and two HPS I, were filled. Twenty of 25 clerical positions were filled, for a 20 percent vacancy rate.

Staffing was negatively impacted by the COVID-19 pandemic and ensuing outbreaks during the review period.

Telepsychiatry:

CSP/Sac only used telepsychiatry for after-hours on-call coverage between 6:00 p.m. and 7:00 a.m.

Quality Management:

CSP/Sac typically continued to have a robust quality management program.

The CEO chaired the local governing body, which met five times and always achieved quorums. Meetings focused on renewing 40 clinical privileges for psychiatrists, psychologists, and physicians, and approving policy updates.

The CEO also chaired the quality management committee's monthly meetings, which also attained quorums.  Monthly agenda items focused on the healthcare access report, subcommittee reports, and program updates.  The mental health subcommittee's reporting to the quality management committee included a summary identifying metrics below, near, or at benchmark, mental health's COVID-19 responses that were related to treatment and programming, suicide prevention efforts, and PC 2602 involuntary medication renewals.

The chief of mental health chaired the mental health subcommittee's monthly meetings, which achieved quorums.  The mental health subcommittee addressed mental health staffing and population trends, MHCB referrals, treatment refusals, and RVRs, and reported results from the CAT.  The subcommittee also reviewed sustainable process, headquarters, and indecent exposure (IEX) audits, PIWPs, and CAPs.

Ongoing audits included a MTP audit that reviewed nine MTPs; only four met expectations.  Deficiencies included a lack of specific interventions and missing MTP medication reviews and updates.  Another audit focused on whether treatment plan's clinical summary and/or case formulation addressed IEX behaviors and whether IPOCs addressed measurable goals and specific interventions.  It found that 85 percent of treatment plans addressed IEX behavior, while 75 percent of IPOCs addressed goals and interventions.

CSP/Sac implemented a quality improvement plan (QIP), QIT/FIT, and several CAPs in response to a suicide case review, audits, and dashboard and performance report data.  Five completed CAPs addressed SPRFIT quorums, MHCB nursing staff not staggering rounds and neglecting to document suicide precautions, timely patient transfers to the EOP and 3CMS programs, and completion of the administrative segregation preplacement form.  There were eight other CAPs in progress during the review period.

677

Since May 2019, CSP/Sac's external peer review had been placed on hold with the institution only conducting internal peer review for CTC psychologists. A prior peer review from June 2021 found that all CTC psychologists either met or exceeded standards. The current peer review was expected to be completed by May 2022.

CSP/Sac disseminated quality management information to line staff during MHSDS program meetings, while performance reports were discussed during weekly supervisors' meetings.

Medication Management:

CSP/Sac provided MAPIP results for the review period for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated that CSP/Sac was compliant for obtaining height, weight, blood pressure, and thyroid tests for all six months of the review period. The institution further reported six months of noncompliance for AIMS tests, glucose (blood sugar) monitoring, CBCs, CMPs, EKGs, lipid monitoring, and obtaining medication consents.

CSP/Sac was a clozapine maintenance facility. During the site visit, 19 patients were prescribed clozapine. CSP/Sac reported six months of compliance for measures for weight, blood pressure, and CBC. It further reported compliance for five months for glucose and height, for four months for medication consents and thyroid tests, for three months for CMP, and for two months for obtaining lipid tests. There was compliance for one of five required months for monitoring AIMS and noncompliance for all five required months for monitoring EKGs.

For monitoring antidepressants, there was compliance for six months for obtaining thyroid tests, and for checking blood pressure for patients taking venlafaxine. There was

noncompliance for all six months for medication consents. CSP/Sac reported that it was not required to check EKGs during the review period.

For patients prescribed carbamazepine, CSP/Sac indicated compliance for one of two required months for checking CBC and for obtaining medication consents. For monitoring CMP and medication levels, CSP/Sac was noncompliant for the one required month.

Medication consent documentation and obtaining CMP for patients prescribed Depakote (divalproex, valproic acid) were compliant for one month. For CBC and medication levels, CSP/Sac reported noncompliance for all six months.

For lamotrigine, CSP/Sac was compliant for two months for medication consents.

For lithium, CSP/Sac reported compliance for five months for kidney function tests, for three months for obtaining medication consents, for two months for monitoring lithium levels and checking EKGs, and for one month for thyroid monitoring.

For medication management metrics reported by mental health headquarters, CSP/Sac was compliant for all six months of the review period for continuity of medications upon parole or transfer to the community. There was compliance for four months for medication continuity upon inter-institutional transfer from R&R and for PC 2602 involuntary medication court orders being in the chart, and for three months for continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), and medication continuity from discharge/transfer from a community hospital and/or DSH. CSP/Sac reported compliance for two months for medication continuity for MHCB transfers and for PC 2602 medication orders, and for one month for continuity of medications with intra-institutional transfer to ASU/SHU/PSU. There was noncompliance for all six months for observation of medication

preparation at HS, observation of medication preparation a.m. and p.m., chronic care medications historical administration, and outpatient provider new medication orders.

Psychiatrists could prescribe medications for a maximum of 180 days.  Bridge orders were permitted for up to 30 days.

The chief or senior psychiatrist reviewed prescribed psychotropic medications with prescribing psychiatrists.

Pursuant to a headquarters' directive, non-formulary medication prescriptions did not require secondary review or approval.  Approximately 18 percent of prescribed medications were non-formulary.

CSP/Sac reported that 997 patients were prescribed a total of 2,830 psychotropic medications.  Eight patients were prescribed psychotropic prescriptions KOP; all were for SSRIs. Reported delays in pill line start times were mostly attributed to alarm responses, custody coverage, or delayed mealtimes impacting the mental health program.  CSP/Sac did not report that the duration of pill lines negatively affected programming.

The monitor's expert could not ascertain either the number of patients who were prescribed HS medications, or the number of medications prescribed at HS.  CSP/Sac did not report how frequently HS medications were administered prior to 8:00 p.m.

During the site visit, 156 patients received medications pursuant to PC 2602 involuntary medication orders.  During the review period, CSP/Sac filed 82 PC 2602 petitions, including 75 renewals, and five emergent and two non-emergent initial petitions.  All were granted.

Transfers:

Transfers were negatively impacted by the COVID-19 pandemic and subsequent outbreaks during the review period.

CSP/Sac had a major sustainability review in November 2021 and a minor sustainability review in February 2022. These reviews included a headquarters' audit that assessed the accuracy and quality of a sample of HLOC considerations. There was also an examination of the degree of concordance or interrater reliability between the headquarters' reviewer's judgment and that of CSP/Sac's inpatient coordinator as to the acceptability of the HLOC forms.

Interrater reliability decreased during the major sustainability process review. The headquarters' reviewer identified the quality results to be 71 percent while CSP/Sac's inpatient coordinator found 85 percent quality. Prior results from the third quarter of 2021 indicated respective 52 and 57 percent quality from the headquarters' and inpatient coordinators' reviews, which reflected significantly lower HLOC form quality, but better interrater reliability. Of 59 cases, headquarters found 17 unacceptable, while the inpatient coordinator determined that only nine were of concern. The unacceptable cases included overreliance on incorrect documentation, failure to note positive considerations, documentation completion errors, an insufficient narrative supporting non-referral, and inadequate treatment modifications.

Non-referral logs were reviewed for July, August, and September 2021. There were 474 log entries for these three months, but only six patients were included in multiple entries for all three months. The regional sustainability review team reviewed these six patients and determined that they did not require further follow-up. Reasons for the multiple entries included MHCB placement, which required weekly IDTTs, placement in the EOP modified program, which required monthly IDTTs, and movement between programs. Regional staff reviewed eight other cases to assess whether there was internal consistency between HLOC considerations and clinical documentation. Three of eight or 38 percent of cases were found not to be internally consistent, requiring subsequent review by program supervisors.

The minor sustainability review demonstrated a further decrease in both quality and interrater reliability.  The headquarters' reviewer found only 43 percent of documentation acceptable, while the inpatient coordinator found 75 percent acceptable.  The unacceptable cases were due to reviewing incorrect documentation, missing positive considerations, copying and pasting information, missing documentation, clinical inconsistencies, documentation completion errors, an indicator being incorrectly marked positive, insufficient narratives supporting non-referral, and insufficient treatment interventions.

The monitor's expert randomly selected several cases from the non-referral log to assess whether patients were timely referred when indicated and whether clinical documentation included adequate non-referral rationales.  This review indicated that CSP/Sac did not refer all patients when inpatient treatment was indicated.  Further, while a patient may have eventually been referred, the review indicated that several patients should have been referred earlier, which would have prevented or minimized the impact of inadequately treated or untreated symptoms.  Moreover, reviewed documentation often included both inadequate non-referral rationales and treatment modifications.  Some treatment modifications simply restated Program Guide requirements, while others were cut and pasted multiple times.  Many did not address the specific criteria marked as positive.

CSP/Sac had two inpatient coordinators; both were senior psychologist specialists.  The institution did not report any issues with IRU kickbacks of inpatient referrals for not meeting criteria.  The inpatient coordinator reported that CHCF's closing of inpatient beds had significantly impacted inpatient transfers from CSP/Sac.

CSP/Sac met timeframe guidelines for sending referrals to IRU for both acute and intermediate care patients. *Vitek* hearings were scheduled timely. CSP/Sac completed 18 *Vitek* hearings. No patients prevailed.

CSP/Sac referred 71 patients to acute care; all referrals were from the MHCB. Fourteen referrals or 20 percent were rescinded; the treatment team rescinded eight referrals, while six patients were referred to intermediate care. The IRU rejected one acute care referral. Seven of 56 or 13 percent of acute care referrals transferred within ten days.

CSP/Sac referred 22 patients to intermediate care, of whom 12 patients were referred from the MHCB, four from the PSU, three from the mainline EOP, one from the EOP hub, and two patients had referrals in progress from other institutions when they were placed in the CSP/Sac MHCB. Four referrals were rescinded; the treatment team rescinded two, and two other patients were referred to acute care. One patient was rejected. Seven of 17 or 41 percent of patients transferred within 30 days.

The institution reported problems with the timely notification of patients returning from inpatient care. Specifically, CSP/Sac often received notice of patient returns when the patient was en route on the bus or when the patient arrived at CSP/Sac's receiving and release. CSP/Sac's inpatient coordinator reported excellent communication with the CSP/Sac C&PR and noted that the late notification was not an internal issue.

Upon notification of a patient return, the inpatient coordinators reviewed the patient's discharge summary and EHR. They then notified all supervisors and followed up with a second email confirming the patient's housing placement. The senior psychologist supervisor made clinician-to-clinician contact after reviewing the EHR. The inpatient clinician's response was then forwarded to the CSP/Sac primary clinician.

CSP/Sac reported an issue with premature discharges and returns from inpatient programs. For example, CSP/Sac received five returns on a Friday evening; four of those patients were immediately sent to the MHCB after clinical evaluation. The inpatient coordinator reported that if a patient had not yet been transported and a chart review revealed that the patient was not clinically appropriate for return, the institution notified IRU and requested a CCAT, which may or may not result in stopping the patient's return until the CCAT was completed.

During the review period, CSP/Sac requested expedited transfer for four patients; one patient transferred within two days of the request, two patients transferred within five days, and the remaining patient took 12 days to transfer after the request.

No inpatient transfers were canceled or delayed due to impending paroles, disciplinary hearings, classification factors, or pending PC 2602 involuntary medication hearings.

No patients with complex medical needs were transferred to inpatient care during the review period.

During the site visit, seven patients were awaiting transfer to acute care; two were awaiting transfer to intermediate care. Three of the acute care patients were beyond ten days. None of the intermediate care patients were beyond 30 days. Reasons for the delays were not provided.

There were 848 instances of non-referral for 488 patients during the review period.

There were 249 referrals to CSP/Sac's MHCB, of which 16 were rescinded. Of the 233 admissions to CSP/Sac's MHCB, the institution provided full data for 210 patients. All but one were admitted within 24 hours; one rescission took 34 hours.

During the review period, the MHCB had an average daily census of 9.95 patients. Physical stays averaged 16.4 days; clinical stays averaged 9.3 days. Twenty-six patients, or 11

percent, had clinical stays exceeding ten days, with ranges from 11 to 50 days. Sixty-four patients waited beyond 72 hours after MHCB clinical discharge to transfer, with a range of 92 hours to 66 days. Of those, 41 patients were awaiting acute care beds, 17 patients had medical holds or were at outside hospitals, five patients were awaiting transfer to intermediate care, and one patient took four days to transfer to an EOP.

Eight patients had three or more MHCB admissions; six patients were admitted three times each, one patient had six admissions, and another patient had four admissions.

CSP/Sac referred 42 patients to outside MHCBs; all transferred within 24 hours of referral.

During the review period, CSP/Sac's EOP hub was closed to external admissions, but the institution continued to place CSP/Sac patients in the unit.

At the time of the site visit, CSP/Sac also housed 20 EOP hub patients in overflow units in the PSU. These patients included 12 with pending RVRs, including seven with SHU-able offenses, and five EOP patients pending transfer to a mainline EOP program. One endorsed NDS patient had been awaiting transfer for over four months.

CSP/Sac's LTRH was closed in December 2021. CSP/Sac did not track transfers to LTRH during the review period. During the site visit, there were two 3CMS patients housed in STRH awaiting transfer to LTRH. CSP/Sac did not provide the date of SHU assessment or endorsement for either patient.

CSP/Sac did not track patients whose level of care changed from EOP to 3CMS during the review period.

No 3CMS patients were admitted to the MSF during the review period.

At the time of the site visit, the ASU housed 11 patients for longer than 90 days; stays averaged 126 days.  Nine patients were endorsed and pending transfer, one was retained due to enemy concerns, and one was pending a RVR hearing.

Programming:

All programming was negatively impacted by the COVID-19 pandemic and ensuing outbreaks during the review period.

MHSDS Patients in Administrative Segregation:

CSP/Sac housed 544 EOP and 173 3CMS patients in administrative segregation during the review period, with average respective lengths of stay of 38 and 72 days.  The 198 non-MHSDS administrative segregation inmates had stays averaging 68 days.

Caseloads for the EOP hub psychiatrist and two of six primary clinicians were within established ratios.  The remaining four PCs had caseloads exceeding the ratio.

CSP/Sac's EOP hub was located on Facility A-5; however, during the review period, EOP hub patients were also housed in overflow units on Facilities A-1 and A-2, which housed PSU patients.  The overflow units housed 44 EOP hub patients in January 2022, 49 patients in February 2022, and 33 patients in March 2022.  Supervisors and staff confirmed that EOP hub overflow patients received treatment as if they were housed in the EOP hub and did not program with PSU patients.

Primarily due to the lack of offered treatment, the EOP hub did not pass certification between September 2021 and January 2022.  During the site visit, CSP/Sac was awaiting EOP hub certification results for February 2022 and had yet to complete EOP hub certification for March 2022.

CSP/Sac offered EOP hub patients an average of 5.23 weekly hours of structured treatment activity, with patients attending 1.85 hours.

Ten patients were randomly selected to have their healthcare records reviewed to assess their administrative segregation hub stays.

Eight of nine or 89 percent of patients had initial psychiatry evaluations before the initial IDTT. One of nine or 11 percent were confidential. Nineteen of 20 or 95 percent of routine psychiatry contacts timely occurred every 30 days; ten percent were confidential.

All nine patients had timely initial primary clinician evaluations before the IDTT; 11 percent were confidential. Sixteen of 20 or 80 percent of required routine PC contacts timely occurred every seven days; 33 percent were confidential.

Eight of nine or 89 percent of patients had timely initial IDTTs within 14 calendar days of admission. Required staff attended 78 percent of initial IDTTs. All six routine IDTTs timely occurred within 90 days; required staff attended 57 percent.

Eight observed initial IDTTs occurred in a very cold room with adequate lighting. Required disciplines attended and actively used computers. Mental health and custody staff appropriately worked together to encourage patients' IDTT attendance; five patients attended.

The psychiatrist and PC had each met with most patients before the IDTTs. The psychiatrist provided information about medications and assessed patients for side effects. The CC I was engaged and provided useful information. However, primary clinicians' discussions of patients' goals were frequently vague and unmeasurable, and HLOC indicators were generally not discussed in a comprehensive and structured manner. Diagnoses were also intermittently concerning. For example, one patient had been diagnosed with adjustment disorder, a condition that was normally a time-limited response to a stressful event, since 2018.

Many IDTTs strongly emphasized criminal behaviors, as well as lowering patients' level of care from EOP to 3CMS.  In fact, one IDTT exemplified this tone with the primary clinician's statement that "the goal is always a lower level of care."  IDTTs also used concerning language, including referring to MHCB treatment as a "vacation."  In another case, the clinician assessed the patient for suicidal thoughts by inquiring, "you're not feeling that way now, right?"

An observed EOP hub group that three patients attended lacked structure and had limited therapeutic value.  The group revealed patients doing a preferred activity, such as reading or playing chess with the facilitator.  Notably, the facilitator opined that the group had therapeutic value because it gave patients respite from the stressors of incarceration.

The three interviewed group participants reported being pleased with primary clinicians but that psychiatry contacts were brief and often at cell front.  They further reported that the facility's environment was an obstacle to their care and indicated dirty TTMs, filthy food trays, and food being "scraps."  They also expressed concerns with laundry services.

Review of 16 weeks of Form 114As revealed the offering of ten or more weekly hours of yard for two of 16 or 12 percent of weeks.

PSU:

PSU A, which was composed of A-1 and A-2, and PSU B, which consisted of B-7, had review period censuses that fluctuated between 104 and 114 patients, and 40 and 44 patients, respectively.  PSU B also housed EOP hub overflow patients; for purposes of PSU certifications, the program included data for EOP hub patients housed in the PSU.

All three PSU psychiatrists had caseloads within the established ratio.  Six of ten primary clinicians exceeded the established ratio, with a range of 14 to 40 patients each.  One intern had a nine-patient caseload.

The PSU failed to achieve certification in November 2021 primarily due to the lack of offered structured therapeutic activities and was closed to intake.  Although CSP/Sac attributed COVID-19 precautions as the primary reason for failing to provide adequate treatment, even after lifting these restrictions, mental health and custody staffing shortages, custody escorting requirements, and medication administration delays prevented the institution from providing sufficient treatment.  Due to mental health staffing challenges, no clinician-led groups were offered; RTs provided all group treatment.

Leadership reported that PSU B patients expressed safety concerns when moving across the yard since the deactivation of two EOP buildings, which resulted in a reduction in the number of the yard's EOP patients and an increase in the Level IV population.  Patients also reported additional reasons for refusing treatment, including custody failing to get them for groups, and characterized groups as boring and unhelpful.  Further, patients expressed a dislike for merged treatment groups, which they stated made them anxious because they did not know who would attend the groups, while reducing the groups' value due to facilitators' inability to establish continuity.

In response to quarantines and modified programming, mental health had increased rounding and implemented patient contests and raffles in an attempt to build a feeling of community and reinforce treatment participation.  Interviewed patients were very positive about these measures, which rewarded treatment participation.

Eighteen patients were randomly selected to have their healthcare records reviewed for Program Guide compliance during their PSU stays.

Thirteen of 17 or 76 percent of patients had timely initial psychiatry contacts before the IDTT.  Twenty-seven of 28 or 96 percent of routine psychiatry contacts timely occurred every 30

days.  Three percent of initial and routine psychiatry contacts were confidential.  None utilized telepsychiatry.

All 17 or 100 percent of initial primary clinician contacts timely occurred before the IDTT; 18 percent were confidential.  Twenty-two of 31 or 71 percent of routine primary clinician contacts timely occurred every seven days; 51 percent were confidential.

All 17 or 100 percent of initial IDTTs timely occurred; patients attended 82 percent.  All 13 or 100 percent of routine IDTTs timely occurred within 90 days; patients attended 43 percent.  Required staff attended 100 percent of initial and routine IDTTs.  Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this assignment was not clearly documented for all cases.

Five observed IDTTs on PSU A and B typically began on time and took place in rooms of comfortable temperatures.  However, the PSU A IDTT "room" was an open area outside of several offices that served multiple purposes, including IDTTs, storage, and photocopying.  These IDTTs had compromised confidentiality because individuals accessing people and resources in the available offices regularly interrupted the IDTTs and allowed non-treatment team members to overhear confidential information.  Multiple interviewed patients admitted not fully trusting their treatment teams and expressed a preference for confidential IDTTs.

Most required team members attended observed IDTTs, except the captain, who was absent or late to two of five meetings.  The attending correctional counselors were not the assigned counselors and typically needed encouragement to participate.  One patient reported being strip searched prior to his escort to the IDTT, which custody staff confirmed.

All IDTTs began with a strong emphasis on custodial factors.  Some clinicians had difficulty conceptualizing cases, although clinical skills fluctuated in this and other treatment

planning areas.  Overall, treatment plans required greater utilization of objective, behaviorally based treatment targets and goals.  Teams also varied in their abilities to work together and focus on relevant information.  At times, the psychiatrist and correctional counselor minimally participated.

All required staff attended four observed ICCs.  The ICC chairperson solicited mental health and custody staff's input about patients' PSU retention or release and partially based decisions on staff input.  Notably, the ICCs retained two patients in the PSU pending RVR hearings.  Another patient was retained to give him more time to consider programing on the mainline; in the past, when he was endorsed to leave, he committed a RVR to remain in restricted housing.

The fourth patient was serving a SHU term with a MERD of July 2024.  He had been attending PC contacts and group treatment and had been disciplinary free for five months.  Custody staff agreed that he was doing very well and supported his release from the PSU.  The ICC released him from the PSU, which was notable since it was more than two years before the end of his SHU term.

Review of Form 114As for yard participation for a total of 24 weeks for ten patients revealed the offering of ten or more weekly hours of yard for 20 of 24 or 83 percent of weeks.

STRH:

The STRH psychiatrist and three primary clinicians all had caseloads within established ratios.

The STRH housed 273 patients during the review period.  Stays averaged 98 days.

Patients reported confidential weekly primary clinician contacts and that psychiatrists and PCs timely responded to their mental health referrals.

The STRH offered 3CMS patients a weekly average of 1.58 hours of structured treatment activity between September 27, 2021, and March 31, 2022; patients attended 0.58 hours.

Seventeen patients were randomly selected to have their healthcare records reviewed for their STRH stays.

Twelve of 16 patients, or 75 percent had a timely initial psychiatry evaluation; 33 percent were confidential. Psychiatry evaluations of three of the remaining four patients were untimely, and one patient did not have an initial psychiatry evaluation. Seven of eight routine psychiatry contacts timely occurred within 90 days; 63 percent were confidential. Telepsychiatry was not used for initial or routine psychiatry contacts.

Thirteen of 16 or 81 percent of initial primary clinician contacts timely occurred; 57 percent were confidential. Of the remaining three, the initial primary clinician contact of one patient did not occur timely; two patients did not receive initial PC contacts. Forty-eight of 60 or 80 percent of routine primary clinician contacts timely occurred within seven days; 50 percent were confidential.

All 16 initial IDTTs were timely; patients attended 75 percent. Six of seven or 86 percent of quarterly IDTTs timely occurred within 90 days. Patients attended 25 percent of routine IDTTs. Required staff attended 100 percent of initial and routine IDTTs. Although a psychiatrist and primary clinician always attended IDTTs, it could not always be determined whether the assigned treatment provider attended.

During the review period, CSP/Sac reported that all required disciplines attended 133 of 138 or 96 percent of IDTTs. During the site visit, PCs, the treating psychiatrist, and the correctional counselor attended seven observed IDTTs; patients attended three. All attendees, including patients, actively participated. The IDTTs revealed detailed discussions of patients'

developmental histories and case conceptualizations.  Attendees concurred on diagnoses and symptoms that were related to appropriate short- and long-term treatment goals.  Interventions were discussed in light of patients' mental status and progress.  Treatment plans were individualized.

The STRH offered 12 treatment groups of 90 minutes each.  An RT facilitated observed groups on social skills/communication and coping skills, which were attended by two and three patients, respectively.  The RTs facilitated meaningful discussions and actively engaged patients.

Observed psych tech rounds demonstrated PTs conducting brief mental status examinations and asking patients meaningful questions about any issues they wanted to discuss and their medications.  Psych tech contacts varied from three to ten minutes.

Review of the log and patient cell observation indicated the timely issuance of radios to STRH patients.  Custody officers documented the offering of phone calls.  Ten weeks of reviewed Form 114As revealed the offering of patients at least 18.5 weekly hours of yard, three weekly showers, and one weekly linen exchange.

All required staff attended an observed STRH ICC.  The mental health clinical supervisor knew the patient and discussed his current mental health and any concerns.  The patient actively participated in the ICC.  The ICC released the patient from STRH, despite a pending serious RVR.  The patient agreed with the ICC action.

Non-Disciplinary Segregation:

STRH and EOP hub staff produced a housing roster that listed patients as group D1 and privilege group A or B, which custody staff interpreted as the patient being on NDS status.  There were 25 patients on NDS status.  EOP hub NDS patients were issued personal property after the ICC determined patients' work and privilege groups.  Logs reflected the issuance of

693

personal property to NDS patients.  All STRH NDS patients were also offered a weekly phone call, which custody officers documented.  EOP hub officers documented NDS patients who made phone calls.

CSP/Sac was unable to report the number of NDS patients who were approved for expedited transfer during the review period.  During the site visit, three patients were approved for expedited transfer.  However, the C&PR stated that patients typically did not transfer within 72 hours due to COVID-19 testing requirements and/or patients' refusal to test for COVID-19.

MHCB:

CSP/Sac operated a 24-bed MHCB consisting of 13 beds in CTC I and 11 beds in CTC II, as well as five beds in Facility B-1 that could be used as MHCBs, if necessary.  During the site visit, only CTC I and CTC II beds were filled.

Two psychiatrists and two primary clinicians were assigned to each MHCB unit.  Both disciplines' caseloads were within established ratios.

MHCB staff expressed an interest in more training and additional staffing when patients were more acute.  Mental health management reported that the unit's current challenges included three clinicians being out, with two on long-term sick leaves.  MHCB staff also reported that most of the unit's patients came from the PSU and had increasing acuity.  However, CSP/Sac had prioritized assigning staff by program acuity, leading to increased staffing stability for the MHCB.

Ten patients were randomly selected to have their records reviewed for their MHCB stays.  Only one or ten percent received an initial primary clinician evaluation within 24 hours of admission.  Nine of ten initial psychiatry evaluations were timely.  The evaluations either

occurred in non-confidential treatment space or the space where the evaluation occurred was unknown.

All 29 of the required twice weekly psychiatry contacts timely occurred; 21 percent were confidential. Seventy-five of 76 or 99 percent of required daily clinical contacts occurred; 13 percent were documented as confidential.

All ten patients had timely initial IDTTs within 72 hours of admission. Required staff attended all initial IDTTs. One hundred percent of patients who required routine IDTTs had them within seven days of their initial IDTT. All patients had a discharge IDTT.

All required team members and the senior psychiatrist attended six observed IDTTs; five patients attended. The IDTTs were generally well-facilitated but varied in quality. One patient who had an initial IDTT had recently returned from DSH and was admitted to the MHCB for grave disability. The patient had a history of decompensating when off his medications and had been off them following his return from DSH; he was now on an involuntary medication order but remained quite acute. The team hoped that the involuntary medication order and his MHCB placement would stabilize him so that he would not need a HLOC referral. Notably, during the site visit, six patients in CTC I were awaiting transfer to acute care. All IDTTs discussed patient privileges, including telephone calls and yard.

MHCB space limitations forced staff to use one room as a multipurpose room for treatment, individual contacts, and recreation therapy, as well as an office. This resulted in most treatment occurring in cell or at cell front.

Communicative MHCB patients reported general satisfaction with their care and did not have any significant issues to report.

Seclusion and Restraint:

CSP/Sac's MHCB did not utilize either seclusion or restraint during the reporting period.

CIT:

CSP/Sac's CIT LOP was consistent with statewide CIT policy.

During regular business hours, crisis triage clinicians who were separate from the CIT responded to patient emergencies.  Otherwise, the CIT operated from 3:00 p.m. until 11:00 p.m. and the on-call clinician handled crises between 11:00 p.m. and 6:00 a.m.  Crisis triage clinicians provided weekend and holiday coverage.

There were 244 CIT activations during the review period; all required team members attended 55 percent.  Of patients that the CIT saw, 81 percent were returned to their cells, 18 percent were referred to the MHCB, and one percent were housed in administrative segregation.

Alternative Housing:

CSP/Sac's alternative housing LOP was in alignment with headquarters' policy and reflected prioritization of housing locations for patients awaiting MHCB placement.  The institution designated 15 cells for alternative housing, including ten cells in B-7 and five cells in B-1.

CSP/Sac reported that it did not have mental health staff specifically assigned to alternative housing.

CSP/Sac did not provide data regarding the number of patients placed in alternative housing during the review period that could be utilized.  All patients placed in alternative housing transferred or returned to their housing units within 24 hours.

EOP:

EOP patients were housed on Facilities A and B.

Seven psychiatrists' caseloads were all within the established ratio. Fifteen of 17 primary clinicians' caseloads exceeded the established ratio. Two psychology interns had caseloads of eight and nine patients.

During the review period, CSP/Sac offered mainline EOP patients an average 4.94 weekly hours of structured treatment. Patients attended 2.3 hours.

Ten EOP patients were randomly selected to have their healthcare records reviewed to assess compliance with Program Guide timeframes during their stays.

Two of six patients had required initial psychiatry evaluations prior to the initial IDTT and within 14 calendar days of arrival. In two of the other four cases, documentation of an initial psychiatry evaluation could not be found, and two did not occur timely. Fifty percent of initial psychiatry contacts were confidential. Fourteen of 37 or 38 percent of routine psychiatry contacts timely occurred within 30 days; 14 percent were confidential. No psychiatry contacts utilized telepsychiatry.

Five of six initial primary clinician contacts timely occurred within 14 days of arrival. Seventeen percent were confidential. Thirty-one of 45 or 69 percent of routine primary clinician contacts were timely; 12 percent were confidential.

Five of six initial IDTTs timely occurred within 14 calendar days; required staff attended 100 percent. Ten of 13 or 77 percent of routine IDTTs timely occurred within 90 days; required staff attended 76 percent.

The monitor's expert was concerned about barriers to meaningful and confidential mental health treatment. The EOPs' PCs reported significant challenges in seeing patients confidentially. Four interviewed primary clinicians reported seeing patients at cell front considerably more than half of the time, as well as spending significant amounts of time waiting

for patients to arrive.  When patients did not show up for appointments, PCs indicated going to their cells to see them at cell front.

Further, the chief psychologist reported that mental health leadership and program supervisors intervened daily in the EOP program to cover IDTTs; supervisors occasionally also conducted individual contacts.  Leadership further reported redirecting clinicians from performing individual contacts to running groups three to four days weekly.

Five observed Facility A IDTTs and three observed Facility B IDTTs revealed spacious rooms with adequate lighting, temperature, and computer access.  However, IDTTs were overly focused on custodial factors.  The correctional counselor often began case discussions, which staff confirmed was a common practice.  In most cases, both the psychiatrist and PC had met with the patient prior to the IDTT.  PCs presented relevant clinical information, but discussed goals were frequently vague and not measurable.  IDTTs typically addressed HLOC indicators, but very few addressed them in a structured and systematic way.  Psychiatrists discussed medications and reviewed side effects in less than half of the reviewed cases.  IDTT conservations were mostly siloed and multidisciplinary, in contrast to robust, collaborative, and interdisciplinary discussions.

IDTT observations also revealed several patients who would benefit from behavioral plans.  However, staff reported no longer having access to a team to implement these plans.

Staff reported that the low number of patients who actually attended group and limited staff availability resulted in frequent group consolidation.  An observed Facility A group began 45 minutes late due to escort issues and patient refusals, which staff confirmed occurred frequently.  Five patients attended the group.

The group room was large and adequate, with a comfortable temperature, sufficient space and light, and several HEPA filters. Patients were socially distanced. One patient was unmasked; two others were inappropriately masked. The room's size and the operating HEPA filters often made it difficult to hear patients. The group had relevant clinical content, but patient side discussions disrupted the group process. Patients further reported that groups, which included activities such as writing down what happened in their childhood and playing cards, were of limited benefit.

A group of five interviewed EOP patients generally reported adequate therapeutic relationships with psychiatry and PCs. They further reported a frequent emphasis on lowering their level of care from EOP to 3CMS, recent frequent changes in their primary clinicians due to PC reassignment or PCs leaving CSP/Sac, and that mental health and custody staffing shortages often resulted in cancelled sessions. Patients also reported an overemphasis on custodial issues, further elaborating that custody "ran the show" at CSP/Sac.

3CMS:

ML 3CMS patients were housed in Facilities A, B, and C. The caseloads of 3CMS psychiatrists were within the established ratio, but PCs' caseloads exceeded it. Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Four patients required and had timely initial psychiatry evaluations prior to the initial IDTT; 25 percent were confidential. None were conducted by telepsychiatry. Four of nine or 44 percent of routine psychiatry contacts timely occurred within 90 days; 50 percent were confidential. Telepsychiatry did not conduct any routine psychiatry contacts.

Two of four patients had timely initial primary clinician evaluations within ten working days. Seventy-five percent were confidential. Twenty-nine of 33 or 88 percent of routine PC contacts timely occurred within 90 days; 39 percent occurred confidentially.

Three of four initial IDTTs timely occurred within 14 working days. All seven routine IDTTs occurred annually. Required staff attended 91 percent of initial and routine IDTTs. Although the Program Guide required attendance of the assigned psychiatrist and primary clinician, this assignment was not always clearly discernable.

Observed IDTTs were attended by the psychiatrist, PC, and correctional counselor, who accessed patients' records using EHRS and SOMS. Psychiatry and the correctional counselor were actively involved in discussions with patients. Psychiatry addressed the risks and benefits of medications, and the correctional counselor discussed available programs. The IDTTs revealed that patients had individualized treatment plans. IDTTs addressed functional impairments, but minimally discussed relevant clinical and psychosocial history. Case conceptualization quality was variable, and often minimally integrated historical data. IDTTs discussed diagnoses and symptoms; however, severity was vague and was typically identified by a number between one and five without further explanation. Treatment goals and progress toward them were discussed, but the specifics were often vague. IDTTs also discussed specific interventions, such as packets and activities including jobs, religious involvement, education, and Alcoholics Anonymous (AA)/Narcotics Anonymous (NAR)participation. In interviews, most patients reported meaningful IDTTs. They denied problems with medication administration or psychiatrists' response to mental health medication referrals. However, several patients reported that ducats for PC contacts were frequently not honored during lockdowns; clinicians reportedly documented such appointments as a "no show."

CSP/Sac did not offer groups to mainline 3CMS patients during the review period and at the time of the site visit.

Other Issues:

Pre-Release Planning:

The pre-release coordinator had this full-time position since October 2021, utilizing SOMs to maintain a current patient release log that also included patient releases for the prior six months. She met with all patients pending release and obtained a Release of Information (ROI) from those scheduled to discharge to probation or community service and completed pre-release planning assessments for all patients scheduled for release. The pre-release coordinator attended weekly ISUDT and monthly headquarters pre-release planning meetings.

Sixty-five CSP/Sac patients were scheduled for release during the review period. The pre-release coordinator shared IPOCs with PCs for inclusion in the treatment team process. She also provided information to patients for medical and dental care, housing and rental assistance, food banks, and transportation, as well as a Sacramento resource guide.

CSP/Sac also offered pre-release groups for the mainline EOPs, and for the PSU, but not for the mainline 3CMS or administrative segregation. However, often due to COVID-19 outbreaks, these groups did not regularly meet. Recreation therapists facilitated EOP pre-release groups; the pre-release coordinator facilitated 3CMS groups.

During the reporting period, TCMP reported meeting with 38 EOP and 16 3CMS patients. TCMP completed Medi-Cal applications for 44 of 54 patients scheduled for release and also assisted 97 percent of patients who were eligible for SSI with applications; one patient refused to participate. Veterans' benefits applications were submitted on behalf of two patients, of whom one was determined to be eligible.

Program Access:

a.      Job Assignments

On April 1, 2022, CSP/Sac's 591 job assignments were held by 139 EOP patients,
representing 19 percent of the EOP population, 74 3CMS patients, representing 27 percent of
3CMS patients, and 378 non-MHSDS patients, reflecting 49 percent of the non-mental health
caseload population.

The 499 academic assignments were held by 130 or 18 percent of EOP patients, 95 or 35
percent of 3CMS patients, and 274 or 35 percent of the non-MHSDS population.
Of the 162 vocational education assignments, 43 or six percent were held by EOP patients, 32 or
12 percent were held by 3CMS patients, and 87 or 11 percent were held by non-MHSDS
patients.

The 80 substance abuse treatment assignments were held by 24 or three percent of EOP
patients, 24 or nine percent of 3CMS patients, and 41 or five percent of non-MHSDS patients.
CSP/Sac did not have voluntary education assignments.

b.      Milestone Credits

Reports dated April 1, 2022, indicated that 682 of 726 or 94 percent of EOP patients were
eligible to earn milestone credits; 47 percent earned the credits.  Of the 271 3CMS patients, 242
or 89 percent were eligible to earn milestone credits, with 14 percent earning them.  For non-
MHSDS patients, 697 of 779 or 89 percent were eligible to earn milestone credits; 13 percent
earned the credits.

c.      Out-of-Level Housing

CSP/Sac reported that on April 1, 2022, there were five EOP and ten non-MHSDS
custody Level I incarcerated persons in Level IV housing.  There were 21 non-MHSDS custody
Level II incarcerated persons in Level I housing, two EOP and seven non-MHSDS custody Level

II patients in Level IV housing, and six EOP, four 3CMS, and 42 non-MHSDS custody Level III incarcerated persons in Level IV housing.

       d.      ADA Reasonable Accommodation and Grievance Procedures

CSP/Sac reported implementation of the revised ADA accommodation and grievance procedures and provided a copy of the updated CDCR Form 1824 Desk Reference Manual.  Staff received refresher training during annual IST training.

Case by Case Reviews:

Six patients housed in STRH or the PSU met criteria for long-term case conference reviews during the reporting period.  One patient was transferred to the CSP/Corcoran SHU and the remaining five patients remained at CSP/Sac.  Twenty-four long-term case reviews for administrative segregation patients resulted in 16 patient transfers from the unit, six patients pending transfer, and two patients' retention pending RVR hearings.

CSP/Sac provided data reflecting the associate director's review of long-term case conferences for January, February, and March 2022.  For these months, the associate director's review was timely, documented the reasons why patients were retained in restricted housing, and established the next review date, which ranged from 60 to 180 days.

"C" Status:

CSP/Sac reported that three patients were on "C" Status during the site visit.  The institution was unable to report the number of "C" Status patients during the review period.

Mental Health Referrals:

CSP/Sac reported 3,111 mental health referrals, including 1,370 emergent, 177 urgent, and 1,564 routine referrals.  There were 549 referrals to psychiatry and 2,562 to primary clinicians.  For emergent referrals, there were timely responses to one of two psychiatry referrals

and to 98 percent of the 1,368 referrals to PCs.  For urgent referrals, there were timely responses to seven of eight psychiatry referrals and to 91 percent of the 169 primary clinician referrals.  For routine referrals, there were timely responses to 95 percent of the 539 psychiatry referrals, as well as to 96 percent of the 1,025 PC referrals.

Interviewed housing unit officers reported completing a CDCR 128-MH5 to refer patients to mental health when they displayed signs of decompensation.  Officers also produced copies of the form's current version.

Custody and Mental Health Partnership Plan:

CSP/Sac's CMHPP LOP was current and in compliance with headquarters' Partnership Plan.

CSP/Sac did not use the correct executive leadership joint rounding form.  Further, review of executive leadership joint rounding documentation did not indicate whether required individuals attended the rounding and whether staff and patients were interviewed.

Minutes from the warden's meeting and the mental health subcommittee merely noted that executive leadership joint rounding had occurred but did not provide further details.  Quality management committee meeting minutes did not reference the rounding.

CSP/Sac initiated specialized bed huddles in October 2021 in the CTC/MHCB that continued during the review period.  Second and third watch mental health huddles occurred for all housing units.  Reviewed huddle sheets reflected use of the appropriate form; however, it could not be determined whether required staff attended all huddles.

Reviewed documentation indicated that weekly 3CMS supervisory meetings occurred on Facilities A, B, and C for 69 percent of weeks.  Several observed 3CMS supervisory meetings reflected well-prepared clinicians discussing pertinent information with housing unit sergeants,

and other attending correctional officers.  Observed meetings reflected appropriate discussions that typically addressed patients' return from higher levels of care and patients on five-day follow-ups.

Joint supervisory 3CMS program area tours usually occurred monthly in each of the housing units on Facilities A, B, and C.  However, due to COVID-19 outbreaks, the 3CMS program area tours were not held during February 2022 on Facility A, and in Facility C in buildings 3 – 8.  In March 2022, these tours also did not occur on Facility B, and in C-1, C-2, C-5, and C-8 due to COVID-19.  Concerns that these tours identified included limited out-of-cell time due to staffing shortages, requests for more timely responses to requests for mental health care, requests for in-cell activities and art supplies, and repeated complaints about physical plant issues, including water leaks in cells and common areas when it rained.

CSP/Sac distributed the 3CMS orientation brochure to new patients.

The institution offered EOP orientation groups to 76 patients during the review period; 41 patients, or 54 percent, attended the first training session, while 12, or 16 percent of patients attended both sessions.  CSP/Sac reported challenges convincing patients to attend these groups, with patients complaining that the groups were too basic.  This resulted in condensing the training into two sessions, as well as CSP/Sac working with headquarters to restructure the training.

An observed STRH huddle was attended by custody, mental health, and medical staff. Attendees reviewed patients' daily appointments and addressed patient self-injuries and other pertinent matters.  No scheduled arrivals or departures were identified.

Fifteen of 24 or 63 percent of monthly IAC meetings occurred.  The warden and mental health staff attended housing units' IAC meetings.  Reviewed meeting minutes reflected interest

in make-up yard time due to yard's cancellation due to staffing shortages, requests for more phone calls, questions about when full visitation would return, tablet availability, a 3CMS leadership change, and more 3CMS groups.

Fifteen patients filed 19 staff misconduct complaints. Of these 19 complaints, five were pending closure, one was awaiting a response, and 13 complaints had been closed. Further, three staff misconduct investigations that were not initiated through the appeals process resulted in the relocation of ten staff members.

CSP/Sac reported attendance at the annual off-post training by all five correctional administrators, but by only one of six captains. All 31 lieutenants attended the training, as did 70 of 81 sergeants, and 233 of 762 correctional officers. One hundred percent of psychiatrists, psychologists, and social workers attended the training.

CSP/Sac utilized the headquarters' curriculum for quarterly round table training, which occurred in the EOP hub, EOP mainline, and PSU. Although the institution provided training attendance sheets, it could not be determined whether all required mental health and custody staff attended the training.

Heat Plan:

Review of CSP/Sac's heat plan LOP revealed compliance with headquarters' heat plan directive. Except for October 2021, the reporting period fell outside of the heat season. There were no reported heat alerts during the review period.

Reviewed indoor and outdoor temperature logs from each yard for the prior heat season, from May through October 2021, indicated central control's hourly recording of outdoor temperatures. Reviewed housing units' indoor temperature logs typically reflected the recording

of temperatures every three hours; however, for four housing units, some temperature readings were not recorded.

The monitor toured housing units on Facilities A, B, and C, and the STRH. All housing units contained lists of patients who were prescribed heat sensitive medications. Some units' offices contained a posting delineating the heat plan's three stages. Interviewed custody officers were familiar with heat plan policy and procedure. They confirmed that patients who were prescribed heat sensitive medications were recalled from yard following activation of a heat alert. They further reported that patients who were prescribed heat sensitive medications were given cooling measures, including hydrating fluids, ice, and showers, during Stage II and Stage III heat alerts. They also stated that nursing staff conducted rounds during Stage III heat alerts.

Interviewed officers who monitored yard were aware of the signs of heat-related distress and confirmed monitoring patients for them. They also confirmed that patients prescribed heat sensitive medications were immediately removed from yard following activation of a heat alert.

The monitor's observation of individual exercise yards for the STRH, EOP hub, and PSU A and B units verified that these housing units had operable misters. The PSU's individual exercise yards also had coverings that provided shade; the STRH's individual exercise yards lacked these coverings.

Reviewed records indicated that the warden, chief deputy warden, and none of five associate wardens or six captains attended the annual heat plan training. However, three of 31 or ten percent of lieutenants completed the training, as did nine of 81 or 11 percent of sergeants, and 92 of 762 or 12 percent of correctional officers. CSP/Sac did not report mental health staff's attendance at this training.

RVRs:

CSP/Sac reported that 100 percent of custody classifications attended RVR training, including six captains, 31 lieutenants, and 81 sergeants. The four clinicians who performed mental health assessments attended required clinical decision-making training for conducting RVR assessments.

CSP/Sac issued 2,087 RVRs during the review period. There were 1,706 RVRs issued to mental health caseload patients, including 16 to acute care patients, 12 to immediate care patients, 61 to MHCB patients, 1,319 to EOP patients, and 298 to 3CMS patients. The institution issued 381 RVRs to non-MHSDS patients.

Review of a sample of 21 RVRs revealed that custody staff timely referred RVRs to mental health for completion of a mental health assessment in 15 of 21 or 71 percent of cases. Mental health timely completed and returned the assessment to custody in all 21 cases. However, clinicians confidentially completed only one of 21 or five percent of assessments. Patients refused the assessment interview in six cases and agreed to a cell front interview in 14 others. CSP/Sac assigned a staff assistant for patients for all 21 RVRs.

Mental health assessments recommended penalty mitigation in 17 of 21 or 81 percent of reviewed RVRs. The SHO documented assessment consideration in 16 of 21 or 76 percent of cases and actually mitigated penalties in 13 of 17 or 76 percent where clinicians recommended it.

The monitor's review of 14 SHU term chronos found that the ICC documented consideration of the mental health assessment in all 14 cases. The ICC actually mitigated the SHU term in eight of 14 or 57 percent; SHU term mitigation ranged from one to eight months.

<u>Use of Force</u>:

CSP/Sac reported that the warden, chief deputy warden, and six captains did not attend the use of force training.  However, the training was attended by one of five correctional administrators, 28 of 31 lieutenants, 73 of 81 sergeants, and 704 of 762 correctional officers. The training was also attended by both mental health chiefs, 17 of 18 mental health supervisors, 16 psychiatrists, 40 psychologists, and 20 of 21 social workers.

There were 14 controlled and 260 immediate use of force incidents during the review period.

The monitor reviewed 13 controlled uses of force, including three incidents in the MHCB.  All 13 incidents were video recorded pursuant to policy and indicated cool down periods ranging from 69 minutes to more than four hours.  There were nonetheless concerns with aspects of some of these encounters.  Among them, in one instance the patient being extracted from his cell for transfer to the MHCB was issued a RVR for obstructing a peace officer; however, this RVR violated applicable policy that recognized that a RVR shall not be issued for patient behavior in connection with a cell extraction for transfer to a mental health inpatient setting.  In four other reviewed controlled use of force episodes, mental health staff attempted to convince patients to comply with custodial orders only once during the cool down period, which the monitor found to be inadequate.  In four other incidents, custody staff conducted unclothed body searches following the use of pepper spray and prior to patients' restraint and removal from their cells in violation of applicable policy requiring that custody first conduct a visual search.

The monitor's review of 11 immediate use of force incidents did not identify any use of force policy violations; however, reviewed incident reports revealed other concerns.  In one case, the incident report indicated that a patient placed in a holding cell after expressing suicidality

must be in hand and leg restraints per CSP/Sac's LOP number 129.  However, the monitor's review of this LOP showed that it did not indicate that patients claiming suicidal ideation must be placed in these restraints.  In another case, although the immediate use of force for a patient who was acting "strangely and making bizarre statements" was appropriate, the incident report did not indicate that a CDCR 128 MH-5 was submitted to mental health staff.

Two reviewed immediate use of force videos reflected compliance with applicable policy.

No use of force was required to administer involuntary medications.

Lockdowns/Modified Programs:

CSP/Sac reported four lockdowns during the review period.  PSRs indicated lockdowns from November 6 -8, 2021 on Facility A for buildings 3, 4, 6, 7 and 8, November 10 -- 19, 2021 for the Minimum Support Facility, and November 27 -- December 22, 2021, on Facility C for buildings 1-7.  Reportedly, these three PSRs did not negatively impact patients' access to mental health, medical, or dental services.  Another PSR that initially affected Facility B was subsequently modified to affect all yards and housing units from December 16, 2021, through April 27, 2022, covering 106 days of the review period.  The PSRs indicated limiting access to mental health, medical, and dental care to emergent and urgent care.

Access to Care:

A review of CSP/Sac's monthly Health Care Access Quality Reports from October 2021 through March 2022 revealed that less than five percent of issued mental health ducats and add-

on appointments were not completed due to custody reasons.  Further, 25 percent were not completed due to non-custodial reasons, excluding patient refusals.

Placement of 3CMS Patients into Minimum Support Facilities:

CSP/Sac did not house any 3CMS patients in its MSF during the review period or at the time of the site visit.

*Coleman* Postings:

The monitor toured all housing units and, except for Facilities A-4, A-7, and A-8, all contained prominently displayed *Coleman* posters in English and Spanish.  Housing unit A7 only posted the *Coleman* poster in English.

Document Production Issues:

The institution was unable to report the number of "C" Status patients during the review period.

**APPENDIX C**

**CLINICAL CASE REVIEWS**

**APPENDIX C-1**
**California Medical Facility (CMF)**
**(June 2, 2021 – June 4, 2021)**

**Patient A**

This 42-year-old inmate was admitted to the MHCB on May 18, 2021 for grave disability. At the time of referral, he was disheveled, confused, presented with poor ADL, auditory hallucinations and reported suicidal ideation. He was diagnosed with unspecified schizophrenia and prescribed Zyprexa and Cogentin. There was no diagnosis for substance use despite a report that this was a precipitant to his difficulty managing his housing unit. His healthcare record was randomly selected from the MHCB census to assess adequacy of care in the MHCB.

Upon admission to the MHCB, he agreed to resume psychiatric medication but remained medication non-compliant throughout his ten day stay. Reasons for non-compliance, which would have provided useful information for treatment, were not clear.

There was no initial primary clinician assessment, but the psychiatric assessment was timely and thorough. Initial IDTT documentation included pertinent clinical factors but was adversely impacted by the lack of the primary clinician assessment. There was no explanation in the treatment plan for a treatment goal that targeted anxiety. Treatment goals regarding reason for admission (medication compliance, poor ADLs, substance use and suicidal ideation) were not considered. Discharge planning despite a September 2021 parole day was not included as a treatment goal.

Clinical contacts did not occur on days that the IDTT was held. Clinical contacts occurred cell front due to refusals. The reasons for refusals were not clear. Documentation did not clearly address status of symptoms that prompted his admission or clinical interventions.

Documentation of discharge on May 28, 2021 did not provide a comprehensive overview of his course of treatment, progress toward treatment goal, medication compliance and status of symptoms that led to admission. Documentation regarding suicidal ideation was unclear. While there was reference to suicidal ideation in primary clinician progress notes and referral documentation, documentation in the discharge IDTT indicated that he was "never suicidal."

Effective communication was documented in clinical documentation.

There was documentation from an unlicensed psychologist but there was no co-signature from a supervisor.

**Findings**

This inmate's care was inadequate on account of insufficient quality and lack of required contacts. Rationale for treatment planning was unclear and individual treatment needs were not addressed. Provided treatment remained unclear as clinical interventions were not documented. Reason for discharge despite continued psychosis and medication non-compliance was unclear and an area of concern as a continued MHCB stay or referral to a HLOC were needed.

Documentation regarding suicidal ideation was contradictory and lack of clear supervision for unlicensed staff documentation was an area of concern.

## Patient B

This 24-old inmate was admitted to the MHCB on May 28, 2021 for risk of harm to himself and others due to anger and command auditory hallucinations to harm himself. There was no diagnosis in the official place of record but diagnoses, which varied in provider documentation included schizophrenia, PTSD, and depressive disorder. He was prescribed antipsychotic, antidepressant and antianxiety medications. His healthcare record was randomly selected from the MHCB census to assess adequacy of care in the MHCB.

The psychiatric assessment included pertinent clinical information. The primary clinician assessment was not completed which impacted quality of the initial treatment plan. Specifically, the majority of treatment plan documentation, including case conceptualization, was pulled forward and there was minimal context provided other than the date from which the previous content originated. Documentation of current function and mental status was minimal and clinically relevant content, (admission from restricted housing, medication non-compliance and more than three MHCBs in six months) was not discussed in the clinical summary. Rationale for non-referral to a HLOC was needed but not provided. Treatment modifications for non-referral were clinically appropriate, but not implemented. Insufficient documentation continued at his June 4, 2021 IDTT at which time he was referred to an intermediate care facility (ICF) but clinical rationale for the referral was lacking and the reason for referral was not readily apparent in routine contact documentation. Relatedly, a summary of his course of treatment and an overview of symptoms and functioning while at the MHCB was not documented on the treatment plan or psychiatric discharge summary. This lack of documentation hindered continuity of care.

Treatment goals addressed auditory hallucinations and were objective and measurable. There was no baseline data to determine if the goal to reduce distress to a two or lower was realistic and no goal to address anger, which contributed to his MHCB admission.

Quality of daily contact documentation, pertinent to continuity of care, varied by provider regarding mental status and functioning and all lacked documentation of clinical interventions. This was particularly insufficient given that contacts occurred with different providers for the majority of his MHCB placement.

There was no documentation of effective communication during his MHCB stay.

Of concern, the inpatient consult indicated that the lieutenant planned to bring the patient to the TTA regardless of the outcome of the CIT findings, an indication of a lack of collaboration and trust between disciplines.

## Findings

This patient's mental health care was inadequate. Failure to complete a primary clinician assessment was a significant deficiency as this comprehensive assessment is pertinent to case conceptualization and collaborative treatment planning. Treatment plan documentation was

poor. Lack of consistency of providers was an area of concern and could have been mitigated with clear documentation; however, documentation lacked sufficient detail for continuity of care. Rationale to support diagnosis and clinical interventions were not documented.

**Patient C**

This 29-year-old inmate was admitted to the MCHB for psychosis on May 28, 2021. Diagnoses varied in documentation but included unspecified bipolar disorder, unspecified personality disorder and schizophrenia. Psychiatric medications (Zyprexa and Trileptal) were initiated upon admission. His healthcare record was randomly selected from the MHCB census to assess adequacy of care in the MHCB.

There was no initial primary clinician assessment. The psychiatric assessment was timely but sufficient clinical detail was not provided. Treatment planning focused on grave disability and ineffective coping. It was not clear how interventions (empathizing with distress) would assist with goal achievement. Relatedly, details were not provided to ascertain what a reduction of grave disability of six or lower would look like. Despite an expected released in September 2021 there were no goals to address release planning nor was there a goal to address substance use despite a diagnosis and long history of amphetamine use.

Initial treatment plan documentation needed improvement. Much of the information was pulled forward but context was not always clear and documentation did not provide a useful narrative of the patient's functioning and mental status overtime. Relatedly, there was reference to prior inpatient admissions, but details were not provided. Lastly there was conflicting information regarding DDP status.

Clinical contacts occurred daily and details varied by provider. Overall, his mental status was generally discussed but often needed more details to fully assist with continuity of care. Documentation of functioning and clinical interventions were lacking.

He was discharged to EOP on June 7, 2021. Rationale for discharge and progress in treatment was not clear in discharge documentation.

Effective communication was included in clinical documentation.

**Findings**

This inmate's care was inadequate. Diagnostic clarification was needed. The primary clinician assessment was not completed which adversely impacted case conceptualization and collaborative treatment planning. Treatment goals needed improvement. While crucial to this patient's recovery, it was unclear what clinical interventions were provided aside from psychiatric medication. Lack of documentation made it difficult to determine if the decision to discharge him was clinically appropriate.

**Patient D**

This 53-year-old inmate was admitted to the MHCB from restricted housing on May 27, 2021. At the time of referral, he appeared to be responding to internal stimuli; while he denied

hallucinations, he endorsed high anxiety and depression. He was prescribed anti-depressant medications. His healthcare record was randomly selected from the MHCB census to assess adequacy of care in the MHCB.

He refused timely initial assessments but quality varied. Psychiatric documentation included pertinent clinical detail and a current and individualized treatment plan. In contrast, the initial primary clinician assessment and initial treatment plan lacked an individualized approach as documentation was primarily pulled forward without consideration of his current status and treatment needs. Documentation of non-referral to a HLOC and treatment modifications were appropriate but not implemented.

Although the MHCB referral was initiated due to acute psychosis, psychosis was not clearly targeted in treatment planning. This was particularly concerning as it was documented that the "root cause" for treatment refusals was his "untreated psychosis compounded by his lack of med [sic] compliance." A pattern of treatment refusals and a history of medication non-compliance, which led to decompensations were not included as treatment goals. The sole plan of care focused on his report of depression. There was no clear documentation to support a treatment goal to challenge dysfunctional thoughts.

Various diagnoses were documented throughout the record. Diagnoses included unspecified schizophrenia and other psychotic disorder, major depression, unspecified anxiety and depression, personality disorder with cluster B traits and antisocial personality disorder. Criteria to support diagnoses was not documented.

The majority of daily clinical contacts occurred cell front due to refusals, during which time he was minimally engaged. Clinical interventions, other than a medication change were not documented in routine contacts.

Toward the end of his admission, a medication change (from Effexor to Celexa) was made at his request because he believed his symptoms were due to the Effexor. There was no documentation to support or refute this perception nor was education provided.

He was discharged to restricted housing on June 5, 2021. Clinical documentation (IDTT and psychiatric discharge summary) did not support sufficient stabilization for a return to restricted housing. Nor was there consideration of impact of isolation on his mental status and risk of decompensation for this individual with a history of medication non-compliance and decompensation.

Effective communication was documented in clinical documentation.

**Findings**

This inmate's care was inadequate. There were various diagnoses without any documented clinical rationale by multiple providers. The quality of the primary clinician assessment, treatment plan and treatment planning was poor. Treatment goals were not individualized and did not address the reason for referral or underlying conditions that led to decompensation. Documentation did not support readiness for discharge or a successful transition to restricted housing.

**Patient E**

This patient was admitted to the Administrative Segregation EOP Hub on May 19, 2021 following battery related RVRs. Diagnoses varied in the record and by provider but included various mood, anxiety, substance abuse disorders as well as antisocial personality disorder. He was prescribed sertraline, olanzapine, mirtazapine and Vistaril. His healthcare record was randomly selected from the Administrative Segregation EOP Hub roster to assess adequacy of care for Hub patients.

Initial assessments were timely and included pertinent clinical information. For unknown reasons, IDTT was held in absentia. Overall, documentation on the treatment plan included relevant clinical information however, treatment goals were not individualized and needed improvement. Treatment goals focused on depression but did not address reports of anxiety, auditory hallucinations, grief, suicidal ideation and opioid dependence.

He had five MHCB admissions in the past six months which required a HLOC assessment. Documentation was thoughtful and appropriately addressed his level of care, however findings from the psychiatric assessment were not included. Treatment modifications were clinically appropriate but not utilized during routine clinical contacts.

Provider documentation included sufficient detail for continuity of care. Primary clinician contacts did not sufficiently address treatment goals and clinical interventions. Documentation of effective communication was not located in clinical documentation.

Documentation of group therapy, the majority of which was provided via recreational therapy occurred less than ten hours weekly.

**Findings**

This inmate's care was adequate but marginally so. Diagnostic clarification, rationale for diagnoses and coordinated care between treatment providers was needed. Treatment planning did not fully address his treatment needs and established goals were not implemented. Frequency of group treatment was insufficient and lacked individualization.

**Patient F**

This 27-year-old transgender patient was admitted to the Administrative Segregation EOP Hub from the MHCB on April 18, 2021. There was no rationale for multiple diagnoses (bipolar disorder, borderline personality disorder, depression, general psychoses, adult antisocial behavior). She was not prescribed any psychiatric medication but was followed by the psychiatrist. Her healthcare record was randomly selected from the Administrative Segregation EOP Hub roster to assess adequacy of care for Hub patients.

She had a history of mood lability, poor distress tolerance, aggression and self-injurious behavior. She had a history of multiple inpatient (MHCB and ICF) placements with more than three in the past six months. Rationale for placement in EOP was adequate with clinically appropriate treatment interventions documented for modified treatment.

Primary clinician and psychiatric assessments were timely and clinically appropriate. The initial IDTT was held in absentia as she was on quarantine status. Overall, documentation on the treatment plan included relevant clinical information however, treatment goals were insufficient. Treatment planning focused on anxiety but did not target primary treatment needs of poor distress tolerance, mood lability, impulsivity and threatening behaviors. Treatment interventions provided during primary clinician contacts were useful although not in alignment with the treatment plan. Psychiatric documentation allowed for continuity of care but the lack of mental status documentation in routine primary clinician documentation did not support continuity of care. Documentation of effective communication was not located in clinical documentation.

Documentation of group treatment, the majority of which was recreational, was minimal.

**Findings**

This patient's care was inadequate. Her primary treatment need - poor distress tolerance, that had a significant impact on her functioning, including multiple inpatient placements, CIT interventions, and RVRs - was not actively addressed. Frequency of group treatment and individualization was insufficient. In addition, diagnostic clarification was needed.

**Patient G**

This 43-year-old DDP patient was admitted to the Administrative Segregation EOP Hub on March 28, 2021. He was diagnosed with major depressive disorder with psychotic features and prescribed mirtazapine. His healthcare record was randomly selected from the Administrative Segregation EOP Hub roster to assess adequacy of care for Hub patients.

Initial assessments were timely and addressed relevant clinical factors. Documentation of specific symptoms varied by provider but neither provided a rationale for diagnosis and diagnostic changes were not explained on subsequent routine psychiatric documentation. These oversights in documentation impacted continuity of care.

There was a pattern of refusals and consequently cell-front contacts for initial and routine contacts. The reason for refusal was not addressed nor were refusals targeted on the treatment plan. Treatment planning addressed depression, although specific symptoms of depression (sad mood, appetite/sleep disturbance) were not identified and therefore not targeted in treatment. The plan to address depression (reduce depression to a four or six and treatment interventions) varied in documentation. Rationale for treatment goals (improve decision making, goal setting) was unclear. Despite shortcomings in treatment planning, documentation was satisfactory as it included pertinent clinical factors and rationale for level of care,

Effective communication was rarely documented in clinical documentation. Documentation of primary clinician interventions during routine contacts was supportive in nature but did not actively address depression, nor was there alignment with the treatment plan. There was sufficient information to support continuity of care in primary clinician routine contact documentation but not psychiatric routine contacts. Rationale for resumption of psychiatric medication was unclear and as an example of brevity, documentation regarding the patient's status on April 29, 2021 stated, "I am good, I am good…" with no further discussion of

718

medication discontinuation, symptoms or functioning since the previous psychiatric contact nor was there integration of primary clinician contact documentation.

Group treatment was minimal and primarily provided via recreational therapy. Although there was no documentation of a substance use diagnosis or active use, for reasons that were unclear, he was offered a substance abuse group.

**Findings**

This inmate's care was inadequate. The strengths of initial assessments and primary clinician documentation was overshadowed by several factors. Clinical justification for diagnosis, an important factor for the identification of symptoms in need of attention, was needed. Treatment planning was generic and there was insufficient documentation regarding how the patient's depression manifested which would result in targeting his specific treatment needs. Provided treatment was not in alignment with established treatment goals and a pattern of refusals was not sufficiently addressed. Routine psychiatric contact documentation was insufficient. Group treatment was not individualized, and frequency was insufficient.

**Patient H**

This 30-year-old-patient was diagnosed with schizoaffective disorder, bipolar disorder, mood disorder, PTSD, general psychoses and substance related disorders were included in his record. He was prescribed several psychiatric medications (antipsychotics, antianxiety, mood stabilizers). His healthcare record was randomly selected from the Administrative Segregation EOP Hub roster to assess adequacy of care for Hub patients.

He was admitted to the Administrative Segregation EOP Hub on May 14, 2021 from the PIP where he had been treated for almost a year after a serious hanging attempt. He had a history of numerous suicide attempts and a long history of self-injurious behavior which continued ten days after the Hub admission. A subsequent suicide risk assessment and safety plan was adequate. Of concern, it was documented that he engaged in self-injurious behavior due to his perception that "custody would not send him to medical after going man down." There was no documentation of further assessment of a possible delay in access to care.

Initial assessments were timely, clinically sound and allowed for continuity of care. Similarly, treatment plan documentation addressed relevant clinical content. However, treatment planning focused on impulsive behavior but neglected to address suicidal ideation/self-harm behavior, depression or distress tolerance. Despite substance related diagnoses, treatment goals did not address substance use. Relatedly, he was prescribed suboxone but there was no integration with the ISUDT program in clinical documentation. Lastly, pre-release planning was not addressed in the treatment plan despite an EPRD in September 2021.

Group treatment was minimal and primarily provided via recreational therapy.

Documentation of effective communication was not found.

**Findings**

This patient's care was inadequate. While clinical assessments were sufficient, identified treatment needs were not addressed in treatment planning, including clear goals for self-harm behavior for this at-risk inmate. Multiple diagnoses in his record warranted clarification and potential access to care delays warranted inquiry. Group treatment was not individualized, and frequency and modality were insufficient.

**Patient I**

This 48-year-old patient was randomly selected for healthcare record review to assess the quality of EOP care provided at CMF. The patient discharged from CMF-PIP's acute care program to the EOP level of care in September 2020. The most recent suicide risk evaluation, dated September 22, 2020, assessed the patient's chronic suicide risk as high and his acute risk as moderate. Psychiatric diagnoses included schizophrenia, antisocial personality disorder, polysubstance dependence, and schizotypal personality disorder. Psychiatry prescribed Zyprexa, Vistaril, Zoloft, and propranolol. A PC 2602 involuntary medication order was active throughout the review period.

Routine contacts with the psychiatrist and PC were timely. The psychiatrist appeared responsive to the patient's requests for medication changes and provided updates on current mental status, medication adherence, and response to medication interventions. PC contacts primarily occurred at cell front, and there was minimal evidence of treatment interventions despite ongoing symptoms.

In April 2021, the patient expressed concern that he had not received "enough groups" to learn coping skills for managing stressors. Treatment plans at CMF confirmed the patient was not offered ten hours of group treatment as required "due to COVID-19."

While IDTTs were timely, it appeared the patient was not invited to attend his January 2021 IDTT due to "COVID-19 protocol." The IDTT's treatment targets included medication adherence and hallucinations. However, despite providers documenting ongoing symptoms of depression and anxiety at moderate to high levels throughout the review period, treatment plans were never modified to address these concerns. Additionally, the IDTT's EOP functional evaluations were not consistently completed, and clinical summaries did not include current symptoms, functioning, or response to treatment.

Suicide risk evaluations were not administered following the September 2020 acute program discharge.

This patient continued to report moderate to high ratings for depression and anxiety until he transferred to RJD on June 29, 2021.

**Findings**

The care provided to this EOP level of care patient at CMF was inadequate. There appeared to be unresolved diagnostic uncertainties, considering the primary clinician maintained both schizophrenia and schizotypal diagnoses, although the provider never documented a rationale for

either diagnosis. IDTTs repeatedly documented less than ten hours of weekly group treatment throughout the review period. Treatment plans failed to address ongoing symptoms of anxiety and depression, which were most prominent between January and June 2021. The PC's progress notes also suggested a lack of treatment interventions during routine contacts. Lastly, SRASHEs were not updated as required after the September 2020 PIP discharge.

**Patient J**

This 53-year-old patient was randomly selected for healthcare record review to assess the quality of EOP care provided at CMF. The patient transferred to CMF from Wasco State Prison (WSP) in 2018 and was placed in EOP level of care in November 2019. Since that time, he had one MHCB admission for danger to self concerns in May 2020. His psychiatric diagnoses were generalized anxiety disorder; major depressive disorder, with recurrent episodes and psychotic features; and antisocial and narcissistic personality disorder. Psychiatry prescribed antipsychotic (Seroquel) and antidepressant (Effexor) medications during the review period. The healthcare record referenced two reported suicide attempts, the most recent of which occurred in 2010 by hanging.

IDTT treatment plans targeted anxiety and depression. Although the IPOC for anxiety included useful interventions relevant to the treatment goal, the IPOC for depression had been pulled forward from prior records since October 2020 without patient specific interventions or meaningful goals. For example, clinicians repeatedly noted a goal of reducing depression to a "6 or below" by the next IDTT interval without noting baseline measures in 2020 to track progress in quantifiable terms. Additionally, the goal for depression remained the same for over a year without noting current ratings for depression and addressing obstacles to meeting this objective. The IDTT clinical summaries did not provide updates on current symptoms, functioning, and response to treatment. While level of care rationales were documented consistently, they were not patient specific.

In contrast to treatment planning documents, psychiatry and PC progress notes provided useful updates on current symptoms, functioning, and response to treatment. The PC also documented appropriate treatment interventions during clinical encounters. Providers described the patient as engaged in treatment and other programming throughout the review period.

A SRASHE, completed as required in May 2021, assessed the patient's chronic suicide risk as moderate and his acute risk as low.

**Findings**

The overall care provided to this EOP level of care patient at CMF was adequate. While IDTT documentation was deficient in several areas, providers' progress notes suggested appropriate treatment interventions were implemented throughout the review period. The patient also appeared to be responding well to treatment efforts. Additionally, the May 2021 suicide risk evaluation was completed within timeframes and included clear justifications for risk ratings.

**Patient K**

This 50-year-old patient was randomly selected for healthcare record review to assess the quality of EOP care provided at CMF. The patient was placed in EOP level of care following an MHCB discharge in September 2020. Clinicians noted a history of suicide attempts and self-harm incidents, the most recent of which occurred prior to the September 2020 MHCB admission. The most recent SRASHE, dated May 20, 2021, assessed the patient's chronic suicide risk as high and his acute risk as moderate. The patient's psychiatric diagnoses included major depressive disorder and PTSD. Psychiatry prescribed Effexor for depression and melatonin for sleep.

IDTT records routinely noted the patient was not offered the requisite ten hours of group treatment "due to COVID 19." PC contacts were generally offered weekly; however, the primary clinician did not complete their initial assessment of the patient as required. While the psychiatrist's initial assessment was completed within timeframes, routine contacts were non-compliant with the 30-day requirement. For example, there was no contact offered between April 26, 2021 and June 1, 2021. Further, when the psychiatrist did follow up on June 1, 2021, they noted that the patient was a "no show to clinic," possibly due to a ducating issue, and subsequently did not meet with the patient until June 22, 2021.

Treatment planning was an area of concern throughout the review period. IDTT treatment plans targeted anxiety and depression with interventions aimed at developing new coping skills; however, the IDTT repeatedly noted that goals pertaining to anxiety and depression had already been met, and they did not develop new treatment goals or provide a clear rationale for retaining the patient in EOP level of care. Based on a review of progress notes during the review period, treatment plans should have addressed PTSD symptoms, medication non-adherence, and treatment non-compliance.

In March 2021, the primary clinician wrote that the patient may be using the EOP level of care for secondary gain; however, the provider did not provide an adequate rationale for this claim. In June 2021, the patient requested a lower level of care and, although the clinician wrote a vague statement indicating treatment goals "will prepare for a lower level of care," there were no goals or interventions documented.

This patient remained in EOP level of care without an updated treatment plan through the date of his transfer to MCSP in July 2021.

**Findings**

The care provided to this EOP level of care patient at CMF was inadequate. Treatment plans were outdated and not revised to address current symptoms, treatment non-compliance, medication non-adherence, and transition to a lower level of care. Level of care decisions were not sufficiently justified. Psychiatry contacts were non-compliant with Program Guide requirements for EOP patients on psychiatric medication. Additionally, the EOP psychiatrist repeatedly documented that this patient and other patients were not showing up to the clinic due to scheduling conflicts or possible ducating issues without indicating whether they planned to address the potential barriers to treatment attendance.

**Patient L**

This 43-year-old patient was randomly selected for healthcare record review to assess the quality of EOP care provided at CMF. The patient was serving a Life Without Parole term and was initially placed in EOP level of care in March 2019. His most recent MHCB admission occurred in November 2020. The patient was diagnosed with major depressive disorder, alcohol use disorder, borderline personality disorder, and antisocial personality disorder. Psychiatry prescribed antidepressant and anxiolytic medications. The healthcare record referenced a history of suicide attempts and self-harm incidents, noting the patient had two recent incidents of cutting at CMF in May and June 2021. The most recent SRASHE, dated June 8, 2021, assessed the patient's chronic suicide risk as high and his acute risk as moderate.

The patient had three IDTTs at CMF between December 2020 and the date of his transfer from the facility in June 2021. However, none of the treatment planning documents contained an actual treatment plan with targets, interventions, and goals. IPOCs were absent in all three documents. IDTT summaries were not updated to include current symptoms, functioning, and response to treatment. As such, it was unclear what treatment the patient was receiving and whether the IDTT had identified the patient's current treatment needs. Even after the patient began reporting suicidal ideation and engaged in two self-harm incidents by cutting, treatment plans were not developed to address these concerns. Further, despite issues with treatment compliance and two recent self-harm incidents, the IDTT continued to write in the level of care sections that the patient was "mostly stable and doing well in EOP."

While the primary clinician contacts were completed timely during the review period, psychiatry appointments were not. For example, psychiatry did not offer a contact between April 26, 2021 and June 1, 2021. The lack of psychiatric monitoring during this timeframe was especially concerning given the patient returned to engaging in self-injurious behaviors to cope with current stressors. Further, it was unclear whether the CMF psychiatrist was aware of the two cutting incidents, as the provider did not reference either incident in their documentation during subsequent contacts.

Similar to other EOP patients reviewed at CMF, the psychiatrist wrote that appointments were often completed at cell front due to repeated "no shows to clinic." The psychiatrist added that there was a "possible issue" with ducating and suggested the appointments conflicted with other activities in the patient's housing unit.

The patient transferred to VSP in late June 2021.

**Findings**

The care provided to this EOP level of care patient at CMF was inadequate. The IDTT never developed a treatment plan for this patient, including to address the relapse with self-injurious behaviors in May and June 2021. Level of care rationales were insufficient and IDTT clinical summaries were missing updated information regarding current symptoms, functioning, and response to treatment. Psychiatry contacts were non-compliant with Program Guide requirements for EOP patients prescribed psychiatric medication. Further, psychiatry

documentation was lacking in quality and did not reference the patient's two recent self-harm incidents, which also suggested a lack of communication among treatment team members.

## Patient M

This 32-year-old patient was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CMF. The patient transferred to CMF from WSP in April 2021, and he was expected to parole in July 2021. He was diagnosed with adjustment disorder, with anxiety and depression, and prescribed Vistaril, Remeron, and Zyprexa. The most recent SRASHE, dated November 2020, assessed the patient's chronic and acute suicide risk as low. The patient reported one incident of self-injury as a child and denied a history of suicide attempts.

The primary clinician and psychiatrist completed their initial assessments of the patient prior to the initial IDTT. The primary clinician noted that the patient found psychiatric medications "useful" for symptom management. At the patient's request, psychiatry reviewed the patient's psychiatric medications and lowered medication dosages following the initial IDTT. The PC completed two routine contacts prior to the patient's parole date in early July 2021. PC progress notes were thorough and suggested routine contacts addressed current symptoms and pre-release planning concerns.

The treatment plan developed on the date of initial IDTT in April 2021 targeted symptoms of depression and anxiety. Goals were measurable. One intervention included assisting the patient with parole planning. IDTT notes also referenced meaningful collateral input from various disciplines and included useful community re-entry planning information. IDTT notes indicated the patient was on a waitlist for a support services job and would likely be assigned to work in the kitchen. Additionally, a pre-release planning assessment was completed in May 2021, noting current needs and plans.

The patient paroled on or around July 22, 2021.

## Findings

The care provided to this 3CMS patient at CMF between April and July 2021 was adequate. The clinical documentation was clear and provided valuable patient information. Treatment plans targeted the patient's presenting problems and included measurable goals and relevant interventions. Psychiatry was responsive to the patient's medication requests. Healthcare records suggested mental health staff appropriately attended to the patient's clinical and non-clinical pre-release planning needs.

## Patient N

This 63-year-old patient was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CMF. The patient had been treated in 3CMS level of care at CMF since 2015. He was diagnosed with major depressive disorder and prescribed antidepressant medication. The healthcare record also noted several medical conditions, including chronic pain. The patient did not have a history of self-injurious behavior or suicide attempts.

The 3CMS treatment plans targeted the patient's depressed mood. IDTT documentation provided useful summaries of meeting discussions, and these notes suggested IDTTs were collaborative, informative, and meaningful. The IDTT noted the patient did not meet HLOC referral indicators and provided current level of care rationales.

Psychiatry and primary clinician contacts were completed timely, and provider progress notes offered useful updates on current symptoms, functioning, and response to treatment interventions. Throughout the review period, mental health providers described the patient as medication adherent and as benefitting from treatment focused on depression.

In October 2021, the IDTT noted that treatment would include pre-release planning in preparation for the patient's March 2022 parole date. In December 2021, a pre-release planning assessment was completed.

**Findings**

The 3CMS care provided to this patient at CMF was adequate. IDTT notes provided clear rationales for treatment team decisions and suggested IDTTs were collaborative and meaningful. Level of care decisions were appropriately justified. Routine contacts with the primary clinician and psychiatrist were timely, and PC contacts at times occurred sooner than every 90 days. Provider progress notes were thorough and suggested appropriate interventions were implemented during routine contacts. Additionally, mental health staff attended to the patient's clinical and non-clinical pre-release planning needs.

**Patient O**

This 43-year-old transgender patient was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CMF. The patient arrived at CMF in November 2020. She was diagnosed with disruptive mood dysregulation disorder and gender dysphoria. Psychotropic medications included Lexapro and Vistaril. The most recent SRASHE assessed the patient's chronic suicide risk as high and acute risk as low. The healthcare record referenced a history of suicide attempts and self-harm incidents, the most recent of which occurred at the age of 19.

IDTTs and routine PC and psychiatry contacts were timely. Treatment plans targeted emotion dysregulation, irritability, and depressed mood. PC progress notes suggested evidenced based treatment interventions were implemented during routine contacts.

In August 2021, the patient met with psychiatry for an individual session and reported an increase in stress, grief, and depressive symptoms. Psychiatry also indicated the patient had requested EOP level of care and had been intermittently refusing medications. Subsequently, an unscheduled "special IDTT" was held to review level of care. The patient ultimately decided that 3CMS was "working for her," and the IDTT agreed. The patient was retained in 3CMS level of care with recommendations for treatment plan modifications and more frequent routine PC contacts.

By November 2021, the patient was exhibiting objective signs of improvement in symptoms and functioning. Psychiatry and primary clinicians described her as stable, medication adherent,

benefitting from psychiatric medication, and denying "any current stress." The PC also documented collateral information suggesting the patient was getting along with others in her dorm and attending her job assignment.

**Findings**

The 3CMS care provided to this patient at CMF was adequate. Mental health treatment addressed the patient's presenting problems with psychiatric medication and evidenced based interventions. In response to changes in symptoms and functioning in August 2021, the IDTT appropriately met for an unscheduled review to discuss level of care. Additionally, the treatment plan and PC contact frequency were sufficiently modified in response to the patient's current needs.

**APPENDIX C-2**
**California Health Care Facility (CHCF)**
**(July 26, 2021 – July 29, 2021)**

**Patient A**

This 25-year-old patient was admitted to the MHCB on July 12, 2021 due to command auditory hallucinations with a plan to hang himself.  Diagnoses varied throughout the documentation and included antisocial personality disorder, mood disorders and psychotic disorders.  He was prescribed Risperdal and Vistaril. His healthcare record was randomly selected from the MHCB roster to assess adequacy of care in the MHCB.

The initial primary clinician assessment was thorough and individualized while the majority of the initial psychiatric assessment was copied from previous documentation and lacked individualized conceptualization.  Goals identified during the initial IDTT addressed treatment needs (suicidal ideation and auditory hallucinations) with appropriate clinical interventions identified.  Of concern, there was documentation of a goal to "refrain from verbalizing suicidal ideation" which could serve as a disincentive to disclose suicidal ideation.

He refused the majority of his individual and group contacts with no clear rationale routinely documented.  Lack of treatment participation was not adequately conveyed in the psychiatric discharge summary.  Continuity of care was disrupted by multiple provider changes.  There were no attempts to understand and therefore address possible safety concerns that precipitated the current or several previous MHCB admissions since February 2020. The safety plan developed upon discharge identified specific behaviors to utilize and was clinically appropriate.

**Findings**

This patient's care was inadequate.  While the initial primary clinician assessment and initial treatment planning showed clinical promise, there were multiple deficiencies in this patient's care, including insufficient initial psychiatric assessment, poor continuity of care, failure to appropriately address treatment refusals and relapse prevention and discharge planning.  Lastly, diagnostic clarification was needed.

**Patient B**

This was the second MHCB admission for this 63-year-old patient.  This MHCB admission was precipitated by continued paranoid and persecutory delusions and occurred shortly after the first MHCB discharge.  There were multiple diagnoses in clinical documentation including attention-deficit hyperactivity disorder, psychotic, anxiety and mood disorders.  He was prescribed antipsychotic, antidepressant and antianxiety medications. His healthcare record was randomly selected from the MHCB roster to assess adequacy of care in the MHCB.

Initial treatment planning was in alignment with initial evaluations which provided relevant clinical information.  Treatment goals appropriately followed from clinical assessments and targeted paranoia, homicidal ideation and distress associated with paranoia.  Clinical interventions were appropriately identified, however other than psychiatric medication, were not readily apparent in clinical documentation.  Routine provider documentation was thorough which

727

was necessary given multiple provider changes. A risk assessment identified him as moderate acute and chronic risk. Although a safety plan was indicated one was not completed. He was appropriately referred to an ICF level of care.

**Findings**

This patient's care was adequate but marginal due to the need for clear documentation of treatment interventions, diagnostic clarification and safety planning. Rationale for level of observation and placement in a suicide smock was not located in clinical documentation.

**Patient C**

This 52-year-old patient was referred to the MHCB on June 21, 2021 for passive suicidal ideation, chronic depression and lack of future orientation. He was diagnosed with bipolar I disorder and polysubstance dependence. He was not prescribed psychiatric medication. His healthcare record was randomly selected from the MHCB roster to assess adequacy of care in the MHCB.

Initial assessments provided relevant recent and long-term clinical history. However, sections of documentation were the same and the original author was not clearly identified. Treatment goals addressed suicidal ideation. A treatment goal for depression was clinically indicated no goal was developed.

Documentation of routine contacts was thorough although clinical interventions were not clearly documented and those identified in the treatment plan were not located. Treatment provided by the primary clinician was supportive in nature. He discontinued psychotropic medication due to side effects and the psychiatrist appropriately addressed psychoeducation. During his MHCB stay he was seen by various providers which was disruptive to continuity of care.

Throughout his MHCB stay, he maintained that the referring clinician misunderstood him, and he denied suicidality. He was discharged to EOP level of care on June 28, 2021. Rationale for level of care change was thoughtful and appropriate. Discharge IDTT documentation indicated that he met his treatment goals. The discharge SRASHE assessed him as chronic high and low acute risk, an improvement from high acute risk at the time of referral. In contrast to his presentation at the time of referral, future orientation was improved and protective factors were identified. The safety plan was individualized and appropriate.

Documentation regarding access to property was not consistently located, and when located, needed improvement. For example, on June 23, 2021 documentation was "full issue due to his depression and isolation as well as refusing treatment with psychiatry today." On June 27, 2021 documentation was "full issue to ensure safety due to referral of SI/DTS [suicidal ideation/danger to self]."

**Findings**

This patient's care was adequate, but documentation needed improvement. Documentation of original author was needed in initial assessments. Treatment planning and implementation of

identified treatment interventions was needed. Documentation regarding rationale for access to property needed improvement.

**Patient D**

This 43-year-old patient was admitted to the MHCB on July 21, 2021. He had multiple diagnoses which warranted clarification and included mood, anxiety and personality disorders. He was prescribed anti-anxiety and antidepressant medication. He declined the antipsychotic medication he was offered. His healthcare record was randomly selected from the MHCB roster to assess adequacy of care in the MHCB.

The MHCB referral was precipitated by a suicidal statement. He also jumped off a cart en route to ASU. This behavior and related suicidal statement was attributed to his fear that custody officers would harm him in segregation. Referral documentation indicated that he experienced poor impulse control, mood instability and distress tolerance. He had been on a hunger strike since July 17, 2021.

Initial assessments were comprehensive and provided clinically useful information. However, some documentation was the same and the original author was unable to be determined. Further, sections of the primary clinician's clinical summary appeared to be copied from an EOP provider without specification that it was not original documentation. Treatment goals narrowly focused on reduction of suicidal ideation with an intervention to foster therapeutic alliance. Additional interventions located in IDTT documentation included utilization of CBT and support. Treatment goals to address his hunger strike, distress tolerance, instability, and impulse control were clinically indicated.

There were significant discrepancies in clinical assessments and findings between routine psychiatric and primary clinician documentation. Psychiatric contact documentation was succinct and focused on assessment of suicidal ideation. Further, despite a prolonged hunger strike, there was documentation that he ate well. In contrast to psychiatric documentation, primary clinician documentation indicated that despite minimal sleep, energy was elevated and that he was paranoid, hypervigilant and hyperverbal. These symptoms were the rationale for a referral to acute level of care. As these symptoms were not included in psychiatric documentation, it was unclear how the referral to acute level of care was made collaboratively.

Documentation regarding level of observation and access to property while on suicide watch was not located.

**Findings**

The referral to acute level of care was appropriate but overall, his care was inadequate. While in the MHCB, the primary deficiency in this case was the lack of collaborative evaluation and treatment between psychiatry and the primary clinician. There was a need for diagnostic clarification, adequate treatment planning, documentation of the rationale for level of observation and access to property and documentation of original author in initial assessments.

**Patient E**

This 42-year-old patient was admitted to the MHCB on July 15, 2021.  He was referred to the MHCB for suicidal ideation with intent and plan as well as command auditory hallucinations exacerbated by concerns for his mother's health.  There was no diagnosis in the official place of record but diagnoses in clinical documentation included schizoaffective disorder and PTSD. Clinical rationale was documented for diagnoses; the patient was prescribed antidepressant, mood stabilizing and antipsychotic medication.  His healthcare record was randomly selected from the MHCB roster to assess adequacy of care in the MHCB.

Initial evaluations were comprehensive and included current mental health needs and relevant clinical history.  The clinical summary and case conceptualization documentation was pulled forward from a previous EOP provider and needed to be updated for his current treatment needs. IPOCs aimed to reduce suicidal ideation via CBT interventions.

Routine contacts provided clinically useful information, addressed treatment goals and utilized appropriate interventions, including those identified in the treatment plan.

Rationale for access to property was included in primary clinician documentation.

**Findings**

This patient's care was adequate.  Documentation would have been improved by including, daily rationale for access to property; relevant symptoms (depression, auditory hallucinations) in treatment planning; and individualized, updated case conceptualization and clinical summary.

**Patient F**

This 34-year-old patient was admitted to the Administrative Segregation EOP Hub in mid-April 2021 from the MHCB.  He was diagnosed with adjustment disorder with anxiety and depression, schizophrenia, and bipolar I disorder.  He was prescribed Remeron and BuSpar.  His healthcare record was randomly selected from the administrative segregation roster to assess adequacy of care in the Administrative Segregation EOP Hub.

Documentation indicated a history of mental health treatment since childhood and a history of multiple incidents of self-harm.  He was admitted to the Administrative Segregation EOP Hub from the MHCB after engaging in self-harm behavior.

Initial assessments were comprehensive and provided relevant clinical information.  Treatment planning focused on anxiety but there were no IPOCs for recent symptoms of auditory hallucinations, self-harm behavior or adjustment to and management of segregation.  He achieved his goal to reduce anxiety, but the treatment goal was not updated.  Treatment interventions, other than psychiatric medications, were not documented in routine provider contacts.  Primary clinician documentation provided an overview of his current stressors and an updated mental status but did not specifically address his treatment goals.

Group treatment was provided by the psychiatric technician or recreational therapist. Reviewed weeks indicated that between seven and ten hours of group treatment was offered. Documentation was sparse, which made it difficult to determine group content.

**Findings**

This patient's care was inadequate. Initial documentation was thorough and thoughtful and set the stage for a comprehensive treatment plan to address his needs. However, his treatment plan was overly narrow and was not applied during subsequent treatment contacts. Diagnostic clarification was needed including symptoms to support diagnoses.

**Patient G**

This 68-year-old patient was admitted to the Administrative Segregation EOP Hub in late July 2021 after threatening a peer. Diagnosis varied by provider and location but included adjustment disorder and cognitive disorder not otherwise specified. He was not prescribed psychiatric medication. His healthcare record was randomly selected from the administrative segregation roster to assess adequacy of care in the Hub.

Despite an emergent consult on July 20, 2021 that the patient was disoriented to date with impaired recall, the initial assessments did not address cognitive concerns. IPOCs developed during the initial IDTT (July 29, 2021) focused on impulsive behavior, self-esteem and reviewing cognitions and were not in alignment with provider assessments or IDTT documentation that indicated significant cognitive limitations. Specifically, he was disoriented to date and season, had impaired short-term recall and failed a cognitive screen. A plan to assess his overall memory and functioning was documented. A referral to DDP and consultation with the Memory Care Unit was completed. Medical provider documentation from July 29, 2021 indicated a plan to transfer him to the OHU. The date of the transfer was unclear.

**Findings**

This inmate's care was inadequate. While appropriate referrals were initiated to address cognitive limitations, the referrals and transfer out of ASU given his limitations was delayed. Initial assessments did not address his cognitive limitations and subsequent treatment planning was unrealistic given cognitive limitations.

**Patient H**

This 49-year-old patient was admitted to the Administrative Segregation EOP Hub on April 2, 2021 for assaulting custody staff and possession of a weapon. He was admitted to the administrative segregation from the MHCB which was precipitated by a suicidal statement that he made while intoxicated and later reported no memory of making. He was prescribed Zoloft. His healthcare record was randomly selected from the roster to assess adequacy of care in the Administrative Segregation EOP Hub.

Diagnosis varied by location and there was no clinical rationale to support diagnosis which was either major depressive disorder; or unspecified psychosis and alcohol use disorder.

An initial psychiatric assessment was not located. The initial primary clinician assessment included recent and historical pertinent clinical information which informed his initial treatment goal of anger. An IPOC to address substance use was added shortly after his initial IDTT. There were no treatment goals developed for documentation of anxiety or depression. Documentation in primary clinician contacts was thorough and generally in alignment with treatment goals and interventions, until his clinician changed, and alignment was not as readily clear, but content was clinically useful. Routine psychiatric contacts were thorough and provided useful clinical information.

Overall, routine provider contacts were timely. A sample of group documentation indicated that group was offered 10 hours weekly by a recreational therapist although specific content was not clearly documented.

**Findings**

Routine provider contacts provided clinically useful documentation and generally addressed treatment goals. Treatment planning needed improvement to fully address his treatment needs. Overall, this patient's care was adequate but only marginally adequate on account of the missed initial psychiatric contact upon discharge from the MHCB to a segregated housing unit.

**Patient I**

This 29-year-old patient was admitted to Administrative Segregation EOP Hub on June 2, 2021 for gassing an officer. He was admitted to the Hub from the MHCB after a suicide attempt. There were multiple diagnoses on his treatment plan including: psychotic disorder, schizophrenia, major depressive disorder, unspecified bipolar disorder, attention-deficit hyperactivity disorder, opioid use disorder, amphetamine-type use disorder, and borderline and antisocial personality disorders. He was prescribed Seroquel and Effexor. His healthcare record was randomly selected from the administrative segregation roster to assess adequacy of care in the Administrative Segregation EOP Hub.

He had a long history of psychiatric treatment for anxiety, depression, trauma and self-harm behaviors.

The majority of the initial psychiatric assessment was pulled from other providers and lacked sufficient individualized assessment. During the initial primary clinician assessment, he reported his presenting problem as with his long trauma history, depression, and anxiety. The content and conceptualization were thorough, although precipitating factors that were brought forward from previous documentation were from 2017 and warranted update. IPOCs developed during his initial treatment plan addressed depression with a plan to utilize CBT as an intervention. There were no goals to address reports of trauma or anxiety. In addition, despite a long history of self-harm behavior and recent suicide attempt, there was no goal for self-harm behavior and no consideration of the safety plan developed upon discharge from the MHCB. Given substance use diagnoses and participation in the medication assistance program, it was unclear why a goal for substance abuse was under consideration and not implemented.

For approximately the first month in the Administrative Segregation EOP Hub he repeatedly refused primary clinician contacts. Following the first month, contacts occurred daily and his

compliance improved. Documentation described his overall status, but treatment goals were not addressed nor were treatment interventions clearly documented. Overall, he was compliant with routine psychiatric contacts and documentation was clinically useful.

**Findings**

This patient's care was inadequate. Given his recent suicide attempt and housing in a high-risk environment, more aggressive attempts to engage him in treatment earlier on were needed. In addition, treatment planning was overly narrow and missed pertinent treatment needs. Lastly, diagnostic clarification and collaboration with medication assistance treatment program providers was needed.

**Patient J**

This 46-year-old patient was admitted to the Administrative Segregation EOP Hub on July 7, 2021 from the MHCB after a suicide attempt with intent to die. Diagnoses varied by location and included major depression, polysubstance dependence, opioid use, and borderline and antisocial personality disorder. He was prescribed antidepressant, anti-anxiety and antipsychotic medication. He was a participant in the medication assistance treatment program. His healthcare record was randomly selected from the administrative segregation roster to assess adequacy of care in the Administrative Segregation EOP Hub.

The initial psychiatric assessment was adequate but needed improvement regarding past psychiatric history. The majority of the primary clinician assessment was copied from previous documentation and while current functioning in administrative segregation was provided, more detail was needed. Treatment goals developed at his initial IDTT focused on depression with utilization of CBT, however, routine primary clinician documentation addressed trauma history and interventions were not in accordance with the treatment plan. Self-harm behaviors and substance use were not addressed.

He was offered at least ten hours of group for the two weeks that were sampled. Group was offered by recreational therapy; content was not always clear.

**Findings**

This patient's care was adequate but only marginally so. The treatment plan failed to include self-harm as a treatment goal. Diagnostic clarification; a more individualized primary clinician assessment; and collaboration with the medication assisted treatment providers was needed.

**Patient K**

This 71-year-old patient's health care record was reviewed to evaluate the quality of 3CMS care provided at CHCF. Although the patient had a history of treatment at the EOP level of care, he appeared to have been retained in the 3CMS level of care since August 2017. The health care record referenced four suicide attempts and multiple incidents of self-harm, with the last known incident occurring in 2013. The most recent suicide risk evaluation assessed his chronic risk as "moderate" and acute risk as "low." At CHCF, the patient was diagnosed with schizoaffective

disorder, depressive type. Psychiatric medications included Remeron (45 mg) for mood, Seroquel (500 mg) for psychosis, and Vistaril (100 mg) for anxiety and sleep.

The IDTT treatment plan indicated the patient's anxiety would be addressed by teaching "thought records to address automatic thoughts related to anxiety." The treatment goals were measurable and included baseline ratings for tracking progress. The treatment team noted that the patient's psychotic and depressive symptoms had remained in remission since the last annual treatment team meeting. The IDTT's level of care justification was clear, appropriate, and patient specific.

The patient's most recent IDTT occurred on August 5, 2021. All required treatment team members attended. IDTT documentation provided useful updates on current symptoms, functioning, and response to treatment. The patient continued to experience anxiety triggered by "worry about his medical illness," including having a stroke.

On August 5, 2021, the IDTT documented a plan for the PC to meet with the patient weekly to review thought diaries. However, the health care record revealed a lack of routine PC contacts during a six-month period from June 2021 through December 2021. Further, the PC's December 17, 2021, progress note offered minimal patient information, although they wrote that they would email psychiatry regarding evidence of tardive dyskinesia.

Despite the PC noting that they would email psychiatry regarding negative medication side effects on December 17, 2021, the patient did not meet with psychiatry until January 18, 2022, and the provider's note did not reference an email from the primary clinician or mention negative medication side effects. There were also no changes to the patient's medications on this date. The health care record also revealed a lack of routine psychiatry contacts between September 7, 2021, and January 18, 2022, despite active prescriptions during this period.

There was no evidence of 3CMS group treatment offered to this patient.

**Findings**

The care provided to this 3CMS patient was inadequate. Although treatment planning documentation was sufficient, implementation was lacking. The frequency of routine primary clinician contacts not only failed to meet Program Guide requirements, but also failed to meet IDTT recommendations for weekly contacts in August 2021. When the PC eventually followed up with the patient in mid-December 2021, the progress note did not provide a clear update on current symptoms, functioning, and treatment response; nor did the note reference interventions outlined in the most recent treatment plan. The PC also failed to submit a referral to psychiatry in response to the patient's report of potentially serious medication side effects. Psychiatry contacts were also not completed in accordance with Program Guide requirements.

**Patient L**

This 56-year-old patient's health care record was reviewed to evaluate the quality of 3CMS care provided at CHCF. The patient was housed in CHCF's OHU for medical care and observation. Health care records referenced a severe neurological disorder with seizures.

The patient had a history of suicide attempts and serious self-harm incidents, with the most recent incident occurring in 2014. Although the patient received mental health services in the EOP program and the MHCB, he had been retained in the 3CMS level of care since 2017. At CHCF, the patient was diagnosed with unspecified psychotic disorder and was prescribed Abilify, Benadryl, olanzapine, Remeron, and Zoloft. Psychiatry also noted a history of conversion disorder, depression, and anxiety.

The most recent treatment team meeting occurred timely on June 1, 2021, with all required IDTT members in attendance. The IDTT described the patient as medication adherent and "at baseline" with "more manageable" psychotic symptoms. The IDTT's treatment plan indicated the primary clinician would offer individual contacts at 90-day intervals to address distress related to psychotic symptoms. The IDTT's level of care justification was clear, appropriate, and patient specific.

Psychiatry contacts occurred timely. However, as of the date of this review, the patient had not received a routine PC contact in eight months. The most recent PC contact occurred on July 12, 2021. No 3CMS treatment groups were offered to this patient.

**Findings**

The care provided to this 3CMS patient in the OHU at CHCF was inadequate. The patient's mental health services were limited to medication management. Individual PC contacts were not offered in accordance with Program Guide requirements or IDTT plans. Implementation of the current treatment plan was not possible given the lack of therapeutic contacts during the last eight months.

**Patient M**

This 49-year-old patient's health care record was reviewed to evaluate the quality of 3CMS care provided at CHCF. The record referenced a history of three suicide attempts, the most recent of which occurred in 1996. The patient had been retained at the 3CMS level of care since his most recent MHCB discharge in August 2017. At CHCF, he was diagnosed with major depressive disorder and prescribed Effexor for depression and BuSpar for anxiety.

The most recent IDTT occurred timely in July 2021 with all required members in attendance. The treatment plan on this date indicated that DBT would be provided; however, this intervention had been pulled forward since 2020 and did not reference a specific treatment target. The IDTT's level of care justification section indicated that the primary clinician would continue to work with the patient on "residual depressed mood and preventing risk of increasing depression."

While psychiatry contacts were timely, there was an 11-month gap between routine PC contacts between March 2021 and February 2022. The primary clinician's most recent progress note indicated the patient experienced a brief episode of depression three weeks prior, which he attributed to being diagnosed with COVID-19 and having limited program access. The patient denied psychiatric symptoms on this date and indicated that he was looking forward to starting his job and other programming. No 3CMS treatment groups were offered to this patient.

## Findings

While this patient appeared to remain mostly stable at the 3CMS level of care, the mental health care provided was inadequate. 3CMS care was limited to medication management. The treatment plan was insufficient and had not been updated since 2020. Despite the Program Guide requiring PC contacts at 90-day minimum intervals, and the IDTT noting that the patient would continue working with the PC on decreasing depressive symptoms, there were no routine PC contacts or therapeutic interventions offered for an 11-month period.

## Patient N

This 72-year-old patient was randomly selected for health care record review to evaluate the quality of EOP care provided at CHCF. The patient had been retained at the EOP level of care and was on modified EOP programming since January 2021. In July 2021, the patient transferred from the CTC at RJD to CHCF's OHU due to numerous chronic medical concerns, mobility issues, and the need for assistance with "bathing and grooming." His medical diagnoses included coronary artery disease, cirrhosis of the liver, diabetes, neuropathy, and paraplegia. Psychiatric diagnoses included persistent depressive disorder and antisocial personality disorder. The patient reportedly refused psychotropic medication, and none were prescribed. The most recent suicide risk evaluation, completed in September 2021, assessed the patient's chronic and acute suicide risk as "moderate."

Despite the patient being retained on modified EOP programming, and the IDTT noting plans to meet more frequently, IDTTs occurred in July, October, December, and February. In December 2021, the IDTT documented a plan to convene again to discuss level of care in 30 days; however, the subsequent IDTT occurred two months later.

The patient met the HLOC referral indicator for participating in less than 50 percent of treatment, and he routinely rated his depression and anxiety as high. He also reportedly postponed his BPH three times due to depression and lack of parole planning. However, CHCF treatment plans targeted only the patient's irritability, and the plan had not been modified in seven months. Depression, anxiety, parole planning, and treatment non-adherence were never incorporated into the existing treatment plan. The IDTT's documented treatment interventions remained limited to fostering a therapeutic alliance, empathizing, and encouraging goal setting, which were all generic statements from the electronic record's pull-down menu.

While psychiatry contacts appeared to occur more frequently than required minimums, primary clinician contacts failed to meet Program Guide requirements for EOP patients. Routine primary clinician contacts generally occurred every two to four weeks, and there were no primary clinician led check-in groups offered between contacts. More frequent primary clinician contacts were also clinically indicated for this patient.

After August 16, 2021, the patient was not seen by a primary clinician until September 10, 2021, at which time he required an MHCB referral and was placed in alternative housing. The MHCB referral was ultimately rescinded, and five-day follow-ups were completed timely. However, there were no subsequent PC contacts for treatment purposes for another two weeks. On September 24, 2021, the clinician wrote, "patient believes he is dipping into depression," and

within a few days of this contact he was referred for one emergent and one urgent clinical contact. The September 30, 2021, emergent contact note indicated that the patient was distressed and depressed. On October 7, 2021, he was described as "clueless on his parole plans and [wanting] to work on this with his clinical team for the next quarter." The next PC contact occurred one month later on November 8, 2021.

PC progress notes for November 2021 described the patient as depressed, anxious, and desiring parole. On November 12, 2021, the patient reported that he had been "out of it" and rated his depression as an eight out of ten, with ten being the highest. The patient refused two individual contacts with his newly assigned primary clinician in November 2021 due to "excruciating pain." During a cell-front contact on November 24, 2021, the clinician noted objective signs of depression and that the patient had expressed a desire to continue individual treatment once he felt physically better. On December 17, 2021, a housing unit officer informed the PC that the patient was "going downhill" and staying "in bed more than he used to." However, during the patient's December 2021 IDTT, the treatment team documented a plan to reduce the patient's level of care to 3CMS in 30 days due to his lack of treatment progress and participation.

Fortunately, during a February 2022 IDTT, the treatment team decided to retain the patient at the EOP level of care for an additional 90 days. However, the treatment plan remained the same, without clear and effective interventions for addressing the patient's depression, anxiety, treatment non-adherence, and parole planning needs.

**Findings**

The modified EOP care provided to this patient at CHCF was inadequate. The Program Guide required weekly primary clinician contacts for EOP patients; however, the provider only offered routine contacts every two to four weeks, even when more frequent contacts were clinically indicated. Treatment plans failed to appropriately address the patient's current treatment needs, including depression, anxiety, pain management, and BPH preparation. The IDTT's decision to reduce the patient's level of care to 3CMS in December 2021 was inappropriate and did not consider the patient's medical conditions and stated reasons for refusals. While the IDTT ultimately made the right decision to retain the patient at the EOP level of care, it failed to revise the treatment plan to address the patient's current needs, including his repeated requests for parole planning.

**Patient O**

This 59-year-old patient was randomly selected for health care record review to evaluate the quality of EOP care provided at CHCF. The patient had been retained at the EOP level of care since October 2017, and it appeared that he initially arrived at CHCF in December 2018. He was diagnosed with major depressive disorder, with psychotic features, and prescribed olanzapine, Lamictal, Remeron, lithium, Cogentin, and Cymbalta. Records suggested that the patient remained housed in the CTC for medical reasons; medical concerns included seizures, traumatic brain injury, blindness in one eye, and risk of falling. The most recent suicide risk evaluation, completed in November 2020, assessed the patient's chronic suicide risk as "high" and acute suicide risk as "low." The patient had multiple prior suicide attempts, the most recent of which occurred in 2016.

In March 2021, the assigned primary clinician noted the patient had not achieved his December 2020 treatment goal of reducing depression ratings to a "4 or below" by the next IDTT interval. However, treatment teams repeatedly retained the same generic goal, and the quality of treatment plans only worsened over time. By November 2021, treatment plans were reduced to one unspecific intervention which involved encouraging the patient to work on "improved functioning by using goal setting."

In November 2021, the IDTT noted the patient continued to experience mood fluctuations, self-reported mild to moderate auditory hallucinations, ineffective coping, and dysfunctional social interactions. However, treatment plans continued to include only one IPOC for depression.

While psychiatry contacts were timely, the patient was often seen by different psychiatric providers. In October 2021, psychiatry noted that the patient's auditory hallucinations were rated at an eight out of ten, with ten being the highest. In November 2021, psychiatry decreased the patient's medication dosages due to reports that they were "too sedating."

Routine PC contacts failed to meet Program Guide requirements. The PC typically met with the patient every two to three weeks, although two routine contacts occurred one month apart between June and September 2021. No PC-led check-in groups were offered.

Recreation therapy groups were offered in the CTC, but the frequency varied.

**Findings**

The care provided to this EOP level of care patient was inadequate. Treatment plans were ineffective and unchanged for a significant period of time. Although psychiatry contacts were timely, routine PC contact frequencies failed to meet Program Guide requirements. PC contacts occurred every two to four weeks, instead of weekly, even when there were clinical indications for more frequent contacts. Documentation discrepancies were also found during this review. While some clinical documentation described the patient as stable and at baseline, other notes authored during the same timeframe suggested difficulty managing moderate to high levels of anxiety, depression, and auditory hallucinations.

**Patient P**

This 53-year-old patient was randomly selected for health care record review to evaluate the quality of EOP care provided at CHCF. The patient had a long history of mental health treatment, including community hospitalizations for suicidal thoughts, self-injurious behaviors, and suicide attempts. His most recent intermediate care admission occurred in January 2020; his most recent MHCB admission was in October 2021. A family history of suicide was also noted in the clinical summary. The IDTT documentation referenced 22 "verified" self-injurious behavior incidents and suggested that the patient used self-harm and destruction of property "as coping mechanisms for stress relief and emotion regulation." The two most recent self-harm incidents occurred in October 2021 and January 2022, and both involved cutting and were precipitated by negative staff interactions.

At CHCF, the patient was prescribed Effexor for depression, BuSpar for anxiety, Clozaril for psychotic symptoms, Benadryl for agitation, prazosin for PTSD-related nightmares, and, as

needed, Haldol for agitation.  Differing psychiatric diagnoses were found in CHCF clinical records, which suggested a lack of diagnostic discussion during treatment team meetings.  Recent clinician progress notes included a diagnosis of major depressive disorder.  IDTT records included diagnoses for adjustment disorder and antisocial and borderline personality disorders.  Psychiatric progress notes included diagnoses of schizoaffective disorder, bipolar type, PTSD, and features of personality disorders.

Despite ongoing depression, anxiety, self-harm, and "frequent issues with staff and custody," there were no treatment plan IPOCs addressing these concerns.  The most recent treatment plan in March 2022 included only one mental health IPOC that targeted impulsive behavior.  This IPOC had been carried forward without modification since October 2021, despite noting the patient's impulsivity would be reduced to "4 or below" by the next IDTT.  There were also no baseline measures for impulsivity to track progress or lack thereof.  Treatment interventions remained the same and were limited to generic statements involving "fostering a therapeutic alliance" and encouraging "coping strategies to increase attention span."

While routine psychiatry contacts appeared to occur as required by the Program Guide, primary clinician contacts were routinely non-compliant.  There were several contacts that occurred two weeks apart and at least two contacts that occurred closer to one month apart.

Routine PC contacts did not occur between December 29, 2021, and January 18, 2022, despite the patient requiring a CIT contact on January 11, 2022.  The CIT clinician noted that the patient had cut on himself following a negative interaction with staff.  On January 18, 2022, the primary clinician wrote that her patient had not been seen during her two-week absence from the facility.  However, despite the PC's concern, there were no PC contacts between February 22, 2022, and March 22, 2022.  On March 26, 2022, the patient was evaluated again by a CIT clinician due to feeling "stressed" and "having bad thoughts."  There were at least two other urgent consult notes around this date.

Despite the lack of EOP treatment offered and the apparent lack of progress toward treatment goals, the primary clinician noted that the IDTT was considering discharging the patient to the 3CMS level of care.

**Findings**

The care provided to this EOP level of care patient at CHCF was inadequate.  There were unresolved significant diagnostic discrepancies.  Treatment plans remained unchanged despite their apparent lack of effectiveness.  Routine primary clinician contacts failed to meet Program Guide requirements.  Primary clinician contacts were not completed when clinically indicated and rarely included therapeutic interventions.  Finally, it was concerning that the IDTT was considering a lower level of care for this patient despite a lack of treatment and evidence of progress toward treatment goals.

**Patient Q**

This 77-year-old patient was randomly selected for health care record review to evaluate the quality of EOP care provided at CHCF.  The patient had been maintained on modified EOP

programming throughout 2020 and most of 2021 due to concerns about disruptive behavior in the context of psychotic symptoms.

There appeared to be longstanding unresolved diagnostic uncertainties, as the patient was diagnosed with both schizophrenia and delusional disorder. Additionally, the primary clinician noted "cognitive impairment" without providing further detail regarding known limitations. EOP providers documented multiple concerns in recent notes, including paranoid and grandiose delusions, hallucinations, disorganization, "dirty" appearance, refusal of showers, impulsivity, lack of insight, "fixated religious beliefs," psychiatric medication refusal, and lack of treatment participation. The treatment team also determined that the patient's inability to manage his current symptoms and behaviors prevented him from attending group treatment and IDTT meetings.

However, despite multiple concerns highlighted by EOP providers, the patient's treatment plans during 2021 were limited to one mental health IPOC that targeted delusions; however, there were no appropriate interventions included for this IPOC. IDTT documentation contained internal inconsistencies, including stating that there were no barriers to discharging the patient to a lower level of care. Although the HLOC considerations' section included some useful planned interventions, the patient's treatment refusals prevented implementation and the proposed interventions were never modified to address his treatment resistance.

For a period of six months during 2021, IDTT documentation repeatedly stated that the treatment team would reconvene to discuss the "right level of care" after 30 days of treatment non-compliance; however, the patient's compliance did not improve, and he was never referred to a HLOC. Additionally, IDTT documentation for February 2021 failed to mention the patient's positive HLOC referral indicators, and, as a result, there was no written rationale for non-referral, or an enhanced treatment plan developed in lieu of an inpatient referral.

Psychiatry notes suggested the patient was very impaired and difficult to interview. One psychiatrist repeatedly noted that he was unable to assess mental status due to the patient's "psychotic disorganization," "gibberish," and response to internal stimuli. Additionally, a telepsychiatrist repeatedly noted "[patient] lacks capacity" in progress notes. However, interventions to address these concerns were lacking.

In July 2021, the patient was described as actively psychotic, dirty, malodorous, "not bird bathing," and not showering. Further, the primary clinician noted, "(i)t's unknown what his current symptoms are because he cannot/will not verbalize his needs or advocate for himself."

IDTT documentation suggested the patient was too unstable to participate in IDTT meetings in May, June, and July 2021. On July 6, 2021, the IDTT noted the patient was unable to attend IDTT due to acting out behavior in the context of psychotic symptoms and that "no discussion was done on his HLOC." Although the IDTT wrote that they would reconvene to discuss a HLOC on July 12, 2021, they did not meet again until July 19, 2021.

The patient was eventually referred to the intermediate level of care on July 19, 2021.

**Findings**

The EOP care provided to this patient was inadequate.  Treatment plans were ineffective and not modified in response to a lack of progress over time.  IDTT documentation included inaccurate and misleading patient information, including suggesting there were no HLOC referral indicators or barriers to treatment progress.  Diagnostic uncertainties were left unresolved, despite EOP providers observing the patient for almost two years in the program. IDTTs did not routinely discuss HLOC referral considerations, even when there were strong clinical indications to refer. While there were reasons to refer this patient to a HLOC for a period of six months, a referral was clearly indicated based on the level of decompensation described in the health care records between April and July 2021.  However, the IDTT repeatedly delayed the HLOC referral without an appropriate rationale or treatment plan.

**APPENDIX C-3**
**California Men's Colony (CMC)**
**(April 19, 2022 – April 22, 2022)**

**Patient A**

This 32-year-old patient's healthcare record was randomly selected from the EOP roster to assess adequacy of care. Providers' diagnoses included unspecified bipolar and related disorder, major depression, antisocial personality disorder, borderline personality disorder and cannabis use disorder. He was prescribed a mood stabilizer and anti-depressant medications.

A review of IDTT documentation during the reporting period indicated delays in IDTTs and poor quality of documentation. There were four months between an IDTT on October 27, 2021 and February 23, 2022. At the time of the review the latter IDTT was incomplete. Neither treatment plan provided a clear update of his functioning or symptoms with the most recent summary of his presentation dated April 21, 2021. In addition, there was no rationale for changes to treatment goals. Specifically, IPOCs that targeted anxiety in October 2021 were not continued during the February 2022 IDTT. Relatedly, the goals for the IPOC for depression were changed without explanation. Lastly, it was unclear how the IPOC was documented as initiated in August 2022 when the IDTT was dated February 2022.

Primary clinician documentation was brief with minimal utilization of clinical interventions. Of the four psychiatric contacts between January and April 2022, he was seen by three different providers. However, documentation provided useful information regarding symptoms and rationale for medication changes.

**Findings**

This patient's care was inadequate. Treatment planning was poor and not appropriately updated. Routine clinician contacts lacked therapeutic interventions. Diagnostic clarification was needed as diagnostic criteria was not evident in reviewed documentation. Reconciliation of diagnosis in provider diagnosis and the official place of record was needed.

**Patient B**

This 46-year-old patient was admitted to the facility on December 31, 2021. His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

Provider assessments were comprehensive and included relevant clinical history. However, the majority of his primary clinician assessment was not individualized as much of the content was copied from a previous provider almost a year prior. Thus, the assessment did not include a review of the patient's recent clinical presentation prior to transfer including an IPOC for delusions.

The patient was diagnosed with major depressive disorder and PTSD, although paranoia was not accounted for in diagnosis. Initial treatment planning targeted depressive symptoms without consideration for night terrors that disrupted his sleep. Objective and measurable goals with appropriate treatment interventions for the established IPOC were identified. Treatment goals

remained unchanged at his quarterly IDTT which included a useful summary of primary clinician contacts but did not include coordination with the psychiatrist.

On account of quarantine, his initial IDTT was held in absentia and his primary clinician's initial assessment was conducted on the tier. The psychiatric initial assessment did not occur until approximately six weeks after his admission on February 16, 2022. He was not prescribed psychiatric medication which he referred to as "poison." Subsequent psychiatric contacts were timely and addressed resistance to medication. Documentation indicated an attempt to determine if his medication resistance was due to paranoia or "suspiciousness of the system." However, there were no attempts to seek collateral information and no documentation that prior documentation was reviewed. Further, primary clinician documentation which detailed additional incidents of paranoia were not considered in psychiatric documentation.

Primary clinician contacts occurred regularly, and documentation provided a useful summary of the patient's symptoms including ongoing paranoia. Across reviewed documentation, utilization of treatment interventions was rare.

**Findings**

This patient's care was inadequate and impacted by a lack of coordination of care between providers at the facility and integration of prior provider's recent documentation. Diagnostic clarification and improved communication between providers was needed. Documentation from providers prior to arrival to the facility was not appropriately utilized in initial provider assessments or treatment planning. Documentation that was not original was not noted as such.

**Patient C**

This 30-year-old patient was admitted to MHCB acute on January 12, 2022 for depressive symptoms and suicidal ideation. Diagnoses varied by provider and location and included bipolar disorder, depression, anxiety and borderline personality disorder. He was prescribed a mood stabilizer and anti-anxiety and antipsychotic medications under a PC 2602. His healthcare record was randomly selected from the MHCB acute roster to assess adequacy of care.

Provider initial assessments were thorough and provided useful information which informed individualized treatment planning. IPOCs implemented at his initial IDTT targeted his treatment needs including self-harm behavior, depressed mood and impulsive behavior but remained unchanged through reviewed IDTTs. Goals were measurable and interventions were reasonable. Routine IDTTs provided a useful summary of his treatment progress and functioning between IDTTs.

Consultation via a CCAT was a positive finding.

He had multiple incidents of self-harm throughout his stay, the majority of which occurred in March and required two-point therapeutic restraints for close to twenty-four hours. Documentation of rationale for therapeutic restraints was thorough. After a medication change his symptoms stabilized and there were no further incidents of self-harm.

## Findings

This complex patient's care was adequate. Overall, reviewed provider routine documentation included a thorough description of his symptoms, functioning, utilization of treatment interventions and his response to treatment. Self-injury was addressed in a therapeutic manner throughout his stay. Further assessment of his ability to self-injure while on one-to-one observation was needed. Areas in need of improvement included updated treatment goals and diagnostic clarification.

## Patient D

This 39-year-old Spanish-speaking patient was admitted to the MHCB acute on March 22, 2022. Diagnoses included amphetamine-induced psychotic disorder, schizophrenia and anxiety. He was admitted on Haldol which was discontinued and subsequent medications for anxiety were also discontinued. His healthcare record was randomly selected from the MHCB acute roster to assess adequacy of care.

The acute admission was necessitated due to psychotic and depressive symptoms that were impairing his functioning and ability to care for himself. Once admitted, he denied psychiatric symptoms which he attributed to a desire to change institutions. However, his presentation was variable, ranging from asymptomatic to odd behaviors which were hypothesized by the primary clinician to be an attempt to remain inpatient until his release on April 30, 2022. However, this hypothesis did not fully explain his lack of self-care and request to return to EOP. His primary complaints were poor sleep and anxiety which he attributed to his upcoming parole date. Other than medication, clinical interventions were not utilized.

The initial psychologist assessment was comprehensive and provided a foundation for individualized treatment planning. However, mental health IPOCs were not established for the duration of his stay. The initial psychiatric assessment was also useful and attributed his lack of psychotic symptoms to recent methamphetamine use. Throughout his stay routine contacts varied by provider and at times, for reasons that were unclear, occurred at the cell front. It was unclear if a translator was consistently used or if the provider spoke his native language. At times, an officer was used to translate, an area of concern.

A CCAT was held to address discharge planning and attempts were made to coordinate services between probation and the Department of Mental Health which he refused. He was fixated on contacting his brother with whom he planned to live with upon release but was unable to do so as he did not remember his access code to make the call. It was unclear why attempts were not made to assist him with accessing the code.

Appropriate risk assessment and clinical interventions were not provided following two instances of self-injury.

## Findings

This patient's care was inadequate due to insufficient treatment planning and lack of coordination between providers' variable assessments of this patient; clinical interventions and risk assessments. Documentation did not consistently support that a translator or his native

language were used for routine contacts. Rationale for multiple non-confidential contacts was not included in documentation. Diagnostic clarification was needed. Of note, there was some documentation that was copied from previous providers without indication of original author or timeframe, which were areas of concern.

**Patient E**

This 32-year-old patient was admitted to MHCB acute on March 24, 2022 from the MHCB for depression and suicidal ideation. He was diagnosed with major depressive disorder. He was not prescribed psychiatric medications. His healthcare record was randomly selected from the MHCB acute roster to assess adequacy of care.

The initial psychiatric assessment was thorough and individualized to the patient's treatment needs. The initial psychologist assessment was similarly comprehensive and included pertinent psychosocial history, however the author and date were unable to be determined as much of the documentation referenced a MHCB admission.

The initial IDTT was individualized and an IPOC for depression was implemented and remained unchanged in reviewed IDTTs. However, there were no IPOCs for suicidal ideation and treatment refusals although clinically indicated. Reviewed routine IDTT documentation included a brief summary of his functioning and progress in treatment. Level of care rationale was reasonable.

The majority of reviewed individual contacts were cell front, many of which were due to refusals, although the reason was not consistently documented. He continued to refuse psychiatric medication despite education and encouragement. Utilization of clinical interventions by the primary clinician varied by provider, but when utilized were clinically appropriate. Over time, his mental status and engagement in treatment including group attendance improved.

**Findings**

This patient's care was adequate. While documentation and treatment planning needed improvement, as a whole, his individual treatment needs were appropriately addressed.

**Patient F**

This patient's healthcare record was selected for review after he was observed during the monitoring visit in an MHCB cell, on the floor, in custody restraints, with a custody observer. According to the healthcare record, the patient discharged from intermediate care on March 21, 2022 and subsequently had four MHCB admissions at CSP/LAC within a very short period of time. On or around April 5, 2022, the patient was sent to an outside hospital after he swallowed a razor blade and was spitting up blood. Upon returning to CSP/LAC, he was referred and transported to an available MHCB at CMC on April 9, 2022.

CMC's MHCB treatment team diagnosed the patient with schizophrenia. The patient had an active PC 2602 involuntary medication order for grave disability and was prescribed antipsychotic, mood stabilizing, and antidepressant medications. The patient was medication

nonadherent, including with medications prescribed for a seizure disorder. He also refused x-rays following foreign body ingestion during the current admission.

The patient's history was significant for multiple self-harm incidents by swallowing razors and one suicide attempt by hanging. A total of four self-harm incidents were noted between March 28 and April 17, 2022. The most recent SRASHE rated his chronic and acute suicide risk as high. During the current MHCB admission, the patient engaged in two self-harm incidents, one of which resulted in transport to an outside hospital for assessment and care. Although some providers noted the patient engaged in self-harm to achieve a HLOC, on April 18, 2022, the primary clinician noted that he engaged in cutting "when feeling emotional pain and boredom."

During the monitoring visit, the expert observed the patient sleeping on the floor of the MHCB cell, in custody restraints, and the window of his cell door was shattered in two places. A custody officer seated outside the cell reported that due to the patient having a razor in his abdomen, which presented ongoing safety concerns, custody leadership initiated contraband or "potty watch" with waist, leg, and wrist restraints in accordance with their contraband policy. The officer further explained that the patient would reach 72-hours in three-point restraints by the end of the day and that custody leadership had no plans to discontinue the restraints until the razor was passed and confiscated. After reviewing the referenced contraband policy, the expert noted that the policy allowed for implementation of contraband watch within the CTC but did not specifically address MHCB patients. Upon further inquiry, the monitor's expert was informed that CMC's executive custody and mental health leadership met and voted to extend the use of the contraband policy for this MHCB patient due to ongoing concerns about his safety with a razor in his possession. However, interviewed MHCB providers and nursing staff reported that they were not included in those discussions and were not given instructions regarding their involvement in implementation. Nursing confirmed they were not following the MHCB restraint policy, including for range of motion, as they perceived the restraints were based on a custody decision and not a doctor's order. MHCB staff also reported different reasons for the custody contraband watch.

Records indicated CMC MHCB clinicians only conducted cell-front contacts and in absentia IDTTs during admission. Mental health cell-front contacts were completed in the presence of the custody watch observer after the patient's return from the outside hospital on April 18, 2022. While some clinicians attributed the cell-front contacts to a contagious skin disorder, others noted non-confidential contacts were due to the patient being on custody watch and "in shackles."

A further review of MHCB progress notes raised concerns about the overall care provided during admission. At the time of the initial psychiatric assessment, the patient complained about retaliation and inadequate care in the MHCB. He reported that he was placed in an unclean cell with dirty linens and denied treatment for scabies. A psychiatry progress note, dated April 16, 2022, stated that, in response to the patient reporting homicidal thoughts and threatening harm toward others, the provider said, "drop the tough guy attitude." The psychiatrist's inappropriate intervention further escalated the patient to the point of swearing at the provider and yelling at her to get away from his cell. In response, the psychiatrist noted that she informed the patient he would be issued a RVR for disrespect. One PC progress note, dated April 19, 2022, inaccurately stated that the patient was "not an imminent threat to self or others," despite returning from an

outside hospital only one day prior for razor blade ingestion and currently being retained on custody watch with restraints due to self-harm concerns. The PC further noted on this date that the patient was cleared for full issue, yard, and group, and that there were no concerns about danger to self.

A review of IDTT records for the current admission revealed at least three positive HLOC referral indicators. However, despite the patient's lack of access to treatment in the MHCB and strong evidence for a referral to a HLOC, the IDTT's non-referral rationales dismissed the patient's symptoms, impaired functioning, and self-harm risk as "impression management" to achieve inpatient care. The care plan, in lieu of referral, also was not feasible for this patient, as he was not invited to leave his cell to participate in confidential sessions.

On April 20, 2022, the monitor's expert requested an unscheduled IDTT for this patient to discuss current care concerns and the patient's need for a HLOC. The mental health providers arrived unprepared for the IDTT held on April 21, 2022, despite the expert requesting the meeting 24-hours prior. Neither the psychiatrist nor the PC had met with the patient on this date. The psychiatrist did not have record access and the PC had no knowledge of recent events, including that the patient had remained in restraints for nearly 72-hours. As such, the monitor's expert presented the case to the team based on record review. The psychiatrist was against the HLOC referral and argued that other patients might also engage in similar behaviors to achieve inpatient care. This provider also smiled when informing the team that she issued him a RVR. The MHCB supervisor ultimately decided to assume primary clinician duties for this patient, and, despite the psychiatrist making inappropriate arguments against the HLOC referral, the patient was referred to a HLOC on this date.

**Findings**

The care provided to this patient in the MHCB was inadequate. The patient was diagnosed with schizophrenia, granted a PC 2602 order for grave disability, and remained at high risk for suicide/self-harm over a ten-day MHCB admission. Mental health staff's interactions with the patient were minimal, non-confidential, and, at times, inappropriate and punitive. The patient clearly could not be managed in the current setting and required a HLOC; however, the documented non-referral rationales were inadequate, and the verbal rationale from psychiatry during IDTT was inappropriate. Documentation was also inconsistent and, at times, dangerously misleading, including when the PC noted the patient was cleared for privileges and no longer presenting risk for self-harm. There also appeared to be an absence of record reviews and information exchange among MHCB providers prior to IDTT decisions, based on their lack of awareness regarding recent serious events. Leadership's decision to extend the contraband policy to MHCB patients was very concerning considering the MHCB restraint policy was not integrated, direct care providers were not consulted, and expectations for implementation of the modified policy were not communicated to MHCB staff. Leadership should address the concerns noted with the MHCB psychiatrist, and, at a minimum, require attendance in IDTTs with record access and training in de-escalation techniques.

**Patient G**

This patient's healthcare record was reviewed following concerning IDTT observations during the monitoring visit. The expert noted that, during the IDTT observation, the treatment team presented information that was inconsistent with the patient's healthcare record, appeared uncertain about the case formulation and psychiatric diagnoses, dismissed signs of elevated suicide risk, and presented insufficient rationale for not referring the patient to a HLOC.

The patient was diagnosed with unspecified schizophrenia, somatic symptoms disorder, PTSD, antisocial personality disorder, anxiety, and substance use disorder. Psychiatric medications included mirtazapine and Zyprexa. Medication adherence was described as "inconsistent" during the course of MHCB admission at CMC. Records also noted the patient was prescribed Suboxone in the MAT program, and that he was non-compliant with required tox screens. The patient's suicide history was significant for eight self-harm incidents in 2020, including razor blade ingestion, and one suicide attempt by hanging in February 2021. The healthcare record also indicated the patient's daughter died in February 2021, and that, following the hanging attempt later that month, he received care in acute and intermediate care facilities from March 1, 2021 through September 8, 2021. The patient's expected release date was June 2022.

The patient's MHCB admission at CMC lasted from March 26, 2022 through May 23, 2022. Admission notes indicated the patient reported a plan to hang himself and that he had exhibited an increase in depression, hopelessness, and suicidal ideation since the one-year anniversary of his daughter's death. The patient also reportedly endorsed serious safety concerns at SVSP due to drug debts. CMC's MHCB staff noted that, while the patient was in the EOP level of care at SVSP, he was non-compliant with treatment contacts, medication, and tox screens for the MAT program.

There were no IPOCs found in the first four MHCB treatment plans (3/29/22, 4/5/22, 4/12/22, and 4/19/22). On April 25, 2022, the IDTT developed IPOCs to address the patient's depressed mood and pre-release planning needs; however, proposed interventions for depression were vague and limited to "goal setting." The IDTT described the patient as unwilling to engage with staff during admission, and at times attributed his presentation to "impression management" to achieve a HLOC.

On April 19, 2022, custody officers reportedly found ten suboxone tabs in the patient's MHCB cell. During the monitoring visit, the treatment team expressed uncertainty about whether the patient had been hoarding suboxone for the purpose of self-harm or distribution. One day later, the patient required transport to a community hospital due to an upper gastrointestinal bleed. On April 23, 2022, the patient returned to CMC's MHCB from the community hospital. Nursing noted later that evening the patient tied a shirt around his neck and threatened to kill himself. Subsequently, the patient was observed with a razor blade in his mouth, and he again threatened to kill himself. Although custody conducted a body and cell search, the razor blade was not found. A transfer of care report, dated April 24, 2022, indicated the patient was placed on one-to-one suicide watch on this date and that "the patient did have a razor on his person which was then confiscated and was not swallowed." The mental health clinician who followed up on this date documented only that, despite nursing staff's claims, there was no razor in the cell.

The MHCB IDTT convened one day later on April 25, 2022 but did not reference the events on April 23 and 24. Further, they did not reference multiple concerns noted in recent progress notes, including current orders for suicide watch due to threats of self-harm, possible foreign body ingestion, or the patient's recent threats to refuse medications and initiate a hunger strike. Instead, the IDTT noted a plan to discharge the patient to EOP level of care as soon as custody's safety concern investigation was complete. While the IDTT appropriately noted a positive HLOC referral indicator for the extended length of stay in the MHCB, the non-referral rationale stated only that the patient remained in the MHCB "solely" due to a pending safety concern investigation. It was especially concerning that the care plan, in lieu of referral, indicated plans for the PC to meet with the patient only twice per week to prepare him for discharge to EOP. There were no interventions targeting current symptoms, behavioral concerns, or suicide risk factors.

The patient's discharge SRASHE rated his chronic suicide risk as high and his acute risk as low. However, it appeared the clinician underestimated his acute risk, and they did not reference the events that occurred in the MHCB at the end of April 2022. Additionally, the evaluating SRASHE clinician inaccurately noted, "currently there are no indicators of risk present." The patient refused to participate in his suicide prevention safety planning at discharge.

Records did note that pre-release planning services were offered on May 2, 2022.

The MHCB staff discharged the patient to EOP level of care on May 23, 2022, noting that the safety concern investigation was resolved, and that the patient was endorsed to CSP/Sac. However, the healthcare record revealed that this patient was readmitted to the MHCB at CSP/Sac on June 9, 2022.

**Findings**

The care provided in the MHCB was inadequate. While the CMC treatment team appropriately responded to the patient's safety concerns and pre-release needs, they failed to sufficiently focus treatment efforts on prominent symptoms, self-harming behaviors, and acute suicide risk factors during admission. Despite the patient's worsening presentation during the first 30-days of MHCB admission, the treatment team did not refer the patient to a HLOC and the non-referral rationale was inappropriate and inaccurate. Additionally, the IDTT's failure to reference significant events during the course of admission when determining treatment decisions and suicide risk was very concerning and appeared to suggest a lack of record review and communication among MHCB staff.

**Patient H**

This patient's healthcare record was selected for review during the monitoring visit as he had at least 14 MHCB referrals within a six-month period. The patient was diagnosed with Bipolar 1 disorder, borderline personality disorder, antisocial personality disorder, and substance use disorder. The patient had an active PC 2602 involuntary medication order and was prescribed Cogentin, Zyprexa, Benadryl, Abilify, and Haldol. Prior to his arrival at CMC, the patient had been referred to acute care for danger to self and foreign body ingestion during an MHCB admission at the California Institution for Men (CIM) in mid-February 2022. CHCF ultimately

rejected the acute care referral, and CIM's rationale for not considering intermediate care was limited to a statement that he had not engaged in self-harm for 45-days.

On February 21, 2022, the patient discharged to the EOP level of care and transferred to CMC. Shortly after arrival on this date, he was admitted to CMC's MHCB for danger to self and swallowing a foreign object. The IDTT discharged the patient after only two days and the HLOC non-referral rationale appeared to focus only on reasons for not referring to acute care: intermediate care was not considered.

On February 23, 2022, the patient discharged to EOP level of care and was placed in administrative segregation. While in the ASU, most clinical encounters were completed at cell front, initially due to the patient testing positive for COVID-19 and later due to refusals. The ASU EOP clinician noted on more than one occasion that the patient appeared to be "underreporting symptoms" during the cell front contacts. Although there was a reference to a self-harm incident on March 5, 2022, there was no corresponding Self-Harm Powerform or further detail. During a March 27, 2022 psychiatry contact, the provider noted a plan to pursue renewal of the involuntary medication order for danger to self, adding that the patient was upset when informed.

Records indicated the patient had five self-harm incidents and eight CIT evaluations between February and May 2022. Although several clinicians wrote that the patient endorsed suicidal ideation to achieve higher levels of care and certain privileges, the patient repeatedly reported that his goals were to discharge from EOP level of care and discontinue orders for involuntary medication. One CIT note, dated March 30, 2022, suggested the patient was in distress after learning his uncle had died and indicated the patient requested a phone call to his mother. The CIT clinician informed the patient he had "misused" the CIT, issued a 128-B chrono to his case file as a warning, and threatened to issue a RVR for similar behavior in the future.

The patient continued to report symptoms of grief in late March and throughout April 2022. On April 1, 2022, the patient engaged in self-harm by lacerating his wrist; although it did not appear he was referred to the MHCB on this date. On April 4, 2022, he was referred to the MHCB by the on-call psychiatrist. On April 6, 2022, a clinician noted the patient continued to endorse passive suicidal ideation due to grief. IDTT documentation, dated April 13, 2022, noted positive HLOC referral indicators. The non-referral rationale, however, stated only that the patient did not require a HLOC.

The most recent SRASHE completed at CMC in April 2022 rated the patient's chronic suicide risk as moderate and his acute suicide risk as low; however, it appeared the evaluating clinician underestimated the acute risk. The clinician was also not required to update the suicide prevention safety plan due to documenting low acute risk.

This patient transferred to CSP/Sac in May 2022, where he continued to receive CIT evaluations and referrals to the MHCB over the next two months.

**Findings**

The care provided to this patient was inadequate. The treatment plan and interventions in the ASU EOP program were insufficient. Clinicians offered discrepant opinions regarding the

patient's symptoms and underlying reasons for frequently endorsing suicidal ideation, which suggested unresolved diagnostic uncertainties. The CIT clinician also inappropriately used punitive measures and threats in response to their perceived misuse of the CIT, instead of developing a plan with the IDTT to address the patient's frequent use of emergent services. There was some evidence for an intermediate care referral or behavior program; however, IDTTs did not appear to consider a referral to intermediate care, the general HLOC non-referral rationales were inadequate, and the required corresponding care plan did not sufficiently address the primary presenting problems.

## Patient I

This 26-year-old patient's healthcare record was reviewed to evaluate the quality of EOP care provided at CMC. This patient entered CDCR in December 2019 and arrived at CMC in June 2021. He had been retained at the EOP level of care since February 2020. According to the record, this patient was initially placed at the 3MS level of care upon entry to CDCR, but approximately one month later was admitted to the MHCB "after a CIT was called for potential grave disability (drinking from toilet with urine in it, decreased ADL, difficulty housing with others, impulse control issues)".

He was subsequently discharged to the EOP level of care. This patient's active medical record mental health diagnosis was unspecified schizophrenia spectrum and other psychotic disorder. This patient was prescribed olanzapine and Vistaril to address symptoms of psychotic disorder.

This patient received timely IDTTs throughout the review period. Each IDTT was attended by requisite staff and the treatment plans appeared to be individualized and patient specific. Goals and identified problem areas were consistent with the patient's symptoms and assessments. At the IDTT on December 7, 2021, the treatment team agreed to retain the patient at the EOP level of care due to anxiety and auditory hallucinations. They also reported the patient "would likely decompensate in 3CMS environment if not in EOP structure and continuing medications." The team identified discharge criteria as the patient maintaining stability and engagement in mental health programming for a minimum of six months. Psychiatry contacts were timely throughout the review period, and closer inspection of those progress notes indicates the patient responded well to psychiatric medications and was working in the canteen during the review period. He continued to endorse auditory hallucinations, but reported they were manageable. This patient's medications remained consistent throughout the review period and neither the psychiatrist nor the patient recommended or requested changes in medications. PC contacts during the review period were not always timely. While this patient received bi-weekly one-to-one PC contacts, PC-led caseload groups were inconsistent. The record reflected several instances where the patient did not have a PC contact for two weeks or more, which was not in accordance with Program Guide requirements. Further, the Mental Status and Mental Health Assessment sections of the PC progress notes were copied and pasted from contact to contact with little to no substantive update. It does appear, however, that the PC was working on the interventions and objectives identified in the treatment plans. Confidentiality of clinical contacts appeared to depend on whether custody was operating a modified programming schedule, or the patient declined a confidential setting, but the majority of clinical contacts for this patient were confidential.

**Findings**

The care and treatment provided to this patient at CMC was generally adequate and according to Program Guide requirements, with the exception of timeliness of PC contacts. Although PC contacts were not always timely, interventions provided by the PC appear to be appropriate and consistent with the treatment plans. Psychiatry contacts were timely and individualized, as were the IDTTs throughout the review period. This patient was appropriately retained at the EOP level of care, and the treatment team provided appropriate discharge criteria for reduction in level of care.

**Patient J**

This 41-year-old patient's healthcare record was reviewed to evaluate the quality of EOP care provided at CMC. This patient entered the CDCR for the current term in April 2006 and had been at CMC since May 2018. This patient began at the 3CMS level of care in April 2009 and was subsequently upgraded to the EOP level of care in August 2015. He had been retained at the EOP level of care since that time. This patient's clinical level of care history included multiple MHCB admissions, one DSH admission, and two PIP admissions: one acute and one intermediate. This patient had one admission to the MHCB during the review period in January 2022 and received appropriate five-day follow-ups. His suicide risk at discharge from the MHCB was reported as "high chronic suicide risk" and "low acute suicide risk." He was discharged to the EOP level of care. While at CMC, this patient was provided mental health diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, major depressive disorder, recurrent episode, unspecified, and major neurocognitive disorder due to traumatic brain injury. This patient had historically been prescribed multiple psychotropic medications, including perphenazine (antipsychotic), Cymbalta (antidepressant), and Vistaril. During the review period, this patient was prescribed Geodon (antipsychotic), and at the conclusion of the review period this patient's psychotropic medications consisted of perphenazine and Vistaril.

This patient received timely IDTTs throughout the review period which were appropriately staffed per Program Guide requirements. The treatment plans provided appropriate and individualized goals and interventions to address this patient's chronic suicidality and anger issues. At his IDTT on January 4, 2022, just prior to his January 2022 MHCB admission, the treatment team reported the patient was referred to the SRMP and collaborative assessment and management of suicidality (CAMS) prior to consideration of another ICF/DSH referral. The team reported there were no plans to consider a reduction in level of care and the IDTT would reconvene in 90 days. He was admitted to the MHCB several days later due to passive suicidal ideation. Upon discharge from the MHCB to EOP in January 2022, although he had been referred to the SRMP, according to the record this patient did not receive any treatment through the program due to COVID-19 related limitations. At that time, the treatment team reported it was still considering a referral to an ICF/DSH after consultation with the program supervising psychologist and the SRMP clinicians, although he was deemed to not require MHCB placement at that time. According to the record, this patient was actively participating in mental health programming during the review period.

PC contacts for this patient were generally timely throughout the review period, with some delays attributable to COVID-19 modified custody programming. The patient was generally

seen weekly for one-to-one PC appointments while not in the MHCB (the majority of which occurred in a confidential setting) and received daily PC contacts while in the MHCB. PC contacts were individualized, and progress notes align with goals and objectives prescribed in the treatment plan. Psychiatry contacts during the review period were generally timely and appropriate, however, this patient did not have a psychiatry contact in February 2022, which was significant as the patient had been discharged from the MHCB in late January. It is unclear from the record whether the psychiatry contacts occurred in confidential settings.

**Findings**

The care and treatment provided to this patient at CMC appeared to be generally adequate and consistent with Program Guide requirements, with the exception of the missed psychiatry contact in February 2022 and isolated instances of delays in PC contacts. Also, due to programming limitations secondary to COVID-19 protocols, the patient did not receive SRMP contacts or support as recommended by the IDTT. Despite these delays/missed contacts, clinical contacts and supports for the patient were appropriate and consistent with the goals and objectives identified in the treatment plans. Consideration for referral to DSH/ICF was appropriate given programming limitations at CMC and the patient's chronic suicidality and recurrent suicidal ideation.

**Patient K**

This 53-year-old patient's healthcare record was reviewed to evaluate the quality of EOP treatment at CMC. This patient entered the CDCR in April 2005 and had been at CMC EOP since November 2017. The patient's clinical level of care designations historically included GP, EOP, MHCB, and an ICF. He had been retained at the EOP level of care since July 2015. This patient's most recent mental health diagnoses were generalized anxiety disorder and persistent depressive disorder (dysthymia), however, historical diagnoses have included schizoaffective, Bipolar type, polysubstance dependence, and antisocial personality disorder. The patient was prescribed BuSpar (antianxiety) during the review period to address his mental health symptoms.

The patient received timely IDTTs throughout the review period. The IDTTs were appropriately staffed per Program Guide requirements. Treatment plan goals, objectives, and interventions were individualized, appropriate for his presentation and diagnoses, and appeared to address relevant problem areas. At the IDTT on December 29, 2021, the team noted the patient would continue at EOP level of care for 90 days, but that he "may be eligible for referral to a less restrictive level of care in six months should he have no MHCB admissions, regularly deny SI/HI, intent, or plan, demonstrate good medication compliance, and continue to participate in treatment (above 50% each week)." The record reflected that over the review period, the patient actively participated in offered mental health programming above the 50 percent threshold identified in the treatment plan.

Psychiatry contacts during the review period were timely and occurred within Program Guide requirements. Review of psychiatry progress notes indicated the patient remained stable on his prescribed medication (BuSpar Pro Re Nata (PRN)) and did not request any changes or increases in medications during the review period. PC contacts throughout the review period were timely as well, generally confidential, and individualized. Review of PC progress notes revealed

consistency with treatment plan goals and objectives, with the PC actively tracking progress towards goals and updating interventions as appropriate.

**Findings**

The care and treatment provided to this patient at CMC appeared to be adequate and within Program Guide requirements. Review of the patient's record indicated appropriate level of care designation, timely and appropriate clinical contacts (IDTT, PC, Psychiatry), and appropriate goals and interventions in his treatment plan.

**Patient L**

The patient was a 63-year-old male at the 3CMS level of care diagnosed with major depressive disorder and adjustment disorder; he was not prescribed psychotropic medication. The patient began his prison term on July 30, 2008 and arrived at CMC on October 10, 2017 from SVSP. According to the records, an IPOC for MH Depressed Mood with specific goals was initiated on March 3, 2020 with an outcome date of June 28, 2021 to be met by the next IDTT which did not occur. The next IDTT was held on April 19, 2022. The patient's last RVR was in 2018. There were no documented inpatient admissions or EOP levels of care.

According to the medical record, the clinical contacts were conducted timely between March 2021 and April 2022, consistent with Program Guide requirements. The clinician provided grief counseling and interventions following the death of the patient's niece in 2021 and provided Center for Clinical Intervention packets throughout 2021 and 2022. The records indicated that the CC I packets were focused on self-esteem and documented that the patient also participated in the Freedom of Choice mail-in correspondence and was provided a domestic violence workbook. The patient also completed computer classes on March 22, 2021 and continued vocational classes at the time of the record review.

The patient was appropriately retained at the 3CMS level of care due to his continued depressed mood and anxiety.

**Findings**

The patient was correctly retained at the current level of care. The clinical care was adequate, sessions were individualized and focused on the patient's needs, although no IDTT was conducted in 2021.

**Patient M**

The patient was a 49-year-old male at the 3CMS level of care diagnosed with major depressive disorder - single episode, moderate unspecified schizophrenia spectrum and other psychotic episodes. The patient was prescribed aripiprazole, citalopram and hydroxyzine. The patient, whose history of incarceration started as a juvenile, was a third striker who began this term in 2018.

According to the patient's medical record, his biopsychosocial history consisted of an unstructured and chaotic childhood. The patient self-reported auditory hallucinations at a young

age, had trust issues, and endured abuse at the hands of his parents.  The patient had two community mental health hospitalizations during his childhood, including one after being burned by his mother.

The patient had a history of suicide attempts.  The first attempt was in 1992 when he attempted suicide by gunshot.  In 2018 he attempted to jump off the second tier while in the Sacramento County Jail.  While in CDCR the patient had not been admitted to any higher levels of care.

The patient arrived at CMC on February 21, 2020.  The clinical contacts occurred timely from his arrival to CMC through April 2022.  IDTTs occurred in 2020, and 2022 but not in 2021.  According to the master treatment plan of April 2022, there was an IPOC for Mental Health Depressed mood which was activated.  An AIMS was conducted on April 15, 2022 and was negative.  The patient was started on Vistaril for sleep according to the treatment plan due to fear of dorm living after previously seeing a stabbing in a dorm setting.  The patient's last RVR was on March 18, 2022 for refusing housing.

## Findings

The clinical contact and IPOC was adequate; however, the patient did not have an annual IDTT in 2021 as required by the Program Guide requirements.  The patient was retained at the current level of care with an appropriate rationale.

## Patient N

The patient was a 45-year-old male at the 3CMS level of care diagnosed with adjustment disorder with anxiety and was not prescribed psychotropic medications.  The patient had no history of inpatient psychiatric admissions or suicide attempts.  The patient began his prison term on June 29, 1998.  The patient transferred to CMC on February 5, 2020, with 91 points and was at CMC on a behavior override.  According to the record, the patient was made 3CMS on March 5, 2020.  The patient's last RVR was in 2018.  The patient's initial assessment occurred on February 19, 2020. IDTTs occurred on February 19, 2020 and April 19, 2022 but no IDTT occurred in 2021.

Clinical contacts over the prior 24 months focused on his criminal thinking, anxieties and preparing for board hearings.

The master treatment plan developed on April 19, 2022 reported that the patient voluntarily postponed his youth offender board hearing from May 2022 to May 2023 to complete courses recommended by the board and enrolled in the ISUDT program to increase his mental health programming.  The record showed that the patient experienced higher than normal anxiety around his board hearing and was working with the clinicians on interventions to reduce anxiety through CBT.

## Findings

This patient received adequate care, but marginally so.  The treatment team appropriately maintained the patient at the current level of care and clinical contacts occurred timely.  The

patient arrived at CMC in 2020 and did not receive an IDTT in 2021, which did not meet the Program Guide requirements as IDTTs for 3CMS patients should occur annually.

**Patient O**

The patient was a 65-year-old male at the 3CMS level of care with no specific diagnosis; he was not prescribed any psychotropic medications. He had an IPOC for anxiety and depressed mood from his IDTT held on June 24, 2021.

According to the record, the patient was made 3CMS in October 2010 after endorsing depressed mood and sleep disturbances. The patient was previously prescribed Remeron but was no longer on any psychotropic medications. The patient had no disciplinary RVRs.

The patient's IDTTs occurred on June 24, 2021, October 10, 2019 and October 24, 2018. An IDTT was not conducted in 2020. The patient's clinical sessions were timely and individualized. The medical record showed that the patient and clinician continued to work on the patient's anxiety and depressed mood. The patient also worked on self-help correspondence called Prep LA, attended NAR/AA meetings and also attended the 3rd Striker's group.

The patient was compliant with medical and mental health appointments.

**Findings**

This patient received adequate care. The treatment team correctly retained the patient at the 3CMS level of care and documented an adequate reason for the retention. Clinical contacts were individualized and appropriate and his IDTT occurred in 2021 as required. However, no IDTT was conducted in 2020 which was out of compliance with the Program Guide. IDTTs for 3CMS patient should occur annually.

**Patient P**

The patient was a 34-year-old make at the 3CMS level of care with a diagnosis of mood disorder with depressive type and adjustment disorder. He was admitted into the 3CMS program in 2011 due to depression, low energy and impaired sleep and loss of appetite. At the time of the review, he was prescribed Effexor. An anxiety IPOC was initiated on June 24, 2021 with interventions and goals that continued through the review period.

The patient who started having suicide ideations at age thirteen also had a history of substance use and addiction that triggered his anger and created anxiety. The patient's last SRASHE was conducted on March 16, 2017.

According to his medical record, the patient's protective factors were consistent communication with his mother who visited monthly and his fiancé. The patient was active in the dog program at CMC. He also participated in the Daring Way group (resiliency) and other self-help groups. The patient's IDTTs occurred on September, 13, 3017, September 12, 2018, September 11, 2019, and on June 24, 2021. No IDTT was held in 2020. The EHRS documentation for clinical and telepsychiatry contacts were timely, individualized and based on events from the previous and current encounters; interventions were appropriate.

**Findings**

This patient received adequate care. The IDTT conducted on June 24, 2021 appropriately retained the patient at the current level of care to continue to work on anxiety and depressed mood. Clinical contacts were individualized and appropriate and his IDTT occurred in 2021 as required. However, no IDTT was conducted in 2020 which was out of compliance with the Program Guide. IDTTs for 3CMS patient should occur annually.

**Patient Q**

This 40-year-old patient was placed in the ASU EOP hub on December 30, 2021 upon his discharge from an ICF PIP. The patient was provided with a diagnosis of schizoaffective disorder, and he was prescribed antipsychotic, antidepressant, and mood stabilizing medications, as well as a medication to address medication side effects. His healthcare record was randomly selected from the restricted housing roster to assess the adequacy of care provided.

During reviewed dates of restricted housing placement, the patient had three MHCB admissions; these admissions occurred from January 20 to January 26, 2022, from February 14 to February 28, 2022, and from April 8 to April 11, 2022.

Primary clinician initial assessments completed upon placement in the ASU EOP hub did not provide a comprehensive assessment of the patient's recent or previous psychiatric functioning, nor did they inform treatment planning. A document identified as an initial psychiatric assessment lacked sufficient detail necessary for an initial psychiatric assessment. IDTTs that occurred after each MHCB discharge through March 2022 did not consider suicidal ideation or auditory hallucinations that resulted in MHCB placement, but instead continued the IPOC for DBT that was established during the IDTT after initial placement in the ASU EOP hub.

Primary clinician contacts occurred with the same provider; however, these contacts were not consistently conducted in confidential settings. The patient experienced increased auditory hallucinations in early March 2022, and the clinician appropriately consulted with the psychiatrist; however, other reasonable interventions did not occur, such as conducting an IDTT meeting or consultation with other pertinent staff. His mental status continued to decline until the third MHCB admission on April 8, 2022.

The patient was evaluated by the CIT on January 14, 2022, when he reported suicidal ideation with a plan to overdose on Suboxone. Of concern was the failure to conduct a SRASHE at that time.

Of note was the inclusion of primary clinician documentation from February 11, 2022 within documentation from February 15, 2022, and there was no indication that the documentation was a late entry.

**Findings**

The care provided to this patient was inadequate.

Treatment planning was not sufficiently individualized, required initial psychiatric assessments and a SRASHE were not completed, psychiatric decompensation was not timely addressed, and there was insufficient coordination of care between all involved providers. For reasons that were undocumented, primary clinician contacts did not consistently occur in a confidential setting.

**Patient R**

This 34-year-old patient returned to CDCR for his second term on March 15, 2022, when he was admitted to the MHCB due to suicidal ideation and recurrent thoughts of death. Following MHCB discharge, he was placed in the ASU EOP hub on March 23, 2022. Provided psychiatric diagnoses included major depressive disorder with psychosis, attention deficit hyperactivity disorder (ADHD), antisocial personality disorder, anger, and anxiety. He was prescribed Benadryl, Strattera, Zoloft, Zyprexa and Trileptal. His healthcare record was randomly selected from the restricted housing roster to assess the adequacy of care provided.

Most of the documentation in the primary clinician initial assessment was copied from other providers and did not reflect a current, individualized assessment of the patient's symptoms, functioning, adjustment to restricted housing, case conceptualization, or treatment needs. Documentation identified as an initial psychiatric assessment lacked comprehensive documentation necessary for an initial assessment and was more consistent with documentation of a routine psychiatric contact.

The initial IDTT was delayed, and the documentation of treatment planning from this IDTT similarly lacked necessary individualization. IPOCs targeted depressed mood and auditory hallucinations but did not address suicidal ideation, which was the reason for admission and the focus of MHCB treatment. Documentation of group referrals was not included despite the patient requesting additional groups. Primary clinician contact documentation lacked the utilization of clinical interventions.

The patient's primary language was Spanish. Provider and IDTT documentation indicated that a custody officer was utilized as an interpreter, and this was an area of concern.

**Findings**

The care provided to this patient was inadequate.

Psychiatric and PC initial assessments were insufficient, and these insufficient assessments impacted treatment planning. Clinical interventions to assist in management of psychiatric symptoms were not utilized. The utilization of custodial staff as an interpreter for clinical encounters resulted in nonconfidential clinical contacts. Diagnostic clarification and documentation of the rationale for providing those diagnoses was also indicated.

**Patient S**

This 34-year-old patient was placed in the ASU EOP hub on December 3, 2021. He was provided with diagnoses of schizophrenia and antisocial personality disorder. He was prescribed Invega and Vistaril. His healthcare record was randomly selected from the restricted housing roster to assess the adequacy of care provided.

Most of the primary clinician initial assessment was copied from other providers and did not provide an updated summary of current symptoms and functioning. The original authors and dates of this copied documentation were not consistently identified. The initial psychiatric assessment included relevant information and noted target symptoms including auditory hallucinations that were included as a treatment goal. The IDTT developed IPOCs that targeted depression, hallucinations and impulsive behavior; these plans of care included reasonable, measurable, and objective goals with appropriate interventions. The treatment plan was appropriately updated during a routine IDTT, and an adequate summary of symptoms and treatment participation was included.

During January and February 2022, the patient was identified as a high treatment refuser. Reviewed primary clinician routine contact documentation during this period was brief in content and not indicative of substantive clinical evaluation and treatment. Relatedly, clinical interventions were not utilized, including those to increase treatment participation or to assess the rationale for treatment refusal. Psychiatric contacts were not documented during April 2022. Other psychiatric documentation provided a brief overview of the patient's symptoms, and it appeared that the psychiatrist was generally responsive to patient requests with medication changes.

**Findings**

The care provided to this patient was inadequate.

The primary clinician initial assessment lacked individualization and did not include a summary of current symptoms and functioning. There was a lack of documentation of clinical interventions, apart from medication management. Overall, routine provider documentation was brief in content and did not provide a thorough description of the patient's functioning. Psychiatric contacts did not occur timely as required by the Program Guide. There was also a lack of documentation for the rationale for provided psychiatric diagnoses.

**Patient T**

This 29-year-old patient was placed in the ASU EOP hub from the MHCB on January 25, 2022. The patient had a history of multiple MHCB admissions and RVRs, a long history of emotional dysregulation, and a pattern of suicidal statements and suicidal behaviors. He was provided with diagnoses of bipolar I disorder, PTSD, and antisocial personality disorder. He was prescribed Depakote, prazosin and Vistaril. His healthcare record was randomly selected from the restricted housing roster to assess the adequacy of care provided.

A document identified as an initial psychiatric assessment was present in the healthcare record; however, this documentation was insufficient for an initial psychiatric assessment. The primary clinician initial assessment provided a comprehensive summary of treatment history; however, current symptoms and functional impairment were not clearly documented. An IPOC targeting anger was initiated at his request, and an IPOC for impulsivity was established. Measurable treatment goals were documented. Documented treatment interventions indicated that two handouts pertaining to each IPOC would be provided to the patient within 90 days. Despite the limited interventions included in the treatment plan, appropriate interventions were utilized

during most clinical contacts with the regular primary clinician. Further, routine primary clinician documentation was indicative of meaningful clinical contact.

Between March 14 and March 27, 2022, the patient was seen by the CIT on six occasions due to suicidal ideation; upon evaluation, the patient recanted his statements and attributed his distress to various institutional concerns. SRASHEs were conducted with appropriate safety planning and utilization of five-day follow-up contacts. The patient was admitted to the MHCB on March 27, 2022, after reporting suicidal ideation, hitting his head and reporting that he had hoarded his medications.

**Findings**

The care provided to this patient was marginally adequate.

Initial psychiatric and PC assessments and treatment planning needed improvement. While this patient required targeted treatment such as DBT for emotional dysregulation and danger to self, the clinician regularly utilized appropriate clinical interventions during routine contacts. The patient could have benefitted from increased clinical contacts during periods of increased distress. While SRASHEs were conducted as was clinically appropriate, variability in the determination of chronic suicide risk (between low and moderate) within several days warranted review.

**Patient U**

This 56-year-old patient was placed in the ASU EOP hub on March 4, 2022. He entered CDCR in 2018 with decompensation shortly after his incarceration resulting in ICF hospitalization. Since ICF discharge in October 2018, the patient received mental health services at the EOP level of care. In the month prior to the restricted housing placement, he learned that he would be released in April 2022, and he was referred for a mentally disordered offender (MDO) evaluation. The patient was provided with diagnoses of bipolar I disorder, alcohol use disorder, and cannabis use disorder. His healthcare record was randomly selected from the restricted housing roster to assess the adequacy of care provided.

On March 4, 2022, two MH-5 forms were submitted which indicated that the patient had been up all night, yelling at peers, using racial slurs, talking to himself, and "slamming" his bunk. When assessed by the CIT, there was a lack of documentation that these concerning behaviors were assessed; and it was questionable whether the healthcare record had been reviewed. The CIT assessment focused on a report of peer conflict and safety concerns, and the patient was referred to custody to address identified safety concerns with subsequent placement in restricted housing.

The primary clinician initial assessment provided a thorough review of the psychiatric history. The assessment only included a brief summary of recent mental status and functioning; his functioning was indicative of signs of decompensation in the days prior to the ASU placement at the time of his mainline EOP IDTT on March 3, 2022. For reasons that were not documented, the initial assessment was conducted at cell front in a nonconfidential setting. There was documentation that the ASU clinician attempted to consult with the mainline EOP clinician, but there was no documentation of a response.

During a five-day follow-up on March 5, 2022, the patient evidenced poor reality testing with his statement that he was "going to be a millionaire and enjoy life;" however, there was no further follow-up or further assessment of this statement conducted during the primary clinician initial assessment on March 8, 2022.  The rationale for the five-day follow-up was unclear, as an order was not located nor was there documentation of a referral for five-day follow-up.  If five-day follow-up was ordered, the assessment was incomplete and only occurred for one day.

The initial psychiatric assessment was thorough and identified signs of decompensation.  The patient was resistant taking medications other than Vistaril, despite appropriate psychiatric education and expressed concern.

The CIT was again activated on March 15, 2022, after the patient presented with disorganized and agitated behavior that resulted in a RVR for aggravated battery on a non-inmate by means of gassing and presumably a delay in his EPRD to September 12, 2023.  Of note, the mental health assessment indicated that mental illness contributed to the behavior that led to the RVR.  He was admitted to the MHCB for treatment of manic symptoms.

**Findings**

The care provided to this patient was inadequate.

While the MHCB placement was appropriate, the referral was delayed.  There were multiple instances prior to the patient's MHCB referral that indicated that he was not functioning appropriately in the EOP.  There was an overreliance on the patient's self-report instead of an adequate assessment of his psychiatric history, current presentation, and the impact on his psychiatric functioning of the significant stressor of unanticipated release to the community.  Relatedly, the lack of coordination of care between providers was an area of concern.

**APPENDIX C-4**
**California Institution for Women (CIW)**
**(September 15, 2021 – September 15, 2021)**

**Patient A**

This 34-year-old patient was admitted to the MHCB on September 9, 2021 due to cutting herself which was precipitated by a peer altercation.  Provider diagnoses were in agreement and included antisocial and borderline personality disorders and bipolar disorder but differed from those (psychosis, schizoaffective disorder) in the official place of record.  She was prescribed multiple medications including antipsychotic, antianxiety and antidepressant medications under PC 2602.  Her healthcare record was randomly selected from the MHCB roster to assess adequacy of care in the MHCB.

Initial psychiatric and primary clinician evaluations identified recent stressors and current treatment needs.  However, initial treatment plan IPOCs of ineffective coping and discharge planning were not individualized and did not address her primary treatment needs.  Treatment planning improved during her routine IDTT and included danger to self and substance use with appropriate interventions.  A goal for grief was needed but not included.

Overall, daily contact documentation provided useful and thorough descriptions of her status.  Documentation of treatment interventions varied by provider.  Primary clinician contacts were provided by various providers, an area of concern.

At the time of discharge, she was appropriately referred to acute level of care for further stabilization.  She was assessed as high acute and chronic risk with solid clinical rationale.  The psychiatric discharge was thorough and useful for continuity of care.

**Findings**

This patient's care was adequate and would have been improved with individualized initial treatment planning.  Strengths in documentation included initial assessments.  Clarification and rationale for diagnosis was needed.

**Patient B**

This 46-year-old patient was re-admitted to the MHCB from the LTRH on September 4, 2021.  She had been discharged from the MHCB on September 3, 2021 but after a brief time in segregated housing she decompensated and experienced suicidal ideation, mood lability and was punching her cell door.  Diagnosis varied by provider and chart location but included major depression, PTSD, borderline personality disorder and malingering.  She was prescribed antipsychotic, antidepressant and antianxiety medications.  Her healthcare record was randomly selected from the MHCB roster to assess adequacy of care in the MHCB.

The initial and psychiatric assessments included current treatment needs and prior treatment history.  She had an extensive history of inpatient admissions and suicide attempts.  At the time of admission, she reported suicidal ideation, elevated anxiety and depression, loss of appetite and

762

trauma symptoms.  Individual plans of care appropriately addressed danger to self, anxiety and depression.  Appropriate treatment interventions were documented.

Daily contacts provided useful information.  Grounding techniques, which she reported were useful during her discharge IDTT were utilized to assist with distress tolerance.  At the time of discharge, clinical rationale for assessment as high chronic, moderate acute risk was appropriate.  Safety planning would have been improved had it been more individualized to her return to segregation.

**Findings**

This patient's care was adequate.  Treatment planning addressed treatment needs identified during initial assessments and appropriate treatment interventions were utilized.  Safety planning ought to have been more individualized.

**Patient C**

This 28-year-old patient was admitted to the MHCB on September 3, 2021for suicidal ideation and auditory hallucinations.  She was diagnosed with schizoaffective disorder.  She was prescribed antipsychotics, antianxiety and side effect medication.  Her healthcare record was randomly selected from the MHCB roster to assess adequacy of care in the MHCB.

Initial assessments were completed at cell front and primarily based on record review due to her refusal to participate.  Documentation from previous providers was utilized but timeframe, level of care and author  could not be determined.  IPOCs appropriately addressed her presenting problems of suicidal ideation and auditory hallucinations, however, it was unclear if goals to reduce symptoms were appropriate, as a baseline assessment was not located.  Interventions to meet goals were appropriate.

While in the MHCB, her symptoms stabilized and she engaged in treatment.  Daily contact documentation addressed contributing factors that led to her MHCB admission, coping skills and medication rationale.  During her weekly IDTT, she was discharged from the MHCB.  Clinical rationale was appropriate and provided a useful summary of her course of treatment.  She was appropriately assessed as moderate chronic and acute risk and her safety plan was individualized.

**Findings**

This patient's care was adequate as the interventions to meet treatment goals were appropriate.  Clinical discharge from the MHCB was adequately documented with sufficient rationale and proper summary of the course of her treatment.

**Patient D**

This 57-year-old patient was admitted to the MHCB on August 31, 2021.  She had a long history of depression and was diagnosed with major depressive disorder.  She was prescribed Effexor, an antidepressant medication.  Her healthcare record was randomly selected from the MHCB roster to assess adequacy of care in the MHCB.

This was her second MHCB admission in less than four months.  The first admission, which occurred in mid-April 2021, was due to suicidal ideation and elevated depression and anxiety.  After treatment she was discharged to 3CMS level of care.  While not reported to anyone, she reported a suicide attempt in May 2021 via overdose on medication.  She wrote a suicide note at that time which was discovered at a later date.  The current MHCB admission was due to a serious suicide attempt in which she ingested seventy heart medication pills.  She again wrote a suicide note in which she listed her frustrations and designated to whom her property should go to.  She was at an outside hospital for four days before returning to CDCR and placed in the MHCB.  Upon return to CDCR she continued to report suicidal ideation with a plan to starve herself.  Two days later, IDTT documentation indicated that she no longer had a plan to take her life; she drank some apple juice and continued to eat during her stay.  Over time, passive suicidal ideation transitioned to denying suicidal ideation.  She also reported that she was less preoccupied but still distressed by prison stressors.

Relevant clinical documentation, including current and previous mental health needs, were included in initial evaluations and IDTTs.  Of note, origin and context of previous clinical documentation included as background information was not clearly documented and the case formulation focused on her controlling offense, not her clinical treatment needs.  Initial treatment goals included a reduction in depression (six or lower) and suicidal ideation (two or lower).  Baseline assessments were not conducted to assess goal appropriateness.  Appropriate interventions were utilized during treatment sessions.

Upon admission she was placed on suicide watch which was continued for the majority of her stay.  Clear documentation regarding rationale for continuation of the suicide watch, changes in property access and discharge of suicide watch were not located.

At the time of discharge, she was assessed as high chronic, moderate acute risk with clear rationale.  She was discharged on September 10, 2021 to EOP.  Documentation in the psychiatric discharge was minimal and did not provide a useful summary of her course of treatment.

**Findings**

This patient's care was adequate.  While she stabilized and suicidal ideation remitted, documentation regarding the reason for the drastic change from her despondence and inability to manage her sentence and prison life to improved management was needed.  Given the seriousness of her suicide attempt, rationale for why she did not meet a PIP referral was clinically indicated.

**Patient E**

This 38-year-old patient was admitted to the Administrative Segregation EOP Hub on September 2, 2021 after a fight with peers.  She was diagnosed with schizophrenia and PTSD.  At the time of admission, she requested to discontinue antipsychotic medication and continued medication for anxiety.  Her healthcare record was randomly selected from the ASU EOP roster to assess adequacy of care in the ASU EOP.

Initial assessments were thorough and included relevant historical and current clinical documentation.  However, multiple grammatical errors rendered some parts of the primary

clinician initial assessment difficult to follow. The initial treatment plan was comprehensive and treatment goals (anxiety, auditory hallucinations, anger and substance use) were developed collaboratively and flowed from initial assessments. Treatment interventions were appropriate.

Reviewed routine contacts provided adequate clinical information. Appropriate treatment interventions and supportive treatment was utilized.

**Findings**

This patient's care was adequate. Her treatment plan which indicated treatment goals and interventions and supportive treatment were appropriate to meet her treatment needs.

**Patient F**

This 35-year-old transgender patient was admitted to the Administrative Segregation EOP Hub on September 5, 2021 after a fight with his cellmate. He was prescribed antipsychotic and antianxiety medications. His healthcare record was randomly selected from the Hub roster to assess adequacy of care in the Administrative Segregation EOP Hub.

Overall, initial assessments described him as stable. While he reported auditory hallucinations, the psychiatrist noted a discrepancy between his self-report and mental status. Multiple psychiatric diagnoses (PTSD, antisocial personality disorder, anxiety, gender dysphoria, schizoaffective disorder, psychosis, ADHD) and substance related diagnoses documented in the health record lacked sufficient clinical rationale. Previous treatment goals of auditory hallucinations and irritability were continued. Despite a report of high anxiety, a treatment goal to address anxiety was not developed.

Reviewed routine contacts provided adequate clinical information including utilization of appropriate treatment interventions.

**Findings**

This patient's care was adequate but marginally adequate. The documentation of multiple psychiatric diagnoses without sufficient supporting documentation was problematic and treatment planning needed improvement.

**Patient G**

This 30-year-old patient's healthcare record was randomly selected from the LTRH roster to assess adequacy of care in the LTRH. She was admitted to the LTRH on June 25, 2021 for battery on a peace officer. Diagnoses varied by provider and included bipolar disorder, PTSD, antisocial personality disorder, opioid use and a rule-out of borderline personality disorder. She was prescribed a mood stabilizer, antidepressant, and antipsychotic for agitation.

Despite several documented attempts to engage her, she refused the initial primary clinician assessment which was subsequently completed based on record review. She also refused to meet confidentially with the psychiatrist which resulted in the initial assessment being completed based on document review and a cell front contact. Both assessments were thorough and

provided relevant clinical information and identified her current treatment needs. Accordingly, treatment plan goals appropriately addressed danger to others, irritability and substance use with appropriate interventions. Goals for mood lability and anxiety were not identified although clinically indicated.

For the next two months after admission to the LTRH, she continued to refuse routine psychiatric and primary clinician contacts and group programming. Psychiatric technician documentation indicated a pattern of mood lability and disrespectful behavior (swearing, demanding) toward staff.

On August 27, 2021, it was documented that she was engaging in behaviors that were consistent with decompensation and that a transfer to EOP had been considered for the last few weeks, although no documentation was located. During IDTT on September 1, 2021 it was determined that she did not meet criteria for a referral to a HLOC. The rationale was thoughtful but weighted heavily on her request to remain at the 3CMS level of care with insufficient objective assessment of her behavior in the previous two months. A referral to the positive behavior support team was made but for reasons that were not located. Her treatment compliance briefly improved but was followed by an increase in erratic behavior (boarding up her cell). A referral to EOP was made on September 17, 2021.

## Findings

This patient's care was inadequate. After consistently refusing treatment for approximately a month, she began to show signs of decompensation but was not timely referred to a HLOC. Treatment noncompliance was not timely targeted and documentation of treatment discussions as they occurred was needed (PBSP denial, previous discussion of consideration of EOP referral with rationale).

## Patient H

This 30-year-old patient's healthcare record was randomly selected from the LTRH roster to assess adequacy of care in the LTRH. She was admitted to the LTRH on June 2, 2021 for threatening a nurse practitioner. She was a participant in the MAT program.

The primary clinician initial assessment was insufficient. The clinical summary was outdated and had been copied from multiple IDTTs since June 9, 2020, a year prior. Original documentation regarding presenting problem needed elaboration. Specifically, while it was documented that she denied mental health distress, there was no context provided for documentation that the "cultural aetiology [sic] of AH (auditory hallucinations) of being that of Santa Muerte." Further, there was no consideration of prior documentation that had been copied from previous providers that indicated that she experienced auditory hallucinations.

The psychiatric initial assessment documented current symptoms of mood lability, depression and anxiety. Psychiatric diagnoses included major depression without psychosis, panic disorder and antisocial personality disorder, a rule out of bipolar disorder and history of polysubstance dependence and contrasted with diagnoses on IDTT documentation (opioid and amphetamine use disorders and PTSD). Rationale for treatment goals (impulsive behavior, danger to others,

anger and substance use) was unclear and not in alignment with documented treatment needs. Other than medication management, clinical interventions were not clearly documented.

Routine IDTT documentation did not provide an adequate summary of mental status or functioning since her initial IDTT nor was the discrepancy in primary clinician and psychiatric documentation discussed. Specifically, it was documented that she often refused primary clinician contacts and denied any mental health distress. In contrast, she was seen several times by psychiatry after submitting requests for increased anxiety, depression and sleep disturbance. Of concern, an urgent mental health consult that occurred after odd content in a letter to her grandmother was intercepted but was not discussed in provider or IDTT documentation.

Psychiatric technician documentation was thorough and indicated that she consistently did not attend yard and isolated.

**Findings**

This patient's care was inadequate. Treatment planning was inadequate, likely impacted by poor coordination of care between psychiatry and the primary clinician as well as poor primary clinician assessment. Relevant documentation was not considered or addressed (even though primary clinician documentation indicated that a chart review had been completed) and pertinent symptoms were not adequately monitored.

**Patient I**

This 33-year-old patient was admitted to the LTRH on May 7, 2021. Her healthcare record was randomly selected from the LTRH roster to assess adequacy of care in the LTRH. Diagnoses varied by provider and healthcare record location and included depression, panic disorder, PTSD and various substance related diagnoses. She was prescribed a mood stabilizer and antidepressant.

The psychiatric and primary clinician assessments provided clear and appropriate current and historical treatment information. Treatment goals were consistent with documentation during initial assessments. While appropriate interventions were included in treatment planning, treatment interventions other than medication and completion of in-cell therapeutic packets during routine contacts was not located.

Routine provider contact occurred cell front at her request and with various providers. There was no treatment goal to address her unwillingness to engage in a confidential treatment contact. Attempts to address barriers to out of cell contacts and programming were not located.

**Findings**

This patient's care was inadequate. Strengths included initial assessments that appropriately identified current treatment needs and treatment goals derived from those findings. However, across time, implementation of treatment interventions and goals was not located, and her treatment goals were not appropriately updated to address her lack of programming. Lastly, clarification of diagnosis was needed, but was not completed.

**Patient J**

This 40-year-old transgender (female to male) patient was being treated in the PSU at the EOP level of care and was diagnosed with major depressive disorder, recurrent, without psychosis, PTSD, gender dysphoria and antisocial personality disorder. The psychiatrist noted a rule-out for bipolar disorder. He was prescribed fluoxetine, benztropine PRN and hydroxyzine PRN.

Initial assessments by the PC and psychiatrist were completed timely and noted to be comprehensive. The initial IDTT was held on time and documentation evidenced consideration of the patient's presenting problems and adequate interventions to address the problems. Treating clinicians were responsive to the patient's needs and provided services in accordance with the treatment plan. Groups were offered to the patient and he mostly attended, with routine summaries being entered into the healthcare record by the psychiatric technician. A decision was made to transfer the patient to the 3CMS level of care and the rationale for that decision was clear and adequate.

**Findings**

Treatment of this patient at the EOP PSU level of care was adequate however there was no clinician's note following the patient's ICC meeting on July 29, 2021, which resulted in him being moved to SHU status and placed in the PSU.

**Patient K**

This 32-year-old patient was treated in the PSU at the EOP level of care and was diagnosed with bipolar I disorder with psychosis, unspecified schizophrenia spectrum and other psychotic disorders, and substance use disorder. She was being treated under a PC 2602 order and was prescribed aripiprazole, buspirone, benztropine PRN and hydroxyzine PRN.

Initial assessments by the PC and psychiatrist were completed timely and were conducted prior to the patient's initial IDTT which was also timely. The PC initial assessment was comprehensive and of good quality, and the initial psychiatric assessment was adequate. The patient's initial IDTT was held in absentia due to patient refusal, but there was evidence that treatment planning had been covered with the patient during an individual session the same day. Weekly PC contacts evidenced the provision of treatment in accordance with the treatment plan. Additionally, the PC added an IPOC for substance use after the patient expressed a willingness to talk about her substance use problems though was unwilling to talk about her mental illness. Psychiatric contacts were held every two to three weeks and while there was no explicit mention of the patient's PC 2602 order, medication adherence was routinely documented. Groups were offered routinely and the patient was participating most of the time. Group notes were individualized. Weekly and monthly psychiatric technician notes were comprehensive.

**Findings**

Treatment of this patient at the EOP PSU level of care was adequate. Initial assessments by the PC and psychiatrist were completed timely. The patient's IPOC addressed her substance use. Groups were offered routinely and her group notes were individualized.

**Patient L**

This 44-year-old patient was treated at the EOP level of care and was diagnosed with schizoaffective disorder, bipolar type and depressive type, as well as methamphetamine dependence.  The psychiatrist also included panic disorder with agoraphobia and PTSD diagnoses in progress notes, but these diagnoses were not included on the patient's problem list or treatment plan.  The patient was prescribed lurasidone, risperidone, sertraline, benztropine, and hydroxyzine PRN.

The patient had been receiving care in the EOP since 2019.  IDTT documentation and treatment plans developed during the review period were reviewed.  Treatment goals addressed most of the patient's identified symptoms but there were no interventions specified to address those goals.  In January and April 2021, it was noted that the IDTTs were held without the patient present secondary to COVID-19 quarantine.  Of concern was the fact that sections of the IDTT documentation referring to new symptoms, new goals, collateral information, and a clinical summary of the patient's progress over the previous quarter were not updated.  The rationale for the lack of information was quarantine status and the patient's absence from the meeting.  Information gleaned from individual and group contacts completed during the quarter should have provided information regarding patient symptoms, functioning and progress.  Further, none of the IDTT documentation reviewed included updates to the EOP Functional Evaluation section which still referenced the patient's "recent release from MHCB" which occurred in March 2019.  A practicum student saw the patient for weekly individual encounters during the review period, but the content of these meetings was not noted by her PC nor psychiatrist and was not incorporated into treatment plan reviews.  There was no evidence that the patient's engagement or participation in group treatment was reviewed by the PC or the IDTT other than noting that the patient had attended more than 50 percent of programming offered during the previous quarter.  Groups were offered by recreational therapists, nursing staff, and clinicians.  Monthly notes regarding patient treatment participation and progress were not present in the record.

The patient had an upcoming release date and there was evidence of release planning in the health care record which appeared adequate.

**Findings**

Treatment of this patient at the EOP level of care was not adequate.  While it appeared that she was offered all required services in a timely manner, there was little evidence of multidisciplinary collaboration and no evidence of assessment of patient progress over time.  While the PC noted the patient's subjective ratings of symptoms during each session, progress assessments were not evident within any IDTT documentation.  Diagnostic discrepancies were neither noted nor discussed.  The level and adequacy of the patient's group participation was not assessed nor summarized in any way in the healthcare record.

**Patient M**

This 32-year-old patient was treated at the EOP level of care and was diagnosed with schizophrenia.  The patient was prescribed haloperidol, sertraline, chlorpromazine PRN, and

hydroxyzine PRN but all medications were discontinued prior to the patient's discharge to the 3CMS level of care.

Throughout her EOP treatment during the review period, the patient's treatment goals were focused on treatment adherence and hallucinations. Goals were established to decrease the distress caused by her hallucinations, decrease the occurrence of hallucinations, and increase adherence to medications and programming. Despite her failure to attend group programming or take her medications, the patient was not placed on modified programming nor were clinical contacts increased. Medications were discontinued without a face-to-face assessment with a psychiatric provider secondary to nonadherence. The psychiatrist cited a previous discussion as rationale for discontinuing medications. The PC provided rationale that modified programming was not indicated because the patient was able to inquire about how modified programming would impact her milestone credits. On the other hand, the treatment team had referred the patient for a developmental disability assessment secondary to concerns about her cognitive functioning. The assessment revealed no evidence of developmental disability but clear evidence of psychosis.

Following discontinuation of psychotropic medications, the patient evidenced thought disorder, increased energy, and reported hallucinations "all day every day." During an IDTT meeting in May, the patient was required to be considered for a HLOC due to her 23 percent attendance rate. The team documented that rather than requiring a HLOC, the patient was being transferred to the 3CMS level of care as she had not been prescribed medication for six weeks and they wanted to give the patient an opportunity to function at the lowest level of care, despite her failure to attend programming or achieve her treatment goals. During her six years of incarceration, this patient had been admitted to an inpatient setting on 14 occasions (MHCB ten times, PIP four times and Patton State Hospital five times) and was noted to be an unreliable reporter.

**Findings**

Treatment of this patient at the EOP level of care was not adequate. While the IDTT appeared to be invested in supporting this patient at the lowest level of care possible, there was insufficient evidence to support the decision to reduce the patient's level of care given her nonadherence to medication, failure to attend programming, and increased psychosis prior to her discharge. She did not achieve her treatment goals nor were her goals modified to address the IDTTs change in understanding what evidence of treatment progress was for this patient. Finally, her psychotropic medications, including clozapine, were discontinued without a psychiatric assessment.

**Patient N**

This 69-year-old patient was treated at the EOP level of care and was diagnosed with schizoaffective disorder, bipolar type. She was prescribed risperidone.

The patient was seen for routine contacts with her assigned PC and psychiatrist. There was a change in assigned PC during the review period and the transition was managed well. The patient was seen by psychiatrists other than the one assigned to her on a few occasions, but care

did not appear to be impacted. Overall, the IDTT treatment goals appeared to address the patient's needs however there was little indication of progress toward goals or adjustments in interventions based on the patient's presenting problems over the review period. For example, there was an entry in a number of progress notes written by the patient's PC that auditory hallucinations would be considered as an additional treatment focus during upcoming IDTT meetings, but the issue was not addressed. There was variable evidence of review by psychiatrists and PC of documentation written by other providers between contacts.

It was noted that the content of much of the PC progress notes was generic and similar in content week to week. The patient had a number of medical concerns during the review period and there was evidence that the IDTT was reviewing the patient's medical conditions routinely. The patient attended groups and was medication adherent.

**Findings**

Treatment of this patient at the EOP level of care was inadequate. Of concern was generic and duplicated content within PC progress notes week to week, lack of collaboration among IDTT members outside of formal meetings, and no review of patient progress during IDTTs despite evidence that the patient was not making progress toward identified goals.

**Patient O**

This 33-year-old patient was treated at the EOP level of care and was diagnosed with bipolar disorder, borderline personality disorder, ADHD, alcohol use disorder, and methamphetamine dependence. Documentation noted that the "patient feels she has" PTSD but IDTT documentation indicated no evidence for meeting criteria while psychiatric progress noted included PTSD as an active diagnosis. At the end of the review period, she was prescribed hydroxyzine PRN but there were numerous medication changes over the review period. The patient requested to be taken off all medications in July 2021 and the psychiatrist agreed to follow patient's request despite active symptoms.

During the review period, this patient presented with instability of mood and behavior, with frequent needs for consults in response to her interpersonal conflicts and mood instability. PC and psychiatric contacts occurred as indicated and early in the review period, her clinicians appeared to be attempting to balance medication and cognitive interventions to produce stability. She had a change in PCs and then in psychiatrists which shifted the focus onto medication interventions as a primary and reactive approach, resulting in frequent medication changes and a reduction on the focus on patient's thoughts and behaviors. The IDTT was noted to take a conservative approach with the patient, tending toward psychiatric technician monitoring over MHCB admissions, which was assessed to be appropriate. A RVR assessment and SRASHEs conducted during the review period were adequate. IDTTs noted changes in patient functioning and challenges with treatment progress, however the IPOCs for this patient did not appear to address her most significant needs.

Of concern were diagnostic discrepancies among the problems listed in the healthcare record, the PCs and the psychiatrists with little evidence of discussion of clinical impressions or attempts to resolve discrepancies. Also, there was documentation indicating that the patient had filed a

PREA complaint and a resulting note from a clinician included the following entry regarding an investigation into the alleged assault without further clarification, "the interview was conducted in such a way that she was then interrogated by other IPs." It could not be determined whether the investigation interview or the clinical contact included other incarcerated individuals, but either would have been inappropriate.

**Findings**

Treatment of this patient at the EOP level of care was not adequate, especially toward the latter part of the review period when the shift to a reactive and primary psychotropic approach to her needs was not effective and ultimately resulted in the discontinuation of all medications secondary to patient refusal despite ongoing evidence of significant mood and behavioral instability.

**Patient P**

This 51-year-old patient was treated at the 3CMS level of care and was diagnosed with schizoaffective disorder bipolar type. She was not prescribed psychotropic medications.

The patient transferred to CIW in April and was seen timely for an initial PC assessment and her initial treatment plan, however her initial psychiatric assessment was entered into the healthcare record following her IDTT meeting. The initial PC assessment was conducted cell front and included minimal documentation and indicated that the patient would be assessed more comprehensively once she was no longer on COVID-19 quarantine. There was no evidence of a more comprehensive assessment completed at a later time. The initial psychiatric assessment included minimal documentation, noted the patient's presenting problem as "I'm good," made no reference to the patient's diagnosis and noted that the patient had been off medications for two months. The IDTT appeared to address the patient's identified needs and a subsequent contact with the PC was in keeping with the treatment plan. A subsequent psychiatric contact was superficial.

**Findings**

Treatment of this patient was assessed to be inadequate due to her initial psychiatric assessment being completed during or after her initial IDTT and poor quality initial assessments by the PC and psychiatrist. Additionally, initial assessments and the patient's IDTT noted significant substance use history, warranting an IPOC to address substance use, but there was no substance use disorder diagnosis in the record.

**Patient Q**

This 29-year-old patient was treated at the 3CMS level of care and was diagnosed with PTSD, cannabis use disorder, and stimulant use disorder. It was difficult to assess what the patient was prescribed during the review period given that some medications appeared to be KOP and the single psychiatric contact she had during the review period mentioned only one medication. From what could be discerned, she appeared to be prescribed sertraline, buspirone, prazosin, trazodone and oxcarbazepine.

A routine annual IDTT was completed during the review period and despite being completed without the patient present due to COVID-19 restrictions, it was complete and included a review of treatment progress. Routine PC contacts were documented and services were in line with treatment plan goals. IPOCs were routinely completed. There was only one psychiatric contact noted in the healthcare record during the six-month period reviewed and it appeared to be prompted by the need to renew one of the patient's medications. The documentation was generic and included many phrases that appeared to be for liability purposes and were unrelated to the patient's mental health needs.

**Findings**

Treatment of this patient was determined to be inadequate based on psychiatric care that did not occur as required and was poorly documented, and noted to be unrelated to the mental health needs of the patient.

**Patient R**

This 40-year-old patient was treated at the 3CMS level of care and was diagnosed with anxiety disorder and unspecified bipolar and related disorder. She was prescribed carbamazepine and hydroxyzine PRN.

During the review period, she was seen more frequently than required by the Program Guide for individual PC contacts based on clinical need. These contacts were well documented and included assessments and interventions in line with the patient's treatment plan. During a contact in May 2021, the patient reported that her medications had expired and requested that they be continued. A review of the medication administration record revealed that the patient's medications were renewed by a psychiatrist other than the patient's treating psychiatrist, but no note was entered into the record. The patient was seen for a single psychiatric contact in February 2021 but not again during the review period. Psychiatric documentation was generic and included language that appeared to be attempts to address liability concerns of the psychiatrist and not the mental health needs of the patient.

**Findings**

Treatment of this patient was determined to be inadequate based on psychiatric care that did not occur as required and was poorly documented, included generic language and did not address the patient's mental health needs.

**APPENDIX C-5**
**San Quentin State Prison (SQ)**
**(October 25, 2021 – October 29, 2021)**

**Patient A**

This 55-year-old, condemned patient was admitted to the MHCB on October 24, 2021.  He was diagnosed with schizophrenia.  Under PC 2602, he was prescribed an antidepressant, antipsychotics and medication to manage side effects.  His record was reviewed to assess the provision of MHCB level of care during the institutional site visit.

This patient had a long history of paranoid delusions.  He was admitted to the MHCB for grave disability at which time his baseline paranoia had increased, attributed to partial medication non-compliance.  It was unclear how he was non-compliant with medications with an active PC 2602 in place.  Reasons for medication non-compliance were not addressed and would have been important relapse prevention treatment strategy. His IPOC focused on grave disability, but specific symptoms and behaviors of grave disability were not included in MHCB documentation. Documentation indicated that he had a goal to decrease anxiety, however an individual plan of care was not created.

He was discharged to EOP on October 28, 2021.  Discharge IDTT documentation indicated that he stabilized, was eating and attending to ADL, maintained a clean cell and developed a coping skill for anxiety.  His psychiatric discharge summary did not provide sufficient information regarding course of treatment, useful for continuity of care.  He was assessed as moderate chronic and low acute risk of harm to self at the time of discharge.

Rationale for observation level and access to property was not documented.

**Findings**

This patient's care was marginally adequate.  An individual plan of care was not created, and the psychiatric discharge documentation was insufficient for appropriate continuity of care.

**Patient B**

This 40-year-old condemned patient was admitted to the MHCB on October 18, 2021 from EOP. Diagnoses varied by provider and healthcare record location but were documented as bipolar disorder and opioid use disorder in the official place of record.  He was prescribed antipsychotic medications under PC 2602.  As he was a MHCB patient during the institutional site visit, his name was provided for healthcare record review to assess the adequacy of care in the MHCB. He was a participant in the MAT program.

The patient had a long history of MHCB and PIP admissions due to suicidal behavior.  Initial assessment documentation indicated that the MHCB admission was precipitated by a suicide attempt, attributed to several psychosocial stressors.  In contrast, he attributed his suicide attempt to substance use during IDTT.  Beginning with the day after admission and throughout his MHCB stay he requested to be discharged to his housing unit.  IPOCs targeted danger to self.  Of concern, IDTT and routine documentation did not address precipitating stressors or substance,

important treatment strategies for relapse prevention.  Routine clinician contacts were primarily supportive in nature and psychiatric contracts addressed medication management.

He was discharged to EOP on October 27, 2021. Assessment of high chronic and moderate acute risk at the time of admission and discharge remained unchanged.  His safety plan was individualized and reasonable.

**Findings**

This patient's care was inadequate.  Treatment, including IDTTs and clinical contacts did not adequately target his risk of harm to self, notably his triggering stressors, or include treatment interventions to prevent relapses.  His diagnoses, which varied in the record by provider needed clarification.

**Patient C**

This 51-year-old condemned, GP patient was admitted to the MHCB on October 22, 2021 due to new onset psychosis with unknown origin.  In contrast, a diagnosis of nonpsychotic mental disorder, unspecified was documented in the official place of record on the date of admission.  Multiple diagnoses were hypothesized during his stay but was not updated to the official place of record once his symptoms improved.  His healthcare record was reviewed to assess adequacy of MHCB care.

Prior to the MHCB admission he made a suicidal statement that he recanted and instead stated he made the suicidal statement to access the TTA to address his concerns that he had been exposed to chemicals.  Throughout his stay he denied suicidal ideation.  At the time of admission, he presented as manic with olfactory hallucinations.  He believed he had experienced a chemical exposure that resulted in various physical symptoms (burning sensations throughout his body).  These symptoms impaired his ability to sleep for approximately a week.  Lab work indicated that he had not been eating or drinking.  A toxicology test, ordered to rule-out substance use origin, was negative.

The primary clinician initial assessment was inadequate, but the psychiatric initial assessment was comprehensive and provided appropriate current and recent history.  IPOCs addressed grave disability; however manic symptoms identified by the psychiatrist were not targeted.  A goal for diagnostic clarification was needed.

Overall, psychiatric documentation was thorough; documentation from October 23, 2021 provided thoughtful diagnostic rule-outs and recommended a Magnetic Resonance Imaging (MRI).  The status of this recommendation was unclear.  Throughout his stay, he refused antipsychotic medication.

Over the course of his stay his symptoms mostly subsided, and his mental status improved.  He was discharged to 3CMS level of care on October 29, 2021.  The origin for his symptoms remained unclear and a plan to address origin was needed.

**Findings**

This patient's care while at the MHCB was inadequate.  A clear plan to assess the origin of his psychosis was needed given the seriousness of his decompensation from his previous level of functioning.  Improved coordination of care for targeted treatment planning between providers was needed.  Diagnostic clarification was needed.

**Patient D**

This 44-year-old patient was admitted to the facility in 1999.  His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

Diagnosis was unclear.  There was no diagnosis in the official place of record.  Primary clinician routine documentation indicated a history of major depressive disorder, antisocial personality disorder and PTSD; these were also documented as problems in the treatment plan.  Routine documentation indicated that he denied depressive symptoms and no other symptoms of a major mental illness were documented.  He was intermittently compliant with Remeron, an antidepressant and Vistaril, prescribed as needed for sleep.

Routine provider documentation did not target depression, his IPOC developed during his annual 2020 IDTT.  Documentation was primarily supportive in nature, particularly after a peer assault in which he incurred multiple injuries.  Assessment of trauma symptoms was clinically indicated but not completed.  The majority of contacts were cell front.

**Findings**

This patient's care was inadequate.  Targeted interventions to address his pattern of refusals were needed as cell front contacts do not provide for a sufficient clinical assessment of treatment needs.  Diagnostic clarification was also needed.

**Patient E**

This 38-year-old condemned patient was admitted to the facility in 2018.  He was diagnosed with psychotic disorder.  He was not prescribed psychiatric medication.  His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

Provider documentation indicated that contacts were cell front on account of refusals.  Minimal mental status documentation was provided and collateral information regarding activities and ADL was needed to assess his stability and functioning.  He was assessed in response to two consults for observations of psychosis including responding to internal stimuli and "loud, strange vocalizations" on October 2, 2021.  A psychiatric consult also occurred with a plan to monitor him.  Despite this change from previous functioning there was no change to his treatment plan.

Annual IDTT documentation was deficient.  A summary of symptoms, functioning and treatment over the previous year was not documented.  IPOCs that addressed substance use and goals (learn five triggers, maintain sobriety for 12 months) remained unchanged since 2017.  Lastly, rationale for treatment goals was not clear.

**Findings**

This patient's care was inadequate.  Treatment planning and routine contact documentation was insufficient.  Frequency of contacts did not occur as clinically indicated.  An IDTT was clinically needed for treatment members to discuss his increase in symptoms, lack of treatment participation and discuss a referral to a HLOC.

**Patient F**

This condemned 48-year-old patient was admitted to the facility in 1998.  His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

This patient had no history of mental health treatment until he self-referred and was seen for an initial primary clinician assessment on October 15, 2021.  Symptoms of anxiety and depression were documented, and specified as hypervigilance, ruminating and low mood.  Impact on functioning was not clearly documented.

IPOCs were not included in the initial IDTT documentation.  Treatment goals were specified on routine primary clinician documentation shortly after the initial IDTT and included "being more positive" and "noticing when I'm distracted."  Documentation indicated that treatment would focus on diagnostic clarification, implementation of IPOCs and processing trauma memories during contacts.  For reasons that were unclear, there was no documentation to support a planned routine contact scheduled on November 1, 2021.

He did not have a psychiatric diagnosis and was not prescribed psychiatric medication.  He had a significant childhood trauma history and his symptoms warranted consideration of PTSD.

**Findings**

This patient's care was inadequate.  Diagnostic clarification was needed.  Treatment planning with measurable goals and clear objectives was needed.  A focus on trauma memories for this isolated patient in the absence of coping skills was insufficient and contra-indicated for segregated individuals who lack sufficient coping skills.  There was no documentation to indicate co-signature or review of a psychology intern's documentation.

**Patient G**

This 51-year-old patient was admitted to the facility on August 31, 2021.  He was prescribed antidepressant and antianxiety medication for mild anxiety and depression.  His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

Initial assessments included clinically appropriate information.  IPOCs were not included on initial IDTT documentation.  However, treatment goals included in the clinical summary focused on "taking initiative for positive interactions, remaining sober, and bettering himself."  Identified anxiety and depressive symptoms were not targeted, rationale for goals was not clearly documented, goals were not measurable, and interventions were not included.

Psychiatric documentation indicated a plan to discontinue psychiatric medication in advance of a scheduled follow-up appointment if a pattern of medication non-adherence continued. The one psychiatric contact addressed psychiatric concerns and included relevant mental status and functioning documentation.

Diagnosis warranted clarification between providers and healthcare documentation. There was no documentation to support a diagnosis of major depression in the official place of record and the author of that diagnosis was not indicated. The primary clinician's diagnosis was not located. Psychiatric diagnosis included adjustment disorder with mixed anxiety and depression, alcohol dependence and amphetamine-type substance use disorder. Consideration of PTSD was warranted.

**Findings**

This patient's care was inadequate. While initial assessment documentation was useful, treatment planning was inadequate. Identified symptoms were not targeted, there was no clear documentation of the rationale for treatment goals, stated goals were not measurable, and interventions to address them were not included in the treatment plan. A plan to discontinue psychiatric medication absent a face-to-face evaluation was inappropriate.

**Patient H**

This 73-year-old patient had been housed at San Quentin since 2009. He was prescribed an antidepressant. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

Annual initial IDTT documentation indicated that IPOCs continued to target anxiety and depression but remained unchanged since his previous IDTT. A summary of symptoms, functioning, and treatment provided since the previous IDTT was needed. Goals were measurable and clinically appropriate although clinical intervention of fostering therapeutic alliance was outdated given documentation of therapeutic rapport.

Provider contacts occurred more frequently than every 90 days. Primary clinician documentation was supportive in nature.

**Findings**

This patient's care was adequate but marginally so. Treatment planning warranted an update. Targeted clinical interventions for ongoing anxiety and depression were needed.

**Patient I**

This 28-year-old patient was transferred to the facility from a reception center on August 24, 2021. He was diagnosed with adjustment disorder with anxiety. He was not prescribed psychiatric medication. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in the 3CMS.

He first sought treatment for anxiety in county jail. He discontinued prescribed psychiatric medication at the reception center and presented as stable at the time of initial psychiatric assessment. Pertinent sections of the primary clinician initial assessment were incomplete (mental status and suicide and self-harm history); case formulation was documented as "CCCMS" and protective factors for this first term patient were not documented.

Documentation during his initial IDTT indicated he requested removal from the MHSDS; a plan in which the treatment team was in agreement. However, documentation did not clearly support an absence of symptoms for six months.

**Findings**

This patient's care was inadequate. The primary clinician initial assessment was incomplete and deficient. Case formulation was inadequately documented, and protective factors were not documented. Clear documentation regarding psychiatric stability was needed prior to discharge from the MHSDS.

**Patient J**

This 55-year-old patient was treated at the EOP level of care and was diagnosed with major depressive disorder, recurrent; PTSD, and depression due to another medical condition. He was prescribed aripiprazole, fluoxetine, and mirtazapine PRN. He was placed in the condemned EOP program on August 26, 2021, after spending nearly two years in PIP intermediate and acute inpatient settings.

Initial PC and psychiatric assessments were timely and thorough, including comprehensive reviews of the patient's history and recent inpatient treatment. The SRASHE done at the time of transfer into EOP was of good quality and included an updated and individualized safety plan. The patient was seen for five-day follow-ups and these contacts reflected review of the patient's functioning and the safety plan. An IDTT meeting was held timely and resulted in an adequate treatment plan which accounted for the patient's needs and desired goals along with a thoughtful case formulation. The patient was seen more frequently than required by both the PC and the psychiatrist secondary to clinical need prompted by challenges with his transition to outpatient care. Both the PC and psychiatrist documented interventions in line with the treatment plan and the patient's current presentation of needs. The PC consistently reviewed the patient's treatment participation. It was noted that psych tech rounds were not documented daily during the period reviewed.

**Findings**

Treatment of this patient at the EOP level of care was not adequate due to the lack of daily psych tech rounding during the review period. Of note, the treatment delivered was of good quality and demonstrated thoughtful and responsive flexibility to meet the patient's needs while maintaining a reasonable effort to ensure his safety upon return from inpatient services.

**Patient K**

This 53-year-old patient was treated at the EOP level of care and was diagnosed with anxiety disorder, major depressive disorder and psychotic disorder. He was prescribed escitalopram and olanzapine.

Documentation indicated that the patient was residing on "North Seg" with access to non-EOP out-of-cell activities and socialization but was unable to access routine programming and group treatment occurring on the formal EOP unit because of COVID-19 restrictions. Due to this fact, the patient was placed on EOP modified status and his treatment consisted of weekly PC sessions, weekly access to RT yard time beginning in July 2021, monthly psychiatric sessions and monthly IDTT meetings. Yet, all IDTT meetings were held in absentia "due to programming modifications." As individual PC and psychiatric contacts were completed in confidential spaces routinely and the patient returned to the EOP unit yard for recreational groups in July, it was not clear why the IDTT meetings could not include the patient. IDTT documentation evidenced discussion of patient progress and the provisions of his modified program but did not consistently review his level of care needs beyond stating that EOP programming was the appropriate level of care. It was not clear what criteria would determine the patient's readiness to move to a lower level of care given that he was not actively participating in EOP level programming other than weekly PC individual session and occasionally RT yard groups.

The quality of PC and psychiatric contacts were good and reflected consistency with the IDTT treatment goals and demonstrated multidisciplinary collaboration. During most, but not all, weeks reviewed, psych tech rounds were documented.

**Findings**

Treatment of this patient at the EOP level of care was clinically adequate but improvements in clearly documenting the patient's need for EOP level of care despite limited EOP programming would have improved documentation.

**Patient L**

This 37-year-old patient was diagnosed with PTSD, generalized anxiety disorder and ADHD. The patient was not prescribed psychotropic medication.

This patient was placed at the EOP level of care from February 24, 2021 through May 25, 2021 yet documentation for individual PC contacts indicated the patient was being treated at the 3CMS level of care. Of concern was the fact that in every progress note written by the PC, there was inclusion of a section of a psychiatric progress note from March 2021 where the patient's placement at the EOP level of care for 90 days was explicitly documented to address his anxiety and trauma related symptoms in weekly therapy. The PC authored the treatment plan in February which moved the patient to the EOP level of care secondary to his inability to function at the 3CMS level of care. The PC, who was an unlicensed psychology intern, noted that the patient was receiving weekly therapy because he was in the "MH intern program" not due to his needs or his EOP level of care. Despite these errors in documentation, contacts with the PC evidenced treatment in line with the patient's treatment plan and identified needs. Psychiatric

contacts occurred as required and were appropriate and well documented.  Groups were documented when offered, however the patient was not offered at least ten hours of structured therapeutic activities during the period reviewed.

An IDTT was held without the patient present, due to COVID-19 restrictions, in May 2021.  During that meeting it was determined that the patient would return to the 3CMS level of care secondary to the fact that he was not consistently participating in all groups offered and the psychiatrist noted an absence of evidence of the patient's anxiety level being reported to the PC.  None of these issues were discussed with the patient prior to the IDTT.  When the patient's level of care change was discussed with him following the IDTT, he was angry and disappointed, noting that he was benefitting from the clinical group he attended weekly.  The PC was able to negotiate for the patient to continue attending that group despite returning to the 3CMS level of care.

**Findings**

Treatment of this patient at the EOP level of care was inadequate secondary to the failure to offer the required number of treatment hours and the IDTT lacking collaboration with the patient.  Further, it was concerning the PC was entering inaccurate information in progress notes.  While this was likely due to copying and pasting of previous content, the result was erroneous documentation.  There was no evidence in the record of clinical supervision of the intern nor review of the intern's documentation, which may have recognized the inaccuracies, and no evidence of supervisory participation in the EOP IDTT for this patient.

**Patient M**

This 27-year-old transgender (male to female) patient was diagnosed with schizoaffective disorder, depressive type; borderline personality disorder; PTSD and gender dysphoria.  She was prescribed paliperidone, atomoxetine, and quetiapine.

This patient was transferred to the SQ EOP program from CHCF on July 26, 2021.  The patient was seen for an initial contact with her assigned PC within nine days of transfer via telehealth equipment but a comprehensive initial assessment was not documented.  An initial psychiatric assessment was completed on August 5, 2021 and was comprehensive and well-documented.  During the first two weeks following transfer to SQ, the patient reported PREA victimization concerns, specifically related to sexual harassment by other incarcerated individuals.  The patient was seen for evaluations following these reports and SRASHEs were completed.  The evaluations, risk assessments, and rationales for risk decisions were adequate.

An initial IDTT was completed on August 24, 2021, nearly a month after the patient's transfer.  The patient was noted to be depressed and experiencing visual hallucinations (i.e., shadows) but no treatment goals were created during the IDTT meeting.  While the documentation indicated that an IPOC had been completed, there was no evidence within the record.  IDTT documentation indicated that a HLOC was not indicated and placement at the EOP level of care was justified by noting the patient's "psychotic symptoms" that would be difficult to manage without structured programming.  The patient's reported PREA concerns were not addressed

beyond noting that the correctional counselor reported that there was "a recent unsubstituted [sic] PREA allegation" in the IDTT documentation.

Weekly PC documentation was repetitive, revealed no active treatment interventions, and did not reflect awareness of significant life events for the patient including being interviewed for gender affirming surgery. Each PC note mentioned a single goal of having the patient attend groups but no treatment goals or intended outcomes were identified. Psychiatric contacts occurred as clinically indicated and addressed the patient's identified needs. The patient was consistently offered more than ten hours of structured treatment weekly and attended most groups.

**Findings**

Treatment of this patient at the EOP level of care was inadequate. There was no initial PC assessment upon transfer, the initial IDTT was significantly delayed, and no treatment goals were identified for the patient. Further, PC contacts did not reflect the delivery of treatment services.

**Patient N**

This 40-year-old patient was treated at the EOP level of care and was diagnosed with schizophrenia, undifferentiated type and major depressive disorder. He was prescribed sertraline.

The patient was transferred to SQ EOP on August 23, 2021 after having his level of care increased at a prior facility. Initial assessments were completed timely and appeared thorough, although there were a number of typographical errors in the psychiatric assessment which appeared to be due to dictation issues making the note difficult to decipher at times. The initial IDTT was held timely and without the patient present due to COVID-19 restrictions. Treatment goals were focused on delusions and it was noted that the patient agreed with the goals during previous clinical contacts, but this did not appear accurate as the patient consistently denied the presence of symptoms and the need for treatment.

PC contacts were conducted weekly yet documentation was superficial and not in keeping with the treatment plan. Of concern were entries which listed a number of therapy methods being provided to the patient during 15-minute sessions, without documentation of the content of those treatments. Documentation regarding the patient's response to treatment interventions was often a brief subjective statement by the patient about getting along with peers and functioning at baseline. The patient consistently refused groups, never attending more than 35 percent of programs offered during any week, yet the PC documented that the patient reported attending programs without any evidence of a record review to validate the statements. Additionally, during a quarterly IDTT meeting in November, 2021, documentation indicated that the patient was attending more than 50 percent of programming, which was not the case. As such, treatment enhancements or modified programming were not put into place as they should have been.

Psychiatric contacts occurred as required and evidenced thorough clinical assessments and appropriate documentation. The patient was consistently offered over ten hours of structured treatment per week. The patient was noted to have an upcoming parole date and release planning

documentation was entered into the record appropriately reflecting the provision of pre-release services.

**Findings**

Treatment of this patient at the EOP level of care was not adequate based on the fact that the IDTT failed to recognize or provide treatment modifications when the patient was consistently refusing treatment groups.  Further, the lack of participation was never noted by the PC or psychiatrist in individual sessions evidencing a failure in adequate chart review and collateral contacts.

**Patient O**

This 51-year-old patient was treated at the EOP level of care and was diagnosed with schizoaffective disorder, PTSD and substance use disorders.  He was prescribed chlorpromazine, diphenhydramine, mirtazapine, and sertraline.

During the review period, the patient was seen as required by his assigned PC, psychiatrist, and the IDTT.  He was consistently offered at least ten hours of structured therapeutic activities per week and attended more than 50 percent of offered programming most weeks.  His treatment plan was drafted to formally address depression and hallucinations through IPOCs, however, progress toward treatment goals using IPOCs had not been assessed from June 2020 through June 2021.  The patient had been receiving services in the SQ EOP during that time.  Further, the patient consistently presented new treatment goals during IDTT meetings, none of which were incorporated into the IPOCs nor individual sessions with the patient.  Additionally, in IDTT documentation in August 2021 there was documentation indicating that the patient had reported auditory hallucinations during that quarter, yet there was no evidence of the same in any psychiatric or PC progress notes.

Individual PC contacts focused mostly on processing the patient's "frustrations" and assessing the patient's mental status.  For most weeks reviewed, the PC entered into the mental status assessment that the patient was experiencing "ongoing passive" suicidal ideation with the same verbiage entered about the patient's having future-oriented thinking as demonstrated by his desire to transfer and receiving medical treatment for his hepatitis.  There was no evidence in the content of the progress note to indicate that suicidal ideation was discussed or assessed during the session.  In fact, in two consecutive sessions, the patient reported hopelessness and feeling "horribly depressed" with no documentation related to suicide risk or suicidal ideation other than the same entry noted above.  In early September 2021, the PC addressed the patient's depression ratings for the only time during the six months reviewed and this was prompted by a rating sheet the patient received during a group.

Psychiatric contacts were occasionally refused by the patient, mostly when offered via telepsychiatry, and face-to-face sessions were often completed in nonconfidential settings secondary to the patient not wanting to see the psychiatrist individually.  Documentation was repetitive and copied from note to note yet included clinically relevant information about the patient's current status, functioning, medication adherence and reflected therapeutic discussions when the patient was seen in confidential sessions.

**Findings**

Treatment of this patient at the EOP level of care was inadequate due to the lack of treatment provided in accordance with the treatment plan to target the patient's identified needs. Psychotropic medication and occasional discussions with the psychiatric appeared to be the only interventions provided to the patient to specifically target the issues identified on the treatment plan.  There was no evidence of the IDTT assessing patient progress toward treatment goals and much of the documentation generated by the PC and psychiatrist was repetitive from session to session.

**APPENDIX C-6**
**Central California Women's Facility (CCWF)**
**(December 13, 2021 – December 16, 2021)**

**Patient A**

This 36-year-old patient was admitted to ASU on November 16, 2021 for peer related safety concerns. She was diagnosed with schizophrenia and paranoid personality disorder. She was prescribed Abilify for psychosis, mood swings and agitation, Cogentin for side effects and Benadryl for side effects and anxiety. Her healthcare record was randomly selected from the ASU EOP roster to assess adequacy of care for ASU EOP patients.

She had a history of PIP admissions with a recent discharge in August 2021. Initial assessments lacked individualization as the majority of information was copied from an unknown provider and timeframe. Consistent with her report during the primary clinician assessment, an IPOC was implemented for anxiety with clinically appropriate interventions. Given documentation of moderate paranoia during the primary clinician initial assessment, an IPOC was needed for paranoia but not developed. For reasons that were unclear, previous IPOCs that targeted delusions were discontinued. Relatedly, symptoms (mood swings, agitation) targeted by medication were not included as IPOCs.

There was no routine contact located between her initial assessment on November 24, 2021 and subsequent contact on December 6, 2021. Documentation indicated a plan to parole to Patton State Hospital on December 13, 2021, which coincided with her discharge date. Given her discharge, it was unclear why it was documented that she attended a group session on December 23, 2021.

**Findings**

This patient's care was inadequate. A combination of insufficient initial assessments and a lack of coordination of care between providers impacted treatment planning. A gap in primary clinician contacts for this patient was an area of concern. Lastly, documentation of group participation, despite facility release, was of significant concern and warranted attention.

**Patient B**

This 35-year-old transgender patient was admitted to the ASU on September 17, 2021. Diagnoses varied across location in the record and included PTSD, mood disorder and gender dysphoria. He was prescribed Risperdal, Cogentin and Vistaril. His healthcare record was randomly selected from the ASU EOP roster to assess adequacy of care in the ASU EOP.

At the time of admission, he was 3CMS level of care, which changed to EOP on October 5, 2021 during IDTT. While there was primary clinician documentation that coping skills, distress tolerance and safety planning would be targeted in treatment, IPOCs were not included on IDTT documentation. Of note, an IPOC for anxiety was located in primary clinician routine contact documentation. Despite identification of specific PTSD symptoms during initial assessments, these symptoms were not addressed in treatment.

785

Initial assessments were completed shortly after admission to ASU. An initial psychiatric assessment was completed after the level of care change, but no initial primary clinician assessment was located. Regardless, because the author(s) and date(s) of previous documentation that was copied into provider initial assessments was unknown, it was difficult to follow this patient's treatment history and needs.

For the two months after the change in level of care, primary clinician routine contacts occurred cell front due to refusals. The reason for refusal was not documented or targeted. Overall, documentation indicated that he denied any mental health concerns or symptoms. Psychiatric documentation was overly brief.

Reviewed group documentation indicated that he attended recreational therapy groups. Groups to address clinical treatment needs were not located.

**Findings**

This patient's care was inadequate. Overall, documentation was sparse and did not convey individualized initial and ongoing assessment of this patient's unique treatment needs. While anxiety was targeted, there was no documentation that his specific PTSD symptoms were targeted in treatment. His pattern of refusals was not addressed.

**Patient C**

This 32-year-old patient was admitted to ASU EOP on December 2, 2021 for battery on staff. There was no diagnosis in the official place of record, but psychiatric documentation indicated a diagnosis of schizophrenia. She was prescribed antipsychotic and antidepressant medication. Her healthcare record was randomly selected from the ASU EOP roster to assess adequacy of care in the ASU EOP.

This patient was newly admitted to CDCR and transferred from the reception center to the MHCB due to command auditory hallucinations on November 5, 2021. She was discharged to EOP on November 15, 2021 and transferred to the current institution on December 1, 2021.

Provider initial assessments lacked sufficient detail regarding presenting problem and functional impairment. Psychiatric history was copied from an assessment that occurred a month prior, which was sufficient given the close proximity between assessments. Multiple sections in the primary clinician assessment, including mental status, were incomplete. Treatment planning addressed identified issues of hallucinations and anger with clinically appropriate interventions.

There was one required primary clinician contact that occurred during reviewed dates. However, there was no documentation of clinical interventions during discussion of the patient's assaultive behavior that resulted in the ASU admission.

**Findings**

This patient's care was inadequate due to need for improved initial assessments, treatment planning and utilization of treatment interventions during session. Despite documentation of a

trauma history there was no documentation to indicate assessment of PTSD.  Rationale for diagnosis was needed.

**Patient D**

This 67-year-old patient was admitted to ASU EOP on December 7, 2021.  She was diagnosed with schizophrenia and prescribed anti-psychotics and anti-anxiety medication.  Her healthcare record was randomly selected from the ASU EOP roster to assess adequacy of care in the ASU EOP.

The patient had a long history of mental illness and psychiatric hospitalizations.  At the time of initial assessments, she was paranoid and delusional.  Documentation indicated that she began to decompensate a month prior to the ASU admission, which was indicated in the RVR assessment.  She believed custody staff were trying to kill her and requested a transfer to DSH.

The psychiatric assessment was adequate and provided relevant clinical information.  The majority of primary clinician initial assessment documentation was copied from a September 15, 2021 IDTT, but the clinician failed to provide a summary of the patient's functioning and mental status during the three months between assessments.  IPOCs were appropriately created for delusions and hallucinations with appropriate clinical interventions.

There were no required provider contacts during the dates reviewed.

**Findings**

This patient's care was adequate; however, improvement was needed in the primary clinician initial assessment.  Documentation was needed regarding her request for a DSH transfer.

**Patient E**

This 59-year-old transgender patient (male to female) was admitted to segregation on September 28, 2021.  Psychiatric diagnosis varied by location and provider and included PTSD, major depressive disorder, generalized anxiety disorder and borderline personality disorder, gender dysphoria and gender identity disorder and substance use disorder.  She was prescribed Vistaril and melatonin for anxiety and sleep.  Her healthcare record was randomly selected from the STRH roster to assess adequacy of care in the STRH.

Provider initial evaluations and the initial IDTT lacked individualization as the majority of documentation was copied from a previous unknown provider and unknown timeframe.  The one IPOC addressed anxiety.  Identified interventions were clinically appropriate but it was unable to be determined if all identified treatment needs were targeted due to insufficient assessments.

Routine primary clinician documentation consistently indicated that the patient was having difficulty managing segregation, including anxiety and depression.  Treatment interventions, when offered, were primarily supportive.  There was variation between symptoms reported to providers which warranted improved collaboration.

787

The patient was double cell approved but was housed in a single cell despite self and clinician advocacy. The patient attributed her distress to not having a cellmate for the duration of her segregation stay. Documentation (October 29, 2019) indicated that custody staff were not comfortable housing her with peers. Later documentation (November 19, 2021) indicated that there were no restrictions and the captain would follow-up with the clinician, although no documentation was found. There were two documented instances where the patient was not offered yard (November 5, 2021 and December 3, 2021).

She regularly attended group treatment.

**Findings**

A strength in this case was the clinician advocacy for this patient; however, the totality of insufficiencies in the provision of treatment made this patient's care inadequate. Initial assessments lacked individualization and impacted treatment planning. The patient was not provided with sufficient treatment interventions to assist her in managing her symptoms. Psychiatric diagnoses lacked clinical rationale and warranted clarification. Collaboration between providers was needed. The lack of access to yard and a cell mate were areas of concern.

**Patient F**

This 46-year-old transgender patient was admitted to the STRH on July 27, 2021 from the MHCB, where he received treatment for exacerbation of PTSD symptoms and suicidal ideation. Psychiatric provider diagnoses included antisocial personality disorder, major depressive disorder, PTSD and anxiety disorder which varied from diagnoses in IDTT and primary clinician documentation. He was prescribed Zoloft, an antidepressant. His healthcare record was randomly selected from the STRH roster to assess adequacy of care in the STRH

Initial assessments were not individualized as the majority of clinical information was copied from previous documentation. IPOCs identified at the initial IDTT targeted anxiety, impulsivity, and anger. IPOCs for danger to self and sleep disturbance were clinically indicated but not targeted. Although a baseline was not located to assess change, initial goals were measurable, and interventions were clinically appropriate. IPOCs were not updated at the routine IDTT despite lack of progress and a pattern of refusals (primary clinician, group, and yard) were not addressed. Additionally, documentation did not sufficiently summarize his symptoms, functioning, treatment participation and progress (or lack of progress) since his initial IDTT.

Overall, primary clinician treatment interventions were supportive in nature. Of note, documentation in psychiatric contacts focused on poor sleep while it was documented that the primary clinician often found the patient sleeping upon arrival to his cell.

**Findings**

This patient's care was inadequate. The lack of individualized initial assessments impacted treatment planning. While IPOCs showed promise, documentation did not support that goals were in alignment with the patient's needs. Treatment planning was not implemented or updated as clinically appropriate. Clinical interventions were needed during primary clinician contacts.

Clinical criteria to support psychiatric diagnoses was lacking.  Collaboration between providers was needed.

## Patient G

At the time this 45-year-old patient was admitted to ASU on July 27, 2021 for battery on a non-prisoner, a SHU-able offense, she was not a participant in the MHSDS.  Following submission of several healthcare requests, she was referred to 3CMS level of care.  She was diagnosed with adjustment disorder with anxiety by the psychiatric nurse practitioner which varied from primary clinician documentation.  At some point a diagnosis of PTSD was added.  She was prescribed medication Vistaril for anxiety.  Her healthcare record was randomly selected from the STRH roster to assess adequacy of care in the STRH.

The initial psychiatric provider assessment included relevant clinical information; however, the primary clinician assessment was overly brief and included outdated documentation.  Specifically, documentation from a 2019 MHCB admission was included in the clinical summary, case conceptualization section, and the initial IDTT, while pertinent history and clinically relevant information since then was not documented.  Initial treatment planning did not include mental health provider-initiated goals.  She refused all provider contacts and was seen cell front.  There was no documented rationale or attempts to encourage her to attend a confidential session.  Primary clinician documentation, while generally timely, was brief and consistent with a check-in rather than a treatment session.

## Findings

This patient's care was inadequate because of the lack of treatment planning, adequate primary clinician assessment, lack of treatment interventions by the primary clinician and lack of attention to refusals.  Collaboration between treatment providers and diagnostic rationale were needed.  It was observed that the psychiatric provider documentation was appropriate.

## Patient H

This 48-year-old patient was admitted to the STRH on July 30, 2021.  She was diagnosed with generalized anxiety disorder.  She was prescribed Trileptal, a mood stabilizer.  Her healthcare record was randomly selected from the STRH roster to assess adequacy of care in the STRH.

Both provider initial assessments and IDTT documentation lacked sufficient detail for a comprehensive evaluation.  Historical functioning focused on documentation from 2019 and lacked a summary of her mental status and functioning since then.  She refused the psychiatric provider assessment but was seen a week later which would have been an appropriate time to complete a comprehensive evaluation.  During that contact, she reported elevated anxiety and depression which were not sufficiently addressed during subsequent primary clinician contacts.

IPOCs addressed treatment non-adherence and anxiety.  Treatment interventions were clinically appropriate but documentation to support that they were individualized was not located.  Regardless, interventions were not utilized during primary clinician contacts which she consistently refused.  There was no documentation to ascertain rationale for primary clinician or group refusals, nor were there attempts to provide education regarding impact of refusals or

attempts to encourage treatment attendance during cell-front contacts or her quarterly IDTT. Relatedly, there was no change to IPOCs.

**Findings**

This patient's care was inadequate. Initial assessments were insufficient. Staff failed to appropriately address her pattern of refusals, which may have been a sign of decompensation. Clinical interventions other than psychiatric medication were rarely utilized. Collaboration between providers and rationale for diagnosis was needed.

**Patient I**

This patient, a 29-year-old woman, was observed as actively psychotic in an Administrative Segregation EOP Hub. Her records were reviewed to assess adequacy of care. She was diagnosed with schizoaffective disorder, bipolar type and unspecified schizophrenia spectrum or other psychotic disorder. She was prescribed benztropine, divalproex sodium, haloperidol and mirtazapine at the time of this review.

On October 29, 2021, the patient was found to be "cheeking" her medications and when confronted, threw water and spit on a correctional officer, resulting in an ASU placement. Assessments completed when she was initially placed in ASU, including her initial PC and psychiatric assessments as well as a mental health assessment for a RVR, were cursory and appeared overly reliant on patient self-reports.

Justification for keeping her at the EOP level of care was based solely on the absence of the three or more MHCB referrals in the previous 180 days, absence of three or more RVRs in the last 90 days, attendance to her ADL, and "engagement with PC both out of cell and at cell-front" but failed to address functional deficits and active psychosis. This latter criterion was inaccurate as the patient had only been offered a single PC contact to date and had been seen cell front. The treatment plan noted the patient "appeared confused and demonstrated thought blocking and cognitive delays." PC contacts relied on patient self-report with minimal discussion of her functioning or mental status and the content of documentation largely unchanged.

On December 7, 2021, an officer referred the patient for isolating and poor hygiene. A cell-front PC contact occurred the same day and noted that the patient was malodorous and her cell was messy. The PC documented that the patient attended more than 50 percent of her groups the previous week, which was not verified in the health record. No further action was noted beyond "working with the patient on increasing insight" into her hallucinations.

Documentation written by the nurse for the group observed by this expert made no reference to the patient's active symptoms, but instead noted that she "displayed appropriate behavior and education with others" and was noted to display "alert, calm" affect and mood that was "congruent with situation." Review of documentation revealed that the same progress note was entered by this nurse for all group sessions attended by this patient for the past month.

## Findings

The treatment for this patient was clinically inadequate.  There were serious concerns about a lack of assessment of this patient's need for a HLOC, overreliance on the patient's self-report despite her being noted as unreliable, inaccurate nursing documentation, and limited treatment. There was a pattern of cell front contacts, restricting the ability of clinicians to directly assess the acuity of her symptoms and her level of functioning.  Accurate documentation of the patient's participation in groups was lacking.  Additionally, there were concerns about the quality of the RVR mental health assessment which did not appear to appropriately consider the patient's mental health status and history when making a determination.

## Patient J

This 40-year-old woman was selected for review due to discrepancies in pre-site data provided by the institution.  Upon review of her healthcare record, it was noted that no IDTT meeting was held for this patient as reported in the data.  She was diagnosed with borderline personality disorder; ADHD; alcohol use disorder, severe, dependence; major depressive disorder, recurrent episode, unspecified; methamphetamine use disorder, severe; opioid use disorder, severe, dependence; and unspecified schizophrenia spectrum and other psychotic disorder.  She was prescribed atomoxetine, venlafaxine, and paliperidone.  She was receiving services at the 3CMS level of care in a STRH unit.

At no time during her stay in ASU had an initial PC assessment been completed.  An initial psychiatric assessment was completed on October 18, 2021 and appeared thorough, indicated patient was requesting specific, often abused, medications and appeared stable at her current level of care.  A progress note was entered into the health record for an IDTT for IEX on October 19, 2021 and indicated that the meeting was held without the patient present although the reason for her absence was not documented.  It was determined that the patient did not meet criteria for an exhibitionistic disorder.

The patient submitted requests to be seen by the psychiatrist on October 23 and November 2, 2021.  She was seen on November 4, 2021.  Her medications were adjusted and the nurse practitioner noted that a HLOC was needed for the patient.  The first documented contact with a PC occurred on November 9, 2021, 24 days after her placement in ASU.  The session was conducted in a confidential location, including providing support for the patient and noted a plan for the patient to "come out next week."  The patient was seen every seven to ten days by the PC in subsequent weeks, with two of the four visits being held cell front secondary to patient refusal. The two confidential sessions appeared clinically appropriate and addressed the patient's needs, although made no reference to the patient's treatment plan.

The healthcare record included that the patient was offered one group session, on November 30, 2021, which she refused.

## Findings

The treatment of this patient in STRH was inadequate.  She was not seen for an initial PC assessment and no formal IDTT was held for this patient since her arrival in ASU on October 15, 2021.  The content of PC sessions did not reflect the patient's treatment goals nor the

interventions included on the treatment plan. The patient was not offered 90 minutes of structured therapeutic activities weekly as required for STRH patients. There was no indication that this patient's lack of treatment and 100 percent refusal rate was reviewed at any time.

Further, this review was prompted by inconsistent tracking information being reported by the site. Upon review of the healthcare record, appointments for an initial PC assessment and initial IDTT meetings were recorded and appeared to have been pulled for tracking purposes, but the documentation for those events did not reflect the type of contact that had been tracked. The entries were inaccurate and reflected interventions that were not actually completed.

**Patient K**

This 43-year-old patient was treated at the EOP level of care and was diagnosed with schizophrenia. She was prescribed haloperidol, buspirone, benztropine PRN and haloperidol PRN.

During June and July 2021, the patient was seen weekly by her PC with evidence of treatment being provided in accordance with the treatment plan and assessments of patient progress. The IDTT reviewed during this time was in keeping with the patient's identified needs and reviewed patient progress. However, in August, the patient's PC was changed, and evidence of treatment was lacking. Treatment progress was not documented for two months in the patient's IPOCs. Additionally, IDTT documentation in August 2021 included no review of patient progress and inaccurately reported the patient had attended at least 50 percent of her programming. Psychiatric contacts occurred as required and were adequate, although the documentation in progress notes included a majority of information copied from note to note and it was difficult to decipher what was new information. Inaccuracies in the psychiatric documentation were present as a result of copying old information that was no longer applicable. These inaccuracies demonstrated that the psychiatrist did not appear to be reading the progress notes being written, nor those from other clinicians. The IDTT conducted in November was completed by none of the patient's assigned treatment team members, without explanation, and included no discussion of progress toward treatment goals.

**Findings**

Treatment of this patient at the EOP level of care was not adequate due to the lack of treatment provided in accordance with the treatment plan, failure to assess treatment progress, inaccurate documentation, and poor continuity of care.

**Patient L**

This 55-year-old patient was treated at the EOP level of care and was diagnosed with schizoaffective disorder, bipolar type. She was prescribed paliperidone, lamotrigine, duloxetine and hydroxyzine.

The patient was seen as required by a PC, psychiatrist and the IDTT throughout the period reviewed. However, many of her PC contacts were held in nonconfidential settings without rationale or explanation. The patient was seen by three PCs during the review period and the quality of health record contents was variable as a result. Only one PC consistently discussed the

patient's symptoms and treatment progress and documented the provision of treatment interventions. The other two PCs provided only point-in-time status assessments of the patient. Of particular concern was the fact that the patient had expressed not attending her groups secondary to being confused about ducats, scheduling and group locations to the EOP supervisor, who noted that the PC would work with the patient to address the issue. There was no evidence that this occurred. Psychiatric contacts appeared to address patient needs but documentation was confusing, internally inconsistent and at times contradictory. For example, during a contact in August 2021 the psychiatrist documented that the patient had experienced auditory hallucinations a few days prior and later noted the patient last experienced auditory hallucinations in March of 2020. There was a concern noted where the patient's sodium levels were determined to be low secondary to a psychotropic medication. The psychiatrist noted that medication would be discontinued within five days of being notified, but the patient was not seen for three weeks, at which time the change was made.

IDTT meetings held during the period reviewed did not consistently include the patient's assigned PC or psychiatrist and did not review patient progress toward treatment goals. Additionally, during an IDTT in July 2021 it was noted that the patient had attended at least 50 percent of her structured treatment, which was not the case as evidenced by clear documentation during June and July, including a note by the EOP supervisor regarding the patient's poor treatment attendance.

**Findings**

Treatment of this patient at the EOP level of care was not adequate due a lack of continuity of care, poor coordinated care, variable quality treatment interventions and inaccurate documentation that failed to address the patient's ongoing treatment needs in a timely and effective manner.

**Patient M**

This 35-year-old patient was treated at the EOP level of care. Psychiatric progress notes indicated a diagnosis of bipolar I disorder with a rule out of schizoaffective disorder. PC notes and the patient's problem list included amphetamine-induced bipolar disorder, substance use disorders (amphetamine and opioid) and borderline personality disorder. She was prescribed haloperidol, lamotrigine, sertraline, venlafaxine, prazosin, benztropine and hydroxyzine PRN.

During the period reviewed, the patient was primarily treated in mainline EOP but had two placements in alternative housing with rescinded MHCB referrals and a 36-day placement in ASU. Treatment provided in mainline EOP was the focus of the review and was noted to be variable. From June to early August 2021, the patient's PC contacts were noted to be of good quality, reflecting interventions in line with the goals of the patient's treatment plan and reviews of patient progress including medication adherence, group participation, and substance treatment. Following a placement in MHCB where the patient refused to engage in safety planning, the PC worked with the patient to update her safety plan during the first clinical contact following discharge. Psychiatric progress notes included substantial amounts of copied text which resulted in notes that were difficult to follow and included contradictory and inaccurate information as a result. Psychiatric treatment appeared to be in alignment with

patient's needs despite the confusing documentation.  IDTTs were comprehensive and included relevant and individualized goals.

In August 2021, a new PC was assigned to the patient and treatment documentation declined.  There was little evidence of interventions being provided and no assessment of patient progress toward treatment plan goals.  The IDTT held during this period included appropriate goals but poorly conceived interventions to address those goals.  Additionally, the patient was flagged for review to a HLOC given the number of MHCB referrals and the patient's high refusals in the previous months.  Rationale for not referring the patient noted that her refusals had occurred while the patient was in ASU and participation increased with her return to mainline EOP.  However, the treatment modifications provided to support the patient, given the number of MHCB referrals, reflected no enhancements to treatment at all, but instead listed only the minimal services required for EOP patients.  Treatment provided by the patient's PC in October and November appeared to consist primarily of handouts being provided to the patient which did not correspond to the patient's needs.  Psychiatric care and documentation were consistent with the description above during this period, adequate but confusing.

**Findings**

Treatment of this patient at the EOP level of care was not adequate.  Diagnostic discrepancies were not acknowledged nor addressed.  Patient care was variable and did not consistently reflect the delivery of services in line with patient needs or identified goals in the treatment plan and did not routinely assess progress.

**Patient N**

This 43-year-old patient was treated at the EOP level of care and was diagnosed with schizoaffective disorder, bipolar type or depressive type (variably entries in record) and substance use disorders.  She was prescribed buspirone, hydroxyzine, lithium, risperidone, sertraline, paliperidone, and benztropine PRN.  During the period reviewed the patient was residing in a skilled nursing facility (SNF) for assistance with her ADL and skin care.

Documentation indicated that the patient was on a modified treatment plan secondary to her SNF placement, yet there was no modified plan outlined in IDTT documentation.  PC documentation noted that the patient was seen weekly for individual sessions and the RT documented that individual one-on-one sessions were being provided secondary to the patient's modified plan.  Despite the patient having been placed in the SNF on May 5, 2021 secondary to incontinence and an inability to maintain her ADL and personal hygiene, no goals nor interventions were documented to address these issues.  In fact, the patient's first IDTT after being placed in the SNF was completed on June 24, 2021 with IPOCs drafted to address depressed mood and hallucinations, neither of which were evidenced by the patient nor addressed by clinicians during the review period beyond the use of psychotropic medication.  The only exception was a single discussion with a PC in November where the patient expressed feeling depressed during the holidays.

IDTTs included minimal and inaccurate information (including that the patient was being treated at the 3CMS level of care), no discussion of treatment progress, and no psychiatric medication

reviews.  The patient's assigned psychiatric provider did not participate in any of the IDTT meetings reviewed and at one IDTT meeting, it was noted that a psychiatrist would be changing the patient's medications, but the name of the psychiatrist listed was neither the psychiatrist noted to be present at the meeting nor the patient's assigned psychiatric provider.  That medication change did not occur until the patient's next routine psychiatric encounter, 14 days after the IDTT meeting.

There were numerous instances of the PC noting an intention to refer the patient to the psychiatric provider or recreational therapist to follow up on patient requests, with no evidence of these intentions being completed.  For a number of months, the patient was noted to be functioning independently and requesting access to groups in order to achieve milestone credits, with no action or follow-up noted beyond the PC and RT documenting the patient's requests.

**Findings**

Treatment of this patient at the EOP level of care was inadequate.  While the record noted the patient to be on a modified treatment plan, there was no evidence of a modified plan and therefore the provision of treatment in accordance with the plan could not be assessed.  Further, while there were weekly PC contacts, only two evidenced the delivery of any mental health services beyond a mental status evaluation during the six months reviewed.  Psychiatric treatment appeared adequate although there was no evidence of cross-discipline consultation.

**Patient O**

This 46-year-old patient was treated at the 3CMS level of care and was diagnosed with unspecified depressive disorder and substance use disorders.  She was prescribed mirtazapine.

The patient entered into CDCR on October 13, 2021 and received 3CMS services while housed in the RC.  Initial assessments, routine contacts, and responses to requests were timely.  Clinical contacts appeared to address the patient's needs, however no documentation evidenced development of an initial treatment plan for the patient.  Further, initial diagnosis of a depressive disorder was not discussed in subsequent contacts, which focused on the patient's anxiety and sleep disturbance.  Both the psychiatrist and the PC noted that mood symptoms were likely secondary to drug use but there was no change in diagnosis entered into the record.

**Findings**

Treatment of this patient at the 3CMS level of care in the reception center was not adequate due to the fact that no initial treatment plan was documented, and the diagnosis needed to be updated to reflect clinical formulations developed after initial contacts.

**Patient P**

This 54-year-old patient was treated at the 3CMS level of care and was diagnosed with adjustment disorder with mixed anxiety and depressed mood.  She was prescribed sertraline.

This patient entered CDCR in August 2021 and was placed at the 3CMS level of care given a history of being prescribed psychotropic medications in jail secondary to self-reported

"claustrophobia." Her medications were not continued when she was seen for an initial psychiatric evaluation. She was retained at the 3CMS level of care, however, with no initial treatment plan or diagnosis entered into the record.

The patient moved to mainline housing and was scheduled for an initial PC assessment, which she reportedly refused, according to custody staff, secondary to mobility issues. The initial PC assessment was completed based solely on a record review and was unchanged from the assessment completed in RC. No initial psychiatric assessment was completed prior to the initial IDTT which was held in absentia, again secondary to custody reporting that the patient was unable to attend due to mobility issues. The IDTT documentation relied solely on previous documentation as neither the PC nor the psychiatrist had met the patient. Goals were created to address anxiety and depression based on chart review and the patient was determined to be functioning adequately secondary to a lack of objective indicators of a need for a HLOC. The day after the IDTT meeting, the patient was seen in response to a crisis request. She initially reported suicidal ideation, but then recanted, stating that she was overwhelmed by housing and peer issues. A SRASHE was completed and appeared adequate. The patient was returned to housing and eventually placed in medical housing for needs related to her inability to function in mainline housing. The patient was seen for an initial psychiatric assessment on October 27, 2021 which was comprehensive, provided a diagnostic assessment and supported the use of medications with a thorough assessment of risk and benefits given the patient's medical comorbidities. The plan was for the patient to return to the psychiatrist within 14 days, but that appointment was cancelled without explanation. She was seen for a follow-up with a telepsychiatrist nearly 30 days later. The patient was never seen by a PC in mainline despite being placed there in September 2021, and a review of the record noted that she still had not been seen through February 8, 2022.

**Findings**

Treatment provided in the 3CMS level of care for this patient was not adequate. The patient was never seen by a PC despite being transferred from a reception center more than four months prior, requiring a crisis contact, and demonstrating an inability to function in mainline housing. An initial psychiatric assessment was not completed prior to the initial IDTT but was completed 30 days after the patient's transfer from RC. Psychiatric care was clinically adequate, but timelines entered into psychiatric notes for patient follow-up were not followed.

**Patient Q**

This 25-year-old patient was treated at the 3CMS level of care and was diagnosed with substance-induced anxiety disorder and substance use disorders. She was not prescribed psychotropic medications.

Following her reception into CDCR and placement at the 3CMS level of care, her medications were discontinued secondary to side effects in August 2021. The patient was seen for follow-up one month later by a reception center psychiatrist and was noted to be stable. She was transferred to mainline housing on September 24, 2021. According to custody staff, the patient refused her initial PC and psychiatric assessments, which had been scheduled timely. An initial PC assessment was held on October 18, 2021 and was sufficient. An initial psychiatric

796

assessment was not completed.  Her initial IDTT which was not timely, was held on October 21, 2021.  The patient refused to attend but was reported to agree with the goals and content which addressed the patient's substance use but not her reported anxiety and depressive symptoms.  No interventions were included in the IDTT documentation beyond fostering a therapeutic alliance with the patient and there was no frequency of expected clinical contacts noted.  IDTT documentation noted that the patient wanted individual therapy to develop coping skills and support her sobriety.  There were no other clinical contacts entered into the record through February 8, 2022.

**Findings**

Treatment for this patient at the 3CMS level of care was not adequate.  The initial PC assessment was not timely, there was no initial psychiatric assessment completed, and her initial IDTT was not timely and did not provide an adequate outline of expected treatment.  The patient was seen on only one occasion, on October 18, 2021 by a PC, between her arrival on September 24, 2021 and February 8, 2022.

**APPENDIX C-7**
**Valley State Prison (VSP)**
**(March 22, 2022 – March 25, 2022)**

**Patient A**

This 51-year-old patient's chart was reviewed because he had been interviewed in a group of patients whose level of care had been changed from EOP to 3CMS while at VSP. During the interview he reported that he was excepted from receiving his psychiatry services via telepsychiatry because he "ripped up the machine" and that as a result he was seen for in person psychiatry contacts. His chart was reviewed in a targeted fashion around these issues.

This patient was diagnosed with schizoaffective disorder and antisocial personality disorder, treated primarily with Risperdal which he had been refusing since October 2021. He had no reported history of community mental health treatment and while in CDCR he had not been housed in a mental health crisis bed or inpatient level of care. Progress notes from the fall of 2020 continuing into early 2022 documented the patient's reports of "chatter in his head" and other potential symptoms of psychosis. At other times, he denied significant symptoms. Although he was not adherent with prescribed psychotropic medications he was assessed by psychiatry as not being a candidate for PC 2602 order. A psychiatry note on September 29, 2021 documented the psychiatrist's assessment that the patient may have been underreporting or concealing information concerning hallucinations. A suicide risk assessment conducted in January 2022 found a moderate chronic risk and a low acute risk; among the documented protective factors was a supportive family.

Clinical notes during the fall of 2021 and onward documented the patient's delusions concerning video screens and technologies which were so pervasive as to interfere with his ability to communicate with his family despite him finding them a strong source of support. Consistent with the patient's reports, some psychiatry notes during this period of onward showed that the patient was seen by an in person psychiatrist. Also consistent with the patient's report, progress notes indicated that the patient had made a sufficient adjustment to the 3CMS level of care.

**Findings**

The patient received adequate treatment consistent with a sufficient adjustment to the 3CMS level of care and his need for in-person rather than telepsychiatry psychiatric treatment at least for a period of time.

**Patient B**

This 43-year-old patient's chart was reviewed because he was identified during an observed 3CMS mainline IDTT as having met his treatment goals with the plan to discharge him from the triple 3CMS program to GP. The review was targeted to that issue. At the time of his March 22, 2022 IDTT he had been at VSP for over a year. The patient was predominantly diagnosed with anxiety and depressive disorders, with the primary diagnosis being generalized anxiety disorder. Although he had a reported, remote history of treatment with Strattera, Xanax, and Zoloft, he had

not been prescribed psychotropic medication in CDCR for over a year without any significant breakthrough of symptoms.

This patient did not have a history of hospitalizations in the community or CDCR and had required treatment at the EOP level of care or referral to MHCB or inpatient treatment. His history was negative for suicide attempt and for trauma.

He did have a significant history of substance use; the primary clinician notes in March 2022 were consistent with what was observed during his IDTT. The patient carried a diagnosis of unspecified schizophrenia and other psychotic disorder by history. Progress notes and treatment plans indicated that previous psychotic symptoms were the result of substance use.

The patient indicated that he was no longer depressed and that he had learned a significant number of coping skills while engaged in treatment at the 3CMS level of care to deal with his anxiety and depression. These coping skills included beading and playing guitar. He reported remaining in contact with supportive friends using the text function in the tablets provided. The patient also reported that his progress in treatment was facilitated by the cessation of alcohol use. He was hopeful and future oriented noting a plan to open a "hippie store" upon his release from custody. Documentation indicated that the patient was requesting removal from the MHSDS.

During the IDTT removing him from 3CMS, the patient was encouraged to contact mental health staff should he feel the need to do so and the mechanisms for reinitiating contact were reviewed.

**Findings**

The decision to remove the patient from 3CMS to GPn appeared justified given the progress he had made in developing coping skills, the period of time he was monitored while off of medications without significant symptoms, and his request to be removed.

**Patient C**

This 29-year-old patient's chart was reviewed because he had been moved from the EOP level of care to 3CMS while at VSP and had been interviewed in a group by the monitor's expert. The review was targeted to that issue.

This patient had been treated for considerable period of time in EOP since 2019 but in November 2021 his level of care was lowered 3CMS. His history was significant for three MHCB admissions and an ICF hospitalization starting in 2019 going into 2020. While he had no history of suicide attempts, he did report periodic suicidal ideations accompanied by depression and anxiety.

Diagnoses ranged from major depression single episode to schizophrenia with reported hallucinations. Following his placement in 3CMS in early 2019, but after requiring treatment in an MHCB following decompensation, he was discharged at the EOP level of care. The decompensation animating the MHCB admissions involved his refusal to eat accompanied by weight loss, poor ADL, and restlessness, symptoms he attributed to hallucinations. In any event, he was discharged to EOP in June of 2019 but rapidly required readmission to the MCHB after demonstrating significant decompensation. From the MHCB, he was discharged to a PIP where

he required a PC 2602 order for medication over objection. He stayed in the PIP until the late fall of 2019, when he transferred to DSH-Atascadero. He remained in DSH-Atascadero until the summer of 2020, when he was discharged to VSP. At VSP, the patient required treatment in EOP after reporting hallucinations, depression and anxiety in the context of what clinical staff assessed as likely self-medication with substance use. This history was outlined in a comprehensive primary clinician progress note of November 2021, which also indicated the patient's desire to move from 3CMS in connection with his desire to move to a MCRP.

More recently, the psychiatrist added a low dose of Zyprexa to his medication. At a treatment team of August 31, 2021, where the patient reported audio visual hallucinations and anxiety around his possible move to 3CMS, the psychiatrist recommended that the patient remain in EOP to transition him more slowly to 3CMS, where he was subsequently moved. However, by the time of his IDTT of January 6, 2022 the team indicated the need to transition the patient to EOP for more intensive counseling and interventions as well as for medication management. The treatment plan of February 8, 2022 indicated his recent transfer from 3CMS and documented the increasing agitation the patient experienced while in 3CMS. The MCRP assessment from the same day suggested that he would have difficulty following through and understanding some basic concepts which was suggestive of significant functional impairment. It also noted his increased symptoms of isolation and agitating while in 3CMS.

A psychiatry note from March 10, 2022 noted the patient's report that he felt safer in EOP. A primary clinician note from March 29, 2022 noted that the patient reported no significant concerns but did endorse auditory hallucinations of his mother's voice and his son crying. By March 24, 2022 psychiatry documented that the patient had required injectable Haldol in February 22, 2022 and that he was experiencing command hallucinations telling him not to eat which had resulted in a weight loss of 2kg in the previous several days. These symptoms were reminiscent of those he experienced earlier in his incarceration which set him on a course eventually requiring extended inpatient treatment.

**Findings**

The attempt to lower this patient's level of care to 3CMS was in the context of his stated desire to transition to an MCRP in the context of preparation to return to the community despite his anxiety around that move. The November 2021 primary clinician note documenting this was comprehensive. The effort to assist the patient with his stated goal was understandable but at minimum he required more intensive follow up in 3CMS and more attentive transition planning given his history and rapid decompensation following transfer to 3CMS.

**Patient D**

This 57-year-old patient's chart was selected for a targeted review because he had been removed from EOP to 3CMS near the end of 2021. Previously, he had been treated at both the 3CMS and EOP levels of care without inpatient or MHCB admissions. His history was significant for two suicide attempts most recently approximately four years ago. He first received medication for psychiatric symptoms in his 40's. His primary diagnosis was schizoaffective disorder with the most recent episode depressed treated variously with Seroquel and BuSpar but more recently with Remeron, Cymbalta and Abilify.

He was assessed by telepsychiatry on December 28, 2021 in connection with a "step down" from EOP. It was noted that his symptoms of depression and anxiety had improved, and he was pleased with the move to 3CMS. Subsequent primary clinician and psychiatry notes in February and March 2022 document that the patient had no significant depressive symptoms or concerns and good adherence with prescribed medications.

**Findings**

This patient's move from EOP to 3CMS appeared to be reasonable and was in accordance with this treatment plan which he was in agreement with. He was followed up with adequately by mental health after his transfer to 3CMS and remained stable at that level of care.

**Patient E**

This forty-year-old patient was diagnosed with schizophrenia, paranoid type although his diagnosis was not included in the official place of record. He was prescribed Celexa and Zyprexa under PC 2602. His healthcare record was randomly selected from the EOP mainline roster to assess adequacy of care.

This patient had a history of multiple HLOC referrals within CDCR including thirteen MHCB, four acute and three intermediate level of care admissions. His last placement in a HLOC occurred in August 2020 in the Temporary Mental Health Housing Unit (TMHU). With the exception of the TMHU placement, he had been EOP since he arrived at the facility in March 2020.

Despite a history of decompensation, clinical documentation described him as stable with limited insight. He was medication adherent. While he isolated on the yard, his group participation was 90 percent during his March IDTT.

Reviewed IDTT documentation was not sufficiently updated, in part due to copying previous documentation. IPOCs targeted treatment non-adherence however, this was not sufficiently individualized because while he consistently attended treatment, he was minimally engaged. The rationale for the delusion IPOC was unclear as he consistently denied delusions during provider contacts and objective data was not clearly documented. Rationale for some treatment objectives (rationale to lower his level or care; improve decision making and identify the benefits of exercise) was not clear. Rationale for continued EOP level of care needed improvement.

Provider documentation indicated that he was minimally engaged in treatment despite provider's multiple attempts to engage him and utilize his native (Spanish) language. Documentation focused on assessment of symptoms and functioning and while treatment goals were not included, was appropriate for his level of participation. Psychiatric contacts were provided by telepsychiatry and documentation was thorough and useful.

**Findings**

Overall, documentation of this patient's care across provider contacts was adequate and he was at the appropriate level of care. However, treatment planning needed improvement in targeting

this patient's unique treatment needs.  Documentation of diagnosis in the place of record was need.

**Patient F**

This sixty-year-old patient was housed at the facility since 2019.  He was not prescribed psychiatric medication.  His healthcare record was randomly selected from the mainline EOP roster to assess adequacy of care.

A review of documentation indicated a transfer from 3CMS to EOP on July 15, 2021 with a discharge to 3CMS three months later and then he was returned to EOP on December 2, 2021.  During that timeframe, there was a period of hygiene concerns, confusion, and the need for a more supportive environment.  Provider initial evaluations were comprehensive and provided useful clinical information.

Documentation of telepsychiatry contacts was comprehensive and described him as stable without any psychiatric concerns or medications.  In contrast, primary clinician documentation indicated that he was prescribed psychiatric medication and diagnoses varied across contacts (depression, schizophrenia, and PTSD) without clinical rationale.

Reviewed IDTT documentation varied by clinician.  In contrast to documentation from March 15, 2022 in which the majority of documentation was copied from a previous provider, IDTT clinical summary documentation from December 21, 2021 was individualized, thorough and provided a clear assessment of depressive symptoms to assess treatment progress.  IPOCs targeted depression and pre-release planning but there were no IPOCs to address the symptoms and behaviors that warranted the signs of decompensation that resulted in level of care changes in the preceding months.

**Findings**

This patient's care was inadequate.  There were inconsistencies between providers which indicated a lack of collaboration.  There were also inconsistencies across primary clinician documentation despite completion by the same clinician.  The primary clinician was unlicensed and review of clinical documentation by a licensed supervisor was necessary.  Clarification of diagnosis and inclusion in the official place of record was needed.  Lastly, treatment interventions were not documented in provider contacts.

**Patient G**

This forty-one-year-old patient was admitted to the facility in June 2020.  His diagnosis was unclear.  He was diagnosed with major depressive disorder in the official place of record although this differed from provider diagnoses (major depression with psychosis and schizoaffective disorder, bipolar spectrum).  He was prescribed a mood stabilizer and antipsychotic medication.  His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

IDTT documentation provided a useful summary of his clinical history, however due to copied previous documentation, it was difficult to determine the timeframe and proximity to current

functioning and symptoms. Relatedly there was no clear summary of his progress in treatment, symptoms, including passive suicidal ideation, or functioning since his previous IDTT. A review of provider documentation indicated that despite medication changes, there was no significant improvement in his symptoms. Rationale for level of care was insufficient and lacked consideration of a referral to a HLOC.

Reviewed IDTT documentation indicated that IPOCs for depression and delusions had not been updated since established in December 2020 and June 2020, respectively. Further, treatment goals that targeted each of his treatment needs (suicidal ideation, hallucinations and paranoia) were not included. Provider documentation between October 2021 and March 2022, indicated a pattern of passive suicidal ideation, however, the most recent risk assessment was in April 2021.

Provider documentation, particularly from the telepsychiatrist was thorough and conveyed pertinent clinical information. Primary clinician documentation included a useful assessment of the patient's functioning and symptoms but treatment interventions were not documented.

**Findings**

This patient's care was inadequate. This patient's pattern of passive suicidal ideation was not appropriately assessed or treated. Collaboration between providers was not evident in IDTT documentation despite both providers attendance. IDTT documentation was insufficient and treatment planning was not appropriately updated. Although consideration of a HLOC referral was clinically indicated, it had not occurred.

**Patient H**

This forty-eight-year-old patient was admitted to the facility in October 2021. Provider documentation included diagnoses of antisocial personality disorder, borderline personality disorder and major depression with psychosis. He was prescribed antidepressant medications. His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

Provider initial assessments were comprehensive. Relevant clinical areas were discussed in detail that were useful for continuity of care. Initial IDTT documentation was similarly thorough as it was based on the primary clinician initial assessment. However, a discrepancy in symptoms identified by providers was not addressed in IDTT documentation. A suicide risk assessment was appropriately completed, and a sufficient safety plan was completed due to the patient's disclosure of chronic suicidal ideation. Of concern, there were multiple incidents in which documentation had been copied from previous providers with no indication of the original date or author.

The sole IPOC for suicidal ideation was appropriate however, his treatment needs were not fully addressed at the initial IDTT. Specifically, the primary clinician identified elevated anxiety and depression as well as emotional dysregulation and low frustration tolerance. In contrast, the patient reported auditory hallucinations and PTSD symptoms to the telepsychiatrist. These differences persisted throughout reviewed documentation. At his routine IDTT, documentation regarding his progress in treatment, symptoms, discrepant presentation to providers and functioning since his last IDTT was not located and treatment goals were not appropriately updated. Rationale for EOP level of care was appropriate and thoughtful, however,

consideration of referral to a HLOC was clinically indicated given ongoing suicidal ideation and need for razor restriction.

Reviewed routine provider documentation was thorough and useful. Despite lack of individualized treatment planning, providers addressed his needs during contacts and treatment interventions were routinely documented by the primary clinician.

**Findings**

This patient's care was adequate but marginal. While treatment planning documentation deficiencies identified above did not negatively impact the care delivered by his providers, consideration of a referral to a HLOC was needed. Further, collaboration between providers regarding their varying observations was needed.

**Patient I**

This patient was selected for review as an example of treatment of caseload patients in an ASU. This patient was made EOP on February 2, 2022 and admitted to ASU on February 3rd. The patient was given a diagnosis of bipolar I disorder, current or most recent episode manic with psychotic features. He was also given a diagnosis of amphetamine and psychostimulant dependence. The patient had been prescribed lithium (900 mg in the morning) and Wellbutrin, but as of February 2, 2022, the Wellbutrin prescription had expired and was not re-prescribed. The patient had been rapidly decompensating prior to the increase in level of care. The patient's work supervisor reported changes in his behavior to mental health. The treatment team increased the patient's level of care to EOP, but the patient was not in agreement and displayed anger toward his team.

The patient was seen on February 3, 2022 for his initial assessment by a clinician in a non-confidential setting (dayroom). He was noted to express delusional beliefs, particularly grandiose and religious delusions (e.g., "I am a certified genius"). During that interview, the patient was reportedly adamant that he would refuse psychiatric medications. The patient was seen by a different clinician for his weekly contacts than the clinician who completed his initial assessment. The patient was seen for his initial psychiatric appointment on February 8, 2022, though a new intake form was not utilized for that contact.

The patient was seen by IDTT on February 9, 2022, and a treatment plan was developed. The treatment plan relied on subjective measurements that could easily fluctuate based on the patient's mood rather than objective, behaviorally based goals. For example, one goal was to reduce mania to a subjective measurement of two on a one to ten scale. There was no information on his baseline to indicate that this was realistic and was particularly inappropriate given the patient's lack of insight. Interventions identified in the treatment plan were not adequate. It would have been more appropriate to transfer this patient to an Administrative Segregation EOP Hub as an expedited transfer to receive required EOP administrative segregation care.

While the patient remained in the ASU, he was being seen regularly, often within seven days of the last appointment and always weekly (i.e., each week but sometimes with ten days between appointments). Treatment appeared to be primarily supportive therapy while awaiting transfer.

**Findings**

The patient was provided minimally adequate mental health treatment as an EOP patient housed in a segregation unit.  However, given his decompensated status, a request for expedited transfer would have been appropriate and should have been completed.

**Patient J**

This case was selected for review because the EOP patient had been identified as remaining in ASU past timelines for a transfer to an Administrative Segregation EOP Hub.  The patient was placed in ASU as an EOP patient.  He received his initial ASU PC intake assessment on January 31, 2022.  The patient had been placed into ASU secondary to being charged with battery on a peace officer.  That initial assessment pulled forward multiple pieces of archival information on the patient's treatment history.  It was unclear which information, if any, was elicited during his assessment at VSP and whether the evaluator properly considered symptoms at the time of the RVR and current functioning.  The patient had been provided with the following diagnoses: adjustment disorder with anxiety, adjustment disorder with depressed mood, and unspecified insomnia disorder.  The patient was seen by psychiatry for an initial assessment on February 1, 2022.  The patient declined psychotropic medications, reporting that he had no mental health symptoms at the time of the psychiatric intake.

The patient was seen by a different primary clinician for ongoing appointments than the one who completed the initial assessment.  Mental health staff repeatedly documented that the patient appeared stable and denied symptomatology.  The primary issue appeared to be the patient's frustration with being incarcerated.  The patient was frequently seen cell front because he refused confidential contacts or because the statewide modified program resulted in minimal movement.  While at times the PC attributed cell front contacts to the patient's refusal, mental health supervisory staff reported that clinical contacts were cell front until February 20, 2022, unless a suicide risk assessment was required.  On February 8, 2022, the PC wanted to update the patient's SRA, but the patient refused a confidential visit.  Despite the requirement regarding confidentiality for SRAs, this patient was seen cell front for his SRA.  This was very concerning given the probability that patients may not fully disclose important but sensitive information in non-private settings.

The progress notes in this case were convoluted due to the PCs and psychiatry pulling old notes forward and including them in a current note.  It was difficult to determine which entries were current.  Bringing the old documentation into current notes provided no apparent clinical benefit, and the clinical rationale for doing this was not evident in light of the older documents being readily available in the chart.  The patient was maintained at EOP despite repeated entries by clinicians documenting that he was stable and experiencing little to no subjective distress due to psychiatric symptomatology.

**Findings**

This patient received minimally adequate care while housed in ASU awaiting transfer to an Administrative Segregation EOP Hub.  The patient was seen regularly but non-confidentially.  Even a critical and sensitive evaluation (SRA) was conducted cell front despite the obvious

limitations and concerns.  Treatment was never modified to address the patient's resistance and the cause of the resistance (e.g., psychiatric symptoms, gang affiliation) was never pursued. Despite the patient remaining at the EOP level of care, mental health staff repeatedly documented that he was stable without psychotropic medications and appeared more appropriate for a 3CMS.  This was also not addressed in the treatment plan.

**APPENDIX C-8**
**CALIFORNIA STATE PRISON/LOS ANGELES COUNTY (CSP/LAC)**
**(March 28, 2022 – March 30, 2022)**

**Patient A**

This 38-year-old patient was admitted to the Administrative Segregation EOP Hub on December 24, 2021 for safety concerns. He was prescribed Abilify and BuSpar. Diagnoses varied by location and provider but included antisocial personality disorder, major depressive disorder, PTSD, and alcohol, opioid and amphetamine use disorders. His healthcare record was randomly selected from the ASU EOP roster to assess adequacy of care.

Initial assessments included an overview of his mental health needs through October 2020 when he was admitted to LAC that appeared copied from another provider. A useful summary of his functioning and mental status between October 2020 and ASU admission was not included in the primary clinician or psychiatric initial assessment. The initial psychiatric assessment briefly referenced his current treatment needs (elevated anxiety and depression); however, the primary clinician initial assessment was not as specific and indicated that he was experiencing more "stress."

His IPOC, which addressed depressed mood, remained unchanged since his admission to the facility in October 2020. Rationale to address dysfunctional thoughts and goal setting was not clear. There was no IPOC for anxiety identified by the psychiatric nurse practitioner or ongoing and recent suicidal ideation, identified by both providers. Of concern, intermittent suicidal ideation identified during a recent mainline EOP IDTT (December 21, 2021) was not included on the SRASHE. Suicidal ideation disclosed to the psychiatric nurse practitioner during the initial assessment was not adequately assessed despite a previous serious hanging attempt.

Primary clinician routine contacts were generally timely, and documentation provided a summary of his mental status and functioning. Relevant symptoms were addressed, and supportive and psychoeducational interventions were utilized. Of concern, suicidal ideation was not routinely assessed, instead it was documented that he did not "report" suicidal ideation.

Documentation indicated that he attended less than fifty percent of treatment but there was no documentation of active interventions to increase treatment compliance or understand reasons for lack of participation.

When the program was on quarantine, documentation indicated that reading materials were provided and brief cell-front contacts with the recreational therapist occurred.

**Findings**

This patient's care was inadequate. This patient had a history of a serious suicide attempt, was in a high-risk environment and suicidal ideation was not appropriately addressed throughout his stay. Lack of collaboration between treatment providers impacted treatment planning. Identified treatment needs were not targeted and treatment planning was not individualized to target his current treatment needs. Treatment interventions for low treatment participation and diagnostic clarification were needed.

**Patient B**

This 26-year-old patient was admitted to Administrative Segregation EOP Hub on September 13, 2021 for possession of a deadly weapon. Diagnosis, which varied by provider and chart location, included unspecified bipolar disorder, bipolar disorder I, anti-social personality disorder and amphetamine and opioid use disorders. He was prescribed Effexor, an antidepressant. His healthcare record was randomly selected from the ASU EOP roster to assess adequacy of care.

Although both providers documented that he reported current depression and psychiatric documentation provided a useful summary of precipitants, overall, both psychiatric and primary clinician assessments were inadequate. Documentation of history of present illness was copied from three previous psychiatric notes in both assessments. The clinical summary from the primary clinician was not individualized and did not address current symptoms, functional impairments, treatment history and relevant psychosocial and custody factors. The psychiatric assessment and plan merely documented his diagnoses.

Despite an identified treatment need for depression by both providers, an IPOC for depression was not developed. Instead, IPOCs that targeted impulsive behavior (initiated April 2021) and substance use (initiated June 2020) were continued despite lack of clear current clinical need during initial assessments. IPOCs remained unchanged at his quarterly IDTT, which lacked a clinical summary of his mental status, functioning and treatment needs over the previous three months.

An overview of his functioning and mental status was included in routine provider documentation. Clinical interventions utilized during primary clinician contacts were appropriate and relevant for identified treatment issues. The clinician provided therapeutic reading/worksheets and followed up on topics discussed. Documentation indicated that he was on the high refuser list but there was no assessment of his reason for refusals located, education regarding the lack of treatment participation or interventions to increase treatment compliance.

**Findings**

This patient's care was adequate but marginally so, due to the disconnect between implemented treatment and assessment of his treatment needs via initial assessments and treatment planning. Documentation in key documents (initial assessments and IDTTs) did not reflect what was occurring in routine provider contacts which is necessary for continuity of care.

**Patient C**

This 45-year-old patient was admitted to an EOP from an ICF on August 19, 2021 where he had been treated for two months. The ICF admission was precipitated by disorganized behavior. Diagnoses varied by provider and chart location and included bipolar I, antisocial personality disorder, mild neurocognitive disorder due to a traumatic brain injury, major depressive disorder and opioid use disorder and anxiety. He was prescribed Zyprexa, an antipsychotic, under a PC 2602. His healthcare record was randomly selected from the ASU roster to assess adequacy of care.

Initial assessments were insufficient.  Historical documentation was copied from an assessment from October 2019.  There was no summary of precipitating factors for his recent PIP admission and resulting treatment needs including current treatment needs and impact on functioning.

IPOCs addressed irritability and impulse behavior and remained unchanged during subsequent IDTTs (November 18, 2021 and January 27, 2022).  Rationale for IPOCs was not clearly documented but appeared reasonable based on limited initial assessment documentation.  A useful clinical summary of primary clinician contacts was documented during the November IDTT but not in the subsequent IDTT.  Across routine IDTTs, treatment goals were not updated accordingly, and intermittent treatment refusals were not discussed during IDTTs.

This patient remained stable since his admission to EOP and generally participated in treatment.  Quality of psychiatric contact documentation varied by provider but overall was succinct.  Primary clinician contacts varied by clinician.  Overall, reasonable clinical interventions were documented but were not in alignment with identified treatment goals.  During quarantine, cell front contacts occurred on account of modified programming.

## Findings

This patient's care was adequate but marginally so.  Initial assessments were poor.  While provided treatment was reasonable, clinical rationale for treatment (socialization, communication, substance use) was not clearly documented and IPOCS were not updated accordingly.  Diagnostic clarification was needed given varying provider diagnoses.  Psychiatric treatment was not included in IDTT documentation indicating a need for improved provider collaboration.  IDTT documentation lacked sufficient detail for continuity of care.

## Patient D

This 25-year-old EOP patient was housed on D Yard.  Diagnoses changed across provider documentation and chart location including variations of adjustment, anxiety, depression diagnoses and an opioid use disorder.  He was prescribed Remeron and Vistaril.  His healthcare record was randomly selected from the EOP roster to assess adequacy of care

This patient was transferred to mainline EOP in September 2021 after an ASU EOP placement.  He remained on mainline until an ASU placement in early January, returned to mainline in mid-January, and had another ASU EOP placement in early February.  Each time he returned to mainline EOP a primary clinician initial assessment was completed.  Each assessment provided appropriate clinical documentation.  A thorough initial psychiatric assessment was completed in September but not after mainline EOP admissions in mid-January.  RVR mental health assessments consistently indicated that mental health factors did not have an impact on his behavior.

IPOCs for depression established on December 23, 2020 were continued during each IDTT.  A goal to reduce depression to a six or lower warranted review as he denied any depression to the primary clinician.  The initial psychiatric assessment (September 29, 2021) indicated that "he appears to have mood issues that lead him into violent behavior, and this will be the focus of his treatment plan;" however an IPOC was not created, indicating a need for improved provider

collaboration.  An IPOC for anger was added during his January 20, 2022 IDTT although rationale was not documented.

There was a delay in psychiatric contacts.  He did not have a psychiatric contact between his initial psychiatric assessment on September 29, 2021 and a subsequent psychiatric assessment on January 11, 2022 despite intermittent medication adherence.  Primary clinician routine contact documentation was thorough and utilized appropriate clinical interventions for psychosocial and interpersonal stressors, although interventions were not clearly connected to IPOCs.

**Findings**

This patient's care was adequate, but marginally so.  The strength of the primary clinician contacts interventions was overridden by the delays in psychiatric care and lack of response to medication non-adherence.  Treatment planning needed improvement.  Provider collaboration was needed for diagnostic clarification and coordination of treatment planning.

**Patient E**

This 49-year-old patient was housed on mainline EOP since 2018.  He was diagnosed with major depression (in remission by the psychiatrist) and prescribed Celexa, an antidepressant.  His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

Treatment planning documentation remained virtually unchanged for three reviewed IDTTs since August 2020, two of which were held in absentia.  The clinical summary section of the document did not provide a summary of current symptoms, functional impairments or treatment needs between IDTTs despite a prompt for this necessary information.  IPOCs that targeted depression, developed in July 2018, remained unchanged across IDTTs for three years, despite documentation that his chief complaints in addition to depression were anger, poor sleep, hopelessness and anxiety in IDTT and primary clinician documentation.  For reasons that were unclear, a goal to increase insight into depression was documented in the clinical summary section of IDTT documentation.

Psychiatric documentation in routine contact notes for the past six months described the patient as in remission.  A January 26, 2022 psychiatric contact was non-confidential as the unit was on quarantine.  For reasons that were unclear the contact occurred at the patient's work in the old mental health building.  Similarly, primary clinician documentation described him as stable and engaged in treatment.  Documentation indicated that provided interventions remained unchanged across the majority of reviewed notes between August 2021 and January 2021 as follows, "Evaluated for daily fx [functioning] and attendance to ADL.  Discussed IDTT outcome.  Reviewed medication compliance.  Evaluated for depression and skills manage depression.  Evaluate for SI/HI [suicidal ideation/homicidal ideation]."  However, clinical interventions to target depression were not located.  Of note, while provider documentation described him as stable, he generally reported his mood as moderate or severe depression.

**Findings**

This patient's care was inadequate.  Treatment planning was not updated according to his treatment needs.  Treatment interventions other than psychiatric medication were not

documented as utilized. Improved collaboration was needed between providers where the psychiatrist considered him in remission despite continued reports of elevated depressed mood to both providers.

**Patient F**

This EOP patient was transferred from the 3CMS to the EOP level of care in mid-November 2021. Diagnoses included antisocial personality disorder, substance use disorder, and major depressive disorder, in remission. The patient was prescribed Vistaril and Remeron. His health care record was selected for review after he approached the monitor's expert during the site visit to report an incident of custody staff misconduct.

Reviewed initial provider assessments and treatment provider collaboration revealed the need for improvement. Documentation in the initial psychiatry assessment included discrepant information about hallucinations that was not addressed in the provider's assessment or in IDTT documentation. Notably, clarification that hallucinations were substance use related was documented in routine psychiatric documentation. However, the 'assessment and plan' section was insufficient because the only documentation that it contained was the patient's diagnosis. The primary clinician assessment also lacked a sufficient clinical summary, while case formulation documentation appeared outdated as it reported that the patient was housed in administrative segregation; however, the patient was in the mainline EOP program.

Initial assessment documentation did not clearly provide rationales for all IPOCs. For example, although there was an IPOC for substance use, assessment documentation provided varying documentation regarding substance use. Goals were measurable but there was no documented baseline to assess change. Interventions were documented but individualization could not be determined.

Reviewed IDTT documentation did not provide a useful summary of progress toward goals or group treatment related to treatment goals and patient treatment participation, status of symptoms, and functional impairment. The rationale for the patient's continued treatment at the EOP level of care was that the patient would "benefit" from it; however, it lacked specificity.

Primary clinician documentation was thorough and provided useful information about this stable patient's institutional stressors. References to functional impairments did not indicate any deficits. The same clinician provided consistent contacts. However, routine contacts did not target treatment goals. While interventions did not align with those identified during IDTT, documentation of interventions was clinically appropriate. Similarly, psychiatry contacts described the patient as stable with no significant functional deficits.

In contrast to the patient's disclosure that he was too fearful to discuss a staff misconduct incident, clinical documentation dated March 2, 2022 clearly documented the incident.

**Findings**

This patient's care was assessed as adequate but marginal. Deficits in initial assessments and treatment planning were counterbalanced by adequate routine contacts.

**Patient G**

This 25-year-old patient was admitted to the facility from the reception center on December 22, 2021. He was diagnosed with schizophrenia but was unwilling to take prescribed psychiatric medication. His health care record was reviewed after observation of his IDTT during the site visit.

The patient had a long history of mental illness since childhood. Prior to his incarceration in November 2021, he was treated at DSH for six years for competency to stand trial.

Initial assessments by both providers indicated that the patient was verbally non-responsive to attempts to engage him and was observed to be self-dialoguing, which were indications that he was responding to internal stimuli. His cell was described as untidy with trash on his desk and food and toilet paper on the floor. An IPOC for negative symptoms was developed. However, the goal to decrease his level of care was unrealistic. There were no IPOCs for treatment non-adherence nor targeted interventions to address the patient's pattern of treatment refusals that had been documented since prior to his transfer to the facility.

Provider documentation reported that the patient continued to refuse individual contacts which resulted in cell-front contacts, during which he was minimally responsive, continued to respond to internal stimuli, and was intermittently described as suspicious or guarded. Documentation indicated that he consistently ate meals but intermittently showered; at times he was described as disheveled and malodorous. Psychiatric documentation noted that he did not meet criteria for a PC 2602 involuntary medication order and would continue to be monitored.

The IDTT discussed a HLOC referral. However, since his primary clinician was not present, it was determined that more information was necessary. He was thus placed on a modified EOP program and referred to the ADL track for assistance. IPOCs were not discussed and a review of IDTT documentation indicated that IPOCs had not been updated according to the patient's current treatment needs. Documentation attributed the patient's poor group attendance to his mental illness and noted that he was functioning at baseline and would continue to be monitored for decompensation.

The non-referral to a HLOC rationale was not fully consistent with clinical documentation. For example, although ADL were documented to be "adequate and occasionally fair," there was also documentation that the patient was unkempt and malodorous (February 4, 2022, and March 11, 2022), and described as being difficult to understand.

RT documentation following the IDTT indicated that the patient was mumbling, disheveled, and difficult to understand, that his cell was dirty and smelled like urine and sweat, and that his sheets were "almost brown." There was no documentation that informed the supervisor of these signs of grave disability, which could have resulted in revisiting the IDTT decision to continue to monitor the patient for a HLOC referral.

**Findings**

This patient's care was inadequate.  A referral to the ADL track, where support for ADL was provided, and EOP modification for this psychotic patient who did not participate in treatment due to his mental illness was long overdue, as was a HLOC referral.

**Patient H**

This 49-year-old patient had multiple STRH admissions since May 2021; the most recent STRH admission was on December 23, 2021.  He was diagnosed with unspecified anxiety disorder and was prescribed Vistaril and Trileptal.  His health care record was selected from the STRH IDTT roster to assess the adequacy of care in STRH.

The primary clinician's initial assessment provided an adequate summary of the patient's relevant psychosocial history; however, specificity about his anxiety was needed.  An IPOC for anger had a measurable goal but lacked a baseline to assess progress or the realistic nature of the goal.  A clinical intervention, to address cognitions, was appropriate.  This IPOC remained unchanged at his routine IDTT meeting.

Although prompted to do so, routine IDTT documentation did not include a summary of the patient's symptoms, functioning, or treatment response since his previous IDTT, which were all important for his continuity of care.  Further, documentation in the 'clinical summary' section did not appear to be significantly changed since his initial IDTT.  It was unclear why the patient remained at the 3CMS level of care given his lack of treatment participation and documentation of routine contacts that the patient was "fine" or "alright."  The rationale to lower his level of care would be completed when he had a reduction in anxiety and anger; however, there was no pattern of anger or anxiety between IDTTs and impact on functioning.

Psychiatric documentation, completed by a nurse practitioner, was concerning.  An initial psychiatry assessment could not be located.  Psychiatry documentation was also overly brief and did not provide a clinical rationale for the addition of a new medication, Trileptal, in January 2022.

**Findings**

The patient's care was inadequate.  Treatment planning needed improvement, while treatment refusals were not adequately addressed during routine IDTTs or in IDTT documentation.  IDTT documentation also was not useful for continuity of care.  Psychiatric documentation was insufficient.  Documentation that addressed continuation of the 3CMS level of care was needed.

**Patient I**

This 58-year-old patient was admitted to STRH on May 5, 2021.  He was diagnosed with unspecified depressive disorder and was prescribed Remeron and Vistaril.  His health care record was selected from the IDTT roster during the site visit to assess the adequacy of care in STRH.

IPOCs in routine IDTT documentation from August 2021 to March 2022 addressed the patient's depression and remained unchanged.  There was no IPOC to address the patient's refusals

despite a pattern of refusing primary clinician contacts. All four reviewed IDTTs were conducted in absentia; three were due to patient refusals. Similarly, the 'clinical summary' section was virtually unchanged across IDTTs and did not include clear documentation regarding the patient's current symptoms, functional impairments, and treatment response despite a prompt to do so. The rationale for the level of care also remained unchanged.

Primary clinician documentation from November 2021 to March 2022 indicated that the majority of the patient's contacts occurred at cell front due to refusals; documentation of the interactions was also brief and indicative of check-ins. There was no documentation of clinical interventions despite documentation of a plan to use CBT and psychoeducation in primary clinician and IDTT documentation. There was no clear documentation of depressive symptoms or impact on functioning despite a diagnosis of unspecified depressive disorder.

Psychiatric documentation was limited. Two of three reviewed routine contacts indicated that the patient refused to respond to assessment questions including those about anxiety, depression, and medication adherence but wished to continue the current medication regimen. In light of the patient's refusals to engage with the provider, there was no documentation that the provider sought collateral information to assess the patient.

**Findings**

This patient's care was inadequate. Documentation was not individualized and did not provide a summary of his treatment needs including symptoms, functional impairments, and treatment progress. Treatment planning did not adequately address treatment refusals and the patient's lack of participation in provider contacts. Psychiatry documentation was insufficient.

**Patient J**

This 34-year-old patient was admitted to the Administrative Segregation EOP Hub on December 27, 2021. Diagnosis varied by provider and location. The patient had a pattern of intermittent medication adherence with prescribed Trileptal that pre-dated his Hub admission. The patient's health care record was selected for review to assess the adequacy of care after his IDTT was observed.

The patient's initial evaluations were insufficient. The psychiatric history was copied from other providers with no updated information since February 2021. The manner in which the documentation was copied did not provide a useful summary of his treatment history, which was concerning for continuity of care. The initial psychiatry assessment provided minimal detail and the 'assessment and plan' section merely listed diagnoses and did not explain the rationale for a diagnosis of psychosis NOS, which was in contrast to copied documentation that indicated a diagnosis of schizophrenia. The primary clinician's initial assessment also copied psychiatric history as described above and did not include his current symptoms or their impact on functioning.

IPOCs of anger, implemented in February 2021, substance use, established in November 2021, and anxiety, developed in November 2020, were unchanged from previous providers. Goals were measurable and objective but there was no documentation that supported that they met the

patient's current treatment needs. Nonetheless, these IPOCs were continued at his routine IDTT on March 29, 2022.

Despite identification on the sustainability report as a high treatment refuser, a relevant IPOC was not identified. Relatedly, reports of paranoia were not included as a treatment goal or considered as part of the patient's treatment refusals. Treatment modification documentation did not address paranoia or treatment refusals.

Routine psychiatric provider documentation was comprehensive and clinically useful. While the RVR mental health assessment indicated that the patient's mental illness did not contribute to his behavior, psychiatry documentation indicated otherwise; this theme was consistent with primary clinician documentation around the time of the incident. An ongoing pattern of medication non-adherence prior to Hub admission was appropriately addressed and alternative medications were appropriately encouraged.

Document review reflected a pattern of minimizing symptoms indicative of psychosis in the Administrative Segregation EOP Hub that over time became more apparent, which included putting up netting in his cell, made from torn sheets, to keep others out. Documentation indicated a complex clinical presentation that included ongoing diagnostic assessment of a substance-induced psychotic disorder versus a primary psychotic disorder that was not evident in IDTT documentation.

**Findings**

This patient's care was adequate but marginal. While initial assessments were insufficient, routine provider documentation countered assessments and provided thorough descriptions of the patient's mental status and symptoms. Despite the comprehensiveness of routine documentation, treatment planning was not appropriately updated, and treatment refusals were not considered as related to psychotic symptoms. A summary of the progression of his symptoms and need for diagnostic clarification was not included in IDTT documentation, which was concerning for continuity of care. This patient was not appropriately considered for a HLOC.

**Patient K**

This 52-year-old patient was prescribed Lamictal, Abilify and Cogentin. Diagnoses located in provider documentation included unspecified bipolar disorder and opioid use disorder. His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

At the time of the review, this patient had been at the facility since March 2020. In August 2020 he was admitted to the MHCB after a suicide attempt in which he cut his left wrist and swallowed several razor blades. He received multiple sutures for the laceration and razors were removed endoscopically. An acute inpatient referral was rescinded as he stabilized. On the day of MHCB discharge, he was found unresponsive after an apparent overdose believed to be an attempt to prevent his MHCB discharge. He was treated at an outside medical hospital and admitted to EOP as planned.

The initial psychiatric assessment lacked individualization and an initial primary clinician assessment was not located. Initial and subsequent IDTT documentation was thoughtful and

thorough with reasonable rationales for EOP level of care and inpatient non-referral when he was briefly identified by the sustainability process for lack of treatment participation. IPOCs were not identified throughout reviewed IDTT documented but with exception of risk of self-harm, identified needs were targeted within IDTT documentation. Of note, treatment planning was not clearly measurable, and interventions were not clearly identified. Lastly, documentation of treatment progress between IDTTs and inclusion of psychiatric care was needed.

A suicide risk assessment completed in December 2021 indicated that he had experienced passive suicidal ideation. However, there was no indication that the treating providers were aware of this prior to the assessment or that his recent ideation was communicated to providers post-assessment. He was assessed as chronic moderate and low acute risk.

Across reviewed provider routine contacts, documentation provided a useful and clear description of his mental status, treatment needs and improved stability over time.

**Findings**

This patient's care was adequate but marginal. A major shortcoming of this patient's treatment was the lack of targeted treatment planning and communication regarding risk of harm. Despite a missing initial primary clinician assessment and need for improved IDTT documentation, routine provider documentation counterbalanced these deficits as documentation conveyed that his treatment needs were appropriately addressed. Individualized treatment interventions were included in primary clinician documentation. Copying of previous provider documentation without reference to timeframe, level of care or original author was an area of concern. Diagnosis was needed in the place of record.

**Patient L**

Diagnoses for this 37-year-old patient varied by chart location and provider and included: ADHD, bipolar disorder, anxiety, depression, unspecified bipolar disorder, unspecified personality disorder and polysubstance dependence. He was prescribed Depakote and Zyprexa under a PC 2602. His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

This patient was on modified EOP due to a pattern of refusing group programming with no change to treatment modifications despite minimal progress over a reviewed six-month period. During his March 2022 IDTT, he was identified as having more than three RVRs in a six-month period. Mental health factors were not assessed as contributing factors. Treatment modifications were appropriate but not utilized during treatment contacts. Each of his monthly IDTTs were held in absentia for various reasons.

His sole IPOC initiated in August 2020 remained unchanged. Substance use was assessed as a contributor to his mental health but was not included as an IPOC nor was treatment non-adherence. While not in alignment with his IPOC, treatment interventions were intermittently utilized as indicated during routine contacts for this minimally engaged patient. He generally attended individual contacts despite being seen by multiple providers.

Overall, he was non-compliant with psychiatric contacts. Psychiatric documentation varied by provider, and at times, was noted to be provided by telepsychiatry.

**Findings**

This patient's care was adequate but marginal. While he generally engaged in primary clinician contacts, he was otherwise disengaged with other treatment providers. Collaborative attempts that targeted his treatment non-adherence, including updated treatment planning was needed. Diagnostic clarification and rationale for diagnosis was needed.

**Patient M**

This 48-year-old patient was admitted to the facility on August 31, 2021. Diagnoses varied across chart location and provider and included attention-deficit hyperactivity disorder, schizophrenia, schizoaffective disorder and anti-social personality disorder. His medications were changed from Zyprexa to Risperdal and Cogentin while in EOP. His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

While in mainline EOP the initial psychiatric assessment was comprehensive and clearly elaborated on the patient's symptoms and medication concerns. The majority of the primary clinician assessment and initial IDTT documentation were copied from unknown providers and timeframes. IPOCs were not established at his initial IDTT but during a subsequent IDTT over a month later and targeted hallucinations. Goals were measurable and the clinician's intervention was reasonable but psychiatric medication was not included.

Overall, mainline primary clinician documentation indicated that auditory hallucinations continued and his mental status began to change over time including difficulty coping with the hallucinations, delusions and some confusion. In contrast, he continued to deny auditory hallucinations to the psychiatrist whose documentation was brief.

On December 14, 2021, a risk assessment was completed after he reported suicidal ideation and recanted. The following day he was he was admitted to ASU following RVRs for IEX and battery on a prisoner. The RVR assessment recognized that he had been medication non-adherent and had been experiencing psychiatric symptoms but did not appropriately discuss his decline in mental status and recent impaired functioning. Mental health factors were not assessed as playing a role in the RVRs.

The patient refused initial provider assessments when placed in ASU. The assessments failed to include his recent functioning in the institution's mainline EOP and thus failed to recognize the change in his functioning and engagement in treatment. Once in ASU, he continued to experience psychotic symptoms and five additional suicide risk evaluations were completed between December 17, 2021 and January 12, 2022.

On January 12, 2022 he was referred to the MHCB for stabilization and referred to an ICF on January 28, 2022.

**Findings**

This patient's care was inadequate. His decompensation was not timely identified and resulted in a delayed referral to a HLOC. Relatedly, there was a lack of collaborative treatment between providers and need for diagnostic clarification. A consultation between mainline and ASU providers would have been useful. Copying of previous provider documentation without reference to timeframe, level of care or original author was an area of concern.

**Patient N**

This 49-year-old patient had been at the facility since 2017. There was no diagnosis in the official place of record; providers diagnosed him with some variation of depression. He was prescribed anti-depressant and anti-anxiety medications. His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

Treatment planning needed improvement. IPOCs for depression and self-harm remained unchanged since established in April 2020. Goals were measurable but interventions were insufficient. Specifically, there was no intervention for the depression IPOC and the sole intervention for the self-harm IPOC was to monitor self-harm ratings.

Reviewed IDTT documentation (August 2021 through January 2022) did not include pertinent information between quarterly reviews which hindered collaborative treatment planning. For example, documentation of intermittent suicidal ideation identified during a risk assessment from August 21, 2021 was not included in the October 28, 2021 IDTT, nor was the intermittent suicidal ideation addressed during treatment sessions. Similarly, documentation of psychiatric symptoms, which were in contrast to disclosures to the primary clinician, including a self-injurious behavior incident were not included on IDTT documentation.

Quality of routine primary clinician documentation varied with by provider. Treatment interventions were rarely utilized, and documentation frequently conveyed a check-in, as opposed to a meaningful therapeutic encounter. Of concern, disclosed self-harm incidents were not appropriately addressed by clinicians, including an incident of self-harm that was disclosed to an unlicensed clinician on March 21, 2022. Specifically, the patient reported that he had cut himself a day or two prior and was "smearing" blood and that he had been "unaware of what he was doing 'for about ten minute's and…praying for his behavior to stop." There was no documentation of consultation with a licensed clinician, no risk assessment completed and no referral to medical.

**Findings**

This patient's care was inadequate as his self-harm ideation and behaviors were not appropriately assessed or addressed in treatment. Further, reviewed IDTT documentation did not sufficiently convey his symptoms, functioning or treatment needs which are necessary for continuity of care. However, routine provider documentation indicated that he continued to have symptoms that warranted EOP level of care.

**Patient O**

This 52-year-old patient was randomly selected for healthcare record review to assess the quality of MHCB care provided at CSP/LAC.  On November 1, 2021, while at the ASU 3CMS level of care, the patient was admitted to the MHCB level of care due to paranoia.  Upon discharge from the MHCB on November 10, 2021, the patient was placed into the EOP level of care.

The most recent suicide risk evaluation, dated June 27, 2022, assessed the patient's chronic suicide risk as high and his acute risk at low.

Psychiatric diagnoses included adjustment disorder, antisocial personality disorder, unspecified depressive disorder, unspecified psychotic disorder, substance use disorder, and substance-induced psychotic disorder.  Psychiatry prescribed fluoxetine (an antidepressant and anti-anxiety medication), with a brief trial of olanzapine (an antipsychotic).  The patient subsequently refused olanzapine, which was discontinued.  Documentation was inconsistent regarding prior medication trials, with some notes saying no prior medications, while others stated that the patient had taken oxcarbazepine, bupropion, quetiapine, sertraline, and escitalopram.  The patient was not under and had no history of being under a PC 2602 involuntary medication order.

The initial PC and psychiatrist MHCB evaluations were completed in a timely manner.

Due to the amount of information extracted from prior progress notes, these evaluations were difficult to follow.  While the notes did reflect what information was borrowed, they were frequently repetitive.  The initial psychiatric evaluation dated November 3, 2021 listed the admitting diagnoses as substance induced psychotic disorder and substance use disorder.  The treatment plan on November 4, 2021 included these diagnoses, but also stated the patient had adjustment disorder.  The psychiatrist note dated November 6, 2021 stated that the patient believed that fluoxetine was helpful for his anxiety; however, anxiety was neither listed in the patient's diagnoses nor reflected in his treatment plan.  The psychiatry notes from November 7, 2021, stated that the patient was only taking one-half of his olanzapine dose; however, there was no clearly documented intervention to address this.

Treatment goals included being free from harm, but also included more ill-defined ones such as displaying behavior appropriate for a lower level of care.

Routine contacts with both the PC and the psychiatrist were timely.

After discharge from the MHCB level of care, five-day follow-ups were completed as required.

**Findings**

The care provided to this patient at the MHCB level of care was inadequate.  While at the MHCB level of care, diagnoses listed in the psychiatrist's and the PC's progress notes, as well as in the treatment plan, were inconsistent.  There was no clear intervention to address these diagnostic inconsistencies.  While the patient reported anxiety and that a medication was helping it, interventions targeting anxiety were not reflected in the treatment plan.  While some treatment interventions were appropriate, such as remaining free from self-injury, others such as presenting behavior suitable for a lower level of care were vague and ill-defined.  The documentation

suffered from excessive reliance on cutting and pasting, which rendered the documents difficult to follow.

**Patient P**

This 36-year-old patient was randomly selected for healthcare record review to assess the quality of MHCB care provided at CSP/LAC. The patient was treated at the MHCB level of care in 2015, 2018, four times in 2019, and once in 2020.

The patient was receiving treatment at the EOP level of care when he was admitted to the MHCB level of care on June 16, 2021, due to suicidal ideation with a plan to hang himself, and a hanging attempt the night prior to the evaluation. Of note, the patient was assessed cell front. The initial SRASHE was inconsistent with other chart documentation regarding the number of prior suicidal and self-injurious events. Documentation reflected multiple prior events, including hanging self in 2005, 2006, and two incidents in 2019, in addition to laceration in December 2019, and ingestion of a razor blade in April 2021. The evaluation noted that patient's actions were "not due to mental health reasons but to avoid discharge from EOP, housing, custodial issues and underlying personality factors." "[H]is responses appeared rehearsed and vague." The SRASHE listed his chronic risk as high, and his acute risk as moderate.

Psychiatric diagnoses included adjustment disorder with anxiety, antisocial personality disorder, and cannabis use disorder. Psychiatry prescribed escitalopram, olanzapine, and hydroxyzine during the review period. The patient had prior trials of buspirone and duloxetine. The patient was not under and had no history of being under a PC 2602 involuntary medication order.

Initial evaluations and follow-up examinations with both the psychiatrist and the PC were timely.

The initial psychiatric evaluation stated the patient's age as 21, 25, and 34 raising a concern that the documentation could be mixed with that of other patients. Diagnoses between mental health clinicians were inconsistent. The PC evaluation completed on June 17, 2021 stated the diagnoses as antisocial personality disorder, anxiety, and marijuana abuse. The psychiatry evaluation, also dated June 17, 2021, stated the diagnoses were adjustment disorder with anxiety, and a rule-out diagnosis of "manufacturing of psychotic symptoms for secondary gain."

Of note, the PC evaluation displayed an excessive emphasis on criminal, rather than clinical factors. Furthermore, the documentation had a clinical summary that was cut from the prior assessment, stating that the patient appeared appropriate for EOP level of care, despite being admitted to the MHCB.

The SRASHE from June 21, 2021 noted the patient's level of risk to be chronic low and acute moderate. The patient requested a referral to DSH.

The SRASHE completed at time of discharge from MHCB on June 24, 2021 was non-confidential, due to patient refusal. Terms used included referring to patient's prior actions as a "gesture" and "acting out behavior for secondary gain." The safety plan noted "IP refused to commit to safety and requesting referral to HLOC, where IP [inmate-patient] indicated he will feel safe." The assessing clinician determined the patient to be at moderate chronic risk, and low acute risk of suicide.

The treatment plan listed appropriate targets of treatment, such as not having recurrent thoughts of death or suicide and being free from self-injurious behavior. The reason for non-referral displayed the clinical summary, and not a clear rationale for why the patient was not being referred to a HLOC. The clinician mentioned the use of CBT, DBT, and Acceptance and Commitment Therapy. Progress notes did not reflect how these modalities were actively incorporated into treatment.

Progress notes reflected the patient asked multiple times to be referred to DSH. The patient was discharged to the EOP level of care. Required five-day follow-ups were completed.

**Findings**

The care provided to this MHCB level of care patient at CSP/LAC was inadequate.

The initial PC evaluation had a clinical summary cut and pasted from a prior evaluation. This displayed multiple inconsistencies, including stating that the patient was appropriate for EOP, despite being admitted to the MHCB. The initial psychiatric evaluation contained three different ages for the patient, which raised the concern that the documentation was mixed with that of other patients. SRASHEs displayed multiple concerns. SRASHEs completed on June 16, 2021, June 21, 2021, and June 24, 2021 stated that the patient's chronic suicide risk was high, low, and moderate respectively. While acute suicide risk would be expected to fluctuate, it was highly unusual to have chronic risk with this degree of variance. While clinically appropriate treatment modalities were mentioned in the treatment plan, there was inadequate documentation of how these were actively incorporated in the patient's treatment, and if they were beneficial or not. Notes reflected a minimization of the degree of patient's mental health challenges, and showed an excessive emphasis on criminal, rather than clinical factors.

**Patient Q**

This 52-year-old male patient's case was randomly chosen for healthcare record review to assess the quality of MHCB care provided at CSP/LAC.

From his arrival at CSP/LAC on March 4, 2020 through August 17, 2021, the patient was treated at the 3CMS level of care. From August 17, 2021 through September 20, 2021, the patient was treated at the MHCB level of care. Upon exiting MHCB, the patient was raised to the EOP level of care.

The patient had previously been treated at the MHCB level of care in March 2013. He had a history of suicidal behaviors, including, in 2001 via hanging while incarcerated in jail, and in 2013 when he was "ready to shoot himself in the mouth."

Diagnoses in the chart included: bipolar disorder; depression; mood disorder not otherwise specified; and opiate use disorder.

The patient had prior medication trials of paroxetine, bupropion, quetiapine, lithium, lorazepam, and hydroxyzine by psychiatry. Of note, the patient was also taking duloxetine prescribed by the medical service, for nerve pain due to diabetes. The patient was not receiving and had no history of receiving medications under a PC 2602 involuntary medication order.

On August 15, 2021, the patient made lacerations to his left wrist, and ingested multiple razor blades. He required admission to at an outside hospital. The laceration was repaired with sutures. X-rays confirmed ingestion of foreign bodies. He had an endoscopy to remove the razor blades. The patient declined further treatment at the outside hospital and was admitted to CSP/LAC MHCB on August 17, 2021. Notes reflected that grief and loss issues were important factors in patient's suicide attempt.

SRASHE at time of admission to MHCB on August 17, 2021 reported a chronic risk of moderate and acute risk high.

The initial PC and psychiatric evaluations, as well as follow-up visits, were completed in a timely manner.

The treatment plans in MHCB displayed several good elements, such as relaxation and grounding techniques to deal with anxiety, which was reportedly a trigger for patient's suicidality; however, progress notes did not consistently reflect how these interventions were actively incorporated into treatment, and the efficacy thereof. Several treatment goals persisted for the duration of the MHCB stay, namely over 30 days. On a positive note, when new symptoms emerged, such as visual hallucinations, his treatment team created new treatment goals and interventions, which appeared clinically appropriate.

During the initial portion of his MHCB stay, the treatment team had concerns for a possible manic episode. Medication management by psychiatry included lowering the patient's dose of mirtazapine, an antidepressant. Lithium was started for mood stabilization; however, the patient had side effects which required stopping this medication. As such, the patient was started on lamotrigine for mood stabilization. The patient remained on duloxetine, an antidepressant useful for some patients with chronic pain, throughout his hospitalization.

On August 26, 2021, the patient was referred to the acute level of care. The patient remained in the MHCB until September 20, 2021, reportedly due to lengthy wait time for services at the acute level of care. Notes reflected that the patient had made interval progress. The treatment team rescinded the referral to the acute level of care. The patient was discharged to the EOP level of care. His SRASHE at time of discharge from MHCB on September 20, 2021 reported a chronic risk of moderate, and an acute risk of low.

After returning to his housing unit on September 20, 2021, the day of discharge from the MHCB, the patient ingested an unknown substance. The patient had respiratory failure and developed an aspiration pneumonia. After stabilization at an outside hospital, the patient was returned to CSP/LAC on September 22, 2021. The SRASHE from this date stated that the patient "appeared to be playing up SX of distress." Documentation stated that it was "unknown" if his ingestion was a suicide attempt or not. The patient remained at the EOP level of care.

On September 23, 2021 and September 27, 2021, MHCB clinicians entered additional notes justifying the decision to rescind the referral to the acute level of care.

**Findings**

The care provided to this MHCB level of care patient at CSP/LAC was inadequate. The patient's length of stay at the MHCB level of care was over 30 days. This far exceeded the Program Guide specified goal of short-term stabilization within a ten-day period. While the patient's clinical team made a clinically appropriate referral to the acute level of care, the team later withdrew this, and the patient was discharged to the EOP level of care. On the day of discharge from MHCB, the patient ingested an unknown substance requiring emergent care at an outside medical facility.

While medication management by psychiatry generally appeared appropriate based on information available for chart review, one significant concern was the continuation of the patient's duloxetine after an apparent manic episode. This medication is an antidepressant, a class of medications which can worsen manic symptoms. While this medication was prescribed by the medical service, close coordination and collaboration between medical providers and psychiatry appeared warranted.

The patient's access to and subsequent ingestion of an unknown substance requiring emergency care was also of substantial concern. Finally, the addition of notes three and seven days after discharge from MHCB, explaining why the acute referral was rescinded, raised concerns regarding documentation in the chart.

**Patient R**

This 57-year-old male was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CSP/LAC.

The patient had been treated at the 3CMS since 2005, except for being GP from November 2018 through March 2020. Documentation was inconsistent regarding prior MHCB admissions. One note stated that there were no prior MHCB admissions, while others stated that there was an admission in 2008. No recent suicide risk assessments were found in the chart; however, notes clearly documented the absence of any self-harm or suicide attempt history.

The patient was diagnosed with unspecified depressive disorder and anxiety. The psychiatrist prescribed escitalopram (an antidepressant and anti-anxiety medication), and as-needed hydroxyzine (for anxiety).

The psychiatrist saw the patient within mandatory timeframes. The primary clinician saw the patient within established timeframes, with the exception of one visit which was approximately one week late. IDTTs were timely. Treatment plan and IPOCs were centered on depression, which appeared appropriate given patient's diagnosis and reported symptoms. PC notes reflected justification for continued treatment at the 3CMS level of care. HLOC indicators were reviewed in IDTT.

**Findings**

The care provided to this 3CMS level of care patient at CSP/LAC was adequate. While one PC contact was late, the clinical care provided appeared appropriate. Both the therapeutic and

medication interventions documented appeared appropriate, based on the patient's diagnoses and treatment plan goals.

## Patient S

This 27-year-old male was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CSP/LAC. The patient was treated at the 3CMS level of care since September 2018. The patient was at CSP/LAC since October 8, 2020.

While the patient had been at CSP/LAC since 2020, he was out-to-court at Deuel Vocational Institution (DVI) from January 2022 through April 2022. As the purpose of this review was to evaluate the care provided at CSP/LAC, the interval of treatment when the patient was at DVI was not considered.

The diagnoses listed in the chart varied, but generally included symptoms of depression and anxiety. Diagnoses included depression, anxiety, and adjustment disorder.

The patient was prescribed the antidepressant mirtazapine, which was subsequently changed to escitalopram. The medical service also prescribed duloxetine, an antidepressant which can help with pain.

The patient had no reported history of self-harm or suicide attempts. A suicide risk assessment was not seen in the chart.

The patient had multiple refusals, both of medication and attending confidential mental health appointments. There were no changes to his treatment plan to address these frequent refusals.

Treatment plan targets focused on reducing the patient's level of depression. There were no IPOCs observed targeting patient's anxiety symptoms. Despite treatment goals stating the goal was to reduce patient's degree of depression based on self-report, notes reflected that patient was being retained in 3CMS due to medication management.

Most PC and psychiatrist notes were plagued by frequent use of carry-over or cut and paste. While some were clearly delineated, many other notes were difficult to follow, due to difficulty determining which was current and which was historical information.

Upon the patient's return to CSP/LAC in May 2022, repeat PC and psychiatry evaluations were completed in a timely manner, prior to IDTT.

The patient had frequent refusals of mirtazapine; however, he was not seen in a timely manner for these refusals. Due to frequent refusal of medication, the psychiatrist discontinued this medication without seeing the patient on June 11, 2022. On June 23, 2022, the psychiatric nurse practitioner started escitalopram, a SSRI which was intended to be ordered KOP; however, there was no clearly documented order for this medication. Despite the patient putting in a patient request form on July 26, 2022 stating that he had not received his medication, his medication was discontinued for non-adherence due to "CDCR protocol" on July 30, 2022. A note from August 4, 2022 noted that the patient's medications were not ordered KOP, as was intended. The PNP

noted that the apparent cause of the patient not taking his medication was a delay in appropriate staff "getting updated med list."

**Findings**

The care provided to this patient at the 3CMS level of care was inadequate. Diagnoses were inconsistent in the chart, without any clear intervention to resolve this. Both PC and psychiatry notes were plagued by frequent cutting and pasting. While some notes clearly documented cut and paste information, others did not. Even in the notes which did reflect cut and paste, they were frequently difficult to follow.

Treatment plan goals inadequately addressed patient's depressive symptoms. Despite multiple mention of anxiety symptoms, and in some notes a formal diagnosis of an anxiety disorder, this was not clearly addressed via the treatment plan. The treatment plan was discrepant from the PC's notes. For example, the treatment plan noted a goal of reducing the patient's depression to below a certain number: in some cases, six out of ten, in other cases four out of ten. Yet, PC notes repeatedly reflected that the patient was enrolled in 3CMS largely given that he was taking medications. While interventions such as cognitive-behavioral therapy interventions were mentioned in the notes, it is unclear how these were actively incorporated into treatment, and whether they resulted in clinical improvement.

Furthermore, the patient had repeated refusals to see his PC in a confidential setting, as well as refusing medication. These were not clearly addressed in his treatment plan.

The medication management of this patient was of particular concern. Notes reflected discontinuation without clinical evaluation of the patient. Some notes referenced a "CDCR protocol" for medication discontinuation without specifying which protocol. Subsequent inquiry with headquarters' psychiatry indicated no such "protocol" existed. Multiple challenges including the medication not being ordered KOP and reported lack of communication with the custodial staff to ensure that the patient was able to obtain his medication were present regarding this patient.

Finally, the lack of psychiatric continuity of care was of concern. During the review period, the patient saw three different psychiatrists and psychiatric nurse practitioners.

**APPENDIX C-9**
**Mule Creek State Prison (MCSP)**
**(March 28 – March 30, 2022)**

MCSP was on modified programming since January 9, 2022.

**Patient A**

This 29-year-old patient was admitted to the Administrative Segregation EOP Hub on October 21, 2021. Diagnoses varied by provider and chart location and included unspecified depressive disorder, antisocial personality disorder, anxiety, schizoaffective disorder, depressive type, and opioid use disorder. The patient was prescribed Zoloft, clonidine, and Benadryl. His health care record was randomly selected from the Administrative Segregation EOP Hub roster to assess the adequacy of care.

The initial primary clinician assessment included a succinct but pertinent summary of the patient's treatment history and treatment needs. An initial psychiatric assessment was not located. An IPOC for anger, developed during his initial IDTT, flowed from the primary clinician initial assessment. An IPOC for depression was not included despite its identification as a treatment need. While the patient's goals were measurable, progress was not clearly documented during the routine IDTT. For example, it could not be determined whether the goal of decreasing anger had been reduced to a six or lower or if recurrent thoughts of harming others was reduced. The documentation of the rationale for EOP level of care, which noted "symptoms of anger management and behavioral concerns," did not sufficiently support continued EOP level of care.

The patient was identified as a high treatment refuser when he arrived at the facility. Treatment noncompliance was appropriately addressed on the HLOC form during his initial IDTT, and treatment modifications, including CBT, were appropriate. After a period of treatment refusals that were consistently addressed, the patient's treatment attendance improved.

Primary clinician documentation targeting anger and appropriate clinical interventions were intermittently documented. However, utilized treatment interventions were not in alignment with identified treatment goals. Psychiatry documentation varied by multiple providers but overall included relevant information for this medication adherent patient.

**Findings**

While documentation needed improvement, this patient's care was adequate. Treatment planning flowed from the available initial assessment. Treatment refusals were routinely addressed, and treatment interventions were utilized. Consideration of transfer to a lower level of care was warranted for this stable patient. Of note, the primary clinician was unlicensed and there was no indication of supervisory review of documentation. Further, but for the clinician disclosing his licensure status to the patient, it would be unknown as the clinician's signature line indicated that he was a "psychologist," which was a title that conveyed licensure.

**Patient B**

This 63-year-old patient was admitted to the Administrative Segregation EOP Hub from the MHCB on February 2, 2022.  He was prescribed Remeron and risperidone.  His health care record was randomly selected from the Administrative Segregation EOP Hub roster to assess the adequacy of care.

The patient was discharged from the PIP on November 3, 2021, at which time he was assessed as primarily antisocial with psychopathic behavior.  He was readmitted to inpatient care (MHCB) between December 27, 2021, and February 1, 2022, due to paranoid delusions and decompensation approaching grave disability.  At the time of discharge, his mental status was assessed as having improved.  There was no diagnosis located in the official place of record or in the initial IDTT.  Primary clinician initial assessment documentation, copied from the patient's MHCB admission, indicated a diagnosis of delusional disorder and antisocial personality disorder.  In contrast, the psychiatry assessment noted a history of diagnosis of bipolar I versus schizophrenia.

During the administrative segregation pre-screen, the patient was referred for a risk assessment.  The assessment was thorough and the clinical rationale for the ability to manage the Administrative Segregation EOP Hub was thoughtful and reasonable.  Various clinicians provided five-day follow-ups; the quality and content of the documentation of his mental status varied accordingly.  Two providers assessed him as delusional.  On the last day of his five-day follow-up, the patient reported suicidal ideation and another risk assessment was completed.  At that time, the patient's level of acute risk was changed from high acute (from five days earlier) to low acute risk; however, there was an insufficient rationale for the significant change in the risk assessment in such a short time period.

The psychiatric assessment provided a useful summary of the patient's current mental status but a choppy review of his history (documentation was copied from February 1, 2022, and December 27, 2021).  It was unclear why the documentation did not indicate continuing all of his medications despite an indication of such on the medication administration record.  The primary clinician assessment copied documentation from previous providers; however, the timeframe and level of care were not always clear.  This approach was not useful for continuity of care, nor did it convey that the clinician had a full understanding of the patient's treatment needs and history.  At the time of the initial assessment, the patient remained delusional; however, at the IDTT the only IPOC targeted anger.

The one primary clinician contact during the review period indicated that the patient remained delusional.

**Findings**

This complex patient's care was inadequate.  Initial assessments were insufficient for continuity of care and treatment planning did not address delusions.  HLOC consideration documentation for this delusional patient in a high-risk environment was insufficient.  Diagnostic clarification was needed.  Of note, the primary clinician was unlicensed and there was no indication of supervisory review of documentation.  Further, but for the clinician disclosing his licensure

status to the patient, it would be unknown as his signature line indicated that he was a "psychologist," which was a title that conveyed licensure.

## Patient C

This 60-year-old patient had been at the EOP level of care for the majority of the past 20 years. He was diagnosed with major depressive disorder with psychosis. He was prescribed multiple psychiatric medications for anxiety, depression, and mood symptoms. His health care record was randomly selected from the EOP roster to assess the adequacy of care.

This DD2 EOP patient was at the 3CMS level of care for approximately two months before returning to the EOP, in part due to unfounded safety concerns that were instead indicative of paranoia, on December 28, 2021. Overall, provider initial assessments documented useful psychosocial information and relevant psychiatric history. Treatment planning targeted depressive symptoms despite identification of various treatment needs including anxiety, paranoia, and dysregulation. Treatment interventions to target depression were not identified.

The majority of primary clinician contacts were brief wellness checks that occurred cell front due to modified programming on account of COVID-19 restrictions. During contacts, the patient was appropriately assessed, and documentation was supportive in nature. Similar to primary clinician documentation, the one telepsychiatry contact described the patient as stable. Documentation indicated that the recreation therapist provided therapeutic materials at least weekly.

### Findings

This patient's care was marginally adequate. While treatment planning needed improvement, initial assessments identified relevant treatment needs and were appropriate for continuity of care. Of concern, it was unclear why this patient was not seen in a confidential setting as cell front contacts were not required as part of COVID-19 modified programming.

## Patient D

This 45-year-old patient was a longtime participant in the EOP. Diagnoses varied by provider and chart location and included anxiety, other induced psychotic disorder, schizoaffective disorder, and polysubstance abuse. He was not prescribed psychiatric medication. His health care record was randomly selected from the EOP roster to assess the adequacy of care.

Various providers delivered routine psychiatric contacts, but documentation was comprehensive and allowed for continuity of care. Primary clinician documentation provided useful information about the patient's symptoms and impact on functioning; however, clinical interventions were not documented. When the housing unit was on modified programming for COVID-19, primary clinician contacts were not confidential and in-cell activities were provided by the recreation therapist in lieu of groups.

**Findings**

This patient's care was marginally adequate. Treatment needs were appropriately identified, and the patient was adequately monitored by providers; however, clinical interventions were not documented. Diagnostic clarification was needed. Of concern, it was unclear why this patient was not seen in a confidential setting as part of COVID-19 modified programming.

**Patient E**

This long-term 61-year-old EOP patient was prescribed several antipsychotics and an antidepressant. Diagnoses varied by provider and chart location and included schizophrenia, psychosis and mood disorders, amphetamine-type substance use disorder, antisocial personality disorder, and polysubstance use disorder. The patient's health care record was randomly selected from the EOP roster to assess the adequacy of care.

Reviewed IDTT documentation indicated that IPOCs were in alignment with identified treatment needs of hallucinations, depression, and treatment non-adherence, which provider contacts appropriately addressed.

Confidential psychiatry contacts consistently occurred with the same psychiatrist. Documentation provided a useful review of the patient's mental status and functioning. Similarly, primary clinician documentation was appropriately descriptive and included utilized clinical interventions. With the implementation of modified programming, the patient was seen in a non-confidential setting for wellness checks. Documentation continued to describe him as stable.

A hiatus of group programming coincided with COVID-19 modified programming between early January and mid-February 2022. During this time, there was no documentation to support the provision of in-cell activities and/or therapeutic reading.

**Findings**

This patient's care was marginally adequate. Reviewed documentation consistently addressed identified treatment needs. Of concern, it was unclear why groups were put on hold and why this patient was not seen confidentially despite COVID-19 modified programming.

**Patient F**

This 46-year-old patient was treated in the Administrative Segregation EOP Hub. He was diagnosed with antisocial personality disorder; substance induced psychotic disorder, with moderate or severe use disorder; unspecified depressive disorder; and unspecified weight loss. He was prescribed haloperidol and hydroxyzine.

The patient was placed in administrative segregation on January 19, 2022, secondary to assault on another incarcerated individual within the mainline EOP. Initial PC and psychiatry assessments were completed; however, they were conducted at cell front secondary to patient refusal. Both assessments were adequate and included a review of patient records. The patient's IDTT was held on January 26, 2022 and included an IPOC to address depressed mood; it also

included goals related to treatment adherence as the patient was not attending structured treatment and had his medications discontinued secondary to non-adherence prior to his placement in administrative segregation. The plan noted the patient's enrollment in the SRMP with adequate goals related to the program and criteria for discharge from EOP. The patient continued to refuse programming and out-of-cell individual contacts. On February 8, 2022, he was placed in the MHCB after he made a noose, was noted to be disorganized, and had filled his soiled toilet with his radio and garbage. He reported that he had not been eating and weight loss was verified. The patient also reported auditory hallucinations and depressed mood. A SRASHE was completed on that date and appeared adequate; however, it included text from a previous SRASHE which made the narrative somewhat confusing.

The patient was treated in the MHCB through March 9, 2022. He was restarted on medications, including an injectable antipsychotic, and was referred to an acute care inpatient setting; however, the referral was rescinded secondary to the patient restabilizing on medications. He returned to the Administrative Segregation EOP Hub on that date. Five-day follow-ups were completed, of which three were adequate and included review of the patient's safety plan; the other two contacts had limited documentation. The patient's initial psychiatric assessment was marginally adequate and noted that he had been diagnosed with schizophrenia, which was not consistent with the diagnoses on record. The initial PC assessment was not adequate, included information pulled forward from the previous assessment, and did not include information about the patient's recent MHCB treatment; it also referred to two SRASHEs completed in January 2022 without referencing four more recently completed SRASHEs. The IDTT was held on March 16, 2022, with a treatment plan that was similar in content to the previous treatment plan. Although the treatment plan referred to the patient's recent MHCB admission and included adequate plans to support the patient at his current level of care, it also failed to note findings from more recent SRASHEs. The patient was returned to the mainline EOP on March 20, 2022, where he reported being in crisis. He was seen for a SRASHE but retained on the unit after being moved to a single cell.

The patient was placed in administrative segregation four days later, on March 24, 2022, after spitting on a clinician who was attempting to complete a SRASHE with him after the patient had engaged in superficial self-injury and reported suicidality. The patient's initial psychiatric and PC assessments completed on March 28, 2022, did not reference his self-injurious behavior four days prior. The PC also documented SRASHEs completed in January, but did not document the more recent SRASHEs, including the one completed prior to the patient's administrative segregation placement. The patient's treatment plan was the same in content as prior plans and did not refer to recent self-injury. During his initial psychiatric assessment, the decision was made to change the patient to oral medication at his request. On March 31, 2022, he was seen for a crisis contact. The SRASHE completed on that date failed to reference the patient's recent self-injury and most recent MHCB placement and only referenced two SRASHEs completed in January 2022. The patient was sent back to his cell following that risk evaluation but made a noose later that day and was placed in the MHCB.

**Findings**

This patient's treatment in the Administrative Segregation EOP Hub was inadequate. This assessment was based on the PC's failure to identify current risk factors and findings from recent

SRASHEs, which other PCs carried into subsequent documentation. The IDTTs also failed to update treatment goals to address recent self-injury given the patient's placement in the SRMP. There was also evidence of diagnostic discrepancies that were not adequately addressed.

**Patient G**

This 36-year-old patient was being treated in the Administrative Segregation EOP Hub. He was diagnosed with major depressive disorder, recurrent episode, unspecified; antisocial personality disorder; and opioid use disorder. He was prescribed quetiapine, bupropion, haloperidol PRN, and hydroxyzine PRN. He was also prescribed buprenorphine for his opioid use disorder through the MAT program.

The patient was placed in the Administrative Segregation EOP Hub from the mainline EOP on December 22, 2021, for assault on a peace officer. He was timely seen for initial PC and psychiatry assessments and the documentation was adequate. His initial IDTT meeting was held on December 29, 2021, and appeared to address his needs, with appropriate goals. The patient was noted to be in the SRMP and his progress toward meeting goals related to suicidality were appropriately reviewed. He was consistently seen for individual PC contacts on a weekly basis; however, it was noted that a few contacts were held cell front secondary to staffing issues. PC contacts evidenced therapeutic interventions in keeping with the treatment plan and the patient's needs. Psychiatric contacts occurred at least monthly and in response to the patient's requests.

The patient submitted requests to see the psychiatrist on January 27, 2022, and again on February 11, 2022. The PC saw the patient during this time, but a psychiatrist did not see him until February 14, 2022; this contact occurred following a consult request by a PC who had seen the patient for a crisis evaluation after he reported suicidal ideation secondary to medication concerns. Of note, the patient's concerns stemmed from discontinuation of his bupropion after he had refused laboratory testing that was a condition of being prescribed the medication.

The patient was mostly engaged in treatment except for a brief period in early February 2022 and was seen for daily contacts as appropriate. The patient resumed programming. During the March quarterly IDTT meeting, the patient's involvement in the SRMP was discontinued and the rationale appeared appropriate. The treatment plan evidenced adequate review of patient progress and appropriate rationale for retaining him at the EOP level of care.

**Findings**

The patient's care at the EOP level of care was mostly appropriate except for the delayed response to patient requests to be seen by the psychiatrist.

**Patient H**

This 34-year-old patient was diagnosed with borderline personality disorder, antisocial personality disorder, and unspecified anxiety disorder while being treated in the Administrative Segregation EOP Hub. He was prescribed hydroxyzine PRN.

The patient arrived in the Administrative Segregation EOP Hub on December 30, 2021, and immediately reported suicidal ideation. The CIT saw him, and he reported being upset about not

831

having a television or the ability to make a telephone call. Notably, the issue was resolved without the need for a HLOC. A SRASHE was adequately completed. Initial PC and psychiatry assessments were completed timely and adequately. The initial IDTT meeting was held on January 5, 2022 and was generally adequate. The patient was seen for weekly PC contacts, most of which were confidential and included implementation of active treatment to address the patient's needs. Mostly due to patient refusals, a few contacts were held at cell front. Psychiatry contacts were scheduled monthly but often refused by the patient, so cell-front checks were completed. Over the course of his stay in the Administrative Segregation EOP Hub, the patient refused to attend most groups. He was seen for daily checks nearly every week and his refusals were addressed in his quarterly IDTT in March 2022, with further plans to address them through schedule changes and targeted interventions.

**Findings**

This patient's treatment in the Administrative Segregation EOP Hub was adequate.

**Patient I**

This 28-year-old patient was treated in the Administrative Segregation EOP Hub with diagnoses of adjustment disorder with disturbance of conduct and antisocial personality disorder. He was not prescribed psychotropic medication. He was noted to have a DD2 designation with adaptive support needs.

The patient was placed in the Administrative Segregation EOP Hub from March 23 – 29, 2022, after transferring from another institution. Upon arrival at MCSP, he was placed on constant observation after verbalizing suicidal ideation. A SRASHE revealed that he had safety concerns and expressed suicidal ideation to ensure safe housing. Once the issue was addressed, it was determined that the patient did not require a HLOC. This pattern continued as the patient expressed suicidal ideation on five more occasions during his brief stay in the Administrative Segregation EOP Hub. Twice, he was placed in alternative housing; however, he was removed the following morning. Each time the patient expressed suicidal ideation, a SRASHE was completed. Tellingly, the contents appeared adequate, but an updated safety plan was not created given the assessment that the patient was at "low" acute risk for suicide, and one was not required. While a low-risk determination appeared appropriate, given the patient's needs and frequent verbalizations of suicidal ideation as a means of influencing housing, an updated safety plan, or at least an enhanced plan to cope with frustration, appeared clinically indicated. When the patient's IDTT was held on March 29, 2022, these issues were addressed through the planned treatment to maintain him at the EOP level of care despite positive indicators (more than three MHCB referrals in the past six months and more than three RVRs in the past three months). The plan appeared appropriate but could not be implemented prior to the patient's return to the mainline EOP.

IDTT documentation included the patient's Developmental Disability Program 2 (DDP2) needs; however, these issues were not specifically addressed in the section of the treatment plan where a EOP functional evaluation was required. All of the items in that section included "n/a" rather than a reference to a clinical summary that documented his adaptive supports. PCs who

reviewed the treatment plan in the future might interpret the "not applicable" entries as indicating that the patient had no functional impairments requiring support when, in fact, he did.

Finally, although documentation indicated that the patient had an upcoming release date, the release date documentation was inconsistent and reflected release dates in March, April, and May. The documentation also mentioned that the patient may not be released secondary to a recent RVR.

**Findings**

This patient's mental health care in the Administrative Segregation EOP Hub was not adequate given documentation concerns, including inadequate completion of sections of the treatment plan and conflicting information regarding the patient's upcoming release date. Further, while not required, an updated safety plan appeared clinically indicated given the patient's frequent expression of suicidal ideation as a means of coping with frustration; however, an updated safety plan was not completed.

**Patient J**

This 30-year-old patient was being treated at the EOP level of care. He was diagnosed with schizoaffective disorder, opioid use disorder, amphetamine-type use disorder, and antisocial personality disorder. He had a DDP2 designation with required adaptive supports. He was prescribed haloperidol, hydroxyzine, olanzapine, prazosin, and atomoxetine. He also received buprenorphine through the MAT program. The patient arrived in the EOP program at MCSP on December 21, 2021.

Other than being seen confidentially for his initial PC assessment on December 21, 2021, and for a consult on January 3, 2022, the patient was not seen for group sessions or confidential PC contacts from admission through April 1, 2022, primarily due to the unit being on COVID-19 quarantine. One PC session was held at cell front due to staffing issues rather than quarantine status. The two conducted IDTTs were held without the patient's presence due to unit quarantine. Of note, however, telepsychiatry contacts were held confidentially with a telepresenter. There was no rationale for this inconsistent application of the patient's quarantine status.

Although early documentation noted inconsistencies with the patient's diagnoses, they were resolved during the initial IDTT on January 6, 2022. The IDTT meetings and resulting treatment plans were adequate, included a review of treatment progress, and adequately addressed issues related to the patient's level of care. However, the therapeutic interventions listed on the treatment plan were not implemented because the patient was not seen out of cell for treatment services. There were concerns that the documentation entered by both the PC and the psychiatrist appeared to be copied from session to session. In two notes, the PC indicated that the patient demonstrated disorganized thinking; however, later in the same note, the PC described the patient's mental status as evidencing a thought process that was "clear and linear," which was also entered in nearly every progress note.

**Findings**

This patient's EOP treatment was not adequate secondary to not being offered out-of-cell treatment, other than telepsychiatry appointments, for nearly four months. The adequacy and accuracy of routine contact documentation was also questionable.

**Patient K**

This 41-year-old patient was transferred to MCSP at the EOP level of care on March 18, 2022. He was diagnosed with persistent depressive disorder, with intermittent major depressive episodes and active major depressive episode with mood congruent psychosis; antisocial personality disorder; and opiate use disorder. There was a rule out for major depressive disorder, recurrent episode, with psychotic features listed in his records and a psychiatrist had noted a rule out for borderline personality disorder. The patient was prescribed buspirone and mirtazapine.

On March 24, 2022, an initial PC assessment and routine follow-up SRASHE were completed cell front secondary to the COVID-19 quarantine. Both assessments were limited by the contact's non-confidential nature. Despite the patient being assessed as having a "moderate" acute level of suicide risk, no safety plan was completed due to the contact being held at cell front. Although it was documented that a plan would be developed during the next confidential session, such a plan was not developed. An IDTT meeting was held on March 30, 2022, without the patient present, secondary to quarantine, despite the fact that no initial psychiatry assessment had been completed. The psychiatrist present at the IDTT was not the patient's assigned psychiatrist. IDTT documentation appeared adequate. The untimely and nonconfidential initial psychiatry assessment was completed with the patient in the dayroom due to COVID-19 restrictions. The assessment was adequately documented.

Group treatment and confidential individual PC contacts were offered beginning April 6, 2022. The content of PC notes indicated an adequate assessment of the patient's status but there was little evidence of treatment interventions beyond the provision of handouts and supportive interactions. Recreation therapists provided groups but did not target clinical needs, while the required hours were not offered.

**Findings**

This patient's treatment at the EOP level of care was inadequate secondary to a lack of offered treatment and a late initial psychiatry assessment that was not completed prior to the patient's initial IDTT meeting.

**Patient L**

This 38-year-old patient was being treated at the EOP level of care. He was transferred to MCSP on December 27, 2021. Throughout most of the period reviewed, the patient carried a diagnosis of bipolar disorder. However, during his most recent IDTT meeting, his diagnosis was changed to unspecified schizophrenia spectrum and other psychotic disorder with marginally adequate rationale. His treating psychiatrist consistently documented a diagnosis of schizoaffective disorder with no documentation that the diagnosis entered in the record was reviewed or had been updated. The patient's IDTTs were attended by a covering psychiatrist and not by the

patient's assigned psychiatrist.  The patient was prescribed asenapine, valproic acid, fluphenazine, and Oxcarbazepine.

Upon arrival at the facility, the patient was seen for a consult in response to a nursing staff referral.  The consult documented that the patient seemed cognitively compromised and likely needed further testing.  However, this issue was not addressed.  An initial PC assessment was completed in response to a referral from the consult which made no reference to the patient's placement at the EOP level of care, nor the need for testing.

Three different assigned PCs saw the patient weekly at cell front during the period reviewed.  He was also seen as required by a telepsychiatrist.  However, the telepsychiatrist's documentation was notably similar across contacts and did not indicate any evidence of the documentation being reviewed other than the psychiatrist's own previous documentation.  There were two IDTTs and two treatment plans created during the review period.  Documentation from the initial IDTT noted that the patient was not in the SRMP program, yet he was noted to be in the program three months later with no rationale.  Level of care considerations were documented with adequate justification for keeping the patient at the EOP level of care.

The patient was not offered any structured therapeutic programming, secondary to the unit being on quarantine.  There was evidence of routine rounding by RTs.

**Findings**

This patient's treatment at the EOP level of care was inadequate.  The patient was not offered required levels of programming and psychiatric documentation was inadequate for its lack of evidence of record review and similarity in content from note to note.  There was also a lack of continuity in PC assignment and psychiatric participation in IDTT meetings, while the patient's SRMP status was not clear.  Finally, there was no follow-up on the patient's need for cognitive testing.

**Patient M**

This 40-year-old patient was being treated at the EOP level of care at MCSP since 2018.  He was diagnosed with schizoaffective disorder, bipolar type and was prescribed risperidone, benztropine, lithium, and hydroxyzine.

During the period reviewed, the patient had three IDTT meetings, two of which were held without the patient present secondary to COVID-19 restrictions.  Documentation from the October 2021 IDTT was of good quality; documentation from the January 2022 IDTT was adequate.  However, IDTT documentation from March 2022 was inadequate.  The patient's only IPOC, which had been addressing delusions, was discontinued but no new goals were established.  The patient had previously been identified as not attending at least 50 percent of his programming, but this was no longer true in March; however, this was likely due to the lack of offered programming and not due to any improvement in the patient's treatment engagement.

Progress notes reflected that the patient was engaged in completing worksheets and discussing the contents with his PC as the primary treatment intervention; however, there was no mention of this in IDTT documentation.  It was also noted that the patient's assigned psychiatrist did not

attend IDTT meetings, while documentation by the psychiatrist did not evidence review of IDTT documentation. The patient was not consistently offered at least ten hours of structured out-of-cell treatment due to COVID-19 restrictions. When offered, the patient often did not attend scheduled treatment.

**Findings**

This patient's treatment at the EOP level of care was inadequate. He was not offered sufficient treatment services and the most recent IDTT documentation was inadequate. The PC's treatment appeared appropriate to the patient's needs but was not adequately supported by IDTT documentation. Psychiatry documentation did not reflect review of IDTT meeting documentation as the assigned psychiatrist did not attend the patient's IDTTs.

**Patient N**

This 46-year-old patient was being treated at the 3CMS level of care. He was diagnosed with major depressive disorder, recurrent episode, moderate; PTSD; gender dysphoria in adolescents and adults; opioid use disorder, alcohol use disorder, severe; cannabis use disorder, moderate, dependance; opioid use, continuous; moderate sedative, hypnotic, or anxiolytic use disorder, in remission; and stimulant use disorder, in remission. He was prescribed fluoxetine and was being treated for his opioid use disorder through the MAT program.

The patient was seen as minimally required by his PC and psychiatrist during the period reviewed; however, contacts were not in keeping with the patient's planned treatment. Following PC contacts in September 2021 and March 2022, the PC noted a plan to see the patient monthly or bimonthly, but these contacts did not occur. A psychiatrist noted that the patient should be seen for follow-up within 14 days of a contact in March 2022, but the patient was not seen. There was evidence of scheduling issues with the patient being seen for two consecutive weeks by his PC on two occasions and being seen two days after a previous contact with his psychiatrist; these contacts appeared to be improperly scheduled and superfluous. The patient's annual IDTT was held in March 2022 and did not include the patient's assigned psychiatrist. IDTT documentation was adequate.

**Findings**

The patient's treatment at the 3CMS level of care appeared adequate. Nonetheless, reviewed documentation revealed concerns with the scheduling system which did not seem to account for changes requested by clinicians or needed adjustments in response to previously completed appointments.

**Patient O**

This 35-year-old patient's record was reviewed as he was noted to have paroled from the MHCB. He was diagnosed with major depressive disorder with psychotic features, recurrent episode, moderate and ADHD. He was prescribed olanzapine, Oxcarbazepine, buspirone, hydroxyzine, and mirtazapine.

The patient was being treated at the 3CMS level of care when he appeared to decompensate, as evidenced by paranoia and disorientation. He was then transferred to the MHCB at another facility on August 10, 2021. After two days, the patient was discharged back to the 3CMS level of care after being restarted on medication that he had been refusing prior to his decompensation. The patient was seen for five-day follow-ups as required. An initial psychiatric assessment was completed timely. A PC documented contact with the patient but did not complete a formal initial assessment upon his return from the MHCB. An IDTT meeting was held without the patient on August 18, 2021, and made no mention of his recent MHCB admission or the symptoms and behaviors that prompted his decompensation. Documentation noted that the patient needed pre-release planning as he was to be paroled on September 25, 2021. On August 25, 2021, the patient was seen for a crisis contact after learning about his uncle's death. A SRASHE was completed and appeared adequate. It included an updated safety plan, but the patient refused to accept handouts to assist with grief. The patient was returned to housing and no follow-up contact was planned. The patient cut both his wrists on August 30, 2021, and required sutures. He reported that he heard he would be transferring to another facility and was concerned that others were going to try to kill him, but he preferred to kill himself.

A SRASHE was completed and rated the patient's chronic and acute risk as "high." The patient was admitted to the MHCB. Initial PC and psychiatric assessments were completed timely and appeared adequate; however, the initial IDTT documentation was not adequate. The treatment plan did not include goals for the patient. It also included contradictory language that portrayed the patient as nonadherent with treatment and yet later noted his presentation to be "compliant and unremarkable," noting without rationale or explanation, that the patient would "stay through the weekend and perhaps discharge early next week." During his MHCB stay, a PC or psychiatrist saw the patient daily. Of note, two PCs saw the patient routinely and each had a different view of him. One documented ongoing paranoia, lack of sleep and appetite, and disorganization during contacts. The other PC made clear through documentation that the PC believed the patient was not being truthful and did not have the symptoms he was reporting. Of note, there was objective and collateral evidence of significant weight loss and lack of sleep, including edema of the patient's legs for standing nonstop for days. Also of note, a PC referred more than once to returning the patient to the EOP level of care, not recognizing that he had been admitted from the 3CMS level of care.

The patient continued to present with paranoid ideation and verbalized disbelief that he would be paroled. On September 10, 2021, the psychiatrist noted that the patient had been evaluated for the need for hospitalization and for commitment as a sex offender after release and both were determined not to be clinically indicated. The patient was not able to be stabilized and a referral was made to an acute level of care on September 13, 2021. IDTT documentation on that date noted the need to contact the parole coordinator. An email exchange was copied into the patient's record in which the pre-release coordinator contacted headquarters to discuss the need for a CCAT meeting given the patient's upcoming parole date and pending referral to acute care. A decision was made to have the patient sent for a 5150 evaluation upon release if he continued to meet criteria on September 25, 2021. Discharge summaries by the psychiatrist and PC were completed and appeared adequate, noting the patient's inconsistent and nontypical presentation of symptoms. The patient was paroled on September 25, 2021, with a 30-day supply of medications. He was reportedly transported by county staff to a hospital for evaluation.

**Findings**

This patient's care was not adequate.  Upon return to the 3CMS level of care from the MHCB, there was no formal PC evaluation and the IDTT failed to recognize the patient's recent inpatient placement.  There was no planned follow-up with the patient after the required five-days despite a crisis contact following a death in his family.  Initial treatment planning within the MCSP MHCB was inadequate; the MHCB IDTT failed to recognize the patient's upcoming parole date and plan accordingly and failed to integrate conflicting views of the patient's needs.

**Patient P**

This patient was a 41-year-old at the EOP level of care.  The patient was diagnosed with schizophrenia and prescribed paliperidone and benztropine.  The patient entered CDCR on February 14, 2022 and arrived at MCSP on March 22, 2022 at the EOP level of care with an EPRD of December 2022.  The patient reported prison history in North Carolina and Florida.  He reported that his mental health problems began at age eight, started drinking alcohol at age ten, smoking marijuana at age 12, and starting methamphetamine use (drug of choice) at age 14.

The patient was placed in EOP at WSP due to active symptoms of psychosis, being a poor historian and a need for further diagnostic clarification.  The patient's last reported mental health hospitalization was in 2020.  His most recent SRASHE was conducted at WSP on February 20, 2022 yielding a score of chronic risk of suicide as moderate and acute risk as low.  According to the record, he struggled with auditory hallucinations and low mood.  The patient had good coping skills and understood his mental illness.  His coping skills and protective factors included reading the bible, listening to the radio, doing sudoku puzzles and communicating with an aunt.  He self-reported having over one hundred suicide attempts.  The patient preferred the Invega injectables but agreed to start with oral medication; the psychiatrist agreed to prescribe.

The patient's initial assessment at MCSP was conducted on March 29, 2022 by an A-yard clinician where all transfers into MCSP were housed.  The initial assessment was conducted cell front by a clinician due to the patient's quarantine status.  The patient's IPOC was mental health hallucinations, and the goal was to reduce feelings of distress below four.  The interventions were to use a diary to educate himself when feeling stressed and to discuss it with PC.  He would also do deep breathing exercises.  His initial IDTT was held in D-yard in absentia.  There was no HLOC consideration criteria flagged for the patient; he was retained at the EOP level of care.

**Findings**

Mental health treatment of the patient was adequate.  There was an agreed diagnosis by the treating PCs in A and D-yards and the psychiatrist.  The initial assessments and IDTT were conducted timely in accordance with the Program Guide.  The PC assisted the patient in identifying his coping skills, his goals and interventions. The patient was correctly retained at the EOP level of care.

**Patient Q**

Patient was a 40-year-old male diagnosed with schizoaffective disorder with depressive type, anti-social personality and mood disorder.  He was not taking any psychotropic medications.

The patient was admitted to MCSP's MHCB on March 19, 2022 for bizarre behavior and suicidal ideation; his initial assessment was conducted on March 19, 2022.  According to the record, the patient was incarcerated since 2001, was made 3CMS in 2012, then EOP in 2015 after repeated MHCB admissions and referrals to DSH for suicide ideations and self-injurious behaviors.  The patient previously had a history of ten MHCB admissions, three acute level of care admissions and one intermediate level of care admission.

The biopsychosocial history from the record indicated both parents were on the streets, an early age of drug use and bizarre behavior with some behaviors being real and others feigned for attention.  He became a gang member beginning at age eight and had safety concerns outside and inside prison due to past gang affiliation.  The patient had a history of smearing and ingesting feces.

The patient was admitted to the MHCB for bizarre behavior and ingestion of metal and plastic objects which were confirmed by x-ray.  The patient was in the MHCB from March 19, 2022 through March 28, 2022.  The issuance order allowed the patient a suicide smock, socks and slippers.  The patient was selectively mute and verbally non-communicative except for making bird squawk sounds.  According to the record some staff members documented that they understood one squawks was "yes" and two were "no."  However, other staff were not clear if squawks were affirmative or negative.  The patient was previously on a PC 2602; however, the PC 2602 was not renewed.  When asked if he was suicidal the patient continued nodding his head.

According to the record, an IDTT was held on March 28, 2022.  In the mental health treatment plan notes, it was reported that all required disciplines, PC, psychiatrist, CC I, nursing staff and the patient were in attendance.  The PC presented the patient and each discipline discussed concerns.  The psychiatrist discussed initiating a non-emergent PC 2602 order, the CC I discussed the possible need for a *Vitek* hearing and nursing discussed concerns with the patient's continued nodding of the head when asked if he was suicidal.  The IDTT agreed to submit a referral for acute level of care and to initiate a PC 2602 order.  An IPOC for danger to self was initiated on March 22, 2022 and active.  The patient was seen daily by psychiatry and the MHCB PC.

**Findings**

The care provided the patient was adequate.  The PC and the psychiatry were in agreement with the patient's diagnosis.  The treatment plan included appropriate goals and interventions.  A PC 2602 was initiated and the patient was appropriately referred to a HLOC.

**Patient R**

Patient is a 53-year-old male, diagnosed with acute schizotypal disorder and PTSD.  He refused prescribed psychotropic medications and medical HIV medications.  The patient was serving life with the possibility of parole for first degree burglary and was a third striker.  He entered CDCR on August 16, 1994 and was designated as GP until October 6, 2008 when he became 3CMS.  He returned to GP from May 2010 through March 2018 and back to 3CMS.  The patient had a

previous MHCB stay from February 10, 2022 to February 21, 2022 and again, March 22, 2022 through March 30, 2022 when he was referred to acute level of care.

The patient had persecutory, grandiose, and somatic delusion along with auditory, visual and tactile hallucinations. He had multiple RVRs with the most recent being in 2021 for attempting to escape from the prison. Other RVRs were possession of dangerous contraband/weapon and failure to meet work expectations. The hallucinations were manifestations of a woman who the patient said killed his sister, mother and other family members and was at the prison to kill him.

According to the heath record, the patient remained very psychotic with paranoid and grandiose delusions during his prior MHCB admission. The record showed an IDTT was held in absentia on March 28, 2022 due to the patient's refusal to believe he had a mental health disorder. According to the master treatment plan, all required disciplines were in attendance (PC, MHCB supervisor, psychiatrist, nursing and a CC I). There were updates to the IPOCs for grave disabilities, self-care and ineffective coping with current goals and interventions. The psychiatry documentation showed approval of the PC 2602 order and injections began. During IDTT, the treatment team agreed to refer the patient to the acute level of care which was completed timely.

**Findings**

The care provided this patient was adequate. Contacts were timely according to Program Guide requirements for MHCBs. A PC 2602 order was approved and involuntary medications started. The treatment team appropriately referred the patient to acute care and timely completed the referral.

**Patient S**

The patient was a 38-year-old male diagnosed with unspecified depressive disorder, psychosis, in relation to affective disorder bipolar type and prescribed Abilify and Remeron. The patient's incarceration began in 2014. The patient's historical symptoms included poor distress tolerance, substance use, hoarding of medications, guilt/shame regarding index crime (killed his mother), safety concerns related to index crime, depressed mod anxiety, panic attacks, homicidal ideations, head banging cutting and burning of himself and swallowing of objects. The patient swallowed cables in 2018 and 2019 and was put in five-point restraints in May of 2017. During the patient's incarceration, to date, the patient had 19 MHCB admissions, five admissions to ICF levels of care and five admissions to acute levels of care.

According to the EHRS, the patient arrived to the MCSP EOP from CHCF's intermediate level of care on December 2, 2021. The patient remained EOP until he was placed in the MCSP MHCB based on a CIT activation visit because the patient was having auditory hallucinations with homicidal ideations and thoughts of possibly being violated after taking illicit drugs. According to the record, the patient had no memory of the event, but woke up after taking drugs with a sore rectum and the smell of latex. An initial IDTT was held on March 22, 2022, with activated IPOCs for anxiety, mood stabilization and delirium.

The initial MHCB assessments was conducted timely. He remained in the MHCB from March 22, 2022 through March 30, 2022.

During the MHCB stay, the patient was seen daily by the psychiatry/psychologist and the recreational therapist.  He was compliant with medications and reported that he feared custody and peers.  During his stay in the MHCB the patient admitted to continued illicit drug use; however, he conformed to appropriate behavior after the fifth or sixth day.  He was reported as respectful, had good eye contact, his speech was linear with normal volume and he did not evince any threat of harm to himself or others.  The patient reported that he continued to have fears of dorm settings but was ready for discharge from MHCB.  The patient was released from the MHCB on March 30, 2022 and discharged to EOP level of care.

**Findings**

The patient's care during his MHCB stay was adequate.  His initial IDTT occurred timely.  While he was in the MHCB, he was seen by all disciplines and was compliant with medications.  Once the patient was stabilized without the symptoms that led to his admission, he was appropriately discharged to EOP.

**APPENDIX C-10**
**Richard J. Donovan Correctional Facility (RJD)**
**(March 28, 2022 – March 30, 2022)**

**Patient A**

This 44-year-old patient received 3CMS level of care in a Level IV facility.  A psychiatrist saw him in his housing unit's dayroom on October 21, 2021, due to COVID-19 issues.  The patient's diagnoses included major depressive disorder and PTSD.  He was prescribed hydroxyzine.  The psychiatrist again saw the patient in the dayroom of his housing unit in February 2022.  The patient reported doing well.  Diagnoses and medications were unchanged.

The patient's master treatment plan was updated in September 2021.  The patient's only primary clinician contact during the review period was on October 5, 2021, when the patient was seen confidentially.  There were approximately four therapeutic intervention group notes that referenced in-cell activities.

**Findings**

The patient did not receive 3CMS level of care that was consistent with Program Guide requirements from the perspective of the frequency of primary clinician contacts and based on the lack of confidential psychiatry contacts.  This patient's treatment was not adequate.

**Patient B**

This 46-year-old patient received 3CMS level of care at a Level IV facility.  Different psychiatrists saw him during October 2021 and February 2022.  During the latter clinical contact, the psychiatrist saw the patient in the dayroom due to COVID-19 issues.  The patient was prescribed venlafaxine for depression, which was considered to be in remission.

There was an updated treatment plan dated January 2022.  However, due to COVID-19 issues, the patient was not present at the treatment team meeting.

During the review period, the primary clinician regularly saw the patient in a confidential setting.

**Findings**

The patient generally received adequate mental health treatment that was consistent with Program Guide requirements.

**Patient C**

This 39-year-old 3CMS patient was not seen by psychiatry during the review period; however, there was one psychiatry phone consultation note.  The patient's diagnosis was listed as adjustment disorder with depressed mood.  He received MAT.  The patient was in a discharge planning group during the review period.  His treatment plan was updated in September and December 2021.  His primary clinician saw him in a non-confidential setting in October 2021.

This patient overdosed on synthetic cannabinoids in December 2021. He was subsequently seen for five-day follow-up and a suicide risk assessment was performed.

**Findings**

Issues with this patient's mental health treatment included a lack of confidential assessments by his primary clinician. The patient's major issues appeared to include substance abuse and discharge planning issues. Notably, the patient's treatment addressed both issues. His treatment was consistent with Program Guide requirements and was adequate.

**Patient D**

This 3CMS patient was last seen by psychiatry in August 2021. However, his master treatment plan was reviewed on March 30, 2022. The patient's diagnoses during August 2021 included bipolar disorder. His medications were discontinued with the plan to see him within 90 days. The reviewed master treatment plan did not appear to be very relevant to the patient's psychiatric condition or his mental health issues.

The patient had primary clinician contacts on September 21 and November 30, 2021, and on March 16, 2022. The patient appeared to have been diagnosed with a major depressive disorder. He was assigned a new primary clinician on November 30, 2021.

**Findings**

There were discrepancies in the patient's diagnoses among clinicians; however, progress notes did not address any of them. The patient's master treatment plan did not include his psychiatric issues. The patient's scheduled follow-up with psychiatry did not occur despite the patient being diagnosed with bipolar disorder and having his medications discontinued. This patient's treatment was not consistent with Program Guide requirements and was not adequate.

**Patient E**

This 43-year-old patient received 3CMS level of care. He confidentially met with his psychiatrist on August 20 and December 2, 2021, and on March 20, 2022. Diagnoses included unspecified anxiety disorder and opioids abuse disorder. The patient received MAT.

During the review period, the patient met with his primary clinician on one occasion in a non-confidential setting on November 11, 2021. Notes specific to the patient's MAT were in the chart.

**Findings**

The patient did not receive adequate treatment from his primary clinician in a manner that was consistent with Program Guide requirements.

**Patient F**

This 67-year-old patient was randomly selected for healthcare record review from a list of mainline EOP patients housed on Facility-E at RJD. The patient was diagnosed with schizoaffective disorder, bipolar type, and treated with antipsychotic, antidepressant, and mood stabilizing medications. He had active involuntary medication orders for grave disability since 2018. The healthcare record referenced a history of psychiatric hospitalizations for violence in the context of paranoid delusions and severe psychiatric decompensation during periods of medication non-adherence. Most recently, the patient received acute and intermediate care in inpatient facilities between August 2019 and June 2021. Psychiatric concerns documented within the past six months included agitation, depression, auditory hallucinations, paranoia, poor self-care, bizarre behavior, suicidal thoughts, self-harm, medication and treatment non-adherence, safety concerns, denial of mental health issues, and violent threats toward his clinician and all US citizens.

On January 31, 2022, psychiatry completed a non-confidential contact in the dayroom due to a custody staff shortage. This provider described the patient as rambling with loose associations and as unable to provide direct answers to mental status interview questions. Subsequently, there were no routine psychiatry contacts offered until March 15, 2022.

On April 29, 2022, the patient was evaluated by the CIT in response to submitting a healthcare request form stating, "Im kill American people Im suicide myself and kill my clinician [sic]." The patient was appropriately referred for MHCB placement on this date, and received MHCB care at CIM until his discharge to EOP level of care ten days later. During the MHCB admission, the patient was described as psychotic, agitated, confused, and disorganized. CIM's May 9, 2022 discharge SRASHE recommended closer monitoring with more frequent clinical contacts in the EOP level of care.

Upon returning to RJD on May 9, 2022, the patient was seen by various mental health staff for his MHCB discharge five-day follow-ups. Although the primary clinician's initial assessment was completed prior to the patient's initial EOP IDTT on May 19, 2022, the initial psychiatry assessment did not occur until May 24, 2022. There were no routine EOP primary clinician contacts between CIM's MHCB discharge on May 9, 2022 and the patient's MHCB readmission on May 26, 2022.

On May 26, 2022, the patient was readmitted to an MHCB at RJD for grave disability. During this MHCB admission, the IDTT documented two positive HLOC referral indicators for low treatment compliance and a ten-day length of stay in MHCB; however, the HLOC non-referral rationale appeared to be based on the patient's brief period of medication adherence in the highly structured hospital setting. The IDTT did not document a sufficient rationale for EOP level of care.

On June 10 and June 22, 2022, the patient was evaluated by two mental health clinicians in response to urgent mental health referrals. One referral from custody was related to repeated requests for cell moves and the other referral reportedly had no accompanying referral information. Subsequently, there were no contacts with mental health clinicians for more than three weeks.

On July 15, 2022, the patient was evaluated twice in response to emergent referrals.  Evaluating clinicians described the patient as disheveled, tangential, and paranoid.  The patient also reported sleeplessness, pacing, and concerns for his safety.  To address the patient's safety concerns, one clinician worked with custody staff to coordinate ASU placement.  On the evening of July 15, 2022, the patient cut on his wrist with a piece of metal, endorsed suicidal ideation and auditory hallucinations, and was placed in alternative housing with an MHCB referral.

On July 16, 2022, the patient's MHCB referral was rescinded after he reportedly denied suicidal ideation and "kept repeating 'what do you want from me? I told you I'm good.'"  The MHCB rescission note was very brief, did not include a full mental status examination, and did not mention whether psychotic symptoms or safety concerns were present on this date.  Although the cutting behavior was documented as "superficial," the patient continued to be scheduled for wound care appointments through July 23, 2022.  The MHCB discharge five-day follow-ups were discontinued on July 21, 2022.  However, on day five, the clinician noted the patient had not showered in three days, planned to refuse psychiatry appointments due to being sent to the hospital too many times, and should be considered for a DDP evaluation due to victimization concerns and "alleged exploitation by other inmates."

Despite records suggesting elevated suicide and self-harm risk, the July 16, 2022 alternative housing discharge SRASHE rated the patient's chronic and acute suicide risk as low.  Based on this, the evaluating clinician documented that they were not required to complete a suicide prevention safety plan.  On July 21, 2022, the EOP psychiatrist noted the patient had a "history of cutting on the bottom of his feet with diabetes" and a recent incident of cutting on his wrist "while having [suicidal ideation]" on July 15, 2022.  The healthcare record also referenced one interrupted hanging attempt at Patton State Hospital in 2016 or 2017.

**Findings**

The mental health care and suicide risk management practices were inadequate for this patient.  EOP treatment was limited to medication management and a few brief check-ins.  Despite CIM's MHCB staff recommending closer monitoring through more frequent mental health contacts, the EOP primary clinician and psychiatry contacts did not occur as required by Program Guide.  The quality of MHCB, alternative housing, and SRASHE documentation was very poor, as clinicians failed to document sufficient justifications for their clinical decisions, which were unsupported based on the patient's health record.  This patient required treatment at a HLOC; however, as of July 23, 2022, there was no indication RJD mental health providers were considering an acute or intermediate care referral.

**Patient G**

This 24-year-old patient was randomly selected for healthcare record review from a list of Administrative Segregation EOP Hub patients provided by RJD.  The patient was diagnosed with schizoaffective disorder, bipolar type, and bipolar I disorder.  He had an active PC 2602 order for grave disability and was treated with antipsychotic and mood stabilizing medications.  Records referenced a history of inpatient psychiatric hospitalization.  In 2020, the patient's level of care was changed from EOP to intermediate care; however, he remained at RJD as a "treat in place" due to COVID-19 movement restrictions at that time.  There were no recorded suicide attempts

or self-injurious behavior incidents, and the patient's acute and chronic suicide risk were assessed as low as recent as March 18, 2022. Psychiatric concerns documented during the past six months included medication non-adherence, delusions of grandeur, grave disability, delirium, and violent and disorganized behavior.

The patient received two RVRs in late January 2022 for possession of a cell phone and distribution of a controlled substance. On February 11, 2022, the patient informed his IDTT he had been "cheeking" his psychiatric medications for two months and demanded blood work to prove he was not on medication at the time of the January 2022 RVR behaviors. The treatment team suspected the patient had stopped taking his PC 2602 medications to "avoid a harsher punishment" for the RVRs.

The IDTT's February 11, 2022 treatment plan indicated the patient's medication would be changed to a long-acting injectable antipsychotic medication to address PC 2602 medication non-adherence. On February 14, 2022, the psychiatrist met with the patient individually, discontinued the patient's current psychiatric medications, and again noted a plan to start the patient on a long-acting injectable antipsychotic pending lab results. On February 28, 2022, psychiatry met with the patient for a non-confidential initial assessment in the dayroom of the housing unit. Although, this was the third note indicating a plan to change the patient to a long-acting injectable, it did not appear the plan was implemented prior to March 8, 2022 when the patient received a RVR for aggravated battery and required transport to an outside hospital for altered consciousness and bizarre and aggressive behavior.

On March 9, 2022, the patient returned to RJD with a community hospital diagnosis of "delirium." He was evaluated by an RJD clinician upon arrival and placed in alternative housing with a referral to MHCB for grave disability. Later on that date, RJD had to extract the patient from the alternative housing cell by controlled use of force for MHCB placement. The MHCB treatment team started the patient on a long-acting injectable antipsychotic medication and monitored the patient for ten days in the crisis bed before discharging him to the Administrative Segregation EOP Hub. Following the MHCB discharge on March 18, 2022, there were no routine PC contacts offered until the initial primary clinician assessment on March 28, 2022.

The patient's RVR mental health assessment (MHA) for aggravated battery was completed during MHCB admission on March 17, 2022. The evaluating clinician appropriately consulted with the treatment team and determined mental illness contributed to the patient's RVR behavior on March 8, 2022. The evaluator also included patient specific recommendations for the hearing officer to consider.

On April 25, 2022, the primary clinician noted worsening psychotic symptoms and bizarre behaviors. On April 26, 2022, the patient refused his PC 2602 long-acting injectable antipsychotic medication, and he subsequently decompensated in the Administrative Segregation EOP Hub and required MHCB admission on May 3, 2022 for grave disability concerns. Although the patient demonstrated an inability to remain stable in the outpatient setting, the MHCB IDTT did not refer the patient to a HLOC and did not appear to consider intermediate care at the time of discharge. The HLOC non-referral rationale completed during the 13-day MHCB admission focused only on the patient's ability to stabilize in the highly structured

inpatient setting.  The patient discharged from the MHCB on May 18, 2022 and transferred to CSP/Sac's PSU.

**Findings**

The care provided to this patient was inadequate.  On February 11, 2022, the patient reported that he had been "cheeking" his PC 2602 medication for two months; however, despite the IDTT documenting a plan to change the patient's medication from a pill to a long-acting injectable on this date, the medication was not changed until after he decompensated, received a serious RVR, and required MHCB admission for grave disability on March 9, 2022.  Following the MHCB discharge, there were no primary clinician contacts completed until ten days after Administrative Segregation EOP Hub placement.  Additionally, the MHCB IDTT should have considered a referral to intermediate care given the patient's inability to remain stable in the outpatient setting; however, the non-referral rationale focused only on his ability to stabilize during extended lengths of stay in the MHCB.

**Patient H**

This 59-year-old patient was randomly selected for healthcare record review from a list of mainline EOP patients on Facility-E at RJD.  The patient had at least four inpatient care admissions during incarceration, the most recent of which occurred from September 2018 through May 2019.  Several treatment records noted diagnoses of schizoaffective disorder, antisocial personality disorder, and "multiple Substance Use Disorders."  However, only the EOP primary clinician included a diagnosis of PTSD, and only the psychiatrist routinely documented a diagnosis of major depressive disorder; neither provider included a schizoaffective or other psychotic disorder in their routine progress notes.  The patient was prescribed Prozac for depressive symptoms, Vistaril for anxiety, and Abilify for auditory hallucinations.  He was also included in the MAT program and prescribed Suboxone during the review period.  The most recent suicide risk evaluation assessed the patient's chronic suicide risk as high and his acute risk as low.  SRASHEs referenced three to 12 reported suicide attempts, the most recent of which occurred in 2005 by hanging.

The patient was admitted and retained in the MHCB level of care between October 13 and November 3, 2021.  MHCB records indicated his stay was extended due to a pending investigation of safety concerns.  RJD ultimately determined the safety concerns were "unsubstantiated," and subsequent records suggested the identified individuals had transferred out of RJD.

In late November 2021, the patient's toxicology screen was positive for several psychiatric medications that were not prescribed.

On December 6, 2021, the patient was readmitted to the MHCB at RJD for danger to self.  Prior to admission he reported a plan to overdose on heroin or "climb the fence with a sheet and hang himself before being stopped."  The IDTT records for this MHCB admission did not include a current clinical summary.

According to the most recent IDTT notes, dated March 24, 2022, due to "COVID-19 protocol," the meeting was held with the patient in absentia and with all IDTT members attending via

Microsoft Teams.  The treatment plan included IPOCs for substance use and hallucinations, but not for depression and anxiety.  The IDTT noted no positive HLOC indicators on this date and the patient was described as medication adherent.  The patient was due for IDTT in June 2022; however, as of July 16, 2022 there were no IDTTs or updated treatment plans in the healthcare record.

Routine primary clinician and psychiatry contacts were not completed timely between March and June 2022.  Several PC contacts were completed as wellness checks between January and March 2022 "due to current COVID-19 pandemic precautions."  The low frequency of PC contacts was most concerning between April and June 2022, as the patient had two to three weeks between contacts despite reporting increased depressive symptoms, a recent relapse, and guilt surrounding the relapse.  Although EOP treatment groups were offered, the patient was routinely documented as a "no show" during the last 60-days.

**Findings**

The care provided to this patient at RJD was inadequate.  The EOP providers clearly had diagnostic uncertainties that were not resolved or discussed during IDTT meetings.  The patient also did not receive timely IDTTs or routine PC and psychiatry contacts, and this was especially concerning given his worsening symptoms and treatment non-compliance since May 2022.  Additionally, the MHCB master treatment plan form for the December 2021 admission offered almost no information about the reason for admission or treatment course prior to discharge.  This patient was overdue for an IDTT and ought to have been scheduled urgently to address diagnostic discrepancies and new treatment concerns, including increased depressive symptoms, recent relapse, anxiety related to BPH, and treatment non-compliance.

**Patient I**

This 54-year-old patient was selected for healthcare record review due to concerns noted during onsite observation of IDTTs on RJD's Facility E.  The patient was diagnosed with schizophrenia, bipolar type, and prescribed Haldol, Vistaril, Thorazine, and Cogentin.  Haldol was prescribed as a long acting injectable.  Although the patient was maintained on involuntary medication orders between 2017 and 2020, there were no PC 2602 petitions since that time.  The patient was also a participant in the DDP and designated DD1.

Prior to the patient's recent acute admission, a psychiatrist at a different facility discontinued the patient's psychiatric medications due to refusals, and the patient severely decompensated.  The acute program records referenced a period of rapid decompensation following medication non-adherence during the inpatient admission; however, the patient did appear medication adherent and relatively stable at the time of discharge.  The PIP recommended EOP clinicians focus on medication adherence in treatment, adding the patient "slips off his medication regimen and begins to decompensate in a day or two."

The patient arrived at RJD from the acute care program on or around March 4, 2022.  On March 5, 2022, a social worker met with the patient at cell front during quarantine on Facility A to complete a suicide risk evaluation.  In response to questions regarding his suicide attempt history, the patient requested to speak in a confidential setting; however, there was no indication

this occurred.  On March 7, 2022, a clinician wrote that the patient was likely to decompensate if not seen regularly by his assigned primary clinician and psychiatrist due to the severity of his mental illness.  Subsequently, the patient received one additional cell front "wellness check" before he was referred to the MHCB level of care on March 15, 2022.

CIT notes for March 15, 2022 indicated the patient was "unraveling," endorsing suicidal ideation, presenting with bizarre behavior, delusions, auditory hallucinations, and suicidal plans to either cut his wrists or hang himself with a sheet.  He was retained in the MHCB until March 21, 2022, at which time he discharged to mainline EOP on Facility E at RJD.  The psychiatric discharge summary did not mention whether a PC 2602 petition was considered during admission.

The patient's initial EOP IDTT occurred during the monitoring visit on March 30, 2022.  The monitor's expert noted that the treatment team did not reference recent inpatient or MHCB records.  The expert inquired about the recent MHCB admission at RJD, and the EOP primary clinician inaccurately reported that it was a "step-down" from acute care.  Although the expert shared their concerns regarding the patient's pattern of medication non-adherence leading to decompensation, the treatment team did not develop an IPOC for medication non-adherence on this date and the psychiatrist encouraged the patient to submit a request form an appointment to discuss his side effect complaints instead of scheduling the appointment for the patient on this date.

On April 4, 2022, the patient requested discontinuation of all psychiatric medications.  Psychiatry noted on this date that the patient had been medication non-adherent and presented as disorganized, tangential, and delusional.  The patient was subsequently placed in alternative housing with referrals for MHCB admission on April 9 and April 13, 2022.

On April 22, 2022, the EOP IDTT noted the patient met the HLOC referral indicator for three or more MHCB referrals within a six-month period.  However, the treatment plans still did not include IPOCs for medication non-adherence.

On May 4, 2022, the patient met with a covering psychiatrist who wrote that the patient was suffering from delusions, had severely impaired judgment, and that his medication regimen "may require optimizing."  The patient remained medication non-adherent through May 20, 2022, at which time he was admitted to the MHCB for a manic episode, bizarre behaviors and statements, and grave disability concerns.  MHCB staff attributed the patient's psychiatric decompensation to multiple Thorazine refusals and noted he had not remained in the outpatient setting for more than three weeks since his discharge from acute care in early March 2022.  However, there was no referral to a HLOC.  Medications were adjusted and the patient discharged to EOP level of care on June 2, 2022 after an 11-day length of stay.

**Findings**

The care provided to this patient was inadequate.  Following discharge from the acute program in early March 2022, the patient had multiple MHCB referrals, continued to refuse psychiatric medications, and clearly demonstrated an inability to remain stable without the structure of an inpatient setting.  However, the treatment teams did not refer the patient to a HLOC, and the non-

referral rationales were insufficient. Treatment teams did not review and reference inpatient records to identify risks, develop effective treatment plans, and follow inpatient discharge recommendations. The EOP treatment plans also did not target treatment and medication non-adherence.

**Patient J**

This 31-yer-old patient's healthcare record was reviewed to evaluate the quality of EOP care at RJD. This patient has been retained at the EOP level of care since 12/18. Since then, this patient has a history of multiple MHCB admissions, one 3-month ICF placement (2019-2020), and one 8-month DSH placement (2020). Most recently, this patient returned to the EOP level of care after discharge from the MHCB in 2/22. He had previously been placed at the 3CMS level of care at his IDTT on 12/16/21, only two months prior, and was admitted to the MHCB on 1/25/22. He remained in the MHCB for approximately two weeks and had his IDTT for his return to the EOP level of care on 2/10/22. This patient's most recent mental health diagnosis of record at RJD is "Anxiety," however, this patient's past diagnoses include schizoaffective disorder, unspecified, bipolar disorder, unspecified, and schizophrenia, unspecified. He is also a participant in the Developmental Disability Program (DDP) with a designation of DD2 due to cognitive deficits with victimization concerns.

During the review period, this patient's clinical contacts with a PC was outside Program Guide requirements. The patient received individual PC contacts every two weeks but did not see his PC for any PC led groups or other contacts, including weekly check-ins in lieu of the PC led group. Psychiatry contacts were timely throughout the review period. Review of PC notes indicate the patient generally reported a "good" mood and stable presentation. Although this patient spent the majority of his time on the MHSDS caseload at the EOP level of care, at his IDTT on 12/16/21 this patient's level of care was reduced to 3CMS by the treatment team. Approximately two weeks later, he was admitted to the MHCB after reporting experiencing command auditory hallucinations to "hurt myself" and "not take my medication." While in the MHCB at his IDTT on 1/26/22, the patient reported having increased auditory command hallucinations since not taking medication "2-3 weeks ago." The patient reported "they said if I got off EOP then I could go to the level I and go home…that didn't happen because they said they don't have DDP in level I." The inmate requested a return to EOP during that IDTT and was subsequently returned to the EOP level of care. Of note, treatment plan clinical summaries and conceptualizations are copied and pasted from plan to plan over time. Further, there was no update provided to this patient's active chart diagnosis to reflect his direct reports of command auditory hallucinations and medication non-adherence.

Upon his return to the EOP level of care on 2/10/22, the Clinical Summary of the IDTT reported the inmate "has begun taking his psych medications once again." The Initial Psychiatry Assessment note of 2/7/22 indicate diagnoses of Schizoaffective Disorder and plan to continue medications including Prolixin, Zoloft, Vistaril, melatonin and Cogentin. The IDTT on 2/10/22 notes "steady improvement" and that the patient would be retained at the EOP level of care until he paroles 6-7 months from now. Per the record, since his return to the EOP level of care the patient received Recreational Therapy (RT) rounding and in-cell therapeutic packets, and received "Therapeutic Intervention/Group" yard time. Although this patient was returned to the EOP level of care on 2/10/22, he was not seen by his PC until 2/23/22, which is outside Program

Guide requirements for weekly PC contacts.  Per the PC note on 2/23/22, the patient was to learn at least 2 Distress Tolerance or Emotional Regulation techniques, continue taking medication as prescribed, and alert staff if he began hearing command auditory hallucinations instructing him to discontinue his meds.  The note also includes plan for patient to attend unit programming daily.

**Findings**

The care and treatment provided to the patient at RJD was inadequate.  This patient had a long history of EOP level of care to address psychosis and severe mood disorder.  He was also in the DDP program throughout his incarceration.  Despite being at the EOP level of care and the DDP designation, the patient's level of care was reduced to 3CMS on 12/16/21 after the treatment team felt the patient had demonstrated treatment compliance and stability over the previous six months.  However, further review of the record indicates the reduction in level of care was not appropriate for his clinical needs, as he stopped taking his medications, rapidly decompensated, and was admitted to the MHCB only two weeks after the reduction in level of care.  He was stabilized at the MHCB, and reported he only desired a reduction in level of care because he "was told" it would increase his likelihood of release from CDCR.  The reduction in level of care was inappropriate and put the inmate at increased risk of self-harm and decompensation.  Also, although he was appropriately returned to EOP level of care, upon his return PC contacts were not timely and the patient did not receive any clinical support aside from medication management, in-cell therapeutic packets, and therapeutic yard time for almost two weeks post-discharge from the MHCB.

**Patient K**

This 37-year-old patient's healthcare record was reviewed to evaluate the quality of EOP care at RJD.  This patient arrived at RJD in 10/20 and has been retained at the EOP level of care throughout his time at RJD.  According to the record, this patient has a history MHCB admission, most recently in 5/19 due to "SI and gravely disabled, documentation states IP was paranoid, manic, acting bizarre, reporting safety concerns for himself and family, with rapid speech."  The record also indicates this patient previously reported delusions and paranoia.  This patient's mental health diagnoses at RJD vary depending on the clinician.  PC notes indicate this patient carried diagnoses of Amphetamine Abuse, Unspecified Schizophrenia Spectrum and other Psychotic Disorder, while psychiatry notes indicate diagnosis of Schizoaffective Disorder, Bipolar type.  This patient was prescribed Vistaril, and antianxiety medication, to address his symptoms.

This patient did not attend his IDTT meeting on 9/15/21.  At that meeting, the treatment team described the patient "often presents with a disorganized thought process which can be challenging to follow, though admittedly he is attending program and participating."  The treatment plan contained IPOCs to address delusions, hallucinations, and depressed mood, however, the interventions and objectives remained unchanged without update or modification and were not individualized. This patient did not have another IDTT during the review period; his next IDTT occurred approximately seven months later on 4/6/22 which is far outside Program Guide requirements.  During the review period, this patient received weekly PC contacts and monthly psychiatry contacts, consistent with Program Guide requirements.

Confidentiality of clinical contacts varied, with some provided cell-front and other contacts provided in a confidential setting. Confidentiality of clinical contacts appeared to depend on COVID-19 and modified programming at RJD in late 2021 and early 2022. PC and psychiatry notes generally reflect a patient who was engaged in treatment and demonstrated adequate participation in programming. PC and psychiatry notes indicate the patient participated in 1:1 contacts appropriately, including engaging with his clinicians and often completing assigned homework. This patient also participated in PC-led caseload groups, recreational therapy groups, and clinical groups when they were available/offered.

**Findings**

The care and treatment provided to this patient at RJD was inconsistent with Program Guide requirements. PC and psychiatry contacts were timely and appropriate, and the patient appeared engaged and motivated towards participating in programming. However, the IDTT process for this patient was severely deficient throughout the review period. This EOP patient had only one IDTT between 9/21 and 4/22 – a period of 7 months. The diagnoses reflect severe mental illness, however, he was prescribed Vistaril, which is inconsistent with the provided diagnoses. Further, the goals and interventions contained within the treatment plan were boilerplate and carried over from previous IDTTs with little change, update or modification over time. This patient would likely benefit from more individualized goals, objectives and interventions within the treatment plan.

**Patient L**

This 32-year-old patient was randomly selected from a list of mainline RJD EOP patients to assess the quality of mental health care provided. The patient arrived at RJD on February 28, 2020, and was primarily housed on Facility C. His psychiatric diagnoses included major depressive disorder, recurrent, severe, adult antisocial behavior and amphetamine use disorder. He was prescribed Trileptal and Benadryl.

The patient was referred to the MHCB on two occasions in 2021 and once in 2022. MHCB records for the July 29, 2021 admission indicated that the patient exhibited bizarre behavior, threatened to hang himself, and reported ingestion of 30 Tylenol tablets. The patient later informed mental health staff he ingested only four Tylenol pills and was under the influence of methamphetamine and other stimulants at the time of admission.

Although the EOP IDTT convened timely after the patient's discharge in August 2021, there were no subsequent EOP IDTT reviews until eight months later on April 7, 2021. Of concern was the lack of documentation indicating communication between the PC and psychiatrist to discuss the patient's worsening psychiatric presentation, level of care, and treatment needs during this timeframe.

During the August 13, 2021 IDTT, the treatment team did not document a reason for the patient's reported refusal to attend. They stated that the patient recently "perseverated on the amount of EOP programming he believes he should receive versus what he is currently getting." While the treatment plan generated on that date included measurable goals and some useful interventions, PC progress notes suggested that the plan was not implemented.

Most PC contacts at RJD were completed as wellness checks in nonconfidential settings. Psychiatry contacts also primarily occurred at cell front in a nonconfidential setting.

When the IDTT convened again eight months later on April 7, 2022, the reason for the patient's refusal to attend was not documented. The treatment plan's clinical summary on this date indicated the patient's sister died in February 2022 and that her death had been "confirmed." The treatment team further noted that, following his sister's death, the patient was placed in ASU briefly for "unsubstantiated safety concerns," had "many RVRs pending," was medication nonadherent, and was recently transported to an outside hospital after ingesting cleaning fluid and falling in his cell. Despite these concerns, the IDTT did not document consideration of referral to a HLOC or modify the treatment plan to address the new concerns and elevated risk.

After the patient ingested cleaning fluid and returned from an outside hospital in March 2022, he was evaluated and referred to the MHCB level of care. The patient reportedly denied suicidal intent when he ingested the cleaning fluid, and the incident was not documented as a suicide attempt. A SRASHE completed after the self-harm incident assessed high chronic and low acute suicide risk; however, the acute risk appeared to have been underestimated due to inaccurate data present in the acute risk factors section of the document. For example, despite collateral notes suggesting the presence of recent depressive symptoms, anxiety, substance use, assaultive behavior, loss of support and hopelessness, the evaluating clinician checked "no" for those risk factors in the SRASHE.

In June 2022, the IDTT convened again with the patient in attendance. The IDTT noted the patient had "gradually decompensated" following the death of his sister and continued to exhibit intermittent suicidal ideation, hopelessness, grief, treatment and medication nonadherence. The IDTT further indicated that the patient reported feelings of emptiness and was "typically tearful and dysphoric" when he engaged with the PC. On this date, the IDTT determined that the patient was unable to function at the current level of care due to a major mental disorder, and he was referred for intermediate care.

The patient transferred to SVSP for intermediate care on June 21, 2022.

**Findings**

The care provided to this mainline EOP patient was inadequate.

For a period of eight months, the IDTT did not convene to discuss level of care, treatment planning, or interventions to address worsening symptoms and increased suicide risk. There was also no documentation indicating mental health providers consulted or met informally during this timeframe to address these important concerns.

Following the patient's sister's death in February 2022, treatment plans required modification to address the patient's grief, recent RVRs, medication and treatment nonadherence, and self-harm; however, this did not occur, even when the IDTT eventually convened in April 2022. The SRASHE completed after the self-harm incident in March 2022 contained inaccurate information, which likely contributed to an underestimation of acute suicide risk and failure to document sufficient interventions to address the elevated risk.

While the patient was appropriately referred to a HLOC in June 2022, the IDTT failed to consider a HLOC when they met in April 2022, nor did they develop an enhanced EOP care plan in lieu of HLOC referral.

Lastly, PC and psychiatry contacts were often completed at cell front in a nonconfidential setting, including those completed shortly after the patient exhibited signs of psychiatric decompensation and engaged in self-harm.

**Patient M**

This 34-year-old patient was randomly selected for healthcare record review to assess the quality of mental health care provided in the mainline RJD EOP. The patient arrived at RJD from CMF acute care in January 2019. He had one MHCB admission at RJD in August 2019. The patient was provided with a diagnosis of schizoaffective disorder, depressed type. He was prescribed antipsychotic, antidepressant, anxiolytic and mood stabilizing medications. A SRASHE conducted on July 2, 2022 assessed high chronic and low acute suicide risk. The patient reported three prior suicide attempts; the most recent occurred in 2017. He also had one documented self-harm incident by cutting in August 2019.

A review of PC progress notes during 2021 indicated that the patient was seen by the PC monthly for therapy sessions, and routine contacts occurred at cell front in a nonconfidential setting. In January, February, March and most of April 2022, it appeared that all routine PC contacts were completed as nonconfidential wellness checks. Additionally, the PC indicated that these contacts occurred in nonconfidential settings due to staffing shortages. Although PC caseload groups were offered during this period, the patient generally refused to attend.

Psychiatry also completed most routine contacts at cell front, and the corresponding clinical notes offered minimal information. No routine psychiatric contacts were documented during December 2021. On January 18, 2022, the psychiatrist documented that the patient was prescribed seven psychotropic medications and appeared sedated; an EKG was ordered on that date.

An absence of IDTT documentation between September 2021 and July 2022 suggested the patient was not reviewed by the treatment team for a period of ten months. There was also no documentation indicating communication and collaboration between the PC and psychiatrist regarding the patient's psychiatric presentation, level of care, and treatment needs. During this period, clinical progress notes indicated that the patient intermittently reported worsening anxiety, depression, and psychotic symptoms.

At an EOP IDTT on September 17, 2021, the treatment team noted that the patient did not attend and that he met the HLOC referral indicator for participating in less than 50 percent of offered treatment. The patient was not referred to a HLOC on this date, and the non-referral rationale section stated that, although the patient refused groups due to paranoia, he was participating in individual sessions, attending dayroom, and "demonstrating an ability to function on the yard."

When the IDTT convened again ten months later on July 1, 2022, ongoing concerns with low treatment participation, medication nonadherence, suspected substance use, and lab refusals were noted. The psychiatrist informed the treatment team that the patient infrequently was seen out of

cell in a confidential setting, that he would be tapered off Depakote due to laboratory refusals, and that he had been removed from the MAT program due to nonadherence with urine toxicology screenings. Although the patient did not appear to meet criteria for a HLOC referral, the non-referral rationale needed improvement. The enhanced care plan, however, did sufficiently address the patient's treatment nonadherence.

**Findings**

The care provided to this mainline EOP patient was inadequate.

IDTTs and routine PC and psychiatric contacts failed to meet Program Guide requirements. The patient also did not receive the required group therapy hours. The patient was not seen by the EOP IDTT for ten months; this lapse occurred despite providers documenting lack of progress in treatment, worsening symptoms, ongoing medication nonadherence, suspected substance use, and participation in less than 50 percent of programming due to "paranoia." During this ten-month period, nearly all psychiatric contacts occurred at cell front with inadequate documentation of those contacts; additionally, most routine PC contacts also occurred in a nonconfidential setting, either at cell front or in the dayroom.

**Patient N**

This 51-year-old patient was randomly selected for healthcare record review to assess the quality of mental health care provided in the mainline RJD EOP. The patient arrived to RJD from a reception center in 2020, and he was primarily housed on the Level II yard (Facility E).

The patient was provided with a diagnosis of schizoaffective disorder, depressive type. He reportedly had symptoms that included depressed mood, intermittent insomnia, grief, and chronic command auditory hallucinations to harm himself or others. The patient also had a history of amphetamine dependence and several medical issues, including chronic obstructive pulmonary disease, type 2 diabetes, sleep apnea, and obesity. He also required hearing aids for effective communication. He was prescribed Depakote, Paxil, Zyprexa, and Thorazine.

The most recent SRASHE completed in 2020 assessed low chronic and acute suicide risk; however, it appeared that the evaluating clinician underestimated the chronic risk as the patient had at least ten of 18 chronic risk factors. The patient's most recent CIT evaluation occurred in March 2020 in response to his endorsement of command auditory hallucinations to harm himself. There were no MHCB admissions during his housing at RJD.

At the time of review, the treatment team had not convened for a formal IDTT in ten months. On May 4 and July 7, 2022, the PC documented in progress notes that routine IDTTs had been cancelled "at the directive of management as of 02/01/2022 due to institution wide staff shortages." The PC progress notes on those dates included brief updates of the patient's clinical presentation and stated that other treatment team members were consulted.

The most recent treatment plan on December 2, 2021, included one IPOC that targeted auditory hallucinations. The treatment plan clinical summary was limited to one sentence that suggested that the patient was able to manage his symptoms with weekly support from the PC and other programming; however, there was no mention of progress toward specific treatment goals. It

was noted in the level of care rationale section of the treatment plan that the patient would be retained in the EOP, as he was treatment adherent, receptive to treatment interventions, and had not met any HLOC referral indicators.

The clinical summary from the prior IDTT in September 2021 indicated that the patient had been experiencing command auditory hallucinations "to hurt himself and/or engage in starting fights with inmate peers and/or officers," but he reportedly managed those thoughts and urges by keeping busy and by distracting himself.

Psychiatric and PC progress notes between December 2021 and July 2022 indicated that the patient routinely endorsed command auditory hallucinations to harm himself or others; further, in response to learning of his mother's death in November 2021, he struggled with grief and worsening depressive symptoms.

The PC progress notes were very detailed and suggested that individualized treatment interventions were regularly implemented at least twice monthly.  The PC also completed wellness checks twice monthly; documentation of these checks provided comprehensive and useful information regarding the patient's clinical presentation and treatment interventions. Although the PC generally met with the patient weekly for clinical contacts or wellness checks; no routine contacts or wellness checks were documented for 20 days during July 2022.

Psychiatric progress notes generally offered sufficient updates regarding the patient's presentation and response to medication interventions; however, there was a lack of documentation of routine psychiatric contacts in February, May, and July 2022.

**Findings**

The overall care provided to this patient was inadequate.

The primary clinician provided clinically useful and detailed documentation of clinical encounters, consulted appropriately, and attempted to address the patient's treatment needs despite limited staffing and intermittent COVID-19 related movement restrictions; however, there were a number of concerns identified during this review.  IDTTs and routine PC and psychiatric contacts failed to meet Program Guide requirements.  The patient also did not receive the required group therapy hours.  The patient was not seen for a psychiatric evaluation during February, May, and July 2022, and the reason for the missed contacts was not documented.  Also in July 2022, there was no documentation of PC contact for 20 days; when contact occurred, it was for a wellness check which was performed in a nonconfidential setting.

The 2020 SRASHE clearly underestimated chronic suicide risk, and an updated SRASHE should have been completed in response to the severity of ongoing command auditory hallucinations.

**Patient O**

This 55-year-old male was randomly selected for healthcare record review to assess the quality of MHCB care provided at RJD.

The patient's most recent CDCR incarceration began in 2013. Before arriving at RJD, he had a history of four prior MHCB stays, most recently in 2020. He had four intermediate care hospitalizations in 2013, 2017, 2019, and 2020 to 2021; additionally, he was hospitalized for acute care from 2017 to 2018 and in 2019. Records indicated the patient was treated at DSH-Patton for competency restoration to stand trial from 1999 to 2000.

The most recent SRASHE on October 11, 2022, assessed the patient with low chronic and acute suicide risk. He had a history of suicide attempts, with the last attempt in 2006 by cutting his wrist. The patient had a reported history of self-harm.

The patient was provided with psychiatric diagnoses that included schizoaffective disorder, bipolar type and delusional disorder.

The patient arrived from the CMC ASU EOP to the mainline EOP at RJD on February 15, 2022.

On March 16, 2022, he was admitted to the MHCB after striking three inmates, reportedly due to delusional thinking that he needed to protect others. The patient had a long history of RVRs, including at least six in the year prior to MHCB placement.

The initial PC and psychiatric evaluations occurred timely prior to the initial IDTT. The initial IDTT established treatment goals that were clinically appropriate and addressed risk of harm to self and others.

The patient refused recommended medications. The psychiatrist promptly filed an emergency PC 2602 on March 17, 2022, for grave disability and danger to others. The patient received involuntary medications by PC 2602 order in 2018; the exact duration of this order was unclear, but it appeared to have remained in place in 2021. The psychiatric note on Friday, March 18, 2022, stated that involuntary medications were not initiated over the weekend due to lack of needed staff should the patient refuse the medication.

On March 22, 2022, controlled use of force was required to administer psychotropic medication. The psychiatrist documented that he prescribed a long-acting injection of paliperidone (antipsychotic), given the risk of harm to the patient and to staff should repeated uses of force be required. The documentation surrounding the use of force was adequate and clearly noted multiple efforts to avoid the use of force.

Routine IDTTs and PC and psychiatric contacts occurred timely. The treatment team also referred the patient to acute care timely. Subsequent IDTTs included clinical summaries, goals, and collateral information which changed minimally. The team actively encouraged the patient to attend his IDTTs. They documented attempts to include the patient in treatment planning; however, due to the severity of his mental health impairment, he was only able to minimally contribute. Due to a hand injury, the patient was placed on a medical hold. The patient transferred to acute care at CMF on May 18, 2022. He remained at that level of care until October 13, 2022, when he paroled.

**Findings**

The care provided to this MHCB patient at RJD was inadequate.

While the initial treatment plan appeared clinically appropriate, the subsequent plans were largely carried forward and not updated as the patient's clinical presentation evolved. Clinical summaries and case formulations in treatment plans lacked sufficient documentation of current symptoms, functional impairments, relevant treatment history and treatment response. Instead, documentation focused on historical information. Documentation from PC contacts did not clearly indicate a correlation to treatment plan goals. The treatment plan also inadequately addressed the mental health effects of the patient's lengthy MHCB stay, which was required due to a medical hold.

Regarding the psychiatric care provided, the psychiatrist promptly filed a clinically appropriate emergency involuntary medication petition. Despite this filing, the administration of psychotropic medications was delayed over the weekend due to staffing issues, resulting in the patient not receiving needed medications for two more days. Additionally, a long-acting injectable antipsychotic medication, and not a daily oral medication was prescribed, with an injectable form as a back-up for patient refusal. While the psychiatrist documented the rationale for minimizing the number of potential uses of force with possible patient and staff injury, the long-acting injectable was given without an authorized PC 2602 order in place. Thus, if the petition for involuntary medications was denied, the patient would still be receiving medications, as the long-acting injectable medication would be slowly released in his body.

Documentation clearly supported the controlled use of force; this occurred only after multiple other interventions were attempted.

**Patient P**

This 39-year-old male was randomly selected for healthcare record review to assess the quality of MHCB care provided at RJD.

His CDCR incarceration began in 2008. He was included in the MHSDS in 2011 at the 3CMS level of care. His first MHCB admission occurred in 2011; the most recent stay occurred prior to transfer to RJD in January 2021. He had a prior history of intermediate care hospitalization during a prior incarceration, as well as a history of treatment at the acute level of care, most recently in 2020.

The patient transferred to the EOP at RJD on August 6, 2021, from the SVSP STRH. The patient was housed in the mainline EOP until February 6, 2022. He was then placed in the ASU EOP until February 22, 2022, when the treatment team referred him for intermediate care. The patient remained housed in the ASU EOP hub until March 14, 2022, when he transferred to the MHCB due to suicidal ideation.

The patient had an extensive history of suicide attempts, with nine reported attempts. The last documented suicide attempt occurred in July 2020 by hanging. He also had a history of self-harm with over 20 documented incidents.

The most recent SRASHE on September 15, 2022, assessed high chronic and low acute suicide risk.

He was provided with diagnoses of major depressive disorder, PTSD, adjustment disorder, antisocial personality disorder, and borderline personality disorder.

The patient received involuntary medications by PC 2602 order. He was prescribed lithium (mood stabilizer), paliperidone (antipsychotic), hydroxyzine (antianxiety), and benztropine (to address side effects of medications).

Upon admission to the MHCB, PC and psychiatric initial evaluations occurred timely and prior to the initial IDTT. Treatment plan targets included resolution of thoughts of death/suicidal ideation, "behavior appropriate for a lower level of care" and working with the therapist on "goal setting." The same goals were present for the duration of the MHCB admission. The patient attended treatment team meetings.

Routine psychiatric and PC contacts, as well as IDTTs, occurred timely. The psychiatrist appropriately adjusted the lithium dose as clinically indicated. The PC notes frequently contained identical plans involving goals for the patient using distraction and identifying distorted thoughts contributing to hopelessness. Treatment plan clinical summaries contained mostly historical, but not current information.

On March 30, 2022, the patient was denied admission to the CMF L-1 intermediate program due to his maximum custody status. On April 1, 2022, custodial staff confirmed plans to remove the maximum custody status upon arrival at CMF. The patient transferred to CMF on April 4, 2022, where he was treated until June 10, 2022. He then transferred to the EOP at MCSP where he remained at the time of this review.

**Findings**

The care provided to this MHCB patient at RJD was inadequate.

The justification for admission to the MHCB appeared clinically adequate.

While some initial treatment plan goals appeared appropriate, others were vague, ill-defined, and difficult to measure. An example was the goal for the patient to display behavior appropriate for placement at a lower level of care. This goal was perplexing, as the patient was awaiting placement at the intermediate level of care, a HLOC than MHCB. Subsequent treatment plans displayed minimal changes to treatment goals; despite the patient's minimal progress in achieving the current goals. Treatment plan clinical summaries and case formulations lacked sufficient documentation of current symptoms, functional impairments, relevant treatment history and treatment response. Instead, documentation focused on historical information, as well as on the patient's presentation at time of intake. Routine treatment plan documentation did not provide an adequate summary of the patient's functioning and treatment between IDTT meetings.

Progress notes did not measurably correlate with treatment plan goals. The plan sections in notes were frequently identical. There was scant evidence that the PC integrated the interventions listed in the plan with clinical contacts and interventions.

Psychiatric medication management appeared clinically appropriate. Also of note, the treatment team actively worked with the relevant custodial staff to remove the maximum custody status to achieve transfer to needed inpatient care.

**Patient Q**

This 42-year-old male was randomly selected for healthcare record review to assess the quality of MHCB care provided at RJD.

His most recent CDCR incarceration began in 2011. The patient was treated primarily at the 3CMS level of care, punctuated with MHCB stays. He did not have a history of treatment at the EOP level of care. Between May 2019 and February 2021, he was not included in the MHSDS.

The patient had two admissions to the MHCB, most recently in 2018. Additionally, the patient had a history of multiple MHCB referrals for which he was not admitted, most recently on March 19, 2022. The patient had no history of intermediate or acute care hospitalizations.

The patient had one prior suicide attempt by cutting in 2012. The most recent SRASHE on October 11, 2022 assessed low chronic and acute suicide risk.

He was provided with diagnoses of adjustment disorder and personality disorder traits.

The patient transferred from Calipatria State Prison (Calipatria) to RJD on March 15, 2021; there he was placed in the 3CMS program. He had multiple ASU placements as well as two evaluations for MHCB placement, most recently on March 19, 2022. On that date, he was evaluated for MHCB placement after medical clearance due to reported ingestion of possible opiates. He was not admitted, and he denied that his ingestion of the unknown pill was due to suicidal intent. On March 22, 2022, the patient expressed suicidal ideation with a plan to cut himself, and he was admitted to the MHCB.

In the MHCB, the initial PC evaluation occurred timely. The initial evaluation contained apparent errors from prior documentation that were repeated, such as the patient appeared to be "adjusting nicely" when he transitioned from the mainline to the ASU. The initial psychiatric evaluation also occurred timely. Both initial evaluations occurred prior to the initial IDTT. The initial treatment plan targets included reducing suicidal thoughts and developing a therapeutic alliance with the patient. The patient attended the treatment team meetings.

The patient was not prescribed scheduled medications at the time of MHCB admission; however, he was prescribed hydroxyzine for anxiety on an as needed basis. The patient had no history of PC 2602 ordered treatment with involuntary medications.

Routine psychiatric and PC contacts occurred timely. Routine IDTTs also occurred timely with documented patient input into the treatment planning process. Although the treatment team added new goals such as reducing anxiety level, original treatment goals were generally not updated.

The patient voiced safety concerns. He remained in the MHCB until completion of the safety inquiry. After completion, he was clinically discharged on April 8, 2022, and he remained in the

MHCB until physical discharge on April 11, 2022. This reportedly occurred due to custody difficulty with locating appropriate housing.

After MHCB discharge, the PC did not complete the first day of the mandated five-day follow-up. Once started on the following day, the PC completed the five-day follow-up.

The patient received mental health services at the 3CMS level of care at RJD until July 26, 2022, when he transferred to CSP/LAC. He was removed from the MHSDS on August 25, 2022. On November 7, 2022, the patient was housed at CSP/LAC, where he was not a participant in the MHSDS.

**Findings**

The care provided to this MHCB patient at RJD was inadequate.

Primary clinician initial assessments lacked clear documentation regarding the patient's current treatment needs in presenting problem/chief complaint and clinical summary sections designated for this clinical information. Instead, these sections included only historical information. PC documentation repeated information from prior assessments; for example, stating that the patient was adjusting well to RJD despite the need for MHCB placement.

Initial treatment plan goals appeared clinically appropriate; however, PC documentation lacked clarity how the treatment directly linked to the stated treatment goals. Routine treatment plan documentation did not provide an adequate summary of the patient's functioning and treatment between IDTT meetings. While the treatment team appropriately added additional treatment goals, the team did not sufficiently update the original goals as the patient's clinical situation evolved.

Finally, the first day of the mandated five-day follow-up after MHCB discharge was not documented, exposing the patient to unnecessary psychiatric risk.

**Patient R**

This 38-year-old male was randomly selected for healthcare record review to assess the quality of MHCB care provided at RJD.

His CDCR incarceration began in 2016. The patient was admitted to the MHCB on the day of intake. Prior to arrival at RJD, the patient had a history of four prior MHCB stays, most recently in September 2020. He had a history of two prior acute care hospitalizations in 2016. He also had a history of intermediate care hospitalization, most recently in 2016.

The most recent SRASHE on November 1, 2022, assessed moderate chronic and acute suicide risk. The patient had a history of suicide attempts, with the most recent attempt on January 1, 2016. He also had a reported history of self-harm.

The patient arrived at RJD on February 15, 2022, from CMF. The patient was not included in the MHSDS until March 4, 2022, when he required MHCB placement due to thoughts of

hanging himself. The patient was transferred to CIM for MHCB admission. He returned to RJD at the EOP level of care on March 15, 2022.

On March 19, 2022, the patient was readmitted to the MHCB at RJD due to suicidal thoughts and "odd" behavior.

Provided psychiatric diagnoses varied, but included unspecified psychotic disorder, a history of amphetamine use disorder, and antisocial personality disorder.

He was prescribed lamotrigine (mood stabilizer), buspirone (antianxiety), aripiprazole (antipsychotic and mood stabilizer), and olanzapine (antipsychotic). The patient had no history of PC 2602 ordered treatment with involuntary medications.

Both the PC and psychiatric initial evaluations included issues of concern. The PC initial evaluation displayed a lack of robust clinical information in the presenting problem. The clinical summary restated the patient's mental status examination with only historical information. The case formulation was inadequate and fragmented. The initial psychiatric evaluation lacked a strong case conceptualization. The PC and psychiatric evaluations did occur prior to the initial IDTT. The initial treatment goals included the elimination of suicidal thoughts. The clinical summary and case formulation were nearly the same as those from the initial PC evaluation. The patient attended the IDTT.

Routine PC and psychiatric contacts occurred timely. Overall, the progress notes failed to document correlation with the goals included in the treatment plan. When such correlation was documented, such as the patient not expressing suicidal thoughts, the steps necessary to achieve that goal were absent.

The patient began to refuse his medically necessary medications; however, the primary care provider noted that the patient was medication adherent.

The psychiatrist initiated treatment with lamotrigine for mood stabilization. A psychiatric follow-up note stated that the contact was conducted at bedside, as confidential treatment space was unavailable. The psychiatrist indicated that there was possible amplification of reported symptoms in an attempt to obtain a referral to the acute or intermediate level of care.

The subsequent IDTT was not timely, as it occurred nine days after the prior treatment team meeting. The clinical summary and case formulation remained largely unchanged from intake documentation. The treatment team recommended discharge. The patient reported that he would refuse housing. He inquired about voicing suicidal ideation for placement in the ASU. The discharge SRASHE documented low chronic and acute suicide risk.

Although the patient was clinically discharged on March 30, 2022, he remained housed in the MHCB at the EOP level of care due to the need to secure housing placement. On April 1, 2022, while still in the MHCB after clinical discharge, the patient reported suicidal ideation; however, he then reportedly engaged in safety planning. The patient was physically discharged from the MHCB to the ASU EOP on April 1, 2022.

Five-day follow-up after MHCB discharge was completed as required.

862

On April 4, 2022, the patient was readmitted to the MHCB due to suicidal ideation.  The initial PC and psychiatric evaluations occurred timely prior to the initial IDTT.  The psychiatric evaluation appeared to minimize the patient's reported suicidality, with the psychiatrist stating "Suicidality is thus not genuine."  This opinion of the patient's reported suicidality was also documented in the PC notes.  For example, on April 6, 2022, the patient voiced suicidal ideation with a plan to hang himself, but the PC doubted the "veracity" of this plan.  Despite the documentation of a reported suicidal plan, the treatment team did not restrict property, such as access to clothing that could be utilized in a suicide attempt.

Routine psychiatric and PC contacts occurred timely.

The initial IDTT was not timely.  The patient was admitted to the MHCB on April 4, 2022, but the initial IDTT did not occur until April 8, 2022.  This April 8, 2022, IDTT was also the patient's discharge IDTT.  The patient was discharged from the MHCB on April 9, 2022, transferring to the mainline EOP at RJD.

Five-day follow-up was completed as required.  Of note, documentation of the five-day follow-up after each MHCB admission stated that weekend contacts were not conducted confidentially due to the lack of custody escort officers.

On November 7, 2022, the patient remained housed at RJD where he received mental health services at the EOP level of care.

**Findings**

The care provided to this MHCB patient at RJD was inadequate.

The primary clinician initial assessments lacked clear documentation regarding the patient's current treatment needs in the presenting problem/chief complaint and clinical summary sections designated for this clinical information.  Instead, these sections largely documented historical information.

Both psychiatric and PC documentation indicated a minimization of the patient's reported suicidality.  While notes mentioned that the patient might be amplifying his symptoms, the notes failed to document how the treatment team actively addressed this serious and significant concern.

During the second MHCB admission, the IDTT did not occur timely.

The patient refused a medically necessary medication; however, the internist's note indicated medication adherence.  This suggested inadequate coordination between the mental health and the medical treatment teams.

Problems with access to confidential treatment space were documented by the psychiatrist and PCs completing five-day follow-up; the psychiatrist reported lack of access to confidential treatment space in the MHCB, and the PC reporting difficulties with adequate weekend custodial escort officers.

**Patient S**

This 28-year-old male patient was randomly selected for healthcare record review to assess the quality of EOP care provided in the ASU at RJD.

The patient's CDCR incarceration began in 2003. He received mental health treatment at the 3CMS, EOP, MHCB, intermediate, and acute levels of care; there were also periods when he was not included in the MHSDS. He had a history of three MHCB stays, most recently in February 2021. He had one intermediate care hospitalization from August 2017 to July 2018; additionally, he had one acute care hospitalization from February to August 2021.

The patient was discharged from CMF acute care on August 12, 2021; subsequently, he transferred to the mainline EOP at RJD. He was placed into the ASU on February 13, 2022 due to safety concerns.

The most recent SRASHE on August 13, 2021 assessed moderate chronic and low acute suicide risk. The patient had a history of suicide attempts, most recently in June 2017. The patient also had a history of self-harm.

He was provided with diagnoses of schizophrenia and unspecified anxiety disorder.

The patient was prescribed haloperidol decanoate (long-acting antipsychotic injectable medication), olanzapine (antipsychotic), and venlafaxine (antidepressant/antianxiety).

The patient received involuntary medications by PC 2602 order from May 2021 until his parole in June 2022.

After transfer to the ASU EOP on February 13, 2022, the patient was seen by the PC timely.

Documentation in the healthcare record about these contacts indicated that the initial presenting problem included useful clinical information; however, the clinical summary and case formulation sections were largely historic. The initial psychiatric evaluation was not timely. The psychiatrist attempted to meet with the patient on February 17, 2022; however, the patient reportedly refused. The first visit with the psychiatrist occurred on March 4, 2022; this contact was documented on a progress note, not the appropriate initial psychiatric evaluation form that would have documented additional clinically relevant information.

The initial IDTT did not occur timely, as it occurred after the ICC. The initial IDTT was conducted without the patient due to COVID-19 "custody modified programming." Treatment plan targets included reducing distress and hallucinations, learning coping skills, and addressing substance use. These targets were unchanged from August 2021, except for the addition of pre-release planning.

Clinical summaries mirrored those from the initial PC evaluation.

Routine contacts with the psychiatrist and PC occurred timely. The PC addressed treatment plan goals, demonstrated evidence-based practices used in clinical contacts, and provided documentation that interventions during clinical contacts were consistent with treatment plan

goals. The PC actively discussed parole planning with the patient. The psychiatric notes were adequate and contained information about progress with medications, as well as monitoring for medication side effects.

Routine IDTTs occurred timely. The goals of parole planning, including facilitating contact with the TCMP, were clearly specified. Other goals were largely repeated from prior treatment plans. Documentation indicated that for one IDTT the PC, psychiatrist, and correctional counselor were "present on the phone." The clinical update contained useful information with an emphasis on safety.

The patient transferred from the ASU EOP to the mainline RJD EOP on May 12, 2022. He paroled on June 22, 2022.

**Findings**

The care provided to this EOP ASU patient at RJD was inadequate.

The initial treatment team meeting occurred after the ICC and thus, was not in accordance with Program Guide requirements. The initial treatment plan repeated many goals from prior treatment plans, without documenting how interventions would change to achieve treatment goals. For one IDTT, the PC, psychiatrist, and correctional counselor were reportedly in attendance by telephone, thus limiting clinical observation and input into the patient's treatment planning. The psychiatric evaluation was not timely.

Positive aspects of this patient's care included the psychiatrist monitoring for medication side effects, and the treatment team linking the patient with the TCMP given his upcoming parole.

**Patient T**

This 65-year-old male was randomly selected for healthcare record review to assess the quality of EOP care provided in the ASU at RJD.

The patient's CDCR incarceration began in 1980. The patient arrived at RJD from KVSP on September 28, 2021 with placement in the mainline EOP. The patient was placed in ASU from February 2 to May 3, 2022, due to safety concerns.

Although documentation was unclear, it appeared that the patient initially received mental health services at the EOP level of care in 1991. He had a history of multiple MHCB stays, most recently from September 20 to September 28, 2022. Additionally, he had several MHCB referrals that were rescinded, most recently on October 4, 2022. He had a history of several intermediate care hospitalizations, most recently from December 2019 to August 2021. There was also documentation that the patient was hospitalized for acute inpatient care; however, the documentation was unclear.

The most recent SRASHE dated October 4, 2022 assessed high chronic and moderate acute suicide risk. The patient had a history of suicide attempts; the last attempt in November 2019 occurred by wrist cutting. The patient also had a reported history of self-harm.

He was provided with a diagnosis of schizoaffective disorder.

The patient received involuntary medications by PC 2602 order since 2008.  The main indication listed was danger to self; however, some petitions were for danger to others.  He was prescribed paliperidone (long-acting injectable antipsychotic), aripiprazole (antipsychotic), and prazosin (for nightmares).

The initial PC evaluation at the RJD ASU EOP occurred timely.  The evaluation had an inadequate clinical summary that simply repeated the information in the presenting problem section of the note.  The case formulation was adequate, exploring early life events that contributed to the patient's current presentation.  The initial psychiatric evaluation on February 11, 2022 occurred timely, and documentation of the evaluation was clinically relevant.  The psychiatrist utilized patient input to inform medication changes.  The initial IDTT occurred prior to the ICC; the initial IDTT was conducted without the patient due to COVID-19 protocols.  The treatment team appropriately updated the treatment goals.  The treatment plan targets included reducing depressed mood and goal setting with the patient.  The clinical summary appeared unchanged from the PC evaluation.

Routine contacts with the psychiatrist and PC occurred timely.  The PC used evidenced-based interventions such as DBT.  Clinicians also respectfully and appropriately integrated the patient's spiritual beliefs into treatment.  The psychiatrist saw the patient more frequently than minimally required; the frequency of these psychiatric contacts was appropriately based on the clinical need to adjust medications and to monitor medication side effects.

On April 13, 2022, the patient was placed into alternative housing due to suicidal thoughts triggered by recent losses.  The assessing psychologist worked collaboratively with the patient, and he was involved in safety planning.  The patient was not admitted to the MHCB.

On May 3, 2022, the patient transferred to the CMC ASU EOP hub.  On November 9, 2022, the patient was housed at CSP/LAC in the ASU EOP hub.

**Findings**

The care provided to this ASU EOP patient at RJD was adequate, but with areas of concern.

While the initial IDTT occurred timely, it displayed several limitations such as repeating prior treatment goals, as well as excessive reliance on historic rather than current information.  Despite this, the treatment team appeared to provide adequate care to the patient.  The PC documented interventions that were connected to treatment plan goals.  The psychiatrist carefully monitored the patient with appropriate medication adjustment based on the evolving clinical situation and patient input.

**Patient U**

This 30-year-old transgender female patient was randomly selected for healthcare record review to assess the quality of EOP care provided in the ASU at RJD.

The patient's current CDCR incarceration began in 2013. At that time, the patient was included in the MHSDS at the 3CMS level of care. Her level of care was increased to EOP later that month after an MHCB admission. She received treatment at the 3CMS, EOP, MHCB, intermediate, and acute levels of care. The patient transferred to the mainline EOP at RJD after discharge from SVSP intermediate care on December 22, 2017.

She had one intermediate care hospitalization in 2017, and one acute care hospitalization in 2013. She had a history of approximately 12 MHCB stays, including one from November 2 - 10, 2021 that immediately preceded her ASU EOP placement. This admission resulted from laceration of both arms requiring sutures. The patient was housed in the ASU from November 10, 2021 to April 21, 2022 due to alleged battery with a deadly weapon.

The most recent SRASHE on October 31, 2022 assessed high chronic and low acute suicide risk. The patient had a reported history of four prior suicide attempts prior to this term of incarceration. The most recent attempt occurred in 2012 by pill overdose. The patient had an extensive history of self-injury, primarily by cutting. The most recent documented incident occurred in July 2022.

The patient was provided with diagnoses of borderline personality disorder, mood disorder not otherwise specified, anxiety disorder not otherwise specified, opioid use disorder, amphetamine use disorder, and in some documentation, gender dysphoria disorder.

The patient had no history of PC 2602 ordered treatment with involuntary medications. She was prescribed mirtazapine (antidepressant/antianxiety), oxcarbazepine (mood stabilizer), prazosin (for nightmares), and hydroxyzine as needed for anxiety.

The initial PC evaluation after placement in the ASU EOP occurred timely. Documentation regarding the presenting problem was adequate; however, the clinical summary was inadequate, consisting of a combination of primarily historic information with the addition of the presenting problem.

The initial psychiatric evaluation occurred timely and provided clinically adequate information. The psychiatrist attempted to differentiate psychiatric medication side effects from those caused by hormone treatment.

The initial IDTT occurred timely. It appeared that the ICC was scheduled when custody placed the patient on ASU status; this occurred when the patient was housed in the MHCB. For this reason, the initial ASU EOP IDTT did not occur prior to the ICC. The patient reportedly refused to attend the IDTT. The treatment plan did not include updated treatment goals.

Routine contacts with the psychiatrist and PC occurred timely. The PC appropriately utilized motivational interviewing to assist the patient with improved treatment attendance and engagement. The patient was placed on the high-refuser list, and she was seen at cell front daily. The patient repeatedly refused to leave her cell for confidential sessions with the PC. The plan section of the PC notes reflected little change over the course of treatment.

Although the patient frequently requested medication changes, the psychiatrist monitored and adjusted medications as was clinically indicated. The quality of the rationale provided for not responding to the requested changes varied, but the rationales were clinically adequate.

Routine IDTTs occurred timely. The IDTT on February 16, 2022 occurred without the patient, with the reason listed as "due to COVID." Treatment goals focused on suicidal thoughts and self-harm. Although the treatment team indicated that the patient had cravings to use illicit substances, this issue was not addressed in treatment planning. The clinical summary was adequate.

The patient transferred from the RJD ASU EOP hub to the CSP/Sac PSU on April 21, 2022. On November 10, 2022, she remained housed in the PSU.

**Findings**

The care provided to this ASU EOP patient at RJD was inadequate.

The initial treatment plan did not include treatment goals. Although treatment goals were included in the subsequent IDTT, the treatment team did not adequately address important areas such as substance use. This omission occurred despite the patient reporting cravings to use illicit substances.

The patient reportedly refused to attend the initial IDTT. The facility did not allow the patient to attend the follow-up IDTT due to COVID-19 restrictions. Thus, the patient was not in attendance for either of the two IDTTs during her ASU EOP stay. As the patient was not present at the IDTTs, documentation that patient input was solicited and incorporated into the treatment planning process was critically important but absent in documentation. The treatment plans generally relied on historic rather than current clinical information. The PC notes were repetitious.

**Patient V**

This 41-year-old male was randomly selected for healthcare record review to assess the quality of EOP care provided in the ASU at RJD.

The patient's current CDCR incarceration began in July 2013. He was included in the MHSDS at the EOP level of care at that time. The patient spent most of his incarceration receiving mental health services at the EOP level of care, with small periods of 3CMS placement. He had multiple MHCB stays and no history of treatment at the acute or intermediate levels of care.

The patient arrived at the mainline RJD EOP from MCSP on September 28, 2018. He had a history of approximately 11 MHCB stays, including one from February 20 to March 2, 2022; this stay, due to suicidal ideation and self-harm, occurred immediately before ASU EOP placement. The patient was housed in the ASU from March 2 to April 13, 2022, pending an investigation as he was the alleged victim of a battery.

The most recent SRASHE on September 3, 2022 assessed moderate chronic and low acute suicide risk. The patient had a history of suicide attempts and self-harm, with the last attempt on June 8, 2022.

He was provided with the following psychiatric diagnoses: unspecified schizophrenia spectrum disorder, unspecified depressive disorder, unspecified anxiety disorder, stimulant use disorder, and antisocial personality disorder.

The patient had no history of PC 2602 ordered treatment with involuntary medications. Prescribed psychotropic medications included aripiprazole (long-acting injectable antipsychotic), venlafaxine (antidepressant and antianxiety), and benztropine as needed for medication side effects.

The initial PC and psychiatric evaluations after placement in the ASU EOP occurred timely and prior to the IDTT. While the presenting information in the PC assessment was clinically useful, the case formulation was not updated from prior assessments. The initial psychiatric evaluation contained adequate clinical information and a rationale for medication management decisions.

The initial IDTT occurred timely and prior to the ICC. The initial IDTT was conducted without the patient, yet the reason provided for his absence was unclear. Treatment plan targets included substance use and anxiety. No significant changes were noted from prior treatment plans. The clinical summary was noted as reviewed "with no further edits/additions."

Routine contacts with the psychiatrist and PC did not occur timely. The patient was seen at cell front as a high refuser contact requirement; however, PC follow-up notes that occurred in a confidential setting were minimal in content. The patient did intermittently attend groups. The patient was not seen for psychiatric follow-up after the initial psychiatric evaluation.

The patient transferred from the RJD ASU EOP hub to the mainline EOP at CSP/LAC on April 13, 2022. On November 10, 2022, the patient was housed in the ASU EOP hub at CSP/LAC.

**Findings**

The care provided to this ASU EOP patient at RJD was inadequate.

The initial treatment plan displayed minimal changes from prior treatment plans. The clinical formulation relied primarily on historic information, rather than current clinical data. The IDTT was conducted without the patient; however, the rationale for his absence was not clearly stated. There was inadequate follow up with the PC and the psychiatrist, and both contacts occurred beyond required timelines.

**APPENDIX C-11**
**Kern Valley Prison (KVSP)**
**(April 5, 2022 – April 7, 2022)**

**Patient A**

This 44-year-old patient was randomly selected for healthcare record review from KVSP's HLOC non-referral list. The patient's history was significant, with two intermediate care admissions, two acute care admissions, and at least ten MHCB referrals during incarceration. Most recently, the patient discharged from acute care at CHCF in August 2021. Records noted the patient was a "gang drop out" and most hospital discharge summaries suggested he sought higher levels of care to escape safety concerns on the yard. The patient was diagnosed with generalized anxiety disorder, mood disorder, antisocial personality disorder, and various substance use disorders. Psychiatric medications were prescribed for anxiety, mood stabilization, and sleep. The patient's chronic and acute suicide risk were assessed as moderate on March 23, 2022; however, it was unclear whether the patient had a history of suicide attempts due to conflicting documentation.

The patient transferred from CSP/LAC to KVSP on or around December 27, 2021. On this date, he endorsed thoughts of self-harm and was placed in alternative housing with a referral to MHCB. Following a mental health evaluation on December 28, 2021, the MHCB referral was rescinded; the discharge five-day follow-ups were completed as required.

The EOP treatment plan appropriately targeted symptoms of anxiety and depression. Although the patient routinely rated his depression and anxiety as high between January and March 2022, his treatment participation improved during this period. In March 2022, the treatment plan noted the patient no longer met the HLOC indicator for participating in less than 50 percent of treatment, and the IDTT retained him in the EOP level of care. Around May 2022, the patient's symptoms and overall functioning appeared to have improved. He endorsed a reduction in symptom severity, was attending Division of Rehabilitative Programs (DRP) groups regularly, and continued to participate in the majority of his mental health appointments. The patient also held a kitchen job, and eventually worked his way up to lead cook.

Routine IDTTs and PC contacts were timely at KVSP. With the exception of one psychiatry contact in May 2022, psychiatry contacts occurred monthly.

On June 15, 2022, the PC noted that the patient learned his former cellmate had died and that he would be transferred back to CSP/LAC where he had significant safety concerns. The PC's progress note described the patient as distraught and as reporting feeling "bad," but there was no assessment of risk or useful interventions documented during this contact. The PC also did not document a plan to follow up with the patient sooner than required. On June 21, 2022, the patient was evaluated for an emergent contact and referred for MHCB admission. He transferred to an available MHCB at SATF on this date.

As of July 14, 2022, the patient was at CSP/LAC.

**Findings**

The care provided to this patient at KVSP between December 2021 and early June 2022 appeared adequate. With the exception of one missed psychiatry contact, EOP treatment contacts were timely. Although it did not appear the patient was offered the requisite minimum group hours for EOP patients, he participated in DRP groups and mental health groups when offered. Most progress notes were sufficiently detailed and provided useful updates on current symptoms and functioning. The patient exhibited clear signs of improvement while at KVSP, and he no longer met HLOC referral indicators between March and early June 2022.

One concern, however, was the PC's failure to appropriately intervene on June 15, 2022 after noting the patient received bad news and was "distraught." Historical records suggested fears for safety regularly resulted in significant anxiety, crisis referrals, and MHCB admissions. As such, the PC should have intervened in response to signs of elevated risk, including to conduct a risk assessment, review safety planning, and explore options for addressing safety concerns.

**Patient B**

This 35-year-old transgender patient was randomly selected for healthcare record review from KVSP's HLOC non-referral list. The patient returned to CDCR for her 11th prison term on or around August 17, 2021 and transferred to KVSP in early October 2021. While at KVSP, the patient met at least two HLOC referral indicators for three or more MHCB admissions within a six-month period and for participating in less than 50 percent of treatment. KVSP clinicians documented concerns regarding repeated acts of self-harm, suicidal ideation, frequent MHCB admissions, bizarre behaviors, illogical thought processes, poor insight, and paranoid delusions.

The patient was diagnosed with schizoaffective disorder, bipolar type; major depressive disorder, recurrent, severe, with psychosis; ADHD; borderline personality disorder; gender dysphoria; and opioid use disorder. Psychiatric medications included BuSpar for anxiety, Strattera for ADHD, Effexor for depression, and olanzapine for psychosis. The patient was generally described as medication adherent.

Since September 2021, the patient had five MHCB referrals and three self-harm incidents. The patient lacerated her forearm requiring "steri-strips to close" on October 7, 2021; inserted or ingested a foreign object, resulting in transportation to an outside hospital for care on November 17, 2021; and lacerated her forearm resulting in referral for MHCB admission on December 27, 2021. KVSP's most recent SRASHE, dated January 23, 2022, assessed the patient's chronic suicide risk as moderate and acute risk as low. The evaluating clinician appeared to underestimate the patient acute suicide risk and inaccurately documented an absence of several acute risk factors during the preceding three-month period, including suicidal ideation, depressive symptoms, psychotic symptoms, agitation, and mood lability—all of which had been documented in clinical notes around that time.

The December 27, 2021 clinical documentation indicated the patient exhibited "bizarre" behaviors and engaged in self-harm by cutting on herself. On this date, the patient reported that her family had died, that she could fly through doors and windows, and that she wanted to kill herself. After cutting on herself, the patient also received a RVR for a sexually inappropriate

statement toward a psychiatric technician.  The patient was admitted to the MHCB on this date and retained until discharge to the STRH on January 3, 2022.

The RVR MHA for overfamiliarity was completed during the December 27, 2021 MHCB admission.  Although the evaluating clinician determined mental illness did not contribute to the patient's behavior, they did not provide a sufficient explanation regarding her altered mental status, with bizarre behavior and possible delusions at the time of the incident.  The evaluator did, however, recommend the hearing officer refrain from removing dayroom and yard privileges to avoid psychiatric decompensation.

The most recent IDTT occurred on January 12, 2022.  The treatment plan developed on this date included IPOCs for depressed mood and self-harm; however, the patient's out-of-cell treatment refusals were not addressed.  The IDTT noted only one positive HLOC referral indicator for multiple MHCB admissions and determined that a HLOC referral was not indicated.  The non-referral rationale stated the patient's repeated acts of self-harm resulting in MHCB admissions were "high rescue, low risk behaviors as a means to getting immediate needs met."  However, prior EOP documentation suggested the patient had safety concerns on the yard, and the MHCB IDTT did not explore or address these concerns prior to discharge.  Further, the MHCB IDTT failed to consider that the patient had not been participating in mental health treatment or responding sufficiently to treatment interventions since her return to prison in August 2021.

On January 22, 2022, the patient was placed in alternative housing with an MHCB referral due to delusional statements and suicidal ideation.  Related progress notes indicated the patient reported that her mother had died in her arms one day prior and that she was able to "move the world." However, the MHCB referral was rescinded the following day, and the patient was returned to the STRH.

On February 8, 2022, the PC conducted a cell front contact and described the patient as "nonsensical" with a disorganized thought process and lack of insight.  The PC also documented that the patient was medication adherent, but not prescribed an antipsychotic medication.  The PC's interventions on this date were inadequate.

On or around February 10, 2022, the patient transferred from KVSP to SVSP's ASU EOP hub. One month later she was referred for intermediate care admission after she was admitted to an MHCB for cutting on her wrists and exhibiting psychotic symptoms.

PC and psychiatry contacts were timely at KVSP.  However, nearly all individual contacts were completed at cell front due to patient refusals.

**Findings**

The care provided to this patient was inadequate.  The patient should have been referred to a HLOC while at KVSP.  However, the IDTT failed to consider all HLOC referral considerations, underestimated the patient's acute suicide risk, and minimized her safety concerns.  Treatment plans did not address the underlying contributing factors to her frequent self-harming behaviors, psychotic symptoms, or out-of-cell treatment refusals.  Suicide prevention safety plans were not completed when indicated.  EOP treatment was limited to medication management and cell-front contacts at KVSP, and the patient continued to demonstrate signs of decompensation in the

STRH until her transfer to SVSP.  A HLOC referral did not occur until one month after the patient transferred from KVSP to another facility where she required another MHCB admission for self-harm in the context of psychotic symptoms.

**Patient C**

This 49-year-old patient was randomly selected for healthcare record review from KVSP's HLOC non-referral log.  The healthcare record referenced a total of 36 MHCB admissions and approximately eight inpatient care admissions since his initial incarceration in 2002.  Most recently, the patient was discharged from intermediate care in August 2019.  PIP admission records indicated the patient found programming easier in the inpatient setting due to his prior sex offense convictions and associated safety concerns.  The patient had eight self-harm incidents since 2018, three of which occurred within the last year at KVSP.

The patient arrived at KVSP in March 2021 at the EOP level of care, and he was maintained on modified EOP programming until his transfer to another facility in March 2022.  He had a documented history of traumatic brain injury (TBI), and was diagnosed with major depressive disorder, antisocial personality disorder, and opioid use disorder.  The patient was reportedly compliant with psychotropic medications, which included Effexor for depression, BuSpar for anxiety, and Remeron for depression and anxiety.  Psychiatric concerns documented within the last six months included paranoia, hallucinations, razor blade ingestion, depression, racing thoughts, anxiety, and difficulty with self-expression.

In November 2021, the patient reported that his brother died from cancer, and he began exhibiting worsening psychiatric symptoms, behavioral concerns, and an overall functional decline.  The patient also relapsed on methamphetamine, ingested a razor blade (confirmed by x-ray), cut on his wrist, and received two RVRs.  On November 30, 2021, the patient informed staff he wanted to go to sleep and never wake up.

The patient was referred to the MHCB at least three times in November and December 2021 for danger to self.  During the December 27, 2021 MHCB admission, the patient requested intermediate care and informed the treatment team he did not have access to EOP groups at KVSP due to being housed in a non-EOP building (in C1).  The patient further reported that he had been locked in his cell most of the time and was feeling stressed out, sad, and hopeless.

The MHCB IDTT noted two positive HLOC referral indicators for three or more MHCB referrals within a six-month period and for participating in less than 50 percent of treatment.  The IDTT's HLOC non-referral rationales were inadequate.  One MHCB clinician documented that intermediate care referrals from the MHCB were "inappropriate" which suggested only acute care referrals were considered during MHCB admissions.

The MHCB discharge SRASHE, dated December 27, 2021, assessed the patient's chronic suicide risk as high and his acute risk as low.  However, the MHCB clinician appeared to underestimate the patient's acute risk and inaccurately noted under suicide risk protective factors that the patient "participates in his EOP treatment" and was "active and motivated in psych treatment."  This same clinician noted conflicting information on the same date to justify not

referring the patient to a HLOC when they wrote that the patient "utilizes crisis bed for inappropriate reasons" as well as "and does not appear to engage meaningfully in treatment."

Following the December 27, 2021 MHCB discharge, the patient was placed in KVSP's STRH. The RVR MHAs noted mental illness was not a contributing factor to the behaviors resulting in RVRs for possession of dangerous contraband and disobeying an order. The RVR MHAs did, however, include appropriate recommendations for the hearing officer to consider.

In the STRH, all individual PC contacts were timely, but completed at cell front due to the patient's refusals. The initial psychiatric assessment indicated a medical assistant was present, which suggested the evaluation may have been completed via telepsychiatry. There was only one routine psychiatry contact completed in the STRH, as the patient had refused his February 2022 appointment. It appeared the patient was offered between three to four treatment groups per week in the STRH. Clinical notes suggested the patient may have felt safer attending out-of-cell treatment groups in the STRH, as his treatment participation improved upon placement. However, despite improvements in group attendance, the patient continued to refuse out-of-cell individual contacts with mental health providers, and no reasons were documented.

Conflicting progress notes made it difficult to determine the patient's mental status prior to transferring from KVSP's STRH to an ASU EOP hub. KVSP providers indicated the patient requested medication adjustments on January 5, 2022, and subsequently refused his next psychiatry appointment on January 13, 2022. Although the PC noted ongoing stability during cell-front contacts, the psychiatrist documented that the patient was "not doing well" during an out-of-cell confidential contact on February 28, 2022. One PC progress note indicated the patient appeared to be minimizing symptoms. Additionally, some PC notes inaccurately stated that the patient was in the 3CMS level of care.

The patient transferred to CSP/Corcoran's ASU EOP hub on March 9, 2022.

**Findings**

The care provided to this patient was inadequate. The MHCB IDTT appeared to disregard the patient's safety concerns, underestimated his acute suicide risk, and failed to update the suicide prevention safety plan when indicated. HLOC non-referral rationales were inadequate and suggested the MHCB IDTT only considered acute referrals based on their statement that intermediate care referrals from the MHCB were "inappropriate." Clinical documentation was internally inconsistent, and providers did not appear to have been consulted when indicated to resolve discrepant observations.

**Patient D**

This 43-year-old patient was housed at the facility since 2019. He was diagnosed with major depression with psychotic features. He was prescribed Zyprexa, Cogentin, Zoloft, BuSpar and melatonin. His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

Reviewed treatment plans lacked individualization and updated clinical information. Specifically, the clinical summary remained unchanged during November 2021 and February

2022 IDTTs and lacked a relevant summary of the patient's functioning, symptoms, treatment participation and treatment progress since the previous IDTT.  Rationale for level of care did not provide individualized assessment of need for EOP level of care.  IPOCs that targeted substance abuse, depression, anxiety, hallucinations, anger and depression were objective and measurable, but interventions were not clearly individualized.

Routine primary clinician documentation from the assigned clinician was thorough and clinically useful.  Documentation regularly included an assessment of his symptoms and appropriate clinical interventions.  A thorough suicide risk assessment was completed after he engaged in superficial self-injurious behavior and a psychiatric referral was submitted.  Psychiatric documentation included relevant clinical information.

### Findings

This patient's care was adequate.  Routine provider documentation was clinically useful.  The primary clinician care exercised good clinical judgement and routinely provided clinical interventions.  However, lack of individualized and updated treatment planning was not useful for this patient's continuity of care.

### Patient E

This 34-year-old patient was admitted to the facility in October 2021.  Psychiatric diagnoses included major depressive disorder and PTSD.  He was prescribed Cymbalta and Vistaril.  His healthcare record was selected from the EOP roster to assess adequacy of care.

An IPOC that targeted depression, identified during the initial IDTT, remained unchanged through February 2022.  The goal was measurable but an intervention to utilize goal setting was not clearly individualized.  Identified treatment needs (suicidal ideation, anxiety and treatment non-adherence) were not included as IPOCs and rationale for exclusion was not documented.  The clinical summary section remained unchanged in the four IDTTs that occurred between October 19, 2021 and February 23, 2022.

Routine psychiatric documentation varied by provider but overall included minimal descriptive information outside the mental status exam.  Except for reference to the provision of workbook activities, primary clinician documentation rarely included utilization of clinical interventions.

### Findings

This patient's care was inadequate.  Treatment planning and accompanying IDTT documentation was not updated or sufficiently individualized.  Reviewed primary clinician documentation did not reflect utilization of appropriate clinical interventions during routine contacts.  Documentation of clinical criteria to support diagnoses was needed.

### Patient F

This 58-year-old patient was admitted to the facility in August 2021 from an ICF. He was diagnosed with bipolar disorder and compliant with psychiatric medication under a PC 2602 order. His healthcare record was randomly selected from the EOP roster to assess adequacy of care.

An individualized clinical summary was not included in initial documentation, including a yearlong ICF placement. Reference to ICF treatment was limited to "admitted to DSH PIP…for suicidal ideation….attended PIP tx [treatment] and was discharged after meeting treatment expectations." A summary of relevant clinical factors, including precipitants to previous decompensation, which would be potentially useful for recognition of future decompensation, were not included.

An IPOC for depression was implemented during his initial IDTT but remained unchanged through subsequent IDTT documentation. Identified treatment needs (suicidal ideation, low group attendance and anxiety) were not added as IPOCs. Goals were measurable but treatment interventions were not clearly individualized. Initial IDTT documentation indicated that treatment would focus on mood regulation and coping skills with utilization of cognitive-behavior therapy due to admission to the SRMP. During his February 23, 2022 IDTT he was identified as having low treatment attendance; rationale for non-referral to a HLOC was individualized and reasonable with appropriate treatment interventions. Treatment interventions, however, were not utilized in subsequent routine contact documentation.

Psychiatric documentation was not located for February or April 2022. Reviewed psychiatric documentation was minimal and not sufficiently individualized. There were typos that made documentation difficult to follow. Minimal changes to documentation occurred between appointments and documentation was similar to another patient's documentation completed by the same provider. Overall, primary clinician contact documentation was descriptive of the patient's functioning and mental status. Group treatment non-adherence was appropriately addressed although treatment interventions, including those identified for SRMP and safety planning were not documented.

**Findings**

This patient's care was inadequate. Treatment planning was neither sufficiently individualized nor updated. Interventions identified under SRMP and interventions from his safety plan should have been included under IPOCs for continuity of care purposes. Psychiatric documentation was insufficient and delays in psychiatric care were an area of concern for this recently discharged ICF patient. Primary clinician documentation lacked utilization of clinical interventions.

**Patient G**

This 32-year-old patient was admitted to the STRH on February 17, 2022 for safety concerns. He was diagnosed with generalized anxiety disorder and opioid use disorder although diagnostic criteria were not clearly documented. His healthcare record was randomly selected from the STRH roster to assess adequacy of care.

Due to refusals, initial provider assessments and the initial IDTT were completed at cell front and in absentia, respectively. Overall, documentation included relevant clinical information but

did not clearly inform treatment planning which was outdated.  Specifically, an IPOC for anxiety had not been changed since implementation on July 14, 2021 and an IPOC for substance use remained unchanged since implementation on May 7, 2020.  Further, documented treatment needs (treatment non-adherence, depression and PTSD symptoms) were not included as IPOCs.

Clinician documentation regarding psychiatric medication was discrepant.  Documentation from March 8, 2022, indicated that he was not prescribed psychiatric medication.  In contrast, other documentation indicated that he was prescribed medication for depressive symptoms which conflicted with psychiatric provider documentation (that he was prescribed prazosin for PTSD symptoms and clonidine, for anxiety).

Weekly primary clinician contacts occurred cell front due to patient refusals.  Documentation indicated attempts to engage him, provide education about treatment attendance and regular assessments of his functioning and coping.  Collateral information was routinely sought including review of medication compliance which was variable and consultation with custody and the psychiatric technician.

**Findings**

This stable and minimally engaged patient's care was adequate but marginal.  Strengths included useful and adequate initial assessments and weekly primary clinician documentation.  However, there were multiple areas in need of improvement including diagnosis rationale and clarification, updated and individualized treatment planning and provider coordination.

**Patient H**

This 34-year-old patient was admitted to the STRH in August 2021.  Diagnoses included unspecified depressive disorder and antisocial personality disorder.  He was prescribed olanzapine and Remeron.  His healthcare record was randomly selected from the STRH roster to assess adequacy of care.

Documentation indicated he was placed in alternative housing at least five times between his admission to STRH and February 9, 2022 due to reports of suicidal ideation, a superficial laceration and a reported overdose.  Each time the MHCB referral was rescinded and he was returned to the STRH with five-day follow-ups.  Throughout this time, he continued to request to return to EOP to address depression, anxiety, PTSD, anger, and grief.  Most of the documentation did not provide sufficient rationale for non-referral to EOP.

Treatment planning was not individualized.  His IDTT from November 17, 2021 included outdated IPOCs and the clinical summary was not updated to include his poor adjustment to STRH.  Specifically, an IPOC for depression remained unchanged since implementation almost two years prior.  Treatment needs such as self-harm, poor distress tolerance and maladaptive coping were not considered.

Psychiatric documentation was useful and clearly documented that reports of symptoms, such as auditory hallucinations, were not objectively observable.  Routine primary clinician documentation included appropriate descriptions of his mental status, functioning, and stressors, and included consultation with correctional staff.  Documentation of clinical interventions varied

by clinician but were not intensive enough for his reported distress, particularly his early poor adjustment to STRH.

**Findings**

This complex patient's care was inadequate.  Treatment planning was not individualized or appropriately updated.  The majority of documentation did not provide sufficient rationale for EOP non-referral, despite his repeated requests for EOP level of care.  While routine contact documentation indicated that his clinical presentation was better than he reported, the precipitants and maintaining factors for multiple self-harm incidents were not sufficiently targeted in treatment.  Diagnostic clarification was needed as criteria to support current diagnoses was not specified and behaviors suggestive of borderline traits were not considered.

**Patient I**

This 31-year-old patient was placed in the STRH in November 2021 for safety concerns.  He was diagnosed with unspecified depressive disorder, cannabis use disorder and antisocial personality disorder.  His healthcare record was randomly selected from the STRH roster to assess adequacy of care.

The psychiatric nurse practitioner and primary clinician initial assessments were individualized and identified his current treatment needs.  A review of his psychiatric history was copied from previous providers, although level of care and original author were not clearly identified.  An IPOC for depression was identified at the initial IDTT and remained unchanged at his quarterly IDTT.  Additional identified symptoms ("bad anxiety, paranoia") documented on the primary clinician initial assessment were not targeted in IPOCs.  Relatedly, the clinical summary section was also unchanged in quarterly IDTT documentation despite prompts to include current symptoms, functional impairments, and treatment response.

Providers completed the majority of routine contacts at cell front with this patient due to refusals.  At the time of STRH placement, he was not prescribed psychiatric medication which he requested during his initial assessment.  Due to ongoing medication nonadherence, medications were discontinued during March 2022.  The patient was also minimally engaged with the primary clinician.  Overall, documentation was descriptive but the majority of contacts with his assigned clinician lacked utilization of clinical interventions and an assessment of his out-of-cell contact refusals.  Consultation with collateral sources including officers was useful.

**Findings**

This patient's care was marginally adequate.  Treatment planning did not target all identified symptoms and documentation was not sufficiently updated between IDTTs.  Both providers included relevant, descriptive documentation for routine contacts; however, primary clinician documentation did not include clinical interventions.

Copied documentation in the initial primary clinician assessment was thorough; however, the format in which it was provided did not allow the reader a user friendly, efficient summary necessary for continuity of care.  In addition, the most recent copied summary was from June 2021; thus, the five months since his admission to STRH in November were not accounted for,

which excluded a level of care change from EOP to 3CMS. Inclusion of recent history would have been useful for case conceptualization and treatment planning.

**Patient J**

This 34-year-old male was randomly selected for healthcare record review to assess the quality of EOP care provided at KVSP.

The patient began treatment in CDCR at the EOP level of care in December 2015. The patient arrived at KVSP from RJD on May 29, 2021. He had a history of multiple MHCB stays, most recently from March 5 to March 15, 2021, at RJD. In May 2021, the patient was evaluated for, but not admitted to the MHCB twice, with placement on suicide watch occurring after hours. He had a history of two hospitalizations at the intermediate level of care; the most recent occurred in 2017. He had no history of inpatient treatment at the acute level of care.

Documentation in the healthcare record was inconsistent regarding the patient's number of suicide attempts. It documented suicide attempts in 2007 by overdose, 2009 by hanging, February 2021 by overdose, and March 2021 by laceration. The most recent SRASHE on May 9, 2022, assessed the patient with moderate chronic and low acute suicide risk.

Provided psychiatric diagnoses varied in the healthcare record. These included major depressive disorder, opioid use disorder, amphetamine use disorder, alcohol use disorder, adjustment disorder, and a history of bipolar disorder.

The patient was prescribed aripiprazole (mood stabilizer/antipsychotic), lamotrigine (mood stabilizer), mirtazapine (antidepressant), and trazodone (for insomnia). The patient was also prescribed buprenorphine/naloxone for MAT. The patient had no history of PC 2602 ordered treatment with involuntary medications.

The initial primary clinician and psychiatric evaluations were completed prior to the IDTT. Although the initial primary clinician evaluation contained useful information, the initial psychiatric evaluation, dated June 3, 2021, included issues of concern. Most of the information in the history of present illness section was historical information. The mental status examination section for "mood" was not completed, despite the patient presenting with a mood disorder. The assessment section only included the following: "33yo M psychiatric diagnostic h/o bipolar." The plan was inadequate and only indicated continuation of current medications.

Subsequent primary clinician and psychiatric evaluations were completed when the patient changed yards in December 2021. This psychiatric evaluation was more clinically appropriate, listing medications with rationale for prescription.

The patient did not attend his initial IDTT on June 8, 2021, and the reason provided was the patient's placement in quarantine. Furthermore, the patient did not attend IDTTs in June 2021, January 2022, or February 2022. IDTTs occurred timely. Treatment targets included mood and anger. Treatment plans contained some positive elements such as reducing depression with appropriate specific goals; however, other elements were vague and ill-defined. The treatment plans included repetitive, vaguely defined goals, such as educating the patient about factors that "cause and maintain anxiety" as well as fostering a therapeutic alliance. Although the patient

was prescribed heat medications, the relevant section of the treatment plans did not include necessary heat-related precautions and limitations. The treatment team did assess the need for a HLOC for this patient.

Routine contacts with the psychiatrist and primary clinician generally occurred timely. The primary clinician notes often contained useful information; however, they frequently failed to address established treatment plan goals. The most recent psychiatric note during review period was dated February 15, 2022. This nonconfidential contact occurred at cell front. The psychiatrist noted that a confidential appointment was offered but declined by the patient. The psychiatrist noted partial medication adherence. The psychiatric note included inconsistent documentation. The medication list indicated that the patient was prescribed mirtazapine; however, the plan stated that the psychiatrist offered the patient an antidepressant medication which he declined. Primary clinician and psychiatric notes also documented discrepant information regarding the patient's psychiatric diagnoses.

The patient transferred to CSP/Sac on February 16, 2022.

**Findings**

The care provided to this EOP patient was inadequate.

The initial psychiatric evaluation contained insufficient clinical information and consisted primarily of repetitive historical documentation. Despite the diagnosis of a mood disorder, the mood section of the mental status examination was not completed. The assessment and plan sections, arguably some of the most crucial portions of a psychiatric evaluation, were unacceptably sparse in documentation and did not demonstrate an adequate clinical conceptualization of the patient. Various psychiatric diagnoses were included in the healthcare record during the review period. Disconcertingly, there was no documentation that efforts were made for diagnostic clarification.

The patient did not attend many of his IDTTs; however, there was a lack of documentation about how the treatment team would address this important treatment barrier. Despite the patient's recent arrival to the institution, the patient's initial IDTT was held *in absentia*. While the patient was under quarantine, the rationale for not including the patient in treatment planning was insufficient.

**Patient K**

This 44-year-old male was randomly selected for healthcare record review to assess the quality of EOP care provided at KVSP.

The patient transferred to KVSP in November 2020. He was primarily treated at the EOP level of care with the exception of MHCB stays. He had a history of multiple MHCB stays, with the most recent occurring prior to transfer to KVSP in October 2020. In November 2021, the patient required MHCB placement, due to reported swallowing of razors and suicidal ideation. Five-day follow-ups were completed as required. Although he was also placed into alternative housing in August 2022, he was not subsequently admitted to the MHCB.

The patient had two ICF hospitalizations, most recently in 2017. He had no reported history of inpatient treatment at the acute level of care.

The patient had a history of multiple suicide attempts and incidents of self-injurious behavior.

The most recent SRASHE on August 11 2022 assessed the patient with high chronic and low acute suicide risk.

Provided psychiatric diagnoses included antisocial personality disorder, malingering, major depressive disorder, bipolar disorder, opiate use disorder, cannabis use disorder, alcohol use disorder, inhalant use disorder, stimulant use disorder and PTSD.

The patient was prescribed lithium (mood stabilizer), olanzapine (antipsychotic), ziprasidone (antipsychotic), benztropine (for antipsychotic side effects), and hydroxyzine on an as-needed basis (for anxiety). The patient had no history of PC 2602 ordered treatment with involuntary medications.

Primary clinician contacts occurred timely; however, the contacts sometimes occurred in non-confidential settings. The primary clinician note on November 24, 2021, stated "We met cellfront in direct sight of officers d/t time constraints per EOP supervisor advisement." Similarly, the primary clinician visit on December 2, 2021 occurred at cell front, reportedly due to COVID-19 precautions and the absence of observed acute mental health concerns. Primary clinician notes frequently contained plans that were not updated from prior documentation.

The psychiatric contacts occurred timely. There was documentation that the patient's medication concerns were addressed.

IDTTs occurred timely. The patient did not attend his IDTT on November 16, 2021, due to his quarantine status. Of concern was documentation from the first IDTT after discharge from the MHCB which stated that the patient "should be transferred from EOP to 3CMS LOC, but for the fact that he was recently prescribed a new anti-psychotic while in MHCB." The patient was placed on EOP modified programming. The next IDTT on December 15, 2021, documented worsening depressive symptoms and passive suicidal ideation. The plan was to change the patient from EOP modified to EOP. On February 9, 2022, the patient reportedly refused to attend his IDTT. The patient attended the IDTT on May 4, 2022. The patient did not attend the IDTT on August 10, 2022, due to "current housing and movement requirements (Pt on orientation status)." The treatment targets included reducing anger and decreasing the intensity of suicidal ideation and cravings for substance use. The treatment plans frequently maintained the same or similar goals such as building rapport and "therapist will encourage patient to work on improved functioning by using goal setting."

The patient was seen by telepsychiatry on July 22, 2022, when he reportedly denied suicidal ideation or psychotic symptoms. The plan was to discontinue lithium with psychiatric follow-up in 90 days or sooner if the patient requested.

On July 25, 2022, the patient was sent to an outside hospital due to reported ingestion of foreign bodies. None were identified by x-ray. The patient also made superficial cuts to his left wrist. The patient required re-admission to the MHCB on July 26, 2022, due to suicidal ideation with

plan to hang or cut himself. The patient was clinically discharged on August 1, 2022, with return to the EOP on the following day.

The patient was also evaluated for MHCB placement on August 8, 2022. He was housed in alternative housing overnight, then returned to the EOP level of care on August 9, 2022. The primary clinician evaluation completed on this date occurred at cell front.

**Findings**

The care provided to this EOP patient was inadequate.

The healthcare record contained contradictory diagnoses, such as Major Depressive Disorder and Bipolar Disorder, which should not be provided to a patient concurrently. There was no documentation of an adequate plan to address these diagnostic discrepancies. The treatment plans displayed vague goals, such as continuing to build rapport with the patient, despite the clinician's treatment of the patient for a protracted period.

This EOP patient met with a telepsychiatrist on July 22, 2022. Concerningly, the plan for follow-up stated that the patient would be seen for follow-up in 90 days or sooner if the patient requested. This recommended frequency of psychiatric contact was inadequate and did not meet the minimum Program Guide requirements. Finally, the justifications provided for seeing the patient in a non-confidential, cell-front setting were inadequate.

**Patient L**

This 50-year-old male was randomly selected for healthcare record review to assess the quality of EOP care provided at KVSP.

The patient's most recent CDCR incarceration began on September 12, 2018. The patient was transferred from California State Prison/Solano (CSP/Solano) to KVSP at the EOP level of care on October 7, 2021. His level of care was changed to the 3CMS level of care on November 10, 2021. The patient was transferred to California Correctional Institution (CCI) on March 18, 2022. He returned to the EOP level of care on April 19, 2022, transferring back to KVSP on June 3, 2022. On October 14, 2022, the patient was receiving treatment at the EOP level of care at KVSP.

The patient had a history of two MHCB stays, most recently in 2019. There was no documented history of inpatient treatment at the intermediate or acute levels of care. Prior to incarceration, the patient had been hospitalized at DSH under PC 1370 (Incompetent to Stand Trial).

The patient underwent several RVR mental health evaluations, including five in 2020, six in 2021, and five to date in 2022. RVR charges included, but were not limited to, arson, battery, fighting, destruction of property, and delaying a peace officer. Of these, mental health concerns were deemed contributing factors in four of the RVRs.

The most recent SRASHE on April 20, 2022, assessed the patient with low chronic and acute suicide risk. He had no reported history of suicide attempts.

The patient was provided with psychiatric diagnoses that included schizophrenia spectrum and other psychotic disorders, schizoaffective disorder, cocaine dependence and antisocial personality disorder.

The patient received involuntary medications by PC 2602 since November 2020, due to grave disability and danger to others.

The patient was prescribed aripiprazole (antipsychotic) and buspirone (antianxiety medication) with an injectable back-up of olanzapine (antipsychotic).

Routine psychiatric and primary clinician contacts as well as IDTTs occurred timely.

The patient did not attend the IDTT on October 19, 2021. The treatment team did not note any progress towards his treatment goals. The clinical summary stated that the patient's suicidal threat was deemed insignificant, as it was determined that the patient was reporting suicidal ideation to have his needs met. Another treatment plan documented that the patient displayed little insight into his mental health symptoms. The clinician noted that since the patient "said there was nothing else he wanted to work on regarding mental health," he was downgraded to the 3CMS level of care. There was no documentation that progress towards treatment goals was achieved.

The psychiatric evaluation noted that the patient had a history of collecting cartons of urine in his cell and fishing feces out of the toilet. The mental status examination was incomplete with no documentation in the sections pertaining to delusions, hallucinations, and judgment.

**Findings**

The care provided to this patient was inadequate.

This patient was under a PC 2602 involuntary medication order. Furthermore, he was treated under PC 1370 (Incompetent to Stand Trial) at DSH in the past. The rationale provided for lowering this patient from the EOP to the 3CMS level of care after approximately one month of treatment at KVSP was inadequate. The patient had multiple RVR mental health evaluations, including ones in which mental health was deemed to be a contributing factor. Treatment planning was also inadequate, including some treatment plans without any noted progress in mental health treatment goals.

**Patient M**

This 31-year-old male was randomly selected for healthcare record review to assess the quality of care provided at the EOP and MHCB levels of care at KVSP.

The patient's CDCR incarceration began in October 2009. He was included in the MHSDS at the 3CMS level of care in December 2018. The patient was transferred from CSP to KVSP in January 2020. The patient was removed from the MHSDS in February 2020, but he was returned to the mental health program in September 2021.

Although the patient had previously been referred for MHCB placement several times, his first formal MHCB stay occurred in October 2021. He had no reported history of inpatient treatment at the intermediate or acute levels of care.

The most recent SRASHE that was completed upon MHCB discharge on October 13, 2021, assessed the patient with moderate chronic and acute suicide risk.

The patient was provided with diagnoses that included adjustment disorder, depression, bipolar disorder, anxiety, and substance use disorder.

The patient was not prescribed psychotropic medications as he declined them. He was previously prescribed divalproex (mood stabilizer) and sertraline (antidepressant/antianxiety). The patient had no history of treatment with PC 2602 involuntary medications.

While the patient was receiving services at the MHCB level of care, routine psychiatric and primary clinician contacts occurred timely. The psychiatric notes contained scant information, making it difficult to obtain an adequate clinical description of the patient. The primary clinician notes contained beneficial clinical information; however, several of the mental status examinations were identical or nearly identical.

The MHCB IDTTs occurred timely, yet displayed an overemphasis on criminal, rather than clinical, factors. Notes also stated that the patient was attempting to misuse MHCB placement to obtain better access to his attorney. Disconcertingly, the discharge treatment plan dated October 13, 2021, listed no progress towards treatment goals. The patient was discharged to the EOP level of care.

After discharge from the MHCB, five-day follow-ups were completed as required.

The EOP treatment plan on October 27, 2021, indicated that the patient reportedly refused to cooperate in the initial psychiatric evaluation on October 26, 2021. The plan was to reschedule the patient within two weeks. The treatment plan provided a rationale for why the patient was not referred to a HLOC, despite having multiple recent MHCB referrals. The treatment plan mentioned the use of evidenced-based interventions, such as DBT. The primary clinician notes documented that these interventions were actively incorporated into treatment.

The EOP psychiatric assessment dated November 9, 2021, contained inaccurate information; for example, it stated that the patient had no MHCB placements, despite his recent MHCB discharge.

**Findings**

The care provided to this patient at the MHCB level of care was inadequate.

The care provided to this patient at the EOP level of care was adequate, although with several clinical concerns.

Regarding treatment at the MHCB level of care, the psychiatric notes contained insufficient information to formulate a robust clinical conceptualization of the patient. The treatment plan

displayed an overemphasis on criminal factors. While the primary clinician notes contained clinically useful information, the mental status examinations were frequently identical or nearly identical.

As for treatment at the EOP level of care, the patient reportedly refused the initial psychiatric examination. Notes indicated that he would be rescheduled within the next two weeks. Given the recent MHCB discharge as well as documented difficulty with impulsivity and poor distress tolerance, the patient should have been rescheduled sooner. Despite this delay in follow-up, there was no apparent negative consequence for the patient. The treatment plan and the primary clinician notes documented good case conceptualization, as well as the use of evidence-based interventions.

**Patient N**

This 40-year-old male was randomly selected for healthcare record review to assess the quality of EOP care provided at KVSP.

The patient had been treated at the EOP level of care since 2015. He had a history of two MHCB stays during a prior term, most recently in 2013; after this MHCB stay, the patient was transferred to acute care, and then to intermediate care.

The most recent SRASHE on October 10, 2019, assessed the patient with moderate chronic and low acute suicide risk. The patient had one prior documented suicide attempt by hanging in 2012.

The patient was provided with psychiatric diagnoses that included opioid use disorder, alcohol use disorder, antisocial personality disorder, major depressive disorder, and PTSD.

The patient had no history of treatment with involuntary PC 2602 medications.

Routine contacts with the psychiatrist generally occurred timely, with occasional lapses in mandated timeframes by a few days.

The patient was prescribed mirtazapine (for depression, anxiety, insomnia) and sertraline (for depression, anxiety). The psychiatrist addressed medication concerns presented by the patient.

The primary clinician worked with the patient on treatment plan goals of reducing depression and anger, as well as discharge planning.

IDTTs occurred timely, with the patient in attendance for most. Treatment targets included reducing depression and anger. Treatment plans contained some measurable, clinically appropriate goals such as reducing depression to a lower level and placing depression in remission for three months. Treatment plans generally indicated that the patient was present at the IDTTs, but they failed to mention the patient's input into treatment planning. Clinical summaries were frequently nearly identical, with only minor edits noted.

The patient was released from CDCR on February 21, 2022. The patient engaged in pre-release planning prior to his release.

**Findings**

The care provided to this EOP patient was adequate.

Treatment plan goals appeared appropriate to the patient's diagnosis and clinical presentation. The medications prescribed appeared appropriate for the diagnoses and symptoms reported. The treatment plans would have benefitted from better documentation of the patient's input in treatment planning as well as less repetitious, identical clinical summaries.

**Patient O**

This 30-year-old patient was provided with a diagnosis of adjustment disorder, unspecified. He was not prescribed psychotropic medications. IDTT meetings were held without the patient present secondary to refusals on March 23, 2021 and March 15, 2022. It was noted that neither the primary clinicians nor the psychiatrist who attended the IDTT meetings had met with the patient at all during the prior year. Of note, the patient was enrolled in the substance use treatment program and began medication assisted treatment, yet there was no mention of this during the patient's IDTT in March, 2022. Both treatment plans were limited in content and included the same individualized plan of care to decrease the patient's self-reported ratings of depressed mood. No treatment interventions were included in either treatment plan.

The patient was seen for a routine PC contact at cell front due to mental health staffing limitations on October 23, 2021. The patient denied any mental health concerns and noted that he had never taken psychotropic medications. The PC indicated that the patient would be considered for discharge from the MHSDS "in a few months," but this issue was not explored during the subsequent IDTT as the patient refused to attend. The patient was seen one other time during the review period, on February 2, 2022, in response to a patient request submitted on January 28, 2022 requesting a workbook. The workbook was provided to the patient at cell front. There was no documentation of treatment interventions provided to the patient and no evidence that the patient was asked to rate his level of depression. He was asked to rate his level of distress on October 23, 2021, but declined to do so.

**Findings**

The mental health care provided to this 3CMS patient was inadequate.

Clinical contacts did not occur timely in accordance with Program Guide requirements, master treatment plans did not include clinical treatment interventions, and IDTT documentation was completed by individuals who had never met with the patient.

**Patient P**

This 33-year-old patient was provided with a diagnosis of major depressive disorder, recurrent, mild. He was prescribed hydroxyzine on an as-needed basis.

The patient was seen for confidential sessions with his PC in September and December 2021; however, he was seen at cell front in March 2022 without an explanation being provided as to why a confidential contact was not offered. The clinical content of the confidential sessions was adequate and in keeping with the patient's treatment plan.

The patient was seen by the psychiatrist more frequently than every 90 days; he refused on one occasion but was rescheduled and seen within two weeks. Psychiatric contacts utilized telepsychiatry. Telepsychiatry documentation was generic in content, and none of it mentioned the frequency that the patient utilized the as-needed medication. Review of the medication administration record revealed that the patient took hydroxyzine rather frequently with a marked decrease in October, November, and December 2021.

**Findings**

The care provided to this 3CMS patient was adequate; however, rationale was not provided why the patient was not seen by the PC in a confidential setting in March 2022. The telepsychiatrist did not document the frequency that the patient chose to take his as-needed medication; this discussion would have been beneficial in appropriate medication management.

**Patient Q**

This 34-year-old patient was provided with diagnoses of unspecified personality disorder, unspecified schizophrenia spectrum and other psychotic disorder, as well as drug abuse, amphetamine type. He was prescribed hydroxyzine on an as-needed basis; briefly during the review period, he was also prescribed olanzapine. When prescribed olanzapine, he was medication nonadherent and was found with several pills in his cell; thus, it was unlikely that the patient was taking his medications even after directly observed medication administration.

During the review period, the patient was seen for one PC contact on October 6, 2021. The note mentioned that the patient requested lithium, and the PC documented that the patient presented with "no indication for lithium." The PC was a social worker and not a licensed prescriber; consequently, this statement was beyond the scope of the primary clinician's practice. Psychiatric documentation included evidence that the patient had been prescribed lithium in the past. The content of the PC note did not include the provision of any interventions outlined in the treatment plan.

The patient was offered psychiatry sessions more often than required but often refused to be seen out of his cell in a confidential setting. The patient consistently denied the need for medications beyond hydroxyzine, stating that it was the same as olanzapine. Although the patient agreed to take olanzapine in January 2022, he took the medication for less than one month before refusing altogether; the olanzapine was discontinued in March 2022. The psychiatrist noted that the patient did not meet the criteria for a PC 2602 involuntary medication order given his ability to care and advocate for himself, avoid rules violation reports, and attend programming.

Throughout the review period, the patient was described as disorganized, tangential, and difficult to follow in conversation, yet he was able to program and to take care of himself. There were no documented safety concerns, no concerns expressed by custody staff, and the patient denied any distress.

**Findings**

The care provided to this 3CMS

**Patient R**

This 41-year-old male was randomly selected for healthcare record review to assess the quality of 3CMS care provided at KVSP.

The patient's most recent period of CDCR incarceration began in September 2009. He returned to KVSP on May 17, 2019, after placement in the CSP/Corcoran SHU followed by a brief stay at CCI.

The patient had a history of one prior MHCB stay in 2012. He was evaluated for MHCB admission in 2014, but was not admitted. He had no history of treatment at the EOP, intermediate, or acute levels of care.

The most recent SRASHE on May 13, 2019, assessed moderate chronic and low acute suicide risk. There was no reported history of suicide attempts or self-harm incidents.

The patient was provided with psychiatric diagnoses that included major depressive disorder, anxiety, antisocial personality disorder, and substance use disorder.

He was prescribed fluoxetine, an antidepressant medication. The patient had no history of PC 2602 ordered treatment with involuntary medications.

The psychiatric follow-up appointments generally occurred timely. The psychiatric follow-up note on August 25, 2021 stated that the patient no longer wanted to take his medication due to wanting to accommodate his cellmate. At a subsequent visit on December 22, 2021, the patient indicated that he wanted to resume fluoxetine. On September 16, 2022, the patient again wanted to discontinue fluoxetine as he wanted to be removed from the MHSDS with the goal of transferring to Calipatria. The psychiatrist discontinued fluoxetine with the plan to see the patient every 30 to 60 days. The patient transferred prior to his psychiatric follow-up appointment.

PC contacts occurred timely and contained clinically useful information. The documentation of those sessions indicated that the interventions provided generally aligned with the treatment goals specified in the treatment plan.

IDTTs also occurred timely. The IDTT on June 8, 2021 was conducted without the patient due to "COVID-19 modified programming." The PC included the patient's input into treatment planning. The IDTT on June 7, 2022 was also conducted without the patient, as he reportedly declined to participate. The treatment plan repeated prior goals; however, new goals were also added, such as the goal of reducing depression below a certain threshold.

The patient transferred to RJD on November 16, 2022, where he remained at the time of this review.

## Findings

The care provided to this 3CMS patient at KVSP was adequate, but with areas of needed improvement.

The psychiatrist was responsive to the patient's medication concerns; however, the patient's ambivalence about medication adherence was inadequately addressed.  Treatment plans repeated several goals, without documentation of definitive interventions to address the barriers preventing achievement of those goals.  Additional goals were added to the treatment plan, which appeared clinically appropriate.

## Patient S

This 34-year-old male was randomly selected for healthcare record review to assess the quality of 3CMS care provided at KVSP.

The patient was incarcerated since March 2013.  He was placed into the MHSDS at the 3CMS level of care shortly after his CDCR arrival.  Since that time, the patient was treated continuously at that level of care, except for May 2019 to April 2020, when he was not a MHSDS participant.

The patient arrived at KVSP in March 2015 from NKSP.  Except for brief stays at other facilities, he was housed at KVSP since that time.  While at KVSP, the patient was housed both in GP and the ASU.  Since October 2020, the patient was housed in GP.  He had no history of treatment at the EOP, MHCB, intermediate, or acute levels of care.

The most recent SRASHE on February 13, 2017, assessed moderate chronic and low acute suicide risk.  He had a history of two suicide attempts that occurred in 2003 by hanging and in 2006 by overdose.  He also had a history of self-harm incidents, but there was no documentation of recent incidents of this behavior.

Various diagnoses were present in the healthcare record including PTSD, opioid use disorder, adjustment disorder, and anxiety.

The patient was not prescribed psychotropic medications at the time of this review.  The patient had no history of PC 2602 ordered treatment with involuntary medications.  He received MAT for opioid use disorder, and was prescribed buprenorphine-naloxone.

The last documented psychiatric follow-up visit occurred on November 2, 2020.  The psychiatrist prescribed mirtazapine, an antidepressant and anxiolytic medication, and clonidine, that was originally prescribed for symptoms of opioid withdrawal, but continued for the anxiolytic effects.  On February 8, 2021, the patient reportedly refused to meet with the psychiatrist, but he stated that he wanted to discontinue medications.  Medications were discontinued.  There were no further documented psychiatric contacts.

While appointments with the PC occurred timely, they were conducted in a nonconfidential setting primarily at cell front, reportedly due to the patient's refusal to meet in a confidential office.  The last confidential visit occurred on September 21, 2021.

IDTTs occurred timely.  The patient reportedly declined to attend his most recent IDTT on October 18, 2022.  The treatment plan targets included learning coping skills and reducing levels of anxiety and depression.  Treatment plan goals were updated to included goals targeting his substance use disorder.  Treatment plan clinical summaries from October 2020, October 2021, and October 2022 were not meaningfully updated.

At the time of this review, the patient remained at KVSP where he received mental health services at the 3CMS level of care.

**Findings**

The care provided to this 3CMS patient at KVSP was inadequate.

The last documented psychiatric visit occurred on November 2, 2020.  Medications were discontinued at the patient's request on February 8, 2021.  This occurred without documentation of psychiatric evaluation of the patient.  Additionally, the patient was not seen for psychiatric follow-up after medication discontinuation.

The last documented confidential session with the PC occurred in September 2021.  While there was documentation that the patient was offered confidential sessions and declined, there were no clear interventions documented to address this treatment nonadherence.

IDTT clinical summaries were not meaningfully updated since October 2020.

**APPENDIX C-12**
**California State Prison/Corcoran (CSP/Corcoran)**
**(April 11, 2022 – April 14, 2022)**

**Patient A**

This 71-year-old EOP patient was transferred from CMC to CSP/Corcoran on November 12, 2021. The patient had monthly primary clinician contacts, but they generally occurred in a non-confidential setting (i.e., cell front) due to COVID-19 related issues. There were similar issues with his monthly psychiatry contacts.

The patient's treatment plans conducted at CMC on October 6, 2021, and at CSP/Corcoran on December 29, 2021, were reviewed. The patient was noted to regularly attend groups. The patient reported mild depression symptoms as he continued to grieve over losing his daughter. There were regular notes from the recreation therapist.

**Findings**

This patient's care was adequate. Mental health clinicians saw this patient at a frequency that was consistent with Program Guide requirements; however, due to COVID-19 related issues, the patient was generally not seen confidentially. At least one of the patient's psychiatry contacts was by way of telepsychiatry. It appeared that recreation therapists provided all group therapy.

**Patient B**

This 52-year-old EOP patient had a diagnosis of major depressive disorder, recurrent episode with mood-congruent psychotic features, polysubstance dependence, and borderline personality disorder. He regularly attended groups.

Due to quarantine issues, a documented IDTT held on November 3, 2021, was held at cell front. During a brief interview on the outdoor recreational yard, the patient reported being unsuccessful in obtaining substance abuse treatment that incorporated a 12-step approach.

The patient's current medications included Zyprexa and Celexa. He had five RVRs; the most recent RVR was dated February 20, 2018 and was for overfamiliarity.

The frequency of the patient's mental health clinical contacts was consistent with Program Guide requirements. Group progress notes confirmed that he received core mental health groups.

On April 13, 2022, the monitor's expert attended the patient's IDTT. All required disciplines were in attendance, although the CC I was covering for the patient's assigned CC I. The patient expressed anxiety about remaining at CSP/Corcoran due to his COVID-19 high risk status, as well as frustration that he still did not have access to a 12-step program. The CC I confirmed that the patient should be transferred from CSP/Corcoran due to his diabetes and emailed the CC II about this matter. With prompting from the monitor's expert, staff decided to contact ISUDT concerning the patient's desire to be in a 12-step program.

**Findings**

From a confidentiality perspective, COVID-19 issues compromised compliance with Program Guide requirements.  The patient nonetheless received the required number of out-of-cell therapeutic activities.  However, the IDTT was problematic from the perspective of only briefly addressing the patient's continued transfer request due to his diabetes and the treatment team's apparent lack of knowledge about the ISUDT at CSP/Corcoran.

**Patient C**

On November 12, 2021, this EOP patient was transferred from SVSP to the CSP/Corcoran mainline EOP program after being reclassified as a Level II patient.  The patient was noted to be stable during his November 17, 2021 IDTT with no urgent mental health issues to address.

The patient had a diagnosis of major depressive disorder.  During the IDTT meeting, he agreed to work toward being discharged to the 3CMS level of care within the next 90 days.

The patient refused to attend his IDTT on November 24, 2021.  He also refused to attend groups and reported feeling depressed.  However, he was encouraged to attend groups and subsequently attended them.  Clinical contacts met Program Guide requirements from a frequency perspective; however, the patient often declined a confidential setting or was not seen confidentially due to COVID-19 restrictions.

The patient's medications included Prozac and MAT.

**Findings**

This patient's programming was compromised by COVID-19 related issues that impacted the EOP program and was inadequate.  It was very unlikely and probably contraindicated to be considering a change in the patient's level of mental health care.

**Patient D**

A September 2, 2021, initial consult note from CSP/Corcoran included the following:

He became very aggravated upon learning that he would likely be spending 14 days in quarantine as he had already spent a month in segregation and 2 weeks in quarantine at the facility he was transferred from.  He stated, "I sleep 24 hours a day.  My body is broken from laying in a bed.  I'm reaching my breaking point…"  I/P was seen at cell front in a non-confidential setting due to COVID-19 quarantine restrictions…

[Diagnoses]

Antisocial personality disorder

HCV infection

Health care maintenance

Liver fibrosis

Noncompliance Schizoaffective disorder, Bipolar type

Vertigo due to brain injury

The October 9, 2021 initial psychiatric examination was consistent with the diagnoses as summarized above following "55 yo … male with SAD, Bipolar Type by History, TBI, History of LSD, Meth, MJ Use D/O, ASPD/ is at his base line on no meds."

The patient was not prescribed medications. Subsequent weekly sessions with his primary clinician demonstrated overt delusional thinking. Many of these PC contacts were at cell front due to COVID-19 quarantine issues. The same psychiatrist then saw the patient again on November 4, 2021. The psychiatrist noted that the patient had been on multiple psychotropic medications in the past but experienced extrapyramidal symptoms and dystonia. On December 9, 2021 the patient again told the psychiatrist that he did not need medications and could not tolerate them due to his brain damage.

A December 15, 2021 treatment plan was reviewed. The patient had been single-celled due to his delusional beliefs and command hallucinations. It appeared that he had been chronically psychotic and continued to not be on medications. The patient had not had any MHCB or DSH admissions.

It also appeared that for at least several months the patient was on a modified program related to COVID-19 restrictions. Further, it appeared that he incorporated a former primary clinician into his delusional system and claimed that he had been sexually assaulted, which was subsequently investigated by ISU and not substantiated.

The patient's April 13, 2022 IDTT meting note included the following:

*Why wasn't referral made:* Over the past 13 weeks, 11 of those weeks, [Patient] has refused on average 8.7 hours of his weekly treatment. From the time period of January 9th till February 14th a statewide modified program was implemented to limit the exposure of COVID 19. Another quarantine was implemented on 3/4/2022 after numerous positive COVID cases in the EOP housing unit. On 3/8/2022 he was transferred to a COVID Isolation building and was released on 3/25/2022. During this time per directive individual therapeutic sessions and EOP groups were conducted at cell front resulting in EOP group treatment to be provided in an alternative manner, group packets. [Patient] reports he could not complete the packets as he says, due to, "brain damage… I'm not doing brain teasers. I'm supposed to be gentle with my brain. I'm not supposed to be thinking… That made my group attendance low…" Therefore, he was not receiving credit for group attendance. Initially upon his arrival back to 3B01 he reports that he was not motivated to be productive due to his dislike of Corcoran and states, "I'm being silenced here it's very hard to program here. But I'm willing to if I can get some more indoor groups." Despite his refusals of groups/yards he does regularly attend his weekly individual sessions. He has not had any CIT activations nor MHCB referrals. He tends to his ADL and participates in

custody related activities such as day room. He has active psychotic symptoms, but has been at his baseline and has denied danger to self and danger to others over the past 90 days. Today he shares he is willing to increase participation in group treatment. Therefore, a HLOC is not warranted at this time.

**Findings**

The treatment plan was not adequate because it did not sufficiently address the patient's chronic psychosis and poor functioning. It was not clear why he did not meet criteria for a modified program based on his refusal rate. Based on the limited review of his heath care record, it was also unclear whether the patient had benefited from psychotropic medications in the past. Establishing a therapeutic alliance with this patient was clearly very difficult. Transferring him to a HLOC should be considered

**Patient E**

Patient E's chart was reviewed because he reported having difficulty adjusting to 3CMS level of care, after several years of receiving a HLOC.

Patient E was a 49-year-old male who had been incarcerated for over 20-years. His earliest parole release date was June 9, 2027. During the past nine years, he received multiple levels of mental health care (two years of acute, five and a half years of EOP, and the past one and a half years of 3CMS). He had an extensive history of engaging in self-injurious behavior and a history of emotional dysregulation (overreacting/outbursts of anger). Additionally, he had a history of receiving MHCB and DSH ICF levels of care.

His record revealed eight suicide attempts with the most recent in August 2015 when he made a lethal hanging attempt. Out of eight attempts, two attempts were highly lethal: namely, cutting his wrist in 2012, and overdosing on pills in 1999. During the review period, he was seen by the CIT on December 29, 2021, resulting in an emergent consult due to suicidal ideation. The patient dismissed his reports of suicidality, claiming others misunderstood him. Two months later, he reported that he would check-out in April 2023 if his parole was denied. A SRASHE was completed revealing high and low chronic and acute suicide risk levels, respectively. During the SRASHE, he told his primary clinician, "You know, I told you before, they will deny me again. They always do, but I am not suicidal."

He had a history of being diagnosed with a bipolar II disorder, insomnia, Asperger's syndrome, a major depressive disorder, a narcissistic personality disorder, and polysubstance use disorders. During the review period, his mental health diagnoses were unclear. The treating psychiatrist diagnosed him with a bipolar disorder, depression, and insomnia, while the primary clinician diagnosed him with a major depressive disorder, a narcissistic personality disorder, and polysubstance use disorders with opioids being his drug of choice. There was also confusion regarding his psychopharmacological treatment, with the treating psychiatrist prescribing Wellbutrin and Benadryl and the primary clinician reporting that he was being treated with BuSpar.

In July and August 2020, this patient requested a discharge from EOP because he was informed of an upcoming transfer to one of two institutions which he believed presented safety concerns

894

due to financial debt.  He also reported that he had not received any RVRs in the last 90-days, and had attended groups, worked in the kitchen, and attended school prior to COVID-19.  The treatment team supported his request and clinically discharged him from an EOP to 3CMS level of care at a discharge IDTT held on August 4, 2020.  Assessment and IDTT timelines were met with the initial psychiatry assessment on August 7, 2020, the initial PC assessment on August 10, 2020, the initial 3CMS IDTT on August 13, 2020, and a continuing IDTT on August 12, 2021.  He was scheduled for a continuing IDTT on July 20, 2022.  The treatment team planned to reduce his depression and anger with CBT interventions.

During the on-site review, the patient reported having difficulty transitioning from an EOP to a 3CMS level of care due to reduced programming and individual treatment sessions.

Routine and urgent/emergent clinical contacts occurred according to Program Guide requirements.  During the review period, this patient was seen by his primary clinician once in November 2021, twice in January 2022, and three times in February 2022.  The treating tele-psychiatrist had three sessions with him, once in October 2021, once in December 2021, and once in February 2022.  He was seen cell front when he was quarantined after testing positive for COVID-19 on February 8, 2022.  Progress notes were informative; however, they did not reveal CBT intervention to help him develop coping skills to reduce his anxiety and anger. There was also little to no evidence of coordination between the treating psychiatrist and primary clinician involving the clarification of diagnoses, treatment goals, and interventions.  Additionally, his high chronic suicide risk level was ignored along with his eight suicide attempts, long sentence, and repeated threats to kill himself if he was denied parole in 2023.  Finally, there was no evidence that clinicians worked with the patient to help him transition from an EOP to a 3CMS level of care by acknowledging these difficulties and offering additional services.

**Findings**

The mental health treatment provided to this patient was inadequate.  Clinicians met with him in a timely manner per program guide requirements; however, they did not acknowledge his difficulties adjusting to the paucity of services at the 3CMS level of care.  During the past nine years, only 17 percent of his time was spent receiving 3CMS level of care while 83 percent was spent receiving higher levels of care (EOP, PIP, and MHCB).  While receiving a HLOC, clinicians focused on his extensive history of emotional dysregulation and self-injurious behavior.  During the review period, his individual sessions appeared to be wellness checks, devoid of continuity of care with past treatment and of coordination among treatment team members.

**Patient F**

Patient F's chart was reviewed to follow up on his report of having difficulties adjusting to ML 3CMS at CSP/Corcoran.  During a group interview, he talked about being unlike the other 3CMS patients because he was struggling with his condemned status.

Patient F was a 60-year-old male with a lengthy juvenile and adult criminal history.  He was convicted of rape and murder one, sentenced to death, and placed on death row at SQ as a

condemned inmate in 2017. His developmental history was chaotic, characterized neglect, sexual abuse, familial criminality and both drug and alcohol abuse.

He started receiving mental health services when he arrived at SQ in January 2017. He continuously received 3CMS level of care, diagnosed with a major depressive disorder and generalized anxiety disorder. Along with his psychological problems, he had several medical problems to include cirrhosis of the liver, urine incontinence, chronic low back pain, a meniscus tear, and Hepatitis C. Much of his anxiety and depression were related to his physical health.

He never received a HLOC or stabilization in MHCB; however, he attempted suicide four times, three times as an adolescent resulting in several hospitalizations and once at 38 years of age. There was no evidence that he ever attempted suicide while in jail or CDCR. A SRASHE revealed acute and chronic suicide risk classifications of low and moderate respectively. Protective factors included maintaining his relationship with his children and listening to music.

During the review period he participated in an initial IDTT on November 18, 2021, met with his primary clinician three times, and met with his treating psychiatrist three times. He expressed concerns about the lack of programming at CSP/Corcoran and minimal treatment sessions, saying he was accustomed to meeting with his primary clinician at least monthly at both SQ and CCI, rather than every 90-days. He and his primary clinician identified functional impairments and discussed treatment strategies for sleep problems, nervousness, and difficulties relaxing. His PC clearly defined her role and used solution focused treatment and CBT interventions. She also recommended he use deep breathing and visualization, and she offered him reading material, which he refused. Additionally, she attempted to empower him, by noting his self-efficacy when he submitted a sick call request to meet with her and with his treating psychiatrist to adjust his psychotropic medication.

**Findings**

Mental health services provided to this patient were marginally adequate. He was having difficulty adjusting to being moved from SQ to a lower level of care at CSP/Corcoran. He talked about having difficulty adjusting to being restricted to his cell for extended periods of time due to COVID-19 outbreaks and having difficulty adjusting to being seen quarterly instead of monthly at SQ and CCI. In response to his request for activities and increased sessions, he received recommendations to use relaxation techniques and was offered reading material which he denied. There was no evidence of any inquiry into the underlying issues resulting in his struggles.

**Patient G**

Patient G's chart was reviewed after he disclosed during a group interview that he needed additional mental health services to help him deal with his life sentence.

Patient G was a 71-year-old male serving 122 years for several violent crimes to include rape and murder. He was admitted to a CDCR reception center in 1993. A review of his record revealed his adjustment to prison was unremarkable, with no RVRs.

From 2002 to 2005, he received EOP level of care. He was admitted to MHCB twice, once in 2002 and once in 2013. He began receiving 3CMS level of care in 2013. He had a history of

several mental health diagnoses to include alcohol and amphetamine substance use disorders, a paraphilia disorder, sexual sadism, and a schizoaffective disorder - depressive type.  There were also reports of cognitive impairment; however, details were not provided, except for a completed screen from the CCHCS Care Guide entitled Cognitive Impairment/Dementia Screen. The screen, completed on February 17, 2022, was positive for organic impairment.

During the review period, he met with his entire treatment team at an IDTT on March 17, 2022 and participated in setting goals which were to reduce the overall frequency and intensity depressive symptoms by using CBT interventions.  The treatment plan indicated that if he was able to manage his depression without medications, MHCB admissions, and RVRs for six months, the treatment team would consider discharging him from 3CMS.  He was not treated with psychotropic medication during the review period, and only met with the treating psychiatrist during the IDTT.  He met with his primary clinician twice, once in December 2021 and again in February 2021.  Treatment focused on depressive symptoms and utilized active listening, reflective empathy, and CBT skills.  Progress notes revealed continuity of care from one session to another and with the treatment plan.  The patient kept his appointments with his primary clinician, and individual sessions were in confidential settings, except for cell front contacts due to COVID-19 outbreaks.

**Findings**

There was no evidence this patient was distressed or needed a HLOC. He was receiving adequate mental health care.

**Patient H**

Patient H, from yard 3B, was randomly selected for a chart review.

This 42-year-old patient was sentenced to CDCR for 27 years, charged with several violent offenses, robbery, and criminal gang activity.  His earliest parole release date was April 4, 2024. During his incarceration he had four RVRs, with the most recent being in July 2021.

This patient began receiving 3CMS level of care on February 1, 2012.  He did not have any crisis bed admissions and he did not receive treatment in EOP or any HLOC.  He was diagnosed with a major depressive disorder, recurrent, mild and he had a history of being treated with Prozac and Vistaril.

During the six-month review period, he met with his primary clinician five times and with his treating psychiatrist twice.  In December 2021, the treating psychiatrist discontinued Prozac and increased Vistaril, per the patient's request.  Progress notes from the primary clinician and treating psychiatrist revealed the patient was relatively stable, without any evidence of acute distress.  The patient did not have an IDTT meeting during the review period; however, the IDTT which preceded the review period and the IDTT which followed the review period were reviewed to create a contextual background.  The reviews indicated a continuity of care over time.  Additionally, this review indicated that he met most of his treatment outcome expectations, except for continuing to be treated with Vistaril.

**Findings**

This patient was receiving an adequate level of care, consistent with the Program Guide. A review of his medical record did not reveal any acute distress during the six-month review period. He was relatively stable and did not need a HLOC.

**Patient I**

Patient I from yard 3C yard was randomly selected to have his case reviewed.

This 58-year-old patient, with an earliest parole release date of November 13, 2031, was receiving 3CMS level of care services during the six-month review period. His diagnosis was an adjustment with anxiety. His treatment goal was to reduce anxiety, and the intervention was to provide coping skills. Since there was no treatment plan completed during the review period, the patient's IDTT documentation from June 2021 was reviewed for context.

This patient received 3CMS services for approximately six months and nine months, from December 13, 2004 through May 11, 2005, and from September 6, 2005 through May 23, 2006. He was most recently placed in MHSDS at a 3CMS level of care in early April 2021 at RJD to observe symptoms of mania, flight of ideas, tangential thinking, and potential delusional thought content. After being placed in MHSDS, he was transferred to ASU and subsequently to CSP/Corcoran on April 29, 2021.

Initial PC and psychiatry evaluations were attempted on May 13, 2021. Due to being quarantined, his PC attempted to evaluate him at cell front, acquiring minimal information. Telepsychiatry was more successful in obtaining meaningful information. On May 21, 2021, CIT was activated after this patient reported having command auditory hallucinations instructing him to assault his cellmate. A SRASHE completed on May 21, 2021 determined his acute and chronic suicide risk levels were both low. He later denied having command auditory hallucinations, reporting it was an attempt to avoid having a cellmate. On May 25, 2021 his primary clinician met with him, to discuss ways he could pursue a single cell chrono.

His initial IDTT was late, held approximately five weeks after his arrival, on June 8, 2021. The treatment team removed his diagnosis of a bipolar I disorder, noting his symptoms could have been related to substance use and/or to an antisocial personality disorder. The team reported his primary problem was anxiety and his primary treatment goal was to reduce anxiety below a score of four on a scale of one to ten. Along with reducing anxiety, clinicians would help him recognize bipolar triggers and address bipolar symptoms during each appointment. The team agreed that he would be continually evaluated for diagnostic clarification to better inform diagnoses and treatment goals. His treatment plan specified the need to observe and manage potential flight of ideas, promote mood stability, and increase insight and judgment. He would also be monitored for potential substance use as this would negatively impact his mental status.

During the review period he was seen three times by his primary clinician and once by his treating psychiatrist. His primary clinician diagnosed him with an adjustment disorder with anxiety on January 6, 2022, and planned to provide coping skills. His primary clinician's treatment sessions appeared to be wellness checks. There was no evidence of any skills training, identification of bipolar triggers, or discussion of bipolar symptoms.

**Findings**

The mental health care delivered to this patient was inadequate. His diagnosis, symptoms/ problems and treatment goals were unclear, along with the treatment interventions used to achieve the goals.

**Patient J**

Patient J from yard 3C was randomly selected for a chart review.

This 33-year-old patient was serving a 16-year sentence for robbery and involuntary manslaughter. His earliest parole release date was July 8, 2023. This patient had a chaotic and traumatic developmental history, characterized by violent behavior and substance use, beginning at age eight.

In CDCR, he began receiving 3CMS services in 2015. He was also admitted to a mental health crisis bed and participated in ISUDT's MAT program. Mental health diagnoses included several substance-use disorders to include cannabis, alcohol, amphetamines, cocaine, heroin and other hallucinogens. Additional diagnoses included depression disorders, an antisocial personality disorder, and a suspected history of a substance induced psychosis.

Since a treatment plan was not completed during the review period, his IDTT documentation from April 27, 2021 was reviewed for context. His treatment plan recommended that he continue to be treated psycho-pharmacologically (i.e., with Remeron and Prozac) and that both his substance use disorders and depressive symptoms be addressed at each appointment. Treatment goals were to reduce substance use behavior, decrease depression, and remain free of RVRs and MHCB admissions.

During the review period, he met with his primary clinician twice, once in November 2021 and once in February 2022. He also met with his treating psychiatrist twice, once in December 2021 and once in February 2022. The primary clinician's documentation was inadequate, as the same progress note was entered into the record with minimal alterations. The progress notes appeared to reflect brief wellness checks, rather than a therapy session requiring rapport and following up on the status of his substance use disorders and depressive symptoms. The telepsychiatrist's documentation reflected therapeutic sessions, where mild distress was identified, concerns were discussed, and medication adjusted.

**Findings**

The treatment of this patient was marginally adequate, with the psychiatrist documenting meaningful contacts, during which times concerns were identified, discussed, and addressed, rather than conducting a brief wellness check. Additionally, there was no evidence the primary clinician reviewed the psychiatrist's documentation, which could have generated a meaningful discussion/intervention.

**Patient K**

Patient K from yard 3B was selected for a case review to investigate his reports provided during a group interview with 11 other 3CMS patients that his individual sessions were not confidential and his IDTT did not occur in the past year.

This 42-year-old patient was diagnosed with an anxiety disorder and a rule out of PTSD. He participated in an IDTT with his entire treatment team prior to the review period on November 12, 2020 and subsequently within one year during the review period, on November 4, 2021. He agreed with the treatment goals and interventions which included prescribing Vistaril and treating him with CBT and person-centered techniques to address cognitive distortions, poor coping skills, and depression. Documentation indicated he met in a confidential setting with his primary clinician on November 24, 2021 and on February 14, 2022. He also met with his treating psychiatrist on November 1, 2021 and February 11, 2022.

**Findings**

This patient was receiving adequate mental health treatment, meeting with his primary clinician and treating psychiatrist at least every 90-days and with his treatment team to review his treatment plan at least annually. His individual sessions with his primary clinician occurred in confidential settings.

**Patient L**

Patient L from yard 3A was selected for a case review after a group interview with nine other 3CMS patients. The purpose of the review was to investigate his reports that he was not seen in a timely manner after arriving at CSP/Corcoran.

This 28-year-old patient returned from Marin County Jail after being out-to-court for approximately two years. He arrived at CSP/Corcoran on March 30, 2022. He had a history of being diagnosed with anxiety and depression, and being treated with psychotropic medication. He was evaluated by psychiatry on April 7, 2022 and April 11, 2022, and by his primary clinician on April 19, 2022. His IDTT occurred on April 27, 2022. His primary clinician's initial evaluation was not completed within the Program Guide requirement of ten days after arrival, and his IDTT was not completed within the Program Guide requirement of 14 days after arrival. He was transferred to CSATF within one week of his CSP/Corcoran initial IDTT.

**Findings**

The primary clinician's initial assessment and the treatment team's initial IDTT were not completed within Program Guide requirements.

**Patient M**

Patient M from yard 3A was randomly selected for a case review.

This 32-year-old patient arrived at CSP/Corcoran in mid-June 2021, serving his first term in prison for child molestation. His initial primary clinician contact, initial primary psychiatrist contact, and initial IDTT occurred within Program Guide timeline requirements.

He reported a significant mental health history, to include depression, substance use disorders (cannabis and amphetamine), and schizophrenia. He also reported auditory hallucinations beginning during adolescence, with his most recent hallucinations occurring in 2021.

Additionally, he reported being found incompetent because he would not work with his attorney. He denied a history of attempting suicide.

His diagnoses were unclear. The primary psychiatrist diagnosed him with a major depressive disorder, but the symptoms were unclear and the primary clinician never clarified a depressive disorder. Additionally, the evidence for a diagnosis of a PTSD was unclear, along with the status of his unspecified schizophrenia spectrum and other psychotic disorder. Symptoms/problems, treatment goals/expectations, and specific interventions were vague. This patient was being treated with medication for depression, anxiety, impulsivity, and mood instability; however, the primary clinician's interventions for depression, anxiety, impulsivity, and mood instability were unclear. The primary psychiatrist and clinician did not appear to be coordinating their interventions to achieve measurable goals. Sessions often looked like wellness checks.

The primary clinician met with this patient every 90 days; however, psychiatry canceled a scheduled appointment during the review period, resulting in a four-month gap between appointments.

**Findings**

The mental health care delivered to this patient was marginally adequate. The patient's diagnoses, symptoms/problems, treatment goals with expected expectations and interventions were not clearly defined in the treatment plan; consequently, treatment sessions were not as effective as they could have been.

**Patient N**

Patient N from yard 3B was randomly selected for a case review.

This 66-year-old patient was diagnosed with a persistent depressive disorder and sexual sadism. He began receiving 3CMS level of care in October 2016. He did not have a history of MHCB admissions or suicidality. He was being treated with antidepressant medication and with cognitive behavioral interventions. Treatment focused on reducing the overall frequency and intensity of depressive symptoms. His primary clinician and treating psychiatrist met with him regularly at least every 90 days, and his IDTT met at least annually. He appeared to have a therapeutic relationship with his primary clinician, and he appeared to be benefiting from treatment.

**Findings**

The mental health treatment provided to this patient was adequate.

**Patient O**

This 34-year-old patient was randomly selected for healthcare record review from a list of CSP/Corcoran Administrative Segregation EOP Hub patients to evaluate the quality of mental health care. The patient was diagnosed with schizoaffective disorder, bipolar type; intellectual disability, mild; and antisocial personality disorder. He was prescribed BuSpar, lithium, Abilify, and Zyprexa. The PC 2602 involuntary medication order for danger to others was renewed in

January 2022. The patient was also a participant in the DDP with a DD1 designation; although some notes identified the patient as DD2. Records referenced a history of self-injurious behaviors and one reported suicide attempt in December 2019. The patient's history was significant for more than 40 MHCB admissions and 15 inpatient hospitalizations for acute and intermediate care. The most recent inpatient admission occurred in 2019.

In November 2021, the IDTT accurately noted a positive referral indicator for frequent RVRs, and referenced a history of more than 30 RVRs for IEX. The corresponding treatment interventions, however, were generic ("goal setting") and insufficient for addressing the patient's frequent IEX and violent behaviors resulting in RVRs. Additionally, CSP/Corcoran failed to note the HLOC indicator for three or more MHCB referrals in a six-month period, despite records indicating four MHCB referrals during the month of October 2021. As such, the IDTT did not consider this indicator in their non-referral rationale or develop an enhanced treatment plan to address the patient's frequent MHCB admissions.

The patient had 12 CIT evaluations and ten MHCB referrals at CSP/Corcoran between November 18, 2021 and February 28, 2022. All MHCB referrals were for danger to self-concerns, and all but one of the MHCB referrals were rescinded while the patient was in alternative housing. The one MHCB admission occurred for only two days in early December 2021, and there was no MHCB treatment plan developed during this admission.

All IDTTs at CSP/Corcoran were completed in absentia, and nearly all individual contacts with the PC and psychiatrist were completed at cell front due to the patient's refusals. Although Administrative Segregation EOP Hub psychiatry contacts were timely, the patient only received only two routine individual primary clinician contacts within a three-month period. PC progress notes also suggested there were no therapeutic interventions offered during the two routine encounters. All other primary clinician contacts occurred for assessments and five-day follow ups, and these encounters did not involve treatment interventions.

While the patient appeared to be attending some ASU EOP treatment groups in early December 2021, group notes suggested his attendance further declined in January and February 2022. There were also fewer out of cell treatment groups offered during that time, presumably due to COVID-19 related program modifications.

The patient was on quarantine status between February 3, 2022 and February13, 2022 after testing positive for COVID-19. On or around February 27, 2022, the patient "boarded up" in his cell and reported suicidal ideation. His chronic and acute suicide risk were assessed as high on this date, and the evaluating clinician noted he did not appear to be benefitting from EOP level of care. The patient subsequently transferred to an available MHCB at CSP/Sac, and he did not return to CSP/Corcoran after discharge.

The patient received approximately 13 RVRs in October and November 2021, including five RVRs for IEX and three for battery on a peace officer. Four of CSP/Corcoran's RVR MHAs were reviewed by the monitor's expert. All RVR MHAs were completed at cell front "due to COVID related modified program." One evaluator completed three of the RVR MHAs for willful disobedience, overfamiliarity, and IEX, and determined the patient's mental illness and developmental disability *did not* contribute to the RVR behaviors. The evaluator did not provide

recommendations for the hearing officer to consider when assessing penalties for the three RVRs. One day later, a supervising psychologist completed a RVR MHA for battery on a peace officer. However, despite the supervisor documenting that mental illness *did* contribute to the patient's RVR behavior, and that the patient "has not demonstrated the ability to manage/control his behavior when distressed," they did not provide recommendations for the hearing officer to consider when assessing penalties. This RVR MHA also included copied and pasted statements from a different evaluator's RVR MHA without explanation.

## Findings

The quality of care provided to this patient was inadequate. The patient had more than ten RVRs and MHCB referrals within a three-month period, at least 12 CIT evaluations, refused more than 50 percent of offered treatment, and demonstrated a lack of progress over a six-month period in EOP level of care. However, IDTTs did not refer the patient to a HLOC, document sufficient non-referral rationales, or develop and implement effective treatment plans in lieu of HLOC referral. Individual contacts in the Administrative Segregation EOP Hub did not include therapeutic interventions, which were especially needed to address the frequent RVR behaviors and underlying issues resulting in frequent MHCB referrals. Lastly, RVR MHAs were inadequate and should be addressed with training, auditing, and direct feedback.

## Patient P

This 54-year-old patient was randomly selected for healthcare record review to assess the quality of care provided at CSP/Corcoran. The patient was diagnosed with schizoaffective disorder, antisocial personality disorder, and "multiple substance use disorders." He was also included in the DDP with a DD2 designation. The patient was prescribed Haldol, Depakote, Cogentin, Effexor, and Zyprexa. His history was significant for multiple MHCB referrals, acute and intermediate care admissions, suicide attempts, hunger strikes, and staff assaults. The most recent inpatient discharge occurred in mid-January 2022, at which time the patient transferred from intermediate care to EOP level of care at CSP/Corcoran.

While at CSP/Corcoran, the patient had three MHCB referrals, participated in less than 50 percent of treatment, and received six RVR MHAs. Despite an active involuntary medication order, healthcare records noted several periods of medication non-adherence. Most of the patient's RVRs were for battery on a peace officer, and reviewed RVR MHAs indicated there was a nexus between the patient's mental illness and RVR behaviors.

In mid-March 2022, the patient appeared to decompensate in the Administrative Segregation EOP Hub. There were a few PC contacts completed at cell front, and corresponding notes described the cell as dark and the patient as uncooperative. The patient was also medication non-adherent around this time and on a brief hunger strike. On March 21, 2022, the PC again noted that the cell was dark and that they were unable to assess the cleanliness of the cell as a result. On March 22, 2022, the patient requested discharge from EOP to 3CMS level of care. On March 24, 2022, the patient was extracted from the cell by use of force and admitted to the MHCB for grave disability and danger to others. Admission records described the patient as crying, malodorous, paranoid, and threatening to spit on staff if admitted to the MHCB. The PC

returned to the patient's cell on this date and found urine on the floor and several cups of urine and feces.

After ten days in the MHCB the patient discharged to the Administrative Segregation EOP Hub on April 4, 2022. Subsequently, on April 13, 2022, the ASU EOP IDTT noted positive HLOC referral indicators for multiple RVR MHAs and less than 50 percent treatment attendance. The IDTT appropriately referred the patient for intermediate care on this date. On or around April 22, 2022, the patient's request to rescind the intermediate care referral was granted. This was very concerning, given the patient discharged from the MHCB only a few weeks prior and continued to refuse group and individual treatment in the outpatient setting. The assigned primary clinician was a psychology intern, and their rationale for rescinding the referral appeared to be based on the patient denying that he had ever experienced genuine mental illness; however, prior clinical records indicated the patient had no insight into his mental illness, maintained a "deeply held" belief that he was not mentally ill, and often requested a lower level of care or removal from MHSDS entirely.

On May 26, 2022, the patient was referred to the MHCB again due to homicidal ideation and grave disability concerns. At that time, he presented with delusions, disorganized thoughts and speech, and he reportedly threatened to kill "everyone." During the first few days in the MHCB, the patient boarded up, repeatedly banged on his cell door, and demanded discharge to a lower level of care. The MHCB discharged the patient to the Administrative Segregation EOP Hub on June 3, 2022. Psychiatry noted on June 3, 2022 that the patient was discharged via WebEx telepsychiatry.

The June 3, 2022 discharge SRASHE rated the patient's acute suicide risk as low and chronic risk as high. The patient had four suicide attempts during incarceration in 2020, one of which included "intent to die" and a "lethal method" by hanging.

On June 15, 2022, the Administrative Segregation EOP Hub IDTT convened and noted the patient had refused to attend. Despite progress notes indicating depressive symptoms, lack of insight, medication non-adherence, and "difficulties related to his DD2 status," the IDTT only developed one IPOC for delusions. The HLOC considerations section of the treatment plan noted positive referral indicators for multiple RVR MHAs and for participating in less than 50 percent of treatment, however, the patient was not referred to a HLOC on this date.

On June 30, 2022, the patient was referred for his third MHCB admission due to concerns regarding danger to self, altered mental status, "incoherent ranting," and "severe psychomotor agitation." One clinical note indicated the patient had manufactured a weapon and "planned to slice a cop." CSP/Corcoran transferred the patient to an available MHCB at CMF, and the treatment team at CMF appropriately referred the patient to a HLOC.

**Findings**

The care provided to this patient was inadequate. There appeared to be unresolved diagnostic uncertainty based on discrepant opinions documented by mental health providers, and the IDTT did not develop an adequate case conceptualization to demonstrate sufficient understanding of the patient's presentation. The patient clearly evidenced an inability to maintain stability in the

Administrative Segregation EOP Hub, and he repeatedly decompensated and appeared to present a serious danger to staff during periods of psychosis. However, in April 2022, the intermediate care referral was inappropriately rescinded based primarily on the patient denying genuine mental illness during his PC contact with a psychology intern, despite records indicating a history of requesting a lower level of care and denying mental illness. Subsequently, the patient's treatment attendance did not improve; he continued to receive serious RVRs, and he required two more referrals to the MHCB for grave disability and danger to others. Despite these concerns, CSP/Corcoran still did not refer the patient to a HLOC. The patient was not referred to a HLOC until after he transferred to CMF in July 2022.

**Patient Q**

This 31-year-old patient's healthcare record was reviewed in response to level of care concerns noted in plaintiffs' pre-site letter. The patient's mental health history was significant for at least two acute and intermediate care admissions, multiple crisis bed referrals, a prior involuntary medication order, suicide attempts, and multiple self-injurious behavior incidents. Most recently, the patient was in acute and intermediate care facilities from November 2018 through October 2021. Clinical records referenced one to three self-reported suicide attempts and 12 incidents of self-harm since his initial incarceration. The patient had been housed primarily in the Administrative Segregation EOP Hub since his arrival at CSP/Corcoran in December 2021. While at CSP/Corcoran, the patient had two MHCB admissions, approximately 12 RVR MHAs, and his treatment participation remained below 50 percent.

The patient was prescribed Zyprexa, Trileptal, Vistaril, BuSpar, and Benadryl. The healthcare record suggested there was ongoing diagnostic uncertainty among the treatment team, and the IDTT's clinical case conceptualization did not offer a sufficient explanation for the patient's psychiatric presentation. While some clinicians suspected "overreporting" of symptoms and primary personality pathology, treatment teams retained diagnoses for schizophrenia and bipolar disorder, and continued to prescribe antipsychotic and mood stabilizing medications to address related symptoms. Additionally, the treatment plan included only one IPOC that targeted anger.

In March 2022, the patient was admitted to the MHCB for eight days. The patient indicated to his treatment team that staff members were using software to monitor his behaviors and that officers were telling people he is a "j-cat." At that time, clinicians documented that the patient "suffers from delusional psychosis" and "extreme aggression and paranoid ideation." The patient had also attributed his refusal to participate in treatment groups to his belief that custody officers were targeting him.

A total of 12 RVR MHAs were completed at CSP/Corcoran, most of which were related to staff assaults, and only two of which indicated mental illness had contributed to the RVR behaviors. The patient received a RVR for attempted murder in February 2022. During an MHCB admission in March 2022, two RVRs were issued for battery on a peace officer. Of note, the IDTT subsequently documented that the patient had refrained from violent and aggressive behaviors following a medication change during the March 2022 MHCB admission. In response to learning his sentence had been extended in March 2022, the patient informed staff he planned to work on his sobriety and requested inclusion in the MAT program.

During the monitoring visit at CSP/Corcoran in April 2022, the monitor's expert interviewed the patient and discussed the case with leadership. Leadership indicated that they would request a CCAT to discuss level of care and treatment interventions. Records confirmed a CCAT was held on April 21, 2022. In response to IRU's questions regarding symptoms, members of the IDTT raised the possibility that substance use may have contributed to prior psychotic symptoms and that the patient's ongoing behavioral concerns may be related to personality pathology rather than an organic psychotic disorder. The team also suggested the patient may not want to parole. Clinicians involved in the CCAT determined that in lieu of a HLOC referral, the IDTT should pursue psychological testing for diagnostic clarification, refer the patient to the MAT program to address substance use concerns, and implement motivational interviewing and CBT to address aggressive behaviors and treatment motivation.

Routine psychiatry and primary clinician contacts in the Administrative Segregation EOP Hub appeared to occur timely. PC progress notes also suggested treatment interventions were implemented during individual encounters. The May 20, 2022 psychiatry contact was completed via telepsychiatry by a covering provider. Also, during the month of May 2022, most PC contacts were completed at cell front due to conflicts with yard and a power outage. Of note, on May 26, 2022, the primary clinician described the patient as manic, and noted the patient reported plans to kill anyone who made him feel bad following his release from prison.

The most recent treatment plan in June 2022 included one IPOC for anger. The IDTT noted positive HLOC referral indicators for participating in less than 50 percent of treatment and for multiple RVR MHAs within a three-month period. The IDTT again determined that a HLOC referral was not indicated, and, instead, document enhanced treatment plans to target RVR behaviors and treatment non-compliance. The IDTT noted the patient was medication adherent, cooperative during individual treatment contacts, and refraining from violent and aggressive behavior. This treatment plan also indicated the patient had "no interest in altering his violent behaviors" and that he "instead embraces this as part of his identity." The patient's diagnoses remained the same, and it did not appear psychological testing had been administered to clarify the diagnosis.

The most recent SRASHE, dated June 28, 2022, assessed the patient's chronic and acute suicide risk as moderate. The corresponding suicide prevention safety plan was adequate.

Progress notes indicated the patient was awaiting transfer to a PSU in April 2022; however, as of August 7, 2022, the patient remained in CSP/Corcoran's Administrative Segregation EOP Hub.

**Findings**

The care provided to this patient was adequate. The monitor's expert noted the patient appeared to be at the appropriate level of care based on record review and face-to-face interview during the site visit. Enhanced treatment plans documented in the HLOC section sufficiently addressed referral indicators. Treatment contacts appeared to occur timely in the Administrative Segregation EOP Hub, and progress notes suggested appropriate interventions were implemented during clinical encounters. It was, however, concerning that, as of August 2022, CCAT recommendations to administer psychological testing for diagnostic clarification had not been implemented, and that patient had not transferred from the Administrative Segregation EOP Hub

to a PSU.  Resolving diagnostic uncertainties and developing an adequate case formulation are necessary for determining appropriate treatment interventions, level of care considerations, and RVR MHA recommendations.

**Patient R**

Patient R was randomly selected for healthcare record review from a list of patients housed in the CSP/Corcoran SHU LTRH to evaluate the care provided.

The patient was a 44-year-old male serving his sixth term for assault with a deadly weapon, with a sentence of life without parole.  He arrived at the CSP/Corcoran LTRH in April 2021 from KVSP, after receiving a RVR for battery on a peace officer.

He reportedly had an extensive mental health history of depression and suicidal ideation beginning in childhood.  In CDCR, he received mental health services in the outpatient and inpatient levels of care, including MHCB placements.  He was provided with diagnoses of bipolar disorder and antisocial personality disorder.  The rationale for the diagnosis of bipolar disorder was not clearly justified by the IDTT during the review period.  His interactions with custody staff were described as problematic, with no further details provided.  He reportedly had trust issues and safety concerns, resulting in avoidance of others and in protective orders against staff.  The primary clinician generally met with the patient weekly.  Two different telepsychiatrists attended his two IDTT meetings during the review period, and two different telepsychiatrists met with him at cell front, in September, November, and December 2021.

IDTT meetings were conducted quarterly, on July 29, 2021, October 14, 2021, and January 6, 2022.  Required treatment team members were present at the IDTT, but the patient refused to attend.  Information from the treatment team meetings was reportedly shared with the patient; however, there was no clear documentation of specific information conveyed or his response to the information.  The correctional counselor and psych tech reportedly provided updates, but the specifics were not documented.  Treatment team members reported that the patient exhibited cognitive distortions which he used to justify and rationalize violent behavior, and he presented with an aggressive attitude.  He was reportedly committed to his family (children and grandson) and to his spiritual beliefs; however, no other documentation was provided regarding his family or explaining his spiritual beliefs.

Treatment plan goals included reduction of anger to a rating of four of ten or below per self-report, to reduce violent, acting out behavior to a rating of two or below per self-report, and to eliminate threatening behavior for an indeterminant period.  He reportedly achieved these goals during the six-month review period, but the treatment team did not establish new goals (i.e., correcting his underlying cognitive distortions, developing prosocial behaviors, and developing a positive behavior support plan to help reduce his fear of others and to increase his activities).

The primary clinician encouraged the patient to utilize acquired coping skills, especially goal setting to manage alleged personal slights, frustration, and anger.  He was also encouraged to develop additional coping skills throughout the course of therapy; however, there was no evidence of the provision of any psychoeducational training for this purpose.

The patient was prescribed Abilify and Cogentin; he received his psychotropic medications under a PC 2602 order that was granted due to danger to others. He frequently met with his primary clinician in a confidential setting, but he met with the treating telepsychiatrists in a nonconfidential setting at cell front. He also did not attend groups or go to yard. The patient appeared to have a therapeutic relationship with the PC, resulting in candid discussions of current issues; however, documentation did not identify the clinical treatment interventions utilized or the patient's progress. Additionally, the plan at the end of each progress note was generic and it was repeated in all progress notes. There was no documentation that new coping strategies were taught, cognitive distortions were corrected, or prosocial behaviors were enhanced.

**Findings**

The mental health care provided to this patient was marginally adequate.

Overall, the primary clinician met with the patient consistently in a confidential setting, and it appeared that there was a good therapeutic alliance with appropriate discussion of areas of concern. The initial treatment outcome expectations to reduce anger and violence and to eliminate threatening behaviors were reportedly achieved and maintained during the review period. The patient also did not receive any RVRs during the review period, and he maintained his ADL. Given these accomplishments, the treatment team should have addressed several other serious issues causing significant functional impairment, such as treatment of cognitive distortions, paranoia, social withdrawal, and enhancement of prosocial behaviors. Further, additional work was indicated for the establishment of a meaningful therapeutic relationship with the telepsychiatrist; this included the participation of one treating telepsychiatrist at the IDTTs and the provision of psychiatric assessment and treatment in confidential settings rather than at cell front.

**Patient S**

Patient S was randomly selected from a list of patients housed in the CSP/Corcoran SHU LTRH to review the care provided.

The patient was a 37-year-old male serving his fifth term for corporal injury. His term began on February 27, 2020. The earliest parole release date was October 1, 2024. He arrived at the CSP/Corcoran LTRH on July 30, 2021 from the CSP/Corcoran EOP ASU hub after refusing to comply with group therapy instructions and receiving four RVRs for battery causing serious injuries, disrespect without potential for violence, disobeying an order, and willfully resisting a peace officer in the performance of duties.

He had an unstable developmental history, growing up in foster care, group homes, and juvenile detention facilities. He was affiliated with gangs and used illicit substances as a child.

The patient was provided diagnoses that included opioid use disorder, bipolar I disorder with the most recent episode of depression with psychotic features, and unspecified schizoaffective disorder. The patient also received medication assisted therapy (MAT). He was prescribed Abilify, BuSpar, Vistaril, Remeron, Trileptal, and Effexor. He had intermittent medication adherence.

The primary clinician documented the use of cognitive behavioral interventions to identify cognitive distortions, as well as instruction in breathing exercises, distress tolerance, and emotional regulation skills. Treatment goals included reducing and/or eliminating the necessity of CIT interventions and angry outbursts. Progress was minimal; however, progress was noted in November and December 2021 when intervention by the CIT was unnecessary.

During the two and one half years when the patient was housed in LTRH, he developed a pattern of reporting suicidal ideation that was triggered by his perception of receiving small food portions at dinner; this usually resulted in receiving an additional food tray or sack lunch after placement in alternative housing. After having his maladaptive behavior reinforced with food, he would rescind his statements of suicidal ideation and be returned to his housing unit. During the review period, there were several CIT interventions, five MHCB referrals due to brief alternative housing placements, and several rounds of five-day follow-up checks. Despite the MHCB referrals, the patient was never admitted to the MHCB due to the instrumental nature of reported suicidality, which was utilized to obtain food and indigent items. SRASHEs repeatedly assessed low acute and low or moderate chronic suicide risk.

The patient reportedly attended to his cell and ADL, socialized in group and on the yard, appropriately interacted with staff, and expressed optimism about discharge and parole. He also requested transfer to the EOP, stating that he needed more socialization with groups than he received in the 3CMS program. His affect was described as labile with impulsive behavior, evidenced by his reaction to receiving additional time on January 19, 2022. Despite receiving the bad news of a longer sentence, he reported that he was doing well because he was able to go to the canteen after court and purchase "a lot of soup."

IDTT meetings occurred quarterly with the necessary participants in attendance. The patient occasionally attended and participated in his treatment team meetings. At the December 15, 2021 IDTT, the treatment team reported the presence of cognitive and information processing deficits; however, the nature of these deficits was not clearly described. A review of effective communication documentation did not reveal the presence of any cognitive or information processing deficits.

During the October 6, 2021 IDTT, the primary clinician agreed to increase the frequency of individual treatment sessions from weekly to twice weekly. Progress notes revealed that the primary clinician continued to meet with the patient weekly, rather than twice weekly as indicated. During individual sessions, psychoeducational handouts were used in conjunction with coping skills training, journaling, recreating, and exercising. Several telepsychiatrists met with the patient during the review period, both for scheduled sessions and in response to TTA referrals for suicidality.

**Findings**

The mental health care provided to this patient was marginally adequate.

The patient exhibited minimal improvement during the review period. The treatment team was unable to interrupt repeated reinforcement of maladaptive behavior to obtain food and increased mental health services. During the past two and one half years in CDCR, he had a history of

alternately receiving mental health services at the 3CMS, EOP, and MHCB levels of care. The treatment team appeared to be attempting to address the maladaptive cycling from one level of care to another by using DBT; however, the sessions were not clearly documented. Treatment could have been enhanced by using both specific cognitive behavioral interventions and a positive behavior support plan (PBSP). The addition of a PBSP would likely positively impact his behavior because he appeared to be influenced by easily identified incentives. There was no documentation of discussions involving modification of treatment goals, clarification of reported cognitive and processing deficits, and replacement of maladaptive coping strategies with adaptive strategies by utilization of a PBSP.

**Patent T**

Patient T was randomly selected from a list of patients housed in the CSP/Corcoran SHU LTRH to review the care provided.

The patient was a 28-year-old male sentenced to 34 years and four months for various gang assaults, including prison assaults. He was incarcerated in CDCR in March 2014 and was later placed in the LTRH due to a battery on a prisoner. In the past year, he received four RVRs involving battery on inmates and possession of weapons.

He was placed in the MHSDS on February 16, 2021 due to sleep problems, mood swings and restlessness. The initial mental health evaluations were cursory and lacking in detailed information, making it difficult to render diagnoses. There was no reported history of suicide attempts or self-injurious behavior. He was provided with diagnoses of adjustment disorder with mixed disturbance of emotions and conduct, and adjustment disorder with mixed anxiety and depressed mood. He was prescribed Trileptal and Remeron for mood stabilization, and the patient reported a positive medication response.

The IDTT met twice during the review period, on October 14, 2021 and January 6, 2022. The patient refused to attend both IDTT meetings. The treatment plan included target symptoms and treatment outcome expectations that were vague in content. The primary treatment plan goal was to reduce irritability to a score of six or below on a one to ten scale, as measured by self-report by the next IDTT. The intervention was for the therapist to encourage the patient to work on improved functioning by using goal setting.

The patient was seen by the primary clinician at least every two weeks, and he was seen by the treating psychiatrist at least monthly. The patient did not participate in therapeutic services except for medication management. All contacts occurred in a nonconfidential setting at cell front. The treating psychiatrist monitored medication adherence with medication adjustments as indicated. The primary clinician's progress notes were almost all identical, indicating the patient was cordial and respectful, while refusing to leave his cell and engage with the primary clinician. The plan was for the patient to continue in-cell activities of drawing and letter writing.

**Findings**

The care provided to this patient was inadequate.

The initial PC evaluation identified complaints of sleep problems, increased depression, anxiety, and anger. Despite these reported issues of concern, there was no documentation of inquiry into the details of these complaints; this intervention was necessary to render an accurate diagnosis and to provide adequate treatment.

The patient presented as guarded and defensive, refusing to engage in evaluations, IDTTs, or treatment. Treatment plans were developed with minimal input from the patient, who was seen at least every other week and indicated that he was not interested in mental health treatment.

Diagnoses needed update and diagnostic clarification. The need for mental health treatment and psychotropic medication also should have been reassessed. Further, the patient's treatment resistance should have been identified as a problem to be addressed by the treatment team and included in treatment planning.

**Patient U**

Patient U was randomly selected from a list of patients housed in the CSP/Corcoran SHU LTRH to review the care provided.

This patient was a 63-year-old male serving his ninth term. He was sentenced to life with parole for assault with intent to commit a sex offense; additionally, he had received his third strike. His adjustment to prison was problematic with several RVRs for IEX, fighting, battery on a non-prisoner, and refusing assigned housing.

He arrived at the CSP/Corcoran LTRH on November 15, 2021. The initial PC assessment was completed within two days of arrival, and the initial psychiatric assessment and IDTT meeting occurred within one week of his arrival to LTRH.

The patient had an extensive mental health history; he had received mental health services at the 3CMS, EOP, ICF, DSH and MHCB levels of care. He was previously provided with diagnoses of schizoaffective disorder depressive type and schizophrenia paranoid type with auditory hallucinations, delusions, and disorganized thinking. He was currently provided with a diagnosis of unspecified depressive disorder; he was prescribed Remeron. He was also prescribed Zyprexa for mood stabilization and historically for psychotic symptoms. It should be noted that he was not provided with a psychotic disorder during the review period; however, during the psychiatric initial assessment on November 23, 2022, the telepsychiatrist indicated that additional information was needed to confirm the accuracy of the provided diagnoses. During the next three and one half months, there was no documentation indicating that diagnostic clarification had occurred.

The IDTT meetings on February 9, 2022 and November 24, 2022 indicated that the treatment goal focused on maintaining depression at a baseline of four of ten with remission for three months. The treatment intervention involved the primary clinician encouraging the patient to work on improved functioning by using goal setting. The primary clinician progress notes never documented problematic depressive symptoms, or the utilization and effectiveness of this intervention strategy. The PC progress notes failed to document whether functioning had improved, specific functions that had improved, and whether improvement in functioning was due to the intervention of goal setting. Additionally, the treatment plan indicated that the patient

would continue to be monitored for changes in mental health symptoms, behavior, functioning, safety, suicidality, and the need for a referral to a HLOC or discharge to a lower level of care. Specific criteria for reducing the level of care were never clarified; however, progress notes indicated that the patient was not a danger to himself or others and that he advocated for himself. The patient did not provide any evidence of distress; he attended to his ADL with adequate programming, absence of interpersonal difficulties, and medication adherence.

The mental health services provided were minimal, with the exception of medication management.  As the patient declined confidential treatment sessions, he received services from the primary clinician at cell front where he was seen weekly.  These individual sessions appeared to be wellness checks rather than actual therapy sessions consistent with treatment plan objectives.

The patient repeatedly reported having no family contact; on February 18, 2022, he stated that he had had no contact with his family for years.  Despite his history of depression and adherence with prescribed antidepressant medication, there was no inquiry into the relationship between his depression and the lack of family support.  Additionally, there was no documentation of any telepsychiatry contacts during the review period, except during IDTT meetings.

**Findings**

The mental health services provided to this patient were inadequate.

Diagnostic clarification never occurred, despite documentation by the psychiatrist indicating the need for such clarification.  Treatment goals, interventions, and progress notes were vague and generic rather than individualized.  Additionally, IDTT documentation and subsequent primary clinician cell-front contacts did not indicate that the treatment outlined in the treatment plan was provided.  Further, there was a lapse in the documentation of timely telepsychiatry contacts.

**Patient V**

Patient V was randomly selected from a list of patients housed in the CSP/Corcoran SHU LTRH to review the care provided.

The patient was a 28-year-old male serving his first term for robbery and assault with a firearm with street gang enhancement; he was sentenced to a 19-year term with an earliest parole release date of January 17, 2028.  He entered CDCR on July 26, 2013, from Los Angeles County.  He was placed in the MHSDS on October 30, 2020, when he was admitted to MHCB due to danger to others.  He was discharged from the MHCB to the EOP level of care and subsequently to the 3CMS program.  He transferred to the CSP/Corcoran LTRH on April 6, 2021, from CIM after he received a RVR for battery on a peace officer.

The patient had an unstable and traumatic developmental history.  He reported a history of anger problems with aggressive and violent behavior.  His parents divorced when he was two years old.  When he was seven, his father was incarcerated and was no longer involved in his life.  His mother had several boyfriends who attempted to be "father figures" using an authoritarian parenting style while his mother passively observed.  He was often labeled "the screwup retard" and "a loser" by his family, and he was often excluded from family events.  At age 13, he began

living with friends and associating with local gangs. He had a history of violent behavior and drug use from an early age; he began using drugs by age 13, and was charged with his first crime at age 14. By age 15, he was involved with juvenile justice, and two years later he was incarcerated for his current case. The patient acknowledged his family's disappointment, and he stated that he had let his family down throughout his life.

The treatment team met quarterly during the review period on September 16, 2021 and December 16, 2021. The necessary treatment team members were present at both IDTTs; however, the patient declined to participate. He was provided with diagnoses of adjustment disorder with mixed disturbance of emotion and conduct, antisocial personality disorder, intermittent explosive disorder, and substance use disorder. Justifications were not provided for any of the provided diagnoses; there was no clinical rationale provided regarding the adjustment problem, no clarification regarding the intermittent explosive disorder, or identification of substances used. Additionally, the September and December 2021 treatment plans were almost identical, despite improvement in his behavior that included intermittent participation in groups and weekly yard participation. The patient had not received a RVR since placement in the LTRH. The patient also reportedly enjoyed reading, exercising, listening to the radio, watching television, and attending yard.

The primary clinician acquired additional information about his relationships with family members; this information suggested the possibility of an underlying depressive disorder. There was no IDTT documentation discussing the need to modify treatment goals and interventions given the recent progress, or the need for diagnostic clarification regarding the possibility of a depressive disorder diagnosis. Additionally, the treatment plans noted that the correctional counselor and psych tech provided relevant information without identifying the relevant information provided. The primary clinician also documented discussing the IDTT with the patient; however, information regarding the patient's input was not documented. Overall, the treatment plan was generic rather than individualized.

The primary clinician met with the patient weekly in a confidential setting. The PC appeared to have a therapeutic relationship with the patient who candidly shared information about his family and current feelings. The clinician repeatedly encouraged the patient to continue taking his medication, to use his coping strategies, to wear his face mask, and to engage in adaptive coping strategies. Despite the abundant information provided to the primary clinician, this information was not used to discuss underlying feelings of loss, distrust, and depression. The sessions occurred regularly, and the patient appeared to value these sessions; however, documentation indicated that the sessions functioned more as wellness checks than actual therapy sessions. The plans reported at the end of each primary clinician progress note were almost identical from session to session, consistent with wellness checks rather than therapy sessions.

There was documentation of only one clinical contact with the telepsychiatrist on October 26, 2022, when education was provided regarding medication side effects and the benefits of treatment with Trileptal. Documentation indicated that an initial psychiatric evaluation was scheduled on October 22, 2022 with follow-up scheduled in eight weeks; however, neither telepsychiatry contact was documented to have occurred. There was no documentation of any telepsychiatry contacts for the subsequent 18 weeks.

**Findings**

The mental health services provided to this patient were marginally adequate.

The primary clinician developed a therapeutic relationship with the patient who valued the sessions; however, sessions were more supportive than therapeutic. Additionally, documentation of necessary psychiatric evaluation and follow-up by the telepsychiatrist was absent.

**Patient W**

This 41-year-old transgender female patient was placed in the MHCB following agitated and threatening behavior on November 18, 2021. The patient was provided with diagnoses of gender dysphoria in adolescents and adults; major depressive disorder, recurrent episode, moderate; and PTSD. The patient was prescribed hydroxyzine on an as-needed basis and olanzapine upon MHCB admission. Buspirone was later added while treated in the MHCB.

Upon MHCB placement, initial PC and psychiatric assessments were completed timely, as was the initial IDTT and SRASHE. Of concern were several inaccuracies in the psychiatric assessment including the patient's age, diagnosis, and the use of "he/him" pronouns. Additionally, the psychiatric assessment used a progress note written in 2020 as the foundation for the patient's current treatment, resulting in an order to discontinue medications that were not prescribed. Also, the psychiatrist noted that the patient would be started on mirtazapine; however, this medication order was not placed. Inadequate psychiatric documentation continued throughout the patient's MHCB placement as evidenced by the initiation of buspirone on November 23, 2021, without any documentation in the healthcare record, as well as telepsychiatry contact notes with extremely limited information. Over the patient's 14-day stay in the MHCB, only three psychiatric contacts were documented, with a seven-day interval between documented contacts from November 21 to 28, 2021.

Treatment provided by the PCs was adequate and included documentation of individualized interventions provided and their effectiveness. On occasion, PC contacts were noted to be held at cell front secondary to staffing issues. The patient received two recreation therapy sessions out of cell. Of concern was an "initial" recreation therapy assessment documented on November 25, 2022, which appeared to have been written at another facility and included outdated information with no evidence of review or updates. IDTT documentation was adequate and included specific interventions to address the patient's needs, and proper justification for the extended MHCB stay was provided. There was evidence of good coordination of care between medical and mental health services. The decision to discharge the patient to the EOP was documented with adequate rationale. The discharge SRASHE was adequate and included a safety plan; however, the plan was minimally adequate. The psychiatric discharge summary was limited in content.

**Findings**

While this patient received satisfactory treatment from PCs while in the MHCB, the overall care was inadequate due to limited and inaccurate psychiatric documentation, insufficient psychiatric contacts, medication orders incongruent with psychiatric documentation, and an inaccurate recreation therapy assessment.

**Patient X**

This 21-year-old patient was admitted to the MHCB following an incident of self-harm on December 23, 2021. He was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. Other diagnoses were considered during his MHCB stay, including unspecified bipolar disorder and psychotic disorder due to known physiological condition; however, the physiological condition was not identified. The patient was prescribed buspirone, olanzapine, and hydroxyzine on an as-needed basis.

The patient was seen for timely individual assessments, SRASHE, and initial IDTT meeting. The initial PC assessment, SRASHE, and initial treatment plan were adequate in content; however, the SRASHE was completed in a nonconfidential setting at the patient's cell door. The initial psychiatric assessment was limited in content and included documentation mostly copied from earlier documentation. During the patient's stay in the MHCB, several PC contacts were conducted at cell-front due to limited mental health staffing and custody escorts. As a result, there was little evidence that interventions outlined in the treatment plan were provided to the patient. Psychiatric contacts did not occur as required by the Program Guide, and many psychiatric notes were limited in content. The patient was largely medication nonadherent throughout his MHCB stay, and he often asked for mirtazapine to be restarted and other medications to be discontinued; however, these requested changes were not made, and the patient continued to refuse medications until discharge. Despite this refusal, the medications were continued.

The patient remained housed in the MHCB beyond ten days due to safety concerns. The IDTT meeting was held as required to address the patient's length of stay. However, a psychiatrist was not present at the meeting, and therefore the patient could not be discharged, which extended his MHCB stay an additional two days. The IDTT documentation did not discuss patient progress or treatment goals. The patient was discharged to the EOP level of care with appropriate rationale. The discharge SRASHE was adequate and included a safety plan that was clinically indicated given the patient's needs.

**Findings**

The care provided to this MHCB patient was inadequate.

The patient was not seen timely as required by psychiatry, psychiatric documentation was limited, interventions outlined in the treatment plan were not provided, and discharge was delayed as a psychiatrist was not present at an IDTT meeting.

**Patient Y**

This 32-year-old patient was admitted to the MHCB on December 11, 2021 after he attempted to die by hanging. He was provided with a diagnosis of schizoaffective disorder, bipolar type. He was prescribed quetiapine. He was also prescribed divalproex sodium for a seizure disorder. Of note, the patient spent nearly a week in a community hospital following his suicide attempt; this hospitalization was complicated by the patient's seizure disorder and traumatic brain injury. During his time in the MHCB, the patient continued to have serious medical needs and continued seizures. He was transferred to a medical unit while at the MHCB level of care.

915

A PC and psychiatrist attempted to assess the patient upon his admission to the MHCB on December 12, 2021, but he refused to engage in the assessments and was described as guarded. An initial SRASHE noted that the patient left a suicide note. Although the patient reported protective factors, these factors were noted to be ineffective and of questionable use to the patient at the time of the assessment. An initial IDTT was completed with the patient present on December 13, 2021, and the IDTT documentation was adequate. The patient was seen daily by a PC or psychiatrist and refused to engage in meaningful interaction. While he denied suicidal ideation, he was noted to be argumentative, guarded, and depressed. He refused offers by the psychiatrist to take antidepressant medication. On December 17, 2021, an IDTT was held without the patient, as he refused to attend. The decision was made to refer the patient to the acute level of care, as it was determined that he was more dangerous to himself than he was willing to disclose, and he needed a HLOC to address his depression and suicidality.

**Findings**

The mental health care provided to this MHCB patient was adequate.

**Patient Z**

This 29-year-old male patient was admitted to the MHCB after reporting suicidal ideation with a plan on December 23, 2021. He arrived at the facility three days prior. He was provided with diagnoses of amphetamine-type substance use disorder, moderate; bipolar I disorder, current or most recent episode unspecified; antisocial personality disorder, and PTSD. There was also documentation in progress notes of diagnoses of bipolar II disorder and borderline personality disorder. The patient received his psychotropic medications under a PC 2602 order for danger to self and others. He was prescribed paliperidone injection, valproic acid, mirtazapine, and benztropine, as well as olanzapine and diphenhydramine prescribed on an as-needed basis.

At the time of MHCB placement, the patient was assessed with high acute and chronic suicide risk, and he was placed on suicide precautions as it was noted that he frequently engaged in non-lethal self-injury as a means of coping with stressors. Within a few hours of admission, the patient attempted suicide by making a noose and securing it tightly to an object in his cell, with subsequent reported loss of consciousness requiring transfer to a community hospital for medical treatment. Upon his return from the community hospital on December 24, 2021, the patient was seen for an initial PC assessment, initial psychiatric assessment, and initial IDTT meeting on the same day. The PC assessment and IDTT documentation were thorough and included a comprehensive and well-documented treatment plan to address the patient's chronic self-injurious behavior and lack of adequate coping skills. The initial psychiatric assessment was adequate.

Over the following six days, the patient was seen by a PC and/or psychiatrist daily with all but one of those contacts occurring at cell front. The rationale for cell-front contacts was documented as either patient refusal or staffing shortages. The use of interventions outlined in the treatment plan were not documented during these contacts. The sole confidential session occurred the day before the patient was discharged from the MHCB and included discussion of a death in the patient's family and the completion of a SRASHE. The SRASHE included inaccurate protective factors (e.g., "active participation" in treatment when the patient was

916

flagged for low treatment participation by the sustainable process) and a poor suicide risk formulation. The safety plan that was documented remained unchanged from prior plans and included names of a PC, psychiatrist, and correctional staff who were no longer available to the patient given that he transferred to another facility. The discharge IDTT documentation was well-written and comprehensive, yet inaccurate and misleading. It noted significant patient progress, stating that the patient had worked with "several clinicians" while in the MHCB on grief and coping skills, and motivational interviewing regarding interacting with male PCs. There was no documentation in the healthcare record to support these statements. The decision to discharge the patient to the EOP level of care, however, was appropriately supported by a clear rationale.

**Findings**

The mental health care provided to this MHCB patient was inadequate given that the treatment interventions developed to address the patient's needs were not documented, SRASHE and IDTT documentation included inaccurate information, a SRASHE was incomplete, and the patient's safety plan was not updated despite clear and ongoing risk of self-injury. Additionally, all but one of the individual clinical contacts were completed in a nonconfidential setting at cell front.

**Patient AA**

This 32-year-old patient was placed at the MHCB level of care on January 30, 2022 secondary to agitation and homicidal ideation. He was provided with diagnoses of unspecified bipolar and related disorder, unspecified schizophrenia spectrum and other psychotic disorder, and adjustment disorder, unspecified. Upon admission to the MHCB, he was not prescribed psychotropic medication; however, while in the MHCB, he was prescribed quetiapine and benztropine, as well as olanzapine and hydroxyzine on an as-needed basis.

A CIT contact on January 30, 2022 noted that the patient had become increasingly agitated and was unable to be calmed in the housing unit. Both officers and other incarcerated individuals were concerned that the patient was at risk of violence to others. Initial PC and psychiatric assessments were completed timely and appeared adequate. The initial psychiatric assessment noted that the patient would be started on quetiapine yet did not document the other medications that were ordered on the same day. The initial PC assessment outlined appropriate treatment interventions to address the patient's needs. An initial recreational therapy assessment was also completed, and there was documentation of an individual recreational therapy contact on February 1, 2022. The patient was seen for an IDTT meeting on February 2, 2022, which served as both his initial and discharge IDTT meeting. Documentation was adequate; however, there was reference to the provision of cognitive behavioral coping techniques with the patient that were not documented. The psychiatric discharge summary included minimal content and noted, in error, that the patient had been admitted secondary to suicidal ideation. A SRASHE completed at discharge was adequate and included an updated safety plan which addressed the patient's needs.

**Findings**

The patient received adequate treatment while at the MHCB level of care; however, psychiatric

**Patient BB**

Patient BB was randomly selected for healthcare record review from a list of 3CMS patients housed in the CSP/Corcoran ASU STRH.

This patient was a 32-year-old male serving his fourth CDCR prison term for murder with weapons. His term began in 2019. He was sentenced to eight years with an earliest parole release date of May 11, 2024.

His developmental history was unstable and traumatic. He was raised by his father and experienced homelessness during childhood. He reported a history of both physical and emotional abuse as well as behavioral and learning problems. He was also diagnosed with childhood depression. Additionally, he reported a history of drug use, with marijuana and methamphetamine as his drugs of choice.

The patient arrived at CSP/Corcoran on May 4, 2021. He was placed at the 3CMS level of care. He was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood and substance use disorder. He was placed in the ASU STRH on October 30, 2021 for battery on an inmate. He received an initial psychiatric assessment on November 3, 2021. On November 5, 2021, he received an initial primary clinician evaluation, and a SRASHE was also completed on that date. These evaluations occurred timely and documented two previous ASU placements and no current concerns for decompensation or suicidality.

The IDTT met twice during the review period on November 17, 2021 and January 5, 2022. All treatment team members and the patient were present at both meetings. He was seen by the primary clinician weekly, and the treating psychiatrist met with him every one to two months or as needed.

During a psychiatric contact on November 30, 2022, the patient was agitated and disorganized, with response to internal stimuli and distorted reality testing; consequently, olanzapine, an antipsychotic medication, was prescribed. The patient refused the medication. Within the next three weeks he refused to meet with the primary clinician who indicated that the patient had been inappropriate with staff, yelling and cursing, and he failed to engage meaningfully with staff who described him as paranoid and disorganized. During the IDTT on January 5, 2022, he was provided with a diagnosis of schizoaffective disorder, bipolar type. The treatment plan goals and interventions were not changed to address this apparent decompensation.

On January 24, 2022, the patient assaulted a custody officer and was charged with battery on a peace officer. A RVR mental health evaluation concluded that mental illness, developmental disability, and cognitive-adaptive deficits contributed to his assault on the custody officer.

**Findings**

The mental health care provided to this patient was inadequate.

918

The treatment team should have explored the antecedents to the patient's recent history of battery on a prisoner and a peace officer, as well as clinician descriptions of the presence of psychotic symptoms in November and December 2021. Additionally, the treatment team added a diagnosis of schizoaffective disorder, bipolar type to the treatment plan without adding any measurable treatment goals or effective interventions to address the new symptoms.

Consideration of referral to a HLOC should have occurred and been documented. This was especially important for this patient with a major mental illness and apparent decompensation in restricted housing, which was a placement that could have resulted in increased risk for decompensation and self-harm for this patient. Additionally, the rationale for not pursuing treatment with involuntary medications under a PC 2602 order should have been documented.

**Patient CC**

Patient CC was randomly selected for healthcare record review from a list of 3CMS patients housed in the CSP/Corcoran ASU STRH.

The patient was serving his fourth CDCR prison term for burglary. He was sentenced to four years with an earliest parole release date of September 22, 2024. His developmental history was unstable with an absent father and a mother who struggled with drug addiction. At age 13, he joined a gang, began smoking marijuana, which progressed to methamphetamine, and was placed in juvenile hall for residential burglary. He never married but had three children, one son and two daughters. He reported having a learning disability and attending an alternative school. He completed the eighth grade and was arrested while in the ninth grade. He did not achieve a GED but expressed a desire to pursue his education.

The patient was provided with diagnoses of unspecified anxiety disorder and unspecified depressive disorder. His primary symptom of concern was insomnia. The patient was seen by the primary clinician and treating telepsychiatrist at cell front. He was seen by the primary clinician weekly. The progress notes of those sessions contained minimal information and were generic and identical from week to week. Additionally, these progress notes appeared to reflect wellness checks rather than actual therapeutic treatment sessions. The mental status, assessment, and plan sections of the progress notes seldom changed. He was seen by the treating psychiatrist at least monthly with medication adjustments of BuSpar prescribed for anxiety and Vistaril prescribed for sleep.

The healthcare record documented one IDTT during the review period that occurred on September 29, 2021. All treatment team members were present; however, the patient did not attend. The treatment plan was generally not updated, except for a note to rule out PTSD. There was no information explaining the rationale for considering this diagnosis, and there was no documentation that this diagnosis was ever ruled out. The treatment plan goals, interventions, and case formulation were essentially repeated from past treatment plans.

**Findings**

The care provided to this patient was inadequate.

Although there was documentation of a mental health treatment plan psychiatric review dated December 27, 2022, the accompanying treatment plan of that date was absent. The treatment plan dated September 29, 2021 was inadequate with a paucity of updated information, treatment goals, and treatment interventions. The primary clinician weekly contact documentation was also inadequate, as clear treatment goals and explicit treatment interventions were absent, compromising continuity of care.

**Patient DD**

Patient DD was randomly selected for healthcare record review from a list of 3CMS patients housed in the CSP/Corcoran ASU STRH.

The patient was a 53-year-old male who was incarcerated for attempted murder. He had an abusive developmental history. He reported that his parents were divorced when he was five years of age. He also reported verbal and physical abuse by his mother and sexual abuse by others. He attributed his violent tendencies to his history of sexual molestation and anxiety resulting from his mother's verbal and physical abuse. He reported using drugs and alcohol as a youth to manage his anxiety, and his drugs of choice were cocaine and methamphetamine. He married twice with one son who lived with the patient's mother. He indicated that he was not concerned that his mother would abuse his son, because he stated that she had changed after his sister became pregnant at age16.

The patient was placed in segregation for attempted murder on September 21, 2021. He worried that the district attorney would prosecute him for this charge, noting that it would impact his future chances of parole, especially since his commitment offense included violence against law enforcement. He indicated that he was more concerned about how the attempted murder charge would impact his family, as he wanted to show them his efforts to gain parole.

He was transferred from Sierra Conservation Center (SCC) to CSP/Corcoran on October 11, 2021. He received an initial primary clinician evaluation on October 12, 2021. The evaluation revealed that he did not have a history of mental health treatment prior to entering CDCR in 1990. His current term started in 2005. He had received mental health services at the 3CMS level of care since 2008, intermittently receiving treatment with psychotropic medication. He was provided with diagnoses of depressive disorder, anxiety disorder, and PTSD. He reported feeling anxious and depressed about abandonment by his family. He was prescribed prazosin for nightmares, flashbacks, and increased startle responses.

During the review period, three IDTT meetings occurred on October 20, 2021, and January 12 and February 9, 2022. The IDTTs were conducted without the patient present, and there was no documentation that the IDTT information was communicated with the patient. The treatment goals and interventions were generic and remained unchanged, focusing on reducing depression, learning three positive coping skills, and maintaining depression in remission. The patient was seen weekly by the primary clinician, and he was seen at least monthly by the treating psychiatrist. Sessions occurred at cell front as the patient refused confidential individual

sessions.  The weekly sessions with the PC were wellness checks with identical weekly progress notes except for minor changes.  The psychiatric contacts focused on medication management.

**Findings**

The mental health treatment provided to this patient was inadequate.

Treatment plans were generic, measurable goals were unclear, and treatment interventions were vague, compromising continuity of care.

**Patient EE**

Patient EE was randomly selected for healthcare record review from a list of 3CMS patients housed in the CSP/Corcoran ASU STRH.

The patient was a 39-year-old male serving a prison term for attempted murder, robbery, and two counts of assault with a firearm.  His earliest parole release date was May 7, 2026.

He was transferred from CSP/Sac to CSP/Corcoran on November 14, 2017.  He received mental health services at the EOP level of care; subsequently, he was lowered to the 3CMS level of care.  He had an extensive mental health history.  He was provided with diagnoses of schizophrenia, paranoid type and mood disorder not otherwise specified.  He also had a long history of poor impulse control and criminal behavior, including multiple convictions for possession of a loaded firearm and arrests for DUI.

During the first two months of the review period, he was receiving mental health services at the 3CMS level of care.  During the second month, he tested positive for COVID-19.  On November 9, 2022, he refused to accept assigned housing.  He was evaluated by the CIT, and was placed in the MHCB on suicide watch.  On November 10, 2021, during the administration of a SRASHE, he reported that he would refuse placement in a specific cell location, and he threatened to do what he had to do not to go to that cell.  After release from the MHCB on suicide watch, he was placed on a five-day follow-up which ended on November 15, 2022.  On November 18, 2021, a mental health RVR assessment determined that there were no significant mental health factors and/or developmental/cognitive deficits that should be considered when assessing penalty.

The ASU pre-placement screening, initial primary clinician assessment, SRASHE, psychiatric appointments, and an IDTT all occurred timely during December 2021.  The treatment team provided a provisional diagnosis of schizoaffective disorder, bipolar type during the IDTT with mention that this diagnosis should later be confirmed by an evaluation.

The patient was seen weekly by the primary clinician and several times by the psychiatrist in January and February 2022; however, he refused most cell-front appointments.  The treating psychiatrist renewed the PC 2602 order on February 16, 2022.  There was no documentation that an evaluation was performed to clarify the schizoaffective disorder diagnosis.

In summary, the patient had a serious mental illness which was effectively treated in the EOP with medication resulting in transfer to the 3CMS level of care. He contracted COVID-19, refused assigned housing, received a RVR, was evaluated by the CIT on the same day he received the RVR, was placed on suicide watch, and eventually was moved to the ASU STRH where treatment was limited due to COVID-19 related modified programming and his treatment refusal. Overall, the mental health team was actively involved with this patient, performing appropriate interventions timely; however, documentation was minimal and generic, and nonpharmacological treatment goals and interventions never changed, despite the significant events which occurred during the review period.

**Findings**

The patient received marginally adequate mental health treatment during the review period.

Mental health contacts occurred timely; however, documentation of treatment was minimal and not individualized. Overall, the documentation indicated that the patient's functioning declined from previously participating in treatment, being future-oriented, and working to complete his GED, to placement on suicide watch and treatment refusal in the ASU STRH.

**Patient FF**

Patient FF was randomly selected for healthcare record review from a list of 3CMS patients housed in the CSP/Corcoran ASU STRH.

This patient was a 52-year-old male incarcerated for murder with a weapon who was sentenced to life with parole with an earliest parole release date of May 20, 2046. He had a history of substance use disorders, including opioid, cannabis, and stimulant use. He also had a history of depression and anxiety disorders.

His developmental history was significant for reported involvement in a motor vehicle accident resulting in a traumatic brain injury at age nine and hospitalization at DSH-Atascadero for four months after trying to burn his mother and her boyfriend at age 11. He reported a history of a diagnosis of schizophrenia and treatment with Haldol and Seroquel for auditory hallucinations that were possibly drug induced.

The patient's CDCR mental health treatment began at the 3CMS level of care from July 1999 to October 2004, and subsequently from June 2007 to February 2022. He was provided with a diagnosis of major depressive disorder, recurrent in partial remission, which was attributable to medication adherence. He was prescribed Prozac. He had a history of one MHCB admission in 2007 due to danger to self. He reported one suicide attempt while incarcerated in the county jail in 1997. He denied other self-harm incidents.

The patient received mental health services in the GP at the 3CMS level of care for most of the review period. He was seen by his primary clinician and/or treating psychiatrist monthly. Progress notes indicated that his mental status was stable. He read his Bible and prayed to help manage his depression. He attended the IDTT on November 9, 2021, where he contributed to the treatment goals and plan, indicating that he was motivated to do well for his children and grandchildren.

On February 15, 2022, the patient received aRVR for possession of a deadly weapon. A mental health RVR evaluation performed on February 23, 2022 concluded that mental illness and/or developmental/cognitive deficits did not contribute to the behavior leading to the RVR. He was seen for PC and psychiatric evaluations for housing program change from GP to STRH on February 23 and 25, 2022 respectively. A SRASHE on February 25, 2022 assessed moderate chronic and low acute suicide risk.

The IDTT met on March 9, 2022. All treatment team members were present, including the patient. The patient again contributed to the treatment plan goals. Additionally, the treatment team documented that they were aware that the patient previously received a RVR for manufacturing a weapon in January 2021, resulting in STRH placement.

**Findings**

The mental health care provided to this patient was adequate and clinically appropriate.

He appeared to have a good therapeutic relationship with the primary clinician and treating psychiatrist. Additionally, the patient was involved in treatment planning and the development of treatment goals. Clinical contacts occurred timely, and the patient appeared stable with good medication adherence.

**APPENDIX B-13**
**Salinas Valley State Prison (SVSP)**
**(April 11, 2022 – April 14, 2022)**

**Patient A**

This 31-year-old EOP patient was admitted to the facility from the PSU on December 10, 2021. Diagnoses varied by chart location but included bipolar disorder, antisocial personality disorder, and borderline personality disorder. The patient was prescribed Abilify, Wellbutrin and Trileptal by way of a PC 2602 involuntary medication order. His health care record was reviewed to assess the adequacy of care after he was discussed in an observed EOP huddle on Facility D.

The patient had an extensive history of incarceration since childhood. He had engaged in 39 incidents of self-harm since 2015. His self-harm behavior was documented as being due to secondary gain and often to affect a housing change. Since his admission to the facility, he had two MHCB admissions and six suicide risk assessments. For the six suicide risk assessments, the patient was consistently assessed as a "high" chronic risk; however, three of six evaluations assessed him as a "low" acute risk.

The quality of risk assessments varied by provider. Overall, assessments lacked a sufficient case formulation despite a prompt to complete one. Clinical rationales for risk assessment also needed improvement, while protective factors were not always updated or included. Previous safety plans were not included even though a safety plan was clinically indicated. Of concern, psychiatric documentation assessed the patient as guarded and indicated that he would act on suicidal ideation without reaching out to staff. Further, on March 24, 2022, the patient reported frequent and intense suicidal ideation; however, documentation did not indicate that this was communicated to the treatment team.

Initial assessments following the patient's return from his second MHCB admission were timely and adequate. Both included individualized psych-social information and the psychiatry assessment provided a thorough review of current symptoms. IDTT documentation was not timely. IPOCs appropriately targeted self-harm and anger, but there was no IPOC for depression, which was identified during the psychiatric assessment and indicated a need for improved provider collaboration. IPOCs included measurable goals but were not clearly individualized. Interventions also were not clearly individualized. Documentation reflected that the patient was identified in the sustainability reports due to ten CIT referrals and four MHCB referrals during the past six months, and three RVR evaluations in the past three months. The non-referral rationales were comprehensive and thoughtful, while treatment modifications were individualized but not implemented.

Psychiatric contacts were timely and provided useful clinical information. However, there were one to two-month gaps in primary clinician contacts. The few available reviewed contacts did not include documentation regarding clinical interventions.

**Findings**

This patient's care was inadequate.  In addition to significant gaps in routine primary clinician contacts, documentation indicated that programming delays exacerbated the patient's distress.  Risk assessments lacked pertinent documentation that was necessary for continuity of care.  Collaboration between treatment providers was needed for routine treatment planning as well as for communication of risk of self-harm.  Implementation of identified treatment interventions other than psychiatric medications was also needed.

**Patient B**

This 53-year-old patient was admitted to the facility from the PIP on April 5, 2022.  He was diagnosed with schizoaffective disorder.  He was medication compliant with antipsychotic and mood stabilizing medications.  His health care record was randomly selected to assess the adequacy of his care after observation of his initial IDTT on Facility A.

The patient was at the PIP between August 16, 2021 and April 5, 2022, after being admitted for a suicide attempt and increased paranoia.  His initial IDTT was prematurely terminated as he presented as agitated and disorganized.  The treating psychiatrist indicated that, according to the primary clinician, the patient had not presented in this manner earlier in the day or during five-day follow-ups.  The patient was appropriately referred for an emergent consult where it was documented that his agitation decreased as he discussed his perception of an incident from the 1990s that was the precipitant for ongoing paranoia.  It was documented that the patient's initial IDTT was rescheduled for two weeks to allow his clinician time to review his treatment needs.  Tellingly, the PC's initial assessment had not been completed in advance of the initial IDTT.

Although a psychiatric contact occurred on April 14, 2022, a psychiatric assessment was not located.  There was no documentation of either psychiatric distress or paranoia.  Previous clinical documentation indicated the patient's pattern of pervasive fixed delusions.

Five-day follow-ups were timely.  Although the IDTT was delayed, the patient had been placed in RT groups, some of which he attended.

**Findings**

This patient's care was inadequate.  The patient had not received appropriate initial assessments since his discharge from the PIP.  Given his mental status during the IDTT, the patient was appropriately referred for an urgent assessment.  However, the patient's IDTT should have been expedited; a two-week delay for the IDTT was inappropriate.

**Patient C**

This 46-year-old patient was admitted to the facility at the 3CMS level of care in December 2019.  His diagnosis was not located in the health care record; however, he was originally referred from GP to the 3CMS level of care due to depressive symptoms and suicidal ideation.  The patient was not prescribed psychiatric medication.  His health care record was selected for review following discussion of his mental status during monthly supervisory program area tours on Facility A.  Notably, he was an urgent mental health referral by custody staff for confused and

withdrawn behavior on April 7, 2022.  For unclear reasons, the referral form was not signed by mental health until four days later, on April 11, 2022.  On April 12, 2022, the sergeant placed him in alternative housing for bizarre behavior.

Of significant concern, there was a two-year gap between this patient's last mental health contact on March 23, 2020, and a brief cell-front check-in on February 17, 2022.  On April 12, 2022, the patient was evaluated in response to an urgent referral due to bizarre behavior in which he was observed to be "looking off in random directions," and repeatedly reported that he was being discharged despite a 2035 release date.  Upon assessment, clinical documentation noted that the patient was not oriented to date; he was described as "confused" and "slightly delusional."  No further evaluation or referral was made and there was no documented follow-up plan.

Documentation reflected that the patient's primary language was Spanish.  At times a translator was used, including a correctional officer.

**Findings**

This patient's care was inadequate.  There was a significant delay in timely contacts during which time his mental health deteriorated.  When custody identified the patient and referred him to mental health, there was a delay in his assessment.  Further, the assessment did not provide any clinical intervention or consider referral to a HLOC.  The use of custody staff for translation of mental health contacts was also inappropriate; use of the language line was required.

**Patient D**

This 36-year-old patient was admitted to the facility on March 24, 2021.  Psychiatric diagnoses, which varied across provider and health care record location, included unspecified schizophrenia spectrum and other psychotic disorder.  The patient was prescribed antipsychotic medications. His health care record was randomly selected to assess the adequacy of care on Facility A.

IDTT documentation provided a review of current symptoms but did not clearly discuss their impact on functioning.  IPOCs included appropriate goals and targeted treatment non-adherence, substance use, and pre-release planning but did not target identified psychiatric symptoms such as paranoid ideation and grief.  The rationale for the level of care was insufficient for the November 2021 documentation but was improved for the February 2022 documentation.

Timely psychiatric contacts included basic clinical information.  Variable medication non-adherence was identified but not assessed or otherwise addressed.  Changes in functioning, such as confusion regarding an appointment and a report of auditory hallucinations after a pattern of denial, were not otherwise addressed.

While not timely, primary clinician contacts were comprehensive and provided an overview of the patient's psychosocial stressors.  Goals were variably addressed and interventions, when utilized, were appropriate.  Cell-front wellness checks were offered during times of modified programming or clinician unavailability.

Pre-release coordinator documentation included relevant psychosocial and clinical needs.

## Findings

This patient's care was adequate but marginal within the context of COVID-19 and staffing limitations.  Treatment planning and psychiatric documentation needed improvement.

## Patient E

This 31-year-old patient was discharged from an ICF in July 2021 but had two MHCB admissions prior to his return to the EOP level of care in late October 2021.  He was compliant with multiple psychiatric medications (lithium, Abilify, clonidine, Remeron and Vistaril).  His health care record was selected to review the adequacy of care following observation of his IDTT on D yard.

The patient's diagnosis was not listed in the official place of record but was located in the body of provider documentation.  The primary clinician documented diagnoses of major depressive disorder with psychosis, PTSD, antisocial personality disorder, and substance use disorder. Psychiatric documentation identified each substance and provided a diagnosis of borderline personality disorder instead of antisocial personality disorder.  Criteria to support diagnoses was not located.

The primary clinician's initial assessment and the initial IDTT were not timely, and documentation was not individualized for the patient's needs.  Notably, documentation had been copied from previous treatment providers but author, level of care, and timeframes were unclear. Documentation labeled as an initial psychiatric assessment also lacked the comprehensiveness of an initial assessment.

A review of treatment planning documentation did not provide a cohesive description of the patient's treatment needs or progress.  Initial IPOCs, which targeted DBT, treatment non-adherence, depressed mood, and hallucinations, remained unchanged in two subsequent routine IDTTs.  Non-referral rationale and treatment modifications, other than medication adjustments, remained unchanged across IDTTs.

The frequency of psychiatric contacts exceeded Program Guide requirements.  Overall, documentation provided a useful summary of this patient's treatment needs.  There were intermittent gaps in primary clinician documentation between January and April 2022.  At times, primary clinician documentation remained unchanged, including mental status documentation.

## Findings

This patient's care was inadequate.  Clinical interventions, other than psychiatric medication, were not documented and primary clinician documentation was not individualized.  Diagnosis needed clarification and was not easily located for continuity of care.  Relatedly, assessment and treatment planning documentation did not provide an updated, cohesive, individualized assessment of this patient's treatment needs, which was important for continuity of care.

927

**Patient F**

This patient was identified on the HLOC audit as an administrative segregation EOP patient housed in STRH. He was identified for consideration for a referral to a HLOC due to three or more RVRs in the last three months. The patient had actually received five RVRs in the last three months. The HLOC audit found that the patient did not have a sufficient narrative justifying non-referral.

While the treatment team did document significant information related to the RVRs and associated mental health assessments, they did not adequately address the clinical rationale for non-referral. There was insufficient documentation regarding justification by the treatment team of its decision of non-referral for this patient. The treatment team also failed to document consideration of an expedited referral to an Administrative Segregation EOP Hub.

This review of the medical record including treatment plan and the HLOC considerations found agreement with the findings of the HLOC audit.

**Findings**

This patient did not receive adequate care. The patient did not receive an adequate clinical justification for non-referral to a HLOC from his treatment team while housed in STRH as an EOP patient pending transfer to an Administrative Segregation EOP Hub. The treatment team failed to adequately consider and address the five RVRs received by the patient in the last three months. In addition to not referring the patient to a HLOC or providing an adequate rationale for non-referral, the treatment team also did not appear to consider expediting the patient's transfer to an Administrative Segregation EOP Hub. On a positive note, the inpatient coordinator documented inadequacy in the HLOC audit. However, the treatment plan was not updated so it was unclear from the review whether the team received feedback regarding their deficiencies.

**Patient G**

This mainline EOP patient diagnosed with schizophrenia was identified on the HLOC audit form for not having adequate treatment enhancements identified and included on the treatment plan HLOC considerations form (formerly 7388B) in his initial treatment plan at SVSP. The patient was on a PC 2602 medication order due to danger to others and was prescribed Abilify injection 200mg intramuscular, Cogentin 1mg daily, and Zyprexa 2.5mg oral daily with backup of Zyprexa 2.5mg intramuscular. The patient was seen in an initial IDTT with all required attendees. The patient had been identified for consideration of HLOC referral due to participating in less than 50 percent of his structured treatment hours. He had a very high refusal rate for the prior ten weeks with an average of ten hours refused weekly during that time. The patient did not attend group treatment, individual contacts or IDTTs due to a language barrier. His primary language was reported to be Mandarin.

It appeared that staff relied on the later addition of the use of interpretive services, though those should have been provided consistently from the beginning in light of the patient's limited language proficiency with English. The patient was still highly anxious due in part to his paranoia. He had previous concerns regarding being poisoned by other inmates and cellmates. It should be noted that on his routine follow-up IDTT, staff failed to properly note that he

continued to meet HLOC criteria for consideration (criterion 7) due to participating in less than 50 percent of his structured treatment hours. Due to this failure, the patient was not properly identified for consideration for referral to HLOC nor were any enhanced patient treatment modifications addressed by the treatment team during the subsequent IDTT after he was not referred.

Review of the HLOC form in the treatment plan supported the HLOC audit findings that there were no treatment enhancements included.

**Findings**

This patient did not receive adequate care. The patient was properly identified for consideration of referral to a HLOC at his initial IDTT though the treatment team did not include enhanced treatment modifications as required by the HLOC form when he was not referred. The treatment team did not specifically address the positive criterion for referral consideration. This inadequacy was properly noted in the inpatient coordinator's HLOC audit. However, there was not an updated treatment plan with corrected HLOC C treatment enhancements and rationale making it unclear if the treatment team received any feedback regarding the deficiencies identified in the inpatient coordinator's HLOC audit. When the patient was seen for his subsequent routine IDTT, the treatment team failed to accurately identify that the patient met at least one objective criterion (continued to participate in less than 50 percent of treatment) and subsequently failed to consider referral to HLOC or enhanced treatment modifications. Reviewed progress notes also failed to document clinical information that would justify a non-referral.

**Patient H**

This patient was identified on the non-referral to HLOC log three times during a stay in the MHCB (November 15, 19, and 26, 2021). The patient had been admitted to the MHCB due to "conditional" suicidality; he began a hunger strike shortly after arrival. The patient had many high-risk factors and few protective factors including paternal suicide, long sentence, chronic health problems, and a desire to die quickly rather than slowly if his health ailments were not properly attended to.

The patient was seen in treatment team on November 15, 2021 and determined to meet HLOC criterion 2 (patient requires highly structured inpatient care with 24-hour nursing supervision due to major mental disorder). He had been diagnosed with antisocial personality disorder, opioid abuse, and alcoholism. He was prescribed BuSpar 20mg three times daily, clonidine .2mg twice daily, and gabapentin 400mg three times daily. There was not an adequate clinical justification for non-referral to a HLOC, but the treatment team did identify some enhanced treatment modifications for the patient.

The patient was seen again in treatment team on November 19, 2021. The treatment team continued to identify that the patient met criterion 2 for HLOC consideration, but simply cut and pasted the clinical rationale for non-referral and treatment modifications from the prior treatment plan (November 15, 2021). The patient was not appropriately considered for referral to HLOC and there were no enhanced treatment modifications from the prior treatment plan. The patient

was seen by IDTT again on November 26, 2021. At this time, he met criterion 2 and criterion 4 (is currently in a MHCB and had been in a MHCB for at least ten days). Despite the additional criterion, the clinical rationale for non-referral was again cut and pasted as were the treatment modifications. The treatment plan did note that the patient had been told that he would be discharged to an EOP mainline yard and he subsequently cut his throat requiring sutures at an outside hospital. Despite this, the treatment team still suggested that he did not want to actually die and minimized the patient's anxiety, stress and consequent behaviors. The staff failed to provide an adequate clinical justification for non-referral, particularly in light of the patient's escalating behaviors, and failed to include additional enhanced treatment modifications, relying instead on cut and pasted information.

Notably, a mental health consult was completed several days after that IDTT (December 1, 2021) and found that the patient was committed to self-harm through his continued hunger strike and self-injurious behavior. The consult found that the patient was at increasing risk of self-harm and should be referred to acute inpatient care.

**Findings**

This patient did not receive adequate care. He was not appropriately considered for referral to a HLOC when indicated. The treatment team failed repeatedly to provide adequate clinical justifications and used cut and pasted documentation that included the same information despite the patient's escalating behaviors. In addition, the treatment team failed to include adequate enhanced treatment modifications. This patient was not timely referred to a HLOC despite needing a HLOC. The treatment team failed to recognize the patient's multitude of high-risk factors and lack of substantial protective factors. They appeared to underestimate his risk of suicide even after a clear incident of escalating self-injurious behavior/suicide attempt. Following the treatment team meeting (December 1, 2021), a provider completed a mental health consult and referred the patient to acute inpatient treatment but without treatment team consensus as documented through the treatment plan. This patient unnecessarily continued to experience psychiatric symptoms that included suicidal ideation and behavior (i.e., hunger strike and cutting his throat) when he should have been more timely referred to a HLOC.

**Patient I**

This patient was a long-term medical patient who had been referred to the MHCB in July 2021. He had been a patient in the CTC medical beds prior to that. The patient had since been referred to acute inpatient care February 4, 2022 by SVSP MHCB but had not transferred despite several CCAT meetings. SVSP MHCB staff reported that they had been told that there were no open "dual" medical-mental health inpatient beds available for the patient during those calls. The patient remained in the MHCB as his mental status failed to improve and there were multiple incidents of attempted or actual self-harm including once when he threw himself from his bed and reportedly fractured his nose. The patient had limited mobility and required assistance to complete ADL.

The patient had been diagnosed with narcissistic personality disorder, depressive disorder due to another medical condition, with major depressive-like episode, and antisocial personality disorder. He was prescribed olanzapine 5mg in the evening and venlafaxine 112.5 daily. The

patient required assistance with ADL due to his medical condition and staff believed that he occasionally exploited those contacts by making lewd remarks to assisting staff, usually female. Staff reported that he had lost mobility in his legs but did have some mobility in his arms and hands.  He had been diagnosed with unspecified pain, oral thrush, neurogenic bladder, and neurocysticercosis along with lesser priority health issues.  While the SVSP physician in charge of the patient's care was reportedly comfortable indicating that the patient was stable for transfer pending that day's assessment, the patient was never transferred to an acute bed following an initial referral (April 20, 2021) and the acute referral was rescinded on July 9, 2021, because of reported improvement.  At that time, the patient had mistakenly been moved to 3CMS level of care despite remaining a dual MHCB-medical patient with suicidal ideation and a self-harm attempt on August 8, 2021.  The change in his level of care was only stopped because staff had maintained him on one-to-one observation due to his suicidality.

Treatment plans at times had no mental health individual plans of care, though there were some treatment interventions included in the HLOC form (formerly 7388B).  There had reportedly been a danger to self "patient level outcome" (PLO) activated without associated treatment goals and interventions.  There was an absence of objective, behaviorally based problems or areas of focus for treatment, treatment goals, interventions, and mental health plan of care.  The HLOC form used cut and paste with inadequate clinical justifications for non-referral to a HLOC as well as inadequate enhanced treatment modifications.  This did appear to be PC-specific, as there were a small number of treatment plans (by a PC) with treatment goals and interventions.  The patient was generally seen every seven days by IDTT, though it appeared that the treatment team may have accepted that the patient would not be transferred as the treatment plans were rarely modified over time except by a certain PC.  At one point, impulsive behavior was added to the treatment plan due to the patient's inappropriate treatment of nursing staff but there were no interventions included with treatment goals.  The treatment team had resisted any behavioral interventions, but the patient was considered treatment resistant.  Instead, when the team did include goals, they were treatment goals that were not appropriate to a treatment resistant patient.

At a previous treatment team meeting, the patient reported that he felt like he did not exist because "no one is helping me."  The treatment team did not identify this dysphoria, potential increased suicide risk or develop any treatment goals as a result of this statement nor did they reassess the patient's risk.  The patient was re-referred to inpatient treatment shortly before the site visit, but staff reported that they continued to be told that there were no beds for this patient.

**Findings**

This patient did not receive adequate care.  The patient required additional services and support while he remained in the MHCB awaiting transfer to an inpatient unit that can also provide for his medical needs.  The treatment team did not develop an adequate treatment plan and had neglected the necessity of behavioral interventions to assist the patient in developing prosocial behaviors and engaging in treatment.  At the time of this review, the patient did appear to continue to meet criteria for acute inpatient treatment, to be appropriately placed and provided acute treatment.  Until that time, CDCR needed to provide additional resources to meet the patient's treatment needs adequately.

**Patient J**

This 40-year-old-patient was chosen for healthcare record review to evaluate the quality of care provided at the EOP level of care at SVSP, as well as concerns raised in the plaintiffs' pre-site visit letter.

The patient had a long history of mental health concerns, dating from age four. The patient had no psychiatric hospitalizations prior to incarceration.

He was provided with diagnoses of schizophrenia, ADHD, bipolar disorder, PTSD, unspecified depressive disorder, antisocial personality disorder, borderline personality disorder, and acute akathisia, a movement disorder often caused by treatment with antipsychotic medications.

The patient was prescribed clozapine (antipsychotic), doxazosin (to treat nightmares of PTSD), and amantadine (to treat movement disorder side effects). Notes indicated that the patient had been prescribed clozapine for approximately six years. The patient had no history of PC 2602 ordered treatment with involuntary medications.

The patient was incarcerated since 1999. He had a history of multiple treatments in the MHCB, and at the acute and intermediate levels of care.

The patient had an extensive history of suicidal behavior, including overdoses and attempted hangings. The patient also had a history of self-harm; the most recent incident occurred on December 13, 2021. The most recent SRASHE dated July 19, 2022 assessed the patient with high chronic and low acute suicide risk.

The patient was transferred from the CHCF-PIP to the SVSP-PIP on August 23, 2021. He continued to receive services at the intermediate level of care until December 29, 2021, when he was discharged to the EOP level of care at SVSP. Although SVSP was not an institution designated for clozapine maintenance, the patient was placed at that institution. SVSP supervisory staff reported that the patient was transferred to their institution without consultation.

One concern mentioned in the plaintiffs' letter was the lack of required regular blood draws for patients prescribed clozapine. Notes reflected that the patient became frustrated with frequent blood draws. The frequency of blood draws increased as additional tests were ordered. The psychiatrist worked with the patient, resulting in agreement on a regular schedule of monthly blood draws.

On March 16, 2022, a mental health consultation stated that the patient was increasingly upset about placement at an institution that was not designated for clozapine maintenance. Although healthcare records reflected the patient's statement that he did not want his symptoms to worsen to the degree that he would harm himself, there was no documentation that a SRASHE was completed.

The patient was transferred and admitted to the CSP/Sac MHCB from May 3 - 24, 2022, after swallowing razor blades. The initial psychiatric assessment stated that one trigger for the ingestion was the patient's frustration with housing at a non-clozapine facility. Upon MHCB discharge on May 25, 2022, the patient returned to the SVSP EOP.

During treatment at the EOP level of care, the patient was seen timely by the psychiatrist, and the patient's concerns were appropriately addressed. In July 2022, there was an interruption in clozapine administration, as the facility did not have the medication. The psychiatry note documented that the patient missed five days of this medication. The psychiatrist stated in the July 12, 2022, progress note, "The unstable Clozapine supply-makes Mr. Dixon's care unmanageable." The psychiatric note on August 8, 2022, stated "He would like more programming. But this doesn't occur at SVSP. He isn't getting 1:1 therapy despite being in an EOP program." Group notes reflected frequent patient refusals.

The most recent IDTT occurred on July 16, 2022. Large sections of the treatment plan were carried over unchanged from prior treatment plans. Treatment plan goals were vague and ill-defined, and one of the few clinically appropriate goals was the need for transfer to a clozapine maintenance institution. Despite this goal, the patient remained prescribed clozapine at the SVSP EOP on October 24, 2022.

**Findings**

The care provided to this EOP patient was inadequate.

Given clozapine's potentially lethal side effects, patients taking this medication required special monitoring and safeguards for safe administration. CDCR addressed these requirements by designating certain institutions for clozapine initiation and maintenance. SVSP, with the exception of the PIP, was not a designated clozapine maintenance facility at the time of the patient's transfer to that facility.

Psychiatric medication management appeared clinically adequate. The psychiatrist worked collaboratively with the patient on a plan for regular required blood monitoring. The patient was not seen by the PC at the frequency required by the Program Guide. Given the patient's extensive history of suicide attempts, as well as a history of engaging in self-injury, the lack of completion of a SRASHE on March 16, 2022, was of concern. Treatment plans were inadequate, due to the relative lack of measurable, concrete, and realistic goals. The patient's frequent group refusal was inadequately addressed in both treatment planning and in PC contacts.

**Patient K**

This 32-year-old patient was selected for healthcare record review to evaluate the quality of care provided at the 3CMS level of care in SVSP's STRH, as well as issues of concern observed at an IDTT during the site visit.

The patient had an extensive history of treatment in the MHCB, and at the acute and intermediate levels of care. His most recent MHCB treatment occurred from May 12 through June 4, 2021, due to an overdose. The patient was subsequently referred for acute care at CHCF from June 4 through July 21, 2021. He was discharged to the intermediate level of care at CHCF where he was hospitalized from July 21 to October 22, 2021. Upon discharge from intermediate care, he transferred to the SVSP EOP. On January 20, 2022, the patient was decreased to the 3CMS level of care. He was placed in the STRH on March 15, 2022, reportedly due to enemy concerns.

The patient had a long history of suicidal behavior, with his first attempt at age 15; healthcare record documentation noted there were between 15 to 24 suicide attempts. The documentation was inconsistent regarding his history of self-injurious behavior without intent to die. The most recent SRASHE on October 25, 2021, assessed the patient with high chronic and low acute suicide risk.

The patient was provided with diagnoses of unspecified depressive disorder, amphetamine use disorder, borderline personality disorder, and antisocial personality disorder.

The patient was prescribed olanzapine on an as-needed basis for aggression; he was not prescribed scheduled psychiatric medications. The patient had no history of PC 2602 ordered treatment with involuntary medications.

The initial PC evaluation occurred on April 7, 2022, and the initial IDTT occurred on April 13, 2022. The treatment goals included increasing distress tolerance. The patient requested that the treatment team increase his level of care to EOP. There was no documentation of psychiatric contact while the patient was housed in the STRH.

The patient transferred to CCI at the 3CMS level of care on April 25, 2022. Records indicated that the patient requested removal from the MHSDS, and this occurred at an August 9, 2022, IDTT.

**Findings**

The care provided to this 3CMS STRH patient was inadequate.

Despite a history of multiple suicide attempts, no SRASHE was documented for this patient since October 2021. The completion of a SRASHE for this patient prior to transition from the EOP to the 3CMS level of care in January 2022, and upon placement in the STRH in March 2022, would have been clinically appropriate.

The patient was not seen for an initial PC assessment or for an initial IDTT within required timeframes. There was no documentation of psychiatric assessment after STRH placement.

**Patient L**

This 37-year-old male was selected for healthcare record review to assess the quality of EOP care provided in STRH at SVSP, as well as issues of concern observed at an IDTT during the site visit.

The patient's most recent incarceration began in October 2018. He was intermittently included in the MHSDS at the 3CMS level of care since that time. The patient had a history of two admissions and four evaluations for admission to the MHCB, and there was no history of treatment at the acute or intermediate levels of care.

The patient had a history of one suicide attempt in December 2021. He had a reported history of self-harm. The most recent SRASHE on June 30, 2022, assessed the patient with moderate chronic and low acute suicide risk.

Prior to his most recent MHCB admission from March 22 through April 1, 2022, the patient was housed in the ASU and was not included in the MHSDS. On the morning of March 22, 2022, the patient was seen by the CIT due to voicing suicidality. The notes reflected that the patient, "Demanded to be transferred and made vague threats to hurt himself in order to be admitted to MHCB." The patient was referred to his PC and psychiatrist, but he was not admitted to the MHCB. The SRASHE assessed the patient with low chronic and acute suicide risk. Later in the day, the patient was sent to an off-site emergency department by ambulance, due to reported ingestion of medication and thoughts of hanging himself. Upon his return, he was admitted to the MHCB.

He was discharged from the MHCB on April 1, 2022, to the EOP level of care. The patient was placed in the STRH from April 1 through April 15, 2022.

The patient was provided with diagnoses of unspecified depressive disorder, amphetamine use disorder, opioid use disorder, and PTSD. He was prescribed mirtazapine, an antidepressant medication. The patient had no history of PC 2602 ordered treatment with involuntary medications.

Initial psychiatric and PC evaluations were completed timely upon STRH placement; these evaluations occurred prior to the initial IDTT.

The psychiatric evaluation on April 8, 2022, was entered in a free text note, not as an initial psychiatric evaluation. The note did not document many important aspects of the mental status examination and assessment, including the patient's chief complaint and mood.

The initial PC evaluation was completed on April 12, 2022. The clinical summary was brief and inadequate in appropriately documenting current symptoms and functional impairments.

The initial IDTT occurred on April 13, 2022, and was timely. A covering psychiatrist, not the psychiatrist who performed the initial psychiatric evaluation, attended the patient's initial IDTT.

The treatment plan targets included depression and substance use; these targets appeared clinically adequate and appropriate.

On April 15, 2022, the patient transferred to RJD at the EOP level of care. The patient paroled from CDCR on or about September 18, 2022.

**Findings**

The care provided to this EOP patient housed in STRH at SVSP was inadequate.

Prior to his placement in STRH, the CIT evaluation appeared to minimize the patient's clinical risk factors. Later that day, the patient required transport to an outside hospital for emergency evaluation due to reported medication ingestion.

Upon placement in STRH, the psychiatry evaluation did not include several key aspects of a standard psychiatric evaluation. The PC evaluation displayed inadequate conceptualization of the case.

Additionally, the treatment plan was not individualized to address this EOP patient's treatment needs. Despite the patient's upcoming release date, there was a lack of documentation that the treatment team initiated necessary pre-release planning. The treatment team was made aware of this omission, as the supervisor noted during the IDTT that this should be a topic warranting focus.

**Patient M**

This 36-year-old male was selected for healthcare record review to assess the quality of 3CMS care provided in STRH at SVSP, as well as issues of concern observed at an IDTT during the site visit.

The patient's most recent incarceration began at NKSP on November 5, 2020. The patient transferred to SVSP on July 20, 2021. He received mental health services at the 3CMS level of care in a mainline yard until February 9, 2022.

He had a history of one MHCB stay in February 2008, during a prior incarceration. He had no history of treatment at the acute or intermediate levels of care.

Documentation in the healthcare record was inconsistent regarding past suicide attempts, stating the patient either had no prior or one prior suicide attempt. The patient had a reported history of self-harm. The most recent SRASHE on April 15, 2022, assessed the patient with moderate chronic and low acute suicide risk.

The patient was provided with diagnoses that included PTSD, unspecified depressive disorder, and opioid use disorder.

He was prescribed paroxetine, an antidepressant medication. The patient had no history of PC 2602 ordered treatment with involuntary medications.

The patient was placed into restricted housing on February 9, 2022, due to alleged battery on an inmate. This placement appeared to be in administrative segregation and not in STRH. A mental health evaluation for this infraction found that mental health factors appeared to play a role in the behavior. On March 25, 2022, the patient transferred to STRH.

As for the treatment received in STRH, the initial PC evaluation occurred timely, prior to the IDTT; however, a psychiatric evaluation was not documented. The initial PC evaluation on April 12, 2022, contained a nearly identical clinical summary from a prior evaluation. The patient requested to be removed from the MHSDS. The initial IDTT in STRH occurred on April 13, 2022. The clinical summary from this treatment plan remained unchanged from the prior two evaluations. The note stated that the patient was present at the IDTT; however, it also stated that the patient was unable to participate. The expert attended this IDTT. The patient did not attend, and the reported reason was a lack of escort officers. The psychiatrist in attendance documented that he was a covering physician. At the conclusion of the IDTT, the patient was removed from the MHSDS.

Two days later, on April 15, 2022, the patient was seen by the CIT after submitting a request stating that he was having auditory hallucinations to hurt himself. A PC evaluation was

performed on April 19, 2022. The PC recommended placement in the EOP; this occurred at an IDTT on the following day.

A psychiatric evaluation on April 28, 2022, was a free text note, not a formal initial psychiatric evaluation. The evaluation lacked the first portion of the exam in which the patient stated the reason for the visit. Additionally, there was no documentation of the patient's self-reported mood. The psychiatrist initiated treatment with paroxetine at this visit.

On May 16, 2022, the patient transferred to the ASU EOP hub at CSP/Corcoran.

**Findings**

The care provided to this 3CMS STRH patient at SVSP was inadequate.

The psychiatrist did not evaluate the patient prior to the initial IDTT. A covering psychiatrist in the IDTT agreed to remove the patient from the MHSDS, despite not having evaluated the patient and the patient not attending the IDTT. The reason provided for the patient's absence was a reported lack of custody escort officers. Two days after removal from the MHSDS, the patient required evaluation by the CIT and subsequent placement in the EOP.

Despite reporting to the CIT that he had command auditory hallucinations to harm himself, the patient was not seen for a formal PC assessment until four days later. A psychiatrist did not evaluate him until 13 days after the CIT. This psychiatric evaluation was inadequate, lacking multiple essential elements of a standard initial psychiatric evaluation.

This patient transferred to an EOP ASU hub within required timeframes.

**Patient N**

This 41-year-old male was selected for healthcare record review to assess the quality of 3CMS and EOP care provided in STRH at SVSP, as well as issues of concern observed at an IDTT during the monitoring visit.

The patient's most recent incarceration began in 2005. Shortly after arriving to prison, the patient was included in the MHSDS at the 3CMS level of care. Except for a period in 2017 and 2018 when he was treated at the EOP level of care, the patient was treated at the 3CMS level of care until April 13, 2022, when he was elevated to the EOP level of care. The patient transferred from KVSP to SVSP on April 28, 2021. The patient was housed in STRH since October 19, 2021, due to reported aggression toward an inmate.

He had no history of treatment at the MHCB, acute, or intermediate levels of care.

The most recent SRASHE on May 25, 2022, assessed the patient with moderate chronic and low acute suicide risk. He had no reported history of suicide attempts or self-harm. He had three reported unintentional overdoses of heroin including two while incarcerated, most recently in 2019.

The patient was provided with diagnoses including unspecified mood disorder, opioid use disorder, and anxiety.

He was prescribed oxcarbazepine, a mood stabilizing medication. The patient also received MAT for his substance use disorder. He had no history of PC 2602 ordered treatment with involuntary medications.

Initial PC and psychiatric evaluations in STRH were timely and occurred prior to the initial IDTT.

The psychiatric evaluation failed to include a chief complaint and did not document the patient's mood, despite the patient having a diagnosis of a mood disorder. The psychiatrist entered the note as a free text note, not using the designated psychiatric evaluation form.

The initial IDTT on November 3, 2021, was held *in absentia*, as the patient reportedly refused to attend. Treatment targets included impulsivity and medication nonadherence. Goals were vague, ill-defined, and difficult to measure. Other goals were more measurable, such as reducing anxiety below a specific level; however, this was undermined by unrealistic elements such as remission of anxiety symptoms for one year.

The next IDTT occurred on January 26, 2022. The patient also reportedly refused to attend this IDTT. The clinical summary and goals in the treatment plan displayed minimal updates.

The IDTT on April 13, 2022, contained measurable and clinically relevant goals, such as skill building for distress, anxiety, and depression. The patient reported increased emotional distress due to the death of a family member. Due to worsening symptoms, the treatment team increased the patient's level of care to EOP.

The patient transferred to a mainline EOP program at CSP/LAC on June 3, 2022.

**Findings**

The care provided to this STRH patient treated at the 3CMS and EOP levels of care at SVSP was inadequate.

The treatment goals were often vague and unrealistic. The patient's reported refusal to attend multiple treatment team meetings was concerning due to limited patient input into treatment planning. The treatment team did not sufficiently alter the treatment plan to address this treatment refusal. Despite placement at the EOP level of care, the treatment team did not alter the treatment plan to incorporate necessary additional treatment. The patient did not transfer to an EOP ASU hub timely.

**Patient O**

This 58-year-old male was selected for healthcare record review to assess the quality of 3CMS care provided at SVSP and based on concerns raised in the plaintiffs' letter.

The patient was incarcerated since 1995, and was included in the MHSDS in 1996. The patient was treated at the 3CMS level of care, punctuated with EOP placement from 2013 to 2015 and 2017 to 2018, as well as MHCB stays. He was treated continuously at the 3CMS level of care since December 2018. With the exception of brief stays at RJD and DVI, he had been housed at SVSP since July 2019.

The patient had a history of multiple MHCB stays, most recently in 2016. He had no history of treatment at the acute or intermediate levels of care.

The most recent SRASHE on April 13, 2021, assessed moderate chronic and low acute suicide risk. The patient had suicide attempts in 1995, 2011, and 2015. He also had a reported history of self-harm.

The patient was provided with diagnoses of major depressive disorder, opioid use disorder, and personality disorder, not otherwise specified.

He was prescribed sertraline (antidepressant), buspirone (antianxiety), trazodone (for insomnia), and melatonin (for insomnia). The patient was also prescribed buprenorphine-naloxone, as MAT for his history of opioid use. He had no history of PC 2602 ordered treatment with involuntary medications.

Psychiatric contacts occurred timely. The psychiatrist documented the patient's medication concerns, and medications were adjusted accordingly. In a note dated August 9, 2021, the patient reported that he wanted to speak with his PC, but it was difficult "to get my clinician." He reportedly requested placement in the EOP due to "symptoms including manic depression and auditory hallucinations;" however, he could "not meet with a clinician to make that request."

On March 15, 2022, the patient was seen by the PC after submitting a healthcare request form stating that he "requested EOP and to be brought to IDTT." The outcome of the session was to "continue plan of care" and to write healthcare request forms "for future sessions."

On August 4, 2022, the patient was seen during administrative rounds. The note stated that the patient "reported not being seen in a long time by mental health and was requesting to see mental health." When brought to an appointment with his PC on August 24, 2022, the patient reportedly refused in person. At the time of this review, no further visits with the PC were documented.

IDTTs did not occur timely. The most recent IDTT observed in the healthcare record was dated March 4, 2020.

On October 28, 2022, the patient remained at SVSP receiving mental health services at the 3CMS level of care.

**Findings**

The care provided to this 3CMS patient at SVSP was inadequate.

The patient's last IDTT occurred on March 4, 2020; this 3CMS IDTT was not timely as it should have occurred at least annually. The patient was not seen by his PC within required timeframes.

Documentation also indicated that the patient needed to submit healthcare requests for future sessions with his PC.  These sessions should be scheduled regularly and should not rely on the patient submitting a request to be seen.

Psychiatric contacts occurred timely.  Medication management appeared clinically appropriate, based on the patient's diagnoses, and reported symptoms.  The psychiatrist appeared responsive to the patient's input.

Documentation in the healthcare record repeatedly stated that the patient's personality disorder had a significant contribution to his mental health challenges; however, documentation did not reflect how the treatment team would address this significant barrier to treatment.

**APPENDIX B-14**
**California Substance Abuse Treatment Facility (CSATF)**
**(April 26, 2022 – April 28, 2022)**

**Patient A**

This 50-year-old patient was treated at the EOP level of care.  He was diagnosed with unspecified depressive disorder and was not prescribed psychotropic medications.

The patient was transferred to CSATF's mainline EOP program on July 29, 2021.  He was timely seen for his initial PC evaluation and IDTT; however, an initial psychiatry evaluation was not completed prior to the initial IDTT despite the patient being prescribed medications at the time of transfer.  IDTT documentation was inadequate, secondary to goals and interventions being carried over from the 3CMS level of care without any updates or goals for the EOP level of care.  There was a single IPOC, for depressed mood, which was neither reviewed nor updated at any point after the initial IDTT.  The next two IDTT meetings were held timely, but there was no indication of a review of treatment progress, program participation, an EOP functional evaluation, collateral information, or changes that had occurred with the patient's psychotropic medication.  Further, IDTT documentation noted that the patient's PC contacts were focused on interpersonal and trauma issues, but there was no mention of them in the patient's treatment goals.

Individual psychiatry and PC contacts were held in accordance with Program Guide requirements.  The telepsychiatrist conducted all psychiatry contacts.  PC contacts did not address issues outlined in the treatment plan and often referenced the patient exhibiting manic or hypomanic symptoms; however, no diagnostic change was discussed, and there was no referral to the psychiatrist.  Of note, the psychiatrist consistently documented that the patient showed no evidence of mania or hypomania.  These discrepant views were not addressed in documentation or during IDTT meetings.  Although documentation indicated that the psychiatrist was present for IDTTs, it was not clear whether the attendance was virtual or in person.  The patient was routinely offered and attended EOP groups.

**Findings**

This patient's treatment at the EOP level of care was inadequate.  IDTT documentation failed to address issues discussed during therapy, medication changes, diagnostic issues, and discrepant views of the patient.  Treatment goals were not updated, and IDTTs did not review treatment progress.

**Patient B**

This 62-year-old patient was treated at the EOP level of care.  He was diagnosed with unspecified depressive disorder; alcohol use disorder, moderate, dependence; opioid use disorder; and polysubstance abuse.  He was prescribed hydroxyzine PRN at CSATF; however, it appeared that he had been prescribed olanzapine and mirtazapine upon discharge from the CIM MHCB on January 20, 2022.  The patient transferred to CSATF on January 26, 2022, but

interfacility transfer documentation only included an active prescription for hydroxyzine. There was no evidence that a psychiatrist had discontinued the olanzapine and mirtazapine.

The primary clinician saw the patient timely for an initial assessment. However, the limited documentation included very little information beyond what was pulled from the patient's MHCB discharge documentation. An initial psychiatry assessment was not completed prior to the patient's initial IDTT. Initial IDTT documentation was completed without the patient present secondary to quarantine; it included an IPOC for depressed mood but included little updated information. The clinical summary was pulled from the patient's MHCB discharge.

An initial psychiatry assessment was conducted cell front. It included minimal information and made no reference to the patient's current medication but noted his previously prescribed mirtazapine, but not the olanzapine. The patient was not seen weekly by his PC nor monthly by the psychiatrist. The telepsychiatrist conducted all psychiatry contacts. Groups were routinely offered, and the patient attended most offered groups, including PC caseload groups. Of note, the patient was seen weekly in PC caseload groups for five consecutive weeks without an individual contact. Documentation from the PC caseload groups was not individualized and was similar in content from week to week. An IDTT held on April 28, 2022, included documentation reflecting the addition of a pre-release IPOC but no other updated information. The clinical summary remained unchanged.

## Findings

This patient's treatment at the EOP level of care was inadequate. Medication continuity was not maintained, the psychiatrist did not see the patient timely for an initial assessment, required contacts were not completed with the primary clinician or psychiatrist, and there was a lack of documentation for PC contacts and IDTT meetings.

## Patient C

This 57-year-old patient was transferred to the EOP level of care on January 12, 2022, after being discharged from inpatient programs that had housed him for more than two years. He was diagnosed with major depressive disorder, recurrent episode; obsessive-compulsive personality disorder; and PTSD. He was prescribed fluoxetine, hydroxyzine, prazosin, and mirtazapine PRN.

The patient was seen for five-day follow-up contacts that were continued for seven days because the fifth day occurred on a weekend. The contacts' content appeared adequate. A sufficient SRASHE was completed on January 13, 2022 and included an adequate safety plan. An initial psychiatry assessment was completed at cell front but was inadequate. In a five-day follow-up note, a PC indicated having clinician-to-clinician contacts with the patient's prior clinician, but no further details were provided, and no additional note was found regarding this consultation.

An initial PC contact and initial IDTT were completed late on February 3, 2022. The initial PC assessment was adequate, but the IDTT included neither goals nor IPOCs. The IDTT documentation failed to include an assessment of the patient's functional needs while at the EOP level of care. An IPOC was created on February 17, 2022, to address the patient's depressed mood. The PC saw the patient, either in group or individually, every week except one. PC

documentation reflected the provision of treatment which appeared to address the patient's needs. The telepsychiatrist conducted psychiatry contacts, which appeared adequate in content, but they did not occur monthly as required. IDTT documentation from April 28, 2022, neither included a review of patient progress nor a functional evaluation; it reported that the patient was to be retained at the EOP level of care but did not provide a rationale. The patient was regularly offered groups.

**Findings**

This patient's treatment at the EOP level of care was inadequate. IDTT documentation was insufficient and psychiatry contacts were not completed as required.

**Patient D**

This 64-year-old patient was treated at the EOP level of care at CSATF following discharge from the MHCB in November 2021. Diagnoses in the EHR included bipolar I disorder, current or most recent episode depressed, with psychotic features; substance-induced psychotic disorder with delusions, and history of anorexia nervosa, restricting type. The telepsychiatrist also documented that the patient was diagnosed with psychosis, NOS, and rule-out obsessive-compulsive disorder. The patient was prescribed quetiapine PRN.

Initial primary clinician and psychiatry assessments were completely timely, as was the patient's initial IDTT meeting. However, the initial PC assessment was barely adequate; the majority of information was taken from previous providers and not updated to reflect the patient's EOP placement nor the rationale for that level of care. The initial psychiatry assessment was adequate. However, initial IDTT documentation included minimally updated information, similar in content to the initial PC assessment.

The primary clinician saw the patient weekly, with the contacts alternating between individual and group contacts. However, there were two weeks when the patient was not seen as required. The content of individual sessions evidenced little to no treatment being provided, while group treatment documentation was not individualized. A telepsychiatrist conducted psychiatry contacts and saw the patient every five to six weeks, and not monthly as required. The psychiatrist noted concerns about more than the patient's mood, including delusions and paranoia. IDTT meetings and treatment plans were completed timely, but documentation was inadequate. The patient had a single goal, to address depression, despite both the psychiatrist and PC referencing delusional ideation, auditory hallucinations, anxiety, and obsessiveness during contacts. Additionally, IDTT documentation included no evidence of the patient's progress being reviewed and there were no substantive updates on any treatment plan.

**Findings**

This patient's treatment at the EOP level of care was inadequate. IDTT and PC documentation failed to identify or address the patient's needs or progress. Psychiatry contacts did not occur as required and there was little evidence of psychiatric contributions to IDTTs.

**Patient E**

This 73-year-old patient was treated at the EOP level of care with a diagnosis of major depressive disorder, recurrent, current episode severe.  He was prescribed mirtazapine.  Notably, the patient was prescribed mirtazapine while housed in the CTC after a stroke, but the medication was discontinued without rationale when the patient was transferred to the EOP level of care.  It was not clear why the medication was discontinued as a psychiatrist had not seen the patient at the time of transfer.

The PC saw the patient for a timely initial assessment, which was adequate.  The telepsychiatrist adequately completed an initial psychiatry assessment but completed it late.  Both clinicians noted that the patient's primary language was Spanish.  The PC noted being fluent in Spanish and the telepsychiatrist indicated using an interpreter.  An interpreter was noted as being present for the patient's IDTT meetings.  The initial IDTT was not completed until the patient had been on the unit for 30 days.  The IDTT documentation was adequate and included patient goals, progress to date, and ongoing concerns.  With a few exceptions, the PC saw the patient weekly for individual or group contacts.  PC documentation included references to patient status and functioning with expressed concerns about cognitive declines.

Telepsychiatry contacts were held monthly, with adequate documentation.  The psychiatrist expressed concerns about the patient's cognitive functioning and the IDTT referred the patient for evaluation.  The patient was evaluated and diagnosed with dementia.  During the patient's IDTT on April 28, 2022, there was a collaborative discussion of considering the patient for a HLOC, either through medical or mental health, to address functional deficits resulting from his cognitive decline.

**Findings**

This patient's treatment at the EOP level of care was clinically appropriate but inadequate based on the initial IDTT not being held timely and the lack of medication continuity following the patient's discharge from the CTC.

**Patient F**

This 46-year-old patient was treated at the EOP level of care.  He was diagnosed with major depressive disorder, recurrent episode, with psychotic features; antisocial personality disorder; borderline personality disorder; and polysubstance abuse.  He was prescribed oxcarbazepine, venlafaxine, olanzapine, and hydroxyzine.

During the period reviewed, the PC saw the patient weekly, either individually or in groups.  Evidence of treatment interventions was documented along with patient response, in keeping with the treatment plan.  The psychiatrist did not see the patient for nearly 90 days between November 2021 and February 2022; thereafter, the telepsychiatrist saw the patient monthly.  Documentation of psychiatry contacts was adequate and evidenced appropriate assessment and intervention.  IDTT meetings were held timely and appeared to address the patient's needs.  However, IDTT documentation from April 28, 2022, included no updated information except that the patient was reporting insomnia and panic symptoms which the telepsychiatrist would

address at the next visit.  The clinical summary was noted to have been updated, but included the same exact content, which was no longer accurate, from the February IDTT meeting.

**Findings**

Overall, this patient's treatment at the EOP level of care was adequate.  However, IDTT documentation from April 2022 was not properly updated.

**Patient G**

This 44-year-old patient was treated at the EOP level of care with diagnoses of adjustment disorder with depressed mood and unspecified depressive disorder.  He also had a designation of DD2 and required adaptive support needs.  He was prescribed hydroxyzine.

Throughout the period reviewed, the patient met weekly with his PC.  However, there were a number of consecutive weeks when the patient was seen in groups and not in individual sessions.  When seen individually, the PC documented clear interventions along with the patient's response.  Telepsychiatry contacts occurred monthly and reflected adequate care.  Notably, IDTT documentation was inadequate and did not include patient progress, the rationale for the patient's EOP placement, and a functional assessment of the patient's needs.  Of note, IDTT documentation included a reference to the patient's adaptive support needs.

**Findings**

This patient's treatment at the EOP level of care was inadequate.  PC individual contacts did not occur as required and IDTT documentation was insufficient.

**Patient H**

This 49-year-old patient was treated at the EOP level of care and was diagnosed with PTSD and schizophrenia, depressive type per his health record.  However, the psychiatrist noted working diagnoses of schizoaffective disorder versus major depressive disorder, severe, with psychotic features.  The patient was prescribed fluoxetine, prazosin, quetiapine, and hydroxyzine.

The assigned PC and telepsychiatrist consistently saw the patient as required.  However, the patient's assigned telepsychiatrist did not participate in the IDTTs held during the period reviewed.  Instead, a covering telepsychiatrist attended.  Individual PC contacts appeared to adequately address the patient's needs.  Nonetheless, documentation of caseload groups was not individualized and did not provide information about the patient's treatment or treatment response.  Psychiatric documentation was adequate and included relevant treatment interventions and patient responses.  Of concern, the telepsychiatrist regularly noted extrapyramidal side effects (i.e., teeth grinding) in monthly progress notes, yet the AIMS assessment inaccurately noted no involuntary movements.  One additional concern was that the patient was prescribed Suboxone and had an IPOC to address substance use; however, neither the psychiatrist nor the PC noted a documented incident of the patient diverting Suboxone.  IDTT documentation was adequate, included the rationale for the patient's continued treatment at the EOP level of care, proper consideration of HLOC needs, and patient functioning.

**Findings**

This patient's treatment at the EOP level of care was inadequate. The patient's assigned psychiatrist did not attend IDTT meetings, AIMS documentation was inaccurate, and PC group documentation was not individualized.

## Patient I

This 29-year-old patient was treated at the EOP level of care. He was diagnosed with schizophrenia, chronic PTSD, and amphetamine-type substance use disorder, severe, in sustained remission. He was prescribed mirtazapine, olanzapine, and ziprasidone.

The patient was transferred to CSATF on April 20, 2022, after being discharged from the CIM MHCB on April 18, 2022. He was admitted to the MHCB for grave disability secondary to his serious mental illness and significant experience of command auditory hallucinations. He was discharged after reaching maximum benefit secondary to psychotropic medication changes. MHCB staff noted that due to the patient's upcoming parole date of May 7, 2022, he had undergone an evaluation to determine whether he should be committed to a DSH facility upon release. At the time of his MHCB discharge, the results were pending. There was no follow-up documentation regarding this evaluation's results in the patient's records. He was paroled on May 7, 2022.

The patient was seen for a timely initial PC assessment, which appeared to be adequate. An initial psychiatry assessment was not completed for the patient. In fact, a psychiatry provider did not see the patient during the duration of his EOP stay, which exceeded 14 days. The patient's initial IDTT was held on April 28, 2022, and included a psychiatric provider; however, the only documented input from the psychiatrist was that the patient was medication adherent. An IPOC for pre-release planning was included in the IDTT documentation and noted that the patient would be referred to the TCMP 90 days prior to his release; however, the patient was being released in less than two weeks.

Following the IDTT, the patient attended a few RT groups. However, the patient was not seen again by a PC and there was no evidence of contact with a pre-release coordinator. There was a signed release of information form to share records with a community health center and a generic form describing how the patient could access services following his release. A progress note written by the psychiatrist on April 28, 2022, noted a phone message where the psychiatrist had ordered parole medication and laboratory testing but there was no documentation that a psychiatrist had examined the patient.

**Findings**

This patient's treatment at the EOP level of care was inadequate. An initial psychiatry evaluation was not completed, and the patient had neither PC nor psychiatry contacts during the nine days following his IDTT, despite an upcoming parole date. There was no evidence of parole planning or follow-up on a commitment evaluation completed with the patient.

**Patient J**

This 48-year-old patient was diagnosed with major depressive disorder, recurrent, chronic and was being treated at the EOP level of care. He was prescribed venlafaxine.

The patient had received mental health services at the EOP level of care since 2016. During the period reviewed, the assigned PC saw him weekly, either in group or individual sessions. Group session documentation was not individualized but individual contacts were well-documented and included treatment provided and the patient's response to treatment. There were monthly psychiatry contacts except for one six-week period between November 29, 2021, and January 13, 2022, when the patient was not seen. Psychiatry documentation was adequate. Two IDTT meetings were completed during the period reviewed and documentation appeared adequate; however, the patient's assigned psychiatrist did not attend the meetings and psychiatry input appeared limited to only noting medication adherence levels.

**Findings**

This patient's treatment at the EOP level of care was generally adequate. However, one psychiatry appointment did not occur within required timeframes and the patient's assigned psychiatrist did not attend IDTT meetings.

**Patient K**

This 54-year-old male patient was admitted to the MHCB on March 1, 2022, after reporting to his EOP PC that he must die in order to save the world. He was tearful and delusional, noting that he did not want to die but had to in order to save mankind. At the time of placement in the MHCB; an initial PC contact, initial psychiatric assessment, and an admission SRASHE were completed. The initial psychiatric assessment included a comprehensive history of the patient but was concerning in that it noted the patient had "contracted for safety;" additionally, the observation, clothing, and property orders in the progress note did not match those entered into the order section of the electronic healthcare record. While the SRASHE appeared adequate and resulted in a sound assessment of suicide risk, it included a safety plan that could not have been developed with the patient at the time of the assessment, as it was noted that the patient was unable to participate in a meaningful way in the process. There was no indication of the origin of the content of the safety plan.

The patient was provided with a diagnosis of schizoaffective disorder, bipolar type. He was prescribed paliperidone, a long-acting injectable antipsychotic medication, and both risperidone and lorazepam ordered on an as-needed basis.

The initial PC assessment and initial IDTT meeting occurred timely, and a master treatment plan was created to address the patient's identified needs. Of concern was a note from the PC on March 3, 2022, noting that the psychiatrist had agreed to enter a standing order for risperidone for the patient after initially ordering the medication only on an as-needed basis. The order was not changed to a standing order.

The patient was seen for daily contacts by a psychologist and/or a psychiatrist consistent with Program Guide requirements. However, over the patient's seven-day placement in the MHCB,

he was seen by five different PCs and three psychiatrists. None of the contacts with PCs documented that interventions listed on the treatment plan were provided to the patient. There was no documentation that groups were offered. A discharge IDTT meeting was documented on March 8, 2022, referring the patient to acute care. While the IDTT documentation included adequate justification for the referral, the documentation did not correspond to daily progress notes entered by PCs. For example, daily PC contacts noted congruent affect, reduced symptoms, medication effectiveness, and lack of delusional content during contacts; yet the IDTT noted no change in the patient's presentation, ongoing suicidal and delusional thoughts, and visibly incongruent affect. The discharge SRASHE included minimal updated information, and much of the content in the assessment was dated March 1, 2022.

**Findings**

While clinical decision making in the case was adequate; treatment and documentation were inadequate. Of concern were the lack of continuity of PCs and psychiatrists, lack of continuity in documentation among progress notes and treatment decisions, lack of provision of treatment interventions identified in the treatment plan, little to no structured treatment provided, and failure to adequately update the SRASHE and safety plan.

**Patient L**

This 45-year-old male patient was referred to the MHCB from EOP on November 2, 2021, after reporting suicidal ideation, paranoia, and command auditory hallucinations to kill himself. The SRASHE completed at the time of placement was comprehensive; however, it included a safety plan, despite the PC documenting that the patient was unable to participate meaningfully in the process. It was unclear how the safety plan was created given this statement. An initial PC assessment was completed on November 3, 2021, that was clinically adequate. The PC assessment noted that the patient was seen by a psychiatrist, and medication changes were being implemented; however, there was no documentation from a psychiatrist on that date. An initial psychiatric assessment was completed the following day. This assessment provided inconsistent information, including documentation that the patient would be monitored every 15 minutes and would receive full issue; however, no corresponding orders were provided. An IDTT meeting occurred on November 4, 2021, when an IPOC was developed for ineffective coping following a trigger; this IPOC was developed, despite the patient's inability to identify a trigger for his suicidal ideation. There was no specific IPOC for suicidal ideation or mention of suicidal ideation in the IPOC described.

Over the following three days, the patient was seen by a PC daily with two of the contacts occurring at cell front. Patient refusal was provided as the rationale for one of the cell-front contacts, but no rationale was included for the second daily contact. No interventions were documented, and the patient was moved to full issue on November 5, 2021, based on the patient's self-reported decrease in suicidal intent. On November 8, 2022, the patient was seen in an IDTT meeting, and it was noted that he would be discharged to the EOP level of care. Much of the treatment plan was blank, and the rationale for discharge was based on the patient's statement that he was ready to return to the EOP. IPOCs were not included, and there was no documentation of the patient's progress toward the goals identified in the admission treatment plan. The SRASHE completed at the time of discharge included minimal changes from the

948

admission SRASHE other than the rationale for discharge that was provided on the treatment plan. The patient's acute risk was reduced to low based on the patient's self-reported denial of suicidal ideation and the patient's protective factors having increased in efficacy since admission. There was no objective evidence provided to support this assessment other than the patient's self-report. A safety plan was not created; the rationale provided was that a safety plan was not required as the acute suicide risk was now assessed as low. Given the patient's history and high chronic risk for suicide, a safety plan was clinically indicated.

The patient was provided with diagnoses of ADHD, combined presentation; major depressive disorder, recurrent episode, severe; schizoaffective disorder, depressive type; and unspecified schizophrenia spectrum and other psychotic disorder. The patient was prescribed mirtazapine, lithium, ziprasidone, and clonidine as well as olanzapine and hydroxyzine on an as-needed basis.

**Findings**

The treatment provided to this MHCB patient was inadequate. The patient was seen for only one PC session in a confidential setting, no treatment interventions were documented beyond psychotropic medication, patient progress was not assessed, discharge decisions were based solely on patient self-report, there was inconsistency between the psychiatrist's documentation and that of other providers, the discharge treatment plan was mostly blank, and the discharge SRASHE included no safety plan despite clear clinical indication that one was clinically indicated.

**Patient M**

This 22-year-old patient was housed in STRH when he engaged in self-harm by cutting himself with a razor while in the shower. Records indicated that he was "disruptive" prior to engaging in self-injury. At the time, the patient denied suicidal ideation. An initial PC assessment and a SRASHE were completed after only a brief bedside visit with the patient in the TTA. He was assessed with high chronic and acute suicide risk; no safety plan was created as the patient was placed in the MHCB. The documentation in both the PC assessment and SRASHE was repetitive, describing the self-injurious incident and listing the patient's recent RVRs and prior placements in the MHCB. During his nine-day stay in MHCB, progress notes written by the PC and psychiatrist occasionally conflicted regarding levels of observation and issue allowed.

This patient was provided with diagnoses of opioid use disorder, amphetamine-type substance use disorder, and unspecified depressive disorder. Progress notes also included diagnoses of bipolar disorder and adjustment disorder. He was prescribed quetiapine at the time of admission to the MHCB on October 22, 2021; mirtazapine and hydroxyzine were added during the MHCB stay.

The patient was seen daily by a PC or psychiatrist but was not seen every three days by a psychiatrist as required. PC documentation included assessments, but no treatment interventions were outlined in the treatment plan. The decision to discharge the patient was based on the assessment that the patient's self-injurious behavior was volitional; there was no documentation that additional support was provided to the patient to find alternative behaviors or to increase adaptive coping, despite the presence of an IPOC to address ineffective coping. At the time of

discharge, a safety plan was not created for the patient, because his acute risk was assessed as low.  Given the patient's history, a safety plan appeared clinically indicated.

**Findings**

The mental health treatment provided to this MHCB patient was inadequate.  No behavioral interventions were provided, despite the treatment team identifying the patient's primary issues as behavioral and resulting from a lack of coping skills.  Psychiatric contacts did not occur consistent with Program Guide requirements, and documentation of patient issue and observation levels were at times inconsistent and conflicting.

**Patient N**

This 25-year-old male patient was admitted to the MHCB from STRH due to severe agitation and attempted assault on a correctional officer.  He was provided with a diagnosis of unspecified anxiety disorder, and he was not prescribed psychotropic medications prior to his placement in the MHCB.

Upon admission to the MHCB on February 15, 2022, progress notes indicated that the patient was placed in five-point restraints and required emergency involuntary medications by injections; yet no documentation to support the use of these emergency interventions was located in the healthcare record.  The first psychiatric documentation was the initial psychiatric assessment completed on February 17, 2022, which did not reference these emergency interventions.   The initial PC and psychiatric assessments, the initial IDTT meeting, and almost all clinical contacts with the patient were completed at cell front, as the patient was beating on his cell door repeatedly (a behavior which preceded his placement in the MHCB).  The rationale for cell-front contacts was that the patient was unsafe to be removed from his cell; despite the patient asking to be seen confidentially and reporting that his frustration stemmed from not being seen confidentially.  Conversely, on February 22, 2022, a RVR mental health assessment was completed confidentially with the patient without incident.  This was the only time the patient was seen by members of the IDTT in a confidential setting.  It was unclear from the documentation if the patient was seen confidentially for his final IDTT meeting on February 24, 2022.  Of note, a PC saw the patient on February 23, 2022, and documented that a progress note would be entered into the record the following day, but no note was located in the healthcare record.

Throughout his stay in the MHCB, the patient presented with agitation, pressured speech, disorganized thinking, memory impairment, little to no insight, poverty of speech, flat affect, and an inability to engage in reciprocal conversations; however, his diagnosis remained unchanged, and his only treatment plan IPOC was to address "ineffective coping."  The psychiatrist listed adjustment disorder, psychotic episode, and anxiety as diagnoses under consideration; but there was no documentation that this necessary diagnostic clarification occurred.  No interventions were provided to the patient beyond quetiapine that was prescribed at the patient's request, and olanzapine and hydroxyzine that were ordered on an as-needed basis.  The patient was referred to acute inpatient care on February 24, 2022.

**Findings**

The treatment provided to this MHCB patient was inadequate. There was no documentation regarding the use of emergency interventions, including emergency involuntary medication administration and the use of five-point restraints. The patient was seen at cell-front repeatedly, despite evidence that he was able to engage safely in a confidential setting. He was provided no interventions beyond medications, and the treatment plan did not adequately address the patient's needs.

**Patient O**

This 66-year-old male patient was admitted to the MHCB after overdosing on over 60 acetaminophen tablets and requiring intervention at a community hospital. He was diagnosed with "depression", and he was prescribed fluoxetine and olanzapine on an as-needed basis while in the MHCB. Prior to his MHCB placement on March 8, 2022, he was not prescribed psychotropic medication. The patient had several significant physical health concerns including renal cancer, blindness, diabetes type 2, anemia, hypertension, and other medical conditions.

Initial PC and psychiatric assessments, and an initial SRASHE were completed timely; however, many sections of these documents were blank, as the patient refused to engage with clinicians. The patient was assessed with high chronic and acute suicide risk given his history and recent overdose. The patient engaged in a hunger strike following his admission; and at the time of the initial IDTT meeting, it was decided to transfer the patient to a community hospital as he was refusing all of his medical medications and was not eating or drinking despite his many medical issues. The initial treatment plan included no mental health IPOCs and only a single nursing IPOC for ineffective coping. There were no goals or interventions listed to address the patient's suicidality or depression, other than a plan to build rapport and to provide psychotropic medications.

On March 12, 2022, the only clinician progress note was a PC note directing the reader to refer to the psychiatric note on the same date. However, no psychiatry note was entered on that date. Following the initial psychiatric assessment on March 9, 2022, there was not another psychiatric progress note until March 15, 2022; even though the patient was prescribed fluoxetine on March 14, 2022. Most contacts with the patient occurred at cell front, noting that the patient refused to attend sessions. No interventions were documented beyond prescribed psychotropic medication.

An IDTT was conducted on March 17, 2022, with the patient present. The decision was made to refer the patient to acute inpatient care, yet the patient adamantly refused and began another hunger strike. The discharge IDTT documentation was inadequate, as it listed planned interventions to include supporting the patient in using "more appropriate ways" to get his needs met rather than expressing suicidal ideation. The patient actually engaged in suicidal behavior, including lethal behavior, not expressed suicidal ideation.

**Findings**

The mental health treatment provided to this MHCB patient was inadequate given the lack of comprehensive assessments, inadequate treatment planning, little to no treatment interventions provided, and a failure to document psychiatric clinical contacts in accordance with Program

Guide requirements. This included no documentation provided to support the initiation of psychotropic medication for this patient.

**Patient P**

This 69-year-old male patient was selected for healthcare record review to assess the quality of care provided at the 3CMS level of care at CSATF, as well as issues of concern observed at an IDTT during the site visit.

The patient was incarcerated out of state from 1981 until 1992. While out of state, the patient had three suicide attempts, including one that led to a three-month stay at a state hospital. The patient arrived in CDCR in 1992. He was included in the MHSDS at the 3CMS level of care in January 2020. He had a history of one MHCB stay in July 2020. The patient arrived at CSATF on March 12, 2022, from CSP/LAC. He had no history of treatment at the acute or intermediate levels of care.

He had a history of multiple suicide attempts. The SRASHE on April 27, 2022, assessed the patient with moderate chronic and low acute suicide risk.

The patient was provided with a diagnosis of major depressive disorder with psychotic features. He was prescribed duloxetine, an antidepressant medication. The patient had no history of PC 2602 ordered treatment with involuntary medications.

The patient had complex medical needs and concerns, including a seizure disorder requiring treatment with three anticonvulsant medications. He also wore a protective helmet to prevent head injury during a seizure. Additionally, he utilized a wheelchair, and he had fecal incontinence.

The psychiatrist at CSATF conducted an initial psychiatric evaluation on March 28, 2022. The evaluation was adequate and timely. The PC attempted to see the patient for an initial evaluation on April 6, 2022; however, the visit was truncated, as the patient was upset due to a prior medical appointment. The PC conducted a formal interview on April 20, 2022.

The expert attended the initial IDTT on April 27, 2022. The IDTT was not timely. The patient stated that he had discontinued two of his three anticonvulsant medications with plans to stop the third soon. The patient stated this treatment refusal was due to his perception that his medical team did not take his medical concerns seriously. He believed that stopping his anticonvulsant medications would trigger a severe seizure, which would help facilitate his desired placement in a medical unit. He stated that medical staff did not provide him sufficient adult diapers and wipes for self-cleaning. He also stated that his cellmate helped to clean him. The patient alluded that he might become suicidal due to the impact of these difficulties on his mental health. The IDTT facilitator told the patient, "What you choose to do is your decision." Additionally, the IDTT documentation did not contain clear mental health treatment goals.

The expert informed regional mental health leadership about the patient's status. The patient transferred to the CTC at CHCF the following day, where he remained until September 12, 2022. The patient then returned to CSATF. Due to his medical issues, the patient was placed into the CTC at CSATF on October 6, 2022.

For unclear reasons, the patient's prescription for duloxetine was not ordered upon his return to CSATF. Thus, there was a lapse in medication continuity from September 12, 2022, until the initial psychiatric evaluation on October 9, 2022.

On November 1, 2022, the patient remained in the CSATF CTC receiving services at the 3CMS level of care.

**Findings**

The care provided to this 3CMS patient at CSATF was inadequate.

While both the PC and the psychiatric evaluations occurred prior to the IDTT, the IDTT did not occur timely. The treatment team did not establish and document clear mental health goals for his treatment. The patient had an extensive history of suicide attempts, including one in which the precipitant was the perception that the institution was not addressing his medical needs. While issues such as seizures and incontinence were in the domain of the medical service, these medical issues had a clear nexus to his worsening psychological distress. Given the complexity of the patient's presentation, the treatment team should have considered inclusion of appropriate medical staff in the IDTT with ongoing interdisciplinary discussion and treatment coordination.

Finally, this patient with a history of severe depression and suicide attempts did not receive his antidepressant medication upon his return from the CHCF CTC for over one month; the medication was only resumed when the patient was seen by the psychiatrist for evaluation. This lack of medication continuity upon interfacility transfer was very concerning, particularly for this patient.

**Patient Q**

This 54-year-old male was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CSATF.

The patient entered CDCR on October 30, 2017. The patient was included in the MHSDS at the 3CMS level of care shortly thereafter. The patient arrived at CSATF on March 20, 2018, from WSP. He had no history of treatment at the EOP, MHCB, acute, or intermediate levels of care.

The most recent SRASHE dated February 2017 assessed the patient with low chronic and acute suicide risk. He had no reported history of suicide attempts or self-harm.

He was provided with diagnoses that included unspecified anxiety disorder and unspecified depressive disorder.

In 2020, the psychiatrist collaborated with the medical provider in prescribing amitriptyline, an antidepressant medication frequently used for chronic pain conditions. The last psychiatric visit occurred in November 2020. The patient had no history of PC 2602 ordered treatment with involuntary medications.

With rare exception, the PC contacts occurred timely. While several of the notes contained useful clinical information, they frequently failed to address specific treatment plan goals. Treatment interventions were often generic and not individualized.

IDTT meetings occurred timely, with the patient in attendance. The treatment targets included reduction of depressive symptoms. Treatment plans contained generic goals, some of which had been carried over since 2018. Clinical summaries were inadequate in providing a comprehensive clinical description of the patient.

On November 1, 2022, the patient remained at CSATF receiving services at the 3CMS level of care.

**Findings**

The care provided to this 3CMS patient at CSATF was inadequate.

Some treatment plan goals remained unchanged since 2018. The PC contacts generally occurred timely; however, the documentation of clinical goals and progress towards them was limited. Although the consultation between the psychiatrist and the medical provider to attempt to use one medication for both psychiatric and medical concerns was admirable, this occurred in 2020. Apart from seeing the patient during IDTT meetings, there was no clear documentation that the psychiatrist had evaluated the patient since that time.

**Patient R**

This 38-year-old male was selected for healthcare record review to assess the quality of 3CMS care provided in the STRH at CSATF, as well as issues of concern observed at an IDTT during the site visit.

The patient had a long history of mental illness, dating back to at least age 14 when he was treated with antipsychotic and antidepressant medications.

The patient was incarcerated since May 2003. He entered the MHSDS in July 2008, upon admission to the MHCB level of care. The patient transferred from CSP/Sac to CSATF on April 19, 2018, receiving services at the 3CMS level of care. The patient had multiple prior EOP placements, most recently from June 13 to August 22, 2018. Subsequently, he was decreased to the 3CMS level of care. The patient was placed in the STRH on April 5, 2022, for safety concerns.

He had a history of three MHCB stays, most recently in 2016. He had a history of treatment at the intermediate level of care in 2013. He had no history of treatment at the acute level of care.

The most recent SRASHE on December 20, 2017, assessed the patient with low chronic and acute suicide risk. He had no reported history of suicide attempts or self-harm.

Various psychiatric diagnoses were present in the healthcare record, including schizophrenia, delusional disorder, unspecified mood disorder, and antisocial personality disorder.

The patient received involuntary medications by PC 2602 order from September 2014 to June 2020 due to danger to others and grave disability.  In June 2020, the PNP filed a notice of non-renewal of the PC 2602.  The patient subsequently refused medications.  The psychiatrist in the STRH did not prescribe psychotropic medications, as the patient declined.

Initial evaluations with the psychiatrist and PC were timely and occurred prior to the initial IDTT.  The initial PNP evaluation occurred in a nonconfidential setting at cell front.  The PNP noted that the patient would not speak words but did respond to questions with a "thumbs up."  The plan indicated that no psychotropic medications would be initiated.

IDTT meetings occurred timely.  While the patient attended his initial IDTT on April 27, 2022, he largely refused to attend subsequent meetings.  The treatment plan focused primarily on anxiety, despite the patient having a psychotic disorder diagnosis.  The treatment team discussed having the patient return to IDTT the following week to consider increasing his level of care to EOP, however, this did not occur.  Treatment plans frequently contained similar or the same treatment goals without change when clinically indicated.

On June 6, 2022, the patient received a RVR mental health evaluation for a charge of battery on a peace officer.  In noting that mental health factors may have contributed to this offense, the evaluating clinician stated, "In fact there is documentation that when the IP was on a PC2620 (sic) that he was stable here at SATF."

The most recent IDTT occurred on October 12, 2022.  It was held *in absentia*, as the patient reportedly refused to participate in a confidential setting.  This treatment plan noted, "IP has demonstrated slow and continues (sic) symptoms decompensation since placed in the STRH."  The patient was noted to have a "pungent odor."  His level of care was increased to the EOP.  The PC note on October 20, 2022, stated "IP present GD condition ad (sic) may require PC2602 treatment, IP demonstrates poor insight and judgment."  Additional notes stated that the patient was not leaving his cell even to shower, and his toilet was full of feces.  Additionally, he was observed responding to internal stimuli, as evidenced by being internally preoccupied and laughing to himself.

On November 1, 2022, the patient remained housed in the CSATF STRH where he continued to received services at the EOP level of care.

**Findings**

The care provided to this patient at CSATF was inadequate.

Notes indicated that the patient exhibited progressive clinical decompensation over a period of several months.  While the treatment team did eventually increase his level of care to EOP, this level of care increase was significantly delayed.  Despite placement at the EOP level of care, the patient was treated by a PNP, which did not conform to the existing CDCR PNP policy.

The patient refused to take psychotropic medication, and he had a history of PC 2602 involuntary medications from 2014 to 2020 for grave disability and danger to others.  It appeared that he would benefit from treatment with psychotropic medications, and due to his treatment resistance and probable psychosis with grave disability, PC 2602 should again be pursued.

Given the pressing clinical observations noted, the expert provided CDCR psychiatric supervisory staff with information regarding the concerns noted for this patient.

## Patient S

This 36-year-old male was randomly selected for healthcare record review to assess the quality of 3CMS care provided in STRH at CSATF.

The patient entered CDCR in November 2016. He was included in the MHSDS in April 2017, after admission to the MHCB. The patient arrived at CSATF on January 24, 2020.

Since incarceration, the patient had multiple stays in restricted housing. While at CSATF, he was housed in STRH from February 2 to October 21, 2021, and again from November 4, 2021, to May 23, 2022.

The patient had a history of multiple MHCB stays, most recently from October 18 to October 31, 2022. The patient had no history of treatment at the EOP or intermediate levels of care. He had one acute care hospitalization at CMF, from October 31, 2022, to the date of this review.

The most recent SRASHE on November 1, 2022, assessed the patient with high chronic and acute suicide risk. The patient had a history of suicide attempts, most recently on October 17, 2022, by hanging.

He was provided with psychiatric diagnoses that included major depressive disorder with psychotic features, unspecified mood disorder, adjustment disorder, and unspecified anxiety disorder.

The patient was seen by a PNP who prescribed oxcarbazepine (mood stabilizer) on a scheduled basis. He was also prescribed olanzapine (antipsychotic) as needed for psychosis, mirtazapine (antidepressant) as needed for anxiety, and hydroxyzine (antihistamine used as an antianxiety medication) as needed for anxiety. The patient had no history of PC 2602 ordered treatment with involuntary medications.

While housed in the STRH beginning on February 2, 2021, both the PC and psychiatric evaluations were completed timely prior to the initial IDTT. The patient did not attend IDTT due to a COVID-19 quarantine. The PC and PNP in attendance were not the clinicians who performed the initial evaluations. Subsequent IDTT meetings occurred quarterly. The patient did not attend, due to refusal or COVID-19 related factors. Treatment goals displayed minimal changes from one IDTT to the next.

The patient was released from the STRH on October 22, 2021; however, he returned on November 3, 2021, due to a RVR for behavior that could lead to violence.

Upon his return to the STRH, both the PC and the psychiatric evaluations occurred timely; however, the patient refused a confidential intake assessment with the PC. The psychiatrist initiated treatment with mirtazapine.

The initial and follow-up IDTTs occurred timely.  Most treatment goals were repetitive from prior treatment plans.  Two IDTT meetings did not document those in attendance.  The patient only attended one of the three IDTT meetings.

On January 6, 2022, the CIT evaluated the patient, as he cut his penis.  The evaluating clinician performed a SRASHE that assessed moderate chronic and acute suicide risk.  The patient was not placed in the MHCB.  Notes from this evaluation stated, "This clinician consulted with Pt's PC and recommended that EOP be considered."  The patient remained at the 3CMS level of care.

At the next IDTT on February 16, 2022, the treatment goals and the clinical summary remained largely unchanged from the prior treatment plan.  For the following IDTT on May 11, 2022, the treatment goals also remain unchanged, despite noting that the patient frequently refused his individual sessions with his PC.

On May 23, 2022, the patient reported suicidal ideation.  He was subsequently admitted to the MHCB at CSP/Corcoran.  He remained there until June 3, 2022, when he was discharged to CSP/Sac at the EOP level of care.  The patient required admission to the MHCB from October 18 to October 31, 2022; subsequently, he transferred to the acute level of care at CMF.  On November 2, 2022, the patient remained at CMF.

**Findings**

The care provided to this 3CMS patient in STRH at CSATF was inadequate.

Treatment planning was inadequate and was not updated, despite the patient's evolving clinical presentation.  Despite the patient's frequent treatment refusals, the treatment team did not update the treatment plan to address this treatment barrier.  Despite the patient cutting his penis and the assessing CIT clinician recommending that the treatment team consider placement at the EOP level of care, the patient remained at the 3CMS level.

**Patient T**

This 34-year-old male was randomly selected for healthcare record review to assess the quality of 3CMS and EOP care provided in STRH at CSATF.

The patient's current incarceration began January 4, 2019, when he was placed at the 3CMS level of care.  The patient was briefly removed from the MHSDS from January 16 to April 24, 2019, when he was returned to the 3CMS level of care.  The patient was housed in the CSATF STRH from November 26, 2021, to May 2, 2022, due to reportedly making threats against staff, and subsequently refusing handcuff placement.  The patient was increased to the EOP level of care on April 13, 2022.

The patient had a history of two MHCB evaluations during a prior incarceration, with the most recent occurring in September 2016.  He had no history of treatment at the acute or intermediate levels of care.

The most recent SRASHE on April 4, 2017, assessed low chronic and acute suicide risk.  He had no prior suicide attempts or self-harm.

The patient was provided with diagnoses of unspecified mood disorder, antisocial personality disorder, cocaine use disorder, and other hallucinogen use disorder.

The psychiatrist initially prescribed escitalopram (antidepressant and antianxiety). This was changed to oxcarbazepine (mood stabilizer), olanzapine (antipsychotic), and hydroxyzine (antihistamine used as an antianxiety medication) as needed for anxiety. The patient had no history of PC 2602 ordered treatment with involuntary medications.

The initial PC and psychiatric evaluations as well as the initial IDTT occurred timely. The patient did not attend this or the subsequent IDTT. The clinical summary remained unchanged across treatment plans, largely focusing on custodial factors. The patient frequently refused confidential sessions with his PC.

The patient agreed to take escitalopram at the initial psychiatric evaluation; however, he subsequently declined to take medications on a follow-up visit on January 18, 2022.

In April 2022, the patient was flagged on a sustainable process report, due to receiving multiple

RVRs in a 90-day period. The patient returned to the IDTT on April 13, 2022. The treatment targets included reducing the patient's level of depression and maintaining remission for one year. He was described as having "rambling and circumstantial" speech. The patient asked to resume medications, which had worked for him in the past. As such, he was started on oxcarbazepine, olanzapine, and hydroxyzine as needed for anxiety. The treatment team increased the patient to the EOP level of care.

On May 2, 2022, the patient transferred to the EOP ASU hub at CSP/Corcoran. On August 24, 2022, the patient transferred to the PSU at CSP/Sac, where he remained on November 1, 2022.

**Findings**

The care provided to this patient treated at the 3CMS and EOP levels of care in STRH at CSATF was inadequate.

Despite declining most confidential contacts with his PC, this treatment refusal was not incorporated into the treatment plan. The diagnoses provided in the healthcare record were inconsistent. The medications prescribed by the psychiatric nurse practitioner did not clearly relate to the listed diagnoses in the healthcare record. Also of concern were the number of medications started at the same time.

The patient significantly worsened for several months, prior to returning to the IDTT, due to a sustainability process report.

Finally, the patient continued to be treated by a PNP, even after EOP placement. This was inconsistent with the CDCR policy regarding PNPs. Once placed at the EOP level of care, the patient transferred timely to an ASU EOP hub.

**APPENDIX B-15**
**CALIFORNIA STATE PRISON/SACRAMENTO (CSP/Sac)**
**(May 9, 2022 – May 12, 2022)**

**Patient A**

This 40-year-old patient was admitted to the institution on March 2, 2021.  Diagnoses varied in the record.  Bipolar disorder was listed in the place of record; however, unspecified anxiety and depressive disorder and antisocial personality disorder were documented in provider documentation.  He was not prescribed psychiatric medication at the time of the review.  His healthcare record was randomly selected to assess adequacy of care.

Treatment planning narrowly focused on anxiety despite reports of depression and PTSD during his initial assessment.  Annual IDTT documentation did not include a useful clinical summary about his treatment during the previous year.  Treatment goals remained focused on anxiety and were not appropriately updated to account for lack of progress and new symptomatology.  Similarly, a treatment intervention to foster a therapeutic alliance remained unchanged.

Psychiatric contacts were insufficient.  There was a lengthy gap between a cell-front contact on September 16, 2021 and March 23, 2022 at which time medication was discontinued at his request.

Primary clinician contacts were timely although treatment interventions were not utilized to address reports of high anxiety or depression.  There were also incidents of poor clinical judgment.  During a cell-front contact he indicated that he was "stressing" but was told to submit a CDCR Form 7362 if he wanted to be seen sooner than ninety days instead of appropriately addressing his treatment needs at that time.  In addition, reports of paranoia, a new symptom, during two consecutive contacts were not addressed and there was no documentation that his paranoia was communicated to the psychiatrist.  Lastly, despite previously reporting elevated depression and paranoia, the clinician accepted his treatment refusal without sufficiently assessing his symptoms or scheduling him as clinically indicated.

**Findings**

This patient's care was inadequate.  Clarification of diagnosis; individualized and updated treatment planning; appropriate treatment interventions; and collaboration between treatment providers was lacking.  There was a meaningful gap between psychiatric contacts; clinician response was insufficient.

**Patient B**

This 37-year-old patient was admitted to the institution in 2019.  Psychiatric diagnoses of unspecified depressive disorder and antisocial personality disorder were not included in the official place of record but were located in provider documentation.  His healthcare record was randomly selected to assess adequacy of care.

Treatment planning remained unchanged since 2020 at which time treatment goals were developed to reduce depression with an intervention to foster a therapeutic alliance.  Treatment

refusals were not included as a treatment goal but clinically indicated. A useful clinical summary of his mental status and treatment participation, or lack thereof, was not included in his annual IDTT documentation.

The four provider contacts during the review period were cell front on account of refusals. Explanations indicated that he was not invested in treatment. His Vistaril, prescribed as needed was discontinued at his request. Contacts were timely, with documentation indicative of a brief check-in for this clinically stable patient.

**Findings**

This patient's care was inadequate because of insufficient treatment planning. Treatment planning was not updated for two years and the lack of useful clinical summary was disruptive to continuity of care. It was unclear why there was no IDTT documentation to address his lack of treatment participation and need for continued treatment given lack of psychiatric symptoms, lack of functional impairment and his pattern of refusals.

**Patient C**

This 27-year-old patient was admitted to the institution on February 14, 2020. A psychiatric diagnosis of persistent depressive disorder was not included in the official place of record but was located in provider documentation. He was not prescribed any psychiatric medication. His healthcare record was randomly selected to assess adequacy of care.

Treatment planning needed improvement. Treatment goals to reduce depression remained unchanged since 2020. An intervention to utilize goal setting was not implemented in reviewed provider documentation. Rationale for level of care was insufficient and did not consider the lack of documented symptoms or functional impairment.

Timely primary clinician contacts described him as stable. Two of three contacts were cell front (due to a refusal and COVID-19 modified programming). Documentation was consistent with a brief check-in. There was no documentation of clinical interventions.

**Findings**

This patient's care was inadequate. Treatment planning was insufficient as there was no clinical summary of his mental status and treatment participation between treatment plans and treatment goals were not adjusted. Appropriate clinical interventions were not utilized. Rationale for continued care warranted review.

**Patient D**

This 39-year-old patient was admitted to the STRH on July 5, 2021. His parole date was scheduled for August 9, 2022. He was diagnosed with schizoaffective disorder, which had a childhood onset and prescribed Thorazine, Zoloft and Trileptal. His healthcare record was selected to assess adequacy of care in the STRH.

IDTT documentation included a very thorough and useful clinical summary of pertinent factors. Treatment planning targeted pre-release planning and auditory hallucinations and included a brief summary of progress toward treatment goals.

Overall, provider documentation included clear documentation regarding current stressors, symptoms and functioning for this stable patient who was engaged in treatment. Appropriate clinical interventions were routinely utilized by the primary clinician to assist with anxiety regarding his release date, including an unexpected six-month delay. Rationale for medication adjustments were documented by the psychiatrist.

**Findings**

This patient's care was adequate. Reviewed documentation was clinically useful and appropriate for continuity of care. IDTT documentation would have been improved had there been a summary of treatment interventions that were utilized.

**Patient E**

This 38-year-old patient was admitted to the administrative segregation on January 8, 2022. His level of care was appropriately changed from EOP to 3CMS on January 19, 2022. He was diagnosed with major depressive disorder, unspecified anxiety disorder, antisocial personality disorder and severe alcohol use disorder. His healthcare record was selected to assess adequacy of care in the STRH.

IPOCs addressed depression, anxiety and substance abuse. Although clinical documentation questioned whether substance abuse was an issue for him, it was unclear why the goal was continued. A goal for treatment refusals was clinically indicated but not established in his record. Goals were measurable and objective but there were no clinical interventions identified regarding them. IDTT documentation provided a comprehensive summary of relevant clinical factors. However, routine IDTT documentation lacked a summary of treatment needs and progress since his initial IDTT.

Psychiatric documentation indicated very poor compliance with Prozac which was listed as a current medication and prescribed as KOP to assist with compliance. However, a review of the record indicated that the medication was not refilled in April 2022.

Reviewed primary clinician documentation indicated a pattern of refusals which resulted in cell front check-ins. When routine contacts were provided, documentation provided a summary of his disclosed stressors and the clinician's response was supportive in nature. Treatment goals were not clearly addressed, and targeted clinical interventions were not utilized.

**Findings**

This patient's care was marginally adequate. This patient needed application of individualized treatment planning. Given his prolonged stability, it would have been reasonable for the clinician to begin discharge planning or transition planning to GP level of care.

**Patient F**

This 37-year-old patient was housed on A yard since August 2020.  He was diagnosed with anti-social personality disorder, schizoaffective disorder and major depressive disorder.  He was prescribed multiple medications under PC 2602 for danger to self.  His healthcare record was randomly selected from the housing roster to assess adequacy of care.

This patient had a long history of mental illness.  He had multiple inpatient admissions due to psychosis and grave disability.  He had a period of stability, as his most recent inpatient admission to an ICF was in 2020.

Three reviewed treatment plans remained unchanged.  An IPOC that targeted hallucinations was objective and measurable with a useful clinical intervention, which was unchanged since it was established in August 2020.  He had a pattern of treatment refusals and was identified for referral to HLOC; however, non-referral rationale and treatment modification remained unchanged across each reviewed treatment plan.  Lastly, the clinical summary section, which prompts the clinician to document current symptoms, functional impairment and recent treatment, focused on historical information which also remained unchanged.

The majority of psychiatric contacts occurred each month with the exception of two months.  Of concern, there were no confidential contacts for this patient during October 2021 and May 2022.  Similar to primary clinician contacts, psychiatric interactions occurred at cell front, on the yard, at work or in the dayroom on account of not attending scheduled appointments.  Psychiatric documentation was indicative of brief interactions.  Reviewed primary clinician documentation between February and April 2022 was virtually unchanged and described him as stable and otherwise unremarkable; no clinical interventions were utilized despite a documented plan to use cognitive-behavioral therapy.  Psychiatric documentation consistently described him as having fair hygiene with mildly disorganized thought processes.  He denied other psychiatric symptoms and other mental status observations were unremarkable.

Of concern, there was no primary clinician contact since April 29, 2022 as of the review date on May 12, 2022.  Further, a refusal form was noted for Clozaril (an anti-psychotic) on May 4, 2022 and there is no indication of alternative medication provided or consultation with the psychiatrist despite a PC 2602.  In contrast, the psychiatric contact on May 11, 2022 indicated he was medication compliant and did not address the refusal.

Collateral documentation to assist with assessing this patient was rare, despite a plan that the primary clinician would consult with custody staff.

**Findings**

This patient's care was inadequate.  The lack of updated and individualized treatment planning was disruptive to continuity of care.  The prolonged combination of brief and non-confidential contacts and lack of collateral assessment did not allow for a reasonable assessment of this patient's mental status and functioning; interventions were not documented to minimize his symptoms.  Further, there was a lack of consultation between providers of this patient's clinical presentation given psychiatric assessment of ongoing mild disorganized thought processes which was not noted by the primary clinician.  In contrast, IDTT non-referral documentation indicated

962

that his thoughts were "clear." Lastly, the lack of response to psychiatric medication and delays in PC contacts were areas of concern.

## Patient G

This 46-year-old patient was housed in the PSU and discharged to mainline EOP on A yard in April 2022. Diagnoses were located in provider documentation and included ADHD, major depressive disorder and "mental illness." He was prescribed Zyprexa, Remeron and Lexapro. His healthcare record was randomly selected from the housing roster to assess adequacy of care.

For reasons that were unclear, each psychiatric contact during the review period was completed at cell front. There were variable reports of depression and auditory hallucinations that were not clearly addressed with the exception of one medication change in October 2021. It was not clear if the psychiatrist was aware of a pattern of Zyprexa non-adherence between January 2022 and May 2022, at which time it was indicated that he was fifty percent non-adherent and medication distribution was changed to "as needed" without a face-to-face contact.

He regularly attended primary clinician contacts. While in the PSU, appropriate and targeted clinical interventions were utilized by an intern, his assigned primary clinician. Following discharge to mainline, he continued to regularly attend treatment which was generally supportive.

IPOCs targeted substance use and depression and remained unchanged since May 2021. Auditory hallucinations were not targeted although clinically indicated. In contrast to psychiatric documentation, the primary clinician documentation indicated that he denied auditory hallucinations.

### Findings

This patient's care was inadequate due to regular cell-front psychiatric contacts without clear rationale, unclear clinical documentation and lack of collaboration between providers. Moreover, there was a lack of individualized and updated treatment planning and diagnostic clarification which were needed for this patient.

## Patient H

This 31-year-old patient was admitted to the institution on September 30, 2021. Diagnoses varied by location and included: bipolar disorder, schizoaffective disorder, bipolar type, depression and antisocial personality disorder. He was prescribed Effexor and Zyprexa. His healthcare record was randomly selected from the B yard housing roster to assess adequacy of care in the EOP.

Initial assessments provided very little information regarding this patient's psychosocial history and treatment needs. Some history was copied from an unknown provider and timeframe. For reasons that were unclear, despite timely IDTTs, IPOCs were not developed until February 2022. IPOCs were generic (reduce depressed mood to a six or lower and discharge to a lower level of care) and interventions were limited to fostering a therapeutic alliance and excluded treatment interventions indicated by case conceptualization.

Psychiatric contacts occurred monthly throughout the review period. The majority of contacts were cell front, primarily on account of COVID-19 restrictions; documentation was consistent with the limitations of this interaction.

This patient experienced five primary clinician changes between his arrival to EOP and May 2022. Overall, primary clinician routine contact documentation included sufficient information for continuity of care although patient awareness and transition planning for provider changes was not located. Documentation conveyed useful assessment of his mental status and functioning with continued use of supportive therapy for this stable patient.

There were various pertinent discrepancies in documentation. First, at the time of EOP admission, current symptoms of self-dialoguing, delusions, disorganized behavior on his initial primary clinician assessment did not correspond to the initial psychiatric assessment or primary clinician documents around the same timeframe. Second, there was a discrepancy in medication management. On October 19, 2022 a psychiatrist indicated that Effexor was clinically contra-indicated given diagnostic history. However, on December 6, 2021 a different psychiatrist prescribed the Effexor with no documented consideration of the previous provider's assessment that the medication was contra-indicated.

**Findings**

This patient's care was adequate but marginal. Excluding the limitation caused by COVID-19 cell-front contacts, the major failure in this patient's treatment was the insufficient initial assessments and lack of treatment goals for the first four months of his treatment. However, this deficit was counteracted by sufficient and appropriate routine provider documentation regarding assessment of his mental status and functioning, and continued use of supportive therapy. While a prolonged period of supportive therapy that was not in alignment with case conceptualization would normally be of concern, in this case it was acceptable given the need to re-build rapport with frequent clinician changes. Diagnostic clarification with rationale for diagnosis was needed. Lastly, the patient ought to have been informed of clinician changes.

**Patient I**

This 49-year-old patient was admitted to the facility in January 2021. During review dates, he had a brief stint in ASU and was returned to ML EOP by November 3, 2021. He was diagnosed with major depressive disorder and opioid use disorder. He was prescribed Zoloft and Vistaril. His healthcare record was randomly selected from the B yard housing roster to assess adequacy of care.

Treatment planning provided a comprehensive summary of the patient's symptoms and treatment summaries. IPOCs targeted depression and substance use with a focus on cognitive-behavioral goals and interventions, although it was not in alignment with case conceptualization.

The primary clinician initial assessment was thorough and provided a relevant summary of this patient's current symptoms and treatment needs. Similarly, routine primary clinician contacts included thorough summaries of the patient's response and management of his depression and various stressors, utilizing appropriate clinical interventions for this treatment engaged and stable patient.

An initial psychiatric assessment was not located after his transfer from ASU to ML.  Overall, psychiatric documentation provided a useful summary of the status of his depressive symptoms which was necessary for continuity of care given several psychiatric providers.

**Findings**

This patient's care was adequate.  It was noted that an initial psychiatric assessment did not occur.  Provider documentation was thorough and conveyed appropriate, individualized treatment interventions for this patient's treatment needs.

**Patient J**

This 32-year-old patient was returned to ASU from the MHCB on March 3, 2022.  He was diagnosed with bipolar disorder and anti-social personality disorder.  He was prescribed Invega, an antipsychotic, under PC 2602.  His healthcare record was randomly selected from the ASU EOP roster to assess adequacy of care.

This patient was admitted to the institution's ASU in late January 2021.  In the following month he received three RVRs and experienced suicidal ideation multiple times.  He displayed bizarre behavior and violent outbursts.  He was subsequently admitted to the MHCB on February 25, 2022 where a medication change was attributed to his improved functioning and mental status.

Treatment planning documentation provided a useful summary of his recent treatment history and high-level overview of his less recent treatment history.  He had multiple HLOC referrals and it was indicated that since his incarceration in 2010 he had spent 25 percent of his incarceration at a HLOC.  He was identified on the HLOC report and the non-referral rationale and treatment modifications were thoughtful and appropriate.

Treatment goals appropriately addressed impulse control, anger management and depression.  Goals were objective and measurable although baseline assessment to assess change was not located and clinical interventions were lacking.

The majority of reviewed provider contacts were at cell front.  Non-confidential contacts were initially attributed to him being unable to attend appointments in the treatment center due to IEX and then his refusal to wear the required IEX jumpsuit to attend appointments in the treatment center.  It was unclear why reference to utilization of the dining room was not routinely offered.  Despite limited cell-front interaction, documentation provided a useful summary of his mental status and functioning that was more than a check-in but less than a treatment session.  Documentation included consultation with officers and there was no indication of psychiatric decline.  Treatment was generally supportive with no clear documentation to support targeting goals or utilizing treatment modifications.

**Findings**

This patient's care was adequate but marginal.  He was housed in a high-risk environment, where he decompensated and required inpatient care.  Following return to segregation, an initial psychiatric assessment was not completed, and overall care was compromised by the lack of confidential contacts with providers.

**Patient K**

This 43-year-old patient was admitted to ASU EOP on March 16, 2022 after a staff assault.  He had a long history of mental illness and was diagnosed with schizoaffective disorder and experienced chronic psychotic symptoms.  He was compliant with prescribed Effexor and BuSpar.  His healthcare record was randomly selected from the ASU EOP roster to assess adequacy of care.

An initial psychiatric assessment was not located and the two subsequent routine contacts were completed cell front due to quarantine and refusal.  The primary clinician initial assessment provided pertinent mental health documentation but would have been improved with a review of the precipitant to the behavior that led to the staff assault and indicated treatment in accordance with identified triggers.  IPOCs targeted anxiety and hallucinations at the patient's request.  Documentation to support individualization of goals and interventions was lacking.

Routine provider documentation provided an adequate summary of his mental status and functioning.  The majority of primary clinician contacts were completed at cell front on account of refusals.  Documentation included utilization of clinical interventions that addressed his psychotic symptoms and ADL.  He was seen regularly on account of placement on the 'high risk' list, attributed to less than 50 percent treatment compliance.

**Findings**

This patient's care was adequate but marginal.  His care was compromised by the lack of confidential treatment contacts.  Refusals were not appropriately understood or targeted.  There was a need for collateral assessment to support the determination that he was stable despite brief cell front contacts.

**Patient L**

This patient was treated at the MHCB between May 5, 2022 through May 13, 2022.  He was admitted from the PSU after superficially cutting his wrist.  This was his third MHCB admission in three months.  In addition, he was discharged from the PIP in September 2021.  Diagnoses varied by chart location and included schizoaffective and bipolar disorders.  He was prescribed Celexa, Trileptal, Benadryl and Thorazine.  His healthcare record was randomly selected from the MHCB roster to assess adequacy of care.

Documentation indicated that he had been referred to the MHCB after he made conditional suicidal statements and presented with disorganization and paranoia.  It was opined that he could be exaggerating symptoms to affect a transfer to an ICF.  An initial primary clinician assessment was not located.  The initial psychiatric assessment included an overview of current mental status and recent MHCB treatment documentation.  The one psychiatric IPOC targeted hypomania, however rationale was not clear and baseline to assess change was not located.  Further, the sole treatment intervention was to foster therapeutic alliance.  IPOCs that targeted factors that led to MHCB, including self-injury and impaired thought processes were clinically indicated but not implemented

Non-referral rationale to a HLOC focused on the receipt of three RVRs in six months but failed to discuss the three MHCB placements in six months. Treatment modifications, like treatment goals were not individualized for his current treatment needs and were in need of an update, as they appeared copied from previous MHCB IDTT documentation on March 22, 2022.

Daily contacts with various providers occurred at cell front due to refusals and modified programming. Documentation provided a brief summary of this patient's mental status and functioning. Other than a medication change at his request, clinical treatment interventions were not documented.

IDTT discharge documentation indicated that he was ready to return to the EOP. However, there was no clear discussion of managing the PSU or understanding of why he was no longer requesting an ICF transfer, part of his reason for admission. The psychiatric discharge summary did not provide a sufficient summary of course of treatment for continuity of care.

There was insufficient rationale for limited issue and level of observation.

**Findings**

This patient's care was inadequate because it lacked comprehensive clinician assessment, lacked individualized treatment planning, and lacked clinical intervention, including identified treatment modification and appropriate interventions to address underlying factors that led to self-injurious behavior and inability to manage PSU. Non-referral documentation was incomplete. While approved reasons for cell-front contacts were documented, the lack of confidential care throughout this inpatient admission and subsequent discharge to the PSU, a high-risk environment from which his stressors and self-injury originated, was an area of significant concern. Lastly, there was no clear coordination between PSU and MHCB providers which was needed given the insufficient discharge documentation and prior MHCB admissions.

**Patient M**

This 31-year-old patient was admitted to the MHCB from EOP after cutting his forearm, requiring twenty sutures. Diagnoses varied by location but included bipolar disorder and antisocial personality disorder. He was prescribed multiple psychiatric medications under PC 2602. His healthcare record was randomly selected from the MHCB roster to assess adequacy of care.

The initial psychiatric summary provided a thorough assessment of his presenting problem and relevant mental health factors. A primary clinician initial assessment was not located. IPOCs addressed substance abuse, danger to self and self-harm and were in alignment with psychiatric assessment documentation. Goals were measurable and objective. Interventions needed improvement. An IPOC for depression was clinically indicated but not developed.

Provider daily contacts occurred at cell front due to modified programming and in a confidential space during his stay. Documentation provided useful information regarding his mental status and functioning, but clinical interventions were not documented. He was appropriately referred to the acute level of care.

There was insufficient rationale documented for limited issue and level of observation.

**Findings**

Treatment planning and clinical interventions during routine contacts in EOP were areas in need of improvement. This patient care was deemed adequate because he was appropriately referred to a HLOC.

**Patient N**

This 21-year-old patient was admitted to the MHCB on April 30, 2022 for suicidal ideation with a plan to hang himself, depression and auditory hallucinations. Decompensation was attributed to familial stressors related to his grandmother's recent passing. He was assessed as high chronic and acute risk. Diagnoses varied across providers and chart location and included: generalized anxiety disorder, substance induced psychotic disorder, major depression with psychosis and PTSD. During his stay, medication adjustments were made and he was compliant with prescribed Invega, clonidine, Remeron and Vistaril. His healthcare record was randomly selected from the MHCB roster to assess adequacy of care

The initial psychiatric assessment included pertinent psychiatric factors. A primary clinician initial assessment was not located. Subsequently, the majority of IDTT documentation, completed by the primary clinician, lacked individualization and was copied from other sources. IPOCs addressed danger to self (reduce suicidal ideation, display appropriate behavior for a lower level of care, discharge to a lower level of care) but were boiler plate and did not consider precipitating factors and his unique treatment needs. It was unclear why a goal to "learn more appropriate methods of getting needs met" instead of engaging in self-harm was initiated as there had not been any documented incidents of self-harm in over two years. Treatment interventions to establish rapport and utilize cognitive-behavior therapy were appropriate, although psychiatric medication was not included.

Daily contacts were completed by various providers. Documentation included useful information regarding mental status and functioning; and at times, included documentation of consultation with nursing staff. Rationale for level of observation and provision of property varied across providers. Interventions included psychiatric medication, in-cell activities (reading, puzzles) but minimal use of the cognitive-behavior therapy interventions identified in the treatment plan.

Throughout the first ten days of his MHCB admission he remained depressed and was assessed as a risk of harm to himself. He was referred to acute inpatient level of care on May 10, 2022 which was rescinded on May 17, 2022 after several days of reported improvement in symptoms which were then attributed to his belief that he lost his job while in the MHCB.

He was discharged to EOP and assessed as high chronic risk and moderate acute risk. His safety plan was sufficient. During the course of MHCB treatment, precipitating factors that resulted in his decompensation were not sufficiently addressed.

**Findings**

Overall, care in the MHCB was adequate but marginal based on the totality of factors discussed below. A primary clinician assessment was not located, and the lack of assessment was reflected in the lack of individualization in case conceptualization and treatment planning. The inpatient rescission was concerning given the patient reported improvement in symptoms without sufficient assessment and treatment of precipitating factors that resulted in his MHCB placement. Integration of psychiatric care in the treatment planning process was insufficient. While daily contact documentation included sufficient information for continuity of care, improved documentation of utilization of targeted clinical interventions was needed. Diagnostic clarification, an important component of effective treatment planning, was needed.

**Patient O**

This 41-year-old patient was admitted to the MHCB on May 5, 2022. He was diagnosed with antisocial personality disorder, major depressive disorder and unspecified anxiety disorder. Medications were initiated in the MHCB and included Lexapro and Trileptal with which he was adherent. His healthcare record was randomly selected from the MHCB roster to assess adequacy of care.

Inpatient consultation documentation indicated that the MHCB admission occurred after he received a RVR that resulted in a loss of property, his primary coping mechanism. He had a long history of isolating and had not left his cell for showers, yard, treatment or general programming while in EOP. It was documented that he had a "level of paranoia and delusional thinking" and suicidal ideation. Following the RVR, he decompensated and lost behavioral control which resulted in initiation of three in-cell fires and two incidents of foreign body ingestion in a month's time.

The initial psychiatric assessment was comprehensive and a plan to resume psychiatric medication was initiated. A document identified as the primary clinician initial assessment was located but was not sufficiently thorough for an initial evaluation to guide treatment.

The majority of IDTT documentation was copied from other providers. IPOCs targeted danger to self and impulsive behavior; treatment interventions were to foster a therapeutic alliance. Clear rationale for the impulsive behavior IPOC was not provided. While non-referral rationale to a higher level of car was insufficient, treatment modifications to utilize motivational interviewing, psycho-education and coping skills were appropriate, although not utilized.

Daily contacts were provided by various providers, but documentation was generally thorough. Medication adjustments were made, and clinician contacts focused on assessment and were appropriately descriptive but lacked documentation of clinical interventions. After a period of minimal improvement, he was referred to ICF level of care.

**Findings**

This patient was appropriately referred to a HLOC. MHCB care was generally adequate, although treatment planning needed improvement. While daily contact documentation included sufficient information for continuity of care following discharge, there was a need for improved documentation regarding targeted clinical interventions.

**Patient P**

This 38-year-old male was randomly selected for healthcare record review to assess the quality of EOP care provided at CSP/Sac.

The patient's most recent incarceration began in December 2015. He was promptly enrolled in the MHSDS at the EOP level of care. The patient arrived at CSP/Sac from SVSP in July 2019.

The patient had a history of seven MHCB stays, most recently in 2018. He had one prior episode of treatment at the intermediate level of care in 2019. He had a history of two acute care hospitalizations in 2015 and 2018.

The most recent SRASHE on November 10, 2020, assessed the patient with moderate chronic and low acute suicide risk. The patient had no history of suicide attempts. He had a reported history of self-harm.

The patient was provided with diagnoses of schizoaffective disorder and schizophrenia.

He was prescribed olanzapine (antipsychotic), bupropion (antidepressant), and hydroxyzine (for insomnia and anxiety) on an as-needed basis.

The patient received involuntary medications by PC 2602 order beginning in 2016. The justification for the PC 2602 included danger to self, danger to others, and grave disability. In September 2020, the psychiatrist filed a notice not to renew the request.

Routine contacts with the psychiatrist were not timely, often occurring several months apart. Some visits did not occur in a confidential setting due to a lack of custody escort officers. Psychiatry notes changed little over the review period, included scant patient input, and did not reflect the evolving clinical picture of the patient. Although the patient had a history of side effects with antipsychotic medications and requested a lower dose, notes reflected that he had ongoing significant psychotic symptoms. Despite these symptoms, the psychiatrist lowered the dosage of antipsychotic medication.

The PC contacts occurred timely, but large sections of the notes were identical to prior notes. Notes were often incongruent with the treatment plan. As an example, the notes repeatedly stated that the patient did not have acute symptoms of depression, yet the treatment plan goals included reducing depressive symptoms.

While IDTTs occurred timely, the patient frequently did not attend. The four IDTTs from July 16, 2020 to March 4, 2021 noted that the patient did not attend due to COVID-19 protocols. The lack of adequate custody escort officers also impaired the patient's ability to attend IDTTs.

The treatment targets included addressing treatment nonadherence and reduction of psychotic and depressive symptoms. Treatment plans contained some specific goals such as reduction of depressive symptoms; however, some goals were vague and repetitive of prior notes, such as "goal setting" with the patient.

The patient remained at CSP/Sac until July 6, 2022, when he transferred to MCSP. On November 4, 2022, the patient remained at MCSP at the EOP level of care.

**Findings**

The care provided to this EOP patient at CSP/Sac was inadequate.

IDTTs occurred timely and were intermittently updated based on the evolving clinical picture of the patient. Many treatment goals were vague, had limited patient input, and were frequently carried over from prior IDTTs. There were significant lapses in psychiatric contact, sometimes for several months, which was not consistent with Program Guide requirements. Despite documentation reflecting ongoing psychotic symptoms, the psychiatrist lowered the dosage of antipsychotic medication based on patient request. While PC visits were generally timely, notes appeared to use the same template, with large portions carried over from one note to the next.

**Patient Q**

This 32-year-old male was selected for healthcare record review to assess the quality of EOP care provided at CSP/Sac, as well as issues of concern observed at an IDTT during the site visit.

The patient's most recent period of incarceration began in March 2019. The patient was placed in the 3CMS level of care at that time. His level of care was increased to EOP in August 2019.

On November 8, 2021, the patient arrived at CSP/Sac for placement in the PSU. While housed at CSP/Sac, the patient had a complex placement history, including stays in the PSU, the MHCB, and the mainline EOP.

The patient had a history of multiple MHCB stays. He had no history of treatment at the intermediate level of care. He had one prior acute care hospitalization in 2019, with return to acute care on August 2, 2022, due to danger to others.

The most recent SRASHE on August 3, 2022, assessed the patient with high chronic and moderate acute suicide risk. The patient had a history of suicide attempts; the last occurred on May 10, 2022. The patient also had a history of self-harm. There were differing opinions as to whether some acts were suicide attempts or self-injurious behavior.

He was provided with diagnoses of schizoaffective disorder and opioid use disorder.

The patient was prescribed aripiprazole (antipsychotic), olanzapine (antipsychotic), paliperidone (antipsychotic), escitalopram (antidepressant), mirtazapine (antidepressant), buspirone (antianxiety), and diphenhydramine (for insomnia and anxiety).

Prior to placement at CSP/Sac, the patient had no history of receiving involuntary medications by PC 2602 order. After transfer to acute care at CMF, the psychiatrist obtained a PC 2602 order due to danger to others.

From April 28 to May 10, 2022, the patient was housed in the mainline EOP. The initial PC evaluation occurred on May 9, 2022, and the IDTT occurred on May 10, 2022; both were timely.

The psychiatrist did not complete an initial psychiatric evaluation. During the IDTT, the patient revealed that he had ingested a battery. Despite this ingestion, the treatment team documentation included the same clinical summary from the PC evaluation the day before. The psychiatric review of the master treatment plan stated that the patient would be retained at the current level of care despite MHCB placement.

On May 17, 2022, the patient discharged from the MHCB and transferred to the mainline EOP. Five-day follow-ups were completed as required. The PC performed an initial evaluation on May 31, 2022, the same day as the initial IDTT, and both occurred timely. There was no psychiatric evaluation documented prior to the IDTT. Regarding the IDTT, the treatment plan noted that the patient reportedly refused to participate; however, the psychiatry review of treatment plan noted that the IDTT was held *in absentia*, due to custody program modifications.

The PC documented that the patient "is not presently experiencing any mental health symptoms, issues, or concerns."

The psychiatrist saw the patient on June 8, 2022; however, this was a follow-up contact, and not an initial psychiatric evaluation, which was not completed. Follow-up visits with the psychiatrist and the PC occurred timely.

The patient had a long history of RVRs, often for violent offenses. Mental health factors were found to be a factor in most of these offenses. The patient was placed in the ASU EOP hub on July 10, 2022.

While in the ASU EOP hub on July 12, 2022, the patient reported to his psychiatrist that he had command auditory hallucinations telling him to harm others. He requested an increase in his olanzapine dosage. The psychiatrist did not make medication changes, documenting a possible interaction regarding the medications that resulted in the decision not to increase or change the medication. On July 13, 2022, the PC note stated that the patient was cleaning his toilet, then pouring the water on his head. On July 20, 2022, the note reflected that the patient was pouring toilet water mixed with urine on his head and throwing food on the floor. The patient was then admitted to the MHCB for stabilization.

On August 2 ,2022, the patient transferred to acute care at CMF; he then refused medications. On August 25, 2022, a PC 2602 order was pursued; this order was granted on September 6, 2022, due to danger to others. At the time of this report, the patient remained in the acute care program at CMF.

**Findings**

The care provided to this EOP patient at CSP/Sac was inadequate.

The treatment plans were inadequate and did not reflect the updated clinical status of the patient. The psychiatrist did not evaluate the patient prior to the IDTT.

The patient requested an adjustment in medications, due to command auditory hallucinations to harm others. The psychiatrist did not do so. This was particularly disconcerting, given the

patient's extensive history of violent RVRs. The medication management was also concerning, as the patient was prescribed three antipsychotic medications simultaneously.

On July 13, 2022, the patient was noted displaying concerning, disorganized behaviors, such as pouring toilet water on his head. Documentation of a clear rationale why the treatment team did not evaluate the patient for immediate MHCB placement was absent. The patient was not admitted to the MHCB until July 20, 2022, when his symptoms had worsened, and he was pouring toilet water mixed with urine on his head, as well as throwing his food on the floor.

**Patient R**

This 44-year-old male was randomly selected for healthcare record review to assess the quality of EOP care provided at CSP/Sac.

The patient's current incarceration began in December 2003. He was quickly enrolled in the MHSDS at the 3CMS level of care and was included in the MHSDS continuously, apart from February 2006 to October 2007. He was initially placed in the EOP in 2013. The patient had been housed at CSP/Sac on several occasions since then; however, his most recent placement at CSP/Sac occurred on October 12, 2021, from MCSP. He was placed in the PSU upon transfer. The patient remained in the PSU until April 25, 2022, when he released to the mainline EOP. He was housed there from April 25 until July 24, 2022, when he was placed in the EOP ASU hub. On November 4, 2022, the patient remained in the EOP ASU hub at CSP/Sac.

The patient had a history of multiple MHCB stays, most recently in March 2020. He had no history of treatment at the intermediate level of care. He had a history of three acute care hospitalizations, most recently in April 2020.

The most recent SRASHE on January 5, 2022, assessed the patient with high chronic and low acute suicide risk. The patient had no history of suicide attempts; however, he had four incidents of self-harm, most recently in June 2019.

He was provided with diagnoses of PTSD, major depressive disorder, and antisocial personality disorder.

He was prescribed prazosin (for nightmares) and sertraline (antidepressant, also used for PTSD). The patient had no history of PC 2602 ordered treatment with involuntary medications.

The patient was placed in the mainline EOP on April 25, 2022. Neither the PC nor the psychiatrist completed their initial evaluations prior to the IDTT. While the IDTT on May 5, 2022 occurred timely, the patient was not present due to a lack of custody escort officers.

The treatment team reconvened the following week, with the patient present. Although the PC completed a "brief wellness check," no initial PC evaluation was completed. Additionally, the psychiatrist had not met with the patient. During treatment team, the patient reported that he wanted to work on PTSD, anxiety, and daily nightmares. The PC also noted problems with impulsivity and anger. The treatment team continued treatment goals from prior IDTTs, which included depression, thought challenging, and attending more than 50 percent of treatment; no new targets of treatment were incorporated. Despite mentioning the use of evidenced-based

therapies, the team did not incorporate these into the treatment plan.  Concerningly, even during this initial IDTT, the team noted supporting the patient "with future transfer to CCCMS" level of care.

The psychiatrist met with the patient on June 17, 2022; the contact was documented as a progress note and not a formal psychiatric evaluation.  Despite this, the note contained several good elements, including exploration of diagnoses and prior traumas.  The patient remained prescribed low-dose prazosin.  On June 22, 2022, a different psychiatrist completed an initial evaluation.  The medications remained unchanged.  At the following visit on July 20, 2022, the psychiatrist initiated treatment with sertraline for PTSD and depression.

**Findings**

The care provided to this EOP patient at CSP/Sac was inadequate.

The patient was not seen for an initial evaluation by his PC or psychiatrist prior to the initial IDTT, nor was the patient present at the initial IDTT.  Admirably, the treatment team reconvened the following week with the patient in attendance.  While the patient had a "brief wellness check" with the PC before this second IDTT, there was no documentation of individual contact with the psychiatrist prior to this second IDTT.  Treatment goals were not clearly aligned with treatment needs identified during initial assessments or updated to address changes in the patient's treatment needs.

Of concern was an observation during the site visit, as well as in other healthcare records, that there was a strong emphasis at CSP/Sac in transitioning patients from the EOP to the 3CMS level of care.

For follow-up visits, the patient was seen timely and consistently by the PC.  The notes were repetitive, with only minor updates.  After the patient received a new PC, the documentation included several clinically appropriate interventions.  Despite this, the treatment team did not address trauma and PTSD-related symptoms.

The patient's psychiatric treatment displayed multiple areas of concern.  A formal psychiatric evaluation was not completed until June 22, 2022, nearly two months after placement in the mainline EOP.  Despite the patient's report of ongoing and distressing nightmares, the psychiatrist prescribed the lowest available dose of the medication for his nightmares.  Additionally, the psychiatrist did not initiate treatment with a SSRI, which is an evidence-based medication for the treatment of PTSD and depression.  Sertraline, a SSRI, was not ordered until July 20, 2022.  There was little justification documented for this significant delay in needed treatment with appropriate psychotropic medication.

**Patient S**

This 32-year-old patient was housed in the ASU EOP hub on overflow status.  He was provided with diagnoses of schizoaffective disorder, ADHD, substance use disorder, and antisocial personality disorder.  He was prescribed Abilify, Effexor, Remeron and Zyprexa.  His healthcare record was randomly selected from the ASU EOP roster to assess the adequacy of provided care.

Treatment planning documentation provided an adequate summary of the patient's mental status and functioning between IDTTs. IPOCs targeted treatment nonadherence, depression, and hallucinations; those IPOCs were unchanged throughout the review period.

During reviewed routine PC contacts, the patient's elevated depressive symptoms were monitored and regularly addressed using behavioral activation to which the patient was receptive. On April 8, 2022, the patient reported increased depression and stated, "I feel like after I tried to kill myself," referring to a suicide attempt several years prior. He also reported questioning why he did not die after "such a severe attempt," and disclosed intermittent passive suicidal ideation. The clinician was an intern; of concern was the lack of documentation of consultation with a supervisor or completion of a SRASHE, which was clinically indicated.

Routine psychiatric contacts provided a reasonable description of the patient's mental status and functioning and were clinically appropriate for continuity of care.

**Findings**

The care provided to this patient was minimally adequate. Of concern was the lack of appropriate clinical supervision and failure by the intern clinician to appropriately identify and assess suicide risk; this was especially pertinent given the patient's placement in a high-risk setting such as administrative segregation. Although concerning, the care provided to this patient was otherwise appropriate. Areas of needed improvement included treatment planning and treatment implementation. Treatment goals warranted update given the patient's lack of progress. Treatment interventions were regularly utilized during clinical sessions to target depression, but additional techniques were needed given the lack of progress. It was unclear why this patient remained in the ASU EOP hub on overflow status for over one month; however, he was consistently followed by his PC and psychiatrist while housed on that unit.

**Patient T**

This 39-year-old patient was placed in the ASU EOP hub on March 17, 2022. He was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Zyprexa, trazodone and Benadryl. He received his psychotropic medications by PC 2602 order. His healthcare record was randomly selected from the ASU EOP hub roster to assess the adequacy of provided care.

The initial PC assessment occurred at cell front due to COVID-19 related concerns. This initial assessment provided a useful review of the patient's mental health history, but documentation of current treatment needs was insufficient. The initial psychiatric assessment did not document a comprehensive psychiatric assessment, and it was completed at cell front due to COVID-19 restrictions. Documentation indicated that the patient was seen lying on his mattress in front of the cell door, where he was fully covered by his blanket. The rationale for this behavior and presentation was unclear. However, eight days later, documentation indicated that delays in laundry resulted in the patient wearing a smock on March 29 and 30, 2022, and covering himself with a blanket on April 4, 2022, as he "still had not received his clothes."

As for treatment planning, the only IPOC developed targeted grave disability, with the goal to reduce grave disability to six or lower on a scale of one to ten. The patient had a history of grave

disability; however, it was unclear why this IPOC was currently indicated. Primary clinician assessment documentation reported that while the patient was disheveled, there were no functional impairments noted and psychiatric documentation did not support this observation.

Routine psychiatric contacts and most routine PC contacts occurred at cell front. The patient's engagement in treatment was variable with a decrease described as time in restricted housing progressed. Overall, providers appropriately assessed his mental status and functioning. Education was provided to the patient about the impact of his treatment refusals; however, the reason for refusals was not clearly and consistently assessed. Collateral consultation regarding his functioning given his history of severe mental illness and grave disability was needed.

In early May 2022, the patient was identified and subsequently monitored as a high treatment refuser.

**Findings**

The care provided to this patient was minimally adequate. Provider initial assessments did not sufficiently inform treatment planning. Given the limitations for adequate clinical assessment at cell front, consultation with custody and psych techs regarding functioning was necessary for this patient with a serious mental illness and a history of grave disability. The prolonged period when the patient did not have access to his uniform was an area of significant concern. An expedited IDTT would have also been useful to address his pattern of treatment refusal.

**Patient U**

This 31-year-old patient was placed in the ASU EOP hub on May 4, 2022. He was provided with diagnoses of unspecified depressive disorder and antisocial personality disorder. He was prescribed BuSpar and Remeron. His healthcare record was randomly selected from the ASU EOP roster to assess the adequacy of provided care.

Despite multiple attempts by the primary clinician, the patient refused to participate in the initial assessment and remained fully covered under a blanket on his bed. Consultation with custody staff indicated that he was eating but refusing yard. Documentation on May 6, 2022 indicated that the patient reported mild anxiety and depression but denied other symptoms. However, documentation also noted a history of talking to himself, grave disability, odd behavior, and disorganized thought processes. He had a history of MHCB and PIP admissions with the most recent in 2019. His last suicide attempt occurred approximately six months prior to his ASU placement.

The initial psychiatric assessment was comparable to routine contact documentation and lacked the comprehensive review of an initial assessment. On May 9, 2022, the patient refused to cooperate with the interview, and he was assessed at cell front. He was observed lying on his mattress on the floor. His hygiene was described as fair, and the assessment was otherwise unremarkable.

During the initial IDTT, IPOCs were implemented to address anxiety and pre-release planning. Treatment goals were appropriate and measurable with an intervention to foster a therapeutic alliance. The IDTT noted that the patient had refused more than 50 percent of programming for

the past 90 days.  Identified treatment modifications for treatment refusals utilized evidence-based techniques.

The patient refused the only required primary clinician contact during reviewed dates, and the primary clinician appropriately consulted with custodial staff about the patient's functioning. The documentation provided a useful summary of his mental status and functioning; this included discussion about the patient's positive response to items the clinician provided to assist in coping with restricted housing and rapport building.

**Findings**

This care provided to this patient was adequate.  Treatment planning needed improvement, including goals to address treatment nonadherence and depression.  Diagnostic clarification and rationale were also needed.

**Patient V**

This 26-year-old patient was housed in the PSU since placement on February 12, 2021.  No formal diagnosis was located in the appropriate area of the healthcare record; however, the primary clinician provided diagnoses of mood disorder and unspecified depressive disorder in a primary clinician progress note.  The patient was prescribed Vistaril, Trileptal and Effexor.  His healthcare record was randomly selected from the PSU roster to assess the adequacy of provided care.

Routine IDTT documentation indicated that an IPOC for anger established on June 24, 2021 was continued at subsequent IDTTs on December 29, 2021 and March 3, 2022.  The IPOC was not updated despite a lack of progress or treatment engagement.  Relatedly, despite the patient's complaints of depression, an IPOC for depression was not added.  A CIT was initiated after the patient made a suicidal attempt on January 31, 2022, after believing his cell was searched.  He was appropriately assessed, but the underlying precipitant was not addressed during subsequent routine clinical contacts by the PC.

Psychiatric documentation was brief and minimally changed across contacts.  There was a lack of documentation that the psychiatrist addressed the patient's medication nonadherence.  Most of the reviewed primary clinician contacts occurred at cell front due to modified programming, quarantine status, and patient refusals.  Primary clinician documentation was clinically relevant, and the PC documented attempts to engage the patient in treatment.  There was documentation that the patient would complete a section of an anger workbook which would be reviewed during the next contact, but there was no further follow-up or other documentation regarding clinical interventions.

The patient intermittently reported depression in response to institutional stressors, but there were no functional impairments noted.  The clinician appropriately discussed change to the 3CMS level of care; however, the patient was not receptive to this change.

**Findings**

977

This care provided to this patient was inadequate. Although the patient was clinically stable and received appropriate monitoring by the primary clinician, clinical interventions were not utilized. Psychiatric documentation was overly terse and minimally useful for continuity of care. Diagnostic clarification and rationale were needed, as well as updated treatment planning.

**Patient W**

This transgender patient was placed in the PSU upon return from an ICF. She was provided with a diagnosis of bipolar II disorder, and was prescribed antipsychotic and mood stabilizing medications. The patient's healthcare record was randomly selected from the PSU roster to assess the adequacy of provided care.

An initial psychiatric assessment was not located in the healthcare record. The primary clinician assessment provided a thorough overview of psychosocial history, although documentation regarding precipitants to the ICF admission were not included in the assessment. The patient's history of trauma warranted assessment for a possible diagnosis of PTSD.

The patient had a history of verbal and physical behavior resulting in RVRs, injuries to others, and destruction of property. During the initial IDTT, an IPOC for "PBS" was implemented with a goal to "eliminate" verbal aggression by the next IDTT; this treatment goal was unrealistic given the patient's extensive history of verbal aggression. Another goal to learn one emotional regulation skill by the next IDTT was also inadequate, as it was unclear why more skills would not be provided to this cognitively capable, treatment-motivated patient. There was documentation that the patient had additional identified treatment needs including low self-esteem, guilt, and feelings of worthlessness and grief that were identified by the primary clinician, as well as instability and agitation that were targeted by psychiatric medication treatment. These treatment needs were not addressed in the initial IDTT. Routine IDTTs later added IPOCs for anger and treatment nonadherence.

All primary clinician contacts were conducted at cell front due to various reasons including quarantine, program "shutdown," refusals, and a nearby cell extraction earlier in the day; despite this, documentation was indicative of meaningful clinical encounters. The clinician consistently offered appropriate clinical interventions that targeted the patient's treatment needs identified during those contacts.

Routine psychiatric documentation was overly brief and not useful for continuity of care. It was unclear if the contacts occurred in a confidential setting.

**Findings**

This care provided to this patient was marginally adequate. There was documentation of meaningful routine contacts and utilization of clinical interventions by the primary clinician. The lack of an initial psychiatric assessment and clinically relevant routine psychiatric documentation were areas of concern. Treatment planning required improvement. Diagnostic rationale and inclusion in the official place of record were also needed.