# EXHIBIT A

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR |
| **To:** | Coleman Team - RBG Only; Coleman Special Master Team; Steven Fama; elise.thorn@doj.ca.gov; Namrata Kotwani; Thind, Sundeep@CDCR; Hockerson, Dillon@CDCR; Bentz, Melissa@CDCR; Paul B. Mello; Sam Wolff (swolff@hansonbridgett.com) |
| **Subject:** | RE: Coleman - COVID 19 Mandatory 15 Day Modified Program |
| **Date:** | Friday, February 4, 2022 7:50:13 PM |
| **Attachments:** | COVID-19 Mandatory 15-Day Modified Program Extension (2).pdf |

All,

On February 3, 2022 CDCR extended the statewide modified program until February 13, 2022.  The memorandum is attached.


Nick Weber

Attorney

Department of Corrections & Rehabilitation

1515 S Street, Suite 314S

Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Weber, Nicholas@CDCR
**Sent:** Monday, January 24, 2022 11:53 AM
**To:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbg.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbg.com>; Steven Fama <sfama@prisonlaw.com>; elise.thorn@doj.ca.gov; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>
**Subject:** RE: Coleman - COVID 19 Mandatory 15 Day Modified Program

All,

On January 20, 2022 CDCR extended the statewide modified program until February 6, 2022 in light of the continued rise in COVID-19 cases throughout California and CDCR institutions.  Please let me know if you have any questions.


Nick Weber

Attorney

Department of Corrections & Rehabilitation

1515 S Street, Suite 314S

Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Weber, Nicholas@CDCR

**Sent:** Friday, January 7, 2022 10:00 AM

**To:** Coleman Team - RBG Only (ColemanTeam-RBGOnly@rbgg.com) <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team (ColemanSpecialMasterTeam@rbgg.com) <ColemanSpecialMasterTeam@rbgg.com>; Steven Fama (sfama@prisonlaw.com) <sfama@prisonlaw.com>; elise.thorn@doj.ca.gov; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Thind, Sundeep@CDCR <SUNDEEP.THIND@cdcr.ca.gov>; Hockerson, Dillon@CDCR (Dillon.Hockerson@cdcr.ca.gov) <Dillon.Hockerson@cdcr.ca.gov>; Bentz, Melissa@CDCR (Melissa.Bentz@cdcr.ca.gov) <Melissa.Bentz@cdcr.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Sam Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>

**Subject:** Coleman - COVID 19 Mandatory 15 Day Modified Program

All,

I write to inform you that CDCR will implement a fifteen day modified program effective Sunday January 9, 2022.  The memorandum is attached.  The terms of the modified program are consistent with those used during the 2020-2021 winter COVID surge.  Please let me know if you have any questions.

Nick Weber

Attorney

Department of Corrections & Rehabilitation

1515 S Street, Suite 314S

Sacramento, CA  95811-7243

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate

applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

DocuSign Envelope ID: 8B911574-4B47-4ED0-8A73-88EBE9FBD630

State of California                                         Department of Corrections and Rehabilitation

# Memorandum

Date:   **January 6, 2022**

To:     Associate Directors, Division of Adult Institutions
        Wardens
        Regional Health Care Executives
        Chief Executive Officers

Subject:   **COVID-19 MANDATORY 15-DAY MODIFIED PROGRAM**

The California Department of Corrections and Rehabilitation's priority is to protect the health and well-being of our staff and the inmate population, as well as providing a safe environment. The purpose of the memorandum is to announce measures intended to reduce staff and inmate exposure to the Coronavirus (COVID-19) by minimizing inmate movement throughout the State.

Effective Sunday, January 9, 2022, all institutions shall implement a mandatory 15-day modified program. Each institution shall be responsible for either creating or amending their current Program Status Report taking all of the following information into consideration:

- The entire institution will be affected, except for Restricted Housing Units, Correctional Treatment Centers, and Psychiatric Inpatient Programs, etc.
- Movement will be via escort – maintain increased physical distancing unless security would dictate otherwise (e.g. Administrative Segregation Unit placement). Movement will be in such a fashion as to not mix inmates from one housing unit with another housing unit
- Feeding – Cell feeding is preferred.  However, if due to the operational design of your facilities,  if you elect to feed in the dining halls it shall be as follows: one housing unit at a time, reduced occupancy, maintaining physical distancing, and disinfecting tables and high touch areas between each use
- Ducats – priority only
- Visiting – no contact or non-contact
- Video-Visiting - only
- Family Visiting - none
- Legal visits – urgent/emergency, via telephone or video conference where available. Board of Parole Hearings will continue with attorney contacts and psychological assessments as required
- Workers – critical and porters. All workers shall use appropriate Personal Protective Equipment (PPE) and wear an N-95 at all times.
  - Refer to attached California-Prison Industry Authority essential Enterprises
  - Inmate Ward Labor or other mission critical, fire, life, safety construction projects shall continue, i.e., roofing projects, health care areas, HVAC, water, etc.
- Showers – maintain distancing and disinfect between each use

Associate Director, Division of Adult Institutions
Wardens
Regional Health Care Executives
Chief Medical Officers
Page 2

- Health care services – limited to essential clinical services including urgent/emergent and priority ducats.
- Request for Health Care Services Forms, CDCR-Form 7362, will be distributed and picked up in the housing units by healthcare staff when access to the 7362 box is restricted by movement.
- Medication(s) distribution – Wardens, please work with your Chief Executive Officers and Chief Nurse Executives to establish a process. When applicable, conduct podium pass within the unit. If movement to the yard, canteen, and/or feeding in the dining halls continues, medication pass shall be maintained at the medication windows, maintaining physical distancing and not mixing inmates from different housing units.
- Law Library – PLU or paging option while maintaining physical distancing in the library
- Dayroom – maintain reduced occupancy to ensure increased physical distancing
- Recreation – One housing unit/dorm at a time. Do not mix inmates from different units.
- Canteen is permitted – shall be conducted in a manner to ensure physical distancing. If unable to accommodate physical distancing, facilitate delivery method
- Packages are permitted
- Phone calls are permitted – ensure physical distancing and disinfect between each use
- Religious programs shall be cell front, or deliver materials to the housing unit/dorm/cells
- Inmate Activity Groups - No in-person groups. Community Based Organization or volunteer program materials to be provided either cell front or to the dorm
- Educational, Vocational and ISUDT – no in-person classes. Educational materials to be provided either cell front, or to the dorm
- Transfer and inmate movement
  - Only essential moves approved via the movement matrix and via Population Management Unit in conjunction with Health Care Population Oversight Program

During this time, Community Resources Managers, Education Department staff, and others designated by the Warden shall facilitate the delivery of increased games, program materials, reading books, or other items to the housing units. Housing unit/dorm officers and supervisors are expected to conduct additional rounds and spot checks of inmates in an effort to reduce self-harm and/or suicide attempts.

All institutions will be required to provide a copy of their Program Status Report, Part-A, to their respective Associate Director each day for this 15-day period. Institutions are expected to brief staff and inmate advisory councils on this directive as this modified program is currently only slated to be in effect for 15-days, through January 23, 2022, or upon further direction.

Associate Director, Division of Adult Institutions
Wardens
Regional Health Care Executives
Chief Medical Officers
Page 3


Thank you for your continued efforts in managing this COVID-19 event. If you have any additional questions, please contact your respective Associate Director, or Regional Health Care Executive.

CONNIE GIPSON
Director
Division of Adult Institutions

DocuSigned by:

**Joseph Bick**

JOSEPH BICK, M.D.
Director
Health Care Services

cc: Kimberly Seibel
    Jared D. Lozano
    Ron Davis
    Rainbow Brockenborough
    Patrice Davis



Quality Products * Changed Lives * A Safer California

State of California
Department of Corrections and Rehabilitation

## OPEN ENTERPRISES AS OF NOVEMBER 26, 2020- REVISED

| Institution | Enterprise |
| --- | --- |
| ASP | Egg |
| ASP | HFM |
| ASP | Laundry |
| ASP | Poultry |
| CAC | HFM |
| CAL | HFM |
| CCC | HFM |
| CCI | HFM |
| CCWF | HFM |
| CEN | HFM |
| CHCF | HFM |
| CIM | Food &Bev |
| CIM | HFM |
| CIM | Laundry |
| CIW | HFM |
| CMC | HFM |
| CMC | Laundry |
| CMF | HFM |
| COR | Dairy |
| COR | Food &Bev |
| COR | HFM |
| COR | Laundry |
| CRC | HFM |
| CTF | HFM |
| CVSP | HFM |
| CVSP | Laundry |
| DVI | Dairy |
| DVI | HFM |
| FSP | HFM |
| FWF | HFM |
| HDSP | HFM |
| ISP | HFM |
| KVSP | HFM |
| LAC | Chemical |
| LAC | HFM |
| LAC | Laundry |
| MCSP | Coffee |
| MCSP | Food &Bev |



State of California
Department of Corrections and Rehabilitation

### OPEN ENTERPRISES AS OF NOVEMBER 26, 2020- REVISED

| | |
|---|---|
| MCSP | HFM |
| MCSP | Laundry |
| MCSP | Meat Cutting |
| NKSP | HFM |
| PBSP | HFM |
| PBSP | Laundry |
| PVSP | HFM |
| RJD | Bakery |
| RJD | HFM |
| RJD | Laundry |
| SAC | HFM |
| SAC | Laundry |
| SATF | Food &Bev |
| SATF | HFM |
| sec | HFM |
| SOL | HFM |
| SOL | Laundry |
| SOL | Optical |
| SQ | HFM |
| SVSP | HFM |
| VSP | HFM |
| VSP | Laundry |
| VSP | Optical |
| WSP | HFM |
| WSP | Laundry |

State of California                                                     Department of Corrections and Rehabilitation

# Memorandum

Date:       February 3, 2022

To:         Associate Directors, Division of Adult Institutions
            Wardens
            Regional Health Care Executives
            Chief Executive Officers

Subject:    **COVID-19 MANDATORY 15-DAY MODIFIED PROGRAM EXTENSION (2)**

The Department continues to evaluate the current operations to reduce staff and inmate exposure to the Coronavirus (COVID-19) by minimizing inmate movement throughout the state.  On January 6, 2022, the attached memorandum titled, *COVID-19 Mandatory 15-Day Modified Program* provided direction to institutions regarding a statewide modified program that will be in effect January 9, 2022 through January 23, 2022.

Due to the continued rise in COVID-19 cases throughout California and within our prisons, there is a need to further extend the above modified program through Sunday, February 13, 2022.  Beginning February 14, 2022, institutional operations will be consistent with the department's Roadmap to Reopening Plan.

Institutions are expected to share this information with their staff and the inmate advisory councils.  Thank you for your continued efforts in managing this COVID-19 pandemic.

If you have any additional questions, please contact your respective Associate Director, or Regional Health Care Executive.

CONNIE GIPSON
Director
Division of Adult Institutions

DocuSigned by:
**Joseph Bick**
347167202A8A404...
JOSEPH BICK, M.D.
Director
Health Care Services

Attachment

cc:  Kimberly Seibel
     Jared D. Lozano
     Ron Davis
     Rainbow Brockenborough
     Patrice Davis

# EXHIBIT B



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

January 25, 2023

VIA ELECTRONIC MAIL ONLY

Matthew A Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Deveraux & O'Gara LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnson, RI  02908
Mlopes@pldolaw.com

      Re:    *Coleman v. Newsom*:  Plaintiffs' Comments on 29th Draft Report, Part C,
               Covering EOP Level of Care Institutions, and Part D, Covering CCCMS
               Level of Care Institutions
               Our File No. 0489-3

Dear Special Master Lopes:

We write to provide Plaintiffs Counsel's comments regarding the Draft 29th Round Report, Part C (EOP Facilities) ("the Draft EOP Report") and regarding the Draft 29th Report, Part D (CCCMS Facilities) ("the Draft CCCMS Report") (collectively, "the Draft Reports").  Our primary concern as to both reports—discussed in Sections I and II below—is to the lack of additional recommendations to remedy the snowballing staffing crisis and the long-standing deficiencies in quality of care.  Such recommendations are necessary in light of the troubling factual findings in both reports regarding those issues.  In addition, we raise some discrete concerns regarding the Draft Reports in Section III below.

## I.      CDCR'S ONGOING STAFFING CRISIS

The evidence of the current acute staffing crisis in CDCR as set forth in the Draft Reports is overwhelming.  As the Draft EOP Report explains:

> Given the persistence of defendants' inability to recruit and
> retain sufficient mental health staff over many years,
> "transformational" solutions may need to be considered, as it

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 2

> is clear defendants are presently unable to provide
> constitutionally adequate mental health care to the number of
> seriously mentally ill persons now incarcerated in California.

Draft EOP Report at 145.[1]  The Draft Reports describe the staffing crisis as "a bona fide mental health staffing emergency within CDCR," *see id*., with CDCR maintaining "abysmally low" fill rates, *see* Draft CCCMS Report at 5.  Statewide staffing vacancy rates across all institutions as of September 2022 for key mental health categories stood at:

- Psychology – line staff:  38.2 percent.

- Psychology – all classifications:  33.1 percent.

- Social Work – line staff:  33.5 percent.

- Social Work – all classifications:  30 percent.

- Recreation Therapist:  26.3 percent.

- Medical Assistant:  47.9 percent.

Draft CCCMS Report at 6 (citing Special Master's December 9, 2022 staffing vacancy report, ECF 7677).

The strong evidence in each of the draft reports concerning the severe staffing crisis now occurring is reviewed in detail below.

### A.    There is a Severe Staffing Crisis In the EOP Institutions

The Draft EOP Report documents extraordinary problems with vacancy rates for the EOP institutions.  The report also highlights that despite some improvements in the persistently problematic psychiatry categories, the chronic shortages in the primary clinician positions (psychologists and social workers) have spiraled out of control to crisis levels.  The report documents that "13 of 15 institutions with enhanced outpatient programs (EOP) failed to fill 90 percent of allocated psychology positions; 11 of 15 were unable to fill 90 percent of allocated social worker positions."  *See* Draft EOP Report at 5-6 and Figure 1.  Many institutions had egregiously high vacancy rates leading to

---

[1] All citations to the Draft CCCMS Report and Draft EOP Report are to the internal pagination provided in those reports.  Citations to ECF filed documents are to the ECF banner number.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 3

"functional vacancy rates for both primary clinician classifications [that] were at or above 30 percent." *Id.* at 6.

The crisis is not limited to primary clinicians. Indeed in all but one staffing category "the 15 institutions with EOP programs continued to report unacceptably high vacancy rates. Except for telepsychiatry, all such vacancy rates exceeded ten percent." *See* Draft EOP Report at 46. The report documents overall vacancy rates across the 15 EOP institutions as follows:

- 13% functional vacancy rate for Chief Psychiatrists.

- 55% functional vacancy rate for Senior Psychiatrists.

- 24% functional vacancy rate for Staff Psychiatrists (51% without registry).

- 17% functional vacancy rate for Chief Psychologists.

- 13% functional vacancy rate for Senior Psychologists.

- 37% vacancy rate for Staff Psychologists (45% without registry).

- 30% functional vacancy rate for Social Workers.

- 11% functional vacancy rate for Recreation Therapists.

- 17% functional vacancy rate for Psychiatric Technicians.

- 26% functional vacancy rate for Office Technicians.

