# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
    Plaintiffs,

v.

GAVIN NEWSOM, et al.,
    Defendants.

No. CIV S-90-0520 KJM DB P

**TWENTY-NINTH ROUND MONITORING REPORT – PART D: SPECIAL MASTER'S MONITORING REPORT ON THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S INSTITUTIONS WITH CORRECTIONAL CLINICAL CASE MANAGEMENT PROGRAMS COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
February 7, 2023

## ACRONYMS AND ABBREVIATIONS

3CMS:           Correctional Clinical Case Management System

ADA:            Americans with Disabilities Act

ADHD:           Attention Deficit Hyperactivity Disorder

ADL:            Activities of Daily Living

AGPA:           Associate Governmental Program Analyst

AIMS:           Abnormal Involuntary Movement Scale

ASP:            Avenal State Prison

ASU:            Administrative Segregation Unit

BPH:            Board of Parole Hearing

BUN:            Blood Urea Nitrogen

CAP:            Corrective Action Plan

CAT:            Chart Audit Tool

CBC:            Complete Blood Count

CBT:            Cognitive Behavioral Therapy

CC I:           Correctional Counselor I

CCAT:           Correctional Clinical Assessment Team

CCHCS:          California Correctional Health Care Services

CCI:            California Correctional Institution

CCWF:           Central California Women's Facility

CDCR:           California Department of Corrections and Rehabilitation

CEO:            Chief Executive Officer

CHCF:           California Health Care Facility

CHSA:           Correctional Health Services Administrator

| | |
|---|---|
| CIM: | California Institution for Men |
| CIT: | Crisis Intervention Team |
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CME: | Chief Medical Executive |
| CMF: | California Medical Facility |
| CMHPP: | Custody and Mental Health Partnership Plan |
| CMP: | Comprehensive Metabolic Panel |
| CNA: | Certified Nursing Assistant |
| CPR: | Cardiopulmonary Resuscitation |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CSR: | Classification Staff Representative |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility |
| CTQ: | Confined to Quarters |
| DAR: | Daily Activity Report |
| DBT: | Dialectical Behavior Therapy |
| DDP: | Developmental Disability Program |

DSH:                Department of State Hospitals

DOT:                Direct Observation Therapy

DVI:                Deuel Vocational Institution

EHRS:               Electronic Health Records System

EKG:                Electrocardiogram

EMRRC:              Emergency Medical Response Review Committee

EOP:                Enhanced Outpatient Program

EPRD:               Estimated Parole/Release Date

ERMS:               Electronic Records Management System

FIT:                Focused Improvement Team

FLSA:               Fair Labor Standards Act

FMLA:               Family Medical Leave Act

Folsom:             Folsom State Prison

FTE:                Full-Time Equivalent

FWF:                Folsom Women's Facility

GP:                 General Population

GP GRC:             General Population Guidance and Resource Center

HCFIP:              Health Care Facilities Improvement Program

HDSP:               High Desert State Prison

HEPA:               High Efficiency Particulate Air

HLOC:               Higher Level of Care

HPS I:              Health Program Specialist I

HPS II:             Health Program Specialist II

HS:             *Hora Somni*/Hour of Sleep

IAC:            Inmate Advisory Counsel

ICC:            Institutional Classification Committee

ICF:            Intermediate Care Facility

IDTT:           Interdisciplinary Treatment Team

IEX:            Indecent Exposure

IP:             Inmate Patient

IPOC:           Interdisciplinary Plan of Care

IRU:            Inpatient Referral Unit

IST:            In-Service Training

ISUDT:          Integrated Substance Use Disorder Treatment

KOP:            Keep on Person

KVSP:           Kern Valley State Prison

LOP:            Local Operating Procedure

LTRH:           Long-Term Restricted Housing

LVN:            Licensed Vocational Nurse

MAPIP:          Medication Administration Process Improvement Program

MAT:            Medication-Assisted Treatment

MCRP:           Male Community Reentry Program

MCSP:           Mule Creek State Prison

MDO:            Mentally Disordered Offender

MERD:           Minimum Eligible Release Date

MHA:            Mental Health Assessment

| | |
|---|---|
| MHCB: | Mental Health Crisis Bed |
| MHPS: | Mental Health Program Subcommittee |
| MHSDS: | Mental Health Services Delivery System |
| MSF: | Minimum Support Facility |
| NA: | Nurse-Administered |
| NDS: | Non-Disciplinary Segregation |
| NKSP: | North Kern State Prison |
| OHU: | Outpatient Housing Unit |
| OSS: | Office Services Supervisor |
| PBSP: | Pelican Bay State Prison |
| PC | Primary Clinician |
| PIP: | Psychiatric Inpatient Program |
| PIWP: | Performance Improvement Work Plan |
| PNP: | Psychiatric Nurse Practitioner |
| PREA: | Prison Rape Elimination Act |
| PRPA: | Pre-Release Program Assessment |
| PSA: | Parole Services Administrator |
| PSR: | Program Status Report |
| PSU: | Psychiatric Services Unit |
| PTSD: | Post-Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIT: | Quality Improvement Team |
| QMC: | Quality Management Committee |

R&R:            Receiving and Release

RJD:            Richard J. Donovan Correctional Facility

RN:             Registered Nurse

ROI:            Release of Information

RVR:            Rules Violation Report

SCC:            Sierra Conservation Center

SHO:            Senior Hearing Officer

SHU:            Security Housing Unit

SNY:            Sensitive Needs Yard

SOMS:           Strategic Offender Management System

SPRFIT:         Suicide Prevention and Response Focused Improvement Team

SQ:             San Quentin State Prison

SRASHE:         Suicide Risk and Self-Harm Evaluation

SRMP:           Suicide Risk Management Program

SRN:            Supervising Registered Nurse

SSI:            Supplemental Security Income

SSRI:           Selective Serotonin Reuptake Inhibitor

STOP:           Specialized Treatment for Optimized Programming

STRH:           Short-Term Restricted Housing

SVSP:           Salinas Valley State Prison

TCMP:           Transitional Case Management Program

TTM:            Therapeutic Treatment Module

TTA:            Triage and Treatment Area

UCC:              Unit Classification Committee

WSP:              Wasco State Prison

## <u>TABLE OF CONTENTS</u>

ACRONYMS AND ABBREVIATIONS .................................................................................. i

THE COLEMAN SPECIAL MASTER'S  TWENTY-NINTH ROUND MONITORING
REPORT – PART D ................................................................................................................ 1

I.      INTRODUCTION........................................................................................................ 1

II.     MENTAL HEALTH VACANCY RATES .................................................................. 23

III.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS.......................................... 28

    A.    Quality Management .................................................................................... 28

    B.    Quality of Care in CDCR's Mental Health Programs ................................. 32

        1.    The IDTT Process.................................................................................. 32

        2.    Overall Quality of Care ........................................................................ 38

        3.    Treatment Planning Concerns ............................................................... 39

        4.    Treatment Interventions........................................................................ 48

        5.    Documentation Issues ........................................................................... 49

        6.    Positive Findings .................................................................................. 53

    C.    Medication Management .............................................................................. 54

        7.    Psychiatry Measures ............................................................................. 55

        8.    Clozapine/Clozaril Institutions............................................................. 57

        9.    Continuity, Compliance, Observation, and Administration Matters ........ 58

    D.    Access to Higher Levels of Care ................................................................. 64

    E.    Custody and Mental Health Partnership Plan.............................................. 68

    F.    Review of the RVR Process ........................................................................ 74

    G.    Use of Force ................................................................................................ 78

    H.    Program Access ........................................................................................... 80

    I.    MHSDS Patients in Segregated Housing ..................................................... 83

    J.    Reception Centers........................................................................................ 86

CONCLUSION ...................................................................................................................... 88

APPENDIX A SPECIAL MASTER'S ACTIVITIES ................................................................... 91

APPENDIX B INSTITUTIONAL SUMMARIES ....................................................................... 94

APPENDIX C CLINICAL CASE REVIEWS ............................................................................ 371

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

    **Plaintiffs,**

    **vs.**                                                                 **No. 2:90-cv-0520 KJM DB**

**GAVIN NEWSOM, et al.,**

    **Defendants.**

**THE COLEMAN SPECIAL MASTER'S**
**TWENTY-NINTH ROUND MONITORING REPORT – PART D**

## I.     INTRODUCTION

This is the fourth installment of the Special Master's Twenty-Ninth Round Monitoring Report. The Twenty-Ninth Monitoring Round commenced with full scale monitoring tours of California Department of Corrections and Rehabilitation (CDCR) institutions in May 2021. The Special Master filed his Twenty-Ninth Round Monitoring Report – Part A, covering the CDCR's Psychiatric Inpatient Programs (PIPs), on May 17, 2022. ECF No. 7555. The Court adopted the Special Master's findings in full and referred two of the Special Master's recommendations to "focused discussions" between the Special Master and CDCR Secretary.[1] ECF No. 7608 at 6.[2] The Special Master filed the second installment of the Twenty-Ninth Round Monitoring Report,

---

[1] Since the distribution of the Draft Report to the parties, the Court issued an order vacating paragraph two of its August 29, 2022 order and instead ordered the parties to meet and confer and file a "joint status report outlining the results of the meet and confer required by this order and, as appropriate, either a stipulated resolution or a schedule for motion practice if one or both issues remains unresolved." ECF No. 7697 at 3.

[2] References to page numbers for documents filed in the Court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system. References to page numbers in the Special Master's Twenty-Ninth Round Monitoring Report – Parts C and D are to the page numbers noted at the bottom of each page.

covering the California Department of State Hospital's (DSH) inpatient programs for *Coleman* class members, on October 14, 2022.  ECF No. 7625.[3]  Finally, the Special Master distributed his Draft Twenty-Ninth Round Monitoring Report – Part C, covering CDCR's 15 institutions with Enhanced Outpatient Programs (EOPs) to the parties on December 8, 2022.

    This Report includes the monitor and monitor's expert's findings from full scale monitoring tours of the following 13 CDCR institutions with Correctional Clinical Case Management Services (3CMS) programs:  Avenal State Prison (ASP); California Correctional Institution (CCI); California Institution for Men (CIM); California Rehabilitation Center (CRC); California State Prison/Solano (CSP/Solano); Correctional Training Facility (CTF); Folsom State Prison (Folsom)/Folsom Women's Facility (FWF); High Desert State Prison (HDSP); North Kern State Prison (NKSP); Pelican Bay State Prison (PBSP); Pleasant Valley State Prison (PVSP); Sierra Conservation Center (SCC); and Wasco State Prison (WSP).

    In his Seventeenth Round Monitoring Report Part A, filed on February 14, 2007, the Special Master highlighted some of the advantages of filing his monitoring round reports in "smaller components:"

> The division of the report into smaller components also allows a more thoughtful analysis of the shared problems and achievements of institutions with similar [Mental Health Services Delivery System] programs and populations.  Covering compliance in all 33 CDCR institutions in one document inevitably resulted in generalizations that were not always useful for the various subsets of facilities with like programs because they were based on data from too many institutions with widely diverse programs and experiences.

ECF No. 2140 at 2.  As will be demonstrated below, while CDCR institutions share many common strengths and weaknesses, there continues to be value in analyzing "shared

---

[3] On December 19, 2022, the Court issued an order adopting the Special Master's Twenty-Ninth Round Monitoring Report – Part B in full and approving DSH's staffing plan.  ECF No. 7688 at 9-10.

problems and achievements of institutions" with similar Mental Health Services Delivery System (MHSDS) missions. *Id.* Accordingly, the Special Master intends to use this approach in the forthcoming Thirtieth Monitoring Round. As of the time of this writing, the Special Master intends to commence the Thirtieth Round with full scale monitoring tours of CDCR's Lift-and-Shift PIPs and paper reviews of California Institution for Women Psychiatric Inpatient Program (CIW-PIP) and San Quentin State Prison Psychiatric Inpatient Program (SQ-PIP) beginning in January 2023. *See* August 29, 2022 Order, ECF No. 7608 at 6 ("The Special Master's third recommendation is adopted in full. The Special Master shall review the CIW-PIP and SQ-PIP via paper review in the next monitoring round.").

The Special Master's Twenty-Ninth Round Monitoring Report covers defendants' compliance with the plans, policies, and protocols provisionally approved by this Court in mid-1997, known as the MHSDS Program Guide. The Program Guide has been subsequently revised, updated, and re-approved by the Court several times. The most recent update to the Program Guide occurred in 2021, as discussed in the Twenty-Ninth Monitoring Round Report – Part C. Special Master's Twenty-Ninth Round Monitoring Report – Part C at 42-47. The monitoring focus areas in this Report include: Mental Health Staffing Vacancies, Quality Management, Quality of Care, Medication Management, Access to Higher Levels of Care, Custody and Mental Health Partnership Plan (CMHPP), Rules Violation Report (RVR) Process, Use of Force, Program Access, MHSDS Patients in Segregated Housing and Reception Centers.

The summaries of the focus areas appear below in Part II and Part III Sections A through J. Appendix A is a list of the Special Master's activities since the distribution of the Twenty-Ninth Round Monitoring Report Part C. Appendix B is comprised of institution-by-institution

3

summaries of the monitor's findings during the monitoring round.  Finally, Appendix C is comprised of the Special Master's clinical reviews of individual patient cases.

## Parties Responses to Draft Reports

On December 8, 2022, the Special Master provided the *Coleman* parties with a draft version of the Twenty-Ninth Round Monitoring Report – Part C, covering CDCR institutions with EOP programs.  On December 16, 2022, the Special Master provided the *Coleman* parties with a draft version of the Twenty-Ninth Round Monitoring Report – Part D (together with the Twenty-Ninth Round Monitoring Report – Part C referred to as the "Draft Reports"), covering CDCR institutions with 3CMS programs.  On December 16, 2022, the Special Master granted defendants' request to extend the respective deadlines for responding to the Draft Reports to January 25, 2023.  The parties each sent their responses and objections to the Draft Reports to the Special Master on January 25, 2023.  *See* Letter from Thomas Nolan, Esq. and Marc Shinn-Krantz, Esq., plaintiffs' counsel, to Special Master Lopes (January 25, 2023), attached hereto as Exhibit A; *see* Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (January 25, 2023), attached hereto as Exhibit B.

The Special Master carefully reviewed the parties' comments and objections and made revisions to the final version of the Reports as warranted.  The parties each responded to both of the Draft Reports in one letter.  As such, this section responds to the parties' correspondence as a whole.  As noted below, corresponding revisions and clarifications have been made to each Report.

## Plaintiffs' Response to the Draft Reports

In their response to the Draft Reports, plaintiffs noted their "primary concern as to both reports…is to the lack of additional recommendations to remedy the snowballing staffing crisis

and the long-standing deficiencies in quality of care." Exhibit A at 1. After reviewing the Draft Reports' findings regarding mental health staffing and quality of care, *see id.* at 1-9, plaintiffs requested the Draft Reports be revised to include recommendations requiring defendants to address deficiencies in staffing and quality of care. *Id.* at 13.

For the reasons explained herein, the Special Master declines to make recommendations for additional remedial orders. *See infra* note 12 and accompanying text. In addition, the Special Master notes that at least one of the topics raised in plaintiffs' preliminary comments, staffing, will be discussed at a status conference on February 10, 2023. *See* January 6, 2023 Order, ECF No. 7699 at 5.

Plaintiffs provided additional comments to the Draft Report's discussion of staff misconduct, RVRs, lengths of stay in segregated housing, overflow housing, pill line length, and document review timeframes. Each of these issues is discussed below.

### Reporting on Staff Misconduct

Plaintiffs stated that the Draft Report's discussion of staff misconduct and patient complaints was "unclear…whether the institutions are reporting only complaints against mental health clinicians or against all staff, whether they are reporting complaints by MHSDS participants or by all incarcerated people, and whether certain institutions are reporting complaints raised through the grievance process or through other avenues such as 989s." Exhibit A at 9-10. Plaintiffs, therefore, requested clarification on the scope of reported data regarding staff misconduct and patient complaints. *Id.* at 10. As plaintiffs alluded to, institutions do not report data regarding allegations of staff misconduct and patient complaints consistently. The Special Master will consider clarifying his pre-site document request in the upcoming monitoring round to ensure it captures sufficient information on this issue.

**Disproportionate Use of RVRs**

Plaintiffs noted that "it appears EOP patients are drastically disproportionately impacted by RVRs" and requested "that the final report update these findings to break out what percentage of the overall population was at each level of care at the fifteen institutions." Exhibit A at 10. In response, the Special Master notes that the information plaintiffs seek can be found in the "Census" sections of each institutional summary. The Special Master did not revise the Report in response to this request.

**Proportions and Lengths of Stay of Class Members in Segregation**

Plaintiffs requested "that the Draft Reports be updated to include findings on the extent to which class members, and particularly EOP class members, are disproportionately held in segregated housing as compared to non-class members." Exhibit A at 10. The Special Master does not have this information to include in the current Report but will consider revising his pre-site document request to ensure it captures sufficient information on this issue going forward.

Plaintiffs also requested that information regarding class members' lengths of stay in segregation "be summarized at a high level and be compared to prior reporting periods to ascertain whether the 2014 remedial plans issued in response to the Court's April 10, 2014 segregation order are decreasing class members' lengths of stay in dangerous segregation units." Exhibit A at 11. The Special Master did not revise the Report in response to this request and notes plaintiffs are free to conduct their own comparisons to prior monitoring round reports.

**Overflow Housing Issues**

Plaintiffs requested additional information regarding the use of overflow housing during the monitoring round. Exhibit A at 11-12. The Special Master notes the overflow housing data provided in plaintiffs' letter was from November 21, 2022, after the review period of the current

6

Report.  Further, findings regarding the use of overflow housing are included in the CIW, CSP/Sac, and KVSP institutional summaries.  *See* Special Master's Twenty-Ninth Round Monitoring Report - Part C at 293, 545, 675, 685-86, 688.  The Special Master did not revise the Report based on this request but will consider revising his pre-site document request to ensure sufficient information about the use of overflow housing is captured going forward.

### Clarification Regarding Reporting on Pill Line Lengths

Plaintiffs requested clarification regarding two pill-line-related timeframes discussed in the Draft Report.  Exhibit A at 12.  As plaintiffs alluded to, the 30-minute timeframe refers to a patient's individual wait time, while the two-hour timeframe is for the entire pill line to be completed for all patients.  Institutions do not report both data points consistently, but the Special Master will consider clarifying his pre-site document request to ensure sufficient information on this issue is captured going forward.

### Document Review Timeframe

The Special Master added the data of the review period in each institutional summary in response to plaintiffs' request.  Exhibit A at 12.

### Defendants' Response to the Draft Reports

The first page of defendants' response includes a mischaracterization of the Draft Report's discussion of the significance of remedying longstanding – and indeed worsening – staffing vacancies and completing data remediation.  *See* Exhibit B at 1 ("The conclusion of the Draft Report – Part C states that addressing staffing vacancies and completing data remediation are CDCR's two major outstanding remedial obligations.").  This is misleading.  The Court has made clear what defendants' remaining remedial obligations are, and they are not limited only to staffing and data remediation.  *See, e.g.*, September 2, 2020 Order, ECF No. 6846 at 2-15.  The

7

conclusion to the Twenty-Ninth Round Monitoring Report – Part C states: "But much work remains. Aside from addressing the staffing emergency, data remediation continues to be of paramount importance." *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 162. Indeed, both of these projects are of "paramount importance" for the reasons the Court has repeatedly identified. However, they are hardly defendants' only outstanding major remedial obligations. *See, e.g.*, ECF No. 6846 at 2-15.

On page two of their letter, defendants stated, "As the Special Master himself acknowledges, CDCR has committed adequate numbers of dedicated and qualified staff to data remediation." Exhibit B at 2. This is also misleading. The Draft Report referenced former CDCR Secretary Kathleen Allison's statements regarding the adequacy of data remediation staff made in a sworn declaration to this Court. *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 32 (citing Declaration of Kathleen Allison in Response to Minute Order, ECF No. 7541, ECF No. 7556 at 3). The Special Master did not express an opinion about whether CDCR in fact has adequate numbers of staff to complete data remediation by December 2023.

I.    **"The Draft Report Should Remove Conclusory Statements on the Constitutionality of Care Provided to the Coleman Class"**

Defendants objected to a statement in the conclusion of the Draft Report that "defendants are presently unable to provide constitutionally adequate mental health care to the number of seriously mentally ill persons now incarcerated in California," arguing this statement amounted to a legal judgment outside the Special Master's authority. Exhibit B at 2. Upon review, the Special Master revised this statement, replacing the phrase "constitutionally adequate" with

"Program Guide-compliant" mental health care.[4]  Of course, the Court has made clear that defendants remedial plan, the Program Guide, constitutes the constitutional floor in this case. *See, e.g.,* August 1, 2020 Order, ECF No. 6806 at 14 ("[T]he Program Guide is based in Eighth Amendment requirements and, although the court has yet to issue an opinion on whether and if so for how long the pandemic might justify emergency departures from Eighth Amendment requirements, the Program Guide and other court-approved remedies provide the Eighth Amendment floor."); *see also Coleman v. Brown*, 756 Fed. Appx. 677, 678-79 (9th Cir. 2018) ("Appellants contend that the district court erred by treating the requirements of the Program Guide as a constitutional minimum and by failing to evaluate the 'deliberate indifference' element of an Eighth Amendment violation.  But the district court was entitled to rely on its previous ruling in these areas, which had become final, as the law of the case.  It was therefore established that the Program Guide sets out the objective standards that the Constitution requires in this context, and that the persistence of objectively unconstitutional conditions satisfies the subjective "deliberate indifference" inquiry.") (internal citations omitted).

## II.    **"The Draft Report Relies Upon an Inaccurately Calculated Psychiatry Vacancy Rate"**

Defendants objected to the Draft Twenty-Ninth Monitoring Round Report – Part C's calculation and reporting of a "'shocking' vacancy rate of 51 percent for psychiatrists at the 15 EOP institutions visited by the Special Master's team during the 29th Round."  Exhibit B at 3.

---

[4] In objecting to the use of the phrase "constitutionally adequate" mental health care on page 36 of the Draft Report, defendants objected to a quotation of their own use of the phrase in a filing related to their updated staffing plan.  *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 52 ("Defendants identified 'these modifications, and in particular the formalized policies for use of PNPs and telepsychiatry from home" as "critical to eliminating barriers to Defendants' ability to deliver constitutionally adequate care, and will improve access to care.'") (quoting ECF No. 6978 at 2).

9

Defendants allege that this reported psychiatry vacancy rate calculation was "erroneous" and "does not comport with the monthly psychiatry vacancy reports defendants had filed during the monitoring period." *Id.* Defendants then surmised how the Special Master may have calculated the psychiatry vacancy rates at the 15 institutions with EOP programs and offered data regarding vacancy rates for December 2022. *Id.*

First, Defendants' provided data for December 2022 is irrelevant because it covers a period subsequent to the review period. Moreover, as of the time of defendants' writing, they had neither uploaded December 2022 vacancy rate data to the CDCR Secure Website for Monthly Reports, nor had they filed their monthly psychiatry vacancy filing with the Court.

Further, as clearly indicated in the Report, the Special Master's source for the psychiatry data was the CDCR Secure Website for Monthly Reports, posted October 2022 and covering August 2022. *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 62 n.22. For psychiatry positions, this website data was limited to the psychiatry positions of chief psychiatrist, senior psychiatrist, and staff psychiatrist, and did not also include telepsychiatry. Adding the secure website data for the 15 EOP institutions revealed a total of 149.8 authorized staff psychiatry positions, of which 73 were filled and 76.8 were vacant, for a 51 percent psychiatry vacancy rate. This website data also reported 40.32 registry staff psychiatrists, for a total of 113.32 staff and registry psychiatrists, for a 24 percent functional vacancy rate. The Special Master did not revise the final Report in response to this preliminary objection.

## III.    <u>"The Draft Report Should Acknowledge That Vacancy Rates Are Heavily Influenced by the Broader Labor Market"</u>

Defendants requested the Draft Report be revised to acknowledge that there is a "nationwide and state-level shortage of mental health professionals" impacting CDCR's ability to recruit and retain sufficient numbers of mental health professionals. Exhibit B at 3. In

response, the Special Master added a footnote to the Report acknowledging defendants' statements.  *See infra* note 8; *see also* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 20 n.9.

## IV.  <u>**"The Draft Report Should Clarify Certain Assertions Regarding Telepsychiatry and Telehealth"**</u>

Defendants objected to the Draft Report's discussion of observed connectivity problems at several institutions.  Exhibit B at 4-5.  Defendants argued that the Special Master's reports of "connectivity issues appear[ed] anecdotal in nature and lack[ed] specificity."  *Id.* at 4.  Defendants requested that the Special Master revise the Report to "quantify the extent of these connectivity problems."  *Id.*

With respect to observed connectivity-related problems at CMC, CSP/Corcoran, CSATF, and SVSP, additional specificity regarding observed connectivity problems and any observed impact on patient care can be found in the respective institution's institutional summaries.  *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 264, 570, 619-20, 644-45, 660, 662.  Accordingly, the Special Master did not revise the Report in response to defendants' preliminary objections.

In other instances, defendants objected to the inclusion of the accounts of interviewed CDCR staff members and *Coleman* class members regarding the use of telepsychiatry in their respective institution or program.  Exhibit B at 4 (objecting to a statement in the Draft Report that "MCSP mental health leadership reported connectivity problems on some facilities…."); *id.* (objecting to a statement in the Draft Report that "CSATF 3CMS staff also reported frequent connectivity issues for telepsychiatrists working from home."); *see also id.* (objecting to statements of interviewed class members at the EOP level of care who expressed "discomfort" with telepsychiatry).  Staff and patient interviews are integral parts of the Special Master's

monitoring tours, providing key insight into the operations of CDCR's institutions and revealing information that may not come to light from reviewing documents.  The Special Master did not revise the Report in response to this objection.

While the Report was not revised in response to defendants' preliminary objections, the Special Master generally agrees that more granular reporting on CDCR's use of telepsychiatry is warranted.  The Special Master will take defendants' comments into consideration in preparation for the 30th round monitoring tours in the coming months.  As CDCR's ability to track telepsychiatry-related data matures, *see* Special Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy, ECF No. 7682 at 64-66, 69, the Special Master will review his pre-site document request to ensure it captures as much relevant information as CDCR can provide regarding its use of telepsychiatry and telehealth.

## V.    <u>Data Remediation</u>

In sections V, VI, and VII of their letter, defendants make several objections to the Draft Report's discussion of ongoing data remediation efforts.  Exhibit B at 5-7.  Specifically, defendants argued: "The Draft Report Contains Contradictory Assertions Regarding Data Remediation and Selectively Quotes Defendants' Prior Filings," *id.* at 5, "The Draft Report Conflates Remediation and Certification with Data Validation and Verification and Avoids Providing Clarity on What Is Necessary to Achieve Data Remediation, Hamstringing Defendants," *id.* at 6, and "The Draft Report Includes Outdated Characterizations of the Post-Certification Process."  *Id.* at 7.

First, defendants misconstrued a quotation from the Draft Report.  Defendants attributed the following to the Draft Report: "The Draft Report states that data remediation is 'intended to

align the scope of a given indicator with the Special Master's current scope of monitoring.'"[5]  In fact, the Draft Report quoted language included in one of defendants' data remediation activation schedules, *see* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 30-31 (quoting ECF No. 7523-1 at 4), and noted that defendants nonetheless regularly resisted efforts to modify CDCR's existing indicators "to align the scope of a given indicator with the Special Master's current scope of monitoring and with the requirements of the Program Guide…." *Id.* at 31.

Contrary to their assertions otherwise, defendants are well aware of the scope of the Special Master's monitoring.  Currently, through the data remediation process, the Special Master's team of monitors and experts provide painstakingly detailed feedback to the parties regarding the design of indicators, including relevant information regarding the scope of the Special Master's monitoring.[6]

---

[5] The Special Master's monitoring reports assess defendants' compliance with the Program Guide, Compendium, and related court-ordered remedial tasks.  As the Court noted in its September 2, 2020 order, "[T]he Program Guide 'is defendants' plan, approved by this court, to remedy the Eighth Amendment violations identified in this court's 1995 order….Because the … Program Guide is the operative remedial plan in this action, the degree to which defendants have implemented the requirements of the …Program Guide is extremely relevant and useful to assessment of whether they are meeting their constitution obligations."  ECF No. 6846 at 19 (citing February 27, 2013 Order, ECF No. 4361 at 6, 9).  Thus, efforts to align the scope of key indicators with the Special Master's long-established (and relied-upon) monitoring practices are intended to assist CDCR achieve its ultimate end-goal through data remediation, "allowing the defendants, ultimately, when they truly can, to accurately demonstrate to the court that the Constitution is finally satisfied."  December 17, 2019 Order, ECF No. 6427 at 49.

[6] Relatedly, defendants requested that the Report "acknowledge that [d]efendants have requested but been denied access to the Special Master's guidebook, business rules, sample size methodology and other necessary documents to properly replicate" the Special Master's "monitoring process."  Exhibit B at 5.  In 2022, for the first time the Special Master can recall in his 15-year tenure (and after 29 rounds of monitoring over more than a quarter century), defendants formally requested a copy of the Special Master's monitoring tool, a request they repeated in their response to the Draft Reports.  *Id.*  The Special Master stands by his decision not to share his internal monitoring tools with the parties.  These are internal documents and

13

Defendants also argued that the Special Master selectively quoted defendants' filings by omitting a sentence which made clear their position that data remediation is "intended to assess whether CDCR's indicators measure what they purport to measure." Exhibit B at 5. Defendants position on this point is a matter of record and the Draft Report accurately reflected the state of the record. In fact, the Draft Report quoted multiple of defendants' filings where this exact point was made, verbatim. *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 30 ("Defendants repeated their arguments that 'the process for completing data remediation remains unclear' and that the data remediation process is '*primarily meant to ensure that each indicator is measuring what it purports to measure*.'") (emphasis added); *see also id.* ("Once again, CDCR lamented the lack of 'clarity on what exactly is needed to achieve certification' and *repeated its argument that the data remediation process is only 'intended to assess whether CDCR's indicators measure what they purport to measure.*'") (emphasis added). Accordingly, the Special Master did not revise the final Report based on this preliminary objection.

Defendants also requested that a footnote in the Draft Report (which includes definitions of "data validation" and "data verification" contained in defendants' September 29, 2021 data remediation activation schedule) be removed from the Report because it "conflates validation and verification with remediation and certification…." Exhibit B at 7. The Draft Report included this footnote, *see* Special Master's Twenty-Ninth Round Monitoring Report – Part C at

---

checklists used by the Special Master's team of monitors and experts to ensure consistent monitoring practices across monitoring teams and reports. Defendants newfound interest in conducting a fishing expedition to scrutinize the Special Master's internal documents is perhaps related to what the Court recently described as defendants' "distracting and costly scorched-earth litigation strategy." January 6, 2023 Order, ECF No. 7699 at 3. As noted above, the Special Master's team regularly provides detailed feedback to the parties during the course of various meetings, including data remediation-related meetings, and will continue to do so.

35 n.15, to provide context to defendants' repeated argument that they know not what is required

of them to complete data remediation.  The text accompanying this footnote is followed by a

update on the Special Master's efforts to "endeavor[] once more to establish clear definitions of

remediation and certification."  *Id*. at 36.  As reported in Part C to the Twenty-Ninth Round

Monitoring Report, defendants rejected the Special Master's proposed definitions.  *See id*.

Rather than attempt to force the Special Master's preferred definitions on defendants through a

formal recommendation in this Report when discussions among the stakeholders remained

unresolved, the Special Master instead provided the court with a status update.

Regarding the post certification review process, the Special Master revised the Report by

specifying the "post-certification review process" as one of the topics Drs. Potter and Cartwright

are addressing in their regular discussions.  *See id*. at 37.

**VI.    <u>"The Draft Report Requires Certain Clarifications."</u>**

Defendants requested numerous clarifications to the Draft Report, as discussed below.

Regarding patient attendance at IDTTs, defendants requested the Draft Report be revised

to note that patients may refuse to attend IDTTs.  Exhibit B at 7.  A clarifying footnote was

added to the final Report (Part C) in response to this concern.  *See* Special Master's Twenty-

Ninth Round Monitoring Report – Part C at 78 n.23.  Neither of the pages of the Draft Part D

Report cited by defendants referred to patients attending less than 90 percent of IDTTs, so no

revisions were made to the final Part D Report.  Regarding supervisor attendance at IDTTs, the

Draft Report did not suggest supervisors were required to attend IDTTs.  Therefore, the Special

Master did not revise the Report based on this concern.

Regarding the Draft Report's discussion of rejected referrals to inpatient care, defendants

noted "that the IRU cannot reject a referral" and that "[o]nly a PIP may reject a referral."

Exhibit B at 8.  The Report was revised to change the phrase "IRU rejections" to "IRU 'kick-backs,'" as this was the term used by CDCR staff during the relevant monitoring tour.  *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 115, 682.  The Special Master further notes the referral data for CIM included in defendants' letter is not from the review period for that institution and, accordingly, made no additional revisions to the Report.

Regarding a section in the Draft Report discussing "institutional compliance with transfers to acute or intermediate inpatient care," defendants noted "[i]nstitutions are not responsible for bed identification." Exhibit B at 8.  Defendants requested that the "Draft Report be revised to reflect that transfers to inpatient care are not an institutional-level issue after a referral is made." *Id.*  The Draft Report's findings regarding compliance with inpatient transfer timelines were reported consistently with prior monitoring reports.  As such, the Special Master did not revise the Report based on this preliminary objection.

Defendants requested clarification regarding the Draft Report's discussion of restricted housing transfers at CMC and requested a sentence be removed from the final Report.  Exhibit B at 8.  The Special Master revised the Report by removing the word "mistaken" from the sentence defendants found objectionable.  *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 120-21.

Defendants erroneously argued that the Draft Report Part D reported noncompliance with the "ten-day requirement" for MHCB lengths of stay at CIM, NKSP, PBSP, and WSP.  Upon review, it appears defendants were referring to a section of the Draft Report discussing

16

compliance with acute care transfer timelines. *See infra* p. 65.[7]  Accordingly, the Special Master did not revise the Report in response to this objection.

Defendants requested clarification to the Draft Report's discussion of staff complaints at eight institutions where these complaints did not result in staff members being "moved to another post as a result." *See* Exhibit B at 8-9.  Defendants opined that this finding "implies wrongdoing on behalf of CDCR for not removing staff from their posts following a staff complaint" and further stated that the Draft Report did not "cite to any policy or procedure that would require removal of staff from a post solely because of an unsubstantiated staff complaint." *Id.* at 9.  In response to defendants' concerns, the Special Master added a footnote indicating that there is no CDCR policy or procedure that removes staff from a post solely due to an unsubstantiated staff complaint.  Special Master's Twenty-Ninth Round Monitoring Report – Part C at 131 n.26.  The Special Master also rephrased its staff misconduct subsection in the Report's custody and mental health partnership plan summary of summaries to eliminate any implication of CDCR noncompliance for not removing staff from their posts following a staff complaint. *See id.* at 131.

Defendants noted that the Draft Report stated "that there were 'no RVR mental health assessments wherein the mental health clinician recommended alternative disciplinary measures at nine institutions,'" and inquired whether this conclusion was based upon a representative sample.  Exhibit B at 9.  In response to this concern, the Special Master refers defendants to the discussion of his RVR review methodology included in Part A of the Twenty-Ninth Monitoring

---

[7] "CIM, HDSP, NKSP, PBSP, and WSP referred patients to acute inpatient care during the review period; only HDSP was compliant with the timely transfer of their only acute patient. The remaining four institutions – CIM, NKSP, PBSP, and WSP – were noncompliant with the ten-day requirement." *Infra* p. 65.

Round Report.  *See* ECF No. 7555 at 20-21.  The Special Master further acknowledges four cases at two institutions reported in Part D of the Draft Report where the mental health clinician recommended alternative disciplinary measures.

Pursuant to defendants' request, Exhibit B at 9, the Special Master clarified the Draft Report to remove statements that a CSATF custody officer's spraying of a patient with pepper spray in connection with an immediate use of force from approximately two feet away violated "applicable policy" and revised the reported number of institutions found to be compliant with use of force policy accordingly.  *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 139, 142.

In response to the Special Master's general comments that "(t)he 15 institutions with EOP programs continued to fail to satisfy the requirements for MHSDS patients for program access,'" and "(t)he 15 institutions with EOP programs did not satisfy the requirements for MHSDS patients for program access," defendants stated that "(t)he Draft Report does not state which requirements govern program access, nor does it establish the policies that were violated." Exhibit B at 9.  As the Draft Report's program access summary of summary thoroughly addressed EOP and 3CMS patients', and non-MHSDS inmates', job and academic assignments, vocational and voluntary education, substance abuse treatment, earning of milestone credits, and other components of program access, the Special Master deleted these two general statements. *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 143, 150.  As far as the Draft Report's assertion that EOP patients were "less likely to access jobs than 3CMS patients and general population inmates", no further response from the Special Master is warranted as the data speaks for itself.

Defendants pointed out that Part D of the Draft Report "summarizes the overall assessment of the quality of treatment into three categories: 'adequate quality,' 'marginally adequate quality,' 'and inadequate quality.'"  Exhibit B at 9.  Defendants further opined that "(t)hese definitions are not well defined—notably, 'marginally adequate quality.'"  *Id*.  The Special Master declined to recategorize these cases in response to defendants' assertion that they were "vague" as the categorizations speak for themselves.

Defendants noted that the Draft Report "includes a discussion of CCCMS patients who were housed out-of-level" and "request that the Special Master provide more details on the reasons these patients were housed out-of-level."  *See* Exhibit B at 9.  The Special Master is unable to provide Defendants with more details as defendants only provided the Special Master with the number of patients who were housed out-of-level, and not the reasons for this out-of-level housing.

A. **Update on Monitoring Activities**

Because of the close proximity between distribution of the Special Master's Draft Twenty-Ninth Round Monitoring Report – Part C and this Draft Report, the Special Master incorporates by reference the following sections of the Part C Report: Part I.B ("Update on Recent Seminal Events in *Coleman*: The Golding Report and Subsequent Data Remediation Process and the Continuing Impact of the COVID-19 Pandemic on the Provision of Mental Health Care to Coleman Class Members); Part I.C ("2021 Update to Program Guide"); Part I.D ("Modifications to CDCR's Staffing Plan"); Part I.E ("Unidentified Needs Assessment"); Part I.F ("Update on Policy Development"); and Part I.G ("Suicide Prevention").  These sections of the Twenty-Ninth Round Monitoring Report - Part C provide updates on case developments and

the Special Master's monitoring activities which are equally applicable to the 3CMS institutions discussed in this Report.

**B.  Staffing Update**

In his Twenty-Ninth Round Monitoring Report – Part A, the Special Master found the Lift and Shift PIPs to be "in a crisis, primarily driven by deficiencies that have plagued defendants' mental health care system throughout the long history of this case, including dangerously high staffing vacancies at some program."  ECF No. 7555 at 37; *see id.* at 50 ("The most alarming findings included in the [Twenty-Ninth Round Monitoring Report – Part A] relate to the unacceptably high staffing vacancies across the four key inpatient mental health clinical disciplines…in the Lift and Shift PIPs.").  Mental health staff turnover, poor continuity of care, and burnout were common across the Lift and Shift PIPs.  *Id.* at 50-51.  For the Lift and Shift PIPs, functional vacancies for psychiatry ranged from 29 to 37 percent, psychology from 20 to 55 percent, social work from 46 to 68 percent, and recreation therapists from 29 to 38 percent. *Id.* at 52.  Staffing vacancies at the CDCR-developed PIPs (SQ-PIP and CIW-PIP) were less severe, but still concerning.  *Id.*

Mental Health staffing fill rates at the 15 EOP institutions covered in the Special Master's Twenty-Ninth Round Monitoring Report – Part C were abysmally low.  The Special Master described the state of mental health staffing at these institutions as a "bona fide mental health staffing emergency."  Special Master's Twenty-Ninth Round Monitoring Report – Part C at 159.

As will be demonstrated below, the 13 3CMS institutions covered in this Report similarly struggled to fill primary clinician positions during the monitoring round.[8]  As of September

---

[8] In their response to the Draft Report, defendants noted that "there is a nationwide and state-level shortage of mental health professionals, and the shortage acutely affects prison systems like

2022, only three of the 13 3CMS institutions (CRC, CTF, and Folsom/FWF) had functional vacancy rates at or below ten percent for staff psychologists, as required by the court's June 12, 2002 order regarding mental health staffing vacancies.  ECF No. 1383 at 4.  Functional vacancy rates for staff psychologists exceeded 20 percent in eight institutions (ASP, CCI, CSP/Solano, HDSP, NKSP, PVSP, SCC, and WSP).  Three institutions (ASP, NKSP, and SCC) had functional vacancy rates in excess of 50 percent.

Five 3CMS institutions (CRC, CTF, HDSP, PVSP, and SCC) had functional vacancy rates at or below ten percent for social workers.  Of the eight noncompliant institutions, functional vacancy rates for social workers exceeded 30 percent at four institutions (ASP, CIM, CSP/Solano, PBSP, and WSP); one of these institutions (PBSP) failed to fill more than 50 percent of social worker positions.

---

CDCR because of additional challenges professional face in treating patients in remote areas or under dangerous or difficult conditions."  Exhibit B at 3-4.



Relatedly, in a December 1, 2022 order, the Court indicated it had "received an increased number of communications from individuals and union leaders concerning mental health staffing levels in the state's prison system." ECF No. 7675 at 1. After consulting with the Special Master and reviewing an "informal summary of vacancy reports for the month of July 2022," the Court "direct[ed] the Special Master to file charts completed with the most recent data provided by defendants that show staffing vacancy rates, by institution and systemwide, for all psychologist classifications, all clinical social worker classifications, all recreation therapist classifications, and all medical assistant classifications." *Id.* Further, the Court required that the charts "be presented in a format that could serve as a template for monthly reporting going forward should the court determine defendants should be required to file such reports in addition to the monthly reports they file on psychiatrist staffing vacancies." *Id.* at 1-2.

As directed, the Special Master filed the mental health staffing vacancy charts required by the Court's December 1, 2022 order on December 9, 2022.  ECF No. 7677.  The charts included in the Special Master's response included data submitted by defendants to the secure website for the month of September 2022.  Statewide vacancy rates were as follows:

- Psychology – line staff:  38.2 percent.
- Psychology – all classifications: 33.1 percent.
- Social Work – line staff: 33.5 percent.
- Social Work – all classifications: 30 percent.
- Recreation Therapist: 26.3 percent.
- Medical Assistant: 47.9 percent.

*Id.* at 2-5.

Clearly, mental health staffing continues to hamper the defendants' ability to provide Program Guide-compliant mental health care to *Coleman* class members.  Defendants are well aware of this and must act to stabilize and rapidly improve CDCR's mental health staffing.  Indeed, "[t]he *Coleman* class cannot afford further delays in remedying the staffing crisis" that exists in many of CDCR's institutions.  ECF No. 7555 at 37.

## II.    <u>MENTAL HEALTH VACANCY RATES</u>

### <u>Mental Health Vacancy Rates Overall and by Disciplines During the Twenty-Ninth Monitoring Round</u>[9]

During the Twenty-Ninth Monitoring Round, the 13 3CMS institutions continued to report considerably high vacancy rates.  Except for telepsychiatry, where overall the institutions reported having more telepsychiatrists than they were allocated, and senior psychologists and

---

[9] Sources (excluding psych techs and telepsychiatrists):  CDCR Secure Website for Monthly Reports, posted October 2022, covering the period of September 2022.  Because psych tech staffing data was not included in the monthly posting, the reported psych tech staffing data was obtained from the individual institutional reports for the Twenty-Ninth Monitoring Round.  Further, telepsychiatry data for September 2022 was taken from Defendants' Monthly Psychiatry Vacancy Report (ECF No. 7645 at page 5).

psych techs, which reported overall vacancy rates of ten percent, the overall vacancy rates for all other disciplines exceeded ten percent.

Specifically, the institutions reported alarming overall respective chief psychiatry and staff psychiatry vacancy rates of 54 and 43 percent; however, the use of contractors eliminated the staff psychiatry vacancy rate.  Similarly, the institutions reported overall respective vacancy rates for chief and staff psychologists of 48 and 40 percent, but the use of registry staff lowered the staff psychology vacancy rate to 34 percent.  Further, the institutions reported an overall functional vacancy rate of 21 percent for social workers, and vacancy rates of 18 percent for recreation therapists and 25 percent for office techs.

Chief Psychiatrists

At the 13 institutions, only six of 13 chief psychiatrist positions were filled, indicating a 54 percent vacancy rate; ASP, CCI, CTF, HDSP, NKSP, PBSP, and WSP all reported vacancies for their chief psychiatrists.  No positions were filled by registry staff.

Staff Psychiatrists

Overall, the 13 institutions reported that 25 of 43.5 authorized staff psychiatry positions were filled, reflecting a 43 percent vacancy rate.  The use of 21.86 registry staff eliminated all staff psychiatry vacancies, with the institutions having 46.82 staff psychiatrists covering 43.4 allocated positions.

For individual institutions, and including registry staff, the following vacancy rates were reported:  ASP, CRC, CSP/Solano, CTF, Folsom/FWF, PVSP, and WSP had more psychiatrists than authorized; HDSP, PBSP, and SCC reported staff psychiatry vacancy rates of zero percent, while NKSP's psychiatry functional vacancy rate was nine percent; otherwise, CCI reported a 20

percent psychiatry vacancy rate and CIM indicated a 23 percent staff psychiatry functional vacancy rate.

### Telepsychiatrists

A total of 17.25 telepsychiatrists covered 16.5 telepsychiatry positions at six of the institutions, reflecting more telepsychiatrists than positions; CCI, NKSP, and PBSP all had more telepsychiatrists than authorized, CIM and WSP reported no telepsychiatry vacancies, and HDSP reported an eight percent psychiatry vacancy rate. Seven institutions – ASP, CRC, CSP/Solano, CTF, Folsom/FWF, PVSP, and SCC, were not allocated telepsychiatry positions.

### Chief Psychologists

Twelve of 13 institutions had two authorized chief psychologist positions and Folsom/FWF had one authorized chief psychologist position for a total of 25 authorized positions. Thirteen of these 25 positions were filled for a 48 percent vacancy rate. No positions were filled by registry. Only ASP reported filling both of its chief psychologist positions. Ten institutions – CIM, CCI, CRC, CSP/Solano, CTF, HDSP, PBSP, PVSP, SCC, and WSP, reported filling one of their two chief psychologist positions. Folsom/FWF indicated filling its one chief psychologist positions; NKSP reported that both of its chief psychologist positions were vacant.

### Senior Psychologists

Of 42 total authorized senior psychologist specialist and supervisor positions, 38 were filled, for a ten percent vacancy rate. No registry staff provided additional coverage. CCI had more senior psychologists than authorized. Ten other institutions – ASP, CIM, CRC, CSP/Solano, CTF, HDSP, PBSP, PVSP, SCC, and WSP, reported zero percent senior psychologist vacancy rates. Otherwise, two institutions – Folsom/FWF and NKSP – indicated vacancy rates above ten percent at 67 and 50 percent, respectively.

25

<u>Staff Psychologists</u>

The 13 institutions reported having a total of 165.5 staff psychologist positions, of which 99 were filled, for a vacancy rate of 40 percent. An additional 10.24 positions were covered by registry, reducing the functional vacancy rate to 34 percent. Only three institutions – CRC, CTF, and Folsom/FWF, reported staff psychology vacancy rates of less than ten percent. CIM and PBSP neared compliance with respective staff psychology vacancy rates of 11 and 16 percent. Otherwise, the remaining eight institutions all reported staff psychology vacancy rates ranging from 20 to 71 percent. Regrettably, the psychology functional vacancy rates exceeded 50 percent at three institutions as follows: ASP 51 percent, NKSP 64 percent, and SCC 71 percent.

<u>Social Workers</u>

Of 107.5 authorized social worker positions, 84 were filled, reflecting a 22 percent vacancy rate. Registry staff covered a mere 1.24 positions, lowering the social worker functional vacancy rate to 21 percent. Notably, both HDSP and SCC reported having more social workers than authorized, while CRC, CTF, and PVSP reported social worker vacancy rates of zero percent. Otherwise, the remaining eight institutions all reported social worker vacancy rates exceeding ten percent that ranged from 17 to 67 percent. Tellingly, four institutions – ASP, CIM, CSP/Solano, and WSP, indicated social worker vacancy rates between 32 and 40 percent, with PBSP reporting the highest vacancy rate at 67 percent.

<u>Psych Techs</u>

The nine institutions that reported psych tech positions indicated a total of 99.98 positions, of which 90.38 were filled, for a ten percent vacancy rate. Contractors did not provide additional services. CIM, CSP/Solano, CTF, and WSP all reported no psych tech vacancies; PVSP reported a psych tech vacancy of less than ten percent. Otherwise, CCI, HDSP, and PBSP

26

all reported psych tech vacancy rates between 22 and 34 precent.  Concerningly, Folsom/FWF

reported a psych tech vacancy rate of 57 percent.

### Recreation Therapists

For the eight institutions with recreation therapist positions, 16 of 19.5 positions were

filled for an overall recreation therapist vacancy rate of 18 percent.  No registry staff provided

additional coverage.  Both CCI and HDSP had more recreation therapists than authorized.  Three

institutions – CSP/Solano, PVSP, and WSP, reported recreation therapist vacancy rates of zero

percent.  The remaining three institutions had recreation therapy vacancy rates that ranged from

17 to 56 percent, with PBSP and NKSP reporting alarming 50 and 56 percent respective

recreation therapy vacancy rates.

### Office Techs

Sixty-eight of 90.5 authorized office tech positions were filled for a 25 percent vacancy

rate.  Registry staff did not provide additional services.  CTF had more office techs than

authorized, while HDSP and PVSP reported an office tech vacancy rate of zero percent.

Otherwise, the remaining ten institutions all reported office tech vacancy rates exceeding ten

percent and ranging from 14 to 56 percent.  Unfortunately, four institutions – CSP/Solano,

NKSP, PBSP, and SCC, reported office tech vacancy rates of between 33 and 45 percent.

Folsom/FWF had the highest office tech vacancy rate at 56 percent.

## Summary - Staffing

The reviewed 13 institutions continued to report unacceptably high vacancy rates.  Only

the vacancy rates for senior psychologists and psych techs were ten percent, and there were no

telepsychiatry vacancies, while the use of contractors eliminated the staff psychiatrist vacancy

rate.  Otherwise, including registry staff where applicable, institutions' overall reported

27

respective functional vacancy rates were 54 percent for chief psychiatrists, 48 percent for chief psychologists, 34 percent for staff psychologists, 21 percent for social workers, 18 percent for recreation therapists, and 25 percent for office techs.

## III.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS

### A.  Quality Management

During the Twenty-Ninth Monitoring Round, the 13 institutions with 3CMS programs continued to make progress with the implementation of quality management programs.  Most institutions' local governing bodies, quality management committees, and mental health subcommittees regularly met; required participants attended and quorums were achieved.  Many institutions' quality management initiatives also included the use of correction action plans (CAPs).  Others included audits and Emergency Medical Response Review Committees (EMRRCs), but few chartered Quality Improvement Teams (QITs)/Focused Improvement Teams (FITs).  There was also limited peer review.  Institutions also had various ways of providing quality management information to staff.

Local governing bodies at HDSP, NKSP, PBSP, PVSP, and WSP all met regularly during the review period.  Frequency of meetings varied by institution.  The local governing bodies at HDSP and WSP met monthly during the review period, NKSP's local governing body met three times, and the local governing bodies at PBSP, PVSP, and WSP met quarterly.  The required participants were in attendance at all meetings.  CSP/Solano's local governing body did not meet during the review period.

Quality management committee meetings were scheduled monthly at ASP, CCI, CIM, CRC, CSP/Solano, CTF, Folsom, HDSP, NKSP, PVSP, SCC, and WSP.  At PBSP, the quality management committee met twice monthly during the review period.  A review of the minutes of

quality management committee meetings revealed comprehensive agendas and regularly achieved quorums across institutions.

Mental health subcommittee meetings occurred monthly at ASP, CCI, CRC, CSP/Solano, CTF, Folsom, HDSP, NKSP, PBSP, PVSP, SCC, and WSP during the review period. The mental health subcommittee at CIM met twice monthly. There were no reported issues with attendance at mental health subcommittee meetings; quorums were regularly achieved across institutions.

As part of their quality management efforts, many institutions utilized CAPs and other improvement plans to address identified issues. At the time of the monitoring visit, ASP had an ongoing improvement plan in place addressing alternative housing discharge custody checks. A performance improvement work plan (PIWP) at CTF addressed the mental health appointments backlog that resulted from limited patient access to care due to COVID-19. CAPs were being used during the review period and/or at the time of the site visit at CIM, CRC, CSP/Solano, HDSP, PBSP, PVSP, and SCC. CAPs at CIM addressed orders and justification for observation status in the mental health crisis bed (MHCB) and increasing Suicide Risk and Self-Harm Evaluation (SRASHE) mentoring to at least 90 percent. HDSP had an open CAP on treatment offered during the monitoring visit. Two PBSP CAPs addressed administrative segregation EOP hub transfers and completion of administrative segregation pre-screens. There were three CAPs in use at PVSP during the review period. They addressed timely administrative segregation EOP hub transfers, treatment plan quality, and the quality of suicide risk evaluations. A CAP for timely mental health referrals at SCC concluded after six months of continuous improvement.

While some institutions chartered QITs/FITs during the review period, others did not. At CIM, a QIT evaluating the MHCB referral process created a new local operating procedure

29

(LOP). NKSP chartered a QIT during the review period on offered treatment. CCI, CRC, CSP/Solano, CTF, Folsom, HDSP, PBSP, PVSP, SCC and WSP did not conduct any QITs/FITs.

Institutions also conducted various audits as part of their quality management process. ASP conducted audits of acute and intermediate referral timelines and clinician documentation. At CRC, audits and CAPs were conducted regarding lengthy pill line wait times, missing suicide watch entries, missing written justifications for statewide alternative housing policy deviations, and mental health attendance during morning health care huddles. At Folsom, quarterly chart audits focused on treatment planning, SRASHEs, RVR evaluations, five-day follow-ups, controlled uses of force, and conflicting diagnoses. The audit process at HDSP involved reviewing performance reports to identify trends and repeated factors to address. Similarly, at SCC, the audit methodology primarily consisted of tracking performance reports to identify areas falling below compliance thresholds.

A review of meeting minutes showed EMRRCs were meeting regularly during the review period at CRC, CTF, NKSP, PBSP, PVSP, and WSP. Required participants were in attendance and meetings were timely convened. NKSP's EMRRC addressed clinically meaningful topics and mental health staff attended all meetings. At PVSP, reviewed topics included unscheduled transports and overdoses/suicides, system surveillance items and activations, case reviews, meeting approval, codes between reporting and meeting dates, and quality concerns. Routine agenda items for the EMRRC at WSP included old case reviews, new case reviews, performance evaluations, improvement projects, surveys and audits, program management, and LOPs.

At PBSP, documentation for emergency program surveillance items that addressed required checks and drills was not consistently completed.

Peer review was limited during the review period.  Most peer review remained on hold per headquarters directive.  There was no peer review conducted at ASP, CCI, CRC, CSP/Solano, CTF, HDSP, PVSP, SCC, or WSP.  At CIM, three MHCB psychiatrists underwent peer review; all passed.  Folsom conducted internal peer review monthly for 15 percent of 3CMS patient charts.  Peer review was conducted for two MHCB psychologists at PBSP, the results were discussed with them.

Quality management information was provided to staff in various manners across institutions.  At ASP, staff received information during monthly mental health meetings.  Mental health leadership and supervisors disseminated quality management information to staff at CIM and mental health leadership reported frequently asking staff to participate in quality management projects, to which a Health Program Specialist (HPS II) was exclusively dedicated.  At CRC, relevant quality management information was forwarded through the quality management committee hierarchy and shared with staff during department meetings.  Mental health line staff at Folsom received information during staff meetings and through emails.  SCC disseminated quality management feedback to staff through mental health subcommittee meetings, mental health staff meetings, and informal discussions.  Staff at PBSP reported being uninformed of quality management issues, including dashboard items, indicating a need for a system to provide staff with pertinent quality management information.

### Summary – Quality Management

Overall, reviewed institutions had quality management programs in place that generally appeared to be functioning well.  However, there were some areas for improvement noted during the review.  For example, at CCI, the mental health subcommittee rarely created action items and did not document CAPs, despite several significant reoccurring issues.  Further, CSP/Solano's

quality management system failed to examine several persistent areas of concern, including the lack of confidential treatment space in administration segregation and the MHCB, and MHCB patients' limited access to recreation therapy and yard.

**B.  Quality of Care in CDCR's Mental Health Programs**

**1.  The IDTT Process**

The Program Guide provided clear expectations for Interdisciplinary Treatment Teams (IDTTs).  IDTTs were responsible for determining MHSDS inclusion and the most appropriate level of care, formulating individualized treatment plans, and reviewing current treatment needs and responses to prior treatment interventions.  IDTTs were also required to update treatment plans when indicated, for example, when prior interventions appeared ineffective or when a new problem arose, such as medication nonadherence.  The Program Guide also clearly stated that individualized treatment plans were developed in consultation and with input from all disciplines based on their current assessments of patients, and with "as much participation from the inmate-patient as possible."

Consistent with the Special Master's Twenty-Eighth Round Monitoring Report, IDTT meetings observed at the 13 3CMS institutions during the Twenty-Ninth Round varied in quality within and across institutions' mental health programs.  While required disciplines were present in all observed IDTTs, and nearly all IDTTs were conducted in confidential settings, there was significant variability in the quality of collaboration among disciplines and discussions regarding individualized treatment planning with measurable goals and interventions, level of care determinations, observations of behaviors and symptoms to support diagnostic and treatment decisions, and psychiatric medication.  Additionally, IDTT case conceptualizations were

32

identified as an area in need of significant improvement across institutions and programs, as only NKSP and HDSP presented adequate case conceptualizations during observed IDTTs.

While several institutions utilized telepsychiatry during IDTTs, problems with connectivity were observed at only one of the institutions. There were, however, five institutions that allowed on-site IDTT members to attend by telephone or videoconferencing equipment, and the quality of those IDTTs generally suffered as a result.

Collaboration in Care Planning During IDTTs

During the Special Master's Twenty-Ninth Monitoring Round site visits at the 3CMS institutions, several programs' IDTTs demonstrated collaborative care planning with each discipline contributing meaningful input toward diagnostic determinations, individualized treatment planning, level of care decisions, and other aspects of care. Adequate IDTT care collaboration was observed in PVSP's 3CMS programs, SCC's 3CMS programs, HDSP's Short-Term Restricted Housing (STRH) and 3CMS programs, PBSP's STRH, Folsom's 3CMS programs, CIM's Facility D 3CMS program and administrative segregation unit (ASU), NKSP's RC-STRH and mainline 3CMS programs, and WSP's RC-STRH. During MHCB IDTT observations at CIM, sufficient collaboration was observed among two of three treatment teams. At CSP/Solano, with the exception of Facility C 3CMS IDTTs, other 3CMS IDTTs demonstrated collaborative care planning.

Inadequate IDTT care collaboration was observed in WSP's MHCB and RC-EOP programs, CCI's 3CMS programs, CSP/Solano's MHCB, FWF's 3CMS program, NKSP's RC-EOP program, CTF's 3CMS program, CSP/Solano's MHCB and Facility C 3CMS program, PBSP's Level II 3CMS program, and CRC's 3CMS program. CRC not only lacked sufficient collaboration among providers, but also unnecessarily excluded patients from initial case

presentations as a general practice.  CSP/Solano's MHCB IDTT clearly expressed opposing views about planned interventions for one patient but ended the meeting without further discussion toward resolution.  At ASP, the level of collaboration varied based on providers in attendance.  During observation of WSP's 3CMS IDTTs, treatment teams failed to discuss case conceptualizations, level of care, and criteria to support diagnoses.  CSP/Solano's Facility C 3CMS IDTTs were disjointed and ineffectual.

IDTT Discussions Regarding Psychiatric Diagnoses

IDTTs were expected to discuss observations and opinions regarding each patient's symptoms, level of functioning, and behavior patterns to support diagnostic decisions and develop targeted individualized treatment plans.  Additionally, these discussions were necessary to improve diagnostic agreement and ensure continuity of care among providers.  During the Special Master's Twenty-Ninth Monitoring Round of the 3CMS institutions, the following programs offered sufficient information to support psychiatric diagnoses: HDSP's STRH and 3CMS programs, PBSP's Facility A 3CMS and STRH programs, SCC's 3CMS programs, CIM's MHCB and ASU, Folsom's 3CMS program, PVSP's STRH and 3CMS programs, NKSP's MHCB, 3CMS, and RC-STRH programs, and WSP's MHCB.

MHSDS programs that did not adequately discuss diagnostic decisions during observed IDTTs included CRC's 3CMS program, CTF's 3CMS program, CIM's Facility B 3CMS program, WSP's RC-EOP and 3CMS programs, FWF, and CCI's 3CMS programs.  At CTF, diagnostic uncertainties were raised by one primary clinician (PC); however, the IDTT did not attempt to discuss their discrepant diagnostic impressions or consider a diagnostic clarification evaluation for resolution.

34

Individualized Treatment Planning Discussions in IDTT

The Program Guide required development of individualized treatment plans through IDTT consultation and each discipline's assessment of MHSDS patients. Treatment plans required patient specific targets based on identified problems, development of measurable treatment objectives to track treatment progress, and selection of appropriate interventions to facilitate progress or resolution. IDTTs were also expected to update and approve treatment plans based on patients' current needs and/or in response to evidence of ineffective interventions in prior treatment plans. Further, treatment planning discussions should also include frequency and duration of services to be provided for each patient based on clinical need and/or in accordance with Program Guide requirements, including determining clinically indicated follow-up timeframes for 3CMS patients.

Treatment team members met Program Guide requirements for contributing relevant input toward developing individualized treatment plans during IDTT observation in PBSP's STRH program, SCC's 3CMS program, Folsom's 3CMS program, CIM's MHCB and Facility D 3CMS programs, NKSP's RC-STRH and 3CMS programs, WSP's MHCB, STRH, and 3CMS programs, ASP's 3CMS program, and CSP/Solano's MHCB.

Treatment teams did not sufficiently contribute meaningful information toward developing individualized treatment plans during observed IDTT discussions in PVSP's STRH and 3CMS programs, CRC's 3CMS program, PBSP's Facility A 3CMS program, CIM's Facility B 3CMS program, WSP's RC-EOP program, CCI's 3CMS program, FWF's 3CMS program, CTF's 3CMS program, and NKSP's MHCB. IDTTs observed in CCI's 3CMS program lacked adequate discussion of clinical issues necessary for adequate treatment planning. PBSP's Level II 3CMS IDTTs were used for completing assessments, as both the PC and telepsychiatrist were

35

unfamiliar with the patients, and this resulted in minimal to no discussion of treatment planning and goal setting.

While record reviews revealed some 3CMS programs met with patients more frequently than the Program Guide's 90-day minimums, 3CMS programs generally did not discuss clinically indicated contact frequencies for patients during observed IDTTs.  Treatment teams should be discussing the most appropriate contact frequencies for each patient, as well as documenting a rationale for planned contact frequencies in treatment plans.  Documentation of planned frequencies was especially important for continuity of care in the event a patient transferred from one institution to another during the course of treatment.

Level of Care Discussions

As mentioned previously, IDTTs were responsible for determining the most appropriate level of care for each patient based on input from each IDTT member, including the patient. Observed IDTT level of care discussions were generally adequate in PVSP's 3CMS program, PBSP's STRH program, HDSP's STRH program, CIM's ASU, SCC's 3CMS program, CSP/Solano's 3CMS program, WSP's MHCB and STRH programs, CCI's 3CMS program, and NKSP's mainline 3CMS program.  For NKSP's RC-STRH and RC-EOP programs, most, but not all, IDTTs adequately discussed level of care.  Although CIM's MHCB routinely discussed level of care considerations, level of care rationales needed improvement.

Level of care discussions were clearly inadequate during IDTT observations in PBSP's Facility A 3CMS program, CRC's 3CMS program, CIM's 3CMS program, WSP's RC-EOP and 3CMS programs, CSP/Solano's MHCB, CTF's 3CMS program, and PVSP's STRH.  CRC's IDTTs failed to discuss case conceptualizations, measurable goals, progress toward treatment objectives, and whether treatment plan updates were indicated.

36

<u>Medication Discussions in IDTTs</u>

Discussions regarding medications during IDTTs should at a minimum include a review of current psychotropic medications, medication adherence, the patient's response to medication interventions, and a brief check-in with the patient about potential adverse side effects when they were in attendance. During IDTT observations, minimum expectations were met in Folsom's 3CMS program, FWF's 3CMS program, HDSP's 3CMS program, CTF's 3CMS program, NKSP's STRH and mainline 3CMS programs, PVSP's STRH and 3CMS programs, WSP's 3CMS program, and CIM's ASU, 3CMS, and MHCB.

Medication discussions were clearly inadequate during IDTT observation at CRC's 3CMS program, WSP's RC-EOP program, and during one of two days observing MHCB IDTTs at CSP/Solano. WSP's RC-EOP psychiatrist was minimally attentive during IDTTs, and at times offered no input at all.

<u>Use of Telepsychiatry/Telehealth During IDTT</u>

During the Twenty-Ninth Monitoring Round site visits to the 3CMS institutions, telepsychiatry was used during IDTT observations at PBSP, NKSP, CCI, and HDSP; however, only CCI's Facility B 3CMS program was found to have problems with connectivity that compromised the overall quality of the IDTTs. Connectivity issues and other disruptions were, however, observed at five institutions that permitted IDTT members to attend via state laptops or by telephone. The five institutions that allowed telehealth for on-site clinicians were PBSP, WSP, CCI, CSP/Solano, and HDSP. Telephone participation appeared to be the most disruptive tool for IDTT participation, and this was permitted for psychiatrists and correctional counselors (CC I) at CSP/Solano, psychiatrists and CC I at WSP, and CC I at HDSP.

2. <u>**Overall Quality of Care**</u>

During the Twenty-Ninth Monitoring Round, patient healthcare records were reviewed in detail to determine the quality of care provided during the reporting period across facilities and programs. In addition to analyses of treatment planning, treatment implementation, and documentation, an overall assessment of the adequacy of treatment was provided for each case. Of the 159 cases reviewed, 64 cases (40 percent) were determined to have received care of adequate quality. Another 25 cases, or 16 percent, were noted as having received care that was of marginally adequate quality, meaning that there were concerns in the care of the patient that bordered on inadequacy (e.g., failure to provide required contacts, untimely IDTTs, poor documentation, and untimely responses to consult requests). Finally, 70 cases, or 44 percent, were noted as having received care of inadequate quality during the review period. The graph and table below provide data on quality of care across facilities.



| | ASP | CCI | CIM | CRC | CTF | FOLSOM | HDSP | NKSP | PBSP | PVSP | SCC | SOL | WSP | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adequate | 80% | 20% | 40% | 40% | 60% | 40% | 33% | 41% | 40% | 30% | 50% | 40% | 24% | **40%** |
| Marginally Adequate | 10% | 10% | 0% | 10% | 0% | 40% | 27% | 0% | 33% | 40% | 40% | 0% | 6% | **16%** |
| Inadequate | 10% | 70% | 60% | 50% | 40% | 20% | 40% | 59% | 27% | 30% | 10% | 60% | 70% | **44%** |

### 3. <u>Treatment Planning Concerns</u>

The Twenty-Ninth Monitoring Round revealed numerous concerns with the adequacy of mental health treatment plans across institutions and programs. Those concerns included treatment goals which did not align with patients' identified symptoms and/or treatment targets, treatment goals that were not updated despite changes in patients' clinical presentations since prior IDTTs, vague or generic goals, nonspecific treatment interventions, lack of discussion regarding patient progress or changes in functioning since the prior IDTT, inadequately updated clinical summaries, and diagnostic issues.

<u>Treatment Goals</u>

Treatment goals provide the foundation for treatment. They identify the symptoms and/or challenges in functioning that are to be targeted by the IDTT over the course of the patient's engagement in mental health services. Treatment goals are to be specific to the patient and measurable, such that progress can be documented over time and goals can be adjusted as needed. Across institutions and programs, there were numerous instances where the Interdisciplinary Plans of Care (IPOCs) and documented treatment goals failed to address the problems identified by the patient over the course of treatment, were not updated from prior IDTT meetings in light of patient progress, or lack thereof, and/or were vague in defining how progress would be measured. Additionally, a number of treatment goals included rating scales to measure patient progress without providing a baseline against which to measure change.

At ASP, a number of patients (ASP Patient B, ASP Patient F, and ASP Patient G) had IPOCs developed which did not align with the symptoms or functional deficits identified during assessments and/or during clinical contacts. For example, ASP Patient F had an IPOC developed to address mania when there was limited documentation to support a current manic episode. Alternatively, ASP Patient B had discussed anxiety symptoms during psychiatric contacts, however, the only IPOC for the patient was developed to address depressed mood with a goal for the patient to report his depression at a rating of eight or less, yet the psychiatric assessment noted the patient was rating his depression at a three out of ten, thus the goal was inappropriate.

There were also a number of cases (ASP Patient A, ASP Patient C, ASP Patient D, ASP Patient I, and ASP Patient J) where IPOCs and treatment goals were not updated across IDTT reviews. In these cases, goals from previous IDTTs were carried forward with no discussion of patient progress or lack thereof. In the case of ASP Patient J, the same treatment goals had been in place since 2017 and IDTT documentation lacked a summary of the patient's functioning, symptoms, and treatment response. Further, the patient appeared to be functioning adequately and was asymptomatic. The rationale for retaining him in treatment was not clear.

Similar issues were identified in cases reviewed at CCI. IPOCs were noted as not aligning with treatment targets for CCI Patient B, CCI Patient H, CCI Patient I and CCI Patient J. For CCI Patient B, treatment goals were vague and developed to improve the patient's "mental health and adaptive functioning" with criteria for discharge being that the patient would be stable off of medications for six months and be asymptomatic. According to treatment documentation, the patient had already met those goals. Conversely, CCI Patient I had a history of engaging in non-suicidal self-injury, was described as psychotic in psychiatric documentation, and reported symptoms of depression and anxiety. There were numerous documented Crisis Intervention

40

Team (CIT) interventions in the patient's record secondary to self-injury and acute symptom presentation. The IDTT included only one goal, for anxiety, with no measurable indicators and no mention of the patient's suicide risk, self-harming behavior, need for frequent crisis intervention, or symptoms of psychosis and depression.

Treatment goal concerns were identified at NKSP. Within the STRH, NKSP Patient D, NKSP Patient E, and NKSP Patient F were identified as having IPOCs which did not align with identified treatment needs. NKSP Patient E consistently reported anxiety as his primary symptom. He refused to attend an IDTT secondary to his anxiety, yet his only IPOC was developed to target depression and had been carried forward from a prior IDTT, unchanged. Documentation indicated that the patient had not reported depressive symptoms over several months.

Within the 3CMS program, NKSP Patient N's IDTT documentation included no IPOCs and no treatment goals. Sections related to treatment goals were blank in IDTT documentation from 2021 and 2022. Progress notes revealed the patient was experiencing depressive symptoms and was prescribed antidepressant medication.

Within the reception center, NKSP Patient B was indicated as requiring an EOP level of care but had been retained in the RC for over 90 days. The only treatment goal for this patient was developed to address impulsive behavior despite IDTT documentation that the patient struggled with paranoia, auditory hallucinations, mild depressed mood, and anxiety. He was prescribed medication for mood and psychotic symptoms.

In the MHCB, NKSP Patient L was disorganized and presenting with bizarre behavior including smearing feces and was ultimately referred to an inpatient level care, yet his treatment goal while in the MHCB was reducing "fecal behavioral issues as rated 2 or below." It was

41

unclear as to how the IDTT was rating the patient's behavior or measuring treatment progress. NKSP Patient I, a transgender patient, was admitted secondary to command auditory hallucinations telling her to hurt herself. The patient was noted as a complex case who required a stay beyond ten days to ensure stabilization. Despite this, her treatment plan was developed to target irritability, behavioral regulation, and building a therapeutic alliance. The treatment plan was not substantially updated despite her changing clinical presentation.

At PVSP, similar concerns about treatment goal inadequacies were noted. Within the 3CMS program, PVSP Patient B, PVSP Patient C, PVSP Patient E, and PVSP Patient J had IPOCs which did not align with their documented treatment needs. PVSP Patient B was diagnosed with bipolar disorder with psychotic features and attention-deficit/hyperactivity disorder (ADHD). He was prescribed medication to address psychosis, mood instability, and inattention. His only IPOC was developed to address distractibility and IDTT documentation had not been updated in two years.

Treatment goals were identified as a concern at WSP in the 3CMS (WSP Patient A and WSP Patient G), MHCB (WSP Patient O and WSP Patient Q), and RC EOP (WSP Patient D and WSP Patient E) programs. For the patients in MHCB, treatment goals were not specific to the patients' needs and included goals of medication adherence, despite neither WSP Patient O nor WSP Patient Q being prescribed medications. For WSP Patient G, it was noted that two IPOCs to address depressed mood were included within the IDTT documentation on the same date with different treatment targets. WSP Patient A's treatment goals were not updated to address his grief over a recent loss, which was being targeted during treatment sessions. Within the RC EOP, WSP Patient D's IDTT documentation lacked specificity regarding his needs. There were no IPOCs developed for the patient and care was documented as targeting "mental health

42

symptoms" without any discussion of what those symptoms were. WSP Patient E, also being treated at the EOP level of care within the RC, had no IPOCs implemented.

Overall, concerns related to treatment goals not aligning with patients' identified needs, treatment goals failing to be updated in light of progress or lack thereof, and treatment goals that were vague in defining how progress would be measured were noted in 75 total cases, or 47 percent of the 159 cases reviewed. Specifically, these concerns were noted in the cases of 46 3CMS patient, 15 MHCB patients, ten STRH patients, and four RC EOP patients and were found at every facility reviewed.

Treatment Interventions

In addition to developing measurable goals designed to focus treatment and assess patient progress, treatment planning includes multidisciplinary interventions to be provided by mental health staff to support the patient's progress toward treatment goals. Across facilities and programs, a number of treatment plans included nonspecific treatment interventions and/or lacked the use of evidence-based therapies to address patient's needs. At CRC, several cases reviewed (CRC Patient A, CRC Patient C, CRC Patient D, and CRC Patient G) included inadequate treatment interventions within IDTT documentation. For CRC Patient C, the only treatment intervention listed was the use of psychotropic medications to address his adjustment disorder marked by anxiety and depression. No therapeutic interventions were planned. CRC Patient D was noted to have poor coping skills with no interventions listed to improve the patient's coping skills. In two of these cases, the only intervention listed on the treatment plan was for the PC to foster a therapeutic alliance with the patient through empathy. For CRC Patient A and CRC Patient G, their treatment needs were symptoms of depression and anxiety.

Fostering an alliance is not evidence-based treatment for these symptoms. The listing of the nonspecific intervention of fostering a therapeutic alliance as the sole therapeutic intervention to treat symptoms of a major mental illness was not limited to CRC. In fact, the Special Master's expert noted concerns about the use of this intervention in a number of additional cases across facilities, including ASP Patient D, CCI Patient G, HDSP Patient I, NKSP Patient A, PBSP Patient C, and PVSP Patient C.

Nonspecific treatment interventions were noted at Folsom/FWF as well (Folsom Patient D, FWF Patient F, and FWF Patient H). For these patients, treatment interventions were vague and included no timeframes or frequencies. Some records at NKSP evidenced similar concerns. For NKSP Patient M, interventions listed only medication without therapeutic interventions to address depression and patient-identified anger issues and NKSP Patient N had no treatment interventions listed on his treatment plan.

<u>Treatment Progress and Clinical Summaries</u>

An important component of the IDTT review process is to assess any changes, positive or negative, in the patient's functioning and symptom presentation since the previous IDTT. This was a concern noted in many cases reviewed. The issue was manifested as an absence of documentation of patient change or the inability to document change over time given the lack of baseline data. In eight of the ten cases reviewed at CRC, this concern was evident (CRC Patient A, CRC Patient C, CRC Patient D, CRC Patient E, CRC Patient F, CRC Patient G, CRC Patient H, and CRC Patient I). The concern was also noted in cases across other facilities at the 3CMS level of care (ASP Patient C, ASP Patient D, ASP Patient I, ASP Patient J, CIM Patient J, NKSP Patient N, PBSP Patient O, PVSP Patient B, and SCC Patient A), two of whom were housed in STRH (PVSP Patient F and PVSP Patient H); cases at the MHCB level of care (CIM Patient A,

44

HDSP Patient G, and WSP Patient Q); and cases of EOP patients housed in RCs (NKSP Patient A and WSP Patient C).

Treatment progress should also be documented in updated clinical summaries within IDTT documentation. Case reviews revealed that in a number of cases across facilities and programs, clinical summaries included only brief, inconsequential updates or were void of updated information altogether including 3CMS level of care (ASP Patient B, ASP Patient I, ASP Patient J, CCI Patient G, CCI Patient H, CIM Patient G, CTF Patient C, CTF Patient G, CTF Patient J, Folsom Patient C, Folsom Patient D, HDSP Patient B, HDSP Patient N, NKSP Patient N, PBSP Patient N, PVSP Patient B, PVSP Patient C, SCC Patient A, CSP/Solano Patient C, and CSP/Solano Patient G), in STRH (NKSP Patient E and NKSP Patient G), RC EOP (NKSP Patient A and WSP Patient D) and even MHCB (NKSP Patient K, NKSP Patient L, PBSP Patient H and CSP/Solano Patient N).

For example, at the 3CMS level of care, ASP Patient B's clinical summary included a brief review of the patient's current functioning without any discussion of how this represented a change over time or how the patient was responding to treatment. In some instances, the content within the clinical summaries was unchanged from the previous IDTT. CTF 3CMS Patient G's clinical summary was copied from the prior year, with a single statement, "the patient reports doing well and has no questions" as the only update on the patient's progress and response to treatment over the course of an entire year. In the case of CSP/Solano Patient N, the IDTT documentation failed to note changes among the IDTT about decisions regarding higher level of care needs of the patient.

In addition to the clinical summaries within IDTT documentation, initial and follow-up PC and psychiatric assessments were concerning. In a number of cases, records did not include

comprehensive initial psychiatric assessments despite the Program Guide requirement that these assessments were to be completed prior to the patient's initial IDTT. These included cases at the 3CMS level of care (CRC Patient A, CRC Patient G, CRC Patient I, CTF Patient A, FWF Patient I, FWF Patient J, HDSP Patient N, PBSP Patient M, PVSP Patient A, PVSP Patient I, CSP/Solano Patient G, CSP/Solano Patient H, and CSP/Solano Patient K), MHCB level of care (HDSP Patient E and HDSP Patient F), STRH (HDSP Patient J, HDSP Patient L, PBSP Patient E, PVSP Patient F, PVSP Patient H, WSP Patient K, and WSP Patient L) and RC EOP level of care (NKSP Patient A). In some of these cases, such as HDSP Patient J and HDSP Patient L, a psychiatrist did meet with the patient prior to the initial IDTT, but the documentation was minimal and not sufficient for a comprehensive initial assessment. In other cases, such as CSP/Solano Patient G and CSP/Solano Patient H, there was no psychiatric assessment in the record.

The Special Master's expert also noted concerns with the lack of updated information in initial PC assessments prior to a patient's initial IDTT. This was true at the 3CMS level of care (CRC Patient D, CRC Patient E, CTF Patient G, SCC Patient D, CSP/Solano Patient C, and WSP Patient A), MHCB level of care (HDSP Patient E, HDSP Patient H, HDSP Patient I, PBSP Patient H, and WSP Patient M), STRH (HDSP Patient J, HDSP Patient L, NKSP Patient G, and PBSP Patient E) and RC EOP level of care (WSP Patient D). Additionally, there was one case, HDSP Patient G, where an initial PC assessment was not completed for an MHCB patient prior to the IDTT. Of serious concern was the fact that for three patients, HDSP Patient E at the MHCB level of care and HDSP Patient J and PBSP Patient E both housed within STRH, neither a sufficient initial psychiatric assessment nor a sufficient initial PC assessment was found in the records.

46

Diagnostic Concerns

A number of cases reviewed included concerns regarding diagnostic issues. These concerns took the form of poor diagnostic rationale or the need for diagnostic clarification. This concern was noted in at least one case across all facilities and at ASP, CRC, HDSP, NKSP, PVSP, SCC, and WSP, the concern was noted in four or more records.

Additionally, there were a number of cases where there was diagnostic discrepancy between the PC and psychiatric documentation, without any acknowledgement of the discrepancy or attempt to resolve the diagnostic differences (ASP Patient D, ASP Patient E, CCI Patient I, NKSP Patient A, NKSP Patient I, NKSP Patient L, PBSP Patient K, PVSP Patient F, WSP Patient A, and WSP Patient F). These differences were not insignificant and had the potential to impact adequate patient care. For example, NKSP Patient I was provided with a diagnosis of schizoaffective disorder by the psychiatrist in the MHCB who was prescribing antipsychotic, mood stabilizing, and anxiolytic medications to treat the patient, while the PC noted the patient to have an adjustment disorder. This same diagnostic discrepancy (schizoaffective disorder versus adjustment disorder) was present for another patient at the MHCB level of care at NKSP (Patient L), raising concerns about a pattern of diagnostic bias or lack of IDTT communication at the NKSP MHCB level of care. For ASP Patient E, diagnoses included unspecified schizophrenia and other related disorders, as well as unspecified depressive disorder by the psychiatrist and unspecified bipolar disorder noted by the PC. WSP Patient E's records indicated that the psychiatrist provided diagnoses of psychotic disorder and unspecified depressive disorder while the PC documented a diagnosis of unspecified anxiety disorder.

47

4. **Treatment Interventions**

Quality care requires the provision of adequate and coordinated treatment interventions provided to patients in order to meet their identified mental health needs. Treatment interventions should be in keeping with the goals of the patient's treatment plan. When significant changes in the patient's functioning, mental health status, or symptom presentation emerge, treatment plans are to be updated with appropriate interventions. The lack of evidence that the treatment interventions provided were those included on the treatment plan was a serious and significant concern across most facilities.

At the 3CMS level of care, 31 cases (30 percent of the 105 3CMS records reviewed) and four STRH cases (21 percent of the 19 cases reviewed) evidenced a lack of implementation of planned treatment interventions. This was a concern in at least one 3CMS and/or STRH case at all facilities except CTF. At CCI, Folsom, HDSP, PBSP, PVSP, and SCC, at least three cases were identified as having this concern. For example, SCC Patient D was being treated at the 3CMS level of care within an ASU setting and moving toward discharge from the MHSDS. He had recently had his medications targeting anxiety and depression discontinued. Weekly PC contacts were documented and provided a point-in-time description of the patient's functioning and stability, yet no interventions supporting relapse prevention and planning for discharge from mental health services were documented. For PVSP Patient B, there was documented evidence of the patient's decompensation, yet no interventions were documented by the PC to assist the patient with his increasing symptoms.

There were five cases where there was a lack of evidence that identified treatment interventions were provided at the MHCB level of care (NKSP Patient I, PBSP Patient H, WSP Patient N, WSP Patient O, and WSP Patient Q). For example, PBSP Patient H had treatment

48

goals developed to address suicidal ideation and depressed mood. Planned interventions included cognitive behavioral therapy (CBT) to tolerate and accept emotional pain and verbalize concerns as well as goal setting. PC contacts with the patient lacked any evidence of these interventions.

Treatment interventions include not only the content of material covered during clinical contact, but also the frequency of those contacts. Both content and timing are necessary elements of adequate care. Across facilities and programs, there were 37 cases (23 percent of the 159 cases reviewed) where the content or timing of clinical interventions were determined not to meet the patient's needs. As an example, CCI Patient C was seen for an IDTT in November 2021. The patient reported depressive and anxiety symptoms, was noted to have a history of special education in school, and asked for treatment to target his substance use and ambivalence about change. The treatment plan included interventions to include motivational interviewing with the PC. The PC did not see the patient again until April 2022 (five months later) and there was no evidence that the treatment goals were addressed or the identified treatment provided. CTF Patient F was not seen for a psychiatric contact within 90 days of his IDTT. Folsom Patient C was serving life in prison and had developed a relationship with his PC over many years. During a treatment session in February 2022, the patient learned that he had been assigned a new primary clinician. Quality care requires that treatment sessions include discussion and processing of termination when changes in clinicians are necessary and this was not included.

**5.  Documentation Issues**

During previous rounds of monitoring, concerns related to healthcare record documentation being copied into subsequent documentation without updating were identified. The Twenty-Ninth Monitoring Round continued to identify this practice. Across facilities, the

issue was noted to be most problematic in STRH (NKSP, PBSP, PVSP, and WSP) where it was noted as a concern in 37 percent (seven out of 19) of the cases reviewed. There were also concerns in a number of 3CMS programs (CCI, CIM, HDSP, Folsom, PVSP, CSP/SOL, and WSP). For NKSP Patient D, the subjective section of each PC progress note, which is intended to document the patient's self-reported issues of relevance during the session, was identical across sessions with the content being copied from the patient's initial PC assessment. This resulted in internally contradictory information in a number of progress notes including different symptom ratings by the patient within the same note. NKSP Patient E's healthcare documentation revealed copied information in progress notes written by the psychiatrist and PC, making the tracking of patient progress difficult, as historical information was being documented as current information. For WSP Patient F, PC progress notes included a copied section describing a list of interventions that were used with the patient during the session. The wording of this section was identical across notes and raised suspicions that the content may not have been accurate. Further, the copied information was non-specific and not individualized to the patient's needs from session to session.

In a number of cases, inconsistencies were noted in documentation either among different clinicians or internally within a single progress note or assessment. This concern had been discussed in prior sections regarding diagnostic discrepancies (ASP Patient D, ASP Patient E, CCI Patient I, NKSP Patient A, NKSP Patient I, NKSP Patient L, PBSP Patient K, PVSP Patient F, WSP Patient A, and WSP Patient F) and the problems related to copied material in documentation creating inconsistencies within single progress notes, IDTT documentation or assessments (NKSP Patient D, NKSP Patient E, NKSP Patient F, NKSP Patient G, PBSP Patient E, PBSP Patient H, WSP Patient E, and WSP Patient I).

Beyond those previously discussed concerns, there were also noted to be inconsistencies among clinicians related to issues of patient functioning, symptoms, levels of distress, and substance use, among other issues (ASP Patient B, CCI Patient C, CCI Patient G, CCI Patient H, CIM Patient B, NKSP Patient B, PBSP Patient B, PVSP Patient C, PVSP Patient E, SCC Patient D, CSP/Solano Patient C, CSP/Solano Patient F, CSP/Solano Patient N). CIM Patient B, who was being treated at the MHCB level of care, was noted by a number of clinicians to be delusional and suffering from a major mental illness, yet one PC documented that the patient was engaging in "impression management" implying that he was fabricating or exaggerating symptoms. This discrepancy in clinical opinion was not addressed in documentation. Such a disparity of clinical opinion can result in inconsistent and possibly inappropriate care, as treatment to assist patients exaggerating or fabricating symptoms differs significantly from treatment to support patients suffering from symptoms of major mental illness in need of crisis care.

This concern was also noted regarding the assessment of suicide risk for CCI Patient G. The patient was seen by the CIT after expressing suicidal ideation. The SRASHE completed at that time rated the patient's chronic and acute suicide risk as moderate. A clinician who was teleworking on the CIT documented that the patient's acute risk factors "seem to be high" and his chronic risk factors appeared to be "moderate/high." To compound the issue, another clinician rated the patient's acute suicide risk as low, a day later. While acute suicide risk can change, the clinician who rated the risk as low failed to incorporate a number of risk factors into the risk formulation. In this case, despite high and moderate ratings of suicide risk within the prior 24-hours, the patient was released to housing without a safety plan secondary to the low acute risk rating made by the third clinician.

51

Lack of adequate record review, as evidenced by failing to acknowledge or to follow-up on previously identified issues, was also identified as a concern in a number of cases (CCI Patient I, CIM Patient J, CRC Patient J, CTF Patient H, Folsom Patient B, HDSP Patient G, NKSP Patient A, NKSP Patient B, NKSP Patient D, NKSP Patient E, NKSP Patient G, NKSP Patient K, NKSP Patient N, PBSP Patient F, PBSP Patient H, PBSP Patient J, PVSP Patient A, SCC Patient D, SCC Patient E, SCC Patient F, CSP/Solano Patient N, WSP Patient G, WSP Patient M, and WSP Patient Q).

For CIM Patient J, the failure to review previous documentation resulted in a treatment plan with inappropriate goals. The content of the IDTT clinical summary had been copied from a prior assessment, without any updated information, and noted that the patient had rated his depression as a one or two out of ten. Yet, the treatment goal created for the patient within the same IDTT documentation was to rate his depression at a six or less. The clinician evidently had not read the content of the documentation copied into the record. SCC Patient E reported during an IDTT meeting that he was experiencing an onset of paranoid symptoms. IDTT documentation noted that the psychiatrist would follow-up with the patient to address those symptoms following the IDTT. The psychiatrist did not see the patient for over six weeks and there was no documentation that paranoia was discussed during that session, revealing that the IDTT documentation had not been reviewed by the psychiatrist. Documentation for CTF Patient H included RVR mental health assessments and PC documentation related to the patient's active substance use, yet psychiatric documentation within six days of one of the RVR mental health assessments noted the patient's substance use was in full remission. This was concerning as the patient was being prescribed psychotropic medications. WSP Patient M, while being admitted to the MHCB level of care, was noted by nursing to have an injection of an antipsychotic

medication ordered every two weeks. The on-call psychiatrist noted that the dosage for the medication appeared to warrant a monthly injection, rather than a bi-weekly injection, and requested that the on-site psychiatrist review the medications prior to ordering. This never occurred. The medication was not ordered and documentation within the patient's record was void of any further discussion regarding this medication.

### 6. Positive Findings

During the Twenty-Ninth Monitoring Round, some positive findings were noted that had been identified as concerns in the past. For example, concerns in prior rounds noted that patients were not referred to higher levels of care when indicated. During the current round, this issue was identified in five cases (three percent of all cases reviewed). NKSP Patient B's documentation did not adequately justify retaining the patient at the RC EOP level of care, PBSP Patient B was not considered for EOP when indicated, WSP Patient A was noted to need EOP level of care but a referral never completed, HDSP Patient H was identified as requiring a higher level of care while in MHCB but was not referred until four to five days later, and NKSP Patient L was discharged from MHCB to the 3CMS level of care when clinical presentation warranted consideration of EOP. While each of the cases is concerning, the overall findings for the Twenty-Ninth Monitoring Round are encouraging with regard to higher level of care referrals at 3CMS institutions.

It should be noted that at some institutions, particularly ASP, SCC, and CTF, certain clinicians increased the frequency of contacts beyond that required in the Program Guide to meet some of their patient's needs. This was a positive finding.

C. **Medication Management**

The court's decision in *Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal 1995) found CDCR's medication management process to be in violation of the Eighth Amendment. Subsequent efforts by the *Coleman* Special Master and the *Plata* Receiver to improve mental health's medication management requirements led to the creation of the Medication Administration Process Improvement Program (MAPIP) audit tool.  All institutions used MAPIP as of the Twenty-Eighth Monitoring Round.  Moreover, as the Twenty-Eighth Round Monitoring Report indicated, MAPIP's mental health medication management components "focuses on specific medication compliance measures that report performance in each area, and identifies problematic medication management administration issues requiring attention by an institution." ECF No. 7074 at 125 (citing ECF No. 5779 at 78).

During the Twenty-Ninth Monitoring Round, all 13 institutions utilized MAPIP to evaluate medication management compliance.  Significantly, institutions' MAPIP results reflected variable compliance for mental health's medication management.  Unfortunately, not one of the 13 institutions reported compliance for all psychiatry measures during all months of the review period.  As was seen with the EOP institutions, compliance was especially poor for atypical antipsychotics, Depakote, and lithium.  Of particular concern, the continuity of medications for patients arriving at the two male reception centers (NKSP and WSP) was notably low.  Institutions also typically failed to report compliance for all required months of the review period for the medication continuity measures.  Most institutions also indicated noncompliance for the administration of AM/PM medications, but typically reported compliance for administering *hora somni*/hour of sleep (HS) medications at or after 8:00 p.m.  For administering psychiatric-prescribed medications, there was often compliance for chronic care medications and

for outpatient provider new medication orders. Further, institutions also typically reported compliance with PC 2602 involuntary medication orders. While most institutions had pill lines under required time limits, many facilities reported challenges with having protected places from the elements for patients to wait while in line.

### 1. **Psychiatry Measures**

Psychiatry measures assessed compliance with laboratory tests and other matters for patients who were prescribed psychotropic medications. Monthly institutional data addressed compliance for diagnostic monitoring for antidepressants, atypical antipsychotics, carbamazepine, Depakote, lamotrigine, and lithium, and for clozapine for institutions that were authorized to initiate or maintain clozapine. MAPIP's reporting of 90 percent or more for a psychiatry measure indicated compliance. Notably, not one of the 13 institutions reported compliance with all applicable psychiatry measures for every month of the review period.

As for the specific measures, only five institutions indicated compliance for diagnostic measures for antidepressants during the reporting period. CRC, CTF, and WSP were compliant for all four measures for all six months. CSP/Solano and PVSP were compliant for three required measures. PBSP and NKSP were compliant for three of four measures. However, six institutions – ASP, CCI, CIM, Folsom, HDSP, and SCC, were only compliant for two of three required measures.

Only one institution, CRC, reported compliance for all 11 diagnostic measures for atypical antipsychotics for all months of the reporting period. SCC was compliant for eight measures. ASP and HDSP were compliant for seven measures. CIM and CSP/Solano were compliant for six measures. PBSP was compliant for five measures. CCI, CTF, Folsom, and

WSP were compliant for four measures, and NKSP was compliant for three measures during each month of the review period.  PVSP indicated compliance for six of ten measures.

Regarding patients who were prescribed carbamazepine, CCI, CIM, and WSP reported compliance for three of three required measures.  Otherwise, no institutions reported compliance for all measures during all months of the review period.  PBSP reported compliance for three of four measures.  NKSP reported compliance for one of three required measures.  No patients at ASP, CRC, CSP/Solano, CTF, Folsom, or PVSP were prescribed carbamazepine.

Reported compliance for the four psychiatric measures for patients prescribed Depakote was disconcerting.  Only one institution, CRC, indicated compliance for all four measures during every month of the review period.  ASP and HDSP reported compliance for three of four measures.  SCC reported compliance for two of four measures.  Five other institutions – CSP/Solano, CTF, Folsom, PBSP, and PVSP, reported compliance for only one measure during every month of the review period.  Four other institutions – CCI, CIM, NKSP, and WSP, did not report compliance for any of the four measures for the duration of the reporting period.

NKSP provided medication management information for clozapine.  The institution was compliant for nine of 11 clozapine-related measures for all required months.

Regarding obtaining medication consents for lamotrigine, two institutions – ASP and WSP, reported compliance for all six months of the reporting period.  CRC, NKSP, Folsom, PBSP, CSP/Solano, PVSP, and SCC reported compliance for required months.  CIM was compliant for four months.  CTF was compliant for three of four months, and CCI indicated compliance for one of two required months.  HDSP reported that no patients were prescribed lamotrigine during the review period.

For patients prescribed lithium, there were five psychiatric measures. Only CRC achieved compliance for all five measures for all required months. CTF reported compliance for three measures. CIM, CSP/Solano, Folsom, and NKSP reported compliance with two measures, and ASP and WSP for one measure. PBSP and PVSP reported compliance for three of four required measures, while CCI reported compliance with two of four measures. SCC reported compliance for both required measures. HDSP reported compliance with the one measure required during the reporting period.

Regarding PIWPs and CAPs to remedy deficient psychiatry measures, CRC implemented a CAP to improve continuity of medications for patients who were discharged from acute or intermediate levels of care. CIM, CTF, and Folsom provided data on their processes for investigating any MAPIP value that was under the 90-percent compliance threshold.

## 2. **Clozapine/Clozaril Institutions**

CDCR's statewide mental health program issued a memorandum on August 8, 2020, indicating that clozapine could only be initiated in a mental health inpatient bed. However, the memorandum also identified several institutions, including NKSP, as approved clozapine maintenance facilities to which reasonably stable patients could be discharged from mental health inpatient beds. During the reporting period, NKSP continued clozapine for a total of three patients taking this medication when they arrived at the facility.

While not a designated clozapine facility, CIM had one patient on clozapine who was transferred from the California Health Care Facility (CHCF) in order to undergo electroconvulsive therapy. This was coordinated with headquarters' mental health leadership.

3. **Continuity, Compliance, Observation, and Administration Matters**

It should be noted that MAPIP also evaluated medication continuity for many other measures. These measures included medication continuity following arrival at reception centers, for inter-institutional transfers at Receiving and Release (R&R), for Nurse-Administered (NA)/Direct Observation Therapy (DOT) medications with intra-institutional transfers excluding ASU/SHU/PSU and to ASU/SHU/PSU, for MHCB transfers, upon discharge/transfer from a community hospital and/or DSH or a CDCR PIP, and following parole/transfer to the community. There were also measures for observation of the preparation and administration of *hora somni*/hour of sleep (HS) and AM/PM medications, for psychiatrist-prescribed chronic care medications and outpatient provider new medication orders, and for compliance with PC 2602 involuntary medications. Attainment of 90 percent or above for a measure indicated compliance. This report also addresses PC 2602 petitions and pill lines.

No institutions reported compliance for all required months of the review period for the above-referenced medication continuity measures. Most facilities also reported noncompliance for observation of the preparation and administration of AM/PM medications, but typically reported compliance for HS medication administration at or after 8:00 p.m. Most institutions also indicated compliance for both psychiatric-prescribed chronic care medications and outpatient provider new medication orders.

a. **Continuity of Medication Upon Arrival at Reception Center**

NKSP reported compliance for medication continuity upon arrival at R&R at the reception center for two of six months. WSP was noncompliant throughout the reporting period.

### b. Continuity of Medication for Inter-Institutional Transfers at R&R

Institutions typically did not report medication continuity compliance for inter-institutional transfers at R&R for all six months of the review period. Nonetheless, ASP, CIM, CRC, CTF, and Folsom reported compliance for this measure for all six months. Otherwise, CSP/Solano and PBSP reported compliance for five months. PVSP reported compliance for four months. CCI and SCC reported compliance for three months. HDSP reported compliance for two months, while NKSP and WSP were compliant for only one of six months.

### c. Continuity of Medication with Intra-Institutional Transfers

Institutions also generally did not report compliance for all six months of the review period for continuity of NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU and to the ASU/SHU/PSU. However, ASP, CIM, CRC, CTF, and SCC reported compliance with NA/DOT medication continuity following intra-institutional transfers excluding ASU/SHU/PSU for all six months. Otherwise, Folsom, HDSP, PBSP, and PVSP indicated compliance for five months, while CSP/Solano and NKSP reported compliance for four months. CCI and WSP noted compliance for two months.

For medication continuity upon intra-institutional transfers to ASU/SHU/PSU, CIM and CSP/Solano reported compliance for all months of the review period. PBSP and SCC reported compliance for five months, while Folsom, HDSP, and NKSP reported compliance for four months. CCI and WSP reported compliance for three months. PVSP reported compliance for two required months. ASP, CRC, and CTF reported that no data were required.

### d. Continuity of Medication following MHCB, Community Hospital, or DSH Transfer, or Parole or Community Transfer

Institutions also typically did not report compliance for medication continuity following transfers from the MHCB for all months of the review period. However, CIM reported

compliance for this measure for all six months. Otherwise, NKSP and PBSP indicated compliance for four months. WSP reported compliance for three months, and CCI noted compliance for one month. CRC and PVSP were compliant for four required months. ASP was compliant for one of three months. CSP/Solano was compliant for one of two required months. CTF, HDSP, and SCC were compliant for the one required month. Folsom reported that no data was required for this metric.

Similarly, most institutions did not indicate compliance for medication continuity for all six months of the review period following discharge/transfer from a community hospital and/or DSH or a CDCR PIP. Nonetheless, CTF and PVSP reported compliance for this measure for all six months. On the other hand, ASP, CRC, CSP/Solano, and Folsom noted compliance for five months, and CIM and NKSP reported compliance for four months. WSP reported compliance for three months, and CCI reported compliance for one of six months. PBSP and SCC reported compliance for five required months. HDSP reported compliance for four of five months.

Most institutions reported compliance during all six months of the review period for medication continuity upon parole or release/transfer to the community. ASP, CCI, CRC, CSP/Solano, HDSP, NKSP, PVSP, SCC, and WSP all reported compliance for all six months. CIM, CTF, Folsom, and PBSP reported compliance for five of six months.

   e. ***Hora Somni*/Hour of Sleep (HS) Medications**

Most institutions reported compliance for observation of the preparation and administration of HS medications for all six months of the reporting period. ASP, CCI, CIM, CRC, CSP/Solano, CTF, Folsom, HDSP, NKSP, PVSP, and SCC all reported compliance for all six months. WSP was noncompliant for the duration of the review period. PBSP did not submit data for this metric.

CCI, CSP/Solano, and WSP reported that all doses of HS medications were given at or after 8:00 p.m.  Folsom reported only two doses of medication given after 8:00 p.m.  ASP, CIM, CRC, CTF, HDSP, NKSP, PBSP, PVSP, and SCC did not report how frequently HS medications were administered prior to 8:00 p.m.

Institutions varied in reporting the number of patients taking HS medications. CSP/Solano, CTF, Folsom, NKSP, PBSP, and WSP reported the number of patients who were prescribed HS medications, while CIM reported the number of HS prescriptions.

### f.  AM/PM Medications

Institutions were variably compliant for the observation of the preparation and administration of AM/PM medications for all six months of the review period.  ASP, CRC, CSP/Solano, Folsom, HDSP, and SCC were compliant for the duration of the review period. CIM was compliant for four of six months.  While CTF and PVSP reported compliance for one month, CCI, NKSP, and WSP were noncompliant with this measure during all six months. PBSP did not report compliance data for this measure.

### g.  Psychiatric-Prescribed Chronic Care Medications

Most institutions reported compliance with psychiatrist-prescribed chronic care medication orders during all six months of the review period.  Specifically, ASP, CCI, CIM, CRC, CSP/Solano, CTF, Folsom, HDSP, PBSP, PVSP, and SCC indicated compliance with this measure for all six months.  NKSP was compliant for four months.  WSP was noncompliant for all six months.

### h.  Psychiatric-Prescribed Outpatient Provider New Medication Orders

Institutions typically reported compliance with psychiatrist-prescribed outpatient new medication orders during all six months of the review period.  ASP, CIM, CRC, Folsom, HDSP,

61

PBSP, PVSP, and SCC reported compliance for the duration of the review period.  CCI, CSP/Solano, CTF, NKSP, and WSP reported compliance for five of six months.

### i. Medication Compliance for PC 2602 Involuntary Medication Orders

While the number of patients was small, institutions generally reported compliance with PC 2602 involuntary medication orders.

CIM reported compliance for four required months, while WSP reported compliance for two required months.  CCI, PBSP, and PVSP noted compliance for the one required month.  ASP, CRC, CSP/Solano, and CTF did not have patients under PC 2602 orders.  HDSP and NKSP submitted unclear data.

None of the reviewed institutions reported any uses of force to administer PC 2602 involuntary medications during the review period.

During site visits, some institutions reported the number of current patients who received medications pursuant to PC 2602 involuntary medication orders.  NKSP noted two patients, while PBSP had three patients.

### j. PC 2602 Involuntary Medication Order Petitions

CCI reported no new petitions during the review period.  However, it further reported that three petitions were renewed, and one patient transferred into the facility with an order already in place.  CSP/Solano reported submitting petitions for three patients, which were granted.

NKSP reported six petitions submitted, with one withdrawn for nonclinical reasons.  The remaining five petitions were granted.  PBSP submitted one initial application and two renewals.  WSP reported that five emergent and three non-emergent initial petitions, as well as one renewal, were granted.

HDSP submitted unclear data.  The information from CDCR headquarters listed no patients, however, the patient roster listed two patients receiving medications under the PC 2602 process.  There were no initial applications submitted.

### k.  Pill Lines

Institutions' reported variability for the duration of pill lines and the amount of time that patients waited in them.  Most pill lines were reported to be less than two hours in duration.

CCI, Folsom, NKSP, PBSP, and WSP reported that all pill lines were under two hours.

CIM reported audited pill lines to be under two hours for all five months that the audits were performed.

CRC reported one pill line in March 2021 that was more than two hours.  The facility stated that patients received their medications in under 30 minutes.  Patients at CRC reported that pill line duration remained a concern.

CTF reported that pill lines were running longer than two hours on two facilities.  This was reportedly due to the number of patients prescribed Suboxone.  The facility reported assigning more nursing staff to these lines, with the result being that pill lines were under 30 minutes.

HDSP reported three instances of pill lines running over two hours.

NKSP reported a lack of protected places from the elements for patients to wait while in pill lines.  ASP reported similar challenges, but stated they were exploring potential solutions.  Folsom reported that all pill lines, but one, had protection; the unprotected pill line was moved inside during inclement weather.

## Summary – Medication Management

Although all 13 institutions with 3CMS programs used MAPIP to assess and report about medication management during the Twenty-Ninth Monitoring Round, reported results reflected variability, and notable noncompliance, for the review period. Not one of the 13 institutions reported compliance for all psychiatry measures during all months of the review period. Institutions also typically did not report compliance for all required months for the various medication continuity measures. Similarly, most institutions reported noncompliance for observation of the preparation and administration of AM/PM medications. Institutions were more likely to report compliance for the administration of HS medications on or after 8:00 p.m., and for psychiatric-prescribed chronic care medications. There was also variability for both pill line lengths and the amount of time that patients waited in pill lines.

**D. Access to Higher Levels of Care**

Transfers to Inpatient Care

Timely Referral to Inpatient Referral Unit (IRU)

The Program Guide requires institutional staff to submit acute inpatient care referrals within two business days of IDTT referral or five days of IDTT referral if a *Vitek* hearing is required. Intermediate inpatient care referrals must be submitted within five business days of IDTT referral or ten days if a *Vitek* hearing is required.

Five institutions—CIM, HDSP, NKSP, PBSP, and WSP, referred patients to acute and intermediate inpatient care. All referrals were submitted to IRU within timeframe guidelines. CIM reported concerns with IRU "kick-backs" of inpatient referrals and the insistence that the institution rescind the referrals. CIM staff also expressed their hesitation in pursuing Correctional Clinical Assessment Teams (CCATs) as they believed it was futile due to IRUs'

decision to reject the referral.  During the site visit, CDCR regional clinicians reported struggling with CIM clinicians to adjust their referral practices to meet IRU criteria.  Further, they described a palpable tension between IRU and CIM referring staff.

### Transfers to Acute Inpatient Care

CIM, HDSP, NKSP, PBSP, and WSP referred patients to acute inpatient care during the review period; only HDSP was compliant with the timely transfer of their only acute patient. The remaining four institutions – CIM, NKSP, PBSP, and WSP, were noncompliant with the ten-day requirement.  For those institutions, the average compliance rate was 30 percent; NKSP achieved the greatest compliance at 45 percent.  For WSP, 33 percent of acute care patients transferred timely, and compliance rates for CIM and PBSP were 19 and 22 percent, respectively.

### Transfers to Intermediate Inpatient Care

Three institutions – CIM, NKSP, and WSP, transferred patients to intermediate care. WSP was 100 percent compliant with transfer within 30 days of referral as required by the Program Guide.  CIM and NKSP were not compliant and achieved only 47 and 50 percent compliance, respectively.

### MHCBs

### Transfers to MHCBs and Bed Availability

The Program Guide requires transfers to MHCBs within 24 hours of referral.  All 13 institutions met this compliance standard.

### MHCB Clinical Lengths of Stay

The Program Guide provides for a clinical length of stay of up to ten days in the MHCB. Of the six institutions with MHCBs, five – CSP/Solano, HDSP, NKSP, PBSP, and WSP, had

average clinical lengths of stay of ten days or less.  CIM had an average length of stay of 12 days.

### Restricted Housing

#### Transfers to Psychiatric Services Unit (PSU)

Transfer to a PSU must occur within 60 days of endorsement.  Four institutions transferred patients to a PSU during the Twenty-Ninth Monitoring Round -- HDSP, NKSP, PBSP, and WSP.  All transfers were completed within 60 days of endorsement, except for one patient who could not transfer due to court proceedings.

#### Transfers to Administrative Segregation EOP Hubs

EOP patients in administrative segregation must transfer to administrative segregation EOP hubs within 30 days of placement.  Eight institutions – CIM, CSP/Solano, Folsom/FWF, HDSP, NKSP, PBSP, PVSP, and WSP, transferred patients to administrative segregation EOP hubs.  CIM and PVSP were compliant with transfer timeframes.  Six institutions – CSP/Solano, Folsom/FWF, HDSP, NKSP, PBSP, and WSP, did not achieve compliance.  CSP/Solano, Folsom/FWF, HDSP, and PBSP reached between 80 and 87 percent compliance, while WSP achieved only 66 percent compliance with transfer completion within 30 days.  At NKSP, only three of ten or 30 percent of transfers occurred within 30 days as required.

#### Transfers to Short-Term Restricted Housing (STRH)

According to the Program Guide, 3CMS patients must transfer to STRH within 30 days of administrative segregation placement.  CCI, CIM, CSP/Solano, Folsom/FWF, SCC, and WSP transferred 3CMS patients to STRH during the Twenty-Ninth Monitoring Round.  CCI, CIM, and SCC complied with the completion of transfers within Program Guide timeframes.  Folsom/FWF neared compliance at 86 percent.  CSP/Solano did not track transfers to STRH,

though a random sample of ten transfers revealed only 50 percent compliance with transfers within 30 days.  WSP transferred only two patients to STRH as they erroneously believed mainline 3CMS patients could remain in their RC STRH; the Program Guide provides different out-of-cell and yard time requirements for mainline STRH and RC STRH patients.

### Transfers to Long-Term Restricted Housing (LTRH)

Transfers to LTRH were required within 30 days of endorsement.  Six institutions – CCI, CSP/Solano, HDSP, NKSP, PBSP, and WSP, transferred patients to LTRH during the review period.  CSP/Solano and WSP transfers met Program Guide timeframes.  HDSP and NKSP did not provide LTRH transfer dates.  One of five transfers at CCI was 15 days late, and two of five transfers at PBSP occurred after 30 days of endorsement.  The institutions did not provide reasons for late transfers.

### Transfers to Mainline EOP

The Program Guide requires the transfer of patients to mainline EOPs within 60 days of the level of care change.  Eleven institutions – ASP, CCI, CIM, CRC, CSP/Solano, CTF, Folsom/FWF, HDSP, PBSP, PVSP, and SCC, transferred patients to mainline EOPs during the Twenty-Ninth Monitoring Round.  NKSP and WSP did not provide data regarding transfers to mainline EOPs.  Seven institutions – ASP, CIM, CRC, Folsom/FWF, PBSP, PVSP, and SCC, were compliant with the transfer of patients within Program Guide timeframes.  CCI, CSP/Solano, and HDSP were between 80 and 86 percent compliant; COVID-19 movement restrictions, pending court dates, and patient refusal to submit to COVID-19 tests impacted those transfers.  Two of three transfers from CTF were timely; no reasons were provided for the delays.

**Summary – Access to Higher Levels of Care**

During the Twenty-Ninth Monitoring Round, CDCR failed to meet Program Guide timeframes for acute and intermediate inpatient care transfers. While all reviewed institutions timely referred patients to IRU, for the five institutions that made referrals to acute care, only one met timeframe guidelines. Likewise, only one of the three institutions that made referrals to intermediate care complied with timeframes. Patient-specific reasons for delays were not routinely provided. One institution reported challenging interactions with IRU, including pressure to rescind referrals. For MHCB transfers, the defendants continued to transfer patients within 24 hours as mandated, and clinical lengths of stay rarely exceeded ten days.

COVID-19 movement restrictions negatively impacted restricted housing transfers throughout the Twenty-Ninth Monitoring Round. Defendants achieved compliance with timely transfers to PSUs; however, transfers to EOP administrative segregation hubs, STRH, and LTRH were noncompliant. One institution wrongly retained mainline 3CMS patients in the RC STRH during the review period.

Transfers to mainline EOP institutions were also hindered by COVID-19 movement restrictions resulting in only 64 percent of institutions effecting transfers within Program Guide timeframe requirements.

**E. Custody and Mental Health Partnership Plan**

During the Twenty-Ninth Monitoring Round, the Special Master's analysis of the CMHPP revealed that many aspects of the CMHPP had been implemented, but with varying degrees of compliance. Regrettably, CMHPP activities, which sought to improve relationships between institutional custody and mental health staff to better patients' mental health treatment, required continuous attention and improvement.

68

On the positive side, 11 of the 13 institutions -- ASP, CCI, CIM, CRC, CSP/Solano, CTF, HDSP, PBSP, PVSP, SCC, and WSP, reported at least general alignment of institutional LOPs with the headquarters' partnership plan.

Further, eight institutions -- ASP, CCI, CIM, CSP/Solano, CTF, PVSP, SCC, and WSP, conducted executive leadership joint rounding during all six months of the review period. Folsom/FWF and HDSP conducted five months of rounding. CRC and PBSP only conducted rounding for three months.

However, the dissemination of executive leadership joint rounding information to staff, which occurred through three primary mechanisms, needed improvement. This dissemination was especially concerning for the warden's executive staff meeting minutes referencing the rounding. Regrettably, only three months of PBSP minutes referenced it. Otherwise, CTF and PVSP did not provide an agenda or minutes of the warden's meeting to confirm discussion of the rounding, and ASP did not distribute executive rounding information during the warden's meeting. The warden's executive meeting agendas/minutes from CIM, CCI, CRC, CSP/Solano, NKSP, and WSP all failed to reference the rounding.

Quality management committee meeting minutes were another vehicle to disseminate executive rounding information. Although most institutions' Quality Management Committees (QMCs) referenced the rounding, meeting minutes typically provided very few details. QMC meeting minutes from PBSP referenced the rounding and provided pertinent details, while those from NKSP reported outcomes. Otherwise, although QMC meeting minutes from PVSP and WSP documented the roundings' occurrence, they did not provide further details. Similarly, CTF's quality management committee minutes for five months were typically limited to referencing the roundings' occurrence, but did not also identify findings. Although all months of

69

HDSP's QMC minutes referenced the CMHPP, only one month addressed executive rounding. Minutes from only one of the QMCs for ASP, CRC, and CSP/Solano noted the CMHPP. Folsom/FWF's QMC meetings did not address executive rounding.

The mental health subcommittee was the third forum to disseminate rounding information. Notably, most institutions' subcommittee minutes addressed it. Specifically, NKSP's mental health subcommittee's minutes reported outcomes from executive rounding, while the CMHPP was a standing agenda item of PBSP's subcommittee. WSP's mental health subcommittee minutes routinely documented where the rounding occurred, while CIM and CRC minutes addressed the rounding and/or the CMHPP. Similarly, five months of HDSP subcommittee minutes discussed the CMHPP and joint rounding in detail, while five months of CSP/Solano subcommittee minutes referenced the CMHPP. ASP's subcommittee provided quarterly CMHPP updates to the QMC.

However, CTF's mental health subcommittee minutes for five of six months were generally limited to noting where the rounding occurred; only one month provided detailed findings. Similarly, PVSP's subcommittee meeting minutes indicated the rounding's occurrence, but did not provide additional details. Folsom/FWF's subcommittee minutes did not address the rounding.

Reviewed huddle forms reflected variability. Huddle forms from NKSP's STRH noted required staff's attendance. One month of reviewed PVSP huddle reports reflected 99 percent compliance for huddle documentation. PBSP MHCB huddle logs reflected attendance by 90 percent of required staff, but logs for the STRH reported required staff's attendance ranging from 80 to 88 percent. Reviewed CIM third watch administrative segregation huddle forms were adequately completed but second watch huddle forms typically contained minimal information.

Most reviewed CIM MHCB huddle forms contained patient information.  Reviewed WSP STRH

and MHCB huddle documentation revealed required staff's attendance, but did not support

huddles' daily occurrence during third watch; the documentation was also incomplete, and, at

times, sparse.  Reviewed CSP/Solano MHCB huddle reports only identified attending staff and

new MHCB admissions, but did not otherwise address the huddle forms' numerous questions.

Six institutions -- ASP, CTF, Folsom/FWF, PBSP, PVSP, and SCC, reported compliance

for conducting weekly 3CMS program supervisory meetings between the 3CMS program

supervisor and the custody sergeant.  CIM conducted these meetings for some months.  CRC

conducted 59 supervisory meetings, but most reviewed meeting reports contained little pertinent

information.  CCI did not conduct the supervisory meetings as required.  WSP reported that

staffing shortages negatively impacted supervisory meeting compliance; there was only 77

percent compliance for reception center yards and 44 percent compliance for mainline 3CMS

supervisory meetings.  CSP/Solano's 3CMS supervisory meeting reports contained minimal

information about patient care.  HDSP did not provide documentation of 3CMS supervisory

meetings.

Only four institutions -- CSP/Solano, PVSP, SCC and WSP, conducted monthly joint

supervisory 3CMS program area tours.  CCI conducted these tours on all facilities, but did not

provide further information.  NKSP conducted the tours for all six months on two facilities, and

for five months on three other facilities.  CIM, CTF, and HDSP conducted the supervisory tours

for five of six months.  CRC conducted 11 3CMS supervisory tours for three months.  PBSP

reported that COVID-19 outbreaks resulted in the cancellation of three supervisory tours.  ASP

did not provide relevant documentation other than a memorandum stating that the July 2022 tour

did not occur.

Ten institutions -- ASP, CCI, CRC, CSP/Solano, CTF, HDSP, PBSP, PVSP, SCC, and WSP, all indicated providing patients with the 3CMS orientation brochure.

There was a considerable need to increase collaboration between the disciplines and thereby effectively implement monthly inmate advisory council (IAC) meetings. PBSP reported IAC meetings' general occurrence but noted some meetings cancellation due to COVID-19; reviewed minutes reflected mental health staff's attendance at only 25 percent of meetings. SCC's IAC met for all but one month. ASP reported that mental health staff attended 76 percent of meetings but that the IAC raised mental health concerns at only seven percent of them. CRC reported that the IAC executive body met with management, but did not report on monthly IAC meetings. CSP/Solano provided meeting minutes for 11 IAC meetings; notably, CSP/Solano mental health reported not being informed about the scheduling of some of meetings, resulting in low mental health attendance at them.

Further, due to various COVID-19 outbreaks, HDSP's IAC only met for three months. Folsom conducted IAC meetings for two months; FWF conducted them for three months. WSP provided IAC meeting minutes for two months, but the 3CMS program was not included as a standing agenda item. NKSP IAC meeting minutes did not indicate attendance by a mental health representative, and IAC agendas did not reference mental health issues. CCI only provided IAC meeting minutes for one-sixth of meetings. CIM did not conduct IAC meetings for two months and did not provide agendas or meeting minutes. CTF's IAC only met once. Reviewed PVSP IAC meeting minutes indicated attendance by custody and mental health staff.

Patients at 12 institutions -- ASP, CCI, CIM, CRC, CSP/Solano, CTF, Folsom/FWF, HDSP, NKSP, PBSP, SCC, and WSP, filed staff misconduct allegations. No staff complaints

were filed at PVSP.  HDSP was the only institution that moved staff to another post due to a misconduct complaint; three HDSP staff were moved.

Regarding off-post partnership training, there was compliance for training attendance by mental health and custody staff from Folsom/FWF, PVSP, and WSP, as well as compliance for NKSP custody staff.  PBSP reported that most mental health staff attended the training.  However, there was noncompliance for attendance at training by PBSP custody staff, and mental health and custody staff at ASP, CCI, CSP/Solano, and HDSP.  Further, it could not be determined whether all required CIM, CTF, and SCC custody and mental health staff attended the training.  There was noncompliance for NKSP's clinical staff's attendance at this training.

As for quarterly partnership round table training, CRC reported that 100 percent of mental health staff and 75 percent of custody staff attended the training.  PVSP reported noncompliance for mental health and custody staff's training attendance.  WSP did not report whether all required staff attended the training; WSP mental health leadership further noted that high staff turnover led to third watch trainings only being attended by custody staff.  It could not be determined whether all required CIM, CSP/Solano, and NKSP mental health and custody staff attended the quarterly round table training.  ASP, CCI, and Folsom/FWF were not required to conduct the training.

## Summary – Custody and Mental Health Partnership Plan

Institutional LOPs were aligned with headquarters' partnership plan.  Although institutions typically indicated conducting executive leadership joint rounding, not all performed the rounding for all six months of the review period, as required.  Further, institutions' overwhelmingly failed in the dissemination of rounding information.  It was rare for institutions' executive staff meeting minutes to reference the rounding.  Further, while many institutions'

73

QMCs referenced the rounding, most provided minimal details. By comparison, most institutions' mental health subcommittees addressed the rounding in more detail.

Reviewed huddle forms reflected variability. Further, six of the institutions reported compliance for weekly 3CMS program supervisory meetings. Only four indicated compliance for required monthly joint supervisory 3CMS program area tours.

Institutions typically had copies of the 3CMS brochure, which they distributed to new 3CMS patients. However, there was significant need for improved collaboration between mental health and custody regarding implementation of monthly IAC meetings. Although most institutions reported that patients' filed staff misconduct complaints, only one reassigned staff as a result.

As for attendance at off-post partnership and quarterly partnership round table training, most institutions either reported noncompliance or compliance could not be determined.

**F.  Review of the RVR Process**

CDCR has improved in some areas of the RVR mental health assessment process since the Twenty-Eighth Monitoring Round. However, CDCR remains noncompliant in multiple areas. Areas of notable improvement during the Twenty-Ninth Monitoring Round included custody staff compliance with the completion of the inmate disciplinary mental health assessment training and senior hearing officers documenting consideration of mental health assessments. Nevertheless, mental health staff training compliance remained low. Additionally, compliance remained low for timely mental health assessments by custody, timely completion and return of mental health assessments by mental health staff, and senior hearing officers

documenting mitigation after consideration of mental health assessments.  Recommendations and utilization of alternative disciplinary measures were rare.

Regarding custody staff training on the inmate disciplinary mental health assessment, seven, or 54 percent, of reviewed institutions were in compliance.  Those institutions were CCI, CIM, CTF, Folsom/FWF, HDSP, PVSP, and SCC.  Five institutions – ASP, CSP/Solano, NKSP, PBSP, and WSP, were not compliant.  NKSP and PBSP were close to compliance at 88 percent, while ASP demonstrated only 41 percent compliance.  CSP/Solano and WSP were 70 and 79 percent compliant; CRC did not provide data for custody staff training.

Two institutions – Folsom/FWF and HDSP, were compliant with mental health staff completing the inmate disciplinary mental health assessment training.  CRC did not supply data for mental health clinician training.  The remaining ten institutions – ASP, CCI, CIM, CSP/Solano, CTF, NKSP, PBSP, PVSP, SCC, and WSP, were not compliant.

CDCR issued 17,761 RVRS at the 13 reviewed institutions during the reporting period.  Of these, 5,908, or 33 percent, were issued to MHSDS patients.  There were 5,675 RVRs issued to 3CMS patients, 106 RVRs issued to EOP patients, 88 RVRs issued to MHCB patients, seven RVRs issued to patients at the intermediate level of care, and 32 RVRs issued to acute level of care patients.

No institution complied with the timely request for mental health assessments; the average compliance rate was 33 percent across institutions.  CSP/Solano achieved 86 percent compliance.  Three institutions -- CCI, SCC, and WSP, demonstrated 40 to 62 percent compliance.  Compliance at Folsom/FWF, NKSP, PBSP, and PVSP ranged from 30 to 38 percent.  HDSP reported 19 percent compliance, and CTF achieved only 14 percent compliance

with the timely assessment request.  ASP, CIM, and CRC were zero percent compliant with requests for assessments.

At five institutions – CCI, CRC, CSP/Solano, HDSP, and PVSP, mental health clinicians completed and returned assessments to custody staff within timeframe guidelines.  NKSP achieved 88 percent compliance.  ASP and WSP demonstrated 86 percent compliance.  Four institutions -- ASP, Folsom/FWF, PBSP, and SCC, achieved 78 to 84 percent compliance.  CIM demonstrated the lowest compliance with completed and returned assessments at 38 percent.

Further, at three institutions, CCI, CIM, and WSP, mental health clinicians used identical boilerplate responses in reviewed cases.  Additionally, at CSP/Solano, the mental health clinician inappropriately recommended allowing access to clinical treatment as a factor that should not be limited; however, limiting mental health treatment is never an option with penalty assessment.

Six institutions – ASP, CIM, CRC, CTF, HDSP, and WSP, were compliant with the conduct of mental health assessments in a confidential setting and documenting patient refusals.  CSP/Solano was 86 percent compliant.  CCI and SCC were between 70 and 80 percent compliant with completing mental health assessments in confidential settings.  Folsom/FWF and PVSP demonstrated compliance between 63 and 67 percent.  NKSP was 58 percent compliant, and PBSP did not provide data.

A reviewed sample of adjudicated RVRs included documentation of consideration of the mental health assessment by the senior hearing officers at 11 institutions, namely, CCI, CIM, CRC, CSP/Solano, CTF, Folsom/FWF, HDSP, PBSP, PVSP, SCC, and WSP.  NKSP demonstrated 81 percent compliance, and ASP achieved only 67 percent compliance with documenting mitigation.

Four institutions – CIM, CRC, CTF, and SCC, were compliant with documenting the mitigation of penalties by the senior hearing officer.  At NKSP, the senior hearing officer mitigated 71 percent of cases recommended for mitigation by mental health clinicians.  ASP recorded mitigation in 67 percent of cases where the mental health clinician recommended it.  At Folsom/FWF, the senior hearing officer documented mitigation in 53 percent of reviewed RVRs.  At CCI, CSP/Solano, and WSP, the senior hearing officer was compliant with documenting the consideration of penalty mitigation in all reviewed cases; however, the senior hearing officer only mitigated the penalty in 50 percent of cases.  Clinicians at HDSP, PBSP, and PVSP did not recommend mitigation in any of the RVRs reviewed.

The reviewed sample of adjudicated RVRs indicated that there were four cases at two institutions – CCI and NKSP, where the mental health clinician recommended alternative disciplinary measures as the patients' behavior was strongly influenced by their mental illness.  The one case at CCI proceeded to the senior hearing officer for adjudication.  NKSP reported three RVRs during the review period for which the mental health clinician recommended alternative discipline, though they did not provide further information about adjudication.  At 11 institutions – ASP, CIM, CRC, CSP/Solano, CTF, Folsom/FWF, HDSP, PBSP, PVSP, SCC, and WSP, there were no RVR mental health assessments wherein the mental health clinician recommended alternative disciplinary measures.

All three reviewed classification committee actions included consideration of mental health factors when assessing secure housing unit (SHU) terms.

### Summary -- RVR Process

During the Twenty-Ninth Monitoring Round, *Coleman* class members received 33 percent of the total RVRs issued by CDCR; non-class members received 67 percent of RVRs.

Although improved, training for custody staff remained noncompliant, and mental health staff training completion was woefully low.  Compliance with timely requests for mental health assessments by custody staff was nonexistent, as no institution achieved compliance.  Mental health clinicians' completion and timely return of assessments to custody staff remained noncompliant during the Twenty-Ninth Monitoring Round.  An average of 85 percent of reviewed RVRs were completed in confidential settings.  Senior hearing officers documenting consideration of mental health assessments improved with 11 institutions achieving compliance.  However, senior hearing officer documentation of mitigation remained noncompliant and alternative discipline was recommended and used minimally.

**G.  <u>Use of Force</u>**

Institutions remained noncompliant with training mental health staff regarding CDCR's use of force policy.  Custody staff compliance also declined across the reviewed institutions.

While institutions complied with immediate use of force policies, CDCR failed to provide documentation for the two controlled use of force incidents during the monitoring round.  Consequently, compliance could not be assessed.  Except for one institution, overall documentation was adequate.  The findings assessing the implementation of the use of force policy for the reviewed 13 institutions are reported below.

<u>Training</u>

CDCR's use of force policy required training on the controlled and immediate uses of force.  Eleven institutions—ASP, CCI, CIM, CTF, CSP/Solano, Folsom/FWF, HDSP, NKSP, PVSP, SCC, and WSP, achieved compliance for training custody staff.  PBSP neared compliance at 89 percent.  CRC did not provide data relative to custody officers' completion of the training.

Ten institutions--CCI, CRC, SCC, CSP/Solano, Folsom/FWF, HDSP, NKSP, PBSP, CIM, and PVSP – were compliant for mental health staff completion of mandatory use of force training.  Three institutions – ASP, CTF, and WSP, were noncompliant; compliance for these institutions was 17, 60 and 52 percent, respectively.

Controlled Use of Force

Of the 13 reviewed institutions, one institution, PBSP, had two controlled use of force incidents during the Twenty-Ninth Monitoring Round.  Both incidents involved the same STRH patient.  PBSP did not provide documentation about either incident; therefore, compliance could not be assessed.

Immediate Use of Force

For the 13 reviewed institutions, 1,013 total immediate use of force incidents were reported as follows: ASP (80), CCI (242), CIM (17), CRC (93), CTF (7), CSP/Solano (40), Folsom/FWF (58), HDSP (94), NKSP (123), PBSP (47), PVSP (38), SCC (74), and WSP (100).

The monitor reviewed a random sample of immediate use of force incidents for compliance with applicable policies and regulations.  For 12 institutions—ASP, CCI, CIM, CRC, CTF, CSP/Solano, Folsom/FWF, HDSP, NKSP, PVSP, SCC, and WSP, there were no issues with the force used.  However, on two occasions, SCC inappropriately reported multiple use of force incidents in a single use of force incident report.  PBSP did not produce documentation for any immediate use of force incidents.

**Summary – Use of Force**

Eleven of 13, or 85 percent, of the reviewed institutions complied with custody training requirements for the use of force policy.  Mental health staff training improved compared to the

Twenty-Eighth Round Monitoring Report, but remained noncompliant, with ten of 13 or 77 percent achieving compliance.

One institution failed to provide documentation for the two controlled use of force incidents during the review period.  For immediate use of force incidents, all institutions that provided documentation demonstrated compliance regarding the force used.  One institution failed to provide documentation, and documentation at another institution was not properly completed.

## H.  <u>Program Access</u>

Access to programs for MHSDS patients improved across the 13 institutions reviewed during the Twenty-Ninth Monitoring Round.  Of the 31,566 individuals who held a job or academic assignment, vocational or voluntary educational placement, or those who attended substance use treatment, 23,677 were held by non-MHSDS individuals, and MHSDS patients held 7,907.  Despite these stark number differences, the percentage of MHSDS patients and non-MHSDS incarcerated persons who had assignments or placements were more aligned.  (See chart below, entitled Jobs and Assignments 3CMS vs. Non-MHSDS).

<u>Job Assignments</u>

For employment, 38 percent of MHSDS patients held job assignments, as did 42 percent of non-MHSDS incarcerated persons.  CDCR did not provide data regarding the number of MHSDS patients and non-MHSDS incarcerated persons who had paid assignments.

<u>Academic Assignments</u>

Academic assignments included adult basic education, adult high school, and other educational programs.  Patients with grade level scores of 6.0 or below were assigned to them.

During the Twenty-Ninth Monitoring Round, 22 percent of MHSDS patients held academic assignments, whereas 23 percent of non-MHSDS incarcerated persons held them.

Education Assignments

Vocational education assignments included carpentry, computer repair, electrical, painting, plumbing, HVAC, and welding.  A slightly higher percentage of 3CMS patients had vocational placements at 7.3 percent, while 6.9 percent of non-MHSDS incarcerated persons had placements.

Voluntary Education

Incarcerated persons approved to participate in college courses held voluntary education assignments.  Across the reviewed institutions, a higher percentage of 3CMS patients had voluntary education placements; 3CMS patients had 11.3 percent of voluntary education placements versus 10.6 percent for non-MHSDS incarcerated persons.

Substance Abuse Treatment

Substance abuse treatment participation by 3CMS patients improved, with 17.2 percent of 3CMS patients and 18.7 percent of non-MHSDS incarcerated persons engaged in treatment.



Milestone Credits

Incarcerated persons who actively participated in and completed in-prison rehabilitation programs, including academic, vocational education, and substance abuse programs, may qualify for a reduction in their length of incarceration.  Incarcerated persons earn milestones as they completed parts of the program and were given credits after certain milestones were met.  During the Twenty-Ninth Monitoring Round, 30,344 MHSDS patients and non-MHSDS incarcerated persons were eligible for milestone credits.  Of those 17.2 percent of MHSDS patients and 18.7 percent of non-MHSDS incarcerated persons received them.  Of the 13 institutions reviewed, SCC reflected the highest percentage of MHSDS patients who earned milestone credits, with 46 percent of eligible 3CMS patients earning them.  WSP presented the lowest rate of MHSDS patients earning milestone credits, with three percent of eligible 3CMS patients earning credits. ASP did not provide milestone credit data.



Out-of-Level Housing

Throughout the Twenty-Ninth Monitoring Round, *Coleman* class members were twice as likely to be placed above their custody housing level than non-MHSDS incarcerated persons.

Across the 13 reviewed institutions, there were 490 Level I 3CMS patients and 265 Level I non-MHSDS incarcerated persons housed in Level II housing; there were ten Level I 3CMS patients in Level III housing.  Additionally, there were 201 Level II 3CMS patients and 21 Level II non-MHSDS incarcerated persons in Level III housing; there were two Level II 3CMS patients in Level III housing.  There were 102 Level III 3CMS patients in Level IV housing and 140 Level III non-MHSDS incarcerated persons in Level IV housing.  (See chart below).

|  | 3CMS | non-MHSDS |
|---|---|---|
| Total placed in more restrictive housing level than classified | 806 | 426 |

## I.  MHSDS Patients in Segregated Housing

To end federal court oversite, CDCR must achieve compliance with the requirements for the treatment of MHSDS patients in administrative segregation.  ECF No. 5779.  During the Twenty-Ninth Monitoring Round, three of the reviewed institutions—HDSP, PBSP, and PVSP, had STRH units, and another two institutions—NKSP and WSP, had RC STRH units.  Across all STRH and RC STRH programs, defendants struggled to achieve compliance with timely and confidential contacts by psychiatry and primary clinicians, as well as the conduct of timely initial IDTTs.  CDCR was compliant with the timeliness of routine IDTTs, though it was unclear if treating clinicians attended as required by the Program Guide.

Short-Term Restricted Housing

At PBSP and PVSP, psychiatry and primary clinician caseloads were within the required staffing ratios.  HDSP did not report staffing ratios.

HDSP was compliant with timely initial psychiatry contacts; PBSP neared compliance at 86 percent. PVSP was noncompliant, as only 40 percent of initial psychiatric contacts were completed timely. For timely routine psychiatry contacts, HDSP and PVSP were compliant; PBSP was just shy of compliance at 89 percent. HDSP and PBSP achieved compliance for the completion of initial and routine contacts in confidential settings. However, PVSP was not compliant with the conduct of initial or routine contacts in confidential settings at 40 and 43 percent, respectively. The reasons for nonconfidential contacts were COVID-19 restrictions and patient refusals.

All three institutions—HDSP, PBSP, and PVSP, complied with timely initial primary clinician contacts. For routine primary clinician contacts, PVSP was compliant. HDSP neared compliance at 86 percent, and at PBSP, only 63 percent of routine primary clinician contacts were timely. None of the institutions were compliant with completing initial or routine primary clinician contacts in confidential settings. PBSP achieved the highest compliance rate for initial contacts in confidential settings at 83 percent; HDSP and PVSP reached 50 percent and 67 percent, respectively. Routine contacts were conducted in confidential settings at PVSP 61 percent of the time; HDSP and PBSP achieved 42 percent and 49 percent compliance. Defendants cited COVID-19 restrictions, clinician absences, and patient refusals as the reasons for noncompliance.

For IDTTs, PVSP was compliant with timely initial IDTTs, and PBSP was close to compliance at 86 percent. HDSP was noncompliant, with only 67 percent completed within Program Guide timeframes. All three institutions were compliant with the timely completion of routine IDTTs.

Required staff attended all initial and routine IDTTs, though documentation did not demonstrate that the treating clinicians attended as required in the Program Guide. Patient presence at both initial and routine IDTTs was notably low. For initial IDTTs, patient attendance reached 36 percent at HDSP, 57 percent at PBSP, and 70 percent at PVSP. For routine IDTTS, patient presence rates were 25 percent at HDSP, 14 percent at PBSP, and 50 percent at PVSP. Reasons for non-attendance included COVID-19 restrictions and patient refusals.

HDSP, PBSP, and PVSP complied with the required weekly offerings of out-of-cell activities, including yard. All three institutions offered 90 minutes of weekly structured group therapeutic activity as required.

RC Short-Term Restricted Housing

NKSP and WSP did not provide psychiatry or primary clinician staffing ratio data.

NKSP was compliant with initial and routine psychiatry contact timeliness. WSP complied with routine contacts; however, only 42 percent of initial psychiatric contacts were completed timely. None of the initial or routine psychiatry contacts at NKSP and WSP were conducted in confidential settings. Neither institution provided reasons for the lack of confidentiality.

Both NKSP and WSP were compliant with timely initial primary clinician contacts. However, both were noncompliant for timely routine contacts; NKSP achieved 70 percent, and WSP achieved 60 percent compliance. Further, neither NKSP nor WSP were compliant with completing initial and routine primary clinician contacts in confidential settings.

NKSP and WSP timely completed initial and routine IDTTs and thus were compliant. While documentation indicated all required staff was present, it was not discernable if it was the patients' treating clinicians as required.

85

NKSP and WSP offered 90 minutes of weekly structured group therapeutic activity.

Non-Disciplinary Segregation

Five institutions – CCI, CIM, HDSP, PBSP, and WSP – placed patients on non-disciplinary segregation (NDS) status during the review period.  HDSP and WSP were compliant with timely transfers of patients placed on NDS status; CCI was noncompliant at ten percent.  CIM and PBSP did not provide transfer data.

## Summary—MHSDS Patients in Restricted Housing

Throughout the Twenty-Ninth Monitoring Round, CDCR did not consistently provide timely psychiatry contacts, primary clinician contacts, and IDTTs for patients in STRH and RC STRH.  Additionally, the lack of confidentiality of all contacts and patient attendance in IDTT remained an issue for defendants.  CDCR achieved compliance with offering weekly out-of-cell activities and structured group therapeutic activities to patients in STRH and RC STRH.

**J.  Reception Centers**

The 3CMS tours also assessed the reception centers at NKSP and WSP.  Both institutions housed reception center patients at the STRH, EOP, and 3CMS levels of care.  Regrettably, clinical staffing was a huge challenge for both institutions' reception centers due to the high volume of intakes.

Due to clinical staffing challenges, neither institutions' reception centers assigned caseloads to the psychiatrists or PCs.  Rather, both established a maximum number of patients who the psychiatrist or PC could see daily.

Both reception centers utilized telepsychiatry with differing reports of effectiveness.  WSP mental health leadership indicated that the use of telepsychiatrists was troublesome, as they were "unknown" to the institution, inexperienced, and not familiar with WSP's documentation.

In contrast, NKSP's mental health leadership reported that the telepsychiatrist had extensive experience working with NKSP and also with the IDTT process.

Both the NKSP and WSP reception centers offered groups to EOP and 3CMS patients. NKSP psych techs facilitated groups, while recreation therapists generally facilitated groups at WSP.  NKSP patients were offered an average of 5.1 weekly hours of group, with patients attending an average of 2.9 weekly hours.  WSP patients were offered an average 4.9 weekly hours of group and attended an average of 3.7 hours.  Reception center patients at both institutions were offered in-cell activities.

Observed IDTTs at both institutions found all required staff members in attendance; however, on occasion attendance was virtual or by teleconference, and during one observed IDTT, staff members on the phones were disruptive to the process.  Otherwise, minimal technical difficulties were observed or reported.

### Summary – Reception Centers

Psychiatrists and psychologists were not assigned caseloads in the reception centers at either NKSP or WSP due to the influx of intakes combined with staffing challenges.  Each of the reception centers utilized telepsychiatry, but reported differing degrees of effectiveness.  In addition to in-cell activities, reception center patients at both NKSP and WSP were offered approximately five weekly hours of group, with patients attending an average of 3.3 hours. IDTTs were attended by all required staff members with minimal technical difficulties.

## **CONCLUSION**

The Special Master began his reporting on the Twenty-Ninth round of monitoring by identifying a "crisis" within CDCR's Lift and Shift PIPs, "driven by deficiencies that have plagued defendants' mental health care system throughout the long history of this case, including dangerously high staffing vacancies at some programs."  Special Master's Twenty-Ninth Round Monitoring Report – Part A, ECF No. 7555 at 37.  As is now clear from the findings contained in the Twenty-Ninth Round Monitoring Report – Part C and this Report, CDCR's residential and outpatient treatment programs (EOP and 3CMS levels of care, respectively) are similarly in a staffing crisis.  *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C at 159 (describing a "bona fide mental health staffing emergency" within CDCR's EOP institutions); *see also supra* p. 21 (reporting eight of 13 3CMS institutions with functional vacancy rates among psychologists exceeding 20 percent, and four 3CMS institutions with functional vacancy rates among social workers exceeding 30 percent.).

The recent progress CDCR has made improving psychiatry fill rates[10] has unfortunately been overshadowed by the woefully inadequate primary clinician fill rates at many CDCR institutions.  *See supra* p. 21; *see also* Special Master's Response to December 1, 2022 Order, ECF No. 7677 at 2-3 (reporting 38 percent statewide functional vacancy rate among clinical psychologists, and 33 percent statewide functional vacancy rate among social workers). Moreover, the quality of mental health care provided to *Coleman* class members remains in large part inadequate, as reflected in the Special Master's expert's clinical case reviews.  *See supra* p. 38 ("Of the 159 cases reviewed, 64 cases (40 percent) were determined to have received care of adequate quality.  Another 25 cases, or 16 percent, were noted as having received care that was

---

[10] *See* Special Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy, ECF No. 7682 at 46-51.

of marginally adequate quality….Finally, 70 cases, or 44 percent were noted as having received care of inadequate quality during the review period.").  As noted in the Special Master's Twenty-Ninth Round Monitoring Report – Part C, despite improvements made over many years, "the woeful state of CDCR's mental health staffing stands in the way of defendants' advancing toward an eventual exit from federal oversight." Special Master's Twenty-Ninth Round Monitoring Report – Part C at 161.

What's also clear, however, is CDCR's MHSDS is staffed by dedicated professionals who in some cases during the monitoring round appropriately responded to their patients' needs by increasing the frequency of clinical contacts, despite significant staffing shortages.[11]  These clinicians and, most importantly the patients they serve, should not have to bear the burden of defendants' inability to comply with their remedial obligations any longer.  Indeed, as the Court noted in its October 10, 2017 order, "It is past time for defendants to complete the task of hiring sufficient mental health staff to come into compliance with the Eighth Amendment and orders of this court."  ECF No. 5711 at 11.

In addition to confronting this mental health staffing crisis, the Special Master and parties have a significant amount of remedial work to complete in the coming months, including but not limited to the Unidentified Needs Assessment study and completion of remediation of CDCR's mental health data systems.  Defendants' remedial obligations, as enumerated in numerous of the

---

[11] *See supra* p. 53 ("It should be noted that at some institutions, particularly ASP, SCC, and CTF, certain clinicians increased the frequency of contacts beyond that required in the Program Guide to meet some of their patients' needs.  This was a positive finding.").

Court's prior orders, are clear.[12]  Thus, the Special Master offers no formal recommendations and makes no request for any additional orders.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr.
Special Master

February 7, 2023

---

[12] As the Court noted in its October 10, 2017 order: "At this juncture, further orders requiring specific remedial measures would in a number of instances be redundant and, more importantly, would tip the balance unacceptably toward micromanagement and substitute this court's judgment for that of prison administrators. The court has repeatedly identified the constitutional deficiencies in staffing and has issued several orders aimed at remedying the deficiencies." ECF No. 5711 at 27.

# **APPENDIX A**

## **SPECIAL MASTER'S ACTIVITIES**

**ACTIVITIES OF THE SPECIAL MASTER <u>SINCE</u> THE SUBMISSION OF THE DRAFT TWENTY-NINTH MONITORING ROUND REPORT – PART C: SPECIAL MASTER'S MONITORING REPORT ON THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATIONS INSTITUTIONS WITH ENHANCED OUTPATIENT PROGRAMS COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS, ISSUED DECEMBER 8, 2022**

## DATA REMEDIATION ACTIVITIES

- Data and CQI Meetings – Two meetings
- Business Rules and Methodology Review Workgroup – 20 meetings
- Quality Assurance Certification Workgroup – Meets Weekly
- Level 1 Data Dispute Meetings – Nine meetings
- Level 2 Data Dispute Meetings – Four meetings
- Indicator Status (based on MH Verification Team Status Tracking System on 2023-02-07)

    Remediated (Validated and Verified):                    26

    Partially Remediated (Validated, but not verified):    1

    Verified, but tagged as having a dispute:              11

    Verified, awaiting final validation by stakeholders:  4

    Additional indicators undergoing verification software test development:   17

## SUICIDE PREVENTION MONITORING

- Special Master's Report on the Expert's Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs, filed October 24, 2022, ECF No. 7636

## COURT COORDINATION MEETINGS – Three meetings

## SMALL WORKGROUP MEETINGS

- DSH Small Workgroup – Nine meetings

**UNA MEETINGS**

- Case Presentations – 85 meetings
- Dispute Resolutions – 12 meetings
- Trainings – 12 trainings
- Patient Interviews – Four patient interviews
- All Parties Meetings – Two meetings

**POLICIES**

- Change Management Policy – Issued to the field December 5, 2022
- Flex Bed Policy – Issued to the field, January 4, 2023

**SPECIAL MASTER REPORTS ISSUED IN 2022**

- Special Master's Report on his Expert's Summary of Findings: Deaths by Suicide in the California Department of Corrections and Rehabilitation from January 1, 2013 through December 31, 2020, Filed March 23, 2022, ECF No. 7511

- Twenty-Ninth Monitoring Round Report – Part A: Special Master's Monitoring Report on the Psychiatric Inpatient Programs for Mental Health Patients of the California Department of Corrections and Rehabilitation, Filed May 17, 2022, ECF No. 7555

- Special Master's Report and Recommendation Regarding the California Department of Corrections and Rehabilitation's Proposal for Assuming the Annual Suicide Monitoring Report, Filed June 28, 2022, ECF No. 7574

- Twenty-Ninth Monitoring Round Report – Part B: Special Master's Monitoring Report on the Inpatient Mental Health Care Programs at the California Department of State Hospitals, Filed October 14, 2022, ECF No. 7625

- Special Master's Report on His Expert's Fifth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation and Baseline Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs, Filed October 24, 2022, ECF No. 7636

- Special Master's Report and Recommendation on a Final Proposal Telepsychiatry Policy, Filed December 15, 2022, ECF No. 7682

# **APPENDIX B**

# **INSTITUTIONAL SUMMARIES**

**APPENDIX B-1**
**CALIFORNIA REHABILITATION CENTER (CRC)**
**(September 13, 2021 – September 15, 2021)**
**Review Period: (March 1, 2021 – August 31, 2021)**

Census:

On September 10, 2021, CRC's total population was 2,597, a 35 percent decrease since the preceding site visit. The mental health caseload population of 1,131 patients decreased by 25 percent since the preceding visit and comprised 43.5 percent of CRC'S population. There were 1,127 mainline 3CMS patients. An additional ten 3CMS patients were housed at the CIM Short Term Restricted Housing (STRH). For classification purposes, those patients remained CRC patients. However, due to the lack of restricted housing units at CRC, they were placed at CIM. There were four EOP patients awaiting transfer. There were no patients housed in the Outpatient Housing Unit (OHU) for mental health treatment.

Staffing:

The senior psychiatrist position was filled and seven civil service psychiatrists covered three established psychiatry positions.

One of two chief psychologist positions was filled; CRC was not permitted to fill the vacant position as a cost savings measure. The 2.5 senior psychologist positions were filled; 0.5 was filled limited-term. There were 9.5 civil service psychologists covering five psychology positions; one psychologist was on an extended leave during the reporting period and at the time of the site visit. All psychologists were licensed.

Twelve social workers covered 9.5 established positions. All social workers were licensed.

There were no established positions for recreation therapists, but CRC had one recreation therapist.

95

Five MHSDS clerical staff covered 4.5 established positions; one clerical staff member was on a long-term leave.  One position each for the Correctional Health Services Manager (CHSA II), Office Services Supervisor (OSS II), and HPS I was filled.

Telepsychiatry:

CRC did not use telepsychiatry during the reporting period.  CRC last utilized telepsychiatry between May 2020 and October 2020, when some CRC assigned psychiatrists provided services from off-site locations due to the COVID-19 pandemic.

Crisis Intervention Team:

The CIT LOP at CRC was revised in July 2021.  The CIT was composed of a mental health clinician, supervising registered nurse (SRN II) or designee, and correctional lieutenant or designee.  During regular business hours (7:00 AM to 10:00 PM), a crisis clinician, either a mental health clinician or psychiatrist, triaged crisis referrals to determine the necessity of CIT involvement.  The crisis clinician utilized a dedicated office within the OHU for confidential crisis interviews and assessments.  After-hours crisis referrals were directed to the on-call psychiatrist.

During the review period, the CRC CIT responded to 13 crisis referrals; four were reportedly resolved without MHCB admission.

Staff Training:

As of September 13, 2021, 87 percent of custody officers and 88 percent of required mental health staff completed the annual suicide prevention training; one of the two mental health staff members who did not attend was on medical leave.  SRASHE training was completed by all mental health staff required to attend.

CRC reported that 95 percent of custody officers completed the required cardiopulmonary resuscitation (CPR) training; mental health staff was not required to take CPR training.

For heat-related pathology on-the-job training, CRC reported that, excluding custody staff on long-term sick leaves, 86 percent of custody officers completed the training.

Fifty percent of captains, 87.5 percent of lieutenants, and 67 percent of sergeants at CRC who were required to receive the inmate disciplinary process mental health assessment training received the training.  All clinicians who completed RVR mental health assessments received the training.

CRC reported that 88 of 91 or 97 percent of custody officers who were required to receive use of force training received the training.  The training was attended by the warden, chief deputy warden, all three correctional administrators, all four captains, 21 of 24 lieutenants, and all 58 sergeants.  CRC did not report on use of force training for correctional officers.  All 33 required mental health staff received the training.

Quality Management:

CRC did not have a Local Governing Body (LGB) as there were no licensed units at the facility.  CRC's Quality Management Committee (QMC), Mental Health Program Subcommittee (MHPS), Suicide Prevention and Response - Focused Improvement Team (SPRFIT), and EMRRC met timely throughout the current review period.  All required members were present during the mental health department's quality management meetings.  Meeting minutes reflected review of meaningful and relevant topics.  Relevant quality management information was forwarded through the quality management committee hierarchy and reportedly shared with staff during department meetings.

CRC did not charter quality improvement teams (QITs) or FITs during the review period. Audits and CAPs referenced in CRC's MHPS meeting minutes pertained to lengthy pill line wait times, missing suicide watch entries, missing written justifications for statewide alternative housing policy deviations, and mental health attendance during morning healthcare huddles.

CRC indicated that peer reviews had not been conducted since 2017 due to delays with the revised statewide policy.

Medication Management:

CRC provided MAPIP results for February 2021 through July 2021 regarding compliance with psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring data for patients prescribed atypical antipsychotics showed that measurements for medication consent, blood pressure, lipid monitoring, height, and weight, were compliant for all six months of the review period. Abnormal involuntary movement scale (AIMS) tests, blood sugar measures, diagnostic monitoring of CBC with platelets, and comprehensive metabolic panel (CMP) were also compliant for all six months of the review period. Electrocardiogram (EKG) measurements were compliant for the five months it was required, and not required for one month during the review period. Thyroid monitoring was compliant for four of the six months and not required for two months.

The medication management dashboard for the period showed that for patients prescribed antidepressants, venlafaxine blood pressure, EKG and thyroid monitoring were compliant for all six months of the review period. Medication consent was compliant for the five of months it was required and not required for one month.

Psychiatric diagnostic measures for CRC patients prescribed Depakote were compliant with CBC with platelets measures and medication consent for all six months of the review

period.  CMP measures and Depakote levels were compliant for the five months they were required and not required for one month.

For Lamotrigine, CRC was compliant with medication consent during the five months it was required; it was not required for one month.

Regarding data for diagnostic measures for patients prescribed Lithium, CRC indicated that Lithium levels, Creatine and blood urine nitrogen (BUN) measures (kidney function tests) and thyroid monitoring were compliant for all six months of the review period.  Medication consent was compliant for the five months it was required and was not required for one month. EKGs were compliant for the three months it was required and not required for three months.

No patients at CRC were prescribed Clozapine or carbamazepine during the review period.

MAPIP data showed that CRC was consistently compliant during each month of the review period with medication continuity with inter-institutional transfer at R&R, at parole or release to the community, continuity of nurse administered (N/A)/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), with observation of medication preparation and administration for HS and AM/PM, continuity for psychiatric-prescribed chronic care medications, and regarding new psychiatric medications.

Medication continuity for MHCB transfers was compliant for the four months it was required and was not required during two months.  Regarding medication continuity following discharge from community hospital or acute or intermediate care, CRC was compliant for five months and not compliant for one month.  A CAP to remediate the non-compliance was instituted.

CRC had no involuntary medication orders during the review period.

The maximum length of medications ordered by a psychiatrist at CRC was 180 days; bridge orders were for 15-30 days.

Telephone and verbal orders were entered into the electronic health records system (EHRS) and were required to be cosigned by the prescribing psychiatrist within 24 hours of the order.

Psychiatrists at CRC were permitted to prescribe non-formulary medications as needed, which prescriptions were regularly reviewed by the senior psychiatrist.

CRC reported that psychiatrists prescribed psychotropic medications as nurse administered or DOT prescriptions, with a preference for DOT to enhance adherence and reduce diversion. Patients prescribed Keep on Person (KOP) medications were assessed individually regarding their reliability for medication adherence prior to such prescriptions.

HS psychiatric medications were reported to be consistently administered on or after 2000 hours. The number of patients prescribed HS psychiatric medications was not provided.

During March 2021 CRC reported that a pill line lasted longer than two hours; however, patients' medications were administered within 30 minutes of arrival at pill lines. During the site visit, patients reported continued problems. CRC leadership agreed to follow up on the issue.

Transfers:

Since April 2019, one senior supervisor psychologist held the inpatient coordinator position in addition to the SPRFIT coordinator and training coordinator positions.

Sustainability reviews were not completed at CRC and no patients were referred to acute or intermediate care during the review period.

During the review period, CRC made 57 referrals to MHCBs. All but one patient transferred within 24 hours of referral; one patient was 2.5 hours late due to outside

hospitalization.  There were no rejections during the review period.  Two patients had three MHCB admissions within six months.

CRC continued to move all patients requiring restricted housing to CIM; patients moved within one hour of identification.  On September 13, 2021, ten 3CMS patients were housed at CIM STRH.

CRC transferred ten patients to EOP programs during the review period, all transferred within 60 days.  At time of the site visit, four patients were waiting transfer to EOPs; all were waiting less than 60 days.  While awaiting transfer, CRC reported that EOP patients received weekly primary clinician contacts, monthly psychiatry contacts, and groups as available.

During the review period, CRC transferred nine patients to Minimum Support Facilities (MSFs); six to the California State Prison/Corcoran (CSP/Corcoran), two to Mule Creek State Prison (MCSP); one to California Men's Colony.  CRC did not report any transfers of patients to desert institutions.

Programming:

Alternative Housing:

CRC updated the local operating policy for Alternative Housing during June 2021.  CRC determined that a retrofitted "wet cell" within the OHU was the safest place at the facility to temporarily house patients awaiting transfer to an MHCB.  The monitor's expert agreed with this determination as all other rooms within the OHU required additional suicide resistant retrofitting.

CRC required suicide watch with direct observation for all patients placed in alternative housing; less restrictive suicide watches or precautions were not permitted.  A minimally retrofitted OHU cell was also available for use when the preferred wet cell was occupied;

however, a pipe along the cell's ceiling presented safety concerns and there was no toilet in the cell. The overflow cell was not used for alternative housing during the review period.

A total of 57 MHCB referrals for 49 patients resulted in alternative housing (OHU wet cell) placement during the review period; the average placement lasted 4.7 hours. Fifty-five patients transferred to MHCBs. Two patients were rescinded within 24 hours of placement; both were placed on suicide watch late at night and were removed after interviews the following morning. There was one patient in alternative housing beyond the 24-hour timeframe; however, this patient had been treated at an outside hospital for 15 of the 26.5 hour wait time.

3CMS:

All psychiatry and primary clinician caseloads were within the established ratios of 1:280 and 1:97, respectively.

CRC had confidential treatment offices on all four yards for individual mental health contacts and assessments. CRC indicated that during quarantine periods, yard and treatment groups were suspended, routine 3CMS contacts were often postponed, self-help packets were distributed daily, and urgent and emergent contacts were completed confidentially and within required timeframes.

While the 3CMS population significantly decreased during the COVID-19 pandemic, beginning in April 2021, CRC experienced a rapid increase in patient intakes from reception centers. Since that time, CRC reported an average of 35 to 50 3CMS arrivals per week from reception centers. Both line staff and leadership reported that many of these patients arrived without initial primary clinician assessments, medication consent forms, AIMS, and labs.

Observed IDTTs were conducted with all required members in attendance, started on time and occurred in a confidential room with computer access for each member. Correctional

counselor's input and patient interactions were good; however, all patients were inappropriately excluded from the room during the IDTT's initial discussion. Once allowed entry, patients were routinely informed that the IDTT determined 3CMS level of care was most appropriate with no rationale provided, nor any level of care discussion during the remainder of the IDTT.

Case conceptualizations, review of progress and treatment obstacles, diagnostic information, measurable treatment objectives, treatment plan modifications to address new problems, and pre-release planning where indicated were routinely missing from observed IDTT discussions. Psychiatrist's contributions were generally limited to asking patients whether they experienced side effects or had any questions for psychiatry. Medication indications and compliance were rarely reviewed, and during two observed IDTTs, there was no mention of whether medications were prescribed.

Eighteen 3CMS patient healthcare records were randomly selected to assess compliance with timely IDTTs during the review period. For the 11 patients that required initial IDTTs, 100 percent occurred within 14 working days of and were compliant. Some IDTTs were held in absentia due to COVID-19 restrictions. Three patients required routine IDTTs during the review period; 100 percent occurred at least annually and were compliant with Program Guide requirements. Required staff members attended all or 100 percent of the initial and routine IDTTs that occurred during the review period.

CRC resumed treatment groups for 3CMS patients in February 2021; 3CMS groups were either recreation therapy groups or process oriented clinician-led groups. While group hours varied throughout the review period, approximately 11 mental health groups were scheduled during the week of onsite monitoring. On September 13, 2021, there were 40 patients on the

group treatment waitlist at CRC.  In addition to mental health groups, the Integrated Substance Use Disorder Treatment (ISUDT) program offered 56 groups as of September 14, 2021.

Two observed clinician-led mental health groups during the site visit were disorganized and offered little therapeutic value.  Two group members left early due to conflicting ducats, which was a problem noted by several patients during interviews.  Interviewed patients did not know the groups' topics or titles.  Patients also expressed a desire for certificate producing structured mental health groups to demonstrate progress during Board of Prison Hearing (BPH) reviews.  CRC leadership reported awareness of all of the aforementioned issues.

The monitor randomly selected 20 healthcare records to assess 3CMS treatment at CRC. Eleven patients required initial psychiatric evaluations during the review period; 82 percent occurred prior to the initial IDTT and were compliant with Program Guide requirements.  For routine psychiatric contacts, 100 percent occurred within 90 days and were compliant with Program Guide requirements.  Notably, many patients were seen more frequently than what was required by the Program Guide.

Six patients required initial primary clinician evaluations during the review period; 100 percent occurred within ten working days of arrival.  Further, 100 percent of routine primary clinician contacts occurred within 90 days for the reviewed sample.  Patients were often seen more frequently than the Program Guide requirements.  A confidential setting was documented in 33 percent of reviewed cases.

Patients reported a range of offered yard time from two to four hours per day.

Patients had no significant concerns related to laundry or canteen.

Other Issues:

Pre-Release Planning:

104

The pre-release program at CRC needed improvement.  During the review period, 197 of the 280 incarcerated persons scheduled for release from CRC were in the 3CMS program.

CRC had one full time pre-release coordinator and one back up staff member for pre-release coverage.  CRC did not offer pre-release groups during the review period or at the time of the site visit.  Instead, the pre-release coordinator reportedly attempted to meet individually with all release eligible patients to assess and address their pre-release needs.  However, CRC's tracking and monitoring of pre-release services was incomplete, and the pre-release coordinator was unable to answer the questions regarding missed contacts.  CRC did not collect Transitional Case Management Program (TCMP) data during the review period.

Although pre-release groups were not offered, CRC provided 14 job readiness courses to 252 incarcerated persons through the education department's Transitions Program during the review period.  CRC did not provide the specific number of 3CMS patients that attended.

Program Access:

a.    Job and Program Assignments:

On September 1, 2021, CRC reported that of 1,386 job assignments, 516 or 48 percent of the 3CMS population held them and 869 or 59 percent of the non-caseload incarcerated persons held them.  One EOP patient held an assignment.

For CRC's 1,190 academic assignments, 410 or 38 percent of 3CMS patients and 779 or 53 percent of non-MHSDS incarcerated persons held these.  One EOP held an academic assignment.

The 183 vocational education assignments were held by 62 or six percent of 3CMS patients, and 121 or eight percent of non-MHSDS incarcerated persons.  No EOP patients held a vocational education assignment.

The 167 voluntary education assignments were held by 48 or four percent of 3CMS patients, and 119 or eight percent of non-MHSDS incarcerated persons.  No EOP patients held this assignment.  Interviewed patients reported they had access to in-person education and college by correspondence.

The 357 substance abuse treatment assignments were held by 184 or 17 percent of 3CMS patients, and 173 or 12 percent of non-MHSDS incarcerated persons.  No EOP patients held this assignment.

b.      Milestone Credits:

During the review period, two EOP patients were eligible to earn milestone credits; neither patient earned the credit.  For 1,077 3CMS patients, all patients were eligible to earn milestone credits; 17 percent earned them.  All 1,468 non-MHSDS incarcerated persons were eligible to earn milestone credits, with 32 percent earning the credit.

c.      Out-of-Level Housing:

On September 1, 2021, there were 154 3CMS custody Level I patients in Level II housing and 21 3CMS custody Level III patients in Level II housing.

d.      ADA Reasonable Accommodation and Grievance Procedures:

CRC previously implemented the revised Americans with Disabilities Act (ADA) accommodation and grievance procedures, which included appeals concerning accommodations for psychiatric disabilities.  CRC also provided a copy of the CDCR Form 1824 Desk Reference Manual which explained the procedure.

"C" Status:

There were no MHSDS patients on "C" Status during the review period or at the time of the site visit.

Mental Health Referrals:

CRC reported a total of 1,121 mental health referrals during the review period.  There were 786 referrals to primary clinicians, including 69 emergent, 130 urgent, and 587 routine referrals.  There were 335 referrals to psychiatry, including 13 emergent, 23 urgent, and 299 routine referrals.  Follow-up to referrals for all categories was compliant by both primary clinicians and psychiatrists during the review period.  CRC was compliant with timely follow-up for emergent, urgent, and routine referrals by primary clinicians and psychiatrists during the review period.  Interviewed housing unit officers were knowledgeable about the referral process and produced CDCR MH5-128 forms upon request.

Treatment Space:

There was sufficient office and treatment space at CRC during the review period and at the time of the site visit.

Custody and Mental Health Partnership Plan:

CRC's CMHPP LOP was dated May 2021 and was aligned with headquarters' Partnership Plan.

CRC conducted executive leadership joint rounding during three months of the review period.  The 3CMS program on Facility A was rounded once; Facility D's 3CMS program was rounded twice.  Notably, the LOP required such rounding no less frequently than annually for each of CRC's four 3CMS program areas but also encouraged more frequent rounding.  Required staff participated in the rounding for two of three months.

Executive leadership joint rounding forms reported relevant findings.  Among them, staff expressed concern about particular patients, reported good working relationships between mental

107

health and custody, and did not indicate access to care barriers in providing patient treatment. However, some staff opined that institutional communication with staff needed to improve.

Patients interviewed during executive leadership joint rounding had generally favorable comments about CRC's mental health program. Patients typically reported genuinely helpful clinicians and had mostly positive comments about custody. However, some patients reported numerous physical plant problems, such as leaky roofs, brown shower water, plumbing problems, and insufficient fans.

Notably, mental health leadership indicated that the warden's executive staff meetings had not been addressing executive leadership joint rounding.

A total of 59 3CMS supervisory meetings between the custody sergeant and the 3CMS program supervisor occurred on all four facilities during the review period. However, most 3CMS supervisory meeting reports contained little, if any, pertinent information. Others reported new patient arrivals, returning patients from the MHCB, odd patient behaviors, and emergent and urgent patient referrals.

A total of 11 joint supervisory 3CMS tours occurred during three months of the review period. The most significant staff concerns were related to COVID-19, which caused patient anxiety, movement restrictions, programming shutdowns, and the quarantine of patients. Most interviewed patients had positive feedback about the 3CMS program and did not report mental health treatment barriers; they further typically reported good treatment by mental health and custody staff. Nonetheless, some patients reported that some mental health staff seemed "burned out" and were just going through the motions; others reported some disrespectful custody officers. Some patients also reported physical plant concerns, including hot, crowded dormitories, which resulted in less access to bathrooms and showers.

108

Quality management committee meeting minutes reflected only one brief reference to the CMHPP.  Mental health subcommittee meeting minutes indicated considerably more CMHPP information.  Specifically, they reported challenges to the partnership plan due to increases in staff COVID-19 infections and that a change in sergeant supervisory staff had necessitated the need for retraining on the partnership plan.  The mental health subcommittee minutes further reported that both staff and patients had expressed continuity of care concerns, which was more prevalent in a COVID-19 environment rife with frequent patient housing changes.

CRC had a copy of the 3CMS orientation brochure, which was reportedly provided to 3CMS patients.

The IAC executive body met with management in March 2021.  Discussed matters included hybrid and virtual visiting requirements, ISUDT coordination, education and work assignments, and the administration of COVID-19 vaccinations to patients and staff. Information on monthly warden IAC meetings was not provided.

CRC reported data on patient complaints for the six-month period of February through July 2021.  Of 49 staff complaints, three were approved, 37 were disapproved, and decisions had yet to be rendered on the remaining nine complaints.  No staff were permanently moved to a different post due to a patient complaint.

CRC reported that 75 percent of custody officers and 100 percent of mental health staff attended the annual off-post partnership training during 2020.

Heat Plan:

The CRC LOP 19 Heat Plan dated June 2021 complied with the California Correctional Health Care Services (CCHCS) 2021 "Heat Plans and Updates" directive.  Review of daily

CDCR Forms 2030 logging of inside and outside temperatures at required intervals during the review period.

The heat plan was in effect for four months of the review period and at the time of the site visit. During the review period there were 71 Stage I heat alerts, 61 Stage II heat alerts, and six Stage III heat alerts. No patients suffered a heat-related illness due to these heat alerts.

Interviewed officers were knowledgeable about the heat plan and were aware of the patients in the units who were prescribed heat-sensitive medications.

All dormitories had two wall mounted thermometers to record the inside air temperature. CRC reported that all dormitory thermometers were checked for accuracy monthly; however, the monitor observed two broken thermometers during the visit. One of the broken thermometers was replaced by the end of the day.

Custody officers reported offering accommodations during heat alert yard cancellation; however, documentation of accommodations was not consistently available.

RVRs:

During the review period, CRC issued 1,499 RVRs; 656 or 44 percent were issued to MHSDS patients. Of those 656 RVRs, 99 percent were issued to 3CMS patients and three RVRs were issued to two EOP patients. No RVRs were issued for self-injurious and suicidal behaviors. There were no RVRs were issued in connection with a cell extraction for the administration of involuntary medication, involuntary medical treatment, or for the purposes of transfer to inpatient care. Further, no RVRs were issued for behavior in connection with placement in mental health restraints or seclusion.

For a reviewed sample of RVRs, none of the mental health assessments were requested timely by custody staff. Mental health staff timely completed and returned the reviewed sample.

Senior hearing officers documented consideration of the mental health assessment and whether there was any mitigation based upon the assessment. All reviewed assessments documented in-person patient interviews in confidential settings, and the limits of confidentiality were relayed to the patients. Clinicians documented a review of the patients' health care records, Electronic Records Management System (ERMS), Strategic Offender Management System (SOMS), adaptive support forms, and consultation with the patient's primary clinician.

Use of Force:

There were no controlled use of force incidents for any incarcerated person at CRC during the review period. There were 50 immediate use of force incidents involving MHSDS patients and 43 involving non-MHSDS incarcerated persons during that period. There were 59 non-use of force incidents, of which 28 involved MHSDS patients and 31 involved non-MHSDS incarcerated persons. The monitor's review of five immediate use of force incidents involving 3CMS patients indicated compliance with CDCR use of force policy.

Lockdowns/Modified Programs:

CRC was on modified programming throughout the review period and at the time of the site visit due to COVID-19 restrictions. A daily "Covid and Influenza Dorm Restriction" matrix was disseminated to all healthcare and custody staff detailing units on total movement restriction, escorted cohort movement, isolation or quarantine. The matrix was updated throughout the day as needed.

On August 19, 2021, CRC experienced a limited outbreak of COVID-19 involving 16 patients who tested positive. One hundred percent of the institution was tested; during the testing period, mental health groups were discontinued, and routine contacts were postponed on all yards.

<u>Access to Care Reports</u>:

A review of CRC's monthly Health Care Access Quality Reports for the five months of March 2021 through July 2021 revealed that 88 percent of mental health ducats and add-on appointments were completed, while 12 percent were not completed. Of the non-completed appointments, zero percent were not completed due to custody factors, while 100 percent were not completed for non-custodial reasons.

<u>*Coleman* Postings</u>:

*Coleman* postings in English and Spanish were displayed in areas accessible by patients in all toured housings units.

**APPENDIX B-2**
**CALIFORNIA STATE PRISON/SOLANO (CSP/Solano)**
**(October 25, 2021 – October 28, 2021)**
**Review Period: (April 1, 2021 – September 30, 2021)**

Census:

On October 25, 2021, CSP/Solano's total population was 3,307, which was a 27 percent decrease since the preceding site visit. The mental health caseload population of 599 patients had decreased by 19 percent since the prior reporting period and represented 18 percent of CSP/Solano's population.

The MHCB housed four patients.

There were 589 mainline 3CMS patients, and six 3CMS patients in administrative segregation. The administrative segregation unit also housed 63 non-MHSDS incarcerated persons.

Staffing:

CSP/Solano had few actual staff vacancies. However, the institution's staffing was negatively impacted during the review period and at the time of the site visit by the extended Family Medical Leave Act (FMLA) leaves of numerous civil service mental health staff.

The chief psychiatrist's position was filled. The 4.25 psychiatry positions were filled by four full-time civil service psychiatrists and a 0.25 dual appointment, whose CSP/Solano assignment was primarily used for on-call and weekend coverage. However, one psychiatrist had an FMLA leave from late June through early August 2021, while another had FMLA leaves during parts of four months of the review period. As a result, the institution had a registry psychiatrist from January through August 2021.

One of two chief psychologist positions was filled; the institution was not permitted to fill the vacant position as a savings action. As the chief psychologist was on an FMLA leave from

113

October 2021 through January 2022, the senior psychologist supervisor acted out of class as the chief psychologist. This resulted in a vacancy for the senior psychologist supervisor position. Both positions for senior psychologist specialists were filled, as were all eight civil service psychologists' positions. However, one psychologist was on an FMLA leave from August through early November 2021. One psychologist was unlicensed.

A 1.0 limited-term supervising social worker filled the 0.5 supervising social worker position due to an FMLA leave from late June through October 2021. At the time of the site visit, all five social worker positions were filled; however, for most of the review period, two of the five social worker positions were vacant. Yet another social worker was on an FMLA leave from July 2021 through January 2022. One social worker was unlicensed.

Both positions for recreation therapists were filled.

As for nursing, the one allocated SRN III position was vacant. Of 11.2 SRN II positions, 10.2 were filled, as were 46.15 of 51.95 registered nurse positions. Of 11.4 positions for medical assistants, 7.4 were filled. For licensed vocational nurses (LVNs), 49.41 of 50.41 positions were filled. The one senior psych tech position was filled, as were all 7.08 psych tech positions.

All five mental health clerical positions were filled.

A 1.0 limited-term Office Services Supervisor (OSS) II filled the 0.5 OSS II position. The Health Program Specialist I position was filled.

Telepsychiatry:

CSP/Solano did not use telepsychiatry during the review period.

Crisis Care:

CSP/Solano did not have a CIT. The institution reported previously covering crisis care through a rotating daily schedule that utilized PCs. However, based on reduced staffing in recent

114

years, CSP/Solano determined that it was no longer feasible to daily assign PCs to handle crisis

care. The institution now relied on supervisors to assess workloads and assign clinicians for this

coverage. Crisis care in administrative segregation was covered by that unit's clinicians. In the

MHCB crises during regular work hours were also covered by clinicians, including psychiatrists,

who were assigned to the unit. After-hours crisis care was provided by the on-call psychiatrist,

who could include the 0.25 dual appointment psychiatrist assigned to CSP/Solano.

Quality Management:

CSP/Solano had a quality management system in place to address issues related to mental

health treatment. However, it did not examine several persistent areas of concern, including the

lack of confidential treatment space in administration segregation and the MHCB, and MHCB

patients' limited access to recreation therapy and yard.

During the reporting period, there were no sustainable process reviews.

The local governing body did not meet during the review period.

The quality management committee met monthly, except during May, due to a COVID-

19 outbreak. Reviewed meeting minutes revealed that the mental health subcommittee did not

report or elevate issues to the QMC.

The mental health subcommittee primarily addressed issues related to mental health care.

Reviewed meeting minutes from April through August 2021 revealed that the subcommittee

achieved a quorum for all five months. September's meeting minutes were pending finalization

at the time of the site visit. The subcommittee addressed staffing, suicide risk evaluations,

treatment hours, and timely psychiatry and PC contacts, with associated CAPs. The focus on

these addressed areas was driven by the need to maintain core functions during a time of

significant COVID-19 related disruption, which resulted from programming restrictions and significant staff absences.

The institution did not utilize QITs or FITs during the review period.

Institutional peer review was on hold for the review period.

Medication Management:

CSP/Solano's psychiatry MAPIP measures evaluated monthly compliance for labs, EKGs, and other matters related to laboratory studies for patients on antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressant medications.  Review of CSP/Solano's MAPIP trend analysis for the review period revealed that several areas were below 90 percent, including antipsychotics CBC with platelets at 86 percent, and CMP and lipid monitoring, which were both at 85 percent.  For Depakote, CBC with platelets was at 88 percent and CMP was at 83 percent.

There were neither CAPs nor performance improvement work plans at CSP/Solano for mental health medication management during the review period.

CSP/Solano was not a designated Clozaril institution.

Three patients were referred for involuntary medication orders pursuant to PC 2602. There were no involuntary medication order renewals or expirations, and no petitions were denied or withdrawn.

Nursing conducted monthly pill line observation audits.  No problems were identified.

CSP/Solano pharmacy data reported that 102 patients were prescribed HS medications, which were administered after 8:00 p.m.

Transfers:

CSP/Solano did not have an inpatient coordinator position. Instead, the acting chief of mental health managed all higher level of care transfers.

During the review period, there were 43 cases involving 35 patients where criteria for higher level of care consideration were met. Four of these patients were referred to acute care. There were no referrals to intermediate care.

All four acute care referrals were made from the MHCB. None of the referred patients transferred within ten days. One acute care referral was rescinded after the MHCB housed the patient for 13 days. The remaining three acute care referrals took 13, 31, and 37 days to transfer. The sole reason provided for these delays was a backlog attributed to COVID-19.

All patients referred to acute care had complex medical needs.

During the review period, there were 45 admissions to CSP/Solano's MHCB, including admissions from other institutions; these admissions were approximately 50 percent less than during the prior monitoring round. Of these 45 admissions, 16 were from CSP/Solano; the institution also referred two patients to MHCBs at other institutions. All 18 patients that CSP/Solano referred to MHCBs were timely admitted within 24 hours of referral.

MHCB stays at CSP/Solano averaged 11 days and ranged from one to 59 days. Twelve patients, or 27 percent, had clinical stays exceeding ten days. Seven patients, or 16 percent, remained in the MHCB for more than 72 hours after clinical discharge; of these, three patients awaiting transfers to acute care had stays of between 28 and 41 days beyond their clinical discharge date.

One patient had three MHCB admissions during the review period.

117

During the site visit, the MHCB housed four patients, with stays ranging from five to 11 days.  Two of these patients had been waiting for one and two days, respectively, beyond their clinical discharges.

During the review period, all alternative housing placements were for less than 24 hours.  No patients transferred to the PSU during the reporting period.

Four of eight EOP patients housed in administrative segregation timely transferred to EOP hubs within 30 days.  The remaining four patients transferred to mainline EOP programs; one of these transfers exceeded 30 days due to quarantine issues.

All eight patients that CSP/Solano transferred to LTRH timely transferred to the CSP/Corcoran LTRH within 30 days.

CSP/Solano transferred 29 patients to STRH during the review period.  CSP/Solano provided data on STRH transfers manually at the end of the visit; therefore, a sample of the data was analyzed.  A reviewed sample of ten STRH transfers indicated that 50 percent took more than 30 days to transfer.  STRH transfers averaged 58 days, and ranged from 20 to 138 days.  Reasons for delays included patients' refusal of COVID-19 testing, which triggered 21-day quarantines, CSP/Solano being closed to intake and transfers for a three-week period, and patients being out to court or close to parole.

During the site visit, three patients were awaiting transfer to STRH.  All were within transfer timeframes.

CSP/Solano transferred seven EOP patients who were not housed in administrative segregation to mainline EOPs during the review period.  Six of seven transferred timely.  The one delay was attributed to COVID-19 movement restrictions.  No patients were pending transfer to an EOP program at the time of the site visit.

Programming:

MHSDS Patients in Administrative Segregation:

The mental health population housed in CSP/Solano's administrative segregation unit was limited. During the review period, it housed eight EOP patients. At the time of the site visit, the administrative segregation population of 69 included six 3CMS patients. Of these, four were pending transfer to STRH and two were pending transfer to another 3CMS program.

Reported data stated that administrative segregation patients had 428 primary clinician contacts during the reporting period. Of these, approximately one third were conducted at cell front, while two thirds occurred using therapeutic treatment modules.

The monitor attended Institutional Classification Committees (ICCs) for nine patients in restricted housing. All committee members were present and participated. The mental health clinician asked individualized, non-scripted questions and referred one patient for a mental health consultation. At the end of the ICCs, the warden specifically asked about follow-up on the mental health referral.

An observed IDTT was attended by required disciplines and the case presentation was adequate. However, the correctional counselor did not have access to a computer and could not access SOMS information relevant to the treatment team's concern about the patient's non-disciplinary segregation status. This was reported to be an ongoing problem.

Interviewed 3CMS patients housed in administrative segregation did not report significant complaints and stated that they received regular psychiatry and PC contacts.

Administrative segregation patients were not offered groups. As in prior rounds, the lack of confidential space for treatment activities and ICCs adversely affected patient care in administrative segregation.

The administrative segregation unit contained semi-private areas to conduct unclothed body searches, namely, the shower stalls and patients' cells.

Review of the 114-A logs of six patients housed in administrative segregation revealed that all were typically offered between three and four weekly showers, and yard in sessions of 3.5 hours, three to four times weekly.

Non-Disciplinary Segregation:

No mental health caseload patients were on NDS during the site visit.  The institution was unable to report MHSDS patients who were designated as NDS during the review period.

MHCB:

CSP/Solano had nine designated MHCBs within their 15-bed Correctional Treatment Center (CTC).

Clinical staff assigned to the MHCB included 2.5 primary clinicians, one recreation therapist, and one weekly rotating psychiatrist from the 3CMS program.  A dual appointment psychiatrist also intermittently provided MHCB and on-call coverage.  During weekly MHCB rotations, psychiatrists were responsible for covering on-call shifts in addition to managing their assigned 3CMS caseloads.

A random sample of ten reviewed MHCB patients were selected to assess compliance with Program Guide requirements.

All ten patients required initial psychiatric evaluations.  Nine of ten, or 90 percent of initial psychiatric evaluations occurred within 24 hours of admission as required.  All ten patients also required initial PC evaluations.  One hundred percent of initial PC evaluations occurred within 24 hours of admission as required.

Of the 33 required twice weekly psychiatry contacts for the reviewed patients, 28 or 85 percent occurred as required. Twenty of 28, or 71 percent of reviewed psychiatry contacts were conducted in confidential settings. Reasons for non-confidential contacts included patient refusals and custody modified programming. Of the 21 patient weeks requiring psychiatry contacts, 16 or 76 percent included all required psychiatry contacts.

There were 76 required daily psychology clinical contacts in the MHCB for the patients reviewed. Seventy-one of 76, or 93 percent of daily contacts occurred as required. Of the 71 reviewed daily contacts, 56 or 79 percent were conducted confidentially. Reasons for non-confidential contacts included patient refusals and custody modified programming.

All ten patients required initial IDTTs during the review period, of which 100 percent occurred within 72 hours of admission as required. Required staff attended nine of ten initial IDTTs.

The ten patients required a total of 13 ongoing IDTTs during the review period, of which 100 percent occurred at least weekly as required. Required staff attended 12 of 13 or 92 percent of ongoing IDTTs. In one case, there was no documentation of staff members attendance in the IDTT documentation. All discharge IDTTs for patients reviewed were conducted within 24 hours of discharge as required.

The monitor's expert had serious concerns with psychiatric continuity of care in the MHCB, which nursing leadership and staff from various healthcare disciplines confirmed. Instead of assigning one psychiatrist to the unit, outpatient psychiatrists provided rotating MHCB coverage and covered on-call shifts for one week at a time, in addition to attending to their assigned 3CMS caseloads.

MHCB staff reported that the rotating psychiatrists were typically absent when important patient information was exchanged during the 3:00 p.m. daily afternoon huddles, as the providers left the unit at approximately 2:00 p.m. to attend to their outpatient caseloads and clinical documentation.  MHCB staff also expressed frustration at having to call around the institution to request an available psychiatrist to respond to patient care issues after 2:00 p.m.

While CSP/Solano's psychiatry leadership denied problems with psychiatric continuity of care, other healthcare staff were vocal regarding their experiences and concerns.  One psychiatrist identified the lack of continuity as a set up for a bad outcome.  Nursing reported that the rotation of psychiatry in the MHCB negatively impacted communication and care coordination; patients who were retained in the MHCB for more than one week had up to three different psychiatric providers.  MHCB primary clinicians similarly reported disruptions in care and communication breakdowns due to inconsistent psychiatry coverage.

Despite concerns reported during preceding monitoring rounds, CSP/Solano's MHCB still lacked confidential treatment space and adequate yard conditions.  Due to space limitations, individual assessments and treatment contacts were non-confidential in the MHCB throughout the review period.  This practice raised serious concerns about the quality of MHCB clinical encounters, as patients were not afforded a private setting to disclose sensitive personal information.  This lack of adequate space also resulted in the MHCB not offering group treatment.

Notably, the MHCB's one available mental health office was a multipurpose room that was used for clinical contacts, assessments, IDTTs, and staff workspace.  This resulted in the mental health office often having clerical staff, recreation therapists, psychiatry, and various primary clinicians present during clinical encounters.  This lack of confidentiality and regular

disruptions resulting from foot traffic, telephone calls, typing, and daily administrative tasks negatively impacted the quality of MHCB services.

Four observed MHCB IDTTs revealed all required treatment team members in attendance. It was observed that nursing staff typically stepped out of the room after presenting each patient's information. Counselors consistently arrived ten to 30 minutes late for IDTTs, despite being scheduled at the same time daily. MHCB staff reported daily calling around the institution to find an available counselor, despite recently having changed the IDTT start time to accommodate counselors' schedules. Although the IDTT space was inadequate, there were computers for all members to access patient information. Observation of numerous disruptions during IDTTs included counselors and nurses arriving late or leaving early, staff responding to phone calls, and treatment team members whispering to one another.

The quality of observed IDTTs ranged from highly inadequate to adequate, with significant variability even among the same treatment team. Property, allowable items, safety observation, and mechanical restraints were consistently reviewed and updated. Primary clinicians appropriately presented historical information, reasons for admission, measurable treatment objectives, safety plans, and treatment progress and barriers. Psychiatrists reviewed medication prescriptions, indications, and side effects. However, IDTTs failed to review medication compliance and positive higher level of care referral indicators. The monitor's expert found that treatment teams allowed one member to make treatment planning decisions, instead of engaging in a collaborative discussion. Even when disagreements were apparent, the team deferred to one treatment team member without resolution.

Recreation therapists did not provide meaningful input during IDTTs. Rather, their contributions were limited to informing patients that they would follow-up after the IDTT. One

of two observed counselors provided useful information for the treatment team and patient; however, another counselor arrived late and offered no information. During one IDTT, half of the treatment team members sat with their backs to the presenting clinician while typing on their computers and whispering to one another.

Review of the 114-A logs for the four patients housed in the MHCB during the reporting period indicated compliance for completion of the required 128B chrono reflecting review of cuffing status during initial IDTTs. Three of the four patients required mechanical restraints; two were from administrative segregation, and mental health staff recommended mechanical restraints for one of the other two patients.

The monitor's expert observed morning and afternoon MHCB huddles. Overall, the huddles were well-organized, collaborative, and useful for exchanging patient information. However, given the psychiatry continuity concerns, rotating psychiatrists should be required to attend the afternoon huddles.

Notably, one observed MHCB huddle revealed that a patient's medication had not been ordered according to the treatment team's plan. Staff attending the huddle suggested that the preceding week's psychiatrist had failed to follow through with the order or share the plan with the current week's covering psychiatrist.

Staff described the MHCB yard space as loud, dirty, and inadequate for recreation therapy. The recreation therapist explained that noise from a generator on the yard made it difficult to hear patients, while built-up bird excrement resulted in poor conditions and an "unbearable smell" during warmer temperatures. Staff stated that they had been reporting concerns about MHCB yard conditions for several years and felt that their concerns went "unheard."

The monitor's expert audited ten randomly selected healthcare records of patients who were not referred to a higher level of care despite positive referral indicators during MHCB stays. The results highlighted problems with accurate documentation of positive higher level of care referral indicators and sufficient higher level of care non-referral rationales. When higher level of care referral considerations were documented, intermediate care programs were not considered; non-referral rationales were generally limited to the patient being a new arrival and/or retaining the patient in the MHCB for further treatment and medication management. In one case, MHCB discharge documentation recommended that the receiving outpatient treatment team refer the patient to intermediate care, instead of generating the referral as soon as it was clinically indicated to ensure timely transfer to an appropriate level of care.

During a meeting with mental health leadership and one of the MHCB treatment teams, the monitor's expert asked whether a referral to acute or intermediate care had been considered for a patient decompensating in the unit after ten days. Leadership responded that the patient had not been referred "because he won't go!" The monitor's expert reminded CSP/Solano staff that higher level of care referrals should be based on clinical indications and that concerns regarding institutional transfers should be addressed separately with regional and/or headquarters' administrators.

A review of current chronos and logs indicated that CSP/Solano adhered to the MHCB mechanical restraint policy and that treatment teams appropriately documented recommendations concerning mechanical restraints during mental health appointments and escorts. Mechanical restraints status was also reviewed during each observed IDTT; in each case, the institution was compliant with policy.

Reviewed 114-A logs for four patients who were housed in the MHCB during the site visit found that two were offered at least four showers during the prior week. Two other patients who had been housed in the MHCB had also each been offered showers. The reviewed 114-As further indicated the offering of yard to patients. However, as noted above, the condition of the MHCB yard was inadequate.

Seclusion and Restraint:

CSP/Solano had no seclusion or restraint episodes during the review period.

Alternative Housing:

During the reporting period, no patients were placed in alternative housing for more than 24 hours. Patients awaiting available MHCBs were routinely placed in designated alternative housing cells in the administrative segregation unit, despite known risks associated with the segregation environment. Administration segregation cells 123 - 128 were retrofitted to house alternative housing patients. The retrofitted cells had double-paned doors, modified ceiling vents, concrete lower bunks, and a window, but did not have desks. No patients were in alternative housing during the site visit.

CSP/Solano's LOP provided that in the event administrative segregation cells 123 - 128 were occupied, non-retrofitted administrative segregation cells would be used for alternative housing. Considering that the availability of retrofitted cells was CSP/Solano's primary reason for using administrative segregation for alternative housing, it was unclear why the institution's LOP would allow the use of non-retrofitted administrative segregation cells for MHCB-referred patients who were generally at a higher risk for self-harm and suicide.

The administrative segregation unit lacked confidential interview space to meet with alternative housing patients; these patients were typically interviewed in therapeutic treatment modules (TTMs) located on the dayroom floor.

3CMS:

Four 3CMS psychiatrists had caseloads of between 88 and 183 patients, which were all within the established psychiatry staffing ratio of 1:280. With one exception, all PCs also had caseloads within the established PC ratio of 1:97.

During the review period, CSP/Solano's 3CMS mental health services were truncated as a result of public health restrictions necessitated by COVID-19 and low clinical staffing due to extended FMLA leaves. As in previous rounds, treatment space for mainline 3CMS patients was generally adequate. Groups were not provided for 3CMS patients.

Interviewed 3CMS patients reported regularly seeing psychiatrists and PCs at least in accordance with minimal frequency requirements. Staff indicated scheduling 3CMS patients for clinically appropriate frequency of contacts, rather than only for the required minimum contacts. Nonetheless, staff interviews and IDTT observation revealed that continuity of psychiatric care was at times inadequate, especially related to the rotation of 3CMS psychiatrists providing services to the MHCB.

Observed IDTTs for 3CMS mainline patients were typically conducted adequately. All required disciplines attended either personally or by way of telephone. Case presentations were variable but at least minimally adequate. The IDTTs generally demonstrated reasonable interactions among treatment team members and discussions of higher level of care considerations.

127

Although PCs in attendance at IDTTs were typically knowledgeable about their patients, this was variable for psychiatry. The psychiatrist was the treating psychiatrist for one observed IDTT; however, for another the chief psychiatrist filled in by way of telephone for the treating psychiatrist, who had been diverted to cover the MHCB.

The IDTTs also demonstrated variability as to treatment team members in person attendance. One team had the correctional counselor call in on the telephone, noting that this was done for public health reasons by limiting in-person participation to the PC and psychiatrist. On a C yard IDTT, it was the psychiatrist who telephoned in. However, this resulted from a last-minute need following redirection of the treating psychiatrist to cover another area. The result was a disjointed and ineffectual IDTT despite the psychiatrist's efforts to actively participate.

All observed treatment teams reviewed the criteria for MHSDS discharge at the end of the IDTTs. They did not report being pressured to justify the patients' continued treatment.

CSP/Solano mental health leadership confirmed that pre-COVID-19 there was a utilization review process consisting of biannual assessments of treatment needs for all 3CMS patients, which had included review of patients' continued suitability for MHSDS participation. Due to COVID-19, this utilization review process was no longer in place.

Twenty patients were randomly selected to have their healthcare records reviewed concerning their 3CMS stays. Four of five patients who required an initial psychiatric evaluation had one prior to the initial IDTT. The remaining patient's record of an initial psychiatric assessment was not located in EHRS; however, the patient had an initial IDTT within 14 days of admission.

There were 15 expected timeframes for routine psychiatry contacts. All 15 occurred within 90 days. Notably, many patients were seen more frequently than what the Program Guide required.

Four of five patients who required initial primary clinician evaluations had them within ten working days of arrival. All 52 expected timeframes for routine PC contacts occurred within 90 days. Similar to routine psychiatry contacts, patients were often seen more frequently than Program Guide requirements for routine PC contacts. It was unclear whether most contacts were held in a confidential setting; however, some records stated that the contacts were not confidential due to COVID-19 restrictions.

Four of five patients had required initial IDTTs. Six of eight patients who required routine IDTTs had them at least annually. Required staff attended all initial and routine IDTTs.

<u>Other Issues</u>: `

<u>Pre-Release Planning</u>:

Pre-release planning was hindered by the pre-release coordinator's absence for an extended leave. As such, pre-release planning efforts were left to individual clinicians. Discussions with leadership revealed that clinicians' attention to this issue varied. Moreover, the institution did not offer pre-release groups. According to leadership, ten to 15 patients were discharged monthly.

During the reporting period, CSP/Solano reported conducting 49 pre-release planning appointments for 48 patients. Thirty-two or 65 percent of appointments were completed by psychologists; social workers completed 17 or 35 percent.

All released patients had a pre-parole planning assessment completed, with all but four conducted within the required 30 to 45-day timeframe. No cases were identified as requiring clinician-to-clinician contact.

The institution reported that the final disposition of California identification card status was not fully known. Review of available databases showed that 38 percent of pre-release patients had obtained a card with the remaining either ineligible, refusing, or the status was unknown.

Coordination between mental health and TCMP as to the status of applications for post-release benefits was minimal.

Program Access:

a.      Job and Program Assignments:

On October 1, 2021, CSP/Solano reported that of 1,465 job assignments, 239 3CMS patients or 39 percent of the 3CMS population held them, as did 1,226 or 46 percent of non-caseload incarcerated persons.

For the 1,218 academic assignments, 211 or 35 percent of the 3CMS population held these assignments, as did 1,007 or 38 percent of the non-MHSDS population.

Of the 154 available vocational education assignments, 22 or four percent of 3CMS patients held them, as did 132 or five percent of non-caseload incarcerated persons.

There were no voluntary education assignments held by 3CMS patients or non-MHSDS incarcerated persons.

The 241 available substance abuse treatment assignments were held by 60 3CMS patients or ten percent of the 3CMS population, and by 181 or seven percent of non-MHSDS incarcerated persons.

b.      Milestone Credits:

130

On October 1, 2021, CSP/Solano reported that 547 or 90 percent of 606 3CMS patients were eligible to earn milestone credits, with 15 percent earning the credit. Of the 2,677 non-MHSDS incarcerated persons, 2,329 or 87 percent were eligible to earn milestone credits; 21 percent earned them.

        c.     <u>Out-of-Level Housing</u>:

As of September 30, 2021, there were 17 3CMS custody Level I patients in Level II housing, 52 3CMS custody Level II patients in Level III housing, nine 3CMS custody Level III patients in Level II housing, and 54 3CMS custody Level IV patients in Level III housing.

<u>Case-by-Case Reviews</u>:

During the reporting period, three MHSDS patients met the requirements for long-term segregated case reviews. Reviewed case notes reflected required staff's attendance at the reviews. Case notes further indicated that all three patients transferred from CSP/Solano after these reviews; one patient transferred to the PBSP STRH, another to the CSP/Corcoran LTRH, and another to the California Men's Colony (CMC).

<u>"C" Status</u>:

During the site visit, the institution reported that 23 incarcerated persons were on "C" Status, including six 3CMS patients. Review of their Unit Classification Committee (UCC) chronos as to the rationales for their "C" Status placement found that all six 3CMS patients had two or more serious RVRs during a 180-day period. Specifically, two patients had three serious RVRs and four had two serious RVRs. The UCC determined that all six patients were program failures. Two patients were placed on "C" Status for 152 days; the four remaining patients were placed on "C" Status for 60, 122, 137 and 180 days, respectively.

<u>Mental Health Referrals</u>:

131

CSP/Solano reported a total of 737 mental health referrals during the review period, of which 221 were to psychiatrists and 516 were to primary clinicians.  Of the 221 mental health referrals to psychiatry, there were timely responses to 23 of 24 or 96 percent of the emergent referrals, all four of the urgent referrals, and 191 of 193 or 99 percent of the routine referrals.

Of the 516 mental health referrals to primary clinicians, there were timely responses to 45 of 46 or 98 percent of the emergent referrals, 55 of 57 or 97 percent of the urgent referrals, and 400 of 413 or 97 percent of the routine referrals.

Treatment Space:

Overall, the lack of adequate treatment space at CSP/Solano represented a severe limitation in the provision of services for the institution's MHSDS population.  Notably, this insufficient treatment space had also been highlighted during prior site visits.

CSP/Solano reported not having a designated group treatment room on Facilities A and B.  In administrative segregation, there was a lack of confidential individual and group treatment space.

The MHCB also lacked confidential treatment space, and adequate yard conditions.  Due to space limitations, individual assessments and treatment contacts were completely non-confidential.  It also resulted in the MHCB not being able to offer groups.  In alternative housing, there also was a lack of confidential space to meet with patients.

Treatment space for mainline 3CMS patients was generally adequate.

Custody and Mental Health Partnership Plan:

CSP/Solano's CMHPP LOP was dated February 2021 and was aligned with headquarters' Partnership Plan.  However, the LOP referenced EOP orientation groups, but the institution did not have an EOP program.  Overall, document review, leadership interviews, and

132

observation of some CMHPP activities during the site visit revealed that the institution was implementing the partnership plan; however, there was a critical need for improved documentation of this implementation.

Executive leadership joint rounding occurred during all six months of the review period. Reviewed rounding minutes indicated participation by required executive mental health and custody staff; they reported that rounding occurred twice in administrative segregation, once in the MHCB, and three times in the housing units/clinics.

Reviewed executive joint rounding minutes reflected executive staff's discussions with mental health and custody staff, but did not indicate any discussions with patients, in violation of the LOP.  The rounding minutes typically reported good working relationships between mental health and custody, and reflected staff's belief that there were no barriers to patients' access to care.  They also identified patients about whom staff had concerns.  Notably, the minutes further reported staff concerns that MHCB psychiatrists were spread too thin, and that MHCB treatment space was inadequate.  Interviewed administrative segregation staff spoke highly of the unit.

Curiously, the answers to 20 questions from the executive joint rounding conducted in the mental health clinic in April and in administrative segregation in May contained identical responses from identical interviewees, which was very troubling.

In violation of the LOP, the warden's executive staff meeting minutes' agendas did not address executive leadership joint rounding.

An observed MHCB huddle revealed attendance by a psychologist, three nurses, and two custody officers and discussions about new MHCB admissions, including a patient with grave disability; it also addressed other patients' mental health conditions.  Reviewed huddle reports from the review period included pre-printed questions that addressed a plethora of issues related

to patient behavior and care; however, the huddle reports only identified staff in attendance at the huddles and new MHCB admissions, but did not otherwise answer the huddle forms' numerous questions.

During the site visit, the monitor attended a weekly 3CMS supervisory meeting that the chief psychologist and one sergeant from each of the four facilities attended. This meeting adequately addressed substantive matters concerning 3CMS patient care. However, other than identifying new patients to the 3CMS program, reviewed weekly 3CMS supervisory meeting reports contained minimal information about patient care.

In accordance with the LOP, the institution conducted monthly joint supervisory 3CMS tours in which required staff participated. Reviewed documentation of these tours reported staff concerns about some patients and that COVID-19 and related restrictions had been very stressful for patients. The documentation also noted discussions with mental health and custody staff on all six tours, but only reported discussions with patients on three of the six tours. Notably, the tour of administrative segregation reported strained working relationships between the mental health administrative segregation supervisor and the second watch sergeant due to differences in beliefs about patient advocacy.

Patients interviewed during the joint supervisory 3CMS tours spoke positively about the mental health program, reported receiving good clinical treatment, and stated that they typically had no problems with mental health or custody staff. However, one interviewed patient noted COVID-19-related problems related to receiving ducats and getting to appointments. Reviewed reports of the joint supervisory 3CMS tours conducted during the review period also reflected minimal information concerning the tours.

Quality management committee meeting minutes for the five monthly meetings during the review period whose minutes had been approved indicated only one reference to the CMHPP, and no substantive information.  However, mental health subcommittee meeting minutes for five monthly meetings contained many partnership plan references.  Among them, they reported implementation of the CMHPP and that the collaboration process was going well.

Provided data on the quarterly partnership round table training for second and third watch reported presentation of lesson seven in April 2021 and lesson eight in July 2021; each training was given once each during second and third watch, and was required to be attended by staff who worked in the MHCB.  Sign-in sheets for both trainings reported attendance by three psychologists and one recreation therapist assigned to the MHCB; three custody officers attended the April 2021 training, but only one custody officer attended the July 2021 training.

CSP/Solano produced a copy of the 3CMS orientation brochure, in English and Spanish, and reported that it was provided to 3CMS patients upon admission.

The institution provided meeting minutes for 11 IAC meetings that occurred during the review period.  On average, nine patients attended each meeting.  Reviewed meeting minutes revealed that they were typically attended by custody leadership, and occasionally by the Chief Medical Executive (CME), CNE, and/or chief of mental health.  Notably, mental health reported not being informed about the scheduling of some of these meetings, which resulted in low mental health attendance at them.

Reviewed IAC meeting minutes demonstrated that the meetings addressed various matters related to patient care and often addressed COVID-19-related issues, including testing, vaccinations, mask wearing, deprivation/restoration of yard and dayroom, and visitation restrictions due to COVID-19, among other matters.

Patients filed 137 staff misconduct allegations, of which 106 were disapproved.  Of the remainder, six were approved, two were under investigation, 18 were pending review, and five were pending OIA referral.  No CSP/Solano staff were directed to move to another post due to a patient complaint.

CSP/Solano reported that 399 of 718 or 56 percent of custody officers attended the annual off-post partnership training entitled "Training Partnership in the Correctional Environment."  For non-custody staff, 288 of 467 or 62 percent of required staff attended this training.

Heat Plan:

CSP/Solano's LOP heat plan was entitled "Extreme Weather Plan" and was dated May 2021.  Review of the LOP indicated compliance with the CCHCS 2021 "Heat Plans and Update" directive.  During the review period, there were 75 Stage I heat alerts, 45 Stage II heat alerts, and three Stage III heat alerts.  There was one heat-related patient illness.

The monitor visited ten housing units and interviewed custody officers about the heat plan.  The officers were typically knowledgeable about the heat plan and the potential for patient heat-related illnesses.  Custody officers were aware of patients who were prescribed heat-sensitive medications, whose identities were reported on a list that was produced weekly, and could also be accessed online.

Each housing unit contained two working thermometers.  The MHCB was air conditioned and had a backup generator, which was tested monthly.

Of 704 custody staff, 674 or 96 percent completed the heat-related pathologies on the job training.  It was also attended by 24 of 33 or 73 percent of mental health staff.

RVRs:

Seventy percent of custody staff who were required to receive inmate disciplinary mental health assessment training received the training; however, no mental health staff received it.

During the review period, CSP/Solano issued 1,308 RVRs. The institution further reported that 338 or 26 percent were issued to MHSDS patients; 333 RVRs were reportedly issued to 3CMS patients, two were issued to MHCB patients, two to acute care patients, and one to an EOP patient. However, the monitor's RVR analysis actually revealed that one of the MHCB patients who received an RVR was a general population (GP) incarcerated person at the time of the offense, the two acute care patients were actually 3CMS patients at the time of the RVRs, the EOP patient was a 3CMS patient, and one 3CMS patient was a GP incarcerated person at the time of the offense. As such, of the 1,308 issued RVRs, 336 were issued to MHSDS patients, with 335 issued to 3CMS patients and one issued to an MHCB patient.

No RVRs were issued for self-injurious or suicidal behaviors or in connection with a cell extraction to administer involuntary medication or medical treatment, or for behavior that occurred due to a cell extraction to transfer the patient to inpatient care. Further, no RVRs were issued for behavior related to patients being placed in restraint or seclusion.

The monitor analyzed 14 RVRs where clinicians completed mental health assessments to assess compliance with applicable CDCR policy. The analysis showed that custody timely referred 12 of 14 or 86 percent to mental health within two calendar days for completion of an assessment; in 13 of 14 or 93 percent of cases, mental health staff timely completed the assessment within eight calendar days and returned it to custody. All clinicians used laymen's terms in completing the assessments. All senior hearing officers documented consideration of the mental health assessment and whether there was penalty mitigation based upon it.

In two cases, clinicians found that the patient's mental illness contributed to the offense and recommended mitigation and factors to consider during penalty assessment. In one of these cases, the senior hearing officer documented mitigation based on the clinician's recommendation. In the other, however, although the senior hearing officer (SHO) noted that the clinician determined that mental health factors influenced the patient's behavior, the senior hearing officer believed that the patient's behavior resulted from ingesting a substance he should not have ingested. The SHO thus found that the patient was liable for the consequences of these actions and therefore, mitigation was inappropriate.

No cases recommended documenting the patient's behavior in an alternate manner. In one case, the clinician inappropriately referred to allowing access to clinical treatment as a factor that should not be limited; however, limiting treatment was never an option with penalty assessment.

All but two assessments documented confidential patient interviews. Notably, the limits of confidentiality were relayed to the patients. One patient refused the non-confidential assessment; the other patient's assessment was completed in a therapeutic treatment module on the dayroom floor of the administrative segregation unit.

The chief disciplinary officer ordered reissue/rehear for two RVRs. One was due to the staff assistant and investigative employee roles being assigned to the same officer. The second was because the senior hearing officer was the same person who originally conducted the administrative review of the administrative segregation placement order for the offense.

Use of Force:

CSP/Solano reported that 100 percent of custody staff and 95 percent of mental health staff completed use of force training.

138

There were no controlled use of force incidents at CSP/Solano during the reporting period.

Of 40 immediate use of force incidents, 14 involved a total of 22 MHSDS patients. Review of five randomly selected immediate use of force incidents involving 3CMS patients indicated compliance with applicable policy. There were also 108 non-use of force incidents, of which 19 involved MHSDS patients and 89 involved non-mental health patients.

<u>Lockdowns/Modified Programs</u>:

During the review period, all CSP/Solano yards and programs experienced restricted operations due to COVID-19. Specifically, the number of COVID-19 positive patients, and the number of patients assigned to quarantined housing due to potential exposures, led to significant restrictions in traditional mental health offerings. Moreover, during the review period, various yards moved between Phase 1 and Phase 3 as patients housed in certain buildings were exposed to COVID-19.

Under Phase I, clinicians typically saw 3CMS patients requiring routine care in their housing units; many were seen at cell front or in other non-confidential settings. Patients who required more critical services were escorted to clinics or the treatment and triage area (TTA) for confidential sessions.

When CSP/Solano operated under Phase 2, patients were sometimes interviewed in clinical settings, but were typically escorted to clinics or the TTA for emergent or urgent care. Under Phase 3, patients were allowed to move among one another and were permitted to simultaneously visit clinics providing they wore masks and maintained social distancing.

Beginning on October 5, 2021 and continuing during the site visit, CSP/Solano was placed on modified programming after receiving information of a credible threat to safety and

security.  This resulted in numerous restrictions, including the escort of all patient movement, suspension of dayroom, recreation, canteen, and phone programs, feeding occurring in the housing units, the allowance of priority ducats only (but the program status report (PSR) stated that this included mental health individual clinical contacts), the delivery of medications to the housing units, the suspension of general in-person and video visits, and incarcerated person employment being limited to certain critical workers.

As of October 19, 2021, some of these restrictions were lifted.  Among them, some housing units were given access to phone calls, dayroom, and yard.

Access to Care:

A review of CSP/Solano's monthly Health Care Access Quality Reports from April through September 2021 reflected the issuance of a total of 5,247 mental health ducats and add-on appointments.  Of these, 4,190 or 80 percent were completed and 1,057 or 20 percent were not completed.  Of the non-completed appointments, 62 or six percent were due to patient refusals, 993 or 94 percent were due to non-custody factors, and two or zero percent were due to custody factors.

Placement of 3CMS Patients into Minimum Support Facilities:

CSP/Solano did not track patient transfers to MSFs during the review period.

*Coleman* Postings:

*Coleman* posters were observed in all housing units in both English and Spanish.

**APPENDIX B-3**
**CALIFORNIA INSTITUTION FOR MEN (CIM)**
**(May 3, 2022 – May 5, 2022)**
**Review Period: (October 1, 2021 – March 31, 2022)**

Census:

On May 3, 2022, CIM's total incarcerated persons population was 2,636, which was a 28 percent decrease since the prior reporting period. The mental health caseload population of 1,098 patients had decreased by five percent since the previous review period and represented 42 percent of CIM's total incarcerated population.

The MHCB housed 27 patients.

Three EOP patients awaited transfer to a mainline program.

There were 1,039 mainline 3CMS patients.

The 78 incarcerated persons in administrative segregation included 29 3CMS patients.

Staffing:

The chief psychiatrist position was filled. One of two chief psychologist positions was filled. CIM was not permitted to fill the vacant position as a savings measure.

Both senior psychologist supervisor and senior psychologist specialist positions were filled.

Four of 8.5 staff psychiatry positions were filled, for a 53 percent vacancy rate. Registry filled two positions, and a dual appointment covered a 0.25 position, reducing the psychiatry functional vacancy rate to 26 percent.

The telepsychiatry position was filled, while another telepsychiatrist also provided services.

Twenty psychologists covered 17.5 positions, but one psychologist was on a long-term leave. All psychologists were licensed.

141

The supervising social worker position was filled.  Twelve social workers covered ten positions, but one social worker was on an extended leave.  All social workers were licensed.

Five of six recreation therapist positions were filled for a 17 percent vacancy rate.

There were four clinical psychology interns.

All 18 registered nurse positions were filled.  Both senior psych tech positions were also filled.  Thirty psych techs covered 29.7 positions.

The OSS II position was filled.  CIM had one Associate Governmental Program Analyst (AGPA) and one HPS II, but no established positions.  The CHCA position was vacant.

Telepsychiatry:

Two telepsychiatrists with responsibilities of initial and routine contacts and responding to mental health referrals carried caseloads of approximately 180 3CMS patients each, which were within the established ratio.  Telepsychiatry was not used in the MHCB.  The monitor's expert did not observe telepsychiatry's use at CIM.

Quality Management:

CIM continued to have a robust quality management program.  As CIM's MHCB was unlicensed, the institution did not have a local governing body.

The quality management committee met during five months of the review period; a COVID-19 outbreak led to one meeting's cancellation.  All meetings attained quorums.  Mental-health related topics that the QMC routinely addressed included MHCB referrals, administrative segregation prescreens, mental health contacts, non-formulary prescriptions, quality improvement projects, and mental health subcommittee updates.

CIM conducted twice monthly mental health subcommittee meetings; the first focused on data review and the second undertook in-depth examinations of processes within the mental

health program.  Reviewed subcommittee meeting minutes addressed the frequency of clinical contacts, MAPIP, administrative segregation prescreens, and quality improvement.

A QIT evaluating the MHCB referral process created a new LOP.  Several open CAPs included some generated by the regional SPRFIT that addressed orders and justification for observation status in the MHCB and increasing SRASHE mentoring to at least 90 percent.

CIM also implemented a quality management project toward improving the entry of mental health referrals into EHRS.  Three other improvement projects reviewed continuity of care challenges with patient movement within CIM, improving compliance for daily provider contacts in the MHCB, and improving SRASHE quality.  All resulted in improvement.

Mental health leadership reported frequently asking staff to participate in quality management projects, to which an HPS II was exclusively dedicated.

A headquarters' directive had suspended outpatient peer review; only MHCB psychiatrists and psychologists underwent peer review.  Three reviewed psychiatrists all passed, and no systemic issues were identified.

The chief of mental health reported that mental health leadership and supervisors routinely disseminated quality management information to staff.

Medication Management:

CIM provided MAPIP results for October 1, 2021 through March 31, 2022 for compliance with psychiatric diagnostic monitoring and nursing measures.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated compliance for all six months of the review period for checking height and weight, blood pressure, thyroid tests, and AIMS monitoring.  CIM further reported compliance for five months for obtaining medication consents.  EKG monitoring was compliant for both required months.

For monitoring glucose (blood sugar), CBC with platelets, CMP, and lipid panels, CIM was noncompliant for all six months.

For monitoring antidepressants, CIM reported compliance for all six months for thyroid tests and venlafaxine blood pressure, and for five months for obtaining medication consents. CIM was not required to perform EKGs to monitor antidepressants during the reporting period.

For patients prescribed carbamazepine, CIM was compliant for checking CBC for both required months. There was compliance for monitoring CMP and for obtaining medication consents for the one required month. CIM was not required to monitor blood levels for carbamazepine.

Medication consent documentation for patients prescribed Depakote (divalproex, valproic acid) was compliant for five of six months. CIM was compliant for checking Depakote levels for two months, and for only one month for both CBC and CMP.

For lamotrigine, CIM reported compliance for obtaining medication consents for four of six months.

As for lithium, the institution reported compliance for all six months for medication consents, and for four months for checking kidney function tests (BUN/Cr). There was compliance for three months for monitoring lithium levels and thyroid tests. CIM was compliant with checking EKGs for three of four required months.

CIM was not an authorized clozapine initiation or maintenance facility, however, one patient who had been transferred from CHCF to undergo electroconvulsive therapy was prescribed clozapine during the reporting period.

For medication management metrics reported by mental health headquarters, CIM indicated compliance for all six months of the reporting period for continuity of medications

upon inter-institutional transfer at R&R, continuity of nurse-administered (NA) and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), continuity of medications with intra-institutional transfer to ASU/SHU/PSU, medication continuity for MHCB transfers, observation of medication preparation at HS, chronic care medications' historical administration, and outpatient provider new medication orders.

Further, there was compliance for five months for medication continuity following parole/transfer to the community. For continuity of medications from discharge/transfer from a community hospital and/or DSH, and observation of medication preparation AM and PM, CIM reported compliance for four months.

For both medication compliance with involuntary medications court orders and compliance with involuntary medication orders (PC 2602), CIM was compliant for all four required months.

CIM's examination of all nursing MAPIP measures that reported less than 90 percent compliance revealed that most were due to modified programming or patient refusal.

CIM did not permit KOP psychiatric medications. Notably, mental health leadership wanted nursing and custody staff to see patients more frequently so that they could monitor them for clinical concerns.

Psychiatrists prescribed medications for a maximum of 90 days. Bridge orders were allowed for up to 30 days. Nursing staff's responsibilities included the entry of telephone and verbal orders into EHRS, which psychiatry was required to sign within 24 hours.

Non-formulary medications, which comprised between three and four percent of all mental health prescriptions, did not require secondary review or approval.

CIM reported compliance for pill line lengths for five of six months; the institution paused pill line observations for one month due to COVID-19. CIM did not report difficulties having a place that was protected from the elements for patients waiting in a pill line.

CIM submitted 11 applications for PC 2602 involuntary medication orders; two were withdrawn. The nine remaining applications included eight initial and one renewal. All were granted. During the site visit, three CIM patients received PC 2602 medications.

CIM prescribed a total of 1,352 psychiatric medications, of which 328 were prescribed HS. CIM did not report the number of patients who were taking HS medications.

Transfers:

CIM's inpatient coordinator started in the position the week before the site visit; she had previously served as the backup coordinator.

MHCB staff reported that the IRU rejected many referrals, although the IRU often requested that CIM clinicians rescind the referral so it would not be rejected. In instances when the clinician resisted recission, the IRU instructed them to pursue a CCAT. MHCB staff further reported not often pursuing CCATs because they believed that the IRU had already decided to reject the referral.

During the site visit, regional staff reported struggling to get CIM clinicians to adjust their referral practices to meet IRU criteria, and noted palpable tension between the IRU and CIM referring staff. It was CIM staff's belief that the IRU had become a gatekeeper and was doing more than simply checking referrals for errors. Instead, IRU was assessing the inpatient referrals' appropriateness and also rejecting them based on patients' past behaviors rather than their current presentations.

There were 275 non-referrals of 91 patients to inpatient care during the review period.

CIM made 32 referrals to acute care. Of these, 19 were admitted, five were rescinded in favor of EOP programming, four were rescinded in favor of intermediate care, two were rescinded but did not indicate placement, one was rejected, and one patient paroled. CIM timely sent all referrals to the IRU. Of the 19 admissions, only three or 16 percent timely transferred within ten days of referral. The remaining transfers took between 11 and 72 days.

During the review period, CIM also referred 29 patients to intermediate care. Of these, 15 patients were admitted, five referrals were rescinded (three to EOP, one to 3CMS, and one referred to acute care), five referrals were rejected, two patients transferred to EOPs with a pending referral, one patient paroled, and one patient remained in the MHCB. All referrals were timely sent to the IRU. Eight of 15 or 53 percent of patient transfers to intermediate care exceeded 30 days, with a range from 33 to 67 days.

During the site visit, two patients were pending acute care transfer and four were pending transfer to intermediate care.

CIM completed ten *Vitek* hearings during the review period; one was scheduled late. No patients prevailed.

No patients returned to CIM from inpatient care during the review period.

CIM referred 93 patients to the MHCB. Four referrals were rescinded, and the remaining 89 patients were admitted to CIM's MHCB. Four patients were admitted to the MHCB more than 24 hours following referral. Including admissions from other institutions, there were 254 admissions to CIM's MHCB, which was 36 percent less than the 396 admissions during the prior reporting period.

MHCB clinical lengths of stay averaged 12.1 days and ranged from two to 75 days. The clinical lengths of stay of 25 percent of MHCB patients exceeded ten days. Physical lengths of

stay averaged 17.4 days and ranged from four to 110 days. Forty-eight or 19 percent of patients took more than 72 hours to transfer following clinical discharge. Reasons for delays were not provided.

During the review period, four patients had three MHCB admissions, three had four admissions, and one had six admissions.

During the reporting period, CIM timely transferred four patients to EOP hubs, but did not transfer any patients to the mainline EOP, PSU, or LTRH.

CIM placed 103 3CMS patients in administrative segregation during the review period, of whom ten patients took longer than 30 days to transfer to STRH, with ranges from 37 to 90 days.

During the site visit, none of the three EOP patients awaiting transfer to mainline EOPs had been waiting for more than 60 days.

During the review period, 162 3CMS patients transferred to CIM who had recently been downgraded from the EOP level of care at other institutions.

Programming:

MHSDS Patients in Administrative Segregation:

During the review period, EOP patients housed in administrative segregation had lengths of stay that averaged 63 days and ranged from one to 276 days. For 3CMS patients, stays averaged 53 days and ranged from one to 248 days.

The caseloads of all administrative segregation clinical staff were within established staffing ratios.

All required treatment team members attended two observed IDTTs. The IDTT room had adequate light, space, and computer access, but was moderately warm. During IDTTs,

patients sat outside of the TTM, which contributed to the feeling that the meeting was therapeutic, rather than custodial in nature.

Observed IDTTs were clinically meaningful, patient-centered, and well-organized.  Team members knew their patients well.  There was active patient engagement and extensive collaboration among all disciplines, including custody.  The treatment team discussed relevant social histories, clinical information, medication-related issues, group attendance, safety concerns, and higher level of care indicators.

Observed psych tech rounds for new intakes revealed a psych tech who was knowledgeable about patients and who provided them with extensive education about the administrative segregation unit, team member roles, and how to access services for worsening symptoms, including suicidality.  The psych tech also followed up with all patients that the IDTT had recently seen to confirm that they understood the treatment teams' decisions.  Both the psych tech and custodial officers understood the importance of patients having property and radios. Staff reported and patients confirmed that all patients housed in administrative segregation had radios.

A review of ten 114As demonstrated the offering of all patients ten weekly hours of yard and three weekly showers.  Fourteen out of 20 weeks or 70 percent of linen exchanges were completed.  Of the ten patients reviewed, all had an initial ICC within ten days of placement in restrictive housing.

Custody staff reported, and an interviewed patient confirmed, that administrative segregation unclothed body searches were typically conducted in holding cells following patient transfers to administrative segregation, or in patients' individual cells.  The holding cells were divided by concrete walls, which were conducive to maintaining privacy.

Non-Disciplinary Segregation:

At the time of the site visit, six MHSDS patients housed in administrative segregation were identified as potential NDS patients. One patient was retained in administrative segregation pending parole in approximately 30 days. The remaining five MHSDS patients had not been in administrative segregation for ten days and had yet to appear before ICC for an NDS determination. Based on provided data, it could not be determined whether CIM was in compliance with NDS transfer timeline policy.

MHCB:

CIM operated a 34-bed MHCB within an unlicensed OHU.

The caseloads of all MHCB staff were within established ratios. Nonetheless, interviewed MHCB primary clinicians repeatedly opined that the MHCB was understaffed. Nonetheless, CIM's MHCB had three psychiatrists and six primary clinicians, while two social workers and two pre-doctoral interns also routinely assisted with coverage. Leadership reported that PC caseloads typically did not exceed five or six patients.

As MHCB staff worked four ten-hour weekly shifts and were expected to work weekends, MHCB caseloads required coverage during two to three weekdays due to clinicians' regular days off. This schedule was not ideal for MHCB continuity of care.

Pre-doctoral interns had assigned MHCB caseloads, provided regular coverage for assigned providers during regular days off, completed initial assessments, and evaluated patients for suicide at discharge. The only change to CIM's practice from the Twenty-Eighth Monitoring Round was supervisors' involvement in IDTT meetings when psychology interns presented cases. CIM did not have a policy for using pre-doctoral interns in the unlicensed MHCB.

Interviewed pre-doctoral interns reported manageable caseloads and expressed positive opinions about their training, supervision, and experiences at CIM. They reported always having access to an on-site program or clinical supervisor for consultation.

A random sample of ten MHCB patients were selected for review to assess compliance with Program Guide requirements.

All ten patients required and received timely initial PC and psychiatric evaluations.

For ten patients, 75 percent of twice weekly psychiatry contacts were timely; 81 percent were confidential. Ninety-six percent of daily contacts were timely, with 71 percent conducted in a confidential setting. Reasons for nonconfidential contacts included patient refusal, modified programming, and custody staffing shortages.

All ten initial IDTTs were timely held within 72 hours of patient admission and were attended by required staff. Seven of ten patients had routine IDTTs within seven days of the initial IDTT. Required staff attended all routine IDTTs. All discharge IDTTs were timely conducted within 24 hours of discharge.

Seven observed MHCB IDTTs conducted by three different treatment teams revealed all required team members in attendance with computer access. IDTT observation demonstrated a well-prepared correctional counselor who was familiar with all patients and who provided useful information. All but one of the PCs facilitated adequate IDTTs, and all but one of the psychiatrists were actively involved in IDTT discussions and plans. However, nursing staff's contributions were minimal.

While case conceptualizations and level of care rationales were areas of weakness, nearly all IDTTs collaboratively addressed treatment planning and level of care decisions. IDTTs also discussed other critical areas, including higher level of care referral indicators, measurable

151

treatment goals, and diagnoses.  All patients who required a higher level of care had either already been referred or were referred during observed IDTTs.

The assigned clinician for several Spanish speaking patients appropriately translated for and engaged patients and the treatment team in collaborative discussions.

The MHCB offered clinical and recreation therapy groups.  One of the pre-doctoral interns facilitated two dialectical behavior therapy (DBT) safety planning groups, and further reported providing in-cell DBT materials to interested patients.  Recreation therapy materials were also regularly provided to patients, and, although recreation therapy groups were intermittently suspended during the review period, they had resumed two weeks prior to the site visit.  CIM reported prioritizing maximum custody MHCB patients for groups.

A recently implemented CIM improvement project sought to identify the factors that contributed to daily contact compliance issues in the MHCB, which had been identified as a problem throughout the review period; one factor that may have contributed to them was the use of pre-doctoral interns to complete some daily contacts.  As of January 2022, headquarters no longer counted daily MHCB contacts that unlicensed clinicians completed toward compliance.

CIM reported that all 3CMS patients in the OHU were at least seen monthly, and that the pre-doctoral intern saw some weekly or biweekly.  Recreation therapy was also provided for these patients.

CIM's MHCB housed one intermediate level of care patient from CHCF-PIP with a plan to transport the patient back and forth to Metro State Hospital for electroconvulsive therapy appointments.  However, this patient remained in CIM's MHCB for 14 months without receiving one electroconvulsive therapy session.  During the patient's stay, litigation surrounding consent for the proposed electroconvulsive therapy took place even though no consent evaluation was

completed.  During IDTT observation, the MHCB treatment team expressed concerns about this patient, and requested that the monitor's expert assist with coordinating a transfer to an appropriate facility.  After discussing the case with headquarters, the monitor's expert learned that the patient would be returned to a PIP within close proximity to an electroconvulsive therapy center.

<u>Crisis Intervention Team</u>:

CIM had CIT coverage during regular business hours and weekday evenings but there was no CIT coverage on weekends.

The CIT responded to 27 referrals during the review period.  Of those, 19 patients were admitted to the MHCB, six returned to housing, and two returned to housing and then to the MHCB within two and 24 hours, respectively.

<u>Seclusion and Restraint</u>:

There were no seclusion or restraint incidents at CIM during the review period.

<u>Alternative Housing</u>:

During the review period, CIM placed 93 patients in alternative housing, of whom 89 or 97 percent were admitted to the MHCB.  Eighty-nine of the 93 patients, or 97 percent, who were housed in alternative housing were there for less than 24 hours.

<u>3CMS</u>:

CIM had adequate staffing to satisfy established caseload ratios for 3CMS patients. However, similar to the prior review period, staffing was unevenly distributed.  As such, two 3CMS psychiatrists and two 3CMS primary clinicians all had caseloads that exceeded established ratios.

Nineteen patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Eight of nine or 89 percent of patients who required initial psychiatric evaluations had them prior to the initial IDTT. All nine initial psychiatric contacts were conducted confidentially. Telepsychiatry was not used for initial psychiatric contacts.

There were 17 expected timeframes for routine psychiatry contacts. Fifteen of 17 or 88 percent timely occurred within 90 days. All routine psychiatry contacts were conducted in a confidential setting. Telepsychiatry was used for 28 percent of routine psychiatry contacts.

Eight of ten, or 80 percent, of patients who required initial PC evaluations had timely evaluations. All eight initial primary clinician contacts were confidential. All 21 expected timeframes for routine primary clinician contacts timely occurred within 90 days. Ninety percent of routine PC contacts were confidential.

Three of nine, or 33 percent, of patients had timely initial IDTTs. Required staff attended eight of nine or 89 percent of initial IDTTs. All five patients who required routine IDTTs had them at least annually. Required staff attended all routine IDTTs. Of note, the Program Guide required attendance of the assigned psychiatrist and PC but this assignment was not clearly discernable for all cases.

An interviewed group of Facility A and C patients revealed that nearly all were able to name their PC while approximately 75 percent could name their psychiatrist. Most interviewed patients reported good rapport with their PC and psychiatrist and opined that their services were helpful.

Most patients reported and PCs confirmed that patients met with their PC every one to two weeks, which was much more frequent than the Program Guide required. While this was

admirable, it raised concerns for the monitor's expert as the frequency of PC contacts more closely approximated patients at the EOP level of care.  Further, this possibly contributed to staff's perceptions of being overburdened with work.  Notably, patients also stated knowing how to access emergent and urgent mental health resources.

Seven observed IDTTs on Facilities B and D all started on time, with all required members present.  The treating psychiatrist and PC were present for all cases and had seen all patients before the IDTTs.  Both facilities' psychiatrists were actively involved and contributed useful information, including medication information.  All IDTTs were timely and IDTT rooms had computer access, and adequate space, light, and temperature.  The IDTTs also demonstrated COVID-19 precautions, such as social distancing, masking, sufficient air flow, and high-efficiency particulate air filters.

While both facilities' IDTTs were adequate, they revealed substantial quality differences. On Facility B, the IDTTs' tone was initially tense, but improved as the treatment team meetings' progressed.  The PC voiced displeasure with the monitor's expert's presence.  As more gentle explanations were unsuccessful, the monitor's expert had to assert a right to attend. Both the psychiatrist and PC knew their cases well, and had reviewed documentation from other facilities. The PC presented copious information, albeit in an unclear manner that impaired the monitor's expert from forming cogent clinical conceptualizations of the patients.  The time spent on events prior to incarceration was excessive.  The PC could have efficiently used this time by focusing on patients' current clinical status, and progress since the last IDTT.

The treatment team discussed safety factors, but failed to discuss higher level of care indicators in a systematic manner.  Treatment goals were often inappropriate.  For instance, one patient's goal was to reduce his level of anxiety, however, the patient reported that his anxiety

was zero.  The treatment team discussed discharge and parole planning.  The CC I was actively involved and provided useful information.

For Facility D, the PC and psychiatrist provided robust, interactive, and interdisciplinary discussions.  The treatment team discussed safety factors, indicators for possible higher level of care referrals, and discharge planning.  The team reviewed relevant historical information, but emphasized current clinical presentation and progress since the last IDTT.  The CC I generally required prompting to participate.

An observed innovative group for patients convicted of sexual offenses on Facility A was organized and structured, but with sufficient flexibility to allow patients to express themselves. The group was appropriate in content and level of complexity.  Patients had workbooks and were actively engaged, and encouraged other patients' participation.  Patients further reported that the group was very beneficial.

Due to less patient movement on Facility A, CIM trialed new programs there.  These programs included a peer support program and family involvement in therapy.  Due to observed benefits, CIM's mental health leadership was expanding these programs to additional yards.

Other Issues:

Pre-Release Planning:

CIM released 421 patients during the review period and reported meeting with nearly all of them beginning 30-to-45 days prior to their release.

CIM's pre-release coordinator was a licensed clinical social worker who did not have any other clinical responsibilities.  The pre-release coordinator was knowledgeable about the pre-release process and reported a strong and effective relationship with the TCMP, custody assigned to pre-release, and parole services.  He reported that the most pressing tasks were often signing

releases of information, obtaining identification cards, and ensuring that patients applied for benefits, including healthcare coverage, social security, and veterans' benefits.

Approximately six months prior to discharge, CIM provided pre-release groups to patients. The pre-release group topics were appropriate. The pre-release coordinator also held monthly prison to community meetings, which allowed appropriate custodial and mental health stakeholders to collaborate about patients approaching release.

Program Access:

a.    Job and Program Assignments:

During the reporting period, CIM reported that of 1,525 job assignments, none were held by EOP patients, and 487 3CMS patients or 49 percent of the 3CMS population held them, as did 1,038 or 64 percent of non-MHSDS incarcerated persons.

Of 538 academic assignments, EOP patients held none of them, and 202 or 20 percent of 3CMS patients held them, as did 336 or 21 percent of non-MHSDS incarcerated persons.

Of 145 vocational education assignments, EOP patients held none, and 62 or six percent of 3CMS patients held these assignments, as did 83 or five percent of the non-MHSDS population.

Of 179 voluntary education assignments, EOP patients held none, and 67 or seven percent of 3CMS patients held them, as did 112 or seven percent of non-MHSDS incarcerated persons.

There were 142 substance abuse treatment assignments; none were held by EOP patients, and 73 or seven percent of 3CMS patients held them, as did 69 or four percent of non-MHSDS patients.

b.    Milestone Credits:

CIM reported that all four EOP patients were eligible to earn milestone credits; one EOP patient earned the credit. Of 990 3CMS patients, 947 or 96 percent were eligible to earn milestone credits, with 18 percent earning the credit. For the non-MHSDS population, 1,554 of 1,626 or 96 percent of incarcerated persons were eligible to earn milestone credits, with 16 percent earning them.

    c.    <u>Out-of-Level Housing</u>:

During the reporting period, there were three custody Level I 3CMS patients in Level II housing, 26 custody Level II 3CMS patients in Level I housing, and three custody Level II 3CMS patients in Level III housing.

    d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CIM confirmed implementation of the revised ADA accommodation and grievance procedures and provided, among other related documentation, a copy of the updated CDCR Form 1824 Desk Reference Manual.

    e.    <u>Periodic Classification Score Reductions: EOP Patients</u>:

Leadership reported that CIM did not have classification score sheets for its EOP patients.

<u>Case-by-Case Reviews</u>:

Two patients who had 150-day case reviews were not released and/or the cases were not resolved. Reviewed case notes indicated that required staff attended the long-term segregated case conferences.

During the site visit, two MHSDS patients were eligible for pre-Minimum Eligible Release Date (MERD) reviews. Both patients had ICCs 120 days prior to the expiration of their

MERDs, and had cases referred to the classification staff representative within 60 days of MERD expiration. One of the two was granted NDS status.

"C" Status:

During the site visit, one MHSDS patient was on "C" Status. The patient requested removal from "C" Status and was pending ICC action.

Mental Health Referrals:

CIM reported 1,591 mental health referrals, excluding Prison Rape Elimination Act (PREA) referrals. There were 467 psychiatry referrals and 1,124 referrals to PCs. The 177 emergent referrals included 66 to psychiatry and 111 to primary clinicians. Of the 199 urgent referrals, 28 were to psychiatry, and 171 were to PCs. The 1,215 routine referrals included 373 to psychiatry and 842 to PCs.

CIM reported 100 percent compliance for timely responses by psychiatrists and PCs to emergent referrals. For urgent referrals, only 89 percent of psychiatry responses were timely, while 95 percent of PC responses were also timely. For routine referrals, psychiatry and PCs timely responded to 96 and 99 percent of such referrals, respectively.

Interviewed housing unit officers were knowledgeable about the mental health referral process and produced CDCR 128 MH-5 referral forms upon request.

Treatment Space:

MHCB IDTT and group treatment space were generally adequate and allowed for confidentiality. However, the MHCB's primary group treatment room lacked a high efficiency particulate air (HEPA) filter.

Two providers shared most MHCB individual treatment offices; however, MHCB staff and patients confirmed that the offices were vacated by one provider to permit confidential individual treatment contacts.

There were TTMs in MHCB rooms that were used for IDTTs, groups, and individual contacts. Leadership and MHCB staff reported that non-maximum custody patients were not placed in TTMs during mental health appointments. However, non-maximum custody MHCB patients reported that some treatment groups used TTMs; they further reported that the TTM door was unlocked and open during those times.

There were MHCB yards for both maximum and non-maximum custody MHCB/OHU patients. Maximum custody patients were escorted to a yard on Facility B and non-maximum custody patients had access to a medium-sized yard attached to the MHCB/OHU.

Facility C patients and clinicians reported that finding treatment space had become challenging, due to COVID-19 related building closures.

Custody and Mental Health Partnership Plan:

CIM's CMHPP was in general alignment with headquarters' partnership plan.

CIM conducted executive leadership joint rounding during all months of the review period. However, the chief psychiatrist did not attend the rounding for two months, the warden did not participate for three months, and the chief nursing executive did not attend any executive leadership joint rounding during the reporting period. The rounding was conducted twice in administrative segregation, once in the MHCB, and once each on Facilities B, C, and D.

Reviewed rounding forms reflected discussions with staff and patients. The warden's meeting agendas did not address executive leadership joint rounding, however, the MHPS discussed the rounding. Generally, identified issues that subcommittee meetings addressed were

160

not related to relations between custody and mental health but focused on patients' inability to have more out-of-cell time due to COVID-19.

An observed huddle conducted in administrative segregation started timely with all required members in attendance and followed an appropriate script.

Reviewed administrative segregation huddle forms for second and third watch indicated four missing forms for the second watch review period of February 1 - 15, 2022.  Although reviewed forms were signed by attendees and reflected supervisors' attendance, they typically contained minimal information; a few contained notations of patients who were new to the unit but there was no other information on the forms' remaining sections.  For third watch, reviewed forms from February 16 - 28, 2022 revealed five missing forms.  The remaining forms were signed and adequately completed.

Reviewed MHCB huddle forms reported the regular occurrence of huddles on second and third watch.  Reviewed second watch MHCB huddle forms for January 1 - 15, 2022 revealed two missing forms.  Except for custody, who was not present on one day, all required staff attended.  All forms were signed and most contained patient information.  Further, reviewed third watch huddle forms for January 16 - 31, 2022 revealed all required staff's attendance and contained detailed information on patients with unusual behavior, unhygienic cells, and those who had received bad news.

CIM conducted 3CMS monthly joint supervisory program area tours during five months of the review period.  The tours revealed positive working relationships between custody and mental health, and that mental health staff was responsive to patients' needs, but also indicated frustration with modified programming.  Patients also expressed frustration about not being able to talk to PCs in their offices.

Reviewed documentation of second watch weekly 3CMS supervisory meetings for Facility C for February and March 2022, and for Facility A for January 2023, revealed that no issues were identified and the lack of attendance by the mental health supervisor. During the site visit, the monitor observed Facility C's weekly 3CMS supervisory meeting; the supervisor was present.

CIM did not provide agendas or minutes for IAC meetings for the review period. CIM further reported not conducting IAC meetings for two months due to COVID-19 outbreaks.

Compliance for quarterly round table training and annual off-post partnership training could not be assessed because it could not be determined whether all required mental health officers and clinical staff attended the trainings.

CIM reported 99 staff misconduct complaints during the review period but did not provide the status nor the findings of the complaints. Generally, complaints focused on harassment, retaliation, lack of professionalism, inappropriate use of force, verbal assaults, property destruction, and discrimination. No staff was moved to another post due to a staff misconduct complaint.

Heat Plan:

Review of CIM's heat plan LOP indicated compliance with CDCR policy. The heat plan was in effect during one month of the review period, when there were five Stage I heat alerts.

The monitor toured several housing units and interviewed custody staff about heat plan protocols. All interviewed custody staff were knowledgeable about heat plan policies and procedures, which was a positive change from previous review periods. Notably, all interviewed custody staff knew the heat plan's stages, the symptoms of heat-related illnesses, and properly logged temperatures. However, in several toured housing units, custody staff reported receiving

the updated list of patients who were prescribed heat sensitive medications weekly, as opposed to daily in accordance with policy.

Multiple interviewed patients on Facilities A and C complained about the temperature in their cells. One patient who had a thermometer in his cell reported temperatures as high as 110 degrees during the summer. This sentiment was echoed by multiple patients, who further reported cold cells during the winter. Further, several patients prescribed heat sensitive medications reported that they found it illogical that they were pulled from groups during a heat alert only to be housed in an equally hot cell.

RVRs:

Of 121 custody staff who were required to complete inmate disciplinary mental health assessment training, 113 or 93 percent received the training. One percent of the 49 mental health staff received the training.

During the review period, CIM issued 752 RVRs, of which 397 or 53 percent were issued to MHSDS patients. RVRs were issued to seven patients designated for transfer to the acute level of care and six designated for intermediate level of care transfer, as well as to 18 MHCB patients, four EOP patients, and 362 3CMS patients.

The monitor analyzed 11 RVRs to assess compliance with CDCR policy and procedure. Mental health assessments were requested in nine of eleven or 82 percent of reviewed RVRs. All but one requested mental health assessment were completed; the assessment that was not completed was deemed "unnecessary." All reviewed mental health assessment interviews were conducted confidentially.

Of the eight completed mental health assessments, four were required due to patients' offense level, while the other four were related to patients' behavior at the time of the offense.

163

Custody did not timely refer any of the mental health assessments to mental health staff. Mental health staff timely completed and returned the assessments to custody in three of eight or 38 percent of cases.

In seven of eight or 88 percent of cases, the mental health assessment recommended penalty mitigation. In two of eight, or 25 percent, the mental health clinician used an identical, boilerplate response when answering question four about penalty mitigation. The senior hearing officer agreed with mental health staff and mitigated the penalties in all seven cases.

<u>Use of Force</u>:

The institution reported 17 immediate and no controlled use of force incidents. Eleven immediate use of force incidents involved mental health patients; one involved an intermediate care patient in the MHCB, one involved an acute care patient, three involved MHCB patients, and six involved 3CMS patients.

Use of force training was attended by the warden, chief deputy warden, and all correctional administrators, captains, and lieutenants. Eighty of 81 or 99 percent of sergeants attended the training, as did 719 of 750 or 96 percent of correctional officers. For mental health staff, use of force training was also attended by both the chief psychiatrist and the chief psychologist, all five supervising psychiatrists, psychologists, and social workers, all eight psychiatrists, all 19 psychologists, 12 of 13 social workers, and 142 of 157 or 90 percent of nurses.

Review of all 11 immediate use of force incidents revealed compliance with CDCR policy and procedure. Notably, most of the immediate use of force incidents stemmed from patients fighting with one another, which was followed by custody staff physically restraining, or

using pepper spray, against the patients.  However, two other immediate use of force incidents stemmed from custody staff stopping apparent suicide attempts.

Lockdowns/Modified Programs:

CIM reported no program lockdowns but four modified programming periods during the review period.  There were two one-day periods when a facility was placed on modified programming due to a sergeant losing a set of facility keys, and a ruptured water line needing repair.  Further, from December 28, 2021, through January 4, 2022, CIM modified virtually all programming due to 40 vacant correctional officer posts.  Facility D was also placed on modified programming from late November 2021 through early January 2022 after several patients tested positive for COVID-19.

Access to Care:

CIM provided monthly Health Care Access Quality reports from October 2021 through March 2022.  Review of the reports indicated that 17 percent of the total issued mental health ducats and add-on appointments were not completed.  Further, of the non-completed appointments, 40 percent were due to patient refusals, none were due to custody reasons, and 60 percent were due to non-custody factors.

Placement of 3CMS Patients into Minimum Support Facilities:

CIM did not transfer any patients to MSFs during the review period.

*Coleman* Postings:

*Coleman* posters in English and Spanish were properly displayed in all toured housing units.

**APPENDIX B-4**
**NORTH KERN STATE PRISON (NKSP)**
**(May 17, 2022 – May 19, 2022)**
**Review Period: (October 1, 2021 – March 31, 2022)**

Census:

On May 16, 2022, NKSP's total inmate population was 4,112, which was a three percent increase from the prior reporting period.  The institution's population included 3,189 inmates housed in the reception center.  The mental health caseload population of 1,011 had increased by 13 percent since the prior review period.

There were ten patients in the MHCB.

The reception center housed 123 EOP and 656 3CMS patients.

The STRH reception center housed 31 3CMS patients.

There were 191 mainline 3CMS patients.

Staffing:

The chief psychiatrist position was vacant.

One of two allocated chief psychologist positions was filled; the remaining position was vacant as a salary savings.  Both senior psychologist supervisor positions were filled, but one position was filled by staff acting out of class.

NKSP lacked civil service psychiatrists.  Of six psychiatry positions, registry filled 4.75 positions, for a 20 percent functional vacancy rate.  Further, four full-time telepsychiatrists covered two telepsychiatry positions.  Two civil service medical assistants and one registry medical assistant supported telepsychiatry.

166

The supervising social worker position was filled.

Of 25.5 psychology positions, 9.5 were filled, but two psychologists were on extended leaves, reflecting a 71 percent vacancy rate. Registry covered 2.7 positions, reducing the psychology functional vacancy rate to 60 percent. Two psychologists were not licensed.

Of 11.5 social worker positions, 10.2 were filled, for an 11 percent vacancy rate. Registry covered 1.45 positions, eliminating all vacancies. All social workers were licensed.

Two of 3.5 recreation therapist positions were filled, for a 43 percent vacancy rate.

The HPS II position was filled. Two HPS Is covered 1.5 positions. The CHSA position was vacant. A 1.0 OSS covered the 0.5 position.

Ten of 10.5 MHSDS clerical positions were filled.

Telepsychiatry:

NKSP used telepsychiatry in the mainline 3CMS program and the reception center, and for assistance with bridge prescriptions. Telepsychiatry was not used in the MHCB or with EOP patients.

Observation of telepsychiatry during mainline 3CMS IDTTs did not reveal any connectivity issues; the monitor's expert was able to clearly see and hear the psychiatrist from across the room. Staff further reported that this telepsychiatrist had extensive experience working with NKSP and was very familiar with their IDTT process.

Quality Management:

The local governing body met three times during the review period and always achieved quorums. There was mental health representation at two of these meetings. The local governing body routinely addressed offered mental health treatment.

The quality management committee met monthly.  Mental health staff attended all meetings.  The QMC discussed multiple topics germane to mental health, including offered treatment, adaptations necessitated by COVID-19, and potential reasons for low group attendance.

The MHPS also met monthly and always achieved quorums.  Minutes reflected review of relevant clinical and program topics.  For example, one discussed item was whether patient refusals to attend treatment was due to a conflict with yard and dayroom times.

The EMRRC met monthly; mental health staff attended all meetings.  The EMRRC addressed clinically meaningful topics and when indicated for a given patient's case, remediation such as additional training or progressive discipline was clearly noted.

During the review period, NKSP chartered a QIT on offered treatment.  Provided documentation indicated collaboration between healthcare and custodial staff to improve this metric.

Medication Management:

NKSP provided MAPIP results for October 1, 2021 through March 31, 2022 for compliance with psychiatric diagnostic monitoring and nursing measures.

Diagnostic monitoring for patients prescribed atypical antipsychotics demonstrated compliance for all six months of the review period for obtaining height, weight, and blood pressure.  There was compliance for all five required months for obtaining thyroid tests, and for three months for measures for glucose (blood sugar), CBC, CMP, lipid panels, medication consents, and EKGs.  Monitoring of AIMS was compliant for two months.

While NKSP was not a clozapine-initiating institution, the institution continued this medication for patients who were taking it at the time of arrival.  For blood pressure, glucose

(blood sugar), CBC, CMP, and lipid panel, the facility was compliant for all five required months. For height and weight, NKSP was compliant for four months and for checking AIMS, the institution was compliant for three required months. There was compliance with obtaining medication consent for the two required months. For both thyroid tests and EKG, NKSP reported compliance for the reporting period.

Three NKSP patients were prescribed clozapine during the review period. At the time of site visit, one patient was prescribed clozapine. Both psychiatry and nursing staff could independently explain the workflow for any patient arriving on clozapine. A psychiatrist held meetings at least quarterly to review all cases of patients who were prescribed clozapine; special attention was given to patient who were preparing to transfer or parole.

For monitoring antidepressants, NKSP reported compliance for all six months for venlafaxine blood pressure and obtaining thyroid tests. There was compliance for obtaining medication consents for three months, and for two months for performing EKGs.

For patients prescribed carbamazepine, NKSP was compliant for all six months for checking blood levels. For checking CBC and CMP, there was compliance for all three required months. NKSP further reported that it was not required to obtain medication consents for any of the six months under review.

Medication consent documentation for patients prescribed Depakote (divalproex, valproic acid) was compliant for three of six months. For both CBC and CMP, there was compliance for all four required months. There was compliance for checking medication levels for two months.

For lamotrigine, there was 100 percent compliance for obtaining medication consents.

As for lithium, NKSP reported compliance for obtaining medication consents and EKGs for all six months of the review period. There was compliance for five months for checking

thyroid tests, for four months for checking kidney function tests, and for three months for monitoring lithium levels.

For medication management metrics reported by headquarters, NKSP was compliant for all six months of the review period for continuity of medications upon parole/transfer to the community. There was compliance for four months for MHCB transfers, and for medication continuity upon discharge/transfer from a community hospital and/or DSH, and with intra-institutional transfer excluding ASU/SHU/PSU. There was compliance for two months for medication continuity upon arrival at reception center, and for one month for medication continuity upon inter-institutional transfer at R&R. For both medication compliance with involuntary medications court orders, and compliance with involuntary medication orders (PC 2602), NKSP reported that no data was required, which was perplexing as the facility had patients who received medications through the PC 2602 process.

NKSP was compliant for all six months for observation of medication preparation HS and noncompliant for all six months for observation of medication preparation AM and PM.

NKSP was compliant with outpatient provider new medication orders for five months and for four months for chronic care medications historical administration.

During the site visit, 868 NKSP patients were prescribed a total of 1,540 psychiatric medications; 400 patients were prescribed HS medications. No patients were prescribed psychiatric medications as KOP.

NKSP audits indicated that pill line lengths were under two hours. The institution further reported ongoing challenges with not having a protected place from the elements for patients to wait while in pill lines.

There were six applications for PC 2602 medications during the review period.  Five were granted and one was withdrawn for non-clinical reasons.  Two patients who received medications through the PC 2602 process during the site visit were both medication compliant.

The monitor's expert toured R&R with nursing leadership.  Nursing leadership and line staff reported a collaborative relationship among mental health, custody, and pharmacy.  There was also a clear process for new arrivals who reported acute psychiatric concerns.  No challenges were reported with getting prescriptions ordered by psychiatry or filled by pharmacy.  Although there were privacy screens in the nursing screening area, challenges remained related to the building's structure, with a resultant lack of confidentiality for nursing screenings.  The increased volume of new intakes also posed a substantial challenge; due to COVID-19 restrictions, many patients were previously held at county jails until transfer restrictions were recently lifted, which caused a substantial increase in the number of new incarcerated persons arriving at NKSP.

Transfers:

The inpatient coordinator fulfilled multiple roles at NKSP, including supervisor for the MHCB, CIT, and alternative housing, as well as assisting with completion of mental health assessments for RVRs, among other tasks.

NKSP referred 12 patients to acute care and eight to intermediate care during the review period.  All acute care referrals were timely sent to the IRU.  Eleven of 12 acute referrals transferred; five patients transferred timely.

All eight intermediate care referrals were timely sent to IRU.  Only two of eight intermediate care referrals transferred to intermediate care; one of the two transfers was timely.  The other six intermediate care referrals transferred to EOP programs.

There were 139 referrals to the MHCB, of which 99 were admitted and 40 were rescinded. MHCB clinical stays averaged 9.5 days and ranged from one to 44 days. MHCB physical stays averaged 12.4 days and ranged from one to 94 days.

One patient with complex medical and mental health needs was pending acute care referral during the site visit; this patient had been hospitalized since January 29, 2022.

NKSP reported reviewing but not referring 249 patients to inpatient care during the review period.

NKSP's inpatient coordinator conducted monthly higher level of care (HLOC) audits, which found that the HLOC form was adequately completed. However, the monitor's expert's review of HLOC forms indicated a higher number of inadequate HLOC forms than the audits suggested.

NKSP's RC STRH housed 110 patients during the review period. Stays averaged 53 days and ranged from one to 348 days.

Ten patients transferred to the EOP hub during the review period. Stays averaged 44 days and ranged from 18 to 96 days. During the site visit, one patient was pending transfer to the EOP hub.

During the review period, NKSP transferred four patients to the California State Prison/Sacramento (CSP/Sac) PSU. All patients transferred timely.

NKSP transferred 793 patients from the reception center to EOP programs during the review period. Reception center stays averaged 42 days, which was within Program Guide timeframes.

There were also 232 transfers from the reception center to 3CMS programs during the reporting period. All patients transferred timely.

172

Programming:

MHSDS Patients in Administrative Segregation:

RC STRH:

ASU and STRH patients were housed in building D-6. Documentation noted the issuance of crank radios to all new arrivals. With one exception, all ASU and STRH cells lacked electrical outlets.

Required staff attended five observed RC STRH IDTTs. The IDTTs were generally adequate. Staff used computers to access patients' files. The treatment team was generally collaborative, the PC made sure that each discipline provided input, and case conceptualizations were thoughtful and detailed. Further, the psychiatrist was familiar with patients' charts and medications and discussed medication compliance, effectiveness, and side effects. Discussed diagnoses were appropriate and matched reported and/or observed symptoms. Substance abuse and safety concerns were also discussed as appropriate. Treatment plans were individualized, with measurable goals and appropriate interventions. However, justification for level of care was only discussed during four of five meetings.

The STRH provided groups for EOP and 3CMS patients. The group room was a small, confidential space with three TTMs. As such, group size could not exceed three participants. Staff reported that 3CMS groups consisted of showing a movie followed by a discussion about the movie. Staff further reported that efforts to provide more clinically oriented groups resulted in patients not attending them.

Psych techs facilitated several weekly EOP groups. Group topics included health issues, current events, leisure activities, recreation therapy, and coping skills, which appeared clinically appropriate for EOP patients. However, staff reported that the groups were poorly attended.

Two patients attended an observed EOP coping skills group that a psych tech facilitated. The facilitator used a skills packet to encourage discussion. Despite the psych tech appearing unfamiliar with the packet's content, the two participants actively participated in the group.

Three interviewed RC STRH 3CMS patients provided positive feedback about mental health treatment. They reported timely primary clinician and psychiatry contacts, and more frequent contact as requested. All three patients reported having had positive and helpful ICC and IDTT meetings following admission. They indicated that psych techs made daily rounds, and provided in-cell activities and support. They further reported being offered confidential psychiatry and PC contacts and weekly group.

Three interviewed RC STRH EOP patients reported varied experiences with mental health treatment. Two of three reported not knowing who their psychiatrist or primary clinician were, that psych techs "sometimes" made rounds, and that they had not yet had an IDTT. Both described the STRH's mental health treatment as "terrible" but further reported that "group is ok." The third interviewed EOP patient reported that he had arrived in STRH on May 4, 2022, and had yet to have an IDTT. He reported seeing both his psychiatrist and PC confidentially twice since arriving in STRH and that psych techs made daily rounds.

Two observed STRH ICC meetings were attended by the warden, two correctional counselors, a captain, a lieutenant, and a unit psychologist. The ICCs were collaborative and exhibited appropriate mental health participation. The psychologist opened each ICC meeting with a mental health status check of the patient and asked whether the patient knew how to access mental health care.

Required staff attended an observed second watch STRH huddle. The huddle demonstrated appropriate engagement and participation. Addressed issues included new arrivals,

patients with a level of care change, high risk patients and those who received bad news, group cancellations, and other pertinent issues.

Eight weeks of reviewed RC EOP 114-As revealed the offering of ten hours of weekly yard and three weekly showers for seven weeks and the offering of phone calls for all eight weeks. The weekly linen exchange only occurred during three of eight weeks.

Thirteen weeks of reviewed RC 3CMS STRH 114-As documented the offering of ten hours of yard during 12 of 13 weeks. However, the 114-As only documented the offering of an additional 3.5 hours of out-of-cell time for two of 13 weeks reviewed. There was 100 percent compliance for the offering of three weekly showers. Linen exchange was documented for four of 13 weeks.

The STRH lieutenant reported the use of "management cell status" and that the LOP articulated both placement in management cells and discharge criteria. The reviewed LOP revealed a section entitled "Management Cell Status Placement Criteria," which identified various cells that were approved for use as management cells.

The STRH lieutenant reported use of the management cells approximately once or twice annually. However, reviewed 114-As revealed an RC EOP level of care patient who had been on management cell status multiple times since his arrival in ASU/STRH on January 4, 2022. The monitor's expert advised the institution that use of management cells for housing had been eliminated several years prior.

      <u>Non-Disciplinary Segregation</u>:

NKSP did not house any NDS patients during the review period or at the time of the site visit.

MHCB:

One full-time registry psychiatrist and two psychologists were assigned to the MHCB.

The MHCB's average daily census during the reporting period was seven patients.

All required staff attended an observed MHCB IDTT. The team initially presented a patient prior to bringing the patient into the IDTT. When the treatment team was asked why the patient was not present, the team responded that the patient was delusional and would likely react negatively to some of the presentation. Thereafter, when the patient was requested to attend the IDTT, he refused. The remainder of the IDTT was held in abstentia. While this was not the patient's first admission, he was originally provided with a diagnosis of adjustment disorder with anxiety and depressed mood, which was an inappropriate diagnosis. However, the IDTT team did discuss a possible diagnosis of delusional disorder, paranoid, though the psychiatrist noted that it had previously been changed to delusional disorder. At the prior IDTT, the patient had been referred to acute care. Regrettably, the patient's treatment plan was not modified despite being ineffective and the patient being noncompliant.

Review of the 114-As for all patients in the MHCB during the site visit for showers, yard and timely completion of ICCs revealed the lack of all relevant documentation, resulting in zero percent compliance. This lack of proper documentation was brought to the attention of regional custody staff. The MHCB lacked a dayroom, but two stand-alone yards were available for use with recreation therapists. However, there was a lack of documentation to show how often the stand-alone yards were used.

Crisis Intervention Team:

The NKSP LOP for crisis intervention was not fully compliant with statewide policy. For example, the LOP allowed the use of a licensed vocational nurse as the nursing staff member

of the CIT team, but this was inconsistent with headquarters' policy.  Further, while custodial duties could be delegated to a sergeant, the LOP did not indicate that this required delegation or that the lieutenant remained responsible to ensure the process occurred pursuant to policy.

NKSP's CIT was hampered by insufficient mental health and nursing staffing.  As a result, the institution did not assign a specific clinician to the CIT, but assigned a different clinician daily.  The CIT's hours were 7:00 a.m. to 6:00 p.m. Monday through Friday, and 6:00 a.m. to 5:00 p.m. on weekends and holidays.  During an evening crisis, patients were placed in alternative housing until the following morning, when a clinician could see them.

Notably, NKSP staff reported that intakes from the county jail had begun to increase in April 2022.  These new arrivals had resulted in an increase in the number of CIT activations.

Alternative Housing:

NKSP's alternative housing LOP was consistent with headquarters' policy.

NKSP's 21 alternative housing cells included 15 cells in Facility A and six CTC cells. All observed Facility A alternative housing cells were wet cells and were suicide resistant. Additional alternative housing cells were located in the TTA and other housing units that provided good visibility.

Of 49 patients placed in alternative housing during the review period, eight patients were admitted to the MHCB.  There were no patients in alternative housing during the site visit.

RC EOP:

The monitor's expert observed three RC EOP IDTTs for Facility B and five for Facility D.  All patients saw their psychiatrist and PC prior to the IDTT.  All required staff members were in attendance.

Overall, the IDTTs were adequately run.  Staff clearly explained the IDTT's purpose to patients and primary clinicians knew their patients.  Approximately two-thirds of cases discussed higher levels of care considerations in a systematic manner.  All cases addressed past and present suicidality.  Where applicable, team members appropriately discussed discharge and parole planning.  However, psychiatry input was limited to brief discussions of medications and side effects.  All observed IDTTs were conducted in the Facility D chapel, which was a large space that allowed all treatment team members to socially distance.  However, it also resulted in IDTT members being seated in separate pews; physical space issues led to a much less cohesive team atmosphere, while the physical plant was in disarray.

Despite ongoing pressures from COVID-19, NKSP continued to offer group treatment. During the reporting period, the institution offered RC EOP patients an average of 5.12 hours weekly hours of group, with patients attending a weekly average of 2.91 hours of group.  There were groups on current events, health issues, and pre-release planning.

Three interviewed patients reported that mental health services provided by both the psychiatrist and primary clinician were adequate and generally, but not always confidential.  One patient reported feeling pressured to step down to the 3CMS level of care; another stated that his prescription for trazodone was discontinued at intake, without him seeing the psychiatrist.

<u>RC 3CMS</u>:

Interview patients generally reported being pleased with provided mental health services. However, the RC 3CMS program did not provide groups.  Interviewed patients knew how to access their psychiatrist and primary clinician between appointments, as well as how to access mental health for emergent services.

Mainline 3CMS:

One observed mainline 3CMS IDTT was appropriately staffed and well-coordinated. The psychiatrist attended the IDTT virtually. Staff reported no difficulties using telepsychiatry for IDTTs and no connectivity issues were observed. Staff further reported that the telepsychiatrist had a long history with NKSP and was familiar with its IDTT process.

The IDTT was well-run, organized, and collaborative. The primary clinician ran the IDTT and provided a thorough case conceptualization, including the patient's psychosocial, institutional, and mental health histories. The case conceptualization provided by the primary clinician was clinically relevant and appropriate to the patient. The psychiatrist discussed the effectiveness and side effects of the patient's medication. The patient's diagnosis was clearly stated, symptoms were consistent with the stated diagnosis, and there was diagnostic agreement among clinicians. Treatment goals were clearly stated and were objective, measurable, and realistic. Further, interventions were clearly stated and appropriate for the identified goals. There was a clear rationale for the level of care, which was agreed to by all treatment team members and the patient. The CC I was also very involved in the IDTT and knowledgeable about the patient.

Interviewed mainline 3CMS patients provided positive feedback about NKSP's mental health program. Staff and patients reported timely clinical contacts with psychiatry and PCs that were often more frequent than Program Guide requirements. Psychiatry visits occurred through telepsychiatry. Patients also provided positive feedback about their experiences with psychiatry, describing the process as "collaborative and effective." Patients also reported always seeing the same psychiatrist and primary clinician without any unexpected changes and further reported being able to access their primary clinician between scheduled contacts. They requested that

NKSP restart 3CMS groups. They also reported that in the absence of groups, it would be helpful to have more self-help programming and materials.

Although mainline 3CMS patients provided positive feedback about mental health staff and programming, they described the relationship between mental health staff and custody staff as "terrible." Interviewed patients reported that custody sometimes hindered patients from receiving treatment. Conversely, mental health staff reported a positive relationship with custody, describing custody staff as "very helpful."

Mainline 3CMS staff reported significant efforts to conduct clinical contacts in confidential settings, and generally, any issue associated with seeing a patient in a confidential setting was usually related to COVID-19 quarantine and/or isolation status.

Nineteen patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Four of five patients who required an initial psychiatric evaluation timely had one prior to the initial IDTT; 80 percent were conducted in a confidential setting. Telepsychiatry conducted four of five initial psychiatry contacts.

There were 19 expected timeframes for routine psychiatric contacts. Six of 19 or 32 percent timely occurred within 90 days. Eight-six percent were conducted in a confidential setting. Telepsychiatry conducted 25 of 29 or 86 percent of routine psychiatry contacts.

Four of five patients who required initial primary clinician evaluations timely had them within ten working days; 80 percent were conducted confidentially.

Of the 27 expected timeframes for routine primary clinician contacts, 17 or 63 percent timely occurred within 90 days; 90 percent were conducted confidentially.

All five patients had timely required initial IDTTs.  Required staff and patients attended all initial IDTTs.  Six of eight patients who required routine IDTTs had them at least annually. Required staff attended all routine IDTTs; patients attended 88 percent.  However, the Program Guide required attendance of the assigned psychiatrist and primary clinician; this was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

NKSP's mental health pre-release coordinator was a licensed clinical social worker who had this position since 2019.  The coordinator also had multiple duties at NKSP, including completing initial evaluations in the reception center.

The pre-release coordinator reported obtaining pre-release information from headquarters.  The coordinator further reported having a face-to-face meeting with every MHSDS patient scheduled for release to complete the Pre-Release Program Assessment (PRPA); for patients who released to probation, a release of information (ROI) was reviewed for signature.  The pre-release coordinator also attended the ISUDT pre-release meeting every two weeks and the monthly pre-release meeting with headquarters staff.

NKSP did not provide pre-release groups to 3CMS patients and further reported that pre-release groups would be offered to EOP patients beginning in July 2022.

Three TCMP caseworkers provided pre-release services program at NKSP.  The TCMP program further reported screening all 38 EOP and 281 3CMS patients who the institution released during the reporting period.  Further, Medi-Cal applications were submitted on behalf of 63 percent of the patients released, while an additional 17 percent of patients were assisted with access to other medical insurance programs.  Further, 49 or 15 percent of released MHSDS

patients were eligible to apply for Social Security Income (SSI); applications were submitted on behalf of 44 or 90 percent.  Two of three eligible MHSDS patients completed the referral process for veterans' benefits.

Program Access:

a.    Jobs and Program Assignments:

On April 1, 2022, NKSP reported that of 490 job assignments, none were held by EOP patients, while 111 or 12 percent of the 3CMS population held them, as did 379 or 13 percent of non-MHSDS inmates.

Of 156 academic assignments, no EOP patients held them, while 52 or six percent of 3CMS patients held these assignments, as did 104 or four percent of non-MHSDS inmates.

The 53 vocational education assignments were held by no EOP patients, and by six or one percent of 3CMS patients, and 47 or two percent of non-MHSDS inmates.

Of 130 voluntary education assignments, none were held by EOP patients, while 17 or two percent of 3CMS patients held them, as did 113 or four percent of non-MHSDS inmates.

Of 102 substance abuse treatment assignments, it was reported that zero percent of EOP patients held assignments, and 26 or three percent of 3CMS patients and 76 or three percent of non-MHSDS incarcerated persons held them.

b.    Milestone Credits:

A report covering October 1, 2021 through March 31, 2022 indicated that of 88 EOP patients, 87 or 99 percent were eligible to earn milestone credits, with four percent earning the credit.  Further, 889 of 905 or 98 percent of 3CMS patients were eligible to earn milestone credits; four percent earned the credit.  Of the 2,904 non-MHSDS inmates, 2,875 or 99 percent were eligible to earn milestone credits, with six percent earning the credit.

182

c.      <u>Out of Level Housing</u>:

As of April 1, 2022, eight 3CMS and 21 non-MHSDS custody Level II patients were in Level III housing.

d.      <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

NKSP confirmed implementation of the revised ADA accommodation and grievance procedures and provided a copy of the updated CDCR Form 1824 Desk Reference Manual.

e.      <u>Compliance with In-Cell/Private Unclothed Body Search Policy</u>:

NKSP did not provide a LOP for unclothed body searches.  Interviewed custody staff reported that all unclothed body searches were conducted within cells or in private temporary holding cells.

<u>Case-by-Case Reviews</u>:

During the review period, nine patients were eligible for 150-day case conferences. Reviewed documentation indicated that the reasons for the continued retention of patients included pending security threat group designations, gang investigations, RVRs, a DRB decision, and transfer to an endorsed institution.

Four of five pre-MERD reviews involved MHSDS patients.  Of the five cases, two patients were retained in administrative segregation pending transfer to their endorsed institution and three were retained pending an RVR hearing.

<u>"C" Status</u>:

NKSP was unable to report the number of patients assigned "C" Status during the review period.  No NKSP patients were on "C" Status during the site visit.

Mental Health Referrals:

During the review period, NKSP reported a total of 6,893 referrals, of which there were 2,142 referrals to psychiatry, and 4,751 referrals to primary clinicians.  There were timely responses to all 41 emergent psychiatry referrals, to 60 percent of the ten urgent psychiatry referrals, and to 78 percent of the 2,091 routine psychiatry referrals.  There were also timely responses to 96 percent of the 288 emergent primary clinician referrals, 92 percent of the 232 urgent PC referrals, and 92 percent of the 4,231 routine referrals to primary clinicians.

Treatment Space:

Multiple disciplines, including mental health, medical, nursing, and custody, attempted to use very limited treatment space, as treatment space availability had been markedly reduced due to Health Care Facilities Improvement Project (HCFIP) construction.  COVID-19 restrictions further impacted space availability.  However, staff further reported that ongoing construction, which was scheduled to be completed by September 2022, would resolve many of the current issues with insufficient treatment space.

Custody and Mental Health Partnership Plan:

Meeting minutes from the quality management committee and the MHPS reported outcomes for executive leadership joint rounding.  Reviewed meetings minutes contained detailed information of interviews with staff and patients that occurred during the rounding. However, NKSP did not provide documentation from the warden's meetings that referenced the rounding.

An observed MHCB huddle revealed all required participants in attendance, interactive staff reviewing MHCB patients, and use of the appropriate huddle form.

184

Review of a binder containing ASU/STRH huddle reports for the period of May 6 through May 16, 2022, indicated the presence of 18 of 22 required huddle forms from second and third watch. All forms noted attendance by required staff. Further, all required staff attended an observed ASU/STRH third watch huddle. Custody and clinical staff appropriately discussed relevant issues, including new arrivals, patients on PC 2602 court orders, potential bad news, group attendance, or decompensating patients.

NKSP documentation reported the conduct of 3CMS monthly joint supervisory program area tours on five facilities. The tours occurred during all six months on Facilities A and M, but only during five of six months on Facilities B, C, and D.

NKSP was not required to offer EOP orientation groups.

There were IAC meetings on Facility A and the Minimum Support Facility; the other facilities were reception centers and did not have IACs. Three months of reviewed IAC meeting minutes and agendas for Facility A did not indicate attendance by a mental health representative at the meetings, while the agendas did not reference mental health issues. NKSP did not provide IAC meeting minutes for the MSF.

One MHSDS patient staff compliant alleged that a clinician threatened to write the patient an RVR for suicidal ideation. NKSP's response to the staff complaint was that there was "no policy violation." No staff were reassigned due to the patient's complaint.

NKSP provided quarterly round table training sign-in sheets and some Fair Labor Standards Act (FLSA) custody sign-in sheets for the fourth quarter of 2021 and the first quarter of 2022 to document this required training for the ASU/STRH, RC EOP, and MHCB. Based on provided information, the monitor was unable to determine whether all required staff attended the training.

185

NKSP reported that all five captains and five correctional administrators attended the annual off-post training, as did 26 of 27 lieutenants, 62 of 63 sergeants, and 581 of 619 correctional officers.  As for mental health staff's attendance at off-post training, three of seven psychiatrists attended the training, as did 11 of 33 psychologists, 13 of 14 social workers, and 53 of 120 nurses.

Heat Plan:

NKSP's heat plan LOP was consistent with headquarters' policy.  The heat plan was in effect during one month of the review period.  There were two Stage I heat alerts during October 2021.

All observed thermometers in the housing units on Facilities A, B, C, D, and E were operable and accurate; the thermometers' sensors hung from the second-floor ceilings.

Interviewed custody officers from several housing units from all five facilities regarding heat plan protocols indicated that they were typically knowledgeable of the heat plan and the potential for patient heat-related illness.  However, some officers lacked specific knowledge of the required procedures at the heat plan's various stages; the most common errors were not knowing the specific temperatures that activated the heat plan's respective stages, incorrectly identifying the heat plan stage when nursing/medical rounds were conducted, and not knowing how often the patient heat risk list was updated.  Most custody officers knew which patients were prescribed heat-sensitive medications, and of the need to refer patients who were having an adverse reaction during a heat alert for medical evaluation.

Some interviewed 3CMS patients reported concerns with heat plan compliance, including a lack of ice and water in the buildings when temperatures were high, being unable to return to the building if they missed the initial announcement, and, at times, having to wait 30 minutes or

more to be let into the building by custody staff. Patients further reported that some officers did not realize the impact that the extreme temperatures could have on patients who were prescribed heat-sensitive medications.

RVRs:

NKSP issued a total of 2,240 RVRs during the review period, of which two were issued to acute level of care patients, nine to MHCB patients, 43 or two percent to EOP patients, 629 or 28 percent to 3CMS patients, 1,395 or 62 percent to general population inmates, and 162 to patients who had not been classified.

Sixteen RVRs were reviewed to assess compliance with applicable policy. Custody staff timely referred the mental health assessment to mental health staff in six of 16 or 38 percent of reviewed cases. Mental health staff timely completed the assessment and returned it to custody staff in 14 of 16 or 88 percent of cases.

Mental health staff recommended penalty mitigation in 14 of 16 or 88 percent of cases. The senior hearing officer documented consideration of the assessment in 13 of 16 or 81 percent of cases and actually mitigated penalties for ten RVRs.

Of the sixteen reviewed RVRs, three mental health assessments recommended documenting the RVR in an alternative manner as the clinician determined that the patients' behavior was "strongly influenced" by the patient's mental illness.

A staff assistant was assigned to all RVRs reviewed. The mental health assessment interview was conducted confidentially in nine of 16 or 56 percent of cases. In four cases the patient refused the interview, in two the assessment stated that a confidential space was not available, and in one the patient was reported to be on quarantine status and could not be removed from the cell.

The monitor reviewed nine patients' ICC actions regarding assessment of a SHU term because of an RVR. In all nine ICCs, the chairperson documented consideration of the mental health assessment, but further details were lacking. Further, three mental health assessments reported that the patient's behavior was impacted by mental illness. The ICC mitigated the SHU term in two of the three cases.

As for training, one of five correctional administrators attended the mandatory RVR mental health assessment training, as did all five captains, 26 of 27 lieutenants, and 57 of 63 sergeants. Eight mental health staff members also attended the training; the eight trained mental health staff completed all mental health assessments that the monitor reviewed.

<u>Use of Force</u>:

NKSP reported attendance at mandatory use of force training by the warden, the chief deputy warden, five correctional administrators, 27 lieutenants, and 63 sergeants. Further, 564 of 619 or 91 percent of correctional officers attended the training. As for mental health staff, neither the chief of mental health nor the chief psychologist attended the training, but it was attended by all supervisory psychiatrists, psychologists, and social workers, three of four psychiatrists, 15 of 16 psychologists, and all 14 social workers, four psychiatric nurse practioners (PNPs), and 88 of 120 nurses.

There were no controlled use of force episodes during the review period. The 123 immediate use of force incidents involved 95 MHSDS patients and 207 non-MHSDS inmates. Of the 123 immediate use of force incidents, one occurred in the MHCB, and ten incidents involved eleven EOP patients.

Five reviewed immediate use of force incidents were all found to be in compliance with applicable policy. Reviewed incident package reports clearly indicated the reasons and

justifications for the immediate uses of force.  There were no patient complaints of unnecessary or excessive use of force noted due to the immediate uses of force.

Lockdown/Modified Programs:

There were no program lockdowns during the review period but there were intermittent periods of modified programming on all facilities.

All facilities were on modified programing from October 1, 2021, through February 13, 2022, due to a medical quarantine and only priority ducats were allowed.  Facilities A, B, C, D, and CTC continued on modified programming from February 14 through February 21, 2022, also due to a medical quarantine and again, health care services were for priority ducats only. This modified programming continued from February 22 through March 31, 2022 on Facilities B and D, again due to a medical quarantine.

Access to Care:

A review of NKSP's monthly Health Care Access Quality Reports from October 2021 through March 2022 indicated that 89 percent of the 45,591 MHSDS ducats and add-on appointments were not completed, of which 89 were due to non-custody reasons, 11 percent were due to patient refusals, and zero percent were not completed due to custody reasons.

Placement of 3CMS into Minimum Support Facilities:

Four 3CMS patients were housed in the minimum supervision unit.  Three of four were prescribed KOP medications and all four had paid employment positions.

*Coleman* Postings:

Current *Coleman* posters in English and Spanish were observed in ten toured housing units and the MHCB.  One toured housing unit did not have the current *Coleman* poster in English, while another did not have the current *Coleman* posters in English or Spanish.

**APPENDIX B-5**
**Folsom State Prison (Folsom)/Folsom Women's Facility (FWF)**
**(May 17, 2022 – May 19, 2022)**
**Review Period: (October 1, 2021 – March 31, 2022)**

Census:

On May 18, 2022, Folsom State Prison/Folsom Women's Facility's (Folsom/FWF) total population was 2,968 and consisted of 2,750 men and 218 women. This population was 14 percent less than what was reported for the prior review period. The mental health caseload population of 655 patients, which included 546 men and 109 women, represented 22 percent of the total incarcerated population. The MHSDS population had decreased by five percent since the preceding review period; the male MHSDS population had increased by five percent, but the female MHSDS population had decreased by 37 percent.

The institution did not have an MHCB.

Three EOP male patients were awaiting transfer to mainline EOP programs; none exceeded transfer timeline guidelines.

The 645 mainline 3CMS patients included 536 males and 109 females.

The 62 incarcerated people in administrative segregation included seven male 3CMS patients.

Staffing:

The chief psychiatrist position was filled. Three psychiatrists covered 2.5 psychiatry positions. However, during the review period, one psychiatrist was on a three-month leave, but registry covered the position. Another psychiatrist began providing treatment using telepsychiatry on March 11, 2022, for 40 hours weekly as a temporary accommodation. Due to family medical issues, the third psychiatrist also began providing treatment utilizing telepsychiatry two weeks prior to the site visit through a 60-day accommodation.

Positions for the chief psychologist and one of two senior psychologist specialists were filled. Half of the vacant senior psychologist specialist position was used to fund half of a senior psychologist supervisor position, increasing that senior psychologist supervisor position from a 0.5 to a 1.0 position. The senior psychologist supervisor position was filled. Five of six staff psychologist positions were filled. All Folsom/FWF psychologists were licensed.

Four of 5.5 social worker positions were filled for a 27 percent vacancy rate. All social workers were licensed.

The senior psych tech position was filled. Of 3.5 psych tech positions, 2.5 were filled but one psych tech was on an extended leave, reflecting a 57 percent functional vacancy rate.

Folsom/FWF did not have any mental health nursing positions.

The HPS II position was filled but the HPS I position was vacant. For office technicians, 1.5 of three positions were filled.

Quality Management:

The quality management committee met four times during the review period. Two meetings were cancelled due to COVID-19. Meeting minutes were comprehensive. Addressed items included customer surveys, the ISUDT, performance improvement work plans, mental health subcommittee reports, audit updates, improvement plans, custody matters, and COVID-19. Completed and newly created action items were also reviewed.

The mental health subcommittee met monthly and attained quorums. The subcommittee reviewed previous action items, LOPs, mental health staffing, training, peer review, inpatient referrals, programming, updates for OnDemand automated measures, the Dashboard, chart audit tool (CAT) results, and the SPRFIT.

There were no mental health QITs/FITs during the review period.

192

Review period audits included quarterly chart audits that focused on treatment planning, SRASHEs, RVR evaluations, five-day follow-ups, controlled uses of force, and conflicting diagnoses. The institution provided training and/or mentoring to clinicians who scored poorly on audits.

The external peer review process for psychiatrists, psychologists, and social workers remained on hold during the review period. However, there was monthly internal peer review for 15 percent of 3CMS patient charts for the Folsom mainline and administrative segregation and for FWF mainline patients. Deficiencies were followed up with training and/or mentoring.

The institution disseminated quality management information to mental health line staff during staff meetings and through emails.

Medication Management:

Folsom/FWF provided MAPIP psychiatric diagnostic and nursing measures monitoring compliance results for the review period.

The medication management dashboard demonstrated, for patients prescribed antidepressants, compliance for the measures for venlafaxine blood pressure and thyroid monitoring for all six months of the review period. Medication consent forms were compliant for two of six months. No EKG measures were required for antidepressants.

Diagnostic monitoring for patients prescribed atypical antipsychotics indicated compliance for all required months of the review period for checking height and weight, and for blood pressure and thyroid monitoring. There was compliance for three months for AIMS tests and for two months for medication consent. Blood sugar testing and EKGs were compliant for one month. Monitoring of CBC with platelets, CMP, and lipid monitoring were not compliant any of the six months of the review period.

193

No patients were prescribed carbamazepine.

Folsom was not a clozapine initiation or maintenance-approved facility.

Psychiatric diagnostic measures for patients prescribed Depakote were compliant for medication consents for all six months. The measures for CBC with platelets, CMP, and Depakote levels were compliant for two of four required months.

For lamotrigine, there was compliance for medication consents for all required months.

As for lithium, there was compliance for medication consents for all six months. There was compliance for the creatine and BUN (kidney function tests) measure for four of five required months. Lithium levels were compliant for three of five required months. There was compliance for two of three required months for thyroid monitoring and for EKGs for the one required month.

MAPIP data indicated consistent compliance for all six months of the review period for medication administration including chronic care medications' historical administration prescribed by a psychiatrist, outpatient providers' new psychiatric medications, observation of medication preparation and administration for HS medications, observation of medication preparation and administration of AM/PM medications, and for medication continuity upon inter-institutional transfer at R&R.

There was compliance for five of six months for nurse administered (N/A)/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), continuity of care following discharge from the community hospital or acute/intermediate care/DSH, and continuity of medications upon parole or release to the community. Folsom was compliant for four of six months for medication continuity for intra-institutional transfers to ASU/SHU/PSU. There were no MHCB transfers during the review period.

194

For the one required month, Folsom was compliant with PC 2602 court orders and noncompliant with PC 2602 medication orders.

Psychiatrists could prescribe medications for up to 180 days. Bridge orders were permitted for up to 30 days.

Nursing documented and tracked telephone and verbal orders in EHRS. Providers issuing authorized telephone/verbal orders were required to sign the orders in EHRS.

Psychiatrists were permitted to prescribe non-formulary medications without a secondary reviewer's approval. Prescribers were required to appropriately document non-formulary prescriptions in EHRS.

Folsom reported that psychiatrists generally prescribed psychotropic medications DOT. Folsom did not report the number of patients prescribed DOT or KOP medications. No patients were prescribed KOP selective serotonin reuptake inhibitor (SSRI) medications. Psychiatry reported that the majority of patients were prescribed medications DOT.

The institution prescribed 914 patients HS psychiatric medications; a total of 40,390 medications were administered. Only two medications were given after 8:00 p.m.

No pill lines lasted longer than two hours. Patients who were prescribed Suboxone did not impact pill lines even though they required nursing observation. With one exception, all pill lines had shelter; the unsheltered pill line was conducted inside during inclement weather.

Transfers:

Folsom/FWF did not refer nor transfer patients to acute or intermediate care, the PSU, or LTRH during the review period. Further, no patients met the criteria for inpatient care referral who were not referred.

Twenty-five patients were referred to MHCBs.  All were admitted and all but one transferred within 24 hours; the one untimely transfer exceeded 24 hours by three hours.

The institution transferred 20 male and six female patients to mainline EOP programs during the review period, of whom 24 or 92 percent transferred timely; the two untimely transfers were due to a COVID-19 outbreak.  During the site visit, none of the three EOP patients awaiting transfer to mainline EOP programs exceeded transfer timeline guidelines.

Folsom/FWF transferred 15 patients to EOP hubs, of whom 12 or 80 percent timely transferred within 30 days.  The three untimely transfers were late by nine, ten, and 38 days due to COVID-19 movement restrictions.  No patients awaited transfer to EOP hubs during the site visit.

During the review period, of 70 Folsom/FWF 3CMS patients housed in administrative segregation, ten or 14 percent took longer than 30 days to transfer to STRH due to COVID-19 movement restrictions.  At the time of the site visit, none of the seven 3CMS patients in administrative segregation pending STRH transfer had been waiting longer than 30 days.

Further, during the review period, 15 3CMS patients transferred to Folsom/FWF who had recently been downgraded from EOP or had discharged from another institution's MHCB.  Two of these patients returned to a higher level of care within three months.

Programming:

MHSDS Patients in Administrative Segregation:

The institution lacked a designated restricted housing mental health program.  During the review period, 319 incarcerated persons were housed in administrative segregation, including ten EOP and 76 3CMS patients, and 233 non-MHSDS incarcerated persons.

The administrative segregation unit's first tier contained single occupancy retrofitted new intake cells.  Emergency cut-down kits were located on each tier and reviewed inventory logs revealed daily maintenance.  Each tier also contained roll-in televisions for patient viewing.  Because cells lacked electrical outlets, patients were provided with hand-crank radios.

Leadership reported that, when 3CMS and EOP patients were temporarily housed in administrative segregation, they were offered a minimum of weekly primary clinician contacts, daily psych tech rounds, confidential IDTTs, and daily in-cell materials until their transfer to an appropriate institution.  There were no treatment groups for administrative segregation patients.

The administrative segregation unit contained two interview rooms on the first floor.  Both rooms had TTMs that allowed for confidentially.  Leadership indicated that, with the exception of periods of movement restrictions during modified programming, all administrative segregation patients were offered confidential contacts with their mental health providers in one of the interview rooms.

During the prior site visit, the monitor's expert raised concerns about Folsom/FWF's use of several isolated cells in the back of a narrow hallway on the ASU's bottom level.  A wall separated these cells from the retrofitted new intake cells located closer to the front of the unit.  Although there were no patients in these cells during the site visit, Folsom reported using the isolated 1B cells 18-23 and 1A cells 16-23 cells, which they referred to as "quiet cells," for housing individuals confined to ASU and in need of separation or "quiet time."

The unit lieutenant and chief psychologist acknowledged that, at times (though not often), the cells were used to house MHSDS patients who needed separation from other incarcerated persons to remove stressors and anxiety; the floor officer also indicated that there were no expectations for rounding the area more frequently, which was concerning given the inherent

197

risks. To that same end, Folsom/FWF did not have a policy regarding utilization of these cells; this included the collaboration of mental health staff regarding placement of a patient in these cells and did not have any requirement for monitoring patients placed in them. Further, Folsom/FWF did not track who or how long patients were placed in these cells. The monitor informed Folsom/FWF that the Special Master historically disagreed with utilizing these management cells.

Reviewed 114s indicated compliance with the offering of three weekly showers and ten weekly hours of yard.

Unclothed body searches were performed in patients' cells or in a holding cell surrounded by privacy screens.

Non-Disciplinary Segregation:

The institution did not track non-disciplinary segregation data for the review period. One MHSDS patient and eight non-MHSDS incarcerated persons were on NDS status during the site visit. The MHSDS patient had been on NDS status for nine days and was expected to transfer in one day.

Crisis Intervention Team:

Folsom/FWF did not operate a CIT during the review period. The on-call psychiatrist managed crises after-hours.

Alternative Housing:

As the institution did not operate an MHCB, all patients who were referred for MHCB placement were temporarily housed in alternative housing cells with a one-to-one suicide watch observer until their transfer to another institution for MHCB care. Incarcerated males who were referred to the MHCB were temporarily housed in one of eight designated alternative housing

cells in the administrative segregation unit; the cells had been retrofitted and were also used as new intake cells for new arrivals to administrative segregation. Female patients awaiting MHCB placement were housed in two designated cells within R&R; these cells had not been retrofitted for suicide prevention.

3CMS:

All Folsom/FWF 3CMS psychiatrists and primary clinicians had caseloads within established ratios.

Staff and patients reported that psychiatrists and PCs met with patients at least once every 90 days, as required. They further reported that psychiatrists and PCs timely responded to sick call requests and referrals.

A widespread COVID-19 outbreak negatively impacted 3CMS patients' programming and services from December 26, 2021 through March 22, 2022, during which 3CMS groups were suspended, routine IDTTs were completed in absentia, and routine psychiatry and PC contacts were completed at cell front. Further, movement restrictions affected access to dayroom, canteen, packages, in-person visitation, and religious services. However, leadership reported that patients continued to have access to video visiting, showers, telephone calls, and medication distribution.

All patients confirmed that mental health staff responded quickly to requests for additional contacts and spent sufficient time with them during clinical encounters. Patients denied problems with custody staff interfering with their treatment and perceived that mental health and custody staff generally worked well together. Overall, patients had mostly positive feedback about the quality of mental health services. The one common complaint was the lack of visual privacy in the primary mental health treatment building.

Observation of six Folsom/FWF IDTTs revealed that they were adequate and were conducted in space that allowed for sound privacy but not visual confidentiality. These IDTTs were attended by the primary clinician, treating psychiatrist, and correctional counselor, all of whom had access to EHRS and C-files. Meetings were interactive, with all team members, including patients, actively participating in discussions. Case conceptualizations were based on historical information and patients' current mental status examinations. Treatment goals and interventions were adequate. Two patients were appropriately removed from MHSDS. No patients were observed who required a higher level of care.

Only one IDTT occurred in absentia due to patient refusal. Overall, the team functioned well and each team member contributed to discussions and interacted appropriately with patients. One of the two primary clinicians seemed less familiar with patients and failed to cover some critical areas; however, the psychiatrist ultimately circled back and ensured that all areas were addressed with the patient in the room. Input from the psychiatrist and counselor was thorough and useful for determining next steps in care, and these two IDTT members were very good at ensuring that effective communication was established with each patient.

IDTT discussions regarding obstacles to treatment, levels of care, and treatment planning were collaborative. Treatment goals were stated in measurable terms. Patients were active in the IDTT discussions and expressed appreciation for mental health services. Of note, several patients expressed a desire for more treatment groups during the IDTTs. Conversely, while no serious patient care concerns were observed, and no patient appeared in need of a higher level of care, IDTT quality was generally lacking in the areas of case conceptualizations, justifications for diagnoses and treatment decisions, collaborative decision making, and patient specific treatment goals. The monitor's expert also noted that one patient received multiple RVRs in a

200

very short period; however, the treatment team did not consider modifying the existing treatment plan to address the behavioral concerns.

Group treatment was discontinued during the COVID-19 outbreak. Folsom/FWF reinitiated group treatment in April 2022. Two observed groups consisted of six and seven patients. PCs facilitated both groups. One group dealt with existential issues using acceptance and commitment therapy interventions and homework. Members were required to read assignments and be prepared to discuss them during their weekly session. The other group, which was for patients who had a life sentence, dealt with their unique issues. Both groups were interactive with patients disclosing personal experiences. A discussion with group members revealed trust and confidentiality. They valued the groups, saying that they were beneficial.

Folsom/FWF patient and staff interviews identified the lack of visual confidentiality as the biggest barrier to the delivery of mental health care; consequently, patients reported being pressured by gang members to discontinue treatment including MAT. FWF patient and staff interviews focused on 3CMS patients who needed more structure than FWF could offer with their open dorms, resulting in EOP referrals. 3CMS patients also reported having plenty of programming opportunities (i.e., jobs and education). Additionally, mental health leadership discussed plans to increase their staffing and group opportunities.

To increase the provision of mental health services, Folsom/FWF created the General Population Guidance and Resource Center (GP GRC) to offer services to individuals needing support or guidance with a specific problem, looking to build new skills, wanting to gain awareness and understanding of the issues leading to their crime, and/or seeking personal growth. The GP GRC was not for individuals seeking or receiving 3CMS or EOP services; furthermore, it had an LOP dated November 21, 2021, and a self-referral form.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Nine patients required initial psychiatric evaluations during the review period. Six of nine or 67 percent timely occurred prior to the initial IDTT. In three cases, initial psychiatric evaluations were not documented. All six documented initial contacts were conducted in a confidential setting. Telepsychiatry did not conduct any initial psychiatry contacts.

There were eight expected timeframes for routine psychiatry contacts. All timely occurred within 90 days. Nine of 11 or 82 percent of routine psychiatry contacts were conducted confidentially; reasons appointments were not confidential included COVID-19 restrictions and medical restrictions. Telepsychiatry conducted 18 percent of routine psychiatry contacts.

Nine patients required initial primary clinician evaluations during the review period. Seven of nine or 78 percent timely occurred within ten working days. One hundred percent of initial contacts were conducted confidentially.

There were 20 expected timeframes for routine primary clinician contacts. Seventeen of 20 or 85 percent timely occurred within 90 days. Twenty-eight of 32 or 88 percent of routine PC contacts were conducted confidentially; like for psychiatry contacts, appointments were not confidential due to COVID-19 restrictions and medical restrictions.

Nine patients required initial IDTTs. Five of nine or 56 percent timely occurred within 14 working days. Four patients required routine IDTTs. One hundred percent timely occurred at least annually. Required staff attended all initial and routine IDTTs that occurred during the review period.

Other Issues:

Pre-Release Planning:

During the site visit, there was one full-time pre-release coordinator for both Folsom and FWF.  The pre-release coordinator kept well-organized spreadsheets containing initial assessment dates, outstanding follow-up items, and releases of information for patients who were eligible for pre-release services.  The coordinator also had access to TCMP caseworker's logs to determine whether required contacts occurred and to track the status of applications for SSI, state identification cards, and MediCal.  The pre-release coordinator confirmed sharing information with TCMP and ISUDT staff during biweekly meetings.

Due to COVID-19, Folsom had not offered pre-release planning groups since July 2021. In lieu of such groups, the coordinator reported that interested patients were provided with modules from the pre-release planning group curriculum.

Despite the pre-release coordinator not carrying a caseload and only having other duties on rare occasions, there were delays in initiating pre-release planning services.  The coordinator stated that services were generally initiated for eligible patients within two weeks of their release instead of 60 days prior.  The monitor's expert noted that this practice increased the likelihood that some eligible patients could be released without pre-release planning services, especially in instances when patients were released earlier than expected.

Additionally, compliance with required timeframes for initiating pre-release planning assessments in EHRS, scheduling face-to-face contacts, and completing the remaining assessment sections was not tracked.  The monitor's expert also reported at least three patients who were reviewed during IDTTs who expressed pre-release planning service needs but had not received them; all were within two months of release.

<u>Program Access</u>:

a.      <u>Job and Program Assignments</u>:

During the reporting period, Folsom/FWF reported that of 1,136 job assignments, none were held by EOP patients, while 177 3CMS patients or 27 percent of the 3CMS population held them, as did 959 or 41 percent of non-MHSDS incarcerated persons.

Of 580 academic assignments, one EOP patient or 25 percent of the EOP population held them, as did 174 3CMS patients or 27 percent of the 3CMS population, and 405 or 18 percent of non-MHSDS incarcerated persons.

The 170 vocational education assignments were held by no EOP patients, and by 43 or seven percent of 3CMS patients, as well as by 127 or five percent of non-MHSDS incarcerated persons.

Of 350 voluntary education assignments, none were held by EOP patients, while 61 or nine percent of 3CMS patients held them, as did 289 or 12 percent of non-MHSDS incarcerated persons.

There were also 142 substance abuse treatment assignments; none were held by EOP patients, and 57 or nine percent of 3CMS patients held them, as did 85 or four percent of non-MHSDS incarcerated persons.

> b.     Milestone Credits:

During the review period, Folsom/FWF reported that all four EOP patients were eligible to earn milestone credits, but that none earned the credit.  Further, all 653 3CMS patients were eligible to earn milestone credits, with 18 percent earning the credit.  Of the 2,313 non-MHSDS incarcerated persons, 2,311 or 99 percent were eligible to earn the credits, with 18 percent earning it.

> c.     Out-of-Level Housing

Female incarcerated persons at FWF were housed in dorms that included Level I, II, and

III incarcerated persons. At Folsom, on April 1, 2022, 36 custody Level II 3CMS patients were in Level I housing, two custody Level III 3CMS patients were in Level II housing, 16 custody Level II 3CMS patients were in Level III housing, and 16 custody Level III 3CMS patients were in Level IV housing.

     d.    <u>ADA Reasonable Accommodation and Grievance Procedures:</u>

Folsom/FWF documentation confirmed implementation of the revised ADA reasonable accommodation and grievance procedures to accommodate psychiatric disabilities.

<u>Case-by-Case Reviews:</u>

During the review period, no Folsom/FWF patients were housed in administrative segregation who met the requirements for case reviews.

<u>"C" Status:</u>

During the site visit, the 38 patients on "C" Status included six 3CMS patients. The reasons for incarcerated individuals' placement on "C" Status included possession of cell phones and alcohol, fighting, and distribution of controlled substances.

<u>Mental Health Referrals:</u>

During the review period, Folsom/FWF reported a total of 1,288 mental health referrals, which included 388 psychiatry referrals and 900 PC referrals, excluding PREA referrals. The 53 emergent referrals included 16 to psychiatry and 37 to primary clinicians. Of the 245 urgent referrals, 35 were to psychiatry and 210 were to primary clinicians. The 990 routine referrals included 337 to psychiatry and 653 to primary clinicians.

For emergent referrals, 100 percent of psychiatry responses were timely, as were 89 percent of PC responses. Of the urgent referrals, 86 percent of psychiatry referrals and 94

percent of primary clinician referrals had timely responses.  For routine referrals, psychiatrists and primary clinicians timely responded to 82 and 94 percent of such referrals, respectively.

Housing unit officers were knowledgeable about the mental health referral process and were able to locate the CDCR 128 MH-5 referral form upon request.

Treatment Space:

Folsom's R&R area had two confidential interview rooms for screenings.  FWF's R&R interview room had a window so that clinicians felt they could close the room's door without feeling that they compromised their personal safety.

Folsom had 13 individual mental health interview offices and one large group treatment room in the mental health treatment building.  However, multiple staff and patients complained about this building's lack of visual privacy, which was described as a serious concern due to prison politics and generally negative attitudes that resulted in safety issues for MHSDS patients. Folsom clinicians further reported that their patients felt unsafe during sessions due to porters on the mental health floor being able to see them through the plexiglass doors.

Folsom's administrative segregation, in addition to the two confidential interview offices, had one large conference room that was used for IDTTs.

FWF had three confidential individual mental health interview rooms but held IDTTs and groups in the visiting area, which lacked visual privacy.  At times, the library was also used for treatment groups.

Custody and Mental Health Partnership Plan:

Folsom/FWF's LOP for the CMHPP was dated March 2022.  As for executive leadership joint rounding, the LOP did not discuss attendance by the chief psychiatrist or chief psychologist.

The institution conducted executive leadership joint rounding during five months of the review period; the cancelled month was due to a COVID-19 outbreak.  Both the warden and chief executive officer attended all joint executive rounding tours and the chief of mental health attended two of five executive leadership joint rounding tours; no other mental health representatives were noted as having attended.  Documentation reflected the interviewing of at least two patients and two staff members during all rounding episodes.  Rounding discussions addressed issues relevant to the custody/mental health relationship and general operational concerns such as toilet repairs and heating.  Interviewed patients expressed satisfaction with the quality of their mental health care.

The institution confirmed that executive leadership joint rounding was not addressed by either the quality management committee or the mental health subcommittee; it further indicated identifying this deficiency and both the QMC and mental health subcommittee began covering the rounding in April 2022.

Because Folsom/FWF was a 3CMS institution, it was not required to conduct second and third watch huddles, quarterly partnership roundtable training, or conduct EOP orientation groups.

The institution provided documentation for weekly 3CMS supervisory meetings for the review period.  Both the mental health supervisor and the program sergeant attended nearly every weekly meeting.  Reviewed forms reflected patient and staff concerns, and staff concerns about patients, including challenges with COVID-19 modified programming and lockdowns, and observed poor hygiene.

Folsom conducted IAC meetings during two months of the review period; FWF conducted them for three months. Addressed issues included the request for a transgender support group, book drop boxes, visitation, and measures for future COVID-19 outbreaks.

There were 189 complaints alleging staff misconduct during the review period. Of the 81 resolved cases, four were approved or substantiated, one was referred for a PREA investigation, and 76 were disapproved or unsubstantiated. No disciplinary actions were made against staff and no staff were moved to other posts due to these complaints.

Ninety-nine percent of custody staff and 100 percent of mental health staff completed annual off-post partnership training.

Heat Plan:

The heat plan was in operation during the review period. Thermometers were appropriately placed, and heat logs were adequately maintained. Interviewed custody staff were familiar with the heat plan and reported offering reasonable accommodations to patients in the form of morning yard, when the weather was cooler, during the heat season.

The Folsom/FWF heat plan LOP stated that MHSDS patients who were prescribed heat sensitive medications could not access the sweat lodge. The LOP differed from statewide policy as it required the Chief Executive Officer (CEO) or designee to annually work with Native American spiritual leaders to discuss alternative means of satisfying their spiritual needs.

RVRs:

During the review period, Folsom/FWF issued 1,111 RVRs, of which 451 or 41 percent were issued to MHSDS patients. Of these, 441 RVRs were issued to 3CMS patients, six were issued to EOP patients, and four were issued to MHCB patients.

Nineteen RVRs were reviewed to assess compliance with CDCR policy and procedure. Reviewed RVRs included two that were issued to MHCB patients, six issued to EOP patients, nine issued to 3CMS patients, and two issued to non-MHSDS incarcerated persons. Custody staff timely referred the mental health assessment to mental health staff in seven of 19 or 37 percent of reviewed cases; late referrals ranged from three to 27 days. Mental health staff timely completed the assessment and returned it to custody staff in 16 of 19 or 84 percent of cases; late referrals ranged from nine to 22 days. Twelve of 19 or 63 percent of mental health assessment interviews were conducted confidentially.

All reviewed RVRs contained mental health assessments. Notably, these assessments recommended penalty mitigation in eight of 19 or 43 percent of the reviewed cases. The senior hearing officer actually mitigated the penalties in five of eight or 63 percent of cases. None of the reviewed RVRs recommended documenting the case in an alternative manner.

A review of the tracking log indicated several instances where mental health assessments were conducted for general population incarcerated persons and 3CMS patients for behavior that was deemed bizarre, unusual, or uncharacteristic.

During the review period, RVRs resulted in the assessment of SHU terms for 17 patients. Review of six of these patients' ICC actions revealed ICC documentation of consideration of clinical input when assessing the SHU term.

All required custody staff completed inmate disciplinary mental health assessment training. Of the 15 mental health staff required to attend, all but one senior psychologist completed the training.

<u>Use of Force</u>:

Folsom/FWF reported that 100 percent of required custody staff received mandatory use of

force training during the past year.  Ninety-six percent of required mental health staff were also trained.

There were no controlled use of force incidents during the review period.  Of the 58 immediate use of force incidents, 25 or 43 percent involved MHSDS patients.  The institution also reported 126 non-use of force incidents, of which 64 or 51 percent involved MHSDS patients.

Lockdowns/Modified Programs:

Folsom/FWF had three COVID-19 related modified programming periods during the reporting period.  Programming and services for MHSDS participants were negatively impacted by modified programming from December 26, 2021 through March 22, 2022.  During this period, 3CMS groups were suspended, routine IDTTs were completed in absentia, and routine PC and psychiatry contacts were completed at cell front.  Health care services were priority ducats only with rounds conducted in the units.

Movement restrictions also affected access to dayroom, canteen, packages, in-person visitation, and religious services. According to leadership, patients continued to have regular access to video visiting, showers, phone calls, and medication distribution during the outbreak. Required routine 3CMS services at Folsom resumed at the end of March 2022; 3CMS groups at FWF were expected to start at the end of May or early June 2022.

Access to Care:

A review of Folsom/FWF's monthly Health Care Access Quality Reports revealed that during the review period none of the issued mental health ducats and add-on appointments were not completed due to custody factors while 30 percent were not completed due to non-custodial reasons.

<u>Placement of 3CMS Patients into Minimum Support Facilities</u>:

The institution did not transfer any patients to a minimum support facility during the review period.

<u>*Coleman* Postings</u>:

The monitor observed current *Coleman* posters in English and Spanish in all toured housing units.

**APPENDIX B-6**
**CORRRECTIONAL TRAINING FACILITY (CTF)**
**(May 24, 2022 – May 26, 2022)**
**Review Period: (November 1, 2021 – April 30, 2022)**

Census:

CTF's total incarcerated population was 3,997, which was a 17 percent decrease since the prior review period. The MHSDS population of 944 patients had decreased by 29 percent since the previous reporting period and represented 24 percent of CTF's population.

The institution housed one EOP and 943 3CMS patients.

Staffing:

CTF's chief psychiatrist position was vacant. The chief psychiatrist position had replaced the position for the senior psychiatrist in CTF's most recent staffing allocation; however, although CTF no longer had a senior psychiatrist position, it had a senior psychiatrist.

One of two chief psychologist positions was filled; the other position remained vacant as a salary savings. Positions for the senior psychologist supervisor and two senior psychologist specialists were filled.

Two of 3.5 staff psychiatrist positions were filled, but one psychiatrist was on an extended leave, reflecting a 71 percent vacancy rate. Two registry psychiatrists reduced the functional vacancy rate to 14 percent. CTF had neither telepsychiatrists nor psychiatric nurse practitioners.

All eight staff psychologist positions were filled. One psychologist was on an extended leave, for a 13 percent vacancy rate. Two psychologists were unlicensed.

The supervising social worker position was filled, as were all nine clinical social worker positions. One social worker was unlicensed.

212

The MHSDS registered nurse position was filled.  The senior psych tech position, and all 3.5 psych tech positions, were also filled.

CTF had no recreation therapist positions.

A total of 9.5 MHSDS clerical staff covered seven positions.  There was one HPS II but no established position.  The OSS II and HPS I positions were filled.  The CHCA position was vacant.

Telepsychiatry:

CTF did not use telepsychiatry during the reporting period.

Crisis Care:

CTF reported that as a 3CMS institution it was not required to have a CIT.  The institution further reported that on-site clinicians managed emergencies during normal business hours; on-call psychiatrists handled them after hours.  Additionally, a clinical social worker responded to crisis calls during the day on Saturday and Sunday, in addition to other assigned duties.  Custody staff participated in crisis intervention when warranted.

Quality Management:

CTF did not have a local governing body.

Quality management committee meetings occurred monthly during the review period. No meetings were cancelled.  All reported quorums.  QMC meeting minutes reflected consistent agendas where subcommittee chairpersons reported on the status of various quality management measures.  Besides mental health, there were subcommittee reports for utilization management, medical, nursing, medication management, EMRRC, patient safety, resource management, and dental.  QMC minutes demonstrated consistent follow-up of previous agenda items, with action plans addressing significant concerns.

The MHPS met monthly and attained quorums, with attendance by required participants or their designees.  Reviewed meeting minutes found coordinators and supervisors reporting on areas of responsibility.  The minutes also contained thorough data analysis and action plans in response to specific goals and benchmarks, referenced agenda items and initiatives from prior meetings, and provided updates and feedback on action plans.

There were no QITs or FITs during the review period or at the time of the site visit.

CTF did not have peer review during the reporting period.

A PIWP addressed the mental health appointments backlog that resulted from limited patient access to care due to COVID-19.  CTF began monitoring the patient backlog in February 2021 and significantly reduced it during the review period.

The QM supervisor reported that another initiative was measuring continuity of care with the goal of new arrivals being seen by the same clinician for intake, IDTT, and follow-up.  QMC meeting minutes reported that continuity of care exceeded 90 percent for January and February for North and Central facilities.

<u>Medication Management</u>:

CTF reported that overall diagnostic monitoring compliance scores ranged from 95 to 99 percent during the review period.

Psychiatrists prescribed medications and bridge orders for a maximum of 180 days.  On-call psychiatrists without EHRS access limited orders to between 14 and 30 days.

CTF had discontinued the non-formulary medication supervisory approval process in September 2019.  The current policy required prescribers to document the justification for non-formulary prescriptions in EHRs.  Between November 2021 and February 2022, non-formulary medications comprised approximately two percent of all mental health prescriptions.

CTF did not prescribe any patients PC 2602 involuntary medication orders during the reporting period or at the time of the site visit.

Nursing staff administered HS medications after 8:00 p.m.  A total of 338 patients were prescribed HS psychiatric medications during the review period.

CTF reported two known occurrences of psychiatric medications' expiration without renewal orders.  Nursing nonetheless opined that such incidents were rare, as upcoming medication expiration dates were routinely discussed during daily healthcare huddles.

Upon learning that long pill line wait times resulted from the observation of Suboxone medication administration, CTF assigned an additional nurse to distribute medications on North and Central facilities.  Thereafter, audits reported that patients' pill line wait times did not exceed 30 minutes.

Transfers:

CTF's inpatient coordinator was a seasoned staff member who had other responsibilities, which included being the SPRFIT and EOP coordinators, and the mental health training coordinator.

CTF did not refer any patients to inpatient care during the reporting period, and none were awaiting transfer to inpatient care at the time of the site visit.  The institution further reported that there were no patients who met the criteria for inpatient care referral who did not transfer.

CTF referred 20 patients to the MHCB, of whom 18 were admitted and two were rescinded.  As CTF did not have an MHCB, crisis bed referrals were made primarily to CHCF, Salinas Valley State Prison (SVSP), the California Substance Abuse Treatment Facility (CSATF), and CMC.  All MHCB referrals timely transferred within 24 hours.

215

During the site visit, no CTF patients were pending administrative segregation placement. While CTF's administrative segregation unit remained under construction, CTF relied on SVSP for its administrative segregation needs.

CTF referred three patients to mainline EOP programs during the review period; two of three timely transferred.

CTF did not transfer any patients to STRH, LTRH, or the PSU during the reporting period.

Programming:

Alternative Housing:

CTF's alternative housing LOP was current and consistent with headquarters' policy.

The institution's alternative housing cells were located in Facility C and consisted of cells 230 – 233.  All four were wet cells that were equipped with a cement bed covered by a removable safety mattress.  Cell 231 permitted the use of five-point restraints when clinically indicated.  Cell 233 was fitted with a handrail for patients with mobility issues.  All cells except cell 233 were suicide resistant.

During the review period, all 20 of CTF's MHCB referrals were initially placed in alternative housing.  Alternative housing stays averaged 8.3 hours and ranged from 1.4 to 19.9 hours.  At the time of the site visit, no patients were in alternative housing.

3CMS:

The staffing ratios for psychiatrists, psychologists, and clinical social workers were all within established ratios.

Twenty 3CMS patients were randomly selected to have their healthcare records assessed for their 3CMS stays.

216

All three patients who required initial psychiatry evaluations had them prior to the initial IDTT. All three were conducted in a confidential setting.

There were 18 expected timeframes for routine psychiatry contacts. Eight of 18, or 44 percent, timely occurred within 90 days. All routine psychiatry contacts were confidential.

One of three patients who required an initial primary clinician evaluation had a timely evaluation within ten working days. Otherwise, all three occurred in a confidential setting.

Thirty of 33 or 91 percent of expected timeframes for routine primary clinician contacts timely occurred within 90 days; all were confidential.

Two of three patients who required initial IDTTs had a timely initial IDTT within 14 working days. Five of seven or 71 percent of routine IDTTs timely occurred at least annually. Patients and required staff attended all initial and routine IDTTs. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician, but this assignment was not clearly discernable for all cases.

IDTTs were observed on North Facility. The IDTTs were appropriately staffed and attended by patients' assigned PCs; however, the assigned psychiatrist did not attend one observed IDTT. The 3CMS program supervisor and pre-release planner also attended. All participants had laptops to access patient information when needed. Patients were informed of the IDTT's purpose, as well as attendees' roles and responsibilities. All treatment team members contributed to the discussion. One PC relied on prompting from the supervisor to provide critical information and ask necessary follow up questions to determine changes in risk. Missing from most IDTT discussions were case conceptualizations, clinically indicated contact frequencies, and patient specific treatment goals and interventions. There was also a general lack of collaboration regarding treatment planning, and rationales for level of care decisions were not

217

provided.  Additionally, treatment plans were not modified to address new patient concerns raised during IDTTs.  For example, the pre-release coordinator mentioned one patient reported anxiety regarding his upcoming release.  Notably, IDTT members failed to consider integrating this information into the treatment plan and offering additional treatment contacts toward a smoother transition into the community.

CTF did not provide group treatment to 3CMS patients during the review period or at the time of the visit.

Multiple observed IDTTs reflected variability.  Observed North Facility IDTTs were well-organized, appropriately staffed, and attended by patients' assigned PCs; however, the assigned psychiatrist did not attend one observed IDTT.  The IDTT process was collaborative with participants providing relevant input and patients contributing.  Patients were informed of the IDTT's purpose, and attendees' roles and responsibilities.  IDTTs included case conceptualizations and active discussions with the psychiatrist about medications' effectiveness and side effects.  IDTTs also clearly stated symptoms, diagnoses, functional impairments, objectives, interventions, and rationales to address mental health concerns.  Objectives and interventions were individualized and clinically appropriate.

Observed South Facility IDTTs revealed required members in attendance with computer access; the 3CMS program supervisor and pre-release planner also attended.  The IDTT room was confidential and of adequate size.  All staff contributed to discussions and appropriately interacted with patients.  However, despite appropriate intervention on multiple occasions by the 3CMS supervisor to follow-up on risk-related concerns and prompt clinicians to discuss relevant clinical information, the IDTTs failed to discuss case conceptualizations, recommended contact frequencies, or measurable and patient specific treatment goals.  There was also a general lack of

collaboration about diagnosis, level of care, and treatment planning, which the PC solely determined without verbal justification.  The primary clinicians' level of care rationales were also unclear, while treatment plans were not consistently modified to address new patient concerns raised during IDTTs.  For example, the pre-release coordinator spoke to a patient about his anxiety over his upcoming release.  Notably, IDTT members failed to consider modifying his treatment plan or offering additional treatment contacts toward a smoother transition to the community.

CTF did not provide group treatment to 3CMS patients during the review period or at the time of the visit.

The monitor's expert interviewed a group of ten 3CMS patients from North's Facility A yard.  Patients reported seeing their psychiatrist and PC at least once every 90 days in accordance with Program Guide requirements, and more frequently if needed.  While patients reported generally seeing their assigned PC, several indicated that staff turnover was disruptive to continuity of care.  Patients reported timely annual IDTTs.  However, some patients reported not being informed during IDTTs what was available for groups and other programming.  Patients opined that more education about the IDTT process would be helpful.

In a group interview attended by clinical staff from various disciplines, a collaborative relationship between mental health clinicians and psychiatry was reported, as well as an efficient system to get patients to appointments, and a positive relationship with custody.  However, staff identified several areas needing improvement.  North and Central Facility clinicians reported limited group space, a lack of group materials, and low morale, particularly among line staff.  Staff also requested more direct contact with leadership and supervisors, and for leadership to be more receptive to feedback.  Further, staff requested updated inmate disciplinary mental health

assessment training, more patient resources, and training to support transgender patients, as well as more transgender-focused groups.

The monitor's expert attended CTF's daily quarantine and isolation meeting. This comprehensive meeting sought to allow facility administration, mental health, custody, and medical to collaborate in real-time to address COVID-19 issues as they arose. It covered topics relevant to the institution's COVID-19 response and protocols, including case reviews of COVID-19 positive patients, surveillance testing procedures, transfers to the facility, and staff vaccination status. Mental health leadership relied on information from the meeting for scheduling, movement, and treatment planning for patients who would be affected by COVID-19 protocols or program status changes.

CTF offered patients tele-visits with their family during the review period and was in the process of restarting in-person visits. Going forward, CTF planned to offer both in-person and virtual visits.

Other Issues:

Pre-Release Planning:

CTF had one mental health pre-release coordinator, who occupied this position for two years and had no other assignments. The pre-release coordinator regularly received a master patient list from headquarters that identified all patients within 60 days of release. The pre-release coordinator used this list to schedule pre-release meetings with patients to complete the PRPA and the ROI for patients who would be released to probation. Upon release, the coordinator provided a pre-release packet to patients that included individualized services depending on patients' needs, such as information on community mental health services, housing, probation or parole resources, or other appropriate services.

CTF reported that pre-release groups had not occurred in more than two years, since the onset of the COVID-19 pandemic, but anticipated their resumption in July 2022. Notably, the institution had used its own pre-release curriculum in the past but was considering using headquarters' curriculum when groups resumed.

The pre-release coordinator attended the ISUDT biweekly pre-release meeting, the monthly headquarters' pre-release coordinators' call, and participated in patient CCATs, although CCATs' need was rare.

The pre-release coordinator reported a collaborative working relationship with TCMP caseworkers. Further, TCMP indicated that 165 MHSDS patients were released from CTF during the review period, of which there were three EOP and 162 3CMS patients. Prior to release, TCMP screened 100 percent of patients for benefit eligibility. Medi-Cal applications were also submitted for 144, or 87 percent of released patients, while eight patients were screened for access to other insurance benefits. Applications were also submitted for two EOP and eight 3CMS patients who were eligible for SSI, and for five 3CMS patients for veterans' benefits; however, two of the five were denied eligibility.

Program Access:

a.      Jobs and Program Assignments:

On May 3, 2022, CTF reported that of 1,990 available job assignments, two EOP patients, or 40 percent of the EOP population, held them. For 3CMS patients, 409 or 44 percent of the 3CMS population held job assignments, and for non-MHSDS incarcerated persons, 1,579 or 51 percent of the non-MHSDS population held them.

221

As for the 1,018 academic assignments, CTF reported that no EOP patients held these assignments. For 3CMS patients, 207 or 22 percent of the 3CMS population held these assignments, and for non-MHSDS, 811 or 26 percent of the non-MHSDS population held them.

Of 537 vocational education assignments, no EOP patients held assignments, 128 or 14 percent of 3CMS patients held them, and 409 or 13 percent of non-MHSDS incarcerated persons held these assignments.

Of 177 voluntary education assignments, no EOP patients held them, 45 or five percent of 3CMS patients held them, and 132 or four percent of the non-MHSDS population held these assignments.

Of 217 substance abuse treatment assignments, no EOP patients held these assignments, 76 or eight percent of 3CMS patients held them, and 141 or five percent of non-MHSDS incarcerated persons held them.

      c.    <u>Milestone Credits</u>:

A report covering November 1, 2021, through April 30, 2022, indicated that both EOP patients were eligible to earn milestone credits but neither earned the credit. All 956 3CMS patients eligible to earn milestone credits; 22 percent earned them. All 3,080 non-MHSDS incarcerated persons were also eligible to earn milestone credits, with 22 percent earning them.

      d.    <u>Out-of-Level Housing</u>:

As of May 12, 2022, CTF reported that 78 3CMS and 230 non-MHSDS custody Level I patients were in Level II housing. There was also one non-MHSDS custody Level II incarcerated person in Level I housing and eight 3CMS and 18 non-MHSDS custody Level III patients in Level II housing. One non-MHSDS custody Level IV incarcerated person was in Level II housing.

e.    Unclothed Body Searches:

CTF did not provide the LOP for unclothed body searches.  Interviewed custody officers reported conducting all unclothed body searches in private settings.  Unclothed body searches normally occurred during initial patient processing upon arrival at CTF or when an escort was necessary.  Handheld metal detectors were also utilized during these searches.

"C" Status:

At the time of the site visit, three of eight incarcerated persons on "C" status were 3CMS patients.  All three were deemed program failures due to multiple serious offenses resulting in RVRs.  Two of the three 3CMS patients were placed on "C" status for 180 days, which was the maximum amount of time, while the third patient was placed on "C" status for 90 days.  All three patients attended their UCC hearings.

Mental Health Referrals:

CDCR's on demand report reflected a total of 1,404 urgent, emergent, or routine referrals to psychiatry and primary clinicians during the review period.  Overall compliance was 86 percent.  There was a timely response to the one emergent psychiatry referral, while 95 percent of the 44 emergent primary clinician referrals had timely responses.  There was a timely response to the one urgent psychiatry referral, and to 94 percent of the 144 urgent primary clinician referrals.  There were also timely responses to 92 percent of the 172 routine psychiatry referrals, and to 84 percent of the 1,042 routine primary clinician referrals.

Interviewed housing unit custody officers knew how to make referrals to mental health using the CDCR MH-5 form, which was easily accessible to officers.

Treatment Space:

Leadership and staff reported that CTF had sufficient individual confidential office space, even though some offices were temporarily unusable due to construction. Available space for IDTTs and planned groups was limited during the site visit but would soon improve following the completion of construction.

However, staff reported a lack of mental health group treatment space on North Facility.

Custody and Mental Health Partnership Plan:

CTF's CMHPP LOP was current, having been revised in July 2021, and was consistent with statewide policy.

The institution reported that in November 2021, executive leadership joint rounding occurred in North's Facilities A and B, and in the mental health clinic. The rounding again occurred in North in February 2022; however, details of this rounding were not documented. The December 2021 executive leadership joint rounding took place in Central's first and second floor infirmaries; Central's second-floor infirmary was also rounded in January and March 2022. There was rounding of the West clinic and the E Wing in April 2022. Notably, all of CTF's facilities typically housed 3CMS patients.

Some concerns that the rounding highlighted included retrofitting ADA cells in the second-floor infirmary and gang activity. The rounding also noted positive relations between mental health and custody staff.

Observed mental health huddles in North and Central facilities demonstrated a collaborative relationship between custody and mental health staff, and individualized patient discussions. Attending staff documented the huddles.

Reviewed quality management committee and MHPS agendas and meeting minutes for five of the review period's six months were generally limited to documenting where executive

leadership joint rounding occurred.  Only the December mental health subcommittee meeting minutes provided detailed findings of the rounding, which included, among other topics, plans for future partnership training.  None of the QMC meeting minutes identified findings from executive rounding.  CTF was not able to provide an agenda or minutes for the warden's meeting to confirm discussion of executive leadership joint rounding.

Monthly joint supervisory program area tours occurred in the Central unit during five of six months of the review period.  In compliance with policy, the 3CMS mental health program supervisor and the sergeant attended these tours.  Weekly 3CMS supervisory meetings between the sergeant and mental health program supervisor also occurred as required during the reporting period.  Some areas of concern raised during the tours included lack of custody staffing and complications arising from COVID-19 outbreaks.

Due to various COVID-19 outbreaks, the IAC only met once during the review period.

The institution provided the 3CMS orientation brochure to patients upon entering the program.

Most of the 42 staff misconduct complaints that were filed during the reporting period alleged disrespectful or retaliatory correctional officer behavior.  No staff members were moved to another post due to patient complaints.

CTF offered the required off-post partnership training annually.  However, the institution did not provide necessary documentation to determine the percentage of custody and mental health staff who attended the training.

Heat Plan:

CTF's heat plan LOP was in compliance with CDCR policy.  However, the heat plan was not in effect at CTF during the review period.

Most interviewed custody officers from all three facilities were knowledgeable of heat plan protocols and the potential for patient heat-related illnesses. However, officers were not consistently aware of the procedures that had to be performed at some heat alert stages. The most common errors were not knowing the specific temperatures that activated the heat plan's distinct stages and incorrectly identifying the stage when nursing/medical rounds were performed. Custody officers could identify patients who were prescribed heat-sensitive medications and were aware of the procedure to refer patients who were having an adverse reaction during a heat alert for a medical examination. Officers further reported receiving a daily copy of the heat medication list.

The site visit occurred during the heat season. All visited housing units contained a current heat log where temperatures were recorded. Observed housing unit thermometers for Facilities A, B, and C all appeared to be operable, accurate, and appropriately placed.

RVRs:

During the review period, CTF issued 193 RVRs to two MHCB and 191 3CMS patients.

Seven of the eight RVRs that required completion of a mental health assessment were reviewed for compliance. Custody staff timely referred the assessment to mental health in only one of seven or 14 percent of the reviewed cases; late referrals ranged from three to 11 days. Mental health staff completed the assessment and timely returned it to custody in six of seven or 86 percent of cases; the late assessment took 18 days to complete. All reviewed mental health assessment interviews were conducted confidentially. Three of seven or 43 percent of reviewed mental health assessments recommended penalty mitigation. The senior hearing officer mitigated the penalties in all three instances.

Eighty-six of 95 or 91 percent of custody staff received required inmate disciplinary mental health assessment training.  Training recipients included all four correctional administrators, four captains, and 27 lieutenants, as well as 51 of 60 sergeants.  Sixteen of 30, or 53 percent of mental health staff, received the training.

Use of Force:

CTF reported four immediate and no controlled use of force incidents involving mental health patients.  Review of the immediate use of force incidents did not reflect any improper actions by custody staff.

During the past year, use of force training for custody staff was attended by the warden but not by the chief deputy warden.  The training was also attended by all four correctional administrators, all four captains, all 27 lieutenants, by 58 of 60 or 97 percent of sergeants, and by 470 of 482 or 98 percent of correctional officers.

As for attendance by mental health staff at the use of force training, the chiefs of mental health, psychiatry, and psychology attended use of force training, as did one of the three supervisors for psychiatry, psychology, and social work, two of three psychiatrists, one of two senior psychologist specialists, six of eight psychologists, and six of 89 or seven percent of nurses.

Lockdowns/Modified Programs:

There were no program lockdowns during the review period, but all CTF facilities experienced modified programming.  Specifically, COVID-19 outbreaks resulted in CTF's operation under modified programming between January and early April 2022, during which mental health leadership prioritized mental health appointments and services, with yard, dayroom, showers, and phone calls being offered on a rotational basis.

In addition, Facility C operated under modified programing for the entire review period following a mass disturbance involving a large-scale riot between rival gangs that began in October 2018, with reoccurrences in August 2019 and May 2021.  All Facility C incarcerated persons were impacted, and Facility C was divided into two groups for programming.  Significantly, this modified programming did not alter access to mental health, medical, and dental care, and medication distribution was handled in the housing units.

Access to Care:

CTF provided monthly Health Care Access Quality reports from November 2021 through April 2022.  Of a total of 7,401 issued mental health ducats and add-on appointments, 6,135 or 83 percent were completed.  Patients refused five or 0.4 percent of the 1,266 ducats and add-on appointments that were not completed.  Excluding patient refusals, 34 or three percent of incomplete ducats and add-on appointments were due to custodial reasons, and 1,227 or 97 percent were due to non-custodial reasons.

Placement of 3CMS patients into Minimum Support Facilities:

CTF's minimum support facility closed in September 2021.  The institution did not transfer any patients to a minimum support facility during the reporting period.

*Coleman* Postings:

*Coleman* posters printed in English and Spanish were properly displayed in all visited housing units.

228

**APPENDIX B-7**
**CALIFORNIA CORRECTIONAL INSTITUTION (CCI)**
**(July 12, 2022 – July 14, 2022)**
**Review Period: (December 1, 2021 – May 30, 2022)**

Census:

On July 11, 2022, CCI's total incarcerated persons population was 2,983, which was a 12 percent decrease from the previous reporting period. The mental health caseload population of 1,114 had decreased by 26 percent since the prior review period and represented 37 percent of the population.

Three EOP patients awaited transfer to a mainline EOP program.

There were 1,080 mainline 3CMS patients.

Two 3CMS patients were in the OHU for medical treatment.

The administrative segregation population of 60 included 29 3CMS patients pending transfer to STRH.

Staffing:

The chief psychiatrist position was vacant.

One of two chief psychologist positions was filled; the vacant position was vacant as a cost savings. The chief psychologist was designated as the chief of mental health. Both senior psychologist supervisor and senior psychologist specialist positions were filled.

Two of four psychiatry positions were filled.

Positions for all nine psychologists were filled. No psychologists were unlicensed.

The supervising social worker position was filled. Seven social workers filled 7.5 positions for a seven percent vacancy rate. One social worker was unlicensed.

One recreation therapist covered a 0.5 position. Both senior psych tech positions were filled. Five of 7.1 psych tech positions were filled for a 30 percent vacancy rate.

There were two medical assistants but no established positions.

The CHSA position was vacant.  Two HPS Is covered 1.5 positions.  The OSS II position was filled.

Five of six office technician positions were filled for a 17 percent vacancy rate.

Telepsychiatry:

CCI had no established telepsychiatry positions, but three telepsychiatrists provided 2.25 full-time equivalent (FTE) of service.  One telepsychiatrist's caseload exceeded the established ratio.  The telepsychiatrists conducted 3CMS individual contacts and IDTTs, and PC 2602 involuntary medication hearings.

On Facilities A, B, and C, telepsychiatry utilized a state-issued laptop and computer monitor, which primary clinicians and patients reported had unreliable connectivity and sound quality.  By comparison, Facility D telepsychiatrists had access to higher quality videoconferencing equipment that included a large screen with an attached camera.

Further, at least two on-site psychiatrists regularly attended IDTTs from their offices using telepsychiatry utilizing laptops instead of personally attending the IDTTs.  Leadership reported that these providers lacked a work accommodation or other agreement to justify this practice.  One primary clinician also provided mental health services utilizing telework for approximately seven months as part of a formal reasonable accommodation.

Additionally, one of two assigned CIT clinicians had been conducting CIT evaluations from home utilizing telehealth as part of a work accommodation for seven months prior to the site visit.

<u>Staffing Shortages and Recruitment Efforts</u>:

CCI lost staff due to retirement, the COVID-19 pandemic, and from employee transfers to other institutions due to safety concerns. The institution further indicated losing staff allocations for positions it could not fill.

The chief of mental health reported that CCI had stopped recruiting on-site psychiatrists after losing multiple interested psychiatrists to telepsychiatry positions. CCI also lacked a sufficient number of medical assistants for telepsychiatry and telehealth.

<u>Quality Management</u>:

CCI did not have a local governing body.

The quality management committee met monthly and attained quorums. Agenda items included review of previous meeting minutes, program and LOP updates, and PIWP projects. Six subcommittees, including mental health, reported to the QMC on various metrics and other significant issues.

The MHPS met monthly with a quorum in attendance. The senior psychologist supervisor facilitated the meetings. Agenda items included approval of previous meetings' minutes, with meetings focusing on metrics from the OnDemand performance report and audit results. Issues that the subcommittee frequently addressed included the timeliness of psychiatry and IDTT contacts and 3CMS patient transfers to STRH, as well as psych tech prescreens. Despite several significant reoccurring issues, the mental health subcommittee rarely created action items and did not document CAPs.

There were no mental health QITs or FITs chartered during the review period.

There were no peer reviews at CCI during the review period.

231

<u>Medication Management</u>:

CCI provided MAPIP results for the review period for compliance for psychiatric diagnostic monitoring and medication management.

The medication management dashboard showed that for patients prescribed antidepressants, venlafaxine blood pressure and thyroid monitoring were compliant for all six months of the review period. There was documentation of medication consents for three months. EKGs were not required for patients prescribed antidepressants.

Diagnostic monitoring data for patients prescribed atypical antipsychotics indicated that measurements for height, weight, and blood pressure were compliant for all six months of the review period. Thyroid monitoring was compliant for five required months, medication consents were compliant for four months, and EKG measures were compliant for three of five required months. AIMS tests, blood sugar measures, diagnostic monitoring of CBC with platelets, CMP, and lipid monitoring were noncompliant for all six months of the review period.

CCI was not a clozapine initiation or maintenance facility.

As for patients prescribed carbamazepine, measures for carbamazepine levels, CBC with platelets, and CMP were compliant for the one required month. Medication consent documentation was not required for patients prescribed carbamazepine.

For Depakote, CCI was compliant with obtaining medication consent for four of five required months. The facility was compliant with monitoring CBC with platelets and CMP for two months, and noncompliant for four months. Depakote levels were compliant for three months, and noncompliant for three months.

Psychiatric diagnostic measures for patients prescribed Depakote were compliant for CBC with platelets and medication consent for all six months of the review period. CMP was compliant for five of six required months. Depakote levels were compliant for four months.

For lamotrigine, there was compliance for one of two required months for medication consents.

As for lithium, CCI reported compliance with obtaining medication consent and creatinine and BUN (kidney function tests), for the three months required. For thyroid tests, CCI was compliant for the two months required. For monitoring lithium levels, CCI was compliant for two of four months. The facility reported that EKG monitoring was not required during the monitoring period.

For medication management metrics reported by mental health headquarters, CCI reported compliance for all six months of the review period for medication continuity following parole/release to the community. There was compliance for three months for medication continuity upon inter-institutional transfer at R&R and intra-institutional transfers to ASU/SHU/PSU, and for two months for continuity of nurse administered (N/A)/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU). There was compliance for only one month for medication continuity for MHCB transfers.

Further, CCI reported compliance for all six months for psychiatric-prescribed chronic care medications and observation of preparation and administration of HS medications, and for five months for compliance for new psychiatric medications. CCI reported compliance for one month for medication continuity following discharge from community hospital or acute/intermediate care. CCI was not compliant with observation of medication preparation and administration for AM/PM for any month of the review period.

233

CCI indicated compliance for one of three required months for PC 2602 orders.

Psychiatrists were permitted to prescribe non-formulary medications as needed.

CCI audits demonstrated that pill lines lasted less than two hours and all patients' medications were administered within 30 minutes of arriving at pill lines.

During the review period, CCI did not initiate any emergent or non-emergent PC 2602 involuntary medication petitions. Three patients had their PC 2602 orders renewed and one patient arrived at CCI with an active order. During the site visit, four CCI patients had active PC 2602 orders but there were no pending PC 2602 petitions.

CCI did not provide the number of patients prescribed HS psychiatric medications but reported that they were consistently administered at or after 8:00 p.m.

Transfers:

During the review period, there were no sustainable process reviews at CCI.

Eight patients met higher level of care referral criteria on ten occasions. However, CCI did not refer any patients to acute or intermediate care.

CCI referred 69 patients to the MHCB, of whom 34 were admitted and 35 were rescinded. Three patients who were referred to the MHCB remained in alternative housing for longer than 24 hours prior to the recission of their MHCB referrals. These three patients had respective alternative housing stays of two, three, and nine days prior to their MHCB recissions.

CCI transferred 20 patients to mainline EOP programs during the review period; three or 15 percent exceeded the 60-day transfer time frame guideline. During the site visit, none of the three EOP patients awaiting transfer to mainline programs had been waiting for more than 60 days.

CCI did not transfer any patients to the PSU or EOP hub during the review period.

234

At the time of the site visit, no patients were awaiting transfer to an EOP hub.

During the review period, CCI transferred 18 patients to STRH and five to LTRH. All but one patient timely transferred within 30 days. The untimely transfer was 15 days late; CCI did not provide a reason for the delay.

At the time of the site visit, 13 3CMS patients had been waiting more than 30 days to transfer to STRH. The most common reason provided for delay was "cannot transfer to STRH or transfer from ASU due to pending safety concern" or "cannot send pending safety closure report." Otherwise, four delays were due to court proceedings, and one was due to a medical hold.

No patients were awaiting LTRH transfer during the site visit.

During the review period, five patients whose level of care was reduced from EOP to 3CMS transferred to CCI. At the time of the site visit, all of these patients remained at the 3CMS level of care.

Programming:

MHSDS Patients in Administrative Segregation:

The psychiatrist and primary clinicians assigned to administrative segregation all had caseloads within established ratios. An on-site psychiatrist treated 3CMS patients in administrative segregation and Facility B mainline 3CMS patients. There were two primary clinicians assigned to administrative segregation; a third clinician was available for coverage as needed.

During the review period, there were typically between 36 and 46 3CMS patients in administrative segregation who were pending transfer to STRH. During the reporting period, between nine and 24 3CMS patients were generally housed in administrative segregation for

235

more than 30 days.  During the site visit, of the 29 3CMS patients in administrative segregation, 12 or 41 percent had been housed there longer than 30 days.

Observation of an administrative segregation morning meeting revealed attendance by custody, mental health, and a psych tech.  However, it was reported that the psych tech was often absent due to staffing shortages.  The morning meeting addressed clinical and custody concerns, whether new patients had arrived or were scheduled to arrive, and whether any patients attempted suicide or injured themselves within the past 24 hours.

Due to space limitations and an insufficient number of TTMs, CCI did not offer group therapy to 3CMS patients housed in administrative segregation.

Seven interviewed administrative segregation 3CMS patients included several who had arrived in administrative segregation within five days of the site visit.  Most indicated having met with their primary clinician, and reported weekly contact, which usually occurred at cell front or in the yard.  Patients indicated rarely having confidential individual contacts.  They further reported that their primary clinician was responsive to their mental health requests.  Five of seven had a radio; one had a television.  Patients reported having opportunities to go to yard, but further stated that they seldom went due to the heat.  None of the interviewed patients appeared distressed or in need of a higher level of care.

Non-Disciplinary Segregation:

CCI reported assigning 40 MHSDS patients NDS status during the review period.  Of these, there was one EOP patient and 39 3CMS patients.  CCI was noncompliant with timely transfers of patients placed on NDS status at ten percent.

Crisis Intervention Team:

CCI's CIT had two assigned primary clinicians. CIT services were generally offered Monday through Friday during regular business hours. On-call clinicians handled after hours crisis calls.

The CIT responded to 25 referrals during the review period, of which 18 involved suicidal ideation and/or recent attempts. CIT data reported that four of 25 or 16 percent of CIT patient encounters were referred to the MHCB, ten or 40 percent were returned to their housing units, three or 12 percent were transferred to another housing unit, six or 24 percent involved safety concerns, and two or eight percent resulted in a psychiatric consult order.

Tellingly, one of the two assigned CIT clinicians had been conducting CIT evaluations from home as part of a work accommodation for seven months prior to the site visit; leadership indicated that this would continue during the next six months. Leadership explained that a medical assistant used a mobile laptop for the telehealth CIT contacts and that this off-site clinician was the only mental health provider who determined whether patients were referred to the MHCB or returned to the yards. Reviewed CIT data further revealed that the teleworker was responsible for at least 13 of the CIT contacts that did not result in a higher level of care referral. All these patients were returned to housing units without a subsequent on-site crisis evaluation.

The monitor's expert shared concerns with leadership about utilizing telehealth for crisis evaluations, noting the lack of a governing policy, standard of care deviation, and potential risks associated with sending patients in crisis back to the housing units without an on-site evaluation and complete mental status examination. The chief of mental health reported not being aware that these patients had not received a subsequent on-site mental health evaluation to determine whether an MHCB referral was indicated. Regrettably, it was unclear whether CCI planned to stop using the telehealth provider for CIT contacts, as leadership reported not having sufficient

staff to replace this provider during CIT hours of operation. CCI also confirmed not having a policy related to the use of telehealth for crisis intervention.

Alternative Housing:

Until July 2022, CCI primarily used four "wet cells" in the Facility B clinic for alternative housing for patients referred to the MHCB. However, as of July 8, 2022, CCI had received approval to fully reopen the OHU and two OHU cells were assigned to mental health as alternative housing's primary location. Facility B's four wet cells continued to be used as the secondary location for alternative housing when the OHU cells were occupied.

Patients in alternative housing were typically seen non-confidentially as there was no confidential space for interviewing them or for medical care. Leadership confirmed that all OHU clinical contacts occurred at cell front, while confidential contacts were also not offered to alternative housing patients in the four wet cells in the Facility B clinic.

No patients were housed in alternative housing during the site visit.

3CMS:

The staffing ratios for psychiatrists and primary clinicians were all within established ratios.

Observed IDTTs were conducted in an adequately sized confidential room. All required staff attended IDTTs and had computer access. Notably, the on-site psychiatrist for Facilities B and C used telepsychiatry to attend IDTTs. Significantly, observed IDTTs on Facilities C and D did not reveal any issues with the use of telepsychiatry. However, there were some telepsychiatry issues with the video connection and audio disruptions on Facility B.

Observed IDTTs did not reveal a collaborative process, as psychiatric input was minimal, primary clinicians asked generic, scripted questions, and other team members' participation was

insignificant.  Further, treatment planning lacked adequate discussion of relevant clinical issues. The primary clinician often did not indicate the length of time the patient had been in the program or mention specific goals or patient progress and responses to treatment interventions. Presenting problems and symptom severity were vaguely explained and not discussed for every patient.  However, indicators for a possible higher level of care were formally discussed for most patients.

During the review period, CCI offered recreation therapy groups to 3CMS patients on all facilities.

Across all yards there were reports of correctional officer misconduct and policy noncompliance.  Patients described Facility A as a violent yard with regular assaults by other incarcerated persons and excessive force from custody officers.

For psychiatry contacts and IDTTs, CCI reported that compliance suffered, primarily due to an influx of new patient arrivals in late 2021 and early 2022.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.

Ten patients required initial psychiatry evaluations.  Six of ten or 60 percent of patients who required an initial psychiatry evaluation timely had one prior to the initial IDTT.  Six of ten, or 60 percent, were conducted in a confidential setting.  Telepsychiatry conducted 30 percent of initial psychiatry contacts.

Nine of 15, or 60 percent, of required 90 day routine psychiatry contacts were conducted timely.  Twelve of 15, or 80 percent, of these routine contacts were confidential.  Telepsychiatry conducted 53 percent of routine contacts.

Ten patients required initial primary clinician evaluations.  Eight of ten or 80 percent had a timely initial primary clinician contact withing ten working days; none were conducted in a confidential setting.

Thirty-two of 37, or 86 percent of routine primary clinician contacts occurred within 90 days.  Three of 47, or six percent, were confidential.

Ten patients required initial IDTTs.  None occurred within 14 working days.  Four of five patients had timely required routine IDTTs.  Required staff members attended all initial and routine IDTTs.

Other Issues:

Pre-Release Planning:

CCI had a full-time pre-release coordinator and a trained backup coordinator.  The pre-release coordinator was knowledgeable of pre-release planning requirements.  CCI's tracking logs were well-organized and routinely updated to closely monitor patients who were eligible for services, changes in release dates, assessment contacts, and resource needs.  CCI offered pre-release planning groups during the review period, with patients being considered for inclusion when they were within six months of release.

CCI was unable to provide requested TCMP data; however, the pre-release coordinator indicated regular communication with TCMP staff about pending releases and coordination of services during biweekly meetings.  CCI's pre-release coordinator also reported routine consultation and collaboration with ISUDT workers.

CCI leadership indicated future plans to train and audit primary clinicians' pre-release initiatives to make sure that they addressed relevant clinical concerns in treatment plans and individual contacts to prepare patients for release.

The pre-release coordinator facilitated an observed pre-release planning group using the statewide pre-release planning group curriculum.  The group was informative, structured, and engaging.  Group participants spoke highly of the facilitator, who they described as knowledgeable and supportive.

Program Access:

a.    Job and Program Assignments:

On June 1, 2022, CCI reported that of 1,009 available jobs, 288 3CMS patients or 25 percent of the 3CMS population held job assignments, as did 721 or 38 percent of non-MHSDS incarcerated persons.

As for the 771 academic assignments, CCI reported that 268 3CMS patients or 23 percent of the 3CMS population held them, as did 503 or 26 percent of non-MHSDS incarcerated persons.

Of 351 vocational education assignments, 106 or nine percent of 3CMS patients held these assignments, as did 245 or 13 percent of non-MHSDS incarcerated persons.

Of 279 voluntary education assignments, 44 or four percent of 3CMS patients held them, as did 235 or 12 percent of the non-MHSDS population.

Of 310 substance abuse treatment assignments, 128 or 11 percent of 3CMS patients held these assignments, as did 182 or ten percent of non-MHSDS incarcerated persons.

b.    Milestone Credits:

A report covering December 1, 2021 to May 31, 2022 indicated that three of four EOP patients were eligible to earn milestone credits, but none earned the credit.  For 3CMS patients, 1,102 of 1,157 or 95 percent were eligible to earn milestone credits; 16 percent earned the credit.

Further, for non-MHSDS incarcerated persons, 1,805 of 1,906 or 95 percent were eligible to earn milestone credits, with 29 percent earning them.

      c.    <u>Out-of-Level Housing</u>:

As of June 15, 2022, one EOP and 51 3CMS custody Level I patients were in Level II housing.  There were 25 3CMS custody Level II patients in Level III housing and two 3CMS custody Level III patients in Level II housing.  There were also 19 3CMS custody Level III patients in Level IV housing and 92 3CMS custody Level IV patients in Level III housing.

      d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CCI documentation demonstrated implementation of the revised ADA accommodation and grievance procedures to accommodate psychiatric disabilities.

<u>Case-by-Case Reviews</u>:

No CCI patients met the requirement for a 150-day case review.  Seventeen patients met the requirement for a 120-day pre-MERD review, which were completed as required.  One patient whose actions did not warrant a SHU term was retained in administrative segregation pending RVR adjudication because CCI did not have an alternative placement option.  Another patient was retained in administrative segregation pending NDS accelerated transfer due to safety concerns.  Two patients received a 30-day administrative segregation extension pending an investigation into threats to staff.  All other patients were held in administrative segregation pending the adjudication process.  No patients were retained beyond their MERD.

<u>"C" Status</u>:

Eleven 3CMS patients and 11 non-MHSDS incarcerated persons were determined to be program failures and were placed on "C" status at the time of the site visit.

<u>Mental Health Referrals</u>:

During the review period, CCI reported 4,586 mental health referrals; there were 1,652 psychiatry referrals and 2,934 primary clinician referrals. The 150 emergent referrals included one to psychiatry and 149 to primary clinicians. Of the 50 urgent referrals, one was to psychiatry and 49 were to primary clinicians. The 2,510 routine referrals included 770 to psychiatry and 1,740 to primary clinicians. CCI reported timely responses to 96 percent of emergent referrals, 98 percent of urgent referrals, and 97 percent of routine referrals.

Treatment Space:

Treatment space on Facilities C and D was generally adequate. However, similar to findings from the preceding monitoring round, there were significant treatment space issues on Facilities A and B, including in the OHU and other areas within the Facility B clinic.

Facility A had one shared confidential office for mental health contacts. Primary clinicians assigned to this area stated that the space was typically used for legal visits or telepsychiatry contacts and was very rarely available for primary clinician use. Instead, Facility A primary clinicians often conducted individual assessments and treatment in one of several non-contact visiting booths. These visiting booths lacked doors and sound privacy, and had broken or poorly working communication devices, with a plexiglass barrier separating clinicians from patients. Clinicians and patients described the booths' temperatures as uncomfortably hot and unbearable during summer months.

Interviewed patients reported a lack of confidentiality in the booths, explaining that other patients could hear their conversations. Custody officers normally placed patients in the neighboring booths prior to their scheduled appointment, which contributed to patients' refusals, safety concerns, and reluctance to disclose sensitive personal information. Primary clinicians

acknowledged the poor conditions and the issues regarding the lack of confidentiality when using the booths.

Facility B mental health contacts primarily occurred in one of three offices located within the chapel, which Facility B patients reported lacked confidentiality. Further, patients noted that clinicians kept the interview door open for "safety reasons" and individuals using the chapel could hear their conversations. Clinicians and patients added that, due to the anti-mental health culture among Facility B's incarcerated population, the chapel's use for mental health contacts presented potential safety concerns, as patients could be observed during their appointments. Mental health staff also reported that the chapel lacked cold water access, had leaking and missing ceiling tiles, and was uncomfortably hot during warmer months.

Treatment space in administrative segregation included several non-contact interview rooms with a plexiglass barrier. Mental health staff also had access to the ASU counselor's office when it was not in use. Nonetheless, interviewed patients and staff reported that administrative segregation mental health contacts often occurred non-confidentially at cell front or on the yard. Observation of the offices revealed that they were not conducive for treatment as they offered little sound privacy since individuals had to raise their voices to be heard through the plexiglass. When they were used for clinical contacts, the offices on either side had to be vacated.

Additionally, *Coleman* class members in the OHU for alternative housing or medical reasons were not offered confidential treatment contacts due to a lack of confidential interview space. Instead, OHU clinical contacts generally occurred at cell front with the door closed or slightly ajar.

<u>Custody and Mental Health Partnership Plan</u>:

CCI's CMHPP LOP was dated January 2022 and was aligned with headquarters' partnership plan.

CCI reported that executive leadership joint rounding occurred monthly during the review period. However, CCI only provided rounding minutes for one month, which reflected notations of discussions with staff and patients. The warden's weekly executive meeting minutes did not address joint rounding.

Reviewed documentation of weekly 3CMS supervisory meetings indicated that the meetings were not held as required, except on Facility A for two months, on Facility B for four months, on Facility C for one month, and on Facility D during five months.

CCI reported conducting monthly joint supervisory 3CMS program area tours on all four facilities but did not provide further information about the tours.

CCI reported that some IAC meeting minutes had been misplaced. Reviewed meeting minutes addressed multiple issues related to patient care. However, the institution did not provide IAC meeting minutes for Facility A, only provided minutes for one of six months for Facility B, for two of six months for Facility C, and for one of six months for Facility D.

CCI provided a copy of the 3CMS orientation brochure in English.

Only one of 332 staff misconduct allegations was approved. Among other findings, 46 were disapproved and 209 were under investigation or pending review. Patient allegations included intimidation, retaliation, unprofessional staff conduct, and safety concerns. No staff were reassigned due to a patient complaint.

CCI reported that 559 of 878 or 64 percent of custody staff attended the annual off-post training, as did 19 of 35 or 54 percent of clinical staff. CCI was not required to provide quarterly partnership round table training.

Heat Plan:

CCI's heat plan LOP was dated May 2022 and was compliant with CDCR policy. The heat plan was in effect for one month of the review period but there were no heat alerts and no heat-related patient illnesses.

Interviewed custody staff were typically knowledgeable of the heat plan's three stages. However, many were unfamiliar with the requirements for patient treatment at the various stages. Specifically, some custody officers were unsure of the stage when medical rounds were conducted. Custody officers further reported receiving a list of patients who were prescribed heat-sensitive medications, but some were unaware that the heat-sensitive medication list was updated daily.

All housing unit thermometers were operable and accurate, while custody officers also had access to handheld thermometers. Reviewed heat logs reflected the hourly logging of outside temperatures and the recording of inside temperatures every three hours according to policy.

RVRs:

Ninety-four percent of required custody staff completed inmate disciplinary mental health assessment training. However, no mental health staff received the training.

During the review period, CCI issued 1,819 RVRs, of which 870 or 48 percent were issued to MHSDS patients. There were six RVRs issued to MHCB patients, seven RVRs issued to EOP patients, 857 RVRs issued to 3CMS patients, and 949 RVRs issued to non-MHSDS incarcerated persons.

Review of a random sample of 20 RVRs revealed that custody staff timely referred the mental health assessment to mental health staff in only nine of 20 or 45 percent of cases. Mental

health staff timely completed the assessment and returned it to custody staff in 19 of 20 or 95 percent of cases. Fifteen of 20 or 75 percent of mental health assessment interviews were conducted confidentially. However, in all 20 reviewed cases, the mental health clinician used the same generic statement for each patient in responding to question number four as to the mental health factors that the hearing officer should consider regarding penalty assessment. Further, in all 20 reviewed cases, the mental health clinician recommended penalty mitigation. The senior hearing officer documented consideration of the assessment in all 20 cases and actually mitigated the penalty in ten of 20 or 50 percent of cases.

Review of the sample of 20 RVRs revealed one mental health assessment that recommended alternative discipline due to the patient's behavior being strongly influenced by mental illness. Nonetheless, although the mental health clinician recommended documenting the incident as a counseling chrono, the SHO did not follow the clinician's recommendation.

Use of Force:

One hundred percent of required mental health staff, and 99 percent of custody staff, received mandatory use of force training.

During the reporting period, there were no controlled use of force incidents and 242 immediate use of force episodes involving 183 MHSDS patients and 59 non-MHSDS incarcerated persons.

Review of a sample of 13 immediate use of force incidents indicated compliance with applicable policy.

Lockdowns/Modified Programs:

COVID-19 resulted in the placement of all facilities on modified programming from January 9 through February 14, 2022, impacting access to mental health, medical, and dental

care. During this period, only priority ducats were issued, medication distribution was conducted in the housing units, and there was limited dayroom access.

Further, Facility A was placed on modified programming multiple times during the review period due to continued gang violence. Although there was continued access to mental health, medical, and dental care, this modified programming also resulted in the issuance of only priority ducats, medication distribution in the housing units, and there was no dayroom, recreation activities, or phone calls during certain periods. Relatedly, Facility B was also placed on modified programming in December 2021 to investigate missing metal stock and in April 2022 due to continued violence. Again, only priority ducats were issued, medication distribution was in the housing units, a custody escort was required for access to care, and there was restricted dayroom, recreation activities, and phone calls.

Access to Care:

A review of CCI's monthly Health Care Access Quality Reports from December 2021 through May 2022 reflected the issuance of a total of 71,839 mental health ducats and add-on appointments. Of these, 48,083 or 67 percent were completed. Of the non-completed appointments, 5,239 or 22 percent were due to patient refusals, 18,498 or 78 percent were due to non-custody factors, and 19 or zero percent were due to custody factors.

Placement of 3CMS Patients into Minimum Support Facilities:

CCI did not have a Minimum Support Facility and did not transfer any patients to an MSF during the review period.

*Coleman* Postings:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

**APPENDIX B-8**
**PLEASANT VALLEY STATE PRISON (PVSP)**
**(July 19, 2022 – July 21, 2022)**
**Review Period: (December 1, 2021 – May 30, 2022)**

Census:

On July 18, 2022, PVSP's total incarcerated population was 2,697, which was 11.6

percent fewer than the previous monitoring round. The MHSDS population of 453 patients also

represented a five percent decrease since the prior review period and represented 17 percent of

the total incarcerated population.

The MHCB was closed during the review period.

Three EOP patients were awaiting transfer; two were for mainline transfers, and the other

was awaiting transfer to an administrative segregation EOP hub.

There were 418 mainline 3CMS patients and 32 3CMS patients housed in STRH.

Staffing:

The chief executive officer, chief of mental health, chief support executive, and chief

nursing executive positions were filled. The chief psychiatrist position and one of the two chief

psychologist positions were filled. Pursuant to headquarters' direction, the second chief

psychologist position remained vacant as a cost-saving measure.

There was no senior psychiatrist position at PVSP. The senior psychologist supervisor

position was filled.

One of the two psychiatry positions was filled for a 50 percent vacancy rate. Registry

staff covered 1.25 positions eliminating any functional vacancy.

The previous 1.0 telepsychiatrist position was reduced to 0.5 during the most recent

budget cycle; the position was filled.

The two senior psychologist specialist positions were filled. Five of the seven psychologist positions were filled for a vacancy rate of 33 percent.

Though no position was allocated at PVSP, PVSP employed a full-time supervising social worker. All four social worker positions were filled.

There was no senior psych tech position. For psych techs, 9.6 of the 10.6 positions were filled, resulting in a nine percent vacancy rate.

The recreation therapist position was filled.

Though PVSP did not have certified nursing assistant certified nursing assistant (CNA) allocated positions, two registry staff provided full-time services to psychiatry, including telepsychiatry.

Two of the four office technician positions were filled, resulting in a 50 percent vacancy rate.

PVSP employed a full-time OSS II to fill a 0.5 position.

Though there was no allocated position, PVSP employed a full-time HPS II. The HPS I position was also filled.

The CHSA II position was vacant.

PVSP reported utilizing registry staff, accepted online applications, and used CalCareers as part of the recruitment process.

<u>Telepsychiatry</u>:

During the most recent budget cycle, the full-time telepsychiatrist position was reduced to a 0.5 position. PVSP voiced significant concern with the reduction due to the anticipated re-opening of the MHCB in January 2023.

The telepsychiatrist provided treatment for one yard of 3CMS patients and did not provide services for any other institution. The telepsychiatrist provided in-person treatment on

251

November 17, 2021, and June 16, 2022. The telepsychiatrist's caseload was within the established staffing ratios.

PVSP reported no problems with the telepsychiatry technology, and the telepsychiatrist and CNA reported adequate sound and visual quality. The telepsychiatrist reported primarily working from home, though she was working at the Diamond Bar telepsychiatry hub at the time of the site visit. The psychiatrist and CNA reported a lack of frequent communication with primary clinicians and custody staff, limiting the amount of patient information they received.

Quality Management:

PVSP convened Local Governing Body (LGB) meetings quarterly, and a quorum was met during both meetings. However, provided meeting documentation was not useful as it did not include identified areas of concern, actions taken, dissemination to line staff, or other relevant discussion.

The Quality Management Committee (QMC) met monthly with a quorum in attendance. Regularly covered topics included process improvement work plan status updates, major program implementations critical to quality of care, upcoming audits, review of operations procedure(s), and new business.

The MHPS also met monthly with a quorum in attendance. Documentation of monthly MHPS meetings was useful, and agenda topics included, but were not limited to, the status of improvement projects, sustaining quality, program management supervisory reports, and new business. A summary of identified issues for each agenda topic with action taken was included. Actions appeared effective as there was no pattern across identified deficiencies. The MHPS indicated a rise in cell-front contacts during April and May 2022; however, cell-front contacts were not appropriately addressed in MHPS documentation.

PVSP's EMRRC met monthly.  EMRRC minutes reflected that reviewed topics included unscheduled transports and overdoses/suicides, system surveillance items and activations, case reviews, meeting approval, codes between reporting and meeting dates, and quality concerns. One discrepancy was noted between the suicide tracking table on the first page and the narrative of suicide attempts under the 'system surveillance and quality concerns' section.  The EMRRC did not identify any concerns with the multidisciplinary response to a suicide attempt.

PVSP did not conduct any audits, QITs, or FITs during the review period, and there has been no peer review process since November 2018.

During the reporting period, PVSP completed three CAPs, including timely EOP administrative segregation hub transfers, treatment plan quality, and the quality of suicide risk evaluations.  The CAP regarding the quality of treatment plans improved from 80 to 87 percent over three consecutive quarters.  However, it was noted that clinicians copied information from previous documentation and did not utilize the checklist provided.  The quality of suicide risk evaluations also improved from 78 percent to 100 percent.  There were no internal delays for transfers to EOP administrative segregation hubs.

Medication Management:

PVSP provided MAPIP results for December 1, 2021, through May 31, 2022, regarding compliance with psychiatric diagnostic monitoring and medication management.  PVSP had a robust system to ensure compliance with required MAPIP monitoring requirements.

Diagnostic monitoring for patients prescribed atypical antipsychotics reported compliance for all six months of the reporting period with obtaining height, weight, blood pressure, and medication consent.  PVSP reported compliance for four months for AIMS monitoring.  For thyroid function testing, PVSP was compliant for two months where required.

For monitoring glucose (blood sugar), CBC, and CMP PVSP was compliant for two months.  For lipid panel monitoring, PVSP was compliant for only one month.  No electrocardiograms (ECGs) were required for antipsychotic monitoring during the reporting period.

PVSP was not an authorized clozapine institution, and there were no patients on carbamazepine during the reporting period.

For monitoring of antidepressants, PVSP was compliant for all six months with obtaining medication consent and for monitoring blood pressure for patients prescribed venlafaxine.  They were compliant with checking thyroid tests for five months of the review period; no tests were required for the remaining month.  PVSP reported that checking ECGs was not required during the review period.

For lamotrigine, PVSP was compliant in obtaining medication consent for one month; no consents were required for the remaining five months.

Medication consent documentation for patients prescribed Depakote (divalproex, valproic acid) was compliant for the entire monitoring period.  For medication levels, PVSP was compliant for five months.  For both CBC and CMP, the facility was compliant for three months, non-compliant for two months, and no data was required for one month.

Regarding lithium, PVSP was compliant with medication consent and thyroid tests for one month; no data was required for five months.  Monitoring of lithium levels was compliant for two months; there was no data required for four months.  PVSP was compliant with checking kidney function tests (BUN/Cr) for one month, noncompliant for one month, and no tests were required for four months.  Finally, PVSP reported that checking ECGs was not required during the monitoring period.

For medication management metrics reported by mental health headquarters, PVSP was compliant for all six months of the reporting period for continuity of medications from discharge/transfer from a community hospital and/or DSH, continuity of medications upon parole/transfer to the community, observation of medication preparation at HS (*hora somni*, bedtime), chronic care medications historical administration, and outpatient provider new medication orders.

Regarding continuity of nurse-administered (NA) and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), PVSP was compliant for five of the six months.

PVSP was compliant for four months with continuity of medications upon inter-institutional transfer at R&R.

For continuity of medications for MHCB transfers, PVSP was compliant for four months; no data was required for two months.

The facility reported compliance with the continuity of medications with intra-institutional transfer to ASU/SHU/PSU for two months. PVSP reported that no data was required for the remaining four months; however, the monitor's expert sought clarification as patients were transferred to STRH during that time. An explanation of the lack of data was not provided other than PVSP mental health leadership noting that admissions to restricted housing slowed during the monitoring period.

PVSP was compliant for only one month with observation of medication preparation AM and PM.

For both PC 2602-related measures, namely medication compliance with involuntary medication court orders and compliance with involuntary medication orders being placed into the

chart appropriately, PVSP was compliant for one month; no data was required for five months. Of note, PVSP reported that no patients were receiving court-ordered medications via the PC 2602 process during the monitoring period; though, while on site, the monitor's expert discovered one patient in the STRH that had been on a PC 2602 order since February 2022.

PVSP conducted regular polypharmacy reviews; the chief psychiatrist reviewed the polypharmacy report weekly and assigned it as necessary. PVSP was compliant for five months of the monitoring period; PVSP reached 89 percent compliance during January 2022.

During the review period, non-formulary medications no longer required secondary review or approval. Between one to two percent of prescriptions at PVSP were for non-formulary psychiatric medications. The chief psychiatrist reported that he did not feel pressure from the local or headquarters administration to keep this number low.

During January 2022, PVSP reported that all patient contacts were conducted at the cell front, medication consent was verbal, and routine labs were not ordered. At the time of the site visit, psychiatrists had resumed regular, confidential contacts, obtained signed medication consents, and ordered routine labs.

Transfers:

PVSP did not refer any patients to acute or intermediate inpatient care during the review period. There were six nonreferrals to a higher level of care; all six cases had appropriate justification for nonreferral documented in the treatment plan.

PVSP made 33 referrals to MHCBs; 27 were admitted, and six were rescinded. The monitor's expert's review indicated that clinical justification for all of the recissions was adequate.

PVSP transferred 22 patients to mainline EOPs; one patient exceeded the Program Guide transfer timeframe requirement by two days.

Three EOP patients transferred to an administrative segregation EOP hub during the review period. All three transfers were completed within Program Guide timeframe guidelines.

PVSP reported no transfers to LTRH during the review period.

There were no transfers from EOP to 3CMS during the reporting period.

<u>Programming</u>:

<u>MHSDS Patients in Administrative Segregation</u>:

<u>STRH</u>

Clinicians in STRH had caseloads within the established staffing ratios.

During the review period, 126 patients had 132 stays in STRH. The average length of stay for those patients was 48 days, ranging from one day to 175 days.

Fourteen patients' EHRS were randomly selected for review of their STRH stays.

Ten of 14 patients required initial evaluations. Of those, four, or 40 percent, were completed timely. Of the ten initial contacts reviewed, four, or 40 percent, were conducted in a confidential setting. PVSP was 100 percent compliant with completing routine contacts within Program Guide timeframes. However, only 43 percent of routine contacts were completed in a confidential setting. COVID-19 restrictions and patient refusal were the reasons provided for the lack of confidentiality for initial and routine psychiatry contacts. Telepsychiatry was not utilized for any initial or routine psychiatry contacts in STRH.

Nine patients required initial primary clinician contacts; 100 percent were completed timely. Six of nine contacts, or 67 percent, were conducted in a confidential setting. For the 14 patients requiring routine primary clinician contacts, 91 percent occurred within seven days and were compliant. Of those, 61 percent occurred in a confidential setting. Reasons for non-

confidential primary clinician initial and routine contacts were attributed to patient refusals and COVID-19 restrictions.

Ten reviewed patients required initial IDTTs; 100 percent were completed timely. Patients attended seven initial IDTTs or 70 percent.  PVSP was compliant with the timely completion of quarterly IDTTs in STRH; patients attended 50 percent.  The reason for patient non-attendance at initial and quarterly IDTTS was COVID-19 and patient refusals.

Required staff was in attendance at 100 percent of initial and routine IDTTs.  Although a primary clinician and psychiatrist attended all IDTTs, it was not discernable whether it was the assigned treatment provider as required by the Program Guide.

The monitor's expert observed three IDTTs in STRH.  All required staff was in attendance; patients were in attendance at two.  Staff had access to patient records, the discussion was collaborative, and with the exception of the CNA and psych tech, all team members actively participated.  The primary clinician led the IDTT.  Current symptoms, diagnosis, psychiatric medication, and relevant psycho-social history were discussed.  Areas needing improvement included discussion of level or care considerations, rationale for level of care, case conceptualization, functional impairment, and treatment planning, specifically treatment goals and corresponding treatment interventions.

PVSP reported that group therapy continued throughout the reporting period and was not interrupted by COVID-19 restrictions.  Groups were scheduled for one hour, not 90 minutes as required, though staff and patients reported groups lasting up to two hours.  Nevertheless, PVSP documentation indicated that per patient, per week, patients were scheduled an average of 2.8 hours of group, offered an average of 2.5 hours, and attended an average of 1.7 hours of group.

The monitor's expert observed a social worker-led treatment group that five patients attended. The attendees watched a movie, and no discussion followed to connect the content observed in the movie to patients' treatment needs. Interviewed patients confirmed that most group contents were movies with no discussion. While this confidential group provided the benefit of out-of-cell time, there was limited clinical benefit. The chief psychologist offered a plan to address this limitation and reported that patients refused groups that were previously more clinical in nature. A clinically focused process group was also facilitated weekly.

Interviewed STRH patients were generally satisfied with mental health programming. Patients reported that they were not offered in-cell therapeutic activities other than puzzles.

A review of 114-A logs demonstrated compliance with the sufficient offering of yard, showers, linen exchange, and phone calls. However, one EOP patient's 114-A was pre-filled for yard for a time in the future in violation of policy.

Radios were provided to patients within one to two days of STRH placement, and the STRH had a supply of more than 50 radios and earbuds available in the unit.

The monitor observed seven ICCs in STRH. While the STRH clinician was present and asked the patient a series of relevant questions, the clinician did not provide any specific mental health information to the ICC chairperson for their consideration.

<u>Non-Disciplinary Segregation</u>

PVSP could not generate a report of MHSDS patients approved for NDS status during the review period. PVSP did not have a specific LOP for NDS status; however, NDS allowable privileges were included in the STRH LOP.

At the time of the site visit, there was one EOP patient on NDS status housed in STRH. He was approved for and pending expedited transfer and was within transfer timeframe

259

guidelines.  The patient was issued all allowable personal property and was offered a telephone call pursuant to policy.

MHCB

PVSP's MHCB was closed in 2018 due to damage sustained during a rainstorm.  Its reopening was delayed due to COVID-19 and supply-chain issues, as well as upgrades to align with necessary suicide prevention recommendations.  PVSP reported that the new anticipated date for reopening was January 2023.

PVSP did not have a CIT; however, they had a clear procedure in place should a patient require an emergent evaluation.  During the regular workday, emergencies were managed by the primary clinicians.  After hours, emergencies were initially attended to by nursing, who followed up with mental health staff.

Alternative Housing:

There were 33 admissions to alternative housing.  Of those, one patient remained longer than 24 hours due to transportation issues.

3CMS:

Twenty 3CMS patients were randomly selected to have their healthcare records reviewed for their 3CMS stays.  Seven patients required initial psychiatric evaluations during the review period; 100 percent occurred before the initial IDTT and complied with Program Guide requirements.  Psychiatry conducted initial contacts in confidential settings, and none were conducted by telepsychiatry.

One hundred percent of routine psychiatric contacts occurred within 90 days and were compliant.  Ten of 21 routine contacts, or 48 percent, were conducted in a confidential setting. Reasons for nonconfidential contacts included patient refusals, medical restrictions, and modified programming.  No routine psychiatry contacts were conducted by telepsychiatry.

260

Seven patients required initial primary clinician evaluations; 100 percent were compliant. Five of seven or 71 percent of initial contacts were conducted in a confidential setting. Reasons for lack of confidentiality were not included in all cases.

One hundred percent of routine primary clinician contacts occurred within 90 days and were compliant. Twenty-eight of 48 routine contacts, or 58 percent, were conducted in a confidential setting. Reasons for nonconfidential contacts included patient refusals, COVID-19 restrictions, and modified programming.

Eight patients required initial IDTTs during the review period. Seven of eight, or 88 percent, occurred within 14 working days and were compliant with Program Guide requirements. Five of eight or 63 percent of initial contacts were conducted in a confidential setting. COVID-19 restrictions limited confidentiality in those cases.

Seven patients required routine IDTTs; 100 percent occurred at least annually and were compliant. Four of seven, or 57 percent of contacts were conducted in a confidential setting; reasons for nonconfidential routine contacts were not always provided.

Required staff members attended 100 percent of the reviewed initial and routine IDTTs. Although the Program Guide required the attendance of the assigned psychiatrist and primary clinician, this was not clearly discernable for all cases.

The monitor's expert observed six IDTTs; two on C yard and four on A yard. The two IDTTs on C yard were conducted in absentia due to patient refusal. All required disciplines attended, including mental health leadership, who provided supervisory input, as well as a CNA who did not participate. The primary clinician presented the patient's clinical history and treatment needs with input from the psychiatrist. Staff presented relevant psycho-social history, previous and current psychiatric medications, diagnosis with sufficient clinical rationale, level of

care considerations, and rationale for level of care.  However, unless prompted, they did not discuss case conceptualization, functional impairment, and treatment planning, particularly treatment goals.  The discussion between the primary clinician and psychiatrist was collaborative; both were compassionate and knowledgeable about the patients.  Participation from the correctional counselor was minimal.

PVSP did not offer group treatment to 3CMS patients outside of STRH.

During the review period, gang activity on C yard disrupted the provision of mental health care.  Specifically, gang members prohibited patients from attending mental health appointments and taking prescribed psychiatric medications.  Staff reported that due to gang intimidation when patients on C yard refused a mental health appointment, they were not required to refuse it in person.  Clinicians provided cell front contact for missed appointments. Individual treatment on C yard was further impacted by the loss of programming space due to building damage.  Clinical contacts occurred in a multi-purpose confidential office in the gym. Use of the office required logistical coordination by leadership staff, and there was also concern about mold from the room next door impacting the office.  Utilization of newly constructed office space for individual contacts was pending custody review at the time of the site visit.

The monitor's expert attempted to interview a group of 3CMS patients on C yard, though all patients refused.  This was complicated by gang-related difficulties occurring at the time of the scheduled meeting.

Interviewed patients from A yard were generally satisfied with mental health programming at PVSP.  They reported that mental health contacts occurred in confidential offices within Program Guide timelines.  However, some indicated that the office temperature during the summer months impacted their desire to attend appointments or remain for the entire

time. Interviewed patients were unaware of their treatment goals, and as observed by the monitor's expert, treatment goals were not discussed in IDTT.

Interviewed 3CMS patients on B yard reported meeting with their primary clinicians and psychiatrist within Program Guide required timeframes and confirmed the lack of group treatment. They reported that IDTTs were not beneficial and that the CC Is who attended did not address custody-related factors that impacted their mental health. Several patients reported having jobs; however, they noted challenges with custody releasing them for their jobs. The patients reported no difficulties obtaining mental health or medical appointments.

Other Issues:

Pre-Release Planning:

The PVSP mental health pre-release coordinator (IMHPRC) was in the position since 2018. The IMHPRC also provided crisis response coverage, primary clinician sick or scheduled days off coverage, completion of SRACHEs, PC 3002 assessments (evaluations for the safe return to the community in child endangerment cases), and CCAT coverage, when necessary.

The IMHPRC generated weekly or daily lists from SOMS that identified patients within 120 days of release from the institution. The IMHPRC met with patients no later than 45 days from release to complete the PRPA and the ROI needed for patients released to probation. PVSP primary clinicians collaborated with the Parole Services Administrator (PSA) regarding Specialized Treatment for Optimized Programming (STOP) program referrals and community housing needs. ISUDT also assisted with securing housing for patients.

PVSP did not provide pre-release groups during the review period due to the insufficient number of eligible patients; individual meetings were offered as a substitute.

263

Two TCMP caseworkers provided pre-release services to patients at PVSP.  PVSP reported a collaborative relationship with TCMP staff.

Program Access:

a.     Job and Program Assignments

On June 1, 2022, PVSP reported that one, or 33 percent of EOP patients held a job assignment during the reporting period.  In addition, for the 1,322 remaining job assignments, 219 were held by 48 percent of 3CMS patients, while 1,103 jobs were held by 49 percent of non-MHSDS incarcerated individuals.

For the 615 academic placements, 93 patients, or 20 percent of the 3CMS population, and 522, or 23 percent of the non-MHSDS population, had placements.  Regarding the 11 substance abuse treatment assignments, three assignments were held by one percent of the 3CMS patients, and eight assignments were held by less than one percent of the non-MHSDS population.  Of the 280 vocational education assignments, 47 were held by ten percent of 3CMS patients, while 233 were held by ten percent of the non-MHSDS incarcerated persons.  Finally, of the 203 voluntary education assignments, 43 were held by nine percent of the 3CMS population, and 160 were held by less than one percent of the non-MHSDS population.

b.     Milestone Credits

On June 1, 2022, three EOP patients were eligible for milestone credits; none earned them.  There were 447 3CMS patients, of which 421 were eligible for milestone credits; 23 percent of those eligible earned them.  Regarding the non-MHSDS population, of the 2,192 incarcerated persons, 2,113 were eligible for milestone credits, and 22 percent earned them.

c.     Out of Level Housing

On June 15, 2022, PVSP reported that 41 Level III 3CMS patients were housed in Level IV housing, 140 level III non-MHSDS incarcerated persons were housed in Level IV housing, and 35 Level I non-MHSDS incarcerated persons were housed in Level II housing.

 d  ADA Reasonable Accommodation and Grievance Procedures

PVSP had a current LOP that outlined the requirements of the Americans with Disabilities Act and the Disability Placement Program (DPP).  There were no grievances for DPP patients with psychiatric illnesses during the review period.

Case-by-Case Reviews:

During the review period, four patients were retained in STRH beyond 150 days.  The monitor's review of all cases indicated that there was appropriate justification and documentation for three cases.  In the fourth case, the patient was inappropriately retained for longer than 150 days due to enemy concerns.

The monitor reviewed ten ICC chronos for patients who had a 120-day pre-MERD hearing.  Decisions to retain all ten patients were appropriate.

"C" Status:

At the time of the site visit, there were 26 patients on "C" status, including six 3CMS patients.  The reason for "C" status was program failure/disciplinary history.  None of the patients on "C" status exceeded six months.

Mental Health Referrals:

During the review period, PVSP reported a total of 739 mental health referrals.  All psychiatry and primary clinician responses to referrals were timely.  There were 204 psychiatry referrals and 535 referrals to primary clinicians.  The 37 emergent referrals included two to psychiatry and 35 to primary clinicians.  Of the 57 urgent referrals, two were to psychiatry, and

55 were to primary clinicians. The 645 routine referrals included 200 to psychiatry and 445 to primary clinicians.

All interviewed correctional staff was knowledgeable regarding the location, completion, and distribution of MH-5 referral forms.

Custody and Mental Health Partnership Plan:

Except for the exclusion of the September 2019 Court order in the references section, the PVSP CMHPP LOP was in alignment with the CDCR Headquarters LOP.

Executive leadership joint rounding occurred monthly and was attended by required staff. Staff interviews consistently indicated positive custody and mental health relationships. However, it was unclear if more than one or two staff members were interviewed during rounds, if the interview was confidential, and if all required and other relevant areas, such as lack of confidential space on C yard, were assessed. Documentation indicated that patients were rarely interviewed, and documentation of the rounding process did not reflect the intent of executive leadership joint rounding identified by the CMHPP.

The observed executive leadership joint rounding in the STRH was attended by the CMH, CEO, associate warden, and various custody staff. PVSP staff reported that this composition was unusual as the warden, CEO, and CMH usually conducted the rounding. Observation confirmed that staff was not interviewed in a confidential space; only one staff member was interviewed, and no issues were reported. Additionally, staff reported that only one patient was selected for an interview due to a high refusal rate. More patients were interviewed upon the monitor's expert's suggestion; no concerns were identified during the interviews. The CMH led the rounds with minimal participation from other leadership staff. The monitor's expert recommended a more collaborative rounding approach.

Documentation in MHPS and QMC minutes indicated that executive rounding occurred, but further detail regarding findings and actions taken were not included. PVSP did not provide the warden's meeting minutes.

The monitor reviewed the second and third watch huddle reports for February 2022; three of the 40 reports were missing resulting in a 99 percent compliance rate. The approved huddle report form was used. The reports included information regarding new arrivals into STRH within the past 72 hours, odd or bizarre patient behavior, medication changes, scheduled appointments out of STRH, and bad news.

Monitor-reviewed copies of IAC meeting minutes revealed custody and mental health staff attendance. Mental health issues discussed included how to request mental health services, mental health groups, mental health priority ducats, mental health signs and symptoms, and the impact of COVID-19 quarantine on the mental health program.

Documentation indicated that 686 of 702, or 98 percent of correctional officers attended the required partnership training. One hundred percent of captains, sergeants, and correctional administrators and 93 percent of lieutenants attended the training.

For mental health staff, the chief psychiatrist, chief psychologist, senior psychologist supervisor, and 100 percent of the psychiatrists, psychologists, recreation therapists, and supervising social workers attended the training. Three of the four social workers, or 75 percent, attended the required annual training.

The 3CMS brochure was available.

No staff complaints were filed during the reporting period, and no staff was reassigned due to a complaint.

The monitor reviewed In-Service Training (IST) sign-in sheets and FLSA staff attendance records for STRH quarterly round table training for the fourth quarter of 2021 and the first quarter of 2022 for second and third watch. Based on the number of custody staff assigned to the STRH on second and third watch, PVSP was not compliant with attendance. For the fourth quarter of 2021, eight custody staff and three mental health staff attended the required quarterly training for both second and third watch. For the first quarter of 2022, 12 custody and six mental health staff attended the required training on second and third watch. Per the FLSA custody staff attendance sheets, there were 19 custody staff assigned on second watch and nine on third watch.

PVSP was compliant with the completion of weekly 3CMS supervisory meetings with appropriate attendees. During the site visit, the monitor observed the weekly 3CMS supervisory meeting; it was attended by the four facility sergeants and the chief psychologist. The meeting was productive and informative, and the sergeants shared information about patients who transferred between the facilities. PVSP utilized the required meeting form, and the meeting content included EOP level of care patients waiting to transfer, patients acting in a bizarre or unusual manner, recent arrivals, returns from court, bad news, and current facility program status.

PVSP documented the completion of monthly supervisory tours on the appropriate form and included the staff who conducted the tours. The documentation included concerns and questions regarding COVID-19 protocols, mental health ducats, pending transfer for EOP level of care patients, modified program due to COVID-19 and/or staff vacancies, and patient interest in mental health groups.

Patients and staff reported a collaborative relationship between custody and mental health staff.

<u>Heat Plan</u>:

PVSP's heat plan LOP was up-to-date and compliant with statewide policy. The heat plan was in effect for one month of the review period. During that month, there were seven Stage I heat alerts and no Stage II and III heat alerts. There were no heat-related incidents during that month.

The monitor toured eight housing units and interviewed custody staff regarding heat plan protocols. All officers interviewed were knowledgeable of heat plan policies and procedures. Additionally, each housing unit had a current list of heat risk patients. A stage I heat alert was activated during the site visit, during which custody staff recalled appropriate patients to the housing units and properly completed unit temperature logs. However, PVSP did not offer accommodations such as dayroom to mitigate the reduction in yard time during Stage I events.

<u>RVRs</u>:

PVSP reported that 100 percent of the correctional administrators, captains, and lieutenants attended the required inmate disciplinary mental health assessment training; 96 percent of sergeants attended the training. For mental health staff, four staff attended the clinical decision-making for RVR mental health assessments training. PVSP reported that those four clinicians completed mental health assessments when required.

PVSP issued 991 RVRs during the review period. Of those, 257 or 26 percent were issued to 3CMS patients, three were issued to EOP patients, and two were issued to MHCB level of care patients. The remaining 729 RVRs were issued to non-MHSDS incarcerated persons.

The monitor reviewed nine RVRs and mental health assessments to assess compliance with CDCR policy and procedure. Custody staff timely requested a mental health assessment in

269

three of nine or 33 percent of reviewed cases. Mental health staff completed and returned the mental health assessment to custody staff within policy timelines 100 percent of the time. The mental health assessment was conducted in a confidential setting in six of nine or 67 percent of reviewed cases. None of the mental health assessments indicated that the patient's mental illness impacted the behavior documented on the RVR. Further, the clinician did not recommend mitigating potential penalties in any of the reviewed mental health assessments.

In all nine reviewed RVRs, the senior hearing officer documented consideration of the mental health assessment. Further, the senior hearing officer indicated that the mental health assessment did not recommend mitigating any penalties.

The monitor reviewed three ICC classification chronos for documentation of the chairperson's consideration of the mental health assessment information; consideration was documented in all three cases. None of the SHU terms were mitigated, as none of the mental health assessments recommended mitigation.

<u>Use of Force</u>:

There were 38 immediate use of force incidents during the review period involving 19 MHSDS patients and 20 non-MHSDS incarcerated persons. There were zero controlled use of force incidents.

PVSP was 100 percent compliant with use of force training for the warden, chief deputy warden, correctional administrators, sergeants, and correctional officers. For captains, five of six, or 83 percent, attended, and for lieutenants, 25 of 26, or 96 percent, completed the training. One hundred percent of mental health staff completed the use of force training. For psych techs, ten of 11, or 91 percent, attended the training.

The monitor reviewed four immediate use of force incidents involving MHSDS patients; no issues or concerns were noted.

<u>Lockdowns/Modified Programs</u>:

PVSP reported one lockdown initiated in April 2022 on C Yard when searches were conducted following the overdose deaths of two non-MHSDS incarcerated persons.

<u>Access to Care</u>:

A review of PVSP's access to care reports from December 2021 to May 2022 revealed a total of 6,302 ducats and add-on appointments.  Of those, 5,062 ducats were completed, while 1,240 were not.  Zero incomplete ducats were due to custody reasons.  Of the ducats reported, 20 percent were not completed for non-custody reasons, excluding patient refusals.

<u>Placement of 3CMS into Minimum Support Facilities</u>:

PVSP did not have a minimum support facility and did not track those transfers.

<u>*Coleman* Postings</u>:

Coleman posters in English and Spanish were properly displayed in all toured housing units.

**APPENDIX B-9**
**HIGH DESERT STATE PRISON (HDSP)**
**(July 26, 2022 – July 28, 2022)**
**Review Period: (December 1, 2021 – May 30, 2022)**

<u>Census</u>:

On July 26, 2022, the total incarcerated population at HDSP was 1,852 persons.  The total MHSDS population was 416 patients or 22 percent of the population.

The MHCB had a population of three patients.

There were five EOP patients.  All were pending transfer to mainline EOP; three were housed in STRH.

The mainline 3CMS population was 408 patients, including 29 housed in STRH.  One 3CMS patient was housed in alternative housing.

<u>Staffing</u>:

HDSP did not have an allocated chief psychiatrist position.

The senior psychiatrist position was vacant.

One of the two chief psychologist positions was filled and served as the chief of mental health; the other remained vacant as a salary savings measure.

Both senior psychologist positions were filled.

The .5 on-site staff psychiatrist position was vacant.  HDSP had four allocated telepsychiatry positions; 4.5 were filled.

Of the 11.5 allocated psychologist positions, five were filled for a 57 percent functional vacancy rate.  One psychologist was out on long-term leave.

The one supervising social worker position was filled.  Six of the seven social worker positions were filled for a 14 percent functional vacancy rate.

The senior psych tech position was filled. Seven of the 10.6 psych tech positions were filled for a functional vacancy rate of 34 percent.

One of the 1.2 MHSDS registered nurse positions were filled for a functional vacancy rate of 17 percent.

The 1.5 recreation therapist position was filled.

One of the 1.5 HPS positions was filled for a functional vacancy rate of 33 percent. The .5 office services supervisor II position was vacant. The CHSA II position was vacant. Five of the 7.5 MHSDS clerical positions were filled for a functional vacancy rate of 33 percent. One of three medical assistant positions was filled; however, one registry CNA assisted. On-call coverage was provided by on-site clinicians.

Telepsychiatry:

Telepsychiatry did not provide on-call coverage. Telepsychiatrists performed initial psychiatric evaluations and routine contacts and participated in IDTT meetings.

Due to ongoing staffing limitations, telepsychiatrists provided psychiatry services in the MHCB. Information provided on telepsychiatry use was inconsistent. One document reported 20 hours per week of total telepsychiatry used in MHCB, or 80 hours per month. Another document reported that one psychiatrist provided 150 hours per month, while another provided 43 hours per month, for a total of 193 hours per month.

Quality Management:

The local governing body and quality management committee meetings occurred monthly throughout the review period and a quorum was met at all meetings. Quality management committee agendas and meeting minutes were provided for review for each month of the reporting period.

The MHPS met monthly throughout the review period and a quorum was met at all meetings.

HDSP used CAPs for mental health quality management.  At the time of the site visit, there was one open CAP on Treatment Offered.  Staff reported that 30 areas were routinely monitored and the audit process involved reviewing performance reports to identify trends and repeated factors to address.  The data was analyzed for red and yellow performance indicators at least once per month, a report was generated based on the data, and any necessary CAPs were developed based on the reports.  Diagnostic Monitoring was the only item on the mental health dashboard and it was monitored internally by specific clinicians responsible for tracking that data.

There were no QITs or FITs during the review period or at the time of the site visit.

Pursuant to instructions from mental health headquarters, peer review did not occur during the review period.

HDSP recently allocated two positions specifically to focus on quality management.  Historically, HPS staff were in charge of maintaining their own departments, to which quality management was then added as an additional responsibility.  Staff reported that the acquisition of dedicated quality management positions had greatly improved the process and staff morale.

Medication Management:

HDSP provided MAPIP results for December 1, 2021 through May 31, 2022 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that HDSP was compliant with obtaining the following measures for all six months of the monitoring period: height, weight, blood pressure, AIMS, and medication consent.

For monitoring CMP and glucose (blood sugar), the facility was compliant for five months, and non-compliant for one. Of note, the one month of glucose monitoring that was non-compliant was at 89 percent, which approached the 90 percent threshold of compliance.

For checking thyroid tests, the institution was compliant for four months, with no data required for two months.

For both CBC with platelets and lipid tests, the facility was compliant for three out of the six months, and non-compliant with the remaining three months of the review period.

For measuring EKGs, the facility was compliant for two months, with no data required for four months of the monitoring period.

HDSP was not an authorized clozapine initiation or maintenance facility. There were no patients on clozapine during the review period.

For required monitoring of antidepressants, the facility was compliant for six months with obtaining medication consents and thyroid tests. The facility was compliant in checking blood pressure for patients taking venlafaxine for five months of the review period, and non-compliant for one month. HDSP reported that checking EKGs for patients prescribed antidepressants was not required during the review period.

For patients prescribed carbamazepine, the facility was compliant with obtaining medication consent for one month, with no data required for five months. The facility reported that the following measures were not required during the review period: checking CBC, CMP, or medication level.

Medication consent documentation for patients prescribed Depakote (divalproex, valproic acid) was compliant for four months during the review period, and no data was required for two months. For both CBCs and CMPs, the facility was compliant three of the six months, and no

275

data were required for the remaining three months.  For checking blood levels of medication, HDSP was compliant for three months, non-compliant for one month, with no data required for two months.

For lamotrigine, the facility reported that no data for obtaining medication consents were required for the six months of the review period.

Regarding lithium, the facility was compliant with medication consent for one out of the six months, and not required for five months.  HDSP reported that monitoring of lithium levels, obtaining EKGs, checking kidney function (BUN/Cr), and monitoring thyroid tests were not required during the review period.

For medication management metrics reported by mental health headquarters, HDSP was compliant with these measures for all six months during the reporting period: continuity of medications upon parole/transfer to the community; observation of medication preparation at HS (*hora somni*, bedtime); observation of medication preparation AM and PM; chronic care medications historical administration; and outpatient provider new medication orders.

Regarding continuity of medications upon inter-institutional transfer at receiving and release, the facility was compliant for two months, and non-compliant for four months.  HDSP was compliant with continuity of nurse administered (NA) and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU) for five months, and non-compliant for the remaining month.  In terms of continuity of medications for MHCB transfers, the facility was compliant for one month, with no data required for five months.  HDSP was compliant with continuity of medications with intra-institutional transfer to ASU/SHU/PSU for four months, and non-compliant for two months.  In terms of continuity of medications for discharge/transfer from

a community hospital and/or DSH, the facility was compliant for four months, non-compliant for one month, with no data required for one month.

The facility submitted unclear documentation regarding patients receiving involuntary medications under the PC 2602 process.  For medication management data reported by headquarters, HDSP reported no patients receiving involuntary medications under the PC 2602 process during the review period; however, the patient list noted two patients receiving PC 2602 medications.  These were both renewals.  No initial applications were filed by the institution during the review period.  There were no instances of use of force related to medication compliance.

HDSP did not report the number of total psychotropic prescriptions, nor the number of prescriptions written as KOP.  The facility noted that KOP medications were only for Selective Serotonin Reuptake Inhibitors (SSRI), in accordance with CDCR policy.

Pill line rarely ran over two hours.  The facility noted three instances of this during the review period.

HDSP was generally timely in the administration of at HS medications at or after 2000, as required by policy.

The facility reported compliance with the completion of polypharmacy reviews for the review period.

The rate of non-formulary usage was not reported.

Transfers:

HDSP referred one patient to inpatient care at the acute level of care.  The patient was admitted within ten days of referral.  There were no patients referred to intermediate care during the review period.  No patients returned to HDSP from inpatient care during the review period.

There were 23 non-referrals for 14 patients during the review period.

There were no *Vitek* hearings during the reporting period, and there were no patients with complex medical needs referred to inpatient care.

HDSP referred 47 patients to the MHCB during the review period; four referrals were rescinded. All patients were admitted or rescinded within 24 hours of referral. There were 60 admissions to the HDSP MHCB during the review period, including 17 patients from other institutions.

During the reporting period, the average daily census in the HDSP MHCB was 1.9 patients. The clinical length of stay averaged five days with a range of two to eight days. The total average physical length of stay during the review period was 5.7 days, ranging from two to 15 days. Two patients, or three percent of patients, took longer than 72 hours to transfer after clinical discharge during the review period. Reasons for the delays included transfer to acute care and mainline EOP.

There were no patients with three or more MHCB admissions during the review period.

HDSP transferred three patients to a PSU during the review period. All transfers occurred within 60 days.

HDSP transferred 16 patients to EOP administrative segregation hubs during the review period. Three patients, or 19 percent, took longer than 30 days to transfer. Reasons for delays included a medical hold, refusal to transfer, and refusal to submit to a COVID-19 test.

HDSP did not track transfers to LTRH during the review period.

There were no delays placing 3CMS patients in STRH.

HDSP transferred 16 patients to mainline EOPs during the reporting period. Three patients, or 19 percent, took longer than 60 days to transfer. Reasons for delays included

pending court dates and refusal to submit to COVID-19 testing.  On July 26, 2022, five patients were pending a transfer to mainline EOPs; none exceeded timeframe guidelines.

During the review period, one 3CMS patient transferred to HDSP.

Programming:

STRH:

HDSP reported 385 patients in STRH during the reporting period.  The average length of stay was 52 days and ranged from one to 483 days.

A review of 114As for ten patients demonstrated patients were offered at least three showers per week and had weekly linen exchanges in 19 of 20 weeks reviewed.  Patients were offered at least 18.5 hours of yard time in 16 of 20 weeks reviewed.  Patients were quarantining due to COVID-19 during the weeks where a minimum of 18.5 hours of yard time were not offered.  Of the ten patients reviewed, nine had an initial ICC within ten days of arrival at HDSP.

Custody and mental health huddles were logged daily.  An observed huddle was attended by the primary clinician, sergeant, nurse, and various other staff members.  Staff was engaged and discussed patients thoroughly; topics discussed included recent admissions or transfers, unusual patient behavior, and treatment and medication-related issues.  STRH mental health staff reported positive relationships and interactions between themselves and custody staff on the unit.  They reported no difficulty with patients accessing care due to custody reasons.

Patients in STRH were offered two groups which included social skills/communication and coping.

The monitor's expert observed a total of seven IDTT meetings in STRH, with five patients present for the IDTT and two IDTTs held in absentia.  The IDTT meetings were well staffed and attended by both STRH mental health clinicians, the psychiatrist via telepsych

monitor, a LPT, and a CC1. There were no observed difficulties with the psychiatrist engaging and participating in the meetings via telepsych.

The overall quality of the IDTTs was adequate. The unit psychologists provided very thorough and individualized case conceptualizations for each patient. Specifically, there was discussion of diagnosis, symptoms, functional impairments, medications, goals, and safety planning (as appropriate) for each patient. There was also appropriate level of care discussion and justification for each patient. Each member of the treatment team, including the LPT and CC1, participated appropriately and provided relevant input to the treatment planning process. For each patient, there was consistent agreement among team members on patient diagnosis, progress, goals, interventions, and level of care.

The monitor's expert observed treatment spaces. STRH contained a group room with the capacity for eight participants and a facilitator. The room was confidential and had a door that could be closed for sound privacy. STRH also contained three individual treatment spaces consisting of small rooms containing a TTM and a desk and computer for the clinician or primary clinician. All observed treatment spaces allowed for confidential clinical contacts between the clinician and patient.

Interviewed patients reported receiving daily LPT rounds, weekly primary clinician contacts, and MHMD contacts every 90 days. The patients also reported timely IDTTs at a frequency of once every 90 days. Patients reported clinical contacts with their primary clinician or the psychiatrist were always offered in a confidential setting unless the patient did not want to come out of cell. Patients and staff reported that when a patient refuses an out-of-cell clinical contact, a cell-front check-in is performed and the patient is encouraged to come out of cell for a confidential contact when they are ready.

STRH patients reported attending one group per week. There were two STRH groups offered during the review period and site visit. A Coping Skills group and a Social Skills/Communication group were each held twice per week. Interviewed patients described the groups as helpful and worthwhile. Patients also reported mental health programming scheduling did not interfere or conflict with yard or out-of-cell time.

EHRS reviews for STRH mainline psychiatric contacts were completed for 15 cases. Twelve patients required initial evaluations. Of those that were required, 11 or 92 percent were compliant. One patient did not receive an initial psychiatric contact. Of the 11 initial contacts reviewed, 100 percent were conducted in a confidential setting.

Regarding the 11 patients expected to be seen for routine contacts, there were 11 expected timeframes, ten or 91 percent occurred within ninety days. Of the 12 psychiatry contacts reviewed, 100 percent were done in a confidential setting.

All reviewed initial or routine psychiatric contacts were conducted via telepsychiatry.

EHRS reviews for mainline primary clinician contacts were completed for 15 cases. Twelve patients required initial primary clinician contacts. Of those that were required, 11 or 92 percent were compliant. Six of 12, or 50 percent, were conducted in a confidential setting. Those that were not confidential were marked as being due to COVID-19 precautions or patient refusals. Of note, while primary clinician contacts were often marked as non-confidential due to COVID-19 quarantines, psychiatry appointments that occurred in that same time period were marked as occurring in a confidential setting.

For the 15 patients expected to be seen for routine contacts, there were 57 expected timeframes for routine contacts, 49 or 86 percent occurred within seven days and were compliant. Of the 60 routine primary clinician contacts reviewed, 25 appointments, or 42

281

percent were done in a confidential setting. Reasons for non-confidential primary clinician appointments were listed as patient refusals, COVID-19 precautions, or assigned primary clinician absences.

EHRS reviews to assess compliance with timely IDTTs were completed for 15 cases. Twelve reviewed patients required initial IDTTs, eight or 67 percent of which were compliant. Of the 11 initial primary clinician contacts reviewed, patients were present for four initial IDTTs, or 36 percent. Reasons for non-attendance included patient refusals and COVID-19 precautions.

There were six patients who required a total of eight quarterly IDTTs during the review period; all occurred within ninety days and were timely. Of the eight routine primary clinician contacts reviewed, patients were present at two routine IDTTs, or 25 percent. The reasons for non-attendance were patient refusals and COVID-19 precautions.

Regarding staffing attendance, required staff were in attendance at 100 percent of initial and routine IDTTs. Of note, while a primary clinician and psychiatrist were in attendance, it was unable to be determined for every case, if the assigned treatment providers were in attendance as required by the Program Guide.

Non-Disciplinary Segregation (NDS):

During the site visit, 11 patients were assigned NDS status including one EOP patient, six 3CMS patients, and four non-MHSDS incarcerated persons. HDSP reported compliance for timely transfers of patients placed on NDS status.

MHCB:

HDSP maintained a ten-bed MHCB, located in the CTC. Staff reported fewer referrals to the MHCB since the preceding review period. This was attributed this to a reduced population at the facility.

Telepsychiatrists provided psychiatry services in the MHCB due to ongoing staffing shortages.  The monitor's expert noted that patients were generally seen in confidential settings, unless they refused.  Additional staff assigned to the MHCB included a senior psychologist supervisor, a senior psychologist specialist, a psychologist, and a recreation therapist.

At the time of the site visit, two patients were in the MHCB.  Both were referred for treatment at the intermediate level of care.  The monitor's expert reviewed the charts for both patients.  The rationale for referral to a higher level of care was clear, and both referrals were done in a timely manner.  Both patients were transferred within mandated timeframes.

No data regarding groups in MHCB was provided for review.

HDSP reported no incidents of seclusion or restraints during the review period.  The facility reported successfully working with the regional SPRFIT coordinator to reduce the use of seclusion and restraints in the MHCB.

CDCR reported that planned construction on the HDSP MHCB, which would require closure of the unit, was delayed.  It was now anticipated to begin in March 2023.

Ten patients who were admitted to the MHCB were selected to have their electronic health records reviewed for compliance during their HDSP admission.  All received a primary clinician evaluation within a 24-hour period.  There were 41 required daily contacts in the MHCB for the admissions reviewed.  Clinicians completed 36, or 88 percent of the daily contacts.

Six psychiatry initial evaluations were timely completed for 60 percent compliance. There were 14 required twice weekly psychiatry contacts, the institution was compliant 93 percent of the time.

Of the ten patient records reviewed, 100 percent were compliant for an initial IDTT within 72 hours of admission. The required staff was present at the initial IDTT as designated by the Program Guide in six cases.

There was 100 percent compliance with routine IDTTs and IDTTs prior to discharge.

3CMS:

The monitor's expert observed three IDTTs on A-yard. The IDTTs were adequately staffed, however, the majority of the treatment team participated virtually. Only the primary clinician and the patient were in the same room. The psychiatrist participated via telepsych on a video monitor, the LCSW was also on the screen with the psychiatrist (in a separate office), and the CC1 participated by phone. There was no issue or difficulty observed with the psychiatrist and LCSW utilizing telemedicine and both parties were able to clearly see, hear, and communicate with the patient. The CC1's participation in the IDTTs was essentially nonexistent due to this CC1 filling in for these patients' usual CC1 and the CC1 had significant difficulty hearing the other meeting participants via speakerphone. Case conceptualizations provided by the primary clinician for two of the three IDTTs were thorough and appropriate. No case conceptualization was provided in the third IDTT, but symptoms and current functional impairments were assessed and discussed. Discussion of diagnoses, symptoms, functional impairments, medications, goals, level of care, and safety planning were present for each patient as appropriate.

The monitor's expert observed two IDTTs on C-yard. Both meetings were adequately staffed with the primary clinician, psychiatrist, CC1, and patient present for the meeting. The psychiatrist participated via telepsych and there were no observed difficulties. The IDTT process was very collaborative between the primary clinician, psychiatrist, and CC1 and the team

demonstrated active discussion and cooperation throughout both meetings. Case conceptualizations provided by the primary clinician were limited, however, lacking psychosocial and pre-institutional history and solely focused on each patient's CDCR history. Appropriate discussion of diagnoses, medications, symptoms, functional impairments, safety, level of care, and goals were present and appropriate for both patients. The interventions provided for both patients, while appropriate to the stated goals, were somewhat vague in scope and measurability.

General population 3CMS patients on A-yard, C-yard, and D-yard were interviewed about their experiences with the MHSDS at HDSP. Patients on A-yard and C-yard reported timely clinical contacts within program guidelines and that all clinical contacts occurred in a confidential setting unless the patient declined the confidential setting. They reported timely scheduled primary clinician contacts and little to no difficulty accessing their primary clinician or psychiatrist between scheduled appointments if necessary. Patients on D-yard, however, reported little to no clinical contacts since arriving at HDSP. Each of these patients reported having arrived at HDSP within the past six months and all reported not having had an IDTT or regular primary clinician contacts.

General population 3CMS patients were not offered clinical groups during the review period or at the time of the site visit.

A total of 20 3CMS patients were randomly selected to assess compliance with timely psychiatric contacts. Eight cases were removed, five due to the patients transferring to different institutions or different levels of care and three due to those patients not receiving medications. Accordingly, EHRS reviews were completed for 12 cases.

Four patients required initial psychiatric evaluations during the review period. Two of four or 50 percent of the expected initial psychiatry contacts occurred, were conducted prior to the initial IDTT, complied with Program Guide requirements, and were conducted in a confidential setting. They were conducted via telepsychiatry. The remaining two patients did not receive an initial psychiatric evaluation; the reason provided was COVID-19 quarantining.

For routine psychiatric contacts, there were 11 expected timeframes. Eight of 11 or 73 percent occurred within 90 days and were compliant with Program Guide requirements. Fifteen of 17 reviewed routine contacts, or 88 percent, were conducted in a confidential setting and were conducted via telepsychiatry; the two non-confidential contacts were due to the patient refusal.

A total of 20 3CMS patients were randomly selected to assess compliance with Program Guide timeframes for primary clinician contacts as documented in the EHRS during the reporting period. Five cases were removed due to patients transferring to different institutions. Accordingly, EHRS reviews were completed on 15 cases.

Four patients required initial primary clinician evaluations during the review period. All four occurred within ten working days and were compliant with Program Guide requirements. Three of the four or 75 percent of initial contacts were conducted in a confidential setting; the non-confidential initial contact was conducted cell-front due to the patient being on COVID-19 quarantine status.

For routine primary clinician contacts, there were 20 expected timeframes. Seventeen of 20 or 85 percent occurred within 90 days and were compliant with Program Guide requirements. Twenty two of 27 reviewed routine contacts, or 81 percent, were conducted in a confidential setting; the five non-confidential routine contacts were conducted cell-front due to the patients being on COVID-19 quarantine status or patient refusal.

286

A total of 20 3CMS patients were randomly selected to assess compliance with timely IDTTs.  Five cases were removed due to those patients transferring to a different institution or level of care.  Accordingly, EHRS reviews were completed on 15 cases.

Four patients required initial IDTTs during the review period.  Two of four or 50 percent occurred within 14 working days and were compliant.  The patient was present for two of four or 50 percent of IDTTs.

Seven patients required routine IDTTs during the review period.  All occurred at least annually and were compliant with Program Guide requirements.  The patient was present for three of seven or 43 percent of routine IDTTs.  Required staff members attended 100 percent of the initial and routine IDTTs that occurred during the review period.  Of note, the Program Guide requires attendance of the assigned psychiatrist and primary clinician, however assignment was not clearly discernable for all cases.

Other Issues:

Pre-Release Planning:

HDSP reported having one mental health pre-release coordinator.  The pre-release coordinator regularly received a master list from headquarters of all patients within 60 days of release.  This list was used to schedule meetings with patients to complete the pre-release planning assessment and the required release of information for patients who will be released to probation.  Due to frequent date changes, the pre-release coordinator reviewed the pre-release report daily.

Pre-release groups were active on Facilities A, C, D, and E.  Facility B closed during the review period.  The last pre-release group on Facility B was held on December 21, 2021.  The groups covered a wide range of topics including employment, resume writing, housing, building

community support, developing an identity, and guidance on obtaining psychiatric medication and mental health resources in the community.  Information regarding the curriculum used in pre-release groups was not available for review.

Upon release, the coordinator provided a pre-release packet to patients which included appropriate services depending upon the patient's needs.

The pre-release coordinator reported a collaborative working relationship with the TCMP caseworkers.  The pre-release coordinator attended the ISUDT bi-weekly pre-release meeting, and the monthly headquarters call for pre-release coordinators.

The TCMP reported there were 45 MHSDS patients released from HDSP during the review period, one EOP and 44 3CMS patients.  Prior to release, 100 percent of the patients were screened for benefit eligibility.  It was reported that Medi-Cal applications were submitted for 44, or 97.8 percent of the patients released.  One patient was out to court.

Applications were submitted for the eight 3CMS patients eligible for SSI.  One 3CMS patient was determined to be eligible for Veterans' benefits; an application was submitted.

Program Access:

a.    Job and Program Assignments:

On June 1, 2022, HDSP reported that of 857 available jobs, 217 3CMS patients, or 42 percent of the 3CMS population held job assignments, and for non-MHSDS incarcerated persons, 640 or 38 percent held job assignments.

For the 458 academic assignments, HDSP reported that 121 3CMS patients, or 24 percent of the 3CMS population held assignments and for non-MHSDS, 337 or 20 percent of the non-MHSDS population held assignments.

Of 174 vocational education assignments, 42 or eight percent of 3CMS patients held assignments and 132 or eight percent of non-MHSDS incarcerated persons held assignments.

Of 477 voluntary education assignments, 136 or 27 percent of 3CMS patients held assignments and 341 or 20 percent of the non-MHSDS population held assignments.

Of two substance abuse treatment assignments, it was reported that two non-MHSDS incarcerated persons or zero percent of non-MHSDS incarcerated persons held assignments.

b.    Milestone Credits:

A report for the time period of December 1, 2021 to May 31, 2022 indicated that of 512 3CMS patients, 477 or 93 percent were eligible to earn milestone credits and 26.21 percent earned the credit.  The data further reflected that of non-MHSDS incarcerated persons, 1,575 of 1,691 or 93 percent were eligible to earn milestone credits, and 22.86 percent earned the credit.

c.    Out-of-Level Housing:

For the out-of-level housing of MHSDS patients, provided data indicated that on June 15, 2022, three 3CMS Level I patients were placed in Level III housing.  Eighty-one 3CMS Level II patients were placed in Level III housing.  Eight 3CMS Level III patients were placed in Level IV housing.  Sixty-nine 3CMS Level IV patients were placed in Level III housing.

d.    Unclothed Body Searches:

Interviewed STRH custody staff described the procedure for unclothed body searches as consistent with the HDSP's LOP and DOM Section 52050.16.5.  The STRH unit contained private areas to conduct unclothed body searches and privacy screens were used to conduct the searches.

Case-by-Case Reviews:

HDSP reported 15 patients were scheduled for a 150-day case-by-case review. A review of case notes for patients who were retained in administrative segregation beyond 150 days indicated adherence with CDCR policy. There were 12 patients awaiting resolution of an RVR and/or DA referral, and five patients elected to be retained pending transfer to their endorsed institution.

HDSP provided information on 42 patients that satisfied the criteria for a 120-day pre-MERD review. Of the 42 patients, two patients were transferred to other institutions prior to their scheduled review. The 120-day pre-MERD reviews were completed for the remaining 40 patients. Fifteen of 40, or 38 percent of 120-day pre-MERD reviews were held 120 days prior to the expiration of the controlling MERD for each patient. Ten patients were retained beyond the MERD date. Seven of ten, or 70 percent of patients retained beyond the MERD date were granted NDS.

"C" Status:

HDSP reported four patients were on "C" Status during the review period and three at the time of the site visit. Two of the patients on "C" Status during the review period had lengths of stay of 103 days and 67 days. The other two patients had lengths of stay of 48 days and 78 days and were still on "C" Status at the time of the site visit. The remaining patient on "C" Status at the time of the site visit had been on "C" Status for six days. Reasons for placement included possession of cell phones, multiple RVRs within 180 days, and possession of alcohol.

Mental Health Referrals:

During the review period, HDSP reported a total of 1,866 mental health referrals. There were 322 psychiatry referrals and 1,544 referrals to primary clinicians. The 154 emergent referrals included 15 to psychiatry and 139 to primary clinicians. Of the 207 urgent referrals,

five were to psychiatry, and 202 were to primary clinicians. The 1,505 routine referrals included 302 to psychiatry and 1,203 to primary clinicians.

HDSP reported timely responses to 80 percent of the emergent referrals to psychiatry and 51 percent of the emergent referrals to primary clinicians. Of the urgent referrals, 100 percent of psychiatry referrals received timely responses, while 82 percent of referrals to primary clinicians were completed within timeframes. Psychiatry timely responded to 92 percent of routine referrals; response to routine primary clinician referrals was at 63 percent compliance.

<u>Custody and Mental Health Partnership Plan:</u>

HDSP effectuated Operational Procedure no. 835 titled "Custody and Mental Health Partnership Plan" (CMHPP) in February 2022. The same had been revised in July 2021. This LOP fully complied with the statewide template.

With the exception of April, joint rounding was conducted in each month of the reporting period in the following locations: December (Facility C), January (Facility Z), February (Facility A), March (MHCB/CTC), and May (Facility A).

Quality management committee meeting minutes were reviewed for each month of the reporting period. Though each month discussed CMHPP at least briefly, joint rounding was only addressed in the February 2022 minutes and revealed no issues worth discussion at the QMC.

Mental health subcommittee agendas and meeting minutes were also provided for each month of the reporting period except May 2022. Each of the other months discussed CMHPP and joint rounding in sufficient detail. The December 2021 minutes, for example, noted that scheduling conflicts made rounding difficult to complete but otherwise reflected comfortability between mental health and nursing staff. Meeting minutes for the other four months indicated no

significant issues reflected during joint rounding and frequently discussed CMHPP training among other items.

Monthly joint supervisory program area tours occurred during each month of the reporting period except for January due to COVID-19 precautions. Each tour was attended by the program supervisor in accordance with policy.

HDSP was unable to provide documentation regarding the occurrence of weekly 3CMS supervisory meetings during the reporting period. However, the monitor was able to observe a weekly 3CMS supervisory meeting during the site visit. The meeting was attended by the 3CMS program supervisor and sergeant. Topics discussed included changes to patient medications, whether any patients had received or were anticipating receiving "bad news," and potential housing unit issues. The IAC, despite policy requiring monthly meetings, only met during December, February, and March during the reporting period due to various COVID-19 outbreaks.

Annual Partnership Off-Post Training was provided yearly. Fifty eight percent of mental health/nursing staff and 89 percent of custody staff received the training.

Patients filed 259 staff misconduct complaints during the reporting period. Most alleged retaliatory behavior or disrespectful comments by staff. Three staff members were moved from their post due to alleged misconduct.

The monitor observed two mental health huddles (one of which was in the STRH and noted above). The observed huddles were collaborative and featured thorough and individualized discussions of each patient.

In accordance with policy, the 3CMS orientation brochure was provided to 3CMS patients throughout the reporting period.

Heat Plan:

The heat plan was in effect for one month during the review period. HDSP prepared and submitted a monthly heat report to CDCR headquarters. No heat alerts were reported. HDSP's LOP conformed with CDCR policy.

Custody staff was interviewed regarding heat plan protocols in the following housing units: A1, A3, C3, C5, STRH, and D6. Custody staff were knowledgeable regarding heat plan policies and protocols; the only recurring issue of note was that custody staff on units C3, C5, and D6 were not updating the list of heat medication patients daily. Otherwise, custody staff were familiar with the stages of the heat plan, were properly logging temperatures, and had mental health referral forms readily available.

RVRs:

During the review period, there was a total of 1,439 RVRs issued to HDSP patients. Ten RVRs were issued to patients at the MHCB level of care, four RVRs were issued to patients at the EOP level of care, 541 RVRs were issued to patients at the 3CMS level of care, and 884 RVRs were issued to non-MHSDS incarcerated persons.

A total of 16 RVRs were reviewed for compliance with CDCR policy and procedure. Of the 16 RVRs reviewed, none recommended alternative discipline. All reviewed mental health assessment interviews were conducted confidentially. Requests for mental health assessments were not referred to mental health staff in a timely manner. Custody staff referred RVRs to mental health staff within policy timelines in three out of 16 cases or 19 percent of the time.

Mental health assessments were timely returned to custody staff 100 percent of the time. The senior hearing officer documented consideration of the mental health assessment (MHA)-

115 information in every case. Mitigation of penalties was not recommended in any of the cases reviewed.

The institution reported 100 percent of correctional administrators attended the required inmate disciplinary mental health assessment training. One hundred percent of captains attended the training, 23 of 24 lieutenants, and 58 of 59 of the sergeants attended the training. Five correctional officers attended the training.

For mental health staff, the chief psychologist attended the required RVR training. One hundred percent of senior psychologists, social worker supervisors, psychologist, and psychiatrist attended the training. Five of six social workers or 83 percent attended the training.

<u>Use of Force</u>:

Annual use of force training was attended by the Warden, Chief Deputy Warden, all correctional administrators, captains, lieutenants, sergeants; and 501 of 503 or 99 percent of custody officers. All required mental health staff attended use of force training and 41 of 123 or 33 percent of nurses.

HDSP reported no controlled use of force incidents involving MHSDS patients. There were 61 immediate use of force incidents involving MHSDS patients during the review period. Review of 17 immediate use of force incidents revealed compliance with CDCR policy in each incident.

<u>Lockdowns/Modified Programs</u>:

HDSP reported five modified programming periods during the reporting period and no program lockdowns. On November 26, 2021, Facility D was placed on modified programming after a stabbing incident. Normal programming resumed on December 13, 2021. Facilities C and D were also placed on modified programming on February 11, 2022 due to a riot. Facility C

294

resumed normal programming on February 17, 2022 and Facility D resumed normal programming on February 28, 2022.

Facility C was placed on modified programming again due to stabbing incidents first on February 18, 2022, with normal programming resuming on February 27, 2022, and on May 14, 2022, with normal programming resuming on May 24, 2022.

From June 3, 2022 through June 13, 2022, Facility D was placed on modified programming due to the discovery of missing metal shelving and three weapons in a cell unit. The institution was unable to provide Program Status Reports for July 2022.

HDSP also modified all programming starting on January 9, 2022 in response to ongoing COVID-19 issues.

Access to Care:

A review of HDSP's monthly Health Care Access Quality Reports from December 2021 through May 2022 reflected the issuance of a total of 50,515 mental health ducats and add-on appointments. Of these, 37,499 or 74 percent were completed and 13,016 or 26 percent were not completed. Of the non-completed appointments, 3,354 or 26 percent were due to patient refusals, 9,637 or 72 percent were due to non-custody factors, and 25 or 0.19 percent were due to custody factors.

Placement of 3CMS into Minimum Support Facilities:

No 3CMS patients were placed in MSF during the review period.

*Coleman* Posters

English and Spanish *Coleman* posters were properly displayed in all toured units referenced above.

**APPENDIX B-10**
**SIERRA CONSERVATION CENTER (SCC)**
**(August 9, 2022 – August 11, 2022)**
**Review Period: (January 1, 2022 – June 30, 2022)**

Census:

On August 9, 2022, SCC's total incarcerated population was 2,518, a 37 percent decrease since the Twenty-Eighth Round Monitoring Report. The MHSDS population of 209 patients decreased by 61 percent since the previous round. The MHSDS population included 202 mainline 3CMS patients and five 3CMS patients in administrative segregation pending transfer to STRH. There were two EOP patients awaiting transfer; one to a mainline and one to an administrative segregation EOP hub.

There were no MHSDS patients in the Fire Camp program.

Staffing:

The chief executive officer, chief medical officer, and supervising registered nurse positions were filled. The chief nursing assistant was filled by an employee acting out of class.

The chief psychiatrist position and one of the two chief psychologist positions were filled. The second chief psychologist position remained vacant as a cost-savings measure pursuant to a headquarters directive.

There was no senior psychiatrist position at SCC. The one staff psychiatrist position was filled, as was the one PNP position.

The one senior psychologist supervisor position was filled. One of the two senior psychologist specialist positions was filled, leaving a 50 percent vacancy rate.

Two of the 3.5 psychologist positions were filled, resulting in a 43 percent vacancy rate. One of the two psychologists was unlicensed.

Two clinical social workers filled 1.5 allocated positions.

297

Though there was no allocated position, SCC employed a full-time recreation therapist.

Similarly, although there was no allocated position, SCC employed a full-time HPS I.

The CHSA II position was filled, as were the two office tech positions.

Telepsychiatry:

SCC did not utilize telepsychiatry during the review period or at the time of the site visit.

Quality Management:

The Quality Management Committee (QMC) met monthly with a quorum in attendance throughout the review period.  The MHPS also met monthly with a quorum in attendance.  The primary audit methodology at SCC consisted of tracking performance reports and the Dashboard to identify areas falling below compliance thresholds.

SCC did not conduct any QITs or FITs, and there was no peer review process during the review period.  One CAP for timely mental health referrals began in June 2021.  The CAP was concluded in December 2021 after six months of continuous improvement and 95 compliance.

SCC disseminated QM feedback to staff through MHPS meetings, mental health staff meetings, and informal discussions.

Medication Management:

SCC provided MAPIP results for January 1, 2022, through June 30, 2022, regarding compliance with psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that SCC was compliant with obtaining the following measures for all six months of the monitoring period:  medication consents; height; weight; blood pressure; AIMS; glucose (blood sugar); and CMP.  For checking thyroid tests, the institution was compliant for four months, with no data required for two months.  EKG monitoring was compliant for three months and was not required

for three months.  For both CBC with platelets, and lipid monitoring, SCC was compliant for four months and noncompliant for two months.

SCC was not an authorized clozapine initiation or maintenance facility, and there were no patients on clozapine during the review period.

For required monitoring of antidepressants, the facility was compliant for all six months with obtaining medication consents and monitoring thyroid tests.  The facility was compliant in checking blood pressure for patients taking venlafaxine for five months of the review period and noncompliant for one month.  SCC reported that checking EKGs was not required during the monitoring period.

For patients prescribed carbamazepine, SCC was compliant with obtaining medication consents for one of six months and not required for five months.  SCC reported that the following tests were not required during the review period:  CBC, CMP, and medication blood levels.

Medication consent documentation for patients prescribed Depakote (divalproex, valproic acid) was compliant for five months during the monitoring period and not required for one month.  For monitoring both CBC and CMP, the facility was compliant for four of six months, with no tests required for two months.  For monitoring medication blood levels, SCC was compliant for four months, noncompliant for one, and no testing was required for one month.

For lamotrigine, the facility reported that no medication consents were required during the monitoring period.

Regarding lithium, the facility reported that checking kidney function tests (BUN/Cr) and medication levels were compliant for one month, and not required for five months.  SCC

reported that the following measures were not required during the monitoring period: medication consent, thyroid tests, and EKG.

For medication management metrics reported by mental health headquarters, SCC was compliant with these measures for all months during the reporting period:  continuity of nurse administered (NA) and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), continuity of medications upon parole/transfer to the community, observation of medication preparation at HS (*hora somni*/hour of sleep), observation of medication preparation AM and PM, chronic care medications historical administration, and outpatient provider new medication orders.

SCC was compliant for five months, with no data required for one month, for continuity of medications from discharge/transfer from a community hospital and/or DSH.

SCC was compliant for three months and noncompliant for three months with continuity of medications upon inter-institutional transfer at R&R.

For continuity of medications for MHCB transfers, SCC was compliant for one month, with no data required for five months.  For continuity of medications for intra-institutional transfer to ASU/SHU/PSU, SCC was compliant for five months and non-compliant for one month.

No patients received involuntary medications under the PC 2602 process at SCC during the review period.

SCC reported that 121 patients were prescribed 201 psychotropic medications.  Of these prescriptions, 41 were prescribed as KOP.  In accordance with CDCR policy, all of these prescriptions were for Selective Serotonin Reuptake Inhibitors (SSRI) and were written for patients at the 3CMS level of care.

300

SCC reported that the psychiatrist documented polypharmacy reviews in the electronic health record system (EHRS) and that the completion of reports was tracked on the dashboard. The number of required or completed reviews was not provided.

SCC did not report the percentage of non-formulary psychotropic prescriptions.

SCC did not have any CAPS or Performance Improvement Plans (PIPS) related to medication during the review period or at the time of the site visit.

Transfers:

SCC did not transfer any patients to the acute or intermediate level of care during the reporting period.

SCC made 20 referrals to MHCBs during the review period; all patients transferred within Program Guide timeframes.

During the review period, SCC transferred one patient to an EOP; the transfer met Program Guide timeframes.  At the time of the site visit, none of the EOP patients awaiting transfer exceeded timeframe guidelines.

SCC transferred 12 patients to STRH during the review period; all transfers occurred within 30 days and were compliant.

Programming:

Alternative Housing:

SCC's OHU was closed during the review period; consequently, those alternative housing cells were unavailable.  As a result, SCC utilized eight intake cells in administrative segregation for alternative housing.  However, these cells were not included in the current alternative housing LOP.  SCC leadership reported that alternative housing would return to the OHU once it reopened.

SCC placed 40 patients in alternative housing during the review period; all patients transferred within 24 hours.

3CMS:

SCC clinician caseloads were within the required staffing ratios.

Sixteen 3CMS patients' healthcare records were randomly selected and reviewed to assess compliance with timely psychiatric contacts. Of those, eight patients required initial psychiatric evaluations. All were conducted prior to the initial IDTT, complied with Program Guide requirements, and were conducted in confidential settings.

For routine psychiatric contacts, 93 percent occurred within 90 days and were compliant; 100 percent occurred in a confidential setting. No patients were seen via telepsychiatry.

For primary clinician contacts, 18 3CMS patients were randomly selected to assess compliance with Program Guide timeframes. Eight of those patients required initial primary clinician evaluations during the review period. Six of eight, or 75 percent, occurred within ten working days and were compliant with Program Guide requirements; all were conducted in a confidential setting.

For routine primary clinician contacts, 82 percent occurred within 90 days; 97 percent were conducted in a confidential setting.

Fourteen 3CMS patients' healthcare records were reviewed to assess IDTTs. Of those, eight patients required initial IDTTs during the review period. Five of eight, or 63 percent, occurred within 14 working days and were compliant. Patients attended all initial IDTTs reviewed.

Five patients required routine IDTTs; 100 percent occurred at least annually and were compliant with Program Guide requirements. Patients attended all routine IDTTs reviewed.

Required staff members attended 100 percent of initial and routine IDTTs.  However, the Program Guide required the assigned psychiatrist and primary clinician's attendance, which was not discernable for all cases.

The monitor's expert observed five IDTTs.  All required disciplines attended, and the meetings were collaborative.  Goals and interventions for each patient were clearly stated, measurable, and appropriate for the patient presentations and diagnoses.  Appropriate level of care discussions occurred for each patient, and patient feedback was encouraged.

Approximately 70 percent of 3CMS patients participated in group therapy at SCC; both clinical and recreation groups were provided.  The monitor's expert observed an anxiety group with four participants.  The group was well-facilitated, and the patients were highly engaged.

Interviewed patients expressed overall satisfaction with the mental health treatment at SCC and described the mental health clinicians as "caring and engaged."  Similarly, staff interviews revealed workplace satisfaction and no barriers to patient care.  Staff reported a collaborative work environment with custody staff.

Other Issues:

Pre-Release Planning:

SCC's institutional mental health pre-release coordinator (IMHPRC) reported responsibility for a myriad of additional assignments, and, as such, could not devote sufficient time to pre-release planning.  The IMHPRC utilized a headquarters-generated list to determine patients scheduled for release; however, SCC did not maintain a log of completed planning assessments or requests for information.  Further, SCC did not track patient referrals to housing programs such as the STOP Program.  SCC's IMHPRC participated in the monthly headquarters pre-release calls and the bi-weekly ISUDT pre-release meetings.

During the review period, TCMP staff met with 21 of 25 3CMS patients prior to their release.  For the remaining four patients, one was out to court, one refused services, and two were ineligible for services due to a hold.

Medi-Cal applications were submitted for all 21 patients, and SSI and VA benefits' applications were completed when applicable.  TCMP staff attended the bi-weekly pre-release ISUDT meetings with other institutional staff.

Program Access:

a.    Job and Program Assignments

During the reporting period, of 691 job assignments, 122, or 62 percent, were held by 3CMS patients, and 569, or 23 percent, were held by non-MHSDS incarcerated individuals.

Of 305 academic assignments, 33, or 17 percent, were held by 3CMS patients, and 272, or 11 percent, were held by non-MHSDS incarcerated individuals.

Of 166 vocational education assignments, 34, or 17 percent, were held by 3CMS patients, and 132, or five percent, were held by non-MHSDS incarcerated individuals.

Of 226 voluntary education assignments, 64, or 32 percent, were held by 3CMS patients, and 162, or seven percent, were held by non-MHSDS incarcerated individuals.

Of five substance abuse treatment assignments, one, or one percent, was held by a 3CMS patient, and four, or less than one percent, were held by non-MHSDS incarcerated individuals.

b.    Milestone Credits

There were 198 3CMS patients, of which 186 were eligible for milestone credits; 46 percent earned them.  Regarding the non-MHDS population, of the 2,441 incarcerated individuals, 2,426 were eligible for milestone credits, and 26 percent earned them.

c.    <u>Out-of-Level Housing</u>

During the reporting period, SCC reported that nine Level II and one Level III 3CMS patients were in Level I housing; 45 Level III 3CMS patients were in Level II housing; one Level II 3CMS patient was in Level III housing, and 18 Level III 3CMS patients were in Level IV housing.

d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>

SCC confirmed the implementation of the revised ADA Reasonable Accommodation and Grievance Procedures and provided a copy of the 1824 Desk Reference Manual.

<u>"C" Status</u>:

At the time of the site visit, there were no MHSDS patients on "C" status. SCC did not provide information regarding class members on "C" Status during the review period.

<u>Mental Health Referrals</u>:

During the review period, SCC responded to 546 mental health referrals, excluding PREA consults. There were 104 referrals to psychiatry and 442 referrals to primary clinicians. Psychiatry responded timely to the 19 urgent referrals and 85 routine referrals. Primary clinicians responded timely to the 80 urgent referrals and 333 routine referrals; however, they were 86 percent compliant for timely response to the 29 emergent referrals.

The monitor's tour of housing units revealed that MH-5 referral forms were not readily available in all units.

<u>Custody and Mental Health Partnership Plan</u>:

The SCC CMHPP LOP was in alignment with the statewide LOP.

Executive leadership joint rounding and joint supervisory program area tours occurred monthly with required members in attendance. SCC also conducted weekly 3CMS supervisory

meetings for each yard during the review period. The monitor attended one meeting with the 3CMS supervisor and sergeant, during which patient movement, medication changes, and receipt of bad news were discussed.

During the review period, the IAC met for all but one month. Topics discussed included improved mail delivery, supply chain and vendor issues, and laundry issues.

The orientation brochure was provided to 3CMS patients in accordance with policy.

SCC patients filed 25 staff misconduct complaints during the reporting period. Complaints included substandard performance, retaliatory behavior, and/or disrespectful comments made by staff. No staff was reassigned due to a staff complaint.

SCC could not provide the percentage of correctional and mental health staff who completed the annual partnership off-post training.

<u>Heat Plan</u>:

SCC's heat plan LOP was up-to-date and compliant with statewide policy. The heat plan was in effect for two months of the review period. During that time, there were 24 Stage I heat alerts and 11 Stage II heat alerts. There were no heat-related incidents.

The monitor toured housing units and interviewed custody staff regarding heat plan policies and protocols; several deficiencies were noted. Officers on C yard were unfamiliar with the stages of the heat plan, a thermometer in a housing unit on B yard was almost impossible to read, and officers referred to outdated lists of patients prescribed heat-sensitive medications.

RVRs:

SCC reported that 97 percent of the correctional administrators, captains, lieutenants, sergeants, and correctional officers completed training regarding mental health assessments and the disciplinary process. For mental health staff, only two of 12 or 17 percent of staff attended.

SCC issued 2,626 RVRs during the review period. Of those, 161 or six percent were issued to 3CMS patients; five required mental health assessments. The monitor's review of all five indicated that custody staff timely requested the mental health assessment in three or 60 percent of reviewed cases. Mental health clinicians completed the mental health assessment and returned it to custody staff timely in four of five or 80 percent of reviewed cases. The mental health assessment was conducted in a confidential setting in four or 80 percent of reviewed RVRs.

The clinician recommended mitigation of penalties in three cases, and the senior hearing officer documented consideration of the mental health assessment and mitigated penalties in all three.

Use of Force:

Use of force training was attended by the warden, four correctional administrators, and four captains. Additionally, 32 of 35 or 91 percent of lieutenants, 57 of 70 or 81 percent of sergeants, and 447 of 488 or 92 percent of correctional staff attended the training. Except for the PNP, all mental health staff completed the use of force training.

During the review period, there were ten immediate and zero controlled use of force incidents involving MHSDS patients. The monitor reviewed all ten incidents. No issues with the force used were noted; however, there were two use of force incidents wherein multiple uses of force occurred and should have been documented independently.

307

<u>Lockdowns/Modified Programs</u>:

Program Status Reports and modified program documentation indicated COVID-19 outbreaks, quarantine, and restrictions as the justification.

<u>Access to Care</u>:

A review of SCC's access to care reports for six months from January through June 2022 indicated a total of 3,769 ducats and add-on appointments. Of those, 2,946 ducats were completed, while 823 were not completed. Zero ducats or add-on appointments were incomplete due to custody reasons, and 823, or 22 percent, were not completed due to non-custody reasons, excluding patient refusals.

<u>Placement of 3CMS in Minimum Support Facilities</u>:

SCC did not have a minimum support facility and reported no transfers during the review period.

<u>*Coleman* Postings</u>:

Updated *Coleman* posters in English and Spanish were displayed in the toured housing units on A yard and C yard, but not B yard.

**APPENDIX B-11**
**PELICAN BAY STATE PRISON (PBSP)**
**(August 16, 2022 – August 18, 2022)**
**Review Period: (January 1, 2022 – June 30, 2022)**

Census:

On August 15, 2022, PBSP's total population was 1,665 incarcerated persons, which was a 36 percent decrease from the prior reporting period.  The mental health caseload population of 317 patients represented 19 percent of the institution's population and had increased by 11 percent since the previous review period.

The MHCB housed one patient.  The CTC housed one 3CMS patient.

The STRH housed 71 patients, including two EOP patients awaiting transfer to an EOP hub.

The 244 mainline 3CMS patients included 20 3CMS patients designated as Restricted Custody General Population (RCGP).

Staffing:

The chief psychiatrist position was vacant.

One of two chief psychologist positions was filled; the second was vacant as a cost savings.  The chief psychologist served as the chief of mental health.  The senior psychologist supervisor position and both senior psychologist specialist positions were filled.

The psychiatry position was filled, as were the 1.5 telepsychiatry positions.

Seven of 9.5 psychology positions were filled for a 26 percent vacancy rate.  One psychologist was unlicensed.

The supervising social worker position was vacant.  One of three social worker positions were filled.

One of two recreation therapist positions were filled.

309

One of three senior psych tech positions were filled.  Eight of 10.2 psych tech positions were filled, reflecting a 22 percent vacancy rate.

The medical assistant position was vacant; a registry CNA assisted the telepsychiatrist.

The CHSA position was vacant.  An OSS II provided services but there was no established position.  One HPS I covered the 0.5 position

Three of five office tech positions were filled for a 40 percent vacancy rate.

Telepsychiatry:

One full-time and one half-time telepsychiatrist filled 1.5 telepsychiatry positions and typically provided services to all non-MHCB MHSDS patients; they also covered the MHCB when the on-site psychiatrist was absent.  The full-time telepsychiatrist provided treatment to the STRH and a mainline 3CMS facility while the half-time telepsychiatrist covered two mainline 3CMS facilities.  Both telepsychiatrists had caseloads within established ratios.

Quality Management:

Both quarterly local governing body meetings achieved quorums.  The local governing body typically addressed licensing and certification, plant operations, patient care policy, audits, and matters related to the quality management committee and the mental health program subcommittee.

The quality management committee met twice monthly and attained quorums.  It addressed program improvement work plan status updates, subcommittee and key indicator reports, the health care access unit, quality improvement teams, and program management.

The mental health subcommittee met monthly and also achieved quorums.  Reviewed meeting minutes were thorough and discussed matters related to mental health treatment.

Two CAPs addressed administrative segregation EOP hub transfers and completion of administrative segregation pre-screens.

The emergency medical response review committee met twice monthly.  Regrettably, documentation for emergency program surveillance items that addressed required checks and drills was not consistently completed.

PBSP did not conduct any QITs or FITs during the reporting period.

Peer review was conducted for two MHCB psychologists.  Results reflecting their satisfaction of clinical standards of care was discussed with them.

 Staff reported not being informed of quality management issues, including dashboard items, so there was a need at the institutional level to disseminate information to staff.

<u>Medication Management</u>:

PBSP provided MAPIP results for January through June 2022 for compliance for psychiatric diagnostic monitoring and medication management.

For monitoring antidepressants, there was compliance for all six months of the review period for obtaining medication consent and venlafaxine blood pressure.  There was four months compliance for thyroid monitoring.  EKGs were noncompliant for the one required month.

For patients prescribed atypical antipsychotics, there was six months of compliance for blood pressure, height and weight, and obtaining medication consents.  There was compliance for five months for AIMS tests, for four required months for thyroid monitoring, and for two of three required months for EKG measurements.  Measures for blood sugar, CBC with platelets, and lipid monitoring were compliant for one month.  There was noncompliance for all six months for CMP.

For patients prescribed carbamazepine, PBSP was compliant for all four required months for CBC and CMP.   There was compliance for three of four required months for monitoring blood levels and for both required months for obtaining medication consents.

PBSP was neither a clozapine initiation nor maintenance institution.

For patients prescribed Depakote, there was compliance for five required months for medication consents.  PBSP was complaint for three of five required months for CBC with platelets, and for two of five required months for checking Depakote levels and CMP.

For lamotrigine, PBSP reported compliance for both required months for medication consents.

As for lithium, there was compliance for both required months for medication consents and for the one required month for EKGs and thyroid monitoring.  There was noncompliance for the one required month for creatine and BUN (kidney function tests).  Lithium levels were not required to be monitored during the review period.

For medication management metrics reported by mental health headquarters, PBSP indicated compliance for all six months for the administration of both chronic care and new medication orders by psychiatrists.  Further, there was compliance for five of six required months for medication continuity upon inter-institutional transfer at R&R, continuity of nurse administered (N/A)/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), intra-institutional transfers to ASU/SHU/PSU, and medication continuity for parole or release to the community.

PBSP reported compliance for all five required months for medication continuity following discharge/transfer from a community hospital and/or acute or intermediate care, and for four of six required months for medication continuity following MHCB transfers.

312

Administration of PC 2602 involuntary medication orders was compliant for the one required month.

Psychiatrists could order psychotropic medications for between 90 and 180 days. However, there was a 30-day order limit for psychotropic medications for patients' discharged from the MHCB. Pursuant to a headquarters' directive, psychiatrists did not need authorization to prescribe non-formulary medications.

A total of 251 PBSP patients were prescribed HS medications, which were administered at 8:00 p.m. or later. Nursing audited compliance on a weekly basis and addressed deficiencies through CAPs and training.

As for involuntary medications, PBSP initiated one emergency PC 2602 order prior to the patient's transfer to another institution. Two renewed orders included one at PBSP and another that started at PBSP but was completed at another institution. During the site visit, three PBSP patients had PC 2602 involuntary medication orders.

No pill line issues were reported.

Transfers:

PBSP's inpatient coordinator had the position for approximately three years. The coordinator reported excellent communication with and guidance from IRU.

The institution's non-referral log identified 11 patients that 14 IDTTs reviewed.

PBSP referred ten patients to acute care. All referral packets were timely completed. There was one rescission but no rejections. Two of the nine referrals transferred timely. Untimely transfers averaged 15 days and ranged from 12 to 24 days. Reasons for transfer delays were not provided.

There was one referral to intermediate care, but the referral was changed to acute care within two days of the original referral.

During the site visit, there were no patients who were pending transfer to inpatient care. PBSP did not refer any patients with complex medical needs to inpatient care.

There were no *Vitek* hearings during the review period.

PBSP referred 31 patients to the MHCB. All were accepted and admitted within 24 hours. Otherwise, five additional patients from three other institutions were timely admitted to PBSP's MHCB within 24 hours of referral.

Clinical stays in PBSP's MHCB averaged nine days and ranged from three to 26 days. Nine patients' clinical stays exceeded ten days. Physical stays averaged 13 days and ranged from three to 44 days. Fifteen patients, or 42 percent, had physical stays exceeding ten days.

During the review period, no patients had three or more MHCB admissions.

At the time of the site visit, the one MHCB patient had been housed in the unit for 23 days.

PBSP transferred one patient to the PSU during the review period. Due to court proceedings, it took 79 days to transfer the patient.

One of six patients who transferred to an EOP administrative hub took longer than 30 days to transfer. One of six patients who transferred to an EOP mainline program took more than 60 days due to a medical hold.

PBSP's STRH had no reported delays with placements. Two of five PBSP patients who transferred to LTRH exceeded the 30-day transfer timeframe guideline.

PBSP's MSF closed in November 2021; no patients transferred to MSFs during the review period.

Programming:

    MHSDS Patients in Administrative Segregation:

        STRH:

The three primary clinicians assigned to STRH had caseloads within the established ratio. One of these primary clinicians also provided pre-release services.

PBSP housed 282 incarcerated persons in STRH during the review period. Stays averaged 41 days and ranged from one to 352 days.

Observation of the one IDTT that was scheduled during the site visit revealed that it was conducted confidentially with all required staff and a telepsychiatrist in attendance. Treatment team members had access to computers. The IDTT was collaborative and addressed relevant clinical information such as diagnoses, current symptoms, mental health history, and treatment goals. However, the IDTT did not discuss in-cell therapeutic activities. Although group attendance was discussed, group participation related to treatment goals was not. The treatment team appropriately referred the patient to the EOP level of care.

A reviewed sample of psych tech round documentation indicated the answering of all required prompts. The psych tech distributed puzzles during rounds.

PBSP offered STRH a weekly average of 1.9 hours of group; patients attended a weekly average of 1.8 hours. Clinician-led groups addressed topics including symptom and stress management, cognitive behavior, and coping skills. Recreation therapists also offered groups.

Interviewed patients reported satisfaction with the STRH's mental health services. They also reported receiving therapeutic packets, seeing the psych tech during daily rounds, having a radio or television, and having daily access to showers and 3.5 hours of yard, 90 minutes of

weekly group therapy, and phone access every two weeks.  Reviewed CDCR 114-A forms largely reflected the same.

Observed IDTT and individual treatment space was confidential.  However, staff reported inadequate office space for the number of assigned clinicians due in part to an office being offline.  As such, individual contacts were occasionally shortened or occurred at cell front.

Seventeen patients were randomly selected to have their healthcare records reviewed for their STRH stays.

Twelve of 14 or 86 percent of patients had timely initial psychiatric evaluations.  Ninety-three percent were confidential.  Telepsychiatry conducted 13 of 14 initial psychiatry contacts.

Eight of nine or 89 percent of routine psychiatry contacts timely occurred within 90 days.  All utilized telepsychiatry and were conducted confidentially.

All 12 patients had required timely initial primary clinician contacts.  Ten of 12 or 83 percent were confidential.

Of the 63 expected timeframes for routine primary clinician contacts, 40 or 63 percent timely occurred within seven days; 49 percent were confidential.

Twelve of 14 or 86 percent of required initial IDTTs occurred timely.  Patients attended eight of 14 or 57 percent of initial IDTTs.

Six patients required a total of seven routine IDTTs; all were timely and occurred within 90 days.  Patients attended 14 percent of routine IDTTs.

Required staff attended 100 percent of initial and routine IDTTs.  Of note, while a primary clinician and psychiatrist always attended, whether the assigned treatment provider attended could not be determined for every case.

Non-Disciplinary Segregation (NDS):

During the site visit, 11 incarcerated people were on NDS status; all 11 were 3CMS patients. Based on provided data, it could not be determined whether PBSP was in compliance with NDS transfer timeline policy.

MHCB:

PBSP operated a ten-bed MHCB within its licensed CTC unit. The census for PBSP's MHCB remained low during most of the review period, when its maximum occupancy was six patients.

Both primary clinicians assigned to the MHCB/CTC had caseloads within the established ratio.

A random sample of ten MHCB patients were selected to assess compliance with Program Guide requirements.

Only six of ten patients had a required timely initial psychiatric evaluation. All ten patients had a timely required initial primary clinician evaluation.

One hundred percent of the 24 required twice weekly psychiatry contacts occurred. Only 11 of 24 or 46 percent were confidential.

One hundred percent of the 66 required daily clinical contacts occurred as required; 64 percent occurred in a confidential setting.

All ten patients required initial IDTTs during the review period, of which all occurred within 72 hours of admission, as required. Required staff attended all initial IDTTs. One hundred percent of patients also had timely ongoing IDTTs. However, one patient was discharged without a discharge IDTT.

Concerningly, one specific patient was discharged twice from the MHCB during the review period without a corresponding IDTT. The monitor's expert noted that the Program Guide permitted MHCB discharges when the IDTT was unavailable provided there was a consult with at least one other IDTT member. In reviewing MHCB discharge documentation, the monitor's expert noted that MHCB staff did not explain why they were unable to hold a formal IDTT. Further, the primary clinician and psychiatrist wrote separate discharge summaries for the patient; no specific reference was made to a discussion between the two IDTT members or indicate attempts at gathering collateral information from other disciplines, such as nursing.

During the site visit, the MHCB housed one patient. The MHCB patient had been housed in the unit for 23 days and, although clinicians documented plans to discharge the patient to the 3CMS level of care as recently as three days prior to the site visit, the patient had been referred to acute care one day before the site visit despite no significant changes in presentation. The monitor's expert reviewed the patient's record and interviewed a treatment team member to inquire about the acute care referral. The monitor's expert was informed that, although the patient desired EOP level of care, due to PBSP's practice of not referring patients to intermediate care and reluctance to grant patients' requests for EOP level of care, the team referred the patient to acute care; in so doing, however, the treatment team acknowledged that the referral would be rejected and that IRU would recommend the EOP level of care. Tellingly, this case supported the need for leadership to address cultural issues surrounding EOP and intermediate care referrals.

On a positive note, the interviewed MHCB patient stated that, during his MHCB stay, showers were offered every three days, yard was offered twice weekly, and recreation therapy services were offered at least two days per week.

318

An observed MHCB morning meeting utilizing Microsoft Teams was organized, covered relevant topics, and was attended by staff from all required disciplines.

Seclusion and Restraint:

PBSP did not report any seclusion or restraint incidents during the review period.

Crisis Intervention Team:

PBSP lacked an active CIT. Clinicians responded to crisis calls during normal business hours and on-call psychiatrists responded to them after hours. Leadership confirmed that the institution assigned clinicians to work weekends and that these staff members responded to crises in addition to their regular duties.

Alternative Housing:

PBSP only used beds within the licensed CTC for patients referred to the MHCB. PBSP's alternative housing LOP noted that, after filling room 184 and all other available CTC medical beds, there were three designated alternative housing cells in the Specialty Clinic. In the event that all of these cells were filled, the institution's LOP permitted the temporary placement of MHCB-referred patients in holding cells, the TTA or other clinic examination room, or other unit housing that allowed for constant observation.

3CMS:

One of two primary clinicians assigned to the mainline 3CMS program had a caseload exceeding the established ratio; the other's caseload was within the ratio.

Four observed Facility A IDTTs revealed all required team members' virtual attendance despite being on-site (except for the telepsychiatrist). The patient was in an office that was across the hall from the primary clinician.

The primary clinician led the IDTT and provided an overview of relevant psychosocial factors. The PC spoke rapidly and used language that was above the average education for incarcerated individuals. Although diagnoses, treatment goals, and interventions were discussed, reviewed IDTT documentation indicated that each patient had an IPOC for impulsive behavior which was not individualized or reflective of treatment needs and goals discussed during the IDTTs. Higher level of care indicators also were not fully addressed. The telepsychiatrist provided valuable patient input and there were no connectivity issues. The correctional counselor also provided useful, individualized input.

The monitor's expert also observed three other IDTTs at a Level II facility. Only the primary clinician and patient were in the room during the IDTT; the counselor and telepsychiatrist attended using video conferencing equipment. The IDTT used Cisco monitors with built-in cameras which produced higher auditory and visual quality than the small, mobile laptops that were typically used for telepsychiatry. Although the PC dismissed the first patient prior to receiving input from the telepsychiatrist and counselor, they contributed meaningfully and interacted with patients appropriately during the other two IDTTs.

Overall, several factors compromised these IDTTs' quality and utility. All three were initial IDTTs and the PC was not familiar with the patients since a different provider completed the initial assessments. As such, the PC spent most of the time reading the initial assessments aloud and asking patients to confirm the assessments' accuracy. Further, the attending telepsychiatrist was also not the assigned psychiatrist and, thus, was also unfamiliar with the patients. As a result, the IDTT spent most of its time on assessment information and little to no time on treatment planning and goal setting. All 3CMS patients reviewed during observed IDTTs appeared to be at the appropriate level of care.

Interviewed 3CMS patients reported overall satisfaction with the mental health program and that they were often seen sooner than every 90 days by primary clinicians. They confirmed confidential, timely, and helpful contacts by supportive providers. However, they also expressed some frustration with continuity of care and elaborated that approximately one of every four PC contacts was with a clinician other than assigned clinicians. Interviewed 3CMS patients also expressed a desire for groups, including pre-release planning groups; PBSP did not offer groups to 3CMS patients. They further reported that a primary stressor was PBSP's significant distance from their family.

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays. All eight patients who required an initial psychiatric evaluation timely had one prior to the initial IDTT; 88 percent were conducted confidentially. Telepsychiatry conducted all initial psychiatry contacts.

There were 20 expected timeframes for routine psychiatry contacts. Nineteen of 20 or 95 percent timely occurred within 90 days; 90 percent were conducted confidentially. Telepsychiatry conducted all routine psychiatry contacts.

Five of eight or 63 percent of patients who required initial primary clinician evaluations timely had them within ten working days; 25 percent of initial contacts were conducted confidentially.

Twenty-six of 27 or 96 percent of expected timeframes for primary clinician contacts timely occurred within 90 days; 51 percent were confidential.

Two of eight patients had timely required initial IDTTs. All three patients who required routine IDTTs had them at least annually. Required staff members attended all initial and

routine IDTTs. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician, but this assignment was not clearly discernable for all cases.

Restricted Custody General Population (RCGP):

The RCGP program was established to provide protective housing to address the safety concerns of former SHU incarcerated persons by providing a less restrictive housing alternative. RCGP incarcerated persons were assigned work/program assignments within their housing units and participated in out-of-cell activities individually or as compatible groups approved by the ICC. There were no limitations on RCGP incarcerated persons' access to mental health services.

During the site visit, 20 3CMS patients were assigned to RCGP on Facility B. Interviewed patients reported satisfaction with mental health treatment. They confirmed confidential and timely mental health contacts, but further reported that their primary clinicians frequently changed, which impacted treatment participation. Patients also reported wanting access to art supplies, therapy groups, and milestone credits as these incentives were available to patients in segregation or at higher levels of care.

Overall, the programming, including mental health programming, that was provided to RCGP incarcerated persons was comparable to what was provided on a Level IV 180 yard.

An observed RCGP supervisory huddle found attending staff discussing new arrivals, medication, incarcerated persons exhibiting bizarre or suicidal behavior, hunger strikes, hygiene, clothing exchange, and custody and mental health staffing.

Other Issues:

Pre-Release Planning:

The assigned pre-release coordinator also had a STRH caseload and was in the process of transferring pre-release planning duties to a psychologist supervisor due to an increase in the

number of patients requiring pre-release services.  PBSP did not offer pre-release planning groups during the review period, but the coordinator admitted there were enough patients to offer pre-release planning groups.

The pre-release coordinator regularly communicated with TCMP and ISUDT staff during biweekly meetings.  Data covering January through June 2022 indicated that all 21 eligible MHSDS patients received pre-release planning services.  PBSP also had adequate systems in place to track patient release dates, assessments, and benefits' applications.  The pre-release coordinator confirmed identifying patients within 45 to 60 days of their release dates for the purpose of scheduling assessments.  However, it was further reported that PBSP was not currently monitoring whether primary clinicians focused on pre-release during clinical contacts or whether pre-release planning IPOCs were generated in treatment plans.

Program Access:

a.    Jobs and Program Assignments:

On June 1, 2022, PBSP reported that of 804 job assignments, 126 or 43 percent of 3CMS patients and 678 or 47 percent of non-MHSDS incarcerated persons, held positions.

Of the 426 academic assignments, 83 or 28 percent of 3CMS patients held assignments, as did 343 or 24 percent of non-MHSDS incarcerated persons.

Of the 749 voluntary education assignments, 90 or 31 percent of 3CMS patients and 659 or 46 percent of non-MHSDS incarcerated persons, held assignments.

For the 69 vocational education assignments, nine or three percent of 3CMS patients and 60 or four percent of non-MHSDS incarcerated persons, held assignments.

The 93 available substance abuse treatment placements were held by 15 or five percent of 3CMS patients and 78 or five percent of non-MHSDS incarcerated persons.

b. <u>Milestone Credits</u>:

On June 1, 2022, PBSP reported that 261 of 294 or 89 percent 3CMS patients were eligible to earn milestone credits, with 16 percent earning the credit. Of the 1,443 non-MHSDS incarcerated persons, 1,257 or 87 percent were eligible to earn milestone credits; 27 percent earned them.

c. <u>Out-of-Level Housing</u>:

On June 1, 2022, 13 percent of PBSP MHSDS patients were housed out-of-level. There were nine custody Level I 3CMS patients in Level II housing, eight custody Level IV 3CMS patients in Level II housing, and three custody Level II and eight custody Level IV patients in Level III housing.

d. <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

PBSP reported that for ADA reasonable accommodation and grievance procedures, designated mental health, custody, and clerical staff were trained online about the reasonable accommodation and the offender grievance and appeal process.

e. <u>Compliance with In-Cell/Private Unclothed Body Search Policy</u>:

PBSP staff reported that unclothed body searches privately occurred in cell in housing units.

<u>Case-by-Case Reviews</u>:

PBSP provided a long-term case conference review report of STRH patients for each month of the review period. There were 18 patients who were housed in STRH who required a long-term case conference. Review of nine STRH patients' ICC documentation verified the timely conduct of long-term case conferences and that the decisions of the ICCs were compliant

with policy.  The rationales for ICCs retaining patients in STRH included pending transfer, investigation, and disciplinary matters.

Review of all pre-MERD cases for June 2022 revealed that the ICC conducted pre-MERD hearings within 120 days of the MERD.

"C" Status:

During the site visit, there were three general population incarcerated persons and one 3CMS patient on "C" Status.  The 3CMS patient had been on "C" Status since July 27, 2022 after receiving two RVRs for disrespecting staff and disobeying orders.  PBSP further reported that there were two GP incarcerated persons and one 3CMS patient on "C" status during the review period.

Mental Health Referrals:

PBSP reported 578 mental health referrals (excluding PREA referrals) consisting of 146 psychiatry referrals and 432 primary clinician referrals.  There were 40 emergent referrals to primary clinicians but none to psychiatry.  The 64 urgent referrals included nine to psychiatry and 55 to primary clinicians.  The 474 routine referrals consisted of 137 to psychiatry and 337 to primary clinicians.  There was 98 percent or greater compliance for timely responses by psychiatrists and primary clinicians to all emergent, urgent, and routine referrals.

Treatment Space:

Treatment space for Facility A and B's Level IV mainline 3CMS patients included three confidential individual treatment offices.  Facility B contained one confidential office used by both psychiatry and the primary clinician and a group room.  Facility D had two confidential offices.  Facility C did not house any MHSDS patients.

STRH individual treatment offices each contained a TTM. As one of the three offices was too small to accommodate COVID-19 precautions, it was used for administrative tasks and telepsychiatry visits, resulting in an inadequate amount of individual treatment space. There was also a group treatment room with adequate space that featured seven individual desks and one security desk with wheelchair accessibility. Each patient was secured to their own individual desk during group sessions. IDTTs were conducted in the group treatment space.

<u>Custody and Mental Health Partnership Plan</u>:

PBSP's CMHPP LOP was generally aligned with headquarters' partnership plan.

Due to COVID-19 outbreaks, PBSP did not conduct executive leadership joint rounding during three months of the review period. During the remaining three months, there was rounding of the MHCB, STRH, and Facility A. STRH rounding documentation reported staff concerns with the lack of treatment space, broken showers, personal property issues, and law library access.

Executive staff meeting minutes from three of six months of the review period referenced the executive leadership joint rounding, but did not indicate what was addressed. Reviewed QMC meeting minutes also referenced the rounding, and included the roundings' dates and locations, as well as details of the rounding. Similarly, reviewed MHPS meetings minutes indicated that the CMHPP was a standing agenda item, with the minutes addressing the executive rounding, huddles, and weekly 3CMS supervisory joint meetings.

Reviewed data reflected the occurrence of weekly 3CMS supervisory meetings on Facilities A, B, and D, and the RCGP, and attendance by the senior psychologist supervisor and respective unit sergeants. An observed supervisory meeting demonstrated discussion of new

arrivals, medication, patients exhibiting bizarre or suicidal behavior, hunger strikes, patient personal hygiene, clothing exchange, building maintenance issues, and staffing.

As for monthly joint supervisory 3CMS program area tours, PBSP reported that COVID-19 outbreaks resulted in the cancellation of three scheduled tours. Otherwise, during the three program area tours that occurred, there were discussions about COVID-19 restrictions, visitation, and reduced programing due to COVID-19. Patients and staff reported a good working relationship between custody and mental health staff.

Reviewed MHCB huddle logs for second and third watch indicated attendance by more than 90 percent of required staff. Required staff also attended an observed MHCB huddle, which addressed treatment, medication, and ambulatory concerns. Further, reviewed STRH huddle logs reflected required staff's attendance ranging from 80 to 88 percent.

PBSP provided a copy of the 3CMS orientation brochure and reported that it was available for 3CMS patients.

PBSP reported the general occurrence of IAC meetings for Facilities A, B and D, and the RCGP, but noted the cancellation of some IAC meetings due to COVID-19, staff shortages, and ongoing program modifications. Reviewed minutes from 12 IAC meetings indicated attendance by a mental health staff member at three or 25 percent of the meetings. Reviewed meeting minutes addressed property, packages, telephone calls, visitation, and recreation equipment.

No staff members were reassigned due to staff complaints.

PBSP reported that 597 of 761 or 78 percent of custody staff attended the annual off-post partnership training. For mental health, the training was attended by the chief psychologist, senior psychologists, psychiatrist, social worker, and recreation therapists, six of eight psychologists, and one of eight psych techs. The senior psych tech did not attend the training.

Heat Plan:

Review of PBSP's heat plan LOP revealed compliance with headquarters' heat plan memorandum. There were no Stage I, Stage II, or Stage III heat alerts during the review period.

The monitor visited housing units on each of the four yards and STRH and interviewed custody officers about the heat plan. The officers were typically knowledgeable about heat plan protocols. Thermometers were also mounted on the walls of each housing pod and most, but not all, were reported to provide accurate readings.

Regrettably, during the housing unit visits, officers were unable to produce a list of patients who were prescribed heat sensitive medications. On the last day of the tour, the monitor learned that this list was disseminated electronically and was available on computer terminals in each housing unit's custody office, but the officers were not aware of this. Staff confirmed that patients prescribed heat-sensitive medications were not exposed to temperatures over 90 degrees for more than 30 minutes.

PBSP provided a list of custody staff who received heat plan training in 2021, but did not provide a current roster of custody employees. Because the list did not identify staff who did not receive the training, and a current custody staff roster was not provided, heat plan training compliance percentages could not be determined for custody staff. For mental health staff, 23 of 34 or 68 percent completed the heat pathologies training.

RVRs:

During the review period, there were 591 RVRs, of which 152 or 26 percent were issued to MHSDS patients. Specifically, 23 RVRs were issued to MHCB patients, including 12 patients who were referred to acute care, three to EOP patients, and 126 to 3CMS patients.

The monitor analyzed nine RVRs where clinicians completed mental health assessments to assess compliance with applicable policy. The nine RVRs included one issued to an MHCB patient who was referred to acute care, seven issued to 3CMS patients, and one to a GP incarcerated person. The institution assigned a staff assistant for the MHCB patient and for two of the 3CMS patients.

Custody timely referred only three of nine mental health assessments to mental health staff for completion of the assessment. Mental health staff timely completed seven of nine or 78 percent of assessments and returned them to custody.

None of the reviewed mental health assessments found that mental illness strongly influenced the patient's behavior or that patients' mental illness contributed to the behavior that led to the RVR. None recommended penalty mitigation.

In all nine reviewed RVRs, patients were found guilty as charged and penalties were assessed. Although there was credit loss for all patients, the hearing officer mitigated penalties for three of nine patients.

Eighty-eight percent of required custody officers and 75 percent of required clinical staff received inmate disciplinary mental health assessment training.

<u>Use of Force</u>

The institution reported two controlled use of force incidents involving the same STRH MHSDS patient but did not produce necessary documentation to assess compliance with the controlled use of force policy.

PBSP also reported 18 immediate use of force episodes involving a total of 76 incarcerated persons, 22 of whom were at the 3CMS level of care. Again, the institution did not produce documentation reflecting these incidents. There were also 157 non-use of force

incidents, of which 25 involved mental health patients and 122 involved non-MHSDS incarcerated persons.

Use of force training was completed 101 of 103 or 98 percent of mental health staff and 686 of 768 or 89 percent of custody staff.

Lockdowns/Modified Programs

A total of seven program modifications during the review period, all related to COVID-19, occurred between January 7 and March 22, 2022, and from May 13 through the end of the review period. During such modified programming, health care staff toured housing units to accommodate the limited access to healthcare, and medication was dispensed at designated locations. The modified programming resulted in the cancellation of 36 mental health appointments.

Access to Care:

Review of PBSP's monthly Health Care Access Quality Reports from January through June 2022 revealed that 48 percent of the total issued mental health ducats and add-on appointments were not completed. Excluding patient refusals, less than one percent of the non-completed appointments were due to custody reasons; 49 percent were due to non-custody factors.

Placement of 3CMS Patients into Minimum Support Facilities:

PBSP's Minimum Support Facility had been closed for approximately one year.

*Coleman* Postings:

During the visit, the monitor toured the STRH and housing units on all four yards. The English and Spanish versions of the *Coleman* poster were prominently displayed on the walls

outside of the custody office in most housing units.  However, buildings B1 and B2 only had the English version of the poster.

**APPENDIX B-12**
**WASCO STATE PRISON (WSP)**
**(August 23, 2022 – August 25, 2022)**
**Review Period: (January 1, 2022 – June 30, 2022)**

Census:

On August 23, 2022, WSP's total incarcerated population was 3,555, a 21 percent decrease since the preceding monitoring round. The mental health caseload population of 1,311 patients increased by 11 percent since the prior reporting period and represented 37 percent of WSP's population.

The MHCB housed three patients.

There were 149 mainline 3CMS patients.

There were 14 RC 3CMS patients, ten mainline 3CMS patients, and four EOP patients in the RC STRH.

There were 2,736 incarcerated persons in RC, including 1,034 3CMS patients, 94 EOP patients, and 1,608 non-MHSDS incarcerated persons.

Staffing:

The chief psychiatrist position has been vacant since 2019, and there was no senior psychiatrist position at WSP. Three of 9.5 psychiatry positions were filled; registry staff covered 3.5 positions. While there were no telepsychiatry positions at WSP, CDCR headquarters telepsychiatrists covered 4.0 positions. With the use of telepsychiatry, there were no functional vacancies for psychiatry at WSP.

There were no psychiatric nurse practitioner positions allocated to WSP.

Though WSP had only four positions, WSP employed five medical assistants.

One of the two chief psychologist positions was vacant, and both senior psychologist positions were filled. Fourteen of 32.5 staff psychologist positions were filled; however, three

were on extended leave.  Contractors covered 5.25 psychologist vacancies, leaving a functional

vacancy rate of 50 percent.  Two psychologists were unlicensed.

The supervising social worker position was filled.  Twelve of 14.5 social worker

positions were filled.  Two social workers were on extended leave resulting in a 31 percent

functional vacancy rate.  Three social workers were unlicensed.

The total functional vacancy rate for primary clinicians was 44 percent.  Five of 16 or 19

percent of primary clinicians were unlicensed.

The three recreation therapist positions were filled.

For nursing, WSP reported that while the 2.4 registered nurse (RN) positions were filled,

one RN was on extended leave.  That position was covered with overtime, leaving no functional

vacancy.

The senior psych tech position was filled, as were all 17.7 psych tech positions.  One

psych tech was on extended leave, though the current staff covered the position with overtime,

resulting in no functional vacancy.

There were no CHSA or AGPA positions at WSP.  The one HPS II position was filled.

Seven of the 10.5 MHSDS clerical positions were filled for a 33 percent functional vacancy rate.

The one OSS II position was vacant.

Telepsychiatry:

During the review period and at the time of the site visit, WSP used an average of 160

hours of telepsychiatry per week for 3CMS services, including RC and mainline patients.  Pre-

site data indicated that telepsychiatry was not utilized for EOP services; however, the monitor's

expert observed an RC EOP IDTT wherein the psychiatrist participated via telework.  The

monitor's expert noted that the psychiatrist's attendance by phone was concerning, as the

provider could not observe the patient, struggled with tracking the discussion and routinely asked questions that had already been answered.

Telepsychiatry was also used to provide treatment in the MHCB.  However, mental health leadership reported that this only occurred when there were no on-site psychiatrists to provide services.  Leadership estimated that telepsychiatry had been used in the MHCB once or twice during the review period.

WSP's on-site psychiatry staff reported that the telepsychiatrists assigned to WSP were not sufficiently trained to work in a prison setting.  Additionally, WSP leadership reported problems with using "unknown" telepsychiatrists to respond to crises after hours.  The after-hours telepsychiatrists were not WSP staff, were unfamiliar with the facility or the patients, and generally admitted all patients without completing admission documentation.  Furthermore, these telepsychiatrists were also responsible for more than one institution at a time and did not have the option of evaluating patients on-site.  WSP reported that when they raised concerns regarding the lack of sufficient documentation by the after-hours telepsychiatrists, they were told that the telepsychiatry supervisor dissuaded completion of SRASHEs due to a lack of training.

Staff Recruitment and Retention:

Staffing at WSP has been exceptionally challenging since the Twenty-Eighth Monitoring Round.  WSP lost approximately 13 primary clinicians, including eight psychologists and five social workers.  Additionally, WSP lost two recreation therapists, two OSS IIs, and two HPS IIs.  Sustained recruitment efforts were unsuccessful in filling these positions, and since then, WSP has hired only two psychologists, two social workers, two recreation therapists, and one HPS II.  All other positions remain vacant.

The hiring process was completed through the headquarters' central hiring unit.  WSP conducted on-site interviews of candidates; however, the candidate pool was generally limited to one or two candidates for both psychologist and social worker positions, and often the candidates did not show for the interviews.

WSP reported that the above-detailed chronic staffing shortages affected the provision of all mental health care at the institution.  WSP did not provide staffing ratios because instead of caseloads, clinicians were assigned an average of ten to 12 "encounters" per day.  These encounters included as aspects of mental health treatment.

Quality Management:

Overall, WSP had a well-functioning quality management program.

The local governing body (LGB) met monthly with quorums in attendance and appropriate agenda items.  LGB documentation was brief and conveyed a high-level summary of each topic.

The quality management committee (QMC) met monthly with a quorum in attendance. Agenda items included action item review, system surveillance and quality concerns, process improvement work plan status updates, project reports, subcommittee reports, audits, LOP review, program updates, and open forum.  The documentation of identified issues was comprehensive.

The MHPS met monthly and attained quorums. Agenda topics included previous action item review, system surveillance and quality concerns, staffing vacancies, audits, other program management, LOPs, open forum, and current action item review.  Detailed summaries of multiple access to care deficiencies were attributed to staffing shortages.  The MHPS provided quarterly reports to the QMC.

The emergency medical response review committee met monthly with a quorum in attendance. Routine topics included old case review, new case review, performance evaluations, improvement projects, surveys and audits, program management, and LOPs. The documentation provided thorough summaries with a critical review. In addition, charts and tables delineated trends across months.

During the review period, WSP did not conduct any QITs, FITs, or peer reviews.

Clinical leadership regularly accessed the dashboard to identify deficiencies that were later discussed with staff. However, staff reported that the focus on metrics overshadowed the importance of quality of care.

Medication Management:

WSP provided MAPIP results for January 1, 2022 through June 30, 2022 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that WSP was compliant with the following measures for the six months of the monitoring period: obtaining medication consent; height; blood pressure; and thyroid tests. For monitoring weight, EKGs, and the AIMS, WSP was compliant for five months, and non-compliant for one month. For glucose (blood sugar), CBC with platelets, WSP was compliant for four months, and non-compliant for two months. For monitoring CMP and lipids, the facility was compliant for three months, and non-compliant for the remaining three.

WSP was not an authorized clozapine initiation or maintenance facility. There were no patients on clozapine during the review period.

For required monitoring of antidepressants, the facility was compliant for six months with obtaining medication consents and monitoring thyroid tests. Additionally, the facility was

compliant in checking blood pressure for patients taking venlafaxine for six months of the review period. For checking EKGs where required, WSP was compliant for one month, with no tests required for the other five months.

For patients prescribed carbamazepine during the review period, the facility was compliant with checking CBC and CMP for three months under review, with no tests required for the remaining three. WSP obtained medication consent for the one month in which it was required.

For Depakote (divalproex, valproic acid), the facility was compliant with obtaining medication consent, CBC, and CMP for five months, and non-compliant for one month. Regarding monitoring blood level of medication, WSP was compliant for three months, and non-compliant for the remaining three.

For lamotrigine, the facility was compliant in obtaining medication consent for all six months of the monitoring period.

Regarding lithium, the facility was compliant with medication consent for the entire six months of the monitoring period. WSP was compliant with monitoring thyroid tests for five months, and was non-compliant for the remaining one month. For checking kidney function tests (BUN/Cr), WSP was compliant for four months, and non-complaint for two months. WSP was compliant with monitoring the blood level of medication for two months, and non-compliant for four months. WSP was compliant with checking EKG for three of four required months.

For medication management metrics reported by mental health headquarters, WSP was compliant with continuity of medications upon parole/transfer to the community for the entire reporting period.

For outpatient provider new medication orders, the facility was compliant for five months, and non-compliant for one month.

Regarding continuity of medications for Mental Health Crisis Bed (MHCB) transfers, continuity of medications with intra-institutional transfer to ASU/SHU/PSU, and continuity of medications from discharge/transfer from a community hospital and/or DSH, WSP was compliant for three months, and non-compliant for three months.

In terms of continuity of nurse administered (NA) and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), WSP was compliant for two months, and non-compliant for four.

For continuity of medications upon inter-institutional transfer at R&R, the facility was compliant for one month, and non-compliant for five months.

For measures of compliance related to the involuntary medications under the PC 2602 process, the facility was compliant for two of two required months.

WSP was non-compliant for all months of the reporting period for the following measures: continuity of medications upon arrival at reception center (RC); observation of medication preparation HS (*hora somni*, bedtime); observation of medication preparation AM and PM; and chronic care medications historical administration.

Nursing staff documented and tracked telephone and verbal medication orders in the electronic health record; providers later signed the orders.

WSP psychiatrists no longer required secondary approval for non-formulary prescriptions. Non-formulary prescribing practices at WSP were consistent with statewide policy.

The maximum duration for psychiatric medication bridge orders was 60 days; all other psychiatric medications were ordered for no more than 180 days.

Polypharmacy reviews occurred monthly through population management meetings. WSP was compliant with polypharmacy reviews for each month of the monitoring period.

There were no patients prescribed KOP SSRIs.

A total of 403 patients had prescribed HS psychiatric medications during the review period; HS medications were administered after 2000 hours.

Pill lines did not exceed two hours during the review period, and interviewed patients denied any problems related to medication administration.

Regarding involuntary medication orders during the review period, WSP processed one PC 2602 renewal petition, initiated five emergency petitions, and initiated three non-emergency petitions. There were no petition withdrawals or denials during the review period. Additionally, there were no use of force incidents for the administration of PC 2602 medication administration during the review period.

WSP was not an authorized Clozaril institution; as such, no patients initiated or maintained on Clozaril during the review period.

<u>Transfers</u>:

During the review period, WSP made 14 referrals to acute care. WSP completed and uploaded all acute care referral packets to SharePoint timely. Two referrals were rescinded, and there were no rejections. Of the 12 referrals that resulted in transfer, four, or 33 percent,

transferred within ten days.  The remaining eight transfers took an average of 16 days and ranged from 13 to 22 days.  Reasons for delays were not provided.  There were no patients pending decision or transfer to acute care at the time of the site visit.

WSP made two referrals to intermediate care during the review period.  Both referral packets were completed timely, and both patients were transferred within 30 days.  On August 23, 2022, one patient had been waiting one day for a decision for intermediate care.

There were no patients with complex medical needs referred to acute or intermediate care.

The institution conducted four *Vitek* hearings during the review period; no patients prevailed.

WSP referred 167 patients to MHCBs during the review period; 17 referrals were rescinded, and 150 patients were admitted.  Of those, 92 patients transferred to external MHCBs. Ninety-seven percent of MHCB transfers were admitted within 24 hours.

There were 67 admissions to WSP's MHCB during the review period.  Of those, 52 or 78 percent were generated from WSP; the remaining 15 were from outside institutions.  Ninety-nine percent of admitted patients had clinical lengths of stay of ten days or less; one had a clinical length of stay of 12 days.  Fourteen patients, or 21 percent, remained in the MHCB for more than 72 hours following clinical discharge.  Of those, 11 patients transferred to the acute level of care, and the remaining three transferred to EOPs.

On August 23, 2022, three patients were housed in WSP's MHCB.  The patients had been in the MHCB for one, five, and nine days.

WSP transferred two patients to PSUs during the review period.  Both transfers were completed within 60 days of endorsement.  On August 23, 2022, no patients were awaiting transfer to a PSU.

WSP transferred eight patients to EOP administrative segregation hubs during the review period.  Of those, six, or 66 percent, transferred within 30 days of placement in administrative segregation.  WSP reported that the reasons for delay were patient refusal of COVID-19 testing and lack of bed availability.  On August 23, 2022, four RC EOP patients housed in restricted housing were awaiting transfer to EOP administrative segregation hubs; none exceeded 30 days.

WSP transferred two patients to LTRH; both transferred within 30 days of their SHU assessment.  At the time of the site visit, no patients were awaiting transfer to LTRH.

During the review period, WSP transferred two mainline 3CMS patients to STRH.  One transfer was completed within 30 days of placement; however, the second placement took 48 days.  The reason for the delay was not provided.  WSP reported, and CDCRs regional lieutenants confirmed that WSP did not transfer mainline 3CMS patients to STRHs as they believed they could remain in the RC STRH.  This practice is not compliant with the Program Guide, which provides different out-of-cell and yard time requirements for RC STRH and mainline STRH.

There were no 3CMS patients housed in WSP's MSF during the review period or at the time of the site visit.

<u>Programming</u>:

    <u>Reception Center</u>:

The total number of incarcerated persons processed through the reception center was not provided; however, WSP processed 3,636 MHSDS patients through the reception center during

the review period.  Of those, 421 were EOP patients, and 3,215 were 3CMS patients.  The average length of stay for EOP patients was 57 days; 155 patients, or 37 percent, waited longer than 60 days to transfer.  For 3CMS patients, the average length of stay was 84 days; 916 patients, or 28 percent, waited longer than 90 days to transfer.  Reasons for delays were not provided for the EOP or 3CMS delays.

WSP conducted 6,671 initial mental health screenings during the review period.  Of those, 6,281, or 94 percent, were screened within the Program Guide timeframe requirements.  WSP did not provide the number of patients who screened positive during the review period.  Further, WSP did not provide data regarding the timely completion of mental health screens after a positive initial screen.  However, interviewed staff and MHPS minutes indicated that mental health screens were not completed within Program Guide required timeframes due to staffing shortages.

RC EOP patients received the required weekly PC contacts.

WSP did not provide data regarding the timeliness of IDTTs for RC EOP patients.  The monitor's expert observed six RC EOP IDTTs during the site visit.  Required staff attended and had access to computers; however, on the first day, the psychiatrist and correctional counselor attended by phone despite being on-site.  This was disruptive to the meetings as the patient could not hear either participant and required frequent repetition.  Phone attendance was attributed to COVID-19 space requirements, though the monitor's expert noted that the IDTT room had sufficient space for all required staff members to sit six feet apart.

During the second day of observed IDTTs, all required staff attended in person.  However, the psychiatrist was minimally attentive and had zero input for one patient.

342

Correctional counselors provided useful information. Two escort officers also attended IDTTs but did not participate, and their radios were disruptive during the meeting.

In all observed IDTTs, the process was not collaborative. A clinical summary was discussed; however, group placement and treatment goals were vaguely addressed. For example, "managing depression" was identified as a treatment goal, but specific objectives and interventions were not clearly stated. Additionally, case conceptualization, safety planning, and substance abuse, when applicable, were not discussed. Higher level of care indicator discussion was variable, and level of care rationale was insufficient. In two cases, it was recommended to continue EOP due to recent discharge from a higher level of care; other rationales were that the patient did not "meet criteria for a higher level of care, so they will stay in EOP," as opposed to discussing why EOP was clinically indicated.

WSP reported that RC EOP patients were offered an hour of group treatment on four out of five business days and two hours on the fifth business day for a total of six hours. However, a provided group schedule indicated that during the week of the site visit, groups were offered by the mental health RN, psych tech, and recreation therapist three days a week. On average, during the reporting period, patients were offered 4.9 hours of group, attended 3.7 hours, refused 1.2 hours, and had 1.2 hours cancelled.

The monitor's expert observed an recreation therapist group with two patients in attendance. The recreation therapist had a clear plan for the group activity. The group began with a brief check-in, and then patients engaged in their activity. Of concern, the group was disrupted by one to three custody officers who remained in the group room and were talking loudly, moving chairs, and had not silenced/lowered their radios. The group was further

disrupted by the presence of a nurse who walked through the room to access office space on the other side of a non-solid door.

During the review period and at the time of the site visit, an recreation therapist provided therapeutic materials during cell front assessments; patients could earn milestone credits for completing the materials. The recreation therapist reported a lack of sufficient supplies.

WSP reported that routine contacts for RC 3CMS patients were not completed timely due to staffing shortages. This was consistent with MHPS documentation.

MHSDS Patients in Restricted Housing:

At the time of the site visit, there were four EOP patients, ten mainline 3CMS, and 14 RC 3CMS patients in the RC STRH. WSP did not provide dates of placement for the 3CMS patients; therefore, length of stay could not be determined. For the EOP patients, none exceeded 30 days.

Twelve STRH patients' healthcare records were randomly selected for review to assess their STRH stays. All 12 required initial psychiatric evaluations; five or 42 percent were compliant; one patient did not receive an initial psychiatric contact. Six or 55 percent of initial psychiatric contacts were conducted in a confidential setting. Telepsychiatry was not utilized for any initial psychiatry contacts.

For routine psychiatric contacts, WSP was 93 percent compliant; 67 percent were completed in a confidential setting. Generally, patients were seen by psychiatry more frequently than Program Guide requirements.

For primary clinicians, 11 patients required initial contacts; 100 percent were compliant. Five of 11 or 45 percent of initial primary clinician contacts were conducted in a confidential setting. The reason for the lack of confidentiality was documented as patient refusals.

For timely routine primary clinician contacts, WSP was 60 percent compliant, and 45 percent were conducted in a confidential setting. The reason for non-confidential primary clinician contacts was patient refusals.

For the 11 patients who required initial IDTTs, WSP was 100 percent compliant for completion within Program Guide timeframes. Patients were present for seven or 64 percent of the IDTTs. Reasons for non-attendance were patient refusals.

Three patients required quarterly IDTTs during the review period; 100 percent occurred within 90 days and were timely. Patients were present at 100 percent of routine IDTTs.

Required staff was in attendance at 100 percent of initial and routine IDTTs. However, while a primary clinician and psychiatrist were in attendance, it was not discernable whether it was the assigned treatment providers as required by the Program Guide.

WSP offered group treatment to both EOP and 3CMS STRH patients. Documentation indicated that WSP offered 3CMS patients more than the requisite 1.5 hours of weekly structured therapeutic activities (STAs), and EOP patients were offered an average of 4.9 hours of weekly STAs.

Observed IDTTs in STRH were well organized and collaborative, and all required disciplines were present except for a psychiatrist attending by phone. Staff had access to computers and initial assessments were completed prior to the IDTTs. All relevant historical and current patient factors were considered, including custody indications.

Psych tech rounds in STRH were observed. The psych tech assessed the immediate mental health needs of each patient and offered reading materials and forms. All patients had radios and reported that in-cell materials and forms were regularly distributed by psych techs. Multiple patients and staff complained about the unit's lack of access to library books.

Non-Disciplinary Segregation:

One 3CMS patient and one non-MHSDS incarcerated person had NDS status during the review period. WSP reported compliance for timely transfers of patients placed on NDS status.

MHCB:

WSP operated a six-bed MHCB within a licensed CTC. The CTC also had two swing beds that could be used for either MHCB or CTC medical patients. One MHCB was redlined due to a broken call button; replacement parts had been ordered. At the time of the site visit, three MHCBs were occupied.

A random sample of ten MHCB patients was selected for review to assess compliance with Program Guide requirements. Nine of ten, or 90 percent of patients, received a timely initial psychiatry evaluation. Further, 100 percent of twice-weekly psychiatry contacts were timely, though only 19 percent were confidential.

Nine of ten or 90 percent of patients received an initial primary clinician evaluation within 24 hours; an unlicensed clinician saw one patient. Ninety percent of daily contacts were timely, with 70 percent conducted in a confidential setting.

Ten of nine or 90 percent of IDTTs were held within 72 hours of admission and were attended by 90 percent of required staff. There was 100 percent compliance with IDTTs within seven days of their initial IDTT while in the MHCB.

The monitor's expert observed the one IDTT conducted during the site visit; the observed IDTT was inadequate. All required staff attended in person with computers for accessing patient records. However, while the primary clinician was thorough in their patient presentation, there was no interaction or collaboration among the disciplines.

MHSDS patients admitted to the CTC for medical reasons were provided mental health contacts in accordance with Program Guide requirements for their assigned level of care. However, no groups were offered in the CTC for EOP or MHCB patients.

Seclusion and Restraint:

There were three restraint incidents for three different patients during the review period; one exceeded four hours by three minutes. There were no incidents of seclusion during the review period.

Crisis Intervention Team:

The CIT responded to 184 referrals during the review period. Of these, 93 patients returned to custody, and 91 were referred to the MHCB.

Due to several factors, including staffing limitations, WSP operated a modified version of the CIT. The CIT was activated as needed after clinicians triaged crisis referrals between 1445 and 2200 hours on Mondays and Tuesdays and between 1900 hours and 2200 hours on Sundays. On-site clinicians responded to crises Monday through Saturday between 0700 and 1800 hours and involved other disciplines only as needed.

For overnight crisis call coverage, WSP utilized two staff psychiatrists and two telepsychiatrists. As addressed herein above, the overnight telepsychiatrists did not complete sufficient documentation during crisis evaluations.

3CMS:

Twenty patients were randomly selected to have their healthcare records reviewed for their 3CMS stays. Seven patients required initial psychiatry evaluations. Of those, five of seven, or 71 percent, had a timely initial psychiatry evaluation; 100 percent were conducted in a confidential setting. Telepsychiatry conducted 40 percent of initial psychiatry contacts.

347

For timely routine psychiatry contacts, WSP was 29 percent compliant. WSP was compliant with the conduct of routine contacts in confidential settings. Telepsychiatry conducted 85 percent of reviewed routine contacts.

Ten patients required initial primary clinician evaluations; eight, or 80 percent, were completed within ten working days. Eighty percent of initial primary clinician contacts were conducted in a confidential setting. WSP was not compliant with routine primary clinician contacts with only 13 percent occurring within 90 days. Eighty-six percent of routine primary clinician contacts were conducted in a confidential setting.

Twelve 3CMS patients required initial IDTTs; four or 33 percent occurred within 14 working days; all required staff attended. Neither of the two patients who required annual IDTTs received them.

For the one initial IDTT that was observed, all required staff attended in person and had computer access. The IDTT was collaborative, and all disciplines participated. A brief clinical history, diagnosis, and psychiatric medications were reviewed, and objective treatment goals and interventions were clearly stated. However, criteria to support diagnosis, case conceptualization, higher level of care indicators, and rationale for level of care were not clearly discussed.

Other Issues:

Pre-Release Planning:

During the preceding monitoring visit, WSP had a full-time pre-release coordinator and a well-functioning pre-release program. However, due to WSP's staffing limitations, the pre-release coordinator was assigned a caseload and dedicated only 50 percent of their time to pre-release duties. As a result, the pre-release coordinator prioritized MHCB, EOP, and Developmental Disability Program (DDP) patients for pre-release coordination services. Pre-

release services were initiated within 30 days of release as opposed to the previous 120 days. WSP estimated that approximately 30 percent of pre-release service-eligible patients were released before services were provided during the review period.

All patients prescribed psychiatric medications were released with orders for a 60-day supply.

During the review period, Transitional Case Management Program (TCMP) case workers completed screenings for 321 MHSDS participants, including 288 3CMS patients and 33 EOP patients.

Pre-release planning groups were not offered during the review period or at the time of the site visit.

Program Access:

a.    Job and Program Assignments

On June 1, 2022, of 492 available jobs at WSP, 97 3CMS patients, or nine percent of 3CMS patients, held job assignments.  For non-MHSDS incarcerated persons, 395 or 15 percent of the non-MHSDS population held job assignments.

For the 132 academic assignments, WSP reported that 37 3CMS patients, or three percent of 3CMS patients, held assignments; for non-MHSDS incarcerated persons, 95, or four percent held assignments.

Of 67 voluntary education assignments, 20 or two percent of 3CMS patients held assignments, and 47 or two percent of the non-MHSDS population held assignments.

Of 67 substance abuse treatment assignments, it was reported that 15 3CMS patients, or one percent of 3CMS patients, held assignments, as did 52 non-MHSDS incarcerated persons, or two percent of the non-MHSDS incarcerated population.

There were no vocational education assignments at WSP.

    b.    <u>Milestone Credit</u>:

From December 1, 2021, to May 31, 2022, of 103 EOP patients, 102 or 99 percent were eligible to earn milestone credits, and three percent earned the credit.  For 3CMS patients, 1,051 of 1,062, or 99 percent, were eligible to earn milestone credits, and three percent earned the credit.  Of the 2,671 non-MHSDS incarcerated persons, 2,699, or 99 percent were eligible to earn milestone credits; five percent earned the credit.

    c.    <u>Out-of-Level Housing</u>:

On July 19, 2022, seven 3CMS Level I patients were placed in Level III housing; 16 3CMS Level II patients were placed in Level III housing; and eight 3CMS Level IV patients were placed in Level III housing.

    d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

WSP documentation demonstrated implementation of the revised ADA accommodation and grievance procedures.  The institution also provided a copy of the updated 1824 Desk Reference Manual.

<u>Case-by-Case Reviews</u>:

Thirty patients met the requirement for a 120-day pre-MERD review; all were completed as required.  All cases were timely reviewed by ICC and the Classification Staff Representative (CSR).

<u>"C" Status</u>:

There were no patients or non-MHSDS incarcerated persons on "C" status at the time of the site visit.  During the review period, three 3CMS patients and seven non-MHSDS incarcerated persons were on "C" status; the length of "C" status was not provided.

<u>Mental Health Referrals</u>:

WSP reported a total of 4,052 mental health referrals during the review period, of which 1,907 were to psychiatrists and 2,145 were to primary clinicians.  The 306 emergent referrals included seven to psychiatry and 299 to primary clinicians.  Of the 249 urgent referrals, 44 were to psychiatry, and 205 were to primary clinicians.  The 3,497 routine referrals included 1,856 to psychiatry and 1,641 to primary clinicians.  For response times, psychiatry responded timely to 78 percent of emergent, 82 percent of urgent, and 86 percent of routine referrals.  Primary clinicians responded timely to 71 percent of emergent, 97 percent of urgent, and 62 percent of routine referrals.

<u>Custody and Mental Health Partnership Plan</u>:

WSP's CMHPP LOP aligned with headquarters' policy, though a discrepancy regarding the dates of the court order in the references section was noted.  In addition, for Quarterly Round Table training, the LOP did not require the submission of the Fair Labor Standards Act (FLSA) utilized for tracking post assignments.

Executive joint rounding occurred monthly and was attended by required staff with one exception when a senior psychologist supervisor covered for the chief of mental health.  Staff interviews indicated favorable custody and mental health relationships.  Reviewed rounding minutes indicated that when issues were brought to leadership's attention by patients or staff, issues were referred for resolution, and staff reported on-site resolution as feasible.

In violation of the LOP, the warden's executive staff meeting minutes' agendas did not address executive leadership joint rounding.

QMC and MHPS meeting minutes routinely included documentation of where joint leadership executive rounding occurred, but details of findings were not provided.

351

Reviewed STRH and MHCB huddle documentation revealed that required staff attended the huddles, although provided documentation did not support that huddles occurred daily during third watch.  Additionally, the documentation was incomplete and, at times, sparse.

WSP did not provide data that addressed whether all required staff attended quarterly partnership roundtable training.  Additionally, FLSA documentation was not provided.  However, data indicated that training occurred quarterly as required.  Mental health leadership reported that due to high staff turnover, trainings during third watch were only attended by custody staff.

Staffing shortages during the review period negatively impacted compliance with weekly 3CMS supervisory meetings.  Data indicated that 20 of 26 or 77 percent of meetings were compliant on RC yards.  On the mainline 3CMS yard, 14 of 26 or 44 percent of meetings were compliant.  Huddle reports were utilized to document meetings, although there were areas on the form that were left blank.  Thus, it was not possible to determine whether the content did not apply or if it was not discussed.

Monthly IAC meeting minutes were provided for two of the six months during the review period.  The chief of mental health was in attendance, but 3CMS was not included as a standing agenda item to address program issues.

Joint supervisory 3CMS program area tours were conducted on required yards.  Reviewed documentation varied by yard, with yards B, C, D, and H being more thorough.  Documentation from yard A indicated that the tour was completed but reflected a brief and rote meeting.  No issues were identified during tours.

Mental health staff reported that the 3CMS orientation brochure was provided to patients as required.

Observed interactions between custody and mental health supervisory staff were positive and facilitated access to care.

Patients filed seven staff misconduct allegations, of which three were for mental health staff.   No staff was directed or moved to another post due to a patient complaint.

WSP reported that 627 of 681, or 92 percent of required custody and clinical staff, attended the annual off-post training.  However, telepsychiatry data was not provided.

Heat Plan:

WSP's heat plan LOP comported with CDCR policy.

The heat plan was in effect for two months of the review period.  During that time, there were 38 Stage I heat alerts, and no Stage II or Stage III alerts.  There were no patient heat-related incidents.

Interviewed custody staff was knowledgeable about the heat plan and the potential for patient heat-related illness.  Some officers lacked specific knowledge of the procedures required at the heat plan's three stages.  Custody officers were aware of patients prescribed heat-sensitive medications, of the need to refer patients who were having an adverse reaction during a heat alert to mental health, and of the procedures necessary to timely report such an event.

All housing unit thermometers were operable and accurate.  Reviewed heat logs were adequately maintained.

RVRs

Seventy-nine percent of custody staff who were required to receive the inmate disciplinary mental health assessment training received the training; however, no mental health staff completed the training.

During the review period, WSP issued 2,037 RVRs. Of those, 816 or 40 percent were issued to MHSDS patients; 11 RVRs were issued to patients at the acute level of care, one RVR was issued to a patient at the intermediate level of care, 16 RVRs were issued to MHCB patients, 31 RVRs were issued to EOP patients, and 757 were issued to 3CMS patients. Additionally, 1,150 or 57 percent of RVRs were issued to non-MHSDS incarcerated persons, and 71 RVRs were issued to incarcerated persons with an unknown level of care.

The monitor reviewed 21 RVRs where clinicians completed mental health assessments to assess compliance with applicable CDCR policy. Custody staff timely requested a mental health assessment for 13 or 62 percent of the cases. Mental health staff timely completed and returned the mental health assessment in 18 of 21 or 86 percent of reviewed cases; 90 percent of mental health assessments were conducted in a confidential setting.

The senior hearing officer documented consideration of the mental health assessment in 100 percent of reviewed cases. The mental health assessment recommended mitigation of penalties in 20 of 21 or 95 percent of the cases. Alternative discipline was not recommended in any case. Of the 20 cases where mitigation was recommended, the senior hearing officer mitigated the penalty in ten or 50 percent of cases.

In 17 of 21 or 81 percent of mental health assessments reviewed, the mental health clinician used canned language for each patient in response to whether there were mental health factors that the hearing officer should consider regarding penalty assessment.

Use of Force:

WSP reported that 97 percent of custody staff and 52 percent of mental staff completed use of force training.

There were no controlled use of force incidents at WSP during the review period.

Of 100 immediate use of force incidents, 73 involved MHSDS patients. The monitor's review of 13 randomly selected immediate use of force incidents revealed compliance with applicable policy.

Lockdowns/Modified Programs:

WSP was on modified programming from January 1, 2022, through April 14, 2022, due to COVID-19. During this period, mental health programming continued with appropriate COVID-19 mitigation measures in place. STRH and EOP group treatment was reduced to allow for social distancing.

Access to Care:

A review of WSP's monthly Health Care Access Quality Reports from January 2022 through June 2022 reflected the issuance of a total of 111,132 mental health ducats and add-on appointments. Of these, 83,740, or 75 percent, were completed, and 27,392, or 25 percent, were not completed. Of the non-completed appointments, 2,584, or nine percent, were due to patient refusals, 24,808, or 91 percent, were due to non-custody factors, and none were due to custody factors.

Placement of 3CMS into Minimum Support Facilities:

WSP did not have a Minimum Support Facility and did not transfer any patients to an MSF during the review period.

*Coleman* Postings:

*Coleman* posters were observed in all toured housing units in both English and Spanish.

**APPENDIX B-13**
**AVENAL STATE PRISON (ASP)**
**(August 30, 2022 – September 1, 2022)**
**Review Period: (February 1, 2022 – July 31, 2022)**

Census:

On August 30, 2022, ASP's total incarcerated population was 4,060, a two percent decrease from the previous reporting period.  The mental health caseload population of 1,286 increased by 26 percent since the prior review period and represented 32 percent of ASP's population.

There were three mainline EOP patients and 1,283 mainline 3CMS patients, including seven 3CMS patients receiving medical treatment in the OHU.

The administrative segregation unit remained closed, and all administrative segregation patients were immediately transferred to Pleasant Valley State Prison.

Staffing:

The chief psychiatrist position was vacant; however, a 0.5 registry psychiatrist provided coverage, leaving a 50 percent functional vacancy.  The two chief psychologist positions were filled; one was the chief of mental health, and the other was assigned to headquarters.

The senior psychologist supervisor position and two senior psychologist specialist positions were filled.

The 4.5 psychiatrist positions were vacant; however, registry staff covered all positions resulting in no functional vacancies.  There were no telepsychiatrist or psychiatric nurse practitioner positions at ASP.

Five of 9.5 psychologist positions were filled; registry staff covered a 0.75 position resulting in a functional vacancy rate of 39 percent.

The social worker supervisor position was filled, and seven of 11 social worker positions were filled for a 36 percent vacancy rate. Three social workers were unlicensed at the time of the site visit.

Although there was no allocated position, ASP employed a full-time recreation therapist. Six of 8.5 office technician positions were filled, leaving a vacancy rate of 29 percent.

The CHSA I position was vacant.

The OSS II position and two HPS I positions were filled.

Telepsychiatry:

While there was no telepsychiatry position at ASP, telework was utilized by registry psychiatrists and primary clinicians during the review period and at the time of the site visit. Mental health leadership acknowledged approving telework for fear of losing more staff if removed as an option.

The monitor's expert observed IDTTs attended remotely by the primary clinician. The patient and primary clinician had adequate visual contact. However, there was no visual contact between the team and the primary clinician, thus limiting the interactions required for effective IDTTs. There were no connectivity issues, and sound quality and resolution were adequate for clinical purposes but were inferior to formal telepsychiatry equipment.

Staff Recruitment and Retention:

In addition to headquarters efforts, ASP contacted colleges and military bases for potential candidates. ASP also participated in the regional job fair in Fresno, California.

During the review period, ASP hired one social worker and one office technician. A psychologist was hired but left within days of hire. There were no applicants for the vacant psychiatry positions during the review period or at the time of the site visit.

Quality Management:

The quality management committee (QMC) met monthly and attained quorums. Minutes revealed appropriate agenda items. QMC minutes revealed a comprehensive agenda, including relevant mental health improvement plans and audits; however, the minutes did not reflect any action items.

The MHPS also met monthly with a quorum in attendance. The minutes reflected a robust agenda that included improvement projects, quality reports, and several action items. Action items included a data gathering workgroup, recreation therapist and integrated substance use disorder treatment (ISUDT) coordination, modification of audit summary forms, and reactivation of both the diagnostic workgroup and the IDTT FIT.

An improvement plan addressing alternative housing discharge custody checks was ongoing at the time of the site visit. There were no other QITs or FITs during the review period.

ASP conducted audits of acute and intermediate referral timelines and clinician documentation. The results of the CAT were reported quarterly to the QMC and primary clinicians. The chief of mental health, with support from a senior psychologist specialist, reviewed the dashboard daily. Mental health leadership was familiar with performance reports' results and various audit tools.

Psychiatry peer reviews were not completed during the review period; however, case reviews, internal consultations, and supervision were provided. Peer review for case managers was also not completed during the review period. However, in June 2022, primary clinicians

358

began presenting cases to team members for review, providing detailed histories, current issues, and interventions.  Team members offered critiques after a review of each patient's healthcare record.  ASP tracked attendance and topics discussed.  Concerns were elevated to mental health supervisors.

Quality management information was disseminated to staff during monthly mental health meetings.

<u>Medication Management</u>:

ASP provided MAPIP results for the review period for compliance with psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring data for patients prescribed atypical antipsychotics indicated that ASP was compliant with obtaining medication consent, checking height and weight, monitoring blood pressure, and monitoring of the AIMS for all six months of the review period.

 For thyroid monitoring and monitoring EKGs, the institution was compliant for five required months.  The diagnostic monitoring of CBC with platelets, CMP, and glucose (blood sugar) were compliant for five of six months.

For monitoring lipids of patients prescribed antipsychotics, ASP was compliant for four of six months.

ASP was not an authorized clozapine initiation or maintenance facility.  There were no patients on clozapine during the review period.

ASP reported no patients were prescribed carbamazepine during the review period.

The medication management dashboard showed that for patients prescribed antidepressants, venlafaxine blood pressure and thyroid monitoring were compliant for all six

months.  No EKG was required for patients prescribed antidepressants.  Regarding obtaining medication consent for antidepressants, ASP was compliant for five of six months.

Medication consent documentation, obtaining CBC with platelets, CMP for patients prescribed Depakote (divalproex, valproic acid) were compliant for all six months.  For therapeutic monitoring of medication level, ASP was compliant for five of six months.

For lamotrigine, the facility was compliant in obtaining medication consent for all six months of the review period.

Regarding lithium, the facility was compliant with medication consent for three of six months.  The monitoring of lithium levels was compliant for four of six months.  For checking kidney function tests (BUN/Cr) the facility was compliant for five of six months.  Thyroid monitoring was compliant for three of four required months.  EKGs for patients were compliant for two required months.

Medication management metrics reported by mental health headquarters indicated that ASP was compliant with these measures for all six months during the reporting period: continuity of medications upon inter-institutional transfer at R&R; continuity of nurse administered (NA) and DOT medications for intra-institutional transfers (excluding ASU/SHU/PSU); continuity of medications upon parole/transfer to the community; observation of medication preparation at HS; observation of medication preparation AM/PM; chronic care medications historical administration; and outpatient provider new medication orders.

For continuity of medications from discharge/transfer from a community hospital and/or DSH, the facility was compliant for five of six months.  For continuity of medications for Mental Health Crisis Bed (MHCB) transfers, ASP was compliant for one of three required months.

No patients received involuntary medications under the PC 2602 process during the review period.

As of September 1, 2022, the facility reported a total of 636 patients taking a total of 1,083 psychotropic prescriptions. Of these, 43 were for KOP medications. In accordance with CDCR policy, all prescriptions were for Selective Serotonin Reuptake Inhibitors (SSRI) written for patients at the 3CMS level of care.

ASP was over 90 percent compliant with polypharmacy reviews for the duration of the monitoring period. ASP also reported that a CNA monitored the polypharmacy dashboard indicator daily. If a patient on the dashboard was prescribed psychotropic medications, the CNA notified the chief psychiatrist. The chief psychiatrist then reviewed the medications and entered a polypharmacy consult note into the medical record.

ASP did not have a place protected from the elements for patients to wait while in pill line. In June 2022 and July 2022, lines on several yards lasted more than two hours. Pill line lengths were due to the increasing census at ASP, as well as the increasing number of patients on Medication-Assisted Treatment (MAT). Leadership reported a recent decision to allot ISUDT funds to purchase coverings for waiting patients.

ASP pharmacy data indicated 332 patients took at HS medications, with all medications administered after 8:00 p.m.

Transfers:

ASP did not refer any patients to acute or intermediate levels of care during the review period. There were nine non-referrals to inpatient care; a review of all nine revealed adequate justification for all cases.

361

ASP made 42 referrals to MHCBs; 27 patients were admitted, and 15 were rescinded. The monitor's expert reviewed five of the 15 rescissions and found adequate clinical rationales in all charts. All transfers were completed within 24 hours and were compliant. Two 3CMS patients had three MHCB placements during the review period.

ASP transferred 16 EOP patients to mainline programs during the review period. All transfers were completed within timeframe guidelines. At the time of the site visit, three EOP patients were awaiting transfer to mainline EOP programs; none were beyond timeframe guidelines.

ASP did not have a mechanism to determine the number of patients transferred to the 3CMS level of care from an EOP level of care.

<u>Programming</u>:

    <u>Alternative Housing</u>:

ASP utilized infirmary beds INF1-001, INF1-002, and INF1-103 for alternative housing. ASP's alternative housing LOP included additional beds in the infirmary if needed. Observed cells were clean, and stack-a-bunks and safety mattresses were available in the unit. One patient was in alternative housing during the site visit; he was transferred to an MHCB within four hours of placement.

    <u>3CMS</u>:

ASP did not provide staffing ratios for psychiatry. The average caseload for primary clinicians in 3CMS was 1:128.6, which exceeded the mandated staffing ratio.

Twenty patients were randomly selected to have their healthcare records reviewed concerning their 3CMS stays. Seven patients required initial psychiatric evaluations; 100 percent had an evaluation prior to IDTT and were compliant. All reviewed initial psychiatric

contacts were conducted in confidential settings, and none were conducted by telepsychiatry. Additionally, ASP was 100 percent compliant with timely routine psychiatry contacts. All reviewed routine psychiatry contacts were completed in a confidential setting, and none were conducted by telepsychiatry.

For primary clinicians, seven patients required initial evaluations within ten working days of arrival; five of seven, or 71 percent, were compliant. One hundred percent of primary clinician routine contacts were completed timely. All initial and routine primary clinician contacts were conducted in a confidential setting.

For the seven patients who required initial IDTTs, ASP was 100 percent compliant with completion within ten working days. Required staff attended all initial IDTTs. Patients attended six of the seven or 86 percent of initial IDTTs. Eight patients required routine IDTTs. ASP was 100 percent compliant with completion within Program Guide timeframes for those patients. Required staff attended all routine IDTTs. Patients attended six of eight or 75 percent of routine IDTTs. Staff cited COVID-19 restrictions and medical emergencies as reasons for the lack of patient attendance in initial and routine IDTTs.

Observed IDTTs for 3CMS patients revealed variation of quality dependent on attendees. Some IDTTs involved cursory reviews and an over-emphasis on rote questions. However, others were comprehensive, with active discussions involving goals, interventions, and levels of care. Mental health leadership reported that prior to the COVID-19 pandemic, they identified treatment planning as an area needing improvement. Improvement activities and audits ensued; however, the progress was paused due to staffing shortages and COVID-19 outbreaks. Improvement activities had yet to resume at the time of the site visit.

While group treatment was significantly reduced during the review period, ASP offered a DBT group and several psycho-educational groups.  One observed DBT group with eight patients in attendance was cohesive and interactive.  An observed psycho-educational group with four patients in attendance engaged in clinically meaningful activities and focused on developing and accomplishing realistic life goals.

Other Issues:

Pre-Release Planning:

The ASP institutional mental health pre-release coordinator (IMHPRC) reported that all PRPAs were completed during the review period; there were 394 PRPAs.  Further, all probation release forms were signed and forwarded, except for three, due to patient refusal.  The IMHPRC tracked all patients seen prior to release; however, data regarding the date the PRPA or ROI completion was not recorded.  The IMHPRC collaborated with parole services representatives to coordinate housing placements for patients, including the STOP program, though no data was available on STOP referrals.

The IMHPRC attended a weekly pre-release ISUDT call and the monthly headquarters call.

Two full-time Transitional Case Management Program (TCMP) caseworkers were assigned to ASP, with whom ASP reported a cooperative working relationship.   TCMP caseworkers continued services throughout the COVID-19 pandemic.

During the review period, TCMP caseworkers met with 298 patients, including four EOP and 294 3CMS patients.  TCMP caseworkers submitted Medic-Cal, SSI, and VA benefits applications for eligible patients.

Program Access:

a.     Job and Program Assignments:

On August 1, 2022, of 2,112 job assignments at ASP, one EOP patient, or 25 percent of EOP patients, held job assignments.  For 3CMS patients, 590 or 46 percent of 3CMS patients held job assignments, and for non-MHSDS incarcerated individuals, 1,521 or 55 percent of the non-MHSDS population held job assignments.

For the 1,037 academic assignments, 276 or 21 percent of 3CMS patients held academic assignments, and for non-MHSDS incarcerated individuals, 761 or 27 percent of the non-MHSDS population held assignments.

Of 459 vocational assignments, 131 or ten percent of 3CMS patients held assignments, and 328 or 12 percent of non-MHSDS incarcerated individuals held assignments.

Of 199 voluntary education assignments, 52 or four percent were held by 3CMS patients, and 147 or five percent of non-MHSDS incarcerated individuals held assignments.

Of 586 substance abuse treatment assignments, 253 or 20 percent of 3CMS patients held assignments, as did 333 non-MHSDS incarcerated individuals or 12 percent of the non-MHSDS population.

b.     Milestone Credits:

ASP did not track the number of EOP, 3CMS, or non-MHSDS incarcerated individuals eligible for milestone credits.

c.     Out-of-Level Housing:

On August 3, 2022, three EOP and 178 3CMS Level I patients were in Level II housing. There were 11 3CMS level III patients in Level II housing.

d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

ASP provided a copy of the ADA Reasonable Accommodation and Grievance Procedure and LOP. The CDCR Form 1824 Reasonable Accommodation Desk Reference Manual and the form have remained the same since 2017.

<u>"C" Status</u>:

During the review period, ten 3CMS patients and seven non-MHSDS incarcerated individuals were placed on C status due to program failure.  The "C" status ranged from 90 to 180 days.

<u>Mental Health Referrals</u>:

ASP was compliant with timely responses to emergent, urgent, and routine referrals by psychiatrists and primary clinicians; documentation revealed compliance rates of 96 percent with emergent responses and 99 percent with urgent and routine responses.  There were 1,933 mental health referrals, including 606 to psychiatry and 1,327 to primary clinicians.  The 203 emergent referrals included nine to psychiatry and 194 to primary clinicians.  Of the 176 urgent referrals, 14 were to psychiatry, and 162 were to primary clinicians.  The 1,554 routine referrals included 583 to psychiatry and 971 to primary clinicians.

<u>Custody and Mental Health Partnership Plan</u>:

ASP's CMHPP LOP was dated December 2021 and aligned with headquarters' partnership plan.

Executive joint rounding occurred during all six months of the review period, and ASP utilized the required form.  The executive joint rounding information was not distributed during the wardens' executive staff meeting; however, corrective action was initiated to share the information at the next scheduled executive staff meeting.

Reviewed weekly 3CMS supervisory huddle documentation revealed 100 percent attendance of required mental health and custody staff at weekly huddles.  ASP utilized the required form and noted information regarding new arrivals and patients' behavior.

CMHPP was included in only one of six monthly QMC meeting minutes during the review period; however, ASP provided documentation indicating that the MHPS provided quarterly updates of the CMHPP to the QMC until May 2022.

Quarterly partnership round table training was not required during the review period.

The 3CMS orientation brochure was provided to 3CMS patients in English and Spanish as appropriate.

ASP did not provide documentation of monthly joint supervisory 3CMS tours other than a memorandum stating that the July 2022 tours did not occur due to staff vacancies.

IAC meeting minutes indicated that mental health staff attended 23 of 30 or 76 percent of meetings.  Mental health concerns were raised in two of 30 or seven percent of meetings.

Patients filed 159 staff misconduct allegations, of which 68 were resolved, and 91 were pending review.  No ASP staff was directed to move to another post due to a patient complaint.

For the review period, 486 of 722 or 67 percent of custody staff attended the annual off-post partnership training.  Five of 15 or 33 percent of clinical staff attended.

Heat Plan:

ASP's heat plan LOP was dated May 2022 and was compliant with CDCR policy.  The heat plan was in effect for three months during the review period.  During those months, there were 67 Stage I heat alerts, 11 Stage II alerts, and no Stage III alerts.  There were no heat-related patient illnesses reported.

Interviewed custody staff was knowledgeable of the heat plan stages and produced current lists of patients prescribed heat-sensitive medications upon request. During the site visit, a Stage I heat alert was activated, and the monitor confirmed that patients prescribed heat-sensitive medications were inside the unit, as required.

Eleven of 12 or 92 percent of housing unit thermometers were operable and accurate. The one broken thermometer was fixed prior to the end of the site visit. Heat logs were completed in accordance with policy.

Regarding accommodations during Stage I heat alerts, patients had access to dayroom, showers, restrooms, and evening yard if the temperature was below 90 degrees.

RVRs:

ASP was not compliant with completing the inmate disciplinary mental health assessment training; 41 percent of required custody staff and 73 percent of mental staff completed the training.

ASP issued 781 RVRs during the review period. Of those, 377 or 48 percent were issued to MHSDS patients, including four to MHCB level of care patients, three to EOP patients, and 370 to 3CMS patients. The remaining 48 percent, or 404 RVRs, were issued to non-MHSDS incarcerated individuals.

Of the issued and adjudicated RVRs for MHSDS patients, 19 required a mental health assessment; the monitor reviewed six. ASP failed to timely request mental health assessments in all of the reviewed RVRs. Mental health staff timely completed and returned the mental health assessment to custody staff in five of six or 83 percent of cases.

ASP completed mental health assessments in a confidential setting.

The mental health clinician recommended penalty mitigation in one of six or 17 percent of the reviewed mental health assessments. The senior hearing officer mitigated the penalties as recommended. The senior hearing officer documented consideration of the mental health assessment in four of six or 67 percent of cases.

Use of Force:

For use of force training, 92 percent of custody staff and 17 percent of mental health staff completed the training.

During the review period, there were no controlled use of force incidents and 80 immediate use of force incidents involving 53 MHSDS patients and 27 non-MHSDS incarcerated individuals.

The monitor's review of six randomly selected immediate use of force incidents indicated compliance with applicable policy.

Lockdowns/Modified Programs:

There were four PSRs during the reporting period. Three of four PSRs were related to COVID-19 outbreaks, and the fourth was due to an injury to a non-MHSDS incarcerated individual. Access to mental health, medical, dental, and specialty appointments continued during modified programming.

Access to Care:

ASP did not provide access to care data for the review period.

Placement of 3CMS into Minimum Support Facilities:

ASP did not have a Minimum Support Facility.

_Coleman_ Postings:

_Coleman_ posters in English and Spanish were appropriately displayed in all housing units toured.

# **APPENDIX C**

# **CLINICAL CASE REVIEWS**

**APPENDIX C-1**
**CALIFORNIA REHABILITATION CENTER (CRC)**
**(September 13, 2021 – September 15, 2021)**

**Patient A**

This 38-year-old patient was admitted to the facility on June 9, 2021.  He was not prescribed psychiatric medication.  His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in the 3CMS.

Presenting problems documented on the primary clinician initial assessment included anxiety, depression and anger.  Symptom manifestation and impact on functioning was not documented. Documented diagnoses included bipolar disorder and major depressive disorder.  An initial psychiatric evaluation was not located in his healthcare record.

Treatment goals were to reduce anxiety and depression by the next IDTT.  Baseline documentation to assess realistic nature of these goals and interventions other than foster a therapeutic alliance were not documented.

The one subsequent routine primary clinician contact during the review period was timely.  He was resistant to engaging due to being in a "funk," but the clinician appropriately assessed him and discussed a psychiatric referral.

**Findings**

This patient's care was inadequate.  There was no initial psychiatric evaluation documented in the record.  Diagnostic assessment was poor, and clarification of diagnosis was needed. Treatment planning was insufficient as the IDTT failed to appropriately document a baseline to realistically assess planned interventions to achieve treatment goals.

**Patient B**

This 28-year-old patient was admitted to the institution from a reception center on June 24, 2021. He reported symptoms of anxiety and depression and was diagnosed with unspecified bipolar disorder.  His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in the 3CMS.

Initial evaluations addressed pertinent psycho-social areas.  He discontinued psychiatric medication upon admission to the facility and medication non-compliance education was provided.

Coordination of care needed between providers was needed.  As an example, psychiatric documentation indicated a history of post-traumatic stress disorder (PTSD) and chronic suicidal ideation that warranted consideration in treatment planning.  Treatment goals addressed a reduction anxiety and depression.  Individualization and rationale for treatment interventions (challenge dysfunctional thoughts and verbalize hope) was not documented.

372

Subsequent routine contacts during the review period were not timely. He requested to discontinue treatment, and the psychiatrist appropriately addressed relapse prevention.

**Findings**

This patient's care was adequate but marginally so. Treatment planning and continuity of care between providers was needed. Diagnostic clarification and rationale to support diagnosis was needed.

**Patient C**

This 38-year-old patient was admitted to the institution on April 8, 2021. He was diagnosed with adjustment disorder with anxiety and depression. He was prescribed Remeron. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in the 3CMS.

The initial psychiatric assessment provided a succinct and clinically useful overview of this stable patient. The initial primary clinician assessment was complete although some of the narrative was copied from the psychiatric assessment with no indication that it was not original. Treatment goals addressed anxiety and depression but there was no established baseline to assess change and interventions were not documented. He continued to present as stable during timely routine provider contacts. Other than medication management, documentation of treatment interventions for IPOCs was not documented.

**Findings**

This patient's care was inadequate because treatment planning was poor. The treatment team failed to establish and document a baseline to determine the effect of interventions regarding treatment goals and clinical interventions other than psychiatric medication were not documented. Lastly, the initial primary clinician assessment needed improvement.

**Patient D**

This 22-year-old patient was admitted to the institution on July 1, 2021. He was diagnosed with ADHD, atypical depression and substance abuse. He was prescribed Remeron. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in the 3CMS.

Overall, initial assessments provided appropriate and useful clinical information about his treatment needs. However, the primary clinician initial assessment lacked individuality as much of the content was copied from previous documentation. Treatment goals focussed solely on reducing depression. A baseline was not established and thus appropriateness of the goal and assessment of progress was not feasible. Interventions were established and consistent with his assessed needs, however clarity was needed regarding an intervention that only stated, "poor coping skills," with no documented strategy to improve coping. His expressed needs were appropriately addressed during routine contacts.

373

**Findings**

This patient's care was adequate; however, treatment planning needed improvement. In addition to a baseline assessment of depression, given his diagnosis of ADHD and substance abuse, treatment planning would have been improved by including treatment needs or explaining exclusion.

**Patient E**    This 27-year-old patient was admitted to the institution from the reception center on July 20, 2021. Diagnoses varied by provider. He was prescribed anti-depressant medication. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in the 3CMS.

The initial psychiatric assessment included appropriate clinical history and current treatment needs including substance use and depression. Documentation supported diagnoses of mood disorder and substance abuse. In contrast, the primary clinician initial assessment was not individualized as the much of the necessary clinical documentation was copied from earlier documentation. There was no documentation to support the unspecified bipolar disorder diagnosis which was included in the official place of record and IDTT documentation.

Treatment goals focussed on depression but there was no baseline to assess realistic nature or progress. Documented symptoms of insomnia and hopelessness were not targeted. Of concern, he had an ERPD of January 2023 and documentation indicated that his committing offense occurred while under the influence. However, treatment goals did not address substance use.

**Findings**

This patient's care did not adequately address his treatment needs because no baseline was established to assess progress and his documented symptoms were not targeted in treatment planning. In addition, to inadequate treatment planning, there were problems with diagnostic clarification and insufficient collaboration between treatment providers.

**Patient F**

This 21-year-old patient was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CRC. The patient transferred to CRC in January 2020. His mental health history included one MHCB placement in 2019, a reported "suicidal gesture" in adolescence, and treatment for ADHD in the community. The most recent suicide risk evaluation rated the patient's chronic and acute suicide risk as low. The patient was diagnosed with Major Depressive Disorder and prescribed Vistaril, Zoloft, and Zyprexa.

IDTT treatment plans targeted the patient's depression, noting a goal of reducing depressed mood to a rating of "4 or below" by the next IDTT interval. However, no baseline rating for depression was provided to track progress or worsening of symptoms.

The PC and psychiatrist completed their initial assessments on the date of the patient's initial IDTT. Routine mental health contacts and IDTTs were timely throughout 2021.

Progress notes between January and April 2021 described the patient as "stable." However, in June 2021, the patient began endorsing increased psychiatric symptoms, which he attributed to family stressors. Psychiatry increased the patient's medications around this time, and both the PC and psychiatrist began meeting with the patient more frequently. PC progress notes suggested therapeutic interventions were appropriately implemented during routine encounters. The PC's interventions included teaching self-soothing techniques such as deep breathing and progressive muscle relaxation. Psychiatry notes were very thorough and provided clear updates on current symptoms, functioning, and responses to treatment. Psychiatry adjusted the patient's medications on at least three occasions in 2021.

Despite PC and psychiatry progress notes suggesting the patient had stabilized by August 2021, both providers continued to follow up with the patient every 30 to 60 days through December 2021.

**Findings**

The 3CMS care provided to this patient at CRC was adequate. Although IDTT treatment plans lacked specificity, other clinical documentation provided clear information regarding interventions, treatment progress, and current symptoms and functioning. Additionally, providers' interventions, including decisions to increase contact frequencies, in response to the patient's worsening symptoms, were appropriate and appeared to result in a positive outcome for the patient.

**Patient G**

This 22-year-old patient was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CRC. The patient was serving his first prison term and transferred to CRC from the reception center in June 2021. His mental health history referenced one psychiatric inpatient hospitalization in the community and longer term outpatient treatment for PTSD and ADHD. Despite the healthcare record referencing an "interrupted" suicide attempt by hanging in 2017, there was no suicide risk evaluation completed during the current prison term.

Psychiatric medications were prescribed at the county jail and discontinued at the reception center in April 2021. The patient's psychiatric diagnosis at CRC was adjustment disorder with depressed mood and PTSD.

The most recent IDTT in September 2021 was held in-absentia "due to COVID-19 precautions." The IDTT treatment plan targeted anxiety and depressed mood; however, the goals relied on ratings for depression and anxiety without documenting baseline measures to track progress or identify worsening symptoms. Planned interventions for both treatment targets were limited to a generic statement from a pull-down menu that noted the therapist would "foster therapeutic alliance" through empathy.

The most recent psychiatric initial assessment was completed at the reception center in May 2021. Psychiatry at CRC did not complete an initial assessment of the patient. In September 2021, the psychiatrist at CRC attempted to meet with the patient and noted that he refused and was not prescribed psychiatric medication. The primary clinician's initial assessment of the

patient was completed timely in June 2021.  Subsequently, there was only one routine PC contact offered in November 2021.  Group treatment was not offered to this 3CMS patient.

The one PC progress note, written in November 2021, indicated the patient had secured a job as a porter and was sufficiently coping with environmental stressors at CRC.

**Findings**

While the patient may have been functioning fairly well in November 2021, the 3CMS care provided at CRC was inadequate and not consistent with Program Guide requirements. Following the patient's arrival and initial assessment in June 2021, there were no face-to-face routine mental health contacts until five months later in November 2021.  Psychiatry at CRC did not complete an initial assessment or attempt to meet with the patient for an individual contact until three months after his arrival, at which time the provider noted the patient had refused. Additionally, the quality of IDTT treatment plans was insufficient and a suicide risk evaluation was not completed despite records noting a history of suicidal ideation with one "interrupted" hanging attempt in 2017.

**Patient H**

This 53-year-old patient was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CRC.  The patient was serving a 14-year sentence and was due to parole in July 2022.  Records suggested the patient transferred to CRC from CMC in December 2018.

The patient was diagnosed with major depressive disorder, moderate, with recurrent episodes. Psychiatry prescribed Effexor to treat the patient's symptoms of anxiety and depression.

At the time of the most recent IDTT in December 2021, the patient reported increased symptoms of anxiety and depression and frustration with the "lack of services available."  The IDTT noted a recent medication adjustment and a plan to continue current medications and provide cognitive behavior therapy to reduce symptoms of depression and anxiety.  Treatment goals relied on subjective ratings for depression and anxiety; however, baseline ratings were not documented to appropriately track progress.  The IDTT's level of care justification indicated the patient would be retained in 3CMS due to benefitting from medication management and "required psychotherapy to help address symptoms of depression/anxiety."

In May 2021, the patient submitted a request for mental health contact due to increased anxiety. Both the PC and psychiatrist subsequently met with the patient in response to the referral.  The PC implemented appropriate interventions and referred the patient for group treatment at his request.  Psychiatry increased the patient's medication on May 11, 2021 and followed up two weeks later to assess the patient's response; the patient denied problematic side effects at that time.

By June 2021, the PC noted the patient had remained medication compliant, was participating in an anger management group, and denying symptoms of depression and anxiety.  Progress notes suggested the PC and psychiatrist continued to increase their contact frequency between May

and November 2021, and the patient reported doing well with current medications and other interventions.

**Findings**

The care provided to this 3CMS level of care patient at CRC was adequate.  Although clinical documentation lacked specificity, the PC and psychiatrist intervened appropriately in response to the patient's worsening symptoms in May 2021.  Providers also continued to monitor the patient more frequently through November 2021, and their progress notes suggested the patient had stabilized with additional support from the mental health department.

**Patient I**

This 31-year-old patient was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CRC.  The patient transferred to CRC from WSP's reception center in April 2021.  He was serving his first prison term and had a release date of April 19, 2024.  Records indicated the patient had no history of mental health treatment prior to incarceration and no self-harm history.

The patient was only briefly included in MHSDS, at the 3CMS level of care, due to initial difficulties adjusting to the prison environment.  Upon MHSDS placement in February 2021, the patient was diagnosed with adjustment disorder with depressed mood. Psychiatric medications were not prescribed at the reception center or CRC.

The CRC primary clinician completed their initial assessment of the patient prior to the initial IDTT.  Psychiatry at CRC did not meet with the patient face-to-face until the September 2021 IDTT, as psychiatry attended the initial IDTT by telephone in April 2021.

The IDTT treatment plan targeted depression and noted a goal of managing depression with "positive coping" and reducing depression to a rating of "2 or below" by the next IDTT interval.  However, no baseline rating for depression was provided to track progress or worsening symptoms.

PC contacts were completed timely and PC progress notes suggested interventions were appropriately therapeutic during encounters.  In June 2021, the PC noted that the patient had been sufficiently managing his mood symptoms and reporting that "things are better for him."  In August 2021, the PC documented that the patient's mood was stable and that he continued to report doing "well."  The patient requested removal from MHSDS during the August 2021 PC contact, and IDTT was scheduled to discuss the level of care change.

The patient was removed from MHSDS in September 2021.

**Findings**

The 3CMS care provided to this patient at CRC was adequate.  Although treatment plans were vague, the PC followed up with the patient timely and implemented appropriate interventions during clinical contacts.  Level of care decisions were also appropriately justified. It was

concerning that the psychiatrist attended IDTTs by telephone instead of utilizing videoconferencing equipment that would allow for patient observation.

**Patient J**

This 47-year-old patient was randomly selected for healthcare record review to assess the quality of 3CMS care provided at CRC. The patient transferred to CRC from WSP's reception center in late July 2021. The patient had two documented suicide attempts in 2019, one of which occurred in the community and the other while in county jail. The most recent SRASHE, dated June 16, 2021, assessed the patient's chronic risk as moderate and his acute risk as low.

The patient was diagnosed with adjustment disorder with mixed anxiety and depressed mood, alcohol use disorder, and amphetamine use disorder. The patient had been prescribed psychiatric medication for depression and anxiety for about eight months; however, psychiatric medications were discontinued prior to his arrival at CRC.

On June 9, 2021, the WSP psychiatrist noted the patient signed a refusal form for psychiatric medication and documented a plan to follow up with the patient in 30 days. However, the patient never met with a psychiatrist after this date, including during his time at CRC. Psychiatry also was not present for the patient's IDTT at CRC in August 2021, as the provider noted the patient was not seen face-to-face due to COVID-19 concerns and that the IDTT "interaction was held over the phone."

The PC completed their initial assessment of the patient timely on August 5, 2021. The patient was described as having "mild depression" at that time. During the initial IDTT on August 12, 2021, the PC developed an IPOC for pre-release planning and noted the patient would be offered "solution focus to build on positive coping skills to manage his mood." However, there were no PC contacts offered until October 12, 2021, and this contact focused only on whether the patient would agree to participate in CDCR's voluntary Male Community Reentry Program (MCRP); the patient refused to participate in MCRP. Subsequently, the PC followed up once more on November 3, 2021, at which time the patient was described as "anxious about parole" and "had many questions about parole, medical records, his money, etc."

On November 22, 2021, the pre-release planning coordinator met with the patient face-to-face in a confidential setting to provide resources and transitional planning services.

The patient paroled on November 28, 2021.

**Findings**

The 3CMS care provided to this patient at CRC was inadequate. The patient's two suicide attempts in 2019 suggested he likely met diagnostic criteria for major depressive disorder; however, he was provided a less severe diagnosis of adjustment disorder at CRC. Psychiatry at WSP also noted a plan to follow up with this patient within 30 days of signing the refusal form for psychiatric medication; however, no follow-up occurred, and this was not identified by the psychiatrist at CRC who should have completed a record review prior to IDTT. CRC psychiatry never met with the patient face-to-face, including during IDTT, as they elected to participate by telephone. At a minimum, psychiatry should have participated in the IDTT by

378

videoconferencing as this would allow for a visual assessment of the patient.  Lastly, while the pre-release coordinator met with the patient six days before his release, mental health staff should have implemented parole related interventions sooner to adequately prepare the patient for the transition back to the community, including interventions to address the patient's parole related anxiety, relapse prevention, and recidivism risk.

**APPENDIX C-2**
**California State Prison/Solano (CSP/SOL)**
**October 25, 2021 – October 28, 2021**

**Patient A**

This forty-seven-year-old patient was admitted to the MHCB on October 15, 2021 after making a suicidal statement. Upon admission he was hypomanic, psychotic and agitated. He was diagnosed with bipolar disorder and PTSD. He was prescribed Abilify, Vistaril and Prozac. His healthcare record was selected from the MHCB roster to assess adequacy of care in the MHCB.

The primary clinician initial assessment was comprehensive and provided relevant clinical documentation that was useful in the development of a treatment plan. The psychiatric initial assessment provided basic information but was adequate. Individual plans of care appropriately targeted delusions, self-harm and hypomania. Daily contacts were supportive in nature and provided adequate descriptions of his mental status and functioning.

He discontinued psychiatric medication in the weeks prior to the MHCB admission which he resumed upon admission. His mental status stabilized shortly after resuming medication and denied suicidal ideation. A safety concern at his previous facility was disclosed and addressed to his satisfaction. The plan was for him to return to the facility and be housed in ASU pending an investigation. However, coping skills for managing segregation were needed.

He was discharged to EOP on October 25, 2021. At the time of discharge, he was assessed as high chronic and low acute risk. His safety plan was reasonable but would have been improved with inclusion of medication non-adherence as a warning sign.

**Findings**

This patient's care was adequate. His initial assessment was relevant in developing his treatment plan; his individual plans of care appropriately targeted his mental health needs. Primary clinician contacts were appropriately supportive in the MHCB; his safety plan at discharge was generally reasonable, but should have noted his medication non-adherence.

**Patient B**

This seventy-year-old patient was admitted to the MHCB on October 17, 2021 for grave disability. Upon admission he was diagnosed with psychosis with unclear origin. He was prescribed Zyprexa, an antipsychotic. His healthcare record was selected from the MHCB roster to assess adequacy of care in the MHCB.

This 3CMS patient had no history of psychosis and was treated for depression and prescribed an antidepressant prior to the MHCB admission. Referral documentation indicated he was, psychotic, confused, malnourished and disheveled. He had an extensive history of substance use and disclosed recent heroin use. A toxicology screen was positive for fentanyl.

Initial assessments provided useful clinical information regarding his mental status and consideration of the origin of his psychosis as due to substance or a medical condition. Individual plans of care addressed auditory hallucinations and grave disability. There was no clear documentation regarding behaviors that were targeted under grave disability.

Throughout his stay, documentation of daily contacts was thorough and included useful descriptions of his mental status, functioning and consideration of diagnosis and treatment plans for him. After a brief period of improvement his mental status worsened and he had several consistent days of not sleeping, paranoia and bizarre behavior. The psychiatrist consulted with the on-call medical provider on October 30, 2021 and further medical testing was ordered to establish the origin of his psychosis.

**Findings**

This patient's care was inadequate. Documentation did not clearly state what behaviors were targeted under grave disability. The patient's mental status worsened in the MHCB. Timely coordination with a physician to clarify diagnosis and determine underlying etiology for new onset psychosis for this elderly gentleman was needed.

**Patient C**

This thirty-two-year-old patient arrived at the facility on July 29, 2021. He reported depressive symptoms and was diagnosed with Major Depression by the psychiatrist. He reported positive benefit from prescription Zoloft, an antidepressant. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

Initial assessments and IDTT documentation lacked sufficient detail. Individual plans of care were not included in IDTT documentation. Documentation indicated poor collaboration between disciplines and questionable communication during IDTT as clinician documentation indicated that he was not prescribed psychiatric medication.

Diagnosis needed clarification. Rationale for diagnosis was not provided, nor was the diagnosis included in the place of record. Psychiatric documentation indicated that he had a diagnosis of PTSD but this diagnosis was not included elsewhere.

**Findings**

This patient's care was inadequate. Initial assessments lacked sufficient clinical detail and his individual plans of care were not included in IDTT. Medication documentation was contradictory. Treatment planning was lacking and there was a need for diagnosis clarification.

**Patient D**

This twenty-six-year-old patient arrived at the facility on October 18, 2021. Documentation indicated a history of major depression and opioid and alcohol dependence. There is no history of psychiatric medication. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

381

Initial assessments and IDTT documentation were thorough, well written and provided clinically useful information. Individual plans of care appropriately targeted depression and substance use. He presented as stable and denied depressive symptoms and requested to terminate 3CMS programming. Discharge planning was reviewed with him.

**Findings**

This patient's care was adequate. His initial assessments and IDTT documentation were appropriate, his individual plans of care targeted his mental health needs, and his discharge planning was examined with him. Of note, diagnosis was not included in the official place of record.

**Patient E**

This sixty-five-year-old patient was admitted to the facility on July 3, 2018. He was diagnosed with major depressive disorder and anxiety. He was prescribed Remeron, an anti-depressant, and Vistaril as needed for his anxiety. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

A summary regarding treatment progress, interventions and response during the previous year was needed. Individual plans of care continued to target depression. It was unclear how the goal to reduce depression would be met.

There were three psychiatric contacts during reviewed dates. Documentation described him as stable but was virtually unchanged. The occurrence of a panic attack was noted by the psychiatrist but neither provider discussed coping skills. Primary clinician contacts provided a summary of his current stressors but needed inclusion of targeted symptoms and functioning between contacts. Overall, contacts were supportive in nature.

**Findings**

This patient's care was inadequate. Treatment planning needed improvement because it failed to clearly state how the goal to reduce the patient's depression would be met. Neither the psychiatrist nor primary clinician documented discussing coping skills with the patient. While overall clinical contacts were supportive of the patient, primary clinician documentation needed to include the patient's targeted symptoms and functioning between contacts.

**Patient F**

This sixty-one-year-old patient was diagnosed with unspecified depressive disorder. He was not prescribed psychiatric medication. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS. He was admitted to the facility on August 8, 2019.

He was seen on May 21, 2021 for an initial IDTT upon return to general population from a brief stay in administrative segregation for refusing assigned housing. His individual plan of care targeted depression but it was unclear how the goal to reduce depression would be achieved. Documented anxiety symptoms were not targeted.

382

Documentation indicated a discrepancy regarding the status of psychiatric medication. A cell front psychiatric contact (September 15, 2021) indicated that he did not want to make any changes to treatment, however, the previous psychiatric contact (February 2021) indicated a low dose of Lexapro, an antidepressant. A review of the Medical Administration Record indicated that the medication was not given on April 1, 2021 due to an outside medical hospital admission. For reasons that were unclear, the medication was not re-started upon his return two weeks later. There was no documentation regarding psychiatric awareness of that the medication was not re-started..

All reviewed provider contacts were cell front secondary to quarantines. This included four primary clinician contacts that occurred between May 27, 2021 and September 10, 2021 and one psychiatric contact (September 15, 2021). There were no additional mental health provider contacts noted between September 15 and November 1, 2021. There was no documentation of interventions to assist with his reported distress (disturbed sleep, irritability, depressed mood).

**Findings**

This patient's care was inadequate. There was no documentation located in the record that the psychiatrist was aware that changes to his psychiatric medication had occurred, specifically that prescribed psychotropic medication was not continued following the patient's return from outside medical care. Treatment plan did not include documentation regarding interventions to assist with the patient's identified needs. Given multiple cell front contacts and observing that no contacts occurred over several weeks, noting the patient's reported distress, a face-to-face contact was clinically indicated once the quarantine was lifted. There was no documentation that this occurred.

**Patient G**

This sixty-five-year-old patient was transferred from the reception center to this facility on July 8, 2021 for his first term. He was diagnosed with unspecified depressive disorder. Per his choice, he was not prescribed psychiatric medication. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

An initial psychiatric assessment was not completed. Primary clinician assessment and initial IDTT documentation were overly brief and incomplete. His treatment goal appropriately targeted depression.

Primary clinician contacts occurred monthly which was clinically appropriate based on his difficulty adjusting to his prison sentence. Contacts were supportive in nature.

**Findings**

This patient's care was inadequate. His initial assessments were incomplete and insufficient. While clinical contacts were appropriately occurring and supportive, clinical interventions and alignment with treatment goals was needed during primary clinician contacts.

383

**Patient H**

This thirty-three-year-old patient was admitted to the facility on May 7, 2021. He was diagnosed with unspecified trauma and stressor related disorder in the official place of record, which differed from initial assessment documentation. He was not prescribed psychiatric medication. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care in 3CMS.

An initial psychiatric assessment was not completed. The primary clinician initial assessment included clinically useful information. Individual plans of care were not found in IDTT documentation. At his request a psychiatric referral was completed but he declined medication.

Primary clinician contacts were supportive in nature after he learned that his girlfriend overdosed.

**Findings**

This patient's care was inadequate due to the lack of treatment planning and an initial psychiatric assessment. Clarification of diagnosis was needed.

**Patient I**

This fifty-three-year-old patient was being treated at the 3CMS level of care and was diagnosed with major depressive disorder, recurrent, mild and alcohol use disorder, severe, in remission in a controlled environment. He was prescribed sertraline.

The patient was seen monthly by his PC and every 60 days by his psychiatrist. PC contacts reflected discussion of the patient's functioning, symptoms, and progress toward his treatment goals. A change in PCs during the review period was handled appropriately including termination and initiation processes with the patient. Psychiatric documentation was inadequate as the same progress note was entered into the record for all contacts with only slight changes noted. The copied text, while at one point accurate in referring to the patient's nonadherence secondary to religious fasting, was inaccurate in subsequent notes as administration time adjustments had been made to address the issue.

His annual IDTT was held in July 2021 and clearly discussed patient progress, functioning, symptom management and patient's goals. Higher level of care considerations were discussed as were the criteria necessary for the patient to be discharged from services. His diagnoses were reviewed and affirmed and his documented history was updated appropriately. There was an urgent patient request to be seen by his PC during the review period which was responded to promptly and adequately.

**Findings**

Treatment of this patient was clinically sufficient but overall inadequate secondary to significantly deficient and inaccurate psychiatric documentation. Psychiatry notes included copied and pasted text that was inaccurate regarding medication administration time that had been adjusted to address the patient's medication nonadherence.

**Patient J**

This fifty-nine-year-old patient was diagnosed with major depressive disorder, recurrent, in partial remission.  He was not prescribed any psychotropic medications.

There was no treatment plan completed during the review period, so the patient's IDTT documentation from October 2020 was reviewed for context.  PC contacts occurred every 90 days and included a review of the patient's symptoms and functioning and evidenced treatment in keeping with the goals of the treatment plan.  The one concern noted was inconsistency in one progress note which indicated that the patient was seen every 90 days but included a plan to see the patient again in 30 days.  The patient was seen in 90 days, not 30 days.  There were no psychiatric contacts during the review period.

**Findings**

Treatment of this patient was adequate.  There was evidence that treatment for this patient was in keeping with the goals of the treatment plan.

**Patient K**

This thirty-one-year-old patient was diagnosed with unspecified trauma and stressor-related disorder.  He was not prescribed psychotropic medications.

The patient had no mental health treatment history prior to submitting a request for services on July 16, 2021.  He was seen timely for a routine consult which was of good quality.  The patient was seen for a full PC initial assessment within five days. The assessment was comprehensive and included discussion of the patient's trauma history, lack of belonging, recent depression and irritability.  It resulted in a diagnosis and placement at the 3CMS level of care.  An IDTT was completed the following day and noted the inclusion of a psychiatrist yet no psychiatric assessment was completed and no input from the psychiatrist was referenced in the IDTT documentation. The psychiatrist who completed the master treatment plan psychiatry review on the same date was not the psychiatrist listed as having participated in the IDTT meeting.   The treatment plan included goals and interventions that appeared to address the patient's needs however no frequency of interventions was included.

The patient was not seen again during the review period.

**Findings**

Treatment of this patient during the review period was inadequate as he was never assessed by a psychiatrist and was not seen for clinical services for more than 60 days following initiation of treatment and a clinical assessment which revealed issues of trauma, lack of belonging, depression and irritability. While the 60-day timeframe is not a violation of requirements, not seeing a patient again who took the risk to engage in therapy for the first time related to trauma and depression is not adequate clinical practice.

385

**Patient L**

This forty-three-year-old patient was diagnosed with major depressive disorder and substance use disorders.  He was prescribed escitalopram.

No IDTT meeting was held during the review period but an annual treatment plan review which occurred in March 2021 was reviewed for context.  The patient was seen routinely by his PC and psychiatrist in keeping with patient needs and requirements.  PC contacts reflected continuity with the treatment plan and evidenced review of psychiatric care.  Psychiatric routine contacts reflected assessment of medication efficacy and one contact for medication nonadherence reflected a responsive change in medication administration time to increase adherence.  Psychiatric documentation was generic and sterile, but adequate.

**Findings**

Treatment of this patient was adequate because he was seen routinely by his PC and psychiatrist in keeping with patient needs and requirements consistent with the treatment plan.

**Patient M**

This sixty-one-year-old patient was diagnosed with major depressive disorder, recurrent, mild.  He was not prescribed psychotropic medications.

The patient was seen every 60 days by his PC and those contacts reflected treatment in keeping with the treatment plan and assessment of the patient's symptoms, functioning and treatment progress.  An IDTT was held in July 2021 and documentation reflected a thoughtful review of the patient's progress and need for ongoing treatment.

**Findings**

Treatment of this patient at the 3CMS level of care was adequate noting that PC contacts were consistent with the treatment plan. The PC appropriately assessed the patient's symptoms, functioning and treatment progress.

**Patient N**

This twenty-seven-year-old patient was diagnosed with schizoaffective disorder, bipolar type and unspecified cannabis-related disorder.  He was prescribed loxapine, buspirone, benztropine, mirtazapine, and olanzapine.

He was admitted to the MHCB on October 21, 2021 after having been discharged from an MHCB at another facility two days prior.  Admission documentation was adequate and timely, revealing clinician-to-clinician contact, an initial PC assessment, initial recreation therapist assessment, and an initial IDTT.  Daily contacts by either the PC or psychiatrist were documented and included assessments of the patient's functioning and mental status.  Diagnostic and medication adjustments were made and appeared appropriate.  There was evidence of recreational therapy contacts routinely during his stay in the MHCB.  The patient's variable presentation resulted in the IDTT deciding between discharging back to EOP or referring to a

higher level of care.  During an IDTT on October 29, 2021 the patient was referred to PIP Acute.  The transfer did not occur until November 23, 2021, outside of acceptable timelines.

While clinical contacts with the patient were generally adequate, there were concerns with the overall care of the patient while in MHCB.  The recreation therapist who engaged with the patient in yard and through playing games noted delusional thinking, sexualized language, a hand tremor and the patient's response to internal stimuli, yet these did not appear to be recognized nor addressed by the PC or psychiatrist.  In fact, the PC independently noted the patient's hand tremor and yet two psychiatric contacts completed the day after the recreation therapist and PC notes were silent on the issue other than one psychiatrist noting and AIMS of zero.  On October 29, 2021, the PC documented that a safety plan had been developed with the patient to address manic episodes and yet there was no documentation of this plan and the SPI section of the SRASHE completed on that date was blank.  Another concern included the fact that during the patient's final IDTT on November 19, 2021, the team noted a decision to continue with the referral to PIP.  The next day, the PC who met with the patient noted informing the patient that he would be returned to EOP "as the wait times for PIP increase stress level" for the patient.   A psychiatrist later noted the same and then noted that the team had discussed the EOP transfer but continued with the PIP transfer as the patient had been accepted.  There was no IDTT documentation to reflect these discussions.  Finally, the discharge summary was inadequate as it included language drafted on October 29, 2021 from the PIP referral and did not include any updated information regarding patient's current presentation or response to treatment over the subsequent 25 days.

**Findings**

Treatment of this patient was noted to be inadequate.  There was no documentation of a safety plan the PC said had been developed and the SPI section of the SRASHE completed on that date was blank.  Although the treatment team had noted a decision to continue with the patient's transfer to a PIP, the PC informed the patient that he would be transferred to EOP and the psychiatrist noted that the team had discussed the EOP transfer but continued with the PIP transfer since the patient had been accepted. However, there was no IDTT documentation reflecting these discussions.  Day-to-day, the daily contacts were adequate and addressed the patient's needs but the lack of continuity of care and collaboration across team members, along with less than adequate documentation resulted in inadequate care.

**Patient O**

This sixty-year-old patient was diagnosed with major depressive disorder, recurrent, mild and was prescribed mirtazapine.

The patient was admitted to MHCB on October 18, 2021 after reporting suicidal ideation.  He was seen timely for initial PC, psychiatric and recreation therapist assessments as well as his initial IDTT.  Documentation was comprehensive and reflected attention to the patient's needs.  Daily contacts with the PC and psychiatrist reflected treatment in line with the goals of the treatment plan and demonstrated patient improvement.  The recreation therapist engaged with the patient most days and documentation was adequate.  The patient was discharged to the EOP level of care, which was an increase from his previous level of care (3CMS), which appeared

appropriate given the patient's progress in MHCB and need for continued treatment more frequently than every 90 days.

**Findings**

Treatment of this patient was adequate. PC and psychiatrist contacts reflected treatment consistent with treatment plan goals and demonstrated patient improvement.

**APPENDIX C-3**
**CIM**
**(May 3, 2022 – May 5, 2022)**

**Patient A**

This 45-year-old patient's healthcare record was reviewed, as the patient had been retained in an unlicensed MHCB for 14 months despite being designated for the intermediate level of care.

Healthcare record review and discussions with staff informed the expert that the patient was initially transferred from the CHCF intermediate care to the CIM unlicensed MHCB on or around March 3, 2021 for transportation to Metropolitan State Hospital for electroconvulsive therapy (ECT). Unfortunately, none of the ECT appointments occurred; however, CIM continued to retain the patient in the unlicensed MHCB in anticipation that CDCR headquarters and the court would settle the question about the patient's need for ECT.

During interviews with CIM leadership, the expert learned that there had been no progress toward providing ECT, as the patient's attorney argued against ECT and had postponed court hearings since June 2021, stating that the patient lacked the capacity to consent to ECT. The current monitoring visit occurred in June 2022, and the date of the most recent hearing had once again been extended. The expert also learned that no capacity evaluation had occurred in response to the attorney's argument.

Clinical summaries in the healthcare record suggested lack of clinical progress since the patient's transfer from the intermediate care facility. The patient only participated in yard on three occasions during the 14-month period he remained in the unlicensed MHCB at CIM. The MHCB treatment team expressed some frustration regarding the housing of this patient perceived as belonging to another facility, while recognizing the complexities of this difficult case. As such, the IDTT for this patient was incomplete, as the team perceived that the patient did not belong to CIM, and that his level of care and treatment planning were determined by CDCR headquarters. Further, as CIM was a 3CMS institution, except for the unlicensed MHCB, the IDTT could not release the patient to a less restrictive setting to access additional programming that would be offered in an EOP. CIM did, however, continue to address the patient's grave disability concerns with interventions targeting hygiene, treatment attendance, and negative symptoms of his psychotic disorder.

Although the most recent CHCF intermediate care treatment plan recommended five clinical groups weekly, weekly recreation therapist services, and four individual weekly PC contacts, CIM was unable to offer group therapy in the MHCB reportedly due to COVID-19 precautions. Although some groups recently resumed, they were not offered to this patient.

**Findings**

The care provided to this patient was inadequate.

This patient requiring intermediate level of care should not have remained in the restrictive setting of an unlicensed MHCB for 14 months without evidence of progress toward receiving

389

needed ECT or sufficient improvement in his clinical presentation.  He should have been returned to an intermediate care facility while the legal process was addressed; the urgency of transfer to the appropriate level of care was further confirmed, as the hearings were expected to occur by videoconferencing that could be accomplished at an intermediate inpatient facility.

CIM did not have a licensed MHCB and did not adhere to Title 22 staffing requirements, such as the use of psychology interns with patient caseloads who routinely provided coverage on this unit.  Additionally, CIM did not have an EOP where the patient could be placed to receive needed additional programming and services while awaiting ECT.  CIM was insufficiently capable of the long-term housing of intermediate or acute care patients referred to Metropolitan State Hospital for ECT.

The expert contacted CDCR headquarters' psychiatry, and they were able to coordinate the patient's transfer to the San Quentin PIP, a facility with previous success regarding ECT coordination.

**Patient B**

This 54-year-old patient's healthcare record was reviewed to assess the quality of care provided in the MHCB at CIM.  The patient transferred from the Richard J. Donovan Correctional Facility (RJD) to the CIM MHCB on or around December 11, 2021, where he remained for almost three months until his eventual referral and transfer to acute care at CHCF on March 4, 2022.  It appeared that the patient had recently been discharged from the MHCB level of care prior to arrival at CIM, as a discharge five-day follow-up order was in place at the time of arrival.  RJD referred the patient from the EOP to the MHCB level of care due to concerns regarding danger to self, as the patient had reported suicidal ideation with a plan to die by starvation.

IDTT clinical summaries noted a history of one suicide attempt by hanging, two episodes of attempted starvation, inpatient admissions for grave disability, and mental health treatment at all levels of care while in CDCR.  The MHCB IDTT provided diagnoses of unspecified depressive disorder, schizoaffective disorder, and conversion disorder with paralysis.  Regarding the conversion disorder diagnosis, healthcare records indicated the patient insisted that he had paraplegia.  CIM pursued a PC 2602 involuntary medication order and prescribed antipsychotic medication (Haldol) at the time of MHCB admission.  He was also prescribed Cogentin for medication side effects, and Keppra for seizures.  CTC staff also provided the patient with diapers, a wheelchair, and a helmet.

On December 21, 2021, the patient was referred to the acute level of care.  The MHCB IDTT documented that the patient continued to report a plan to die by starvation; he had missed five meals and was eating feces.  The patient was also reportedly treatment nonadherent, smearing feces, threatening staff, and urinating and defecating on himself.  One clinician noted the patient appeared to be engaging in "impression management" to avoid return to RJD; however, this was not consistent with progress notes from psychiatry and other clinicians.

The February 15, 2022, IDTT documentation indicated that the acute program referral was reviewed "by regional," and that the treatment team agreed with their recommendation to rescind the acute care referral and to generate an intermediate care referral. Based on discussions with the MHCB staff at CIM during the monitoring visit, the IDTT documentation may have referred to the IRU when documenting that the referral was reviewed by "regional." Although the IDTT noted on this date that the patient had stopped smearing feces and had not engaged in self-harm, they continued to document that he required ongoing one-to-one suicide watch and exhibited erratic behavior, suicidal ideation, "yelling at staff," low frustration tolerance, inconsistent attention to activities of daily living (ADLs), and delusional thinking involving "connections with the illuminati." Further, they documented that the patient was unable to function adequately in the MHCB setting, required 24-hour nursing supervision due to a major mental disorder, and had remained in the MHCB for more than two months without demonstrating sufficient progress toward stabilization for discharge. Except for changing the level of care referral decision, the IDTT did not modify the MHCB treatment plan on this date.

On February 24, 2022, a different primary clinician participated in the IDTT and determined that the patient continued to require acute care referral. As such, the intermediate care referral was rescinded, and a new acute referral was submitted. The patient transferred to CHCF for acute care on March 4, 2022.

**Findings**

The overall care provided to this patient was inadequate due to problems with continuity of care and delayed transfer to a clinically appropriate care setting.

The patient was retained in a very restrictive level of care in the MHCB for almost three months before ultimately transferring to acute care. The decision to rescind the initial acute care referral was not supported by the documentation or ongoing orders requiring suicide watch. While one clinician followed the "regional" or IRU recommendation to rescind the acute referral, a different clinician appeared to disagree with the recommendation and again referred the patient to acute care. There was no documentation that a clinical case conference including IRU, CIM MHCB, and other relevant staff was conducted regarding any of these referrals.

While many of the MHCB IDTT treatment interventions were appropriate, the clinicians involved in the patient's care documented discrepant information regarding whether his symptoms were motivated by genuine mental illness, secondary gain, or a combination of both. Further, the clinician who suspected the presence of secondary gain did not sufficiently explain the underlying motivations for the behaviors to address them in an alternative manner, such as involving custody to address possible safety concerns at RJD. The psychiatrist and one of the clinicians also did not resolve apparent diagnostic disagreements, as the psychiatrist repeatedly documented a diagnosis of schizoaffective disorder and prescribed involuntary antipsychotic medication, while one of the PC's documented a primary diagnosis of unspecified depressive disorder with suspicion of secondary gain.

Of note, the CIM MHCB staff informed the expert that they routinely received emails from the IRU staff attempting to discourage pursuit of higher level of care referrals instead of allowing the

referring facility and inpatient program to seek clarification through consultation and to address disagreements by the CCAT process when indicated.

**Patient C**

This 40-year-old patient's healthcare record was reviewed to assess the quality of care provided in the MHCB at CIM. On or around January 28, 2022, the patient transferred from CRC to CIM for MHCB admission due to grave disability and danger to self. Prior to arrival, CRC documented that the patient presented with rambling speech, refusal to engage with staff, and refusal of meals for seven days.

During the MHCB admission, the patient was provided with a diagnosis of unspecified bipolar disorder; additionally, the IDTT noted a history of bipolar disorder with psychotic symptoms. The patient refused psychotropic medication throughout the MHCB stay at CIM.

The IDTT convened on January 31, 2022, and the patient refused to attend. An IPOC for grave disability was developed on this date with measurable goals and appropriate interventions included. The IDTT documented that the patient continued to refuse all meals and would not communicate with staff, although the patient did inform the psychiatrist that he had suicidal thoughts. His suicide history was significant for an overdose in 2010 and self-harm by cutting in 2014.

On February 8, 2022, the IDTT indicated that the patient had three positive higher level of care referral indicators, no improvement in functioning or symptoms, a lack of attention to his ADLs, and refusal of all psychotropic medications. The IDTT referred the patient to acute care on that date. There were, however, improvements with food intake, as records indicated that he had eaten approximately half of his meals by this date.

On February 22, 2022, the IDTT continued to document lack of improvement while the patient awaited acute care transfer. The psychiatrist noted a plan to pursue PC 2602 involuntary medication due to ongoing medication refusal and grave disability concerns; a PC 2602 hearing was scheduled for March 10, 2022

Between February 22 and March 7, 2022, the patient reportedly exhibited improvement in his ADLs, food intake, and interactions with staff, and the MHCB staff noted improvement in symptoms and functioning despite his medication nonadherence. On March 7, 2022, the acute care referral was rescinded, the PC 2602 hearing was cancelled, and the patient was discharged to the EOP level of care.

The patient discharged to CIM quarantine housing in Cypress Hall while awaiting transfer to an EOP institution. Before transfer, however, the patient was readmitted to the CIM MHCB on March 13, 2022, for danger to self; the patient reported thoughts of wanting to go to sleep forever. During this admission, the patient expressed motivation to accept mental health treatment and a willingness to take psychotropic medication. He received a diagnosis of bipolar I disorder, an IPOC for danger to self, and prescriptions for Vistaril and Invega. Documentation suggested that the patient stabilized by March 22, 2022, and his level of care was changed to EOP on this date.

**Findings**

The overall care provided to this MHCB patient at CIM was adequate.

The psychiatrist appropriately pursued a PC 2602 involuntary medication order. The acute care referral occurred timely, and the referral rescission was justified in the documentation. Level of care rationales and enhanced care plans were appropriate and individualized. IDTT documentation also provided updated information in progress notes and clinical summaries to support treatment decisions.

## Patient D

This 76-year-old patient's healthcare record was reviewed to assess the quality of care provided in the 3CMS program at CIM during the review period. The patient was housed at CIM since arrival from the reception center in November 2015. His psychiatric diagnosis was major depressive disorder, recurrent, mild. Psychotropic medications were not prescribed, as the patient preferred counseling rather than treatment with medication.

The patient was seen by the PC to offer supportive counseling services every 30 to 60 days during the review period. PC progress notes included updates on current stressors, ratings for depression and anxiety, and general functioning. Individualized interventions were documented during each PC encounter, and the patient's responses to these interventions were also included.

On December 6, 2021, the PC met with the patient to encourage attendance at an upcoming IDTT, to review progress toward treatment goals, and to discuss whether new goals should be included in the treatment plan. The PC indicated that the patient wanted to prepare for the BPH during the follow year, and related recommendations and resources were offered during this contact. The patient was also encouraged to participate in available groups, and medication treatment was discussed as an option. The PC further indicated that they would address the patient's social anxiety in treatment, as this was identified as a barrier to group participation.

IDTT meetings occurred timely for this patient. The treatment plan was updated at the most recent IDTT on December 7, 2021. The clinical summary offered updated information on progress and responses to treatment interventions. While the IPOC section offered a generic intervention and targeted only depressed mood, the level of care section included measurable treatment goals for depression and anxiety. The PC also documented in the level of care section that they would focus on preparing the patient for his next BPH hearing.

**Findings**

The care provided to this patient was more than adequate.

His level of care was appropriate, and he appeared to benefit from the mental health services provided. Clinical contacts occurred more frequently than minimally required. The PC interventions during clinical contacts were consistent with treatment goals and stated concerns. Progress in treatment was clearly documented, and treatment plans were modified when indicated.

**Patient E**

This 35-year-old patient's healthcare record was reviewed to assess the quality of care provided in the MHCB at CIM. The patient transferred from Kern Valley State Prison (KVSP) to CIM for MHCB admission on or around March 17, 2022. The reason for MHCB admission was danger to self.

The patient was provided with a diagnosis of adjustment disorder with depressed mood and anxiety. The MHCB psychiatrist prescribed Remeron and Effexor.

MHCB IDTTs occurred timely. At the initial IDTT, the treatment team developed an IPOC for danger to self. While some of the IPOC goals and interventions were generic, the higher level of care section included a more individualized treatment plan with measurable goals and interventions to address suicidal thinking, cognitive distortions, and stress tolerance. Plans regarding medication management were also included in this section.

Progress notes suggested that MHCB clinical contacts occurred timely and included interventions consistent with the IDTT treatment plan.

The patient appeared to stabilize within six days of MHCB admission. The final treatment plan and discharge summary on March 24, 2022, offered useful information to support discharge from the MHCB level of care, and discharge diagnosis. Recommendations for the receiving 3CMS providers were also included for continuity of care. The discharge SRASHE on March 24, 2022, assessed low acute and chronic suicide risk, and a suicide prevention safety plan was completed on this date.

The patient's presentation during a follow-up psychiatric appointment on March 29, 2022, suggested that he remained stable, medication adherent, and was programming appropriately at the 3CMS level of care.

**Findings**

The care provided to this MHCB patient at CIM was adequate.

Treatment plans were individualized, clinical summaries offered sufficiently detailed information, and treatment decisions including level of care determinations were appropriately justified. Further, the interventions implemented during the MHCB stay were appropriate and consistent with the documented plan of care. Providers also developed a suicide prevention safety plan with the patient at discharge and offered useful recommendations for the outpatient providers.

**Patient F**

This 59-year-old patient's healthcare record was reviewed to assess the quality of care provided in the MHCB at CIM. The patient discharged from the PIP at the California Medical Facility (CMF) on September 3, 2021, after a three-month intermediate care hospitalization. The discharge summary for that stay indicated that the patient had been "stable for quite some time" and would be discharged to the EOP level of care at RJD. Subsequently, the patient transferred

to CIM from RJD for MHCB admission on December 14, 2021, after reporting thoughts of "banging his head until it bleeds." He was discharged from the MHCB to the EOP at RJD after an eight-day stay. Prior to the current CIM MHCB admission on February 18, 2022, he was maintained at the EOP level of care at RJD for approximately two months.

The current MHCB stay also occurred due to danger to self and thoughts of head banging. The patient was provided with diagnoses of schizoaffective disorder, manic type, borderline personality disorder, and unspecified personality disorder. The MHCB psychiatrist prescribed Buspar, Zyprexa, and Haldol. During the initial IDTT, baseline measures for reported depression and anxiety were documented to track progress. Providers also noted that the patient's suicidal thoughts had decreased at the time of the initial IDTT. An IPOC for danger to self was developed, and a more detailed and individualized treatment plan was documented in the higher level of care section of the master treatment plan form. The treatment plan included measurable goals and evidenced-based interventions that appropriately addressed current symptoms, level of functioning, and suicide risk.

Provider progress notes documented that required contacts occurred timely and that clinical interventions consistent with the treatment plan were implemented. The patient appeared to respond well to these interventions, and the IDTT determined that he had stabilized and was ready for discharge on February 24, 2022. The patient informed the MHCB staff that he was "doing a lot better," and that he "just needed a few days [in the MHCB] for a break." The documented level of care rationale was thorough, indicated that the patient had met his discharge objectives, and justified discharge to the EOP level of care. The discharge SRASHE assessed high chronic and low acute suicide risk, and the suicide risk ratings were supported by the healthcare record documentation. A suicide risk safety plan was completed, and the provider indicated that the patient was provided a copy of the plan.

**Findings**

The care provided to this MHCB patient at CIM was adequate.

Treatment plans were individualized and included measurable goals and evidenced-based interventions. Treatment interventions were implemented during required contacts as outlined in the treatment plan. Daily progress notes provided updates on progress toward discharge objectives, and the documentation supported the treatment, discharge, and level of care decisions. The patient was appropriately provided with suicide prevention safety planning upon MHCB discharge.

**Patient G**

This 69-year-old patient's healthcare record was reviewed to assess the quality of care provided in the 3CMS program at CIM. The patient was housed at CIM since his transfer from Deuel Vocation Institution (DVI) in June 2018. He was provided with diagnoses of bipolar I disorder and antisocial personality disorder.

Although the patient was not prescribed psychotropic medications, he generally was seen every two to three months by the psychiatrist. The psychiatrist noted that the patient's medical

provider continued to prescribe Cymbalta for pain management. Psychiatric documentation provided useful mental status updates.

The patient met with his assigned PC on six occasions between August 30, 2021 and August 4, 2022. While PC contacts were at times completed more frequently than minimally required, the PC notes for all six contacts included the same copied and pasted lengthy paragraphs to describe "current status of illness," including current symptoms, coping skills, interventions, and discussions. Multiple quotes from the patient were also copied and pasted into progress notes from one year prior. As such, the expert was unable to determine the patient's current mental status, whether progress was observed, and whether any interventions were implemented.

IDTT meetings occurred timely. The most recent treatment plan included an IPOC for depressed mood with a measurable goal and evidenced-based planned intervention. However, the clinical summary section contained the same copied and pasted paragraphs from all six PC progress notes during the preceding year.

**Findings**

The care provided to this patient was inadequate.

While the patient was seen for psychiatric follow-up timely and consistently with appropriate clinical information documented, the PC progress notes and recent IDTT documentation contained the same copied and pasted paragraphs for an entire year. These copied and pasted paragraphs were misleading, as they offered the same specific quotes from the patient, the same detailed description of a social interaction, and the same detailed intervention and response. As such, the expert could not determine the status of current symptoms, functional impairments, whether treatment interventions were implemented, and whether the patient had demonstrated progress toward the treatment goal of decrease in depressive symptoms.

**Patient H**

This 38-year-old male patient was provided with diagnoses of major depressive disorder, single episode, in partial remission; alcohol use disorder, mild, in sustained remission; and cannabis use disorder, moderate, in sustained remission. He was not prescribed psychotropic medications. His healthcare record was randomly selected to assess the treatment provided at the 3CMS level of care.

No IDTT meeting was scheduled during the review period, so IDTT documentation from March 25, 2021 and May 12, 2022 was reviewed. One IPOC was added to the treatment plan during the 2022 IDTT meeting, but prior IPOCs were not addressed. The interventions were the same for all IPOCs in the treatment plan and were not appropriate to the issues identified. The treatment interventions included establishing a therapeutic alliance and engaging in goal setting with the patient to address irritability, hypomania, and problems with attention and concentration. These were inappropriate interventions for these treatment targets.

The patient was seen by his PC in December 2021 and January 2022, but not again during the review period, despite the progress note in January 2022 indicating that the patient would be seen in one month. Clinical contacts did not evidence the use of therapeutic interventions, and the

mental status examination appeared to be copied from note to note without substantive changes. The patient was briefly placed in the ASU for COVID-19 quarantine and was seen for initial PC and psychiatric assessments, which were adequate. The patient was also provided with recreation therapist packets while housed in the ASU.

**Findings**

The care provided to this 3CMS patient was inadequate.

There was a lack of documentation related to the delivery of treatment interventions to address the patient's treatment goals, lack of discussion regarding progress toward treatment goals during the IDTT, and failure to see the patient as planned.

**Patient I**

This 77-year-old male patient was provided with diagnoses of major depressive disorder, recurrent, mild and mild cognitive impairment. He was prescribed sertraline, which he took consistently. The patient also had a DD2 designation due to dementia. His healthcare record was randomly selected to assess treatment provided at the 3CMS level of care.

An IDTT meeting was held October 14, 2021 with the required participants present. Of note, the psychiatrist who attended the meeting was not the treating psychiatrist. IDTT documentation included one IPOC for depressed mood entered three times in the plan. It appeared that patient progress was being documented by assigning new IPOCs with the goal for the patient's ratings of depression to decrease over time. Determination of the patient's progress in treatment was, however, not explicit. For example, in 2017 the target was a rating of six or below, and in 2021 the goal was a rating of two or below. The interventions were generic and were not evidence-based treatments for depression. Medication management was not included in the treatment plan despite the patient being prescribed an antidepressant medication. The patient's DD2 designation was acknowledged. The patient was also seen for an interdisciplinary support team (IDST) review on October 25, 2021, and that review was adequate.

The patient attended a weekly recreation therapy "current events" group; however, there was no documentation of group therapy in treatment planning. The patient was seen for two PC sessions during the review period, which did not include the provision of interventions but did include review of the patient's depressive symptoms and medication adherence. The treating psychiatrist saw the patient in November 2021, and a telepsychiatrist saw the patient in January 2022. The content of psychiatry contacts was adequate.

**Findings**

The care provided to this 3CMS patient was inadequate.

The treatment plan did not include evidence-based interventions and failed to note medication and group therapy provided to the patient. PC documentation failed to document the provision of any therapeutic interventions.

**Patient J**

This 30-year-old male patient was provided with diagnoses of unspecified depressive disorder and severe opioid disorder. He was prescribed bupropion with good adherence. His record was randomly selected to assess the treatment provided at the 3CMS level of care.

There was no IDTT meetings scheduled during the review period, so IDTT documentation from August 3, 2021 was reviewed. This was the initial CIM IDTT. An IPOC was initiated to address depressed mood, and while it included a goal for the patient to rate depression at six or less, no baseline information was available to determine patient progress. The clinical summary in the treatment plan noted that the patient had rated his depression at one or two of ten in May 2021; thus, the goal of achieving six or less seemed inappropriate, and indicated that a review of the documentation copied into the IDTT clinical summary may not have been reviewed by the PC. The patient's release date was noted to be early 2022, and a release planning goal appeared necessary but was not included in the treatment plan. The only intervention noted to address the patient's depression was the fostering of a therapeutic alliance. There was no mention of psychotropic medications in the treatment plan, despite the patient being prescribed antidepressant medication.

The patient was seen for a routine PC contact on October 13, 2021. The patient reported mild symptoms and noted that he believed his depression was related to elevated estrogen levels. The patient had been diagnosed with gynecomastia and was upset about the physical effects of this diagnosis, as well as how his mood was affected. Documentation noted that the patient expected to be released in February 2022, but no further discussion of release planning was documented by the PC.

A psychiatrist saw the patient on October 20, 2022, and the documentation of that contact was adequate.

On November 11, 2022, the PC responded to a consult request related to a grievance the patient had filed against medical staff for failing to treat his gynecomastia appropriately. The patient reported that he was upset about developing breasts with resulting depression. The PC offered no interventions, but instead referred the patient to see the psychiatrist. The psychiatrist saw the patient on October 29, 2022, when mirtazapine was discontinued at the patient's request as it was prescribed on an as-needed basis, and the patient had not been taking it. Estrogen issues were referred to the endocrinologist. The psychiatrist noted increased depression, loss of appetite, and weight loss.

The patient was not seen again by either the PC or psychiatrist prior to his release from prison. There was a pre-release contact on January 14, 2022, and the patient paroled on January 23, 2022.

**Findings**

The care provided to this patient was inadequate.

The treatment plan did not accurately reflect the patient's current symptom presentation, did not include appropriate interventions to treat depression, and did not include a goal for pre-release

planning.  IDTT documentation also revealed a poor review of the patient's healthcare record.
Contacts with the PC and psychiatrist failed to document acknowledgement of the patient's
upcoming release.  Additionally, the patient's increased depression, decreased appetite, and
weight loss appeared to warrant more frequent clinical contacts, especially with a pending parole
date; yet no additional contacts occurred.

**APPENDIX C-4
NORTH KERN STATE PRISON (NKSP)
(May 17, 2022 – May 19, 2022)**

## Patient A

This patient was identified on the NKSP length of stay log as one of several RC EOP patients with lengths of stay exceeding 90 days. The healthcare record was reviewed to assess the quality of EOP care provided during the patient's 98-day stay in the NKSP reception center.

The patient's mental health history was significant for multiple community psychiatric hospitalizations, two MHCB admissions in 2018 and 2019, one reported suicide attempt, and one self-harm incident in 2019. The patient was maintained at the EOP level of care since his arrival at NKSP on December 9, 2021. He was prescribed BuSpar for anxiety and Remeron for depression. The NKSP treating psychiatrist consistently documented a diagnosis of major depressive disorder, recurrent and severe; this diagnosis was consistent with documentation in healthcare records from prior prison terms. The PC progress notes and IDTT documentation, however, consistently provided a less clinically significant and seemingly inaccurate diagnosis of adjustment disorder with mixed anxiety and depressed mood.

The initial mental health diagnostic screening assessment, initial PC assessment, and routine IDTTs were completed timely at NKSP. However, there was no documentation that an initial psychiatry assessment was completed during the patient's extended length of stay in the reception center. Although routine psychiatry contacts were generally offered timely, several routine PC contacts occurred with greater than seven days intervals.

On December 24, 2021, the CIT was activated as the patient reported suicidal ideation. The corresponding CIT documentation indicated that the patient was in distress related to familial concerns, that custody staff would assist the patient with a telephone call home, that an MHCB referral was not indicated, and that the patient was returned to his housing unit following the evaluation. The SRASHE completed on this date assessed low acute and moderate chronic suicide risk.

The EOP IDTT documentation and PC progress notes never referenced the CIT intervention or the new suicide risk information from the December 24, 2021 SRASHE. The IDTT also did not appear aware that the patient's mental health screening, initial PC assessment, and recent SRASHE had referenced one prior suicide attempt in 2019 and one confirmed self-harm incident at the California State Prison/Los Angeles County (CSP/LAC) in December 2019. Instead, all IDTT documentation completed at NKSP indicated the patient had "no reported history of self-harm" or suicide attempts.

On January 19, 2022, IDTT documentation noted the absence of higher level of care referral indicators, recent RVRs, or MHCB admissions during the current prison term. The patient was retained in the EOP on this date. The IDTT treatment plan included one IPOC for depressed mood; however, the only documented intervention was generic in content and was limited to a statement from the healthcare records pull-down menu stating, "the therapist will foster a

therapeutic alliance [through empathy]." While there were other treatment targets mentioned elsewhere in the documentation, the corresponding goals were not measurable.

The most recent IDTT at NKSP occurred on March 17, 2022. The patient reportedly refused to attend the IDTT, but there was no documentation of the reason for refusal or whether efforts were made to encourage participation. The IDTT noted that the patient had been treatment and medication adherent throughout the current prison term, and that no higher level of care referral indicators were met. Although the IDTT also documented that the patient reported an increase in depressive symptoms since the preceding IDTT, the treatment plan was not modified on this date.

Notably, this patient transferred to RJD from NKSP in March 2022, and was admitted to the MHCB for danger to self within a week of his arrival. He subsequently had three additional MHCB admissions, and he was ultimately referred for inpatient care in July 2022.

**Findings**

The mental health care provided to this patient was inadequate for several reasons.

The expert noted problems with continuity of care, misleading statements about suicide risk in IDTT documentation, and vague and seemingly ineffective treatment planning. Additionally, an initial psychiatric assessment was not documented, and PC contacts occurred untimely. There were also unresolved diagnostic discrepancies between clinicians. Lastly, IDTT summaries did not provide sufficient updates on progress toward treatment goals, and treatment plans were not modified in response to worsening symptom severity while at NKSP.

**Patient B**

This 35-year-old patient was identified on the NKSP length of stay log as one of several RC EOP patients with lengths of stay exceeding 90 days. The patient was sentenced to 16 months for failure to register as a sex offender in the community, and he had an expected upcoming release date of April 4, 2022. On November 2, 2021, the patient transferred from county jail to NKSP for the current term, and it appeared that his total length of stay at the NKSP reception center was 121 days. Records noted that, during prior prison terms, the patient received mental health services at the EOP, MHCB, and acute levels of care.

At NKSP, the patient was provided with diagnoses of schizoaffective disorder, unspecified depressive disorder, and unspecified schizophrenia spectrum and other psychotic disorder. His prescribed psychotropic medications included Abilify and Effexor. The patient also had a seizure disorder for which he was prescribed Keppra. The patient presented with symptoms that included depressed mood, mood instability, disorganized thinking, poor impulse control, self-harm, traits of a personality disorder, and psychosis.

The initial mental health screening completed on November 4, 2021 occurred timely. While the initial primary clinician assessment occurred timely on November 10, 2021, the initial psychiatric assessment was not completed until December 31, 2021; at that time, the patient was housed in the MHCB due to auditory hallucinations, suicidal ideation, and a suicide attempt by cutting his wrist.

During SRASHE evaluations completed at NKSP, the patient reported a history of between five and eight suicide attempts. The patient also had several documented self-harm incidents while at NKSP; at least two incidents required multiple wound care follow-up appointments. His chronic suicide risk was consistently assessed as moderate in SRASHEs completed at NKSP, and acute risk ranged from low to moderate.

Between November 3, 2021 and February 18, 2022, the patient received eight CIT evaluations and was referred to the MHCB on four occasions. During a CIT evaluation on November 22, 2021, the patient informed the evaluator that this was his fourth time reporting suicidal thoughts without receiving "help" or "suicide watch." The CIT clinician noted on this date that the patient appeared to have removed or tampered with healing scabs on his left wrist, stated, "I just need help," was unable to "provide an answer as to what he wanted to work on in MHCB," and was ultimately not referred to the MHCB. On December 23, 2022, clinical notes indicated the patient had engaged in "superficial cutting" requiring wound care on the following day; however, the required Self-Harm Powerform in the healthcare record was not completed for this or any other incident of self-harm documented at NKSP.

In late December 2021, the patient received an RVR for fighting, resulting in ASU placement. The evaluating RVR MHA clinician determined there was a nexus between the patient's mental health symptoms and "fighting" behavior that resulted in the RVR. The corresponding recommendations for the hearing officer were appropriate.

On February 17, 2022, the IDTT convened and noted one positive higher level of care referral indicator for participation in less than 50 percent of treatment. The IDTT, however, failed to note that the patient also met the higher level of care referral indicator for three or more MHCB referrals within a six-month period. The IDTT did not refer the patient to a higher level of care on this date or document a sufficient non-referral rationale. Further, the IPOC section targeted only "impulsive behavior," and the required modifications to treatment in lieu of higher level of care referral did not explain or address the treatment refusals. Pre-release planning and self-harm also were not addressed in the treatment plans at NKSP. Additionally, the IDTT rationale for not including the patient in the Suicide Risk Management Program (SRMP) on this date was inaccurate, as it falsely stated that the patient had only two MHCB referrals.

The most recent IDTT completed at NKSP occurred on March 24, 2022. On this date, the IDTT noted that the patient struggled with "paranoia/hearing voices" and "mild depressed mood/anxiety." The IDTT failed to note any positive higher level of care referral indicators on this date, despite documentation that the patient continued to meet at least two of the objective higher level of care referral indicators. The IDTT also did not complete the required higher level of care non-referral justification or modify the treatment plan in lieu of higher level of care referral as required. Impulsive behavior remained the only treatment target listed in the IPOC section of the treatment plan. The IDTT did, however, include the patient in the SRMP with a recommendation for DBT.

During his final month at NKSP, clinical notes suggested that the patient began exhibiting improvement in his symptoms, functioning, treatment participation, and medication adherence. Progress notes completed that month also indicated that the patient had no further CIT evaluations or MHCB referrals.

**Findings**

While improvements were noted during the patient's final month at NKSP, the overall care provided to this patient was inadequate.

Problems were noted regarding suicide risk management practices, clinical documentation, and inadequate pre-release planning. RC EOP treatment plans repeatedly only targeted impulsive behavior with generic interventions provided; this despite documentation of ongoing suicidal ideation, possible safety concerns, repeated acts of self-harm, treatment nonadherence, and an upcoming release date. EOP treatment plans offered inaccurate information about higher level of care referral indicators, which appeared to contribute to inaccurate non-referral rationales and a lack of treatment plan modifications when indicated. Written case conceptualizations did not demonstrate an understanding of the patient's lack of treatment participation, self-harming behaviors, and frequent use of the CIT and MHCB. There also appeared to be a need for diagnostic clarification, as IDTTs continued to retain a diagnosis of schizoaffective disorder while often suggesting the patient was feigning symptoms of psychosis in progress notes. Lastly, CIT clinician documentation often failed to include sufficient MHCB non-referral rationales and appropriate interventions offered in lieu of MHCB referral.

**Patient C**

This 60-year-old male patient was receiving mental health services at the 3CMS level of care when he was placed in the ASU on January 17, 2022, after assaulting a peace officer. He was provided with a diagnosis of persistent depressive disorder, and was not prescribed psychotropic medications.

Initial PC and psychiatric assessments were attempted on January 20, 2022, but the patient refused to participate. Both were completed by healthcare record review and were adequate. The PC also completed a SRASHE by healthcare record review, which was also adequate. Attempts were made by both the PC and the psychiatrist to engage the patient every few days, but the patient continued to refuse mental health contacts, stating that he did not trust mental health staff, had no mental health issues, and was not interested in treatment with psychotropic medications. The patient was frequently hostile and angry during interactions with mental health staff. At the same time, the patient's mental status was described as within normal limits, having a clean cell, having no problems completing ADLs, and with no concerns reported by custody staff.

During an interaction with the psychiatrist on January 26, 2022, at cell front, the patient reported experiencing both suicidal and homicidal ideation but would not further elaborate. An emergent consult was placed, and the CIT responded. The patient was pleasant in his interactions with the CIT, stating that there was a misunderstanding as he was fine without suicidal or homicidal thoughts. Another SRASHE was completed, which continued to appropriately rate the patient's suicide risk as low. The patient was offered weekly group therapy, but he refused.

On February 2, 2022, an IDTT meeting was held without the patient present, but no reason for his lack of participation was documented. The patient was noted to have issues with anger, but did not want to engage in mental health services. The IDTT determined that the patient would be

removed from the MHSDS given that he was not interested in services and was not prescribed psychotropic medications. The IDTT documentation noted that the decision would be discussed with the patient following the meeting, but there was no entry in the healthcare record that this discussion occurred. A psychiatrist attempted to follow-up with the patient on February 23, 2022, but the patient refused the contact.

**Findings**

The care provided to this STRH patient was adequate.

Clinicians repeatedly attempted on multiple occasions to engage the patient in mental health services. Minor concerns that were noted included the lack of documentation for the patient's absence at the initial IDTT, as well as a lack of documentation that the IDTT decision was discussed with the patient.

**Patient D**

This 27-year-old male patient was provided with a diagnosis of bipolar II disorder, and was prescribed valproic acid. He was placed in the ASU on November 2, 2021, but was not included in the MHSDS at that time.

On December 3, 2021, the patient submitted a health care services request form 7362 to see the psychiatrist to restart medications he had been previously prescribed. The patient was seen by a psychiatrist and started on valproic acid on December 7, 2021. Documentation included informed consent for the medication, but a comprehensive initial psychiatric assessment was not documented on that date. The patient was seen for an initial PC assessment and SRASHE on December 10, 2022. Both were adequately completed. The patient was described as exaggerating mental health symptoms. He was placed at the 3CMS level of care as he was prescribed psychotropic medications. Documentation noted that the ICC and IDTT were pending, however, the patient was seen in ICC on November 10, 2021.

The patient attended a treatment group on December 14, 2021. He was seen for a full initial psychiatric evaluation on December 15, 2021, which was comprehensive. The patient was seen for PC contacts on December 17 and 21, 2021. The subjective section of each note consisted of content taken directly from the patient's initial PC assessment with minimal changes, including documentation that the patient was exaggerating symptoms. However, both notes included contradictory information in the assessment section of the note, including different symptom ratings that appeared more accurate. Both notes discussed the patient's depressive feelings regarding the time of year and frustrations over yard "politics."

The patient was seen for an initial IDTT on December 22, 2021. The treatment plan noted that the patient wanted to work on decreasing depression, anxiety, and anger. A list of appropriate interventions was included, however, no IPOCs were entered into the treatment plan. Later that day, an IPOC for anger was documented in the healthcare record. The patient was seen by a psychiatrist on December 22, 2021 to discuss his medication and to review laboratory studies. The patient transferred to another facility on December 28, 2021.

404

**Findings**

The care provided to this STRH patient was adequate; however, two PC progress notes were repetitive, confusing, and internally inconsistent.

**Patient E**

This 56-year-old male patient was provided with a diagnosis of affective disorder. He was prescribed oxcarbazepine and sertraline with reported medication adherence. He was housed in the STRH and received mental health contacts consistent with those requirements, including weekly PC contacts, weekly groups, and monthly psychiatric contacts.

This patient consistently refused all mental health individual and group contacts throughout the review period. The patient was seen either at cell front or in the yard; those brief nonconfidential contacts only allowed for incomplete assessments of the patient and primarily relied on self-report and limited observation. During these contacts, the patient reported experiencing a moderate degree of anxiety, but was functioning adequately otherwise. PC and psychiatric documentation were redundant and included little updated information across contacts. At times, this resulted in PC progress notes that were internally inconsistent in that they contained historical information that was entered into the healthcare record as if it were current, yet that information was later contradicted in the same note. Another concern was noted in the PC notes documentation. The patient reported feeling anxious to the PC; however, the PC documented offering the patient consultation with the psychiatrist for medication management rather than providing the patient with non-pharmaceutical counseling interventions to address anxiety. Also, several PC notes indicated that cell-front contacts with the patient were conducted by the PC and a correctional officer. It is unclear why a correctional officer was included in those contacts.

An updated PC assessment and IDTT meeting with treatment plan were completed in early November 2021. The patient refused to attend either. The PC assessment noted that it was completed because the patient was new to the institution, which was inaccurate. The PC assessment included little to no updated information, which resulted in inaccuracies, again in the form of historical information presented as current. IDTT documentation noted that the patient refused to attend due to social anxiety. While the discussion of the patient's presenting symptoms focused on his anxiety, the IPOC focused on depressive symptoms and was carried forward from the patient's prior treatment plan; the patient denied the presence of depressive symptoms for several months. Depressive symptoms were not covered in any manner in the IDTT documentation other than in the IPOC. The patient appeared to have met the goals outlined in the IPOC, yet this was not documented. A mental health progress note about the ICC on November 10, 2021, was generic and discussed the PC's participation virtually but made no reference to the patient or what was discussed regarding the patient.

The patient was scheduled for parole on January 30, 2022. Discussion about upcoming release was first documented in the healthcare record when the patient discussed the issue with the PC at cell front on December 9, 2021. The PC indicated that the release planner would be contacted, and the release planner met with the patient on December 29, 2021. Release planning appeared adequate; however, of concern was the lack of documentation by the psychiatrist indicating knowledge of the patient's upcoming prison release.

**Findings**

Although this STRH patient was seen for the required frequency in clinical contacts and group offering, the care provided was inadequate.

This finding of inadequacy was made as the PC did not address the patient's identified symptoms in treatment interventions or in treatment planning.  Additionally, redundant, contradictory, and often inaccurate documentation was provided by the PC and psychiatrist.

**Patient F**

This 33-year-old male patient was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and unspecified depressive disorder.  He had been prescribed olanzapine, but due to medication nonadherence, the medication was discontinued.

The patient was transferred to the ASU at the 3CMS level of care on January 4, 2022 when he refused to answer questions during the pre-placement screening; as a result, he was referred for mental health consultation.  On January 6, 2022, the patient was seen by a PC in response to the referral but also to complete an initial PC assessment and SRASHE.  The patient was on confined to quarters (CTQ) status, so the assessments were completed at cell front.  The content was adequate given the nonconfidential nature of the contact.  An RVR mental health assessment was completed on January 10, 2022 that found no nexus between the patient's assaultive behavior and his mental illness.  Upon placement in the ASU, the patient had an active IPOC for hallucinations, and the PC documented that the patient was not experiencing hallucinations.  A contact on January 11, 2022 noted that the patient wanted to work on reducing his anxiety, yet the following week the PC noted that the patient's treatment goals would address treatment nonadherence as the patient was often refusing medications and not participating in treatment.

An initial IDTT was held on January 19, 2022, and an IPOC for treatment nonadherence was included in the treatment plan.  The goal was to encourage the patient to attend at least one out-of-cell session each month.  The IDTT documentation noted medication nonadherence reported by the psychiatrist, and medication adherence reported by the psych tech, without any acknowledgement of this discrepancy nor attempt to reconcile the varied reports.

On January 21, 2022, the patient was referred for evaluation by the PC after engaging in "gassing" and presenting with hostility.  On January 22, 2022, he was referred to the CIT when he was described as rambling, perseverative, and angry about placement in an "AdSeg cell."  It was unclear from the documentation if the patient's cell had been moved after the gassing incident and the patient was angry about the move, or if he was generally angry about ASU placement.  He had been housed in the ASU for nearly three weeks at that time.

The patient was offered weekly contacts with a PC which he refused consistently and was seen at cell front.  Documentation was redundant each week, often containing contradictory information including statements that the patient was "rude, disrespectful, and antagonistic" in the subjective section of the note, only to state that the patient was "cooperative and engaged" in the mental status section of the note.  One PC consistently included the same grammatical error from note to note, revealing that the note was neither reviewed nor updated each week.  The patient also

consistently refused psychiatric contacts, which were offered monthly. The content of psychiatric progress notes remained largely unchanged each month, noting the same quote from the patient and documenting poor medication adherence. On February 10, 2022, the patient reported that he no longer wanted to take psychotropic medication and refused to sign a consent form for olanzapine, so the medication was discontinued on that date. The patient consistently refused weekly offered groups.

In March 2022, the patient began covering his cell window and not responding to staff approaches. On March 21, 2022 the PC saw the patient for "a weekly contact and 2 consults ordered by PT stating 'I/P observed responding to internal stimuli, looking over his shoulder and having a separate conversation. When describing his situation, I/P used the words 'we' and 'us.'" The PC noted that the patient was psychotic responding to internal stimuli with intermittent agitation and a recent RVR for aggravated assault on a correctional officer. Despite this change in presentation, the PC note continued to include the same statement from prior notes that custody staff reported "no behavioral concerns." The plan section of the note was unchanged from prior entries, noting that the patient was reminded to report thoughts of self-harm to custody staff or psych techs, despite the patient having no history of such behavior, and to submit health care requests as needed. The plan documented was to see the patient again the following week and to consider increasing the level of care at the next IDTT.

On March 24, 2022, three days after that PC contact, the patient was seen by the CIT when he required MHCB admission.

**Findings**

The care provided to this STRH patient was inadequate.

Although he was offered required treatment contacts, the patient's history included psychosis and violence that were not addressed by the IDTT. Additionally, documentation revealed minimal efforts to engage the patient in treatment, despite treatment adherence as the only goal included in the treatment plan. Documentation by both the PC and the psychiatrist was redundant and inadequate. Of concern was the decompensation that occurred following discontinuation of the patient's medication that was not appropriately addressed; subsequently, he required placement in the MHCB.

**Patient G**

This 55-year-old-patient returned to ASP on February 14, 2022, after he had been out to court since August 2021. He was provided with a diagnosis of unspecified bipolar and related disorder. He was prescribed divalproex sodium. He was placed in the STRH upon his return to CDCR as this was his prior CDCR placement.

Records from the county jail where the patient was housed while out to court revealed that he was not prescribed psychotropic medication there. The patient was seen for a mental health receiving screening on February 17, 2022, and reported that he was functioning well without medications. A SRASHE was completed on that date that was adequate in content but the reason for the evaluation was erroneously noted as related to an MHCB admission. Over the following

week, the patient was seen for initial psychiatric and PC assessments. It was noted that the patient refused the psychiatric assessment, so minimally updated information was documented. It could not be determined from the documentation if the patient was seen in a confidential setting for his initial PC assessment, but the information in the assessment was minimally updated from prior documentation. The updates included fewer than three sentences related to the patient's housing and charges; no clinical information was updated. The patient was seen for an initial IDTT meeting on March 1, 2022, and an IPOC was developed to address the patient's depressed mood. Goals and interventions were adequate, however, the clinical summary included only a mental status examination and no additional clinical information.

The patient was offered weekly PC contacts and group sessions which he routinely attended. PC documentation was repetitive and often contained the exact same language each week, including inaccurate information. For example, the patient was started on medication on March 8, 2022, but PC notes continued to indicate that the patient was not prescribed medications until March 24, 2022. The PC noted in a progress note on March 9, 2022 that the patient had restarted medications, despite noting the patient was not prescribed medications later in the same note; therefore, the error was clearly related to unchanged material copied each week and not a lack of awareness regarding medications. PC notes evidenced no clinical interventions. The patient was seen for psychiatric contacts more frequently than minimally required, and the documentation of those contacts was minimally adequate.

**Findings**

The care provided to this STRH patient was inadequate, due to the lack of clinical interventions provided by the PC, as well as PC documentation that was minimally updated, redundant, inaccurate, and internally inconsistent.

**APPENDIX C-5**
**Folsom State Prison (Folsom)/Folsom Women's Facility (FWF)**
**(May 17, 2022 – May 19, 2022)**

**Patient A**

Patient A's chart was reviewed after observing his IDTT on May 17, 2022, during which time the treatment team decided to remove him from MHSDS. The purpose of the review was to determine if a reduction in his level of care from 3CMS to GP was appropriate.

Patient A was a 39-year-old male serving his second term for assault with a deadly firearm. He was given a five-year sentence with an earliest parole release date of March 3, 2024. He entered CDCR at WSP on November 4, 2021 and was transferred to Folsom on February 16, 2022.

On the initial health screen at WSP, this patient reported a history of mental health treatment and his mental health screen revealed psychopharmacological treatment with Remeron and Seroquel for anxiety while withdrawing from heroin while he was in the county jail. On December 29, 2021 he was administered an MHPC assessment. The assessment revealed an extensive drug and alcohol history starting at 12 years of age. As an adult, he had a history of mixing heroin and methamphetamine daily, for years. The evaluator reported he was hyperverbal, talking loudly and rapidly. His thinking was described as rambling and tangential. He was cooperative, but distracted. A diagnosis of an unspecified bipolar and related disorder was rendered and he was placed in MHSDS to receive 3CMS level of care.

Six weeks later he was transferred to Folsom and administered an MHPC evaluation, 12 days after his arrival on February 28, 2022. He denied having any mental health problems and requested removal from the mental health treatment program. He was quarantined during the initial evaluation and agreed to meet with his primary clinician after he was released from quarantine to discuss possible removal from the mental health program. During a MAT evaluation on April 13, 2022, he reported a history of treatment with Suboxone and requested it be reinitiated. On April 16, 2022 he received two RVR's for unauthorized possession of drug paraphernalia and possession of alcohol. On April 18, 2022 he was placed in ASU for a toxicology investigation. He received an MHPC initial assessment in ASU on April 16, 2022 and was scheduled for an ASU 3CMS initial IDTT. The mental health evaluation noted he recently submitted a 7362 due to having "bad thoughts". He said he was unable to sleep and was going through withdrawal. During his ASU 3CMS initial IDTT, he was agitated because the meeting was cutting into his yard time; thus, he refused to discuss his treatment goals. On April 29, 2022 he received mental health evaluations for several RVRs. The evaluations concluded he had a history of mental illness which manifested itself in symptoms of depression and mania; however, at the time of the incidents, his mental illness did not appear to strongly influence his behavior.

His primary clinician met with him weekly for the next four weeks, discussing removal from MHSDS. His mental status remained stable and he continued to request removal from the mental health program. He repeatedly stated that he did not want to be in the mental health program or be treated with Suboxone due to patient politics. On May 16, 2022 he was

administered a SRASHE which revealed a low chronic suicide risk and a low acute suicide risk. During an IDTT on May 17, 2022, he was removed from the mental health treatment program and he agreed to meet with his primary clinician in one week for a follow-up session. The patient and his primary clinician met on May 25, 2022. He denied any mental health problems and his mental status was stable.

**Findings**

Patient A received adequate mental health care at Folsom. The patient had an extensive history of mental illness and drug and alcohol abuse, resulting in limited insight, poor judgment and unpredictable behavior. While at Folsom, he struggled, vacillating between requesting MAT and mental health treatment on April 13, 2022 and April 16, 2022 respectively. He later refused both MAT and mental health services due to patient politics. His primary clinician was aware of his history and current struggles, meeting with him weekly to determine if he should have remained on or been removed from MHSDS. Despite his unstable history, his mental status was stable when he was requesting MHSDS removal. He was not motivated for treatment and did not meet criteria for involuntary medications. The treatment team monitored and evaluated him for four weeks before removing him from MHSDS, and subsequently followed-up meeting with him a week later to make sure he was safe. The team also made sure he knew how to access mental health services.

**Patient B**

Patient B's chart was randomly selected as a patient at the 3CMS level of care.

Patient B was a 44-year-old male, who was incarcerated in 2003 at approximately 26 years of age. He was serving an in determinant life sentence for attempted murder. His record indicated a history of depression prior to being incarcerated. He also attempted suicide once as an adolescent by overdosing on aspirin. He started receiving mental health treatment when he was incarcerated. He was transferred to Folsom on May 9, 2006. He met with his primary clinician twice during the review period. To help place these two sessions in context, an IDTT was reviewed from September 17, 2021, along with progress notes from September 16, 2021, and April 27, 2022.

This patient was diagnosed with an unspecified depressive disorder, which had not been treated with psychotropic medication for approximately the past four years. His primary clinician reported he continued to experience episodes of depression characterized by a low mood, frustration and anhedonia. On September 16, 2021 he rated his depression as five on a scale of zero to ten. His treatment plan goals were to have him rate his symptoms as two or below over the next year, and to have a PHQ-9 depression score (a multipurpose instrument for screening, diagnosing, monitoring and measuring the severity of depression) in the minimally depressed range between 0 - 4 for six months. Current stressors impacting his ability to achieve those goals included a recent parole board denial and starting a new job after working with a special project since 2008.

All treatment team members were present for his IDTT, except for the patient, who was unable to attend due to COVID-19 precautions. The primary clinician reported he and the patient

reviewed and agreed upon his treatment goals/expectations. A review of the two progress notes from the reporting period (November 29, 2022 and February 17, 2022) and a progress note one month after the reporting period (April 27, 2022) revealed almost identical notes, to include the mental status examinations. Additionally, there was no documentation of his PHQ-9 depression score or the details of his symptom ratings which would be used by the IDTT to decide if he could be removed from the mental health program.

**Findings**

Based on a chart review, the mental health care delivered to this patient was inadequate. The severity of specific depressive symptoms and the specific interventions being used during the reporting period were unclear. His depression on September 16, 2021 and February 17, 2022 was rated as five out of ten and six out of ten, indicating increased depression. The three progress notes over seven months were identical, and did not address the increased depression. Additionally, the notes did not contain PHQ-9 scores or identify specific treatment interventions, making continuity of care very difficult.

**Patient C**

Patient C's chart was randomly selected as a patient at the 3CMS level of care.

Patient C was a 54-year-old male serving a life sentence. He arrived at Folsom in June 2007. He was serving an indeterminate life sentence. During the reporting period, he had two individual treatment sessions and attended a weekly "existential lifer's group." To place those two individual sessions into context, an IDTT was reviewed from August 27, 2021, along with progress notes from June 11, 2021 and May 11, 2022.

Patient C had an extensive history of drug and alcohol abuse, but no history of mental health treatment until he referred himself to mental health in November 2017. On December 1, 2017 he was placed in MHSDS at the 3CMS level of care. Subsequent significant events included the death of his father in June 2019 and a serious drug overdose resulting in hospitalization in August 2019, after 15 months of sobriety. He was diagnosed with an opioid use disorder and an unspecified depressive disorder. He was not treated with psychotropic medication.

Several concerns include the August 27, 2021 treatment plan's case formulation consisting of a note stating "will need to update after meeting with [inmate patient] IP for a few more sessions." It was unclear why the primary clinician was unable to document a case formulation since this patient was assigned to him over one year before, in February 2020. The primary clinician's documentation suggested this patient and the PC had a therapeutic alliance, resulting in trust and self-disclosure. The treatment sessions appeared to be helpful, which made it difficult to understand why the primary clinician did not document a termination when the patient was reassigned to another clinician. The patient was irritated on February 24, 2022 when he discovered, during a treatment session, that he had a new primary clinician. The record did not document an explanation for the change. Additionally, the patient's understanding of the rationale for the change was unclear.

**Findings**

The mental health care delivered to this patient had been adequate, until there was a change in primary clinicians without informing the patient. Changing his primary clinician without informing the patient and providing an explanation for the change disrespected the patient and undercut the therapeutic foundation developed over two years, resulting in inadequate care.

**Patient D**

Patient D's chart was randomly selected as a patient at the 3CMS level of care.

Patient D was a 59-year-old male who was incarcerated since 1998. He was serving an indeterminant life sentence. His developmental history was traumatic due to witnessing violence in his community and his father physically abusing his mother. He also witnessed her traumatic shooting. As an adolescent, he attempted suicide twice, once by attempting to jump from a three-story building and subsequently by overdosing with pills. After these events he began receiving mental health services in the community.

He arrived at Folsom in January 2013. He lived in general population from 1998 until May 2002, when he was transferred to an EOP level of care. He received EOP services for seven months through November 2002, when his level of care was reduced to 3CMS in ML. He was diagnosed with a major depressive disorder. He was not treated with psychotropic medication.

During the reporting period, he had three individual confidential treatment sessions with his primary clinician, one in October 2021, one in January 2022, and one in March 2022. He also attended a weekly existential lifer's group. To place these three sessions in context, his IDTT on August 21, 2021 was reviewed along with progress notes from August 2021 and June 2022.

This patient's treatment plan and progress notes from the confidential treatment sessions indicated the primary clinician and patient had a therapeutic relationship. The primary clinician's case formulation demonstrated an understanding of this patient's mental health issues and the patient's self-disclosures revealed feelings of safety and trust.

Concerns included a paucity of historical information, vague treatment goals, and unclear treatment interventions. A review of the three progress notes from the reporting period, along with two other notes revealed an informative new issues/complaint section and an informative current status of illness section; however, the mental health assessment section, the assessment/progress towards discharge section, and the plan/disposition section were uninformative and almost identical. Additionally, the patient appeared to have plateaued at a rating of three out of ten during the reporting period, with no comment on the specific troubling symptoms or specific interventions being used to reduce the symptoms. To ensure continuity of care, the primary clinician needed to identify the specific mental health issues / target symptoms, the specific treatment outcome expectations, and the specific coping strategies which were being developed.

**Findings**

The mental health services delivered to this patient were marginally adequate. The patient was engaged in treatment and he appeared to be gaining insight into his underlying psychological state; however, the severity rating of his depressive symptoms remained unchanged.

**Patient E**

Patient E's chart was reviewed after observing his IDTT on May 17, 2022 when the treatment team decided to lower his level of care. The purpose of the review was to determine if he was ready for a reduced level of care, from 3CMS to GP.

Patient E was a 63-year-old male convicted of robbery and murder. He was serving an indeterminate life sentence which started in 2005. He entered Folsom on June 22, 2005 and started receiving mental health services to assist in dealing with the anniversary death of three of his children. The focus of treatment evolved from issues involving depression (i.e., developing coping skills to help him manage his depression and identifying triggers which exacerbated his depression) to managing issues related to his life sentence and to gaining insight into the dynamics underlying his criminal behavior as an adult. Among these treatment goals, he also planned to contact five transitional homes in preparation for his BPH.

Patient E had two confidential treatment sessions during the reporting period, one in November 2021 and another in February 2022. To place these two sessions into context, his IDTT from June 25, 2021 was reviewed along with therapy progress notes from June 2021, September 2021 and May 2022. The six progress notes reviewed from June 9, 2021 through June 21, 2022 were generally identical, with few exceptions. Occasionally a word would be changed in the mental status section and the current state of illness section. For example, the current state of illness section from November 19, 2021 noted the patient was "stable/asymptomatic" and on February 3, 2022, it noted the patient was "stable/symptomatic." The clinician did not clarify the patient's symptoms on February 3, 2022. The assessment/progress towards discharge section of the progress notes was also identical, stating "history of depressive disorder and PTSD." Overall, the case conceptualization, which included developmental traumas, underlying dynamics, unresolved issues, and treatment goals, was adequate, along with proposed interventions.

**Findings**

The mental health care delivered to this patient was inadequate. There was no evidence that the treatment plan was implemented, or that the patient's mental status was improving. There were progress note sections, including documentation of assessment/progress towards discharge section that were identical, and had inconsequential changes. Despite an appropriate case formulation, the record did not adequately document treatment or outcomes.

**Patient F**

Patient F was randomly selected as a patient at the 3CMS level of care.

Patient F was a 44-year-old female who arrived at FWF on May 10, 2021 from CIW. She was serving a 12-year sentence to serve 85 percent for elder abuse, battery, and assault with a deadly

413

weapon.  Her earliest parole release date was June 1, 2023.  She was diagnosed with an unspecified anxiety disorder and an opioid use disorder.  She was treated with Remeron and suboxone.

Her developmental history was characterized by parental abandonment, sexual abuse, self-injurious behavior, a suicide attempt at 15-years of age, and substance abuse (Oxycontin Hydrocodone, Xanax, Valium, Klonopin, Seroquel, and heroin).  She reported an extensive history of anxiety and depression with minimal mental health treatment, except for postpartum depression counseling at 26 years of age and marriage counseling at 28 and 29 years of age.  She completed the 11th grade, was married and divorced with one daughter.

She entered CDCR in 2016 and received 3CMS level of care from 2016 through 2019.  She also was admitted to MHCB twice in August 2017 due to what she says was a PREA related issue rather than suicidality.  Between May 2021 and February 2022, while at FWF, she requested mental health services ten times for anxiety and/or depression prior to being placed in MHSDS.  A mental health primary clinician met with her nine times and a psychiatrist met with her once on October 21, 2021.  They provided brief supportive counseling for her anxiety and depression, and they offered mental health services; however, she declined their offers saying she was not sure if she was ready for psychotropic medication.  She did not appear to understand or consider the benefits of nonpharmacological treatment.  She also participated in the MAT program and was treated with Suboxone.

After much ambivalence, she requested mental health services (medication) and received a primary clinician assessment on February 28, 2022 along with the PHQ-9 and GAD-7 which assisted in identifying specific depression and anxiety symptoms.

The IDTT met on March 1, 2022 in absentia due to COVID-19 restrictions.  Attendees included the PC, correctional counselor, treating psychiatrist, and an additional provider.  The patient's problems were operationalized, goals were identified, and vague interventions were listed without frequency and timeframes.  Psychiatry did not contribute to the treatment plan; however, the team noted the patient would be referred to psychiatry for an evaluation.

The psychiatrist who attended the IDTT was not the same psychiatrist who conduct the initial psychiatric assessment which was completed three days after the IDTT on March 4, 2022.  The patient was prescribed Remeron.  The record did not contain a master treatment plan psychiatry review.  She had a follow-up appointment with psychiatry within 60 days and a follow-up appointment with her primary clinician within 90 days.  Psychiatry continued her prescription of Remeron without altering the dose schedule and her primary clinician reported practicing CBT skills during the session, assigning CBT skills homework, encouraging both exercise and a maintenance of social connections, and practicing skills to reduce bodily stress (deep breathing, progressive muscle relaxation, visualization/imagery).  The Remeron was reportedly helping her sleep, but specific targets and progress attributable to the nonpharmacological interventions were unclear.  The primary clinician's progress note from May 23, 2022 reported using interventions which were not clearly identified in the treatment plan.  Finally, it was unclear how the primary clinician was going to teach the patient how to identify cognitive distortions, reframe maladaptive thoughts, and use visualization/imagery and progressive muscle relaxation by only meeting with her once every 90 days.

**Findings**

This patient's psychiatric care was marginally adequate, but the overall mental health care was inadequate.  This patient was primarily interested in psychopharmacological treatment.  There was no documentation indicating the patient was motivated to learn CBT skills, exercise, or learn and practice stress management skills.  Given her history of substance use disorders and tendency to rely on prescribed medications and illicit drugs, the treating psychiatrist should have actively participated in the IDTT with the primary clinician to increase the likelihood that she would seriously try to learn and practice the above-mentioned skills by her estimated parole/release date (EPRD) of June 1, 2023.  Additionally, the primary clinician's method of measuring progress should have been better defined (i.e., quarterly re-administration of the GAD-7 and PHQ-9).  Finally, the nonpharmacological interventions being used, which were not clearly specified in the treatment plan, could not be learned and practiced if the patient's motivation was low and if the clinician only met with the patient once a quarter, (four times before her EPRD).

**Patient G**

Patient G was randomly selected as a patient at the 3CMS level of care.

Patient G was a 50-year-old female who entered CDCR at the Central California Women's Facility (CCWF) in October 2021.  She was transferred to FWF in December 2021 and had an earliest parole release date of July 23, 2022.

She had an unstable and traumatic developmental history with reports of being sexually abused by a cousin and by a daycare worker.  She left high school with her boyfriend when she was 16 years old.  She later achieved a GED.  She was married, had a child, and divorced in 2010, which was when she began abusing alcohol and methamphetamine resulting in homelessness.  She became suicidal and was psychiatrically hospitalized twice, once in 2018 and again in 2019.  While in county jail, she was briefly treated with lithium and Zoloft.

While at CCWF, she requested an appointment with mental health in December 2021.  She was transferred to FWF on December 16, 2021, prior to meeting with mental health.  After arriving at FWF, she submitted a routine mental health consult involving sleep problems.  She was evaluated on December 27, 2021 by a social worker who referred her to mental health for an evaluation.  She was evaluated within one week.  Her presenting problems were insomnia and a bipolar disorder with hypomania.  She was subsequently referred to psychiatry and scheduled for an IDTT.  During the IDTT, held on January 18, 2022 she was diagnosed with a bipolar disorder and an IPOC for hypomania was initiated.  All treatment team members were present except for the patient due to COVID-19 restrictions.  There was no documentation of psychiatry's contributions and there was no master treatment plan psychiatry review.  She was evaluated by psychiatry three days after the IDTT on January 21, 2022.  The psychiatrist who attended the IDTT and conducted the initial assessment was not the treating psychiatrist who met with her in February, March, April and May, 2022.

Since the IDTT, her primary clinician met with her in January and April 2022.  Psychiatry met with her every 30 days after the initial psychiatric assessment.  Her primary clinician provided

education and skills training, preparing her for possible reentry into the community in July 2022. Her treating psychiatrist worked closely with her, adjusting medications to reduce her symptoms. Evaluations and progress notes from both her primary clinician and treating psychiatrist were adequate.

**Findings**

The mental health treatment provided to this patient was adequate.  The evaluations concluded she met the criteria for a bipolar disorder diagnosis.  The treatment team was working closely with her and the institutional reentry coordinator to ensure continuity of care when she transitioned to the community.  Clinicians provided appropriate services to stabilize the patient and prepare her for reentry.

**Patient H**

Patient H was randomly selected as a patient at the 3CMS level of care.

Patient H was a 63-year-old female who was serving her first term, sentenced to five years to serve 85 percent for arson which occurred while she was under the influence and had an intent to die.  She had been on probation for assault since 2019. Her earliest parole release date was October 27, 2023.

She entered CCWF in September 2021 and was transferred to FWF in November 2021.  She was evaluated by her primary clinician on November 19, 2021 and by her treating psychiatrist on November 20, 2021.  They discovered she had an extensive history of drug use.  She started using methamphetamine and alcohol during adolescence, and used them daily for the next 50 years, except for two years when she was sober and able to maintain a relationship and a job. She also had a history of attending multiple drug and alcohol treatment programs.  In December 2021, she reported having been sober for the past 20 months.  Her SRASHE revealed a moderate chronic suicide risk level and a low acute level.  She reported a history of having been diagnosed with a bipolar disorder in 2010, and having been treated with Zoloft for anxiety and depression. The treating psychiatrist continued her prescription of Zoloft.

A master treatment plan psychiatry review was completed and an IDTT met on November 30, 2021.  All IDTT members to include the patient were present.  She was diagnosed with an adjustment disorder with mixed anxiety and depressed mood, and with substance use disorders. The treatment team also noted she had a history of being diagnosed with a bipolar disorder, unspecified.  During the IDTT, she reported feeling good and agreed with the treatment goals of reducing anxiety and depression. Interventions were vague and the frequency and time frames were not stated.  Despite these vague interventions, the clinicians provided timely and efficacious care.  The PC and treating psychiatrist responded to three urgent/emergent consults (on December 28, 2021 involving insomnia, on March 8, 2022 involving bullying, and on June 3, 2022 involving erratic moods, irritability, and crying) in a timely and appropriate manner.  The PC met with her almost monthly, providing supportive counseling and basic CBT and DBT skills training.  The treating psychiatrist also met with her almost monthly, adjusting and readjusting her medications until she was relatively stable with Zyprexa, Remeron, and hydroxyzine.

416

## Findings

The mental health care provided to this patient was adequate. She was a fairly complex patient with a history of extensive substance use disorders and symptoms consistent with a bipolar disorder. She was motivated for both mental health and MAT/ISUDT treatment. She worked well with both the primary clinician and treating psychiatrist. Clinical assessments of the situations were comprehensive and interventions were effective.

## Patient I

Patient I was randomly selected as a patient at the 3CMS level of care.

Patient I was a 47-year-old female who was incarcerated at CCWF in April 2021 and transferred to FWF in June 2021. She was convicted of robbery in 2018 and arrested for a probation offense. Her earliest parole release date was July 20, 2023.

Her mental health history started in childhood when she was diagnosed with ADHD and treated with Adderall. As an adult, she was diagnosed with anxiety, depression, a bipolar disorder (i.e., rapid cycling, racing thoughts, and euphoria/depression), opioid use disorder and a posttraumatic stress disorder after being raped in 2014. She attempted suicide twice. The first attempt occurred in 2006 when she attempted to overdose with pills related to being divorced and depressed. Her second attempt occurred in 2016 when she drank rubbing alcohol. She received inpatient treatment for approximately 72 hours after each suicide attempt. At FWF she was being treated by her primary clinician with supportive counseling, education, and CBT and DBT interventions. Psychiatry was treating her with Zoloft and Lamictal.

She also had an extensive drug and alcohol history. She started drinking alcohol at 13 years of age. She reported drinking heavily in 2008 after her mother's death and after being raped in 2014 until she was arrested. She had a history of being treated in Alcoholics Anonymous and in both inpatient and outpatient treatment mental health programs. Her drugs of choice were cocaine, hallucinogens, marijuana, and methamphetamine. She started using illicit drugs at 14 years of age, stopped at 19 years of age, and restarted at 41 years of age. She was participating in MAT, being treated with Suboxone.

For the past year, Patient I's treatment at FWF consisted of individual sessions with her primary clinician, treating psychiatrist, and MAT clinicians. She received an initial PC assessment on July 9, 2022, and participated in an IDTT meeting on July 13, 2022. The chief psychiatrist completed the master treatment plan psychiatry review and attended the IDTT in place of the treating psychiatrist. An initial psychiatric assessment was never completed. The treating psychiatrist met with the patient approximately four weeks after the IDTT, and subsequently met with her five times in the past ten months, adjusting her medications. Her primary clinician met with her at least every 90 days. Their confidential contacts focused on her functioning, symptoms, and progress.

## Findings

Mental health treatment provided to this patient was marginally adequate. She was a complex patient struggling with substance use disorders, dealing with ambivalence regarding

417

psychopharmacological treatment, and learning adaptive coping skills.  The stability of her mental status, which was closely monitored, was tenuous, and progress was slow.  While the minimum 90-day timeframe was consistent the Program Guide, given her instability, insight, and motivation, more frequent session would have been appropriate to help her master CBT and DBT skills.

**Patient J**

Patient J was randomly selected as a patient at the 3CMS level of care.

Patient J was a 38-year-old female serving her second term, convicted of robbery.  She entered CDCR on April 12, 2021 and was transferred to FWF on June 7, 2021.  Her earliest parole release date was February 3, 2024.

Her chart revealed an initial contact note within seven days of her arrival on June 14, 2021, which was completed by a psychiatrist not assigned to the patient.  The psychiatry note was brief, noting adjustments to medications pending an initial psychiatric evaluation; however, an initial psychiatric assessment was never completed.  The chief psychiatrist met with her 11 days after she arrived, on June 18, 2021, and documented the contact in a progress note, rather than documenting an official initial psychiatric assessment.  In the note's plan/disposition, the chief psychiatrist prescribed Topamax, and strongly encouraged her to attend recovery groups due to her drug abuse exacerbating her mental health symptoms.  The patient was scheduled for an initial psychiatric assessment on July 1, 2021; however, that appointment was cancelled.  She met with the chief psychiatrist again on July 14, 2021 for a follow up appointment.  She never received an official psychiatric assessment.

A social worker also met with her eleven days after she arrived on June 18, 2021 and performed an initial PC assessment.  The evaluation revealed an extensive history of mental health problems and substance use disorders.  She was psychiatrically hospitalized in 2018 and reported being diagnosed with schizophrenia, a depressive disorder, and a borderline personality disorder.  Her symptoms included occasional auditory hallucinations starting at 17 years of age, mania, and anxiety.  She also reported one suicide attempt related to her grandmother's death while she was incarcerated in 2012.  Her alcohol and drug abuse history also began at 17 years of age, and likely contributed to her mental health symptoms.  She reported receiving treatment which resulted in sobriety at 36 years of age.

Her IDTT and the master treatment plan psychiatry review were completed on June 22, 2021, fifteen days after arriving at FWF.  The chief psychiatrist who met with her on June 18, 2021 completed the master treatment plan psychiatry review.  The patient's primary clinician, correctional counselor, and the chief psychiatrist were present for the IDTT; however, the patient was absent due to COVID-19 restrictions.  The social worker who completed the initial PC assessment was also absent, and thus unable to contribute to the development of her treatment plan.  Additionally, there was no documentation indicating that her primary clinician met with her before or after the in absentia IDTT.  Her primary clinician met with her for an initial contact approximately 90 days after the IDTT on September 13, 2021.  During their initial contact, there was no documentation that the primary clinician discussed her mental health treatment plan,

diagnoses, treatment goals, or interventions.  Her treating psychiatrist met with her on October 16, 2021 for an initial contact, approximately 120 days after the IDTT.

Subsequently, her primary clinician met with her every 30 to 60 days for the first five months of treatment, and then every 90 days for the next five months.  The progress notes were substantial, clarifying and resolve presenting psychological problems with education and CBT skills.  The notes demonstrated the presence of a therapeutic relationship and good clinical practice by closely monitoring her mental status, following the death of her brother in December 2021.  Her treating psychiatrist met with her every 30 to 60 days from October 2021 through February 2022 and then did not meet with her for approximately 120 days.  He was treating her with Clonidine which helped reduce her anxiety to the minimal range on the GAD-7, for six months.

**Findings**

The mental health care provided to this patient was marginally adequate.  Her ability to manage her anxiety was improving despite a late initial PC assessment, the absence of an initial psychiatric evaluation, a late initial IDTT, and changing clinicians during her first three to four months at FWF.

# APPENDIX C-6
## CORRECTIONAL TRAINING FACILITY (CTF)
### (May 24, 2022 – MAY 26, 2022)

**Patient A**

This 40-year-old male patient was provided with diagnoses of bipolar I disorder, PTSD, attention deficit disorder, adjustment disorder with anxiety, and substance use disorder.  Of note, a diagnosis of psychotic disorder with hallucinations was also listed in the healthcare record but not acknowledged by the psychiatrist or PC.  The patient was prescribed venlafaxine.  He was adherent with his medication, but plans were in place to taper and eventually discontinue this medication.

The patient transferred to CTF on October 18, 2021.  An initial PC assessment and SRASHE were completed on November 12, 2021.  No initial psychiatric assessment was documented.  An IDTT was held on November 18, 2021 with the patient present.  The psychiatrist present at the IDTT was not the treating psychiatrist, which required some issues to be deferred.  Given the patient's medical needs, the PC contacted the medical provider on December 2, 2021 to determine if integrated care was needed.

The patient was seen by the psychiatrist on January 10, 2022, for a routine visit but not again within the next 90 days.  Medication adjustments were made at the patient's request, including discontinuation of hydroxyzine, which was prescribed on an as-needed basis for sleep.  The patient was seen timely in January and April 2022 by the PC.  In April 2022, the visit included response to a consult request to address the patient's possible transfer to a MSF or a MCRP.  The documentation of this encounter was adequate.  A SRASHE was completed on that date as well, that was unchanged from the previous assessment.

Another IDTT was held on April 28, 2022 that was designated as an annual meeting, despite an IDTT that occurred less than six months prior.  The content of the IDTT documentation was adequate, however, the assigned psychiatrist was not the psychiatrist present at the meeting, and one patient concern was deferred to be discussed with the treating psychiatrist.

**Findings**

The care provided to this patient was inadequate.

No comprehensive psychiatric assessment was documented, and the treating psychiatrist was not present at the IDTT meetings, requiring treatment issues to be deferred.  Additionally, the initial PC assessment was not timely following his transfer to CTF.

**Patient B**

This 49-year-old male patient was provided with a diagnosis of unspecified depressive disorder.  He was not prescribed psychotropic medication.  The patient received mental health services at the 3CMS level of care.  The patient was seen consistently for 90-day PC contacts throughout the review period.

420

On January 6, 2022, a referral was submitted for an emergency mental health contact as the patient's mother had died unexpectedly. He was seen the same day by his assigned PC, and they discussed grief, coping, and social support. The plan was to see the patient again the following week, and this contact occurred. The patient was provided with psychoeducational information related to grief. All contacts occurred in a confidential setting and addressed the goals outlined in the treatment plan.

**Findings**

The care provided to this 3CMS patient was adequate.

The PC provided timely and clinically appropriate treatment, including grief and supportive therapy that was consistent with the goals included in treatment planning.

**Patient C**

This 60-year-old male patient was provided with diagnoses of unspecified anxiety disorder and major depressive disorder, single episode, in full remission. The patient was not prescribed psychotropic medication.

The patient was seen every 90 days by his PC in a confidential setting for routine contacts that addressed treatment goals. Additionally, an annual PC assessment and SRASHE were completed on March 21, 2022 in preparation for the annual IDTT meeting. Both documents were completed adequately.

The patient was seen by the psychiatrist on March 12, 2022, when he denied the need for medication treatment. When the patient was seen by the PC on March 21, 2022, he reported increased anxiety related to an upcoming parole hearing and requested to see the psychiatrist to discuss treatment with medications. The psychiatrist saw the patient again on March 24, 2022 to discuss this issue, but the patient reported that he had decided not to go to his board hearing, which greatly reduced his anxiety. He reported that he no longer required treatment with medications.

The patient was seen for his IDTT meeting on March 28, 2022, and all required members were present. The IDTT documentation was adequate, except the PC entered outdated information from March 21, 2022 related to the patient's anxiety about his parole board and desire for medication treatment. It was unclear why there was no documentation indicating discussion of this important issue at the IDTT meeting, as it appeared to be a significant decision for the patient.

**Findings**

The care provided to this patient was adequate, however, a significant decision made recently by the patient was not documented or apparently addressed in the most recent treatment planning.

**Patient D**

This 39-year-old male patient was provided with diagnoses of major depressive disorder, recurrent, moderate and ADHD.  He was prescribed atomoxetine and sertraline, and he was generally medication adherent.  The patient was seen every 90 days by his PC in a confidential setting, and the discussions were consistent with the treatment plan and goals.  The psychiatrist saw the patient for routine contacts in November and January 2022.  The patient was seen by the psychiatrist in response to a request on February 14, 2022, as the patient had missed one dose of medication and thought that he would receive an RVR for this refusal. The psychiatrist allayed the patient's fears.  Both the PC and the psychiatrist provided supportive therapy to the patient, who was working toward release from prison in the upcoming year.

**Findings**

The care provided to this 3CMS patient was adequate.

**Patient E**

This 28-year-old male patient received mental health services at the 3CMS level of care.  The diagnosis listed in the healthcare record was unspecified anxiety disorder, yet the patient's most recent treatment plan provided diagnoses of unspecified depressive disorder and PTSD.  He was not prescribed psychotropic medications.

The patient was seen by the PC as required every 90 days for confidential therapeutic contacts that adequately addressed treatment goals related to depressed mood and poor coping.  Much of the sessions focused on the patient's preparation for upcoming parole on May 18, 2022.  An annual PC assessment and SRASHE were completed on March 28, 2022 that were adequate in content, with appropriate rationale for the suicide risk levels identified.  No safety plan was indicated, as his acute suicide risk was assessed as low.

The patient was seen for a pre-IDTT psychiatric appointment on March 29, 2022, and the documentation of this contact was adequate.  The patient's annual IDTT meeting was held on April 4, 2022 and included the required attendees, yet the psychiatrist who attended the meeting was not the psychiatrist who completed the evaluation of the patient the week prior.  The IDTT documentation was adequate.

There were two pre-release coordinator contacts with the patient in early April 2022 which appeared adequate and addressed the patient's needs, as well as providing follow-up on his request to have his parole transferred to another county.  The patient was seen by his PC prior to release, even though he was not yet due for a 90-day contact, to discuss his anxiety and future plans.  The patient was released from prison on May 18, 2022.

**Findings**

The care provided to this 3CMS patient was adequate.

**Patient F**

This 55-year-old male 3CMS patient was provided with a diagnosis of persistent depressive disorder. He was not prescribed psychotropic medications.

The patient was seen as required by his PC, including an annual PC assessment and SRASHE completed in February 2022. Of note, PC sessions clearly addressed the patient's identified treatment needs and included explicit delivery of interventions consistent with the treatment plan. An annual IDTT meeting was held on March 3, 2022, that included all required participants, however, the patient had not been seen for psychiatric assessment during the 90 days prior to this IDTT. Additionally, the patient did not participate in the IDTT, yet no rationale was documented for his absence. The IDTT documentation was otherwise adequate.

**Findings**

Although the treatment provided by the PC was well-documented, the overall care provided to this 3CMS patient was inadequate, given the patient had no contact with a psychiatric provider prior to the annual IDTT, and the patient was not included in this IDTT meeting without rationale.

**Patient G**

This 57-year-old male patient was provided with diagnoses of unspecified anxiety disorder, adjustment disorder with depressed mood, and amphetamine dependence. Of note, the adjustment disorder diagnosis was in place in the healthcare record since 2017, which far exceeded the clinical diagnostic timeframe. The patient was not prescribed psychotropic medication.

The patient was seen for a PC treatment session in November 2021. He was seen for the annual PC assessment and SRASHE in February 2022, but documentation did not indicate any treatment interventions provided on that date. Neither the PC assessment nor the SRASHE included any updated information. A psychiatric appointment occurred on March 17, 2022 in preparation for the annual IDTT meeting, and the documentation of that encounter was adequate. The annual IDTT occurred on April 4, 2022. The documentation of this IDTT was identical to the IDTT documentation one year earlier; the only additional entry stated, "the patient reports doing well and has no questions."

**Findings**

The care provided to this patient was inadequate.

Other than one PC contact that documented appropriate treatment provided to the patient and an annual psychiatric assessment, documentation of all other services was unchanged from the year prior. Additionally, provided diagnoses required review and updating.

**Patient H**

This 36-year-old male patient was provided with diagnoses of unspecified anxiety disorder; cannabis use disorder, severe, in early remission; and amphetamine-type substance use disorder, severe, in early remission.  He was prescribed sertraline and hydroxyzine on an as-needed basis.

The patient was seen for PC contacts at least every 90 days as required.  The documentation for the PC contact in November 2021 was cursory, included an incorrect diagnosis, and reflected little provided treatment.  However, the patient was assigned a new PC in January 2022 who reviewed the treatment plan goals and created a new IPOC to address the patient's anxiety, replacing a prior IPOC that focused on depressed mood.  This change was clinically appropriate, as the patient had reported anxiety as his primary symptom to both the PC and the psychiatrist. The patient was seen by the psychiatrist nearly monthly, to address medication effectiveness and adjustments needed to address symptoms of anxiety and panic.

The patient also had significant substance use concerns, and he received RVRs in November 2021 and January 2022 related to his substance use.  This substance use issue was discussed during a PC contact in March 2022, but not during any psychiatric contacts.  In fact, in January 2022, the psychiatrist documented that the patient's substance use was in remission, despite an RVR mental health assessment for possession of a controlled substance documented in the healthcare record six days prior to the psychiatric appointment.  No IDTT occurred during the review period for this patient.

**Findings**

The care provided to this patient was adequate, however, the psychiatrist failed to address the patient's active substance use.

**Patient I**

This 35-year-old male patient was provided with diagnoses of other specified trauma and stressor-related disorder and cannabis use disorder, moderate, in early remission.  He was not prescribed psychotropic medication.  The patient was prescribed hydroxyzine on an as-needed basis; however, he requested discontinuation in November 2021, as he had successfully utilized breathing and cognitive strategies to manage his anxiety symptoms.

This patient was seen more frequently than every 90 days by his PC to address issues of anxiety, interpersonal stressors, and substance use.  Progress notes were well-written and included clear indications for treatment used to support the patient and to address his needs.  He was seen for his annual PC assessment and SRASHE on February 22, 2022.  The clinical assessment was excellent and included an informative narrative of the course of the patient's treatment.  The assessment also identified changes to the patient's symptoms, presentation, and drug use (he had been sober since January 1, 2022) that warranted thoughtful diagnostic changes.  An annual psychiatric assessment was completed in March 2022 that was adequate.

An IDTT occurred that included the patient on March 29, 2022.  Prior treatment goals related to substance use were discontinued, and a new goal was added to target interpersonal issues.  These changes were consistent with PC documentation during prior months.  The patient submitted a

request to see his PC after the IDTT meeting due to depressive symptoms. He was seen by the PC on April 8, 2022. The PC addressed the patient's feelings and helped him to reframe his experiences considering situational stressors. He was provided with appropriate psychoeducation and homework.

**Findings**

The care provided to this patient was adequate and clinically appropriate.

**Patient J**

This 50-year-old male patient was provided with diagnoses of major depressive disorder, recurrent episode, moderate and substance use disorders. He was prescribed fluoxetine. His primary language was Spanish.

The patient was seen more frequently than every 90 days by his PC to discuss management of stressors. There was documentation that treatment interventions were provided that were appropriate to the patient's needs and consistent with the treatment plan.

The patient was not seen by the psychiatrist every 90 days, and he was seen only once during the review period. The content of the contact was adequate, addressing the patient's needs. Documentation from the PC and the psychiatrist consistently reflected that the patient's depressive symptoms were well-controlled with medication, and his substance use was in remission. Much of the clinical focus addressed assisting the patient with current stressors, including family issues and his upcoming parole board hearing.

An annual PC assessment and SRASHE were completed on February 3, 2022, that were adequate in describing the patient's current functioning and treatment needs. His suicide risk was evaluated due to the upcoming parole hearing and concern that the hearing outcome might affect suicide risk.

An IDTT occurred without the patient present on March 3, 2022, and no rationale was provided for his absence. The content of IDTT documentation was mostly adequate, however, there was little information regarding the patient's course of treatment over the prior year and no update to treatment goals, despite documentation indicating that depressive symptoms were well-controlled. Despite this, the treatment plan continued to target depression.

As previously mentioned, Spanish was the primary language for this patient; the psychiatrist documented that the patient declined an interpreter for the single psychiatric contact, and the PC consistently documented that effective communication was established.

**Findings**

The care provided to this patient, while clinically sound, was inadequate.

The patient was not seen as required by the psychiatrist, and the patient was not present at the IDTT without explanation. Further, treatment goals were not updated despite documentation that documented goals had been achieved.

**APPENDIX C-7**
**CALIFORNIA CORRECTIONAL INSTITUTION (CCI)**
**(July 12, 2022 – July 14, 2022)**

**Patient A**

Patient A from ASU was randomly selected for a 3CMS level of care chart review.

Patient A was a 40-year-old male who was transferred from HDSP to CCI on December 15, 2021 after being treated in MHCB/CTC following a referral for bizarre behavior (indecent exposure (IEX) and masturbation), and subsequent placement in STRH.

He entered MHSDS in June 2006. He had a history of being diagnosed with an antisocial personality disorder, an anxiety disorder, substance use disorders, and uncomplicated bereavement. Psychiatry was treating him with Prozac, Effexor, Remeron, and Seroquel.

He received a mental health assessment within ten days of his arrival, on December 22, 2021. He completed a SRASHE on December 30, 2021, 15 days after his arrival. On March 4, 2022, he submitted a CDCR 7362, requesting psychotropic medication to help him manage his depression/anxiety. On March 8, 2022 he met with the treating psychiatrist who prescribed Prozac to his list of psychotropic medications (Effexor, Remeron, and Seroquel). On March 8, 2022 he also met with his primary clinician who ordered an IDTT.

The treatment team met on March 15, 2022, three months after he arrived at CCI. All treatment team members were present for the IDTT, along with the patient. The treatment plan noted his traumatic developmental history to include alleged childhood abuse, multiple unstable caretakers, early onset of drug use, significant family losses, violent behavior, criminal gang activity, and expulsion from school for carrying guns to school. The treatment plan identified several other issues, including impulsivity, and a desire for revenge toward the individual who gave his mother AIDS and the individual who murdered his twin brother. Treatment goals consisted of reducing depression and improving judgment by developing coping skills and prosocial behaviors, correcting distorted thinking errors, and restructuring cognition.

Patient A was referred to mental health several times during the review period. He referred himself to mental health, requesting psychotropic medication. A registered nurse referred him due to his receipt of bad news in video-court, and another nurse referred him for bizarre behavior (IEX). A teacher also referred him because he appeared depressed. The referrals were adequately addressed in a timely manner.

Review of the progress notes revealed an absence of continuity of care from one session to another session, a disconnect between treatment sessions and the treatment plan, and a disconnect between providers in the sensitive needs yard (SNY) and ASU. Sessions tended to address "the issue of the day" rather than the underlying issues which were identified in the mental health assessments and the treatment plan such as loss, grief, depression, and anxiety related to returning to the community. There was no discussion of his increased number of RVRs, which repeatedly extended his sentence, delaying his discharge to the community.

**Findings**

The mental health services delivered to this patient were marginally adequate.  Urgent and routine referrals were appropriately addressed in a timely manner; however, his treatment plan was unacceptably late, and treatment sessions were rarely tied to the treatment plan.  Continuity of care between sessions and providers was unacceptable.

**Patient B**

Patient B from B-yard was randomly selected for a 3CMS level of care chart review.

Patient B was a 33-year-old male serving his second term.  He reported a traumatic and violent developmental history.  He also reported being diagnosed with a learning disability and dropping out of school after the 11th grade.  He did not obtain a GED.  He denied a history of mental health services in the community.  While incarcerated in CDCR, he occasionally received outpatient services (3CMS level of care) from 2013 to 2018 when his brother was reportedly shot by police and once again when his mother died.  He also reported a history of abusing substances, to include his current use of opioids.

He arrived at CCI on November 8, 2021.  He received an initial mental health assessment and an initial psychiatric assessment within two weeks rather than ten days of arrival.  His presenting problem was unclear.  The treating psychiatrist noted he asked why he was receiving 3CMS level of care.  He had a history of occasional depression and anxiety; however, he appeared to be asymptomatic and had not been treated with psychotropic medication since childhood when he was treated with Ritalin.  His mental status examinations were unremarkable and there was no evidence of any specific functional impairments or problems with ADLs.  He denied a history of self-injurious behavior or suicidality.  His diagnoses included SUDs and unspecified depression and anxiety.  Target symptoms were vague.

The treatment team met 23 days after his arrival rather than within 14-days.  The IDTT was completed in absentia because the patient refused to attend.  He reportedly contributed to the development of his treatment plan; however, his contributions to identification of goals and the overall treatment plan were unclear.  The treatment goals and intervention strategies were abstract and vague, (i.e., "to improve the inmate-patient's mental health and adaptive functioning to a point where he is living in a healthy and stable manner without requiring mental health treatment").  Discharge criteria included being off psychotropic medications for at least six months, being asymptomatic, being able to program, not having any urgent/emergent consults in the past six months, and no RVR's related to mental health within the past six months.  A review of his record suggested he met discharge criteria.

During the six-month review period, he was only seen by psychiatry for the initial psychiatric assessment and treatment plan.  Similarly, he was seen by his primary clinician for the initial mental health assessment, the initial treatment plan, and for two treatment sessions, dated approximately six months after the treatment plan on June 9, 2022 and June 24, 2022.  The notes were almost identical, devoid of intervention strategies, measurable goals, and the patient's progress.

427

## Findings

Based on a chart review, the mental health care delivered to this patient was inadequate. Initial assessments and the IDTT did not identify any significant mental health problems. The treatment plan did not identify measurable goals or specific intervention strategies. He was supposed to be receiving 3CMS level of care; however, there was no documented contacts in six months. After six months, he was seen twice by his primary clinician. The documentation was minimal, almost identical, and unrelated to the treatment plan.

## Patient C

Patient C from B-yard was randomly selected for a 3CMS level of care chart review.

Patient C was a 26-year-old male sentenced to life with the possibility of parole. He completed the tenth grade and planned to obtain a GED. He received special education services for slow information processing. He first drank alcohol at 14 years of age, used amphetamines and cocaine by 16 years of age. His controlling offense involved drugs.

Since there was no treatment plan completed during the review period, the IDTT documentation from November 17, 2021 was reviewed to create a context. Treatment team members were present, including the patient. He was diagnosed with an unspecified mood disorder, an unspecified anxiety disorder, and substance use disorders to include an opioid use disorder. IPOCs focused on substance use disorders and poor coping skills. The goals were clear; however, contact frequency and time frames were missing. Interventions were vague. The patient stated, "I want to work on my substance use." Higher level of care considerations were addressed, along with discharge criteria. The patient was ambivalent about treatment, reporting "sometimes I want to change, but other times I don't." The treatment team recommended the primary clinician focus on motivational interviewing to build motivation for change.

Patient C participated in medication assisted treatment, psychiatric treatment and treatment from his primary clinician. Two follow-up psychiatry contacts occurred in January 2022, two months after the IDTT. Psychiatry was treating him with sertraline, Zyprexa, and Vistaril. During a psychiatric contact, he expressed interest in being treated for anxiety/depression and was prescribed Zoloft.

The primary clinician's contact was not timely. She met with him on April 7, 2022 and April 21, 2022, approximately five months after developing the treatment plan. Additionally, documentation of contacts was minimal, neither addressing treatment goals or proposed interventions (motivational interviewing). First, the patient reported being ambivalent about engaging in treatment during his initial IDTT; however, he was willing to work with the primary clinician. Rather than waiting five months to start treatment, she should have started shortly after the IDTT. Second, during a session with the treating psychiatrist, the patient expressed an interest in treatment for depression and anxiety, requesting antidepressant medication. His willingness to work with the primary clinician five months earlier and his request for treatment involving his depression, were two opportunities lost by the primary clinician.

## Findings

The patient's individual treatment sessions with his primary clinician were delayed and the minimal documentation by the primary clinician was clinically insufficient. The primary clinician's treatment of this patient during the review period was inadequate, disconnected from the treatment plan and psychiatry's interventions.

**Patient D**

Patient D from C-yard was randomly selected for a 3CMS level of care chart review.

Patient D was a 25-year-old male who was serving his first term. He arrived at CCI on November 1, 2021, and both his primary clinician and treating psychiatrist conducted initial assessments approximately one week later on November 9, 2022, and November 10, 2022 respectively. The patient's chief complaint was depression, manifested by little interest in activities, feelings of depression, fatigue, a loss of energy, and poor concentration. He was diagnosed with an unspecified adjustment disorder and substance use disorders to include an opioid use disorder. He began MAT in September 2021 and was treated with Suboxone. The SRASHE, administered on November 9, 2021 revealed his chronic and acute suicide risk levels were low.

The IDTT met on November 18, 2021, 17 days after arriving at CCI. All treatment team members were present, including the patient. Treatment goals and interventions were identified. Higher levels of care were considered and discharge criteria was stated. The clinical summary and case formulation were comprehensive.

On December 2, 2021, the patient was escorted to the clinic with an urgent request to speak with someone as soon as possible. He reported receiving bad news and was having a crisis; however, he denied being suicidal or homicidal. Within several hours he met with his primary clinician who administered a SRASHE. His chronic and acute suicide risk levels were low. His primary clinician met with him and appropriately followed up with him in approximately one week. He subsequently met with him routinely in 90 days.

**Findings**

Treatment of this patient was adequate. His primary clinician and treating psychiatrist routinely met with him. He was engaged in treatment, met his treatment goals, and was being considered for a GP discharge.

**Patient E**

Patient E from C-yard was randomly selected for a 3CMS level of care chart review.

Patient E was a 42-year-old male serving a minimum of 20 year. He arrived at CCI in 2019. Since there was no treatment plan completed during the review period, his IDTT documentation from July 15, 2021 was reviewed for context. All treatment team members were present, including the patient. He was diagnosed with an adjustment disorder with a depressed mood, an antisocial personality disorder, and polysubstance dependence. Specific symptoms included sleeping too much, and being fidgety, anxious, and irritable. Mental health and anxiety IPOCs were recommended. Higher level of care considerations were reviewed. Discharge criteria were

vague, requiring a reduction in anxiety and depression with a rating of four or lower, out of a possible 10, and an increase in his positive coping skills. His July 2022 treatment plan approached more measurable goals. It did note that his reduction in depression and anxiety must be related to a reduction of in symptoms but did not identify specific symptom. Additionally, it did not specify how positive coping skills would be measured; however, it noted that graduation would be considered after attaining improved ratings and avoiding RVRs for six months.

His primary clinician routinely met with him in individual confidential sessions every 90 days. Additionally, he was being psychiatrically treated with sertraline and Zoloft. The primary clinician's progress notes did not indicate any progress, describe any specific interventions, or present any specific plans. Progress notes tended to be static and generic, without an update on the patient's progress toward discharge. The primary clinician's sessions appeared to be wellness checks rather than therapy sessions. They lacked continuity of care from one session to another, and were disconnected from the treatment plan.

**Findings**

Treatment provided by this patient's primary clinician was inadequate. It was not focused on goals identified by the treatment plan. Additionally, it was devoid of specific intervention strategies or a plan to accomplish the treatment goals; consequently, continuity of care was compromised.

**Patient F**

This 40-year-old 3CMS patient's healthcare record was reviewed in response to concerns by the plaintiffs' attorney. The patient transferred from PVSP to CCI on May 23, 2022, and was placed in the ASU upon arrival. A May 31, 2022, RVR mental health assessment indicated that the patient had received an RVR for possession of a cell phone on or around May 21, 2022. Despite records noting that the patient was placed in the ASU on non-disciplinary segregation status, he remained in the CCI ASU without his property until he ultimately transferred to the RJD STRH on July 18, 2022. Progress notes suggested that the lack of access to his property while at CCI was a significant stressor.

The patient was provided with diagnoses of unspecified anxiety disorder, antisocial personality disorder, and various substance use disorders. Records indicated that the patient had been retained in the 3CMS program since his discharge from the EOP in November 2018. The most recent MHCB admission occurred in July 2017.

A May 31, 2022, RVR mental health assessment found that the patient's mental health symptoms did not influence his behavior resulting in the RVR; however, the evaluating clinician appropriately offered recommendations for the hearing officer to consider when assessing penalties.

While no IDTTs occurred at CCI, a primary clinician completed the initial assessment on June 1, 2022, and updated the treatment plan targets to address treatment nonadherence. The PC noted that although the patient repeatedly reported feeling stressed due to the lack of access to his

property, he refused out-of-cell confidential contacts for the initial assessment and subsequent routine PC contacts. The PC did, however, provide timely follow-up and documented sufficient interventions during cell-front contacts.

On June 10, 2022, the patient was evaluated by his assigned primary clinician after reporting suicidal ideation to custody staff. The PC noted that while the patient was extremely frustrated due to not receiving his property, he was future-oriented, ultimately denied plan or intent for self-harm, and was not referred for MHCB admission. The PC further indicated that the patient met with the ASU sergeant regarding his property on this date, and the PC agreed to follow-up with the property officer. The SRASHE completed on this date assessed moderate chronic and low acute suicide risk.

On July 1, 2022, the patient was seen for an initial psychiatric assessment. The patient reported during this assessment that he was exercising three to four days per week. The psychiatric provider provided diagnoses of unspecified mood disorder and anxiety disorder, and Zoloft was prescribed to address symptoms of anxiety.

This patient transferred to RJD on or around July 18, 2022.

**Findings**

The care provided to this patient was adequate.

Although the property issues were not resolved, and a formal IDTT was not held at CCI, the overall mental health services were adequate. The treatment targets were updated to address treatment nonadherence, and Zoloft was initiated to address the patient's anxiety. Despite refusal to leave his cell for confidential mental health contacts, the PC provided timely follow-up contacts, advocated for the patient when indicated, and offered useful interventions at cell front to help the patient manage his distress. Additionally, the RVR mental health assessment recommendations provided to the hearing officer were appropriate.

**Patient G**

This 58-year-old patient's healthcare record was reviewed to assess the care provided by a CCI teleworking CIT psychologist. The patient transferred from HDSP to CCI on or around December 8, 2021. Although the patient was not included in the MHSDS at the time of his arrival to CCI, prior records noted a history of treatment at the 3CMS, EOP, and MHCB levels of care. The patient also had a documented history of self-harm, three suicide attempts, and drug overdoses. The most recent suicide attempt occurred by wrist cutting in 2005.

On December 10, 2021, at approximately 1700 hours, the CIT was contacted after the patient reported suicidal thoughts to custody staff. The CIT included an RN, a custody lieutenant, and a teleworking psychologist. CCI also utilized a medical assistant during CIT responses to operate the mobile telehealth equipment. The teleworking CIT clinician's documentation indicated that the patient presented with anger, endorsed suicidal ideation, and was generally uncooperative

during the evaluation and attempts to develop a safety plan.  The CIT ultimately referred the patient to the MHCB, placing him in alternative housing in the Facility B clinic on suicide watch.

While the teleworking CIT provider documentation offered sufficient justifications for the MHCB referral, an MHCB discharge summary documented by the same provider just a few hours later at 2144 hours offered no clear justification for discharge.  Further, the patient was discharged from the MHCB level of care and released from alternative housing to the general population without placement in the MHSDS.  No documentation of level of care justification was provided.  Nursing documentation indicated that the patient was released from alternative housing at approximately 0858 hours, prior to evaluation by an onsite mental health clinician.

A December 10, 2021, SRASHE assessed moderate acute and chronic suicide risk.  This SRASHE noted multiple chronic and acute risk factors; however, in contrast, the teleworking clinician's corresponding CIT progress note stated, "acute risk factors seem to be high" and chronic risk appears to be "moderate/high."  Further, one day after discharge, a different clinician completed a SRASHE with assessment of low acute suicide risk.  The second clinician noted the complete absence of acute risk factors during the preceding three-month period and documented that a suicide prevention safety plan was not required due to the low acute risk rating.  This clinician did not offer a sufficient explanation for the discrepant suicide risk information or consider completing a safety plan based on clinical indications.  Additionally, following the MHCB referral rescission and release from alternative housing, the discharge five-day follow-up was completed and extended for an additional two days without documentation of the rationale for this extension, including whether there were ongoing concerns about suicide risk.

The initial psychiatric evaluation was completed on December 14, 2021.  The treating psychiatrist noted the patient had a lengthy history of "antisocial sociopathic involvement," polysubstance dependence, chronic anxiety, a mood disorder, consideration of a bipolar spectrum disorder, and "possible coprophilia" (abnormal sexual arousal and/or pleasure from feces/defecation).  The psychiatrist indicated that the patient had requested and was prescribed mood stabilizing medication on this date, and subsequent psychiatric notes indicated medication adherence.

The initial primary clinician assessment was completed on January 4, 2022.  For unknown reasons, the assigned primary clinician relied on documentation from the teleworking CIT clinician encounter, despite the CIT provider repeatedly noting reliance on outdated records, most of which were from HDSP.

The initial IDTT convened on January 5, 2022 with all required disciplines present.  The IDTT documentation also contained the same copied and pasted outdated text from the initial CIT evaluation, including an inadequate case formulation; this formulation was critical to offering a clinical explanation of current behaviors and symptoms and to guide appropriate diagnostic and treatment decisions.  The IDTT treatment plan only targeted anger, and the only documented intervention was limited to a generic statement indicating the "therapist will foster a therapeutic alliance by empathizing with the patient's feelings of distress."

432

On or around April 25, 2022, the patient was placed in administrative segregation. Mental health notes did not document the reason for ASU placement. While primary clinician contacts were offered weekly in the ASU through May 18, 2022, progress notes indicated the patient was interviewed at cell front while lying in bed in his darkened cell. As a result, clinicians were often unable to fully assess the patient's mental status. There were no IDTTs or treatment plan modifications after the initial IDTT on January 5, 2022, despite evidence of symptom exacerbation and possible decline in functioning.

This patient transferred to CSATF in late May 2022.

**Findings**

The care provided to this patient was inadequate.

Suicide prevention efforts were inadequate and concerning. Serious concerns were also noted about the practice of using teleworking clinicians to evaluate and determine the need for patient referral to the MHCB. For this patient, it was especially concerning that the teleworking clinician discharged the patient to the general population without MHSDS inclusion and without documentation of an adequate level of care justification. Further, opinions regarding acute suicide risk differed by provider within a 24-hour period between the crisis response and subsequent follow-up.

In general, clinical documentation was extremely poor, including case formulations, treatment planning, discharge and level of care justifications, and the absence of a rationale for five-day follow-up extension. Lastly, the patient's presentation in the ASU suggested the need for IDTT review to determine the next steps in treatment; however, this did not occur.

Concerns noted by the expert were conveyed to mental health leadership during the site visit regarding the use of a telehealth clinician for emergency response and MHCB referral rescission. This review also suggested the need for additional training and monitoring for treatment planning, level of care determinations and justifications, and SRASHE completion.

**Patient H**

This 25-year-old patient's healthcare record was reviewed due to his reported dissatisfaction with the mental health services provided at CCI at an IDTT that was observed during the monitoring visit. The patient returned to CDCR for his current prison term on October 12, 2021, and he transferred from NKSP reception center to CCI on or around December 7, 2021. The patient was provided with a diagnosis of unspecified bipolar and related disorder. The CCI psychiatrist continued the prescription for Effexor upon arrival.

The initial PC assessment was completed on December 16, 2021. The PC also completed a SRASHE that assessed low acute and chronic suicide risk. The patient reported no history of suicide attempts or self-harm. The initial psychiatric assessment occurred on January 18, 2022. At that time, the psychiatrist noted that the patient presented with mildly blunted affect, and his mood was described as "ok." Although the psychiatrist encouraged the patient to continue

Effexor on this date, the medication was ultimately discontinued at the patient's request in early February 2022.

The initial IDTT at CCI occurred on January 19, 2022, and the IDTT retained the patient at the 3CMS level of care and developed a treatment plan that focused solely on impulsive behavior. The treatment plan documentation offered minimal information about the patient. For example, the clinical summary page of the treatment plan had only one word written in each of the sections intended to describe predisposing factors, perpetuating factors, and precipitating factors of the psychiatric presentation. No case formulation was completed.

While at CCI, the patient was offered only one routine primary clinician contact that occurred on March 10, 2022. There were no therapeutic interventions documented on this date. The PC did, however, note that the patient appeared "happy," despite discontinuing his medications. The patient also reportedly participated in programming and self-care. Additionally, the clinician indicated that removal from the MHSDS would be considered after the next routine contact.

For reasons that were unclear, the PC met with the patient on May 31, 2022, to complete a second initial assessment. Although the patient previously denied a history of self-harm, he reported that he engaged in self-harm by cutting his wrists in adolescence during this assessment. On this date, an IPOC for depressed mood was created, but there were no corresponding interventions documented or implemented. There were no additional PC contacts after the May 31, 2022 assessment.

The expert observed the second IDTT at CCI on July 13, 2022. In response to the IDTT inquiring about patient satisfaction with the 3CMS services provided at CCI, the patient reported dissatisfaction due to not receiving therapy services for depression and parole preparation. The patient added that his only contacts with mental health were for information gathering, as opposed to "therapy." The IDTT discharged the patient from the MHSDS on this date. A review of the IDTT documentation revealed that the IDTT did not provide a sufficient rationale for MHSDS removal or document the patient's reported dissatisfaction with mental health services. There was also no mention of whether the patient made progress toward treatment objectives or whether pre-release planning services were offered in response to his request after arriving at CCI. Additionally, the clinical summary section was not updated, and only included a copied and pasted paragraph from the May 31, 2022 PC assessment.

**Findings**

The care provided to this 3CMS patient was inadequate.

The PC met with the patient only once for a therapeutic contact during the seven-month period he was included in the MHSDS program at CCI, and there were no documented therapeutic interventions provided during that contact. Documentation from other PC contacts was used for assessments, and the documentation in those assessments and treatment plans was insufficient. The patient identified parole preparation as his primary goal after arriving to CCI; however, there was no indication this was provided. As such, the patient's complaints about the lack of services offered in the MHSDS at CCI were supported by healthcare record documentation.

434

**Patient I**

This 39-year-old patient's healthcare record was reviewed as he was identified as one of several patients evaluated by the CIT at CCI without referral to the MHCB level of care. The purpose of the review was to determine the overall quality of care provided and the adequacy of the CIT evaluations, as well as whether CIT outcomes were supported by corresponding documentation.

The patient was designated Level IV and SNY. Prior assessments noted a history of self-harm by cutting without intent to die. The PC at CCI provided a diagnosis of adjustment disorder, with mixed anxiety and depressed mood; psychiatrists routinely noted "Psychosis" as the diagnosis in the assessment section of their progress notes. The patient transferred from CSP/Corcoran to CCI on or around October 28, 2021. The patient repeatedly reported significant distress due to safety concerns and the inability to obtain his property during the seven months that he was housed at CCI.

The initial PC assessment at CCI was completed on November 4, 2021. PC progress notes for routine contacts did not include therapeutic interventions, despite records repeatedly noting that the patient was highly anxious, depressed, and reporting safety concerns. Documented interventions were generally limited to, "Patient was encouraged to reach out to his custody counselor to discuss his safety concerns."

The initial psychiatric evaluation occurred on November 15, 2021. The psychiatrist at CCI prescribed Vistaril for anxiety. Haldol was briefly prescribed; subsequently Haldol was discontinued, and Zyprexa was prescribed to address agitation and auditory hallucinations.

During April 2022, the patient reported increased depression and anxiety due to ASU placement. He refused to attend confidential clinical contacts during this time and continued to report frustration and stress due to not receiving his property.
On May 12, 2022, the CIT was contacted in response to the patient reporting suicidal ideation. The CIT mental health clinician was a teleworking psychologist who conducted the evaluation by mobile telehealth equipment. The CIT clinician noted the patient had "an altercation" with another inmate and reported safety issues "on both yards." The patient reported sleeplessness, auditory hallucinations, fear of assault, and pressure to join prison gangs. The documented outcome of the CIT evaluation indicated that the patient was returned to custody to address his safety concerns in lieu of an MHCB referral. No face-to-face crisis evaluation was completed by a mental health clinician. In reviewing the SRASHE completed by the teleworking CIT clinician, the expert noted that the patient's acute risk was underestimated. The CIT clinician assessed low acute suicide risk; however, the risk factors section did not include positive risk indicators that were referenced elsewhere in the healthcare record, including recent depressive symptoms, recent anxiety, mood lability, increasing isolation from others, and helplessness. Additionally, the CIT clinician determined that a suicide prevention safety plan was not indicated due to the inappropriately determined low suicide risk rating.

On the following day on May 13, 2022, the patient engaged in self-harm by hitting his head, resulting in swelling and bleeding. There was also reference to the use of OC spray on the

435

patient in one progress note, but the details surrounding this incident were unclear. It appeared that the patient was placed in alternative housing with a suicide watch observer ordered by an on-call clinician on this date. Following evaluation on the following day, the MHCB referral was rescinded, and the patient was returned to the ASU. While the clinician noted the patient would be returned to ASU to address his safety concerns on this date, there were no clinical interventions or recommendations to address the patient's distress and behavior concerns.

The initial IDTT at CCI occurred on November 17, 2021. Subsequent IDTTs occurred on April 13 and May 25, 2022. Although the patient repeatedly reported symptoms of depression, anxiety, and safety concerns, all treatment plans at CCI only targeted anxiety with the generic intervention of establishing a therapeutic alliance through empathy. There were no measurable goals included in these treatment plans, and they were not modified in response to the patient's self-harm behavior, changes in suicide risk, refusal of confidential treatment contacts, and evidence of worsening symptoms. Although the level of care rationale on May 25, 2022 indicated the patient would be retained at the 3CMS level of care to address his "psychotic symptoms," this was not incorporated in the treatment plan or referenced in the section about new symptoms.

The patient transferred from CCI to KVSP on June 9, 2022.

**Findings**

The overall care provided to this patient at CCI was inadequate.

Treatment plans failed to address presenting problems noted throughout the treatment record, lacked measurable goals and patient specific interventions, and were not modified as needed during subsequent IDTT meetings.

Despite the patient reporting worsening anxiety and depression in the ASU, the PC did not advocate for the patient when indicated, document useful treatment interventions in weekly progress notes, or encourage confidential out-of-cell contacts.

The expert also noted concerns with the utilization of a teleworking mental health clinician to evaluate and determine whether patients required MHCB referral and placement in alternative housing with suicide watch or were returned to their housing units without a face-to-face evaluation. This patient engaged in self-harm after the teleworking clinician evaluation and recommended return to housing. The clinicians involved in the CIT and documentation regarding alternative housing discharge also failed to note clinical interventions at the time of evaluation or offer recommendations to the assigned clinician to incorporate into treatment planning.

There was also evidence of unresolved diagnostic uncertainty and/or lack of diagnostic discussions during IDTT meetings, as only the psychiatrist documented concerns regarding psychotic symptoms for this patient.

**Patient J**

436

This 49-year-old patient's healthcare record was reviewed as he was identified as one of several patients interviewed by the CIT at CCI without a referral to the MHCB. The purpose of the review was to determine the overall quality of care provided and the adequacy of the CIT evaluations, as well as whether CIT outcomes were supported by corresponding documentation.

The patient transferred from RJD to CCI on or around March 11, 2022. CCI documentation did not clearly document the patient's psychiatric diagnosis; however, the treatment providers at RJD documented a diagnosis of schizoaffective disorder, depressive type as recently as February 7, 2022. Prescribed psychotropic medications at CCI included Thorazine, Cogentin, and Remeron. Symptoms and concerns documented at CCI included depression, command auditory hallucinations for self-harm, anxiety, safety concerns, and self-injurious behavior.

The PC initial assessment was completed on March 16, 2022. The psychiatric initial assessment was completed on April 18, 2022, when antipsychotic medication was increased.

On April 11, 2022, the patient reported command auditory hallucinations telling him to kill himself and to cut both wrists, and he was placed in alternative housing with referral to the MHCB. Following a mental health evaluation on the following morning of April 12, 2022, the clinician rescinded the MHCB referral and returned the patient to his housing unit. In reviewing documentation related to this event, however, the expert noted several concerns. The patient reported that he was not provided a safety mattress, had 22 prior suicide attempts, felt "a little messed up right now," and had "voices telling me to kill myself." In response to the clinician's questions regarding recent medication refusals, the patient said he had been refusing "because of the curse" and fear of being battered by other inmates if he left his cell. The patient also reported that his psychiatric medications were ineffective and that his "best" coping skill was "cutting to dull the pain." At the request of the patient, the evaluating clinician agreed to refer the patient to the IDTT for level of care review, and the patient was released from alternative housing. A review of the corresponding suicide risk evaluation on April 11, 2022, revealed the clinician did not accurately document positive acute risk factors present, underestimating the acute suicide risk with a low rating, and inappropriately choosing not to complete a suicide prevention safety plan despite the self-harm incident and ongoing reports of command auditory hallucinations to self-harm. The clinician documented the opinion that the patient "seems to be making these claims" that voices were telling him to kill himself "for secondary gain," and that the patient was future-oriented based on his plans to seek a shaman in Mexico to remove his curse upon release.

The patient was referred for a second crisis evaluation for suicidal thoughts on April 11, 2022, and the CIT responded. The only mental health representative involved in the CIT was a psychologist teleworking from home. The CIT note on this date indicated the crisis had been resolved by the lieutenant who planned to place the patient in the ASU due to safety concerns. There were no therapeutic interventions documented at the time of this crisis evaluation or recommendations provided for the primary clinician. Additionally, the CIT clinician appeared to complete the SRASHE based on review of the prior clinician's SRASHE completed earlier that day, as they also rated low acute risk and chose not to complete a suicide prevention safety plan due to the low risk rating. Due to ongoing safety concerns, the patient remained in the ASU until his eventual parole on June 28, 2022.

In summary, prior to the only IDTT at CCI on April 20, 2022, the patient engaged in self-harm by "superficially" cutting both wrists, had one MHCB referral that was rescinded after overnight placement in alternative housing, and one CIT evaluation that resulted in ASU placement. Progress notes during the weeks preceding this IDTT referenced ongoing endorsement of depression, anxiety, command auditory hallucinations, treatment and medication nonadherence, safety concerns, and conditional suicide plans if not successful in parole. Despite these documented concerns, the April 20, 2022 treatment plan included only pre-release planning as a treatment target, and the rationale for retaining the patient at the 3CMS level of care only referenced anxiety, active psychotropic medication treatment, and pre-release planning needs.

On April 18, 2022, the primary clinician documented that the patient's routine PC contact occurred at cell front in the ASU due to a lack of available custody escort officers. An April 25, 2022, progress note stated that the routine PC contact was "prematurely ended" after the patient complained about the mental health services offered and asked questions about the *Coleman* lawsuit, about referral to a higher level of care, and "how long [the clinician] had been working, etc." The clinician noted that they perceived the latter to be a "personal question" that justified prematurely terminating the session but did not indicate whether they attempted less punitive interventions prior to termination. The patient subsequently refused all weekly PC contacts in the ASU until the date of his parole on June 28, 2022, and he would not engage with the PC at cell front when approached.

The mental health pre-release planning assessment occurred on June 27, 2022, one day prior to the patient's parole date. There was documentation suggesting that the patient met with a TCMP representative prior to release.

**Findings**

The care provided to this patient was inadequate.

Safety planning was indicated at the time of the MHCB referral rescission on April 12, 2022, and the decision to rescind the referral on this date was not well-supported by the documentation. SRASHEs underestimated acute suicide risk, and the acute risk factors section was inaccurate and misleading.

The expert also noted concerns with utilizing a teleworking mental health clinician to evaluate and determine whether patients required referral to alternative housing with safety observation or return to their housing without a face-to-face evaluation.

Treatment plans were incomplete and ineffective, and were not modified when clinically indicated. There appeared to be diagnostic uncertainties that treatment teams did not attempt to resolve. The assigned PC failed to implement effective interventions during weekly PC contacts in the ASU. The PC also did not consider requesting a change in clinicians after observing damaged rapport had resulted in the patient refusing all weekly ASU PC contacts during the two-month period leading to his release date.

The pre-release planning assessment was not completed until one day prior to the patient's release date, and he did not have access to pre-release groups due ASU housing. As such, the patient likely did not receive sufficient clinical interventions to prevent recidivism prior to his parole date.

**APPENDIX C-8**
**PLEASANT VALLEY STATE PRISION (PVSP)**
**(July 19, 2022 – July 21, 2022)**

**Patient A**

This twenty-seven-year-old patient was admitted to the facility on June 20, 2022 and was housed on C yard at the time of this review.  He was diagnosed with adjustment disorder with anxiety and unspecified schizophrenia.  He was not prescribed psychiatric medication at the time of the review as he discontinued antipsychotic medication in April 2022. His healthcare record was selected for review after his case was observed in IDTT to assess adequacy of care.

This patient had recently discharged from STRH. While in STRH, he denied any mental health history and asked to be discharged from 3CMS. In contrast to his denial, documentation indicated a history of auditory hallucinations and community inpatient treatment for suicidal ideation, hallucinations, and a delusion that he was possessed. Documentation indicated that psychiatric diagnosis was complicated by methamphetamine use during times of psychosis.

Following discharge from STRH to a mainline CCCMS yard, he refused treatment attributed to alignment with gang culture at the facility. He attended an initial primary clinician assessment where cognitive confusion was noted, and it was documented that he was "operating at a borderline psychotic level." There was no documentation of an initial psychiatric assessment prior to the IDTT.

IDTT was conducted in absentia where differential diagnoses of drug related psychosis versus paranoid schizophrenia were raised. Consistent with clinical documentation, cognitive confusion was discussed. Consistent with team discussion, documentation indicated a plan to monitor for EOP level of care.

A review of subsequent contacts indicated that a subsequent primary clinician contact did not occur until September 7, 2022; close to two months after consideration for EOP level of care. The patient refused the appointment and no further plan to assess him was documented nor was collateral information sought.

**Findings**

This patient's care was inadequate. Based on IDTT discussion and primary clinician initial assessment, this patient was depicted as vulnerable due to his mental status and concerns about his overall functioning were raised. Follow-up contacts to monitor need to a higher level of care did not occur as clinically indicated.  Close monitoring with frequent contacts in close proximity to IDTT and collateral information were not sought as recommended during IDTT. Diagnostic clarification was needed.

**Patient B**

This fifty-year-old patient had been at the facility since 2019.  He was diagnosed with bipolar disorder with psychotic features and attention deficit disorder.  He was prescribed Strattera,

Lamictal and abilify during reviewed dates. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care. At the time of the review, he was housed on C yard.

IDTT documentation from January 25, 2022 was not sufficiently updated. The clinical summary was based on documentation from 2020 and lacked a summary of current symptoms, functioning and treatment progress, despite a prompt to do so. The sole IPOC targeted distractibility.

Primary clinician and psychiatric contacts occurred more frequently than required by Program Guide requirements. Neither provider included a sufficient mental status exam. Primary clinician documentation routinely included canned language, "continue to consider EOP should exacerbation of illness occur" but lacked substance when there were signs of instability.

Primary clinician contacts did not occur as clinically indicated. For example, on March 24, 2022, he was described as "managing his program but he is fragile." However, despite assessment as fragile, the next contact did not occur until a month later. Similarly, on June 22, 2022, he was described as "Mood is ever-shifting and, quite unstable" and assessed as in "acute distress." There was no documentation of consideration for a referral to a higher level of care and the next contact did not occur until two weeks later. Despite documentation of instability, clinical interventions were rarely offered by the primary clinician nor was there documented consultation or referral to psychiatry until the June 22, 2022 primary clinician contact which did not occur until on June 28, 2022.

**Findings**

This patient's care was inadequate. Primary clinician contacts described an individual in need of a higher level of care. However, steps to pursue a higher level of care were not completed nor was clinical follow-up timely. Outside of improper clinical follow-up, overall, outdated IDTT and insufficient mental status assessments did not provide the reader with a useful summary of this patient's specific mental health needs.

**Patient C**

This twenty-eight-year-old patient had been at the facility since 2021. He was diagnosed with an adjustment disorder with minor variations between providers. Of note, no diagnosis was included in the official place of record. He was prescribed Remeron. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care. At the time of the review, he was housed on B yard.

IDTT documentation from April 5, 2022, indicated that his sole IPOC targeted sleep disturbance. Goals were objective but not sufficiently measurable to assess treatment progress. The only identified treatment intervention was to foster a therapeutic alliance but did not include evidence-based treatment interventions or inclusion of prescribed psychiatric medications. An IPOC for anxiety was needed but not identified. Lastly, the clinical summary section was based on documentation from his previous IDTT in May 2021 and lacked a summary of current symptoms, functioning and treatment progress over the past year, despite a prompt to do so. This patients EPRD was documented as November 9, 2022, however treatment planning and routine

contacts did not address relapse prevention or strategies for a successful management of symptoms upon release to the community.

Provider contacts occurred more frequently than required by the Program Guide.  Overall, documentation summarized the status of his sleep disturbance and anxiety and medication was adjusted accordingly. However, clinical interventions to target these issues were not included in primary clinician documentation for sleep or anxiety. Thus, documentation was more representative of a case management contact than a therapeutic treatment encounter. Neither provider included a sufficient summary of standard components of the mental status exam.

**Findings**

This patient's care was marginally adequate. IDTT documentation was not useful for ongoing treatment or continuity of care as it was not updated appropriately, and all treatment needs (anxiety, relapse prevention/discharge planning) were not targeted. Utilization of clinical interventions other than psychiatric medications were needed.  A key component of a psychiatric assessment, the mental status exam was insufficient.

**Patient D**

This thirty-six-year-old patient was admitted to the facility in September 2021.  He was diagnosed with Panic Disorder and prescribed Celexa. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care.  At the time of the review, he was housed on A yard.

This patient's anxiety responded well to prescribed Celexa which was monitored regularly by the psychiatrist during timely psychiatric contacts. Provider documentation was thorough and included relevant and useful details regarding his functioning, response to medication and use of coping skills.

**Findings**

This patient's care was adequate and comprehensive enough to be useful for continuity of care. Due to his stability, clinical interventions were not offered by the primary clinician, however, this was a missed opportunity to teach the patient skills to use during times of increased anxiety.

**Patient E**

This twenty-eight-year-old patient was admitted to a CDCR reception center on March 1, 2022 and transferred to PVSP on April 22, 2022 where he remained through July 19, 2022. His healthcare record was randomly selected from the 3CMS roster to assess adequacy of care.

Provider diagnosis differed with psychiatric diagnosis including major depressive disorder and PTSD. The primary clinician initial assessment included discrepancies regarding diagnosis (major depressive disorder with psychosis versus unspecified depressive disorder), auditory hallucinations and psychiatric medications. Regarding psychosis, documentation in one section indicated that auditory hallucinations occurred exclusively during times of substance use.

However, in another section of the same document, it was documented that hallucinations occurred during depressive episodes.

An IPOC for depression was established but not for anxiety, despite identification by the primary clinician and insomnia during the initial psychiatric assessment. Psychiatric contacts occurred monthly, which was more frequently than required by the Program Guide. Medication adjustments were made at the patient's request. During reviewed dates he discontinued abilify and Vistaril but continued Prozac and initiated Remeron. The one primary clinician contact during the review period was timely and supportive in nature.

**Findings**

This stable patient's care was marginally adequate. Psychiatric care was attentive and responsive to the patient's requests for medication adjustments and self-disclosed treatment needs. However, lack of coordination of care impacted individualized treatment planning such that treatment narrowly targeted depression but not all identified treatment needs which was an area of concern for continuity of care, particularly given release from PVSP. Diagnostic clarification and rationale were needed. Relatedly, discrepancies in the primary clinician assessment were areas of concern for continuity of care.

**Patient F**

This thirty-two-year-old patient was placed in the STRH in April 2022. Opioid use disorder was documented as his diagnosis in the official place of record. Adjustment disorder with anxiety was recorded on his initial treatment plan; psychiatric documentation included a diagnosis of psychosis not otherwise specified with a rule-out of schizophrenia. His healthcare record was randomly selected from the STRH roster to assess adequacy of care.

Initial primary clinician assessment and IDTT documentation indicated that the patient had a history of anxiety that responded to medication when compliant. He experienced increased anxiety which he attributed to a recent DA referral and placement in restricted housing. Other than "anxiety," specific symptoms and impact on functioning were not documented. His IPOC targeted anxiety and was measurable but depression and sleep disturbance targeted by the psychiatrist were not included despite psychiatric attendance at the IDTT. There was no baseline data regarding his level of anxiety, thus assessment of treatment progress or goal appropriateness was not possible.

Documentation identified as the initial psychiatric assessment occurred after IDTT and was not comprehensive enough to warrant an initial assessment. Psychiatric documentation of the mental status exam was brief and remained unchanged across contacts. Prescribed psychiatric medications, Buspar for anxiety and Remeron for depression and sleep disturbance were discontinued at his request and he remained stable.

Routine primary clinician documentation was thorough and provided a useful summary of the patient's response to the STRH, management of stressors and overall functioning. Overall, treatment was supportive in nature and stressors were addressed.

**Findings**

This stable patient's care was marginally adequate. There was a need for improvement in coordination of care between providers, clarification of diagnosis with clinical rationale, specification of symptoms, improved detail in psychiatric mental status exam, treatment planning and completion of initial psychiatric assessment. Lastly, clinical interventions to address relapse prevention or management of symptoms if they returned would have been useful.

**Patient G**

This forty-four-year-old patient was placed in the STRH in April 2022. He was diagnosed with adjustment disorder with anxiety and depression in initial IDTT documentation but there was no diagnosis in the official place of record. His healthcare record was randomly selected from the STRH roster to assess adequacy of care of patients pending transfer to an EOP hub.

Initial primary clinician, psychiatric and IDTT documentation indicated that the patient was experiencing anxiety and depression which was attributed to situational stressors and safety concerns. His IPOC targeted anxiety and included goals to reduce anxiety and depression to a two by the next IDTT. The goals were likely unrealistic given the patient's rating of anxiety and depression on a Likert scale as ten out of ten with ten being the highest.

During primary clinician contacts, he remained pre-occupied with safety concerns. During the contact on June 3, 2022, he reported psychotic symptoms and paranoia which persisted in subsequent contacts. IDTT was convened on June 29, 2022 where his level of care was changed from CCCMS to EOP; an IPOC for delusions was added. Following the level of care change, his diagnosis was updated to unspecified schizophrenia spectrum and other psychotic disorder in primary clinician documentation but remained discrepant with psychiatric documentation and the official place of record. Primary clinician documentation was thorough and provided useful documentation for continuity of care. Documentation conveyed an attentive and responsive clinician with good therapeutic rapport and utilization of clinical interventions as indicated.

Routine psychiatric contacts occurred regularly; documentation was solely focussed on symptoms and medication compliance and would have been improved with context and a more detailed mental status exam. At the time of admission to the STRH he was not prescribed psychiatric medication. Shortly after placement into STRH his depressive symptoms increased, and he was willing to initiate Remeron. On June 29, 2022, Zyprexa, an antipsychotic was initiated after he reported minimized psychotic symptoms. The antipsychotic assisted with improvement of symptoms.

**Findings**

This patient's care was adequate. Providers appropriately increased this patient's level of care, monitored, and attended to his symptoms. While improvement was needed in completion of psychiatric documentation, treatment planning and diagnostic clarification, these deficiencies did not negatively impact this patient's care.

**Patient H**

This twenty-year-old patient was placed in the STRH in April 2022.  He was diagnosed with adjustment disorder with mixed anxiety and depressed mood in primary clinician documentation but not the official place of record.  He was prescribed Remeron and Buspar. His healthcare record was randomly selected from the STRH roster to assess adequacy of care.

Documentation was labeled as an initial psychiatric assessment but lacked comprehensiveness required for an initial assessment. He refused his one scheduled psychiatric contact during this review period.

Primary clinician initial assessment and IDTT documentation indicated an increase in anxiety and depression with placement in restrictive housing but otherwise lacked specification of symptoms. An IPOC was developed for anxiety but not for depression despite identification as a treatment need by both providers. Further, discharge planning was not identified as an IPOC despite an EPRD of September 9, 2023. Of note, the goal was to decrease anxiety to a two or lower by the next IDTT, but assessment of appropriateness or progress was difficult without baseline data.

Overall, primary clinician documentation provided a useful description of this stable patient's adjustment to restricted housing, his functioning and management of stressors. Treatment was supportive in nature with missed opportunities to utilize clinical interventions.  Of concern, documentation of this patient's mental status exam remained unchanged across contacts.

**Findings**

This stable patient's care was adequate. Improvements were needed in treatment planning, specification of symptoms, delivery of clinical interventions and individualized mental status exams by the primary clinician.

**Patient I**

This 3CMS twenty-six-year-old patient was admitted to CDCR in March 2022 and transferred to PVSP on May 12, 2022. He was diagnosed with major depressive disorder with psychotic features. His healthcare record was randomly selected from the non-referral log to assess adequacy of care.

While in county jail the patient was prescribed Remeron and Zyprexa for depression and auditory hallucinations.  He discontinued psychiatric medication upon admission to CDCR reception center. Upon admission to the PVSP, he refused the initial primary clinician assessment which prompted the clinician to document that the patient was unable to function at the current level of care on the IDTT higher level of care form. A confusing rationale for non-referral and treatment modification included consultation with custody staff to better assess the patient's functioning was added after a higher level of care audit.

Documentation labeled as an initial psychiatric assessment occurred on the same day as IDTT but was insufficiently comprehensive or individualized for an initial assessment.

Despite documented inability to assess this patient, including the patient's ability to function at the current level of care, a higher level of care indicator, the clinician did not follow-up with the patient until August 5, 2022, almost three months later.

**Findings**

This patient's care was inadequate. There was no initial psychiatric assessment completed for this patient with a documented history of psychosis and recent termination of antipsychotic medication. Additionally, the patient was not re-assessed as clinically indicated following IDTT nor was collateral consultation regarding the patient's functioning sought.

**Patient J**

This twenty-six-year-old patient's healthcare record was randomly selected from the non-referral log. He was identified on the non-referral log due to identification during IDTT (January 20, 2022) that he had received three RVRs in three months. RVR assessments were not located, and it is possible that he was erroneously placed on the non-referral long.

The patient was prescribed Trileptal, Vistaril and Remeron. Diagnoses varied by provider and healthcare record location.  Other than heroin use, there was no psychiatric diagnosis in the official place of record. Primary clinician diagnosis included adjustment disorder with mixed anxiety and depression and antisocial personality disorder while psychiatric diagnosis was unspecified bipolar disorder.

Initial IDTT documentation from December 2, 2021 was based on primary clinician documentation which indicated that his primary treatment need was for ongoing substance use. IDTT clinical summary documentation indicated that he did not have any mental health symptoms or functional impairments.  For reasons that were unclear, an IPOC was developed for anxiety but not for substance use. There was no assessment of bipolar disorder despite a documented history of bipolar disorder and psychiatric related diagnosis.  During his subsequent IDTT, documentation indicated that his anxiety and substance use impacted his ability to program but symptoms and behaviors were not specified and his IPOC remained unchanged.

While provider contacts occurred more frequently than Program Guide requirements, the majority of primary clinician documentation was overly succinct as clinically relevant details, including a mental status exam were not provided and clinical interventions were rarely offered.

**Findings**

Overall, care was adequate but marginal. This stable patient responded well to psychiatric medication. Psychiatric documentation was clinically useful but coordination of care between providers needed improvement in individualized treatment planning and alignment with clinical assessments. Specification of symptoms, diagnostic clarification and diagnostic rationale were needed.

**APPENDIX C-9**
**HIGH DESERT STATE PRISON (HDSP)**
**(July 26, 2022 – July 28, 2022)**

**Patient A**

This 26-year-old patient's healthcare record was reviewed to evaluate the quality of 3CMS

care provided at HDSP. This patient entered CDCR for his initial term in December 2019 by way of NKSP, and according to the record, was placed at the 3CMS level of care on December 31, 2019, which was 25 days after entering reception. He subsequently transferred to HDSP in March 2020, and he had received mental health services at the 3CMS level of care since that time. The patient did not have a history of EOP, MHCB, or DSH placements. He also did not have a history of suicide attempts or self-harm. At the most recent IDTT in July 2022, he was retained at the 3CMS level of care. He was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood and PTSD. He was prescribed Trileptal, Vistaril, and Remeron.

Although no IDTT was required during the review period, review of the healthcare record indicated that IDTTs occurred timely and included the necessary participants. Reviewed treatment plans contained appropriate goals and objectives, as well as individualized interventions focused on identified problem areas. Treatment plans were updated appropriately over time and reflected stable functioning at this level of care.

Psychiatric contacts occurred timely during the review period. The psychiatric progress note on February 23, 2022, indicated that the patient reported insomnia; he requested and received an increase in Remeron. The psychiatric progress note on May 17, 2022, noted that the patient refused to see the provider and was intermittently medication adherent.

PC contacts also occurred timely throughout the review period. These contacts occurred both in a confidential office setting and at cell front, as the patient refused confidential contact because he was awaiting a call with his lawyer. Treatment interventions and strategies provided by the PC were clinically appropriate and consistent with the treatment plan. This patient was not offered and did not participate in group therapy during the review period.

**Findings**

The care and treatment provided to this patient at HDSP was adequate.

IDTTs, psychiatric, and PC contacts occurred timely, and the treatment plan was individualized with appropriate goals and clinical interventions provided by clinicians. This patient was appropriately retained at the 3CMS level of care.

**Patient B**

This 31-year-old patient's healthcare record was reviewed to evaluate the quality of 3CMS care provided at HDSP. The patient was serving his first CDCR term that began in November 2011. He had received mental health services at the 3CMS level of care since April 2018. He had no

history of EOP, DSH, or MHCB placements.  There was no documented history of self-injurious behavior or suicide attempts in CDCR or in the community.  He was reportedly placed in the 3CMS program due to "being anxious.  Not being able to sleep."  He was provided with diagnoses of adjustment disorder with anxiety and major depressive disorder, single episode, unspecified.  He was prescribed Remeron and Prozac.

Although no IDTT was required during the review period, review of the healthcare record indicated that IDTTs occurred timely and included the necessary participants. The July 2021 treatment plan was identical to the prior July 2020 treatment plan, with no modifications or updates.  While treatment goals were identified and appropriate for this patient, there were no clear interventions specified in the treatment plan to achieve those goals.  Level of care justification was appropriately provided.

Although the patient was scheduled for timely psychiatric appointments throughout the review period, he refused each appointment.  The patient did not meet with his psychiatrist for any appointments between August 30, 2021, and the end of the review period on May 31, 2022.  He also had inconsistent medication adherence.  This psychiatrist discontinued psychotropic medications in April 2022 after the patient had not taken medications for more than one month and refused another scheduled appointment.  Although there was inconsistent adherence with scheduled psychiatric and PC appointments, PC contacts were conducted timely when he participated, and the patient consistently reported minimal symptoms.  There was no documentation that the patient was offered or participated in groups during the review period.

**Findings**

The care and treatment provided to this patient at HDSP was generally adequate.

IDTTs, and psychiatric and PC contacts, occurred timely.  Although treatment plans lacked specificity with regard to interventions and strategies, the patient appeared to respond well to the treatment provided and regularly reported minimal, if any, symptoms during PC contacts.  Medications were appropriately discontinued due to medication nonadherence and refusal of several consecutive psychiatric appointments.  His placement and retention at the 3CMS level of care was appropriate.

**Patient C**

This 30-year-old patient's healthcare record was reviewed to evaluate the quality of 3CMS care provided at HDSP.  The patient was serving his second CDCR term and was housed at HDSP since May 2021.  He received mental health services at the 3CMS level of care during his first term and since this reincarceration in April 2018.

The patient had his first MHCB admission in April 2022 after ingesting an unknown number of pills.  He reported in subsequent interviews and assessments that he was not suicidal at that time; rather, he was frustrated and angry with staff so he "acted out."  His acute and chronic suicide risk was consistently assessed as low, which was appropriate given his clinical history and presentation.  At the time of MHCB discharge in May 2022, he was also assessed with low acute

and chronic suicide risk; he stated that he would not repeat this behavior as it "made his stomach hurt."  Five-day follow-up after the MHCB discharge occurred timely and was appropriate.

He was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood, depression, and cannabis use disorder, moderate.  He was prescribed Lexapro and Vistaril and was generally medication adherent.

Since arrival to HDSP in May 2021, four IDTT meetings were conducted on June 8, 2021, February 23, 2022, May 4, 2022, and July 27, 2022.  IDTTs occurred timely.  Notably, the patient refused to participate in all but the most recent IDTT in July 2022, when he requested removal from the MHSDS.  The treatment team documented their concern as the patient was still prescribed psychotropic medication; they recommended psychiatric assessment and consultation about possible medication tapering, and indicated that the IDTT would reconvene in six months for reassessment of the level of care.  Although IDTT interventions were not individualized, the only mental health problem documented in the healthcare record was anxiety, and this issue appeared well maintained with medication management.

This patient was housed in the STRH since February 2022 for battery on a peace officer.  Since placement in the STRH, he received timely weekly PC and monthly psychiatric contacts. Documentation indicated that all clinical PC and psychiatric contacts occurred at cell front due to patient refusal of a confidential contact.  He was consistently medication adherent and did not demonstrate overt mental health symptoms or distress.  While housed in the STRH, the patient was offered weekly recreation therapy group; specifically, a social skills/communication group. The patient initially refused to participate, but he later attended weekly with adequate participation.

**Findings**

The care and treatment provided to this patient at HDSP was appropriate.

IDTTs, and psychiatric and PC contacts, occurred timely, despite the patient's frequent refusal to participate in IDTTs and consistent refusal of confidential clinical contacts.  Although treatment plans lacked specificity regarding therapeutic interventions to address reported anxiety, symptoms appeared well-controlled on medication, and progress notes of cell-front check-ins with both the PC and psychiatrist indicated that the patient was stable without evidence of distress or acute mental health symptoms.  The treatment team appropriately referred the patient for psychiatric assessment after his request for removal from the MHSDS. Continued retention at the 3CMS level of care was appropriate.

**Patient D**

This 50-year-old patient's healthcare record was reviewed to evaluate the quality of 3CMS care provided at HDSP.  The patient was serving his sixth CDCR term and was housed at HDSP since June 2019.  He entered the MHSDS in November 2003 at the 3CMS level of care.  Since that time, he had eight MHCB admissions; six admissions lasted for only one day, and he was placed at the EOP level of care eight times.  He received treatment at the 3CMS level of care between

449

EOP and MHCB placements.  He received treatment at the 3CMS level of care since arrival at HDSP.

The patient was provided with diagnoses of adjustment disorder with depressed mood and alcohol dependence, uncomplicated.  He had been prescribed Remeron for depressive symptoms; however, this medication was discontinued just prior to the review period in October 2021 as the patient refused to meet with the psychiatrist and to sign the medication consent forms.  The SRASHE assessed moderate chronic and low acute suicide risk.  He had a history of eight suicide attempts, the most recent in 2008 for attempted hanging.

Timely IDTTs occurred at least annually as required.  IDTT meetings were attended by the appropriate clinical and custody staff.  Review of IDTT treatment plans indicated that they were appropriately updated, and interventions appeared appropriate for the clinical presentation.

Review of the March 2022 treatment plan documented a plan to address depressive symptoms by a combination of medication management, CBT, psychotherapy, psychoeducation, and stress reduction exercises.  MHSDS discharge criteria were clearly stated and appropriate, consisting of the patient "able to report that he is able to program effectively on the yard for at least 6 months after discontinued psychotropic medication."  Treatment goals were clearly stated and measurable, and level of care justification was appropriate.

This patient received timely PC contacts during the review period, occurring at least every 90 days.  Individual, confidential PC sessions were documented on December 28, 2021, March 17, 2022, and June 6, 2022.  Although scheduled timely, the patient refused to participate in psychiatric appointments scheduled on January 28, 2022, and March 17, 2022.  As a result, Remeron, ordered on an as-needed basis, was subsequently discontinued as the patient refused to meet with the psychiatrist and sign medication consent forms.  It did not appear that the patient was offered or participated in groups during the review period.

**Findings**

The mental health care and treatment provided to this patient at HDSP was generally appropriate.

The patient received timely IDTTs that included the necessary staff, and his participation and input was included in treatment planning.  The interventions and goals were updated regularly and were individualized for the patient's clinical presentation.  PC contacts occurred timely, and progress notes and interventions reflected continuity with treatment planning.  Psychiatric contacts were scheduled appropriately despite the patient's refusal to participate.  The psychiatrist made appropriate attempts to reschedule appointments and to engage the patient despite his refusals; nonetheless, as-needed medication was appropriately discontinued due to treatment nonadherence.  Treatment plans documented coordination of care among treatment team members, and appropriate justification was provided for treatment at the current level of care.

**Patient E**

This 31-year-old patient was admitted to the MHCB on June 30, 2022, from the ASU where he had been placed on June 27, 2022.  He was provided with diagnoses of adjustment disorder and

adult antisocial behavior. His healthcare record was randomly selected from the MHCB roster to assess the adequacy of care provided.

At the time of referral, the patient reported that he experienced increased distress following recent discharge from the 3CMS program. Referral and initial assessment documentation indicated that he reported suicidal ideation to expedite resumption of psychotropic medication. While the patient reported depression, other mental health symptoms were not reported.

The primary clinician initial assessment documentation provided a brief but useful summary of the patient's presenting problem; however, mental health history documentation was copied from previous provider assessments. Information regarding the original author, date, institution, and level of care were not provided. Relatedly, a summary of current functioning in the 3CMS program was not provided. Documentation labeled as an initial psychiatric assessment was representative of a routine contact; however, this documentation did not provide a comprehensive assessment of the patient's mental health history. Psychiatric medications were not recommended, but clinical rationale for this was not clearly documented.

The patient was discharged from the MHCB to the STRH at the 3CMS level of care. An initial IDTT on July 1, 2022, included documentation indicating that the patient presented with stability and denial of suicidal ideation. He reportedly stated that he made suicidal statements to resume psychiatric medication; however, an assessment regarding his reason for wanting to resume psychiatric medication was not completed. He was encouraged to attend an initial psychiatric assessment in the STRH.

The discharge SRASHE and safety plan were appropriate.

**Findings**

The care provided to this patient was marginally adequate.

Based on available documentation, he was appropriately admitted and discharged from the MHCB; however, initial assessments were insufficient. In addition to the lack of an updated, comprehensive assessment of mental health history by both providers, the underlying precipitant for the patient's distress was inadequately assessed and therefore not addressed. Relatedly, no interventions to assist in return to restricted housing, the housing placement where he was located when he experienced psychiatric crisis, were provided. Diagnostic clarification appeared indicated, as the patient reported depression, but the diagnostic focus solely addressed anxiety.

**Patient F**

This 55-year-old patient was admitted to the MHCB on May 28, 2022. He was provided with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, and adjustment disorder with anxiety. His healthcare record was randomly selected from a MHCB roster to assess the adequacy of care provided.

At the time of MHCB referral, this patient was not a participant in the MHSDS. Prior to admission, he experienced increased anxiety and was placed in the ASU for safety concerns. Shortly thereafter, he experienced sleep deprivation and exhibited acute paranoia with

451

persecutory delusional thinking.  Specifically, he was observed in the back of his cell, covered by a blanket to hide from perceived snipers.

The primary clinician initial assessment included relevant clinical documentation.  A psychiatric initial assessment included a description of current symptoms but was not sufficiently comprehensive for an initial evaluation.  IPOCs appropriately targeted delusional thinking and grave disability and addressed associated distress but not sleep deprivation that was identified during the primary clinician initial assessment.  Goals were objective and measurable but used generic language (reduce grave disability/feelings of distress, move to a lower level of care); better individualization would have more effectively assisted in assessment of treatment progress and facilitating continuity of care.

Provider contacts occurred daily except on June 2, 2022, when the patient was discharged from the MHCB.  Documentation varied by provider, but overall reflected improved stability and was useful for continuity of care and included documentation of clinical interventions.  The patient remained nonadherent with prescribed antipsychotic medication Zyprexa due to ongoing paranoia.

The patient was discharged to the EOP on June 2, 2022.  While he remained symptomatic, the discharge rationale was clinically appropriate as his symptoms and functioning improved.

The rationale for the provision of property was not clearly documented.

**Findings**

The care provided to this patient was adequate.

Assessments, treatment planning, and interventions appropriately targeted treatment needs.  Areas of needed improvement included targeted interventions to address medication nonadherence and the need for diagnostic clarification.

**Patient G**

This 28-year-old patient was admitted to the MHCB on May 24, 2022.  He was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood, and unspecified depressive disorder.  He was not prescribed psychotropic medication.  His healthcare record was randomly selected from a MHCB roster to assess the adequacy of care provided.

Prior to the MHCB admission, the patient was not included in the MHSDS.  He was evaluated on May 23, 2022, in response to an urgent referral for withdrawn behavior, confusion, and possible psychosis.  At that time, he presented with depressive symptoms, including increasing hopelessness during the past three months.  He was assessed as stable and returned to housing.  Several hours later, he reported suicidal ideation with a plan of hang himself, and he was referred to the MHCB.

A primary clinician initial assessment was not located in the healthcare record.  The initial psychiatric assessment was appropriate; the patient stated that he made the suicidal statement for transfer from his prior institution, and his suicidality was conditional upon his return to the

previous institution.  There was no documentation regarding the rationale for not prescribing psychotropic medication despite collateral sources that indicated depressive symptoms in the three months preceding the MHCB admission.

During the initial IDTT, IPOCs were developed for depressed mood and danger to self.  Treatment goals were measurable and objective, although a baseline assessment to assess change was unclear.  Relatedly, goals utilized generic language (reduce depression/suicidal ideation, discharge to a lower level of care).  Interventions targeted the development of a therapeutic alliance and symptom monitoring.  On May 26, 2022, the patient was discharged to the 3CMS level of care due to continued stabilization.

**Findings**

The care provided to this patient was marginally adequate.

A primary clinician initial assessment and adequate rationale for not prescribing possibly clinically indicated psychotropic medication were absent.  In addition, while the patient did not exhibit acute distress at the time of MHCB discharge, he would have benefitted from targeted treatment to address crisis management and distress tolerance prior to discharge.

**Patient H**

This 34-year-old patient was admitted to the MHCB on May 25, 2022.  He was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder.  He was prescribed Zyprexa, an antipsychotic medication; however, he was medication nonadherent.  His healthcare record was randomly selected from an MHCB roster to assess the adequacy of care provided.

This patient had a long history of mental illness including psychosis, and he was admitted to the MHCB due to grave disability including poor ADLs and cell condition, lack of engagement in treatment, medication nonadherence, and social isolation.  He refused the primary clinician initial assessment which resulted in much of the documentation repeated from prior assessments, although the date and original author of this information were not readily discernible.  Initial IPOCs targeted grave disability and treatment nonadherence.  An IPOC targeting substance use was implemented, although the rationale was not clearly documented.

The patient continued to refuse psychiatric medication and either minimally engaged in or refused daily contacts.  He reportedly ate his meals; however, his mental status remained largely unchanged, as he did not shower, minimally engaged with staff, and maintained an unkempt cell.

Providers on May 27, 2022 and May 28, 2022 documented consideration of referral to a higher level of care, but the patient was not referred until June 1, 2022.  At that time, IDTT documentation indicated that he presented with persistent auditory hallucinations and disorganized behavior.

**Findings**

The care provided to this patient was inadequate.

The patient exhibited significant psychotic decompensation that was clearly documented; however, there was delay in clinically indicated referral to a higher level of care.

**Patient I**

This 64-year-old patient was admitted to the MHCB on May 20, 2022, from an ASU EOP Hub. He was provided with a diagnosis of major depressive disorder. His healthcare record was randomly selected from a MHCB roster to assess the adequacy of care provided.

Referral documentation indicated that the patient was admitted to the MHCB due to suicidal ideation with a plan for cutting, as well as hopelessness precipitated by endorsement to an institution where he had enemies. He perceived the endorsement as an attempt by custody staff to sabotage his parole hearing, as he would likely engage in violence to protect himself, possibly resulting in additional prison time.

The initial MHCB psychiatric assessment included relevant clinical information, including reports of anxiety and depression, as well as documentation that the patient was grieving the loss of three family members from COVID-19 in the past year. The patient refused to participate in the primary clinician initial assessment. Consequently, documentation was copied from previous providers, with the most recent information from two years prior to the MHCB admission.

IPOCs appropriately targeted identified treatment needs of anxiety, depression, and suicidal ideation. However, specific goals were generic (reduce suicidal ideation, discharge to a lower level of care) and not fully representative of the patient's specific treatment needs precipitating the MHCB admission. Clinical interventions were similarly generic (foster therapeutic alliance, and prescriber to monitor symptoms).

Documentation indicated that the patient appeared to be exaggerating distress to facilitate PIP admission. Documentation of daily contacts also indicated improvement in his depression and suicidal ideation. Trileptal was discontinued, and treatment was initiated with Abilify to address newly reported auditory hallucinations, which had not been objectively observed.

A SRASHE competed upon MHCB admission assessed moderate chronic and acute suicide risk; a subsequent assessment at discharge assessed moderate chronic and low acute suicide risk. The patient participated in clinically reasonable safety planning.

The rationale for discharge to the EOP level of care on May 27, 2022 was appropriate.

**Findings**

The care provided to this patient was marginally adequate.

Improvement was needed in the documentation regarding the reason for referral, initial assessments, treatment planning, and ongoing treatment. The primary clinician initial assessment was not sufficiently updated for the patient's current treatment needs. Primary clinician contacts generally focused on monitoring and assessment of his mental status with minimal clinical interventions provided for reported stressors.

**Patient J**

This 28-year-old patient was placed in the STRH on June 30, 2022.  He was provided with diagnoses of attention deficit disorder and cyclothymia.  He was prescribed Remeron and Trileptal.  His healthcare record was randomly selected from the STRH roster to assess the adequacy of care provided.

The primary clinician initial assessment was based on healthcare record review as the patient was on quarantine.  The document provided little useful updated information as the overly abbreviated summary of present illness was outdated with documentation based on information from 2019, and the clinical summary was also outdated from July 2021.  An IPOC for depression established a year prior was continued at the time of his initial IDTT.

Reviewed primary clinician contacts occurred at cell front, one occurred due to patient refusal, and the other two contacts occurred in a nonconfidential setting at cell front due to "Covid-19 protocol requires cell-front interactions."  While therapeutic handouts were provided, no treatment interventions were offered.  Documentation lacked a mental status assessment and was indicative of a wellness check instead of a comprehensive therapeutic encounter.

An initial psychiatric assessment was not located in the healthcare record.  The patient was seen by the telepsychiatrist after submitting a healthcare request for a medication change.

There was no documentation of the provision of group therapy.

**Findings**

The care provided to this patient was inadequate.

The completion of the primary clinician initial assessment in absentia was an area of concern, and it was unclear why approved COVID-19 precautions were not utilized.  Regardless, the assessment was insufficient due to utilization of outdated information.  There was no initial psychiatric assessment documented, treatment planning required update, and clinically relevant therapeutic individual or group encounters were not provided.  Diagnostic clarification was also indicated, as criteria to support diagnoses were not clearly documented.  Documentation that cell-front contacts were routinely required due to COVID-19 and subsequently provided in this manner was an issue of concern.

**Patient K**

This 25-year-old patient was provided with a diagnosis of adjustment disorder with mixed anxiety and depression.  He was prescribed Remeron and Vistaril.  His healthcare record was randomly selected from the STRH roster to assess the adequacy of care provided.

This patient was admitted to the HDSP MHCB on May 6, 2022, after a Tylenol overdose.  He was discharged on May 11, 2022; shortly thereafter, he was placed in the STRH due to an allegation of battery on an officer.  He refused the primary clinician assessment; consequently, documentation was based on MHCB documentation, which was sufficient given recent discharge and no other substantive clinical contacts or incidents since that time.  An initial psychiatric

assessment included a useful summary of recent mood and stressors but lacked comprehensive detail required by an initial assessment.

A self-harm IPOC should have been developed given the recent suicide attempt. There was no documentation of group referral or in-cell therapeutic activities provided. There was documentation of weekly group therapy provision only on two occasions, June 8 and June 20, 2022. There was no group therapy documentation during the week of June 13, 2022.

Routine primary clinician documentation was clinically useful including information regarding the patient's mood, functioning, management of stressors, and the application of treatment interventions.

**Findings**

The care provided to this patient was marginally adequate.

The primary clinician initial assessment was appropriate, but treatment planning needed improvement. The psychiatric initial assessment was insufficient. Despite these deficiencies, his treatment needs were appropriately addressed during routine primary clinician contacts. The provision of required activities, specifically weekly 90-minute group therapy and IDTT documentation of and subsequent distribution of in-cell programming, was unclear.

**Patient L**

This 55-year-old patient was placed in the STRH on May 18, 2022. His healthcare record was randomly selected from the STRH roster to assess the adequacy of care provided.

The initial psychiatric assessment provided minimal clinical documentation and was not appropriate for a comprehensive initial assessment. Documentation indicated that the patient had a history of treatment for major depressive disorder with psychosis and bipolar disorder in the same progress note. He was prescribed Prozac, Vistaril and Abilify.

The primary clinician initial assessment included relevant clinical information; however, dates and the original author of the documentation copied from previous encounters was not included, so it was difficult to determine the current applicability.

During the initial IDTT, an IPOC for hallucinations was identified; however, there were no IPOCs for depression, anxiety, anger, or self-harm, despite clinical documentation of these concerns in the clinical summary. The diagnosis was updated to unspecified bipolar disorder with depressed mood; however, the patient and the psychiatrist were not in attendance at the IDTT.

During June and July 2022, the patient consistently refused primary clinician contacts. While documentation provided clinically useful information, no collateral consultation was obtained regarding the patient's functioning or attempts made to address treatment refusal.

The patient was offered weekly groups for three of four weeks in June and July 2022.

456

**Findings**

The care provided to this patient in restricted housing was inadequate.

Psychiatric documentation was insufficient, and the psychiatrist did not attend the initial IDTT meeting. Additionally, IPOCs were not identified for each treatment need, and despite a two-month period of treatment refusals, collateral documentation regarding the patient's functioning was not obtained, and targeted interventions to increase program participation were not provided.

**Patient M**

This 40-year-old patient was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

Routine primary clinician contacts occurred timely and more frequently than minimally required with good continuity of care provided. Clinical documentation was minimal in content and lacked an updated mental status exam and clinical interventions. The documented plan for each routine contact was repeated for each encounter, and documented clinical interventions were not utilized.

Despite these issues, documentation indicated that the patient presented with clinical stability. In January 2022, he was seen for two wellness checks during COVID-19 quarantine. In February 2022, he presented with guardedness, and he refused an April 13, 2022, contact because he was "busy." He was seen one week later for an assessment after attending court, when he reported that his symptoms were "low." On May 31, 2022, he discussed interpersonal stressors, and he refused a July 15, 2022, clinical contact.

**Findings**

The care provided to this patient was inadequate.

Routine clinical documentation was insufficient, as the mental status examination was not included, and clinical interventions were not utilized. When seen for clinical contacts, the documentation was not indicative of a clinically therapeutic encounter, but rather a brief wellness check. Additionally, diagnostic clarification was indicated.

**Patient N**

This 26-year-old patient transferred to HDSP during May 2020. He was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

The patient submitted a healthcare request and was seen by the telepsychiatrist on June 28, 2022. He was subsequently prescribed Remeron on as as-needed basis for anxiety, racing thoughts, disturbed sleep and panic attacks. An initial psychiatric assessment was not documented.

Routine primary clinician contact documentation noted symptoms of anxiety, depression, and anger. There were no documented clinical interventions to address these symptoms.

The annual IDTT occurred on April 27, 2022. Although there was recent documentation of report of anger and depression, no IPOCs for these symptoms were initiated. An IPOC to address anxiety was continued but not updated from the previous IDTT. Relatedly, the clinical summary was also not updated.

**Findings**

The care provided to this patient was inadequate.

Psychiatric documentation was insufficient for an adequate initial assessment, clinical interventions by the primary clinician were deficient, and treatment planning was not appropriately updated or individualized for treatment needs. Diagnostic clarification and review were indicated as the current diagnosis of an adjustment disorder was provided in 2020, significantly exceeding the timeframes for the diagnostic criteria of this disorder.

**Patient O**

This 37-year-old patient transferred to HDSP on September 28, 2021. He was provided with a diagnosis of major depressive disorder. He was not prescribed psychotropic medication. His healthcare record was randomly selected from the 3CMS roster to assess the adequacy of care provided.

This patient was scheduled for three routine clinical contacts during reviewed dates, and all occurred timely. He refused one contact, and he reported minimal symptoms during attended contacts. Clinical documentation was brief in content, providing an assessment of current symptoms and mental status but lacking documentation of clinical interventions provided.

**Findings**

The care provided to this patient was inadequate.

While the patient exhibited minimal symptomatology, clinical interventions were needed to assist with maintaining stability. Diagnostic review was indicated, as the criteria to support the provided diagnosis was unclear.

**APPENDIX C-10**
**Sierra Conservation Center (SCC)**
**(August 9, 2022 – August 11, 2022)**

**Patient A**

This 48-year-old patient was provided with diagnoses of adjustment disorder with depressed mood and major depressive disorder, recurrent, mild.  He was not prescribed psychotropic medication.  His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

This patient was seen for his annual IDTT on May 5, 2022.  The clinical summary was brief and stated that he was experiencing "elevated stress, anxiety and depressed mood."  There was no summary of symptom impact on functioning, treatment provided, or response to treatment since the previous IDTT.  A goal to reduce depression to a two or lower on a ten-point scale using CBT was established.  The rationale to maintain 3CMS level of care was as follows, "…continues to benefit from CCCMS…no indication that a higher level of care is needed."  No IPOC was initiated for anxiety, and the baseline assessment of his current depressed mood was not documented.

The patient was consistently seen by the same providers.  Primary clinician routine contact documentation provided a useful description of the patient's mental status and reaction to stressors and reflected appropriate support and assistance to the patient in processing his reaction.  Psychiatric documentation was equally descriptive and useful for continuity of care.

**Findings**

The care provided to this patient was adequate, but needed improvement.

Treatment planning documentation needed improvement; specifically, a comprehensive update of the patient's functioning, symptoms, and progress in treatment since the initial IDTT as well as IPOCs for all identified symptoms with current baseline data to assess progress.  The identified clinical intervention (CBT to address negative thought patterns) was not utilized.  Clarification of and rationale for provided diagnoses were needed.  The consistency of the primary clinician and psychiatric provider as well as the thoroughness of routine contact documentation were positive features of treatment.

**Patient B**

This 56-year-old patient transferred to SCC in 2012.  His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

The patient was provided with a diagnosis of major depressive disorder; additionally, a diagnosis of PTSD was present in the psychiatric documentation.  He was prescribed Lexapro for anxiety and depression with medication adherence.

Psychiatric contacts and primary clinician contacts occurred more frequently than minimally required, and treatment targeted the patient's anxiety and depression.  Documentation was

thorough and included a useful description of the patient's mental status, functioning, and response to treatment. The primary clinician consistently documented utilization of various clinical interventions including psychoeducation, mindfulness, and cognitive behavior therapy.

**Findings**

The care provided to the patient was adequate.

Clinical documentation was sufficiently thorough for continuity of care, and symptoms were consistently and appropriately targeted by treatment providers. Documentation of the rationale for diagnoses provided and diagnostic clarification were needed.

**Patient C**

This 48-year-old patient was housed at SCC since 2010. He was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood, and adult ADHD. He was prescribed Remeron for depression, anxiety, and sleep disturbance by a psychiatric nurse practitioner. His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

Provider contacts occurred more frequently than minimally required by the Program Guide, and he was seen by the same provider during the review period. Documentation was clinically useful and provided a summary of current symptoms, functioning, and the use of coping skills; however, the utilization of clinical interventions by the primary clinician was not clearly documented.

**Findings**

The care provided to this patient who was clinically stable was marginally adequate.

Primary clinician contacts did not document the utilization of clinical interventions. The rationale for current diagnoses was also not well documented.

**Patient D**

This 40-year-old patient transferred to the SCC ASU from the WSP reception center on July 6, 2022. He was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

Initial assessments and IDTTs were timely completed. Clinical documentation was useful; however, the primary clinician initial assessment was essentially repeated from prior assessments by other providers. This may have resulted from a limited, nonconfidential cell-front assessment, but this was not clearly documented by the clinician. Both providers identified symptoms of anxiety and depression; however, while an IPOC was developed to target anxiety, there was no IPOC developed for depression.

Notably, neither provider queried the patient regarding his report of auditory hallucinations during the intake process on May 11, 2022.  There was also discrepant provider documentation of the reason for ASU placement.  The psychiatric provider documented safety concerns as the reason for ASU placement, while the primary clinician documented placement due to an RVR for battery.

Psychiatric documentation from July 15, 2022, indicated a plan to discontinue prescribed Remeron at the patient's request with the goal to terminate participation in the MHSDS; this goal was also documented by the primary clinician.  Weekly primary clinician contacts were provided by the same clinician.  A brief summary of the patient's functioning, mental status, and continued stability following termination of psychiatric medication were documented; however, utilization of clinical interventions, particularly those aimed at relapse prevention and discharge planning for successful transition from the MHSDS, were not included.

**Findings**

The care provided to this patient who was clinically stable was marginally adequate, with some areas of concern.

There was a lack of utilization of clinical interventions during primary clinician contacts documented.  Additionally, treatment planning needed improvement in targeting each identified treatment need.  Relatedly, the reason for placement in restricted housing could impact treatment planning, and documentation of clinician knowledge of the reasons for ASU placement were clinically important.  An IPOC to address any underlying precipitant to violent behavior, such as anger management, could have been useful if the ASU placement was due to violent behavior.

Further, it was unclear if prior healthcare records were reviewed by providers, given the oversight in assessment of the recent report of auditory hallucinations.  It was particularly concerning as the primary clinician repeated the documentation of the patient's report of auditory hallucinations from a previous provider's assessment, and thus should have been aware of the finding.

It was unclear why this 3CMS patient was not transferred to the RC STRH at WSP.

**Patient E**

This 40-year-old patient arrived at SCC from the reception center on November 18, 2021.  His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

At the time of CDCR intake, the patient was not a participant in the MHSDS.  However, in May 2022, he submitted two health care request forms requesting treatment for anxiety and depression.  He was subsequently evaluated and referred to the IDTT for MHSDS inclusion. Initial assessments were thorough and included clinically relevant content.  He was provided with diagnoses of adjustment disorder with mixed anxiety and depressed mood, and unspecified schizophrenia spectrum and other psychotic disorder.  He was prescribed Prozac.

An IPOC was developed to decrease anxiety with a plan to teach relaxation skills.  Despite reports of depression, paranoia and a plan to return to using methamphetamine once released

461

from prison (September 2022 or August 2024 depending upon the source), IPOCs for depression, discharge planning, relapse prevention, and paranoia were not implemented.

The only primary clinician contact required during the review period provided useful information regarding the patient's mood and functioning. Parole plans were assessed, but no other clinical interventions were utilized, despite his reported plan to sleep on the beach if no housing was obtained. Further follow-up with the clinician did not occur.

Psychiatric providers met with the patient more than the minimal requirement, but not as was clinically indicated. Specifically, June 2, 2022 IDTT documentation indicated that he disclosed new onset paranoia with a plan for psychiatric follow-up. Psychiatric follow-up did not, however, occur until July 17, 2022, when paranoia was not addressed.

**Findings**

The care provided to this patient was inadequate.

Areas of needed improvement included clinical interventions other than medication management, and IPOCs for all identified treatments needs, as well as rationale for provided diagnoses. Lastly, provider contacts did not occur when clinically indicated.

**Patient F**

This 42-year-old patient had been housed at SCC since 2012. He was provided with diagnoses of persistent depressive disorder and ADHD. He was prescribed Celexa by the psychiatric nurse practitioner. His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

Except for one delayed psychiatric contact, routine provider contacts generally occurred more than minimally required and were conducted by the same providers. The documentation provided an adequate summary of this stable patient's functioning and mental status. There was no documentation of clinical interventions provided during primary clinician contacts.

**Findings**

The care provided to this patient was marginally adequate.

Although his symptoms were mild and responded well to psychotropic medication, there were multiple missed opportunities by the primary clinician to utilize clinical interventions to address relapse prevention and to strengthen coping strategies.

**Patient G**

This 35-year-old patient transferred to SCC on March 18, 2022. He was provided with diagnoses of bipolar disorder and major depressive disorder. He was prescribed Vistaril on an as-needed basis for sleep. His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

Initial assessments were thorough and individualized. An IPOC for depression was developed during the initial IDTT. Goals were objective and measurable, and clinical interventions included the utilization of evidence-based cognitive behavioral techniques. Despite identification of ongoing mood lability and anxiety by the primary clinician, there were no IPOCs established for these symptoms. Relatedly, the psychiatrist addressed the importance of sleep to assist with preventing a manic episode, but sleep hygiene was not addressed by the primary clinician.

Psychiatric contacts occurred more frequently than minimally required by the Program Guide. Documentation was clinically useful for continuity of care. It was hypothesized that Keppra, prescribed for seizures, also assisted with mood stabilization. Education was provided by the psychiatrist regarding the importance of sleep to prevent decompensation.

Documentation from the only required primary clinician contact that occurred during the review period was comprehensive and included a review of the content discussed during the treatment encounter, the patient's mental status, and the utilization of clinical interventions.

**Findings**

The care provided to this patient was adequate.

While there was a need for improved treatment planning, documentation indicated that the treatment provided was timely, appropriate, and individualized. Diagnostic clarification and documentation of clinical rationale were needed.

**Patient H**

This 35-year-old patient had been housed at SCC since 2018. He was provided with diagnoses of PTSD and unspecified depressive disorder. He was adherent with Effexor prescribed for anxiety and depression. His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

The annual IDTT occurred on March 24, 2022. An updated clinical summary was noted, however, IPOCs that targeted anger and depression had not been updated since implementation on June 16, 2021. Goals were measurable, and CBT was documented as the treatment intervention. Despite psychiatric documentation of medication management for treatment of anxiety, an IPOC for anxiety was not established.

Primary clinician contacts occurred every two months, a frequency that was more often than minimally required. Documentation described the patient's reaction to psychosocial stressors, mental status, and functioning. However, clinical interventions were not utilized consistently during contacts, even when the patient disclosed distress about his housing.

Most psychiatric contacts with a psychiatric nurse practitioner occurred monthly. A medication adjustment was made following report of sleep difficulty, and medication side effects were addressed. Documentation included relevant information for continuity of care and indicated that symptoms were well managed by medication.

**Findings**

The care provided to this patient who was clinically stable was marginally adequate.

While the psychiatric care was appropriate, the lack of clinical interventions provided to the patient impacted overall care. Treatment planning and provider coordination needed improvement, and diagnostic clarification was needed.

## Patient I

This 41-year-old patient was housed at SCC since 2018. Diagnoses varied by provider and included anxiety disorders, substance related disorders, and personality disorders. His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

This patient was housed in the general population until July 20, 2022, when he was transferred to the ASU for safety concerns after an assault by a peer. A week after his initial IDTT, he was returned to the IDTT for an increase in level of care to EOP due to increased anxiety. On August 8, 2022, he was transferred to the MHCB due to an escalation in his anxiety and suicidal ideation.

Routine clinical contacts occurred timely and more frequently than minimally required. Documentation was clinically relevant and useful for continuity of care, as it included a summary of his response to various stressors, mental status, and functioning. Rationale for medication adjustments was included in psychiatric documentation, and clinical interventions were routinely utilized by the primary clinician.

**Findings**

The care provided to this patient was adequate.

Treatment provided while the patient was housed in the general population was appropriate, and the decision to increase his level of care to EOP and then the MHCB was appropriate and timely. Diagnostic clarification and documentation of clinical rationale were needed.

## Patient J

This 62-year-old patient was housed at SCC since 2020. He was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was adherent with Remeron prescribed for depression and anxiety. His healthcare record was randomly selected to assess the adequacy of 3CMS care provided.

The annual IDTT occurred on February 1, 2022. An IPOC for anxiety that was objective and measurable was established at that meeting. Cognitive behavior therapy was the identified clinical intervention, and this intervention was documented in one of two reviewed primary clinician contacts.

Provider contacts generally occurred more frequently that minimally required by the Program Guide. Clinical documentation consistently summarized his management of various stressors

and the impact of those stressors on mental status and functioning.  Overall, the patient was engaged in treatment, and his symptoms responded well to medication management.

**Findings**

The care provided to this patient who was clinically stable was adequate.

Provider documentation indicated responsiveness to treatment needs and was appropriate for continuity of care.  The diagnosis of adjustment disorder had been in place since 2020 and warranted review, as this was a time-limited psychiatric diagnosis.

**APPENDIX C-11**
**PELICAN BAY STATE PRISON (PBSP)**
**(August 16, 2022 – August 18, 2022)**

**Patient A**

This forty-six-year-old patient was placed in the STRH following a battery on a peace officer charge. He was diagnosed with unspecified schizophrenia or other psychotic disorder. His healthcare record was selected to assess the adequacy of treatment for EOP patients pending transfer to an ASU EOP hub.

During the initial IDTT his level of care was changed from CCCMS to EOP due to ongoing delusions, psychosis and paranoia. Documentation provided a useful summary of relevant clinical factors and clinical rationale. IDTT and psychiatric documentation referenced consideration of a PC 2602 but details regarding why he did not meet criteria and threshold to pursue the PC 2602 were not provided.

At the EOP level of care, primary clinician contacts occurred twice weekly.  An attempt was made by the telepsychiatrist to assess him, but he refused.  Similarly, primary clinician contacts were cell front on account of a pattern of refusals, due to his lack of insight. Attempts to engage him typically resulted in agitated behavior. Documentation was descriptive and would have been improved with consultation with custodial staff.

Following placement in EOP, he was offered groups regularly twice a week but often refused.

**Findings**

This patient's care was adequate. The patient's level of care was appropriately changed to EOP. Attempts to engage this patient were reasonable and documentation was clinically useful although a psychiatric contact with an onsite provider would have been beneficial.  Consultation with custodial staff and clearer rationale regarding PC 2602 was needed.

**Patient B**

This patient's level of care was changed from CCCMS to EOP after he showed signs of decompensation in the STRH. He was diagnosed with psychotic disorder and unspecified anxiety disorder. His healthcare record was selected assess adequacy of care for a patient pending transfer to an ASU EOP hub.

This patient was admitted to the STRH on May 12, 2022. His level of care was changed from CCCMS to EOP during IDTT on July 27, 2022 after a decline in his functioning that began in mid-June.  Signs and symptoms of decompensation included: lack of treatment participation, lack of engagement with custodial staff and mood instability, paranoia, disruptive behaviors and delusions. Documentation also indicated that he had been refusing showers and was malodorous. The sole IPOC targeted anxiety but IPOCs for signs and symptoms indicative of psychosis and decompensation were not targeted.

466

Since his admission to STRH, he had a pattern of requesting to see the psychiatrist with intermittent attendance and engagement.  He remained focussed on preferred medications (Remeron, Vistaril and Benadryl) but refused a mood stabilizer to address hypomania. On July 26, 2022 he was agreeable to taking Abilify after receiving an RVR for assaulting an officer. With the medication, his thought processes and attention to ADLs were documented as improved on August 8, 2022.

Following the level of care change, he continued to be regularly evaluated by the psychiatrist. He was also offered EOP groups and seen twice weekly by the primary clinician.  Of note, there were discrepancies in psychiatric documentation which described his grooming and cell condition as "good" while primary clinician documentation which described him as disheveled, malodorous and at times with an unkempt cell.

**Findings**

This patient's care was inadequate. While level of care was appropriately increased from CCCMS the change was delayed and there was no documentation to support why a MHCB was not considered given signs of grave disability.  The discrepancies in psychiatric technician documentation raised concerns regarding quality of daily assessments. Lastly, while providers monitored psychosis during routine contacts, IPOCs were needed on IDTT documentation.

## Patient C

This forty-one-year-old patient was housed in the RCGP unit.  He was diagnosed with anxiety although diagnostic rationale was unclear.  He was not prescribed psychiatric medications. His healthcare record was selected to assess adequacy of care in the RCGP after he reported to the Special Master's expert that he refused all treatment contacts due to lack of continuity of care in the RC GP.

Annual IDTT documentation completed in January 2022 was held in absentia due to COVID-19 modified programming. His IPOC addressed anxiety but additional identified treatment needs (substance use and treatment non-adherence) were not targeted. Goals were objective and measurable; however, the sole therapeutic intervention was to foster a therapeutic alliance. Rationale for level of care focussed on need for continued assessment.

Documentation indicated that primary clinician contacts occurred every two months.  Between January 2022 and July 2022, four mental health contacts occurred with three different clinicians. Despite this patient's pattern of refusals since April 15, 2021 clinicians attempted to engage him and clinical interventions were offered.  Documentation described him as stable. There was no documentation of functional impairment or emotional distress to support diagnosis.

**Findings**

This patient's care was adequate but marginal.  While attempts were made to engage him in treatment, lack of provider consistency was disruptive to treatment participation. It was not clear why an IDTT was not scheduled to review MHSDS discharge given his prolonged stability. Diagnostic rationale was needed.

**Patient D**

This thirty-nine-year-old patient was admitted to the RCGP unit in March 2022. He was diagnosed with major depressive disorder and antisocial personality disorder by providers, however opioid use disorder was listed in the official place of record. He was prescribed Remeron and Prozac. His healthcare record was randomly selected from the housing roster to assess adequacy of care in the RC GP.

Provider initial assessments were thorough and comprehensive despite minimal patient engagement. While assessments occurred in advance of his IDTT, the psychiatric initial assessment and IDTT exceeded timelines. IPOCs included impulsive behavior and depressed mood. Goals were objective and measurable. No interventions were recorded.

Provider contacts occurred more frequently than required by the Program Guide. Documentation described him as stable although minimally engaged in treatment.

**Findings**

With the exception of delayed IDTT and the initial psychiatric assessment, this stable patient's care was adequate. Rationale for diagnosis and clinical interventions on the treatment plan were needed.

**Patient E**

This forty-two-year-old patient was admitted to the STRH on August 4, 2022 from an acute inpatient discharge. He was diagnosed with persistent depressive disorder, PTSD and anxiety. He was not prescribed psychiatric medication. His healthcare record was selected to assess adequacy of care in the STRH following discharge from acute level of care.

This patient was admitted to acute level of care from the MHCB on June 27, 2022 due to paranoia and grave disability which subsided during the course of treatment in acute where his symptoms were attributed to substance use. Following STRH placement from acute, the patient refused to attend the primary clinician initial assessment and suicide risk evaluation on August 8,2022. Consequently, documentation was copied from other sources. In some documentation, the original author and timeframe were not included, thus applicability of documentation was unclear

Five-day follow-ups were conducted, however documentation remained unchanged. Documentation regarding a refusal and his denial of suicidal ideation was copied from the SRE and thus did not clearly convey a current assessment of risk or functioning during the five-day follow-ups. Overall, he was uncooperative during five-day follow-ups. Of concern, between August 7, 2022 and August 9, 2022, he was on a hunger strike, however, this was not noted on the five-day follow-ups or otherwise addressed by mental health staff, including the initial mental health assessment.

On August 10, 2022, he submitted a health care request in which he indicated that he did not feel safe and documented what appeared to be an individual's name. The same day, he boarded up resulting in an emergency response. He removed the window coverings and was described as

delusional and paranoid. He voiced safety concerns regarding correctional staff. A routine mental health referral was submitted, and documentation indicated that the Sargent would elevate the issue.

A social worker did not follow-up until August 15, 2022. Documentation was unclear; he was described as delusional in the mental status section but it was also noted that he "does not appear to be experiencing delusional content based on collateral information….refuses to participate in confidential setting citing a larger conspiracy in which custody staff were trying to kill him."

He had a psychiatric contact on August 16, 2022, as of this writing (August 18, 2022) the initial psychiatric assessment and IDTT were not completed. During the psychiatric contact, Zyprexa, an antipsychotic was discontinued based on documentation that appears to have relied on the patient's self-report as there was no indication that the telepsychiatrist was aware of the patient's previous psychosis and recent signs of decompensation.

## Findings

This patient's care was inadequate. The lack of individualized assessment and coordination of care coupled with lack of timely responses were areas of concern. Specifically, given this patient's recent discharge from acute level of care, the lack of timely response to the multiple signs of decompensation (treatment refusals, paranoia, delusions that impacted his functioning) was of significant concern.

## Patient F

This 35-year-old male patient was provided with diagnoses of panic disorder and unspecified anxiety disorder. He was prescribed hydroxyzine on an as-needed basis. The patient was admitted to the MHCB on May 11, 2022, from the STRH where he attempted to hang himself in his cell. The attempt was thwarted because the noose broke. The patient reported that he left a suicide note for his family.

Initial assessments by the PC, psychiatrist, and recreation therapist were all completed timely and appeared adequate. The initial SRASHE was completed timely, but included a number of entries that were inconsistent with prior documentation, and the suicide risk determinations were inaccurate. For example, the SRASHE noted that the patient had no substance use issues, despite being prescribed buprenorphine, stated that the patient did not feel isolated when he expressed that he was isolated, and stated that he had no history of violence despite being incarcerated for attempted murder. The patient had attempted suicide the day prior, had written a suicide note, had one prior suicide attempt, and reported feeling hopeless with limited access to his family (which was a trigger for the attempt); yet he was assessed with low chronic and moderate acute suicide risk. This assessment underestimated the patient's suicide risk given the available and documented information.

The patient was seen daily by either a psychiatrist or a PC consistent with Program Guide requirements. There were no recreational therapy contacts documented. Of note, a psychiatric contact on May 12, 2022, indicated that the patient would be started on mirtazapine once the patient had access to a pen and could sign a consent form. It was unclear why medications could

not be started immediately with documented verbal consent.  Unfortunately, the medication was not prescribed nor was another discussion about treatment with mirtazapine documented.  There were, however, documented discussions regarding treatment with another antidepressant medication.

One IDTT meeting was documented on May 13, 2022, that served as both the initial and discharge IDTT meeting.  A treatment goal was developed to reduce the patient's suicidal ideation, which was already documented as having decreased, and the IDTT documentation noted that the patient's crisis "resolved almost immediately" upon MHCB admission with no discussion of the patient's suicide attempt or suicide note.  The IDTT noted a plan to discharge the patient on May 16, 2022, to the 3CMS level of care.  An adequate safety plan was developed with the patient on May 14, 2022.  During that contact with the PC, the patient asked about the possibility of discharge to the EOP level of care given his increased anxiety, depression, and hopeless; but he was informed that changes to levels of care could only occur during IDTTs, and the patient had already had an IDTT the day prior.  The patient was advised to explore the level of care change after discharge.  That same day, the patient was noted to have vomited twice and had difficulty breathing secondary to anxiety.  There was no mention of this incident in any of the mental health documentation.  A discharge SRASHE was completed on May 15, 2022, that assessed high chronic and low acute suicide risk.  This chronic risk estimate was a more accurate assessment of suicide risk than the prior SRASHE.  A discharge summary was completed and characterized the patient's MHCB admission as due to his desire for a level of care change or for a housing transfer.  There was no mention of the suicide attempt or suicide note.  The documented goals for treatment after discharge were adequate.

### Findings

The care provided to this patient was inadequate secondary to an inaccurate SRASHE, a minimization of suicide risk, poor continuity of care regarding medication discussions, no documented discharge IDTT meeting, and a failure to identify the patient's level of distress in discharge documentation.

### Patient G

This 33-year-old male patient was admitted to the MHCB from the general population on February 18, 2022 after reporting suicidal ideation with a plan to overdose.  He was not included in the MHSDS prior to MHCB admission.  While in the MHCB, he was provided with diagnoses of unspecified depressive disorder and adjustment disorder with depressed mood.  He was not prescribed psychotropic medications and denied interest in taking medications.

The patient was seen timely for his initial PC, psychiatric assessments, and initial SRASHE.  All were completed adequately and included consistent information.  An initial recreation therapist assessment and initial IDTT meeting were held on February 22, 2022.  The IDTT meeting was late due to a long holiday weekend.  During the IDTT, the patient revealed safety concerns, which were conveyed to custody staff.

The patient was seen daily by either a PC or a psychiatrist.  PC contacts occurred in a confidential setting except for two sessions where the patient refused to meet out of cell.  These

sessions were consistent with treatment planning and included development of a safety plan for the patient. Psychiatric contacts were adequate, however, two consecutive telepsychiatry progress notes were nearly identical in content. The patient was seen for individual recreation therapist contacts several times during his stay, and the sessions were adequately documented. A weekly IDTT was held on February 25, 2022, where it was discussed that the patient would be discharged to the 3CMS level of care on February 28, 2022; the patient would also likely be discharged to the ASU to address his safety concerns. During an individual session with the PC on February 26, 2022, the patient was provided orientation materials regarding the MHSDS and 3CMS services. The safety plan was finalized with the patient on that date and was adequate. A discharge summary was written by the PC on February 28, 2022, and a SRASHE was completed; both were adequate.

**Findings**

The care provided to this MHCB patient was adequate, despite the initial IDTT completed one day late secondary to a holiday weekend.

**Patient H**

This 24-year-old male patient was admitted to the MHCB on April 15, 2022, after reporting suicidal ideation with a plan to hang himself shortly after transfer to PBSP. He was provided with diagnoses of persistent depressive disorder and generalized anxiety disorder at the time of MHCB admission; the discharge summary also included additional diagnoses of adjustment disorder with mixed disturbance of emotions and conduct and antisocial personality disorder. The patient was prescribed buspirone and oxcarbazepine upon admission, but he was largely medication nonadherent. Oxcarbazepine was discontinued while the patient was treated in the MHCB.

Prior to MHCB placement, a SRASHE was adequately completed and assessed the patient with high chronic and acute suicide risk. An initial psychiatric assessment was adequately completed upon admission; however, the mental status examination section was crossed out and not completed. Of note, on that same date the patient refused to engage with a PC to complete the initial PC assessment and another SRASHE; as a result, those assessments were largely based on healthcare record review.

On April 18, 2022, the IDTT developed treatment goals to target the patient's suicidal ideation and depressed mood; yet much of the treatment plan documentation focused on the patient's use of the MHCB for secondary gain. It was noted that during the IDTT meeting, the patient became frustrated about the team's decision to retain him at the MHCB level of care for an additional week. The patient kicked and banged his head to express his frustration with the decision. The patient was returned to his cell without further evaluation. The patient also reportedly hit his toilet with his hand over the weekend prior to the IDTT and may have sustained an injury, but he refused assessment of the possible injury. This incident was documented by nursing staff, but no follow-up with mental health staff was documented. IDTT documentation noted that the patient would likely be discharged to the 3CMS level of care, with the rationale that his reports of suicidal ideation had been made to secure transfer to another facility. There was no discussion of the patient's ongoing treatment needs.

471

PCs and psychiatrists consistently documented that the patient was irritable, refusing medications, reporting poor sleep, experiencing weight loss, and desired discharge to an EOP. The recreation therapist documented that the patient regretted reporting suicidal ideation and that he was not receiving any treatment, yet the patient engaged in recreational therapy when offered. The patient was seen daily by either a PC or a psychiatrist.  PC contacts did not evidence the provision of treatment outlined in the treatment plan.  Psychiatric documentation noted engagement with the patient, and medication adjustments were made collaboratively with the patient.  Despite IDTT documentation which noted plans to discharge the patient on April 25, 2022, the patient was discharged on April 23, 2022.  The decision for early discharge was noted in the PC discharge summary to have been made by a "mini-IDTT," yet the individuals involved were not documented.  A discharge SRASHE was completed as well as a safety plan that were adequate.  The discharge summary included somewhat contradictory information in that it discussed the patient having achieved his treatment goals yet asserted that his placement was initiated for secondary gain.  There was no mention of the patient having engaged in self-harm on two occasions while in the MHCB.  The rationale for discharge to the 3CMS level of care continued to be simply that the patient had used the MHCB to obtain a facility transfer.

**Findings**

The care provided to this MHCB patient was inadequate.

There was a negative tone in much of the documentation by one of the PCs that appeared biased against providing the patient with treatment for his presenting symptoms; instead, the documentation was focused on the patient's desire for a transfer.  This PC was the primary individual who saw the patient and the individual who did not document the provision of any treatment outlined in the treatment plan.  There was no documentation regarding consideration of clinical interventions to address the patient's self-injurious behavior.  IDTT documentation was internally inconsistent, and it was unclear that the decision to discharge the patient was made by the IDTT.

**Patient I**

This 55-year-old male patient was provided with diagnoses of schizoid personality disorder, and antisocial personality disorder; additionally, a provisional diagnosis of unspecified trauma and stressor-related disorder was also under consideration.  He was not prescribed psychotropic medications.  The patient was admitted to the MHCB for grave disability from RCGP housing where he was treated at the 3CMS level of care.  Documentation noted that the outpatient IDTT was considering transfer to the EOP level of care given recent concerns about the patient's functioning.

On April 8, 2022, mental health staff was contacted prior to a use of force with the patient.  The patient had been refusing to shower, had not been submitting laundry, and was trying to extort canteen from others on his unit.  He was described as increasingly bizarre and disruptive in recent weeks, necessitating a number of urgent referrals from custody staff.  At the time of the consultation, the patient had covered his cell window, was refusing to leave his cell, and had flooded the unit with water, coffee, coffee grounds, and possibly urine.  The patient was able to

be transported safely to the MHCB without use of force after complying with the requests of a custody staff member.

Initial PC and psychiatric assessments were completed upon admission, and both assessments described a disorganized, guarded, and suspicious patient with rigid thinking and limited insight. The patient was adamant that he did not need mental health intervention, but instead needed to be returned to his cell in RCGP. The patient was not observed responding to internal stimuli and did not appear to be psychotic. The patient was seen daily by a PC and/or psychiatrist who noted that the patient was fixated on not losing his housing in the RCGP and denying the need for mental health intervention. The patient was resistant to discussing transfer to the EOP level of care.

On April 11, 2022, an IDTT meeting was held with the patient present. Treatment goals were created to address the patient's resistance to mental health intervention, poor hygiene, and anxiety. The patient reported that his only goal was to return to RCGP before the weekend. The IDTT decided to refer the patient to the EOP level of care upon discharge but informed the patient that he would be able to return to RCGP while he awaited transfer. He reluctantly agreed. Documentation of PC and psychiatric sessions was consistent with the treatment plan goals and interventions.

On April 10, 2022, the patient was observed washing himself in his cell and brushing his teeth. He agreed to shower on that date. The patient also agreed to shower on April 13, 2022, and was observed washing himself in his cell unprompted on other days. Throughout his stay, he continued to demonstrate rigidity of thinking, paranoia, guardedness, and poor insight. The patient was discharged on April 14, 2022, to the EOP level of care but was allowed to return to RCGP as decided by the IDTT. PC and psychiatric discharge summaries were consistent, adequate, and included a comprehensive discharge plan of care.

**Findings**

The care provided to this patient in the MHCB was adequate.

**Patient J**

This 29-year-old male patient was provided with diagnoses of adjustment disorder, unspecified; alcohol use disorder, moderate, in early remission; cannabis use disorder, moderate, in early remission, and antisocial personality disorder. At the time of MHCB discharge, the psychiatrist documented additional diagnoses of major depressive disorder, recurrent, moderate and unspecified bipolar disorder that were under consideration. He was prescribed mirtazapine and olanzapine, and was generally medication adherent.

The patient was admitted to the MHCB on June 8, 2022, from the STRH after being found guilty of an RVR. The patient did not expect this outcome and subsequently reported suicidal ideation. After two CIT contacts, the patient was referred to the MHCB. The initial SRASHE documented a pattern of the patient reporting suicidal ideation when frustrated. This was confirmed by clinician-to-clinician contacts. Initial PC, psychiatric, and recreation therapist assessments were attempted during the first two days of the MHCB stay, but he refused all contacts. On June 10,

2022, the patient met with the psychiatrist when he agreed to take olanzapine; this medication had been previously discussed with the patient the prior month but was not initiated. An IDTT meeting was held on June 10, 2022, and appropriate goals were developed with the patient to target irritability and self-harm. The patient was assessed regarding the need for a higher level of care given that he had been admitted to the MHCB on three occasions during the previous six months. The team decided that the patient needed more time at the MHCB level of care to determine if the planned interventions would assist in stabilization. Those interventions were appropriate. During that meeting, the patient was informed that he had received an RVR for threatening staff on June 7, 2022. He refused to leave the IDTT meeting for two hours and then attempted to hang himself upon returning to his cell. The patient refused clinical contacts over the next two days and again attempted to hang himself on June 12, 2022. At that time, the patient required use of force and became combative with staff. Involuntary intramuscular psychotropic medications were administered. The patient stated that he had been injured by the use of force and was transported to a community hospital for evaluation, but he reportedly declined care in the emergency department.

On June 13, 2022, the patient minimally engaged with the psychiatrist, PC, and RT, and he continued to report suicidal and homicidal ideation, auditory hallucinations, visual hallucinations, and belief that custody officers were tampering with his food. The recreation therapist noted that the patient was stable, engaged, and attentive while watching movies and talking on the phone. When the patient agreed to meet with his PC, the sessions appeared to adequately target the patient's needs. On June 17, 2022, an IDTT meeting was held, and it was decided to refer the patient to the acute level of inpatient care due to his ongoing suicidal ideation, impulsivity, and inability to demonstrate behavioral improvement. The PC and psychiatric discharge summaries adequately described the patient's course of treatment and goals for inpatient placement.

**Findings**

The care provided to this patient at the MHCB level of care was adequate. The only concern noted was documentation in a prior clinical summary by a clinician that treatment teams should avoid placing the patient at an inpatient level of care, given the potential for such placement to reinforce his self-injurious behavior and threats of self-harm. This statement was not acknowledged by the IDTT during his current MHCB stay.

**Patient K**

This 44-year-old 3CMS patient's healthcare record was randomly selected from the institutional census to assess the adequacy of care provided.

The initial psychiatric evaluation was clinically thorough and useful, whereas the primary clinician initial evaluation needed improvement in the documentation of the assessment of current symptoms. Psychiatric documentation indicated that the patient reported anxiety, depression, and ongoing substance use. The patient also disclosed grief of his mother's death within the past year from COVID-19.

474

The psychiatrist provided a diagnosis of mood disorder, not otherwise specified, while the PC provided a diagnosis of major depressive disorder. IPOCs did not target either of these diagnoses but instead targeted impulsive behavior. Both providers acknowledged the presence of substance use; however, this diagnosis was not included in the official place of record. The patient was prescribed Vistaril and Remeron.

Psychiatric contacts occurred more often than minimally required. Documentation was thorough; medication response was assessed, and clinical interventions including psychoeducation and cognitive behavioral skills were utilized. The patient was initially prescribed Vistaril and Remeron, but the Remeron was appropriately discontinued due to nonadherence. The psychiatrist coordinated with custody staff after the patient did not attend his scheduled appointment, subsequently, he was able to meet with the patient. On the other hand, the one required primary clinician contact was conducted at cell front due to patient refusal, and the documentation indicated a brief contact rather than a therapeutic clinical session.

**Findings**

The care provided to this patient was marginally adequate.

The psychiatric care provided was clinically appropriate, however, the primary clinician assessment and routine documentation were insufficient. Treatment planning was individualized, but identified treatment needs were not targeted. Relatedly, coordination between providers regarding diagnosis and clinical rationale to support diagnosis was indicated.

**Patient L**

This 43-year-old 3CMS patient was housed at PBSP since May 2021. The patient was provided with diagnoses of adjustment disorder with anxiety, anxiety disorder, and depressive disorder. He was prescribed Zyprexa. His healthcare record was randomly selected from the institutional roster to assess the adequacy of care provided.

The patient initially received mental health services in the MHSDS in April 2021, with subsequent stabilization of symptoms. PC documentation was useful for continuity of care. The patient was described by both providers as minimally engaged in treatment, in part due to gang politics. However, there was no primary clinician documentation that indicated that clinical interventions were initiated or offered but declined.

At the annual IDTT on May 19, 2021, the IDTT decided that the patient would work toward discharge from the 3CMS level of care. For reasons that were unclear, the IPOC for impulsive behavior was continued, despite the provision of anxiety and depression related diagnoses, and the need for relapse prevention and discharge planning given the plan to discharge from the 3CMS level of care.

**Findings**

The care provided to this patient who was clinically stable was marginally adequate.

Individualized treatment planning and utilization of clinical interventions with patient response were needed. Provider coordination and clinical rationale supporting provided diagnoses was also indicated.

**Patient M**

This 25-year-old patient was provided with a diagnosis of adjustment disorder with anxiety and depression. He was prescribed Remeron for sleep. His healthcare record was randomly selected from the institutional roster to assess the adequacy of care provided.

An initial psychiatric assessment was not completed. Instead, documentation which was indicative of a routine contact occurred prior to the IDTT, yet it was clinically useful as it addressed treatment response and current symptoms. Of note, the same psychiatrist evaluated the patient for an initial assessment less than one month prior when the patient was briefly placed in restricted housing.

The primary clinician initial assessment was individualized and included useful information for treatment planning and continuity of care. The initial treatment plan included goals to reduce anxiety and depression which addressed identified symptoms. A relapse prevention goal was also established, which was appropriate given the plan to work toward MHSDS discharge.

Routine contacts were meaningful and occurred more frequently than minimally required. Appropriate clinical interventions such as cognitive behavior therapy, Socratic questioning, empathy, and reflective listening were utilized.

**Findings**

The care provided to this patient was adequate. Although the lack of documentation of an initial psychiatric assessment was an area of concern, the patient was known to the psychiatrist, and a recent assessment had been completed. The lack of assessment, although, not consistent with requirements, did not appear to negatively impact this stable patient's care. Primary clinician documentation was thorough, individualized, and clinically appropriate.

**Patient N**

This 25-year-old patient transferred to PBSP in February 2021. He was provided with a diagnosis of adjustment disorder with mixed anxiety and depression. He was prescribed Remeron and Vistaril. His healthcare record was randomly selected from the institutional roster to assess the adequacy of care provided.

The annual IDTT treatment plan was not appropriately updated. Documentation did not provide a summary of the patient's current symptoms, functional impairment, or response to treatment, despite a prompt to do so. Instead, documentation was repeated from the initial treatment plan. Relatedly, IPOCs established during the initial IDTT remained unchanged.

Overall, provider documentation described the patient as stable. Routine psychiatric documentation was clinically useful and addressed the patient's symptoms, functioning, and

treatment response.  Routine primary clinician documentation provided a brief summary of the patient's activities, but it was not reflective of a clinically relevant therapeutic encounter.

**Findings**

The care provided to this patient was marginally adequate.

Treatment planning was inadequate as it was not updated, individualized, or useful for continuity of care.  However, documentation of meaningful therapeutic encounters was indicated.

**Patient O**

This 30-year-old patient was housed at PBSP since 2019.  He was provided with a diagnosis of major depressive disorder, and was prescribed Prozac.  His healthcare record was randomly selected from the institutional roster to assess the adequacy of care provided.

Annual IDTT documentation did not provide a useful summary of the patient's current symptoms, functional impairment, or treatment response.  An IPOC for depression was minimally changed and included goals to reduce depression and anxiety.

Routine primary clinician documentation included a summary of patient activities, but overall, it was brief in content and not reflective of meaningful therapeutic contact.  The patient consistently refused psychiatric contacts, but the psychiatrist appropriately coordinated with custody staff to ensure that individual contact occurred.  Documentation was clinically useful and included the utilization of cognitive behavioral skills.

**Findings**

The care provided to this patient was marginally adequate.

Psychiatric care was appropriate; however, primary clinician contacts did not document meaningful therapeutic encounters.  In addition, treatment planning required update and adjustment to address the patient's current and individualized treatment needs to assist in continuity of care.

**APPENDIX C-12**
**WASCO STATE PRISON (WSP)**
**(August 23, 2022 – August 25, 2022)**

**Patient A**

This 35-year-old patient was provided with various psychiatric diagnoses that varied by discipline and were not documented in the official place of record. The PC provided a diagnosis of major depressive disorder, while psychiatry provided various diagnoses related to anxiety or depression. He was prescribed Remeron. His healthcare record was reviewed at the request of the plaintiffs' attorney to determine whether the patient's request for referral to a higher level of care was timely addressed and to assess the overall adequacy of care provided.

A primary clinician initial assessment was completed on November 4, 2021. The reason for completion of this assessment was unclear, as the content of this assessment was virtually unchanged from a primary clinician assessment completed on September 10, 2021, in response to a health care request submitted when the patient was not a MHSDS participant. Regardless of the reason for the assessment, an IDTT was convened on November 10, 2021, when the patient was included in the MHSDS at the 3CMS level of care to address ongoing depression exacerbated by his mother's death several days prior.

The patient was not seen for a routine mental health evaluation until December 8, 2021, despite documentation that it was ordered on November 11, 2021, in response to his mother's death. Clinical interventions, primarily motivational interviewing with a focus on behavior change were utilized, but there was no documentation of new treatment targets for grief and bereavement, or the reason for referral. There was conflicting information documented regarding level of care; "Recommended perfect EOP tx [treatment] programming attendance…;" "continue at GP level of care…;" and "continue to work with MD for med [medication] stabilization," despite placement in the 3CMS program and lack of treatment with psychotropic medication at that time. A routine appointment was scheduled for continued therapy, which did not occur until January 5, 2022. At that visit, appropriate treatment interventions were utilized to address ongoing depression and bereavement. The patient was also referred to see the psychiatrist.

The initial psychiatric assessment was timely completed; however, the quality was inadequate as most of the documentation was copied from previous providers, and it was difficult to determine what documentation was original and applied to the current mental health needs. Subsequent psychiatric contacts occurred timely and appropriately assessed symptoms and addressed medication nonadherence.

During the February 1, 2022 contact, the patient requested placement at the EOP level of care due to increased symptoms. Documentation indicated a plan to submit a referral for EOP placement, but no follow-up was documented. During the subsequent contact on May 1, 2022, he reported coping with new onset suicidal ideation, but there was no referral for a SRASHE nor did the provider appropriately assess the current suicide risk.

The patient was not seen by a clinician until he was referred by a psych tech in August 2022 for an emergent consultation after he was placed in the STRH.

478

**Findings**

The care provided to this patient was inadequate.

There were multiple missed opportunities for appropriate clinical intervention for this patient. Healthcare record documentation described the patient's worsening mental status and symptoms that ultimately included suicidal ideation; these symptoms were not appropriately addressed. Primary clinician contacts did not occur as were clinically indicated or in accordance with Program Guide requirements. While psychiatric contacts occurred timely, the request for higher level of care was not appropriately addressed. Further, provider continuity of care was poor; this likely contributed to the poor provider collaboration regarding the patient's worsening symptomatology.

While outside the review period, it appeared that the concerns noted by the plaintiffs' attorney regarding the patient's request for a higher level of care during the fall of 2021 were not timely addressed.

**Patient B**

This 56-year-old patient was transferred to WSP on May 25, 2022. He was provided with a diagnosis of schizoaffective disorder. He was prescribed antidepressant, antipsychotic, and anxiolytic medications. His healthcare record was randomly selected to assess the adequacy of care provided in the reception center.

After submitting a health care request on May 27, 2022, the patient was seen for an urgent mental health evaluation as he reported several suicide attempts in county jail, and current auditory hallucinations, depression, and anxiety. Clinical documentation confirmed a hanging attempt three months prior in county jail and ongoing auditory hallucinations and paranoia. Despite the seriousness of his symptoms, recent suicide attempt, and lengthy sentence with an EPRD in 2047, he was placed at the 3CMS level of care. The patient was seen timely for psychiatric assessment, and medications were adjusted.

On June 4, 2022, the patient submitted another health care request, reporting command auditory hallucinations and "feeling desperate and out of control and out of options;" he was not seen by mental health for a SRASHE until two days later on June 6, 2022, when he was increased to the EOP level of care. In addition, 30-minute custody checks and five-day follow-up were initiated. The five-day follow-up was delayed and did not begin until June 7, 2022; subsequently they occurred timely until June 11, 2022, and were extended until June 13, 2022.

On June 7, 2022, the patient submitted another health care request form when he stated, "All I can think about is killing myself…." and he reported that he was unable to manage command auditory hallucinations. It was unclear from healthcare documentation that this request was addressed. Of concern, 30-minute custody checks were discontinued on June 8, 2022. Of note, on June 11, 2022, he reported suicidal ideation which he attributed to the inability to use the telephone. He was evaluated by the CIT and returned to his unit. The CIT failed to consider the patient's mental status and functioning during the previous two weeks.

On June 13, 2022, the patient was referred to the MHCB after he reported a plan to kill his cellmate.

**Findings**

The care provided to this patient was inadequate.

The initial placement in the 3CMS level of care was inappropriate, and the more clinically appropriate referral to a higher level of care was delayed. There were also delays in assessment, including response to the June 4, 2022 health care request and five-day follow-up; additionally, custody checks were prematurely terminated.

**Patient C**

This 35-year-old patient transferred to WSP on July 27, 2022. He was provided with a diagnosis of unspecified schizophrenia. He was prescribed monthly Invega Sustenna injections. His healthcare record was randomly selected from the RC EOP roster to assess the adequacy of care provided.

This patient was previously incarcerated in CDCR during a prior term when he received mental health services at the EOP level of care. He had an extensive history of mental health treatment including intermediate care facility (ICF) placement as a mentally disordered offender (MDO) in 2017. He was discharged from DSH and placed on a PC 1370 order while in the county jail. The mental health screening, primary clinician and psychiatric initial assessments, and SRASHE were all completed on August 2, 2022. Daily weekday recreation therapist contacts generally occurred at cell front due to quarantine, and in-cell materials were provided.

This patient attended a symptom management group conducted on August 11, 2022. Group treatment documentation noted regular attendance and participation. Primary clinician documentation indicated that an IPOC for hallucinations was initiated on August 15, 2022, after the IDTT meeting. Given the lack of baseline assessment, it was unclear if the goal to reduce the frequency of hallucinations was realistic. Treatment interventions were not documented. The rationale for placement at the EOP level of care was adequate.

The primary clinician initial assessment was succinct but included key information regarding treatment needs, including auditory hallucinations. The psychiatric initial assessment included relevant treatment information, and the patient was seen for psychiatric follow-up on August 18, 2022.

Primary clinician contacts occurred weekly and provided a useful assessment of mental status and ability to cope with symptoms; however, there was a lack of documentation that clinical interventions were utilized.

**Findings**

The care provided to this patient was inadequate.

480

Treatment planning required improvement, and documentation of the utilization of clinical interventions by the primary clinician were needed.

**Patient D**

This 27-year-old patient was returned to CDCR for this term on June 15, 2022. During his previous incarceration he received mental health services at the EOP level of care. He was provided with a diagnosis of unspecified bipolar and related disorder. He was not prescribed psychotropic medication. His healthcare record was randomly selected from the RC EOP roster to assess the adequacy of care provided.

The primary clinician assessment was completed timely on June 21, 2022, however, most of the documentation was copied from previous sources with limited documentation of current patient input, symptoms, and the rationale for treatment. Similarly, IDTT documentation lacked patient input and individualization. The documented rationale for continued placement at the EOP level of care was due to continued mental health symptoms; however, as was previously noted, specific symptoms were not clearly identified in the documentation. IPOCs were not developed during the IDTT meeting.

Routine primary clinician and psychiatric provider documentation indicated that the patient appeared stable, and he denied the presence of mental health symptoms. Cell-front recreational therapy contacts were initiated the day of arrival and continued until EOP groups were initiated on July 7, 2022. Overall, the patient was offered five hours of group therapy weekly.

**Findings**

The care provided to this patient who appeared clinically stable was inadequate.

There was a lack of documentation of individualized assessments, adequate treatment planning, and the development of clinically indicated IPOCs.

**Patient E**

This 44-year-old patient transferred to WSP on June 6, 2022. He was provided with a diagnosis of schizoaffective disorder, bipolar type. He was generally adherent with prescribed Vistaril and Zyprexa. His healthcare record was randomly selected from the RC EOP roster to assess the adequacy of care provided.

This patient was referred to the EOP level of care during the primary clinician initial assessment on June 9, 2022, due to symptoms of anxiety, depression, and auditory hallucinations; these symptoms had been present since a traumatic head injury at age six. He had an extensive history of suicide attempts and self-injurious behavior. A SRASHE completed on the same day assessed low acute suicide risk; a discrepancy in the assessment of chronic risk indicated both moderate and high chronic suicide risk.

During the IDTT on June 15, 2022, the EOP level of care was continued due to mood lability and anxiety. IPOCs were not implemented.

Continuity of providers and quality of clinical documentation varied.  Each of the three reviewed psychiatric contacts occurred with a different provider.  During June and August 2022, contacts consistently occurred with a different primary clinician.  Overall, the patient was described as stable and medication adherent.  Documentation was indicative of routine monitoring with rare utilization of clinical interventions.

Prior to the commencement of group treatment, recreation therapist cell-front contacts occurred daily on weekdays.  Reviewed group treatment documentation indicated that the patient generally attended five hours weekly offered treatment, with a range of three to seven hours weekly.

**Findings**

The care provided to this patient was inadequate.

Treatment goals were not established for this patient.  While routine supportive services and monitoring were provided, continuity of care was poor, and utilization of clinical interventions apart from medication management was minimal.

**Patient F**

This 41-year-old patient's healthcare record was randomly selected from the mainline 3CMS roster to assess the adequacy of care provided.

Provided psychiatric diagnoses varied by provider and included psychotic disorder and unspecified depressive disorder.  In contrast, the PC provided a diagnosis of unspecified anxiety disorder.  None of the providers documented diagnostic rationale.  The patient was prescribed BuSpar and Vistaril during the fall of 2021, but requested discontinuation of these medications on February 2, 2022.  Provider documentation did not note whether the medications were discontinued, and no further provider follow-up was documented.

Initially, the patient attended mental health appointments; however, subsequently, he consistently refused routine primary clinician and psychiatric contacts due to gang involvement and prison politics.  Based on brief interactions, providers indicated that the patient was stable.  There was a lapse in PC contacts from March 23, 2022 to August 23, 2022.  Documentation of all primary clinician routine contacts included statements that remained unchanged regarding various techniques to be utilized.  Additionally, the PC notes did not include individualized techniques for this patient, nor did the clinician address the patient's treatment nonadherence.

**Findings**

The care provided to this patient was marginally adequate.

Despite refusals, providers attempted to engage the patient in treatment.  Although clinical contacts were limited to brief interactions due to treatment nonadherence, limited documentation indicated that the patient was stable without mental health distress.  However, the lack of documented plan and rationale regarding termination of psychiatric medication was an area of concern.  Relatedly, the missed contact between March and August 2022, was an area of

particular concern as the patient had discontinued psychotropic medications. Additionally, given his limited engagement with providers, documentation of consultation with custody staff regarding his functioning would have been useful.

**Patient G**

This 58-year-old patient transferred to WSP on May 6, 2021, and he transferred to a mainline yard on June 22, 2021. His healthcare record was randomly selected from the mainline 3CMS roster to assess the adequacy of care provided.

According to IDTT documentation on June 30, 2021, the patient was provided with a diagnosis of major depressive disorder. He was not prescribed psychotropic medication. Treatment goals were difficult to decipher given a discrepancy in the IDTT documentation. Specifically, an IPOC for depression was implemented with a goal to reduce depression to a four or lower on a one to ten scale before the next IDTT. In contrast, a goal to decrease depression to a two or lower and to maintain that level with utilization of cognitive behavior therapy and DBT was also located in the rationale for the level of care section of the treatment plan. Regardless, depression was not actively addressed as indicated during the two primary clinician routine contacts available for review.

There was a lengthy delay between primary clinician contacts on January 11, 2022, and the next contact on July 5, 2022. Of note, both contacts occurred in response to health care requests. In January 2022, the patient rated his depression as four of ten, which was an increase from his rating during the most recent IDTT. He also reported new onset anxiety symptoms. He was frustrated regarding receiving recent RVRs, as well as his medical care for chronic back pain. Five months later, he requested removal from the MHSDS and stated, "I want to get off this; I'm not getting any help." He denied current anxiety or depression. Documentation indicated that an IDTT would be scheduled, but documentation of this IDTT was not located.

A routine primary clinician contact occurred on August 24, 2022, when the patient reported ongoing chronic pain and again requested removal from the MHSDS. He rated his depression as a four of ten, and he denied anxiety symptoms. The earlier plan to schedule an IDTT was not addressed.

Of note, between June and August 2022, there were multiple refusals for medical care, including KOP medications, provider appointments, and blood pressure checks.

**Findings**

The care provided to this patient was inadequate.

There was a substantial delay in mental health follow-up and evaluation, despite an increase in self-reported anxiety and depression. The delay likely added to the patient's perception that mental health services were not helpful. Relaxation and mindfulness skills, which would have been useful in managing chronic pain, were not utilized. Treatment planning needed clarification. The provided diagnosis lacked clinical rationale. Documentation of interdisciplinary medical and mental health collaboration regarding medical care treatment refusals was also clinically needed.

483

**Patient H**

This 33-year-old male patient was placed in the ASU on May 11, 2022, after reporting a PREA incident. On May 12, 2022, the patient reported suicidal ideation and was placed at the MHCB level of care until May 19, 2022, when he was discharged to the 3CMS level of care in the STRH. The patient had not received mental health services prior to MHCB placement. The patient was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was not prescribed psychotropic medications.

Upon arrival to the STRH, the patient refused to sign a consent for mental health treatment and refused to participate in his initial PC assessment or SRASHE. There was a documented request by his PC for a clinician-to-clinician contact with the MHCB PC on May 20, 2022, but no further follow-up to this request was documented. The initial PC assessment noted that the patient would be offered groups twice weekly and individual therapy weekly. Five-day follow-up contacts were completed as required. There was no documentation that an IDTT meeting was held for this patient, there was no treatment plan developed, there was no evidence of any groups offered, and there was one note on May 24, 2022, stating that the patient refused mental health treatment. The patient paroled on June 20, 2022, without any further documentation of contact or attempted contact by mental health staff with the patient.

**Findings**

The care provided in the STRH for this patient was inadequate.

The patient was not seen by the IDTT, had no treatment plan, no documentation that groups or weekly individual contacts were offered, and no evidence of parole planning prior to his release 30 days after arriving in restricted housing.

**Patient I**

This 33-year-old male patient was provided with diagnoses of major depressive disorder, recurrent episode, moderate; moderate cannabis use disorder; and moderate cocaine use disorder. He was prescribed buspirone, duloxetine, mirtazapine, and oxcarbazepine.

He was placed in the STRH on January 22, 2022, following an incident of IEX. He was discovered with over 30 pills in his property upon transfer to the ASU and was suspected of hoarding his prescribed medications, yet he reported purchasing the medications for intoxication. There was no further information documented in the healthcare record regarding these medications.

An IEX screening was completed and noted that the patient should be scheduled for an IDTT for IEX behavior. Clinician-to-clinician requests were entered into the record prior to the patient's IDTT, and responses were documented. An initial PC assessment and SRASHE were completed on January 25, 2022, that were clinically adequate. The patient refused to participate in an initial psychiatric assessment but was willing to sign a consent for his medications at cell front. The patient refused to participate in his initial IDTT meeting on January 26, 2022. The initial treatment plan included an IPOC for depressed mood. There were two IDTT entries on the same date; one was designated as the patient's initial IDTT, and the other was identified as an IDTT to

address IEX. Of note, there was discussion of IEX in both treatment plans, and the content of the plans appeared to be identical other than the reason for the IDTT.

The patient refused all groups, all individual PC contacts, and all psychiatric contacts offered to him while housed in the STRH. He was seen at cell front and was described as agitated, depressed, with tangential thinking, responding to internal stimuli, and talking to himself. PC documentation was at times contradictory. Specifically, there were notes in which the patient was described with tangential thinking during the contact, yet the mental status description in the same note documented linear and relevant thought processes. Also, PC notes indicated that the patient programmed adequately with peers, while the record indicated that he had refused all groups.

On February 27, 2022, a CIT contact occurred in response to a custody request noting that the patient was responding to internal stimuli, with yelling and derogatory statements to others, talking and yelling to himself, and pacing. He also was uncooperative with inappropriate behavior toward staff. During the cell-front contact, the patient was described as paranoid, with auditory hallucinations and irritability. The patient requested an increase in his buspirone, and a psychiatric referral was generated. Additionally, the patient reported that he had previously submitted a request to see the psychiatrist. The patient was seen by a psychologist, not a psychiatrist, in response to this request on March 1, 2022. At that time, he was reportedly doing fine, despite talking to himself in his cell both prior to and following the psychologist's contact at his cell door. The patient refused psychiatric contact on March 3, 2022, and was released from the ASU on March 5, 2022.

### Findings

The treatment provided to this STRH patient was inadequate.

Multiple progress notes and a crisis contact noted that the patient was decompensating with probable psychosis; this decompensation was not addressed during clinical contacts or by the IDTT. Additionally, PC documentation was internally inconsistent, and a psychologist, rather than a psychiatrist, responded to a referral and request for psychiatric evaluation.

### Patient J

This 36-year-old patient was provided with diagnoses of unspecified depressive disorder, unspecified schizophrenia, and other psychotic disorder. He was prescribed olanzapine, mirtazapine, buspirone, and benztropine. He was generally medication adherent. The patient was placed in the STRH on March 28, 2022, for possession of a deadly weapon. The initial PC and psychiatric assessments were adequate and occurred timely. The initial IDTT occurred on April 6, 2022, and a treatment plan was developed to address depression. IDTT documentation was clinically adequate.

The patient was offered weekly PC sessions; when the patient chose to attend those sessions, the contacts appeared to be therapeutic. The patient was offered two to three groups weekly but refused to attend all groups while housed in ASU. The patient was offered psychiatric contacts monthly, and patient needs were addressed appropriately by medication management. The

patient was appropriately assessed for involuntary movements possibly resulting from treatment with antipsychotic medications. The patient was released from the ASU on June 9, 2022.

**Findings**

The care provided to this STRH patient was adequate.

**Patient K**

This 23-year-old patient was placed in the STRH on March 11, 2022. He was provided with a diagnosis of major depressive disorder, recurrent episode, mild. He was prescribed mirtazapine, sertraline, aripiprazole, and buspirone; he was medication adherent.

On March 14, 2022, a PC initiated a clinician-to-clinician contact which was responded to appropriately; however, another PC initiated clinician-to-clinician contact on March 18, 2022, received no response. A routine psychiatric follow-up was completed on March 15, 2022, to address the patient's report of insomnia, and medications were adjusted. There was no formal initial psychiatric assessment conducted, and the psychiatrist present at the initial IDTT was not the psychiatrist who evaluated the patient on March 15, 2022.

The ICC occurred on March 17, 2022. Although mental health staff attended the ICC, no PC had met with the patient prior to the ICC. The initial PC assessment and SRASHE were attempted on March 18, 2022; however, the patient refused, and the assessments were completed by healthcare record review.

An IDTT occurred on March 23, 2022, with the patient present, and it appeared clinically adequate. The treatment plan indicated that the patient would be offered groups twice weekly and would be seen by the PC weekly. The patient was offered three groups over the following three weeks, which was inconsistent with the treatment plan and STRH treatment requirements. Additionally, current events group documentation on March 22, 2022, noted in the comments section, "No group participants, MH scheduling conflict," yet the patient was noted as having attended that group for a full 60-minute session. The patient was offered weekly sessions by a PC but was seen by different PCs each time during his stay. The only contact the patient agreed to attend included adequate documentation. The patient was transferred on April 8, 2022.

**Findings**

The care provided to this STRH patient was inadequate.

An initial psychiatric assessment was not documented, and the initial ICC occurred prior to any mental health clinical contact. The patient was not offered the required group therapy. Additionally, there was poor continuity of care.

**Patient L**

This 47-year-old patient was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was prescribed mirtazapine and buspirone with intermittent medication adherence. He was placed in the STRH on March 9, 2022, and the ASU pre-

placement screening incorrectly noted that the patient was housed in the general population and not receiving treatment at the 3CMS level of care. A clinician-to-clinician contact was requested on March 10, 2022, with no response documented. Despite being documented by the same clinician on the same date at nearly the same time, the initial PC assessment noted that the patient had refused and therefore was completed by record review, while the SRASHE included information noted to have been obtained during a patient interview. The SRASHE did not indicate whether the interview occurred in a confidential setting or at cell front. The patient refused a psychiatric session on March 16, 2022. A progress note was written on that date, but there was no indication that a comprehensive assessment or record review was completed by the psychiatrist. An IDTT was held on March 16, 2022, which the patient attended. IDTT documentation was adequate, however, there was no mention of group therapy in the treatment plan, a requirement for STRH patients. Despite this, the patient was offered the required number of groups during his stay, but he refused all groups.

The patient was offered weekly PC contacts, and refused all contacts. He was seen at cell front. The patient agreed to see the psychiatrist on two occasions in a confidential setting to address sleep concerns and for medication adjustments. The patient was seen in the ICC with mental health staff present as required. He was transferred to another facility on May 19, 2022.

**Findings**

While the care provided to this STRH patient was generally consistent with requirements, it was inadequate as there was no documentation that an initial psychiatric assessment was completed, and group programming was not addressed in the patient's treatment plan.

**Patient M**

This 34-year-old male patient was admitted to the MHCB after refusing to eat for several days and exhibiting signs of active psychosis. He was provided with a diagnosis of unspecified schizophrenia and other psychotic disorders. He was prescribed benztropine, haloperidol, olanzapine, and valproic acid; at the time of admission lorazepam was prescribed on an as-needed basis during the MHCB stay.

On March 8, 2022, the day of MHCB admission, the patient was seen for the initial primary clinician assessment and SRASHE; however, the content of these assessments was minimal and provided little information beyond what was documented by the CIT on the same date. An initial psychiatric evaluation and a second initial PC evaluation were completed on March 9, 2022, the same date as the initial IDTT meeting. It could not be determined whether these assessments were completed prior to or during the IDTT meeting. The content of these initial assessments was comprehensive, and the IDTT was adequate. The patient was seen for an initial recreation therapist assessment on March 10, 2022, and the content was also adequate. The patient was seen daily by either a psychiatrist or PC; on some occasions, the patient was seen by both clinicians. There was documentation of at least three recreation therapist contacts while the patient was housed in the MHCB. Nursing notes were entered into the healthcare record following each shift that were clinically relevant and useful.

Patient progress was documented, and a discharge IDTT was held on March 15, 2022. A discharge SRASHE that was completed the day prior was of adequate quality. It included an updated safety plan. The discharge summary written by the PC was adequate and addressed the patient's upcoming parole date. Recommendations for follow-up with the patient in the EOP were included.

The only area of concern noted during the review was documentation by nursing staff at the time of admission that the patient was prescribed a haloperidol injection every two weeks, but the on-call psychiatrist indicated that the dosage reflected a monthly injection rather than a bi-weekly injection. This issue was not discussed further in the documentation, and the injection was not prescribed nor provided to the patient while housed in the MHCB.

**Findings**

The care provided to this patient was adequate, however there were concerns noted with medication reconciliation at the time of admission that were not resolved in the healthcare record documentation.

**Patient N**

This 42-year-old male patient was admitted to the MHCB from the 3CMS level of care on March 16, 2022, after reporting suicidal ideation. He was provided with diagnoses of amphetamine type substance use disorder, major depressive disorder, recurrent, moderate, and opioid use disorder, severe. Progress notes also noted diagnoses of generalized anxiety disorder, PTSD, and impulse control disorder. Upon MHCB admission he was not prescribed psychotropic medications; but clonidine, mirtazapine, and venlafaxine were later prescribed during the stay, and those medications were continued upon discharge.

Initial PC and psychiatric assessments as well as an initial SRASHE were completed timely. The psychiatric assessment was noted to be comprehensive and thorough. The initial IDTT meeting was held on March 17, 2022. The resulting treatment plan was adequate and appeared to be developed to address the patient's needs. On the same date as the IDTT, a second initial PC assessment was completed that was more comprehensive than the one completed at the time of admission. The PC also completed the Reasons for Attempting Suicide Questionnaire (RASQ) at that time, although it was unclear from documentation how the results were interpreted or integrated into the patient's clinical picture. An initial recreation therapist assessment was completed and appeared adequate. During the patient's eight-day stay in the MHCB, he was seen daily by a psychiatrist or PC and had two recreation therapist contacts. PC contacts evidenced engagement in formal therapeutic activities, and although they did not match the interventions identified in the treatment plan, the interventions were appropriate to the patient's needs and appeared effective. A discharge SRASHE, discharge treatment plan, and PC discharge summary were completed prior to discharge to the EOP level of care. The rationale for the decision to discharge the patient was adequate, as was the plan developed for follow-up.

**Findings**

The care provided to this MHCB patient was adequate.

**Patient O**

This 31-year-old male patient was admitted to the MHCB from the general population on June 27, 2022, following an episode of drug intoxication. He was provided with diagnoses of amphetamine or other stimulant intoxication, without perceptual disturbances, without use disorder; acute spice intoxication, now resolved; and adjustment disorder with anxiety. During his stay in the MHCB, he was prescribed hydroxyzine and olanzapine on an as-needed basis, but he did not take these medications. Documentation indicated that the patient was not interested in taking psychotropic medications.

The patient was admitted for altered mental status, hypersexual behavior, and disorientation following ingestion of "spice," which resulted in evaluation and treatment at a community hospital. Upon admission to the MHCB, initial assessments and a SRASHE were attempted but could not be completed thoroughly due to the patient's altered mental status. On June 28, 2022, the initial psychiatric, PC, and recreation therapist assessments were completed, as was an initial IDTT meeting. The content of the initial assessments were adequate. The initial IDTT included an IPOC to address "grave disability," as well as IPOCs for alteration in comfort, ineffective coping, and psychosocial well-being managed by nursing staff. While much of the treatment plan appeared appropriate to the patient's needs, the treatment goals included medication management, despite the patient not being prescribed medications and "therapy to address substance induced MH symptoms" without further explanation. The patient was seen daily by a psychiatrist or PC; he was often seen by both simultaneously. Psychiatric documentation was adequate; however, PC documentation was redundant. No discussion of treatment interventions provided by the PC were documented. Recreation therapist contacts included discussion and practice of coping skills with the patient.

At the time of discharge an IDTT was held, and a discharge summary and SRASHE were completed. The SRASHE included a safety plan which was adequate. The discharge summary and discharge IDTT were limited in content. The decision was made to discharge the patient to the 3CMS level of care without rationale and without outlining treatment goals. Required follow-up contact timeframes were listed without clinical targets.

**Findings**

The care provided to this MHCB patient was inadequate.

PC documentation was poor. This documentation was limited and redundant, with possibly inaccurate entries due to repeating content from note to note. The treatment plan included goals irrelevant to the patient's treatment, and there was no documentation that therapeutic interventions were provided by the PC. Discharge documentation was insufficient to assist with continuity of care.

**Patient P**

This 46-year-old transgender patient was admitted to the MHCB on January 3, 2022, after reporting suicidal ideation with a plan to hang herself. She was provided with diagnoses of bipolar I disorder, current or most recent episode depressed; unspecified borderline personality

disorder; gender dysphoria; and PTSD. The patient was prescribed olanzapine, lithium, and mirtazapine at the time of admission. Fluoxetine was added during the MHCB stay.

Initial psychiatric, PC, and recreation therapist assessments were completed on January 4, 2022, as well as the initial IDTT meeting. It could not be determined if the initial assessments were completed prior to the initial IDTT. The quality of the assessment documentation and the initial master treatment plan were adequate. The patient was seen daily by a psychiatrist, a PC, or both clinicians, and recreation therapist contacts were documented five times during the patient's eight-day MHCB stay. Clinically appropriate therapeutic interventions were documented, including coping skill development, relaxation practice, and affect regulation skills. At the time of discharge, a SRASHE was completed adequately and included an updated safety plan. The discharge IDTT documentation and discharge summary were adequate and provided support for continuity of care at the EOP level of care.

**Findings**

The care provided to this MHCB patient was adequate.

**Patient Q**

This 38-year-old male patient was placed at the MHCB level of care on January 22, 2022, after reporting suicidal ideation. He was initially provided with a diagnosis of bipolar I disorder, most recent episode depressed; progress note documentation included additional diagnoses of chronic PTSD and substance use disorder. However, at the time of discharge, the patient was provided with a diagnosis of adjustment reaction with anxiety and depression and a possible diagnosis of major depressive disorder. He was only prescribed hydroxyzine on an as-needed basis while housed in the MHCB.

Initial PC and psychiatric assessments as well as an initial SRASHE were completed timely. The content of the PC assessment and SRASHE were comprehensive and thorough. Initial assessments noted that the patient was suicidal after his daughter told him that she no longer wanted to communicate with him. He reported that he struggled with thoughts of suicide for several days.

An initial IDTT meeting was held on January 24, 2022, and it was documented that the patient reported absence of all symptoms and denied suicidal ideation at that time without any further explanation or exploration. The goals developed for the patient appeared generic and included a goal of medication adherence, despite no psychotropic medications prescribed. The following day, the patient was tearful during a PC session and reported that he was never suicidal. He reported that he felt alone and did not have a cellmate. The patient was seen more frequently than minimally required by a psychiatrist and consistently reported that he was not interested in taking psychotropic medications, preferring verbal therapies. PC contacts were held as required but little evidence of therapeutic interventions was documented despite the patient's stated preference for the same.

A discharge SRASHE completed on January 30, 2022, was inadequate as the patient was described as medication adherent, despite not being prescribed psychotropic medications. It also

indicated that the strongest protective factor for the patient was family support and included the patient's daughter as the only individual the patient would turn to for help. This was problematic in that interpersonal challenges with the patient's daughter had triggered suicidal ideation and placement in the MHCB. There was no reference to this in the SRASHE nor any mention of the need to address interpersonal coping following discharge to the EOP. Similarly, the PC discharge summary recommended weekly therapy in the EOP to address depression and anxiety without reference to the family/interpersonal triggers for those symptoms. The discharge summary was generic and void of any description of the patient's course of treatment or what interventions proved useful to assist the patient in achieving stability.

**Findings**

The care provided this MHCB patient was inadequate.

There were frequent inaccurate entries about the patient's medication status, a paucity of documented treatment interventions, poor suicide risk assessment, insufficient safety planning, and an inadequate discharge summary.

**APPENDIX C-13**
**AVENAL STATE PRISION (ASP)**
**August 30, 2022 – September 1, 2022**

**Patient A**

This 37-year-old patient was housed at ASP since 2018.  He was provided with a diagnosis of adjustment disorder with mixed disturbance of emotions and conduct.  He was not prescribed psychotropic medication.  His healthcare record was randomly selected to assess the adequacy of care provided.

This patient's annual IDTT occurred on April 6, 2022.  The clinical summary provided a brief review of his functioning since the previous IDTT, however documentation of response to treatment interventions was needed.  The IPOC for decrease in functioning, that was established in 2019, was continued without update.  IPOCs were not developed for identified symptoms of anxiety, depression, and sleep disturbance.

Primary clinician contacts occurred more often than minimally required with good continuity of care.  The clinician, an unlicensed social worker, appropriately documented communication of her unlicensed status and her ongoing supervision by a licensed clinician.  Documentation included a thorough review of the patient's management of stressors, mental status, and impact on functioning.  Symptoms of irritability and moderate to severe anxiety and depression were exacerbated by chronic pain from a shoulder injury for which the patient believed that he was not receiving adequate medical care.  Treatment interventions frequently included processing stressors and providing support with the utilization of mindfulness during one clinical contact.

**Findings**

The care provided to this patient was inadequate.

Treatment planning was not updated for the patient's treatment needs.  The utilization of clinical interventions was a positive finding; however, utilization of more active, evidence-based interventions such as CBT or interventions to assist in pain management were indicated.  The duration of reported moderate to severe anxiety and depression warranted consideration of a psychiatric referral.  The current diagnosis of adjustment disorder, that was time-limited, was in place since 2019 and warranted clinical review for update.

**Patient B**

This stable, 35-year-old patient transferred to ASP on June 13, 2022.  His healthcare record was randomly selected to assess the adequacy of care provided.

The patient had a history of auditory hallucinations but was asymptomatic for several months.  PCs identified depression as a treatment target; conversely, anxiety was identified as a treatment target by the psychiatrist.  There was clearly indication for coordination of care as anxiety was not targeted as an IPOC during the initial IDTT.  The goal to reduce depression to an eight or lower on a ten-point scale was inappropriate, as the only documented rating of depression was

provided during the psychiatric assessment when depression was rated three of ten. The rationale for the identified intervention to utilize goal setting was not clearly documented. There was no clear alignment between the clinical data and the case formulation. Of concern, was reference to passive suicidal ideation in the case formulation section; it was unclear if this symptom was current or historical.

Psychiatric contacts occurred more frequently than minimally required with good continuity of care. Documentation was thorough and provided a useful, descriptive summary of mental status and current functioning. The psychiatrist provided rationale for mental health diagnostic considerations; possible diagnoses of major depressive disorder with psychotic features, schizophrenia and substance induced mood/psychosis were all under consideration, but these diagnostic considerations should have been finalized by the second routine psychiatric contact. The patient was prescribed Prozac.

No primary clinician contact was available for review during the monitoring period; however, a PC contact was not clinically indicated or required during the dates reviewed.

**Findings**

The psychiatric care provided to this patient was adequate; however, the overall care was assessed as marginally adequate.

Treatment planning required improvement with provider coordination and individualized goal setting. Case conceptualization also needed improvement, including clarification regarding the timeframe of passive suicidal ideation mentioned in IDTT documentation.

**Patient C**

This 39-year-old patient transferred to ASP in 2018. He was provided with a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of care provided.

Primary clinician contact occurred with good continuity of care approximately every other month, which was more often than minimally required. Throughout contacts, the patient presented with stability. There was no clear documentation of current symptomatology, other than depression was "partially in remission", or the impact of symptoms on current functioning.

An annual IDTT was held on August 25, 2022. An IPOC targeting depression, implemented in October 2020, was continued despite documentation in routine contacts that the patient had met this established goal since April 2021. The provided rationale for the current level of care was to "retain for symptoms of anxiety and depression"; this rationale lacked specificity and full alignment with the reviewed primary clinician documentation.

**Findings**

The care provided to this patient who was clinically stable was adequate.

493

Given the lack of documented specific signs and symptoms of mental illness, impact on functioning and achievement of treatment goals; it was unclear why reviewed treatment did not address discharge and transition planning for removal from the MHSDS. Relatedly, it was unclear why the patient was continued at the 3CMS level of care at his annual IDTT. His diagnosis of adjustment disorder was established in February 2020 and warranted review as the diagnostic timeframe criterion was exceeded.

**Patient D**

This 35-year-old patient transferred to ASP on May 19, 2021. His healthcare record was randomly selected to assess the adequacy of care provided.

Provided psychiatric diagnoses varied by provider and location in the healthcare record. Anxiety was provided as the diagnosis in the official place of record. Conversely, adjustment disorder with mixed anxiety and depressed mood was listed in psychiatric documentation, and unspecified depressive disorder was included in PC documentation.

Most PC contacts occurred more often than minimally required. Documentation was generally descriptive of the patient's response to stressors, mental status, functioning and utilization of appropriate clinical interventions. His symptoms were well managed by prescribed Zoloft and Vistaril.

An annual IDTT was completed on May 11, 2022. A summary of functioning, symptoms, and treatment response over the past year was needed, as documentation focused on more recent functioning. An IPOC for depression with an intervention to foster a therapeutic alliance, established in June 2021, was not updated.

**Findings**

The overall care provided to this patient who was clinically stable was adequate.

While treatment planning was not appropriately updated, and diagnostic clarification was needed; these shortcomings did not impact ongoing care by providers. These issues required attention, as they could disrupt continuity of care with a change in providers.

**Patient E**

This 39-year-old patient transferred to ASP on June 14, 2021. His healthcare record was randomly selected to assess the adequacy of care provided.

There was a diagnostic discrepancy between providers. Both providers provided the patient with a diagnosis of PTSD. Psychiatric documentation also indicated diagnoses of unspecified schizophrenia and other related disorder and unspecified depressive disorder, while primary clinician documentation included a separate diagnosis of unspecified bipolar disorder.

Monthly PC contacts occurred for this patient who reported daily but manageable hallucinations with intermittent and mild anxiety and depression. He was able to appropriately manage the unexpected loss of his sister. Reviewed documentation indicated that the patient remained

494

engaged in treatment, was medication adherent and appeared psychiatrically stable. PC documentation also included a useful description of mental status, functioning and response to treatment. Primary clinician contacts consistently included documentation of active listening, reflection, validation, and processing.

An IDTT was held on January 6, 2022 to remove the patient from the "risk list" which included termination of weekly contacts. A summary of functioning since placement on the risk list, as well as the rationale for placement and removal were not located in IDTT documentation. However, it appeared that the patient was placed on the list due to assessment of moderate acute suicide risk in June 2021 when initial assessments were completed. A SRASHE was completed after removal from the risk list and in response to his sister's death when the patient was assessed with high chronic and low acute suicide risk.

An annual IDTT was held on June 9, 2022, when the IPOC for hallucinations was continued; a self-harm IPOC was discontinued without rationale, and an anxiety IPOC was added. A summary of current mood and recent functioning was documented. No summary of mood, functioning and treatment response since the prior IDTT was documented.

**Findings**

The overall care provided to this patient who was clinically stable was adequate.

Treatment needs were consistently addressed during routine clinical contacts, although treatment planning and inclusion of individualized treatment for grief and diagnostic clarification were needed. The lack of assessment and clinical rationale for removal from the 'risk list' was an area of concern.

**Patient F**

This 42-year-old patient transferred to ASP on February 5, 2021. He was provided with diagnoses of ADHD, PTSD, and unspecified bipolar related disorder. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of care provided.

The patient was not a participant in the MHSDS when he submitted a health care request for anger management programming. He was seen for three follow-up contacts, when the personal insight exploration curriculum workbook was reviewed with the patient. Following a report of symptoms of mania and depression; psychiatric and PC initial assessments were completed, and the patient was referred for mental health treatment at the 3CMS level of care.

PC initial assessments and a SRASHE were comprehensive and included sufficient psychosocial content. IPOCs for mania and depression with measurable, and objective goals were established. The identified clinical intervention was to foster a therapeutic alliance. It was unclear why an IPOC for mania was developed given the lack of documentation to support current manic symptoms. During a subsequent primary clinician contact, the personal insight exploration curriculum workbook continued to be utilized.

**Findings**

The overall care provided to this patient who was clinically stable was adequate.

This patient was appropriately referred to the MHSDS, and appropriate clinical interventions were utilized. Clinical documentation was thorough and useful for continuity of care. The rationale for each diagnosis, alignment between treatment provided and identified treatment interventions, and improved treatment planning was needed.

**Patient G**

This 41-year-old patient transferred to ASP in 2018. He was provided with a diagnosis of major depressive disorder, and he was prescribed Zoloft. His healthcare record was randomly selected to assess the adequacy of care provided.

Psychiatric contacts occurred more frequently than minimally required, and the patient was generally seen monthly by either the psychiatrist or primary clinician to address anxiety or depression. Overall, he responded well to psychotropic medication and clinical interventions utilized by the primary clinician that included support, validation, and processing.

The patient's annual IDTT was completed on May 19, 2022. An IPOC for depression was continued with updates made to treatment goals. No IPOC for anxiety was documented, despite identification of anxiety as a treatment need. The clinical summary did not provide a sufficient summary of the patient's mental status, functioning and response to treatment since the previous IDTT.

**Findings**

The overall care provided to this patient who was clinically stable was adequate.

Routine contacts consistently occurred with the same provider and documentation was appropriate for continuity of care. Treatment planning needed improvement.

**Patient H**

This 61-year-old patient transferred to ASP in 2015. He was provided with a diagnosis of bipolar disorder II, and he was prescribed Lamictal and Zoloft. His healthcare record was randomly selected to assess the adequacy of care provided.

Provider contacts generally occurred more often than minimally required, and the documentation was clinically useful. Primary clinician documentation indicated that depression was partially in remission and the utilization of clinical interventions such as positive psychology, reflective listening, validation and problem-solving. This patient was actively involved in various institutional programs, demonstrated good coping, and had positive family support. Psychiatric documentation similarly indicated ongoing psychiatric stability and good response to treatment.

496

**Findings**

The overall care provided to this patient who was clinically stable was adequate.

The patient's treatment needs appeared to be met by mental health care providers. Documentation included sufficient clinical information for continuity of care.

**Patient I**

This 32-year-old patient transferred to ASP on June 9, 2021. He was provided with diagnoses of adjustment disorder with anxiety and unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Remeron and Zyprexa. His healthcare record was randomly selected to assess the adequacy of care provided.

Psychiatric contacts occurred more frequently than minimally required. Mental health symptoms, impact on functioning, medication side effects and laboratory studies were routinely reviewed. After a period of stability, the patient requested discontinuation of Zyprexa, and shortly thereafter, Remeron. After these medication changes, he was followed regularly and continued to exhibit mental health stability.

Primary clinician documentation described the patient as stable. Supportive therapy was provided, although identified interventions included in treatment planning were not located in reviewed documentation of routine PC contacts. Documentation indicated that the clinician utilized appropriate termination techniques when the clinician ended employment at the facility.

The annual IDTT occurred on June 28, 2022. IPOCs for hallucinations and anxiety developed during the previous IDTT were not updated, nor was a summary of symptoms, functioning or treatment response provided.

**Findings**

The overall care provided to this patient who was clinically stable was adequate.

Reviewed documentation indicated ongoing stability, provider continuity of care and positive response to treatment. There was need for improvement regarding the utilization of treatment interventions identified during the IDTT and updated treatment planning documentation.

**Patient J**

This 40-year-old patient transferred to ASP in 2017. He was not prescribed psychotropic medication. His healthcare record was randomly selected to assess the adequacy of care provided.

There was discrepant information included in routine primary clinician contact documentation regarding the patient's diagnosis. In one area he was provided with diagnoses of antisocial personality disorder and unspecified anxiety disorder; this contrasted with a diagnosis of unspecified bipolar disorder elsewhere documented.

Primary clinician contacts occurred more frequently than minimally required, with a frequency ranging between weekly and every three months.  The clinical rationale for the weekly PC contacts was not located, but this frequency of contacts did not appear clinically necessary. Symptoms of depression and anxiety were generally described as in remission or manageable. The patient was actively involved in institutional programming.  Overall, clinical interventions included reflective listening, positive psychology, validation and problem-solving.

This annual IDTT occurred on August 11, 2022.  IPOCs developed in 2017 remained unchanged, and a summary of functioning, symptoms and treatment response was not updated.  The rationale for level of care stated, "will be retained in CCCMS."  The required psychiatric contact in advance of the IDTT did not occur.

**Findings**

The overall care provided to this patient who was clinically stable was adequate.

It was unclear why MHSDS discharge was not considered and documented for this clinically stable patient.  Treatment planning was not appropriately updated, and the rationale provided for the current level of care was insufficient.  Diagnostic clarification was also indicated.