# EXHIBIT A



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email: tnolan@rbgg.com

January 25, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Matthew A Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Deveraux & O'Gara LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnson, RI  02908
Mlopes@pldolaw.com

   Re: *Coleman v. Newsom*:  Plaintiffs' Comments on 29th Draft Report, Part C,
      Covering EOP Level of Care Institutions, and Part D, Covering CCCMS
      Level of Care Institutions
      <u>Our File No. 0489-3</u>

Dear Special Master Lopes:

   We write to provide Plaintiffs Counsel's comments regarding the Draft 29th Round
Report, Part C (EOP Facilities) ("the Draft EOP Report") and regarding the Draft 29th
Report, Part D (CCCMS Facilities) ("the Draft CCCMS Report") (collectively, "the Draft
Reports").  Our primary concern as to both reports—discussed in Sections I and II
below—is to the lack of additional recommendations to remedy the snowballing staffing
crisis and the long-standing deficiencies in quality of care.  Such recommendations are
necessary in light of the troubling factual findings in both reports regarding those issues.
In addition, we raise some discrete concerns regarding the Draft Reports in Section III
below.

**I.**  **CDCR'S ONGOING STAFFING CRISIS**

   The evidence of the current acute staffing crisis in CDCR as set forth in the Draft
Reports is overwhelming.  As the Draft EOP Report explains:

     Given the persistence of defendants' inability to recruit and
     retain sufficient mental health staff over many years,
     "transformational" solutions may need to be considered, as it

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 2

> is clear defendants are presently unable to provide
> constitutionally adequate mental health care to the number of
> seriously mentally ill persons now incarcerated in California.

Draft EOP Report at 145.[1]  The Draft Reports describe the staffing crisis as "a bona fide mental health staffing emergency within CDCR," *see id*., with CDCR maintaining "abysmally low" fill rates, *see* Draft CCCMS Report at 5.  Statewide staffing vacancy rates across all institutions as of September 2022 for key mental health categories stood at:

- Psychology – line staff:  38.2 percent.

- Psychology – all classifications:  33.1 percent.

- Social Work – line staff:  33.5 percent.

- Social Work – all classifications:  30 percent.

- Recreation Therapist:  26.3 percent.

- Medical Assistant:  47.9 percent.

Draft CCCMS Report at 6 (citing Special Master's December 9, 2022 staffing vacancy report, ECF 7677).

The strong evidence in each of the draft reports concerning the severe staffing crisis now occurring is reviewed in detail below.

### A.     There is a Severe Staffing Crisis In the EOP Institutions

The Draft EOP Report documents extraordinary problems with vacancy rates for the EOP institutions.  The report also highlights that despite some improvements in the persistently problematic psychiatry categories, the chronic shortages in the primary clinician positions (psychologists and social workers) have spiraled out of control to crisis levels.  The report documents that "13 of 15 institutions with enhanced outpatient programs (EOP) failed to fill 90 percent of allocated psychology positions; 11 of 15 were unable to fill 90 percent of allocated social worker positions."  *See* Draft EOP Report at 5-6 and Figure 1.  Many institutions had egregiously high vacancy rates leading to

---

[1] All citations to the Draft CCCMS Report and Draft EOP Report are to the internal pagination provided in those reports.  Citations to ECF filed documents are to the ECF banner number.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 3

"functional vacancy rates for both primary clinician classifications [that] were at or above 30 percent." *Id.* at 6.

The crisis is not limited to primary clinicians. Indeed in all but one staffing category "the 15 institutions with EOP programs continued to report unacceptably high vacancy rates. Except for telepsychiatry, all such vacancy rates exceeded ten percent." *See* Draft EOP Report at 46. The report documents overall vacancy rates across the 15 EOP institutions as follows:

- 13% functional vacancy rate for Chief Psychiatrists.

- 55% functional vacancy rate for Senior Psychiatrists.

- 24% functional vacancy rate for Staff Psychiatrists (51% without registry).

- 17% functional vacancy rate for Chief Psychologists.

- 13% functional vacancy rate for Senior Psychologists.

- 37% vacancy rate for Staff Psychologists (45% without registry).

- 30% functional vacancy rate for Social Workers.

- 11% functional vacancy rate for Recreation Therapists.

- 17% functional vacancy rate for Psychiatric Technicians.

- 26% functional vacancy rate for Office Technicians.

Draft EOP Report at 46-47. Reviewing these numbers, the Draft EOP Report concludes, "It is axiomatic that defendants' failure to satisfy the established staffing requirements significantly contributed to its inability to provide the Coleman class with constitutionally adequate mental health treatment." *Id.* at 51-52.

Significantly, "the dire state of CDCR's mental health staffing levels has led Mental Health leadership to authorize a 'patient triaging' process at twelve [of the 15 EOP] institutions." *Id.* at 7. The Draft EOP Report correctly observes that "[b]y pivoting to triaging patients, CDCR is tacitly acknowledging that many institutions' mental health staffing vacancies make it impossible to provide Program Guide compliant mental health care to the entire MHSDS population. Without dramatic intervention, defendants will remain noncompliant with the Court's June 13, 2002 staffing order, and patients will suffer." *Id.*

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 4

The Draft EOP Report illustrates the myriad ways in which "the staffing crisis … continues to hinder defendants' ability to provide constitutionally adequate mental health care to the plaintiff class." *See id.* at 4. To list just a few examples, across multiple EOP institutions, "[c]ompliance with the requirements for treatment of MHSDS patients in restricted housing was significantly impeded by the defendants' inability to secure adequate staffing to satisfy Program Guide ratios." *Id.* at 144. Similarly across the institutions "the majority of CMHPP components were implemented with varying degrees of compliance and quality and, at times, impacted by staffing deficiencies." *Id.* at 109. At one major EOP institution, "CHCF reported that staffing was its most significant challenge during 2020 and 2021, during which the institution's very consequential staff turnover had a horrific impact on patient care and staff morale." *Id.* at 189-90. Yet despite efforts, "CHCF was unable to hire *any* new mental health staff during the review period" and was forced to implement a "'harm reduction' strategy" and to transfer out hundreds of EOP patients due to poor staffing. *See id.* at 190. This even as CDCR is making use of multiple overflow housing units to house scores of EOP patients due to a lack of adequate EOP housing. *See infra* Section III.D and Attachment A hereto. At another institution, "MCSP was noncompliant all six months for observation of the preparation and administration of HS and AM/PM medications due to staffing shortages." *Id.* at 451. And even after COVID-19 conditions improved at MCSP, "there continued to be challenges related to the provision of required treatment hours, mostly due to staffing limitations." *Id.* at 466-67. "On weekends and holidays, SVSP reported that it attempted to have a CIT clinician on-site but due to staffing limitations this was not always possible." *Id.* at 611.

**B.       There Is Also A Severe Staffing Crisis At the CCCMS Institutions.**

The Draft CCCMS Report reinforces the conclusion that CDCR has a severe, current staffing crisis, with the 13 institutions reviewed "continu[ing] to report unacceptably high vacancy rates." Draft CCCMS Report at 11.

At a more granular level, the Draft CCCMS Report notes that "only three of the 13 3CMS institutions … had functional vacancy rates at or below ten percent for staff psychologists, as required by the court's June 12, 2002 order regarding mental health staffing vacancies." Draft CCCMS Report, at 5. Eight institutions had staff psychologist functional vacancy rates over 20 percent, and three institutions had functional vacancy rates over 50%. *Id.* The CCCMS Report finds the following, extremely deficient functional vacancy rates for a number of other positions and disciplines among the 13 CCCMS Institutions:

- 54% functional vacancy rate for Chief Psychiatrists. *Id.* at 8.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 5

- 48% functional vacancy rate for Chief Psychologists.  *Id.* at 9.

