1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
BRENDA MUÑOZ – 328813
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

11  Attorneys for Plaintiffs

12            UNITED STATES DISTRICT COURT

13            EASTERN DISTRICT OF CALIFORNIA

15  RALPH COLEMAN, et al.,

16            Plaintiffs,

17       v.

18  GAVIN NEWSOM, et al.,

19            Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' NOTICE OF MOTION AND MOTION IN RESPONSE TO DECEMBER 29, 2022 ORDER REGARDING DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF NO. 7690)**

Judge:   Hon. Kimberly J. Mueller
Date:     April 28, 2023
Time:    10:00 am
Crtrm.:  3, 15th Floor

[4224934.9]

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION................................................................................................ 1

INTRODUCTION ...................................................................................................... 2

LEGAL STANDARD ................................................................................................ 3

ARGUMENT.............................................................................................................. 4

I.    THE COURT SHOULD ISSUE AN ORDER CLARIFYING THAT THE
      DATA REMEDIATION PROCESS IS ABOUT MORE THAN JUST
      ENSURING THE DATA ELEMENTS MEASURE WHAT CDCR
      DESIGNED THEM TO MEASURE ............................................................. 4

II.   THE COURT SHOULD ORDER DEFENDANTS TO ACCOUNT FOR
      CDCR MENTAL HEALTH LEADERSHIP'S INCREASING CULTURE
      OF DISDAIN TOWARDS THE COURT AND SPECIAL MASTER  ................. 10

III.  THE COURT SHOULD CLARIFY THAT ITS PRIOR ORDERS
      REQUIRING DEFENDANTS NOT TO SIDELINE PSYCHIATRISTS
      APPLY WITH EQUAL FORCE TODAY................................................. 14

CONCLUSION.......................................................................................................... 19

CERTIFICATION OF ORDERS REVIEWED ................................................. 20

[4224934.9]

i

PLS.' NOTICE OF MOT. AND MOT. IN RESPONSE TO DEC. 29, 2022 ORDER RE: DR. GOLDING'S SECOND
WHISTLEBLOWER REPORT (ECF NO. 7690)

# NOTICE OF MOTION

PLEASE TAKE NOTICE that on April 28, 2023 at 10:00 a.m., or as soon as the matter may be heard before the Honorable Kimberly J. Mueller, at the United States District Court at 501 I Street, Sacramento, California 95814, Plaintiffs will move for clarification of the Court's prior orders regarding the purpose of the data remediation process and the mandates stemming from the 2019 evidentiary proceedings on the whistleblower report from Defendant California Department of Corrections and Rehabilitation's (CDCR's) Chief Psychiatrist, Michael Golding, M.D.  Dr. Golding issued a second whistleblower report (hereafter "Second Golding Report"), which the Deputy Special Master provided to counsel for Plaintiffs and Defendants on November 28, 2022. The Second Golding Report makes plain that the parties disagree about the meaning and magnitude of several of this Court's prior orders, as well as their ongoing relevance and import.  The Court should clarify these prior orders in order to assist the parties in resolving their disagreements.

At the date and time specified above, Plaintiffs will also move for an order requiring the Undersecretary of Health Care Services for CDCR, Dr. Diana Toche, and/or CDCR's newly appointed Secretary, Jeffrey Macomber, to appear in Court and explain the efforts they have made since Dr. Toche's January 22, 2020 declaration (ECF No. 6451-1), or will make in the future, to ensure CDCR staff understand their obligations pursuant to this Court's orders, and to promote accountability.

Plaintiffs' motion is based on this notice, the following memorandum of points and authorities, and the pleadings and records on file with the Court in this action.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4224934.9]

1

PLS.' NOTICE OF MOT. AND MOT. IN RESPONSE TO DEC. 29, 2022 ORDER RE: DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF NO. 7690)

# INTRODUCTION

On November 28, 2022, Deputy Special Master Kerry F. Walsh provided counsel for Plaintiffs and Defendants with a voluminous report which the Special Master had received from Defendant California Department of Corrections and Rehabilitation's (CDCR's) Chief Psychiatrist, Michael Golding, M.D.  Plaintiffs notified the Court of Dr. Golding's report on December 9, 2022 (hereafter "Second Golding Report").  *See* Pls.' Notice of Second Whistleblower Report, ECF No. 7678 at 3.  The Court granted Plaintiffs an opportunity "to file a motion … for such specific relief they believe is suggested by the second Golding Report."  Dec. 29, 2022 Order, ECF No. 7690 at 3; Jan. 11, 2023 Stipulated Order, ECF 7700 at 3.  This motion is in response to that order.

The allegations in the Second Golding Report make starkly apparent that Defendants interpret the Court's December 17, 2019 Order (ECF No. 6427) differently than Plaintiffs.  In particular, the Report suggests the parties disagree about what that Order and this Court's related subsequent orders require with respect to the purpose of the data remediation process.  Defendants also appear to understand the meaning and magnitude of the Court's prior orders regarding psychiatrists' involvement in policy and data work differently than Plaintiffs.  *See* Dec. 17, 2019 Order, ECF No. 6427 at 42-43; Nov. 4, 2020 Order, ECF No. 6938 at 4.  Finally, the Second Golding Report makes clear that a culture of disdain for this Court's remedial orders and the Special Mastership appears to have infiltrated Mental Health leadership and possibly the entire Department, rendering it necessary for the Court to reaffirm its directive that all parties and their counsel must be fully familiar with the remedial plans and court orders in this case.  Plaintiffs maintain that the Court's prior orders are clear and impose relevant ongoing obligations.  The allegations in the Second Golding Report, however, show that Defendants interpret the meaning and magnitude of these orders differently, as well as their ongoing relevance and import.  Plaintiffs therefore seek an order clarifying and reaffirming the December 17, 2019 Order and related orders as described below.

