Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov

Paul B. Mello, State Bar No. 179755
Samantha D. Wolff, State Bar No. 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
Hanson Bridgett LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** <br><br> Plaintiffs, <br><br> v. <br><br> **GAVIN NEWSOM, et al.,** <br><br> Defendants. | 2:90-cv-00520 KJM-DB (PC) <br><br> **DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S TWENTY-NINTH MONITORING REPORT ON DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS FOR EOP AND CCCMS PROGRAMS, PARTS C AND D** |

**INTRODUCTION**

On February 7, 2023, the Special Master filed his Twenty-Ninth Round Monitoring Report, Part C ("Report, Part C"), on the Enhanced Outpatient Programs (ECF No. 7715), and his Twenty-Ninth Round Monitoring Report, Part D ("Report, Part D"), on the Correctional Clinical Case Management System programs. (ECF No. 7716.) The Special Master provided Defendants with the drafts of both reports on December 8 and 16, respectively ("Draft Reports"). Defendants submitted their written responses and objections to the Draft Reports on January 25, 2023. (*See* Exhibit C to Draft Report, Part C, ECF No. 7715-1 at 31-40, and Exhibit B to Draft Report,

1

Part D, ECF No. 7716-1 at 21-30.) Although the 29th Round Monitoring Report, Parts C and D ("Report") addresses some of the issues and objections raised in Defendants' January 25 letter, it does not acknowledge or adequately address all of the issues. Defendants now reassert their objections to those remaining issues that were not adequately addressed in the Report.

I.  **THE REPORT PAINTS AN INCOMPLETE PICTURE OF DEFENDANTS' STAFFING EFFORTS BY FAILING TO ACKNOWLEDGE THE NATIONWIDE SHORTAGE OF MENTAL HEALTH CLINICIANS.**

In their January 25, 2023 response to the Report, Defendants requested that the Special Master revise the Report to acknowledge the significant, widespread shortage of mental health professionals nationwide. While the Special Master did add a footnote to his Report, the footnote merely repeats Defendants' sentiments and implies that the nationwide staffing shortage is simply an argument put forward by Defendants, and not an uncontroverted fact. (*See* Report, Part C at 20, fn. 8 ("In their response to the Draft Report, defendants noted that 'there is a nationwide and state-level shortage of mental health professionals, and the shortage acutely affects prison systems like CDCR because of additional challenges professionals face in treating patients in remote areas or under dangerous or difficult conditions.'").) Further, by relegating this important point to a footnote, the Report discounts the critical context of the staffing deficiencies on which he reports.

As the Court has recognized in its January 6, 2023 order, recruiting and retaining mental health clinicians has been an ongoing challenge despite Defendants' many efforts to increase staffing. (ECF No. 7699 at 2:13-16.) For purposes of full transparency and completeness, the Report should acknowledge that CDCR is not an outlier—there is a nationwide and state-level shortage of mental health professionals. Due to the added challenges professionals face in a correctional setting—i.e., treating patients in remote areas or under dangerous or difficult conditions—these labor market conditions and staffing shortages acutely affect prison systems like CDCR. *See* ECF No. 7715-1 at 34; Stacy Weiner, A growing psychiatrist shortage and an enormous demand for mental health services, Association of American Medical Colleges, Sep. 9, 2022, https://www.aamc.org/news-insights/growingpsychiatrist-shortage-enormous-demand-mental-health-services); Jocelyn Wiener, Unanswered cries: Why California faces a shortage of mental health workers, Sep. 8, 2022, https://calmatters.org/health/2022/09/california-shortage-

mental-health-workers/). The Report fails to acknowledge, much less address, this important and widespread concern head-on, failing to reference the labor economists' reports in Defendants' response (ECF No. 7715-1 at 33-34) or offering the Court context on how this crisis is impacting Defendants' ability to comply with Coleman staffing mandates.

