DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>        Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' REQUEST FOR LEAVE TO FILE SUPPLEMENTAL DECLARATION OF PABLO STEWART IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY**<br><br>Judge:   Hon. Kimberly J. Mueller |

[4237819.1]

Case No. 2:90-CV-00520-KJM-DB

PLAINTIFFS' REQUEST FOR LEAVE TO FILE SUPPLEMENTAL DECL. OF P. STEWART ISO PLS.' RESPONSE TO
SPECIAL MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY

**INTRODUCTION**

Plaintiffs seek leave from the Court to file a supplemental expert declaration from Pablo Stewart, M.D. regarding recently issued guidance from the American Psychiatric Association ("APA") about telepsychiatry. The proposed supplemental expert declaration from Dr. Stewart is attached to this request as **Attachment A**. The Special Master filed his Report and Recommendation on a Final Proposed Telepsychiatry Policy on December 15, 2022, which includes telepsychiatry-related findings to support his recommendation to adopt the provisional telepsychiatry policy as final. *See* ECF No. 7682. On January 17, 2023, Plaintiffs filed a Response to the Special Master's Report and Recommendations on a Final Proposed Telepsychiatry Policy ("Plaintiffs' Response), including an expert declaration from Pablo Stewart, M.D. *See* ECF Nos. 7703, 7703-1. Defendants also filed a response on the same day. *See* ECF Nos. 7702 – 7702-3. In February 2023, after the parties filed their responses, the APA released a publication entitled "Telepsychiatry for Adults in Jails and Prisons" ("APA telepsychiatry guidance") which is a guide for psychiatrists interested in or already working with adults incarcerated in jails or prisons, and for whom telepsychiatry is a current or potential clinical practice. The APA telepsychiatry guidance is publicly available to download at:

https://www.psychiatry.org/Psychiatrists/Search-Directories-Databases/Resource-Documents/2023/Telepsychiatry-for-Adults-in-Jails-and-Prisons.

**I.    THE COURT SHOULD PERMIT PLAINTIFFS TO FILE A SUPPLEMENTAL DECLARATION FROM PABLO STEWART, M.D. ABOUT THE SIGNIFICANCE OF THE APA'S RECENT PUBLICATION.**

The Court should give approval to Plaintiffs to file a supplemental expert declaration from Dr. Stewart about the significance of the APA telepsychiatry guidance. *See* L.R. 230(m) (prior Court approval required to file additional materials after briefing is completed). A central part of the dispute before the Court is whether there is evidence to support Defendants' proposed changes to the provisional telepsychiatry policy, which the Special Master rejected. Defendants argue that the relevant scientific literature supports their proposed modifications to the provisional telepsychiatry policy, whereas Plaintiffs

and the Special Master disagree.  *Compare* Defendants' Response, Jan. 17, 2023, ECF No. 7702 at 8-12 *with* Plaintiffs' Response, Jan. 17, 2023, ECF No. 7703 at 20-22 (academic landscape indicates there is insufficient research to conclude that telepsychiatry is an appropriate modality for treating patients with severe psychiatric symptoms in correctional settings); *see also* Telepsychiatry Report, Dec. 15, 2022, ECF No. 7682 at 42-46 (Special Master concluded that the relevant literature did not support adopting Defendants' proposed changes to the provisional telepsychiatry policy).  The Court should consider Dr. Stewart's analysis of the APA telepsychiatry guidance, especially given Defendants' arguments that their proposed modifications to the provisional telepsychiatry policy are in line with the APA's position.  *See* Defendants' Response, Jan. 17, 2023, ECF No. 7702 at 11.

Accordingly, Plaintiffs request leave to file a supplemental declaration from Pablo Stewart, M.D. regarding the APA's recently issued guidance about telepsychiatry for adults in jails and prisons, which is attached to this request as **Attachment A**.

DATED:  February 24, 2023

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Amy Xu*

Amy Xu

Attorneys for Plaintiffs

# Attachment A
# Proposed Supplemental Declaration of Dr. Pablo Stewart, M.D.

DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
BRENDA MUÑOZ – 328813
ARIELLE W. TOLMAN – 342635
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **SUPPLEMENTAL DECLARATION OF PABLO STEWART, M.D. IN SUPPORT OF PLAINTIFFS' RESPONSE TO SPECIAL MASTER'S REPORT AND RECOMMENDATION ON A FINAL PROPOSED TELEPSYCHIATRY POLICY** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | Judge: Hon. Kimberly J. Mueller |

[4240887.1]

**INTRODUCTION**

1.      I am providing this declaration to supplement the declaration I provided on January 17, 2023, filed as ECF No. 7703-1 in this action.

2.      The reason for supplementing my declaration is that after I completed the declaration, the American Psychiatric Association (APA) issued a new "Resource Document on Telepsychiatry for Adults in Jails and Prisons," dated February 2023.  The Resource Document is available on the APA website at https://www.psychiatry.org/getattachment/00e3f401-0792-4b78-90ba-5985dd791a4e/Resource-Document-on-Telepsychiatry-in-Jails-and-Prisons.pdf.  I have attached a PDF copy of the Resource Document as **Exhibit A** to this declaration.

3.      In my opinion this new Resource Document is an important source of information for decision-makers, including CDCR and this Court, in setting the right mix between on-site and remote psychiatric services in a prison setting.  As I stated in my January 17, 2023 declaration, there is a shortage of guidance in the medical literature regarding the use of telepsychiatry at higher levels of care in correctional settings.  (ECF No. 7703-1 at 7.)  This new Resource Document provides the Court with guidance from 11 physician-authors listed on the first page as contributors.

