ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-4431
  Fax:  (415) 703-5843
  E-mail:  Namrata.Kotwani@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS, SBN 321994
CARSON R. NIELLO, SBN 329970
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE:    925-746-8460
FACSIMILE:    925-746-8490
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | Case No. 2:90-CV-00520- KJM-DB |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN RESPONSE TO DECEMBER 29, 2022 ORDER REGARDING DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF No. 7721)** |
| v. | |
| **GAVIN NEWSOM, et al.,** | |
| Defendants. | Date:       March 24, 2023<br>Time:       10:00 am<br>Crtrm.:     3, 15th Floor |
| | Judge:          Hon. Kimberly J. Mueller |

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................... 1

Argument ........................................................................................................................ 2

    I.     Plaintiffs Are Mistaken – No "Culture of Disdain" Towards the Court and Special Master Exists. ................................................................................. 2

    II.    CDCR Psychiatrists Are Deeply and Actively Involved in Decision-Making; Assumptions to the Contrary Lack Support. ........................................ 7

    III.   An Order Clarifying Prior Data Remediation Orders Will Not Resolve Outstanding Data Remediation Disputes. ...................................................... 9

    IV.   Plaintiffs Mischaracterize Defendants' Position on Data Remediation. ............... 11

        A.    Defendants take painstaking efforts to ensure their data appropriately measures Program Guide compliance. ................................ 11

        B.    The crux of the dispute is that Plaintiffs believe they should be able to override Defendants' reasonable interpretations of Program Guide requirements and unilaterally expand the key indicators list. ........ 11

        C.    Dr. Golding's allegations do not call into question Defendants' commitment to data remediation. ............................................................... 14

            1.    Defendants resolved a good-faith dispute with Plaintiffs on an indicator measuring property receipt in segregation. ............... 15

            2.    Defendants identified and self-corrected issues with an IDTT compliance indicator. ........................................................... 16

            3.    Defendants revised a policy and indicator on initial clinical contacts in the pre-review process. ................................................ 16

            4.    Defendants resolved a policy and indicator on timely clinical contacts internally. ............................................................. 17

            5.    Defendants resolved the MHCB initial contact indicator with input from Dr. Potter and Plaintiffs. .................................... 17

            6.    Separating policy creation from data remediation is not resisting the remediation process. ................................................ 18

    V.    If the Court Agrees that Clarification Is Required, Any Further Order Should Define Data Remediation and Certification, Direct the Special Master to Disclose his Methodology, and Clarify that Data Remediation Should be Guided by Reasonable Interpretations of the Program Guide. ........... 19

        A.    The Court should issue clear definitions of data "remediation" and "certification." ............................................................................... 19

        B.    The parties are entitled to a full and transparent disclosure of the Special Master's methodology for monitoring. ........................................ 20

        C.    Data remediation should be guided by reasonable interpretations of existing policies. ....................................................................................... 22

i

19409879.1

1

**TABLE OF CONTENTS**
**(continued)**

2

                                                                                        **Page**

3    Conclusion ........................................................................................................... 22

4    Certification ......................................................................................................... 23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Lewis v. Casey*
    518 U.S. 343 (1996) ............................................................................................................ 22

STATUTES

18 United States Code 3626(a)(2) .............................................................................................. 13

iii

**INTRODUCTION**

Plaintiffs seek clarifying orders from the Court purportedly to "make clear": (1) the purpose of data remediation, (2) that all parties and their counsel must be familiar with minimum treatment requirements in this case, and (3) that Defendants must "meaningfully consult" clinical psychiatry leadership on policy changes and data issues. Plaintiffs also request that the Court order Secretary Macomber or Undersecretary Toche to appear in court to explain CDCR's efforts to ensure staff understand their obligations under this Court's orders. Plaintiffs have failed to provide a sufficient basis for these requests, and no such orders are necessary.

Overwhelming evidence demonstrates that no "culture of disdain" toward the Special Master team or this Court exists among CDCR Mental Health leadership. To the contrary, the evidence of agreements reached to date with the Special Master demonstrate that Mental Health leadership work collaboratively and professionally to improve the provision of mental health care to CDCR's patients. While disagreements may naturally arise between CDCR's Mental Health leadership team, such disagreements are not evidence of disdain for the Court or the Special Master. Nor are CDCR Mental Health leadership or staff under any misconceptions that compliance with this Court's orders is somehow optional. CDCR Mental Health leadership and staff are resolute in their shared goal of improving mental health care to their patients. Leadership does not perceive court orders as optional, and assertions to the contrary are not representative of Mental Health leadership's collective understanding or direction on this issue.

Additionally, based upon the evidence presented by Defendants in support of their opposition, there can be no dispute that CDCR's clinical psychiatry leadership are active participants in all decisions that may implicate psychiatry. They are valued, integral team members who are consulted and included in all relevant decision-making. Suggestions to the contrary are simply wrong.

Plaintiffs' motion is also based upon a faulty premise. The core issue is not a misunderstanding as to the purpose of data remediation that needs to be clarified, as Plaintiffs suggest in their motion. Rather, the dispute centers on the way that Plaintiffs have chosen to use the data remediation process. Despite this Court's statements that "the data remediation project

1

1    should not be resolving policy disputes" (April 22, 2022 Tr. at 29:25-30:1, ECF No. 7540),

2    Plaintiffs seek to use the data remediation process to expand the scope of the key indicator list,

3    revisit previously-settled policy, or create new indicators.

4         Defendants have committed extensive resources to data remediation and one person's

5    perceptions do not undermine Defendants' demonstrated commitment to data remediation.  In

6    fact, the issues mentioned in connection with the impugned indicators discussed in Plaintiffs'

7    motion were either already known to CDCR and internally resolved before Plaintiffs and the

8    Special Master were involved, or were successfully negotiated to the parties' satisfaction in

9    Business Rules and Methodology Review (BRMR) meetings where each indicator is discussed in

10   painstaking detail as it moves through the data remediation process.  Differing opinions or points

11   of view on policy interpretation and data remediation are not evidence of an attempt to subvert

12   the court-ordered data remediation process.

13        To the extent that the Court believes that clarification is required, it should define the terms

14   "certification" and "remediation" so that the parties understand how and when a specific indicator

15   has (or, all indicators have) been successfully remediated and certified as such.  And the Court

16   should clarify that while the Special Master and Plaintiffs are active participants in data

17   remediation, Plaintiffs should defer to Defendants' reasonable interpretations of Program Guide

18   language.

19        Because Defendants' evidence demonstrates that Plaintiffs' clarification requests are

20   premised on false assumptions, their requests for relief should be denied.

21                                    **ARGUMENT**

22   **I.    PLAINTIFFS ARE MISTAKEN – NO "CULTURE OF DISDAIN" TOWARDS THE COURT
            AND SPECIAL MASTER EXISTS.**
23

24        Plaintiffs claim that "rather than striving to foster a culture of respect for this Court and its

25   orders, CDCR and its leadership have tolerated, and in some cases actively cultivated, one of

26   strident opposition."  (ECF No. 7721 at 13:20-22.)[1]  Plaintiffs reference comments by former

27        ───────────────
          [1] Citations to page numbers in documents filed in the Court's Electronic Case Filing
28   (ECF) System are to the page number assigned by ECF and located in the upper right hand corner
     of the page.

