Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-4431
  Fax: (415) 703-5843
  E-mail: Namrata.Kotwani@doj.ca.gov
*Attorneys for Defendants*

Paul B. Mello, State Bar No. 179755
Samantha D. Wolff, State Bar No. 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias, SBN 321994
Carson R. Niello, SBN 329970
Hanson Bridgett LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                  Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                  Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF NAMRATA KOTWANI IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN RESPONSE TO DECEMBER 29, 2022 ORDER RE DR. GOLDING'S SECOND WHISTLEBLOWER REPORT (ECF No. 7721)** |

1
DECLARATION OF NAMRATA KOTWANI ISO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
IN RESPONSE TO DEC. 29, 2022 ORDER (2:90-cv-00520 KJM-DB (PC))

19387675.5

**DECLARATION OF NAMRATA KOTWANI**

I, Namrata Kotwani, declare as follows:

1. I am a Deputy Attorney General in the California's Attorney General's Office, counsel of record for Defendants. I am licensed to practice before all of the courts of the State of California, and am admitted to practice before this Court. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion in Response to the Court's December 29, 2022 Order Regarding Dr. Golding's Second Whistleblower Report (ECF No. 7721). I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

2. Attached as **Exhibit A** is a true and correct copy of Former CDCR Secretary Allison's December 21, 2022 Letter to the *Coleman* Special Master, which was circulated to me via e-mail.

3. Attached as **Exhibit B** is a true and correct copy of CDCR Attorney Nick Weber's November 15, 2022 Letter to the *Coleman* Special Master, which was circulated to me via e-mail.

4. Attached as **Exhibit C** is a true and correct copy of Former CDCR Secretary Allison's September 28, 2022 Letter to the *Coleman* Special Master, which was circulated to me via e-mail.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2nd day of March, 2023, at Berkeley, California.

*/s/ Namrata Kotwani*
Namrata Kotwani

# EXHIBIT A

DocuSign Envelope ID: C48CF526-00BB-4780-B1B9-3AAB11A98BFE

**STATE OF CALIFORNIA -- DEPARTMENT OF CORRECTIONS AND REHABILITATION**  **GAVIN NEWSOM, GOVERNOR**

**OFFICE OF THE SECRETARY**
PO Box 942883
Sacramento, CA 94283-0001



December 21, 2022

**VIA EMAIL ONLY**

Matthew Lopes
*Coleman* Special Master
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park
1301 Atwood Avenue, Ste. 215 N.
Johnston, RI  02919
mlopes@pldolaw.com

Dear Special Master Lopes:

Thank you for the conversation we had yesterday at the end of the Level 2 Data Disputes meeting. I write to memorialize our conversation and to further respond to your December 8, 2022, letter to me regarding comments that Dr. Mehta and I made during an internal leadership conference. I am limiting my response to only those points that merit correction and further clarification.

As I stated yesterday, I take full responsibility for my comments, which were not meant to be offensive. My intent was to convey to mental health leadership statewide how strong and impressive Dr. Mehta is as the leader of CDCR's mental health program. CDCR's mental health program is a healthcare delivery system that is not defined by any one lawsuit. That is not to say that we countenance resistance to the Court's lawful orders; to the contrary, we strive to achieve compliance with all court orders and certainly understand that compliance is not optional. At the leadership meeting, Dr. Mehta and I were conveying to CDCR's clinician professionals – who have been extensively trained to deliver mental health care and who were the intended audience for our comments – that they should focus on the best delivery of mental health care, not legal issues beyond their purview or control. Criticisms with respect to your team's operations do not equate to "resistance to the Court's lawful orders," and it is inaccurate to suggest otherwise.

The comments that we made during the conference are consistent with comments that we have routinely made publicly and to you and your team (regarding the data remediation process, the UNA, and telepsychiatry expansion). That CDCR has voiced concerns with aspects to these projects and the Special Master's recommendations is not to suggest that we would ever encourage resistance to any court order.

DocuSign Envelope ID: C48CF526-00BB-4780-B1B9-3AAB11A98BFE

Matthew Lopes, *Coleman* Special Master
Page 2


In addition, while many of the statements were taken out of context, we do have the right to discuss the status of the mental health program with our leadership, and that includes frank assessments of the impact external stakeholders have on our ability to provide care.

Finally, CDCR's actions to date are what matter most – and there can be no dispute about CDCR's significant efforts to improve the delivery of mental health services, including by dedicating inordinate amounts of time and resources to data remediation, the UNA, closing L1, and investing years into suicide prevention and annual reporting.

