**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.,
    **Plaintiffs**

    **vs.**                                                  **No. 2:90-CV-0520 KJM DB**

GAVIN NEWSOM, et al.,
    **Defendants**

_____


**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING THIRD-LEVEL DATA REMEDIATION DISPUTES PURSUANT TO THE DATA REMEDIATION DISPUTE RESOLUTION PROCESS, ECF NO. 7556-2**

**Introduction**

    This is the Special Master's first Report and Recommendation concerning data remediation related disputes as outlined in the data remediation dispute resolution process filed with the Court. *See* Declaration of Kathleen Allison in Response to April 19, 2022 Order, ECF No. 7556-2 at 2-3 (describing the data remediation dispute resolution process). This Report outlines the information the Special Master believes the Court requires to make focused determinations concerning the four data remediation related disputes the parties, working with the Special Master, have been unable to resolve through the Court-sanctioned dispute resolution process. As of the time of this writing, four other disputes have gone through the Second Level Review process without the need for a Third Level recommendation from the Special Master.[1]

_____

[1] Four disputed issues – impacting 11 separate indicators – went through the second level of the data remediation dispute resolution process. These issues were: (1) Measurement and Reporting Requirements for Restricted Housing and Segregation Units (impacting three indicators); (2) Sufficient Number of Adequate Treatment Spaces (impacting three indicators); (3) RVR Process Quality Control (impacting four indicators); and (4) NDS Transfers (impacting one indicator). Regarding Measurement and Reporting Requirements for Restricted Housing and Segregation

As the Special Master previously reported, the data remediation dispute resolution process includes three levels of review with the goal of resolving and/or narrowing disputes among the stakeholders[2] at the lowest level possible. *See* Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 42-43. Upon exhaustion of the First and Second Levels of review, the following four indicator-related disputes require elevation to the Court with a Third Level recommendation from the Special Master:

(1) Transfer to STRH/LTRH within Timeframes (Transfer Clock Freeze/Suspending Events).

(2) MHCB Daily Provider Contacts (Telepsychiatry).

(3) IDTT Staffing (patient attendance).

(4) IDTT Staffing (psychiatric nurse practitioner (PNP) participation).

In addition to the specifics regarding these four disputes, the Report also delineates relevant background information including the contours of disparities among the stakeholders' understanding of the fundamental purpose of the data remediation process, which to date have proved unbridgeable. These disconnects as to the foundational purpose of the overall data remediation endeavor infuse conflict and delay into each step of the process (including the primary focus here, dispute resolution). The absence of a meeting of the minds here has bred

---

Units, CDCR agreed to refer the disputed issues to an internal workgroup for consideration of policy revisions. Regarding Sufficient Number of Adequate Treatment Spaces, the Special Master agreed with defendants that the design of the existing indicator adequately measured defendants' remedial obligations regarding treatment space. Regarding RVR Process Quality Control and NDS Transfers, the Special Master agreed with defendants' view that the requested revisions to the indicator should be considered as requests for new indicators under the dispute resolution process. The Special Master previously informed plaintiffs of the outcome of these Level II disputes.

[2] For purposes of this Report, data remediation "stakeholders" refers collectively to the Special Master, plaintiffs, and defendants.

inefficiency and proven to be disruptive to the stakeholders' consideration of the full gamut of data remediation issues, from what should be purely technical issues which could have been resolved in a straightforward manner to overarching issues (e.g. definitions of "remediation" and "certification").  *See* Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 45-47 (discussing efforts to define "remediation" and "certification").  If the passengers in a car have different destinations in mind, it is not surprising that they would come to divergent conclusions as to the most efficient route to take.  Similarly with respect to data remediation: divergent views about the core purpose of the endeavor regularly bubble to the surface.  These persistent distractions from the task at hand—completion of data remediation by the end of this year at the latest—call out for guidance from the Court.

## I.     __Background__

At a status conference on April 22, 2022 where data remediation was discussed, the Court noted that if disputes regarding data remediation could not be resolved by the Special Master, the CDCR Secretary, and Undersecretary "working together," "then the issue could be brought to the Court with any focused questions that the parties or any one party might think the Court needs to resolve."  Reporter's Transcript of Proceedings (4/22/2022 RT), ECF No. 7540 at 31:21-24.

With that direction, and the Court's admonition to "[e]xhaust, exhaust, exhaust, and if need be, then request the chance to bring it to the Court in a focused motion," *id.* at 32:24-25, the parties, working under the guidance of the Special Master, worked to develop a data remediation dispute resolution process.  The contours of the data remediation dispute resolution process were outlined in then-CDCR Secretary Kathleen Allison's May 19, 2022 declaration.  ECF No. 7556.  The May 19, 2022 declaration described the agree-upon "plan to streamline data remediation" and resolve data remediation-related disputes.  *Id.* at 2.  On May 20, 2022, the Court issued a

Minute Order acknowledging the May 19, 2022 declaration, which the Court stated "confirm[ed]

that the Special Master and the Secretary have satisfactorily resolved" the data remediation

issues[3] that the Court had previously identified as needing clarification.  ECF No. 7557.

The data remediation dispute resolution process begins with the stakeholders' review of

each indicator in the Business Rules and Methodology Review (BRMR) meeting.  ECF No.

7556-2 at 2.[4]  Disputes regarding methodological issues were to be "addressed in the

BRMR/QAC process and only move through dispute resolution as a last resort."  *Id.* at 2.  Where

the Special Master and parties agreed on an indicator "but also agree[d] that the policy measured

by the indicator" required modification "to align with the indicator," CDCR would pursue the

policy modification in a manner so as not to "delay the data remediation process."  *Id.*  Requests

for a new policy were to be discussed between the parties through the meet and confer process.

---

[3] In a May 29, 2022 Minute Order, the Court identified four data remediation issues that required clarification, as follows: "First, methods need to be identified to streamline the data remediation process so the process can be completed well before December 2023, including the time during the process for court resolution as needed of any disputes.  Second, tools need to be adopted to monitor deadlines for complete remediation of each CQIT indicator as part of completion of the entire project globally; to this end the Special Master will provide a template to Secretary Allison for discussion.  Third, a focused process needs to be adopted to identify disputes or gaps arising during the data remediation process, provide for efficient exhaustion of dispute resolution and to the extent needed prompt presentation to the court for resolution.  Finally, the court expects confirmation from the Secretary and the Undersecretary, in consultation with the Special Master, that the staff assigned to the data remediation project is sufficient in number and qualifications to complete the project well in advance of December 2023."  ECF No. 7541.

[4] In the Special Master's data expert's report appended to the Twenty-Eighth Round Monitoring Report, the data expert described the initial work of the BRMR process as follows:  "On October 15, 2020, CDCR Mental Health and Dr. Potter initiated a series of Business Rule and Methodology Review meetings to develop the detailed and specific information that specifies both the current intended operation (i.e. how the system is supposed to be currently working), and when needed, required future intended operation (i.e. how the system needs to work to be in concordance with the Program Guide) for the On-Demand indicator values required with ASU EOP Hub Certification."  ECF No. 7074 at 233.

