# EXHIBIT A

**DEVEREAUX & O'GARA LLC**

*counselors at law*

December 16, 2022

***VIA EMAIL***

Nicholas Weber, Esquire                    Cara Trapani, Esquire
California Department of Corrections        Rosen Bien Galvan and Grunfeld LLP
& Rehabilitation                           101 Mission Street, Sixth Floor
Office of Legal Affairs                     San Francisco, CA 94105
P.O. Box 942883
Sacramento, CA 94283

      Re:    <u>Data Remediation</u>

Dear Mr. Weber and Ms. Trapani:

      I write to address the ever-increasing correspondence that seems to be overshadowing the data remediation process extending from the BRMR meetings up to the 2nd Level Dispute Resolution meetings.  Although the steady stream of written complaints lodged by defendants has been left unanswered by the Special Master in his desire not to exacerbate what at times are contentious meetings, the most recent correspondence received by the Special Master now compels him to respond.  The issues expressed by defendants in these most recent missives have plagued this process from the beginning.[1]  For the sake of efficiency, I will address both letters with this one response as well as the repetitious barriers that beset many of the BRMR meetings.

      I want to begin on a positive note and state that the Special Master's team is in agreement that scrubbing the indicators list for duplicates and possibly decommissioning others is a worthwhile endeavor.  We are continuing that process internally and look forward to having that conversation with the parties to address Nick Weber's letter dated October 31, 2022 and plaintiffs' response dated November 18, 2022.

      As for the remainder of the assertions and conclusions found in Mr. Weber's correspondence of December 8, 2022, unfortunately there is far less agreement.

      The Special Master and his experts firmly believe there are at least two fundamental disputes threatening the ability to complete data remediation by December 2023:

---

[1] Letters from Nick Weber dated October 31, 2022, and December 8, 2022.

Northwoods Office Park
1301 Atwood Avenue, Suite 215 N  Johnston, RI  02919
tel 401 824 5100    fax 401 824 5123
pldolaw.com

Nicholas Weber, Esquire
Cara Trapani, Esquire
December 16, 2022
Page 2

(1)     Whether the proper scope of the data remediation process is to rubber stamp
CDCR's understanding of the scope of their own indicators and their existing way
of operationalizing the key CQIT indicators regardless of their design or
operation, or, in the alternative, to ensure CDCR's mental health data system
produces accurate and informative data and summary statistics as to the
department's level of compliance with the material provisions of its own remedial
plan (the Program Guide) and related court orders.

(2)     Under what circumstances requests for modifications to CDCR's existing
indicators require the creation of a new indicator.

Although the events that gave rise to the appointment of a neutral investigator in 2018,
the evidentiary hearing in 2019, and the hiring of a data expert in 2020, transpired over three and
a half years ago, no one should lose sight of the fact that the actions of defendants gave rise to
the data remediation process that has now veered off the path of collaboration and onto an
adversarial road.  Any trust that existed regarding defendants' ability to self-monitor their
constitutional obligations to the *Coleman* class was strained in 2018 through no fault of the
plaintiffs or the Special Master.

Making the assertion that inefficiencies which exist in the current BRMR meetings
should foreclose the addition of another weekly BRMR meeting is misplaced.  These are not two
mutually exclusive concepts.  The Special Master and his team have long suggested scheduling
additional BRMR meetings to move the process along but have been consistently rebuffed by
defendants.  We remain amenable to continue exploring ways to improve the existing process.