Draft EOP Report at 46-47. Reviewing these numbers, the Draft EOP Report concludes, "It is axiomatic that defendants' failure to satisfy the established staffing requirements significantly contributed to its inability to provide the Coleman class with constitutionally adequate mental health treatment." *Id.* at 51-52.

Significantly, "the dire state of CDCR's mental health staffing levels has led Mental Health leadership to authorize a 'patient triaging' process at twelve [of the 15 EOP] institutions." *Id.* at 7. The Draft EOP Report correctly observes that "[b]y pivoting to triaging patients, CDCR is tacitly acknowledging that many institutions' mental health staffing vacancies make it impossible to provide Program Guide compliant mental health care to the entire MHSDS population. Without dramatic intervention, defendants will remain noncompliant with the Court's June 13, 2002 staffing order, and patients will suffer." *Id.*

[4221023.6]

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 4

The Draft EOP Report illustrates the myriad ways in which "the staffing crisis …
continues to hinder defendants' ability to provide constitutionally adequate mental health
care to the plaintiff class." *See id.* at 4. To list just a few examples, across multiple EOP
institutions, "[c]ompliance with the requirements for treatment of MHSDS patients in
restricted housing was significantly impeded by the defendants' inability to secure
adequate staffing to satisfy Program Guide ratios." *Id.* at 144. Similarly across the
institutions "the majority of CMHPP components were implemented with varying
degrees of compliance and quality and, at times, impacted by staffing deficiencies." *Id.*
at 109. At one major EOP institution, "CHCF reported that staffing was its most
significant challenge during 2020 and 2021, during which the institution's very
consequential staff turnover had a horrific impact on patient care and staff morale." *Id.* at
189-90. Yet despite efforts, "CHCF was unable to hire *any* new mental health staff
during the review period" and was forced to implement a "'harm reduction' strategy" and
to transfer out hundreds of EOP patients due to poor staffing. *See id.* at 190. This even
as CDCR is making use of multiple overflow housing units to house scores of EOP
patients due to a lack of adequate EOP housing. *See infra* Section III.D and Attachment
A hereto. At another institution, "MCSP was noncompliant all six months for
observation of the preparation and administration of HS and AM/PM medications due to
staffing shortages." *Id.* at 451. And even after COVID-19 conditions improved at
MCSP, "there continued to be challenges related to the provision of required treatment
hours, mostly due to staffing limitations." *Id.* at 466-67. "On weekends and holidays,
SVSP reported that it attempted to have a CIT clinician on-site but due to staffing
limitations this was not always possible." *Id.* at 611.

**B.    There Is Also A Severe Staffing Crisis At the CCCMS Institutions.**

The Draft CCCMS Report reinforces the conclusion that CDCR has a severe,
current staffing crisis, with the 13 institutions reviewed "continu[ing] to report
unacceptably high vacancy rates." Draft CCCMS Report at 11.

At a more granular level, the Draft CCCMS Report notes that "only three of the 13
3CMS institutions … had functional vacancy rates at or below ten percent for staff
psychologists, as required by the court's June 12, 2002 order regarding mental health
staffing vacancies." Draft CCCMS Report, at 5. Eight institutions had staff psychologist
functional vacancy rates over 20 percent, and three institutions had functional vacancy
rates over 50%. *Id.* The CCCMS Report finds the following, extremely deficient
functional vacancy rates for a number of other positions and disciplines among the
13 CCCMS Institutions:

- 54% functional vacancy rate for Chief Psychiatrists. *Id.* at 8.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 5

- 48% functional vacancy rate for Chief Psychologists. *Id.* at 9.

- 34% functional vacancy rate for Staff Psychologists (reduced from 40% by registry). *Id.*

- 21% functional vacancy rate for Social Workers. *Id* at 10.

- 18% functional vacancy rate for Recreation Therapists. *Id.*

- 25% functional vacancy rate for Office Technicians. *Id* at 11.

The Draft CCCMS Report shows that harm from the current staffing crisis in CCCMS institutions is significant and detrimentally affects myriad aspects of CDCR's mental health care programs: At CIM, staffing shortages were partly responsible for the high rates of nonconfidential clinical contacts. *Id.* at 133. At CDCR's Reception Centers for men, NKSP and WSP, due to clinical staffing shortages caseloads were not assigned to psychiatrists or case managers – rather, the institutions established a maximum number of patients that individual psychiatrists and case managers can see each day, which means there was no continuity of care for patients there. *See id.* at 69. At CCI, psych techs – the members of the clinical team who interact with class members the most frequently in segregation units – often failed to attend the mandated Administrative Segregation morning meetings due to staffing shortages. *Id.* at 218. At Wasco, staff reported "chronic staffing shortages affected the provision of all mental health care at the institution." *Id.* at 317. In particular, access to care problems identified at Wasco were attributed to staffing shortfalls, *id.*, as were untimely initial mental health initial screenings, *id.* at 324, and untimely routine contacts with CCCMS patients, *id.* at 326. The Wasco staffing shortages also "negatively impacted compliance with weekly 3CMS supervisory meetings" required by the CMHPP. *Id.* at 334. At North Kern, the Crisis Intervention Team "was hampered by insufficient mental health and nursing staffing." *Id.* at 159. At Avenal, progress in addressing deficiencies in treatment planning stalled in part due to staffing problems there. *Id* at 345. At CIM, the institution did not comply with Title 22 staffing requirements and psychology interns routinely provided coverage for patient caseloads. *Id.* at 372. Although staffing during the period at Solano was generally good on paper, in practice the institution struggled with "low clinical staffing due to FMLA leaves." *Id.* at 95, 109. At Wasco, the pre-release coordinator was assigned a regular caseload due to staffing shortages, and thus was only able to devote half of their time to the pre-release program. *Id.* at 330.

As discussed further below, given the extensive, detailed documentation in the EOP and CCCMS Reports of the severe and rapidly growing staffing problems taking

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 6

hold in all clinical categories in CDCR, recommendations for further remediation are necessary.

## II.    CDCR'S ONGOING QUALITY OF CARE DEFICIENCIES IN EOP AND CCCMS PROGRAMS

Both Draft Reports document pervasive chronic problems with quality of care in the MHSDS.  For example, the Draft CCCMS Report identifies severe deficiencies in quality in the 160 detailed clinical case reviews conducted by the experts  at the 13 CCCMS institutions.  Of 160 detailed clinical case reviews at those institutions conducted by the Special Master's Clinical Experts, the following results were observed:

- 40 percent of patients reviewed received care of adequate quality;

- 16 percent of patients reviewed received care of marginally adequate quality;

- 44 percent of patients reviewed received care of inadequate quality.

Draft CCCMS Report at 21-22, 71.  The fact that almost half of all patients reviewed received care of inadequate quality is very troubling.

While it does not categorize the quality of care provided to patients covered by the detailed cases reviews in the summary section in the same manner as the Draft CCCMS Report,[2] the Draft EOP report contains numerous findings about quality problems with specific EOP institutions that supports the need for remediation in this area.  *See, e.g.*, Draft EOP Report, at 171 (at CMF "IDTT quality varied across treatment teams, with only three of 13 meeting all audit criteria.  There were deficiencies in most level of care justifications and/or higher level of care discussions" and noting that "the quality and quantity of EOP treatment groups were inadequate"), 211 (at CHCF "treatment plans were deficient" and there "was an overreliance on copied and pasted generic statements"), 335 (noting issues with hours of structured therapy at SQ and with "the quality of the structured treatment."), 441 (at LAC, "IDTT quality varied by provider.").

---

[2] The Draft EOP Report includes findings regarding, by our count, 282 detailed clinical case reviews of patients at the fifteen EOP institutions and observing that many of these patients received "inadequate quality" care.  We request that the Special Master add a summary section to the Draft EOP Report, similar to the Draft CCCMS Report, summarizing what proportion of patients at the fifteen EOP institutions received inadequate care, including information showing whether the patients reviewed were at the EOP or CCCMS level of care.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 7

The more granular findings in both the Draft EOP Report and the Draft CCCMS Report are also deeply concerning.  For example:

a.  <u>IDTT Case conceptualizations</u>:  The Draft CCCMS Report found serious problems with IDTTs, noting among other problems that "IDTT case conceptualizations were identified as an area in need of significant improvement across institutions and programs, as only NKSP and HDSP presented adequate case conceptualizations during observed IDTTs."  Draft CCCMS Report at 16.  The Draft EOP Report also found deficient case conceptualizations and/or treatment formulations.  Draft EOP Report at 78-79; *see also id.* at 61-62.

b.  <u>Inadequate Collaboration in Care Planning in IDTTs</u>:  The Reports also document inadequate IDTT collaboration in care planning at many though not all institutions.  *See* Draft CCCMS Report at 16-17; Draft EOP Report at 57, 74, 79.

c.  <u>Inadequate Discussions of Individualized Treatment Planning in IDTTs</u>:  The Draft EOP Report noted variability in treatment planning at observed IDTTs and noted that "reviewed treatment plans revealed similar inadequacies in the quality of treatment planning."  *See* Draft EOP Report at 57.  Similarly, patient health care record reviews for the EOP institutions found, as in each of the prior three monitoring rounds, "there were widespread problems with treatment plans."  *See* Draft EOP Report at 74.  The Draft CCCMS Report also found that "[t]reatment teams did not sufficiently contribute meaningful information toward developing individualized treatment plans during observed IDTT discussions" in 12 out of 24 programs observed.  *See* Draft CCCMS Report at 18-19.

d.  <u>Inadequate Level of Care and Medication Discussions in IDTTs</u>:  The Draft EOP Report identified that "healthcare record review indicated many instances where the IDTT did not properly consider and refer patients to higher levels of care" and highlighted numerous examples of serious concerns from the individual case reviews.  *See* Draft EOP Report at 82-84.  The Draft CCCMS Report noted medications and level of care decisions were each inadequate during IDTTs at about a third of the programs where IDTTs were reviewed in CCCMS institutions.  *See* Draft CCCMS Report at 20-21.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 8

e.    <u>Treatment Planning – Lack of Individualized Goals and Inadequate Treatment Goals</u>:  The Draft EOP Report noted "[s]imilar to prior monitoring rounds, reviewed patient healthcare records revealed numerous instances of IDTTs failing to appropriately modify patients' treatment plans in response to changes in patients' symptoms, mental health condition, or lack of treatment progress, and/or where the treatment plan did not address the patient's current treatment needs."  Draft EOP Report at 76.  The Draft CCCMS Report similarly found significant problems with inadequate treatment goals in cases reviewed at ASP, CCI, NKSP, PVSP, and WSP.  Draft CCCMS Report at 23-26.

f.    <u>Treatment Planning – Inadequate Treatment Interventions</u>:  Among the EOP facilities, "[m]ost institutions also failed to … develop appropriate treatment interventions for positive inpatient care referral indicators."  Draft EOP Report at 108.  The Draft CCCMS Report found that "[a]cross facilities and programs, a number of treatment plans included nonspecific treatment interventions and/or lacked the use of evidence-based therapies to address patients' needs."  Draft CCCMS Report at 27.

g.    <u>Inadequate Clinical Summaries and Inadequate Documentation of Progress</u>:  The Draft EOP Report noted that, as in the prior monitoring round, this monitoring round also "revealed numerous concerns with the adequacy of treatment plans' clinical documentation across institutions and programs."  Draft EOP Report at 71.  These problems included "concerns with the adequacy of provided documentation, which included sparse, overly brief, incomplete, and/or inadequate documentation" and documentation that "included substantial amounts of copied text," was "outdated," "generic," "included many phrases that appeared to be for liability purposes and unrelated to the patient's mental health needs," "overly terse and minimally useful for continuity of care," and/or contained significant "discrepancies."  *Id.* at 71-73.  The CCCMS Report found significant problems with inadequate assessments of changes in patient functioning since the prior IDTT in many specific cases, with many cases providing on "brief inconsequential updates" or being "void of updated information altogether."  Draft CCCMS Report at 28.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 9

      h.    <u>Diagnostic Concerns</u>:  The Draft EOP Report noted "Patient healthcare record review also indicated numerous records needing diagnostic clarification and/or resolution of conflicting or multiple diagnoses."  *See* Draft EOP Report at 79.  The CCCMS Report noted several concerning diagnostic discrepancies and failures to resolved diagnostic differences.  *See* Draft CCCMS Report at 30-31.  Additionally, a minority of CCCMS programs whose IDTTs were observed failed to adequately discuss diagnostic decisions.  Draft CCCMS Report at 18.

      i.    <u>Failures to Implement Treatment Recommendations</u>:  The CCCMS Report noted widespread failures to implement key treatment recommendations.  As the report notes, "quality care requires the provision of adequate and coordinated treatment interventions provided to patients in order to meet their identified mental health needs."  *Id*. at 31.  The report found a failure to implement treatment recommendations in 31 percent of mainline CCCMS cases reviewed and in 21 percent of STRH cases reviewed.  Draft CCCMS Report at 30-31.

      j.    <u>Use of Outdated Language from Prior Notes Without Updating It</u>.  The CCCMS Report found significant problems with "healthcare record documentation being copied into subsequent documentation without updating."  *Id*. At 33.  This issues was most severe in STRH units, where it was notes as a problem in 37% of the 19 cases reviewed in STRH units at NKSP, PBSP, PVSP and WSP.  Draft CCCMS Report at 30-31.  The Draft EOP Report similarly noted instances of outdated documentation and text or clinical information that was copied from previous or outdated documentation.  *See* Draft EOP Report at 71-72, 77-78.

As discussed further below, given the depth and breadth of these identified problems, the Draft EOP and CCCMS Reports should both include a recommendation to address this long-standing, well-documented issue.

## III.   ADDITIONAL COMMENTS ON THE DRAFT REPORTS

### A.   Reporting on Staff Misconduct

The Draft Reports summarize the institutions' reporting regarding staff misconduct.  *See* Draft EOP Report at 116; Draft CCCMS Report at 55-56.  It is unclear

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 10

from these overall summaries and the underlying Institutional Summaries whether the institutions are reporting only complaints against mental health clinicians or against all staff, whether they are reporting only complaints by MHSDS participants or by all incarcerated people, and whether certain institutions are reporting complaints raised through the grievance process or through other avenues such as 989s. It is not clear whether each institution followed the same reporting methodology. Plaintiffs are concerned about whether these issues may have contributed to the wide disparities in data such as data showing two "staff complaints" at RJD compared with "134 substandard performance claims and 58 use of force allegations" at CHCF, even though both institutions have large MHSDS populations. *See* Draft EOP Report at 116.

We therefore request that the Draft Reports clarify the scope of the reported data, and any limitations on the data such as a discussion of different or unclear reporting methodologies by the institutions.

### B.    Disproportionate use of RVRs

We appreciate the Special Master's detailed findings in the Draft EOP Report regarding the disproportionate use of RVRs to punish class members as compared to non-class members. For example, the Draft EOP Report found that 65% of RVRs were issued to MHSDS patients at the 15 institutions, even though those patients accounted for only 50% of the population. *See* Draft EOP Report at 119. The report also helpfully includes the specific numbers of RVRs issued to patients broken out by level of care. *See id.* From our review, it appears that EOP patients are drastically disproportionately impacted by RVRs. We request that the final report update these findings to break out what percentage of the overall population was at each level of care at the fifteen institutions.