- 34% functional vacancy rate for Staff Psychologists (reduced from 40% by registry).  *Id.*

- 21% functional vacancy rate for Social Workers.  *Id* at 10.

- 18% functional vacancy rate for Recreation Therapists.  *Id.*

- 25% functional vacancy rate for Office Technicians.  *Id* at 11.

The Draft CCCMS Report shows that harm from the current staffing crisis in CCCMS institutions is significant and detrimentally affects myriad aspects of CDCR's mental health care programs:  At CIM, staffing shortages were partly responsible for the high rates of nonconfidential clinical contacts.  *Id.* at 133.  At CDCR's Reception Centers for men, NKSP and WSP, due to clinical staffing shortages caseloads were not assigned to psychiatrists or case managers – rather, the institutions established a maximum number of patients that individual psychiatrists and case managers can see each day, which means there was no continuity of care for patients there.  *See id.* at 69.  At CCI, psych techs – the members of the clinical team who interact with class members the most frequently in segregation units – often failed to attend the mandated Administrative Segregation morning meetings due to staffing shortages.  *Id.* at 218.  At Wasco, staff reported "chronic staffing shortages affected the provision of all mental health care at the institution."  *Id.* at 317.  In particular, access to care problems identified at Wasco were attributed to staffing shortfalls, *id.*, as were untimely initial mental health initial screenings, *id.* at 324, and untimely routine contacts with CCCMS patients, *id.* at 326.  The Wasco staffing shortages also "negatively impacted compliance with weekly 3CMS supervisory meetings" required by the CMHPP.  *Id.* at 334.  At North Kern, the Crisis Intervention Team "was hampered by insufficient mental health and nursing staffing."  *Id.* at 159.  At Avenal, progress in addressing deficiencies in treatment planning stalled in part due to staffing problems there.  *Id* at 345.  At CIM, the institution did not comply with Title 22 staffing requirements and psychology interns routinely provided coverage for patient caseloads.  *Id.* at 372.  Although staffing during the period at Solano was generally good on paper, in practice the institution struggled with "low clinical staffing due to FMLA leaves."  *Id.* at 95, 109.  At Wasco, the pre-release coordinator was assigned a regular caseload due to staffing shortages, and thus was only able to devote half of their time to the pre-release program.  *Id.* at 330.

As discussed further below, given the extensive, detailed documentation in the EOP and CCCMS Reports of the severe and rapidly growing staffing problems taking

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 6

hold in all clinical categories in CDCR, recommendations for further remediation are necessary.

## II.    CDCR'S ONGOING QUALITY OF CARE DEFICIENCIES IN EOP AND CCCMS PROGRAMS

Both Draft Reports document pervasive chronic problems with quality of care in the MHSDS.  For example, the Draft CCCMS Report identifies severe deficiencies in quality in the 160 detailed clinical case reviews conducted by the experts  at the 13 CCCMS institutions.  Of 160 detailed clinical case reviews at those institutions conducted by the Special Master's Clinical Experts, the following results were observed:

- 40 percent of patients reviewed received care of adequate quality;

- 16 percent of patients reviewed received care of marginally adequate quality;

- 44 percent of patients reviewed received care of inadequate quality.

Draft CCCMS Report at 21-22, 71.  The fact that almost half of all patients reviewed received care of inadequate quality is very troubling.

While it does not categorize the quality of care provided to patients covered by the detailed cases reviews in the summary section in the same manner as the Draft CCCMS Report,[2] the Draft EOP report contains numerous findings about quality problems with specific EOP institutions that supports the need for remediation in this area.  *See, e.g.*, Draft EOP Report, at 171 (at CMF "IDTT quality varied across treatment teams, with only three of 13 meeting all audit criteria.  There were deficiencies in most level of care justifications and/or higher level of care discussions" and noting that "the quality and quantity of EOP treatment groups were inadequate"), 211 (at CHCF "treatment plans were deficient" and there "was an overreliance on copied and pasted generic statements"), 335 (noting issues with hours of structured therapy at SQ and with "the quality of the structured treatment."), 441 (at LAC, "IDTT quality varied by provider.").

---

[2] The Draft EOP Report includes findings regarding, by our count, 282 detailed clinical case reviews of patients at the fifteen EOP institutions and observing that many of these patients received "inadequate quality" care.  We request that the Special Master add a summary section to the Draft EOP Report, similar to the Draft CCCMS Report, summarizing what proportion of patients at the fifteen EOP institutions received inadequate care, including information showing whether the patients reviewed were at the EOP or CCCMS level of care.

[4221023.6]

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 7

       The more granular findings in both the Draft EOP Report and the Draft CCCMS Report are also deeply concerning.  For example:

a.    <u>IDTT Case conceptualizations</u>:  The Draft CCCMS Report found serious problems with IDTTs, noting among other problems that "IDTT case conceptualizations were identified as an area in need of significant improvement across institutions and programs, as only NKSP and HDSP presented adequate case conceptualizations during observed IDTTs."  Draft CCCMS Report at 16.  The Draft EOP Report also found deficient case conceptualizations and/or treatment formulations.  Draft EOP Report at 78-79; *see also id.* at 61-62.

b.    <u>Inadequate Collaboration in Care Planning in IDTTs</u>:  The Reports also document inadequate IDTT collaboration in care planning at many though not all institutions.  *See* Draft CCCMS Report at 16-17; Draft EOP Report at 57, 74, 79.

c.    <u>Inadequate Discussions of Individualized Treatment Planning in IDTTs</u>:  The Draft EOP Report noted variability in treatment planning at observed IDTTs and noted that "reviewed treatment plans revealed similar inadequacies in the quality of treatment planning."  *See* Draft EOP Report at 57.  Similarly, patient health care record reviews for the EOP institutions found, as in each of the prior three monitoring rounds, "there were widespread problems with treatment plans."  *See* Draft EOP Report at 74.  The Draft CCCMS Report also found that "[t]reatment teams did not sufficiently contribute meaningful information toward developing individualized treatment plans during observed IDTT discussions" in 12 out of 24 programs observed.  *See* Draft CCCMS Report at 18-19.

d.    <u>Inadequate Level of Care and Medication Discussions in IDTTs</u>:  The Draft EOP Report identified that "healthcare record review indicated many instances where the IDTT did not properly consider and refer patients to higher levels of care" and highlighted numerous examples of serious concerns from the individual case reviews.  *See* Draft EOP Report at 82-84.  The Draft CCCMS Report noted medications and level of care decisions were each inadequate during IDTTs at about a third of the programs where IDTTs were reviewed in CCCMS institutions.  *See* Draft CCCMS Report at 20-21.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 8

    e.    <u>Treatment Planning – Lack of Individualized Goals and Inadequate</u>
<u>Treatment Goals</u>:  The Draft EOP Report noted "[s]imilar to prior
monitoring rounds, reviewed patient healthcare records revealed
numerous instances of IDTTs failing to appropriately modify
patients' treatment plans in response to changes in patients'
symptoms, mental health condition, or lack of treatment progress,
and/or where the treatment plan did not address the patient's current
treatment needs."  Draft EOP Report at 76.  The Draft CCCMS
Report similarly found significant problems with inadequate
treatment goals in cases reviewed at ASP, CCI, NKSP, PVSP, and
WSP.  Draft CCCMS Report at 23-26.