Plaintiffs also seek an order requiring the Undersecretary of Health Care Services

[4224934.9]

PLS.' NOTICE OF MOT. AND MOT. IN RESPONSE TO DEC. 29, 2022 ORDER RE: DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF NO. 7690)

1  for CDCR, Dr. Diana Toche, and/or CDCR's newly appointed Secretary, Jeffrey

2  Macomber, to appear in Court and explain the efforts they have made since Dr. Toche's

3  January 22, 2020 declaration (ECF No. 6451-1), or will make in the future, to ensure

4  CDCR staff understand their obligations pursuant to this Court's orders, and to promote

5  accountability.  For all the reasons described below, having the Court hear directly from

6  the Secretary or the Undersecretary regarding Defendants' efforts is an appropriate

7  response to the allegations in Dr. Golding's report that many CDCR staff still do not fully

8  understand or appreciate the import of the remedial orders and requirements in this case.

9                              **LEGAL STANDARD**

10       "A court may clarify its order for any reason."  *In re Twitter, Inc. Sec. Litig.*, No.

11  16-cv-05314-JST, 2020 WL 2519890, at *1 (N.D. Cal. May 18, 2020) (quoting *Wahl v.*

12  *Am. Sec. Ins. Co.*, No. C 08-0555 RS, 2010 WL 2867130, at *3 (N.D. Cal. July 20, 2010)).

13  Clarification of a prior order is "undoubtedly proper" because it can "facilitate compliance

14  with the order" and "prevent 'unwitting contempt.'"  *Paramount Pictures Corp. v. Carol*

15  *Publ'g Group*, 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998) (quoting *Regal Knitwear Co. v.*

16  *NLRB*, 324 U.S. 9, 15 (1945)).  "[A] court should construe the scope of an injunction in

17  light of its purpose and history, in other words, 'what the decree was really designed to

18  accomplish.'"  *Salazar v. Buono*, 559 U.S. 700, 762 (2010) (Breyer, J., dissenting)

19  (quoting *Mayor of Vicksburg v. Henson*, 231 U.S. 259, 273 (1913)).

20       In addition to this Court's power to clarify its prior orders, district courts have

21  "broad authority to manage complex litigation" as they see fit.  *See Plata v. Brown*, 754

22  F.3d 1070, 1077 (9th Cir. 2014) (citing Fed. R. Civ. P. 16; *United States v. W.R.*

23  *Grace,* 526 F.3d 499, 509 (9th Cir. 2008)); *see also Armstrong v. Brown*, 768 F.3d 975,

24  986 (9th Cir. 2014) ("The ongoing, intractable nature of this litigation affords the district

25  court considerable discretion in fashioning relief.").

26  / / /

27  / / /

28  / / /

[4224934.9]

3

PLS.' NOTICE OF MOT. AND MOT. IN RESPONSE TO DEC. 29, 2022 ORDER RE: DR. GOLDING'S SECOND
WHISTLEBLOWER REPORT (ECF NO. 7690)

**ARGUMENT**

**I.    THE COURT SHOULD ISSUE AN ORDER CLARIFYING THAT THE DATA REMEDIATION PROCESS IS ABOUT MORE THAN JUST ENSURING THE DATA ELEMENTS MEASURE WHAT CDCR DESIGNED THEM TO MEASURE**

The allegations in the Second Golding Report, and the documents attached to it, underscore the parties' vastly divergent interpretations of this Court's prior orders about the purpose of the data remediation process.  Defendants' mental health leadership appear to believe the process is limited to verifying that the data measures what CDCR designed it to measure.  *See* Second Golding Report at 9, 33-34, 139.[1]  Plaintiffs maintain that the data remediation process is meant to ensure not only that the data is technically accurate, but that it also properly reflects the minimum remedial requirements that govern this case. *See, e.g.*, Pls.' Resp. to Defs.' Updated Data Activation Schedules, ECF No. 7528 at 5-7[2] (Apr. 12, 2022).  The Court's prior orders make clear that Plaintiffs' interpretation is correct.  In light of the allegations in the Second Golding Report, though, it is clear that Defendants require more explicit guidance.  The Court should clarify and reaffirm that the data measures are required to align with the remedial requirements in this case in order to resolve the parties' dispute once and for all, and expedite the data remediation process.

The Second Golding Report is replete with illustrations of how Defendants do not believe their data must comport with the remedial requirements in this case.  For example, Dr. Golding alleges he had the following exchange with the CDCR Employee 1,[3] who is

---

[1] Citations to Dr. Golding's report, which the Court has ordered Defendants to submit for in camera review, are to the PDF page numbers.  *See* Dec. 29, 2022 Order, ECF No. 7690 at 3.

[2] Citations to electronically filed documents are to the ECF-generated page numbers.

[3] Although Plaintiffs maintain that employee identifying information should not be redacted, Plaintiffs have substituted three employee names with the labels "CDCR Employee 1," "CDCR Employee 2," and "CDCR Employee 3" throughout this motion because the parties have a pending dispute regarding whether employee names should be redacted from the Second Golding Report.  Plaintiffs will lodge a key for the Court's in camera review that identifies the employees.  Plaintiffs can file the key on the docket if the Court agrees that the names should not be redacted.

[4224934.9]

part of the Department's senior mental health leadership, regarding the purpose of the

Business Rules and Methodology Review ("BRMR") meetings that occur each week (and

twice every other week) as part of the data remediation process:

> I once asked [CDCR Employee 1] about a hypothetical situation in which an indicator measuring whether patients are being seen on time, instead asks us to count the number of cars in the parking lot. I asked him if that were hypothetically the case, then would the purpose of the BRMR meeting (at this stage) be to validate the correct counting of the number of cars in the parking lot? Or should we not be changing the scope of the indicator to enable it to help us to measure whether patients were being seen on time?