As an extension of the Special Master's unwillingness to acknowledge this staffing crisis, the Report also ignores Defendants' objections to the short-sighted statement that "[t]ime spent training and supervising unlicensed clinicians further strained licensed staff members' ability to focus on delivery of care to patients." (ECF No. 7715 at 32.) As Defendants pointed out in their response, the training and supervision of unlicensed clinicians allows CDCR to create a pipeline of future licensed clinicians, a critical tool for the recruitment and retention in a challenging labor market. (ECF No. 7715-1 at 34.) Defendants therefore request that the Report be revised to acknowledge the impact of the nationwide staffing shortage on Defendants' recruitment and retention efforts (and not simply as a footnote quoting Defendants), and withdraw the critique of Defendants' efforts to create a pipeline for future licensed staff.

## II. THE REPORT CONTAINS CONTRADICTORY ASSERTIONS REGARDING DATA REMEDIATION AND MISREPRESENTS DEFENDANTS' POSITION.

The Report states that data remediation is "intended to align the scope of a given indicator with the Special Master's current scope of monitoring." (ECF No. 7715 at 41.) Yet, the Special Master continues to deny Defendants' oft repeated requests for the Special Master's guidebook, business rules, sample size methodology and other necessary documents to properly replicate the monitoring process so that it aligns with Defendants' data indicators. Without these materials, Defendants are severely hamstrung in their ability to understand the exact specifications that would result in an indicator being remediated. (*See* December 8, 2022 Letter from Secretary Allison to the Special Master.) Certainly, the parties and the Special Master should be working together to achieve compliance, with all stakeholders making every effort to reach compliance as quickly and efficiently as possible. Indeed, this Court previously noted the importance of transparent benchmarks, noting that the Special Master "has a rubric for monitoring," and suggested "clearly put[ting] out there the benchmark the special master has been using reflected

in his reports to the Court for quite some time now and ask why these should not be confirmed as the benchmarks." (July 18, 2020 Tr., ECF No. 67871 at 11:7, 14-17.)  Nonetheless, Defendants' requests for these materials have been consistently rejected.

Worse, the Report includes a footnote that both misrepresents the nature and timing of Defendants' request, and seemingly attacks Defendants for their requests for further transparency and cooperation.  The Report characterizes Defendants' requests as a "newfound interest in conducting a fishing expedition to scrutinize the Special Master's internal documents." (Report, Part C at 13-14, fn. 6.)  The statement is off base, counterproductive, and incorrect.  Defendants have sought access to the tool for many years while developing CQIT, culminating most recently in two letters sent to the Special Master on August 5 and December 8, 2022.  (ECF No. 7715-1 at 47-53; Weber Decl. ¶ 2, Exh. A.)  Defendants also had hoped to have received the tool following the court's July 12, 2018 order requiring the Special Master establish benchmarks (*See* ECF No. 5852 at 3) and following the court's July 18, 2020 status conference.  As the alignment of scope, methodology, sample sizes, and business rules of CDCR's key indicators with "the Special Master's long-established (and relied upon) monitoring practices" access to the Special Master's monitoring tool, which ostensibly will provide the necessary detail on the scope and mythology of his "long-established" monitoring practices, has become even more essential.  (Report, Part C at 24, fn. 6.)

With respect to the scope of data remediation, the Report includes a quotation from Defendants' prior filing that purportedly concedes that the data remediation process necessarily includes modifications to align the scope of a given indicator with the Special Master's current scope of monitoring.  (*See* Report at 41, n. 13, citing ECF No. 7523-1 at 4.)  Notably, the Report omits the sentence that follows, which states that data remediation is "intended to assess whether CDCR's indicators measure what they purport to measure." (ECF No. 7523-1 at 4).  Defendants have consistently held this position. (*See* ECF No. 7523 at 14 ("The data remediation process CDCR agreed to follow . . . and the timeline developed in response to this process does not include the creation of a new policy, expanded policy, or expanded indicator. Yet, every indicator reviewed by the Special Master's team and Plaintiffs (approximately 50 – 60 indicators) has

required changes to achieve data remediation.").) Defendants remain concerned that data remediation is "increasingly becoming an overhaul of long-established and court-approved policies and processes rather than a transparency check or data validation project." (*See* ECF No. 7523 at 14.)