4.      The following statements in the Resource Document are particularly useful in evaluating CDCR's proposal to transition the EOP to full telepsychiatry.

        a.      The first "Key Principle" in the Resource Document is to "[i]dentify whether telepsychiatry is appropriate for the level of mental health care being delivered." (Exhibit A at 3.)  In addressing higher levels of care, which the authors identify as "residential treatment units, inpatient psychiatry units, crisis units," the Resource Document states:  "It is the opinion of the authors that telepsychiatry in higher levels of care be used as a last resort or in very specific situations, for example when in-person recruitment is not successful." (Exhibit A at 4.)  For these higher levels of care, the Resource Document includes additional considerations:  (1) having the telepsychiatrist provide services on-site at a minimum annually for outpatient care, and "quarterly to

1  semiannually" at higher levels; and (2) ongoing recruitment for on-site psychiatrists,

2  especially at higher levels of care.

3          b.      The second "Key Principle" in the Resource Document concerns on-

4  site visits at the correctional facility. (Exhibit A at 3, 5-7.) The Resource Document

5  correctly points out at that the psychiatrist is likely to misinterpret what the patient says if

6  the psychiatrist has no first-hand knowledge of prison life. (Exhibit A at 5.) On-site visits

7  provide telepsychiatrists with a better understanding of the facility and may improve

8  relationships with the on-site clinical team. Exhibit A at 7. The Resource Document

9  therefore recommends frequent on-site visits that include delivery of patient care.

10          c.      "Patients should be afforded the same rights to consent to treatment in

11  telepsychiatry as for in-person psychiatry." (Exhibit A at 8.) The Resource Document

12  correctly emphasizes that the psychiatrist should inform the patient about the use of

13  telepsychiatry, and proceed only with consent.

14          d.      Cellside telepsychiatry is not equivalent to confidential telepsychiatry;

15  nor is it even equivalent to on-site cellside psychiatry. (Exhibit A at 9.) The Resource

16  Document correctly states that if the patient cannot be escorted to the telepsychiatry office,

17  the patient may be better served "by in-person services due to significant technical

18  difficulties with cell-front telepsychiatry, especially the lack of adequate confidentiality."

19  (*Id.*) Based on my familiarity with the delivery of care in CDCR, it is my opinion that this

20  statement would be too permissive of cell-front telepsychiatry if applied to CDCR. The

21  level of crowding, the noise, the lack of aural privacy between cells, and the prevalence of

22  ethnic and gang politics in CDCR, make cellside contacts almost always useless, and

23  probably always useless if the complexity of telepsychiatry is added.

24       5.     The APA's Resource Document comes at very important moment in

25  correctional mental health care. Because of the Covid-19 pandemic, telehealth adoption

26  accelerated enormously, far faster than it would have without the pandemic, and far

27  outpacing the development of evidence that it is effective. Now that many pandemic

28  restrictions are being eased, it is critical that clinical leadership take a close look at how far

1  their systems have gone in becoming reliant on telehealth, and what should be the

2  appropriate mix of on-site and telemedicine in the post-pandemic environment.  It is not

3  safe to simply adopt what we did during Covid as the new normal, without careful

4  evaluation of the risks and benefits for patient care.  CDCR's proposal for full

5  telepsychiatry in the EOP, for infrequent on-site visits, and for fully embracing cellside

6  telepsychiatry, represent the wrong way to move forward with telehealth after the

7  pandemic.  The APA Resource Document correctly points to a more careful and safer way

8  to proceed.

9      I declare under penalty of perjury under the laws of the United States of America

10  that the foregoing is true and correct to the best of my knowledge, and that this declaration

11  was executed at Honolulu, Hawaii this 24th day of FEBRUARY, 2023.

12

13

14  _____

15  Pablo Stewart, M.D.

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A
# APA Resource Document on Telepsychiatry for Adults in Jails and Prisons

## APA Resource Document

# Resource Document on Telepsychiatry for Adults in Jails and Prisons

Approved by the Joint Reference Committee, February 2023

"The findings, opinions, and conclusions of this report do not necessarily represent the views of the officers, trustees, or all members of the American Psychiatric Association. Views expressed are those of the authors." – *APA Operations Manual*

CONTRIBUTORS TO TELEPSYCHIATRY DOCUMENT TO DATE (IN ALPHABETICAL ORDER):

Margarita Abi Zeid Daou, MD
Elizabeth Ford, MD
Tanuja Gandhi, MD
Dionne Hart, MD
Danielle Kushner, MD
Eugene Lee, MD
Ashley MacLean, MD
Nathaniel P. Morris, MD
Jeffrey Metzner, MD
Debra A. Pinals, MD
Stephanie Rolin, MD

## 1. Introduction

Telepsychiatry is the use of "electronic communication and various technologies to provide psychiatric care between a psychiatrist in one location and a patient in another location" (Lambert, 2016). One of the earliest objectives of telepsychiatry was to improve access to care for populations for whom there were insufficient resources to deliver that care, including people confined in jails and prisons. Although available health care, including mental health care, is a constitutional requirement in correctional facilities (*Estelle v. Gamble*, 1976), funding shortages, security priorities, geographic isolation, and continued professional staff shortages (Manfredi et al., 2005; Buche et al., 2018; Morris & West, 2020) limit the quality of and access to such care.

Early telepsychiatry—first introduced in prisons in Florida in the late 1980s—had relatively poor audio-visual capabilities (Ollove, 2016). Advances in technology and decreased associated costs dramatically improved the quality-of-care delivery (Deslich et al., 2013; Ollove, 2016) and prison telepsychiatry greatly expanded in the 1990s (Shore, 2015). States including Ohio, Arizona, Kansas, Georgia, California, West Virginia, and Texas developed programs in correctional facilities. Over the subsequent decades, telepsychiatry continued to spread, albeit limited by technological factors (Leonard, 2004; Deslich et al., 2013). According to a 2016 national survey by the Center for Disease Control and Prevention (CDC), over 60% of state prisons surveyed (28 out of 45) were using some form of telepsychiatry; numbers for local jails are not known (Chari et al., 2016). In 2020, the COVID-19 pandemic and associated social distancing requirements dramatically increased the utilization of telepsychiatry across almost all settings where mental health treatment is delivered, including in jails and prisons.