                                         2

1    Secretary Allison and Deputy Director Mehta at CDCR's Mental Health Leadership Conference

2    and the fact that Defendants have filed over a dozen appeals in five years (in a case with nearly

3    8,000 docket entries) as further evidence of this supposed "culture of disdain." Put simply,

4    Plaintiffs are wrong and the purported evidence they rely upon is misguided, incomplete, lacking

5    in context, or irrelevant.

6          As an initial matter, one employee's statements regarding a large organization's culture are

7    not representative of all (or even most) employees within that organization, particularly one the

8    size of CDCR's Mental Health Services Delivery System (MHSDS) with over 1,700 clinicians

9    and dozens of headquarters and regional staff. (*See* Declaration of Diana Toche in Support of

10   Defendants' Opposition (Decl. Toche), ¶ 1.) Yet, Plaintiffs extrapolate Dr. Golding's perceptions

11   of culture to the entirety of the Mental Health leadership team and ask this Court to do the same.

12   But as the declarations submitted by Defendants in support of their opposition demonstrate,

13   Plaintiffs' assumptions are misguided and incomplete. CDCR's Mental Health leadership team,

14   and those who work closely with them, "strongly disagree" with Plaintiffs' characterization of

15   CDCR's relationship with the Special Master team and the Court, and further describe Plaintiffs'

16   characterization as "unfair," "mistaken," and "not accurate." (Declaration of Steven Cartwright

17   in Support of Defendants' Opposition (Decl. Cartwright), ¶ 4; Decl. Toche, ¶ 3; Declaration of

18   Wendy Worrell in Support of Defendants' Opposition (Decl. Worrell), ¶ 4; *see also* Declaration

19   of Toni Martello in Support of Defendants' Opposition (Decl. Martello), ¶ 4; Declaration of

20   Michael Hewitt in Support of Defendants' Opposition (Decl. Hewitt), ¶ 3; Declaration of Amar

21   Mehta in Support of Defendants' Opposition (Decl. Mehta), ¶ 3.) CDCR's Mental Health

22   leadership team describe their daily interactions with the Special Master's team as generally

23   "collaborative," "cooperative and friendly," "positive and productive," and note that their

24   "communications have always been professional" and that they have "great working

25   relationships." (Decl. Hewitt, ¶ 3; Decl. Martello, ¶ 4; Decl. Cartwright ¶ 5; Declaration of Travis

26   Williams in Support of Defendants' Opposition (Decl. Williams), ¶ 5; Decl. Toche, ¶ 3.)

27          Although there are disagreements and frustrations along the way, these "disagreements

28   between and among medical professionals—based on their own personal clinical judgment—in

5

1   terms of what they believe is best for patient care" are natural in any oversight role and to be

2   expected.  (Decl. Mehta, ¶ 4; *see also* Decl. Cartwright, ¶ 5; Decl. Toche, ¶ 4; Decl. Martello, ¶ 4;

3   Decl. Worrell, ¶ 5.)  Disagreements are addressed "professional[ly] and respecful[ly]," and "have

4   never become argumentative or contentious."  (Decl. Toche, ¶ 5; Decl. Williams, ¶ 5; Decl.

5   Hewitt, ¶ 3; *see also* Decl. Worrell, ¶ 5.)  Despite disagreements, "[a]t the end of the day, [CDCR

6   Mental Health leadership] tr[ies] to align with the Special Master's team on what's best for our

7   patients."  (Decl. Hewitt, ¶ 3.)  Nonetheless, "professional disagreements do not equate to

8   hostility toward the Special Master team or the court" (Decl. Toche, ¶ 5), nor does such a

9   contention comport with CDCR Mental Health leadership's experiences or observations.  (Decl.

10   Mehta, ¶ 4; *see also* Decl. Williams, ¶ 4; Decl. Hewitt, ¶ 3.)

11        Furthermore, administrators at all levels enjoy direct lines of communication to the Special

12   Master's team to assist in making rapid decisions and working through issues of concern.  (Decl.

13   Hewitt, ¶ 4.)  CDCR Mental Health leadership "work closely with the Special Master team on a

14   wide range of issues" (Decl. Toche, ¶ 3) and strongly believe that they, along with the Court and

15   Special Master team, "share a common goal of providing quality and appropriate mental

16   healthcare to CDCR's patients," and "all have the patients' best interests in mind."  (Decl.

17   Cartwright, ¶ 5; *see also* Decl. Williams, ¶ 6; Decl. Mehta, ¶ 6; Decl. Hewitt, ¶ 4.)  Indeed,

18   CDCR's Mental Health leadership team "believe that if asked, [the Special Master's] monitors

19   would agree that our telepsychiatry meetings are usually cooperative and friendly.  I believe they

20   would also say we work well together."  (Decl. Martello, ¶ 4.)  While "[t]here will naturally be a

21   push and pull[, ] there is no wholesale fight against monitoring or oversight, and [no one] would

22   characterize it that way either."  (Decl. Hewitt, ¶ 5.)  In short, it is not fair or accurate to assume

23   that Dr. Golding's perceptions as to CDCR's culture apply equally and consistently to all within

24   CDCR's Mental Health leadership team.  (*See*, *e.g.*, Decl. Mehta, ¶¶ 3, 8.)

25        Nor is it accurate to suggest that CDCR believes the Court's orders are to be fought at every

26   step of the way, no matter the cost to patient care.  As the Undersecretary of Health Care Services

27   states in her accompanying declaration, "[p]atient care is our top priority and suggestions to the

28   contrary are wrong and distasteful."  (Decl. Toche, ¶ 7.)  Compliance with court-ordered

4

1   mandates is not optional, nor has CDCR mental health leadership indicated to staff that

2   compliance with court-ordered mandates is optional. (*Id.*; Decl. Mehta, ¶ 9.) Instead, every

3   action taken by CDCR Mental Health leadership has been in furtherance of the shared goal of

4   doing what is best for patient care, including compliance with court-ordered mandates. (Decl.

5   Mehta, ¶ 9.) It is consistently made clear by persons within CDCR's Mental Health leadership

6   team to those beneath them in the organization "that compliance with court-ordered mandates is

7   not optional." (Decl. Cartwright, ¶ 6; *see also* Declaration of Laurie Ball in Support of

8   Defendants' Opposition (Decl. Ball), ¶ 4; Decl. Martello, ¶ 5.) As Undersecretary Toche

9   previously informed this Court, she "take[s] seriously all remedial orders issued by this Court and

10  [her] obligation as a Defendant in this case, and the Undersecretary of Health Care Services, to

11  ensure that CDCR adopts programs and policies that are capable of meeting the Court's orders

12  and providing mental health care to its patients." (ECF 6451-1 at ¶ 2; Decl. Toche, ¶ 7.)