Regards,

DocuSigned by:

*Kathleen Allison*

066FFF332C694AB...

KATHLEEN ALLISON
Secretary

# EXHIBIT B

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                            GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 15, 2022

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

RE:  Second Level Disputes

Special Master Lopes,

Following their presentation at the first level dispute resolution meetings, it has been determined that three disputes are appropriate for presentation to second level dispute resolution.  Like many disputes that came before, none are truly disputes appropriate for inclusion in either the first or second level dispute resolution process because they are all requests for new indicators.  While Plaintiffs may couch the disputes as "reasonable modifications" to existing indicators, if Plaintiffs' proposed changes were to be accepted, all of them would fundamentally change the purpose and nature of the indicator and would render the indicator misleading and unhelpful.  And Plaintiffs plainly admit that creating a new indicator, as opposed to convoluting existing ones, would satisfy their dispute.

Requests for new indicators disguised as disputes or barriers to remediation unnecessarily derail BRMR and dispute resolution meetings.  Worse, they contribute to avoidable delays in data remediation -- a project nearly half a year behind schedule.  The process to request new indicators is laid out in the Secretary's May 19, 2022 declaration.  (ECF No. 7556-2 at 2.)  The process, as designed, does not permit delaying other indicators from remediation.

Repeatedly discussing new indicators during BRMR or dispute resolution meetings are not worthy of the time and resources expended by the parties and the Special Master's data team.  And yet again, three new requests for new indicators have been elevated to the second level review while the indicators to which those requests are tangentially related are delayed from data remediation.  Those three "disputes" are discussed below.

1. Scoring for Mental Health Crisis Bed (MHCB) Daily Provider Contacts (SP22 MHCB Daily Provider Contacts)

The MHCB Daily Provider Contacts indicator measures whether a patient in the MHCB was seen by either a psychiatrist or psychologist each day, and whether documentation was signed within 24 hours of the contact.

There is no dispute that the indicator measures whether patients received daily contacts. Plaintiffs have raised objections regarding the scoring of telepsychiatrists in the MHCB Daily Provider Contacts indicator. In their April 22, 2022 letter regarding this indicator, Plaintiffs stated that they "object to CDCR relying on telepsychiatrists rather than onsite psychiatrists for MHCB coverage." (Letter at 3.) From discussions held during the first level of dispute resolution, it appears that Plaintiffs want to exclude clinical contacts conducted by telepsychiatrists from this indicator. As a result, MHCB patients who received care from a telepsychiatrist would be flagged as having received no care, thereby rendering the indicator misleading and unhelpful. This would be antithetical to the purpose of the indicator in determining whether patients in crisis beds are getting daily clinical contacts. Plaintiffs' request is also at odds with the current telepsychiatry policy which allows for clinical contacts in crisis beds. It is also not directly related to the section of the Program Guide – crisis beds - that this indicator is designed to measure.

Data remediation of the MHCB clinical contacts indicator is not the time or the place to discuss the propriety of whether telepsychiatrists may provide care to crisis bed patients. It is wholly inappropriate for this indicator to be delayed from remediation for a "dispute" that is being handled outside of data remediation. And Plaintiffs have stated that if CDCR developed a new indicator to measure the telepsychiatry policy this purported dispute would be resolved.

Plaintiffs are free to seek a new indicator built to measure telepsychiatry policy. But it is inappropriate to attempt to shoehorn monitoring of staffing policy into an indicator that measures whether patients received care each day. That review of CDCR's proposed telepsychiatry policy is not related or subject to remediation of the MHCB clinical contacts indicator. If Plaintiffs are seeking an indicator measuring whether the telepsychiatry policy is being followed (which they appear to be), then they should request that through the agreed upon process, but this indicator should not be held up from remediation in the interim.

2. Scoring for Interdisciplinary Treatment Team (IDTT) Staffing (QC1 IDTT Staffing)

   a. Issue 1: Use of PNPs in IDTTs

The IDTT Staffing indicator measures whether all required staff were in attendance at an IDTT. Among the required attendees are Psychiatric Nurse Practitioners (PNP), when one has been assigned to a patient.

PNPs work within CDCR in accordance with the current PNP policy, which was developed a little less than two years ago. To date, CDCR employs just 8.85 full time equivalent PNPs. (ECF No. 7645.) CDCR's negotiated policy permits PNPs to provide care only to CCCMS patients, barring special exceptions. Much like the telepsychiatrist dispute, above, Plaintiffs object to the indicator counting attendance by a PNP as compliant outside of the CCCMS level of care. And like the telepsychiatrist dispute above, this indicator, which measures attendance at an IDTT, is not the appropriate place to police CDCR's PNP policy.