*Id.*  Further, "[a]ny request by the parties for a new indicator (*not including a reasonable modification to an existing one*) shall be sent to the Special Master for his consideration" in advance of his report on CQIT indicators.  *Id.* (emphasis added).[5]

Those disputes left unresolved after two weeks of consideration in BRMR/QAC are referred to the "First Level Review Team," consisting of "[CDCR's] Mental Health Program Deputy Director, Undersecretary of Health Care Services, the Special Master and/or the Special Master's designated experts, defendants' counsel, plaintiffs' counsel, and the minimal number of subject matter experts necessary."  ECF No. 7556-2 at 2.  Dispute(s) that remained unresolved after two weeks of First Level review are referred to the "Second Level Review Team," consisting of the CDCR Secretary, Special Master, and "whomever else either deems necessary."  *Id.* at 3.  Finally, the third step of the dispute resolution process consists of the Special Master making a recommendation to the Court to resolve those disputes left unresolved after two weeks of "Second Level" review.  *Id.*

While this Report discusses four specific data remediation-related disputes, fundamental disputes between the parties regarding the purpose and scope of data remediation in the context of this case have hampered progress on this remedial project.  These pervasive disagreements

---

[5] On December 30, 2022, the Special Master filed a request for extension of time to file his report "on the functionality and efficacy of the provisionally approved indicators… until the data remediation project is complete."  ECF No. 7693 at 5; *see also id.* at 2 ("[A] final list of proposed key indicators cannot be provided at this time as the list is progressing jointly with the remediation process and the efficacy and functionality is intertwined with data remediation.  A complete list will only emerge at the conclusion of the data remediation project.").  On January 3, 2023, the Court issued an order approving the Special Master's request for an extension of time and vacating "paragraph 4 of the court's July 1, 2021 order, ECF No. 7216, requiring the Special Master to report his findings on the functionality and efficacy of the provisionally approved list of CQIT indicators as part of his Twenty-Ninth Monitoring Report."  ECF No. 7695 at 2.  The Court further directed the Special Master to file a "brief report on the status of data remediation generally and as it pertains to finalization of the list of CQIT indicators in particular" by June 30, 2023.  *Id.*

bog down the data remediation process at each step.  Based on his experience to date, the Special

Master anticipates the parties will remain ensnared in a cycle of disputes regarding the proper

scope of the provisionally approved indicators.  Given the significance of data remediation in the

ultimate resolution of this case and the approaching deadline for completion, this cycle cannot

continue.  The Special Master and parties are actively working to ensure completion of data

remediation by December 2023, as reflected by the parties' recent agreement to increase the

frequency of BRMR meetings.[6]  However, these overarching disputes about the purpose and

scope of data remediation will continue to loom over the process and slow the progress of

remediation.

### A.  Dispute Regarding Purpose and Scope of Data Remediation

As will be discussed below, the essential dispute among the stakeholders is whether the

purpose of data remediation is to determine whether: (a) defendants operationalization of key

CQIT indicators accurately measure what defendants purport them to measure; or (b) defendants'

operationalization of the provisionally approved indicators accurately measure what they should

measure in concordance with the Program Guide or other court-ordered remedial requirements,

as informed by the Special Master's long-standing monitoring practices.

### B.  Special Master's View and Court's Guidance on the Purpose of Data Remediation

The Special Master and his data expert have continually viewed the core function of data

remediation to be ensuring that the indicators and their operationalization are concordant with

the Program Guide and related court-ordered remedial requirements, informed by the context of

---

[6] After rejecting the Special Master's and plaintiffs' recommendation to convene twice-weekly
BRMR meetings for months, defendants recently changed their position and agreed to staff two
BRMR meetings per week.

the Special Master's monitoring practices.  For CDCR's mental health data systems and

ultimately CQIT to be relied upon as CDCR's self-monitoring tool, data and summary statistics

which accurately measure and report defendants' compliance with the Program Guide and

related remedial requirements are essential.[7]  The Special Master's data expert made this point

clear in the Twenty-Eighth Monitoring Round Report:

> To be considered accurate, the *business rules must be designed with fidelity to the dictates of the Program Guide and rely on data that is appropriate to achieve its intended purpose*.  The actual operation of the indicator must then match its intended operation.

> In order to determine whether an indicator is accurate requires both careful review of its design to determine if it will correctly measure its business requirement, and comparison of its intended operation with its actual operation.  In other words, the system *must not only give a technically precise correct answer to a query, but it must also ask the right question and have access to information appropriate to answer that question*.

ECF No. 7074 at 218-19 (emphasis added); *see also supra* note 7.

Further, the Court's direction on the purpose and scope of data remediation has been

clear and consistent.  For instance, in its December 17, 2019 Order following the Golding Report

evidentiary hearings, the Court summarized its views on the need for data remediation as

follows:

> Relatedly, *Coleman* data collection and reporting must be fixed, and it must be fixed to serve the policies and orders in this case, not the other way around.  The policies and orders must not be drained of meaning in an effort to squeeze a square peg into a round hole.  And the data must be fixed with all key stakeholders at the table.  It must be…checked and double checked.  All with an eye toward allowing the

---

[7] *See* Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 218 ("Data that accurately measures defendants' compliance with Program Guide and other court-ordered requirements for a constitutionally adequate mental health service system is an indispensable element of assessing whether defendants are meeting those requirements.  An acceptable quality management system that relies on such data is a primary mechanism for defendants to attain compliance and demonstrate their ability to self-diagnose and self-correct any backsliding which may occur over time, thus eventually eliminating the need for federal court oversight.")

defendants ultimately, when they truly can, to accurately demonstrate to the court
that the Constitution is finally satisfied.

ECF No. 6427 at 49.

As alluded to, CQIT has for years been envisioned as a key element of defendants' efforts
to self-monitor their mental health program's compliance with remedial requirements in this case
and, ultimately, end federal court supervision of CDCR's Mental Health Services Delivery
System (MHSDS).  *See* September 2, 2020 Order, ECF No. 6846 at 24.  Accordingly, as the
Court has made clear, defendants must "to the extent possible, make sure the data reports
produced to support defendants' provision of constitutionally adequate mental health care *will
accurately measure the remedial requirements for this action*."  December 17, 2019 Order, ECF
No. 6427 at 30 (emphasis added).

During the course of the Golding Report-related proceedings, the Court found that the
design of certain of defendants' then-existing indicators inaccurately measured compliance with
the mandates of the Program Guide and defendants acknowledged that "misleading information
was provided to the court."  *Id.* at 12.  For instance, with respect to defendants' efforts to define
"monthly" as 45 days rather than 30 days for measuring compliance with the Program Guide's
requirement that EOP patients be seen by psychiatrists at least "monthly," the Court found the
change to be "inconsistent with implementation of the relevant Program Guide requirements as
established through more than a decade of practice."  *Id.* at 29; *see also id.* at 24 (describing the
Special Master's interpretation of "monthly" to be "30 days" and noting "documentary evidence
showing that prior to the business rule change at issue defendants had also interpreted 'monthly'
in this context to mean 30 days.").  In another instance, regarding the need for psychiatric
evaluations to be conducted in confidential settings, the Court rejected defendants' argument that
the Program Guide was "insufficiently clear" and instead "resolved that question…concluding

that an April 18, 2007 memorandum attached to the Program Guide 'and a *plain reading of the Program Guide* support the conclusion these psychiatric evaluations must be confidential.'" *Id.* at 21 (quoting ECF No. 6242 at 7) (emphasis added).

These illustrative examples demonstrate that the record here plainly supports remediating CDCR's mental health data systems to ensure provision of *accurate* data and summary statistics regarding defendants' compliance with their myriad remedial requirements in this case, not merely to confirm that defendants' indicators measure what they "purport" to measure. Indeed, the concerns about defendants' data which gave rise to the need for data remediation were not primarily due to technical, computational, or computer programming errors; rather, they evinced faulty interpretations of court-ordered remedial requirements. The operationalization of an indicator can provide a precise and mathematically correct answer to a question but still be inaccurate (and thus misleading) if the question posed does not properly reflect court ordered requirements associated with the topic addressed by the indicator. "In other words, the system must not only give a technically precise correct answer to a query, but *it must also ask the right question* and have access to information appropriate to answer that question."[8] Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 219.