Defendants assign complete blame to the plaintiffs and Special Master for all claimed
inefficiencies and barriers they assert are slowing the process and potentially extending the
completion date past the end of 2023.  Before the plaintiffs were fully engaged in the meetings,
the Special Master and plaintiffs waited for responses from defendants on comments regarding
data subcomponents stretching anywhere from 62 days up to 135 days – four and a half months.[2]
Clearly there is plenty of blame to spread around but that does nothing to improve the process or
work towards the common goal of data remediation.  Just recently, we were informed that Dr.
Cartwright would be out for a month and that Dr. Worrell would take over his data remediation
responsibilities.  We certainly do not begrudge Dr. Cartwright for taking well-deserved time off,
but there was a plan in place for Dr. Cartwright and Dr. Potter to meet weekly in an attempt to
refine issues and make the BRMR meetings more efficient.  Dr. Potter now states that these
weekly meetings with Dr. Worrell are not taking place because of scheduling issues.

---

[2] See letters from Sundeep Thind to plaintiffs and the Special Master dated 3/21/2022, 2/25/2022, 5/24/2022,
2/24/2022 and 6/2/2022



Nicholas Weber, Esquire
Cara Trapani, Esquire
December 16, 2022
Page 3

In addition, there continues to be a basic misunderstanding and/or disagreement regarding the purpose of the remediation process, which profoundly impacts the BRMR meeting process. Defendants have clearly and repetitively stated the purpose of the remediation process is to determine if the business rules measure the key CQIT indicators as CDCR has determined they should be measured in contrast to determining whether the key indicators are measuring what they are supposed to measure via the Program Guide and court orders.

In the 28th Round Monitoring Report, the Special Master's data expert reported that,

> In CDCR, indicators designed to meet Program Guide compliance rely on a series of business rules to describe and implement their operation. *To be considered accurate, the business rules must be designed with fidelity to the dictates of the Program Guide and rely on data that is appropriate to achieve its intended purpose.* The actual operation of the indicator must then match its intended operation. ECF No. 7074 at 218 (emphasis added)

The Special Master's 28th Round Monitoring Report was adopted by the court on June 9, 2022. ECF No. 7566.

The IDTT staffing indicator, which has gone through the level 1 and level 2 dispute resolution process, is a good example of this fundamental misunderstanding. The *Coleman* experts recommended to defendants that the IDTT staffing key indicator include patient attendance to comply with the relevant Program Guide requirements as well as to reflect the Special Master's monitoring process. Specifically, the Program Guide requires that IDTT meetings, ***at a minimum***, include the inmate-patient along with required staff members. The relevant citations in the Program Guide are reported below:

| ECF 7333-1: | Program | Program Guide Section |
|---|---|---|
| Page 42 | CCCMS | 12-3-9 |
| Page 56 | EOP | 12-4-6 |
| Page 82 | MHCB | 12-5-11 |
| Page 137-138 | Administrative Segregation | 12-7-12 to 12-7-13 |
| Page 148 | SHU | 12-8-8 |
| Page 158 | PSU | 12-9-5 |

However, defendants' position is that this key indicator should not measure whether an inmate-patient attends the IDTT for various reasons including the following:



Nicholas Weber, Esquire
Cara Trapani, Esquire
December 16, 2022
Page 4

- The inmate-patient is not a "staff" member.

- This indicator has been part of the CQIT process, a process which was done in collaboration with the *Coleman* experts, and which has never measured whether the inmate-patient attended the IDTT.

- Measuring inmate-patient attendance at IDTTs would constitute a new indicator and should be removed from the dispute resolution process.

- There has been periodic concern voiced by defendants that such a measurement would unfairly result in lower compliance ratings since the inmate-patient has a right not to attend the IDTT.

The above rationales are faulty for a myriad of reasons.

Although a CQIT indicator on its face may appear to match the key indicator in the court's provisional list, it is incorrect to believe that the purpose of remediating such an indicator is to determine if the business rule correctly measures what the key indicator, as defined by the CQIT process and a business rule previously unknown to the Special Master, was designed to measure. The BRMR process is intended to ensure that the key indicator measures what it is supposed to be measuring pursuant to Program Guide requirements and court orders.