### C.    Proportions and Lengths of Stay of Class Members in Segregation

We appreciate the Draft Reports' detailed findings regarding segregation units. We request that the Draft Reports be updated to include findings on the extent to which class members, and particularly EOP class members, are disproportionately held in segregated housing as compared to non-class members. For example, Defendants' Report that as of December 1, 2022, 2.28% (1,331 of 58,423) of non-MHSDS people in CDCR were in segregation. *See* D. Hockerson Ltr. Re November 2022 Seg Data (Dec. 7, 2022). By comparison, relying on Defendants' December 1, 2022 segregation data and Defendants' close-in-time November 28, 2022 MIS Report, Plaintiffs calculate that approximately 5.48% of the *Coleman* class was in segregation, including 10.93% of EOP/EOP Mod class members. In other words, from this data produced by CDCR, EOP class members were about five times more likely to be housed in segregation than non-class members. Plaintiffs request that the Special Master's final reports include

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 11

information on whether and to what extent the monitor found disproportionate and concentrated use of segregated housing for class members during this round.

Additionally, both Draft Reports provide some information regarding class members' lengths of stay in segregated housing. Plaintiffs request that the information be summarized at a high level and be compared to prior reporting periods to ascertain whether the 2014 remedial plans issued in response to the Court's April 10, 2014 segregation order are decreasing class members' lengths of stay in dangerous segregation units.

      **D.**      **Overflow Housing Issues**

It is apparent from class member reports and Defendants' data that CDCR has been utilizing significant amounts of overflow housing in recent months and years, both in segregation and non-segregation settings. Defendants' use of overflow housing for patients on segregation status at CSP-Sacramento, whereby EOP ASU class members are being held indefinitely in PSU overflow, is confirmed in the Draft EOP Report at 662, 672-73, 675, 965. Additionally, Defendants reported in the email attached hereto as **Attachment A** (with redactions of patient identifying information) the following non-EOP units held the following census of EOP class members as of November 21, 2022:

1. KVSP (C7): 61
2. SVSP (D4): 21
3. SATF (overflow is occurring due to outbreak and quarantine issues)
   a. (A-3): 8
   b. (D): 7
   c. (E): 3
   d. (F): 26
4. MCSP
   a. (B): 10
   b. (3A): 9
5. CSP-SAC
   a. (A5): 9
   b. (A2): 19

We request that the Special Master include in the final reports a discussion and findings regarding the extent to which the monitors observed the use of overflow housing for class members during the monitoring round; whether the patients held in overflow settings receive the treatment, property and privileges commensurate with the housing unit to which they are endorsed to the extent it differs from the unit where they are housed; and, to the extent possible, the reasons for Defendants' apparently increased reliance on

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 12

E.    **Clarification Regarding Reporting on Pill Line Lengths**

The Draft Reports document the extent to which the institutions' pill line durations exceeded two hours. *See* Draft CCCMS Report at 46 (noting that "[m]ost pill lines were reported to be less than two hours in duration" and documenting the five institutions that reported that all pill lines were under two hours, but also noting reports at three institutions that some pill lines were over two hours); *see also* Draft EOP Report at 96-97. Prior reports highlighted whether pill lines were longer than thirty minutes long. *See* 28th Round Report, ECF No. 7074 at 137-38 ("Eleven of the 18 CDCR institutions covered in this report indicated no problems with lengthy pill lines, indicating that inmates generally moved through the lines in 30 minutes or less."); 27th Round Report, ECF No. 5779 at 85-88 (employing thirty minute or less standard). It appears the Draft Reports focus on the total duration of the pill line for all people in the line, while earlier reports focus on the how long each class member had to stand in line to receive their pills. Assuming that is correct, please clarify the language in the Draft Reports and provide information for each institution as to whether patients waited longer than thirty minutes to receive their pills, consistent with prior reports.

F.    **Document Review Timeframes**

Finally, for clarity and historical purposes, Plaintiffs request that the Special Master specify the document review timeframes in both the EOP Report (for each of the 15 institutions) and the CCCMS Report (for each of the 13 institutions).

## CONCLUSION AND PROPOSED RECOMMENDATIONS

It is clear that CDCR mental health leadership feels besieged and defensive, and oversees its chronic staffing troubles in a reactive manner that fails to anticipate problems and is extremely slow to make needed changes in compensation and recruitment strategies. In the last 20 years, CDCR has stumbled from one staffing crisis to the next. The harm from these failures of management are significant, as the Draft Reports make clear. As the Court has found, and the CCCMS Report notes, "[t]he Coleman class cannot afford further delays in remedying the staffing crisis." Draft CCCMS Report, at 7.

[4221023.6]

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 13

Remediation of this issue is urgently needed, and a recommendation for action is more than warranted based on the findings in the Draft Reports. Given the Court's October 10, 2017 Order (ECF No. 5711) and Defendants' continuing inaction in the face of rapidly deteriorating clinical staffing, we request that the Special Master recommend the Court order Defendants to propose within 30 days a comprehensive plan with specific actionable steps and a timeline of no more than one year to remediate the current staffing deficiencies across all clinical categories. Given prior failed attempts to address this problem, any such plan should be required to include any and all measures necessary, such as consideration of targeted and across the board compensation increases, retention efforts including addressing deficient workplace conditions, clustering, and targeted population reduction measures. Additionally, either as an alternative remedy, or if Defendants do not have an adequate proposed remedy to quickly address the shortfalls, Defendants should be required to explain why, after over 20 years of failing to achieve mandated staffing levels, a Receiver should not be appointed to manage staffing and recruitment for them.

Similarly, CDCR quality of care has long lagged, as is well documented in these Draft Reports. Plaintiffs therefore request that the Special Master add a recommendation requiring Defendants to propose a plan within 90 days to address CDCR's chronically deficient quality of mental health care, including, for instance, appointment of a quality of care point-person within CDCR to oversee training and establishment of standards and benchmarks for progress aimed at improving mental health quality of care.

Thank you for considering these comments.

Sincerely,

ROSEN BIEN GALVAN & GRUNFELD LLP

/s/ Thomas Nolan          /s/ Marc J. Shinn-Krantz

By:  Thomas Nolan          Marc J. Shinn-Krantz
     Of Counsel            Associate

TN/MSK
Enclosure:  Attachment A
cc: *Coleman* co-counsel          Paul Mello          Carrie Stafford
    *Coleman* Special Master Team   Samantha Wolff      Nicholas Weber
    Elise Thorn                     Melissa Bentz       Brent Reden
    Namrata Kotwani                 Sundeep Thind       Nina Raddatz
    Damon McClain                   Dillon Hockerson    Kristopher Kent

[4221023.6]

# Attachment A

| | |
|---|---|
| **From:** | Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov> |
| **Sent:** | Tuesday, January 17, 2023 12:54 PM |
| **To:** | Marc Shinn-Krantz |
| **Cc:** | Damon McClain; Elise Thorn; Namrata Kotwani; Paul B. Mello; Samantha Wolff; Coleman Special Master; Matt Lopes; Coleman Team - RBG Only; Steve Fama; Nick Weber; Stafford, Carrie@CDCR; CDCR OLA Coleman CAT Mailbox |
| **Subject:** | RE: Coleman: Inquiries re ███████, ████, EOP; and re EOP Overflow Housing at SVSP, KVSP, Systemwide - Confidential - Subject to Protective Order [IMAN-DMS.FID12440] |

**[EXTERNAL MESSAGE NOTICE]**

Dear Marc,

OLA is in receipt of Plaintiffs' follow-up email regarding Mr. ██████████'s, ██████, housing situation and providing adequate mental health care. OLA will provide responsive information soon.

Sincerely,
**Dillon Hockerson**
Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Tuesday, January 10, 2023 3:14 PM
**To:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Cc:** Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Matt Lopes <mlopes@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** RE: Coleman: Inquiries re ██████████, ████, EOP; and re EOP Overflow Housing at SVSP, KVSP, Systemwide - Confidential - Subject to Protective Order [IMAN-DMS.FID12440]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Dillon,

We write again on behalf of ██████████, ████, EOP, who remains improperly housed in overflow housing on SVSP D4, over a month since your below email, and nearly 12 weeks after being transferred there on October 19, 2022.

He is not receiving EOP-level treatment at D4 and reports he is depressed and suffering due to a lack of one-on-one and group treatment and is unable to get help through repeated attempts to use CDCR's 7362 process. He reports he

receives ducats for EOP groups on the "D1 EOP yard" or the "D Mental Health Group MH" location, but the ducats are repeatedly not honored. Our review of CDCR's EHRS and OnDemand data supports this. For example his IDTT documented their concern that he flagged on the high treatment refusal list, but that he reported not being let out for ducats, "which may be impacting [his] appointment history in ONDemand" and "his low treatment participation may be due to institutional barriers and his own volitional choice." *See* 12/15/22 MH Master Treatment Plan. Mr. ███ confirms he wants to go to these groups. Our review of the Appointments Indicator in On Demand confirms that a majority of his mental health groups during his time at SVSP have been cancelled, and he is listed as "refusing" a majority of those that are not cancelled. We are concerned that CDCR appears to have no specific plan to provide Mr. ███ adequate treatment.

What are the results of CDCR's bi-weekly review of Mr. ███ to address any barriers to transfer? We request that CDCR promptly transfer Mr. ███ to an appropriate setting where he can receive treatment commensurate with the EOP level of care (or higher if needed).

Thank you,
Marc

---

**From:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:** Friday, December 9, 2022 11:38 AM
**To:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Cc:** Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Special Master <colemanspecialmaster@pldlaw.com>; Matt Lopes <mlopes@pldlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** RE: Coleman: Inquiries re ███████████, ██████, EOP; and re EOP Overflow Housing at SVSP, KVSP, Systemwide - Confidential - Subject to Protective Order [IMAN-DMS.FID12440]

[EXTERNAL MESSAGE NOTICE]

Dear Marc,

I write in response to Plaintiffs' November 16th email regarding Mr. ███████████'s, ██████, housing and the California Department of Corrections and Rehabilitation's (CDCR) plan to address overflow housing for patients at the Enhanced Outpatient Program (EOP) at Kern Valley State Prison (KVSP) and Salinas Valley State Prison (SVSP).

First, Plaintiffs note that Mr. ███ was transferred from Richard J. Donovan Correctional Facility's (RJD) EOP Administrative Segregation Unit (ASU) Hub to SVSP's Facility D4, and ask why Mr. ███ was transferred to a non-EOP housing unit. On September 9, 2022, Mr. ███ was review by RJD's Institutional Classification Committee (ICC) meeting for alleged safety concerns. Although CDCR could not substantiate Mr. ███'s safety concerns, CDCR attempted to rehouse Mr. ███ at RJD, but was unsuccessful due to Mr. ███'s repeated refusals to accept housing. The ICC later recommended that Mr. ███ be transferred from RJD to another institution. On October 19, 2022, Mr. ███ was transferred to SVSP, but due to bed availability, Mr. ███ was transferred to Facility D4, the EOP overflow housing unit.

Second, Plaintiffs request further updates on CDCR's plan to address EOP overflow housing at KVSP and SVSP so that EOP patients, like Mr. ███, can receive treatment in the appropriate setting. CDCR has been reviewing patients in overflow housing on a bi-weekly basis to address any barriers to transfer the patients to their

appropriate housing unit; and has created a workgroup at the Headquarters level to discuss locations for a potential EOP Level IV housing unit to alleviate the need for EOP overflow.

Lastly, Plaintiffs request a list of all the units currently being used for EOP overflow housing. As of November 21, 2022, CDCR used the below units for overflow housing based on bed availability and Quarantine or Isolation need. Also provided are the units' census of EOPs as of November 21, 2022.

1. KVSP (C7): 61
2. SVSP (D4): 21
3. SATF (overflow is occurring due to outbreak and quarantine issues)
    a. (A-3): 8
    b. (D): 7
    c. (E): 3
    d. (F): 26
4. MCSP
    a. (B): 10
    b. (3A): 9
5. CSP-SAC
    a. (A5): 9
    b. (A2): 19

Feel free to contact me if you would like to discuss further.

Sincerely,

**Dillon Hockerson**
Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

---

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Wednesday, November 16, 2022 2:08 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Cc:** Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Matt Lopes <mlopes@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** Coleman: Inquiries re ███████████, █████, EOP; and re EOP Overflow Housing at SVSP, KVSP, Systemwide - Confidential - Subject to Protective Order [IMAN-DMS.FID12440]

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear OLA,

We write on behalf of ███████████, ███████, EOP, housed in non-EOP housing at SVSP D4, and to request more information about the use of EOP overflow housing.

Mr. ██████ is a long-time *Coleman* class member who is currently at the EOP level of care and has been at that level or higher since May 2021.  CDCR records show that on October 19, 2022, he was transferred from the RJD EOP ASU Hub to mainline SNY housing at SVSP D4 where he was not offered any group treatment for the first two weeks.  After we sent a CPT memo regarding Mr. ██████ on November 1, 2022, CDCR records reflect he started to receive groups the following day but he remains housed in D4.  **Why was Mr. ██████ transferred to non-EOP housing rather than EOP mainline housing at RJD, SVSP, or another location?  What is CDCR's plan to ensure Mr. ██████ receives treatment in an appropriate setting?**

We also note that CDCR's On Demand Census shows that as of this morning, November 16, 2022, there are 23 EOP class members in SVSP's non-EOP D4 unit, co-mingled with numerous CCCMS class members and non-MHSDS individuals.  This is particularly concerning given Defendants' recent response to our query about the scores of EOP patients being housed in non-EOP overflow housing at KVSP C7.  CDCR reports its plan to transfer overflow EOP patients out of KVSP is that "KVSP conducts case reviews with Salinas Valley State Prison to ensure EOP patients can transfer when there feasible." *See* Ltr. From D. Hockerson Re Mission Changes (October 27, 2022).  We note that CDCR's Census data as of this morning shows KVSP C7 is still an almost entirely EOP unit with 62 class members at the EOP or higher level of care.  Given the apparent overcrowding in both KVSP and SVSP EOP housing, **please provide a further update on CDCR's plan to address EOP overflow housing at these two facilities.  Please also provide us a list of any buildings systemwide that CDCR is using as EOP overflow housing.**

Best,
Marc

**Marc J. Shinn-Krantz**
(he/him)
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
MShinn-Krantz@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at mshinn-krantz@rbgg.com.

# EXHIBIT C

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
JENNIFER NEILL
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 25, 2023

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Dear Special Master Lopes,

     Defendants are in receipt of the Special Master's draft Twenty-Ninth Round Monitoring Report – Parts C and D ("Draft Report") pertaining to Defendants' Compliance with Enhanced Outpatient Programs (EOP) and Correctional Clinical Case Management Programs (CCCMS) Provisionally Approved Plans, Policies, and Protocols.  Defendants offer the following objections and comments concerning your Draft Report and request that the Draft Report be revised accordingly.