    f.    <u>Treatment Planning – Inadequate Treatment Interventions</u>:  Among
the EOP facilities, "[m]ost institutions also failed to … develop
appropriate treatment interventions for positive inpatient care
referral indicators."  Draft EOP Report at 108.  The Draft CCCMS
Report found that "[a]cross facilities and programs, a number of
treatment plans included nonspecific treatment interventions and/or
lacked the use of evidence-based therapies to address patients'
needs."  Draft CCCMS Report at 27.

    g.    <u>Inadequate Clinical Summaries and Inadequate Documentation of</u>
<u>Progress</u>:  The Draft EOP Report noted that, as in the prior
monitoring round, this monitoring round also "revealed numerous
concerns with the adequacy of treatment plans' clinical
documentation across institutions and programs."  Draft EOP Report
at 71.  These problems included "concerns with the adequacy of
provided documentation, which included sparse, overly brief,
incomplete, and/or inadequate documentation" and documentation
that "included substantial amounts of copied text," was "outdated,"
"generic," "included many phrases that appeared to be for liability
purposes and unrelated to the patient's mental health needs," "overly
terse and minimally useful for continuity of care," and/or contained
significant "discrepancies."  *Id.* at 71-73.  The CCCMS Report found
significant problems with inadequate assessments of changes in
patient functioning since the prior IDTT in many specific cases, with
many cases providing on "brief inconsequential updates" or being
"void of updated information altogether."  Draft CCCMS Report at
28.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 9

    h.    <u>Diagnostic Concerns</u>:  The Draft EOP Report noted "Patient healthcare record review also indicated numerous records needing diagnostic clarification and/or resolution of conflicting or multiple diagnoses."  *See* Draft EOP Report at 79.  The CCCMS Report noted several concerning diagnostic discrepancies and failures to resolved diagnostic differences.  *See* Draft CCCMS Report at 30-31.  Additionally, a minority of CCCMS programs whose IDTTs were observed failed to adequately discuss diagnostic decisions.  Draft CCCMS Report at 18.

    i.    <u>Failures to Implement Treatment Recommendations</u>:  The CCCMS Report noted widespread failures to implement key treatment recommendations.  As the report notes, "quality care requires the provision of adequate and coordinated treatment interventions provided to patients in order to meet their identified mental health needs."  *Id*. at 31.  The report found a failure to implement treatment recommendations in 31 percent of mainline CCCMS cases reviewed and in 21 percent of STRH cases reviewed.  Draft CCCMS Report at 30-31.

    j.    <u>Use of Outdated Language from Prior Notes Without Updating It</u>.  The CCCMS Report found significant problems with "healthcare record documentation being copied into subsequent documentation without updating."  *Id*. At 33.  This issues was most severe in STRH units, where it was notes as a problem in 37% of the 19 cases reviewed in STRH units at NKSP, PBSP, PVSP and WSP.  Draft CCCMS Report at 30-31.  The Draft EOP Report similarly noted instances of outdated documentation and text or clinical information that was copied from previous or outdated documentation.  *See* Draft EOP Report at 71-72, 77-78.

As discussed further below, given the depth and breadth of these identified problems, the Draft EOP and CCCMS Reports should both include a recommendation to address this long-standing, well-documented issue.

## III.    ADDITIONAL COMMENTS ON THE DRAFT REPORTS

### A.    Reporting on Staff Misconduct

The Draft Reports summarize the institutions' reporting regarding staff misconduct.  *See* Draft EOP Report at 116; Draft CCCMS Report at 55-56.  It is unclear

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 10

from these overall summaries and the underlying Institutional Summaries whether the
institutions are reporting only complaints against mental health clinicians or against all
staff, whether they are reporting only complaints by MHSDS participants or by all
incarcerated people, and whether certain institutions are reporting complaints raised
through the grievance process or through other avenues such as 989s. It is not clear
whether each institution followed the same reporting methodology. Plaintiffs are
concerned about whether these issues may have contributed to the wide disparities in data
such as data showing two "staff complaints" at RJD compared with "134 substandard
performance claims and 58 use of force allegations" at CHCF, even though both
institutions have large MHSDS populations. *See* Draft EOP Report at 116.

We therefore request that the Draft Reports clarify the scope of the reported data,
and any limitations on the data such as a discussion of different or unclear reporting
methodologies by the institutions.

### B.    Disproportionate use of RVRs

We appreciate the Special Master's detailed findings in the Draft EOP Report
regarding the disproportionate use of RVRs to punish class members as compared to non-
class members. For example, the Draft EOP Report found that 65% of RVRs were issued
to MHSDS patients at the 15 institutions, even though those patients accounted for only
50% of the population. *See* Draft EOP Report at 119. The report also helpfully includes
the specific numbers of RVRs issued to patients broken out by level of care. *See id.*
From our review, it appears that EOP patients are drastically disproportionately impacted
by RVRs. We request that the final report update these findings to break out what
percentage of the overall population was at each level of care at the fifteen institutions.

### C.    Proportions and Lengths of Stay of Class Members in Segregation

We appreciate the Draft Reports' detailed findings regarding segregation units.
We request that the Draft Reports be updated to include findings on the extent to which
class members, and particularly EOP class members, are disproportionately held in
segregated housing as compared to non-class members. For example, Defendants'
Report that as of December 1, 2022, 2.28% (1,331 of 58,423) of non-MHSDS people in
CDCR were in segregation. *See* D. Hockerson Ltr. Re November 2022 Seg Data (Dec. 7,
2022). By comparison, relying on Defendants' December 1, 2022 segregation data and
Defendants' close-in-time November 28, 2022 MIS Report, Plaintiffs calculate that
approximately 5.48% of the *Coleman* class was in segregation, including 10.93% of
EOP/EOP Mod class members. In other words, from this data produced by CDCR, EOP
class members were about five times more likely to be housed in segregation than non-
class members. Plaintiffs request that the Special Master's final reports include

information on whether and to what extent the monitor found disproportionate and concentrated use of segregated housing for class members during this round.

Additionally, both Draft Reports provide some information regarding class members' lengths of stay in segregated housing. Plaintiffs request that the information be summarized at a high level and be compared to prior reporting periods to ascertain whether the 2014 remedial plans issued in response to the Court's April 10, 2014 segregation order are decreasing class members' lengths of stay in dangerous segregation units.

### D.    Overflow Housing Issues

It is apparent from class member reports and Defendants' data that CDCR has been utilizing significant amounts of overflow housing in recent months and years, both in segregation and non-segregation settings. Defendants' use of overflow housing for patients on segregation status at CSP-Sacramento, whereby EOP ASU class members are being held indefinitely in PSU overflow, is confirmed in the Draft EOP Report at 662, 672-73, 675, 965. Additionally, Defendants reported in the email attached hereto as **Attachment A** (with redactions of patient identifying information) the following non-EOP units held the following census of EOP class members as of November 21, 2022:

1. KVSP (C7): 61
2. SVSP (D4): 21
3. SATF (overflow is occurring due to outbreak and quarantine issues)
    a. (A-3): 8
    b. (D): 7
    c. (E): 3
    d. (F): 26
4. MCSP
    a. (B): 10
    b. (3A): 9
5. CSP-SAC
    a. (A5): 9
    b. (A2): 19

We request that the Special Master include in the final reports a discussion and findings regarding the extent to which the monitors observed the use of overflow housing for class members during the monitoring round; whether the patients held in overflow settings receive the treatment, property and privileges commensurate with the housing unit to which they are endorsed to the extent it differs from the unit where they are housed; and, to the extent possible, the reasons for Defendants' apparently increased reliance on

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 12

overflow housing.  For instance, to the extent overflow units are employed to address
with staffing or bed shortages, Plaintiffs ask that those issues be identified.  Similarly, to
the extent the Special Master has identified limitations in the data needed to track this
issue on a systemic level, Plaintiffs request that those issues be discussed in the final
versions of the Reports.