> [CDCR Employee 1] said that as long as nothing in the Program Guide is violated by measuring that, given that the Special Master's team has in general agreed to our indicators, the purpose of the BRMR meetings is to validate whether we are correctly counting "the number of cars in the parking lot."

Second Golding Report at 33-34. Later in the Report, Dr. Golding summarizes

Defendants' position as follows:

> As an argument against mandatory clinical standards in our chaotic prisons, [CDCR Employee 1] , [CDCR Employee 2] , and our lawyers repeatedly assert that the purpose of the data remediation process in BRMR is to validate what CDCR is already doing, and that no changes need to be made in this process as long as no specific language in the Program Guide can be found that specifically contradicts how CDCR is measuring compliance. Clinical judgement, they say, determines what is clinically appropriate. Thus, CDCR seems to be fighting the entirely reasonable data remediation processes every step of the way.

*Id.* at 139; *see also id.* at 242 (July 8, 2021 email in which CDCR Employee 1 writes to Dr.

Golding, "We are being transparent in saying this is the way it *has been measured*. To

change the way anything is measured, we have a change process, which pre-dates BRMR.

This stage in the data process is to identify the existing system."). This superficial

perspective of the purpose of data remediation has only further eroded Plaintiffs' trust in

Defendants' data system, which this Court held "is essential to successful completion of

the remedy in this case." *See* Aug. 14, 2019 Order, ECF No. 6242 at 3-4.

The allegations in the Second Golding Report suggest that without the close

oversight that the Special Master's Data Expert and Plaintiffs' counsel have applied

throughout the data remediation process, Defendants would continue to produce the same

kinds of misleading data that the Court condemned in 2019. For example, the Second

1    Golding Report alleges that one of Defendants' segregation indicators was not measuring

2    whether patients actually received property to which they were entitled under Title 15, just

3    whether the institution had a *system* for measuring whether patients received their

4    property.  Second Golding Report at 20; *see also* Cal. Code Regs. tit. 15, § 3190 (cited in

5    2021 Compendium of Custody-Related Remedial Measures, ECF No. 7333-2 at 2).

6    Similarly, Defendants' interdisciplinary treatment team ("IDTT") compliance indicator

7    scored IDTTs as compliant when *any* psychiatrist was present, despite that the Program

8    Guide requires the patient's *assigned* psychiatrist to be present.  Second Golding Report at

9    21; *see also* 2021 Program Guide, ECF No. 7333-1 at 42, 56, 158.  The Report also alleges

10   that Defendants perversely interpreted the rules about initial clinical contacts to allow late

11   contacts to count as compliant so long as the initial IDTT was also late.  Second Golding

12   Report at 36-37; *see also* 2021 Program Guide, ECF No. 7333-1 at 41, 57, 641.  Other

13   examples include allowing psychiatrists' brief welfare checks and medication non-

14   adherence appointments to count as full psychiatric evaluations that reset the Program

15   Guide timelines for clinical encounters, and scoring as compliant initial clinical contacts in

16   the mental health crisis bed ("MHCB") that occur within the first 48 hours, despite that the

17   Program Guide requires those contacts to occur within 24 hours of the patient's arrival.

18   Second Golding Report at 43-44, 46; *see also* 2021 Program Guide, ECF No. 7333-1 at 82;

19   Aug. 14, 2019 Order, ECF No. 6242 at 7-8 (rejecting Defendants' expansive interpretation

20   of clinical "evaluation" for purposes of Program Guide compliance).  Although Dr.

21   Golding alleges that the Special Master's Data Expert identified and corrected these errors,

22   CDCR's erroneous view of the purpose of data remediation will almost certainly lead to

23   similar misleading methodologies in the future absent outside pressure to do otherwise.

24   This risk is particularly acute after the Data Expert is no longer closely examining

25   Defendants' data.

26        The Second Golding Report also reveals a cultural perspective within CDCR

27   leadership that the Program Guide is a barrier to exercising clinical judgment.  In

28   particular, several emails attached to the Report show that CDCR Employee 1 and CDCR

[4224934.9]

6

Employee 2—both part of senior mental health leadership and intimately involved in the data remediation process—encourage an as-narrow-as-possible reading of remedial requirements, regardless of appropriate clinical standards and the impact on patient care. *See, e.g.*, Second Golding Report at 234 (Sept. 1, 2021 email from CDCR Employee 2 quoting CDCR Employee 1's response to the psychiatry team's concerns about lack of sufficient clinical contacts for patients awaiting inpatient hospitalization: "Some believe that the spirit of the [Program Guide] and community standards support the expansion of [clinical contact] requirements[.] … At this point, I have reservations about the proposed expansion of requirements and welcome feedback that would help me reconcile the need to replace clinical judgment with a one-size-fits-all policy."); *id.* at 228 (Oct. 17, 2022 email from CDCR Employee 2: "Most of our policies restrict clinical judgment in specified situations and set requirements that must be followed."); *id.* at 243 (July 8, 2021 email from Dr. Golding in response to CDCR Employee 2: "But we (and [CDCR Employee 3]) also discussed something else.  You said that there did not need to be a BRMR rule that specified that patients waiting for ICF *hospitalization* did not need to be seen more than the Program minimum.  That's what we disagreed about. … I said that [patients] referred to the intermediate hospital who are at the CCC[MS] level of care, in fact (as a Constitutional minimum) do need to be seen more frequently (and it must be specified in the BRMR rule) than for example every 90 days or even every 30 days."); *id.* at 252 (July 8, 2021 email from CDCR Employee 2: "No one can find a current policy that directly sets an expectation for treatment services when patients are referred to Acute or ICF level of care but are awaiting transfer/admission in outpatient housing programs. … [Office of Legal Affairs] also offered a legal opinion on the Business Rule alignment with Program Guide expectations").