In addition, Defendants objected to the Report's characterization of Defendants' concerns on the expansion of the data remediation process as an attempt to wrest a "rubber stamp" of key indicators from the Special Master. (Report – Part C, at 44.) This language misleadingly portrays Defendants' concerns with respect to the data remediation process. CDCR has devoted significant resources to this effort—as the Report notes, thirty-nine all-parties data meetings and eighty-three BRMR meetings have occurred just since March 5, 2021. (*Id.* at 38.) This does not include the countless internal meetings, preparatory tasks, or meetings with the Special Master's data team, including those in QAC. (*See* ECF No. 7715-1 at 32.) Defendants' staff spend significant time and resources developing documentation for indicators discussed at these meetings, and shepherd these indicators through a thirteen-step validation and verification process. (*See* ECF No. 7415, at 17.)

Through hundreds of hours of weekly meetings on data remediation, some involving the highest levels of CDCR management, Defendants have demonstrated their commitment to the process of explaining their data systems to Plaintiffs and the Special Master team, undertaking validation and verification, as well as incorporating stakeholder feedback. Defendants are unclear how much more is required to show the "steadfast focus" on data remediation that the Special Master has requested from the parties. (*See* – Part C, at 45.) What contributes to delay are discussions that often stray far beyond these areas and instead become top to bottom reviews of existing policies and their corresponding indicators with an eye toward expanding them. These discussions result in requests to fundamentally change how an indicator operates or culminates in requests to create entirely new indicators, which go beyond ensuring indicators are measuring what they purport to measure. Describing these concerns as seeking a "rubber stamp" from the Special Master displays a deep misunderstanding of Defendants' position. To label this onerous and time-consuming process as an attempt to "seek the Special Master's rubber stamp on any

indicator which accurately measures what it purports to measure without any regard for whether it is measuring what it is supposed to measure in the context of this case" mischaracterizes Defendants' intent and efforts, and fails to credit the good faith, assiduous work done by CDCR staff involved in data remediation. (See Report, Part C at p. 44.)

Moreover, in the Report, the Special Master characterizes Defendants' January 7, 2022 updated activation schedule as an effort to "la[y] the foundation to blame any future delays on the Special Master or plaintiffs' counsel [with respect to data remediation]." (Report, Part C at 39-40.) As stated in Defendants' response to the Report, attributing bad faith intentions to Defendants is unproductive and, more importantly, inaccurate. In fact, the Report's reference to a declaration by Secretary Allison, which reinforced CDCR's commitment to assigning additional staff to data remediation, contradicts the Special Master's statement above. (*Id.* at 32.) Accordingly, Defendants request that the Report be amended to remove the Special Master's mischaracterization of Defendants' January 7, 2022 updated activation schedule.

### III. THE REPORT CONFLATES REMEDIATION AND CERTIFICATION WITH DATA VALIDATION AND VERIFICATION, AND FAILS TO DEFINE TERMS THAT ARE CRITICAL TO ACHIEVING DATA REMEDIATION.

More than two and a half years after Dr. Potter was retained, and despite multiple requests from Defendants, the Special Master refuses to define "data remediation" and "certification". The Report obfuscates this fact. Although the Report emphasizes that "successful completion of data remediation . . . remains defendants' most direct path to ending this case," the Special Master has not provided guidance on how and when the parties will know that a single indicator (or, all indicators) has been successfully remediated and certified; and how and when the Special Master or his expert will communicate the completion of the data remediation process to the parties and Court. (*See* ECF No. 7556 at 3-4.) Without clarity as to the requirements to achieve data remediation, the successful completion of this process becomes nearly impossible.