Although now outdated due to having been conducted prior to the COVID-19 pandemic, several studies have shown the efficacy of telepsychiatry for outpatient-level mental health care in correctional settings with respect to clinical improvement, correlation of psychiatrist evaluation with patient symptom reports, and patient satisfaction (Zaylor et al., 2001; Nelson et al., 2004; Brodey et al., 2000; Morgan et al., 2008). Studies have also revealed concerns about privacy (Myers et al., 2006) and unauthorized access to confidential information (Miller et al., 2005), along with an impact on therapeutic rapport (Khalifa et al., 2008). One study reported that patients with thought disorders appeared more satisfied with telepsychiatry than those with affective disorders and personality disorders (Magaletta et al., 2000). More recent literature indicates that telepsychiatry allows greater access not just to standard psychiatric services that may be difficult to staff with in-person psychiatrists (Batastini et al., 2020; Kaftarian, 2019) but also to specialty psychiatric services such as geriatric, addiction, reproductive, and child/adolescent (Bouknight, 2017). Most of the literature on telepsychiatry is based on an outpatient level of care in a community setting. Thus, there are limits to extrapolating this data to within a correctional setting.

Correctional settings have unique issues related to lack of autonomy (e.g., escorted movements, restricted access to the internet, schedules that are limited by custody programs), lack of confidentiality and privacy, and potential for limited to no provider familiarity with the environment in which care is provided. This document is designed to review the issues of telepsychiatry specific to jails and prisons; it is not a primer on general telepsychiatry. Issues for which there are no substantive telepsychiatry differences between a correctional environment and other clinical care settings will not be covered (e.g., diagnostic interview, specific psychiatric treatment, informed consent, basic technical specifications). For information on those topics, please refer to the American Psychiatric Association's Telepsychiatry Toolkit and its Best Practices in Videoconferencing-Based Telemental Health (APA, 2018), Practice Guidelines for Videoconferencing-Based Telemental Health (ATA, 2019), and Evidence- Based Practice for Telemental Health (ATA, 2019).

This APA Resource Document is a guide for psychiatrists interested in or already working with adults who are incarcerated in jails or prisons and for whom telepsychiatry is a current or potential clinical practice. This document may also be helpful for psychiatric administrators in correctional facilities who are considering the implementation of telepsychiatry.

The following clinical vignette highlights some of the considerations of telepsychiatry in jails and prisons:

*Psychiatrist Perspective*

Dr. Smith arrives at her private practice office, where she has just started spending several days a week conducting telepsychiatry visits with people incarcerated in a neighboring state prison. She logs in to the telemedicine software prior to the appointment with her first patient of the day at 8:00 am. Mr. Jones has been incarcerated for two years and was prescribed an SSRI for depression for most of that period. Dr. Smith first reviews the electronic medical record (EMR) to see when they last met, and the medications prescribed. A few minutes later, Mr. Jones appears on the screen. Although he appears to be alone, Mr. Jones reports the presence of a corrections officer off camera in the room when Dr. Smith discusses confidentiality. Dr. Smith must occasionally request that Mr. Jones repeat a statement since the internet connection is spotty. At one point, she thinks she hears him say he wants to hurt himself, but when she seeks clarification, he says he feels frustrated by the long periods of time spent locked in a cell due to COVID-19. Mr. Jones also shares that he is not taking his medication regularly, but he does not elaborate when she requests more details. Their appointment lasts for approximately 15 minutes

© Copyright, American Psychiatric Association, all rights reserved.

since the accompanying officer urges Dr. Smith to hurry, as there is a full docket of other inmates waiting to meet with her.

After the session, Dr. Smith spends five minutes on chart review and documentation, including checking pharmacy records, which must be accessed through a separate electronic portal. She makes a note to herself to reach out to the prison social worker to coordinate care on-site and check on the patient after one week. Dr. Smith knows the social worker she met while onboarding has recently quit but is uncertain of the new social worker's name or contact information. At the end of her day, Dr. Smith sends an email to the prison health services administrator with a list of follow-ups for all 18 patients she has seen that day. She asks that Mr. Jones be scheduled for another psychiatric appointment in one month.

*Patient Perspective*

Mr. Jones awakens at the usual time (5:00 am) and completes his morning activities (shower, breakfast) before returning to his cell for morning count. At 6:30 am, a corrections officer escorts him to the telemedicine facilities on the other side of the prison. Mr. Jones waits for about an hour until an officer escorts him into a room with a large television screen. After he has waited a few more minutes, the screen turns on and Dr. Smith appears. Mr. Jones has met with her only a few times since she replaced his previous psychiatrist. He does not know whether he can trust her; she seems naïve about life in prison.

Mr. Jones has difficulty hearing Dr. Smith because of the poor internet connection. He is reluctant to share too much in front of the correctional officer in the room, but he acknowledges feeling worse since being locked in his cell for long periods of time due to COVID-19. He also tells Dr. Smith that he has not been taking his medication regularly. He does not share his recent weight gain or his concern that a decline in his physical fitness might put him at increased risk of assault by his peers. He also does not explain that he occasionally contemplates ending his life when he feels particularly isolated. After the visit, Mr. Jones must wait for another hour before being escorted back to his cell by custodial staff.

Quick Guide for Key Principles Specific to Jails and Prisons:

- Identify whether telepsychiatry is appropriate for the level of mental health care being delivered.
- Schedule an on-site visit at the correctional facility to view housing units and treatment areas and to meet health care and custodial staff.
- Verify that there is appropriate equipment and IT infrastructure at the correctional facility to reliably deliver telepsychiatry.
- Familiarize yourself with the procedures for managing psychiatric emergencies.
- Establish in advance the mutual expectations of your role as a telepsychiatrist and the interactions with and on-site staff.
- Familiarize yourself with the contingency plan if the technology fails or there are safety issues preventing the patient's attendance.
- If a staff escort is present (either custodial or health care), ensure that they and their role are introduced and that the patient consents to the arrangement.
- Ensure that you are familiar with documentation requirements and procedures, including access to the patient's medical record and coordination with the pharmacy.