13  Undersecretary Toche further stated that she similarly takes seriously her "obligation to ensure

14  that CDCR's employees are also aware of their obligation to provide mental health care to its

15  patients, follow CDCR's policies and programs, and follow this Court's orders." (*Id.*) She stands

16  by those words and believes them to be true today. (Decl. Toche, ¶ 7.)

17          These beliefs are not just held by those in top positions of leadership within CDCR's

18  MHSDS. Indeed, those who hold supporting roles have observed that "mental health leadership

19  has supported and prioritized efforts to improve the delivery of care to patients." (Decl. Worrell,

20  ¶ 5.) Further, "it has always been made clear [ ] that compliance with court-ordered mandates is

21  not optional," and that "[c]ompliance with *Coleman* court requirements was part of our training

22  from day one." (*Id.* at ¶ 6; *see also* Decl. Williams ¶ 7; Decl. Ball, ¶ 4.) This remains true today.

23  (Decl. Worrell, ¶ 6.) Further, many persons who currently hold leadership roles within CDCR's

24  MHSDS rose to those positions from within the organization, and note that as a line staffer, they

25  are taught and trained "[f]rom day one … that compliance with *Coleman* requirements were an

26  important part of our jobs, and were never told that they were optional." (Decl. Martello, ¶ 5.)

27  Nothing has changed in this regard. (*Id.*)

28

19409879.1

1    Notwithstanding these statements by CDCR's Mental Health leadership team and those

2    who directly support them, actions speak louder than words, and Defendants' actions only

3    amplify these statements.  By way of example, data remediation "has become an all-

4    encompassing effort" that requires CDCR's Mental Health leadership team to "spend hours at a

5    time painstakingly trying to define indicators, many times parsing the meaning of singular

6    words." (Decl. Martello, ¶ 6.)  Nonetheless, CDCR's leadership team "devote[s] that time and

7    attention to [data remediation] because we understand we are required to do so." (*Id*.)  There is

8    no effort internally to "'fight' this or any other court-ordered mandate." (*Id*.)  Similarly, CDCR

9    has widely disseminated the call-in information for Court proceedings in this matter since July

10   2020, "to ensure that information from the Court is made available to staff" so that CDCR's

11   "mental health professionals stay apprised of the court-ordered mandates in this case," and to

12   "make[] clear the importance of the Court's remedial orders and the ongoing obligation to

13   provide quality and appropriate mental healthcare to patients." (Decl. Mehta, ¶ 8.)  CDCR has

14   also committed to work with Plaintiffs and the Special Master to develop a training that

15   "'explains the history of the *Coleman* case, its importance, CDCR's renewed commitment and

16   focus on patient care, and expectations for all CDCR staff.'" (Decl. Toche, ¶ 7 *quoting* ECF 7718

17   at 3, ¶ 3.)

18      Undersecretary Toche has also taken extensive action, particularly since 2020, to

19   operationalize these obligations, including through regular participation in monthly meeting with

20   headquarters staff and the Secretary to guide the mental health program on policy decisions;

21   visiting institutions and engaging in conversations with staff about Program Guide compliance

22   and the need to deliver care to the patient population; regularly attending the suicide summit and

23   other all-staffing meetings where the delivery of quality patient care is discussed; participating in

24   all work group meetings with the Special Master's team during the pandemic to ensure the

25   delivery of care; attending Warden's meetings where she raises discussion of *Coleman* mandates;

26   and attending CEO conferences to discuss the delivery of quality care to patients. (Decl. Toche, ¶

27   8.)

28      Finally, Plaintiffs misconstrue a handful of statements made by former Secretary Allison

6

and Deputy Director Mehta during a CDCR Mental Health Leadership Conference as alleged

evidence of a "culture of disdain."  The intent behind these comments was to convey appreciation

to mental health clinicians who "work tirelessly to improve the care of CDCR's patients."  (Decl.

Mehta, ¶ 5.)  The Deputy Director intended to support and encourage clinicians, and remind them

that they are not defined by any one lawsuit, but rather, by their dedication to delivering quality

and appropriate mental healthcare to patients.  (*Id.*; *see also* Decl. Toche, ¶ 6.)   In short, the

intention was to reiterate that patient care is CDCR's top priority, and to further inspire those who

provide that care.  (Decl. Mehta, ¶ 5.)  At no point were these comments intended to disparage the

Special Master's team.  (Decl. Mehta, ¶ 5; *see also* Decl. Toche, ¶ 6.)  Indeed, the former

Secretary's letter to the Special Master on this subject confirms her intention, "which [was] not

meant to be offensive," but rather, to convey her support of Dr. Mehta.  (Declaration of Namrata

Kotwani in Support of Defendants' Opposition, Ex. A at 1.)  She also clearly stated that CDCR

does not "countenance resistance to the Court's lawful orders; to the contrary, we strive to

achieve compliance with all court orders and certainly understand that compliance is not

optional."  (*Id.*)

Whereas the Plaintiffs misinterpret comments made at one meeting and cite to the State's

irrelevant appellate history to support one employees' perception of culture, the evidence

submitted by Defendants overwhelmingly contradicts Plaintiffs' assertions and obviates the need

for further orders.

## II.    CDCR PSYCHIATRISTS ARE DEEPLY AND ACTIVELY INVOLVED IN DECISION-MAKING; ASSUMPTIONS TO THE CONTRARY LACK SUPPORT.

Plaintiffs ask this Court to clarify its prior orders requiring psychiatry staff to be

meaningfully consulted in internal policy- and decision-making processes, but fail to cite

sufficient evidence that clarification of this order is actually needed.  Instead, Plaintiffs' motion

relies on one employee's claims that he did not receive two documents over a three-year period (a

psychiatry staffing proposal in 2020 and a telepsychiatry policy proposal in 2022), and that he

received conflicting instructions regarding his participation in the data remediation process.

(Pltfs.' Mot., ECF No. 7721 at 18:7-10, 18:24-27, 19:22-23.)  By contrast, Defendants submit

1   overwhelming evidence that psychiatrists are deeply valued team members who are regularly

2   consulted for important policies and decisions, and are included in all data remediation meetings.

3   Clarification is therefore unnecessary and would serve no purpose other than to further congest

4   the docket.

5           CDCR psychiatrists, including the Deputy Director of the Statewide Mental Health

6   Program who is himself a psychiatrist, are "valued team members and deeply involved in the

7   headquarters and regional decision-making process." (Decl. Mehta, ¶ 10.)  CDCR Mental Health

8   leadership is "always mindful of having representation from all disciplines in meetings."  (Decl.

9   Williams, ¶ 9.)  At least eight headquarters and regional-level psychiatrists, including Dr.

10  Golding, are heavily involved in weekly meetings pertaining to data remediation – including pre-

11  stakeholder internal review meetings, pre-BRMR internal review meetings, BRMR meetings, and

12  CAPC meetings.  (Decl. Mehta, ¶ 10; Decl. Cartwright, ¶ 9; *see also* Decl. Ball, ¶ 6.)  The

13  invitations appear on the clinical psychiatry leadership team's calendars as a recurring invite, and

14  all are encouraged to attend.  (Decl. Mehta, ¶ 10; Decl. Martello, ¶ 7; Decl. Worrell, ¶ 7.)