There is no dispute that the indicator measures whether a patient's assigned PNP attended the IDTT. Instead, Plaintiffs appear to want the indicator to label an IDTT as non-compliant if the

Page 3

assigned PNP attends an IDTT at the EOP level of care or above. In other words, violations of the PNP policy would directly impact the IDTT Staffing indicator. But this is not the policy that the indicator is designed to measure. Revising the indicator to meet Plaintiffs' demands would cause the aberrant result of labeling a fully staffed IDTT as non-compliant, simply because the patient received care from a PNP outside the bounds of the PNP policy.

It is not appropriate to shoehorn monitoring of the PNP policy into an indicator that measures whether an IDTT was attended appropriately. If Plaintiffs are seeking an indicator measuring whether the PNP policy is being followed, then they should request that through the agreed upon process, but they should not be permitted to further delay remediation of this indictor.

    b. Issue 2: Whether Patients are CDCR Staff

The IDTT Staffing indicator measures whether all required staff were in attendance at an IDTT.

Plaintiffs believe that the indicator is insufficient because it does not measure whether the patient was in attendance at the IDTT. However, as transparently stated in the title, the indicator measures whether staff were present at the IDTT, not the patient. Staff includes people employed by an organization, or workers, employees, or personnel. For this indicator, it measures whether the patient's assigned primary clinician, the assigned prescriber (psychiatrist or PNP), the licensed psychiatric technician and the correctional counselor were in attendance. The benefit of this indicator comes from its ability to measure staff attendance and for management to identify deficiencies and implement corrective action in its workforce. Although patients are an integral part of the IDTT, they are not staff and do not answer to local health care or custody managers. And unlike staff who wish to remain employed, patients have the right to refuse to attend their IDTT.

Once again, Plaintiffs have made clear that this dispute can be resolved by creating a new indicator to measure whether patients attend their IDTTs. Adding patients to an indicator that measures staff attendance would completely change the nature of the indicator – one which CDCR values as a management tool. Such a fundamental change cannot be said to be measuring the same thing as the original indicator. The process for requesting a new indicator is clear. It does not involve holding up other indicators from remediation in the meantime.

Sincerely,

Nick Weber

*/s/ Nick Weber*

Attorney
CDCR
Office of Legal Affairs

# EXHIBIT C

**OFFICE OF THE SECRETARY**
PO Box 942883
Sacramento, CA 94283-0001



9/28/2022

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

**VIA EMAIL**

Dear Special Master Lopes,

In advance of our first second-level dispute resolution meeting, I write to alert you to a concern I have about the insertion of requests for new indicators in the "data remediation" dispute resolution process. Including requests for new indicators in the dispute resolution process undermines the agreement that you and I reached in May 2022, and has derailed the remediation process for numerous indicators, seriously jeopardizing the California Department of Correction and Rehabilitation's (CDCR's) ability to complete the project by the end of 2023.

We agreed that requests for new indicators will not be part of the dispute resolution process. The agreement specifies, "Any request for a new indicator (not including a reasonable modification to an existing one) shall be sent to the Special Master for his consideration prior to his draft 29th Round Monitoring Report being sent to the parties." Over the past several weeks, however, it has become apparent that there is now a disagreement over what constitutes a "new indicator" versus a modification to an existing indicator.

There are currently five disputes at the second level of dispute resolution. Four of the five items appear to be requests for new indicators. For those items, Plaintiffs are not disputing the content of the current indicators, but are demanding fundamental changes to the indicators that would require CDCR to look at different housing programs or create new methodologies or audits. The fundamental changes Plaintiffs seek cannot reasonably be described as reasonable modifications of existing indicators because they would effect a wholesale transformation to the existing indicators. Instead, these are requests for new indicators, which should be diverted from the data remediation process as we previously agreed.

CDCR is prepared to discuss Plaintiffs' request for new indicators as part of the revised key indicator list expected as part of your 29th Round Report. Failure to divert requests for new indicators out of the data remediation process, however, will render the May 2022 agreement between us effectively meaningless and prevent completion of data remediation by the end of 2023.

I look forward to discussing this when we meet for the second-level dispute resolution.

*DocuSigned by:*
*Kathleen Allison*
066EFE3326694AB...

Kathleen Allison
Secretary