---

[8] As the Court has made clear, "…the data remediation process should not be resolving policy disputes." 4/22/2022 RT, ECF No. 7540 at 29-30. In the appropriate manner, the process must account for the fact that defendants' bedrock obligation is defined in the Program Guide and court orders, not the wording of their existing policy. The Special Master staffs the BRMR with clinical experts and personnel with relevant custody experience to identify areas where CDCR's existing policy either erroneously or incompletely covers court ordered obligations and where possible quickly offer solutions. The Special Master's data expert, working with relevant defendant personnel, have provided exploratory data analysis when requested to better define and narrow the scope of these issues. Where disputes remain, reasonable modifications to policy can be addressed through dispute resolution and if needed brought to the court for resolution. Where an entirely new policy is required to address the conflict or gap between existing policy and court order, the dispute resolution process provides that it be addressed via the meet and

In the context of this case, evaluating the *accuracy* of an indicator's design necessarily involves identification of the relevant remedial requirements and consideration of how the Court and its Special Master have interpreted the remedial requirement being measured. Designing indicators without regard to "whether [they are] measuring what [they are] supposed to measure in the context of this case," ECF No. 7715 at 44, as plaintiffs recently noted, risks creating an "unusable" self-monitoring tool for purposes of ending federal court oversight of CDCR's mental health system. *See* ECF No. 7721 at 11. To ignore the circumstances giving rise to the need for data remediation in the first place would sow the seeds for the next round of problems, an outcome which can only be avoided by a robust, properly conceived, review of each indicator. Indeed, if defendants continue to insist on their narrow conception of data remediation, they will be destined to repeat the same errors that gave rise to the Golding Report in the first place. And as the Court has noted, this must not be allowed to happen. *See* December 17, 2019 Order, ECF No. 6427 at 47 ("This court must ensure no court is called upon again in the future to consider whether and how misleading information has been presented to it.").

Once accuracy of the data is achieved, they must be presented in transparent fashion which readily permits the stakeholders to identify where defendants are meeting their constitutional obligations and where further remedial action is required.

## C. Defendants' Position on the Purpose of Data Remediation

Despite the clarity of the record, defendants have consistently stated their position that the data remediation process is "primarily meant to ensure that each indicator is measuring what it purports to measure." Special Master's Twenty-Ninth Round Monitoring Report – Part C,

---

confer process. Like the issue of reasonable modification of an indicator versus a request for a new one, the process would be greatly aided if defendants exhibited increased flexibility.

ECF No. 7715 at 40; *see also id.* ("Once again, CDCR lamented the lack of 'clarity on what exactly is needed to achieve certification' and repeated its argument that the data remediation process is only 'intended to assess whether CDCR's indicators measure what they purport to measure.'"). Notably, defendants have not cited anything in the record that would support this narrow view of the purpose of data remediation. In fact, defendants' position appears in conflict with CDCR's original data remediation activation schedule, which acknowledged the need to ensure indicators accurately measured Program Guide requirements.[9]

To limit the scope of data remediation to only assessing whether CDCR's indicators "measure what they purport to measure," the Court, Special Master, and plaintiffs would have to

---

[9] *See* Defendants' Preliminary Activation Schedule for Completion of Court-Ordered Data Remediation, ECF No. 7334 at 9 ("Data validation asks: is the system *designed to correctly measure Program Guide requirements*? Software validation is the process of ensuring a program's design satisfies its business requirements. In the context of data remediation, this consists of a careful review of each indicator's design (including the design of all its business rules) *to ensure that it accurately measures Program Guide Requirements within a reasonable margin of error.* Indicators that rely on the (EHRS) workflows *require the workflows to also comport (i.e. be validated) against Program Guide Requirements* and other CDCR business requirements. Similar comments apply to indicators that depend on data derived from other systems within CDCR, such as the Strategic Offender Management System (SOMS).") (emphasis added); *id.* at 10 ("Data verification asks: have the measurements been coded correctly? The detailed specification on how exactly an indicator and its business rules are intended to work is used to create a set of 'software tests' (that can be run as needed). These tests help verify the indicator and business rules operate as intended within a reasonable margin of error. For example, such tests can check that the numerator and denominator in a percentage score have not overlooked any patients. Currently, the verification process has not benefitted from standardization and must be completed by individuals familiar with test writing best practices. Consequently, the current preliminary timeline cannot offer a more precise estimate of the time needed to accomplish this test writing…. Ultimately, data verification will evaluate the entire indicator through an in-depth process to confirm the indicator is operating as intended by the approved documentation.") (emphasis added); *see also id.* at 31 ("The goals of the business rules and methodology review meeting include the following: 1. To provide the Coleman Special Master's data team information necessary for data validation and verification, 2. To ensure mental health reports, indicators, and business rules are reviewed compared to workflows, policies, and other business requirements and are updated by mental health leadership *to ensure they accurately measure compliance with the Mental Health Program Guide business requirements* and other business requirements.") (emphasis added).

rely on an assumption: that CDCR's existing design of its indicators *accurately* measures and reports defendants' compliance with their remedial plans and related court orders. Indeed, relying on defendants' representations about what their data represented has proven to be untenable in this case. *See* December 17, 2019 Order, ECF No. 6427 at 5 ("[G]iven the authority that here remains vested in defendants themselves, the importance of defendants' transparent and accurate reporting is paramount: the court and Special Master must be able to rely fully on defendants' representations. As explained in this order, the court has concluded the reliability of those representations at multiple levels of the *Coleman* case structure is in serious doubt."). As a result, data remediation cannot be premised on defendants' representations alone, nor can the scope of remediation be limited only to assessing whether the indicators in question measure what defendants "purport" them to measure. As the Court has stated, in the context of data remediation, defendants' work must be "checked and double checked" to ensure remedial requirements are *accurately* measured. *Id.* at 49.

In practice, defendants use their narrow view of the purpose of data remediation to reject proposed modifications to the design of CDCR's existing indicators, including those reasonable modifications needed to align the indicator with remedial requirements, informed by the Special Master's monitoring of those remedial requirements. *See* Special Master's Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 40-41 ("Notably, in expressing their 'concerns about the scope of the Data Remediation process,' defendants appeared to acknowledge that part of the process is to assess 'what is currently being done by the Special Master during his monitoring.' Modifications intended to align the scope of a given indicator with the Special Master's current scope of monitoring and with the requirements of the Program Guide are the types of modifications that CDCR regularly resists during the remediation process."); *see also id.*

at 44 ("Defendants have repeatedly resisted plaintiffs' proposed modifications to existing key indicators, arguing that the scope of the requested revisions required a new indicator.").

Rejecting many proposed modifications to their existing key indicators, defendants instead insist that the modifications sought by either the Special Master or plaintiffs require the creation of new indicators.  As noted in the Twenty-Ninth Round Monitoring Report – Part C:

> [T]he parties' disagreement over the need to create new CQIT indicators as opposed to making reasonable modifications to existing indicators has slowed down the remediation process for certain indicators.  Defendants have repeatedly resisted plaintiffs' proposed modifications to existing key indicators, arguing that the scope of the requested revisions required a new indicator.
>
> For their part, defendants seek the Special Master's rubber stamp on any indicator which accurately measures what it purports to measure without any regard for whether it is measuring what it is supposed to measure in the context of this case…. Plaintiffs, on the other hand, use the data remediation to, in some cases, relitigate issues and broaden the scope of monitoring in the case beyond what the Special Master has deemed necessary over several decades.

ECF No. 7715 at 44.

As the Special Master reported in his Twenty-Ninth Monitoring Round Report – Part C, defendants root their position, in part, on the "misguided argument that the Special Master was aware of and ha[d] previously agreed to the scope of CDCR's CQIT indicators and associated business rules that put them into place.  *Id.*; *see also id.* at 44 n.14 (noting that the Court had to order defendants to give the Special Master "access to all of the business rules defendants are currently using to process mental health data and generate informational reports related to delivery of constitutionally adequate mental health care to members of the plaintiff class."). Indeed, the necessity of the Special Master's close scrutiny of CDCR's CQIT indicators' business rules "was not evident until the Golding Report proceedings had run their course; and,

in any event, would not have been possible given the mental health data system's lack of precise documentation concerning how it operated." *Id.*[10]

In sum, defendants' resistance to considering "whether [an indicator] is measuring what it is supposed to measure in the context of this case" has resulted in the unnecessary proliferation of requests for "new indicators" when a more efficient modification to an existing indicator could have been accomplished. Defendants' restrictive view of the purpose of data remediation, and their concomitant resistance to reasonable modifications of existing indicators has resulted in the review of multiple data measures being put off to a later date, jeopardizing the completion of remediation by the end of this year.