Despite repeated statements from the *Coleman* experts that they were involved in the CQIT process but *not* involved in development of the business rules pertinent to the CQIT indicators, defendants are either undertaking revisionist history believing that the *Coleman* experts reviewed the business rules during the development of CQIT or simply choose to ignore such an important fact. Faulty and misleading business rules form the bedrock of why the court ordered the current remediation process. As was reported in the 29th Round Monitoring Report, the data expert found that large portions of the quality assurance system were entirely undocumented and there was no way for the Special Master, plaintiffs or even defendants the specific details of how it operated. In an order dated December 23, 2019, the court stated that "the Special Master must forthwith be given access to all of the business rules defendants are currently using to process mental health data and generate informational reports related to the delivery of adequate mental health care to members of the plaintiff class." ECF No. 6435 at page 2.

Defendants claim that measuring patient attendance at IDTT meetings would constitute a new indicator and should be removed from the dispute resolution process and addressed at a later time. The idea that including patient attendance in this indicator could be considered a reasonable modification to an existing indicator was also dismissed by defendants. The Special Master and plaintiffs both suggested merely changing the name of the indicator to "IDTT



Nicholas Weber, Esquire
Cara Trapani, Esquire
December 16, 2022
Page 5

Composition", as it is stated in the Program Guide, rather than IDTT Staffing, but this too was rebuffed by defendants.

Defendants appear to believe that any modification to an existing CQIT indicator developed ten years ago should be classified as a new indicator. The Special Master is left to wonder who will be to blame when this growing list of new indicators, which the Special Master currently monitors, have to be remediated before the end of 2023.

The position of the Special Master and his experts is that a key indicator needs to be designed to measure the core aspects of the business requirements, which is guided by Program Guide requirements, court orders and the Special Master's monitoring practices over the last 25 years and not how it has been literally defined by CDCR's operationalization of CQIT indicators.

As a result of this disagreement, Defendants early in the process essentially suggested that such disagreements would be tabled via a referral to CDCR as a recommended improvement idea. Such disagreements were also suggested to be handled as a new indicator that could be considered later in the BRMR process.

This fundamental disagreement is why Defendants perceive that the "BRMR meetings remain unfocused and unmoderated open-ended discussions." It is also the reason that the BRMR meetings are not as efficient as they could be since the parties do not agree about the purpose of the meetings, which results in different agendas being pursued.

Defendants have repeatedly argued that certain measurements should not be included in key indicators since there is no compliance measure. We have consistently reminded the defendants that the current process within the BRMR meetings does not include determining the parameters of compliance with any indicator. The court has made it clear that the development of indicators and compliance measurements are two separate and distinct processes.

Mr. Weber states that a "glaring example of the inefficiencies in the BRMR meetings is a discussion of MAPIP indicators." He indicates that the extensive discussions during BRMR and the Special Master's team unfamiliarity with the MAPIP audit is troubling given that MAPIP has been monitored since 2009 and that the Coleman experts were involved in its development.

Like the lack of involvement with the CQIT business rules, the *Coleman* experts were not involved in the development of the business rules for the MAPIP measures/indicators. A review during our meetings showed that some of the business rules did not measure what the *Coleman experts* thought they were measuring. In addition, the business rules are significantly being changed and revised at defendants' request. The use of MAPIP as "[o]ne glaring example of the inefficiencies in the BRMR meetings" is misleading, inaccurate and offensive. The



Nicholas Weber, Esquire
Cara Trapani, Esquire
December 16, 2022
Page 6

majority of the discussions in the BRMR meetings regarding MAPIP has focused on the business rules, and we would not describe these discussions as rambling but rather on point.

Casting blame serves no useful purpose to this process and is not helpful to any of the parties and especially the 33,000 patients whose lives are affected by our actions. Given the collective intelligence and number of higher degrees possessed by the individuals working on this process, we should certainly be able to work together to find solutions to the problems, finish this process and move closer to ending court oversight. We look forward to working together for the betterment of the *Coleman* class members.