     The Draft Report's findings in Part C are based on site visits at 15 CDCR institutions that occurred between May 2021 and May 2022.  (Draft Report – Part C, p. 2.)  The Draft Report's findings in Part D are based on site visits at 13 CDCR institutions that occurred during the same timeframe.  The conclusion of the Draft Report – Part C states that addressing staffing vacancies and completing data remediation are CDCR's two major outstanding remedial obligations.  (*Id.* at pp. 145-46; 147-48.)  In Parts C and D, the Special Master did not provide any formal recommendations and did not request the Court to issue any additional orders.  The Draft Report – Part C acknowledges that "CDCR's MHSDS has improved in significant ways since the Court's remedial order in 1995," noting that CDCR has constructed housing and treatment space for patients and office space for mental health clinicians and advanced its suicide prevention program such that the Special Master has delegated the responsibility of drafting the annual suicide report to CDCR.  (*Id.* at p. 146.)  In addition, the Special Master recognized the quality of treatment provided at the inpatient programs at the Department of State Hospitals, California Institution for Women, and San Quentin and previously reported that these programs will be monitored by paper review in the 30th monitoring round.  The Draft Report – Part C also notes that CDCR may be within "striking distance" of demonstrating statewide compliance with psychiatry staffing requirements. (*Id.* at p. 147.)  And while the Draft Report – Part D highlighted staffing vacancies with primary care physicians specifically, the Special Master acknowledges that CDCR has made recent progress improving psychiatry fill rates, recognizing that "CDCR's MHSDS is staffed by dedicated professionals who in some cases during the monitoring round appropriately responded to their patients' needs by increasing the frequency of clinical contacts, despite significant staffing shortages."  (Draft Report – Part D, p. 72.)

     As it works to resolve staffing vacancies, and forge ahead with data remediation, CDCR hopes to collaborate productively with the Special Master.  Nevertheless, Defendants request that the Draft Reports be revised to provide necessary context that there is both a nationwide and

statewide shortage of mental health clinicians, and that CDCR's challenges in recruiting and retaining professionals are a reflection of the complex post-COVID labor market environment, over which CDCR has no control.  (Draft Report – Part C, pp. 4-8; pp. 46-52; p. 145-46; Draft Report – Part D, pp. 3-7; pp. 7-11; pp. 70-72.)  Further, Defendants reiterate that their data activation schedules were not drafted with an eye to "la[y] the foundation to blame any future delays on the Special Master or plaintiffs' counsel." (Draft Report – Part C, p. 14.)  Attributing bad faith intentions to Defendants is unproductive.  As the Special Master himself acknowledges, CDCR has committed adequate numbers of dedicated and qualified staff to data remediation.  (*See id*. at p. 16.)  As the Draft Report notes, thirty-nine all-parties data meetings and eighty-three BRMR meetings have occurred just since March 5, 2021.  (*Id*. at p. 12.)  This does not include the countless internal preparatory tasks and meetings or meetings with the Special Master's data team such as those in QAC.  Defendants' staff spend time and resources developing documentation for indicators discussed at these meetings, and shepherd these indicators through a thirteen-step validation and verification process.  (*See* ECF No. 7415, at 17.)  Defendants are not familiar with any other government agency within the state or nationally that commits as much time and attention to ensuring that outside stakeholders understand the intricacies of their data and then incorporates that stakeholder's feedback into its data management and methodology.  To label this onerous and time-consuming process as an attempt to "seek the Special Master's rubber stamp on any indicator which *accurately* measures what it purports to measure without any regard for whether it is measuring what it is *supposed to measure* in the context of this case" fails to credit the assiduous work done by CDCR staff involved in data remediation.  (*See id*. at p. 18.)

I.    **The Draft Report Should Remove Conclusory Statements On the Constitutionality of Care Provided to the *Coleman* Class.**

The Draft Report includes conclusory statements such as "defendants are presently unable to provide constitutionally adequate mental health care to the number of seriously mentally ill persons now incarcerated in California." (Draft Report – Part C, p. 145; *see also id.* at 4; 36; 51-52).  Defendants vehemently disagree with these statements, which furthermore exceed the authority granted to the Special Master.  The *Coleman* Court has stated that "the Special Master is not tasked with assessing whether the State's prison mental health care system satisfies constitutional standards." (ECF No. 4361, at 2 (internal quotation marks omitted)).  The Special Master's task, while preparing monitoring reports, is to measure the State's compliance with "any remedial plan that this court may order." (*Id.* (citing Order of Reference ¶¶ 4-5).)  Accordingly, Defendants request that such legal judgments be removed from the Draft Report.

The Draft Reports amount to 1459 pages containing countless factual assertions and observations obtained over a lengthy timespan, which CDCR must review and analyze in a compressed timeframe to prepare objections[1].  This entails soliciting and compiling responses from all involved institutional and headquarters staff.  Given the volume of the information in these reports and the complexity of the subject-matter, CDCR has endeavored to enumerate major factual inaccuracies and identify portions of the reports where additional information and clarification from the Special Master will be most productive.  Where CDCR has not responded

---

[1] CDCR understands that the monitoring took place between May 2021 and May 2022, however, data collected for monitoring at some institutions likely goes back to late 2020.

19289969.2

to conclusory findings that CDCR is currently providing Coleman class members with constitutionally inadequate mental health care, that failure to respond is not and should not be construed in any way as an admission.

## II.    The Draft Report Relies Upon an Inaccurately Calculated Psychiatry Vacancy Rate.

The Draft Report claims a "shocking" vacancy rate of 51 percent for psychiatrists at the 15 EOP institutions visited by the Special Master's team during the 29th Round.  (Draft Report – Part C, pp. 46; 48; 51.)  This calculation is erroneous, leading to a highly misleading conclusion. It also does not comport with the monthly psychiatry vacancy reports Defendants had filed during the monitoring period.  While the specifics of the Special Master's calculation cannot be gleaned from the body of the report, CDCR analysis using more current data suggests that the Special Master may have counted the same sixty or so allocated positions in both the on-site and telepsychiatry fill rate calculation.

As of December 2022, 198.1 staff psychiatrist positions have been allocated to these 15 EOP institutions.  Of these 198.1 positions, 63 are telepsychiatrist positions.  These institutions have filled 118.35 of 135.1 allocated on-site civil service and registry psychiatrist positions, amounting to a fill rate of 87.6% or a vacancy rate of 12.4% for on-site and registry positions.  If telepsychiatrist positions are included, these institutions have filled 181.35 of 198.1 total allocated positions, amounting to a fill rate of 91.5% or a vacancy rate of just 8.5% - a far cry from the 51% figure in the Special Master's report.

Defendants suspect that the Special Master miscalculated the fill rate for on-site psychiatrists by including in the denominator the approximately sixty allocated positions that had been filled with telepsychiatry.   When a telepsychiatrist is assigned to an institution, the on-site allocation is removed and converted to a telepsychiatry position.  By using the telepsychiatry positions twice – once for the onsite calculation and once for the telepsychiatry allocation – the resulting fill rate for on-site allocation is incorrect.  Defendants request that this erroneous vacancy rate be revised.  Defendants are willing to meet with you and your experts to discuss the Draft Report on this issue to ensure that the issue is accurately resolved and the staffing vacancies corrected.

## III.    The Draft Report Should Acknowledge That Vacancy Rates Are Heavily Influenced by the Broader Labor Market.

As the Court has recognized (ECF No. 7699 at 2:13-16), recruiting and retaining mental health clinicians has been an ongoing challenge despite Defendants' many efforts to increase staffing.  Similarly, the Draft Report refers to a "staffing crisis" and notes a "vacancy rate explosion among primary clinicians."  (Draft Report – Part C, p. 5; see pp. 4; pp. 5-8; p. 23).  For purposes of full transparency and completeness, the Draft Report should acknowledge that CDCR is not an outlier—there is a nationwide and state-level shortage of mental health professionals, and the shortage acutely affects prison systems like CDCR because of additional

3

challenges professionals face in treating patients in remote areas or under dangerous or difficult conditions. *See Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Psychiatrists, 9/18/18, Economists Incorporated*, ECF No. 6695 at 97-100; *id.* at 105 (noting "the supply of psychiatrists in California has neither kept pace with demand, nor has it been sufficient to replace a diminishing workforce"); Stacy Weiner, *A growing psychiatrist shortage and an enormous demand for mental health services*, Association of American Medical Colleges, Sep. 9, 2022, https://www.aamc.org/news-insights/growing-psychiatrist-shortage-enormous-demand-mental-health-services); Jocelyn Wiener, Unanswered cries: Why California faces a shortage of mental health workers, Sep. 8, 2022, https://calmatters.org/health/2022/09/california-shortage-mental-health-workers/).  In light of contracted labor supply, Defendants have correctly identified the "provision of telepsychiatry from home" as "critical to eliminating barriers to [their] ability to deliver constitutionally adequate care, and . . . improv[ing] access to care" and possibly alleviate the loss of staff who may leave due to the availability of telework opportunities elsewhere.  (Draft Report – Part C, pp. 35-36; *see also* p. 7).

The Draft Report also states that "[t]ime spent training and supervising unlicensed clinicians further strained licensed staff members' ability to focus on delivery of care to patients."  (Draft Report – Part C, p. 6).  But this statement paints an incomplete picture because the training and supervision of unlicensed clinicians allows CDCR to create a pipeline of future licensed clinicians, a critical tool for the recruitment and retention in a challenging labor market.

## IV.   The Draft Report Should Clarify Certain Assertions Regarding Telepsychiatry and Telehealth.

The Draft Report notes that "connectivity issues negatively impacted IDTTs for CMC's 3CMS program on A Quad, CSP/Corcoran's LTRH, CSATF's EOP and 3CMS programs, and SVSP's STRH," and that "MCSP mental health leadership reported connectivity problems on some facilities as well."  (Draft Report – Part C, p. 70.)  In addition, "CSATF 3CMS staff also reported frequent connectivity issues for telepsychiatrists working from home."  (*Id.*)  In Part D of the Draft Report, the Special Master indicates that problems with connectivity during IDTTs were observed at only one of the institutions.  (Draft Report – Part D, p. 16).  The Draft Report also notes that the quality of the IDTTs at five institutions "generally suffered" as a result of allowing on-site IDTT members to attend by telephone or videoconferencing equipment.  (*Id.*)  These connectivity issues appear anecdotal in nature and lack specificity.  Defendants request that the final Reports be revised to quantify the extent of these connectivity problems.  For instance, the Report should provide the number of complaints compared to the total number of telehealth encounters observed.

Similarly, the Draft Report states that "VSP's EOP patients expressed discomfort with telepsychiatry's use."  (Draft Report – Part C, p. 70.)  Without providing actual data and details concerning a monitor's observations, including context regarding the nature of the expressed discomfort, or the number of patients who made these complaints, this information is anecdotal and Defendants cannot use it for any extrapolation regarding the use of telepsychiatry.  (*Id.*)

19289969.2

To illustrate "difficulties with telepsychiatry," the Draft Report asserts that "CSATF's 3CMS clinicians reported telepsychiatry challenges which occasionally led to different diagnostic assessments between the PC and telepsychiatrist." (*Id*. at p. 69.) Again, without more information, it is difficult to glean whether the differences in diagnostic assessments were typical professional disagreements that may arise among multiple providers, or whether the disagreement arose due to one provider's use of telepsychiatry. Defendants request that the Special Master provide more information and transparency in the final Report so Defendants can address any challenges.

V.    **The Draft Report Contains Contradictory Assertions Regarding Data Remediation and Selectively Quotes Defendants' Prior Filings.**

The Draft Report states that data remediation is "intended to align the scope of a given indicator with the Special Master's current scope of monitoring." (*Id*. at p. 15.) If the data remediation process is intended to replicate the current monitoring scheme, the Report should acknowledge that Defendants have requested but been denied access to the Special Master's guidebook, business rules, sample size methodology and other necessary documents to properly replicate the monitoring process. Defendants reiterate their request to the Special Master to provide these materials—without which they are severely hampered in their ability to understand the exact specifications that would result in an indicator being remediated. (*See* December 8, 2022 Letter from Secretary Allison to the Special Master.)

The Draft Report includes a quotation from Defendants' prior filing that purportedly concedes that the data remediation process necessarily includes "modifications intended to align with the scope of a given indicator with the Special Master's current scope of monitoring" the Special Master's indicators: "The Data Remediation process is not meant to be an overhaul of CDCR's data system, or the forum to wordsmith indicators, expand the scope, or add requirements above and beyond what is currently being done by the Special Master during his monitoring." (*See* Draft Report – Part C, pp. 14; 15, n. 5, citing ECF No. 7523-1 at 4.) The Draft Report omits the sentence that follows this quotation, which states: "Rather, it's [data remediation] intended to assess whether CDCR's indicators measure what they purport to measure." (ECF No. 7523-1 at 4.) Defendants have consistently held this position. (*See* ECF No. 7523 at 14 ("The data remediation process CDCR agreed to follow . . . and the timeline developed in response to this process does not include the creation of a new policy, expanded policy, or expanded indicator. Yet, every indicator reviewed by the Special Master's team and Plaintiffs (approximately 50 – 60 indicators) has required changes to achieve data remediation.").)

Defendants remain concerned that data remediation is "increasingly becoming an overhaul of long-established and court-approved policies and processes rather than a transparency check or data validation project." (*See* ECF No. 7523 at 14.) Defendants request that the Draft Report be modified to accurately reflect their understanding of the data remediation process. In addition, Defendants object to the Special Master's characterization of their concerns on the runaway expansion of the data remediation process as an attempt to wrest a "rubber stamp" of

5

key indicators from the Special Master.  (Draft Report – Part C, p. 18.)  In fact, Defendants are committed to the process of explaining their data systems to the parties, undertaking validation and verification, as well as incorporating stakeholder feedback, which is a concrete demonstration of the "steadfast focus" on data remediation that the Special Master has requested from the parties.  (*See* Draft Report – Part C, p. 19.)  Unfortunately, discussions often stray far beyond these areas and instead become top to bottom reviews of existing policies and their corresponding indicators with an eye toward expanding them.  This results in requests to fundamentally change how an indicator operates or requests to create entirely new indicators, which goes beyond ensuring indicators are measuring what they purport to measure.

## VI. The Draft Report Conflates Remediation and Certification with Data Validation and Verification, and Avoids Providing Clarity on What Is Necessary to Achieve Data Remediation, Hamstringing Defendants.

More than two and a half years after Dr. Potter was retained, the definitions of "data remediation" and "certification" remain opaque.  The Draft Report obfuscates the fact that Defendants have not received the definition of these terms from the Special Master, despite multiple requests.  The Special Master requests that the parties apply "steadfast focus" to complete data remediation (p. 19), but he does not acknowledge that Defendants have been provided with an impossible instruction— to aim at a hidden target that is not completely specified.

The Draft Report misleadingly states that Defendants understand what it means to remediate and certify an indicator, citing a September 2021 filing that defines the meaning of two different terms—*data validation* and *data verification*.  (Draft Report – Part C, pp. 19-20, n. 7.)  That citation does not speak to remediation or certification—topics on which Defendants have requested guidance from the Special Master on several occasions since this project commenced in August 2021.  (*See, e.g.*, ECF No. 7523-1 at 14 ("This process is increasingly becoming an overhaul of long-established and court-approved policies and processes rather than a transparency check or data validation project.  In short, the scope of the data remediation process seems to evolve continually and expand without any clear boundaries . . . . It's intended to evaluate whether CDCR's indicator measure what they purport to measure. This issue has been raised several times with the Special Master's Data Expert, and most recently, on March 28, 2022."); ECF No. 7556 at 4 ("The Special Master has declined to include a clear definition of what it means for an indicator to be remediated within the proposed Activation Schedule template.  From my discussions with the data expert, I understand that he believes that an indicator is remediated if the parties agree upon its operation and it is operating as specified. CDCR learned for the first time during the meet and confer process, that the Special Master's data expert would only "remediate" individual indicators and not certify them. Instead, during the meet and confer process, the Special Master's data expert informed CDCR that he would only certify the entire data system, but not individual indicators . . . . I request that the court direct the Special Master to adopt an agreed upon definition of the term "remediation."  It is important that the Special Master and the parties agree on what it means to remediate and to certify CDCR's data.  I am concerned that without greater clarity on what is required to

6

remediate an indicator and to certify CDCR's data system, the end goal of this project and how to achieve that goal remain undefined.").)