### E.    Clarification Regarding Reporting on Pill Line Lengths

The Draft Reports document the extent to which the institutions' pill line durations
exceeded two hours*.  See* Draft CCCMS Report at 46 (noting that "[m]ost pill lines were
reported to be less than two hours in duration" and documenting the five institutions that
reported that all pill lines were under two hours, but also noting reports at three
institutions that some pill lines were over two hours); *see also* Draft EOP Report at 96-
97.  Prior reports highlighted whether pill lines were longer than thirty minutes long.  *See*
28th Round Report, ECF No. 7074 at 137-38 ("Eleven of the 18 CDCR institutions
covered in this report indicated no problems with lengthy pill lines, indicating that
inmates generally moved through the lines in 30 minutes or less."); 27th Round Report,
ECF No. 5779 at 85-88 (employing thirty minute or less standard).  It appears the Draft
Reports focus on the total duration of the pill line for all people in the line, while earlier
reports focus on the how long each class member had to stand in line to receive their
pills.  Assuming that is correct, please clarify the language in the Draft Reports and
provide information for each institution as to whether patients waited longer than thirty
minutes to receive their pills, consistent with prior reports.

### F.    Document Review Timeframes

Finally, for clarity and historical purposes, Plaintiffs request that the Special
Master specify the document review timeframes in both the EOP Report (for each of the
15 institutions) and the CCCMS Report (for each of the 13 institutions).

## CONCLUSION AND PROPOSED RECOMMENDATIONS

It is clear that CDCR mental health leadership feels besieged and defensive, and
oversees its chronic staffing troubles in a reactive manner that fails to anticipate problems
and is extremely slow to make needed changes in compensation and recruitment
strategies.  In the last 20 years, CDCR has stumbled from one staffing crisis to the next.
The harm from these failures of management are significant, as the Draft Reports make
clear.  As the Court has found, and the CCCMS Report notes, "[t]he Coleman class
cannot afford further delays in remedying the staffing crisis."  Draft CCCMS Report, at
7.

Special Master Matthew A. Lopes, Jr.
January 25, 2023
Page 13

Remediation of this issue is urgently needed, and a recommendation for action is more than warranted based on the findings in the Draft Reports. Given the Court's October 10, 2017 Order (ECF No. 5711) and Defendants' continuing inaction in the face of rapidly deteriorating clinical staffing, we request that the Special Master recommend the Court order Defendants to propose within 30 days a comprehensive plan with specific actionable steps and a timeline of no more than one year to remediate the current staffing deficiencies across all clinical categories. Given prior failed attempts to address this problem, any such plan should be required to include any and all measures necessary, such as consideration of targeted and across the board compensation increases, retention efforts including addressing deficient workplace conditions, clustering, and targeted population reduction measures. Additionally, either as an alternative remedy, or if Defendants do not have an adequate proposed remedy to quickly address the shortfalls, Defendants should be required to explain why, after over 20 years of failing to achieve mandated staffing levels, a Receiver should not be appointed to manage staffing and recruitment for them.

Similarly, CDCR quality of care has long lagged, as is well documented in these Draft Reports. Plaintiffs therefore request that the Special Master add a recommendation requiring Defendants to propose a plan within 90 days to address CDCR's chronically deficient quality of mental health care, including, for instance, appointment of a quality of care point-person within CDCR to oversee training and establishment of standards and benchmarks for progress aimed at improving mental health quality of care.

Thank you for considering these comments.

Sincerely,

ROSEN BIEN GALVAN & GRUNFELD LLP

/s/ Thomas Nolan          /s/ Marc J. Shinn-Krantz

By:  Thomas Nolan          Marc J. Shinn-Krantz
     Of Counsel            Associate

TN/MSK
Enclosure: *Attachment A*
cc: *Coleman* co-counsel          Paul Mello          Carrie Stafford
    *Coleman* Special Master Team   Samantha Wolff      Nicholas Weber
    Elise Thorn                     Melissa Bentz       Brent Reden
    Namrata Kotwani                 Sundeep Thind       Nina Raddatz
    Damon McClain                   Dillon Hockerson    Kristopher Kent

# Attachment A

| | |
|---|---|
| **From:** | Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov> |
| **Sent:** | Tuesday, January 17, 2023 12:54 PM |
| **To:** | Marc Shinn-Krantz |
| **Cc:** | Damon McClain; Elise Thorn; Namrata Kotwani; Paul B. Mello; Samantha Wolff; Coleman Special Master; Matt Lopes; Coleman Team - RBG Only; Steve Fama; Nick Weber; Stafford, Carrie@CDCR; CDCR OLA Coleman CAT Mailbox |
| **Subject:** | RE: Coleman: Inquiries re ▮▮▮▮▮, ▮▮▮, EOP; and re EOP Overflow Housing at SVSP, KVSP, Systemwide - Confidential - Subject to Protective Order [IMAN-DMS.FID12440] |

[EXTERNAL MESSAGE NOTICE]

Dear Marc,

OLA is in receipt of Plaintiffs' follow-up email regarding Mr. ▮▮▮▮▮▮'s, ▮▮▮, housing situation and providing adequate mental health care. OLA will provide responsive information soon.

Sincerely,
**Dillon Hockerson**
Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Tuesday, January 10, 2023 3:14 PM
**To:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Cc:** Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Matt Lopes <mlopes@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** RE: Coleman: Inquiries re ▮▮▮▮▮, ▮▮▮, EOP; and re EOP Overflow Housing at SVSP, KVSP, Systemwide - Confidential - Subject to Protective Order [IMAN-DMS.FID12440]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Dillon,

We write again on behalf of ▮▮▮▮▮, ▮▮▮, EOP, who remains improperly housed in overflow housing on SVSP D4, over a month since your below email, and nearly 12 weeks after being transferred there on October 19, 2022.

He is not receiving EOP-level treatment at D4 and reports he is depressed and suffering due to a lack of one-on-one and group treatment and is unable to get help through repeated attempts to use CDCR's 7362 process.  He reports he

receives ducats for EOP groups on the "D1 EOP yard" or the "D Mental Health Group MH" location, but the ducats are repeatedly not honored.  Our review of CDCR's EHRS and OnDemand data supports this.  For example his IDTT documented their concern that he flagged on the high treatment refusal list, but that he reported not being let out for ducats, "which may be impacting [his] appointment history in ONDemand" and "his low treatment participation may be due to institutional barriers and his own volitional choice."  *See* 12/15/22 MH Master Treatment Plan.  Mr. ████ confirms he wants to go to these groups.  Our review of the Appointments Indicator in On Demand confirms that a majority of his mental health groups during his time at SVSP have been cancelled, and he is listed as "refusing" a majority of those that are not cancelled.  We are concerned that CDCR appears to have no specific plan to provide Mr. ████ adequate treatment.

What are the results of CDCR's bi-weekly review of Mr. ████ to address any barriers to transfer?  We request that CDCR promptly transfer Mr. ████ to an appropriate setting where he can receive treatment commensurate with the EOP level of care (or higher if needed).

Thank you,
Marc

---

**From:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:** Friday, December 9, 2022 11:38 AM
**To:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Cc:** Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Special Master <colemanspecialmaster@pldlaw.com>; Matt Lopes <mlopes@pldlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** RE: Coleman: Inquiries re ████████, ████, EOP; and re EOP Overflow Housing at SVSP, KVSP, Systemwide - Confidential - Subject to Protective Order [IMAN-DMS.FID12440]

[EXTERNAL MESSAGE NOTICE]

Dear Marc,

I write in response to Plaintiffs' November 16th email regarding Mr. ████████'s, ████, housing and the California Department of Corrections and Rehabilitation's (CDCR) plan to address overflow housing for patients at the Enhanced Outpatient Program (EOP) at Kern Valley State Prison (KVSP) and Salinas Valley State Prison (SVSP).