Disputes about whether to memorialize the Program Guide's minimum treatment standards in the business rules, and the ongoing mistrust in Defendants' data caused by those disputes, continue to plague the efficacy and purpose of data remediation today. This Court has expressed that "to understand remediation … persons need to understand

[4224934.9]

7

PLS.' NOTICE OF MOT. AND MOT. IN RESPONSE TO DEC. 29, 2022 ORDER RE: DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF NO. 7690)

1   the history of this case."  Oct. 23, 2019 Evidentiary Hr'g Tr., ECF No. 6380 at 468:10-13.

2   The history of data remediation originates from the Court's scathing December 17, 2019

3   Order following the evidentiary hearing on Dr. Golding's initial whistleblower report.  The

4   Court held that Defendants' data was misleading not only because an indicator's descriptor

5   did not accurately describe its methodology (as was the case with the Appointments Seen

6   as Scheduled indicator), but also because certain data did not correctly measure the

7   Program Guide's requirements (as was the case with the Timely Psychiatry Contacts

8   indicator).  *See* Dec. 17, 2019 Order, ECF No. 6427 at 40-41; *id.* at 28; *see also* Aug. 14,

9   2019 Order, ECF No. 6242 at 7-8 (finding Defendants' decision to count all psychiatry

10   contacts, even non-confidential ones, towards compliance was erroneous under the

11   Program Guide).

12         Specifically, the Court's December 17, 2019 Order found that Defendants' decision

13   to redefine "monthly" in the Timely Psychiatry Contacts indicator from 30 to 45 days "was

14   a material change that was inconsistent with the implementation of the relevant Program

15   Guide requirement as established through more than a decade of practice."  Dec. 17, 2019

16   Order, ECF No. 6427 at 29.  The Court found this change "involved the knowing

17   presentation of misleading information to the court," *id.* at 40, and emphasized the duty of

18   "CDCR management to … make sure the data reports produced to support defendants'

19   provision of constitutionally adequate mental health care **will accurately measure the**

20   **remedial requirements for this action**."  *Id.* at 30 (emphasis added); *see also* App'x A to

21   Special Master's Twenty-Eighth Round Monitoring Report – Special Master's Data Expert

22   Report, ECF No. 7074 at 218 (Mar. 5, 2021) ("[T]he business rules must be designed with

23   fidelity to the dictates of the Program Guide and rely on data that is appropriate to achieve

24   the intended purpose."), *adopted by* July 14, 2021 Order, ECF No. 7229; *see also* Sept. 3,

25   2020 Order, ECF No. 6846 at 24 n.11 ("The 'key indicators' in CQIT are likely equivalent

26   to the material provisions of the Program Guide and the Compendium that may not be

27   modified without court approval."); Dec. 17, 2020 Order, ECF No. 6996 at 7-8 ("[T]he

28   quality improvement process serves an integral remedial function in this action:

1 defendants' assumption of responsibility for self-monitoring the adequacy of mental health

2 care delivered to the plaintiff class. … [K]ey CQIT indicators must be identified as an aid

3 to measurement of compliance with remedial plans in this action, namely the Program

4 Guide and the Compendium …").

5       In its December 17, 2019 Order, the Court further emphasized that "this is the time

6 to effect a sea change," and that "*Coleman* data collection and reporting must be fixed, and

7 it must be fixed to serve the policies and orders in this case, not the other way around.  The

8 policies and orders must not be drained of meaning in an effort to squeeze a square peg

9 into a round hole."  Dec. 17, 2019 Order, ECF No. 6427 at 47, 49.  The Court held that

10 "[u]nder no circumstances may remediation be accomplished by end runs and hiding the

11 ball to create a false picture for the court, as has happened here."  *Id.* at 5.

12       The examples cited above from the Second Golding Report call into question

13 Defendants' commitment to these mandates.  "This court must ensure no court is called

14 upon again in the future to consider whether and how misleading information has been

15 presented to it."  *Id.* at 47; *see also* Nov. 4, 2020 Order, ECF No. 6938 at 4 ("[T]he court

16 'expects defendants … will continue to take all steps necessary to avoid the errors that

17 required the court's intervention to correct.").  Accordingly, while the Court's December

18 17, 2019 Order makes clear that Defendants' narrow-minded view of data remediation is

19 invalid, the evidence in the Second Golding Report suggests that Defendants will continue

20 to resist revising their data indicators to align with the Program Guide and other court-

21 ordered requirements, as well as the Special Master's historical way of monitoring those

22 requirements, unless the Court clarifies and reaffirms that they must.  *See* July 1, 2021

23 Order, ECF No. 7216 a 2 (listing governing remedial orders beyond the Program Guide);

24 *see also* Sept. 3, 2020 Order, ECF No. 6846 20-28 (summarizing remedial requirements to

25 guide implementation towards constitutional compliance).  If the data remediation process

26 fails to ensure that Defendants' data comports with the remedial requirements in this case,

27 this years-long project will result in data that, although perhaps more technically accurate,

28 would be unusable to properly measure Defendants' compliance with the Program Guide

[4224934.9]

9

1   and other Court-ordered remedies.  Given the Court's desired intent to use Defendants'

2   Continuous Quality Improvement Tool (CQIT) as the ultimate lens through which it will

3   assess Defendants' compliance with the remedy, it follows that the data indicators

4   comprising CQIT must adhere to the Program Guide and other requirements necessary to

5   remediate the Eighth Amendment violations.  *See, e.g.,* Sept. 3, 2020 Order, ECF No. 6846

6   at 28 (identifying "CQIT's 'key indicators' as the functional equivalent of 'benchmarks