The Report misleadingly states that Defendants understand what it means to remediate and certify an indicator, citing a September 2021 filing that defines the meaning of two different terms—*data validation* and *data verification*. (Report, Part C at 45, n. 15.) That citation does not speak to remediation or certification—topics on which Defendants have requested guidance from

the Special Master on several occasions since this project commenced in August 2021. (*See, e.g.*, ECF No. 7523-1 at 14 ("This process is increasingly becoming an overhaul of long-established and court-approved policies and processes rather than a transparency check or data validation project. In short, the scope of the data remediation process seems to evolve continually and expand without any clear boundaries . . . . It's intended to evaluate whether CDCR's indicator measure what they purport to measure.  This issue has been raised several times with the Special Master's Data Expert, and most recently, on March 28, 2022."); ECF No. 7556 at 4 ("The Special Master has declined to include a clear definition of what it means for an indicator to be remediated within the proposed Activation Schedule template.  From my discussions with the data expert, I understand that he believes that an indicator is remediated if the parties agree upon its operation and it is operating as specified.  CDCR learned for the first time during the meet and confer process, that the Special Master's data expert would only 'remediate' individual indicators and not certify them.  Instead, during the meet and confer process, the Special Master's data expert informed CDCR that he would only certify the entire data system, but not individual indicators . . . . I request that the court direct the Special Master to adopt an agreed upon definition of the term 'remediation.'  It is important that the Special Master and the parties agree on what it means to remediate and to certify CDCR's data.  I am concerned that without greater clarity on what is required to remediate an indicator and to certify CDCR's data system, the end goal of this project and how to achieve that goal remain undefined.").)

        The Special Master committed to revising his proposed definitions of data certification and remediation after multiple all-party meetings between July and October 2022.  And while the Report notes that "the outcome of these discussions [on the definitions of data remediation and certification] is pending," (ECF No. 7715 at 47) four months later Defendants are still waiting for the Special Master to issue his amended definitions of data certification and remediation. Accordingly, Defendants request that the Report be amended to remove footnote 15, which conflates validation and verification with remediation and certification, obscuring the requirements to remediate an indicator and certify CDCR's data.

///

### IV. THE REPORT INCLUDES OUTDATED CHARACTERIZATIONS OF THE POST-CERTIFICATION PROCESS.

The Report states that during the Post-Certification Annual Review Cycle "[a]t least annually, all Key Indicators will be reviewed through the data remediation process," citing an activation schedule filed in September 2021. (Report, Part C at 39, n. 12.) The cited filing includes a very preliminary view of the Post-Certification process that CDCR no longer holds. The process has evolved over the past fifteen months, resulting in significant modifications to the anticipated Post-Certification process. For instance, Defendants would not necessarily put all Key Indicators through the full data remediation process annually. Nor would stakeholder review (i.e. BRMR) be included in the Post-Certification process. Drs. Potter and Cartwright are discussing the Post-Certification review process this year in parallel with reviewing the existing Change Management policy. Defendants requested that the Special Master remove the reference to the Post-Certification process, or alternatively, clarify that Defendants no longer anticipate following the approach set out in the Draft Report. The Report ignores this request and, as a consequence, the reporting of the post-certification process is inaccurate.

### V. THE REPORT SHOULD CLARIFY VAGUE AND ANECDOTAL ASSERTIONS REGARDING TELEPSYCHIATRY AND TELEHEALTH.

In their response and objections to the Draft Report, Defendants noted that the connectivity issues the Special Master raised against the full use of telepsychiatry appear anecdotal in nature and lack specificity. (ECF No. 7715-1 at 34.) Despite Defendants' request that the Special Master revise his final report to quantify the extent of these connectivity problems, the Report remains unsupported by specific data. (*See* Report, Part C at 22-23.)