*© Copyright, American Psychiatric Association, all rights reserved.*

## 2. Levels of Mental Health Care

Jails and prisons provide different levels of mental health care depending on, among other things, the type of facility, acuity of patient needs, local/state/federal regulations, and staffing. Care provided to individuals in general population housing is similar, albeit with logistical differences, to the type of care one might receive in an outpatient community clinic. In general population settings, telepsychiatry may be clinically sufficient and comparable to the provision of in-person services.

For higher levels of mental health care in correctional settings (e.g., residential treatment units, inpatient psychiatry units, crisis units), about which more research is needed and where the most psychiatrically vulnerable patients reside, several factors may be considered when weighing the use of telepsychiatric services and/or in-person services. Such factors include opportunities to interact on a regular and timely basis with correctional officers and other mental health staff; awareness about current milieu issues and risks to patient safety; and control of the therapeutic environment. It is the opinion of the authors that telepsychiatry in higher levels of care be used as a last resort or in very specific situations, for example when in-person recruitment is not successful.

When telepsychiatric services are utilized in these settings, additional considerations include:

1. The telepsychiatrist periodically coming on-site (depending on the size of the facility and scope of patient coverage) to both provide on-site services and interact with pertinent custody and mental health staff. The frequency of such periodic visits depends on the level of care (LOC). For example, a site may have a telepsychiatrist come in-person annually, at a minimum, for outpatient level of care and quarterly to semiannually for provision of psychiatric care at more intensive levels. More frequent visitation may be necessary if the telepsychiatrist is working in more acute contexts.
2. Recruitment efforts (which should include access to competitive salaries) should be ongoing, including contractual incentives for in-person psychiatry, especially for higher acuity settings.
3. Telepsychiatry contracts should uphold accountability and provide sufficiently funded time spent in telepsychiatry activities including patient visits and medicolegal documentation so as to not compromise patient care responsibilities.

## 3. General Clinical Considerations

*Establishing a Therapeutic Relationship*

In a 2008 literature review, Khalifa and colleagues noted that one of the commonly cited reservations about telepsychiatry is that patient interviews may be less empathetic than direct face-to-face interviews, resulting in a detrimental impact on the development of therapeutic rapport (Khalifa et al., 2008). Telepsychiatry may present additional hurdles in correctional settings where there may be dual loyalty concerns, patient mistrust of providers, lack of privacy, significant socioeconomic differences between patient and provider, lack of provider continuity, and distracting background noise complicating the therapeutic relationship. In addition, telepsychiatry may especially exacerbate feelings of isolation in patients who experience limited human contact through disciplinary or administrative

© Copyright, American Psychiatric Association, all rights reserved.

segregation practices (e.g., solitary confinement). On the other hand, studies suggest imprisoned patients may be more comfortable discussing sexual abuse history over telepsychiatry than in face-to-face encounters (Tucker et al., 2006). A recent meta-analysis examining intervention outcomes and assessment reliability across a variety of mental health populations and settings indicated that telepsychiatry was associated with outcomes largely equivalent to in-person services, although it should be noted that only two of the 57 reviewed studies involved correctional settings (Batastini et al., 2021).

Jail and prison psychiatrists can optimize rapport with patients by considering nonverbal body language, eye contact, screen resolution, and background display, including visible personal items. The psychiatrist may consider spending a few minutes orienting the patient to telepsychiatry during a first encounter. Patients may have already experienced virtual arraignments, hearings, and adjudicative proceedings, but not previously experienced virtual treatment. It can be helpful in initial sessions to be honest and transparent with a patient about any format challenges and assure them that such challenges can be surmounted with additional technical assistance if necessary. As with any treatment interaction in a jail or prison, it is important to distinguish the psychiatrist's role from that of custodial staff. It is also important to remind the patient that unlike phone calls or other forms of video conferencing in carceral settings, telepsychiatry sessions are not typically recorded. Concerns may arise pertaining to self-incrimination and the potential use of recordings impacting a patient's legal case (Batastini & Morgan, 2016). If there is a monitor or chaperone with the patient, ask them to introduce themselves and to clearly explain their role. Setting an open frame that acknowledges the potential for awkward exchanges or technological challenges is also helpful.

The telepsychiatrist should have adequate time to review relevant aspects of the patient's health care records, preferably prior to the telepsychiatry session or during the session. Psychiatrists working in jails and prisons should have dedicated time to complete medicolegal documentation following telepsychiatry visits. If the system's health care records are electronic, the telepsychiatrist should have off-site access to the electronic health care records. In systems without electronic health care records, protocols should be developed and implemented regarding how, when, and which sections of the health care record will be accessed by the telepsychiatrist (e.g., fax, scan via email) as well as how the telepsychiatrist's documentation will occur. If there is concurrent documentation or chart review during the session, the psychiatrist should inform the patient in advance so that their shift in eye contact or body language that accompanies note writing is not misinterpreted as dismissive. For example, the psychiatrist might explain, "I'm just looking up your lab results right now" or "Let me double check your list of medications in the chart here" when turning attention away from the patient on the screen. The telepsychiatrist should be able to determine the duration and frequency of psychiatric appointments and should consider the patient experience getting to and from the session. A 20-minute appointment on the provider side may be a four-hour endeavor for the patient.

*Understanding the Setting*

Most psychiatrists have never seen the inside of a prison or jail and may not understand the unique challenges that such environments pose to the physical and mental health of those incarcerated. For correctional facilities that use off-site telepsychiatrists located in private offices, a central telepsychiatry hub for the correctional system, or private homes, the actual and metaphorical distance between the psychiatrist's world and the world their patients inhabit may interfere with the quality of care. For example, if a psychiatrist does not understand their patient's safety concerns, they may misinterpret their patient's statements as trivial or manipulative. In the above vignette, Mr. Jones fears that gaining weight could increase his risk of being assaulted. What he knows, and Dr. Smith may not, is that two

© Copyright, American Psychiatric Association, all rights reserved.

people in his cell block were assaulted last week. Additionally, if Dr. Smith does not know what his cell looks like or does not understand how lock-in affects his access to care, she will not be able to adequately assess Mr. Jones' clinical risk.