15  Psychiatrists actively participate in these meetings and are encouraged to provide their input, even

16  when the meetings that do not directly concern psychiatry.  (Decl. Ball, ¶ 6; Decl. Williams, ¶ 8.)

17  To the extent there is "an absence of psychiatrists at data meetings, [it is] not because they were

18  not invited, but because they chose not to attend."  (Decl. Martello, ¶ 7; *see also* Decl. Worrell, ¶

19  7.)  The Statewide Chief of Telepsychiatry, Dr. Toni Martello, states that she chooses not to

20  attend every single data meeting because "[p]sychiatrists are not data scientists nor database

21  experts," but knows she is always welcome to participate in those discussions.  (Decl. Martello, ¶

22  7.)  Dr. Martello believes that her "input is valued by [her] non-psychiatry colleagues and [she]

23  has never felt excluded from decision-making that may impact psychiatry."  (*Id*.)  In addition,

24  four of the eight voting members of CAPC (where votes are taken to approve or deny everything

25  that has proceeded through BRMR) are psychiatrists.  (Decl. Cartwright, ¶ 9; Decl. Ball, ¶ 6.)

26  And Dr. Mehta doubled the size of Dr. Golding's team, from four Senior Psychiatrist Specialists

27  to eight.  (Decl. Mehta, ¶ 15.)

28

8

1    Headquarters and regional psychiatrists are also provided with shared information on which

2    to comment with as much advance notice as any other mental health staff member, including

3    information concerning policies that may not directly impact psychiatry.  (Decl. Mehta, ¶ 13;

4    Decl. Ball, ¶ 7.)  Deputy Director Mehta continues to maintain close relationships with all

5    members of the psychiatry team – having been a member of the headquarters psychiatry team for

6    well over a year before becoming Deputy Director – as he "value[s] their input and insight and

7    routinely refer[s] items to the team for comment."  (Decl. Mehta, ¶ 14.)  Moreover, Drs. Mehta

8    and Cartwright have stressed to staff "the importance of working together harmoniously as a team

9    and demonstrat[ing] respect for one another."  (Decl. Worrell, ¶ 7.)  In fact, a Mental Health

10   Administrator believes that her long-standing working relationship with her psychiatry colleagues

11   was the reason she was selected for her current role.  (*Id*.)  Additionally, CDCR established an

12   Assistant Deputy Director of Psychiatric Services position, which was recently filled by Dr. Erick

13   Rizzotto, formerly the Chief Psychiatrist over San Quentin State Prison's Psychiatric Inpatient

14   Program.  (Decl. Mehta, ¶ 16.)  Dr. Rizzotto is highly experienced in the workings of the

15   institutions and is now deeply involved in policy and ongoing improvements.  (*Id*.)

16   In short, CDCR Mental Health leadership "actively work to ensure that all staff have a

17   voice and input regarding patient care – including social workers, psychiatrists, and psychologists

18   alike," and staff are simply "not aware of anyone trying to sideline anyone else within Mental

19   Health leadership."  (Decl. Worrell, ¶ 7; Decl. Hewitt, ¶ 7.)  CDCR Mental Health leadership

20   recognizes the strengths each discipline bring to the collective table, and actively encourage

21   participation by all.  (Decl. Hewitt, ¶ 7; Decl. Mehta, ¶ 10.)  Because CDCR is under no

22   misconceptions regarding this Court's previous requirement to meaningfully include psychiatrists

23   in all internal policy- and decision-making processes, and because there is no evidence to suggest

24   this is not now the status quo, no further clarification order is necessary.

25   **III.    AN ORDER CLARIFYING PRIOR DATA REMEDIATION ORDERS WILL NOT RESOLVE**
     **OUTSTANDING DATA REMEDIATION DISPUTES.**

26

27   Plaintiffs request that "the Court should clarify and reaffirm that the data measures are

28   required to align with the remedial requirements in this case in order to resolve the parties'

9

1    dispute once and for all, and expedite the data remediation process." (ECF No. 7721 at 6:15-17.)

2    Defendants do not disagree that data measures should comport with remedial requirements;

3    however, the parties do diverge on the breadth and scope of the "remedial requirements."

4         The clarification order that Plaintiffs seek would not resolve the parties' actual disputes,

5    which are: (1) which indicators are key, *i.e.* a core metric that provides useful information on

6    remedial requirements; (2) whether the underlying business rule ensures that indicators properly

7    measure the Program Guide; and (3) whether certain proposed changes are reasonable

8    modifications, attempts to expand the remedial scope beyond the key provisions of the Program

9    Guide compliance, or disguised requests for entirely new indicators. (Decl. Cartwright, ¶ 13.)

10   Indeed, in his 29th Round Monitoring Report, the Special Master recognized that Plaintiffs "use

11   the data remediation process to, in some cases, relitigate issues and broaden the scope of

12   monitoring in the case beyond what the Special Master has deemed necessary over several

13   decades." (Special Master's 29th Round Monitoring Report, ECF No. 7715 at 44.)

14        The issue of key indicators will only be resolved after the Special Master submits his final

15   list of key indicators "at the conclusion of the data remediation project" and therefore cannot be

16   clarified now. (Jan. 4, 2023 Order, ECF No. 7695 at 2:1-2.) And a clarification order would not

17   resolve the inevitable indicator-level disputes that are certain to arise during data remediation.

18   Those indicators can only be resolved on an indicator-by-indicator basis in BRMR, or through the

19   dispute resolution agreement.

20        BRMR and the May 2022 Dispute Resolution Process were explicitly designed to resolve

21   genuine disputes between the parties. This Court should reject Plaintiffs' attempt to seek an order

22   that would allow them to bypass these painstakingly negotiated processes, especially in light of

23   the progress that has been made. As of February 21, 2023, CDCR, the Special Master, and

24   Plaintiffs have successfully validated 71 provisionally approved indicators. (Decl. Cartwright, ¶

25   11.) Only five of the indicators that have gone through the process remain unresolved and are

26   currently moving through the dispute resolution process, while the remaining indicators proceed

27   through various stages of the remediation process. (*Id.*)

28

19409879.1

**IV.    PLAINTIFFS MISCHARACTERIZE DEFENDANTS' POSITION ON DATA REMEDIATION.**

    **A.    Defendants take painstaking efforts to ensure their data appropriately measures Program Guide compliance.**

This Court has provisionally approved a list of key indicators.  (July 1, 2021 Order, ECF No. 7216 at 4:1-2; 8:5-7; and 14:11-12; *see also* Special Master's Report on the CQIT Key Indicators (CQIT Report), ECF No. 7151).  Defendants have worked in good faith to ensure that indicators reflect and measure the corresponding section in the Program Guide.  Plaintiffs' brief appears to suggest that CDCR is mechanically checking whether the data that flow into an indicator are accurate without substantively evaluating that the indicator is properly reflecting Program Guide requirements for patient care.  (ECF No. 7721 at 8:26 – 9:24.)  This is a gross mischaracterization of Defendants' approach to data remediation.  Defendants' data remediation efforts have been thorough and include taking a close look at the source and accuracy of the data, as well as undertaking a rigorous substantive review.  (Decl. Cartwright, ¶ 10.)  It is indisputable that Defendants' staff spend significant time and resources developing documentation for indicators discussed at BRMR meetings, and shepherd these indicators through an eleven-step validation and verification process to ensure that the data is accurate and appropriately reflects Program Guide requirements.  (*Id.*; *see also* Defs.' Updated Activation Schedules for Completion of Court Ordered Data Remediation, ECF No. 7415 at 17.)[2]