### D. Plaintiffs' Position on the Purpose of Data Remediation

In their February 9, 2023 Notice of Motion and Motion in response to the Court's December 29, 2022 order, plaintiffs indicated "that the parties disagree about the meaning and magnitude of several of this Court's prior orders [regarding data remediation], as well as their ongoing relevance and import." ECF No. 7721 at 3. Plaintiffs further argued that "Defendants' mental health leadership appear to believe the process is limited to verifying that the data measures what CDCR designed it to measure," while plaintiffs "maintain that the data

---

[10] Deputy Special Master Kerry Walsh addressed this issue in a December 16, 2022 letter to the parties: "Despite repeated statements from the *Coleman* experts that they were involved in the CQIT process but *not* involved in development of the business rules pertinent to the CQIT indicators, defendants are either undertaking revisionist history believing that the *Coleman* experts reviewed the business rules during the development of CQIT or simply choose to ignore such an important fact. Faulty and misleading business rules form the bedrock of why the court ordered the current remediation process. As was reported in the [28th] Round Monitoring Report, the data expert found that large portions of the quality assurance system were entirely undocumented and there was no way for the Special Master, plaintiffs or even defendants [to know] the specific details of how it operated." Letter from Deputy Special Master Kerry Walsh to Mr. Nicholas Weber, Esq., CDCR Office of Legal Affairs, and Ms. Cara Trapani, Esq., Plaintiffs' Counsel (December 16, 2022), attached hereto as Exhibit A at 4.

remediation process is meant to ensure not only that the data is technically accurate, but that it also properly reflects the minimum remedial requirements that govern this case." *Id.* at 6; *see id.* at 9 ("Disputes about whether to memorialize the Program Guide's minimum treatment standards in the business rules, and the ongoing mistrust in Defendants' data caused by those disputes, continue to plague the efficacy and purpose of data remediation today.").  Plaintiffs' argued that the Court's prior orders "make[] clear that Defendants' narrow-minded view of data remediation is invalid." *Id.* at 11.  Moreover, plaintiffs expressed their concern that "Defendants will continue to resist revising their data indicators to align with the Program Guide and other court-ordered requirements, as well as the Special Master's historical way of monitoring those requirements, unless the Court clarifies and reaffirms that they must." *Id.*  Accordingly, plaintiffs requested "that the Court issue an order that clarifies and reaffirms the December 17, 2019 Order and other above-cited prior orders to make clear that (1) the purpose of the data remediation process is to ensure not only that the data is technically accurate, but that it also properly reflects the minimum treatment requirements that govern this case." *Id.* at 21.

## II.     Analysis of the Four Third Level Disputes

This Report makes recommendations regarding four disputes that were referred to the second level of review under the dispute resolution process outlined in former CDCR Secretary Kathleen Allison's May 19, 2022 declaration but were not resolved.  *See* ECF No. 7556-2 at 2-3. These four disputes relate to the following indicators/data elements:

- Transfer to STRH/LTRH within Timeframes (Transfer Clock Freeze/Suspending Events).
- MHCB Daily Provider Contacts (Telepsychiatry).
- IDTT Staffing (patient attendance).
- IDTT Staffing (psychiatric nurse practitioner (PNP) participation).

Each of these disputes will be discussed in greater detail below, followed by the Special Master's recommendations.

**A. Transfer to STRH/LTRH within Timeframes (Transfer Clock Freeze/Suspending Events)**

*1. Remedial Requirement*

The Compendium of Custody Related Remedial Measures requires transfer of "all CCCMS inmates retained by the ICCs to a designated CCCMS-STRH within 30 days of ASU placement." ECF No. 7333-1 at 451. Likewise, incarcerated persons included in the 3CMS program after placement in ASU must be transferred within 30 days of placement at the 3CMS level of care. *Id.* Patients at the 3CMS level of care are also required to be transferred to an LTRH program within 30 days of placement in ASU. *Id.* at 453.

*2. Indicator Measuring Remedial Requirement*

The provisionally approved key indicator titled Transfer to STRH/LTRH within Timeframes measures compliance with this remedial requirement.

*3. Brief Statement of Dispute*

The dispute revolves around how to assess compliance with STRH/LTRH transfer timelines where a patient remains in a non-mental health segregation unit for more than 30 days because of a temporary medical hold placed by health care personnel.

*4. Statement of when dispute was discussed and at which levels*

Plaintiffs first raised questions and concerns regarding the Transfer to STRH/LTRH within Timeframes indicator in correspondence dated February 25, 2022. CDCR responded in writing on May 20, 2022.

This issue was addressed during the data remediation dispute resolution process as follows:

- First Level Dispute Resolution meetings: August 11, 2022, August 23, 2022, September 1, 2022, September 8, 2022, November 10, 2022, and December 8, 2022.

- Second Level Dispute Resolution meetings: October 25, 2022, November 8, 2022, and December 20, 2022.

During the course of these discussions, the parties narrowed the scope of the dispute to focus only on the medical hold issue, eliminating from consideration other events which might suspend the transfer clock in some manner.

5. *Summary of plaintiffs' position*

Currently, this indicator allows Defendants to receive a score of "compliant" when a CCCMS patient remains in a non-mental health segregation unit for more than 30 days due to a medical hold. Defendants should receive a score of "noncompliant" for that situation. The definition of "Temporary Medical Hold," per the document linked in the Business Rules for this indicator, is very broad, can last for up to six months, and covers non-urgent medical care with no attempt to balance a patient's mental health needs. According to the same document, Temporary Medical Holds are distinct from Temporary Medical Isolation chronos. The operative Program Guide policy that this indicator is measuring provides that CCCMS patients must be transferred to an LTRH or STRH within 30 days, and contains no requirement that the clock must "freeze" for medical holds. *See* Program Guide (Sept. 29, 2021), ECF No. 7333-1 at 450, 453, 457. Nor have the parties negotiated any exception that would strike an appropriate balance between a patient's medical and mental health needs, such as in the inpatient transfer timeline context. The Court has determined that segregation is extremely dangerous for class members, and the suicide rate in such units is extremely high. Allowing patients to remain in a non-mental health segregation setting for months on end with no mental health care for broadly defined medical reasons should not be scored as "compliant" under the rule. Accordingly, "medical hold" should be struck from the list of exceptions that freeze the transfer clock for this indicator.

Plaintiffs' Position Statement, attached hereto as Exhibit B1 at 2.

6. *Summary of defendants' position*

The Temporary Medical Hold policy is a standalone and long-standing agreement, and is used in multiple other contexts. Re-defining a Temporary Medical Hold is outside the scope of Data Remediation, and indeed outside the scope of the *Coleman* case alone, requiring court coordination with the *Plata* physicians. If plaintiffs wish to pursue this policy change, they should do so outside of the Data

Remediation process, through the channels that have existed to do so for many years.

Defendants' Position Statement, attached hereto as Exhibit C1 at 2.

Notably, on December 8, 2022, defendants distributed a proposed resolution to this dispute. Defendants proposed no changes to the current design of the indicator but offered to send a "memo…to [mental health] staff in all administrative segregation housing units memorializing" the expectation that there be "appropriate clinical discussion" between mental health and medical staff regarding medical holds "and ensuring that all staff are aware that is the expected clinical standard for these patients [housed in non-mental health segregation units]." *Id.*

Plaintiffs' rejected defendants proposed resolution to this dispute. Notably, defendants' proposal came after defendants rejected plaintiffs' suggestion that the parties negotiate the terms of "any exception" to the STRH/LTRH transfer timeline rule "that would strike an appropriate balance between a patient's medical and mental health needs, such as in the inpatient transfer timeline context."[11] *See* Exhibit B1 at 2.