Sincerely,

*/s/ Kerry F. Walsh*

Kerry F. Walsh



# EXHIBIT B1



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

September 7, 2022

VIA ELECTRONIC MAIL ONLY
Mohamedu Jones
Deputy Special Master
mjones@pldolaw.com

Re:    Coleman v. Newsom: Plaintiffs' Statements Regarding Level 1 Data
       Disputes That Will Be Elevated to Level 2 Dispute Resolution
       Our File No. 0489-03

Dear Mohamedu:

Per your request during the 4th Dispute Resolution Level 1 meeting on September 1, 2022, attached are Plaintiffs' statements of the currently existing disputes that are set to be elevated to Level 2 of the dispute resolution process.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

/s/ Cara E. Trapani

By:  Cara E. Trapani

CET
cc:    Dan Potter
       Henry Dlugacz
       Kerry Walsh
       Matt Lopes
       Melissa Bentz
       Nick Weber

[4152352.4]

Mohamedu Jones
September 7, 2022
Page 2

## 1. Suspending Events/Transfer Clock Freezes

**Issue:** *Should the indicator that measures compliance with the 30-day transfer timeline for CCCMS patients to transfer from a non-mental health segregation unit to an STRH or LTRH allow Defendants to achieve a score of "compliant" in cases where the patient remains in a non-mental health segregation unit for more than 30 days, and for up to six months, due to a medical hold?*

**Affected indicator:** Transfer to STRH/LTRH within Timeframes

**Plaintiffs' Position:** <u>No.</u> Currently, this indicator allows Defendants to receive a score of "compliant" when a CCCMS patient remains in a non-mental health segregation unit for more than 30 days due to a medical hold. Defendants should receive a score of "non-compliant" for that situation. The definition of "Temporary Medical Hold," per the document linked in the Business Rules for this indicator, is very broad, can last for up to six months, and covers non-urgent medical care with no attempt to balance a patient's mental health needs. According to the same document, Temporary Medical Holds are distinct from Temporary Medical Isolation chronos. The operative Program Guide policy that this indicator is measuring provides that CCCMS patients must be transferred to an LTRH or STRH within 30 days, and contains no requirement that the clock must "freeze" for medical holds. *See* Program Guide (Sept. 29, 2021), ECF No. 7333-1 at 450, 453, 457. Nor have the parties negotiated any exception that would strike an appropriate balance between a patient's medical and mental health needs, such as in the inpatient transfer timeline context. The Court has determined that segregation is extremely dangerous for class members, and the suicide rate in such units is extremely high. Allowing patients to remain in a non-mental health segregation setting for months on end with no mental health care for broadly defined medical reasons should not be scored as "compliant" under the rule. Accordingly, "medical hold" should be struck from the list of exceptions that freeze the transfer clock for this indicator.

[4152352.4]

# EXHIBIT B2



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

November 14, 2022

VIA ELECTRONIC MAIL ONLY

Kerry Walsh
Deputy Special Master
kwalsh@pldolaw.com

> Re:  *Coleman v. Newsom*: Plaintiffs' Third Set of Summaries of Disputes for
> Second Level Review
> Our File No. 0489-03

Dear Kerry:

Attached please find Plaintiffs' summaries of the disputes for the following
indicators: (1) Scoring for *MHCB Daily Provider Contacts*, and (2) Scoring for *IDTT
Staffing*.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:  Cara E. Trapani

CET
cc:  Special Master Lopes
     Dr. Dan Potter
     Henry Dlugacz
     Nick Weber

[4185626.4]

Kerry Walsh
November 14, 2022
Page 2

## 1. Scoring for *MHCB Daily Provider Contacts*

**Affected indicator:** SP22 MHCB Daily Provider Contacts.

**Issue:** *Should CDCR receive compliance credit for daily contacts in the MHCB provided by telepsychiatrists, even when use of telepsychiatry in the MHCB is not authorized under the Court's 2017 Order and CDCR's policy?*