Accordingly, footnote 7, which conflates validation and verification with remediation and certification, must be removed.  The Special Master has still not answered the question of when an indicator may be relied upon.  Although the Draft Report emphasizes that "successful completion of data remediation . . . remains defendants' most direct path to ending this case," the Special Master has not provided guidance on how and when the parties will know that a single indicator (or, all indicators) has been successfully remediated and certified; and how and when the Special Master or his expert will communicate the completion of the data remediation process to the parties and Court.  (*See* ECF No. 7556 at 3-4.)  As the Draft Report notes, "the outcome of these discussions [on the definitions of data remediation and certification] is pending."  (*Id*. at p. 20.)  The Special Master was to revise his proposed definitions of data certification and remediation after multiple all-party meetings between July and October 2022. As of the time of this writing, Defendants are still waiting for the Special Master to issue his amended definitions of data certification and remediation.

## VII.  The Draft Report Includes Outdated Characterizations of the Post-Certification Process.

The Draft Report states that during the Post-Certification Annual Review Cycle "[a]t least annually, all Key Indicators will be reviewed through the data remediation process," citing an activation schedule filed in September 2021.  (Draft Report – Part C, p. 13, n. 4.)  The cited filing includes a very preliminary view of the Post-Certification process that CDCR no longer holds.  The process has evolved over the past fifteen months resulting in significant modifications to the anticipated Post-Certification process.  For instance, Defendants would not necessarily have all Key Indicators go through the full data remediation process annually.  Nor would stakeholder review (i.e. BRMR) be included in the Post-Certification process.  As you know, Drs. Potter and Cartwright are discussing the Post-Certification review process this year in parallel with reviewing the existing Change Management policy.  Defendants request that the Special Master remove this reference to the Post-Certification process, or alternatively, clarify that Defendants no longer anticipate following the approach set out in the Draft Report.

## VIII. The Draft Report Requires Certain Clarifications.

The Draft Report states that patients attended less than 90 percent of IDTTs.  (Draft Report – Part C, pp. 62-63; Draft Report – Part D, p. 136; p. 163.)  But if the purpose of the report is to measure compliance, the final Report should note that patients may refuse to attend IDTTs.  Similarly, in the section on Supervisors' IDTT Attendance, the Report should recognize that supervisors are not required to attend IDTTs.  These changes will help the reader of the report to understand that the comments on attendance are not meant to criticize CDCR's compliance with policy requirements.

Part C of the Draft Report states that "some institutions reported pressure from IRU to rescind referrals in an effort to avoid rejections."  (Draft Report – Part C, p. 99.)  Part D of the

Draft Report indicates that "CIM reported concern with IRU rejections of inpatient referrals and the insistence that the institution rescind the referrals." (Draft Report – Part D, p. 47.) Defendants note that the IRU cannot reject a referral. Only a PIP may reject a referral. When a PIP rejects a referral, IRU sends the information to the referring team. The team is given the choice to either accept the rejection or proceed to CCAT for a discussion with the PIP that issued the rejection. Defendants request that the final Report Part C clarify which institutions reported this pressure, so we may provide further information and assistance to these institutions. For instance, in the case of CIM discussed in Part D, Defendants found the following data showing a low rejection rate and low rescission rate:

- Number of referrals submitted last six months: 62
- Accepted: 52
- Referrals rejected by PIP: 7
- Referrals directed to CCAT: 4 (3 accepted; and 1 rejection appealed and upheld)
- Rescinded: 5

The Draft Report includes a section on institutional compliance with transfers to acute or intermediate inpatient care. (Draft Report – Part C, p. 104.) Institutions are not responsible for bed identification. Once a referral is made, IRU and HCPOP identify an appropriate bed and authorize movement. The Draft Report should be revised to reflect that transfers to inpatient care are not an institutional-level issue after a referral is made.

The Draft Report states that, regarding restricted housing transfers, "CMC failed to timely transfer patients due to an erroneous practice of maintaining patients under the mistaken belief that it could provide a better level of care." (Draft Report – Part C. p. 105.) The report should specify what level of care CMC could not provide within its restricted housing program and which patients it retained. The report makes clear that CMC did not miss any PSU transfer timeframes or ASU EOP Hub transfer timeframes, since CMC has an ASU EOP Hub. (Id. at p. 106.) The report does find that "CMC did not transfer [CCCMS] patients to STRHs and instead inappropriately placed them in its EOP hub." (*Id.* at p. 107.) But placement of a CCCMS patient at a higher level of care does not equate with worse care, as implied by the finding that CMC "mistaken[ly]" thought it "could provide a better level of care." The report should be revised by removing the sentence on page 105 regarding CMC.

The Draft Report states that the "Program Guide provided for a length of stay of up to ten days in the MHCB." (Draft Report – Part C, p. 105.) Four institutions had average lengths of stays exceeding 10 days. (*Id.*) In addition, Part D of the Draft Report indicates that "CIM, NKSP, PBSP, and WSP were noncompliant with the ten-day requirement." (Draft Report – Part D, p. 48.) The Draft Reports misstate the policy and Defendants' compliance—the expectation is that the length of stay should not exceed 10 days, but it can be extended if the chief psychiatrist or designee authorizes it. (See Program Guide at 12-5-1.) The Draft Reports should be corrected to accurately state the full policy and remove any statements regarding noncompliance.

The Draft Report states that, despite staff complaints spread across eight institutions, "no staff members were moved to another post as a result." (Draft Report – Part C. p. 116.) The

19289969.2

finding implies wrongdoing on behalf of CDCR for not removing staff from their posts following a staff compliant, but the report does not make any findings that the staff complaints were substantiated and that staff were not moved in accordance with policy.  Nor does the Draft Report cite to any policy or procedure that would require removal of staff from a post solely because of an unsubstantiated staff complaint.  The report should be revised by removing that clause.

Part C of the Draft Report states that there were "no RVR mental health assessments wherein the mental health clinician recommended alternative disciplinary measures" at nine institutions.  (Draft Report – Part C, p. 121.)  If this conclusion is based upon a sample (*see* Draft Report – Part C, p. 120), it is unclear whether the sample is representative.  Notably, Part D of the Draft Report notes that there were four cases at two institutions – CCI and NKSP – where the mental health clinician recommended alternative disciplinary measures "as the patients' behavior was strongly influenced by their mental illness," showing that alternative disciplinary measures are considered when appropriate.  (Draft Report – Part D, p. 60.)

Additionally, Part D of the Draft Report summarizes the overall assessment of the quality of treatment into three categories: "adequate quality," "marginally adequate quality," and "inadequate quality."  (Draft Report – Part D, pp. 21-22.)  These definitions are not well defined—notably, "marginally adequate quality," which the Report characterizes as care that "bordered on inadequacy" is particularly vague.  (*Id*.)  Defendants request that the Special Master provide more detailed descriptions of each category in the final Report.

Further, the Draft Report states that in one instance of "CSATF immediate use of force," a custody officer sprayed a patient from approximately two feet away, violating applicable policy that required a six-feet minimum distance to use pepper spray.  The Draft Report should be revised to reflect that there is no policy requiring a minimum distance of 6 feet during an immediate use of force.  CDCR officers utilize the best practice of spraying from a six-feet distance when time permits, which is also a factory recommendation.  In the case of an immediate use of force, the officer is required to articulate why the pepper spray streamer was deployed at a distance of closer than six feet.

The Draft Report also states that "15 institutions with EOP programs continued to fail to satisfy the requirements for MHSDS patients for program access."  (Draft Report – Part C, p. 129; *see also* p. 135.)  The Draft Report does not state which requirements govern program access, nor does it establish the policies that were violated.  The Draft Report further states that EOPs are less likely to access jobs than CCCMS patients and general population inmates.  (*Id.*)  However, the Draft Report should note that EOP patients are less likely to accept jobs due to mental illness and may instead be choosing EOP group treatment.  In fact, as the Draft Report recognizes, EOP patients were more likely to earn milestone credits, which were received by 66 percent of eligible EOP patients, as compared to 19 percent of eligible CCCMS patients and 21 percent of non-MHSDS incarcerated persons.  (*Id.* at p. 133.)

Finally, the Draft Report includes a discussion of CCCMS patients who were housed out-of-level.  (*Id.* at p. 135).  Defendants request that the Special Master provide more details on the reasons these patients were housed out-of-level.  There could be specific reasons for an

9

individual to be placed out-of-level – which could even include a placement to less restrictive housing.

       Thank you for consideration of these comments.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs

10

# EXHIBIT D

**Millham, Sofia A.**

| | |
|---|---|
| **From:** | Walsh Kerry F. |
| **Sent:** | Wednesday, July 20, 2022 10:01 AM |
| **To:** | Elise Thorn; Namrata Kotwani; Bentz, Melissa@CDCR; Nick Weber; Thind, Sundeep@CDCR; Cartwright, Steven@CDCR; LElls@rbgg.com; Cara Trapani; Thomas Nolan; Steve Fama |
| **Cc:** | Lopes Matthew; Jones Mohamedu; Walsh Kerry F.; McClendon-Hunt, LaTri-c-ea; Millham, Sofia A. |
| **Subject:** | Data Remediation and Certification Definitions |
| **Attachments:** | Data Remediation and Data System Certification 7-19-2022 Draft.pdf |

Good morning – attached please find a draft copy of the definitions for remediation and certification that was discussed yesterday during the data meeting.  Please provide any comments, if any, so that we may move this forward.  Thank you.

**Kerry F. Walsh, Partner**
kwalsh@pldolaw.com
P 401.824.5118 • F 401.824.5123

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

Data Remediation and Data System Certification

Details of the requirements for Data Remediation and Data System Certification are listed below. As the work progresses, each indicator on the provisionally approved key indicator list that has been validated and verified, and for which there are not any unresolved disputes, will be remediated.[1] However, if there are change(s) that significantly affect a remediated indicator, and/or it stops passing verification, it will no longer be considered remediated; to become re-remediated, the appropriate steps of the validation and verification process will need to be re-visited, with all disputes resolved concerning the changes made. This work must be done in a transparent manner, such that all relevant updates to mental health quality assurance (MH QA) system, underlying software systems and related policies (e.g., workflows, and operational business requirements), can be tracked and are reviewable.[2]

Once the remediation of the provisionally approved key indicator list is complete including the reports and reporting interfaces used to report key indicator data to the court and Special Master, the data expert will additionally review and certify whether or not the requirements outlined below have been implemented in a sustainable manner. The purpose of this Certification is to help ensure future data concerning the key indicators reported to the court and Special Master that is produced using the MH QA system is accurate and will likely remain so to the extent CDCR continues to utilize the processes and procedures they have adopted during the Data Remediation process.

Data Remediation

1. Data Validation – Asks, is the system designed to correctly measure business requirements?

    a) The MH QA team creates detailed design specifications on what exactly each indicator is supposed to measure with respect to business requirements derived from policy and practice, as well as design specifications for reports and reporting interfaces used to report key indicator data to the court and Special Master.

    b) The Stakeholder Review step and the Business Rules and Methodology Review meeting are used to validate these design specifications in the context of CDCR's underlying approach (including workflows, and associated user interfaces, instructions, audits and underlying policy) to meeting the measured business requirements. In other words, this step ensures design specifications will correctly and sufficiently measure the business requirements under consideration.

    c) When a conflict is found between the design specifications and business requirements, the Special Master's data team and other stakeholders work with MH to develop appropriate revisions to the QA system. Updates to the workflows and operational policies to meet business requirements may be needed to bring them into alignment with Program Guide, court orders, and other policies.

1

d) A mutually agreed upon dispute resolution process is now in place to handle disputes regarding interpretation of the existing business requirements and the design of indicators and other items intended to measure those requirements.

e) An <u>indicator is validated when the above have been successfully completed</u>.

f) If there are changes that significantly affect what an indicator measures or what it should measure, the indicator will need to be <u>re-validated</u> in the context of those changes. Similarly, changes that significantly affect the reports and reporting interfaces used to report key indicator data to the court and Special Master need to be re-validated in the context of those changes.

2. <u>Data Verification</u> - Asks, have the design specifications (e.g., measurements) been coded correctly?

a) The detailed design specifications on <u>what</u> an indicator and its business rules are intended to measure must be used to create a set of "software tests" (that are scheduled to run automatically).  Similarly, software tests must be created that confirm the design specifications for reports and reporting interfaces that are used to report key indicator data to the court and Special Master.

b) These tests <u>verify</u> the indicator and business rules <u>operate</u> as intended (i.e., find the correct answer), and are reported as such. For example, when appropriate, such tests should check whether the numerator and denominator in a percentage score have overlooked any patients.

c) <u>An indicator and its related items are verified (passing verification) if they are passing their software tests</u>.[3] Items whose software tests are failing must be updated or repaired. Changes to design specifications (e.g., designs for a revised indicator) may require <u>re-verification</u> to update or add software tests.

As described above, indicators and reports that are validated and verified, and for which there are not any unresolved disputes, will be remediated. If there are change(s) that significantly affect an indicator or report, and/or it stops passing verification, it will no longer be considered remediated; to become re-remediated, the appropriate steps of the validation and verification process will need to be re-visited, with all disputes resolved concerning the changes made.

<u>Data System Certification</u>

Once the Data Remediation process is complete, the data expert will certify that appropriate policy, procedures, and staffing are in place so that these requirements will continue to be followed in the future.  Certification will depend on CDCR's commitment to ongoing use of the validation and verification process described above, as wells as maintenance of associated MH QA system design specification documentation, code, and system parameters, such that all changes can be easily tracked and compared with prior versions in a transparent manner.

---

[1] Items that impact the operation of each indicator, including business rules, operational policies, and workflows and reports and reporting interfaces used to report key indicator data to the court and Special Master are included in validation and verification process, and can be similarly thought of being remediated with respect to the operation of each remediated indicator. The Special Master's data team is working with MH and other stakeholders to identify and categorize currently outstanding disputes to efficiently implement use of this process.

[2] To support the remediation effort, including its transparency requirement, the data expert worked with the CDCR staff member, Dr. Leidner, to create an example framework that MH could use to document their Quality Assurance system. The framework included a change tracking and management interface. MH subsequently adopted a version of this framework implemented using Microsoft SharePoint Online (SPO). MH's SPO is largely operational but still needs several refinements to support transparent document-change review, e.g., access to documents that have been reviewed and commented on by Stakeholders is still not available. MH and CCHCS IT report they now also require use of software development and deployment practices which ensure all QA system-related code and database parameter table changes are versioned and cataloged by date and author.

[3] In consultation with CCHCS IT, the data expert and Dr. Leidner worked to develop an automated testing framework. At MH's request, Dr. Leidner now manages the team that is using it in practice. Indicator tests currently rely on the CDCR and MH data warehouse (as opposed to the underlying source data systems). To complete verification of the MH QA Data System, the data expert has been working with Dr. Leidner to identify different approaches that can be used to verify relevant underlying data warehouse data. Such data is relevant if it is utilized in the calculation of a provisionally approved key indicator.