First, Plaintiffs note that Mr. ████ was transferred from Richard J. Donovan Correctional Facility's (RJD) EOP Administrative Segregation Unit (ASU) Hub to SVSP's Facility D4, and ask why Mr. ████ was transferred to a non-EOP housing unit.  On September 9, 2022, Mr. ████ was review by RJD's Institutional Classification Committee (ICC) meeting for alleged safety concerns.  Although CDCR could not substantiate Mr. ████'s safety concerns, CDCR attempted to rehouse Mr. ████ at RJD, but was unsuccessful due to Mr. ████'s repeated refusals to accept housing.  The ICC later recommended that Mr. ████ be transferred from RJD to another institution.  On October 19, 2022, Mr. ████ was transferred to SVSP, but due to bed availability, Mr. ████ was transferred to Facility D4, the EOP overflow housing unit.

Second, Plaintiffs request further updates on CDCR's plan to address EOP overflow housing at KVSP and SVSP so that EOP patients, like Mr. ████, can receive treatment in the appropriate setting.  CDCR has been reviewing patients in overflow housing on a bi-weekly basis to address any barriers to transfer the patients to their

appropriate housing unit; and has created a workgroup at the Headquarters level to discuss locations for a potential EOP Level IV housing unit to alleviate the need for EOP overflow.

Lastly, Plaintiffs request a list of all the units currently being used for EOP overflow housing. As of November 21, 2022, CDCR used the below units for overflow housing based on bed availability and Quarantine or Isolation need. Also provided are the units' census of EOPs as of November 21, 2022.

1. KVSP (C7): 61
2. SVSP (D4): 21
3. SATF (overflow is occurring due to outbreak and quarantine issues)
   a. (A-3): 8
   b. (D): 7
   c. (E): 3
   d. (F): 26
4. MCSP
   a. (B): 10
   b. (3A): 9
5. CSP-SAC
   a. (A5): 9
   b. (A2): 19

Feel free to contact me if you would like to discuss further.

Sincerely,

**Dillon Hockerson**
Attorney
CDCR Office of Legal Affairs
Cell: (916) 413-5796
Email: Dillon.Hockerson@cdcr.ca.gov

THIS DOCUMENT MAY CONTAIN CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT MY PERMISSION. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY ME IMMEDIATELY.

---

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Wednesday, November 16, 2022 2:08 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Cc:** Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff <SWolff@hansonbridgett.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Matt Lopes <mlopes@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** Coleman: Inquiries re ▮▮▮▮▮▮▮▮, ▮▮▮▮, EOP; and re EOP Overflow Housing at SVSP, KVSP, Systemwide - Confidential - Subject to Protective Order [IMAN-DMS.FID12440]

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear OLA,

We write on behalf of ███████████, ██████, EOP, housed in non-EOP housing at SVSP D4, and to request more information about the use of EOP overflow housing.

Mr. ██████ is a long-time *Coleman* class member who is currently at the EOP level of care and has been at that level or higher since May 2021.  CDCR records show that on October 19, 2022, he was transferred from the RJD EOP ASU Hub to mainline SNY housing at SVSP D4 where he was not offered any group treatment for the first two weeks.  After we sent a CPT memo regarding Mr. ██████ on November 1, 2022, CDCR records reflect he started to receive groups the following day but he remains housed in D4.  **Why was Mr. ██████ transferred to non-EOP housing rather than EOP mainline housing at RJD, SVSP, or another location?  What is CDCR's plan to ensure Mr. ██████ receives treatment in an appropriate setting?**

We also note that CDCR's On Demand Census shows that as of this morning, November 16, 2022, there are 23 EOP class members in SVSP's non-EOP D4 unit, co-mingled with numerous CCCMS class members and non-MHSDS individuals.  This is particularly concerning given Defendants' recent response to our query about the scores of EOP patients being housed in non-EOP overflow housing at KVSP C7.  CDCR reports its plan to transfer overflow EOP patients out of KVSP is that "KVSP conducts case reviews with Salinas Valley State Prison to ensure EOP patients can transfer when there feasible." *See* Ltr. From D. Hockerson Re Mission Changes (October 27, 2022).  We note that CDCR's Census data as of this morning shows KVSP C7 is still an almost entirely EOP unit with 62 class members at the EOP or higher level of care.  Given the apparent overcrowding in both KVSP and SVSP EOP housing, **please provide a further update on CDCR's plan to address EOP overflow housing at these two facilities.  Please also provide us a list of any buildings systemwide that CDCR is using as EOP overflow housing.**


Best,
Marc

**Marc J. Shinn-Krantz**
(he/him)
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
MShinn-Krantz@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at mshinn-krantz@rbgg.com.

# EXHIBIT B

**OFFICE OF LEGAL AFFAIRS**
JENNIFER NEILL
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 25, 2023

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Dear Special Master Lopes,

Defendants are in receipt of the Special Master's draft Twenty-Ninth Round Monitoring Report – Parts C and D ("Draft Report") pertaining to Defendants' Compliance with Enhanced Outpatient Programs (EOP) and Correctional Clinical Case Management Programs (CCCMS) Provisionally Approved Plans, Policies, and Protocols. Defendants offer the following objections and comments concerning your Draft Report and request that the Draft Report be revised accordingly.

The Draft Report's findings in Part C are based on site visits at 15 CDCR institutions that occurred between May 2021 and May 2022. (Draft Report – Part C, p. 2.) The Draft Report's findings in Part D are based on site visits at 13 CDCR institutions that occurred during the same timeframe. The conclusion of the Draft Report – Part C states that addressing staffing vacancies and completing data remediation are CDCR's two major outstanding remedial obligations. (*Id.* at pp. 145-46; 147-48.) In Parts C and D, the Special Master did not provide any formal recommendations and did not request the Court to issue any additional orders. The Draft Report – Part C acknowledges that "CDCR's MHSDS has improved in significant ways since the Court's remedial order in 1995," noting that CDCR has constructed housing and treatment space for patients and office space for mental health clinicians and advanced its suicide prevention program such that the Special Master has delegated the responsibility of drafting the annual suicide report to CDCR. (*Id.* at p. 146.) In addition, the Special Master recognized the quality of treatment provided at the inpatient programs at the Department of State Hospitals, California Institution for Women, and San Quentin and previously reported that these programs will be monitored by paper review in the 30th monitoring round. The Draft Report – Part C also notes that CDCR may be within "striking distance" of demonstrating statewide compliance with psychiatry staffing requirements. (*Id.* at p. 147.) And while the Draft Report – Part D highlighted staffing vacancies with primary care physicians specifically, the Special Master acknowledges that CDCR has made recent progress improving psychiatry fill rates, recognizing that "CDCR's MHSDS is staffed by dedicated professionals who in some cases during the monitoring round appropriately responded to their patients' needs by increasing the frequency of clinical contacts, despite significant staffing shortages." (Draft Report – Part D, p. 72.)