7   that, as used in this order, signify the material provisions of the Program Guide and the

8   Compendium that must be durably implemented at a degree of compliance the court will

9   confirm in a subsequent order."); *see also* Feb. 7, 2022 Order, ECF No. 7456 at 3; Aug. 26,

10  2021 Order, ECF No. 7285 at 5.  The evidence in the Second Golding Report illustrating

11  Defendants' artificially narrow interpretation of the purpose of data remediation evidences

12  the same "willful blindness or reckless indifference" that the Court observed in 2019.  *See*

13  Dec. 17, 2019 Order, ECF No. 6427 at 29.

14      The Court must clarify once and for all that Defendants are required to ensure not

15  only that their data elements measure what they say they measure (verification), but also

16  that they accurately measure the correct remedial requirements (validation).  *See In re*

17  *Twitter,* 2020 WL 2519890, at *1; *see also* Aug. 25, 2021 Order, ECF No. 7283 at 6

18  ("[T]he court recognizes the urgency that must attend satisfactory completion of data

19  remediation, as CQIT cannot be implemented until the data on which it depends can be

20  validated and verified.").  If it does not, Defendants can never be trusted to provide data

21  that can be truly used to assess constitutional compliance, rather than the same self-serving

22  disinformation that required remediation in the first place.

23  **II.   THE COURT SHOULD ORDER DEFENDANTS TO ACCOUNT FOR**
       **CDCR MENTAL HEALTH LEADERSHIP'S INCREASING CULTURE OF**
24     **DISDAIN TOWARDS THE COURT AND SPECIAL MASTER**

25      After the evidentiary hearing on Dr. Golding's 2018 whistleblower report, the Court

26  issued a remedial order that required Dr. Toche to file a statement in response to the

27  Court's findings.  Dec. 23, 2019 Order, ECF No. 6435 at 4 ("As discussed in the

28  December 17, 2019 order, the court expects that Undersecretary Toche 'is thinking deeply

[4224934.9]

10

1  about a proper response to plaintiffs' counsel's question [at hearing on the Golding Report]

2  about how she can work to make clear to those who work for and with her that 'CDCR has

3  been found to have violated the Constitution as to the mental health program and is under a

4  remedial order supervised by this court' and that '*Coleman* is not just a word' but signifies

5  a federal court order, 'upheld by the United States Supreme Court[,] that governs a

6  remedial process.'").

7       On January 22, 2020, Dr. Toche filed a responsive declaration in which she

8  committed to take action "to reiterate to CDCR's employees that they have an ongoing

9  constitutional obligation to provide mental health care to patients and the importance of the

10 Court's remedial orders, the Special Master monitoring, the Program Guide, and CDCR

11 mental health policies to meet that obligation," and to ensure accountability.  Def. Dr. D.

12 Toche's Resp. to Dec. 23, 2019 Order, ECF No. 6451-1 ¶¶ 4, 9 (Jan. 22, 2020).  Among

13 those steps was a commitment to develop and implement a mandatory training for all staff

14 that simply never materialized in the ensuing three years.  *See id.*; *see also* Stip. & Prop.

15 Order re Second Golding Report, ECF No. 7718 at ¶¶ 3-4 (Feb. 9, 2023) (agreeing to

16 create training promised in 2019 Toche declaration).  Recognizing the possible need to

17 take additional steps in the future, Dr. Toche further committed to "continu[ing] to work

18 with [her] staff to identify additional steps and to reinforce the importance of complying

19 with this Court's orders and providing constitutional mental health care to CDCR's

20 patients." ECF No. 6451-1 ¶ 10.  But the Second Golding Report indicates that rather than

21 striving to foster a culture of respect for this Court and its orders, CDCR and its leadership

22 have tolerated, and in some cases actively cultivated, one of strident opposition.

23       For instance, Dr. Golding reports that on November 16, 2022 during CDCR's

24 Mental Health Leadership Conference, the former Secretary of CDCR praised CDCR

25 Employee 1 in front of a crowd of CDCR staff for fighting the Special Master instead of

26 cooperating, explaining, "He's taking their lunch money! … And he *wins* too!"  Second

27 Golding Report at 12.  The comments were apparently met by "thunderous applause."  *Id.*

28       These openly disdainful and provocative comments towards the Special Mastership

[4224934.9]

1   were knowingly made in the presence of members of the Special Master team who were

2   observing the meeting along with hundreds of CDCR employees.  Decl. of Cara E. Trapani

3   In Supp. of Pls.' Mot. In Resp. to Dec. 29, 2022 Order, filed concurrently herewith

4   (hereafter "Trapani Decl."), ¶ 2 & Ex. A (Special Master's Dec. 8, 2022 letter to former

5   Secretary).  Nor was the open antagonism toward this Court and its Special Master—

6   before hundreds of CDCR employees—limited to one remark.  The Deputy Director of the

7   Statewide Mental Health Program fostered further hostility by repeatedly implying that the

8   Court's orders impede patient care, and that the Court is not concerned about patients'

9   well-being.  *Id.* Ex. A at 2.  He also spoke dismissively about the Court-ordered

10   Unidentified Needs Assessment, and disparaged one of the Special Master's expert's

11   suicide prevention reports.  *Id.*  Rather than disavow the statements or acknowledge that

12   fomenting rancor toward the Court and Special Mastership was deeply inappropriate and

13   counterproductive toward remediation, the former Secretary doubled down, defending her

14   and the Deputy Director's comments.  *Id*. ¶ 4 & Ex. C (former Secretary's Dec. 22, 2022

15   letter in response to the Special Master).