Specifically, the Report states that "connectivity issues negatively impacted IDTTs for CMC's 3CMS program on A Quad, CSP/Corcoran's LTRH, CSATF's EOP and 3CMS programs, and SVSP's STRH," and that "MCSP mental health leadership reported connectivity problems on some facilities as well." (Report, Part C at 96.) The Report further states that "CSATF 3CMS staff also reported frequent connectivity issues for telepsychiatrists working from home." (*Id*.) Part D of the Report indicates that problems with connectivity during IDTTs were observed at

only one of the institutions. (Report, Part D at 43.) The Report also notes that the quality of the IDTTs at five institutions "generally suffered" as a result of allowing on-site IDTT members to attend by telephone or videoconferencing equipment. (*Id.*) Similarly, the Report states that "VSP's EOP patients expressed discomfort with telepsychiatry's use." (Report, Part C at 96.) Without providing actual data and details of the monitor's observations, including context pertaining to the nature of the expressed discomfort, or the number of patients who made these complaints, this information is anecdotal and unhelpful.

Similarly, to illustrate "difficulties with telepsychiatry," the Report asserts that "CSATF's 3CMS clinicians reported telepsychiatry challenges which occasionally led to different diagnostic assessments between the PC and telepsychiatrist." (Report, Part C at 95.) Again, without more information, it is difficult to glean what role, if any, telepsychiatry played. After all, differences in diagnostic assessments are not atypical among multiple providers. In light of these conclusory assertions, the Report should be amended to provide the number of complaints and technical issues compared to the total number of telehealth encounters observed to provide appropriate context.

## VI. THE REPORT CONTAINS ERRORS.

In their objections to the Draft Report, Defendants identified numerous inconsistent or potentially misleading statements and requested that they be clarified in the final report. While Defendants appreciate the changes the Special Master made to the Report, the following issues remain. (ECF No. 7715-1 at 37-44.)

### A. The Report Cites to Inaccurate Psychiatry Vacancy Data.

In their January 25, 2023 response, Defendants objected to the Special Master's erroneous calculation and reporting of psychiatry vacancy rates in the Draft Report. (ECF No. 7715-1 at 33.) Disregarding Defendants' objections, the Report continues to describe a "shocking" vacancy rate of 51 percent for psychiatrists at the 15 EOP institutions visited by the Special Master's team during the 29th Round. (Report, Part C at 73-74 and 77-78.) However, this calculation is grossly and demonstrably inaccurate. As of December 2022, 198.1 staff psychiatrist positions have been allocated to these 15 EOP institutions. Of these 198.1 positions, 63 are civil service

telepsychiatrist positions. (*Id.*) These institutions have filled 118.35 of 135.1 allocated on-site civil service and registry psychiatrist positions, amounting to a fill rate of 87.6% or a vacancy rate of 12.4% for on-site and registry positions. (*Id.*) If telepsychiatrist positions are included, these institutions have filled 181.35 of 198.1 total allocated positions, amounting to a fill rate of 91.5% or a vacancy rate of just 8.5%. (*Id.*)

The Special Master's calculation is highly misleading about psychiatry vacancy rates, and it is also inconsistent with the monthly psychiatry vacancy reports Defendants filed during the Special Master's review period. (*See* ECF No. 7715-1 at 33.) The Special Master does not cite his source and Defendants' requests for an explanation of the Special Master's calculations and/or methodology, or a meeting to discuss the same, were ignored.

Defendants are left to surmise as to the source of the miscalculation, and believe that the Special Master essentially double-counted the approximately 60 allocated positions that had been filled with telepsychiatry. (*Id.*) When a telepsychiatrist is assigned to an institution, the onsite allocation is removed and converted to a telepsychiatry position. By using the telepsychiatry positions twice – once for the onsite calculation and once for the telepsychiatry allocation – the resulting fill rate for on-site allocation is incorrect. (*See* ECF No. 7715-1 at 33.)

Given the demonstrably false data regarding the psychiatry vacancy rate that was included in this Report, Defendants request that the Court reject these findings.

### B. The Report Fails to Correctly Describe Inpatient Referral Process.

The Report includes a discussion of institutional compliance with transfers to acute or intermediate inpatient care. (Report, Part C at 129.) As Defendants clarified in their January 25, 2023 letter, however, institutions are not responsible for bed identification. (ECF No. 7715-1 at 38.) Once a referral is made, IRU and HCPOP identify an appropriate bed and authorize movement. Defendants request that the Special Master be instructed to amend the Report to reflect that transfers to inpatient care are not an institutional-level issue after a referral is made. The Special Master refused to make this requested change because "findings regarding compliance with inpatient transfer timelines were reported consistently with prior monitoring

reports." (Report, Part C at 27.) Accordingly, the Report should be amended to correct the Special Master's erroneous reporting.