It is important that correctional facilities establish regular intervals for remote telepsychiatry psychiatrists to visit the jails and prisons where the patients are living. We suggest that these visits occur at least annually for an outpatient level of mental health care and after any major renovation or new programming.

*Confidentiality*

In a correctional facility, security and safety interests must often be prioritized over a patient's privacy and confidentiality during psychiatric treatment. There may be concerns about a patient's risk to themselves or to equipment or property if the patient is left alone during a telepsychiatry session, so a provider from health care staff (e.g., medical assistant, LPN, RN) may be present during the session. Custody staff should not be present except under unusual circumstances (e.g., the patient is very disruptive or assaultive). The presence of a staff member and resulting privacy limitations may compromise the quality of the doctor/patient interaction (Antonacci et al., 2008; Myers et al., 2006), particularly in the case of custody staff. For Mr. Jones, the presence of a custodial officer for the duration of his session with Dr. Smith limited what he was willing to share. If unaccompanied telepsychiatry visits are prohibited in a facility, then the presence of health care staff (as opposed to a correctional staff member) is preferable.

Even if patients are permitted to remain unaccompanied during a telepsychiatry visit, their interview room may not have doors, be soundproofed, or have walls that reach to the ceiling. In these instances, correctional officers are typically within earshot of conversations, so measures should be taken to reduce privacy concerns as much as is safely possible. Headphones, which can be helpful, are often not permitted in carceral settings or are only available to individuals who have earned the privilege or have enough commissary money to purchase them. As with general telepsychiatry, informed consent on the risks and benefits must be obtained from the patient (Hyler, 2004).

*Engagement with On-site Clinical Team*

A challenge to remote working arrangements is the diminished opportunity to build important relationships with coworkers. Telepsychiatrists who are off-site are not part of the conventional flow of information throughout the day, which often includes informal conversations with staff and other patients as well as patient observations outside of appointments (Kaftarian, 2019). Especially in jails and prisons, where patients have limited ability to manage their own health care, communication between relevant staff regarding treatment plans is critical to ensure that patient needs are met. It is helpful for a telepsychiatrist serving jails and prisons to have an orientation regarding on-site staff communications, and subsequent and timely updates about key on-site personnel changes. Even if the telepsychiatrist knows whom to contact, there may be a delay reaching that person since many prisons and jails do not allow staff to carry cellphones. This can cause a critical delay in communicating time-sensitive information, such as when there is concern about an acute risk of self-injury or violence. For example, if Mr. Jones had expressed acute suicidal ideation with a credible and imminent threat to harm himself, Dr. Smith would have likely needed to act on this information immediately instead of waiting until the end of the day to contact the on-site supervisor. For psychiatrists providing remote services to

© Copyright, American Psychiatric Association, all rights reserved.

correctional facilities, establishing a clear chain of command in advance of emergencies may help minimize critical delays and facilitate smooth communications when an acute concern arises.

On-site visits should provide telepsychiatrists with a better understanding of the facility's layout of the facility and may improve their relationship with the on-site clinical team. Separate from the periodic visits noted above, when regular on-site visits are not feasible or practical, an alternative may be occasional routine video staff meetings that include off-site and on-site team members. In some situations, telepsychiatrists may struggle with access to information about a patient's functioning, especially if the jail or prison does not maintain EMRs. Collateral information from institutional staff, including disciplinary write-ups, can serve as useful narratives of documented impairments in behaviors and functioning (Kaftarian, 2019). This information could be shared in these staff meetings to confer on patient status and needs.

*Access to Medical Records and Documentation*

Use of EMRs for documentation and communication is extremely valuable to the telepsychiatrist. Although more U.S. correctional facilities have begun using EMRs in recent years, EMRs are not yet standard in all jails and prisons, even in facilities utilizing telepsychiatry services. Sometimes information is documented in multiple electronic databases, such as the pharmacy records described in the clinical vignette. In some facilities that maintain EMRs, information still needs to be printed and placed in an on-site binder to become part of the official record. Ideally, the telepsychiatrist can access all available clinical information through secured networks. However, there should always be a backup method for communicating and documenting clinical information in a timely manner if those networks are unavailable. In some cases, it may be impractical or unfeasible to expect the telepsychiatrist to thoroughly review large volumes of records for every single patient, given the time limitations of a typical workday. Similar to an on-site psychiatrist, telepsychiatrists ought to make reasonable efforts to understand the case in front of them with the time allotted and the records available.

Information sharing should be considered bi-directionally, with timely information from other staff documentation being accessible to the telepsychiatrist and information from the telepsychiatrist, including orders for medications or monitoring, being timely transmitted to nursing and other clinical staff as relevant. Arrangements for this type of information should be made in order to make telepsychiatry workable. In facilities that use paper medical records, the telepsychiatrist may need to transmit records and notes through mail, fax, or secured email (Kalibe et al., 2011). These methods are typically burdensome, costly, and inefficient, with a higher risk of negative consequences for patient care. Additional staff may be required to collect and maintain the records. Medication orders may need to be faxed and prescriptions for schedule II drugs sent by courier (Kalibe et al., 2011). In the vignette, Dr. Smith documents her sessions and prescriptions in the EMR, but the pharmacy documents administration of medications using a different system. This exposes the care delivery system to more opportunities for error.

*Safety*

Despite limited available evidence comparing safety risks to psychiatrists working in correctional facilities to safety risks in non-carceral settings (Morris & West, 2020), many mental health professionals report safety concerns when asked to work in jails and prisons (Fuehrlein et al., 2012; Morgan et al., 2007; Kaftarian, 2019). Telepsychiatry can provide added physical safety for psychiatrists during clinical encounters since physical contact is not possible.