    **B.    The crux of the dispute is that Plaintiffs believe they should be able to override Defendants' reasonable interpretations of Program Guide requirements and unilaterally expand the key indicators list.**

Defendants have long reported that data remediation is increasingly becoming an overhaul of long-established and court-approved policies and processes rather than a transparency check or data validation project, as was initially intended.  (*See* Defs.' Updated Activation Schedules, ECF No. 7523-1 at 4 and 14.)  Plaintiffs expect carte blanche to impose their preferred interpretations of the scope of key indicators on CDCR.  The parties' disagreements as to the scope of each

---

[2] The thirteen-step process proposed in the January 7, 2022 Data Activation Schedule was modified into an eleven-step process because Plaintiffs were integrated into the BRMR meetings.  (Decl. Cartwright, ¶ 10.)

1    indicator are not new—Dr. Cartwright explained this issue to the Court during the April 2022

2    Status Conference:

3        CDCR starts off with how we understand -- we wrote the policies and how we
         understand them to be interpreted. And then we are very transparent with everyone

4        involved, and we show how we intend to measure that policy. The conflict comes up
         when either the Special Master's team or plaintiffs believe that we have

5        misinterpreted our policies or -- and, in some cases, where what is written in black
         and white is not actually what we should be doing, and they are encouraging us to

6        broaden the scope of the indicator or broaden the scope of how much of the policy it
         measures.

7

8    (ECF No. 7540 at 32:5-15.)  Defendants make every effort to provide the rationale for their

9    Program Guide interpretations to Plaintiffs, and these interpretations are guided by *Coleman*

10   obligations and well-reasoned clinical judgment regarding the best interests of patients.  (Decl.

11   Cartwright, ¶ 10.)

12        Although Plaintiffs claim that "data measures are required to align with remedial

13   requirements (ECF No. 7721 at 6:15-17)," the BRMR process has shown that Plaintiffs take an

14   expansive view of "remedial requirements" and want to create new indicators that reflect their

15   preferred interpretations, which in some cases exceed constitutional minimums and Program

16   Guide requirements.  Indeed, Plaintiffs now treat the provisional key indicators as representing

17   general categories of topics that can be indefinitely expanded to include additional new

18   indicators.  (*See* Decl. Cartwright ¶¶ 14-15.)

19        Plaintiffs' attempted expansion of key indicators is demonstrated by a review of the parties'

20   disputes under the agreed-upon dispute resolution process.  Multiple disagreements on key

21   indicators addressed at the second level of dispute resolution are the result of Plaintiffs' attempts

22   to disguise demands for new indicators or demands for policy revisions as requests for

23   "reasonable modifications."  (*See* Decl. Kotwani, Ex. B (Defs.' November 15, 2022 Ltr. to the

24   Special Master at 1); *see also* Decl Cartwright. ¶¶ 14-16.)  Plaintiffs' repeated "modification"

25   requests in data remediation often require significant revisions of audit tools and methodologies

26   or the creation of new quality standards, inevitably leading to the creation of new indicators.  (*See*

27   Decl. Kotwani, Ex. A, K. Allison September 28, 2022 Ltr. to Special Master.)

28

12

1    But the purpose of data remediation is not to completely rewrite CQIT, nor is it a gateway

2    for Plaintiffs to expand or revise each indicator to include areas or items not previously measured.

3    Not every line of the Program Guide should be turned into a key indicator—the Court and the

4    Special Master have both emphasized that the key indicators should be a "distil[lation]" of the

5    "most salient elements" of the Program Guide (May 6, 2021 Special Master's CQIT Report, ECF

6    No. 7151 at 4), and should "signify the material provisions of the Program Guide and

7    Compendium." (July 1, 2021 Order, ECF No. 7216 at 4 (internal citations omitted)).

8    In effect, Plaintiffs are asking this Court to intervene now in defining the final list of CQIT

9    key indicators, even though the Special Master has yet to recommend such a list to the Court.

10    While committed to ensuring the accuracy and transparency of their data, Defendants have

11    repeatedly expressed their concerns that many of the indicators that the Special Master or

12    Plaintiffs may designate as "key indicators" do not in fact measure constitutionally-mandated

13    requirements. Any order finding that such indicators are necessary to measure a constitutionally

14    adequate mental health delivery system would not only be premature, but also run afoul of the

15    Prison Litigation Reform Act's needs-narrowness-intrusiveness requirement, which mandates that

16    preliminary injunctive relief be "narrowly drawn, extend no further than necessary to correct the

17    harm the court finds requires preliminary relief, and be the least intrusive means necessary to

18    correct the harm." 18 U.S.C. 3626(a)(2). To date, this Court has not determined in a final,

19    appealable order which CQIT indicators meet the PLRA's exacting standards and thus are subject

20    to the Court's injunctive authority. Should this Court plan to issue such an order, Defendants

21    request the opportunity to brief the issue.

22    CDCR acknowledges Plaintiffs' right to request new indicators and is willing to consider

23    proposed new indicators during the revised key indicator list development process, which is

24    anticipated to be included in the Special Master's June 2023 Report.. (Decl. Cartwright, ¶ 16.)

25    But such requests should, in the first instance, be made as requests for new indicators, instead of

26    improperly shoe-horning them into existing indicators, which only protracts BRMR discussions

27    and the data remediation process. (*Id.*)

28

13

19409879.1

### C.    Dr. Golding's allegations do not call into question Defendants' commitment to data remediation.

Plaintiffs claim that the "Second Golding Report is replete with illustrations of how Defendants do not believe their data must comport with the remedial requirements in this case." (ECF No. 7721 at 6:18-19.)  But Plaintiffs' purported examples of CDCR's nefarious intent are actually examples of issues that were typically identified by CDCR staff during pre-review and internally remedied prior to the involvement of Plaintiffs and Special Master, or were successfully negotiated with Plaintiffs during BRMR or dispute resolution.  In fact, all these issues were fully resolved before the Second Golding Report was ever submitted to the Special Master, as demonstrated below.