7.  *Special Master's Recommendation*

The policies underlying the dispute here developed out of the Court's April 10, 2014 Order, ECF No. 5131, granting in part plaintiffs' May 6, 2013 motion for enforcement of court

---

[11] *See* April 19, 2017 Order, ECF 5610 at 7-8 ("In the March 24, 2017 order, the court signaled its intention, for purposes of enforcement by this court, to exclude from the ten and thirty-day periods in which transfer to inpatient care must occur 'any time a class member referred to inpatient mental health care spends in treatment for medical needs deemed more urgent than the mental health need that led to the inpatient referral, or any time a class member spends on out-to-court status pursuant to a court order or subpoena….An addendum to the Program Guide that identifies circumstances under which time after an inmate-patient is referred to inpatient mental health care should be excluded from Program Guide timelines for transfer to such care, and also identifies timelines for completion of the referral process when such circumstances are present, will be necessary going forward.").

orders and affirmative relief regarding improper housing and treatment of seriously mentally ill prisons in segregation.  ECF No. 4580.  In response to the Court's order to "develop a protocol for placement decisions, including, as appropriate, a plan for alternative housing, that will preclude placement of any *Coleman* class member in existing administrative segregation units when clinical information demonstrates substantial risk of exacerbation of mental illness, decompensation, or suicide from such placement," ECF No. 5131 at 59, defendants proposed development of the STRH and LTRH programs.  *See* ECF No. 5211-1 at 2-4.  These programs were designed for 3CMS patients "who are removed from the general population for disciplinary reasons."  *Id.* at 2.  "These units change conditions of confinement in segregated units for this population by allowing inmates increased programming, increased mental health contacts, and increased structured mental health treatment, lessening the risk of decompensation while also allowing CDCR to maintain the safety and security of the institution."  *Id.* at 3.

        As noted, the STRH/LTRH policies submitted to and approved by the Court included 30-day transfer timeframes for 3CMS patients transferring to these programs.  Critically, the transfer timelines contemplated within the STRH/LTRH policies submitted to the Court and ultimately implemented included no exceptions.

        Defendants misconstrue plaintiffs' request to modify the design of this indicator as a request for a modification to the HCDOM's medical hold provisions.  In fact, plaintiffs are not requesting a modification to any policy.  Plaintiffs are requesting that the indicator in question be designed to accurately measure CDCR's STRH/LTRH policy, which requires transfer of 3CMS patients to these specialized units within 30 days, without exception.  This is precisely the type of modification the data remediation process was intended to identify and operationalize.

As they did with respect to inpatient and MHCB transfer timelines, the parties are free to negotiate exceptions to these policies and submit them to the Court for consideration. However, what defendants cannot do is read an exception into this Court-approved policy where none exists. To date, defendants have rejected plaintiffs' offer to negotiate mutually acceptable exceptions to the STRH/LTRH transfer timeframes based on medical concerns.

In consideration of the foregoing, the Special Master recommends defendants modify the Transfer to STRH/LTRH within Timeframes indicator design to score transfers beyond 30 days as noncompliant, unless or until the parties negotiate and the court adopts an exception to this Court-approved policy.

## B. MHCB Daily Provider Contacts (Telepsychiatry)

### 1. Remedial Requirement

The Program Guide requires "an [MHCB] inmate-patient's condition [to] be assessed and monitored daily by the treating clinician, either a psychiatrist or psychologist." ECF No. 7333-1 at 84. "Documentation of daily contacts" are required to be made within 24 hours. *Id.* Moreover, patients housed in MHCBs must be seen "at least twice weekly" by the "assigned psychiatrist" to address psychiatric medication issues. *Id.* at 85.

### 2. Indicator Measuring Remedial Requirement

The provisionally approved key indicator titled MHCB Daily Provider Contact measures compliance with this remedial requirement.

### 3. Brief Statement of Dispute

The parties dispute under what circumstances telepsychiatry contacts should count toward compliance with the Program Guide requirements for psychiatry contacts in MHCBs. Plaintiffs contend that only those telepsychiatry contacts that are otherwise compliant with

20

CDCR's operative telepsychiatry policy should count as "compliant" contacts, while defendants argue all telepsychiatry contacts should count toward this remedial requirement regardless of whether the contact is in violation of the telepsychiatry policy.

4. *Statement of when dispute was discussed and at which levels*

This issue was addressed during the data remediation dispute resolution process as follows:

- First Level Dispute Resolution meetings: October 10, 2022, October 27, 2022, and November 3, 2022.

- Second Level Dispute Resolution meetings: November 8, 2022 and November 22, 2022.

5. *Summary of plaintiffs' position*

This indicator measures whether MHCB patients are assessed by a psychiatrist or a psychologist at least once per day, which is required under the Program Guide. The provisionally approved telepsychiatry policy, consistent with the Court's 2017 Order, prohibits use of telepsychiatry in the MHCB 'except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program.' All other telepsychiatry contacts in the MHCB violate CDCR's governing policy and the Court's Order. Therefore, it is Plaintiffs' position that only telepsychiatry contacts that occur under the above very narrow exception should be counted toward compliance for this indicator. Defendants disagree; they argue that all clinical contacts should count as compliant, regardless of whether the modality used is authorized under their policy.

Alternatively, if Defendants wish to have a separate indicator to measure compliance with the telepsychiatry policy once that policy is stabilized, that would resolve Plaintiffs' concerns with this indicator. But Defendants have stated that regardless of the outcome of the telepsychiatry policy, they do not intend to create such an indicator, and therefore a dispute remains.

Plaintiffs' Position Statement, attached as Exhibit B2 at 2.

6. *Summary of defendants' position*

The MHCB Daily Provider Contacts indicator measures whether a patient in the MHCB was seen by either a psychiatrist or psychologist each day, and whether documentation was signed within 24 hours of the contact.

There is no dispute that the indicator measures whether patients received daily contacts. Plaintiffs have raised objections regarding the scoring of telepsychiatrists in the MHCB Daily Provider Contacts indicator. In their April 22, 2022 letter regarding this indicator, Plaintiffs stated that they 'object to CDCR relying on telepsychiatrists rather than onsite psychiatrists for MHCB coverage.' From discussions held during the first level of dispute resolution, it appears that Plaintiffs want to exclude clinical contacts conducted by telepsychiatrists from this indicator. As a result, MHCB patients who received care from a telepsychiatrist would be flagged as having received no care, thereby rendering the indicator misleading and unhelpful. This would be antithetical to the purpose of the indicator in determining whether patients in crisis beds are getting daily clinical contacts. Plaintiffs' request is also at odds with the current telepsychiatry policy which allows for clinical contacts in crisis beds. It is also not directly related to the section of the Program Guide—crisis beds—that this indicator is designed to measure.

Data remediation of the MHCB clinical contacts indicator is not the time or the place to discuss the propriety of whether telepsychiatrists may provide care to crisis bed patients. It is wholly inappropriate for this indicator to be delayed from remediation for a 'dispute' that is being handled outside of data remediation. And Plaintiffs have stated that if CDCR developed a new indicator to measure the telepsychiatry policy this purported dispute would be resolved.

Plaintiffs are free to seek a new indicator built to measure telepsychiatry policy. But it is inappropriate to attempt to shoehorn monitoring of staffing policy into an indicator that measures whether patients received care each day. That review of CDCR's proposed telepsychiatry policy is not related or subject to remediation of the MHCB clinical contacts indicator. If Plaintiffs are seeking an indicator measuring whether the telepsychiatry policy is being followed (which they appear to be), then they should request that through the agreed upon process, but this indicator should not be held up from remediation in the interim.