**Plaintiffs' Position:** <u>No.</u>  This indicator measures whether MHCB patients are assessed by a psychiatrist or a psychologist at least once per day, which is required under the Program Guide.  *See* ECF No. 7333-1 at 84 (Section 12-5-13).  The provisionally approved telepsychiatry policy, consistent with the Court's 2017 Order, prohibits use of telepsychiatry in the MHCB "except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program."  *See* Mar. 27, 2020 Order, ECF No. 6539 at 7; Oct. 10, 2017 Order, ECF No. 5711 at 21.  All other telepsychiatry contacts in the MHCB violate CDCR's governing policy and the Court's Order.  Therefore, it is Plaintiffs' position that only telepsychiatry contacts that occur under the above very narrow exception should be counted towards compliance for this indicator.  Defendants disagree; they argue that all clinical contacts should count as compliant, regardless of whether the modality used is authorized under their policy.

Alternatively, if Defendants wish to have a separate indicator to measure compliance with the telepsychiatry policy once that policy is stabilized, that would resolve Plaintiffs' concerns with this indicator.  But Defendants have stated that regardless of the outcome of the telepsychiatry policy, they do not intend to create such an indicator, and therefore a dispute remains.

[4185626.4]

Kerry Walsh
November 14, 2022
Page 3

## 1. Scoring for *IDTT Staffing*

**Affected indicator:** QC1 IDTT Staffing.

**Issue 1:** *Should CDCR receive compliance credit when Psychiatric Nurse Practitioners (PNPs) are used in violation of CDCR's Court-approved PNP policy?*

**Plaintiffs' Position:** <u>No.</u>  This indicator measures whether required treatment team participants (such as psychiatrists) attended the IDTT.  CDCR's Court-approved, closely negotiated PNP policy prohibits PNPs from treating patients except at the CCCMS level of care, and only at institutions with a current permanent Chief Psychiatrist or Senior Psychiatrist, Supervisor who enters an agreement to supervise a PNP.  *See* ECF No. 6978-1 at 7 (adopted by Jan. 27, 2021 Order, ECF No. 7035 at 2).  All other PNP contacts violate CDCR's policy and cannot substitute for required psychiatry contacts, just as, for example, psychologists and other categories of clinical staff cannot substitute for psychiatrists.  Therefore, it is Plaintiffs' position that CDCR should only be awarded credit for PNP attendance at IDTTs when they are authorized to treat patients in lieu of psychiatrists under the court-ordered PNP policy.  Defendants disagree; they argue that all PNP attendance should count towards compliance, regardless of whether it constitutes a violation of the PNP policy.

Alternatively, if Defendants wish to have a separate indicator to measure compliance with the PNP policy, that would resolve Plaintiffs' concerns with this indicator.  But Defendants have stated they do not intend to create such an indicator, and therefore a dispute remains.

---

**Issue 2:** *Should this indicator measure patient attendance at IDTTs?*

**Plaintiffs' Position:** <u>Yes.</u>  Under the Program Guide, all patients shall be included in the IDTT (if clinically and custodially appropriate) unless they refuse to participate.  *See* 2021 Program Guide, ECF No. 7333-1 at 42, 56, 82, 138, 148, 158 (Sections 12-3-9, 12-4-6, 12-5-11, 12-7-13, 12-8-8, and 12-9-5).  Including patients in treatment planning is a key necessary to the provision of minimally adequate mental health care.  Therefore, assuring compliance with this requirement is a crucial component of the remedy.  Currently, there is no indicator that measures patient attendance at IDTTs.  Defendants argue that patient attendance should not be included in the "IDTT Staffing" indicator because patients, unlike staff, can refuse to attend.  But the business rules could be modified to provide an exception that would allow Defendants to still receive credit if a patient refuses or is deemed clinically or custodially inappropriate to attend.  Indeed,

Kerry Walsh
November 14, 2022
Page 4

similar exceptions exist in other indicators.  Without measuring patient attendance on a
broad scale, situations like what occurred at RJD earlier this year—when the UNA
process uncovered that IDTTs were occurring *in absentia* due to widespread staffing
shortages, not patient refusals—would likely never come to Headquarters' or
stakeholders' attention.