# EXHIBIT E

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



August 5, 2022


Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919


**VIA EMAIL**


Dear Special Master Lopes,

I write in response to the draft Data Remediation and Data System Certification document (Draft DR Document) that Deputy Special Master Kerry Walsh shared with the California Department of Corrections and Rehabilitation (CDCR) and Plaintiffs on July 20, 2022. Below are several questions, comments, and concerns raised by the document.

I.    **CDCR's Overarching Concerns**

First, CDCR has serious concerns about changing the timeline that it has been operating under for well over a year, significantly elongating the already much delayed data remediation process, and further delaying (possibly for years) the completion of CDCR's Continuous Quality Improvement (CQI) process. CDCR estimate that it would complete the data remediation process by December 2023 based on its understanding of the remediation process, and the number of provisionally approved key indicators and reports when CDCR filed its initial data remediation activation schedule on September 29, 2021. (ECF No. 7334.) This estimate did not include the time for indicators to move through the dispute resolution process or any time needed to achieve "remediation." For the first two years of this project, Dr. Potter verbally assured CDCR that the final steps to achieve remediation would take about one week if (1) CDCR followed the established process, (2) OSM agrees with the documentation, (3) controls are in place to monitor changes to the indicator and documentation, and (4) to a reasonable degree of software engineering certainty, the KPI is operating correctly.

The estimate provided in CDCR's data remediation activation schedules (*see* ECF Nos. 7334, 7457, and 7523) did not take into account *re-remediation* of indicators or a subsequent certification of the system as a whole, which now appear to be part of the anticipated process. It now appears

remediation cannot be achieved if Plaintiffs do not agree for any reason at some point, even after the indicator in question has been reviewed and is passing verification. Including these new steps will unquestionably push out the December 2023 deadline, which would in turn delay CDCR from fully implementing CQI and taking over monitoring from the Special Master. As the court has stated several times, "the goal is development and implementation of a continuous quality improvement process that will ultimately allow defendants to assume responsibility for monitoring and improvement of their mental health care delivery system." (ECF No. 7283 at 5, referencing ECF No. 6996 at 7.) The proposals in the Draft DR document will significantly delay achieving that goal.

It is further possible that the proposal to re-remediate indicators, discussed more below, will make data remediation a never-ending process. This would leave CDCR in an endless holding pattern with no clear conclusion to data remediation or defined steps forward to taking over monitoring from the Special Master. This is especially troubling given the Court's concern the data remediation process ought to be completed "earlier than December 2023." (Transcript of April 22, 2022 Status Conference at 10:20-11:4.)

Second, CDCR sees no reason that certification must wait until each of the provisionally approved CQI key indicators on the Court's provisionally approved list of key indicators are remediated or that certification cannot be completed in parallel to the individual indicator remediation process. Despite the Special Master's data expert working closely with Mental Health for over two years, it is troubling that CDCR must now wait even longer – until the end of data remediation of each and every indicator – to learn whether they have developed a sustainable system. The Special Master should begin certification immediately and, in the event that certification is not possible, the Special Master must provide specific and articulable steps that must be taken to fulfill certification. This will enable CDCR to address and correct any issues resulting from the non-certification of an indicator as issues arrive and without delay.

Third, for the sake of transparency and to ensure that CDCR is on the right path to remediate the indicators on the provisionally approved list of key indicators, CDCR recommends that the Special Master provide written documentation expressly stating when an indicator has been remediated. The Draft DR document should be revised to reflect a process for providing written confirmation of remediation before it is finalized.

## II.   CDCR's Feedback Regarding Data Remediation

### A.   Definition of Data Remediation

The Draft DR document's proposed definition of "remediation" is still vague and subjective in the context of this project. Per the Draft DR document, it seems an indicator is "remediated" if (1) it appears on the provisionally approved key indicator list; (2) has been validated and verified; and

(3) has no unresolved disputes.[1] It also seems that a successfully remediated indicator could subsequently fail remediation if changes significantly affect the indicator or it stops passing verification. Assuming this understanding is correct, CDCR has several questions.

First, under what conditions could a change "significantly affect a remediated indicator?" (Draft DR document at 1.) Could changes that significantly affect a remediated indicator include if the scope of an indicator is expanded or narrowed, or if the content and the meaning of the business rule(s) of a remediated indicator are changed? Additionally, who is responsible for determining whether a change is *significant*? Given the difficulties the parties had in agreeing to whether a policy change was *material*, how will the Special Master successfully identify when a change to an indicator is significant?

Second, how many times does a remediated indicator need to stop passing verification for it to no longer be considered remediated? For example, the ASU prescreen indicator failed verification once over a period of several months, but subsequently continued to pass verification thereafter. The Special Master's data expert previously verbally notified CDCR that this indicator is remediated (ECF No. 7523-1 at 9) and has not informed CDCR that the indicator is no longer remediated or that it needs to be re-remediated. Clarification on this point is paramount to understanding the data remediation process.

Third, in order to re-remediate an indicator, which "appropriate steps of the validation and verification process" will be revisited? (Draft DR document at 1.)  The validation and verification process for each indicator consists of several steps and, overall, takes several months[2] to complete. Sending an indicator back through this process would be a lengthy diversion. Does this mean the indicator would have to undergo all of the steps included in the workflow titled "Quality Assurance Certification Workgroup CDCR's Data Remediation Plan Overview" (CDCR's DR Plan Overview) again? (ECF No. 7523-1 at 6.)  If all steps in CDCR's DR Plan Overview do not need to be revisited to re-remediate an indicator, the Draft DR document should expressly list which steps from CDCR's DR Plan Overview would be the "appropriate steps" to revisit to re-remediate an indicator. Additionally, the Draft DR document should reflect who is responsible for determining what appropriate steps need to be revisited when an indicator needs to be re-remediated.

Fourth, the December 2023 timeline does not include any time that may be needed for an indicator to be re-remediated. Is the intent of the Draft DR Document to change expectations set forth by the initial data activation schedule (ECF No. 7334) by insisting all re-remediation steps are completed by December 2023 as well? The activation schedule clearly establishes an annual

---

[1] If CDCR's understanding of the word "remediated" is correct, once an indicator is remediated, its business rules, operational policies, workflows, reports, and reporting interfaces used to report key indicator data to the Court and the Special Master will be considered remediated.

[2] The current process takes 19 weeks (almost 5 months) for each indicator to complete validation and verification without factoring in delays.

review (or sooner if necessary) process to review each indicator after achieving remediation. Any so-called re-remediation steps should fall under the on-going review process, and not the activation schedule aimed at achieving initial data remediation for provisionally approved CQI key indicators by December 2023.

Finally, CDCR is concerned that the definition of remediation seems to go beyond whether an indicator accurately measures what it says it measures, and asks whether the indicator—in the opinion of the Special Master and Plaintiffs—measures the policy correctly. The data remediation process CDCR agreed to follow does not include the creation of a new policy, expanded policy, or expanded indicator. (ECF No. 7523-1 at 14.) As we have learned, many of the disputes between the Special Master and/or Plaintiffs and Defendants have revolved around policy interpretation or alleged gaps in policies. The Court has clearly stated that "the data remediation project should not be resolving policy disputes." (Transcript of April 22, 2022 Status Conference at 29:25-30:1.) While CDCR agrees that any major policy gaps or flaws should be raised and remedied, most comments provided by Plaintiffs' counsel and the Special Master's team during Business Rules and Methodology Review meetings (BRMR) or stakeholder review seek to change or expand well-established policy, revise long-standing indicators that the Special Master's team created alongside CDCR, or add new requirements. (ECF No. 7523-1 at 14.) CDCR maintains that data remediation should focus on whether the indicators accurately measure what they purport to measure and should not turn on whether there is an agreement between the parties and the Special Master that policies are being interpreted correctly, the scope of the indicator is appropriate, or any other number of disputes that may arise.

### B. Definition of Data Validation

First, CDCR suggests the reference in 1(a) to the MH QA team be revised to "CDCR MH QA team" for more specificity and clarity. (Draft DR Document at 1.)

Second, 1(a) also states that CDCR creates "detailed design specifications" regarding what "each indicator is supposed to measure with respect to business requirements derived from policy and practice." (Draft DR Document at 1.) However, as Defendants have repeatedly pointed out, many indicators on the provisionally approved list of key indicators are not supported by policy or practice. Thus, the statement in the document is not factually correct if it is based on the Court's provisionally approved key indicator list. CQI key indicators should be based on key *Coleman* required policies. Defendants will make all necessary arguments when the key indicator discussions resume towards the end of this year.

Third, CDCR disagrees with how the Stakeholder Review and BRMR meetings are described in 1(b) because it does not reflect current practice. The Draft DR document portrays BRMR as a forum used to "to validate these design specifications in the context of CDCR's underlying approach (including workflows, and associated user interfaces, instructions, audits and

underlying policy) to meeting the measured business requirements." (Draft DR Document at 1.) This is inconsistent with what actually occurs during these meetings – a review and negotiation with Plaintiffs' counsel and the Special Master's team. Section 1(b) should be revised to state that BRMR meetings are discussions among stakeholders about design specifications, and negotiations as to what should be measured by an indicator and the policies applicable to that particular indicator.

Fourth, the Draft DR document includes references about the Special Master's team's collaboration with Mental Health specifically, rather than CDCR broadly. But Mental Health is not the only division within CDCR working with the Special Master's data team and other stakeholders to remediate its indicators. Rather, multiple CDCR staff from different programs and divisions assist with this process, including nursing, the Division of Adult Institutions, and CCHCS staff. Accordingly, Defendants request that "CDCR" take the place of "Mental Health" references throughout the Draft DR document.

Fifth, Section 1(c) mentions "updates to the workflows and operational policies to meet business requirements may be needed..." (Draft DR Document at 1.) But the Court has previously cautioned that "the data remediation project should not be resolving policy disputes..." (Transcript of April 22, 2022 Status Conference at 29:25-30:1.) The purpose of the data remediation process is to validate and verify requirements measured by existing policy. While CDCR has occasionally agreed that policy revisions are necessary, such revisions should not stall any part of data remediation, nor should it be expected that policy revisions or new indicators based on those policy revisions should be completed as part of data remediation.

III.     **CDCR's Feedback Regarding the Section on Data System Certification**

The Draft DR document notes that the "data expert will certify that appropriate...staffing are in place." (Draft DR document at 2.) CDCR interprets this statement to mean that the data expert will certify whether appropriate CDCR data team staff are in place to run a sustainable data system. CDCR objects to the data expert being given the power to certify whether appropriate staffing is in place. As previously discussed in QAC and the bi-weekly data discussions with the Special Master and all Stakeholders, CDCR, in coordination with CCHCS IT, has ample staff in place to ensure the data remediation process moves efficiently. Additionally, the Secretary confirmed CDCR has sufficient staff assigned to work on data remediation. (ECF. No 7556 at 3.) To date, staffing has not been a barrier to data remediation, and it is therefore unclear why the scope of the data expert's work has been expanded to include an assessment of CDCR's staffing or whether the data expert is even qualified to assume such a function.

Additionally, the Draft DR Document appears to permanently give the Special Master and the Court the final say on all data remediation issues, since system certification won't happen unless current processes, like the dispute resolution process continue. As stated above, this would put

CDCR in a continuous holding pattern with no clear end in sight. Finality to this process is necessary so Defendants can move forward in this case.

IV.    **CDCR's Feedback Regarding Endnotes**

As stated above, the Draft DR document – including its endnotes – should be revised to refer to CDCR rather than referencing specific divisions or individuals employed by CDCR (i.e. Mental Health or Dr. Leidner) because the data remediation process is occurring within CDCR and the staff working on this project are all employees across various divisions within CDCR.

Second, for the sake of clarity and specificity, CDCR recommends endnote one be revised to state: "Other related items that are remediated with the indicator include: business rules, operational policies, work flows, reports, and reporting interfaces used to report key indicator data to the Court and Special Master. The Special Master's data team is working with CDCR and other stakeholders to identify and categorize currently outstanding disputes to efficiently implement the use of this process."

Third, endnote two states there are "several refinements" CDCR needs to make to "support transparent document-change review," specifically "access to documents that have been reviewed and commented on by Stakeholders is still not available." (Draft DR document at 3.) Although the old stakeholder review process spanned from October 2021 to April 2022, CDCR did not receive a request from the Special Master's data expert to make accessible this documentation until May 11, 2022. Because the documentation is voluminous, has to be applied retroactively to all indicators that have already been reviewed by stakeholders months ago, and because CDCR is simultaneously trying to balance other demands and time-consuming tasks, this request has not been prioritized. However, CDCR will continue to discuss this matter with the Special Master.

Given the concerns in the paragraph above, CDCR recommends endnote two be revised as follows: "To support the remediation effort, including its transparency requirement, the Special Master's data expert worked with CDCR to create an example framework that CDCR could use to document their Quality Assurance system. The framework included a change tracking and management interface. CDCR subsequently adopted a version of this framework using Microsoft SharePoint Online (SPO). Further refinements may occur to support transparent document-change review. CDCR also requires the use of software development and deployment practices which ensure all QA system-related code and database parameter table changes are versioned and cataloged by date and author."

///

///

Special Master Lopes
Page 7


Please let me know if you would like to discuss this further.

Sincerely,

*/s/ Sundeep Thind*

SUNDEEP THIND
Attorney
Office of Legal Affairs


cc:     *Coleman* Plaintiffs' Counsel
        *Coleman* Court's Special Master's Team
        *Coleman* Office of the Attorney General's Team
        *Coleman* CDCR Team

# EXHIBIT F



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email:  CTrapani@rbgg.com

September 11, 2022

VIA ELECTRONIC MAIL ONLY
Special Master Lopes
Pannone Lopes Devereaux and O'Gara
LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919
mlopes@pldolaw.com

Re:    *Coleman v. Newsom*: Plaintiffs' Response to Defendants' August 5, 2022
       Letter Regarding the Special Master's Draft Data Remediation and Data
       System Certification Document
       Our File No. 0489-03

Dear Special Master Lopes:

We write in response to Defendants' August 5, 2022 letter regarding the draft Data Remediation and Data Systems Certification document (hereafter "DR Document") that Deputy Special Master Kerry Walsh shared with the parties on July 20, 2022.[1]

As an initial matter, Defendants appear to believe that as long as they complete the data remediation process by the Court's December 2023 deadline, they will be able to self-monitor with little oversight.  But for all the reasons discussed in Plaintiffs' filing in response to Defendants' Updated Data Activation Schedule (ECF No. 7523), this completely disregards the true purpose of this project, which is to hopefully restore the trust in Defendants' data that was destroyed after the Court found Defendants had knowingly and repeatedly presented false and misleading information to the Court, Special Master, and Plaintiffs.  *See* Pls.' Resp. to Defs.' Updated Activation Schedules, ECF No. 7528 at 3 (Apr. 14, 2022); Dec. 17, 2019 Order, ECF No. 6427 at 41, 22.   The end goal of the data remediation process is to develop a set of indicators that Plaintiffs and the Special Master can agree accurately and transparently measure Defendants'

---

[1] Both documents are attached hereto as **Exhibits A** and **B**, respectively, for ease of reference.