As it works to resolve staffing vacancies, and forge ahead with data remediation, CDCR hopes to collaborate productively with the Special Master. Nevertheless, Defendants request that the Draft Reports be revised to provide necessary context that there is both a nationwide and

statewide shortage of mental health clinicians, and that CDCR's challenges in recruiting and retaining professionals are a reflection of the complex post-COVID labor market environment, over which CDCR has no control.  (Draft Report – Part C, pp. 4-8; pp. 46-52; p. 145-46; Draft Report – Part D, pp. 3-7; pp. 7-11; pp. 70-72.)  Further, Defendants reiterate that their data activation schedules were not drafted with an eye to "la[y] the foundation to blame any future delays on the Special Master or plaintiffs' counsel." (Draft Report – Part C, p. 14.)  Attributing bad faith intentions to Defendants is unproductive.  As the Special Master himself acknowledges, CDCR has committed adequate numbers of dedicated and qualified staff to data remediation. (*See id*. at p. 16.)  As the Draft Report notes, thirty-nine all-parties data meetings and eighty-three BRMR meetings have occurred just since March 5, 2021.  (*Id*. at p. 12.)  This does not include the countless internal preparatory tasks and meetings or meetings with the Special Master's data team such as those in QAC.  Defendants' staff spend time and resources developing documentation for indicators discussed at these meetings, and shepherd these indicators through a thirteen-step validation and verification process.  (*See* ECF No. 7415, at 17.) Defendants are not familiar with any other government agency within the state or nationally that commits as much time and attention to ensuring that outside stakeholders understand the intricacies of their data and then incorporates that stakeholder's feedback into its data management and methodology.  To label this onerous and time-consuming process as an attempt to "seek the Special Master's rubber stamp on any indicator which *accurately* measures what it purports to measure without any regard for whether it is measuring what it is *supposed to measure* in the context of this case" fails to credit the assiduous work done by CDCR staff involved in data remediation.  (*See id*. at p. 18.)

I.    **The Draft Report Should Remove Conclusory Statements On the Constitutionality of Care Provided to the *Coleman* Class.**

The Draft Report includes conclusory statements such as "defendants are presently unable to provide constitutionally adequate mental health care to the number of seriously mentally ill persons now incarcerated in California." (Draft Report – Part C, p. 145; *see also id.* at 4; 36; 51-52).  Defendants vehemently disagree with these statements, which furthermore exceed the authority granted to the Special Master.  The *Coleman* Court has stated that "the Special Master is not tasked with assessing whether the State's prison mental health care system satisfies constitutional standards." (ECF No. 4361, at 2 (internal quotation marks omitted)).  The Special Master's task, while preparing monitoring reports, is to measure the State's compliance with "any remedial plan that this court may order." (*Id.* (citing Order of Reference ¶¶ 4-5).) Accordingly, Defendants request that such legal judgments be removed from the Draft Report.

The Draft Reports amount to 1459 pages containing countless factual assertions and observations obtained over a lengthy timespan, which CDCR must review and analyze in a compressed timeframe to prepare objections[1].  This entails soliciting and compiling responses from all involved institutional and headquarters staff.  Given the volume of the information in these reports and the complexity of the subject-matter, CDCR has endeavored to enumerate major factual inaccuracies and identify portions of the reports where additional information and clarification from the Special Master will be most productive.  Where CDCR has not responded

---

[1] CDCR understands that the monitoring took place between May 2021 and May 2022, however, data collected for monitoring at some institutions likely goes back to late 2020.

to conclusory findings that CDCR is currently providing Coleman class members with constitutionally inadequate mental health care, that failure to respond is not and should not be construed in any way as an admission.

## II.    The Draft Report Relies Upon an Inaccurately Calculated Psychiatry Vacancy Rate.

The Draft Report claims a "shocking" vacancy rate of 51 percent for psychiatrists at the 15 EOP institutions visited by the Special Master's team during the 29th Round.  (Draft Report – Part C, pp. 46; 48; 51.)  This calculation is erroneous, leading to a highly misleading conclusion. It also does not comport with the monthly psychiatry vacancy reports Defendants had filed during the monitoring period.  While the specifics of the Special Master's calculation cannot be gleaned from the body of the report, CDCR analysis using more current data suggests that the Special Master may have counted the same sixty or so allocated positions in both the on-site and telepsychiatry fill rate calculation.

As of December 2022, 198.1 staff psychiatrist positions have been allocated to these 15 EOP institutions.  Of these 198.1 positions, 63 are telepsychiatrist positions.  These institutions have filled 118.35 of 135.1 allocated on-site civil service and registry psychiatrist positions, amounting to a fill rate of 87.6% or a vacancy rate of 12.4% for on-site and registry positions.  If telepsychiatrist positions are included, these institutions have filled 181.35 of 198.1 total allocated positions, amounting to a fill rate of 91.5% or a vacancy rate of just 8.5% - a far cry from the 51% figure in the Special Master's report.

Defendants suspect that the Special Master miscalculated the fill rate for on-site psychiatrists by including in the denominator the approximately sixty allocated positions that had been filled with telepsychiatry.   When a telepsychiatrist is assigned to an institution, the on-site allocation is removed and converted to a telepsychiatry position.  By using the telepsychiatry positions twice – once for the onsite calculation and once for the telepsychiatry allocation – the resulting fill rate for on-site allocation is incorrect.  Defendants request that this erroneous vacancy rate be revised.  Defendants are willing to meet with you and your experts to discuss the Draft Report on this issue to ensure that the issue is accurately resolved and the staffing vacancies corrected.

## III.    The Draft Report Should Acknowledge That Vacancy Rates Are Heavily Influenced by the Broader Labor Market.

As the Court has recognized (ECF No. 7699 at 2:13-16), recruiting and retaining mental health clinicians has been an ongoing challenge despite Defendants' many efforts to increase staffing.  Similarly, the Draft Report refers to a "staffing crisis" and notes a "vacancy rate explosion among primary clinicians."  (Draft Report – Part C, p. 5; see pp. 4; pp. 5-8; p. 23.)  For purposes of full transparency and completeness, the Draft Report should acknowledge that CDCR is not an outlier—there is a nationwide and state-level shortage of mental health professionals, and the shortage acutely affects prison systems like CDCR because of additional

challenges professionals face in treating patients in remote areas or under dangerous or difficult conditions. *See Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Psychiatrists, 9/18/18, Economists Incorporated*, ECF No. 6695 at 97-100; *id.* at 105 (noting "the supply of psychiatrists in California has neither kept pace with demand, nor has it been sufficient to replace a diminishing workforce"); Stacy Weiner, *A growing psychiatrist shortage and an enormous demand for mental health services*, Association of American Medical Colleges, Sep. 9, 2022, https://www.aamc.org/news-insights/growing-psychiatrist-shortage-enormous-demand-mental-health-services); Jocelyn Wiener, Unanswered cries: Why California faces a shortage of mental health workers, Sep. 8, 2022, https://calmatters.org/health/2022/09/california-shortage-mental-health-workers/).  In light of contracted labor supply, Defendants have correctly identified the "provision of telepsychiatry from home" as "critical to eliminating barriers to [their] ability to deliver constitutionally adequate care, and . . . improv[ing] access to care" and possibly alleviate the loss of staff who may leave due to the availability of telework opportunities elsewhere.  (Draft Report – Part C, pp. 35-36; *see also* p. 7).

The Draft Report also states that "[t]ime spent training and supervising unlicensed clinicians further strained licensed staff members' ability to focus on delivery of care to patients." (Draft Report – Part C, p. 6).  But this statement paints an incomplete picture because the training and supervision of unlicensed clinicians allows CDCR to create a pipeline of future licensed clinicians, a critical tool for the recruitment and retention in a challenging labor market.