16          The message that this Court and its constitutional mandates are to be fought at every

17   step of the way—no matter the cost to the patients—is the precise cultural posture that this

18   Court so strongly denounced in 2019:

19          In the final analysis, inexplicably, it is apparent defendants lost complete
        sight of the reasons remediation is required here. Defendants adopted a laser

20          focus in an effort to obtain termination of court supervision, which lead to a
        stark "ends justify the means" approach. Their litigation tactics have wholly

21          missed the significance of the constitutional rights of the thousands of
        mentally ill persons defendants have in their custody.

22
        As the court said in its oral pronouncement following hearing, legal cases are

23          not just words on a piece of paper and a series of jousting matches. Almost
        all legal cases have hearts and souls, as does this one in particular. This

24          court's predecessor, Judge Karlton, put his heart and his soul into this case,
        as reflected in the care he paid and his orders which stand today. This is a

25          case that cries out for every single player to consult their hearts daily and
        keep their eyes hourly on those souls who are the members of the plaintiff

26          class: the seriously mentally ill individuals housed behind bars in this state
        who have the absolute, undeniable right to constitutionally adequate

27          treatment and care.

28          …

> In sum, litigation once again has trumped substantive compliance, a path defendants have taken repeatedly. … The litigation efforts in this case, however, have exacted a steep, steep price at the expense of the plaintiff class.

*Id.* at 44-46.

But this attitude has sunk in again at CDCR, to the extent it ever subsided.  The Court itself recently stressed that "[f]urther delay is particularly likely given that the state has adopted a distracting and costly scorched-earth litigation strategy, prosecuting more than a dozen appeals and mandamus petitions within the last five years alone, none successful."   Jan. 6, 2023 Order, ECF No. 7699 at 3.  Dr. Golding concludes his Report by stating that "[i]nformation from the Court is known by almost none of the staff,*"* and that "[o]ur clinicians see these court-ordered processes as inconveniences and hardships." Second Golding Report at 166, 167.  When he circulated to headquarters staff a copy of the transcript of the Court's bench order following the 2019 evidentiary proceedings, the former Deputy Director allegedly accused him of bullying his colleagues.  *Id.* at 110. These actions are antithetical to the Court's order:

> It should not have to be said:  All parties to this action and their counsel must be fully familiar with the remedial plans and court orders in this case.  To that end, going forward each brief filed by any party shall be accompanied by counsel's certification that they have read all court orders relevant to any issue addressed in such brief, including a list of those orders.

Nov. 6, 2017 Order, ECF No. 5726 at 10.

The deep seated resentment toward this Court within CDCR leadership is fundamentally incompatible not only with the achievement of a durable remedy for Defendants' constitutional violations, but also with the basic processes of civil litigation and the orderly resolution of disputes—as the Court itself has explained on multiple occasions.  The Court's recent orders corroborate Dr. Golding's observation that Defendants at best misunderstand, and at worst willfully ignore, the magnitude of the Court's remedial orders related to Defendants' intentional presentation of misleading data and the purpose of the data remediation process, and even the underlying ongoing constitutional violations. *See, e.g.*, Dec. 29, 2022 Order, ECF No. 7690 at 2 & n.1 ("These

[4224934.9]

13

PLS.' NOTICE OF MOT. AND MOT. IN RESPONSE TO DEC. 29, 2022 ORDER RE: DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF NO. 7690)

1    contentions [regarding Defendants' framing of the Second Golding Report as

2    "unsubstantiated accusations to publicly attack dedicated public servants"] … fail to

3    acknowledge that Dr. Golding's first whistleblower report led to extensive findings by this

4    court after a two day evidentiary hearing."); Apr. 22, 2022 Hr'g Tr., ECF No. 7540 at 9:7-

5    11 ("With respect to the parties' filings here on the data remediation question, the parties

6    have not agreed, it's clear, on which orders matter.   And the defense filings omit, in the

7    Court's view, orders that are critical to focusing minds on data remediation.").

8         The Court must reiterate that these prior orders continue to govern and that all

9    parties and their counsel must be fully familiar with the remedial plans and court orders in

10   this case.  *See* Nov. 6, 2017 Order, ECF No. 5726; Dec. 17, 2019 Order, ECF No. 6427;

11   Dec. 23, 2019 Order, ECF No. 6435.  The Court should exercise its "broad authority to

12   manage complex litigation," *Plata*, 754 F.3d at 1077, to try to effectuate positive change

13   and preserve the integrity of these proceedings.  The Court should order Dr. Toche, and/or

14   CDCR's newly appointed Secretary, Jeffrey Macomber, to appear in court and explain the

15   efforts they have made since Dr. Toche's January 22, 2020 filing or will make "to reiterate

16   to CDCR's employees that they have an ongoing constitutional obligation to provide

17   mental health care to patients and the importance of the Court's remedial orders, the

18   Special Master monitoring, the Program Guide, and CDCR mental health policies to meet

19   that obligation," and to ensure accountability.  Toche Decl., ECF No. 6451-1 ¶¶ 4, 9.  The

20   cultural shift that Dr. Toche promised to promote in CDCR has not taken hold – and

21   indeed appears to have settled into outright defiance.  As this Court has repeatedly stated,

22   true, durable remediation of the constitutional violations will never succeed in such

23   circumstances.  *See* Dec. 17, 2019 Order, ECF No. 6427 at 45-46; Jan. 6, 2023 Order, ECF

24   No. 7699 at 3.

25   **III.    THE COURT SHOULD CLARIFY THAT ITS PRIOR ORDERS**
     **REQUIRING DEFENDANTS NOT TO SIDELINE PSYCHIATRISTS**
26   **APPLY WITH EQUAL FORCE TODAY**

27        In 2019, this Court determined that "[i]n critical policy decisions affecting this case,

28   psychiatry's ability to provide substantive input also was severely constrained."  Dec. 17,

1  2019 Order, ECF No. 6427 at 41. The Court held that Defendants' 2018 staffing

2  proposal—which would have cut by approximately twenty percent the total number of line