### C. The Report Misstates the Program Guide Policy on Length of Stay in a Mental Health Crisis Bed.

In their response and objections to the Draft Reports, Defendants noted that the reporting of the policy on the length of stay for the Mental Health Crisis Beds was incomplete. (ECF No. 7715-1 at 38.) The Special Master refused to correct this section of the Report that states that the "Program Guide provided for a length of stay of up to ten days in the MHCB." (Report, Part C at 130.) The Report further states that four institutions had average lengths of stays exceeding ten days. (*Id*.) Defendants reassert these objections as the Reports misstate the policy and Defendants' compliance. The Report should clarify that the expectation is that the length of stay should not exceed 10 days, but it can be extended if the chief psychiatrist or designee authorizes it. (*See* Program Guide at 12-5-1 and ECF No. 7333-1 at 72.) Defendants request that the Court reject any related findings concerning noncompliance and note the full policy reflected in the Program Guide.

### D. Reporting of Class Members' Access to Jobs.

The Draft Report included a general comment that "(t)he 15 institutions with EOP programs did not satisfy the requirements for MHSDS patients for program access." (Report, Part C at 153.) Defendants objected to such comments because the Report does not state which requirements govern program access, nor does it establish the policies that were violated. (ECF No. 7715-1 at 39.) Although the Special Master removed two general statements from the final Report, it includes the assertion that "non-MHSDS incarcerated persons held more job assignments than mental health caseload patients, with 3CMS patients holding more assignments than EOP patients," based simply on the statement that "the data speaks for itself." (Report, Part C at 29, 153.) As stated in Defendants' January 25, 2023 response, this conclusion fails to acknowledge that EOP patients are less likely to accept jobs due to mental illness and may instead choose EOP group treatment. Defendants request that the Special Master be instructed to amend the Report to include this added context.

### E. The Report Uses Undefined Terms to Report on Quality of Treatment.

As with prior reports, Part D of the Draft Report improperly "summarizes the overall assessment of the quality of treatment into three categories: 'adequate quality,' 'marginally,' adequate quality,' 'and inadequate quality.'" (ECF No. 7715-1 at 39.) Defendants reassert their objections on the grounds that "(t)hese definitions are not well defined—notably, 'marginally adequate quality.'" (*Id.*) The Special Master has refused Defendants' requests for definitions and clarification on the basis that "the categorizations speak for themselves." Such a conclusory, unsupported statement should not be adopted as findings in an order by this Court. Accordingly, Defendants request that the Special Master be instructed to amend the Report to remove this statement.

### CONCLUSION

Defendants acknowledge that the Special Master noted their objections to parts C and D of the Draft Reports and corrected several issues that Defendants raised in their January 25 objections. However, the final Reports fail to address several important objections, noted above, and as a result, are not comprehensive and accurate reports of Defendants' compliance with the EOP and 3CMS programs. Defendants therefore respectfully request the above-described changes to the Report.

### CERTIFICATION

Defendants' counsel certify that they reviewed the following orders relevant to this filing: ECF Nos. 4361; 5852; and 7699.

| | | |
|---|---|---|
| Dated: February 17, 2023 | | Respectfully submitted, |
| | | ROB BONTA<br>Attorney General of California<br>DAMON MCCLAIN<br>Supervising Deputy Attorney General |
| | | /s/ *Elise Owens Thorn*<br>Elise Owens Thorn<br>Deputy Attorney General<br>*Attorneys for Defendants* |
| Dated: February 17, 2023 | | HANSON BRIDGETT LLP |
| | | /s/ *Paul Mello*<br>PAUL MELLO<br>SAMANTHA D. WOLFF<br>*Attorneys for Defendants* |