*© Copyright, American Psychiatric Association, all rights reserved.*

While immediate physical risks to the psychiatrist are minimized, it is not clear that telepsychiatry meaningfully improves patient safety. Nevertheless, some telepsychiatry practices may enable patients in jails and prisons to remain in their housing areas, thus reducing risks associated with transportation to a separate clinic or telepsychiatry hub (e.g., cuff injuries, assault, escape, delays in receipt of care) (Deslich et al., 2013; Mikow-Porto & Smith, 2011). However, patients who self-injure may be at higher risk in a clinical session where the psychiatrist cannot immediately intervene. On-site support staff are a critical safety intervention to reduce this risk. Please see section 3 for additional information about emergency clinical situations.

*Consent and Treatment Refusals*

Patients should be afforded the same rights to consent to treatment in telepsychiatry as for in-person psychiatry, and psychiatrists should inform the patient about the use of telepsychiatry, and that conversations are not recorded and are as secure as possible from a privacy standpoint (see the privacy section in this report). Still, refusal of care is a common experience in prisons and jails where psychiatric treatment may not be prioritized by the patient over other activities like attorney or family visits, a trip to the commissary or law library, or outdoor recreation time. On-site psychiatrists may have the opportunity for a brief face-to-face interaction with a patient who has refused services, during which time they can quickly assess a patient's mental status and capacity to refuse and determine whether an emergency intervention is necessary. In telepsychiatry, a visit refusal is likely to be communicated second- or even thirdhand and may not always be a reliable communication. In such cases, the psychiatrist's next steps may be unclear, as they lack the information ordinarily gathered during an in-person encounter to assess risk and voluntariness of refusal. Jails and prisons that utilize telepsychiatry should develop policies and protocols to ensure that treatment refusals are not coerced or misreported, and that there are alternative backup plans for appropriate in-person assessment by an alternative psychiatrist or sufficiently qualified mental health clinician following treatment refusal(s) that raise clinical concerns.

## 4. Specific Clinical Considerations

*Psychiatric Emergencies*

While the guidelines for non-incarcerated patient populations indicate that there are no absolute contraindications to using telepsychiatry (APA & ATA, Best Practices in Videoconferencing-Based Telemental Health, 2018), risk-mitigation strategies (e.g., immediate availability of support staff, medical interventions, and on-site health providers such as nursing staff and psychologists to meet patients' in-person needs) may not be readily available in a jail or prison.

As jails and prisons hold people with a full range of mental health and substance use disorders in varying states of crisis, protocols and policies for workflow and management of emergencies during telepsychiatry encounters should be developed and implemented. The management of clinical emergencies depends not only on a patient's specific circumstances and case factors but also on the structural and staffing resources available at the time. It is helpful for staff to be trained on emergency protocols for when a patient engages in self-harm or assaultive behavior during the telepsychiatry encounter. It is helpful for the psychiatrist to be informed whether it is possible to hold unplanned telepsychiatry sessions, whether the institution can safely administer emergency medication or provide

© Copyright, American Psychiatric Association, all rights reserved.

emergency medical transport if needed, and whether it is institutional practice to have a safety chaperone in the room or close by.

*Substance Use-Related Services*

The delivery of substance use services in jails and prisons is growing more robust and complex, including the prescribing of medications for addiction as well as counseling and other therapeutic programming. The community standards of practice are evolving with respect to telephonic vs. video vs. in-person interactions and may soon inform carceral standards. Patients within jails and prisons are at risk of many sequelae related to substance use withdrawal or misuse (including risk for suicide or medical consequences of withdrawal, or risk of intoxication from ongoing substance use), and induction of medications requires a full understanding of the patient's facts and circumstances. As such, telepsychiatric interactions should ensure access to medical information related to the impact of substance use and withdrawal and should allow the inclusion of visual observation of the patient.

*Geriatric, Visually/Hearing Impaired Patients* and *Non-English-Speaking Patients*

In theory, elderly patients, especially those with long sentences, may not be familiar with technology and thus may be less comfortable in a telepsychiatry session. These patients may benefit from more education and assistance in using the technology as well as patience on the part of the psychiatrist.

Hearing and visually impaired individuals may require additional technology accommodations such as audio-only telehealth for blind persons and a sign language interpreter for patients who are deaf or hard of hearing. Given that prisons and jails may have large populations of non-English-speaking individuals, interpreter services should be made available when needed. Telepsychiatry can be advantageous in these situations where an interpreter can be connected remotely through three-way video or audio conferencing or through ADA-approved technology. Alternatively, when feasible, an interpreter arrangement can be prescheduled.

*Patients in Restrictive Housing (e.g., solitary confinement)*

Patients in administrative or punitive segregation may have difficulty accessing appropriate health care because leaving one's cell generally requires additional staff and the implementation of increased safety measures. Often, mental health sessions are provided cell-side (the psychiatrist conducts the interview from outside the patient's cell) if the facility is not able to bring the patient to a separate clinical space. Unless the patient can be escorted to a telepsychiatry office, patients in segregation may be best served by in-person services due to significant technical difficulties with cell-front telepsychiatry, especially the lack of adequate confidentiality.

## 5. Administrative Considerations

*Convenience*

The environmental and security challenges of working in a correctional setting are common barriers to recruitment and retention (Kaftarian, 2019). Typically, psychiatrists must pass through security screening areas, sally ports, locked gates, and other barriers to reach designated clinical areas. In many situations, psychiatrists may also need to navigate different pods, housing units, and triage areas located outside of the usual clinical areas. Time spent traversing various security measures and navigating large

© Copyright, American Psychiatric Association, all rights reserved.

correctional complexes can, at times, be inefficient and can slow down the provision of care. In contrast, telepsychiatry enables the psychiatrist to provide care to numerous patients from a single location that may be entirely outside of the correctional facility (Kaftarian, 2019). Telepsychiatrists may find they have more time available for patient care and other related activities (Deslich et al., 2013) such as documentation. One study showed telemedicine in correctional facilities increased administrative workload in scheduling appointments and coordinating tasks prior to the visits; however, staff were noted to become more efficient over time (Neuhaus, 2018).