Plaintiffs discount CDCR's arduous process of problem identification and solution development.  Disagreements with one psychiatrist's point of view do not amount to a subversion of the court-ordered data remediation process.  As the Court acknowledged in its December 17, 2019 order, psychiatrists must be "meaningfully consulted" but "[t]his does not mean psychiatrists must always prevail in internal policy- and decision-making processes."  (ECF No. 6427 at 42:2-3.)  Moreover, the Special Master, his expert, and Plaintiffs are involved in every step of data remediation.[3]

As of February 21, 2023, CDCR, the Special Master, and Plaintiffs have successfully validated 71 provisionally approved indicators.  (Decl. Cartwright, ¶ 11.)  Currently, five indicators are moving through the dispute resolution process.  (*Id.*)  Minor edits to improve clarity, readability, and consistency notwithstanding, 42 of the 71 validated indicators included significant changes to the workflows, data gathering procedures, volume of data collected, or measurement methodology.  (*Id.*)  CDCR independently identified the need for some of those changes to achieve data remediation, and accepted other changes advocated by the Special Master and Plaintiffs using the agreed-upon data remediation process.  (*Id.*)

---

[3] *See* Defs. Updated Activation Schedules, ECF No. 7523-1 at 6 (diagrammatic representation of data remediation showing the involvement of the Special Master and Plaintiffs in each step of the process).

14

1

### 1. Defendants resolved a good-faith dispute with Plaintiffs on an indicator measuring property receipt in segregation.

2

3    Plaintiffs and Dr. Golding allege that "one of Defendants' segregation indicators was not

4    measuring whether patients actually received property to which they were entitled under Title 15,

5    just *whether the institution had a system for measuring whether patients received their property*."

6    (ECF No. 7721 at 8, emphasis added.)  But the relevance of the allegation is not clear because this

7    indicator has now been validated, after the resolution of a good-faith dispute with Plaintiffs.

8    This indicator was originally titled "Units in which Staff can Identify Non-Disciplinary

9    Segregation (NDS) Patients and *Have Tracking System* for Phone Calls and Property."  (Special

10    Master's CQIT Report, ECF No. 7151 at 24, emphasis added.)  No CDCR staff, including Dr.

11    Golding, raised concerns about measuring the existence of a property tracking system during

12    CDCR's internal review process, spanning the period between November 2021 and April 2022.

13    (Decl. Cartwright, ¶ 17.)  Later, Plaintiffs argued that the indicator should measure if and when

14    NDS patients are receiving property, and not merely confirm the existence of a tracking system as

15    the Special Master's report recommended.  (*Id.*)

16    During BRMR, CDCR initially opposed Plaintiffs' proposed change as it appeared to be a

17    request for a new indicator.  (*Id.*)  The indicator was ultimately moved to dispute resolution and

18    was modified to measure whether NDS patients received their property.[4]  (*Id.*)  On December 29,

19    2022, CDCRs' Change Approval Committee (CAPC), including three psychiatrists (Drs.

20    Golding, Morrison, and Bunn) unanimously approved the amended documentation associated

21    with this indicator.  (*Id.*)

22    Contrary to Plaintiffs' assertions, the fact that there was a good-faith disagreement between

23    the parties—which they were ultimately able to resolve through dispute resolution—is not

24    evidence of malafide intent.

25

26

27

28

---

[4] The indicator title has been updated to "NDS Patients Provided Personal Property." ((Decl. Cartwright, ¶ 17.)

15

1

2

### 2.     Defendants identified and self-corrected issues with an IDTT compliance indicator.

3    Plaintiffs and Dr. Golding allege that "Defendants' interdisciplinary treatment team

4    ("IDTT") compliance indicator scored IDTTs as compliant when any psychiatrist was present,

5    despite the fact that the Program Guide requires the patient's assigned psychiatrist to be present."

6    (ECF No. 7721 at 8.)  Previously, the EHRS could only track whether a psychiatrist attended the

7    IDTT, and could not specifically track whether the patient's assigned psychiatrist attended.

8    (Decl. Cartwright, ¶ 18.)  However, in response to staff concerns, CDCR convened a workgroup

9    led by one of Dr. Golding's subordinates to change that process.  (*Id.*)  The resulting system now

10   tracks whether the assigned psychiatrist attended the IDTT.  (*Id.*)  Thus, as Plaintiffs are aware,

11   this issue was identified and resolved by CDCR internally *before* Plaintiffs and the Special

12   Master were involved.  That Plaintiffs cite this as an example of CDCR's malfeasance is curious

13   because it shows just the opposite.

14

15

### 3.     Defendants revised a policy and indicator on initial clinical contacts in the pre-review process.

16   Plaintiffs and Dr. Golding allege that "Defendants perversely interpreted the rules about

17   initial clinical contacts to allow late contacts to count as compliant so long as the initial IDTT was

18   also late." (ECF No. 7721 at 8.)  As in the instances discussed above, however, Defendants

19   discovered this issue during an internal review and independently mitigated it by revising the

20   internal policy memorandum governing clinical contact timelines.  (Decl. Cartwright ¶ 19.)  The

21   revised language unambiguously declares late contacts non-compliant: "The psychiatrist must

22   complete their initial evaluations within 10 working days after arrival to a Correctional Clinical

23   Case Management System (CCCMS) program, or within 14 calendar days after arrival to an

24   Enhanced Outpatient Program (EOP), and before the initial IDTT for all new intakes and patient

25   transfers." (*Id.*)  Thus, contrary to Plaintiffs' assertions, this example only demonstrates

26   Defendants' efforts to improve its policies.

27

28

Defendants' Opp to Plaintiffs' Mtn in Resp to Dec 29, 2022 Order  (2:90-cv-00520 KJM-DB (PC))

19409879.1

1      **4.    Defendants resolved a policy and indicator on timely clinical contacts
2            internally.**

3          Plaintiffs and Dr. Golding allege that Defendants allowed "psychiatrists' brief welfare

4   checks and medication nonadherence appointments to count as full psychiatric evaluation that

5   reset the Program Guide timelines for clinical encounters." (ECF No. 7721 at 8.)  Mental Health

6   staff do not dispute that welfare checks and medication nonadherence appointments do not count

7   as full psychiatric evaluations, and this consensus predates the data remediation process.  (Decl.

8   Cartwright, ¶ 20.)  In 2021, CDCR internally discovered this issue and made a change request to

9   have it remedied.  (*Id*.)  But in February 2022, CDCR discovered that this modification was still

10  not reflected in the indicator because the change request language and the underlying policy had

11  been unclear to the coding team.  (*Id*.)  This issue was finally resolved on April 5, 2022, and

12  retroactively applied so any appointment checked out as "wellness checks only" did not count as

13  fulfilling Program Guide requirements for Timely PC contact and Timely Psychiatrist Contact,

14  effective January 7, 2021.  (*Id*.)  Again, this example only shows Defendants' independent and

15  good-faith efforts to correct a problem.

16     **5.    Defendants resolved the MHCB initial contact indicator with input
17            from Dr. Potter and Plaintiffs.**

18         Plaintiffs and Dr. Golding allege that Defendants were "scoring as compliant initial clinical

19  contacts in the mental health crisis bed ('MHCB') that occur within the first 48 hours, despite that

20  the Program Guide requires those contacts to occur within 24 hours of the patient's arrival."

21  (ECF No. 7721 at 8.)  But this allegation ignores that during BRMR, the parties were negotiating

22  how to operationalize the 24-hours or one-calendar-day requirement for relevant key indicators.