Defendants' Position Paper, attached as Exhibit C2 at 1-2.

   7.  *Special Master's Recommendation*

The Special Master views plaintiffs' request as a reasonable modification to an existing indicator. However, the Special Master acknowledges that the contours of defendants' use of telepsychiatry is before the Court and thus one of the policies underlying this dispute is unsettled. Notably, defendants have rejected the Special Master's suggestion to wait until the telepsychiatry policy is settled before designing indicators and data elements to measure compliance with the policy.

The Special Master found defendants' argument that this dispute requires a new indicator unpersuasive. Defendants state that the purpose of the MHCB Daily Provider Contact indicator is to "determine[] whether patients in crisis beds are getting daily clinical contacts." That is partially true. The purpose of the indicator is to determine if patients in crisis beds are getting daily clinical contacts consistent with the requirements of defendants' remedial plan (the Program Guide) and related court-orders, not whether they receive a clinical contact of any kind. At present, defendants are only permitted to use telepsychiatry in MHCBs in very limited circumstances. Designing this indicator to score daily contacts as "compliant" when those contacts are provided outside the bounds of the court-ordered remedy in this case would be misleading and unhelpful.

In consideration of the above, the Special Master recommends this indicator be designed with plaintiffs requested reasonable modification.[12]

**C. IDTT Staffing (patient attendance)**

*1. Remedial Requirement*

At all MHSDS levels of care, the Program Guide requires patients to be part of the IDTT.[13]

---

[12] The Special Master notes that this indicator can be designed to provide both parties with the information they seek: A drill-down could be built into the indicator to demonstrate the provider type for the MHCB daily contacts so that stakeholders can view (1) all clinical contacts provided (including those telepsychiatry contacts provided in violation of the telepsychiatry policy) and (2) all clinical contacts provided in conformance with the Program Guide and related remedial requirements (including the telepsychiatry policy).

[13] ECF No. 7333-1 at 42 ("The [3CMS] IDTT is composed of, at a minimum: Assigned Primary Clinician, Assigned Psychiatrist, Correctional Counselor, *Inmate-patient*.") (emphasis added); *id.* at 56 ("The [EOP] IDTT is composed of, at a minimum: Assigned Primary Clinician (PC), Assigned Psychiatrist, Correctional Counselor, *Inmate-Patient*) (emphasis added); *id.* at 82 ("The [MHCB] IDTT is composed of, at a minimum: Assigned MHCB Psychiatrist, Assigned MHCB Primary Clinician, Nursing staff, Correctional Counselor, *Inmate-patient (if clinically and*

2.  *Indicator Measuring Remedial Requirement*

The provisionally approved key indicator titled IDTT Staffing measures compliance with the Program Guide's IDTT composition requirements.

3.  *Brief Statement of Dispute*

Defendants oppose plaintiffs' request to include patient attendance in their existing IDTT Staffing indicator.

4.  *Statement of when dispute was discussed and at which levels*

This issue was addressed during the data remediation dispute resolution process as follows:

- First Level Dispute Resolution meetings: October 27, 2022, November 3, 2022, November 10, 2022.

- Second Level Dispute Resolution meetings: November 22, 2022.

5.  *Summary of plaintiffs' position*

Under the Program Guide, all patients shall be included in the IDTT (if clinically and custodially appropriate) unless they refuse to participate. Including patients in treatment planning is a key necessary to the provision of minimally adequate mental health care. Therefore, assuring compliance with this requirement is a crucial component of the remedy. Currently, there is no indicator that measures patient attendance at IDTTs. Defendants argue that patient attendance should not be

---

*custodially appropriate)* (emphasis added); *id.* at 137-138 ("The ASU MHS IDTT is composed of, at a minimum: The assigned PC, the assigned psychiatrist, the [Licensed Psychiatric Technician] LPT, the assigned Correctional Counselor…*The inmate-patient shall be included in the IDTT, if clinically and custodially appropriate, unless the inmate-patient refuses to participate.* If the inmate-patient refuses to participate, the clinician must document the reason for refusal….") (emphasis added); *id.* at 148 ("The [Secure Housing Unit (SHU)] IDTT is composed of, at a minimum: The assigned PC (either a psychologist or a Clinical Social Worker), the LPT, the SHU Senior Psychologist or designee, the assigned psychiatrist, the assigned Correctional Counselor, *the inmate-patient (if clinically and custodially appropriate)*….") (emphasis added); *id.* at 158 ("The [Psychiatric Services Unit (PSU)] IDTT is composed of, at minimum: Senior Psychologist, Assigned Psychiatrist, PSU Facility Captain, Correctional Counselor II, Assigned Primary Clinician, *Inmate-patient*.") (emphasis added).

included in the "IDTT Staffing" indicator because patients, unlike staff, can refuse to attend. But the business rules could be modified to provide an exception that would allow Defendants to still receive credit if a patient refuses or is deemed clinically or custodially inappropriate to attend. Indeed, similar exceptions exist in other indicators. Without measuring patient attendance on a broad scale, situations like what occurred at RJD earlier this year—when the UNA process uncovered that IDTTs were occurring in absentia due to widespread staffing shortages, not patient refusals—would likely never come to Headquarters or stakeholders' attention.

Alternatively, if Defendants wish to have a separate indicator to measure patient attendance at IDTTs, that would resolve Plaintiffs' concerns with this indicator. But Defendants have stated they do not intend to create such an indicator, and therefore a dispute remains.

Exhibit B2 at 3-4.

6. *Summary of defendants' position*

The IDTT Staffing indicator measures whether all required staff were in attendance in an IDTT.

Plaintiffs believe that the indicator is insufficient because it does not measure whether the patient was in attendance at the IDTT. However, as transparently stated in the title, the indicator measures whether staff were present at the IDTT, not the patient. Staff includes people employed by an organization, or workers, employees, or personnel. For this indicator, it measures whether the patient's assigned primary clinician, the assigned prescriber (psychiatrist or PNP), the licensed psychiatric technician and the correctional counselor were in attendance. The benefit of this indicator comes from its ability to measure staff attendance and for management to identify deficiencies and implement corrective action in its workforce. Although patients are an integral part of the IDTT, they are not staff and do not answer to local health care or custody managers. And unlike staff who wish to remain employed, patients have the right to refuse to attend their IDTT.

Once again, Plaintiffs' have made clear that this dispute can be resolved by creating a new indicator to measure whether patients attend their IDTTs. Adding patients to an indicator that measures staff attendance would completely change the nature of the indicator—one which CDCR values as a management tool. Such a fundamental change cannot be said to be measuring the same thing as the original indicator. The process for requesting a new indicator is clear. It does not involve holding up other indicators from remediation in the meantime.

Exhibit C2 at 3.

7. *Special Master's Recommendation*

The Special Master views the inclusion of patient attendance information in the IDTT Staffing indicator as a reasonable modification of CDCR's existing IDTT Staffing indicator.  As indicated, the Program Guide is clear that patients are required members of their own IDTT, though they have the right to refuse to attend.  The Special Master has historically included information regarding patient attendance at IDTTs in his monitoring reports.  Including patient attendance information in this indicator is the most efficient, logical way to capture a complete picture of IDTT attendance as required by the Program Guide.  The Special Master's data team has offered numerous suggestions about how to design the indicator to capture all relevant information regarding patient attendance—including patient refusals.  Defendants have rejected these proposals.