Alternatively, if Defendants wish to have a separate indicator to measure patient
attendance at IDTTs, that would resolve Plaintiffs' concerns with this indicator.  But
Defendants have stated they do not intend to create such an indicator, and therefore a
dispute remains.

# EXHIBIT C1

| | |
|---|---|
| **From:** | Ryan, Jr., Michael F. |
| **To:** | Ryan, Jr., Michael F. |
| **Subject:** | RE: Coleman - Second Level Dispute for Suspending Events/Transfer Clock Freezes |
| **Date:** | Thursday, March 9, 2023 9:27:24 AM |

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Thursday, December 8, 2022 5:08 PM
**To:** Cara Trapani (CTrapani@rbgg.com) <CTrapani@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Lisa Ells (LElls@rbgg.com) <LElls@rbgg.com>; Walsh Kerry F. <kwalsh@pldolaw.com>; Henry A. Dlugacz <hdlugacz@blhny.com>; Dan Potter <dpotter@alumni.brown.edu>
**Cc:** Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>
**Subject:** Coleman - Second Level Dispute for Suspending Events/Transfer Clock Freezes

All,

In September the parties raised a dispute to the second level regarding the Transfer to STRH/LTRH within Timeframes indicator because, under Defendants' design, the indicator stops the transfer timeframe clock for patients who are on a medical hold and restarts the clock once the medical hold is cleared.  (CDCR's September 6, 2022 statement is attached.)  During the second level review meeting it was decided to move the dispute back to the first level for further consideration.  The parties discussed the indicator during the last two first level dispute meetings.  In advance of the December 8 meeting, Defendants circulated the attached proposal, recommending that Defendants' indicator logic remain intact but offering to issue a memo to clinicians working in segregation units memorializing the expectation that they work collaboratively with local medical staff when a medical hold is placed in order to coordinate care.  Plaintiffs did not accept Defendants' offer and we again agreed to raise this dispute to the second level.

Defendants request that the attached proposal be provided to the Special Master and secretary in advance of any second level dispute resolution meeting.

Thank you.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

1. Suspending Events/Transfer Clock Freezes
**Affected indicator**: Transfer to STRH/LTRH within Timeframes

**Issue**: Should the indicator that measures compliance with the 30-day transfer timeline for CCCMS patients to transfer from a non-mental health segregation unit to an STRH or LTRH allow Defendants to achieve a score of "compliant" in cases where the patient remains in a non-mental health segregation unit for more than 30 days due to a Temporary Medical Hold? [Sharepoint]

Other suspending events are no longer disputed at this time:
- Physical MHCB stays
- Physical CTC stays
- MHI change to Acute
- MHI change to ICF
- Temporary departure (e.g. out to court)

**CDCR proposal**: The Temporary Medical Hold policy is a standalone and long-standing agreement, and is used in multiple other contexts. Re-defining a Temporary Medical Hold is outside the scope of Data Remediation, and indeed outside the scope of the *Coleman* case alone, requiring court coordination with the *Plata* physicians. If Plaintiffs wish to pursue this policy change, they should do so outside of the Data Remediation process, through the channels that have existed to do so for many years.

In recognition of the importance of this issue to the psychiatric wellbeing of MHSDS patients, CDCR would like to ensure that the appropriate clinical discussion continues to occur. Whether the Temporary Medical Hold extends patients over 30 days or not, currently a member of the MH treatment team should be in contact with the medical team about medical holds in this environment. This contact is expected to communicate any special circumstances for the patient, share pertinent clinical information such as elevated distress or decompensation for the patient, and understand the reason for the medical hold in order to both address this potential stressor within the treatment as well as coordinate care.