[4153902.3]

Special Master Lopes
September 11, 2022
Page 2

compliance with the core remedial requirements in this case. Establishing communal
buy-in and trust amongst the Special Master and the parties is crucial to facilitating the
Court's reliance on Defendants' CQIT data in determining the appropriateness of self-
monitoring and ongoing federal oversight.

Defendants' complaints that Plaintiffs' involvement in this process has caused
delays also reveals a short-sighted memory of the events that brought us here. *See* Defs.'
Aug. 5, 2022 Ltr. at 2. Plaintiffs' efforts to bring the October 4, 2018 whistleblower
report to light and our involvement in the ensuing proceedings (which culminated in the
four-day evidentiary hearing in October 2019), heavily contributed to the Court's orders
requiring this process in the first instance. It goes without saying that Plaintiffs have an
appropriate and necessary role in determining whether trust has been restored and
stakeholders, and ultimately the Court, can or should rely on Defendants' data to
accurately portray the Department's compliance with the core remedial requirements in
this case.

Furthermore, Defendants' repeated insinuation that Plaintiffs and the Special
Master knew or should have known all along what Defendants' CQIT indicators were
measuring is preposterous. Prior to the evidentiary proceedings in 2019, there was no
reason to scrutinize Defendants' data to the level now required. The Court found that
Defendants *knowingly* provided misleading information, which called into question the
reliability of their entire data system. *See* Dec. 17, 2019 Order, ECF No. 6427 at 40.
That is why the parties agreed, and the Court ordered, that the Special Master be
authorized to hire a specialized data expert who could opine on Defendants' data system
overall – both because such focus was necessary given Defendants' bad acts, and because
the Special Master team previously lacked sufficient expertise to properly understand the
data, particularly given how poorly documented and organized Defendants' data system
was prior to this process. *See* Apr. 29, 2020 Order, ECF No. 6646 at 1; *see also* Ex. B to
Defs.' Updated Data Schedules, ECF No. 7523-3 at 4 (Dec. 18, 2020 K. Walsh Ltr. to E.
Thorn noting CDCR's mental health reporting system lacked proper documentation,
change management systems, or source control at start of data remediation process); 2021
Data Expert Report, ECF No. 7074 at 224 (Mar. 5, 2021) (noting CDCR's data system
was "was developed predominantly by highly capable and dedicated laypeople" and in a
"disordered state" when the Data Expert was appointed).

Defendants' contention that the DR Document outlines a new process is also
unsupported. Dr. Potter has reiterated the concepts of verification and validation from
the early stages of his appointment (*see, e.g.*, 2021 Data Expert Report, ECF No. 7074 at
235-42 (Mar. 5, 2021), and has on numerous occasions explained to the parties how
indicators would move through the process until all indicators were reviewed and
disputes resolved. The data expert referenced these discussions during the April 22, 2022

[4153902.3]

Special Master Lopes
September 11, 2022
Page 3

Status Conference, explaining to the Court that "when an indicator has been remediated, it means that there's some tests that are being run to make sure that it is producing accurate results. And, you know, if those tests indicate that the indicator is no longer functioning, I cannot imagine that CDCR would wany to portray that indicator as having been remediated because it's clearly not working." Apr. 22, 2022 Hr'g Tr., ECF No. 7540 at 42:4-11.

Despite their arguments to the contrary, Defendants do appear to understand what would constitute a "significant change" requiring revisiting an indicator. Their letter acknowledges that this could occur "if the scope of an indicator is expanded or narrowed, or if the content and the meaning of the business rule(s) of a remediated indicator are changed." *See* Defs.' Aug. 5, 2022 Ltr. at 3. Defendants further state that "CDCR agrees that any major gaps or flaws should be raised and remediated." *See id.* at 4. And their April 2022 filing specifically requested an order that "recertification of the indicator is not necessary absent that indicator undergoing a *substantial change*." Defs.' Updated Activation Schedules, ECF No. 7523 at 4 (Apr. 7, 2022) (emphasis added). Deciding what changes are "major" or "substantial" requires all the same judgment-calls required to decide when a change is "significant." To the extent Defendants believe some gap, flaw, or change is "major," "substantial," or "significant," they should raise it. Indeed, the Court has already ordered that "there will be full transparency. If any stakeholder has a question about whether information should be shared, it should be shared. Everyone involved should err on the side of transparency." Jan. 7, 2020 Order, ECF No. 6441 at 2. If Defendants need more guidance on what kinds of changes could be considered "significant," they should propose clearer language for all stakeholders to consider. They have not done that.

Next, Defendants argue that certification should be individualized to each indicator, not to the system as a whole at the end of the process. For all the reasons described in our filing, the current approach is appropriate because it adheres to data industry standards requiring flexibility. *See* Pls.' Resp. to Defs.' Updated Activation Schedules, ECF No. 7528 at 10. It is undisputed that the mental health data system is comprised of numerous intricate and interconnected part that pull from different data sources, including various audits that can and do change. Requiring end-to-end certification of the entire system once all individual indicators are remediated is a logical approach to ensuring the entire system is working in an accurate, transparent, and sustainable way. *See id.* at 15-16.

Defendants claim "that data remediation should focus on whether the indicators accurately measure what they purport to measure and should not turn on whether there is an agreement between the parties and the Special Master that policies are being interpreted correctly, the scope of the indicator is appropriate, or any other number of

[4153902.3]

Special Master Lopes
September 11, 2022
Page 4

disputes that may arise." Defs.' Aug. 5, 2022 Ltr. at 4. This is incorrect. If the process were limited to whether the indicators accurately measure what they purport to measure, and nothing more, an indicator measuring the Program Guide's monthly psychiatry contact requirement could pass certification so long as it correctly measured Defendants' policy – even if that policy allowed for 45 days between contacts rather than 30 days. That is obviously and patently unacceptable, as that exact scenario led to the Court's December 17, 2019 Order and the current remediation process. *See* Dec. 17, 2019 Order, ECF No. 6427 at 29-30, 45; *see also* Aug. 14, 2019 Order, ECF No. 6242 at 7-8 (finding Defendants' policy decision to count all psychiatry contacts, including non-confidential ones, as compliant was erroneous under the Program Guide).

The Special Master has explained that the key indicator list was created by mapping the Special Master's own broad categories of monitoring onto the titles of CDCR's pre-existing indicators without being able to verify ahead of time the specific computer programming or business rules underlying those indicators. It is only through our current process of reviewing each indicator individually that the stakeholders are able to determine whether an indicator actually accurately measures the core remedial requirement contemplated by the Special Master when he created the provisionally approved key indicator list. The list was meant to cover the core remedial requirements in the Program Guide, and thus the current process necessarily must identify any instances in which Defendants' policies or practices deviate from those requirements or fail to fully capture them.

On page five of Defendants' letter, they request that the Special Master replace "Mental Health" with "CDCR" in the DR Document. While this may be appropriate in most cases, it is also critical not to erase the role of CCHCS, given its separate but overlapping function in the *Plata* case. We request that CCHCS's involvement in data remediation (including through nursing and their IT teams) be acknowledged if this change is made.

Next, Defendants object to the notion that the Special Master's data expert should opine at the end of the data verification process whether Defendants have sufficient staffing in place to ensure appropriate data practices are followed in the future. Defendants' claim that "[t]o date, staffing has not been a barrier to data remediation" (Defs.' Aug. 5, 2022 Letter at 5) distorts reality. Defendants' failure to provide adequate numbers of staff with appropriate data systems expertise has resulted in numerous delays to date. *See* Pls.' Resp. to Defs.' Updated Activation Schedules, ECF No. 7528 at 9-10, 13 (Apr. 14, 2022). For instance, Dr. Potter and Plaintiffs spent months requesting that Defendants employ someone with technical writing expertise because the documentation provided to stakeholders routinely lacked necessary specificity and consistency of terminology, not to mention being riddled with typos, which dragged out stakeholder

[4153902.3]

Special Master Lopes
September 11, 2022
Page 5

meetings and caused unnecessary confusion and delay. The dearth of technical writing
expertise on Defendants' data team was so glaring and problematic that it became a
specific point of extended negotiation between the parties and Special Master leading up
to Secretary Allison's declaration. Indeed, within their own letter, Defendants report that
staffing restraints have rendered them unable to address the data expert's repeated
requests to refine CDCR's document-change review transparency tools. Defs.' Aug. 5,
2022 Ltr. at 6 (stating requested changes could not be "prioritized" because CDCR staff
are "simultaneously trying to balance other demands and time-consuming tasks"). The
Special Master and Court's concerns that Defendants were failing to devote necessary
resources to the data remediation project are well established, and led directly to the
Court's requirement that Secretary Allison attest under oath that appropriate resources
would be devoted to ensure the timely completion of the process. *See* Apr. 22, 2022 Hr'g
Tr., ECF No. 7540 at 54:21-22 (Special Master explaining that "Dr. Potter feels … that
the staffing is inadequate"); Apr. 29, 2022 Minute Order, ECF No. 7541 (ordering the
Secretary and Undersecretary, in consultation with the Special Master, to confirm that
appropriate staff would be in place to complete data remediation by December 2023);   .
Decl. of Secretary Allison, ECF No. 7556 at 3 (May 19, 2022) (assuring the Court that
staffing was adequate and committing to adding additional staff as necessary to complete
the project by December 2023). Given the Court's keen interest in this area and the
Secretary's representations, it is appropriate for the data expert to continue to opine on
the sufficiency of Defendants' data team staffing, particularly if he is to confirm at the
end of the process that Defendants are capable of self-monitoring into the future. The
Court's long-term goal of transitioning monitoring to CDCR as part of ending federal
oversight will remain illusory if Defendants gut the staffing necessary to sustain and
maintain the improved data system the Special Master's data expert is helping
Defendants to build through this process.

    Finally, Defendants complain that the DR Document "appears to permanently give
the Special Master and the Court the final say on all data remediation issues." Defs.'
Aug. 5, 2022 Ltr. at 5. Of course the Court will have final say on data remediation, upon
consideration of appropriate factual findings and recommendations by the Special Master
in accord with the Order of Reference. As the Court stated in October 23, 2019,
Defendants' data must be remediated with the end goal of accurately "demonstrat[ing] to
the Court that the Constitution is finally satisfied." Oct. 23, 2019 Hr'g Tr., ECF No.
6380 at 40:16-20. The reason why the Court ordered Defendants to develop CQIT in the
first place was to ensure CDCR had the ability to "self-monitor and, as necessary, self-
correct inadequacies in the delivery of mental health care to the thousands of seriously
mentally ill inmates incarcerated in California's prisons." Mar. 3, 2014 Order, ECF No.
5092 at 5. The fact that "the court ultimately will use the CQIT reports as part of an
overall determination of compliance with constitutional standards and durability of the

Special Master Lopes
September 11, 2022
Page 6


remedy" (*see* Sept. 3, 2020 Order, ECF No. 6846 at 24) makes it clear that the Court must have the final say in the data remediation process, particularly given its scathing findings in the December 17, 2019 Order.  Only through such oversight can the Court ensure that Defendants' data system aligns with Court-ordered mandates and that Defendants do not present the Court with false or misleading data in the future.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:   Cara E. Trapani

CET
cc: *Coleman* co-counsel          Paul Mello          Carrie Stafford
    *Coleman* Special Master team   Samantha Wolff      Brent Reden
    Nick Weber                      Melissa Bentz       Nina Raddatz
    Elise Thorn                     Sundeep Thind       Kristopher Kent
    Namrata Kotwani                 Dillon Hockerson
    Damon McClain

[4153902.3]

# EXHIBIT A

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                      GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



August 5, 2022


Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919


**VIA EMAIL**


Dear Special Master Lopes,

I write in response to the draft Data Remediation and Data System Certification document (Draft DR Document) that Deputy Special Master Kerry Walsh shared with the California Department of Corrections and Rehabilitation (CDCR) and Plaintiffs on July 20, 2022. Below are several questions, comments, and concerns raised by the document.

   I.   <u>**CDCR's Overarching Concerns**</u>

First, CDCR has serious concerns about changing the timeline that it has been operating under for well over a year, significantly elongating the already much delayed data remediation process, and further delaying (possibly for years) the completion of CDCR's Continuous Quality Improvement (CQI) process. CDCR estimate that it would complete the data remediation process by December 2023 based on its understanding of the remediation process, and the number of provisionally approved key indicators and reports when CDCR filed its initial data remediation activation schedule on September 29, 2021. (ECF No. 7334.) This estimate did not include the time for indicators to move through the dispute resolution process or any time needed to achieve "remediation." For the first two years of this project, Dr. Potter verbally assured CDCR that the final steps to achieve remediation would take about one week if (1) CDCR followed the established process, (2) OSM agrees with the documentation, (3) controls are in place to monitor changes to the indicator and documentation, and (4) to a reasonable degree of software engineering certainty, the KPI is operating correctly.

The estimate provided in CDCR's data remediation activation schedules (*see* ECF Nos. 7334, 7457, and 7523) did not take into account *re-remediation* of indicators or a subsequent certification of the system as a whole, which now appear to be part of the anticipated process. It now appears

remediation cannot be achieved if Plaintiffs do not agree for any reason at some point, even after the indicator in question has been reviewed and is passing verification. Including these new steps will unquestionably push out the December 2023 deadline, which would in turn delay CDCR from fully implementing CQI and taking over monitoring from the Special Master. As the court has stated several times, "the goal is development and implementation of a continuous quality improvement process that will ultimately allow defendants to assume responsibility for monitoring and improvement of their mental health care delivery system." (ECF No. 7283 at 5, referencing ECF No. 6996 at 7.) The proposals in the Draft DR document will significantly delay achieving that goal.

It is further possible that the proposal to re-remediate indicators, discussed more below, will make data remediation a never-ending process. This would leave CDCR in an endless holding pattern with no clear conclusion to data remediation or defined steps forward to taking over monitoring from the Special Master. This is especially troubling given the Court's concern the data remediation process ought to be completed "earlier than December 2023." (Transcript of April 22, 2022 Status Conference at 10:20-11:4.)

Second, CDCR sees no reason that certification must wait until each of the provisionally approved CQI key indicators on the Court's provisionally approved list of key indicators are remediated or that certification cannot be completed in parallel to the individual indicator remediation process. Despite the Special Master's data expert working closely with Mental Health for over two years, it is troubling that CDCR must now wait even longer – until the end of data remediation of each and every indicator – to learn whether they have developed a sustainable system. The Special Master should begin certification immediately and, in the event that certification is not possible, the Special Master must provide specific and articulable steps that must be taken to fulfill certification. This will enable CDCR to address and correct any issues resulting from the non-certification of an indicator as issues arrive and without delay.

Third, for the sake of transparency and to ensure that CDCR is on the right path to remediate the indicators on the provisionally approved list of key indicators, CDCR recommends that the Special Master provide written documentation expressly stating when an indicator has been remediated. The Draft DR document should be revised to reflect a process for providing written confirmation of remediation before it is finalized.

## II.    CDCR's Feedback Regarding Data Remediation

### A.    Definition of Data Remediation

The Draft DR document's proposed definition of "remediation" is still vague and subjective in the context of this project. Per the Draft DR document, it seems an indicator is "remediated" if (1) it appears on the provisionally approved key indicator list; (2) has been validated and verified; and

(3) has no unresolved disputes.[1] It also seems that a successfully remediated indicator could subsequently fail remediation if changes significantly affect the indicator or it stops passing verification. Assuming this understanding is correct, CDCR has several questions.