## IV.  The Draft Report Should Clarify Certain Assertions Regarding Telepsychiatry and Telehealth.

The Draft Report notes that "connectivity issues negatively impacted IDTTs for CMC's 3CMS program on A Quad, CSP/Corcoran's LTRH, CSATF's EOP and 3CMS programs, and SVSP's STRH," and that "MCSP mental health leadership reported connectivity problems on some facilities as well." (Draft Report – Part C, p. 70.)  In addition, "CSATF 3CMS staff also reported frequent connectivity issues for telepsychiatrists working from home." (*Id.*)  In Part D of the Draft Report, the Special Master indicates that problems with connectivity during IDTTs were observed at only one of the institutions. (Draft Report – Part D, p. 16).  The Draft Report also notes that the quality of the IDTTs at five institutions "generally suffered" as a result of allowing on-site IDTT members to attend by telephone or videoconferencing equipment. (*Id.*)  These connectivity issues appear anecdotal in nature and lack specificity.  Defendants request that the final Reports be revised to quantify the extent of these connectivity problems.  For instance, the Report should provide the number of complaints compared to the total number of telehealth encounters observed.

Similarly, the Draft Report states that "VSP's EOP patients expressed discomfort with telepsychiatry's use." (Draft Report – Part C, p. 70.)  Without providing actual data and details concerning a monitor's observations, including context regarding the nature of the expressed discomfort, or the number of patients who made these complaints, this information is anecdotal and Defendants cannot use it for any extrapolation regarding the use of telepsychiatry.  (*Id.*)

To illustrate "difficulties with telepsychiatry," the Draft Report asserts that "CSATF's 3CMS clinicians reported telepsychiatry challenges which occasionally led to different diagnostic assessments between the PC and telepsychiatrist." (*Id*. at p. 69.)  Again, without more information, it is difficult to glean whether the differences in diagnostic assessments were typical professional disagreements that may arise among multiple providers, or whether the disagreement arose due to one provider's use of telepsychiatry.  Defendants request that the Special Master provide more information and transparency in the final Report so Defendants can address any challenges.

## V.    The Draft Report Contains Contradictory Assertions Regarding Data Remediation and Selectively Quotes Defendants' Prior Filings.

The Draft Report states that data remediation is "intended to align the scope of a given indicator with the Special Master's current scope of monitoring." (*Id*. at p. 15.)  If the data remediation process is intended to replicate the current monitoring scheme, the Report should acknowledge that Defendants have requested but been denied access to the Special Master's guidebook, business rules, sample size methodology and other necessary documents to properly replicate the monitoring process.  Defendants reiterate their request to the Special Master to provide these materials—without which they are severely hampered in their ability to understand the exact specifications that would result in an indicator being remediated.  (*See* December 8, 2022 Letter from Secretary Allison to the Special Master.)

The Draft Report includes a quotation from Defendants' prior filing that purportedly concedes that the data remediation process necessarily includes "modifications intended to align with the scope of a given indicator with the Special Master's current scope of monitoring" the Special Master's indicators: "The Data Remediation process is not meant to be an overhaul of CDCR's data system, or the forum to wordsmith indicators, expand the scope, or add requirements above and beyond what is currently being done by the Special Master during his monitoring." (*See* Draft Report – Part C, pp. 14; 15, n. 5, citing ECF No. 7523-1 at 4.)  The Draft Report omits the sentence that follows this quotation, which states: "Rather, it's [data remediation] intended to assess whether CDCR's indicators measure what they purport to measure." (ECF No. 7523-1 at 4).  Defendants have consistently held this position.  (*See* ECF No. 7523 at 14 ("The data remediation process CDCR agreed to follow . . . and the timeline developed in response to this process does not include the creation of a new policy, expanded policy, or expanded indicator. Yet, every indicator reviewed by the Special Master's team and Plaintiffs (approximately 50 – 60 indicators) has required changes to achieve data remediation.").)

Defendants remain concerned that data remediation is "increasingly becoming an overhaul of long-established and court-approved policies and processes rather than a transparency check or data validation project." (*See* ECF No. 7523 at 14.)  Defendants request that the Draft Report be modified to accurately reflect their understanding of the data remediation process.  In addition, Defendants object to the Special Master's characterization of their concerns on the runaway expansion of the data remediation process as an attempt to wrest a "rubber stamp" of

key indicators from the Special Master. (Draft Report – Part C, p. 18.) In fact, Defendants are committed to the process of explaining their data systems to the parties, undertaking validation and verification, as well as incorporating stakeholder feedback, which is a concrete demonstration of the "steadfast focus" on data remediation that the Special Master has requested from the parties. (*See* Draft Report – Part C, p. 19.) Unfortunately, discussions often stray far beyond these areas and instead become top to bottom reviews of existing policies and their corresponding indicators with an eye toward expanding them. This results in requests to fundamentally change how an indicator operates or requests to create entirely new indicators, which goes beyond ensuring indicators are measuring what they purport to measure.

## VI. The Draft Report Conflates Remediation and Certification with Data Validation and Verification, and Avoids Providing Clarity on What Is Necessary to Achieve Data Remediation, Hamstringing Defendants.

More than two and a half years after Dr. Potter was retained, the definitions of "data remediation" and "certification" remain opaque. The Draft Report obfuscates the fact that Defendants have not received the definition of these terms from the Special Master, despite multiple requests. The Special Master requests that the parties apply "steadfast focus" to complete data remediation (p. 19), but he does not acknowledge that Defendants have been provided with an impossible instruction— to aim at a hidden target that is not completely specified.

The Draft Report misleadingly states that Defendants understand what it means to remediate and certify an indicator, citing a September 2021 filing that defines the meaning of two different terms—*data validation* and *data verification*. (Draft Report – Part C, pp. 19-20, n. 7.) That citation does not speak to remediation or certification—topics on which Defendants have requested guidance from the Special Master on several occasions since this project commenced in August 2021. (*See, e.g.*, ECF No. 7523-1 at 14 ("This process is increasingly becoming an overhaul of long-established and court-approved policies and processes rather than a transparency check or data validation project. In short, the scope of the data remediation process seems to evolve continually and expand without any clear boundaries . . . . It's intended to evaluate whether CDCR's indicator measure what they purport to measure. This issue has been raised several times with the Special Master's Data Expert, and most recently, on March 28, 2022."); ECF No. 7556 at 4 ("The Special Master has declined to include a clear definition of what it means for an indicator to be remediated within the proposed Activation Schedule template. From my discussions with the data expert, I understand that he believes that an indicator is remediated if the parties agree upon its operation and it is operating as specified. CDCR learned for the first time during the meet and confer process, that the Special Master's data expert would only "remediate" individual indicators and not certify them. Instead, during the meet and confer process, the Special Master's data expert informed CDCR that he would only certify the entire data system, but not individual indicators . . . . I request that the court direct the Special Master to adopt an agreed upon definition of the term "remediation." It is important that the Special Master and the parties agree on what it means to remediate and to certify CDCR's data. I am concerned that without greater clarity on what is required to

remediate an indicator and to certify CDCR's data system, the end goal of this project and how to achieve that goal remain undefined.").)

Accordingly, footnote 7, which conflates validation and verification with remediation and certification, must be removed. The Special Master has still not answered the question of when an indicator may be relied upon. Although the Draft Report emphasizes that "successful completion of data remediation . . . remains defendants' most direct path to ending this case," the Special Master has not provided guidance on how and when the parties will know that a single indicator (or, all indicators) has been successfully remediated and certified; and how and when the Special Master or his expert will communicate the completion of the data remediation process to the parties and Court. (*See* ECF No. 7556 at 3-4.) As the Draft Report notes, "the outcome of these discussions [on the definitions of data remediation and certification] is pending." (*Id*. at p. 20.) The Special Master was to revise his proposed definitions of data certification and remediation after multiple all-party meetings between July and October 2022. As of the time of this writing, Defendants are still waiting for the Special Master to issue his amended definitions of data certification and remediation.