3  psychiatry staff positions statewide—was based on misleading data and unsupported by

4  CDCR's own clinical psychiatry leadership: "Defendants failed either to consult key

5  headquarters psychiatrists or to heed the clearly relevant information those psychiatrists

6  attempted to provide." *Id.* at 40; *see also id.* at 17 (finding "Ms. Tebrock's handling of the

7  defendants' misguided 2018 staffing proposal … inextricably constrained, as if carefully

8  curated to preclude meaningful input from psychiatry"); *id.* at 42 ("Ms. Ponciano pulled

9  Dr. Kuich out of one meeting for 'about five minutes' to run some numbers by him for

10 providing on-call services through telepsychiatry without giving him context, full

11 information or time to evaluate the information she was putting together to support the

12 staffing proposal. This exchange too is not the kind of meaningful discussion required

13 under the circumstances …." (internal citations omitted)). In this environment where

14 psychiatry leaders were silenced and sidelined, Dr. Golding was forced to issue his original

15 whistleblower report to ring the alarm bell regarding the dangerous staffing cuts. *Id.* at 22

16 ("[The absence of court action on the proposal is because the whistleblower reports

17 blocked the proposal's presentation to the court in the first place, and not because

18 defendants recognized that aspects of the proposal were based on flawed data and took

19 action to correct the flaws."); *id.* at 42 ("Dr. Kuich described multiple instances where he

20 just gave up trying to report problems or make necessary changes, because his voice was

21 never heard.").

22         Accordingly, the Court ordered:

23     Psychiatrists are critical to appropriate mental health staffing, given that they
       are medical doctors bound by the Hippocratic Oath. *See* Kuich Dep. At
24     33:8-9 ('Psychiatrists as physicians do have the Hippocratic Oath to do the
       best we can for our patients.'). This does not mean psychiatrists must always
25     prevail in internal policy- and decision-making processes. But they must be
       meaningfully consulted; their professional views must be heard, considered
26     and accounted for. Defendants' marginalization of psychiatry and their
       clumsiness in the process reflects a significant lack of good judgment and
27     bureaucratic dysfunction that, if allowed to continue, presents a major
       obstacle to successful remediation.

28

[4224934.9]

15

1   ECF No. 6427 at 42-43; *see also* Nov. 4, 2020 Order, ECF No. 6938 at 4 (reiterating that

2   "the court expects defendants will be fully transparent with all key stakeholders, including

3   but not limited to CDCR psychiatrists, and will continue to take all steps necessary to

4   avoid the errors that required the court's intervention to correct").  Unfortunately, the

5   Second Golding Report indicates that Defendants do not appreciate the magnitude of these

6   mandates or their application to recent policy proposals and the data remediation process.

7          As with Defendants' 2018 staffing proposal, Dr. Golding states in his second report

8   that despite being a headquarters-level psychiatrist, he never received a copy of a

9   psychiatry staffing proposal that CDCR finalized and circulated to the Special Master and

10  Plaintiffs' counsel on September 8, 2020.  Second Golding Report at 732; *see also* Decl. of

11  E. Galvan In Supp. of Pls' Brief Re: Staffing and Population, ECF No. 6852 at ¶ 5 & Ex.

12  A (Sept. 14, 2020) (attaching Defs.' Sept. 8, 2020 staffing proposal)).  Dr. Golding claims

13  "[t]here was a major lack of transparency on the part of CDCR, no representation of our

14  psychiatry team's argument against radically changing the 2009 plan, and no indication

15  that our argument would have any effect. … [O]ur attorneys' interaction with the court

16  system in no way took into account our psychiatrists' opinions about staffing allocation

17  cuts and the 2009 staffing plan."  Second Golding Report at 732.  Dr. Golding attaches to

18  his Report an August 3, 2020 email from CDCR Employee 1, which implies even *he* felt

19  conflicted about certain proposals, but was constrained to revise them.  *See id.* at  915 ("I

20  understand the larger context on the [Psychiatric Nurse Practitioner] issue, but we cannot

21  show a single healthcare system that does not count them, even ones similar to prison.

22  There are larger issues about personnel/hiring/human resources/reality/etc. that have to be

23  taken into account.  To the extent that the plaintiffs and OSM can fight this battle for us, let

24  them, & we wish them good luck.").  Dr. Golding further alleges that he was never

25  informed of, or shown, Defendants' telepsychiatry policy proposal before it was provided

26  to the Special Master and Plaintiffs in 2022 (and ultimately filed with the Court), and he

27  had to request a copy after it was already finalized.  *Id.* at 146

28          Despite the Court's directive that Defendants consider "what steps … to take to

1  ensure indicators and definitions are developed with appropriate consultation and quality

2  control in the future," Dec. 17, 2019 Order, ECF No. 6427 at 34, and Defendants'

3  commitment that "[m]ental health program reporting and its supporting  methodologies

4  will  be  transparent … *to all clinicians and mental health leadership*," Defs' Resp. Re:

5  Proposed Remedies Following Evid. Hr'g, ECF No. 6388 at 3 (Nov. 13, 2019) (emphasis

6  added), CDCR appears to be sidelining Dr. Golding and other headquarters and regional

7  clinical psychiatrists from the data stakeholder review process that directly resulted from

8  Dr. Golding's own whistleblowing report.  For example, Dr. Golding reports that "entire

9  packages of information about multiple topics have been bundled together for quick votes

10  at CAPC [the Change Advisory Prioritization Committee], which do not allow proper

11  analysis and discussion."  Second Golding Report at 145-46.  And headquarters

12  psychiatrists such as Dr. Golding are not allowed to fully participate in all data meetings.