Although telepsychiatry is safe and convenient for psychiatrists who need not physically enter a jail or prison, it may not always be as convenient for incarcerated patients or on-site staff. Except for housing areas with telepsychiatry rooms/booths nearby, security staff must typically transport patients to the clinic or setting where the telepsychiatry session will take place. Transport may require an escorting officer. All movement in a correctional facility is contingent on security considerations; emergencies anywhere in the complex can delay service delivery for hours. Telepsychiatrists should be patient and prepared for such delays. It can be helpful to establish in advance the mutual expectations of provider and on-site support staff for addressing unplanned delays. For example, if a patient cannot attend their appointment, efforts should be made to reschedule the session for the next available date.

*Cost*

The State Prison Health Care Spending Report from 2014 reported ongoing increases in correctional health care spending and identified telehealth as a chief strategy to reverse this trend (Pew, 2014).

Establishing telepsychiatry in jails and prisons may entail some up-front costs, such as electronic equipment, reliable internet access, and staff training. Once telepsychiatry systems have been established, mental health care costs can be expected to diminish in the following ways: reduction of transportation costs for both provider and those transporting the patient to, within, or between facilities (Deslich et al., 2013; Sales et al., 2018); increasing productivity of providers (Deslich et al., 2013); and a reduction in need for on-site office space and facility maintenance (Kaftarian, 2019). One multistate literature review of correctional facilities found between $12,000 and $1 million of cost savings following the implementation of telepsychiatry programs (Deslich et al., 2013). States reported substantial savings through decreased transportation costs for patients and providers, reduction of administrative costs, and utilization of government incentives such as national and local grants for the use of telemedicine (Deslich et al., 2013). That said, incentives for recruitment should not favor telepsychiatry over in-person psychiatric services.

*Technology*

Telepsychiatry requires stable, secure audio and video connections that hinge on both a reliable internet network and a reliable security system. Jails and prisons often have old buildings with outdated equipment and technology. Protective casing around monitors or equipment, designed to prevent damage, can sometimes interfere with both video and sound quality. This can be particularly challenging if the space in which the patient is located is loud or dimly lit. Security considerations and size of the correctional system across multiple sites limits technology vendor options. There may be difficulty accessing the system's internet, requiring the assistance of facility administrators to get through the firewall (Larsen et al., 2004; Deslich et al., 2013). Even newer facilities may not have current technology infrastructure because of cost considerations. Unstable connections and low bandwidth can lead to miscommunication between the patient and provider, which decreases the quality of the encounter and

© Copyright, American Psychiatric Association, all rights reserved.

results in frustration on both sides. Limited technological competence, unreliable prison servers, and the need for a solid information technology (IT) department have been cited as reasons for an initial reluctance to adoption of telehealth in prisons (Deslich et al., 2013; Larsen et al., 2004). Yet, as some correctional facilities demonstrated in response to the COVID-19 pandemic, staff can set up telepsychiatry services relatively quickly by installing external USB video cameras and microphones on existing computer systems (Burton et al., 2021).

Providers who are less familiar with technology may be resistant to using it; however, this can be effectively improved with increased training (Perry, 2020). It is helpful for staff to receive additional training on how to use the technology and receive periodic maintenance training when needed. A contingency plan such as contacting supportive IT services, conducting the session via telephone, or rescheduling the visit, should be in place for when equipment fails or malfunctions (Miller et al., 2005). The perspective of the patient should be taken into account to ensure that the telepsychiatry contact worked for them as well as for the psychiatrist.

## Conclusion

Growing use of telepsychiatry is reshaping the delivery of outpatient mental health services in jails and prisons across the United States. Jails and prisons have historically faced difficulties recruiting mental health professionals, so the convenience and perceived safety of telepsychiatry might attract some clinicians to consider correctional mental health work who might otherwise not have done so. Still, as with the provision of remote care in other clinical contexts, telepsychiatry in jails and prison settings is not without its challenges. Considerations related to privacy, staff collaboration, adverse outcomes, and technological factors will continue to shape policies and attitudes toward telepsychiatry in correctional settings. Ongoing research into the use of telepsychiatry in U.S. jails and prisons can help clarify ways in which to optimize the use of digital tools to better deliver safe and effective mental health services to incarcerated patients.

## References

Antonacci, D., Bloch, R., Saeed, S., et al. (2008). Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: Implications for forensic and correctional psychiatry. *Behav Sci Law, 26*(3), 253–269.

Batastini, A.B., Jones, A.C.T., Lester, M.E., et al. (2020). Initiation of a multidisciplinary Telemental health clinic for rural justice-involved populations: Rationale, recommendations, and lessons learned. *J Community Psychol, 48*(7), 2156-2173.

Batastini, A.B. & Morgan, R.D. (2016). Connecting the disconnected: Preliminary results and lessons learned from a telepsychology initiative with special management inmates. *Psychol Serv, 13*(3), 283-291. doi: 10.1037/ser0000078. PMID: 27504646.

Batastini, A.B., Paprzycki, P., Jones, A., & MacLean, N. (2021). Are videoconferenced mental and behavioral health services just as good as in-person? A meta-analysis of a fast-growing practice. *Clinical psychology review, 83*, 101944.

Bouknight, J.G. (2017). The Economics of Geriatric Telepsychiatry: A Clinician's Guide. In *Geriatric Telepsychiatry* (27-51). Springer, Cham. doi: 10.1007/978-3-319-51491-8_3

*© Copyright, American Psychiatric Association, all rights reserved.*

Brodey, B.B., Claypoole, K.H., Motto, J., Arias, R. G., & Goss, R. (2000). Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation. *Psychiatric Services*, *51*(10), 1305–1307.

Buche, J., Gaiser, M., Rittman, D., et al. (2018). Characteristics of the behavioral health workforce in correctional facilities. *Behavioral Health Workforce Research Center: Ann Arbor, MI, USA.* Available at https://www.behavioralhealthworkforce.org/wp-content/uploads/2016/09/Y2FA2P1_BHWRC_Corrections-Full-Report.pdf.