23  (Decl. Cartwright, ¶ 21.)  That issue has since been resolved to the parties' satisfaction and the

24  "MHCB Daily Provider Checks" has been validated.  (*Id.*)

25         The "MHCB Daily Provider Checks" indicator was reviewed by a variety of CDCR staff,

26  including the eight psychiatrists invited to participate in data remediation.  (*Id.*)  During the

27  internal review process from August 3 to August 31, 2021, no CDCR staff raised concerns with

28  this measure starting on the first full day of MHCB care (as opposed to within the first 24 hours

17

1    of arrival).  (*Id.*)  During the September 22, 2021 BRMR meeting, Dr. Potter raised concerns that

2    the first daily contact could occur more than 24 hours after arrival and still be considered

3    compliant.  (*Id.*)  CDCR adopted Dr. Potter's suggestion that the documentation specify that the

4    indicator measure the percentage of full calendar days for each patient in MHCB when contact

5    was offered and documented, as well as measure the first day as occurring within 24-hours of

6    arrival to match Program Guide expectations.  (*Id.*)

7         On April 15, 2022, Plaintiffs sent a letter to CDCR with questions and concerns regarding

8    this indicator, which included a clarifying question similar to Dr. Potter's comment.  (*Id.*)  After

9    resolving all potential barriers to validating this indicator, it was successfully validated on July

10   29, 2022.  (*Id.*)  On August 4, 2022, CDCR's Change Approval Committee, including three

11   psychiatrists (Drs. Golding, Gonzalez, and Martello) unanimously approved the amended

12   documentation—resolving this issue months before Plaintiffs filed this motion.  (*Id.*)

13            **6.    Separating policy creation from data remediation is not resisting the**
                    **remediation process.**
14

15        Plaintiffs and Dr. Golding allege that "patients referred to Acute or ICF level of care

16   awaiting transfer/admission in outpatient housing programs" should be seen more frequently as a

17   rule and demand a key indicator that measures this frequency.  (ECF No. 7721 at 9.)  However, as

18   Plaintiffs are aware, there is no Program Guide requirement that governs the frequency of such

19   contacts.  (Decl. Cartwright, ¶ 22.)  Rather, individual clinicians see referred patients as often as

20   needed based on their clinical judgment.  (*Id.*)  Key indicators should reflect carefully selected

21   metrics that concern the provision of individualized care, rather than require a narrow check-the-

22   box approach that forces a clinician or administrator to robotically hew to a flowchart—and

23   eliminate clinical judgment—that does not materially advance patient care and safety.  (*Id.*)

24        During the internal review process on June 30, 2021, some staff stated that a new policy

25   was needed to clearly define expectations for treatment services when patients are referred to

26   Acute or ICF level of care but are awaiting transfer to outpatient housing programs.  (*Id.*)  Dr.

27   Cartwright advised staff that at any point, anyone may initiate the process to create a new policy

28

18

1    or modify an existing policy.  (*Id.*)  A new workgroup was later established to discuss a policy on

2    this topic in July 2021, even though the Program Guide is silent on this issue.  (*Id.*).

3        On July 14, 2021, this issue was discussed in BRMR.  (*Id.*)  Contrary to Plaintiffs'

4    assertions, Dr. Cartwright did not advocate for contacts once every 90 days for referred patients

5    during this meeting; indeed, Dr. Cartwright does not support that position.  (*Id.*)  Instead, Dr.

6    Cartwright inquired whether the absence of policy in the Program Guide indicated that the

7    frequency of clinical contacts for a referred patient was left up to the treating clinician's clinical

8    judgment until the transfer occurred.  (*Id.*)  Dr. Cartwright also clarified that he was not

9    advocating for reducing or lowering current treatment expectations, but that clinical judgment

10   need not be replaced by a one-size-fits-all policy in this instance.  (*Id.*)  While Dr. Golding may

11   have disagreed with their positions, failure to adopt his views after they were meaningfully

12   considered is not an instance of malfeasance, contrary to Plaintiffs' implication.

13   **V.    IF THE COURT AGREES THAT CLARIFICATION IS REQUIRED, ANY FURTHER ORDER
         SHOULD DEFINE DATA REMEDIATION AND CERTIFICATION, DIRECT THE SPECIAL**

14   **MASTER TO DISCLOSE HIS METHODOLOGY, AND CLARIFY THAT DATA
         REMEDIATION SHOULD BE GUIDED BY REASONABLE INTERPRETATIONS OF THE**

15   **PROGRAM GUIDE.**

16       Plaintiffs assert that, absent clarification, "Defendants will continue to resist . . . the Special

17   Master's historical way of monitoring [Program Guide] requirements."  (ECF No. 7721 at 11.)

18   First, Defendants do not and have not resisted the Special Master's monitoring.  Second, it is hard

19   to conceive how Defendants could resist the Special Master's historical way of monitoring when

20   he has repeatedly refused to provide his methodology.  Thus, a meaningful "clarification" would

21   include direction to the Special Master to be transparent with his standards and would plainly

22   define what is meant by "remediation" and "certification."

23       **A.    The Court should issue clear definitions of data "remediation" and
             "certification."**

24

25       More than two and a half years after Dr. Potter was retained, and despite multiple requests

26   from Defendants, the Special Master has not defined data "remediation" and "certification."

27   While the 29th Round Monitoring Report: Part C emphasizes that "successful completion of data

28   remediation . . . remains defendants' most direct path to ending this case," the Special Master has

19

1    not provided guidance on how and when the parties will know that a single indicator has (or, all

2    indicators have) been successfully remediated and certified, or how and when the Special Master

3    or his expert will communicate the completion of the data remediation process to the parties and

4    the Court.  (*See* Declaration of K. Allison In Resp. to Apr. 29, 2022 Order Req. Clarification of

5    Data Remediation Issues, ECF No. 7556 at 3-4.)  Dr. Potter has labeled 27 indicators as

6    "remediated," but the Special Master has not made any corresponding official findings.  (Decl.

7    Cartwright, ¶ 11).  Without clarity as to the requirements to achieve data remediation, the

8    successful completion of this process, or even estimating possible completion of this project

9    becomes nearly impossible.

10          Plaintiffs attempt to muddy the waters here by insisting that the definitions and questions

11   that need clarification concern validation and verification of data.  (ECF No. 7721 at 12:7-13.)

12   Again, the definitions and requirements that need clarification concern data remediation and

13   certification—so far, the Special Master has not provided guidance on how and when the parties

14   will know that a single indicator has (or, all indicators have) been successfully remediated and

15   certified; and how and when the Special Master or his expert will communicate the completion of

16   the data remediation and certification process to the parties and Court.  (*See* Apr. 22, 2022 Status

17   Conf. Tr., ECF No. 7540 at 41:1-19.)  Plaintiffs' citation to the Court's August 2021 discussion

18   of the urgency surrounding data remediation (ECF No. 7283 at 6) does not address those

19   definitions, which remain a vital missing piece of the Special Master's data remediation

20   requirements.  To ensure transparency and an opportunity to present their positions on the record,

21   the Court should order the Special Master and his expert to provide the requested definitions in a

22   report filed with the Court.