Rather than accept this request for a reasonable modification to the IDTT Staffing indicator, defendants argue that patients are not "staff" and thus cannot be included in this indicator.  Because the Program Guide makes clear that patients are indeed members of their IDTT, the Special Master's data team suggested re-naming the indicator "IDTT Composition" to accurately reflect the Program Guide requirement being measured, but defendants rejected this proposal as well.[14]

Accordingly, the Special Master recommends renaming the IDTT Staffing indicator "IDTT Composition" and to design the indicator to capture data on all required IDTT attendees, including patients.  The relevant Program Guide provisions are unambiguous, as is the record of the Special Master's coverage of patient attendance at IDTTs in his monitoring reports.  Nothing

---

[14] It is worth noting that the Program Guide itself uses the word "composition" when delineating required members of the IDTT at each level of care. *See supra* note 13 and sources cited therein.

in this recommendation precludes defendants from designing the indicator to also capture and account for patient refusal information, nor are defendants prevented from drilling down and separately analyzing "staff" attendance from "all required attendee" attendance for purposes of using the indicator as a "management tool."

### D. IDTT Staffing (PNP participation)

#### 1. Remedial Requirement

At all MHSDS levels of care, the Program Guide requires the patient's "assigned psychiatrist" to be part of the IDTT.  ECF No. 7333-1 at 42 ("The [3CMS] IDTT is composed of, at a minimum: Assigned Primary Clinician, *Assigned Psychiatrist*, Correctional Counselor, Inmate-patient."); *id.* at 56 ("The [EOP] IDTT is composed of, at a minimum: Assigned Primary Clinician, *Assigned Psychiatrist*, Correctional Counselor, Inmate-Patient); *id.* at 82 ("The [MHCB] IDTT is composed of, at a minimum: *Assigned MHCB Psychiatrist*, Assigned MHCB Primary Clinician, Nursing staff, Correctional Counselor, Inmate-patient (if clinically and custodially appropriate); *id.* at 137-38 ("The ASU MHS IDTT is composed of, at a minimum: The assigned PC, *the assigned psychiatrist*, the LPT, the assigned Correctional Counselor…The inmate-patient shall be included in the IDTT, if clinically and custodially appropriate, unless the inmate-patient refuses to participate.  If the inmate-patient refuses to participate, the clinician must document the reason for refusal…."); *id.* at 148 ("The [SHU] IDTT is composed of, at a minimum: The assigned PC (either a psychologist or a Clinical Social Worker), the LPT, the SHU Senior Psychologist or designee, *the assigned psychiatrist*, the Correctional Counselor, the inmate-patient (if clinically and custodially appropriate)…."); *id.* at 158 ("The [PSU] IDTT is composed of, at minimum: Senior Psychologist, *Assigned Psychiatrist*, PSU Facility Captain, Correctional Counselor II, Assigned Primary Clinician, Inmate-patient.").

2.  *Indicator Measuring Remedial Requirement*

The provisionally approved key indicator titled IDTT Staffing measures compliance with this remedial requirement.

3.  *Brief Statement of Dispute*

CDCR's operative Psychiatric Nurse Practitioner Policy[15] only permits PNPs to provide services at the 3CMS level of care "only at institutions with a current permanent Chief Psychiatrist or Senior Psychiatrist, Supervisor who enters an agreement to supervise a PNP." ECF No. 6978-1 at 7.  The parties dispute whether a psychiatric nurse practitioner can serve as the patient's "assigned psychiatrist" in levels of care above 3CMS for purposes of determining compliance with required staff attendance at IDTTs.  In other words, can a PNP deployed in a level of care contravening the restrictions of the policy "count" as compliant for purposes of this indicator?

4.  *Statement of when dispute was discussed and at which levels*

This issue was addressed during the data remediation dispute resolution process as follows:

- First Level Dispute Resolution meetings: October 27, 2022, November 3, 2022, November 10, 2022.

- Second Level Dispute Resolution meetings: November 22, 2022.

5.  *Summary of Plaintiffs' Position*

This indicator measures whether required treatment team participants (such as psychiatrists) attended the IDTT.  CDCR's Court-approved, closely negotiated PNP policy prohibits PNPs from treating patients except at the CCCMS level of

---

[15] In a January 26, 2021 Order, the Court approved CDCR's proposed PNP Policy.  ECF No. 7035 at 2 ("Defendants' December 11, 2020 proposed policy for use of psychiatric nurse practitioners in their mental health care delivery system is approved and shall be implemented forthwith.").

care, and only at institutions with a current permanent Chief Psychiatrist or Senior Psychiatrist, Supervisor who enters an agreement to supervise a PNP. All other PNP contacts violate CDCR's policy and cannot substitute for required psychiatry contacts, just as, for example, psychologists and other categories of clinical staff cannot substitute for psychiatrists. Therefore, it is Plaintiffs' position that CDCR should only be awarded credit for PNP attendance at IDTTs when they are authorized to treat patients in lieu of psychiatrists under the court-ordered PNP policy. Defendants disagree; they argue that all PNP attendance should count toward compliance, regardless of whether it constitutes a violation of the PNP policy.

Alternatively, if Defendants wish to have a separate indicator to measure compliance with the PNP policy, that would resolve Plaintiffs' concerns with this indicator. But Defendants have stated they do not intend to create such an indicator, and therefore a dispute remains.

Exhibit B2 at 3.

6.  *Summary of Defendants' Position*

The IDTT Staffing indicator measures whether all required staff were in attendance at an IDTT. Among the required attendees are Psychiatric Nurse Practitioners when one has been assigned to a patient.

PNPs work within CDCR in accordance with the current PNP policy, which was developed a little less than two years ago. To date, CDCR employs just 8.85 full time equivalent PNPs. CDCR's negotiated policy permits PNPs to provide care only to CCCMS patients, barring special exceptions. Much like the telepsychiatrist dispute…Plaintiffs object to the indicator counting attendance by a PNP as compliant outside of the CCCMS level of care. And like the telepsychiatrist dispute…this indicator, which measures attendance at an IDTT, is not the appropriate place to police CDCR's PNP policy.

There is no dispute that the indicator measures whether a patient's assigned PNP attended the IDTT. Instead, Plaintiffs appear to want the indicator to label an IDTT as non-compliant if the assigned PNP attends an IDTT at the EOP level of care or above. In other words, violations of the PNP policy would directly impact the IDTT Staffing indicator. But this is not the policy that the indicator is designed to measure. Revising the indicator to meet Plaintiffs' demands would cause the aberrant result of labeling a fully staffed IDTT as non-compliant, simply because the patient received care from a PNP outside the bounds of the PNP policy.

It is not appropriate to shoehorn monitoring of the PNP policy into an indicator that measures whether an IDTT was attended appropriately. If Plaintiffs are seeking an indicator measuring whether the PNP policy is being followed, then they should

request that the agreed upon process, but they should not be permitted to further delay remediation of this indicator.

Exhibit C2 at 2-3.

   *7.   Special Master's Recommendation*

   The Special Master views plaintiffs' request as a reasonable modification to CDCR's existing IDTT Staffing indicator. While defendants often lament the lack of a policy-underpinning for some of the plaintiffs' requested modifications to indicators, the Special Master observes that this is an indicator with clear, settled policy underpinnings – both the Program Guide (requiring a patient's "assigned" psychiatrist to participate in IDTTs) and the court-approved PNP policy (which prohibits PNPs from practicing outside of the 3CMS level of care). As defendants acknowledge, there is no dispute as to the interpretation of the PNP policy: Defendants agree that PNPs serving as the "assigned psychiatrist" outside of the 3CMS level of care would constitute a policy violation. Exhibit C2 at 3.[16] Finally, unlike the telepsychiatry policy, the PNP policy is final and was approved by the Court with no allowance whatsoever for PNPs to provide services outside of the 3CMS level of care under appropriate supervision.