CDCR proposes that a memo be sent out to MH staff in all administrative segregation housing units memorializing this expectation and ensuring that all staff are aware that is the expected clinical standard for these patients. In addition, the suspending event and length of suspension can be added in the drilldown so this is easily visible to all and can be tracked. The current design of the indicator will remain unchanged – the clock pauses during the medical hold and once the medical hold is resolved, the clock will start from where it left off.

Patients continue to receive MH care while awaiting the transfer or the resolution of the Temporary Medical Hold. It is also worth noting that CDCR does not receive a score of "compliant" while a patient is waiting on a medical hold. There is no positive or negative credit given until the patient is released from the hold, and then CDCR is only compliant if the patient was transferred within 30 days, excluding the time of the medical hold. If that transfer occurs after 30 days, CDCR will still be noted noncompliant.

Thank you for your consideration.

# EXHIBIT C2

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                   GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 15, 2022

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

RE:  Second Level Disputes

Special Master Lopes,

Following their presentation at the first level dispute resolution meetings, it has been determined
that three disputes are appropriate for presentation to second level dispute resolution.  Like many
disputes that came before, none are truly disputes appropriate for inclusion in either the first or
second level dispute resolution process because they are all requests for new indicators.  While
Plaintiffs may couch the disputes as "reasonable modifications" to existing indicators, if
Plaintiffs' proposed changes were to be accepted, all of them would fundamentally change the
purpose and nature of the indicator and would render the indicator misleading and unhelpful.
And Plaintiffs plainly admit that creating a new indicator, as opposed to convoluting existing
ones, would satisfy their dispute.

Requests for new indicators disguised as disputes or barriers to remediation unnecessarily derail
BRMR and dispute resolution meetings.  Worse, they contribute to avoidable delays in data
remediation -- a project nearly half a year behind schedule.  The process to request new
indicators is laid out in the Secretary's May 19, 2022 declaration.  (ECF No. 7556-2 at 2.)  The
process, as designed, does not permit delaying other indicators from remediation.

Repeatedly discussing new indicators during BRMR or dispute resolution meetings are not
worthy of the time and resources expended by the parties and the Special Master's data team.
And yet again, three new requests for new indicators have been elevated to the second level
review while the indicators to which those requests are tangentially related are delayed from data
remediation.  Those three "disputes" are discussed below.

1. Scoring for Mental Health Crisis Bed (MHCB) Daily Provider Contacts (SP22 MHCB
   Daily Provider Contacts)

The MHCB Daily Provider Contacts indicator measures whether a patient in the MHCB was
seen by either a psychiatrist or psychologist each day, and whether documentation was signed
within 24 hours of the contact.

Page 2

There is no dispute that the indicator measures whether patients received daily contacts. Plaintiffs have raised objections regarding the scoring of telepsychiatrists in the MHCB Daily Provider Contacts indicator. In their April 22, 2022 letter regarding this indicator, Plaintiffs stated that they "object to CDCR relying on telepsychiatrists rather than onsite psychiatrists for MHCB coverage." (Letter at 3.) From discussions held during the first level of dispute resolution, it appears that Plaintiffs want to exclude clinical contacts conducted by telepsychiatrists from this indicator. As a result, MHCB patients who received care from a telepsychiatrist would be flagged as having received no care, thereby rendering the indicator misleading and unhelpful. This would be antithetical to the purpose of the indicator in determining whether patients in crisis beds are getting daily clinical contacts. Plaintiffs' request is also at odds with the current telepsychiatry policy which allows for clinical contacts in crisis beds. It is also not directly related to the section of the Program Guide – crisis beds - that this indicator is designed to measure.

Data remediation of the MHCB clinical contacts indicator is not the time or the place to discuss the propriety of whether telepsychiatrists may provide care to crisis bed patients. It is wholly inappropriate for this indicator to be delayed from remediation for a "dispute" that is being handled outside of data remediation. And Plaintiffs have stated that if CDCR developed a new indicator to measure the telepsychiatry policy this purported dispute would be resolved.