First, under what conditions could a change "significantly affect a remediated indicator?" (Draft DR document at 1.) Could changes that significantly affect a remediated indicator include if the scope of an indicator is expanded or narrowed, or if the content and the meaning of the business rule(s) of a remediated indicator are changed? Additionally, who is responsible for determining whether a change is *significant*? Given the difficulties the parties had in agreeing to whether a policy change was *material*, how will the Special Master successfully identify when a change to an indicator is significant?

Second, how many times does a remediated indicator need to stop passing verification for it to no longer be considered remediated? For example, the ASU prescreen indicator failed verification once over a period of several months, but subsequently continued to pass verification thereafter. The Special Master's data expert previously verbally notified CDCR that this indicator is remediated (ECF No. 7523-1 at 9) and has not informed CDCR that the indicator is no longer remediated or that it needs to be re-remediated. Clarification on this point is paramount to understanding the data remediation process.

Third, in order to re-remediate an indicator, which "appropriate steps of the validation and verification process" will be revisited? (Draft DR document at 1.) The validation and verification process for each indicator consists of several steps and, overall, takes several months[2] to complete. Sending an indicator back through this process would be a lengthy diversion. Does this mean the indicator would have to undergo all of the steps included in the workflow titled "Quality Assurance Certification Workgroup CDCR's Data Remediation Plan Overview" (CDCR's DR Plan Overview) again? (ECF No. 7523-1 at 6.) If all steps in CDCR's DR Plan Overview do not need to be revisited to re-remediate an indicator, the Draft DR document should expressly list which steps from CDCR's DR Plan Overview would be the "appropriate steps" to revisit to re-remediate an indicator. Additionally, the Draft DR document should reflect who is responsible for determining what appropriate steps need to be revisited when an indicator needs to be re-remediated.

Fourth, the December 2023 timeline does not include any time that may be needed for an indicator to be re-remediated. Is the intent of the Draft DR Document to change expectations set forth by the initial data activation schedule (ECF No. 7334) by insisting all re-remediation steps are completed by December 2023 as well? The activation schedule clearly establishes an annual

---

[1] If CDCR's understanding of the word "remediated" is correct, once an indicator is remediated, its business rules, operational policies, workflows, reports, and reporting interfaces used to report key indicator data to the Court and the Special Master will be considered remediated.

[2] The current process takes 19 weeks (almost 5 months) for each indicator to complete validation and verification without factoring in delays.

review (or sooner if necessary) process to review each indicator after achieving remediation. Any so-called re-remediation steps should fall under the on-going review process, and not the activation schedule aimed at achieving initial data remediation for provisionally approved CQI key indicators by December 2023.

Finally, CDCR is concerned that the definition of remediation seems to go beyond whether an indicator accurately measures what it says it measures, and asks whether the indicator—in the opinion of the Special Master and Plaintiffs—measures the policy correctly. The data remediation process CDCR agreed to follow does not include the creation of a new policy, expanded policy, or expanded indicator. (ECF No. 7523-1 at 14.) As we have learned, many of the disputes between the Special Master and/or Plaintiffs and Defendants have revolved around policy interpretation or alleged gaps in policies. The Court has clearly stated that "the data remediation project should not be resolving policy disputes." (Transcript of April 22, 2022 Status Conference at 29:25-30:1.) While CDCR agrees that any major policy gaps or flaws should be raised and remedied, most comments provided by Plaintiffs' counsel and the Special Master's team during Business Rules and Methodology Review meetings (BRMR) or stakeholder review seek to change or expand well-established policy, revise long-standing indicators that the Special Master's team created alongside CDCR, or add new requirements. (ECF No. 7523-1 at 14.) CDCR maintains that data remediation should focus on whether the indicators accurately measure what they purport to measure and should not turn on whether there is an agreement between the parties and the Special Master that policies are being interpreted correctly, the scope of the indicator is appropriate, or any other number of disputes that may arise.

### B. Definition of Data Validation

First, CDCR suggests the reference in 1(a) to the MH QA team be revised to "CDCR MH QA team" for more specificity and clarity. (Draft DR Document at 1.)

Second, 1(a) also states that CDCR creates "detailed design specifications" regarding what "each indicator is supposed to measure with respect to business requirements derived from policy and practice." (Draft DR Document at 1.) However, as Defendants have repeatedly pointed out, many indicators on the provisionally approved list of key indicators are not supported by policy or practice. Thus, the statement in the document is not factually correct if it is based on the Court's provisionally approved key indicator list. CQI key indicators should be based on key *Coleman* required policies. Defendants will make all necessary arguments when the key indicator discussions resume towards the end of this year.

Third, CDCR disagrees with how the Stakeholder Review and BRMR meetings are described in 1(b) because it does not reflect current practice. The Draft DR document portrays BRMR as a forum used to "to validate these design specifications in the context of CDCR's underlying approach (including workflows, and associated user interfaces, instructions, audits and

underlying policy) to meeting the measured business requirements." (Draft DR Document at 1.) This is inconsistent with what actually occurs during these meetings – a review and negotiation with Plaintiffs' counsel and the Special Master's team. Section 1(b) should be revised to state that BRMR meetings are discussions among stakeholders about design specifications, and negotiations as to what should be measured by an indicator and the policies applicable to that particular indicator.

Fourth, the Draft DR document includes references about the Special Master's team's collaboration with Mental Health specifically, rather than CDCR broadly. But Mental Health is not the only division within CDCR working with the Special Master's data team and other stakeholders to remediate its indicators. Rather, multiple CDCR staff from different programs and divisions assist with this process, including nursing, the Division of Adult Institutions, and CCHCS staff. Accordingly, Defendants request that "CDCR" take the place of "Mental Health" references throughout the Draft DR document.

Fifth, Section 1(c) mentions "updates to the workflows and operational policies to meet business requirements may be needed…" (Draft DR Document at 1.) But the Court has previously cautioned that "the data remediation project should not be resolving policy disputes…" (Transcript of April 22, 2022 Status Conference at 29:25-30:1.) The purpose of the data remediation process is to validate and verify requirements measured by existing policy. While CDCR has occasionally agreed that policy revisions are necessary, such revisions should not stall any part of data remediation, nor should it be expected that policy revisions or new indicators based on those policy revisions should be completed as part of data remediation.

III.    **CDCR's Feedback Regarding the Section on Data System Certification**

The Draft DR document notes that the "data expert will certify that appropriate…staffing are in place." (Draft DR document at 2.) CDCR interprets this statement to mean that the data expert will certify whether appropriate CDCR data team staff are in place to run a sustainable data system. CDCR objects to the data expert being given the power to certify whether appropriate staffing is in place. As previously discussed in QAC and the bi-weekly data discussions with the Special Master and all Stakeholders, CDCR, in coordination with CCHCS IT, has ample staff in place to ensure the data remediation process moves efficiently. Additionally, the Secretary confirmed CDCR has sufficient staff assigned to work on data remediation. (ECF. No 7556 at 3.) To date, staffing has not been a barrier to data remediation, and it is therefore unclear why the scope of the data expert's work has been expanded to include an assessment of CDCR's staffing or whether the data expert is even qualified to assume such a function.

Additionally, the Draft DR Document appears to permanently give the Special Master and the Court the final say on all data remediation issues, since system certification won't happen unless current processes, like the dispute resolution process continue. As stated above, this would put

Special Master Lopes
Page 6

CDCR in a continuous holding pattern with no clear end in sight. Finality to this process is necessary so Defendants can move forward in this case.

**IV.    CDCR's Feedback Regarding Endnotes**

As stated above, the Draft DR document – including its endnotes – should be revised to refer to CDCR rather than referencing specific divisions or individuals employed by CDCR (i.e. Mental Health or Dr. Leidner) because the data remediation process is occurring within CDCR and the staff working on this project are all employees across various divisions within CDCR.

Second, for the sake of clarity and specificity, CDCR recommends endnote one be revised to state: "Other related items that are remediated with the indicator include: business rules, operational policies, work flows, reports, and reporting interfaces used to report key indicator data to the Court and Special Master. The Special Master's data team is working with CDCR and other stakeholders to identify and categorize currently outstanding disputes to efficiently implement the use of this process."

Third, endnote two states there are "several refinements" CDCR needs to make to "support transparent document-change review," specifically "access to documents that have been reviewed and commented on by Stakeholders is still not available." (Draft DR document at 3.) Although the old stakeholder review process spanned from October 2021 to April 2022, CDCR did not receive a request from the Special Master's data expert to make accessible this documentation until May 11, 2022. Because the documentation is voluminous, has to be applied retroactively to all indicators that have already been reviewed by stakeholders months ago, and because CDCR is simultaneously trying to balance other demands and time-consuming tasks, this request has not been prioritized. However, CDCR will continue to discuss this matter with the Special Master.

Given the concerns in the paragraph above, CDCR recommends endnote two be revised as follows: "To support the remediation effort, including its transparency requirement, the Special Master's data expert worked with CDCR to create an example framework that CDCR could use to document their Quality Assurance system. The framework included a change tracking and management interface. CDCR subsequently adopted a version of this framework using Microsoft SharePoint Online (SPO). Further refinements may occur to support transparent document-change review. CDCR also requires the use of software development and deployment practices which ensure all QA system-related code and database parameter table changes are versioned and cataloged by date and author."

///

///

Special Master Lopes
Page 7


Please let me know if you would like to discuss this further.

Sincerely,

*/s/ Sundeep Thind*

SUNDEEP THIND
Attorney
Office of Legal Affairs


cc:    *Coleman* Plaintiffs' Counsel
       *Coleman* Court's Special Master's Team
       *Coleman* Office of the Attorney General's Team
       *Coleman* CDCR Team

# EXHIBIT B

<u>Data Remediation and Data System Certification</u>

Details of the requirements for Data Remediation and Data System Certification are listed below. As the work progresses, each indicator on the provisionally approved key indicator list that has been validated and verified, and for which there are not any unresolved disputes, will be <u>remediated</u>.[1] However, if there are change(s) that significantly affect a remediated indicator, and/or it stops passing verification, it will no longer be considered remediated; to become re-remediated, the appropriate steps of the validation and verification process will need to be re-visited, with all disputes resolved concerning the changes made. This work must be done in a transparent manner, such that all relevant updates to mental health quality assurance (MH QA) system, underlying software systems and related policies (e.g., workflows, and operational business requirements), can be tracked and are reviewable.[2]

Once the remediation of the provisionally approved key indicator list is complete including the reports and reporting interfaces used to report key indicator data to the court and Special Master, the data expert will additionally review and certify whether or not the requirements outlined below have been implemented in a sustainable manner. The purpose of this Certification is to help ensure future data concerning the key indicators reported to the court and Special Master that is produced using the MH QA system is accurate <u>and</u> will likely remain so to the extent CDCR continues to utilize the processes and procedures they have adopted during the Data Remediation process.

<u>Data Remediation</u>

1. <u>Data Validation</u> – Asks, is the system designed to correctly measure business requirements?

   a) The MH QA team creates detailed design specifications on <u>what exactly</u> each indicator is supposed to measure with respect to business requirements derived from policy and practice, as well as design specifications for reports and reporting interfaces used to report key indicator data to the court and Special Master.

   b) The Stakeholder Review step and the Business Rules and Methodology Review meeting are used to validate these design specifications in the context of CDCR's underlying approach (including workflows, and associated user interfaces, instructions, audits and underlying policy) to meeting the measured business requirements. In other words, this step ensures design specifications will correctly and sufficiently measure the business requirements under consideration.

   c) When a conflict is found between the design specifications and business requirements, the Special Master's data team and other stakeholders work with MH to develop appropriate revisions to the QA system. Updates to the workflows and operational policies to meet business requirements may be needed to bring them into alignment with Program Guide, court orders, and other policies.

1

    d)  A mutually agreed upon dispute resolution process is now in place to handle disputes regarding interpretation of the existing business requirements and the design of indicators and other items intended to measure those requirements.

    e)  An <u>indicator is validated when the above have been successfully completed</u>.

    f)  If there are changes that significantly affect what an indicator measures or what it should measure, the indicator will need to be <u>re-validated</u> in the context of those changes. Similarly, changes that significantly affect the reports and reporting interfaces used to report key indicator data to the court and Special Master need to be re-validated in the context of those changes.

2.  <u>Data Verification</u> - Asks, have the design specifications (e.g., measurements) been coded correctly?

    a)  The detailed design specifications on <u>what</u> an indicator and its business rules are intended to measure must be used to create a set of "software tests" (that are scheduled to run automatically). Similarly, software tests must be created that confirm the design specifications for reports and reporting interfaces that are used to report key indicator data to the court and Special Master.

    b)  These tests <u>verify</u> the indicator and business rules <u>operate</u> as intended (i.e., find the correct answer), and are reported as such. For example, when appropriate, such tests should check whether the numerator and denominator in a percentage score have overlooked any patients.

    c)  <u>An indicator and its related items are verified (passing verification) if they are passing their software tests</u>.[3] Items whose software tests are failing must be updated or repaired. Changes to design specifications (e.g., designs for a revised indicator) may require <u>re-verification</u> to update or add software tests.

        As described above, indicators and reports that are validated and verified, and for which there are not any unresolved disputes, will be remediated. If there are change(s) that significantly affect an indicator or report, and/or it stops passing verification, it will no longer be considered remediated; to become re-remediated, the appropriate steps of the validation and verification process will need to be re-visited, with all disputes resolved concerning the changes made.

<u>Data System Certification</u>

        Once the Data Remediation process is complete, the data expert will certify that appropriate policy, procedures, and staffing are in place so that these requirements will continue to be followed in the future. Certification will depend on CDCR's commitment to ongoing use of the validation and verification process described above, as wells as maintenance of associated MH QA system design specification documentation, code, and system parameters, such that all changes can be easily tracked and compared with prior versions in a transparent manner.

---

[1] Items that impact the operation of each indicator, including business rules, operational policies, and workflows and reports and reporting interfaces used to report key indicator data to the court and Special Master are included in validation and verification process, and can be similarly thought of being remediated with respect to the operation of each remediated indicator.  The Special Master's data team is working with MH and other stakeholders to identify and categorize currently outstanding disputes to efficiently implement use of this process.

[2] To support the remediation effort, including its transparency requirement, the data expert worked with the CDCR staff member, Dr. Leidner, to create an example framework that MH could use to document their Quality Assurance system.  The framework included a change tracking and management interface. MH subsequently adopted a version of this framework implemented using Microsoft SharePoint Online (SPO). MH's SPO is largely operational but still needs several refinements to support transparent document-change review, e.g., access to documents that have been reviewed and commented on by Stakeholders is still not available. MH and CCHCS IT report they now also require use of software development and deployment practices which ensure all QA system-related code and database parameter table changes are versioned and cataloged by date and author.

[3] In consultation with CCHCS IT, the data expert and Dr. Leidner worked to develop an automated testing framework.  At MH's request, Dr. Leidner now manages the team that is using it in practice.  Indicator tests currently rely on the CDCR and MH data warehouse (as opposed to the underlying source data systems).  To complete verification of the MH QA Data System, the data expert has been working with Dr. Leidner to identify different approaches that can be used to verify relevant underlying data warehouse data. Such data is relevant if it is utilized in the calculation of a provisionally approved key indicator.