## VII. The Draft Report Includes Outdated Characterizations of the Post-Certification Process.

The Draft Report states that during the Post-Certification Annual Review Cycle "[a]t least annually, all Key Indicators will be reviewed through the data remediation process," citing an activation schedule filed in September 2021. (Draft Report – Part C, p. 13, n. 4.) The cited filing includes a very preliminary view of the Post-Certification process that CDCR no longer holds. The process has evolved over the past fifteen months resulting in significant modifications to the anticipated Post-Certification process. For instance, Defendants would not necessarily have all Key Indicators go through the full data remediation process annually. Nor would stakeholder review (i.e. BRMR) be included in the Post-Certification process. As you know, Drs. Potter and Cartwright are discussing the Post-Certification review process this year in parallel with reviewing the existing Change Management policy. Defendants request that the Special Master remove this reference to the Post-Certification process, or alternatively, clarify that Defendants no longer anticipate following the approach set out in the Draft Report.

## VIII. The Draft Report Requires Certain Clarifications.

The Draft Report states that patients attended less than 90 percent of IDTTs. (Draft Report – Part C, pp. 62-63; Draft Report – Part D, p. 136; p. 163.) But if the purpose of the report is to measure compliance, the final Report should note that patients may refuse to attend IDTTs. Similarly, in the section on Supervisors' IDTT Attendance, the Report should recognize that supervisors are not required to attend IDTTs. These changes will help the reader of the report to understand that the comments on attendance are not meant to criticize CDCR's compliance with policy requirements.

Part C of the Draft Report states that "some institutions reported pressure from IRU to rescind referrals in an effort to avoid rejections." (Draft Report – Part C, p. 99.) Part D of the

Draft Report indicates that "CIM reported concern with IRU rejections of inpatient referrals and the insistence that the institution rescind the referrals." (Draft Report – Part D, p. 47.) Defendants note that the IRU cannot reject a referral. Only a PIP may reject a referral. When a PIP rejects a referral, IRU sends the information to the referring team. The team is given the choice to either accept the rejection or proceed to CCAT for a discussion with the PIP that issued the rejection. Defendants request that the final Report Part C clarify which institutions reported this pressure, so we may provide further information and assistance to these institutions. For instance, in the case of CIM discussed in Part D, Defendants found the following data showing a low rejection rate and low rescission rate:

- Number of referrals submitted last six months: 62
- Accepted: 52
- Referrals rejected by PIP: 7
- Referrals directed to CCAT: 4 (3 accepted; and 1 rejection appealed and upheld)
- Rescinded: 5

The Draft Report includes a section on institutional compliance with transfers to acute or intermediate inpatient care. (Draft Report – Part C, p. 104.) Institutions are not responsible for bed identification. Once a referral is made, IRU and HCPOP identify an appropriate bed and authorize movement. The Draft Report should be revised to reflect that transfers to inpatient care are not an institutional-level issue after a referral is made.

The Draft Report states that, regarding restricted housing transfers, "CMC failed to timely transfer patients due to an erroneous practice of maintaining patients under the mistaken belief that it could provide a better level of care." (Draft Report – Part C. p. 105.) The report should specify what level of care CMC could not provide within its restricted housing program and which patients it retained. The report makes clear that CMC did not miss any PSU transfer timeframes or ASU EOP Hub transfer timeframes, since CMC has an ASU EOP Hub. (Id. at p. 106.) The report does find that "CMC did not transfer [CCCMS] patients to STRHs and instead inappropriately placed them in its EOP hub." (*Id.* at p. 107.) But placement of a CCCMS patient at a higher level of care does not equate with worse care, as implied by the finding that CMC "mistaken[ly]" thought it "could provide a better level of care." The report should be revised by removing the sentence on page 105 regarding CMC.

The Draft Report states that the "Program Guide provided for a length of stay of up to ten days in the MHCB." (Draft Report – Part C, p. 105.) Four institutions had average lengths of stays exceeding 10 days. (*Id.*) In addition, Part D of the Draft Report indicates that "CIM, NKSP, PBSP, and WSP were noncompliant with the ten-day requirement." (Draft Report – Part D, p. 48.) The Draft Reports misstate the policy and Defendants' compliance—the expectation is that the length of stay should not exceed 10 days, but it can be extended if the chief psychiatrist or designee authorizes it. (See Program Guide at 12-5-1.) The Draft Reports should be corrected to accurately state the full policy and remove any statements regarding noncompliance.

The Draft Report states that, despite staff complaints spread across eight institutions, "no staff members were moved to another post as a result." (Draft Report – Part C. p. 116.) The

8

finding implies wrongdoing on behalf of CDCR for not removing staff from their posts following a staff compliant, but the report does not make any findings that the staff complaints were substantiated and that staff were not moved in accordance with policy.  Nor does the Draft Report cite to any policy or procedure that would require removal of staff from a post solely because of an unsubstantiated staff complaint.  The report should be revised by removing that clause.

Part C of the Draft Report states that there were "no RVR mental health assessments wherein the mental health clinician recommended alternative disciplinary measures" at nine institutions.  (Draft Report – Part C, p. 121.)  If this conclusion is based upon a sample (*see* Draft Report – Part C, p. 120), it is unclear whether the sample is representative.  Notably, Part D of the Draft Report notes that there were four cases at two institutions – CCI and NKSP – where the mental health clinician recommended alternative disciplinary measures "as the patients' behavior was strongly influenced by their mental illness," showing that alternative disciplinary measures are considered when appropriate.  (Draft Report – Part D, p. 60.)

Additionally, Part D of the Draft Report summarizes the overall assessment of the quality of treatment into three categories: "adequate quality," "marginally adequate quality," and "inadequate quality."  (Draft Report – Part D, pp. 21-22.)  These definitions are not well defined—notably, "marginally adequate quality," which the Report characterizes as care that "bordered on inadequacy" is particularly vague.  (*Id.*)  Defendants request that the Special Master provide more detailed descriptions of each category in the final Report.

Further, the Draft Report states that in one instance of "CSATF immediate use of force," a custody officer sprayed a patient from approximately two feet away, violating applicable policy that required a six-feet minimum distance to use pepper spray.  The Draft Report should be revised to reflect that there is no policy requiring a minimum distance of 6 feet during an immediate use of force.  CDCR officers utilize the best practice of spraying from a six-feet distance when time permits, which is also a factory recommendation.  In the case of an immediate use of force, the officer is required to articulate why the pepper spray streamer was deployed at a distance of closer than six feet.

The Draft Report also states that "15 institutions with EOP programs continued to fail to satisfy the requirements for MHSDS patients for program access."  (Draft Report – Part C, p. 129; *see also* p. 135.)  The Draft Report does not state which requirements govern program access, nor does it establish the policies that were violated.  The Draft Report further states that EOPs are less likely to access jobs than CCCMS patients and general population inmates.  (*Id.*)  However, the Draft Report should note that EOP patients are less likely to accept jobs due to mental illness and may instead be choosing EOP group treatment.  In fact, as the Draft Report recognizes, EOP patients were more likely to earn milestone credits, which were received by 66 percent of eligible EOP patients, as compared to 19 percent of eligible CCCMS patients and 21 percent of non-MHSDS incarcerated persons.  (*Id.* at p. 133.)

Finally, the Draft Report includes a discussion of CCCMS patients who were housed out-of-level.  (*Id.* at p. 135).  Defendants request that the Special Master provide more details on the reasons these patients were housed out-of-level.  There could be specific reasons for an

19289969.2

individual to be placed out-of-level – which could even include a placement to less restrictive housing.

Thank you for consideration of these comments.

Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs

10