13  In a February 24, 2022 email, Dr. Golding asked CDCR Employee 1 whether he and other

14  members of the clinical psychiatry team were permitted to voice disagreements with

15  CDCR's "final position" on matters of clinical care during the weekly all-parties' BRMR

16  meetings.  *See id.* at 159-60 & Attachment 79 (pp. 973-78).  CDCR Employee 1 allegedly

17  responded by "exhibit[ing] remarkable public anger [at Dr. Golding] in a meeting with the

18  psychiatry team," over this issue.  *Id.* at 976.  CDCR Employee 1 stated in a February 24,

19  2022 email that he could not provide Dr. Golding with a "yes or no answer to [his]

20  question," but implied he could not raise concerns during BRMR meetings because there

21  were other preferred forums.  *Id.* at 974.

22      But Dr. Golding reportedly received conflicting instructions from CDCR Employee

23  2 who manages the data remediation process for CDCR.  On November 16, 2021, when

24  Dr. Golding raised concerns at an internal meeting that Defendants' methodology for

25  calculating compliance with Program Guide timelines "created misleading or inaccurate

26  representations," CDCR Employee 2 allegedly told Dr. Golding to raise his disagreement

27  at the upcoming BRMR meeting.  *Id.* at 147-48; *see id.* at 146 ("Thus … effectively

28  eliminating all reasonable forums in which one *could* (even briefly) exchange ideas with

1    the OSM experts about data issues affecting patient care.").

2          Dr. Golding reports that the problem with limiting psychiatrists' opportunities to

3    raise clinical disagreements is that CDCR presents a "consensus clinical position" during

4    data meetings that gives the misimpression to the Special Master and Plaintiffs' counsel

5    that CDCR's clinical psychiatry leaders have weighed in and agree.  Second Golding

6    Report at 144-45; *see also id.* at 146 ("The problem is that I am often only hearing about

7    CDCR's clinically unwise positions during the meetings at which [CDCR Employee 1]

8    seemed to be saying [psychiatrists] should not be speaking …."); *id.* at 151 ("So our

9    silence in meetings signals agreement with whatever CDCR is saying in the meetings, and

10    CDCR evidently feels free to later cite our silence as evidence that we agreed.").  This is

11    highly reminiscent of the behavior the Court denounced in 2019.

12          Given the parties' apparent differing opinions about the ongoing relevance and

13    import of the Court's December 17, 2019 and November 4, 2020 orders directing

14    Defendants to meaningfully consult psychiatrists, the Court should clarify that these

15    mandates extend to the data remediation process and future policy changes that implicate

16    psychiatry in any way, including, for instance, those related to staffing, provision of

17    clinical care, compliance methodologies including timeliness, and oversight and

18    management of institution-level psychiatrists and telepsychiatrists.  The Court should

19    further clarify and reaffirm that Defendants must consult clinical headquarters and regional

20    psychiatrists (as opposed to psychiatrists serving in administrative roles not on the clinical

21    psychiatry leadership team, such as the Deputy Director) on data indicators and policies

22    that implicate psychiatry, including but not limited to Dr. Golding so long as he remains

23    employed as a headquarters psychiatrist.  This should include providing the headquarters

24    and regional psychiatrist leadership staff sufficient advance warning of proposed policy

25    changes and data issues concerning provision or measurement of clinical care or affecting

26    management of patient care, and, where applicable, written materials for comment before

27    they are finalized.

28    [4224934.9]

**CONCLUSION**

1

2          For the reasons set forth above, Plaintiffs request that the Court issue an order that

3   clarifies and reaffirms the December 17, 2019 Order (ECF No. 6427) and other above-

4   cited prior orders to make clear that (1) the purpose of the data remediation process is to

5   ensure not only that the data is technically accurate, but that it also properly reflects the

6   minimum treatment requirements that govern this case; (2) all parties and their counsel

7   must be fully familiar with the remedial plans and court orders in this case; and (3)

8   Defendants must meaningfully consult clinical psychiatry leadership on policy changes

9   and data issues that affect psychiatry in any way, including but not limited to those

10  concerning provision of clinical care or affecting management of patient care.

11         Plaintiffs also request that the Court order Dr. Toche and/or Secretary Macomber to

12  appear in court to explain efforts Defendants have made since Dr. Toche's January 22,

13  2020 declaration (ECF No. 6451-1), or will make in the future, to ensure CDCR staff

14  understand their obligations pursuant to this Court's orders, and to promote accountability.

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

[4224934.9]

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATION OF ORDERS REVIEWED

Plaintiffs' counsel certifies that she reviewed the following orders relevant to this filing:  Jan. 11, 2023 Stipulated Order, ECF 7700; Jan. 6, 2023 Order, ECF No. 7699; Dec. 29, 2022 Order, ECF No. 7690; Feb. 7, 2022 Order, ECF No. 7456; Aug. 26, 2021 Order, ECF No. 7285; July 1, 2021 Order, ECF No. 7216; Aug. 25, 2021 Order, ECF No. 7283; July 14, 2021 Order, ECF No. 7229; Dec. 17, 2020 Order, ECF No. 6996; Nov. 4, 2020 Order, ECF No. 6938; Sept. 3, 2020 Order, ECF No. 6846; Dec. 23, 2019 Order, ECF No. 6435; Dec. 17, 2019 Order, ECF No. 6427; Oct. 23, 2019 Evidentiary Hr'g Tr., ECF No. 6380; Aug. 14, 2019 Order, ECF No. 6242; Nov. 6, 2017 Order, ECF No. 5726.

DATED:  February 9, 2023

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Cara E. Trapani*

Cara E. Trapani

Attorneys for Plaintiffs

[4224934.9]

PLS.' NOTICE OF MOT. AND MOT. IN RESPONSE TO DEC. 29, 2022 ORDER RE: DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF NO. 7690)