Burton, P.R.S., Morris, N.P., & Hirschtritt, M.E. (2021). Mental health services in a U.S. prison during the COVID-19 pandemic. *Psychiatric Services, 72*(4), 458-460.

Chari, K.A., Simon, A.E., DeFrances, C.J., & Maruschak, L. (2016). National survey of prison health care: Selected findings. *National Health Statistics Reports* (96). Retrieved from https://www.cdc.gov/nchs/data/nhsr/nhsr096.pdf

Deslich, S.A., Thistlewaite, T., & Coustasse, A. (2013). Telepsychiatry in correctional facilities: Using technology to improve access and decrease costs of mental health care in underserved populations. *The Permanente Journal*, *17*(3), 80–86.

Estelle v. Gamble, 429 U.S. 97 (1976).

Fuehrlein, B.S., Jha, M.K., Brenner, A.M., et al. (2012). Can we address the shortage of psychiatrists in the correctional setting with exposure during residency training? *Community Ment Health J*, *48*(6), 756–760.

Hyler, S., & Gangure, D. (2004). Legal and ethical challenges in telepsychiatry. *Journal of Psychiatric Practice, 10*, 272-276. doi:10.1097/00131746-200407000-00011.

Kaftarian, E. (2019). Lessons learned in prison and jail-based telepsychiatry. *Curr Psychiatry Rep, 21*, 15.

Khalifa, N., Saleem, Y., & Stankard, P. (2008). The use of telepsychiatry within forensic practice: A literature review on the use of videolink. *Journal of Forensic Psychiatry and Psychology*, *19* (1), 2-13.

Lambert, C., & Wertheimer, M. (2016) Telepsychiatry: Who, what, where, and how. *Psychiatric News, 51* (3). doi:10.1176/appi.pn.2016.2a13

Larsen, D., Stamm, B.H., Davis, K., & Magaletta, P.R. (2004). Prison telemedicine and telehealth utilization in the United States: State and federal perceptions of benefits and barriers. *Telemedicine Journal and E-Health, 10* (S2), 81-89.

Leonard, S. (2004). The development and evaluation of a telepsychiatry service for prisoners. *Journal of Psychiatric and Mental Health Nursing*, *11*, 461-468.

Magaletta, P.R., Fagan, T.J., & Peyrot, M.F. (2000). Telehealth in the federal bureau of

© Copyright, American Psychiatric Association, all rights reserved.

prisons: Inmates' perceptions. *Prof Psychol Res Pract, 31,* 497–502.

Manfredi, L., Shupe, J., & Batki. SL. (2005) Rural jail telepsychiatry: A pilot feasibility study. *Telemed J E Health, 11*(5), 574-7.

Mikow-Porto, V.A., & Smith, T.A. (2011). The IHSSF 2011 prisoner escape study. *J Healthc Prot Manage, 27,* 38–58.

Miller, T.W., Burton, D.C., Hill, K., Luftman, G., Veltkemp, L.J., & Swope, M. (2005). Telepsychiatry: Critical dimensions for forensic services. *Journal of the American Academy of Psychiatry and the Law Online, 33*(4), 539-546.

Morgan, R.D., Beer, A.M., Fitzgerald, K.L., *et al.* (2007). Graduate students' experiences, interests, and attitudes toward correctional/forensic psychology. *Crim Justice Behav, 34*(1), 96-107.

Morgan, R.D., Patrick, A.R., & Magaletta, P.R. (2008). Does the use of telemental health alter the treatment experience? Inmates' perceptions of telemental health versus face-to-face treatment modalities. *J Consult Clin Psychol, 76,* 158–162.

Morris, N.P., & West, S.G. (2020). Misconceptions about working in correctional psychiatry. *J Am Acad Psychiatry Law, 48*(2), 251–258.

Myers, K., Valentine, J., Morganthaler, R., & Melzer, S. (2006). Telepsychiatry with incarcerated youth. *Journal of Adolescent Health, 38*(6), 643-648.

Nelson, E.L., Zaylor, C., & Cook, D. (2004). A comparison of psychiatric evaluation and patient symptom report in a jail telepsychiatry clinic. *Telemedicine Journal and E-health, 10* (S 2), 54-59.

Neuhaus, M., Langbecker, D., Caffery, L.J., et al. (2018). Telementoring for hepatitis C treatment in correctional facilities. *J Telemed Telecare, 24,* 690–696.

Ollove, M. (2016). State prisons turn to telemedicine to improve health and save money. Available from: https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2016/01/21/state-prisons-turn-to-telemedicine-to-improve

Perry, K., Gold, S., & Shearer, E.M. (2020). Identifying and addressing mental health providers' perceived barriers to clinical video telehealth utilization. *J Clin Psychol, 76*(6), 1125-1134.

Sales, C.P., McSweeney, L., Saleem, Y., et al. (2018). The use of telepsychiatry within forensic practice: A literature review on the use of videolink - A ten-year follow-up. *J Forens Psychiatry Psychol, 29*(3), 387-402.

Shore, J. (2015). The evolution and history of telepsychiatry and its impact on psychiatric care: Current implications for psychiatrists and psychiatric organizations. *International Review of Psychiatry, 27*(6), 469-475.

The Pew Charitable Trusts and John D. and Catherine T. MacArthur Foundation (2014). State

© Copyright, American Psychiatric Association, all rights reserved.

prison healthcare spending. *The Pew Charitable Trusts*.

Tucker, W., Olfson, M., Simring, S., Goodman, W., & Bienenfeld, S. (2006). A pilot survey of inmate preferences for on-site, visiting consultant, and telemedicine psychiatric services. *Cns Spectrums, 11*, 783-787.

Zaylor, C., Nelson, E.L., & Cook, D.J. (2001). Clinical outcomes in a prison telepsychiatry clinic. *Journal of Telemedicine and Telecare, 7*(Suppl. 1), 47–49.

*© Copyright, American Psychiatric Association, all rights reserved.*