23          **B.   The parties are entitled to a full and transparent disclosure of the Special**
              **Master's methodology for monitoring.**
24

25          If Defendants' data reports will ultimately replicate the Special Master's monitoring, as he

26   and his team have suggested and as the Court and has acknowledged (ECF No. 7151 at 5, citing

27   ECF No. 6996 at 7 (defendants' assumption of responsibility for self-monitoring is an integral

28   remedial function in this action)), the Court should direct the Special Master to produce his

1    guidebook, business rules, sample-size methodology and other necessary information to assist

2    CDCR in its replication efforts.  The Special Master has rejected Defendants' reasonable requests

3    for his methodology, claiming that Defendants know what he monitors based on decades of

4    monitoring reports and characterizing Defendants' request as "a fishing expedition to scrutinize

5    the Special Master's internal documents." (ECF No. 7717, at 15 n. 7.)  But this response misses

6    the point.  Understanding or knowing "what" the Special Master monitors, does not mean that

7    Defendants know "how" he monitors the Mental Health Services Delivery System.  Defendants

8    do not raise these concerns to antagonize the Special Master or impugn the credibility of his

9    experts and monitors.  Defendants simply want transparency and the ability to fully understand

10   the findings and conclusions reached by the Special Master and his experts.  Moreover, if CQIT is

11   ultimately intended to replicate the Special Master's monitoring, it is essential to know

12   specifically what is measured and how.

13        Additionally, access to the underlying methodology, guidebook, business rules, and sample-

14   size methodology may provide tools Defendants need to improve performance and may also

15   expedite the data remediation process.  Indeed, this Court previously noted the importance of

16   transparent benchmarks, stating that the Special Master "has a rubric for monitoring," and

17   suggested "clearly put[ting] out there the benchmark the special master has been using reflected

18   in his reports to the Court for quite some time now and ask why these should not be confirmed as

19   the benchmarks."  (July 18, 2020 Tr., ECF No. 6781 at 11:7, 14-17.)  Nonetheless, Defendants'

20   multiple requests for these materials have been consistently rejected, including most recently in

21   the Special Master's 29th Round Monitoring Report.[5]  It is unclear how or why the Special

22   Master believes that withholding his tools and methodologies advances the shared goals of

23   improving patient care or resolution of this case.

24

25   _____

26   [5] The Special Master states in his 29th Round Monitoring Report, ECF No. 7717, at 15 n. 7, that
     Defendants only recently requested his monitoring tools for the first time ("In 2022, for the first
27   time the Special Master can recall in his 15-year tenure (and after 29 rounds of monitoring over
     more than a quarter century), defendants formally requested a copy of the Special Master's
28   monitoring tools, a request they repeated in their response to the Draft Reports. *Id*.").  This
     ignores Defendants' prior requests and the current posture of data remediation.

21

19409879.1

**C.    Data remediation should be guided by reasonable interpretations of existing policies.**

In April 2022, Defendants raised concerns that the data remediation process "does not include the creation of a new policy, expanded policy, or expanded indicator" yet "[t]his process is increasingly becoming an overhaul of long-established and court-approved policies and processes rather than a transparency check or data validation project.  In short, the scope of the data remediation process seems to evolve continually and expand without any clear boundaries." (ECF No. 7523, Ex. A at 14.)  Despite this Court's clarification that "the data remediation project should not be resolving policy disputes" (April 22, 2022, Tr., ECF No. 7540 at 29:25-30:1), much of the parties' disagreements relate to policy interpretation and efforts to rewrite and redefine long-existing policies.  Once again, it appears necessary that the Court reiterate its previous position that resolution of policy disputes is not part of the data remediation process.  To the extent that data remediation involves the resolution of disputes concerning policy language, interpretation of policy language, or CDCR's approach to operationalize a policy, deference should be given to CDCR's reasonable interpretation of its own policies.  Unless CDCR's policy interpretations clearly exceed constitutional bounds, those interpretations are due deference.  *See Lewis v. Casey*, 518 U.S. 343, 363 (1996).

**CONCLUSION**

Plaintiffs extrapolate the views of one employee to the entirety of CDCR's Mental Health leadership team, and seek relief based on these isolated perceptions.  The overwhelming evidence, however, shows that CDCR's Mental Health leadership team work closely and collaboratively with the Special Master's team, and that the leadership team's interactions with the Special Master's team are professional, cooperative, and collegial.  Nor is there any reason to suggest that CDCR views the Court or its orders with any disdain, or that the Mental Health leadership team – and those who work below them – believe that compliance with Court orders is somehow optional.  CDCR's Mental Health leadership team, like this Court and the Special Master's team, have patients' best interest in mind with every decision they make, and the delivery of quality and adequate mental health care is their first priority.  Further, psychiatrists at

22

1   both headquarters and regional levels are valued team members who are embedded in all relevant

2   policy and data discussions.  Accusations of exclusion are grossly inaccurate.

3        Finally, Plaintiffs' attempts to infer that Defendants are somehow not committed to data

4   remediation are contradicted by the extensive resources they have committed to this project.

5   Differing opinions or view points on policy interpretation is not evidence that Defendants do not

6   understand the purpose of data remediation, as Plaintiffs suggest.  Rather, Plaintiffs seek by way

7   of their motion – and the data remediation process – to expand the scope of the key indicator list,

8   revisit previously-settled policy, and create new indicators – all in contravention of this Court's

9   prior statements that data remediation "should not be resolving policy disputes" and in advance of

10  the Special Master's determination of the key indicator list.

11       For these reasons, no clarifying order is necessary or appropriate.  However, to the extent

12  this Court seeks to clarify issues pertaining to data remediation, it should define the terms

13  "certification" and "remediation," or request that the Special Master do so.  Such an order should

14  also clarify that Plaintiffs should defer to Defendants' reasonable policy interpretations of

15  Program Guide language.

16  **CERTIFICATION**

17       Counsel for Defendants have reviewed the following orders that are relevant to the

18  issues raised in this opposition: ECF Nos. Counsel for Defendants certified that they have

19  reviewed the following orders that are relevant to this filing: ECF Nos. 4232, 5726, 6242, 6380,

20  6427, 6429, 6435, 6846, 6938, 6996, 7216, 7229, 7283, 7285, 7415, 7456, 7541, 7612, 7690,

21  7695, 7699, and 7700.

22

23  DATED: March 2, 2023                 ROB BONTA
                                       Attorney General of California

24                                       DAMON MCCLAIN
                                     Supervising Deputy Attorney General

25

26                              By:     */s/ Namrata Kotwani*

27                                    NAMRATA KOTWANI
                                   Deputy Attorney General
                                   *Attorneys for Defendants*

28                                    23

1     DATED:  March 2, 2023                    HANSON BRIDGETT LLP

2

3                                        By:      /s/ Samantha Wolff

4                                              PAUL B. MELLO
                                               SAMANTHA D. WOLFF
5                                              KAYLEN KADOTANI
                                               DAVID C. CASARRUBIAS
6                                              CARSON R. NIELLO
7                                              Attorneys for Defendants

8

9

10    CF1997CS0003
      65787946.docx
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        24