   Like the MHCB Daily Contacts indicator discussed above, defendants here resist measuring both a Program Guide requirement (attendance of "assigned psychiatrist" at IDTT) and a court-approved policy (PNP policy) which impact the same indicator: "In other words, violations of the PNP policy would directly impact the IDTT Staffing indicator. But *this is not*

---

[16] While there is no dispute that PNPs practicing above the 3CMS level of care would constitute a policy violation, defendants alluded to "special exceptions" that would permit PNPs to provide services above the 3CMS level of care. *See* Exhibit C2 at 2 ("CDCR's negotiated policy permits PNPs to provide care only to CCCMS patients, barring special exceptions."). However, unlike the provisionally-approved telepsychiatry policy, the PNP policy contains no such exceptions. *See* ECF No. 6978-1 at 7 ("PNPs shall only treat patients in the Clinical Correctional Case Management System level of care, and only at institutions with a current permanent Chief Psychiatrist or Senior Psychiatrist, Supervisor who enters an agreement to supervise a PNP.").

*the policy that the indicator is designed to measure*." *Id.* at 3. Defendants' argument ignores the fact that the PNP policy directly impacts which type of "assigned psychiatrist" is allowed to provide services at the EOP level of care and above and, thus, what would constitute compliance with this remedial requirement. By ignoring the requirements of the remedy here, defendants risk creating a misleading picture of the state of their mental health system.

Finally, defendants' suggestion that plaintiffs can simply request a new indicator to measure the PNP policy rings hollow in light of defendants' opposition to classifying the PNP policy as a "material modification" of the Program Guide. *See* Special Master's Twenty-Ninth Monitoring – Part C, ECF No. 7715 at 55-56 (discussing five policies that were omitted from the 2021 Program Guide Update, including the PNP Policy, due to a dispute between the parties about whether the policies constituted "material modifications" of the Program Guide). Given that the defendants' opposed inclusion of the PNP policy in the 2021 Program Guide update, it is possible (perhaps likely) they would object to any new proposed indicator measuring the PNP policy.

In consideration of the foregoing, the Special Master recommends the IDTT Staffing indicator be modified to account for violations of the PNP policy. In other words, an IDTT at the EOP level of care or higher would be noncompliant if attended by a PNP serving as the "assigned psychiatrist."

## III.  Conclusion

To date, the data remediation dispute resolution process has yielded mixed results. On a positive note, the Special Master and CDCR Secretary were able to resolve several other disputes without the need for the Court's intervention. *See supra* note 1 and accompanying text. However, the four disputes discussed herein illustrate the persistent challenges the stakeholders

have faced in moving this remedial project forward.  The parties' divergent understandings of the purpose of remediating CDCR's indicators have ensnared them in a cycle of data-related disputes.  Without resolution of this fundamental dispute about the purpose of data remediation in the context of this case, the Special Master is deeply concerned that the process will continue to be bogged down, jeopardizing the completion of data remediation by the end of this calendar year.

Importantly, the four data-related disputes discussed in this Report fall squarely within the scope of the dispute resolution process.  Contrary to defendants' assertions otherwise, these disputes do not center on requests for policy modifications, new policies, or new indicators.  A plain reading of the remedial requirements subject to dispute in these indicators demonstrates that plaintiffs have not requested modification to existing policies or new policies but rather that the disputed indicators be designed to incorporate measurement of *existing* material remedial obligations. *See* June 30, 2021 Order, ECF No. 7216 at 4 ("The 'key indicators' in CQIT 'signify the material provisions of the Program Guide and Compendium that must be durably implemented' in order to satisfy the Eighth Amendment." (quoting ECF No. 6846 at 28)); *see also* Special Master's Report on the Continuous Quality Improvement Tool Key Indicators, ECF No. 7151 at 21 ("In developing his recommended list [of 'key' CQIT indicators], the Special Master concluded that if an indicator was sufficiently salient to be included in the original CQIT pursuant to the exhaustive process he and his staff undertook with defendants to develop the CQIT with input from plaintiffs, then it was presumptively a 'key' indicator.  In addition, if an indicator measured a requirement that cannot be changed without leave of the Court, the Special Master also considered it presumptively material, and therefore a CQIT 'key' indicator.").

Defendants' resistance to making reasonable modifications to the provisionally approved indicators has delayed data remediation at virtually every step of the process and has created unnecessary uncertainty. Failing to make reasonable modifications to existing indicators intended to more completely align those indicators with defendants' remedial obligations heightens the risk that the "remediated" data will be insufficient to demonstrate defendants' compliance with the *Coleman* remedy. It will also lead to increased requests for new indicators which will have to be remediated, further jeopardizing the timely completion of this critical project.

Ultimately, the Special Master will recommend as many new indicators as necessary to ensure adequate and accurate measurement of defendants' court-ordered remedial obligations. However, as is evident from the discussion above, the data remediation process would be significantly more efficient if defendants exercised a reasonable degree of flexibility in their consideration of requests for modification to existing indicators.

In recent months, the Special Master and parties have taken a number of steps intended to expedite the completion of data remediation, including convening additional BRMR meetings. *See supra* note 6. While additional meetings will help, the Special Master and parties will continue to confront the essential dispute about the purpose of data remediation without further clarity that only the Court can provide. Therefore, in order to expedite the process of completing remediation by the end of this calendar year, the Special Master requests the Court's guidance regarding the overarching dispute about the purpose of data remediation discussed in this Report.[17]

---

[17] Similarly, plaintiffs requested that the Court "clarif[y] and reaffirm[]" its prior data remediation-related orders in their February 9, 2023 Motion in Response to December 29, 2022 Order. ECF No. 7721 at 21.

As required by the data remediation dispute resolution process, *see* ECF No. 7556-2 at 3, the Special Master's recommendations regarding each of the four data remediation disputes are noted above, *see supra* pp. 20, 23, 26-27, 31, and are summarized in the table below.

| Affected Indicator | Dispute | SM Recommendation |
|---|---|---|
| **Transfer to STRH/LTRH within Timeframes (Transfer Clock Freeze/Suspending Events)** | The dispute revolves around how to assess compliance with STRH/LTRH transfer timeframes where a patient remains in a non-mental health segregation unit for more than 30 days because of a temporary medical hold placed by healthcare personnel | The Special Master recommends defendants modify the Transfer to STRH/LTRH within Timeframes indicator design to score transfers beyond 30 days as noncompliant, unless or until the parties negotiate and the Court adopts an exception to this existing requirement. |
| **MHCB Daily Provider Contacts (Telepsychiatry)** | The parties dispute under what circumstances telepsychiatry contacts should count toward compliance with the Program Guide requirements for psychiatry contacts in MHCBs. Plaintiffs contend that only telepsychiatry contacts that are otherwise compliant with CDCR's operative telepsychiatry policy should count as "compliant" contacts, while defendants argue all telepsychiatry contacts should count toward this remedial requirement regardless of whether the contact is in violation of the telepsychiatry policy. | The Special Master recommends this indicator be designed with plaintiffs requested reasonable modification. |
| **IDTT Staffing (patient attendance)** | Defendants oppose plaintiffs' request to include patient attendance in their existing IDTT Staffing indicator. | The Special Master recommends renaming the IDTT Staffing indicator "IDTT Composition" and designing the indicator to capture data on all required IDTT attendees, including patients. |

| | | |
|---|---|---|
| **IDTT Staffing (PNP participation)** | CDCR's operative PNP policy only permits PNPs to provide services at the 3CMS level of care "only at institutions with a current permanent Chief Psychiatrist or Senior Psychiatrist Supervisor who enters an agreement to supervise a PNP."  The parties dispute whether a PNP can serve as the patient's "assigned psychiatrist" in levels of care above 3CMS for purposes of determining compliance with required staff attendance at IDTTs.  In other words, can a PNP deployed in a level of care contravening the restrictions of the policy "count" as compliant for purposes of this indicator? | The Special Master recommends the IDTT Staffing indicator be modified to account for violations of the PNP policy.  In other words, an IDTT at the EOP level of care or higher would be noncompliant if attended by a PNP serving as the "assigned psychiatrist." |

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr. Esq.
Special Master

March 9, 2023