Plaintiffs are free to seek a new indicator built to measure telepsychiatry policy. But it is inappropriate to attempt to shoehorn monitoring of staffing policy into an indicator that measures whether patients received care each day. That review of CDCR's proposed telepsychiatry policy is not related or subject to remediation of the MHCB clinical contacts indicator. If Plaintiffs are seeking an indicator measuring whether the telepsychiatry policy is being followed (which they appear to be), then they should request that through the agreed upon process, but this indicator should not be held up from remediation in the interim.

2. Scoring for Interdisciplinary Treatment Team (IDTT) Staffing (QC1 IDTT Staffing)

a. Issue 1: Use of PNPs in IDTTs

The IDTT Staffing indicator measures whether all required staff were in attendance at an IDTT. Among the required attendees are Psychiatric Nurse Practitioners (PNP), when one has been assigned to a patient.

PNPs work within CDCR in accordance with the current PNP policy, which was developed a little less than two years ago. To date, CDCR employs just 8.85 full time equivalent PNPs. (ECF No. 7645.) CDCR's negotiated policy permits PNPs to provide care only to CCCMS patients, barring special exceptions. Much like the telepsychiatrist dispute, above, Plaintiffs object to the indicator counting attendance by a PNP as compliant outside of the CCCMS level of care. And like the telepsychiatrist dispute above, this indicator, which measures attendance at an IDTT, is not the appropriate place to police CDCR's PNP policy.

There is no dispute that the indicator measures whether a patient's assigned PNP attended the IDTT. Instead, Plaintiffs appear to want the indicator to label an IDTT as non-compliant if the

assigned PNP attends an IDTT at the EOP level of care or above.  In other words, violations of the PNP policy would directly impact the IDTT Staffing indicator.  But this is not the policy that the indicator is designed to measure.  Revising the indicator to meet Plaintiffs' demands would cause the aberrant result of labeling a fully staffed IDTT as non-compliant, simply because the patient received care from a PNP outside the bounds of the PNP policy.

It is not appropriate to shoehorn monitoring of the PNP policy into an indicator that measures whether an IDTT was attended appropriately.  If Plaintiffs are seeking an indicator measuring whether the PNP policy is being followed, then they should request that through the agreed upon process, but they should not be permitted to further delay remediation of this indictor.

> b.  Issue 2:  Whether Patients are CDCR Staff

The IDTT Staffing indicator measures whether all required staff were in attendance at an IDTT.

Plaintiffs believe that the indicator is insufficient because it does not measure whether the patient was in attendance at the IDTT.  However, as transparently stated in the title, the indicator measures whether staff were present at the IDTT, not the patient.  Staff includes people employed by an organization, or workers, employees, or personnel.  For this indicator, it measures whether the patient's assigned primary clinician, the assigned prescriber (psychiatrist or PNP), the licensed psychiatric technician and the correctional counselor were in attendance. The benefit of this indicator comes from its ability to measure staff attendance and for management to identify deficiencies and implement corrective action in its workforce.  Although patients are an integral part of the IDTT, they are not staff and do not answer to local health care or custody managers.  And unlike staff who wish to remain employed, patients have the right to refuse to attend their IDTT.

Once again, Plaintiffs have made clear that this dispute can be resolved by creating a new indicator to measure whether patients attend their IDTTs.  Adding patients to an indicator that measures staff attendance would completely change the nature of the indicator – one which CDCR values as a management tool.  Such a fundamental change cannot be said to be measuring the same thing as the original indicator.  The process for requesting a new indicator is clear.  It does not involve holding up other indicators from remediation in the meantime.


Sincerely,

Nick Weber

*/s/ Nick Weber*

Attorney
CDCR
Office of Legal Affairs